# Exhibit E

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC<br><br><br>**NOTICE OF MOTION FOR**<br>**SUMMARY JUDGMENT** |

**PLEASE TAKE NOTICE** that, upon the accompanying: 1) Memorandum of Law in Support of Defendant's Motion for Summary Judgment; 2) Declaration of Alina Habba, and the exhibits attached thereto; Defendant's Rule 56.1 Statement of Material Facts; and upon all prior proceedings, pleadings, and filings in this Action, Defendant, Donald J. Trump, will move this Court at the Daniel Patrick Moynihan United States Courthouse, Courtroom 15C, 500 Pearl Street, New York, New York, on such date and at such time as the Court may direct, for an Order granting Defendant summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for such other relief that the Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the schedule contained in the Court's November 30, 2022 Order, Plaintiff shall file her opposition by January 12, 2023; and Defendant shall file his reply by January 19, 2023.

Dated: December 22, 2022                    Respectfully submitted,


_____
Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

E. JEAN CARROLL,

        *Plaintiff,*

  v.

DONALD J. TRUMP, in his personal capacity,

        *Defendant.*

</td><td>

Civil Action No.: 1:20-cv-7311-LAK-JLC

**DECLARATION OF ALINA HABBA, ESQ. IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

</td></tr>
</table>

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump (the "Defendant") in the above-captioned matter (the "Action").

2.     I submit this declaration pursuant to Federal Rule of Civil Procedure 56 in support of Defendant's Motion for Summary Judgment. The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.     As counsel for Defendant, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

4.     Attached hereto as **Exhibit A** is a true and accurate copy of the Complaint filed on November 4, 2019.

5.      Attached hereto as **Exhibit B** is a true and accurate copy of the relevant portions of Plaintiff's deposition which took place on October 14, 2022.

6.      Attached hereto as **Exhibit C** is a true and accurate copy of the Expert Report of Professor Ashlee Humphreys, PhD, dated October 14, 2022.

7.      Attached hereto as **Exhibit D** is a true and accurate copy of a New York Times Article entitled: "*What Happened Between E. Jean Carroll and Elle Magazine?*" dated February 21, 2020.

8.      Attached hereto as **Exhibit E** is a true and accurate copy of the Brief for Appellee filed by Plaintiff on December 1, 2022 in the matter of *Donald J. Trump, et. al., v. E. Jean Carroll*, District of Columbia Court of Appeals, No. 22-SP-0745.


Dated: December 22, 2022                Respectfully submitted,

Alina Habba, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

# EXHIBIT A

Case 1:20-cv-07311-LAK Document 102 Filed 12/22/22 Page 7 of 246

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

E. JEAN CARROLL,

      *Plaintiff,*

 -against-

DONALD J. TRUMP, in his personal capacity,

      *Defendant.*

Index No.  _____

**COMPLAINT AND
JURY DEMAND**

Plaintiff E. Jean Carroll ("Plaintiff" or "Carroll"), by and through her attorneys at Kaplan Hecker & Fink LLP, alleges as follows:

## <u>INTRODUCTION</u>

1.  Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual assault behind a wall of defamatory falsehoods and deflections. The rape of a woman is a violent crime; compounding that crime with acts of malicious libel is abhorrent. Yet that is what Defendant Donald J. Trump did to Plaintiff E. Jean Carroll.

2.  Roughly 23 years ago, playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her.

3.  In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

4.  Carroll chose silence—and remained silent for over two decades.

Case 1:22-cv-10016-LAK Document 1-2 Filed 12/22/22 Page 5 of 246

5.      Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved.

6.      Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but grew *more* popular with some supporters as a result of the controversy.

7.      Carroll's mother, a respected Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.      But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.      For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think clearly, and to seek justice. When readers overcome with the doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own

Case 1:22-cv-10016-LAK Document 1-3 Filed 11/22/22 Page 6 of 246

experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10. Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's rape in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11. When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the rape. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of rape. For good measure, he insulted her physical appearance.

12. Each of these statements was false. Each of them was defamatory.

13. Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

3

Case 1:20-cv-07311-LAK Document 2-1 Filed 12/22/22 Page 10 of 246

14.     These lies were familiar to Trump. He had used them before, when other women stated that he had grabbed, groped, or raped them.

15.     Trump's defamatory statements injured Carroll. They inflicted emotional pain and suffering, they damaged her reputation, and they caused substantial professional harm.

16.     Carroll filed this lawsuit to obtain redress for those injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

17.     Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and advice columnist for *Elle* magazine. She is a resident of the State of New York.

18.     Defendant Donald J. Trump is currently the President of the United States, although he is sued here only in his personal capacity. Since taking office, Trump has filed several lawsuits in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald J. Trump for President, Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v. Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136 (D.D.C.). Trump is also defending a related case pending in this Court. *See Zervos v. Trump*, No. 150522/2017 (N.Y. Sup. Ct., N.Y. Cty.). Trump is a resident of the State of New York.

## JURY DEMAND

19.     Plaintiff E. Jean Carroll hereby demands a trial by jury.

## JURISDICTION & VENUE

20.     This Court has jurisdiction pursuant to NY CPLR § 301.

21.     Venue is proper in this county pursuant to NY CPLR § 503 and § 509.

4

Case 1:20-cv-07311-LAK   Document 180-1   Filed 12/21/22   Page 6 of 246

## FACTUAL ALLEGATIONS

### I.    TRUMP RAPES CARROLL AT BERGDORF GOODMAN

22.    One evening between the fall of 1995 and the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

23.    That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

24.    Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched *Today* show.

25.    Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

26.    Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

27.    Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

5

Case 1:20-cv-07311-LAK Document 208-4 Filed 12/22 Page 9 of 246

28.     As Trump cuddled the fur hat, Carroll asked how old "the girl" was. Trump did not

answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years

old, he taunted her, "You're so *old*!"

29.     Trump then had an idea: He would buy lingerie instead.

30.     Trump and Carroll rode up the escalator to the lingerie department. When they

arrived, it was uncharacteristically empty, with no sales attendant in sight. Sitting on the counter

near them were two or three boxes and a see-through bodysuit in lilac gray.

31.     Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll

responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went

back and forth, teasing each other about who should try on the bodysuit.

32.     Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

33.     Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed,

thinking to herself that she would make him put the bodysuit on over his pants.

34.     Strangely for Bergdorf's, the dressing room door was open and unlocked.

35.     Trump closed the door of the dressing room.

36.     Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her

head quite badly, and putting his mouth on her lips.

37.     Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll

burst out in awkward laughter. She could hardly process the insanity of the situation. She also

hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

38.     But Trump did not stop. He seized both of her arms and pushed her up against the

wall again, bumping her head a second time. While pinning Carroll against the wall with his

shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

6

39.     Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

40.     Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

41.     Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

42.     The whole attack lasted two to three minutes.

## II.     CARROLL CONFIDES IN TWO FRIENDS ABOUT THE RAPE

43.     As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

44.     Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

45.     "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a rape victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

46.     Carroll drove home and crawled straight into bed.

47.     Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

7

Case 1:20-cv-07311-LAK Document 108 Filed 12/22/22 Page 14 of 246

rape. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

48. Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

49. Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

50. Carroll was also afraid of being dragged through the mud if she reported the rape. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had raped her because she had entered that Bergdorf dressing room.

51. Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

52. Carroll thus chose silence.

53. Carroll did not mention the rape again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

54. Carroll has not had sex with anyone since that day when Trump raped her.

8

Case 20-cv-7311-LAK Document 202 Filed 12/22/22 Page 15 of 246

## III.   CARROLL REMAINS SILENT FOR TWENTY YEARS

55.     For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

56.     Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

57.     One reader, for example, despaired in 1994, "My boss is always rubbing up against me . . . . He scares me because he's very powerful and could ruin me." Carroll responded: "Darling, if the old snake has done so much to help your career, why are you still an assistant? Sex harassers are filthy yellow sneaking cowards and must be won over, or crushed . . . . If all else fails, next time the old waterhead touches you, give him a knee in the groin. You've got nowhere to go but up."[2]

58.     Another reader had been raped when thirteen years old and sought advice from Carroll because her rapist had just been hired as a co-worker. Carroll responded: "[T]he gentleness of your [letter] speaks strongly for your forgiving nature; however, it makes my duty *very* difficult. Because now I must harden your soul. I must twist a little bit of steel—I'd try a big block of metal

---

[2] *Reprinted in* E. JEAN CARROLL, A DOG IN HEAT IS A HOT DOG AND OTHER RULES TO LIVE BY 28-29 (1996).

Case 20-cv-07311-LAK Document 7-2 Filed 12/22/22 Page 16 of 246

if I could—around your backbone, and persuade you to report your friend to the police."[3] Carroll added:

> "First, call your rape crisis center and speak with a counselor. Second, join a group of rape survivors—with their hardy support, you'll start constructing a world for *yourself* and leave the world the rapist built for you. And, third, find another job at once. (Do *not* tell your employer about the rape. Do *not* inform the rapist of these steps. Stay cool. He's dangerous.)"[4]

59.     In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

60.     But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

61.     During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearance.

62.     And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had raped her.  But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a

---

[3] *Id.* at 141-42.

[4] *Id.* at 142.

Case 1:20-cv-07311-LAK Document 102 Filed 12/22/22 Page 14 of 246

media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

63.     Indeed, Carroll worried that she might make Trump *more* popular in states like Indiana by revealing the rape, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

64.     Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

65.     Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

## IV.     CARROLL DECIDES TO SPEAK OUT

66.     On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women

11

Case 20-cv-07311-LAK Document 1-02 Filed 12/22/22 Page 15 of 246

in the film industry.[5] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

67.     Days later, several women accused Weinstein of rape.[6] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

68.     As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

69.     Carroll was moved by this experience. The walls that she had erected in her mind—the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being raped—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

70.     Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

---

[5] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

[6] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

Case 20-cv-0075-LAK Document 782 Filed 12/22/22 Page 16 of 246

71.     These observations lead Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

72.     These internal reflections loomed larger in her mind—and became inescapable— as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

73.     Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

74.     While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

75.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who raped her when she was 52. Carroll described that attack in detail.

76.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her

13

Case 1:20-cv-07311-LAK    Document 182    Filed 12/22/22    Page 17 of 246

inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

77.     In her book, Carroll truthfully described, in meticulous detail, the rape in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely—I'm not certain—inside me."[7]

78.     She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them, never sounded like much fun. Also, I'm a coward."[8]

79.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the rape on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut,* a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

80.     Carroll's book was released by St. Martin's Press on July 2, 2019.

---

[7] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[8] *Id.* at 244.

Case 1:20-cv-07311-LAK Document 108 Filed 12/22/22 Page 18 of 246

## V.   TRUMP REPEATEDLY DENIES RAPING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

81.     In three statements—published on June 21, 22, and 24 respectively—Trump responded to Carroll by publicly, falsely, and maliciously smearing her reputation.

82.     On June 21, 2019, Trump issued the following public statement:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

83.     Upon information and belief, Trump's June 21 statement was first given to the press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[9]

---

[9]   *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

15

Case 1:20-cv-07311-LAK Document 108-2 Filed 12/22/22 Page 19 of 246

84.     Trump's June 21 statement was subsequently shared online by other journalists and covered by many leading news sources as Trump's statement in response to Carroll.[10]

85.     In the June 21 statement, Trump falsely stated that he did not rape Carroll.

86.     In the June 21 statement, Trump falsely stated that he had never met Carroll.

87.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

---

[10] *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

16

Case 20-cv-07311-LAK Document 10-28 Filed 12/22/22 Page 20 of 246

88.    In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.

89.    In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.

90.    In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

91.    On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

17

Case 1:20-cv-07311-LAK Document 182 Filed 12/22/22 Page 21 of 246

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[11]

92.     Like his first statement, Trump's June 22 statement regarding Carroll was widely reported in the national press.[12]

93.     In the June 22 statement, Trump falsely stated that he did not rape Carroll.

94.     In the June 22 statement, Trump falsely stated that he had no idea who Carroll was.

95.     In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

96.     In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent the rape accusation against him.

---

[11] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[12] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will": Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

97.     Two days later, on June 24, 2019, *The Hill* released an interview in which Trump made the following statement in response to Carroll: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[13]

98.     Trump's statement in *The Hill* was widely reported by the national press.[14]

99.     This insulting statement was consistent with Trump's response to other accusations of sexual assault. About one woman who claimed he groped her and tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump told crowds at a rally,

---

[13] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[14] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type'*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

19

Case 1:20-cv-07311-LAK Document 102 Filed 12/22/22 Page 26 of 246

"Believe me. She would not be my first choice. That I can tell you."[15] He reportedly called that same woman "the cunt on the airplane" when he ran into her at a charity gala years after the assault.[16] About a second woman, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look. You take a look. Look at her, [then] look at her words. You tell me what you think. I don't think so. I don't think so."[17] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[18]

100.  In the June 24 statement, Trump falsely stated that he did not rape Carroll.

101.  On June 27, Birnbach and Martin went on the record to corroborate Carroll.[19]

102.  Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh, he kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's go to the police. No. Come to my house. No. I want to go home. I'll take you to the

---

[15] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

[16] BARRY LEVINE & MONIQUE EL-FAIZY, ALL THE PRESIDENT'S WOMEN: DONALD TRUMP AND THE MAKING OF A PREDATOR 72 (2019).

[17] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[18] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, HOLLYWOOD REP. (Oct. 13, 2016).

[19] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. TIMES (June 27, 2019).

20

Case 1:20-cv-07311-LAK  Document 108  Filed 12/22/22  Page 21 of 246

police. No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[20]

103.   Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you, you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[21]

104.   Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[22]

105.   Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[23]

## VI.   TRUMP'S FALSE STATEMENTS ABOUT CARROLL WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

106.   The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

107.   Trump knew who Carroll was at the time he raped her.

108.   Trump identified Carroll on sight when they met at Bergdorf Goodman.

109.   In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump,* N.Y. Times (June 27, 2019).

21

110.    In 1987, Trump and Carroll were photographed at a party together:



111.    Trump has stated that he possesses "one of the great memories of all time."[24]

112.    Trump has also described himself as a "very stable genius."[25]

113.    In June 2019, Trump knew it was false to state that he had never met Carroll.

114.    In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

115.    In June 2019, Trump knew it was false to state that he had never raped Carroll.

116.    Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the rape accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

117.    Moreover, Trump lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he raped her at Bergdorf Goodman. And since all of these statements about Carroll were made to impute motives for lying, when in fact he

---

[24] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

[25] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

22

Case 20-cv-0751-LAK Document 208 Filed 12/22/22 Page 26 of 246

knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

118.    Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

119.    Carroll did not reveal Trump's rape for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a rape accusation—was false.

120.    To the contrary, Carroll feared that revealing Trump's rape would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

121.    With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

122.    Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

123.     In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women in almost exactly the same manner that he had raped Carroll:

> "I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was looking at, whom he had never met before]. You know, I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. Grab them by the pussy. You can do anything. . . . Oh, [she has] nice legs, huh?"[26]

124.     Based on Carroll's own experiences, Trump's 2005 statement was not "locker room talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

125.     Indeed, Trump has openly suggested that sexual assault is inevitable when men and women interact. In 2013, for instance, he tweeted: "26,000 unreported sexual assults [sic] in the military . . . . What did these geniuses expect when they put men & women together?"[27]

126.     In addition to Carroll, Trump has been accused publicly by over a dozen women of forcibly kissing them, groping them above or below the waist, or attempting to rape them—often upon meeting him for the very first time. Those women include Jill Harth, Jessica Leeds, Cathy Heller, Temple Taggart McDowell, Karena Virginia, Bridget Sullivan, Tasha Dixon, Mindy McGillivray, Rachel Crooks, Natasha Stoynoff, Summer Zervos, and Cassandra Searles. Trump has responded to their accusations in a manner eerily similar to the statements he made about Carroll in June 2019.

127.     A recently published book by Barry Levine and Monique El-Faizy documents 67 incidents of alleged inappropriate behavior by Trump toward women, including 26 allegations of unwanted sexual contact. Forty-three of the allegations of inappropriate behavior in the book had

---

[26] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

[27] Daniella Diaz, *Trump Defends Tweet on Military Sexual Assault*, CNN (Sept. 8, 2016).

not been previously reported.[28] The book traces "Trump's transformation from a kid from Queens to high school 'ladies' man' into a womanizing, model-chasing, porn-star-frequenting philanderer," who "repeatedly and systematically engaged in aggressive sexual pursuit of women over the course of many decades."[29] In one instance, Karen Johnson describes Trump hiding behind a tapestry at his Mar-a-Lago home during a party and, when she walked by to use the restroom, grabbing her by the genitals, pulling her toward him, and kissing her without consent.[30] In another, Kristin Anderson describes Trump putting his hands up her skirt and touching her vagina through her underwear in a Manhattan nightclub. Trump denied that could have happened because he never would have been at a nightclub alone.[31]

128. Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her, just as he had sexually assaulted many other women over many years.

## VII. CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

129. Trump's false and insulting statements about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

130. Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

131. Carroll endured stoically when she kept secret the fact that Trump had raped her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since

---

[28] *See* LEVINE & EL-FAIZY, *supra* n.16, at 2.

[29] *Id.* at 2-3.

[30] *Id.* at 80-82, 88, 254.

[31] *Id.* at 250-51.

used that platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

132.    These defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

133.    Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

134.    Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

135.    Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

136.    Carroll filed this lawsuit to obtain redress for those injuries.

## CAUSE OF ACTION: DEFAMATION

137.    Plaintiff Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

138.    Trump published statements to the media on June 21, 22, and 24, 2019.

139.    Each of those statements identified—and was "of or concerning"—Carroll.

Case 20-cv-00731 Document 208 Filed 12/22/22 Page 30 of 246

140.   Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

141.   Trump's false statements regarding Carroll were defamatory *per se*.

142.   Trump's false and defamatory statements were published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

143.   Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

144.   Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

145.   Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Carroll prays for relief as follows:

a.   Ordering Trump to retract any and all defamatory statements;

b.   Ordering Trump to pay compensatory damages in an amount to be determined at trial;

c.   Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d.   Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Case 1:20-cv-07311-LAK   Document 182   Filed 12/22/22   Page 34 of 246

Dated:  November 4, 2019                  Respectfully submitted,


                                          By:

                                          Roberta A. Kaplan
                                          Matthew J. Craig
                                          Martha E. Fitzgerald
                                          KAPLAN HECKER & FINK LLP
                                          350 Fifth Avenue, Suite 7110
                                          New York, New York 10118
                                          Tel: (212) 763-0883
                                          Fax: (212) 564-0883
                                          rkaplan@kaplanhecker.com
                                          mcraig@kaplanhecker.com
                                          mfitzgerald@kaplanhecker.com

                                          *Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT B

Page 1

```
 1
 2          UNITED STATES DISTRICT COURT
 3          SOUTHERN DISTRICT OF NEW YORK
 4
 5    E. JEAN CARROLL,            )
                  Plaintiff,     )
 6                               )
            -against-           )20-cv-7311(LAK)
 7                               )
      DONALD J. TRUMP, in his   )
 8    personal capacity,        )
                  Defendant.    )
 9    _____    )
10
11
12            ***CONFIDENTIAL***
13          VIDEOTAPED DEPOSITION OF
14              E. JEAN CARROLL
15            New York, New York
16          Friday, October 14, 2022
17
18
19
20    Reported By:
21    CATHI IRISH, RPR, CRR, CLVS
22
23
24
25
```

Page 186

CARROLL - CONFIDENTIAL

1    communication, we'll just go one by one,
2    with Laurie Abraham?
3         A.   Laurie was surprised that they
4    would fire a woman who would accuse a man
5    of rape.
6         Q.   Did she have any knowledge that
7    the reasons they accused you was because
8    of --
9         A.   She had no knowledge.  They had
10   the knowledge of the culture, the women I
11   spoke with, they had the knowledge of the
12   magazine culture and we would keep it on
13   that.  As for the individuals, neither
14   they nor I really, we weren't talking to
15   people who made the decision.  To this
16   day, I don't know who made the decision.
17        MS. HABBA:  Okay.  We can mark
18   this P-7.
19        (Exhibit P-7, document entitled
20   Conversation on:  DF99WWW24RY-
21   dms-ngarcia@hearst.com-08-04-2019.pdf,
22   marked for identification.)
23   BY MS. HABBA:
24        Q.   I'm going to show you a document

Page 186

CARROLL - CONFIDENTIAL

1    communication, we'll just go one by one,
2    with Laurie Abraham?
3         A.   Laurie was surprised that they
4    would fire a woman who would accuse a man
5    of rape.
6         Q.   Did she have any knowledge that
7    the reasons they accused you was because
8    of --
9         A.   She had no knowledge.  They had
10   the knowledge of the culture, the women I
11   spoke with, they had the knowledge of the
12   magazine culture and we would keep it on
13   that.  As for the individuals, neither
14   they nor I really, we weren't talking to
15   people who made the decision.  To this
16   day, I don't know who made the decision.
17        MS. HABBA:  Okay.  We can mark
18   this P-7.
19        (Exhibit P-7, document entitled
20   Conversation on:  DF99WWW24RY-
21   dms-ngarcia@hearst.com-08-04-2019.pdf,
22   marked for identification.)
23   BY MS. HABBA:
24        Q.   I'm going to show you a document

Page 187

CARROLL - CONFIDENTIAL

1    that was previously produced by Hearst in
2    connection with this instant litigation.
3    Do you see this correspondence?  This is
4    an internal Hearst communication.
5         A.   Um-hum.
6         Q.   Do you know who Nina Garcia is?
7         MS. KAPLAN:  I just want to get
8    the testimony clear.  You're seeing it
9    in front of you now.
10        THE WITNESS:  Um-hum.
11        MS. KAPLAN:  Did you say anything
12   else?  Did you say -- I don't want
13   to --
14        THE WITNESS:  I see it in front
15   of me.  Who's Kate?
16   BY MS. HABBA:
17        Q.   I was just going to walk you
18   through.
19        Do you see on the top, this was
20   produced by Hearst in production.  They
21   said -- do you see on the top it says
22   it's a conversation?
23        A.   Yes.
24        Q.   There are several letters that

Page 188

CARROLL - CONFIDENTIAL

1    are not relevant but DF99WWW24RY-
2    dms-ngarcia@hearst.com.
3         A.   Yes.
4         Q.   The date is 8/4/2019?
5         A.   Yes.
6         Q.   Okay.  Do you know who ngarcia at
7    Hearst would be?
8         A.   Who?
9         Q.   I'll state it differently.
10        A.   Oh, Nina Garcia.
11        Q.   Exactly.  Who is Ms. Garcia?
12        A.   Ms. Garcia is a well respected
13   editor in the magazine world.  She is the
14   editor-in-chief of Elle.  She's also one
15   of the stars of Project Runway.
16        Q.   She was the editor-in-chief at
17   Elle at this time?
18        A.   Yes.
19        Q.   Did you have a relationship with
20   Ms. Garcia?
21        A.   No, just an admirer of hers.  I
22   liked her style, I liked her on Project
23   Runway.
24        Q.   According to the contents of this

Page 189

CARROLL - CONFIDENTIAL

1    communication, it states "Hi, Kate, Emma
2    told me you are aware of the E. Jean
3    situation.  Sadly she will not reconsider
4    her exclusive with New York Magazine.
5    I've been talking to Erin Hobday about our
6    situation with HR, and Brandy about our PR
7    strategy.  Both feel prepared to move
8    forward.  I don't feel it sets the right
9    precedent if we keep her.  Let me know
10   your thoughts."
11        A.   Exactly.
12        Q.   Do you know who Erin --
13        MS. KAPLAN:  I think she was
14   going to say exactly.  Anything else?
15        THE WITNESS:  This is a shocking
16   e-mail for me because what precedent
17   are they talking about, does anybody
18   know?
19   BY MS. HABBA:
20        Q.   I'll ask you some more detailed
21   questions.
22        According to the contents of this
23   communication that I just read, it is said
24   that you would not reconsider your

1      CARROLL - CONFIDENTIAL
2  exclusive with New York Magazine.
3      A.  Right.
4      Q.  Do you know what they are
5  referencing there?
6      A.  Yes, they would have preferred
7  the excerpt to run in Elle but I decided
8  to run it in New York Magazine.
9      Q.  Tell me who originally approached
10  you from Elle Magazine regarding your
11  exclusive with Elle Magazine and your
12  decision to share it with New York
13  Magazine.
14      A.  I told them after the fact.
15      Q.  Why didn't you give your
16  exclusive to Elle Magazine?
17      A.  Because they don't publish
18  anything of this length.  They don't
19  publish articles about women being raped.
20  It's just they are very careful about not
21  upsetting their readers and I don't
22  believe that they would have run anything
23  close to what New York ran.  They would
24  have cut it out very -- they wouldn't want
25  to have their readers upset by concerning

1      CARROLL - CONFIDENTIAL
2  their columnist.
3      Q.  Had anybody at Elle Magazine
4  asked you for the exclusive on your story?
5      A.  After they heard I wanted to sell
6  it to New York, yes, they said let us run
7  it.
8      Q.  And how much did you sell it for
9  to New York Magazine?
10      A.  I think 7,000 -- $7,000 I think.
11      Q.  Did Elle Magazine offer you?
12      A.  No.
13      MS. KAPLAN:  Just so that
14  question is clear, you meant offer you
15  money?
16      MS. HABBA:  Yes.
17      THE WITNESS:  They offered me
18  nothing.
19  BY MS. HABBA:
20      Q.  They just wanted the exclusive
21  and you said no?
22      A.  Because I didn't believe they
23  would run a full excerpt.
24      Q.  Who discussed the decision to not
25  allow Elle to distribute the excerpt with

1      CARROLL - CONFIDENTIAL
2  you?
3      A.  Well, my agent and I, but it was
4  pretty much a foregone conclusion we would
5  go with New York.
6      Q.  Who from Elle spoke to you or
7  your agent about getting the exclusive?
8      A.  Oh, they -- who from Elle?  Oh,
9  Emma, I call her Emma Woodhouse, Emma
10  Rosenblum called the publisher and said
11  we'd like first rights and the publisher
12  said no, we're giving it to New York
13  Magazine.
14      Q.  Were you part of that decision?
15      A.  I made the decision along with
16  the publisher and my agent.
17      Q.  Even though you worked for Elle
18  Magazine for over two decades?
19      A.  And I was planning to continue to
20  work for Elle.  To me it was a no-brainer.
21  This is a New York man with a New York
22  subject about a book about what women
23  think about men going across the country.
24  It's a New York story, not an Elle story.
25      Q.  Did anybody tell you they were

1      CARROLL - CONFIDENTIAL
2  disappointed from Elle that you weren't
3  giving them the exclusive?
4      A.  Yes, in a phone call.
5      Q.  Who did that?
6      A.  Boy, I think it was Emma.  Emma.
7      Q.  When was that, do you recall?
8      A.  Right after they found out that I
9  was giving the excerpt to New York.  The
10  point is they valued me as a writer and
11  they wanted to run the excerpt and this is
12  before they saw the excerpt.  They never
13  saw that.  We never gave them the excerpt.
14      Q.  Did you appear on any media
15  outlets following the release of your
16  book?
17      A.  A few.
18      Q.  Do you know who Anderson Cooper
19  is?
20      A.  Yes.
21      Q.  Did his production team reach out
22  to you to arrange the interview?
23      A.  I believe, yes, his producer, I
24  believe.
25      Q.  Do you recall who that was?

Page 230

1     CARROLL - CONFIDENTIAL
2 you bought the dress with?
3    A. Marcia Pinkstaff, Renata Joy,
4 J-O-Y, Marcia Pinkstaff.
5    Q. Could you spell that?
6    A. Marcia, C-I-A, and Pinkstaff,
7 P-I-N-K-S-T-A-F-F.
8    Q. Do you still communicate with
9 these two friends?
10    A. Renata, I get her newsletter, and
11 I haven't talked to Marcia for a while.
12    Q. When is the last time you spoke
13 to Renata?
14    A. Oh, 10 years maybe.
15    Q. And Marcia?
16    A. 15, 20.
17    Q. Do you know where they live?
18    A. I think they are both in
19 New York.
20    Q. Last question, do you keep track
21 of how many letters you get from your
22 readers at Elle?
23    A. I never did until -- until this
24 happened, until the lawsuit happened.
25    Q. When was that, 2019?

Page 231

1     CARROLL - CONFIDENTIAL
2    A. Yeah. Before that, I would
3 delete. You know, after that I deleted
4 nothing and so --
5    Q. So now you keep track meaning you
6 keep count or you just keep them?
7    A. I don't delete anything anymore.
8    Q. Do you keep count of your letters
9 that you receive?
10    A. Yes.
11    Q. And where do you keep count of
12 them?
13    A. Oh, in Gmail.
14    Q. In Gmail. So you don't have a
15 spreadsheet that keeps track?
16    A. No, no, I can just go through and
17 say January and just count the number of
18 Ask E. Jean letters.
19    MS. HABBA: All right.
20    MS. KAPLAN: Let me just correct
21 the record. The document that we
22 introduced should have been, because I
23 have no idea what side of the case I'm
24 on anymore, it should be Plaintiff's
25 Exhibit 1 and the exhibits you

Page 232

1     CARROLL - CONFIDENTIAL
2 introduced --
3    MS. HABBA: Is Defendant's per
4 these, yes.
5    MS. KAPLAN: My bad.
6    MS. HABBA: She's right, and
7 likewise I'll confuse us on Wednesday,
8 too. Yes, so we can just make a note.
9 It speaks for itself. Thank you.
10 We're done.
11    THE VIDEOGRAPHER: We are off the
12 record at 4:18 p.m. and this concludes
13 today's testimony given by E. Jean
14 Carroll.
15    (Time noted: 4:19 p.m.)
16
17     _____
18     E. JEAN CARROLL
19
20 Subscribed and sworn to before me
21 this ____ day of _____, 2022.
22
23 _____
24    NOTARY PUBLIC
25

Page 233

1     CARROLL - CONFIDENTIAL
2    C E R T I F I C A T E
3 STATE OF NEW YORK  )
4        : ss.
5 COUNTY OF NASSAU  )
6
7    I, CATHI IRISH, a Registered
8 Professional Reporter, Certified Realtime
9 Reporter, and Notary Public within and for
10 the State of New York, do hereby certify:
11    That E. JEAN CARROLL, the witness
12 whose deposition is hereinbefore set
13 forth, was duly sworn by me and that such
14 deposition is a true record of the
15 testimony given by the witness.
16    I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage, and that I am
19 in no way interested in the outcome of
20 this matter.
21    IN WITNESS WHEREOF, I have hereunto
22 set my hand this 17th day of October,
23 2022.
24
25    CATHI IRISH, RPR, CRR, CLVS

59 (Pages 230 - 233)

# EXHIBIT C

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

E. JEAN CARROLL,

     *Plaintiff,*

  v.

DONALD J. TRUMP, in his personal capacity,

     *Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

### EXPERT REPORT OF PROFESSOR ASHLEE HUMPHREYS, PHD

October 14, 2022

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.    **INTRODUCTION** ............................................................................ 1

    A.  Qualifications ......................................................................... 1

    B.  Assignment ............................................................................ 2

    C.  Summary of Opinions ............................................................ 3

II.    **CASE BACKGROUND** ................................................................ 6

    A.  The Parties ............................................................................. 6

        i.    E. Jean Carroll ............................................................ 6

        ii.   Donald J. Trump ...................................................... 6

    B.  Allegedly Defamatory Statements ......................................... 8

III.   **THEORETICAL BACKGROUND** ........................................... 11

    A.  Reputation and Reputational Damage ................................. 11

        i.    Reputational Repair ............................................... 12

        ii.   Person Brands and Brand Value .............................. 13

    B.  Reputational Damage in a Complex Media System ............. 15

        i.    The Media System .................................................. 15

        ii.   Social Media Impressions ....................................... 17

        iii.  Traditional Media Impressions ............................... 21

    C.  Assessing Damages for Defamation Online: Adapting Traditional Approaches to the Sphere of Social Media ...... 22

        i.    Rectifying Harm to Reputation Online .................... 22

    D.  Media Exposure and Counter-Attitudinal Attitude Change ............................................. 24

IV.   **IMPRESSIONS MODEL** ........................................................... 26

    A.  Web Impressions .................................................................. 26

    B.  Social Media Impressions .................................................... 27

    C.  Television Impressions ........................................................ 31

    D.  Print Impressions ................................................................. 33

    E.  Total Impressions ................................................................ 34

        i.    Other Impressions Not Calculated into Model ........ 35

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

V.     **IMPACT ASSESSMENT** ............................................................................. **40**

  A. Qualitative Impact Assessment ............................................................. 41

      i.    Reception to Ms. Carroll's Professional Work ........................... 42

      ii.   Elle's Readership ........................................................................ 44

      iii.  Search Interest ............................................................................ 46

      iv.  Engagement Analysis .................................................................. 49

  B. Quantitative Impact Assessment ........................................................... 58

      i.    Readership Analysis ................................................................... 59

VI.    **MODELING THE COSTS FOR REPUTATION REPAIR IN SOCIAL MEDIA** .... **64**

  A. Modeling Reputation Repair on Social Media ...................................... 64

      i.    Campaign Goals, Platforms, and Measurements ....................... 65

      ii.   Media Mix .................................................................................. 66

      iii.  Attitude Change Multiplier ........................................................ 68

      iv.  Potential Overlap in Impressions ............................................... 69

  B. Costs of the Corrective Campaign ........................................................ 70

VII.   **CONCLUSION** .................................................................................... **72**

  **APPENDIX A.**   **PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY** ............. **74**

  **APPENDIX B.**   **MATERIALS CONSIDERED** ............................................... **75**

  **APPENDIX C.**   **GLOSSARY OF TERMS** .................................................... **87**

  **APPENDIX D.**   **WEB IMPRESSIONS MODEL** ........................................... **90**

  **APPENDIX E.**   **SOCIAL MEDIA IMPRESSIONS MODEL** ............................ **100**

  **APPENDIX F.**   **TV IMPRESSIONS MODEL** ............................................. **105**

  **APPENDIX G.**   **PRINT IMPRESSIONS MODEL** ........................................ **115**

  **APPENDIX H.**   **EXAMPLES OF NEGATIVE COMMENTS AND POSTS ABOUT MS CARROLL** ........................................................................ **116**

  **APPENDIX I.**   **EXAMPLES OF DIRECT MESSAGES AND EMAILS TO MS. CARROLL** ........................................................................ **117**

  **APPENDIX J.**   **IMPACT MODEL** .......................................................... **118**

  **APPENDIX K.**   **DAMAGES MODEL** ....................................................... **126**

  **APPENDIX L.**   **LIST OF CONSERVATIVE STEPS TAKEN** .......................... **133**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## I.  INTRODUCTION

### A.  Qualifications

I am a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management, Northwestern University. I hold a Doctorate in Marketing from the Kellogg School of Management with a concentration in Cultural Sociology and a Bachelor of Arts degree in Economics and Philosophy from Northwestern University.

I have been on the faculty at Northwestern University for 14 years, regularly teaching classes on Social Media, Consumer Research, and Marketing Research. I instruct students on both the strategic and analytical tasks of Marketing, which include assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding.

My current research focuses on social media and online communities. I am the author of *Social Media: Enduring Principles* (Oxford University Press, 2016), a review and synthesis of the empirical social science research on social media. My research on social media includes a project looking at the development of norms and institutions on social media platforms like Wikipedia and YouTube. I also have conducted recent research in the area of online search and search engine optimization, including a project in which I use text analysis to identify consumer goals that, when matched, can optimize advertising spending and increase click-through rates. In this work, I have developed and refined the method of automated text analysis, which I use to analyze textual data—a method I helped introduce to Marketing.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

My broader research agenda concerns the role of institutions in markets. My dissertation research examined how markets are created through shifts in social structure using the case of casino gambling in America. This research ("Megamarketing: The Creation of Markets as a Social Process, *Journal of Marketing*, 2010) was selected as a lead article in the *Journal of Marketing*.

I have received several accolades for my research. I was runner up for the Maynard Award for best paper in Marketing. I have also won the Sidney J. Levy award in 2010 for the contribution of my dissertation research to Consumer Culture Theory. In addition, I was named an MSI Young Scholar in 2012 and have been selected as an MSI Scholar in 2020, one of a select group of 35 Marketing Scholars who are counted "amongst the most prominent marketing scholars in the world," according to Barbara Kahn, MSI's Executive Director.

My full CV and list of matters in which I have testified is attached as Appendix A.

**B. Assignment**

I was engaged by Kaplan Heckler & Fink LLP on behalf of E. Jean Carroll to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statements ("Statements") that were made by Donald Trump on June 21, 22, and 24, 2019, and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of these Statements by estimating the percentage of people who may have been receptive to these Statements and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll in connection with the above-

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

captioned case.[1, 2]

The analysis detailed in this report provides an estimate of the impressions across social and traditional media channels and their reputational impact in order to assess reputational harm based on the information provided to me by Counsel and my independent research. Specifically, it takes into account the multi-channel dissemination of the Statements across social media like Twitter, traditional media like the *New York Times* and CNN, and websites like the *Huffington Post* and the *Washington Examiner*.

My analysis is presented as of October 14, 2022. On October 12, 2022, Mr. Trump made a new statement regarding Ms. Carroll, reiterating many of the defamatory claims against Ms. Carroll.[3] Given the recency of this statement, and that the extent of its dissemination is not yet known, it has not been incorporated into the models used to calculate damages to Ms. Carroll's reputation. I reserve the right to amend or supplement my opinions in consideration of this new information or if other new information becomes available to me.

### C. Summary of Opinions

After reviewing the data provided in this case, performing independent research and analysis, and based on my own professional background, prior research, education, and more

---

[1] I was assisted in the preparation of this report by a team of research assistants at Voluble Insights, whom I supervised. Throughout my report, I use the word "I" to refer to work conducted by myself or work Voluble implemented under my direction.

[2] For the purposes of writing this report, I am being compensated at a rate of $600 per hour, subject to a 15 percent discount. I will be compensated at a rate of $1,000 per hour for deposition testimony, and at a rate of $1,000 per hour for trial testimony, subject to the same 15 percent discount. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in this report or subsequent testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

[3] https://truthsocial.com/@realDonaldTrump/posts/109158644496040450;
https://truthsocial.com/@realDonaldTrump/posts/109158586745522514.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

than a decade of experience in the field of digital communication and marketing, I conclude the

following with a reasonable degree of certainty:

A. Person brands are well-known people who also possess a set of brand meanings and associations that have value. Person brands are formed through exposure in a media system. They have social and cultural capital and can become devalued when an unpredictable event occurs, or if a negative claim is made about the person. A person brand that has a general popular following can be especially harmed by negative claims, even if only a subset of the public believes the claims. Their reputation relies on a "generalized perception" among the public, and public opinions and individual beliefs can shift when people take cues from their surroundings, including what they learn in the media. The damage to a person brand can be severe and lasting, no matter if the person at issue is at fault or whether their primary followers believe the claims.

B. Once a popular advice columnist at *Elle* Magazine, Ms. Carroll had invested many years in forming and maintaining a person brand as a wise, personable, and insightful truth-seeker. As a celebrated writer, she had a broad readership, reaching about 4.5 million *Elle* readers.

C. Mr. Trump made the at-issue Statements on June 21, 22, and 24, 2019, about Ms. Carroll in response to her allegation that Mr. Trump had sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City. These Statements made by Mr. Trump, an extraordinarily high-profile person, have received wide and sustained dissemination and media coverage.

D. A measure of the dissemination of the Statements is possible using an information cascade model to estimate impressions on social media and with ratings, circulation, and web traffic data to estimate impressions on traditional media. I have identified between **142,334,424 and 188,155,507 impressions** generated by Mr. Trump's Statements ("Impressions Model"). This very high number of impressions reflects the prominence of Mr. Trump, but nonetheless is a conservative estimate for the reasons I detail in the description of the Impressions Model.

E. The impressions Mr. Trump's Statements generated across online and traditional media impacted Ms. Carroll's person brand. It is possible to quantify some, but not all, of the negative impact. Through a qualitative analysis of media coverage, search trends, and comments about Ms. Carroll, it is clear that there was a significant shift in the nature of Ms. Carroll's person brand. Associations with her shifted from her role as an advice columnist to her association with Mr. Trump. A high volume of negative and vicious messages has continued to be posted up to the present, indicating that her person brand has been, and continues to be harmed.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

F.  In an attempt to quantify at least a portion of the impact these Statements had on Ms. Carroll's brand, I applied academic research and industry estimates related to audience composition to estimate that, of the impressions collected, an average of 25.45% of the impression recipients were likely receptive to Mr. Trump's message, resulting in an estimated range of **34,075,512 to 42,936,354 receptive impressions** that should be corrected (*i.e.,* impressions that may have been received by those who likely found those Statements credible; "Impact Model").

G.  The utterance and circulation of Mr. Trump's Statements caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims. Ms. Carroll's reputational value has been diminished due to the Statements. This kind of reputational harm has long-lasting effect on her ability to capitalize on her person brand in the future because Ms. Carroll has lost control of her brand, which she worked for decades to develop.

H.  A holistic, integrated campaign is needed to effectively create attitudinal change and in turn repair reputational damage. In such a campaign, the corrective message would need to come from a trusted source and would need to ensure that the audience is exposed to the message multiple times. For example, one such solution to reputation repair is to enlist the help of multiple online intermediaries and sources that consumers trust. The campaign would need to take into account where the target audience gets their news. Using my estimates for the quantifiable impact of Mr. Trump's Statements (*i.e.,* the **34,075,512 to 42,936,354** receptive impressions that should be corrected) and research related to exposures required and media considerations costs, I estimate that the cost to counteract the impact of the defamatory claims is between **$3,333,058.72 and $20,998,861.18** ("Damages Model"). Given the above-stated needs of the campaign, I believe the minimum appropriate corrective campaign to run would be the middle range, from $9,999,176.17 to $12,599,316.71.

I.  My estimates of the impressions generated by the Statements, the quantification of the receptive impressions, and the costs of the corrective campaign are all conservative. Among other things, I consider only a subset of the impressions generated by Mr. Trump's Statements and do not attempt quantify the significant impact of Mr. Trump's status as then-President. Therefore, I undercount the receptive impressions and the costs needed to correct the receptive impressions.

The materials I considered are noted in this report, provided as appendices or native files, and/or listed in Appendix B. A glossary of technical terms used throughout my report can be found in Appendix C.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## II. CASE BACKGROUND

### A. The Parties

#### i. E. Jean Carroll

Elizabeth Jean (E. Jean) Carroll is a journalist, author, former writer for *Saturday Night Live*, and former advice columnist for *Elle* Magazine.[4] Ms. Carroll wrote for *Saturday Night Live* in the 1980s and hosted her own show called *Ask E. Jean* on MSNBC's predecessor, America's Talking, from 1994 to 1996.[5] Her work was featured in numerous major publications including *Rolling Stone*, *GQ*, and *Playboy*. Ms. Carroll's column for *Elle* Magazine, "Ask E. Jean," was at the time it was published, the longest running advice column in the United States.[6]

Ms. Carroll is also the author of numerous books including *Female Difficulties: Sorority Sisters*, *Rodeo Queens*, *Frigid Women*, *Smut Stars*, *and Other Modern Girls*, *Hunter: The Strange and Savage Life of Hunter S. Thompson*, *A Dog in Heat Is a Hot Dog and Other Rules to Live By*, *Mr. Right, Right Now*, and *What Do We Need Men For?: A Modest Proposal*.[7]

#### ii. Donald J. Trump

Donald John Trump is an American businessman, media personality, and politician who served as the 45th president of the United States from 2017 to 2021.[8] He was a real estate developer who owned and/or had his name on numerous hotels, casinos, golf courses, and other buildings in New York and around the world.[9] In 2004, Mr. Trump starred in "The Apprentice"

---

[4] https://www.elle.com/author/4913/e-jean/
[5] https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/
[6] https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM
[7] https://www.goodreads.com/author/show/30738.E_Jean_Carroll
[8] https://www.britannica.com/biography/Donald-Trump
[9] https://www.britannica.com/biography/Donald-Trump

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(later known as "The Celebrity Apprentice"), a reality television competition series where he judged aspiring business people based on his business experience.[10] He hosted for 14 seasons until 2015.[11]

In July 2016, Mr. Trump was nominated as the Republican presidential candidate and ultimately won the 2016 U.S. presidential election.[12] Throughout his time as president, Mr. Trump enjoyed significant support from Republican voters, with an average of 87% of Republicans saying they approved his handling of the job from 2017 through 2020.[13] After serving one term as president, Mr. Trump lost his bid for re-election and officially left the White House in January 2021.[14]

Since leaving office, there have been a number of investigations into Mr. Trump, his business dealings, and his handling of classified information.[15] Despite these investigations, polls show that support for Mr. Trump has remained consistent. Polls tracked by FiveThirtyEight show that Mr. Trumps maintained a favorability rating of around 40% from February 2021 through October 2022.[16] Favorability among Republican voters is even higher. A September 2022 New York Times-Siena College poll found that 90% of Republican respondents had either a very favorable or somewhat favorable impression of Mr. Trump.[17] Further, the same poll found

---

[10]  https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
[11]  https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
[12]  https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
[13]  https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/
[14]  https://time.com/5907973/donald-trump-loses-2020-election/;
     https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
[15]  https://time.com/6212677/donald-trump-investigations-explained/
[16]  https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
[17]  https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that 91% of Republican respondents indicated they would vote for Mr. Trump, assuming he were the Republican nominee and President Biden were the Democratic nominee in the 2024 election.[18] In an August 2022 Ipsos poll, 59% of Republicans indicated that Mr. Trump should be the Republican party nominee for the 2024 election.[19]

### B. Allegedly Defamatory Statements

Mr. Trump made a series of three Statements in which he made allegedly defamatory claims about Ms. Carroll.[20] These Statements were made in response to the allegation by Ms. Carroll in an excerpt from her forthcoming book that Mr. Trump sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City.[21]

The first of the three Statements was released by Mr. Trump on June 21, 2019:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident,

---

[18]   https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html
[19]   https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader
[20]   Throughout this report, when I use the phrase "defamatory statements," I mean "allegedly defamatory statements" and am basing my opinion on the assumption that these statements are defamatory.
[21]   https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[22]

The second Statement was made to reporters at the White House on June 22:

[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But

---

[22]     Complaint, ¶82

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.[23]

The final Statement was published in an interview with *The Hill* on June 24, 2019: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[24]

I understand that these three Statements contained several allegedly defamatory claims about Ms. Carroll, including: (1) that Mr. Trump did not rape Ms. Carroll, (2) that he had never met Ms. Carroll, (3) that he had no idea who Ms. Carroll was, (4) that she had made up the allegation to increase the sales of her book, (5) that she made up the allegation to carry out a political agenda, (6) that she made up the allegation as part of a conspiracy against him by the Democratic Party, (7) that she had falsely accused other men of sexual assault, and (8) that she had been paid money to invent the rape accusation against him.[25]

As discussed below, these three Statements received widespread circulation across print,

---

[23]    Complaint, ¶¶ 91
[24]    Complaint, ¶97
[25]    Complaint, ¶¶81-100

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

web, social, and traditional media outlets and directly impacted Ms. Carroll's brand.

## III. THEORETICAL BACKGROUND

### A. Reputation and Reputational Damage

Reputation is fundamentally a social concept; one's reputation is determined by the social esteem held among a bounded group of people, up to and including the public sphere at large.[26] It has value in the sense that it gives someone social standing and respect in society. Reputation has been conceptualized as property—something that has economic value—and as dignity—something that has moral value.[27]

Reputation is determined in the sphere of generalized public opinion, which encompasses individual beliefs but is more than the sum of them, a "generalized perception."[28] What people think their friends, family, coworkers, and other members of their community think is an important determinate of an individual's belief, particularly if one does not have strong opinions about an issue or person. Over time, the beliefs of a subset of society, including what is represented in the media, can shift in public opinion and generalized associations as people take cues from those around them who believe differently.[29] If someone is receptive to a claim—if it is congruent with their other beliefs and/or if the claim comes from a source they trust—they

---

[26]  Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press.

[27]  Ardia, David S. (2010) "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," *Harvard Civil Rights-Civil Liberties Law Review*, 45(2), 261-328, p. 261.

[28]  Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press. Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." *Political Studies* 55, no. 1: 20-37.

[29]  Dewenter, Ralf, Melissa Linder, and Tobias Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," *European Journal of Political Economy*, 58, 245-61. Huang, J., *et al.* (2021). "Large-scale quantitative evidence of media impact on public opinion toward China," *Humanities and Social Sciences Communications,* 8(1), 1-8.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

may only need to be exposed to it once to form a belief.[30] If they are less receptive to the claim, mere exposure, again from a trusted source, can eventually change attitudes through repetition.[31] An individual's receptivity to a claim is based on the process through which people process new information, form beliefs, and integrate beliefs with prior knowledge.[32] According to the balance theory of attitudes,[33] when people do not have a belief about a person, it is relatively easy to create a belief, particularly when it is congruent with their other beliefs.[34] However, once people have a belief, it is harder to change that belief and requires multiple exposures, often from several different, trusted sources.[35]

### i. Reputational Repair

Reputational repair is a matter of public good and must occur in relation to the public sphere and the sphere in which it was originally damaged. To quantify the damage to one's reputation, one must look to the *cost to repair* rather than the *cost to inflict* reputational harm. I

---

[30]  Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21(1), 107-12, Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," *Social Networks*, 25 (1), 17-49.

[31]  Cialdini, Robert B (1987), *Influence*, Vol. 3: A. Michel Port Harcourt, Sterrett, David, Dan Malato, Jennifer Benz, Liz Kantor, Trevor Tompson, Tom Rosenstiel, Jeff Sonderman, and Kevin Loker (2019), "Who Shared It?: Deciding What News to Trust on Social Media," *Digital Journalism*, 7 (6), 783-801.

[32]  Ajzen, I. (1985). From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11-39).; Heider (1946); Cacioppo, J. T. and R. E. Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," *Current Issues and Research in Advertising*, 3 (1), 97-122.

[33]  Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21 (1), 107-12.

[34]  Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.; Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, *Journal of Information Technology & Politics*, 11:368–382; Festinger, L. (1962), "Cognitive dissonance." *Scientific American* 207(4): 93-106.; Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.

[35]  Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.; Housholder and LaMarre (2014); Weiss, Robert Frank (1969), "Repetition of Persuasion," *Psychological Reports*, 25 (2), 669-70.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

therefore provide three models: a model that estimates the impressions that initially created the reputational beliefs, a model to estimate the percentage of readers or viewers who were receptive to those claims, and a model of damages that estimates the cost to repair reputational damage.

### ii. Person Brands and Brand Value

Human, or person, brands are "well-known persona[e] who [are] the subject of marketing communications efforts," and have been shown to enhance consumers' feelings of autonomy and relatedness to the brand and others.[36] Starting from attachment theory, scholars have researched the ways in which consumers and audiences form attachments to people—who themselves become brands—through exposure in a media system.[37] Human brands are both biographical people and brands—constellations of meaning—and these two elements form interdependences as the actions of biographical people can affect their brand value.[38] Brand value is the aggregate of associations with a brand.[39] If those associations change, brand value can be diminished.

Person brands can become devalued when unpredictable or unforeseen events occur to them.[40] Fournier and Eckhardt (2019), for example, find that mortality, hubris, unpredictability, and social embeddedness underlie the value of human brands and have the potential to build or

---

[36] Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. *Journal of Marketing*, 70(3), 104–119, p. 104.

[37] Dyer (1979) Heavenly Bodies: Film Stars and Society; Thomson (2006); Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87; Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.

[38] Fournier and Eckhardt (2019).

[39] Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.

[40] Dyer (1979) *Heavenly Bodies: Film Stars and Society*; Gamson (1994) *Claims to Fame: Celebrity in Contemporary America.*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

diminish brand value. As Fournier and Eckhardt say, "the meaning and daily manifestations of person-brands are inherently socially embedded in a web of relationships that the person-brand cannot control, escape, or ignore."[41] That is, if an unpredictable event or claim is made about the person, it affects their brand because of their embeddedness within a social system.[42] The damage to a person brand can be severe and lasting. This damage can persist, *even when* they are not at fault.[43] It can persist *even when* their primary fans or followers do not believe the claims.[44] Loss of value for a person brand, particularly a person brand that has a general popular following, can be harmed even if only a subset of the public believes the negative claims. Person brands have social and cultural capital.[45] This capital can become harmed, thereby affecting their overall brand value to a popular audience.

Although it may be difficult to repair reputational damage on social media, it is possible, actionable, and important to the restoration of reputation. As Ardia (2010) notes:

> Although the global communication networks that are the hallmarks of our networked society have brought new reputational challenges, they also provide novel solutions to prevent and ameliorate those harms. One such solution is to enlist, through legal and social incentives, the help of private online intermediaries such as content hosts and search providers. These intermediaries play a central role in community governance and are often in a position to

---

[41] Fournier and Eckhardt (2019) p. 611.

[42] Fournier and Eckhardt (2019).

[43] David, John (2016), *How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business*: Red Wheel/Weiser.

[44] Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," *Journal of consumer research*, 36 (6), 1016-32.

[45] Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," *Journal of Advertising*, 50 (5), 528-47, Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," *Journal of the Academy of Marketing Science*, 41 (3), 373-87.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

recognize and respond to reputational harms.[46]

The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media.[47] Given the fracture of media audiences in the last 10 years, new forms of media are required to reach what was formerly a relatively unified "public" of news readers and TV viewers. Accordingly, an attempt to repair reputational harm must now account for new channels of communication and for the importance of sources in the communication process.

## B. Reputational Damage in a Complex Media System

Assessing reputational damage is complex when the public sphere is fragmented by aspects of digital technology such as filter bubbles, political polarization, ranking algorithms, reputational cues, such as followers, and the proliferation of claims both true and false. Understanding how the "public sphere" is constructed online requires understanding how social media platforms filter and display content and how multiple platforms—traditional television and print in addition to web and social media—disseminate information.

### i. The Media System

When a prominent person makes a claim, it enters the media system, a network of platforms and people who circulate information.[48] As illustrated in Figure 1 below, the media

---

[46] Ardia (2010).
[47] https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/
[48] Chadwick, Andrew (2017), *The Hybrid Media System: Politics and Power*: Oxford University Press; Curran, James, Shanto Iyengar, Anker Brink Lund, and Inka Salovaara-Moring (2009) "Media System, Public Knowledge and Democracy: A Comparative Study," *European Journal of Communication*, 24 (1), 5-26; Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

system consists of press briefings or reports; Associated Press or other syndication; print and web coverage by major print and broadcast news outlets; podcasts and radio; social media posts on Twitter and Facebook or other platforms; comments, retweets, and likes to a story; and, in some instances, re-coverage of the claims themselves in traditional journalism or social media,[49] to say nothing of word-of-mouth conversation and other informal channels such as rumor or gossip.[50] The spread of information, particularly when it originates from a high-profile individual like Mr. Trump, is vast and sweeping. The claims of high-profile figures tend to receive more coverage, and more sustained coverage, than others due to the routines of the newsroom and reporting and the effects of status on public attention.[51]

---

[49] Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," *Journal of Marketing Communications*, 20 (1-2), 117-28; Tuchman, Gaye (1978), *Making News: A Study in the Construction of Reality*, New York: Free Press; Curran (2009); Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," *Journalism Studies*, 9 (3), 447-63.

[50] Rosnow, Ralph L. and Gary A. Fine (1976), *Rumor and Gossip: The Social Psychology of Hearsay*: Elsevier.

[51] Grabe, Zhou & Barnett, 1999; Gans, Herbert J (2004), *Deciding What's News: A Study of Cbs Evening News, Nbc Nightly News, Newsweek, and Time*: Northwestern University Press; Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," *Public Administration Review*, 336-45; Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982‑1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 1. The Media System**[52]



Estimating the number of impressions for a Statement requires itemizing impressions from each source that disseminated the Statement. As Figure 1 above illustrates, that means that one would need to calculate and then sum the number of impressions from, at a minimum, (1) web and social media, (2) print, and (3) television.

### ii. Social Media Impressions

On social media, impressions are estimated by calculating an information cascade.[53] To model the impact of the Statements, I rely on the prior work in sociology, computer science, and information systems concerning cascades and social networks. To understand what might be needed to change attitudes and repair reputation, I rely on research from social psychology and marketing concerning persuasion, media exposure, and developing effective integrated media

---

[52] I have grayed out media types that I am not considering in my quantitative analysis.

[53] Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," *Science*, 359 (6380), 1146-51.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

campaigns that include social media advertising. A brief overview of prior research is necessary to understand how impressions and damage are calculated.

*Networks and Information Cascades.* Unlike traditional media, messages travel on social media through a network—a system of users connected by exchanges of information. The network structure—how many connections one has and how many connections *those* connections have—can determine whether and how fast a message travels through the network. Social capital is represented in the network by the number of followers, or connections, one has, and greatly increases how broadly and deeply a message spreads. If one sends a message, it has the potential reach of not only all of one's followers, but all of *their* followers as well. Additionally, false news spreads more broadly, more deeply in the network, and faster online than true news.[54]

Social media is a hybrid of mass and face-to-face communication.[55] In mass media like television or news, there is typically one source that sends messages out to many readers or viewers (known as one-to-many communication). In face-to-face distribution of rumors, messages are transmitted from one person to another, usually one at a time. In social media, messages are transmitted both through hubs (one-to-many) and dyadically, creating chains of messages called information cascades. The time it takes for the message to move from one person to another in the information cascade is typically a day for traditional media but can be only a few hours to seconds for online communication, leading to rapid dissemination of both

---

[54] Vosoughi *et al.* (2018).
[55] Humphreys, A. (2015). Social Media: Enduring Principles, Oxford University Press.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

true and false news.[56]

*Impression Rate*. Although the number of followers is a measure of reach, it represents only the potential impressions of a message. Information competes for attention in any attention economy.[57] Although a message may be tweeted to all followers, it is not necessarily seen by that number of followers for a variety of reasons: only a subset of followers will sign on that day, they follow a certain number of accounts, or ranking algorithms may not prioritize the content. For these reasons, information scientists incorporate an impression rate when calculating social media impressions, which represents the chance that the message was seen by a follower.[58]

*Engagement Rate*. Engagement rate represents the percent of people who engage with— retweet or like—a post. It has two components: 'liking rate' and 'retweet rate'. Here, I computationally consider only a subset of the engagement rate: the retweet rate, which is defined as the percent chance that the message was retweeted (or quote tweeted).[59] Only a fraction of social media posts are seen, and only a fraction of those are retweeted or liked. While not directly used in my calculation of impressions, 'liking' can be used in some algorithms to rank or promote content. In short, content that is 'liked' by more people is likely to be prioritized and therefore to be viewed by more people.[60] Engagement can be used to understand impact in that it reflects response to the statement. In social and web forms of media, comments can further

---

[56]  Pfeffer *et al.* (2014); Vosoughi *et al.* (2018).
[57]  Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
[58]  Wang et al. (2016); https://martech.org/facebook-twitter-impressions/.
[59]  A quote tweet is a retweet with comment (https://help.twitter.com/en/using-twitter/types-of-tweets). When reporting the total number of retweets generated by a post, Twitter combines the number of retweets with the number of quote tweets.
[60]  Newswhip (2019). 2019 Guide to Publishing on Facebook. http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

constitute and amplify the impact of false information.[61]

*Impression vs. Individuals.* Scholarship on media viewership has provided two ways to measure audiences: as people and as impressions. New media like social and digital media tends to be measured in impressions[62] while old media tends to be measured in reach, or people.[63] One individual may receive multiple impressions. That is, some people may receive multiple exposures to a Statement while others may receive only one exposure. I assume that for media broadcast on television, one viewer represents one impression and do not consider the number of times a viewer was exposed to a statement during a broadcast, which is conservative. As I will discuss in the Damages section, I also lower my estimate of the number of exposures needed in a corrective campaign in order to account for the fact that the impressions generated by a corrective campaign may reach some people more frequently than others.

*Calculating Impressions.* To model the total number of impressions in an information cascade, one calculates and sums the number of impressions that occur at each level in the network.[64] To calculate the total number of impressions at each level requires also determining how many diffused to the next level of the network, multiplied by the chance those messages were seen, and then adding the number of impressions at the next level, and so on (see Figure 2 below).

---

[61] Vosoughi *et al.* (2018).
[62] https://theraveagency.com/blog/finding-the-value-in-twitter-impressions.
[63] Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," *Journal of Marketing Research*, 17 (3), 307-15, Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," *Journal of Media Economics*, 1 (1), 61-74.
[64] Vosoughi *et al.* (2018).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 2. Information Cascade**



Adapted from Vosoughi, Soroush, Deb Roy, and Sinan Aral. "The spread of true and false news online." *Science* 359, no. 6380 (2018): 1146-1151.

- *Social media.* Social media impressions are measured based on the number of followers to an account, the account's estimated impression rate, the number of retweets, the impression rate of retweeters, and their number of followers at the second level.

The Impressions Model section details the particular parameters chosen given this prior literature and the data presented in the case.

### iii.    Traditional Media Impressions

Methods for calculating the number of impressions generated by traditional, mass media have been in use since at least 1942.[65] Because ratings are tied to advertising revenue, metrics are carefully audited by services like Nielsen and the Alliance for Audited Media (AAM).[66]

---

[65]    Buzzard, Karen (2012), *Tracking the Audience: The Ratings Industry from Analog to Digital.*
[66]    https://markets.nielsen.com/us/en/solutions/measurement/television/ and
        https://auditedmedia.com/Solutions/Print-Publisher-Audits.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Paradigms for measuring circulation and readership are well established in media and communication scholarship.[67] I therefore use the following measures of impression:

- *Television.* Television impressions are measured through viewership, the ratings derived from independently audited services like Nielsen.[68]

- *Print.* Print impressions are measured through circulation, the number of readers as reported by the AAM.[69]

- *Web impressions.* Though existing online, articles published on websites tend to be more 'traditional' in nature because viewership can be estimated by the amount of traffic or page views. I use the number of daily users, discounted by the bounce rate (the percent of users who do not perform an action on the site).

- *Total impressions.* Total impressions are calculated as the total of impressions across social media, television, print, and web.

### C. Assessing Damages for Defamation Online: Adapting Traditional Approaches to the Sphere of Social Media

#### i. Rectifying Harm to Reputation Online

Traditional approaches to rectifying reputational harm involve attempts to repair reputation in the public sphere.[70] However, social media has complicated these traditional approaches in a few ways. Some aspects of social media such as filter bubbles and echo chambers have fragmented the public sphere such that it is unclear how or where reputation repair can and should take place. Secondly, trust in traditional media has declined across the ideological spectrum.[71] Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims both in social and

---

[67]   Gensch & Shaman (1980); Picard (1988).
[68]   https://markets.nielsen.com/us/en/solutions/measurement/television/
[69]   https://auditedmedia.com/Solutions/Print-Publisher-Audits
[70]   Ardia (2010).
[71]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

traditional media—and this is true regardless of political ideology.[72] Finally, increasing

polarization[73] in the American context means that attitudes have become more entrenched and

therefore harder to change.[74] In this section, I provide a brief overview of the theories necessary

for understanding how reputational harm can occur, and be repaired, through social media.

Prior cases have taken a traditional approach to assessing damages to reputation in the

public sphere. For example, in the case of *United States v. Macys.com, Inc.* (D. Del. July 26,

2000),[75] the remedy for alleged violation of consumers' expectations relating to product

shipping time was the purchase of banner advertising on search engines to inform consumers

about their rights when shopping online. However, the traditional approach represented by prior

cases fails to take into account the new and complex technological infrastructure for

communication, the erosion of trust in mass media particularly among the audience likely to be

receptive to the Statements (*i.e.*, people on the political right and/or supporters of Mr. Trump)[76]

and the importance of personal sources that are trusted by the individual for news online.

Persuasion online now includes influencers, social networking, and live video in addition to

search and display advertising. The educational campaign of *United States v. Bayer Corp.*, No.

07-01(HAA) (D.N.J. Jan. 4, 2007) is more akin to the current state of social media. In this case,

an educational campaign was required as remediation that included a consumer brochure,

---

[72]   https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-
       number-of-news-sources-than-republicans/

[73]   https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/

[74]   Conover, Michael, Jacob Ratkiewicz, Matthew Francisco, Bruno Gonçalves, Filippo Menczer, and
       Alessandro Flammini. "Political polarization on Twitter." In *Proceedings of the International AAAI
       Conference on Web and Social Media,* Vol. 5, No. 1, pp. 89-96. 2011; Prior, Markus. "Media and political
       polarization." *Annual Review of Political Science* 16 (2013): 101-127.

[75]   https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf.

[76]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-
       decline-among-republicans/

advertisement for that brochure, and placement of the information with key opinion leaders and gatekeepers, such as physicians. In this way, remediation for reputational harm entails working with multiple sources that consumers trust to counter false claims.

### D.  Media Exposure and Counter-Attitudinal Attitude Change

To understand how to assess the costs for repairing reputational harm on social media, one must understand the process of attitude change, also known as persuasion.[77] Source, message, and even media type can play a role in how many exposures it requires to change attitudes.[78] For someone who holds a weak attitude or no attitude about someone or something, one exposure to a message from a reasonably credible source is likely to be enough to change attitudes.[79] However, for someone with entrenched beliefs, source and message quality become very important, and changing that belief requires more than a few exposures from a single source.[80] Due to confirmatory bias,[81] people are likely to attend to information that confirms or is congruent with their existing beliefs and ignore or discount information that is counter to them. The more entrenched the belief, the more exposures required to change attitudes. For these reasons, changing an attitude that is counter to one's existing set of beliefs is exceedingly hard and potentially requires multiple messages from multiple trusted sources.

Here, a trusted source means a person or entity that is trusted by the user or reader, not necessarily a source that would be deemed trustworthy by the public at large. Platforms like

---

[77]  Cialdini R. B., R. E. Petty, J. T. Cacioppo. (1981). Attitude and Attitude Change, *Annual Review of Psychology.*

[78]  Albarracin, D., and Shavitt, S. (2018). Attitudes and attitude change. *Annual Review of Psychology*, 69, 299–327; Cialdini *et al.* (1981).

[79]  Cialdini *et al.* (1981).

[80]  Cialdini *et al.* (1981).

[81]  Kahneman and Tversky (1974).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

newspapers and websites can be the source, but they can also convey the information of sources that may or may not be trusted. Research in psychology and communication shows that readers and viewers can distinguish between the media source and the individual source when interpreting a message.[82] For example, a reader may not trust the *New York Times* but may trust direct quotes attributed to a trusted source reported by the *New York Times*.

On social media, attitude change can be even more complex. Filter bubbles mean that users are likely to see only information that is congruent with their present and past beliefs and behaviors[83] and come from selective media sources that viewers trust.[84] Due to homophily, we tend to know and follow others who have the same attitudes that we do. As Garrett (2009) notes, multiple messages coming from multiple sources about the same event or fact create the impression for the user that the event is indeed true and that the belief is universally held.

In all media, but particularly social media, messages are received, trusted, and interpreted relative to their source. Social capital (*i.e.*, how many people you know) and status (*i.e.*, legitimacy) of a source is important. Messages that come from sources with no social capital (*i.e.*, no followers) do not have the same strength as those that come from sources with considerable social capital.[85] Because trust of unfamiliar sources is typically lacking online,[86]

---

[82]    Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013). "The Context of Content: The Impact of Source and Setting on the Credibility of News," *Recherches en Communication*, 40, 151-68.

[83]    Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."

[84]    https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/.

[85]    Kruglanski, A. W., and Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). *Psychological Review*, 118(3), 522–522. https://doi.org/10.1037/a0023709

[86]    Metzger, M. J., and Flanagin, A. J. (2013). Credibility and trust of information in online environments: The

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

known and trusted sources are particularly important when communicating messages attempting to change attitudes online.[87] In this sense, attitude change requires the message to come from *inside* the filter bubble and requires considering a number of trusted sources within the echo chamber to influence opinion.

In sum, if harm is caused amongst a population who do not trust traditional media, the most effective way to repair it is through alternative informational channels the audience trusts and that mirror where people get their news.[88]

## IV. IMPRESSIONS MODEL

The Impressions Model section details the particular parameters chosen given this prior literature and the data presented in the case. In order to estimate the number of impressions generated by the Statements, I reviewed and analyzed news coverage of the claims, including 53 online news articles, 55 social media posts, 63 television broadcasts, and 14 print articles.

### A. Web Impressions

The web impressions analysis is limited to the set of 52 online news articles[89] cited in the Complaint in footnotes 9-14. In these footnotes, the Complaint list a set of online sources that reported on the Statements.

---

use of cognitive heuristics. *Journal of Pragmatics*, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.

[87] Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," *Information Sciences*, 306, 34-52.

[88] For example, 35% of Republicans reported trusting national news media: https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

[89] Please note, my analysis incorporates 53 unique URLs as the June 21, 2019 article by Yahoo! News appeared on both news.yahoo.com and sports.yahoo.com.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

To estimate the number of web impressions, I used data provided by Semrush, a company that provides website traffic statistics.[90] Semrush reports unique monthly visitors, and I transformed this measure to daily visitors by dividing unique monthly visitors by 30. Further, to account for people who visit the site but do not perform any other action, I multiplied daily visitors by 1 minus the bounce rate (see Figure 3 below). A table showing the online articles considered and the impressions estimate is included as Appendix D.

**Figure 3. Equation 1**

**Web Impressions = (Unique Monthly Visitors/30)\*(1-bounce rate)**

## B. Social Media Impressions

The social media impressions analysis is limited to the set of tweets that (a) link to one of the 53 online news stories I considered in my analysis of web impressions, (b) were published by the primary account of the publisher or the article's author, and (c) contain one of the defamatory claims contained in the Statements when viewed by a user (*i.e.*, a user who sees the tweets is exposed to a defamatory claim even if they do not click through to the article). A total of 55 tweets met the three criteria.

To measure social media impressions, one must estimate the percent of followers who saw a particular message. As described above, this is called the impression rate. Impression rates vary depending on the number of followers and the other contextual conditions in the system such as

---

[90] https://www.semrush.com/kb/26-traffic-analytics

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

competition for attention on any given day.[91] Impression rates for Twitter are estimated at between 1.3% to 2.6% for typical users.[92] However, that range can vary depending on number of followers, publisher/non-publisher status, frequency and relevance of tweets, and other variables. Sites aimed at creating shareable content, including political news, can have impression rates up to 22%.[93] Account holders can directly view their impression rate for each tweet, but otherwise the information is not publicly available. Buzzfeed, for example, has an impressions rate of 22%, which is convergent with conventional marketing goals that aim for a rate of 20%,[94] but lower than the 30% rate that Twitter suggested in 2014.[95]

Based on all publicly available information, I provide estimates using two impression rates. The first estimate comes from Wang *et al.*'s (2016) formula for calculating impressions given the total number of followers in the cascade, retweets, and followers of the original tweet (Equation 2a). Equation 2a can be used to estimate impressions for each account, given the account's number of followers, the number of retweets, and the followers of the retweeters. This means that each tweet has a unique impression rate. Wang *et al.* (2016) develop this equation from a full set of data taken from Buzzfeed and Buzzfeed News and its associated accounts (average followers at the time of Wang *et al.*'s analysis: Buzzfeed = 2.8 million, BuzzfeedNews = 470,000). Based on a full set of data, they are able to provide an estimate of impressions given

---

[91]    Wang et al., 2016; https://martech.org/facebook-twitter-impressions/.
[92]    https://martech.org/facebook-twitter-impressions/
[93]    https://martech.org/facebook-twitter-impressions/
[94]    https://www.tweetbinder.com/blog/twitter-impressions/; https://marxcommunications.com/what-does-impressions-mean-on-twitter/
[95]    Ad Age (2014). "Twitter Tells Brands They Can Reach 30% of Their Followers for Free," https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

known and public data like followers and retweets. As a conservative step, I took into account the potential presence of bots as followers in my estimation although it may be unnecessary in this model.[96]

The impressions estimate generated by Equation 2a may be considered low for a number of reasons. First, Buzzfeed, from which the equation was developed, is an account that has had and continues to have considerably fewer followers than many accounts in our data set (*e.g.*, Buzzfeed$_{2022}$ = 6.3 million followers vs. New York Times$_{2022}$ = 54.4 million, Washington Post$_{2022}$ = 19.9 million).[97] Secondly, as large publications, people are likely to be exposed to these accounts because they are considered more legitimate than a site like Buzzfeed News.[98] Finally, because they are high status, "standard-bearers" of news, people often tweet them to share relevant, official news stories. In addition, I account for the potential presence of bots as followers, 12.6%, based on recent estimates in computer science.[99] The formula used to calculate impressions using Equation 2a is displayed in Figure 4 below. The formula is applied for each of the 55 tweets considered in the social media impressions analysis.

---

[96]  This may be an unnecessarily conservative step, as Wang *et al.* (2016) formed their estimate of parameters from a set of known and actual impressions provided by Twitter, which may have already accounted for bots.

[97]  Data were collected October 7th, 2022.

[98]  https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/

[99]  Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. *First Monday*, *24*(9). https://doi.org/10.5210/fm.v24i9.10213

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 4. Equation 2a**

$$\text{Social Media Impressions} = 10\verb|^|(0.7396 \log(\textit{TF}*(1\text{-bot rate}))$$
$$+$$
$$0.0473 \log(\textit{PF}*(1\text{-bot rate})) + 0.1027 \log(\textit{RT}))$$

Where:

      PF (primary followers) = number of followers of original tweet
      RT (retweets) = number of retweets to the original post
      TF (total followers) = average number of followers of all retweets*RT[100] + number of followers of original poster (PF)
      Bot rate = 0.126

Given the differences between Buzzfeed and some of the accounts in the Twitter dataset, I calculated a second estimate of impressions based on an impression rate of 20% (Equation 2b).[101] Not only was Buzzfeed itself purported to have a rate close to this, but it is also a rate used as a marketing "rule of thumb" as a benchmark for most major accounts.[102] Given the size and the influence of some of the accounts in the dataset, 20% is a reasonable and likely estimate for impression rate. Here, I again used 12.6% to account for potential bots.[103] In this equation, I include impressions at both the first level (*i.e.*, the number of followers of the original tweet and an impression rate of 20%) and the second level of the information cascade (*i.e.*, the number of

---

[100]    To collect the number of followers for all retweets, I used the Twitter API to search for both retweets and quote tweets (retweets with comment) of each of the 55 original tweets considered in the social media impressions analysis. I then filtered out any tweets that don't reference the original tweet (*e.g.*, retweets of quote tweets). After analyzing the data, I found a discrepancy between the number of retweets displayed on www.Twitter.com and the number of retweets I was able to collect. The discrepancy is likely due to users whose accounts are private and/or protected, meaning their data is not retrievable using Twitter's API. Using the list of retweets and quote tweets I assembled, I collected the Tweet IDs of each user who posted a retweet or quote tweet and used Brandwatch to collect the follower count of each of the users at the time they posted the retweet or quote tweet. I then averaged the follower counts of each retweeters or quote tweeter for each of the 55 original tweet and multiplied the average by the number of retweets.

[101]    https://martech.org/facebook-twitter-impressions/.

[102]    https://www.tweetbinder.com/blog/twitter-impressions/.

[103]    Luceri *et al.* (2019)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

retweets multiplied by the average number of followers held by people who retweeted and an impression rate of a "typical" Twitter user of 1%[104]). The formula used to calculate impressions using Equation 2b is displayed in Figure 5 below. The formula is applied for each of the 55 tweets considered in the social media impressions analysis. A table showing the tweets considered and the impressions estimate (using both Equation 2a and Equation 2b) is included as Appendix E.

**Figure 5. Equation 2b**

$$\text{Social Media Impressions} = \text{followers}_{\text{first-level}} * \text{first level impression rate} * (1 - \text{bot rate}) + \text{retweets} * \text{followers}_{\text{second-level}} * \text{second level impression rate} * (1 - \text{bot rate})$$

Where:

$\text{Followers}_{\text{first-level}}$ = number of followers of the original tweet
First level impression rate = 0.2
Bot rate = 0.126
$\text{Followers}_{\text{second-level}}$ = average number of followers of all retweets[105]
Second level impression rate = 0.01

## C. Television Impressions

To measure television impressions, I relied on the TV News Archive, a database maintained by the Internet Archive, a non-profit archive of content from television, internet, and audio, among many other sources.[106] The Internet Archive's TV News Archive allows users to

---

[104] https://martech.org/facebook-twitter-impressions/
[105] I used the same process described above to collect data on the average number of followers of all retweets. I collected a list of all retweets and quote tweets of the 55 original tweets using the Twitter API. Using that list, I collected the follower accounts of all users who published a retweet or quote tweet from Brandwatch. I then averaged the follower counts of each retweeters or quote tweeter for each original tweet and multiplied the average by the number of retweets.
[106] https://archive.org/details/tv

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

search through the closed captioning of broadcasts. To identify broadcasts to incorporate into the television impressions analysis, I searched through the closed captioning of broadcasts mentioning "E Jean Carroll" from June 21, 2019, to June 27, 2019, from the following stations: ABC, Fox, NBC, MSNBC, CBS, and CNN. After identifying the broadcasts, I searched through the closed captioning to identify broadcasts that referenced the Statements. Please note, I considered only broadcasts that included verbatim quotes from Mr. Trump's Statements. The search yielded a total of 63 broadcasts.

To estimate the number of impressions these programs received, I consulted public reports of viewership for each program from 2019,[107] which are usually derived from Nielsen. Where possible, I collected the Live + Same Day[108] or P2+[109] ratings estimates for the program in which a Statement appeared. If I was unable to find ratings estimates associated with a specific program, I relied on the average total day viewership for the network for the quarter or year closest to June 2019. To be conservative, I only counted ratings for a particular program once per day, even if a program appeared multiple times in the search results. For instance, the search results include two broadcasts of *Anderson Cooper 360* on June 21, 2019, one at 5pm-6pm PDT[110] and another at 8pm-9pm PDT.[111] Even though both airings mention the Statements (and

---

[107]   *e.g.*, https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/. Wherever possible, I relied on ratings estimates from June 2019 or second quarter of 2019 or. In some instances, it was not possible to collect data from that time period. In these cases, I relied on data that averages viewers from 2018 to 2019 and from 2019 to 2020.

[108]   Live + Same Day is an estimate of the number of households that watched a program while it aired or watched it via DVR on the same day the program aired. (https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf; https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/)

[109]   P2+ is an estimate of the persons aged 2 or older who watched a program.

[110]   https://archive.org/details/CNNW_20190622_000000_Anderson_Cooper_360/

[111]   https://archive.org/details/CNNW_20190622_030000_Anderson_Cooper_360

Expert Report of Professor Humphreys                    32

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

thereby generated two separate impressions), my analysis only incorporates ratings for one airing. Similarly, CNN's *New Day with Alisyn Camerota and John Berman* appeared in the search results two times on June 22, 2019, once between 3am-4am PDT[112] and again between 4am-5am PDT.[113] *New Day* is a three-hour long morning show that the TV News Archive split into three hour-long blocks. I am only counting once instance of New Day in my calculations even though viewers would have been exposed to a Statement twice.[114] A table showing the broadcasts considered, the ratings estimate, and the source of the rating estimate is included as Appendix F.

### D. Print Impressions

To capture the spread of the news stories in print as well as online, I searched for print articles covering the Statements from the publications I considered in my analysis of web impressions. Using ProQuest's U.S. Newstream database, a database of all U.S. news from 1980 to present,[115] I searched for newspaper articles containing "E Jean Carroll" in the publications of interest from June 21, 2019, to June 27, 2019. All articles returned by the search were reviewed to ensure they mentioned at least one of the Statements. The search yielded 11 articles from six news publications that mentioned the Statement.

---

[112]    https://archive.org/details/CNNW_20190625_100000_New_Day_With_Alisyn_Camerota_and_John_Berman/

[113]    https://archive.org/details/CNNW_20190625_110000_New_Day_With_Alisyn_Camerota_and_John_Berman/

[114]    Additionally, I am also not considering whether the statements appeared multiple times within a one-hour block.

[115]    https://about.proquest.com/en/products-services/nationalsnews_shtml/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

To estimate the number of print impressions, I used the data provided by the Alliance for Audited Media, a widely accepted standard for measuring print audience size that determines advertising rates.[116] I was able to find audience estimates for only five of the six publications. Only the nine articles from these five publications with audience estimates contributed to the print impressions estimate. A table showing the print articles considered and the circulation is included as Appendix G.

### E. Total Impressions

I calculated both a high and low estimate for impressions of Mr. Trump's Statements. The low estimate is calculated with social media impression rate using Equation 2a. The high estimate is calculated with industry standard impression rate to estimate social media impressions using Equation 2b.[117] To calculate the total impressions across media, I aggregated views/impressions for the (1) social media impressions, (2) TV impressions, (3) print impressions, and (4) web impressions (see Figure 6 below).

**Figure 6. Equation 3**

$$\text{Total impressions = social media impressions + TV impressions + print impressions + web impressions}$$

Figure 7 below summarizes the results of the impressions analysis.

---

[116] https://auditedmedia.com/about/who-we-are

[117] Please note, in four cases the impressions associated with the "low" estimate are higher than the "high" estimate. Nonetheless, the "high" estimate is much higher than the "low" estimate overall.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 7. Total Impressions**

|  | Social Media | Web | Print | TV | Total |
|---|---|---|---|---|---|
| **High** | 63,040,041 | 13,922,234 | 2,613,232 | 108,580,000 | 188,155,507 |
| **Low** | 17,218,959 | 13,922,234 | 2,613,232 | 108,580,000 | 142,334,424 |

High=impression rate of 20% for first level followers, 1% for second level followers (Sullivan 2014)
Low=median impression rate of 5.2% (Wang *et al.* 2016)

The Statements generated between 142,334,424 and 188,155,507 impressions between June 21, 2019, and September 6, 2022, the time frame from which data were collected for this analysis.

### i.    Other Impressions Not Calculated into Model

There are a number of impressions that my estimate does not take into account. Equations 2a and 2b adjust for different impression rates, but they omit many significant sources of impressions due to data availability or clarity. This makes both estimates a considerable undercount of impressions.

*Web Impressions*. Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statements. Additionally, some of the articles I did consider were authored by the Associated Press[118] and

---

[118]    The analysis incorporates five versions of two Associated Press articles. Darlene Superville, Trump Denies Knowing NY Woman Accusing Him of Sexual Assault, ASSOCIATED PRESS (June 22, 2019); Darlene Superville, Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store, ABC NEWS (June 22, 2019); Associated Press, Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type", HOLLYWOOD REP. (June 25, 2019); Associated Press, Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type", CHI. TRIB. (June 24, 2019); Associated Press, Trump: Woman Who Accused Him of Sexual Assault Not His Type, DENVER POST (June 24, 2019).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Reuters.[119] Although it likely that identical (or very similar) versions of these articles appeared in multiple publications, I did not count these impressions due to the inability to access traffic numbers for each of these websites. For instance, the June 25, 2019, *Hollywood Reporter* article, titled "Trump on E. Jean Carroll Sexual Assault Claim: 'She's Not My Type,'" appeared in at least 20 additional publications.[120] Further, the June 22, 2019, Associated Press article, titled "Trump Denies Knowing NY Woman Accusing Him of Sexual Assault" appeared in at least 7 additional publications.[121]

---

[119] The analysis incorporates two versions of the same Reuters article: Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", BUS. INSIDER (June 25, 2019); and Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", REUTERS (June 25, 2019).

[120] https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type; https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6; https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054; https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type; https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html; https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/; https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type; https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp; https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/; and https://www.necn.com/news/local/trump-e-jean-carroll/220418/.

[121] https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22; https://www.gazettenet.com/Carroll-26480259; https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial; https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; and https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Social Media Impressions*. I limited social media impressions to those generated from tweets published by the primary account of the publisher or the article author. While I did consider the retweets and quote tweets of the 55 original tweets, I did not consider retweets to quote tweets even though a user who navigates to a quote tweet will be shown the text of the original tweet. Data suggests that some of the quote tweets generated significant engagement. For instance, four quote tweets[122] of The Hill's original tweet[123] published at 7:40 am ET on June 25 generated over 100 retweets. One of those quote tweets generated over 2,000 retweets.[124] For comparison, the combined total of all retweets generated by the original tweets I considered was 5,560.

Additionally, I did not consider any tweets from other publishers of stories covering Mr. Trump's Statements, tweets from users who shared links to the 52 articles (or other articles containing the Statements), or tweets in which users repeated or otherwise amplified the Statements.

Additionally, the social media impressions analysis does not consider impressions generated on other platforms, such as Facebook and Reddit because it is difficult to find research or publicly available data on impression rates for platforms other than Twitter. Nonetheless, there is evidence that the 52 online news articles I considered in my web impressions analysis were shared widely on those platforms. Using CrowdTangle,[125] a social media insights tool

---

[122] https://twitter.com/1/status/1142180829835255808; https://twitter.com/1/status/1142184727492878336; https://twitter.com/1/status/1142197820826501120; and https://twitter.com/1/status/1142226611380600832.
[123] https://twitter.com/1/status/1143477200148189184.
[124] https://twitter.com/Olivianuzzi/status/1142197820826501120.
[125] Meta provides a free and publicly accessible CrowdTangle extension for the Chrome browser that allows

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

owned and operated by Meta,[126] I searched for instances where the 52 articles were shared on Facebook and Reddit. CrowdTangle data were available for 39 of the news articles considered,[127] yielding a total of 588 shares and 396,390 interactions, disseminating to 476,196,543 followers.[128] On average, the data from CrowdTangle suggest that each article was shared 15 times and generated more than 10,000 interactions per article. Given the high number of shares and the overall number of followers associated with those shares, it is clear that my estimate of social media impressions is a significant undercount of the actual impressions generated.

*Television Impressions.* I limited the television impressions analysis to broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: ABC, Fox, NBC, MSNBC, CBS, and CNN. I did not include television shows that paraphrased Mr. Trump's claims but did not directly quote. For example, *The Tucker Carlson Show*, which averaged over 2.8 million viewers at the time,[129] covered the issue for 12 minutes on June 25, 2019,[130] but I did not include it. Additionally, I only counted ratings for a particular program

---

users to track shares of webpages across multiple social media platforms (https://apps.crowdtangle.com/chrome-extension). For each share in CrowdTangle's database, the Chrome extension provides a list of each share, the number of interactions (i.e., the number of reactions, upvotes, likes, comments, and shares) generated by that share, and the total number of followers associated with the share. (Followers are defined as "The sum of Page Likes, Instagram followers, Twitter followers, or Subreddit subscribers for all of the matching results.") The browser extension does not track reach or impressions generated by a post nor does the list of shares incorporate data from private or restricted accounts.

[126] https://help.crowdtangle.com/en/articles/4201940-about-us

[127] It was not possible to find shares of the Washington Examiner article, likely due to the way the Washington Examiner structures its URL. Instead of generating URLs with unique identifiers, articles are assigned tags (in this case, the tag was "donald-trump") and stored on a single webpage in reverse chronological order. As a result, using the CrowdTangle Chrome extension returns the shares of all articles assigned the "Donald Trump" tag, rather than shares of the specific at-issue article.

[128] To arrive at the total number of followers, I summed together all the followers associated with each share. It was not possible to deduplicate unique followers across different articles and channels.

[129] https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-show-in-cable-news-as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c

[130] https://archive.org/details/tv.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

once in a day, even if a program was aired multiple times in day. I also did not consider the number of times a Statement was mentioned during a broadcast, even though multiple mentions of a Statement generate multiple impressions.

*Print Impressions.* I limited the print impressions analysis to publications that published an online news article that was cited in the Complaint. I did not count other print news articles about Carroll that may have mentioned the claims, even though I was able to find 33 print articles via ProQuest published between June 22, 2019, and September 28, 2022, that referenced the Statements.[131] None of these 33 articles overlapped with the 14 articles I considered in my analysis. Further, only five of the six publications contributed to the impressions estimate because I was unable to find publicly available circulation for all six publications.

*Other Sources of Impressions.* I did not include podcast impressions, although there is anecdotal evidence that these claims were discussed on podcasts and radio shows like *The Kevin Jackson Show* and the *New York Times*' *The Daily*.[132] I did not include impressions generated from people who were exposed to the Statements in article headlines while browsing Google News, Apple News, or other news aggregating applications. As well, I did not include face-to-face pass-along of the claims.

For these reasons, the estimate of impressions I provide is a conservative estimate in which several sources of further dissemination were not taken into account. A summary of

---

[131] Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean"))

[132] https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/, https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/, and https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

conservative steps taken in the impressions analysis is included in Appendix J.

## V. IMPACT ASSESSMENT

In this section, I provide an impact assessment to evaluate the nature and amount of harm done to Ms. Carroll's person brand as a result of Mr. Trump's Statements. The impact of these Statements should be viewed both qualitatively and quantitatively.

In the qualitative assessment, I assess the nature of the Statements and their more generalized harm to a brand that faces a general (rather than niche) public. I also take into account the nature of the associations and their likely harm to the person brand of a professional woman and assess the long-term nature of this harm. These are dynamics that occur on the sociocultural level and therefore require more qualitative assessment. Further, they impact the generalized social perceptions of Ms. Carroll, thereby diminishing her reputational value to speak to a broad and diverse public. As such, this kind of reputational harm may impact her ability to capitalize on her person brand in the future.

I also provide a quantitative impact assessment to link the impressions estimate with the damages estimate. How many people saw and might have believed or been receptive to Mr. Trump's Statements? There are some who would have read/heard his Statement and dismissed it out of hand. While the Statement itself may represent some generalized harm, to calculate a fair estimate to rectify the more specific harm, one must take into account the fact that not everyone may have read/heard and readily believed Mr. Trump's Statements. Yet, political science provides tools for estimating the quantitative impact by incorporating the likelihood that a reader or viewer would have been receptive to Mr. Trump's Statements.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### A. Qualitative Impact Assessment

To conduct the qualitative impact analysis, I relied on materials publicly available from before and after Mr. Trump's Statements on June 21, 22, and 24, 2019. These include media coverage of Ms. Carroll both before and after the Statements,[133] Amazon reviews of her books,[134] negative social media comments generated after the Statements, and negative messages sent privately to Ms. Carroll.

Prior to the Statements on June 21, 2019, Ms. Carroll was a popular advice columnist at *Elle* Magazine, where she had been a mainstay for 25 years.[135] Her brand personality was that of a sassy dating advice columnist and author of books on a range of topics, including dating, culture, and the life of Hunter S. Thompson. As the columnist of "Ask E. Jean" at *Elle*, she reached about 4.5 million readers, according to her publisher.[136] Ms. Carroll was known widely for her personable, modern advice for women.[137] Over the years of her popularity, she was heralded as "feminism's answer to Hunter S. Thompson."[138] She is the author of *A Dog in Heat is a Hot Dog and Other Rules to Live By*, (1996) and *Mr. Right, Right Now!* (2005), books that offer "sassy" dating and personal advice.[139] Former *Elle* editor-in-chief Robbie Myers, who until

---

[133] Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean")).

[134] https://www.amazon.com/product-reviews/0060530286 and https://www.amazon.com/product-reviews/0525935681/.

[135] Deposition of Robbie Myers, October 12, 2022, 31:20-22, 32:4-12; https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html.

[136] https://web.archive.org/web/20200520030235/http:/www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326. I was unable to find readership data prior to 2020.

[137] Deposition of Robbie Myers, October 12, 2022, 23:7-24:4.

[138] Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.

[139] Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2017 was Ms. Carroll's boss,[140] described her as a gifted, beloved writer:

> "That's a -- the term that came to mind is sort of she's a baller, meaning she's -- as a writer. She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts, but she -- she also, you know, has a lot of wit and I think that's why her readers loved her so much."[141]

Ms. Myers noted Ms. Carroll's "high public profile" and credited her with elevating the national advice column genre and building trust with her readers by being witty but grounded in the facts of journalism:

> "…I mean, what other people are doing is great, right, and it's fun and interesting, but women really trusted E. Jean and we got lots of feedback from readers that she helped them. Also, you know, they loved her voice because she puts a lot of funny in there or sort of -- but it's always undergirded by reporting."[142]

Ms. Myers stated that Ms. Carroll had made significant positive contributions to *Elle* in helping to build the magazine's audience both in print and online, which resulted in both a raise and increased space allotted to the "Ask. E. Jean" column.[143]

### i. Reception to Ms. Carroll's Professional Work

Ms. Carroll was known to her readers as a "a sharp and funny social commentator, and a terrific journalist,"[144] offering "sassy female insights."[145] Ms. Carroll was noted for dishing out "SASSY BUT SANE ADVICE," "E. Jean's PUNCHY wisdom SHINES in compilation."[146]

"E. Jean Carroll, with her razor-sharp insights and wildly popular way of serving

---

[140] Deposition of Robbie Myers, October 12, 2022, 9:11-13.
[141] Deposition of Robbie Myers, October 12, 2022, 21:15-22.
[142] Deposition of Robbie Myers, October 12, 2022, 22:12-18.
[143] Deposition of Robbie Myers, October 12, 2022, 28:9-14, 28:18-21, and 32:9-12
[144] https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
[145] https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
[146] Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

them up to the masses, is, above all else, a truth-seeker."[147]

> "She's a real writer, a sharp and funny social commentator, and a terrific journalist, and I love her voice. Smart readers will be particularly impressed with her skill reporting the current research in sex and marriage. I admire the way she covers the waterfront. She goes to rock-climbing spots, moto-cross tracks, gun clubs, university labs, millionaires' cocktail parties. About halfway through, I realized, this woman is an explorer. I think we're lucky that someone with her quality of mind and sense of humor has turned her attention to one of the most frustrating dilemmas of contemporary women: how to find someone real to love."

After June 2019, the associations with Ms. Carroll's person brand shifted. One way to examine the shift in associations is through word association, as represented in a word cloud.[148] As can be seen in Figure 8 and Figure 9 below, the semantic associations shifted from those associated with her role as a sassy news columnist ("love," "dating," and "men") to being associated with Mr. Trump, sexual assault, and this case ("defamation," "justice"). While some shift was attributable to the publication of her memoir and *New York Magazine* piece in which she detailed the alleged encounter with Mr. Trump,[149] an analysis of Google search data in Subsection iii below, illustrates that Mr. Trump's response, and not her initial claim, resulted in the escalating attention that she has received and played a considerable role in shifting the nature and valence of associations with her name.

---

[147] https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
[148] Humphreys and Wang (2018)
[149] https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 8. Before June 2019 (top 200 words in news articles about E. Jean Carroll)**



**Figure 9. After June 2019 (top 200 words in news articles about E. Jean Carroll)**



## ii. Elle's Readership

It is also noteworthy to consider the composition of *Elle*'s readership. In 2019, 36% of the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

American public identified as conservative.[150] *Elle* has a large and diverse readership in all regions of the country.[151] Its readers have a median age of 41 and an income of $194,000 per year.[152] Given the composition of the United States and the reach of *Elle's* readership, a meaningful proportion of Elle readers, roughly 1 in 3 readers, is likely conservative. Further, according to a poll conducted by YouGov,[153] 76% of Republicans polled either found the allegations of sexual harassment and sexual assault made against Mr. Trump to be not credible or needed more information about the claims, which I consider to mean that they are receptive to believing the Statements in this case.[154] Taken together, this means that 26%[155] of *Elle* readers— or about one in four—may have been receptive to Mr. Trump's Statements. While not all *Elle* readers would have been receptive, a considerable portion would have.

One in four *Elle* readers being receptive to the Statements is a considerable portion of readers to critically damage Ms. Carroll's brand as a columnist for the magazine. *Elle* reported having 4.5 million readers in 2019,[156] meaning more than a million readers may have been receptive to the claim that she was a "totally lying" about having been sexually assaulted by Mr. Trump. Further, the shift in associations provoked by the Statements undermines generalized, public perceptions of Ms. Carroll in ways that can unsettle prior perceptions about her. These

---

[150] https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
[151] AAM 2019
[152] http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326;
https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html
[153] https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll
[154] The YouGov poll was conducted in 2020, after Ms. Carroll published the allegations about Mr. Trump.
[155] 26% is the product of multiplying the 34.7% of *Elle* who identify as conservative and the 76% of republicans polled who found the allegations of sexual harassment and sexual assault made against Mr. Trump to be either not credible or needed more information about the claims.
[156] https://web.archive.org/web/20200520030235/http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

readers also have friends, family, neighbors, and colleagues. They are part of the public at large. As sociologists argue, public perception can be colored not only by what an individual thinks, but also by what an individual's friends and family think.[157] For example, if someone not inclined to believe Mr. Trump's claims about Ms. Carroll is friends with or married to someone who does find them credible, this also imperils reputational value due to the nature of social influence, particularly over time.[158]

### iii.  Search Interest

Google Trends provides another way to assess the impact of Mr. Trump's Statements on Ms. Carroll's brand. Google Trends is a free tool that allows users to compare relative search interest on up to five different search terms and topics. Data on Google Trends are presented on a relative scaled from 0 to 100, indexed to the peak search volume achieved during the time period of interest. Using Google Trends, I can analyze the change in search volume related to E. Jean Carroll following *New York Magazine* publishing an excerpt from her memoir on June 21, 2019, and Mr. Trump making the Statements on June 21, 22, and 24, 2019.

The graph in Figure 10 below shows the relative search interest in E. Jean Carroll[159] from June 1, 2019, through June 30, 2022, for searches conducted in the United States.[160, 161] The data

---

[157]    Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," *Annual Review of Sociology*, 32, 53-78.

[158]    Ardia (2010).

[159]    I relied on the "E. Jean Carroll" topic (as opposed to terms) when conducting the search. Topics are groups of keywords and phrases Google categorizes as referring to the same concept. Searching by topic is beneficial as it allows the results to incorporate misspellings and different ways of referring to the concept of interest. https://support.google.com/trends/answer/4359550?hl=en

[160]    https://trends.google.com/trends/explore?date=2019-06-01%202019-06-30&geo=US&q=%2Fm%2F02qwtqv

[161]    When exporting data from Google Trends, Google will sometimes list the daily volume as "<1" when the relative volume is between 0 and 1. I have converted all instances of "<1" to 0.5.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

show two clear spikes in search volume. The first spike occurred on June 22, the day Mr. Trump made his second Statement. The second occurred on June 24, the day that Mr. Trump made the third Statement. Notably, the relative search volume on June 21 (the day *New York Magazine* released an excerpt from Ms. Carroll's memoir) was 55, or nearly half the relative volume generated on June 22 (94) and June 25 (100), indicating the Mr. Trump's response to Ms. Carroll's accusation may have been at least as impactful as Ms. Carroll's allegations.

**Figure 10. Daily Relative Search Interest for E. Jean Carroll for June 2019**



Another way to measure the impact of Mr. Trump's statement using data from Google Trends is by analyzing the "related queries." Related queries are other searches users conducted

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

when searching for the topic of interest. Like search interest, related queries are indexed to the most commonly searched words and phrases and reported on a scale from 0 to 100. I reviewed the top related queries for searches of E. Jean Carroll to determine the degree to which consumers searching for Ms. Carroll were interested in her "Ask E. Jean" column compared to searches linking her to Mr. Trump.

The tables in Figure 11 below show the top related queries associated with searches of E. Jean Carroll[162] across three different time periods. The first time period (the "before" period) incorporates searches conducted from January 1, 2019, through June 20, 2019.[163] The second period (the "after – short" period) incorporates searches conducted from June 21, 2019, through November 3, 2019,[164] the day before Ms. Carroll filled the present lawsuit. The third period (the "after – long" period) incorporates searches conducted from November 4, 2019, through the end of the most recent month before I conducted my analysis, August 31, 2022.[165] Rows highlighted in green indicate related queries that link Ms. Carroll to her "Ask E. Jean" column; rows highlighted in yellow indicate related queries that link Ms. Carroll to Mr. Trump. As the data show, consumer associations for Ms. Carroll changed following her accusation and Mr. Trump's response. Prior to her allegations, related searches associated with Ms. Carroll's column were relatively high. After the allegations and Mr. Trump's response, queries related to Ms. Carroll's column disappear from the list and are replaced by queries linking Ms. Carroll to Mr. Trump.

---

[162] Here too, I relied on the "E. Jean Carroll" topic when searching on Google Trends.
[163] https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
[164] https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
[165] https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### Figure 11. Top Related Queries for E. Jean Carroll

| Before (01/01/19 – 06/20/19) | |
| --- | --- |
| Related Query | Relative Value |
| e jean | 100 |
| ask e jean | 75 |
| jean carroll | 69 |
| dear abby | 14 |
| miss manners | 6 |

| After – Short (06/21/2019 – 11/03/19) | |
| --- | --- |
| Related Query | Relative Value |
| jean carroll | 100 |
| e jean | 66 |
| e carroll | 60 |
| jean e carroll | 60 |
| e. jean | 23 |
| e. jean carroll | 22 |
| trump | 16 |
| carroll trump | 15 |
| trump jean carroll | 13 |
| e jean carroll trump | 8 |
| jean carroll young | 6 |
| e jean carroll young | 5 |
| donald trump | 3 |
| trump rape | 3 |
| e. jean carroll trump | 3 |
| jean carroll donald trump | 3 |
| anderson cooper | 2 |
| jean carroll anderson cooper | 2 |
| e.jean | 2 |
| donald trump e jean carroll | 2 |
| jean carrol | 2 |
| john johnson | 1 |
| e.jean carroll | 1 |
| e jean carrol | 1 |
| e jean carroll anderson cooper | 1 |

| After – Long (11/04/19 – 08/31/22) | |
| --- | --- |
| Related Query | Relative Value |
| jean carroll | 100 |
| e jean | 51 |
| e carroll | 49 |
| jean e carroll | 48 |
| trump | 21 |
| e. jean carroll | 21 |
| jean carroll trump | 18 |
| trump e jean carroll | 11 |
| trump rape | 5 |
| e. jean carroll trump | 4 |
| jean carroll young | 4 |
| jean carroll dna | 4 |
| donald trump | 3 |
| e jean carroll trump rape | 3 |
| trump dna | 3 |
| e jean carroll young | 2 |
| e jean carroll dna | 2 |
| e jean carroll news | 2 |
| e jean carroll donald trump | 2 |
| e jean carroll twitter | 2 |
| e jean carroll case | 2 |
| trump news | 2 |
| trump rape case | 1 |
| jean carroll dress | 1 |
| e jean carroll lawsuit | 1 |

#### iv. Engagement Analysis

*Comments and Engagement on Social Media News Article Shares.* As an additional

Expert Report of Professor Humphreys 49

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

qualitative indicator of the impact of these Statements in the public sphere, I examined engagement on social media that resulted as a response to news articles covering Mr. Trump's Statements. The news articles I analyzed in the Impressions Model and that were posted on Twitter by the publications received 7,880 responses and 10,982 likes. Comments on these articles repeated and agreed with Mr. Trump's Statements about Ms. Carroll, showing yet again that his Statements about her resonated with some people. For example, on a *Washington Post* article, one commenter said, "Baloney---For over 20 years silence and now since book is ready for sale we need new sensation to boost sale."[166] Another commenter, on the *New York Magazine* article, replied, "I could care less about this phony article being that the source is a leftist mouthpiece for brainwashing and helping an agenda of the antiAmerican left Communist Democrats in DC work toward Communism of our country. TRUMP is doing a great job. I voted for him and will do it again in 2020. New York has the worst Mayor ever in the entire United States. SUPPORT CAPITALISM AND SAVE OUR NATION. VOTE TRUMP 2020!"[167]

   Since the news broke in June 2019, these same news publications have continued to cover the story, which has extended the effect of Mr. Trump's Statements further into the present day. To gain insight into whether the public continued to view Carroll negatively, I selected a sample of four publications that covered Mr. Trump's Statements and were included in my Impressions

---

[166]    Colby Itkowitz, Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies, WASH. POST (June 21, 2019), https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html.

[167]    Sarah Jones, E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman.", N.Y. MAG. (June 21, 2019), https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Model (New York Times, Daily Caller, Washington Examiner, and USA Today.) I identified these news outlets' coverage of Ms. Carroll on Twitter and Facebook, after June 2019, when the statements first appeared in news through when I conducted this analysis on September 28, 2022.[168] Searching for replies using three phrases that reference a subset of Mr. Trump's claims ("book sale," "sell her book" and "agenda") and three negative terms ("crazy," "whore," and "bitch") led me to hundreds of negative comments about Ms. Carroll.  Figure 12 below includes some of these comments, and Appendix H contains over a hundred additional examples.

---

[168]    On Twitter, I used the Twitter API to search for Carroll-related tweets authored by each of the four specified news publication, using a query such as "e jean carroll from:usatoday since: 2019-07-01." On Facebook, I went on each publication's Facebook Page and searched for posts mentioning "e jean carroll" since July 2019. I then collected all the comments and replies to these tweets and Facebook posts.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 12.  Sample of Replies Generated by Long-Term News Coverage[169]**



The nature of the engagement around this news coverage continues to reference Mr. Trump's Statements to this day and illustrates the changed tenor and malice of the associations with Ms. Carroll's name. For example, in response to recent press coverage, readers say, "… after all the women who have lied in court under oath about being raped by someone in or affiliated with the trump administration, yeah ima call this bitch a liar. …", and label her a "attention whore" and "lying bitch" in response to articles that contain the allegedly defamatory

---

[169]     https://twitter.com/1/status/1304903451625713664, https://twitter.com/1/status/1303742205648142336, https://twitter.com/1/status/1303700235210891265, https://twitter.com/1/status/1438311461110095873, https://twitter.com/1/status/1572592008316981250, https://twitter.com/1/status/1572467301315940352.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

claims. These negative messages are further indication of the lingering negative effect of Mr. Trump's claims about Ms. Carroll on her person brand.

*Posts on Twitter*. The negative and malicious nature of the messages to Ms. Carroll extend to social media more broadly as evidenced by posts with no direct connection to the original Statements. Using the same search phrases as I did above led me to thousands of negative posts in response to or mentioning Ms. Carroll.[170] Many of the replies and tweets I found explicitly reference and/or repeat Mr. Trump's defamatory claims about Ms. Carroll, as illustrated in Figure 13 below.

For example, RunnerMoe24 calls Ms. Carroll a "Liar…a disgusting person" and accuses her of making up the story to "draw sales for your book," as Mr. Trump claimed. These kinds of comments continue into the present, with Angerisinnate calling her a "sick, ugly, rejected old hag," and repeating Mr. Trump's claim that she is attempting to sell books as recently as September 2022.

---

[170] I used Brandwatch to conduct this search. I searched for posts from January 1, 2019 through September 28, 2022 with the following query: (ejeancarroll OR "e jean carroll" OR "jean carroll" OR jeancarroll) OR engagingWith:ejeancarroll.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 13. Sample of Twitter Commentary about Ms. Carroll Following Mr. Trump's Statements[171]**



**Patriot24**
@RunnerMo24

Replying to @ejeancarroll

Liar, Liar. You are a disgusting person. Women like you are the reason people hesitate to believe women who are truly sexually assaulted. You are psychological messed up to lie about something like this to draw sales for your book because you're unknown by most. Seek help.

5:29 PM · Jun 21, 2019 · Twitter for Android



**MCWAY2000**
@MCWAY2000

Replying to @poconnell2 @ananavarro and @ejeancarroll

The same screwball woman who waited until she had a book to pimp…ahem…sell before off-handedly claiming that Trump felt her up 30+ years ago? Notice how all these loons claim something happens DECADES ago, but only when Trump was becoming (and actually became) president

11:18 AM · Aug 4, 2021 · Twitter Web App

**Scott L. Harris**
@PapaNeanderthal

Replying to @ShelbyTalcott @DailyCaller and 2 others

She's not going to bring charges against Trump because it never happened. She only looking for 3 things: Publicly for her book, $$$, & some political agenda.!..

2:02 PM · Jun 22, 2019 · Twitter for iPhone



**Chas**
@firethornranch

@ejeancarroll says @realDonaldTrump attacked her in the 90's. She didn't report it, she's writing a book, etc blah, blah! "Same song same verse a little louder a little worse!" Another person using the #FalseMedia for publicity and a way to sell her book for $. #BadFiction

6:14 PM · Jun 21, 2019 · Twitter for iPhone

**Even the HORSE knows**
@Angerisinnate

He wouldn't have touched THAT with YOURS! Sick, ugly, rejected old hags trying to UP their book sales should go to prison themselves. Even her story backs his claim that he wouldn't EVER. This just makes women look bad.



msn.com
Trump will be sued for sexual assault by writer E. Jean Carr…
E. Jean Carroll, who is already suing Trump for defamation, notified a judge overseeing the case of her intent to sue as …

12:23 PM · Sep 21, 2022 · Twitter Web App

**PinochetPilot**
@pinochet_pilot

Replying to @ejeancarroll

Aren't you the lady that claimed trump sexually assaulted you? Lmao right. He has access to supermodels but he had time to go after you? Trump has a type, and it isn't crazy cat ladies. I guess if it helped your book sell 😂

8:26 PM · Sep 5, 2022 · Twitter for iPhone

**FLOCCINAUCINIHILIPILIFICATION**
@floccinaucini1

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda,"-Trump. E. Jean Carroll accusing Trump of rape in 1990 in ritzy department store, as bad as Kavanaugh's accuser! 🔴 What a Dork Fish!



6:24 PM · Jun 21, 2019 · Twitter Web App

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Replies Directly to Ms. Carroll on Facebook and Instagram.* Additionally, I reviewed comments and replies to posts made by Ms. Carroll on her personal Facebook and Instagram, accounts where I found hundreds of negative and malicious messages and attacks on her character (see Figure 14 and Figure 15 below.) One, for example, says, "I hope you're sued into hell and back for these FALSE allegations." Another says, "Pathetic.... you are a true POS... cry wolf years later? 20+ years??? Your (sic) a sorry sack of shit... not brave... brave would have been to call it out then and there...."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 14. Examples from Ms. Carroll's Facebook Page[172]**



---

[172]     https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ51tESLc41qzM8fSB
Vm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176;
https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ51tESLc41qzM8fSB
Vm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176;
https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLfMNXp7iaVe7cJ4e6n
8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725176;
https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPFJS9xmq4cbSBCFpS
CfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 15.  Examples from Ms. Carroll's Instagram[173]**



The negative impression people have of Ms. Carroll persists to the present, as the hateful messages continue to be posted and continue to reference Mr. Trump's Statements (see, for example, Appendix H). While there are many messages of support for Ms. Carroll among the posts I reviewed, the fact that I was able to find a high volume of negative and vicious messages using a limited set of phrases is indicative of the persistent and ongoing harm to her person

---

[173]    https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673,
https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795,
https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171,
https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561,
https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

brand. Appendix I contains over 1,000 examples of these acerbic and hurtful public comments, both from responses to her personal accounts and from Twitter more generally.

In addition to these types of general social media comments, Ms. Carroll received many malicious direct messages and emails, over 80 examples of which can be found in Appendix I. These hateful messages continue into 2022, calling her a "liar and a fraud" and a "stupid bitch."[174] The direct messages to Ms. Carroll come from a wide range of platforms including email, Facebook, Twitter, and the submission email account for her "Ask E. Jean" column.

Overall, my qualitative impact analysis indicates that Ms. Carroll's person brand has been harmed by Mr. Trump's Statements. While her brand was associated with dating and advice prior to the Statements in 2019, after the Statements, her name is, and continues to be, associated with a different set of associations, and she is assailed publicly and continually online, often with direct reference to Mr. Trump's Statements. The news coverage of her and search traffic about her continues to be tied to Mr. Trump and his Statements. While some public attention came just after the publication of her book, the highest volume of attention came directly after Mr. Trump's Statements.

### B. Quantitative Impact Assessment

In addition to a qualitative analysis of the tenor and nature of the impact of Mr. Trump's Statements on Ms. Carroll's person brand, I conducted a quantitative analysis to assess the portion of impressions calculated in the impressions analysis that would have been made to a receptive audience (the "receptive impressions"). To approximate the receptive impressions, I

---

[174]    CARROLL_028059 and CARROLL_029774.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

used estimates of the percent of the readership/viewership who identify as Trump supporters and/or are Republicans and estimates of the percent of Republicans who did not find allegations of sexual harassment and sexual assault made against Mr. Trump to be credible. I then discounted the total number of impressions generated by the Statements (as calculated in the Impressions Model) by the estimated percent of receptive impressions.

### i.   Readership Analysis

*Readership Based on Pew Data.* What percentage of the impressions were made to an audience that was inclined to believe them? To understand the impact of Mr. Trump's claims regarding Ms. Carroll, I used data from Pew Research's ongoing survey of American Trends. Pew Research is a non-partisan think-tank that does "data-driven social research."[175] Their American Trends panel survey provides information about Americans' political beliefs, and I use it to calculate the percent of readership that were receptive to his claims.[176] I used data from the survey Pew conducted between October 29 and November 11, 2019, making it a reasonable approximation of the composition of readership of the sources where the June 21, 22, and 24, 2019 Statements appeared (subscription periods tend to be on a yearly basis). The survey data and documentation are publicly available.[177] The Pew survey is "a national, probability-based online panel of adults living in households in the United States" and generated 12,043 responses collected from a nationally-representative sample.[178]

---

[175]   https://www.pewresearch.org/about/

[176]   https://www.pewresearch.org/our-methods/u-s-surveys/

[177]   The data from this study was downloaded and produced. Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019,
https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/.

[178]   With a probabilistic sample of this size, the sampling error was ± 1.43 percentage points,
https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The following variables were used in the analysis:

- SOURCEUSE: "Please click on all of the sources that you got political and election news from in the past week. This includes any way that you can get the source. If you are unsure, please DO NOT click it. **[KEEP IN SAME ORDER AS SOURCEHEARD]**"

- PARTY: "In politics today, do you consider yourself a: **ASK IF INDEP/SOMETHING ELSE (PARTY=3 or 4) OR MISSING:** PARTYLN As of today do you lean more to…"

- THERMO: "We'd like to get your feelings toward a number of people on a 'feeling thermometer.' A rating of zero degrees means you feel as cold and negative as possible. A rating of 100 degrees means you feel as warm and positive as possible. You would rate the person at 50 degrees if you don't feel particularly positive or negative toward them." (recoded to Trump receptive if value was >=50).

*Receptivity based on YouGov Poll.* Not every Republican is necessarily inclined to be receptive to Mr. Trump's Statements. For that reason, I corrected by discounting according to the percent of Republicans who either (1) found the various allegations of sexual harassment and assault made against Mr. Trump to not be credible (49%) or (2) needed more information (27%), for a total of 76%.[179] I did not include those who were unsure. These responses indicate a reasonable expectation that the respondent either already believed Mr. Trump's Statements or was open to believing them, given their other beliefs and their current lack of information (*i.e.*, they did not select that they did believe the allegations made against Mr. Trump were credible).

I performed the following calculations:

- *Percent Republicans* = percent of a publications' audience that are Republican[180]

- *Percent Receptive Republicans* = Percent Republicans * Percent of Republicans Receptive to the claims (.76, YouGov)

---

[179] https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll

[180] Republicans were identified as PARTY=1 in the raw data.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- *Percent Trump Supporters* = sum of all people who were receptive towards Mr. Trump[181]

Based on this analysis, I can conclude that an average of 25% of the total impressions were to individuals inclined to be receptive to the Statements of Mr. Trump. As can be seen in Figure 16 below, the minimum receptive audience was 11.25% (*Huffington Post*), while publications like the *Daily Caller* had a more receptive audience of 68.63%.

---

[181]  I considered all people who listed a "feeling thermometer" greater than or equal to 50 to be receptive to Mr. Trump (*i.e.*, THERMO>=50).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 16. Percentages of Republican or Republican-Leaning Readers/Viewers and the Percentage of Trump Supporters for Each Publication[182]**

| Publication | Percent Republican | Percent Receptive Republicans | Trump Supporters |
|---|---|---|---|
| The New York Times | 16.3% | 12.39% | 13.7% |
| ABC | 34.7% | 26.37% | 32.5% |
| NBC | 31.0% | 23.56% | 29.5% |
| CBS | 33.7% | 25.61% | 31.6% |
| Washington Post | 18.1% | 13.76% | 14.6% |
| Time | 21.0% | 15.96% | 18.5% |
| Huffington Post | 14.8% | 11.25% | 12.4% |
| Daily Caller | 90.3% | 68.63% | 84.9% |
| Fox News | 69.8% | 53.05% | 68.2% |
| MSNBC | 20.5% | 15.58% | 19.9% |
| CNN | 23.6% | 17.94% | 23.3% |
| The Wall Street Journal | 38.7% | 29.41% | 31.6% |
| USA Today | 34.9% | 26.52% | 32.6% |
| Politico | 22.4% | 17.02% | 17.8% |
| BuzzFeed | 23.2% | 17.63% | 19.8% |
| Newsweek | 23.1% | 17.56% | 20.9% |
| Business Insider | 31.5% | 23.94% | 26.3% |
| The Hill | 32.1% | 24.40% | 26.6% |
| Washington Examiner | 65.7% | 49.93% | 58.4% |
| The Guardian | 19.2% | 14.59% | 16.7% |
| **Average** | | **25.25%** | |

To calculate the final number of impressions to a receptive audience, I took the lowest of these variables, which is the Receptive Republicans, and multiplied the impressions generated by

---

[182]    Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

each media source by that percent. Data was not available for some of the publications

considered in the Impressions Model. I used the average for all other publications if data was

unavailable for a specific publication. Multiplying the impressions estimate from the Impressions

Model by the Percent Receptive Republicans yields the percent of impressions made to people

who were receptive to them. This estimate of the receptive impressions can then be carried

forward to assess how much it would cost to repair reputational damage with this population.

The formula used to calculate receptive impressions is displayed in Figure 17 below. The

formula is applied to each of the media analyzed in the Impressions Model.

### Figure 17.  Receptive Impressions Calculation

**Receptive Impressions = Percent Republicans * Percent of Receptive Republicans * Impressions Estimate**

Where:

> Percent Republican = percent of a publications' audience that are Republican
> Receptive Republicans = Republicans receptive to the claims (.76, YouGov)[183]
> Impressions Estimate = the total impressions from the Impressions Model

Figure 18 below summarizes the total receptive impressions generated by the Statements.

Appendix J includes the detailed results of the quantitative impact model.

### Figure 18.  Total Receptive Impressions

|        | Social Media | Web       | Print   | TV         | Total      |
|--------|-------------:|----------:|--------:|-----------:|-----------:|
| **High** | 12,441,816 | 3,275,673 | 444,737 | 26,774,128 | 42,936,354 |
| **Low**  |  3,580,974 | 3,275,673 | 444,737 | 26,774,128 | 34,075,512 |

---

[183]  If data related to Percent Republicans is not available, the equation is as follows: the average Percent Receptive Republicans (25.25%) * Impressions Estimate.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The quantitative impact analysis uses information about readership, political ideology, and receptivity given political ideology to calculate the number of impressions generated by Mr. Trump's Statements that were made to a receptive audience. Certainly, as detailed in the qualitative impact analysis and impression analysis, the Statements caused sufficient harm to Ms. Carroll's brand to a general public, meaning individuals across the ideological spectrum. The quantitative impact analysis provides an estimate of the target audience for a corrective campaign. That said, the total harm done to Ms. Carroll's brand in the eyes of the generalized public exceeds the very limited bounds of this quantitative impact and damages calculation. Appendix J includes a summary of the various reasons why the quantitative impact analysis is an undercount.

## VI. MODELING THE COSTS FOR REPUTATION REPAIR IN SOCIAL MEDIA

### A. Modeling Reputation Repair on Social Media

As detailed in the theoretical background section above, defamation causes harm to one's reputation in the public sphere. As a corrective measure to repair reputation, an advertising and strategic communications plan can attempt to change attitudes that may have been affected by the Statements. This section details the methodology for calculating the costs to repair reputation damage via social media channels. The costs to repair the reputation are based on the estimates of the number of receptive impressions. The goal of the corrective campaign is to counteract the number of receptive impressions generated by the Statements, enabling Ms. Carroll to repair the damage done to her person brand by Mr. Trump. The best way to allocate spending on media for this kind of campaign would be to create a media mix that is based on how the target audience

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

gets their information.[184] Further, a particular group that does not trust traditional media, such as those who identify as Republicans and/or support Mr. Trump, requires alternative information channels that they do trust.

### i. Campaign Goals, Platforms, and Measurements

In my opinion, and given the prior literature summarized in Section II, a campaign to repair reputational damage must include (i) hiring influencers whom the audience regards as trusted sources, (ii) circulating statements in multiple media to replicate the echo chambers in which they originated, (iii) ensuring that the audience is exposed to the message multiple times in order to create attitude change, and (iv) extending for a long enough time to allow for dissemination, given what is known about the slow spread of true versus false claims online[185] and the multifaceted nature of effective corrective repair through online channels (*e.g.*, *United States v. Bayer Corp.*, No. 07-01(HAA) (D.N.J. Jan. 4, 2007). A holistic social media campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case.[186]

An effective social media campaign to repair reputational damage must be multi-pronged and include a mix of platforms and people. A typical social media campaign will combine display and search advertising along with hiring influencers to promote a message via blogs and on their Instagram, YouTube, and other channels. Production costs for video and to promote

---

[184]    Ardia 2010.
[185]    Vosoughi *et al.* (2018).
[186]    Shankar, V., and Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? *International Journal of Research in Marketing*; Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. *Journal of Research in Interactive Marketing*, 11(2), 185–197.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

content are often also included. Because the source—and not just the message—is so critical to attitude change, particularly on social media, it is important to work with credible and likeable sources likely to gain traction with the intended audience. For this reason, hiring social and mass media influencers is critical to one's ability to repair reputational damage.

## ii.    Media Mix

To allocate media budget and media spend across each platform, I relied on the Pew data previously cited in the impact analysis. Using the Pew data, I conducted an analysis of the ways individuals who identify as Trump supporters reported getting their news (see Figure 19 below). Respondents who identified as Trump supporters[187] were asked "what is the most common way you get political and election news?" News websites or apps were the most commonly cited media used, with 23.1%. I added this together with social media (13%) to allocate the online and influencer budget. The next most common responses were cable (21.3%), local (15.6%), and national network television (14%), which I allocated to the mass media budget. I allocated radio (9.1%) and print (3.4%) accordingly as well, using publicly available data on rates for these media channels.

---

[187]    I analyzed the media habits of Trump supporters (THERMO variable >50), as that was the closest reflection of the receptive Republican audience in the Pew data.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 19. The Media Mix of Respondents who Identify as Trump Supporters**

| *NEWS_MOST_W57. What is the most common way you get political and election news?* | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **Print newspaper or magazines** | 162 | 3.4 | 3.4 | 3.4 |
| **Radio** | 438 | 9.1 | 9.1 | 12.5 |
| **Local television** | 748 | 15.6 | 15.6 | 28.1 |
| **National network television** | 669 | 14 | 14 | 42.1 |
| **Cable television** | 1020 | 21.3 | 21.3 | 63.3 |
| **Social media** | 623 | 13 | 13 | 76.3 |
| **News website or app** | 1109 | 23.1 | 23.1 | 99.5 |
| **Refused** | 26 | 0.5 | 0.5 | 100 |
| *Total* | 4795 | 100 | 100 | |
| | | *99.5* | | |

To estimate the cost for repair on each platform, two measurements are used as the industry standard. To assess the number of impressions, one can use the cost per thousand impressions, otherwise known as cost per mille (CPM) to estimate how many impressions would be gained for each dollar spent and cost per click (CPC) to estimate the number of engagements each dollar is likely to yield. For each channel, I calculated either the CPM or CPC multiplied by the number of receptive impressions generated by the Statements (as discussed, below I also incorporated an attitude-change multiplier to account for the fact it takes multiple exposures to change an existing attitude). I also included costs to have social and mass media influencers share the message across their channels, similar to the method in which Mr. Trump's Statements were spread and that mirrors the ways in which Trump supporters get their news, according to analysis of the Pew Research poll.[188]

Costs of advertising were calculated as CPM or CPC multiplied by the target number of

---

[188]    Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

impressions of each channel or platform. Whether to use CPM or CPC in a cost calculation depends on the goal of the campaign. Annual industry benchmark reports of CPM and CPC for different channels and platforms published by research firms and advertising networks are used in the damages model to estimate costs for reputation repair. When the cost of advertising of a specific channel could be calculated from either CPM or CPCI used CPC in the final cost of this channel in order to ensure attitude change/conversion. For influencer promotion and mass media advertising, only CPM was used for cost calculation because CPC is usually not available.

### iii. Attitude Change Multiplier

As covered in the aforementioned psychological literature, an attitude is not changed by one impression alone. In order to actually change attitudes, a campaign would need to serve multiple impressions per person; showing someone a counter-attitudinal message one time will not change their attitude. This is true in traditional media,[189] but it is particularly true in the crowded attention marketplace of social media. While prior research has found that it requires about 3 to 5 impressions to change an attitude in traditional advertising exposure, on social media the number of exposures is likely much higher. Taking into account the attention environment, the strength of attitudes, and the impression rate (likelihood of an exposure leading to an actual impression), I estimate that a message would need to be seen approximately 3 to 5 times on social media *from a credible source* before it would lead to attitude change. With some audiences, 7 times may be more appropriate. For some audiences, it would be impossible to change attitudes.

---

[189]    Cacioppo and Petty (1980).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

###### iv.     Potential Overlap in Impressions

As mentioned above, the aim of the corrective campaign is to repair the harm to Ms. Carroll's brand caused by the receptive impressions. Yet the literature on attitude change multipliers is based on individuals and not impressions (*i.e.*, one individual would require between 3 and 5 impressions to change attitudes). It is possible that the proposed campaign, which is measured in impressions, could serve multiple impressions to one individual, even without an attitude change multiplier. In order to account for this potential overlap, I provide estimates as low as a multiplier of 1, which would undercover the number of impressions needed for attitude change. For informative purposes, the damages model that I include provides a range of attitude change multiples, from 1 to 5. However, owing to the need to include multiple exposures for everyone in the target audience,[190] I believe at least 3 impressions would be needed to change attitudes in this case.

Empirical data suggest that a multiplier of 1 is overly conservative, especially given the media habits of the audience who were likely receptive to the Statements. Using the Pew dataset referenced previously, I conducted an analysis of media habits of Trump supporters. The data show that Trump supporters[191] are more likely to use only one news source (37% vs. 27% for non-Trump supporters), and they are more likely to use cable news than non-Trump supporters (21% vs. 16%).[192] If the audience tends to consume one news source, it is unlikely that they will

---

[190]   Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).

[191]   Because the survey did not have a "receptive Republicans" measure and I could not infer it on an individual level, I used survey respondents who indicated support for Trump. According to my prior analysis, this percentage is roughly equivalent to receptive Republicans.

[192]   The most common way Trump supporters get their news is through a news website (23.1%), followed closely by cable television (21.3%). Although only 13% report commonly getting news from social media, 43.4%

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

receive multiple impressions from a campaign with a frequency multiplier of 1. A campaign that would actually change attitudes for this audience would need to show multiple impressions, particularly to those who only use one primary news source (the others would be likely to get multiple impressions if they use more than one news source).[193] Taking into account the potential overlap of impressions per person in this instance, the damages model therefore presents a conservative range from 1 impression—which I feel is an underestimate—to 5 impressions.

### B.  Costs of the Corrective Campaign

Figure 20 below shows the total costs of the corrective campaign. I include three costs: a low estimate, which incorporates an attitude change multiplier of 1; a medium estimate, which incorporates an attitude change multiplier of 3; and a high estimate, which incorporates an attitude change multiplier of 5. As detailed above, I believe a multiplier of at least 3 (the medium estimate) would constitute the minimum corrective campaign to run, given the importance of multiple exposures and the likelihood that the audience will receive them and be affected by them.[194] Appendix K includes the detailed results of the damages model.

---

report often or sometimes getting news from social media (17.9% reporting that they often get news from social media). The most common sources for political news by media can be found by analyzing the Pew Research 2019 dataset.  For each channel, I used the rates associated with the most common response, as listed in the Pew Survey (variables MAINSOPOL_USE_W57 and NEWS_MOST_W57). Respondents also provided an open-ended response about what media sources they use, which provided insight into the best channels for placement and guided rate selection.

[193]  Note that a campaign with a multiplier of 1 may result in some people seeing the same message more than once (say, for example on cable television), even if they only get their information from one news source. Nonetheless, a 1x multiplier mimics the number of initial impressions they received on a 1:1 basis, not a 3:1 basis, as I would suggest for counter-attitudinal messages.

[194]  Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 20. Final Damages Calculations**

|  | **Low** | **Medium** | **High** |
|---|---|---|---|
| **High Impressions** | $4,199,772.24 | $12,599,316.71 | $20,998,861.18 |
| **Low Impression** | $3,333,058.72 | $9,999,176.17 | $16,665,293.62 |

High & low impressions from the Impressions Model
Low = 1x attitude change multiplier, Medium = 3x, High = 5x
In the campaign, I assume an impression rate of 5%[195] and
a bounce rate of 90%.[196]

The damages model presents a conservative estimate of the cost to run a multi-media campaign to correct attitudes amongst the audience most likely to have been receptive to the Statements (see Appendix J for the reasons why the damages model is conservative). It does not account for the harm to Ms. Carroll's brand in the public at large, but only among this specific receptive audience. The campaign takes into account readership and viewership patterns in the target audience, the number of receptive impressions, and the current advertising costs across media. In this case, the Statements came from Mr. Trump, a high-profile individual with a loyal following whom the media covered, and continues to cover, extensively. Given his status, Mr. Trump's Statements received a very large number of impressions. Of the large audience where these statements appeared, at least 25% were receptive to them. The estimate to correct reputational damage is therefore of the same magnitude as the inflicted harm.

---

[195] The CPMs I rely on for Twitter, Facebook, and YouTube influencers are based on an influencer's number of followers or subscribers. For the reasons described above, not all a user's followers will see an influencer's post. As a result, to ensure the corrective campaign generates sufficient impressions, it is necessary to incorporate an impression rate. In this case, I am relying on an impression rate of 5% which is the median impression rate calculated using Equation 2a from the Impression Model.

[196] The CPM I rely on for web blog influencers is based on site visits. To account for people who visit a blogger's website but do not perform any other action, I multiplied the impressions needed by a bounce rate of 90%, a typically bounce rate for blogs. (https://influencermarketinghub.com/glossary/bounce-rate/).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## VII. CONCLUSION

I conclude that Mr. Trump's Statements about Ms. Carroll have significantly harmed her person brand. My conclusion is based on my academic research and expertise and my analysis of the facts of this case and of data I collected regarding the dissemination of, and receptivity to, Mr. Trump's Statements; it is also supported by abundant qualitative evidence. The models I developed demonstrate how Mr. Trump's Statements spread to a receptive audience across online and traditional media platforms and provide the basis for calculating the cost of an effort to repair the damage done to Ms. Carroll's person brand. My conclusions are as follows:

- **Impressions Model Conclusion:** Mr. Trump's Statements made on June 21, 22, and 24, 2019, received between 142,334,424 and 188,155,507 impressions across social, digital, television, and print media. The extraordinary dissemination of the Statements is in keeping with the high profile and ongoing media coverage of Mr. Trump. While extraordinary, this number of impressions is a conservative estimate for reasons I have previously delineated.

- **Impact Model Conclusion:** Of the impressions generated, an average of 25% of recipients were receptive to these Statements, resulting in between 34,075,512 and 42,936,354 impressions that should be corrected. Further, my qualitative assessment of the impact of the dissemination of Mr. Trump's Statements is that they caused short- and long-term harm to Ms. Carroll beyond the estimate of receptive impressions calculated in my Impact Model. Evidence from a number of sources indicates that there has been a shift in the perceptions associated with Ms. Carroll's person brand with the general public and specific perceptions amongst a group of people receptive to the claims.

- **Damages Model Conclusion:** The cost to counteract the impact of these Statements is between $3,333,058.72 and $20,998,861.18. I believe the minimum corrective campaign to repair reputational damage would be the middle range, from $9,999,176.17 to $12,599,316.71 for reasons outlined above. Because I took a conservative approach to calculating the Impressions input, this range represents a conservative estimate.

I reserve the right to revisit and supplement this analysis and amend these conclusions should additional informatin and/or documents become available, such as Mr. Trump's October 12 statement, reiterating many of the defamatory claims against Ms. Carroll, in response to a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

judge's denial of Mr. Trump's request to delay his deposition. I further reserve the right to respond to opinions and issues raised by any opposing experts. Finally, I reserve the right to use demonstrative and/or other exhibits to present the opinions expressed in this report and/or any supplemental, amended, and/or rebuttal reports.

Dated: October 14, 2022

Professor Ashlee Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX A.  <u>PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY</u>**

[Produced in Native Format]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX B.  <u>MATERIALS CONSIDERED</u>

**Bates Stamped Documents**

- CARROLL_024475-79
- CARROLL_024499
- CARROLL_024554
- CARROLL_024559
- CARROLL_024562
- CARROLL_024640-41
- CARROLL_024684
- CARROLL_024796
- CARROLL_024944
- CARROLL_024974
- CARROLL_025080
- CARROLL_026326
- CARROLL_026329
- CARROLL_026331
- CARROLL_026473
- CARROLL_026479
- CARROLL_026596
- CARROLL_028058-59
- CARROLL_028063-65
- CARROLL_028069
- CARROLL_028115
- CARROLL_028549
- CARROLL_028588
- CARROLL_028592
- CARROLL_029331
- CARROLL_029774-75
- CARROLL_030105-08
- CARROLL_030111-29
- CARROLL_030131-48
- CARROLL_030150-56

**Legal Filings and Depositions**

- Complaint, November 4, 2019.
- Deposition of Robbie Myers, October 12, 2012.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Academic Articles

- Ajzen, I. (1985), From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11–39).
- Albarracin, D., & Shavitt, S. (2018). Attitudes and attitude change. Annual Review of Psychology, 69, 299–327.
- Ardia, D. S. (2010). Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law. Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 264.
- Ardia, David S. (2010), "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 261.
- Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013), "The Context of Content: The Impact of Source and Setting on the Credibility of News," Recherches en Communication, 40, 151-68.
- Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," Journal of Advertising, 50 (5), 528-47,
- Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.
- Cacioppo, John T and Richard E Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," Current issues and research in advertising, 3 (1), 97-122.
- Cialdini R B, R E Petty, J T Cacioppo, (1981) Attitude and Attitude Change, Annual Review of Psychology.
- Conover, M. et al (2011), "Political Polarization on Twitter." In Proceedings of the International AAAI Conference on Web and Social Media, 5:1, 89-96.
- Curran, J. et al (2009), "Media System, Public Knowledge and Democracy: A Comparative Study," European Journal of Communication, 24 (1), 5-26.
- Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
- Dewenter, R., M. Linder, and T. Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," European Journal of Political Economy, 58, 245-61.
- Festinger, L. (1962), "Cognitive dissonance." Scientific American 207(4): 93-106.
- Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," Journal of Marketing Research, 17 (3), 307-15.
- Grabe, M. E., Zhou, S., & Barnett, B. (1999). Sourcing and Reporting in News Magazine Programs: 60 Minutes versus Hard Copy. Journalism & Mass Communication Quarterly, 76(2), 293–311.
- Heider, Fritz (1946), "Attitudes and Cognitive Organization," The Journal of psychology, 21 (1), 107-12.
- Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, Journal of Information Technology & Politics, 11:368–382.
- Huang, J., et al. (2021), "Large-scale quantitative evidence of media impact on public opinion toward China," Humanities and Social Sciences Communications, 8(1): 1-8.
- Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," Social networks, 25 (1), 17-49.
- Humphreys, A. and R. Jen-Hui Wang, (2018) Automated Text Analysis for Consumer Research, Journal of Consumer Research, Volume 44, Issue 6, Pages 1274–1306.
- Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," Annual review of sociology, 32, 53-78.
- Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.
- Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.
- Kruglanski, A. W., & Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). Psychological Review, 118(3), 522–522. https://doi.org/10.1037/a0023709
- Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.
- Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," Information Sciences, 306, 34-52.
- Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. First Monday, 24(9). https://doi.org/10.5210/fm.v24i9.10213
- Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," Journal of consumer research, 36 (6), 1016-32.
- Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," Journalism Studies, 9 (3), 447-63.
- Metzger, M. J., & Flanagin, A. J. (2013). Credibility and trust of information in online environments: The use of cognitive heuristics. Journal of Pragmatics, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87.
- Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. Journal of Research in Interactive Marketing, 11(2), 185–197.
- Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," Journal of Marketing Communications, 20 (1-2), 117-28.
- Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," Journal of Media Economics, 1 (1), 61-74.
- Prior, Markus (2013) "Media and political polarization." Annual Review of Political Science 16: 101-127.
- Shankar, V., & Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? International Journal of Research in Marketing.
- Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." Political Studies 55, no. 1: 20-37.
- Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," Public Administration Review, 336-45.
- Singh, N., A. Singh, R. Sharma (2020), Predicting Information Cascade on Twitter Using Random Walk, Procedia Computer Science, 173, 201-209.
- Sterrett, D. et al (2019), "Who Shared It?: Deciding What News to Trust on Social Media," Digital Journalism, 7 (6), 783-801.
- Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. Journal of Marketing, 70(3), 104–119, p. 104.
- Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," Science, 359 (6380), 1146-51.
- Wang, L., Ramachandran, A., & Chaintreau, A. (2016). Measuring Click and Share Dynamics on Social Media: A Reproducible and Validated Approach. Proceedings of the International AAAI Conference on Web and Social Media, 10(2), 108-113.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California Press.
- Weiss, Robert Frank (1969), "Repetition of Persuasion," Psychological Reports, 25 (2), 669-70.
- Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982‐1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.
- Zha, X. et al (2018). Exploring the effect of social media information quality, source credibility and reputation on informational fit-to-task: Moderating role of focused immersion. Computers in Human Behavior, 79, 227–237.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Books**

- Buzzard, Karen (2012), Tracking the Audience: The Ratings Industry from Analog to Digital.
- Chadwick, Andrew (2017), The Hybrid Media System: Politics and Power: Oxford University Press.
- Cialdini, Robert B (1987), Influence, Vol. 3: A. Michel Port Harcourt.
- David, John (2016), How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business: Red Wheel/Weiser.
- Dyer (1979) Heavenly Bodies: Film Stars and Society.
- Gamson (1994) Claims to Fame: Celebrity in Contemporary America.
- Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.
- Humphreys, A. (2015). Social Media: Enduring Principles, Oxford University Press.
- Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."
- Rosnow, Ralph L and Gary A Fine (1976), Rumor and Gossip: The Social Psychology of Hearsay: Elsevier.
- Tuchman, Gaye (1978), Making News: A Study in the Construction of Reality, New York: Free Press.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California press.

**Websites**

- http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf
- http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054
- https://about.proquest.com/en/products-services/nationalsnews_shtml
- https://archive.org/details/tv
- https://auditedmedia.com/about/who-we-are
- https://auditedmedia.com/Solutions/Print-Publisher-Audits
- https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/
- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
- https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
- https://hbr.org/2022/02/whats-the-point-of-a-personal-brand
- https://help.crowdtangle.com/en/articles/4201940-about-us

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
- https://help.twitter.com/en/using-twitter/types-of-tweets
- https://influencermarketinghub.com/what-is-personal-branding/
- https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/
- https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type
- https://markets.nielsen.com/us/en/solutions/measurement/television/
- https://markets.nielsen.com/us/en/solutions/measurement/television/ and
- https://martech.org/facebook-twitter-impressions/
- https://marxcommunications.com/what-does-impressions-mean-on-twitter/
- https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
- https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html.
- https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205
- https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
- https://sproutsocial.com/insights/social-media-algorithms/
- https://theraveagency.com/blog/finding-the-value-in-twitter-impressions
- https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf
- https://time.com/5907973/donald-trump-loses-2020-election/
- https://time.com/6212677/donald-trump-investigations-explained/
- https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll
- https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-01%202019-06-30&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv
- https://web.archive.org/web/20200520030235/http:/www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/
- https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM
- https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
- https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286
- https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286
- https://www.amazon.com/product-reviews/0060530286
- https://www.amazon.com/product-reviews/0525935681/
- https://www.britannica.com/biography/Donald-Trump
- https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
- https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html
- https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
- https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.elle.com/author/4913/e-jean/
- https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-show-in-cable-news-as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c
- https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp
- https://www.foxnews.com/politics/trump-responds-jean-carroll-defamation-lawsuit-after-judge-denies-delay
- https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf
- https://www.gazettenet.com/Carroll-26480259
- https://www.goodreads.com/author/show/30738.E_Jean_Carroll
- https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/
- https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6
- https://www.investopedia.com/terms/c/cpm.asp
- https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader
- https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault
- https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/
- https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22
- https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/
- https://www.necn.com/news/local/trump-e-jean-carroll/220418/
- https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html
- https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
- https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
- https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html
- https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html
- https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type
- https://www.pewresearch.org/about/
- https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/
- https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/
- https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/
- https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/
- https://www.pewresearch.org/our-methods/u-s-surveys/
- https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/
- https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.semrush.com/kb/26-traffic-analytics
- https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages
- https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html
- https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type
- https://www.tweetbinder.com/blog/twitter-impressions/
- https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/
- https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp
- https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html.
- https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f

**Social Media Posts**

- http://twitter.com/Angerisinnate/statuses/1572622451607244801
- http://twitter.com/firethornranch/statuses/1142194188852895746
- http://twitter.com/floccinaucini1/statuses/1142196689148813313
- http://twitter.com/pinochet_pilot/statuses/1566945839679180800
- http://twitter.com/RunnerMo24/statuses/1142182659071860737
- http://twitter.com/ScottLHarris1/statuses/1142493161886892032
- https://truthsocial.com/@realDonaldTrump/posts/109158586745522514
- https://truthsocial.com/@realDonaldTrump/posts/109158644496040450
- https://twitter.com/1/status/1142180829835255808
- https://twitter.com/1/status/1142184727492878336
- https://twitter.com/1/status/1142197820826501120
- https://twitter.com/1/status/1142226611380600832
- https://twitter.com/1/status/1143477200148189184
- https://twitter.com/1/status/1303700235210891265
- https://twitter.com/1/status/1303742205648142336

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://twitter.com/1/status/1304903451625713664
- https://twitter.com/1/status/1438311461110095873
- https://twitter.com/1/status/1572467301315940352
- https://twitter.com/1/status/1572592008316981250
- https://twitter.com/AP/status/1580371759240548353
- https://twitter.com/MCWAY2000/status/1422939994235228162
- https://twitter.com/Olivianuzzi/status/1142197820826501120
- https://twitter.com/TristanSnell/status/1580390962115006464
- https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLf MNXp7iaVe7cJ4e6n8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725 176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5 1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5 1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176
- https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPF JS9xmq4cbSBCFpSCfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764
- https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171
- https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795
- https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673
- https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673
- https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561

**TV Rating References**

- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
- https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
- https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/
- https://thecomicscomic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
- https://www.adweek.com/tvnewser/evening-news-ratings-q2-2019-and-week-of-june-24/407844/
- https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
- https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
- https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
- https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html
- https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/

## Damages Model References

- https://blog.hootsuite.com/twitter-statistics/
- https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf
- https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549
- https://www.webfx.com/social-media/pricing/influencer-marketing/
- https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost

## Print Publication Data References

- Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
- Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.

## ProQuest Articles:

- "America, listen to Ms. Carroll." The Washington Post. 26 June 2019: A.26.
- Abraham, Yvonne. "Silly liberals, don't be mad." Boston Globe. 27 June 2019: B.1.
- Baker, Peter; Vigdor, Neil. "Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type.'" New York Times. 25 June 2019: A.15.
- Bernard, Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Carpenter, Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.
- Colby Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex assault allegation against Trump draws muted political reaction." The Washington Post. 26 June 2019: A.6.
- Graham, Renée. "If this nation cared about sexual assault, Trump would not be president." Boston Globe. 26 June 2019: A.11.
- Henneberger, Melinda. "Don't ignore latest Trump rape allegation." USA TODAY. 25 June 2019: A.7.
- Hesse, Monica. "Reading between the lines in E. Jean Carroll's columns." The Washington Post. 26 June 2019: C.1.
- Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex allegation against Trump draws muted reaction" Chicago Tribune. 26 June 2019: 12.
- Pilkington, Ed. "Donald Trump accused of sexually assaulting writer E Jean Carroll." The Guardian. 21 June 2019: 39.
- Pilkington, Ed. "Why did the media downplay the latest sexual assault allegation against Trump?" The Guardian. 25 June 2019: 25.
- Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.
- Reinhard, Beth; Colby Itkowitz. "N.Y. writer says Trump assaulted her in the '90s." The Washington Post; Washington, D.C. [Washington, D.C] 22 June 2019: A.1.
- Rosenberg, Alyssa. "Trump will never be held accountable for his treatment of women." The Washington Post. 23 June 2019: A.23.
- Wagner, John. "Trump says latest accuser is 'lying.'" The Washington Post. 25 June 2019: A.3.
- Zaveri, Mihir. "Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist." New York Times. 23 June 2019: A.23.

**Databases**

- Brandwatch, https://www.brandwatch.com/
- Internet Archive TV News, https://archive.org/details/tv
- ProQuest, https://www.proquest.com/index
- Twitter API, https://developer.twitter.com/en/docs/twitter-api

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### APPENDIX C.  GLOSSARY OF TERMS

**Bounce Rate:** The percentage of users who leave a page without taking any action.

**Cost Per Click (CPC):** The cost an advertiser pays each time a user clicks on an advertisement.[197]

**Cost Per Mille (CPM):** The cost an advertiser pays per one thousand impressions generated by an advertisement on a web page.[198]

**Echo Chamber:** An environment where a person only encounters information or opinions that reflect and reinforce their own.[199]

**Engagement:**  Measures of audience involvement with or responsiveness to a particular message. Can include metrics such as likes, retweets, and comments/replies.

**Engagement Rate:**  The percentage of people who engage with a post. Engagement rate is calculated by dividing the number of impressions by the number of engagements.

**Filter Bubble:** An environment isolated by algorithms that prevent users from being exposed to information and perspectives they haven't already expressed an interest in.[200]

**Followers:** The total number of users who could potentially see another user's post.

**Impressions:** The total number of times a post or other piece of content has been displayed to users.[201]

**Impression Rate:** The percentage of a user's followers who are exposed to a post. Impression rates are unique to each account and are not publicly available. Nonetheless, academic researchers have developed a formula to estimate the impressions rate using follower counts.[202]

**Influencers:** People with specialized knowledge, authority, or insight into a specific niche or industry that can sway the opinions of a target audience.

**Information Cascade:** The way information is exchanged on social media networks. After a user posts content to social media, that user's followers observe that behavior and repeat the

---

[197]  https://www.investopedia.com/terms/c/cpm.asp
[198]  https://www.investopedia.com/terms/c/cpm.asp
[199]  https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
[200]  https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
[201]  https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
[202]  Wang et al., 2016

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

same process by reposting or sharing the original user's content. Through sharing and reposting, an unbroken chain of messages is formed with a common, singular origin, that keeps extending until individuals stop spreading or reposting it.[203]

**Media System:** A network of platforms, institutions, practices, and people understood as circulating information, who by interacting with one another, shape each other's opinions.[204]

**Network:** A system of users connected by exchanges of information.

**Network Structure:** The number of connections (*e.g.*, followers) one user has and the number of connections that user's connections have.

**Person Brand:** An actively curated image that projects how a person wants the public to view them. The brand image often consists of the person's unique combination of skills, experience, and personality.[205]

**Ranking Algorithm:** The algorithm each social media platform relies on to determine what content to display to each user.[206]

**Reach:** The total number of people who could potentially be exposed to a post or other piece of content.

**Retweet Rate:** The percentage of a user's followers who retweeted a post. The retweet rate is calculated by dividing the number of retweets by the number of followers.

**Social Capital:** The quality and quantity of social connections. Social capital can be measured by the number of connections a user has on a social media network. Users with high social capital are able to spread a message broadly and deeply on a network.

**Social Media Platform:** The websites and applications that focus on communication, community-based input, interaction, content-sharing, and collaboration. Some popular examples of social media platforms include Twitter, Facebook, Reddit, and YouTube.

**Source Credibility:** The extent to which the persons or entities generating information on social media are perceived to be trustworthy, knowledgeable, and believable.[207]

---

[203] Vosoughi et al., 2018; Singh et al., 2020
(https://www.sciencedirect.com/science/article/pii/S1877050920315283);
https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/

[204] https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205

[205] https://hbr.org/2022/02/whats-the-point-of-a-personal-brand; https://influencermarketinghub.com/what-is-personal-branding/

[206] https://sproutsocial.com/insights/social-media-algorithms/

[207] Zha et al., 2018

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Unique Visitors:** The total number of unique visits to a given page. Each visitor to the site is counted once during the reporting period.[208]

---

[208]   https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### APPENDIX D.  WEB IMPRESSIONS MODEL

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-1 | US writer says Trump sexually assaulted her in mid-1990s[212] | Agence France-Presse (AFP) | 6/21/2019 | aljazeera.com | 3,200,000 | 0.4052 | 43,221 |
| W-2 | E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir[213] | Alexandra Alter | 6/21/2019 | newyorktimes.com | 60,400,000 | 0.4767 | 959,756 |
| W-3 | Trump On E. Jean Carroll Rape Allegation: 'I've Never Met This Person In My Life'[214] | Jenna Amatulli | 6/21/2019 | huffpost.com | 24,200,000 | 0.5484 | 442,376 |
| W-4 | Trump Responds To Rape Accuser: 'People Should Pay Dearly For Such False Accusations'[215] | Amber Athey | 6/21/2019 | dailycaller.com | 4,600,000 | 0.4859 | 74,505 |
| W-5 | Trump Says He 'Never Met' Author Who Has Accused Him of Sexual Assault[216] | Brian Bennett | 6/21/2019 | time.com | 12,800,000 | 0.3216 | 137,216 |

[209]   The total number of unique visitors to a given page in June 2019. Data collected from Semrush.
[210]   The percentage of users who leave a page without taking any action
[211]   Impressions estimate calculated using the following formula: (Unique Monthly Visitors/30)*(1-bounce rate)
[212]   https://www.aljazeera.com/news/2019/6/21/us-writer-says-trump-sexually-assaulted-her-in-mid-1990s
[213]   https://www.nytimes.com/2019/06/21/books/e-jean-carroll-trump.html
[214]   https://www.huffpost.com/entry/trump-response-e-jean-carroll-rape-allegation_n_5d0d4a42e4b0a39418626c52
[215]   https://dailycaller.com/2019/06/21/trump-rape-accusation-false-e-jean-carroll/
[216]   https://time.com/5612502/trump-jean-carroll-sexual-assault-allegation/

Expert Report of Professor Humphreys                                          90

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page133 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page134 of 302

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-6 | Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation[217] | Ellie Bufkin | 6/21/2019 | washingtonexaminer.com | 15,400,000 | 0.2133 | 109,494 |
| W-7 | Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s — 'Never Happened,' Trump Responds[218] | Adam Carlson | 6/21/2019 | people.com | 27,400,000 | 0.3455 | 315,557 |
| W-8 | Trump dismisses new sexual assault allegation[219] | Matthew Choi | 6/21/2019 | politico.com | 14,100,000 | 0.4098 | 192,606 |
| W-9 | Writer says she was raped by Trump in 1990s[220] | Casey Darnell | 6/21/2019 | news.yahoo.com | 13,900,000 | 0.4611 | 213,643 |
| W-10 | Writer says she was raped by Trump in 1990s[221] | Casey Darnell | 6/21/2019 | sports.yahoo.com | 11,000,000 | 0.4943 | 181,243 |
| W-11 | E. Jean Carroll Alleges President Donald Trump Assaulted Her[222] | EJ Dickson | 6/21/2019 | rollingstone.com | 9,800,000 | 0.4129 | 134,881 |
| W-12 | Trump responds to E Jean Carroll's allegations[223] | - | 6/21/2019 | theguardian.com | 28,100,000 | 0.4327 | 405,296 |

---

[217] https://www.washingtonexaminer.com/tag/donald-trump?source=%2Fnews%2Ftrump-issues-blistering-denial-of-e-jean-carrolls-rape-allegation
[218] https://people.com/politics/donald-trump-raped-e-jean-carroll/
[219] https://www.politico.com/story/2019/06/21/trump-dismisses-new-sexual-assault-allegation-1376698
[220] https://news.yahoo.com/writer-says-she-was-raped-by-trump-in-1990-s-190337681.html
[221] https://sports.yahoo.com/writer-says-she-was-raped-by-trump-in-1990-s-190337681.html
[222] https://www.rollingstone.com/culture/culture-news/e-jean-carroll-president-donald-trump-sexual-assault-851261/
[223] https://www.theguardian.com/us-news/live/2019/jun/21/trump-iran-news-us-latest-tehran-strike-washington-2020?page=with:block-5d0d4b9e8f081e872734c692#block-5d0d4b9e8f081e872734c692

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-13 | Magazine columnist accuses Trump of sexual assault more than two decades ago, an allegation he denies[224] | Beth Reinhard and Colby Itkowitz | 6/21/2019 | washingtonpost.com | 42,300,000 | 0.5450 | 768,450 |
| W-14 | E. Jean Carroll: "Trump attacked me in the dressing room of Bergdorf Goodman."[225] | Sarah Jones | 6/21/2019 | nymag.com | 8,100,000 | 0.4640 | 125,280 |
| W-15 | E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women[226] | Hilary Lewis | 6/22/2019 | hollywoodreporter.com | 11,500,000 | 0.3343 | 128,148 |
| W-16 | Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault[227] | Caitlin Mac Neal | 6/21/2019 | talkingpointsmemo.com | 1,800,000 | 0.5923 | 35,538 |
| W-17 | Longtime advice columnist E. Jean Carroll accuses Trump of sexual assault in 1990s[228] | Alex Pappas | 6/21/2019 | foxnews.com | 71,500,000 | 0.4955 | 1,180,942 |

---

[224]  https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html

[225]  https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html

[226]  https://www.hollywoodreporter.com/lifestyle/lifestyle-news/writer-e-jean-carroll-no-disrespectful-rape-charges-trump-1220447/

[227]  https://talkingpointsmemo.com/news/e-jean-carroll-donald-trump-sexual-assault

[228]  https://www.foxnews.com/politics/longtime-advice-columnist-e-jean-carroll-accuses-trump-of-sexual-assault-in-1990s

Expert Report of Professor Humphreys                    92

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page136 of 302

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-18 | Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims[229] | Daniel Politi | 6/22/2019 | slate.com | 10,500,000 | 0.3781 | 132,335 |
| W-19 | Author E. Jean Carroll accuses President Trump of sexual assault in 1990s[230] | Christina Prignano | 6/21/2019 | bostonglobe.com | 3,700,000 | 0.5045 | 62,222 |
| W-20 | Trump claims he's never met the columnist who just accused him of sexual assault despite photo evidence of them together[231] | Eliza Relman | 6/21/2019 | insider.com | 5,000,000 | 0.3806 | 63,433 |
| W-21 | Trump denies knowing NY woman accusing him of sexual assault[232] | Darlene Superville | 6/22/2019 | apnews.com | 13,700,000 | 0.2070 | 94,530 |
| W-22 | Trump Denies New Sexual Assault Allegation By Advice Columnist E. Jean Carroll[233] | Jessica Taylor | 6/21/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |

[229]   https://slate.com/news-and-politics/2019/06/trump-slams-e-jean-carroll-accusation-sexual-assault-bergdorf-goodman.html
[230]   https://www.bostonglobe.com/news/politics/2019/06/21/author-jean-carroll-accuses-president-trump-sexual-assault/g3iN16JP6dqpiK5g0n9OJN/story.html
[231]   https://www.businessinsider.com/trump-says-e-jean-carroll-falsely-accused-him-sexual-assault-2019-6
[232]   https://apnews.com/article/politics-ap-top-news-new-york-donald-trump-sexual-assault-899e37de570940a3a88d2245609ee328
[233]   https://www.npr.org/2019/06/21/734918876/trump-denies-new-sexual-assault-allegation-by-advice-columnist-e-jean-carroll

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-23 | Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s[234] | Josh Wingrove and Bloomberg | 6/21/2019 | fortune.com | 4,900,000 | 0.3350 | 54,717 |
| W-24 | Trump dismisses E. Jean Carroll rape allegation as 'fiction'[235] | - | 6/22/2019 | bbc.com | 30,500,000 | 0.4985 | 506,808 |
| W-25 | Woman Accuses Trump of Sexual Assault at New York Store in 1990s[236] | Josh Wingrove | 6/21/2019 | bloomberg.com | 18,100,000 | 0.3615 | 218,105 |
| W-26 | Remarks by President Trump Before Marine One Departure[237] | - | 6/22/2019 | white house | 2,100,000 | 0.3076 | 21,532 |
| W-27 | Trump goes on manic tirade after being asked about new rape allegation: Women get 'paid money to say bad things about me'[238] | Matthew Chapman | 6/22/2019 | rawstory.com | 2,800,000 | 0.6100 | 56,933 |
| W-28 | Writer E. Jean Carroll made a claim of sexual assault against Trump. Here's what we know[239] | William Cummings | 6/25/2019 | usatoday.com | 43,100,000 | 0.3823 | 549,238 |

---

[234] https://fortune.com/2019/06/21/e-jean-carroll-trump-rape-new-yorker/
[235] https://www.bbc.com/news/world-us-canada-48727972
[236] https://www.bloomberg.com/news/articles/2019-06-21/e-jean-carroll-accuses-trump-of-sexual-assault#xj4y7vzkg
[237] https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-marine-one-departure-49/
[238] https://www.rawstory.com/2019/06/trump-goes-on-manic-tirade-after-being-asked-about-new-rape-allegation-women-get-paid-money-to-say-bad-things-about-me/
[239] https://www.usatoday.com/story/news/politics/onpolitics/2019/06/25/e-jean-carroll-what-we-know-sexual-assault-claim-against-trump/1546559001/

Expert Report of Professor Humphreys                    94

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page138 of 302

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-29 | George Conway Says Trump's Credibility is 'Annihilated' After President Denies Knowing Alleged Assault Victim[240] | Gillian Edevane | 6/22/2019 | newsweek.com | 13,100,000 | 0.3319 | 144,930 |
| W-30 | It Hurt. And It Was Against My Will': Trump Accuser Stands By Her Story[241] | Lulu Garcia-Navarro and Daniella Cheslow | 6/22/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |
| W-31 | Trump repeats contested claim he does not know latest sexual assault accuser[242] | Amanda Holpuch | 6/22/2019 | theguardian.com | 28,100,000 | 0.4327 | 405,296 |
| W-32 | Trump compares himself to Kavanaugh in latest sexual assault allegation[243] | Colby Itkowitz, Beth Reinhard and David Weigel | 6/22/2019 | washingtonpost.com | 42,300,000 | 0.5450 | 768,450 |
| W-33 | Trump denies knowing NY woman accusing him of sexual assault[244] | Darlene Superville | 6/22/2019 | abcnews.go.com | 16,800,000 | 0.4084 | 228,704 |

---

[240] https://www.newsweek.com/george-conway-says-trumps-credibility-annihilated-after-president-denies-knowing-alleged-1445387

[241] https://www.npr.org/2019/06/22/735080909/it-hurt-and-it-was-against-my-will-trump-accuser-stands-by-her-story

[242] https://www.theguardian.com/us-news/2019/jun/22/trump-sexual-assault-accuser-e-jean-carroll

[243] https://www.washingtonpost.com/politics/trump-compares-himself-to-kavanaugh-in-latest-sexual-assault-allegation/2019/06/22/81e2c1b4-9509-11e9-aadb-74e6b2b46f6a_story.html

[244] https://abcnews.go.com/Politics/wireStory/trump-faces-sexual-assault-allegation-issues-denial-63873470

Expert Report of Professor Humphreys

95

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-34 | Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll[245] | Mihir Zaveri | 6/22/2019 | newyorktimes.com | 60,400,000 | 0.4767 | 959,756 |
| W-35 | Trump on E. Jean Carroll's Assault Allegations: 'She's Not My Type'[246] | Julia Arciga | 6/25/2019 | thedailybeast.com | 24,500,000 | 0.3059 | 249,818 |
| W-36 | EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type'[247] | Jordan Fabian and Saagar Enjeti | 6/24/2019 | thehill.com | 17,500,000 | 0.3991 | 232,808 |
| W-37 | Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"[248] | The Associated Press | 6/25/2019 | hollywoodreporter.com | 11,500,000 | 0.3343 | 128,148 |
| W-38 | Trump says famed advice columnist who accused him of sexual assault is 'not my type'[249] | The Associated Press | 6/24/2019 | chicagotribune.com | 8,300,000 | 0.4070 | 112,603 |
| W-39 | Trump: Woman who accused him of sexual assault not his type[250] | The Associated Press | 6/24/2019 | denverpost.com | 3,200,000 | 0.4071 | 43,424 |

---

[245]   https://www.nytimes.com/2019/06/22/us/e-jean-carroll-donald-trump.html
[246]   https://www.thedailybeast.com/trump-on-e-jean-carrolls-assault-allegations-shes-not-my-type
[247]   https://thehill.com/homenews/administration/450116-trump-vehemently-denies-e-jean-carroll-allegation-shes-not-my-type/
[248]   https://www.hollywoodreporter.com/news/politics-news/trump-says-accuser-e-jean-carroll-not-my-type-1220818/
[249]   https://www.chicagotribune.com/nation-world/ct-nw-e-jean-carroll-donald-trump-sexual-assault-allegation-20190625-wqtl77cbtra7fd2fuq64xhs6b4-story.html
[250]   https://www.denverpost.com/2019/06/24/trump-addresses-sexual-assault-allegations/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-40 | Trump Says Columnist Who Accused Him Of Rape Is 'Not My Type'[251] | Amber Athey | 6/24/2019 | dailycaller.com | 4,600,000 | 0.4859 | 74,505 |
| W-41 | Trump, accused again of sexual misconduct, insults woman who said he assaulted her[252] | Peter Baker and Niel Vigdor | 6/25/2019 | bostonglobe.com | 3,700,000 | 0.5045 | 62,222 |
| W-42 | Trump On E. Jean Carroll Accusing Him Of Rape: 'She's Not My Type'[253] | Antonia Blumberg | 6/24/2019 | huffpost.com | 24,200,000 | 0.5484 | 442,376 |
| W-43 | Trump denies woman's sexual assault accusation: 'She's not my type'[254] | Reuters | 6/25/2019 | insider.com | 5,000,000 | 0.3806 | 63,433 |
| W-44 | Trump denies woman's sexual assault accusation: 'She's not my type'[255] | Reuters | 6/25/2019 | reuters.com | 11,900,000 | 0.3870 | 153,510 |
| W-45 | I believe the president': GOP stands by Trump on sexual assault allegation[256] | Burgess Everett Melanie Zanona | 6/25/2019 | politico.com | 14,100,000 | 0.4098 | 192,606 |

---

[251] https://dailycaller.com/2019/06/24/trump-e-jean-carroll-rape-not-my-type/
[252] https://www.bostonglobe.com/news/nation/2019/06/25/trump-accused-again-sexual-misconduct-insults-woman-who-said-assaulted-her/ebBy7ynB1nOE96gZPbwa4M/story.html
[253] https://www.huffpost.com/entry/trump-e-jean-carroll-rape-allegation-denial_n_5d1157dce4b0a39418678e0e
[254] https://www.insider.com/trump-denies-womans-sexual-assault-accusation-shes-not-my-type-2019-6
[255] https://www.reuters.com/article/usa-trump-women-idUSL2N23W0IF
[256] https://www.politico.com/story/2019/06/25/trump-accuse-gop-1382385

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page140 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-46 | Trump says he didn't rape author E. Jean Carroll: "She's not my type"[257] | Rebecca Falconer | 6/24/2019 | axios.com | 4,500,000 | 0.4717 | 70,755 |
| W-47 | The Real Meaning of Trump's 'She's Not My Type' Defense[258] | Megan Garber | 6/25/2019 | theatlantic.com | 15,600,000 | 0.2615 | 135,980 |
| W-48 | She's not my type': Trump again denies E. Jean Carroll's sexual misconduct allegation[259] | Rebecca Morin | 6/24/2019 | usatoday.com | 43,100,000 | 0.3823 | 549,238 |
| W-49 | A Look At President Trump's Pattern Of Responding To Accusations Of Sexual Misconduct[260] | Ari Shapiro and Anna North | 6/25/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |
| W-50 | Trump Responds to E. Jean Carroll Rape Allegation: 'She's Not My Type'[261] | Matt Stieb | 6/25/2019 | thecut.com | 5,200,000 | 0.4347 | 75,348 |
| W-51 | E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar[262] | Jia Tolentino | 6/25/2019 | newyorker.com | 6,900,000 | 0.4737 | 108,951 |

[257]   https://www.axios.com/2019/06/24/trump-says-he-didnt-rape-author-e-jean-carroll-shes-not-my-type
[258]   https://www.theatlantic.com/entertainment/archive/2019/06/trump-e-jean-carroll-rape-allegation-not-my-type-defense/592555/
[259]   https://www.usatoday.com/story/news/politics/2019/06/24/trump-e-jean-carroll-shes-not-my-type/1554116001/
[260]   https://www.npr.org/2019/06/25/735930764/a-look-at-president-trumps-pattern-of-responding-to-accusations-of-sexual-miscon
[261]   https://www.thecut.com/2019/06/trump-on-e-jean-carroll-rape-claim-shes-not-my-type.html
[262]   https://www.newyorker.com/news/our-columnists/e-jean-carrolls-accusation-against-donald-trump-and-the-raising-and-lowering-of-the-bar

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page141 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-52 | Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"[263] | Jay Willis | 6/25/2019 | gq.com | 4,300,000 | 0.5004 | 71,724 |
| W-53 | Trump says sexual assault accuser E Jean Carroll 'not my type'[264] | - | 6/25/2019 | bbc.com | 30,500,000 | 0.4985 | 506,808 |
| | | | | | | **TOTAL WEB IMPRESSIONS** | **13,922,234** |

---

[263]  https://www.gq.com/story/trump-not-my-type
[264]  https://www.bbc.com/news/world-us-canada-48754959

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page142 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX E.  SOCIAL MEDIA IMPRESSIONS MODEL**

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-1 | @LauraLitvan[272] | N/A | 17,586 | 597 | 10,946 | 28,532 | 302,891 | 60,190 |
| S-2 | @nytimes[273] | W-2 | 43,602,518 | 123 | 1,062 | 43,603,580 | 1,517,403 | 7,622,861 |
| S-3 | @dailycaller[274] | W-4 | 509,377 | 82 | 1,404 | 510,781 | 50,916 | 90,045 |
| S-4 | @dailycaller[275] | W-4 | 509,211 | 241 | 4,319 | 513,530 | 111,412 | 98,107 |
| S-5 | @dailycaller[276] | W-4 | 509,023 | 379 | 1,846 | 510,869 | 97,086 | 95,090 |
| S-6 | @time[277] | W-5 | 16,073,840 | 34 | 702 | 16,074,542 | 605,662 | 2,809,916 |
| S-7 | @people[278] | W-7 | 7,515,391 | 17 | 598 | 7,515,989 | 310,072 | 1,313,779 |

---

[265]  Twitter's unique identifier for the original tweet

[266]  Number of followers of original tweet

[267]  Total number of retweets (and quote tweets) to the original tweet

[268]  Estimated average number of followers of all retweets. Estimate is based on retweets accessible via the Twitter API.

[269]  (Average RT Followers * Retweets) + Primary Followers

[270]  Equation 2a: $10^{\wedge}(0.7396 \log(\text{Total Followers}*(1\text{-bot rate})) + 0.0473 \log(\text{Primary Followers}*(1\text{-bot rate})) + 0.1027 \log(\text{Retweets}))$. Where:
"Bot rate" is an estimate rate of bot activity on Twitter. I'm estimating a 12.6% bot rate.

[271]  Equation 2b: (primary followers * First Level Impression Rate * (1-bot rate of 12.6%)) + (Retweets * Second Level Impression Rate * (1-bot rate)).
Where:
"First Level Impression Rate" is an estimated impression rate for the original tweet. I'm estimating a 20% First Level Impression Rate.
"Second Level Impression Rate" an estimated impression rate for the retweets of the original tweet. I'm estimating a 1% Second Level Impression Rate.

[272]  https://twitter.com/LauraLitvan/status/1142179819075121154

[273]  https://twitter.com/nytimes/status/1142469834170601477

[274]  https://twitter.com/DailyCaller/status/1143013379558334464

[275]  https://twitter.com/DailyCaller/status/1142809657653813248

[276]  https://twitter.com/DailyCaller/status/1142420738865078272

[277]  https://twitter.com/TIME/status/1142190416256782337

[278]  https://twitter.com/people/status/1142189984574836736

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page143 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page144 of 302

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-8 | @politico[279] | W-8 | 3,838,011 | 621 | 8,539 | 3,846,550 | 501,872 | 717,229 |
| S-9 | @politico[280] | W-8 | 3,838,042 | 168 | 3,051 | 3,841,093 | 253,407 | 675,370 |
| S-10 | @politico[281] | W-8 | 3,838,042 | 66 | 1,727 | 3,839,769 | 214,427 | 671,886 |
| S-11 | @politico[282] | W-8 | 3,838,042 | 67 | 1,805 | 3,839,847 | 215,038 | 671,947 |
| S-12 | @RollingStone[283] | W-11 | 6,278,602 | 16 | 1,584 | 6,280,186 | 268,022 | 1,097,721 |
| S-13 | @washingtonpost[284] | W-13 | 13,798,619 | 229 | 4,023 | 13,802,642 | 684,581 | 2,420,050 |
| S-14 | @Slate[285] | W-18 | 1,778,594 | 24 | 1,661 | 1,780,255 | 104,961 | 311,247 |
| S-15 | @Slate[286] | W-18 | 1,778,506 | 15 | 10,499 | 1,789,005 | 104,756 | 312,259 |
| S-16 | @Slate[287] | W-18 | 1,778,538 | 12 | 3,580 | 1,782,118 | 97,870 | 311,264 |
| S-17 | @Slate[288] | W-18 | 1,778,659 | 13 | 5,059 | 1,783,718 | 99,595 | 311,484 |
| S-18 | @Slate[289] | W-18 | 1,778,670 | 10 | 2,492 | 1,781,162 | 95,355 | 311,129 |
| S-19 | @Slate[290] | W-18 | 1,778,685 | 9 | 7,318 | 1,786,003 | 95,909 | 311,490 |
| S-20 | @Slate[291] | W-18 | 1,778,560 | 8 | 1,622 | 1,780,182 | 92,734 | 311,006 |
| S-21 | @Slate[292] | W-18 | 1,778,681 | 9 | 464 | 1,779,145 | 93,526 | 310,950 |

[279] https://twitter.com/politico/status/1142187206834081792
[280] https://twitter.com/politico/status/1142205734639362048
[281] https://twitter.com/politico/status/1142205735553634305
[282] https://twitter.com/politico/status/1142205736405131264
[283] https://twitter.com/RollingStone/status/1142189715392798720
[284] https://twitter.com/washingtonpost/status/1142240399312019458
[285] https://twitter.com/Slate/status/1142815602077327361
[286] https://twitter.com/Slate/status/1142492014820438016
[287] https://twitter.com/Slate/status/1142617601220259840
[288] https://twitter.com/Slate/status/1142884945943289856
[289] https://twitter.com/Slate/status/1143436727371124737
[290] https://twitter.com/Slate/status/1143296495204126723
[291] https://twitter.com/Slate/status/1142690168002027520
[292] https://twitter.com/Slate/status/1143355260850905089

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-22 | @Slate[293] | W-18 | 1,778,697 | 5 | 692 | 1,779,389 | 88,022 | 310,946 |
| S-23 | @Slate[294] | W-18 | 1,778,705 | 3 | 2,678 | 1,781,383 | 83,682 | 310,988 |
| S-24 | @Slate[295] | W-18 | 1,778,696 | 5 | 1,481 | 1,780,177 | 88,166 | 310,981 |
| S-25 | @Slate[296] | W-18 | 1,778,673 | 7 | 547 | 1,779,220 | 91,129 | 310,945 |
| S-26 | @Slate[297] | W-18 | 1,778,701 | 3 | 1,903 | 1,780,604 | 83,601 | 310,967 |
| S-27 | @NPR[298] | W-22 | 7,770,046 | 94 | 956 | 7,771,002 | 382,281 | 1,358,989 |
| S-28 | @FortuneMagazine[299] | W-23 | 2,262,542 | 1 | 0 | 2,262,542 | 90,034 | 395,492 |
| S-29 | @BBCNews[300] | W-24 | 10,029,760 | 31 | 767 | 10,030,527 | 414,204 | 1,753,410 |
| S-30 | @BBCWorld[301] | W-24 | 25,250,057 | 66 | 3,758 | 25,253,815 | 930,727 | 4,415,878 |
| S-31 | @BBCWorld[302] | W-24 | 25,251,777 | 118 | 109,206 | 25,360,983 | 1,330,634 | 4,526,637 |
| S-32 | @RawStory[303] | W-27 | 198,447 | 39 | 7,764 | 206,211 | 38,345 | 37,335 |
| S-33 | @newsweek[304] | W-29 | 3,333,156 | 48 | 1,025 | 3,334,181 | 183,730 | 583,066 |
| S-34 | @NPR[305] | W-30 | 7,770,824 | 95 | 1,060 | 7,771,884 | 383,118 | 1,359,220 |

---

[293]   https://twitter.com/Slate/status/1143242046377025538
[294]   https://twitter.com/Slate/status/1143103358351360001
[295]   https://twitter.com/Slate/status/1143077862464983040
[296]   https://twitter.com/Slate/status/1142966568806227968
[297]   https://twitter.com/Slate/status/1143195574482677761
[298]   https://twitter.com/NPR/status/1142260932703334400
[299]   https://twitter.com/FortuneMagazine/status/1142556629906415616
[300]   https://twitter.com/BBCNews/status/1142225240942141440
[301]   https://twitter.com/BBCWorld/status/1142220276538720256
[302]   https://twitter.com/BBCWorld/status/1142380908311453696
[303]   https://twitter.com/RawStory/status/1142478448746749952
[304]   https://twitter.com/Newsweek/status/1142781858796703746
[305]   https://twitter.com/NPR/status/1142824913822244864

Expert Report of Professor Humphreys                     102

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page146 of 302

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-35 | @guardiannews[306] | W-31 | 2,875,794 | 10 | 2,203 | 2,877,997 | 138,523 | 502,881 |
| S-36 | @washingtonpost[307] | W-32 | 13,801,157 | 450 | 2,709 | 13,803,866 | 744,815 | 2,423,097 |
| S-37 | @washingtonpost[308] | W-32 | 13,802,210 | 426 | 7,599 | 13,809,809 | 813,052 | 2,440,919 |
| S-38 | @nytimes[309] | W-34 | 43,606,559 | 102 | 3,864 | 43,610,423 | 1,495,243 | 7,625,871 |
| S-39 | @thedailybeast[310] | W-35 | 1,220,166 | 42 | 5,081 | 1,225,247 | 91,591 | 215,150 |
| S-40 | @thehill[311] | W-36 | 3,294,185 | 125 | 1,681 | 3,295,866 | 207,974 | 577,660 |
| S-41 | @thehill[312] | W-36 | 3,294,122 | 68 | 26,072 | 3,320,194 | 256,624 | 591,307 |
| S-42 | @thehill[313] | W-36 | 3,294,403 | 31 | 1,554 | 3,295,957 | 174,036 | 576,283 |
| S-43 | @thehill[314] | W-36 | 3,294,049 | 9 | 3,448 | 3,297,497 | 152,682 | 576,071 |
| S-44 | @dailycaller[315] | W-40 | 509,572 | 151 | 1,738 | 511,310 | 63,413 | 91,367 |
| S-45 | @dailycaller[316] | W-40 | 509,664 | 17 | 867 | 510,531 | 38,068 | 89,218 |
| S-46 | @huffpost[317] | W-42 | 11,437,397 | 266 | 4,559 | 11,441,956 | 615,996 | 2,009,856 |
| S-47 | @politico[318] | W-45 | 3,840,348 | 61 | 14,392 | 3,854,740 | 242,492 | 678,966 |
| S-48 | @axios[319] | W-46 | 277,660 | 46 | 1,481 | 279,141 | 30,111 | 49,130 |

[306] https://twitter.com/guardiannews/status/1142535020504113167
[307] https://twitter.com/washingtonpost/status/1142492789336346624
[308] https://twitter.com/washingtonpost/status/1142615547688955917
[309] https://twitter.com/nytimes/status/1142794459052224512
[310] https://twitter.com/thedailybeast/status/1143302340235202561
[311] https://twitter.com/thehill/status/1143499091789471747
[312] https://twitter.com/thehill/status/1143477200148189184
[313] https://twitter.com/thehill/status/1143535330164953089
[314] https://twitter.com/thehill/status/1143445235445436416
[315] https://twitter.com/DailyCaller/status/1143314226095755265
[316] https://twitter.com/DailyCaller/status/1143492790329970688
[317] https://twitter.com/HuffPost/status/1143300651532898304
[318] https://twitter.com/politico/status/1143648348945178624
[319] https://twitter.com/axios/status/1143292968771604480

Expert Report of Professor Humphreys                    103

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-49 | @usatoday[320] | W-48 | 3,812,700 | 18 | 1,852 | 3,814,552 | 183,849 | 666,751 |
| S-50 | @thecut[321] | W-50 | 1,411,305 | 5 | 12,513 | 1,423,818 | 75,654 | 247,243 |
| S-51 | @GQMagazine[322] | W-52 | 1,302,850 | 5 | 160 | 1,303,010 | 68,828 | 227,745 |
| S-52 | @GQMagazine[323] | W-52 | 1,302,856 | 3 | 3,926 | 1,306,782 | 65,717 | 227,842 |
| S-53 | @GQMagazine[324] | W-52 | 1,302,845 | 4 | 771 | 1,303,616 | 67,356 | 227,764 |
| S-54 | @BBCNews[325] | W-53 | 10,033,926 | 104 | 844 | 10,034,770 | 471,389 | 1,754,697 |
| S-55 | @BBCWorld[326] | W-53 | 25,264,091 | 362 | 1,322 | 25,265,413 | 1,116,377 | 4,420,345 |
| **TOTAL SOCIAL MEDIA IMPRESSIONS (LOW/HIGH)** | | | | | | | **17,218,959** | **63,040,041** |

---

[320]   https://twitter.com/USATODAY/status/1143375768682160128
[321]   https://twitter.com/TheCut/status/1143501166678106112
[322]   https://twitter.com/GQMagazine/status/1143610084611768320
[323]   https://twitter.com/GQMagazine/status/1143645060262694919
[324]   https://twitter.com/GQMagazine/status/1143952085978947586
[325]   https://twitter.com/BBCNews/status/1143451392058830848
[326]   https://twitter.com/bbcworld/status/1143414344287510528

Expert Report of Professor Humphreys                                            104

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### APPENDIX F. TV IMPRESSIONS MODEL

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-1 | Anderson Cooper 360[328] | 6/21/2019 | 5:00pm-6:00pm PDT | CNN (San Francisco) | 877,000[329] |
| T-2 | Anderson Cooper 360[330] | 6/21/2019 | 8:00pm-9:00pm PDT | CNN (San Francisco) | N/A |
| T-3 | Cuomo Prime Time[331] | 6/21/2019 | 9:00pm-10:00pm PDT | CNN (San Francisco) | 936,000[332] |
| T-4 | CBS Evening News[333] | 6/21/2019 | 6:30pm-7:00pm PDT | KPIX (CBS) | 5,863,000[334] |
| T-5 | The Ten O'Clock News on KTVU Fox 2[335] | 6/21/2019 | 10:00pm-10:59pm PDT | KTVU (FOX) | 1,401,000[336] |
| T-6 | The Last Word With Lawrence O'Donnell[337] | 6/21/2019 | 10:00pm-11:00pm PDT | MSNBC West | 2,010,000[338] |

[327] I only count ratings for a particular program once in a day. I use "N/A" to denote broadcasts that I am not counting.
[328] https://archive.org/details/CNNW_20190622_000000_Anderson_Cooper_360/
[329] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
[330] https://archive.org/details/CNNW_20190622_030000_Anderson_Cooper_360/
[331] https://archive.org/details/CNNW_20190622_040000_Cuomo_Prime_Time
[332] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[333] https://archive.org/details/KPIX_20190622_013000_CBS_Evening_News
[334] https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
[335] https://archive.org/details/KTVU_20190622_050000_The_Ten_OClock_News_on_KTVU_Fox_2
[336] https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
[337] https://archive.org/details/MSNBCW_20190622_050000_The_Last_Word_With_Lawrence_ODonnell
[338] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page148 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-7 | All In With Chris Hayes[339] | 6/21/2019 | 5:00pm-6:00pm PDT | MSNBC West | 1,552,000[340] |
| T-8 | The Rachel Maddow Show[341] | 6/21/2019 | 9:00pm-10:01pm PDT | MSNBC West | 2,561,000[342] |
| T-9 | CNN Newsroom Live[343] | 6/22/2019 | 1:00am-2:00am PDT | CNN (San Francisco) | 628,000[344] |
| T-10 | CNN Newsroom Live[345] | 6/22/2019 | 12:00am-1:00am PDT | CNN (San Francisco) | N/A |
| T-11 | CNN Newsroom With Ana Cabrera[346] | 6/22/2019 | 12:00pm-1:00pm PDT | CNN (San Francisco) | N/A |
| T-12 | New Day Weekend With Victor Blackwell and Christi Paul[347] | 6/22/2019 | 3:00am-4:00am PDT | CNN (San Francisco) | 534,000[348] |
| T-13 | New Day Weekend With Victor Blackwell and Christi Paul[349] | 6/22/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | N/A |
| T-14 | New Day Weekend With Victor Blackwell and Christi Paul[350] | 6/22/2019 | 5:00am-6:00am PDT | CNN (San Francisco) | N/A |

---

[339] https://archive.org/details/MSNBCW_20190622_000000_All_In_With_Chris_Hayes
[340] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[341] https://archive.org/details/MSNBCW_20190622_040000_The_Rachel_Maddow_Show
[342] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[343] https://archive.org/details/CNNW_20190622_080000_CNN_Newsroom_Live
[344] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
[345] https://archive.org/details/CNNW_20190622_070000_CNN_Newsroom_Live
[346] https://archive.org/details/CNNW_20190622_190000_CNN_Newsroom_With_Ana_Cabrera
[347] https://archive.org/details/CNNW_20190622_100000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul
[348] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[349] https://archive.org/details/CNNW_20190622_110000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul
[350] https://archive.org/details/CNNW_20190622_120000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|------|-------|------|------|---------|-----------------------|
| T-15 | CNN Newsroom With Victor Blackwell and Christi Paul[351] | 6/22/2019 | 7:00am-8:00am PDT | CNN (San Francisco) | N/A |
| T-16 | CNN Newsroom With Fredricka Whitfield[352] | 6/22/2019 | 8:00am-9:00am PDT | CNN (San Francisco) | N/A |
| T-17 | Cavuto Live[353] | 6/22/2019 | 7:00am-9:00am PDT | Fox News West | 1,401,000[354] |
| T-18 | America's News HQ[355] | 6/22/2019 | 9:00am-11:00am PDT | Fox News West | 1,401,000[356] |
| T-19 | NBC Nightly News With Lester Holt[357] | 6/22/2019 | 5:30pm-5:59pm PDT | KNTV (NBC) | 6,769,000[358] |
| T-20 | CBS This Morning[359] | 6/22/2019 | 4:00am-5:59am PDT | KPIX (CBS) | 2,700,000[360] |
| T-21 | The Ten O'Clock News on KTVU Fox 2[361] | 6/22/2019 | 10:00pm-10:44pm PDT | KTVU (FOX) | 1,401,000[362] |

---

[351] https://archive.org/details/CNNW_20190622_140000_CNN_Newsroom_With_Victor_Blackwell_and_Christi_Paul
[352] https://archive.org/details/CNNW_20190622_150000_CNN_Newsroom_With_Fredricka_Whitfield
[353] https://archive.org/details/FOXNEWSW_20190622_140000_Cavuto_Live
[354] https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
[355] https://archive.org/details/FOXNEWSW_20190622_160000_Americas_News_HQ
[356] https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
[357] https://archive.org/details/KNTV_20190623_003000_NBC_Nightly_News_With_Lester_Holt
[358] https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/
[359] https://archive.org/details/KPIX_20190622_110000_CBS_This_Morning
[360] https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
[361] https://archive.org/details/KTVU_20190623_050000_The_Ten_OClock_News_on_KTVU_Fox_2
[362] https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history

Expert Report of Professor Humphreys                    107

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|------|-------|------|------|---------|------------------------|
| T-22 | KTVU Mornings on 2 at 7am[363] | 6/22/2019 | 7:00am-10:00am PDT | KTVU (FOX) | 1,401,000[364] |
| T-23 | Up With David Gura[365] | 6/22/2019 | 5:00am-7:00am PDT | MSNBC West | 900,000[366] |
| T-24 | The Rachel Maddow Show[367] | 6/22/2019 | 6:00pm-7:00pm PDT | MSNBC West | 2,561,000[368] |
| T-25 | Weekends With Alex Witt[369] | 6/22/2019 | 9:00am-11:00am PDT | MSNBC West | 900,000[370] |
| T-26 | Cuomo Prime Time[371] | 6/24/2019 | 10:00pm-11:00pm PDT | CNN (San Francisco) | 936,000[372] |
| T-27 | CNN Tonight With Don Lemon[373] | 6/24/2019 | 11:00pm-12:00am PDT | CNN (San Francisco) | 833,000[374] |

---

[363] https://archive.org/details/KTVU_20190622_140000_KTVU_Mornings_on_2_at_7am
[364] https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
[365] https://archive.org/details/MSNBCW_20190622_120000_Up_With_David_Gura
[366] https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
[367] https://archive.org/details/MSNBCW_20190623_010000_The_Rachel_Maddow_Show
[368] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[369] https://archive.org/details/MSNBCW_20190622_160000_Weekends_With_Alex_Witt
[370] https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
[371] https://archive.org/details/CNNW_20190625_050000_Cuomo_Prime_Time
[372] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[373] https://archive.org/details/CNNW_20190625_060000_CNN_Tonight_With_Don_Lemon
[374] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Expert Report of Professor Humphreys                                                 108

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|------|-------|------|------|---------|------------------|
| T-28 | CNN Newsroom With Brooke Baldwin[375] | 6/24/2019 | 12:00pm-1:00pm PDT | CNN (San Francisco) | 534,000[376] |
| T-29 | Situation Room With Wolf Blitzer[377] | 6/24/2019 | 3:00pm-4:00pm PDT | CNN (San Francisco) | 168,000[378] |
| T-30 | New Day With Alisyn Camerota and John Berman[379] | 6/24/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | 460,000[380] |
| T-31 | New Day With Alisyn Camerota and John Berman[381] | 6/24/2019 | 5:00am-6:00am PDT | CNN (San Francisco) | N/A |
| T-32 | Anderson Cooper 360[382] | 6/24/2019 | 5:00pm-6:00pm PDT | CNN (San Francisco) | 877,000[383] |
| T-33 | Cuomo Prime Time[384] | 6/24/2019 | 6:00pm-7:00pm PDT | CNN (San Francisco) | N/A |
| T-34 | CNN Tonight With Don Lemon[385] | 6/24/2019 | 7:00pm-8:00pm PDT | CNN (San Francisco) | N/A |

[375] https://archive.org/details/CNNW_20190624_190000_CNN_Newsroom_With_Brooke_Baldwin
[376] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[377] https://archive.org/details/CNNW_20190624_220000_Situation_Room_With_Wolf_Blitzer
[378] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[379] https://archive.org/details/CNNW_20190624_110000_New_Day_With_Alisyn_Camerota_and_John_Berman
[380] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[381] https://archive.org/details/CNNW_20190624_120000_New_Day_With_Alisyn_Camerota_and_John_Berman
[382] https://archive.org/details/CNNW_20190625_000000_Anderson_Cooper_360
[383] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
[384] https://archive.org/details/CNNW_20190625_010000_Cuomo_Prime_Time
[385] https://archive.org/details/CNNW_20190625_020000_CNN_Tonight_With_Don_Lemon

Expert Report of Professor Humphreys                                109

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|------|-------|------|------|---------|-----------------------|
| T-35 | Anderson Cooper 360[386] | 6/24/2019 | 9:00pm-10:00pm PDT | CNN (San Francisco) | N/A |
| T-36 | The Last Word With Lawrence O'Donnell[387] | 6/24/2019 | 10:00pm-11:00pm PDT | MSNBC West | 2,010,000[388] |
| T-37 | First Look[389] | 6/24/2019 | 2:00am-3:00am PDT | MSNBC West | 385,000[390] |
| T-38 | Morning Joe[391] | 6/24/2019 | 3:00am-6:00am PDT | MSNBC West | 1,033,000[392] |
| T-39 | Andrea Mitchell Reports[393] | 6/24/2019 | 9:00am-10:00am PDT | MSNBC West | 839,000[394] |
| T-40 | CNN Tonight With Don Lemon[395] | 6/25/2019 | 12:00am-1:00am PDT | CNN (San Francisco) | 833,000[396] |
| T-41 | Early Start With Christine Romans and Dave Briggs[397] | 6/25/2019 | 2:00am-3:00am PDT | CNN (San Francisco) | 534,000[398] |

[386] https://archive.org/details/CNNW_20190625_040000_Anderson_Cooper_360
[387] https://archive.org/details/MSNBCW_20190625_050000_The_Last_Word_With_Lawrence_ODonnell
[388] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[389] https://archive.org/details/MSNBCW_20190624_090000_First_Look
[390] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[391] https://archive.org/details/MSNBCW_20190624_100000_Morning_Joe
[392] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[393] https://archive.org/details/MSNBCW_20190624_160000_Andrea_Mitchell_Reports
[394] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[395] https://archive.org/details/CNNW_20190625_070000_CNN_Tonight_With_Don_Lemon
[396] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[397] https://archive.org/details/CNNW_20190625_090000_Early_Start_with_Christine_Romans_and_Dave_Briggs
[398] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Expert Report of Professor Humphreys                                                110

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page153 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-42 | New Day With Alisyn Camerota and John Berman[399] | 6/25/2019 | 3:00am-4:00am PDT | CNN (San Francisco) | N/A |
| T-43 | New Day With Alisyn Camerota and John Berman[400] | 6/25/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | 460,000[401] |
| T-44 | CNN Newsroom with Poppy Harlow and Jim Sciutto[402] | 6/25/2019 | 7:00am-8:00am PDT | CNN (San Francisco) | 534,000[403] |
| T-45 | World News Now[404] | 6/25/2019 | 2:42am-4:00am PDT | KGO (ABC) | 3,929,000[405] |
| T-46 | ABC World News Tonight With David Muir[406] | 6/25/2019 | 5:30pm-6:00pm PDT | KGO (ABC) | 9,390,000[407] |
| T-47 | Good Morning America[408] | 6/25/2019 | 7:00am-9:00am PDT | KGO (ABC) | 3,920,000[409] |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page154 of 302

---

[399] https://archive.org/details/CNNW_20190625_100000_New_Day_With_Alisyn_Camerota_and_John_Berman
[400] https://archive.org/details/CNNW_20190625_110000_New_Day_With_Alisyn_Camerota_and_John_Berman
[401] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[402] https://archive.org/details/CNNW_20190625_140000_CNN_Newsroom_with_Poppy_Harlow_and_Jim_Sciutto
[403] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[404] https://archive.org/details/KGO_20190625_094200_World_News_Now
[405] https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
[406] https://archive.org/details/KGO_20190626_003000_ABC_World_News_Tonight_With_David_Muir
[407] https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
[408] https://archive.org/details/KGO_20190625_140000_Good_Morning_America
[409] https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|------|-------|------|------|---------|------------------------|
| T-48 | The Late Show With Stephen Colbert[410] | 6/25/2019 | 11:35pm-12:37am PDT | KPIX (CBS) | 3,800,000[411] |
| T-49 | KPIX 5 News at 6:00PM[412] | 6/25/2019 | 6:00pm-6:30pm PDT | KPIX (CBS) | 5,468,000[413] |
| T-50 | CBS Evening News[414] | 6/25/2019 | 6:30pm-7:00pm PDT | KPIX (CBS) | 5,863,000[415] |
| T-51 | CBS This Morning[416] | 6/25/2019 | 7:00am-9:00am PDT | KPIX (CBS) | 2,700,000[417] |
| T-52 | Deadline: White House[418] | 6/25/2019 | 1:00pm-2:00pm PDT | MSNBC West | 1,378,000[419] |
| T-53 | First Look[420] | 6/25/2019 | 2:00am-3:00am PDT | MSNBC West | 385,000[421] |
| T-54 | Morning Joe[422] | 6/25/2019 | 3:00am-6:00am PDT | MSNBC West | 1,033,000[423] |

---

[410]  https://archive.org/details/KPIX_20190626_063500_The_Late_Show_With_Stephen_Colbert
[411]  https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html?login=email&auth=login-email&login=email&auth=login-email#:~:text=The%20latest%20season-to-date,viewers%20in%20that%20same%20period.
[412]  https://archive.org/details/KPIX_20190626_010000_KPIX_5_News_at_600PM
[413]  https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
[414]  https://archive.org/details/KPIX_20190626_013000_CBS_Evening_News
[415]  https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
[416]  https://archive.org/details/KPIX_20190625_140000_CBS_This_Morning
[417]  https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
[418]  https://archive.org/details/MSNBCW_20190625_200000_Deadline_White_House
[419]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[420]  https://archive.org/details/MSNBCW_20190625_090000_First_Look
[421]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[422]  https://archive.org/details/MSNBCW_20190625_100000_Morning_Joe
[423]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page155 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-55 | MSNBC Live With Stephanie Ruhle[424] | 6/25/2019 | 6:00am-7:00am PDT | MSNBC West | 984,000[425] |
| T-56 | MSNBC Live With Hallie Jackson[426] | 6/25/2019 | 7:00am-8:00am PDT | MSNBC West | 887,000[427] |
| T-57 | MSNBC Live With Craig Melvin[428] | 6/25/2019 | 8:00am-9:00am PDT | MSNBC West | 800,000[429] |
| T-58 | Andrea Mitchell Reports[430] | 6/25/2019 | 9:00am-10:00am PDT | MSNBC West | 839,000[431] |
| T-59 | Late Night With Seth Meyers[432] | 6/26/2019 | 12:37am-1:37am PDT | KNTV (NBC) | 1,293,000[433] |
| T-60 | CBS Overnight News[434] | 6/26/2019 | 3:12am-4:00am PDT | KPIX (CBS) | 2,986,000[435] |
| T-61 | At This Hour With Kate Bolduan[436] | 6/27/2019 | 8:00am-9:00am PDT | CNN (San Francisco) | 534,000[437] |

---

[424]  https://archive.org/details/MSNBCW_20190625_130000_MSNBC_Live_With_Stephanie_Ruhle
[425]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[426]  https://archive.org/details/MSNBC_20190625_140000_MSNBC_Live_With_Hallie_Jackson
[427]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[428]  https://archive.org/details/MSNBC_20190625_150000_MSNBC_Live_With_Craig_Melvin
[429]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[430]  https://archive.org/details/MSNBCW_20190625_160000_Andrea_Mitchell_Reports
[431]  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[432]  https://archive.org/details/KNTV_20190626_073700_Late_Night_With_Seth_Meyers
[433]  https://thecomicscomic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
[434]  https://archive.org/details/KPIX_20190626_101200_CBS_Overnight_News
[435]  https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
[436]  https://archive.org/details/CNNW_20190627_150000_At_This_Hour_With_Kate_Bolduan
[437]  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page156 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-62 | ABC World News Tonight With David Muir[438] | 6/27/2019 | 3:30pm-4:00pm PDT | KGO (ABC) | 9,390,000[439] |
| T-63 | NBC Nightly News With Lester Holt[440] | 6/27/2019 | 7:00pm-7:30pm EDT | WRC (NBC) | 6,769,000[441] |
| | **TOTAL TV IMPRESSIONS ESTIMATE** | | | | **108,580,000** |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page157 of 302

---

[438]   https://archive.org/details/KGO_20190627_223000_ABC_World_News_Tonight_With_David_Muir
[439]   https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
[440]   https://archive.org/details/WRC_20190627_230000_NBC_Nightly_News_With_Lester_Holt
[441]   https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX G.  PRINT IMPRESSIONS MODEL

| No. | Article Title | Publication | Date | Circulation[442] |
|---|---|---|---|---|
| P-1 | Donald Trump accused of sexually assaulting writer E Jean Carroll | The Guardian | 6/21/2019 | N/A |
| P-2 | N.Y. writer says Trump assaulted her in the '90s | Washington Post | 6/22/2019 | 229,475[443] |
| P-3 | Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist | New York Times | 6/23/2019 | 454,861[444] |
| P-4 | Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type' | New York Times | 6/25/2019 | 454,861[445] |
| P-5 | Trump says latest accuser is 'lying' | Washington Post | 6/25/2019 | 229,475[446] |
| P-6 | If this nation cared about sexual assault, Trump would not be president | Boston Globe | 6/25/2019 | 92,515[447] |
| P-7 | Don't ignore latest Trump rape allegation | USA Today | 6/25/2019 | 544,002[448] |
| P-8 | Why did the media downplay the latest sexual assault allegation against Trump? | The Guardian | 6/25/2019 | N/A |
| P-9 | Latest sex assault allegation against Trump draws muted political reaction | Washington Post | 6/26/2019 | 229,475[449] |
| P-10 | America, listen to Ms. Carroll | Washington Post | 6/26/2019 | 229,475[450] |
| P-11 | Latest sex allegation against Trump draws muted reaction | Chicago Tribune | 6/26/2019 | 149,093[451] |
| | | | **TOTAL PRINT IMPRESSIONS** | **2,613,232** |

[442]   I use "N/A" for publications for which I do not have circulation data.
[443]   Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
[444]   Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
[445]   Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
[446]   Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
[447]   Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
[448]   Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
[449]   Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
[450]   Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
[451]   Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page158 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX H.  <u>EXAMPLES OF NEGATIVE COMMENTS AND POSTS ABOUT</u>**

<u>**MS. CARROLL**</u>

[Produced in Native Format]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX I. <u>EXAMPLES OF DIRECT MESSAGES AND EMAILS TO MS.**

**CARROLL</u>**

[Produced in Native Format]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX J.  IMPACT MODEL

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-1 | | | 25.45% | 43,221 | 43,221 | 10,999 | 10,999 |
| Web | W-2 | 16.30% | 76.00% | 12.39% | 959,756 | 959,756 | 118,895 | 118,895 |
| Web | W-3 | 14.80% | 76.00% | 11.25% | 442,376 | 442,376 | 49,758 | 49,758 |
| Web | W-4 | 90.30% | 76.00% | 68.63% | 74,505 | 74,505 | 51,131 | 51,131 |
| Web | W-5 | 21.00% | 76.00% | 15.96% | 137,216 | 137,216 | 21,900 | 21,900 |
| Web | W-6 | 65.70% | 76.00% | 49.93% | 109,494 | 109,494 | 54,673 | 54,673 |
| Web | W-7 | | | 25.45% | 315,557 | 315,557 | 80,301 | 80,301 |
| Web | W-8 | 22.40% | 76.00% | 17.02% | 192,606 | 192,606 | 32,789 | 32,789 |
| Web | W-9 | | | 25.45% | 213,643 | 213,643 | 54,366 | 54,366 |
| Web | W-10 | | | 25.45% | 181,243 | 181,243 | 46,122 | 46,122 |
| Web | W-11 | | | 25.45% | 134,881 | 134,881 | 34,324 | 34,324 |
| Web | W-12 | 19.20% | 76.00% | 14.59% | 405,296 | 405,296 | 59,141 | 59,141 |

[452]   Percent of a publications' audience that are Republican, based on data from Pew Research. Cell is empty when data for the relevant publication is not available.

[453]   Republicans receptive to the claims (.76, YouGov). Cell is empty when Percent Republican data is not available for the relevant publication.

[454]   Calculated using the following formula: Percent Republicans * Receptive Republicans. When Percent Republican data is not available, I rely on the average Percent Receptive Republicans (25.25%)

[455]   The impressions estimate calculated in the Impressions Model. For social media posts, the high estimate is calculated using Equation 2a.

[456]   The impressions estimate calculated in the Impressions Model. For social media posts, the low estimate is calculated using Equation 2b.

[457]   Calculated using the following formula:  Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (25.25%) * Impressions Estimate. The high receptive impressions estimate is based on the impressions estimate incorporating Equation 2a.

[458]   Calculated using the following formula: Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (25.25%) * Impressions Estimate. The low Receptive Impressions Estimate is based on the impressions estimate incorporating Equation 2b.

Expert Report of Professor Humphreys                                      118

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-13 | 18.10% | 76.00% | 13.76% | 768,450 | 768,450 | 105,708 | 105,708 |
| Web | W-14 | | | 25.45% | 125,280 | 125,280 | 31,880 | 31,880 |
| Web | W-15 | | | 25.45% | 128,148 | 128,148 | 32,610 | 32,610 |
| Web | W-16 | | | 25.45% | 35,538 | 35,538 | 9,043 | 9,043 |
| Web | W-17 | 69.80% | 76.00% | 53.05% | 1,180,942 | 1,180,942 | 626,466 | 626,466 |
| Web | W-18 | | | 25.45% | 132,335 | 132,335 | 33,676 | 33,676 |
| Web | W-19 | | | 25.45% | 62,222 | 62,222 | 15,834 | 15,834 |
| Web | W-20 | 31.50% | 76.00% | 23.94% | 63,433 | 63,433 | 15,186 | 15,186 |
| Web | W-21 | | | 25.45% | 94,530 | 94,530 | 24,055 | 24,055 |
| Web | W-22 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-23 | | | 25.45% | 54,717 | 54,717 | 13,924 | 13,924 |
| Web | W-24 | | | 25.45% | 506,808 | 506,808 | 128,969 | 128,969 |
| Web | W-25 | | | 25.45% | 218,105 | 218,105 | 55,502 | 55,502 |
| Web | W-26 | | | 25.45% | 21,532 | 21,532 | 5,479 | 5,479 |
| Web | W-27 | | | 25.45% | 56,933 | 56,933 | 14,488 | 14,488 |
| Web | W-28 | 34.90% | 76.00% | 26.52% | 549,238 | 549,238 | 145,680 | 145,680 |
| Web | W-29 | 34.90% | 76.00% | 26.52% | 144,930 | 144,930 | 38,441 | 38,441 |
| Web | W-30 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-31 | 19.20% | 76.00% | 14.59% | 405,296 | 405,296 | 59,141 | 59,141 |
| Web | W-32 | 18.10% | 76.00% | 13.76% | 768,450 | 768,450 | 105,708 | 105,708 |
| Web | W-33 | 34.70% | 76.00% | 26.37% | 228,704 | 228,704 | 60,314 | 60,314 |
| Web | W-34 | 16.30% | 76.00% | 12.39% | 959,756 | 959,756 | 118,895 | 118,895 |
| Web | W-35 | | | 25.45% | 249,818 | 249,818 | 63,572 | 63,572 |
| Web | W-36 | 32.10% | 76.00% | 24.40% | 232,808 | 232,808 | 56,796 | 56,796 |
| Web | W-37 | | | 25.45% | 128,148 | 128,148 | 32,610 | 32,610 |
| Web | W-38 | | | 25.45% | 112,603 | 112,603 | 28,655 | 28,655 |
| Web | W-39 | | | 25.45% | 43,424 | 43,424 | 11,050 | 11,050 |
| Web | W-40 | 90.30% | 76.00% | 68.63% | 74,505 | 74,505 | 51,131 | 51,131 |

Expert Report of Professor Humphreys                    119

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-41 | | | 25.45% | 62,222 | 62,222 | 15,834 | 15,834 |
| Web | W-42 | 14.80% | 76.00% | 11.25% | 442,376 | 442,376 | 49,758 | 49,758 |
| Web | W-43 | 31.50% | 76.00% | 23.94% | 63,433 | 63,433 | 15,186 | 15,186 |
| Web | W-44 | | | 25.45% | 153,510 | 153,510 | 39,064 | 39,064 |
| Web | W-45 | 22.40% | 76.00% | 17.02% | 192,606 | 192,606 | 32,789 | 32,789 |
| Web | W-46 | 22.40% | 76.00% | 17.02% | 70,755 | 70,755 | 12,045 | 12,045 |
| Web | W-47 | | | 25.45% | 135,980 | 135,980 | 34,603 | 34,603 |
| Web | W-48 | 34.90% | 76.00% | 26.52% | 549,238 | 549,238 | 145,680 | 145,680 |
| Web | W-49 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-50 | | | 25.45% | 75,348 | 75,348 | 19,174 | 19,174 |
| Web | W-51 | | | 25.45% | 108,951 | 108,951 | 27,725 | 27,725 |
| Web | W-52 | | | 25.45% | 71,724 | 71,724 | 18,252 | 18,252 |
| Web | W-53 | | | 25.45% | 506,808 | 506,808 | 128,969 | 128,969 |
| Social | S-1 | | | 25.45% | 302,891 | 60,190 | 77,078 | 15,317 |
| Social | S-2 | 16.30% | 76.00% | 12.39% | 1,517,403 | 7,622,861 | 187,976 | 944,320 |
| Social | S-3 | 90.30% | 76.00% | 68.63% | 50,916 | 90,045 | 34,943 | 61,796 |
| Social | S-4 | 90.30% | 76.00% | 68.63% | 111,412 | 98,107 | 76,460 | 67,329 |
| Social | S-5 | 90.30% | 76.00% | 68.63% | 97,086 | 95,090 | 66,628 | 65,259 |
| Social | S-6 | 21.00% | 76.00% | 15.96% | 605,662 | 2,809,916 | 96,664 | 448,463 |
| Social | S-7 | | | 25.45% | 310,072 | 1,313,779 | 78,905 | 334,322 |
| Social | S-8 | 22.40% | 76.00% | 17.02% | 501,872 | 717,229 | 85,439 | 122,101 |
| Social | S-9 | 22.40% | 76.00% | 17.02% | 253,407 | 675,370 | 43,140 | 114,975 |
| Social | S-10 | 22.40% | 76.00% | 17.02% | 214,427 | 671,886 | 36,504 | 114,382 |
| Social | S-11 | 22.40% | 76.00% | 17.02% | 215,038 | 671,947 | 36,608 | 114,392 |
| Social | S-12 | | | 25.45% | 268,022 | 1,097,721 | 68,205 | 279,341 |
| Social | S-13 | 18.10% | 76.00% | 13.76% | 684,581 | 2,420,050 | 94,171 | 332,902 |
| Social | S-14 | | | 25.45% | 104,961 | 311,247 | 26,710 | 79,204 |
| Social | S-15 | | | 25.45% | 104,756 | 312,259 | 26,658 | 79,462 |

Expert Report of Professor Humphreys                    120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Social | S-16 | | | 25.45% | 97,870 | 311,264 | 24,905 | 79,208 |
| Social | S-17 | | | 25.45% | 99,595 | 311,484 | 25,344 | 79,264 |
| Social | S-18 | | | 25.45% | 95,355 | 311,129 | 24,265 | 79,174 |
| Social | S-19 | | | 25.45% | 95,909 | 311,490 | 24,406 | 79,266 |
| Social | S-20 | | | 25.45% | 92,734 | 311,006 | 23,598 | 79,143 |
| Social | S-21 | | | 25.45% | 93,526 | 310,950 | 23,800 | 79,128 |
| Social | S-22 | | | 25.45% | 88,022 | 310,946 | 22,399 | 79,128 |
| Social | S-23 | | | 25.45% | 83,682 | 310,988 | 21,295 | 79,138 |
| Social | S-24 | | | 25.45% | 88,166 | 310,981 | 22,436 | 79,136 |
| Social | S-25 | | | 25.45% | 91,129 | 310,945 | 23,190 | 79,127 |
| Social | S-26 | | | 25.45% | 83,601 | 310,967 | 21,274 | 79,133 |
| Social | S-27 | | | 25.45% | 382,281 | 1,358,989 | 97,280 | 345,827 |
| Social | S-28 | | | 25.45% | 90,034 | 395,492 | 22,911 | 100,642 |
| Social | S-29 | | | 25.45% | 414,204 | 1,753,410 | 105,404 | 446,196 |
| Social | S-30 | | | 25.45% | 930,727 | 4,415,878 | 236,845 | 1,123,723 |
| Social | S-31 | | | 25.45% | 1,330,634 | 4,526,637 | 338,611 | 1,151,908 |
| Social | S-32 | | | 25.45% | 38,345 | 37,335 | 9,758 | 9,501 |
| Social | S-33 | 23.10% | 76.00% | 17.56% | 183,730 | 583,066 | 32,256 | 102,363 |
| Social | S-34 | | | 25.45% | 383,118 | 1,359,220 | 97,493 | 345,885 |
| Social | S-35 | 19.20% | 76.00% | 14.59% | 138,523 | 502,881 | 20,213 | 73,380 |
| Social | S-36 | 18.10% | 76.00% | 13.76% | 744,815 | 2,423,097 | 102,457 | 333,321 |
| Social | S-37 | 18.10% | 76.00% | 13.76% | 813,052 | 2,440,919 | 111,843 | 335,773 |
| Social | S-38 | 16.30% | 76.00% | 12.39% | 1,495,243 | 7,625,871 | 185,231 | 944,693 |
| Social | S-39 | | | 25.45% | 91,591 | 215,150 | 23,308 | 54,750 |
| Social | S-40 | 32.10% | 76.00% | 24.40% | 207,974 | 577,660 | 50,737 | 140,926 |
| Social | S-41 | 32.10% | 76.00% | 24.40% | 256,624 | 591,307 | 62,606 | 144,255 |
| Social | S-42 | 32.10% | 76.00% | 24.40% | 174,036 | 576,283 | 42,458 | 140,590 |
| Social | S-43 | 32.10% | 76.00% | 24.40% | 152,682 | 576,071 | 37,248 | 140,538 |

Expert Report of Professor Humphreys                    121

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Social | S-44 | 90.30% | 76.00% | 68.63% | 63,413 | 91,367 | 43,519 | 62,703 |
| Social | S-45 | 90.30% | 76.00% | 68.63% | 38,068 | 89,218 | 26,125 | 61,229 |
| Social | S-46 | 14.80% | 76.00% | 11.25% | 615,996 | 2,009,856 | 69,287 | 226,069 |
| Social | S-47 | 22.40% | 76.00% | 17.02% | 242,492 | 678,966 | 41,282 | 115,587 |
| Social | S-48 | | | 25.45% | 30,111 | 49,130 | 7,662 | 12,502 |
| Social | S-49 | 34.90% | 76.00% | 26.52% | 183,849 | 666,751 | 48,764 | 176,849 |
| Social | S-50 | | | 25.45% | 75,654 | 247,243 | 19,252 | 62,917 |
| Social | S-51 | | | 25.45% | 68,828 | 227,745 | 17,515 | 57,955 |
| Social | S-52 | | | 25.45% | 65,717 | 227,842 | 16,723 | 57,980 |
| Social | S-53 | | | 25.45% | 67,356 | 227,764 | 17,140 | 57,960 |
| Social | S-54 | | | 25.45% | 471,389 | 1,754,697 | 119,956 | 446,524 |
| Social | S-55 | | | 25.45% | 1,116,377 | 4,420,345 | 284,088 | 1,124,860 |
| Print | P-1 | | | | 0 | 0 | 0 | 0 |
| Print | P-2 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-3 | 16.30% | 76.00% | 12.39% | 454,861 | 454,861 | 56,348 | 56,348 |
| Print | P-4 | 16.30% | 76.00% | 12.39% | 454,861 | 454,861 | 56,348 | 56,348 |
| Print | P-5 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-6 | | | 25.45% | 92,515 | 92,515 | 23,543 | 23,543 |
| Print | P-7 | 34.90% | 76.00% | 26.52% | 544,002 | 544,002 | 144,291 | 144,291 |
| Print | P-9 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-8 | | | | 0 | 0 | 0 | 0 |
| Print | P-10 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-11 | | | 25.45% | 149,093 | 149,093 | 37,940 | 37,940 |
| TV | T-1 | 34.70% | 76.00% | 26.37% | 9,390,000 | 9,390,000 | 2,476,331 | 2,476,331 |
| TV | T-2 | 34.70% | 76.00% | 26.37% | 9,390,000 | 9,390,000 | 2,476,331 | 2,476,331 |
| TV | T-3 | 20.50% | 76.00% | 15.58% | 1,552,000 | 1,552,000 | 241,802 | 241,802 |
| TV | T-4 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-5 | 23.60% | 76.00% | 17.94% | 877,000 | 877,000 | 157,299 | 157,299 |

Expert Report of Professor Humphreys                    122

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page165 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-7 | 23.60% | 76.00% | 17.94% | 877,000 | 877,000 | 157,299 | 157,299 |
| TV | T-8 | | | | | 0 | 0 | 0 |
| TV | T-9 | 20.50% | 76.00% | 15.58% | 839,000 | 839,000 | 130,716 | 130,716 |
| TV | T-10 | 20.50% | 76.00% | 15.58% | 839,000 | 839,000 | 130,716 | 130,716 |
| TV | T-11 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-12 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-13 | 33.70% | 76.00% | 25.61% | 5,863,000 | 5,863,000 | 1,501,632 | 1,501,632 |
| TV | T-14 | 33.70% | 76.00% | 25.61% | 5,863,000 | 5,863,000 | 1,501,632 | 1,501,632 |
| TV | T-15 | 33.70% | 76.00% | 25.61% | 2,986,000 | 2,986,000 | 764,774 | 764,774 |
| TV | T-16 | 33.70% | 76.00% | 25.61% | 2,700,000 | 2,700,000 | 691,524 | 691,524 |
| TV | T-17 | 33.70% | 76.00% | 25.61% | 2,700,000 | 2,700,000 | 691,524 | 691,524 |
| TV | T-18 | 23.60% | 76.00% | 17.94% | 628,000 | 628,000 | 112,638 | 112,638 |
| TV | T-19 | | | | | 0 | 0 | 0 |
| TV | T-20 | | | | | 0 | 0 | 0 |
| TV | T-21 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-22 | | | | | 0 | 0 | 0 |
| TV | T-23 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-24 | | | | | 0 | 0 | 0 |
| TV | T-25 | 23.60% | 76.00% | 17.94% | 833,000 | 833,000 | 149,407 | 149,407 |
| TV | T-26 | | | | | 0 | 0 | 0 |
| TV | T-27 | 23.60% | 76.00% | 17.94% | 833,000 | 833,000 | 149,407 | 149,407 |
| TV | T-28 | 23.60% | 76.00% | 17.94% | 936,000 | 936,000 | 167,881 | 167,881 |
| TV | T-29 | 23.60% | 76.00% | 17.94% | 936,000 | 936,000 | 167,881 | 167,881 |
| TV | T-30 | | | | | 0 | 0 | 0 |
| TV | T-31 | 20.50% | 76.00% | 15.58% | 1,378,000 | 1,378,000 | 214,692 | 214,692 |
| TV | T-32 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-33 | 20.50% | 76.00% | 15.58% | 385,000 | 385,000 | 59,983 | 59,983 |
| TV | T-34 | 20.50% | 76.00% | 15.58% | 385,000 | 385,000 | 59,983 | 59,983 |

Expert Report of Professor Humphreys                    123

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page166 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-35 | 34.70% | 76.00% | 26.37% | 3,920,000 | 3,920,000 | 1,033,782 | 1,033,782 |
| TV | T-36 | 33.70% | 76.00% | 25.61% | 5,468,000 | 5,468,000 | 1,400,464 | 1,400,464 |
| TV | T-37 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-38 | 31.00% | 76.00% | 23.56% | 1,293,000 | 1,293,000 | 304,631 | 304,631 |
| TV | T-39 | 20.50% | 76.00% | 15.58% | 1,033,000 | 1,033,000 | 160,941 | 160,941 |
| TV | T-40 | 20.50% | 76.00% | 15.58% | 1,033,000 | 1,033,000 | 160,941 | 160,941 |
| TV | T-41 | 20.50% | 76.00% | 15.58% | 800,000 | 800,000 | 124,640 | 124,640 |
| TV | T-42 | 20.50% | 76.00% | 15.58% | 887,000 | 887,000 | 138,195 | 138,195 |
| TV | T-43 | 20.50% | 76.00% | 15.58% | 984,000 | 984,000 | 153,307 | 153,307 |
| TV | T-44 | 31.00% | 76.00% | 23.56% | 6,769,000 | 6,769,000 | 1,594,776 | 1,594,776 |
| TV | T-45 | 31.00% | 76.00% | 23.56% | 6,769,000 | 6,769,000 | 1,594,776 | 1,594,776 |
| TV | T-46 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-47 | | | | | 0 | 0 | 0 |
| TV | T-48 | | | | | 0 | 0 | 0 |
| TV | T-49 | 23.60% | 76.00% | 17.94% | 460,000 | 460,000 | 82,506 | 82,506 |
| TV | T-50 | | | | | 0 | 0 | 0 |
| TV | T-51 | | | | | 0 | 0 | 0 |
| TV | T-52 | 23.60% | 76.00% | 17.94% | 460,000 | 460,000 | 82,506 | 82,506 |
| TV | T-53 | 23.60% | 76.00% | 17.94% | 168,000 | 168,000 | 30,132 | 30,132 |
| TV | T-54 | 20.50% | 76.00% | 15.58% | 2,010,000 | 2,010,000 | 313,158 | 313,158 |
| TV | T-55 | 20.50% | 76.00% | 15.58% | 2,010,000 | 2,010,000 | 313,158 | 313,158 |
| TV | T-56 | 33.70% | 76.00% | 25.61% | 3,800,000 | 3,800,000 | 973,256 | 973,256 |
| TV | T-57 | 20.50% | 76.00% | 15.58% | 2,561,000 | 2,561,000 | 399,004 | 399,004 |
| TV | T-58 | 20.50% | 76.00% | 15.58% | 2,561,000 | 2,561,000 | 399,004 | 399,004 |
| TV | T-59 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-60 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-61 | 20.50% | 76.00% | 15.58% | 900,000 | 900,000 | 140,220 | 140,220 |
| TV | T-62 | 20.50% | 76.00% | 15.58% | 900,000 | 900,000 | 140,220 | 140,220 |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page167 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-63 | 34.70% | 76.00% | 26.37% | 3,929,000 | 3,929,000 | 1,036,156 | 1,036,156 |
| **TOTAL RECEPTIVE IMPRESSIONS (LOW/HIGH)** | | | | | | | **34,075,512** | **42,936,354** |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page168 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX K.  DAMAGES MODEL

*High Impression Estimate, 1x Attitude Change Multiplier*

Impression Target:[459] 42,936,354
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight[460] | Target Impressions[461] | Adjusted Impressions[462] | CPM (per 1,000 impressions) | Total Cost[463] |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 2,790,863 | 2,790,863 | $6.46[464] | $18,028.98 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 2,790,863 | 2,790,863 | $14.40[465] | $40,188.43 |
| Influencer | Web Blog Influencer | 5.00% | 2,146,818 | 21,468,177 | $60.00[466] | $1,288,090.62 |
| | Twitter Influencer | 7.00% | 3,005,545 | 60,110,896 | $2.00[467] | $120,221.79 |
| | Facebook Influencer | 7.00% | 3,005,545 | 60,110,896 | $25.00[468] | $1,502,772.39 |
| | YouTube Influencer | 4.60% | 1,975,072 | 39,501,446 | $20.00[469] | $790,028.91 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 12,709,161 | 12,709,161 | $16.00[470] | $203,346.57 |
| | Cable TV (Excluding Primetime) | 21.30% | 9,145,443 | 9,145,443 | $10.00[471] | $91,454.43 |
| | Podcasts | 5.00% | 2,146,818 | 2,146,818 | $19.00[472] | $40,789.54 |
| | Radio | 4.10% | 1,760,391 | 1,760,391 | $4.00[473] | $7,041.56 |
| | Print newspapers | 3.40% | 1,459,836 | 1,459,836 | $67.00[474] | $97,809.01 |
| | **Total** | **100.00%** | **42,936,354** | | | **$4,199,772.24** |

---

[459]  The impressions estimate from the Impressions Model.
[460]  The percentage of impressions allocated to different media types. Allocations based on Trump supporters most common way of getting political and election news.
[463]  Calculated using the following formula: (Adjusted Impressions / 1000) * CPM.

Expert Report of Professor Humphreys                                    126

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

---

462 The number of impressions allocated to the media type, taking into account the impression rate for Twitter, Facebook, and YouTube influencers and the bounce rate for web blog influencers. For all other media types the Adjusted Impressions are the same as the Target Impressions.

463 Calculated using the following formula: (Adjusted Impressions / 1000) * CPM.

464 https://blog.hootsuite.com/twitter-statistics/

465 https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost

466 https://www.webfx.com/social-media/pricing/influencer-marketing/

467 https://www.webfx.com/social-media/pricing/influencer-marketing/

468 https://www.webfx.com/social-media/pricing/influencer-marketing/

469 https://www.webfx.com/social-media/pricing/influencer-marketing/

470 https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf

471 https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf

472 https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf

473 https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf

474 https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549

Expert Report of Professor Humphreys                                     127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 42,936,354
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 8,372,589 | 8,372,589 | $6.46 | $54,086.93 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 8,372,589 | 8,372,589 | $14.40 | $120,565.28 |
| Influencer | Web Blog Influencer | 5.00% | 6,440,453 | 64,404,531 | $60.00 | $3,864,271.86 |
| | Twitter Influencer | 7.00% | 9,016,634 | 180,332,687 | $2.00 | $360,665.37 |
| | Facebook Influencer | 7.00% | 9,016,634 | 180,332,687 | $25.00 | $4,508,317.17 |
| | YouTube Influencer | 4.60% | 5,925,217 | 118,504,337 | $20.00 | $2,370,086.74 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 38,127,482 | 38,127,482 | $16.00 | $610,039.72 |
| | Cable TV (Excluding Primetime) | 21.30% | 27,436,330 | 27,436,330 | $10.00 | $274,363.30 |
| | Podcasts | 5.00% | 6,440,453 | 6,440,453 | $19.00 | $122,368.61 |
| | Radio | 4.10% | 5,281,172 | 5,281,172 | $4.00 | $21,124.69 |
| | Print newspapers | 3.40% | 4,379,508 | 4,379,508 | $67.00 | $293,427.04 |
| | **Total** | **100.00%** | **128,809,062** | | | **$12,599,316.71** |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page171 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 42,936,354
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 13,954,315 | 13,954,315 | $6.46 | $90,144.88 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 13,954,315 | 13,954,315 | $14.40 | $200,942.14 |
| Influencer | Web Blog Influencer | 5.00% | 10,734,089 | 107,340,885 | $60.00 | $6,440,453.10 |
| | Twitter Influencer | 7.00% | 15,027,724 | 300,554,478 | $2.00 | $601,108.96 |
| | Facebook Influencer | 7.00% | 15,027,724 | 300,554,478 | $25.00 | $7,513,861.95 |
| | YouTube Influencer | 4.60% | 9,875,361 | 197,507,228 | $20.00 | $3,950,144.57 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 63,545,804 | 63,545,804 | $16.00 | $1,016,732.86 |
| | Cable TV (Excluding Primetime) | 21.30% | 45,727,217 | 45,727,217 | $10.00 | $457,272.17 |
| | Podcasts | 5.00% | 10,734,089 | 10,734,089 | $19.00 | $203,947.68 |
| | Radio | 4.10% | 8,801,953 | 8,801,953 | $4.00 | $35,207.81 |
| | Print newspapers | 3.40% | 7,299,180 | 7,299,180 | $67.00 | $489,045.07 |
| | **Total** | **100.00%** | **214,681,770** | | | **$20,998,861.18** |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page172 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 1x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 2,214,908 | 2,214,908 | $6.46 | $14,308.31 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 2,214,908 | 2,214,908 | $14.40 | $31,894.68 |
| Influencer | Web Blog Influencer | 5.00% | 1,703,776 | 17,037,756 | $60.00 | $1,022,265.36 |
| | Twitter Influencer | 7.00% | 2,385,286 | 47,705,717 | $2.00 | $95,411.43 |
| | Facebook Influencer | 7.00% | 2,385,286 | 47,705,717 | $25.00 | $1,192,642.92 |
| | YouTube Influencer | 4.60% | 1,567,474 | 31,349,471 | $20.00 | $626,989.42 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 10,086,352 | 10,086,352 | $16.00 | $161,381.62 |
| | Cable TV (Excluding Primetime) | 21.30% | 7,258,084 | 7,258,084 | $10.00 | $72,580.84 |
| | Podcasts | 5.00% | 1,703,776 | 1,703,776 | $19.00 | $32,371.74 |
| | Radio | 4.10% | 1,397,096 | 1,397,096 | $4.00 | $5,588.38 |
| | Print newspapers | 3.40% | 1,158,567 | 1,158,567 | $67.00 | $77,624.02 |
| | **Total** | **100.00%** | **34,075,512** | | | **$3,333,058.72** |

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page173 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 6,644,725 | 6,644,725 | $6.46 | $42,924.92 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 6,644,725 | 6,644,725 | $14.40 | $95,684.04 |
| Influencer | Web Blog Influencer | 5.00% | 5,111,327 | 51,113,268 | $60.00 | $3,066,796.08 |
| | Twitter Influencer | 7.00% | 7,155,858 | 143,117,150 | $2.00 | $286,234.30 |
| | Facebook Influencer | 7.00% | 7,155,858 | 143,117,150 | $25.00 | $3,577,928.76 |
| | YouTube Influencer | 4.60% | 4,702,421 | 94,048,413 | $20.00 | $1,880,968.26 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 30,259,055 | 30,259,055 | $16.00 | $484,144.87 |
| | Cable TV (Excluding Primetime) | 21.30% | 21,774,252 | 21,774,252 | $10.00 | $217,742.52 |
| | Podcasts | 5.00% | 5,111,327 | 5,111,327 | $19.00 | $97,115.21 |
| | Radio | 4.10% | 4,191,288 | 4,191,288 | $4.00 | $16,765.15 |
| | Print newspapers | 3.40% | 3,475,702 | 3,475,702 | $67.00 | $232,872.05 |
| | **Total** | **100.00%** | **102,226,536** | | | **$9,999,176.17** |

Expert Report of Professor Humphreys                    131

Case 23-1045, Document 27-8, 08/24/2023, 3561016, Page174 of 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 11,074,541 | 11,074,541 | $6.46 | $71,541.54 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 11,074,541 | 11,074,541 | $14.40 | $159,473.40 |
| Influencer | Web Blog Influencer | 5.00% | 8,518,878 | 85,188,780 | $60.00 | $5,111,326.80 |
| | Twitter Influencer | 7.00% | 11,926,429 | 238,528,584 | $2.00 | $477,057.17 |
| | Facebook Influencer | 7.00% | 11,926,429 | 238,528,584 | $25.00 | $5,963,214.60 |
| | YouTube Influencer | 4.60% | 7,837,368 | 156,747,355 | $20.00 | $3,134,947.10 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 50,431,758 | 50,431,758 | $16.00 | $806,908.12 |
| | Cable TV (Excluding Primetime) | 21.30% | 36,290,420 | 36,290,420 | $10.00 | $362,904.20 |
| | Podcasts | 5.00% | 8,518,878 | 8,518,878 | $19.00 | $161,858.68 |
| | Radio | 4.10% | 6,985,480 | 6,985,480 | $4.00 | $27,941.92 |
| | Print newspapers | 3.40% | 5,792,837 | 5,792,837 | $67.00 | $388,120.08 |
| | **Total** | **100.00%** | **170,377,560** | | | **$16,665,293.62** |

*Summary of Calculated Damages:*

| Attitude Change Multiplier | 1x | 3x | 5x |
|---|---|---|---|
| Low Receptive Impression Estimate | **$3,333,058.72** | **$9,999,176.17** | **$16,665,293.62** |
| High Receptive Impression Estimate | **$4,199,772.24** | **$12,599,316.71** | **$20,998,861.18** |

Expert Report of Professor Humphreys                    132

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX L.  LIST OF CONSERVATIVE STEPS TAKEN

| IMPRESSIONS MODEL | |
|---|---|
| | **IMPRESSIONS MODEL** |
| Online News Articles Considered | <ul><li>Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statements.</li><li>Further, some of the articles from the Complaint were authored by the Associated Press and Reuters.[475] It is likely that identical (or very similar) versions of these articles appeared in multiple publications. For instance, the June 25, 2019 Hollywood Reporter article, titled "Trump on E. Jean Carroll Sexual Assault Claim: 'She's Not My Type,'" appeared in at least 20 additional publications.[476] Further, the June 22, 2019 Associated press article, titled "Trump Denies Knowing NY Woman Accusing</li></ul> |

---

[475]  The analysis incorporates two versions of the same Reuters article: Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); and Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019).

[476]  https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type; https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6; https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054; https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type; https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html; https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/; https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type; https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp; https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/; and https://www.necn.com/news/local/trump-e-jean-carroll/220418/.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

|  | Him of Sexual Assault" appeared in at least 7 additional publications. [477] |
|---|---|
| Social Media Posts Considered | • I limited social media impressions to those generated from Tweets published by the primary account of the publisher or the article author. I did not consider, for example, retweets of quote tweets, any tweets from other publishers of stories covering Mr. Trump's Statements, tweets from users who shared links to the 52 articles (or other articles containing the Statements), or tweets in which users repeated or otherwise amplified the Statements.<br><br>• Additionally, due to the opacity of other platforms, I do not account for impressions generated on any other social media platform, despite there being evidence the articles considered in the impressions analysis were spread widely online. |
| Print Articles Considered | • When identifying print articles, I limited the analysis to publications that published an online news article that was cited in the Complaint.<br><br>• The 11 articles I found are an undercount of all print articles published that covered the Statements. I was able to find 33 print articles via ProQuest published between June 22, 2019, and September 28, 2022, that referenced the Statements. [478] None of these articles overlapped with the 14 articles I considered in my analysis. |

---

[477] https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22; https://www.gazettenet.com/Carroll-26480259; https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp; https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; and https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f.

[478] Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean"))

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

|  | • Only 9 of the 11 articles I found contributed to the impressions estimate as I was unable to find publicly available circulation for all 11 articles. |
|---|---|
| TV Broadcasts Considered | • I only considered TV broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: ABC, Fox, NBC, MSNBC, CBS, and CNN.<br><br>• Among the broadcasts I found on the TV News Archive, I only included broadcasts that included direct quotes from the Statements. Broadcasts that only included paraphrases of the Statements were not included. For example, The Tucker Carlson Show (ratings: 2,822,000) covered the issue for 12 minutes on June 25, 2019, but I did not include it.<br><br>• I only counted ratings for a particular program once in a day, even if a program was aired multiple times in day. I also did not consider the number of times a Statement was mentioned during a broadcast, even though multiple mentions of a Statement generate multiple impressions. |
| Other Sources of Impressions Not Considered | • I did not include impressions generated from podcasts or radio broadcasts that covered the Statements. There is anecdotal evidence that these claims were discussed on popular podcasts.[479]<br><br>• I did not include impressions generated from people who were exposed to the Statements in article headlines while browsing Google News, |

---

[479] See, for example, the June 27, 2019 broadcast of *The Daily* (https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/) and two June 26, 2019 broadcasts of *The Kevin Jackson Show* (https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/; https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | Apple News, or other news aggregating applications. |
|---|---|
| | • I did not consider the impact of word-of-mouth on the transmission of the Statements. |
| Social Media Impression Calculation | • Since tweets are seen only by a subset of a user's followers, I incorporated an impression rate into the impressions model. When selecting an impression estimate, I relied on a model developed by information scientists who relied on data collected from Buzzfeed's accounts. Using their model, I relied on Buzzfeed's impression rate as the high end for impression rates despite the fact Buzzfeed is less prominent than many of the sources included in my impression calculation. |
| Online News Impressions Calculation | • I incorporated a website's bounce rate when calculating online news impressions to exclude users who navigated to a website without performing any actions. Nonetheless, it's possible that users could have navigated directly to the relevant article on the website and been exposed the Statement without taking any additional actions. |
| **QUANTITATIVE IMPACT MODEL** | |
| Negative Associations are Harmful | • Any impression generated that linked Ms. Carroll's person brand with the content of the Statements is harmful. Person brands need to be protected and any information that connects a person brand to 'lying' and other negative information is harmful, even if the person's fans or followers do not believe the claims. Nonetheless, I limited my estimate of the quantitative impact to potential readers and viewers who identify as Trump supporters and/or are Republicans who may find Trump's Statements credible. |
| Limited Set of Impressions as an Input | • The impact model relies on the impressions estimate and therefore does not account for the impact associated with impressions generated from additional online and print articles, TV |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | broadcasts, and social media posts covering the Statements. |
|---|---|
| **DAMAGES MODEL** ||
| Impressions and Impact as Inputs | • The damages model also relies on the impact model and therefore does not account for impressions generated by additional online and print articles, TV broadcasts, and social media posts that covered the Statements.<br><br>• The damages model also relies on the impact model and therefore is limited to the costs needed to repair the impressions generated by people who are likely to be receptive to the Statements. |
| Production Costs | • The damages model does not incorporate the production and operating costs associated with running the campaign. |
| Attitude Change Multiplier | • When calculating damages, I included attitude change multipliers (1x, 3x, and 5x) to account for the fact that it takes multiple impressions to change an attitude. I estimate that 3 exposures would be most appropriate.<br>• I incorporated the 1x attitude change multiplier to account for the fact that the same person may have been exposed to multiple impressions. Empirical data suggests that a multiplier of 1 is overly conservative, especially because Mr. Trump's supporters are more likely to use only one news source. |

# EXHIBIT D

12/22/22, 3:56 PM
Case 1:20-cv-07311-LAK-OTW What Happened Between E. Jean Carroll and Elle Magazine? - The New York Times
Case 1:20-cv-07311-LAK Document 189-9 Filed 12/22/22 Page 178 of 246

# What Happened Between E. Jean Carroll and Elle Magazine?

Her contract was terminated early, but the fashion magazine maintains it wasn't because of her allegations against President Trump.

 

**By Katherine Rosman and Jessica Bennett**

Feb. 21, 2020

8 MIN READ

In the fall of 2017, when Nina Garcia, the fashion editor and "Project Runway" judge, became the editor in chief of Elle magazine, E. Jean Carroll felt she needed to fight for her job.

Ms. Garcia was remaking the staff and was scaling back on lucrative contracts the magazine offered freelance contributors like Ms. Carroll, who had written the Ask E. Jean advice column since 1993.

But rather than dash off a pleading email, as many writers might, Ms. Carroll did something more in line with her outsize personality: She showed up at the offices of Hearst Magazines, the publisher of Elle, with a stack of hula hoops. "I said, 'Here's some hula hoops, let's get it going girl!'" she recalled in a phone interview.

Ms. Garcia appeared to love it.

"Oh, my God, I adore E. Jean!" she said in a 2018 interview, about a year after taking over. "She's just so perfect for this generation. Her voice is so modern, quirky, and cheeky. While everybody on Twitter thinks they could be the E. Jean, she is the E. Jean!"

The same month that the interview ran, Ms. Garcia agreed to provide a blurb for Ms. Carroll's forthcoming memoir, "What Do We Need Men For?," praising her work at Elle. At that point, Ms. Carroll had shared the book's contents with very few people, and Ms. Garcia had not read it.

"E. Jean Carroll is a force of nature, whose natural vibrancy has held readers in rapture for decades," read Ms. Garcia's blurb, which was printed on the back cover.

In the book, which recounts stories from her life, Ms. Carroll accuses Donald Trump of raping her in a department store dressing room in the mid-1990s. The details were revealed in an excerpt in New York magazine in June of 2019, just before the book was published, and quickly picked up by news outlets around the world.

Mr. Trump denied ever meeting Ms. Carroll, calling her a liar. ("She's not my type," he told The Hill.) Several months later, she filed a defamation suit against him. She argued he had damaged her reputation and her career by denying that her story was true, and by saying that she took money from his political opponents to fabricate the allegation.

Elle covered the story, reporting on her book's revelations and the reaction to them on its website. It also ran a column in print (but not online) last fall in which Ms. Carroll explained why she had decided to come forward at last.

But by December 2019, Elle's regard for its columnist had changed. Ms. Carroll, 76, was contacted by a Hearst editor, Erin Hobday, who asked if she was free for a call; Ms. Carroll thought she was being invited to the company holiday party.

Instead, she was informed that her contract, which was supposed to go through July of this year, was being terminated. She was asked to invoice for the remaining four columns, which would not be published and for which Ms. Carroll said she still has not been paid.

"We and your readers so appreciate your many years of work for the magazine, and the wonderful columns you contributed to our publication," Ms. Hobday wrote in an email, adding: "We will miss you tremendously."

## 'A Beloved Voice'

On Feb. 18, Ms. Carroll wrote on Twitter: "Because Trump ridiculed my reputation, laughed at my looks, & dragged me through the mud, after 26 years, ELLE fired me. I don't blame Elle. It was the great honor of my life writing 'Ask E. Jean.' I blame @realdonaldtrump."

Earlier that day, her lawyers had disclosed in a court filing in connection to her defamation suit against Mr. Trump that Elle had killed the Ask E. Jean column, which had been published virtually every month for 26 years.

In response to a list of questions sent by The New York Times, a Hearst spokeswoman emailed a statement. "E. Jean Carroll was long a beloved voice in the pages of Elle, the decision not to renew her contract was a business decision and had nothing to do with politics," it said.

Even if Ms. Carroll did not blame Elle, others did, and were quick to say so. Soon, the hashtag #BoycottElleMagazine began appearing on Twitter.

"Extremely disappointing from the woman's mag that historically has done more hard hitting reporting and taken stands than most," Clara Jeffery, the editor of Mother Jones magazine, wrote on Twitter.

"If you ever wondered whether women's magazines are really on the side of women, I think this says all we need to know," said Nancy Jo Sales, a magazine writer.

Many editors who have worked with Ms. Carroll say Elle has lost an important voice. "E. Jean is an American original and to many, an icon," said Robbie Myers, the longtime editor of Elle, before Ms. Garcia.

"E. Jean was just so beloved," said Maggie Bullock, a former deputy editor at Elle. "It seems really sad that a women's publication that had the chance to align itself with a woman who was speaking her truth — and speaking truth to power — in a time like this, chose not to. What a shortsighted thing to do."

But inside the Hearst building in Midtown Manhattan this week, some journalists quietly fumed at what they saw as an inaccurate portrayal.

More than a dozen current and former Hearst employees, who spoke to The Times anonymously for fear they would face repercussions in their jobs, attributed Ms. Carroll's contract termination, at least in part, to a steep paycheck and a break in convention: Ms. Carroll had given away the news-breaking excerpt from her book to New York magazine — not Elle. (The New York cover story, "Hideous Men," was edited by Laurie Abraham, one of Ms. Carroll's former editors at Elle. Ms. Abraham now works at The Atlantic.)

Some said that Ms. Carroll's contention that Mr. Trump's insults cost her the columnist job was self-serving, since her defamation lawsuit against him will require her to prove she has been damaged by his remarks.

Ms. Carroll dismissed those comments. "The lawsuit is for all women who have been harassed, who cannot speak up and don't have the money to sue," Ms. Carroll said. "I am speaking out now for the women who have spoken out and have met their doom. Sometimes you speak out against a man in power and you lose your job."

Ms. Carroll has been credited with helping to shape the advice column genre and voice, inspiring modern-day iterations like Ask Polly, published by New York magazine, and "Dear Sugars," an advice column turned podcast.

"She didn't just toss off a bunch of fluff — she used research, referenced current events and politics, interviewed experts and actually gave real advice that often was as much about helping get a woman's career on track as a relationship," said Ms. Bullock, the former Elle editor, now a freelance writer. "Early on, Jean was inclusive and, you could argue, 'woke.'"

But the days of lucrative magazine contracts are largely a thing of the past. When Ms. Garcia took over Elle, Ms. Carroll was being paid $120,000 a year for 12 columns of about 1,800 words each. (At about $5.50 per word, that was more than twice the $2 per word usually paid to Elle's freelance writers for the print magazine.)

When Ms. Carroll's contract came up for renewal during Ms. Garcia's first year, editors went to bat for Ms. Carroll, arguing that her column had become synonymous with the Elle brand.

Ms. Garcia gave Ms. Carroll a new contract: $60,000 per year for 12 columns of 900 words.

## Changing of the Guard

The changes at Elle, many of them in response to the economic challenges of the magazine industry, reflect big shifts at its parent company, Hearst, which is also facing tension with employees who recently unionized.

In 2018, David Carey, the president of Hearst Magazines for eight years, stepped down. Troy Young, who had previously overseen the company's digital efforts, succeeded him. Since then, most of the high-profile editors who served under Mr. Carey have left. (In 2019, Mr. Carey was named by Hearst Corporation as senior vice president of public affairs and communications.)

Ms. Garcia has worked to put her own stamp on Elle. She has made the magazine more visual, and amped up its social media presence. She has dedicated less space to political features, which had been a hallmark of Elle under its previous editors. Its annual women-in-Washington "Power List" magazine feature and awards dinner was canceled under Ms. Garcia.

She has also worked hard to avoid ruffling feathers, according to some current and former employees. In a 2017 article about Whitney Wolfe, the founder of the dating app Bumble, several paragraphs detailing her perspective on feminism were removed from the digital version of the article after Ms. Wolfe complained that the quotes were taken out of context, according to four former staffers who were aware of the discussions. (Later, Hearst worked with Bumble to start Bumble Mag.)

Last winter, a profile of Dr. Jen Gunter, the ob-gyn (and New York Times columnist) who has been a critic of Gwyneth Paltrow and Goop, was killed after top editors expressed concern that it might upset Ms. Paltrow and her publicist Stephen Huvane, who represents a variety of celebrity clients, according to three former staffers. (Ms. Paltrow appeared on a November 2019 cover of Elle.)

Sources also said a profile of Lara Trump, the president's daughter-in-law, was published in the print magazine but not on the Elle website because of fear it would stoke rage online.

After sending the statement about Ms. Carroll, Hearst did not respond to questions about these editorial decisions.

## Shifting Loyalties

By the time Ms. Carroll was deciding where to excerpt her book — and publish her accusation that the sitting president had raped her years before — Ms. Carroll didn't consider Elle.

"Under Nina, Elle has been less into politics or news," Ms. Carroll said. "Nina's Elle is a fashion magazine. So I went with New York magazine, which knows how to break news."

That decision was revealed to Elle editors over drinks at the Russian Tea Room last spring, where Ms. Carroll and a few of the editors had gone to celebrate the upcoming publication of her book. It was there that she told the editors what the book was about — including what she had written about Mr. Trump — and that an excerpt containing this revelation would be running in New York magazine.

"They were extremely disappointed," Ms. Carroll said of the Elle editors.

They told Ms. Carroll that they were shocked, both by what she said had happened to her and by the fact that she had not given Elle first dibs on the excerpt.

By the terms of her contract, Ms. Carroll was not required to offer her story to Elle. But she agreed to help facilitate a phone call between Elle editors, her agent and a representative of her book publisher.

The excerpt still was published by New York.

When it came time to make budget cuts this past December, Hearst employees said, few felt lingering loyalty to Ms. Carroll. That's when Ms. Hobday told her she had been cut loose.

In a statement, Ms. Garcia, said: "E. Jean and I have known each other for more than two decades and she will always be part of the Elle DNA. We applaud and support her for coming forward with telling her story. The response to her allegations were not a factor in not renewing her contract."

Ms. Carroll is under no illusion that she was carrying the magazine into the next era. "I AM old, unhip and uncool, yes," she wrote on Twitter. But she doesn't believe Elle gave her the boot simply because it couldn't afford her. "I would have taken a new contract for less money," she said.

By Thursday, Ms. Carroll said she had received inquiries from four other publications asking if she would consider writing for them.

*A correction was made on Feb. 21, 2020: An earlier version of this article misspelled the surname of the editor of Mother Jones magazine. She is Clara Jeffery, not Jeffrey.*

―――

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.　　Learn more

Katherine Rosman is a features reporter on the Styles desk. She covers media, the business of fitness, and the politics of gender. She joined The Times in 2014. @katierosman

Jessica Bennett is a writer and editor at The Times focused on gender and culture. She is the author of "Feminist Fight Club." @jessicabennett ・ Facebook

A version of this article appears in print on , Section B, Page 5 of the New York edition with the headline: How Elle and Its Star Columnist Split

# EXHIBIT E



Clerk of the Court
Received 12/01/2022 07:00 PM

NO. 22-SP-0745

# IN THE DISTRICT OF COLUMBIA
# COURT OF APPEALS

DONALD J. TRUMP, *et al.*,

*Appellants,*

v.

E. JEAN CARROLL,

*Appellee.*

On Certified Question of Law from the
United States Court of Appeals for the Second Circuit

## BRIEF FOR APPELLEE E. JEAN CARROLL

Joshua Matz*
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

Roberta A. Kaplan
Matthew J. Craig
Rachel L. Tuchman
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883

*Counsel for Oral Argument

# LIST OF PARTIES AND *AMICI*

Pursuant to Rule 28(a)(2) of the Rules of the District of Columbia Court of Appeals, counsel identifies the following parties and attorneys who appeared in the lower court and have appeared in appellate proceedings in this action:

## D.C. Court of Appeals

For Appellee E. Jean Carroll: Roberta A. Kaplan, Joshua Matz, Raymond Tolentino, Matthew J. Craig, and Rachel L. Tuchman (Kaplan Hecker & Fink LLP)

For Appellant Donald J. Trump: Alina Habba and Michael Madaio (Habba Madaio & Associates LLP); Jason C. Greaves (Binnall Law Group, PLLC)

For Appellant United States of America: Brian M. Boyton, Mark R. Freeman, Mark B. Stern, Joshua M. Salzman, and Sean R. Janda

## U.S. Court of Appeals for the Second Circuit

For Plaintiff-Appellee E. Jean Carroll: Roberta A. Kaplan, Joshua Matz, and Raymond Tolentino (Kaplan Hecker & Fink LLP); Leah Litman

For Defendant-Appellant Donald J. Trump: Alina Habba and Michael Madaio (Habba Madaio & Associates LLP); Marc E. Kasowitz (Kasowitz Benson Torres LLP)

For Movant-Appellant United States of America: Jennifer B. Dickey, Sopan Joshi, Mark R. Freeman, Mark B. Stern, and Joshua M. Salzman

For *Amici Curiae* The Rape, Abuse & Incest National Network, Legal Momentum, The Women's Legal Defense and Education Fund, National Alliance to End Sexual Violence, The National Center for Victims of Crime, The New York City Alliance Against Sexual Assault, Safe Horizon, Inc., and Time's Up Foundation: Zoe Salzman (Emery Celli Brinckerhoff Abady Ward & Maazel LLP)

**U.S. District Court for the Southern District of New York**

For Plaintiff E. Jean Carroll: Roberta A. Kaplan, Joshua Matz, Shawn G. Crowley, and Matthew J. Craig (Kaplan Hecker & Fink LLP)

For Defendant Donald J. Trump: Alina Habba (Habba Madaio & Associates LLP); Marc E. Kasowitz, Christine A. Montenegro, and Paul J. Burgo (Kasowitz Benson Torres LLP)

For Movant United States of America: Jeffrey Bossert Clark, James G. Touhey, Jr., Stephen Terrell, and William Kerwin Lane III

For *Amicus Curiae* Government Accountability Project: John A. Kolar (Government Accountability Project); Ned Miltenberg (National Legal Scholars Law Firm, P.C.)

**New York State Supreme Court**

For Plaintiff E. Jean Carroll: Roberta A. Kaplan, Gabrielle E. Tenzer, Joshua Matz, Matthew J. Craig, Louis W. Fisher, and Martha E. Fitzgerald (Kaplan Hecker & Fink LLP)

For Defendant Donald J. Trump: Lawrence S. Rosen (LaRocca Hornik Rosen & Greenberg LLP); Marc E. Kasowitz, Christine A. Montenegro, and Paul J. Burgo (Kasowitz Benson Torres LLP)

# TABLE OF CONTENTS

LIST OF PARTIES AND *AMICI* ................................................................. i

TABLE OF AUTHORITIES ......................................................................v

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION .............................................................2

STATEMENT OF THE ISSUE...................................................................2

STATEMENT OF THE CASE...................................................................2

    A.    Factual Background.................................................................2

    B.    Procedural Background .............................................................5

STANDARD OF REVIEW .....................................................................10

SUMMARY OF ARGUMENT ................................................................10

ARGUMENT ....................................................................................12

I.    THIS COURT NEED NOT DEFINE THE SCOPE OF EMPLOYMENT
    FOR THE PRESIDENT OF THE UNITED STATES ................................12

II.    TRUMP'S DEFAMATORY STATEMENTS TARGETING CARROLL
    WERE OUTSIDE THE SCOPE OF HIS FEDERAL EMPLOYMENT......13

    A.    This Court Should Confirm the Rule that an Employee's
        Motive for Tortious Conduct is Crucial to Scope-of-
        Employment Analysis ........................................................15

        1.    The Early Development of *Respondeat Superior* Law in
            the District Identified Employee Intent as a Key
            Consideration ........................................................15

        2.    From 1976 to 1986, this Court Revisited its *Respondeat
            Superior* Doctrine but Adhered to the Restatement.................18

3.      Recent Cases Confirm that the District Adheres to the
        Restatement and Treats Employee Motives as Crucial ............23

4.      The Vast Majority of Jurisdictions Similarly Treat
        Employee Motive as Crucial to Scope-of-Employment
        Analysis ..................................................................................28

B.      Trump Acted Outside the Scope of his Employment as
        President in Repeatedly Defaming and Insulting Carroll ..................30

C.      Appellants' Proposed Categorical Rule Conflicts with Settled
        District Jurisprudence and American Constitutional Traditions.........38

1.      The Categorical Position Is Inconsistent with District
        Law..........................................................................................39

2.      The Categorical Position Offends Constitutional
        Traditions ...............................................................................41

3.      The Categorical Position Is Unsupported by Precedent ..........45

CONCLUSION...........................................................................................50

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Aldridge v. Metro. Life Ins. Co.*,
 No. 18 CVS 1050, 2019 WL 7374878 (N.C. Super. Ct. Dec. 31, 2019) ............29

*Antonio v. SSA Sec., Inc.*,
 110 A.3d 654 (Md. 2015) ...................................................................................29

*Armstrong v. Thompson*,
 759 F. Supp. 2d 89 (D.D.C. 2011).............................................................. 34, 40

*Axman v. Washington Gaslight Co.*,
 38 App. D.C. 150 (D.C. Cir. 1912) ............................................................. 16, 18

*Baker v. Saint Francis Hosp.*,
 126 P.3d 602 (Okla. 2005) .................................................................................29

*Bernie v. Catholic Diocese of Sioux Falls*,
 821 N.W.2d 232 (S.D. 2012)..............................................................................29

*Blair v. District of Columbia*,
 190 A.3d 212 (D.C. 2018) .......................................................... 24, 25, 26, 38

*Boykin v. District of Columbia*,
 484 A.2d 560 (D.C. 1984) ................................................. 22, 23, 35, 36, 40, 41

*Bratton v. Calkins*,
 870 P.2d 981 (Wash. Ct. App. 1994) .................................................................30

*Brown v. Argenbright Sec., Inc.*,
 782 A.2d 752 (D.C. 2001) ......................................................... 24, 26, 35, 40

*Burroughs v. Com.*,
 673 N.E.2d 1217 (Mass. 1996)...........................................................................29

*Carroll v. Trump*,
 49 F.4th 759 (2d Cir. 2022) ............................... 9, 10, 13, 14, 26, 31, 33, 36, 37

*Carroll v. Trump*,
 498 F. Supp. 3d 422 (S.D.N.Y. 2020) .......................................... 7, 27, 31, 33, 50

*Carroll v. Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022) ....................................................................8

*Carroll v. Trump*,
No. 20 Civ. 7311, 2022 WL 6897075 (S.D.N.Y Oct. 12, 2022).......................6, 9

*Clark v. McGee*,
404 N.E.2d 1283 (N.Y. 1980) .............................................................................50

*Clinton v. Jones*,
520 U.S. 681 (1997) ....................................................................... 7, 42, 44, 45

*Clo White Co. v. Lattimore*,
590 S.E.2d 381 (Ga. 2003) ..................................................................................29

*Council on American-Islamic Relations v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006).................................................................. 47, 48, 49

*District of Columbia v. Bamidele*,
103 A.3d 516 (D.C. 2014) ............................................. 17, 24, 25, 27, 35, 37, 40

*District of Columbia v. Coron*,
515 A.2d 435 (D.C. 1986) ........................................................................ 23, 34, 40

*District of Columbia v. Davis*,
386 A.2d 1195 (D.C. 1978) ..................................................................................18

*District of Columbia v. Jones*,
919 A.2d 604 (D.C. 2007) ........................................................................ 14, 45, 46

*Doe v. Forrest*,
853 A.2d 48 (Vt. 2004)........................................................................................29

*Does 1-10 v. Haaland*,
973 F.3d 591 (6th Cir. 2020) ...............................................................................47

*Dragomir v. Spring Harbor Hosp.*,
970 A.2d 310 (Me. 2009) ....................................................................................29

*Drew v. Pac. Life Ins. Co.*,
496 P.3d 201 (Utah 2021) ....................................................................................29

*Engler v. Gulf Interstate Eng'g, Inc.*,
 280 P.3d 599 (Ariz. 2012) ......................................................................29

*Fiano v. Old Saybrook Fire Co. No. 1, Inc.*,
 209 A.3d 629 (Conn. 2019) ....................................................................29

*Giudicessi v. State*,
 868 N.W.2d 418 (Iowa Ct. App. 2015) ..................................................29

*Grease Monkey Int'l, Inc. v. Montoya*,
 904 P.2d 468 (Colo. 1995) .....................................................................29

*Grimes v. B.F. Saul Co.*,
 47 F.2d 409 (D.C. Cir. 1931).......................................................... 16, 36

*Hamed v. Wayne Cnty.*,
 803 N.W.2d 237 (Mich. 2011) ...............................................................29

*Harkness v. Platten*,
 375 P.3d 521 (Or. 2016).........................................................................29

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
 491 U.S. 657 (1989) ...............................................................................34

*Hechinger Co. v. Johnson*,
 761 A.2d 15 (D.C. 2000) ................................................................. 26, 38

*Herbin v. Hoeffel*,
 886 A.2d 507 (D.C. 2005) ......................................................................24

*Howard University v. Best*,
 484 A.2d 958 (D.C. 1984) ............................................................ 21, 22, 24

*Johnson v. Weinberg*,
 434 A.2d 404 (D.C. 1981) ................................................ 20, 21, 22, 23, 24

*Jordan v. Medley*,
 711 F.2d 211 (D.C. Cir. 1983).............................................................22

*Kase v. Ebert*,
 707 S.E.2d 456 (S.C. Ct. App. 2011) .....................................................29

*L.B. v. United States*,
    515 P.3d 818 (Mont. 2022)......................................................................29

*Lyon v. Carey*,
    533 F.2d 649 (D.C. Cir. 1976)......................................... 19, 20, 21, 22

*M.J. Uline Co. v. Cashdan*,
    171 F.2d 132 (D.C. Cir. 1948)................................................................41

*Majano v. United States*,
    469 F.3d 138 (D.C. Cir. 2006)........................................ 28, 35, 37, 40

*Mathis v. United States*,
    579 U.S. 500 (2016) ...............................................................................26

*Meyers v. Nat'l Detective Agency, Inc.*,
    281 A.2d 435 (D.C. 1971) ....................................................................17

*Nava v. Rivas-Del Toro*,
    264 P.3d 960 (Idaho 2011) ....................................................................29

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ...............................................................................42

*Operation Rescue Nat'l v. United States*,
    975 F. Supp. 92 (D. Mass. 1997)..........................................................47

*Osborn v. Haley*,
    549 U.S. 2252 (2007) ............................................................................31

*Park Transfer Co. v. Lumbermens Mut. Cas. Co.*,
    142 F.2d 100 (D.C. Cir. 1944)....................................................... 16, 17

*Parmenter v. J & B Enterprises, Inc.*,
    99 So. 3d 207 (Miss. App. Ct. 2012)....................................................29

*Patterson v. Blair*,
    172 S.W.3d 361 (Ky. 2005)...................................................................29

*Penn Central Transportation Co. v. Reddick*,
    398 A.2d 27 (D.C. 1979) ......................................... 19, 20, 21, 34, 40, 41

*Perks v. Town of Huntington*,
    251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ...................................................................36

*Pineda v. Chase Bank USA, N.A.*,
    186 A.3d 1054 (R.I. 2018) ....................................................................................29

*Plains Res., Inc. v. Gable*,
    682 P.2d 653 (Kan. 1984) .....................................................................................29

*Porter v. City of Manchester*,
    921 A.2d 393 (N.H. 2007) ....................................................................................29

*Rivera v. Lew*,
    99 A.3d 269 (D.C. 2014) .....................................................................................10

*Ross v. Mitsui Fudosan, Inc.*,
    2 F. Supp. 2d 522 (S.D.N.Y. 1998) ......................................................................36

*Sandman v. Hagan*,
    154 N.W.2d 113 (Iowa 1967) ...............................................................................30

*Schecter v. Merchants Home Delivery, Inc.*,
    892 A.2d 415 (D.C. 2006) ........................................................................... 24, 37

*Sherman v. State Dep't of Pub. Safety*,
    190 A.3d 148 (Del. 2018) .....................................................................................29

*Sitton v. Massage Odyssey, LLC*,
    158 N.E.3d 156 (Ohio Ct. App. 2020) .................................................................29

*Spitsin v. WGM Transp., Inc.*,
    97 A.3d 774 (Pa. Super Ct. 2014) ........................................................................29

*Spurlock v. Townes*,
    368 P.3d 1213 (N.M. 2016) ..................................................................................29

*State v. Hoshijo ex rel. White*,
    76 P.3d 550 (Haw. 2003) ......................................................................................29

*Strong v. K & K Invs., Inc.*,
    343 N.W.2d 912 (Neb. 1984) ...............................................................................29

*Synergies3 Tec Servs., LLC v. Corvo*,
   319 So. 3d 1263 (Ala. 2020) ...............................................................29

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022)........................................................44

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................42

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) ................................................................... 6, 42

*United States v. Burr*,
   25 F. Cas. 30 (Va. Cir. Ct. 1807).........................................................43

*VECO, Inc. v. Rosebrock*,
   970 P.2d 906 (Alaska 1999) ................................................................30

*Waldon v. Covington*,
   415 A.2d 1070 (D.C. 1980)..................................................................18

*Walters v. Homestaff Health Care*,
   No. Civ. 950146961S, 1996 WL 88058 (Conn. Super. Ct. Feb. 8, 1996) ..........36

*Williams v. United States*,
   71 F.3d 502 (5th Cir. 1995).................................................................47

*Wilson v. Libby*
   535 F.3d 697 (D.C. Cir. 2008).............................................................47

*Wuterich v. Murtha*,
   562 F.3d 375 (D.C. Cir. 2009).............................................................47

## Statutes

28 U.S.C. § 1346(b)(1).................................................................................6

28 U.S.C. § 2679(d)(2).................................................................................6

D.C. Code § 11-723 .....................................................................................2

## Rules

D.C. App. R. 22............................................................................................2

## Other Authorities

Br. of Donald J. Trump, *Trump v. United States*,
No. 22-13005 (11th Cir. Nov. 10, 2022) ............................................................43

Br. of U.S., *Swalwell v. Trump*,
No. 21 Civ. 586 (D.D.C. July 27, 2021).............................................................44

Catherine M. Sharkey, *Institutional Liability for Employees' Intentional Torts:*
*Vicarious Liability As A Quasi-Substitute for Punitive Damages*,
53 Val. U. L. Rev. 1 (2018)................................................................................29

James Wilson, Debates in the Convention of the State of Pennsylvania (Dec. 4,
1787), *in* The Debates in the Several State Conventions on the Adoption of the
Federal Constitution (Jonathan Elliot ed., Washington, 2d ed. 1836) ...............42

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over*
*Defamation Suite Against Trump, Barr Says*,
N.Y. Times (Sept. 9, 2020)...................................................................................6

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ...........................43

Mot. to Dismiss, *District of Columbia v. Trump*,
No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) .........................................................43

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*,
No. 20-197 (U.S. Aug. 20, 2020) .......................................................................43

Restatement (Second) of Agency (1958)............................................. 14, 17, 34, 40

Restatement (Third) of Agency (2006)............................................................ 18, 27

William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law*
(1987).................................................................................................................18

**INTRODUCTION**

In June 2019, E. Jean Carroll revealed that former President Donald J. Trump had sexually assaulted her decades earlier. Although Trump denied it, he did not stop there. He launched a series of vicious, personal attacks. He implied that she was too ugly to rape; that she had falsely accused other men of sexual assault; and that she had invented her story for money, or to sell books, or to advance a political plot. None of this was true. Trump knew who Carroll was when he attacked her, he knew who she was in 2019, and he knew what he was doing when he went on a rampage designed to punish and humiliate her for daring to reveal his decades-old crime.

The only two judges who have reached the issue found that these statements revealed a man pursuing a personal vendetta, not a federal officer advancing public purposes. On that basis, they concluded that Trump acted outside the scope of his federal employment under the District's law of *respondeat superior* (which applies under the Westfall Act). The majority of a Second Circuit panel, however, held that relevant District law is unclear—and therefore certified the question to this Court. Trump and the Department of Justice, for their part, have responded to that development by asking this Court to announce a categorical rule that elected officials always and automatically act within their employment whenever they address the public. This Court should reject that position and hold that Trump acted outside the scope of his federal employment when he repeatedly defamed Carroll in June 2019.

## STATEMENT OF JURISDICTION

On September 27, 2022, the United States Court of Appeals for the Second Circuit issued an opinion in which it certified a question of District law to this Court. *See* D.C. App. R. 22. On October 25, 2022, this Court agreed to consider the certified question *en banc*. The Court has jurisdiction pursuant to D.C. Code § 11-723.

## STATEMENT OF THE ISSUE

Under the laws of the District, were the allegedly libelous public statements made, during his term in office, by the President of the United States, denying allegations of misconduct, with regards to events prior to that term of office, within the scope of his employment as President of the United States?

## STATEMENT OF THE CASE

### A.    Factual Background[1]

One evening in the mid-1990s, Carroll went to shop at the Bergdorf Goodman department store in Manhattan after work. A28 ¶ 22. As she was exiting through the revolving glass doors on the north side of the building, Trump entered through the same doors from 58th Street. A28 ¶ 23. Trump recognized Carroll—they had met at least once before, they traveled in similar circles, and Carroll was then a frequent

---

[1] Citations to "A__" are to the Joint Appendix that is part of the record transmitted to this Court by the Second Circuit. Citations to "Dist. Ct. Doc. No. __" are to the United States District Court for the Southern District of New York docket, No. 20 Civ. 7311 (S.D.N.Y.). Citations to "NYSCEF Doc. No. __" are to the New York state court docket, No. 160694/2019 (N.Y. Sup. Ct.).

guest on the *Today* show as well as the host of her own daily *Ask E. Jean* television show. A28 ¶ 24. Trump put his hand up to stop Carroll, saying, "Hey, you're that advice lady!" A28 ¶ 25. Trump told Carroll that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to advise him. A28 ¶ 26. Carroll thought the encounter might make for a funny story, so she agreed to help Trump. *Id.*

Carroll suggested various items: first a handbag, then a hat. A28 ¶ 27. Trump decided on lingerie. A29 ¶ 29. When they arrived at the lingerie department, it was practically empty, with no attendant in sight. A29 ¶ 30. Trump snatched a see-through bodysuit and insisted that Carroll try it on. A29 ¶¶ 30-31. Bemused, Carroll responded that he should try it on himself. A29 ¶ 31.

Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on." A29 ¶ 32. He maneuvered Carroll into a dressing room, shut the door, and lunged at her—knocking her head against the wall. A29 ¶¶ 33-36. He then forcibly put his mouth on her lips. A29 ¶ 36. Shocked by Trump's behavior, Carroll shoved him back and burst out in awkward laughter, hoping that he would retreat. A29 ¶ 37. Instead, Trump seized both of Carroll's arms and pushed her up against the wall again. A29 ¶ 38. Trump then jammed his hand under her coatdress and pulled down her tights. *Id.* He opened his overcoat, unzipped his pants, pushed his fingers around Carroll's genitals, and forced his penis inside of her. A30 ¶ 39. Carroll resisted, struggling to break free. A30 ¶ 40. She tried to stomp Trump's foot. She tried to push him away.

*Id.* Finally, she raised her knee high enough to push him off her. *Id.* Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue. A30 ¶ 41.

Immediately after Trump attacked her, Carroll told two close friends about what had happened; both of them have since publicly confirmed her account of these events. A30-31 ¶¶ 43, 47. One urged her to report the crime, but the other warned her that Trump would ruin her life if she did. A30-31 ¶¶ 44-48. Carroll chose silence. She knew how brutal Trump could be and was convinced that nobody would believe her. Like so many other survivors of sexual assault, Carroll also blamed herself. A31 ¶¶ 49-50. Carroll did not mention the assault to another soul for over twenty years— not wanting to be perceived or to see herself as a victim of rape. A31 ¶ 53.

For the next two decades, Carroll pursued her career as a writer and advice columnist while concealing her own trauma. A32 ¶ 55; A33 ¶¶ 59-60. During the last month of the 2016 election, several women publicly revealed that Trump had engaged in sexual misconduct. A33 ¶ 61. During this period, however, Carroll was focused on attending to her dying mother, who was then in hospice care. A33-34 ¶ 62. Carroll feared that speaking up would provoke a media storm and destroy any peace in her mother's remaining time. *Id.* It was only after her mother died—and the #MeToo movement empowered survivors of sexual assault to come forward—that Carroll decided to reveal the truth. A34-36 ¶¶ 65-73. A writer to her core, determined to tell her story on her own terms, Carroll described Trump's attack in a book

released on July 2, 2019. A37 ¶¶ 77, 80. On June 21, 2019, *New York* magazine published an excerpt from Carroll's book detailing Trump's attack. A37 ¶ 79.

Trump then unleashed a series of vicious, personal attacks over a four-day period. He denied her accusation and insisted they had never met. A38-41 ¶¶ 81-96. But he went much further than that. He insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too unattractive for him to have raped her. A42 ¶ 97. He accused Carroll of lying about the rape to make money, to increase book sales, or to carry out a political agenda. A26 ¶ 11; A38 ¶ 82; A40 ¶¶ 88-90. He also implied that she had falsely accused other unspecified men of sexual assault. A40 ¶ 91; A41 ¶ 95. And Trump did all this while fully aware that he *in fact* had raped Carroll: he thus acted with actual malice in every sense of the term. A44-48 ¶¶ 106-28. He sought to punish and humiliate Carroll for speaking up, and to bury her in defamatory lies. Ultimately, his repeated attacks caused Carroll significant harm. A48-49 ¶¶ 129-36.

## B.     Procedural Background

To redress her injuries, Carroll filed a defamation action in New York court in November 2019. Trump first evaded service of the complaint. *See* NYSCEF Doc. Nos. 6, 15. He then sought dismissal based on a specious claim that the court lacked personal jurisdiction. *See* NYSCEF Doc. Nos. 33, 36. Finally, he sought a stay based

on a theory of absolute immunity unsupported by precedent—as was soon confirmed by *Trump v. Vance*, 140 S. Ct. 2412 (2020). *See* NYSCEF Doc. Nos. 49, 110.

By September 8, 2020, Trump faced a choice: either engage in discovery or appeal the denial of a stay. Instead, Trump induced the Department of Justice (DOJ) to intervene. At his urging, DOJ removed this case to federal court and sought to substitute the United States as defendant. *See* Dist. Ct. Doc. No. 3. The hook for that maneuver was the Westfall Act, which allows the United States to be sued for money damages in federal district court in certain circumstances. *See* 28 U.S.C. § 1346(b)(1). If a plaintiff sues a federal employee instead of suing the United States, the United States may move to substitute itself for that employee upon the Attorney General's (judicially reviewable) certification that the employee was "acting within the scope of his [federal] office or employment." 28 U.S.C. § 2679(d)(2).

Although Westfall Act removals are commonplace (*e.g.*, in cases involving car accidents caused by U.S. Postal Service employees), the circumstances here were exceedingly irregular. DOJ intervened ten months after the state court action was first filed, during which time neither Trump nor DOJ made "any suggestion that the government of the United States had anything whatever to do with [the case]." *Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *1 (S.D.N.Y Oct. 12, 2022). Attorney General William Barr later confirmed that DOJ had intervened at Trump's urging. *See* Katie Benner & Charlie Savage, *White House Asked Justice*

*Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020). And in a prior case where a President faced defamation claims based on his reaction to revelations of prior sexual misconduct, DOJ never suggested that the matter implicated the Westfall Act. *Cf. Clinton v. Jones*, 520 U.S. 681, 685 (1997).

DOJ's removal petition in this case presented the question whether Trump was covered by the Westfall Act—and, if so, whether he had committed his tortious acts within the scope of his employment. Following briefing and a hearing (where DOJ declined to present argument), Judge Kaplan denied DOJ's motion to substitute itself as the defendant. *Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020). He based this decision on two grounds: *first*, that the Westfall Act does not cover the President; and *second*, that Trump had acted outside the scope of his employment under District law, thereby forfeiting any Westfall Act protections. *Id.* at 443, 457.

In analyzing these issues, Judge Kaplan noted the awkwardness of applying scope-of-employment concepts to this case. Ordinarily, a principal can be held liable for certain acts by his agent (acts within the "scope of employment") because the principal can "control and direct the servant in the performance of his work and the manner in which the work is to be done." *Id.* at 448. But here, "holding that [Trump] is a 'servant' whom a 'master' 'has the right to control and direct' when he speaks to reporters, or otherwise, would be absurd." *Id.* Judge Kaplan elaborated: "No one

gives him permission to speak. No one can require him to say, or not to say, anything at all. No one has the authority to cut him off." *Id.* at 450.

More fundamentally, Judge Kaplan found that Trump had acted outside the scope of his employment because his conduct was "too little actuated by a purpose to serve the master." *Id*. As he explained: "President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office. Neither the media reports nor the underlying allegations have any relationship to his official duties." *Id.* at 455-56. Thus, "the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue." *Id.* at 457.

Trump and DOJ appealed Trump subsequently sought a stay, which was denied. Dist. Ct. Doc. No. 56. Months later, Trump sought leave to amend his answer to allege a counterclaim against Carroll. Dist. Ct. Doc. No. 64. Judge Kaplan denied that motion, too, observing that Trump's "litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity [Carroll] may have to present her case against him." *Carroll v. Trump*, 590 F. Supp. 3d 575, 588 (S.D.N.Y. 2022). Ultimately, the parties agreed to a discovery schedule. Dist. Ct. Doc. Nos. 76-77.

Meanwhile, the Second Circuit heard argument on December 3, 2021. There, Judge Guido Calabresi expressed confusion over the District's standard for scope-

of-employment analysis, and all three judges on the panel explored District law concerning employee action driven by private (as opposed to job-related) motives.

On September 27, 2022, a divided panel of the Second Circuit issued its decision. *See Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022). The majority (Judges Calabresi and William Nardini) held that the Westfall Act does apply to the President and certified to this Court the question whether Trump's defamatory statements targeting Carroll occurred within the scope of his federal employment. *See id*. at 780.

In dissent, Judge Denny Chin saw "no question that Trump was acting outside the scope of his employment when he made at least some of the alleged defamatory remarks about Carroll's accusations." *Id.* at 789. "In the context of an accusation of rape, the comment 'she's not my type' surely is not something one would expect the President of the United States to say in the course of his duties." *Id.* Together, "Carroll's allegations plausibly paint a picture of a man pursuing a personal vendetta against an accuser, not the United States' 'chief constitutional officer' engaging in 'supervisory and policy responsibilities of utmost discretion and sensitivity.'" *Id.*

The day after the Second Circuit issued its opinion, Trump filed a third motion to stay the proceedings. Dist. Ct. Doc. No. 92. Judge Kaplan denied this motion as well, finding that Trump "should not be permitted to run the clock out on [Carroll's] attempt to gain a remedy for what allegedly was a serious wrong." *Carroll*, 2022 WL 6897075, at *6. Fact and expert discovery in the district court have since closed.

On October 25, 2022, this Court (proceeding *en banc*) accepted the Second Circuit's certified question and established a briefing schedule for the parties.

On November 24, 2022, Carroll filed a second action against Trump, in which she alleges one count of battery under New York law for the underlying rape and one count of defamation for a series of statements that Trump posted on Truth Social in October 2022. *See Carroll v. Trump*, No. 22 Civ. 10116 (S.D.N.Y.).

On November 29, 2022, recognizing this Court's expedited consideration of the appeal, Judge Kaplan set a trial date of April 10, 2022. Dist. Ct. Doc. No. 100.

## STANDARD OF REVIEW

The Second Circuit has certified a question of law that the Court addresses *de novo*. *See Rivera v. Lew*, 99 A.3d 269, 271 (D.C. 2014); *see also Carroll*, 49 F.4th at 772 ("[W]e review the scope of employment issue *de novo*.").

## SUMMARY OF ARGUMENT

The certified question asks this Court to decide whether Trump acted outside the scope of his employment in repeatedly defaming Carroll after she revealed that he had raped her decades before being elected to office. The Court should provide a direct answer to that question—and should make clear that Trump's conduct placed him beyond the scope of his employment. In doing so, the Court can address the Second Circuit's general uncertainty about District law, the proper understanding of

that law in this particular context, and the error in Trump and DOJ's request for this court to adopt a new, categorical rule applicable only to elected public officials.

**I.** Because the question here is whether Trump acted with private motives in defaming Carroll, the Court need not undertake a general definition of the scope of the President's employment.

**II.** Trump's defamatory statements targeting Carroll after she revealed that he had raped her were outside the scope of his employment as President: he acted with private motives, and not in furtherance of any official federal purpose or function, in seeking to punish and humiliate Carroll for revealing his decades-old crime.

**II.A.** The Second Circuit asked this Court to clarify whether, under District law, an employee's motives for tortious conduct can place him outside the scope of his employment. The answer to that question is "yes." Through most of the twentieth century, this Court consistently held that employees act outside their employment if they lack a purpose to serve their employer. Nearly four decades ago, this Court briefly considered an alternative approach (which the Second Circuit referred to as "internalization") that would prioritize the foreseeability of employee conduct and treat employee motives as irrelevant. But the Court almost immediately returned to its traditional emphasis on employee motivation. Ever since, it has adhered to the widely accepted rule that an employee acts outside the scope of his employment if

he is too little actuated by a job-related purpose in committing an intentional tort. The Court should confirm that this remains the law of the District.

**II.B.** The Second Circuit also asked this Court to clarify how its legal standard applies here. Because of the appeal's unusual procedural posture, that is a question of law. Given the Second Circuit's admission of uncertainty and the undue delays that have already plagued this case, the Court should reach that issue directly and hold that Trump acted outside the scope of his employment in repeatedly defaming Carroll. That conclusion, which has already been endorsed by Judges Chin and Kaplan, follows from the undisputed facts and from the application of precedent identifying indicia of personal motivation in the scope-of-employment setting.

**II.C.** Trump and DOJ, largely ignoring the facts of this case and the issues as framed by the Second Circuit, urge this Court to adopt a categorical rule that whenever an elected official speaks publicly on any matter of public concern, he is acting within the scope of his employment. This approach should be rejected: it defies core precepts of *respondeat superior* jurisprudence, offends our constitutional traditions, and is unsupported by (indeed, it is inconsistent with) precedent.

## ARGUMENT

## I. THIS COURT NEED NOT DEFINE THE SCOPE OF EMPLOYMENT FOR THE PRESIDENT OF THE UNITED STATES

The Court has directed the parties to address the necessity of opining on "the scope of the President of the United States' employment." Order, *Trump v. Carroll*,

No. 22-SP-0745 (D.C. 2022). We believe that this is unnecessary; the Court can and should resolve this appeal without comprehensively defining the precise bounds of the President's employment. For purposes of the *respondent superior* analysis at issue here, the question is not whether Trump engaged in an act that by its very nature is beyond the scope of the President's employment. Instead, the only question is whether Trump's conduct—as alleged by Carroll in the Complaint—was too little actuated by a job-related purpose. The answer to that question turns on Trump's own motives (as evidenced by the nature and particular circumstances of his conduct), and on the distinction between personal and employment-related motives that has been applied in a wide range of *respondeat superior* cases for over a century.

That said, Trump and DOJ urge this Court to adopt a new, categorical rule that would effectively exempt the President (and other officials) from the standard scope-of-employment test. As we explain in Part II.C below, that proposal is meritless as a matter of agency law and inconsistent with constitutional traditions.

## II. TRUMP'S DEFAMATORY STATEMENTS TARGETING CARROLL WERE OUTSIDE THE SCOPE OF HIS FEDERAL EMPLOYMENT

The Second Circuit has asked this Court to address whether Trump's repeated defamatory attacks on Carroll were undertaken within the scope of his employment. It certified that *respondeat superior* issue based partly on its belief that District law is torn between "two competing views." *Carroll v. Trump*, 49 F.4th 759, 776 (2d Cir. 2022). On one view, an employee acts outside the scope of employment where

13

he is "too little actuated by a purpose to serve the master." Restatement (Second) of Agency § 228 (1958). On the other view, when an employee's acts result from any foreseeable risks of running a business, their conduct is treated as within the scope of employment, thus forcing the employer to internalize all costs connected to its enterprise. *See Carroll*, 49 F.4th at 773-74. Importantly, an employee's state of mind when committing a tort can remove him from the scope of his employment under the Restatement approach, but not under a pure internalization approach.

As the Second Circuit recognized, this Court has expressly held that the District adheres to the Second Restatement. But looking mainly to a handful of cases from the mid-1980s, the Second Circuit asked this Court to clarify whether it had *sub silentio* abandoned the Restatement in favor of internalization.

In their briefs, Trump and DOJ largely ignore this question. Rather than address the general rule of *respondeat superior* liability in the District, they devote their attention to a different argument: namely, that there is a new and distinct rule of *respondeat superior* liability that they say applies only to certain high-ranking or elected public officials. Under this supposed rule, whenever such officials address the public on a matter of public concern, they are categorically held to have acted within the scope of their employment—without any consideration of motive or context. Trump and DOJ impute this rule to a few D.C. Circuit cases and to a single District precedent: *District of Columbia v. Jones*, 919 A.2d 604 (D.C. 2007), which

14

did not address any scope-of-employment issue (indeed, the phrases "scope of employment" and "*respondeat superior*" appear nowhere in the *Jones* opinion).

We first describe the general rule of *respondeat superior* doctrine in the District. We then apply that general rule in these particular circumstances. And we conclude by explaining the substantial errors in Trump and DOJ's position.

## A. This Court Should Confirm the Rule that an Employee's Motive for Tortious Conduct is Crucial to Scope-of-Employment Analysis

The Second Circuit asked this Court to clarify District law concerning the general standard for *respondeat superior*. The Court should reaffirm its century-old adherence to the rule that an employee acts outside the scope of his employment if (at the moment he engaged in his tortious conduct) he was too little actuated by a purpose to serve his employer. This fact-intensive and context-sensitive rule is not only the longstanding law of the District, but it also reflects sound public policy and constitutes the decisive majority view among American jurisdictions. The handful of older cases cited by the Second Circuit reflected only a short-lived, abortive foray into merging internalization and Restatement concepts. More modern cases from the District have made clear that an employee's purposes remain central to the inquiry.

### 1. The Early Development of *Respondeat Superior* Law in the District Identified Employee Intent as a Key Consideration

In 1909, agents of the Washington Gaslight Company suspected that Anna Axman was stealing gas. So they broke into her house to inspect her gas meter. In

response, Axman sued their employer. That course of events led to an early pronouncement on *respondeat superior* law. *See Axman v. Washington Gaslight Co.*, 38 App. D.C. 150 (D.C. Cir. 1912). There, the court sought to strike a balance. On the one hand, if an employee's "recklessness or lack of judgment cause[s] loss or damage" while carrying out his employer's business, the employer who "selected and commissioned him" should be held accountable. *Id.* at 158. On the other hand, "the moment the agent turns aside from the business of the principal and commits an independent trespass, the principal is not liable." *Id.* Thus, employers could not be held liable where their employees acted in furtherance of "some real or fancied personal grievance," rather than to further their employer's business. *Id.* at 159.

Over the following decades, the D.C. Circuit issued several opinions building on *Axman*. In *Grimes v. B.F. Saul Co.*, 47 F.2d 409, 410 (D.C. Cir. 1931), it held that *respondeat superior* did not apply where a janitor employed by a real estate business assaulted a tenant in her apartment. The court reasoned that "[t]he act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor." *Id.* (citation omitted). This same principle controlled in *Park Transfer Co. v. Lumbermens Mut. Cas. Co.*, 142 F.2d 100 (D.C. Cir. 1944), which concerned a construction company's liability for an assault by one of its workers

who had been provoked with racist slurs. Citing *Axman* and *Grimes*, the court held the worker was outside his employment: "unless an assault, or other tort, is actuated in part at least by a purpose to serve a principal, the principal is not liable." *Id.*

In 1958, the Restatement (Second) of Agency arrived on the scene and described four independent requirements of an employee's conduct, each of which must be met to trigger *respondeat superior* liability: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) *it is actuated, at least in part, by a purpose to serve the master*, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master." § 228 (emphasis added). In other words, "[c]onduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or *too little actuated by a purpose to serve the master*." *Id.* (emphasis added). The Second Restatement thus treated employee motivation as central to any scope-of-employment determination.

The Second Restatement's approach closely tracked existing District law— and the District deepened its commitment to that view over the following decades. *See District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014) ("We have long endorsed the Second Restatement's approach."). In case after case, this Court explained that an employee acts outside the scope of his employment if he was too little actuated by a job-related purpose. *See Meyers v. Nat'l Detective Agency, Inc.*,

17

281 A.2d 435, 437 (D.C. 1971); *District of Columbia v. Davis*, 386 A.2d 1195, 1203 (D.C. 1978); *Waldon v. Covington*, 415 A.2d 1070, 1074 n.13 (D.C. 1980).

That rule flowed from sound public policy concerns. *Respondeat superior* developed from the premise that employers should have to bear the costs of conduct committed for their benefit. *See Axman*, 38 App. D.C. at 158. This is both fair and efficient: employers are morally and financially on the hook when conduct carried out at their direction (and for their benefit) causes harm to third parties. In practice, that rule pushes employers to exercise care in managing and supervising employees.

The calculus changes, however, when an employee acts largely on personal motives. In those cases, the employer is ill-equipped to prevent his conduct. *See* William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 208-09 (1987) ("If the employee is actuated by purely personal motives, the employer's practical ability to prevent the tort will be slight."). The economic and moral arguments for imposing liability in such circumstances are correspondingly frail. *See* Restatement (Third) of Agency § 7.07 cmt. b. (2006). Therefore, courts (including this one) hold that employees who are "too little actuated" by job-related motives have acted outside the scope of their employment under *respondeat superior*.

## 2. From 1976 to 1986, this Court Revisited its *Respondeat Superior* Doctrine but Adhered to the Restatement

Through 1976, this Court stated many times that purpose was crucial to its analysis. In the Second Circuit's view, however, this Court muddied the waters in a

series of decisions issued between 1976 to 1984. But a chronological review of those decisions makes clear that the District's flirtation with internalization was partial and short lived. By the late 1980s, the District's adherence to the Restatement stood firm.

That story begins with *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976)—an opinion issued by the D.C. Circuit, not by this Court. There, a mattress deliveryman had raped a customer after a dispute arose during a delivery. *Id.* at 650. Admitting that "the assault was perhaps at the outer bounds of *respondeat superior*," the court nonetheless concluded that the scope-of-employment issue should be decided by a jury, rather than by a judge. *Id.* at 651. It reasoned that the "dispute arose out of the very transaction which had brought [the employee] to the premises" and "out of the employer's instructions to get cash only before delivery." *Id.* at 652. On that basis, it believed a jury could potentially find that deliveryman's actions were not part of a "personal adventure," but instead reflected a job-related motivation. *Id.* at 651. As the Second Circuit noted in *Carroll*, this decision tended toward imposing employer liability for *any* foreseeable employee misconduct (*i.e.*, an internalization approach).

Three years later, this Court issued a more wide-ranging opinion on these issues: *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979). *Penn Central* involved a railroad employee who had attacked a taxi driver when the driver said he needed to use the restroom before departing. *See id.* at 29. The Court held that he had acted outside the scope of his employment. In doing so, it described the

traditional Restatement view and a "present trend [to] extend liability for intentional torts to situations where the employment provides a 'peculiar opportunity and … incentive for such loss of temper." *See id.* at 30-31. However, even for the latter approach, the Court treated motives as crucial: "The employer will not be held liable for those willful acts, intended by the agent only to further his own interest, not done for the employer at all." *Id.* at 31 (cleaned up). Ultimately, the Court seemed to apply *both* modes of analysis, holding on the one hand that the attack suggested a "personal as distinguished from business-related motive," but also that it was not foreseeable as "a direct outgrowth of the employee's instruction or job assignment, nor an integral part of the employer's business activity, interests or objectives." *Id.* at 32.

Two years later, in *Johnson v. Weinberg*, this Court followed *Lyon* in stepping toward an internalization model. *See* 434 A.2d 404 (D.C. 1981). There, a laundromat had directed its employees to empty out washing machines after each cycle. *Id.* at 406. When a customer lost his shirts and confronted an employee, the employee shot the customer. *Id.* In analyzing whether the laundromat itself could be held liable, this Court began with the Restatement, but suggested that if an employee's intentional tort resulted from any foreseeable job-related controversy, he was within the scope of his employment. *See id.* at 408-09. Relying on that logic—and citing the absence of any relationship between the customer and the employee that might suggest "that the tort was personal"—the Court held this to be an issue for the jury. *Id.* at 409.

The zenith of this Court's trend toward a pure foreseeability analysis came in *Howard University v. Best*, 484 A.2d 958 (D.C. 1984). There, a former professor alleged that a dean had sexually harassed her on multiple occasions, including in front of other faculty members and during official meetings. *Id.* at 981-82. This Court devoted merely two paragraphs in a 27-page opinion to analyzing her claim that the University itself should be held liable. In those two paragraphs, it did not disavow the relevance of motives; instead, it reasoned only that the dean had acted within his employment because "many of the incidents of alleged sexual harassment occurred during faculty, administrative or other professional meetings." *Id.* at 987.

The Second Circuit's certification to this Court cited *Lyon*, *Penn Central*, *Johnson*, and *Best* as reflecting confusion in District law. In its view, these cases leaned toward treating motive as irrelevant to the scope-of-employee analysis. But this Court never went so far: it consistently adhered to the Second Restatement approach while in some cases privileging foreseeability as a paramount concern. The relevance of foreseeability was most clear when (unlike in this case) the employer exercised direct supervision and control over the relevant employee, and when the employer was positioned to take steps to avoid tortious conduct by his employees.

Importantly, however, none of these cases actually rejected a motive-based analysis. And in the years that followed, the Court recalibrated its jurisprudence, returning to the Restatement standard and affirming that motive remains crucial.

21

That retrenchment began as early as 1983, when then-Judge Antonin Scalia (joined by Judges Abner Mikva and Harry T. Edwards) provided a broad survey of District law in *Jordan v. Medley*, 711 F.2d 211 (D.C. Cir. 1983). Remarking on the recent invocation of foreseeability, Judge Scalia described District law as "less than entirely clear." *Id.* at 213. "It is possible," he wrote, "to apply this 'foreseeability' principle as a substitute for the requirement of intent to further the employer's business." *Id.* But that interpretation struck him as mistaken: foreseeability analysis had not, in practice, displaced motive; instead, it had liberalized a distinct part of the *respondeat superior* inquiry concerned with how closely the employee's act was connected to the employer's business. *See id. at* 214-15. On that basis, he held that District law adhered to the rule that an employee is beyond the scope of employment when acting for personal reasons rather than to further an employer's interests. *Id.*

One year later—and three weeks after the *Best* decision—this Court made clear that it agreed with *Jordan*. In *Boykin v. District of Columbia*, which concerned a school's liability for sexual misconduct by a teacher, the Court held that *Johnson* "approaches the outer limits of the liability that may be imposed under *respondeat superior*." 484 A.2d 560, 563 (D.C. 1984). It then narrowed and distinguished *Lyon*, as well. *See id.* at 563-64. Finally, it "agree[d]" with *Jordan*'s observation that "an approach that would substitute foreseeability for intent to further the employer's

business" would be "inconsistent with previous cases in this jurisdiction." *Id.* at 563 n.2; *see also id.* (emphasizing that *Johnson* itself did not actually adopt that rule).

Two years later, the Court doubled down on that position in *District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986). *Coron* invoked the Restatement as "clarify[ing] conduct that is not within the scope of employment," and held that the employee at issue had acted outside the scope of his employment because "at no time was [his] conduct in furtherance of [his employer's] interests." *Id.* at 437-38.

Chronology thus helps to clarify the Second Circuit's confusion about District law. In the late 1970s and early 1980s, the Court partly embraced a more expansive view of "scope of employment," drawing on ideas (like foreseeability) associated with internalization. In doing so, however, it merged those concerns with its longstanding commitment to an approach modeled by the Second Restatement (but dating back even earlier), which assigned heavy weight to whether the employee was too little actuated by a purpose to serve the master. Then, in a series of decisions issued from 1984 to 1986, the Court made clear that it had recalibrated its doctrine back to the settled Restatement model, which remains the law of the District.

### 3. Recent Cases Confirm that the District Adheres to the Restatement and Treats Employee Motives as Crucial

Since the 1980s, this Court has developed a stable and consistent approach to scope-of-employment analysis—one that follows the familiar Second Restatement model and subjects employee motives to fact-intensive scrutiny. Applying that

23

approach, this Court has rejected a view of scope of employment that would cover virtually all employee conduct. Indeed, over the past 21 years, this Court has *never* held that an employee's tortious conduct fell within the scope of employment as a matter of law. Instead, the Court has held either that the employee's conduct was clearly beyond the scope of employment, or that this was a fact question to be decided by a jury. And in each case, the Court has assigned substantial weight to the employee's motive for engaging in the alleged tortious conduct. *See, e.g.*, *Blair v. District of Columbia*, 190 A.3d 212, 226 (D.C. 2018); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014); *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006); *Herbin v. Hoeffel*, 886 A.2d 507, 509 (D.C. 2005); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001).

Two of the Court's most recent *respondeat superior* cases—both involving off-duty police officers—illustrate that approach. *District of Columbia v. Bamidele* involved off-duty officers who got into an altercation at a restaurant and, during the ensuing mayhem, attacked another patron. *See* 103 A.3d at 519. This Court held that they had acted outside the scope of their employment in doing so, relying on the rule that "conduct of a servant that is too little actuated by a purpose to serve the master is not within the scope of employment." *Id.* at 525 (cleaned up). Confirming its pivot from *Johnson* and *Howard*, the Court further clarified that its inquiry into the employees' motives was independent of any foreseeability analysis—and that, "at

least where intentional torts are concerned, it is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort." *Id.* Because the off-duty officers did not intend to take police action against the plaintiffs, and instead assaulted them as vengeance for a perceived personal affront, they had not acted within the scope of their employment. *Id.* at 526.

Four years later, in *Blair v. District of Columbia*, the Court applied the same legal framework where an off-duty officer (working as a bouncer at a bar) used force against a patron after identifying himself as an officer and instructing that patron to leave the premises. 190 A.3d at 216. Like *Bamidele*, *Blair* identified motivation and foreseeability as distinct requirements—and held that "[t]o be within the scope of employment, the tortious activity must be actuated, at least in part, by a purpose to further the master's business." *Id.* at 226 (cleaned up). On the facts before it, the Court concluded that a reasonable jury could find that the officer's "professional and personal motives for his actions toward [the patron] were significantly intertwined," and therefore reversed a grant of summary judgment. *Id.* at 227-29.

Together, *Bamidele* and *Blair* make clear that scope-of-employment analysis in the District requires a context-sensitive analysis of the employee's motives for his tortious conduct. These cases also confirm that where an employee is "too little actuated" by a purpose to serve their employer, they are outside the scope of their employment as a matter of law. And it follows from these cases, as well as the others

cited above, that the District does not adhere to an internalization approach. While Carroll believes this is already clear, confirming these points would respond to a significant aspect of the Second Circuit's confusion about District law.[2]

In that vein, the Court might use this opportunity to offer one point of further clarification. Over time, the Court has used varied formulations to describe how the purpose requirement should be applied. In some cases, it has stated that if even a mere iota of an employee's motives for a tort were job-related, then the employee acted within the scope of his employment. *E.g.*, *Blair*, 190 A.3d at 228. Elsewhere, and consistent with the text of the Second Restatement, the Court has highlighted the "too little actuated" standard (which was invoked by the district court in this case)—and has further held that an employee's intentional tort is not within the scope

---

[2] The Second Circuit identified *Hechinger Co. v. Johnson*, 761 A.2d 15 (D.C. 2000), and *Brown v. Argenbright Security, Inc.*, 782 A.2d 752 (D.C. 2001), as cases that "stretched employer benefit very far." *Carroll*, 49 F.4th at 779. Respectfully, that is mistaken. *Hechinger* concerned a challenge to a jury verdict, and this Court held only that a reasonable jury could find that a supervisor acted within the scope of his employment in pushing a patron amid a heated altercation about whether the patron was entitled to certain items for free. 761 A.2d at 25. *Brown* concerned a security guard who improperly touched a woman while searching her; it held only that the scope-of-employment issue had to go to a jury, since "[w]hile it is probable that the vast majority of sexual assaults arise from purely personal motives," this guard may have had job-related reasons for how he searched a suspected shoplifter. 758 A.2d at 758. Both *Hechinger* and *Brown* reflect a straightforward application of the Second Restatement standard and neither altered settled District law. *Cf. Mathis v. United States*, 579 U.S. 500, 514 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same.").

of employment merely because his employment afforded the opportunity or means to pursue a fundamentally personal motive. *E.g.*, *Bamidele*, 103 A.3d at 525-26.[3]

In practice, this is often a distinction without a difference. Here, for instance, the record supports a finding that Trump acted outside the scope of his employment under either standard. If the Court agrees, it need not go any further.

But if the Court finds that the difference matters, it should not apply an unduly expansive view of Trump's scope of employment here, for reasons arising from the fundamental policies that animate this doctrine. As explained above, *respondeat superior* reflects the principle that an employer—who controls and supervises an employee—should be held responsible when its employee harms third parties while engaged in conduct for the employer's benefit. This case, however, defies that principal-agent logic. As Judge Kaplan observed, the employer here (the American electorate) has virtually no direct supervisory power or control over its employee (the President), and it is poorly positioned to take any concrete steps to avoid or sanction that employee's tortious actions. *See Carroll v. Trump*, 498 F. Supp. 3d 422, 450 (S.D.N.Y. 2020) ("No one even arguably directed or controlled President Trump when he commented on the plaintiff's accusation, which had nothing to do

---

[3] The Restatement (Third) of Agency § 7.07 (2006) proposed restating the scope-of-employment inquiry as whether the employee committed "an independent course of conduct not intended by the employee to serve any purpose of the employer." Since then, this Court has on numerous occasions adhered to the Second Restatement, which remains a widely accepted authority. *See, e.g.*, *Bamidele*, 103 A.3d at 525.

with the official business of government, that he raped her decades before he took office. And no one had the ability to control him."). As a result, the understanding of employer control that ordinarily frames scope-of-employment analysis is on shaky footing when applied in this particular employment context. Moreover, this case does not involve mere negligence, but instead involves an intentional tort—which, by its nature, is more likely to evade employer control. *See Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006) (explaining that an intentional tort "by its nature is willful and thus more readily suggests personal motivation").

In these circumstances, it is logical and fair to ask whether job-related motives in fact contributed in some material respect to Trump's tortious conduct. Therefore, if necessary to resolve the issues presented here, the Court should clarify that Trump acted outside his employment if he was "too little actuated" by job-related motives.

### 4. The Vast Majority of Jurisdictions Similarly Treat Employee Motive as Crucial to Scope-of-Employment Analysis

For the reasons given above, this Court should confirm that an employee acts outside the scope of their employment when their intentional tortious conduct is too little actuated by a purpose to serve the master. Recognizing that this Court has at times looked to the law of other jurisdictions, it bears emphasis that such a holding would keep this Court aligned with the strong majority of state courts, which either

expressly state that rule or incorporate it through the Second Restatement.[4] *See*
Catherine M. Sharkey, *Institutional Liability for Employees' Intentional Torts:
Vicarious Liability As A Quasi-Substitute for Punitive Damages*, 53 Val. U. L. Rev.
1, 12 (2018) ("The majority position [among states] is that intentional torts are only
within the scope of employment when committed to serve the employer's interest.").

Like this Court did in the 1980s, many courts have considered and then
rejected a pure internalization approach. *E.g.*, *Patterson v. Blair*, 172 S.W.3d 361,

---

[4] *See, e.g.*, *Synergies3 Tec Servs., LLC v. Corvo*, 319 So. 3d 1263, 1273 (Ala. 2020);
*Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 601-02 (Ariz. 2012); *Grease
Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472 (Colo. 1995); *Fiano v. Old
Saybrook Fire Co. No. 1, Inc.*, 209 A.3d 629, 635 (Conn. 2019); *Sherman v. State
Dep't of Pub. Safety*, 190 A.3d 148, 157 (Del. 2018); *Clo White Co. v. Lattimore*,
590 S.E.2d 381, 382-83 (Ga. 2003); *Nava v. Rivas-Del Toro*, 264 P.3d 960, 964
(Idaho 2011); *State v. Hoshijo ex rel. White*, 76 P.3d 550, 562-63 (Haw. 2003);
*Giudicessi v. State*, 868 N.W.2d 418, 421-24 (Iowa Ct. App. 2015); *Antonio v. SSA
Sec., Inc.*, 110 A.3d 654, 658 (Md. 2015); *Hamed v. Wayne Cnty.*, 803 N.W.2d 237,
244 (Mich. 2011); *Plains Res., Inc. v. Gable*, 682 P.2d 653, 661 (Kan. 1984);
*Dragomir v. Spring Harbor Hosp.*, 970 A.2d 310, 314 (Me. 2009); *Burroughs v.
Com.*, 673 N.E.2d 1217, 1219 (Mass. 1996); *Parmenter v. J & B Enterprises, Inc.*,
99 So. 3d 207, 216 (Miss. App. Ct. 2012); *L.B. v. United States*, 515 P.3d 818, 825
(Mont. 2022); *Strong v. K & K Invs., Inc.*, 343 N.W.2d 912, 916 (Neb. 1984); *Porter
v. City of Manchester*, 921 A.2d 393, 399 (N.H. 2007); *Spurlock v. Townes*, 368 P.3d
1213, 1216 (N.M. 2016); *Aldridge v. Metro. Life Ins. Co.*, No. 18 CVS 1050, 2019
WL 7374878, at *20 (N.C. Super. Ct. Dec. 31, 2019); *Sitton v. Massage Odyssey,
LLC*, 158 N.E.3d 156, 159 (Ohio Ct. App. 2020); *Baker v. Saint Francis Hosp.*, 126
P.3d 602, 605-07 (Okla. 2005); *Harkness v. Platten*, 375 P.3d 521, 532 (Or. 2016);
*Spitsin v. WGM Transp., Inc.*, 97 A.3d 774, 778 (Pa. Super Ct. 2014); *Pineda v.
Chase Bank USA, N.A.*, 186 A.3d 1054, 1058-59 (R.I. 2018); *Kase v. Ebert*, 707
S.E.2d 456, 458 (S.C. Ct. App. 2011); *Bernie v. Catholic Diocese of Sioux Falls*,
821 N.W.2d 232, 238 (S.D. 2012); *Drew v. Pac. Life Ins. Co.*, 496 P.3d 201, 214
(Utah 2021); *Doe v. Forrest*, 853 A.2d 48, 54 (Vt. 2004).

366-69 (Ky. 2005); *Bratton v. Calkins*, 870 P.2d 981, 987 (Wash. Ct. App. 1994); *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 924 n.36 (Alaska 1999); *Sandman v. Hagan*, 154 N.W.2d 113, 118-19 (Iowa 1967). Thus, to the extent the Second Circuit implied that internalization represents the prevailing approach, it was mistaken.

Accordingly, under District law—which follows the clear majority view—Trump acted outside the scope of his federal employment in committing a series of intentional torts against Carroll if he was too little actuated by a job-related purpose. As we will next explain, the allegations here overwhelmingly support that finding.

### B. Trump Acted Outside the Scope of his Employment as President in Repeatedly Defaming and Insulting Carroll

The Second Circuit certified to this Court the question whether Trump's defamatory statements concerning Carroll were within the scope of his employment as President. This certification partly reflected uncertainty about the general standard for *respondeat superior*. But it also reflected uncertainty—expressed at argument—concerning how this Court defines private- versus employment-related motives and undertakes such inquiries. For that reason, and to facilitate a more expeditious resolution of the case (which has been pending for over three years and is otherwise ready for trial), the Court should directly resolve the certified question. Although scope-of-employment issues are ordinarily reserved for juries, here the scope issue presents a legal question properly decided by this Court: the relevant facts are undisputed, and the scope-of-employment issue must be resolved within judicial

review of the Westfall Act determination. *See Carroll* 49 F.4th at 772, 781; *see also Osborn v. Haley*, 549 U.S. 225, 251-52 (2007) (explaining lack of jury process).[5]

Under District law, the answer to the certified question is clear: Trump acted outside the scope of his federal employment when he repeatedly defamed Carroll as punishment for revealing that he had raped her decades earlier. Both federal judges in this case who actually reached the issue have agreed that Trump "was not serving any purpose of the federal government" in slandering Carroll. *Carroll*, 49 F.4th at 789 (Chin, J., dissenting); *see Carroll*, 498 F. Supp. 3d at 457 ("[T]he undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue.").

This conclusion flows directly from the factual record before the Court, which consists exclusively of the particularized factual allegations in the Complaint (since Trump and DOJ have not adduced any evidence of their own). *See* A44-48 ¶¶ 106-28. Although those allegations must be accepted as true for purposes of this appeal, Trump and DOJ hardly address them. To summarize: Trump knew exactly who Carroll was when he raped her, A44-45 ¶¶ 106-12; he knew in June 2019 that he had raped her and that his denials were false, A45 ¶¶ 113-15; he deliberately lied, and spoke with no concern for the truth, in accusing Carroll of fabricating her account of

---

[5] We are not aware of a case under the Westfall Act where the threshold scope-of-employment issue was submitted to a jury rather than decided by a court.

the rape in exchange for payment, or as part of a political conspiracy, or as a plot to increase book sales, A45-46 ¶¶ 116-18; he deliberately lied, or spoke with no concern for the truth, in implying that Carroll had falsely accused other men of sexual assault, A46 ¶¶ 118-19; he not only lied about her with full knowledge that he was lying, but he also doubled down on his retaliation by describing her as too ugly for him to have raped her, A42 ¶ 97; and he engaged in these personal attacks because they were his *modus operandi*—before and during his time in office—for responding to reports that he had sexually assaulted women, A46-48 ¶¶ 122-27.

At bottom, Trump "knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth." A48 ¶ 128. Trump insulted Carroll's appearance to advance that same underlying lie. A42 ¶ 97. And Trump did not attack Carroll intending to advance any federal interest. Instead, he lied to protect himself from the truth and to destroy Carroll for daring to speak up. After knowingly lying about his decades old criminal act, "he surrounded that central lie with a swarm of related lies in an effort to explain why [Carroll] would invent an accusation of rape." A26 ¶ 13.[6]

---

[6] The record on appeal is undisputed and closed. We note for the Court's awareness, however, that since the Second Circuit issued its decision, the parties have completed fact discovery, including depositions of both Trump and Carroll in which issues such as Trump's mental state when he made the alleged defamatory statements and the truth of the statements themselves were fully explored.

Reviewing this evidence, Judge Kaplan saw "no basis for concluding that a D.C. court would ignore the nature and context of [Trump's] statements and hold that anything he says is within the scope of his employment." *Carroll*, 498 F. Supp. 3d at 453. To the contrary: "A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office" and that plainly had no "relationship to [Trump's] official duties." *Id.* at 453, 456.

This conclusion is bolstered by four additional considerations, each reflecting tried-and-true judicial measures of personal motivation for intentional torts.

*First*, the nature and content of Trump's statements powerfully indicate a personal motive. Trump did not simply deny Carroll's claim. Instead, with full awareness of his lies, Trump used the loudest megaphone on the planet to launch a shockingly personal attack. He implied Carroll was too ugly for him to sexually assault; he implied that she had falsely accused other unknown men of rape; and he devised a malicious narrative under which Carroll lied to make money or increase book sales. A26 ¶ 11. If this is not evidence of personal ill will and spite, it is hard to imagine what would be. Trump sought to destroy and humiliate Carroll after she revealed that he had raped her decades ago. There is no basis here to find that Trump had any presidential obligation to make these statements, or that Trump did so to advance any federal purpose. *See Carroll*, 49 F.4th at 789 (Chin, J., dissenting).

The more natural conclusion—bolstered by this Court's precedents—is that Trump behaved "in an outrageous manner" and "inflict[ed] a punishment out of all proportion to the necessities of his master's business" because he had "departed from the scope of employment in performing the act." Restatement (Second) of Agency § 245 cmt. f. Where (as here), an employee "did not handle the situation in a manner expected" of his employment—and instead behaved like "an individual bent on personal vengeance for a perceived personal affront"—courts have not hesitated to find personal motivations. *See, e.g.*, *Coron*, 515 A.2d at 438. In *Penn Central*, for example, this Court found that the "violent and unprovoked nature of [an] attack indeed suggests a personal as distinguished from business-related motive." 398 A.2d at 32. And *Armstrong v. Thompson* applied District law to conclude that "an air of contempt and deprecation" in alleged defamatory statements strongly suggested "personal motives." 759 F. Supp. 2d 89, 95 (D.D.C. 2011). So too in this case.[7]

*Second*, Trump's conduct was not only outrageous, but it was intentional. Trump and DOJ gloss over the point, but it bears emphasis: Trump made each of these statements with actual malice—both literally and technically. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). That willful state of

---

[7] To be clear, the point is not simply that Trump departed from how prior Presidents generally conducted themselves when accused of wrongdoing. It is that his behavior toward Carroll—which far exceeded any public purpose and seemed calculated to punish and retaliate against her for revealing his earlier private sexual misconduct— evinced every recognized hallmark of a personally motivated attack.

mind powerfully supports finding that he acted for personal reasons, rather than in furtherance of his job duties. As the D.C. Circuit has recognized, "it would be unusual to find, as a matter of law, that an employee was acting within the scope of her employment [under D.C. law] when she committed an intentional tort." *Majano*, 469 F.3d at 141; *accord Bamidele*, 103 A.3d at 525. As a presumptive matter, intentional torts do not further any employer interests—and certainly should not be treated as automatically advancing the interests of the government. Indeed, it would send a troubling message for the Court to find that Trump's repeated defamatory attacks on Carroll were simply part of his job. No court has ever held that officials enjoy total civil immunity for willfully slandering private citizens as retribution for revealing private misconduct that they committed before taking office.

*Third*, the prior dealings between Trump and Carroll, as well as the sexual nature of Trump's misconduct, further establish personal motivation. This case is very different from proceedings in which there was "no evidence that the employee and [his victim] had had previous dealings that would indicate that the tort was personal." *Boykin*, 484 A.2d at 563. As alleged, Trump raped Carroll. He knew who she was when he did it, and he knew who she was when he defamed her. That is exactly the kind of "previous dealing[]" that suggests personal motive—particularly in the context of sexual misconduct and associated defamatory statements, which often involve and evoke personal motivations. *See, e.g.*, *Brown*, 782 A.2d at 758;

35

*Boykin*, 484 A.2d at 563; *Grimes*, 47 F.2d at 410; *see also, e.g.*, *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1166-67 (E.D.N.Y. 2003); *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."); *Walters v. Homestaff Health Care*, No. Civ. 950146961S, 1996 WL 88058, at *1 n.1 (Conn. Super. Ct. Feb. 8, 1996).

*Fourth*, and finally, the personal nature of Trump's conduct is illuminated by its striking consistency with the personal attacks he has launched for decades (and continues to launch) against women who accuse him of sexual misconduct. *See* A46-47 ¶¶ 122-27; *see also Carroll*, 49 F.4th at 789 (Chin, J., dissenting) (noting that Trump "made these comments because they were part of his 'playbook' of public response to credible reports that he had assaulted women"). Simply put, Trump's attacks on Carroll did not reflect anything unique to his high office, nor did they arise from any distinctively presidential consideration. Rather, they followed directly from a *modus operandi* stretching back decades into his life as a private citizen. And he has persisted in that *modus operandi* since leaving office. In October 2022, Trump again defamed Carroll, denigrating her as not his "type" and claiming that her story was a "[h]oax and a lie" and a "scam" to "promot[e] a really crummy book." Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 12, 2022, 10:38

PM). This stark consistency across time supports the conclusion that Trump's efforts to destroy and discredit Carroll were simply how he responds to any woman who accuses him of sexual abuse; they had nothing to do with any federal purpose.

Taken together, these considerations confirm what is clear from the face of Trump's statements: his attacks on Carroll, which sought to humiliate and punish her for revealing a crime he committed decades earlier, reflected "a man pursuing a personal vendetta against an accuser, not the United States' Chief Constitutional Officer engaging in supervisory and policy responsibilities of utmost discretion and sensitivity." *Carroll*, 49 F.4th at 789 (Chin, J., dissenting) (cleaned up).

Trump and DOJ contend that Trump's statements were job-related because they occurred while he spoke to the press. But this Court has long recognized that an employee can commit intentional torts outside the scope of his employment even "while he is on duty" and "even if those duties bear some causal relationship to the tort." *Bamidele*, 103 A.3d at 525; *see also Majano*, 469 F.3d at 142 ("[T]he key inquiry is the employee's intent at the moment the tort occurred."); *Schecter*, 892 A.2d at 427 ("[T]he moment the agent turns aside from the business of the principal and commits an independent trespass, the principal is not liable."). Here, as Judges Kaplan and Chin have concluded, that is exactly what happened. This Court should therefore answer the certified question by confirming under District law that Trump

acted beyond the scope of his employment when he targeted Carroll with repeated defamatory statements to punish and humiliate her.[8]

### C. Appellants' Proposed Categorical Rule Conflicts with Settled District Jurisprudence and American Constitutional Traditions

Trump and DOJ have almost nothing to say about the District's *respondeat superior* precedents or (even more remarkably) the facts of this case. In their view, whenever an elected federal official "communicat[es] with the press and constituents on a matter of public concern," he is always automatically within the scope of his employment. DOJ Br. at 8; *accord* Trump Br. at 1 (asserting that "a public official's statements to the press definitively fall within the scope of employment").

This categorical position totally precludes any possibility that an elected federal official could act with purely (or decisively) personal motives while speaking publicly—no matter how private the subject matter, how unrelenting and incendiary the official's statements, how patently disconnected from any government business, or how plainly consistent with that official's prior personal conduct. Trump and DOJ

---

[8] Trump cites a few cases where juries found—or could reasonably have found— that an employee acted within the scope of his employment. Trump Br. at 25. None supports his position. In *Blair*, for instance, an off-duty police officer's "professional and personal motives" were "significantly intertwined" during an altercation outside a nightclub, largely because that officer had announced he was on duty, displayed his badge, and instructed people to leave the premises. *See* 190 A.3d at 216-17, 227- 28. Even then, this Court left the issue for a jury. *See id.* at 229. In *Hechinger* the defendant pushed a patron amid a job-related dispute over the patron's right to take wood scraps from the store for free. *See* 761 A.2d at 25. These cases both involved much more powerful indicia of job-related motivation than are present here.

reason that public statements are always within an official's scope of employment because they may incidentally affect his perceived fitness to hold office. On that basis, Trump and DOJ ask this Court to announce a doctrine of categorical immunity for public officials, affording them *carte blanche* to use the public platform inherent in their office to defame any private citizen—anywhere, anytime, for any reason.

That categorical position is not (and should never be) the law. As we will show, it defies basic principles of *respondeat superior* jurisprudence, offends our constitutional traditions, and arises from a misreading of precedent. It is also wrong in a much deeper sense. No President should be heard to argue that he is free to willfully injure and punish a private citizen who revealed that he raped her because inflicting such punishment might incidentally help him politically. That reasoning dishonors the American Presidency and the rule of law—if anything, it most immediately calls to mind King Louis XIV's declaration, "L'état, c'est moi."

### 1.  The Categorical Position Is Inconsistent with District Law

The first flaw in Trump and DOJ's position is that it defies District precedent (and the Second Restatement) by collapsing the settled, multi-factor standard for *respondeat superior* analysis into a single factor. As Trump and DOJ see it, the *only* relevant question is whether an official is speaking to the press about a matter of potential public concern. If so, they insist, the analysis is complete and the official was acting within the scope of their employment, since speaking to the public is the

type of thing that officials typically do as part of their jobs. But as this Court has repeatedly held, the fact that an employee is on duty (or is doing the kind of work he is employed to perform) is *never* the end of the inquiry. Instead, it is just one among several factors in a scope-of-employment analysis. *See Bamidele*, 103 A.3d at 525 ("It is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort."); *see also Majano*, 469 F.3d at 142; *Armstrong*, 759 F. Supp. 2d at 94; *Brown*, 782 A.2d at 758; *Coron*, 515 A.2d at 438; *Boykin*, 484 A.2d at 563; *Penn Central*, 398 A.2d at 30.

Indeed, a central premise of the District's multi-factor *respondeat superior* analysis is that an employee might satisfy one factor (*e.g.*, his conduct "is of the kind he is employed to perform"), but still fall outside the scope of his employment because he does not satisfy others (*e.g.*, his conduct occurred beyond authorized space and time limits, or was motivated by personal interests). *See* Restatement (Second) of Agency § 228. Trump and DOJ thus offend a fundamental precept of the District's *respondeat superior* jurisprudence by advocating a categorical rule that writes off most of the relevant legal standard—including any consideration of the employee's purposes, which (as we explained above) has long ranked among the crucial features of scope-of-employment analysis in the District.[9]

---

[9] This Court has issued many opinions finding that individuals otherwise engaged in the customary duties of their position veered outside their employment because some

A related and equally fundamental flaw in Trump and DOJ's position is that it treats facts and context as totally irrelevant in defining employment for a whole category of employees. This would be unprecedented in District law, which has consistently applied a single fact-intensive standard to a wide range of settings. It would also defy the principle that "the determination of scope of employment is dependent upon the facts and circumstances of each case." *Penn Central*, 398 A.2d at 29. And it would collide with this Court's frequent admonition that "as a general rule, whether an employee is acting 'within the scope of his employment' is a question of fact for the jury." *Boykin*, 484 A.2d at 562. Accordingly, the Court should not accept Trump and DOJ's invitation to hold categorically (and as a matter of law) that the fact-intensive scope-of-employment test is automatically met whenever an elected official speaks in public, no matter the context and no matter his motives.

## 2. The Categorical Position Offends Constitutional Traditions

The arguments advanced by Trump and DOJ are not only inconsistent with *respondeat superior* doctrine; they are also offensive to our constitutional traditions.

---

intentional tort they committed was motivated by private purposes. *M.J. Uline Co. v. Cashdan*, 171 F.2d 132 (D.C. Cir. 1948), offers a vivid example. There, a hockey player hit the puck at a bystander in the middle of a game. The district court instructed the jury that the player was acting within the scope of his employment, but the D.C. Circuit reversed, since he "may have been, at the moment when he struck the blow, completely indifferent to the work he was employed to do and actuated only by anger or hostility toward the man he tried to injure." *Id.* at 134.

There is no denying that the Presidency is a very broad job, and that one of the President's duties includes communicating with the public. *See Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020); *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Trump and DOJ would extrapolate from this premise that every time the President (among others) communicates with the public, he is necessarily engaged in conduct bearing on his duties, and in that respect is within the scope of his employment.

But the Presidency is not boundless—and not every public statement by the President is an official act. In rejecting royal rule, the Framers rightly foresaw that Presidents would engage in private acts with private motives that might well violate the law. To address that risk, James Wilson emphasized in the ratification debates that "[f]ar from being above the laws," the President "is amenable to them in his private character as a citizen."[10] Consistent with Wilson's guidance, the Supreme Court has held that the President may face civil liability for private acts beyond the "'outer perimeter' of his official responsibility," *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982); that he remains fully "subject to the laws for his purely private acts," *Clinton v. Jones*, 520 U.S. 681, 696 (1997); and that he can be investigated while in office for private crimes, *see Vance*, 140 S. Ct. at 2426-27. Time and again, the Court has declined to treat every act by the current President as an act by the Office of the

---

[10] James Wilson, Debates in the Convention of the State of Pennsylvania (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836).

Presidency. *See* Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000) (recalling that the President "is a person as well as an institution").

This rule reflects experience. In the earliest days of the Republic, Chief Justice Marshall saw that the demands of a President's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (Va. Cir. Ct. 1807). More recently, Trump insisted that aspects of his conduct while in office were entirely private, including profitable business deals with foreign nations and censoring critics on Twitter. Although Trump was mistaken that these claims freed him of legal constraint, these statements show that Trump subjectively understood himself as acting in a purely personal capacity—and as pursuing private motives—while dealing with the public throughout his tenure in office.[11]

Trump and DOJ thus go too far in contending that any public statement by a President on a matter of public concern is automatically within his employment.

---

[11] *See, e.g.*, Petition for Writ of Certiorari at 14, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("[B]locking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mem. in Supp. of Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that President Trump was free to profit from private commercial transactions with foreign powers, so long as he did not receive "compensation for services rendered … in an official capacity or in an employment (or equivalent) relationship with a foreign government"); *see also* Br. of Donald J. Trump, *Trump v. United States*, No. 22-13005 (11th Cir. Nov. 10, 2022) (arguing—albeit unconvincingly—that classified documents created during Trump's tenure in office and taken to Mar-a-Lago from the White House should be considered "personal" rather than governmental records).

Indeed, Judge Amit Mehta of the D.C. District Court recently rejected a version of that claim in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46, 84 (D.D.C. 2022). Moreover, DOJ itself took a position in that case at odds with its filing here: it argued that an elected federal official (Rep. Mo Brooks) had acted outside the scope of his employment when he spoke at the January 6 rally, reasoning that Brooks's statements at the rally (which were public statements on a matter of public concern) were not "actuated … by a purpose to serve" his employer. *See* Br. of U.S. at 8-19, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. July 27, 2021) (opposing Westfall Act certification).[12]

If accepted, Trump and DOJ's position would collapse a core distinction between the presidential office and its temporary occupant. That categorical view would not only depart from the constitutional plan, but would also conflict with the Supreme Court's intensely fact-dependent analysis in related doctrinal contexts. Consider, for example, how *Clinton v. Jones* addressed the defamation claim that Paula Jones had alleged against Clinton and his associates (including his press secretary). *See* 520 U.S. at 685. Rather than hold that Clinton automatically enjoyed immunity as to this claim—as would seem to follow from Trump and DOJ's categorical position here—the Supreme Court proceeded cautiously, noting only that

---

[12] Judge Mehta did not reach this issue because he held that the claims against Brooks were foreclosed by the First Amendment. *See Thompson*, 590 F. Supp. 3d at 125-26.

the defamation claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities." *Id.* at 686. This modest observation reflects the Supreme Court's context-sensitive approach to the line between personal and presidential conduct, particularly where a president's private wrongs are at issue. [13]

For these reasons, too, the categorical position advocated by Trump and DOJ cannot be squared with our constitutional traditions concerning the Presidency.

### 3. The Categorical Position Is Unsupported by Precedent

Given the many flaws in their position, it is unsurprising that Trump and DOJ cannot identify any case that has endorsed it. Instead, they seek to attribute it to a single District case that in fact said nothing about *respondeat superior*, and to a couple of D.C. Circuit cases that are inapposite and distinguishable.

First consider District law: Trump and DOJ both cite *District of Columbia v. Jones*, which concerned a defamation claim by Marc Jones, former Deputy Chief of Staff to Mayor Anthony Williams. *See* 919 A.2d 604, 606 (D.C. 2007). Jones alleged that Williams defamed him in public statements responding to reports of official

---

[13] The position pressed by Trump and DOJ would have other nonsensical results. Imagine if a business-minded President appeared at one of his own privately-owned hotels and made false, unlawful statements about a competitor while urging listeners to stay at his hotel. Or consider a President who appeared at a campaign event and declared that he would publicly celebrate anybody who burned down his political opponent's private residence. Or take a President who publicly threatens his child's teacher to turn an "F" into an "A." In these scenarios, treating his conduct as automatically within the scope of his presidential employment—without any further analysis or consideration of motive—would be at odds with the rule of law.

misconduct in fundraising activities of the Mayor's Executive Office. *See id.* Williams sought dismissal based on absolute immunity. *See id.* at 610. Under settled District law, absolute immunity is very different than scope-of-employment analysis: "When determining whether an act qualifies for absolute immunity, the court *does not inquire* into an official's motives." *Id.* (emphasis added). Applying this rule, the Court held that Williams's motives for his statements were irrelevant. *See id.* at 610-11. It further held that Williams's statements—which concerned "Jones's performance on duty," "the Mayor's own knowledge of and responsibility for those actions," and "the conduct of persons serving in the Office of the Mayor"— were "within the 'outer perimeter' of [Williams's] duties." *Id.* at 608.

*Jones* has no bearing on this case. It did not involve *respondeat superior*; to the contrary, it involved a distinct legal doctrine that precludes any consideration of motive. Further, the statements at issue in *Jones* concerned the Mayor's knowledge of misconduct in his own office by a former senior staffer. The fact that such statements were within the outer perimeter of his official duties says nothing about whether Trump's statements attacking Carroll were within his employment. *Jones* certainly does not stand for the sweeping proposition that anything an elected official tells the press is always, automatically an official act or within his employment.

This leaves only Trump and DOJ's reliance on a few federal cases, most of which are easily set aside: they arose from workaday statements by Members of

Congress on pending legislative or oversight matters, and they did not present any evidence of private motivation, targeted animus, or personal wrongdoing on the part of the federal official.[14] If anything, these cases cut *against* the categorical view pushed by Trump and DOJ, since the painstaking and exceptionally fact-intensive analysis that those courts undertook into the scope-of-employment inquiry would have been totally unnecessary if a categorical rule covered such circumstances.

Of course, Trump and DOJ rely most heavily on the D.C. Circuit's opinion in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006).[15] There, a congressman spoke to a reporter about the dissolution of his

---

[14] *See Does 1-10 v. Haaland*, 973 F.3d 591, 600-01 (6th Cir. 2020) (Rep. Deb Haaland and Senator Elizabeth Warren acted within employment while "reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall"); *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009) (Ranking Member of the House Appropriations Subcommittee on Defense acted within his employment in criticizing the Defense Secretary's handling of the Iraq War, including when he made a claim that a particular squad was responsible for civilian deaths in Haditha); *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) (Chairman of the House Appropriations Committee acted within employment when he criticized a lobbyist's conduct while discussing the status of a pending appropriations bill pushed by that same lobbyist); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 94-95 (D. Mass. 1997) (Senator Ted Kennedy acted within employment when he criticized a violent anti-abortion organization while speaking about a bill he had sponsored—which was set for a vote the next day—meant to protect access to women's health clinics from that very group).

[15] Trump and DOJ also cite *Wilson v. Libby*, but that case is easily distinguished on its facts, as it involved executive officials who made statements while motivated in substantial respects by executive branch debates over United States public and foreign policy. *See* 535 F.3d 697, 712-13 (D.C. Cir. 2008) (holding that senior

---

marriage (which he thought his constituents would care about) and, in the course of

that discussion, glancingly stated that CAIR was the "fund-raising arm for

Hezbollah." *Id.* at 662. When CAIR sued for libel, the D.C. Circuit upheld dismissal

of its claim, concluding that the Congressman's "conduct was motivated—at least

in part—by a legitimate desire to discharge his duty as a congressman," since it

believed that there was a "nexus" between answering questions about his personal

life and his ability to carry out a political agenda in Congress. *Id.* at 664-66.

Although this case and *Ballenger* both involve the discussion of an elected

official's personal life, that is where the similarity ends. In *Ballenger*, the evidence

did not disclose any particular reason for the statement about CAIR. There was no

evidence of any animus or retaliatory motive. It appears the Congressman randomly

made a single stray comment about CAIR—a group engaged in lobbying and

governmental affairs—while explaining his wife's dissatisfaction with life in D.C.

Here, in contrast, there is overwhelming evidence that Trump willfully and

repeatedly singled out Carroll for malicious, humiliating lies. He attacked her three

times over four days. He implied that she was too ugly to rape. He accused her of

falsifying experiences of sexual assault by other men. He concocted dark schemes

and nefarious motives. He did all this against a private citizen (not a leading civil

---

officials who acted with the goal of defending the administration's handling of war-
related intelligence were within the scope of their employment in revealing a CIA
operative whose husband had published criticism of U.S. intelligence policy).

rights and advocacy organization actively involved in political deliberations). And he acted with obvious private motives—consistent with his prior practice—to punish and retaliate against her for revealing his decades-old crime. Whereas the statement about CAIR in *Ballenger* registered as reckless, Trump knew exactly what he was doing (and who he was doing it to), and he targeted Carroll with vicious precision.

For these reasons, *Ballenger* is distinguishable on its facts. While there may be limited circumstances in which an official publicly discusses aspects of his private life for reasons related to his job, it simply does not follow that elected officials always and everywhere (as a matter of law) act within their employment when speaking about decades-old private misconduct. Trump and DOJ seek to extract that principle from *Ballenger*, but *Ballenger* itself denied any such broad-based rule of immunity for "gratuitous slander in the context of statements of a purely personal nature." *Id.* at 666. Indeed, it then emphasized that its result "cannot be divorced from its facts"—which differ mightily from those presented here. *See id.*

More fundamentally, as the Second Circuit explained while certifying the issue, this Court—not the D.C. Circuit—is the final arbiter of District law. Read fairly, *Ballenger* does not hold that elected officials categorically act within the scope of their official employment when defaming private citizens. Indeed, it would be dangerous and undemocratic to declare that whenever an official might benefit politically from slandering a private citizen who reveals their personal misconduct,

the law creates an irrebuttable presumption that they must have acted in furtherance of official motives in seeking to destroy that person. And to the extent *Ballenger* might be taken as supporting that doubtful proposition, it is well within this Court's authority to clarify the proper interpretation of District law. *See Carroll*, 498 F. Supp. 3d at 452 (concluding that "*Ballenger*'s reasoning is wanting").

\*   \*   \*

In exchange for a promise to serve the country and all who live here, elected officials are vested with great power. It is a betrayal of this public trust to weaponize that power while pursuing selfish interests in punishing and humiliating those who reveal private malfeasance. Presidents are free to deny allegations of misconduct. But a White House job is not a promise of unlimited authority to brutalize victims of prior wrongdoing through vicious, personal, defamatory attacks. That is not the law—and this Court should not make it so. *See Clark v. McGee*, 404 N.E.2d 1283, 1286 (N.Y. 1980) ("Public office does not carry with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members.").

## CONCLUSION

For the reasons given above, the Court should answer the certified question by holding that under District law, Trump acted outside the scope of his employment when he made the defamatory statements about Carroll at issue in this case.

Dated:  Washington, D.C.
        December 1, 2022

Respectfully submitted,

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

Roberta A. Kaplan (*admitted pro hace vice*)
Matthew J. Craig (*admitted pro hace vice*)
Rachel L. Tuchman (*admitted pro hace vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mcraig@kaplanhecker.com
rtuchman@kaplanhecker.com

*Counsel for Appellee E. Jean Carroll*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2022, I caused the foregoing brief to be electronically filed with the District of Columbia Court of Appeals using the online e-filing system. Service will be accomplished on all parties through that system.

_____

Joshua Matz

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>        *Plaintiff,*<br><br>  v.<br><br>DONALD J. TRUMP,<br><br>        *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

SUMMARY JUDGMENT STANDARD .................................................................. 2

ARGUMENT ............................................................................................................ 3

    I.      ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFEMATION CLAIM ......... 3

        A.  The Evolution of Absolute Immunity Pre-*Nixon* ....................................... 5

        B.  *Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity ...... 9

        C.  The Alleged Defamatory Statements Were Made Within the Outer
            Perimeter of Defendant's Official Duties as President ............................ 11

    II.     PLAINTIFF'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ...... 19

        A.  Plaintiff Has Failed to Establish Cognizable Damages ............................ 20

           i.      The Statements Do Not Constitute Defamation *Per Se*. ............... 20

           ii.     Plaintiff Cannot Establish Her Entitlement to Special Damages ... 24

        B.  Plaintiff's Defamation Claim is Barred as a Direct Result of her
            Consent to the Publication of Statements .................................................. 28

        C.  The Vast Majority of the Statements are Nonactionable Opinions .......... 31

    III.    THE EXTREME REMEDY OF PUNITIVE DAMAGES IS NOT
         WARRANTED ............................................................................................ 34

CONCLUSION ......................................................................................................... 35

# TABLE OF AUTHORITIES

*Cases*

*Aronson v. Wiersma,*

    65 N.Y.2d at 594, 493 N.Y.S.2d at 1008 ...................................................................23

*Aslanidis v. United States Lines, Inc.,*

    7 F.3d 1067, 1072 (2d Cir. 1993). .........................................................................3

*Barr v. Matteo,*

    360 U.S. 564, 79 S. Ct. 1335 (1959) ...............................................................7, 8, 9

*Barret v. Harrington,*

    130 F.3d 246, 254-55 (6th Cir. 1997) ...................................................................12

*Bradley v. Fisher,*

    80 U.S. 335, 20 L. Ed. 646 (1871) ...................................................................5, 6

*Brian v. Richardson,*

    87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 351 (1995) ...............................................33

*Butz v. Economou,*

    438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978) ....................................................5

*Cain v. Atelier Esthetique Inst. of Esthetics Inc.,*

    733 Fed.Appx. 8, 11 (2d Cir. 2018) ...................................................................19

*Camp v. Recreation Bd,*

    104 F. Supp. 10 (D.D.C. 1952) ...........................................................................7

*Carroll v. Trump,*

    498 F.Supp.3d 422, 456 (S.D.N.Y. 2020) .........................................................13

*CBS v. FCC,*

    454 F.2d 1018, 1020 (D.C. Cir. 1971) ...............................................................17

*Celle v. Filipino Reporter Enters,*

    209 F.3d 163, 179 (2d Cir. 2010) .................................................................25, 27

*Celotex v. Catrett,*

    477 U.S. 317, 322 (1986).........................................................................................2

*Chastain v. Sundquist,*

    833 F.2d 311, 315 (D.C. Cir. 1987) .....................................................................11

*Church of Scientology Int'l v. Behar,*

    238 F.3d 168, 173-74 (2d Cir. 2001) .............................................................19, 20

*Clinton v. Jones,*

    520 U.S. 681, 694 (1997)...............................................5, 9, 10, 11, 13, 17, 32

*Coleman v Grand,*

    18-CV-5663ENVRLM, 2021 WL 768167, at *9 [EDNY Feb. 26, 2021] ............................20

*Cooper v. O'Connor,*

    99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) .....................................7

*Coppola v. Bear Stearns & Co.,*

    499 F.3d 144, 148 (2d Cir. 2007) ...........................................................................2

*Council on American-Islamic Relations v. Ballenger,*

    444 F.3d 659, 662 (D.C. Cir. 2006)..........................................................13, 15, 17

*Cruz v. Reiner,*

    11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) ........3

*Cummings v. City of N.Y.,*

    No. 19-cv-7723 (CM)(OTW), 2020 U.S. Dist. LEXIS 31572, at *62 (S.D.N.Y. Feb. 24, 2020)

    ....................................................................................................................34

*Dickson v. Slezak,*

    73 A.D.3d 1249, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) ......................................28

*District of Columbia v. Jones,*

    919 A.2d 604, 608-09 (D.C. 2007) ..........................................................14, 15, 16

*Doe v. French,*

    2012 WL 129836 (2d Cir. January 18, 2012) .......................................................32

*Drug Research Corp. v. Curtis Publ'g Co,*

    7 N.Y.2d 435, 441, 166 N.E.2d 319, 322 (1960)..................................................26

*Dworin v. Deutsch,*

    2008 WL 508019, at *4 ......................................................................33, 34, 35

*Elias v. Rolling Stone LLC,*

    872 F.3d 97, 104 (2d Cir. 2017) ........................................................................19

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst,*

    184 U.S. App. D.C. 397, 400, 566 F.2d 289, 292 (1977) ....................................16

*Ferri v. Ackerman,*

    444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979)............................10

*Fowler v. New York Herald,*

    172 N.Y.S. 423 (1st Dep't 1918).........................................................................30

*Franklin v. Daily Holdings, Inc.,*

    21 N.Y.S.3d 6, 11-12, 135 A.D.3d 87, 93 (1st Dept. 2015) ......................25, 26, 27

*Gentile v. Grand St. Med. Associates,*

    79 A.D.3d 1351, 1354, 911 N.Y.S.2d 743............................................................35

*Goetz v. Kunstler,*

    625 N.Y.S.2d 447, 459 (Sup. Ct., New York Cty. 1995) .......................................35

*Golub v. Enquirer/Star Grp.,*

    89 N.Y.2d 1074, 1076 (1997) ...................................................................................22

*Gregoire v. Biddle,*

    177 F.2d 579 (2d Cir. 1949) .......................................................................................7

*Gurtler v. Union Parts Mfg. Co., Inc.,*

    285 A.D. 643, 646 (1st Dep't 1955) ..........................................................................21

*Harlow v. Fitzgerald,*

    457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) .................................................4, 5

*Hobbs v. Imus,*

    266 A.D.2d, 36, 698 N.Y.S.2d 25 ..............................................................................32

*Huggins v. Povitch,*

    1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) .........................34, 35

*Immuno AG. v. Moor-Jankowski,*

    77 N.Y.2d 235, 254, 66 N.Y.S.2d 906, 917 (1991) .............................................33, 34

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.,*

    981 F. Supp. 124, 125, 128 (E.D.N.Y. 1997) ...........................................................36

*In re Grand Jury Proceedings,*

    5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) ...................................................................18

*Jeffreys v. City of New York,*

    426 F.3d 549 (2d Cir. 2005) ........................................................................................3

*Kane v. Orange Cty. Publ'ns,*

    232 A.D.2d 526, 527, (App. Div. 2nd Dept. 1996*)* ..................................................30

*Kforce, Inc. v. Alden Personnel, Inc.,*

    288 F.Supp.2d 513, 517 (S.D.N.Y. 2003) .......................................................22

*Klayman v. Obama,*

    125 F.Supp.3d 67, 86 (D.D.C. 2015) ...........................................................12

*Knight v. U.S. Fire Ins. Co.,*

    804 F.2d 9, 12 (2d Cir. 1986) ......................................................................3

*Lang Sang v. Ming Hai,*

    951 F. Supp. 2d 504, 525 (S.D.N.Y. 2013) ...................................................26

*Laughlin v. Garnett,*

    138 F.2d 931 (D.C. Cir. 1943)......................................................................7

*Laughlin v. Rosenman,*

    163 F.2d 838 (D.C. Cir. 1947)......................................................................7

*Lerman v Flynt Distrib. Co., Inc.,*

    745 F2d 123, 136-137 [2d Cir 1984] ...........................................................20

*Liberman v. Gelstein,*

    80 N.Y.2d 429, 435 (1992)....................................................................21, 25

*Mahoney v. Adirondack Pub. Co.,*

    71 N.Y.2d 31, 37 (1987)............................................................................36

*Masson v. New Yorker Magazine, Inc.,*

    501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991)...................20

*Mandelblatt v. Perelman,*

    683 F. Supp. 379, 383 (S.D.N.Y. 1988) .......................................................28

*Matherson v. Marchello,*

    100 A.D.2d 233, 473 N.Y.S.2d 998 (2d Dept. 1984). ........................................26

*McDougal v Fox News Network, LLC,*

    No. 1:19-CV-11161 (MKV), 2020 WL 5731954 [S.D.N.Y. Sept. 24, 2020]). .....................20

*Mencher v. Chesley,*

    85 N.Y.S.2d 431 (N.Y. Sup. Ct. 1948) ................................................................30

*Mitchell v. Forsyth,*

    472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985) ................................................4

*Morsette v. "The Final Call,*

    309 A.D.2d 249, 254 (1st Dep't 2003) ..............................................................36

*Moss v. Stockard,*

    580 A.2d 1011 (D.C. 1990*)* ............................................................................15

*Murphy v. Cadillac Rubber & Plastics, Inc.,*

    946 F. Supp. 1108, 1124 (W.D.N.Y. 1996) ......................................................25

*New York Times Co. v. Sullivan,*

    376 U.S. 254, 280, 84 S. Ct. 710 (1964 ...........................................................19

*Nixon v. Fitzgerald,*

    457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982) ................1, 3, 4, 5, 9, 10, 11, 12, 17, 18, 19

*Papagianakis v. The Samos,*

    186 F.2d 257 (4th Cir. 1950) .............................................................................7

*Perez v Violence Intervention Program,*

    116 AD3d 601, 601, 984 N.Y.S.2d 348 [1st Dept 2014] .....................................20

*Pierson v. Ray,*

    386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967) ..............................................4, 10

*Present v. Avon Products, Inc.,*

    253 A.D.2d 183, 189 (1st Dep't 1999) ..............................................................36

*Preston v. Hobbs,*

    146 N.Y.S. 419 (1st Dep't 1914) ......................................................................... 30

*Project Veritas v. NY Times citing Prozeralik v Capital Cities Communications, Inc,*

    82 NY2d 466, 474 [1993] ................................................................................... 19

*Prozeralik v. Capital Cities Commc'ns, Inc,*

    82 N.Y.2d 466, 479-80 (1993) ............................................................................ 36

*Puranmalka v. Puranmalka,*

    39 N.Y.S.2d 802, 803 (N.Y. App. Div. 1989) .................................................... 28

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*

    813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ................................................. 22, 25

*Rankin v. McPherson,*

    483 U.S. 378, 387 (1987) ................................................................................... 17

*Rappaport v. VV Pub. Corp.,*

    618 N.Y.S.2d 746, 751 (Sup. Ct., New York Cty. 1994) .................................... 34

*Reynolds v. Pegler,*

    223 F.2d 429, 432 (2d Cir. 1955) ...................................................................... 30

*Rickerson v. Porsch,*

    2019 NY Slip Op 50369(U), 63 Misc. 3d 1204(A), 114 N.Y.S.3d 184 (Sup. Ct.). ............... 22

*Robertson v. Doe,*

    2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ......................................... 36

*Robertson v. Dowbenko,*

    443 F. App'x 659 (2d Cir. 2011) ................................................................... 36, 37

*Rufeh v. Schwartz,*

    50 A.D.3d 1002, 1004-05 (2d Dep't 2008) ........................................................ 21

*Scott v. Harris*,

    550 U.S. 372, 380 (2007).........................................................................3

*Sharratt v. Hickey*,

    20 A.D.3d 734, 736 (3d Dep't 2005).......................................................27

*Shenkman v. O'Malley*,

    157 N.Y.S.2d 290, 297-98 (1st Dep't 1956)...........................................30

*Siegel v. Metropolitan Life Ins. Co.*,

    32 N.Y.S.2d 658 (1st Dep't 1942)...........................................................30

*Sleepy's LLC v Select Comfort Wholesale Corp.*,

    779 F3d 191, 199 (2d Cir 2015) ...............................................28, 29, 30

*Snyder v. Phelps*,

    562 U.S. 443, 453 (2011).......................................................................17

*Spalding v. Vilas*,

    161 U.S. 483, 16 S.Ct. 631 (1896)........................................................6, 7

*Standard Nut Margarine Co. v. Mellon*,

    72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) ....................7

*Steinhilber v. Alphonse*,

    68 N.Y.2d at 286, 508 N.Y.S.2d at 901.............................................32, 33

*Stepanov v. Dow Jones & Co.*,

    987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014) .............................................19

*Stern v. Cosby*,

    645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) ...........................................21

*Tacopina v. Kerick*,

    14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) ...................21, 22

*Taylor v. Glotfelty,*

    201 F.2d 51 (6th Cir. 1952) ....................................................................................7

*Teichner v. Bellan,*

    181 N.Y.S.2d 842, 846 (App. Div. 1959)..............................................................28

*Torain v. Liu,*

    279 Fed. App'x 46, 47 (2d Cir. 2008)..............................................................33, 34

*Trump v. Hawaii,*

    138 S. Ct. 2392, 2417–18 (2018)..........................................................................17

*Trump v. Mazars USA, LLP,*

    140 S.Ct. 2019, 2034 (2020)................................................................................18

*Trump v. Vance,*

    140 S. Ct. 2412, 2425 ...................................................................................10, 13

*Van-Go Transp. Co. Inc. v. New York City Board of Education,*

    971 F. Supp. 90, 98 (E.D.N.Y. 1997) ...................................................................22

*Weiner v. Doubleday & Co.,*

    142 A.D.2d 100, 105 (1st Dep't 1988) ..................................................................35

*Weinstock v. Columbia Univ.,*

    224 F.3d 33, 41 (2d Cir. 2000). ..............................................................................2

*Wilson v. Libby,*

    535 F.3d 697 (D.C. Cir. 2008)..............................................................................14

*Wuterich v. Murtha,*

    562 F.3d 375 (D.C. Cir. 2009) ........................................................................14, 32

*Yaselli v. Goff,*

    12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927).........................................7

*Zellner v. Summerlin,*

    494 F.3d 344, 371 (2d Cir. 2007) ............................................................3

*Zerman v. Sullivan & Cromwell,*

    677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) ...........................................34

## **Statutes and Rules**

Fed. R. Civ. P. 56 (c)(2) ............................................................................2

Restatement (Second) of Torts, § 583 .......................................................28

Restatement (Second) of Torts § 892 ........................................................28

Restatement (Second) of Torts § 594 ........................................................30

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion for summary judgment against the plaintiff, E. Jean Carroll ("Plaintiff"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

At the heart of this case lies a singular question of paramount importance: should a sitting President have the right to address the public on matters of grave national importance without fear of being dragged into harassing and burdensome lawsuits? The answer to this question will reverberate well beyond the instant dispute.

This action, which sounds in a single claim for defamation, seeks to impute civil liability upon Donald J. Trump, then-sitting President of the United States, for statements he made in response to Plaintiff's serious accusations which had ignited a media frenzy and threatened to cast a shadow upon his moral standing. President Trump issued the challenged statements as a necessary measure to maintain the public's trust and assure the American people that the heinous allegations were not true. This scenario perfectly illustrates how the President is an "easily identifiable target for suits to civil damages" and why there "exists the greatest public interest" in providing [the President] 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Nixon v. Fitzgerald,* 457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982). Indeed, "because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and would be "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 751-52. Thus, given the vital considerations at stake, there is no question that Plaintiff's run-of-the-mill defamation suit does not merit upending

decades of Supreme Court precedent which has consistently emphasized the monumental importance of endowing the President with absolute immunity for his official conduct.

Even setting aside the question of absolute immunity, Plaintiff's defamation claim is deficient as a matter of law and this Court should grant summary judgment in Defendant's favor for three additional reasons. *First*, the alleged defamatory statements were not targeted towards Plaintiff's professional competence and, therefore, are not defamatory *per se*. Since Plaintiff has also failed to substantiate any entitlement to special damages, her defamation claim fails as a matter of law because she has failed to establish any form of cognizable damages. *Second,* Plaintiff intentionally solicited the allegedly defamatory statements by levying heinous (and false) allegations against a sitting President, in a profoundly public manner, thereby necessitating him to issue a public denial. *Third*, the majority of Defendant's statements do not even qualify as defamation in a substantive respect, but instead are largely comprised of non-actionable opinion.

Therefore, this Court should grant summary judgment in Defendant's favor.

## STATEMENT OF FACTS

Pursuant to Local Civil Rule 56.1, the uncontested material facts relevant to this motion are set forth in Defendant's Statement of Uncontested Facts ("DSOF").

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to isolate and terminate claims that are factually unsupported so as to avoid costly and unnecessary trials. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). As such, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). In that regard, a particular fact will be deemed "material" only if

its existence or non-existence would "affect the outcome of the suit under governing law." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation and internal quotations omitted). Likewise, an issue will only be considered "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 148 (citation and internal quotations omitted). Thus, for factual issues to be considered genuine, they must have a real basis in the record. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). "The requirement of detecting a genuine issue of fact finds substance in the principle that despite some evidence in opposition to a summary judgment motion, if 'no reasonable jury could have believed' the opponent's version of the events, summary judgment is appropriate." *Cruz v. Reiner*, 11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1775 (2007)).

In order to withstand a motion for summary judgment, the plaintiff must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with specific and admissible evidence showing a genuine issue for trial on each element of her claim. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## ARGUMENT

### I.   ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFAMATION CLAIM

It is blackletter law that a President is "entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749. This wide-spanning, unqualified immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.; see also Mitchell v.*

*Forsyth,* 472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability."). It is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision making from second guessing by the courts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or adjudicative functions, and the President); *Mitchell*, 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Presidential immunity serves a vital function for the office of the presidency. Since the President is an "easily identifiable target for suits for civil damages" due to the "visibility of his office and the effect of his actions on countless people," there "exists the greatest public interest in providing [him] 'the maximum ability to deal fearlessly and impartially with' the duties of his office," *Nixon*, 457 U.S. at 751. Indeed, this protection benefits not only the President, but the nation as a whole, since "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and "could distract a President from his public duties." *Id.* at 752. By granting immunity for a President's official acts, he is able to function with "bold and unhesitating action." *Id.* at 744–45; *see also Pierson v. Ray,* 386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials).

Presidential immunity is rooted in the historical doctrine of absolute immunity, which recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727 (1982) (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)). As the doctrine has evolved over time, the Supreme Court has emphasized that the policy considerations underlying absolute immunity apply with special force to the President, who is the quintessential official "whose special functions or constitutional status requires complete protection from suit." *Harlow*, 457 U.S. 800 at 807. Thus, the Supreme Court has broadly applied absolute immunity to foreclose civil suits against the President in his individual capacity and has clarified that the protection extends to any and all "acts within the 'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 755; *see also Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997) ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

## A. The Evolution of Absolute Immunity Pre-*Nixon*

As early as 1871, in *Bradley v. Fisher*, 80 U.S. 335, 20 L. Ed. 646 (1871), the Supreme Court recognized that public policy considerations weighed in favor of providing absolute immunity to public officials for actions taken within the scope of their official duties. In *Bradley*, a trial judge had disbarred an attorney who represented an alleged co-conspirator in the plot to assassinate President Lincoln. *Id.* at 342. The attorney sued the judge in question, arguing that the disbarment was malicious. *Id*. The Supreme Court, however, held that the judge was absolutely immune from civil suit for his judicial acts "even when such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly." *Id*. at 357. The *Bradley* court drew

on English common law and reasoned that that absolute immunity was needed to safeguard judicial independence and stated that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. *Id*. at 347. The *Bradley* court found it imperative to protect sincere judges from "vexatious actions." *Id*. at 349.

The Supreme Court extended the newly-minted doctrine of absolute immunity to federal executive officers in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631 (1896), where the Supreme Court addressed the question of whether a court could adjudicate a civil claim based on the allegedly malicious acts of an executive official. Relying upon *Bradley,* the Court found that "the allegation of malicious or corrupt motives could always be made, and, if the motives could be inquired into, judges would be subjected to the same vexatious litigation upon such allegation, whether the motives had or had not any real existence." *Spalding*, 161 U.S. at 494, 16 S.Ct. at 635. The Court also noted that this limitation on liability, and the justifications for it, "has a deep root in the common law [and] is to be found in the earliest judicial records, and it has been steadily maintained by an undisputed current of decisions in the English courts, amidst every change of policy, and through every revolution of their government." *Id*. at 494. Applying these same standards to the facts before it, the Supreme Court held that:

> the same general consideration of public policy and convenience which demand for judges . . . immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions apply, to a large extent, to [the heads of executive departments] when engaged in the discharge of duties imposed upon them by law . . . In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of government, if he were subjected to any such restraint.

6

*Id*. at 498.

A litany of cases would follow *Spalding*, wherein federal courts continued to expand the doctrine of absolute immunity to encompass a wide range of federal officials. *See, e.g.*, *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927) (special assistant to the Attorney General); *Standard Nut Margarine Co. v. Mellon*, 72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) (Treasury Secretary); *Cooper v. O'Connor*, 99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) (F.B.I. agent, Comptroller of the Currency); *Laughlin v. Garnett*, 138 F.2d 931 (D.C. Cir. 1943), cert. denied, 322 U.S. 738 (1944) (United States Attorney); *Laughlin v. Rosenman*, 163 F.2d 838 (D.C. Cir. 1947) (Special Counsel to the President); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950) (Attorney General); *Papagianakis v. The Samos*, 186 F.2d 257 (4th Cir. 1950), cer. denied, 341 U.S. 921 (1951) (immigration officer); *Taylor v. Glotfelty*, 201 F.2d 51 (6th Cir. 1952) (prison psychiatrist); *Camp v. Recreation Bd*., 104 F. Supp. 10 (D.D.C. 1952) (Interior Secretary).

Subsequently, in *Barr v. Matteo*, the Supreme Court recognized that the doctrine of absolute immunity encompasses an absolute privilege for federal executive officials who publish defamatory statements in the performance of their official duties. There, two employees of the Federal Office of Rent Stabilization sued the agency's Acting Director in relation to the publication of a press release in which he promised to suspend the employees for promoting an unpopular budget plan. *Barr v. Matteo*, 360 U.S. 564, 79 S. Ct. 1335 (1959). The former employees contended that the director's press release contained defamatory statements. *Id.* at 568. However, the Supreme Court ruled that the director was protected by absolute privilege when he issued the press release and dismissed the employees' claims, reasoning that communicating with the media by disseminating the press release "was an appropriate exercise of the discretion which an officer of

that rank must possess if the public service is to function effectively." *Id.* at 575. The Court went on to emphasize that "***[i]t would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty***." *Id.* (emphasis supplied).

In coming to this holding, the Supreme Court established the seminal rule that federal officials are absolutely immune from damages taken for actions taken within the "outer perimeter" of their duties. *Id.* The Supreme Court was well aware of the wide applicability of this standard, but explained that "the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted the relation of the act complained of to "matters committed by law to his control or supervision." *Id.* at 573 (internal citations omitted).

Importantly, the *Barr* Court refused to consider the plaintiffs' argument that the defendant had acted with malice, noting that "the claim of an unworthy purpose does not defeat the privilege." *Id.* at 575. The *Barr* Court acknowledged that conferring an absolute privilege may lead to "occasional instances of actual injustice," but reasoned that such a price is "a necessary one to pay for the greater good." *Id.* at 576. In coming to this conclusion, the Court weighed the competing public policy considerations at play:

> [O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or illfounded damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr*, 360 U.S. at 565, 79 S.Ct. 1335. The Supreme Court ultimately determined that shielding public officers from civil liability was the more compelling need, reasoning that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id.* at 572

### B. *Nixon v. Fitzgerald* **Establishes the Doctrine of Presidential Immunity**

Relying on the above holdings, the Supreme Court, in *Nixon v. Fitzgerald*, affirmed that the doctrine of absolute immunity applies special force to the office of the presidency.

In *Nixon*, a government whistleblower attempted to sue President Nixon for wrongful termination, claiming that Nixon had unlawfully fired him in retaliation for damaging testimony that he had given before an oversight committee. The Supreme Court flatly rejected the contention that President Nixon could be subject to civil liability for his decision to terminate the whistleblower, and affirmed, in a sweeping decision, that "a former President of the United States is entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749. The Supreme Court recognized that this immunity—"presidential immunity"—is a "functionally mandated incident of the President's unique office," *id.*, which extends beyond the mere 'functional' immunity afforded to other federal officials such as judges, prosecutors, etc., *id.* at 755. Given the "special nature of the President's constitutional office and functions," the Supreme Court found it appropriate to define the scope of presidential immunity as encompassing any and all "acts within the '***outer perimeter***' of [the President's] official responsibility," *id.* at 756 (emphasis added); *see also Clinton*, 520 U.S. at 694, 117 S.Ct. 1636 ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

9

Throughout the *Nixon* decision, the Supreme Court continually emphasized the indispensable nature of presidential immunity, noting that, without it, a President's ability to effectively serve his country would be severely hindered. The Supreme Court observed:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government. As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at 554, 87 S.Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753; *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (noting that the President's duties "are of unrivaled gravity and breadth."). In short, the Supreme Court acknowledged that, since the President's duties "must necessarily include[] the power to perform them without any obstruction or impediment whatsoever," it follows that "the President . . . must be deemed, in civil cases at least, to possess an official inviolability." *Nixon*, 457 U.S. at 776-77, 102 S.Ct. at 2701.

The Supreme Court was again asked to explore the contours of presidential immunity in *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636. In *Clinton*, an individual filed suit against President Clinton after she publicly accused him of sexual misconduct before he took office. *Id.* at 685. Unlike the case at bar, however, all of three claims under review by the Supreme Court arose from President Clinton's conduct *before* he was in office. *Id.* Due to this distinguishable factor, the *Clinton* court found that those causes of action were unrelated to any of his official duties as

President. *Id.* at 710. The *Clinton* court, however, took occasion to recognize the "high respect that is owed to the office of the Chief Executive," *id.* at 707, and to acknowledge that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Id.* at 697.

Notably, the underlying case in *Clinton* had involved a fourth defamation claim which did arise during President Clinton's time in office when he publicly responded to the plaintiff's allegations of misconduct. Although this claim was not at issue before the Supreme Court, the Court expressly noted that the claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities," thereby qualifying it for presidential immunity.

## C. The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President.

A thorough analysis of decades of case law leaves little room for doubt – a President is entitled to wide-ranging immunity for conduct that occurs within the "outer perimeter" of his official responsibilities. *Nixon*, 457 U.S. at 749.

Thus, as established in *Nixon*, in determining whether a President should be afforded absolute immunity, the relevant inquiry is whether the liability in a civil lawsuit is "predicated on [the President's] official acts." *Nixon,* 457 U.S. at 749. A President's "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id.* at 756; *see also Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties"); *Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.").

The test is an objective one – it focused on the nature of the act in question, not the motive underlying it. *Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). Indeed, presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997)); even "***alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority***." *Nixon*, 457 U.S. at 757 (emphasis added). Thus, inquiry into the subjective motive or intent underlying the President's alleged conduct is simply improper. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.").[1]

The broad interpretation of this test is justified by historical tradition and functional considerations that are grounded in the President's "unique position in the constitutional scheme." *Nixon,* 457 U.S. at 749. The President must be immune from constant judicial scrutiny so that he may concentrate on the task of governing. *Id*. at 750 n.31. The passage of time has only intensified these concerns; the President holds "supervisory and policy responsibilities of utmost discretion and sensitivity," *id*. at 750, concerning "matters likely to arouse the most intense feelings[.]" *Id*. at 752. The President's prominence makes him "an easily identifiable target," yet the public interest demands that he be able "to deal fearlessly and impartially with the duties of his office." *Id*. at 752-53. Presidential immunity guards against "this personal vulnerability," *Id*. at 753, not just for his "particular functions," but for his official responsibilities more generally[.] *Id*. at 755-56.

---

[1] Plaintiff recently conceded this point in an appellate brief filed with the D.C. Court of Appeals, acknowledging that "absolute immunity . . . ***precludes any consideration of motive***." *See* Habba Dec., Ex. E, *Carroll v. Trump*, D.C. Court of Appeals, 22-SP-0745 (2022), App. Br. at 46.

Further, the "outer perimeter" analysis must be viewed in the context of the President's wide-ranging duties. The Supreme Court has consistently acknowledged that the President's responsibilities are "of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that "[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear," *Clinton*, 520 U.S. at 698. In other words, considering the vastness and importance of his duties, and the multitude of functions he performs, it can be said that the President "never adjourns." *Id.* at 713 (Breyer. J., concurring in judgment).

One of those functions must include the President's ability to address matters of national concern and defend himself from grave accusations that impugn his character. Indeed, a well-established body of case law demonstrates that lower officials, who are not tasked with the same constitutional protections enjoyed by the President, have been found to have acted within the outer perimeter of their official responsibilities when speaking to the press.

Even under the narrower *respondeat superior* test applied in Westfall Act cases,[2] courts have consistently found that statements to the press, even when they involve personal matters, fall within the scope of an elected official's responsibilities. In *Council on American-Islamic Relations v. Ballenger*—a case the Second Circuit has described as "directly on point" with respect to the facts *sub judice*, *Carroll v. Trump*, 49 F.4th 759, 780 (2d Cir. 2022)—the Council on American-Islamic Relations sued congressman Ballenger for calling it the "fundraising arm for Hezbollah." *CAIR v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006). In applying the narrower scope-of-

---

[2] Although this Court previously found that Defendant's statements were not within the scope of employment for the purposes of the Westfall Act, it also acknowledged that absolute immunity is applied more broadly than the traditional scope of employment test. *Carroll v. Trump*, 498 F.Supp.3d 422, 456 (S.D.N.Y. 2020), *revd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022) ("[E]ven if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not enough under the District of Columbia's scope of employment doctrine.").

employment test, the D.C. Circuit found that the congressman's acted within the scope of his duties in making the allegedly defamatory statement when speaking to the press reasoning that ""[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties'" because a "[m]ember's ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 664- 65. The D.C. Circuit identified "a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id.* at 665-66.

In a series of cases that followed, the D.C. Circuit applied the holding in *Ballenger* to similarly conclude that other high-ranking government officials were acting within the scope of their duties in similar dealings with the press. *See, e.g. Wuterich v. Murtha,* 562 F.3d 375 (D.C. Cir. 2009) (holding that congressman acted within the scope of his employment in disseminating a purportedly defamatory stated when responding to a question from a reporter; *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (finding that executive branch employees acted within the scope of their employment in "discredit[ing] public critics of the Executive Branch," even though the officials had acted in ways that were alleged to be unlawful and contrary to the national security of the United States.).

In a case that bears a striking resemblance to the matter *sub judice*, the D.C. Court of Appeals concluded that the Mayor of the District of Columbia acted within the scope of his duties when he allegedly issued defamatory statements to the media. *See District of Columbia v. Jones*, 919 A.2d 604, 608-09 (D.C. 2007). In *Jones,* after various news stations began to scrutinize the Mayor's fundraising activities, the Mayor placed his deputy chief of staff, Marc Jones on

administrative leave and then proceeded to terminate him. *Id.* at 606. During that time, the Mayor allegedly "made numerous remarks" to the media "placing primary responsibility" on the deputy chief of staff for any purported wrongdoing. *Id.* Shortly thereafter, Mr. Jones sued the Mayor for defamation, alleging that the Mayor's statements were "false and malicious" and that the allegations were made "to protect himself politically at the known expense of [Jones's] reputation, character, and integrity." *Id.*

The court in *Jones* proceeded to analyze whether it was appropriate to apply the doctrine of absolute immunity in that matter. Applying the absolute immunity test circumscribed in *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990), the court held that absolute immunity applies when the challenged conduct is (1) within the "outer perimeter" of official duties, and (2) the governmental function was "discretionary" rather than ministerial." *Id.* at 608 (citing *Moss,* 580 A.2d at 1020.) The court indicated that the test is rather expansive, finding that the court need only determine "whether the official acted 'in relation to matters committed by law to his control or supervision.'" *Id.* (*citing Moss*, 580 A.2d at 1020.).

Readily disposing of the first prong of that analysis, the court found that "*it cannot be questioned*" that responding to inquiries from the press fell within the "outer perimeter of the Mayor's official duties." *Jones*, 919 A.2d at 608 (quotation omitted). In coming to that conclusion, the *Jones* court relied on the principle set forth in *Ballenger* that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" The court explained that the allegedly defamatory statements concerned a mayoral staff member's activities "and the Mayor's own knowledge of and responsibility for those activities," and it is "certainly" the case that the Mayor's "official responsibilities" include "[i]nforming the public about the conduct of persons serving in the Office of the Mayor." *Id.*

15

The *Jones* court expressly rejected the plaintiff's contention that the statements fell outside the outer perimeter of the Mayor's duties because the underlying conduct he was discussing—allegations of improper fundraising—fell outside the scope of any official duties. As the Court explained, it is part of the Mayor's responsibilities to "account[] to the press and the public for the manner in which his staff conducted itself," regardless of whether the underlying conduct itself constituted part of the staff member's, or the Mayor's, official duties. *Jones*, 919 A.2d at 608 n.8.

Lastly, the court refused to inquire into the Mayor's motives in making the challenged statements, relying on a substantive body of law which specifically precludes this type of analysis. *Jones*, 919 A.2d at 610. The court cautioned that "[p]ermitting inquiry into the official's motives would defeat the very purpose of absolute immunity. A determined litigant could always assert an improper motive, and the official would be required to shoulder the burden of responding to discovery, and perhaps enduring a trial, to expose these motives." *Id*. at 611. The Court acknowledged that, in applying absolute immunity to such cases, it may result in personal injury that cannot be redressed, but ultimately concluded that such a "trade off" is necessary to "promote our mutual interest in in effective government." *Id*. (citing *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 292 (1977), "it is better to leave unredressed some defamations by officers acting out of malice or excess zeal, than to subject the conscientious to the constant dread of retaliation.").

Like in *Jones*, it cannot reasonably be questioned that the conduct at issue herein—namely, the communications made by Defendant to the press in response to the allegations raised by Plaintiff—fell squarely within the "outer perimeter" of Defendant's official duties as President. More than any other public official, the President "possesses an extraordinary power to speak to his fellow citizens," *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018), and is ubiquitous in the

16

public eye due to the "sheer prominence" of his position, *Nixon*, 457 at 753; *see also Clinton*, 520 U.S. at 698 ("[T]he Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations."); *CBS v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role.").

Here, Defendant made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation. As both the leader of the nation and head of the Executive Branch, Defendant could not sit idly while a "media frenzy" erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to "maintain the continued trust and respect of [his] constituents" and to "preserve his ability to carry out his [] responsibilities." *Ballenger*, 444 F.3d at 320 (internal quotations omitted); *see also*, *Barr*, 360 U.S. at 575. ("It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty."). Thus, it cannot be reasonably disputed that Defendant's conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation. *Snyder v. Phelps,* 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"); *Rankin v. McPherson*, 483

17

U.S. 378, 387, 107 S. Ct. 2891, 2898 (1987)("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

Further, it bears repeating that the absolute immunity test is an *objective* one and inquiry into Defendant's subjective motive or intent in making the alleged defamatory statements is expressly prohibited. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). The only question is whether the objective nature of his conduct was within the scope of his official duties as President. This is undoubtedly the case. Defendant's statements were made in a White House press release in response to reporter's inquiries to the White House, and otherwise in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries. Simply stated, he was addressing an issue of national importance.

That Defendant himself was the subject of the accusations does not in any way diminish the level of public concern, nor does it remove it from the scope of his official responsibilities. In fact, due to their sheer prominence, it is commonly the case that the personal affairs of a President are a matter of public concern. *See Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2034 (2020) (noting that because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs."); *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) (President Clinton's communications concerning how to respond to Monica Lewinsky affair were "in the President's performance of his official duties," because "the President does need to address personal matters in the context of his official decisions.").

18

Based on the foregoing, in accordance with long-established Supreme Court precedent, Defendant is entitled to "absolute immunity from damages liability" predicated on the statements he made to the media in response to the heinous allegations Plaintiff levied against him. *Nixon*, 457 U.S. at 749. Since such conduct was within the "'outer perimeter' of his official responsibility," the instant action must be dismissed in its entirety. *Id.* at 755.

## II.     PLAINTIFF's DEFAMATION CLAIM FAILS AS A MATTER OF LAW

Even setting aside the issue of absolute immunity, Plaintiff's defamation claim fails on a fundamental level since she has failed to establish a cognizable cause of action.

To state a claim for defamation under New York law, the plaintiff must allege "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 Fed.Appx. 8, 11 (2d Cir. 2018) (citing *Elias v. Rolling Stone LLC,* 872 F.3d 97, 104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.,* 987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014)).  In addition, as is the case here, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001) (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710 (1964)). "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Project Veritas v. N.Y. Times Co.,* 2021 NY Slip Op 31908(U) (Sup. Ct.).

### A.  Plaintiff Has Failed to Establish Cognizable Damages

In a defamation case, a plaintiff is required to prove that the defamation "either cause[d] special harm or constitute[s] defamation per se." *Peters v. Baldwin Union Free Sch. Dist*, 320 F.3d

19

164, 169 (2d Cir. 2003) (quoting *Dillon v. City of N.Y.*, 261 A.D.2d 34 (1st Dep't 1999)). Here, after the completion of fact discovery, Plaintiff has failed to establish any entitlement to damages whatsoever. Therefore, there is no genuine issue of material fact and Plaintiff's defamation claim fails as a matter of law.

### i. The Statements Do Not Constitute Defamation *Per Se*.

The New York Court of Appeals has recognized four narrowly defined categories of statements which are considered to be defamatory *per se*, including statements: "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). In her Complaint, Plaintiff alleges that the statements fit within the second category because they "tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information." *See* Habba Dec., Exhibit A at ¶ 129. As discussed herein, Plaintiff's contention is misplaced.

"Determining whether a statement is defamatory per se is a question of law for the Court." *Stern v. Cosby*, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009). "To find that a statement qualifies as one that tends to injure another in his or her 'trade, business, or profession,' the statement must be made with reference to a matter of significance and importance for [the operation of the business], rather than a more general reflection upon the plaintiffs' character or qualities." *Rufeh v. Schwartz*, 50 A.D.3d 1002, 1004-05 (2d Dep't 2008) (citations omitted). "[W]ords [such] as 'cheat,' 'dishonest,' 'immoral' and many others, if *generally* applied are not slanderous per se, but become such if applied to the plaintiff's trade, business or profession" because "[i]t is not sufficient that [such words] tend to injure plaintiff in his business, they must have been spoken of him *in his*

*business*.'" *Gurtler v. Union Parts Mfg. Co., Inc.*, 285 A.D. 643, 646 (1st Dep't 1955) (emphasis added). In other words, to qualify as defamation *per se*, the allegedly defamatory statement "must be targeted at specific standards of performance that are *directly relevant* to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'" *Tacopina v. Kerick*, 14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) (citing *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011); *Van-Go Transp. Co. Inc. v. New York City Board of Education*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997)).

Here, the alleged defamatory statements, which lack any correlation to Plaintiff's professional capabilities, are not defamatory *per se*. The statements do not impugn, or even relate to, any particular talent or ability needed to perform in Plaintiff's profession as a "writer and advice columnist" *See* Habba Dec., Ex. A, at ¶ 55. Thus, the statements "do[] not, on [their] face, defame [P]laintiff in her trade, business or profession." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

As outlined in the Complaint, the first alleged defamatory statements, the first statement, made on June 21, 2019 (the "June 21 Statement"), states as follows:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that **should** indicate her motivation. It **should** be sold in the fiction section.
>
> Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.
>
> Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

*See* Habba Dec. Ex. A at ¶ 82. (emphasis added).

The second statement at issue, made on June 22, 2019 (the "June 22 Statement"), is comprised of the following language:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

> You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.
>
> But here's a case, it's an absolute disgrace that she's allowed to do that.

*See* Habba Dec. Ex. A at ¶ 91.

The third and final statement, issued on June 24, 2019 (the "June 24 Statement"), provides as follows:

> I'll say with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?

*See* Habba Dec., Ex. A at ¶ 97.

Based on the contents of these statements, Defendant is entitled to summary judgment because the statements are incapable, as a matter of law, of the defamatory construction Plaintiff seeks to ascribe to them. Notably absent from the above statements is any language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a "writer and advice columnist," *Id.* at ¶ 55, much less one of "significance and importance," *Rufeh,* 50 A.D.3d at 1005. Even read in a light most favorable to Plaintiff, the statements are, at most, a general reflection upon her character or qualities, as they portray her as a dishonest individual who fabricated an account that "never happened." *Id.* at ¶ 82. Yet, it is well established that a "statement imputing . . . dishonesty to the plaintiff" may be construed as defamatory *per se* only if there is "some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the charge of incompetence or dishonesty to the particular profession or trade engaged in by plaintiff." *Van Lengen v. Parr,* 136 A.D.2d 964 (4th Dep't 1988). Since the alleged defamatory statements do not peculiarly relate to Plaintiff's occupation as a "writer and advice columnist." Habba Dec., Ex. A

at ¶ 55, it cannot be said that they impute "conduct that is 'of a kind incompatible with the proper conduct" of her profession, *Tacopina*, 2016 WL 1268268 at *4.

Indeed, New York courts consistently find that these types of statements—which broadly refer to a person's dishonest nature—are insufficient to support a claim of defamation *per se*. *See, e.g., Davydov v. Youseffi*, 205 A.D.3d 881, 882 (1st Dep't 2022) ("While the plaintiff asserted in his affidavit that the defendant had called him a 'fraud' and that he 'operate[d] as a fake,' there are no allegations that these statements were specifically directed at the plaintiff in his professional capacity as a dentist."); *Pure Power Boot Camp*, LLC, 813 F. Supp. 2d at 551 (statements characterizing plaintiff as a "loose cannon" and a "liar" were not defamatory *per se* because the statements reflected personal characteristics rather than reflections of professional competence); *Ram v. Moritt*, 205 A.D. 516 (2d Dep't 1994) (finding that statements referring to the plaintiff, a doctor, as a "a 'liar,' a 'cheat,' and a 'debtor'" did not constitute defamation *per se* because they "did not address the plaintiff's professional status as a doctor[.]").

Plaintiff has failed to present any evidence to contrary, or otherwise substantiate how the statements could possibly be construed as defamation *per se*. Accordingly, Plaintiff has failed to establish defamation *per se* because her allegation that Defendant made a statement calling into question her general character and morality does not in any way reflect on her ability to perform in a professional capacity, or otherwise "injure [her] in [] her trade, business or profession." *Liberman*, 80 N.Y.2d at 435.

### ii.     Plaintiff's Cannot Establish Her Entitlement to Special Damages.

Where, as here, the defamation alleged does not fall into one of the *per se* categories, the plaintiff must establish entitlement to special damages. *Mable Assets, LLC v. Rachmanov*, 192 A.D.3d 998, 1001 (2d Dep't 2021) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 434-435 (1992)).

To adequately plead special damages, a plaintiff must claim "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179 (2d Cir. 2010) (citation and internal quotation marks omitted). The special harm must be "alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts." *Cambridge Assoc. v. Inland Vale Farm Co.*, 116 A.D.2d 684, 686 (2d Dep't 1986); *see also Franklin v. Daily Holdings*, 135 A.D.3d 87, 93 (1st Dep't 2015) ("Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation."). "The particularity requirement is strictly applied, as courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai v. Cayre Group, Ltd.*, 726 F.Supp.2d 323, 330 (S.D.N.Y. 2010). Further, the requirement that special damages be pleaded with particularity flows not only from state law, but from the Federal Rules as well, which require that special damages be "specifically stated." Fed. R. Civ. P. 9(g). Accordingly, a plaintiff's failure to plead special damages with sufficient precision, in and of itself, warrants dismissal of a cause of action. *See Franklin*, 135 A.D.3d at 92.

In the instant matter, Plaintiff has failed to plead, substantiate, or otherwise prove her entitlement to special damages. From the outset, the bare allegations of harm plead in the Complaint fell remarkably short of the stringent standard applied by New York courts to establish special damages. Plaintiff's sole allegation of special damages consists of the unquantified, non-itemized claim that Plaintiff has received "roughly 50% fewer letters than she received during the same period in 2018." *See* Habba Dec., Ex. A at ¶ 134. This unspecified allegation fails to meet the requisite degree of specificity required to survive on a summary judgment motion. This is

especially true where Plaintiff has failed to establish that any loss in readership was causally related to the alleged defamatory statements, nor identified a single reader she purportedly lost. *See*, *Lang Sang v. Ming Hai*, 951 F. Supp.2d 504, 525 (S.D.N.Y. 2013) ("The individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized."); *Drug Research. v. Curtis Pub.*, 7 N.Y.2d 435, 441 (1960) ("[I]f the special damage was a loss of customers, the persons who ceased to be customers, or who refused to purchase, must be named."). Even more damning, Plaintiff freely admitted during her deposition that she never kept track of the amount of letters that she received *until she filed the instant lawsuit*. *See* Habba Dec., Ex. B at 230:20-24; 231:2-7 (When asked whether she kept track of the amount of letters she received, Ms. Carroll testified that "I never did until – until this happened ... before that, I would delete. You know, after that I deleted nothing . . .). Thus, her claim—advanced in her Complaint—that she had received "roughly 50%" less letters over the course of the prior year is positively groundless.

Likewise, Plaintiff's allegation that "Trump has injured the reputation on which she makes her livelihood and attracts readers" similarly fails. *See* Habba Dec. Ex. A at ¶ 133. In an attempt to quantify her damages, Plaintiff submitted an expert report authored by Professor Ashlee Humphreys, PhD. *See generally, id.*, Exhibit C (the "Report"). The Report, however, exclusively assesses "the damage to Ms. Carroll's *reputation* and person brand." *Id.* at 2 (emphasis added). In summarizing her findings, for instance, Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "*reputational value* has been diminished due to the Statements." *Id.* at 5 (emphasis added). The Report entirely misses the mark and fails to identify any actionable harm since special damages require "the loss

26

of something having economic or pecuniary value," *Franklin*, 135 A.D.3d at 93, and do not include damages for "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering," *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 179 (2d Cir. 2000) (citation omitted); *see also Salomone v. MacMillan Pub. Co., Inc.*, 77 A.D.2d 501, 502 (1st Dep't 1980) (noting that plaintiff "pleads no special damage" where he "claims damages for loss of reputation and for mental anguish."); *Sharratt v. Hickey*, 20 A.D.3d 734, 736 (3d Dep't 2005) ("General testimony regarding humiliation and loss of reputation in the community is insufficient to prove special damages."); *Franklin*, 135 A.D.3d at 93 ("[A]lthough plaintiff states the ways in which he believes his career was damaged as a result of the article, he fails to state more than a round figure of $3,000,000 when alleging his damages, which is insufficient to state special damages."); *Garland v. Vermilyea*, 88 A.D.2d 1044 (3d Dep't 1982) ("The allegation that plaintiff 'was required to expend large sums of money' does not allege special damages for it is of insufficient particularity . . . as is the claim that plaintiff has been damaged in the round figure of $1,000,000.") (citations omitted); *Jordan v. Tucker, Albin and Assoc., Inc.*, 3-CV-6863-JMA-SIL, 2017 WL 2223918, at *10 (E.D.N.Y. May 19, 2017) ("'Emotional distress, 'hurt feelings,' 'embarrassment,' or 'chagrin' do not constitute 'special damages.'") (citations omitted).

Thus, due to Plaintiff's failure to identify the "loss of something having economic or pecuniary value" with the requisite degree of particularity, she is unable to establish a claim for special damages. Since Plaintiff is also unable to maintain a claim for defamation *per se*, her defamation claim fails as a matter of law based on the absence of cognizable damages.

## B. Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of the Statements.

New York courts have long recognized that consent is a complete defense to actions for defamation which is unaffected by the motives of the speaker. *See* Restatement (Second) of Torts,

§ 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."); *id.* (comment f) ("The protection given by it is complete, and it is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication."); *see also Teichner v. Bellan,* 7 A.D.2d 247, 251 (4th Dep't 1959) (describing consent as "an absolute immunity or an absolute privilege upon the defendant.").

A plaintiff expresses apparent consent to the alleged defamation where her "words or conduct are reasonably understood by another to be intended as consent." Restatement (Second) of Torts § 892. Even where the plaintiff "does not in fact agree" to publication of the defamatory statement, her "words or acts or even [her] inaction may manifest a consent that will justify the other in acting in reliance upon them." Restatement (Second) of Torts § 892 cmt. c (emphasis added). When apparent consent is given, it is "as effective as consent in fact." Restatement (Second) of Torts § 892.

Second Circuit precedent provides that, in certain circumstances, a plaintiff's intentional eliciting of a statement which she expects will be defamatory constitutes her consent to the making of the statement. In *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191 (2d Cir. 2015), the plaintiff, Sleepy's, sent hired personnel into Select Comfort stores posing as customers to determine whether salespeople were disparaging Plaintiff and its merchandise. *Id.* at 194. Plaintiff's secret shoppers then intentionally elicited the alleged defamation from Select Comfort salespeople, finding that they regularly disparaged plaintiff's products. *Id.* Upon further investigation, Select Comfort was able to present evidence showing that plaintiff instructed its secret shoppers to ask about differences between Sleepy's products and Select Comfort's products to determine whether Select Comfort was denigrating its products. *Id.* at 201. The Second Circuit

ultimately remanded this issue to the District Court to determine whether plaintiff's defamation claims were barred by plaintiff's consent. *Id*. at 202.

The Second Circuit went on to explain that, in assessing whether a plaintiff consents to the publication of an alleged defamatory statement, the "more evidence that supports the proposition that the plaintiff elicited the statement with a high degree of certainty that it would be defamatory, for the purpose of enabling a lawsuit, the stronger the defendant's case for deeming the statement consented to, thus barring the claim." *Sleepy's LLC*, 779 F.3d at 199. Referencing the Restatement the Second Circuit found that this type of elicitation by the plaintiff is tantamount to "*decoying the defendant into a lawsuit*" and thus cannot sustain a valid cause of action for defamation." *Id.* at 199 (citing Restatement (Second) of Torts, § 584 (comment d)) (emphasis added).

Based on this principle, the Second Circuit remanded the case for the district court to make findings as to whether the plaintiff was "motivated by a good faith attempt to learn whether" the defendant was "carrying on a consistent pattern of slander, or [was] merely a ruse to decoy [the defendant] into a lawsuit, along with the closely related question [of] what was the degree of [the plaintiff's] confidence or certainty at the time of each inquiry that such a pattern of slander existed." *Id.* at 201. On remand from the Second Circuit, the District Court found that:

> "In short, because the evidence shows that [plaintiff] Sleepy's was both virtually certain that its inquiry would elicit allegedly slanderous statements and substantially motivated by the desire to bolster a contemplated lawsuit, Sleepy's consented to the publication of these allegedly defamatory statements.

*Sleepy's LLC*, 133 F. Supp. 3d at 500.

Here, similarly, Plaintiff's pattern of conduct demonstrates that she sought to intentionally elicit a denial from Defendant of her inflammatory allegations, in the hopes that any such retort could serve as a basis for defamation lawsuit. By her own admission, Plaintiff purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible. Plaintiff

chose not to consider *Elle* because ""under Nina, *Elle* has been less into politics or news," Ms. Carroll said. "Nina's *Elle* is a fashion magazine. So I went with New York magazine, *which knows how to break news.*" *See* Habba Dec., Ex. D. at 3. Plaintiff also testified that she decided to move forward with *New York Magazine* because she believed that *Elle* would not run a full excerpt of the story and that "they would not have run anything close to what New York ran." *See* Habba Aff., Ex. B at tr. 190:15-25.

In addition, the timing of Plaintiff making her claims is highly indicative of an intentional effort to solicit the allegedly defamatory remarks from Defendant. Despite the fact that the incident purportedly happened in 1995, Plaintiff waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States. The suspect timing can only lead to one logical conclusion – she publicized her account to maximize the national attention her story would receive. As discussed at length *supra*, Defendant's prominent position as the head of the executive branch left him with no choice but to defend himself against these heinous accusations. *See Wuterich*, 562 F.3d at 384 ("[A] congressman's ability to do his job as a legislator effectively is tied . . . to [his] relationship with the public and . . . his constituents."); *see also Clinton*, 520 U.S. at 698 (noting that the President is "the focus of public hopes and expectations.").

In short, Plaintiff sought to drum up a national outcry in response to her narrative, she succeeded, and she cannot now claim that the statements were defamatory when she actively solicited them. Therefore, Plaintiff's defamation claim must fail because she consented to the publication of the allegedly defamatory statements.

## C. The Vast Majority of the Statements are Nonactionable Opinions.

To the extent Plaintiff's defamation claim survives at all, nearly all of the content contained in the statements are immaterial since they constitute protected opinion speech.

It is well settled that "expressions of an opinion, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 286 (1986) (citations omitted) (emphasis added); *Hobbs v. Imus*, 266 A.D.2d 36, 37 (1999); *Doe v. French*, 458 F. App'x 21, 22 (2d Cir. 2012*)*. Opinions can only be actionable if they imply that the speaker knows certain facts which are detrimental to the plaintiff and false *Steinhilber,* 68 N.Y.2d at 289. The question of whether a statement is one of fact or opinion is a question of law to be determined by the Court. *Id*. Courts examine the following four factors when determining whether a statement is protected opinion: (1) whether the specific language in the statements has a precise meaning which is readily understood (i.e. the language is not indefinite, ambiguous, hyperbolic, or figurative); (2) whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication, including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact. *Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008); *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995); *Steinhilber*, 68 N.Y.2d at 292. Applying these four factors, the Court of Appeals has mandated against a "hypertechnical parsing" of written or spoken words "for the purpose of identifying possible facts that might form the basis of a sustainable [defamation] action." *Dworin*, 2008 WL 508019, at *4 (internal quotations omitted). Instead, courts are required to examine the overall context in which the statements were made and "determine whether the reasonable reader [or listener] would have believed that the challenged statements were conveying facts about the… plaintiff." *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991).

Further, under New York law, it has been repeatedly held that statements made that address another person's state of mind or motivations are constitutionally protected opinion speech that cannot form the basis for a defamation claim. *See e.g., Huggins v. Povitch*, 1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) (statements that address someone's state of mind or motivations "are speculation and are generally not readily verifiable" and cannot form the foundation for a defamation claim); *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (statement that plaintiff aimed to "set up" brokerage houses "is nothing more than speculation about . . . motivations" and, as such, is a "clear statement of opinion" which "does not support a claim for libel.").

In accordance with this principle, the courts have repeatedly dismissed defamation claims where the alleged defamatory statements constituted opinions about a plaintiff's state of mind or personal motivations. *See e.g. Dworin*, 2008 WL 508019, at *5 (statements made to New York Post that plaintiff was a "disgruntled ex-employee" threatening to sue was opinion not susceptible to objective verification); *Gentile v. Grand St. Med.*, 79 A.D.3d 1351, 1354 (statements that plaintiff's motives for bringing sexual harassment lawsuit were that she "[did] not want work" and "want[ed] to make easy money" could not form basis of defamation claim as they were "not capable of being proven true or false"); *Weiner v. Doubleday*, 142 A.D.2d 100, 105 (1st Dep't 1988) (dismissing defamation claim for calling plaintiff "ugly" because "there can be no action for libel based upon opinion, expressed in the form of epithets"), *aff'd*, 74 N.Y.2d 586 (1989).

In her Complaint, Plaintiff contends that various aspects of the alleged defamatory statements, aside from the general repudiation of Plaintiff's allegations, are defamatory for the following reasons: (1) Defendant lacked any factual basis for stating that Plaintiff had falsely accused other men of sexual assault; (2) Defendant knew it was false to state he both never met

her and had no idea who Plaintiff was; (3) she fabricated her claims to increase her books sales; and (4) she fabricated her claims as part of a conspiracy with the Democratic Party or in exchange for payment. *See* Habba Aff., Ex. A ¶¶ 116-117. Each of these purported statements, however, are no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false. No reasonable reader would find the challenged comments defamatory. At most, Defendant was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims. This is particularly true here, given that Defendant was merely defending himself, and the integrity of his office, by publicly denying Plaintiff's allegations of unlawful conduct. *See, e.g., Indep. Living Aids v. Maxi-Aids*, 981 F. Supp. 124 (E.D.N.Y. 1997) (defendant's statement that plaintiff was "a liar," in the context of responding to plaintiff's accusations, "can only be understood as a denial of [plaintiff's] accusations," and constituted "personal opinion and rhetorical hyperbole, rather than objective fact").

Thus, aside from Defendant's repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation.

## III.    THE EXTEME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED

Plaintiff has not established that she has a right to punitive damages which requires that the statements be made with "common law malice—that is, with a desire to harm plaintiff or reckless disregard for the injurious effect the [statement] would have upon [her]." *Mahoney v. Adirondack Pub. Co.*, 71 N.Y.2d 31, 37 (1987). Common law malice "focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity." *Morsette v. "The Final Call"*, 309 A.D.2d 249, 254 (1st Dep't 2003) (quoting *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993)). To prove common law malice,

the speaker must be "*solely* motivated by a desire to injure plaintiff, and there must be some evidence that the animus was the one and only cause for the publication." *Morsette*, 309 A.D.2d at 255 (emphasis in original) (internal citations omitted.); s*ee also Robertson v. Doe*, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ("Under New York law, only a finding that [defendant] 'was **solely motivated** by a desire to injure plaintiff' can establish common-law malice."), *aff'd sub nom.*

As discussed at length herein, Defendant made the statements in direct response to heinous allegations levied against him by Plaintiff. Thus, these statements could not have been "motivated by a desire to injure plaintiff," since they were strictly made in Defendant's own defense. *Morsette*, 309 A.D.2d at 255. Indeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity. *See Kane v. Orange Cty.,* 232 A.D.2d 526, 527 (2d Dept. 1996) ("response to unfavorable publicity against [the defendant is] covered by a qualified privilege"); *see also* Restatement (Second) of Torts § 594 cmt. k (1977) ("A conditional privilege exists . . . when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself . . . Thus the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar.").

Therefore, Plaintiff is not entitled to punitive damages as she has failed to show that Defendant's statements were at all motivated by a desire to injure Plaintiff, much less solely motivated by such a desire.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant, Donald J. Trump, respectfully submits that summary judgment should be granted in his favor.

Dated: December 22, 2022

Respectfully submitted,

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
                    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD J. TRUMP, in his personal capacity, <br><br> *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Civil Rule 56.1., defendant, Donald J. Trump ("Defendant"), submits the following statement of material facts as to which there is no genuine issue to be tried.

## STATEMENT OF FACTS

1. According to the Complaint, Plaintiff alleges that she encountered Defendant at the Bergdorf Goodman Store located at 754 5th Ave, New York, NY 10019. Plaintiff is unable to specify a date or time period when the events giving rise to this Complaint allegedly occurred, other than "between the fall of 1995 and the spring of 1996." *Id.* Plaintiff was approximately 52 years old at the time that the purported incident occurred. *See* Declaration of Alina Habba, ("Habba Dec."), Exhibit A at ¶ 22.

2.      Plaintiff, an advice columnist, alleges that Defendant recognized her on sight as the "advice lady" and asked her to help him selected a present for a woman who was not present with him at the store. *Id*. at ¶¶ 24-26.

3.      Plaintiff alleges that the two eventually proceeded to take the escalator to either the sixth or seventh floor, where the lingerie department was located. *Id*. at ¶¶ 29-30

4.      Plaintiff alleges that the floor they visited was entirely abandoned, and there were no sales attendants on the floor. Once there, Defendant allegedly insisted that Plaintiff try on the bodysuit. Defendant then purportedly led Plaintiff by the arm to the dressing rooms. *Id*. at ¶¶ 31-35.

5.      At this point, Plaintiff alleges that Defendant purportedly closed the door to of the dressing room, pushed her against a wall, and began kissing her without her consent. She then claims that she pushed Defendant away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her until she managed to push him off and flee the store. *Id*. at ¶¶ 36-42.

6.      Plaintiff testifies that she only contemporaneously disclosed the details of this alleged attack to two of her friends: Lisa Birnbach and Carol Martin. After sharing her account of the purported attack, Plaintiff did not speak of it, or even so much as dwell on the incident, until Defendant was elected President in 2016. *Id*. at ¶¶ 43-52.

7.      Thereafter, Plaintiff decided to reveal these allegations publicly against Appellant for the first time with the release of the book entitled: 'What Do You Need Men For?" in or around May of 2019. *Id*. at ¶ 74.

8.      Plaintiff made a conscious decision to issue an excerpt of her book to *New York Magazine* as opposed to *Elle*, the magazine that formerly published her *Ask E. Jean* advice column.

Publicly, she has proffered the following justification for this decision: "Under Nina, Elle has been less into politics or news . . . Nina's Elle is a fashion magazine. So I went with New York Magazine, which knows how to break news." *See id.*, Exhibit D at 3.

9.    Additionally, Plaintiff testified that she chose *New York Magazine* over *Elle* because she didn't "believe that [*Elle*] would have run anything close to what New York ran." *See Id*. Exhibit B at 190:15-25.

10.    Following these public allegations set forth in Appellee's book, Plaintiff's defamation claim arises out of three statements in June 2019 made directly in response to Plaintiff's allegations (the "Statements"). *See id*., Ex. A at ¶ 81.

11.    On June 21, 2019, a statement circulated by the Deputy White House Press Secretary to the press denied the accusation and Appellant stated:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.
>
> Shame on those people who make up false stories of assault to try to get publicly for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.
>
> Ms. Carroll & New York Magazine. No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.
>
> False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.
>
> If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

*Id*. at ¶ 82.

3

12.     On June 22, 2019, Defendant made the following statement to the White House

press:

> "[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—
>
> [Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.
>
> [Reporter]: You were in a photograph with her.
>
> [Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.
>
> And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.
>
> New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.
>
> It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.
>
> You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me. But here's a case, it's an absolute disgrace that she's allowed to do that.

*Id*. at ¶ 91.

13.     On June 24, 2019, Defendant issued a third statement in response to Plaintiff's

allegations against him: "I'll say with great respect: Number one, she's not my type. Number

two, It never happened. It never happened, OK?" Id. at ¶ 97.

14.     Following Defendant's repudiation of Plaintiff's claims, Plaintiff filed the instant complaint. *See generally, id.*

15.     The Complaint alleges, among other things, that the above referenced statements issued by the President were defamatory per se and caused her to "suffer reputational, emotional, and professional harm. *Id.*

16.     Plaintiff alleges that the Statements caused her professional harm by causing "injury to her reputation, honor, and dignity." *Id*. at ¶ 132.

17.     In a meager attempt to quantify this damage, Plaintiff alleges that she "received roughly 50% fewer letters than she received during the same period in 2018." *Id*. at ¶ 134.

18.     Plaintiff when deposed, however, candidly admitted that she never kept track of the letters she received from Elle Readers until 2019, after the lawsuit was filed. *See id*., Exhibit B at 230:20-24; 231:2-7.

19.     Plaintiff also produced the expert report of Professor Ashlee Humphries, PhD to assess the damages Plaintiff purportedly suffered as a result of the Statements. *See generally, id*., Exhibit C (the "Report").

20.     Upon examination, the Report almost exclusively focuses on the purported harm Plaintiff has allegedly sustained to her "reputation and person brand." *Id.* at 2.

21.     Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short - and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "reputational value has been diminished due to the Statements." *Id*. at 5.

Dated: December 22, 2022             Respectfully submitted,

_____

Alina Habba, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*