# EXHIBIT 1

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL, | No. 20 Civ. 7311 (LAK) |
| *Plaintiff*, | |
| v. | **FIRST AMENDED COMPLAINT** |
| DONALD J. TRUMP, in his personal capacity, | **AND DEMAND FOR JURY** |
| *Defendant*. | **TRIAL** |

Plaintiff E. Jean Carroll, by and through her attorneys at Kaplan Hecker & Fink LLP, alleges as follows:

## INTRODUCTION

1.      Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual assault behind a wall of defamatory falsehoods and deflections. The sexual assault of a woman is a violent crime; compounding that crime with acts of malicious libel and slander is abhorrent. Yet that is what Defendant Donald J. Trump did to Plaintiff E. Jean Carroll—repeatedly, over several years, and even after a jury of six men and three women in this District unanimously found him liable for sexual abuse and defamation based on a statement that was substantially similar to the ones at issue in this lawsuit.

2.      Roughly 27 years ago, what began as playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and sexually assaulted her.

3.      In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

4.      Carroll chose silence—and remained silent for over two decades.

5.      Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of sexual assault was rarely believed, a woman who accused a rich, famous, violent man of such conduct would risk losing everything. She therefore reasonably concluded that if she accused Donald Trump of assault, he would bury her in threats, and she would probably lose her job and reputation, not to mention everything she had worked for and achieved, all of which turned out to be true.

6.      Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but actually grew *more* popular with some supporters as a result of the controversy.

7.      Carroll's mother, a former Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.      But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.      For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think

clearly, and to seek justice. When readers overcome with doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10. Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's sexual assault in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11. When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the sexual assault. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of assault. For good measure, he insulted her physical appearance.

12. Each of these statements was false. Each of them was defamatory.

13. Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he sexually abused her, and he knew who she was in 2019.

He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of sexual assault. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

14.     These lies were familiar to Trump. He had used them before, when other women stated that he had grabbed or groped them.

15.     Trump's June 2019 defamatory statements injured Carroll, adding to the harm she suffered from his underlying sexual assault. They inflicted emotional pain and suffering, they damaged her reputation, and they caused substantial professional harm.

16.     But Trump's defamatory lies did not stop in 2019. He made additional, substantially similar false claims about Carroll again in October 2022 when he was a private citizen. This time, Trump posted similar smears—once again asserting that he never sexually abused Carroll, denied having known her, and asserted that she was too ugly to have assaulted—to his more than four million followers on his own social media platform, Truth Social, damaging her reputation even further.

17.     On May 9, 2023, after a two-week trial in the Southern District of New York, a nine-person jury found that Trump had sexually abused Carroll and that his 2022 statement denying the assault on Truth Social was defamatory. The jury awarded Carroll $5 million in damages: $2.02 million for the assault, and $2.98 million for the defamation.

18.     But Trump, undeterred by the jury's verdict, persisted in maliciously defaming Carroll yet again. On the very next day, May 10, 2023, Trump lashed out against Carroll during a televised, primetime "town hall" event hosted by CNN. He doubled down on his prior defamatory statements, asserting to an audience all too ready to cheer him on that "I never met this woman. I

never saw this woman," that he did not sexually assault Carroll, and that her account—which had just been validated by a jury of Trump's peers one day before—was a "fake," "made up story" invented by a "whack job." Those statements resulted in enthusiastic cheers and applause from the audience on live TV.

19.     Carroll filed this lawsuit to obtain redress for her injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

20.     Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and former advice columnist for *Elle* magazine. She is a domiciliary of the State of New York.

21.     Defendant Donald J. Trump is the former President of the United States, and he is sued here only in his personal capacity. While in office, Trump filed several lawsuits in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald J. Trump for President, Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v. Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136 (D.D.C.). At the time Carroll filed this suit, Trump was also a domiciliary of the State of New York.

## JURISDICTION AND VENUE

22.     Carroll initiated this action in the Supreme Court of the State of New York on November 4, 2019. The Attorney General's delegate then issued a certification pursuant to 28 U.S.C. § 2679(d)(2), and the United States removed the action to this Court on September 8, 2020. This Court thus has subject matter jurisdiction of this action. *See Osborn v. Haley*, 549 U.S. 225, 245 (2007).

23.     Venue is proper pursuant to 28 U.S.C. § 2679(d)(2). It is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

24.     Personal jurisdiction over Trump is proper pursuant to C.P.L.R. § 301, as Trump was a domiciliary of the State of New York at the time Carroll initiated this action.

## FACTUAL ALLEGATIONS

## I.     TRUMP SEXUALLY ASSAULTS CARROLL AT BERGDORF GOODMAN

25.     One evening in the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

26.     That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

27.     Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. Trump himself had appeared on Ailes's talk show, *Straight Forward*, on that network in November 1995. And Carroll's show re-ran each night at 11 p.m., right before the nightly re-run of Ailes's show. She was also on a frequent guest and commentator on the widely watched *Today* show and *Good Morning America*.

28.     Trump and Carroll had previously been photographed at a party together:



29.     At the 58th Street revolving glass doorway of Bergdorf's, Trump put up his hand to stop Carroll from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

30.     Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

31.     Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

32.     As Trump petted the fur hat, Carroll asked how old "the girl" was. Trump did not answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years old, he taunted her, "You're so *old*!"

33.     Trump then had an idea: He would buy lingerie instead.

34.     Trump and Carroll rode up the escalator to the lingerie department. When they arrived, it was empty, with no sales attendant in sight, as was not uncommon past 6 p.m. on a Thursday night in the spring of 1996. Sitting on the counter near them were two or three boxes and a see-through bodysuit in lilac gray.

7

35.     Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit.

36.     Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

37.     Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself that she would make him put the bodysuit on over his pants.

38.     As was not uncommon at Bergdorf's during this period, the dressing room door was open and unlocked.

39.     Trump closed the door of the dressing room.

40.     Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips.

41.     Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter. She could hardly process the insanity of the situation. She also hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

42.     But Trump did not stop. He seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

43.     Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

44.     Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

45.     Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

46. The whole attack lasted only a few minutes.

## II. CARROLL CONFIDES IN TWO FRIENDS ABOUT THE SEXUAL ASSAULT

47. As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

48. Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

49. "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

50. Carroll drove home and crawled straight into bed.

51. Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the incident. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

52. Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

53.     Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

54.     Carroll was also afraid of being dragged through the mud if she reported the sexual assault. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had assaulted her because she had entered that Bergdorf dressing room.

55.     Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

56.     Carroll thus chose silence.

57.     Carroll did not mention the sexual assault again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

### III.     CARROLL REMAINS SILENT FOR TWENTY YEARS

58.     For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

59.     Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was

appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

60.     In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

61.     But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

62.     During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearances.

63.     And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had assaulted her. But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

64. Indeed, Carroll worried that she might make Trump *more* popular in states like Indiana by revealing the sexual assault, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

65. Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

66. Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

## IV. CARROLL DECIDES TO SPEAK OUT

67. On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women in the film industry.[2] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

---

[2] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

68.     Days later, several women accused Weinstein of rape.[3] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

69.     As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

70.     Carroll was profoundly moved by this experience. The walls that she had erected in her mind—the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being sexually assaulted—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

71.     Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

72.     These observations led Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely

---

[3] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

73.     These internal reflections loomed larger in her mind—and became inescapable—as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

74.     Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

75.     While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

76.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who sexually abused her when she was 52. Carroll described that attack in detail.

77.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to

14

act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

78.     In her book, Carroll truthfully described, in meticulous detail, the sexual assault in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely, I'm not certain—inside me."[4]

79.     She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them doesn't sound like much fun. Also, I'm a coward."[5]

80.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the sexual assault on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut,* a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

81.     Carroll's book was released by St. Martin's Press on July 2, 2019.

## V.     TRUMP REPEATEDLY DENIES SEXUALLY ASSAULTING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

82.     In three statements—published on June 21, 22, and 24, 2019, respectively—Trump responded to Carroll by denying the attack and publicly, falsely, and maliciously smearing her reputation.

83.     On June 21, 2019, Trump issued the following public statement:

---

[4] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[5] *Id.* at 244.

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

84.    Upon information and belief, Trump's June 21, 2019 statement was first given to the press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[6]

85.    Trump's June 21, 2019 statement was subsequently shared online by other journalists and covered by many leading news sources as Trump's statement in response to Carroll.[7]

---

[6] *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

[7] *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam

86.     In the June 21, 2019 statement, Trump falsely stated that he did not sexually assault Carroll.

87.     In the June 21, 2019 statement, Trump falsely stated that he had never met Carroll.

88.     In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

89.     In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented her allegations as a ploy for increased book sales.

90.     In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented her allegations to carry out a political agenda.

---

Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

91.     In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented her allegations as part of a conspiracy with the Democratic Party.

92.     On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[8]

93.     Like his first statement, Trump's June 22, 2019 statement regarding Carroll was widely reported in the national press.[9]

94.     In the June 22, 2019 statement, Trump falsely stated that he did not sexually assault Carroll.

95.     In the June 22, 2019 statement, Trump falsely stated that he had no idea who Carroll was.

96.     In the June 22, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

97.     In the June 22, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent allegations against him.

---

[8] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[9] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will": Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

98.     Two days later, on June 24, 2019, *The Hill* released an interview in which Trump made the following statement in response to Carroll: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[10]

99.     Trump's statement in *The Hill* was widely reported by the national press.[11]

100.    This insulting statement was consistent with Trump's response to other accusations of sexual assault. About one woman, Jessica Leeds, who claimed he groped her and tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump told crowds at a rally, "Believe me, she would not be my first choice, that I can tell you."[12] He called Leeds

---

[10] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[11] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type'*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

[12] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

"the cunt on the airplane" when he ran into her at a charity gala years after the assault.[13] About a second woman, Natasha Stoynoff, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look, you take a look. Look at her, [then] look at her words, you tell me what you think. I don't think so."[14] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[15]

101.    In the June 24, 2019 statement, Trump falsely stated that he did not sexually assault Carroll.

102.    On June 27, 2019, Birnbach and Martin went on the record to corroborate Carroll.[16]

103.    Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh. He kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's go to the police. [Carroll said,] No. [Birnbach said,] Come to my house. [Carroll said,] No. I want to go home. [Birnbach said,] I'll take you to the police. [Carroll said,] No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[17]

---

[13] BARRY LEVINE & MONIQUE EL-FAIZY, ALL THE PRESIDENT'S WOMEN: DONALD TRUMP AND THE MAKING OF A PREDATOR 72 (2019).

[14] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[15] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, HOLLYWOOD REP. (Oct. 13, 2016).

[16] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. TIMES (June 27, 2019).

[17] *Id.*

104.    Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you [Carroll], you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[18]

105.    Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[19]

106.    Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[20]

## VI.    TRUMP'S FALSE STATEMENTS ABOUT CARROLL IN JUNE 2019 WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

107.    The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

108.    Trump knew who Carroll was at the time he sexually assaulted her. And Trump also knew who Carroll was when he made his false statements in June 2019.

109.    Trump was photographed with Carroll in the years prior to the assault.

110.    Trump identified Carroll on sight as the "advice lady" when they met at Bergdorf Goodman.

111.    In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

112.    Trump has stated that he possesses "one of the great memories of all time."[21]

---

[18] *Id.*

[19] *Id.*

[20] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump*, N.Y. TIMES (June 27, 2019).

[21] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

113.    Trump has also described himself as a "very stable genius."[22]

114.    In June 2019, Trump knew it was false to state that he had never met Carroll.

115.    In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

116.    In June 2019, Trump knew it was false to state that he had never sexually assaulted Carroll.

117.    Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

118.    Trump has admitted that he lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he sexually assaulted her at Bergdorf Goodman. Trump had no knowledge of Carroll's financial circumstances or the details of Carroll's book deal, and he had no knowledge of Carroll's political affiliation or party registration. Trump did not personally investigate any of the relevant factual circumstances, nor did he instruct anyone else on his White House staff to do so. Indeed, Trump has admitted that neither he nor anyone on his staff reached out to Bergdorf Goodman prior to his June 2019 statements, in which he thanked the store for "confirming they have no video footage of any such incident." Additionally, although Trump requested in his June 21, 2019 statement to be notified if "anyone has information that the Democratic party is working with Ms. Carroll," he testified in his deposition that he could recall no one ever providing any such information. And since all of these statements about Carroll were made to impute motives for lying, when in fact he knew that

---

[22] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

119.     Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. When he made his June 2019 statements, Trump had not read the excerpt of Carroll's book in which certain of these allegations appeared and had no knowledge of their truth or falsity. As of his October 19, 2022 deposition, Trump had not read the excerpt or any other part of Carroll's book either. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

120.     Carroll did not reveal Trump's sexual assault for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a sexual assault accusation—was false.

121.     To the contrary, Carroll feared that revealing Trump's sexual assault would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

122.     With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

123.     Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

124. In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women in almost exactly the same manner that he had sexually assaulted Carroll:

"I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was looking at, whom he had never met before]. You know, I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. . . . Grab 'em by the pussy. You can do anything. . . . Ooh, [she has] nice legs, huh?"[23]

125. Based on Carroll's own experiences, Trump's 2005 statement was not "locker room talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

126. Indeed, Trump has emphasized that stars have been able to grab women by their genitals for "the last million years"—a circumstance that he suggested might be "fortunate[]" for stars like him.

127. Trump thus knew he was lying when he said that Carroll had fabricated her accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth, for purely personal reasons. He knew she was telling the truth because he knew who she was and he knew that he had sexually assaulted her, just as he had sexually assaulted other women over many years.

## VII. TRUMP'S FALSE STATEMENTS ABOUT CARROLL IN JUNE 2019 WERE MADE FOR PURELY PERSONAL REASONS

128. In making the June 2019 statements, Trump was motivated by purely personal reasons, rather than presidential or official reasons.

129. At the time Trump made his statements in June 2019, nobody in the White House (to Trump's knowledge) had undertaken any research into Carroll or her allegations.

---

[23] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

130.    Thus, at the time Trump made his statements in June 2019, neither Trump nor (to his knowledge) any of his White House aides had conducted any research or investigation into Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors (or lack thereof), her reasons for speaking up, or the veracity of her allegations concerning experiences of sexual misconduct at the hands of other men.

131.    At the time Trump made his statements in June 2019, neither Trump nor (to his knowledge) any of his White House aides had contacted Bergdorf Goodman about this matter.

132.    At the time Trump made his statements in June 2019, Trump had not read Carroll's book excerpt and had no firsthand knowledge of her statements concerning his sexual assault.

133.    At his deposition in this case, Trump did not identify *any* White House personnel as involved in investigating, preparing, strategizing, or creating his June 2019 statements. Nor did he identify any other administration official as playing any role at all in the June 2019 statements, or any official meetings focused on Carroll's allegations or his response that he attended, organized, requested, or proposed.

134.    For example, Trump testified that he did not recall speaking about Carroll's allegations with Mick Mulvaney (Trump's acting Chief of Staff at the time of his June 2019 statements) or Emma Doyle (his Principal Deputy Chief of Staff). He testified that he did not speak with Sarah Sanders (his Press Secretary at the time of the June 2019 statements) or Hope Hicks (his Communications Director). And he has alternately denied speaking to or said he had "not much" conversation with Stephanie Grisham (whom Trump promoted to Press Secretary and Communications Director on June 25, 2019).

135.    In fact, at Trump's deposition, the *only* individuals at all associated with the Executive Branch with whom Trump recalled speaking about Carroll's allegations were two of his

family members: First Lady Melania Trump and his daughter, Ivanka Trump, who served in an unpaid advisory position during Trump's presidency.

136.    The fact that Trump discussed Carroll's allegations only with his wife and daughter— and did not discuss Carroll's allegations or his response in June 2019 with White House or Executive Branch political officials—reflects the personally motivated nature of his conduct.

137.    The nature and content of Trump's statement further betrayed his personal motives, and revealed his ill will and spite toward Carroll. Trump did not simply deny Carroll's allegations in his June 2019 statements, but instead launched deeply personal attacks. Trump implied that Carroll was too ugly for him to sexually assault, falsely stated that Carroll had previously lodged fake allegations of sexual misconduct against other men, and invented a baseless narrative that Carroll fabricated her accusation for money, to promote a book, or to further a political conspiracy—without possessing or pointing to one iota of support for those claims.

138.    When asked at his deposition in this action whether his statements were intended to punish Carroll, Trump initially denied it, but then stated: "She made a false charge. People shouldn't be allowed to make false charges."

139.    Trump's private motives are underscored by the fact that he later made materially identical defamatory statements about Carroll (detailed below) in his capacity as a private citizen. These statements included substantively similar, strikingly personal lies. In October 2022, for example, Trump again defamed Carroll, denigrating her as not his "type" and claiming that he didn't know her, had never met her, and her account of being sexually assaulted by him was a "[h]oax and a lie" and a "scam" to "promot[e] a really crummy book." More recently, in May 2023 and following an adverse jury verdict, Trump demeaned Carroll once more, making light of his assault by referring to it as "hanky-panky" and stating that he had "no idea who the hell she is."

140.     This pattern of personally motivated attacks not only persisted long after Trump left elected office; it also preceded his election in 2016. Trump has a long history of viciously demeaning women who credibly accuse him of sexual assault. It's his personal *modus operandi*. Put differently, Trump has a playbook that he uses to attack women who reveal his own sexual misconduct, and that conduct arises from private motives rather than any governmental purpose.

## VIII.   CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

141.     Trump's false and insulting claims about Carroll in June 2019 were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

142.     Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

143.     Carroll endured stoically when she kept secret the fact that Trump had sexually assaulted her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since used his platform—now as a candidate for President—to repeatedly attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

144.     Trump's defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who sexually assaulted her, as well as injury to her reputation, honor, and dignity.

145.     Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

146.     Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the

President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

147.    In all, and based on conservative assumptions, Trump's June 2019 defamatory statements generated between 142,334,424 and 188,155,507 impressions across various media. An estimated 34,075,512 to 42,936,354 of these were receptive impressions—*i.e.*, impressions involving individuals likely to believe Trump's false claims about Carroll. As a result, the minimum appropriate corrective campaign, as calculated by Professor Ashlee Humphreys, would cost at least $10 million.

148.    Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

149.    Carroll filed this lawsuit to obtain redress for those injuries.

## IX.    A JURY FINDS TRUMP LIABLE FOR BATTERY AND DEFAMATION IN *CARROLL II*

150.    As part of his defense to this action, Trump has claimed various immunities from liability by virtue of his status as President at the time he made his June 2019 defamatory statements. Trump's efforts to obtain immunity have contributed to years of delay that have extended forward to today.

151.    These delays have given Trump further opportunity to inflict further harm on Carroll. In due course, he seized on it.

152.    On October 12, 2022, nearly three years after Carroll filed this action, Trump posted a lengthy message on his personal account on Truth Social, a social media platform created by

Trump as an alternative to Twitter. In that statement, Trump substantially repeated his June 2019

defamatory statements:

> "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in
> this Country, but especially in New York State (just look at Peekaboo James), is a
> broken disgrace. You have to fight for years, and spend a fortune, in order to get
> your reputation back from liars, cheaters, and hacks. This decision is from the Judge
> who was just overturned on my same case. I don't know this woman, have no idea
> who she is, other than it seems she got a picture of me many years ago, with her
> husband, shaking my hand on a reception line at a celebrity charity event. She
> completely made up a story that I met her at the doors of this crowded New York
> City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie,
> just like all the other Hoaxes that have been played on me for the past seven years.
> And, while I am not supposed to say it, I will. This woman is not my type! She has
> no idea what day, what week, what month, what year, or what decade this so-called
> 'event' supposedly took place. The reason she doesn't know is because it never
> happened, and she doesn't want to get caught up with details or facts that can be
> proven wrong. If you watch Anderson Cooper's interview with her, where she was
> promoting a really crummy book, you will see that it is a complete Scam. She
> changed her story from beginning to end, after the commercial break, to suit the
> purposes of CNN and Andy Cooper. Our Justice System is broken along with
> almost everything else in our Country."

He then continued:

> "In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a
> woman who I had nothing to do with, didn't know, and would have no interest in
> knowing her if I ever had the chance. Now all I have to do is go through years more
> of legal nonsense in order to clear my name of her and her lawyer's phony attacks
> on me. This can only happen to 'Trump'!"[24]

153.    Trump published the October 12, 2022 statement to his more than four million

followers on Truth Social. Around the same time, Trump emailed the statement to a listserv of

supporters, and it was widely reported in the press, reaching millions upon millions of people.

154.    On November 24, 2022, Carroll sued Trump for defamation for the harms that she

incurred as a result of the October 12, 2022 statement. *See Carroll v. Trump*, No. 22 Civ. 10016

---

[24] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 12, 2022, 10:38 PM),
https://truthsocial.com/@realDonaldTrump/posts/109158644496040450.

(S.D.N.Y.) ("*Carroll II*"). As part of that lawsuit, Carroll also brought a claim for battery pursuant to New York's Adult Survivors Act relating to the underlying sexual assault. That Act revived certain battery claims for a one-year period if the conduct of the defendant would have constituted a sex offense as defined in Article 130 of the New York Penal Law. C.P.L.R. § 214-j.

155.    Trial in *Carroll II* began on April 25, 2023. The Court empaneled an anonymous jury of nine members, including six men and three women.

156.    Over the next two weeks, Carroll presented eleven witnesses who corroborated key aspects of her account. Those included Birnbach and Martin, the two friends who Carroll told of the assault right after it happened; two former employees of Bergdorf's who worked at the store during the period when the assault occurred; a psychological expert who testified that Carroll's reaction to and damages from the assault were consistent with responses to sexual trauma more generally; a defamation damages expert who testified regarding the significant harm that Carroll's reputation suffered as a result of the October 12, 2022 statement; two women who Trump had assaulted in remarkably similar ways; Carroll's sister; Carroll's former boss at *Elle* magazine; and Carroll herself. An aggressive cross-examination of Carroll, in which Trump's attorney sought to undermine her credibility by asking why she didn't scream when Trump assaulted her and whether having someone "rummage around in" her vagina was different than having someone insert a finger in her vagina, took up almost two full trial days.

157.    Trump, for his part, chose not to testify—or to attend any of the trial at all. Instead, he let the jury hear from him only through video excerpts of the deposition taken in this action on October 19, 2022. Trump called no witnesses of his own.

158.    After the parties rested and presented their closing arguments, the Court instructed the jury on the morning of May 9, 2023. Less than three hours later, the jury reached a verdict.

159.    On the first count, battery, the jury found in favor of Carroll. The jury determined by a preponderance of the evidence that Trump sexually abused her in the dressing room at Bergdorf's—*i.e.*, that Trump subjected Carroll to sexual contact (meaning any touching of the sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either person), without her consent, by the use of forcible compulsion (meaning intentionally to compel by the use of physical force). *See* N.Y.P.L. § 130.65. The jury awarded Carroll $2 million in compensatory damages for this claim.

160.    The jury also determined by a preponderance of the evidence that Trump's sexual abuse was willfully or wantonly negligent, reckless, or done with a conscious disregard of Carroll's rights or was so reckless as to amount to such disregard. Accordingly, the jury awarded Carroll $20,000 in punitive damages.

161.    On the second count, defamation, the jury also found in favor of Carroll. It determined by a preponderance of the evidence that Trump's October 12, 2022 statement—in which Trump denied knowing Carroll, claimed he "had nothing to do with" her, and insisted that Carroll had "completely made up" the incident at Bergdorf's—was defamatory.[25] The jury further determined by clear and convincing evidence that Trump's statement was false and that Trump had made it with actual malice. After determining that Carroll was injured by Trump's statement, the jury awarded her $2.7 million in compensatory damages.

---

[25] The jury was directed to consider those portions of the October 12, 2022 about Carroll—*i.e.*, where Trump called Carroll's accusation "a complete con job" and "a Hoax, and a lie"; stated that Carroll "completely made up a story that I met her at the doors of this crowded New York City department store and, within minutes 'swooned' her"; claimed that his sexual abuse "never happened" and that "Carroll is not telling the truth"; asserted that Carroll "changed her story from beginning to end" during a CNN interview; insinuated that Carroll fabricated her accusation as part of "a complete Scam" to "promot[e] a really crummy book"; asserted that he "didn't know" and "had nothing to do with" Carroll; stated that he "would have no interest in knowing her if [he] ever had the chance"; and insisted that she was not his "type."

162.    The jury also found that Trump had acted maliciously, out of hatred, ill will, or spite, or with wanton, reckless, or willful disregard of Carroll's rights in making his October 12, 2022 statement and awarded Carroll $280,000 in punitive damages.

163.    In total, the jury held Trump liable for $5 million in damages.

## X.    TRUMP AGAIN DENIES SEXUALLY ABUSING CARROLL AND MAKES A SLEW OF FALSE, INSULTING CLAIMS ABOUT HER

164.    Immediately after the verdict was announced, Trump began lashing out in response. He started by posting various messages and videos on his Truth Social account decrying the verdict, and disparaging Carroll, the jury, and the judicial system more generally.

165.    Mere minutes after the verdict became public, Trump repeated the defamatory lie that he had no idea who Carroll was and again claimed that her accusation of sexual assault was politically motivated: "I HAVE ABSOLUTELY NO IDEA WHO THIS WOMAN IS. THIS VERDICT IS A DISGRACE – A CONTINUATION OF THE GREATEST WITCH HUNT OF ALL TIME!"[26]

166.    Shortly after midnight that night, Trump followed up with another Truth Social post attacking the "partisan Judge & Jury on the just concluded Witch Hunt Trial," and again insisting that the "Hoax" (Carroll's suit and the ensuing trial) was part of a political conspiracy.[27]

---

[26]    Donald J. Trump (@realDonaldTrump), Truth Social (May 9, 3:29 PM), https://truthsocial.com/@realDonaldTrump/posts/110340379870475514.

[27]    Donald J. Trump (@realDonaldTrump), Truth Social (May 10, 12:34 AM), https://truthsocial.com/@realDonaldTrump/posts/110342521655891366.

167. Less than an hour later, Trump once again insisted that Carroll's accusation and suit were a "Rigged Hoax," "yet another TRAVESTY OF JUSTICE," and "a continuation of the greatest political Witch Hunt of all time!!!"[28]

168. Then, in the evening of May 10, 2023, CNN hosted a primetime town hall event in New Hampshire. Trump received questions from the audience and the event's moderator, Kaitlan Collins. Early in the broadcast, Collins turned to the prior day's jury verdict. Trump responded to her questions by repeating many of the same defamatory statements for which the jury had just found him liable the day before:

COLLINS: This was a jury of nine people who found you –

TRUMP: That's right.

COLLINS: – liable of sexual abuse. Do you think that – that will deter women from voting for you?

TRUMP: No, I don't think so because I think the whole thing – just so you understand – ready? I never met this woman. I never saw this woman. This woman said I met her at the front door of Bergdorf Goodman which I never go into other than for a couple of charities. I met her in the front door. She was about 60 years. This is like 22, 23 years ago. I met her in the front door of Bergdorf Goodman. I was immediately attracted to her and she was immediately attracted to me. And we had this great chemistry. We're walking into a crowded department store. We had this great chemistry. And a few minutes later, we end up in a room, a dressing room of Bergdorf Goodman, right near the cash register. And then she found out that there were locks in the door. She said, I found one that was open. She found one, she learned this at trial. She found one that was open. What kind of a woman meet somebody and brings them up and within minutes, you're playing hanky-panky in a dressing room, okay? I don't know if she was married then or not. John Johnson, I feel sorry for you, John Johnson.

COLLINS: Mr. President, can I – can I ask you this?

TRUMP: Think of it, think of this –

COLLINS: I know you're recounting what you said but, Mr. President –

---

[28] Donald J. Trump (@realDonaldTrump), Truth Social (May 10, 1:20 AM), https://truthsocial.com/@realDonaldTrump/posts/110342704670441764.

TRUMP: But let me just, if I could because you asked a question.

COLLINS: This was a jury though –

TRUMP: Just so you understand, because I was walking in at a department – because I was very famous then and I owned the Plaza Hotel right next door and I owned the buildings around it. I'm not going into a dressing room of a crowded department store. Then I say, if she was being raped – and by the way, they said she wasn't raped, okay? That was her charge. It wasn't –

COLLINS: They found that you sexually abused her.

TRUMP: Oh, that was – say what the – they didn't – they said he didn't rape her.

COLLINS: They did not say –

TRUMP: And I didn't do anything else either. You know what? Because I have no idea who the hell she is. I don't know who this woman is.

COLLINS: But, Mr. President, can I – can I ask you given your recounting and your version –

TRUMP: I don't know who – and I tell you this. Are you ready?

COLLINS: But, Mr. President, can I – can I ask you because –

TRUMP: And I swear on my children, which I never do. I have no idea who this woman. This is a fake story, made up story. We had a horrible Clinton-appointed judge. He was horrible. He allowed her to put everything in. He allowed us to put nothing in. This is a fake story.

COLLINS: Mr. President, you're recounting your version of events here right now to the audience. You reference the trial. You did not go to the trial and actually testify.

TRUMP: That's right.

COLLINS: Do you wish that you had testified?

TRUMP: No, it wouldn't have made a difference. This is rigged deal. This was a – my lawyer said, sir, you don't have to do it. I actually said, I think I should, it would be disrespectful. They said, sir, don't do it. This is fake story and you don't want to give it credibility.

COLLINS: One thing you –

TRUMP: That's why I didn't go.

COLLINS: One thing you did do in this –

TRUMP: And I swear and I've never done that, and I swear to – I have no idea who the hell – she's a whack job.[29]

169. During the exchange, Trump falsely stated that he did not sexually abuse Carroll, that he has no idea who Carroll was, and that Carroll's now-proven accusation was a "fake" and "made up story" created by a "whack job." Trump also insulted Carroll's character and downplayed his sexual abuse of her by asking "what kind of woman meets someone" and then "within minutes" plays "hanky-panky in a dressing room."

170. Approximately 3.3 million viewers watched the CNN broadcast during which this exchange took place.[30] Viewers heard the studio audience applauding and laughing along uproariously to Trump's comments. The entire segment ran from 8:00 p.m. to 9:15 p.m. During that time, CNN was the most-watched cable news network, more than doubling the ratings of Fox News and MSNBC.[31] CNN reported that the program was the network's second most-viewed single-candidate town hall since 2016.[32]

171. Trump's statements about Carroll were also widely reported in the press.[33]

---

[29] *READ: Transcript of CNN's Town Hall with Former President Donald Trump*, CNN (May 11, 2023).

[30] Ted Johnson, *CNN's Donald Trump Town Hall Wins Time Slot With 3.3 Million Viewers — Update*, DEADLINE (May 11, 2023).

[31] *Id.*

[32] *Id.*

[33] *E.g.*, Benjamin Weiser, Lola Fadulu, and Kate Christobek, *E. Jean Carroll May Sue Trump a Third Time After 'Vile' Comments on CNN*, N.Y. TIMES (May 11, 2023); Claire Lampen, *Donald Trump Still Claims He Doesn't Know E. Jean Carroll*, CUT (May 11, 2023); Steve Peoples, *Trump turned his liabilities into laugh lines at CNN town hall, underscoring GOP rivals' challenge*, ASSOCIATED PRESS (May 11, 2023); Peter Sblendorio, *Donald Trump's 'disastrous' CNN town hall elicits strong reactions*, N.Y. DAILY NEWS (May 11, 2023); Kierra Frazier, *CNN's own employees are disparaging the Trump town hall*, POLITICO (May 11, 2023); Abigail Weinberg, *Trump Mocked E. Jean Carroll Live on CNN. The Audience Laughed*, MOTHER JONES (May 11, 2023); Laura Italiano and Natalie Musumeci, *Sex-assault survivors unleash a firestorm of anger at CNN letting Trump try to re-victimize E. Jean Carroll by dismissing his abuse as 'hanky*

172.    Supporters of Trump echoed many of the lies and demeaning remarks that Trump made about Carroll. One Twitter user wrote: "@ejeancarroll You've not won a thing. You've just proven what men have known for years: once women are short of cash you fabricate a crock of shite to fund your plastic lifestyle. A two-bit money grabbing whore who belongs in an asylum.

---

*panky'*, INSIDER (May 11, 2023); *Fact-checking Trump's CNN town hall in New Hampshire*, CNN (May 11, 2023); Christian Blauvelt, *CNN Trump Town Hall Backlash Grows After Verdict in E. Jean Carroll Case*, INDIE WIRE (May 10, 2023);  Kyler Alvord, *Trump Draws Laughter, Applause as He Mocks E. Jean Carroll During CNN Town Hall*, PEOPLE MAG. (May 11, 2023); Brian Bennett, *Trump Uses CNN Town Hall to Mock E. Jean Carroll After a Jury Found Him Liable For Sexually Abusing Her*, TIME (May 10, 2023); *Trump takes aim at E. Jean Carroll at CNN town hall after lawsuit loss*, AXIOS (May 10, 2023); Jill Colvin, *Trump Digs In On Election Lies, Insults Accuser During CNN Town Hall Event*, ASSOCIATED PRESS (May 11, 2023); Domenico Montanaro, *Trump Continues Lies About Election And Lashes Out After N.Y. Verdict In Town Hall*, NPR (May 10, 2023); Kevin Breuninger, *Trump pushes false election claims, mocks E. Jean Carroll to applause during CNN town hall*, CNBC (May 10, 2023); Nikki McCann Ramirez, *Trump Mocks E. Jean Carroll at Town Hall, as His Fans Cheer Him On*, ROLLING STONE (May 10, 2023); Brett Samuels, *Trump calls E. Jean Carroll a 'whack job' after sexual abuse verdict*, HILL (May 10, 2023); Ursula Purano, *Trump Abused and Defamed E. Jean Carroll All Over Again on CNN*, DAILY BEAST (May 10, 2023); Patrick Reilly, *Trump claims E. Jean Carroll trial was rigged after he was found liable of sexual abuse, defamation* , N.Y. POST (May 10, 2023); Chris Stein, *Trump town hall live: ex-president repeats election lies and denies sexual abuse verdict to mostly Republican crowd*, GUARDIAN (May 10, 2023); Michelle L. Price, *What to know about Trump's CNN town hall: Lies about election and abortion, attacks on accuser*, ASSOCIATED PRESS (May 10, 2023); Isaac Arnsdorf and Maeve Reston, *Trump's CNN town hall: Defending rioters, mocking sexual assault, threatening default*, WASH. POST (May 10, 2023); Jeremy Herb, *Trump again refuses to concede 2020 election while taking questions from New Hampshire GOP primary voters*, CNN (May 10, 2023); Kathryn Watson, Jacob Rosen, and Olivia Rinaldi, *Trump CNN town hall highlights include comments on E. Jean Carroll verdict, Jan. 6 and more*, CBS NEWS (May 11, 2023); Allan Smith, *Trump dismisses his sex abuse verdict and gloats that it will help his 2024 bid*, NBC NEWS (May 10, 2023); Nathan Layne and Tim Reid, *Trump jokes about sexual abuse verdict, repeats election falsehoods*, REUTERS (May 10, 2023); Brent D. Griffiths, *Trump insulted the woman he was found liable of sexually abusing — and CNN's audience laughed about it*, INSIDER (May 11, 2023); Ed Kilgore, *Trump's CNN Town Hall Was a MAGA Rally*, N.Y. MAG. (May 10, 2023); Brian Niemietz, *Donald Trump bashes E. Jean Carroll, repeats 2020 election lies in CNN town hall*, N.Y. DAILY NEWS (May 10, 2023); Mel Leonor Barclay, *Trump uses CNN town hall to insult a woman he assaulted*, 19TH (May 10, 2023); Meredith Deliso and Will McDuffie, *Trump denies knowing E. Jean Carroll during CNN town hall: 'I swear on my children'*, ABC NEWS (May 10, 2023); Ryan Gajewski, *CNN Town Hall Audience Members Laugh, Cheer as Trump Talks About E. Jean Carroll Sexual Abuse Verdict*, HOLLYWOOD REP. (May 10, 2023).

Such antics are typical of cretins."[34] Another wrote: "They laughed when Trump provided a scenario, absolutely so absurd, in which a woman would meet a stranger & go into a dressing room for 'hanky panky' - that is what garnered the laugh. Americans know @ejeancarroll LIED to stop Trump 2024 run."[35] Yet another: "can someone please JFK this lunatic. @ejeancarroll is the most vile disgusting piece of rotten smelly putrid shit i have ever fucking seen."[36]

173.    These and other similar messages are exactly what Trump intended. Trump used a national platform to demean and mock Carroll. He egged on a laughing audience as he made light of his violent sexual assault, called Carroll names, implied that Carroll was asking to be assaulted, and dismissed the jury's verdict vindicating Carroll.

174.    At the jury trial that took place in the related action between April 25 and May 9, 2023, this Court instructed the jury concerning an award of punitive damages in connection with Trump's October 12, 2022 defamatory statement as follows: "[P]unitive damages . . . may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. . . . A statement is made with malice or it's made maliciously . . . if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights." Both "prior or subsequent defamations" and "subsequent statements of the defendant" may reflect a defendant's malice. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 184–85 (2d Cir. 2000) (quoting *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979)). Trump's defamatory statements post-verdict show the depth of his malice toward Carroll since it

---

[34]    Hank (@HankJoho), Twitter (May 13, 2023, 4:47 PM), https://twitter.com/ HankJoho/status/1657487688772235264.

[35]    Dawn (@Dogs4Dawn), Twitter (May 11, 2023, 8:40 AM), https://twitter.com/ Dogs4Dawn/status/1656640433651429376.

[36]    Keke Gayle McGavock (@alovelykink), Twitter (May 13, 2023, 3:02 PM), https:// twitter.com/alovelykink/status/1657461413877633026.

is hard to imagine defamatory conduct that could possibly be more motivated by hatred, ill will, or spite. This conduct supports a very substantial punitive damages award in Carroll's favor both to punish Trump, to deter him from engaging in further defamation, and to deter others from doing the same.

## CAUSE OF ACTION: DEFAMATION

175. Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

176. Trump published statements to the media on June 21, 22, and 24, 2019.

177. Each of those statements identified—and was "of or concerning"—Carroll.

178. Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

179. Trump's false statements in June 2019 regarding Carroll were defamatory *per se*.

180. These false and defamatory statements were published throughout New York state and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

181. Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

182. Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

183. Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Carroll prays for relief as follows:

a. Ordering Trump to retract any and all defamatory statements;

b. Ordering Trump to pay compensatory damages in an amount to be determined at trial, but in no event less than $10 million;

c. Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d. Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff E. Jean Carroll hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: New York, New York
   May 22, 2023

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1051 K Street NW, Suite 1040
Washington, D.C. 20001
(202) 742-2661
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*

# EXHIBIT 2

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page45 of 158

# Exhibit B

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page46 of 158

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
E. JEAN CARROLL,                                    Index No.: 160694/19

        Plaintiff,

      -against-                                    **ANSWER**

DONALD J. TRUMP, in his personal capacity,

        Defendant.
-------------------------------------------------------------------X

      Defendant Donald J. Trump ("President Trump"), subject to and reserving all rights to his

immunity, under the Supremacy Clause of the United States Constitution, Article IV, Section II, of a

sitting United States President from being sued in state court while serving as President, for his

answer to the complaint:

      1.      Denies the allegations contained in paragraph 1 of the Complaint.

      2.      Denies the allegations contained in paragraph 2 of the Complaint.

      3.      Denies the allegations contained in paragraph 3 of the Complaint.

      4.      Denies the allegations contained in paragraph 4 of the Complaint.

      5.      Denies the allegations contained in paragraph 5 of the Complaint.

      6.      Denies the allegations contained in paragraph 6 of the Complaint.

      7.      Denies the allegations contained in paragraph 7 of the Complaint.

      8.      Denies the allegations contained in paragraph 8 of the Complaint.

      9.      Denies the allegations contained in paragraph 9 of the Complaint.

      10.    Denies the allegations contained in paragraph 10 of the Complaint.

      11.    Denies the allegations contained in paragraph 11 of the Complaint.

      12.    Denies the allegations contained in paragraph 12 of the Complaint.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page47 of 158

13.     Denies the allegations contained in paragraph 13 of the Complaint.

14.     Denies the allegations contained in paragraph 14 of the Complaint.

15.     Denies the allegations contained in paragraph 15 of the Complaint.

16.     Denies the allegations contained in paragraph 16 of the Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint.

18.     Denies the allegations contained in paragraph 18 of the Complaint.

19.     The allegation contained in paragraph 19 of the Complaint asserts a demand for a jury trial for which no response is required.

20.     Denies the allegations contained in paragraph 20 of the Complaint.

21.     Denies the allegations contained in paragraph 21 of the Complaint.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.     Denies the allegations contained in paragraph 23 of the Complaint.

24.     Denies the allegations contained in paragraph 24 of the Complaint.

25.     Denies the allegations contained in paragraph 25 of the Complaint.

26.     Denies the allegations contained in paragraph 26 of the Complaint.

27.     Denies the allegations contained in paragraph 27 of the Complaint.

28.     Denies the allegations contained in paragraph 28 of the Complaint.

29.     Denies the allegations contained in paragraph 29 of the Complaint.

30.     Denies the allegations contained in paragraph 30 of the Complaint.

31.     Denies the allegations contained in paragraph 31 of the Complaint.

32.     Denies the allegations contained in paragraph 32 of the Complaint.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page48 of 158

33.     Denies the allegations contained in paragraph 33 of the Complaint.

34.     Denies the allegations contained in paragraph 34 of the Complaint.

35.     Denies the allegations contained in paragraph 35 of the Complaint.

36.     Denies the allegations contained in paragraph 36 of the Complaint.

37.     Denies the allegations contained in paragraph 37 of the Complaint.

38.     Denies the allegations contained in paragraph 38 of the Complaint.

39.     Denies the allegations contained in paragraph 39 of the Complaint.

40.     Denies the allegations contained in paragraph 40 of the Complaint.

41.     Denies the allegations contained in paragraph 41 of the Complaint.

42.     Denies the allegations contained in paragraph 42 of the Complaint.

43.     The allegations contained in paragraph 43 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 43 of the Complaint.

44.     Denies the allegations contained in paragraph 44 of the Complaint.

45.     Denies the allegations contained in paragraph 45 of the Complaint.

46.     Denies the allegations contained in paragraph 46 of the Complaint.

47.     Denies the allegations contained in paragraph 47 of the Complaint.

48.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint.

49.     Denies the allegations contained in paragraph 49 of the Complaint.

50.     Denies the allegations contained in paragraph 50 of the Complaint.

51.     Denies the allegations contained in paragraph 51 of the Complaint.

52.     Denies the allegations contained in paragraph 52 of the Complaint.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page49 of 158

53.     Denies the allegations contained in paragraph 53 of the Complaint.

54.     Denies the allegations contained in paragraph 54 of the Complaint.

55.     Denies the allegations contained in paragraph 55 of the Complaint.

56.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 of the Complaint.

57.     The allegations contained in paragraph 57 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint.

58.     The allegations contained in paragraph 58 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Complaint.

59.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Complaint.

60.     Denies the allegations contained in paragraph 60 of the Complaint.

61.     Denies the allegations contained in paragraph 61 of the Complaint.

62.     Denies the allegations contained in paragraph 62 of the Complaint.

63.     Denies the allegations contained in paragraph 63 of the Complaint.

64.     Denies the allegations contained in paragraph 64 of the Complaint.

65.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint.

66.     The allegations contained in paragraph 66 of the Complaint can neither be admitted

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page50 of 158

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 66 of the Complaint.

67.  The allegations contained in paragraph 67 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 of the Complaint.

68.  Denies the allegations contained in paragraph 68 of the Complaint.

69.  Denies the allegations contained in paragraph 69 of the Complaint.

70.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint.

71.  Denies the allegations contained in paragraph 71 of the Complaint.

72.  Denies the allegations contained in paragraph 72 of the Complaint.

73.  Denies the allegations contained in paragraph 73 of the Complaint.

74.  Denies the allegations contained in paragraph 74 of the Complaint.

75.  Denies the allegations contained in paragraph 75 of the Complaint.

76.  Denies the allegations contained in paragraph 76 of the Complaint.

77.  The allegations contained in paragraph 77 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 77 of the Complaint.

78.  The allegations contained in paragraph 78 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 78 of the Complaint.

79.  Denies the allegations contained in paragraph 79 of the Complaint.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page51 of 158

80.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint.

81.     Denies the allegations contained in paragraph 81 of the Complaint.

82.     Denies the allegations contained in paragraph 82 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

83.     The allegations contained in paragraph 83 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 83 of the Complaint.

84.     The allegations contained in paragraph 84 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 84 of the Complaint.

85.     Denies the allegations contained in paragraph 85 of the Complaint.

86.     Denies the allegations contained in paragraph 86 of the Complaint.

87.     Denies the allegations contained in paragraph 87 of the Complaint.

88.     Denies the allegations contained in paragraph 88 of the Complaint.

89.     Denies the allegations contained in paragraph 89 of the Complaint.

90.     Denies the allegations contained in paragraph 90 of the Complaint.

91.     The allegations contained in paragraph 91 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 91 of the Complaint and respectfully refers the Court to any alleged statements for their full and complete content and context.

92.     The allegations contained in paragraph 92 of the Complaint can neither be admitted

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 92 of the Complaint.

93.    Denies the allegations contained in paragraph 93 of the Complaint.

94.    Denies the allegations contained in paragraph 94 of the Complaint.

95.    Denies the allegations contained in paragraph 95 of the Complaint.

96.    Denies the allegations contained in paragraph 96 of the Complaint.

97.    The allegations contained in paragraph 97 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 97 of the Complaint and respectfully refers the Court to any alleged statement for its full and complete content and context.

98.    The allegations contained in paragraph 98 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 98 of the Complaint.

99.    The allegations contained in paragraph 99 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 99 of the Complaint.

100.   Denies the allegations contained in paragraph 100 of the Complaint.

101.   The allegations contained in paragraph 101 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 101 of the Complaint.

102.   The allegations contained in paragraph 102 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 102 of the Complaint.

103.     The allegations contained in paragraph 103 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint.

104.     The allegations contained in paragraph 104 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint.

105.     The allegations contained in paragraph 105 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 of the Complaint.

106.     Denies the allegations contained in paragraph 106 of the Complaint.

107.     Denies the allegations contained in paragraph 107 of the Complaint.

108.     Denies the allegations contained in paragraph 108 of the Complaint.

109.     Denies the allegations contained in paragraph 109 of the Complaint.

110.     Denies allegations contained in paragraph 110 of the Complaint and respectfully refers the Court to any alleged photographs for their full and accurate depictions.

111.     The allegations contained in paragraph 111 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 111 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page54 of 158

112.    The allegations contained in paragraph 112 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 112 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

113.    Denies the allegations contained in paragraph 113 of the Complaint.

114.    Denies the allegations contained in paragraph 114 of the Complaint.

115.    Denies the allegations contained in paragraph 115 of the Complaint.

116.    Denies the allegations contained in paragraph 116 of the Complaint.

117.    Denies the allegations contained in paragraph 117 of the Complaint.

118.    Denies the allegations contained in paragraph 118 of the Complaint.

119.    Denies the allegations contained in paragraph 119 of the Complaint.

120.    Denies the allegations contained in paragraph 120 of the Complaint.

121.    Denies the allegations contained in paragraph 121 of the Complaint.

122.    Denies the allegations contained in paragraph 122 of the Complaint.

123.    The allegations contained in paragraph 123 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 123 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

124.    Denies the allegations contained in paragraph 124 of the Complaint

125.    The allegations contained in paragraph 125 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 125 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page55 of 158

126. Denies the allegations contained in paragraph 126 of the Complaint.

127. The allegations contained in paragraph 127 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 127 of the Complaint.

128. Denies the allegations contained in paragraph 128 of the Complaint.

129. Denies the allegations contained in paragraph 129 of the Complaint.

130. Denies the allegations contained in paragraph 130 of the Complaint.

131. Denies the allegations contained in paragraph 131 of the Complaint.

132. Denies the allegations contained in paragraph 132 of the Complaint.

133. Denies the allegations contained in paragraph 133 of the Complaint.

134. Denies the allegations contained in paragraph 134 of the Complaint.

135. Denies the allegations contained in paragraph 135 of the Complaint.

136. Denies the allegations contained in paragraph 136 of the Complaint.

## FIRST CAUSE OF ACTION

137. Paragraphs 1 through 136 are realleged.

138. Denies the allegations contained in paragraph 138 of the Complaint.

139. Denies the allegations contained in paragraph 139 of the Complaint.

140. Denies the allegations contained in paragraph 140 of the Complaint.

141. Denies the allegations contained in paragraph 141 of the Complaint.

142. Denies the allegations contained in paragraph 142 of the Complaint.

143. Denies the allegations contained in paragraph 143 of the Complaint.

144. Denies the allegations contained in paragraph 144 of the Complaint.

145. Denies the allegations contained in paragraph 145 of the Complaint.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page56 of 158

## DEMAND FOR RELIEF

146.    President Trump denies that plaintiff is entitled to any relief requested in the *ad damnum* clause of the Complaint or any other relief.

## FIRST AFFIRMATIVE DEFENSE

147.    Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States.

## SECOND AFFIRMATIVE DEFENSE

148.    The Complaint fails to state a cause of action.

## THIRD AFFIRMATIVE DEFENSE

149.    The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

## FOURTH AFFIRMATIVE DEFENSE

150.    The alleged defamatory statements are true.

## FIFTH AFFIRMATIVE DEFENSE

151.    Plaintiff's claim is barred because her damages, if any, were caused by acts of third persons, for which defendant is not responsible.

## SIXTH AFFIRMATIVE DEFENSE

152.    Plaintiff is not entitled to punitive damages as a matter of law.

## SEVENTH AFFIRMATIVE DEFENSE

153.    Plaintiff has not sufficiently alleged defamation *per se*.

## EIGHTH AFFIRMATIVE DEFENSE

154.    Plaintiff has failed to plead damages with the required specificity.

## NINTH AFFIRMATIVE DEFENSE

155.    The Court lacks personal jurisdiction over President Trump.


WHEREFORE, defendant Donald J. Trump respectfully demands judgment dismissing the

Complaint in its entirety, together with costs, disbursements, and all such other relief as this Court

deems just and proper.

Dated: New York, New York
      January 23, 2020

                        **LAROCCA HORNIK ROSEN**
                        **& GREENBERG LLP**

By:   _____

      Lawrence S. Rosen, Esq.
      Amy D. Carlin, Esq.
      Patrick McPartland, Esq.
      40 Wall Street, 32nd Floor
      New York, New York 10005
      T: (212) 530-4822, 4836, 4837
      E: LROSEN@LHRGB.COM
         ACARLIN@LHRGB.COM
         PMCPARTLAND@LHRGB.COM

      *Attorneys for Donald J. Trump*

To:    Roberta Kaplan, Esq.
       Kaplan Hecker & Fink LLP
       350 Fifth Avenue, Suite 7110
       New York, NY  10118

# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------- x
                                             :
E. JEAN CARROLL,                             :    Index No. 160694/2019
                                             :
              Plaintiff,                     :    Hon. Verna L. Saunders
                                             :
          - against-                         :    Mot. Seq. No. 002
                                             :
DONALD J. TRUMP,                             :
                                             :
              Defendant.                     :
                                             :
------------------------------------------- x


**MEMORANDUM OF LAW OF PRESIDENT DONALD J. TRUMP
IN SUPPORT OF MOTION FOR A STAY OF PROCEEDINGS**


KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Christine A. Montenegro
Paul J. Burgo
1633 Broadway
New York, New York 10019
(212) 506-1700

LAROCCA HORNIK ROSEN &
GREENBERG LLP

40 Wall Street, 32nd Floor
New York, New York 10005
(212) 530-4822

*Attorneys for Defendant,
President Donald J. Trump*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

PRIOR PROCEEDINGS ...................................................................................... 4

ARGUMENT ......................................................................................................... 6

    A.    If the Court of Appeals Reverses *Zervos v. Trump*, This Action Must be Dismissed or Stayed................................................................................ 7

    B.    Official Immunity Claims Must be Decided at the Outset of the Case. ................. 8

    C.    The Courts are Constitutionally Required to Give Deference to the President........................................................................................................ 8

    D.    The Requested Stay is Warranted Under CPLR § 2201. ..................................... 11

CONCLUSION ..................................................................................................... 13

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assenzio v A.O. Smith Water Prods.*,
    No. 190008/12, 2015 WL 5283301 (Sup. Ct., N.Y. Cnty. Aug. 28, 2015) ...........................11

*Behrens v. Pelletier*,
    516 U.S. 299 (1996) ....................................................................................................................8

*Belabarodaya v. Carepro of NY, Inc.*,
    No. 152534/2018, 2018 WL 3733304 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) ......................4, 11

*Belopolsky v. Renew Data Corp.*,
    41 A.D.3d 322 (1st Dep't 2007) ..............................................................................................12

*Cheney v. U.S. Dist. Court for D.C.*,
    542 U.S. 367 (2004) ...............................................................................................................2, 9

*Clinton v. Jones*,
    520 U.S. 681 (1997) ....................................................................................... *passim*

*Felder v. Casey*,
    487 U.S. 131 (1988) ..................................................................................................................11

*Galicia v. Trump*,
    No. 24973/15E, M-7413 (1st Dep't Oct. 24, 2019) ............................................................4, 10

*Haywood v. Drown*,
    556 U.S. 729 (2009) ................................................................................................................10

*Hegarty v. Somerset Cnty.*,
    25 F.3d 17 (1st Cir. 1994) ..........................................................................................................8

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ...................................................................................................................8

*Jones v. Clinton*,
    No. 95-1167, BL-62 (8th Cir. Apr. 16, 1996) ......................................................................3, 10

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .................................................................................................................13

*Lerner v. Karageorgis Lines, Inc.*,
    66 N.Y.2d 479 (1985) ..............................................................................................................11

ii

*Liu v. New York City Police Dep't,*
 216 A.D.2d 67 (1st Dep't 1995) .........................................................................8

*Nixon v. Fitzgerald,*
 457 U.S. 731 (1982).............................................................................2, 9, 13

*Nixon v. Sirica,*
 487 F.2d 700 (D.C. Cir. 1973) .....................................................................3, 10

*OneBeacon Am. Ins. Co. v. Colgate-Palmolive Co.,*
 96 A.D.3d 541 (1st Dep't 2014) ....................................................................4, 11

*In re Reynders v. Conway,*
 79 A.D.2d 863 (4th Dep't 1980) .......................................................................11

*Trump v. Deutsche Bank AG,*
 --- S.Ct. ----, 2019 WL 6797733 (U.S. Dec. 13, 2019).......................................3, 9

*Trump v. Mazars USA, LLP,*
 --- S.Ct. ----, 2019 WL 6328115 (U.S. Nov. 25, 2019), ......................................2, 9

*Trump v. Mazars USA, LLP,*
 940 F.3d 710 (D.C. Cir. 2019) ........................................................................10

*Trump v. Vance,*
 941 F.3d 631 (2d Cir. 2019)..............................................................................6

*Trump v. Vance,*
 No. 19-3204, 2019 WL 5703884 (2d Cir. Oct. 7, 2019)....................................3, 9, 10

*In re Trump,*
 781 F. App'x 1 (D.C. Cir. 2019) .......................................................................3, 9

*In re Trump,*
 928 F.3d 360 (4th Cir. 2019) .........................................................................3, 10

*United States v. Burr,*
 25 F.Cas. 187 (C.C. Va. 1807)...........................................................................2, 9

*United States v. Nixon,*
 418 U.S. 683 (1974)..............................................................................2, 3, 9, 12

*Uptown Healthcare Mgmt., Inc. v. Rivkin Radler LLP,*
 116 A.D.3d 631 (1st Dep't 2014) ...................................................................12, 13

*Zervos v. Trump,*
 171 A.D.3d 110 (1st Dep't 2019) ................................................................. *passim*

iii

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page63 of 158

*Zervos v. Trump*,
2020 WL 63397, 2020 N.Y. Slip Op. 60193(U)..........................................................1, 5, 6, 7

**Statutes and Other Authorities**

U.S. Const. art VI, cl. 2........................................................................................ *passim*

CPLR § 2201...............................................................................................................1, 4, 11

Patrick M. Connors, Practice Commentaries, McKinney's Cons. Laws of NY
Annotated, CPLR C2201:11 ....................................................................................11

iv

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page64 of 158

Defendant President Donald J. Trump respectfully submits this memorandum of law in support of his motion for a stay of proceedings, pursuant to CPLR § 2201, pending the decision of the Court of Appeals on his appeal from *Zervos v. Trump*, 171 A.D.3d 110 (1st Dep't 2019), *lv and stay pending appeal granted*¸ 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U) (1st Dep't Jan. 7, 2020)).[1]

## PRELIMINARY STATEMENT

This defamation action against the President of the United States may not proceed if the Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office.  That precise issue, which the U.S. Supreme Court has called an "important constitutional issue," *Clinton v. Jones*, 520 U.S. 681, 690-91 (1997), is now squarely before the Court of Appeals on the President's pending appeal from the First Department's 3-2 decision in *Zervos v. Trump*.

In *Zervos*, the First Department, in granting President Trump leave to appeal, also granted the President's motion to stay the proceedings "pending hearing and determination of the appeal by the Court of Appeals." *Zervos v. Trump*, 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U).  If President Trump is successful on that appeal, this Court would be without jurisdiction to hear this action while President Trump is in office, and that threshold issue should be decided by the Court of Appeals before this action proceeds.  Like *Zervos*, this action should be stayed pending that decision.

The requested stay here is mandated not only because it would permit resolution of the President's claim that he is immune from suit in state court while in office, but also because of

---

[1]  Submitted herewith in support of the motion is the affirmation of Marc E. Kasowitz, dated February 4, 2020 ("Kasowitz Aff.").  References to "Ex." are to exhibits to the Kasowitz Aff.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page65 of 158

the unique role of the President under Article II of the Constitution. *See Clinton v. Jones*, 520

U.S. at 697-98 (Supreme Court had "no dispute" with the fundamental premise that the President

"occupies a unique office with powers and responsibilities so vast and important that the public

interest demands that he devote his undivided time and attention to his public duties").

Accordingly, courts are required under the U.S. Constitution to give deference to the President.

*See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 391-92 (2004) ("Special considerations

applicable to the President . . . suggest that the courts should be sensitive to requests by the

Government for interlocutory appeals . . . ."); *Clinton v. Jones*, 520 U.S. at 707 ("The high

respect that is owed to the office of the Chief Executive . . . is a matter that should inform

the conduct of the entire proceeding, including the timing and scope of discovery."); *Nixon v.

Fitzgerald*, 457 U.S. 731, 753 (1982) ("Courts traditionally have recognized the President's

constitutional responsibilities and status as factors counseling judicial deference and restraint.");

*United States v. Nixon*, 418 U.S. 683, 715 (1974) (Courts must extend the President "that high

degree of respect due the President of the United States."); *United States v. Burr*, 25 F.Cas. 187,

192 (No. 14,694) (C.C. Va. 1807) (John Marshall, C.J., sitting by designation) (Courts may not

"proceed against the President as against an ordinary individual.").

Given this constitutionally required deference, courts routinely grant requests by the

President for stays pending appeal or for interlocutory appeals on constitutional issues. *See, e.g.*,

*Trump v. Mazars USA, LLP*, --- S.Ct. ----, 2019 WL 6328115 (Mem) (U.S. Nov. 25, 2019) (No.

19A545) (granting President Trump's application for a stay, pending disposition of his petition

for writ of certiorari and, if granted, judgment of the Court, on the constitutionality, under the

Separation of Powers doctrine, of a Congressional subpoena to President's accountant seeking

pre-presidential, private documents), *cert. granted*, --- S.Ct. ----, 2019 WL 6797734 (Mem) (U.S.

Dec. 13, 2019) (No. 19-715); *Trump v. Deutsche Bank AG*, --- S.Ct. ----, 2019 WL 6797733

(Mem) (U.S. Dec. 13, 2019) (No. 19A640) (same); *United States v. Nixon*, 418 U.S. at 714

("[e]nforcement of the subpoena duces tecum [directed to President Nixon] was stayed pending

this Court's resolution of the issues," including whether, under the Separation of Powers

doctrine, a federal district court may issue a subpoena to the President in a criminal action);

*Trump v. Vance*, No. 19-3204, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019) (granting stay of

enforcement of state grand jury subpoena seeking the President's documents from his

accountant, given "the unique issues raised by the appeal," including whether, under the

Supremacy Clause, a state grand jury may issue a subpoena seeking the President's records); *In*

*re Trump*, 781 F. App'x 1, 2 (D.C. Cir. 2019) (district court abused its discretion in denying the

President's request for an immediate interlocutory appeal from denial of his motion to dismiss

claim that he violated the Foreign Emoluments Clause of the U.S. Constitution, because the

issues raised were "unsettled" and potentially "dispositive"); *In re Trump*, 928 F.3d 360, 364

(4th Cir. 2019) (granting President permission to file interlocutory appeal and staying district

court proceedings pending that appeal from district court's orders, which denied the President's

motion to dismiss and permitted discovery on claims he violated the Emoluments Clauses), *reh'g*

*granted*, 780 Fed. Appx. 36 (Mem); *Jones v. Clinton*, No. 95-1167, BL-62 (8th Cir. Apr. 16,

1996) (granting President Clinton's motion to stay pending President Clinton's appeal to the U.S.

Supreme Court on whether the Separation of Powers doctrine bars federal court jurisdiction over

actions against the President arising from his unofficial conduct); *Nixon v. Sirica*, 487 F.2d 700,

721 (D.C. Cir. 1973) (directing district court to stay the action to allow the President to appeal

the district court's determinations compelling disclosure of materials subject to the President's

claim of Article II privilege); *Galicia v. Trump*, No. 24973/15E, M-7413 (1st Dep't Oct. 24,

3

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page67 of 158

2019) (granting the President a stay pending appeal on whether the state trial court could, consistent with Article II of the U.S. Constitution, require the President to appear for deposition).

The requested stay here under these circumstances is thus authorized and mandated. Under CPLR § 2201, which authorizes courts to "grant a stay of proceedings in a proper case, upon such terms as may be just," New York courts grant stays pending appeals in other actions where those appeals would, as here, resolve a dispositive issue. *See, e.g.*, *OneBeacon Am. Ins. Co. v. Colgate-Palmolive Co.*, 96 A.D.3d 541, 541 (1st Dep't 2014) (affirming grant of stay under CPLR § 2201, and holding that "[t]he duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay [pending appeal in a related action in another state] outweigh any prejudice to plaintiff"); *Belabarodaya v. Carepro of NY, Inc.*, No. 152534/2018, 2018 WL 3733304, at *2 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) (granting stay pending appeals to the Court of Appeals in two separate actions addressing a dispositive issue). Moreover, not only is a stay constitutionally required, but a stay would also avoid "duplication of effort, waste of judicial resources, and [the] possibility of inconsistent rulings." *OneBeacon*, *supra*. Accordingly, the stay should be granted.

## **PRIOR PROCEEDINGS**

Like this action, *Zervos* is an alleged defamation action against President Trump in Supreme Court, New York County.  In *Zervos*, the President moved to dismiss on the ground, among others, that the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, bars state courts from exercising jurisdiction over the President while he or she is in office.  On March 20, 2018, Justice Schecter denied the President's motion, *Zervos*, 59 Misc.3d 790 (Sup. Ct., N.Y. Cnty. 2018), and on March 14, 2019, the First Department affirmed in a 3-2 decision, *Zervos*, 171 A.D.3d at 120.

4

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page68 of 158

Several days after filing this action in November 2019, plaintiff sought to have it

reassigned to Justice Schecter on the grounds that this action and *Zervos* "present similar, and

often novel, legal issues," including "the same argument[s] that Trump made, and Justice

Schecter considered, in *Zervos*," and that "[a]ssigning two different Justices to these cases would

both amplify the Court's workload unnecessarily and risk conflicting rulings." (Kasowitz Aff.,

Ex. A (NYSCEF Nos. 3 at ¶¶ 6, 8, 24 at ¶¶ 9, 10, 12).)[2]

On December 12, 2019, this Court entered a Preliminary Conference Order ordering that

document requests be served by February 6, 2020, with responses due March 6, that party

depositions be completed by April 6, 2020, and that "[t]he filing of a dispositive motion,

including a Motion to Dismiss, will not stay discovery." (Kasowitz Aff., Ex. B (NYSCEF No.

27).)

Plaintiff has served the President with numerous and burdensome discovery requests,

including notices to admit, interrogatories, two sets of document requests, and a notice for

physical examination. (Kasowitz Aff. ¶ 6.)

On January 3, 2020, defendant filed a proposed order to show cause and accompanying

motion to dismiss the complaint for lack of jurisdiction and to stay discovery pending the Court's

decision on the motion to dismiss. (NYSCEF Nos. 28-33.) On January 6, 2020, this Court

declined to sign the order to show cause. (NYSCEF No. 36.)

The next day, on January 7, 2020, the First Department in *Zervos* granted President

Trump leave to appeal to the Court of Appeals. *Zervos*, 2020 WL 63397, 2020 N.Y. Slip Op.

60193(U). The First Department also granted President Trump's motion to "stay . . .

---

[2] Plaintiff's request to reassign the action was denied by letter, dated December 9, 2019, from Hon. Deborah A. Kaplan, Administrative Judge for Civil Matters, Supreme Court of the State of New York.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page69 of 158

proceedings pending hearing and determination of the appeal by the Court of Appeals." *Id.* On January 17, 2020, in *Zervos*, President Trump filed in the Court of Appeals his preliminary appeal statement. On January 21, 2020, the Court of Appeals issued a briefing schedule under which the appeal will be fully briefed by May 11, 2020. (Kasowitz Aff., Ex. C.)

On February 4, 2020, the Court so-Ordered the parties' stipulation adjourning all discovery deadlines by the amount of time from January 31 to the date of the Court's decision on this motion, plus five business days. (Kasowitz Aff., Ex. D at 2.)

## ARGUMENT

Whether the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office is now squarely before the Court of Appeals on the President's appeal from the First Department's 3-2 decision in *Zervos v. Trump*, 171 A.D.3d 110. A stay of this action is thus mandated until the Court of Appeals decides that issue, which the U.S. Supreme Court in *Clinton v. Jones*, 520 U.S. at 690-91, called an "important constitutional issue[]."

In *Clinton v. Jones*, the Supreme Court held that the Separation of Powers doctrine does not bar federal court jurisdiction over an action against the President arising from alleged private conduct, on the ground that the federal Judicial Branch is a coequal branch with the Executive Branch of the federal government. The Supreme Court took pains, however, to note that it was "not necessary to consider or decide whether a comparable claim might succeed in a state tribunal" under the Supremacy Clause, which might "present a more compelling case for immunity." *Id.* at 691. *See also Trump v. Vance*, 941 F.3d 631, 642-43 (2d Cir. 2019) (acknowledging, without deciding, that "the President may be correct that state courts lack the authority to issue him orders"), *cert. granted*, --- S.Ct. ----, 2019 WL 6797730 (Mem) (U.S. Dec.

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page70 of 158

13, 2019) (No. 19-635); *Zervos v. Trump*, 171 A.D.3d at 113 (whether state courts can hear

actions against a sitting president is a "constitutional issue of first impression").

> A.   **If the Court of Appeals Reverses *Zervos v. Trump*,**
> **This Action Must be Dismissed or Stayed.**

In *Zervos v. Trump*, 171 A.D.3d at 113, the First Department, acknowledging that it was

deciding a "constitutional issue of first impression," held, citing *Clinton v. Jones*, that the

"Supremacy Clause does not deprive a state court of its power and authority to decide [the]

case," *id.* at 128.  Two justices in dissent, however, correctly noted that the holding in *Clinton v.*

*Jones*, on its face, does not extend to state courts and concluded that the Supremacy Clause bars

state-court jurisdiction over a sitting President because "subjecting the President to a state trial

court's jurisdiction imposes upon him a degree of control by the State of New York that

interferes with his ability to carry out his constitutional duty of executing the laws of the United

States."  *Id.* at 131.  The First Department granted the President leave to appeal its 3-2 decision

to the Court of Appeals and granted the President's motion to stay proceedings "pending hearing

and determination of the appeal by the Court of Appeals."  *Zervos v. Trump*, 2020 WL 63397,

2020 N.Y. Slip Op. 60193(U).

This action should be stayed as well.  The issue on appeal in *Zervos* is squarely present in

this action, and if resolved by the Court of Appeals in favor of the President, this Court would be

without jurisdiction to hear this action, which must be dismissed or stayed while President

Trump is in office.  Accordingly, this threshold issue -- whether the President is immune from

suit in state court while in office -- should be decided by the Court of Appeals before this action

proceeds.

**B.     Official Immunity Claims Must be Decided at the Outset of the Case.**

To avoid negating a claim of official immunity -- here, the President's constitutional right to immunity from suit in state court while in office -- the courts have repeatedly made clear that courts should decide such claims at the beginning of the case, before discovery.  *See, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (Immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery …, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'") (emphasis in original) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."); *Hegarty v. Somerset Cnty.*, 25 F.3d 17, 18 (1st Cir. 1994) ("[I]mmunity from suit includes protection from the burdens of discovery . . . [and] the stay of discovery, of necessity, ordinarily must carry over through the *appellate court's* resolution of [the immunity question], so long as the appeal is non-frivolous.") (emphasis in original); *Liu v. New York City Police Dep't*, 216 A.D.2d 67, 69 (1st Dep't 1995) (assertion of immunity is "an issue of law which the court should decide at the earliest possible stage of the litigation").

**C.     The Courts are Constitutionally Required to Give Deference to the President.**

*A fortiori*, when the official asserting immunity is the President, the immunity issue must be decided first.  A stay would permit resolution of the President's claim that he is immune from suit in state court while in office, and is also mandated because of the unique role of the President under Article II of the Constitution.  *See Clinton v. Jones*, 520 U.S. at 697-98 (Court had "no dispute" with the premise that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties").  Accordingly, courts are required to give

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page72 of 158

deference to the President of the United States under the U.S. Constitution. *See Cheney*, 542

U.S. at 391-92 ("Special considerations applicable to the President . . . suggest that the courts

should be sensitive to requests by the Government for interlocutory appeals . . . ."); *Clinton v.

Jones*, 520 U.S. at 707 ("The high respect that is owed to the office of the Chief Executive . . . is

a matter that should inform the conduct of the entire proceeding, including the timing and scope

of discovery."); *Nixon v. Fitzgerald*, 457 U.S. at 753 ("Courts traditionally have recognized the

President's constitutional responsibilities and status as factors counseling judicial deference and

restraint."); *United States v. Nixon*, 418 U.S. at 715 (1974) (Courts must extend the President

"that high degree of respect due the President of the United States."); *United States v. Burr*, 25

F.Cas. at 192 (Courts may not "proceed against the President as against an ordinary individual.").

Given this constitutionally required deference, courts thus routinely grant a President's

request for a stay pending appeal or interlocutory appeal on constitutional issues like the one

presented here. *See Trump v. Mazars USA*, *supra* (granting President Trump's motion to stay,

pending disposition of his petition for writ of certiorari, and, if granted, judgment of the Court,

on the constitutionality, under the Separation of Powers doctrine, of a Congressional subpoena to

President's accountant seeking pre-presidential, private documents); *Trump v. Deutsche Bank*,

*supra* (same); *United States v. Nixon*, 418 U.S. at 714 ("[e]nforcement of the subpoena duces

tecum [directed to President Nixon] was stayed pending this Court's resolution of the issues,"

including whether, under the Separation of Powers doctrine, a federal district court may issue a

subpoena to the President in a criminal action); *Trump v. Vance*, *supra* at *1 (granting stay of

enforcement of state grand jury subpoena seeking the President's documents from his

accountant, given "the unique issues raised by this appeal," including whether, under the

Supremacy Clause, a state grand jury may issue a subpoena seeking the President's records); *In*

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page73 of 158

*re Trump*, 781 F. App'x at 2 (district court abused its discretion in denying the President's request for an immediate interlocutory appeal from denial of his motion to dismiss claim that he violated the Foreign Emoluments Clause of the U.S. Constitution, because the issues raised were "unsettled" and potentially "dispositive"); *In re Trump*, 928 F.3d at 364 (granting President permission to file interlocutory appeal and staying district court proceedings pending that appeal from district court's orders, which denied the President's motion to dismiss and permitted discovery on claims he violated the Emoluments Clauses); *Jones v. Clinton*, *supra* (granting President Clinton's motion to stay pending President Clinton's appeal to the U.S. Supreme Court on whether the Separation of Powers doctrine bars federal court jurisdiction over actions against the President arising from his unofficial conduct); *Nixon v. Sirica*, 487 F.2d at 721 (directing district court to stay the action to allow the President to appeal the district court's determinations compelling disclosure of materials subject to the President's claim of Article II privilege); *Galicia v. Trump*, *supra* (granting the President a stay pending appeal on whether the trial court could, consistent with Article II of the U.S. Constitution, require the President to appear for deposition).[3]

Moreover, under the Supremacy Clause, a substantive federal right -- including the President's right to judicial deference -- takes precedence over any state procedures that would nullify that right. *See Haywood v. Drown*, 556 U.S. 729, 736, 740-41 (2009) ("[A]lthough States retain substantial leeway to establish the contours of their judicial systems, they lack authority to

---

[3] The principle that the President is entitled to a stay pending appeal is so well recognized that, in *Trump v. Vance*, *supra*, after the Second Circuit granted an initial, administrative stay, No. 19-3204, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019), the parties -- including the New York County District Attorney, the Department of Justice, and the President -- all acknowledged that a stay pending President Trump's appeal was necessary. *See* Appellee's Letter, *Trump v. Vance*, No. 19-3204 (2d Cir. Oct. 21, 2019), ECF No. 136 (memorializing parties' agreement to a stay pending appeal and petition for *certiorari*). *See also Trump v. Mazars USA, LLP*, 940 F.3d 710, 718 (D.C. Cir. 2019) ("By agreement of the parties, Mazars need not comply with the subpoena during the pendency of this expedited appeal."), *cert. granted*, --- S.Ct. ----, 2019 WL 6797734 (Mem) (U.S. Dec. 13, 2019) (No. 19-715).

nullify a federal right. . . . A State's authority to organize its courts, while considerable, remains subject to the strictures of the Constitution."); *Felder v. Casey*, 487 U.S. 131, 151 (1988) ("Just as federal courts are constitutionally obligated to apply state law to state claims, *see* [*Erie R. Co. v. Tumpkins*, 304 U.S. 64 (1983)], so too the Supremacy Clause imposes on state courts a constitutional duty 'to proceed in such manner that all the substantial rights of the parties under controlling federal law [are] protected.'") (citation omitted); *Lerner v. Karageorgis Lines, Inc.*, 66 N.Y.2d 479, 485 (1985) ("[A] state court may not limit a party's [federal] substantive rights by applying its own procedural rules . . . .").

### D. The Requested Stay is Warranted Under CPLR § 2201.

The requested stay is thus unquestionably warranted under CPLR § 2201, which authorizes this Court to "grant a stay of proceedings in a proper case, upon such terms as may be just." Under CPLR § 2201, courts stay proceedings where, as here, "the point of law involved in the case, and potentially dispositive of it, is about to be definitively decided in another case presently on appeal before a court whose decisions bind the trial court." Patrick M. Connors, Practice Commentaries, McKinney's Cons. Laws of NY Annotated, CPLR C2201:11 (citation omitted). *See also In re Reynders v. Conway*, 79 A.D.2d 863, 864 (4th Dep't 1980) ("[T]he court had the power to stay petitioners['] . . . action until the . . . appeal was argued in the Court of Appeals."); *Belabarodaya*, *supra* at *2 (granting stay pending two appeals to the Court of Appeals in other cases on a dispositive issue); *Assenzio v A.O. Smith Water Prods.*, No. 190008/12, 2015 WL 5283301, at *1-2 (Sup. Ct., N.Y. Cnty. Aug. 28, 2015) (granting stay pending appeal in a separate case that would have a "significant impact" on the action.)

A stay would also avoid "the duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay [which] outweigh any prejudice to plaintiff." *OneBeacon Am. Ins. Co.*, *supra* at 541, 541 (affirming grant of stay under CPLR

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page75 of 158

§ 2201, and holding that "[t]he duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay [pending appeal in a related action in another state] outweigh any prejudice to plaintiff"); *see also Uptown Healthcare Mgmt., Inc. v. Rivkin Radler LLP*, 116 A.D.3d 631, 631 (1st Dep't 2014) (affirming granting of a stay pending ruling in a separate case in federal court which presented "common question of law and fact"); *Belopolsky v. Renew Data Corp.*, 41 A.D.3d 322, 322 (1st Dep't 2007) (affirming stay pending resolution of related case between different parties where the resolution "may dispose of or limit issues which are involved in the subsequent action").[4]

The balance of the equities also favors granting a stay. Absent a stay, the President would be deprived of his constitutional right to immunity from this action while in office, including his immunity to the extensive and burdensome discovery requests plaintiff has served under the Court's scheduling order. (*See* Kasowitz Aff. ¶ 6.) In this regard, the U.S. Supreme Court has made clear that courts may not, consistent with the Constitution, require a President to "place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling . . . ." *United States v. Nixon*, 418 U.S. at 692. The only appropriate procedure, therefore, is to stay this action, including all discovery and scheduling orders, to enable the Court of Appeals to review and decide whether the President, under the Supremacy Clause, is subject to such discovery and orders in the first place.

Moreover, if this action proceeds, the burden would extend to the public interest. The unnecessary distraction of the "President from his public duties [works] to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve."

---

[4] Plaintiff herself argued that this action should be designated as a related case to *Zervos* and reassigned to Justice Schecter based on overlapping and novel legal issues and judicial economy. (*See supra* at 5.)

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page76 of 158

*Nixon v. Fitzgerald*, 457 U.S. at 753.  In such a circumstance, a party "may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936); *see also Uptown Healthcare Mgmt.*, 116 A.D.3d at 631 ("[T]he duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay outweigh any prejudice to plaintiff resulting from the stay.") (citation omitted).

## CONCLUSION

A stay of all proceedings pending the decision of the Court of Appeals in *Zervos v. Trump* should be granted.

13

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page77 of 158

Dated: New York, New York.
       February 4, 2020

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By:    */s/ Marc E. Kasowitz*
      Marc E. Kasowitz
      Christine A. Montenegro
      Paul J. Burgo

      1633 Broadway
      New York, New York 10019
      T: (212) 506-1700
      E: mkasowitz@kasowitz.com
        cmontenegro@kasowitz.com
        pburgo@kasowitz.com

LAROCCA HORNIK ROSEN &
      GREENBERG LLP
      Lawrence S. Rosen
      Patrick McPartland
      Jared E. Blumetti

      40 Wall Street 32nd Floor
      New York, New York 10005
      T: (212) 530-4822, 4837, 4831
      E: lrosen@lhrgb.com
        pmcpartland@lhrgb.com
        jblumetti@lhrgb.com

*Attorneys for Defendant Donald J. Trump*

14

# EXHIBIT 4

# Kasowitz Benson Torres llp

Marc E. Kasowitz
Direct Dial: (212) 506-1710
Direct Fax: (212) 835-5010
MKasowitz@Kasowitz.com

1633 Broadway
New York, New York 10019
(212) 506-1700
Fax: (212) 506-1800

Atlanta
Houston
Los Angeles
Miami
Newark
San Francisco
Silicon Valley
Washington DC

July 16, 2020

VIA NYSCEF

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

Re:     *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

I write on behalf of defendant President Donald J. Trump to correct certain assertions in plaintiff's July 15, 2020 letter ("PL") to the Court.

First, plaintiff asserts that the President's argument is based on a contention that state courts are "inferior" or "incapable" (PL at 1, 2). That is not so. The President's argument -- that under Article II and the Supremacy Clause, a President is temporarily immune while in office from being sued in state court -- is based on the federal structure of the Constitution, which every state ratified and by which every state is bound.[1] Ironically, it is plaintiff, not the President, who seems to believe that the Court could be "distract[ed]" by legal arguments. (PL at 2.)

Second, plaintiff asserts that the President's argument is "desperate," "novel," and "extreme." (PL at 1, 2.) Even allowing for rhetorical flourish, that characterization is completely off base: the President's argument was raised in 1997 by the Supreme Court itself in *Clinton v. Jones* -- where the Supreme Court characterized that supposedly "desperate," "novel" and "extreme" argument as an "important constitutional issue[]," which it recognized could "present a more compelling case for immunity" than a "comparable claim" in federal court. 520 U.S. 681, 690-91, 691 n.13 (1997). And not only did nothing in the Supreme Court's decision in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), address that issue, but the

---

[1]     Under plaintiff's "logic," the U.S. Supreme Court's holding in *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which vacated orders upholding Congressional subpoenas, must have been based on the Supreme Court's view that Congress is inferior or less capable than the state prosecutor in its *Vance* decision, which affirmed an order upholding the prosecutor's criminal subpoena to the President. Such a conclusion would, of course, be as baseless as plaintiff's assertion concerning the President's argument here. *See also* Reply Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1, at 1 ("No one questions the capability of state courts.").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 2

Supreme Court the same day, in *Mazars*, made sure not to include the issue of state court civil cases in its description of its Presidential immunity jurisprudence -- it plainly did so because the important constitutional issue has not yet been decided. (*See* Defendant's July 14, 2020 Letter to the Court ("DL") at 1-2 (quoting *Mazars*, 2020 WL 3848061, at *4).)

Third, plaintiff grossly mischaracterizes the Supreme Court Presidential immunity cases she cites. (PL at 1.) Rather than dismiss or downplay, as plaintiff does, the unique status of the President under the Constitution, every case cited by plaintiff reaffirms that status. In *United States v. Nixon*, while the Supreme Court rejected an "absolute privilege of confidentiality for all Presidential communications," it adopted a "presumptive privilege for Presidential communications." 418 U.S. 683, 703, 708 (1974). In *Clinton v. Jones*, while the Supreme Court allowed civil damages suits against a President in federal courts, it specifically left unresolved not only the issue at stake here, but also whether any court -- state or federal -- "may compel the attendance of the President at a specific time or place," 520 U.S. at 690-91, and reaffirmed that courts may not "proceed against the President as against an ordinary individual." *Id.* at 704 n.39 (citation omitted).[2]

And, in *Mazars*, the Supreme Court in fact granted the President's appeal and -- after having earlier stayed the proceedings, *see Mazars*, 2020 WL 3848061, at *6 -- vacated the decisions below upholding the Congressional subpoenas, *id.* at *12. The Court agreed with the President that, because of the "President's unique constitutional position," Congressional subpoenas to the President "implicate special concerns" not applicable to other citizens -- regardless of whether the information sought is "personal or official." *Id.* at *11-12. Thus, contrary to plaintiff's assertion, *Mazars* did not reject the President's "argument that his private papers should . . . be treated the same as his official papers." (PL at 2.) In fact, the Supreme Court specifically pointed out that "a subpoena for personal papers may pose a heightened risk of . . . impermissible purposes," such as harassment. *Mazars*, 2020 WL 3848061, at *11.

Although the Supreme Court in *Mazars* did find, with respect to the Congressional subpoenas at issue, that "a categorical approach" to assessing the "distinctions between [among other things] official and personal information," was inappropriate, it did so because such an approach "would represent a significant departure from the longstanding way of doing business between the branches.'" *Mazars*, 2020 WL 3848061, at *9. However, there is no "longstanding way of doing business" between state courts and the President. Rather, as shown (DL at 2),

---

[2]     *See also Mazars*, 2020 WL 3848061, at *11 ("The President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation."); *Vance*, 2020 WL 3848062, at *7 (the "President 'occupies a unique position in the constitutional scheme'" and "Article II guarantees the independence of the Executive Branch" (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982))); *Clinton v. Jones*, 520 U.S. at 697-98 (the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties"); *Nixon v. Fitzgerald*, 457 U.S. at 749 ("immunity [is] a functionally mandated incident of the President's unique office"); *United States v. Nixon*, 418 U.S. at 710, 715 ("courts have traditionally shown the utmost deference to Presidential responsibilities" and the President has a "singularly unique role under Art. II").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 3

while Congress, like the federal judiciary, is a coequal branch of government and may therefore exercise "*partial agency* in, or [] *controul* over," the Executive Branch, *Clinton v. Jones*, 520 U.S. at 702-03 (emphasis in original) (citation omitted), state courts, as *Vance* confirmed, are not coequal branches and may not do so. *See Vance*, 2020 WL 3848062, at *8.

Finally, no one is seeking to "escape accountability" here (PL at 2). Plaintiff is free to pursue this action when the President is no longer in office. Plaintiff's repetition of the assertion that a postponement of proceedings would place the President "above the law" (*id.* at 1) does not make it so, and has been squarely rejected by the Supreme Court (DL at 4).[3]

\*      \*      \*

The bottom line is that the issue of temporary Presidential immunity has not yet been decided by the Court of Appeals in *Zervos* -- which itself is stayed pending that decision -- or by the U.S. Supreme Court. Under these circumstances, there is every reason to stay this case, which raises the identical issue, as well.

Respectfully submitted,

Marc E. Kasowitz

cc:     Counsel of Record

---

[3]     That the Supremacy Clause mandates that civil cases in state court be postponed, does not make the President "above the law" any more than, say, the automatic stay granted bankruptcy debtors places them "above the law."

# EXHIBIT 5

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| PRESENT: | **HON. VERNA L. SAUNDERS** | PART | **IAS MOTION 36** |
|---|---|---|---|
| | *Justice* | | |

-------------------------------------------------------------------------------X

E. JEAN CARROLL,

Plaintiff,

- v -

DONALD TRUMP,

Defendant.

-------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 160694/2019 |
| **MOTION SEQ. NO.** | 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 43, 44, 45, 46, 47, 48, 49, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 97, 98, 101, 102, 105, 106

were read on this motion to/for                                    **STAY**                                    .

Plaintiff, E. Jean Carroll, commenced this defamation action seeking damages stemming from defendant Donald Trump's alleged defamatory statements made in connection with plaintiff's allegations of sexual assault at the hands of defendant.

Defendant, who is currently serving as President of the United States, moves the court pursuant to CPLR § 2201 seeking a stay of the proceedings pending the decision of the Court of Appeals on defendant's appeal from *Zervos v Trump*, 171 AD3d 110 ( 1st Dept 2019) wherein the Appellate Division, First Department affirmed an order of the Supreme Court, New York County denying defendant's motion seeking a dismissal of the defamation action. In the alternative, defendant seeks a stay of the action on the ground that he is currently sitting as President of the United States.

Defendant, in sum and substance, argues that this action will not lie if it is barred by the Supremacy Clause of the United States Constitution prohibiting state court subject matter jurisdiction over a sitting United States President. Defendant asserts that this very issue is pending before the Court of Appeals in the *Zervos* action and that when granting leave to appeal, the First Department also granted a stay of those proceedings.[1] Defendant thus claims a stay of the instant proceeding is warranted as the outcome of the *Zervos* action will determine whether this court has jurisdiction over defendant while he is in office. Defendant further argues that New York courts often grant stays pending appeals in other actions where the decision on those appeals resolve a

---

[1] *Zervos v Trump*, 2020 WL 63397, 2020 NY Slip Op 60193(U).

**160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.**
**Motion No. 002**

Page 1 of 4

1 of 4

dispositive issue, as is the case here. Defendant contends that due to the unique role of the President under Article II of the Constitution, deference is required, and a stay mandated.

In opposition, plaintiff argues that defendant's motion serves as a further delaying tactic and that stays are reserved for extraordinary circumstances. Plaintiff asserts that no such circumstances exist here where there is binding appellate precedent and the determination of the pending appeal is not imminent. Furthermore, plaintiff contends that defendant's reliance upon case law where a stay was granted pending an appeal in the same action is misplaced. Moreover, plaintiff argues that the constitutional immunity afforded to the President applies to official conduct, not personal or unofficial conduct as is alleged in this case. Plaintiff avers that defendant's engagement in other personal litigation during his presidency undermines the argument that a stay in this action is necessary.

In support of plaintiff's primary contention that a stay is inappropriate where binding appellate authority exists, plaintiff cites to *Miller v Miller*, 109 Misc 2d 982 [Sup Ct, Suffolk County 1981], wherein the court declined to issue a stay pending the Court of Appeals decision as it was bound by the Appellate Court decision and the Court of Appeals decision was not imminent. Plaintiff contends that the cases cited by defendant in support of a stay are easily distinguishable from this action as those matters either involved identical issues and parties; were fully briefed and awaiting oral argument at the time a stay was requested; or, there was no binding appellate authority on point.

In reply, defendant reiterates the arguments advanced in the moving papers and adds that as the *Zervos* appeal will be fully briefed by May 11, 2020 a stay of this action pending the appeal of the *Zervos* case is warranted as its decision will inform jurisdiction of this action.

In the *Zervos* case, this court held that:

"[n]othing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility. Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions. There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action... [T]here is absolutely no authority for dismissing or staying a civil action related purely to unofficial conduct because defendant is the President of the United States. Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible direct control . . . over the President." (*Zervos v Trump*, 59 Misc 3d 790 [Sup Ct, NY County 2018], internal citations omitted).

Case 23-1045, Document 38-3, 09/05/2023, 3564558, Page85 of 158

On appeal, the Appellate Division, First Department noted that the *Zervos* action presented a constitutional issue of first impression: "whether the Supremacy Clause of the United States Constitution requires a state court to defer litigation of a defamation action against a sitting President until his terms end." (*Zervos,* supra). Ultimately, the Appellate Division's decision to affirm the Supreme Court's ruling unequivocally resolved this issue holding that pursuant to the United States Supreme Court's decision in *Clinton v Jones,* 520 US 681 [1997] "the presidency and the President are indeed separable" and thus, "the President is presumptively subject to civil liability for conduct that has taken place in his private capacity." (*Zervos,* supra at 124).

At issue here is whether this action should be stayed pending a decision from the Court of Appeals regarding the First Department's decision to affirm this court's ruling on *Zervos*.

Pursuant to CPLR § 2201, which authorizes the granting of a stay "in a proper case, upon such terms as may be just," stays are in the sound discretion of the trial court. However, the First Department has ruled that stays should be exercised "sparingly and only when other remedies are inadequate and the equities invoked apparent and strong." (See generally, *Croker v NY Trust Co.*, 206 AD 11 [1st Dept 1923]). Nevertheless, it is axiomatic that this court is bound by the decisions of the Appellate Division, First Department unless same has been overturned by the Court of Appeals.

In this instance, defendant implores the court to stay this action until the Court of Appeals has ruled on a separate action, arguing that the appeal is fully briefed and thus, imminent. Conversely, plaintiff objects avowing that there is no immediate date set for arguments or likelihood that a decision is imminent and thus, the court is bound by the binding appellate precedent which specifically addresses the issue in contention. While the arguments advanced by both parties are compelling, they have been rendered moot in light of the recent United States Supreme Court decision in *Trump v Vance*, 591 U.S. __, __, 140 S Ct 2412 [2020]. In *Trump v Vance*, the U.S. Supreme Court held that "Article II and the Supremacy Clause do not categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President." (Slip Op at 1.) The *Vance* Court reasoned that as the Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties, absolute immunity is not necessary or appropriate under Article II or the Supremacy Clause as state courts and prosecutors are expected to observe constitutional limitations and, if they fail to

**160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.**
**Motion No.  002**

Page 3 of 4

3 of 4

do so, federal law allows a President to challenge any constitutional influence. (Slip Op at 17.) While the *Vance* Court's decision permits the issuance of a criminal subpoena to a sitting President, it's analysis and conclusions address the same issues and questions raised by defendant in this action, as well as, the *Zervos* action: whether the Supremacy Clause of the Constitution bars a state court from exercising jurisdiction over a sitting President of the United States during his term. No, it does not. Further, the holding in *Vance* is not limited solely to criminal proceedings. In fact, the *Vance* Court concluded,

> Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard[ ] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. (Slip Op at 21, internal citations omitted.)

This court construes the holding in *Vance* applicable to all state court proceedings in which a sitting President is involved, including those involving his or her unofficial/personal conduct. Accordingly, the application for a stay is denied and it is hereby

ORDERED, defendant's motion is denied in accordance with the foregoing; and it is further

ORDERED, that the parties are to appear for a telephonic compliance conference on September 30, 2020 at 11:00 AM; and it is further

ORDERED, that any requested relief not expressly addressed herein has been considered and is hereby denied.

This constitutes the decision and order of the court.

__August 3, 2020__                                    _____
                                                      HON. VERNA L. SAUNDERS, JSC

| CHECK ONE: | | | | | |
|---|---|---|---|---|---|
| | CASE DISPOSED | | | X | NON-FINAL DISPOSITION |
| | GRANTED | X | DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | SETTLE ORDER | | | | SUBMIT ORDER |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | REFERENCE |

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                               Plaintiff,

            -against-                                            20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                               Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

                        Roberta A. Kaplan
                        Joshua A. Matz
                        KAPLAN HECKER & FINK LLP
                        *Attorneys for Plaintiff*

                        Stephen R. Terrell
                        William K. Lane III
                        James G. Touhey, Jr.
                        Director, Torts Branch, Civil Division
                        JEFFREY BOSSERT CLARK
                        ACTING ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION
                        *Attorneys for Movant*

                        John A. Kolar
                        *Attorney for Amicus Curiae Government Accountability Project, Inc.*

Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Statutory Context – The FTCA and the Westfall Act . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Events Giving Rise to This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.      Whether the President Is an "Employee" Under the Westfall Act . . . . . . . . . . . 14

          A.     The Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          B. .    The Legislative History – The *Westfall* Decision and the Westfall Act
                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

          C.     *Franklin v. Massachusetts* and Lack of Clear Statement to Include the
               President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          D.     Decisions of Other Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    II.     Scope of Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          A.     Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          B.     Scope of Employment Under D.C. Law . . . . . . . . . . . . . . . . . . . . . . . 39

              1.     Master-Servant Relationship . . . . . . . . . . . . . . . . . . . . . . . . . 41

              2.     Scope of Employment Test . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

          C.     Scope of Employment Under New York Law . . . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

LEWIS A. KAPLAN, *District Judge.*

The plaintiff in this case, E. Jean Carroll, published a book excerpt in 2019 in which she wrote that, in the 1990s, businessman Donald J. Trump, as he then was, raped her in a dressing room of a New York City department store. Almost immediately after publication of Ms. Carroll's excerpt, Mr. Trump – who by then was president – told the press that Ms. Carroll had made up the rape story. In substance, he called Ms. Carroll a liar and stated that he never met her. So Ms. Carroll sued him in New York State court. She claims that his statements accusing her of lying about the alleged rape were false, that they injured her reputation, and that she is entitled to damages from him. The legal terms are that Ms. Carroll asserts that President Trump's statements were defamatory – libelous and slanderous.

The question whether Mr. Trump in fact raped Ms. Carroll appears to be at the heart of her lawsuit. That is so because the truth or falsity of a defendant's alleged defamatory statements can be dispositive of any defamation case. Although the Court eventually may need to resolve this issue, this opinion concerns a threshold question. To make the significance of that question clear, we must digress into some technical detail.

Ms. Carroll sued the president in his individual (or personal) capacity, as distinguished from suing him as the president (*i.e.*, in his official capacity). In other words, she claims that the president personally harmed her and that he, not the U.S. government, should pay any damages to which she may be entitled.

For nearly a year, this lawsuit proceeded in state court as an ordinary defamation case between Ms. Carroll and President Trump. The president defended the case as a private individual. He was represented by his personal lawyers, not by the U.S. Department of Justice ("DOJ") or other government lawyers. And although he claimed that he could not be sued

2

because he currently is president, the state court rejected that argument and denied a stay of further proceedings, which would have included pretrial discovery.[1]

It was at that point that the U.S. government inserted itself into the case. It "removed" the case from the state court to this one – that is, it filed a paper certifying that a designee of the Attorney General had determined that the president's statements to the press were part of his job as president and that this case therefore could be moved into federal court. For reasons that will appear, that certificate – whether it is right or wrong – conclusively authorized the removal of the case, and no one claims otherwise. But the DOJ did something else too, and that is what now is before the Court.

The government moves to substitute the United States for President Trump as the defendant. It does so in essence on the theory that this is not truly a lawsuit against President Trump as a private individual. Instead, the government argues, this is really a lawsuit against the United States because Ms. Carroll has sued an "employee" of the United States of America for actions within the scope of his employment. The government thus asserts that this case is virtually identical in principle to a lawsuit against a Postal Service driver for causing a car accident while delivering the mail. But the word "virtually" in the last sentence is necessary because there is an important difference between this case and the case of the hypothetical mail driver. Here is the catch.

---

[1] Dkt. 14-111.

The United States of America is a sovereign nation. It therefore shares with other nations what is called sovereign immunity. This means that it cannot be sued for money damages except to the extent that it explicitly has agreed to being sued.[2]

Within certain limits, the United States has so agreed in a statute called the Federal Tort Claims Act (the "FTCA"). The FTCA authorizes damages claims for negligence and certain other civil wrongs committed by government employees within the scope of their employment. The postal driver hypothetical is a classic example of a case that generally would be covered by the statute. But the FTCA specifically excepts libel and slander cases from the United States's consent to be sued. Thus, if this really is a suit against the United States, it is one to which the United States seemingly has not waived its sovereign immunity. So if President Trump is an "employee of the Government" within the meaning of the FTCA, and if his statements about Ms. Carroll were within "the scope of his employment," it could well be argued that this case must be dismissed because the United States has sovereign immunity.[3] In that

---

[2]

Sovereign immunity derives from the principle that "the law ascribes to the king the attribute of sovereignty, or pre-eminence. . . . Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power . . . ." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 234-235 (1765) (quoted in *Alden v. Maine*, 527 U.S. 706, 715 (1999)).

[3]

This point has been made in the media. *E.g.*, Barbara McQuade, *Barr's Defense of Trump in E. Jean Carroll's Suit Could Give Presidents Carte Blanche,* (Oct. 21, 2020), https://www.nbcnews.com/opinion/barr-s-defense-trump-e-jean-carroll-s-suit-could-n12 44088; James D. Zirin, *The Strange Case of 'Carroll v. Trump' – An Adventure in Wonderland* (Sept. 11, 2020), https://billmoyers.com/story/the-strange-case-of-carroll-v-trump-an-adventure-in-wonde rland/. The Court expresses no opinion on this question, which is not now before it.

4

event, Ms. Carroll would be left with no remedy, even if the president's statements were false and defamatory.

This is the nutshell version of this case. But for the present purpose of deciding the government's motion to substitute, the dispositive questions are two:

- Is the president an "employee of the Government" within the meaning of the FTCA?

- Even if the president is an "employee of the Government" as the FTCA defines that term, were his statements concerning Ms. Carroll within the scope of his "employment" under the law of the relevant jurisdiction?

The answer to both questions is "no." While the president possesses all of the executive power of the United States, he is not an "employee" within the meaning of the FTCA. The FTCA's definition of that term does not include presidents. And even if the president were an employee under that statute, his statements concerning Ms. Carroll were not within the scope of his employment under the law of the relevant jurisdiction, which for reasons explained below is Washington, D.C.

*Facts*

Before turning to the details of this dispute, the Court places them in context by reviewing the constitutional and statutory framework in which this motion is situated.

*Statutory Context – The FTCA and the Westfall Act*

We already have introduced the principle of sovereign immunity. It remains to mention a closely related principle, namely that federal employees and the president long

enjoyed absolute official immunity with respect to lawsuits in federal courts charging them with liability for performance of their official functions.[4]

In 1946, Congress enacted the FTCA.  The statute was a major step to provide compensation to victims of certain torts – *i.e.*, civil wrongs such as negligence – committed by federal employees.  As relevant here, the FTCA provides that the district courts of the United States

> "have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[5]

Although the FTCA's precise workings are complicated, its basic function is simple.  With numerous qualifications and exceptions, the statute allows a person injured by an "employee of the Government" who is "acting within the scope of his office or employment" to sue the United States for tort damages, notwithstanding its sovereign immunity, if the United States would be liable as an employer under the law of the state where the act or omission occurred.  Thus, Congress adopted the view that (1) a suit for damages against a federal employee acting within the scope of his or her employment in substance is a suit against the United States, (2) in such a case the United States would be substituted as the defendant for the individual employee, and (3) the United States is responsible for defending such lawsuits in the

---

[4]

       *See, e.g., Barr v. Matteo,* 360 U.S. 564, 597 (1959).

[5]

       28 U.S.C. § 1346(b)(1).

name of the United States and for paying any damages awarded. The individual employee sued in his or her official capacity is not a proper defendant in such a case.

The FTCA does not authorize suits against government employees in their individual or personal capacities. But state law often does. Thus, even after the FTCA was enacted, federal employees were exposed to tort actions against them in their individual capacities in some states.

In 1988, the Supreme Court held in *Westfall v. Erwin*[6] that federal government employees are not absolutely immune from state tort claims based on conduct performed within the scope of their employment except in certain circumstances.[7] This decision opened the door to individual liability for federal employees wider than previously had been understood.

Congress moved promptly to close that door. In 1988, it enacted the Federal Employees Liability Reform and Tort Compensation Act of 1988, more commonly known as the Westfall Act.[8] The statute's "core purpose . . . is to relieve covered employees from the cost and effort of defending [a] lawsuit, and to place those burdens on the Government's shoulders."[9] Pursuant to the Westfall Act:

> "The remedy against the United States provided by sections 1346(b) [the FTCA] and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

---

[6] 484 U.S. 292 (1988).

[7] *Id.* at 299.

[8] The statute as amended is codified at 28 U.S.C. § 2679.

[9] *Osborn v. Haley*, 549 U.S. 225, 252 (2007).

7

employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.  Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred."[10]

In essence, the quoted provision bars tort claims against government employees acting within the scope of their employment.   But it provides plaintiffs with a different remedy: a lawsuit against the United States under the FTCA.  Under subsection (c) of the Westfall Act, "[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any [of the above described] damage or injury."[11]

Because the Westfall Act operates where a lawsuit could have been brought against the United States under the FTCA, the statutes share the same threshold requirements. Thus, in order for the Westfall Act to apply, the defendant must be an "employee of the Government" who was acting within the scope of his or her employment.  Under Subsection (d) of the Westfall Act, the Attorney General makes an initial determination as to both issues:

"Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[12]

---

[10]    28 U.S.C. § 2679(b)(1).

[11]    *Id.* § 2679(c).

[12]    *Id.* § 2679(d)(1).

8

If the Attorney General issues a certification and the action is pending in state court, the Westfall Act requires that the action be removed to federal court.[13] If the Attorney General declines to issue a certification, "the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."[14] Either way, if the court is satisfied that the threshold requirements are met, the action "shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA]."[15]

The Attorney General's certification is conclusive only "*for purposes of removal*"[16] – that is to say, only for purposes of whether the action shall continue in federal rather than state court. As the Supreme Court has held, such a certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee."[17] "The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification . . . ."[18] Hence, the federal court to which the action has been removed must determine for itself whether the

---

[13]

    *Id.* § 2679(d)(2).

[14]

    *Id.* § 2679(d)(3).

[15]

    *Id.* § 2679(d)(4).

[16]

    *Osborn*, 549 U.S. at 242 (emphasis in original) (quoting 28 U.S.C. § 2697(d)(2)).

[17]

    *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995).

[18]

    *Id.* at 436-37.

individual defendant is covered by the statute and, if so, whether the actions of which that defendant is accused or committed were within the scope of the defendant's federal employment. If those conditions both are met, the United States is made the defendant and the individual defendant is dismissed from the case. If either condition is not met, the case proceeds against the individual defendant in his or her personal capacity.

*The Events Giving Rise to This Lawsuit*

According to the complaint, Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996.[19] Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store.[20] The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit.[21] Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent.[22] She claims that she pushed Mr. Trump away and laughed at him, and that

---

[19] Dkt. 3-3 at 5.

[20] *Id.*

[21] *Id.* at 6.

[22] *Id.*

he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store.[23]

Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days.[24]  She did not, however, make the allegations public at that time.[25]  They remained private for many years.

In 2017, the plaintiff began drafting a book about twenty-one men who had left ugly marks on her life.[26]  One of those men was Donald Trump.[27]  On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.[28]  The book was published on July 2, 2019.[29]

Roughly two hours after the excerpt was published in *New York* magazine, the president issued a public statement to media outlets.  It said:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago.  I've never met this person in my life.  She is trying to sell a new book – that should indicate her motivation.  It should be sold

---

[23]  *Id.* at 6-7.

[24]  *Id.* at 7.

[25]  *Id.* at 8.

[26]  *Id.* at 13.

[27]  *Id.*

[28]  *Id.* at 14.

[29]  *Id.*

11

in the fiction section.  Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh.  It's just as bad for people to believe it, particularly when there is zero evidence.  Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine: No pictures?  No surveillance?  No video?  No reports?  No sales attendants around??  I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault.  All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible.  The world should know what's really going on.  It is a disgrace and people should pay dearly for such false accusations."[30]

The next day, June 22, 2019, a reporter at the White House confronted President Trump about the story.[31]  They had the following exchange:

[Reporter:] Mr. President, you had said earlier that you never met E. Jean Carroll.  There was a photograph of you and her in the late 1980's —

[President Trump:] I have no idea who this woman is.  This is a woman who has also accused other men of things, as you know.  It is a totally false accusation.  I think she was married — as I read; I have no idea who she is — but she was married to a, actually, nice guy, Johnson — a newscaster.

[Reporter:] You were in a photograph with her.

[President Trump:] Standing with [my] coat on in a line – give me a break – with my back to the camera.  I have no idea who she is.  What she did is – it's terrible, what's going on.  So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

---

[30]    *Id.* at 15.

[31]    *Id.* at 17.

And, you know, people have to be careful because they're playing with very dangerous territory.  And when they do that – and it's happening more and more.  When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine.  It's ready to go out of business, from what I hear.  They'll do anything they can.  But this was about many men, and I was one of the many men that she wrote about.  It's a totally false accusation.  I have absolutely no idea who she is.  There's some picture where we're shaking hands. It looks like at some kind of event.  I have my coat on.  I have my wife standing next to me.  And I didn't know her husband, but he was a newscaster.  But I have no idea who she is – none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York – which is one of the reasons it's failing.  People don't read it anymore, so they're trying to get readership by using me.  It's not good.

You know, there were cases that the mainstream media didn't pick up.  And I don't know if you've seen them.  And they were put on Fox.  But there were numerous cases where women were paid money to say bad things about me.  You can't do that.  You can't do that.  And those women did wrong things – that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[32]

President Trump commented on the story a third time on June 24, 2019, when he gave an interview to *The Hill*.  As relevant here, he stated: "I'll say it with great respect: Number one, she's not my type.  Number two, it never happened.  It never happened, OK?"[33]

*Procedural Background*

On November 4, 2019, the plaintiff filed this lawsuit in the New York Supreme

---

[32]  *Id.* at 17-18.

[33]  *Id.* at 19.

13

Court, New York County, against President Trump in his personal capacity.[34]  On the basis of the June 21, June 22, and June 24 statements, she alleged that the president defamed her under New York law.[35]

The lawsuit proceeded in state court for ten months during which time the court resolved, among other things, a motion to dismiss and several motions to stay.[36]  On September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General "on the basis of the information now available with respect to the incidents alleged in the [plaintiff's] complaint, that Defendant Donald J. Trump was acting within the scope of his office as the President of the United States at the time of the alleged conduct."[37]  Shortly after, the government filed in this Court a notice of removal.[38]  It filed also a motion, pursuant to the Westfall Act, to substitute itself in place of President Trump as the defendant.[39]  It is that motion that now is ripe for decision.

---

[34]  *Id.* at 1.

[35]  *Id.* at 26-27.

[36]  *See, e.g.*, Dkts. 14-36, 14-111.

[37]  Dkt. 3-4.

[38]  Dkt. 6.

[39]  Dkt. 3.

*Discussion*

The government's motion to substitute turns on whether the Attorney General's certification that President Trump was an employee of the government acting within the scope of his employment was correct. As noted at the outset of this opinion, that question raises two subsidiary issues: (1) whether the President of the United States is an "employee of the Government" and, if the answer to this question is "yes," (2) whether President Trump was acting within the scope of his employment when he made the allegedly defamatory statements.[40]

I.   *Whether the President Is an "Employee" Under the Westfall Act*

As noted above, the Westfall Act applies to any "employee of the Government."[41] That phrase is defined in 28 U.S.C. § 2671, a provision enacted by the Act of June 25, 1948 as part of a "Tort Claims Procedure" package. The statute reads:

"As used in this chapter and sections 1346(b) [the FTCA] and 2401(b) of this title, the term [[42]] * * *

---

[40]   For reasons explained below, D.C. law applies to this issue.

[41]   28 U.S.C. § 2679(b)(1).

[42]   The Act of June 25, 1948 contains an em dash in this location, signifying that the "As used in this chapter" clause applies to all three of the definitions that follow. *See* Act of June 25, 1948, ch. 646, 62 Stat. 982, *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf. In 1962, Congress amended the definition of "federal agency," the first defined term. In doing so, it omitted the em dash and combined the "As used in this chapter" clause with the paragraph defining "federal agency." *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307, *available at* https://www.govinfo.gov/content/pkg/STATUTE-80/pdf/STATUTE-80-Pg306.pdf. The failure to retain the em dash appears to have been a scrivener's error. For one thing, the term "federal agency" is not used in Section 1346(b). And taking Congress literally would require a belief that, in updating the definition of "federal agency," it silently chose to un-define "employee of the Government" as that term is used in the chapter where it is found

15

"'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18."[43]

The term "federal agency" also is defined by Section 2671:

"'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."[44]

These definitions apply to both the Westfall Act provisions codified in 28 U.S.C. § 2679 and the FTCA provisions codified in 28 U.S.C. § 1346(b).[45]

Neither Ms. Carroll nor the government has cited any case addressing the question whether the President of the United States is an "employee of the Government" under

---

and in Section 1346(b) while inexplicably keeping it in the definition section. Whatever the case may be, the Supreme Court has stated that both definitions apply to Section 1346(b). *See Logue v. United States*, 412 U.S. 521, 525-26 (1973).

[43]

28 U.S.C. § 2671.

[44]

*Id.*

[45]

Section 2679, where the Westfall Act provisions are codified, is part of the chapter in which the definition is contained. *See also* note 42, *supra*.

16

Section 2671 specifically or the Westfall Act or FTCA more generally. And the Court is aware of none. We therefore begin the search for an answer to this question with the statutory text.[46]

A.      *The Plain Language*

Section 2671's definition of "employee of the Government" says that the term "includes" five categories of government personnel:

1.      "officers or employees of any federal agency,"

2.      "members of the military . . . ,"

3.      "members of the National Guard [in certain circumstances],"

4.      "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States," and

5.      "any officer or employee of a Federal public defender organization."

Categories 2, 3 and 5 obviously do not apply to the president. Nor does category 4, which "is designed to cover special situations such as government officials who serve without pay, or an employee of one government agency who is loaned to and works under the direct supervision of another government agency."[47]   Thus, the remaining question is whether

---

[46]

See, e.g., *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

[47]

*Leone v. United States*, 910 F.2d 46, 51 (2d Cir. 1990); *see also Logue*, 412 U.S. at 531 (noting that the legislative history of the provision suggests that "the language is designed to cover special situations such as the 'dollar-a-year' man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement").

presidents are "officers or employees of any federal agency."[48]   Unfortunately, the terms

"officers" and "employees" are not defined.[49]

The president is a *constitutional* officer.  He occupies the highest office in our

nation, which is created by Article II of the Constitution.  But that is not what Section 2671

requires.  It speaks only of "officers . . . *of any federal agency*," not officers of the United States

within the meaning of the Constitution.  So we turn to the question whether the president is an

---

[48]

The government argues for the first time in its reply brief that the use of the word "includes" indicates that the five categories that follow it are exemplary, not exclusive.  In other words, the use of the word "includes" invites courts to rewrite Section 2671 by expanding "employees of the Government" to include categories of individuals that Congress did not see fit to identify.  This contention fails.

As an initial matter, counsel for the government at oral argument waived on the record all arguments raised for the first time in the government's reply brief.  *See* Tr. at 4:13-24 (Oct. 21, 2020) (agreeing, in exchange for precluding the plaintiff from filing a surreply, "to invoke the time-honored principle that new arguments raised for the first time in a reply brief will not be considered").  This argument therefore is waived.  *See also Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

In any case, the Court would reject this argument.   "[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).  As discussed below, if Congress had intended to include an individual as significant and obvious as the president in this statute, it would have done so clearly.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992).  Moreover, and also discussed below, there are compelling reasons to conclude that Congress did not intend the major expansion of federal tort exposure that would arise if the FTCA applied to the president's conduct.

[49]

The original definition of "employee of the Government" does not shed any additional light on this question.  It reads:

"'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." Act of June 25, 1948, c. 646, 62 Stat. 982.

18

officer "of any federal agency" within the meaning of Section 2671. As noted above, Section

2671 states that the term "federal agency" "includes the executive departments, the judicial and

legislative branches, the military departments, independent establishments of the United States,

and corporations primarily acting as instrumentalities or agencies of the United States."[50]

  At the outset, it is apparent that this definition does not include the entire

executive branch. Although Congress referred to "the executive departments," the fact that the

phrase is plural makes clear that Congress did not mean "the executive branch." Congress knew

how to refer to an entire branch of government, as evidenced by the fact that the very next words

of the statute are "the judicial and legislative branches."[51] The plain meaning of this language is

---

[50]

   The 1948 version of the statute, which since has been amended, stated:

> "[T]he term- 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States." *Id.*

   The singular "independent establishment" appears to have been a typographical error. It was changed to "independent establishments" in the 1966 amendment. *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307.

[51]

   The Supreme Court drew the same inference with regard to a related section of the same statute, the Act of June 25, 1948. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) ("It is difficult to reconcile the Government's . . . reading with the fact that two of the Act's other exceptions specifically reference an 'act or omission.' *See* 28 U.S.C. § 2680(a). The Government's request that we read that phrase into the [FTCA's] foreign country exception, when it is clear that Congress knew how to specify 'act or omission' when it wanted to, runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06, p. 194 (6th rev. ed. 2000))).

   Although the original statute did not refer to the judicial and legislative branches, this fact does not offer any reason to conclude that Congress's use of "executive departments" in 1948 was intended as a reference to the executive branch as a whole. The phrase "executive

that members of Congress, federal judges, and the staffs of both all are included in the term "federal agency." But the entire executive branch is not. Only those parts of the executive branch that fall within the other terms of the definition are included.

Here, the arguably relevant parts of the "federal agency" definition are "the executive departments" and "independent establishments." The governing statutes do not define either term. Although the government asserts that the president is covered by the Westfall Act, its five page memorandum in support of its motion neither cites to Section 2671 nor argues that either of the plausibly relevant terms applies to the president.[52]

Of course, one of the best ways to understand what Congress meant by "federal agency" is to examine how it used that term. The definition applies to Sections 1346(b) and 2401(b), to which it refers specifically, as well as the remaining sections of the Act of June 25, 1948, which are codified as amended at 28 U.S.C. §§ 2672-2680. Six of these eleven statutory sections use the term "federal agency." And four of them[53] suggest strongly that the term applies to what one ordinarily thinks of as a federal agency or executive department: a unit of government housed within the executive branch, such as the Department of Defense, the Department of State, or the Central Intelligence Agency,[54] and not a single constitutional officer,

---

departments" did not mean "executive branch" in 1948. And the fact that Congress added the phrase "judicial and legislative branches" immediately following "executive departments" demonstrates that it was aware of the difference and employed it intentionally. *See id.*

[52]  *See* Dkt. 3-1.

[53]  The other provisions, 28 U.S.C. §§ 2679 and 2680, shed no additional light on this issue.

[54]  *Cf. Executive Agency*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An executive-branch department whose activities are subject to statute and whose contracts are

the president.  The statutes likewise make clear in several ways that "federal agency" does not refer to the executive branch as a whole or to any particular unit of the executive branch of which the president is an "officer," if any such unit existed.

First, under 28 U.S.C. § 2672, "[t]he head of each Federal agency or his designee" is permitted, pursuant to any regulations promulgated by the Attorney General, to settle claims for money damages against the United States caused by "any employee of the agency while acting within the scope of his office or employment" provided that any award "in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his designee."  In the original 1948 statute, the dollar amount was just $1,000.[55]  It is difficult to imagine that Congress intended, without any explicit affirmative statement, to require the president to seek the approval of the Attorney General, one of his subordinates, before settling, on behalf of the federal government, claims against the United States.  And to suggest that the president could be an "officer" of a federal agency without being its head would contravene our constitutional design, which vests in the president "the 'executive power' – all of it."[56]  The far more natural reading is that when Congress referred to "executive departments" and "federal

---

subject to judicial review.  One example is the National Aeronautics and Space Agency."); *see also, e.g.*, *Department of Defense*, *id.* ("An executive department of the federal government . . . ."); *Department of State*, *id.* ("The cabinet-level department of the federal government responsible for advising the President in formulating and executing foreign policy."); *Central Intelligence Agency*, *id.* ("An independent federal agency that compiles intelligence information, conducts counterintelligence activities outside the United States, and advises the President and the National Security Council on matters of foreign intelligence and national security.").

[55]

Act of June 25, 1948, c. 646, 62 Stat. 982.

[56]

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).

agencies," it was referring to entities such as the Department of Defense and the Central Intelligence Agency.

Second, under 28 U.S.C. § 2673, Congress required that "[t]he head of each federal agency shall report annually to Congress all claims paid by it under section 2672 of this title, stating the name of each claimant, the amount claimed, the amount awarded, and a brief description of the claim." The government has presented no evidence that any president ever has authorized a payment on an FTCA claim or supplied such a report to Congress on behalf of an agency of which he is the head, if any such agency existed.

Third, 28 U.S.C. § 2675(a) provides that a plaintiff who wishes to sue under the FTCA "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This would make little sense if it were applied to the president. Certainly, the government has not suggested that an individual with a tort claim based on actions of the president first must present that claim to the president and obtain the president's final written denial before bringing suit under the FTCA. Similar inferences may be drawn from 28 U.S.C. § 2401(b), which sets a statute of limitations for presenting tort claims to an agency and filing them in court following the agency's determination.

Because the president is at the apex of the executive branch, many think of him, in a colloquial sense, as the "head" of many federal departments, agencies, and organizations. At the very least, one might imagine that he leads some agency at the core of the executive branch. The government has not attempted to identify any such agency in its papers, but the two most obvious candidates are the Executive Office of the President ("EOP") and the president's cabinet. But neither entity fits the bill. The head of the EOP, which is a network of agencies, is

the president's chief of staff.[57]   And even if one were to call the cabinet an "executive department" or "independent establishment" – a dubious contention – the president himself is not a member of the cabinet, although the vice president is.[58]

Indeed, the basic civics lessons on the White House's website draw a clear distinction between "the executive branch," "the executive departments," and "federal agencies." Its page on "The Executive Branch" states that the Constitution vests in the president "[t]he power of the Executive Branch" and that "[f]ifteen executive departments – each led by an appointed member of the President's Cabinet – carry out the day-to-day administration of the federal government."[59]   It states also that the "executive departments" "are joined in this [effort] by other executive agencies such as the [Central Intelligence Agency] and Environmental

---

[57]

THE EXECUTIVE BRANCH, WHITE HOUSE, https://www.whitehouse.gov/about-the-white-house/the-executive-branch/ ("The EOP, overseen by the White House Chief of Staff, has traditionally been home to many of the President's closest advisers.").

[58]

THE CABINET, WHITE HOUSE, https://www.whitehouse.gov/about-the-white-house/the-cabinet/ ("President Donald J. Trump's Cabinet includes Vice President Mike Pence and the heads of the 15 executive departments – the Secretaries of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Labor, State, Transportation, Treasury, and Veterans Affairs, and the Attorney General.   Additionally, the Cabinet includes the White House Chief of Staff and heads of the Environmental Protection Agency, Office of Management and Budget, United States Trade Representative, Central Intelligence Agency, Office of the Director of National Intelligence, and Small Business Administration.").

[59]

THE EXECUTIVE BRANCH, WHITE HOUSE, https://www.whitehouse.gov/about-the-white-house/the-executive-branch/.

Protection Agency, the heads of which are not part of the Cabinet, but who are under full authority of the President."[60]

The phrase "independent establishments" does not rescue the government's argument. As Judge Sullivan once observed, "[a]lthough the Second Circuit has never definitively interpreted what 'independent establishment' means, it has suggested that independent establishments are defined by a 'substantial governmental role in funding and oversight.'"[61] The opinion to which he referred is *Johnson v. Smithsonian Institution*,[62] in which the Second Circuit cited favorably a D.C. Circuit opinion stating with respect to the Smithsonian Institution that "the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition."[63]

Although the FTCA does not define "independent establishments," Congress defined the term in 1966 when it enacted 5 U.S.C. § 104. That definition does not apply to the FTCA, but it is instructive as to how Congress understood the relevant language. It states:

"For the purpose of [Title 5], 'independent establishment' means—

"(1) an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an

---

[60]
    *Id.*

[61]
    *U.S. S.E.C. v. Syron*, 934 F. Supp. 2d 609, 623 (S.D.N.Y. 2013) (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999)).

[62]
    189 F.3d 180, 189 (2d Cir. 1999).

[63]
    *Id.* (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. The Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (panel opinion reprinted as appendix to opinion en banc)).

Executive department, military department, Government corporation, or part thereof, or part of an independent establishment; and

"(2) the Government Accountability Office."[64]

The D.C. Circuit has held that this definition does not apply to "the Executive Residence."[65] And DOJ's Office of Legal Counsel – in two different presidential administrations – took the position that the definition does not apply to the Executive Office of the President.[66]

The government has identified no component of the United States of which the president is an officer or employee that satisfies these understandings of the phrase "independent establishments." Moreover, and as will be discussed, the idea that the chief executive of the United States could be an officer or employee of an entity for which there is a "substantial governmental role in funding and oversight" makes little sense.

B. . *The Legislative History – The* Westfall *Decision and the Westfall Act*

There is still another strong reason supporting the view that president is not an "employee of the Government" within the meaning of the Westfall Act. That reason is apparent from the context in which the statute was enacted.

---

[64]

5 U.S.C. § 104.

[65]

*See Haddon v. Walters*, 43 F.3d 1488, 1489 (D.C. Cir. 1995).

[66]

*See* Mem. for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 & n.15 (Sept. 17, 2009). On two earlier occasions, however, the Office of Legal Counsel took the opposite view. *See id.* at 15 n.14.

25

In 1982, the Supreme Court decided in *Nixon v. Fitzgerald*[67] that the president "*is entitled to absolute immunity* from damages liability predicated on his official acts."[68] So when the Supreme Court decided *Westfall* just six years later and held that "federal officials *are not absolutely immune* from state-law tort liability for all actions committed within the outer perimeter of their duties," it clearly was not referring to the president.[69] When *Westfall* referred generally to "federal officials," it merely expanded the potential amenability to suit and liability of that more limited group of individuals.

Congress was well aware of this background when it passed the Westfall Act. As the Supreme Court later wrote, "[w]hen Congress wrote the Westfall Act, which covers federal employees generally . . . , the legislators had one purpose firmly in mind."[70] That purpose was "to 'return Federal employees to the status they held prior to the *Westfall* decision.'"[71] There was no need to extend the protections of the Westfall Act to the president, whom the Supreme Court evidently recognized was not a "federal employee," for the very good reason that the president already had "absolute immunity from damages liability predicated on his official acts"

---

[67] 457 U.S. 731 (1982).

[68] *Id.* at 749 (emphasis added).

[69] *Westfall*, 484 U.S. at 299 (emphasis added).

[70] *Gutierrez*, 515 U.S. at 425. Senator Grassley, the principal sponsor of the bill, explained that the purpose of the Westfall Act was to solve the "immediate crisis of personal liability exposure for the entire Federal Work force," "particularly rank-and-file civil servants," occasioned by the *Westfall* decision. 134 Cong. Rec. 14265 (June 13, 1988) (Sen. Grassley).

[71] *Id.* (quoting H.R. REP. NO. 100-700, p. 4 (1988)).

by virtue of *Nixon v. Fitzgerald*.[72]

Unless one ignores *Nixon*, it is impossible to read *Westfall* as applying to the president.  Given that the "one purpose" of the Westfall Act was to "return Federal employees to the status they held prior to the *Westfall* decision," Congress presumptively was aware that neither Section 2671 nor the FTCA applied to the president.  It therefore had no reason to extend the Westfall Act to that office.

    C.    Franklin v. Massachusetts *and Lack of Clear Statement to Include the President*

The foregoing discussion provides numerous grounds for concluding that the president is not an "employee of the Government."  At best, the government might argue the statute is silent on the issue and, on that basis, it should be read expansively to include the president.

The Court rejects the view that the statute is silent on the matter, an argument that the government in any event has waived.  But even granting the point for the sake of argument, any statutory silence would not help the government.  Instead, it would provide an additional reason to conclude that the failure to mention the president should be understood as *excluding* him from the scope of the Westfall Act and Section 2671.

---

[72]    Congress was well aware of this fact. *See* H.R. Rep. 100-700, 100th Cong., 2d Sess. 5 (June 14, 1988) ("The United States is liable under the Federal Tort Claims Act. * * * 'under circumstances where the United States, if a private person, would be liable * * *' 28 U.S.C. 1346(b).  Thus ordinary tort defenses, such as contributory negligence, assumption of risk, estoppel, waiver, and res judicata, as applicable, continue to be available to the United States.  *The United States would also be able to continue to assert other functional immunities, such as Presidential and prosecutorial immunity, recognized in the constitution and judicial decisions*. (emphasis added)).

27

Under the Administrative Procedure Act ("APA"), plaintiffs have a cause of action to petition courts for review of "agency action." In *Franklin v. Massachusetts*,[73] the Supreme Court considered whether "agency action" included the conduct of the president. It held that "the President is not an agency within the meaning of the Act."[74]

*Franklin* does not resolve the question of whether the president is an employee of a federal agency under Section 2671. But the following line of reasoning, portions of which are not limited to the APA, is directly on point:

> "The APA defines 'agency' as 'each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include – (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia.' The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. *We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion. Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 748, n.27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President). As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."[75]

*Franklin* not only prohibits courts from presuming, absent "an express statement by Congress," that Congress "intended the President's performance of his statutory duties to be reviewed for abuse of discretion." By relying on *Nixon*, it makes clear that the same reasoning applies when a plaintiff sues the president for tort damages predicated on acts allegedly done in

---

[73]     505 U.S. 788 (1992).

[74]     *Id.* at 796.

[75]     *Id.* at 800-01 (emphasis added).

the scope of his employment – lawsuits that, by definition, challenge the president's performance of his job. The government is asking this Court to do precisely what *Franklin* forbids: to take a statute that, at best from the government's standpoint, is silent on the question of whether it applies to the president – and in fact strongly appears to exclude him – and hold that Congress intended to authorize lawsuits by private plaintiffs requiring federal courts to review his official acts. This would run afoul of *Franklin*.

One could attempt to distinguish *Franklin* on the ground that an FTCA claim is pled against the United States, while the president himself was among the defendants in *Franklin*. But *Franklin* itself defeats that argument. *Franklin*'s holding – like the APA itself – is agnostic to the identity of the defendant. The relevant question is who committed the "agency action."[76] In fact, the Supreme Court spent several pages emphasizing this point, because its ultimate holding that the president's actions were not reviewable shielded all the defendants from suit, including the Secretary of Commerce and other lower-level officials.[77]

---

[76]

> *See, e.g.*, *id.* at 801 ("Although the President's *actions* may still be reviewed for constitutionality, we hold that *they* are not reviewable for abuse of discretion under the APA." (emphasis added)).

[77]

> *See id.* at 796 ("The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.' 5 U.S.C. § 704. At issue in this case is whether the 'final' action that appellees have challenged is that of an 'agency' such that the federal courts may exercise their powers of review under the APA. We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards."); *id.* at 799 ("Because it is the President's personal transmittal of the report to Congress that settles the apportionment, until he acts there is no determinate agency action to challenge. The President, not the Secretary, takes the final action that affects the States."); *id.* at 800 ("As enacted, 2 U.S.C. § 2a provides that the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress. That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not

The same focus is present here.  The function of an FTCA lawsuit is to decide whether a government employee's official conduct was tortious and, if so, to compensate one injured by that conduct.  When the employee is the president, his actions are the ones under review.  It does not matter whether his name appears in the caption of the case.  Thus, as *Franklin*'s reliance on *Nixon* makes plain, the lack of "an express statement by Congress" indicating that the president's actions are reviewable through FTCA lawsuits is decisive.

One other point about *Franklin* deserves attention.  The outcome of that case was that the president's conduct was not subject to review in an APA suit.  Here the poles in some sense are reversed.  If the Court holds that the president's conduct cannot be challenged in tort suits under the FTCA, this case most likely will move forward, albeit against President Trump in his individual or personal capacity.  But that difference does not affect the result here.

To begin, nothing in *Franklin* forbids courts from reviewing the president's official actions.  The case provides instead a rule of statutory interpretation: that a court should not assume, absent a clear statement, that *Congress* authorized such review in a *federal statute*.  Here, the plaintiff's cause of action arises under *state common law*.  *Franklin* says nothing about such claims.  And in fact, it is the government, rather than Ms. Carroll, that is arguing that a federal statute (the FTCA) authorizes review of the president's official actions, albeit in a case in which it argues the United States should be substituted for the president.

Why, then, would holding that the FTCA authorizes review of the president's official actions most likely secure the dismissal of this lawsuit?  The reason is that the FTCA's

merely ceremonial or ministerial.  Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an "agency" within the meaning of the Act.").

waiver of sovereign immunity contains an exception for libel and slander claims.[78]  For that reason, and that reason alone, permitting FTCA lawsuits challenging the president's job performance would close the door on this particular lawsuit.

But what would happen in cases involving the many types of torts for which the United States *has* waived its sovereign immunity – cases in which no FTCA exception applies? The answer, if the Court agrees with the government, is that those lawsuits could move forward – the precise problem that *Franklin* sought to avoid.  In essence, the government is arguing that, so long as none of the exceptions applies, the FTCA authorizes plaintiffs to sue the United States for money damages when the president, acting within the scope of his employment, engages in an "act or omission" that allegedly is negligent or wrongful under state law and causes them injury.

The President of the United States wields the entire executive power of the federal government.  Each day, he or she makes decisions that affect the lives of hundreds of millions of Americans in countless ways.  It is difficult to fathom that Congress – without any textual indication, and with considerable evidence to the contrary – intended for the FTCA to authorize tort lawsuits that bring the president's official conduct into question.[79]  "Congress . . .

---

[78]

      28 U.S.C. § 2680(h) (exempting from the FTCA claims arising out of, among other things, libel and slander).

[79]

      One might surmise that *Nixon* would prevent such an expansion of federal tort exposure.  It would not.  *Nixon* holds that *the president* is absolutely immune from suit with respect to official conduct.  The defendant in an FTCA suit is the United States.  Moreover, Congress could not have relied on this backstop when it passed the FTCA.  The FTCA and its procedural provisions were enacted in the 1940s.  *Nixon* was decided in 1982.

      Nor is it sufficient to say that other legal doctrines such as the need for proximate causation might protect the government against liability in such cases.  Even if the government

does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."[80]

### D.    Decisions of Other Courts

The government relies on several cases in other circuits for the proposition that "elected officials" in general are government employees under the Westfall Act.  None of those cases so held.  And none supports the argument that the statute applies to the president.

*Council on American Islamic Relations v. Ballenger*,[81] a D.C. Circuit case discussed in more detail below on another issue, held that certain statements of a Member of Congress – not the president – had been made within the scope of his employment.  But the parties did not brief the question whether a Member of Congress (or any elected official) is an "employee of the Government," and the D.C. Circuit did not even mention the issue.[82]  *Wuterich v. Murtha*,[83] another D.C. Circuit decision concerning a Member of Congress that relied on *Ballenger*, similarly did not acknowledge the existence of the issue.

---

sometimes would prevail on these arguments, the cases would need to be defended at least to a certain point, and the president's conduct would be reviewed in the same manner as any other federal employee's.

[80]

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[81]

444 F.3d 659 (D.C. Cir. 2006).

[82]

*See* Brief of Appellant, *Council on Am. Islamic Relations v. Ballenger*, No. 05-5161 (D.C. Cir. Dec. 22, 2005); Brief for Appellee, *id.* (D.C. Cir. Feb. 3, 2006); Reply Brief of Appellant, *id.* (D.C. Cir. Feb. 16, 2006).

[83]

562 F.3d 375 (D.C. Cir. 2009).

The Sixth Circuit held recently in *Does 1-10 v. Haaland*[84] that Members of Congress are "employees of the Government" under the Westfall Act.  But its conclusion turned on the fact that Section 2671 defines "federal agency" to include "the judicial and legislative branches" and thereby "expands sovereign immunity to the entire legislative branch."[85]  As discussed above, Section 2671's definition of "federal agency" does not use the phrase "executive branch."  It refers to "the executive *departments*, [and] the judicial and legislative *branches*."[86]

Like *Does 1-10*, two older decisions from the First and Fifth Circuits held that Members of Congress are employees under the Westfall Act.  Neither contains significant reasoning, and the few points they raise are particular to Congress.[87]  The government's remaining cases neither raise nor resolve the issue.[88]

---

[84]

No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020).

[85]

*Id.* at *4.

[86]

The Sixth Circuit relied also on the fact that the Supreme Court once held "that a Representative is 'an officer acting under the authority of the United States' for purposes of a criminal statute that punishes individuals who 'falsely assume or pretend to be an officer or employee acting under the authority of the United States.'"  *Id.* at *4 (quoting *Lamar v. United States*, 241 U.S. 103, 111-12 (1916)).  This holding has no relevancy when the alleged federal employee is the president.

[87]

*See Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (noting that "in 1988, Congress extended coverage under the FTCA to officers and employees of the legislative and judicial branches"); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998) (concluding that because no Members of Congress spoke up about their possible exclusion from the Westfall Act when they debated the statute, the Members presumably understood the statute to include them, and that holding otherwise would be irrational).

[88]

*See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017).

\* \* \*

The president is not an "employee of the Government" under the Westfall Act. The text of the Act of June 25, 1948 offers numerous strong indications that Congress did not intend for this term to apply to him. Congress clearly held that view when it passed the Westfall Act in 1988. And the *Franklin* decision forbids the Court from reading the president into the FTCA without a clear statement from Congress. Moreover, holding that the president is an "employee of the Government" within the meaning of the Act could ignite a significant expansion of federal tort exposure – without any evidence of a congressional intent to do so – by authorizing lawsuits that could involve review of the president's job performance.

As the president is not an "employee of the Government" within the meaning of the Westfall Act, the Attorney General's certification was erroneous.

## II.     *Scope of Employment*

The holding that the president of the United States is not an "employee of the Government," as Congress defined that term, is sufficient to resolve the government's motion. But the parties have briefed also the question of whether, if the president is a government employee, President Trump's allegedly defamatory statements were made within the scope of his employment. And it is appropriate to address that issue as well in order to avoid the possibility of an unnecessary remand should a higher court disagree on the "employee" question.

### A.     *Choice of Law*

Under Second Circuit law, the question of whether government employees are acting within the scope of their employment for the purposes of the FTCA is resolved "in

accordance with the respondeat superior law of the jurisdiction where the tort occurred."[89]  The origin of this rule and its precise meaning are complicated issues that will be discussed momentarily.  For present purposes, it suffices to note that the rule is derived from a provision of the FTCA stating that the government's ultimate liability turns on "the law of the place where the act or omission occurred."[90]

The parties disagree over which jurisdiction's law applies to the scope of employment issue.  The government argues that because President Trump's allegedly defamatory statements were made in the District of Columbia, the Court should apply D.C. law.  Ms. Carroll, though not disputing that the statements were made in Washington, D.C., argues that the tort occurred where she was injured, which was New York.  Both parties, however, assert that the outcome would be the same under the *respondeat superior* doctrine of either jurisdiction.[91]

As to the question of where the tort occurred for FTCA purposes, the Court agrees with the government.  The governing case law refers to the place of the tort, not the place

---

[89]

See, e.g., *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016); *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007).

*Respondeat superior* is a Latin phrase meaning "let the superior make answer."  The substance of the doctrine is that an employer is liable for any injuries wrongly inflicted by its employee within the scope of the employment.  *See Respondeat Superior*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019).  The doctrine applies also to principal and agent and to master and servant.

[90]

See *Fountain*, 838 F.3d at 135 (quoting 28 U.S.C. § 1346(b)(1)).

[91]

See Dkt. 16 at 31 n.18 (plaintiff arguing that "[a]lthough New York laws governs and supplies a more restrictive rule of respondeat superior liability than does D.C., the ultimate outcome would be the same under D.C. law"); Dkt. 21 at 13 (government arguing that "[t]he outcome under New York law would be no different")

35

of injury. And the FTCA's reference to the "act or omission" makes the conclusion absolutely clear.

But the apparently simple question of which law applies is more nuanced than the parties acknowledge. The complication turns on whether the Court must apply the D.C. *respondeat superior* doctrine or whether it instead must apply D.C.'s choice of law rules to determine which jurisdiction's *respondeat superior* doctrine applies.

At first blush, the FTCA appears to require the choice of law path. The statute predicates the government's liability on "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[92] This language seems to suggest that a federal court hearing an FTCA claim should apply the same law as would a local court in the relevant jurisdiction. In *Richards v. United States*,[93] the Supreme Court took that view by holding that the FTCA "requires application of the whole law of the [jurisdiction] where the act or omission occurred," which includes that jurisdiction's choice of law rules.[94]

The issue in *Richards* was which jurisdiction's law applied to the question of liability – not whose *respondeat superior* doctrine applied. But nothing in the opinion distinguished between those questions or suggests that they might require a different type of

---

[92]

28 U.S.C. § 1346(b)(1).

[93]

369 U.S. 1 (1962).

[94]

*Id.* at 11; *see also Winston v. United States*, 305 F.2d 253, 272 n.20 (2d Cir. 1962) (reading *Richards* as interpreting the FTCA "language to mean the 'whole law' of that place, including its conflict of law rules").

analysis. And the FTCA provides no textual basis for distinguishing between them. It would be odd to read the statute to require that courts apply the *respondeat superior* doctrine of the place where the act or omission occurred, but they must begin with that jurisdiction's choice of law rules when determining the law applicable to liability. Moreover, treating the *respondeat superior* issue differently may violate *Richards*. A scope of employment finding is a necessary component of liability in a suit against an employer.

However, a separate line of cases suggests that federal courts may have developed different rules for liability and scope of employment, seemingly without considering the possible inconsistency. In *Williams v. United States*,[95] decided seven years before *Richards*, the Supreme Court reviewed a Ninth Circuit decision that applied federal law to the scope of employment question. In a two sentence *per curiam* opinion, the Supreme Court vacated and remanded on the ground that "[t]his case is controlled by the California doctrine of respondent superior."[96] The Court did not set forth its reasoning.

There are two plausible explanations for that result. One is that the Court, consistent with the reading it later gave in *Richards*, looked to the whole law of California, the place where the act or omission occurred, and found that California's choice of law rules required application California *respondeat superior* doctrine. The other is that California's *respondeat superior* doctrine applied by virtue of the FTCA itself – *i.e.*, California was where the act or omission occurred.

---

[95]     350 U.S. 857 (1955) (per curiam).

[96]     *Id.*

All twelve of the geographic courts of appeals have said specifically that the FTCA requires courts to apply "the *respondeat superior* law" of the jurisdiction where the act or omission occurred.[97] But all twelve of those courts have stated also that courts must apply "the law" of the relevant jurisdiction without indicating whether they are referring to (a) that jurisdiction's "whole law," which includes its choice of law rules, or (b) the jurisdiction's

---

[97] *See, e.g.*, *Nasuti v. Scannell*, 906 F.2d 802, 806 n.1 (1st Cir. 1990) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of respondeat superior of the state in which the negligent or wrongful conduct occurred."); *Fountain*, 838 F.3d at 135 ("We interpret the FTCA's 'scope of employment' requirement in accordance with the respondeat superior law of the jurisdiction where the tort occurred."); *McSwain v. United States*, 422 F.2d 1086, 1088 (3d Cir. 1970) ("Such liability for the acts or omissions of a civilian or military federal employee is determined by the law of respondeat superior of the state in which the act or omission occurred."); *Ross v. Bryan*, 309 F.3d 830, 834 (4th Cir. 2002) ("To determine whether Bryan's acts were within the scope of his employment, we must apply Virginia respondeat superior law."); *Garza v. United States*, 809 F.2d 1170, 1171 (5th Cir. 1987) ("Whether military personnel are acting within the line of duty is determined by applicable state rules of respondeat superior."); *United States v. Taylor*, 236 F.2d 649, 653 (6th Cir. 1956) ("[T]he standard of governmental liability under the Federal Tort Claims Act is with respect to both military and civilian employees that imposed by the respondeat superior doctrine of the state."); *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992) ("[W]e have followed the Court's ruling in *Williams* and looked to state law of respondeat superior to determine whether a person was acting 'in the line of duty.'"); *United States v. Farmer*, 400 F.2d 107, 109 (8th Cir. 1968) ("[T]he question of whether a Government employee is acting within the scope of his office or employment must be determined by the respondeat superior rule of the state where the negligent act occurred."); *United States v. McRoberts*, 409 F.2d 195, 197 (9th Cir. 1969) ("In resolving the sole issue before us, we must apply the respondeat superior principles of California, the state wherein the alleged tort was committed."); *Nichols v. United States*, 796 F.2d 361, 365 n.4 (10th Cir. 1986) ("Whether he was 'acting within the scope of his office or employment' at the time his act caused injury to Nichols is determined by reference to the respondeat superior law of the state in which the accident occurred."); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996) ("'Line of duty,' in turn, draws its meaning from the applicable state law of respondeat superior."); *Nelson v. United States*, 838 F.2d 1280, 1282 (D.C. Cir. 1988) ("'Line of duty,' in turn, takes its meaning from the applicable state law of respondeat superior.").

*respondeat superior* doctrine without regard to its choice of law rules.[98]  It is not crystal clear

which of these approaches is the law, although that fact that most of the decisions in both groups

cite *Williams* and none conducts a choice of law analysis strongly suggests that the former view

controls.  Nevertheless, this Court need not and does not resolve this issue.

Although the *respondeat superior* doctrines of New York and the District of

Columbia are not identical, they dictate the same outcome on these facts, largely for the same

reasons.  As will appear, *respondeat superior* liability does not apply under the law of either

---

[98]

See, e.g., *Borrego v. United States*, 790 F.2d 5, 6 (1st Cir. 1986) ("Whether or not a particular act is within the scope of employment is a matter to be determined in accordance with the law of the place in which the alleged negligent act or omission occurred."); *Mandelbaum v. United States*, 251 F.2d 748, 750 (2d Cir. 1958) ("Under [the FTCA] the law applicable to this case is that of New York [where the act or omission occurred].  And subsequent to the decision below the Supreme Court [in *Williams*] has made it absolutely clear that . . . the state law controls."); *Matsko v. United States*, 372 F.3d 556, 559 (3d Cir. 2004) ("We assess whether Kotor was acting within the scope of his employment under the law of Pennsylvania, because that is where the incident occurred."); *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1156 (4th Cir. 1997) ("In answering [the scope of employment] question, we apply the law of the state where the conduct occurred."); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred."); *Arbour v. Jenkins*, 903 F.2d 416, 421-22 (6th Cir. 1990) ("Whether an employee's actions are within the scope of his employment for purposes of the Westfall Act is an issue that must be determined in accordance with the law of the state where the incident occurred."); *Guthrie v. United States*, 392 F.2d 858, 859 (7th Cir. 1968) (holding, because the act or omission occurred in Wisconsin, that "[t]he state law of Wisconsin is decisive on this issue"); *Brown v. Armstrong*, 949 F.2d 1007, 1012 n.7 (8th Cir. 1991) ("Under the FTCA, the law of the place of the alleged tort governs the scope-of-employment question."); *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) ("This phrase must be applied according to the law of the state where the alleged tort occurred."); *United States v. Hainline*, 315 F.2d 153, 155 (10th Cir. 1963) ("In actions brought under the Act, the scope of employment is determined by the state law."); *Green v. Hill*, 954 F.2d 694, 698 (11th Cir. 1992) ("The issue of whether an employee acted within the scope of his employment is determined by the law of the state where the alleged tort occurred."); *United States v. Baker*, 265 F.2d 123, 123 (D.C. Cir. 1959) (noting that "the law of Virginia, where the accident occurred, would control the question of 'scope of employment'").

jurisdiction unless the employer exercises, or has the ability to exercise, control over the employee's relevant actions.[99]  Because the control factor is dispositive and would reach an identical result under either D.C. or New York law, there is no true conflict between D.C. and New York law for the purpose of D.C.'s governmental interest analysis.  In fact, and as noted at the outset, both parties assert that the outcome would be the same under New York and D.C. law.  "Since there is 'no real conflict' . . . it is unnecessary for [the Court] to engage in the choice-of-law exercise . . . ."[100]

### B.    Scope of Employment Under D.C. Law

"'*Respondeat superior* is a doctrine of vicarious liability' that imposes liability on employers for tortious and negligent 'acts of [their] employees committed within the scope of their employment.'"[101]  "Generally, 'whether an employee is acting within the scope of his

---

[99]

> *Compare Fountain*, 838 F.3d at 135 ("Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'" (brackets omitted) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 471 (1969))), *with Tolu v. Ayodeji*, 945 A.2d 596, 602 (D.C. 2008) ("The decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." (ellipsis omitted) (quoting *Safeway Stores v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)).

[100]

> *Barimany v. Urban Pace LLC*, 73 A.3d 964, 968 (D.C. 2013) (quoting *Taylor v. Canady*, 536 A.2d 93, 96 (D.C. 1988)).

[101]

> *Blair v. D.C.*, 190 A.3d 212, 225 (D.C. 2018) (quoting *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006)).

employment is a question of fact for the jury.'"[102]  However, the issue becomes a question of law "if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment."[103]

As to the legal question, the D.C. Court of Appeals has adopted Section 228 of the Restatement (Second) of Agency.[104]  In that court's words, D.C. law holds that "[i]n order to succeed under a *respondeat superior* theory of liability, [a party] must show [1] that a master-servant relationship existed between [the employer] and [its] workers or contractors, and

---

[102]

> *Id.* (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001)).

[103]

> *Id.* at 226 (quoting *Brown*, 782 A.2d at 757).
>
> Whether the provision about sending this issue to a jury applies here is unclear.  The reason for the lack of clarity is that the scope of employment issue arises as a threshold question about the Westfall Act's applicability, rather than as an element of the plaintiff's cause of action that might be resolved at trial.  For reasons explained below, however, the Court holds that the matter is decided appropriately as a question of law in this case.

[104]

> *See, e.g.*, *District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014); *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987); *Wuterich*, 562 F.3d at 383.  The full provision reads:
>
> > "(1) Conduct of a servant is within the scope of employment if, but only if:
> >
> > > (a) it is of the kind he is employed to perform;
> > >
> > > (b) it occurs substantially within the authorized time and space limits;
> > >
> > > (c) it is actuated, at least in part, by a purpose to serve the master, and
> > >
> > > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
> >
> > "(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

[2] that the incident at issue occurred while the workers or contractors were acting within the scope of their employment."[105]  The Court begins with the master-servant issue.

       *1.*    *Master-Servant Relationship*

"The terms 'master' and 'servant' are defined as follows:

> "(1) A master is a principal who employs an agent to perform service in his affairs *and who controls or has the right to control the physical conduct of the other* in the performance of the service.

> "(2) A servant is an agent employed by a master to perform service in his affairs *whose physical conduct in the performance of the service is controlled or is subject to the right to control* by the master."[106]

"The decisive test [for the existence of a master-servant relationship] is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."[107]  "[T]here is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no

---

[105]

    *Tolu*, 945 A.2d at 601-02 (brackets omitted) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)); *see Moorehead v. D.C.*, 747 A.2d 138, 142 (D.C. 2000) (same).

[106]

    *Safeway*, 448 A.2d at 856 n.6 (quoting RESTATEMENT (SECOND) OF AGENCY § 2) (emphasis added).

[107]

    *Tolu*, 945 A.2d at 602 (ellipsis omitted) (quoting *Safeway*, 448 A.2d at 860); *cf.* RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c) (noting that "one is a servant only if, as to his physical conduct in the performance of the service, he is subject to the control or to the right to control of the master"); *id.* § 220(1) (similar). The Supreme Court has made the same observation about the "control" element's centrality to one's status as a servant. *See Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003) ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.  The general definition of the term 'servant' in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master.").

control or right to control by the master."[108]   D.C. courts consider five factors in determining

whether a master-servant relationship exists:   "(1) the selection and engagement of the servant,

(2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's

conduct, (5) and whether the work is part of the regular business of the employer."[109]

      "The President of the United States possesses an extraordinary power to speak to

his fellow citizens . . . ."[110]   While he is a "public servant," holding that he is a "servant" whom a

"master" "has the right to control and direct" when he speaks to reporters, or otherwise, would

be absurd.

      First, except for the payment of a salary, not one of the five factors relied upon by

D.C. courts to determine whether a master-servant relationship exists is satisfied here.   The

president is selected by the electoral college, not the executive branch or any part of it.   The

government does not have the power to discharge him in any circumstances, unless one

construes impeachment, or removal under the Twenty-Fifth Amendment, as forms of discharge.

And while commenting on the operation of government is part of the regular business of the

United States, commenting on sexual assault allegations unrelated to the operation of

government is not.[111]

---

[108]

      RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

[109]

      *See, e.g.*, *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901, 906 (D.C. 2009) (quoting *Safeway*, 448 A.2d at 860); *Bostic v. D.C.*, 906 A.2d 327, 331 (D.C. 2006) (same) (quoting *Giles*, 487 A.2d at 611).

[110]

      *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018).

[111]

      Although the government waived this argument, one could contend that the president cannot meaningfully perform his job without responding to public sexual assault allegations.

The "decisive" factor, however, is the fourth and most important: control.  The president is the chief executive of the United States government.  No one, inside or outside of the executive branch, has "the power to control the [president's] conduct."

That conclusion is found in the first sentence of the president's job description.  Under Article II of the Constitution, "[t]he executive Power shall be vested in a President of the United States of America."[112]  As Justice Scalia explained in his famous dissent in *Morrison v. Olson*,[113] "this does not mean *some of* the executive power, but *all of* the executive power."[114]  "The entire 'executive Power' belongs to the President alone."[115]

Not only does the president's sole possession of the executive power place him atop the chain of command of the executive branch.  "Article II confers on the President 'the general administrative *control* of those executing the laws.'"[116]  "The buck stops with the President, in Harry Truman's famous phrase."[117]

---

Because this argument is better characterized as a question of whether the president acted within the scope of his employment, rather than a question of whether he is a "servant" under the "control" of a "master," the Court addresses this theory below.

[112] U.S. Const. Art. II, § 1, cl. 1.

[113] 487 U.S. 654 (1988).

[114] *Id.* at 705.

[115] *Seila*, 140 S. Ct. at 2197.

[116] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (emphasis added).

[117] *Id.*

To hold that someone else exercises control over the president would turn the Constitution on its head. And it would subvert the requirement that the president "shall take Care that the Laws be faithfully executed."[118] As explained recently by the Supreme Court:

> "The . . . constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections. In that scheme, individual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision *and control* of the elected President. Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'"[119]

Interpreting this authority, Justices Thomas and Kavanaugh have opined that components of the executive branch "that wield substantial power with no accountability to either the President or the people . . . 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'"[120]

As noted above, "there is no liability for the conduct of one who . . . is doing work as to which there is no control or right to control by the master."[121] Such control is absent

---

[118]

U.S. Const. Art. II, § 3.

[119]

*Seila*, 140 S. Ct. at 2203 (quoting 1 Annals of Cong. 499 (J. Madison)); *see also, e.g.*, *Free Enter. Fund*, 561 U.S. at 514 ("Without [the] power [to remove and control subordinates], the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." (quoting The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)); *id.* at 492 ("As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, *overseeing*, and *controlling* those who execute the laws.'" (emphasis added) (quoting 1 Annals of Cong. 463 (J. Madison))).

[120]

*Seila*, 140 S. Ct. at 2212 (Thomas, *J.*, concurring in part) (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting)).

[121]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

whenever the president discharges his duties. And it is non-existent when the president exercises his "extraordinary power to speak to his fellow citizens"[122] by addressing the press. No one gives him permission to speak. No one can require him to say, or not to say, anything at all. No one has the authority to cut him off. And the statements he makes, as well as the topics he discusses, are entirely of his own choosing.

These points are clearer still on the facts of this case. No one even arguably directed or controlled President Trump when he commented on the plaintiff's accusation, which had nothing to do with the official business of government, that he raped her decades before he took office. And no one had the ability to control him.

President Trump is not a "servant" controlled by a "master" within the meaning of the District of Columbia's scope of employment doctrine. Thus, his allegedly defamatory statements were not "actuated, at least in part, by a purpose to further the master's business."[123] He was not acting within the scope of his employment when he made them, and the Attorney General's certification under the Westfall Act was erroneous.[124]

### 2. *Scope of Employment Test*

The president is no one's servant. But assume, for the sake of argument, that he were an employee of the United States whose master were something vaguely described as "the

---

[122]

    *Trump*, 138 S. Ct. at 2417.

[123]

    *Blair*, 190 A.3d at 225.

[124]

    Because the Court concludes as a matter of law that President Trump is not a servant, it concludes also that no reasonable jury could find that his actions were done within the scope of his employment.

public," which "controlled" him indirectly through its role in choosing the electoral college members[125] or in electing the Members of Congress who can impeach and remove him. Even then, the Court would hold that President Trump was not acting within the scope of his employment when he made the allegedly defamatory statements.

Under D.C. law, "[t]o be within the scope of employment, the tortious activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this 'intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.'"[126] The "at least in part" language demonstrates that the action need not "be wholly in furtherance of the employer's business."[127] That said, a slight purpose to serve the master is not enough. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[128] Finally, "the employee's 'tortious conduct must be foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments.'"[129]

---

[125]

    This view is impossible to reconcile with the "control" element of D.C. law. "The public" is not an employer, and it does not have the authority to control the president's performance of his job when he makes statements to reporters or otherwise. Nor, because of the electoral college system, is the president directly elected by the public. And while our system of checks and balances gives Congress (and the judiciary) certain powers that the president lacks, no branch of government "controls" another in anything resembling the same manner that an employer controls an employee.

[126]

    *Blair*, 190 A.3d at 226 (quoting *Bamidele*, 103 A.3d at 525).

[127]

    *Id.*

[128]

    *See, e.g.*, *Bamidele*, 103 A.3d at 525 (quoting Restatement (Second) of Agency § 228(2)); *Brown*, 782 A.2d at 758 (same).

[129]

    *Blair*, 190 A.3d at 226 (alteration omitted) (quoting *Bamidele*, 103 A.3d at 525).

At its core, the government's argument is that speaking to reporters is part of the president's job. Thus, it argues, whenever the president speaks to reporters – no matter the topic – he is acting within the scope of his employment. For this proposed rule, the government relies on the D.C. Circuit's *Ballenger* decision. A discussion of *Ballenger* will be helpful to explaining why the Court is not persuaded.

The defendant in *Ballenger* was Rep. Cass Ballenger, a Member of Congress. Ballenger's chief of staff gave an interview to a reporter who asked a question about Ballenger's recent separation from his wife.[130] Ballenger later called the reporter "from his congressional office during regular business hours" and stated, among other things, that the separation was amicable and that his wife was uncomfortable living across the street from the plaintiff, an Islamic institution.[131] The journalist reported this comment, and the plaintiff sued Ballenger for defamation.[132]

Shortly after the lawsuit was filed, the Department of Justice certified that Ballenger "acted within the scope of his employment as an employee of the United States when he made the allegedly defamatory statement."[133] The district court agreed and dismissed the case under the FTCA's exemption for libel and slander claims.[134]

---

[130]  *Ballenger*, 444 F.3d at 661.

[131]  *Id.* at 662.

[132]  *Id.* at 663.

[133]  *Id.*

[134]  *Islamic Council on Am. Islamic Relations, Inc. v. Ballenger*, 366 F. Supp. 2d 28, 30 (D.D.C. 2005).

The D.C. Circuit affirmed.  Like the district court, it did not acknowledge the question of whether a Member of Congress is an "employee of the Government" pursuant to the Westfall Act or a "servant" under a master's control.  But it nonetheless found that Ballenger acted within the scope of his employment when he made the comment at issue.

The D.C. Circuit began by rejecting the plaintiff's argument "that Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform."[135]  Instead, it reasoned that D.C. law and the Westfall Act "direct[] courts to look beyond alleged intentional torts themselves."[136]  Finding that the "'underlying dispute or controversy' was the phone call between Ballenger and [the reporter] discussing the marital separation," it held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'"[137]  The court did not explain its use of the word "authorized" nor offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters, much less to discuss his marital status with them.  Nor, when it reached the question of whether speaking to reporters is conduct "actuated, even in part, to serve *the master*," did the court offer any theory as to who is the "master" of a Member of Congress or who controls a Member's discussions with the press.[138]  The D.C. Circuit appears to have

---

[135] *Ballenger*, 444 F.3d at 664.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 665.  Although the court quoted this standard several times, its analysis failed to engage with it.

overlooked these requirements by focusing only on whether the "conduct was motivated – at least in part – by a legitimate desire to discharge his duty as a congressman."[139]

Even on the issues it addressed, *Ballenger*'s reasoning is wanting. Its explanation for why a Member of Congress acts within the scope of his employment is presented in the following paragraph:

> "[The plaintiff] resists this conclusion on two grounds. First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern. The circumstances of the conversation belie this suggestion. The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested in the separation. Given this level of public interest, we find CAIR's absolutist view at odds with reality. Moreover, it is telling that [the reporter] felt at liberty to ask [Ballenger's chief of staff] – rather than Ballenger himself – about the marital separation."[140]

There are two problems with this passage. The first is that it is unpersuasive. Gossip about a congressperson's marriage may very well be interesting to the public. But that fact does not transform it into the official business of the United States Congress. The job description of a congressperson does not include transparency about one's personal life.

In addition, *Ballenger* misstates D.C. law – and not only in the manner described above. A plaintiff is not required, as the court asserted, to show that the defendant's "statement was *purely* private, unrelated to any matter of public concern."[141] A real but insubstantial

---

[139]     *Id.* This language tracks Section 228(1)(a) of the Restatement. But that is only one element of the definition of scope of employment. *See* RESTATEMENT (SECOND) OF AGENCY § 228(1) (listing four elements); *see also, e.g.*, *id.* § 228(1)(c) (requiring that the conduct be "actuated, at least in part, by a purpose to serve the master").

[140]     *Ballenger*, 444 F.3d at 665.

[141]     *Id.* (emphasis added).

purpose to serve the master is insufficient. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[142]

The implications of *Ballenger*'s holding also are troubling. The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment. Setting aside the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

*Ballenger* acknowledged this concern. But it made no attempt to assuage it. It noted merely that the case was limited to its facts.[143]

A subsequent panel of the D.C. Circuit did not accept the invitation to read *Ballenger* so narrowly. In *Wuterich*, the court held that *Ballenger* controlled where a Member of Congress was sued for defamation based on his comments about the Iraq War.[144] Unlike

---

[142]

    *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)). Although *Ballenger* includes this language when it quotes the entirety of Section 228, its analysis does not engage with it.

[143]

    *See Ballenger*, 444 F.3d at 666 ("This case, like every judicial decision, cannot be divorced from its facts. To be sure, it involves a statement by a congressman to the press. But our *ratio decidendi* necessarily depends on the context in which the statement was made. *See* KARL LLEWELLYN, THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those 'who think that precedent produces or ever did produce a certainty that did not involve matters of judgment and of persuasion . . . simply do not know our system of precedent in which they live.'). We lack the power to render an opinion on any case or controversy not properly before us.").

[144]

    *Wuterich*, 562 F.3d at 384.

*Ballenger*, however, *Wuterich* considered the relationship between the congressperson's remarks and his official duties. It relied on the fact that "the underlying conduct – interviews with the media about the pressures on American troops in the ongoing Iraq war – is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress," particularly because he "was the Ranking Member of the Appropriations Committee's Subcommittee on Defense and had introduced legislation to withdraw American troops from Iraq."[145]

The Court declines to apply a *Ballenger*-like principle to the president on the facts of this case. Perhaps the president, were he in service of a "master," would act within the scope of his employment when he comments on matters having a non-negligible nexus to his official duties. But there is no basis for concluding that a D.C. court would ignore the nature and content of his statements and hold that anything he says is within the scope of his employment. A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office. And the public's reasons for being interested in these comments are different as well. The president's views on the former topics are interesting because they alert the public about what the government is up to. President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government.

---

[145] *Id.* at 384-85. These facts are irrelevant under *Ballenger*'s broader holding that essentially any comment a Member of Congress makes to the press is done within the scope of his or her employment. That said, *Wuterich* did not purport to narrow *Ballenger* or limit the case to its facts.

The government's best argument on this point is that President Trump's statements about Ms. Carroll were within the scope of his employment in that refuting her accusation furthered his ability to govern effectively because the accusation was reported widely and charged him with the commission of a serious crime. But there are at least three answers to that objection.

As an initial matter, the government first made the argument in its reply brief, thereby foreclosing the plaintiff from responding to it. As previously discussed, it thereby waived the argument as its counsel agreed in open court, as previously discussed.

Second, the Court would reject the argument even if it were not waived. While the government's position is not entirely without merit, it goes much too far. Accepting it would mean that a president is free defame anyone who criticizes his conduct or impugns his character – without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to their government employment, would undermine their ability to perform effectively while in office.

Finally, even if the president's comments here had some nexus to his official duties, that nexus would be too weak. As stated several times now, "'[c]onduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[146] That is the case here.

---

[146] *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

Beyond the District of Columbia precedent already discussed, support for this conclusion comes from the Supreme Court's decision in *Clinton v. Jones*.[147]  Much like in this case, a plaintiff sued the sitting president for defamation after she accused him of engaging in sexual misconduct before he took office.[148]  Her theory was that "various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred."[149]

As relevant here, the Supreme Court held that President Clinton was not absolutely immune from suit by virtue of his office where the claims against him were based on his "*unofficial* conduct."[150]  As to most of the plaintiff's claims, the Court explained, "it is perfectly clear that the alleged misconduct of [President Clinton] was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office."[151]  The one possible exception was the alleged defamatory comments that were made while he was in office.  The Court noted that the defamation claim "arguably may involve

---

147

  520 U.S. 681 (1997).

148

  *Id.* at 685-86; *see also Jones v. Clinton*, 72 F.3d 1354, 1357 (8th Cir. 1996) (1997) ("Her complaint also includes two supplemental state law claims, one against Mr. Clinton for intentional infliction of emotional distress and the other against both Mr. Clinton and Trooper Ferguson for defamation.").

149

  *Clinton*, 520 U.S. at 685.

150

  *Id.* at 694 (emphasis in original); *see also id.* at 695 ("As our opinions have made clear, immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." (citation and quotation marks omitted)).

151

  *Id.* at 686.

conduct within the outer perimeter of the President's official responsibilities."[152]  But because that issue was "not before [the Court]," it declined to consider whether the president's absolute immunity extended to these comments.[153]

Although both doctrines call for some assessment of whether the defendant was engaged in the performance of his job, the absolute immunity doctrine is different than D.C.'s scope of employment doctrine.  But as to the president's job description, *Clinton* suggests that a sitting president's comments about a sexual assault allegation fall somewhere between being outside the scope of his duties and "arguably . . . within [their] outer perimeter."  At least where D.C. law is concerned, conduct that is "too little actuated by a purpose to serve the master" does not suffice.[154]  It is difficult to see how conduct that at most is in the "outer perimeter" of the president's job duties could be actuated in any meaningful degree to serve his master, whomever that may be.

In this regard, the Court notes also that all of the remaining Westfall Act defamation decisions relied upon by the government are distinguished easily from this case – and not merely because each of them concerned a Member of Congress.  Although the Sixth Circuit's *Does 1-10* case involved a defamation claim against a Senator who commented "on an event of widespread public interest," the decision applied Kentucky's scope of employment

---

[152]

    *Id.*

[153]

    *Id.* at 686 n.3.

[154]

    *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

law.[155]  According to the Supreme Court of Kentucky decision relied upon by the Sixth Circuit,

Kentucky's doctrine is similar to the Restatement (Third) of Agency approach.[156]  While that

approach resembles in some ways Section 228 of the Restatement (Second) of Agency,[157] the

drafters intentionally omitted the "too little actuated" standard discussed above:

> "Under § 228(2), conduct is not within the scope of employment if it is 'too little
> actuated by a purpose to serve' the employer.  Under § 235, conduct is not within
> the scope of employment 'if it is done with no intention' to perform an authorized
> service or an incidental act.  These formulations are not entirely consistent; an act
> motivated by *some* purpose to serve the employer could still be '*too little
> actuated*' to be within the scope of employment.
>
> *In contrast*, under subsection (2) of [Section 7.07 of the Restatement (Third)], an
> employee's conduct is outside the scope of employment when it occurs within an
> independent course of conduct intended to serve *no purpose* of the employer."[158]

As explained, the "too little actuated" caveat is decisive on these facts to the extent that one

considers President Trump's comments to have been actuated in some small part to serve

whomever one believes to be his "master."  Thus, the Sixth Circuit's interpretation of Kentucky

law is of no moment here.

The government's remaining cases involve the laws of different jurisdictions or

Members of Congress who commented on matters related clearly to their job duties.  *Wuterich*

---

[155]
   No. 19-6347, 2020 WL 5242402, at *2, 6.

[156]
   *Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) ("Kentucky's approach . . . [focuses
   on whether the servant's] purpose, however misguided, is wholly or in part to further the
   master's business.").

[157]
   A key difference is that the Restatement (Third) abandons the foreseeability element of the
   Restatement (Second).  *See* RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006), cmt.

[158]
   *Id.* (citation omitted, emphasis added).

56

involved D.C. law but concerned remarks that the D.C. Circuit found were "unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress."[159] *Williams v. United States*[160] involved a Texas congressperson's comments "concerning the status of an appropriations bill to restore the Battleship Texas."[161] And the case applied Texas's scope of employment doctrine, which differs from the Restatement (Second) approach.[162] And *Operation Rescue National v. United States*[163] did not consider whether the defendant's comments were made within the scope of his employment because the issue was not raised on appeal. The district court did consider that issue, but it did so under Massachusetts law where the defendant, a Senator, commented on a "bill, of which he was the prime sponsor, [that] was to be debated in the Senate the following day."[164]

President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office. Neither the media reports nor the underlying allegations have any relationship to his official duties. And even if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not

---

[159]

*Wuterich*, 562 F.3d at 384-85.

[160]

71 F.3d 502 (5th Cir. 1995).

[161]

*Id.* at 504, 506.

[162]

*See id.* at 506 (citing *Mata v. Andrews Transp., Inc.*, 900 S.W.2d 363, 366 (Tex. App. 1995)).

[163]

147 F.3d 68, 69 (1st Cir. 1998).

[164]

*Id.* at 68-69.

enough under the District of Columbia's scope of employment doctrine.

C.    *Scope of Employment Under New York Law*

If the Court were to apply New York law, it would reach the same conclusion largely for the same reasons.

"Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'"[165] "Whether an employee acted within the scope of employment is a fact-based inquiry."[166]

For all the reasons already outlined, any person or group that might be characterized as President Trump's employer neither controls, nor could control, his activities. And even if that were not so, the government's argument would fail also because the president's actions were not taken "in furtherance of the duties he owes to his employer," whoever or whatever that may be.

When applying the "in furtherance" requirement, New York courts "consider, among other factors,

---

[165]    *Fountain*, 838 F.3d at 135 (brackets omitted) (quoting *Hamm*, 483 F.3d at 138 (quoting *Lundberg*, 25 N.Y.2d at 471)).

[166]    *Rivera v. State*, 34 N.Y.3d 383, 90 (2019). Although it is fact heavy, "the question may be resolved on summary judgment, particularly when the material facts are undisputed." *Id.* This language arguably does not apply here because the scope of employment question arises as a threshold issue, rather than as a merits issue on summary judgment or even a Rule 12 motion. But in either event, the issue is resolved appropriately by the Court because the material facts are not in dispute.

'the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated' (i.e., whether it was foreseeable)."[167]

Conduct "committed for wholly personal motives" is not done in furtherance of any duties owed to the employer.[168]   And at least as a general matter, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."[169]   That said, "[i]nvoking respondeat superior both in defamation cases and in sexual harassment cases is not unprecedented."[170]   As in all cases, "the determination of whether a particular act was within the scope of the servant's employment is . . . heavily dependent on factual considerations."[171]

As explained above, the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue.  His comments concerned an alleged sexual assault that took place several decades before he took office, and the allegations have no relationship to the official business of

---

[167]

*Rivera*, 34 N.Y.3d at 389-90 (2019) (quoting *Riviello v Waldron*, 47 N.Y.2d 297, 304 (1979)); *see also Fountain*, 838 F.3d at 138 (applying these factors to the "in furtherance" inquiry).

[168]

*See, e.g.*, *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002).

[169]

*Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

[170]

*Rausman v. Baugh*, 682 N.Y.S.2d 42 (App. Div. 2d 1998).

[171]

*Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

59

the United States.  To conclude otherwise would require the Court to adopt a view that virtually everything the president does is within the public interest by virtue of his office.  The government has provided no support for that theory, and the Court rejects it as too expansive.

*Conclusion*

The President of the United States is not an "employee of the Government" within the meaning of the relevant statutes.  Even if he were such an "employee," President Trump's allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment.  Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.

SO ORDERED.

Dated:      October 26, 2020

_____

Lewis A. Kaplan
United States District Judge

# EXHIBIT 7

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:    (202) 353-1651
Facsimile:     (202) 616-5200
Email:          stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>              Plaintiff,<br><br>      -against-<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>             Defendant. | **ECF Case**<br><br>No. 1:20-cv-7311-LAK-JLC |

## NOTICE OF APPEAL

Notice is hereby given that the United States appeals to the United States Court of

Appeals for the Second Circuit from the Order entered in this action on October 27, 2020, ECF

No. 32.

 Dated:  November 25, 2020                    JEFFREY BOSSERT CLARK

Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director

 S/ Stephen R. Terrell
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:     (202) 353-1651
Facsimile:     (202) 616-5200
Email: stephen.terrell2@usdoj.gov

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

E. JEAN CARROLL,　　　　　　　　　　　　 :

　　　　　　　　　Plaintiff,　　　　　 :　　　No. 20-cv-7311 (LAK)

　　　　　　　　　　　　　　　　　　　 :

　　　　　　　　- v -　　　　　　　　 :　　　**ECF Case**

　　　　　　　　　　　　　　　　　　　 :

DONALD J. TRUMP, in his personal capacity,　 :　　　**NOTICE OF APPEAL**

　　　　　　　　　　　　　　　　　　　 :

　　　　　　　　　Defendant.　　　　 :

------------------------------------------------------------- x

　　　　PLEASE TAKE NOTICE that President Donald J. Trump, by and through his

undersigned counsel, hereby appeals to the United States Court of Appeals for the Second

Circuit from the Opinion and Order of the Hon. Lewis A. Kaplan, U.S.D.J., entered October 27,

2020 (Dkt. 32), attached hereto as Exhibit A, denying the United States' Motion to Substitute the

United States as Defendant (Dkt. 3).

Dated:　New York, New York
　　　　　November 25, 2020

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　KASOWITZ BENSON TORRES LLP

　　　　　　　　　　　　　　　　By:＿＿*/s/ Marc E. Kasowitz*＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　Marc E. Kasowitz
　　　　　　　　　　　　　　　　　　　Christine A. Montenegro
　　　　　　　　　　　　　　　　　　　Paul J. Burgo

　　　　　　　　　　　　　　　　1633 Broadway
　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　(212) 506-1700

　　　　　　　　　　　　　　　　*Attorneys for Defendant Donald J. Trump*

To:　　All Counsel of Record (via ECF)

# EXHIBIT 9

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

MARC E. KASOWITZ
DIRECT DIAL: 212-506-1710
DIRECT FAX: 212-835-5010
mkasowitz@kasowitz.com

December 10, 2020

<u>VIA ECF</u>
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *Carroll v. Trump*, 1:20-cv-07311 (LAK)

Dear Judge Kaplan:

We represent President Donald J. Trump in the above-referenced action. I submit this letter motion to respectfully request that this Court immediately stay all proceedings. As shown below, the Court has been divested of jurisdiction during the appeals to the United States Court of Appeals for the Second Circuit from this Court's October 27, 2020 Opinion and Order (the "Order") (ECF No. 32) denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute as the defendant in place of President Trump.

On November 25, 2020, the United States and the President both filed notices of appeal from the Order. (ECF Nos. 45-46.) As the Supreme Court has held, "[t]he filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982); *see also Abrahams v. Inc. Vill. of Hempstead*, 390 F. App'x 4, 5 (2d Cir. 2010) (summary order) ("A notice of appeal divests a district court of jurisdiction.").

Here, all "aspects of the case" are "involved in the appeal" because the Order's "rejection of certification and substitution effectively denied [defendant] the protection afforded by the Westfall Act, a measure designed to immunize covered federal employees *not simply from liability, but from suit*." *Osborn v. Haley*, 549 U.S. 225, 238, 127 S. Ct. 881, 892 (2007) (emphasis added);[1] *see also Behrens v. Pelletier*, 516 U.S. 299, 308, 116 S. Ct. 834, 839 (1996)

---

[1]     The Supreme Court held that that such an order is immediately appealable "as a reviewable final decision within the compass of 28 U.S.C. § 1291" pursuant to the collateral order doctrine, because the order "conclusively

# KASOWITZ BENSON TORRES LLP

Hon. Lewis A. Kaplan
December 10, 2020
Page 2

(immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery'" (emphasis in original)); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985) (immunity constitutes "an entitlement not to stand trial or face the other burdens of litigation"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 116 S. Ct. 834, 839 (1982) (holding that discovery should not proceed until "threshold immunity question" is resolved); *Locurto v. Safir*, 264 F.3d 154, 164 (2d Cir. 2001) ("denials of immunity are conclusive with regard to a defendant's right to avoid *pretrial* discovery" (emphasis in original) (citation omitted)).

Numerous district courts, including in this District, have recognized and applied these principles. *See, e.g.*, *Edrei v. City of New York*, No. 16 Civ. 1652 (RWS), 2017 WL 3822744, at *3 n.2 (S.D.N.Y. Aug. 31, 2017) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp. 3d 556, 558 (S.D.N.Y. 2014) (Sweet, J.) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting argument that divestiture is not automatic in the qualified immunity context); *Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

Moreover, the district court is divested of jurisdiction even "[w]hen qualified immunity is in issue" on appeal. *See Garcia v. Bloomberg*, No. 11 Civ. 6957(JSR), 2012 WL 3127173, at *1 (S.D.N.Y. July 27, 2012) ("discovery . . . cannot be said to be collateral [to the appeal] because qualified immunity is an entitlement to 'immunity from suit,' including the right to avoid even pre-trial discovery" (citations omitted)). Accordingly, "[t]his principle has even stronger force in the present case, since the Westfall Act confers *absolute*, not merely qualified, immunity upon federal employees . . . . " *Wuterich v. Murtha*, 562 F.3d 375, 378, 382 (D.C. Cir. 2009) (emphasis in original) (vacating district court order that "reserved judgment on certification pending discovery" because it "effectively denied [the defendant] the absolute immunity from suit guaranteed him by the Westfall Act").

Defendant therefore respectfully requests that all proceedings be immediately stayed pending appeal.

Respectfully submitted,
/s/ *Marc E. Kasowitz*
Marc E. Kasowitz

cc:     Counsel of Record (via ECF)

---

decide[s] a contested issue, the issue decided is important and separate from the merits of the action, and the District Court's disposition would be effectively unreviewable later in the litigation." *Id.*

# EXHIBIT 10

| | | | |
|---|---|---|---|
| ☐ 56 | Sep. 15, 2021 | **Request** | ORDER denying without prejudice 47 Letter Motion to Stay re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 09/15/2021) |