# EXHIBIT 11

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
270 West 60th Street
New York, New York 10023
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>        *Plaintiff,*<br><br>   v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>        *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR LEAVE TO AMEND HIS ANSWER PURSUANT TO FRCP RULE 15(A)**</u>

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
270 West 60th Street
New York, New York 10023
(908) 869-1188
ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ..............................................................................................1

PROCEDURAL HISTORY.......................................................................................................2

ARGUMENT .............................................................................................................................3

THIS COURT MUST GRANT DEFENDANT'S MOTION TO AMEND THE

ANSWER TO ASSERT AN ANTI-SLAPP DEFENSE AND COUNTERCLAIM.......................3

    I.      THE ANTI-SLAPP AMENDMENT APPLIES RETROACTIVELY TO THIS

          ACTION ....................................................................................................................3

    II.     DEFENDANT MUST BE PERMITTED LEAVE TO AMEND HIS ANSWER ..6

          A. THERE IS NO BASIS TO DENY THE PROPOSED AMENDMENT .....6

          B. DEFENDANT HAS DEMONSTRATED COLORABLE GROUNDS FOR

             RELIEF TO PERMIT THE PROPOSED AMENDMENT.........................7

CONCLUSION...........................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.,*

    60 Misc. 3d 1221(A) (N.Y. Sup. Ct. 2019), aff'd 176 A.D.3d 434 (1st Dep't 2019) ..............9

*Adelson v. Harris,*

    774 F.3d 803, 809 (2d Cir. 2014) ............................................................................4

*CBS, Inc. v. Ahern,*

    108 F.R.D. 14, 18 (S.D.N.Y. 1985) ........................................................................7

*Coleman v. Grand,*

    523 F. Supp 3d 244, 258 (E.D.N.Y. 2021) ...........................................................4, 5

*Foman v. Davis,*

    371 U.S. 178, 182 (1962)........................................................................................6

*Feirstein v. Nanbar Realty Corp.,*

    963 F.Supp. 254, 261 (S.D.N.Y. 1997) ..................................................................6

*Gasperini v. Ctr. for Humanities, Inc.,*

    518 U.S. 415, 427 (1996).........................................................................................3

*Goldman v Reddington,*

    No. 18-CV-3662 (RPK) (ARL), 2021 WL 4755293, at *4 (E.D.N.Y., Apr. 21, 2021]...........5

*Harris v. American Accounting Association, et al.,*

    No. 5:20-cv-010507 (MAD) (ATB), 2021 WL 5505515, at *15 (N.D.N.Y. Nov. 24, 2021)..5

*John Hancock Mut. v. Amerford Intern.,*

    22 F.3d 458, 462 (2d Cir. 1994) ..............................................................................6

*Kurland & Associates, PC v. Glassdoor, Inc.,*

    2021 WL 1135187 (N.Y. Sup. Ct. Mar 22, 2021) ...................................................6

*La Liberte v. Reid,*

    966 F.3d 79, 86 (2d Cir. 2020) ......................................................................................4

*Luther M. Ragin, Jr. v. The Harry Macklowe Real Estate Co. Inc.,*

    126 F.R.D. 475, 478 (S.D.N.Y. 1989) ..........................................................................6

*Marsh v Sheriff of Cayuga County,*

    36 Fed App'x 10, 11 (2d Cir. 2002) ..............................................................................6

*Massa Construction, Inc. v. Meany,*

    No. 126837/2020 (N.Y. Sup. Ct. May 13, 2021).........................................................6

*Matter of Gleason (Michael Vee, Ltd.),*

    96 N.Y.2d 117, 122 (2001)............................................................................................4

*Nelson v. HSBC Bank USA,*

    87 A.D.3d 995, 998 (2d Dep't 2011) .............................................................................4

*Palin v. New York Times Company,*

    510 F. Supp.3d 21, 24 (S.D.N.Y 2020) ...............................................................4, 5, 6

*Project Veritas v. New York Times Co.,*

    2021 WL 2395290 (N.Y. Sup. Ct. Mar. 18, 2021)........................................................5

*Ragin v. Harry Macklowe Real Estate Co., Inc.,*

    126 F.R.D. 475, 479 (S.D.N.Y. 1989) ..........................................................................8

*Reus v. ETC Hous. Corp.,*

    2021 WL 1837673, at *4 (N.Y. Sup. Ct. May 6, 2021) ................................................5

*Sackler v Am. Broadcasting Companies, Inc.,*

    71 Misc. 3d 693, 698 (N.Y. Sup. Ct. 2021)..................................................................5

*Scheuer v. Rhodes,*

    416 U.S. 232, 236 (1974)...........................................................................................7, 8

iii

*Sweigert v. Goodman*,

    No. 1:18-CV-08653 (VEC) (SDA), 2021 WL 1578097, at *3 (S.D.N.Y. Apr. 22, 2021).......5

**Statutes and Cases**

A.B. 5991-A § 4.................................................................................................................................4

CPLR § 3211(g)..................................................................................................................................9

CPLR § 3212(h)..................................................................................................................................9

CRL § 70-a.........................................................................................................................................9

CRL § 76-a(1)(a)............................................................................................................................3, 8

CRL § 76-a(1)(d) .........................................................................................................................3, 8, 9

Fed.R.Civ.P. 12(b)(6)........................................................................................................................7

New York Civil Rights Law §§ 70-a ........................................................................................ passim

New York Civil Rights Law § 76-a .......................................................................................... passim

Rule 15(a)...........................................................................................................................................1

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion to amend his Answer ("Answer") pursuant to Rule 15(a) of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

On November 10, 2020, the New York legislature amended the state's Anti-Strategic Lawsuit Against Public Participation law, codified as New York Civil Rights Law §§ 70-a and 76-a (collectively, the "anti-SLAPP statute"), in an effort to greatly expand its scope and impact. Specifically, the legislature's purpose for revising the anti-SLAPP statute was to ensure "the utmost protection for the free exercise of speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. In its revised form, the law is broadly intended to deter bad-faith actors from commencing and/or continuing vexatious or malicious lawsuits, particularly those designed to inhibit an individual's ability to speak freely on matters of public concern. Since that is precisely what has occurred in this instance, Defendant hereby seeks leave to amend his Answer to assert a counterclaim against the plaintiff, E. Jean Carroll ("Plaintiff") under the revised anti-SLAPP statute.

Although the anti-SLAPP statute was modified after this action was commenced, New York courts have widely held that the legislature's change was meant to be remedial in nature and, therefore, is to be applied retroactively. Thus, since this action falls well within the expanded scope of anti-SLAPP legislation, and since the amendment is to be liberally granted when "justice so requires," Defendant must be permitted to amend his Answer accordingly. Plaintiff will not be

prejudiced by the proposed amendment, as there has been no undue delay, bad faith, or dilatory conduct on Defendant's behalf. Therefore, Defendant's motion must be granted in its entirety.

## PROCEDURAL HISTORY

On November 4, 2019, Plaintiff commenced the instant action against Defendant with the filing of a complaint (the "Complaint") in the Supreme Court of New York, New York County under Index No. 160694/2019. *See* Habba Aff., Ex. A. In the Complaint, Plaintiff asserts a single cause of action for defamation. *Id.*

On January 23, 2020, prior counsel for Defendant, Kasowitz Benson Torres LLP, served an Answer upon Plaintiff's counsel (the "Answer") putting forth numerous affirmative defenses. *See* Habba Aff., Ex. C.

On September 8, 2020, the United States of America removed the action to this Court upon certification from James G. Touhey, Director, Torts Branch, Civil Division, United States Department of Justice, that Defendant was acting within the scope of his presidential office at the time of the incidents out of which Plaintiff's claims arose. *See* Habba Aff., Ex. B.

On October 27, 2020, this Court denied the United States of America's motion to intervene and substitute itself for Defendant, which Order is currently being reviewed on appeal before the Second Circuit. *See* Docket Entry Nos. 32, 45, and 46.

On November 10, 2020, Governor Andrew Cuomo signed into law New York's revised anti-SLAPP statute, codified as New York Civil Rights Law §§ 70-a and 76-a. Initially enacted in 1992, the anti-SLAPP statute has always been designed to penalize parties who file ill-intentions lawsuits – particularly those meant to discourage public participation or chill the free speech of others – by providing additional safeguards to defendants in these types of actions. Among other things, the 2020 amendment significantly broadened the statute by expanding the definition of an

"action involving public petition and participation" to include any claim based upon: "(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." New York Civil Rights Law § 76-a(1)(a). The amendment also clarified that the term "public interest" is meant to be "construed broadly and shall mean any subject other than a purely private matter." *Id*. 76-a(1)(d).

Defendant now seeks to amend his Answer in accordance with the revised anti-SLAPP statute, as this action now falls squarely within the ambit of the law. Plaintiff has refused to provide consent to Defendant's request to amend, thereby necessitating the filing of the instant motion.

## ARGUMENT

### THIS COURT MUST GRANT DEFENDANT'S MOTION TO AMEND THE ANSWER TO ASSERT AN ANTI-SLAPP DEFENSE AND COUNTERCLAIM

Pursuant to the instant application, Defendant seeks leave to amend his Answer to assert an additional defense and counterclaim under New York's recently amended anti-SLAPP statute. Given the broad scope of the law – which has been widely held to apply retroactively – and because the amendment is neither futile nor proposed in bad faith and is not otherwise prejudicial to Plaintiff, Defendant's application must be granted, and the Answer amended accordingly.

### I. The Anti-SLAPP Amendment Applies Retroactively to This Action

At the outset, it is firmly established that the legislature's November 10, 2020, amendment to the anti-SLAPP statute applies retroactively and, therefore, the instant application is both timely and proper.

It is well-settled that "federal courts sitting in diversity apply state substantive and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). New York

federal courts have consistently found that the anti-SLAPP statute, a state law, applies on a federal

level since it is substantive law, not a procedural one. *See Palin v. New York Times Company*, 510

F. Supp.3d 21, 24 (S.D.N.Y 2020) ("It is also undisputed […] that a federal court sitting in diversity

must apply §76-a because it is a substantive, rather than a procedural provision."); *see also*

*Coleman v. Grand*, 523 F. Supp 3d 244, 258 (E.D.N.Y. 2021) ("The anti-SLAPP provision at issue

here, § 76-a, applies in federal court because it is 'manifestly substantive,' governing the merits of

libel claims and increasing defendants' speech protections.") (citing *La Liberte v. Reid*, 966 F.3d

79, 86 (2d Cir. 2020); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (affirming district

court's application of certain substantive provisions of Nevada's anti-SLAPP law).

Thus, as in *Palin*, "the only question here is whether [the anti-SLAPP statute] should be

given retroactive effect to this action, which was filed before the amendments took effect but has

not yet gone to trial." *Id*. Under New York law, statutory amendments are generally "presumed to

have prospective application unless the Legislature's preference for retroactivity is explicitly stated

or clearly indicated." *Matter of Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122 (2001). "So-

called remedial legislation, however, should be given retroactive effect in order to effectuate its

beneficial purpose." *Palin*, 510 F. Supp.3d at 24. Remedial statutes are those designed to correct

imperfections in prior law, by generally giving relief to the aggrieved party." *Nelson v. HSBC Bank*

*USA*, 87 A.D.3d 995, 998 (2d Dep't 2011).

In assessing whether the anti-SLAPP amendment was intended to be remedial, the *Palin*

Court noted that the New York legislature "conveyed a sense of urgency by directing that the [anti-

SLAPP] amendment was to 'take effect immediately.'" *Palin*, 510 F. Supp.3d at 28 (citing A.B.

5991-A § 4). The Court also pointed to the legislative history of the statute, which "demonstrates

that the amendments to [the anti-SLAPP statute] were intended to correct the narrow scope of New

York's prior anti-SLAPP law." *Id.* These factors, taken together, led the Court to affirmatively

hold that the anti-SLAPP amendment "is a remedial statute that should be given retroactive effect."

*Id.*

Following the *Palin* decision, numerous federal courts have affirmed its holding and found

that the anti-SLAPP amendment is remedial legislation that must be applied retroactively. *See*

*Coleman v. Grand*, 523 F. Supp 3d 244, 258 (E.D.N.Y. 2021) ("Under New York law, these clear

legislative expressions of remedial purpose and urgency give the [anti-SLAPP] amendments

retroactive effect.") (citing *Palin*, 510 F.Supp.3d at 27); *Sweigert v. Goodman*, No. 1:18-CV-08653

(VEC) (SDA), 2021 WL 1578097, at *3 (S.D.N.Y. Apr. 22, 2021) ("[T]he Court grants the

Defendant's motion to amend his Answer to add a defense under the New York anti-SLAPP

statute."); *Goldman v Reddington*, No. 18-CV-3662 (RPK) (ARL), 2021 WL 4755293, at *4

(E.D.N.Y., Apr. 21, 2021], *report and recommendation adopted*, 18-CV-3662 (RPK) (ARL), 2021

WL 4099462 (E.D.N.Y., Sept. 9, 2021) (affirming retroactive application of the anti-SLAPP

amendment and permitting the defendant to amend its answer to include anti-SLAPP

counterclaim.); *Harris v. American Accounting Association, et al.*, No. 5:20-cv-010507 (MAD)

(ATB), 2021 WL 5505515, at *15 (N.D.N.Y. Nov. 24, 2021) (granting motion to dismiss brought

pursuant to CRL § 70-a and awarding costs and attorneys' fees.). Several state courts have also

found that the revision applies retroactively. *See Project Veritas v. New York Times Co.*, 2021 WL

2395290 (N.Y. Sup. Ct. Mar. 18, 2021) ("[T]he court will apply the anti-SLAPP statute

retroactively."); *see also Sackler v Am. Broadcasting Companies, Inc.*, 71 Misc. 3d 693, 698 (N.Y.

Sup. Ct. 2021 ("This court finds that the anti-SLAPP amendments are intended to apply

retroactively in order to effectuate the remedial and beneficial purpose of the statute."); *Reus v.*

*ETC Hous. Corp.*, 2021 WL 1837673, at *4 (N.Y. Sup. Ct. May 6, 202) ("Although the [anti-

SLAPP] [l]aw was amended in November of 2020, the amendments were effective retroactively."); *Kurland & Associates, PC v. Glassdoor, Inc.*, 2021 WL 1135187 (N.Y. Sup. Ct. Mar 22, 2021); *Massa Construction, Inc. v. Meany*, No. 126837/2020 (N.Y. Sup. Ct. May 13, 2021).

Consistent with the holding set forth in *Palin* and its progeny, it is axiomatic that the anti-SLAPP statute applies retroactively. Therefore, Defendant's request to amend his Answer to include an anti-SLAPP counterclaim is timely raised and properly before the Court.

## II.    **Defendant Must Be Permitted Leave to Amend His Answer**

### A.    **There Is No Basis to Deny the Proposed Amendment**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court shall grant leave to amend "freely…when justice so requires."  Leave to amend will be granted absent a showing of undue delay, bad faith, futility, or prejudice to the defendant. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Feirstein v. Nanbar Realty Corp.*, 963 F.Supp. 254, 261 (S.D.N.Y. 1997).  Determining whether to grant leave to amend is within the sound discretion of the court. *John Hancock Mut. v. Amerford Intern.*, 22 F.3d 458, 462 (2d Cir. 1994).  There is no requirement that a defendant plead all known affirmative defenses at the time of their first answer.  "As long as amendment of pleadings does not prejudice plaintiffs, defendants will not be precluded from adding additional defenses about which they had knowledge." *Luther M. Ragin, Jr. v. The Harry Macklowe Real Estate Co. Inc.*, 126 F.R.D. 475, 478 (S.D.N.Y. 1989).  In determining whether an amendment would cause prejudice, courts will consider whether "the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute." Marsh v Sheriff of Cayuga County, 36 Fed App'x 10, 11 (2d Cir. 2002).

The instant application is brought for the purpose of adding a defense and counterclaim pursuant to the recently amended anti-SLAPP statute, which amendment was made while the instant action was pending and, most importantly, after Defendant's Answer was served. *See* Habba Aff., Ex. 1. Undersigned counsel for Defendant was substituted into this action on or about November 11, 2021, and now, promptly thereafter, undersigned counsel makes the instant application. Since this action is still in its early stage of litigation – as of the date of this motion, discovery has not even started – permitting the proposed amendments to Defendant's Answer will not meaningfully delay this action in any way. *Id.* Moreover, the proposed amendments will not prejudice Plaintiff in the slightest. The anti-SLAPP counterclaim will not broaden the scope of this action, it will only require Plaintiff to prove that the claims she has asserted have a "substantial basis in law." Plainly stated, there are simply no circumstances present which even remotely suggests any undue delay, bad faith, futility, or prejudice sufficient to warrant the denial of Defendant's application.

As such, pursuant to the rules governing motions to amend pleadings in both state and federal courts, well-established law dictates that Defendant's instant motion to amend must be granted.

B. **Defendant Has Demonstrated Colorable Grounds for Relief to Permit the Proposed Amendment**

While a party seeking to amend its answer need not establish the merit of its proposed new defenses and/or counterclaims, "[i]n deciding whether the movant has a colorable ground for relief to permit an amendment, an inquiry must be made comparable to that required by Fed.R.Civ.P. 12(b)(6)." *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 18 (S.D.N.Y. 1985). In considering a 12(b)(6) motion to dismiss, a court must construe the pleading's allegations in the light most favorable to the pleading party and accept those allegations as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236

(1974). "Moreover, it must appear beyond doubt that the [moving party] can prove no set of facts supporting his claim that entitles him to relief." *Ragin v. Harry Macklowe Real Estate Co., Inc.*, 126 F.R.D. 475, 479 (S.D.N.Y. 1989).

In this instance, there is no question that Defendant presents a colorable claim under the anti-SLAPP statute, as the cause of action asserted by Plaintiff is precisely the type that the recent amendment was intended to encompass. Pursuant to the legislature's November 10, 2020 revision to the law, the scope of the anti-SLAPP statute was broadened to apply to any action based upon: "(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." CRL § 76-a(1)(a). Notably, the amendment also clarified that the term "public interest" is meant to be "construed broadly and shall mean any subject *other than a purely private matter*." *Id.* § 76-a(1)(d) (emphasis added).

The statements at issue here – namely, Defendant's denials of Plaintiff's allegations against him – were public statements made by a then-sitting president. The statements were of momentous public interest; even Plaintiff acknowledges in her complaint that she expected her allegations to ignite a "media storm." *See* Compl. ¶¶ 10-11. Indeed, Plaintiff's allegations – and Defendant's denials thereof – garnered an immense amount of public attention and media coverage which remains to this day. Accordingly, the subject matter of this action cannot be construed as being anything other than an "issue of public interest." CRL § 76-a(1)(a). Surely it cannot possibly be described as a "purely private matter." *Id.* § 76-a(1)(d). Rather, it is indisputable that the instant action is an "action involving public petition and participation" and, therefore, squarely within the ambit of the anti-SLAPP statute.

Critically, once it is established that an action falls within the ambit of the anti-SLAPP statute, the defendant is entitled to file a motion to dismiss under CPLR § 3211(g) and/or a motion for summary judgment pursuant to CPLR § 3212(h). Under either scenario, the burden shifts away from the defendant and lies solely with the plaintiff, who must "demonstrate that the cause of action has a "substantial basis in law," CPLR § 3211(g), or a "substantial basis in fact and law," CPLR § 3212(h). Under these heightened standards, the plaintiff bears a "heavy burden" to make the requisite showing to defeat dismissal. *161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.*, 60 Misc. 3d 1221(A) (N.Y. Sup. Ct. 2019), aff'd 176 A.D.3d 434 (1st Dep't 2019). In addition, if at any point during litigation the defendant is able to demonstrate that the action was "commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law," the defendant is entitled to an award of costs an attorneys' fees. CRL § 70-a.

Given the burden-shifting nature of the anti-SLAPP statute, the multiple avenues for redress, and the stringent standards Plaintiff will need to overcome to establish the viability of her claim, it is evident that Defendant has a colorable claim under the anti-SLAPP statute. Further, Defendant will be severely prejudiced if he is deprived of the opportunity to invoke the heightened standard of the anti-SLAPP claim. It would therefore be inappropriate to deny Defendant's motion at this early stage of litigation.

**CONCLUSION**

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests this Court

grant its motion to amend his Answer to assert an additional affirmative defense and counterclaim

pursuant to Rule 15 of the Federal Rules of Civil Procedure.


Dated: December 1, 2021.          Respectfully submitted,
       New York, New York

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
       -and-
270 West 60th Street
New York, New York, 10023
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                              Plaintiff,

            -against-                                        20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

            Appearances:

                        Roberta Kaplan
                        Joshua Matz
                        KAPLAN HECKER & FINK LLP
                        *Attorneys for Plaintiff*


                        Alina Habba
                        HABBA MADAIO & ASSOCIATES LLP
                        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

            This is a defamation action against Donald J. Trump.  Mr. Trump, purely in his

individual capacity and represented by private counsel,[1] has moved for leave to amend his answer

---
[1]

            Long after this action was commenced in the state courts, the United States removed it to
            this Court and moved to be substituted as defendant in place of Mr. Trump, who then was
            president.  This Court denied the motion to substitute.  *Carroll v. Trump,* 498 F. Supp. 3d
            422 (S.D.N.Y. 2020).  That ruling is pending on appeal.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/11/2022

to assert an affirmative defense and counterclaim alleging that plaintiff's claim is baseless and interposed for harassment and other improper purposes. He proposes to seek damages and other relief under New York's so-called anti-SLAPP law. Plaintiff contends that the motion should be denied because (1) defendant has delayed unduly in seeking leave, (2) he seeks leave for dilatory purposes, (3) granting leave would be unduly prejudicial to her and, in any case, (4) leave would be futile because defendant's proposed affirmative defense and counterclaim would be subject to dismissal on motion. The Court assumes familiarity with its prior opinion, which describes the underlying factual dispute.

*Legal Standard*

       The standards governing this motion are clear.

       *First,* as defendant concedes, futility of amendment warrants denial of leave to amend.[2] In other words, a court may deny leave to assert a counterclaim or defense that would not withstand a motion to dismiss or to strike.

       *Second,* futility of amendment is not the only basis for denying leave to amend. While "leave to amend 'shall be freely given when justice so requires,' . . . a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[3]

       So we turn to these considerations.

---

[2]     Def. Reply Mem. (Dkt. 66) at 1, 5; Transcript, Feb. 22, 2022 (Dkt. 71) (hereinafter "Tr.") 3:4-7. All docket citations are to 20-cv-7311 (LAK) unless otherwise specified.

[3]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d. Cir. 2007) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

*Futility of Amendment*

>  *The Availability of a Futility Argument*

As noted, defendant conceded, both in motion papers and at argument, that futility of amendment is a ground upon which leave to amend properly may be denied. Indeed, he went well beyond that. His motion papers assert, correctly, that:

> "it is undisputed that '[a]n amendment is futile if the proposed amended claim would not withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.'"[4]

Yet he argues that "it would be a fool's errand, and not to mention a waste of judicial time and resources, to defend the substantive merits of every potential use of the anti-SLAPP law that Defendant may have in this case."[5]

These two assertions – made on consecutive pages of defendant's memorandum – are inconsistent. In order to grant leave to amend, the Court may insist that the proposed amendment would not be futile, which requires the conclusion that the amended claim would be sufficient to withstand a motion to dismiss.[6] And in order to determine whether it would withstand a motion to dismiss, the Court must determine whether it pleads facts which, if proven, "plausibly

---

[4]   Dkt. 66 at 5 (citation omitted).

[5]   *Id.* at 6.

[6]   *E.g.*, *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (noting a proposed amendment is futile if it "would fail . . . to state a claim under Rule 12(b)(6)") (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)); 3 MOORE'S FEDERAL PRACTICE § 15.15 (2021); 6 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 1487 (3d ed. 2021).

give rise to an entitlement to relief."[7]  It follows, therefore, that one cannot decide whether a proposed amendment would be futile without deciding its legal sufficiency.

But rejection of defendant's position is not warranted only by logic.  His position simply is wrong.  Federal courts – including courts in this circuit – regularly decide the legal sufficiency of proposed amended pleadings in order to decide whether leave to amend would be futile.  And "the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss."[8]  It routinely is applied to deny motions for leave to amend.

For example, in *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Group, PLC*,[9] the Second Circuit reviewed the district court's denial of leave to amend *de novo*[10] – because the district court's ruling was based on futility, an issue of law – and affirmed.  In so doing, it necessarily determined that the plaintiffs' proposed amended complaint, which had been before the district court,[11] did not state a legally sufficient claim under Section 10(b) of the Securities Exchange Act of 1934.

The Second Circuit similarly affirmed the district court's denial of leave to amend on grounds of futility in *Thea v. Kleinhandler*.[12]  Following dismissal of their first amended

---

[7]

    *Panther Partners Inc.*, 681 F.3d at 119.

[8]

    *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 389.

[9]

    *Id.*

[10]

    *Id.* (citing *Panther Partners Inc.*, 681 F.3d at 119).

[11]

    *Id.* at 387.

[12]

    807 F.3d 492 (2d Cir. 2015).

complaint, plaintiffs moved for leave to file a proposed second amended complaint.[13] The district court denied the motion, concluding that amendment would be futile because "the claims alleged in the proposed second amended complaint would not withstand a motion to dismiss."[14] And the Court of Appeals reviewed that determination *de novo* and affirmed.

These are not outlier cases. In fact, it is unexceptional for federal courts to deny leave to amend on the basis of futility where the proposed amended pleading would not withstand a motion to dismiss.[15]

The defendant nevertheless argues that it would be unfair to consider the legal sufficiency of his proposed amended pleading on this motion for leave "because we [*i.e.*, his counsel] haven't delved into it and it is not ripe at this point . . . ."[16] But that contention is entirely without merit. If defendant has not "delved into" the sufficiency of his proposed amended pleading, it is only because he ignored his own statements that "[a] court may only deny leave 'for good

---

[13]

    *Id.* at 494.

[14]

    *Id.* at 496; *see also Thea*, 2014 WL 3812231, at *6, 9.

[15]

    *See, e.g.*, *Hay v. N.Y. Media LLC*, ___ F. App'x ___, No. 21-1727 (2d Cir. Mar. 10, 2022) (summary order); *Convergen Energy LLC v. Brooks*, No. 20-cv-3746 (LJL), 2020 WL 5549039, at *27 (S.D.N.Y. Sept. 16, 2020); *ACR Sys., Inc. v. Woori Bank*, No. 14-cv-2817 (JFK), 2018 WL 1757019, at *7 (S.D.N.Y. Apr. 10, 2018); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15-cv-6369 (JFK), 2018 WL 1449206, at *8 (S.D.N.Y. Mar. 23, 2018); *Manhattan Rev. LLC v. Yun*, No. 16-cv-0102 (LAK), 2017 WL 3034350, at *1 (S.D.N.Y. July 17, 2017); *United States v. N.Y. City Dep't of Educ.*, No. 16-cv-4291 (LAK) (JCF), 2017 WL 1169653, at *4 (S.D.N.Y. Mar. 28, 2017); *In re Sling Media Slingbox Advert. Litig.*, No. 15-cv-05388 (GBD), 2017 WL 5558679, at *1-2 (S.D.N.Y. Mar. 22, 2017); *Lin v. Toyo Food, Inc.*, No. 12-cv-7392 (KMK), 2016 WL 4502040, at *6 (S.D.N.Y. Aug. 26, 2016).

[16]

    Tr., at 6:16-18.

reason, *including futility*'"[17] and that courts "freely grant leave to amend . . . *absent a showing of
. . . futility . . . ,*"[18] not to mention the decades of authority and practice that support those statements.
In fact, he has had a full opportunity to address these issues.

In consequence, we turn to the question of whether defendant's proposed amendment
would be futile.

### The anti-SLAPP Law

"SLAPP" is an acronym for "strategic lawsuits against public participation." Anti-
SLAPP laws are intended to deter actions filed to punish or harass a defendant for participating in
public life. New York long has had such a statute, which at the outset permitted a defendant in a
covered claim to "maintain an action, claim, cross claim or counterclaim" against the plaintiff and
to recover if the plaintiff's action lacked sufficient basis.[19] As originally enacted, however, the
coverage of the statute was narrow.

That changed in 2020 when the Legislature amended Sections 70-a and 76-a of the
Civil Rights Law and Rules 3211 and 3212 of the Civil Practice Law and Rules to broaden the
applicable standards and to provide additional procedural rights to make those standards more
effective.[20] The key points are that the law as amended

---

[17]     Dkt. 66 at 1 (citation omitted and emphasis added).

[18]     Tr., at 3:5-7 (emphasis added).

[19]     N.Y. Civ. Rts. L. § 70-a (McKinney 2009).

[20]     N.Y. Law 2020, chap. 250 (2020), *as codified in* N.Y. Civ. Rts. L. §§ 70-a, 76-a, and N.Y.
CPLR 3211-12.

- Extends coverage to "any communication in a place open to the public or a public forum in connection with an issue of public interest" or based upon "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest . . . ."[21]

- Requires the plaintiff in any covered action to establish by clear and convincing evidence that "any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue,"[22] *i.e.*, that the defendant acted with actual malice in the First Amendment sense of that term.[23]

- Requires courts, in considering motions to dismiss complaints and other pleadings in actions within the coverage of the statute, to consider supporting and opposing factual affidavits rather than limiting their consideration to the pleadings.[24]

- Requires courts to stay all discovery, pending hearings, and motions from the

---

[21] N.Y. Civ. Rts. L. § 76-a, subd. 1(a).

[22] *Id.*, subd. 2.

[23] *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 182-84 (2d Cir. 2000) (noting that "actual malice means 'with knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not'" and must be "supported by clear and convincing proof") (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) and *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511 n.30 (1984)).

[24] N.Y. CPLR 3211(g), subd. 2.

filing until the determination of any motion to dismiss pursuant to the statute.[25]

- Shifts the burden of proof from the defendant to the plaintiff and heightens the standard a plaintiff must meet to avoid dismissal on motion. Whereas an ordinary complaint or counterclaim typically withstands a motion to dismiss for failure to state a cause of action if it states "a claim to relief that is plausible on its face,"[26] the amended anti-SLAPP law requires dismissal of a covered complaint or counterclaim unless the plaintiff establishes that the proposed pleading "has a substantial basis in law or is supported by a substantial argument for extension, modification or reversal of existing law."[27]

- Requires a court to award costs and attorney's fees in any covered action in which the defendant demonstrates that such a substantial basis in law and fact was lacking.[28]

- Provides for the recovery of compensatory damages by the defendant upon an additional demonstration that the suit was "commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously

---

[25] *Id.*, subd. 3.

[26] *See e.g., Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495 (2d Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Lynch v. City of N.Y.*, 952 F.3d 67, 74 (2d Cir. 2020).

[27] N.Y. CPLR 3211(g), subd. 1.

[28] N.Y. Civ. Rts. L. § 70-a, subd. 1(a).

inhibiting the free exercise of speech, petition or association rights," and punitive damages upon a demonstration that the action was commenced or continued *solely* for that purpose.[29]

### The Proposed Affirmative Defense

Defendant proposes first to amend his answer to assert a new purported affirmative defense: viz., a defense that alleges, in its entirety, that "[p]laintiff's claim is barred by New York's anti-SLAPP laws, NY Civil Rights Law §§ 70-a and 76-a."[30] But that is not a legally sufficient affirmative defense.

As the Second Circuit has written:

> "An affirmative defense is defined as '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, *even if all allegations in the complaint are true*.' Black's Law Dictionary 430 (7th ed.1999); *see also Wolf* [*v. Reliance Standard Life Ins. Co.,* 71 F.3d 444, 448-49 (1st Cir.1995)]."[31]

But defendant's proposed additional defense raises no new facts. And while it does assert the new argument that the amended anti-SLAPP law bars plaintiff's claim, that argument is without merit. The amendments to Sections 70-a and 76-a of the Civil Rights Law expand the availability of monetary relief for the institution and continuation of baseless lawsuits in certain circumstances. The amendments to CPLR 3211 and 3212 alter some New York procedures when applied to actions covered by the new law. But none of them creates a defense that would knock plaintiff out of court

---

[29]     *Id.,* subd. 1(b)-(c).

[30]     Def. Proposed Am. Answer (Dkt. 63-1) at 12.

[31]     *Saks v. Franklin Covey Co.,* 316 F.3d 337, 349 (2d Cir. 2003) (emphasis added).

if all the allegations of her complaint are true.

Ms. Carroll's complaint, briefly summarized, alleges that the defendant raped her years ago and that his much more recent denial – coupled with other disparaging and insulting remarks – defamed her.[32]  If all of that is true, then this action would not have been "commenced or continued without a substantial basis in fact and law."[33]  To put it another way, assuming that the facts are as plaintiff claims them to be, nothing in the anti-SLAPP law would defeat her complaint.

Accordingly, amendment to assert the new purported "affirmative defense" would be entirely futile.

### The Proposed Counterclaim

In addition to the purported affirmative defense, defendant seeks to amend his answer to assert a counterclaim against the plaintiff under the same provisions of the amended anti-SLAPP law.

When a party brings a state law claim in federal court, the federal court must apply state substantive law and federal procedural law.[34]  In the event of a conflict between a Federal Rule of Civil Procedure and a provision of state law, the Federal Rule governs unless it is "inapplicable or invalid."[35]  A Federal Rule is applicable if it is "sufficiently broad to control the issue before the

---

[32]

    *See generally Carroll*, 498 F. Supp.3d at 425, 430-32.

[33]

    *See* N.Y. Civ. Rts. L. § 70-a.

[34]

    *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996).

[35]

    *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (citing *Hanna v. Plumer*, 380 U.S. 460, 469-71 (1965)).

Court"[36] or, in other words, if it is capable of "answer[ing] the question in dispute."[37] The Federal Rules are presumed valid under the Constitution and the Rules Enabling Act.[38] The Supreme Court long has held that a Federal Rule is valid under the Rules Enabling Act if it "regulate[s] matters rationally capable of classification as procedure," including matters which fall within "the uncertain area between substance and procedure."[39] "Procedure" for this purpose means "the judicial process for enforcing rights and duties recognized by substantive law . . . that governs the rights and obligations of individuals within a given jurisdiction."[40]

The Second Circuit's recent decision in *La Liberte v. Reid*[41] requires the conclusion that the defendant cannot here invoke any of the relevant New York anti-SLAPP law's provisions.

*La Liberte* dealt with a California anti-SLAPP law that permitted a defendant in a covered case to make a "special motion to strike," the making of which required the court to dismiss plaintiff's case unless the plaintiff could "establish[] a probablility that he or she will prevail on the claim."[42] The Court of Appeals, however, held that those provisions, along with an additional

---

[36]

   *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980).

[37]

   *Shady Grove*, 559 U.S. at 398 (citing *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987)).

[38]

   *Burlington N. R.R. Co.*, 480 U.S. at 6 (citing *Hanna*, 380 U.S. at 471).

[39]

   *Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 894 (2d Cir. 2019) (citing *Shady Grove*, 559 U.S. at 406 and *Hanna*, 380 U.S. at 472).

[40]

   *Id.* (quoting *Hanna*, 380 U.S. at 464 and *Shady Grove*, 559 U.S. at 407).

[41]

   966 F.3d 79 (2d Cir. 2020).

[42]

   *Id.* at 87 (quoting Cal. Civ. Proc. Code § 425.16(b)(3)).

provision that awarded attorneys' fees to defendants who prevail "on a special motion to strike,"[43] could not be applied in federal court because they conflicted with Federal Rules of Civil Procedure 12 and 56:

> "The test is whether 'a Federal Rule of Civil Procedure "answer[s] the same question" as the [special motion to strike].' *Abbas* [*v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015)] (alteration in original) (quoting *Shady Grove*[, 559 U.S. at 398-99]). If so, the Federal Rule governs, unless it violates the Rules Enabling Act. *Id.* Applying that test, we first conclude that the special motion to strike in California's anti-SLAPP statute answers the same question as Federal Rules 12 and 56.

> "The special motion to strike requires outright dismissal unless the plaintiff can 'establish[] a probability that he or she will prevail on the claim.' Cal. Civ. Pro. Code § 425.16(b)(3). The statute thus 'establishes the circumstances under which a court must dismiss a plaintiff's claim before trial,' a question that is already answered (differently) by Federal Rules 12 and 56. *Abbas*, 783 F.3d at 1333-34. Under Rule 12(b)(6), the pleading burden is to allege 'enough facts to state a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 [] (2007). This 'does not impose a probability requirement at the pleading stage. . . . [A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable.' *Id.* at 556[]. California's anti-SLAPP statute, however, 'abrogates that entitlement . . . by requiring the plaintiff to establish that success is not merely plausible but probable.' *Carbone* [*v. Cable News Network, Inc.*, 910 F.3d 1345, 1353 (11th Cir. 2018)].

> "It also conflicts with Rule 56, which permits summary judgment only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a). The Rule thus enables plaintiffs to proceed to trial by identifying any genuine dispute of material fact, whereas California's anti-SLAPP statute 'nullif[ies] that entitlement by requiring the plaintiff to prove that it is likely, and not merely possible, that a reasonable jury would find in his favor.' *Carbone*, 910 F.3d at 1353. Together, Rules 12 and 56 'express "with unmistakable clarity" that proof of probability of success on the merits "is not required in federal courts" to avoid pretrial dismissal.' *Id.* at 1351 (quoting *Hanna*[, 380 U.S. at 470]). Therefore, California's special motion requires the plaintiff to make a showing that the Federal Rules do not

---

[43]

Cal. Civ. Proc. Code § 425.16(c)(1).

require."[44]

And the Second Circuit is not alone in reaching such conclusions.[45]

In this case, CPLR 3211(g), subd. 1, of the anti-SLAPP law, as amended, requires that a court grant an anti-SLAPP law motion to dismiss "unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." Moreover, CPLR 3211(g), subd. 2, as amended, provides that a motion to dismiss made under the anti-SLAPP law shall be decided on the basis not only of the pleadings, but also of "supporting and opposing affidavits." These provisions conflict with Federal Rule of Civil Procedure 12 for two reasons.

First, in resolving a Rule 12(b)(6) motion, a district court must construe the complaint liberally, accept all the factual allegations of the complaint as true, and draw all reasonable inferences in the plaintiff's favor. If the complaint – so viewed – "plead[s] 'enough facts to state a claim to relief that is plausible on its face,'"[46] the motion must be denied. CPLR Section 3211(g), subds. 1 and 2, in contrast, demand that a plaintiff in a covered action satisfy a higher standard –

---

[44] 966 F.3d at 87.

[45] *See, e.g., Klocke v. Watson,* 936 F.3d 240, 242-46 (5th Cir. 2019) (Texas anti-SLAPP statute does not apply in federal court because it "deals only with the conduct of the lawsuit; it creates no rights independent of existing litigation"); *Carbone,* 910 F.3d at 1347-54 (Georgia anti-SLAPP statute does not apply in federal court because it merely provides "a special procedural device . . . that applies a heightened burden to the claims that fall within its ambit"); *Los Lobos Renewable Power, LLC v. Americulture, Inc.,* 885 F.3d 659, 668-73 (10th Cir. 2018) (New Mexico anti-SLAPP statute does not apply in federal court); *Intercon Sols., Inc. v. Basel Action Network,* 791 F.3d 729, 729-32 (7th Cir. 2015) (Washington anti-SLAPP statute does not apply in federal court); *Abbas,* 783 F.3d at 1333-34 (Washington, D.C. anti-SLAPP statute does not apply in federal court).

[46] *Green v. Dep't of Educ. of the City of N.Y.,* 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting *Twombly,* 550 U.S. at 570).

14

both legally and factually – to avoid dismissal than is required by Rule 12(b)(6).

Second, and closely related to the first point, CPLR 3211(g), subd. 2, as amended by the anti-SLAPP law, provides that a motion to dismiss made under the anti-SLAPP law shall be decided on the basis not only of the pleadings, but also of "supporting and opposing affidavits." It thus suggests that (a) the substantiality of the law upon which a covered action is based depends at least in part on an evidentiary showing, and (b) the court is not required to treat the complaint in the same liberal manner as Rule 12 requires. In any case, the requirement of consideration of affidavits conflicts with Federal Rule 12, which permits consideration only of the pleadings and documents incorporated therein by reference[47] unless affidavits are submitted to and not excluded by the court.[48]

Subdivisions 1 and 2 of CPLR 3211(g) thus are inapplicable in federal court by parity of reasoning with *La Liberte*. And since the stay required by CPLR 3211, subd. 3, applies only during the pendency of a motion to dismiss under CPLR 3211, which itself is inapplicable in federal court, subdivision 3 likewise is inapplicable.

Much the same analysis is fatal to the applicability of CPLR 3212(h). It provides that a motion under the anti-SLAPP law, as amended, for summary judgment of dismissal in a covered action "shall be granted unless the party responding to the motion demonstrates that the action . . . has a substantial basis in fact and law or is supported by a substantial argument for an extension, modification or reversal of existing law." It therefore makes summary judgment more readily available in covered actions than would Federal Rule 56, which permits summary judgment of

---

[47] *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).

[48] Fed. R. Civ. P. 12(d).

dismissal only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[49]

This analysis leaves only a question regarding the anti-SLAPP statute amendment to Section 70-a of the Civil Rights Law, which requires the imposition of liability for costs and attorney's fees upon a demonstration that a covered action was "commenced or continued without a substantial basis" and of compensatory and punitive damages upon demonstration of additional circumstances.[50]

One of my colleagues already has applied *La Liberte* to find a conflict between the Federal Rules 12 and 56, on the one hand, and amended Section 70-a of the New York anti-SLAPP statute and, implicitly, amended CPLR 3211(g) and 3212(h).[51] In *National Academy of Television Arts and Sciences v. Multimedia System Design, Inc.*, she ruled that "[Section] 70-a is inapplicable in federal court" because its "'substantial basis' standard . . . conflicts with the standards under

---

[49]     Fed. R. Civ. P. 56(a).

[50]     N.Y. Civ. Rts. L. § 76-a , subd. 2, as amended, which requires a *plaintiff* in a covered action to prove actual malice in the First Amendment sense in order to recover damages, is academic in this case. Ms. Carroll concedes that she is at least a limited purpose public figure that she would have to prove constitutional actual malice by clear and convincing evidence to recover against the defendant without regard to the anti-SLAPP law. Pl. Mem. (Dkt. 65) at 10; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) ("Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth."). In these circumstances, the applicability of the state law provision need not be addressed.

[51]     *See Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, ___ F. Supp. 3d ___, No. 20-cv-7269 (VEC), 2021 WL 3271829, at *13 (S.D.N.Y. July 30, 2021).

16

Federal Rules of Civil Procedure 12 and 56."[52]  I agree with her analysis, which is dispositive as to

Section 70-a.  And that makes it unnecessary to consider whether New York's anti-SLAPP law is

inapplicable in federal courts for the additional reason that it is inconsistent with Federal Rule 11

and, indeed, whether the New York statute is an unconstitutional infringement on the First

Amendment right to petition.

*Undue Delay, Dilatory Motive, Bad Faith and Prejudice*

As noted previously, leave to amend may be denied on the basis of undue delay in

seeking leave, dilatory motive, bad faith and/or prejudice to the opposing party.  In this case, all of

these factors are present.

*Undue Delay*

The current version of the anti-SLAPP statute was enacted and became effective on

November 10, 2020.  This motion was filed on January 11, 2022.  Plaintiff contends that there is no

satisfactory excuse for this 14 month delay and that it weighs in favor of denial of leave to amend.

Plaintiff is right.

To be sure, "mere delay," in the absence of bad faith, dilatory motive or undue

prejudice ordinarily will not foreclose leave to amend.[53]  But when there has been a delay and the

---

[52]  *Id.* at *12-13.  *See also Ginx, Inc. v. Soho All.*, 720 F. Supp.2d 342, 366 (S.D.N.Y.2010), *as corrected* (Aug. 19, 2020) ("New York's legislature may have adopted the Anti-SLAPP law to elevate a plaintiff's burden at the pleading stage above 'plausibility' . . . to 'substantial basis,' but the United States Congress has thus far declined to follow suit.")

[53]  *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

nonmoving party has made a showing of bad faith or undue prejudice, "the burden is on the party who wishes to amend to provide a satisfactory explanation for the delay."[54] "[T]he longer the period of unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice."[55]

The defendant has not offered a satisfactory reason for the length of his delay in this case. He waited over a year after the anti-SLAPP statute was amended before moving for leave to amend his answer. The closest his moving papers came to offering an excuse for this delay is the assertion that his newly retained counsel "was substituted into this action on or about November 11, 2021, and now, promptly thereafter, . . . makes the instant application."[56] But that is not a satisfactory explanation, especially in view of the fact that the defendant previously was represented in this action for two full years by a very large and prominent law firm.

At oral argument, defendant tried a new tack. His counsel argued first that the delay "does not exist" because defendant "was a sitting president for a portion of that . . . [and w]e can't litigate when there is a sitting president . . . ."[57] But even if that were true, and it is not,[58] Mr. Trump

---

[54]      *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d. Cir. 1990).

[55]      *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir 1993) (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir.1983)).

[56]      Def. Mem. (Dkt. 64) at 7. Interestingly, defendant's new attorney submitted an affirmation in support of the motion. Dkt. 63-1. But it is silent as to the reason for the delay. It does no more than authenticate copies of the original and proposed amended answers and attach a proposed order.

[57]      Tr., at 15:1-4, 17-18.

[58]      *See Clinton v. Jones,* 520 U.S. 681 (1997); *see also Trump v. Vance*, 140 S. Ct. 2412 (2020) (holding Article II and the Supremacy Clause do not categorically prohibit the issuance of

was president for only two months between the enactment of the anti-SLAPP amendment and the end of his term.[59]  Moreover, this action was removed from the state court *before* the anti-SLAPP amendments were enacted.  Accordingly, whatever happened in the state court is entirely immaterial to the delay upon which plaintiff relies, *i.e.*, the 14 month delay between the enactment of that legislation and the filing of the motion for leave to amend.[60]  What matters is why the defendant did not make this motion between November 2020 and January 11, 2022.  So defendant's position reduces to the proposition that this delay was justified because he moved in December 2020 for a stay of proceedings pending appeal from this Court's denial of the government's motion to substitute the United States for Mr. Trump.  But the mere filing of that motion did not stay the proceedings,[61] and it ultimately was denied months ago.[62]

Accordingly, defendant has offered no satisfactory justification for failing to move for leave to amend for a 14 month period.

---

a state criminal subpoena to a sitting president).

[59] November 10, 2020 until January 20, 2021.

[60] As will appear, the proceedings in the state court are quite relevant for the issues of dilatory motive, bad faith, and prejudice.

[61] *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167 (2d Cir. 2007).  In that case, after defendants filed a motion to stay the proceedings pending interlocutory appeal, an applications judge granted "a temporary stay pending panel consideration of the stay motion."  *Id.* at 169.  If the filing of the motion to stay alone sufficed to stay the proceedings pending a decision on the motion, there would have been no need for the temporary stay.

[62] Dkt. 56.

*Dilatory Motive, Bad Faith and Prejudice*

As plaintiff contends, defendant's actions have been dilatory throughout the litigation. As she aptly puts it, he "has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails."[63]

This action was filed in state court on November 4, 2019.[64] In the days following, defendant, then the president of the United States, attempted to evade service of the complaint at his New York City residence and the White House.[65] Service was completed only by mail after the state court granted plaintiff's application for alternative service.[66] Defendant then attempted to delay the progress of the lawsuit through frivolous motions practice. First, he filed a motion to dismiss and to stay discovery on January 3, 2020, alleging that the court lacked personal jurisdiction over him.[67] The court denied his motion, holding that defendant had failed to meet the procedural prerequisites to contest personal jurisdiction and concluding that his arguments were baseless.[68] Defendant later

---

[63]

Dkt. 65 at 9.

[64]

Complaint, NYSCEF Doc. No. 2. All state court docket citations are to *Carroll v. Trump*, Index No. 160694/2019.

[65]

*See* Aff. in Support of *Ex Parte* App., NYSCEF Doc. No. 6 (describing law enforcement interference – including by Secret Service agents and officers of the New York City Police Department – with attempted service of process on defendant at Trump Tower in Manhattan and at the White House in Washington, D.C.); Order Permitting Alt. Serv., Doc. No. 15 (granting *ex parte* application).

[66]

Aff. of Serv., NYSCEF Doc. No. 17.

[67]

Mem. in Support of Mtn. to Dismiss and Stay Discovery, NYSCEF Doc. No. 33.

[68]

Order, NYSCEF Doc. No. 36.

reasserted the same defense in his answer, forcing plaintiff to make a motion to strike,[69] after which defendant voluntarily withdrew the defense.[70]

Meanwhile, defendant moved to stay the case pending an appeal in another action arising from alleged sexual misconduct by defendant with another woman, *Zervos v. Trump*.[71] In support of that motion, defendant here argued that the outcome of the *Zervos* appeal would be dispositive in this case because, should he prevail, the court would be divested of jurisdiction to consider the action while he served as president.[72] But that argument at least suggested a dilatory motive, as defendant previously had disclaimed any relation between this case and the *Zervos* matter in a request for this case to be assigned randomly rather than sent to the judge overseeing the *Zervos* case.[73]

Next, on August 7, 2020, after the state court rejected defendant's effort to stay the state court litigation,[74] defendant reportedly instructed William Barr, then Attorney General, to cause the United States to intervene and remove the case to this Court under the Westfall Act.[75] The

---

[69]     Mem. in Support of Mtn. to Strike, NYSCEF Doc. No. 92.

[70]     Notice of Withdrawal, NYSCEF Doc. No. 93.

[71]     171 A.D.3d 110 (1st Dep't 2019); Notice of Mtn. to Stay, NYSCEF Doc. No. 43.

[72]     Mem. in Support of Mtn. to Stay, NYSCEF Doc. No. 49 at 6.

[73]     Letter App. for Reassignment, NYSCEF Doc. No. 25.

[74]     *See* Order, NYSCEF Doc. No. 110.

[75]     Notice of Removal, NYSCEF Doc. No. 112; *see also* Katie Brenner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. TIMES (Sept. 9, 2020).

Department of Justice then moved, unsuccessfully, to substitute the United States as the defendant in place of Mr. Trump.[76]

Taken together, these actions demonstrate that defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him. That conclusion draws further support from the facts that (1) the plaintiff is the only percipient witness (other than the defendant) to the alleged rape, and (2) she is 78 years of age. The relevance of these facts is obvious.

Finally, if there were serious doubt about defendant's dilatory purpose, it would be eliminated or vastly diminished by his contention that the Court should not pass on the futility of amendment in ruling on the motion for leave to amend.

Defendant argues his motion should be granted because the anti-SLAPP law opens "multiple avenues for redress" that otherwise would be unavailable to him,[77] which include a motion to dismiss under CPLR 3211(g), a motion for summary judgment under CPLR 3212(h), and the accompanying stay of discovery and special award of costs and attorneys' fees. He argues that leave to amend should be granted without considering the futility of the amendment in order to leave him free to attempt to use these procedural mechanisms at "any point during the litigation."[78] He wishes to engage in separate motion practice whenever he might seek to take advantage of one of those

---

[76]    *See* Notice of Mtn. to Substitute (Dkt. 3).

        This Court denied the motion. Opinion (Dkt. 32). Appeals from that decision are *sub judice* in the Second Circuit.

[77]    Dkt. 64 at 9.

[78]    *Id.*

22

"multiple avenues,"[79] thus needlessly delaying the case further and driving up the cost of litigating it.  Moreover, when asked whether defendant, if allowed to amend,  would "seek to stay all proceedings here until the anti-SLAPP law claim is resolved," defendant's counsel deflected the Court's question by insisting that that issue should be addressed only after an anti-SLAPP motion was filed.[80]  Thus, the effect of granting defendant leave to amend without determining whether the proposed amendment would be futile – and quite likely the purpose of advocating that course – almost certainly would be to delay this action for no legitimate purpose.

In the Court's view, characterization of defendant's previous and threatened future actions as dilatory, in bad faith or unduly prejudicial would be a bootless exercise.  They are, in varying degrees, all three.

Plaintiff's only claim in this case is a single count of defamation.  It could have been tried and decided – one way or the other – long ago.  The record convinces this Court that the defendant's litigation tactics, whatever their intent, have delayed the case to an extent that readily could have been far less.  Granting leave to amend without considering the futility of the proposed amendment needlessly would make a regrettable situation worse by opening new avenues for significant further delay.  That would unduly prejudice plaintiff which, in my view, is a motive for defendant's position on this motion.

---

[79]       Tr., at 5:21-23, 13:22-14:4; Dkt. 66 at 6.

[80]       Tr., at 5:9-6:3.

23

*Conclusion*

        Defendant's motion, in his personal capacity, for leave to amend (Dkt. 63) is denied

on the ground that the proposed amendment would be futile.  In the alternative, it is denied in the

exercise of discretion on the grounds that the defendant delayed unduly in seeking leave to amend,

that the motion for leave is made at least in part for a dilatory purpose and thus at least in part in bad

faith, and that granting the motion would prejudice the plaintiff unduly.

        SO ORDERED.

Dated:        March 10, 2022

                                            Lewis A. Kaplan
                                United States District Judge

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5-5-22

E. JEAN CARROLL,

   *Plaintiff,*

  v.

DONALD J. TRUMP, in his personal capacity,

   *Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

**[PROPOSED] SCHEDULING ORDER**

It is hereby ORDERED as follows:

1. The parties shall serve any and all written discovery requests on each other on or before May 27, 2022.

2. The parties shall substantially complete their productions of written discovery and requests for inspection or examination on or before August 3, 2022.

3. Depositions to take place between August 3, 2022, to October 19, 2022.

4. The parties shall make any and all expert disclosures under Rule 26(a)(2) on or before September 16, 2022.

5. The parties shall substantially complete any and all fact discovery on or before October 19, 2022.

6. The parties shall complete any and all expert discovery on or before November 16, 2022.

KAPLAN HECKER & FINK LLP

By: _____

Roberta A. Kaplan
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com

Joshua Matz
1050 K Street, Suite 1040
Washington, DC 20001
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

HABBA MADAIO & ASSOCIATES LLP

By: _____

Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
            -and-
270 West 60th Street
New York, New York 10023
(908) 869-1188
ahabba@habbalaw.com

*Counsel for Defendant, Donald J. Trump*

SO ORDERED:

Dated: _____5/4/22_____

_____
The Honorable Lewis A. Kaplan
United States District Court Judge

# EXHIBIT 14

# KAPLAN HECKER & FINK LLP

**350 FIFTH AVENUE | 63ʳᵈ FLOOR**
**NEW YORK, NEW YORK 10118**

**1050 K STREET NW | SUITE 1040**
**WASHINGTON, DC 20001**

**TEL (212) 763-0883 | FAX (212) 564-0883**

**WWW.KAPLANHECKER.COM**

DIRECT DIAL        212.763.0883

DIRECT EMAIL        rkaplan@kaplanhecker.com

September 30, 2022

**VIA ECF**

The Honorable Lewis A. Kaplan
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

> *Re:* *Carroll v. Trump*, No. 20 Civ. 07311 (LAK) (JLC)

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll in opposition to Defendant Donald J. Trump's letter motion for a stay dated September 28, 2022. ECF 92. For the reasons below, we believe the motion should be denied.

> ***Defendant seeks to unilaterally reap the benefits of discovery by invoking an appeal that has been pending for twenty months.*** Defendant claims that discovery should be stayed because there is a "case-dispositive" appeal pending. But that has been true since November 2020, and current circumstances are not materially different now that the scope-of-employment issue has been certified to the D.C. Court of Appeals. In that time, Defendant has not hesitated to litigate in pursuit of his own advantage. On December 1, 2021, he moved to expand the scope of this action by adding an anti-SLAPP counterclaim against Plaintiff. ECF 59. And on April 1, 2022, after the Court denied that motion, Defendant affirmatively proposed to Plaintiff (and Plaintiff agreed) that the parties resume discovery. ECF 75. On May 5, the parties *jointly* stipulated to a schedule, which the Court adopted that same day. ECF 75-1, 76. Once again, all of this occurred while Defendant knew that a "case-dispositive" appeal was pending. *See* Letter from A. Habba, *Carroll v. Trump*, No. 20-3977 (2d Cir. July 20, 2022) (informing Second Circuit of ongoing discovery and acknowledging that "issues raised in this appeal are dispositive as to the underlying case").

Moreover, Defendant has spent four months taking advantage of the very discovery process that he set in motion. He has obtained 30,469 pages of records from Plaintiff, obtained hundreds more pursuant to nonparty subpoenas, obtained 19 substantive interrogatory responses, and recently deposed a key nonparty witness. In contrast, Defendant produced just *eight* documents and four incomplete interrogatory responses; he otherwise stonewalled every document request and interrogatory, refused to turn over basic information about witnesses required by Local Civil

KAPLAN HECKER & FINK LLP                                                                        2

Rule 26.3(c)(3),[1] and violated every deadline that applied to his discovery responses without any credible excuse for his failure. Throughout, Defendant has objected to discovery requests on the ground that it was "more practical" to obtain the information Plaintiff seeks at "a deposition"—and so Plaintiff finally had to schedule Defendant's deposition for the first half of October.[2]

Now that Defendant has benefited substantially from a discovery process that he actively set in motion—and now that he faces the prospect of his own deposition, having stonewalled every other discovery mechanism—he suddenly says that the continued pendency of a "case-dispositive" appeal changes everything. Nonsense. The Second Circuit's ruling changed hardly anything: it left open the ultimate question that has been on appeal for twenty months—namely, whether the United States should have been substituted for Defendant. Defendant initiated discovery while the scope-of-employment question was on appeal, he sought to add a counterclaim while it was on appeal, and he obtained documents and testimony while it was on appeal. He should not be permitted to assert at the last minute that he is entitled to avoid a deposition because it remains on appeal.

***The argument that the Second Circuit decision requires substitution and a stay is both self-defeating and legally flawed.*** Defendant does not address any of the factors that a party typically must satisfy to obtain a stay. *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). Instead, he principally argues that because the Second Circuit vacated this Court's scope-of-employment decision and certified the scope-of-employment question to the D.C. Court of Appeals, the United States is now the proper defendant in this case. ECF 92 at 1–2.

As an initial matter, if Defendant were correct that the United States is now the defendant, then he would lack standing to seek a stay. Where a person "is not a party to [a] civil action," that person "does not have standing to move for a stay." *Doe v. Indyke*, No. 20 Civ. 00484, 2020 WL 5518384, at *2 (S.D.N.Y. Sept. 14, 2020). If the Court were to hold that the Second Circuit's decision somehow resulted in substitution of the United States, and if a party at that point were to seek a stay of proceedings, a different set of issues would arise. But for now, there is no basis for Defendant to seek both substitution and a stay of all proceedings in the case.

More fundamentally, Defendant is mistaken that substitution must occur "[b]y virtue of the Second Circuit's Decision." ECF 92 at 1. Although the language of the Westfall Act refers to what "shall" happen "[u]pon certification" by the Attorney General, 28 U.S.C. § 2679(d)(2), that language does not leave judges with the sole job of "rubber-stamp[ing]" the Attorney General's scope-of-employment certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429, 115 S. Ct. 2227, 2234 (1995). In holding that such certifications are subject to judicial review, the

---

[1] For example, Defendant identified his son-in-law Jared Kushner as one of only six people with whom Defendant has purportedly ever spoken about Plaintiff or this action. We have requested the address and employer of Mr. Kushner and the other five witnesses—information that Defendant must disclose under Local Civil Rule 26.3(c)(3)—on six occasions since August 23. Defendant's counsel have repeatedly dodged our request, writing recently that they "have reached out to the appropriate parties and are still working to obtain this information."

[2] The current schedule for confirmed depositions is as follows: Plaintiff's deposition of Cande Carroll (October 4), Plaintiff's deposition of Stephanie Grisham (October 6), Plaintiff's deposition of Roberta Myers (October 12), Defendant's deposition of Carol Martin (October 12), Plaintiff's deposition of Jessica Leeds (October 13), Plaintiff's deposition of Natasha Stoynoff (October 13), Defendant's deposition of Plaintiff (October 14), and Plaintiff's deposition of Defendant (October 19).

KAPLAN HECKER & FINK LLP

Supreme Court disagreed that "[u]pon certification . . . the United States would automatically become the defendant." *Id.* In so ruling, the Supreme Court emphasized that "shall" does not always mean "must," and it sometimes means "should, will, or even may." *Id.* at 432 n.9. Accounting for statutory text and purpose, the Supreme Court held that certification "does not conclusively establish as correct the substitution of the United States as defendant." *Id.* at 434.

Indeed, many cases (including several cited by Defendant on appeal) demonstrate that when certification is contested, it occurs *after* the United States prevails on a motion to substitute. In *Council on American Islamic Relations v. Ballenger*, for example, the D.C. Circuit stated that "[o]*nce a court determines* that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act." 444 F.3d 659, 662 (D.C. Cir. 2006) (emphasis added). The D.C. Circuit similarly explained in *Wuterich v. Murtha* that "*where a plaintiff fails* to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit." 562 F.3d 375, 381 (D.C. Cir. 2009) (emphasis added).

Tellingly, the United States followed that exact procedure here. On September 8, 2020, the United States filed a motion requesting "an order substituting the United States as defendant for President Donald J. Trump." ECF 3 at 1. It reiterated its "request[]" in its reply, ECF 21 at 15, and, in seeking adjournment of oral argument, referred to its "pending motion to substitute," ECF 25.[3] In Defendant's view, the United States never had to file any motion at all, and apparently seasoned Department of Justice lawyers misunderstood Westfall Act procedure. But the record is clear: the United States still has not obtained the relief it expressly requested, and the Second Circuit has not resolved the motion in its favor. Instead, it vacated (rather than reversed) this Court's ruling on the United States' motion to substitute, which at most reverts the status of that motion to "pending." *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 424 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (upon vacatur of original decision, issues raised by underling motion remained to be decided). In these circumstances, the United States has not been substituted in lieu of Defendant.

The language that Defendant quotes from *Osborn v. Haley*, 549 U.S. 225, 127 S. Ct. 881 (2007), is not to the contrary. *See* ECF 92 at 2. *Osborn* concerned whether certification is proper when a federal officer denies the occurrence of the allegedly tortious conduct. *Id.* at 231. Although the Court stated that the United States remained the defendant "unless and until the District Court determines that the employee, *in fact*, . . . engaged in conduct beyond the scope of his employment," the Court was a drawing contrast with a situation in which the employee "simply as alleged by the plaintiff" engaged in such conduct. *Id.* In other words, the Court was focused on what it took to rebut the certification as an evidentiary matter, and it did not depart from its reasoning in *Gutierrez* (discussed above). *Accord Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017) (quoting *Osborn* in stating that certification "constitutes '*prima facie* evidence'").

---

[3] The United States and Defendant presented the same account on appeal. *E.g.*, U.S. Appellate Br. at 2 ("The district court rejected the United States' motion to be substituted as the defendant."); *id.* at 3 ("[T]he United States filed . . . a motion to have the United States substituted as the sole defendant."); *id.* at 23 ("In its opening motion papers, the United States sought substitution . . . ."); *id.* at 24 ("[T]he relevant claim is that the United Sates should properly be substituted . . . ."); Trump Appellate Br. at 2 ("[T]he United States moved in the District Court to substitute . . . ."); *id.* at 3 ("[T]he United States . . . filed a motion in that court to substitute the United States as defendant.").

KAPLAN HECKER & FINK LLP

***The traditional stay factors cut strongly against a stay.*** Defendant argues that because the D.C. Court of Appeals' "forthcoming ruling will be case-dispositive," it would be "highly prejudicial and inequitable for Defendant to engage in time-consuming and expensive pre-trial preparation—much less proceed to trial—until this issue has been conclusively resolved." ECF 92 at 2. That argument echoes many of the points that Defendant raised in his first motion to stay, which this Court denied, and for which Defendant did not seek reconsideration. ECF 47, 56; Text Order dated Sept. 15, 2021. Moreover, as explained above, it would be inequitable for Defendant now to obtain a stay based on the pendency of the same case-dispositive appeal that has been pending throughout his own efforts to add a counterclaim and engage in substantial discovery practice. A mere change in venue to D.C. for that ongoing appeal does not explain—and certainly does not justify—Defendant's about-face on whether discovery should continue while the appellate process unfolds.

The impracticality of cutting off discovery now that Defendant finally faces the prospect of satisfying his discovery obligations is only heightened by one more consideration: the relevance of the discovery here to the Adult Survivors Act case that Plaintiff will file in November. *See* ECF 89. The underlying dispute in both cases encompasses a single core disagreement—did Defendant sexually assault Plaintiff—and Defendant will have to testify under oath about his actions either way. To assuage concerns about duplicative discovery, and to the extent it wasn't already clear, Plaintiff agrees that any depositions in the present action may be used for Plaintiff's forthcoming action, thereby promoting efficiency and obviating the need for do-overs.

\*     \*     \*

This case began on November 4, 2019, and it could hardly be clearer that Defendant hopes to "run out the clock" until he is elected president again. Defendant's motion to stay represents more of the same delay tactics he has long used, *see* ECF 16 at 7–8—and reflects his broader pattern of contorting the law and facts to avoid any legal repercussions for his misconduct. It also reflects his continued bad faith. Indeed, even as Defendant's lawyers insisted in this case that "Presidents plainly are employees of the Government," Trump Appellate Br. at 6, his lawyers told the Justice Department on May 25, 2022, that he could not face criminal liability for misappropriating classified documents to Mar-a-Lago because "an element of this offense . . . is that the accused is 'an officer, employee, contractor, or consultant of the United States" and "[t]he President is none of these," Ex. 1 to Unsealed Search Warrant at 2, *In re: Sealed Search Warrant*, No. 22 M.J. 8332 (S.D. Fla. Aug. 26, 2022), ECF 102-1. To hear Defendant tell it, he acted as an employee of the government in retaliating against Plaintiff for revealing that he had raped her decades earlier, and in declaring that she was too ugly to rape, but he could not possibly have been an employee of the government when he absconded from the White House with national security secrets.

Defendant's inconsistencies continue here. He cannot seek a stay based on a theory of substitution that would deprive him of standing to argue for a stay in the first place. He cannot obtain automatic substitution of the United States when the very cases he has previously cited describe a very different order of operations. And he cannot rely on the pendency of an appeal to block any further discovery when he has aggressively pursued counterclaims, document requests, and depositions during the pendency of that very same appeal.

KAPLAN HECKER & FINK LLP                                    5

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record

# EXHIBIT 15



Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

September 28, 2022

**VIA ECF**
The Honorable Lewis A. Kaplan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

  *Re:*   *Carroll v. Trump*
     Civil Case No.: 1:20-cv-7311-LAK-JLC

Dear Judge Kaplan:

  This office represents the defendant, former President Donald J. Trump ("Defendant"), in the above-referenced action. By way of this letter, I respectfully request that this Honorable Court substitute the United States as the defendant in this action and immediately stay all proceedings.

  On September 27, 2022, the Second Circuit rendered a decision (the "Decision") (*see* ECF No. 91), which reversed in part and vacated in part this Court's October 27, 2020 Opinion and Order (the "Order") (*see* ECF No. 32) denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute as the defendant in the place of Defendant Trump. Specifically, the Decision held that "the President is an employee of the government under the Westfall Act" and certified the question of whether Defendant acted within the scope of his employment when he publicly repudiated the allegations made by the plaintiff, E. Jean Carroll ("Plaintiff"), to the D.C. Court of Appeals. *See* Decision at 33.

  By virtue of the Second Circuit's Decision, the United States must be substituted as the defendant in the instant action pending resolution of the proceedings before the D.C. Court of Appeals. The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). To invoke the Westfall Act, the Attorney General (or his delegate) must certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Upon such certification, the statute expressly dictates that "any civil action or proceeding commenced upon such claim in a United States district court ***shall be deemed an action against the United States*** under the provisions of this title and all references thereto, and the ***United States shall be substituted as the party defendant***." *Id.* (emphasis added).

Here, on September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General that Defendant was acting within the scope of his office as President of the United States as the time of the alleged conduct. *See* ECF No. 6, Ex. B. Given that the Second Circuit has confirmed that Defendant is indeed an employee of the government for the purposes of the Westfall Act, the United States must automatically be "substituted as the party defendant" in this case. *Id.* This substitution is not discretionary; it occurs by operation of law. *See e.g., Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) ("Upon the Attorney General's certification, the federal employee is dismissed from the case and the United States is substituted as the defendant in place of the employee.") (citing 28 U.S.C. § 2679(d)(1)); *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990) ("Although . . . [the] scope certification is not dispositive for purposes of substitution, it indicates that the United States is substituted as an *automatic consequence* of the [Government's] certification.") (emphasis added). Indeed, "[t]he United States . . . must remain the federal defendant in the action **unless and until** the [court] determines that the employee, in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley,* 549 U.S. 225 231 (2007) (emphasis added). Therefore, the United States must be deemed, and remain, the defendant in the instant action—effectively staying all proceedings—until the scope of employment issue is resolved by the D.C. Court of Appeals.

Moreover, the D.C. Court of Appeals' forthcoming ruling will be case-dispositive and, therefore, it would be highly prejudicial and inequitable for Defendant to engage in time-consuming and expensive pre-trial preparation—much less proceed to trial—until this issue has been conclusively resolved. *See Behrens v. Pelletier*, 516 U.S. 299, 308, 116 S. Ct. 834, 839 (1996) (immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery'" (emphasis in original)). As the Second Circuit properly stated, "[t]he FTCA, expressly, does not waive the sovereign immunity of the United States for the tort of defamation, *see* 28 U.S.C. § 2680(h) . . . *[s]o substituting the United States in place of Trump means the failure of Carroll's defamation lawsuit. See* Decision at 18 (emphasis added). Indeed, the "core purpose" of the Westfall Act "is to relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders." *Osborn*, 549 U.S. at 252; *see also, e.g., Mitchell v. Carlson*, 896 F.2d 128, 133 (5th Cir. 1990) (Westfall immunity encompasses the right to avoid the "burden[s] of defending a suit"). Here, as with other immunity contexts, "if the defendant is correct that it has immunity, its right to be free of litigation is compromised, and lost to a degree, if the district court proceeds while the appeal is pending." *Goshtasby v. Bd. of Trs.*, 123 F.3d 427, 428 (7th Cir. 1997*); see also, e.g., Williams v. Brooks*, 996 F.2d 728, 730 n.2 (5th Cir. 1993) (immunity "'is effectively lost' if a case is erroneously permitted to proceed at the district court level while an interlocutory appeal of a denial of immunity is pending.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985*); In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) (Sweet, J.) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting argument that divestiture is not automatic in the qualified immunity context); *Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

For the foregoing reasons, it is respectfully requested that this Court substitute the United States as the sole defendant in this action and immediately stay all proceedings pending resolution of the D.C. Court of Appeal's case-dispositive determination on the scope of employment issue.

Respectfully submitted,

Alina Habba, Esq.
For HABBA MADAIO & ASSOCIATES LLP

cc: All Counsel of Record (via ECF)

# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                             Plaintiff,

         -against-                              20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY** FILED
**DOC #:** _____
**DATE FILED:** 10/12/2022

**MEMORANDUM OPINION**

Appearances:

        Roberta Kaplan
        Joshua Matz
        Shawn Crowley
        Matthew Craig
        KAPLAN HECKER & FINK LLP
        *Attorneys for Plaintiff*

        Alina Habba
        HABBA MADAIO & ASSOCIATES LLP
        *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        This is a defamation action against Donald J. Trump. The question whether Mr. Trump defamed the plaintiff depends largely upon whether Mr. Trump, as plaintiff claims, raped her in a department store fitting room. The matter is before the Court on a motion by Mr. Trump to substitute the United States for him as the defendant and to stay the action. A previous motion

by the United States to substitute itself for Mr. Trump was denied, so this is a second bite at that apple.

*Facts*

As this Court previously has observed, Mr. Trump has litigated this case since it began in 2019 with the effect and probably the purpose of delaying it.[1] Among the actions with this effect was this. After litigating the case in the state court for almost a year without any suggestion that the government of the United States had anything whatever to do with it, Mr. Trump "reportedly instructed William Barr, then [Mr. Trump's appointee as] Attorney General, to cause the United States to intervene and remove the case to this Court under the Westfall Act."[2] The Department of Justice ("DOJ") then moved "to substitute the United States as the defendant in place of Mr. Trump."[3] It did so on the basis of a DOJ certification (the "DOJ Certification") that (1) then President Trump was an "employee" of the United States as defined in the Westfall Act, and (2) the conduct of which the plaintiff complained was within the scope of that employment. Under the relevant statute, the DOJ certification "conclusively establish[es] scope of employment *for purposes of removal*"[4] – i.e., only for the purpose of effecting transfer of such a case from a state to a federal

---

[1]      *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2022 WL 748128, at *8-10 (S.D.N.Y. Mar. 11, 2022).

[2]      *Id.* at *9 & n.75.

[3]      *Id.* at *9.

[4]      28 U.S.C. § 2679(d)(2) (emphasis added).

court. The legal correctness of the DOJ Certification was and remains subject to judicial review and ultimate determination of the courts.

This Court denied the government's motion to substitute on two independent grounds. First, it held that Mr. Trump was not an "employee" of the United States within the meaning of the Westfall Act, a prerequisite to the substitution sought by the government. Second, even if he were such an "employee," the alleged defamation was not committed within the scope of his employment – also a prerequisite to that substitution.[5] Neither Mr. Trump nor DOJ suggested that the DOJ Certification *ipso facto* substituted the United States for Mr. Trump as the defendant.

Both the government and Mr. Trump appealed from that ruling. Neither contended before the Court of Appeals that the DOJ Certification *ipso facto* substituted the United States for Mr. Trump as the defendant. Mr. Trump, but not the government, moved in this Court for a stay pending appeal, but did not make the *ipso facto* substitution argument. That motion was denied on September 15, 2021.[6] Mr. Trump did not seek a stay from the Court of Appeals.

Since the denial of the government's substitution motion, this action has proceeded for more than a year without any claim that the government was substituted for Mr. Trump as the defendant simply by fact that the DOJ filed the DOJ Certification. For example:

---

[5] *See Carroll v. Trump*, 498 F. Supp.3d 422 (S.D.N.Y. 2020).

[6] Dkt. 56. All docket citations are to 20-cv-7311 (LAK) unless otherwise specified.

4

- Mr. Trump, in his individual capacity, caused his private attorneys to move, unsuccessfully, for leave to amend to assert a so-called SLAPP counterclaim against the plaintiff.[7]

- Mr. Trump, in his individual capacity, stipulated to a scheduling order pursuant to which he and his adversary obligated themselves, *inter alia*, to complete all depositions and fact discovery by agreed and court-ordered dates.[8]

- Mr. Trump, in his individual capacity, made no objection to the Court setting the case for trial, unless it were disposed of previously, for February 6, 2023.

These and other actions by Mr. Trump all were flatly inconsistent with any suggestion that the United States had been substituted as the party defendant. *If the DOJ Certification had the effect he now claims, Mr. Trump no longer was a party to this case and had no standing to do any of those things.*

On September 27, 2022, a divided panel of the Court of Appeals reversed this Court's holding that the president of the United States is not an "employee" of the government under the Westfall Act. While the Circuit vacated this Court's holding that Mr. Trump had not acted within the scope of employment, it did not do so on the merits. Instead, it certified that question to the Court of Appeals of the District of Columbia (the "D.C. Court of Appeals"), as the scope of

---

[7]

Dkt. 63 (mtn.); *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2022 WL 748128 (S.D.N.Y. Mar. 11, 2022).

[8]

Dkt. 76.

employment issue is governed by the local law of the District.[9] The question whether this Court's scope of employment holding was correct therefore remains open.

On the following day – 22 days before Mr. Trump's scheduled deposition in this case – Mr. Trump abruptly reversed course. He moved before this Court to substitute the United States as defendant and immediately stay all proceedings in light of the Court of Appeals' decision.[10] He now claims that the DOJ Certification, in and of itself, substituted the government for Mr. Trump as the defendant. He contends that this action – and certainly his deposition – should be stayed because the resolution of the scope of employment issue might result in dismissal of this case.

The premise upon which Mr. Trump's motion rests – that the DOJ Certification, in and of itself, substituted the government for Mr. Trump as the defendant – is inconsistent with Mr. Trump's own actions, the actions of the government, the statute upon which Mr. Trump relies, and the case law. He nevertheless asserts it with such certitude that he characterizes his adversary's contrary argument as "asinine."[11]

---

[9]      *See Carroll v. Trump*, ___ F.4th ___, 2022 WL 4475079 (2d Cir. Sept. 27, 2022).

[10]      Letter Mtn. to Substitute and Stay Proceedings [Dkt. 92], at 1.

     Defendant incorrectly persists in referring to the Court of Appeals' decision as "case dispositive." It is nothing of the sort. A case dispositive issue is one that will resolve a case, one way or the other, regardless of how it is decided. The Court of Appeals decision resolving the "employee" question was not "case dispositive" at least because the scope of employment question remains unresolved.

[11]      Reply [Dkt. 94], at 1.

     The Court will not tolerate by counsel such inappropriate language again.

6

*Discussion*

*A.     Substitution*

Mr. Trump contends that the Second Circuit's decision means that "the United States must automatically be substituted as the party defendant in this case."[12]   He relies on Section 2679(d)(1) of the Federal Tort Claims Act which, in relevant part, reads:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[13]

But he ignores Section 2679(d)(2) which, in relevant part, provides:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a State court shall be removed . . . to the [appropriate] district court of the United States . . . . Such action or proceeding shall be deemed to be an action . . . brought against the United States . . . , and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment *for purposes of removal.* "[14]

Taken as a whole, the statute makes clear that the DOJ Certification is conclusive only for purposes of removal and that it is subject to judicial review.

The consequences of reading the relevant provisions of the statute together are clear. As plaintiff responded to Mr. Trump's argument:

---

[12]

Dkt. 92, at 2 (internal quotation marks and citation omitted).

[13]

28 U.S.C. § 2679(d)(1).

[14]

*Id.* § 2679(d)(2) (emphasis added).

"Defendant is mistaken that substitution must occur '[b]y virtue of the Second Circuit's Decision.' ECF 92 at 1. Although the language of the Westfall Act refers to what 'shall' happen '[u]pon certification' by the Attorney General, 28 U.S.C. § 2679(d)(2), that language does not leave judges with the sole job of 'rubber-stamp[ing]' the Attorney General's scope-of-employment certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 [] (1995). In holding that such certifications are subject to judicial review, the Supreme Court disagreed that '[u]pon certification . . . the United States would automatically become the defendant.' *Id.* In so ruling, the Supreme Court emphasized that 'shall' [the word upon which Mr. Trump's entire argument depends] does not always mean 'must,' and it sometimes means 'should, will, or even may.' *Id.* at 432 n.9 [internal quotation marks omitted]. Accounting for statutory text and purpose, the Supreme Court held that certification 'does not conclusively establish as correct the substitution of the United States as defendant.' *Id.* at 434.

"Indeed, many cases (including several cited by Defendant on appeal) demonstrate that when certification is contested, it occurs *after* the United States prevails on a motion to substitute. In *Council on American Islamic Relations v. Ballenger*, for example, the D.C. Circuit stated that '*[o]nce a court determines* that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act.' 444 F.3d 659, 662 (D.C. Cir. 2006) (emphasis added). The D.C. Circuit similarly explained in *Wuterich v. Murtha* that '*where a plaintiff fails* to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit.' 562 F.3d 375, 381 (D.C. Cir. 2009) (emphasis added).

"Tellingly, the United States followed that exact procedure here. On September 8, 2020, the United States filed a motion requesting 'an order substituting the United States as defendant for President Donald J. Trump.' ECF 3 at 1. It reiterated its 'request[]' in its reply, ECF 21 at 15, and, in seeking adjournment of oral argument, referred to its 'pending motion to substitute,' ECF 25. In Defendant's view, the United States never had to file any motion at all, and apparently seasoned Department of Justice lawyers misunderstood Westfall Act procedure. But the record is clear: the United States still has not obtained the relief it expressly requested, and the Second Circuit has not resolved the motion in its favor. Instead, it vacated (rather than reversed) this Court's ruling on the United States'[s] motion to substitute, which at most reverts the status of that motion to 'pending.' *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 424 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (upon vacatur of original decision, issues raised by underl[y]ing

8

motion remained to be decided). In these circumstances, the United States has not been substituted in lieu of Defendant."[15]

Plaintiff's argument is correct. At least where, as here, the correctness of a DOJ certification is disputed, the government need not be substituted for Mr. Trump unless *two* conditions are satisfied, viz. that the courts hold that defendant was an employee of the government and he is found to have acted within the scope of that employment.

The Second Circuit recently concluded that the answer to the first question in this case is "yes."[16] But it did not resolve the second question, certifying it instead for decision by the D.C. Court of Appeals because "the District's law regarding vicarious liability is sufficiently unclear that [the Second Circuit is] unable to predict with any confidence how the District's highest court . . . would resolve this issue."[17] The D.C. Court of Appeals may refuse to accept the certification, in which case the question would return to the Second Circuit for decision. It may decide the question, one way or another.[18] How the question ultimately will be resolved remains unknown. In the meantime, substitution would be premature, as judicial review of the DOJ Certification has not concluded.

Mr. Trump nevertheless quibbles with the procedure through which the Court took up the substitution issue when this case was removed to federal court. He now – for the first time

---

[15]  Opp. [Dkt. 93], at 2-3.

[16]  Of course, even that decision is subject to the possibility of review.

[17]  *Carroll*, 2022 WL 4475079, at *6.

[18]  It conceivably might conclude that the scope of employment issue raises issues of fact requiring further district court proceedings.

9

– contends that the United States automatically was substituted as the party defendant on a "provisional" basis by virtue of the DOJ Certification. If the courts ultimately were to decide that he did not act within the scope of his employment, Mr. Trump then should be "resubstituted" as the defendant for the United States.[19]

To be sure, Mr. Trump has identified at least one case in which a district court apparently followed such a procedure.[20] But the appellate decision in that case did not deal with the issue. Moreover, as explained by plaintiff in the passage quoted above, the United States here did not argue that it already had been substituted, provisionally or otherwise, for Mr. Trump. It instead made a motion to be substituted, a motion that required the Court's disposition.[21] Nor did it make an *ipso facto* substitution argument in its reply to plaintiff's opposition to its motion. Instead, it responded to the substance of plaintiff's arguments in opposition to substitution.[22] Mr. Trump took

---

[19]

Dkt. 94, at 2 (quoting *Aversa v. United States*, 99 F.3d 1200, 1208 (1st Cir. 1996)).

[20]

In that case, *Aversa v. United States*, the First Circuit reviewed *de novo* the district court's scope of employment determination. 99 F.3d at 1210. It observed that the district court had "provisionally substituted [the United States] as party defendant" and then permitted plaintiff to contest substitution with the aid of special discovery. *Id.* at 1206. The Circuit did not comment on the procedure beyond a conclusory reference to the potential for "the employee [to] be resubstituted" after judicial review. *Id.* at 1208. But the court's authority in support of the resubstitution mechanism is inapposite. The Circuit cited *Gutierrez de Martinez* but, in that very case – which stands for the proposition that scope of employment certification must be subject to judicial review – the Supreme Court noted that, "to avoid the consequences of *unrecallable substitution of the United States as the party defendant*, petitioners asked the District Court to review certification." 515 U.S. at 422 (emphasis added). In *Gutierrez de Martinez* of course, as in this case, substitution likely would "cause the demise of the action" because the claims at issue "fell within an exception to the FTCA's waiver of . . . sovereign immunity." *Id.*

[21]

Dkt. 3.

[22]

Reply in Support of Mtn. to Substitute [Dkt. 21].

10

no issue with the government's position or with the Court's determination that the government's motion required the Court's leave for substitution of the United States for the defendant. As noted, neither the United States nor Mr. Trump made such an argument on appeal.[23]

In all the circumstances, the Court concludes that Mr. Trump's argument that the government automatically was substituted for him as the defendant in this case, or even now must be substituted for him, simply by virtue of the DOJ Certification is incorrect. Moreover, even if there were greater merit to his substantive contention, it would not lie with him to advance that argument in the unusual circumstances of this case.

B.    *Stay of Proceedings*

Next, defendant urges the Court to issue an immediate stay of the proceedings for the principal reason that "a dispositive issue" – namely, whether defendant was acting within the scope of his employment – "remains pending and unresolved before the D.C. Court of Appeals . . . ."[24] In so doing, he does not directly address the standard that governs this application.

In general, the question whether to stay proceedings is addressed to the trial court's discretion:

> "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for the litigants. How this can best be done calls for the

---

[23]

    *See* No. 20-3977, Dkts. 45 (Brief of Appellant United States of America), 48 (Brief and Special Appendix for Defendant-Appellant [Donald J. Trump]).

[24]

    Dkt. 94, at 4.

11

exercise of judgment, which must weigh competing interests and maintain an even balance."[25]

In this case, the factors relevant to the grant or denial of a motion for a stay pending appeal provide guidance as to relevant considerations. In ruling on such an application, a court considers four "well known" factors "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[26] Read generously, defendant contends that he would be injured irreparably – through completing discovery and conceivably an eventual trial – unless the Court stays the proceedings. We consider each factor in turn.

First, Mr. Trump has not shown the requisite strong likelihood of success. His bare assertion that "a dispositive issue remains pending"[27] is not a "strong showing that he is likely to succeed on the merits."[28] The question that has been certified to the D.C. Court of Appeals obviously could go either way, either in that forum or elsewhere. Indeed, the fact that the District of Columbia law on scope of employment was unclear to the Circuit is the precise reason that two members of the Circuit concluded that they could not predict how it would be resolved and therefore would not itself decide the entire appeal. And Mr. Trump has offered no reason for this Court to

---

[25]

     *Landis v. North Am. Corp.*, 299 U.S. 248, 254-55 (1936).

[26]

     *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[27]

     Dkt. 94, at 4.

[28]

     *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170.

conclude that the D.C. Court of Appeals or the Second Circuit will rule in his favor on scope of employment. Indeed, as Mr. Trump is aware from my prior decision, my view is that he did not act within the scope of his employment within the meaning of the law of the District of Columbia.

The bulk of Mr. Trump's arguments that are relevant to the stay question go to the second relevant factor, whether he would suffer irreparable injury if a stay were denied. He contends that the Westfall Act protection extended to many government employees sued for actions within the scope of their employment is intended to protect covered employees from both liability and the burdens of defending lawsuits, including those associated with pretrial discovery and trial.[29] That of course is true. But it begs the question.

Westfall Act protection requires both that the individual in question have been an "employee" of the government, an issue on which Mr. Trump thus far as prevailed, and also that he have acted within the scope of his employment. The latter issue remains unresolved. If it were resolved in his favor, any proceedings from now until such a determination, those proceedings – subject to the important comments made below – might prove to have been unnecessary. But any threat of "injury" as a result of further proceedings depends entirely on whether Mr. Trump prevails on the scope of employment issue, which at this juncture cannot be said to be likely. So the threat of any injury is quite uncertain. And that uncertainty is magnified by view of other circumstances.

As an initial matter, discovery in this case has virtually concluded. Mr. Trump has conducted extensive discovery of the plaintiff, yet produced virtually none himself. The principal open items, as the Court understands it, are the depositions of Ms. Carroll and Mr. Trump, scheduled

---

[29] Dkt. 92, at 2 (collecting cases).

13

for October 14 and 19, respectively. Completing those depositions – which already have been delayed for years – would impose no undue burden on Mr. Trump, let alone any irreparable injury.

In any case, even Mr. Trump's contention that denial of a stay irreparably would injure what he characterizes as his immunity from suit – an "immunity" that would apply only if he prevails on the scope of employment – does not remedy the failure to show a meaningful threat of irreparable injury.

In *In re World Trade Center Disaster Site Litigation*, the Second Circuit held that the prospect that "any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit" was to be balanced against the other factors under consideration.[30] And, in that case, the Court of Appeals vacated the stay of proceedings in the district court pending appeal in light of its conclusions on the other factors and their relevant weights.[31]

Given his conduct so far in this case, Mr. Trump's position regarding the burdens of discovery is inexcusable. On December 10, 2020, he moved for a stay pending appeal.[32] His arguments then in support of that motion were almost identical to those advanced here. This Court denied the motion on September 15, 2021.[33] And since that motion was denied, he has taken discovery against plaintiff when the circumstances were not materially different.

---

[30]

*In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170.

[31]

*Id.* at 171.

[32]

Letter Mtn. for Stay [Dkt. 47].

[33]

Text Order [Dkt. 56] (denying without prejudice defendant's motion for stay).

14

Third, a stay would cause substantial injury to plaintiff. As the Court noted in an earlier opinion in this case, "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him."[34] Delay is a more serious concern in this case than usual for several reasons. First, the appeal from my order denying substitution already has consumed 20 months from the day it was noticed and it is not over yet. The remaining question has been certified to the D.C. Court of Appeals, a process that reasonably may be expected to be lengthy. Perhaps most significant, both plaintiff and defendant – and perhaps other witnesses – already are of advanced age. The defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.

Finally, as noted at the outset, plaintiff claims that the defendant raped her years ago. As the statute of limitations had long since expired when she brought this action, the claim she asserts here is that which still was timely when this case was filed – a claim for defamation that allegedly occurred in the context of Mr. Trump's far more recent denial that he raped the plaintiff. That was the only remaining timely claim. But the world has changed since this case began.

New York has enacted a revival statute, the Adult Survivors Act. Effective November 24, 2022, a claim for damages for the alleged rape will be revived, free of the existing bar of the statute of limitations. And plaintiff intends to sue Mr. Trump for the alleged rape itself.

---

[34] *Carroll v. Trump*, 2022 WL 748128, at *10.

15

The question whether Mr. Trump in fact raped Ms. Carroll is central to this case.[35] But it will be central also to the new case that almost certainly will be filed on November 24, 2022 or soon thereafter. Accordingly, discovery and evidence relating to whether or not the alleged rape occurred is relevant to both cases. Mr. Trump has pointed to no discovery or other proceedings that would occur in this case absent a stay that would not be relevant also to the imminent new case.

Mr. Trump argues that the Court should not consider the imminent new case in its analysis because plaintiff "has no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."[36] But the argument, in this context, is both incorrect and beside the point. It is incorrect because calling the imminent new case a "new claim" blinks reality. The question whether Mr. Trump raped Ms. Carroll is the paramount issue in both cases. And it is beside the point because discovery here would not "develop" evidence for a "new claim," even if the anticipated suit for damages for the alleged rape properly were so characterized, because the discovery that would occur here would go directly to the claim in *this* case. Staying discovery in this case on the ground that it might be of use in a future litigation would make no sense.

---

[35]     *Carroll*, 498 F. Supp. 3d at 426.

[36]     Dkt 94, at 4.

16

For all of the foregoing reasons, Mr. Trump has not established that he has a strong likelihood of success.  In any event, the balance of the equities tips decidedly against him.

*Conclusion*

The defendant's letter motion [Dkt. 92] is denied.

SO ORDERED.

Dated: October 12, 2022

_____
Lewis A. Kaplan
United States District Judge

# EXHIBIT 17



Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

November 21, 2022

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

   Re: *E. Jean Carroll v. Donald J. Trump*
      *20 Civ. 07311 (LAK) (JLC)*

Dear Judge Kaplan:

   We write on behalf of the defendant, Donald J. Trump ("Defendant"), in response to the letter filed by the plaintiff, E. Jean Carroll ("Plaintiff") on November 17, 2022 (the "Letter") (ECF No. 98) with respect to the upcoming status conference scheduled to be held on November 22, 2022. While we appreciate Plaintiff's counsel's efforts to adjourn the trial date (and all related deadlines) to a later date in light of the expedited schedule set forth by the D.C. Court of Appeals, the proposal they offer constitutes a material departure from that which was originally agreed upon by the parties.

   By way of background, on November 10, 2022, this office advised Plaintiff's counsel that, pursuant to FRAP 8(a)(2), Defendant would move before the Second Circuit for an emergency stay of proceedings pending appeal. In response, Plaintiff's counsel reached out to this office and requested a call to discuss the application and determine whether the matter could be resolved between the parties. Later that day, the parties had a call, wherein it was mutually agreed that a temporary delay of proceedings was appropriate pending a decision before the D.C. Court of Appeals. While Defendant had initially asked for a stay, Plaintiff stated that an adjournment would be preferable. Plaintiff's counsel's reasoning at the time was that she preferred an adjournment over a stay because it would forgo the additional, tedious filings needed to lift a stay. Accordingly, the parties agreed that all relevant deadlines in this action would be adjourned in one of two ways: (1) for the duration of time that the D.C. Court of Appeals' decision remains pending, to be reinstated upon the issuance of a decision; or (2) for a period of two-to-three months, which would be revisited if the D.C. Court of Appeals did not render a decision during that time. Importantly, Plaintiff's contemplated second action (the "Second Action")[1], which has yet to be filed, *was never mentioned on the call*.

   Rather than stipulate to a proposed schedule, Plaintiff's counsel proposed that the parties request a conference before Your Honor. Plaintiff's counsel represented that a conference was

---

[1] Plaintiff has previously stated that she intends to file a second action against Defendant under the Adult Survivor's Act.

necessary so that the parties could request that Your Honor approve the above-stated terms. Again, no mention was made of the Second Action or any dates relating to the Second Action. Given Plaintiff's counsel's representations, Defendant agreed, and the parties subsequently corresponded with the Court requesting the conference. Defendant also refrained from filing the emergency application to the Second Circuit.

Thereafter, on November 17, 2022, Plaintiff's counsel sent a proposed schedule to this office which, for the first time, proposed consolidating the instant matter with the Second Action. This office rejected that proposal, as it was never discussed, contemplated, or agreed to by Defendant, and instead proffered the following proposed dates which relate only to the within action:

| Deadline | Current Date | Proposed Date |
|---|---|---|
| Joint Pretrial Order and Any Summary Judgment Motions in Current Action | Dec. 1, 2022 | Mar. 2, 2023 |
| Motions in Limine in Current Action | Dec. 8, 2022 | Mar. 9, 2023 |
| Exchange of Pre-marked Trial Exhibits in Current Action | Dec. 8, 2022 | Mar. 9, 2023 |
| Oppositions to Motions in Limine in Current Action | Dec. 15, 2022 | Mar. 16, 2023 |
| Trial | Feb. 6, 2023 | May 8, 2023 |

Instead of responding to Defendant, Plaintiff's counsel proceeded to file the Letter and request this Court to ratify Plaintiff's proposed scheduling order, which was entirely inconsistent with the parties' agreement and had been expressly rejected by Defendant.

Plaintiff's proposal to join the two cases into one consolidated action with an expedited schedule is entirely inappropriate and wholly premature, especially here, given that the Second Action has not yet been filed, let alone served upon Defendant. Further, it is respectfully submitted that such action by the Plaintiff was made in bad faith, and clearly to expedite an action that has not been commenced.

Therefore, we respectfully ask that Your Honor instead accept Defendant's above proposal, which is far more appropriate given the procedural posture of this matter.

We thank the Court for its attention to this matter and await its guidance.

Respectfully submitted,

Alina Habba, Esq.
For HABBA MADAIO & ASSOCIATES LLP

# EXHIBIT 18

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
|      *Plaintiff,* | |
| v. | |
| DONALD J. TRUMP, | |
|      *Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF FACTS .............................................................................2

SUMMARY JUDGMENT STANDARD .......................................................2

ARGUMENT .................................................................................................3

    I.      ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFEMATION CLAIM .........3

          A.  The Evolution of Absolute Immunity Pre-*Nixon* .......................................5

          B.  *Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity......9

          C.  The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President .............................11

    II.     PLAINTIFF'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ......19

          A.  Plaintiff Has Failed to Establish Cognizable Damages ...........................20

               i.       The Statements Do Not Constitute Defamation *Per Se*. ...............20

               ii.      Plaintiff Cannot Establish Her Entitlement to Special Damages...24

          B.  Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of Statements .................................................28

          C.  The Vast Majority of the Statements are Nonactionable Opinions ..........31

    III.    THE EXTREME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED ................................................................................................34

CONCLUSION..............................................................................................35

# TABLE OF AUTHORITIES

***Cases***

*Aronson v. Wiersma,*

 65 N.Y.2d at 594, 493 N.Y.S.2d at 1008.................................................23

*Aslanidis v. United States Lines, Inc.,*

 7 F.3d 1067, 1072 (2d Cir. 1993). ........................................................3

*Barr v. Matteo,*

 360 U.S. 564, 79 S. Ct. 1335 (1959).................................................7, 8, 9

*Barret v. Harrington,*

 130 F.3d 246, 254-55 (6th Cir. 1997).................................................12

*Bradley v. Fisher,*

 80 U.S. 335, 20 L. Ed. 646 (1871).....................................................5, 6

*Brian v. Richardson,*

 87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 351 (1995).................................33

*Butz v. Economou,*

 438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)....................................5

*Cain v. Atelier Esthetique Inst. of Esthetics Inc.,*

 733 Fed.Appx. 8, 11 (2d Cir. 2018)...................................................19

*Camp v. Recreation Bd,*

 104 F. Supp. 10 (D.D.C. 1952)............................................................7

*Carroll v. Trump,*

 498 F.Supp.3d 422, 456 (S.D.N.Y. 2020) ...........................................13

*CBS v. FCC,*

 454 F.2d 1018, 1020 (D.C. Cir. 1971).................................................17

*Celle v. Filipino Reporter Enters,*

    209 F.3d 163, 179 (2d Cir. 2010) ...................................................................25, 27

*Celotex v. Catrett,*

    477 U.S. 317, 322 (1986)........................................................................................2

*Chastain v. Sundquist,*

    833 F.2d 311, 315 (D.C. Cir. 1987) ....................................................................11

*Church of Scientology Int'l v. Behar,*

    238 F.3d 168, 173-74 (2d Cir. 2001) ..............................................................19, 20

*Clinton v. Jones,*

    520 U.S. 681, 694 (1997)....................................................5, 9, 10, 11, 13, 17, 32

*Coleman v Grand,*

    18-CV-5663ENVRLM, 2021 WL 768167, at *9 [EDNY Feb. 26, 2021] ............................20

*Cooper v. O'Connor,*

    99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) .....................................7

*Coppola v. Bear Stearns & Co.,*

    499 F.3d 144, 148 (2d Cir. 2007) ..........................................................................2

*Council on American-Islamic Relations v. Ballenger,*

    444 F.3d 659, 662 (D.C. Cir. 2006)........................................................13, 15, 17

*Cruz v. Reiner,*

    11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) ........3

*Cummings v. City of N.Y.,*

    No. 19-cv-7723 (CM)(OTW), 2020 U.S. Dist. LEXIS 31572, at *62 (S.D.N.Y. Feb. 24, 2020)

    ....................................................................................................................34

*Dickson v. Slezak,*

    73 A.D.3d 1249, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) ....................................28

*District of Columbia v. Jones,*

    919 A.2d 604, 608-09 (D.C. 2007) ..........................................................14, 15, 16

*Doe v. French,*

    2012 WL 129836 (2d Cir. January 18, 2012) ......................................................32

*Drug Research Corp. v. Curtis Publ'g Co,*

    7 N.Y.2d 435, 441, 166 N.E.2d 319, 322 (1960)................................................26

*Dworin v. Deutsch,*

    2008 WL 508019, at *4 ..........................................................................33, 34, 35

*Elias v. Rolling Stone LLC,*

    872 F.3d 97, 104 (2d Cir. 2017) .........................................................................19

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst,*

    184 U.S. App. D.C. 397, 400, 566 F.2d 289, 292 (1977) ...................................16

*Ferri v. Ackerman,*

    444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979)..........................10

*Fowler v. New York Herald,*

    172 N.Y.S. 423 (1st Dep't 1918).........................................................................30

*Franklin v. Daily Holdings, Inc.,*

    21 N.Y.S.3d 6, 11-12, 135 A.D.3d 87, 93 (1st Dept. 2015)......................25, 26, 27

*Gentile v. Grand St. Med. Associates,*

    79 A.D.3d 1351, 1354, 911 N.Y.S.2d 743..........................................................35

*Goetz v. Kunstler,*

    625 N.Y.S.2d 447, 459 (Sup. Ct., New York Cty. 1995) ......................................35

*Golub v. Enquirer/Star Grp.,*

    89 N.Y.2d 1074, 1076 (1997) ................................................................22

*Gregoire v. Biddle,*

    177 F.2d 579 (2d Cir. 1949) ..................................................................7

*Gurtler v. Union Parts Mfg. Co., Inc.,*

    285 A.D. 643, 646 (1st Dep't 1955) .....................................................21

*Harlow v. Fitzgerald,*

    457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) ...............................4, 5

*Hobbs v. Imus,*

    266 A.D.2d, 36, 698 N.Y.S.2d 25 .........................................................32

*Huggins v. Povitch,*

    1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) ...................34, 35

*Immuno AG. v. Moor-Jankowski,*

    77 N.Y.2d 235, 254, 66 N.Y.S.2d 906, 917 (1991) ...............................33, 34

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.,*

    981 F. Supp. 124, 125, 128 (E.D.N.Y. 1997) .......................................36

*In re Grand Jury Proceedings,*

    5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) ...............................................18

*Jeffreys v. City of New York,*

    426 F.3d 549 (2d Cir. 2005) ..................................................................3

*Kane v. Orange Cty. Publ'ns,*

    232 A.D.2d 526, 527, (App. Div. 2nd Dept. 1996*)* ............................30

*Kforce, Inc. v. Alden Personnel, Inc.,*

    288 F.Supp.2d 513, 517 (S.D.N.Y. 2003) ........................................................22

*Klayman v. Obama,*

    125 F.Supp.3d 67, 86 (D.D.C. 2015) ............................................................12

*Knight v. U.S. Fire Ins. Co.,*

    804 F.2d 9, 12 (2d Cir. 1986) .........................................................................3

*Lang Sang v. Ming Hai,*

    951 F. Supp. 2d 504, 525 (S.D.N.Y. 2013) ...................................................26

*Laughlin v. Garnett,*

    138 F.2d 931 (D.C. Cir. 1943) ........................................................................7

*Laughlin v. Rosenman,*

    163 F.2d 838 (D.C. Cir. 1947) ........................................................................7

*Lerman v Flynt Distrib. Co., Inc.,*

    745 F2d 123, 136-137 [2d Cir 1984] ............................................................20

*Liberman v. Gelstein,*

    80 N.Y.2d 429, 435 (1992) .....................................................................21, 25

*Mahoney v. Adirondack Pub. Co.,*

    71 N.Y.2d 31, 37 (1987) ...............................................................................36

*Masson v. New Yorker Magazine, Inc.,*

    501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991)...................20

*Mandelblatt v. Perelman,*

    683 F. Supp. 379, 383 (S.D.N.Y. 1988) .......................................................28

*Matherson v. Marchello,*

    100 A.D.2d 233, 473 N.Y.S.2d 998 (2d Dept. 1984). ...................................26

*McDougal v Fox News Network, LLC,*

    No. 1:19-CV-11161 (MKV), 2020 WL 5731954 [S.D.N.Y. Sept. 24, 2020]). ......................20

*Mencher v. Chesley,*

    85 N.Y.S.2d 431 (N.Y. Sup. Ct. 1948) ...................................................................................30

*Mitchell v. Forsyth,*

    472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985) ....................................................................4

*Morsette v. "The Final Call,*

    309 A.D.2d 249, 254 (1st Dep't 2003) ...................................................................................36

*Moss v. Stockard,*

    580 A.2d 1011 (D.C. 1990*)* ....................................................................................................15

*Murphy v. Cadillac Rubber & Plastics, Inc.,*

    946 F. Supp. 1108, 1124 (W.D.N.Y. 1996) ...........................................................................25

*New York Times Co. v. Sullivan,*

    376 U.S. 254, 280, 84 S. Ct. 710 (1964 ................................................................................19

*Nixon v. Fitzgerald,*

    457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982) ................1, 3, 4, 5, 9, 10, 11, 12, 17, 18, 19

*Papagianakis v. The Samos,*

    186 F.2d 257 (4th Cir. 1950) ...................................................................................................7

*Perez v Violence Intervention Program,*

    116 AD3d 601, 601, 984 N.Y.S.2d 348 [1st Dept 2014] .......................................................20

*Pierson v. Ray,*

    386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967) ...............................................................4, 10

*Present v. Avon Products, Inc.,*

    253 A.D.2d 183, 189 (1st Dep't 1999) ...................................................................................36

*Preston v. Hobbs,*

    146 N.Y.S. 419 (1st Dep't 1914) ................................................................30

*Project Veritas v. NY Times citing Prozeralik v Capital Cities Communications, Inc,*

    82 NY2d 466, 474 [1993] ........................................................................19

*Prozeralik v. Capital Cities Commc'ns, Inc,*

    82 N.Y.2d 466, 479-80 (1993) ...................................................................36

*Puranmalka v. Puranmalka,*

    39 N.Y.S.2d 802, 803 (N.Y. App. Div. 1989) ..................................................28

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*

    813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ...............................................22, 25

*Rankin v. McPherson,*

    483 U.S. 378, 387 (1987) .........................................................................17

*Rappaport v. VV Pub. Corp.,*

    618 N.Y.S.2d 746, 751 (Sup. Ct., New York Cty. 1994) .....................................34

*Reynolds v. Pegler,*

    223 F.2d 429, 432 (2d Cir. 1955) ................................................................30

*Rickerson v. Porsch,*

    2019 NY Slip Op 50369(U), 63 Misc. 3d 1204(A), 114 N.Y.S.3d 184 (Sup. Ct.). ...............22

*Robertson v. Doe,*

    2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ...........................................36

*Robertson v. Dowbenko,*

    443 F. App'x 659 (2d Cir. 2011) .............................................................36, 37

*Rufeh v. Schwartz,*

    50 A.D.3d 1002, 1004-05 (2d Dep't 2008) .....................................................21

*Scott v. Harris*,

    550 U.S. 372, 380 (2007)..................................................................................3

*Sharratt v. Hickey*,

    20 A.D.3d 734, 736 (3d Dep't 2005)...............................................................27

*Shenkman v. O'Malley*,

    157 N.Y.S.2d 290, 297-98 (1st Dep't 1956).....................................................30

*Siegel v. Metropolitan Life Ins. Co.*,

    32 N.Y.S.2d 658 (1st Dep't 1942)...................................................................30

*Sleepy's LLC v Select Comfort Wholesale Corp.*,

    779 F3d 191, 199 (2d Cir 2015) ...........................................................28, 29, 30

*Snyder v. Phelps*,

    562 U.S. 443, 453 (2011)...............................................................................17

*Spalding v. Vilas*,

    161 U.S. 483, 16 S.Ct. 631 (1896)...............................................................6, 7

*Standard Nut Margarine Co. v. Mellon*,

    72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) ..............................7

*Steinhilber v. Alphonse*,

    68 N.Y.2d at 286, 508 N.Y.S.2d at 901......................................................32, 33

*Stepanov v. Dow Jones & Co.*,

    987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014) .....................................................19

*Stern v. Cosby*,

    645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) ...................................................21

*Tacopina v. Kerick*,

    14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) ...................21, 22

*Taylor v. Glotfelty,*

    201 F.2d 51 (6th Cir. 1952) ...........................................................................7

*Teichner v. Bellan,*

    181 N.Y.S.2d 842, 846 (App. Div. 1959).......................................................28

*Torain v. Liu,*

    279 Fed. App'x 46, 47 (2d Cir. 2008)......................................................33, 34

*Trump v. Hawaii,*

    138 S. Ct. 2392, 2417–18 (2018).................................................................17

*Trump v. Mazars USA, LLP,*

    140 S.Ct. 2019, 2034 (2020).......................................................................18

*Trump v. Vance,*

    140 S. Ct. 2412, 2425 ...........................................................................10, 13

*Van-Go Transp. Co. Inc. v. New York City Board of Education,*

    971 F. Supp. 90, 98 (E.D.N.Y. 1997) ..........................................................22

*Weiner v. Doubleday & Co.,*

    142 A.D.2d 100, 105 (1st Dep't 1988) ........................................................35

*Weinstock v. Columbia Univ.,*

    224 F.3d 33, 41 (2d Cir. 2000). ....................................................................2

*Wilson v. Libby,*

    535 F.3d 697 (D.C. Cir. 2008).....................................................................14

*Wuterich v. Murtha,*

    562 F.3d 375 (D.C. Cir. 2009) ...............................................................14, 32

*Yaselli v. Goff,*

    12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927)..................................7

*Zellner v. Summerlin,*

    494 F.3d 344, 371 (2d Cir. 2007) ............................................................3

*Zerman v. Sullivan & Cromwell,*

    677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) ..........................................34

## Statutes and Rules

Fed. R. Civ. P. 56 (c)(2)................................................................................2

Restatement (Second) of Torts, § 583........................................................28

Restatement (Second) of Torts § 892..........................................................28

Restatement (Second) of Torts § 594..........................................................30

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion for summary judgment against the plaintiff, E. Jean Carroll ("Plaintiff"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

At the heart of this case lies a singular question of paramount importance: should a sitting President have the right to address the public on matters of grave national importance without fear of being dragged into harassing and burdensome lawsuits? The answer to this question will reverberate well beyond the instant dispute.

This action, which sounds in a single claim for defamation, seeks to impute civil liability upon Donald J. Trump, then-sitting President of the United States, for statements he made in response to Plaintiff's serious accusations which had ignited a media frenzy and threatened to cast a shadow upon his moral standing. President Trump issued the challenged statements as a necessary measure to maintain the public's trust and assure the American people that the heinous allegations were not true. This scenario perfectly illustrates how the President is an "easily identifiable target for suits to civil damages" and why there "exists the greatest public interest" in providing [the President] 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Nixon v. Fitzgerald,* 457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982). Indeed, "because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and would be "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 751-52. Thus, given the vital considerations at stake, there is no question that Plaintiff's run-of-the-mill defamation suit does not merit upending

decades of Supreme Court precedent which has consistently emphasized the monumental importance of endowing the President with absolute immunity for his official conduct.

Even setting aside the question of absolute immunity, Plaintiff's defamation claim is deficient as a matter of law and this Court should grant summary judgment in Defendant's favor for three additional reasons. *First*, the alleged defamatory statements were not targeted towards Plaintiff's professional competence and, therefore, are not defamatory *per se*. Since Plaintiff has also failed to substantiate any entitlement to special damages, her defamation claim fails as a matter of law because she has failed to establish any form of cognizable damages. *Second,* Plaintiff intentionally solicited the allegedly defamatory statements by levying heinous (and false) allegations against a sitting President, in a profoundly public manner, thereby necessitating him to issue a public denial. *Third*, the majority of Defendant's statements do not even qualify as defamation in a substantive respect, but instead are largely comprised of non-actionable opinion.

Therefore, this Court should grant summary judgment in Defendant's favor.

## STATEMENT OF FACTS

Pursuant to Local Civil Rule 56.1, the uncontested material facts relevant to this motion are set forth in Defendant's Statement of Uncontested Facts ("DSOF").

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to isolate and terminate claims that are factually unsupported so as to avoid costly and unnecessary trials. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). As such, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). In that regard, a particular fact will be deemed "material" only if

its existence or non-existence would "affect the outcome of the suit under governing law." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation and internal quotations omitted). Likewise, an issue will only be considered "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 148 (citation and internal quotations omitted). Thus, for factual issues to be considered genuine, they must have a real basis in the record. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). "The requirement of detecting a genuine issue of fact finds substance in the principle that despite some evidence in opposition to a summary judgment motion, if 'no reasonable jury could have believed' the opponent's version of the events, summary judgment is appropriate." *Cruz v. Reiner*, 11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1775 (2007)).

In order to withstand a motion for summary judgment, the plaintiff must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with specific and admissible evidence showing a genuine issue for trial on each element of her claim. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## ARGUMENT

## I. ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFAMATION CLAIM

It is blackletter law that a President is "entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749. This wide-spanning, unqualified immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.; see also Mitchell v.*

*Forsyth,* 472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability."). It is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision making from second guessing by the courts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or adjudicative functions, and the President); *Mitchell*, 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Presidential immunity serves a vital function for the office of the presidency. Since the President is an "easily identifiable target for suits for civil damages" due to the "visibility of his office and the effect of his actions on countless people," there "exists the greatest public interest in providing [him] 'the maximum ability to deal fearlessly and impartially with' the duties of his office," *Nixon*, 457 U.S. at 751. Indeed, this protection benefits not only the President, but the nation as a whole, since "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and "could distract a President from his public duties." *Id.* at 752. By granting immunity for a President's official acts, he is able to function with "bold and unhesitating action." *Id.* at 744–45; *see also Pierson v. Ray,* 386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials).

Presidential immunity is rooted in the historical doctrine of absolute immunity, which recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727 (1982) (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)). As the doctrine has evolved over time, the Supreme Court has emphasized that the policy considerations underlying absolute immunity apply with special force to the President, who is the quintessential official "whose special functions or constitutional status requires complete protection from suit." *Harlow*, 457 U.S. 800 at 807. Thus, the Supreme Court has broadly applied absolute immunity to foreclose civil suits against the President in his individual capacity and has clarified that the protection extends to any and all "acts within the 'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 755; *see also Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997) ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

## A. The Evolution of Absolute Immunity Pre-*Nixon*

As early as 1871, in *Bradley v. Fisher*, 80 U.S. 335, 20 L. Ed. 646 (1871), the Supreme Court recognized that public policy considerations weighed in favor of providing absolute immunity to public officials for actions taken within the scope of their official duties. In *Bradley*, a trial judge had disbarred an attorney who represented an alleged co-conspirator in the plot to assassinate President Lincoln. *Id.* at 342. The attorney sued the judge in question, arguing that the disbarment was malicious. *Id*. The Supreme Court, however, held that the judge was absolutely immune from civil suit for his judicial acts "even when such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly." *Id*. at 357. The *Bradley* court drew

on English common law and reasoned that that absolute immunity was needed to safeguard judicial independence and stated that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. *Id*. at 347. The *Bradley* court found it imperative to protect sincere judges from "vexatious actions." *Id*. at 349.

The Supreme Court extended the newly-minted doctrine of absolute immunity to federal executive officers in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631 (1896), where the Supreme Court addressed the question of whether a court could adjudicate a civil claim based on the allegedly malicious acts of an executive official. Relying upon *Bradley,* the Court found that "the allegation of malicious or corrupt motives could always be made, and, if the motives could be inquired into, judges would be subjected to the same vexatious litigation upon such allegation, whether the motives had or had not any real existence." *Spalding*, 161 U.S. at 494, 16 S.Ct. at 635. The Court also noted that this limitation on liability, and the justifications for it, "has a deep root in the common law [and] is to be found in the earliest judicial records, and it has been steadily maintained by an undisputed current of decisions in the English courts, amidst every change of policy, and through every revolution of their government." *Id*. at 494. Applying these same standards to the facts before it, the Supreme Court held that:

> the same general consideration of public policy and convenience which demand for judges . . . immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions apply, to a large extent, to [the heads of executive departments] when engaged in the discharge of duties imposed upon them by law . . . In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of government, if he were subjected to any such restraint.

*Id*. at 498.

A litany of cases would follow *Spalding*, wherein federal courts continued to expand the doctrine of absolute immunity to encompass a wide range of federal officials. *See, e.g.*, *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927) (special assistant to the Attorney General); *Standard Nut Margarine Co. v. Mellon*, 72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) (Treasury Secretary); *Cooper v. O'Connor*, 99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) (F.B.I. agent, Comptroller of the Currency); *Laughlin v. Garnett*, 138 F.2d 931 (D.C. Cir. 1943), cert. denied, 322 U.S. 738 (1944) (United States Attorney); *Laughlin v. Rosenman*, 163 F.2d 838 (D.C. Cir. 1947) (Special Counsel to the President); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950) (Attorney General); *Papagianakis v. The Samos*, 186 F.2d 257 (4th Cir. 1950), cer. denied, 341 U.S. 921 (1951) (immigration officer); *Taylor v. Glotfelty*, 201 F.2d 51 (6th Cir. 1952) (prison psychiatrist); *Camp v. Recreation Bd*., 104 F. Supp. 10 (D.D.C. 1952) (Interior Secretary).

Subsequently, in *Barr v. Matteo*, the Supreme Court recognized that the doctrine of absolute immunity encompasses an absolute privilege for federal executive officials who publish defamatory statements in the performance of their official duties. There, two employees of the Federal Office of Rent Stabilization sued the agency's Acting Director in relation to the publication of a press release in which he promised to suspend the employees for promoting an unpopular budget plan. *Barr v. Matteo*, 360 U.S. 564, 79 S. Ct. 1335 (1959). The former employees contended that the director's press release contained defamatory statements. *Id.* at 568. However, the Supreme Court ruled that the director was protected by absolute privilege when he issued the press release and dismissed the employees' claims, reasoning that communicating with the media by disseminating the press release "was an appropriate exercise of the discretion which an officer of

that rank must possess if the public service is to function effectively." *Id*. at 575. The Court went on to emphasize that "*[i]t would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty*." *Id.* (emphasis supplied).

In coming to this holding, the Supreme Court established the seminal rule that federal officials are absolutely immune from damages taken for actions taken within the "outer perimeter" of their duties. *Id*. The Supreme Court was well aware of the wide applicability of this standard, but explained that "the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted the relation of the act complained of to "matters committed by law to his control or supervision." *Id*. at 573 (internal citations omitted).

Importantly, the *Barr* Court refused to consider the plaintiffs' argument that the defendant had acted with malice, noting that "the claim of an unworthy purpose does not defeat the privilege." *Id*. at 575. The *Barr* Court acknowledged that conferring an absolute privilege may lead to "occasional instances of actual injustice," but reasoned that such a price is "a necessary one to pay for the greater good." *Id*. at 576. In coming to this conclusion, the Court weighed the competing public policy considerations at play:

> [O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or illfounded damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr*, 360 U.S. at 565, 79 S.Ct. 1335. The Supreme Court ultimately determined that shielding public officers from civil liability was the more compelling need, reasoning that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id.* at 572

**B. *Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity**

    Relying on the above holdings, the Supreme Court, in *Nixon v. Fitzgerald*, affirmed that the doctrine of absolute immunity applies special force to the office of the presidency.

    In *Nixon*, a government whistleblower attempted to sue President Nixon for wrongful termination, claiming that Nixon had unlawfully fired him in retaliation for damaging testimony that he had given before an oversight committee. The Supreme Court flatly rejected the contention that President Nixon could be subject to civil liability for his decision to terminate the whistleblower, and affirmed, in a sweeping decision, that "a former President of the United States is entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749. The Supreme Court recognized that this immunity—"presidential immunity"—is a "functionally mandated incident of the President's unique office," *id.*, which extends beyond the mere 'functional' immunity afforded to other federal officials such as judges, prosecutors, etc., *id.* at 755. Given the "special nature of the President's constitutional office and functions," the Supreme Court found it appropriate to define the scope of presidential immunity as encompassing any and all "acts within the '***outer perimeter'*** of [the President's] official responsibility," *id.* at 756 (emphasis added); *see also Clinton*, 520 U.S. at 694, 117 S.Ct. 1636 ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

Throughout the *Nixon* decision, the Supreme Court continually emphasized the indispensable nature of presidential immunity, noting that, without it, a President's ability to effectively serve his country would be severely hindered. The Supreme Court observed:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government. As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at 554, 87 S.Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753; *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (noting that the President's duties "are of unrivaled gravity and breadth."). In short, the Supreme Court acknowledged that, since the President's duties "must necessarily include[] the power to perform them without any obstruction or impediment whatsoever," it follows that "the President . . . must be deemed, in civil cases at least, to possess an official inviolability." *Nixon*, 457 U.S. at 776-77, 102 S.Ct. at 2701.

The Supreme Court was again asked to explore the contours of presidential immunity in *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636. In *Clinton*, an individual filed suit against President Clinton after she publicly accused him of sexual misconduct before he took office. *Id.* at 685. Unlike the case at bar, however, all of three claims under review by the Supreme Court arose from President Clinton's conduct *before* he was in office. *Id.* Due to this distinguishable factor, the *Clinton* court found that those causes of action were unrelated to any of his official duties as

President. *Id.* at 710. The *Clinton* court, however, took occasion to recognize the "high respect that is owed to the office of the Chief Executive," *id.* at 707, and to acknowledge that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Id.* at 697.

Notably, the underlying case in *Clinton* had involved a fourth defamation claim which did arise during President Clinton's time in office when he publicly responded to the plaintiff's allegations of misconduct. Although this claim was not at issue before the Supreme Court, the Court expressly noted that the claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities," thereby qualifying it for presidential immunity.

## C. The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President.

A thorough analysis of decades of case law leaves little room for doubt – a President is entitled to wide-ranging immunity for conduct that occurs within the "outer perimeter" of his official responsibilities. *Nixon*, 457 U.S. at 749.

Thus, as established in *Nixon*, in determining whether a President should be afforded absolute immunity, the relevant inquiry is whether the liability in a civil lawsuit is "predicated on [the President's] official acts." *Nixon,* 457 U.S. at 749. A President's "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id.* at 756; *see also Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties"); *Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.").

The test is an objective one – it focused on the nature of the act in question, not the motive underlying it. *Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). Indeed, presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997)); even "***alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority***." *Nixon*, 457 U.S. at 757 (emphasis added). Thus, inquiry into the subjective motive or intent underlying the President's alleged conduct is simply improper. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.").[1]

The broad interpretation of this test is justified by historical tradition and functional considerations that are grounded in the President's "unique position in the constitutional scheme." *Nixon,* 457 U.S. at 749. The President must be immune from constant judicial scrutiny so that he may concentrate on the task of governing. *Id*. at 750 n.31. The passage of time has only intensified these concerns; the President holds "supervisory and policy responsibilities of utmost discretion and sensitivity," *id*. at 750, concerning "matters likely to arouse the most intense feelings[.]" *Id*. at 752. The President's prominence makes him "an easily identifiable target," yet the public interest demands that he be able "to deal fearlessly and impartially with the duties of his office." *Id*. at 752-53. Presidential immunity guards against "this personal vulnerability," *Id*. at 753, not just for his "particular functions," but for his official responsibilities more generally[.] *Id*. at 755-56.

---

[1] Plaintiff recently conceded this point in an appellate brief filed with the D.C. Court of Appeals, acknowledging that "absolute immunity . . . ***precludes any consideration of motive***." *See* Habba Dec., Ex. E, *Carroll v. Trump*, D.C. Court of Appeals, 22-SP-0745 (2022), App. Br. at 46.

Further, the "outer perimeter" analysis must be viewed in the context of the President's wide-ranging duties. The Supreme Court has consistently acknowledged that the President's responsibilities are "of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that "[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear," *Clinton*, 520 U.S. at 698. In other words, considering the vastness and importance of his duties, and the multitude of functions he performs, it can be said that the President "never adjourns." *Id.* at 713 (Breyer. J., concurring in judgment).

One of those functions must include the President's ability to address matters of national concern and defend himself from grave accusations that impugn his character. Indeed, a well-established body of case law demonstrates that lower officials, who are not tasked with the same constitutional protections enjoyed by the President, have been found to have acted within the outer perimeter of their official responsibilities when speaking to the press.

Even under the narrower *respondeat superior* test applied in Westfall Act cases,[2] courts have consistently found that statements to the press, even when they involve personal matters, fall within the scope of an elected official's responsibilities. In *Council on American-Islamic Relations v. Ballenger*—a case the Second Circuit has described as "directly on point" with respect to the facts *sub judice*, *Carroll v. Trump*, 49 F.4th 759, 780 (2d Cir. 2022)—the Council on American-Islamic Relations sued congressman Ballenger for calling it the "fundraising arm for Hezbollah." *CAIR v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006). In applying the narrower scope-of-

---

[2] Although this Court previously found that Defendant's statements were not within the scope of employment for the purposes of the Westfall Act, it also acknowledged that absolute immunity is applied more broadly than the traditional scope of employment test. *Carroll v. Trump*, 498 F.Supp.3d 422, 456 (S.D.N.Y. 2020), *revd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022) ("[E]ven if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not enough under the District of Columbia's scope of employment doctrine.").

employment test, the D.C. Circuit found that the congressman's acted within the scope of his duties in making the allegedly defamatory statement when speaking to the press reasoning that ""[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties'" because a "[m]ember's ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id*. at 664- 65. The D.C. Circuit identified "a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id*. at 665-66.

In a series of cases that followed, the D.C. Circuit applied the holding in *Ballenger* to similarly conclude that other high-ranking government officials were acting within the scope of their duties in similar dealings with the press. *See, e.g. Wuterich v. Murtha,* 562 F.3d 375 (D.C. Cir. 2009) (holding that congressman acted within the scope of his employment in disseminating a purportedly defamatory stated when responding to a question from a reporter; *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (finding that executive branch employees acted within the scope of their employment in "discredit[ing] public critics of the Executive Branch," even though the officials had acted in ways that were alleged to be unlawful and contrary to the national security of the United States.).

In a case that bears a striking resemblance to the matter *sub judice*, the D.C. Court of Appeals concluded that the Mayor of the District of Columbia acted within the scope of his duties when he allegedly issued defamatory statements to the media. *See District of Columbia v. Jones*, 919 A.2d 604, 608-09 (D.C. 2007). In *Jones,* after various news stations began to scrutinize the Mayor's fundraising activities, the Mayor placed his deputy chief of staff, Marc Jones on

administrative leave and then proceeded to terminate him. *Id.* at 606. During that time, the Mayor allegedly "made numerous remarks" to the media "placing primary responsibility" on the deputy chief of staff for any purported wrongdoing. *Id.* Shortly thereafter, Mr. Jones sued the Mayor for defamation, alleging that the Mayor's statements were "false and malicious" and that the allegations were made "to protect himself politically at the known expense of [Jones's] reputation, character, and integrity." *Id.*

The court in *Jones* proceeded to analyze whether it was appropriate to apply the doctrine of absolute immunity in that matter. Applying the absolute immunity test circumscribed in *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990), the court held that absolute immunity applies when the challenged conduct is (1) within the "outer perimeter" of official duties, and (2) the governmental function was "discretionary" rather than ministerial." *Id.* at 608 (citing *Moss,* 580 A.2d at 1020.) The court indicated that the test is rather expansive, finding that the court need only determine "whether the official acted 'in relation to matters committed by law to his control or supervision.'" *Id.* (*citing Moss*, 580 A.2d at 1020.).

Readily disposing of the first prong of that analysis, the court found that "*it cannot be questioned*" that responding to inquiries from the press fell within the "outer perimeter of the Mayor's official duties." *Jones*, 919 A.2d at 608 (quotation omitted). In coming to that conclusion, the *Jones* court relied on the principle set forth in *Ballenger* that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" The court explained that the allegedly defamatory statements concerned a mayoral staff member's activities "and the Mayor's own knowledge of and responsibility for those activities," and it is "certainly" the case that the Mayor's "official responsibilities" include "[i]nforming the public about the conduct of persons serving in the Office of the Mayor." *Id.*

The *Jones* court expressly rejected the plaintiff's contention that the statements fell outside the outer perimeter of the Mayor's duties because the underlying conduct he was discussing— allegations of improper fundraising—fell outside the scope of any official duties. As the Court explained, it is part of the Mayor's responsibilities to "account[] to the press and the public for the manner in which his staff conducted itself," regardless of whether the underlying conduct itself constituted part of the staff member's, or the Mayor's, official duties. *Jones*, 919 A.2d at 608 n.8.

Lastly, the court refused to inquire into the Mayor's motives in making the challenged statements, relying on a substantive body of law which specifically precludes this type of analysis. *Jones*, 919 A.2d at 610. The court cautioned that "[p]ermitting inquiry into the official's motives would defeat the very purpose of absolute immunity. A determined litigant could always assert an improper motive, and the official would be required to shoulder the burden of responding to discovery, and perhaps enduring a trial, to expose these motives." *Id*. at 611. The Court acknowledged that, in applying absolute immunity to such cases, it may result in personal injury that cannot be redressed, but ultimately concluded that such a "trade off" is necessary to "promote our mutual interest in in effective government." *Id*. (citing *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 292 (1977), "it is better to leave unredressed some defamations by officers acting out of malice or excess zeal, than to subject the conscientious to the constant dread of retaliation.").

Like in *Jones*, it cannot reasonably be questioned that the conduct at issue herein—namely, the communications made by Defendant to the press in response to the allegations raised by Plaintiff—fell squarely within the "outer perimeter" of Defendant's official duties as President. More than any other public official, the President "possesses an extraordinary power to speak to his fellow citizens," *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018), and is ubiquitous in the

public eye due to the "sheer prominence" of his position, *Nixon*, 457 at 753; *see also Clinton*, 520 U.S. at 698 ("[T]he Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations."); *CBS v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role.").

Here, Defendant made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation. As both the leader of the nation and head of the Executive Branch, Defendant could not sit idly while a "media frenzy" erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to "maintain the continued trust and respect of [his] constituents" and to "preserve his ability to carry out his [] responsibilities." *Ballenger*, 444 F.3d at 320 (internal quotations omitted); *see also*, *Barr*, 360 U.S. at 575. ("It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty."). Thus, it cannot be reasonably disputed that Defendant's conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation. *Snyder v. Phelps,* 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"); *Rankin v. McPherson*, 483

17

U.S. 378, 387, 107 S. Ct. 2891, 2898 (1987)("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

Further, it bears repeating that the absolute immunity test is an *objective* one and inquiry into Defendant's subjective motive or intent in making the alleged defamatory statements is expressly prohibited. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). The only question is whether the objective nature of his conduct was within the scope of his official duties as President. This is undoubtedly the case. Defendant's statements were made in a White House press release in response to reporter's inquiries to the White House, and otherwise in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries. Simply stated, he was addressing an issue of national importance.

That Defendant himself was the subject of the accusations does not in any way diminish the level of public concern, nor does it remove it from the scope of his official responsibilities. In fact, due to their sheer prominence, it is commonly the case that the personal affairs of a President are a matter of public concern. *See Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2034 (2020) (noting that because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs."); *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) (President Clinton's communications concerning how to respond to Monica Lewinsky affair were "in the President's performance of his official duties," because "the President does need to address personal matters in the context of his official decisions.").

Based on the foregoing, in accordance with long-established Supreme Court precedent, Defendant is entitled to "absolute immunity from damages liability" predicated on the statements he made to the media in response to the heinous allegations Plaintiff levied against him. *Nixon*, 457 U.S. at 749. Since such conduct was within the "'outer perimeter' of his official responsibility," the instant action must be dismissed in its entirety. *Id.* at 755.

## II.     PLAINTIFF's DEFAMATION CLAIM FAILS AS A MATTER OF LAW

Even setting aside the issue of absolute immunity, Plaintiff's defamation claim fails on a fundamental level since she has failed to establish a cognizable cause of action.

To state a claim for defamation under New York law, the plaintiff must allege "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 Fed.Appx. 8, 11 (2d Cir. 2018) (citing *Elias v. Rolling Stone LLC,* 872 F.3d 97, 104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.,* 987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014)).  In addition, as is the case here, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001) (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710 (1964)). "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Project Veritas v. N.Y. Times Co.,* 2021 NY Slip Op 31908(U) (Sup. Ct.).

### A.  Plaintiff Has Failed to Establish Cognizable Damages

In a defamation case, a plaintiff is required to prove that the defamation "either cause[d] special harm or constitute[s] defamation per se." *Peters v. Baldwin Union Free Sch. Dist*, 320 F.3d

19

164, 169 (2d Cir. 2003) (quoting *Dillon v. City of N.Y.*, 261 A.D.2d 34 (1st Dep't 1999)). Here, after the completion of fact discovery, Plaintiff has failed to establish any entitlement to damages whatsoever. Therefore, there is no genuine issue of material fact and Plaintiff's defamation claim fails as a matter of law.

### i. The Statements Do Not Constitute Defamation *Per Se*.

The New York Court of Appeals has recognized four narrowly defined categories of statements which are considered to be defamatory *per se*, including statements: "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). In her Complaint, Plaintiff alleges that the statements fit within the second category because they "tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information." *See* Habba Dec., Exhibit A at ¶ 129. As discussed herein, Plaintiff's contention is misplaced.

"Determining whether a statement is defamatory per se is a question of law for the Court." *Stern v. Cosby*, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009). "To find that a statement qualifies as one that tends to injure another in his or her 'trade, business, or profession,' the statement must be made with reference to a matter of significance and importance for [the operation of the business], rather than a more general reflection upon the plaintiffs' character or qualities." *Rufeh v. Schwartz*, 50 A.D.3d 1002, 1004-05 (2d Dep't 2008) (citations omitted). "[W]ords [such] as 'cheat,' 'dishonest,' 'immoral' and many others, if *generally* applied are not slanderous per se, but become such if applied to the plaintiff's trade, business or profession" because "[i]t is not sufficient that [such words] tend to injure plaintiff in his business, they must have been spoken of him *in his*

*business.*'" *Gurtler v. Union Parts Mfg. Co., Inc.*, 285 A.D. 643, 646 (1st Dep't 1955) (emphasis added). In other words, to qualify as defamation *per se*, the allegedly defamatory statement "must be targeted at specific standards of performance that are *directly relevant* to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'" *Tacopina v. Kerick*, 14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) (citing *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011); *Van-Go Transp. Co. Inc. v. New York City Board of Education*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997)).

Here, the alleged defamatory statements, which lack any correlation to Plaintiff's professional capabilities, are not defamatory *per se*. The statements do not impugn, or even relate to, any particular talent or ability needed to perform in Plaintiff's profession as a "writer and advice columnist" *See* Habba Dec., Ex. A, at ¶ 55. Thus, the statements "do[] not, on [their] face, defame [P]laintiff in her trade, business or profession." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

As outlined in the Complaint, the first alleged defamatory statements, the first statement, made on June 21, 2019 (the "June 21 Statement"), states as follows:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that ***should*** indicate her motivation. It ***should*** be sold in the fiction section.
>
> Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.
>
> Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

*See* Habba Dec. Ex. A at ¶ 82. (emphasis added).

The second statement at issue, made on June 22, 2019 (the "June 22 Statement"), is

comprised of the following language:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.

*See* Habba Dec. Ex. A at ¶ 91.

The third and final statement, issued on June 24, 2019 (the "June 24 Statement"), provides as follows:

I'll say with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?

*See* Habba Dec., Ex. A at ¶ 97.

Based on the contents of these statements, Defendant is entitled to summary judgment because the statements are incapable, as a matter of law, of the defamatory construction Plaintiff seeks to ascribe to them. Notably absent from the above statements is any language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a "writer and advice columnist," *Id*. at ¶ 55, much less one of "significance and importance," *Rufeh*, 50 A.D.3d at 1005. Even read in a light most favorable to Plaintiff, the statements are, at most, a general reflection upon her character or qualities, as they portray her as a dishonest individual who fabricated an account that "never happened." *Id*. at ¶ 82. Yet, it is well established that a "statement imputing . . . dishonesty to the plaintiff" may be construed as defamatory *per se* only if there is "some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the charge of incompetence or dishonesty to the particular profession or trade engaged in by plaintiff." *Van Lengen v. Parr,* 136 A.D.2d 964 (4th Dep't 1988). Since the alleged defamatory statements do not peculiarly relate to Plaintiff's occupation as a "writer and advice columnist." Habba Dec., Ex. A

at ¶ 55, it cannot be said that they impute "conduct that is 'of a kind incompatible with the proper conduct" of her profession, *Tacopina*, 2016 WL 1268268 at *4.

Indeed, New York courts consistently find that these types of statements—which broadly refer to a person's dishonest nature—are insufficient to support a claim of defamation *per se*. *See, e.g., Davydov v. Youseffi*, 205 A.D.3d 881, 882 (1st Dep't 2022) ("While the plaintiff asserted in his affidavit that the defendant had called him a 'fraud' and that he 'operate[d] as a fake,' there are no allegations that these statements were specifically directed at the plaintiff in his professional capacity as a dentist."); *Pure Power Boot Camp*, LLC, 813 F. Supp. 2d at 551 (statements characterizing plaintiff as a "loose cannon" and a "liar" were not defamatory *per se* because the statements reflected personal characteristics rather than reflections of professional competence); *Ram v. Moritt*, 205 A.D. 516 (2d Dep't 1994) (finding that statements referring to the plaintiff, a doctor, as a "a 'liar,' a 'cheat,' and a 'debtor'" did not constitute defamation *per se* because they "did not address the plaintiff's professional status as a doctor[.]").

Plaintiff has failed to present any evidence to contrary, or otherwise substantiate how the statements could possibly be construed as defamation *per se*. Accordingly, Plaintiff has failed to establish defamation *per se* because her allegation that Defendant made a statement calling into question her general character and morality does not in any way reflect on her ability to perform in a professional capacity, or otherwise "injure [her] in [] her trade, business or profession." *Liberman*, 80 N.Y.2d at 435.

### ii.  Plaintiff's Cannot Establish Her Entitlement to Special Damages.

Where, as here, the defamation alleged does not fall into one of the *per se* categories, the plaintiff must establish entitlement to special damages. *Mable Assets, LLC v. Rachmanov*, 192 A.D.3d 998, 1001 (2d Dep't 2021) (citing *Liberman v. Gelstein,* 80 N.Y.2d 429, 434-435 (1992)).

To adequately plead special damages, a plaintiff must claim "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179 (2d Cir. 2010) (citation and internal quotation marks omitted). The special harm must be "alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts." *Cambridge Assoc. v. Inland Vale Farm Co.*, 116 A.D.2d 684, 686 (2d Dep't 1986); *see also Franklin v. Daily Holdings*, 135 A.D.3d 87, 93 (1st Dep't 2015) ("Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation."). "The particularity requirement is strictly applied, as courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai v. Cayre Group, Ltd.*, 726 F.Supp.2d 323, 330 (S.D.N.Y. 2010). Further, the requirement that special damages be pleaded with particularity flows not only from state law, but from the Federal Rules as well, which require that special damages be "specifically stated." Fed. R. Civ. P. 9(g). Accordingly, a plaintiff's failure to plead special damages with sufficient precision, in and of itself, warrants dismissal of a cause of action. *See Franklin*, 135 A.D.3d at 92.

In the instant matter, Plaintiff has failed to plead, substantiate, or otherwise prove her entitlement to special damages. From the outset, the bare allegations of harm plead in the Complaint fell remarkably short of the stringent standard applied by New York courts to establish special damages. Plaintiff's sole allegation of special damages consists of the unquantified, non-itemized claim that Plaintiff has received "roughly 50% fewer letters than she received during the same period in 2018." *See* Habba Dec., Ex. A at ¶ 134. This unspecified allegation fails to meet the requisite degree of specificity required to survive on a summary judgment motion. This is

especially true where Plaintiff has failed to establish that any loss in readership was causally related to the alleged defamatory statements, nor identified a single reader she purportedly lost. *See*, *Lang Sang v. Ming Hai*, 951 F. Supp.2d 504, 525 (S.D.N.Y. 2013) ("The individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized."); *Drug Research. v. Curtis Pub.*, 7 N.Y.2d 435, 441 (1960)  ("[I]f the special damage was a loss of customers, the persons who ceased to be customers, or who refused to purchase, must be named."). Even more damning, Plaintiff freely admitted during her deposition that she never kept track of the amount of letters that she received *until she filed the instant lawsuit*. *See* Habba Dec., Ex. B at 230:20-24; 231:2-7 (When asked whether she kept track of the amount of letters she received, Ms. Carroll testified that "I never did until – until this happened ... before that, I would delete. You know, after that I deleted nothing . . .). Thus, her claim—advanced in her Complaint—that she had received "roughly 50%" less letters over the course of the prior year is positively groundless.

Likewise, Plaintiff's allegation that "Trump has injured the reputation on which she makes her livelihood and attracts readers" similarly fails. *See* Habba Dec. Ex. A at ¶ 133. In an attempt to quantify her damages, Plaintiff submitted an expert report authored by Professor Ashlee Humphreys, PhD. *See generally, id.*, Exhibit C (the "Report"). The Report, however, exclusively assesses "the damage to Ms. Carroll's *reputation* and person brand." *Id.* at 2 (emphasis added). In summarizing her findings, for instance, Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "*reputational value* has been diminished due to the Statements." *Id.* at 5 (emphasis added). The Report entirely misses the mark and fails to identify any actionable harm since special damages require "the loss

of something having economic or pecuniary value," *Franklin*, 135 A.D.3d at 93, and do not include damages for "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering," *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 179 (2d Cir. 2000) (citation omitted); *see also Salomone v. MacMillan Pub. Co., Inc.*, 77 A.D.2d 501, 502 (1st Dep't 1980) (noting that plaintiff "pleads no special damage" where he "claims damages for loss of reputation and for mental anguish."); *Sharratt v. Hickey*, 20 A.D.3d 734, 736 (3d Dep't 2005) ("General testimony regarding humiliation and loss of reputation in the community is insufficient to prove special damages."); *Franklin*, 135 A.D.3d at 93 ("[A]lthough plaintiff states the ways in which he believes his career was damaged as a result of the article, he fails to state more than a round figure of $3,000,000 when alleging his damages, which is insufficient to state special damages."); *Garland v. Vermilyea*, 88 A.D.2d 1044 (3d Dep't 1982) ("The allegation that plaintiff 'was required to expend large sums of money' does not allege special damages for it is of insufficient particularity . . . as is the claim that plaintiff has been damaged in the round figure of $1,000,000.") (citations omitted); *Jordan v. Tucker, Albin and Assoc., Inc.*, 3-CV-6863-JMA-SIL, 2017 WL 2223918, at *10 (E.D.N.Y. May 19, 2017) ("'Emotional distress, 'hurt feelings,' 'embarrassment,' or 'chagrin' do not constitute 'special damages.'") (citations omitted).

Thus, due to Plaintiff's failure to identify the "loss of something having economic or pecuniary value" with the requisite degree of particularity, she is unable to establish a claim for special damages. Since Plaintiff is also unable to maintain a claim for defamation *per se*, her defamation claim fails as a matter of law based on the absence of cognizable damages.

## B. Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of the Statements.

New York courts have long recognized that consent is a complete defense to actions for defamation which is unaffected by the motives of the speaker. *See* Restatement (Second) of Torts,

§ 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."); *id.* (comment f) ("The protection given by it is complete, and it is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication."); *see also Teichner v. Bellan,* 7 A.D.2d 247, 251 (4th Dep't 1959) (describing consent as "an absolute immunity or an absolute privilege upon the defendant.").

A plaintiff expresses apparent consent to the alleged defamation where her "words or conduct are reasonably understood by another to be intended as consent." Restatement (Second) of Torts § 892. Even where the plaintiff "does not in fact agree" to publication of the defamatory statement, her "words or acts or even [her] inaction may manifest a consent that will justify the other in acting in reliance upon them." Restatement (Second) of Torts § 892 cmt. c (emphasis added). When apparent consent is given, it is "as effective as consent in fact." Restatement (Second) of Torts § 892.

Second Circuit precedent provides that, in certain circumstances, a plaintiff's intentional eliciting of a statement which she expects will be defamatory constitutes her consent to the making of the statement. In *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191 (2d Cir. 2015), the plaintiff, Sleepy's, sent hired personnel into Select Comfort stores posing as customers to determine whether salespeople were disparaging Plaintiff and its merchandise. *Id.* at 194. Plaintiff's secret shoppers then intentionally elicited the alleged defamation from Select Comfort salespeople, finding that they regularly disparaged plaintiff's products. *Id.* Upon further investigation, Select Comfort was able to present evidence showing that plaintiff instructed its secret shoppers to ask about differences between Sleepy's products and Select Comfort's products to determine whether Select Comfort was denigrating its products. *Id.* at 201. The Second Circuit

28

ultimately remanded this issue to the District Court to determine whether plaintiff's defamation claims were barred by plaintiff's consent. *Id*. at 202.

The Second Circuit went on to explain that, in assessing whether a plaintiff consents to the publication of an alleged defamatory statement, the "more evidence that supports the proposition that the plaintiff elicited the statement with a high degree of certainty that it would be defamatory, for the purpose of enabling a lawsuit, the stronger the defendant's case for deeming the statement consented to, thus barring the claim." *Sleepy's LLC*, 779 F.3d at 199. Referencing the Restatement the Second Circuit found that this type of elicitation by the plaintiff is tantamount to "*decoying the defendant into a lawsuit*" and thus cannot sustain a valid cause of action for defamation." *Id.* at 199 (citing Restatement (Second) of Torts, § 584 (comment d)) (emphasis added).

Based on this principle, the Second Circuit remanded the case for the district court to make findings as to whether the plaintiff was "motivated by a good faith attempt to learn whether" the defendant was "carrying on a consistent pattern of slander, or [was] merely a ruse to decoy [the defendant] into a lawsuit, along with the closely related question [of] what was the degree of [the plaintiff's] confidence or certainty at the time of each inquiry that such a pattern of slander existed." *Id.* at 201. On remand from the Second Circuit, the District Court found that:

> "In short, because the evidence shows that [plaintiff] Sleepy's was both virtually certain that its inquiry would elicit allegedly slanderous statements and substantially motivated by the desire to bolster a contemplated lawsuit, Sleepy's consented to the publication of these allegedly defamatory statements.

*Sleepy's LLC*, 133 F. Supp. 3d at 500.

Here, similarly, Plaintiff's pattern of conduct demonstrates that she sought to intentionally elicit a denial from Defendant of her inflammatory allegations, in the hopes that any such retort could serve as a basis for defamation lawsuit. By her own admission, Plaintiff purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible. Plaintiff

chose not to consider *Elle* because ""under Nina, *Elle* has been less into politics or news," Ms. Carroll said. "Nina's *Elle* is a fashion magazine. So I went with New York magazine, *which knows how to break news***.*" *See* Habba Dec., Ex. D. at 3. Plaintiff also testified that she decided to move forward with *New York Magazine* because she believed that *Elle* would not run a full excerpt of the story and that "they would not have run anything close to what New York ran." *See* Habba Aff., Ex. B at tr. 190:15-25.

In addition, the timing of Plaintiff making her claims is highly indicative of an intentional effort to solicit the allegedly defamatory remarks from Defendant. Despite the fact that the incident purportedly happened in 1995, Plaintiff waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States. The suspect timing can only lead to one logical conclusion – she publicized her account to maximize the national attention her story would receive. As discussed at length *supra*, Defendant's prominent position as the head of the executive branch left him with no choice but to defend himself against these heinous accusations. *See Wuterich*, 562 F.3d at 384 ("[A] congressman's ability to do his job as a legislator effectively is tied . . . to [his] relationship with the public and . . . his constituents."); *see also Clinton*, 520 U.S. at 698 (noting that the President is "the focus of public hopes and expectations.").

In short, Plaintiff sought to drum up a national outcry in response to her narrative, she succeeded, and she cannot now claim that the statements were defamatory when she actively solicited them. Therefore, Plaintiff's defamation claim must fail because she consented to the publication of the allegedly defamatory statements.

## C. The Vast Majority of the Statements are Nonactionable Opinions.

To the extent Plaintiff's defamation claim survives at all, nearly all of the content contained in the statements are immaterial since they constitute protected opinion speech.

It is well settled that "expressions of an opinion, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 286 (1986) (citations omitted) (emphasis added); *Hobbs v. Imus*, 266 A.D.2d 36, 37 (1999); *Doe v. French*, 458 F. App'x 21, 22 (2d Cir. 2012*)*. Opinions can only be actionable if they imply that the speaker knows certain facts which are detrimental to the plaintiff and false *Steinhilber,* 68 N.Y.2d at 289. The question of whether a statement is one of fact or opinion is a question of law to be determined by the Court. *Id*. Courts examine the following four factors when determining whether a statement is protected opinion: (1) whether the specific language in the statements has a precise meaning which is readily understood (i.e. the language is not indefinite, ambiguous, hyperbolic, or figurative); (2) whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication, including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact. *Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008); *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995); *Steinhilber*, 68 N.Y.2d at 292. Applying these four factors, the Court of Appeals has mandated against a "hypertechnical parsing" of written or spoken words "for the purpose of identifying possible facts that might form the basis of a sustainable [defamation] action." *Dworin*, 2008 WL 508019, at *4 (internal quotations omitted). Instead, courts are required to examine the overall context in which the statements were made and "determine whether the reasonable reader [or listener] would have believed that the challenged statements were conveying facts about the… plaintiff." *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991).

Further, under New York law, it has been repeatedly held that statements made that address another person's state of mind or motivations are constitutionally protected opinion speech that cannot form the basis for a defamation claim. *See e.g., Huggins v. Povitch*, 1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) (statements that address someone's state of mind or motivations "are speculation and are generally not readily verifiable" and cannot form the foundation for a defamation claim); *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (statement that plaintiff aimed to "set up" brokerage houses "is nothing more than speculation about . . . motivations" and, as such, is a "clear statement of opinion" which "does not support a claim for libel.").

In accordance with this principle, the courts have repeatedly dismissed defamation claims where the alleged defamatory statements constituted opinions about a plaintiff's state of mind or personal motivations. *See e.g. Dworin*, 2008 WL 508019, at *5 (statements made to New York Post that plaintiff was a "disgruntled ex-employee" threatening to sue was opinion not susceptible to objective verification); *Gentile v. Grand St. Med.*, 79 A.D.3d 1351, 1354 (statements that plaintiff's motives for bringing sexual harassment lawsuit were that she "[did] not want work" and "want[ed] to make easy money" could not form basis of defamation claim as they were "not capable of being proven true or false"); *Weiner v. Doubleday*, 142 A.D.2d 100, 105 (1st Dep't 1988) (dismissing defamation claim for calling plaintiff "ugly" because "there can be no action for libel based upon opinion, expressed in the form of epithets"), *aff'd*, 74 N.Y.2d 586 (1989).

In her Complaint, Plaintiff contends that various aspects of the alleged defamatory statements, aside from the general repudiation of Plaintiff's allegations, are defamatory for the following reasons: (1) Defendant lacked any factual basis for stating that Plaintiff had falsely accused other men of sexual assault; (2) Defendant knew it was false to state he both never met

her and had no idea who Plaintiff was; (3) she fabricated her claims to increase her books sales; and (4) she fabricated her claims as part of a conspiracy with the Democratic Party or in exchange for payment. *See* Habba Aff., Ex. A ¶¶ 116-117. Each of these purported statements, however, are no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false. No reasonable reader would find the challenged comments defamatory. At most, Defendant was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims. This is particularly true here, given that Defendant was merely defending himself, and the integrity of his office, by publicly denying Plaintiff's allegations of unlawful conduct. *See, e.g., Indep. Living Aids v. Maxi-Aids*, 981 F. Supp. 124 (E.D.N.Y. 1997) (defendant's statement that plaintiff was "a liar," in the context of responding to plaintiff's accusations, "can only be understood as a denial of [plaintiff's] accusations," and constituted "personal opinion and rhetorical hyperbole, rather than objective fact").

Thus, aside from Defendant's repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation.

## III.    THE EXTEME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED

Plaintiff has not established that she has a right to punitive damages which requires that the statements be made with "common law malice—that is, with a desire to harm plaintiff or reckless disregard for the injurious effect the [statement] would have upon [her]." *Mahoney v. Adirondack Pub. Co.*, 71 N.Y.2d 31, 37 (1987). Common law malice "focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity." *Morsette v. "The Final Call"*, 309 A.D.2d 249, 254 (1st Dep't 2003) (quoting *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993)). To prove common law malice,

the speaker must be "*solely* motivated by a desire to injure plaintiff, and there must be some evidence that the animus was the one and only cause for the publication." *Morsette*, 309 A.D.2d at 255 (emphasis in original) (internal citations omitted.); s*ee also Robertson v. Doe*, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ("Under New York law, only a finding that [defendant] 'was **solely motivated** by a desire to injure plaintiff' can establish common-law malice."), *aff'd sub nom.*

As discussed at length herein, Defendant made the statements in direct response to heinous allegations levied against him by Plaintiff. Thus, these statements could not have been "motivated by a desire to injure plaintiff," since they were strictly made in Defendant's own defense. *Morsette*, 309 A.D.2d at 255. Indeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity. *See Kane v. Orange Cty.,* 232 A.D.2d 526, 527 (2d Dept. 1996) ("response to unfavorable publicity against [the defendant is] covered by a qualified privilege"); *see also* Restatement (Second) of Torts § 594 cmt. k (1977) ("A conditional privilege exists . . . when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself . . . Thus the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar.").

Therefore, Plaintiff is not entitled to punitive damages as she has failed to show that Defendant's statements were at all motivated by a desire to injure Plaintiff, much less solely motivated by such a desire.

## **CONCLUSION**

For the reasons set forth above, Defendant, Donald J. Trump, respectfully submits that summary judgment should be granted in his favor.

Dated: December 22, 2022     Respectfully submitted,

               Alina Habba, Esq.
               Michael T. Madaio, Esq.
               Habba Madaio & Associates LLP
               1430 US Highway 206, Suite 240
               Bedminster, New Jersey 07921
                  -and-
               112 West 34th Street, 17th & 18th Floors
               New York, New York 10120
               Telephone: (908) 869-1188
               Facsimile: (908) 450-1881
               E-mail: ahabba@habbalaw.com

               *Attorneys for Defendant, Donald J. Trump*

# EXHIBIT 19

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

               *Plaintiff*,

      v.

DONALD J. TRUMP, in his personal capacity,

               *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOP SUMMARY JUDGMENT**

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 1

    A. Factual Background ............................................................................ 1

    B. Procedural History ............................................................................. 7

STANDARD OF REVIEW ................................................................................. 10

ARGUMENT ...................................................................................................... 10

    I.     TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS 10

    A. Trump Waived Any Claim to Absolute Immunity .............................. 10

        1. Legal Standard .......................................................................... 10

        2. Trump Waived His Absolute Immunity Defense ......................... 12

        3. There is No Excuse for Trump's Waiver ..................................... 13

        4. Alternatively, The Law of the Case Rule Precludes Trump's Position ......... 16

    B. Trump's Absolute Immunity Defense is Meritless ............................. 16

        1. Absolute Immunity Is Subject to Important Limits ..................... 17

        2. Trump's Categorical Position Should Be Rejected ..................... 19

        3. Trump Lacks Absolute Immunity for his Defamatory Statements ................ 24

    II.   TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS .............................. 27

    A. Trump's Statements Constituted Defamation Per Se........................... 27

    B. Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements ......... 30

    C. Trump's Statements Are Actionable as a Matter of Law ..................... 32

    D. Carroll is Entitled to Present the Punitive Damages Issue to the Jury................. 35

CONCLUSION .................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allam v. Meyers,*
    906 F. Supp. 2d 274 (S.D.N.Y. 2012) .................................................................. 35

*Am. Acad. of Religion v. Napolitano,*
    573 F.3d 115 (2d Cir. 2009) ............................................................................... 34

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505 (1986) ............................................................... 10

*Aramony v. United Way of Am.,*
    254 F.3d 403 (2d Cir. 2001) ............................................................................... 16

*Armstrong v. Simon & Schuster, Inc.,*
    85 N.Y.2d 373 (1995) ......................................................................................... 29

*Aronson v. Wiersma,*
    65 N.Y.2d 592 (1985) ......................................................................................... 30

*Banneker Ventures LLC v. Graham,*
    798 F.3d 1119 (D.C. Cir. 2015) ......................................................................... 19

*Barrett v. Harrington,*
    130 F.3d 246 (6th Cir. 1997) .............................................................................. 21

*Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs,*
    41 F.3d 600 (10th Cir. 1994) .............................................................................. 11

*Broker Genius Inc. v. Gainor,*
    810 F. App'x 27 (2d Cir. 2020) .......................................................................... 15

*Buckley v. Fitzsimmons,*
    509 U.S. 259, 113 S. Ct. 2606 (1993) ............................................................... 21

*Butler v. Catinella,*
    868 N.Y.S.2d 101 (2d Dep't 2008) .................................................................... 13

*Carroll v. Trump,*
    49 F.4th 759 (2d Cir. 2022) ....................................................................... 8, 9, 25

*Carroll v. Trump,*
    120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020) ............................................................. 7

*Carroll v. Trump*,
498 F. Supp. 3d 422 (S.D.N.Y. 2020)............................................................... 8, 24, 25, 27

*Carroll v. Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022).................................................................... 9, 14, 15

*Carroll v. Trump*,
No. 20 Civ. 7311, 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) ......................................... 14, 15

*Carroll v. Trump*,
No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020) ................................... 8, 16

*Celle v. Filipino Reporter Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000)................................................................................. 27, 29

*Celotex Corp v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548 (1986) ................................................................................ 10

*Chestnut v. City of Lowell*,
305 F.3d 18 (1st Cir. 2002)................................................................................................ 11

*Clinton v. Jones*,
520 U.S. 681, 117 S. Ct. 1636 (1997) ...................................................................... *passim*

*Cozzo v. Tangipahoa Par. Council*,
279 F.3d 273 (5th Cir. 2002) ............................................................................................ 11

*Davis v. Boeheim*,
24 N.Y.3d 262 (2014) ........................................................................................... 32, 33, 34

*Davydov v. Youssefi*,
169 N.Y.S.3d 322 (1st Dep't 2022) ............................................................................ 29, 30

*Doe v. McMillan*,
412 U.S. 306, 93 S. Ct. 2018 (1973)................................................................................. 22

*Dworin v. Deutsch*,
No. 06 Civ. 13265, 2008 WL 508019 (S.D.N.Y. Feb. 22, 2008) ................................... 34

*Edwards v. Nat'l Audubon Soc., Inc.*,
556 F.2d 113 (2d Cir. 1977)............................................................................................. 29

*Firestone v. Berrios*,
42 F. Supp. 3d 403 (E.D.N.Y. 2013) ............................................................................... 16

*Francis v. Costco Wholesale Corp.*,
No. 19 Civ. 1979, 2021 WL 1298616 (S.D.N.Y. Apr. 7, 2021)............................................ 10

*Gasperini v. Ctr. for Humans., Inc.*,
　518 U.S. 415, 116 S. Ct. 2211 (1996) ......................................................... 13

*Gentile v. Grand Street Medical Assocs.*,
　79 A.D.3d 1351 (3d Dep't 2010) .................................................................. 34

*Gong v. Savage*,
　169 N.Y.S.3d 511 (Table) (N.Y. Sup. Ct. N.Y. Cty. 2022) .......................... 29

*Gross v. New York Times Co.*,
　82 N.Y.2d 146 (1993) .................................................................................. 33

*Gurtler v. Union Parts Mfg. Co., Inc.*,
　285 A.D. 643 (1st Dep't 1955) .................................................................... 30

*Hamer v. Neighborhood Hous. Servs. of Chicago*,
　138 S. Ct. 13 (2017) .................................................................................... 11

*Huggins v. Povitch*,
　No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996) ............... 34

*Hunter v. Bryant*,
　502 U.S. 224, 112 S. Ct. 534 (1991) ........................................................... 15

*Hutchinson v. Proxmire*,
　443 U.S. 111, 99 S. Ct. 2675 (1979) ........................................................... 21

*In re Stock Exchanges Options Trading Antitrust Litig.*,
　317 F.3d 134 (2d Cir. 2003) ........................................................................ 11

*Jones v. Clinton*,
　72 F.3d 1354 (8th Cir. 1996) ...................................................................... 24

*Joyce v. Thompson Wigdor & Gilly LLP*,
　No. 06 Civ. 15315, 2008 WL 2329227 (S.D.N.Y. June 3, 2008) ................. 33

*Levy v. Nissani*,
　115 N.Y.S.3d 418 (2d Dep't 2020) .............................................................. 29

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*,
　397 F.3d 77 (2d Cir. 2005) .......................................................................... 16

*McNamee v. Clemens*,
　762 F. Supp. 2d 584 (E.D.N.Y. 2011) ......................................................... 31

*Milkovich v. Lorain Journal Co.*,
　497 U.S. 1, 110 S. Ct. 2695 (1990) ............................................................. 33

*Morales v. Kavulich & Assocs., P.C.*,
  294 F. Supp. 3d 193 (S.D.N.Y. 2018)..................................................... 35

*Nevada v. Hicks*,
  533 U.S. 353, 121 S. Ct. 2304 (2001) .................................................... 12

*Nixon v. Fitzgerald*,
  457 U.S. 731, 102 S. Ct. 2690 (1982) ............................................ *passim*

*Pfizer, Inc. v. Stryker Corp.*,
  348 F. Supp. 2d 131 (S.D.N.Y. 2004) .................................................... 31

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
  813 F. Supp. 2d 489 (S.D.N.Y. 2011)................................................ 29, 30

*Ram v. Moritt*,
  612 N.Y.S.2d 671 (2d Dep't 1994) ........................................................ 30

*Reynaga Hernandez v. Skinner*,
  969 F.3d 930 (9th Cir. 2020) ................................................................. 11

*Rose v. AmSouth Bank of Fla.*,
  391 F.3d 63 (2d Cir. 2004)..................................................................... 14

*Saks v. Franklin Covey Co.*,
  316 F.3d 337 (2d Cir. 2003)..................................................... 11, 13, 14

*Satchell v. Dilworth*,
  745 F.2d 781 (2d Cir. 1984)................................................................... 11

*Shmueli v. City of New York*,
  424 F.3d 231 (2d Cir. 2005)............................................................ 10, 12

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  779 F.3d 191 (2d Cir. 2015)................................................................... 30

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  No. 07 Civ. 4018, 2020 WL 1244930 (E.D.N.Y. Mar. 16, 2020) ........... 30

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
  762 F.3d 165 (2d Cir. 2014)................................................................... 11

*Stern v. Cosby*,
  645 F. Supp. 2d 258 (S.D.N.Y. 2009) ............................................... 27, 35

*Tacopina v. Kerick*,
  No. 14 Civ. 749, 2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) ............. 30

*Thompson v. Trump*,
  590 F. Supp. 3d 46 (D.D.C. 2022) ................................................................. 23, 24

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ................................................................................... 19, 22

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ............................................................................... 7, 8, 17

*United States v. Burr*,
  25 F. Cas. 30 (C.C.D. Va. 1807) ......................................................................... 17

*United States v. Stein*,
  473 F. Supp. 2d 597 (S.D.N.Y. 2007) ................................................................. 34

*Zerman v. Sullivan & Cromwell*,
  677 F. Supp. 1316 (S.D.N.Y. 1988) ................................................................... 34

*Zervos v. Trump*,
  74 N.Y.S.3d 442 (N.Y. Sup. Ct. 2018) .......................................................... 33, 34

*Zervos v. Trump*,
  171 A.D.3d 110 (1st Dep't 2019) ......................................................................... 7

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1 ................................................................................ 21

U.S. Const. art. II, § 1 ....................................................................................... 20

U.S. Const. art. II, § 1, cl. 8 .............................................................................. 20

U.S. Const. art. II, § 2, cl. 1 .............................................................................. 20

U.S. Const. art. II, § 2, cl. 2 .............................................................................. 20

U.S. Const. art. II, § 3 ....................................................................................... 20

**Rules**

Fed. R. Civ. P. 8(c) ...................................................................................... 10, 11

Fed. R. Civ. P. 15(a) ........................................................................................ 11

Fed. R. Civ. P. 16(b)(4) .................................................................................... 11

Fed. R. Civ. P. 56(a) ........................................................................................ 10

NY CPLR § 3211 ............................................................................................... 7

## Other Authorities

Doris Kearns Goodwin, *The Bully Pulpit* (2013) .......................................................... 22

James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The
    Debates in the Several State Conventions on the Adoption of the Federal Constitution 480
    (Jonathan Elliot ed., Washington, 2d ed. 1836) ...................... 18

Jeffrey K. Tulis, *The Rhetorical Presidency* (1987) ................................................... 22

Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon, Teac*hing
    American History ............................................................................ 20

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit
    Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020) .......................... 8

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ................. 18

Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss, *Swalwell v.
    Trump*,
    No. 21 Civ. 586 (D.D.C. May 24, 2021) ...................... 15

Mem. in Support of Mot. to Dismiss, *District of Columbia v. Trump*,
    No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) ...................... 18

Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at*
    https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/ ........... 23, 26

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*,
    No. 20-197 (U.S. Aug. 20, 2020) ...................... 18

Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection
    Isn't Impeachable*, Wash. Post (Jan 29, 2020) ...................... 20

Sand, et al., *Modern Federal Jury Instructions* (2022) ...................... 34

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.) ...................... 16

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.) ...................... 11

# INTRODUCTION

Now that this defamation case is ready for trial after three years of litigation, Defendant Donald J. Trump seeks summary judgment based mainly on his argument that absolute immunity bars Plaintiff E. Jean Carroll's claim. But Trump has waived that affirmative defense: he did not assert it in his answer, he did not mention it at any point prior to the filing of this summary judgment motion, and he took positions in state court that were clearly at odds with it. As a result, Trump can raise absolute immunity at this late stage only in the absence of prejudice to Carroll, undue delay, bad faith or dilatory motive, or futility—and each of those considerations independently prohibits excusing his waiver. Trump's absolute immunity theory is also meritless: his personal attacks on Carroll did not constitute the performance of any presidential function.

This leaves only a handful of other arguments asserted by Trump, each of which lacks merit. First, as explained in Carroll's recent opposition to Trump's motion to dismiss in *Carroll v. Trump*, No. 22 Civ. 10016, ECF 26, Carroll was not required to plead special damages because Trump's statements were defamatory *per se*. Second, it goes without saying that Carroll did not "consent" to Trump's defamation—and it is frivolous to assert that when a woman reveals sexual abuse by a powerful man, she somehow automatically consents to whatever defamatory abuse he may unleash as retribution. Third, precedent confirms that Trump's highly specific factual claims about Carroll's motives for speaking up are actionable as a matter of law and do not qualify as speculative opinion. Finally, Carroll is surely entitled to ask a jury to impose punitive damages.

# BACKGROUND

## A.     Factual Background

More than 25 years ago, Carroll left work at a studio in New Jersey where she had taped her daily television show ("Ask E. Jean") and headed to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. *See* Plaintiff E. Jean Carroll's Response to Defendant

Case 1:20-cv-07311-LAK Document 205-2 Filed 01/12/23 Page 10 of 24

Donald J. Trump's Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 24. Carroll did not find what she was looking for and was about to leave the store empty-handed. *Id.* She approached the revolving door on 58th Street, where she saw Trump. *Id.* ¶¶ 24-25. They knew people in the same circles and had previously met at a party. *Id.* ¶ 22. When Trump saw Carroll at Bergdorf's, he "held up [his] hand," so she "stopped and he came in." *Id.* ¶ 25. He said: "Hey, you're that advice lady." Carroll replied: "Hey, you're that real estate tycoon." *Id.*

Trump told Carroll that he was at Bergdorf's to buy a present for a girl and asked her to "come help [him]." *Id.* ¶ 26. Trump and Carroll began searching for a gift. Eventually, on Trump's suggestion, they went upstairs to the lingerie department. *Id.* ¶ 27. When they arrived, it was empty. *Id.* ¶ 28. Sitting on the glass counter near them were "three or four boxes" and "a see-through [lilac-greyish] bodysuit with a little bit of lace on it." *Id.* ¶ 29. Trump picked up the bodysuit, tossed it at Carroll, and said "go put this on." *Id.* ¶ 30. Bemused, Carroll "tossed it back to him" and said to him "it goes with your eyes." *Id.* Trump caught the bodysuit, held it up to Carroll's chest, and said "you're in good shape, this looks like it might fit you." *Id.* ¶ 31. Carroll had assumed they were engaging in "an enjoyable repartee," but then Trump abruptly grabbed her arm and said, "let's go put this on." *Id.* ¶¶ 32-33. As he maneuvered her into a fitting room, Carroll thought to herself, "this is hilarious, I'm going to make him put it on over his pants." *Id.* ¶ 33.

Trump, as it turns out, had a very different plan in mind. As soon as Carroll walked into the dressing room, Trump closed the door and lunged at her. *Id.* ¶¶ 34-35. He pushed her against the wall; she hit her head for the first time before "he had his hands on [her] arms" and "pushed [her] back a second time." *Id.* ¶¶ 34, 37. She "hit [her] head [again] and then he put his shoulder into [her]." *Id.* ¶ 37. As Carroll struggled, she began to realize that "this [was] a battle." *Id.* He grabbed both of her arms, held his weight on her up against the wall, jammed his hand under her

dress, and forcibly pulled down her tights. *Id.* Carroll "tried to get [her] arms up to push him back" but she "couldn't get [her] knee up because the pantyhose had been taken down." *Id.* ¶ 38. Carroll "felt [Trump's] fingers rummaging around" her genitals, and then his penis inside her. *Id.* ¶ 39. Finally, Carroll managed to escape by "push[ing] him with [her] hands and knee." *Id.* ¶ 40.

Carroll ran out of the Bergdorf's and onto Fifth Avenue, scared that Trump would "come after" her and "grab [her] again." *Id.* ¶¶ 40-41. Once outside, Carroll immediately called her friend, Lisa Birnbach. *Id.* ¶¶ 42, 44. When Birnbach picked up the phone, Carroll was "very agitated, very hyperventilating. Emotional. And she told [Birnbach] about what happened to her just really moments before she made the phone call." *Id.* ¶ 43. In that moment, Carroll "was in shock and disordered." *Id.* ¶ 42. She "felt unbalanced." *Id.* Birnbach explained to Carroll that what happened to her was rape—and urged her to go the police. *Id.* ¶ 44. Carroll resisted and swore Birnbach to secrecy. *Id.* ¶ 45. A day or two after the rape, Carroll confided in another close friend, Carol Martin. *Id.* ¶ 46. When Carroll told Martin what had occurred, Martin warned Carroll against revealing the assault because Trump was a powerful man, "he's got 200 lawyers, he'll bury you." *Id.*

Apart from her conversations with Birnbach and Martin, Carroll remained silent about the sexual assault for two decades. *Id.* ¶ 47. She was "embarrassed" and "ashamed," so she "said let's never talk about this again." *Id.* She recalls, "I always feel I can handle things myself." *Id.* She knew that sexual assault was pervasive but feared that "women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked." *Id.* ¶ 49. Carroll's silence, though, concealed trauma. After Trump raped her, "the music had stopped" and her "light was gone." *Id.* ¶ 50. Carroll never had sex or dated again; she "had no desire for desire"—she did not "have the desire to want sex." *Id.*

3

Years later, when Trump announced he was running for President, Carroll watched with "disbelief" and "heartache." *Id.* ¶ 51. But she did not come forward at the time because her mother, a respected Republican politician in Indiana, was dying. *Id.* ¶ 52. She knew that if she spoke up, "it would ruin" her mother's last days. *Id.* It would also come to nothing: "I didn't want to get fired from *Elle* and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about." *Id.* ¶ 53. Moreover, Carroll was horrified that some of Trump's supporters seemed to admire him *more* as woman after woman revealed that he had sexually assaulted them. *Id.*

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with the men in their lives. *Id.* ¶ 54. On the first day of her trip, "the Harvey Weinstein story broke" and Carroll watched "the flood of stories … as women started standing up." *Id.* ¶¶ 55, 57. Her book began to take a different shape, and Carroll started to create a list of terrible men she had encountered in her own life. *Id.* ¶ 55 Inspired by the women of the #MeToo movement—and understanding the importance of being honest with loyal readers of her column—Carroll decided she had to include Trump. *Id.* ¶ 57. Carroll's book was ultimately published in 2019. In advance of its release, *New York Magazine* published an eight-page excerpt containing, among other things, her account of being raped by Trump. *Id.* ¶ 59.

Trump responded by seeking to punish and humiliate Carroll. He denied her accusation and insisted they had never met. *Id.* ¶¶ 11-13, 61. But he went much further than that. He insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too ugly for him to have raped her. *Id.* ¶ 13. He said that Carroll's non-fiction book, with its accounts of what women on her road trip had told her (as well as her own autobiographical account of the rape), "should be sold in the fiction section." *Id.* ¶ 11.

He accused Carroll of "mak[ing] up false stories of assault to try to get publicity for [herself], or to sell [her] book." *Id.* He charged that Carroll had invented an allegation of rape to make money. *Id.* ¶¶ 11-12 And he implied that she had falsely accused other men of sexual assault. *Id.* ¶ 12.

At his deposition in this case, Trump doubled down on each of these statements. *Id.* ¶¶ 64-68. When pressed on his claim that Carroll was too unattractive for him to have sexually assaulted her, for instance, he reiterated it: "And that's 100 percent true. She's not my type. … There's no way I would ever be attracted to her." *Id.* ¶ 69. However, when shown a photograph including himself and Carroll from a party several years before the rape, Trump *twice* misidentified Carroll as his ex-wife Marla Maples—insisting that it was Marla smiling at him in the photo even as he pointed straight at Carroll. *Id.* ¶¶ 70-71. Ultimately, Trump's lawyer had to correct his mistake (which obviously undercut any assertion that Carroll was not "his type"). *Id.* ¶ 70.

Trump's total lack of knowledge about Carroll was unsurprising. When Trump made his statements in June 2019, nobody in the White House had undertaken any research into Carroll or her allegations. *Id.* ¶ 72. Trump admitted during the deposition that he had never read Carroll's book or magazine excerpt. *Id.* ¶ 78. Moreover, neither Trump nor (to his knowledge) any of his White House aides conducted any research or investigation into Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors, her reasons for speaking up, or the veracity of her allegations concerning experiences of sexual misconduct at the hands of other men. *Id.* ¶¶ 72-77. Nor did Trump identify any White House personnel as involved in investigating, preparing, strategizing, or creating the defamatory statements he made about Carroll in June 2019. *Id.* ¶ 72.

Trump's attacks directly targeted Carroll's professional life. Carroll is a journalist, author, and advice columnist who built her career providing honest advice to women in response to their

questions *Id.* ¶ 81. Indeed, her "entire career as an advice columnist rested on the fact that [she] could be trusted." *Id.* ¶ 88. And her advice column had run in *Elle* for 26 years, where it "was one of the most popular columns ever in the magazine." *Id.* ¶ 81. As explained by Roberta Myers (*Elle*'s editor-in-chief for 17 years), Carroll was "a destination, meaning readers would want to hear from her. She was an important part of what kept [*Elle*] popular." *Id.* ¶ 84. Myers elaborated that Carroll "is a journalist first and everything that she writes is informed by that, meaning the facts." *Id.* ¶ 87. As Carroll explained at her own deposition, while she was not surprised that Trump denied raping her, she actually thought he would insist that because she had been flirtatious with him she had somehow consented to having sex with him in the dressing room that day. *Id.* ¶ 62. She was shocked that Trump instead stated that he had never met her and the incident had never happened at all—statements that he subsequently reaffirmed at his deposition. *Id.* ¶¶ 62, 64-65.

But President Trump's charge that she had lied about everything—about meeting him, about the rape itself, about her motives for coming forward—had devastating consequences. As she had feared, Carroll became viewed "as a woman who's untrustworthy," and "a woman who can't be believed." *Id.* ¶ 89. She also received fewer letters from readers—and then was unexpectedly fired from *Elle* before her contract was up for renewal. *Id.* ¶ 90. An expert analysis confirms that Trump's statements reached an immense audience and harmed Carroll's reputation and professional endeavors. *See id.* ¶ 91 (analyzing dissemination of the statements and concluding they generated between 142,334,424 and 188,155,507 impressions); *id.* ¶ 92 (completing quantitative impact analysis to determine number of readers and listeners likely to believe Trump's statements by publication, averaging 25.25%)]. In short, Trump's defamation "shook th[e] whole foundation" of the career that Carroll had painstakingly built for herself as an author and journalist over many years, and "that was it." *Id.* ¶ 89.

6

## B. Procedural History

Carroll filed this action in New York state court in November 2019. From the start, Trump engaged in a pattern of bad faith and dilatory measures. He began by evading service of the complaint, forcing Carroll to seek leave to serve him through alternatives means. NYSCEF No. 15.[1] Once served, Trump filed a motion to dismiss under NY CPLR 3211 that presented only a single, frivolous ground for dismissal: lack of personal jurisdiction in New York. *See* NYSCEF Nos. 33. This motion was denied. *See Carroll v. Trump*, 120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020).

After Trump's initial evasions failed, he filed an answer raising nine affirmative defenses. NYSCEF No. 68. Eight of them concerned the merits of Carroll's defamation claim or personal jurisdiction over him in New York. *Id.* ¶¶ 148-55. The sole remaining affirmative defense asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." *Id.* ¶ 147 (emphasis added). Trump's affirmative defenses did not include any assertion that the Supremacy Clause or Article II rendered him absolutely immune from liability in this proceeding.

Trump subsequently relied on his Supremacy Clause defense in seeking a stay of the case pending a decision by the New York Court of Appeals in *Zervos v. Trump*. The *Zervos* case concerned whether a civil suit could proceed against Trump in state court during his time in office. *See* 171 A.D.3d 110, 113 (1st Dep't 2019). In his stay motion, Trump argued only that the Supremacy Clause "bars state-court subject matter jurisdiction over actions against a U.S. President *while he or she is in office*." NYSCEF No. 49 at 6 (emphasis added); *accord id.* at 1-4.

While Trump's stay motion was pending, the U.S. Supreme Court decided *Trump v. Vance*, which held that the Constitution does not categorically preclude the issuance of a state criminal

---

[1] Citations to "NYSCEF No. __" are to the New York state court docket, No. 160694/2019 (N.Y. Sup. Ct.).

subpoena to a sitting President. *See* 140 S. Ct. 2412, 2421-29 (2020). In light of *Vance*, Carroll renewed her opposition to Trump's stay motion. Trump responded by asserting that *Vance* was limited to the criminal context: "[T]here is no pressing need for a state court to exercise control over a sitting President in a civil action, particularly because the action can be stayed *until the President is no longer in office*." NYSCEF No. 99 at 3 (emphasis added). Two days later, Trump expressly disclaimed any effort to evade litigation or liability once he was no longer President: "No one is seeking to 'escape accountability' here. Plaintiff is free to pursue this action *when the President is no longer in office*." NYSCEF No. 103 at 3 (cleaned up) (emphasis added).[2]

In August 2020, Justice Saunders denied Trump's stay motion. *See Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020). Trump then faced a choice: seek appellate relief or comply with his discovery obligations. Trump opted instead to pressure the United States Department of Justice (DOJ) to intervene under the Westfall Act. *See* Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020). At Trump's behest, the DOJ removed the case to this Court and filed a motion to substitute itself as the defendant. *See* Dist. Ct. Doc. No. 3.

This Court denied the DOJ's motion to substitute on two grounds: first, the Westfall Act does not cover the President; second, Trump's defamatory attacks on Carroll were not undertaken within the scope of his office or employment as President. *See Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020). Both Trump and the DOJ appealed. *See* Dist. Ct. Doc. Nos. 45, 46. On September 27, 2022—over a dissent by Judge Chin—a Second Circuit panel held that the Westfall Act does cover the President. *See Carroll v. Trump*, 49 F.4th 759, 767-72 (2d Cir. 2022). The

---

[2] At this point, Trump was represented by attorneys at the law firm of Kasowitz Benson Torres LLP.

majority then certified the scope-of-employment issue to the District of Columbia Court of Appeals, *see id.* at 772-81, which held oral argument sitting *en banc* on January 10, 2023.[3]

During the pendency of his appeal, Trump remained exceptionally active in this Court. He moved to stay proceedings twice, first on December 10, 2020, and then again on September 28, 2022. *See* Dist. Ct. Doc. Nos. 47, 92. This Court denied both motions. *See id.* at 56, 96. Trump also moved to amend his answer to add an anti-SLAPP affirmative defense and counterclaim against Carroll. *See id.* at 64. The Court denied that motion, too, observing that "Trump has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails." *Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). Indeed, the Court not only found Trump's amendment to be futile, but also determined that Trump had "delayed unduly in seeking leave to amend," that Trump had made the request to amend his answer "at least in part in bad faith," and that "granting the motion would prejudice the plaintiff unduly." *Id*. at 589.

Trump thereafter proposed, and Carroll agreed to, a discovery schedule. *See* Dist. Ct. Doc. Nos. 76, 77. Throughout discovery, Trump affirmatively invoked this Court's power to press and litigate his case: he obtained 30,469 pages of records from Carroll and hundreds more pursuant to nonparty subpoenas; he received 19 substantive interrogatory responses; and he deposed Carroll herself, numerous nonparty witnesses, and Carroll's expert witness. In contrast, Trump produced a mere handful of documents and discovery responses before sitting for a deposition.

Following the close of discovery, Trump submitted a proposed schedule for the remainder of the case. Although Trump urged the Court to schedule trial in May 2023, he did not reveal that he planned to inject a previously undisclosed affirmative defense into the action—even as he sought to push the summary judgment schedule closer to the trial date. Dist. Ct. Doc. Nos. 99, 102.

---

[3] A recording of that oral argument is available here: https://www.youtube.com/watch?v=EFX5Y8kp4Co.

**STANDARD OF REVIEW**

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant bears the burden of proof. *See id.* at 323, 106 S. Ct. at 2552. The court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Francis v. Costco Wholesale Corp.*, No. 19 Civ. 1979, 2021 WL 1298616, at *2 (S.D.N.Y. Apr. 7, 2021) (Kaplan, J.).

**ARGUMENT**

**I.      TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS**

**A.      Trump Waived Any Claim to Absolute Immunity**

Trump did not attempt to raise an absolute immunity argument until over three years into this litigation. He did not assert this affirmative defense in his answer, nor did he include it any of his voluminous filings in state or federal court. Instead, he took positions in state court plainly at odds with an assertion of absolute immunity—and more recently asked this Court to set a trial date without even mentioning that he planned to raise an unpleaded affirmative defense. Trump therefore waived any contention that absolute immunity defeats Carroll's case. And although the Court has discretion to excuse that waiver in the absence of bad faith or dilatory motive, prejudice to the plaintiff, undue delay of the proceedings, or futility, in this case each of those considerations *independently* forecloses any claim that Trump's waiver of absolute immunity should be excused.

**1.      Legal Standard**

Absolute immunity is an affirmative defense. *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). Under Federal Rule of Civil Procedure 8(c), "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." A "core purpose[]" of this

rule is "to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). Accordingly, "[i]t is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case." Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.); *see Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014); *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984). This longstanding rule applies with full force to absolute immunity. *See Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded."); *accord Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 n.1 (9th Cir. 2020); *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003); *Chestnut v. City of Lowell*, 305 F.3d 18, 22 (1st Cir. 2002) (Torruella, J., concurring); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604-05 (10th Cir. 1994).

As the Second Circuit has explained, the waiver of an affirmative defense may be excused only in limited circumstances: namely, "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks*, 316 F.3d at 350. In those exceptional situations—and consistent with Federal Rules of Civil Procedure 15(a) and 16(b)(4)—"the district court may construe the motion for summary judgment as a motion to amend the defendant's answer." *Id.* at 350-51 (citations omitted).[4]

---

[4] Adhering to Second Circuit precedent, we describe Trump's conduct in this litigation as resulting in a waiver, even though it may also properly be characterized as a forfeiture under recent Supreme Court precedent. *See, e.g.*, *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) ("The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." (cleaned up)).

## 2. Trump Waived His Absolute Immunity Defense

Trump waived his affirmative defense of absolute immunity by failing to raise it in his answer. That waiver is confirmed by his subsequent conduct in this litigation.

Trump's answer raised nine affirmative defenses, only one of which concerned official immunity in any respect. In his first affirmative defense, Trump asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." NYSCEF No. 68 at ¶ 147 (emphasis added). On its face, this defense did not invoke Article II, did not invoke absolute immunity, and did not claim total or permanent immunity from either litigation or liability. Neither in form nor in substance did it encompass absolute immunity, which "protects an official not only from liability but also from suit." *Shmueli*, 424 F.3d at 236.

Instead, this part of Trump's answer raised a very different argument: that the Supremacy Clause divested the state court of power to hear this case during Trump's presidential tenure. In other words, Trump claimed only that the state court temporarily lacked subject matter jurisdiction over him by virtue of his federal office. *See* NYSCEF No. 49 at 1 (contending that the "Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office"). That time-limited Supremacy Clause argument is fundamentally different from an assertion of absolute immunity in two respects. First, within its scope, absolute presidential immunity provides *permanent* rather than *temporary* immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748-49, 102 S. Ct. 2690, 2700-01 (1982). And second, in contrast to Trump's portrayal of his Supremacy Clause argument as jurisdictional, "there is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373, 121 S. Ct. 2304, 2317 (2001).

Accordingly, the affirmative defense in Trump's answer simply had nothing to do with absolute immunity—and so Trump waived absolute immunity by failing to raise it in his answer.[5]

Trump's subsequent litigation conduct only confirmed that waiver. In state court, Trump repeatedly described his immunity position as limited to his tenure in office. *See* NYSCEF No. 99 at 3. More fundamentally, Trump affirmatively stated that "no one is seeking to 'escape accountability' here," and he conceded that "Plaintiff is free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Meanwhile, Trump neither sought to amend his answer nor sought appellate relief after his Supremacy Clause defense was rejected in state court. The subsequent removal of this case to federal court only gave Trump more opportunities to persist in his waiver: he failed to raise absolute immunity in his first stay motion, *see* Dist. Ct. Doc. No. 47; in his second stay motion, *see id.* at 92; in his motion to amend his answer to add an anti-SLAPP affirmative defense and counterclaim, *see id.* at 64, in agreeing to a joint proposed discovery schedule, *see id.* at 75; or in his letters to the Court concerning a proposed schedule for summary judgment briefing and trial proceedings, *see id.* at 99, 102. Stated simply, Trump waived absolute immunity when he filed his answer on January 23, 2020, and he deepened that waiver by litigating this case for almost three years before seeking to raise that defense.

### 3. There is No Excuse for Trump's Waiver

In light of the Court's power to grant leave to amend an answer, the Court may "entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of

---

[5] To the extent Trump may argue that he raised absolute immunity by averring that the complaint fails to state a claim, that position is foreclosed by Second Circuit precedent. *See Saks*, 316 F.3d at 350 (collecting cases). To the extent Trump claims that state court procedural rules are different, he is mistaken, *see Butler v. Catinella*, 868 N.Y.S.2d 101, 106 (2d Dep't 2008) ("Affirmative defenses … as a general rule, would be deemed waived if not raised in the pleadings." (citation omitted)), and in all events federal procedural rules apply now that the case has been removed to federal court, *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219 (1996).

the proceedings." *Saks*, 316 F.3d at 350. Because Trump fails that standard several times over, the Court should not excuse Trump's waiver of the affirmative defense of absolute immunity.

First, Trump has clearly acted with bad faith and dilatory motive. In fact, this Court already reached that conclusion with specific respect to the propriety of granting Trump leave to amend his answer to add an unpleaded affirmative defense. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022) (denying Trump's motion for leave to amend his answer to include an anti-SLAPP defense and finding that Trump "has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails"); *see also id.* at 587-89 (describing the course of Trump's dilatory conduct). The Court then reaffirmed that finding of bad faith just three months ago. *See Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *6 (S.D.N.Y. Oct. 12, 2022) (adhering to the Court's earlier finding that "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him"). Whether seen as law of the case concerning Trump's entitlement to amend his answer or instead as highly relevant findings concerning Trump's bad faith and dilatory purpose, these decisions make clear that Trump's waiver should not be excused. Indeed, as noted above, Trump previously sought to shore up his state court stay motion by insisting that Carroll was "free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Now that he has left office—and his other stall tactics have failed—Trump should not be permitted to renege on that position by introducing yet another brand-new argument (which, if rejected, he will presumably seek to leverage into another interlocutory appeal). No party should be allowed to deliberately engage in such a "seriatim appeals" strategy.

Second, Trump did not seek to raise this defense "at the first pragmatically possible time," and allowing him to do so at this late juncture would "unfairly prejudice the opposing party." *Rose*

*v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004); *see Broker Genius Inc. v. Gainor*, 810 F. App'x 27, 32 (2d Cir. 2020) (upholding finding of waiver). The law of absolute immunity is not new—and Trump has known all the facts relevant to that potential defense from the outset of this case. *See* Mot. at 3-18. Moreover, immunity doctrines are meant to be raised and resolved "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991), and Trump has had no difficulty asserting absolute immunity at the outset of other civil damages cases, *see, e.g.*, Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss at 8-11, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. May 24, 2021). These facts not only confirm Trump's bad faith and dilatory purpose, but also highlight the substantial prejudice to Carroll that would result from allowing him to invoke an unpleaded affirmative defense that he could have raised much earlier. *See Carroll*, 590 F. Supp. 3d at 586 ("The defendant has not offered a satisfactory reason for the length of his delay in this case."). That prejudice includes a lack of notice concerning the need to respond to this affirmative defense throughout the now-concluded discovery process. It encompasses Trump's efforts to raise this issue only after having inflicted substantial burdens on Carroll and third parties in discovery (when a major purpose of absolute immunity is to gatekeep access to discovery in the first place). And it captures the potential for significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings. *See Carroll*, 2022 WL 6897075, at *6 ("Delay is a more serious concern in this case than usual …. [T]he defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.").

Finally, for the reasons set forth below in Part I.B, Trump's absolute immunity argument is meritless, and so his attempt to overcome or excuse his waiver would fail based on futility.

For each of these independent reasons—bad faith and dilatory motive, undue prejudice to the plaintiff, undue delay of the proceedings, and futility—the Court should find that Trump has waived any affirmative defense of absolute immunity and should not excuse that waiver.

### 4. Alternatively, The Law of the Case Rule Precludes Trump's Position

In the event this Court concludes that Trump's first affirmative defense did include absolute immunity, the Court should nonetheless reject it as precluded by the law-of-the-case doctrine.

If one court decides a legal issue, "that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (citation omitted). That is especially true where "one judge or court is asked to consider the ruling of a different judge or court." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (quoting Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.)). This doctrine applies, as here, "when a state court case is removed to federal court." *Firestone v. Berrios*, 42 F. Supp. 3d 403, 412 (E.D.N.Y. 2013) (citation omitted).

Trump's first affirmative defense in this case maintained that the state court temporarily lacked jurisdiction under the Supremacy Clause. To the extent this qualified as an assertion of absolute immunity, it was rejected by the state trial court when considered directly in connection with Trump's motion to stay, *see Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130, at *2 (N.Y. Sup. Ct. Aug. 03, 2020), and Trump then chose *not* to appeal that determination. Therefore, Trump has either waived absolute immunity or, alternatively, law of the case precludes it.

### B. Trump's Absolute Immunity Defense is Meritless

Even if it were not waived or precluded, Trump's absolute immunity defense should be rejected: it is foreclosed by precedent and would invite abuse by future officeholders. Because Trump's attacks on Carroll were private conduct beyond the scope of any Article II function, there is no basis for concluding that absolute immunity bars Carroll's defamation action.

16

### 1. Absolute Immunity Is Subject to Important Limits

As the "chief constitutional officer of the Executive Branch," the President "occupies a unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749-50, 102 S. Ct. at 2701. "His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020). Therefore, to avoid the "distortion of the Executive's decisionmaking process with respect to official acts that would stem from worry as to the possibility of damages," *id.* (citation omitted), courts have long held that the President enjoys absolute immunity from "damages liability for acts within the 'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704. This rule upholds the separation of powers by policing judicial intrusion on Article II functions.

If extended beyond official conduct, however, this doctrine poses a risk of abuse, since it would immunize the President for even egregious personal wrongs. The Supreme Court has thus held that the purposes of absolute immunity also define its limits. *See id.* at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes."). Because those purposes concern only the President's official acts, there is "no support for an immunity for *unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997). Simply put, the President does not receive immunity for acts beyond the "'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704; *see also Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645 (the President lacks immunity "for his purely private acts").

In practice, this limitation underscores the importance of discerning the scope of official presidential conduct. The Presidency is a demanding job. But as Chief Justice Marshall anticipated, the demands of a president's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14692D); *see*

*also* Clinton, 520 U.S. at 705 n.40, 117 S. Ct. at 1650 (Presidents "face a variety of demands on their time, … some private, some political, and some as a result of official duty"); Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000) (recalling that the President "is a person as well as an institution"). Indeed, the Framers foresaw that Presidents would engage in private conduct.[6] And while serving as President, Trump insisted that aspects of his conduct were wholly private, including profitable business deals with foreign nations and censoring critics on Twitter.[7]

Because Presidents engage in a shifting mix of personal and official acts, only some of which reflect presidential functions, the Supreme Court has provided additional guidance. *First*, plaintiffs cannot defeat immunity merely by alleging that the President's conduct was unlawful or motivated by an improper purpose. *See Nixon*, 457 U.S. at 756, 102 S. Ct. at 2705. *Second*, the President cannot invoke immunity merely by claiming that his conduct was "clearly taken *within* an official capacity," since the "scope of an immunity" even for otherwise official acts depends on "'performance of particular functions of his office.'" *Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (citation omitted). *Third*, a conception of absolute immunity that would encompass all presidential conduct is inconsistent with the teaching that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 695, 117 S. Ct. at 1644 (citation omitted). *Finally*, as the D.C. Circuit has recognized, the official seeking immunity (here,

---

[6] *See* James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836) ("Far from being above the laws, [the President] is amenable to them in his private character as a citizen.").

[7] Although Trump was mistaken in those contexts that his actions were not subject to constitutional constraint, Trump concededly understood himself to be acting in a purely private capacity during important interactions with the public during his tenure in office. *See, e.g.*, Petition for Writ of Certiorari at 14, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("Blocking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mem. in Supp. of Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that President Trump was free to profit from private commercial transactions with foreign powers, so long as he did not receive "compensation for services rendered … in an official capacity or in an employment (or equivalent) relationship with a foreign government").

the President) bears the burden of proof in establishing his entitlement to it for any particular act. *See, e.g.*, *Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015). Under this framework, the President enjoys robust protection for conduct undertaken as part of an Article II function, but lacks immunity for personal conduct outside the scope of his presidential role.

### 2. Trump's Categorical Position Should Be Rejected

Trump asks this Court to hold that whenever the President addresses the public on a matter of "national concern," or "defend[s] himself from grave accusations that impugn his character," he has engaged in a presidential function shielded by absolute immunity. Mot. at 13. That proposed categorical rule—which treats the nature and context of his public statements as all but irrelevant— sweeps much too far. It defies precedent and tradition, and it should be rejected.

Starting with first principles, the Supreme Court has made clear that absolute immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Clinton*, 520 U.S. at 695, 117 S. Ct. at 1644. Thus, absolute immunity shields only particular presidential functions, rather than all conduct by the holder of the office. For that distinction to bear weight, presidential functions cannot be defined so expansively as to encompass everything a President might say. Yet that is what Trump urges here. Every statement by the President may— by simple virtue of who uttered it—be seen as involving a matter of "national concern." Similarly, the President could describe most (or all) of his statements as responses to those who "impugn his character." Trump's position therefore conflicts with *Clinton*: it would treat virtually every statement by a President as the performance of an official function, and would (in effect) assign unlimited immunity to the President himself rather than to his perceptibly presidential conduct.

To be sure, nobody doubts that the President "possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Certain exercises of

Article II authority inherently involve speech, including the Oath of Office, U.S. Const. art. II, § 1, cl. 8, the State of the Union, *id.* art. II, § 3, the Commander in Chief power, *id.* art. II, § 2, cl. 1, the pardon power, *id.*, and the nominating power, *id.* art. II, § 2, cl. 2. In many other settings, such as signing statements, veto threats, supervision of the executive branch, and certain personnel announcements, the President performs an official function by speaking about how he has exercised (or intends to exercise) aspects of "the executive Power." *Id.* art. II, § 1. Speech by the President about the operation and administration of the government, and about the execution of the laws that he has sworn to faithfully execute, is ordinarily part of his official functions as well.

But when the President speaks about personal and private matters bearing no relation to any historical, ongoing, or intended use of Article II authority—and bearing no relation to the operation and administration of the government—it is more tenuous to claim that he is engaged in a presidential function. In such cases, a context-sensitive assessment is necessary to honor the purposes and limits of absolute immunity. *See Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes …."). Holding otherwise (as Trump urges) would conflate the President's private interests with the functions of his office in circumstances far removed from any official undertaking.[8]

This fundamental point has been understood in every analogous setting: time and again, courts have denied absolute immunity to statements beyond the scope of official functions. *See Nixon*, 457 U.S. at 759, 102 S. Ct. at 2706 (Burger, C.J., concurring) ("President[s], like Members of Congress, judges, prosecutors, or congressional aides—all having absolute immunity—are not

---

[8] At Trump's first impeachment trial, his lawyer insisted that "if a president does something, which he believes will help him get elected in the public interest, that cannot be [an impeachable offense]." Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, Wash. Post (Jan 29, 2020). Similar logic underwrites Trump's position here that anything the President says is necessarily a presidential function. Of course, our nation has historically rejected analogous claims that "when the president does it, that means that it is not illegal." Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon*, Teaching American History.

immune for acts outside official duties."). Starting with other Executive Branch officials, the Supreme Court has held that prosecutors are not protected by absolute immunity for statements at press conferences, even though they "may be an integral part of a prosecutor's job" and "may serve a vital public function." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278, 113 S. Ct. 2606, 2618 (1993). So too for the Judiciary. As the Sixth Circuit has emphasized, judges lack absolute immunity for statements made to the press about matters and litigants pending before them: "Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense." *Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997). The same rule covers Congress, whose members (like the President) are accountable to the public through elections and may feel hindered if they cannot speak about matters of "national concern" or respond to accusations that "impugn their character." Members of Congress enjoy a constitutional immunity of their own under the Speech or Debate Clause— which, unlike Article II, *specifically* guarantees immunity for their "Speech." U.S. Const. art. I, § 6, cl. 1. But public statements uttered outside the context of official congressional proceedings constitute non-legislative activity and are *not* shielded by any absolute constitutional immunity— even when a legislator's statements may have "a significant impact on the other [legislators]," and even when statements are issued in furtherance of Congress's own "informing function." *See Hutchinson v. Proxmire*, 443 U.S. 111, 131-32, 99 S. Ct. 2675, 2686-87 (1979). Together, these cases concerning all three branches of government confirm that absolute immunity has *never* been held to encompass all public statements by federal officials, even if those statements may help facilitate the performance of their official functions or are issued in response to public criticism.[9]

---

[9] Strangely, Trump suggests that cases involving legislators and other executive branch officials support his position— and does so relying almost exclusively on cases involving Westfall Act immunity. *See* Mot. at 13-16. Those cases are not a reliable guide to ascertaining the scope of absolute immunity. In some circumstances absolute immunity is

Although the Presidency is unique in certain respects, that uniqueness does not transform every public statement into the performance of an official function. This conclusion is bolstered by original understanding, as well as by common sense. First consider history. *See Nixon*, 457 U.S. at 747, 102 S. Ct. at 2700. Tested against an originalist perspective, Trump's position is baseless: from the founding of the Republic through the early twentieth century, the President's rhetorical function was not understood to encompass public pronouncements on every matter of perceived private or national importance. *See generally* Jeffrey K. Tulis, *The Rhetorical Presidency* (1987). It was not until Presidents Woodrow Wilson, William Howard Taft, and Theodore Roosevelt that the "bully pulpit" came to be seen as a substantial part of the Presidency. *See id.*; *see also* Doris Kearns Goodwin, *The Bully Pulpit* (2013). In our own era, of course, the bully pulpit is established as a presidential function. *See Hawaii*, 138 S. Ct. at 2417-18. But its modern vintage—coupled with its lack of an originalist grounding, sustained contest over its proper scope, and the principle that absolute immunity must be limited—precludes Trump's maximalist position.

So does common sense; hypotheticals illustrate the point. Imagine if a President responded to criticism of his business acumen by appearing at one of his privately-owned hotels to make unlawful statements about a competitor while urging listeners to stay at his property. Or consider a President who appeared at a campaign event and declared that he would endorse anybody who burned down his political opponent's private residence. Or a President who responded to debates over electoral integrity by hosting events in which he urged supporters to engage in unlawful voter

---

broader than Westfall Act protections, and in some circumstances it may be narrower. When it comes to speech by legislators, for instance, the Westfall Act may provide comparatively broad protection by virtue of its application to *all* job-related duties that are actuated by a job-related purpose. In contrast, courts have more tightly limited absolute immunity, denying it to conduct undertaken within the scope of employment wherever that conduct is not in actual, objective furtherance of an official function. *See, e.g.*, *Doe v. McMillan*, 412 U.S. 306, 313, 93 S. Ct. 2018, 2025 (1973) ("[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause."); *see also Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (holding that conduct "clearly taken *within* an official capacity" lacks absolute immunity if not undertaken in performance of an official function).

22

intimidation. Or a President who retained a private residence, got into a property dispute with his neighbor, and willfully sought to incite local protesters to violence and trespass. Or a President who, first thing every morning, randomly picked the name of a critic on social media and then made sure to accuse them of some horrible crime in answering questions from the press that day. For each of these scenarios, Trump's position would shield the President with absolute immunity. Not only would those results be absurd; they would also entail a stark departure from the constitutional principles that animate presidential immunity, which exists to ensure that the President is not improperly diverted in the exercise of his traditional Article II functions.

It is therefore unsurprising that the courts have rejected Trump's proposed rule. This occurred directly in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46 (D.D.C. 2022). There, Judge Mehta described Trump's position as "too simplistic." *Id.* at 77. As he reasoned, "to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity?" *Id.* at 79. Ultimately, Judge Mehta found that "the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function." *Id.* at 81. Applying that rule to the facts in the case before him, he concluded that Trump lacked absolute immunity.[10]

Trump's proposed categorical rule is also at odds with *Clinton v. Jones*. There, as here, a plaintiff sued the President for defaming her after she revealed that he had engaged in sexual misconduct before taking office. More precisely, she alleged that "various persons authorized to

---

[10] On December 7, 2022, the D.C. Circuit—Chief Judge Srinavasan, Judge Rogers, and Judge Katsas—heard oral argument in Trump's appeal from Judge Mehta's ruling. *See* Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at* https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/.

speak for the President"—including his own White House aides and the official White House Spokesman—"publicly branded her a liar by denying that the incident had occurred." *Clinton*, 520 U.S. at 685, 117 S. Ct. at 1640. Under Trump's position, *Clinton* should have been an easy case: it involved a comparatively mild denial of alleged sexual misconduct, and that denial was issued by the President in coordination with his official White House agents and spokespersons.[11] But the Eighth Circuit described Clinton's entitlement to absolute immunity as "not free from doubt." *Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). And the Supreme Court declined to address whether Clinton's defamatory statements were "taken within the 'outer perimeter' of his official responsibilities," observing only that the allegations "arguably may involve conduct" within that outer perimeter. *Clinton*, 520 U.S. 686 & n.3, 117 S. Ct. at 1640 & n.3.

Like *Nixon* before it and Judge Mehta's decision more recently, *Clinton* made clear that absolute immunity requires a careful examination of the facts to see whether a particular act was undertaken in performance of a recognized presidential function. *See Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 ("[W]hen defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach."); *accord Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704; *Thompson*, 590 F. Supp. 3d at 76-81. That context-sensitive approach requires a rejection of Trump's proposed categorical rule—and also requires the denial of absolute immunity here.

### 3. Trump Lacks Absolute Immunity for his Defamatory Statements

As this Court has already recognized, "while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not." *Carroll v. Trump*, 498 F. Supp. 3d 422, 448

---

[11] The complaint in *Jones v. Clinton*, No. 94 Civ. 290 (E.D. Ark.), is available at https://www.washingtonpost.com/wp-srv/politics/special/pjones/docs/complaint.htm.

(S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022). Under the undeniably unusual and extreme facts presented here, Trump has no legitimate claim to absolute immunity.

Although Trump never previously raised absolute immunity in this case, and Carroll lacked notice of that issue, the discovery process partly illuminated the context of Trump's statements. Trump never read (or even saw) Carroll's article or book before he set out to destroy her. He did not undertake any investigation whatsoever into Carroll, her background, or her claims, nor did he ask anyone in the White House to do so. He had no idea what Carroll even looked like—and, when first presented with a photo of himself with Carroll during the deposition, twice mistook Carroll for his second wife, at least until his lawyer corrected him. At the time he made the defamatory statements at issue, Trump had no knowledge of Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors, or her reasons for speaking up—in other words, he knew nothing (and made no effort to learn anything) about the defamatory attacks he aimed at Carroll, and had no recollection of involving White House staff or aides in those attacks (or seeking their advice). He does not recall any specific basis to have believed when he defamed her that Carroll had falsely accused any other particular man of sexual assault. He did not engage in any notable way with White House aides in making his defamatory statements, and there was no effort within the White House to investigate Carroll's claim.

On its face, this conduct did not constitute the performance of any presidential function: "A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office. … President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government." *Carroll*, 498 F. Supp. 3d at 453. Simply put, Trump's attacks on Carroll had no connection to the exercise of

any Article II power, had nothing to do with the operation or administration of the government, did not concern any government policy or program or position, and did not reflect the execution of any presidential duty under the Take Care Clause. Moreover, the subject matter of Trump's attacks arose from his own private sexual misconduct years before he took his office, and his defamatory statements went far beyond a mere denial to encompass specific and highly personal remarks about a private citizen. This spree of defamatory statements not only was unusually vitriolic (including Trump's conceded implication that Carroll was too unattractive for him to have raped her), but was also undertaken with no official executive process and hardly any White House involvement (beyond someone handing a reporter a copy of Trump's statement on June 21, 2019). Nothing about Trump's many statements concerning Carroll had *any* connection to a presidential function. Even as compared to the *Clinton* case, which the Supreme Court appeared to view as a closer call, Trump's statements were more decisively private along every relevant dimension.[12]

All but conceding as much, Trump resorts to a sweeping claim that the President is entitled to open season whenever he addresses a matter of "public concern" or responds to "allegations which impugned his character." Mot. at 17. Analogous arguments have been repeatedly rejected as to other officials, *see supra* at 21, and that position should be rejected here as well: "[I]t would mean that a president is free [to] defame anyone who criticizes his conduct or impugns his character—without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to

---

[12] At oral argument in the *Blassingame* appeal, Trump conceded that he would not have enjoyed absolute immunity for an act of sexual assault while in office. *See supra* n.10, at 8:38-8:48. It would appear that Trump believes Presidents lack immunity if they rape someone *while* in office, but enjoy immunity if they rape someone *before* taking office and then (after being sworn in) use their bully pulpit to viciously destroy that person when they reveal the sexual assault.

their government employment, would undermine their ability to perform effectively while in office." *Carroll*, 498 F. Supp. 3d at 453.

While he served as President, Trump may have seen a benefit to punishing and humiliating women who revealed that he had sexual assaulted them. He may even have been right that he would benefit personally or politically by taking such actions. But that self-interested calculation does not render his defamatory statements a performance of *presidential* functions. Holding otherwise would obliterate the crucial line between office and occupant, collapsing presidential functions into anything that might advance the personal or electoral interests of the incumbent. That has never been the law in this country. It would dishonor the Constitution to declare that the President is free to willfully injure private citizens who reveal his own private misconduct.

## II.     TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS

### A.     Trump's Statements Constituted Defamation *Per Se*

While Trump asserts that no reasonable juror could find Carroll has established cognizable damages, damages are presumed because his statements were defamatory *per se*.

As explained in Carroll's opposition to Trump's motion to dismiss in *Carroll II*, No. 22 Civ. 10016, ECF 26, a statement qualifies as defamatory *per se* if it "affect[s] a person in [her] profession, trade, or business by imputing to [her] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (citation omitted). With respect to such statements, the law "dispenses with the special damages requirement … because [they] are considered so inflammatory and offensive that the law presumes the statements to have caused damage." *Stern v. Cosby*, 645 F. Supp. 2d 258, 289 (S.D.N.Y. 2009). When a statement "impugns the basic integrity or creditworthiness of a [person's] business," it is settled that "an action for defamation lies and injury is conclusively presumed." *Celle*, 209 F.3d at 180 (citation omitted).

27

A reasonable juror could find that standard to be met here. Carroll is a journalist, author, and advice columnist who built her career providing honest, trustworthy advice to women in response to intimate questions—many of which concerned sex, men, and relationships. Her career "rested on the fact that [she] could be trusted." Pl. 56.1 ¶ 88; *see also id.* ¶ 86 ("[W]omen really trusted E. Jean and [*Elle*] got lots of feedback from readers that she helped them."). For Carroll's community of loyal readers, integrity and credibility were essential.

In his defamatory statements, Trump took *direct aim* at that credibility. Each of his three statements targeted an autobiographical account in her non-fiction book and denounced it as false. His June 21 statement, moreover, directly and repeatedly attacked her as an author: it accused her of lying "to sell a new book," it said her book "*should* be sold in the fiction section," and it claimed that she wrote about being raped to "try to get publicity for [herself], or sell a book, or carry out a political agenda." *Id.* ¶ 11; *see id.* ¶ 66. It also implied a conspiracy between Carroll, *New York Magazine*, and "the Democratic Party." *Id.* ¶ 11; *see id.* ¶¶ 67, 75. Trump's June 22 statement continued in the same vein, implying that she had falsely accused other men, stating that he had "no idea who she is," and attacking Carroll and her publisher. *Id.* ¶ 12; *see id.* ¶¶ 13, 68.

A reasonable juror could easily find that these statements attacked Carroll not only in general terms, but also specifically in her trade and profession. Trump directly attacked an author and columnist—who specializes in honest advice to women about sex and men—with false claims that she lied about an experience of being raped (which she had revealed in her non-fiction book) and that she did so for despicable reasons that would eviscerate her professional credibility, integrity, and trust. Trump thereby "impugn[ed] the basic integrity or creditworthiness of [Carroll's] business," and attributed to her an "unfitness" in her profession as a writer and advice

columnist. *Celle*, 209 F.3d at 180. He took direct aim not only at the veracity of her non-fiction

book, but also at her reliability as an honest broker who could be trusted by her readers.

This conclusion is supported by *Celle v. Filipino Reporter Enterprises Inc*. There, a news

commentator alleged that two statements were defamatory: one that suggested a judge had found

him to be negligent, and one that suggested he had made false accusations about another person's

financial obligations. *See* 209 F.3d at 185-86. The Second Circuit found the challenged statements

to be defamatory *per se* under settled New York law because they "impugn[ed]" the plaintiff's

"trustworthiness." *Id.* at 185.[13] So too here. Carroll has spent decades building an audience and

community of loyal readers who trust her to provide accurate facts and trustworthy, honest advice.

A statement by Trump accusing her of lying about being sexually assaulted—and of making

fraudulent claims against others, and of lying in her article and book, and of doing all this for

nefarious financial and political reasons—would surely "leave readers with the conclusion that

[she] abused her position as a [writer]." *See id.*; *see also Edwards v. Nat'l Audubon Soc., Inc.*, 556

F.2d 113, 121 n.5 (2d Cir. 1977) (statements accusing scholars of being "paid liars" were

defamatory *per se*); *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 n.5 (1995)

(statement that attorney suborned perjury was defamatory *per se*); *Levy v. Nissani*, 115 N.Y.S.3d

418, 421 (2d Dep't 2020); *Gong v. Savage*, 169 N.Y.S.3d 511 (Table), at *2 (N.Y. Sup. Ct. N.Y.

Cty. 2022) (statement accusing researcher of stealing research was defamatory *per se*).

The cases that Trump cites do not support his position. *See Pure Power Boot Camp, Inc. v.

Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011); *Davydov v. Youssefi*, 169

---

[13] As to the first statement, the court noted that as a reporter in a tightly knit community, his "professional reputation would turn in large measure on the community's faith in the accuracy and fairness of his reporting," and "[t]he statement that a United States judge has found plaintiff negligent for spreading false information would leave readers with the conclusion that he abused his position as a news commentator." *Id.* As to the second claim, the court found it defamatory because it impugned his "trustworthiness," could lead "an average reader to believe [the plaintiff had] made 'false' accusations" about someone else, and could "cause listeners and advertisers … who read the article to question [his] professional integrity." *Id.* at 185-86.

N.Y.S.3d 322 (1st Dep't 2022); *Ram v. Moritt*, 612 N.Y.S.2d 671 (2d Dep't 1994). In *Davydov* and *Ram*, the plaintiffs (a doctor and dentist) had not been targeted in their professional capacity by statements calling them cheats and frauds. And the statements at issue in *Pure Power Boot Camp* were about the plaintiff's personal characteristics—alleging she treated her employees poorly or fired an employee for being gay—which the court found were not defamatory *per se* because they did "not impute fraud or misconduct to [her], nor do they suggest a general unfitness, incapacity, or inability to perform her duties." 813 F. Supp. 2d at 551. Trump's remaining cases are equally inapposite. *Gurtler v. Union Parts Mfg. Co., Inc.* concerned claims about the plaintiff's political affiliation that bore no relationship—not even "by way of innuendo"—to his professional endeavors. 285 A.D. 643, 647 (1st Dep't 1955). In *Tacopina v. Kerick*, claims that the plaintiff "disclos[ed] privileged information to federal prosecutors" did not "specifically discredit" him as an author. No. 14 Civ. 749, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016). And in *Aronson v. Wiersma*, the "mere expression of unhappiness with plaintiff's fulfilling her duties" was not "of significance" to her work as a linguist and researcher. 65 N.Y.2d 592, 594 (1985).

## B. Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements

Trump next asserts that Carroll's claim is barred because she consented to his defamatory statements. *See* Mot. at 27-30. This argument is not only highly offensive, but it is also frivolous.

Consent is a rare, narrow defense to defamation. It applies where a person has the specific intent of eliciting a defamatory statement from the defendant and in that sense affirmatively agrees to its publication. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07 Civ. 4018, 2020 WL 1244930, at *7 (E.D.N.Y. Mar. 16, 2020). For instance, this defense may apply where a plaintiff sends a letter requesting a statement that they consider defamatory, or has a private investigator willfully elicit such a statement, or provides written consent to the publication of a defamatory claim, or obtains

a statement by impersonating a third party, or otherwise acts with the goal of eliciting a statement on which to base a defamation lawsuit. *See McNamee v. Clemens*, 762 F. Supp. 2d 584, 604-05 (E.D.N.Y. 2011) (collecting New York cases). Trump contends that Carroll provided such specific content in two respects: (1) choosing to publish with *New York Magazine*, which would run a full excerpt and had a broad circulation; and (2) revealing her account while Trump was President, since at that point he had "no choice but to defend himself." Mot. at 29-30.

Recalling that credibility judgments about the underlying sexual assault must be resolved in Carroll's favor at this stage, any reasonable juror would reject Trump's consent defense. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 136 n.11 (S.D.N.Y. 2004). At bottom, Trump insists that Carroll cannot sue him for defamation because she was asking for it. This insulting argument is foreclosed by Carroll's own deposition testimony, where Carroll explained that she was "shocked" by Trump's statements after her book excerpt was published. Pl. 56.1 ¶¶ 62-63. It is also wrong in a deeper sense. When a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response. The law does not vest perpetrators of sexual assault with a right to slander survivors who decide to come forward in a public manner. It is perverse to claim that the revelation of sexual abuse by a powerful man automatically invites (and somehow legally protects) further defamatory abuse. If anything, Trump gets it backwards: his position of political power made it *more* important, not *less* important, that he follow the law in responding to Carroll's revelation that he had assaulted her. Her decision to speak up—prompted by her mother's death and the phenomenon of the #MeToo movement—did not give Trump any warrant to break the law in seeking to punish her. Indeed, Trump's *modus operandi* of seeking to destroy women who accused

him of sexual assault, which was on display before and after his term in office, undercuts any claim that his conduct here reflected anything unique to the political office he occupied in 2019.

Trump's defense that he had "no choice" in defaming Carroll is really no defense at all. Mot. at 30. Of course he had a choice. And because he chose to issue a series of brutal, defamatory statements rife with injurious lies about Carroll, he is not entitled to summary judgment.

## C.     Trump's Statements Are Actionable as a Matter of Law

Trump's third argument is that many (though concededly not all) of his statements were merely speculative expressions of opinion. Mot. at 30-31. In support of this theory, he asserts that statements "about a plaintiff's state of mind or personal motivations" qualify as "non-actionable opinions" and "are not capable of being proven true or false." *Id.* at 32-33. Trump is mistaken.

"Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false … only statements alleging facts can properly be the subject of a defamation action." *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014) (cleaned up). "An opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it is a mixed opinion and is actionable." *Id.* at 269 (cleaned up). "The dispositive inquiry … is 'whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff.'" *Id.* at 269-70 (citation omitted). In "distinguishing between fact and opinion," the Court asks "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 269-70 (citation omitted) (cleaned up).

Applying this familiar framework, courts have repeatedly held that statements concerning a person's motivation for conduct can be actionable if they imply a knowledge of facts about that

person. In *Davis v. Boeheim*, the New York Court of Appeals concluded that the defendants made actionable statements where they claimed that the plaintiffs (who had made allegations of sexual molestation) had lied and had done so to make money. *See id.* at 271-73. In *Zervos v. Trump*, the court concluded that Trump made actionable statements when he claimed that the plaintiff (who had accused him of sexual abuse) told "phony stories" that were "totally false" since the events supposedly "never happened" and she was "was motivated by fame and/or directed by Clinton or the Democrats." *See* 74 N.Y.S.3d 442, 445-46, 449 (N.Y. Sup. Ct. 2018) ("A reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe what defendant's statements convey: that plaintiff is contemptible because she 'fabricated' events for personal gain."). Many other decisions reflect similar logic. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S. Ct. 2695, 2705-06 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 150 (1993) (defendants made actionable statements where the "overall-thrust" of their publications was that "plaintiff had issued false or misleading reports about deaths occurring within his jurisdiction in order to protect the police"); *Joyce v. Thompson Wigdor & Gilly LLP*, No. 06 Civ. 15315, 2008 WL 2329227, at *9 (S.D.N.Y. June 3, 2008) (R&R finding that defendants made actionable statements where they claimed that the plaintiff had faked having breast cancer because she hoped to thereby avoid being fired).

Here, each of Trump's statements about Carroll's motives had a readily understood and precise meaning: that she had falsely accused other men of sexual assault; that Trump had never met her; and that she had lied about being assaulted by Trump to make money, to get publicity, to sell her book, or as part of a conspiracy with the Democratic party. Each of these statements can be proven objectively true or false. Moreover, in context, a reasonable observer would understand

33

Trump to be implying or stating concrete facts (not opinions) about Carroll based on knowledge not known to the public. *See Davis*, 24 N.Y.3d at 269-73; *Zervos*, 74 N.Y.S.3d at 448-49.

At bottom, Trump is wrong that claims about a person's motivations for revealing a sexual assault are inherently opinions rather than facts. It is commonplace for courts and juries to make fact findings about a person's motives. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 133 n.17 (2d Cir. 2009) ("[A] person's state of mind is a fact question to be proved the same as any other fact."); *accord United States v. Stein*, 473 F. Supp. 2d 597, 602-03 (S.D.N.Y. 2007) (Kaplan, J.); Sand, et al., *Modern Federal Jury Instructions*, at § 91-7 (2022). By imputing specific nefarious motives to Carroll—each of which she either *did* or *did not* possess—Trump committed actionable defamation. His effort to disavow the obvious import of his own statements, or to claim that a person can respond to allegations of sexual assault by imputing vile motives with factual particularity, is at odds with common sense, precedent, and his own deposition (where he agreed that he made these precise claims about Carroll, *see supra* at 5). His argument thus fails.[14]

---

[14] The cases that Trump cites involved very different kinds of statements. *See* Mot. at 32. In *Huggins v. Povitch*, for instance, a talk show guest said: "Uh, because there would be times when, uh, my husband would have hundreds of dollars in his pocket and I had to take the subway, my daughter and myself. And we have a Rolls-Royce in the garage, and he would say, the car is not available. I understand now that was psychological, uh, easing me into the point where, either get used to it or get mad, I think he wanted me to divorce him." No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996). The court reasonably understood that specific statement as "speculat[ion] on plaintiff's motivation for certain conduct" and held it to be non-actionable. *Id.* at *8. In *Zerman v. Sullivan & Cromwell*, the relevant news article explicitly made clear that it contained only speculation: "But lawyers for the five securities firms *speculate* that the Zermans have a different motive …." 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (emphasis added). In *Gentile v. Grand Street Medical Assocs.*, the statement at issue was "loose and generalized," referring vaguely to "several people in the community who do not want to work, hold jobs and want to make easy money, [who] find a few lawyers who make a living exploiting hard working people and corporations." 79 A.D.3d 1351, 1352-53 (3d Dep't 2010). Finally, in *Dworin v. Deutsch*, a news article "merely" referred to the plaintiff as a "disgruntled former employee," a phrase the court deemed "a matter of opinion based on the fact that he was 'threatening to sue'" his former employer. No. 06 Civ. 13265, 2008 WL 508019, at *8 (S.D.N.Y. Feb. 22, 2008).

### D.   Carroll is Entitled to Present the Punitive Damages Issue to the Jury

Finally, Trump argues that Carroll should not be allowed to seek punitive damages. Mot. at 33-34. Here, too, he is wrong. Punitive damages are available where the defendant acted "with 'hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice.'" *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009) (citation omitted). The decision to award punitive damages involves evaluating the defendant's "moral culpability" and thus "rests within the sound discretion of the jury." *Allam v. Meyers*, 906 F. Supp. 2d 274, 291 (S.D.N.Y. 2012) (citation omitted). Where there is a need to "interpret[] the character of [the defendant's] actions," summary judgment is necessarily "inappropriate." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018). That rule controls here: Trump's repeated and highly inflammatory statements—which he issued from a position of power and influence—were maliciously calculated to punish, humiliate, and destroy a woman who he had raped and who he knew he had raped. *See also* Pl. 56.1 ¶¶ 79-80. Under these circumstances, Carroll is entitled to put the propriety of punitive damages to a jury when this case is tried.

## CONCLUSION

For the foregoing reasons, Trump's motion for summary judgment should be denied.

Dated: New York, New York
      January 12, 2023

Respectfully submitted,

_____
Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT 20

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
          -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>        *Plaintiff,*<br><br>  v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>        *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

<u>**MEMORANDUM OF LAW IN FURTHER SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
          -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

ARGUMENT ............................................................................................................... 1

    I.     DEFENDANT DID NOT WAIVE HIS ENTITLEMENT TO PRESIDENTIAL IMMUNITY ............................................................................................... 1

    II.    ALTERNATIVELY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE CONSTRUED AS A MOTION TO AMEND HIS ANSWER ........ 5

    III.   DEFENDANT'S ENTITLEMENT TO PRESIDENTIAL IMMUNITY IS WELL ESTABLISHED ....................................................................................... 7

    IV.   PLAINTIFF'S DEFAMATION PER SE CLAIM FAILS A MATTER OF LAW . 7

        A.  Plaintiff Cannot Meet The Elements Necessary to Plead Defamation Per Se ... 9

        B.  Plaintiff Consented to the Defamation ............................................................ 9

CONCLUSION ........................................................................................................... 10

# TABLE OF AUTHORITIES

*Cases*

*Albert v. Loksen,*
    239 F.3d 256, 265 (2d Cir. 2001) ...................................................................................8

*Anthony v. City of N.Y.,*
    339 F.3d 129, 138, n. 5 (2d Cir. 2003). ........................................................................5

*Barret v. Harrington,*
    130 F.3d 246, 254-55 (6th Cir. 1997);...........................................................................7

*Block v. First Blood Assocs.,*
    988 F.2d 344, 350 (2d Cir. 1993). .................................................................................5

*Carroll v. Trump,*
    2-cv-10016 (LAK), 2023 U.S. Dist. LEXIS 6953, at *2 (S.D.N.Y. Jan. 13, 2023) ................6

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398, 408, 133 S. Ct. 1138, 1146 (2013*)* ...................................................3

*Clinton v. Jones,*
    520 U.S. 681, 694, 117 S.Ct. 1636, 1644 (1997)................................................3, 7

*Trs. of ALA-Lithographic Pension Plan v. Crestwood Printing Corp.,*
    127 F. Supp. 2d at 479 ..................................................................................................5

*Dickson v. Slezak,*
    73 A.D.3d 1249, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) .........................................9

*Gonzalez v. Thaler,*
    565 U.S. 134, 141, 132 S.Ct. 641, 648 (2012).............................................................5

*Harlow v. Fitzgerald,*
    457 U.S. 800, n. 17 (1982).......................................................................................1, 2

*Ins. Corp. of Ireland, Ltd. v Cie. des Bauxites de Guinee*,

456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982) ..................................................................4

*Kendall v. United States*,

12 Pet. 524, 610, 9 L.Ed. 1181 (1838) ................................................................................1

*Klayman v. Obama*,

125 F.Supp.3d 67, 86 (D.D.C. 2015) ....................................................................................7

*Loving v. United States*,

517 U.S. 748, 757 (1996) ......................................................................................................3

*Mandelblatt v. Perelman*,

683 F. Supp. 379, 383 (S.D.N.Y. 1988) ...............................................................................9

*Monahan v. N.Y.C. Dep't of Corr.*,

214 F.3d 275, 283 (2d Cir. 2000) .........................................................................................6

*Nixon v. Fitzgerald*,

57 U.S. 731, 743, 102 S.Ct 2690, 2698 (1982) ...............................................1, 2, 3, 5, 8, 9

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,

813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ..........................................................................9

*Raines v. Byrd*,

521 U.S. 811, 820 (1997) ......................................................................................................3

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,

42 N.Y.2d 369, 379 (1977) ...................................................................................................9

*Sleepy's LLC v Select Comfort Wholesale Corp.*,

779 F3d 191, 199 (2d Cir 2015) ...........................................................................................9

*State Teachers Ret. Bd. v. Fluor Corp.*,

654 F.2d 843, 856 (2d Cir. 1981). ........................................................................................5

*Teichner v. Bellan*,

    181 N.Y.S.2d 842, 846 (App. Div. 1959) ................................................................9

*Thompson v. Cty. of Franklin*,

    15 F.3d 245 (2d Cir. 1994). ......................................................................................4

*Thompson v. Trump*,

    590 F. Supp. 3d 46 (D.D.C. 2022) ..........................................................................8

*Trump v. Mazars USA LLP*,

    140 S.Ct. 2019, 2035 (2020) ...................................................................................4

*Trump v. Vance*,

    140 S. Ct. 2412, 2426 (2020) ..................................................................................2

*United States v. Nixon*,

    418 U.S. 683, 703-713, 94 S.Ct. 3090, 3105-3110 (1974) .....................................3

*Youngstown Sheet & Tube Co. v. Sawyer*,

    343 U.S. 579, 72 S.Ct. 863 (1952) ..........................................................................3

## **Rules and Statutes**

Rule 56 of the Federal Rules of Civil Procedure ...........................................................1

Commentaries on the Constitution of the United States § 1563 ....................................2

Fed. R. Civ. P. 12(h)(3)..................................................................................................4

Rule 15(a)(2)...............................................................................................................5, 6

Restatement (Second) of Torts, § 583 (1977)................................................................9

Defendant, Donald J. Trump ("Defendant") respectfully submits this memorandum of law in further support of his motion for summary judgment against Plaintiff, E. Jean Carroll ("Plaintiff").

## ARGUMENT

### I. PRESIDENTIAL IMMUNITY CANNOT BE WAIVED

In her opposition brief, Plaintiff contends that Defendant waived his entitlement to absolute immunity by neglecting to raise it in his Answer, which was filed in the state court proceedings. However, this argument is flawed in its premise since the type of absolute immunity at issue here—presidential immunity—is a "functionally mandated incident of the President's unique office" which, when applicable, inherently precludes the judiciary from exercising jurisdiction over the head of the Executive Department for acts taken within the scope of his official duties. *Nixon v. Fitzgerald*, 457 U.S. 731, 743, 102 S.Ct 2690, 2698 (1982). Thus, given its unique rooting in the separation of powers doctrine, presidential immunity is not waivable.

The Supreme Court has declared that "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Nixon*, 457 U.S. at 750, 102 S.Ct at 2701; *see also Harlow v. Fitzgerald*, 457 U.S. 800, n. 17 (1982) (noting that presidential immunity "derives in principle part from factors unique to [the President's] constitutional responsibilities and station."). Indeed, "[t]he executive power is vested in [the] President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Nixon*, 457 U.S. at 754, 102 S.Ct. at 2703 (citing *Kendall v. United States*, 12 Pet. 524, 610, 9 L.Ed. 1181 (1838)). In view of the "singular importance of his duties," there exists an overarching concern that "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 751, 102 S.Ct. at 2702; *see also Trump v. Vance*,

140 S. Ct. 2412, 2426 (2020) (noting that the "dominant concern" which justifies presidential immunity is the risk of "distortion of the [President's] 'decisionmaking process' with respect to official acts that would stem from 'worry as to the possibility of damages.'") (citation omitted).

Thus, unlike "[s]uits against other officials [which] . . . generally do not invoke separation-of-powers considerations," *Harlow*, 457 U.S. at n. 17 (1982), presidential immunity is an "essential Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of powers," *Nixon*, 457 U.S. at 743, 749, 102 S.Ct. at 2698, 2701. As explicated by the Supreme Court in *Nixon v. Fitzgerald*:

> "There are . . . incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among these, must necessarily be included the power to perform them . . . The president **cannot**, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases at least, to possess an **official inviolability**."

*Id.* at 749, 2701 (citations omitted) (emphasis added).

The *Nixon* court went on to explain that a court is divested of jurisdiction in cases where presidential immunity applies, as the separation of powers doctrine flatly prohibits a court from imposing civil liability upon a President for his official acts:

> [O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . or to vindicate the public interest in an ongoing criminal prosecution . . . the exercise of jurisdiction has been held warranted. ***In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not.***

*Id.* at 754, 2703 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863 (1952); *United States v. Nixon*, 418 U.S. 683, 703-713, 94 S.Ct. 3090, 3105-3110 (1974)) (emphasis added).

The synthesis between presidential immunity and the separation of powers doctrine was further confirmed in *Clinton v. Jones*, when the Supreme Court clarified that the "dominant concern" in *Nixon* was not that a sitting President might be "distracted by the need to participate in litigation during the pendency of his office" but that his "decisionmaking process" may be distorted due to "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. at 694, 117 S.Ct. at 1636. While the *Clinton* court concluded that President Clinton was not entitled to presidential immunity, the Court's decision was premised upon its finding that the conduct at issue had taken place *before* President Clinton was in office; therefore, the Court reasoned, "[w]hatever the outcome of this case, there is ***no possibility*** that the decision will curtail the scope of the official powers of the Executive Branch." *Clinton*, 520 U.S. at 682, 117 S.Ct. at 1638 (emphasis added); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) (stating "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties" (citations omitted)).

The Supreme Court's holdings in *Nixon* and *Clinton* are consistent with the principle that the separation of powers doctrine is a creature of Article III standing which "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 1146 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."); *see also Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.") (internal quotation marks omitted). Article III standing, in turn, is an issue of subject matter jurisdiction. *Ins. Corp. of Ireland, Ltd. v. Cie. des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982) ("Subject-matter jurisdiction, then, is an Art. III as well as a statutory

requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign."); *Thompson v. Cty. of Franklin*, 15 F.3d 245, 248 n.3 (2d Cir. 1994) (noting that courts have an "independent obligation to insure that federal jurisdiction is not extended beyond the limits of Article III.").

Subject matter jurisdiction, critically, is a jurisdictional necessity that cannot be waived. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Gonzalez v. Thaler*, 565 U.S. 134, 141, 132 S.Ct. 641, 648 (2012) ("Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety.")*; Ins. Corp. of Ireland*, 456 U.S. at 702, 102 S.Ct. at 2099 ("No action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.") (citations omitted)).

Here, even though Defendant has been sued in his individual capacity, the separation of powers concerns are implicated all the same. Indeed, the "interbranch conflict here does not vanish simply because . . . the President sued in his personal capacity." *Trump v. Mazars USA LLP*, 140 S.Ct. 2019, 2035 (2020). "The President is the only person who alone composes a branch of government," and therefore "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Id.* (quoting *The Federalist* No. 51). Nor is it of any moment that Defendant is a former President, as opposed to a sitting President, since the Supreme Court has affirmed that "a *former* President of the United States is entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749; *see also Clinton*, 520 U.S. at 693 ("[T]hat

rationale provided the principal basis for our holding that a *former* President of the United States was 'entitled to absolute immunity for damages liability predicated on his official acts.'") (citing *Nixon*, *supra*) (emphasis added).

In short, whether presidential immunity applies in this case is a non-waivable question of subject matter jurisdiction. If it does not apply, the case may properly proceed to trial. If it does, however, then judicial review of Defendant's official acts as President would "inevitably inhibit the processes of the Executive Branch decision making and impede the functioning of the Office of the President." *Nixon*, 457 U.S. at 763 (Burger, J., concurring). Therefore, this Court is "obligated to consider *sua sponte*" this issue, and to consider whether exercising its jurisdiction is proper under the separation of powers doctrine. *Gonzalez v. Thaler*, 565 U.S. 134, 141, 132 S.Ct. 641, 648 (2012) (citations omitted).

## II.  ALTERNATIVELY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE CONSTRUED AS A MOTION TO AMEND HIS ANSWER

In the alternative, should this Court accept Plaintiff's position regarding waiver, Defendant should be permitted to assert presidential immunity as a defense in the interest of justice. Pursuant to Rule 15(a)(2), a "court has discretion, when a party omits a defense, to nevertheless allow the defense at any time 'when justice so requires.'" *Trs. of ALA-Lithographic v. Crestwood Printing*, 127 F. Supp. 2d 475, 478-79 (S.D.N.Y. 2001). Further, a "district court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend the defendant's answer." *Anthony v. City of N.Y.*, 339 F.3d 129, 138, n. 5 (2d Cir. 2003).

In deciding whether to exercise such discretion, a court considers "the presence or absence of such factors as undue delay, bad faith, undue prejudice to opposing party, or futility of amendment." *Crestwood Printing Corp.*, 127 F. Supp. 2d at 479 (citations omitted). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district

court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). Instead, a court must consider whether amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Each factor weighs heavily in favor of permitting the Defendant to raise the defense of presidential immunity. *First*, Plaintiff would not be required to expend any additional resources to conduct discovery and prepare for trial. Indeed, Plaintiff's counsel has already represented that "discovery in the present action has already addressed almost all of the issues relevant to the Second Action." *See* ECF No. 98. *Second*, permitting Plaintiff to raise this affirmative defense would not delay resolution of the dispute, but instead accelerate it. If indeed Defendant was acting within the "outer perimeter" of his presidential duties when addressing the media on a matter of public concern—a point which is firmly supported by decades of constitutional jurisprudence— then this matter is resolved and the litigation is concluded. *Third*, Plaintiff would not be prevented from bringing a timely action in another action. Indeed, Plaintiff has already filed a second action, *Carroll v. Trump*, No. 22-cv-10016 (Carroll II), in which this Court stated that the issues in both cases are "exactly the same." *See Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 U.S. Dist. LEXIS 6953, at *2 (S.D.N.Y. Jan. 13, 2023).

Further, under Rule 15(a)(2), the Court should "freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Rule encourages courts to determine claims "on the merits" rather than disposing of claims or defenses based on "mere technicalities." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) Here, as recognized by the Supreme Court, there exists "the greatest public interest in providing an official "the maximum ability to deal

fearlessly and impartially with the duties of his office." *Nixon*, 457 U.S. at 749. This overriding constitutional concern necessitates a determination on the merits.

As such, Defendant respectfully requests that, in the alternative, this Court should construe Defendant's Motion for Summary Judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend his answer.

### III. DEFENDANT'S ENTITLEMENT TO PRESIDENTIAL IMMUNITY IS WELL ESTABLISHED

As set forth in considerable length in Defendant's moving papers, Defendant's entitlement to presidential immunity is firmly supported by Supreme Court precedent. Plaintiff attempts to circumvent this fact by characterizing Defendant's alleged conduct as malicious, retaliatory or otherwise wrongful. Yet, in doing so, Plaintiff fails to recognize that "immunities are grounded in 'the nature of the function performed," rather than in the lawful or unlawful motivations of the person performing them. *Clinton*, 520 U.S. at 693. Indeed, presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997); even "alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority. *Nixon*, 457 U.S. at 757. Thus, despite Plaintiff's best effort to argue otherwise, inquiry into the subjective motive or intent underlying Defendant's alleged conduct is simply improper. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.").

Plaintiff's remaining contentions that presidential immunity should not apply here are unavailing. Indeed, the Supreme Court has stressed that presidential immunity it is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history" and has acknowledged that there "exists the

greatest public interest" in upholding the protections afforded thereunder. *Nixon*, 457 U.S. at 749. In fact, the Supreme Court has specifically noted that the *lack* of presidential immunity would be a "detriment[] not only [to] the President and his office, but also the Nation that the Presidency was designed to serve." *Id.* at 753. It has also squarely rejected Plaintiff's contention that the application of presidential immunity here would "dishonor the Constitution." Pl. Mem. at 27; *compare to Nixon*, 457 U.S. at 758 ("The existence of alternative remedies and deterrents *will not place the President 'above the law.'*") (emphasis added).

Further, Plaintiff misstates the holding of *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022). Contrary to Plaintiff's arguments, the *Thompson* court affirmed that the president's speech is an "unquestionably a critical function of the presidency." *Id.* at 79. It further recognized that "to deny a President immunity from civil damages is no small step." *Id*. at 83. In *Thompson*, the court ultimately determined that the Defendant was not entitled to absolute immunity because they were done in his capacity as a candidate and "***entirely*** concern his efforts to remain in office for a second term." *Id*. at 84 (emphasis added).

At bottom, it cannot conceivably be argued that the Defendant's statements bore "no relation to the operation and administration of government." *See* Pl. Mem. at 20. Indeed, Plaintiff made her accusations a matter of public concern, by publishing a magazine article and book levying serious accusations against Defendant which undoubtedly brought his fitness to govern into question. Defendant's rebuttals were then issued in a White House press release and in response to reporters' questions at the White House. A holding limiting the President's ability to defend himself from grave accusations of this kind, which bring into question his fitness for office and ability to lead, would forever fetter the Presidency.

## IV. **PLAINTIFF'S DEFAMATION PER SE CLAIM FAILS A MATTER OF LAW**

### A. **Plaintiff Cannot Meet The Elements Necessary to Plead Defamation Per Se.**

Plaintiffs argument that the challenged statements are defamatory per se similarly fail. A claim for "defamation" is an umbrella term that incorporates the "twin torts of libel and slander." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (citations omitted). To invoke the exceptional case of a per se defamatory statement, the allegation must be: "(1) a statement charging an individual with a serious crime; (2) a statement that tends to injure another in his or her trade, business, or profession; (3) a statement that claims an individual has a 'loathsome disease;' or (4) a statement 'imputing unchastity to a woman.'" *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011). Libel per se, on the other hand, consists of a statement that "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehart*, 42 N.Y.2d 369, 379 (1977).

Of the three challenged statements, only the June 21 statement can be considered under the libel per se standard, while the remaining two, which were spoken to reporters in response to their questions, should be considered under the more stringent slander per se standard. It is respectfully submitted that the challenged statements fail to meet either standard. As set forth in Defendant's original motion, the Statements do not reference Plaintiff's profession as an advice columnist, nor do they touch upon Plaintiff's "Ask E. Jean" column. The Statements are instead serve as a direct rebuttal to Plaintiff's allegations and serve as no more than a general characterization of Plaintiff's characters or qualities. As such, the Statements cannot constitute defamation per se.

### B. **Plaintiff Intentionally Solicited the Alleged Defamatory Statements.**

It is well established that consent is a valid defense to defamation under New York law. *Sleepy's LLC v Select Comfort Wholesale Corp.*, 779 F3d 191, 199 (2d Cir. 2015) (citation

omitted); s*ee also Teichner v. Bellan,* 181 N.Y.S.2d 842, 846 (App. Div. 1959) (describing consent as "an absolute immunity or an absolute privilege upon the defendant."); Restatement (Second) of Torts, § 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.").

Plaintiff's conduct here squarely falls within this sphere, as Plaintiff's conduct demonstrates that she sought to gain maximum exposure for her claims and place Defendant into a position where he was forced to defend himself against her heinous allegations. Despite claiming that her assault took place in 1995, she waited over two decades before bringing these allegations to light, when the Defendant was two years into his presidency. She chose to publicize her claims in a manner that would receive maximum publicity – by releasing them through New York magazine "which knows how to break news." *See* Habba Dec., Ex. D. at 3. As such, the Defendant was compelled to respond and rebut Plaintiff's accusations. Her intent to further inflame the public was made evident when Plaintiff made rounds through the media to advance her claims even after the challenged statements were made.[1] Therefore, Defendant has successfully demonstrated that Plaintiff intentionally solicited the alleged defamatory statements from Defendant.

## CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that summary judgment be awarded in his favor.

Dated: January 19, 2023      Respectfully submitted,

Alina Habba, Esq.
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP

---

[1] By way of example, Plaintiff was interviewed on primetime CNN by well-known commentator Anderson Cooper on June 24, 2019,. *See https://cnn.it/3XLaHrF.*