# EXHIBIT 21

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

        *Plaintiff*,

    v.

DONALD J. TRUMP, in his personal capacity,

        *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

## PLAINTIFF E. JEAN CARROLL'S SURREPLY BRIEF IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR SUMMARY JUDGMENT

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 1

CONCLUSION ............................................................................................................................ 6

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Beechwood Restorative Care Center v. Leeds*,
   436 F.3d 147 (2d Cir. 2006) .................................................................................... 2

*Boyd v. Carroll*,
   624 F.2d 730 (5th Cir. 1980) ................................................................................... 2

*Bradley v. Fisher*,
   80 U.S. 335, 20 L. Ed. 646 (1871) .......................................................................... 2

*Burnham v. Friedland*,
   No. 21-3888, 2022 WL 3046966 (6th Cir. Aug. 2, 2022) ....................................... 2

*Clinton v. Jones*,
   520 U.S. 681, 117 S. Ct. 1636 (1997) ..................................................................... 3

*Cohen v. United States*,
   2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022) ...................................................... 3

*Collyer v. Darling*,
   98 F.3d 211 (6th Cir. 1996) ..................................................................................... 2

*Cozzo v. Tangipahoa Parish Council*,
   279 F.3d 273 (5th Cir. 2002) ................................................................................... 2

*Desi's Pizza, Inc. v. City of Wilkes-Barre*,
   321 F.3d 411 (3d Cir. 2003) .................................................................................... 2

*District of Columbia v. Trump*,
   959 F.3d 126 (4th Cir. 2020) ................................................................................... 3

*Henderson ex rel. Henderson v. Shinseki*,
   562 U.S. 428, 131 S. Ct. 1197 (2011) ..................................................................... 4

*Imbler v. Pachtman*,
   424 U.S. 409, 96 S. Ct. 984 (1976) ......................................................................... 2

*In re Kendall*,
   712 F.3d 814 (3d Cir. 2013) .................................................................................... 2

*K&D, LLC v. Trump Old Post Office, LLC*,
   2018 WL 6173449 (D.D.C. Nov. 26, 2018) ........................................................... 3

*McCray v. Biden*,
574 F. Supp. 3d 1 (D.D.C. 2021) ................................................................. 4

*Nevada v. Hicks*,
533 U.S. 353, 121 S. Ct. 2304 (2001) ....................................................... 1, 2

*Nixon v. Fitzgerald*,
457 U.S. 731, 102 S. Ct. 2690 (1982) .................................................... 1, 3, 4

*Shmueli v. City of New York*,
424 F.3d 231 (2d Cir. 2005) ......................................................................... 2

*Thompson v. Trump*,
590 F. Supp. 3d 46 (D.D.C. 2022) ............................................................... 4

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) ........................................................................ 4

*Trump v. Vance*,
140 S. Ct. 2412 (2020) ............................................................................ 1, 3, 5

*Tully v. Barada*,
599 F.3d 591 (7th Cir. 2010) ........................................................................ 2

*United States v. Reynolds*,
345 U.S. 1, 73 S. Ct. 528 (1953) ................................................................... 4

**Other Authorities**

Memorandum in Support of Motion to Dismiss on Behalf of Defendant in His Individual
Capacity, ECF 112-1, *District of Columbia v. Trump*,
No. 8:17 Civ. 01596 (D. Md. May 1, 2018) ............................................... 4

Reply in Support of Motion to Dismiss on Behalf of Defendant in His Individual Capacity,
ECF 118, *District of Columbia v. Trump*,
No. 8:17 Civ. 01596 (D. Md. May 25, 2018) ............................................. 4

**PRELIMINARY STATEMENT**

Defendant Donald J. Trump does not deny that he waived his absolute immunity defense. Nor does he deny that he sought strategic advantage in state court from his assurance that "no one is seeking to 'escape accountability here'" because "Plaintiff is free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3 (cleaned up). Instead, Trump asserts that absolute presidential immunity is jurisdictional and therefore cannot be waived. Reply at 1-5. This position is mistaken: it misreads *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 102 S. Ct. 2690, 2701 (1982); it departs from separation of powers principles and common law traditions; it is at odds with Trump's own filings in numerous cases; and it would produce anomalous consequences.

**ARGUMENT**

*Nixon v. Fitzgerald* held that absolute presidential immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." 457 U.S. at 749, 102 S. Ct. at 2701. In arriving at this view, the Supreme Court first surveyed its common law precedents concerning official immunity for judges and prosecutors. *See id.* at 744-48, 102 S. Ct. at 2698-2700. It then drew upon those same cases while discussing the "policies and principles" that supported its understanding of presidential immunity as a constitutional matter. *See id.* at 748-54, 102 S. Ct. at 2700-03; *see also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) (noting that the *Nixon* Court "drew a careful analogy to the common law absolute immunity of judges and prosecutors"). These common law cases thus constitute the background against which *Nixon* developed its presidential immunity doctrine.

Under those cases, absolute immunity (including for judges and prosecutors) has long been treated as non-jurisdictional in nature. *See* Carroll Br. at 10-11. As the Supreme Court emphasized in *Nevada v. Hicks*, "[t]here is no authority whatever for the proposition that absolute- and

1

qualified-immunity defenses pertain to the court's jurisdiction." 533 U.S. 353, 373, 121 S. Ct. 2304, 2317 (2001); *accord Burnham v. Friedland*, No. 21-3888, 2022 WL 3046966, at *2 (6th Cir. Aug. 2, 2022) (Thapar, J., concurring) ("[J]udicial immunity isn't a jurisdictional doctrine; it's an affirmative defense that goes to the merits."). Consistent with that principle, courts have repeatedly explained that absolute immunity can be waived and forfeited based on litigation conduct. *See, e.g.*, *In re Kendall*, 712 F.3d 814, 822 n.4 (3d Cir. 2013) (Virgin Islands judge); *Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010) (prosecutor); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) (health department officials); *Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002) (police); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) (state attorney general); *Boyd v. Carroll*, 624 F.2d 730, 732-33 (5th Cir. 1980) (judge). And federal courts have uniformly described absolute immunity as an affirmative defense that must be pleaded by the defendant-officer. *See* Carroll Br. at 11; *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) (Alito, J.).

Those principles apply even though the absolute immunity of judges and prosecutors rests on traditions and justifications grounded in our constitutional structure. Judges enjoy absolute immunity to protect a core Article III principle: "[T]hat independence without which no judiciary can be either respectable or useful." *Bradley v. Fisher*, 80 U.S. 335, 347, 20 L. Ed. 646 (1871). Similarly, prosecutors (as quasi-judicial agents) are cloaked with immunity to avoid harassment that may lead them to "shade [their] decisions instead of exercising the independence of judgment required by [their] public trust." *Imbler v. Pachtman*, 424 U.S. 409, 422-23, 96 S. Ct. 984, 991 (1976). In both cases, the importance of the justifications for absolute immunity has not led courts to transmute the immunity into a jurisdictional rule; instead, courts have applied absolute immunity within its scope while recognizing that it may be waived or forfeited if not properly invoked.

Nothing about *Nixon* suggests a rupture from this established understanding of absolute immunity. To the contrary, *Nixon* flows from the same tradition—though rather than ground its immunity directly in the common law (which developed before the institution of the Presidency), it invoked our "constitutional heritage and structure." 457 U.S. at 748, 102 S. Ct. at 2700.

Since *Nixon*, moreover, courts and litigants have broadly evinced an understanding that absolute immunity is *not* jurisdictional in nature. In both *Clinton v. Jones* and *Trump v. Vance*, neither the briefs submitted by the parties nor the opinion issued by the Supreme Court described absolute presidential immunity as implicating subject matter jurisdiction. *See generally Clinton*, 520 U.S. 681, 117 S. Ct. 1636 (1997); *Vance*, 140 S. Ct. 2412. Nor has any federal appellate court held that absolute presidential immunity bears on subject matter jurisdiction—and when the issue has arisen, respected jurists have suggested that it does not. *See, e.g.*, *District of Columbia v. Trump*, 959 F.3d 126, 141 (4th Cir. 2020) (en banc) (Niemeyer, J., dissenting) ("[A]ny question of subject matter jurisdiction—including, as relevant here, the issue of Article III standing—must be considered *before* the merits of the [President's] immunity defense." (emphasis added)).

This logic is also reflected in district court decisions that have dismissed claims on the merits without first considering an absolute presidential immunity defense (which, if it were jurisdictional, would have to precede the merits). *See, e.g.*, *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at *10 n.6 (S.D.N.Y. Nov. 14, 2022) (Liman, J.). Indeed, in at least one such case, the court noted that Trump had expressly agreed at oral argument that "absolute presidential immunity" was *not* a "threshold issue[] that must be decided before reaching the merits." *K&D, LLC v. Trump Old Post Off., LLC*, No. 17 Civ. 731, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) (Leon, J.). And in the Emoluments Clause litigation, Trump raised an absolute immunity defense independently of his defenses framed as "jurisdictional," without once

referring to that defense as bearing on the court's jurisdiction. *See District of Columbia v. Trump*, No. 8:17 Civ. 01596 (D. Maryland), at ECF 112-1 and 118 (Trump's motion to dismiss briefing).[1]

To be sure, the *Nixon* Court styled part of its discussion as referring to "jurisdiction." *See* 457 U.S. at 753-54, 102 S. Ct. at 2703. But that was long before the Supreme Court's modern effort to "bring some discipline to the use of this term." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435, 131 S. Ct. 1197, 1202 (2011). Indeed, in this part of its discussion, *Nixon* did not invoke cases understood as addressing subject matter jurisdiction. *See* 457 U.S. at 753-54, 102 S. Ct. at 2703 (discussing the Steel Seizure case, the Nixon tapes case, and a case upholding the Presidential Recordings and Materials Preservation Act). *Nixon* instead referred to "jurisdiction" in the informal sense characteristic of that period—and as part of its broader weighing of interests to decide whether to recognize absolute immunity at all. This part of its reasoning does not reflect the articulation of a formal jurisdictional rule and has not since been understood as doing so.[2]

Nor would the separation of powers principles cited by *Nixon* support treating absolute presidential immunity as jurisdictional. As noted above, absolute immunity doctrines that secure other constitutional values are subject to waiver. *See supra* at 2. And other incidents of Article II, such as executive privilege, have also been interpreted as requiring affirmative invocation and being subject to intentional waiver. *See United States v. Reynolds*, 345 U.S. 1, 7-8, 73 S. Ct. 528, 532 (1953); *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021). More fundamentally, the policy concerns that led the Supreme Court to recognize absolute immunity in this setting—the risk of distracting a sitting President, or diverting him from fearless and impartial attention to his duties—

---

[1] In *Thompson v. Trump*, 590 F. Supp. 3d 46, 69 (D.D.C. 2022), though, Judge Mehta did include absolute immunity within his discussion of subject matter jurisdiction, seemingly in response to Trump's framing of the issue.

[2] The leading modern jurisdictional question in this context concerns not the absolute immunity of a former officeholder, but instead the very different question of when courts possess jurisdiction to issue declaratory or injunctive relief against the incumbent President. *See McCray v. Biden*, 574 F. Supp. 3d 1, 8-11 (D.D.C. 2021).

do not require that the immunity be nonwaivable. *See Vance*, 140 S. Ct. at 2425-26. Until this case, no current or former President has waived his absolute immunity from a civil damages suit, and only in rare cases would that be expected to occur. So there is little risk that Article II functions would be undermined or infringed by application of the traditional rule that absolute immunity is a non-jurisdictional affirmative defense that must be properly invoked by the President.

Further, if Trump's view were right, strange consequences would follow: courts would be obliged to *sua sponte* raise and adjudicate absolute immunity even if it were deliberately waived or disavowed (which might itself spark concerns about judicial intrusion on Article II prerogatives), and a court's failure to raise this issue *sua sponte* at the very outset of a lawsuit before addressing any merits defenses would be reversible error (in which case numerous federal courts have overstepped their jurisdiction). Given all this, where a President waives their absolute immunity, it is proper to hold them to it, particularly where that waiver is expressed in clear terms and was undertaken as part of a calculated gambit for some discernible strategic advantage.

Of course, that is what happened here: Trump not only failed to raise absolute immunity, but affirmatively told the state court that he did not seek to "escape accountability" and that Carroll was "free to pursue this action" after his tenure in office. NYSCEF No. 103 at 3. He made those representations as part of a calculated effort to increase the odds that the state court would stay all proceedings until the conclusion of his presidential term. After that tactic failed, he then waited until three full years into the case before even mentioning absolute immunity, and in the interim borrowed the power of the Court to undertake intrusive discovery into Carroll (and her friends and family) and sought to countersue her within this very proceeding on anti-SLAPP grounds. In these circumstances, whether applying ordinary waiver rules or any heightened standard (though Trump does not advocate for one), the Court should conclude that Trump has waived this defense.

## CONCLUSION

For the foregoing reasons, Trump's motion for summary judgment should be denied.


Dated: New York, New York  
January 24, 2023

Respectfully submitted,

_(signature)_

_____  
Roberta A. Kaplan  
Shawn G. Crowley  
Trevor W. Morrison (admitted *pro hac vice*)  
Matthew J. Craig  
KAPLAN HECKER & FINK LLP  
350 Fifth Avenue, 63rd Floor  
New York, New York 10118  
Telephone: (212) 763-0883  
Fax: (212) 564-0883  
rkaplan@kaplanhecker.com  
scrowley@kaplanhecker.com  
tmorrison@kaplanhecker.com  
mcraig@kaplanhecker.com

Joshua Matz  
KAPLAN HECKER & FINK LLP  
1050 K Street NW, Suite 1040  
Washington, DC 20001  
Telephone: (212) 763-0883  
Fax: (212) 564-0883  
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

No. 20 Civ. 7311 (LAK) (JLC)

DONALD J. TRUMP, in his personal capacity,

*Defendant.*

## JOINT PRETRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to Fed. R.

Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order

herein.

## I.    NATURE OF THE CASE

### A.    Plaintiff's Proposed Statement of the Case

In the fall of 1995 or spring of 1996, Plaintiff E. Jean Carroll, a journalist, writer, and

advice columnist, encountered Defendant Donald J. Trump at the Bergdorf Goodman department

store in New York City. Playful banter took a dark turn when Trump seized Carroll, forced her up

against a dressing room wall, pinned her in place with his shoulder, and raped her. After Carroll

managed to escape, she immediately called her friend Lisa Birnbach and told her what had

happened. A day or two after the rape, Carroll confided in another close friend, Carol Martin.

Carroll blamed herself for what had happened, felt embarrassment and shame, and feared what

would happen if she spoke out. She swore her two friends to secrecy and did not speak about the

rape again for more than two decades.

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with men. Inspired by the #MeToo movement, Carroll decided to include in her book her own negative experiences with men, including Trump's attack at Bergdorf's many years before. Carroll's book was published in 2019, and in advance of its release, on June 21, 2019, *New York Magazine* published an excerpt containing, among other things, Carroll's account of being raped by Trump.

Trump responded by publicly, falsely, and maliciously smearing Carroll's reputation three times over a four-day period. On June 21, 22, and 24, 2019, Trump denied that he raped Carroll and insisted they had never met. He also accused Carroll of lying about the rape to make money, to increase book sales, or to carry out a political agenda. He implied that she had falsely accused other unspecified men of sexual assault. And he insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too unattractive for him to have raped her. Trump made these statements knowing full well that they were false. He knew he had raped Carroll, and he has admitted not having any evidence supporting his claims about her financial or political motivation or about her supposedly false accusations against other men.

Trump's three defamatory statements caused Carroll to suffer reputational, emotional, and professional harm. She demands that Trump retract his statements and seeks compensatory and punitive damages.

### B. Defendant's Proposed Statement of the Case

This action involves a single cause of action for defamation against the Defendant, Donald J. Trump, then sitting President of the United States, for statements he made in response to Plaintiff's allegations of sexual misconduct. Plaintiff's contentions arise out of an alleged incident

which she claims occurred at the Bergdorf Goodman store in New York, New York on an uncertain date "between the fall of 1995 and the spring of 1996." Defendant wholly denies the veracity of Plaintiff's claim and maintains that his denial of her allegations was truthful.

Accordingly, Defendant respectfully demands judgment dismissing the Complaint in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

## II.    JURY/NON-JURY

Carroll and Trump both request that this action be tried by jury. The parties estimate that the trial will take between 5 and 7 days.

## III.    STIPULATED FACTS

None.

## IV.    EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes, (b) by plaintiff on rebuttal, or (c) if good cause for its exclusion from the pretrial order is shown.

### A.    Plaintiff's Exhibits

The following is a list of exhibits Plaintiff intends to offer in her case-in-chief:

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-1 | Trump's June 21, 2019 statement (Laura Litvan tweet) (Defendant Dep. Ex. 20) | | | |
| PX-2 | Trump's June 22, 2019 statement (transcript of remarks before Marine One departure) (MP-001795) (Defendant Dep. Ex. 21) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-3 | Trump's June 24, 2019 statement (article from *The Hill*: Jordan Fabian and Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*) (Defendant Dep. Ex. 22) | | | |
| PX-4 | Trump's October 12, 2022 statement (Truth Social post) (Defendant Dep. Ex. 28) | | | |
| PX-5 | E. Jean Carroll's book: *What Do We Need Men For? A Modest Proposal* (2019) (Defendant Dep. Ex. 19) | Hearsay | | |
| PX-6 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 21, 2019) (online version) (Plaintiff Dep. Ex. 4) | Hearsay | | |
| PX-7 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 24, 2019) (print version) (CARROLL_024386, Plaintiff Dep. Ex. 3 (cover); CARROLL_024378 (article)) | Hearsay | | |
| PX-8 | *New York Magazine* article: Lisa Birnbach, *Mi Casa Es Su Casa* (Feb. 12, 1996) (Defendant Dep. Ex. 1) | Hearsay | | |
| PX-9 | *People* article: Natasha Stoynoff, *Happy Anniversary* (Jan. 16, 2006) | Hearsay | | |
| PX-10 | Publishing contract between E. Jean Carroll and St. Martin's Press, dated June 8, 2018 (CARROLL_015939) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-11 | Contract between E. Jean Carroll and Hearst Magazine Media, dated January 28, 2019 (CARROLL_025665) | | | |
| PX-12 | Photo of E. Jean Carroll, John Johnson, Donald J. Trump, and Ivanka Trump (CARROLL_030211) (Defendant Dep. Ex. 23; Plaintiff Dep. Ex. 2) | | | |
| PX-13 | Photo of E. Jean Carroll from Miss Indiana photo shoot (CARROLL_030203) | | | |
| PX-14 | Photo of E. Jean Carroll in 1998 (CARROLL_030201) | | | |
| PX-15 | Photo of E. Jean Carroll eating at a restaurant, for the "Ask E. Jean" column (CARROLL_030242) | | | |
| PX-16 | Photo of E. Jean Carroll looking out a window, for the "Ask E. Jean" column (CARROLL_030229) | | | |
| PX-17 | Photo of Natasha Stoynoff with Donald Trump and others at Mar-a-Lago in December 2005 | Irrelevant & unduly prejudicial | | |
| PX-18 | Photo of Jessica Leeds in 1978 | Irrelevant & unduly prejudicial | | |
| PX-19 | Television graphic for *Ask E. Jean* Show (1995) | | | |
| PX-20 | Bergdorf Goodman floorplan, dated March 23, 1990 (BG_0001) | | | |
| PX-21 | Bergdorf Goodman floorplan, dated November 8, 1999 (BG_0011) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-22 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030804) | | | |
| PX-23 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030809) | | | |
| PX-24 | Bergdorf Goodman Fifth Avenue Sixth Floor Plan, dated April 12, 1996, and certified by the New York Department of Buildings (CARROLL_030840) | | | |
| PX-25 | Access Hollywood video recording of Donald J. Trump speaking to Billy Bush in September 2005 (Defendant Dep. Ex. 35) | Irrelevant & unduly prejudicial | | |
| PX-26 | September 26, 2016 Presidential debate video (Stoynoff Dep. Ex. 3; Leeds Dep. Ex. 1) | Irrelevant & unduly prejudicial | | |
| PX-27 | October 13, 2016 West Palm Beach campaign rally video (14:28-15:32) (Defendant Dep. Ex. 40) | Irrelevant & unduly prejudicial | | |
| PX-28 | October 13, 2016 West Palm Beach campaign rally video (17:32-17:57) | Irrelevant & unduly prejudicial | | |
| PX-29 | October 13, 2016 West Palm Beach campaign rally video (17:58-19:23) (Defendant Dep. Ex. 36) | Irrelevant & unduly prejudicial | | |
| PX-30 | October 14, 2016 Greensboro, NC campaign rally video (17:10-18:30) | Irrelevant & unduly prejudicial | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-31 | October 14, 2016 Greensboro, NC campaign rally video (24:34-25:06) (Defendant Dep. Ex. 38) | Irrelevant & unduly prejudicial | | |
| PX-32 | October 21, 2016 Gettysburg, PA campaign rally video (9:44-10:06) | Irrelevant & unduly prejudicial | | |
| PX-33 | Video recording of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-34 | Video recording of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-35 | Video recording of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-36 | Video recording of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-37 | Video recording of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-38 | Transcript of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-39 | Transcript of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-40 | Transcript of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-41 | Transcript of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-42 | Transcript of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-43 | Prof. Ashlee Humphreys demonstrative exhibit | | | |
| PX-44 | Tweets @ejeancarroll by @typonow and @kittywaymo (June 21, 2019) (CARROLL_030264) | | | |
| PX-45 | Tweets @ejeancarroll by @battlebornVT, @nycfla2, @MattSkyFather, @jillybean0313, @ProfSchlitzo7, @TrumpVoter9 (June 21 and 22, 2019) (CARROLL_030256) | Irrelevant (does not cite to Trump statements) | | |
| PX-46 | Tweet @ejeancarroll by @rightside4me (June 22, 2019) (CARROLL_030263) | | | |
| PX-47 | Tweet @ejeancarroll by @theboydoutdoors (June 28, 2019) (CARROLL_030251) | Irrelevant & does not cite to statement | | |
| PX-48 | Email to e.jean@askejean.com from marianneofmaui@aol.com (June 21, 2019) (CARROLL_024499) | Id. | | |
| PX-49 | Email to ejean@askejean.com from Anonymous (June 22, 2019) (CARROLL_024554) | Id. | | |
| PX-50 | Email to e.jean@askejean.com from sports_justice@gmx.com (June 22, 2019) (CARROLL_024559) | Id. | | |
| PX-51 | Email to e.jean@askejean.com from aaarocket37@gmail.com (June 22, 2019) (CARROLL_024562) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-52 | Email to e.jean@askejean.com from meg814@msn.com (June 22, 2019) (CARROLL_024640) | Id. | | |
| PX-53 | Email to ejeancarroll@gmail.com from lahey.s@shaw.ca (June 22, 2019) (CARROLL_024641) | Id. | | |
| PX-54 | Email to e.jean@askejean.com from dwdwdw10@hotmail.com (June 23, 2019) (CARROLL_024684) | Id. | | |
| PX-55 | Email to comment@askejean.com from coupclan1962@gmail.com (June 23, 2019) (CARROLL_024796) | Id. | | |
| PX-56 | Email to e.jean@askejean.com from rob702@gmx.com (June 25, 2019) (CARROLL_024944) | Id. | | |
| PX-57 | Email to e.jean@askejean.com; dori.weintraub@stmartins.com; slazin@aevitascreative.com; and awarren@aevitascreative.com from sports_justice@gmx.com (June 25, 2019) (CARROLL_024974) | Id. | | |
| PX-58 | Email to comment@askejean.com from zanderzax407@gmail.com (June 27, 2019) (CARROLL_025080) | | | |
| PX-59 | Email to ejean@askejean.com from Anonymous (Jan. 4, 2020) (CARROLL_026329) | Irrelevant & does not cite to statement | | |
| PX-60 | Email to e.jean@askejean.com from scottie7389@outlook.com (Jan. 10, 2020) (CARROLL_026331) | Id. | | |
| PX-61 | Email to e.jean@askejean.com from imaseeker1@aol.com (Feb. 19, 2020) (CARROLL_026479) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-62 | Email to e.jean@askejean.com from bobruberry@hotmail.com (Sept. 8, 2020) (CARROLL_028058) | Id. | | |
| PX-63 | Email notification of Tweet @ejeancarroll by @tschuler (Sept. 9, 2020) (CARROLL_028063) | Id. | | |
| PX-64 | Email to ejeancarroll@gmail.com from samlupowitz@aol.com (Sept. 9, 2020) (CARROLL_028069) | Id. | | |
| PX-65 | Email to ejeancarroll@gmail.com from lsprywa@gmail.com (Sept. 9, 2020) (CARROLL_028115) | Id. | | |
| PX-66 | Facebook message from Joseph Rowland to E. Jean Carroll (Oct. 21, 2020) (CARROLL_028549) | Id. | | |
| PX-67 | Email to e.jean@askejean.com from nwrsupertech@yahoo.com (Oct. 27, 2020) (CARROLL_028588) | Id. | | |
| PX-68 | Email to e.jean@askejean.com from kuke@dakotacom.net (June 8, 2021) (CARROLL_029331) | Id. | | |
| PX-69 | Facebook message from Isaac Blanchard to E. Jean Carroll (Mar. 11, 2022) (CARROLL_029774) | Id. | | |
| PX-70 | Facebook message from Michael Drury to E. Jean Carroll (June 21, 2019) (CARROLL_030118) | Id. | | |
| PX-71 | Facebook messages from Brian Flowers to E. Jean Carroll (June 22, 2019) (CARROLL_030119) | Id. | | |
| PX-72 | Facebook messages from VJ Zimmerman to E. Jean Carroll (June 22, 2019) (CARROLL_030120) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-73 | Facebook message from Renee Shipley to E. Jean Carroll (June 22, 2019) (CARROLL_030121) | Id. | | |
| PX-74 | Facebook message from Steve Barnet to E. Jean Carroll (June 22, 2019) (CARROLL_030122) | Id. | | |
| PX-75 | Facebook message from Patrick Harris to E. Jean Carroll (June 22, 2019) (CARROLL_030123) | | | |
| PX-76 | Facebook message from Karen Marie Jacobsen Strunk to E. Jean Carroll (June 23, 2019) (CARROLL_030124) | Irrelevant & does not cite to statement | | |
| PX-77 | Facebook messages from Kathleen Woolard to E. Jean Carroll (June 22, 2019; July 24, 2019) (CARROLL_030126) | | | |
| PX-78 | Facebook message from Tim Wolffis to E. Jean Carroll (June 23, 2019) (CARROLL_030127) | Irrelevant & does not cite to statement | | |
| PX-79 | Facebook messages from Nellie Marsell to E. Jean Carroll (June 23, 2019) (CARROLL_030128) | Id. | | |
| PX-80 | Facebook message from David Alan to E. Jean Carroll (June 24, 2019) (CARROLL_030131) | Id. | | |
| PX-81 | Facebook messages from Jeff Tucker to E. Jean Carroll (June 24, 2019; Sept. 8, 2020) (CARROLL_030133) | Id. | | |
| PX-82 | Facebook message from Patrick McDowell to E. Jean Carroll (June 24, 2019) (CARROLL_030134) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-83 | Facebook message from Norm Sargent to E. Jean Carroll (June 24, 2019) (CARROLL_030136) | Id. | | |
| PX-84 | Facebook message from Jamie Lynn Ockerman to E. Jean Carroll (June 25, 2019) (CARROLL_030137) | Id. | | |
| PX-85 | Facebook message from S.K. Bernethy to E. Jean Carroll (June 25, 2019) (CARROLL_030138) | Id. | | |
| PX-86 | Facebook message from Michael Hartman to E. Jean Carroll (June 26, 2019) (CARROLL_030142) | Id. | | |
| PX-87 | Facebook messages from Bill Kilby to E. Jean Carroll (June 27, 2019; Dec. 25, 2019) (CARROLL_030143) | Id. | | |
| PX-88 | Facebook message from Ken Nelson to E. Jean Carroll (June 27, 2019) (CARROLL_030145) | Id. | | |
| PX-89 | Facebook message from Memphis Raine to E. Jean Carroll (July 4, 2019) (CARROLL_030147) | Id. | | |
| PX-90 | Facebook message from Joanie Petersen to E. Jean Carroll (Nov. 8, 2019) (CARROLL_030150) | Id. | | |
| PX-91 | Facebook message from Larry Thomas to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030151) | Id. | | |
| PX-92 | Facebook message from Bonnie Elizabeth Daily to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030153) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-93 | Facebook messages from Ruby Shankles to E. Jean Carroll (Feb. 18, 2020) (CARROLL_030154) | Id. | | |
| PX-94 | Facebook message from Jen Burton to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030155) | Id. | | |
| PX-95 | Facebook message from Stuart Campbell to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030156) | Id. | | |
| PX-96 | Tweet @ejeancarroll by @firethornranch (June 21, 2019) | Id. | | |
| PX-97 | Tweet by @floccinaucini1 (June 21, 2019) | | | |
| PX-98 | Tweet @ejeancarroll by @RunnerMo24 (June 21, 2019) | Irrelevant & does not cite to statement | | |
| PX-99 | Tweet @ShelbyTalcott and @DailyCaller by @PapaNeanderthal (June 22, 2019) | Id. | | |
| PX-100 | Tweet @nytimes by @DizZieNewz (Sept. 9, 2020) | | | |
| PX-101 | Tweet @nytimes by @nterruptedgirl (Sept. 12, 2020) | | | |
| PX-102 | Tweet @dcexaminer by @BruceWe77516428 (Sept. 16, 2021) | | | |

**B.     Defendant's Exhibits**

The following is a list of exhibits Defendant intends to offer in his case-in-chief:

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-A | Bergdorf Goodman Floor Plan, floors one through ten, dated March 23, 1990 (BG_0001-0010) | None. | Yes. | Yes. |
| DX-B1 | Bergdorf Goodman, Sixth Floor Renovation Plans (CARROLL_030800; 30804 – 30807- 30809; 30821; 30824; 30827; 30829; 30839-30840.) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B2 | Bergdorf Goodman, Sixth Floor Demolition Plans (CARROLL_030801; 30803; 30810; 30820) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B3 | Bergdorf Goodman, Sixth Floor Architectural Plans (CARROLL_030802; 30808; 30811 – 30819; 30822-30823; 30825 – 30826; 30828; 30830 – 30838) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-C | Expert Report of Robert J. Fisher dated November 13, 2022 | FRE 401, 403, 702, 703, 801, and 802; FRCP 26(a)(2)(D)(ii); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); Stipulation re Operative Version of Report. | No. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-D | Transcript of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-E | Video Recording of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-F | Transcript of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-G | Video Recording of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-H | Transcript of the Deposition of Lisa Birnbach dated September 21, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-I | Transcript of the Deposition of Carol Martin dated October 18, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

## V.  GENERAL PROVISIONS, STIPULATIONS, AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.

See chart above in Section IV for stipulations and objections with respect to exhibits.

## VI.  PLAINTIFF'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be

permitted to testify in either party's case-in-chief absent good cause shown.

Plaintiff may call at trial the following:

- E. Jean Carroll
- Lisa Birnbach
- Carol Martin
- Cande Carroll
- Stephanie Grisham
- Roberta Myers
- Natasha Stoynoff
- Jessica Leeds
- Cheryl Beall
- Robert Salerno
- Prof. Ashlee Humphreys

## VII.    DEFENDANT'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Excepting rebuttal or impeachment, Defendant may call at trial the following:

- Donald J. Trump
- Lisa Birnbach
- Anderson Cooper
- David Haskell
- Elizabeth Dysssegaard
- Erin Hobday
- Laurie Abraham
- Sarah Lazin
- Robert J. Fisher

## VIII.   RELIEF SOUGHT

Carroll seeks an order that Trump retract all defamatory statements and seeks compensatory and punitive damages for the harms caused by Trump's defamatory statements. Carroll also seeks pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Defendant respectfully demands judgment dismissing this action in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

Dated: February 9, 2023                         Respectfully submitted,


/s/ Alina Habba_____            /s/ Roberta A. Kaplan_____
Alina Habba                                      Roberta A. Kaplan
Michael Madaio                                   Shawn Crowley
HABBA MADAIO & ASSOCIATES LLP                    Trevor Morrison
1430 U.S. Highway 206, Suite 240                 Matthew J. Craig
Bedminster, NJ 07921                             KAPLAN HECKER & FINK LLP
Phone: (908) 869-1188                            350 Fifth Avenue, 63rd Floor
ahabba@habbalaw.com                              New York, New York 10118
mmadaio@habbalaw.com                             Phone: (212) 763-0883
                                                 rkaplan@kaplanhecker.com
*Counsel for Defendant Donald J. Trump*          scrowley@kaplanhecker.com
                                                 tmorrison@kaplanhecker.com
                                                 mcraig@kaplanhecker.com

                                                 Joshua Matz
                                                 KAPLAN HECKER & FINK LLP
                                                 1050 K Street NW, Suite 1040
                                                 Washington, D.C. 20001
                                                 Phone: (212) 763-0883
                                                 jmatz@kaplanhecker.com

                                                 *Counsel for Plaintiff E. Jean Carroll*




IT IS SO ORDERED this _____ day of _____, 2023.


_____
The Hon. Lewis A. Kaplan
United States District Judge

# EXHIBIT 23

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/13/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

## JOINT PRETRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.

## I. NATURE OF THE CASE

### A. Plaintiff's Proposed Statement of the Case

In the fall of 1995 or spring of 1996, Plaintiff E. Jean Carroll, a journalist, writer, and advice columnist, encountered Defendant Donald J. Trump at the Bergdorf Goodman department store in New York City. Playful banter took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her. After Carroll managed to escape, she immediately called her friend Lisa Birnbach and told her what had happened. A day or two after the rape, Carroll confided in another close friend, Carol Martin. Carroll blamed herself for what had happened, felt embarrassment and shame, and feared what would happen if she spoke out. She swore her two friends to secrecy and did not speak about the rape again for more than two decades.

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with men. Inspired by the #MeToo movement, Carroll decided to include in her book her own negative experiences with men, including Trump's attack at Bergdorf's many years before. Carroll's book was published in 2019, and in advance of its release, on June 21, 2019, *New York Magazine* published an excerpt containing, among other things, Carroll's account of being raped by Trump.

Trump responded by publicly, falsely, and maliciously smearing Carroll's reputation three times over a four-day period. On June 21, 22, and 24, 2019, Trump denied that he raped Carroll and insisted they had never met. He also accused Carroll of lying about the rape to make money, to increase book sales, or to carry out a political agenda. He implied that she had falsely accused other unspecified men of sexual assault. And he insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too unattractive for him to have raped her. Trump made these statements knowing full well that they were false. He knew he had raped Carroll, and he has admitted not having any evidence supporting his claims about her financial or political motivation or about her supposedly false accusations against other men.

Trump's three defamatory statements caused Carroll to suffer reputational, emotional, and professional harm. She demands that Trump retract his statements and seeks compensatory and punitive damages.

### B.    Defendant's Proposed Statement of the Case

This action involves a single cause of action for defamation against the Defendant, Donald J. Trump, then sitting President of the United States, for statements he made in response to Plaintiff's allegations of sexual misconduct.  Plaintiff's contentions arise out of an alleged incident

which she claims occurred at the Bergdorf Goodman store in New York, New York on an uncertain date "between the fall of 1995 and the spring of 1996." Defendant wholly denies the veracity of Plaintiff's claim and maintains that his denial of her allegations was truthful.

Accordingly, Defendant respectfully demands judgment dismissing the Complaint in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

## II. JURY/NON-JURY

Carroll and Trump both request that this action be tried by jury. The parties estimate that the trial will take between 5 and 7 days.

## III. STIPULATED FACTS

None.

## IV. EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes, (b) by plaintiff on rebuttal, or (c) if good cause for its exclusion from the pretrial order is shown.

### A. Plaintiff's Exhibits

The following is a list of exhibits Plaintiff intends to offer in her case-in-chief:

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-1 | Trump's June 21, 2019 statement (Laura Litvan tweet) (Defendant Dep. Ex. 20) | | | |
| PX-2 | Trump's June 22, 2019 statement (transcript of remarks before Marine One departure) (MP-001795) (Defendant Dep. Ex. 21) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-3 | Trump's June 24, 2019 statement (article from *The Hill*: Jordan Fabian and Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*) (Defendant Dep. Ex. 22) | | | |
| PX-4 | Trump's October 12, 2022 statement (Truth Social post) (Defendant Dep. Ex. 28) | | | |
| PX-5 | E. Jean Carroll's book: *What Do We Need Men For? A Modest Proposal* (2019) (Defendant Dep. Ex. 19) | Hearsay | | |
| PX-6 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 21, 2019) (online version) (Plaintiff Dep. Ex. 4) | Hearsay | | |
| PX-7 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 24, 2019) (print version) (CARROLL_024386, Plaintiff Dep. Ex. 3 (cover); CARROLL_024378 (article)) | Hearsay | | |
| PX-8 | *New York Magazine* article: Lisa Birnbach, *Mi Casa Es Su Casa* (Feb. 12, 1996) (Defendant Dep. Ex. 1) | Hearsay | | |
| PX-9 | *People* article: Natasha Stoynoff, *Happy Anniversary* (Jan. 16, 2006) | Hearsay | | |
| PX-10 | Publishing contract between E. Jean Carroll and St. Martin's Press, dated June 8, 2018 (CARROLL_015939) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-11 | Contract between E. Jean Carroll and Hearst Magazine Media, dated January 28, 2019 (CARROLL_025665) | | | |
| PX-12 | Photo of E. Jean Carroll, John Johnson, Donald J. Trump, and Ivanka Trump (CARROLL_030211) (Defendant Dep. Ex. 23; Plaintiff Dep. Ex. 2) | | | |
| PX-13 | Photo of E. Jean Carroll from Miss Indiana photo shoot (CARROLL_030203) | | | |
| PX-14 | Photo of E. Jean Carroll in 1998 (CARROLL_030201) | | | |
| PX-15 | Photo of E. Jean Carroll eating at a restaurant, for the "Ask E. Jean" column (CARROLL_030242) | | | |
| PX-16 | Photo of E. Jean Carroll looking out a window, for the "Ask E. Jean" column (CARROLL_030229) | | | |
| PX-17 | Photo of Natasha Stoynoff with Donald Trump and others at Mar-a-Lago in December 2005 | Irrelevant & unduly prejudicial | | |
| PX-18 | Photo of Jessica Leeds in 1978 | Irrelevant & unduly prejudicial | | |
| PX-19 | Television graphic for Ask E. Jean Show (1995) | | | |
| PX-20 | Bergdorf Goodman floorplan, dated March 23, 1990 (BG_0001) | | | |
| PX-21 | Bergdorf Goodman floorplan, dated November 8, 1999 (BG_0011) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-22 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030804) | | | |
| PX-23 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030809) | | | |
| PX-24 | Bergdorf Goodman Fifth Avenue Sixth Floor Plan, dated April 12, 1996, and certified by the New York Department of Buildings (CARROLL_030840) | | | |
| PX-25 | Access Hollywood video recording of Donald J. Trump speaking to Billy Bush in September 2005 (Defendant Dep. Ex. 35) | Irrelevant & unduly prejudicial | | |
| PX-26 | September 26, 2016 Presidential debate video (Stoynoff Dep. Ex. 3; Leeds Dep. Ex. 1) | Irrelevant & unduly prejudicial | | |
| PX-27 | October 13, 2016 West Palm Beach campaign rally video (14:28-15:32) (Defendant Dep. Ex. 40) | Irrelevant & unduly prejudicial | | |
| PX-28 | October 13, 2016 West Palm Beach campaign rally video (17:32-17:57) | Irrelevant & unduly prejudicial | | |
| PX-29 | October 13, 2016 West Palm Beach campaign rally video (17:58-19:23) (Defendant Dep. Ex. 36) | Irrelevant & unduly prejudicial | | |
| PX-30 | October 14, 2016 Greensboro, NC campaign rally video (17:10-18:30) | Irrelevant & unduly prejudicial | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-31 | October 14, 2016 Greensboro, NC campaign rally video (24:34-25:06) (Defendant Dep. Ex. 38) | Irrelevant & unduly prejudicial | | |
| PX-32 | October 21, 2016 Gettysburg, PA campaign rally video (9:44-10:06) | Irrelevant & unduly prejudicial | | |
| PX-33 | Video recording of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-34 | Video recording of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-35 | Video recording of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-36 | Video recording of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-37 | Video recording of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-38 | Transcript of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-39 | Transcript of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-40 | Transcript of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-41 | Transcript of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-42 | Transcript of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-43 | Prof. Ashlee Humphreys demonstrative exhibit | | | |
| PX-44 | Tweets @ejeancarroll by @typonow and @kittywaymo (June 21, 2019) (CARROLL_030264) | | | |
| PX-45 | Tweets @ejeancarroll by @battlebornVT, @nycfla2, @MattSkyFather, @jillybean0313, @ProfSchlitzo7, @TrumpVoter9 (June 21 and 22, 2019) (CARROLL_030256) | Irrelevant (does not cite to Trump statements) | | |
| PX-46 | Tweet @ejeancarroll by @rightside4me (June 22, 2019) (CARROLL_030263) | | | |
| PX-47 | Tweet @ejeancarroll by @theboydoutdoors (June 28, 2019) (CARROLL_030251) | Irrelevant & does not cite to statement | | |
| PX-48 | Email to e.jean@askejean.com from marianneofmaui@aol.com (June 21, 2019) (CARROLL_024499) | Id. | | |
| PX-49 | Email to ejean@askejean.com from Anonymous (June 22, 2019) (CARROLL_024554) | Id. | | |
| PX-50 | Email to e.jean@askejean.com from sports_justice@gmx.com (June 22, 2019) (CARROLL_024559) | Id. | | |
| PX-51 | Email to e.jean@askejean.com from aaarocket37@gmail.com (June 22, 2019) (CARROLL_024562) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-52 | Email to e.jean@askejean.com from meg814@msn.com (June 22, 2019) (CARROLL_024640) | Id. | | |
| PX-53 | Email to ejeancarroll@gmail.com from lahey.s@shaw.ca (June 22, 2019) (CARROLL_024641) | Id. | | |
| PX-54 | Email to e.jean@askejean.com from dwdwdw10@hotmail.com (June 23, 2019) (CARROLL_024684) | Id. | | |
| PX-55 | Email to comment@askejean.com from coupclan1962@gmail.com (June 23, 2019) (CARROLL_024796) | Id. | | |
| PX-56 | Email to e.jean@askejean.com from rob702@gmx.com (June 25, 2019) (CARROLL_024944) | Id. | | |
| PX-57 | Email to e.jean@askejean.com; dori.weintraub@stmartins.com; slazin@aevitascreative.com; and awarren@aevitascreative.com from sports_justice@gmx.com (June 25, 2019) (CARROLL_024974) | Id. | | |
| PX-58 | Email to comment@askejean.com from zanderzax407@gmail.com (June 27, 2019) (CARROLL_025080) | | | |
| PX-59 | Email to ejean@askejean.com from Anonymous (Jan. 4, 2020) (CARROLL_026329) | Irrelevant & does not cite to statement | | |
| PX-60 | Email to e.jean@askejean.com from scottie7389@outlook.com (Jan. 10, 2020) (CARROLL_026331) | Id. | | |
| PX-61 | Email to e.jean@askejean.com from imaseeker1@aol.com (Feb. 19, 2020) (CARROLL_026479) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-62 | Email to e.jean@askejean.com from bobruberry@hotmail.com (Sept. 8, 2020) (CARROLL_028058) | Id. | | |
| PX-63 | Email notification of Tweet @ejeancarroll by @tschuler (Sept. 9, 2020) (CARROLL_028063) | Id. | | |
| PX-64 | Email to ejeancarroll@gmail.com from samlupowitz@aol.com (Sept. 9, 2020) (CARROLL_028069) | Id. | | |
| PX-65 | Email to ejeancarroll@gmail.com from lsprywa@gmail.com (Sept. 9, 2020) (CARROLL_028115) | Id. | | |
| PX-66 | Facebook message from Joseph Rowland to E. Jean Carroll (Oct. 21, 2020) (CARROLL_028549) | Id. | | |
| PX-67 | Email to e.jean@askejean.com from nwrsupertech@yahoo.com (Oct. 27, 2020) (CARROLL_028588) | Id. | | |
| PX-68 | Email to e.jean@askejean.com from kuke@dakotacom.net (June 8, 2021) (CARROLL_029331) | Id. | | |
| PX-69 | Facebook message from Isaac Blanchard to E. Jean Carroll (Mar. 11, 2022) (CARROLL_029774) | Id. | | |
| PX-70 | Facebook message from Michael Drury to E. Jean Carroll (June 21, 2019) (CARROLL_030118) | Id. | | |
| PX-71 | Facebook messages from Brian Flowers to E. Jean Carroll (June 22, 2019) (CARROLL_030119) | Id. | | |
| PX-72 | Facebook messages from VJ Zimmerman to E. Jean Carroll (June 22, 2019) (CARROLL_030120) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-73 | Facebook message from Renee Shipley to E. Jean Carroll (June 22, 2019) (CARROLL_030121) | Id. | | |
| PX-74 | Facebook message from Steve Barnet to E. Jean Carroll (June 22, 2019) (CARROLL_030122) | Id. | | |
| PX-75 | Facebook message from Patrick Harris to E. Jean Carroll (June 22, 2019) (CARROLL_030123) | | | |
| PX-76 | Facebook message from Karen Marie Jacobsen Strunk to E. Jean Carroll (June 23, 2019) (CARROLL_030124) | Irrelevant & does not cite to statement | | |
| PX-77 | Facebook messages from Kathleen Woolard to E. Jean Carroll (June 22, 2019; July 24, 2019) (CARROLL_030126) | | | |
| PX-78 | Facebook message from Tim Wolffis to E. Jean Carroll (June 23, 2019) (CARROLL_030127) | Irrelevant & does not cite to statement | | |
| PX-79 | Facebook messages from Nellie Marsell to E. Jean Carroll (June 23, 2019) (CARROLL_030128) | Id. | | |
| PX-80 | Facebook message from David Alan to E. Jean Carroll (June 24, 2019) (CARROLL_030131) | Id. | | |
| PX-81 | Facebook messages from Jeff Tucker to E. Jean Carroll (June 24, 2019; Sept. 8, 2020) (CARROLL_030133) | Id. | | |
| PX-82 | Facebook message from Patrick McDowell to E. Jean Carroll (June 24, 2019) (CARROLL_030134) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-83 | Facebook message from Norm Sargent to E. Jean Carroll (June 24, 2019) (CARROLL_030136) | Id. | | |
| PX-84 | Facebook message from Jamie Lynn Ockerman to E. Jean Carroll (June 25, 2019) (CARROLL_030137) | Id. | | |
| PX-85 | Facebook message from S.K. Bernethy to E. Jean Carroll (June 25, 2019) (CARROLL_030138) | Id. | | |
| PX-86 | Facebook message from Michael Hartman to E. Jean Carroll (June 26, 2019) (CARROLL_030142) | Id. | | |
| PX-87 | Facebook messages from Bill Kilby to E. Jean Carroll (June 27, 2019; Dec. 25, 2019) (CARROLL_030143) | Id. | | |
| PX-88 | Facebook message from Ken Nelson to E. Jean Carroll (June 27, 2019) (CARROLL_030145) | Id. | | |
| PX-89 | Facebook message from Memphis Raine to E. Jean Carroll (July 4, 2019) (CARROLL_030147) | Id. | | |
| PX-90 | Facebook message from Joanie Petersen to E. Jean Carroll (Nov. 8, 2019) (CARROLL_030150) | Id. | | |
| PX-91 | Facebook message from Larry Thomas to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030151) | Id. | | |
| PX-92 | Facebook message from Bonnie Elizabeth Daily to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030153) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-93 | Facebook messages from Ruby Shankles to E. Jean Carroll (Feb. 18, 2020) (CARROLL_030154) | Id. | | |
| PX-94 | Facebook message from Jen Burton to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030155) | Id. | | |
| PX-95 | Facebook message from Stuart Campbell to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030156) | Id. | | |
| PX-96 | Tweet @ejeancarroll by @firethornranch (June 21, 2019) | Id. | | |
| PX-97 | Tweet by @floccinaucini1 (June 21, 2019) | | | |
| PX-98 | Tweet @ejeancarroll by @RunnerMo24 (June 21, 2019) | Irrelevant & does not cite to statement | | |
| PX-99 | Tweet @ShelbyTalcott and @DailyCaller by @PapaNeanderthal (June 22, 2019) | Id. | | |
| PX-100 | Tweet @nytimes by @DizZieNewz (Sept. 9, 2020) | | | |
| PX-101 | Tweet @nytimes by @nterruptedgirl (Sept. 12, 2020) | | | |
| PX-102 | Tweet @dcexaminer by @BruceWe77516428 (Sept. 16, 2021) | | | |

**B.     Defendant's Exhibits**

The following is a list of exhibits Defendant intends to offer in his case-in-chief:

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-A | Bergdorf Goodman Floor Plan, floors one through ten, dated March 23, 1990 (BG_0001-0010) | None. | Yes. | Yes. |
| DX-B1 | Bergdorf Goodman, Sixth Floor Renovation Plans (CARROLL_030800; 30804 – 30807- 30809; 30821; 30824; 30827; 30829; 30839-30840.) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B2 | Bergdorf Goodman, Sixth Floor Demolition Plans (CARROLL_030801; 30803; 30810; 30820) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B3 | Bergdorf Goodman, Sixth Floor Architectural Plans (CARROLL_030802; 30808; 30811 – 30819; 30822-30823; 30825 – 30826; 30828; 30830 – 30838) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-C | Expert Report of Robert J. Fisher dated November 13, 2022 | FRE 401, 403, 702, 703, 801, and 802; FRCP 26(a)(2)(D)(ii); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); Stipulation re Operative Version of Report. | No. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-D | Transcript of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-E | Video Recording of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-F | Transcript of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-G | Video Recording of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-H | Transcript of the Deposition of Lisa Birnbach dated September 21, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-I | Transcript of the Deposition of Carol Martin dated October 18, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

## V.  GENERAL PROVISIONS, STIPULATIONS, AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.

See chart above in Section IV for stipulations and objections with respect to exhibits.

## VI.  PLAINTIFF'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Plaintiff may call at trial the following:

- E. Jean Carroll
- Lisa Birnbach
- Carol Martin
- Cande Carroll
- Stephanie Grisham
- Roberta Myers
- Natasha Stoynoff
- Jessica Leeds
- Cheryl Beall
- Robert Salerno
- Prof. Ashlee Humphreys

## VII. DEFENDANT'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Excepting rebuttal or impeachment, Defendant may call at trial the following:

- Donald J. Trump
- Lisa Birnbach
- Anderson Cooper
- David Haskell
- Elizabeth Dysssegaard
- Erin Hobday
- Laurie Abraham
- Sarah Lazin
- Robert J. Fisher

## VIII. RELIEF SOUGHT

Carroll seeks an order that Trump retract all defamatory statements and seeks compensatory and punitive damages for the harms caused by Trump's defamatory statements. Carroll also seeks pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Defendant respectfully demands judgment dismissing this action in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

Dated: February 9, 2023

Respectfully submitted,

/s/ Alina Habba
Alina Habba
Michael Madaio
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, NJ 07921
Phone: (908) 869-1188
ahabba@habbalaw.com
mmadaio@habbalaw.com

*Counsel for Defendant Donald J. Trump*

/s/ Roberta A. Kaplan
Roberta A. Kaplan
Shawn Crowley
Trevor Morrison
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Phone: (212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Phone: (212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

IT IS SO ORDERED this 13ᵗʰ day of February, 2023.

The Hon. Lewis A. Kaplan
United States District Judge

# EXHIBIT 24

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

March 17, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

*Re:*     *Carroll v. Trump*, No. 20 Civ. 07311 (LAK)

Dear Judge Kaplan:

I write on behalf of all parties concerning the trial date in this case (*Carroll I*), as well as the trial date in *Carroll v. Trump*, No. 22 Civ. 10016 (*Carroll II*).

The trial date in *Carroll I* is currently set for April 10, 2023, ECF No. 100, and the trial date in *Carroll II* is currently set for April 25, 2023, *see Carroll II*, ECF No. 49. The Court has stated its intention to address at a later date whether to try these actions together. *See Carroll II*, ECF No. 49. As the parties have begun their pretrial preparations—and have submitted motions related to the trial proceedings—they have also met and conferred concerning the possibility of a single consolidated trial, which would advance important interests of efficiency and judicial economy. Following those discussions, and consistent with the attached stipulation, the parties jointly and respectfully request that the Court consolidate the trials in *Carroll I* and *Carroll II*, subject to the following proposed terms and conditions that are agreed to by both parties:

- The consolidated trial shall start on April 25, 2023.

- The consolidated trial shall cover liability and damages for both *Carroll I* and *Carroll II*.

- The jury shall use a special verdict form to separately identify the damages, if any, attributable to each claim in *Carroll I* and *Carroll II*.

- Under Federal Rules of Civil Procedure 54(b) and 58(b)(2), the Court shall enter judgment on *Carroll I* only after all interlocutory appeals are finally resolved.

KAPLAN HECKER & FINK LLP                                                    2

- The parties shall not seek any stay of the trial date in either *Carroll I* or *Carroll II*.

- The parties shall waive any objection to the trial judgment in *Carroll II* based on its consolidation with *Carroll I*.

- On April 17, 2023, the parties shall jointly notify the District of Columbia Court of Appeals of the upcoming jury trial schedule and respectfully request that the court defer issuing any decision until the conclusion of the trial.

This joint proposal is consistent with Federal Rule of Civil Procedure 42(a), which is "a valuable and important tool of judicial administration, invoked to expedite trial and eliminate unnecessary repetition and confusion." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (internal quotations omitted). Indeed, consolidation is favored where it would "reduce the costs for all parties, and avoid the possible risk of inconsistent rulings." *Darezzo v. 200 Ninth Rest. LLC*, No. 14 Civ. 5099, 2015 WL 195852, at \*3 (S.D.N.Y. Jan. 14, 2015).

The parties believe that trying *Carroll I* and *Carroll II* together serves these interests. Your Honor has recognized that the same factual question is "central" to both actions. *Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at \*7 (S.D.N.Y. Oct. 12, 2022). As such, evidence relating to this central factual question "is relevant to both cases," *id.*, and will be presented at both trials. Because of the overlapping nature of these proceedings, a single trial will reduce costs across the board, avoid the risk of inconsistent factual rulings or jury confusion, and economize matters for the Court (as well as for both parties' witnesses). Finally, the parties are confident that their joint proposal accounts for any issues that might arise relating to the D.C. Court of Appeals' ultimate answer to the certified question and any subsequent action that the Second Circuit might take.

A Stipulation and Proposed Order memorializing the parties' proposed plan for consolidation is attached. The parties are available to discuss this proposal if helpful to the Court.

Respectfully submitted,

Roberta A. Kaplan

cc: All Counsel of Record

(Attachment)

# EXHIBIT 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                    Plaintiff,

        -against-

DONALD J. TRUMP,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                    Plaintiff,

        -against-

DONALD J. TRUMP,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20-cv-7311 (LAK)

22-cv-10016 (LAK)

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        1.      The letter motion to consolidate these cases for trial, filed in the first captioned case as Dkt 147, is denied. The parties overestimate both the judicial economy benefits that would be achieved and the risk of inconsistent rulings that would be eliminated by consolidation. Issue preclusion appears to the Court adequate to achieve appropriate conservation of judicial resources and avoidance of inconsistent rulings even if the two cases were tried separately. Moreover, a trial in 20-cv-7311 conceivably could prove unnecessary. In addition, approval of the consolidation proposal would be in tension with the deference to the Second Circuit and the District of Columbia Court of Appeals that this Court believes appropriate in the circumstances.

        2.      The trial of 20-cv-7311, previously scheduled tentatively to begin on April 10, 2023, is adjourned *sine die.*

        SO ORDERED

Dated:      March 20, 2023

                                   Lewis A. Kaplan
                             United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALL...
DOC #: _____
DATE FILED: 3-20-2023

# EXHIBIT 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

              Plaintiff,

      -against-                          22-cv-10016 (LAK)

DONALD J. TRUMP,

              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## VERDICT FORM

### Battery

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

1.    Mr. Trump raped Ms. Carroll?

          YES _____         NO _✓_

*[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 2.]*

2.    Mr. Trump sexually abused Ms. Carroll?

          YES _✓_         NO _____

*[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 3.]*

3.    Mr. Trump forcibly touched Ms. Carroll?

          YES _____         NO _____

*[If you answered "Yes," continue to Question 4. If you answered "No," skip to Question 6.]*

4.    Ms. Carroll was injured as a result of Mr. Trump's conduct?

          YES _✓_         NO _____

If "Yes," insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.

$ 2,000,000 — (2 million)

If "No," insert $1.

$ _____

*[Continue to Question 5, whether you answered "Yes" or "No."]*

5.  Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard?

    YES ___✓___        NO _____

    If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

    $ _20,000_ — (twenty thousand)

    *[Continue to Question 6, whether you answered "Yes" or "No."]*

**Defamation**

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

6.  Mr. Trump's statement was defamatory?

    YES ___✓___        NO _____

    *[If you answered "Yes," continue to Question 7. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by clear and convincing evidence, that**

7.  Mr. Trump's statement was false?

    YES ___✓___        NO _____

    *[If you answered "Yes," continue to Question 8. If you answered "No," stop here and return your verdict.]*

8.  Mr. Trump made the statement with actual malice?

    YES ___✓___        NO _____

    *[If you answered "Yes," continue to Question 9. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

9.    Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement?

YES   ✓           NO  _____

If "Yes," insert a dollar amount for any damages other than the reputation repair program.

$  1,000,000. — ( 1 million)

If "Yes," insert a dollar amount for any damages for the reputation repair program only.

$  1,700,000. — (1.7 million)

If "No," insert $1.

$ _____

*[Continue to Question 10, whether you answered "Yes" or "No."]*

10.    In making the statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another?

YES   ✓           NO  _____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$  280,000. — (two hundred eighty thousand)

*[Please write your juror number (not you seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated:     5/9    , 2023

Juror numbers:

| | |
|---|---|
| 10 | 58 |
| 37 | 77 |
| 39 | 80 |
| 44 | 81 |
| 48 | |

# EXHIBIT 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                                        Plaintiff,

                -against-                                                22-cv-10016 (LAK)

DONALD J. TRUMP,

                                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7-19-2023__

## MEMORANDUM OPINION DENYING
## DEFENDANT'S RULE 59 MOTION

Appearances:

Roberta Kaplan
Joshua Matz
Shawn Crowley
Matthew Craig
Trevor Morrison
Michael Ferrara
KAPLAN HECKER & FINK LLP

*Attorneys for Plaintiff*

Joseph Tacopina
Matthew G. DeOreo
Chad Derek Seigel
TACOPINA SEIGEL & DEOREO, P.C.

Alina Habba
Michael T. Madaio
HABBA MADAIO & ASSOCIATES LLP

*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

In 2019, E. Jean Carroll first publicly claimed that businessman Donald J. Trump, as he then was, sexually assaulted ("raped") her in the mid-1990s. Mr. Trump responded almost immediately by charging that Ms. Carroll's claim was entirely false, that no such thing ever had happened, and that Ms. Carroll falsely accused Mr. Trump for ulterior and improper purposes. He repeated that contention in 2022 and yet again more recently. Ms. Carroll consequently sued Mr. Trump twice.

Ms. Carroll's first lawsuit (*"Carroll I"*), commenced in 2019, alleges that Mr. Trump's 2019 statements were defamatory. While that case was delayed for years for reasons that need not be recapitulated here, it now is scheduled for trial in January 2024.

This, the second case (*"Carroll II"*), also contains a defamation claim, albeit one based on Mr. Trump's comparable 2022 statement. But *Carroll II* made an additional claim – one for damages for the sexual assault. That claim could not have been made in 2019 because the statute of limitations almost doubtless would have expired long before. But the claim was made possible in 2022 by the enactment that year of New York's Adult Survivors Act (the "ASA"), which temporarily revived the ability of persons who were sexually assaulted as adults to sue their alleged assaulters despite the fact that an earlier statute of limitations had run out.

This case, *Carroll II,* was tried in April and May 2023. Ms. Carroll contended that Mr. Trump had assaulted her in a dressing room at a New York department store where, among other things, he forcibly penetrated her vagina with his fingers and his penis. She testified in person for most of three days and was cross-examined intensively. Her sexual assault claim was corroborated by two "outcry" witnesses in whom Ms. Carroll had confided shortly after the attack, and was supported by six other fact witnesses. Mr. Trump's defense – based exclusively on an

3

attempt to discredit Ms. Carroll and her other witnesses – in substance was that no assault ever had occurred, that he did not even know Ms. Carroll, and that her accusations were a "Hoax." Mr. Trump, however, did not testify in person or even attend the trial despite ample opportunity to do so.

The jury's unanimous verdict in *Carroll II* was almost entirely in favor of Ms. Carroll. The only point on which Ms. Carroll did not prevail was whether she had proved that Mr. Trump had "raped" her within the narrow, technical meaning of a particular section of the New York Penal Law – a section that provides that the label "rape" as used in criminal prosecutions in New York applies only to vaginal penetration by a penis. Forcible, unconsented-to penetration of the vagina or of other bodily orifices by fingers, other body parts, or other articles or materials is not called "rape" under the New York Penal Law. It instead is labeled "sexual abuse."[1]

As is shown in the following notes, the definition of rape in the New York Penal Law is far narrower than the meaning of "rape" in common modern parlance, its definition in some dictionaries,[2] in some federal and state criminal statutes,[3] and elsewhere.[4] The finding that Ms.

---

[1]

"Sexual abuse" involving sexual contact by forcible compulsion (sexual abuse in the first degree) nevertheless is a felony punishable by a term of imprisonment and requiring sex offender registration. N.Y. Penal Law §§ 70.02(1)(c) (sexual abuse in the first degree is a Class D violent felony), 3(c) ("For a class D felony, the term must be at least two years and must not exceed seven years . . .."); N.Y. Correct. Law §§ 168-a(3)(a)(i) (defining "[s]exually violent offense" to include a conviction of sexual abuse in the first degree), 7(b) (defining "[s]exually violent offender" as "a sex offender who has been convicted of a sexually violent offense defined in subdivision three of this section").

[2]

One dictionary, for example, defines rape as "unlawful sexual intercourse *or any other sexual penetration* of the vagina, anus, or mouth of another person, with or without force, *by a sex organ, other body part, or foreign object*, without the consent of the person subjected to such penetration." "[R]ape," Dictionary.com, https://www.dictionary.com/br owse/rape (last accessed July 14, 2023) (emphasis added). The most recent edition of Black's Law Dictionary defines rape in part as "[u]nlawful sexual activity (esp. intercourse) with a person (usu[ally] a female) without consent and usu[ally] by force or threat of injury" and

4

Carroll failed to prove that she was "raped" within the meaning of the New York Penal Law does

_____

it defines "intercourse" in the sexual sense as "*[p]hysical sexual contact*, esp. involving the penetration of the vagina by the penis." Black's Law Dictionary 966, 1511 (11th ed. 2019).

3

*E.g.,* 10 U.S.C. § 920(g)(1)(C) (Uniform Code of Military Justice) (defining "sexual act" for purposes of rape and sexual assault as, *inter alia*, "the penetration, however slight, of the vulva or penis or anus of another *by any part of the body or any object*, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person") (emphasis added); WAYNE R. LAFAVE, SUBST. CRIM. L., § 17.2(a) & n. 43 (3d ed.) ("In recent years, revision of rape laws have often brought about coverage of a broader range of conduct than is encompassed within the common law term 'carnal knowledge.'... As for the acts covered, the new statutes 'fall into three categories: those that continue the narrow notion that rape should punish only genital copulation; those that agree with the Model Code that rape laws should be expanded to include anal and oral copulation; and *those that go beyond the Model Code to include digital or mechanical penetration* as well as genital, anal, and oral sex.") (emphasis added) (citing state statutes).

In fact, "rape" as defined in the relevant part of the New York Penal Law – forcible, unconsented-to penetration of the vagina by a penis – constitutes "sexual assault" under the Code of Criminal Justice of the State of New Jersey. N.J. Stat. Ann. §§ 2C:14-2c.(1) ("[a]n actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person" and does so "using coercion or without the victim's affirmative and freely-given permission") and 2C:14-1c ("'Sexual penetration' means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction."). New Jersey, like some other states, does not statutorily define any crime as "rape." As indicated by the foregoing, New Jersey's penal code – unlike New York's – treats digital and other modes of penetration in the same manner as penile penetration.

4

The American Psychological Association, for example, defines rape as "the nonconsensual oral, anal, or vaginal penetration of an individual by another person *with a part of the body or an object*, using force or threats of bodily harm or taking advantage of the individual's inability to give or deny consent. U.S. laws defining rape vary by state, but the crime of rape is no longer limited to . . . vaginal penetration . . . ." APA Dictionary of Psychology, "Rape," AMERICAN PSYCHOLOGICAL ASSOCIATION, https://dictionary.apa.org/rape (last accessed July 14, 2023) (emphasis added).

The United States Attorney General announced in January 2012 a new definition of rape for the purpose of the Federal Bureau of Investigation's Uniform Crime Report Summary Reporting System by, among other changes, "recogniz[ing] that rape with an object can be as traumatic as penile/vaginal rape." U.S. Department of Justice, *An Updated Definition of Rape*, Jan. 6, 2012, https://www.justice.gov/archives/opa/blog/updated-definition-rape (new definition of "rape" as "[t]he penetration, no matter how slight, of the vagina or anus *with any body part or object*, or oral penetration by a sex organ of another person, without the consent of the victim") (emphasis added).

5

not mean that she failed to prove that Mr. Trump "raped" her as many people commonly understand the word "rape." Indeed, as the evidence at trial recounted below makes clear, the jury found that Mr. Trump in fact did exactly that.

So why does this matter? It matters because Mr. Trump now contends that the jury's $2 million compensatory damages award for Ms. Carroll's sexual assault claim was excessive because the jury concluded that he had not "raped" Ms. Carroll.[5] Its verdict, he says, could have been based upon no more than "groping of [Ms. Carroll's] breasts through clothing or similar conduct, which is a far cry from rape."[6] And while Mr. Trump is right that a $2 million award for such groping alone could well be regarded as excessive, that undermines rather than supports his argument. His argument is entirely unpersuasive.

This jury did not award Ms. Carroll more than $2 million for groping her breasts through her clothing, wrongful as that might have been. There was no evidence at all of such behavior. Instead, the proof convincingly established, and the jury implicitly found, that Mr. Trump deliberately and forcibly penetrated Ms. Carroll's vagina with his fingers, causing immediate pain and long lasting emotional and psychological harm. Mr. Trump's argument therefore ignores the bulk of the evidence at trial, misinterprets the jury's verdict, and mistakenly focuses on the New York Penal Law definition of "rape" to the exclusion of the meaning of that word as it often is used in everyday life and of the evidence of what actually occurred between Ms. Carroll and Mr. Trump.

There is no basis for disturbing the jury's sexual assault damages. And Mr. Trump's

---

[5]   The jury awarded Ms. Carroll $20,000 in punitive damages, in addition to the $2 million in compensatory damages.

[6]   Dkt 205 (Def. Mem.) at 1.

arguments with respect to the defamation damages are no stronger.

## Facts

### The Evidence at Trial

Ms. Carroll's case in chief constituted all of the evidence at trial. Mr. Trump neither testified nor called any witnesses. Apart from portions of his deposition that came in on Ms. Carroll's case, there was no defense evidence at all. The defense consisted entirely of (1) an attempt to discredit Ms. Carroll's proof on cross-examination, and (2) Mr. Trump's testimony during his deposition that Ms. Carroll's account of the alleged events at the department store was a hoax.

#### Sexual Battery

##### Liability

The principal evidence as to Mr. Trump's liability for the sexual assault was the testimony of Ms. Carroll, of the two "outcry" witnesses and of two other women who claimed to have been sexually assaulted by Mr. Trump, the so-called *Access Hollywood* video, and Mr. Trump's remarkable comments about that video during his deposition.

##### Ms. Carroll

In her first public accusation of sexual assault – "rape" – against Mr. Trump, which was published in June 2019 as an excerpt of her then-forthcoming book, Ms. Carroll described the assault in relevant part as follows:

> "The moment the dressing-room door [(at Bergdorf Goodman, a department
>
> store in New York)] is closed, he lunges at me, pushes me against the wall, hitting

my head quite badly, and puts his mouth against my lips. I am so shocked I shove him back and start laughing again. He seizes both my arms and pushes me up against the wall a second time, and, as I become aware of how large he is, he holds me against the wall with his shoulder and jams his hand under my coat dress and pulls down my tights. . . . The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, *unzips his pants, and, forcing his fingers around my private area, thrusts his penis halfway — or completely, I'm not certain — inside me.* It turns into a colossal struggle.[7]

At trial, Ms. Carroll testified:

- "He [(Mr. Trump)] immediately shut the [(dressing room)] door and shoved me up against the wall and shoved me so hard my head banged."

- "I pushed him back, and he thrust me back against the wall again, banging my head again."

- "He put his shoulder against me and hold [*sic*] me against the wall."

- "I remember him being -- he was very large, and his whole weight came against my chest and held me up there, and he leaned down and pulled down my tights."

- "I was pushing him back. . . . I pushed him back. This arm was pinned down. This arm had my purse. Trying to get him back."

- "His head was beside mine breathing. First, he put his mouth against me."

---

[7] E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump -assault-e-jean-carroll-other-hideous-men.html (emphasis added).

8

- "[I was] [s]tamping and trying to wiggle out from under him. *But he had pulled down my tights and his hand went -- his fingers went into my vagina, which was extremely painful, extremely painful. It was a horrible feeling because he curved, he put his hand inside of me and curved his finger. As I'm sitting here today, I can still feel it.*"

- "Then he inserted his penis."

- "He was against me, his whole shoulder -- I couldn't see anything. I couldn't see anything that was happening. *But I could certainly feel it. I could certainly feel that pain in the finger jamming up.*"[8]

After a day and a half of direct testimony, Ms. Carroll was subjected to a lengthy cross examination during which she testified:

"Q. It's your story that at some point you felt his penis inside of you?

A. Yes.

Q. But before that, *it's your sworn testimony that you felt his fingers, what you said was rummaging around your vagina*?

A. *It's an unforgettable feeling.*

Q. Now, when you say rummaging around your vagina, that's different than inserting a finger inside your vagina.

A. *At first he rummaged around and then he put his finger inside me.*

Q. In your book you wrote that he was forcing his fingers around my private area and then thrust his penis halfway completely, I'm not certain, inside me. Is that accurate?

---

[8] Dkt 187 (Trial Tr.) at 177:22-181:23 (emphasis added).

9

A. Yes."[9]

*The Outcry Witnesses*

Ms. Carroll confided in two of her friends, Lisa Birnbach and Carol Martin (the "outcry" witnesses), about the attack shortly after it occurred. Almost immediately after Ms. Carroll escaped from Mr. Trump and exited the store, she called Ms. Birnbach. Ms. Carroll testified that during that call:

"A. I said, you are not going to believe what just happened. I just needed to tell her. I said I met Donald Trump in Bergdorf's. We went lingerie shopping and I was so dumb I walked in a dressing room and he pulled down my tights."

. . .

Q. What else did you say?

A. Well, she asked me, she said, after she heard he had pulled down my tights, she asked me, did he insert his penis? I said yes. And then Lisa said the words: Probably why I called her. She said he raped you. He raped you, E. Jean. You should go to the police. I said: No way. Then she said: I will go with you."[10]

The next day, or the day after that, Ms. Carroll told Ms. Martin about the attack. Ms. Carroll testified:

"I said [(to Ms. Martin)]: Carol, you are not going to believe it. I had a run-in with Donald Trump at Bergdorf's. She said -- she saw my face. She said: We can't talk

---

[9]

Dkt 189 (Trial Tr.) at 406:5-18 (emphasis added).

[10]

Dkt 187 (Trial Tr.) at 186:4-19.

here. We were back behind the studio. She said: Let's talk tonight at my house.

. . .

I took her through step by step what happened. And Carol is a very unjudgmental, open-hearted friend. But she was -- she gave me the exact -- her concern was very different than Lisa's. Carol's concern was, do not go to the police."[11]

Both Ms. Birnbach and Ms. Martin testified about their conversations with Ms. Carroll. Ms. Birnbach testified in relevant part:

"Q. What was the first thing that Ms. Carroll said when you picked up the phone?

A. She said, Lisa, you are not going to believe what happened to me.

. . .

Q. What did she say after she said, Lisa, you are not going to believe what just happened?

A. E. Jean said that she had, after work that day, she had gone to Bergdorf's to look around, and she was on her way out -- and I believe it was a revolving door -- and she said on the other side of the glass from her going in, as she was going out, Donald Trump said to her, *Hey, you're the advice lady*. And she said, *You're the real estate guy*. And he said, *You're so good at advice, you are so smart, why don't you help me pick out a present for a friend*? So she thought she would, it sounded like a funny thing, this guy, who is famous. And she went back in the store and tried to, in my -- in my memory tried to show him things[.] . . . They went upstairs, eventually finding themselves in the lingerie department, and there was no one behind the

---

[11]    *Id.* at 190:5-20.

counter but there was a little bodysuit --

. . .

Q. What did she say happened after they got to the lingerie department?

A. He said, *Why don't you try this on?* And she, continuing sort of the jokey banter that they had, she said, *Why don't you try it on?* And then the next thing that happened is they were both in the dressing room and he slammed her against the wall. And then, as she was trying to move, he -- he slammed his whole arm, pinned her against the wall with his arm and shoulders, and with his free hand pulled down her tights. And E. Jean said to me many times, *He pulled down my tights. He pulled down my tights.* Almost like she couldn't believe it. She was still processing what had just happened to her. It had just happened to her. *He pulled down my tights.* And then he penetrated her.

Q. Did she say how he penetrated her?

A. Yes. She said with his penis.

Q. What did you say after Ms. Carroll described this to you?

A. As soon as she said that . . . and I said, I whispered, *E. Jean, he raped you.* . . . "[12]

Two days later, Ms. Martin testified in pertinent part:

"Q. And what did she say -- again, taking this piece by piece, what did she say what happened?

A. She introduced it by saying, *You won't believe what happened to me the other*

---

[12] Dkt 193 (Trial Tr.) at 688:5-690:9 (emphases in original).

*night*. As I recall. And I didn't know what to expect and so, I just turned to her and she said, *Trump attacked me*.

. . .

Q. Now, Ms. Carroll says to you that *Trump attacked me*. Do you recall what you said next, if anything?

A. Yeah. I was completely floored. I didn't quite know what was coming next. She is leaning in to me, and I'm saying, *What are you talking about?* But the next thing that came to my mind was if she was OK and that's what I asked her. So I said, *Are you OK?* Because she seemed -- her affect was, I would say, anxious and excitable, but she could be that way sometimes but that part was different in her affect. But what she was saying didn't make any sense at first.

Q. And when you asked her was she OK, did she respond?

A. She said -- she probably said I don't know. She kept telling me what happened, *that he attacked me*. I think she said 'pinned me' is what she said and I still didn't know what that meant.

Q. So, to the best of your recollection -- I understand it would be crazy if you could remember every word, but what did she tell you that day about what had happened to her at Bergdorf Goodman?

A. Basically, she backtracked. I kept asking her to backtrack. It wasn't a linear conversation, as you would expect, because it was news, it was I didn't know what I am hearing here, and she was clearly agitated, anxious. And she said she was at Bergdorf's the night before -- probably two nights, if I recall -- and that she ran into Mr. Trump going in one of the revolving doors. And she said that they started up a

conversation. My sense is that she engaged him, or vice versa, because that's not uncommon for E. Jean. He recognized her, she recognized him.

. . .

Q. And what else did she tell you about what happened once they were inside Bergdorf Goodman?

A. So, she related that they sort of started kibbitzing or talking back and forth, it was apparently friendly, and she said that he was looking for a gift. And so, she engaged him that way suggesting certain things. I don't remember all of the things. But this must have gone on for a few minutes and then, somehow, they started up the stairs -- escalator, she said.

Q. And did she tell you what happened after they got off the escalator?

A. Yeah. And again, this was disjointed because I would stop and ask her, *What do you mean? What do you mean?* And she was explaining as she's going that once they reached a level -- and I don't know Bergdorf's that well, but once they reached a level where there was -- there were dressing rooms, and she said at that point that he attacked her. Those were the words that I remember but I still said, *What do you mean? You look OK. You look* -- and she had been at work so I couldn't put it together. And she didn't use the word 'rape,' that I recall. I have said that before. But she said it was a frenzy. She said, *I was fighting. I was fighting.* She kept saying that."[13]

_____

[13]

Dkt 197 (Trial Tr.) at 1028:22-1032:6 (emphases in original).

14

*Other Alleged Survivors*

The jury heard also from two other women who allegedly were sexually assaulted by Mr. Trump: Jessica Leeds and Natasha Stoynoff.[14]  Ms. Leeds claims she was seated beside Mr. Trump on a flight to New York in 1978 or 1979 when he allegedly assaulted her. She testified:

> "A. Well, what happened was they served a meal, and it was a very nice meal, as Braniff was -- was -- reputation to do, and it was cleared and we were sitting there when all of a sudden Trump decided to kiss me and grope me.
>
> Q. What led to that? Was there conversation?
>
> A. There was no conversation. It was like out of the blue.
>
> . . .
>
> Q. What did you -- so describe, if you would, what he did exactly.
>
> A. Well, it was like a tussle. He was -- his hands and -- he was trying to kiss me, he was trying to pull me towards him. He was grabbing my breasts, he was -- it's like he had 40 zillion hands, and it was a tussling match between the two of us. And *it was when he started putting his hand up my skirt* that that kind of gave me a jolt of strength, and I managed to wiggle out of the seat and I went storming back to my seat in the coach."[15]

---

[14]    The testimony of Mss. Leeds and Stoynoff was received pursuant to Federal Rule of Evidence 415, which provides that "evidence that the [defendant] committed any other sexual assault" may be admitted in "a civil case involving a claim for relief based on a party's alleged sexual assault." Fed. R. Evid. 415(a).  The Court's analysis is contained in a prior decision and need not be repeated here. *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023).

[15]    Dkt 193 (Trial Tr.) at 741:13-742:6 (emphasis added).

15

On cross examination, she testified also:

> "Q. And it is your story that after you were done eating, the flight attendant cleared your tray tables and this man suddenly attacked you?
>
> A. Correct.
>
> Q. It is your story this man grabbed you with his hands, tried to kiss you, grabbed your breasts, and pulled you towards him?
>
> A. Correct.
>
> Q. And pulled himself onto you?
>
> A. It's not -- no, not onto me but he was leaning-in to me, pushing me against the back of the seat.
>
> Q. OK. And then according to you he, at one point, put his hand on your knee?
>
> A. *He started putting his hand up my skirt*.
>
> Q. *OK, on your leg and up your skirt?*
>
> A. *Correct.*"[16]

Ms. Leeds confirmed that "if the man had just stuck with the upper part of [her] body, [she] might not have gotten that upset" and that "it is only when he eventually started putting his hands up [her] skirt that [she] said I don't need this[.]"[17]  On re-direct she explained:

> "Q. Why did you find it less upsetting when he had his hands above your skirt than when they went into your skirt, when his hand went into your skirt?
>
> A. That's sort of the demarcations -- I mean, people -- men -- would frequently pat

---

[16]     *Id.* at 771:19-772:8 (emphasis added).

[17]     *Id.* at 774:24-775:2, 775:13-16.

you on the shoulder and grab you or something like that and you just -- it is not serious and you don't -- you don't -- *but when somebody starts to put their hand up your skirt, you know they're serious and this is not good.*"[18]

Ms. Stoynoff, then a reporter for a magazine, encountered Mr. Trump in 2005 at Mar-a-Lago, his residence in Florida, on an assignment to interview him and his wife, Melania. Ms. Stoynoff testified:

"Q. So where did you go with Mr. Trump after he said, I want to show you this room?

A. So we -- I followed him, and we went in through these back doors and down a hall, as I recall it, and turned right into a room.

Q. Who was with you at that point?

A. As I recall, just he and I.

Q. So what happened next?

A. So we -- we walked into a room, and I'm looking in this room, and I went in first and I'm looking around, I'm thinking, wow, really nice room, wonder what he wants to show me, and he -- I hear the door shut behind me. And by the time I turn around, he has his hands on my shoulders and he pushes me against the wall and starts kissing me, holding me against the wall.

Q. Was anyone else in the room at this time?

A. Nobody else.

Q. What did you -- how did you react?

A. I started -- I tried to push him away.

---

[18] *Id.* at 787:6-14 (emphasis added).

Q. Had you -- had anything been said up until that point when you walked into the room? Did he say anything or did you say anything?

A. No, not that I recall.

. . .

Q. So what -- I think you said you tried to shove him away. What happened?

A. He came toward me again, and I tried to shove him again.

Q. What was he doing sort of -- what was he doing with, let's say, the rest of his face or body?

A. Well, he was kissing me and, you know, he was against me and just holding my shoulders back.

Q. Did you -- what, if anything, did you say while this was happening?

A. I didn't say words. I couldn't. I tried. I mean, I was just flustered and sort of shocked and I -- no words came out of me. I tried, though. I remember just sort of mumbling.

. . .

Q. How long -- do you recall how long that went on for?

A. A few minutes.

Q. How did it end?

A. A butler came into the room.

. . .

Q. How did Mr. Trump react when the butler came in?

A. He stopped doing what he was doing.

Q. Were you able to perceive whether the butler saw what had been happening?

18

A. I don't know if he saw, but to my mind, I gave him a kind of a 'get me out of here' look, and I felt like he understood.

Q. So what happened, what happened next?

A. The butler led us back to the couch area, and Melania was on her way, and Trump said a few things to me.

Q. What did he say to you?

A. *He said, Oh, you know we are going to have an affair, don't you? You know, don't forget what -- don't forget what Marla said, best sex she ever had. We are going to go for steak, we are going to go to Peter Luger's. We're going to have an affair.*

*. . .*

Q. . . . Before the butler came into the room, *did Mr. Trump do anything to you that suggested he was going to stop on his own*?

A. *No.*"[19]

*The Access Hollywood Tape*

The so-called *Access Hollywood* tape, a recorded exchange among Mr. Trump and others as they arrived for the shooting of a television episode that was broadcast nationwide repeatedly during the 2016 presidential campaign, was played twice for the jury.[20]  In that video, Mr.

---

[19]

Dkt 195 (Trial Tr.) at 989:24-996:7 (emphasis added).

[20]

Like the testimony of Mss. Leeds and Stoynoff, the Court initially determined that the *Access Hollywood* tape was admissible on the ground that a jury reasonably could find it was evidence that Mr. Trump "committed any other sexual assault" pursuant to Rule 415. *Carroll*, 2023 WL 2441795 at *3-4. At trial, however, it became clear that reliance on Rule 415 was unnecessary because the video was offered for a purpose other than to show the

Trump stated that he previously had "moved on [a woman] like a bitch, but [he] couldn't get there."

He said also in the following exchange:

> Trump: "Maybe it's a different one."
>
> Billy Bush: "It better not be the publicist. No, it's, it's her."
>
> Trump: "Yeah that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful -- I just start kissing them. It's like a magnet. Just kiss. I don't even wait. *And when you're a star they let you do it. You can do anything.*"
>
> Bush: "Whatever you want."
>
> Trump: "*Grab them by the pussy. You can do anything.*"

In the following excerpt of his deposition, which was played for the jury, Mr. Trump testified that:

> "*Q. And you say -- and again, this has become very famous -- in this video, 'I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything, grab them by the pussy. You can do*

---

defendant's propensity to commit sexual assault. Instead, it was offered – as Ms. Carroll's counsel argued in rebuttal summation – as "a confession." Dkt 199 (Trial Tr.) at 1403:24. Given that Mr. Trump states in the video that he "just start[s] kissing" women without "even wait[ing]" and that a "star" (such as himself) could "grab [women] by the pussy," it "has the tendency to make [the] fact [of whether he sexually assaulted Ms. Carroll] more or less probable than it would be without the evidence" because one of the women he referred to in the video could have been Ms. Carroll. Fed. R. Evid. 401. *See also, e.g.*, *United States v. Cordero*, 205 F.3d 1325 (2d Cir. 2000) (unpublished opinion) ("Proof of similar acts may be admitted so long as such evidence is offered 'for any purpose other than to show a defendant's criminal propensity.'") (citation omitted); *Woolfolk v. Baldofsky*, No. 19-CV-3815(WFK) (ST), 2022 WL 2600132, at *2 (E.D.N.Y. July 8, 2022) ("Evidence of prior crimes, wrongs, or acts, however, may be admissible if offered 'for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403.'") (citation omitted). Accordingly, the Court did not include the *Access Hollywood* tape in its instructions to the jury on the evidence of Mr. Trump's alleged sexual assaults of other women, and neither party objected to its exclusion from that portion of the charge.

anything. That's what you said; correct?"

A. Well, historically, that's true with stars.

Q. True with stars that they can grab women by the pussy?

A. Well, that's what -- if you look over the last million years, I guess that's been largely true. Not always, but largely true. Unfortunately or fortunately.

Q. And you consider yourself to be a star?

A. I think you can say that, yeah.

Q. And -- now, you said before, a couple of minutes ago, that this was just locker room talk?

A. It's locker room talk.

Q. And so does that mean that you didn't really mean it?

A No. It's locker room talk. I don't know. It's just the way people talk."[21]

*Damages for Sexual Assault (Battery) Claim*

The damages evidence at trial consisted primarily of Ms. Carroll's own testimony as well as the testimony of Dr. Leslie Lebowitz, a clinical psychologist with expertise in trauma and in sexual trauma who evaluated Ms. Carroll for this case. Dr. Lebowitz testified in detail on the psychological harm of the assault by Mr. Trump on Ms. Carroll. She explained that:

"There were three dominant ways that I felt that she [(Ms. Carroll)] had been harmed. She has suffered from painful, intrusive memories for many years; she endured a diminishment in how she thought and felt about herself; and, perhaps most

---

[21] Dkt 138-1 (Def. Dep. Designations) at 174:5-175:4 (emphasis added).

prominently, she manifests very notable avoidance symptoms which have curtailed her romantic and intimate life and caused profound loss."[21]

Dr. Lebowitz testified also that, although Ms. Carroll did not meet the full criteria to have been diagnosed with post-traumatic stress disorder ("PTSD"), Ms. Carroll exhibited symptoms in at least some of the four categories that are necessary for a diagnosis of PTSD, including "avoidance symptoms, . . . alterations in her thoughts and feelings about herself, and ... intrusions."[22]  She explained that Ms. Carroll blamed herself for the assault and that the assault "made her feel like she was worth less than she had been before" and "[s]he felt degraded and diminished."[23] As an example of an intrusive memory, which Dr. Lebowitz defined as "when some part of the traumatic experience, either what it felt like or it felt like in your body or in your emotions, just pierces your consciousness and lands in the middle of your experience and essentially hijacks your attention," Dr. Lebowitz testified that at one point during her interview with Ms. Carroll, she "began to squirm in her seat because she was actually reexperiencing Mr. Trump's fingers inside of her, what she alleges to be Mr. Trump's fingers inside of her."[24] She explained also Ms. Carroll's comment that she felt she had died and somehow still was alive as a manifestation of "what it feels like psychologically" because "what rape does is it so violates that sense of humanity and independence and selfhood than people feel psychologically that they are being killed. They feel

---

[21]  Dkt 193 (Trial Tr.) at 829:22-830:2.

[22]  Dkt 195 (Trial Tr.) at 853:13-15.

[23]  *Id.* at 876:2-4.

[24]  *Id.* at 861:8-19.

at risk. They feel like their personhood is being murdered . . . ."[25]  Dr. Lebowitz summarized the

psychological impact of Mr. Trump's assault on Ms. Carroll as follows:

> "Because she was frightened and rendered helpless in a way that had never
>
> happened to her before and because she blamed herself and because the meaning of
>
> that event and the feelings associated with it were simply too big for her to cope with
>
> in her usual ways, *it became a stuck point in her life*, something that she had to walk
>
> around in her day-to-day basis; and, in doing that, in working so hard to stay away
>
> from those feelings of helplessness and vulnerability, she gave up one of the great
>
> sources of joy and connection in her life, which was the opportunity to be intimate
>
> with a man, and that was a huge loss for her."[26]

*Defamation*

*Liability*

Most of the evidence of Mr. Trump's liability for the defamation claim based on his

2022 statement was coextensive with the evidence of his liability for the sexual assault. The crux

of Mr. Trump's 2022 statement was that Ms. Carroll lied about him sexually assaulting her and that

her entire accusation was a "Hoax" concocted to increase sales of her then-forthcoming book. To

prove that Mr. Trump defamed her, Ms. Carroll needed to prove that his statement was false (i.e.,

not substantially true), that he knew the statement was false when he made it or acted in reckless

---

[25]

    *Id.* at 864:19-865:12.

[26]

    *Id.* at 888:10-20 (emphasis added).

disregard of whether or not it was true (actual malice), and that the statement tended to disparage Ms. Carroll in the way of her profession or expose her to hatred or contempt in the minds of a substantial number of people in the community.

The evidence that Mr. Trump sexually assaulted Ms. Carroll proved also the falsity of his statement, which contended that Ms. Carroll's entire account – not any particular sexual act – was a fabrication. With respect to its defamatory import, in addition to showing the jury examples of Internet hate messages Ms. Carroll received from people she did not know, Ms. Carroll testified:

"Q. How, if at all, do you believe this statement affected your reputation?

A. I really thought I was gaining back a bit of ground. I thought, it's starting to go and I felt, you know, happy that, you know, I was back on my feet, had garnered some readers, and feeling pretty good, and then, boom, he knocks me back down again.

. . .

Q. What, if any, I'll call it sort of public response did you experience after Mr. Trump made his October 2022 statement?

A. It was not very nice.

Q. What do you recall?

A. Just a wave of slime. It was very seedy comments, very denigrating. Almost an endless stream of people repeating what Donald Trump says, I was a liar and I was in it for the money, can't wait for the payoff, working for the democrats, over and over. But the main thing was way too ugly. It is very hard to get up in the morning and face the fact that you're receiving these messages you are just too ugly to go on

living, practically."[28]

Ms. Carroll further testified that in comparison to the "tweets or messages [she] received after Mr. Trump made his first remarks in June of 2019," the messages that came after October 2022 "were equally, equally disparaging and hurtful, but these particularly hurt because I thought I had made it through and here they are again."[29]

In excerpts of Mr. Trump's deposition that were played for the jury, Mr. Trump confirmed that he wrote the statement "all myself"[30] and testified that:

> "I still don't know this woman.  I think she's a wack job.  I have no idea.  I don't know anything about this woman other than what I read in stories and what I hear.  I know nothing about her."[31]

### *Damages for Defamation Claim*

The damages evidence consisted primarily of Ms. Carroll's testimony as to the harm she suffered, which is described above, plus the testimony of Professor Ashlee Humphreys with respect to a "reputation repair program" to correct the harm to Ms. Carroll's reputation caused by Mr. Trump's statement.

" . . . [T]he nature of the work [(for Professor Humphreys)] was to look at a

---

[28]  Dkt 189 (Trial Tr.) at 322:6-324:5.

[29]  *Id.* at 329:2-7.

[30]  Dkt 138-1 (Def. Dep. Designations) at 134:13.

[31]  *Id.* at 137:14-17.

statement that was posted on social media and to understand the spread of that statement, how many people saw it, how broadly did it spread, then to look at the impact that statement might have had on Ms. Carroll's reputation, if any, and finally to estimate, well, how much would it cost to repair that reputation."[32]

Professor Humphreys testified about her process and various calculations. She used an "impression model" to determine approximately how many people saw Mr. Trump's 2022 statement. She determined that across various forms of media, including on the Internet, social media, print media, and television, "the final estimate . . . was between 13.7 million and 18 million impressions," which she explained likely "was an undercount."[33] She stated that "after June 2019 . . . of course there was a lot more volume of statements about her [(Ms. Carroll)] and they contained pretty negative associations including that she was a liar, the perpetrator of a scam, a hoax. Things like that."[34] With respect to Ms. Carroll's reputation before and after the 2022 statement, she testified:

"So, what I noticed is that those meetings [*sic*] existed after June 2019, but the frequency of the posting with those associations had started to decline. However, after the statement on October 12th, the frequency of the negative associations, the volume of them again escalated."[35]

Professor Humphreys accordingly "concluded that there was a relationship" between Mr. Trump's

---

[32]  Dkt 197 (Trial Tr.) at 1114:2-8.

[33]  *Id.* at 1127:24-25, 1128:16-19.

[34]  *Id.* at 1130:9-12.

[35]  *Id.* at 1130:18-22.

2022 statement and Ms. Carroll's reputation "given the timing and the fact that they [(posts with negative associations)] were in kind of direct response to his [(Mr. Trump's)] statement, as well as the particular language, words like 'liar' etc."[36]  She looked at approximately how many people likely believed Mr. Trump's statement, and determined that "between 3.7 million and 5.6 million people saw Mr. Trump's statement and likely believed it."[37]  Finally, she explained that to repair Ms. Carroll's reputation, there would need to be "a campaign to put out positive message" about her (a "reputational repair campaign" or "reputation repair program").[38]  In total, Professor Humphreys calculated that the cost of such a campaign to repair Ms. Carroll's reputation on the low end would be $368,000 and on the high end would be $2.7 million.[39]

*The Structure of the Verdict*

Both parties submitted proposed "special verdict" forms to distribute to the jury. Pursuant to Federal Rule of Civil Procedure 49, which governs jury verdict forms and questions, "[t]he court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact."[40]  A special verdict stands in contrast to a general verdict form, which typically asks jurors to answer only the ultimate questions of liability and the damages amounts, if

---

[36]
      *Id.* at 1130:25-1131:3.

[37]
      *Id.* at 1134:16-19.

[38]
      *Id.* at 1136:10-13.

[39]
      *Id.* at 1142:11-20.

[40]
      Fed. R. Civ. P. 49(a)(1).

any.

The Court here used a special verdict form that was substantially similar to the parties' proposed forms, consisting of factual questions going to liability and damages, organized by the two claims. Neither party raised any objection to the Court's verdict form nor demanded that any specific questions other than those on the special verdict form be submitted to the jury. In accordance with Rule 49, the Court "g[a]ve the instructions and explanations necessary to enable the jury to make its findings on each submitted issue" contained in the verdict form.[41] Accordingly, the meaning of the jury's answers to each question on the verdict form depends upon the instructions given as to what it had to conclude in order to answer the questions.

*Sexual Battery Instructions*

The liability questions for Ms. Carroll's sexual battery claim were whether Ms. Carroll proved by a preponderance of the evidence that (1) "Mr. Trump raped Ms. Carroll?", (2) "Mr. Trump sexually abused Ms. Carroll?", (3) "Mr. Trump forcibly touched Ms. Carroll?".[42] These three theories of liability (rape, sexual abuse, and forcible touching) were the same three proposed by both parties. As the Court instructed the jury:

> "Ms. Carroll claims that Mr. Trump is liable to her for battery on three different and alternative bases, each of which corresponds to a criminal law definition of a different sex crime. Mr. Trump denies that he is liable to her for battery on any of these three different and alternative bases. . . . Accordingly, the first

---

[41] Fed. R. Civ. P. 49(a)(2).

[42] Dkt 174 (Verdict) at 1.

set of questions in the verdict form has to do with whether or not Ms. Carroll has established that Mr. Trump's conduct, if any, came within any of those criminal law definitions."[43]

The Court then instructed the jury on the definitions of the three different sex crimes.

On the first question – whether Ms. Carroll proved that Mr. Trump "raped" her – the Court instructed the jury in accordance with the New York Penal Law's definition of rape:[44]

> "In order to establish that Mr. Trump raped her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.
>
> The first element is that Mr. Trump engaged in *sexual intercourse* with her.
>
> The second element is that Mr. Trump did so without Ms. Carroll's consent by the use of forcible compulsion. . . .
>
> 'Sexual intercourse' means any penetration, however slight, *of the penis* into the vaginal opening. In other words, *any penetration of the penis* into the vaginal opening, regardless of the distance of penetration, constitutes an act of sexual intercourse. Sexual intercourse does not necessarily require erection *of the penis*, emission, or an orgasm.
>
> . . .
>
> I also used the phrase 'forcible compulsion,' and what that means is intentionally to compel by the use of physical force.

---

[43]  Dkt 201 (Trial Tr.) at 1416:1-9.

[44]  It was necessary to obtain findings under the New York Penal Law definitions because the timeliness of the battery claim under the Adult Survivors Act depended on such findings. N.Y. CPLR § 214-j.

. . .

> If you find that Ms. Carroll has proved by a preponderance of the evidence both of those two elements, you will answer Question 1 'yes.' If you answer Question 1 'yes,' I instruct you that Mr. Trump thus committed battery against Ms. Carroll. There would be no need to consider whether he committed battery on either of the other two alternative bases. . . . If you find that Ms. Carroll has not proven either of the two elements of rape by a preponderance of the evidence, you must answer 'no' to Question 1 and go on to Question 2, which deals with the second of the three alternative bases for the battery claim."[45]

Thus, the instructions required the jury to answer Question 1 "No" unless it found that Ms. Carroll had proved that Mr. Trump penetrated her vagina *with his penis*. Penetration by any other body part did not suffice.

With respect to the second question, whether Ms. Carroll proved that Mr. Trump "sexually abused" her within the meaning of the New York Penal Law, the Court instructed the jury:

> "The second theory of battery corresponds to something called sexual abuse. Sexual abuse has two elements. In order to establish that Mr. Trump sexually abused her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.
>
> The first element is that Mr. Trump subjected Ms. Carroll to sexual contact.
>
> The second element is that he did so without Ms. Carroll's consent by the use of forcible compulsion.

---

[45] Dkt 201 (Trial Tr.) at 1416:18-1418:2 (emphasis added).

. . . Sexual contact for this purpose means *any touching of the sexual or other intimate parts* of a person for the purpose of gratifying the sexual desire of either person. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, and the touching may be either directly or through clothing.

. . . For this purpose, *a 'sexual part' is an organ of human reproduction*. So far as intimate part is concerned, the law does not specifically define which parts of the body are intimate. Intimacy, moreover, is a function of behavior and not just anatomy. Therefore, if any touching occurred, the manner and circumstances of the touching may inform your determination whether Mr. Trump touched any of Ms. Carroll's intimate parts. You should apply your common sense to determine whether, under general societal norms and considering all the circumstances, any area or areas that Mr. Trump touched, if he touched any, were sufficiently personal or private that it would not have been touched in the absence of a close relationship between the parties. . . .

If you find that Ms. Carroll has proved by a preponderance of the evidence both of the two elements that I just referred to, the two elements of sexual abuse, then you will answer 'yes' to Question 2. If you answer yes to Question 2, I instruct you that Mr. Trump thus committed battery against Ms. Carroll. There would be no need to consider whether he committed battery on the third alternative test. . . . If you find that Ms. Kaplan [*sic*] has not proven either of the two elements of sexual abuse by a preponderance of the evidence, you must answer 'no' to Question 2 and proceed to Question 3, which deals with the third of the three alternative bases for the battery

claim."[46]

Thus, if the jury found that Mr. Trump penetrated Ms. Carroll's vagina with his fingers, it was obliged to answer Question 2 "Yes" assuming the other element was satisfied.

Questions 4 and 5 dealt with compensatory and punitive damages, respectively, for Ms. Carroll's battery claim. Question 4 asked whether Ms. Carroll proved that she was injured as a result of Mr. Trump's conduct, and if so, to insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries. The Court instructed the jury:

> "My instructions to you on the law of damages should not be taken by you as a hint that you should find for the plaintiff. That is for you to decide by answering the questions I have put to you based on the evidence presented. But if you answer 'yes' to any of Question 1, Question 2, or Question 3, you will have determined that Ms. Carroll has prevailed on her claim of battery. In that event, it will be your task to determine from the evidence a dollar amount, if any, that would justly and adequately compensate Ms. Carroll for any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Mr. Trump's alleged rape, sexual abuse, or forcible touching as the case may be.

> You may award damages only for those injuries that you find Ms. Carroll has proved by a preponderance of the evidence. Compensatory damages may not be based on speculation or sympathy. They must be based on the evidence presented at trial and only on that evidence.

---

[46] *Id.* at 1418:3-1420:8 (emphasis added).

Now, if you answer 'yes' to Question 4 . . . she [(Ms. Carroll)] would be entitled to a dollar amount to compensate her adequately and fairly for any physical injury, pain and suffering, mental anguish, emotional distress, and the other things I just mentioned a moment ago, that she suffered by virtue of Mr. Trump's alleged battery, in other words, his alleged rape, sexual abuse, or forcible touching, as the case may be. Damages may be awarded based on a plaintiff's subjective testimony of pain, but the plaintiff's proof must satisfactorily establish that the injury is more than minimal."[47]

*Defamation Instructions*

The factual questions for the defamation liability issue were (1) whether Ms. Carroll proved by a preponderance of the evidence that Mr. Trump's statement was defamatory and (2) whether Ms. Carroll proved by clear and convincing evidence his statement was (a) false and (b) made with actual malice. As relevant to Mr. Trump's arguments in this motion, the Court instructed the jury that:

"Question 7, as you see on the verdict form, asks whether Ms. Carroll has proved by something called clear and convincing evidence that Mr. Trump's

---

[47]

    *Id.* at 1422:17-1423:25.

    Question 5 on punitive damages asked whether Ms. Carroll proved by a preponderance of the evidence that Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard. If so, it asked how much Mr. Trump should pay to Ms. Carroll in punitive damages. Given that Mr. Trump does not dispute the jury's $20,000 award in punitive damages for Ms. Carroll's battery claim, the Court's instructions on this question need not be reproduced here.

statement was false. . . . A statement is false if it is not substantially true. You will determine from the evidence presented what the truth was and then compare that with Mr. Trump's October 12 statement, taking that statement according to its ordinary meaning, the ordinary meaning of its words.

As you probably already have guessed, *whether Mr. Trump's statement is false or true depends largely or entirely on whether you find that Mr. Trump raped or sexually abused or forcibly touched or otherwise sexually attacked Ms. Carroll.* . . .

Question 8, in substance, asks you to determine whether Ms. Carroll has proved by clear and convincing evidence that Mr. Trump made the statement with what the law calls actual malice. Actual malice for this purpose . . . means that Mr. Trump made the statement knowing that it was false or acted in reckless disregard of whether or not it was true. Reckless disregard means that when he made the October 12 statement, he had serious doubts as to the truth of the statement or made the statement with a high degree of awareness that it was probably false. So Question 8 asks you to decide whether Ms. Carroll proved by clear and convincing evidence that Mr. Trump, when he made his October 12 statement, knew that it was false, had serious doubts as to its truth, or had a high degree of awareness that the statement probably was false."[48]

The question on compensatory damages was broken down into several parts. First, it asked whether Ms. Carroll proved by a preponderance of the evidence that Ms. Carroll was injured

---

[48] *Id.* at 1430:17-1432:3 (emphasis added).

as a result of Mr. Trump's publication of the October 12, 2022 statement. If so, it asked that the jury (1) insert a dollar amount for any damages other than the reputation repair program, and (2) insert a dollar amount for any damages for the reputation repair program only. The Court instructed the jury that:

> "In the event Mr. Trump is liable for defamation, you will award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement. In fixing that amount, if you fix one, you should consider the plaintiff's standing in the community, the nature of Mr. Trump's statement made about Ms. Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Ms. Carroll, and all of the other facts and circumstances in the case. These damages can't be proved with mathematical certainty. Fair compensation may vary, ranging from one dollar, if you decide that there was no injury, to a substantial sum if you decide that there was substantial injury.
>
> Now, in this case, Question 9, I have divided the damages determination into two parts . . . . The first part of Question 9, right at the top, the yes/no question asks you to decide whether Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I just described. . . . If the answer is 'yes,' you first will fill in the amount you award for all defamation damages, excluding the reputation repair program. You will leave that out if you put in a figure in the first blank. That was of course the testimony of Professor Humphreys. Second, you will

fill in the amount, if any, that you award for the reputation repair program only."[49]

The last question on the form, on punitive damages for the defamation claim, asked whether in making the 2022 statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another.  If so, it asked how much, if any, Mr. Trump should pay to Ms. Carroll in punitive damages.  The Court instructed the jury:

> "In addition to the claim for punitive damages for the defamation, Ms. Carroll asks also that you award punitive damages for the defamation. Similar to my earlier instructions to you regarding punitive damages on the battery claim, punitive damages in relation to a libel claim – the defamation claim – may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. Now, this is where that difference between 'actual malice,' which I already talked about, and 'malice' or 'maliciously' comes into play. . . . A statement is made with malice or it's made maliciously for the purpose of Question 10 if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights.
>
> If you answer 'yes' to the first part of Question 10 – in other words, if you find that Mr. Trump acted with malice, as I have just defined that term for you, in making the October 12 statement about Ms. Carroll – you will write down an amount, if any, that you find Mr. Trump should pay to Ms. Carroll in punitive damages for the defamation. If you answer 'no' to that first part of Question 10 – that is, you find that Mr. Trump's statement was not made maliciously – you may not

---

[49] *Id.* at 1432:25-1434:7.

award punitive damages. . . .

In arriving at your decision as to the amount of punitive damages, you should consider here with respect to the defamation punitive damage claim:

The nature and reprehensibility of what Mr. Trump did if he defamed her; that would include the character of the wrongdoing and Mr. Trump's awareness of what harm the conduct caused or was likely to cause. In considering the amount of punitive damages to award, you should weigh that factor heavily;

You should consider the actual and potential harm created by Mr. Trump's conduct; and

You should consider Mr. Trump's financial condition and the impact of your award of punitive damages, if any, on Mr. Trump."[50]

This concluded the Court's substantive instructions on the law, as relevant to Mr. Trump's motion.

*The Jury's Decision*

In accordance with the Court's instructions, which the jury is presumed to have followed,[51] the jury made the following explicit findings based on its answers to the verdict form. On the sexual battery claim, the jury found that:

- Mr. Trump *sexually abused* Ms. Carroll.

- Mr. Trump *injured her* in doing so.

- "Mr. Trump's conduct was *willfully or wantonly negligent, reckless, or done*

---

[50] *Id.* at 1434:17-1436:10.

[51] *E.g.*, *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998).

*with a conscious disregard of the rights of Ms. Carroll*, or was so reckless as to amount to such disregard".[50]

- Ms. Carroll was entitled to compensatory and punitive damages on the sexual battery claim of *$2.02 million* ($2 million in compensatory damages and $20,000 in punitive damages).

On the defamation claim, it found that:

- Mr. Trump's October 12, 2022 statement was *defamatory* and *false* (*i.e.*, "not substantially true").

- Mr. Trump made that statement "with actual malice" – that is, that when he made the statement, Mr. Trump *"knew that it was false", "had serious doubts as to its truth",* or *"had a high degree of awareness that the statement probably was false."*[51]

- "Ms. Carroll was *injured* as a result of Mr. Trump's publication of the October 12, 2022 statement."[52]

- "Mr. Trump *acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard* of the rights of another."[53]

- Ms. Carroll was entitled to *$2.98 million* in compensatory and punitive

---

[50]    Dkt 174 (Verdict) at 2 (emphasis added).

[51]    Dkt 201 (Trial Tr.) at 1432:1-3 (emphasis added).

[52]    Dkt 174 (Verdict) at 3 (emphasis added).

[53]    *Id.* (emphasis added).

damages on the defamation claim relating to the October 12, 2022 statement ($1.7 million in compensatory damages for the "reputation repair program" only, $1 million in compensatory damages for damages other than the reputation repair program, and $280,000 in punitive damages).

## *Discussion*

Mr. Trump's motion is addressed only to the jury's damages awards, specifically its compensatory damages award for Ms. Carroll's sexual battery claim, and its compensatory and punitive damages awards for the defamation claim. He does not challenge the Court's instructions or the jury's liability verdict. All of his arguments are unpersuasive.

### *The Legal Standard*

A "trial judge enjoys 'discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence,' and . . . '[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'"[56] "In considering motions for a new trial and/or remittitur, '[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'"[57]

---

[56] *Lore v. City of Syracuse*, 670 F.3d 127, 176–77 (2d Cir. 2012) (alterations in original) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996)).

[57] *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Gasperini*, 518 U.S. at 435).

"Ordinarily, a court should not grant a new trial 'unless it is convinced that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.' . . . Nevertheless, the standard for granting a new trial under Rule 59 is less stringent than the standard under Rule 50."[58]  Specifically, unlike the standard on a Rule 50 motion, on a Rule 59 motion: "(1) a new trial . . . may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[59]  "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility."[60]

With respect to determining whether the jury's damages awards come within the confines of state law, "[u]nder New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'"[61]  "To

---

[58] *Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 475 (S.D.N.Y. 1998) (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988)).

In *Mono*, the Court identified "an unresolved *Erie* issue – whether the state or federal standard of review applies in a motion for a new trial in a diversity action. New York law does not distinguish between a motion for a new trial and a motion for a judgment notwithstanding the verdict. . . . Thus, if state law applies to defendants' Rule 59 motion, the standard of review would be whether the jury could have reached its verdict on 'any fair interpretation of the evidence.'" *Id.* at 475, n.2 (citations omitted). However, as in *Mono,* "[b]ecause the evidence presented at trial [in *Carroll II*] satisfies both the federal and state standards, I need not determine which jurisdiction's law controls [Mr. Trump's] motion for a new trial." *Id.*

[59] *Iverson v. Surber*, No. 13-CV-633 (RA), 2018 WL 6523176, at *1 (S.D.N.Y. Nov. 13, 2018), *aff'd*, 800 F. App'x 50 (2d Cir. 2020) (citation omitted).

[60] *Id.* (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

[61] *Stampf*, 761 F.3d at 204 (quoting  N.Y. CPLR § 5501(c)).

determine whether a jury award is excessive within the meaning of [New York Civil Practice Law and Rules] § 5501(c), New York courts compare it with awards in similar cases."[62]  The relevant standard "is not whether an award deviates *at all* from past awards – it is whether an award deviates *materially* from *reasonable compensation*."[63]

*Compensatory Damages - Sexual Battery Claim*

*Mr. Trump Digitally and Forcibly Penetrated Ms. Carroll's Vagina*

Mr. Trump argues that the Court should grant a new trial or remittitur with respect to the jury's award of compensatory damages for Ms. Carroll's sexual battery claim chiefly on the ground that "the [j]ury found that [Ms. Carroll] was not raped but was sexually abused by [Mr. Trump] during the 1995/96 Bergdorf Goodman incident."[64]  According to Mr. Trump, "[s]uch abuse could have included groping of Plaintiff's breasts through clothing or similar conduct, which is a far cry from rape. Therefore, an award of $2 million for such conduct, which admittedly did not cause any diagnosed mental injury to Plaintiff, is grossly excessive under the applicable case law."[65] Mr. Trump's argument is incorrect at every step.

First, the definition of "rape" in the New York Penal Law – which the jury was obliged to apply in responding to Question 1 on the verdict form – requires forcible penetration of

---

[62]  *Id.*

[63]  *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008) (emphasis in original).

[64]  Dkt 205 (Def. Mem.) at 1.

[65]  *Id.*

the victim's vagina *by the accused's penis*.[66]  Accordingly, the jury's negative answer to Question 1 means *only* that the jury was unpersuaded that Mr. Trump's penis penetrated Ms. Carroll's vagina. It does not mean that he did not forcibly insert his fingers into her – that he "raped" her in the broader sense of that word which, as discussed above, includes any penetration by any part of an accused's body (including a finger or fingers) or any other object.[67]

       Second, Mr. Trump's argument ignores the fact that the verdict in this case was a

---

[66]

       The New York Penal Law states that "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . 1. By forcible compulsion . . . ." N.Y. Penal Law § 130.35.  It provides also that "'[s]exual intercourse' has its ordinary meaning and occurs upon any penetration, however slight." *Id.* § 130.00. New York courts have interpreted "sexual intercourse" as involving *penile* penetration. *E.g.*, *People v. Berardicurti*, 167 A.D.2d 840, 841 (4th Dept. 1990) ("The trial court properly instructed the jury that, to constitute sexual intercourse, penetration 'need not be deep' and that '[a]ny penetration of the penis into the vaginal opening, regardless of the distance or amount of penetration' constitutes sexual intercourse.") (citation omitted); *People v. Peet*, 101 A.D.2d 656, 656 (3d Dept. 1984), *aff'd*, 64 N.Y.2d 914 (1985) ("[T]he use of one's finger has already been sufficiently proscribed by section 130.65 of the Penal Law  [(sexual abuse in the first degree)] . . . ."); *Williams v. McCoy*, 7 F. Supp. 2d 214, 220-21 (E.D.N.Y. 1998) (rejecting petitioner's argument that "the trial judge erred in instructing the jury on the elements of rape because he neglected to explain that rape requires penile – as opposed to digital – penetration" because "[a] jury of competent adults surely understood the 'ordinary meaning' of 'sexual intercourse' to require penile penetration"). This Court accordingly instructed the jury that sexual intercourse required penile penetration of the vagina, and neither party objected to that definition.

[67]

       It is not entirely surprising that the jury did not find penile penetration but, as discussed below, implicitly found digital penetration.  Ms. Carroll testified about the specific physical memory and excruciating pain of the digital penetration at great length and in greater detail than the penile penetration. She acknowledged that she could not see exactly what Mr. Trump inserted but testified on the basis of what she felt. Dkt 187 (Trial Tr.) at 181:20-23 ("I couldn't see anything. I couldn't see anything that was happening. But I could certainly feel it. *I could certainly feel that pain in the finger jamming up.*") (emphasis added). Moreover, the jury might have been influenced by defense counsel's ardent summation in which he virtually begged the jury not to answer the "rape" question against Mr. Trump. Dkt 199 (Trial Tr.) at 1370:5-10 ("To condemn someone as a rapist is a decision you would have to live with for the rest of your lives. Don't let her throw that burden on you. Don't let her throw her burden on you to have to carry forever. You know this didn't happen, that Donald Trump raped E. Jean Carroll in a Bergdorf Goodman changing room. You know it didn't happen.").

special verdict governed by Rule 49 of the Federal Rules of Civil Procedure. The form of the verdict, including the fact that it did not ask the jury to decide exactly what conduct Mr. Trump committed in the event it found for Ms. Carroll as to sexual abuse – was approved by Mr. Trump as well as by Ms. Carroll.[68]  In these circumstances,

> "A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. *If the party does not demand submission, the court may make a finding on the issue. If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.*"[69]

Neither party made any such demand here. So the jury (or the Court) is deemed to have made a finding in accord with the judgment on the special verdict unless the Court makes a contrary finding.[70]  In other words, the jury is deemed to have found that the specific conduct in which Mr.

---

[68]

Dkt 199 (Trial Tr.) at 1208:12-21 (Both Ms. Carroll's counsel and Mr. Trump's counsel stating that they have no objection to the verdict form).

[69]

Fed. R. Civ. P. 49(a)(3).

[70]

*Roberts v. Karimi,* 251 F.3d 404, 407 (2d Cir. 2001) ("When a jury is specially instructed, and 'an issue [is] omitted' without objection, it 'shall be deemed' that a finding was made 'in accord with the judgment on the special verdict,' *unless* the court makes a finding to the contrary.") (alterations and emphasis in original) (citation omitted); *Marbellite Co. v. Naitonal Sign & Signal Co.,* 2 Fed. App'x 118, 120 (2d Cir. 2001) ("If the court fails to make a finding on the issue, it will be deemed to have made a finding that is harmonious with the judgment entered on the special verdict."); *Getty Petroleum Corp. v. Island Transpp. Corp.,* 878 F.2d 650, 655-56 (2d Cir. 1989) (in special verdict case, affirming on basis of implicit jury finding or, in the alternative, on basis of implicit finding in statement of the trial court).

As the jury's response to Question 2 was an implicit finding that Mr. Trump forcibly digitally penetrated Ms. Carroll's vagina, no explicit independent finding by the Court is

Trump actually engaged was such that the damages award was justified provided the evidence permitted such a finding.[71] And for reasons discussed in greater detail below, the evidence of the attack generally coupled with forcible digital penetration of Ms. Carroll justified the damages awarded regardless of the jury's finding adverse to Ms. Carroll on the New York Penal Law rape question.

Ms. Carroll testified that the sexual assault – the "rape" – of which she accused Mr. Trump involved especially painful, forced digital penetration, which as recounted above she described graphically and emphatically to the jury. The testimony of the outcry witnesses, Mss. Birnbach and Martin, corroborated the essence of Ms. Carroll's account of a violent, traumatic sexual assault. Ms. Leeds's testimony that Mr. Trump attacked her, culminating in putting his hand on her leg and up her skirt, suggests that Mr. Trump has a propensity for attempting forcibly to get his hands on and into women's sexual organs. Mr. Trump's own words from the *Access Hollywood* tape and from his deposition – that (a) stars "[u]nfortunately or fortunately" "c[ould] do anything" they wished to do to women, including "grab[bing] them by the pussy" and (b) he considers himself

---

necessary. Nevertheless, the Court alternatively finds that he did so.

[71] As the Second Circuit has put it:

"A district court has a duty to reconcile the jury's answers on a special verdict form with any reasonable theory consistent with the evidence, and to attempt to harmonize the answers if possible under a fair reading of those answers. . . . The court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, . . . and if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained. . . . The district court should refer to the entire case and not just the answers themselves." *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1311 (2d Ci. 1993) (citations omitted).

Thus, the Court is obliged to construe the jury's answer to Question 2 with reference to the entire case and in a manner that renders it consistent with the $2 million award for sexual assault.

to be a "star" – could have been regarded by the jury as a sort of personal confession as to his behavior. Thus, there was ample, arguably overwhelming evidence, that Mr. Trump forcibly digitally penetrated Ms. Carroll, thus fully supporting the jury's sexual abuse finding.

        Mr. Trump's attempt to minimize the sexual abuse finding as perhaps resting on nothing more than groping of Ms. Carroll's breasts through her clothing is frivolous. There was no evidence whatever that Mr. Trump groped Ms. Carroll's breasts, through her clothing or otherwise. The only evidence of bodily contact between Mr. Trump and Ms. Carroll other than the digital and alleged penile penetration was Ms. Carroll's testimony that Mr. Trump (a) "shoved" and "thrust" her against the wall, (b) "put his shoulder against [her] and h[eld] [her] against the wall," (c) "his whole weight came against [her] chest and held [her] up there," (d) he "pulled down [her] tights," (e) her "arm was pinned down" while she pushed him back, and (f) "he put his mouth against [hers]." The jury was instructed that one of the essential elements of sexual abuse under the New York Penal Law is "sexual contact," defined as "touching of the sexual or intimate parts." None of these actions, other than putting his mouth against hers and perhaps pulling down her tights, was sexual contact.[72] The jury's finding of sexual abuse therefore necessarily implies that it found that

---

[72]     Mr. Trump does not argue that the jury's sexual abuse finding was based on Ms. Carroll's testimony that he put his mouth against hers (or any of the other actions listed above). Even assuming this non-consensual kiss was "touching of [a] sexual or intimate part[]," there is no basis to assume that the jury found Mr. Trump sexually abused her based on that contact but not on digital penetration. Ms. Carroll testified that "it was a shocking thing for him to suddenly put his mouth against [hers]," Dkt 187 (Trial Tr.) at 179:22-23, and that she thinks she "laughed pretty consistently after the kiss to absolutely throw cold water on anything he thought was about to happen," Dkt 189 (Trial Tr.) at 405:22-24. She did not testify as to any physical pain and lasting trauma of the non-consensual kiss, or of any other bodily contact between her and Mr. Trump, as she did repeatedly of the digital penetration. A determination that this jury found Mr. Trump sexually abused Ms. Carroll solely on the basis of a non-consensual kiss would require ignoring all this testimony and accepting a far less malign, albeit still wrongful, version of events that is contradicted by the overwhelming weight of the evidence.

Mr. Trump forcibly penetrated her vagina. And since the jury's answer to Question 1 demonstrates that it was unconvinced that there was penile penetration, the only remaining conclusion is that it found that Mr. Trump forcibly penetrated her vagina with his fingers – in other words, that he "raped" her in the sense of that term broader than the New York Penal Law definition.  And this conclusion is fully supported by Ms. Carroll's repeated and clear testimony on the digital penetration (more than the penile penetration), Dr. Lebowitz specifically mentioning Ms. Carroll squirming in response to an intrusive memory of Mr. Trump's fingers in her vagina, and the evidence at trial taken as a whole. It also is bolstered by the amount of the jury's verdict.

*The Jury's $2 Million Damages Award Is Not Excessive*

The trial evidence of the harm to Ms. Carroll as a result of being assaulted and digitally raped supports the jury's $2 million award as reasonable compensation for her pain and suffering. Ms. Carroll testified in detail with respect to the physical, emotional, and psychological injury she suffered after the incident with Mr. Trump. She expressed that in "the seconds, the minutes following [the assault] . . . my overwhelming thought was I had died and was somehow still alive."[73]  She testified that when she called Ms. Birnbach immediately after the assault, "I had not processed it. I had not processed what was going on. I felt the hand jammed, and I felt the back of my head hurting."[74]  The night of the assault, she testified "[m]y head hurt, my vagina felt pain ... ."[75]  In relation to the specific act of being digitally raped, Ms. Carroll testified that it was

---

[73]         Dkt 191 (Trial Tr.) at 635:23-636:1.

[74]         Dkt 187 (Trial Tr.) at 185:15-17.

[75]         *Id.* at 188:18.

"extremely painful," "a horrible feeling," "unforgettable," and that the day after the assault she "felt [her] vagina still hurt from his fingers."[76]  She testified also about not being able to maintain a romantic relationship or have sex for the past two decades since the "very violent" incident with Mr. Trump and about experiencing "visions" or "sudden intrusions" which she has "had . . . ever since the attack" and that "would absolutely take over [her] brain."[77]  These visions included her "feel[ing] Donald Trump again on top of [her] . . . [she] thought for a minute [she] was going to die because [she] couldn't breathe" and while going about her day "in would slide just a picture of him going like this into the dressing room or hitting [her] head or feeling his fingers jammed up inside of [her]."[78]  Ms. Carroll's testimony and Dr. Lebowitz's testimony, which is summarized above, of the long-lasting emotional and psychological trauma that Ms. Carroll experienced as a result of the incident with Mr. Trump demonstrate that the jury's $2 million award was motivated not by sympathy, but by competent evidence of harm to Ms. Carroll.

       In view of the jury's implicit finding that Mr. Trump digitally raped Ms. Carroll, Mr. Trump's argument and references to examples of damages awards "in the 'low six-figure range'" where a plaintiff's "intimate parts were groped by a defendant" plainly are irrelevant.[79]  Many of the

---

[76]

       *Id.* at 180:24-25; Dkt 189 (Trial Tr.) at 406:10, 432:7-8.

[77]

       Dkt 187 (Trial Tr.) at 225:3, 225:19-226:7.

[78]

       *Id.* at 226:14-21.

[79]

       Dkt 205 (Def. Mem.) at 14-16.

       Mr. Trump's argument that Ms. Carroll's "alleged damages are identical to plaintiffs in other cases asserting . . . a [loss of consortium claim], namely that Plaintiff argued to the Jury that she should be compensated for living a life since early 1996 without companionship," also is unavailing.  Dkt 211 (Def. Reply Mem.) at 1; *see also* Dkt 205 (Def. Mem.) at 13. His theory ignores all of the other types of harm to Ms. Carroll that were discussed in her and

47

cases Mr. Trump cites are distinguishable also for the reasons identified by Ms. Carroll.[80]  To be sure, there are New York cases in which plaintiffs who were sexually assaulted and/or raped were awarded lower damages than was Ms. Carroll.[81]  There also, however, are cases with facts and injuries comparable to those here in which plaintiffs were awarded similar or higher compensatory damages.[82]  "Although a review of comparable cases is appropriate," the Court "need not average

---

        Dr. Lebowitz's testimony, and in any case mistakenly conflates the loss of companionship in the context of a loss of consortium claim with the inability to form a romantic connection and have sex as a result of trauma arising from sexual assault.

[80]

        Dkt 207 (Pl. Opp. Mem.) at 15-16 ("In some [of Mr. Trump's 'comparator'] cases, the plaintiff was awarded the exact amount of compensatory damages that the plaintiff herself had requested, often as part of a damages inquest conducted by a magistrate judge during default judgment proceedings. . . . As a result, those cases obviously have little to nothing to say about the damages that a jury might have awarded on a full evidentiary record developed at trial, as occurred here. Other cases cited by Trump involved evidentiary issues not present in this case. . . . And not one of the cases Trump cites involved evidence of injury covering a 25-year-plus period. That distinguishes Carroll's case from all of the cases on which Trump relies, and it was entirely reasonable for the jury to account for the harm that Carroll has experienced ever since the assault in 1996 in determining compensatory damages.") (citations omitted).

[81]

        *See* Dkt 205 (Def. Mem.) at 15-16 (citing cases).

[82]

        *E.g.*, *Ortiz v. New York City Hous. Auth.*, 22 F. Supp. 2d 15, 39 (E.D.N.Y. 1998), *aff'd*, 198 F.3d 234 (2d Cir. 1999) (jury's $3 million compensatory damages award for plaintiff who was raped at gunpoint, diagnosed with PTSD, and suffered "dramatic[] change[s]" to the quality of her life did not deviate materially from reasonable compensation) (citing cases).

        Ms. Carroll cites to three cases, one of which is *Ortiz*, in which the plaintiffs were awarded more than Ms. Carroll was. *Breest v. Haggis*, No. 161137/2017, 2023 WL 374404 (N.Y. Sup. Ct., N.Y. Cty. Jan. 24, 2023) ($7.5 million); *Egan v. Gordon*, No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) ($13.8 million). Mr. Trump correctly observes certain differences between those cases and this one, including in the details of the rapes and in the fact that the plaintiffs in those cases were diagnosed with PTSD whereas Ms. Carroll was not. Those differences, however, do not render these cases of no value in determining the appropriate range of reasonable compensation. Indeed, the greater severity of the harm in those cases might explain why the awards were greater than the amount awarded to Ms. Carroll, while still demonstrating that $2 million is not outside the bounds in circumstances such as these.

the high and low awards; [it may] focus instead on whether the verdict lies within the reasonable range."[83]  It accordingly suffices for present purposes that the jury's award of $2 million falls within a reasonable range of the amounts awarded to plaintiffs in comparable sexual assault and rape cases.

In these circumstances, and based on all of the evidence presented at trial, the jury's compensatory damages award to Ms. Carroll for her sexual battery claim did not deviate materially from reasonable compensation so as to make it excessive under New York law.

*Compensatory Damages - Defamation Claim*

Mr. Trump argues that "the general compensatory damages for the defamation claim should be no more than $100,000, and no more than $368,000 (the low estimate provided by Professor Humphreys) for the reputation repair campaign."[84]  He contends that the jury's awards should be reduced to these amounts because "the jury awards in this case for these categories of damages were speculative and based upon alleged harms caused by the June 2019 statements."[85] He makes eleven specific arguments, at least seven of which are based on challenges to the testimony of Professor Humphreys, Ms. Carroll's defamation damages expert.  None ultimately is persuasive.

*Professor Humphreys's Testimony*

Mr. Trump makes the following challenges to Professor Humphreys's testimony:

---

[83]

*Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017).

[84]

Dkt 205 (Def. Mem.) at 18.

[85]

*Id.*

49

1.    "Professor Humphreys testified about the purported harm arising from the June 2019 Statements and even compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, but did not do a comparison between her reputational harm before and after the October 12, 2022 Statement. . . .   Therefore, Professor Humphreys must have included the alleged harm from the June 2019 Statements as part of her damages analysis."

2.    "Professor Humphreys testified that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social [(Mr. Trump's social media platform)] and Twitter to anything more specific than somewhere 'between 1.5 million and 5.7 million times,' which is an error rate of 74%. . . . Such an analysis is thus pure speculation."

3.    "Professor Humphreys testified that the people who read and believed the October 12, 2022 Statement were 'republicans [who] typically believe Mr. Trump.' . . . Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of the October 12, 2022 Statement, and that Plaintiff's reputation with such supporters would not have changed due to such statement."

4.    "Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is 'a campaign to put out positive messages about' Plaintiff. . . . However, Professor Humphreys did not

explain how existing Trump supporters would have changed their minds about Plaintiff from merely seeing positive messages about Plaintiff. Professor Humphreys also testified that she has never done a reputation repair campaign before, and thus, her opinion on this issue should be given little weight."

5.  "Professor Humphreys testified that (a) the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement . . . and (b) she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiffs rape allegation from reading the June 2019 Statements. . . . Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. Additionally, her testimony only supports the argument that the October 2022 Statement did not cause Plaintiff any harm in addition to any harm that was caused by the June 2019 Statements, because people already had made up their minds as to the veracity of Plaintiffs accusations as of the June 2019 Statements."

6.  "Professor Humphreys's cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million . . . , which is an error rate of 86 percent. This is especially troublesome since Professor Humphreys testified that she has never done a reputation repair campaign before."

7.    "Professor Humphreys also testified that she did not analyze any of Plaintiffs

numerous media appearances where Plaintiff enhanced her reputation with

regard to her allegations against Defendant. . . . In fact, Plaintiff conceded

that she received a vast amount of positive support from the public after

making her accusation against Defendant. . . . Even though Professor

Humphreys admitted that Plaintiff received positive support from the public

after the rape allegation, she did not factor such support into her analysis of

the harm allegedly caused by the October 12, 2022 Statement. . . .

Accordingly, her analysis of reputational harm is pure speculation."[86]

Ms. Carroll points out that Mr. Trump's arguments concerning Professor Humphreys

"get at the core of Professor Humphreys's reliability as an expert, something Trump could have

challenged under Federal Rule of Evidence 702 [(which governs the admissibility of expert

testimony)] or raised on cross-examination."[87] His failure to do so, she contends, waived his present

complaints. Mr. Trump counters, however, that his challenges are timely because they go to the

weight, not the admissibility, of Professor Humphreys's testimony and because he preserved the

issues by raising them on cross examination at trial.[88]  Thus, there is a threshold question with

---

[86]

Dkt 205 (Def. Reply Mem.) at 19-21.

[87]

Dkt 207 (Pl. Opp. Mem.) at 19.

[88]

Dkt 205 (Def. Reply Mem.) at 3.  *See Disability Advocs., Inc. v. Paterson*, No. 03-CV-3209
(NGG) (MDG), 2009 WL 1312112, at *7 (E.D.N.Y. May 8, 2009) ("Thus, while Defendants
are free to conduct vigorous cross-examine of Plaintiff's experts at trial and may argue in
their post-trial briefing that the court should accord the opinions of those experts little or no
weight, they may not renew their challenge to the admissibility of those opinions.");
*Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 446 (S.D.N.Y. 2007) ("[E]ven
where a post-trial challenge to the admissibility of expert evidence is barred, a trial court

respect to whether Mr. Trump waived those arguments in relation to Professor Humphreys's testimony by failing to raise them previously, as a Rule 59 motion generally is not a proper vehicle to raise new arguments or legal theories.[89]

On reflection, the Court concludes that Mr. Trump's arguments listed above go primarily to the weight, rather than the admissibility, of Professor Humphreys's testimony. "Generally, arguments that the assumptions relied on by an expert are unfounded go to the weight rather than the admissibility of the evidence."[90]   Most of Mr. Trump's arguments concern certain assumptions Professor Humphreys made or did not make in forming her expert opinion (*e.g.*, whether she included the alleged harm from the 2019 statements in her analysis, whether and how she considered Mr. Trump's supporters who viewed his 2022 statement, and whether she took into account Ms. Carroll's media appearances). The Court therefore considers Mr. Trump's challenges

---

remains free to grant a new trial if it weighs the prevailing party's scientific proof and finds it wanting.").

[89]   *MJAC Consulting, Inc. v. Barrett*, No. 04-cv-6078 (WHP), 2006 WL 2051129, at *3 (S.D.N.Y. July 24, 2006) (citing cases).

[90]   *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 270 (S.D.N.Y. 2001).  *See also AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW) (SN), 2019 WL 1254763, at *3 (S.D.N.Y. Mar. 19, 2019)*, objections overruled*, No. 1:15-CV-3411(GHW), 2019 WL 2992016 (S.D.N.Y. July 8, 2019) ("Any contentions that the expert's 'assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448, at *1 (S.D.N.Y. Dec. 29, 2015) ("'Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); *Colombo v. CMI Corp.*, 26 F. Supp. 2d 574, 576 (W.D.N.Y. 1998) ("Although a district court 'may ... inquire into the reliability and foundation of any expert opinion to determine admissibility,' *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987), '[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.' *Id.*") (ellipsis and alteration in original).

53

to Professor Humphreys's testimony as having been timely raised.[91]  Nevertheless, Mr. Trump's

arguments are unavailing on the merits.

His contention that Professor Humphreys "did not do a comparison between [Ms.

Carroll's] reputational harm before and after the October 12, 2022 Statement" and she therefore

"must have included the alleged harm from the June 2019 Statements as part of her damages

analysis" is contradicted by the record. Professor Humphreys testified that in her analysis, although

she "noticed . . . that those meetings [(public statements of negative associations with Ms. Carroll)]

existed after June 2019,  . . . the frequency of the posting with those associations had started to

decline. However, after the statement on October 12th, the frequency of the negative associations,

the volume of them again escalated."[92]  She testified also that she "only looked at the reputational

harm from the October 12[, 2022] statement" and that the cost she estimated to repair Ms. Carroll's

reputation following Mr. Trump's 2019 statements – the subject of *Carroll I* – was "higher" than

---

[91]
        Mr. Trump's two "error" rate arguments arguably go more to the admissibility of Professor Humphreys's testimony and therefore would be waived. *E.g.*, *AU New Haven, LLC*, 2019 WL 1254763, at *23 (stating that a high error rate "would be a valid basis to exclude an expert with scientific knowledge under *Daubert*"). But there is a vast difference between an error rate, on the one hand, and an expert opining that a quantity falls within a certain range, on the other.  For example, an appraiser who values a piece of real state as falling in the range of $12 million to $14 million has not made an "error"; the expert is merely giving an opinion that a willing buyer and a willing seller would conclude a sale within that range. In any event, Mr. Trump's arguments that there were high error rates in Professor Humphreys's calculations fail to demonstrate that the jury's compensatory damages award was erroneous or against the weight of the evidence. Indeed, it is plausible that the jury took the so-called error rates, along with any other purported weaknesses in Professor Humphreys's testimony, into account in awarding damages well below the high end of Professor Humphreys's estimated range. Dkt 197 (Trial Tr.) at 1142:14-16 ("[O]n the low, low end it would be [$368,000], and on the high end it would be 2.7 million.").

[92]
        Dkt 197 (Trial Tr.) at 1130:18-22.

the cost she estimated to repair Ms. Carroll's reputation following the 2022 statement.[93]  Moreover, to remove any doubt, the Court specifically instructed the jury that "the question of whether there was any adverse effect by virtue of the 2019 statements and, if there was, how much adverse effect is not at issue in this case. It is not for you to determine."[94]  There accordingly is no basis to assume that the jury award for the 2022 statement improperly included damages for the 2019 statements.

Mr. Trump's remaining challenges to Professor Humphreys's testimony similarly fail to support his argument for a new trial on or a reduction in the damages. Professor Humphreys's testimony was not "pure speculation" because she "did not analyze any of Plaintiffs numerous media appearances where Plaintiff enhanced her reputation with regard to her allegations against Defendant."  Professor Humphreys testified that "in terms of reputation," the "positive responses or comments [do not] offset negative responses."[95]  She explained: "if you imagine, like, at the place where you work, if 20 percent of your colleagues think that you stole money where you work, let's say you have a hundred colleagues and 20 of them think that you stole money, that still has an impact on your work life and your day-to-day reputation, and so I think that 20 percent is still important."[96]

Nor are his arguments that Professor Humphreys "did not take into consideration the fact that Trump's supporters [who read and believed the 2022 statement] likely would never have

---

[93]     *Id.* at 1158:12-23.

[94]     *Id.* at 1158:3-6.

[95]     *Id.* at 1135:9-11.

[96]     *Id.* at 1135:11-17.

supported or believed Plaintiff regardless of the [2022 statement]" and "did not explain how existing Trump supporters [or people who had made up their minds already based on the 2019 statements] would have changed their minds about Plaintiff" through her proposed reputation repair program grounds to minimize the weight of her testimony. Mr. Trump's counsel cross examined Professor Humphreys on these points. Professor Humphreys explained that in her view, it is "very likely that [the 2022 statement] was seen by some new people."[97]

The jury considered all of Professor Humphreys's testimony, including the purported flaws Mr. Trump's counsel attempted to draw out on cross examination and in summation, and determined that her testimony still was worthy of sufficient weight to reach the $1.7 million it awarded for the reputation repair program. None of Mr. Trump's challenges to that testimony, considered separately or collectively, supports a determination that the jury's compensatory damages award was seriously erroneous, egregious, or against the weight of the evidence.

*Mr. Trump's Other Arguments and Awards in Comparable Defamation Cases*

Mr. Trump's other objections to the jury's compensatory damages award for Ms. Carroll's defamation claim are without merit. He contends that the jury's award was excessive because:

> "[T]he overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed Plaintiff when he denied her rape allegation. . . . [T]he Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed. Accordingly, all that was left of Plaintiff's

---

[97] *Id.* at 1135:10-11.

defamation claim was that Defendant defamed Plaintiff by stating that 'he has no idea who Carroll was[,]' . . . which is far less damaging to Plaintiff's reputation than accusing Plaintiff of lying about the alleged rape."[98]

His argument is grounded entirely on false premises.

The crux of Ms. Carroll's defamation claim was that Mr. Trump defamed her by stating that she lied about him sexually assaulting her in order to increase sales of her new book or for other inappropriate purposes. Her claim, as noted above, never was limited to the specific definition of "rape" in the New York Penal Law, which requires penile penetration. Nor was any specific "portion[] of the defamation claim based upon an alleged rape." Mr. Trump did not deny specifically "raping" Ms. Carroll or specifically penetrating her with his penis as opposed to with another body part in his 2022 statement. He instead accused her of lying about the incident as a whole, of "completely ma[king] up a story" that was a "Hoax and a lie."[99] There is thus no factual or legal support for Mr. Trump's made-up version of Ms. Carroll's defamation claim.[100]

---

[98]    Dkt 205 (Def. Mem.) at 18-19.

[99]    Dkt 1 (Compl.) at 18, ¶ 92.

[100]    Mr. Trump's remaining arguments similarly lack merit. His contention that the jury "clearly must have [awarded compensatory damages for the June 2019 statements]" because Ms. Carroll "did not even attempt the separate the harm caused by the June 2019 Statements and the October 12, 2022 Statement" in her testimony fails for the same reasons discussed above with respect to his "double recovery" argument based on Professor Humphreys's testimony. Dkt 205 (Def. Mem.) at 19. It also is inaccurate because, as noted above, Ms. Carroll in fact did compare the post-2022 messages she received to the post-2019 messages and stated that the post-2022 messages were "equally disparaging and hurtful, but these particularly hurt because [she] thought [she] had made it through and there they are again." Dkt 189 (Trial Tr.) at 329:5-7. Moreover, even if Ms. Carroll had not clearly separated the harm from the 2019 statements from the 2022 statement, it would not demonstrate that the jury's award was against the weight of the evidence. The same is true for Mr. Trump's argument that in summation, Ms. Carroll's counsel stated "public statements" as opposed to the singular 2022 "statement." Dkt 205 (Def. Mem.) at 19. As noted above, the Court's instruction to the jury

Mr. Trump argues also that the jury's damages award deviates materially from the compensatory damages awards in other defamation cases in New York. Similar to the review of damages awards in sexual assault and rape cases, there certainly are cases – including those cited by Mr. Trump – in which plaintiffs in defamation cases in New York received compensatory damages awards considerably lower than the amount awarded to Ms. Carroll.[101]  The facts of those cases, however, were materially different from the facts and evidence in this case.  In many of those cases, the defamatory statements were published in far less public forums (*e.g.*, a "local newspaper"),[102] and none involved the scale of attention and influence commanded when the defendant in this case chooses to speak publicly. The cases Mr. Trump cites "do not compare in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a 'hoax,' and accused you of making up a horrific accusation to sell a 'really crummy book.'"[103] And, as Ms. Carroll cites, there are cases in New York in which defamation plaintiffs have been awarded compensatory damages higher than the amount awarded to Ms. Carroll, demonstrating that the jury's award here is not excessive and falls within the range of reasonable compensation.[104]

---

to ignore any harm arising from the 2019 statements overrides Mr. Trump's concern in this respect. Finally, his argument that Ms. Carroll testified she made more money after leaving *Elle* magazine and therefore suffered no financial harm from the 2022 statement is irrelevant. Ms. Carroll did not argue that she was owed compensatory damages for financial harm resulting from the 2022 statement.

[101]  Dkt 205 (Def. Mem.) at 16-17.

[102]  *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (N.Y. App. Div. 3d Dep't 2009).

[103]  Dkt 207 (Pl. Opp. Mem.) at 24.

[104]  *Id.* at 23-25.

Mr. Trump accordingly has failed to meet his burden of demonstrating that a new trial or remittitur is warranted on the jury's compensatory damages award for Ms. Carroll's defamation claim.

*Punitive Damages - Defamation Claim*

Lastly, Mr. Trump argues that the jury's $280,000 punitive damages award for Ms. Carroll's defamation claim violated due process principles. He principally argues that the punitive damages award for Ms. Carroll's defamation claim should be no more than $5,000 because his conduct with regard to the 2022 statement is "barely reprehensible, if at all, because he was defending himself against a false accusation of rape."[105]   "The Supreme Court [has] outlined three 'guideposts' to facilitate its review of state court punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'"[106] Mr. Trump's argument plainly is foreclosed by the analysis set forth above and by the Court's determination that the jury implicitly found Mr. Trump did in fact digitally rape Ms. Carroll.

Moreover, the evidence presented at trial and the jury's findings that Mr. Trump made the 2022 statement knowing that it was false (or with reckless disregard of its truth or falsity) and with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights firmly establish the high reprehensibility of Mr. Trump's

---

[105]    Dkt 205 (Def. Mem.) at 23.

[106]    *Stampf*, 761 F.3d at 209 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

59

defamatory statement. In these circumstances, the jury's $280,000 punitive damages award was not excessive and did not violate due process.

I have considered Mr. Trump's other arguments and found them all unpersuasive.


### Conclusion

The jury in this case did not reach "a seriously erroneous result." Its verdict is not "a miscarriage of justice." Mr. Trump's motion for a new trial on damages or a remittitur (Dkt 204) is denied.

SO ORDERED.

Dated:     July 19, 2023

_____
Lewis A. Kaplan
United States District Judge

# EXHIBIT 28

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

May 22, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:     *Carroll v. Trump*, No. 20 Civ. 7311 (LAK) ("*Carroll I*")

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll to propose a schedule for further proceedings in the above-referenced action.

* * *

As Your Honor is aware, at this point, there are four key issues that need to be dealt with in this matter known as *Carroll I*: (1) the United States's pending motion to substitute itself as the defendant under the Westfall Act; (2) Defendant Donald J. Trump's pending summary judgment motion, which principally relies on an assertion of absolute presidential immunity; (3) the implications of the recent jury verdict in *Carroll v. Trump*, No. 22 Civ. 10016 (LAK) ("*Carroll II*"); and (4) Carroll's concurrently-filed motion to amend her complaint. We address each of these points below and then propose a schedule to move these issues forward in order to reach a final resolution of this matter.

**Westfall Act**: The D.C. Court of Appeals has now answered the scope-of-employment question certified by the Second Circuit, and the Second Circuit has remanded the case to this Court for further proceedings. Importantly, the D.C. Court of Appeals made clear that this Court's understanding of D.C. law—on the basis of which this Court originally denied the United States's motion to substitute—was fundamentally correct. *See Carroll v. Trump*, 498 F. Supp. 3d 422, 450–56 (S.D.N.Y. 2020). Specifically, the D.C. Court of Appeals held that D.C. "adheres to the 'traditional view' of the scope of employment inquiry of *respondeat superior* set forth in the Restatement (Second) of Agency § 228," it confirmed that the "focus is on the subjective state of mind of the tortfeasor-employee," it clarified that D.C. "retains the 'too little actuated' standard," and it rejected the categorical reading of *CAIR v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), on which both Donald J. Trump and the United States previously relied. *See Trump v. Carroll*, No. 22-SP-745, 2023 WL 2920882, at *4, *9, *12, *14 (D.C. Apr. 13, 2023). Given that ruling, as well

KAPLAN HECKER & FINK LLP

2

as the extensive discovery that has already occurred here (including Donald Trump's deposition), we respectfully submit that the Court should permit expedited supplemental briefing in the event that the United States does not withdraw its previous Westfall Act certification.[1] Because Trump already gave extensive and thorough deposition testimony regarding his June 2019 defamatory statements, Carroll does not request any Westfall Act-related discovery at this time, nor does she believe that any such discovery would be necessary to decide the issue.

**Presidential Immunity**: In the event that the United States is not substituted, Trump will remain the only defendant and his pending summary judgment motion will await disposition. That summary judgment motion has now been fully briefed. *See* ECF 109, 113, 122, 125. Trump's principal argument for summary judgment is based on an assertion of absolute presidential immunity. Even though Trump concedes that he waived that affirmative defense, he now insists it is nonwaivable. *See* ECF 122, 125. As reflected in the proposed schedule below, we respectfully request that the Court consider addressing both the Westfall Act issue and Trump's absolute immunity argument at the same time. The relevant facts heavily overlap, the underlying issues are fairly related, and this approach would facilitate efficient appellate review and avoid the prospect of piecemeal appeals. *Cf. Carroll*, 498 F. Supp. 3d at 443 (denying motion to substitute on two independently sufficient grounds "to avoid the possibility of an unnecessary remand should a higher court disagree on the 'employee' question").

**Implications of the Verdict in *Carroll II***: Just four days after the Second Circuit remanded *Carroll I*, trial began in *Carroll II*. After a two-week trial, the jury determined that Trump had committed battery and defamation, and awarded Plaintiff $5 million in compensatory and punitive damages. On their face, the defamatory statements at issue in *Carroll I* and *Carroll II* are materially identical. Moreover, the core question underlying the defamation claim in both actions is "whether Mr. Trump sexually assaulted Ms. Carroll." *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 3000562, at *3 (S.D.N.Y. Mar. 20, 2023). As a result, the preclusive effect of the *Carroll II* jury verdict leaves nothing to resolve with respect to the merits of the *Carroll I* defamation claim, beyond the amount of Carroll's damages. Resolution of the Westfall Act and summary judgment issues will therefore either terminate this case or permit a streamlined disposition of the few remaining factual issues.[2]

**Proposed Amended Complaint**: Concurrently with the filing of this letter, Carroll has moved to amend her complaint in the present action. The proposed amendment seeks to facilitate the resolution of the scope-of-employment issue and, to that end, adds information bearing on that issue drawn from the discovery process. The proposed amendment also adds allegations

---

[1] The Justice Department has broad discretion to withdraw a Westfall Act certification under 28 C.F.R. § 15.4(c), which provides that any "certification under this section may be withdrawn if a further evaluation of the relevant facts or the consideration of new or additional evidence calls for such action." *See also Becker v. Fannin Cty., Ga.*, No. 09 Civ. 0047, 2012 WL 3113908, at *7–9 (N.D. Ga. Jul. 3, 2012) (resubstituting individual defendant after withdrawal of certification in FTCA case).

[2] The preclusive effect of the *Carroll II* judgement is unaltered by Trump's notice of appeal in that action. New York law controls the preclusive effect of the jury's verdict, *Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 508 n.3 (2d Cir. 2020) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508, 121 S. Ct. 1021, 149 (2001)). And under New York law, "the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (internal quotation omitted).

3

concerning the verdict in *Carroll II* and Trump's public response to that verdict, which involved repeating on CNN the statements the *Carroll II* jury found to be defamatory, allegations that we believe are now directly relevant to the issue of punitive damages on the defamation claim in *Carroll I. See, e.g.*, *Carroll II* Jury Charge, Trial Tr. at 1434–35 ("[P]unitive damages in relation to a libel claim—the defamation claim—may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. . . . A statement is made with malice or it's made maliciously . . . if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights."). The nature of Carroll's underlying claim for defamation against Trump based on his 2019 statements, however, remains the same.

* * *

As outlined above, given the preclusive effect of *Carroll II*, there are only a few steps that remain to bring this action to a close. Accordingly, Plaintiff respectfully proposes the following schedule:

| June 7, 2023 | Opposition to Plaintiff's motion to amend |
|---|---|
| June 14, 2023 | Plaintiff's reply in support of motion to amend |
| June 21, 2023 | Motion to substitute (if any) |
| July 19, 2023 | Plaintiff's opposition to motion to substitute |
| July 31, 2023 | Reply in support of motion to substitute |

In accordance with this schedule, the United States's motion to substitute (if any) and Trump's already-fully briefed summary judgment motion would be ripe for simultaneous disposition.

We have proposed the above plan and schedule to counsel for both Defendant and the United States. Defendant does not consent—and threatened to file a separate case against E. Jean Carroll in retaliation and possibly to seek sanctions.[3] The United States's position is as follows:

> The United States believes that it would be most appropriate for the court to fully adjudicate the motion to amend the complaint before any briefing schedule is set regarding the Westfall Act issue. Any briefing regarding substitution should be addressed to the operative complaint. The United States therefore suggests that the parties meet and confer and submit a joint proposed briefing schedule on the issue of substitution 30 days after the court rules on the motion to amend the complaint. If the court nonetheless chooses to set a briefing schedule regarding substitution, the United States requires at least sixty days to make any filing. This time is needed so that

---

[3] Counsel for Trump were unable to meet and confer on these issues until the morning of May 22, which accounts for the delay in sending this letter to the Court after the verdict in *Carroll II*.

KAPLAN HECKER & FINK LLP                                                                    4

government counsel can review deposition and other discovery
material that the United States has not previously had an opportunity
to consider and that the parties have suggested may be relevant to
the substitution issue.

We obviously disagree with both Defendant and the United States on these issues. Our
proposed schedule takes into account the fact that, as Your Honor has noted, Plaintiff is almost 80
years old,[4] as well as the fact that Defendant is now running again for president. Our proposed
schedule affords the United States ample time in which to assess its position on the Westfall Act
issue and does so without unduly delaying these proceedings. Plaintiff E. Jean Carroll is eager to
get this case, originally filed in late 2019, resolved while she remains in good health and before
Donald Trump's time and attention are consumed entirely by his presidential campaign.

We appreciate the Court's consideration of this matter.

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record (via ECF)

---

[4] *See Carroll v. Trump*, 590 F. Supp. 3d 575, 588 (S.D.N.Y. 2022).

# EXHIBIT 29

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

               *Plaintiff,*

     v.

DONALD J. TRUMP, in his personal capacity,

               *Defendant.*

No. 20 Civ. 7311 (LAK)

---

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO AMEND

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

## PRELIMINARY STATEMENT

The parties have been litigating this case since November 2019. Defendant Donald J. Trump, for his part, has sought to delay and evade these proceedings in every way he could. As part of that effort, Trump has claimed various immunities emanating from his status as President in June 2019 when he committed the defamation that gave rise to this action. Trump's claim to immunity under the Westfall Act is now back before this Court, following consideration by both the Second Circuit and the D.C. Court of Appeals. The D.C. Court of Appeals reaffirmed this Court's understanding of D.C. *respondeat superior* law (which controls the scope-of-employment inquiry for Westfall Act purposes), and the Second Circuit remanded the case so that the Court may render a decision in conformity with the D.C. court's decision. The entire certification process has lasted more than 31 months to date.

In the meantime, the facts and circumstances have changed. In order to facilitate final resolution of the scope-of-employment issue, Plaintiff E. Jean Carroll now moves to amend her complaint to add relevant facts bearing on that issue that were disclosed in the discovery process in this action. Carroll's proposed amendment also accounts for the recent verdict in the related action, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) ("*Carroll II*"), as well as Trump's recent public comments about Carroll following that verdict. Given the absence of any delay by Carroll, and the absence of any prejudice to Trump, the motion should be granted.

## ARGUMENT

Under Federal Rule of Civil Procedure 15(a)(2), leave to amend a complaint should be "freely give[n] . . . when justice so requires." The "rule" in the Second Circuit "has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quoting *AEP Energy Servs. Gas*

*Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). "Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Id.* (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

Here, Carroll's proposed amendment principally includes three categories of additional allegations: (1) allegations drawing from Trump's deposition in this action that demonstrate his personal motive in defaming Carroll; (2) allegations accounting for the verdict in *Carroll II*; and (3) allegations regarding Trump's continued defamatory statements about Carroll following that verdict. *See* Ex. A. to Kaplan Decl. These allegations are all responsive to the D.C. Court of Appeals' recent decision, holding that D.C. "adheres to the 'traditional view' of the scope of employment inquiry of *respondeat superior* set forth in the Restatement (Second) of Agency § 228," which requires a court to inquire into "the subjective state of mind of the tortfeasor-employee" to determine "whether the employee was, in fact, motivated by a purpose to serve their employer." *Trump v. Carroll*, No. 22-SP-745, 2023 WL 2920882, at *4, *9 (D.C. Apr. 13, 2023). Trump's own deposition testimony about the total lack of official process surrounding his June 2019 defamatory statements reflects his personal motivation in making them. And his malicious repetition of materially identical defamatory statements about Carroll in October 2022 and May 2023—long after his presidency had ended—only underscores the personal nature of his June 2019 conduct. *See id.* at *12 (as part of scope-of-employment inquiry, a factfinder "is free to consider any probative, relevant evidence tending to establish the employee's purpose behind their conduct, regardless of how temporally remote that may be from the moment of the tort"). Trump's later public statements about Carroll are also relevant to Carroll's entitlement to punitive damages. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 184 (2d Cir. 2000) ("prior or subsequent defamations" and "subsequent statements of the defendant" are relevant to punitive damages for

2

defamation claim (quoting *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643 n.12 (1979)).

Moreover, given the straightforward nature of these allegations, Carroll easily satisfies the "permissive standard" of Rule 15.[1] *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)).

***First***, there has been no undue delay or bad faith because Carroll's proposed amendment responds to very recent developments and could not have been offered before now. The scope-of-employment issue that Carroll's amended complaint mainly addresses has been on appeal since November 25, 2020, *see* ECF 45, 46, and the certified question to the D.C. Court of Appeals invited that court to reach a final determination of whether Trump acted within the scope of his employment in defaming Carroll in June 2019, *see Carroll v. Trump*, 49 F.4th 759, 781 (2d Cir. 2022). It was not until the D.C. Court of Appeals clarified its *respondeat superior* law (without resolving the ultimate scope-of-employment issue), and the Second Circuit then remanded the case to this Court for further proceedings on April 21, 2023, that Carroll's proposed amendment was relevant. ECF 149, 150. And given the centrality of the original complaint to the appellate courts' consideration of Trump's immunity under the Westfall Act, *see Carroll*, 49 F.4th at 761–63, amending the pleading during the pendency of an appeal would not have been proper. *Cf. Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982). The new allegations

---

[1] While no scheduling order in this case has set a deadline for motions to amend, *see* ECF 76, 77, 88, 100, 102, even if the Court were to construe this motion as a motion to amend a scheduling order, Carroll still easily satisfies the "good cause" standard of Rule 16(b)(4). "A finding of 'good cause' depends on the diligence of the moving party," and, in the context of a motion to amend, the court "may also weigh other relevant factors including, in particular, whether allowing the amendment of the pleading at the present stage of the litigation will prejudice the opposing party." *Flanagan v. New York City Dep't of Education*, No. 13 Civ. 8456, 2019 WL 6647870, at *1 (S.D.N.Y. Nov. 7, 2019) (Kaplan, J.). For substantially the same reasons detailed in this motion, Carroll has shown good cause to amend any scheduling order that the Court might find controlling.

relating to the May 9, 2023 jury verdict in *Carroll II* and Trump's subsequent statements about Carroll, of course, could not have been made any earlier.

      **Second**, the proposed amendment would obviously cause no prejudice to Donald Trump. The allegations drawing from Trump's own deposition concern facts already known to him, and courts regularly grant parties leave to amend "to conform the pleadings to the evidence unearthed by discovery." *Mellon Bank F.S.B. v. Alexander Wescott & Co.*, No. 98 Civ. 2650, 1999 WL 504914, at *5 (S.D.N.Y. July 16, 1999) (internal quotation omitted); *accord Stonewell Corp. v. Conestoga Title Ins. Co.*, No. 04 Civ. 9867, 2010 WL 647531, at *2 (S.D.N.Y. Feb. 18, 2010). Trump's deposition testimony would be properly considered in connection with additional Westfall Act briefing in any event. The same is true for new allegations relating to the jury verdict in *Carroll II* as well as Trump's recent defamatory statements. Those allegations reflect public and undisputed facts, including the existence of a jury verdict against Trump. *Daelim Trading Co. v. Giagni Enters., LLC*, No. 10 Civ. 2944, 2012 WL 5995119, at *3 (S.D.N.Y. Oct. 16, 2012) (where "the content of the proposed amendment is not unexpected," the amendment "does not cause defendants undue prejudice"). Most critically, the proposed amendment does not change the nature of Carroll's single cause of action against Trump in the slightest, and raises no new issues requiring additional discovery or further motion practice. Where an amendment does not "require the opponent to expend significant additional resources" or "significantly delay the resolution of the dispute," no prejudice will be found. *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 350).

      **Finally**, the proposed amendment is not futile. A motion to amend may be denied on the ground of futility if the amended pleading would be subject to dismissal for failure to state a claim. *See Thea v. Kleinhandler*, 807 F.3d 492, 496–97 (2d Cir. 2015). Carroll's amended complaint,

however, does not add any new claims or alter the nature of Carroll's pending defamation claim in any way.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff leave to amend her complaint.

Dated: New York, New York
       May 22, 2023

Respectfully submitted,

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT 30

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
E-mail: mmadaio@habbalaw.com
*Attorneys for Defendant/Counterclaimant Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>            *Plaintiff,*<br><br>   v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>            *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC<br><br><br>**DEFENDANT'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM** |

Defendant, Donald J. Trump, ("Defendant"), by and through his attorneys at Habba Madaio & Associates LLP, subject to and reserving all rights, for his Answer to Plaintiff's First Amended Complaint, says:

**<u>INTRODUCTION</u>**

1.     Defendant denies the allegations set forth in Paragraph 1 of the First Amended Complaint.

2.     Defendant denies the allegations set forth in Paragraph 2 of the First Amended Complaint.

3.      Defendant denies the allegations set forth in Paragraph 3 of the First Amended Complaint.

4.      Defendant denies the allegations set forth in Paragraph 4 of the First Amended Complaint.

5.      Defendant denies the allegations set forth in Paragraph 5 of the First Amended Complaint.

6.      Defendant denies the allegations set forth in Paragraph 6 of the First Amended Complaint.

7.      Defendant denies the allegations set forth in Paragraph 7 of the First Amended Complaint.

8.      Defendant denies the allegations set forth in Paragraph 8 of the First Amended Complaint.

9.      Defendant denies the allegations set forth in Paragraph 9 of the First Amended Complaint.

10.     Defendant denies the allegations set forth in Paragraph 10 of the First Amended Complaint.

11.     Defendant denies the allegations set forth in Paragraph 11 of the First Amended Complaint.

12.     Defendant denies the allegations set forth in Paragraph 12 of the First Amended Complaint.

13.     Defendant denies the allegations set forth in Paragraph 13 of the First Amended Complaint.

14.     Defendant denies the allegations set forth in Paragraph 14 of the First Amended Complaint.

15.     Defendant denies the allegations set forth in Paragraph 15 of the First Amended Complaint.

16.     Defendant denies the allegations set forth in Paragraph 16 of the First Amended Complaint.

17.     Defendant admits only that the jury in *E. Jean Carroll v. Donald J. Trump,* Civil Action No. 22-cv-10016 ("*Carroll II*") released its verdict on May 9, 2023 but otherwise denies Plaintiff's characterizations and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

18.     Defendant denies the allegations set forth in Paragraph 18 of the First Amended Complaint.

19.     Defendant denies the allegations set forth in Paragraph 19 of the First Amended Complaint.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the First Amended Complaint.

21.     As to Paragraph 21, Defendant admits only that he served as the 45th President of the United States and is a resident of the State of Florida.

## JURISDICTION AND VENUE

22.     Defendant admits the allegations contained in Paragraph 22 of the First Amended Complaint.

23.     Defendant denies the allegations set forth in Paragraph 23 of the First Amended Complaint as the allegations set forth a legal conclusion.

3

24.     Defendant denies the allegations set forth in Paragraph 24 of the First Amended Complaint as the allegations set forth a legal conclusion.

## FACTUAL ALLEGATIONS

25.     Defendant denies the allegations set forth in Paragraph 25 of the First Amended Complaint.

26.     Defendant denies the allegations set forth in Paragraph 26 of the First Amended Complaint.

27.     Defendant denies the allegations set forth in Paragraph 27 of the First Amended Complaint.

28.     As to Paragraph 28, Defendant admits only that the photograph exists, but otherwise denies the Plaintiff's allegations and respectfully refers the Court to the cited photograph for the true, accurate, and contextual meaning thereof.

29.     Defendant denies the allegations set forth in Paragraph 29 of the First Amended Complaint.

30.     Defendant denies the allegations set forth in Paragraph 30 of the First Amended Complaint.

31.     Defendant denies the allegations set forth in Paragraph 31 of the First Amended Complaint.

32.     Defendant denies the allegations set forth in Paragraph 32 of the First Amended Complaint.

33.     Defendant denies the allegations set forth in Paragraph 33 of the First Amended Complaint.

34.     Defendant denies the allegations set forth in Paragraph 34 of the First Amended Complaint.

35.     Defendant denies the allegations set forth in Paragraph 35 of the First Amended Complaint.

36.     Defendant denies the allegations set forth in Paragraph 36 of the First Amended Complaint.

37.     Defendant denies the allegations set forth in Paragraph 37 of the First Amended Complaint.

38.     Defendant denies the allegations set forth in Paragraph 38 of the First Amended Complaint.

39.     Defendant denies the allegations set forth in Paragraph 39 of the First Amended Complaint.

40.     Defendant denies the allegations set forth in Paragraph 40 of the First Amended Complaint.

41.     Defendant denies the allegations set forth in Paragraph 41 of the First Amended Complaint.

42.     Defendant denies the allegations set forth in Paragraph 42 of the First Amended Complaint.

43.     Defendant denies the allegations set forth in Paragraph 43 of the First Amended Complaint.

44.     Defendant denies the allegations set forth in Paragraph 44 of the First Amended Complaint.

45.     Defendant denies the allegations set forth in Paragraph 45 of the First Amended Complaint.

46.     Defendant denies the allegations set forth in Paragraph 46 of the First Amended Complaint.

47.     Defendant denies the allegations set forth in Paragraph 47 of the First Amended Complaint.

48.     Defendant denies the allegations set forth in Paragraph 48 of the First Amended Complaint.

49.     Defendant denies the allegations set forth in Paragraph 49 of the First Amended Complaint.

50.     Defendant denies the allegations set forth in Paragraph 50 of the First Amended Complaint.

51.     Defendant denies the allegations set forth in Paragraph 51 of the First Amended Complaint.

52.     Defendant denies the allegations set forth in Paragraph 52 of the First Amended Complaint.

53.     Defendant denies the allegations set forth in Paragraph 53 of the First Amended Complaint.

54.     Defendant denies the allegations set forth in Paragraph 54 of the First Amended Complaint.

55.     Defendant denies the allegations set forth in Paragraph 55 of the First Amended Complaint.

56.     Defendant denies the allegations set forth in Paragraph 56 of the First Amended Complaint.

57.     Defendant denies the allegations set forth in Paragraph 57 of the First Amended Complaint.

58.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58 of the First Amended Complaint.

59.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59 of the First Amended Complaint.

60.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60 of the First Amended Complaint.

61.     Defendant denies the allegations set forth in Paragraph 61 of the First Amended Complaint.

62.     Defendant denies the allegations set forth in Paragraph 62 of the First Amended Complaint.

63.     Defendant denies the allegations set forth in Paragraph 63 of the First Amended Complaint.

64.     Defendant denies the allegations set forth in Paragraph 64 of the First Amended Complaint.

65.     Defendant denies the allegations set forth in Paragraph 65 of the First Amended Complaint.

66.     Defendant denies the allegations set forth in Paragraph 66 of the First Amended Complaint.

67.     Defendant denies the allegations set forth in Paragraph 67 of the First Amended Complaint.

68.     Defendant denies the allegations set forth in Paragraph 68 of the First Amended Complaint.

69.     Defendant denies the allegations set forth in Paragraph 69 of the First Amended Complaint.

70.     Defendant denies the allegations set forth in Paragraph 70 of the First Amended Complaint.

71.     Defendant denies the allegations set forth in Paragraph 71 of the First Amended Complaint.

72.     Defendant denies the allegations set forth in Paragraph 72 of the First Amended Complaint.

73.     Defendant denies the allegations set forth in Paragraph 73 of the First Amended Complaint.

74.     Defendant denies the allegations set forth in Paragraph 74 of the First Amended Complaint.

75.     Defendant denies the allegations set forth in Paragraph 75 of the First Amended Complaint.

76.     Defendant denies the allegations set forth in Paragraph 76 of the First Amended Complaint.

77.     Defendant denies the allegations set forth in Paragraph 77 of the First Amended Complaint.

78.     Defendant denies the allegations set forth in Paragraph 78 of the First Amended

Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

79.     Defendant denies the allegations set forth in Paragraph 79 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

80.     Defendant denies the allegations set forth in Paragraph 80 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

81.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 81 of the First Amended Complaint.

82.     Defendant denies the allegations set forth in Paragraph 82 of the First Amended Complaint.

83.     Defendant denies the allegations set forth in Paragraph 83 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

84.     Defendant denies the allegations set forth in Paragraph 84 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

85.     Defendant denies the allegations set forth in Paragraph 85 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

86.     Defendant denies the allegations set forth in Paragraph 86 of the First Amended Complaint.

87.     Defendant denies the allegations set forth in Paragraph 87 of the First Amended Complaint.

88.     Defendant denies the allegations set forth in Paragraph 88 of the First Amended Complaint.

89.     Defendant denies the allegations set forth in Paragraph 89 of the First Amended Complaint.

90.     Defendant denies the allegations set forth in Paragraph 90 of the First Amended Complaint.

91.     Defendant denies the allegations set forth in Paragraph 91 of the First Amended Complaint.

92.     Defendant denies the allegations set forth in Paragraph 92 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

93.     Defendant denies the allegations set forth in Paragraph 93 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

94.     Defendant denies the allegations set forth in Paragraph 94 of the First Amended Complaint.

95.     Defendant denies the allegations set forth in Paragraph 95 of the First Amended Complaint.

96.     Defendant denies the allegations set forth in Paragraph 96 of the First Amended Complaint.

97.     Defendant denies the allegations set forth in Paragraph 97 of the First Amended Complaint.

98.     Defendant denies the allegations set forth in Paragraph 98 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

99.     Defendant denies the allegations set forth in Paragraph 99 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

100.    Defendant denies the allegations set forth in Paragraph 100 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

101.    Defendant denies the allegations set forth in Paragraph 101 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

102.    Defendant denies the allegations set forth in Paragraph 102 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

103.    Defendant denies the allegations set forth in Paragraph 103 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

104.    Defendant denies the allegations set forth in Paragraph 104 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

105.    Defendant denies the allegations set forth in Paragraph 105 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

106.    Defendant denies the allegations set forth in Paragraph 106 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

107.    Defendant denies the allegations set forth in Paragraph 107 of the First Amended Complaint.

108.    Defendant denies the allegations set forth in Paragraph 108 of the First Amended Complaint.

109.    Defendant denies the allegations set forth in Paragraph 109 of the First Amended Complaint.

110.    Defendant denies the allegations set forth in Paragraph 110 of the First Amended Complaint.

111.    Defendant denies the allegations set forth in Paragraph 111 of the First Amended Complaint.

112.    Defendant admits only that he has made the referenced statement set forth in Paragraph 112 but otherwise denies the Plaintiff's characterizations and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

113.    Defendant admits only that he has made the referenced statement set forth in Paragraph 113 but otherwise denies the Plaintiff's characterizations and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

114.    Defendant denies the allegations set forth in Paragraph 114 of the First Amended Complaint.

115.    Defendant denies the allegations set forth in Paragraph 115 of the First Amended Complaint.

116.    Defendant denies the allegations set forth in Paragraph 116 of the First Amended Complaint.

117.    Defendant denies the allegations set forth in Paragraph 117 of the First Amended Complaint.

118.    Defendant denies the allegations set forth in Paragraph 118 of the First Amended Complaint.

119.    Defendant denies the allegations set forth in Paragraph 119 of the First Amended Complaint.

120.    Defendant denies the allegations set forth in Paragraph 120 of the First Amended Complaint.

121.    Defendant denies the allegations set forth in Paragraph 121 of the First Amended Complaint.

122.    Defendant denies the allegations set forth in Paragraph 122 of the First Amended Complaint.

123.    Defendant denies the allegations set forth in Paragraph 123 of the First Amended Complaint.

124.    Defendant denies the allegations set forth in Paragraph 124 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

125. Defendant denies the allegations set forth in Paragraph 125 of the First Amended Complaint.

126. Defendant denies the allegations set forth in Paragraph 126 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

127. Defendant denies the allegations set forth in Paragraph 127 of the First Amended Complaint.

128. Defendant denies the allegations set forth in Paragraph 128 of the First Amended Complaint.

129. Defendant denies the allegations set forth in Paragraph 129 of the First Amended Complaint.

130. Defendant denies the allegations set forth in Paragraph 130 of the First Amended Complaint.

131. Defendant denies the allegations set forth in Paragraph 131 of the First Amended Complaint.

132. Defendant denies the allegations set forth in Paragraph 132 of the First Amended Complaint.

133. Defendant denies the allegations set forth in Paragraph 133 of the First Amended Complaint.

134. Defendant denies the allegations set forth in Paragraph 134 of the First Amended Complaint.

135. Defendant denies the allegations set forth in Paragraph 135 of the First Amended Complaint.

136.     Defendant denies the allegations set forth in Paragraph 136 of the First Amended Complaint.

137.     Defendant denies the allegations set forth in Paragraph 137 of the First Amended Complaint.

138.     Defendant denies the allegations set forth in Paragraph 138 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

139.     Defendant denies the allegations set forth in Paragraph 139 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

140.     Defendant denies the allegations set forth in Paragraph 140 of the First Amended Complaint.

141.     Defendant denies the allegations set forth in Paragraph 141 of the First Amended Complaint.

142.     Defendant denies the allegations set forth in Paragraph 142 of the First Amended Complaint.

143.     Defendant denies the allegations set forth in Paragraph 143 of the First Amended Complaint.

144.     Defendant denies the allegations set forth in Paragraph 144 of the First Amended Complaint.

145.     Defendant denies the allegations set forth in Paragraph 145 of the First Amended Complaint.

146.     Defendant denies the allegations set forth in Paragraph 146 of the First Amended Complaint.

147.     Defendant denies the allegations set forth in Paragraph 147 of the First Amended Complaint.

148.     Defendant denies the allegations set forth in Paragraph 148 of the First Amended Complaint.

149.     Defendant denies the allegations set forth in Paragraph 149 of the First Amended Complaint.

150.     Defendant denies the allegations set forth in Paragraph 150 of the First Amended Complaint.

151.     Defendant denies the allegations set forth in Paragraph 151 of the First Amended Complaint.

152.     Defendant denies the allegations set forth in Paragraph 152 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

153.     Defendant denies the allegations set forth in Paragraph 153 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

154.     Defendant denies the allegations set forth in Paragraph 154 of the First Amended Complaint as the allegations set forth a legal conclusion.

155.     Defendant admits only that the trial in *Carroll II* commenced on April 25, 2023.

156.     Defendant denies the allegations set forth in Paragraph 156 of the First Amended Complaint as the allegations set forth a legal conclusion.

157.    Defendant denies the allegations set forth in Paragraph 157 of the First Amended Complaint.

158.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 158 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

159.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 159 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

160.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 160 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

161.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 161 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

162.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 162 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

163.     Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 163 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

164.     Defendant denies the allegations set forth in Paragraph 164 of the First Amended Complaint.

165.     Defendant denies the allegations set forth in Paragraph 165 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

166.     Defendant denies the allegations set forth in Paragraph 166 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

167.     Defendant denies the allegations set forth in Paragraph 167 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

168.     Defendant denies the allegations set forth in Paragraph 168 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

169.     Defendant denies the allegations set forth in Paragraph 169 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

170.     Defendant denies the allegations set forth in Paragraph 170 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and

contextual meaning thereof.

171.     Defendant denies the allegations set forth in Paragraph 171 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

172.     Defendant denies the allegations set forth in Paragraph 172 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

173.     Defendant denies the allegations set forth in Paragraph 173 of the First Amended Complaint.

174.     Defendant denies the allegations set forth in Paragraph 174 of the First Amended Complaint.

## CAUSE OF ACTION: DEFAMATION

175.     Defendant incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

176.     Defendant denies the allegations set forth in Paragraph 176 of the First Amended Complaint.

177.     Defendant denies the allegations set forth in Paragraph 177 of the First Amended Complaint.

178.     Defendant denies the allegations set forth in Paragraph 178 of the First Amended Complaint.

179.     Defendant denies the allegations set forth in Paragraph 179 of the First Amended Complaint.

180.     Defendant denies the allegations set forth in Paragraph 180 of the First Amended Complaint.

181.     Defendant denies the allegations set forth in Paragraph 181 of the First Amended Complaint.

182.     Defendant denies the allegations set forth in Paragraph 182 of the First Amended Complaint.

183.     Defendant denies the allegations set forth in Paragraph 183 of the First Amended Complaint.

## DEMAND FOR RELIEF

184.     Defendant denies that Plaintiff is entitled to any of the relief requested in the *ad damnum* clause of the First Amended Complaint or any relief.

## GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in the First Amended Complaint. Defendant denies any allegations contained in the headings and subheadings throughout the First Amended Complaint. Defendant denies all allegations, declarations, claims or assertions in the First Amended Complaint that are not specifically admitted in this Answer.

## ADDITIONAL DEFENSES

As separate, additional defenses to the First Amended Complaint and the purported causes of action therein, but without assuming the burden of proof with regard to these defenses, Defendant alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

1.     Plaintiff's claim is barred because the alleged defamatory statements are privileged

20

and protected under the doctrine of presidential absolute immunity.

## SECOND AFFIRMATIVE DEFENSE

2.     The Complaint fails to state a cause of action.

## THIRD AFFIRMATIVE DEFENSE

3.     The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

## FOURTH AFFIRMATIVE DEFENSE

4.     The alleged defamatory statements are true.

## FIFTH AFFIRMATIVE DEFENSE

5.     Some or all of the statements at issue are matters of opinion that are not capable of being proven true or false.

## SIXTH AFFIRMATIVE DEFENSE

6.     The alleged defamatory statements constitute fair comment.

## SEVENTH AFFIRMATIVE DEFENSE

7.     The alleged defamatory statements are with respect to a public person.

## EIGHTH AFFIRMATIVE DEFENSE

8.     The alleged defamatory statements are not reasonably capable of the defamatory meaning attributed to them by Plaintiff.

## NINTH AFFIRMATIVE DEFENSE

9.     The claims set forth in Plaintiff's Complaint are unconstitutional.

## TENTH AFFIRMATIVE DEFENSE

10.     Plaintiff's claims are barred because her damages, if any, were caused by acts of third persons, for which Defendant is not responsible.

**ELEVENTH AFFIRMATIVE DEFENSE**

11.    Plaintiff is a public figure for purposes of this case, and Defendant did not publish with actual malice.

**TWELFTH AFFIRMATIVE DEFENSE**

12.    Plaintiff is not entitled to punitive damages as a matter of law.

**THIRTEENTH AFFIRMATIVE DEFENSE**

13.    Plaintiff is not entitled to injunctive relief as a matter of law.

**FOURTEENTH AFFIRMATIVE DEFENSE**

14.    Plaintiff is not entitled to counsel fees and/or costs as a matter of law.

**FIFTEENTH AFFIRMATIVE DEFENSE**

15.    Plaintiff has not sufficiently pled defamation or defamation *per se*.

**SIXTEENTH AFFIRMATIVE DEFENSE**

16.    Plaintiff has failed to plead damages with the required specificity.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

17.    Neither Defendant nor the challenged statements proximately caused any injury that the Plaintiff allegedly suffered.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

18.    Plaintiff has not suffered special damages.

**NINETEENTH AFFIRMATIVE DEFENSE**

19.    Defendant, as sitting President, made the challenged statements within the scope of his employment, and is therefore immune from suit under the Westfall Act.

**TWENTIETH AFFIRMATIVE DEFENSE**

20.    Plaintiff's claims are time-barred by the applicable statute(s) of limitations.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

21.     The alleged defamatory statements are, in part, privileged and protected under N.Y. Civ. Rights Law § 74.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

22.     Plaintiff's claims are barred, in whole or in part, by the doctrine of *res judicata.*

## TWENTY-THIRD AFFIRMATIVE DEFENSE

23.     Plaintiff's claims are barred, in whole or in part, by the doctrine of collateral estoppel.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

24.     Plaintiff is barred in equity from claiming or recovering any relief set forth in the First Amended Complaint because of her conduct under the doctrine of unclean hands.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

25.     By virtue of the tortious conduct and defamatory statements made by Plaintiff against Defendant, Plaintiff is barred in whole or in part from recovering for the claims made in her First Amended Complaint.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

26.     Defendant hereby reserves the right to assert all affirmative defenses available under any applicable federal and state law, and to assert any cross-claims, counterclaims and third-party claims when and if they become appropriate in this action.

## COUNTERCLAIM AGAINST E. JEAN CARROLL

Defendant/Counterclaimant, Donald J. Trump ("Counterclaimant"), by way of Counterclaim against Plaintiff/Counterclaim Defendant, E. Jean Carroll ("Counterclaim Defendant"), says:

**THE PARTIES**

1.      Counterclaimant, Donald J. Trump, is an individual who is a resident of the State of Florida.

2.      Counterclaim Defendant, E. Jean Carroll, is an individual who is a resident of the State of New York.

**JURISDICTION, VENUE AND COMPLIANCE WITH F.R.C.P. 13**

3.      This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

5.      Pursuant to F.R.C.P. 13(a), this Counterclaim is properly brought before this Court as it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim.

6.      This counterclaim is properly brought before this Court as it arises from the same transaction or occurrence that is the subject matter of the opposing party's claim, as set forth in the First Amended Complaint, and because it does not require adding another party over whom this Court cannot acquire jurisdiction.

**CAUSE OF ACTION**

**DEFAMATION**

1.      On June 21, 2019, Counterclaim Defendant first accused Counterclaimant of raping her after publishing a book excerpt in New York Magazine entitled "Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my

life."

2.      Since that time, Counterclaim Defendant has repeatedly accused Counterclaimant

of raping her in a series of public statements, which include, but are not limited to, the following:

- " If you're asking why the COVID-19 rate is so low in Germany and so high in America, it is because Germany has a leader and America has a rapist."[1]

- "Jenn Budd! Hail, valiant woman! It is NOT weird! I called what happened a "tussle!" I called it a "fight!" I called what happened "against my will!" It took a quarter of a century to call what @realDonaldTrump did to me "rape."[2]

- "All 9,023 lawyers of the DOJ won't be able to save Trump when the Adult Survivors Act passes. The very moment it's LAW, I am suing Donald Trump for rape. The best civil rights attorneys in the nation-- @kaplanrobbie and @JoshuaMatz8 ARE READY!"[3]

- "My name is E. Jean Carroll. I'm a survivor of sexual assault. I stayed silent for years after I was attacked, and by staying silent lost my chance to hold my attacker accountable. I was raped by Donald Trump. And while my rapist may be famous, my story is, sadly, extremely common."[4]

3.      Thereafter, on May 10, 2023, Counterclaim Defendant appeared on CNN for a

television interview (the "Interview"), following the jury verdict on May 9, 2023, in the case of *E.*

*Jean Carroll v. Donald J. Trump,* Civil Action No. 22-cv-10016[5] ("*Carroll II*").

4.      During the Interview, Counterclaim Defendant was specifically asked about the

jury unanimously finding Counterclaimant not liable for rape in *Carroll II*.

5.      In response to that specific inquiry, Counterclaim Defendant disregarded the jury's

finding that Counterclaimant did not rape her, and replied: "oh yes he did, oh yes he did."

6.      Further, during the Interview, following the conclusion of the trial in *Carroll II*,

---

1 E. Jean Carroll (@ejeancarroll), Twitter Apr. 6, 2020, 12:47 PM) https://bit.ly/3Pt940N
2 E. Jean Carroll (@ejeancarroll), Twitter Jan. 4, 2021, 9:53 PM) https://bit.ly/46s3Isw.
3 E. Jean Carroll (@ejeancarroll), Twitter (Jan. 12, 2022, 11:27 AM) https://bit.ly/442qN3s.
4 E. Jean Carroll, *Why I Waited 23 Years to Speak Up*, Ask E. Jean (April 25, 2022), https://bit.ly/3NNBmls.
5 CNN, "E. Jean Carroll says Trump is 'incorrect' about civil trial jury," YouTube (May 10, 2023), https://bit.ly/3WRSXeF

Counterclaim Defendant explained her exchange with the attorney representing Counterclaimant in the trial of *Carroll II,* Joseph Tacopina, Esq.

7.      Specifically, Counterclaim Defendant stated in the Interview that she emphatically told Mr. Tacopina at the conclusion of the trial that "he did it and you know it," again reaffirming her claim that Counterclaimant raped her.

8.      Counterclaim Defendant made these statements knowing each of them were false or with reckless disregard for their truth or falsity.

9.      The Interview was on television, social media and multiple internet websites, with the intention of broadcasting and circulating these defamatory statements among a significant portion of the public.

10.     Counterclaim Defendant made these false statements with actual malice and ill will with an intent to significantly and spitefully harm and attack Counterclaimant's reputation, as these false statements were clearly contrary to the jury verdict in *Carroll II* whereby Counterclaimant was found not liable for rape by the jury.

11.     Counterclaim Defendant's actions of wantonly and falsely accusing the Counterclaimant on multiple occasions of committing rape constitute defamation *per se,* as Counterclaim Defendant accused Counterclaimant of rape, which clearly was not committed, according to the jury verdict in *Carroll II.*

12.     Due to Counterclaim Defendant's repeated falsehoods and defamatory statements made against the Counterclaimant, Counterclaimant has been the subject of significant harm to his reputation, which, in turn, has yielded an inordinate amount of damages sustained as a result.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant/Counterclaimant respectfully requests that this Court:

(1) Deny any and all relief sought by Plaintiff in this First Amended Complaint;

(2) Deny any and all purported damages sought by Plaintiff in the First Amended
Complaint;

(3) Order Plaintiff to retract her defamatory statements against the Defendant;

(4) Award Defendant compensatory and punitive damages as a result of Plaintiff's
defamatory statements made against the Defendant; and

(5) Award counsel fees, costs, and any further relief as this Court may be deem just and
proper.


Dated:  New York, New York
        June 27, 2023

 

Alina Habba, Esq.
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
E-mail: mmadaio@habbalaw.com
*Counsel for Defendant/Counterclaimant*
*Donald J. Trump*