# EXHIBIT 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ x

E. JEAN CARROLL,

                          Plaintiff,

        -against-                              20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                          Defendant.

------------------------------------------ x

**MEMORANDUM OPINION GRANTING PLAINTIFF'S
MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM
AND CERTAIN PURPORTED AFFIRMATIVE DEFENSES**

Appearances:

Roberta Kaplan
Joshua Matz
Shawn Crowley
Matthew Craig
Trevor Morrison
Michael Ferrara
KAPLAN HECKER & FINK LLP

*Attorneys for Plaintiff*

Alina Habba
Michael T. Madaio
HABBA MADAIO & ASSOCIATES LLP

*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

This is a defamation case against Donald Trump brought by writer E. Jean Carroll for certain statements Mr. Trump made in 2019, while he was President, in response to Ms. Carroll's public accusation that he sexually assaulted ("raped") her in the mid 1990s. In a closely related second case ("*Carroll II*"), Ms. Carroll brought a defamation claim for Mr. Trump's comparable 2022 statement as well as a sexual battery claim pursuant to the Adult Survivors Act ("ASA"). The battery claim became permissible as a result of the ASA, a new law enacted by New York in 2022, which created a one-year period within which persons who were subjected as adults to conduct that would have constituted a sex offense under the New York Penal Law could sue their alleged assaulters for damages even if their civil claims otherwise would have been expired.

*Carroll II* was tried in this Court in April and May 2023. Ms. Carroll testified that Mr. Trump assaulted her in the dressing room of a New York department store in what most likely was the spring of 1996 by, among other things, forcibly penetrating her vagina with his fingers and with his penis. The essence of her account was corroborated by two "outcry" witnesses in whom she had confided shortly after the attack and six other fact witnesses. Mr. Trump relied exclusively on attempting to discredit Ms. Carroll's proof and on portions of his deposition testimony that came in on Ms. Carroll's case. He did not testify in person, attend the trial, or present any defense evidence.

The jury's unanimous verdict was almost entirely in favor of Ms. Carroll. It found that Mr. Trump "sexually abused" Ms. Carroll, which is defined in the New York Penal Law as sexual contact by forcible compulsion and is a felony punishable by a term of imprisonment and registration as a sex offender. It determined also that Mr. Trump defamed Ms. Carroll in his 2022 statement. It awarded Ms. Carroll $2.02 million in compensatory and punitive damages on her sexual

battery claim and $2.98 million in compensatory and punitive damages on her defamation claim.

The only issue on which the jury did not find in Ms. Carroll's favor was whether she proved that Mr. Trump "raped" her within the narrow, technical meaning of that term in the New York Penal Law. The jury in *Carroll II* was instructed that it could find that Mr. Trump "raped" Ms. Carroll only if it found that he forcibly penetrated Ms. Carroll's vagina *with his penis*. It could not find that he "raped" her if it determined that Mr. Trump forcibly penetrated Ms. Carroll's private sexual parts with his fingers – which commonly is considered "rape" in other contexts – because the New York Penal Law definition of rape is limited to penile penetration. As the Court explained in its recent decision denying Mr. Trump's motion for a new trial on damages and other relief in *Carroll II*, based on all of the evidence at trial and the jury's verdict as a whole, the jury's finding that Mr. Trump "sexually abused" Ms. Carroll implicitly determined that he forcibly penetrated her digitally – in other words, that Mr. Trump in fact did "rape" Ms. Carroll as that term commonly is used and understood in contexts outside of the New York Penal Law.

The day after the jury's verdict, Ms. Carroll and her counsel gave interviews with the media where they discussed the trial and Ms. Carroll's reaction to the verdict. On June 27, 2023, in his answer to Ms. Carroll's amended complaint in this action, *Carroll I*,[1] Mr. Trump asserted for the

---

[1]        "The amended complaint made three main sets of changes. First, it added allegations based upon the jury's verdict in [*Carroll II*], including substitution of the phrase 'sexual assault' (or derivatives of that phrase) for the word 'rape' (or derivatives of that word) wherever that word (or its derivatives) appeared in the original complaint. Second, it set forth alleged facts concerning Mr. Trump's recent statements following the *Carroll II* verdict in which he again claimed that he does not know Ms. Carroll and that no such incident occurred between them. Third, it added allegations drawn from Mr. Trump's deposition in this case that allegedly demonstrate his personal motive in defaming Ms. Carroll. Importantly, as the Court noted in its decision denying Mr. Trump's motion for summary judgment [in this case], '[t]he amended complaint did not add any new claims or otherwise change the focus of [Ms. Carroll's] original complaint.' *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL

4

first time a defamation counterclaim against Ms. Carroll. He alleged that Ms. Carroll, in an interview with CNN following the *Carroll II* verdict, "disregarded the jury's finding that [Mr. Trump] did not rape her" by (1) stating that when she heard that the jury's response was "no" to the question of whether she proved that Mr. Trump raped her, she responded "oh yes he did, oh yes he did", and (2) stating that at the conclusion of the trial, she said to Mr. Trump's counsel "he [(Mr. Trump)] did it and you know it."[2]

 The matter now is before the Court on Ms. Carroll's motion to dismiss Mr. Trump's counterclaim and to strike certain affirmative defenses in his answer. For the reasons stated below, Ms. Carroll's motion to dismiss the counterclaim is granted. Her motion to strike certain affirmative defenses is granted in part and denied in part.

### *Facts*

*The "Rape" Question in Carroll II*

 Ms. Carroll's sexual battery claim in *Carroll II* involved three independent and alternative theories of liability: rape, sexual abuse, and forcible touching. Each theory corresponded to a definition of a sex crime by the same name in the New York Penal Law. It was necessary to define these acts in the precise terms of the New York Penal Law because the ASA requires that the alleged conduct for which a person is able to bring a sexual battery claim within the temporary claim revival period "would constitute a sexual offense as defined in article one hundred thirty of the penal

---

4744176, at *1 (S.D.N.Y. July 25, 2023) (quoting *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 4393067 at *2 n.6 (S.D.N.Y. July 5, 2023)).

[2] Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 25-26 ¶¶ 5-7.

law."[3] The special verdict form provided to the jury accordingly consisted of three liability questions relating to Ms. Carroll's sexual battery claim: whether Ms. Carroll proved by a preponderance of the evidence that (1) "Mr. Trump raped Ms. Carroll?", (2) "Mr. Trump sexually abused Ms. Carroll?", and (3) "Mr. Trump forcibly touched Ms. Carroll?".[4]

The Court instructed the jury that the "first set of questions in the verdict form has to do with whether or not Ms. Carroll has established that Mr. Trump's conduct, if any, came within any of th[e] criminal law definitions," and proceeded to instruct the jury on each such definition.[5] With respect to the first question on the verdict form, whether Ms. Carroll proved that Mr. Trump raped her, the Court instructed the jury in accordance with the New York Penal Law's definition of

---

[3]

N.Y. CPLR § 214-j ("Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of *conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law* committed against such person who was eighteen years of age or older . . . which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived . . . .") (emphasis added).

[4]

*Carroll II*, Doc. No. 22-cv-10016, Dkt 174 (Verdict) at 1.

"Pursuant to Federal Rule of Civil Procedure 49, which governs jury verdict forms and questions, '[t]he court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact.' A special verdict stands in contrast to a general verdict form, which typically asks jurors to answer only the ultimate questions of liability and the damages amounts, if any. The Court here used a special verdict form that was substantially similar to the parties' proposed forms, consisting of factual questions going to liability and damages, organized by the two claims [(battery and defamation)]." *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, at *12 (S.D.N.Y. July 19, 2023).

[5]

*Carroll II*, Doc. No. 22cv10016, Dkt 201 (Trial Tr.) at 1416:6-9.

6

rape, as relevant here, that:

> "In order to establish that Mr. Trump raped her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.
>
> "The first element is that Mr. Trump engaged in *sexual intercourse* with her.
>
> "The second element is that Mr. Trump did so without Ms. Carroll's consent by the use of forcible compulsion. . . .
>
> "'Sexual intercourse' means any penetration, however slight, *of the penis* into the vaginal opening. In other words, any penetration of the penis into the vaginal opening, regardless of the distance of penetration, constitutes an act of sexual intercourse. Sexual intercourse does not necessarily require erection of the penis, emission, or an orgasm."[6]

The instructions with respect to the rape question thus made clear that if the jury found that Mr. Trump forcibly penetrated Ms. Carroll's vagina with his fingers, but not also with his penis, it was obliged to answer "no" to the rape question. However, if it found that Mr. Trump forcibly penetrated Ms. Carroll digitally, it was obliged to answer "yes" to the sexual abuse question, as the New York Penal Law definition of "sexual abuse" encompasses such conduct. For the reasons stated in the Court's recent decision denying Mr. Trump's motion for a new trial in *Carroll II*:

> "The jury's finding of sexual abuse therefore necessarily implies that it found that Mr. Trump forcibly penetrated her vagina. And since the jury's answer to [the rape question] demonstrates that it was unconvinced that there was penile

---

[6]      *Id.* at 1416:18-1417:6 (emphasis added).

penetration, the only remaining conclusion is that it found that Mr. Trump forcibly

penetrate her vagina with his fingers – *in other words, that he 'raped' her in the*

*sense of that term broader than the New York Penal Law definition*."[7]

The jury's answer of "no" to the question of whether Ms. Carroll proved that Mr. Trump "raped" her

therefore established *only* that the jury was unconvinced that he penetrated her *with his penis*.

*Ms. Carroll's Statements After the Jury's Verdict in Carroll II*

On May 10, 2023, the day after the jury's verdict in *Carroll II*, Ms. Carroll and her

counsel gave interviews with the media, including on the television program *CNN This Morning*.

During that interview, Ms. Carroll made the following statements:

"[Reporter]: What about when that first finding was found? This jury found that

Trump did not rape you. What about that moment?

[Ms. Carroll]: Robbie [(Ms. Carroll's counsel)] can explain the legal?

[Reporter]: Sure. And I want you to, but I just wonder, E. Jean, what went through

your head when you heard that?

[Ms. Carroll]: Well, I just immediately say in my own head, *oh, yes, he did -- oh, yes,*

*he did.* See, that's my response."

. . .

---

[7]  *Carroll*, 2023 WL 4612082, at *20 (emphasis added).

In any event, the Court alternatively found, in accordance with Rule 49, that Mr. Trump did
forcibly digitally penetrate Ms. Carroll's vagina. *Id.* at *19 n.70 ("As the jury's response to
Question 2 [(the sexual abuse question)] was an implicit finding that Mr. Trump forcibly
digitally penetrated Ms. Carroll's vagina, no explicit independent finding by the Court is
necessary. Nevertheless, the Court alternatively finds that he did so.").

"[Reporter]: There in the courtroom was an encounter and exchange between you and the President's lawyer, Joe Tacopina. He came up, you shook hands, I believe. What did he say?

[Ms. Carroll]: Well, Joe Tacopina is very likeable. He's sort of like an 18th century strutting peacock. And he's people like him [*sic*]. So, when he sticks out his hand to – first, he congratulated Robbie. And then, he was congratulating people on the team. And as I put my hand forward, I said, *he did it and you know it*. Then we shook hands, and I passed on."[8]

*Mr. Trump's Counterclaim and Affirmative Defenses*

Mr. Trump alleges in his counterclaim that Ms. Carroll's statements during the CNN interview on May 10, 2023 "repeated falsehoods and defamatory statements" that caused "significant harm to [Mr. Trump's] reputation."[9] He alleges that her statement "oh yes he did, oh yes he did" in response to the reporter's question about her reaction "disregarded the jury's finding that [Mr. Trump] did not rape her" and that her statement to Mr. Trump's counsel that "he did it and you know it" "again reaffirm[ed] her claim that [Mr. Trump] raped her."[10] He contends that:

"[Ms. Carroll] made these statements knowing each of them were false or with reckless disregard for their truth or falsity.

---

[8]      Dkt 176-3, Ex. C to Decl. of Roberta A. Kaplan, Tr. of CNN Interview, at 11-13 (emphasis added).

[9]      Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 26 ¶ 12.

[10]      *Id.* at 25 ¶ 5, 26 ¶ 7.

. . .

> [Ms. Carroll] made these false statements with actual malice and ill will with an intent to significantly and spitefully harm and attack [Mr. Trump's] reputation, as these false statements were clearly contrary to the jury verdict in *Carroll II* whereby [Mr. Trump] was found not liable for rape by the jury.
>
> [Ms. Carroll's] actions of wantonly and falsely accusing [Mr. Trump] on multiple occasions of committing rape constitute defamation *per se*, as [Ms. Carroll] accused [Mr. Trump] of rape, which clearly was not committed, according to the jury verdict in *Carroll II*."[11]

He accordingly seeks compensatory and punitive damages, an order requiring Ms. Carroll to retract her defamatory statements, and other relief.

Mr. Trump raises also in his answer certain affirmative defenses that Ms. Carroll argues should be stricken "because the Court considered and rejected each of these defenses in denying [Mr.] Trump's motion for summary judgment."[12] They are discussed below.

## *Discussion*

### *Legal Standard*

The standards governing a motion to dismiss are well established. As the Second Circuit has explained:

---

[11]  *Id.* at 26 ¶¶ 8, 10, 11.

[12]  Dkt 175 (Pl. Mem.) at 27-28.

"'[A] complaint [or counterclaim] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007))."[13]

Although the Court must accept as true all factual allegations, it "should not accept as true allegations that amount to mere 'legal conclusions.'"[14] Furthermore, a complaint or counterclaim "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[15] "'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding [a] motion to dismiss, without converting the proceeding to one for summary judgment."[16]

With respect to Ms. Carroll's motion to strike certain of Mr. Trump's affirmative defenses, Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading

---

[13]

*King v. City of New York*, No. 22-231, 2023 WL 2398679, at *1 (2d Cir. Mar. 8, 2023) (first alteration in original).

[14]

*Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[15]

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

[16]

*Id.* (second alteration in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied*, 503 U.S. 960 (1992)).

an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[17] The

Second Circuit has stated that:

> "We conclude that the plausibility standard of *Twombly* applies to
> determining the sufficiency of all pleadings, including the pleading of an affirmative
> defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying
> the plausibility standard to any pleading is a 'context-specific' task."[18]

It has set forth also certain considerations in relation to a motion to strike an affirmative defense

including, as relevant here, that "an affirmative defense is improper and should be stricken if it is a

legally insufficient basis for precluding a plaintiff from prevailing on its claims."[19]


*Mr. Trump's Defamation Claim Fails With Respect To Falsity*

Ms. Carroll argues that Mr. Trump has failed to state a legally sufficient claim for

defamation both because her statements were at least "substantially true" and because Mr. Trump

has not adequately pled actual malice. In view of the following analysis of the falsity-substantial

truth issue, there is no need to address the sufficiency of Mr. Trump's actual malice allegations.

In order to make out a defamation case, a public figure plaintiff or counterclaimant

such as Mr. Trump "must show that the statements [the plaintiff] complains of were (1) of and

concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false,

---

[17]    Fed. R. Civ. P. 12(f).

[18]    *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019) (citation omitted).

[19]    *Id.* at 98.

and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the truth."[20]  "[W]hen falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false. . . . In particular, several courts of appeals have affirmed dismissals of defamation claims because the material in the complaint cannot be reasonably understood except as being true or substantially true."[21]  "'[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"[22]  To determine whether a statement is substantially true, "[c]ourts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the

---

[20]    *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

[21]    *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017). *See also, e.g., Nunes v. NBCUniversal Media, LLC*, No. 22-cv-1633 (PKC), 2022 WL 17251981, at *4 (S.D.N.Y. Nov. 28, 2022) ("Whether a statement is substantially true is an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion."); *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 65 (S.D.N.Y. 2021) ("The issue of whether a statement is substantially true may present an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion."); *Marom v. Pierot*, No. 18-cv-12094 (VB) (JCM), 2020 WL 6572509, at *4 (S.D.N.Y. Aug. 30, 2020), *report and recommendation adopted*, No. 18 CV 12094 (VB), 2020 WL 6565199 (S.D.N.Y. Nov. 9, 2020) ("'Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint...must plead facts that, if proven, would establish that the defendant's statements were not substantially true.' . . . Consistent with this requirement, a plaintiff asserting a claim of defamation must not only identify the allegedly defamatory statement, 'but also the respect in which it was allegedly false.') (first ellipsis in original) (citations omitted); *Verragio, Ltd. v. AE Jewelers, Inc.*, No. 15-cv-6500 (CM), 2017 WL 4125368, at *8 (S.D.N.Y. Aug. 23, 2017) (dismissing counterclaim for defamation on ground of substantial truth).

[22]    *Tannerite Sports, LLC*, 864 F.3d at 247 (quoting *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dept. 2015)).

mind of the average reader."[23] "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done."[24] But Mr. Trump has not plausibly alleged that Ms. Carroll's statements during the CNN interview were not at least substantially true.

The only basis for Mr. Trump's assertion of falsity is the fact that the jury in *Carroll II* was not persuaded that Mr. Trump had "raped" her within the meaning of the New York Penal Law – in other words, that it did not find that he penetrated her vagina with his penis.[25] And that indeed was its decision. But that is insufficient to state a claim for defamation here for two reasons. The argument presupposes (1) that the jury's answer to the Penal Law "rape" question in *Carroll II* would establish falsity and, if it did, (2) that it is binding on Ms. Carroll in this case. Both of those presuppositions are incorrect. Indeed, the jury's verdict in *Carroll II* establishes, as against Mr. Trump, the fact that Mr. Trump "raped" her, albeit digitally rather than with his penis. Thus, it establishes against him the substantial truth of Ms. Carroll's "rape" accusations. In any case, the *Carroll II* jury's Penal Law rape finding does not even establish, as against Ms. Carroll, Mr. Trump's contention that he did not penetrate her with his penis, *i.e.*, that he did not rape her within the meaning of the Penal Law. The Court begins with the latter point.

---

[23]      *Franklin.*, 135 A.D.3d at 94.

[24]      *Cafferty v. S. Tier Pub. Co.*, 226 N.Y. 87, 93 (1919).

[25]      *See, e.g.*, Dkt 181 (Def. Opp. Mem.) at 5-6 ("Here, Plaintiff's statement was demonstrably false. Plaintiff does not dispute, nor can she, that the jury in *Carroll II* determined that Defendant did not rape her. . . . In view of the jury's finding, there is simply no argument that Plaintiff's statement was 'substantially true' as a matter of law.").

*The Jury's Penal Law Rape Finding in Carroll II Is Not Conclusive in this Case*

In order for Ms. Carroll to have defamed Mr. Trump by asserting that he "raped" her as that term is defined in the New York Penal Law (even assuming that her post-verdict statements reasonably could be construed as meaning what Mr. Trump claims it meant),[26] Mr. Trump was required to plead sufficient facts to allege that her statements were false or at least not substantially true. But, as noted, the only basis for Mr. Trump's claim of falsity is the jury's answer to the Penal Law rape question in *Carroll II*. Thus, he invokes the doctrine of issue preclusion, also referred to as collateral estoppel, to contend that the jury's verdict on the Penal Law rape question precludes Ms. Carroll from contending that Mr. Trump in fact penetrated her with his penis.[27]

The parties agree that "a party is collaterally estopped from relitigating an issue if a four-part test is met: '(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair

---

[26]      The parties dispute whether Ms. Carroll was referring to "rape" within the meaning of the New York Penal Law or "rape" as that term is understood more broadly in the allegedly defamatory statements. Drawing all reasonable inferences in favor of Mr. Trump, as the Court must on this motion to dismiss, the Court assumes without now deciding that Ms. Carroll was referring to rape within the meaning of the New York Penal Law in the two allegedly defamatory statements.

[27]      *See also* Dkt 194 (Def. Mem. Issue Preclusion) at 4-6.

     Although Mr. Trump has appealed the judgment in *Carroll II*, "it is well established that the fact that . . . an appeal from the judgment has . . . been taken does not divest the judgment of finality for the purposes of collateral estoppel." *Samhammer v. Home Mut. Ins. Co. of Binghamton*, 120 A.D.2d 59, 64 (3d Dept. 1986). *See also Anonymous v. Dobbs Ferry Union Free Sch. Dist.*, 19 A.D.3d 522, 522 (2d Dept. 2005) ("The rule in New York is that the 'pendency of an appeal does not prevent the use of the challenged judgment as the basis of' collateral estoppel.") (citation omitted). It is well established also – and neither party contends otherwise – that the preclusive effect of the *Carroll II* judgment is governed by New York law, as *Carroll II* was a diversity case. *E.g.*, *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001).

opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'"[28]  Mr. Trump contends, however, that:

> "[T]he issue of falsity has been conclusively established in Defendant's favor
> with respect to the claim for defamation asserted in his counterclaim. . . . First, there
> is little question that the issue of whether Defendant raped Plaintiff has always been
> a central question in both *Carroll I* and *Carroll II*. . . . Second, the issue was actually
> determined in *Carroll II* when the jury expressly found that Plaintiff failed to
> demonstrate by a preponderance of the evidence that she was raped by Defendant.
> . . . Third, the parties had a full and fair opportunity to litigate the issue throughout
> *Carroll II*'s proceedings and trial, and despite Plaintiff's extensive testimony
> advancing her claim that she was raped, the jury rejected her account and returned a
> verdict in Defendant's favor. Finally, it is readily apparent that the issue of whether
> Plaintiff was raped was a material aspect to the jury's finding."[29]

But Mr. Trump entirely ignores the fourth element of the collateral estoppel test, whether the issue was "'necessary to support a valid and final judgment on the merits.'"[30]

---

[28]    *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted). *See also* Dkt 194 (Def. Mem. Issue Preclusion) at 1 ("Under New York law, collateral estoppel applies when 'the issue in the second action [(1)] is identical to an issue which was raised, [(2)] necessarily decided and material in the first action, and [(3)] the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.'") (quoting *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000)).

[29]    Dkt 194 (Def. Mem. Issue Preclusion) at 4.

[30]    *Boguslavsky*, 159 F.3d at 720 (citation omitted). *See also, e.g.*, *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 491 (2d Cir. 2004) ("[A] party is estopped from relitigating an issue *when that issue was necessary to the resolution of the prior action*, and the party

As noted above and in a prior decision in this case, the issue of whether Mr. Trump "raped" Ms. Carroll within the meaning of the Penal Law was in this case for one and only one reason. As the parties agreed, Ms. Carroll was entitled under the ASA to sue Mr. Trump for sexual battery in 2022, despite the years that had passed since the parties' encounter, only if she could establish that Mr. Trump's conduct met *any one* of three alternative definitions of sex crimes set out in the Penal Law – rape, sexual abuse or forcible touching. The jury was required to answer "yes" to only one of these three theories in order to award damages. It found that Mr. Trump had abused Ms. Carroll sexually, thus satisfying the requirement of the ASA. The issues of whether he "raped" or "forcibly touched" her were entirely extraneous given the sexual abuse finding. Indeed, the verdict form could have omitted the rape question entirely, and the judgment in *Carroll II* would have been unaffected.

The *Carroll II* jury's answer to the Penal Law "rape" question therefore was unnecessary and immaterial. Accordingly, it is not binding on Ms. Carroll in this case. In consequence, there is no merit to Mr. Trump's argument that the jury's finding on the Penal Law "rape" question established that Ms. Carroll's statements were false even if her statements reasonably could be construed as referring to "rape" in that specialized Penal Law sense, a subject on which this Court now expresses no view.

*In Any Case, Ms. Carroll's Statements Were Substantially True*

Unlike the jury's finding on the Penal Law "rape" question, its finding on the sexual

_____

against whom estoppel is invoked had a full and fair opportunity to contest that issue in the previous litigation.") (emphasis added) (collecting New York cases).

abuse question – and specifically its implicit determination that Mr. Trump digitally raped her – is conclusive with respect to this case. As a result, Ms. Carroll's statements are "substantially true."

The finding that Mr. Trump digitally raped Ms. Carroll is conclusive because it was necessary to support the judgment in *Carroll II*. As recounted above and in the Court's recent new trial decision in *Carroll II*, "the only remaining conclusion" based on all of the evidence at trial was that the jury implicitly found that Mr. Trump forcibly penetrated Ms. Carroll's vagina with his fingers.[31] "[T]here was ample, arguably overwhelming evidence, that Mr. Trump forcibly digitally penetrated Ms. Carroll, thus fully supporting the jury's sexual abuse finding."[32]  The finding of forcible digital penetration "is fully supported by Ms. Carroll's repeated and clear testimony on the digital penetration (more than the penile penetration), Dr. Lebowitz [(Ms. Carroll's damages expert for her battery claim)] specifically mentioning Ms. Carroll squirming in response to an intrusive memory of Mr. Trump's fingers in her vagina, and the evidence at trial taken as a whole. It also is bolstered by the amount of the jury's verdict."[33]  Indeed, the finding of digital rape is essential to support the size of the jury's damages award on the battery claim – over $2 million.  It accordingly is the "truth," as relevant here, that Mr. Trump digitally raped Ms. Carroll.

As stated above, a statement is substantially true if it "would not have a different

---

[31]

*Carroll*, 2023 WL 4612082, at *20.

Moreover, as noted above, the Court in any event determined, in the alternative and pursuant to Rule 49, that Mr. Trump digitally raped Ms. Carroll.

[32]

*Id.*

[33]

*Id.*

effect on the mind of the reader from that which the pleaded truth would have produced."[34]  Here, the "pleaded truth" would have been that Mr. Trump forcibly penetrated Ms. Carroll's vagina with his fingers. The difference between Ms. Carroll's allegedly defamatory statements – that Mr. Trump "raped" her as defined in the New York Penal Law – and the "truth" – that Mr. Trump forcibly digitally penetrated Ms. Carroll – is minimal. Both are felonious sex crimes.  If Ms. Carroll had stated that Mr. Trump "raped" her by forcibly digitally penetrating her vagina instead of referring also (allegedly) to forcible penile penetration, there would have been no different effect on the mind of an average listener. Indeed, both acts constitute "rape" in "common modern parlance, its definition in some dictionaries, in some federal and state criminal statutes, and elsewhere."[35]  Given that the anatomical difference between the alleged falsehood and the truth is a "fine and shaded distinction[] [that] must be drawn" in order "to sustain a charge of libel" based on Ms. Carroll's interview statements, "no legal harm has been done."[36]

Mr. Trump accordingly fails to state a claim for defamation because (1) he fails plausibly to allege that Ms. Carroll's statements were not true, and (2) in the alternative, Ms. Carroll's allegedly defamatory statements were substantially true as a matter of law.

*Mr. Trump's Affirmative Defenses*

Ms. Carroll argues that the Court should strike Mr. Trump's first, third, fifth, twelfth,

---

[34]    *Tannerite Sports, LLC*, 864 F.3d at 247 (quoting *Franklin*, 135 A.D.3d at 94).

[35]    *Carroll*, 2023 WL 4612082, at *2 & n. 2-4.

[36]    *Cafferty*, 226 N.Y. at 93.

and fifteenth affirmative defenses because the Court "considered and rejected each of these defenses in denying [Mr.] Trump's motion for summary judgment."[37] She relies on the law-of-the-case doctrine, which provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[38] Her argument is persuasive with respect to some, but not all, of Mr. Trump's purported affirmative defenses.

Mr. Trump's fifth and fifteenth affirmative defenses are that "[s]ome or all of the statements at issue are matters of opinion that are not capable of being proven true or false" and that "[p]laintiff has not sufficiently pled defamation or defamation *per se*," respectively.[39] In its decision denying Mr. Trump's motion for summary judgment, the Court determined that "Mr. Trump's statements were factual assertions rather than expressions of opinion" and that Ms. Carroll adequately alleged that his 2019 statements are defamatory *per se*.[40] Nothing in Ms. Carroll's amended complaint – which, as the Court has explained, "did not add any new claims or otherwise change the focus of her original complaint" – would change the Court's prior analysis or decision with respect to those defenses.[41] However, as the Court noted in its summary judgment decision:

"Neither party addresses specifically Mr. Trump's June 24, 2019 statement, in which he said only: 'I'll say it with great respect: Number one, she's not my type.

---

[37] Dkt 175 (Pl. Mem.) at 27-28.

[38] *Pepper v. United States*, 562 U.S. 476, 506 (2011) (citation omitted).

[39] Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 21, ¶ 5, 22 ¶ 15.

[40] *Carroll*, 2023 WL 4393067, at *14-17.

[41] *Id.* at *2 n.6.

Number two, it never happened. It never happened, OK?'. In her complaint, Ms. Carroll alleges that all three June 2019 statements were defamatory. However, as stated above, the crux of Ms. Carroll's defamation claim lies in Mr. Trump's statements that Ms. Carroll lied for financial and/or personal gain. Indeed, Mr. Trump appears to ground his argument that 'the majority' of his statements are nonactionable opinion on the assumption that Ms. Carroll does not allege his 'general repudiation of Plaintiff's allegations' in itself was defamatory. . . . As the parties have not adequately addressed this point, the Court does not now decide it."[42]

Given that the Court has not previously decided the application, if any, of Mr. Trump's fifth and fifteenth affirmative defenses Mr. Trump's June 24, 2019 statement, it does not strike those defenses to the extent they might concern only that statement. Those two affirmative defenses, however, are stricken insofar as they apply to anything else.

Mr. Trump's twelfth affirmative defense is that Ms. Carroll "is not entitled to punitive damages as a matter of law."[43] But the Court rejected that claim when it determined, in denying Mr. Trump's motion for summary judgment, that "Mr. Trump has failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied."[44] Mr. Trump's argument that the Court "did not find that there is 'no question of fact' which could potentially lead to Defendant successfully raising this defense at trial" is

---

[42]     *Id.* at *17, n. 85.

[43]     Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 22 ¶ 12.

[44]     *Carroll*, 2023 WL 4393067, at *20.

irrelevant because Mr. Trump's stated defense is that she is not entitled to punitive damages *as a matter of law* – in other words, that she would not be entitled to punitive damages irrespective of the evidence at trial.[45]

He contends also that the amended complaint "adds an entirely new theory of punitive damages, relating to statements Defendant made on May 10, 2023, which Defendant has not yet had an opportunity to challenge."[46] The amended complaint added allegations with respect to Mr. Trump's remarks concerning Ms. Carroll during the CNN Town Hall event on May 10, 2023 as "subsequent statements of the defendant" "which may be considered to establish that Mr. Trump made the 2019 statements that always have been the subject of this action with the deliberate intent to injure or out of hatred, ill will, or spite ('common law malice') in order for Ms. Carroll to obtain punitive damages" with respect to the 2019 statements.[47] She asserts no stand-alone claim based on the post-*Carroll II* verdict statements. The Court's decision with respect to Mr. Trump's defense therefore is unaffected by the inclusion of his subsequent statements in Ms. Carroll's amended complaint. The Court accordingly strikes the twelfth affirmative defense on the grounds that it already decided that this defense is legally insufficient and that nothing in the amended complaint warrants any different result.[48]

---

[45]      Dkt 181 (Def. Opp. Mem.) at 24.

[46]      *Id.*

[47]      *Carroll v. Trump*, 2023 WL 4744176, at *2.

[48]      *See, e.g., Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-cv-5075 (LJL), 2020 WL 3472597, at *14 (S.D.N.Y. June 25, 2020) ("The Court strikes the First Affirmative Defense to the extent that it seeks to relitigate the legal sufficiency of claims

Mr. Trump's first defense is absolute presidential immunity. But the Court previously determined that Mr. Trump waived that defense by failing to raise it in the first three years of litigating this case and, in any case, that it would have been insufficient as a defense.[49] Mr. Trump rejoins that "although this Court has held that the presidential immunity defense was waived when it was not raised in Defendant's initial [a]nswer . . . his defense has now been properly and timely raised since it was asserted in connection with Defendant's [a]mended [a]nswer."[50] He misunderstands, however, the relevant standard. "A defendant who is responding to an amended complaint cannot amend his answer as of right without any regard to the amendments taken by his adversary."[51] There is nothing new in the amended complaint that would make Mr. Trump's presidential immunity defense any more viable or persuasive now than it would have been before. The fact that he has raised it now in an answer does not (1) undo the fact that he waived the defense by failing to raise it in the first three years of litigating this case or (2) change the Court's decision that his purported defense would have been insufficient in any case. The opportunity to answer an amended complaint is not a free pass to correct past wrongs without any justification or basis for doing so. The Court accordingly strikes Mr. Trump's first affirmative defense.

Mr. Trump's third affirmative defense is that "[t]he alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the

---

already decided.").

[49] *Carroll*, 2023 WL 4393067, at *8-9.

[50] Dkt 181 (Def. Opp. Mem.) at 25.

[51] *Pereira v. Cogan*, No. 00-cv-619 (RWS), 2002 WL 1822928, at *4 (S.D.N.Y. Aug. 7, 2002).

Constitution of the United States."[52]  Ms. Carroll does not adequately explain her request to strike this defense. To the extent Mr. Trump claims that his third defense "assert[s] the defense of presidential immunity,"[53] the Court strikes it for the same reasons stated above for striking Mr. Trump's first defense asserting absolute presidential immunity. To the extent, however, that it concerns a different defense or issue not previously decided, the Court does not now decide to strike the defense in those other respects, if any, as the parties have not adequately addressed it.

---

[52]
      Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 21 ¶ 3.

[53]
      Dkt 181 (Def. Opp. Mem.) at 25.

      Although Mr. Trump asserts in his opposition here that this defense relates to presidential immunity, he made no such argument with respect to that defense – which also was included in his original answer – when he moved for summary judgment on the basis of absolute presidential immunity. In any event, to the extent he now claims it is related to presidential immunity, it is stricken for the same reasons explained above.

### *Conclusion*

For the foregoing reasons, Ms. Carroll's motion to dismiss Mr. Trump's counterclaim (Dkt 174) is granted. Her motion to strike Mr. Trump's affirmative defenses (Dkt 174) is granted in part and denied in part as follows:

(1) Mr. Trump's first and twelfth affirmative defenses are stricken in their entirety.

(2) Mr. Trump's fifth and fifteenth affirmative defenses are stricken except to the extent, if any, that they relate to Mr. Trump's June 24, 2019 statement.

(3) Mr. Trump's third affirmative defense is stricken to the extent it asserts an absolute presidential immunity defense, and is not stricken in any other respect, if there is any. It is denied in its remaining respects.

SO ORDERED.

Dated:          August 7, 2023

_____
Lewis A. Kaplan
United States District Judge

# EXHIBIT 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                 Plaintiff,

       -against-                               20-cv-7311 (LAK)

DONALD J. TRUMP,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

        Appearances:

                           Roberta Kaplan
                           Joshua Matz
                           Shawn Crowley
                           Matthew Craig
                           Trevor Morrison
                           Michael Ferrara
                           KAPLAN HECKER & FINK LLP

                           *Attorneys for Plaintiff*

                           Alina Habba
                           Michael T. Madaio
                           HABBA MADAIO & ASSOCIATES LLP

                           *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        This is a defamation case brought by writer E. Jean Carroll against President Donald

2

Trump, as he then was, for statements Mr. Trump made in June 2019 shortly after Ms. Carroll publicly accused him of sexual assault. In those statements, Mr. Trump denied Ms. Carroll's accusation, stated that he "has no idea who this woman is," and suggested that she fabricated her accusation for ulterior and improper purposes, including to increase sales of her then-forthcoming book in which she discusses having been sexually assaulted by Mr. Trump and other men.

In a second and very closely related case ("*Carroll II*"), Ms. Carroll sued Mr. Trump for the alleged sexual assault itself and for defamation based on a statement that Mr. Trump published on his social media platform in October 2022 that was substantially similar to his June 2019 statements. That case was tried in April and May 2023. The jury unanimously found that Mr. Trump had sexually abused Ms. Carroll and defamed her in his October 2022 statement.[1] It awarded Ms. Carroll a total of $5 million in compensatory and punitive damages: $2.02 million for her sexual assault claim, and $2.98 million for her defamation claim.[2]

In this case ("*Carroll I*"), Ms. Carroll seeks damages and other relief for defamation

---

[1]

It found also that Ms. Carroll had not established that Mr. Trump "raped" her within the relevant definition of that term in the New York Penal Law.

[2]

The Court assumes familiarity with its prior decisions, which describe in detail the facts and procedural histories of both cases. Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); Dkt 145, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Doc. No. 22-cv-10016 (*Carroll II*), Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023).

Except where preceded by *"Carroll II"*, "Dkt" references are to the docket in this case.

for Mr. Trump's June 2019 statements only.[3]  The matter now is before me on Mr. Trump's motion for summary judgment dismissing the action on four grounds:

    (1)    Mr. Trump is entitled to absolute presidential immunity

    (2)    Mr. Trump's statements were not defamatory *per se* and Ms. Carroll cannot establish special damages

    (3)     the majority of Mr. Trump's statements were nonactionable opinion

    (4)    Ms. Carroll consented to Mr. Trump's allegedly defamatory statements.[4]

He argues also that punitive damages in any case would be unwarranted on Ms. Carroll's defamation claim. His arguments are without merit.

### *Facts*

*Mr. Trump's Allegedly Defamatory June 2019 Statements*

        Ms. Carroll's accusation that Mr. Trump sexually assaulted her first became public on June 21, 2019, when *New York* magazine published on the Internet an excerpt from her then-forthcoming book in which Ms. Carroll described Mr. Trump's alleged assault of her, which she referred to as "rape."  Over the next several hours and days, Mr. Trump issued three allegedly

---

[3]    When Ms. Carroll brought this lawsuit in 2019, she presumably was foreclosed from suing for sexual battery by New York's then-existing statute of limitations. As noted above, the Adults Survivors Act enacted by New York in 2022 temporarily revived the ability to bring such claims without regard to the otherwise applicable statute of limitations. She therefore was permitted to bring that claim in her second lawsuit now referred to as *Carroll II*.

[4]    For avoidance of confusion: In his memorandum, Mr. Trump argues what is identified as ground four here before what is identified as ground three here. This opinion discusses Mr. Trump's arguments in the sequence noted above.

defamatory statements in response to Ms. Carroll's accusation.

*Statement One*

Two hours and seventeen minutes after Ms. Carroll's accusation became public, Mr. Trump published this statement on Twitter[5]:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

> "Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

> "Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

> "False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

---

[5] Mr. Trump testified in his deposition that he provided the statement to his staff to give to the press. Dkt 135-3 (Def. Dep.) at 59:20-23.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[6]

*Statement Two*

The next day, Mr. Trump made the following comments that were reported in the national press and published in a White House press release entitled "Remarks by President Trump Before Marine One Departure" issued on June 22, 2019:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

"[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

"[Reporter]: You were in a photograph with her.

"[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going

---

[6] Dkt 157-1 (Pl. Amend. Compl.) at 15-16, ¶ 83.

On June 13, 2023, this Court granted Ms. Carroll's motion to amend her complaint. The amended complaint did not add any new claims or otherwise change the focus of her original complaint. Unless indicated otherwise, citations to Ms. Carroll's complaint are to the amended complaint.

on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

"And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

"New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

"It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

"You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

"But here's a case, it's an absolute disgrace that she's allowed to do that."[7]

*Statement Three*

Finally, on June 24, 2019, Mr. Trump stated in an interview with the newspaper *The Hill*: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[8]

*Ms. Carroll's Defamation Claim*

Ms. Carroll initiated this lawsuit against Mr. Trump in November 2019 for defaming her in these statements. The case originally began in a state court in New York before being removed to this Court for reasons explained in the Court's previous decisions.[9] Ms. Carroll alleges that:

"When [her] account [of the alleged assault] was published, Trump lashed out with a series of false and defamatory statements. He denied the sexual assault. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also

---

[7]     *Id.* at 18, ¶ 92.

[8]     *Id.* at 20, ¶ 98.

[9]     *E.g.*, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312, at *4 (S.D.N.Y. Feb. 15, 2023); *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022), *remanded in part*, 66 F.4th 91 (2d Cir. 2023).

8

deliberately implied that she had falsely accused other men of assault. For good measure, he insulted her physical appearance."[10]

The core of Ms. Carroll's defamation claim is that Mr. Trump lied in accusing her of fabricating her sexual assault allegation against him in order to increase sales of her book and for other improper purposes and that he thus caused Ms. Carroll professional and reputational harm as well as emotional pain and suffering.

*Mr. Trump's Answer*

In his formal answer to Ms. Carroll's complaint, which originally was filed in state court in February 2020, Mr. Trump raised nine affirmative defenses, including as relevant here that:

- "[t]he [c]omplaint fails to state a cause of action,"

- "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States,"

- "[t]he allegedly defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States,"

- "Plaintiff is not entitled to punitive damages as a matter of law," and

- "Plaintiff has not sufficiently alleged defamation *per se*," and

---

[10]

*Id.* at 3, ¶ 11.

- "Plaintiff has failed to plead damages with the required specificity."[11]

Noticeably missing from this list is any mention of the absolute presidential immunity defense that Mr. Trump now asserts for the first time.[12]

## *Discussion*

*Legal Standard*

The standards for summary judgment are well established.  In brief:

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law.  . . . In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. . . . To grant the motion, the court must determine that there is no genuine issue of material fact to be tried. . . . The Supreme Court teaches that 'all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' . . . It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the

---

[11]  Dkt 14-69 (Def. Answer).

[12]  Nor did Mr. Trump seek to add this defense to his answer when he moved to amend his answer in January 2022 to add an affirmative defense and counterclaim based on New York's "anti-SLAPP" law.  Dkt 63.

jury, not for the court on a motion for summary judgment.'"[13]

"A material fact is one that might 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [fact finder] could return a verdict for the nonmoving party.'"[14]

*Ground One: Absolute Presidential Immunity*

      In *Nixon v. Fitzgerald*,[15] the Supreme Court held that the President of the United States is entitled to "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility."[16]  Mr. Trump argues that the allegedly defamatory statements in this case came within this "outer perimeter" because he made those statements "in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation."[17]

      Before the Court even may address the merits of Mr. Trump's absolute immunity defense, it must decide a threshold question: whether Mr. Trump is barred from raising this defense

---

[13]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (alterations in original) (citations omitted).

[14]     *Madison Nat. Life Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 462 F. App'x 102, 103–04 (2d Cir. 2012) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[15]     457 U.S. 731 (1982).

[16]     *Id.* at 756.

[17]     Dkt 109 (Def. Mem.) at 17.

11

because he waived it by failing to raise it earlier. Mr. Trump does not dispute that, under the controlling rules of civil procedure, he waived the defense by failing to plead it as an affirmative defense in his answer.[18] Instead, he contends that any such waiver can have no effect because absolute presidential immunity is an unwaivable obstacle to any court exercising subject matter jurisdiction over any claim within its ambit. In the alternative, if the Court determines that absolute presidential immunity can be waived, Mr. Trump argues that his motion for summary judgment should be construed as a motion for leave to amend his answer so that he can assert the absolute immunity defense. Neither argument is persuasive.

### *Absolute Presidential Immunity Can Be Waived*

Mr. Trump argues that "whether presidential immunity applies in this case is a non-waivable question of subject matter jurisdiction."[19] His argument relies on the theory that absolute presidential immunity is non-waivable because it is different from absolute immunity available to judges and prosecutors – which decidedly is waivable – due to what he claims, mistakenly, is "its

---

[18]

In the table of contents to Mr. Trump's reply brief, the first argument heading reads: "Defendant did not waive his entitlement to presidential immunity." Dkt 122 (Def. Reply Mem.) at I. However, that heading never reappears in his brief. Instead, the first heading of his argument section is "Presidential immunity cannot be waived," followed by his argument that Ms. Carroll's claim that he waived his absolute immunity defense by failing to raise it in his answer "is flawed in its premise" because absolute presidential immunity is not waivable. *Id.* at 1. In a recent letter, Mr. Trump again did not dispute that he waived the defense and instead wrote that he "unequivocally stated that absolute immunity is a non-waivable question of subject matter jurisdiction." Dkt 160 at 2. It accordingly is clear that Mr. Trump does not dispute that if absolute presidential immunity can be waived, he in fact waived it in this case.

[19]

Dkt 122 (Def. Reply Mem.) at 5.

12

unique rooting in the separation of powers doctrine."[20]

Absolute presidential immunity is no such anomaly. There is nothing so exceptional about absolute immunity available to a president that makes it non-waivable unlike other types of absolute immunity. For starters, "[m]ost immunities are affirmative defenses."[21]  Failure to assert an affirmative defense, including absolute immunity, in an answer or other responsive pleading results in waiver of that defense.[22]  Moreover, as the Supreme Court has stated, "[t]here is no

---

[20]

    *Id.*

[21]

    *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003). *See also San Filippo v. U.S. Tr. Co. of New York*, 737 F.2d 246, 252 (2d Cir. 1984) ("In their answer and amended answer, defendants asserted several affirmative defenses, including their absolute immunity from § 1983 liability for their grand jury testimony or prior discussions with the prosecutor.").

[22]

    As noted above, Mr. Trump's answer first was filed in a state court in New York before this case was removed to this Court. Assuming his answer was governed by New York's Civil Practice Law and Rules, he was required to plead absolute immunity as an affirmative defense in his answer or in a pre-answer motion.  N.Y. CPLR § 3018(b) ("A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading."); *Pitts v. State*, 166 A.D.3d 1505, 1506 (4th Dept. 2018) ("Defendant waived that affirmative defense [of governmental function immunity] inasmuch as defendant did not plead it in its amended answer.") (citing cases).

    The result would be the same if Mr. Trump's answer were governed by Federal Rule of Civil Procedure 8(c), which requires a party to "affirmatively state any . . . affirmative defense" in responding to a pleading. *E.g.*, 5 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1278 (4th ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by [Rule] 8(c) results in the waiver of that defense and its exclusion from the case.") (citing cases); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) ("Appellees mention an absolute immunity defense in passing, but that defense is considered waived since it only appears in a footnote. . . .  And we decline to overlook the waiver."); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) ("Absolute immunity is an affirmative defense that should be asserted in an answer."); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) ("It is well established that unless affirmatively pleaded, the defenses of qualified and absolute immunity are waived."); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994) ("[T]his

authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction."[23]   To prevail in his argument, Mr. Trump must demonstrate that absolute immunity available to a president deviates from these well-settled norms. He has not done so.

The focal point of Mr. Trump's reasoning is the foundation of absolute presidential immunity in separation of powers principles.  His argument goes: (1) absolute presidential immunity is grounded in the separation of powers doctrine, (2) "the separation of powers doctrine is a creature of Article III standing" and "Article III standing, in turn, is an issue of subject matter jurisdiction,"[24] and (3) absolute presidential immunity therefore is an unwaivable obstacle to the exercise of subject matter jurisdiction. His theory fails for two reasons. First, absolute presidential immunity is not the only type of absolute immunity that raises separation of powers concerns. Second, and more importantly, "separation of powers" is not a magic phrase that automatically transforms any issue it touches into an impediment to the exercise of subject matter jurisdiction. Indeed, a determination that absolute presidential immunity is an issue of subject matter jurisdiction would present its own separation of powers concerns and contravene many of the same principles that underpin absolute presidential immunity.

The Supreme Court in *Nixon v. Fitzgerald* determined that absolute presidential

---

[23]   Court has long held that both qualified and absolute immunity are affirmative defenses that must be pleaded."); *Boyd v. Carroll*, 624 F.2d 730, 732–33 (5th Cir.1980) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded.").

[24]   *Nevada v. Hicks*, 533 U.S. 353, 373 (2001). *See also Mordkofsky v. Calabresi*, 159 F. App'x 938, 939 (11th Cir. 2005) ("[J]udicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction.").

Dkt 122 (Def. Reply Mem.) at 3.

14

immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."[25]  In reaching its decision, the Court discussed common law precedents that recognized immunity for government officials, including absolute immunity for judges and prosecutors.[26]  These precedents, the Court noted, "have been guided by the Constitution, federal statutes, and history" and "at least in the absence of explicit constitutional or congressional guidance," they "have been informed by the common law."[27]  With respect to absolute presidential immunity, the Court explained:

> "Because the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure. Historical inquiry thus merges almost at its inception with the kind of 'public policy' analysis appropriately undertaken by a federal court. This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers."[28]

The heart of the separation of powers doctrine invoked in *Fitzgerald* is respect for the independence of the three branches of government. "In the often-quoted words of Justice Jackson: 'While the Constitution diffuses power the better to secure liberty, it also contemplates that practice

---

[25]

457 U.S. at 749.

[26]

*Id.* at 744-48.

[27]

*Id.* at 747.

[28]

*Id.* at 748.

will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'"[29]  Accordingly, one of the central bases justifying absolute *judicial* immunity is the need to protect the "independence without which no judiciary can be either respectable or useful."[30]  Absolute *prosecutorial* immunity, although perhaps a bit removed from the constitutional doctrine of separation of powers, similarly is rooted in the "concern that harassment by unfounded litigation" could "shade [a prosecutor's] decisions instead of exercising the independence of judgment required by his public trust."[31]  Given the overlaps in reasoning, it is unsurprising that the Court in *Fitzgerald* compared explicitly the absolute immunity it recognized for the president with that already recognized for judges and prosecutors.[32]

---

[29]     *Morrison v. Olson*, 487 U.S. 654, 694 (1988) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J., concurring)).

[30]     *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). *See also id.* ("If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away.").

[31]     *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).

[32]     457 U.S. at 758 ("For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends."); *id.* at 751-52 ("As is the case with prosecutors and judges— for whom absolute immunity now is established—a President must concern himself with matters likely to 'arouse the most intense feelings.') (citation omitted).  *See also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) ("We instead [(in *Fitzgerald*)] drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties" by the prospect of civil liability for official acts.'") (quoting *Fitzgerald*, 457 U.S. at 751-752 & n.32).

Perhaps aware of these comparisons, Mr. Trump does not argue specifically that absolute presidential immunity is distinct from absolute judicial and prosecutorial immunity by its foundation in separation-of-powers principles.  Instead, he cites a footnote in *Harlow v. Fitzgerald*, in which the Supreme Court stated that "the recognition of absolute immunity

Moreover, the fact that presidential immunity is grounded in separation of powers principles does not convert it into a jurisdictional issue. Mr. Trump relies chiefly on two points in support of his argument to the contrary. Neither withstands analysis.

First, he quotes the following from *Fitzgerald*:

> "[O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . or to vindicate the public interest in an ongoing criminal prosecution . . . the exercise of jurisdiction has been held warranted. In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not."[33]

Mr. Trump's selected passage, however, omits the sentence preceding it, that "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."[34]   Even more to the point, "[j]urisdiction . . . is a word of many, too many,

---

for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." 457 U.S. 800, 811 n.17 (1982). *Harlow*, however, dealt with the scope of immunity available to aides and advisers of the President and held that presidential aides are entitled to qualified, rather than absolute, immunity.  It therefore is inapposite here.

[33]

Dkt 122 (Def. Reply Mem.) at 2 (alterations in original) (emphasis omitted) (quoting *Fitzgerald*, 457 U.S. at 754).

[34]

*Fitzgerald*, 457 U.S. at 753-54.

17

meanings."[35]  And the Court in *Fitzgerald* did not use the word "jurisdiction" in reference to a

federal court's fundamental ability to adjudicate a case on its merits. Indeed, it there specifically left

unresolved the "the immunity question as it would arise if Congress expressly had created a damages

action against the President of the United States."[36]  If the Court had understood presidential

immunity as a restriction on a court's exercise of subject matter jurisdiction, there would have been

no need for the Court to have left that question open. The possibility would have been foreclosed by

the long-standing principle that Congress cannot expand the scope of federal courts' jurisdiction

beyond what is permitted by Article III.[37]

This detail helps to underscore the confusion in Mr. Trump's second point that "the

separation of powers doctrine is a creature of Article III standing."[38]  As the cases Mr. Trump quotes

make clear, it is Article III standing that "is built on separation-of-powers principles," not *vice

versa*.[39]  Therefore, although Article III standing of course is an issue of subject matter jurisdiction,

it does not follow that the separation of powers doctrine in all circumstances is as well.  Mr. Trump's

---

[35]

    *Wilkins v. United States*, 143 S. Ct. 870, 875 (2023) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006)).

[36]

    *Fitzgerald*, 457 U.S. at 748 n.27.

[37]

    *Marbury v. Madison*, 5 U.S. 137, 138 (1803); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 65 (1996); *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 66 (2d Cir. 2012) ("Neither we nor Congress may [expand the federal courts' subject matter jurisdiction], for the Constitution alone defines the outer limits of subject-matter jurisdiction.").

[38]

    Dkt 122 (Def. Reply Mem.) at 3.

[39]

    *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

argument in this respect lacks logical coherence and plainly is frivolous.

More fundamentally, Mr. Trump's argument that absolute presidential immunity is jurisdictional runs afoul of many of the same principles on which the immunity is based. As the Supreme Court stated in *Clinton v. Jones*,[40] the "dominant concern [in *Fitzgerald*] was with the diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision."[41] The Court was concerned with intruding on the president's scope of authority and ability to make decisions to govern effectively. It sought to protect the president's autonomy, not diminish it by denying the president the ability to choose whether or not to defend himself or herself in a civil lawsuit in federal court. As law professor Akhil Amar and former Solicitor General Neal Katyal wrote:

> "[The president's] immunity is of course waivable . Surely the President in whatever spare time he has should be allowed to litigate civil damage actions — or to watch basketball for that matter — but he should not be legally obliged to do either. As a practical matter, politics may sometimes create strong pressure to litigate now — or, again, to watch a basketball game — but political pressure should not be confused with legal obligation. In a civil damage action in the early 1960s, then-President John Kennedy asserted litigation immunity under a statute. When that failed, he settled the case instead of asserting presidential immunity . . . ."[42]

---

[40]

520 U.S. 681 (1997).

[41]

*Id.* at 694 n.19.

[42]

Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 HARV. L. REV. 701, 726 n.53 (1995).

19

Yet the rule Mr. Trump advocates would remove this choice from the president. Under Mr. Trump's approach, each time a president is sued in federal court, the court would be obligated to raise and resolve the issue of absolute presidential immunity *sua sponte* and, if the defense applied, it would be obligated to dismiss the case for want of subject matter jurisdiction *even if* the president wished to litigate in that case. Such a requirement would contradict the results in many of the other civil lawsuits filed against Mr. Trump for actions during his presidency, in at least one of which, as Ms. Carroll points out, Mr. Trump agreed with the plaintiff that absolute presidential immunity was not a "threshold issue[] that must be decided before reaching the merits."[43] More importantly, it would risk encroachment by the judiciary into the president's domain by eliminating the president's ability to choose. There is no indication in *Fitzgerald* or in its progeny that absolute presidential immunity ever was meant to be so patronizing.

### Leave to Amend Mr. Trump's Answer Is Not Warranted

In the alternative, Mr. Trump argues that the Court should construe his motion for summary judgment as a motion for leave to amend his answer to resurrect the previously waived absolute presidential immunity defense. The standard governing this request is clear. Although Rule

---

[43] *K&D, LLC v. Trump Old Post Off., LLC*, No. CV 17-731 (RJL), 2018 WL 6173449, at *3 (D. D.C. Nov. 26, 2018), *aff'd*, 951 F.3d 503 (D.C. Cir. 2020) (emphasis omitted).

There possibly is an argument that Mr. Trump is judicially estopped from taking the opposite position now in this case. *See Clark v. AII Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018) ("[T]he equitable doctrine of judicial estoppel . . . 'prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.'") (citation omitted). Given that neither party has briefed this issue and it is unnecessary to my decision, I do not address it here.

20

15(a) provides that leave to amend "shall be freely given when justice so requires,"[44] "it is within the sound discretion of the district court to grant or deny leave to amend."[45]  "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[46]

Mr. Trump's request is denied on two independent grounds. First, it is denied on the ground that the proposed amendment would be futile. In the alternative, it is denied on the ground that Mr. Trump delayed unduly in raising his presidential immunity defense and granting his request would prejudice Ms. Carroll unfairly.

*Futility of Mr. Trump's Proposed Amendment*

A motion for leave to amend an answer to assert an affirmative defense may be denied as futile when the affirmative defense would be meritless.[47]  "In fact, it is unexceptional for federal courts to deny leave to amend on the basis of futility where the proposed amended pleading would not withstand a motion to dismiss."[48]

---

[44]

    Fed. R. Civ. P. 15(a).

[45]

    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted).

[46]

    *Id.*

[47]

    *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, 403 F. App'x 530, 532–33 (2d Cir.2010)*; Fireman's Fund Ins. Co. v. Krohn*, No. 91-cv-3546 (PKL), 1993 WL 299268, at *3 (S.D.N.Y. Aug. 3, 1993) (citing cases).

[48]

    *Carroll v. Trump*, 590 F. Supp. 3d 575, 579 (S.D.N.Y. 2022) (citing cases).

As noted above, the president is entitled to absolute immunity from liability in civil damages lawsuits "for acts within the 'outer perimeter' of [the president's] official responsibility."[49] The expansive scope of this immunity is based on "the special nature of the President's constitutional office and functions," the president's "discretionary responsibilities in a broad variety of areas, many of them highly sensitive," and the "difficult[y] [in] determin[ing] which of the President's innumerable 'functions' encompass[] a particular action."[50]  Implicit in that statement of the scope of presidential immunity, however, is the acknowledgment that there indeed is an "outer perimeter" of the president's official duties, and that the president is not immune from liability for acts outside that perimeter. As the Supreme Court explained in *Jones*:

> "The principal rationale for affording certain public servants immunity from
> suits for money damages arising out of their official acts is inapplicable to unofficial
> conduct. . . .  As we explained in *Fitzgerald*, 'the sphere of protected action must be
> related closely to the immunity's justifying purposes.' . . . Because of the President's
> broad responsibilities, we recognized in that case an immunity from damages claims
> arising out of official acts extending to the 'outer perimeter of his authority.' . . . But
> we have never suggested that the President, or any other official, has an immunity
> that extends beyond the scope of any action taken in an official capacity."
>
> "Moreover, when defining the scope of an immunity for acts clearly taken
> *within* an official capacity, we have applied a functional approach. 'Frequently our

---

[49]

*Fitzgerald*, 457 U.S. at 756.

[50]

*Id*.

decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office.'. . . As our opinions have made clear, immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'"[51]

Mr. Trump argues that he is entitled to absolute presidential immunity because he "made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation."[52]  He states that:

> "As both the leader of the nation and head of the Executive Branch, [he] could not sit idly while a 'media frenzy' erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to 'maintain the continued trust and respect of [his] constituents' and to 'preserve his ability to carry out his [] responsibilities.' . . . Thus, it cannot be reasonably disputed that [Mr. Trump's] conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation."[53]

Mr. Trump accordingly contends that his responses to Ms. Carroll's accusation "fell squarely within

---

[51]    520 U.S. at 692–95 (emphasis in original) (citations omitted).

[52]    Dkt 109 (Def. Mem.) at 17.

[53]    *Id.* (citations omitted).

the 'outer perimeter' of [his] official duties as President."[54]

The fatal flaw in Mr. Trump's reasoning is that he ignores the precise acts that are the subject of this lawsuit. For the sake of argument, the Court assumes that, when Mr. Trump responded to Ms. Carroll's sexual assault accusation, he was addressing a matter of public concern because the accusation "impugned his character and, in turn, threatened his ability to effectively govern the nation."[55] It accepts also, for the sake of argument, that the president's speech on a matter of public concern comes within the president's official responsibilities. These points, however, do not lead to the conclusion that Mr. Trump's statements in this case came within the outer perimeter of his official duties as president. As Judge Mehta thoughtfully wrote in another case where Mr. Trump asserted an absolute presidential immunity defense, an analysis with which this Court agrees:

"[T]o say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: '[T]o construct an immunity from suit for unofficial acts

---

[54]

*Id.* at 16.

[55]

*Id.* at 17. *See Snyder v. Phelps,* 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'") (citations omitted).

grounded purely in the identity of [the President's] office is unsupported by precedent.'. . . And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: 'Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty.'. . . Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

"Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to 'punch' a protester 'in the face right now.' Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is blocking the legislation of running a child-trafficking operation. Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support. In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech. To be sure, these scenarios may seem far-fetched, but they illustrate an important point: blanket immunity cannot shield a President from suit merely because his words touch on

matters of public concern. *The context in which those words are spoken and what is said matter*."[56]

The conduct at issue here consists not only of what Mr. Trump did (*i.e.*, make public statements in response to Ms. Carroll's accusation) but also, and importantly, the *content* of his statements (*i.e.*, what he said in his statements). Mr. Trump did not merely deny Ms. Carroll's accusation of sexual assault. Instead, he accused Ms. Carroll of lying about him sexually assaulting her in order to increase sales of her book, gain publicity, and/or carry out a political agenda. Even assuming that the president's decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that the president's own personal attacks on his or her accuser equally fall within that boundary. Mr. Trump does not identify any connection between the allegedly defamatory content of his statements – that Ms. Carroll fabricated her sexual assault accusation and did so for financial and personal gain – to any official responsibility of the president. Nor can the Court think of any possible connection.

The justifying purposes of presidential immunity support this determination. The fundamental purpose of presidential immunity is to avoid "diversion of [the president's] energies" and "distract[ing] a President from his [or her] public duties" by subjecting the president to "concern with private lawsuits."[57] It is not a "get out of damages liability free" card that permits the president to say or do anything he or she desires even if that conduct is disconnected entirely from an official function. On the facts presented here, there is no concern that the president "would be subject . . .

---

[56]

     *Thompson v. Trump*, 590 F. Supp. 3d 46, 79–80 (D. D.C. 2022) (emphasis added) (citations omitted).

[57]

     *Fitzgerald*, 457 U.S. at 751–53.

to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose."[58]  The question of whether presidential immunity applies in this case turns not on an allegation that Mr. Trump acted unlawfully or made the statements with actual and common law malice, but on whether the act itself – accusing an individual who has charged the president with a personal wrongdoing of fabricating the charge for ulterior and improper purposes – is within the outer perimeter of the president's official responsibility.[59]  Subjecting the president to damages liability for making a personal attack that is unrelated to the president's official responsibilities would not threaten to distract the president from his or her official duties.

*Undue Delay and Unfair Prejudice*

Leave to amend is denied also on the basis of undue delay, dilatory motive, bad faith and/or prejudice to the opposing party.

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith. . . . However, '*the longer the period of an unexplained delay, the less will be required of the*

---

[58]
   *Id.* at 756.

[59]
   Mr. Trump compares this case to *Barr v. Matteo*, 360 U.S. 564 (1959), where the Supreme Court determined that the director of a federal agency was protected by an absolute privilege in a libel action brought by former employees based on a press release in which the director announced his intention to suspend the employees. The Court stated that "[t]e fact that the action here taken was within the outer perimeter of [the director's] line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint."  *Id.* at 575.  The decision in that case makes no difference to the analysis here.  As noted above, the question of whether presidential immunity applies here does not require crediting Ms. Carroll's allegation of malice or any consideration of Mr. Trump's motives.  His accusation against Ms. Carroll, which forms the basis of Ms. Carroll's defamation claim, suffices to render his presidential immunity defense meritless.

> *nonmoving party in terms of a showing of prejudice.*' . . . In determining what
> constitutes 'prejudice,' we consider whether the assertion of the new claim would:
> (I) require the opponent to expend significant additional resources to conduct
> discovery and prepare for trial; (ii) significantly delay the resolution of the dispute;
> or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction....
> 'Mere delay, however, absent a showing of bad faith or undue prejudice, does not
> provide a basis for a district court to deny the right to amend.'"[60]

Mr. Trump's three-year delay in raising his presidential immunity defense, for which he offers no
explanation, coupled with the unfair prejudice that would result from an amendment for this purpose
to Ms. Carroll, warrant denial of leave to amend.

The Court has set forth in its prior opinions the record of Mr. Trump's efforts to delay
both this case and *Carroll II*.[61] Those details need not be repeated here. It suffices for present
purposes to note that the Court denied Mr. Trump's prior request for leave to amend his answer in
January 2022. Mr. Trump then sought leave to amend to assert an affirmative defense and
counterclaim based on New York's "anti-SLAPP" law and to argue that Ms. Carroll's defamation

---

[60]

    *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (emphasis added) (citations omitted).

[61]

    *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2960061 (S.D.N.Y. Apr. 17, 2023) (denying Mr. Trump's application for a month-long postponement of the trial of *Carroll II*); *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023) (denying Mr. Trump's offer to provide a DNA sample in exchange for production by Ms. Carroll of an undisclosed appendix to a report examining the DNA found on the dress Ms. Carroll wore when she was assaulted); *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) (denying Mr. Trump's motion to substitute the United States for him as the defendant and to stay the action); *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022) (denying Mr. Trump's motion for leave to amend his answer).

claim is baseless and intended for harassment.  That motion was denied on two alternative grounds.

First, on the basis that the proposed amendment would be futile.  Second, on the additional ground

that Mr. Trump's motion was delayed unduly and made at least in part for a dilatory purpose. As the

Court explained:

> "[D]efendant's actions have been dilatory throughout the litigation. As [Ms.
> Carroll] aptly puts it, he 'has slow-rolled his defenses, asserting or inventing a new
> one each time his prior effort to delay the case fails. . . . Taken together, these actions
> [(the history of defendant's motions to stay and other litigation conduct)] demonstrate
> that defendant's litigation tactics have had a dilatory effect and, indeed, strongly
> suggest that he is acting out of a strong desire to delay any opportunity plaintiff may
> have to present her case against him."[62]

Since that decision was issued in March 2022, Mr. Trump's conduct both in this case and in *Carroll*

*II* – as discussed in detail in my prior decisions and incorporated herein by reference – only has

corroborated the Court's earlier hypothesis of his dilatory motive.

These facts perhaps would suffice on their own to deny Mr. Trump's request for leave

to amend. But the Court does not rely solely on them in denying the relief Mr. Trump seeks. The

unfair prejudice to Ms. Carroll if leave to amend were granted also is clear.

The effect of granting leave, and thus relieving Mr. Trump of his prior waiver, even

assuming his absolute immunity defense were meritorious, would be the dismissal of this case.  And,

to be sure, the dismissal, in and of itself, would not be *unfair* prejudice to Ms. Carroll because it

---

[62]    *Carroll*, 590 F. Supp. 3d at 588.

would reflect the fact that there was an insurmountable obstacle to her claim in the first place. But such a dismissal cannot be considered in isolation. Ms. Carroll now has litigated this case for more than three and a half years. She has completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before Court, the Second Circuit and the D.C. Court of Appeals, and devoted untold hours and resources to pursuing her claim. And that weighs very heavily in the analysis. For, if Mr. Trump's absolute immunity argument were valid, his failure to assert it at the outset of this lawsuit needlessly, unfairly, and inexcusably subjected Mr. Carroll to all of those burdens. The undue delay in asserting the defense thus was inherently and unfairly prejudicial even if this Court is mistaken in concluding that it is legally insufficient.

Finally, there is the one more consideration. If Mr. Trump were granted leave to amend and this Court were to reject his absolute immunity claim, the order doing so likely would be appealable. No doubt Mr. Trump would appeal. And an appeal likely would cause "significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings."[63] Were this Court's rejection of his defense upheld on appeal, those additional delays would further prejudice Ms. Carroll unfairly. She now is 79 years old and, as just mentioned, has been litigating this case for more than three and a half years. There is no basis to risk prolonging the resolution of this litigation further by permitting Mr. Trump to raise his absolute immunity defense now at the eleventh hour when he could have done so years ago.

For all these reasons, leave to amend would be unjustified.

---

[63] Dkt 113 (Pl. Opp. Mem.) at 15.

*Ground Two: Defamatory Per Se*

Mr. Trump's remaining arguments concern the substance of his allegedly defamatory statements. First, he argues that his statements were not defamatory *per se*. As this Court stated in denying Mr. Trump's motion to dismiss Ms. Carroll's defamation claim in *Carroll II* on the same basis:

> "There are two categories of defamation under New York law: *libel*, for written statements, and *slander*, for spoken statements. Written statements actionable as libel include statements published on social media outlets and on the Internet....
>
> "A written statement is libelous *per se* if it '*tends* to disparage a person in the way of his [or her] office profession or trade.' A writing also is libelous *per se* if it 'tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her].' . . .
>
> "Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation of the higher standard applied to slander *per se* with the lower standard for libel *per se*. Mr. Trump argues that there are 'four narrowly defined categories of statements which are considered to be defamatory *per se*,' and that Ms. Carroll has failed to state a claim for defamation *per se* 'because it does not, on its face, defame [P]laintiff in her trade, business or profession,' one of the four categories. However, nearly every authority Mr. Trump cites, including the case identifying those four categories and the cases describing the category of injury in one's profession are slander *per se*, not libel, cases. Unlike a libelous *per se* statement, a slanderous *per*

*se* statement 'must be made with reference to a matter of significance and importance for that purpose [(of defaming a person in his or her trade, business, or profession)], rather than a more general reflection upon the plaintiff's character or qualities.' Moreover, if a complaint fails to allege sufficient facts to state a claim for slander *per se*, 'the plaintiff must show . . . that the statement complained of caused him or her special harm" – generally "the loss of something having economic or pecuniary value.' The more stringent standard for slander *per se* is grounded in sound logic: 'What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and perpetuates the scandal.'"[64]

Much of the same analysis applies to Mr. Trump's argument with respect to his 2019 statements. Mr. Trump concedes that his June 21, 2019 statement, which he provided in written form to his staff to distribute to the press, "can be considered under the libel *per se* standard."[65]  His other two statements similarly sound in libel rather than slander. "Where a defamatory statement is oral, but is expected by the speaker to be reduced to writing and published, and is subsequently communicated in written form, such statement constitutes a libel."[66]  "A statement made to a person known to be by the speaker to be a working newspaper reporter, for example, will be treated as libel,

---

[64]     *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507, at *10-11 (S.D.N.Y. Jan. 13, 2023) (emphases and alterations in original).

[65]     Dkt 122 (Def. Reply Mem.) at 9.

[66]     *Park Knoll Assocs. v. Schmidt*, 89 A.D.2d 164, 168 (2d Dept. 1982), *rev'd on other grounds*, 59 N.Y.2d 205 (1983) (citing ROBERT D. SACK, LIBEL AND SLANDER AND RELATED PROBLEMS § 2:3, p. 44)); *see also Macineirghe v. Cnty. of Suffolk*, No. 13-cv-1512 (ADS)(SIL), 2015 WL 4459456, at *9 (E.D.N.Y. July 21, 2015).

provided the statement is thereafter communicated in written form."[67]  Mr. Trump made the other

two June 2019 statements to individuals he knew to be reporters. He does not argue that he did not

understand his remarks would be publicly reported in writing.[68]  All three of Mr. Trump's June 2019

statements therefore properly are assessed under the libel *per se* standard.

 Ms. Carroll adequately has alleged that Mr. Trump's statements are libelous *per se*.

As in his 2022 statement, in his 2019 statements – particularly in his first two statements issued on

June 21, 2019 and June 22, 2019, respectively – he accuses Ms. Carroll of making up a "totally false

accusation" "to sell a new book" and "for the sake of publicity." As the Court wrote previously:

> "Ms. Carroll is a 'writer, advice columnist, and journalist.' Honesty and
> credibility are critical to these professions, which rely heavily on the trust and
> confidence of their audiences. A writer who writes about his or her own experiences,
> as Ms. Carroll did, depends on his or her readers believing the writer, which they may
> be less inclined to if the writer is called dishonest. The October 12 statement – in
> addition to accusing Ms. Carroll of 'completely ma[king] up a story' about Mr.
> Trump – states that Ms. Carroll 'changed her story from beginning to end' during an
> interview 'where she was promoting a . . . book.' Drawing all reasonable inferences

---

[67] ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:3 (4th ed. 2011).

[68] Indeed, with respect to the June 22, 2019 statement that Mr. Trump made to reporters before boarding Marine One, when Mr. Trump was asked during his deposition whether it is "fair to say that when [he] made comments while [he was] president on [his] way to somewhere . . . on [his] way to boarding Air Force One or Marine One that a transcript would be created like this [(transcript of the June 22, 2019 statement)] and released by [his] press office," he responded "oftentimes."  Dkt 117-6 (Def. Dep.) at 64:4-10.

in favor of plaintiff, the October 12 statement on the whole can be construed as Ms.
Carroll falsely accusing Mr. Trump of rape in order to promote her book and increase
its sales. Based on the facts alleged in the complaint, Ms. Carroll has sufficiently
pleaded a claim of libel *per se* because the October 12 statement may have affected
her in her profession by 'imputing to [her] . . . fraud, dishonesty, [and/or] misconduct
. . . .'"[69]

Similarly, Mr. Trump's 2019 statements reasonably can be construed as tending to
disparage Ms. Carroll in the way of her profession and/or by exposing her to hatred, contempt or
aversion or inducing an evil or unsavory opinion of her in the minds of a substantial number of the
community. Mr. Trump's contention that the statements "do not reference Plaintiff's profession as
an advice columnist, nor do they touch upon Plaintiff's 'Ask E. Jean' column" is inapposite to the
libel *per se* standard, which requires no such specific references.[70]  Nor was Ms. Carroll required to
plead special damages because she has sufficiently pleaded the elements of a libel *per se* claim.  Mr.
Trump's second argument to dismiss Ms. Carroll's claim therefore is without merit.


*Ground Three: Nonactionable Opinion*

Related also to the substance of his allegedly defamatory statements, Mr. Trump
argues that "nearly all of the content contained in the statements are immaterial since they constitute

---

[69]

*Carroll*, 2023 WL 185507, at *11 (emphases and alterations in original).

[70]

Dkt 122 (Def. Reply Mem.) at 9.

protected opinion speech."[71]   Specifically, he contends that "aside from [his] repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation."[72]

Statements of opinion are not actionable as defamation "however unreasonable the opinion or vituperous the expressing of it may be."[73]   "While it is clear that expressions of opinion receive absolute constitutional protection . . . , determining whether a given statement expresses fact or opinion may be difficult. The question is one of law for the court and one which must be answered on the basis of what the average person hearing or reading the communication would take it to mean."[74]

The New York Court of Appeals has identified three factors relevant to determining whether an average person would understand a statement as conveying fact or opinion:

"'(1) [W]hether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to

---

[71]    Dkt 109 (Def. Mem.) at 30.

[72]    *Id.* at 33.

[73]    *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977).

[74]    *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986).

be opinion, not fact[.]'"

"The third factor 'lends both depth and difficulty to the analysis' . . . , and requires that the court consider the content of the communication as a whole, its tone and apparent purpose. Thus, we have adopted a holistic approach to this inquiry. Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.'"[75]

"The dispositive inquiry . . . is whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff."[76]

Mr. Trump has not addressed the first and third factors. In any event, both weigh against his position. Mr. Trump "used specific, easily understood language to communicate" that Ms. Carroll made up a false story about Mr. Trump sexually assaulting her to increase sales of her book, to get publicity, and/or for political reasons.[77]   Indeed, the third sentence of his June 21, 2019 statement makes plain his central message that "[s]he [(Ms. Carroll)] is trying to sell a new book – that should indicate her motivation." Considering each statement as a whole, there is nothing vague or ambiguous about the statements that would make it difficult for an average reader to appreciate

---

[75]

      *Davis v. Boeheim*, 24 N.Y.3d 262, 269–70 (2014) (citations omitted).

[76]

      *Id.* (alterations in original) (internal quotation marks and citation omitted).

[77]

      *Id.* at 271.

their main point: that Ms. Carroll lied and her motives for lying.

The contexts in which the statements were made also convey that they were assertions of fact. The heading of the June 21, 2019 statement reads "Statement from President Donald J. Trump" and was prepared by Mr. Trump to distribute to the press. The June 22, and June 24, 2019 statements were made to reporters, the former expected by Mr. Trump to be transcribed and released by his press office and the latter made by Mr. Trump in the course of an exclusive interview with a newspaper focused on political coverage. Unlike other contexts that courts have determined tended to signal expressions of opinion, such as the Republican presidential primary debate or a character-limited post on Twitter,[78] the circumstances here indicate that Mr. Trump's apparent purpose was to state that Ms. Carroll falsely accused him of sexual assault for financial and/or personal gain as a matter of fact, not as a matter of his personal belief or opinion.

The only factor that Mr. Trump touches upon is the second, whether the statements are capable of being proven true or false. Mr. Trump argues that his statements are "no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false" and he "was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims."[79]  Courts have determined that statements that an individual made a false accusation or lied for financial or for personal gain are capable of

---

[78]

*Jacobus v. Trump*, 51 N.Y.S.3d 330, 342 (N.Y. Sup. Ct. 2017), *aff'd*, 156 A.D.3d 452, 64 N.Y.S.3d 889 (1st Dept. 2017).

[79]

Dkt 109 (Def. Mem.) at 33.

being proven true or false.[80]  Importantly, Mr. Trump did not use speculative language in stating Ms. Carroll's motives for falsely accusing him of sexual assault. Instead, he stated "[s]hame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda" and "you can't do that for the sake of publicity."  In another portion of his June 21, 2019 statement, he wrote "[t]he world should know what's really going on" after requesting anyone who "has information that the Democratic Party is working with Ms. Carroll" to notify Mr. Trump and his staff. The specificity of Mr. Trump's statements makes clear that he was not merely guessing or speculating as to Ms. Carroll's motive. Instead, he attributes to Ms. Carroll specific and objectively verifiable motives for fabricating her sexual assault accusation.

　　　　　The cases Mr. Trump cites are inapposite. For example, "the loose and generalized statement that [the plaintiffs who brought a sexual harassment lawsuit] 'do not want to work' or 'hold jobs' and simply 'want to make easy money' . . ."[81] and the statement "I think he wanted me to divorce him,"[82] are a far cry from Mr. Trump's clear and definite statement that Ms. Carroll "is

---

[80]

　　　　　*E.g.*, *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225 n.4 (2d Cir. 1985) ("In *Edwards*, we distinguished the epithet 'liar' from the epithet 'paid liar.' We found that unlike calling someone a liar, charging someone with being a paid liar was an assertion of fact. We explained: '[T]o call the appellees, all of whom are university professors, paid liars clearly involves defamation that far exceeds the bounds of the prior controversy.... And, to say a scientist is paid to lie implies corruption, and not merely a poor opinion of his scientific integrity. Such a statement requires a factual basis....'") (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977)); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382 (1977) ("The ordinary and average reader would likely understand the use of these words [(that the plaintiff is "probably corrupt")], in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions.").

[81]

　　　　　*Gentile v. Grand St. Med. Assocs.*, 79 A.D.3d 1351, 1353 (3d Dept. 2010).

[82]

　　　　　*Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996).

trying to sell a new book–that should indicate her motivation," among other assertions he made.

Although some courts have been reluctant to find statements concerning a "plaintiff's frame of mind

and motivation" to be capable of being objectively verifiable,[83] whether or not that is so is a case-

specific determination dependent on the specific statements at issue and the other factors relevant

to this analysis. Here, although there perhaps was a subjective component to Mr. Trump's statements

that Ms. Carroll was trying to increase sales of her book and gain publicity, in these circumstances,

her "state of mind is a fact question [susceptible to proof] the same as any other fact."[84]

All three factors therefore weigh in favor of a determination that Mr. Trump's

statements were factual assertions rather than expressions of opinion.[85]

---

[83]

E.g., *Treppel v. Biovail Corp.*, No. 03-cv-3002 (PKL), 2004 WL 2339759, at *14 (S.D.N.Y. Oct. 15, 2004), *on reconsideration*, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005); *Coleman v. Grand*, 523 F. Supp. 3d 244, 264 (E.D.N.Y. 2021).

In *Immuno AG. v. Moor-Jankowski*, the New York Court of Appeals stated that "[s]peculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel." 74 N.Y.2d 548, 560 (1989). The court's judgment was vacated, 497 U.S. 1021 (1990), and that statement did not appear again in the court's opinion on remand. 77 N.Y.2d 235 (1991). Notably, the original opinion cited to *Rinaldi v. Holt* (cited above, *supra* n. 71). In *Rinaldi*, however, Judge Gabrielli wrote in his dissent: "[a]s the majority quite properly observes, the charge that plaintiff is 'probably corrupt' is a statement of fact and not an expression of opinion," and in a footnote to that statement, he wrote "[a] charge of corruption goes essentially to the motive behind an individual's acts. As one court has noted, '(t)he state of a man's mind is as much a fact as the state of his digestion' (*Edgington v. Fritzmaurice*, 29 Ch.D. 459, 483 (CA))." 42 N.Y.2d at 954 & n.1. It therefore is possible that some of the modern case law on whether a statement as to an individual's state of mind is objectively verifiable is based in part on a misconstruction of the precedents on this issue.

[84]

*Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 134 (2d Cir. 2009) (quoting *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 838 (2d Cir.1994) (Van Graafeiland, J., dissenting)).

[85]

Neither party addresses specifically Mr. Trump's June 24, 2019 statement, in which he said only: "I'll say it with great respect: Number one, she's not my type. Number two, it never

*Ground Four: Consent*

Mr. Trump contends also that Ms. Carroll's claim is barred because she consented to Mr. Trump's allegedly defamatory statements. Under New York law, "[c]onsent is a bar to a recovery for defamation under the general principle of *volenti non fit injuria* or, as it is sometimes put, the plaintiff's consent to the publication of the defamation confers an absolute immunity or an absolute privilege upon the defendant[.]."[86] "Decisions of New York's intermediate appellate courts have established that the consent of the person defamed to the making of a defamatory statement bars that person from suing for the defamation, and that, in some circumstances, a person's intentional eliciting of a statement she expects will be defamatory can constitute her consent to the making of the statement."[87] As the Second Circuit has stated:

"The contours and purposes of the rule are somewhat illuminated by the Restatement (Second) of Torts (1977), which in defamation cases has been cited with approval by the highest court of New York. . . . Section 583 of the Restatement provides, 'Except as stated in § 584, the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for

---

happened. It never happened, OK?". In her complaint, Ms. Carroll alleges that all three June 2019 statements were defamatory. However, as stated above, the crux of Ms. Carroll's defamation claim lies in Mr. Trump's statements that Ms. Carroll lied for financial and/or personal gain. Indeed, Mr. Trump appears to ground his argument that "the majority" of his statements are nonactionable opinion on the assumption that Ms. Carroll does not allege his "general repudiation of Plaintiff's allegations" in itself was defamatory. Dkt 109 (Def. Mem.) at 32. As the parties have not adequately addressed this point, the Court does  not now decide it.

[86]

*Teichner v. Bellan*, 7 A.D.2d 247, 251 (4th Dept. 1959).

[87]

*Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015) (citing cases).

defamation.' Comment d to this Section says, 'It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that . . . he has reason to know that it may be defamatory.' As an illustration, the Restatement notes that a summarily discharged school teacher who 'demands that the reason for his dismissal be made public . . . has consented to the publication [of the reason] though it turns out to be defamatory.' Restatement (Second) of Torts § 583 cmt. d (1977)."[88]

The Reporter's Note to Section 583 of the Restatement provides that "[t]he plaintiff's consent is a defense even though he procures the publication for the purpose of decoying the defendant into a lawsuit."[89]  The Restatement states also that:

"[c]onsent means that the person concerned *is in fact willing* for the conduct of another to occur. Normally this willingness is manifested directly to the other by words or acts that are intended to indicate that it exists. It need not, however, be so manifested by words or by affirmative action. It may equally be manifested by silence or inaction, if the circumstances or other evidence indicate that the silence or inaction is intended to give consent. Even without a manifestation, consent may be proved by any competent evidence to exist in fact, and when so proved it is as effective as if manifested."[90]

---

[88]     *Id.* (alteration in original) (citations omitted).

[89]     WILLIAM L. PROSSER AND JOHN W. WADE, RESTATEMENT (SECOND) OF TORTS § 583 (1977).

[90]     *Id.*  § 892 (1979) (emphasis added).

Mr. Trump argues that Ms. Carroll consented to Mr. Trump's allegedly defamatory remarks because she (1) "purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible" and (2) "waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States," leaving him "with no choice but to defend himself against th[e] heinous allegations."[91]  Neither of these points demonstrates that Ms. Carroll had any reason to expect Mr. Trump to make statements that would be defamatory. Indeed, Mr. Trump's argument amounts to suggesting that any time an individual comes forward with an accusation of wrongdoing against a public official, that person thereby consents to the official stating anything he or she wishes in response, no matter how calumnious. As Ms. Carroll aptly states, "[w]hen a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response."[92]

The only evidence that Ms. Carroll possibly "had reason to anticipate that [Mr. Trump's] response [to her accusation] might be a defamatory one"[93] – which Mr. Trump entirely ignores – comes from her own words in the excerpt of her book published in *New York* Magazine:

> "*Why haven't I 'come forward' before now?*
>
> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the 15 women who've come forward with credible stories about how the man [(Mr. Trump)] grabbed, badgered, belittled,

---

[91]     Dkt 109 at 29-30.

[92]     Dkt 113 (Pl. Opp. Mem.) at 31.

[93]     *Handlin v. Burkhart*, 220 A.D.2d 559, 559 (2d Dept. 1995).

mauled, molested, and assaulted them, only to see the man turn it around, deny,

threaten, and attack them, never sounded like much fun. Also, I am a coward."[94]

It nevertheless fails to establish consent. First, as observed by another court in this circuit, "[a]

review of case law indicates that the type of consent accepted as a complete[] defense to a

defamation action is *specific* consent, typically initiated by the plaintiff, which clearly indicates that

the plaintiff was aware of and agreed to the possibility that defamatory statements might be

published."[95]  Ms. Carroll's generalized concern that she might be subject to the same attacks that

other women, as she stated, have experienced after coming forward with their accusations against

Mr. Trump does not demonstrate her awareness of and agreement to the possibility that Mr. Trump

might defame her in response to her specific accusation of sexual assault and rape.

Second, there is no evidence to suggest that Ms. Carroll had reason to know the type

or content of a public statement, if any, Mr. Trump might make in response to her accusation, let

alone that she agreed to it. "Implicit in the concept of consent is the conception that the consenting

party have the power to control the publication. Thus, there can be no finding of consent where, as

here, there is no effective control over the dissemination of the defamatory material."[96]  Indeed, when

asked in her deposition how she expected Mr. Trump would react to her sexual assault accusation,

---

[94]

      E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html.

[95]

      *McNamee v. Clemens*, 762 F. Supp. 2d 584, 604–05 (E.D.N.Y. 2011) (emphasis added) (citing cases).

[96]

      *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 104 (E.D.N.Y. 1997).

Ms. Carroll testified that:

> "I didn't think he would deny it. I thought he would just say it didn't happen that way. She agreed to it or it was consensual sex. . . . I just was shocked that he absolutely denied it because he was there and he denied it. That's what gets me every time. He was there, he denied it.[97]

She testified also that she "ha[s] no idea" if she would have sued Mr. Trump if he had instead said that it was consensual sex because "it would have been him saying yeah, it happened and then we could have disagreed and then I could have vehemently said no, I did not consent."[98]

Drawing all factual inferences in favor of Ms. Carroll, as the Court must on this motion for summary judgment, Ms. Carroll's testimony makes clear that any generalized concern Ms. Carroll harbored based on Mr. Trump's "den[ials], threat[s], and attack[s]" against his other accusers did not translate to her consenting to the possibility the same would occur with her.[99]

*Punitive Damages*

Lastly, Mr. Trump argues that Ms. Carroll's punitive damages claim should be dismissed because she cannot demonstrate that Mr. Trump acted with common law malice.

"Punitive damages may only be assessed under New York law if the plaintiff has

---

[97] Dkt 116-1 (Carroll Dep.) at 166:2-6, 167:3-7.

[98] *Id.* at 166:9-15.

[99] In the alternative, there at least is a genuine issue of material fact based on the evidence as to whether Ms. Carroll consented to Mr. Trump's allegedly defamatory statements, precluding dismissal as a matter of law on summary judgment.

established common law malice in addition to the other elements of libel. . . . To do so, plaintiffs

must prove by a preponderance of the evidence that the libelous statements were made out of 'hatred,

ill will, [or] spite.'"[100]  The Appellate Division, First Department, one of New York's intermediate

appellate courts, has "held that a triable issue of common-law malice is raised only if a reasonable

jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there

must be some evidence that the animus was 'the one and only cause for the publication.'"[101]

"Common law malice is established by examining all of the relevant circumstances surrounding the

dispute, including any rivalries and earlier disputes between the parties so long as they are not too

remote."[102]

   Mr. Trump contends that his "statements could not have been 'motivated by a desire

to injure plaintiff'" because "they were strictly made in Defendant's own defense."[103]  His argument

merely presents his characterization of his own conduct, which of course is favorable to him. He fails

---

[100]

  *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 184 (2d Cir. 2000).

[101]

  *Morsette v. "The Final Call"*, 309 A.D.2d 249, 255 (1st Dept. 2003) (emphasis in original) (citation omitted).

[102]

  *Celle*, 209 F.3d at 185.

[103]

  Dkt 109 (Def. Mem.) at 34 (quoting *Morsette*, 309 A.D. at 255).

  In passing, Mr. Trump raises also the point that "[i]ndeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity." *Id.* at 34 (citing cases).  First, his argument arguably has been waived because it was not raised in his answer and is "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013). In any event, any such claim of a qualified privilege – as with his main argument against punitive damages – depends on weighing the evidence of Mr. Trump's motives for making the allegedly defamatory statements.

to address any of the relevant evidence, including, for example, his deposition testimony with respect to the circumstances in which he made the statements and whether he ever read the *New York* magazine article or Ms. Carroll's book that contain her sexual assault accusation.

Furthermore, it is relevant – although not dispositive – that the jury in *Carroll II* in fact awarded punitive damages to Ms. Carroll for her defamation claim for Mr. Trump's 2022 statement, which as discussed above substantially is similar to Mr. Trump's statements in this case. To do so, the jury was required to find and did find that Ms. Carroll proved (1) Mr. Trump knew it was false or acted in reckless disregard of its truth or falsity when he made the statement accusing Ms. Carroll of lying about her sexual assault accusation to promote her book (actual malice) and (2) Mr. Trump made the statement with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights (common law malice). This outcome undermines Mr. Trump's argument that the same result is impossible in this closely related case.

In all the circumstances, Mr. Trump has failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied.

### Conclusion

For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied.

SO ORDERED.

Dated:      June 29, 2023

_____
Lewis A. Kaplan
United States District Judge

# EXHIBIT 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                 Plaintiff,

         -against-                                    20-cv-7311 (LAK)

DONALD J. TRUMP,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Corrected)**

       Appearances:

               Roberta Kaplan
               Joshua Matz
               Shawn Crowley
               Matthew Craig
               Trevor Morrison
               Michael Ferrara
               KAPLAN HECKER & FINK LLP

               *Attorneys for Plaintiff*

               Alina Habba
               Michael T. Madaio
               HABBA MADAIO & ASSOCIATES LLP

               *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

       This is a defamation case brought by writer E. Jean Carroll against President Donald

Trump, as he then was, for statements Mr. Trump made in June 2019 shortly after Ms. Carroll

publicly accused him of sexual assault. In those statements, Mr. Trump denied Ms. Carroll's

accusation, stated that he "has no idea who this woman is," and suggested that she fabricated her

accusation for ulterior and improper purposes, including to increase sales of her then-forthcoming

book in which she discusses having been sexually assaulted by Mr. Trump and other men.

In a second and very closely related case ("*Carroll II*"), Ms. Carroll sued Mr. Trump

for the alleged sexual assault itself and for defamation based on a statement that Mr. Trump

published on his social media platform in October 2022 that was substantially similar to his June

2019 statements. That case was tried in April and May 2023. The jury unanimously found that Mr.

Trump had sexually abused Ms. Carroll and defamed her in his October 2022 statement.[1]  It awarded

Ms. Carroll a total of $5 million in compensatory and punitive damages: $2.02 million for her sexual

assault claim, and $2.98 million for her defamation claim.[2]

In this case ("*Carroll I*"), Ms. Carroll seeks damages and other relief for defamation

---

[1]

It found also that Ms. Carroll had not established that Mr. Trump "raped" her within the
relevant definition of that term in the New York Penal Law.

[2]

The Court assumes familiarity with its prior decisions, which describe in detail the facts and
procedural histories of both cases. Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y.
2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK),
2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); Dkt 145, *Carroll v. Trump*, No. 20-cv-7311
(LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Doc. No. 22-cv-10016 (*Carroll II),*
Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13,
2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312
(S.D.N.Y. Feb. 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK),
2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No.
22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96,
*Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023).

Except where preceded by *"Carroll II"*, "Dkt" references are to the docket in this case.

for Mr. Trump's June 2019 statements only.[3]  The matter now is before me on  Mr. Trump's motion

for summary judgment dismissing the action on four grounds:

    (1)    Mr. Trump is entitled to absolute presidential immunity

    (2)    Mr. Trump's statements were not defamatory *per se* and Ms. Carroll cannot

        establish special damages

    (3)     the majority of Mr. Trump's statements were nonactionable opinion

    (4)    Ms. Carroll consented to Mr. Trump's allegedly defamatory statements.[4]

He argues also that punitive damages in any case would be unwarranted on Ms. Carroll's defamation

claim. His arguments are without merit.

### *Facts*

*Mr. Trump's Allegedly Defamatory June 2019 Statements*

    Ms. Carroll's accusation that Mr. Trump sexually assaulted her first became public

on June 21, 2019, when *New York* magazine published on the Internet an excerpt from her then-

forthcoming book in which Ms. Carroll described Mr. Trump's alleged assault of her, which she

referred to as "rape."  Over the next several hours and days, Mr. Trump issued three allegedly

---

[3]

    When Ms. Carroll brought this lawsuit in 2019, she presumably was foreclosed from suing
for sexual battery by New York's then-existing statute of limitations. As noted above, the
Adults Survivors Act enacted by New York in 2022 temporarily revived the ability to bring
such claims without regard to the otherwise applicable statute of limitations. She therefore
was permitted to bring that claim in her second lawsuit now referred to as *Carroll II*.

[4]

    For avoidance of confusion: In his memorandum, Mr. Trump argues what is identified as
ground four here before what is identified as ground three here. This opinion discusses Mr.
Trump's arguments in the sequence noted above.

4

defamatory statements in response to Ms. Carroll's accusation.

*Statement One*

Two hours and seventeen minutes after Ms. Carroll's accusation became public, Mr. Trump published this statement on Twitter[5]:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

---

[5]     Mr. Trump testified in his deposition that he provided the statement to his staff to give to the press. Dkt 135-3 (Def. Dep.) at 59:20-23.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[6]

*Statement Two*

The next day, Mr. Trump made the following comments that were reported in the national press and published in a White House press release entitled "Remarks by President Trump Before Marine One Departure" issued on June 22, 2019:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

"[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

"[Reporter]: You were in a photograph with her.

"[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going

---

[6] Dkt 157-1 (Pl. Amend. Compl.) at 15-16, ¶ 83.

On June 13, 2023, this Court granted Ms. Carroll's motion to amend her complaint. The amended complaint did not add any new claims or otherwise change the focus of her original complaint. Unless indicated otherwise, citations to Ms. Carroll's complaint are to the amended complaint.

on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

"And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

"New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

"It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

"You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

"But here's a case, it's an absolute disgrace that she's allowed to do that."[7]

*Statement Three*

Finally, on June 24, 2019, Mr. Trump stated in an interview with the newspaper *The Hill*: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[8]

*Ms. Carroll's Defamation Claim*

Ms. Carroll initiated this lawsuit against Mr. Trump in November 2019 for defaming her in these statements. The case originally began in a state court in New York before being removed to this Court for reasons explained in the Court's previous decisions.[9] Ms. Carroll alleges that:

"When [her] account [of the alleged assault] was published, Trump lashed out with a series of false and defamatory statements. He denied the sexual assault. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also

---

[7]    *Id.* at 18, ¶ 92.

[8]    *Id.* at 20, ¶ 98.

[9]    *E.g.*, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312, at *4 (S.D.N.Y. Feb. 15, 2023); *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022), *remanded in part*, 66 F.4th 91 (2d Cir. 2023).

8

deliberately implied that she had falsely accused other men of assault. For good measure, he insulted her physical appearance."[10]

The core of Ms. Carroll's defamation claim is that Mr. Trump lied in accusing her of fabricating her sexual assault allegation against him in order to increase sales of her book and for other improper purposes and that he thus caused Ms. Carroll professional and reputational harm as well as emotional pain and suffering.

*Mr. Trump's Answer*

In his formal answer to Ms. Carroll's complaint, which originally was filed in state court in February 2020, Mr. Trump raised nine affirmative defenses, including as relevant here that:

- "[t]he [c]omplaint fails to state a cause of action,"

- "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States,"

- "[t]he allegedly defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States,"

- "Plaintiff is not entitled to punitive damages as a matter of law," and

- "Plaintiff has not sufficiently alleged defamation *per se*," and

---

[10] Dkt 157-1 (Pl. Amend. Compl.) at 3, ¶ 11.

• "Plaintiff has failed to plead damages with the required specificity."[11]

Noticeably missing from this list is any mention of the absolute presidential immunity defense that Mr. Trump now asserts for the first time.[12]

## *Discussion*

*Legal Standard*

The standards for summary judgment are well established. In brief:

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law. . . . In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. . . . To grant the motion, the court must determine that there is no genuine issue of material fact to be tried. . . . The Supreme Court teaches that 'all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' . . . It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the

---

[11] Dkt 14-69 (Def. Answer).

[12] Nor did Mr. Trump seek to add this defense to his answer when he moved to amend his answer in January 2022 to add an affirmative defense and counterclaim based on New York's "anti-SLAPP" law. Dkt 63.

10

jury, not for the court on a motion for summary judgment.'"[13]

"A material fact is one that might 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [fact finder] could return a verdict for the nonmoving party.'"[14]

*Ground One: Absolute Presidential Immunity*

In *Nixon v. Fitzgerald*,[15] the Supreme Court held that the President of the United States is entitled to "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility."[16]   Mr. Trump argues that the allegedly defamatory statements in this case came within this "outer perimeter" because he made those statements "in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation."[17]

Before the Court even may address the merits of Mr. Trump's absolute immunity defense, it must decide a threshold question: whether Mr. Trump is barred from raising this defense

---

[13]

     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (alterations in original) (citations omitted).

[14]

     *Madison Nat. Life Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 462 F. App'x 102, 103–04 (2d Cir. 2012) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[15]

     457 U.S. 731 (1982).

[16]

     *Id.* at 756.

[17]

     Dkt 109 (Def. Mem.) at 17.

11

because he waived it by failing to raise it earlier. Mr. Trump does not dispute that, under the controlling rules of civil procedure, he waived the defense by failing to plead it as an affirmative defense in his answer.[18]  Instead, he contends that any such waiver can have no effect because absolute presidential immunity is an unwaivable obstacle to any court exercising subject matter jurisdiction over any claim within its ambit. In the alternative, if the Court determines that absolute presidential immunity can be waived, Mr. Trump argues that his motion for summary judgment should be construed as a motion for leave to amend his answer so that he can assert the absolute immunity defense.  Neither argument is persuasive.

### *Absolute Presidential Immunity Can Be Waived*

Mr. Trump argues that "whether presidential immunity applies in this case is a non-waivable question of subject matter jurisdiction."[19]  His argument relies on the theory that absolute presidential immunity is non-waivable because it is different from absolute immunity available to judges and prosecutors – which decidedly is waivable – due to what he claims, mistakenly, is "its

---

[18]
        In the table of contents to Mr. Trump's reply brief, the first argument heading reads: "Defendant did not waive his entitlement to presidential immunity."  Dkt 122 (Def. Reply Mem.) at i. However, that heading never reappears in his brief. Instead, the first heading of his argument section is "Presidential immunity cannot be waived," followed by his argument that Ms. Carroll's claim that he waived his absolute immunity defense by failing to raise it in his answer "is flawed in its premise" because absolute presidential immunity is not waivable. *Id.* at 1. In a recent letter, Mr. Trump again did not dispute that he waived the defense and instead wrote that he "unequivocally stated that absolute immunity is a non-waivable question of subject matter jurisdiction." Dkt 160 at 2. It accordingly is clear that Mr. Trump does not dispute that if absolute presidential immunity can be waived, he in fact waived it in this case.

[19]
        Dkt 122 (Def. Reply Mem.) at 5.

12

unique rooting in the separation of powers doctrine."[20]

Absolute presidential immunity is no such anomaly. There is nothing so exceptional about absolute immunity available to a president that makes it non-waivable unlike other types of absolute immunity. For starters, "[m]ost immunities are affirmative defenses."[21] Failure to assert an affirmative defense, including absolute immunity, in an answer or other responsive pleading results in waiver of that defense.[22] Moreover, as the Supreme Court has stated, "[t]here is no

---

[20]

*Id.* at 1.

[21]

*In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003). *See also San Filippo v. U.S. Tr. Co. of New York*, 737 F.2d 246, 252 (2d Cir. 1984) ("In their answer and amended answer, defendants asserted several affirmative defenses, including their absolute immunity from § 1983 liability for their grand jury testimony or prior discussions with the prosecutor.").

[22]

As noted above, Mr. Trump's answer first was filed in a state court in New York before this case was removed to this Court. Assuming his answer was governed by New York's Civil Practice Law and Rules, he was required to plead absolute immunity as an affirmative defense in his answer or in a pre-answer motion. N.Y. CPLR § 3018(b) ("A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading."); *Pitts v. State*, 166 A.D.3d 1505, 1506 (4th Dept. 2018) ("Defendant waived that affirmative defense [of governmental function immunity] inasmuch as defendant did not plead it in its amended answer.") (citing cases).

The result would be the same if Mr. Trump's answer were governed by Federal Rule of Civil Procedure 8(c), which requires a party to "affirmatively state any . . . affirmative defense" in responding to a pleading. *E.g.*, 5 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1278 (4th ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by [Rule] 8(c) results in the waiver of that defense and its exclusion from the case.") (citing cases); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) ("Appellees mention an absolute immunity defense in passing, but that defense is considered waived since it only appears in a footnote. . . . And we decline to overlook the waiver."); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) ("Absolute immunity is an affirmative defense that should be asserted in an answer."); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) ("It is well established that unless affirmatively pleaded, the defenses of qualified and absolute immunity are waived."); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994) ("[T]his

13

authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction."[23]   To prevail in his argument, Mr. Trump must demonstrate that absolute immunity available to a president deviates from these well-settled norms. He has not done so.

The focal point of Mr. Trump's reasoning is the foundation of absolute presidential immunity in separation of powers principles.  His argument goes: (1) absolute presidential immunity is grounded in the separation of powers doctrine, (2) "the separation of powers doctrine is a creature of Article III standing" and "Article III standing, in turn, is an issue of subject matter jurisdiction,"[24] and (3) absolute presidential immunity therefore is an unwaivable obstacle to the exercise of subject matter jurisdiction. His theory fails for two reasons. First, absolute presidential immunity is not the only type of absolute immunity that raises separation of powers concerns. Second, and more importantly, "separation of powers" is not a magic phrase that automatically transforms any issue it touches into an impediment to the exercise of subject matter jurisdiction. Indeed, a determination that absolute presidential immunity is an issue of subject matter jurisdiction would present its own separation of powers concerns and contravene many of the same principles that underpin absolute presidential immunity.

The Supreme Court in *Nixon v. Fitzgerald* determined that absolute presidential

---

Court has long held that both qualified and absolute immunity are affirmative defenses that must be pleaded."); *Cozzo v. Tangipahoa Par. Council--President Gov't*, 279 F.3d 273, 283 (5th Cir. 2002) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded.").

[23]

*Nevada v. Hicks*, 533 U.S. 353, 373 (2001). *See also Mordkofsky v. Calabresi*, 159 F. App'x 938, 939 (11th Cir. 2005) ("[J]udicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction.").

[24]

Dkt 122 (Def. Reply Mem.) at 3.

14

immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."[25]  In reaching its decision, the Court discussed common law precedents that recognized immunity for government officials, including absolute immunity for judges and prosecutors.[26]  These precedents, the Court noted, "have been guided by the Constitution, federal statutes, and history" and "at least in the absence of explicit constitutional or congressional guidance," they "have been informed by the common law."[27]  With respect to absolute presidential immunity, the Court explained:

> "Because the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure. Historical inquiry thus merges almost at its inception with the kind of 'public policy' analysis appropriately undertaken by a federal court. This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers."[28]

The heart of the separation of powers doctrine invoked in *Fitzgerald* is respect for the independence of the three branches of government. "In the often-quoted words of Justice Jackson: 'While the Constitution diffuses power the better to secure liberty, it also contemplates that practice

---

[25]   457 U.S. at 749.

[26]   *Id.* at 744-48.

[27]   *Id.* at 747.

[28]   *Id.* at 748.

will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'"[29]  Accordingly, one of the central bases justifying absolute *judicial* immunity is the need to protect the "independence without which no judiciary can be either respectable or useful."[30]  Absolute *prosecutorial* immunity, although perhaps a bit removed from the constitutional doctrine of separation of powers, similarly is rooted in the "concern that harassment by unfounded litigation" could "shade [a prosecutor's] decisions instead of exercising the independence of judgment required by his public trust."[31]  Given the overlaps in reasoning, it is unsurprising that the Court in *Fitzgerald* compared explicitly the absolute immunity it recognized for the president with that already recognized for judges and prosecutors.[32]

---

[29]

    *Morrison v. Olson*, 487 U.S. 654, 694 (1988) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J., concurring)).

[30]

    *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). *See also id.* ("If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away.").

[31]

    *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).

[32]

    457 U.S. at 758 ("For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends."); *id.* at 751-52 ("As is the case with prosecutors and judges— for whom absolute immunity now is established—a President must concern himself with matters likely to 'arouse the most intense feelings.') (citation omitted).  *See also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) ("We instead [(in *Fitzgerald*)] drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties" by the prospect of civil liability for official acts.'") (quoting *Fitzgerald*, 457 U.S. at 751-752 & n.32).

Perhaps aware of these comparisons, Mr. Trump does not argue specifically that absolute presidential immunity is distinct from absolute judicial and prosecutorial immunity by its foundation in separation-of-powers principles.  Instead, he cites a footnote in *Harlow v. Fitzgerald*, in which the Supreme Court stated that "the recognition of absolute immunity

Moreover, the fact that presidential immunity is grounded in separation of powers principles does not convert it into a jurisdictional issue. Mr. Trump relies chiefly on two points in support of his argument to the contrary. Neither withstands analysis.

First, he quotes the following from *Fitzgerald*:

> "[O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . or to vindicate the public interest in an ongoing criminal prosecution . . . the exercise of jurisdiction has been held warranted. In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not."[33]

Mr. Trump's selected passage, however, omits the sentence preceding it, that "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."[34]  Even more to the point, "[j]urisdiction . . . is a word of many, too many,

---

for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." 457 U.S. 800, 811 n.17 (1982). *Harlow*, however, dealt with the scope of immunity available to aides and advisers of the President and held that presidential aides are entitled to qualified, rather than absolute, immunity.  It therefore is inapposite here.

[33]

Dkt 122 (Def. Reply Mem.) at 2 (alterations in original) (emphasis omitted) (quoting *Fitzgerald*, 457 U.S. at 754).

[34]

*Fitzgerald*, 457 U.S. at 753-54.

meanings."[35]  And the Court in *Fitzgerald* did not use the word "jurisdiction" in reference to a federal court's fundamental ability to adjudicate a case on its merits. Indeed, it there specifically left unresolved the "the immunity question as it would arise if Congress expressly had created a damages action against the President of the United States."[36]  If the Court had understood presidential immunity as a restriction on a court's exercise of subject matter jurisdiction, there would have been no need for the Court to have left that question open. The possibility would have been foreclosed by the long-standing principle that Congress cannot expand the scope of federal courts' jurisdiction beyond what is permitted by Article III.[37]

   This detail helps to underscore the confusion in Mr. Trump's second point that "the separation of powers doctrine is a creature of Article III standing."[38]  As the cases Mr. Trump quotes make clear, it is Article III standing that "is built on separation-of-powers principles," not *vice versa*.[39]  Therefore, although Article III standing of course is an issue of subject matter jurisdiction, it does not follow that the separation of powers doctrine in all circumstances is as well.  Mr. Trump's

---

[35]

  *Wilkins v. United States*, 143 S. Ct. 870, 875 (2023) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006)).

[36]

  *Fitzgerald*, 457 U.S. at 748 n.27.

[37]

  *Marbury v. Madison*, 5 U.S. 137, 138 (1803); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 65 (1996); *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 66 (2d Cir. 2012) ("Neither we nor Congress may [expand the federal courts' subject matter jurisdiction], for the Constitution alone defines the outer limits of subject-matter jurisdiction.").

[38]

  Dkt 122 (Def. Reply Mem.) at 3.

[39]

  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

18

argument in this respect lacks logical coherence and plainly is frivolous.

More fundamentally, Mr. Trump's argument that absolute presidential immunity is jurisdictional runs afoul of many of the same principles on which the immunity is based. As the Supreme Court stated in *Clinton v. Jones*,[40] the "dominant concern [in *Fitzgerald*] was with the diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision."[41] The Court was concerned with intruding on the president's scope of authority and ability to make decisions to govern effectively. It sought to protect the president's autonomy, not diminish it by denying the president the ability to choose whether or not to defend himself or herself in a civil lawsuit in federal court. As law professor Akhil Amar and former Acting Solicitor General Neal Katyal wrote:

> "[The president's] immunity is of course waivable . Surely the President in whatever spare time he has should be allowed to litigate civil damage actions — or to watch basketball for that matter — but he should not be legally obliged to do either. As a practical matter, politics may sometimes create strong pressure to litigate now — or, again, to watch a basketball game — but political pressure should not be confused with legal obligation. In a civil damage action in the early 1960s, then-President John Kennedy asserted litigation immunity under a statute. When that failed, he settled the case instead of asserting presidential immunity . . . ."[42]

---

[40]

520 U.S. 681 (1997).

[41]

*Id.* at 694 n.19.

[42]

Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 HARV. L. REV. 701, 726 n.53 (1995).

19

Yet the rule Mr. Trump advocates would remove this choice from the president. Under Mr. Trump's approach, each time a president is sued in federal court, the court would be obligated to raise and resolve the issue of absolute presidential immunity *sua sponte* and, if the defense applied, it would be obligated to dismiss the case for want of subject matter jurisdiction *even if* the president wished to litigate in that case. Such a requirement would contradict the results in many of the other civil lawsuits filed against Mr. Trump for actions during his presidency, in at least one of which, as Ms. Carroll points out, Mr. Trump agreed with the plaintiff that absolute presidential immunity was not a "threshold issue[] that must be decided before reaching the merits."[43]  More importantly, it would risk encroachment by the judiciary into the president's domain by eliminating the president's ability to choose. There is no indication in *Fitzgerald* or in its progeny that absolute presidential immunity ever was meant to be so patronizing.

> *Leave to Amend Mr. Trump's Answer Is Not Warranted*

In the alternative, Mr. Trump argues that the Court should construe his motion for summary judgment as a motion for leave to amend his answer to resurrect the previously waived absolute presidential immunity defense. The standard governing this request is clear. Although Rule

---

[43]

K&D, LLC v. Trump Old Post Off., LLC, No. CV 17-731 (RJL), 2018 WL 6173449, at *3 n.2 (D. D.C. Nov. 26, 2018), *aff'd*, 951 F.3d 503 (D.C. Cir. 2020) (emphasis omitted).

There possibly is an argument that Mr. Trump is judicially estopped from taking the opposite position now in this case. *See Clark v. AII Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018) ("[T]he equitable doctrine of judicial estoppel . . . 'prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.'") (citation omitted).  Given that neither party has briefed this issue and it is unnecessary to my decision, I do not address it here.

15(a) provides that leave to amend "shall be freely given when justice so requires,"[44] "it is within the sound discretion of the district court to grant or deny leave to amend."[45] "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[46]

Mr. Trump's request is denied on two independent grounds. First, it is denied on the ground that the proposed amendment would be futile. In the alternative, it is denied on the ground that Mr. Trump delayed unduly in raising his presidential immunity defense and granting his request would prejudice Ms. Carroll unfairly.

*Futility of Mr. Trump's Proposed Amendment*

A motion for leave to amend an answer to assert an affirmative defense may be denied as futile when the affirmative defense would be meritless.[47] "In fact, it is unexceptional for federal courts to deny leave to amend on the basis of futility where the proposed amended pleading would not withstand a motion to dismiss."[48]

---

[44]

Fed. R. Civ. P. 15(a).

[45]

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted).

[46]

*Id.*

[47]

*Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, 403 F. App'x 530, 532–33 (2d Cir.2010); *Fireman's Fund Ins. Co. v. Krohn*, No. 91-cv-3546 (PKL), 1993 WL 299268, at *3 (S.D.N.Y. Aug. 3, 1993) (citing cases).

[48]

*Carroll v. Trump*, 590 F. Supp. 3d 575, 579 (S.D.N.Y. 2022) (citing cases).

As noted above, the president is entitled to absolute immunity from liability in civil damages lawsuits "for acts within the 'outer perimeter' of [the president's] official responsibility."[49] The expansive scope of this immunity is based on "the special nature of the President's constitutional office and functions," the president's "discretionary responsibilities in a broad variety of areas, many of them highly sensitive," and the "difficult[y] [in] determin[ing] which of the President's innumerable 'functions' encompass[] a particular action."[50]  Implicit in that statement of the scope of presidential immunity, however, is the acknowledgment that there indeed is an "outer perimeter" of the president's official duties, and that the president is not immune from liability for acts outside that perimeter. As the Supreme Court explained in *Jones*:

> "The principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct. . . .  As we explained in *Fitzgerald*, 'the sphere of protected action must be related closely to the immunity's justifying purposes.' . . . Because of the President's broad responsibilities, we recognized in that case an immunity from damages claims arising out of official acts extending to the 'outer perimeter of his authority.' . . .  But we have never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity."
>
> "Moreover, when defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach. 'Frequently our

---

[49]

*Fitzgerald*, 457 U.S. at 756.

[50]

*Id*.

decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office.'. . . As our opinions have made clear, immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'"[51]

Mr. Trump argues that he is entitled to absolute presidential immunity because he "made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation."[52]  He states that:

> "As both the leader of the nation and head of the Executive Branch, [he] could not sit idly while a 'media frenzy' erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to 'maintain the continued trust and respect of [his] constituents' and to 'preserve his ability to carry out his [] responsibilities.' . . . Thus, it cannot be reasonably disputed that [Mr. Trump's] conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation."[53]

Mr. Trump accordingly contends that his responses to Ms. Carroll's accusation "fell squarely within

---

[51] 520 U.S. at 692–95 (emphasis in original) (citations omitted).

[52] Dkt 109 (Def. Mem.) at 17.

[53] *Id.* (citations omitted).

the 'outer perimeter' of [his] official duties as President."[54]

The fatal flaw in Mr. Trump's reasoning is that he ignores the precise acts that are the subject of this lawsuit. For the sake of argument, the Court assumes that, when Mr. Trump responded to Ms. Carroll's sexual assault accusation, he was addressing a matter of public concern because the accusation "impugned his character and, in turn, threatened his ability to effectively govern the nation."[55] It accepts also, for the sake of argument, that the president's speech on a matter of public concern comes within the president's official responsibilities. These points, however, do not lead to the conclusion that Mr. Trump's statements in this case came within the outer perimeter of his official duties as president. As Judge Mehta thoughtfully wrote in another case where Mr. Trump asserted an absolute presidential immunity defense, an analysis with which this Court agrees:

> "[T]o say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: '[T]o construct an immunity from suit for unofficial acts

---

[54] *Id.* at 16.

[55] *Id.* at 17. *See Snyder v. Phelps,* 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'") (citations omitted).

grounded purely in the identity of [the President's] office is unsupported by precedent.'. . . And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: 'Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty.'. . . Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

"Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to 'punch' a protester 'in the face right now.' Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is blocking the legislation of running a child-trafficking operation. Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support. In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech. To be sure, these scenarios may seem far-fetched, but they illustrate an important point: blanket immunity cannot shield a President from suit merely because his words touch on

matters of public concern. *The context in which those words are spoken and what is said matter.*"[56]

The conduct at issue here consists not only of what Mr. Trump did (*i.e.*, make public statements in response to Ms. Carroll's accusation) but also, and importantly, the *content* of his statements (*i.e.*, what he said in his statements). Mr. Trump did not merely deny Ms. Carroll's accusation of sexual assault. Instead, he accused Ms. Carroll of lying about him sexually assaulting her in order to increase sales of her book, gain publicity, and/or carry out a political agenda. Even assuming that the president's decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that the president's own personal attacks on his or her accuser equally fall within that boundary. Mr. Trump does not identify any connection between the allegedly defamatory content of his statements – that Ms. Carroll fabricated her sexual assault accusation and did so for financial and personal gain – to any official responsibility of the president. Nor can the Court think of any possible connection.

The justifying purposes of presidential immunity support this determination. The fundamental purpose of presidential immunity is to avoid "diversion of [the president's] energies" and "distract[ing] a President from his [or her] public duties" by subjecting the president to "concern with private lawsuits."[57] It is not a "get out of damages liability free" card that permits the president to say or do anything he or she desires even if that conduct is disconnected entirely from an official function. On the facts presented here, there is no concern that the president "would [be] subject ...

---

[56]
     *Thompson v. Trump*, 590 F. Supp. 3d 46, 79–80 (D. D.C. 2022) (emphasis added) (citations omitted).

[57]
     *Fitzgerald*, 457 U.S. at 751–53.

26

to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose."[58]  The question of whether presidential immunity applies in this case turns not on an allegation that Mr. Trump acted unlawfully or made the statements with actual and common law malice, but on whether the act itself – accusing an individual who has charged the president with a personal wrongdoing of fabricating the charge for ulterior and improper purposes – is within the outer perimeter of the president's official responsibility.[59]  Subjecting the president to damages liability for making a personal attack that is unrelated to the president's official responsibilities would not threaten to distract the president from his or her official duties.

### Undue Delay and Unfair Prejudice

Leave to amend is denied also on the basis of undue delay, dilatory motive, bad faith and/or prejudice to the opposing party.

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith. . . . However, '*the longer the period of an unexplained delay, the less will be required of the*

---

[58]    *Id.* at 756.

[59]    Mr. Trump compares this case to *Barr v. Matteo*, 360 U.S. 564 (1959), where the Supreme Court determined that the director of a federal agency was protected by an absolute privilege in a libel action brought by former employees based on a press release in which the director announced his intention to suspend the employees. The Court stated that "[t]e fact that the action here taken was within the outer perimeter of [the director's] line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint." *Id.* at 575.  The decision in that case makes no difference to the analysis here.  As noted above, the question of whether presidential immunity applies here does not require crediting Ms. Carroll's allegation of malice or any consideration of Mr. Trump's motives.  His accusation against Ms. Carroll, which forms the basis of Ms. Carroll's defamation claim, suffices to render his presidential immunity defense meritless.

*nonmoving party in terms of a showing of prejudice.*' . . . In determining what

constitutes 'prejudice,' we consider whether the assertion of the new claim would:

(I) require the opponent to expend significant additional resources to conduct

discovery and prepare for trial; (ii) significantly delay the resolution of the dispute;

or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction....

'Mere delay, however, absent a showing of bad faith or undue prejudice, does not

provide a basis for a district court to deny the right to amend.'"[60]

Mr. Trump's three-year delay in raising his presidential immunity defense, for which he offers no

explanation, coupled with the unfair prejudice that would result from an amendment for this purpose

to Ms. Carroll, warrant denial of leave to amend.

The Court has set forth in its prior opinions the record of Mr. Trump's efforts to delay

both this case and *Carroll II*.[61]  Those details need not be repeated here. It suffices for present

purposes to note that the Court denied Mr. Trump's prior request for leave to amend his answer in

January 2022.  Mr. Trump then sought leave to amend to assert an affirmative defense and

counterclaim based on New York's "anti-SLAPP" law and to argue that Ms. Carroll's defamation

---

[60]

    *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (emphasis added) (citations omitted).

[61]

    *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2960061 (S.D.N.Y. Apr. 17, 2023) (denying Mr. Trump's application for a month-long postponement of the trial of *Carroll II*); *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023) (denying Mr. Trump's offer to provide a DNA sample in exchange for production by Ms. Carroll of an undisclosed appendix to a report examining the DNA found on the dress Ms. Carroll wore when she was assaulted); *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) (denying Mr. Trump's motion to substitute the United States for him as the defendant and to stay the action); *Carroll v. Trump*, 590 F. Supp. 3d 575  (S.D.N.Y. 2022) (denying Mr. Trump's motion for leave to amend his answer).

claim is baseless and intended for harassment. That motion was denied on two alternative grounds. First, on the basis that the proposed amendment would be futile. Second, on the additional ground that Mr. Trump's motion was delayed unduly and made at least in part for a dilatory purpose. As the Court explained:

> "[D]efendant's actions have been dilatory throughout the litigation. As [Ms. Carroll] aptly puts it, he 'has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails. . . . Taken together, these actions [(the history of defendant's motions to stay and other litigation conduct)] demonstrate that defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him."[62]

Since that decision was issued in March 2022, Mr. Trump's conduct both in this case and in *Carroll II* – as discussed in detail in my prior decisions and incorporated herein by reference – only has corroborated the Court's earlier hypothesis of his dilatory motive.

These facts perhaps would suffice on their own to deny Mr. Trump's request for leave to amend. But the Court does not rely solely on them in denying the relief Mr. Trump seeks. The unfair prejudice to Ms. Carroll if leave to amend were granted also is clear.

The effect of granting leave, and thus relieving Mr. Trump of his prior waiver, even assuming his absolute immunity defense were meritorious, would be the dismissal of this case. And, to be sure, the dismissal, in and of itself, would not be *unfair* prejudice to Ms. Carroll because it

---

[62] *Carroll*, 590 F. Supp. 3d at 588.

29

would reflect the fact that there was an insurmountable obstacle to her claim in the first place. But such a dismissal cannot be considered in isolation. Ms. Carroll now has litigated this case for more than three and a half years. She has completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before Court, the Second Circuit and the D.C. Court of Appeals, and devoted untold hours and resources to pursuing her claim. And that weighs very heavily in the analysis. For, if Mr. Trump's absolute immunity argument were valid, his failure to assert it at the outset of this lawsuit needlessly, unfairly, and inexcusably subjected Mr. Carroll to all of those burdens. The undue delay in asserting the defense thus was inherently and unfairly prejudicial even if this Court is mistaken in concluding that it is legally insufficient.

Finally, there is the one more consideration. If Mr. Trump were granted leave to amend and this Court were to reject his absolute immunity claim, the order doing so likely would be appealable. No doubt Mr. Trump would appeal. And an appeal likely would cause "significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings."[63] Were this Court's rejection of his defense upheld on appeal, those additional delays would further prejudice Ms. Carroll unfairly. She now is 79 years old and, as just mentioned, has been litigating this case for more than three and a half years. There is no basis to risk prolonging the resolution of this litigation further by permitting Mr. Trump to raise his absolute immunity defense now at the eleventh hour when he could have done so years ago.

For all these reasons, leave to amend would be unjustified.

---

[63]     Dkt 113 (Pl. Opp. Mem.) at15.

*Ground Two: Defamatory Per Se*

Mr. Trump's remaining arguments concern the substance of his allegedly defamatory statements. First, he argues that his statements were not defamatory *per se*. As this Court stated in denying Mr. Trump's motion to dismiss Ms. Carroll's defamation claim in *Carroll II* on the same basis:

"There are two categories of defamation under New York law: *libel*, for written statements, and *slander*, for spoken statements. Written statements actionable as libel include statements published on social media outlets and on the Internet....

"A written statement is libelous *per se* if it '*tends* to disparage a person in the way of his [or her] office profession or trade.' A writing also is libelous *per se* if it 'tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her].' . . .

"Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation of the higher standard applied to slander *per se* with the lower standard for libel *per se*. Mr. Trump argues that there are 'four narrowly defined categories of statements which are considered to be defamatory *per se*,' and that Ms. Carroll has failed to state a claim for defamation *per se* 'because it does not, on its face, defame [P]laintiff in her trade, business or profession,' one of the four categories. However, nearly every authority Mr. Trump cites, including the case identifying those four categories and the cases describing the category of injury in one's profession are slander *per se*, not libel, cases. Unlike a libelous *per se* statement, a slanderous *per*

*se* statement 'must be made with reference to a matter of significance and importance for that purpose [(of defaming a person in his or her trade, business, or profession)], rather than a more general reflection upon the plaintiff's character or qualities.' Moreover, if a complaint fails to allege sufficient facts to state a claim for slander *per se*, 'the plaintiff must show . . . that the statement complained of caused him or her special harm" – generally "the loss of something having economic or pecuniary value.' The more stringent standard for slander *per se* is grounded in sound logic: 'What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and perpetuates the scandal.'"[64]

Much of the same analysis applies to Mr. Trump's argument with respect to his 2019 statements. Mr. Trump concedes that his June 21, 2019 statement, which he provided in written form to his staff to distribute to the press, "can be considered under the libel per se standard."[65] His other two statements similarly sound in libel rather than slander. "Where a defamatory statement is oral, but is expected by the speaker to be reduced to writing and published, and is subsequently communicated in written form, such statement constitutes a libel."[66] "A statement made to a person known to be by the speaker to be a working newspaper reporter, for example, will be treated as libel,

---

[64]     *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507, at *10-11 (S.D.N.Y. Jan. 13, 2023) (emphases and alterations in original).

[65]     Dkt 122 (Def. Reply Mem.) at 9.

[66]     *Park Knoll Assocs. v. Schmidt*, 89 A.D.2d 164, 168 (2d Dept. 1982), *rev'd on other grounds*, 59 N.Y.2d 205 (1983) (citing ROBERT D. SACK, LIBEL AND SLANDER AND RELATED PROBLEMS § 2:3, p. 44)); *see also Macineirghe v. Cnty. of Suffolk*, No. 13-cv-1512 (ADS)(SIL), 2015 WL 4459456, at *9 (E.D.N.Y. July 21, 2015).

provided the statement is thereafter communicated in written form."[67]  Mr. Trump made the other

two June 2019 statements to individuals he knew to be reporters. He does not argue that he did not

understand his remarks would be publicly reported in writing.[68]  All three of Mr. Trump's June 2019

statements therefore properly are assessed under the libel *per se* standard.

Ms. Carroll adequately has alleged that Mr. Trump's statements are libelous *per se*.

As in his 2022 statement, in his 2019 statements – particularly in his first two statements issued on

June 21, 2019 and June 22, 2019, respectively – he accuses Ms. Carroll of making up a "totally false

accusation" "to sell a new book" and "for the sake of publicity." As the Court wrote previously:

> "Ms. Carroll is a 'writer, advice columnist, and journalist.' Honesty and
>
> credibility are critical to these professions, which rely heavily on the trust and
>
> confidence of their audiences. A writer who writes about his or her own experiences,
>
> as Ms. Carroll did, depends on his or her readers believing the writer, which they may
>
> be less inclined to if the writer is called dishonest. The October 12 statement – in
>
> addition to accusing Ms. Carroll of 'completely ma[king] up a story' about Mr.
>
> Trump – states that Ms. Carroll 'changed her story from beginning to end' during an
>
> interview 'where she was promoting a . . . book.' Drawing all reasonable inferences

---

[67]     ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:3 (4th ed. 2011).

[68]     Indeed, with respect to the June 22, 2019 statement that Mr. Trump made to reporters before boarding Marine One, when Mr. Trump was asked during his deposition whether it is "fair to say that when [he] made comments while [he was] president on [his] way to somewhere . . . on [his] way to boarding Air Force One or Marine One that a transcript would be created like this [(transcript of the June 22, 2019 statement)] and released by [his] press office," he responded "oftentimes."  Dkt 117-6 (Def. Dep.) at 64:4-10.

in favor of plaintiff, the October 12 statement on the whole can be construed as Ms.

Carroll falsely accusing Mr. Trump of rape in order to promote her book and increase

its sales. Based on the facts alleged in the complaint, Ms. Carroll has sufficiently

pleaded a claim of libel *per se* because the October 12 statement may have affected

her in her profession by 'imputing to [her] . . . fraud, dishonesty, [and/or] misconduct

. . . .'"[69]

Similarly, Mr. Trump's 2019 statements reasonably can be construed as tending to

disparage Ms. Carroll in the way of her profession and/or by exposing her to hatred, contempt or

aversion or inducing an evil or unsavory opinion of her in the minds of a substantial number of the

community. Mr. Trump's contention that the statements "do not reference Plaintiff's profession as

an advice columnist, nor do they touch upon Plaintiff's 'Ask E. Jean' column" is inapposite to the

libel *per se* standard, which requires no such specific references.[70]  Nor was Ms. Carroll required to

plead special damages because she has sufficiently pleaded the elements of a libel *per se* claim.  Mr.

Trump's second argument to dismiss Ms. Carroll's claim therefore is without merit.


*Ground Three: Nonactionable Opinion*

Related also to the substance of his allegedly defamatory statements, Mr. Trump

argues that "nearly all of the content contained in the statements are immaterial since they constitute

---

[69]      *Carroll*, 2023 WL 185507, at *11 (emphases and alterations in original).

[70]      Dkt 122 (Def. Reply Mem.) at 9.

protected opinion speech."[71]  Specifically, he contends that "aside from [his] repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation."[72]

Statements of opinion are not actionable as defamation "however unreasonable the opinion or vituperous the expressing of it may be."[73]  "While it is clear that expressions of opinion receive absolute constitutional protection . . . , determining whether a given statement expresses fact or opinion may be difficult. The question is one of law for the court and one which must be answered on the basis of what the average person hearing or reading the communication would take it to mean."[74]

The New York Court of Appeals has identified three factors relevant to determining whether an average person would understand a statement as conveying fact or opinion:

"'(1) [W]hether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to

---

[71]    Dkt 109 (Def. Mem.) at 30.

[72]    *Id.* at 33.

[73]    *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977).

[74]    *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986).

be opinion, not fact[.]'"

"The third factor 'lends both depth and difficulty to the analysis' . . . , and requires that the court consider the content of the communication as a whole, its tone and apparent purpose. Thus, we have adopted a holistic approach to this inquiry. Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.'"[75]

"The dispositive inquiry . . . is whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff."[76]

Mr. Trump has not addressed the first and third factors. In any event, both weigh against his position. Mr. Trump "used specific, easily understood language to communicate" that Ms. Carroll made up a false story about Mr. Trump sexually assaulting her to increase sales of her book, to get publicity, and/or for political reasons.[77]  Indeed, the third sentence of his June 21, 2019 statement makes plain his central message that "[s]he [(Ms. Carroll)] is trying to sell a new book – that should indicate her motivation." Considering each statement as a whole, there is nothing vague or ambiguous about the statements that would make it difficult for an average reader to appreciate

---

[75]  *Davis v. Boeheim*, 24 N.Y.3d 262, 269–70 (2014) (citations omitted).

[76]  *Id.* (alterations in original) (internal quotation marks and citation omitted).

[77]  *Id.* at 271.

their main point: that Ms. Carroll lied and her motives for lying.

The contexts in which the statements were made also convey that they were assertions of fact. The heading of the June 21, 2019 statement reads "Statement from President Donald J. Trump" and was prepared by Mr. Trump to distribute to the press. The June 22, and June 24, 2019 statements were made to reporters, the former expected by Mr. Trump to be transcribed and released by his press office and the latter made by Mr. Trump in the course of an exclusive interview with a newspaper focused on political coverage. Unlike other contexts that courts have determined tended to signal expressions of opinion, such as the Republican presidential primary debate or a character-limited post on Twitter,[78] the circumstances here indicate that Mr. Trump's apparent purpose was to state that Ms. Carroll falsely accused him of sexual assault for financial and/or personal gain as a matter of fact, not as a matter of his personal belief or opinion.

The only factor that Mr. Trump touches upon is the second, whether the statements are capable of being proven true or false. Mr. Trump argues that his statements are "no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false" and he "was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims."[79] Courts have determined that statements that an individual made a false accusation or lied for financial or for personal gain are capable of

---

[78]

      *Jacobus v. Trump*, 51 N.Y.S.3d 330, 342 (N.Y. Sup. Ct. 2017), *aff'd*, 156 A.D.3d 452 (1st Dept. 2017).

[79]

      Dkt 109 (Def. Mem.) at 33.

being proven true or false.[80]  Importantly, Mr. Trump did not use speculative language in stating Ms. Carroll's motives for falsely accusing him of sexual assault. Instead, he stated "[s]hame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda" and "you can't do that for the sake of publicity."  In another portion of his June 21, 2019 statement, he wrote "[t]he world should know what's really going on" after requesting anyone who "has information that the Democratic Party is working with Ms. Carroll" to notify Mr. Trump and his staff. The specificity of Mr. Trump's statements makes clear that he was not merely guessing or speculating as to Ms. Carroll's motive. Instead, he attributes to Ms. Carroll specific and objectively verifiable motives for fabricating her sexual assault accusation.

   The cases Mr. Trump cites are inapposite. For example, "the loose and generalized statement that [the plaintiffs who brought a sexual harassment lawsuit] 'do not want to work' or 'hold jobs' and simply 'want to make easy money' . . ."[81] and the statement "I think he wanted me to divorce him,"[82] are a far cry from Mr. Trump's clear and definite statement that Ms. Carroll "is

---

[80]  *E.g.*, *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225 n.4 (2d Cir. 1985) ("In *Edwards*, we distinguished the epithet 'liar' from the epithet 'paid liar.' We found that unlike calling someone a liar, charging someone with being a paid liar was an assertion of fact. We explained: '[T]o call the appellees, all of whom were university professors, paid liars clearly involves defamation that far exceeds the bounds of the prior controversy.... And, to say a scientist is paid to lie implies corruption, and not merely a poor opinion of his scientific integrity. Such a statement requires a factual basis....'") (alteration in original) (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977)); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382 (1977) ("The ordinary and average reader would likely understand the use of these words [[that the plaintiff is "probably corrupt")], in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions.").

[81]  *Gentile v. Grand St. Med. Assocs.*, 79 A.D.3d 1351, 1353 (3d Dept. 2010).

[82]  *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996).

trying to sell a new book–that should indicate her motivation," among other assertions he made.

Although some courts have been reluctant to find statements concerning a "plaintiff's frame of mind

and motivation" to be capable of being objectively verifiable,[83] whether or not that is so is a case-

specific determination dependent on the specific statements at issue and the other factors relevant

to this analysis. Here, although there perhaps was a subjective component to Mr. Trump's statements

that Ms. Carroll was trying to increase sales of her book and gain publicity, in these circumstances,

her "state of mind is a fact question [susceptible to proof] the same as any other fact."[84]

All three factors therefore weigh in favor of a determination that Mr. Trump's

statements were factual assertions rather than expressions of opinion.[85]

---

[83]

E.g., *Treppel v. Biovail Corp.*, No. 03-cv-3002 (PKL), 2004 WL 2339759, at *14 (S.D.N.Y. Oct. 15, 2004), *on reconsideration*, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005); *Coleman v. Grand*, 523 F. Supp. 3d 244, 264 (E.D.N.Y. 2021).

In *Immuno AG. v. Moor-Jankowski*, the New York Court of Appeals stated that "[s]peculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel." 74 N.Y.2d 548, 560 (1989). The court's judgment was vacated, 497 U.S. 1021 (1990), and that statement did not appear again in the court's opinion on remand. 77 N.Y.2d 235 (1991). Notably, the original opinion cited to *Rinaldi v. Holt* (cited above, *supra* n. 80). In *Rinaldi*, however, Judge Gabrielli wrote in his dissent: "[a]s the majority quite properly observes, the charge that plaintiff is 'probably corrupt' is a statement of fact and not an expression of opinion," and in a footnote to that statement, he wrote "[a] charge of corruption goes essentially to the motive behind an individual's acts. As one court has noted, '(t)he state of a man's mind is as much a fact as the state of his digestion' (*Edgington v. Fritzmaurice*, 29 Ch.D. 459, 483 (CA))." 42 N.Y.2d at 954 & n.1. It therefore is possible that some of the modern case law on whether a statement as to an individual's state of mind is objectively verifiable is based in part on a misconstruction of the precedents on this issue.

[84]

*Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 134 (2d Cir. 2009) (quoting *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 838 (2d Cir.1994) (Van Graafeiland, J., dissenting)).

[85]

Neither party addresses specifically Mr. Trump's June 24, 2019 statement, in which he said only: "I'll say it with great respect: Number one, she's not my type. Number two, it never

*Ground Four: Consent*

Mr. Trump contends also that Ms. Carroll's claim is barred because she consented to Mr. Trump's allegedly defamatory statements. Under New York law, "[c]onsent is a bar to a recovery for defamation under the general principle of *volenti non fit injuria* or, as it is sometimes put, the plaintiff's consent to the publication of the defamation confers an absolute immunity or an absolute privilege upon the defendant[.]."[86] "Decisions of New York's intermediate appellate courts have established that the consent of the person defamed to the making of a defamatory statement bars that person from suing for the defamation, and that, in some circumstances, a person's intentional eliciting of a statement she expects will be defamatory can constitute her consent to the making of the statement."[87] As the Second Circuit has stated:

"The contours and purposes of the rule are somewhat illuminated by the Restatement (Second) of Torts (1977), which in defamation cases has been cited with approval by the highest court of New York. . . . Section 583 of the Restatement provides, 'Except as stated in § 584, the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for

---

happened. It never happened, OK?". In her complaint, Ms. Carroll alleges that all three June 2019 statements were defamatory. However, as stated above, the crux of Ms. Carroll's defamation claim lies in Mr. Trump's statements that Ms. Carroll lied for financial and/or personal gain. Indeed, Mr. Trump appears to ground his argument that "the majority" of his statements are nonactionable opinion on the assumption that Ms. Carroll does not allege his "general repudiation of Plaintiff's allegations" in itself was defamatory. Dkt 109 (Def. Mem.) at 32. As the parties have not adequately addressed this point, the Court does not now decide it.

[86]
    *Teichner v. Bellan*, 7 A.D.2d 247, 251 (4th Dept. 1959).

[87]
    *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015) (citing cases).

defamation.' Comment d to this Section says, 'It is not necessary that the other know

that the matter to the publication of which he consents is defamatory in character. It

is enough that . . . he has reason to know that it may be defamatory.' As an

illustration, the Restatement notes that a summarily discharged school teacher who

'demands that the reason for his dismissal be made public . . . has consented to the

publication [of the reason] though it turns out to be defamatory.' Restatement

(Second) of Torts § 583 cmt. d (1977)."[88]

The Reporter's Note to Section 583 of the Restatement provides that "[t]he plaintiff's consent is a

defense even though he procures the publication for the purpose of decoying the defendant into a

lawsuit."[89]  The Restatement states also that:

> "[c]onsent means that the person concerned *is in fact willing* for the conduct
>
> of another to occur. Normally this willingness is manifested directly to the other by
>
> words or acts that are intended to indicate that it exists. It need not, however, be so
>
> manifested by words or by affirmative action. It may equally be manifested by silence
>
> or inaction, if the circumstances or other evidence indicate that the silence or inaction
>
> is intended to give consent. Even without a manifestation, consent may be proved by
>
> any competent evidence to exist in fact, and when so proved it is as effective as if
>
> manifested."[90]

---

[88]     *Id.* (alteration in original) (citations omitted).

[89]     WILLIAM L. PROSSER AND JOHN W. WADE, RESTATEMENT (SECOND) OF TORTS § 583 (1977).

[90]     *Id.*  § 892, Comment b (1979) (emphasis added).

Mr. Trump argues that Ms. Carroll consented to Mr. Trump's allegedly defamatory remarks because she (1) "purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible" and (2) "waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States," leaving him "with no choice but to defend himself against th[e] heinous allegations."[91]  Neither of these points demonstrates that Ms. Carroll had any reason to expect Mr. Trump to make statements that would be defamatory. Indeed, Mr. Trump's argument amounts to suggesting that any time an individual comes forward with an accusation of wrongdoing against a public official, that person thereby consents to the official stating anything he or she wishes in response, no matter how calumnious. As Ms. Carroll aptly states, "[w]hen a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response."[92]

The only evidence that Ms. Carroll possibly "had reason to anticipate that [Mr. Trump's] response [to her accusation] might be a defamatory one"[93] – which Mr. Trump entirely ignores – comes from her own words in the excerpt of her book published in *New York* Magazine:

> "*Why haven't I 'come forward' before now?*
>
> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the 15 women who've come forward with credible stories about how the man [(Mr. Trump)] grabbed, badgered, belittled,

---

[91]     Dkt 109 (Def. Mem.) at 29-30.

[92]     Dkt 113 (Pl. Opp. Mem.) at 31.

[93]     *Handlin v. Burkhart*, 220 A.D.2d 559, 559 (2d Dept. 1995).

mauled, molested, and assaulted them, only to see the man turn it around, deny,

threaten, and attack them, never sounded like much fun. Also, I am a coward."[94]

It nevertheless fails to establish consent. First, as observed by another court in this circuit, "[a]

review of case law indicates that the type of consent accepted as a complete[] defense to a

defamation action is *specific* consent, typically initiated by the plaintiff, which clearly indicates that

the plaintiff was aware of and agreed to the possibility that defamatory statements might be

published."[95]  Ms. Carroll's generalized concern that she might be subject to the same attacks that

other women, as she stated, have experienced after coming forward with their accusations against

Mr. Trump does not demonstrate her awareness of and agreement to the possibility that Mr. Trump

might defame her in response to her specific accusation of sexual assault and rape.

Second, there is no evidence to suggest that Ms. Carroll had reason to know the type

or content of a public statement, if any, Mr. Trump might make in response to her accusation, let

alone that she agreed to it. "Implicit in the concept of consent is the conception that the consenting

party have the power to control the publication. Thus, there can be no finding of consent where, as

here, there is no effective control over the dissemination of the defamatory material."[96]  Indeed, when

asked in her deposition how she expected Mr. Trump would react to her sexual assault accusation,

---

[94]

    E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump -assault-e-jean-carroll-other-hideous-men.html.

[95]

    *McNamee v. Clemens*, 762 F. Supp. 2d 584, 604–05 (E.D.N.Y. 2011) (emphasis added) (citing cases).

[96]

    *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 104 (E.D.N.Y. 1997).

Ms. Carroll testified that:

> "I didn't think he would deny it. I thought he would just say it didn't happen
> that way. She agreed to it or it was consensual sex. . . . I just was shocked that he
> absolutely denied it because he was there and he denied it. That's what gets me every
> time. He was there, he denied it.[97]

She testified also that she "ha[s] no idea" if she would have sued Mr. Trump if he had instead said
that it was consensual sex because "it would have been him saying yeah, it happened and then we
could have disagreed and then I could have vehemently said no, I did not consent."[98]

Drawing all factual inferences in favor of Ms. Carroll, as the Court must on this
motion for summary judgment, Ms. Carroll's testimony makes clear that any generalized concern
Ms. Carroll harbored based on Mr. Trump's "den[ials], threat[s], and attack[s]" against his other
accusers did not translate to her consenting to the possibility the same would occur with her.[99]

*Punitive Damages*

Lastly, Mr. Trump argues that Ms. Carroll's punitive damages claim should be
dismissed because she cannot demonstrate that Mr. Trump acted with common law malice.

"Punitive damages may only be assessed under New York law if the plaintiff has

---

[97]

  Dkt 116-1 (Pl. Dep.) at 166:2-6, 167:3-7.

[98]

  *Id.* at 166:9-15.

[99]

  In the alternative, there at least is a genuine issue of material fact based on the evidence as
  to whether Ms. Carroll consented to Mr. Trump's allegedly defamatory statements,
  precluding dismissal as a matter of law on summary judgment.

established common law malice in addition to the other elements of libel. . . . To do so, plaintiffs must prove by a preponderance of the evidence that the libelous statements were made out of 'hatred, ill will, [or] spite.'"[100]  The Appellate Division, First Department, one of New York's intermediate appellate courts, has "held that a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was 'the one and only cause for the publication.'"[101] "Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote."[102]

Mr. Trump contends that his "statements could not have been 'motivated by a desire to injure plaintiff'" because "they were strictly made in Defendant's own defense."[103]  His argument merely presents his characterization of his own conduct, which of course is favorable to him. He fails

---

[100]

*Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 184 (2d Cir. 2000).

[101]

*Morsette v. "The Final Call"*, 309 A.D.2d 249, 255 (1st Dept 2003) (emphasis in original) (citation omitted).

[102]

*Celle*, 209 F.3d at 185.

[103]

Dkt 109 (Def. Mem.) at 34 (quoting *Morsette*, 309 A.D. at 255).

In passing, Mr. Trump raises also the point that "[i]ndeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity." *Id.* at 34 (citing cases).  First, his argument arguably has been waived because it was not raised in his answer and is "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013). In any event, any such claim of a qualified privilege – as with his main argument against punitive damages – depends on weighing the evidence of Mr. Trump's motives for making the allegedly defamatory statements.

45

to address any of the relevant evidence, including, for example, his deposition testimony with respect to the circumstances in which he made the statements and whether he ever read the *New York* magazine article or Ms. Carroll's book that contain her sexual assault accusation.

Furthermore, it is relevant – although not dispositive – that the jury in *Carroll II* in fact awarded punitive damages to Ms. Carroll for her defamation claim for Mr. Trump's 2022 statement, which as discussed above substantially is similar to Mr. Trump's statements in this case. To do so, the jury was required to find and did find that Ms. Carroll proved (1) Mr. Trump knew it was false or acted in reckless disregard of its truth or falsity when he made the statement accusing Ms. Carroll of lying about her sexual assault accusation to promote her book (actual malice) and (2) Mr. Trump made the statement with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights (common law malice). This outcome undermines Mr. Trump's argument that the same result is impossible in this closely related case.

In all the circumstances, Mr. Trump has failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied.

46

## *Conclusion*

For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied.

SO ORDERED.

Dated:       June 29, 2023

Corrected:    July 5, 2023

_____
Lewis A. Kaplan
United States District Judge

# EXHIBIT 34



**U.S. Department of Justice**

Civil Division

_Torts Branch, Federal Tort Claims Office_
_P.O. Box 888_
_Washington, DC 20044_
JGT:KLW:CSP:STerrell/DJ# 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

_Telephone (202) 353-1651_
_Facsimile (202) 616-5200_

June 9, 2023

**BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

     RE:    _Carroll v. Trump_, No. 1:20-cv-7311-LAK

Dear Judge Kaplan:

     As directed by the Order of June 1, 2023 (ECF No. 163), we submit this letter to advise the Court of the United States' position as to whether the filing of a new complaint in this action would render the government's previous Westfall Act certification ineffective and moot the government's motion to substitute itself for Mr. Trump.

     Since the government executed the Westfall Act certification, this Court rendered a decision denying the government's motion to substitute, the United States Court of Appeals for the Second Circuit vacated that decision and remanded the case for further proceedings in light of the intervening decision by the Court of Appeals of the District of Columbia clarifying D.C.'s law of _respondeat superior_, plaintiff proposed an amended complaint, and the parties to this case undertook discovery in parallel proceedings.  Given these collective developments, the prior certification and motion to substitute have been overtaken by events.  The Attorney General should therefore be given the opportunity to decide anew whether to certify that Mr. Trump was acting within the scope of his office as President at the time of the incidents out of which the plaintiff's claim arose, and to do so with respect to the allegations that are set forth in the operative complaint.  And, in light of the numerous potentially relevant developments, it is unnecessary for this Court to resolve whether the filing of the proposed new complaint, standing alone, would render the prior certification ineffective.

     Accordingly, we respectfully request that the Court afford the United States time after the Court decides the motion for leave to amend to allow the United States to reach a determination as to the scope-of-employment question. As set forth in our prior submission, we think the Court should first resolve plaintiff's pending motion to amend her complaint and then order the parties to meet and confer and submit a joint proposed briefing schedule on the issue of substitution 30

Hon. Lewis A. Kaplan
Page 2

days after the Court rules on the motion to amend the complaint.

Sincerely,

STEPHEN TERRELL

Digitally signed by STEPHEN
TERRELL
Date: 2023.06.09 12:37:47 -04'00'

Stephen R. Terrell

cc:     Counsel of Record (by ECF)

# EXHIBIT 35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

E. JEAN CARROLL,

                                    Plaintiff,


            -against-                                                    20-cv-7311 (LAK)


DONALD J. TRUMP, in his personal capacity,

                                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        1.    The plaintiff's motion for leave to amend [Dkt 155] is granted. A memorandum opinion may follow. The amended complaint is deemed served and filed today.

        2.    Defendant has requested that the Court, "[s]hould the Court . . . deny Plaintiff's Motion to Amend" [Dkt 164, at 19], grant defendant permission to file a supplemental motion for summary judgment. As the Court has granted plaintiff's motion, that request is moot.

        3.    The United States concedes that subsequent events have "overtaken" both (1) the government's 2020 certification that the defendant acted within the scope of his employment in making his allegedly defamatory statements, and (2) the government's 2020 motion to substitute the United States for the defendant in this case under the Westfall Act. It nevertheless has requested time following determination of the motion for leave to amend for the government to determine its present position on the scope of employment question. In all the circumstances, any further submission by the United States (including any new or amended certification and/or motion to

2

substitute) and/or the defendant with respect to substitution of the United States for the defendant shall be served and filed no later than July 13, 2023. Any response by the plaintiff shall be served and filed no later than July 27, 2023. Any reply(ies) by the United States and/or the defendant shall be served and filed no later than August 3, 2023.

       SO ORDERED.

Dated:      June 13, 2023

                               Lewis A. Kaplan
                           United States District Judge

# EXHIBIT 36



**U.S. Department of Justice**

Civil Division

---

*Torts Branch, Federal Tort Claims Office*
*P.O. Box 888*
*Washington, DC 20044*
JGT:JGTouhey/DJ# 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

*Telephone (202) 616-4400*
*Facsimile (202) 616-5200*

July 11, 2023

**By ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

     RE: *Carroll v. Trump*, No. 1:20-cv-7311-LAK

Dear Judge Kaplan:

     Attached please find a letter to the parties conveying the Department of Justice's determination not to certify under the Westfall Act.

                    Sincerely,

                    BRIAN M. BOYNTON
                    Principal Deputy Assistant Attorney General

By: **JAMES TOUHEY**
                        Digitally signed by JAMES
                        TOUHEY
                        Date: 2023.07.11 15:45:51 -04'00'

                    JAMES G. TOUHEY, JR.
                    Director, Torts Branch

cc: Counsel of Record (by ECF)

Attachment



**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*          *Washington, DC 20044*

July 11, 2023

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
ahabba@habbalaw.com
mmadaio@habbalaw.com

Roberta Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
rkaplan@kaplanhecker.com

     Re:    *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y.)

Dear Counsel:

     I write to inform you that, in light of the D.C. Court of Appeals' clarification of the standard for *respondeat superior* liability under D.C. law, *see Trump v. Carroll*, 292 A.3d 220 (D.C. 2023), as well as new factual developments, the Department of Justice is declining to certify under the Westfall Act, 28 U.S.C. § 2679(d), that defendant Donald J. Trump was acting within the scope of his office and employment as President of the United States when he made the statements that form the basis of the defamation claims in plaintiff's Amended Complaint in this action.

**The D.C. Court of Appeals Decision**

     Under the Westfall Act, federal employees are entitled to absolute immunity from personal tort liability for conduct occurring within the scope of their employment. *See* 28 U.S.C. § 2679. State tort law governs the scope-of-employment inquiry under the Act. Here, the parties agree that D.C. *respondeat superior* law governs. *Carroll v. Trump*, 49 F.4th 759, 766 & n.6 (2d Cir. 2022). The District of Columbia "generally adheres" to the Restatement (Second) of Agency's formulation of the *respondeat superior* standard, as set forth in § 228. *See Carroll*, 292 A.3d at 225; *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987).

The D.C. Court of Appeals clarified the meaning of this standard in response to the Second Circuit's certification in this case. The Court explained that the question under § 228(1)(c)—whether the conduct "is actuated, at least in part, by a purpose to serve" the employer—contains distinct components, two of which are relevant here: the "purpose" element and the "quantum" element. *Carroll*, 292 A.3d at 233-34.

The purpose element "is an inquiry into the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer." *Id.* at 234. This element focusses on the *subjective* state of mind of the employee, notwithstanding prior D.C. Court of Appeals decisions suggesting that the inquiry was an objective one. *E.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986). The Court explained that any history between the employee and the victim may also be relevant to this determination of subjective intent: "Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance." *Carroll*, 292 A.3d at 235.

The quantum element requires that the employee be motivated "at least in part" by a purpose to serve the employer. The requirement "does not foreclose that an employee could be concurrently motivated by a personal purpose," nor that such personal purpose could be the employee's predominant motivation. *Id.* at 235-36. But "if the employee's conduct is 'too little actuated' by [a public] purpose, then the employee's conduct would be outside the scope of employment." *Id.* at 236. The Court declined to "parse out an exact threshold" at which an employee is "actuated at least in part" by a purpose to serve their employer but "too little actuated" by that purpose for their conduct to fall within the scope of employment, instead "entrust[ing] this question to the factfinder." *Id.* at 237. The Court explained: "In other words, the factfinder must determine that an employee's partial purpose to serve their employer was more than an insignificant interest. It is a balancing and weighing of the evidence, both direct and circumstantial, to determine whether the quantum of purpose is more than insignificant." *Id.*

Finally, with respect to the D.C. Circuit's decision in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), the Court of Appeals made two observations: First, it noted that *Ballenger* did not adopt a categorical rule holding that "the conduct of elected officials speaking to the press is always within the scope of that official's employment," and the Court declined to itself adopt such a categorical rule. *Carroll*, 292 A.3d at 239-240 ("We have never adopted a rule that has determined that a certain type of conduct is per se within (or outside of) the scope of employment, and we decline to do so now."). Second, it noted that the *Ballenger* court's holding "rested on undisputed, affirmative evidence in the record that [Ballenger's] purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities," *id.* at 239, and suggested that in this respect, the record before the *Ballenger* court was distinct from the record in this case, "which is disputed by the parties." *Id.* at 239 n.23.

**Analysis**

Applying the clarified D.C. *respondeat superior* standard, the Department has determined that it lacks adequate evidence to conclude that the former President was sufficiently actuated by a purpose to serve the United States Government to support a determination that he was acting within the scope of his employment when he denied sexually assaulting Ms. Carroll and made the other statements regarding Ms. Carroll that she has challenged in this action.[1] The evidence of Mr. Trump's state of mind, some of which has come to light only after the Department last made a certification decision, does not establish that he made the statements at issue with a "more than insignificant" purpose to serve the United States Government. *Id.* at 237.

No direct evidence of the former President's state of mind in making these statements is available. As the D.C. Court of Appeals noted, this case stands in contrast to *Ballenger*, in which the Congressman offered "undisputed, affirmative evidence," *id.* at 239, by way of his affidavit, on which the district court relied in finding that he was acting, at least in part, "for the purpose of preserving his effectiveness as a congressman." *Ballenger*, 444 F.3d at 663 (quotation marks and citation omitted).

Moreover, the circumstantial evidence of Mr. Trump's *subjective* intent in making the allegedly defamatory statements does not support a determination in this case that he was sufficiently motivated by a desire to serve the United States Government. There is some evidence that could, in some circumstances, support a certification. The former President was responding to allegations that could have called into question his fitness to hold the office of the Presidency. In addition, the statements at issue were drafted or made at the White House, in response to inquiries made to or at the White House, through official channels that Presidents often use to communicate with the media: a statement issued by the press office to a daily press pool, a press "gaggle" on the White House lawn, and an interview in the Oval Office. *See, e.g.*, *Does 1-10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) ("Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.").

The D.C. Court of Appeals, however, has now made clear that D.C. law does not hold that *any* statement, whatever its actual purpose, is by definition made for official purposes simply because it is made using official channels of communication. *See Carroll*, 292 A.3d at 232 ("The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy."). Additionally, the Court of Appeals' clarification that *Ballenger* did not establish a "categorical" rule "that would hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment," *id.* at 239, confirms that the context in which the former President made these statements does not end our inquiry even if it would, on its own, give rise to an inference that he was acting for an official purpose.

---

[1] In her Amended Complaint, Ms. Carroll no longer challenges Mr. Trump's denial of having raped her.

3

Instead, the Department must also consider whether the allegedly tortious action arose out of a work-related incident. *See id.* at 232 (explaining that "the District of Columbia case precedents have focused on whether the conduct was an 'outgrowth of a job-related controversy,'" which has been "framed as an inquiry into whether the conduct was the 'outgrowth of the employees' instructions or job assignments'" (citation omitted)).[2]  The D.C. Court of Appeals explained that this inquiry may be informed by whether the alleged tortfeasor and the victim had a prior history that would suggest that the alleged tortfeasor was personally motivated. *See id.* at 234 ("Likewise, we have viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim.").  Here, although the statements themselves were made in a work context, the allegations that prompted the statements related to a purely personal incident: an alleged sexual assault that occurred decades prior to Mr. Trump's Presidency.  That sexual assault was obviously not job-related.  As a general matter, an elected official's ability to retain the trust of his constituents—including by addressing their concerns and informing them of his views on issues that they care about, or by discussing personal matters that may pertain to the public's confidence in him—is an important part of his ability to effectively perform his job.  But that background principle cannot overcome countervailing evidence that an official who made defamatory statements was insufficiently actuated by a public purpose, to justify a finding that he was acting within the scope of his employment.  *See, e.g.*, *Lyons v. Brown*, 158 F.3d 605, 610 (1st Cir. 1998) (noting that "whatever justification [the defendant] might have for his actions could be overcome if his actual purpose was to retaliate").  The evidence of personal motivation that has been developed in this case outweighs any public-purpose inference one might draw in other circumstances.

*First*, Mr. Trump's statements regarding Ms. Carroll continued after the former President left office, as indicated by new allegations in the Amended Complaint.  *See Carroll v. Trump*, No. 20-cv-07311, Dkt. No. 157, Ex. A (Amended Complaint), ¶ 152 (October 12, 2022 Truth Social post that the *Carroll II* jury found defamatory); ¶ 165 ("Mere minutes after the verdict [in *Carroll II*] became public, Trump repeated the defamatory lie that he had no idea who Carroll was" on his Truth Social account); *id.* ¶¶ 166-67 (two additional Truth Social posts the night after the jury verdict, calling Ms. Carroll's allegations a "Hoax" and suggesting that the accusations and subsequent trial were part of a political conspiracy); *id.* ¶ 168 (stating, during a CNN town hall on May 10, 2023, "I never saw this woman"; labelling Ms. Carroll's accusations a "fake story"; and calling her "a whack job").  The later statements are substantially similar to the three June 2019 statements at issue in this action, and because he was no longer the President when he made the later statements, Mr. Trump could not have been motivated by any interest in serving the United States Government.  These post-Presidency statements, which were not before the Department during the original scope certification in this case, tend to undermine the claim that the former President made very similar statements at issue in *Carroll I* out of a desire to

---

[2] Although this language comes from the Court of Appeals' discussion of the first prong of its *respondeat superior* test—whether the allegedly tortious conduct was "of the kind" the person is employed to perform, *see Carroll*, 292 A.3d at 232—the Court also considered it relevant for purposes of determining the defendant's subjective state of mind under the third prong.  *See id.* at 235 ("[I]nquiries into whether the tort was the outgrowth of a job-related controversy allow the factfinder to make inferences about whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated.").

serve the Government.

   *Second*, the prior history between Ms. Carroll and Mr. Trump supports a determination that the former President's statements were not sufficiently motivated by a purpose to serve the Government. As noted above, the D.C. Court of Appeals "ha[s] viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim." *Carroll*, 292 A.3d at 234; *id.* at 235 ("Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance."). And a jury has now found that Mr. Trump sexually assaulted Ms. Carroll long before he became President. That history supports an inference that Mr. Trump was motivated by a "personal grievance" stemming from events that occurred many years prior to Mr. Trump's presidency. *Id.* at 235.[3]

   *Third*, certain aspects of the content of the statements at issue and subsequent statements by Mr. Trump go far beyond merely denying Ms. Carroll's accusation. *See, e.g.*, Amended Compl. ¶ 83 ("Shame on those who make up false stories of assault to try to get publicity for themselves or sell a book or carry out a political agenda."); *id.* ("It is a disgrace, and people should pay dearly for such false accusations."); *id.* ¶ 92 ("This is a woman who has also accused other men of things . . . she's made this charge against others. . . I was one of the many men that she wrote about."); *id.* ("I have no idea who she is, none whatsoever."); *id.* ("[T]here were numerous cases where women were paid money to say bad things about me . . . those women did wrong things . . . here's a case, it's an absolute disgrace that she's allowed to do that."); *id.* ¶ 98 & n. 10; Jordan Fabian & Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type,"* The Hill (June 24, 2019), at 11 ("[S]he made this charge up. And by the way, she's made it up about, or she's said it about other people too."); *id.* ("I'll say it with great respect, number one, she's not my type."). In his deposition, Mr. Trump indicated that he "wanted people to know" that "she's . . . a very deranged, sick person[.]" Deposition of Donald J. Trump, *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y. Oct. 19, 2022), at 216:3-8. The "tone of [the relevant statements] strongly suggests that [defendant's] motivation . . . did not spring from a desire to serve . . . the United States." *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011).

*     *     *

   The Department must "take a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct," as is "appropriate under the facts presented," *Carroll*, 292 A.3d at 235. After "balancing and weighing [] the evidence," *id.* at 237, from Mr. Trump's deposition, the jury verdict in *Carroll II*, and the new allegations in the Amended

---

[3] The Westfall Act affords the Attorney General or his designee broad latitude to make factual determinations relevant to applying the scope-of-employment standard. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 (1995); *cf. Osborn v. Haley*, 549 U.S. 225, 247 (2007). For this reason, the Department is not bound by the jury's findings. At the same time, in this case, there does not appear to be a basis to disregard the jury's conclusions, which were made after weighing the relevant evidence presented by both parties in that case.

5

Complaint, the Department has determined that there is no longer a sufficient basis to conclude that the former President was motivated by "more than an insignificant" desire to serve the United States Government, *id*.  Accordingly, the Department hereby declines to issue a new Westfall Act certification.

Sincerely,

BRIAN BOYNTON  Digitally signed by BRIAN BOYNTON  Date: 2023.07.11 13:17:39 -04'00'

Brian M. Boynton
Principal Deputy Assistant Attorney General

# EXHIBIT 37

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0883
DIRECT EMAIL    rkaplan@kaplanhecker.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-26-2023

July 25, 2023

**VIA COURIER**



The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *Carroll v. Trump*, 20 Civ. 7311 (LAK) ("*Carroll I*")

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll with respect to Your Honor's July 19, 2023 Order directing each party to "file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims *Carroll II* has preclusive effective in this action." ECF 178. We understand this Order as directing the parties to submit any targeted summary judgment motions they may wish to make in *Carroll I* raising preclusion arguments based on *Carroll II*.

In light of the jury's verdict in *Carroll II*, it is our position that trial in the present action need only address narrow issues relating to damages. As we will explain in our briefing, two of the disputed elements of Carroll's defamation claim can be resolved entirely by collateral estoppel: specifically, the elements of *defamatory meaning* and *falsity*. The remaining three elements of Carroll's defamation claim are affected by collateral estoppel, but require a slightly different approach for pre-trial resolution. As to the elements of *publication* and being statements *of and concerning the plaintiff*, there has never been any genuine dispute of material fact on these points (and Trump did not seek to dispute these elements in *Carroll II*), and so we propose to incorporate into our papers a request for targeted summary judgment on these elements.

That leaves only the element of actual malice—that is, whether Defendant Donald J. Trump made his June 2019 statements knowing that they were false or with serious doubts as to their truth. In *Carroll II*, the jury found that Trump acted with actual malice in October 2022 when he denied assaulting Carroll and accused her of fabricating her statements. The *Carroll II* jury also found that Trump acted in a manner (and with a mental state) rendering him culpable for punitive damages. Those findings are preclusive in this action as to Trump's state of mind in making the October 2022 statement. It is our position that those jury findings, together with Trump's deposition in this action, foreclose any claim that Trump acted with actual malice in October 2022 but somehow did not do so in making substantively identical statements in June 2019. Therefore,

KAPLAN HECKER & FINK LLP                                              2

we propose to incorporate into our briefing papers a request for targeted summary judgment on the element of actual malice.

Because these summary judgment arguments are still dependent on what the *Carroll II* jury found—and because Your Honor has directed that "[n]o fact or proposition of law not identified in such a motion shall be regarded as having been established by *Carroll II*"—our plan (as set forth above) is to brief these points as part of Plaintiff's forthcoming motion. Should Your Honor prefer that we proceed differently, we of course will comply with any further order from the Court.

Respectfully submitted,

Roberta A. Kaplan

cc:      Counsel of Record

# EXHIBIT 38

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC<br><br>**NOTICE OF MOTION TO STAY<br>PENDING APPEAL** |

**PLEASE TAKE NOTICE** that the defendant, Donald J. Trump ("Defendant"), hereby moves this Court, before the Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, located at 500 Pearl Street, New York, NY 10007, on a date to be set by the Court, for an order granting Defendant's motion to stay this case pending resolution of his appeal of this Court's July 5, 2023 Order (ECF No. 173) under Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure.

This motion is supported by the annexed memorandum of law, any arguments or evidence presented in reply, and all arguments or evidence presented at a hearing or with leave of Court.

Dated: New York, New York
      July 27, 2023

Respectfully submitted,

_____
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
      -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: mmadaio@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

1

# EXHIBIT 39

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

               Plaintiff,

-against-

DONALD J. TRUMP, in his personal capacity,

               Defendant.

Civil Action No.: 1:20-cv-7311-LAK-JLC

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO STAY PENDING APPEAL

Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th St, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: mmadaio@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..........................................................................................................................2

    I.       The Stay Factors Weigh Heavily in Favor of Granting Defendant Relief...............2

      A.   Defendant Has Shown Sufficient Probability of Success on the Merits......................2

      B.   Defendant Will Suffer Irreparable Harm If No Stay Is Granted .................................7

      C.   Plaintiff Will Not Suffer Harm from a Stay Pending Appeal ....................................10

      D.   The Public Interest Favors a Stay .............................................................................11

    II.      This Court Has Been Divested of Jurisdiction Pending Appeal ...........................13

CONCLUSION.....................................................................................................................14

# TABLE OF AUTHORITIES

*Cases*

*Ashcroft v. Iqbal,*
    556 U.S. 662, 685 (2009)....................................................................................7

*Behrens v. Pelletier,*
    516 U.S. 299, 308 (1996)..................................................................................7, 9

*Blue Ridge Investments, L.L.C. v Republic of Argentina,*
    735 F.3d 72, 79-81 (2d Cir. 2013) .......................................................................6

*Bradley v. Jusino,*
    No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009)...................9

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
    598 F3d 30, 37 (2d Cir 2010) ...............................................................................3

*Clinton v. Jones,*
    520 U.S. 681, 694 (1997)......................................................................................5

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541, 69 S.Ct. 1221 (1949); ..................................................................6, 8

*Compare Barea v. State Univ. of New York at Albany,*
    1:05CV1523(GLS/DRH), 2005 WL 3531463, at *1 (N.D.N.Y. 2005)...................3

*District of Columbia v. Jones,*
    919 A.2d 604, 611 (D.C. 2007) ............................................................................7

*Dubose v. Pierce,*
    761 F2d 913, 920 (2d Cir 1985) ...........................................................................3

*Eddy v Virgin Is. Water and Power Auth.,*
    256 F.3d 204, 209 (3d Cir 2001) ........................................................................6, 7

*EM Ltd. v Banco Cent. De La Republica Argentina,*
    800 F3d 78, 82 (2d Cir 2015) .............................................................................6, 8

*Ferri v. Ackerman,*
    444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979)...........................12

*Free Ent. Fund v. Public CO. Acctg.,*
    561 U.S. 477 (2010)..........................................................................................5, 10

*Freytag v. Commissioner*,
    501 U.S. 868, 879-880, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) ............................6

*Garcia v. Bloomberg*,
    No. 11 Civ. 6957(JSR), 2012 WL 3127173, at *1 (S.D.N.Y. 2012) ......................9

*Goshtasby v. Bd. of Trs.*,
    123 F.3d 427, 428 (7th Cir 1997*)* ..................................................................9

*Griggs v. Provident Consumer Discount Co.*,
    459 U.S. 56, 58 (1982)..............................................................................13

*Gunter v. Carrion*,
    335 Fed Appx 130, 131 (2d Cir 2009)........................................................3

*Harlow v. Fitzgerald*,
    457 U.S. 800, n. 17 (1982)....................................................................4, 5

*Helstoski v. Meaner*,
    442 U.S. 500, 99 S. Ct. 2445 (1979) ..........................................................6

*Hernandez v Cook County Sheriff's Off.*,
    634 F.3d 906, 912-13 (7th Cir 2011) ..........................................................7

*Imbler v. Pachtman*,
    424 U.S. 409, 419 n.13 (1976)..................................................................8

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F3d 167, 170 (2d Cir 2007) ........................................................1, 8, 11

*In re Country Squire Assoc. of Carle Place, L.P.*,
    203 B.R. 182, 183 (B.A.P. 2d Cir 1996) ......................................................8

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) ....................................................9

*Ins. Corp. of Ireland, Ltd. v. Cie. des Bauxites de Guinee*,
    456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982)............................................5

*Kendall v. United States*,
    12 Pet. 524, 610, 9 L.Ed. 1181 (1838)........................................................4

*Locurto v. Safir*,
    264 F.3d 154, 164 (2d Cir 2001) ..............................................................9

*Maricultura del Norte, S. de R.L. de C.V. v. WorldBusiness Capital, Inc.,*
    No. 14 CIV. 10143 (CM), 2019 WL 2117645, at *3-4, 6 (S.D.N.Y. Apr. 26, 2019) ...........13

*Minotti v. Lensink,*
    98 F.2d 607, 608 (2d Cir. 1986) ...............................................................6

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985)..................................................................6, 7, 8, 9

*Mohammed v. Reno,*
    309 F3d 95, 100 (2d Cir 2002) ...............................................................1, 2

*MyWebGrocer, LLC v. Hometown Info, Inc.,*
    375 F3d 190, 192 (2d Cir 2004) ...............................................................3

*New York v. United States,*
    505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).................................6

*Nixon v. Fitzgerald,*
    457 U.S. 731, 744, 102 S. Ct. 2690, 2698, 73 L. Ed. 2d 349 (1982)..............4, 5, 6, 10, 12, 13

*Pasco ex rel. Pasco v. Knoblauch,*
    566 F.3d 572, 577 (5th Cir. 2009) ...........................................................7

*Pierson v. Ray,*
    86 U.S., at 554, 87 S.Ct., at 1218 ...........................................................12

*Raines v. Byrd,*
    521 U.S. 811, 820 (1997)..........................................................................5

*San Filippo v U.S. Tr. Co. of New York, Inc.,*
    737 F2d 246, 254 (2d Cir 1984) ...............................................................8

*Siegert v. Gilley,*
    500 U.S. 226, 232 (1991)...........................................................................8

*Trump v. Mazars USA LLP,*
    140 S.Ct. 2019, 2035 (2020)......................................................................4

*Trump v. Vance,*
    481 F Supp 3d 161, 164 (S.D.N.Y. 2020) ...........................................3, 4, 5, 12

*United States v. Rodgers,*
    101 F.3d 247, 251 (2d Cir 1996) ...............................................................13

*Williams v. Brooks,*
    996 F.2d 728, 730 n.2 (5th Cir 1993) ........................................................9


**Rules and Statutes**

28 U.S.C. § 1291 .............................................................................................7

Fed. R. Civ. P. 12(h)(3) ..................................................................................5

Rule 8(a)(1)(A) ................................................................................................1

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion, pursuant to Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure to stay this case pending resolution of his appeal of this Court's July 5, 2023 Order (ECF No. 173) (the "Order") denying Defendant's motion for summary judgment filed on December 22, 2022 (ECF No. 107) (the "Motion for Summary Judgment"), which is currently pending before the United States Court of Appeals for the Second Circuit under case no. 23-0793 (the "Appeal"). For the reasons discussed herein, Defendant's motion should be granted in its entirety.

## PRELIMINARY STATEMENT

Pursuant to the instant application, Defendant seeks a stay of this action pending resolution of his appeal of this Court's denial of his Motion for Summary Judgment. As outlined herein, the factors for determining whether a stay is appropriate weigh heavily in Defendant's favor.   First, Defendant has a substantial likelihood of success on that appeal because—as fully set forth in Defendant's underlying motion papers—the claims asserted by the plaintiff, E. Jean Carroll ("Plaintiff") against Defendant are wholly barred by the doctrine of absolute presidential immunity, which is a non-waivable issue of subject matter jurisdiction by way of the separation of powers doctrine.  Second, absent a stay of proceedings, Defendant will be irreparably harmed since his immunity defense will be rendered moot, while Plaintiff will sustain little, if any, prejudice. Third, given the important public policy considerations at play, there is an immense public interest in staying this action to permit the Second Circuit to issue a ruling on Defendant's presidential immunity defense.

Therefore, for the reasons set forth herein, a stay of this action pending resolution of the Appeal is warranted, necessary, and appropriate at this time.

## ARGUMENT

### I. THE STAY FACTORS WEIGH HEAVILY IN FAVOR OF GRANTING DEFENDANT RELIEF.

"The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007).

While these four factors are relatively settled, the exact phrasing differs between opinions even in this Circuit—especially regarding the first factor. *See Mohammed v. Reno,* 309 F.3d 95, 100 (2d Cir. 2002) ("Although courts have discussed and applied these four criteria on numerous occasions, some uncertainty has developed as to the first factor because of the various formulations used to describe the *degree* of likelihood of success that must be shown"). Regardless of the standard applied, the factors clearly support granting a stay based on the specific circumstances at hand.

#### A. Defendant Has Shown Sufficient Probability of Success on the Merits

As recognized above, the Second Circuit has formulated the relevant test for likelihood of success in various ways:

> "[o]n occasion [this Circuit has] required 'a probability of the movant's prevailing that is better than 50 percent.' . . . On the other hand, we have also used 'possibility' rather than 'probability,' usually requiring a 'substantial possibility' of success. . . *Dubose* expressed the standard as "a substantial possibility, although less than a likelihood, of success.' "

*Mohammed,* 309 F.3d at 101 (internal quotations and revisions omitted) (citing *Dubose v. Pierce,* 761 F.2d 913, 920 (2d Cir. 1985), overturned on grounds unrelated to the stay).

Ultimately, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors." *Mohammed*, 309 F.3d at 101 (internal quotation marks omitted).

More recent holdings have gone even further, recognizing the appropriateness of staying litigation where there is at least a "serious question going to the merits" pending appeal. *See Trump v. Vance*, 481 F.Supp.3d 161, 164 (S.D.N.Y. 2020) (movants seeking a stay pending appeal must show "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation.") (quoting *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004)).

This is significantly less than the "substantial likelihood of success" test necessary for obtaining injunctive relief that has the effect of granting substantially all of the relief requested. *Compare Barea v. State Univ. of New York at Albany,* No. 1:05-CV-1523(GLS/DRH), 2005 WL 3531463, at *1 (N.D.N.Y. 2005) with *Gunter v. Carrion,* 335 Fed. Appx. 130, 131 (2d Cir. 2009). In fact, the Second Circuit has explicitly held that even where decisions regarding stays pending appeal utilize phrasing such as "likely to succeed on the merits," this "[does] not suggest that this factor requires a showing that the movant is more likely than not to succeed on the merits." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010) (internal quotations omitted).

Here, it is virtually beyond dispute that an important question has been presented to the Second Circuit to resolve on appeal, as the issue of whether presidential immunity can be waived is a novel question of law which has significant ramifications on the level of autonomy afforded to the Executive Branch.

As an initial matter, there is no question that the Second Circuit has jurisdiction to immediately review the Court's finding that Defendant waived the defense of presidential immunity pursuant to the collateral order doctrine. *See generally Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221 (1949); *see also Nixon*, 457 U.S. at 731, 102 S.Ct. 2690 (denial of presidential immunity was immediately appealable); *Helstoski v. Meaner*, 442 U.S. 500, 99 S. Ct. 2445 (1979) (denial of Congressman's claim for absolute immunity under the Speech or Debate Clause was immediately appealable); *Mitchell v. Forsyth*, 472 U.S. 511 (1985) (denial of claim of qualified immunity by former attorney general was immediately appealable); *Will v. Hallock*, 564 U.S. 345, 353, 126 S. Ct. 952, 959 (2006) ("In *Nixon*, *supra*, we stressed the 'compelling public ends, rooted in . . . the separation of powers,' that would be compromised by failing to allow immediate appeal of a denial of absolute Presidential immunity[.]") (citing *Nixon*, *supra*). Indeed, the Second Circuit has routinely held that denials of immunity based on a theory of *waiver* are immediately appealable just as any other denial of such immunity. *See, e.g.*, *EM Ltd. v Banco Cent. De La Republica Argentina*, 800 F.3d 78, 82 (2d Cir. 2015) (holding denial of foreign sovereign immunity as waived was immediately appealable); *Blue Ridge Investments, L.L.C. v Republic of Argentina*, 735 F.3d 72, 79-81 (2d Cir. 2013) (holding denial of foreign sovereign immunity as waived was immediately appealable); *Minotti v. Lensink*, 798 F.2d 607, 608 (2d Cir. 1986) (holding denial of Eleventh Amendment immunity as waived was immediately appealable).

Numerous other circuits have also held that an order finding that an immunity has been waived is immediately appealable. *See Eddy v Virgin Is. Water and Power Auth.*, 256 F.3d 204, 209 (3d Cir 2001) ("The district court's holding that the [immunity] defense was waived can be considered an appealable final order for purposes of 28 U.S.C. § 1291, under which we have jurisdiction to review 'final orders' of a district court, because it conclusively forecloses the

defendants' entitlement not to stand trial and is separate from the merits of Henricks's claim.") (brackets added); *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (Holding that the Fifth Circuit had jurisdiction under the collateral order doctrine to determine whether individual defendants waived the defense of quailified immunity by failing to raise it until their motion for summary judgment); *Hernandez v Cook County Sheriff's Off.*, 634 F.3d 906, 912-13 (7th Cir 2011) ("Accordingly, a finding of waiver is a legal determination which enables appellate review of the denial of qualified immunity."). Therefore, appealability does not present a procedural hurdle for Defendant; he is entitled to an immediately appeal the Order pursuant to the collateral order doctrine.

As for the substantive merits of Defendant's appeal, while Defendant's arguments are set forth at length in his underlying moving and reply papers, *see* ECF Nos. 109 and 122, which are incorporated by reference herein, Defendant reiterates both that presidential immunity is a fundamentally unique and important form of immunity which is intended to shield against the "threatened breach of essential Presidential prerogatives under the separation of powers," and, thus, is non-waivable by its very nature. *Nixon v. Fitzgerald*, 457 U.S. 731, 744, 102 S. Ct. 2690, 2698 (1982). Indeed, "[t]he President is the only person who alone composes a branch of government," and therefore "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Trump v. Mazars USA LLP*, 140 S.Ct. 2019, 2035 (2020) (quoting *The Federalist* No. 51).

The Supreme Court has declared that "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Nixon*, 457 U.S. at 750, 102 S. Ct. at 2701; *see also Harlow v. Fitzgerald*, 457 U.S. 800, n. 17 (1982) (noting that presidential immunity "derives in principle part from factors unique to [the President's] constitutional responsibilities and

station."). Indeed, "[t]he executive power is vested in [the] President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Nixon*, 457 U.S. at 754, 102 S. Ct. at 2703 (citing *Kendall v. United States*, 12 Pet. 524, 610, 9 L.Ed. 1181 (1838)). In view of the "singular importance of his duties," there exists an overarching concern that "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 751, 102 S. Ct. at 2702; *see also Vance*, 140 S. Ct. at 2426 (noting that the "dominant concern" which justifies presidential immunity is the risk of "distortion of the [President's] 'decision making process' with respect to official acts that would stem from 'worry as to the possibility of damages.'") (citation omitted).

Hence, unlike "[s]uits against other officials [which] . . . generally do not invoke separation-of-powers considerations," *Harlow*, 457 U.S. at n. 17, presidential immunity is an "essential Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of powers," *Nixon*, 457 U.S. at 749. This point was further elaborated on in *Clinton v. Jones*, when the Supreme Court clarified that the "dominant concern" in *Nixon* was not that a sitting President might be "distracted by the need to participate in litigation during the pendency of his office" but that his "decision making process" may be distorted due to "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. 681, 694 (1997); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) (stating "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties" (citations omitted).

Thus, given the interplay between the separation of powers doctrine, Article III standing, and subject matter jurisdiction—as set forth at length in Defendant's motion papers, *see* ECF

6

122—there is a compelling argument that presidential immunity is a non-waivable issue of subject matter jurisdiction. *See Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.") (internal quotation marks omitted); *Ins. Corp. of Ireland, Ltd. v. Cie. des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982) ("Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign."); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Free Ent. Fund v. Public CO. Acctg.*, 561 U.S. 477 (2010) ("[T[he separation of powers does not depend on the views of individual Presidents . . . nor on whether 'the encroached-upon branch approves the encroachment[.]'") (citing *Freytag v. Commissioner,* 501 U.S. 868, 879-880, 111 S.Ct. 2631 (1991); *New York v. United States,* 505 U.S. 144, 182, 112 S.Ct. 2408 (1992)).

In short, Defendant has set forth a substantial likelihood of success on the Appeal, and, at a minimum, there certainly is an important, novel and compelling argument as to the viability of his presidential immunity defense. Therefore, this prong weighs heavily in Defendant's favor.

### B.    Defendant Will Suffer Irreparable Harm If No Stay Is Granted

Given the immunity-based question at the heart of the Appeal, the risk that Defendant will be irreparably harmed absent a stay is patent.

"The purpose of conferring absolute immunity is to protect officials not only from ultimate liability but also from all the time-consuming, distracting, and unpleasant aspects of a lawsuit . . ." *District of Columbia v. Jones*, 919 A.2d 604, 611 (D.C. 2007); *see also Mitchell*, 472 U.S. at 525 ("[T]he essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action."). Assertions of immunity provide protection "not merely

to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (interior quotation marks and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) ("The basic thrust of the qualified immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery.") (interior quotation marks and citation omitted).

Immunity provisions, whether absolute or qualified, serve to spare officials from unwarranted liability as well as "demands customarily imposed upon those defending a long drawn-out lawsuit," and are "effectively lost if a case is erroneously permitted to go to trial." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (quoting in part *Mitchell*, 472 U.S. at 525). It follows that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). This is the very reason that denials of immunity are one of the few categories of orders subject to interlocutory appeals. *See*, *e.g.*, *San Filippo v U.S. Tr. Co. of New York, Inc.*, 737 F2d 246, 254 (2d Cir 1984) ("The Supreme Court has held on several occasions that interlocutory orders denying claims of absolute immunity are appealable under *Cohen . . .*") (gathering cases); *EM Ltd. v Banco Cent. De La Republica Argentina*, 800 F3d 78, 82 (2d Cir 2015) (decision that defendant had waived foreign sovereign immunity was immediately appealable).

In other words, the entire purpose of an immunity is inherently and unavoidably frustrated when a Court acknowledges the viability of an immunity only *after* the conclusion of litigation, at which point the immunity from suit has already been irreparably and indisputably forfeited. *See In re Country Squire Assoc. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (noting that it is the "quintessential form of prejudice" when "absent a stay pending appeal . . . the appeal will be rendered moot."); *see also Mitchell,* 472 U.S. at 526 ("The entitlement [of qualified

8

immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial") (emphasis in original); *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007) ("any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit."); *Locurto v. Safir*, 264 F.3d 154, 164 (2d Cir. 2001) (holding that qualified immunity explicitly includes the right to avoid trial and "pre-trial burdens," including discovery) (citing to *Behrens v. Pelletier*, 516 U.S. 299 (1996)); *Garcia v. Bloomberg*, No. 11 Civ. 6957(JSR), 2012 WL 3127173, at *1 (S.D.N.Y. 2012) (finding that "qualified immunity is an entitlement to 'immunity from suit,' including the right to avoid even pre-trial discovery"); *see also Mitchell*, 472 U.S. at 526 ("The entitlement [of qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial") (emphasis added).

In this context, it is axiomatic that irreparable harm results when a defendant is forced to proceed forward with a matter while the issue of whether an immunity applies has yet to be resolved. *Goshtasby v. Bd. of Trs.*, 123 F.3d 427, 428 (7th Cir. 1997) ("[I]f the defendant is correct that it has immunity, its right to be free of litigation is compromised, and lost to a degree, if the district court proceeds while the appeal is pending."); *see also, e.g., Williams v. Brooks*, 996 F.2d 728, 730 n.2 (5th Cir 1993) (immunity "'is effectively lost' if a case is erroneously permitted to proceed at the district court level while an interlocutory appeal of a denial of immunity is pending.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting the argument that divestiture is not automatic in the qualified immunity context);

*Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

Here, Defendant has raised the defense of absolute presidential immunity since the Complaint seeks to impose liability for conduct Defendant is alleged to have undertaken while he was a sitting President. At present, trial is currently schedule for January 15, 2024. If this case proceeds forward absent a stay, it is all but certain that Defendant will be required to proceed to trial without final resolution as to whether his presidential immunity defense is viable. In such a scenario, the presidential immunity defense will be "effectively lost." *Mitchell,* 472 U.S. at 526; see also *Nixon*, 457 US at 749, 102 S. Ct. at 2701 (noting that a President is entitled to "absolute immunity from damages liability predicated on [his] official acts," and that such immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history.").

Therefore, the immediately appealable nature of Defendant's presidential immunity defense, his substantial likelihood of success on the merits of his Appeal, and the imminent harm that will result without the imposition of a stay, all weigh in favor of granting the instant application.

### C.     Plaintiff Will Not Suffer Harm from a Stay Pending Appeal

It is axiomatic that where harm to the plaintiff is a factor to be considered before staying an appeal, the very existence of a stay, without more, cannot constitute that harm or it would otherwise be a meaningless factor. While no delay is ideal, here Plaintiff will suffer no more harm than any other litigant and less than many.

Plaintiffs must show significant and particularized hardship to outweigh the irreparable harm defendants will suffer when litigation is not stayed pending review of their claim for immunity, and Plaintiff is unable to make this unique showing. See e.g., *In Re World Trade Ctr*., 503 F.3d at 170. In the case of *In Re World Trade Ctr.,* regarding toxic fumes inhaled by workers at the "ground zero site" of the World Trade Center disaster, the court recognized that the defendants faced irreparable harm if litigation was not stayed pending appeal of their claim of immunity. *Ibid.* In order to overcome that irreparable harm, it took a showing that many of the plaintiffs faced life-threatening injuries and that other plaintiffs had already died while litigation was pending. *Id.* at 171.

Here, Plaintiff is unable to demonstrate that the harm she would suffer should this Court grant a stay of proceedings. While it is true that this action has been pending for several years, Plaintiff was able to utilize discovery gathered in this action to proceed to trial in an expedited basis in the related matter of *Carroll II*. In this context, the harm of delay is significantly diminished. Indeed, it cannot be reasonably disputed that Defendant's entitlement to be heard on the threshold question of whether he is entitled to absolute immunity from liability outweighs Plaintiff's desire to expeditiously hold a *second* trial on similar and related claims. Therefore, this factor tips in Defendant's favor.

### D.    The Public Interest Favors a Stay

When an appeal to determine whether immunity applies remains pending, "there is a public interest in vindicating the immunity of any of the defendants who might be entitled to immunity from suit" by staying litigation until the question of that immunity has been resolved. *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d at 170 (finding that such public interest was only

overcome upon a showing of a competing public interest in allowing the litigation to reach trial and possibly "result in compensation for at least some Plaintiffs during their lifetimes").

With respect to the interests involved in the instant matter, the immunity claimed by Defendant is "rooted in the constitutional tradition of the separation of powers and supported by our history," based on the President's "unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749, 102 S. Ct. at 2701. The Supreme Court has confirmed that there "exists the greatest public interest in providing" the President immunity from his official acts, and that deprivation of such immunity would be to the "detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 752 (internal quotations omitted).

Indeed, in *Nixon v. Fitzgerald*, the Supreme Court emphasized the indispensable nature of this protection, noting that, without it, a President's ability to effectively serve his country would be severely hindered. In particular, the Supreme Court reasoned:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government. As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at 554, 87 S.Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753; *see also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government

officials); *Vance*, 140 S.Ct. at 2425 (noting that the President's duties "are of unrivaled gravity and breadth.").

Thus, given the "compelling public ends" served by the doctrine of presidential immunity, it is incontrovertible that there are immense public interests at play, and that the public interest weighs heavily in favor of a stay pending resolution of these vital questions. *Nixon*, 457 U.S. at 758, 102 S. Ct. at 2705.

## II. <u>THIS COURT HAS BEEN DIVESTED OF JURISDICTION PENDING APPEAL</u>

This action must also be stayed on the independent basis that this Court is currently divested of jurisdiction. Interlocutory appeals divest trial courts of jurisdiction "over those aspects of the case involved in the appeal," and as presidential immunity confers immunity from suit in its entirety, appeals involving immunity from suit therefore pertain to—and divest jurisdiction from the trial court over—the entirety of the litigation. *See Griggs v. Provident Consumer Discount Co*., 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance— it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").

It has ultimately been established that because this appeal involves immunity from suit, which protects a defendant from the expense of pre-trial litigation, an appeal from that denial of that immunity divests the Court of jurisdiction to oversee litigation of that appeal. *See*, *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir 1996) ("A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals."); *Maricultura del Norte, S. de R.L. de C.V. v. WorldBusiness Capital, Inc.*, No. 14 CIV. 10143 (CM), 2019 WL 2117645, at *3-4, 6 (S.D.N.Y. Apr. 26, 2019) (denying motion to compel because "ordering discovery at this stage would be premature" until "the Court of Appeals issues its mandate"). Thus, as demonstrated

13

above, the finding that Defendant waived the defense of presidential immunity has divested this Court of jurisdiction until the Court of Appeals resolves the outstanding question of whether Defendant is immune from having to engage in this lawsuit.

## **CONCLUSION**

For all the reasons above, Defendant respectfully requests that this Court grant a stay of this action pending resolution of the Appeal.

Dated:  July 27, 2023
      New York, New York

Respectfully submitted,

_____
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
      -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Phone: (908) 869-1188
Fax: (908) 450-1881
Email: mmadaio@habbalaw.com
*Attorneys for Defendant Donald J. Trump*

# EXHIBIT 40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                Plaintiff,

          -against-                              20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION DENYING
DEFENDANT'S MOTION TO STAY**

          Appearances:

                    Roberta Kaplan
                    Joshua Matz
                    Shawn Crowley
                    Matthew Craig
                    Trevor Morrison
                    Michael Ferrara
                    KAPLAN HECKER & FINK LLP
                    *Attorneys for Plaintiff*

                    Alina Habba
                    Michael T. Madaio
                    HABBA MADAIO & ASSOCIATES LLP
                    *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

          A little less than four years ago, writer E. Jean Carroll commenced this defamation

lawsuit against then-president Donald Trump for certain statements he made in 2019 shortly after

2

Ms. Carroll publicly accused him of sexually assaulting ("raping") her in the mid 1990s. This case was largely stalled for years due in large part to Mr. Trump's repeated efforts to delay, which are chronicled in the Court's prior decisions.[1]  Mr. Trump's latest motion to stay – his *fourth* such request – is yet another such attempt to delay unduly the resolution of this matter.

After litigating this case for over three years, Mr. Trump, in his motion for summary judgment filed in December 2022, for the first time asserted that he has absolute presidential immunity for his 2019 statements about Ms. Carroll. This Court rejected the argument. It first held that Mr. Trump had waived his absolute presidential immunity defense by failing to plead or otherwise raise it earlier. It denied also, on two independent grounds, Mr. Trump's alternative request to amend his answer to raise the defense now: (1) the proposed amendment would be futile because the presidential immunity defense would be without merit, and (2) Mr. Trump in any case delayed unduly in raising the defense, and granting his request would prejudice Ms. Carroll unfairly.

Mr. Trump filed an interlocutory appeal of that decision. He now seeks to stay this case pending resolution of his appeal. For the reasons stated below, his request is denied.

### *Facts*

The Court assumes familiarity with its prior decisions in this case ("*Carroll I*") and in a second closely related case ("*Carroll II*"), which detail the facts and procedural histories of both

---

[1]    *E.g.*, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 4393067, at *12 (S.D.N.Y. July 5, 2023); *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022).

cases.[2]

*Ms. Carroll Files This Lawsuit In November 2019*

          In the hours and days immediately after Ms. Carroll first publicly accused Mr. Trump

of sexually assaulting ("raping") her in a department store in New York in the mid 1990s, Mr. Trump

issued public statements in which he denied the accusation, stated that he did not know and never

had met Ms. Carroll, and claimed that she fabricated the accusation for ulterior and improper

purposes. Approximately five months later, in November 2019, Ms. Carroll brought this lawsuit

alleging that Mr. Trump defamed her in his statements and seeking damages and other relief. The

case was filed originally in a state court in New York before being removed to this Court in

September 2020 in circumstances discussed previously.

*Mr. Trump's Previous Motions To Stay This Case*

          This motion is Mr. Trump's fourth attempt to stay this case.

---

[2]

    *E.g.*, Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll*, 590 F. Supp. 3d 575; Dkt 96, *Carroll*, 2022 WL 6897075; Dkt 145, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 173, *Carroll*, 2023 WL 4393067; Dkt 200, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 5017230, (S.D.N.Y. Aug. 7, 2023); Doc. No. 22-cv-10016 (*Carroll II*), Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb, 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No. 22-cv-100l6 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023), *Carroll II*, Dkt 212, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, (S.D.N.Y. July 19, 2023).

    Unless otherwise indicated, Dkt references are to the docket in this case.

4

He first moved to stay it while it still was in state court, where he moved to stay the proceedings pending a decision by the New York Court of Appeals in a different lawsuit against him.[3] The state court denied that motion, and the case was removed to this Court a month later.

Mr. Trump's second and third motions to stay, made before this Court, also were denied. Both were related to a motion by the Department of Justice to substitute the United States for Mr. Trump as the defendant in this case pursuant to the Westfall Act based on the theory that Mr. Trump was an "employee" of the United States within the meaning of the Westfall Act and that he had acted within the scope of his employment as president when he made the allegedly defamatory statements. In October 2020, this Court denied the government's then motion to substitute the United States in place of Mr. Trump.[4] Both Mr. Trump and the government appealed, and Mr. Trump moved in this Court to stay all proceedings pending appeal. He argued that this Court was "divested of jurisdiction" because its "'rejection of certification and substitution effectively denied [defendant] the protection afforded by the Westfall Act, a measure designed to immunize covered federal employees *not simply from liability, but from suit*.'"[5] The Court denied Mr. Trump's motion to stay

---

[3]

    *Carroll v. Trump*, Index No. 160694/2019 (NY. Sup. Ct.), Dkt 43.

[4]

    In June 2023, the government stated that in its view, "the prior certification [under the Westfall Act] and motion to substitute have been overtaken" by developments subsequent to the government's initial certification, which included decisions on the substitution issue by the Second Circuit and the District of Columbia Court of Appeals. Dkt 166. On July 11, 2023, the government informed the Court and the parties of its decision not to renew its Westfall Act certification in this case. Dkt 177.

[5]

    Dkt 47 (Def. Letter Request to Stay) at 1 (emphasis and alteration in original) (quoting *Osborn v. Haley*, 549 U.S. 225, 238 (2007)).

without prejudice.[6]  Mr. Trump neither sought a stay from the Second Circuit nor renewed his

motion in this Court.

Mr. Trump moved a third time to stay this case in conjunction with a second motion,

that one filed by Mr. Trump, to substitute the United States in his place. Both requests came shortly

after the Second Circuit's decision on Mr. Trump's and the government's appeal of this Court's

Westfall Act decision, in which the Circuit certified the question of the whether Mr. Trump had

acted within the scope of his employment to the District of Columbia Court of Appeals. This Court

denied both motions – the stay motion and Mr. Trump's motion to substitute the United States, and

explained:

"As an initial matter, discovery in this case has virtually concluded. Mr.

Trump has conducted extensive discovery of the plaintiff, yet produced virtually none

himself. The principal open items, as the Court understands it, are the depositions of

Ms. Carroll and Mr. Trump, scheduled for October 14 and 19, respectively.

Completing those depositions – which already have been delayed for years – would

impose no undue burden on Mr. Trump, let alone any irreparable injury. . . . Given

his conduct so far in this case, Mr. Trump's position regarding the burdens of

discovery is inexcusable. On December 10, 2020, he moved for a stay pending

appeal. His arguments then in support of that motion were almost identical to those

advanced here. This Court denied the motion on September 15, 2021. And since that

motion was denied, he has taken discovery against plaintiff when the circumstances

---

[6]   Dkt 56.

6

were not materially different.

"[A] stay [also] would cause substantial injury to plaintiff. As the Court noted in an earlier opinion in this case, 'defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him.' Delay is a more serious concern in this case than usual for several reasons. First, the appeal from my order denying substitution already has consumed 20 months from the day it was noticed and it is not over yet. The remaining question has been certified to the D.C. Court of Appeals, a process that reasonably may be expected to be lengthy. Perhaps most significant, both plaintiff and defendant – and perhaps other witnesses – already are of advanced age. The defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong."[7]

*Current Status Of This Case*

There have been several developments relevant to this case following the Court's October 2022 denial of Mr. Trump's third motion to stay. Most significantly, in November 2022, Ms. Carroll filed a second lawsuit against Mr. Trump in a case now known as "*Carroll II*" in which she brought two claims. The first was a sexual battery claim under the Adult Survivors Act ("ASA"), a new law enacted by New York in 2022 that created a one-year period within which persons who were sexually assaulted as adults could sue their alleged assaulters even if their claims otherwise

---

[7]    *Carroll*, 635 F. Supp. 3d at 236-37.

7

would have been untimely. She brought also a defamation claim for a statement Mr. Trump published on social media in 2022 that was substantially similar to his 2019 statements.

By the time *Carroll II* was filed, discovery in this case had been completed.[8] The parties submitted a joint pretrial order, which this Court approved, and decided Mr. Trump's motion for summary judgment and both parties' pretrial *in limine* motions.[9] This case originally was set for trial on February 6, 2023, and later was adjourned until April 10, 2023. The Court subsequently adjourned the April 10, 2023 trial date *sine die* given the then still pending certified questions in the District of Columbia Court of Appeals on the Westfall Act issue. Following the D.C. court's ruling on the certified questions, a remand of this case by the Second Circuit, and completion of the trial in *Carroll II*, the Court set a new trial date of January 15, 2024 in this case. At present, the only matter that remains open prior to trial is completion of reply memoranda on the issue of preclusive effect, if any, of the findings in *Carroll II* in this action.

*Carroll II* was tried in this Court from April 25, 2023 to May 9, 2023. The jury in that case unanimously determined that Mr. Trump "sexually abused" Ms. Carroll and that he defamed her in his 2022 statement, awarding her $2.02 million for her sexual battery claim and $2.98

---

[8]

The deadline to complete all discovery in this case was November 16, 2022. Dkt 77.

[9]

Ms. Carroll notes that "[i]f cross-applied to this proceeding, as they should be, the Court's decisions on the motions *in limine* submitted in *Carroll II* would resolve the bulk of the outstanding *Carroll I* evidentiary issues (though of course the parties may wish to submit additional motions in limine in advance of the trial scheduled for January 2024)." Dkt 202 (Pl. Opp. Mem.) at 6 n.7. As this issue is not presently before the Court, it does not now decide or take any position with respect to it.

8

million for her defamation claim.[10]

## *Discussion*

*Legal Standard*

The legal standards governing a motion to stay are well settled:

"'The proponent of a stay bears the burden of establishing its need.' *Clinton v. Jones*, 520 U.S. 681, 708 (1997). Even where irreparable injury might result, a stay is 'not a matter of right.' *Virginian Ry. Co.*, 272 U.S. 658, 672 (1926). Rather, it is 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.' *Id.* at 672–73. Yet the Court's discretion is not unguided. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Courts weighing motions to stay consider four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.' *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Sailor v. Scully*, 666 F.Supp. 50, 51 (S.D.N.Y.1987) (describing the four factors regulating issuance of a stay pursuant to Federal Rule of Civil Procedure 62). Courts treat these four factors 'like a sliding scale.' *Thapa v. Gonzales*, 460 F.3d 323, 334

---

[10] The precise meaning of the jury's "sexual abuse" finding has been detailed in the Court's prior decisions and need not be repeated here. *E.g.*, *Carroll*, 2023 WL 5017230; *Carroll*, 2023 WL 4612082.

(2d Cir.2006). '[M]ore of one excuses less of the other.' *Id.* (quoting *Mohammed v. Reno*, 309 F.2d 95, 101 (2d Cir.2002))."[11]

Mr. Trump contends that this case should be stayed pending appeal because (1) there is a substantial likelihood he will succeed in his appeal, (2) he would suffer irreparable harm in the absence of a stay, (3) a stay would not harm Ms. Carroll, and (4) the public interest favors a stay. His argument fails on each criterion.

*Likelihood of Success*

 Mr. Trump argues that there is a sufficient probability of success on the merits of his

---

[11]   *Whitehaven S.F., LLC v. Spangler*, No. 13-CV-8476 (ER), 2014 WL 5510860, at *1 (S.D.N.Y. Oct. 31, 2014) (footnote omitted). *See also, e.g.*, *New York v. United States Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020) ("The factors relevant in assessing a motion for a stay pending appeal are the applicant's 'strong showing that he is likely to succeed on the merits,' irreparable injury to the applicant in the absence of a stay, substantial injury to the nonmoving party if a stay is issued, and the public interest.") (citation omitted); *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) ("The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'") (footnote omitted) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

 Mr. Trump points out that courts in this Circuit have differed in the "exact phrasing" of the four factors relevant to a motion to stay, specifically with respect to the first factor on likelihood of success. Dkt 186 (Def. Mem.) at 2. The Second Circuit has acknowledged that "some uncertainty has developed as to the first factor because of the various formulations used to describe the *degree* of likelihood of success that must be shown," and has stated that "'[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors.'" *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002) (emphasis in original) (quoting *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir.1977)). Mr. Trump identifies "[m]ore recent holdings" that he claims have "recogniz[ed] the appropriateness of staying litigation where there is at least a 'serious question going to the merits' pending appeal." Dkt 186 (Def. Mem.) at 3 (citing *Trump v. Vance*, 481 F.Supp.3d 161, 164 (S.D.N.Y. 2020)). The Court need not and does not now decide between these various formulations because it finds that Mr. Trump's motion would fail under any of the applicable formulations.

appeal of the absolute presidential immunity decision principally for the same reasons he advanced unsuccessfully in his summary judgment motion. Indeed, many of Mr. Trump's points in his current motion repeat almost verbatim those offered in his prior briefing in support of his assertion that presidential immunity is a non-waivable issue of subject matter jurisdiction. But he does not address any of this Court's reasoning in rejecting his argument. Nor does he engage in any meaningful way with this Court's conclusion that permitting him amend to raise his purported presidential immunity defense at this late date in any event would be futile because the defense is legally insufficient. His only other argument – that the Second Circuit has jurisdiction immediately to review the Court's decision that he waived his presidential immunity defense – is irrelevant to the question of whether he has any significant likelihood of success on appeal.

In sum, Mr. Trump has not provided a single reason for the Court to find that there is any likelihood that he will succeed on appeal, let alone a "strong showing." Accordingly, this factor weighs against Mr. Trump.[12]

*Irreparable Harm*

Mr. Trump's arguments with respect to irreparable harm also are unpersuasive. He contends that  he would be subjected to irreparable harm in the absence of a stay because, he argues,

---

[12]

To the extent Mr. Trump relies on the court's articulation of the standard in *Trump v. Vance*, 481 F.Supp.3d 161 (S.D.N.Y. 2020), that "[t]he movant must show . . . either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor,'" his argument fares no better. *Id.* at 164 (citation omitted). Even accepting for the sake of argument that the latter standard would apply here and that Mr. Trump's appeal presents "sufficiently serious questions going to the merits," the "balance of hardships" in this case is far from "decidedly in the movant's favor" for the reasons discussed below.  *Id.* Indeed, the balance of hardships in these circumstances strongly disfavors a stay.

"the entire purpose of an immunity is inherently and unavoidably frustrated when a Court acknowledges the viability of an immunity only *after* the conclusion of litigation, at which point the immunity from suit has already been irreparably and indisputably forfeited."[13] While that argument is convincing in many circumstances, it entirely is without merit in the unusual circumstances in this case.

First, by litigating this case for *over three years* before even raising his presidential immunity defense – and waiting another *seven months* between first raising his immunity defense and moving to stay this case on that basis – Mr. Trump effectively has forfeited any claim to irreparable harm in the absence of a stay. He has not offered any explanation for either delay despite ample opportunity to do so.[14] Although he now argues that his "presidential immunity defense will be 'effectively lost'" without a stay because he otherwise "will be required to proceed to trial without final resolution as to whether his presidential immunity defense is viable," his loss of that defense was the product of his own decision not to raise it until the tail end of this litigation.[15] In other words, any purported harm resulting from his having to stand trial despite a potential claim to immunity would be entirely of his own doing.

Second, Mr. Trump's argument for irreparable harm is even weaker in this case's current posture. As noted above, discovery in this case was completed in November 2022. Almost

---

[13]     Dkt 186 (Def. Mem.) at 8 (emphasis in original).

[14]     *New York v. United States Dep't of Com.*, 339 F. Supp. 3d 144, 148 (S.D.N.Y. 2018) ("'[I]nexcusable delay in filing' a motion to stay 'severely undermines the . . . argument that absent a stay irreparable harm would result.'") (quoting *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993)).

[15]     Dkt 186 (Def. Mem.) at 10 (citation omitted).

all of the pretrial litigation is complete, and trial is less than five months away. Moreover, while the precise scope of the trial in this case is yet to be determined, the Court already has concluded that the jury's finding in *Carroll II* that Mr. Trump sexually abused Ms. Carroll "is conclusive with respect to this case."[16] Thus, having completed already the pretrial burdens to which he refers in his argument, the only purported harm Mr. Trump reasonably may claim he would suffer in this case would be having to stand trial. In these somewhat unusual and extraordinary circumstances where immunity is being litigated essentially on the eve of trial, Mr. Trump has not satisfied his burden of establishing that he would suffer irreparable harm in the absence of a stay.

*Injury to Plaintiff and Public Interest*

By contrast, a stay almost certainly would injure both Ms. Carroll and the public interest.

Mr. Trump contends that a stay would cause minimal harm, if any, to Ms. Carroll. He argues that:

> "While it is true that this action has been pending for several years, Plaintiff was able to utilize discovery gathered in this action to proceed to trial in an expedited basis in the related matter of *Carroll II*. In this context, the harm of delay is significantly diminished. Indeed, it cannot be reasonably disputed that Defendant's entitlement to be heard on the threshold question of whether he is entitled to absolute immunity from liability outweighs Plaintiff's desire to expeditiously hold a second

---

[16] *Carroll*, 2023 WL 5017230, at *7.

trial on similar and related claims. Therefore, this factor tips in Defendant's favor."[17] But his argument mistakenly conflates the relief Ms. Carroll was awarded in *Carroll II* (which now is pending on appeal) and the relief she seeks for the distinct injuries she allegedly suffered as a result of the alleged defamation asserted in this case. The fact that the claims in both cases are "similar and related" has nothing to do with whether Ms. Carroll would be injured by a stay in this case. And for reasons this Court has discussed previously, she almost certainly would. As the Court explained in denying Mr. Trump's request for leave to raise his absolute immunity defense on the alternative basis of undue delay and unfair prejudice:

> "Ms. Carroll now has litigated this case for more than three and a half years. She has completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before [this] Court, the Second Circuit and the D.C. Court of Appeals, and devoted untold hours and resources to pursuing her claim. . . . [A]n appeal likely would cause 'significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings.' Were this Court's rejection of his defense upheld on appeal, those additional delays would further prejudice Ms. Carroll unfairly. She now is 79 years old and, as just mentioned, has been litigating this case for more than three and a half years. There is no basis to risk prolonging the resolution of this litigation further by permitting Mr. Trump to raise his absolute immunity defense

---

[17] Dkt 186 (Def. Mem.) at 11.

now at the eleventh hour when he could have done so years ago."[18]

That analysis applies here too. In addition to all of these reasons that delaying trial would injure Ms. Carroll, a stay in these circumstances also could – as Ms. Carroll points out – "cause a spiral of further delays" given that "a rescheduled trial may have to compete with the end of [Mr.] Trump's presidential campaign, any number of other civil and criminal trials [that Mr. Trump currently faces], the possibility of a prison sentence, and/or conceivably the start of a second Trump presidency."[19] The injury likely to result to Ms. Carroll therefore counsels against a stay.

Finally, public interest considerations disfavor a stay. Mr. Trump contends that "there 'exists the greatest public interest in providing' the President immunity from his official acts, and that deprivation of such immunity would be to the 'detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.'"[20] His argument again fails to take into account the fact that this Court already has held that his immunity defense, even if his answer were amended to assert it at this late date, would fail on the merits, a determination with which Mr. Trump has not engaged at all other than by incorporating his prior unsuccessful arguments by reference. While there is a public interest in immunizing presidents for actions properly taken within the scope of their duties, there is a public interest also in ensuring that even presidents will be held accountable for actions that – as this Court already has determined in this case – do not come within

---

[18]        *Carroll*, 2023 WL 4393067, at *12-13.

[19]        Dkt 202 (Pl. Opp. Mem.) at 9.

[20]        Dkt 186 (Def. Mem.) at 12 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982)).

that scope.[19]  Moreover, although the Second Circuit has acknowledged "a public interest in vindicating the immunity of [a defendant] who might be entitled to immunity from suit," it has recognized also – as Mr. Trump concedes –  "a public interest in having [a plaintiff] who might be entitled to recovery receive compensation while still living and able to use it to . . . improve the quality of [his or her life]."[20]  As noted above, both parties are of advanced age, and a stay of this case pending resolution of Mr. Trump's appeal would threaten delaying any compensation to which Ms. Carroll might be entitled by at least several months, if not a year or more.  The public interest therefore weighs against a stay.

Given that all four factors weigh against Mr. Trump's request to stay this case, his motion is denied on that basis.

*This Court Has Not Been Divested Of Jurisdiction*

In a one page argument at the end of his brief, Mr. Trump contends that this action "must also be stayed on the independent basis that this Court is currently divested of jurisdiction" because "as presidential immunity confers immunity from suit in its entirety, appeals involving immunity from suit therefore pertain to – and divest jurisdiction from the trial court over – the

---

[19]

Mr. Trump argues also that the public interest favors a stay because he claims his appeal raises "important and novel questions concerning the doctrine of presidential immunity, the separation of powers doctrine, and the interplay between the Executive Branch and Judicial Branch."  Dkt 207 (Def. Reply Mem.) at 1-2.  His bare assertion that the issues raised by his immunity defense are "important and novel," without demonstrating that there is any merit to those issues, plainly is irrelevant to the question of where the public interest lies.

[20]

*In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170.

entirety of the litigation."[21]  His argument is without merit.

Without now deciding the issue, the Court assumes *arguendo* that its decision that

Mr. Trump waived his immunity defense properly is immediately appealable under the collateral

order doctrine.[22]  It does not follow, however, that this Court is divested of jurisdiction as a result

of that appeal. Even where an interlocutory appeal of a denial of an immunity defense otherwise

might divest a district court of jurisdiction, "[c]ourts having considered this question have uniformly

applied the 'dual jurisdiction rule'. . . , under which 'the filing of an appeal under the collateral order

doctrine respecting a right not to be tried divests the district court of jurisdiction to proceed with the

trial [against the appealing defendant] *unless the district court certifies that the appeal is*

---

[21]

       Dkt 186 (Def. Mem.) at 13.

[22]

       Ms. Carroll contends that "the Second Circuit has made clear that '[t]he divestiture of jurisdiction rule is … not a *per se* rule'" and instead "'is a judicially crafted rule' grounded in 'concerns of efficiency.'" Dkt 202 (Pl. Opp. Mem.) at 12 (emphasis in original) (quoting *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996)).  The question in *Rodgers*, however, was "whether filing a notice of appeal from a district court order that is *patently nonappealable* divested the district court of jurisdiction to resentence." 101 F.3d at 251 (emphasis added). *See also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp. 3d 556, 561 (S.D.N.Y. 2014) ("*Rodgers*, . . . however, is not directly on point as it does not bear directly on cases involving the appeal of a denial of qualified immunity."). Ms. Carroll does not argue that Mr. Trump's appeal is "patently nonappealable." Moreover, courts in this Circuit have adopted the principle, as discussed above, that *unless an appeal is frivolous*, a district court is divested of jurisdiction "immediately upon the filing of a request for interlocutory review under the collateral order doctrine . . . in cases 'respecting a right not to be tried,' such as double jeopardy, foreign sovereign immunity, Eleventh Amendment immunity, and qualified immunity." *In re S. Afr. Apartheid Litig.*, No. 02-CV-4712 (SAS), 2009 WL 5183832, at *1 (S.D.N.Y. July 7, 2009) (citation omitted) (emphasis added). Accordingly, and in the absence of fuller briefing by the parties on this issue, the Court assumes without now deciding that Mr. Trump's appeal is immediately reviewable but nonetheless determines that it is not divested of jurisdiction because the appeal is frivolous.

17

*frivolous*[.]'"[23]

As stated above, Mr. Trump has not made any argument different from the points contained in his summary judgment briefing – all of which this Court has rejected – that would permit a determination that absolute presidential immunity is a nonwaivable question of subject matter jurisdiction. What is more, even if the Circuit were to disagree on that question, this Court already has determined also that Mr. Trump's immunity defense would fail on the merits. He has not engaged with this Court's analysis of either question and thus shown no likelihood of success on appeal. Accordingly, this Court certifies that Mr. Trump's appeal is frivolous and therefore has not divested this Court of jurisdiction.

### *Conclusion*

For the foregoing reasons, Mr. Trump's motion for a stay pending appeal (Dkt 185) is denied. This Court certifies that the appeal itself is frivolous.

SO ORDERED.

Dated:        August 18, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[23] *New York v. Locke*, No. 08-CV-2503 (CPS) (RLM), 2009 WL 2413463, at *3 (E.D.N.Y. Aug. 3, 2009) (second and third alterations in original) (emphasis added) (citation omitted). *See also, e.g.*, *Davis v. City of New York*, No. 12-CV-3297 (PGG), 2018 WL 10070503, at *1 (S.D.N.Y. Dec. 14, 2018) ("The Supreme Court has approved the 'dual jurisdiction' approach as an appropriate method to deal with frivolous interlocutory appeals. *Behrens v. Pelletier*, 516 U.S. 299, 310 (1996). Accordingly, this Court must determine whether [defendant's] appeal [(including of the denial of qualified immunity)] is frivolous."); *Garcia v. Bloomberg*, No. 11-CV-6957 (JSR), 2012 WL 3127173, at *1 (S.D.N.Y. July 27, 2012) ("An interlocutory appeal, *unless frivolous*, generally divests the district court of jurisdiction respecting the issues raised and decided in the order on appeal . . . .") (emphasis added); *In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d 134, 137 (S.D.N.Y. 2007) ("I hold, following full consideration of Defendants' arguments, that their notice of appeal is legally ineffective to divest the district court of its jurisdiction."); *City of New York v. Beretta U.S.A. Corp.*, 234 F.R.D. 46, 51-53 (E.D.N.Y. 2006) (Weinstein, J.).

# EXHIBIT 41

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff,* | |
| v. | No. 20 Civ. 7311 (LAK) |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION TO STAY

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 2

    I.    TRUMP IS NOT ENTITLED TO A STAY PENDING APPEAL ................................... 2

        A.   Trump Is Unlikely to Succeed on the Merits of His Appeal ....................................... 2

        B.   Trump Will Not Suffer Irreparable Injury Absent a Stay............................................ 4

        C.   A Stay Will Cause Carroll to Suffer Substantial Injury ............................................. 8

        D.   The Public Interest Weighs Against a Stay ............................................................. 10

    II.   THIS COURT HAS NOT BEEN DIVESTED OF JURISDICTION............................... 11

CONCLUSION................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Barretta v. Wells Fargo Bank, N.A.*,
    693 F. App'x 26 (2d Cir. 2017) ............................................................................... 11

*Carroll v. Trump*,
    590 F. Supp. 3d 575 (S.D.N.Y. 2022) ........................................................................ 7

*Carroll v. Trump*,
    635 F. Supp. 3d 229 (S.D.N.Y. 2022) .......................................................... 2, 5, 8, 9, 12

*Carroll v. Trump*,
    No. 20 Civ. 7311, 2023 WL 4393067 (S.D.N.Y. July 5, 2023) .......................... 3, 4, 6, 9, 11

*Carroll v. Trump*,
    No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ................................ 6

*Clinton v. Jones*,
    520 U.S. 681, 117 S. Ct. 1636 (1997) ........................................................................ 4

*Cohen v. United States*,
    No. 21 Civ. 10774, 2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022) ........................... 3

*District of Columbia v. Trump*,
    No. 8:17 Civ. 1596 (D. Md.) .................................................................................. 4

*District of Columbia v. Trump*,
    959 F.3d 126 (4th Cir. 2020) .................................................................................. 3

*Griggs v. Provident Consumer Discount Co.*,
    459 U.S. 56, 103 S. Ct. 400 (1982) ................................................................... 11, 12

*Hirschfeld v. Bd. of Elections*,
    984 F.2d 35 (2d Cir. 1993) ..................................................................................... 7

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007) ....................................................................... 2, 11, 12, 12

*K&D, LLC v. Trump Old Post Off., LLC*,
    No. 17 Civ. 731, 2018 WL 6173449 (D.D.C. Nov. 26, 2018) ................................. 4

*Leroy v. Hume*,
    563 F. Supp. 3d 22 (E.D.N.Y. 2021) ..................................................................... 11

*Loria v. Gorman*,
   306 F.3d 1271 (2d Cir. 2002) ................................................................ 12

*New York v. United States Dep't of Com.*,
   339 F. Supp. 3d 144 (S.D.N.Y. 2018) ...................................................... 7

*Nken v. Holder*,
   556 U.S. 418, 129 S. Ct. 1749 (2009) ...................................................... 2

*Owens v. Taliban*,
   No. 22 Civ. 1949, 2023 WL 2368981 (S.D.N.Y. Mar. 6, 2023) ................. 2

*People v. Trump*,
   Ind. No. 71543-23 (N.Y. Sup. Ct., N.Y. Cnty. 2023) ............................... 9

*Plummer v. Quinn*,
   No. 07 Civ. 6154, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) ............... 12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806, 65 S. Ct. 993 (1945) ......................................................... 5

*S.E.C. v. Daspin*,
   557 F. App'x 46 (2d Cir. 2014) ............................................................... 8

*S.E.C. v. WorldCom, Inc.*,
   452 F. Supp. 2d 531 (S.D.N.Y. 2006) ...................................................... 4

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995) ...................................................................... 8

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) ............................................................................ 4

*Trump v. Vance*,
   481 F. Supp. 3d 161 (S.D.N.Y. 2020) ...................................................... 2

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
   No. 16 Civ. 8507, 2020 WL 359907 (S.D.N.Y. Jan. 21, 2020) ............ 8, 9

*United States v. Rodgers*,
   101 F.3d 247 (2d Cir. 1996) .................................................................. 12

*United States v. Trump*,
   No. 9:23 Cr. 80101 (S.D. Fl.) ................................................................. 9

*V.S. v. Muhammad*,
No. 07 Civ. 213, 2008 WL 5068877 (E.D.N.Y. Nov. 24, 2008) ........................................... 12

**OTHER AUTHORITIES**

Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701 (1995) .......................................................................... 3

Erica Orden, *Trump Now Faces Four Trials over Six-Month Span During Critical Phase of 2024 Campaign*, Politico (June 15, 2023) .................................................................................. 9

Hugo Lowell & Chris Stein, *Trump's Mar-a-Lago Classified Documents Trial to Begin in May 2024*, Guardian (July 21, 2023) ........................................................................................ 9

*Important Dates in the 2024 Presidential Race*, Ballotpedia ....................................................... 9

*Keeping Track of the Trump Investigations*, N.Y. Times (last updated Aug. 1, 2023) .................. 9

## PRELIMINARY STATEMENT

Defendant Donald J. Trump comes nowhere close to justifying his request for a stay of proceedings pending the resolution of his latest interlocutory appeal. Most fundamentally, he fails to show any likelihood of success on appeal. In asserting otherwise, Trump neither cites nor quotes (nor otherwise addresses) the Court's thorough opinion explaining that his immunity defense was both waivable and waived. Nor does Trump challenge the Court's alternative holding that his immunity defense fails on the merits. Trump's decision not to engage with this Court's analysis, or to address the underlying futility of his position, is reason enough to deny his motion.

But there is more. With respect to irreparable injury, Trump's conduct defeats any claim that it would be inequitable for him to see this case through to its end. Trump affirmatively waived his immunity in pursuit of strategic advantage in state court; he zealously litigated in federal court for years without mentioning this issue; during that time, he attempted to lodge a counterclaim against Carroll and borrowed this Court's power to undertake intrusive discovery; even after he first sought to raise an absolute immunity argument, Trump tried to lodge a second counterclaim; and when the Court finally rejected his position, Trump did not immediately file an appeal and seek a stay, but instead waited *a full month* for overtly strategic and self-serving reasons. This conduct eviscerates Trump's insistence that continued litigation would work irreparable harm.

That leaves only two remaining considerations, both of which further undermine Trump's position. *First*, granting a stay would substantially harm Carroll, who has waited years for justice in this case, is of an advanced age, and has endured continued outrageous attacks by Trump even since the *Carroll II* verdict. *Second*, the public maintains a powerful interest in finality, which would be poorly served by the effectively indefinite delay that would result from granting Trump's motion. For these reasons, Trump's motion for a stay of proceedings should be denied.

## ARGUMENT

## I.   TRUMP IS NOT ENTITLED TO A STAY PENDING APPEAL

"In general, the question whether to stay proceedings is addressed to the trial court's discretion." *Carroll v. Trump*, 635 F. Supp. 3d 229, 235 (S.D.N.Y. 2022). In exercising that discretion, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) ("*In re WTC*") (cleaned up). Courts balance the stay factors so that "the degree to which a factor must be present varies with the strength of the other factors, meaning that 'more of one [factor] excuses less of the other.'" *Id.* (citation omitted). A stay is "not a matter of right, even if irreparable injury might otherwise result to the appellant." *Owens v. Taliban*, No. 22 Civ. 1949, 2023 WL 2368981, at *1 (S.D.N.Y. Mar. 6, 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 427, 129 S. Ct. 1749, 1757 (2009)). Here, every factor cuts against Trump's motion.

### A.   Trump Is Unlikely to Succeed on the Merits of His Appeal

First and foremost, Trump's motion should be denied because he has not established "the requisite strong likelihood of success." *Carroll*, 635 F. Supp. 3d at 235. Trump works hard to lower the bar for himself in describing this obligation, *see* Trump Br. 3, but the bottom line is that he utterly fails to show any error in the Court's decision denying his summary judgment motion. *See Nken*, 556 U.S. at 434, 129 S. Ct. at 1761 (requiring more than a "mere possibility" of success).[1]

---

[1] In citing *Trump v. Vance*, 481 F. Supp. 3d 161 (S.D.N.Y. 2020), Trump selectively lifts some language without including an important caveat. Read properly, *Vance* does not hold that a movant need only show "at least 'a serious question going to the merits' pending appeal." Trump Br. 3 (quoting *Vance*, 481 F. Supp. 3d at 164). Rather, *Vance* explained that a "movant must show '(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *Vance*, 481 F. Supp. 3d at 164 (citation

2

Indeed, Trump stumbles at the outset by failing to address this Court's reasoned holding that his assertion of absolute presidential immunity is meritless. *See Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 4393067, at *9–*11 (S.D.N.Y. July 5, 2023). Although the Court addressed this point while denying leave to amend based on futility, its reasoning constitutes an independent and adequate basis for the denial of Trump's summary judgment motion. Yet Trump says nothing about this holding in his motion for a stay—and has thus waived and forfeited any such arguments. *See* Trump Br. 5–7. Trump cannot show a strong likelihood of success on the merits of his interlocutory appeal when he offers no response at all to the Court's unequivocal holding that his claim of absolute presidential immunity fails as a matter of law.

Trump fares no better on the waiver issue. Rather than engage with the Court's analysis, he asserts in broad strokes that he was right, and the Court was wrong. He does not include a single quotation of (or citation to) the Court's opinion, and he makes no effort to state with specificity where and how he believes the Court erred. Nor does he address any of the other authorities that disagree with his position: he does not explain what Judge Niemeyer got wrong in describing absolute presidential immunity as non-jurisdictional,[2] what Judge Liman missed in reaching the merits of a claim without first considering such an immunity defense,[3] why Akhil Amar and Neal Katyal were mistaken in their study of the issue,[4] or how this supposedly obvious theory of

---

omitted). Here, given the numerous flaws in Trump's merits position and the other stay factors that decidedly favor Carroll (as discussed below), Trump's motion fails under either version of the legal standard as articulated in *Vance*.

[2] *See District of Columbia v. Trump*, 959 F.3d 126, 141 (4th Cir. 2020) (en banc) (Niemeyer, J., dissenting).

[3] *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at *10 n.6 (S.D.N.Y. Nov. 14, 2022).

[4] Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 HARV. L. REV. 701, 726 n.53 (1995).

jurisdiction escaped mention in the last two on-point Supreme Court decisions.[5] Trump also makes the choice to ignore cases in which he personally proceeded with the opposite legal position.[6]

More fundamentally, Trump offers no direct rejoinder to the Court's reading of precedent. In a stay posture, that choice is all but fatal. It also contrasts starkly with the Court's own careful study of Trump's arguments—a study that led the Court to describe Trump's position as deviating from "well-settled norms," *Carroll*, 2023 WL 4393067, at *5, as "present[ing] its own separation of powers concerns," *id.* at *6, as advancing a premise that "lacks logical coherence," *id.* at *7, and as running "afoul of many of the same principles on which the immunity is based," *id.* at *8. At the risk of stating the obvious, a position beset by so many (and such grave) flaws is unlikely to prevail on appeal, especially where its advocate declines to respond to judicial analysis.

For these reasons—and for those set forth in Carroll's summary judgment stage briefs—Trump has not established a strong likelihood of success on appeal. No appellate court has accepted the position he now advances; numerous respected authorities have expressly rejected it; and this Court's constitutional analysis correctly stated and applied the governing legal principles.

## B. Trump Will Not Suffer Irreparable Injury Absent a Stay

Trump's motion should also be denied on the independent ground that any injury ensuing from the denial of a stay will be self-inflicted and the result of his own strategic gamesmanship. *See, e.g.*, *S.E.C. v. WorldCom, Inc.*, 452 F. Supp. 2d 531, 532 (S.D.N.Y. 2006) (denying stay motion that "fail[ed] to comport with the most elementary principles of equity").

Where absolute presidential immunity applies, it is virtually always invoked at the very outset of a case. Such diligent invocation is necessary for it to serve its core purpose as a shield

---

[5] *Clinton v. Jones*, 520 U.S. 681, 117 S. Ct. 1636 (1997); *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020).

[6] *K&D, LLC v. Trump Old Post Off., LLC*, No. 17 Civ. 731, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) (Leon, J.); *District of Columbia v. Trump*, No. 8:17 Civ. 1596 (D. Md.), at ECF 112-1 and 118.

from litigation and not just a defense to liability. *See* Trump Br. 7–8. Here, however, Trump's conduct of the case has made a self-serving mockery of that purpose, undermining his last-minute assertion that proceeding to trial (which is all that remains) would inequitably or intolerably burden him. *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S. Ct. 993, 997 (1945) ("[H]e who comes into equity must come with clean hands.").

After this case was first filed in state court, Trump waived his immunity from suit as part of a strategic effort to bolster his request for a temporary stay of proceedings; to that end, he stated that "no one is seeking to escape accountability here" because Carroll was "free to pursue this action when [he was] no longer in office." NYSCEF No. 103 at 3 (cleaned up). When that effort failed, Trump pressured the Department of Justice to remove this case to federal court under the Westfall Act. *See* ECF 1. After Your Honor denied the ensuing motion to substitute, *see* ECF 32, Trump and the Department of Justice filed notices of appeal, *see* ECF 45, 46. But then, during the pendency of those interlocutory appeals, Trump moved to substantially expand the scope of this action—and to gain a tactical advantage—by adding an anti-SLAPP counterclaim against Carroll. *See* ECF 59. Following the denial of that motion, *see* ECF 73, Trump proposed (and Carroll agreed) to undertake discovery, *see* ECF 75. Trump thereupon borrowed this Court's power to obtain over 30,000 pages of records from Carroll, to issue a volley of nonparty subpoenas, and to depose Carroll and 5 additional witnesses. Meanwhile, Trump himself produced a pittance of documents and stonewalled Carroll's requests. Although he sat for a deposition, it was only after a last-minute motion to stay pending appeal was denied. ECF 96. In denying that motion, this Court emphasized Trump's weak showing of irreparable injury, noting that his odds of success on appeal "cannot be said to be likely," "discovery in this case has virtually concluded," and Trump's "conduct so far" had undercut his position. *Carroll*, 635 F. Supp. 3d at 236.

Since then, Trump has only further eviscerated any credible assertion of irreparable injury. In December 2022, he sought summary judgment based partly on presidential absolute immunity, despite never mentioning this issue in over three years of litigation and waiving it in state court. ECF 107, 109. While that motion was pending, Trump conferred with Carroll and the parties submitted a joint pretrial order, which the Court adopted. ECF 128, 129. Trump also litigated numerous motions *in limine*, many of which the Court resolved. ECF 130–145.[7] The parties then submitted a joint motion to consolidate trial in this matter with the *Carroll II* trial. ECF 147, 148 (denying motion). After the trial in *Carroll II*, Trump opposed Carroll's motion to amend her complaint and sought to bolster his position by proposing to lodge a counterclaim against Carroll. ECF 164, 171. Thus, even after first seeking to raise his immunity defense, Trump actively litigated the case and once again attempted to allege an entirely new claim against Carroll.

On June 29, 2023, the Court denied Trump's summary judgment motion. *Carroll*, 2023 WL 4393067, at *20; ECF 172. At that point, Trump could have immediately filed a notice of interlocutory appeal and sought a stay. Instead, he waited 28 days. Four full weeks. This delay was overtly strategic: Trump apparently hoped that the Justice Department would issue a new Westfall Act certification and was willing to wait on that potential benefit. ECF 177 (declining new certification on July 11, 2023). He perhaps also hoped that his newly asserted counterclaim would improve his position—a hope that was dashed eight days later, when the Court denied his motion for a new trial in *Carroll II* in an opinion that rejected the core premise of his counterclaim in *Carroll I* (namely, that the *Carroll II* jury had found that he did not rape Carroll). *See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023). Finally, in the days that

---

[7] If cross-applied to this proceeding, as they should be, the Court's decisions on the motions *in limine* submitted in *Carroll II* would resolve the bulk of the outstanding *Carroll I* evidentiary issues (though of course the parties may wish to submit additional motions *in limine* in advance of the trial scheduled for January 2024).

immediately preceded Trump's decision to seek a stay, it became much clearer to him that he faced substantial legal risk in *Carroll I*: the Court issued an order on July 19, 2023 directing the parties to address whether the *Carroll II* verdict precluded any issues in *Carroll I*, ECF 178; and on July 25, 2023, Carroll filed a letter setting forth her view that summary judgment would be warranted on all merits elements of her claim, leaving only a damages trial in *Carroll I*, ECF 182. Trump then filed his stay motion the very next day—on July 26, 2023—after these intervening procedural and substantive developments had weakened rather than strengthened his litigation position.

Putting it together: Trump could have raised absolute presidential immunity when this suit was filed in November 2019. Instead, he affirmatively and strategically waived it in state court. He then zealously litigated the case in federal court—including through aggressive party and non-party discovery, and an attempted counterclaim against Carroll—until December 2022. At that point, having never mentioned presidential absolute immunity as a defense, he sought to raise it on a novel theory of non-waivability that was inconsistent with his litigating position in other recent cases. While this summary judgment motion was pending, Trump pressed ahead and attempted to lodge yet another counterclaim against Carroll. When the Court ultimately denied his summary judgment motion, Trump did not seek immediate equitable relief. He instead waited a full month, during which time he apparently hoped to obtain multiple strategic advantages in the litigation. Only after he came up short did Trump finally submit a motion to stay.

This behavior reflects Trump's pattern of bad-faith, dilatory conduct. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). It also takes the wind out of his sails on the issue of irreparable injury. *See, e.g.*, *New York v. United States Dep't of Com.*, 339 F. Supp. 3d 144, 148 (S.D.N.Y. 2018) (holding that "'inexcusable delay in filing' a motion to stay 'severely undermines the … argument that absent a stay irreparable harm would result'" (quoting *Hirschfeld v. Bd. of*

7

*Elections*, 984 F.2d 35, 39 (2d Cir. 1993)); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[F]ailure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."). Indeed, as a result of Trump's own litigation strategy, many of the irreparable harms that he warns against are already in the rear-view mirror. *See* Trump Br. 7–9 (discussing discovery).

Looking ahead, little remains. Discovery is complete. A joint pretrial order has been adopted. ECF 129. The Court has resolved Trump's counterclaim and ruled on amendments to the pleadings. ECF 169, 200. The Court will soon be set to resolve the parties' motions concerning preclusion—a determination that could significantly narrow the case. *See* ECF 189, 193. This leaves only motions *in limine*, many of which have already been decided, and the trial itself, which should be much shorter and more straightforward than the two-week jury trial in *Carroll II*.

In these unusual circumstances, Trump's complaint about irreparable injury rings hollow and hypocritical. It certainly comes nowhere close to justifying the entry of a stay. Indeed, even if Trump has made out some showing of harm based on the prospect of standing trial, that showing fails to carry his motion—particularly given the weakness of his merits position and his own unclean hands in seeking to raise these arguments. *See Carroll*, 635 F. Supp. 3d at 236; *see also, e.g.*, *S.E.C. v. Daspin*, 557 F. App'x 46, 49 (2d Cir. 2014); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507, 2020 WL 359907, at *4, *6 (S.D.N.Y. Jan. 21, 2020) (denying stay pending appeal despite concluding that movant "will be irreparably harmed absent a stay").

### C.    A Stay Will Cause Carroll to Suffer Substantial Injury

Granting a stay would not only unjustly reward Trump's gamesmanship, but it would also inflict substantial harm on Carroll, who "has litigated this case for more than three and a half years[,] completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before [this] Court, the Second Circuit and the D.C. Court of Appeals,

and devoted untold hours and resources to pursuing her claim." *Carroll*, 2023 WL 4393067, at

\*12. In contrast, Trump has waged a war of attrition designed to impede these proceedings. *Id.* at

\*12 & n.61. Requiring Carroll to endure further delay—possibly years of it—would thus be deeply

unfair. As the Court has already found, Trump "should not be permitted to run the clock out on

plaintiff's attempt to gain a remedy for what allegedly was a serious wrong," especially given that

"both plaintiff and defendant … already are of advanced age." *Carroll*, 635 F. Supp. 3d at 237.[8]

The burdens of delay are especially concerning here because a stay could cause a spiral of

further delays. Trump is running for president and, if he prevails in the Republican primary, he

may well seek to stay any trials scheduled for mid-to-late 2024. *See Important Dates in the 2024*

*Presidential Race*, Ballotpedia. In addition, Trump has four other trials scheduled between now

and May 2024. *See* Hugo Lowell & Chris Stein, *Trump's Mar-a-Lago Classified Documents Trial*

*to Begin in May 2024*, Guardian (July 21, 2023); Erica Orden, *Trump Now Faces Four Trials over*

*Six-Month Span During Critical Phase of 2024 Campaign*, Politico (June 15, 2023). And Trump

currently faces three criminal indictments, with the reported possibility of at least one more. *United*

*States v. Trump*, 23 Cr. 257 (D.D.C.); *United States v. Trump*, No. 9:23 Cr. 80101 (S.D. Fl.);

*People v. Trump*, Ind. No. 71543-23 (N.Y. Sup. Ct., N.Y. Cnty. 2023); *Keeping Track of the Trump*

*Investigations*, N.Y. Times (last updated Aug. 1, 2023). If trial in this case is stayed until after the

resolution of Trump's most recent interlocutory appeal, a rescheduled trial may have to compete

with the end of Trump's presidential campaign, any number of other civil and criminal trials, the

possibility of a prison sentence, and/or conceivably the start of a second Trump presidency.

---

[8] Trump asserts that the burden is on Carroll to demonstrate "significant and particularized hardship to outweigh the irreparable harm defendant[] will suffer." Trump Br. 11. He is mistaken. The "moving party bears the heavy burden of establishing that" the stay factors support his position. *U.S. Bank Nat'l Ass'n*, 2020 WL 359907, at \*1.

The current trial date avoids those pitfalls; a stay inevitably triggers them. Accordingly, granting a stay would substantially burden Carroll, who filed this case nearly four years ago.

This leads to one final point. Trump suggests that the jury verdict in *Carroll II* mitigates any harm of delay. Trump Br. 11. Not so. Carroll endured distinct, significant harm from Trump's June 2019 statements—which were issued not by a former officeholder on social media years after Carroll spoke up, but rather by a sitting President at the White House in virtually immediate response to her revelation that he had sexually assaulted her. As the record establishes, Carroll's damages from the June 2019 statement are substantial in their own right. She has an independent right to remedy for that harm. A jury verdict affirming this point is essential to make her whole. Such a verdict would also serve two separate, vital purposes in remedying Carroll's injuries: (1) confirming that Trump does not stand above the law and may be held accountable for abusing his bully pulpit to seek to punish and humiliate her; and (2) affording an opportunity for Carroll to obtain punitive damages against Trump based upon conduct including (though not limited to) the many outrageous public attacks he has leveled against her since the *Carroll II* verdict.[9] It is crystal clear that the compensatory and punitive damages awarded in *Carroll II* were insufficient to deter Trump from repeating the very same defamatory statements as before. A jury trial in *Carroll I* will afford the justice system an opportunity to more fully remedy and protect Carroll; staying these proceedings all but indefinitely would reward Trump's behavior and exacerbate injuries to Carroll.

### D.    The Public Interest Weighs Against a Stay

This leaves only consideration of the public interest, which weighs against a stay for three reasons. *First*, "the Second Circuit has recognized that 'there is a public interest in having plaintiffs who might be entitled to recovery receive compensation while still living and able to use it to

---

[9] Indeed, it is offensive for Trump to claim that the *Carroll II* verdict mitigates harm to Carroll when he has gone out of his way to trash that verdict, attack the Court, and willfully repeat statements found to be false and defamatory.

improve the quality of their lives.'" *Leroy v. Hume*, 563 F. Supp. 3d 22, 31 (E.D.N.Y. 2021) (cleaned up) (quoting *In re WTC*, 503 F.3d at 170–71). For the reasons given above, granting a stay risks unduly prolonging this matter, which Carroll has been litigating for many years. *See Carroll*, 2023 WL 4393067, at *13 ("[Carroll] now is 79 years old and . . . has been litigating this case for more than three and a half years. There is no basis to risk prolonging the resolution of this litigation further by permitting Mr. Trump to raise his absolute immunity defense now at the eleventh hour when he could have done so years ago."). *Second*, more generally, "there is a public interest in finality" of litigation that supports the denial of a stay. *Barretta v. Wells Fargo Bank, N.A.*, 693 F. App'x 26, 28 (2d Cir. 2017). *Finally*, the public interest would be served by the resolution of this matter, in which Trump (a current candidate for elected office) is alleged to have used the bully pulpit to defame a private citizen for revealing his personal misconduct.

Together, these interests outweigh Trump's claim that the public is interested in vindicating claims of official immunity. *See* Trump Br. 11–13. As Trump concedes, the Second Circuit found this immunity-related interest "overcome upon a showing of a competing public interest in allowing the litigation to reach trial and possibly 'result in compensation for at least some Plaintiffs during their lifetimes.'" *Id.* at 12 (quoting *In re WTC*, 503 F.3d at 170). Moreover, Trump's own conduct throughout this litigation has been at odds with any commitment on his part to vindicating a public interest in official immunities—and that interest is obviously lessened when the official in question has made (but later comes to regret) a strategic choice to waive their own immunity.

## II.   THIS COURT HAS NOT BEEN DIVESTED OF JURISDICTION

In a single page at the very end of his brief (which makes clear what he really thinks of the argument), Trump asserts that his filing of an interlocutory appeal divested the Court of jurisdiction over the "entirety" of this action because this appeal involves immunity from suit. Trump Br. 13 (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982)).

Trump is mistaken—as this Court necessarily recognized when it denied Trump's motion to stay proceedings following the initial interlocutory appeal of the Westfall Act question. *See* ECF 56 (denying without prejudice a stay motion based on a similar misreading of *Griggs*).

Simply put, the Second Circuit has made clear that "[t]he divestiture of jurisdiction rule is … not a *per se* rule." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (emphasis added). Instead, "it is a judicially crafted rule" grounded in "concerns of efficiency." *Id.* Consistent with that understanding, the Second Circuit held in *In re WTC* that the question whether district court proceedings should continue pending an appeal from a denial of immunity is guided by the same four factors that usually apply to stays pending appeal. *See* 503 F.3d at 169–70; *see also Carroll*, 635 F. Supp. 3d at 236 ("In [*In re WTC*], the Second Circuit held that the prospect that 'any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit' was to be balanced against the other factors under consideration." (citation omitted)). Applying that traditional test, *In re WTC* vacated a previously entered stay because it had come to perceive there to be a "lesser probability" that the defendants would succeed on the merits of their immunity claims. 503 F.3d at 170. Notably, the Second Circuit reached this conclusion even though the defendants in that case (like Trump here) argued that *Griggs* precluded the district court from exercising jurisdiction. *See id.* at 169–70; *accord Loria v. Gorman*, 306 F.3d 1271, 1279–80 (2d Cir. 2002) (recognizing the district court had denied motions for a stay pending appeal of an order denying a qualified immunity defense); *Plummer v. Quinn*, No. 07 Civ. 6154, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) (applying four-factor test to motion to stay pending appeal of denial of qualified immunity); *V.S. v. Muhammad*, No. 07 Civ. 213, 2008 WL 5068877 (E.D.N.Y. Nov. 24, 2008) (applying four-factor analysis even though some defendants had appealed the denial of qualified immunity defenses). Under *In re*

*WTC*—which Trump properly treats as the controlling framework for all but a single page of his brief—the traditional test applies here and (as explained above) forecloses Trump's motion.

## CONCLUSION

For the foregoing reasons, the Court should deny Trump's motion for a stay.


Dated: New York, New York
       August 10, 2023

                            Respectfully submitted,

                            *Roberta A. Kaplan*

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT 42

**Selected Public Statements by Donald J. Trump Since the *Carroll II* Verdict**

## MAY 9, 2023: TRUTH SOCIAL STATEMENTS

- "I HAVE ABSOLUTELY NO IDEA WHO THIS WOMAN IS. THIS VERDICT IS A DISGRACE – A CONTINUATION OF THE GREATEST WITCH HUNT OF ALL TIME!"

  o https://truthsocial.com/@realDonaldTrump/posts/110340379870475514

- "VERY UNFAIR TRIAL!"

  o https://truthsocial.com/@realDonaldTrump/posts/110340693890735488

- "WHAT ELSE CAN YOU EXPECT FROM A TRUMP HATING, CLINTON APPOINTED JUDGE, WHO WENT OUT OF HIS WAY TO MAKE SURE THAT THE RESULT WAS AS NEGATIVE AS IT COULD POSSIBLY BE, SPEAKING TO, AND IN CONTROL OF, A JURY FROM AN ANTI-TRUMP AREA WHICH IS PROBABLY THE WORST PLACE IN THE U.S. FOR ME TO GET A FAIR "TRIAL.""

  o https://truthsocial.com/@realDonaldTrump/posts/110341037861272906

- Video Statements:

  o "This was a very unfair trial. That's all you have to say. [It] was a very unfair trial."

    ▪ https://truthsocial.com/@realDonaldTrump/posts/110341679071502131

  o "I have absolutely no idea who this woman is. The verdict is a disgrace, a continuation of the greatest witch hunt of all time. Absolutely a shame."

    ▪ https://truthsocial.com/@realDonaldTrump/posts/110341680295215530

  o "What else can you expect from a Trump-hating, Clinton-appointed judge who went out of his way to make sure that the result of this trial was as negative as it could possibly be. Speaking to and in control of a jury from an anti-Trump area, which is probably the worst place in the United States for me to get a fair trial. We'll be appealing this decision, it's a disgrace. I don't even know who this woman is. I have no idea who she is, where she came from. This is another scam, it's a political witch hunt, and somehow, we're gonna have to fight this stuff. We can not let our country go into this abyss;

this is disgraceful. You have somebody running for office, you have a woman that's financed and lied about it. She totally lied about it. By Democrat operatives, like, just about the biggest one there is. And she said that wasn't true. They found that she lied about it, and the judge wasn't even I guess letting it be put in as evidence. The whole thing is a scam, and it's a shame, it's a disgrace to our country."

- https://truthsocial.com/@realDonaldTrump/posts/110341681988271203

## MAY 10, 2023: TRUTH SOCIAL STATEMENTS

- "After listening to the Anderson Cooper tape of the Carroll interview where she said "rape is sexy," and other totally incriminating things, it is not possible to believe that this woman, who I do not know and have never met before (except on a crowded celebrity photo line), could be credible or convincing to a Judge & Jury. Why did Cooper SUDDENLY call for a commercial break, and why was Carroll a totally different person after the break? What took place during the break for such drastic change?"

  o https://truthsocial.com/@realDonaldTrump/posts/110342629389312163

- "This Clinton appointed Judge, Lewis Kaplan, hated President Donald J. Trump more than is humanly possible. He is a terrible person, completely biased, and should have RECUSED himself when asked to do so. He quickly refused! This case should never have been allowed to be tried in this completely partisan venue, perhaps the worst for me in the Nation! The whole Rigged Hoax is yet another TRAVESTY OF JUSTICE, a continuation of the greatest political Witch Hunt of all time!!!"

  o https://truthsocial.com/@realDonaldTrump/posts/110342704670441764

- "I HAVE NO IDEA WHO THIS WOMAN, WHO MADE A FALSE AND TOTALLY FABRICATED ACCUSATION, IS. HOPEFULLY JUSTICE WILL BE SERVED ON APPEAL!"

  o https://truthsocial.com/@realDonaldTrump/posts/110344508749115738

**MAY 10, 2023: CNN TOWN HALL INTERVIEW**

TRUMP: …This woman, I don't know her. I never met her. I have no idea who she is. I had a picture taken years ago with her and her husband, nice guy John Johnson. He was a newscaster, very nice man. She called him an ape, happens to be African-American. Called him an ape – the judge wouldn't allow us to put that in. Her dog or her cat was named vagina, the judge wouldn't allow to put that in. All these things, he – but with her, they can put in anything, "Access Hollywood"

COLLINS: This was a jury of nine people who found you –

TRUMP: That's right

COLLINS: – liable of sexual abuse. Do you think that – that will deter women from voting for you?

TRUMP: No, I don't think so because I think the whole thing – just so you understand –ready? I never met this woman. I never saw this woman. This woman said I met her at the front door of Bergdorf Goodman which I never go into other than for a couple of charities. I met her in the front door. She was about 60 years. This is like 22, 23 years ago. I met her in the front door of Bergdorf Goodman. I was immediately attracted to her and she was immediately attracted to me. And we had this great chemistry. We're walking into a crowded department store. We had this great chemistry. And a few minutes later, we end up in a room, a dressing room of Bergdorf Goodman, right near the cash register. And then she found out that there were locks in the door. She said, I found one that was open. She found one, she learned this at trial. She found one that was open. What kind of a woman meet somebody and brings them up and within minutes, you're playing hanky-panky in a dressing room, okay? I don't know if she was married then or not. John Johnson, I feel sorry for you, John Johnson.

COLLINS: Mr. President, can I – can I ask you this?

TRUMP: Think of it, think of this –

COLLINS: I know you're recounting what you said but, Mr. President –

TRUMP: But let me just, if I could because you asked a question.

COLLINS: This was a jury though –

TRUMP: Just so you understand, because I was walking in at a department – because I was very famous then and I owned the Plaza Hotel right next door and I owned the buildings around it. I'm not going into a dressing room of a crowded department store. Then I say, if she was being raped – and by the way, they said she wasn't raped, okay? That was her charge. It wasn't –

COLLINS: They found that you sexually abused her.

TRUMP: Oh, that was – say what the – they didn't – they said he didn't rape her."

https://www.cnn.com/2023/05/11/politics/transcript-cnn-town-hall-trump/index.html

## MAY 23, 2023: TRUTH SOCIAL STATEMENTS

- "I don't know E. Jean Carroll, I never met her or touched her □(except on a celebrity line with her African American husband who she disgustingly called the "Ape,"), I wouldn't want to know or touch her, I never abused her or raped her or took her to a dressing room 25 years ago in a crowded department store where the doors are LOCKED, she has no idea when, or did anything else to her, except deny her Fake, Made Up Story, that she wrote in a book. IT NEVER HAPPENED, IS A TOTAL SCAM, UNFAIR TRIAL!"

  o https://truthsocial.com/@realDonaldTrump/posts/110417777996621361

- "Page 2: The Carroll case is part of the Democrats playbook to tarnish my name and person, much like the now fully debunked Russia, Russia, Russia Hoax, the 51 Intelligence Agents, FBI/Twitter Files, and so much more. It is being funded and tried by Democrat operatives, although this was denied by them, and when they got caught in the lie, the Clinton appointed judge would not let us use it in trial. Time will prove him to be highly partisan & very unfair. Where's the dress she said she had?"

  o https://truthsocial.com/@realDonaldTrump/posts/110417846464005356

- Quote Truth of first listed statement on May 23, with accompanying video of EJC on Anderson Cooper.

  o https://truthsocial.com/@realDonaldTrump/posts/110418234501420922

4

## MAY 24, 2023: TRUTH SOCIAL STATEMENT

- "Is she, in actuality, a stalker?"

  o https://truthsocial.com/@realDonaldTrump/posts/110424386452180138

## JULY 12, 2023: TRUTH SOCIAL STATEMENTS

- "Page 1: The DOJ will not defend me in the E. Jean Carroll civil case, which is all part of the political Witch Hunt, lawyered up by a political operative who I just beat in another case, financed by a big political funder, and 'judged' by a Clinton appointee who truly hates 'TRUMP.' The statements that I made about Carroll are all true. I didn't Rape her (I won that at trial) and other than for this case, I have NO IDEA WHO SHE IS, WHAT SHE LOOKS LIKE, OR ANYTHING ABOUT HER…"

  o https://truthsocial.com/@realDonaldTrump/posts/110700658213984237

- "Page 2: The Carroll civil case against me is a Miscarriage of Justice and a total Scam. The trial was very unfair, with the other side being able to do and present virtually anything they wanted, and our side being largely and wrongfully shut down by an absolutely hostile, biased, and out of control judge. My lawyers, due to their respect for the Office of the President and the incredulity of the case, did not want me to testify, or even be at the trial…"

  o https://truthsocial.com/@realDonaldTrump/posts/110700815543746376

- "Page 3: The net result of this horrible INJUSTICE, where a completely unknown to me woman made up a ridiculous story, wrote it in a book to increase publicity and sales, I correctly disputed the story and got sued for Defamation, whereupon a hostile Judge and Jury shockingly awarded a woman who I don't know, have never known, and don't want to know, $5,000,000, while at the same time throwing out the Fake Rape claim. WE ARE STRONGLY APPEALING THIS TRAVESTY OF JUSTICE!!!"

  o https://truthsocial.com/@realDonaldTrump/posts/110700915073200793

5

## AUGUST 30, 2023: INTERVIEW WITH GLENN BECK ON THE GLENN BECK PROGRAM

- "The woman that I never met that they accused me of rape; that's being run by a Democrat, a Democrat operative, and paid for by the Democrat Party… you know, so many of these things, I have a couple of other lawsuits, all funded against me by the Democrat [sic] Party. These are sick people. These are evil people."

  o https://www.youtube.com/watch?v=IHz7sJvTD6Q at 03:11:00.