# 23-1045(L)
# 23-1146(CON)

## 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
## for the 𝔖econd 𝔆ircuit



E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPELLANT'S APPENDIX
## VOLUME I OF V (Pages A1-A284)

HABBA MADAIO & ASSOCIATES LLP
MICHAEL T. MADAIO, ESQ.
ALINA HABBA, ESQ.
*Attorneys for Defendant-Appellant*
*Donald J. Trump*
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
(908) 869-1188
*mmadaio@habbalaw.com*
*ahabba@habbalaw.com*

[REPRODUCED ON RECYCLED PAPER]

# **TABLE OF CONTENTS**

*Page(s)*

U.S. District Court Docket Sheet ....................................................................A1-A33

Letter Motion to Stay, dated December 10, 2020 ...........................................A34-A35

Memorandum of Law in Support of Defendant's Motion
for Leave to Amend his Answer Pursuant to FRCP Rule
15(A), dated December 1, 2021 ......................................................................A36-A50

Memorandum Opinion, dated March 10, 2022...............................................A51-A73

Scheduling Order, dated May 4, 2022 ............................................................A74-A75

Letter Motion, dated September 28, 2022........................................................A76-A78

Letter Response, dated September 30, 2022 ....................................................A79-A83

Memorandum Opinion, dated October 12, 2022 .............................................A84-A99

Letter, dated November 21, 2022...................................................................A100-A101

Notice of Motion for Summary Judgment, dated December
22, 2022 ........................................................................................................A102-A103

Declaration of Alina Habba, Esq. in Support of
Defendant's Motion for Summary Judgment, dated
December 22, 2022 ......................................................................................A104-A105

    Exhibit A – Complaint and Jury Demand, dated
    November 4, 2019 ...............................................................................A106-A134

    Exhibit B – Deposition of E. Jean Carroll, held on
    October 14, 2022 .................................................................................A135-A139

    Exhibit C – Expert Report of Professor Ashlee
    Humphreys, Ph.D., dated October 14, 2022 ......................................A140-A280

i

*Table of Contents(cont'd)* *Page(s)*

Exhibit D – The New York Times Article, dated
February 21, 2020 ...............................................................A281-A284

Exhibit E – Brief for Appellee E. Jean Carroll, dated
December 1, 2022 ................................................................A285-A349

Memorandum of Law in Support of Defendant's Motion
for Summary Judgment, dated December 22, 2022.....................A350-A396

Defendant's Local Rule 56.1 Statement of Material
Facts as to Which There is no Genuine Issue to be
Tried, dated December 22, 2022 .........................................A397-A402

Plaintiff E. Jean Carroll Memorandum of Law in
Opposition to Defendant Donald J. Trump for Summary
Judgment, dated January 12, 2023 ................................................A403-A446

Plaintiff E. Jean Carroll's Response to Defendant Donald
J. Trump's Statement of Undisputed Material Facts
Pursuant to Local Civil Rule 56.1, dated January 12, 2023 ........................A447-A472

Declaration of Roberta A. Kaplan in Support of Plaintiff E.
Jean Carroll's Opposition to Defendant Donald J. Trump's
Motion for Summary Judgment, dated January 12, 2023 ...........................A473-A475

Exhibit 1 - Excerpts of Deposition of E. Jean Carroll,
dated October 14, 2022 .......................................................A476-A550

Exhibit 2 - New York Magazine Article (Online
Version)..............................................................................A551-A571

Exhibit 3 - June 21, 2019 Statement ...................................A572-A573

Exhibit 4 - June 22, 2019 Statement ...................................A574-A587

ii

*Table of Contents(cont'd)*                                                                                    *Page(s)*

Exhibit 5 - June 24, 2019 Statement ....................................................A588-A593

Exhibit 6 - Excerpts of Deposition of Donald J.
Trump ..................................................................................................A594-A643

Exhibit 7 - Photograph of E. Jean Carroll and Donald
Trump ..................................................................................................A644-A645

Exhibit 8 - Excerpts of Deposition of Lisa Birnbach,
held on September 21, 2022....................................................................A646-A654

Exhibit 9 - Excerpts of Deposition of Carol Martin,
held on October 18, 2022 ......................................................................A655-A660

Exhibit 10 - New York Magazine Article (Print
Version)...............................................................................................A661-A669

Exhibit 11 - Defendant's Responses and Objections to
Plaintiff's First Set of Requests for Admission, dated
July 13, 2022 .......................................................................................A670-A717

Exhibit 12 - Excerpts of Deposition of Roberta
Myers, held on October 12, 2022 ..........................................................A718-A728

Exhibit 13 - Appendix H to Expert Report of Ashlee
Humphreys ...........................................................................................A729-A795

Exhibit 14 - Appendix I to Expert Report of Ashlee
Humphreys ...........................................................................................A796-A879

Reply Memorandum of Law in Support of Defendant's
Motion for Summary Judgment, dated January 19, 2023 ..........................A880-A894

*Table of Contents(cont'd)* *Page(s)*

Plaintiff E. Jean Carroll's Surreply Brief in Opposition to
Defendant Donald J. Trump's Motion for Summary
Judgment, dated January 24, 2023 ................................................................A895-A904

Proposed Joint Pre-Trial Order ..................................................................A905-A922

Joint Pretrial Order, dated February 13, 2023............................................A923-A940

Letter Motion, dated March 17, 2023 ..........................................................A941-A942

Stipulation and [Proposed] Order ...............................................................A943-A944

Letter addressed to Judge Lewis A. Kaplan from Roberta
A. Kaplan, dated May 22, 2023 ...................................................................A945-A948

Plaintiff E. Jean Carroll's Memorandum of Law in Support
of Motion to Amend, dated May 22, 2023...................................................A949-A954

Declaration of Roberta A. Kaplan in Support of Plaintiff's
Motion to Amend, dated May 22, 2023 ...................................................................A955

    Exhibit A – First Amended Complaint and Demand
    for Jury Trial, dated May 22, 2023 ......................................................A956-A997

    Exhibit B – Redlined First Amended Complaint and
    Demand for Jury Trial, dated May 22, 2023 ....................................A998-A1043

Letter addressed to Judge Lewis A. Kaplan from Stephen
Terrell, dated June 9, 2023........................................................................A1044-A1045

Order, dated June 13, 2023 ......................................................................A1046-A1047

Defendant's Answer to Plaintiff's First Amended
Complaint, Affirmative Defenses and Counterclaim, dated
June 27, 2023 ...........................................................................................A1048-A1074

iv

*Table of Contents(cont'd)*                                                 *Page(s)*

Notice Of Plaintiff E. Jean Carroll's Motion to Dismiss
And Motion to Strike, dated July 11, 2023 ............................................... A1075-A1076

Plaintiff E. Jean Carroll's Memorandum of Law in Support
of Her Motion to Dismiss and Motion to Strike, dated July
11, 2023 .............................................................................................. A1077-A1113

Declaration of Roberta A. Kaplan in Support of Plaintiff's
Motion to Dismiss and Motion to Strike ................................................... A1114-A1115

       Exhibit A – Excerpts of Carroll II Trial Transcript ........................ A1116-A1166

       Exhibit B – Video of May 10, 2023 CNN Interview
       of E. Jean Carroll (previously provided to the court
       via DVD) ...................................................................................... A1167

       Exhibit C – Transcript of Carroll Interview on CNN ....................... A1168-1193

Memorandum of Law Regarding Plaintiff's Motion to File
an Amended Complaint, dated July 25, 2023 ........................................... A1194-A1198

Defendant's Memorandum of Law in Opposition to
Plaintiff's Motion to Dismiss and Motion to Strike, dated
July 25, 2023 ....................................................................................... A1199-A1233

Letter Addressed to Judge Lewis A. Kaplan from Roberta
A. Kaplan, dated July 25, 2023 .............................................................. A1234-A1235

Notice Of Motion to Stay Pending Appeal, dated July 27,
2023 .................................................................................................... A1236

Memorandum of Law in Support of Defendant's Motion to
Stay Pending Appeal, dated July 27, 2023 ............................................... A1237-A1256

*Table of Contents(cont'd)*                                                        *Page(s)*

Plaintiff E. Jean Carroll's Reply Memorandum of Law in
Support of her Motion to Dismiss and Motion to Strike,
dated August 1, 2023 ................................................................... A1257-A1272

Memorandum Opinion Granting Plaintiff's Motion to
Dismiss Defendant's Counterclaim and Certain Purported
Affirmative Defenses, dated August 7, 2023 ........................... A1273-A1296

Memorandum of Law in Further Support of Defendant's
Motion to Stay Pending Appeal, dated August 17, 2023 ......... A1297-A1309

Memorandum Opinion Denying Defendant's Motion to
Stay, dated August 18, 2023 ..................................................... A1310-A1326

Order of USCA (Certified Copy) .............................................. A1327-A1328

vi

SDNY CM/ECF NextGen Version 1.7

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:20-cv-07311-LAK

| | |
|---|---|
| Carroll v. Trump, et al. | Date Filed: 09/08/2020 |
| Assigned to: Judge Lewis A. Kaplan | Jury Demand: None |
| Related Case: 1:22-cv-10016-LAK | Nature of Suit: 360 P.I.: Other |
| Case in other court: State Court - Supreme, 160694-2019 | Jurisdiction: U.S. Government Defendant |
| Cause: 28:2679(d)(2) Federal Tort Claims Act - Employee of U.S.A. | |

**Plaintiff**

**E. Jean Carroll**                    represented by

**Roberta Ann Kaplan**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
63rd Floor
10118
New York, NY 10118
212-763-0883
Fax: 212-564-0883
Email: rkaplan@kaplanhecker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Adam Matz**
Kaplan Hecker & Fink LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
929-294-2537
Email: jmatz@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Matthew J. Craig**
Kaplan Hecker & Fink LLP
350 Fifith Avenue, Suite 7110
New York, NY 10118
(212)-763-0883
Fax: (212)-564-0883
Email: mcraig@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Michael Ferrara**
Kaplan Hecker & Fink LLP
350 5th Ave.
Ste 63rd Floor
New York, NY 10118

929-294-2529
Email: mferrara@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Shawn Geovjian Crowley**
Kaplan, Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: scrowley@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Trevor Morrison**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: tmorrison@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**United States of America**                 represented by **William Kerwin Lane , III**
DOJ-Civ
950 Pennsylvania Avenue, NW
Ste Main 3138
Washington, DC 20530
202-305-7920
Email: william.lane2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Stephen Terrell**
DOJ-Enrd
Civl Division, Torts Branch
P.O. Box 888
Washington, DC 20044
202-353-1651
Email: stephen.terrell2@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Donald J. Trump**                          represented by **Alina Habba**
*in his personal capacity*                   Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908-869-1188
Email: ahabba@habbalaw.com

**A3**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine A. Montenegro**
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019
(212) 506-1700
Fax: (212) 506-1800
Email: cmontenegro@kasowitz.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Marc E. Kasowitz**
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019
212-506-1710
Fax: 212-506-1800
Email: MEKcourtnotices@kasowitz.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Paul J. Burgo**
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019
(212)-506-1700
Fax: (212)-506-1800
Email: pburgo@kasowitz.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Michael T Madaio**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908-869-1188
Email: mmadaio@habbalaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Government Accountability Project**          represented by   **John A. Kolar**
1612 K Street, N.W,                                            Government Accountability Project, Inc.
Suite 1100                                                    1612 K Street, NW
Washington, DC 20006                                          Ste 1100
202-457-0034 X197                                             Washington, DC 20006
                                                              202-457-0034
                                                              Email: jackk@whistleblower.org
                                                              *LEAD ATTORNEY*

**Counter Claimant**

**A4**

| | | |
|---|---|---|
| **Donald J. Trump**<br>*in his personal capacity* | represented by | **Alina Habba**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Christine A. Montenegro**<br>(See above for address)<br>*TERMINATED: 11/22/2021*<br>*LEAD ATTORNEY* |
| | | **Marc E. Kasowitz**<br>(See above for address)<br>*TERMINATED: 11/22/2021*<br>*LEAD ATTORNEY* |
| | | **Paul J. Burgo**<br>(See above for address)<br>*TERMINATED: 11/22/2021*<br>*LEAD ATTORNEY* |
| | | **Michael T Madaio**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Counter Defendant**

| | | |
|---|---|---|
| **E. Jean Carroll** | represented by | **Roberta Ann Kaplan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Joshua Adam Matz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew J. Craig**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Ferrara**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Shawn Geovjian Crowley**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Trevor Morrison**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 09/08/2020 | 1 <br> 20.1 MB | ☐ | **FILING ERROR - EXHIBITS NOT CLEARLY TITLED** - NOTICE OF REMOVAL from Supreme Court of the State of New York, County of New York. Case Number: 160694/2019..Document filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D (Part 1), # 5 Exhibit D (Part 2), # 6 Exhibit D (Part 3), # 7 Certificate of Service).(Terrell, Stephen) Modified on 9/9/2020 (pne). (Entered: 09/08/2020) |
| 09/08/2020 | 2 <br> 92.9 KB | ☐ | **FILING ERROR - PDF ERROR** -CIVIL COVER SHEET filed..(Terrell, Stephen) Modified on 9/9/2020 (pne). (Entered: 09/08/2020) |
| 09/08/2020 | 3 <br> 1.6 MB | ☐ | MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . Document filed by UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Affidavit, # 3 Exhibit A, # 4 Exhibit B, # 5 Certificate of Service).(Terrell, Stephen) (Entered: 09/08/2020) |
| 09/08/2020 | 4 <br> 159.8 KB | ☐ | NOTICE OF APPEARANCE by Roberta Ann Kaplan on behalf of E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/08/2020) |
| 09/08/2020 | 5 <br> 160.3 KB | ☐ | NOTICE OF APPEARANCE by Joshua Adam Matz on behalf of E. Jean Carroll..(Matz, Joshua) (Entered: 09/08/2020) |
| 09/09/2020 | | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Lewis A. Kaplan. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pne) (Entered: 09/09/2020) |
| 09/09/2020 | | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pne) (Entered: 09/09/2020) |
| 09/09/2020 | | | Case Designated ECF. (pne) (Entered: 09/09/2020) |
| 09/09/2020 | | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Stephen Terrell. The party information for the following party/parties has been modified: Donald J. Trump. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party text was omitted. (pne)** (Entered: 09/09/2020) |
| 09/09/2020 | | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Stephen Terrell to RE-FILE Document No. 1 Notice of Removal,. The filing is deficient for the following reason(s): caption entered on civil cover sheet does not match pleading caption. Re- file the document using the event type Civil Cover Sheet found under the** |

| | | | |
|---|---|---|---|
| | | | **event list Other Documents and attach the corrected PDF. (pne)** (Entered: 09/09/2020) |
| 09/09/2020 | | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING.** **Notice to Attorney Stephen Terrell to RE-FILE Document No. 1 Notice of Removal,. The filing is deficient for the following reason(s): As per Rule 13.3, each attachment to the pleading must be clearly titled in the ECF entry so the subject of the exhibit is clear; do not put only "Exhibit A, B, etc.". Re-file the pleading using the event type Notice of Removal found under the event list Complaints and Other Initiating Documents - attach the PDF(s) - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pne)** (Entered: 09/09/2020) |
| 09/09/2020 | 6 | ☐ 20.1 MB | NOTICE OF REMOVAL from Supreme Court of the State of New York, County of New York. Case Number: 160694/2019..Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - State Court Complaint, # 2 Exhibit B - Westfall Act Certification, # 3 Exhibit C - State Court Docket Index, # 4 Exhibit D (Part 1) - State Court Process, Pleadings, and Orders (less exhibits), # 5 Exhibit D (Part 2) - State Court Process, Pleadings, and Orders (less exhibits), # 6 Exhibit D (Part 3) - State Court Process, Pleadings, and Orders (less exhibits)).(Terrell, Stephen) (Entered: 09/09/2020) |
| 09/09/2020 | 7 | ☐ 114.8 KB | CIVIL COVER SHEET filed..(Terrell, Stephen) (Entered: 09/09/2020) |
| 09/10/2020 | 8 | ☐ 663.6 KB | LETTER MOTION for Conference *re: Schedule* addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated September 10, 2020. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/10/2020) |
| 09/10/2020 | 9 | ☐ 284.1 KB | ORDER granting in part and denying in part 8 Letter Motion for Conference. (Signed by Judge Lewis A. Kaplan on 9/10/2020) (Kaplan, Lewis) (Entered: 09/10/2020) |
| 09/11/2020 | 10 | ☐ 635.2 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated September 11, 2020 re: Court's Order of September 10, 2020 (ECF 9). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/11/2020) |
| 09/11/2020 | 11 | ☐ 333.7 KB | MEMO ENDORSEMENT on re: 10 Letter filed by E. Jean Carroll. ENDORSEMENT: SO ORDERED. (Responses due by 10/5/2020, Replies due by 10/19/2020.) (Signed by Judge Lewis A. Kaplan on 9/11/2020) (jca) (Entered: 09/11/2020) |
| 09/14/2020 | 12 | ☐ 82.4 MB | NOTICE of Lodging State Court Process, Pleadings, and Orders. Document filed by Donald J. Trump. (Attachments: # 1 Process, Pleadings, and Orders Part 1, # 2 Process, Pleadings, and Orders Part 2, # 3 Process, Pleadings, and Orders Part 3, # 4 Process, Pleadings, and Orders Part 4, # 5 Process, Pleadings, and Orders Part 5, # 6 Process, Pleadings, and Orders Part 6, # 7 Process, Pleadings, and Orders Part 7, # 8 Process, Pleadings, and Orders Part 8, # 9 Process, Pleasings and Orders Part 9, # 10 Process, Pleadings, and Orders Part 10, # 11 Process, Pleadings, and Orders Part 11, # 12 Process, Pleadings, and Orders Part 12).(Terrell, Stephen) (Entered: 09/14/2020) |
| 09/15/2020 | 13 | ☐ 292.5 KB | ORDER: Accordingly, the United States, nor before September 18, 2020, shall file the entire state court record as of the time of removal. Each separate paper shall be filed as a separate numbered attachment, shall be clearly titled so hat the subject of the attachment is clear, and shall show the date of the attachment. |

| | | | Attachments hall be listed in chronological order. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 9/14/2020) (jca) (Entered: 09/15/2020) |
|---|---|---|---|
| 09/15/2020 | 14 | ☐ 79.3 MB | NOTICE of Lodging State Court Process, Pleadings, and Orders. Document filed by Donald J. Trump. (Attachments: # 1 Summons (11/04/2019), # 2 Complaint (11/04/2019), # 3 Affirmation re Identification of Related Case (11/08/2019), # 4 RJI Ex Parte Application (11/08/2019), # 5 Orioised Ex Oarte Order (11/08/2019), # 6 Affidavit in Supoort of Ex Parte Application (11/08/2019), # 7 Exhibit (Summons and Complaint) (11/08/2019), # 8 Exhibit (Trump Voter Registration ) (11/08/2019), # 9 Exhibit (Nov 4 Service Attempt) (11/08/2019), # 10 Exhibit (Nov 5 Service Attempt) (11/08/2019), # 11 Exhibit (Nov 6 Service Attempt) (11/08/2019), # 12 Exhibit (Nov 6 Service Attempt) (11/08/2019), # 13 Exhibit (Nov 6 at White House) (11/08/2019), # 14 Exhibit (E-mail) (11/08/2019, # 15 Ex Parte Order (11/13/2019), # 16 Notice of Appearance (11/13/2019), # 17 Affirmation of Service (11/13/2019), # 18 Notice of Appearance (11/13/2019), # 19 Notice of Appearance (11/25/2019), # 20 Stipulation - Briefing Schedule (11/26/2019), # 21 Notice of Appearance (11/26/2019), # 22 Letter/Correspondence - So Ordered (12/03/2019), # 23 Letter to Judge (12/03/2019), # 24 Exhibit (Affirmation re Identification of Related Case) (12/03/2019), # 25 Letter Application to Administrative Judge (12/05/2019), # 26 Letter to Judge (12/05/2019), # 27 Order - Preliminary Conference (12/12/2019), # 28 Proposed OSC (01/03/2020), # 29 Affidavit in Support (01/03/2020), # 30 Exhibit (Complaint) (01/03/2020), # 31 Exhibit (11-13-19 Ex Parte order) (01/03/2020), # 32 Exhibit (Preliminary Conference Order) (01/03/2020), # 33 Memorandum of Law (01/03/2020), # 34 Affirmation in Opposition to OSC (01/06/2020), # 35 OSC - Decline/Withdrawn (01/08/2020), # 36 Decision + Order of Motion (01/10/2020), # 37 Notice of Entry (01/13/2020), # 38 Stipulation (Briefing Schedule) (02/03/2020), # 39 Stipulation - So Ordered (02/04/2020), # 40 Notice of Appearance (02/04/2020), # 41 Notice of Appearance (02/04/2020), # 42 Notice of Appearance (02/04/2020), # 43 Notice of Motion to Stay (02/04/2020), # 44 Affidavit in Support of Motion (02/04/2020), # 45 Exhibit (RJI Submissions) (02/04/2020), # 46 Exhibit (Preliminary Conference Order) (02/04/2020), # 47 Exhibit (Letter from Ct of Appeals) (02/04/2020), # 48 Exhibit (So-Ordered Stipulation) (02/04/2020), # 49 Memorandum of Law (02/04/2020), # 50 Stipulation - Briefing Schedule (02/06/2020), # 51 Stipulation - So Ordered (02/10/2020), # 52 Stipulation - Adjournment of Motion (02/11/2020), # 53 Notice of Appearance (02/18/2020), # 54 Memorandum of Law in Opposition (02/18/2020), # 55 Affiavit in Opposition to Motion (02/18/2020), # 56 Exhibit (First Notice of Submit to Physical Examination (02/18/2020) (PART 1), # 57 Exhibit (First Notice of Submit to Physical Examination (02/18/2020) (PART 2), # 58 Exhibit (Discovery Stipulation) (02/18/2020), # 59 Exhibit (Letter) (02/18/2020), # 60 Exhibit (Notice of Motion) (02/18/2020), # 61 Exhibit (Order) (02/18/2020), # 62 Exhibit (Letter) (02/18/2020), # 63 Exhibit (Letter) (02/18/2020), # 64 Exhibit (Letter) (02/18/2020), # 65 Exhibit (Email) (02/18/2020), # 66 Exhibit (Memorandum of Law) (02/18/2020), # 67 Affidavit in Reply (02/28/2020), # 68 Exhibit (Article) (02/28/2020), # 69 Exhibit (Answer) (02/28/2020), # 70 Exhibit (Decision Granting Leave to Appeal) (02/28/2020), # 71 Memorandum of Law in Reply (02/28/2020), # 72 Letter to Judge (03/02/2020), # 73 Exhibit (Complaint in Trump for President v. NYT Co.) (03/02/2020), # 74 Letter to Judge (03/06/2020), # 75 Exhibit (Complaint in Trump for President v. WP Co.) (03/06/2020), # 76 Exhibit (Complaint in Trump for President v. CNN) (03/06/2020), # 77 Letter to Judge (03/10/2020), # 78 Letter to Judge |

| | | | |
|---|---|---|---|
| | | | (03/11/2020), # [79](#) Letter to Judge (03/11/2020), # [80](#) Court Appearance Update (03/20/2020), # [81](#) Notice (04/14/2020), # [82](#) Notice of Appearance (06/15/2020), # [83](#) Notice of Motion (06/15/2020), # [84](#) Affirmation in Support of Motion (06/15/2020), # [85](#) Exhibit (Logo for The Apprentice) (06/15/2020), # [86](#) Exhibit (Entry information page) (06/15/2020), # [87](#) Exhibit (Entry information page) (06/15/2020), # [88](#) Exhibit (FEC filing) (06/15/2020), # [89](#) Exhibit (Report titled Expenditures) (06/15/2020), # [90](#) Exhibit (Certified transcript of phone call) (06/15/2020), # [91](#) Exhibit (Florida Voter Registration Applications) (06/15/2020), # [92](#) Exhibit (Declaration of Use Agreement) (06/15/2020), # [93](#) Memorandum of Law in Support (06/15/2020), # [94](#) Letter to Judge (06/29/2020), # [95](#) Letter to Judge (06/29/2020), # [96](#) Exhibit (Correspondence Between Counsel) (06/29/2020), # [97](#) Decision + Order on Motion (07/01/2020), # [98](#) Letter to Judge (07/10/2020), # [99](#) Exhibit (Trump v. Vance Opinion) (07/10/2020), # [100](#) Letter to Judge (07/14/2020), # [101](#) Exhibit (Brief for Appellant in Zervos) (07/14/2020), # [102](#) Letter to Judge (07/15/2020), # [103](#) Exhibit (Trump v. Mazars Opinion) (07/16/2020), # [104](#) Letter to Judge (07/16/2020), # [105](#) Exhibit (Reply Brief of Appellant in Zervos) (07/16/2020), # [106](#) Letter to Judge (07/17/2020), # [107](#) Exhibit (Submission to Court of Appeals) (07/17/2020), # [108](#) Substitution of Attoeney (07/24/2020), # [109](#) Letter to Judge (07/28/2020), # [110](#) Exhibit (Letetr response to Court of Appeals) (07/28/2020), # [111](#) Decision + Order on Motion (08/06/2020), # [112](#) Notice of Entry (08/08/2020)).(Terrell, Stephen) (Entered: 09/15/2020) |
| 10/05/2020 | [15](#) | ☐ 528.0 KB | MOTION for Leave to File Amicus Brief *IN SUPPORT OF PLAINTIFFS OPPOSITION TO THE MOTION OF THE UNITED STATES TO SUBSTITUTE ITSELF AS THE DEFENDANT*. Document filed by Government Accountability Project. (Attachments: # [1](#) Exhibit Amicus Brief).(Kolar, John) (Entered: 10/05/2020) |
| 10/05/2020 | [16](#) | ☐ 2.9 MB | MEMORANDUM OF LAW in Opposition re: [3](#) MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . . Document filed by E. Jean Carroll. (Attachments: # [1](#) Affidavit of Roberta A. Kaplan In Support of Plaintiff's Opposition to Defendant's Motion to Substitute, # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Exhibit C, # [5](#) Exhibit D, # [6](#) Exhibit E, # [7](#) Exhibit F, # [8](#) Exhibit G, # [9](#) Exhibit H).(Kaplan, Roberta) (Entered: 10/05/2020) |
| 10/09/2020 | [17](#) | ☐ 94.3 KB | LETTER MOTION for Leave to File Excess Pages *re: Reply in support of Motion to Substitute* addressed to Judge Lewis A. Kaplan from Stephen Terrell dated 10/09/2020. Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/09/2020) |
| 10/09/2020 | [18](#) | ☐ 310.2 KB | ORDER SCHEDULING ORAL ARGUMENT with respect to [3](#) MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America. The Court will hear oral argument in the Ceremonial Courtroom on the motion of the United States to substitute the United States for President Donald J. Trump in his individual capacity on Wednesday, October 21, 2020 at 3:30 p.m. Thirty minutes are allocated to each of the plaintiff and the United States. Counsel for each of the plaintiff the defendant, and the United States each shall inform the deputy clerk on or before October 16, 202 of the number of attorneys and their assistants whom that party wishes to have present in the courtroom. The undersigned prohibits the bringing of any Personal Electronic Device or General Purpose Computing Device into courtrooms, witness rooms, robing rooms,jury rooms and associated spaces, and judicial chambers used by him absent written permission granted by him as provided by standing order of |

| | | | |
|---|---|---|---|
| | | | the Court. See In the Matter of Personal Electronic Devices and General Purpose Computing Devices, Standing Order Ml0-468 (revised), 14-mc-0047 (filed Feb. 27, 2014). That prohibition shall apply to the oral argument an any other proceedings in this case scheduled hereby notwithstanding In re Coronavirus/COVID-19 pandemic, Standing Order Ml0-468 (revised), 20-mc-316 (filed Sept. 9, 2020). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/9/2020) (jca) (Entered: 10/09/2020) |
| 10/09/2020 | | | Set/Reset Hearings: Oral Argument set for 10/21/2020 at 03:30 PM before Judge Lewis A. Kaplan. (jca) (Entered: 10/09/2020) |
| 10/11/2020 | 19 | | ORDER granting 17 Letter Motion for Leave to File Excess Pages (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 10/11/2020) |
| 10/15/2020 | 20 | ☐ 159.7 KB | ORDER: The argument of the pending motion on October 21 shall take place in Courtroom 21B rather than the ceremonial courtroom. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/14/2020) (jca) (Entered: 10/15/2020) |
| 10/19/2020 | 21 | ☐ 84.6 KB | REPLY MEMORANDUM OF LAW in Support re: 3 MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . . Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/19/2020) |
| 10/19/2020 | 22 | ☐ 23.0 KB | MEMORANDUM OF LAW in Opposition re: 15 MOTION for Leave to File Amicus Brief *IN SUPPORT OF PLAINTIFFS OPPOSITION TO THE MOTION OF THE UNITED STATES TO SUBSTITUTE ITSELF AS THE DEFENDANT*. . Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/19/2020) |
| 10/20/2020 | 23 | ☐ 11.5 KB | NOTICE OF APPEARANCE by William Kerwin Lane, III on behalf of Donald J. Trump..(Lane, William) (Entered: 10/20/2020) |
| 10/20/2020 | 24 | | ORDER granting 15 Motion for Leave to File Document (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 10/20/2020) |
| 10/21/2020 | 25 | ☐ 24.8 KB | LETTER MOTION to Continue *Hearing* addressed to Judge Lewis A. Kaplan from Stephen R. Terrell dated 10/21/2020. Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/21/2020) |
| 10/21/2020 | 26 | ☐ 40.0 KB | ORDER with respect to 25 Letter Motion to Continue. Denied. The Court will hear the government's argument (a) in person if offered by an attorney who is permitted entry to the courthouse under existing rules and orders pertaining to COVID, or (b) by telephone from outside the courthouse if offered by any attorney not eligible to enter the courthouse. Alternatively, the Court will take the motion on submission without oral argument. The undersigned is not authorized to vary the existing restrictions on entry into the courthouse. The government shall advice the Courtroom deputy as promptly as possible what it intends to do.. (Signed by Judge Lewis A. Kaplan on 10/21/2020) (Mohan, Andrew) (Entered: 10/21/2020) |
| 10/21/2020 | 27 | ☐ 43.7 KB | CORRECTED ORDER denying 25 Letter Motion to Continue. Denied. The Court will hear the government's argument (a) in person if offered by an attorney who is permitted entry to the courthouse under existing rules and orders pertaining to COVID, or (b) by telephone from outside the courthouse if offered by any attorney not eligible to enter the courthouse. Alternatively, the Court will take the motion on submission without oral argument. The undersigned is not authorized to vary the existing restrictions on entry into the |

| | | | |
|---|---|---|---|
| | | | courthouse. It notes further that, contrary to the government's suggestion, it appears that Virginia was added to the list of Restricted States over a week ago. New York State, Governor Cuomo Announces Three States Added to Travel Advisory (Oct. 13, 2020), available at https://www.govenor.ny.gov/news/govenor-cuomo-announces-three-states-added-travel-advisory (last visited Oct. 21, 2020). The government shall advise the courtroom deputy as promptly as possible what it intends to do. So ordered. (Signed by Judge Lewis A. Kaplan on 10-21-2020) (Mohan, Andrew) (Entered: 10/21/2020) |
| 10/21/2020 | | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Motion Hearing held on 10/21/2020 re: 3 MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . filed by Donald J. Trump. Argument on submission. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 10/21/2020) |
| 10/26/2020 | 28 | ☐ 18.4 KB | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/21/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/16/2020. Redacted Transcript Deadline set for 11/27/2020. Release of Transcript Restriction set for 1/24/2021..(McGuirk, Kelly) (Entered: 10/26/2020) |
| 10/26/2020 | 29 | ☐ 388.9 KB | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/21/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 10/26/2020) |
| 10/26/2020 | 31 | ☐ 388.9 KB | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 9/17/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 10/26/2020) |
| 10/26/2020 | | | ***DELETED DOCUMENT. Deleted document number 30 TRANSCRIPT. The document was incorrectly filed in this case as per email of 12/7/2020. (rro) Modified on 12/7/2020 (rro). (Entered: 12/07/2020) |
| 10/27/2020 | 32 | ☐ 927.4 KB | Opinion and Order denying 3 Motion to Substitute Party. The President of the United States is not an employee of the Government within the meaning of the relevant statutes. Even if he were such an employee, President Trumps allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment. Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.. (Signed by Judge Lewis A. Kaplan on 10/26/2020) (Mohan, Andrew) (Entered: 10/27/2020) |
| 10/27/2020 | 33 | ☐ 694.0 KB | RAJ PATEL'S (PRO SE)MOTION FOR PERMISSIVE INTERVENTION. Document filed by Raj Patel.(sc) (Entered: 10/27/2020) |

| | | | |
|---|---|---|---|
| 10/27/2020 | 34 | ☐ 127.3 KB | NOTICE OF PRO SE APPEARANCE. Document filed by Raj K. Patel, applicant to intervene in this action. (sc) (Entered: 10/27/2020) |
| 10/27/2020 | 35 | ☐ 251.1 KB | MEMORANDUM OF LAW in Opposition re: 33 MOTION to Intervene. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 10/27/2020) |
| 10/28/2020 | 36 | ☐ 334.7 KB | MEMO ENDORSEMENT denying 33 Motion to Intervene. ENDORSEMENT: Denied. See Doe v. Trump, No. 19-9936 (LGS), Dkt. 272 (Mag 26, 2020). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/28/2020) (jca) (Entered: 10/28/2020) |
| 10/28/2020 | 37 | ☐ 448.6 KB | MOTION FOR COURT-APPOINTED COUNSEL.Document filed by intervenor-plaintiff applicant , Raj K. Patel.(sc) Modified on 10/28/2020 (sc). (Entered: 10/28/2020) |
| 11/05/2020 | 38 | ☐ 23.6 KB | ORDER denying as moot 37 MOTION FOR COURT-APPOINTED COUNSEL. Denied as moot and on true merits. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 11/5/2020) (jca) (Entered: 11/05/2020) |
| 11/09/2020 | 39 | ☐ 18.3 KB | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/21/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/30/2020. Redacted Transcript Deadline set for 12/10/2020. Release of Transcript Restriction set for 2/8/2021..(McGuirk, Kelly) (Entered: 11/09/2020) |
| 11/09/2020 | 40 | ☐ 388.9 KB | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/21/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 11/09/2020) |
| 11/11/2020 | 41 | ☐ 61.3 KB | Initial Conference Order: The initial conference by telephone is set for 12/11/2020 at 09:30 AM before Judge Lewis A. Kaplan. Counsel for all parties are directed to confer regarding an agreed scheduling order. If counsel are able to agree on a schedule and the agreed schedule calls for filing of the pretrial order not more than six (6) months from the date of this order, counsel shall sign and file within twenty-one (21) days from the date hereof a consent order in the form annexed for consideration by the Court. If such a consent order is not filed within the time provided, a teleconference will be held on 12/11/2020 at 9:30 AM. The teleconference can be reached by calling 888-363-4749 and using access code 7664205. (Signed by Judge Lewis A. Kaplan on 11/11/2020) (Mohan, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 42 | ☐ 61.3 KB | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE: It is hereby, ORDERED as follows: Counsel receiving this order shall promptly mail copies hereof to all other counsel of record or, in the case of parties for which no appearance has been made, to such parties. Counsel for all parties are directed to confer regarding an agreed scheduling order. If counsel are able to agree on a schedule and the agreed schedule calls for filing of the pretrial order not more than six (6) months from the date of this order, counsel shall sign and file within twenty-one (21) days from the date hereof a consent order in the form annexed for consideration by the Court. If such a consent order is not filed |

| | | | |
|---|---|---|---|
| | | | within the time provided, a teleconference will be held on 12/11/2020 at 9:30 AM. The teleconference can be reached by calling 888-363-4749 and using access code 7664205.( Initial Conference set for 12/11/2020 at 09:30 AM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 11/11/20) (yv) (Entered: 11/12/2020) |
| 11/16/2020 | [43](#) | ☐ 90.5 KB | CERTIFICATE OF SERVICE of the Court's Order dated November 11, 2020 (Doc. No. 41) served on Donald J. Trump, in his personal capacity on November 13, 2020 and November 14, 2020. Document filed by E. Jean Carroll..(Matz, Joshua) (Entered: 11/16/2020) |
| 11/20/2020 | [44](#) | ☐ 35.6 KB | ORDER: This action was commenced against Donald J. Trump in his individual (not his official) capacity in New York State court. By substitution for the original private counsel for Mr. Trump, Mark E. Kasowitz, Christine A. Montenegro, and Paul J. Burgo of the firm of Kasowitz Benson Torres LLP appeared on defendant's behalf on July 24, 2020. Dkt. 14-108. On September 8, 2020, the United States of America - represented by Stephen Terrell and other attorneys at the Department of Justice (the "DOJ") - removed the action to this Court and later moved to substitute the United States as defendant in place of Mr. Trump. Dkt. 1. On October 27, 2020, I denied that motion. Dkt. 33. Section 1450 of the Judicial Code, 28 U.S.C. § 1450, provides in relevant part that "[a]ll injunctions, orders, and other proceedings had in such action [i.e., any removed action] prior to its removal shall remain in full force and effect until dissolved or modified by the district court." Accordingly, by virtue of their appearance on behalf of Mr. Trump in the state court, Messrs. Kasowitz and Burgo and Ms. Montenegro represent Mr. Trump in this removed action unless and until relieved by this Court. Nevertheless, the docket sheet erroneously lists Mr. Terrell and another attorney as counsel for defendant Trump. That is incorrect. They represent only the United States. The Clerk shall correct the docket sheet to reflect that (1) Messrs. Terrell and his colleagues at the DOJ represent only the United States of America and (2) Messrs. Kasowitz and Burgo and Ms. Montenegro represent Mr. Trump. The Clerk shall mail copies of this order, all others entered by this Court subsequent to removal, and the Court's opinion to counsel for Mr. Trump. Attorney Marc E. Kasowitz, Christine A. Montenegro, Paul J. Burgo for Donald J. Trump added. United States of America added. (Signed by Judge Lewis A. Kaplan on 11/18/2020) (tro) Transmission to Docket Assistant Clerk for processing. (Entered: 11/20/2020) |
| 11/20/2020 | | | Mailed a copy of [36](#) Order on Motion to Intervene, [20](#) Order on Motion to Continue, [27](#) Order, [38](#) Order on Application for the Court to Request Counsel, [26](#) Order on Motion to Continue, [41](#) Scheduling Order, Set Hearings, [32](#) Order on Motion to Substitute Party, [13](#) Order, [11](#) Memo Endorsement, Set Deadlines, [42](#) Order for Initial Pretrial Conference, 19 Order on Motion for Leave to File Excess Pages, [9](#) Order on Motion for Conference, [44](#) Order, Add and Terminate Attorneys, Add and Terminate Parties, 24 Order on Motion for Leave to File Document, [18](#) Order on Motion to Substitute Party, to Christine A. Montenegro, Marc E. Kasowitz, Paul J. Burgo at Kasowitz, Benson, Torres LLP (NYC), 1633 Broadway, New York, NY 10019 Via UPS Tracking Number: 1Z E22 E53 37 1005 148 0.(dsh) (Entered: 11/20/2020) |
| 11/25/2020 | [45](#) | ☐ 7.9 KB | NOTICE OF INTERLOCUTORY APPEAL from [32](#) Order on Motion to Substitute Party,,. Document filed by United States of America. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit.. (Terrell, Stephen) (Entered: 11/25/2020) |

| 11/25/2020 | 46 | ☐ 1.2 MB | NOTICE OF INTERLOCUTORY APPEAL from 32 Order on Motion to Substitute Party,,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-22753482. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A - Order Denying Motion to Substitute).(Kasowitz, Marc) (Entered: 11/25/2020) |
|---|---|---|---|
| 11/30/2020 | | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 45 Notice of Interlocutory Appeal..(nd) (Entered: 11/30/2020) |
| 11/30/2020 | | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 45 Notice of Interlocutory Appeal filed by United States of America were transmitted to the U.S. Court of Appeals..(nd) (Entered: 11/30/2020) |
| 11/30/2020 | | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 46 Notice of Interlocutory Appeal..(nd) (Entered: 11/30/2020) |
| 11/30/2020 | | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 46 Notice of Interlocutory Appeal, filed by Donald J. Trump were transmitted to the U.S. Court of Appeals..(nd) (Entered: 11/30/2020) |
| 12/10/2020 | 47 | ☐ 19.4 KB | LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. Document filed by Donald J. Trump.. (Kasowitz, Marc) (Entered: 12/10/2020) |
| 12/11/2020 | | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Telephone Conference held on 12/11/2020. Plaintiff's opposition to defendants motion to stay is due 12/17/2020 and Defendant's reply is due 12/21/2020. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 12/11/2020) |
| 12/14/2020 | 48 | ☐ 57.2 KB | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/11/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2021. Redacted Transcript Deadline set for 1/14/2021. Release of Transcript Restriction set for 3/15/2021..(McGuirk, Kelly) (Entered: 12/14/2020) |
| 12/14/2020 | 49 | ☐ 390.1 KB | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/11/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/14/2020) |
| 12/17/2020 | 50 | ☐ 374.7 KB | MEMORANDUM OF LAW in Opposition re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 12/17/2020) |
| 12/21/2020 | 51 | ☐ 124.5 KB | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 21, 2020 re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated |

|  |  |  |  |
|---|---|---|---|
|  |  |  | December 10, 2020. . Document filed by Donald J. Trump. (Attachments: # 1 Exhibit 1 - Mar. 9, 2007 LEXIS Decision, In re World Trade Ctr. Disaster Site Litig. (2d Cir.)).(Kasowitz, Marc) (Entered: 12/21/2020) |
| 01/15/2021 | 52 | ☐ 197.3 KB | MOTION for Joshua Matz to Withdraw as Attorney . Document filed by E. Jean Carroll. (Attachments: # 1 Declaration of J. Matz in Support).(Matz, Joshua) (Entered: 01/15/2021) |
| 01/18/2021 | 53 | ☐ 11.7 KB | MOTION for William Kerwin Lane III to Withdraw as Attorney . Document filed by United States of America..(Lane, William) (Entered: 01/18/2021) |
| 01/18/2021 | 54 |  | ORDER granting 52 Motion to Withdraw as Attorney. Attorney Joshua Adam Matz terminated (Kaplan, Lewis) (Entered: 01/18/2021) |
| 01/18/2021 | 55 |  | ORDER granting 53 Motion to Withdraw as Attorney.. (Signed by Judge Lewis A. Kaplan on 1/18/2021) (Kaplan, Lewis) (Entered: 01/18/2021) |
| 09/15/2021 | 56 |  | ORDER denying without prejudice 47 Letter Motion to Stay re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. (HEREBY ORDERED by Judge Lewis A. Kaplan) (Text Only Order) (Kaplan, Lewis) (Entered: 09/15/2021) |
| 11/22/2021 | 57 | ☐ 471.0 KB | PROPOSED ORDER FOR SUBSTITUTION OF ATTORNEY. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 11/22/2021) |
| 11/22/2021 | 58 | ☐ 35.3 KB | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY, The substitution of attorney is hereby approved and SO ORDERED. (Attorney Alina Habba for Donald J. Trump added. Attorney Christine A. Montenegro; Paul J. Burgo and Marc E. Kasowitz terminated.) (Signed by Judge Lewis A. Kaplan on 11/22/21) (yv) (Entered: 11/22/2021) |
| 12/01/2021 | 59 | ☐ 2.5 MB | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*. Document filed by Donald J. Trump. (Attachments: # 1 Affirmation of Alina Habba, Esq. with Exhibits, # 2 Memorandum of Law, # 3 Proposed Order). (Habba, Alina) Modified on 1/10/2022 (kj). (Entered: 12/01/2021) |
| 12/01/2021 |  |  | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Alina Habba to RE-FILE Document 59 MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*.. ERROR(S): Supporting Documents are filed separately, each receiving their own document #. (Supporting Documents are found under the Event Type - Replies, Opposition and Supporting Documents; Rule 56.1 Statement is found under Other Answers). Proposed Order(s) and/or Certificate of Service(s) can be filed with the Motion.. (kj)** (Entered: 01/10/2022) |
| 12/06/2021 | 60 | ☐ 115.8 KB | NOTICE OF APPEARANCE by Joshua Adam Matz on behalf of E. Jean Carroll..(Matz, Joshua) (Entered: 12/06/2021) |
| 12/15/2021 | 61 | ☐ 2.2 MB | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MEMORANDUM OF LAW in Opposition re: 59 MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*. . Document filed by E. Jean Carroll.. (Kaplan, Roberta) Modified on 1/10/2022 (kj). (Entered: 12/15/2021) |
| 12/15/2021 |  |  | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Roberta Kaplan to RE-FILE Document 61 Memorandum of Law in Opposition to Motion,.** |

| | | | |
|---|---|---|---|
| | | | **ERROR(S): Supporting and or Opposing/Response Document(s) linked to a deficient entry.. (kj)** (Entered: 01/10/2022) |
| 12/22/2021 | 62 | ☐ 249.3 KB | **FILING ERROR - DEFICIENT DOCKET ENTRY** - REPLY MEMORANDUM OF LAW in Support re: 59 MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*. . Document filed by Donald J. Trump..(Habba, Alina) Modified on 1/10/2022 (kj). (Entered: 12/22/2021) |
| 12/22/2021 | | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Alina Habba to RE-FILE Document 62 Reply Memorandum of Law in Support of Motion,. ERROR(S): Supporting and or Opposing/Response Document(s) linked to a deficient entry.. (kj)** (Entered: 01/10/2022) |
| 01/11/2022 | 63 | ☐ 1.9 MB | MOTION to Amend/Correct *Defendant's Answer*. Document filed by Donald J. Trump. (Attachments: # 1 Affirmation of Alina Habba, Esq. with Exhibits, # 2 Text of Proposed Order).(Habba, Alina) (Entered: 01/11/2022) |
| 01/11/2022 | 64 | ☐ 584.1 KB | MEMORANDUM OF LAW in Support re: 63 MOTION to Amend/Correct *Defendant's Answer*. . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/11/2022) |
| 01/11/2022 | 65 | ☐ 2.2 MB | MEMORANDUM OF LAW in Opposition re: 63 MOTION to Amend/Correct *Defendant's Answer*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/11/2022) |
| 01/28/2022 | 66 | ☐ 249.3 KB | REPLY MEMORANDUM OF LAW in Support re: 63 MOTION to Amend/Correct *Defendant's Answer*. . Document filed by Donald J. Trump.. (Habba, Alina) (Entered: 01/28/2022) |
| 02/11/2022 | 67 | ☐ 13.2 KB | ORDER, The Court will hear argument on defendant's motion for leave to file an amended answer on February 17, 2022 at 4:00 p.m. SO ORDERED. ( Oral Argument set for 2/17/2022 at 04:00 PM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 2/11/22) (yv) (Entered: 02/11/2022) |
| 02/11/2022 | | | Dial in re Oral Argument set for 2/22/2022 at 04:00 PM in Courtroom 21B, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan. Public seating in the gallery of courtroom 21B will be limited due to Covid-19 social distancing requirements. However, the public and press may dial in to listen to the oral argument as scheduled at 1-888-363-4749 and entering conference code 7664205#. Please be aware that Court rules prohibit listeners from recording or rebroadcasting the hearing in whole or in part. (Mohan, Andrew) Modified on 2/14/2022 (Mohan, Andrew). (Entered: 02/11/2022) |
| 02/14/2022 | 68 | ☐ 245.7 KB | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba, Esq. dated 2/14/2022 re: rescheduling oral arguments on Defendant's Motion to amend the answer. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/14/2022) |
| 02/14/2022 | 69 | ☐ 37.2 KB | MEMO ENDORSEMENT On the 2/14/2022 letter of Ms. Alina Habba requesting an adjournment of the 2/17/2022 oral argument date. Adjourned until 2/22/22 at 4:00 PM. (Signed by Judge Lewis A. Kaplan on 2/14/2022) (Mohan, Andrew) (Entered: 02/14/2022) |
| 02/22/2022 | | | Minute Entry for proceedings held before Judge Lewis A. Kaplan in courtroom 21B: Oral Argument held on 2/22/2022 re: 63 MOTION to Amend/Correct *Defendant's Answer*. filed by Donald J. Trump. Public dial-in line was active. |

| | | | Court's decision reserved. (Court Reporter Rebecca Forman) (Mohan, Andrew) (Entered: 02/23/2022) |
|---|---|---|---|
| 02/24/2022 | 70 | ☐ 183.3 KB | JOINT LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated February 24, 2022 re: response to the Court's request concerning previous stays. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/24/2022) |
| 02/24/2022 | 71 | ☐ 100.9 KB | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/22/2022 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2022. Redacted Transcript Deadline set for 3/28/2022. Release of Transcript Restriction set for 5/25/2022..(Moya, Goretti) (Entered: 02/24/2022) |
| 02/24/2022 | 72 | ☐ 458.0 KB | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/22/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/24/2022) |
| 03/11/2022 | 73 | ☐ 603.3 KB | MEMORANDUM OPINION re: 63 MOTION to Amend/Correct *Defendant's Answer.* filed by Donald J. Trump. Defendant's motion, in his personal capacity, for leave to amend (Dkt. 63) is denied on the ground that the proposed amendment would be futile. In the alternative, it is denied in the exercise of discretion on the grounds that the defendant delayed unduly in seeking leave to amend, that the motion for leave is made at least in part for a dilatory purpose and thus at least in part in bad faith, and that granting the motion would prejudice the plaintiff unduly. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/10/22) (yv) (Entered: 03/11/2022) |
| 03/11/2022 | 74 | ☐ 52.7 KB | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 3/10/22 re: notify the Court of the attached decision issued by a unanimous panel of the Appellate Division, First Department this afternoon. ENDORSEMENT: The Appellate Division of the New York Supreme Court yesterday held the 2020 amendment to N.Y. Civ. Rts. L. § 76-a has only prospective effect. Gottwald v. Sebert, _ A.D. 3d _, Index No. 653118/2014 (1st Dep't filed Mar. 10, 2021). Its logic applies equally to the all of the 2020 amendments to the anti-SLAPP law. In the absence of compelling reasons to believe that the New York Court of Appeals would reach a different result, this Court is obliged under Erie to follow it. E.g., Hicks on Behalf of Feiockv. Feiock, 485 U.S. 624, 629-30 & n.3 (1988) (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940)); AEI Life LLC v. Lincoln Benfit Life Co., 892 F.3d 126, 138-39 & n.15 (2d Cir. 2018) (quoting Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 134 (2d Cir. 1999); Pentech Int'l, Inc. v. Wall Street Clearing Co., 983 F.2d 441, 445 (2d Cir.1993); Deeper Life Christian Fellowship, Inc. v. Sobol, 948 F.2d 79, 84 (2d Cir.1991). Nevertheless, contrary to plaintiff's suggestion, this does not moot the issues addressed in the opinion dated March 10, 2021 (Dkt. 73), as N.Y. Civ. Rts. L. § 70-a applies not only to the commencement of a covered action, but also to its continuation. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/11/22) (yv) (Entered: 03/11/2022) |

| 05/05/2022 | 75 <br> 711.8 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated May 5, 2022 re: Agreed discovery schedule. Document filed by E. Jean Carroll. (Attachments: # 1 Text of Proposed Order / [Proposed] Scheduling Order). (Kaplan, Roberta) (Entered: 05/05/2022) |
|---|---|---|
| 05/05/2022 | 76 <br> 91.2 KB | SCHEDULING ORDER: It is hereby ORDERED as follows: 1. The parties shall serve any and all written discovery requests on each other on or before May 27, 2022. 2. The parties shall substantially complete their productions of written discovery and requests for inspection or examination on or before August 3, 2022. 3. Depositions to take place between August 3, 2022, to October 19, 2022. 4. The parties shall make any and all expert disclosures under Rule 26(a)(2) on or before September 16, 2022. 5. The parties shall substantially complete any and all fact discovery on or before October 19, 2022. 6. The parties shall complete any and all expert discovery on or before November 16, 2022. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/4/2022) Deposition due by 10/19/2022. Fact Discovery due by 10/19/2022. Expert Discovery due by 11/16/2022. Discovery due by 5/27/2022. (ks) (Entered: 05/05/2022) |
| 07/19/2022 | 77 <br> 22.5 KB | SUPPLEMENTAL SCHEDULING ORDER:The existing scheduling order (Dkt 76) is supplemented as follows: 1. All discovery shall be completed on or before November 16, 2022. 2. Any summary judgment motions and a joint pretrial order in the form attached as Annex A to the individual practices of the undersigned (which are posted on the Court's web site) shall be filed on or before December 1, 2022. 3. Absent prior disposition of the case by motion or otherwise, the trial will commence on February 6, 2023 at 9:30 a.m. 4. The parties shall exchange premarked trial exhibits no later than December 8, 2022. 5. Any motions in limine and oppositions thereto shall be filed no later than December 8 and December 15, 2022, respectively. SO ORDERED. Motions due by 12/8/2022. Responses due by 12/15/2022 Discovery due by 11/16/2022. Pretrial Order due by 12/1/2022. Ready for Trial by 2/6/2023. (Signed by Judge Lewis A. Kaplan on 7/19/2022) (tg) (Entered: 07/19/2022) |
| 07/20/2022 | 78 <br> 317.8 KB | LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated July 20, 2022. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 07/20/2022) |
| 07/21/2022 | 79 <br> 324.2 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated July 21, 2022 re: Supplemental Scheduling Order (ECF 77) and Plaintiff's Letter Motion (ECF 78). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 07/21/2022) |
| 07/26/2022 | 80 <br> 115.3 KB | NOTICE OF APPEARANCE by Shawn Geovjian Crowley on behalf of E. Jean Carroll..(Crowley, Shawn) (Entered: 07/26/2022) |
| 07/26/2022 | 81 <br> 115.1 KB | NOTICE OF APPEARANCE by Matthew J. Craig on behalf of E. Jean Carroll..(Craig, Matthew) (Entered: 07/26/2022) |
| 08/01/2022 | 82 <br> 333.1 KB | LETTER MOTION for Discovery / *Discovery Dispute* addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated August 1, 2022. Document filed by E. Jean Carroll. (Attachments: # 1 Text of Proposed Order [Proposed] Protective and Confidentiality Order).(Kaplan, Roberta) (Entered: 08/01/2022) |
| 08/03/2022 | 83 <br> 326.3 KB | ORDER: Counsel are advised as follows: 1. Shawn G. Crowley, Esq., who filed a notice of appearance in the first captioned case on July 26, 2022, is a former law clerk to the undersigned. The undersigned co-officiated (with another judge) at the marriage of Ms. Crowley approximately seven years ago. 2. |

|  |  |  | Assistant United States Attorney Jeffrey W. Coyle, who appears for the United States in the second captioned case, which was assigned to the undersigned on August 2, 2022, is a former law clerk to the undersigned. (Signed by Judge Lewis A. Kaplan on 8/3/2022) (rro) (Entered: 08/03/2022) |
|---|---|---|---|
| 08/11/2022 | 84 | ☐ 1.9 MB | PROTECTIVE AND CONFIDENTIALITY ORDER...regarding procedures to be followed that shall govern the handling of confidential material...SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/11/22) (yv) (Entered: 08/11/2022) |
| 08/17/2022 | 85 |  | ORDER denying 78 Letter Motion for Conference re: 78 LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated July 20, 2022. (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 08/17/2022) |
| 08/17/2022 | 86 |  | ORDER terminating 82 Letter Motion for Discovery (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 08/17/2022) |
| 08/23/2022 | 87 | ☐ 105.6 KB | PROPOSED STIPULATION AND ORDER. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/23/2022) |
| 08/24/2022 | 88 | ☐ 44.6 KB | STIPULATION AND ORDER. IT IS ACCORDINGLY STIPULATED AND AGREED that the parties' deadline for making their expert disclosures under Rule 26(a)(2) is extended until October 14, 2022. IT IS SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/24/22) (yv) Modified on 9/13/2022 (yv). (Entered: 08/24/2022) |
| 09/20/2022 | 89 | ☐ 229.1 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 8/8/22 re: providing the Court a brief update on discovery; and (2) informing the Court of a case that Plaintiff plans to file against Defendant pursuant to New York's Adult Survivors Act as soon as that statute authorizes us to do so on November 24, 2022. Document filed by E. Jean Carroll.(yv) (Entered: 09/20/2022) |
| 09/20/2022 | 90 | ☐ 200.4 KB | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated 8/11/22 re: response to the letter submitted by the plaintiff, E. Jean Carroll ("Plaintiff"), on August 8, 2022. Document filed by Donald J. Trump.(yv) (Entered: 09/20/2022) |
| 09/27/2022 | 91 | ☐ 2.5 MB | USCA OPINION (Certified) as to 46 Notice of Interlocutory Appeal, filed by Donald J. Trump, 45 Notice of Interlocutory Appeal filed by United States of America. USCA Case Number 20-3977-cv (L), 20-3978-cv (Con). Defendant-Appellant Donald J. Trump and Movant-Appellant the United States of America appeal from a judgment of the United States District Court for the Southern District of New York (Kaplan, J.) denying their motion to substitute the United States in this action pursuant to the Westfall Act of 1988. On appeal, appellants argue that substitution is warranted because the President of the United States is a covered government employee under the Westfall Act, and because Trump had acted within the scope of his employment when he made the allegedly defamatory statements denying Plaintiff-Appellee E.Jean Carroll's 2019 sexual1 assault allegations. We REVERSE the District Court's holding that the President of the United States is not an employee of the government under the Westfall Act. And we VACATE the District Court's judgment that Trump did not act within the scope of his employment, and CERTIFY that question to the D.C. Court of Appeals. Judge Calabresi concurs in a separate opinion, and Judge Chin dissents in a separate opinion.. Catherine O'Hagan |

| | | | |
|---|---|---|---|
| | | | Wolfe, Clerk USCA for the Second Circuit. Certified: 9/27/2022. (Attachments: # 1 Concurring by Judge CALABRESI, # 2 Dissenting by Judge Chin).(nd) (Entered: 09/27/2022) |
| 09/27/2022 | | | Transmission of USCA Mandate to the District Judge re: 91 USCA Order,,,,,,. (nd) (Entered: 09/27/2022) |
| 09/28/2022 | 92 | ☐ 213.3 KB | LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 09/28/2022) |
| 09/30/2022 | 93 | ☐ 350.6 KB | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated September 30, 2022 re: 92 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/30/2022) |
| 10/03/2022 | 94 | ☐ 213.5 KB | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Alina Habba dated 10/3/2022 re: 92 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 10/03/2022) |
| 10/04/2022 | 95 | ☐ 145.5 KB | LETTER MOTION for Conference re: 92 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. addressed to Judge Lewis A. Kaplan from Alina Habba, Esq. dated 10/4/22. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 10/04/2022) |
| 10/04/2022 | | | Set Hearings: Status Conference via-video conference is set for 10/7/2022 at 03:45 PM before Judge Lewis A. Kaplan. Counsel have been sent video-conference invites by email. Public and press may listen in via audio-only by dialing 1-888-363-4749 and entering access code 7664205# Participants and listeners are reminded that recording or re-broadcasting of the conference in whole or in part is prohibited by Court rules. (Mohan, Andrew) (Entered: 10/04/2022) |
| 10/06/2022 | | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Video-Conference held on 10/6/2022. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 10/06/2022) |
| 10/07/2022 | | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Interim Pretrial Conference held via video-conference on 10/7/2022. AT&T Line was active for public and press to listen. (Court Reporter Lisa Franko) (Mohan, Andrew) (Entered: 10/07/2022) |
| 10/12/2022 | 96 | ☐ 420.0 KB | MEMORANDUM OPINION: re: 92 LETTER MOTION to Stay. addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. filed by Donald J. Trump. The defendant's letter motion [Dkt. 92] is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/12/2022) (ama) (Entered: 10/12/2022) |
| 11/10/2022 | 97 | ☐ 552.9 KB | CONSENT LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated November 10, 2022. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - D.C. Court of Appeals Order). (Kaplan, Roberta) (Entered: 11/10/2022) |
| 11/17/2022 | 98 | ☐ 1.8 MB | SUPPLEMENTAL LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated November 17, 2022 re: November 11, 2022 LETTER MOTION for Scheduling Conference 97 . Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Correspondence Between Counsel, # 2 Exhibit B |

| | | |
|---|---|---|
| | | - Color-Coded Complaint in Second Action, # 3 Exhibit C - Complaint in Second Action).(Kaplan, Roberta) (Entered: 11/17/2022) |
| 11/18/2022 | | Set/Reset Hearings: Status video-conference set for 11/22/2022 at 03:00 PM to be held by video-conference with audio access for public and press to listen to the proceeding held before Judge Lewis A. Kaplan. Counsel will appear by video. Listeners may dial-in for audio at 1-888-363-4749 and enter conference ID 7664205# Recording or re-broadcasting of the hearing is prohibited by Court rules. (Mohan, Andrew) Modified on 11/20/2022 (Mohan, Andrew). (Entered: 11/18/2022) |
| 11/21/2022 | 99<br>162.7 KB | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated 11/21/2022 Document filed by Donald J. Trump..(Habba, Alina) (Entered: 11/21/2022) |
| 11/22/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan via video-conference: Status Conference held on 11/22/2022. Public dial-in by AT&T conference line was active. (Court Reporter Pam Utter) (Mohan, Andrew) (Entered: 11/22/2022) |
| 11/29/2022 | 100<br>246.7 KB | ORDER re: Plaintiffs consent letter motion (Dkt 97), as supplemented (Dkt 98), is granted to the extent that (1) the trial of this action is postponed until April 10, 2023, and (2) the Court adopts, for this action only, the proposed schedule for in limine motions and exchange of premarked exhibits. Except as modified by the preceding sentence, the scheduling and supplemental scheduling orders (Dkt 76, Dkt 77) remain in effect. Insofar as plaintiffs motion, as supplemented, relates to the subsequently filed action Carroll v Trump, 22-cv-10016 (LAK), the Court does not now make any rulings. (Signed by Judge Lewis A. Kaplan on 11/29/2022) (Mohan, Andrew) (Entered: 11/29/2022) |
| 11/29/2022 | 101<br>144.1 KB | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated 11/29/2022 re: modified schedule. Document filed by Donald J. Trump.. (Habba, Alina) (Entered: 11/29/2022) |
| 11/30/2022 | 102<br>47.5 KB | MEMO ENDORSEMENT on re: 101 Letter modified schedule filed by Donald J. Trump. ENDORSEMENT: Counsel's understanding is incorrect. As the November 29, 2022 order (Dkt 100) makes quite clear, the scheduling and supplemental scheduling orders remain in effect except to the extent that (I) the trial date has been adjourned until April 10, 2023 and (2) the Court adopted the proposed schedule for in limine motions and exchange of premarked exhibits. It did not adopt the proposal to delay the briefing and filing of any summary judgment motions and the filing of a joint pretrial order for more than two months, which would threaten to delay even the April 10 trial date, should a trial prove necessary. In the circumstances, the Court treats defendant's letter (Dkt 101) as an application for an extension of time for the filing of any summary judgment motions and the joint pretrial order and grants it to the extent that (1) any summary judgment motions shall be filed on or before December 22, 2022, (2) any papers in opposition to any summary judgment motions shall be filed on or before January 12, 2023, (3) any reply papers shall be filed on or before January 19, 2023, and (4) the joint pretrial order shall be filed on or before February 9, 2023. The application is otherwise denied. SO ORDERED., ( Motions due by 12/22/2022., Pretrial Order due by 2/9/2023., Responses due by 1/12/2023, Replies due by 1/19/2023.) (Signed by Judge Lewis A. Kaplan on 11/30/22) (yv) Modified on 12/28/2022 (yv). (Entered: 11/30/2022) |

| | | |
|---|---|---|
| 12/02/2022 | 103<br>27.6 KB | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/22/2022 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/23/2022. Redacted Transcript Deadline set for 1/3/2023. Release of Transcript Restriction set for 3/2/2023..(McGuirk, Kelly) (Entered: 12/02/2022) |
| 12/02/2022 | 104<br>42.1 KB | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 11/22/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/02/2022) |
| 12/05/2022 | 105<br>56.1 KB | ORDER. If she has not already done so, counsel of record for the defendant in this case shall transmit to the defendant and to any counsel who may have been engaged to represent defendant in Carroll v. Trump, 22-cv-10016 (LAK) ( "Carroll II"), for delivery no later than December 6, 2022, a copy of this Court's order, dated December 2, 2022, in Carroll II Counsel is directed to do so as an officer of the Court. The Court does not imply that she has been or will be engaged to represent the defendant in Carroll II SO ORDERED. (Signed by Judge Lewis A. Kaplan on 12/5/22) (yv) (Entered: 12/05/2022) |
| 12/20/2022 | 106<br>321.4 KB | PROTECTIVE AND CONFIDENTIALITY ORDER...regarding procedures to be followed that shall govern the handling of confidential material... SO ORDERED. (Signed by Judge Lewis A. Kaplan on 12/20/2022) (vfr) (Entered: 12/20/2022) |
| 12/22/2022 | 107<br>144.5 KB | MOTION for Summary Judgment . Document filed by Donald J. Trump.. (Habba, Alina) (Entered: 12/22/2022) |
| 12/22/2022 | 108<br>4.2 MB | DECLARATION of Alina Habba in Support re: 107 MOTION for Summary Judgment .. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/22/2022) |
| 12/22/2022 | 109<br>571.6 KB | MEMORANDUM OF LAW in Support re: 107 MOTION for Summary Judgment . . Document filed by Donald J. Trump. (Attachments: # 1 Supplement Statement of Material Facts).(Habba, Alina) (Entered: 12/22/2022) |
| 01/09/2023 | 110<br>963.3 KB | MOTION for Trevor W. Morrison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27180100. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by E. Jean Carroll. (Attachments: # 1 Affidavit of Trevor W. Morrison, # 2 Exhibit - Certificate of Good Standing, # 3 Text of Proposed Order for Admission Pro Hac Vice). (Morrison, Trevor) (Entered: 01/09/2023) |
| 01/10/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 110 MOTION for Trevor W. Morrison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27180100. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 01/10/2023) |
| 01/12/2023 | 111<br>185.2 KB | LETTER MOTION to Seal addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated January 12, 2023. Document filed by E. Jean Carroll..(Kaplan, |

| | | | Roberta) (Entered: 01/12/2023) |
|---|---|---|---|
| 01/12/2023 | 112 | 9.5 MB | MEMORANDUM OF LAW in Opposition re: 107 MOTION for Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | 113 | 444.6 MB | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 107 MOTION for Summary Judgment . . Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: 111 .(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | 114 | 2.0 MB | RULE 56.1 STATEMENT. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | 115 | 411.3 KB | ***SELECTED PARTIES***RULE 56.1 STATEMENT. Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: 111 . (Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | 116 | 34.6 MB | DECLARATION of Roberta A. Kaplan in Opposition re: 107 MOTION for Summary Judgment .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of E. Jean Carroll, # 2 Exhibit 2 - New York Magazine Article (Online Version), # 3 Exhibit 3 - June 21, 2019 Statement, # 4 Exhibit 4 - June 22, 2019 Statement, # 5 Exhibit 5 - June 24, 2019 Statement, # 6 Exhibit 6 - Excerpts of Deposition of Donald J. Trump, # 7 Exhibit 7 - Photograph of E. Jean Carroll and Donald Trump, # 8 Exhibit 8 - Excerpts of Deposition of Lisa Birnbach, # 9 Exhibit 9 - Excerpts of Deposition of Carol Martin, # 10 Exhibit 10 - New York Magazine Article (Print Version), # 11 Exhibit 11 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, # 12 Exhibit 12 - Excerpts of Deposition of Roberta Myers, # 13 Exhibit 13 - Appendix H to Expert Report of Ashlee Humphreys, # 14 Exhibit 14 - Appendix I to Expert Report of Ashlee Humphreys).(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | 117 | 166.7 KB | ***SELECTED PARTIES***DECLARATION of Roberta A. Kaplan in Opposition re: 107 MOTION for Summary Judgment .. Document filed by E. Jean Carroll, Donald J. Trump. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of E. Jean Carroll, # 2 Exhibit 2 - New York Magazine Article (Online Version), # 3 Exhibit 3 - June 21, 2019 Statement, # 4 Exhibit 4 - June 22, 2019 Statement, # 5 Exhibit 5 - June 24, 2019 Statement, # 6 Exhibit 6 - Excerpts of Deposition of Donald J. Trump, # 7 Exhibit 7 - Photograph of E. Jean Carroll and Donald Trump, # 8 Exhibit 8 - Excerpts of Deposition of Lisa Birnbach, # 9 Exhibit 9 - Excerpts of Deposition of Carol Martin, # 10 Exhibit 10 - New York Magazine Article (Print Version), # 11 Exhibit 11 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, # 12 Exhibit 12 - Excerpts of Deposition of Roberta Myers, # 13 Exhibit 13 - Appendix H to Expert Report of Ashlee Humphreys, # 14 Exhibit 14 - Appendix I to Expert Report of Ashlee Humphreys)Motion or Order to File Under Seal: 111 .(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/13/2023 | 118 | 26.5 KB | ORDER granting 110 Motion for Trevor W. Morrison to Appear Pro Hac Vice. (Signed by Judge Lewis A. Kaplan on 1/13/2023) (Mohan, Andrew) (Entered: 01/13/2023) |
| 01/13/2023 | 119 | 78.1 KB | MEMO ENDORSEMENT Granting the 1/12/2023 letter from Roberta A. Kaplan to Hon. Lewis A. Kaplan requesting provisional approval to file certain materials under seal. (Signed by Judge Lewis A. Kaplan on 1/13/2023) (Mohan, Andrew) (Entered: 01/13/2023) |

| 01/17/2023 | 120 <br> 43.6 KB | ☐ | LETTER addressed to Judge Lewis A. Kaplan from Michael Madaio dated 1/17/2023 re: withdrawing request to seal documents. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 01/17/2023) |
| --- | --- | --- | --- |
| 01/18/2023 | 121 <br> 98.9 KB | ☐ | MEMO ENDORSEMENT: on re: 120 Letter filed by Donald J. Trump. ENDORSEMENT: The Clerk Shall unseal the requested portions of defendant's deposition transcript attach by ECF #117. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/18/2023) (ama) (Entered: 01/18/2023) |
| 01/19/2023 | 122 <br> 276.5 KB | ☑ | REPLY MEMORANDUM OF LAW in Support re: 107 MOTION for Summary Judgment . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/19/2023) |
| 01/20/2023 | 123 <br> 203.8 KB | ☐ | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated January 20, 2023 re: Summary Judgment Reply Brief. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/20/2023) |
| 01/20/2023 | 124 <br> 42.8 KB | ☐ | MEMO ENDORSEMENT on re: 123 Letter Summary Judgment Reply Brief filed by E. Jean Carroll. ENDORSEMENT: Sur-reply due by 1/24/23. No argument. SO ORDERED., ( Surreplies due by 1/24/2023.) (Signed by Judge Lewis A. Kaplan on 1/20/2023) (yv) (Entered: 01/20/2023) |
| 01/24/2023 | 125 <br> 289.7 KB | ☑ | SUPPLEMENTAL REPLY MEMORANDUM OF LAW in Opposition re: 107 MOTION for Summary Judgment . . Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 01/24/2023) |
| 02/02/2023 | 126 <br> 39.6 KB | ☐ | LETTER addressed to Judge Lewis A. Kaplan from Cory Gnazzo dated 1/31/23 re: request that the Clerk of Court file a public, unredacted version of ECF No. 112. (yv) (Entered: 02/02/2023) |
| 02/07/2023 | 127 <br> 60.2 KB | ☐ | MEMO ENDORSEMENT: on re: 126 Letter. ENDORSEMENT: The redacted portions of the plaintiffs opposition brief and plaintiffs response to the defendant's Rule 56.1 statement are information drawn from the defendant's deposition transcript,which already has been unsealed pursuant to this Court's order on January 18, 2023 (Dkt 121). The designated portions of plaintiffs opposition filings accordingly no longer need to be sealed. The Clerk shall unseal the designated portions of plaintiffs opposition brief (Dkt 113) and plaintiffs response to defendant's Rule 56.1 statement (Dkt 115). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/07/2023) (ama) (Entered: 02/07/2023) |
| 02/09/2023 | 128 <br> 194.3 KB | ☑ | PROPOSED PRE-TRIAL ORDER. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 02/09/2023) |
| 02/13/2023 | 129 <br> 586.5 KB | ☑ | JOINT PRETRIAL ORDER. The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein as further set forth in this Order. Carroll and Trump both request that this action be tried by jury. The parties estimate that the trial will take between 5 and 7 days. IT IS SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/13/23) (yv) (Entered: 02/13/2023) |
| 02/16/2023 | 130 <br> 145.1 KB | ☐ | MOTION in Limine . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/16/2023) |
| 02/16/2023 | 131 <br> 295.9 KB | ☐ | MEMORANDUM OF LAW in Support re: 130 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/16/2023) |

| 02/16/2023 | [132] 230.7 KB | ☐ | DECLARATION of Alina Habba in Support re: [130] MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # [1] Exhibit A - Deposition of Natasha Stoynoff, # [2] Exhibit B - Deposition of Jessica Leeds).(Habba, Alina) (Entered: 02/16/2023) |
| 02/16/2023 | [133] 134.7 KB | ☐ | MOTION in Limine . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/16/2023 | [134] 553.4 KB | ☐ | MEMORANDUM OF LAW in Support re: [133] MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/16/2023 | [135] 29.8 MB | ☐ | DECLARATION of Roberta A. Kaplan in Support re: [133] MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # [1] Exhibit 1 Excerpts of Deposition of Lisa Birnbach, # [2] Exhibit 2 Excerpts of Deposition of Carol Martin, # [3] Exhibit 3 Excerpts of Deposition of Donald J. Trump, # [4] Exhibit 4 Excerpts of Deposition of Natasha Stoynoff, # [5] Exhibit 5 Excerpts of Deposition of Jessica Leeds, # [6] Exhibit 6 Excerpt of Deposition of E. Jean Carroll, # [7] Exhibit 7 Exhibit 33 from the Deposition of Donald J. Trump, # [8] Exhibit 8 Expert Report of Ashlee Humphreys, PhD, # [9] Exhibit 9 Rebuttal Expert Report of Robert J. Fisher, # [10] Exhibit 10 Excerpts of Deposition of Robert J. Fisher, # [11] Exhibit 11 Trumps Initial Disclosures, # [12] Exhibit 12 Trumps Supplemental Expert Disclosures, # [13] Exhibit 13 Trumps Initial Disclosures in Carroll II, # [14] Exhibit 14 - Trumps Supp. Responses to Interrogatories, # [15] Exhibit 15 Aug. 24, 2022 Email from M. Madaio, # [16] Exhibit 16 Exhibit 20 from the Deposition of Donald J. Trump, # [17] Exhibit 17 - Excerpts of Deposition of Stephanie Grisham).(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/23/2023 | [136] 378.6 KB | ☐ | MEMORANDUM OF LAW in Opposition re: [133] MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | [137] 4.6 MB | ☐ | DECLARATION of Alina Habba in Opposition re: [133] MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # [1] Exhibit A - Deposition of Natasha Stoynoff, # [2] Exhibit B - Deposition of Jessica Leeds, # [3] Exhibit C - Expert Report of Robert Fisher, # [4] Exhibit D - Deposition of Robert Fisher, # [5] Exhibit E - Deposition of E. Jean Carroll, # [6] Exhibit F- Deposition of E. Jean Carroll, # [7] Exhibit G - Plaintiff's Second Supplemental Disclosure, # [8] Exhibit H - Plaintiff's Third Supplemental Disclosure).(Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | [138] 391.6 KB | ☐ | MEMORANDUM OF LAW in Opposition re: [130] MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/23/2023) |
| 02/23/2023 | [139] 9.5 MB | ☐ | DECLARATION of Roberta A. Kaplan in Opposition re: [130] MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # [1] Exhibit 1 - Excerpts of Deposition of Natasha Stoynoff, # [2] Exhibit 2 - Excerpts of Deposition of Jessica Leeds, # [3] Exhibit 3 - Access Hollywood Video, # [4] Exhibit 4 - Excerpts of Deposition of Donald J. Trump, # [5] Exhibit 5 - Sept. 26, 2016 Debate Video, # [6] Exhibit 6 - Excerpts of Deposition of E. Jean Carroll, # [7] Exhibit 7 - Oct. 13, 2016 Campaign Video 1, # [8] Exhibit 8 - Oct. 13, 2016 Campaign Video 2, # [9] Exhibit 9 - Oct. 13, 2016 Campaign Video 3, # [10] Exhibit 10 - Oct. 14, 2016 Campaign Video 1, # [11] Exhibit 11 - Oct. 14, 2016 Campaign Video 2, # [12] Exhibit 12 - Oct. 21, 2016 Campaign Video, # [13] Exhibit 13 - June 21, 2019 Statement, # [14] Exhibit 14 - June 22, 2019 Statement, # [15] Exhibit 15 - June 24, 2019 Statement, # [16] Exhibit 16 - Oct. 12, 2022 Statement).(Kaplan, Roberta) (Entered: 02/23/2023) |

| 03/02/2023 | 140 <br> 269.3 KB | ☐ | REPLY MEMORANDUM OF LAW in Support re: 130 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 03/02/2023) |
|---|---|---|---|
| 03/03/2023 | 141 <br> 206.9 KB | ☐ | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated March 3, 2023 re: Defendants Unauthorized Reply Brief. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/03/2023) |
| 03/03/2023 | 142 <br> 43.9 KB | ☐ | MEMO ENDORSEMENT on re: 141 Letter Defendants Unauthorized Reply Brief filed by E. Jean Carroll. ENDORSEMENT : Reply brief not to exceed 5 pages due by March 9, 2023. SO ORDERED., ( Replies due by 3/9/2023.) (Signed by Judge Lewis A. Kaplan on 3/3/23) (yv) (Entered: 03/03/2023) |
| 03/09/2023 | 143 <br> 257.1 KB | ☐ | REPLY MEMORANDUM OF LAW in Support re: 133 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/09/2023 | 144 <br> 323.0 KB | ☐ | DECLARATION of Roberta A. Kaplan in Support re: 133 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of Robert J. Fisher in Carroll I, # 2 Exhibit 2 - Excerpt of Deposition of Robert J. Fisher in Carroll II).(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/10/2023 | 145 <br> 612.0 KB | ☐ | MEMORANDUM OPINION re: 130 MOTION in Limine , filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's in limine motion (Dkt. 130) is denied in all respects. This ruling is without prejudice to renewing his objection to the campaign speech excerpts in the event they are offering at trial. Unless otherwise ordered, those excerpts shall not be mentioned in opening statements. (Signed by Judge Lewis A. Kaplan on 3/10/2023) (tro) (Entered: 03/10/2023) |
| 03/10/2023 | 146 <br> 110.3 KB | ☐ | NOTICE OF APPEARANCE by Michael Ferrara on behalf of E. Jean Carroll.. (Ferrara, Michael) (Entered: 03/10/2023) |
| 03/17/2023 | 147 <br> 449.4 KB | ☑ | LETTER MOTION to Consolidate Cases 1:22-cv-10016 *for Trial* addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated March 17, 2023. Document filed by E. Jean Carroll. (Attachments: # 1 Text of Proposed Order / Stipulation and [Proposed] Order).(Kaplan, Roberta) (Entered: 03/17/2023) |
| 03/20/2023 | 148 <br> 23.1 KB | ☐ | ORDER denying 147 Letter Motion to Consolidate Cases. The letter motion to consolidate these cases for trial, filed in the first captioned case as Dkt 14 7, is denied. The parties overestimate both the judicial economy benefits that would be achieved and the risk of inconsistent rulings that would be eliminated by consolidation. Issue preclusion appears to the Court adequate to achieve appropriate conservation of judicial resources and avoidance of inconsistent rulings even if the two cases were tried separately. Moreover, a trial in 20-cv-7311 conceivably could prove unnecessary. In addition, approval of the consolidation proposal would be in tension with the deference to the Second Circuit and the District of Columbia Court of Appeals that this Court believes appropriate in the circumstances. 2.The trial of 20-cv-7311, previously scheduled tentatively to begin on April 10, 2023, is adjourned sine die. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/20/23) (yv) (Entered: 03/20/2023) |
| 04/21/2023 | 149 <br> 806.8 KB | ☐ | OPINION of USCA (Certified Copy) as to 46 Notice of Interlocutory Appeal, filed by Donald J. Trump, 45 Notice of Interlocutory Appeal filed by United States of America USCA Case Number 20-3977-cv (L), 20-3978-cv (Con). Having vacated in our prior opinion the District Court's judgment that Trump did not act within the scope of his employment, Carroll I, 49 F.4th at 761, we now REMAND to the district court for further proceedings consistent with the |

| | | | |
|---|---|---|---|
| | | | detailed guidance provided by the D.C. Court of Appeals. The Clerk is directed to issue the mandate forthwith. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 4/21/2023. (tp) Modified on 4/21/2023 (tp). (Entered: 04/21/2023) |
| 04/21/2023 | 150 | 983.7 KB | MANDATE of USCA (Certified Copy) as to 46 Notice of Interlocutory Appeal, filed by Donald J. Trump, 45 Notice of Interlocutory Appeal filed by United States of America USCA Case Number 20-3977-cv (L), 20-3978-cv (Con). IT IS HEREBY ORDERED, ADJUDGED and DECREED that the cause is REMANDED to the district court for further proceedings consistent with the detailed guidance provided by the D.C. Court of Appeals. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 4/21/2023. (Attachments: # 1 Appendix Supporting Document). (tp) (Entered: 04/21/2023) |
| 05/11/2023 | 151 | 1.7 MB | LETTER addressed to Judge Lewis A. Kaplan from Susan S. Harmon, Esq. dated 5/1/2023 re: Alleged 1996 Rape at Bergdorf Goodman. I have some exculpatory evidence and material to offer in this case in favor of defendant. (Mohan, Andrew) (Entered: 05/11/2023) |
| 05/11/2023 | 152 | 11.3 MB | MOTION to Intervene. Document filed by Reuben Larson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Certificate of Service.(vba) (Entered: 05/12/2023) |
| 05/15/2023 | 153 | 16.4 KB | ORDER. Reuben Larson, appearing prose, has petitioned to "address" and "remonstrance" this Court in relation to the above-captioned matter. Applying a liberal interpretation of his pro se filing, the Court construes his petition as a motion to intervene. That motion is denied both as a matter of law and in the Court's discretion. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/11/23) (yv) (Entered: 05/15/2023) |
| 05/22/2023 | 154 | ☑ 228.7 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated May 22, 2023 re: Proposed Schedule. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/22/2023 | 155 | 140.5 KB | MOTION to Amend/Correct . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/22/2023 | 156 | ☑ 191.9 KB | MEMORANDUM OF LAW in Support re: 155 MOTION to Amend/Correct . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/22/2023 | 157 | 1.2 MB | DECLARATION of Roberta A. Kaplan in Support re: 155 MOTION to Amend/Correct .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Amended Complaint, # 2 Exhibit B - Redline Comparison).(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/24/2023 | | | ORDER terminating 152 Motion to Intervene (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 05/24/2023) |
| 05/24/2023 | 158 | 23.3 KB | ORDER, 1.Any response to plaintiff's letter of May 22, 2023 shall be filed on or before May 26, 2023. Unless otherwise ordered, any opposition to plaintiff's motion to amend, and any reply in support thereof, under the Rules of this Court, is due on or before June 5, 2023 and June 12, 2023, respectively. 3. Government counsel promptly should begin their review of deposition and other discovery material and such other material as may be appropriate that the United States has not previously considered and that the patties have suggested may be relevant "to the substitution issue." SO ORDERED. ( Replies due by 6/12/2023.) (Signed by Judge Lewis A. Kaplan on 5/24/23) (yv) (Entered: 05/24/2023) |

| | | |
|---|---|---|
| 05/26/2023 | 159<br>212.7 KB | LETTER addressed to Judge Lewis A. Kaplan from Stephen Terrell dated 05/26/2023 re: May 22, 2023, Letter; Order of May 24, 2023. Document filed by United States of America..(Terrell, Stephen) (Entered: 05/26/2023) |
| 05/26/2023 | 160<br>347.5 KB | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated May 26, 2023 re: Response to Plaintiff's Letter. Document filed by Donald J. Trump.. (Habba, Alina) (Entered: 05/26/2023) |
| 05/31/2023 | 161<br>273.8 KB | AFFIDAVIT IN SUPPORT OF MOTION TO INTERVENE(MOTION to Intervene).Document filed by James H. Brady, proposed intervenor. (Attachments: # 1 Exhibit 1, # 2 Certificate of Service)(sc) Modified on 6/1/2023 (sc). (Entered: 06/01/2023) |
| 06/01/2023 | 162<br>40.8 KB | MEMO ENDORSED ORDER denying 161 Motion to Intervene. ENDORSEMENT: There are only two bases on which one may intervene in a civil action. The first is intervention as of right, which is available only to one who "is given an unconditional right to intervene by a federal statute" or "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). The second is intervention by permission of the court, which in an appropriate case may be granted if the putative intervenor "is given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Mr. Brady does not satisfy any of these criteria. Accordingly, this motion is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 6/1/23) (yv) (Entered: 06/01/2023) |
| 06/01/2023 | 163<br>25.5 KB | ORDER: The government shall advise the Court on or before June 9, 2023, whether it is the government's position that the filing of an amended complaint in this case would render the government's previous Westfall Act certification ineffective and moot the government's motion to substitute itself for Mr. Trump under that Act. The Court implies no determination or view as to whether plaintiff's motion for leave to amend the complaint should be granted or denied. (Signed by Judge Lewis A. Kaplan on 6/1/2023) (ate) (Entered: 06/01/2023) |
| 06/05/2023 | 164<br>281.1 KB | MEMORANDUM OF LAW in Opposition re: 155 MOTION to Amend/Correct . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 06/05/2023) |
| 06/05/2023 | 165<br>4.2 MB | DECLARATION of Alina Habba in Opposition re: 155 MOTION to Amend/Correct .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A- New York Magazine Article, # 2 Exhibit B - Complaint, # 3 Exhibit C - Carroll II Complaint, # 4 Exhibit D - Relevant Portion of Plaintiff's Trial Testimony, # 5 Exhibit E - Carroll II Jury Verdict, # 6 Exhibit F - Notice of Appeal, # 7 Exhibit G - Defendant's CNN Town Hall Transcript, # 8 Exhibit H - Deposition of E. Jean Carroll).(Habba, Alina) (Entered: 06/05/2023) |
| 06/09/2023 | 166<br>☑<br>203.0 KB | LETTER addressed to Judge Lewis A. Kaplan from Stephen Terrell dated June 9, 20203 re: Order of June 1, 2023. Document filed by United States of America..(Terrell, Stephen) (Entered: 06/09/2023) |
| 06/09/2023 | 167<br>260.8 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 06/09/2023 re: Department of Justice Letter. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 06/09/2023) |

| 06/12/2023 | 168<br>291.7 KB | REPLY MEMORANDUM OF LAW in Support re: 155 MOTION to Amend/Correct . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 06/12/2023) |
|---|---|---|
| 06/13/2023 | 169<br>☑<br>38.8 KB | ORDER granting 155 Motion to Amend/Correct 155 MOTION to Amend/Correct ., 6 Notice of Removal. The plaintiff's motion for leave to amend [Dkt 155] is granted. A memorandum opinion may follow. The amended complaint is deemed served and filed today. Defendant has requested that the Court, "[s]hould the Court... deny Plaintiff's Motion to Amend" [Dkt 164, at 19], grant defendant permission to file a supplemental motion for summary judgment. As the Court has granted plaintiff's motion, that request is moot. In all the circumstances, any further submission by the United States (including any new or amended certification and/or motion to substitute) and/or the defendant with respect to substitution of the United States for the defendant shall be served and filed no later than July 13, 2023. Any response by the plaintiff shall be served and filed no later than July 27, 2023. Any reply(ies) by the United States and/or the defendant shall be served and filed no later than August 3, 2023. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 6/13/23) (yv) (Entered: 06/13/2023) |
| 06/13/2023 | | Set/Reset Deadlines: Motions due by 7/13/2023. Responses due by 7/27/2023. Replies due by 8/3/2023. (yv) (Entered: 06/13/2023) |
| 06/15/2023 | 170<br>13.4 KB | ORDER, Unless this case previously has been entirely disposed of, trial of this action shall commence on January 15, 2024 absent contrary order of the Court. ( Jury Trial set for 1/15/2024 at 09:30 AM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 6/15/2023) (Mohan, Andrew) (Entered: 06/15/2023) |
| 06/27/2023 | 171<br>☑<br>773.1 KB | AMENDED ANSWER to., COUNTERCLAIM against E. Jean Carroll. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 06/27/2023) |
| 06/29/2023 | 172<br>☑<br>406.4 KB | MEMORANDUM OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT re: 107 MOTION for Summary Judgment . filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied. (Signed by Judge Lewis A. Kaplan on 6/29/2023) (tro) (Entered: 06/29/2023) |
| 07/05/2023 | 173<br>☑<br>335.0 KB | MEMORANDUM OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (CORRECTED): For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 7/5/2023) (tg) (Entered: 07/05/2023) |
| 07/11/2023 | 174<br>☑<br>132.9 KB | MOTION to Dismiss *and Motion to Strike*. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 07/11/2023) |
| 07/11/2023 | 175<br>☑<br>417.9 KB | MEMORANDUM OF LAW in Support re: 174 MOTION to Dismiss *and Motion to Strike*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 07/11/2023) |
| 07/11/2023 | 176<br>799.9 KB | DECLARATION of Roberta A. Kaplan in Support re: 174 MOTION to Dismiss *and Motion to Strike*.. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Excerpts of Carroll II Trial Transcript, # 2 Exhibit B - Video |

| | | | |
|---|---|---|---|
| | | | Recording of Carroll Interview on CNN, # 3 Exhibit C - Transcript of Carroll Interview on CNN).(Kaplan, Roberta) (Entered: 07/11/2023) |
| 07/11/2023 | 177 | ☐ 464.6 KB | LETTER addressed to Judge Lewis A. Kaplan from James G. Touhey, Jr. dated July 11, 2023 re: Westfall Act Certification. Document filed by United States of America. (Attachments: # 1 Exhibit July 11, 2023, Ltr from Boynton to Counsel).(Terrell, Stephen) (Entered: 07/11/2023) |
| 07/19/2023 | 178 | ☐ 23.1 KB | ORDER, The Court hereby establishes the following procedure. I. On or before August 2, 2023, each party shall file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims Carroll II has preclusive effect in this action. The motion shall be supported by a memorandum of law setting forth the bases for the moving party's claim.No fact or proposition of law not identified in such a motion shall be regarded as having been established by Carroll II 2. Answering and reply papers with respect to any such motion shall be filed on or before August 16, 2023 and August 23, 2023, respectively. SO ORDERED. ( Motions due by 8/2/2023., Replies due by 8/23/2023., Responses due by 8/16/2023) (Signed by Judge Lewis A. Kaplan on 7/19/23) (yv) (Entered: 07/19/2023) |
| 07/19/2023 | 179 | ☑ 505.4 KB | NOTICE OF INTERLOCUTORY APPEAL from 173 Memorandum & Opinion,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-28020542. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit Memorandum Opinion Denying Defendant's Motion for Summary Judgment (Corrected)). (Madaio, Michael) (Entered: 07/19/2023) |
| 07/19/2023 | | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 179 Notice of Interlocutory Appeal. (km) (Entered: 07/19/2023) |
| 07/19/2023 | | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 179 Notice of Interlocutory Appeal, filed by Donald J. Trump were transmitted to the U.S. Court of Appeals. (km) (Entered: 07/19/2023) |
| 07/25/2023 | 180 | ☑ 315.2 KB | MEMORANDUM REGARDING PLAINTIFF'S MOTION TO FILE AN AMENDED COMPLAINT. There accordingly is no merit to any of Mr. Trump's arguments in opposition to Ms. Carroll's motion for leave to amend her complaint. (Signed by Judge Lewis A. Kaplan on 7/25/23) (yv) (Entered: 07/25/2023) |
| 07/25/2023 | 181 | ☑ 350.6 KB | MEMORANDUM OF LAW in Opposition re: 174 MOTION to Dismiss *and Motion to Strike*. . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 07/25/2023) |
| 07/26/2023 | 182 | ☑ 60.3 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 7/25/2023 re: We write on behalf of Plaintiff E. Jean Carroll with respect to Your Honor's July 19, 2023 Order directing each party to "file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims Carroll II has preclusive effective in this action." ECF 178. We understand this Order as directing the parties to submit any targeted summary judgment motions they may wish to make in Carroll I raising preclusion arguments based on Carroll II. Document filed by E. Jean Carroll.(Mohan, Andrew) (Entered: 07/26/2023) |

| 07/27/2023 | 183 | ☐ 372.0 KB | LETTER addressed to Judge Lewis A. Kaplan from Susan Hoffinger dated 7/26/23 re: equest that Your Honor apprise us as to whether Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena or if the Protective and Confidentiality Order in Carroll v. Trump precludes such compliance.(yv) (Entered: 07/27/2023) |
|---|---|---|---|
| 07/27/2023 | 184 | ☐ 129.3 KB | NOTICE OF APPEARANCE by Michael T Madaio on behalf of Donald J. Trump..(Madaio, Michael) (Entered: 07/27/2023) |
| 07/27/2023 | 185 | ☑ 154.3 KB | MOTION to Stay *Pending Appeal*. Document filed by Donald J. Trump.. (Madaio, Michael) (Entered: 07/27/2023) |
| 07/27/2023 | 186 | ☑ 293.8 KB | MEMORANDUM OF LAW in Support re: 185 MOTION to Stay *Pending Appeal*. . Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 07/27/2023) |
| 07/28/2023 | 187 | ☐ 158.7 KB | ORDER Any response to the District Attorneys letter shall be filed on or before August 2, 2023. (Signed by Judge Lewis A. Kaplan on 7/28/2023) (Mohan, Andrew) (Entered: 07/28/2023) |
| 08/01/2023 | 188 | ☑ 317.3 KB | REPLY MEMORANDUM OF LAW in Support re: 174 MOTION to Dismiss *and Motion to Strike*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/01/2023) |
| 08/02/2023 | 189 | ☐ 134.6 KB | MOTION for Partial Summary Judgment . Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 08/02/2023) |
| 08/02/2023 | 190 | ☐ 406.6 KB | MEMORANDUM OF LAW in Support re: 189 MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/02/2023) |
| 08/02/2023 | 191 | ☐ 509.6 KB | RULE 56.1 STATEMENT. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/02/2023) |
| 08/02/2023 | 192 | ☐ 15.3 MB | DECLARATION of Roberta A. Kaplan in Support re: 189 MOTION for Partial Summary Judgment .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - New York Magazine Article (Online Version), # 2 Exhibit 2 - Excerpts of Deposition of Donald J. Trump, # 3 Exhibit 3 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, # 4 Exhibit 4 - June 21, 2019 Statement, # 5 Exhibit 5 - June 22, 2019 Statement, # 6 Exhibit 6 - June 24, 2019 Statement, # 7 Exhibit 7 - Excerpt of Deposition of E. Jean Carroll, # 8 Exhibit 8 - Photograph of E. Jean Carroll and Donald Trump, # 9 Exhibit 9 - Expert Report of Ashlee Humphreys, # 10 Exhibit 10 - October 12, 2022 Statement, # 11 Exhibit 11 - Excerpts of Carroll II Trial Transcript, # 12 Exhibit 12 - Carroll II Jury Charge).(Kaplan, Roberta) (Entered: 08/02/2023) |
| 08/02/2023 | 193 | ☐ 141.9 KB | MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/02/2023) |
| 08/02/2023 | 194 | ☐ 366.0 KB | MEMORANDUM OF LAW in Support re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/02/2023) |
| 08/02/2023 | 195 | ☐ 6.6 MB | DECLARATION of Alina Habba in Support re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE |

| | | | |
|---|---|---|---|
| | | | GROUNDS OF COLLATERAL ESTOPPEL .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Expert Report of Professor Ashlee Humphreys, PhD, dated January 9, 2023, # 2 Exhibit B - Expert Report of Professor Ashlee Humphreys, PhD, dated October 14, 2022).(Habba, Alina) (Entered: 08/02/2023) |
| 08/03/2023 | 196 | ☐ 74.9 KB | MEMO ENDORSEMENT on re: (215 in 1:22-cv-10016-LAK, 183 in 1:20-cv-07311-LAK) Letter request that Your Honor apprise us as to whether Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena. ENDORSEMENT: Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena. SO ORDERED., (Signed by Judge Lewis A. Kaplan on 8/3/23) (yv) (Entered: 08/03/2023) |
| 08/03/2023 | 197 | ☐ 166.7 KB | LETTER addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated 8/3/2023 Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 08/03/2023) |
| 08/03/2023 | 198 | ☐ 51.0 KB | MEMO ENDORSEMENT on re: 197 Letter requests 21 days to file an opposition to Plaintiff's motion. filed by Donald J. Trump. ENDORSEMENT: To the extent, if any, defendant seeks an extension of time to respond to plaintiff's motion insofar as it seeks a determination with respect to facts established by the Carroll II verdict, the application is denied. To the extent that defendant seeks an extension to respond to plaintiff's motion insofar as it seeks partial summary judgment, the application is granted. Plaintiffs time to file a reply to defendant's submission on that issue is extended by an equal period of time. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/3/23) (yv) (Entered: 08/03/2023) |
| 08/03/2023 | 199 | ☐ 226.6 KB | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated August 3, 2023 re: proposed briefing in connection with Defendant's collateral estoppel motion. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/03/2023) |
| 08/07/2023 | 200 | ☑ 725.2 KB | MEMORANDUM OPINION GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM AND CERTAIN PURPORTED AFFIRMATIVE DEFENSES re: 174 MOTION to Dismiss *and Motion to Strike*. filed by E. Jean Carroll. For the foregoing reasons, Ms. Carroll's motion to dismiss Mr. Trump's counterclaim (Dkt 174) is granted. Her motion to strike Mr. Trump's affirmative defenses (Dkt 174) is granted in part and denied in part as follows: (1)Mr. Trump's first and twelfth affirmative defenses are stricken in their entirety. (2)Mr. Trump's fifth and fifteenth affirmative defenses are stricken except to the extent, if any, that they relate to Mr. Trump's June 24, 2019 statement. (3) Mr. Trump's third affirmative defense is stricken to the extent it asserts an absolute presidential immunity defense, and is not stricken in any other respect, if there is any. It is denied in its remaining respects. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/7/23) (yv) (Entered: 08/07/2023) |
| 08/08/2023 | 201 | ☐ 297.8 KB | MEMO ENDORSEMENT on re: 199 Letter proposed briefing in connection with Defendant's collateral estoppel motion filed by E. Jean Carroll. ENDORSEMENT : Denied as moot by Court's decision on plaintiff's motion to dismiss (Dkt 200). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/8/23) (yv) (Entered: 08/08/2023) |
| 08/10/2023 | 202 | ☐ 303.7 KB | MEMORANDUM OF LAW in Opposition re: 185 MOTION to Stay *Pending Appeal*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: |

| | | | 08/10/2023) |
|---|---|---|---|
| 08/10/2023 | 203 | ☐ 1.4 MB | NOTICE OF INTERLOCUTORY APPEAL from 200 Memorandum & Opinion,,,,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-28132521. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit).(Madaio, Michael) (Entered: 08/10/2023) |
| 08/10/2023 | | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 203 Notice of Interlocutory Appeal.(km) (Entered: 08/10/2023) |
| 08/10/2023 | | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 203 Notice of Interlocutory Appeal, filed by Donald J. Trump were transmitted to the U.S. Court of Appeals.(km) (Entered: 08/10/2023) |
| 08/16/2023 | 204 | ☐ 290.7 KB | MEMORANDUM OF LAW in Opposition re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/16/2023) |
| 08/16/2023 | 205 | ☐ 264.7 KB | DECLARATION of Roberta A. Kaplan in Opposition re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Carroll II Trial Transcript). (Kaplan, Roberta) (Entered: 08/16/2023) |
| 08/16/2023 | 206 | ☐ 241.7 KB | MEMORANDUM OF LAW in Opposition re: 189 MOTION for Partial Summary Judgment . *With Respect to Facts Established by the Verdict in Carroll II*. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/16/2023) |
| 08/17/2023 | 207 | ☑ 718.3 KB | REPLY MEMORANDUM OF LAW in Support re: 185 MOTION to Stay *Pending Appeal*. . Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 08/17/2023) |
| 08/18/2023 | 208 | ☑ 207.1 KB | MEMORANDUM OPINION DENYING DEFENDANT'S MOTION TO STAY re: 185 MOTION to Stay *Pending Appeal*, filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's motion for a stay pending appeal (Dkt 185) is denied. This Court certifies that the appeal itself is frivolous. (Signed by Judge Lewis A. Kaplan on 8/18/2023) (tro) (Entered: 08/18/2023) |
| 08/23/2023 | 209 | ☐ 184.5 KB | REPLY MEMORANDUM OF LAW in Support re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/23/2023) |
| 08/23/2023 | 210 | ☐ 170.6 KB | REPLY MEMORANDUM OF LAW in Support re: 189 MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/23/2023) |
| 08/23/2023 | 211 | ☐ 304.7 KB | MEMORANDUM OF LAW in Opposition re: 189 MOTION for Partial Summary Judgment . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/23/2023) |
| 08/23/2023 | 212 | ☐ 415.0 KB | RESPONSE in Opposition to Motion re: 189 MOTION for Partial Summary Judgment . *Response to Local Rule 56.1 Statement*. Document filed by Donald |

| | | J. Trump..(Habba, Alina) (Entered: 08/23/2023) |
|---|---|---|
| 08/30/2023 | 213 195.7 KB | REPLY MEMORANDUM OF LAW in Support re: 189 MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/30/2023) |
| 09/06/2023 | 214 704.9 KB | MEMORANDUM OPINION re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . filed by Donald J. Trump, 189 MOTION for Partial Summary Judgment . filed by E. Jean Carroll. For the foregoing reasons, Ms. Carroll's motion for partial summary judgment (Dkt 189) is granted except with respect to Mr. Trump's June 24, 2019 statement. Mr. Trump's motion with respect to the issue preclusive effect of the Carroll II verdict in this action (Dkt 193) is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 9/6/2023) (tg) (Entered: 09/06/2023) |
| 09/13/2023 | 215 ☑ 776.2 KB | ORDER of USCA (Certified Copy) as to 203 Notice of Interlocutory Appeal, filed by Donald J. Trump USCA Case Number 23-1045; 23-1146. Upon due consideration of these factors, the parties' submissions, and our own careful and independent review of the record, it is hereby ORDERED that Appellant's motions for a stay pending appeal are DENIED as further set forth. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 9/13/2023. (tp) (Entered: 09/13/2023) |
| 09/13/2023 | 216 776.2 KB | ORDER of USCA (Certified Copy) as to 179 Notice of Interlocutory Appeal, filed by Donald J. Trump USCA Case Number 23-1045; 23-1146. Upon due consideration of these factors, the parties' submissions, and our own careful and independent review of the record, it is hereby ORDERED that Appellant's motions for a stay pending appeal are DENIED as further set forth. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 9/13/2023. (tp) (Entered: 09/13/2023) |

View Selected

or

Download Selected

Total filesize of selected documents (MB):  0

Maximum filesize allowed: 10.1 MB

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/21/2023 17:01:04 | | |
| **PACER Login:** | Db00092016 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-07311-LAK |
| **Billable Pages:** | 28 | **Cost:** | 2.80 |

# Kasowitz Benson Torres llp

<table>
<tr><td></td><td>1633 BROADWAY</td><td>Atlanta</td></tr>
<tr><td>Marc E. Kasowitz</td><td>NEW YORK, NEW YORK 10019</td><td>Houston</td></tr>
<tr><td>Direct Dial: 212-506-1710</td><td>(212) 506-1700</td><td>Los Angeles</td></tr>
<tr><td>Direct Fax: 212-835-5010</td><td></td><td>Miami</td></tr>
<tr><td>mkasowitz@kasowitz.com</td><td>FAX: (212) 506-1800</td><td>Newark</td></tr>
<tr><td></td><td></td><td>San Francisco</td></tr>
<tr><td></td><td></td><td>Silicon Valley</td></tr>
<tr><td></td><td></td><td>Washington DC</td></tr>
</table>

December 10, 2020

<u>VIA ECF</u>
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

  Re: *Carroll v. Trump*, 1:20-cv-07311 (LAK)

Dear Judge Kaplan:

  We represent President Donald J. Trump in the above-referenced action.  I submit this letter motion to respectfully request that this Court immediately stay all proceedings.  As shown below, the Court has been divested of jurisdiction during the appeals to the United States Court of Appeals for the Second Circuit from this Court's October 27, 2020 Opinion and Order (the "Order") (ECF No. 32) denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute as the defendant in place of President Trump.

  On November 25, 2020, the United States and the President both filed notices of appeal from the Order.  (ECF Nos. 45-46.)  As the Supreme Court has held, "[t]he filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982); *see also Abrahams v. Inc. Vill. of Hempstead*, 390 F. App'x 4, 5 (2d Cir. 2010) (summary order) ("A notice of appeal divests a district court of jurisdiction.").

  Here, all "aspects of the case" are "involved in the appeal" because the Order's "rejection of certification and substitution effectively denied [defendant] the protection afforded by the Westfall Act, a measure designed to immunize covered federal employees *not simply from liability, but from suit*."  *Osborn v. Haley*, 549 U.S. 225, 238, 127 S. Ct. 881, 892 (2007) (emphasis added);[1] *see also Behrens v. Pelletier*, 516 U.S. 299, 308, 116 S. Ct. 834, 839 (1996)

---

[1]  The Supreme Court held that that such an order is immediately appealable "as a reviewable final decision within the compass of 28 U.S.C. § 1291" pursuant to the collateral order doctrine, because the order "conclusively

# KASOWITZ BENSON TORRES LLP

Hon. Lewis A. Kaplan
December 10, 2020
Page 2

(immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery'" (emphasis in original)); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985) (immunity constitutes "an entitlement not to stand trial or face the other burdens of litigation"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 116 S. Ct. 834, 839 (1982) (holding that discovery should not proceed until "threshold immunity question" is resolved); *Locurto v. Safir*, 264 F.3d 154, 164 (2d Cir. 2001) ("denials of immunity are conclusive with regard to a defendant's right to avoid *pre-trial* discovery" (emphasis in original)  (citation omitted)).

Numerous district courts, including in this District, have recognized and applied these principles.  *See, e.g.*, *Edrei v. City of New York*, No. 16 Civ. 1652 (RWS), 2017 WL 3822744, at *3 n.2 (S.D.N.Y. Aug. 31, 2017) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp. 3d 556, 558 (S.D.N.Y. 2014) (Sweet, J.) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting argument that divestiture is not automatic in the qualified immunity context); *Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

Moreover, the district court is divested of jurisdiction even "[w]hen qualified immunity is in issue" on appeal.  *See Garcia v. Bloomberg*, No. 11 Civ. 6957(JSR), 2012 WL 3127173, at *1 (S.D.N.Y. July 27, 2012) ("discovery . . . cannot be said to be collateral [to the appeal] because qualified immunity is an entitlement to 'immunity from suit,' including the right to avoid even pre-trial discovery" (citations omitted)).  Accordingly, "[t]his principle has even stronger force in the present case, since the Westfall Act confers *absolute*, not merely qualified, immunity upon federal employees . . . . "  *Wuterich v. Murtha*, 562 F.3d 375, 378, 382 (D.C. Cir. 2009) (emphasis in original) (vacating district court order that "reserved judgment on certification pending discovery" because it "effectively denied [the defendant] the absolute immunity from suit guaranteed him by the Westfall Act").

Defendant therefore respectfully requests that all proceedings be immediately stayed pending appeal.

Respectfully submitted,
*/s/ Marc E. Kasowitz*
Marc E. Kasowitz

cc:     Counsel of Record (via ECF)

---

decide[s] a contested issue, the issue decided is important and separate from the merits of the action, and the District Court's disposition would be effectively unreviewable later in the litigation."  *Id.*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
270 West 60th Street
New York, New York 10023
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff,* | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

<div align="center">

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR LEAVE TO AMEND HIS ANSWER PURSUANT TO FRCP RULE 15(A)**

</div>

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
270 West 60th Street
New York, New York 10023
(908) 869-1188
ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................1

PROCEDURAL HISTORY...........................................................................................2

ARGUMENT .................................................................................................................3

THIS COURT MUST GRANT DEFENDANT'S MOTION TO AMEND THE

ANSWER TO ASSERT AN ANTI-SLAPP DEFENSE AND COUNTERCLAIM......................3

    I.     THE ANTI-SLAPP AMENDMENT APPLIES RETROACTIVELY TO THIS ACTION ........................................................................................3

    II.    DEFENDANT MUST BE PERMITTED LEAVE TO AMEND HIS ANSWER ..6

          A. THERE IS NO BASIS TO DENY THE PROPOSED AMENDMENT .....6

          B. DEFENDANT HAS DEMONSTRATED COLORABLE GROUNDS FOR RELIEF TO PERMIT THE PROPOSED AMENDMENT.........................7

CONCLUSION...........................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.,*

    60 Misc. 3d 1221(A) (N.Y. Sup. Ct. 2019), aff'd 176 A.D.3d 434 (1st Dep't 2019) ..............9

*Adelson v. Harris,*

    774 F.3d 803, 809 (2d Cir. 2014) ........................................................................................4

*CBS, Inc. v. Ahern,*

    108 F.R.D. 14, 18 (S.D.N.Y. 1985)......................................................................................7

*Coleman v. Grand,*

    523 F. Supp 3d 244, 258 (E.D.N.Y. 2021) .......................................................................4, 5

*Foman v. Davis,*

    371 U.S. 178, 182 (1962)......................................................................................................6

*Feirstein v. Nanbar Realty Corp.,*

    963 F.Supp. 254, 261 (S.D.N.Y. 1997) ...............................................................................6

*Gasperini v. Ctr. for Humanities, Inc.,*

    518 U.S. 415, 427 (1996)......................................................................................................3

*Goldman v Reddington,*

    No. 18-CV-3662 (RPK) (ARL), 2021 WL 4755293, at *4 (E.D.N.Y., Apr. 21, 2021]...........5

*Harris v. American Accounting Association, et al.,*

    No. 5:20-cv-010507 (MAD) (ATB), 2021 WL 5505515, at *15 (N.D.N.Y. Nov. 24, 2021)..5

*John Hancock Mut. v. Amerford Intern.,*

    22 F.3d 458, 462 (2d Cir. 1994) ..........................................................................................6

*Kurland & Associates, PC v. Glassdoor, Inc.,*

    2021 WL 1135187 (N.Y. Sup. Ct. Mar 22, 2021) ................................................................6

*La Liberte v. Reid,*

    966 F.3d 79, 86 (2d Cir. 2020) ................................................................................4

*Luther M. Ragin, Jr. v. The Harry Macklowe Real Estate Co. Inc.,*

    126 F.R.D. 475, 478 (S.D.N.Y. 1989)......................................................................6

*Marsh v Sheriff of Cayuga County,*

    36 Fed App'x 10, 11 (2d Cir. 2002) ........................................................................6

*Massa Construction, Inc. v. Meany,*

    No. 126837/2020 (N.Y. Sup. Ct. May 13, 2021).....................................................6

*Matter of Gleason (Michael Vee, Ltd.),*

    96 N.Y.2d 117, 122 (2001) ......................................................................................4

*Nelson v. HSBC Bank USA,*

    87 A.D.3d 995, 998 (2d Dep't 2011).......................................................................4

*Palin v. New York Times Company,*

    510 F. Supp.3d 21, 24 (S.D.N.Y 2020) ............................................................4, 5, 6

*Project Veritas v. New York Times Co.,*

    2021 WL 2395290 (N.Y. Sup. Ct. Mar. 18, 2021)..................................................5

*Ragin v. Harry Macklowe Real Estate Co., Inc.,*

    126 F.R.D. 475, 479 (S.D.N.Y. 1989)......................................................................8

*Reus v. ETC Hous. Corp.,*

    2021 WL 1837673, at *4 (N.Y. Sup. Ct. May 6, 2021) ...........................................5

*Sackler v Am. Broadcasting Companies, Inc.,*

    71 Misc. 3d 693, 698 (N.Y. Sup. Ct. 2021)............................................................5

*Scheuer v. Rhodes,*

    416 U.S. 232, 236 (1974)......................................................................................7, 8

*Sweigert v. Goodman,*

    No. 1:18-CV-08653 (VEC) (SDA), 2021 WL 1578097, at *3 (S.D.N.Y. Apr. 22, 2021) .......5

**Statutes and Cases**

A.B. 5991-A § 4 ..............................................................................................................4

CPLR § 3211(g) .............................................................................................................9

CPLR § 3212(h) .............................................................................................................9

CRL § 70-a ....................................................................................................................9

CRL § 76-a(1)(a) ........................................................................................................3, 8

CRL § 76-a(1)(d) ......................................................................................................3, 8, 9

Fed.R.Civ.P. 12(b)(6) ...................................................................................................7

New York Civil Rights Law §§ 70-a ................................................................... passim

New York Civil Rights Law § 76-a .................................................................... passim

Rule 15(a) .....................................................................................................................1

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion to amend his Answer ("Answer") pursuant to Rule 15(a) of the Federal Rules of Civil Procedure ("FRCP").

<u>**PRELIMINARY STATEMENT**</u>

On November 10, 2020, the New York legislature amended the state's Anti-Strategic Lawsuit Against Public Participation law, codified as New York Civil Rights Law §§ 70-a and 76-a (collectively, the "anti-SLAPP statute"), in an effort to greatly expand its scope and impact. Specifically, the legislature's purpose for revising the anti-SLAPP statute was to ensure "the utmost protection for the free exercise of speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. In its revised form, the law is broadly intended to deter bad-faith actors from commencing and/or continuing vexatious or malicious lawsuits, particularly those designed to inhibit an individual's ability to speak freely on matters of public concern. Since that is precisely what has occurred in this instance, Defendant hereby seeks leave to amend his Answer to assert a counterclaim against the plaintiff, E. Jean Carroll ("Plaintiff") under the revised anti-SLAPP statute.

Although the anti-SLAPP statute was modified after this action was commenced, New York courts have widely held that the legislature's change was meant to be remedial in nature and, therefore, is to be applied retroactively. Thus, since this action falls well within the expanded scope of anti-SLAPP legislation, and since the amendment is to be liberally granted when "justice so requires," Defendant must be permitted to amend his Answer accordingly. Plaintiff will not be

prejudiced by the proposed amendment, as there has been no undue delay, bad faith, or dilatory conduct on Defendant's behalf. Therefore, Defendant's motion must be granted in its entirety.

## PROCEDURAL HISTORY

On November 4, 2019, Plaintiff commenced the instant action against Defendant with the filing of a complaint (the "Complaint") in the Supreme Court of New York, New York County under Index No. 160694/2019. *See* Habba Aff., Ex. A. In the Complaint, Plaintiff asserts a single cause of action for defamation. *Id.*

On January 23, 2020, prior counsel for Defendant, Kasowitz Benson Torres LLP, served an Answer upon Plaintiff's counsel (the "Answer") putting forth numerous affirmative defenses. *See* Habba Aff., Ex. C.

On September 8, 2020, the United States of America removed the action to this Court upon certification from James G. Touhey, Director, Torts Branch, Civil Division, United States Department of Justice, that Defendant was acting within the scope of his presidential office at the time of the incidents out of which Plaintiff's claims arose. *See* Habba Aff., Ex. B.

On October 27, 2020, this Court denied the United States of America's motion to intervene and substitute itself for Defendant, which Order is currently being reviewed on appeal before the Second Circuit. *See* Docket Entry Nos. 32, 45, and 46.

On November 10, 2020, Governor Andrew Cuomo signed into law New York's revised anti-SLAPP statute, codified as New York Civil Rights Law §§ 70-a and 76-a. Initially enacted in 1992, the anti-SLAPP statute has always been designed to penalize parties who file ill-intentions lawsuits – particularly those meant to discourage public participation or chill the free speech of others – by providing additional safeguards to defendants in these types of actions.  Among other things, the 2020 amendment significantly broadened the statute by expanding the definition of an

"action involving public petition and participation" to include any claim based upon: "(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition."  New York Civil Rights Law § 76-a(1)(a).  The amendment also clarified that the term "public interest" is meant to be "construed broadly and shall mean any subject other than a purely private matter." *Id*. 76-a(1)(d).

Defendant now seeks to amend his Answer in accordance with the revised anti-SLAPP statute, as this action now falls squarely within the ambit of the law. Plaintiff has refused to provide consent to Defendant's request to amend, thereby necessitating the filing of the instant motion.

## ARGUMENT

### THIS COURT MUST GRANT DEFENDANT'S MOTION TO AMEND THE ANSWER TO ASSERT AN ANTI-SLAPP DEFENSE AND COUNTERCLAIM

Pursuant to the instant application, Defendant seeks leave to amend his Answer to assert an additional defense and counterclaim under New York's recently amended anti-SLAPP statute. Given the broad scope of the law – which has been widely held to apply retroactively – and because the amendment is neither futile nor proposed in bad faith and is not otherwise prejudicial to Plaintiff, Defendant's application must be granted, and the Answer amended accordingly.

### I.   The Anti-SLAPP Amendment Applies Retroactively to This Action

At the outset, it is firmly established that the legislature's November 10, 2020, amendment to the anti-SLAPP statute applies retroactively and, therefore, the instant application is both timely and proper.

It is well-settled that "federal courts sitting in diversity apply state substantive and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). New York

federal courts have consistently found that the anti-SLAPP statute, a state law, applies on a federal level since it is substantive law, not a procedural one. *See Palin v. New York Times Company*, 510 F. Supp.3d 21, 24 (S.D.N.Y 2020) ("It is also undisputed […] that a federal court sitting in diversity must apply §76-a because it is a substantive, rather than a procedural provision."); *see also Coleman v. Grand*, 523 F. Supp 3d 244, 258 (E.D.N.Y. 2021) ("The anti-SLAPP provision at issue here, § 76-a, applies in federal court because it is 'manifestly substantive,' governing the merits of libel claims and increasing defendants' speech protections.") (citing *La Liberte v. Reid*, 966 F.3d 79, 86 (2d Cir. 2020); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (affirming district court's application of certain substantive provisions of Nevada's anti-SLAPP law).

Thus, as in *Palin*, "the only question here is whether [the anti-SLAPP statute] should be given retroactive effect to this action, which was filed before the amendments took effect but has not yet gone to trial." *Id.* Under New York law, statutory amendments are generally "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." *Matter of Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122 (2001). "So-called remedial legislation, however, should be given retroactive effect in order to effectuate its beneficial purpose." *Palin*, 510 F. Supp.3d at 24. Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." *Nelson v. HSBC Bank USA*, 87 A.D.3d 995, 998 (2d Dep't 2011).

In assessing whether the anti-SLAPP amendment was intended to be remedial, the *Palin* Court noted that the New York legislature "conveyed a sense of urgency by directing that the [anti-SLAPP] amendment was to 'take effect immediately.'" *Palin*, 510 F. Supp.3d at 28 (citing A.B. 5991-A § 4). The Court also pointed to the legislative history of the statute, which "demonstrates that the amendments to [the anti-SLAPP statute] were intended to correct the narrow scope of New

York's prior anti-SLAPP law." *Id.* These factors, taken together, led the Court to affirmatively

hold that the anti-SLAPP amendment "is a remedial statute that should be given retroactive effect."

*Id.*

Following the *Palin* decision, numerous federal courts have affirmed its holding and found

that the anti-SLAPP amendment is remedial legislation that must be applied retroactively. *See*

*Coleman v. Grand*, 523 F. Supp 3d 244, 258 (E.D.N.Y. 2021) ("Under New York law, these clear

legislative expressions of remedial purpose and urgency give the [anti-SLAPP] amendments

retroactive effect.") (citing *Palin*, 510 F.Supp.3d at 27); *Sweigert v. Goodman*, No. 1:18-CV-08653

(VEC) (SDA), 2021 WL 1578097, at *3 (S.D.N.Y. Apr. 22, 2021) ("[T]he Court grants the

Defendant's motion to amend his Answer to add a defense under the New York anti-SLAPP

statute."); *Goldman v Reddington*, No. 18-CV-3662 (RPK) (ARL), 2021 WL 4755293, at *4

(E.D.N.Y., Apr. 21, 2021], *report and recommendation adopted*, 18-CV-3662 (RPK) (ARL), 2021

WL 4099462 (E.D.N.Y., Sept. 9, 2021) (affirming retroactive application of the anti-SLAPP

amendment and permitting the defendant to amend its answer to include anti-SLAPP

counterclaim.); *Harris v. American Accounting Association, et al.*, No. 5:20-cv-010507 (MAD)

(ATB), 2021 WL 5505515, at *15 (N.D.N.Y. Nov. 24, 2021) (granting motion to dismiss brought

pursuant to CRL § 70-a and awarding costs and attorneys' fees.). Several state courts have also

found that the revision applies retroactively. *See Project Veritas v. New York Times Co.*, 2021 WL

2395290 (N.Y. Sup. Ct. Mar. 18, 2021) ("[T]he court will apply the anti-SLAPP statute

retroactively."); *see also Sackler v Am. Broadcasting Companies, Inc.*, 71 Misc. 3d 693, 698 (N.Y.

Sup. Ct. 2021 ("This court finds that the anti-SLAPP amendments are intended to apply

retroactively in order to effectuate the remedial and beneficial purpose of the statute."); *Reus v.*

*ETC Hous. Corp.*, 2021 WL 1837673, at *4 (N.Y. Sup. Ct. May 6, 202) ("Although the [anti-

SLAPP] [l]aw was amended in November of 2020, the amendments were effective retroactively."); *Kurland & Associates, PC v. Glassdoor, Inc.*, 2021 WL 1135187 (N.Y. Sup. Ct. Mar 22, 2021); *Massa Construction, Inc. v. Meany*, No. 126837/2020 (N.Y. Sup. Ct. May 13, 2021).

Consistent with the holding set forth in *Palin* and its progeny, it is axiomatic that the anti-SLAPP statute applies retroactively. Therefore, Defendant's request to amend his Answer to include an anti-SLAPP counterclaim is timely raised and properly before the Court.

II.     **Defendant Must Be Permitted Leave to Amend His Answer**

  A.     **There Is No Basis to Deny the Proposed Amendment**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court shall grant leave to amend "freely…when justice so requires."  Leave to amend will be granted absent a showing of undue delay, bad faith, futility, or prejudice to the defendant. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Feirstein v. Nanbar Realty Corp.*, 963 F.Supp. 254, 261 (S.D.N.Y. 1997).  Determining whether to grant leave to amend is within the sound discretion of the court. *John Hancock Mut. v. Amerford Intern.*, 22 F.3d 458, 462 (2d Cir. 1994).  There is no requirement that a defendant plead all known affirmative defenses at the time of their first answer.  "As long as amendment of pleadings does not prejudice plaintiffs, defendants will not be precluded from adding additional defenses about which they had knowledge." *Luther M. Ragin, Jr. v. The Harry Macklowe Real Estate Co. Inc.*, 126 F.R.D. 475, 478 (S.D.N.Y. 1989).  In determining whether an amendment would cause prejudice, courts will consider whether "the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute." Marsh v Sheriff of Cayuga County, 36 Fed App'x 10, 11 (2d Cir. 2002).

The instant application is brought for the purpose of adding a defense and counterclaim pursuant to the recently amended anti-SLAPP statute, which amendment was made while the instant action was pending and, most importantly, after Defendant's Answer was served. *See* Habba Aff., Ex. 1. Undersigned counsel for Defendant was substituted into this action on or about November 11, 2021, and now, promptly thereafter, undersigned counsel makes the instant application. Since this action is still in its early stage of litigation – as of the date of this motion, discovery has not even started – permitting the proposed amendments to Defendant's Answer will not meaningfully delay this action in any way. *Id.* Moreover, the proposed amendments will not prejudice Plaintiff in the slightest. The anti-SLAPP counterclaim will not broaden the scope of this action, it will only require Plaintiff to prove that the claims she has asserted have a "substantial basis in law." Plainly stated, there are simply no circumstances present which even remotely suggests any undue delay, bad faith, futility, or prejudice sufficient to warrant the denial of Defendant's application.

As such, pursuant to the rules governing motions to amend pleadings in both state and federal courts, well-established law dictates that Defendant's instant motion to amend must be granted.

### B.    Defendant Has Demonstrated Colorable Grounds for Relief to Permit the Proposed Amendment

While a party seeking to amend its answer need not establish the merit of its proposed new defenses and/or counterclaims, "[i]n deciding whether the movant has a colorable ground for relief to permit an amendment, an inquiry must be made comparable to that required by Fed.R.Civ.P. 12(b)(6)." *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 18 (S.D.N.Y. 1985). In considering a 12(b)(6) motion to dismiss, a court must construe the pleading's allegations in the light most favorable to the pleading party and accept those allegations as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236

(1974). "Moreover, it must appear beyond doubt that the [moving party] can prove no set of facts supporting his claim that entitles him to relief." *Ragin v. Harry Macklowe Real Estate Co., Inc.*, 126 F.R.D. 475, 479 (S.D.N.Y. 1989).

In this instance, there is no question that Defendant presents a colorable claim under the anti-SLAPP statute, as the cause of action asserted by Plaintiff is precisely the type that the recent amendment was intended to encompass. Pursuant to the legislature's November 10, 2020 revision to the law, the scope of the anti-SLAPP statute was broadened to apply to any action based upon: "(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." CRL § 76-a(1)(a). Notably, the amendment also clarified that the term "public interest" is meant to be "construed broadly and shall mean any subject *other than a purely private matter.*" *Id.* § 76-a(1)(d) (emphasis added).

The statements at issue here – namely, Defendant's denials of Plaintiff's allegations against him – were public statements made by a then-sitting president. The statements were of momentous public interest; even Plaintiff acknowledges in her complaint that she expected her allegations to ignite a "media storm." *See* Compl. ¶¶ 10-11. Indeed, Plaintiff's allegations – and Defendant's denials thereof – garnered an immense amount of public attention and media coverage which remains to this day. Accordingly, the subject matter of this action cannot be construed as being anything other than an "issue of public interest." CRL § 76-a(1)(a). Surely it cannot possibly be described as a "purely private matter." *Id.* § 76-a(1)(d). Rather, it is indisputable that the instant action is an "action involving public petition and participation" and, therefore, squarely within the ambit of the anti-SLAPP statute.

Critically, once it is established that an action falls within the ambit of the anti-SLAPP statute, the defendant is entitled to file a motion to dismiss under CPLR § 3211(g) and/or a motion for summary judgment pursuant to CPLR § 3212(h). Under either scenario, the burden shifts away from the defendant and lies solely with the plaintiff, who must "demonstrate that the cause of action has a "substantial basis in law," CPLR § 3211(g), or a "substantial basis in fact and law," CPLR § 3212(h). Under these heightened standards, the plaintiff bears a "heavy burden" to make the requisite showing to defeat dismissal. *161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.*, 60 Misc. 3d 1221(A) (N.Y. Sup. Ct. 2019), aff'd 176 A.D.3d 434 (1st Dep't 2019). In addition, if at any point during litigation the defendant is able to demonstrate that the action was "commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law," the defendant is entitled to an award of costs an attorneys' fees. CRL § 70-a.

Given the burden-shifting nature of the anti-SLAPP statute, the multiple avenues for redress, and the stringent standards Plaintiff will need to overcome to establish the viability of her claim, it is evident that Defendant has a colorable claim under the anti-SLAPP statute. Further, Defendant will be severely prejudiced if he is deprived of the opportunity to invoke the heightened standard of the anti-SLAPP claim. It would therefore be inappropriate to deny Defendant's motion at this early stage of litigation.

### CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests this Court grant its motion to amend his Answer to assert an additional affirmative defense and counterclaim pursuant to Rule 15 of the Federal Rules of Civil Procedure.

Dated: December 1, 2021.
     New York, New York

Respectfully submitted,

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
270 West 60th Street
New York, New York, 10023
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                                    Plaintiff,

              -against-                                        20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

              Appearances:

                        Roberta Kaplan
                        Joshua Matz
                        KAPLAN HECKER & FINK LLP
                        *Attorneys for Plaintiff*

                        Alina Habba
                        HABBA MADAIO & ASSOCIATES LLP
                        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

              This is a defamation action against Donald J. Trump.  Mr. Trump, purely in his

individual capacity and represented by private counsel,[1] has moved for leave to amend his answer

---

[1]     Long after this action was commenced in the state courts, the United States removed it to
this Court and moved to be substituted as defendant in place of Mr. Trump, who then was
president.  This Court denied the motion to substitute.  *Carroll v. Trump,* 498 F. Supp. 3d
422 (S.D.N.Y. 2020).  That ruling is pending on appeal.

2

to assert an affirmative defense and counterclaim alleging that plaintiff's claim is baseless and

interposed for harassment and other improper purposes.  He proposes to seek damages and other

relief under New York's so-called anti-SLAPP law.  Plaintiff contends that the motion should be

denied because (1) defendant has delayed unduly in seeking leave, (2) he seeks leave for dilatory

purposes, (3) granting leave would be unduly prejudicial to her and, in any case, (4) leave would be

futile because defendant's proposed affirmative defense and counterclaim would be subject to

dismissal on motion.  The Court assumes familiarity with its prior opinion, which describes the

underlying factual dispute.

*Legal Standard*

The standards governing this motion are clear.

*First,* as defendant concedes, futility of amendment warrants denial of leave to

amend.[2]  In other words, a court may deny leave to assert a counterclaim or defense that would not

withstand a motion to dismiss or to strike.

*Second,* futility of amendment is not the only basis for denying leave to amend.

While "leave to amend 'shall be freely given when justice so requires,' . . . a district court has

discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue

prejudice to the opposing party."[3]

So we turn to these considerations.

---

[2]  Def. Reply Mem. (Dkt. 66) at 1, 5; Transcript, Feb. 22, 2022 (Dkt. 71) (hereinafter "Tr.") 3:4-7.  All docket citations are to 20-cv-7311 (LAK) unless otherwise specified.

[3]  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d. Cir. 2007) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

3

*Futility of Amendment*

    *The Availability of a Futility Argument*

      As noted, defendant conceded, both in motion papers and at argument, that futility

of amendment is a ground upon which leave to amend properly may be denied. Indeed, he went

well beyond that. His motion papers assert, correctly, that:

> "it is undisputed that '[a]n amendment is futile if the proposed amended claim would
> not withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of
> Civil Procedure.'"[4]

Yet he argues that "it would be a fool's errand, and not to mention a waste of judicial time and

resources, to defend the substantive merits of every potential use of the anti-SLAPP law that

Defendant may have in this case."[5]

      These two assertions – made on consecutive pages of defendant's memorandum –

are inconsistent. In order to grant leave to amend, the Court may insist that the proposed

amendment would not be futile, which requires the conclusion that the amended claim would be

sufficient to withstand a motion to dismiss.[6] And in order to determine whether it would withstand

a motion to dismiss, the Court must determine whether it pleads facts which, if proven, "plausibly

---

[4]    Dkt. 66 at 5 (citation omitted).

[5]    *Id.* at 6.

[6]    *E.g.*, *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland
Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (noting a proposed amendment is futile if it
"would fail . . . to state a claim under Rule 12(b)(6)") (quoting *Panther Partners Inc. v.
Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)); 3 MOORE'S FEDERAL PRACTICE
§ 15.15 (2021); 6 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 1487 (3d
ed. 2021).

4

give rise to an entitlement to relief."[7]  It follows, therefore, that one cannot decide whether a proposed amendment would be futile without deciding its legal sufficiency.

But rejection of defendant's position is not warranted only by logic.  His position simply is wrong.  Federal courts – including courts in this circuit – regularly decide the legal sufficiency of proposed amended pleadings in order to decide whether leave to amend would be futile.  And "the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss."[8]  It routinely is applied to deny motions for leave to amend.

For example, in *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Group, PLC,*[9]  the Second Circuit reviewed the district court's denial of leave to amend *de novo*[10] – because the district court's ruling was based on futility, an issue of law – and affirmed.  In so doing, it necessarily determined that the plaintiffs' proposed amended complaint, which had been before the district court,[11] did not state a legally sufficient claim under Section 10(b) of the Securities Exchange Act of 1934.

The Second Circuit similarly affirmed the district court's denial of leave to amend on grounds of futility in *Thea v. Kleinhandler.*[12]  Following dismissal of their first amended

---

7

*Panther Partners Inc.,* 681 F.3d at 119.

8

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund,* 783 F.3d at 389.

9

*Id.*

10

*Id.* (citing *Panther Partners Inc.,* 681 F.3d at 119).

11

*Id.* at 387.

12

807 F.3d 492 (2d Cir. 2015).

5

complaint, plaintiffs moved for leave to file a proposed second amended complaint.[13] The district court denied the motion, concluding that amendment would be futile because "the claims alleged in the proposed second amended complaint would not withstand a motion to dismiss."[14] And the Court of Appeals reviewed that determination *de novo* and affirmed.

These are not outlier cases. In fact, it is unexceptional for federal courts to deny leave to amend on the basis of futility where the proposed amended pleading would not withstand a motion to dismiss.[15]

The defendant nevertheless argues that it would be unfair to consider the legal sufficiency of his proposed amended pleading on this motion for leave "because we [*i.e.*, his counsel] haven't delved into it and it is not ripe at this point . . . ."[16] But that contention is entirely without merit. If defendant has not "delved into" the sufficiency of his proposed amended pleading, it is only because he ignored his own statements that "[a] court may only deny leave 'for good

---

[13]

    *Id.* at 494.

[14]

    *Id.* at 496; *see also Thea*, 2014 WL 3812231, at *6, 9.

[15]

    *See, e.g.*, *Hay v. N.Y. Media LLC*, ___ F. App'x ___, No. 21-1727 (2d Cir. Mar. 10, 2022) (summary order); *Convergen Energy LLC v. Brooks*, No. 20-cv-3746 (LJL), 2020 WL 5549039, at *27 (S.D.N.Y. Sept. 16, 2020); *ACR Sys., Inc. v. Woori Bank*, No. 14-cv-2817 (JFK), 2018 WL 1757019, at *7 (S.D.N.Y. Apr. 10, 2018); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15-cv-6369 (JFK), 2018 WL 1449206, at *8 (S.D.N.Y. Mar. 23, 2018); *Manhattan Rev. LLC v. Yun*, No. 16-cv-0102 (LAK), 2017 WL 3034350, at *1 (S.D.N.Y. July 17, 2017); *United States v. N.Y. City Dep't of Educ.*, No. 16-cv-4291 (LAK) (JCF), 2017 WL 1169653, at *4 (S.D.N.Y. Mar. 28, 2017); *In re Sling Media Slingbox Advert. Litig.*, No. 15-cv-05388 (GBD), 2017 WL 5558679, at *1-2 (S.D.N.Y. Mar. 22, 2017); *Lin v. Toyo Food, Inc.*, No. 12-cv-7392 (KMK), 2016 WL 4502040, at *6 (S.D.N.Y. Aug. 26, 2016).

[16]

    Tr., at 6:16-18.

6

reason, *including futility*'"[17] and that courts "freely grant leave to amend . . . *absent a showing of . . . futility . . .*,"[18] not to mention the decades of authority and practice that support those statements. In fact, he has had a full opportunity to address these issues.

In consequence, we turn to the question of whether defendant's proposed amendment would be futile.

### The anti-SLAPP Law

"SLAPP" is an acronym for "strategic lawsuits against public participation." Anti-SLAPP laws are intended to deter actions filed to punish or harass a defendant for participating in public life. New York long has had such a statute, which at the outset permitted a defendant in a covered claim to "maintain an action, claim, cross claim or counterclaim" against the plaintiff and to recover if the plaintiff's action lacked sufficient basis.[19] As originally enacted, however, the coverage of the statute was narrow.

That changed in 2020 when the Legislature amended Sections 70-a and 76-a of the Civil Rights Law and Rules 3211 and 3212 of the Civil Practice Law and Rules to broaden the applicable standards and to provide additional procedural rights to make those standards more effective.[20] The key points are that the law as amended

---

[17]    Dkt. 66 at 1 (citation omitted and emphasis added).

[18]    Tr., at 3:5-7 (emphasis added).

[19]    N.Y. Civ. Rts. L. § 70-a (McKinney 2009).

[20]    N.Y. Law 2020, chap. 250 (2020), *as codified in* N.Y. Civ. Rts. L. §§ 70-a, 76-a, and N.Y. CPLR 3211-12.

7

- Extends coverage to "any communication in a place open to the public or a public forum in connection with an issue of public interest" or based upon "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest . . . ."[21]

- Requires the plaintiff in any covered action to establish by clear and convincing evidence that "any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue,"[22] *i.e.*, that the defendant acted with actual malice in the First Amendment sense of that term.[23]

- Requires courts, in considering motions to dismiss complaints and other pleadings in actions within the coverage of the statute, to consider supporting and opposing factual affidavits rather than limiting their consideration to the pleadings.[24]

- Requires courts to stay all discovery, pending hearings, and motions from the

---

[21] N.Y. Civ. Rts. L. § 76-a, subd. 1(a).

[22] *Id.*, subd. 2.

[23] *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 182-84 (2d Cir. 2000) (noting that "actual malice means 'with knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not'" and must be "supported by clear and convincing proof") (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) and *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511 n.30 (1984)).

[24] N.Y. CPLR 3211(g), subd. 2.

8

filing until the determination of any motion to dismiss pursuant to the statute.[25]

• Shifts the burden of proof from the defendant to the plaintiff and heightens the standard a plaintiff must meet to avoid dismissal on motion. Whereas an ordinary complaint or counterclaim typically withstands a motion to dismiss for failure to state a cause of action if it states "a claim to relief that is plausible on its face,"[26] the amended anti-SLAPP law requires dismissal of a covered complaint or counterclaim unless the plaintiff establishes that the proposed pleading "has a substantial basis in law or is supported by a substantial argument for extension, modification or reversal of existing law."[27]

• Requires a court to award costs and attorney's fees in any covered action in which the defendant demonstrates that such a substantial basis in law and fact was lacking.[28]

• Provides for the recovery of compensatory damages by the defendant upon an additional demonstration that the suit was "commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously

---

[25]     *Id.*, subd. 3.

[26]     *See e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495 (2d Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Lynch v. City of N.Y.*, 952 F.3d 67, 74 (2d Cir. 2020).

[27]     N.Y. CPLR 3211(g), subd. 1.

[28]     N.Y. Civ. Rts. L. § 70-a, subd. 1(a).

9

inhibiting the free exercise of speech, petition or association rights," and punitive damages upon a demonstration that the action was commenced or continued *solely* for that purpose.[29]

### The Proposed Affirmative Defense

Defendant proposes first to amend his answer to assert a new purported affirmative defense: viz., a defense that alleges, in its entirety, that "[p]laintiff's claim is barred by New York's anti-SLAPP laws, NY Civil Rights Law §§ 70-a and 76-a."[30]  But that is not a legally sufficient affirmative defense.

As the Second Circuit has written:

> "An affirmative defense is defined as '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, *even if all allegations in the complaint are true*.' Black's Law Dictionary 430 (7th ed.1999); *see also Wolf* [*v. Reliance Standard Life Ins. Co.,* 71 F.3d 444, 448-49 (1st Cir.1995)]."[31]

But defendant's proposed additional defense raises no new facts.  And while it does assert the new argument that the amended anti-SLAPP law bars plaintiff's claim, that argument is without merit. The amendments to Sections 70-a and 76-a of the Civil Rights Law expand the availability of monetary relief for the institution and continuation of baseless lawsuits in certain circumstances. The amendments to CPLR 3211 and 3212 alter some New York procedures when applied to actions covered by the new law.  But none of them creates a defense that would knock plaintiff out of court

---

[29]   *Id.,* subd. 1(b)-(c).

[30]   Def. Proposed Am. Answer (Dkt. 63-1) at 12.

[31]   *Saks v. Franklin Covey Co.,* 316 F.3d 337, 349 (2d Cir. 2003) (emphasis added).

10

if all the allegations of her complaint are true.

Ms. Carroll's complaint, briefly summarized, alleges that the defendant raped her years ago and that his much more recent denial – coupled with other disparaging and insulting remarks – defamed her.[32] If all of that is true, then this action would not have been "commenced or continued without a substantial basis in fact and law."[33] To put it another way, assuming that the facts are as plaintiff claims them to be, nothing in the anti-SLAPP law would defeat her complaint.

Accordingly, amendment to assert the new purported "affirmative defense" would be entirely futile.

### The Proposed Counterclaim

In addition to the purported affirmative defense, defendant seeks to amend his answer to assert a counterclaim against the plaintiff under the same provisions of the amended anti-SLAPP law.

When a party brings a state law claim in federal court, the federal court must apply state substantive law and federal procedural law.[34] In the event of a conflict between a Federal Rule of Civil Procedure and a provision of state law, the Federal Rule governs unless it is "inapplicable or invalid."[35] A Federal Rule is applicable if it is "sufficiently broad to control the issue before the

---

[32]  See generally Carroll, 498 F. Supp.3d at 425, 430-32.

[33]  See N.Y. Civ. Rts. L. § 70-a.

[34]  Gasperini v. Ctr. for Humans., Inc., 518 U.S. 415, 427 (1996).

[35]  Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 398 (2010) (citing Hanna v. Plumer, 380 U.S. 460, 469-71 (1965)).

11

Court"[36] or, in other words, if it is capable of "answer[ing] the question in dispute."[37] The Federal

Rules are presumed valid under the Constitution and the Rules Enabling Act.[38] The Supreme Court

long has held that a Federal Rule is valid under the Rules Enabling Act if it "regulate[s] matters

rationally capable of classification as procedure," including matters which fall within "the uncertain

area between substance and procedure."[39] "Procedure" for this purpose means "the judicial process

for enforcing rights and duties recognized by substantive law . . . that governs the rights and

obligations of individuals within a given jurisdiction."[40]

The Second Circuit's recent decision in *La Liberte v. Reid*[41] requires the conclusion

that the defendant cannot here invoke any of the relevant New York anti-SLAPP law's provisions.

*La Liberte* dealt with a California anti-SLAPP law that permitted a defendant in a

covered case to make a "special motion to strike," the making of which required the court to dismiss

plaintiff's case unless the plaintiff could "establish[] a probability that he or she will prevail on the

claim."[42] The Court of Appeals, however, held that those provisions, along with an additional

---

[36]

    *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980).

[37]

    *Shady Grove*, 559 U.S. at 398 (citing *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987)).

[38]

    *Burlington N. R.R. Co.*, 480 U.S. at 6 (citing *Hanna*, 380 U.S. at 471).

[39]

    *Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 894 (2d Cir. 2019) (citing *Shady Grove*, 559 U.S. at 406 and *Hanna*, 380 U.S. at 472).

[40]

    *Id.* (quoting *Hanna*, 380 U.S. at 464 and *Shady Grove*, 559 U.S. at 407).

[41]

    966 F.3d 79 (2d Cir. 2020).

[42]

    *Id.* at 87 (quoting Cal. Civ. Proc. Code § 425.16(b)(3)).

12

provision that awarded attorneys' fees to defendants who prevail "on a special motion to strike,"[43]

could not be applied in federal court because they conflicted with Federal Rules of Civil Procedure

12 and 56:

> "The test is whether 'a Federal Rule of Civil Procedure "answer[s] the same question" as the [special motion to strike].' *Abbas* [*v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015)] (alteration in original) (quoting *Shady Grove*[, 559 U.S. at 398-99]). If so, the Federal Rule governs, unless it violates the Rules Enabling Act. *Id.* Applying that test, we first conclude that the special motion to strike in California's anti-SLAPP statute answers the same question as Federal Rules 12 and 56.

> "The special motion to strike requires outright dismissal unless the plaintiff can 'establish[] a probability that he or she will prevail on the claim.' Cal. Civ. Pro. Code § 425.16(b)(3). The statute thus 'establishes the circumstances under which a court must dismiss a plaintiff's claim before trial,' a question that is already answered (differently) by Federal Rules 12 and 56. *Abbas*, 783 F.3d at 1333-34. Under Rule 12(b)(6), the pleading burden is to allege 'enough facts to state a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 [] (2007). This 'does not impose a probability requirement at the pleading stage. . . . [A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable.' *Id.* at 556[]. California's anti-SLAPP statute, however, 'abrogates that entitlement . . . by requiring the plaintiff to establish that success is not merely plausible but probable.' *Carbone* [*v. Cable News Network, Inc.*, 910 F.3d 1345, 1353 (11th Cir. 2018)].

> "It also conflicts with Rule 56, which permits summary judgment only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a). The Rule thus enables plaintiffs to proceed to trial by identifying any genuine dispute of material fact, whereas California's anti-SLAPP statute 'nullif[ies] that entitlement by requiring the plaintiff to prove that it is likely, and not merely possible, that a reasonable jury would find in his favor.' *Carbone*, 910 F.3d at 1353. Together, Rules 12 and 56 'express "with unmistakable clarity" that proof of probability of success on the merits "is not required in federal courts" to avoid pretrial dismissal.' *Id.* at 1351 (quoting *Hanna*[, 380 U.S. at 470]). Therefore, California's special motion requires the plaintiff to make a showing that the Federal Rules do not

---

[43]   Cal. Civ. Proc. Code § 425.16(c)(1).

13

require."[44]

And the Second Circuit is not alone in reaching such conclusions.[45]

In this case, CPLR 3211(g), subd. 1, of the anti-SLAPP law, as amended, requires that a court grant an anti-SLAPP law motion to dismiss "unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." Moreover, CPLR 3211(g), subd. 2, as amended, provides that a motion to dismiss made under the anti-SLAPP law shall be decided on the basis not only of the pleadings, but also of "supporting and opposing affidavits." These provisions conflict with Federal Rule of Civil Procedure 12 for two reasons.

First, in resolving a Rule 12(b)(6) motion, a district court must construe the complaint liberally, accept all the factual allegations of the complaint as true, and draw all reasonable inferences in the plaintiff's favor. If the complaint – so viewed – "plead[s] 'enough facts to state a claim to relief that is plausible on its face,'"[46] the motion must be denied. CPLR Section 3211(g), subds. 1 and 2, in contrast, demand that a plaintiff in a covered action satisfy a higher standard –

---

[44]
966 F.3d at 87.

[45]
*See, e.g.*, *Klocke v. Watson,* 936 F.3d 240, 242-46 (5th Cir. 2019) (Texas anti-SLAPP statute does not apply in federal court because it "deals only with the conduct of the lawsuit; it creates no rights independent of existing litigation"); *Carbone,* 910 F.3d at 1347-54 (Georgia anti-SLAPP statute does not apply in federal court because it merely provides "a special procedural device . . . that applies a heightened burden to the claims that fall within its ambit"); *Los Lobos Renewable Power, LLC v. Americulture, Inc.,* 885 F.3d 659, 668-73 (10th Cir. 2018) (New Mexico anti-SLAPP statute does not apply in federal court); *Intercon Sols., Inc. v. Basel Action Network,* 791 F.3d 729, 729-32 (7th Cir. 2015) (Washington anti-SLAPP statute does not apply in federal court); *Abbas,* 783 F.3d at 1333-34 (Washington, D.C. anti-SLAPP statute does not apply in federal court).

[46]
*Green v. Dep't of Educ. of the City of N.Y.,* 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting *Twombly,* 550 U.S. at 570).

14

both legally and factually – to avoid dismissal than is required by Rule 12(b)(6).

Second, and closely related to the first point, CPLR 3211(g), subd. 2, as amended by the anti-SLAPP law, provides that a motion to dismiss made under the anti-SLAPP law shall be decided on the basis not only of the pleadings, but also of "supporting and opposing affidavits." It thus suggests that (a) the substantiality of the law upon which a covered action is based depends at least in part on an evidentiary showing, and (b) the court is not required to treat the complaint in the same liberal manner as Rule 12 requires. In any case, the requirement of consideration of affidavits conflicts with Federal Rule 12, which permits consideration only of the pleadings and documents incorporated therein by reference[47] unless affidavits are submitted to and not excluded by the court.[48]

Subdivisions 1 and 2 of CPLR 3211(g) thus are inapplicable in federal court by parity of reasoning with *La Liberte*. And since the stay required by CPLR 3211, subd. 3, applies only during the pendency of a motion to dismiss under CPLR 3211, which itself is inapplicable in federal court, subdivision 3 likewise is inapplicable.

Much the same analysis is fatal to the applicability of CPLR 3212(h). It provides that a motion under the anti-SLAPP law, as amended, for summary judgment of dismissal in a covered action "shall be granted unless the party responding to the motion demonstrates that the action . . . has a substantial basis in fact and law or is supported by a substantial argument for an extension, modification or reversal of existing law." It therefore makes summary judgment more readily available in covered actions than would Federal Rule 56, which permits summary judgment of

---

[47] *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).

[48] Fed. R. Civ. P. 12(d).

15

dismissal only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[49]

This analysis leaves only a question regarding the anti-SLAPP statute amendment to Section 70-a of the Civil Rights Law, which requires the imposition of liability for costs and attorney's fees upon a demonstration that a covered action was "commenced or continued without a substantial basis" and of compensatory and punitive damages upon demonstration of additional circumstances.[50]

One of my colleagues already has applied *La Liberte* to find a conflict between the Federal Rules 12 and 56, on the one hand, and amended Section 70-a of the New York anti-SLAPP statute and, implicitly, amended CPLR 3211(g) and 3212(h).[51] In *National Academy of Television Arts and Sciences v. Multimedia System Design, Inc.*, she ruled that "[Section] 70-a is inapplicable in federal court" because its "'substantial basis' standard . . . conflicts with the standards under

---

[49]   Fed. R. Civ. P. 56(a).

[50]   N.Y. Civ. Rts. L. § 76-a, subd. 2, as amended, which requires a *plaintiff* in a covered action to prove actual malice in the First Amendment sense in order to recover damages, is academic in this case. Ms. Carroll concedes that she is at least a limited purpose public figure that she would have to prove constitutional actual malice by clear and convincing evidence to recover against the defendant without regard to the anti-SLAPP law. Pl. Mem. (Dkt. 65) at 10; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) ("Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth."). In these circumstances, the applicability of the state law provision need not be addressed.

[51]   *See Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, ___ F. Supp. 3d ___, No. 20-cv-7269 (VEC), 2021 WL 3271829, at *13 (S.D.N.Y. July 30, 2021).

16

Federal Rules of Civil Procedure 12 and 56."[52] I agree with her analysis, which is dispositive as to

Section 70-a. And that makes it unnecessary to consider whether New York's anti-SLAPP law is

inapplicable in federal courts for the additional reason that it is inconsistent with Federal Rule 11

and, indeed, whether the New York statute is an unconstitutional infringement on the First

Amendment right to petition.


*Undue Delay, Dilatory Motive, Bad Faith and Prejudice*

As noted previously, leave to amend may be denied on the basis of undue delay in

seeking leave, dilatory motive, bad faith and/or prejudice to the opposing party. In this case, all of

these factors are present.


*Undue Delay*

The current version of the anti-SLAPP statute was enacted and became effective on

November 10, 2020. This motion was filed on January 11, 2022. Plaintiff contends that there is no

satisfactory excuse for this 14 month delay and that it weighs in favor of denial of leave to amend.

Plaintiff is right.

To be sure, "mere delay," in the absence of bad faith, dilatory motive or undue

prejudice ordinarily will not foreclose leave to amend.[53] But when there has been a delay and the

---

[52]

*Id.* at *12-13. *See also Ginx, Inc. v. Soho All.*, 720 F. Supp.2d 342, 366 (S.D.N.Y.2010), *as corrected* (Aug. 19, 2020) ("New York's legislature may have adopted the Anti-SLAPP law to elevate a plaintiff's burden at the pleading stage above 'plausibility' . . . to 'substantial basis,' but the United States Congress has thus far declined to follow suit.")

[53]

*State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

17

nonmoving party has made a showing of bad faith or undue prejudice, "the burden is on the party

who wishes to amend to provide a satisfactory explanation for the delay."[54] "[T]he longer the period

of unexplained delay, the less will be required of the nonmoving party in terms of a showing of

prejudice."[55]

The defendant has not offered a satisfactory reason for the length of his delay in this

case.  He waited over a year after the anti-SLAPP statute was amended before moving for leave to

amend his answer.  The closest his moving papers came to offering an excuse for this delay is the

assertion that his newly retained counsel "was substituted into this action on or about November 11,

2021, and now, promptly thereafter, . . . makes the instant application."[56]  But that is not a

satisfactory explanation, especially in view of the fact that the defendant previously was represented

in this action for two full years by a very large and prominent law firm.

At oral argument, defendant tried a new tack.  His counsel argued first that the delay

"does not exist" because defendant "was a sitting president for a portion of that . . . [and w]e can't

litigate when there is a sitting president . . . ."[57]  But even if that were true, and it is not,[58] Mr. Trump

---

[54]

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d. Cir. 1990).

[55]

*Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir.1983)).

[56]

Def. Mem. (Dkt. 64) at 7.  Interestingly, defendant's new attorney submitted an affirmation in support of the motion.  Dkt. 63-1.  But it is silent as to the reason for the delay.  It does no more than authenticate copies of the original and proposed amended answers and attach a proposed order.

[57]

Tr., at 15:1-4, 17-18.

[58]

*See Clinton v. Jones,* 520 U.S. 681 (1997); *see also Trump v. Vance*, 140 S. Ct. 2412 (2020) (holding Article II and the Supremacy Clause do not categorically prohibit the issuance of

18

was president for only two months between the enactment of the anti-SLAPP amendment and the

end of his term.[59]   Moreover, this action was removed from the state court *before* the anti-SLAPP

amendments were enacted.  Accordingly, whatever happened in the state court is entirely immaterial

to the delay upon which plaintiff relies, *i.e.*, the 14 month delay between the enactment of that

legislation and the filing of the motion for leave to amend.[60]  What matters is why the defendant did

not make this motion between November 2020 and January 11, 2022.   So defendant's position

reduces to the proposition that this delay was justified because he moved in December 2020 for a

stay of proceedings pending appeal from this Court's denial of the government's motion to substitute

the United States for Mr. Trump.  But the mere filing of that motion did not stay the proceedings,[61]

and it ultimately was denied months ago.[62]

Accordingly, defendant has offered no satisfactory justification for failing to move

for leave to amend for a 14 month period.

---

a state criminal subpoena to a sitting president).

[59]   November 10, 2020 until January 20, 2021.

[60]   As will appear, the proceedings in the state court are quite relevant for the issues of dilatory motive, bad faith, and prejudice.

[61]   *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167 (2d Cir. 2007).  In that case, after defendants filed a motion to stay the proceedings pending interlocutory appeal, an applications judge granted "a temporary stay pending panel consideration of the stay motion." *Id.* at 169.  If the filing of the motion to stay alone sufficed to stay the proceedings pending a decision on the motion, there would have been no need for the temporary stay.

[62]   Dkt. 56.

19

*Dilatory Motive, Bad Faith and Prejudice*

As plaintiff contends, defendant's actions have been dilatory throughout the

litigation. As she aptly puts it, he "has slow-rolled his defenses, asserting or inventing a new one

each time his prior effort to delay the case fails."[63]

This action was filed in state court on November 4, 2019.[64] In the days following,

defendant, then the president of the United States, attempted to evade service of the complaint at his

New York City residence and the White House.[65] Service was completed only by mail after the state

court granted plaintiff's application for alternative service.[66] Defendant then attempted to delay the

progress of the lawsuit through frivolous motions practice. First, he filed a motion to dismiss and

to stay discovery on January 3, 2020, alleging that the court lacked personal jurisdiction over him.[67]

The court denied his motion, holding that defendant had failed to meet the procedural prerequisites

to contest personal jurisdiction and concluding that his arguments were baseless.[68] Defendant later

---

[63] Dkt. 65 at 9.

[64] Complaint, NYSCEF Doc. No. 2. All state court docket citations are to *Carroll v. Trump*, Index No. 160694/2019.

[65] *See* Aff. in Support of *Ex Parte* App., NYSCEF Doc. No. 6 (describing law enforcement interference – including by Secret Service agents and officers of the New York City Police Department – with attempted service of process on defendant at Trump Tower in Manhattan and at the White House in Washington, D.C.); Order Permitting Alt. Serv., Doc. No. 15 (granting *ex parte* application).

[66] Aff. of Serv., NYSCEF Doc. No. 17.

[67] Mem. in Support of Mtn. to Dismiss and Stay Discovery, NYSCEF Doc. No. 33.

[68] Order, NYSCEF Doc. No. 36.

20

reasserted the same defense in his answer, forcing plaintiff to make a motion to strike,[69] after which defendant voluntarily withdrew the defense.[70]

Meanwhile, defendant moved to stay the case pending an appeal in another action arising from alleged sexual misconduct by defendant with another woman, *Zervos v. Trump*.[71] In support of that motion, defendant here argued that the outcome of the *Zervos* appeal would be dispositive in this case because, should he prevail, the court would be divested of jurisdiction to consider the action while he served as president.[72] But that argument at least suggested a dilatory motive, as defendant previously had disclaimed any relation between this case and the *Zervos* matter in a request for this case to be assigned randomly rather than sent to the judge overseeing the *Zervos* case.[73]

Next, on August 7, 2020, after the state court rejected defendant's effort to stay the state court litigation,[74] defendant reportedly instructed William Barr, then Attorney General, to cause the United States to intervene and remove the case to this Court under the Westfall Act.[75] The

---

[69]

Mem. in Support of Mtn. to Strike, NYSCEF Doc. No. 92.

[70]

Notice of Withdrawal, NYSCEF Doc. No. 93.

[71]

171 A.D.3d 110 (1st Dep't 2019); Notice of Mtn. to Stay, NYSCEF Doc. No. 43.

[72]

Mem. in Support of Mtn. to Stay, NYSCEF Doc. No. 49 at 6.

[73]

Letter App. for Reassignment, NYSCEF Doc. No. 25.

[74]

*See* Order, NYSCEF Doc. No. 110.

[75]

Notice of Removal, NYSCEF Doc. No. 112; *see also* Katie Brenner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. TIMES (Sept. 9, 2020).

21

Department of Justice then moved, unsuccessfully, to substitute the United States as the defendant in place of Mr. Trump.[76]

Taken together, these actions demonstrate that defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him.  That conclusion draws further support from the facts that (1) the plaintiff is the only percipient witness (other than the defendant) to the alleged rape, and (2) she is 78 years of age.  The relevance of these facts is obvious.

Finally, if there were serious doubt about defendant's dilatory purpose, it would be eliminated or vastly diminished by his contention that the Court should not pass on the futility of amendment in ruling on the motion for leave to amend.

Defendant argues his motion should be granted because the anti-SLAPP law opens "multiple avenues for redress" that otherwise would be unavailable to him,[77] which include a motion to dismiss under CPLR 3211(g), a motion for summary judgment under CPLR 3212(h), and the accompanying stay of discovery and special award of costs and attorneys' fees.  He argues that leave to amend should be granted without considering the futility of the amendment in order to leave him free to attempt to use these procedural mechanisms at "any point during the litigation."[78]  He wishes to engage in separate motion practice whenever he might seek to take advantage of one of those

---

[76]

*See* Notice of Mtn. to Substitute (Dkt. 3).

This Court denied the motion.  Opinion (Dkt. 32).  Appeals from that decision are *sub judice* in the Second Circuit.

[77]

Dkt. 64 at 9.

[78]

*Id.*

22

"multiple avenues,"[79] thus needlessly delaying the case further and driving up the cost of litigating it.  Moreover, when asked whether defendant, if allowed to amend,  would "seek to stay all proceedings here until the anti-SLAPP law claim is resolved," defendant's counsel deflected the Court's question by insisting that that issue should be addressed only after an anti-SLAPP motion was filed.[80]  Thus, the effect of granting defendant leave to amend without determining whether the proposed amendment would be futile – and quite likely the purpose of advocating that course – almost certainly would be to delay this action for no legitimate purpose.

In the Court's view, characterization of defendant's previous and threatened future actions as dilatory, in bad faith or unduly prejudicial would be a bootless exercise.  They are, in varying degrees, all three.

Plaintiff's only claim in this case is a single count of defamation.  It could have been tried and decided – one way or the other – long ago.  The record convinces this Court that the defendant's litigation tactics, whatever their intent, have delayed the case to an extent that readily could have been far less.  Granting leave to amend without considering the futility of the proposed amendment needlessly would make a regrettable situation worse by opening new avenues for significant further delay.  That would unduly prejudice plaintiff which, in my view, is a motive for defendant's position on this motion.

---

[79]    Tr., at 5:21-23, 13:22-14:4; Dkt. 66 at 6.

[80]    Tr., at 5:9-6:3.

23

*Conclusion*

Defendant's motion, in his personal capacity, for leave to amend (Dkt. 63) is denied

on the ground that the proposed amendment would be futile.  In the alternative, it is denied in the

exercise of discretion on the grounds that the defendant delayed unduly in seeking leave to amend,

that the motion for leave is made at least in part for a dilatory purpose and thus at least in part in bad

faith, and that granting the motion would prejudice the plaintiff unduly.

SO ORDERED.

Dated:        March 10, 2022

_____
Lewis A. Kaplan
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-5-22

E. JEAN CARROLL,

                    *Plaintiff,*

        v.                                          No. 20 Civ. 7311 (LAK) (JLC)

DONALD J. TRUMP, in his personal capacity,

                    *Defendant.*

**[~~PROPOSED~~] SCHEDULING ORDER**

It is hereby ORDERED as follows:

1. The parties shall serve any and all written discovery requests on each other on or before May 27, 2022.

2. The parties shall substantially complete their productions of written discovery and requests for inspection or examination on or before August 3, 2022.

3. Depositions to take place between August 3, 2022, to October 19, 2022.

4. The parties shall make any and all expert disclosures under Rule 26(a)(2) on or before September 16, 2022.

5. The parties shall substantially complete any and all fact discovery on or before October 19, 2022.

6. The parties shall complete any and all expert discovery on or before November 16, 2022.

KAPLAN HECKER & FINK LLP

By: _____

Roberta A. Kaplan
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com

Joshua Matz
1050 K Street, Suite 1040
Washington, DC 20001
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*


HABBA MADAIO & ASSOCIATES LLP

By: _____

Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
          -and-
270 West 60th Street
New York, New York 10023
(908) 869-1188
ahabba@habbalaw.com

*Counsel for Defendant, Donald J. Trump*


SO ORDERED:

Dated: _____

_____
The Honorable Lewis A. Kaplan
United States District Court Judge



Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

September 28, 2022

**VIA ECF**
The Honorable Lewis A. Kaplan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

   *Re:*  *Carroll v. Trump*
     Civil Case No.: 1:20-cv-7311-LAK-JLC

Dear Judge Kaplan:

   This office represents the defendant, former President Donald J. Trump ("Defendant"), in the above-referenced action. By way of this letter, I respectfully request that this Honorable Court substitute the United States as the defendant in this action and immediately stay all proceedings.

   On September 27, 2022, the Second Circuit rendered a decision (the "Decision") (*see* ECF No. 91), which reversed in part and vacated in part this Court's October 27, 2020 Opinion and Order (the "Order") (*see* ECF No. 32) denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute as the defendant in the place of Defendant Trump. Specifically, the Decision held that "the President is an employee of the government under the Westfall Act" and certified the question of whether Defendant acted within the scope of his employment when he publicly repudiated the allegations made by the plaintiff, E. Jean Carroll ("Plaintiff"), to the D.C. Court of Appeals. *See* Decision at 33.

   By virtue of the Second Circuit's Decision, the United States must be substituted as the defendant in the instant action pending resolution of the proceedings before the D.C. Court of Appeals. The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). To invoke the Westfall Act, the Attorney General (or his delegate) must certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Upon such certification, the statute expressly dictates that "any civil action or proceeding commenced upon such claim in a United States district court **shall be deemed an action against the United States** under the provisions of this title and all references thereto, and the **United States shall be substituted as the party defendant**." *Id.* (emphasis added).

Here, on September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General that Defendant was acting within the scope of his office as President of the United States as the time of the alleged conduct. *See* ECF No. 6, Ex. B. Given that the Second Circuit has confirmed that Defendant is indeed an employee of the government for the purposes of the Westfall Act, the United States must automatically be "substituted as the party defendant" in this case. *Id.* This substitution is not discretionary; it occurs by operation of law. *See e.g., Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) ("Upon the Attorney General's certification, the federal employee is dismissed from the case and the United States is substituted as the defendant in place of the employee.") (citing 28 U.S.C. § 2679(d)(1)); *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990) ("Although . . . [the] scope certification is not dispositive for purposes of substitution, it indicates that the United States is substituted as an *automatic consequence* of the [Government's] certification.") (emphasis added). Indeed, "[t]he United States . . . must remain the federal defendant in the action ***unless and until*** the [court] determines that the employee, in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley,* 549 U.S. 225 231 (2007) (emphasis added). Therefore, the United States must be deemed, and remain, the defendant in the instant action—effectively staying all proceedings—until the scope of employment issue is resolved by the D.C. Court of Appeals.

Moreover, the D.C. Court of Appeals' forthcoming ruling will be case-dispositive and, therefore, it would be highly prejudicial and inequitable for Defendant to engage in time-consuming and expensive pre-trial preparation—much less proceed to trial—until this issue has been conclusively resolved. *See Behrens v. Pelletier*, 516 U.S. 299, 308, 116 S. Ct. 834, 839 (1996) (immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery'" (emphasis in original)). As the Second Circuit properly stated, "[t]he FTCA, expressly, does not waive the sovereign immunity of the United States for the tort of defamation, *see* 28 U.S.C. § 2680(h) . . . *[s]o substituting the United States in place of Trump means the failure of Carroll's defamation lawsuit. See* Decision at 18 (emphasis added). Indeed, the "core purpose" of the Westfall Act "is to relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders." *Osborn,* 549 U.S. at 252; *see also, e.g., Mitchell v. Carlson*, 896 F.2d 128, 133 (5th Cir. 1990) (Westfall immunity encompasses the right to avoid the "burden[s] of defending a suit"). Here, as with other immunity contexts, "if the defendant is correct that it has immunity, its right to be free of litigation is compromised, and lost to a degree, if the district court proceeds while the appeal is pending." *Goshtasby v. Bd. of Trs.*, 123 F.3d 427, 428 (7th Cir. 1997*); see also, e.g., Williams v. Brooks*, 996 F.2d 728, 730 n.2 (5th Cir. 1993) (immunity "'is effectively lost' if a case is erroneously permitted to proceed at the district court level while an interlocutory appeal of a denial of immunity is pending.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)*; In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) (Sweet, J.) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting argument that divestiture is not automatic in the qualified immunity context); *Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

For the foregoing reasons, it is respectfully requested that this Court substitute the United States as the sole defendant in this action and immediately stay all proceedings pending resolution of the D.C. Court of Appeal's case-dispositive determination on the scope of employment issue.

Respectfully submitted,

Alina Habba, Esq.
For HABBA MADAIO & ASSOCIATES LLP

cc: All Counsel of Record (via ECF)

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

September 30, 2022

**VIA ECF**

The Honorable Lewis A. Kaplan
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

<div align="center">

*Re:*     *Carroll v. Trump*, No. 20 Civ. 07311 (LAK) (JLC)

</div>

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll in opposition to Defendant Donald J. Trump's letter motion for a stay dated September 28, 2022. ECF 92. For the reasons below, we believe the motion should be denied.

***Defendant seeks to unilaterally reap the benefits of discovery by invoking an appeal that has been pending for twenty months.*** Defendant claims that discovery should be stayed because there is a "case-dispositive" appeal pending. But that has been true since November 2020, and current circumstances are not materially different now that the scope-of-employment issue has been certified to the D.C. Court of Appeals. In that time, Defendant has not hesitated to litigate in pursuit of his own advantage. On December 1, 2021, he moved to expand the scope of this action by adding an anti-SLAPP counterclaim against Plaintiff. ECF 59. And on April 1, 2022, after the Court denied that motion, Defendant affirmatively proposed to Plaintiff (and Plaintiff agreed) that the parties resume discovery. ECF 75. On May 5, the parties *jointly* stipulated to a schedule, which the Court adopted that same day. ECF 75-1, 76. Once again, all of this occurred while Defendant knew that a "case-dispositive" appeal was pending. *See* Letter from A. Habba, *Carroll v. Trump*, No. 20-3977 (2d Cir. July 20, 2022) (informing Second Circuit of ongoing discovery and acknowledging that "issues raised in this appeal are dispositive as to the underlying case").

Moreover, Defendant has spent four months taking advantage of the very discovery process that he set in motion. He has obtained 30,469 pages of records from Plaintiff, obtained hundreds more pursuant to nonparty subpoenas, obtained 19 substantive interrogatory responses, and recently deposed a key nonparty witness. In contrast, Defendant produced just *eight* documents and four incomplete interrogatory responses; he otherwise stonewalled every document request and interrogatory, refused to turn over basic information about witnesses required by Local Civil

KAPLAN HECKER & FINK LLP                                                                              2

Rule 26.3(c)(3),[1] and violated every deadline that applied to his discovery responses without any credible excuse for his failure. Throughout, Defendant has objected to discovery requests on the ground that it was "more practical" to obtain the information Plaintiff seeks at "a deposition"—and so Plaintiff finally had to schedule Defendant's deposition for the first half of October.[2]

Now that Defendant has benefited substantially from a discovery process that he actively set in motion—and now that he faces the prospect of his own deposition, having stonewalled every other discovery mechanism—he suddenly says that the continued pendency of a "case-dispositive" appeal changes everything. Nonsense. The Second Circuit's ruling changed hardly anything: it left open the ultimate question that has been on appeal for twenty months—namely, whether the United States should have been substituted for Defendant. Defendant initiated discovery while the scope-of-employment question was on appeal, he sought to add a counterclaim while it was on appeal, and he obtained documents and testimony while it was on appeal. He should not be permitted to assert at the last minute that he is entitled to avoid a deposition because it remains on appeal.

***The argument that the Second Circuit decision requires substitution and a stay is both self-defeating and legally flawed.*** Defendant does not address any of the factors that a party typically must satisfy to obtain a stay. *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). Instead, he principally argues that because the Second Circuit vacated this Court's scope-of-employment decision and certified the scope-of-employment question to the D.C. Court of Appeals, the United States is now the proper defendant in this case. ECF 92 at 1–2.

As an initial matter, if Defendant were correct that the United States is now the defendant, then he would lack standing to seek a stay. Where a person "is not a party to [a] civil action," that person "does not have standing to move for a stay." *Doe v. Indyke*, No. 20 Civ. 00484, 2020 WL 5518384, at *2 (S.D.N.Y. Sept. 14, 2020). If the Court were to hold that the Second Circuit's decision somehow resulted in substitution of the United States, and if a party at that point were to seek a stay of proceedings, a different set of issues would arise. But for now, there is no basis for Defendant to seek both substitution and a stay of all proceedings in the case.

More fundamentally, Defendant is mistaken that substitution must occur "[b]y virtue of the Second Circuit's Decision." ECF 92 at 1. Although the language of the Westfall Act refers to what "shall" happen "[u]pon certification" by the Attorney General, 28 U.S.C. § 2679(d)(2), that language does not leave judges with the sole job of "rubber-stamp[ing]" the Attorney General's scope-of-employment certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429, 115 S. Ct. 2227, 2234 (1995). In holding that such certifications are subject to judicial review, the

---

[1] For example, Defendant identified his son-in-law Jared Kushner as one of only six people with whom Defendant has purportedly ever spoken about Plaintiff or this action. We have requested the address and employer of Mr. Kushner and the other five witnesses—information that Defendant must disclose under Local Civil Rule 26.3(c)(3)—on six occasions since August 23. Defendant's counsel have repeatedly dodged our request, writing recently that they "have reached out to the appropriate parties and are still working to obtain this information."

[2] The current schedule for confirmed depositions is as follows: Plaintiff's deposition of Cande Carroll (October 4), Plaintiff's deposition of Stephanie Grisham (October 6), Plaintiff's deposition of Roberta Myers (October 12), Defendant's deposition of Carol Martin (October 12), Plaintiff's deposition of Jessica Leeds (October 13), Plaintiff's deposition of Natasha Stoynoff (October 13), Defendant's deposition of Plaintiff (October 14), and Plaintiff's deposition of Defendant (October 19).

KAPLAN HECKER & FINK LLP                                                                    3

Supreme Court disagreed that "[u]pon certification . . . the United States would automatically become the defendant." *Id*. In so ruling, the Supreme Court emphasized that "shall" does not always mean "must," and it sometimes means "should, will, or even may." *Id.* at 432 n.9. Accounting for statutory text and purpose, the Supreme Court held that certification "does not conclusively establish as correct the substitution of the United States as defendant." *Id.* at 434.

Indeed, many cases (including several cited by Defendant on appeal) demonstrate that when certification is contested, it occurs *after* the United States prevails on a motion to substitute. In *Council on American Islamic Relations v. Ballenger*, for example, the D.C. Circuit stated that "[*o*]*nce a court determines* that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act." 444 F.3d 659, 662 (D.C. Cir. 2006) (emphasis added). The D.C. Circuit similarly explained in *Wuterich v. Murtha* that "*where a plaintiff fails* to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit." 562 F.3d 375, 381 (D.C. Cir. 2009) (emphasis added).

Tellingly, the United States followed that exact procedure here. On September 8, 2020, the United States filed a motion requesting "an order substituting the United States as defendant for President Donald J. Trump." ECF 3 at 1. It reiterated its "request[]" in its reply, ECF 21 at 15, and, in seeking adjournment of oral argument, referred to its "pending motion to substitute," ECF 25.[3] In Defendant's view, the United States never had to file any motion at all, and apparently seasoned Department of Justice lawyers misunderstood Westfall Act procedure. But the record is clear: the United States still has not obtained the relief it expressly requested, and the Second Circuit has not resolved the motion in its favor. Instead, it vacated (rather than reversed) this Court's ruling on the United States' motion to substitute, which at most reverts the status of that motion to "pending." *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 424 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (upon vacatur of original decision, issues raised by underling motion remained to be decided). In these circumstances, the United States has not been substituted in lieu of Defendant.

The language that Defendant quotes from *Osborn v. Haley*, 549 U.S. 225, 127 S. Ct. 881 (2007), is not to the contrary. *See* ECF 92 at 2. *Osborn* concerned whether certification is proper when a federal officer denies the occurrence of the allegedly tortious conduct. *Id.* at 231. Although the Court stated that the United States remained the defendant "unless and until the District Court determines that the employee, *in fact*, . . . engaged in conduct beyond the scope of his employment," the Court was a drawing contrast with a situation in which the employee "simply as alleged by the plaintiff" engaged in such conduct. *Id.* In other words, the Court was focused on what it took to rebut the certification as an evidentiary matter, and it did not depart from its reasoning in *Gutierrez* (discussed above). *Accord Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017) (quoting *Osborn* in stating that certification "constitutes '*prima facie* evidence'").

---

[3] The United States and Defendant presented the same account on appeal. *E.g.*, U.S. Appellate Br. at 2 ("The district court rejected the United States' motion to be substituted as the defendant."); *id.* at 3 ("[T]he United States filed . . . a motion to have the United States substituted as the sole defendant."); *id.* at 23 ("In its opening motion papers, the United States sought substitution . . . ."); *id.* at 24 ("[T]he relevant claim is that the United Sates should properly be substituted . . . ."); Trump Appellate Br. at 2 ("[T]he United States moved in the District Court to substitute . . . ."); *id.* at 3 ("[T]he United States . . . filed a motion in that court to substitute the United States as defendant.").

KAPLAN HECKER & FINK LLP

<div align="right">4</div>

*The traditional stay factors cut strongly against a stay.* Defendant argues that because the D.C. Court of Appeals' "forthcoming ruling will be case-dispositive," it would be "highly prejudicial and inequitable for Defendant to engage in time-consuming and expensive pre-trial preparation—much less proceed to trial—until this issue has been conclusively resolved." ECF 92 at 2. That argument echoes many of the points that Defendant raised in his first motion to stay, which this Court denied, and for which Defendant did not seek reconsideration. ECF 47, 56; Text Order dated Sept. 15, 2021. Moreover, as explained above, it would be inequitable for Defendant now to obtain a stay based on the pendency of the same case-dispositive appeal that has been pending throughout his own efforts to add a counterclaim and engage in substantial discovery practice. A mere change in venue to D.C. for that ongoing appeal does not explain—and certainly does not justify—Defendant's about-face on whether discovery should continue while the appellate process unfolds.

The impracticality of cutting off discovery now that Defendant finally faces the prospect of satisfying his discovery obligations is only heightened by one more consideration: the relevance of the discovery here to the Adult Survivors Act case that Plaintiff will file in November. *See* ECF 89. The underlying dispute in both cases encompasses a single core disagreement—did Defendant sexually assault Plaintiff—and Defendant will have to testify under oath about his actions either way. To assuage concerns about duplicative discovery, and to the extent it wasn't already clear, Plaintiff agrees that any depositions in the present action may be used for Plaintiff's forthcoming action, thereby promoting efficiency and obviating the need for do-overs.

<div align="center">*   *   *</div>

This case began on November 4, 2019, and it could hardly be clearer that Defendant hopes to "run out the clock" until he is elected president again. Defendant's motion to stay represents more of the same delay tactics he has long used, *see* ECF 16 at 7–8—and reflects his broader pattern of contorting the law and facts to avoid any legal repercussions for his misconduct. It also reflects his continued bad faith. Indeed, even as Defendant's lawyers insisted in this case that "Presidents plainly are employees of the Government," Trump Appellate Br. at 6, his lawyers told the Justice Department on May 25, 2022, that he could not face criminal liability for misappropriating classified documents to Mar-a-Lago because "an element of this offense . . . is that the accused is 'an officer, employee, contractor, or consultant of the United States'" and "[t]he President is none of these," Ex. 1 to Unsealed Search Warrant at 2, *In re: Sealed Search Warrant*, No. 22 M.J. 8332 (S.D. Fla. Aug. 26, 2022), ECF 102-1. To hear Defendant tell it, he acted as an employee of the government in retaliating against Plaintiff for revealing that he had raped her decades earlier, and in declaring that she was too ugly to rape, but he could not possibly have been an employee of the government when he absconded from the White House with national security secrets.

Defendant's inconsistencies continue here. He cannot seek a stay based on a theory of substitution that would deprive him of standing to argue for a stay in the first place. He cannot obtain automatic substitution of the United States when the very cases he has previously cited describe a very different order of operations. And he cannot rely on the pendency of an appeal to block any further discovery when he has aggressively pursued counterclaims, document requests, and depositions during the pendency of that very same appeal.

KAPLAN HECKER & FINK LLP                                                    5

Respectfully submitted,

Roberta A. Kaplan

cc:      Counsel of Record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                              Plaintiff,

        -against-                                          20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____                   │
│ DATE FILED: 10/12/2022           │
└─────────────────────────────────┘
```

**MEMORANDUM OPINION**

Appearances:

        Roberta Kaplan
        Joshua Matz
        Shawn Crowley
        Matthew Craig
        KAPLAN HECKER & FINK LLP
        *Attorneys for Plaintiff*

        Alina Habba
        HABBA MADAIO & ASSOCIATES LLP
        *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        This is a defamation action against Donald J. Trump. The question whether Mr.

Trump defamed the plaintiff depends largely upon whether Mr. Trump, as plaintiff claims, raped

her in a department store fitting room. The matter is before the Court on a motion by Mr. Trump

to substitute the United States for him as the defendant and to stay the action. A previous motion

2

by the United States to substitute itself for Mr. Trump was denied, so this is a second bite at that apple.

*Facts*

As this Court previously has observed, Mr. Trump has litigated this case since it began in 2019 with the effect and probably the purpose of delaying it.[1] Among the actions with this effect was this. After litigating the case in the state court for almost a year without any suggestion that the government of the United States had anything whatever to do with it, Mr. Trump "reportedly instructed William Barr, then [Mr. Trump's appointee as] Attorney General, to cause the United States to intervene and remove the case to this Court under the Westfall Act."[2] The Department of Justice ("DOJ") then moved "to substitute the United States as the defendant in place of Mr. Trump."[3] It did so on the basis of a DOJ certification (the "DOJ Certification") that (1) then President Trump was an "employee" of the United States as defined in the Westfall Act, and (2) the conduct of which the plaintiff complained was within the scope of that employment. Under the relevant statute, the DOJ certification "conclusively establish[es] scope of employment *for purposes of removal*"[4] – i.e., only for the purpose of effecting transfer of such a case from a state to a federal

---

[1] *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2022 WL 748128, at *8-10 (S.D.N.Y. Mar. 11, 2022).

[2] *Id.* at *9 & n.75.

[3] *Id.* at *9.

[4] 28 U.S.C. § 2679(d)(2) (emphasis added).

3

court. The legal correctness of the DOJ Certification was and remains subject to judicial review and ultimate determination of the courts.

This Court denied the government's motion to substitute on two independent grounds. First, it held that Mr. Trump was not an "employee" of the United States within the meaning of the Westfall Act, a prerequisite to the substitution sought by the government. Second, even if he were such an "employee," the alleged defamation was not committed within the scope of his employment – also a prerequisite to that substitution.[5] Neither Mr. Trump nor DOJ suggested that the DOJ Certification *ipso facto* substituted the United States for Mr. Trump as the defendant.

Both the government and Mr. Trump appealed from that ruling. Neither contended before the Court of Appeals that the DOJ Certification *ipso facto* substituted the United States for Mr. Trump as the defendant. Mr. Trump, but not the government, moved in this Court for a stay pending appeal, but did not make the *ipso facto* substitution argument. That motion was denied on September 15, 2021.[6] Mr. Trump did not seek a stay from the Court of Appeals.

Since the denial of the government's substitution motion, this action has proceeded for more than a year without any claim that the government was substituted for Mr. Trump as the defendant simply by fact that the DOJ filed the DOJ Certification. For example:

---

[5]

   *See Carroll v. Trump,* 498 F. Supp.3d 422 (S.D.N.Y. 2020).

[6]

   Dkt. 56. All docket citations are to 20-cv-7311 (LAK) unless otherwise specified.

4

- Mr. Trump, in his individual capacity, caused his private attorneys to move, unsuccessfully, for leave to amend to assert a so-called SLAPP counterclaim against the plaintiff.[7]

- Mr. Trump, in his individual capacity, stipulated to a scheduling order pursuant to which he and his adversary obligated themselves, *inter alia*, to complete all depositions and fact discovery by agreed and court-ordered dates.[8]

- Mr. Trump, in his individual capacity, made no objection to the Court setting the case for trial, unless it were disposed of previously, for February 6, 2023.

These and other actions by Mr. Trump all were flatly inconsistent with any suggestion that the United States had been substituted as the party defendant. *If the DOJ Certification had the effect he now claims, Mr. Trump no longer was a party to this case and had no standing to do any of those things.*

On September 27, 2022, a divided panel of the Court of Appeals reversed this Court's holding that the president of the United States is not an "employee" of the government under the Westfall Act. While the Circuit vacated this Court's holding that Mr. Trump had not acted within the scope of employment, it did not do so on the merits. Instead, it certified that question to the Court of Appeals of the District of Columbia (the "D.C. Court of Appeals"), as the scope of

---

[7] Dkt. 63 (mtn.); *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2022 WL 748128 (S.D.N.Y. Mar. 11, 2022).

[8] Dkt. 76.

5

employment issue is governed by the local law of the District.[9]  The question whether this Court's

scope of employment holding was correct therefore remains open.

On the following day – 22 days before Mr. Trump's scheduled deposition in this case

– Mr. Trump abruptly reversed course.  He moved before this Court to substitute the United States

as defendant and immediately stay all proceedings in light of the Court of Appeals' decision.[10]  He

now claims that the DOJ Certification, in and of itself, substituted the government for Mr. Trump

as the defendant.  He contends that this action – and certainly his deposition – should be stayed

because the resolution of the scope of employment issue might result in dismissal of this case.

The premise upon which Mr. Trump's motion rests – that the DOJ Certification, in

and of itself, substituted the government for Mr. Trump as the defendant – is inconsistent with Mr.

Trump's own actions, the actions of the government, the statute upon which Mr. Trump relies, and

the case law.  He nevertheless asserts it with such certitude that he characterizes his adversary's

contrary argument as "asinine."[11]

---

[9]

See Carroll v. Trump, ___ F.4th ___, 2022 WL 4475079 (2d Cir. Sept. 27, 2022).

[10]

Letter Mtn. to Substitute and Stay Proceedings [Dkt. 92], at 1.

Defendant incorrectly persists in referring to the Court of Appeals' decision as "case
dispositive."  It is nothing of the sort.  A case dispositive issue is one that will resolve a case,
one way or the other, regardless of how it is decided.  The Court of Appeals decision
resolving the "employee" question was not "case dispositive" at least because the scope of
employment question remains unresolved.

[11]

Reply [Dkt. 94], at 1.

The Court will not tolerate by counsel such inappropriate language again.

6

*Discussion*

*A.    Substitution*

Mr. Trump contends that the Second Circuit's decision means that "the United States must automatically be substituted as the party defendant in this case."[12]   He relies on Section 2679(d)(1) of the Federal Tort Claims Act which, in relevant part, reads:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[13]

But he ignores Section 2679(d)(2) which, in relevant part, provides:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a State court shall be removed . . . to the [appropriate] district court of the United States . . . . Such action or proceeding shall be deemed to be an action . . . brought against the United States . . . , and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment *for purposes of removal.* "[14]

Taken as a whole, the statute makes clear that the DOJ Certification is conclusive only for purposes of removal and that it is subject to judicial review.

The consequences of reading the relevant provisions of the statute together are clear. As plaintiff responded to Mr. Trump's argument:

---

12

Dkt. 92, at 2 (internal quotation marks and citation omitted).

13

28 U.S.C. § 2679(d)(1).

14

*Id.* § 2679(d)(2) (emphasis added).

7

"Defendant is mistaken that substitution must occur '[b]y virtue of the Second Circuit's Decision.' ECF 92 at 1. Although the language of the Westfall Act refers to what 'shall' happen '[u]pon certification' by the Attorney General, 28 U.S.C. § 2679(d)(2), that language does not leave judges with the sole job of 'rubber-stamp[ing]' the Attorney General's scope-of-employment certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 [] (1995). In holding that such certifications are subject to judicial review, the Supreme Court disagreed that '[u]pon certification . . . the United States would automatically become the defendant.' *Id.* In so ruling, the Supreme Court emphasized that 'shall' [the word upon which Mr. Trump's entire argument depends] does not always mean 'must,' and it sometimes means 'should, will, or even may.' *Id.* at 432 n.9 [internal quotation marks omitted]. Accounting for statutory text and purpose, the Supreme Court held that certification 'does not conclusively establish as correct the substitution of the United States as defendant.' *Id.* at 434.

"Indeed, many cases (including several cited by Defendant on appeal) demonstrate that when certification is contested, it occurs *after* the United States prevails on a motion to substitute. In *Council on American Islamic Relations v. Ballenger*, for example, the D.C. Circuit stated that '*[o]nce a court determines* that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act.' 444 F.3d 659, 662 (D.C. Cir. 2006) (emphasis added). The D.C. Circuit similarly explained in *Wuterich v. Murtha* that '*where a plaintiff fails* to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit.' 562 F.3d 375, 381 (D.C. Cir. 2009) (emphasis added).

"Tellingly, the United States followed that exact procedure here. On September 8, 2020, the United States filed a motion requesting 'an order substituting the United States as defendant for President Donald J. Trump.' ECF 3 at 1. It reiterated its 'request[]' in its reply, ECF 21 at 15, and, in seeking adjournment of oral argument, referred to its 'pending motion to substitute,' ECF 25. In Defendant's view, the United States never had to file any motion at all, and apparently seasoned Department of Justice lawyers misunderstood Westfall Act procedure. But the record is clear: the United States still has not obtained the relief it expressly requested, and the Second Circuit has not resolved the motion in its favor. Instead, it vacated (rather than reversed) this Court's ruling on the United States'[s] motion to substitute, which at most reverts the status of that motion to 'pending.' *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 424 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (upon vacatur of original decision, issues raised by underl[y]ing

8

motion remained to be decided).  In these circumstances, the United States has not been substituted in lieu of Defendant."[15]

Plaintiff's argument is correct.  At least where, as here, the correctness of a DOJ certification is disputed, the government need not be substituted for Mr. Trump unless *two* conditions are satisfied, viz. that the courts hold that defendant was an employee of the government and he is found to have acted within the scope of that employment.

The Second Circuit recently concluded that the answer to the first question in this case is "yes."[16]  But it did not resolve the second question, certifying it instead for decision by the D.C. Court of Appeals because "the District's law regarding vicarious liability is sufficiently unclear that [the Second Circuit is] unable to predict with any confidence how the District's highest court . . . would resolve this issue."[17]  The D.C. Court of Appeals may refuse to accept the certification, in which case the question would return to the Second Circuit for decision.  It may decide the question, one way or another.[18]  How the question ultimately will be resolved remains unknown. In the meantime, substitution would be premature, as judicial review of the DOJ Certification has not concluded.

Mr. Trump nevertheless quibbles with the procedure through which the Court took up the substitution issue when this case was removed to federal court.  He now – for the first time

---

[15]    Opp. [Dkt. 93], at 2-3.

[16]    Of course, even that decision is subject to the possibility of review.

[17]    *Carroll*, 2022 WL 4475079, at *6.

[18]    It conceivably might conclude that the scope of employment issue raises issues of fact requiring further district court proceedings.

9

– contends that the United States automatically was substituted as the party defendant on a "provisional" basis by virtue of the DOJ Certification.  If the courts ultimately were to decide that he did not act within the scope of his employment, Mr. Trump then should be "resubstituted" as the defendant for the United States.[19]

  To be sure, Mr. Trump has identified at least one case in which a district court apparently followed such a procedure.[20]  But the appellate decision in that case did not deal with the issue.  Moreover, as explained by plaintiff in the passage quoted above, the United States here did not argue that it already had been substituted, provisionally or otherwise, for Mr. Trump.  It instead made a motion to be substituted, a motion that required the Court's disposition.[21]  Nor did it make an *ipso facto* substitution argument in its reply to plaintiff's opposition to its motion.  Instead, it responded to the substance of plaintiff's arguments in opposition to substitution.[22]  Mr. Trump took

---

[19]

  Dkt. 94, at 2 (quoting *Aversa v. United States*, 99 F.3d 1200, 1208 (1st Cir. 1996)).

[20]

  In that case, *Aversa v. United States*, the First Circuit reviewed *de novo* the district court's scope of employment determination. 99 F.3d at 1210.  It observed that the district court had "provisionally substituted [the United States] as party defendant" and then permitted plaintiff to contest substitution with the aid of special discovery.  *Id.* at 1206.  The Circuit did not comment on the procedure beyond a conclusory reference to the potential for "the employee [to] be resubstituted" after judicial review.  *Id.* at 1208.  But the court's authority in support of the resubstitution mechanism is inapposite.  The Circuit cited *Gutierrez de Martinez* but, in that very case – which stands for the proposition that scope of employment certification must be subject to judicial review – the Supreme Court noted that, "to avoid the consequences of *unrecallable substitution of the United States as the party defendant*, petitioners asked the District Court to review certification."  515 U.S. at 422 (emphasis added).  In *Gutierrez de Martinez* of course, as in this case, substitution likely would "cause the demise of the action" because the claims at issue "fell within an exception to the FTCA's waiver of . . . sovereign immunity."  *Id.*

[21]

  Dkt. 3.

[22]

  Reply in Support of Mtn. to Substitute [Dkt. 21].

10

no issue with the government's position or with the Court's determination that the government's

motion required the Court's leave for substitution of the United States for the defendant.  As noted,

neither the United States nor Mr. Trump made such an argument on appeal.[23]

In all the circumstances, the Court concludes that Mr. Trump's argument that the

government automatically was substituted for him as the defendant in this case, or even now must

be substituted for him, simply by virtue of the DOJ Certification is incorrect.  Moreover, even if

there were greater merit to his substantive contention, it would not lie with him to advance that

argument in the unusual circumstances of this case.


B.    *Stay of Proceedings*

Next, defendant urges the Court to issue an immediate stay of the proceedings for the

principal reason that "a dispositive issue" – namely, whether defendant was acting within the scope

of his employment – "remains pending and unresolved before the D.C. Court of Appeals . . . ."[24]

In so doing, he does not directly address the standard that governs this application.

In general, the question whether to stay proceedings is addressed to the trial court's

discretion:

> "[T]he power to stay proceedings is incidental to the power inherent in every court
> to control the disposition of causes on its docket with economy of time and effort for
> itself, for counsel, and for the litigants.  How this can best be done calls for the

---

[23]
    *See* No. 20-3977, Dkts. 45 (Brief of Appellant United States of America), 48 (Brief and
Special Appendix for Defendant-Appellant [Donald J. Trump]).

[24]
    Dkt. 94, at 4.

11

exercise of judgment, which must weigh competing interests and maintain an even balance."[25]

In this case, the factors relevant to the grant or denial of a motion for a stay pending appeal provide guidance as to relevant considerations.  In ruling on such an application, a court considers four "well known" factors "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[26]  Read generously, defendant contends that he would be injured irreparably – through completing discovery and conceivably an eventual trial – unless the Court stays the proceedings.  We consider each factor in turn.

First, Mr. Trump has not shown the requisite strong likelihood of success.  His bare assertion that "a dispositive issue remains pending"[27] is not a "strong showing that he is likely to succeed on the merits."[28]  The question that has been certified to the D.C. Court of Appeals obviously could go either way, either in that forum or elsewhere.  Indeed, the fact that the District of Columbia law on scope of employment was unclear to the Circuit is the precise reason that two members of the Circuit concluded that they could not predict how it would be resolved and therefore would not itself decide the entire appeal.  And Mr. Trump has offered no reason for this Court to

---

25

*Landis v. North Am. Corp.,* 299 U.S. 248, 254-55 (1936).

26

*In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987)).

27

Dkt. 94, at 4.

28

*In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d at 170.

12

conclude that the D.C. Court of Appeals or the Second Circuit will rule in his favor on scope of

employment. Indeed, as Mr. Trump is aware from my prior decision, my view is that he did not act

within the scope of his employment within the meaning of the law of the District of Columbia.

The bulk of Mr. Trump's arguments that are relevant to the stay question go to the

second relevant factor, whether he would suffer irreparable injury if a stay were denied. He

contends that the Westfall Act protection extended to many government employees sued for actions

within the scope of their employment is intended to protect covered employees from both liability

and the burdens of defending lawsuits, including those associated with pretrial discovery and trial.[29]

That of course is true. But it begs the question.

Westfall Act protection requires both that the individual in question have been an

"employee" of the government, an issue on which Mr. Trump thus far as prevailed, and also that he

have acted within the scope of his employment. The latter issue remains unresolved. If it were

resolved in his favor, any proceedings from now until such a determination, those proceedings –

subject to the important comments made below – might prove to have been unnecessary. But any

threat of "injury" as a result of further proceedings depends entirely on whether Mr. Trump prevails

on the scope of employment issue, which at this juncture cannot be said to be likely. So the threat

of any injury is quite uncertain. And that uncertainty is magnified by view of other circumstances.

As an initial matter, discovery in this case has virtually concluded. Mr. Trump has

conducted extensive discovery of the plaintiff, yet produced virtually none himself. The principal

open items, as the Court understands it, are the depositions of Ms. Carroll and Mr. Trump, scheduled

---

[29]

    Dkt. 92, at 2 (collecting cases).

13

for October 14 and 19, respectively.  Completing those depositions – which already have been delayed for years – would impose no undue burden on Mr. Trump, let alone any irreparable injury.

In any case, even Mr. Trump's contention that denial of a stay irreparably would injure what he characterizes as his immunity from suit – an "immunity" that would apply only if he prevails on the scope of employment – does not remedy the failure to show a meaningful threat of irreparable injury.

In *In re World Trade Center Disaster Site Litigation*, the Second Circuit held that the prospect that "any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit" was to be balanced against the other factors under consideration.[30]  And, in that case, the Court of Appeals vacated the stay of proceedings in the district court pending appeal in light of its conclusions on the other factors and their relevant weights.[31]

Given his conduct so far in this case, Mr. Trump's position regarding the burdens of discovery is inexcusable.  On December 10, 2020, he moved for a stay pending appeal.[32]  His arguments then in support of that motion were almost identical to those advanced here.  This Court denied the motion on September 15, 2021.[33]  And since that motion was denied, he has taken discovery against plaintiff when the circumstances were not materially different.

---

[30]

    *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170.

[31]

    *Id.* at 171.

[32]

    Letter Mtn. for Stay [Dkt. 47].

[33]

    Text Order [Dkt. 56] (denying without prejudice defendant's motion for stay).

14

Third, a stay would cause substantial injury to plaintiff.  As the Court noted in an earlier opinion in this case, "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him."[34]  Delay is a more serious concern in this case than usual for several reasons.  First, the appeal from my order denying substitution already has consumed 20 months from the day it was noticed and it is not over yet.  The remaining question has been certified to the D.C. Court of Appeals, a process that reasonably may be expected to be lengthy.  Perhaps most significant, both plaintiff and defendant – and perhaps other witnesses – already are of advanced age.  The defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.

Finally, as noted at the outset, plaintiff claims that the defendant raped her years ago. As the statute of limitations had long since expired when she brought this action, the claim she asserts here is that which still was timely when this case was filed – a claim for defamation that allegedly occurred in the context of Mr. Trump's far more recent denial that he raped the plaintiff. That was the only remaining timely claim.  But the world has changed since this case began.

New York has enacted a revival statute, the Adult Survivors Act.  Effective November 24, 2022, a claim for damages for the alleged rape will be revived, free of the existing bar of the statute of limitations.  And plaintiff intends to sue Mr. Trump for the alleged rape itself.

---

[34]     *Carroll v. Trump*, 2022 WL 748128, at *10.

15

The question whether Mr. Trump in fact raped Ms. Carroll is central to this case.[35] But it will be central also to the new case that almost certainly will be filed on November 24, 2022 or soon thereafter. Accordingly, discovery and evidence relating to whether or not the alleged rape occurred is relevant to both cases. Mr. Trump has pointed to no discovery or other proceedings that would occur in this case absent a stay that would not be relevant also to the imminent new case.

Mr. Trump argues that the Court should not consider the imminent new case in its analysis because plaintiff "has no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."[36] But the argument, in this context, is both incorrect and beside the point. It is incorrect because calling the imminent new case a "new claim" blinks reality. The question whether Mr. Trump raped Ms. Carroll is the paramount issue in both cases. And it is beside the point because discovery here would not "develop" evidence for a "new claim," even if the anticipated suit for damages for the alleged rape properly were so characterized, because the discovery that would occur here would go directly to the claim in *this* case. Staying discovery in this case on the ground that it might be of use in a future litigation would make no sense.

---

[35] *Carroll*, 498 F. Supp. 3d at 426.

[36] Dkt 94, at 4.

16

For all of the foregoing reasons, Mr. Trump has not established that he has a strong

likelihood of success.  In any event, the balance of the equities tips decidedly against him.

*Conclusion*

The defendant's letter motion [Dkt. 92] is denied.

SO ORDERED.

Dated: October 12, 2022

_____
Lewis A. Kaplan
United States District Judge



<div align="right">
Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT
</div>

<div align="right">November 21, 2022</div>

**VIA ECF**
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

   Re: *E. Jean Carroll v. Donald J. Trump*
     *20 Civ. 07311 (LAK) (JLC)*

Dear Judge Kaplan:

   We write on behalf of the defendant, Donald J. Trump ("Defendant"), in response to the letter filed by the plaintiff, E. Jean Carroll ("Plaintiff") on November 17, 2022 (the "Letter") (ECF No. 98) with respect to the upcoming status conference scheduled to be held on November 22, 2022. While we appreciate Plaintiff's counsel's efforts to adjourn the trial date (and all related deadlines) to a later date in light of the expedited schedule set forth by the D.C. Court of Appeals, the proposal they offer constitutes a material departure from that which was originally agreed upon by the parties.

   By way of background, on November 10, 2022, this office advised Plaintiff's counsel that, pursuant to FRAP 8(a)(2), Defendant would move before the Second Circuit for an emergency stay of proceedings pending appeal. In response, Plaintiff's counsel reached out to this office and requested a call to discuss the application and determine whether the matter could be resolved between the parties. Later that day, the parties had a call, wherein it was mutually agreed that a temporary delay of proceedings was appropriate pending a decision before the D.C. Court of Appeals. While Defendant had initially asked for a stay, Plaintiff stated that an adjournment would be preferable. Plaintiff's counsel's reasoning at the time was that she preferred an adjournment over a stay because it would forgo the additional, tedious filings needed to lift a stay. Accordingly, the parties agreed that all relevant deadlines in this action would be adjourned in one of two ways: (1) for the duration of time that the D.C. Court of Appeals' decision remains pending, to be reinstated upon the issuance of a decision; or (2) for a period of two-to-three months, which would be revisited if the D.C. Court of Appeals did not render a decision during that time. Importantly, Plaintiff's contemplated second action (the "Second Action")[1], which has yet to be filed, *was never mentioned on the call*.

   Rather than stipulate to a proposed schedule, Plaintiff's counsel proposed that the parties request a conference before Your Honor. Plaintiff's counsel represented that a conference was

---

[1] Plaintiff has previously stated that she intends to file a second action against Defendant under the Adult Survivor's Act.

<div align="center">1430 U.S. Highway 206, Suite 240, Bedminster, NJ 07921 • Tel. 908.869.1188</div>

necessary so that the parties could request that Your Honor approve the above-stated terms. Again, no mention was made of the Second Action or any dates relating to the Second Action. Given Plaintiff's counsel's representations, Defendant agreed, and the parties subsequently corresponded with the Court requesting the conference. Defendant also refrained from filing the emergency application to the Second Circuit.

Thereafter, on November 17, 2022, Plaintiff's counsel sent a proposed schedule to this office which, for the first time, proposed consolidating the instant matter with the Second Action. This office rejected that proposal, as it was never discussed, contemplated, or agreed to by Defendant, and instead proffered the following proposed dates which relate only to the within action:

| Deadline | Current Date | Proposed Date |
|---|---|---|
| Joint Pretrial Order and Any Summary Judgment Motions in Current Action | Dec. 1, 2022 | Mar. 2, 2023 |
| Motions in Limine in Current Action | Dec. 8, 2022 | Mar. 9, 2023 |
| Exchange of Pre-marked Trial Exhibits in Current Action | Dec. 8, 2022 | Mar. 9, 2023 |
| Oppositions to Motions in Limine in Current Action | Dec. 15, 2022 | Mar. 16, 2023 |
| Trial | Feb. 6, 2023 | May 8, 2023 |

Instead of responding to Defendant, Plaintiff's counsel proceeded to file the Letter and request this Court to ratify Plaintiff's proposed scheduling order, which was entirely inconsistent with the parties' agreement and had been expressly rejected by Defendant.

Plaintiff's proposal to join the two cases into one consolidated action with an expedited schedule is entirely inappropriate and wholly premature, especially here, given that the Second Action has not yet been filed, let alone served upon Defendant. Further, it is respectfully submitted that such action by the Plaintiff was made in bad faith, and clearly to expedite an action that has not been commenced.

Therefore, we respectfully ask that Your Honor instead accept Defendant's above proposal, which is far more appropriate given the procedural posture of this matter.

We thank the Court for its attention to this matter and await its guidance.

Respectfully submitted,

Alina Habba, Esq.
For HABBA MADAIO & ASSOCIATES LLP

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC<br><br><br>**NOTICE OF MOTION FOR**<br>**SUMMARY JUDGMENT** |

**PLEASE TAKE NOTICE** that, upon the accompanying: 1) Memorandum of Law in Support of Defendant's Motion for Summary Judgment; 2) Declaration of Alina Habba, and the exhibits attached thereto; Defendant's Rule 56.1 Statement of Material Facts; and upon all prior proceedings, pleadings, and filings in this Action, Defendant, Donald J. Trump, will move this Court at the Daniel Patrick Moynihan United States Courthouse, Courtroom 15C, 500 Pearl Street, New York, New York, on such date and at such time as the Court may direct, for an Order granting Defendant summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for such other relief that the Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the schedule contained in the Court's November 30, 2022 Order, Plaintiff shall file her opposition by January 12, 2023; and Defendant shall file his reply by January 19, 2023.

Dated: December 22, 2022                    Respectfully submitted,

_____
Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff,* | |
| v. | **DECLARATION OF ALINA HABBA, ESQ. IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump (the "Defendant") in the above-captioned matter (the "Action").

2.    I submit this declaration pursuant to Federal Rule of Civil Procedure 56 in support of Defendant's Motion for Summary Judgment.  The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.    As counsel for Defendant, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

4.    Attached hereto as **Exhibit A** is a true and accurate copy of the Complaint filed on November 4, 2019.

5.      Attached hereto as **Exhibit B** is a true and accurate copy of the relevant portions of Plaintiff's deposition which took place on October 14, 2022.

6.      Attached hereto as **Exhibit C** is a true and accurate copy of the Expert Report of Professor Ashlee Humphreys, PhD, dated October 14, 2022.

7.      Attached hereto as **Exhibit D** is a true and accurate copy of a New York Times Article entitled: "*What Happened Between E. Jean Carroll and Elle Magazine?*" dated February 21, 2020.

8.      Attached hereto as **Exhibit E** is a true and accurate copy of the Brief for Appellee filed by Plaintiff on December 1, 2022 in the matter of *Donald J. Trump, et. al., v. E. Jean Carroll*, District of Columbia Court of Appeals, No. 22-SP-0745.

Dated: December 22, 2022                   Respectfully submitted,

_____
Alina Habba, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

2

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 20                                        RECEIVED NYSCEF: 01/04/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------

E. JEAN CARROLL,

                             *Plaintiff*,

    -against-

DONALD J. TRUMP, in his personal capacity,

                             *Defendant*.

------------------------------------------------

Index No. _____

**COMPLAINT AND
JURY DEMAND**

Plaintiff E. Jean Carroll ("Plaintiff" or "Carroll"), by and through her attorneys at Kaplan Hecker & Fink LLP, alleges as follows:

## INTRODUCTION

1.      Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual assault behind a wall of defamatory falsehoods and deflections. The rape of a woman is a violent crime; compounding that crime with acts of malicious libel is abhorrent. Yet that is what Defendant Donald J. Trump did to Plaintiff E. Jean Carroll.

2.      Roughly 23 years ago, playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her.

3.      In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

4.      Carroll chose silence—and remained silent for over two decades.

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 20    Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 5 of 246    RECEIVED NYSCEF: 01/04/2020

5.     Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved.

6.     Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but grew *more* popular with some supporters as a result of the controversy.

7.     Carroll's mother, a respected Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.     But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.     For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think clearly, and to seek justice. When readers overcome with the doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own

2

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM

NYSCEF DOC. NO. 20

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 6 of 246

experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10.     Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's rape in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11.     When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the rape. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of rape. For good measure, he insulted her physical appearance.

12.     Each of these statements was false. Each of them was defamatory.

13.     Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM        INDEX NO. 160694/2019
NYSCEF DOC. NO. 20        RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 7 of 246

14.    These lies were familiar to Trump. He had used them before, when other women

stated that he had grabbed, groped, or raped them.

15.    Trump's defamatory statements injured Carroll. They inflicted emotional pain and

suffering, they damaged her reputation, and they caused substantial professional harm.

16.    Carroll filed this lawsuit to obtain redress for those injuries and to demonstrate that

even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

17.    Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night

Live, and advice columnist for *Elle* magazine. She is a resident of the State of New York.

18.    Defendant Donald J. Trump is currently the President of the United States, although

he is sued here only in his personal capacity. Since taking office, Trump has filed several lawsuits

in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump

et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald J. Trump for President,

Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means

of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v.

Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136

(D.D.C.). Trump is also defending a related case pending in this Court. *See Zervos v. Trump*, No.

150522/2017 (N.Y. Sup. Ct., N.Y. Cty.). Trump is a resident of the State of New York.

## JURY DEMAND

19.    Plaintiff E. Jean Carroll hereby demands a trial by jury.

## JURISDICTION & VENUE

20.    This Court has jurisdiction pursuant to NY CPLR § 301.

21.    Venue is proper in this county pursuant to NY CPLR § 503 and § 509.

4

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM    INDEX NO. 160694/2019

NYSCEF DOC. NO. 20    Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 8 of 246    RECEIVED NYSCEF: 01/04/2020

## FACTUAL ALLEGATIONS

### I.    TRUMP RAPES CARROLL AT BERGDORF GOODMAN

22.    One evening between the fall of 1995 and the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

23.    That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

24.    Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched *Today* show.

25.    Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

26.    Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

27.    Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM

NYSCEF DOC. NO. 20

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 9 of 246

28.     As Trump cuddled the fur hat, Carroll asked how old "the girl" was. Trump did not answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years old, he taunted her, "You're so *old*!"

29.     Trump then had an idea: He would buy lingerie instead.

30.     Trump and Carroll rode up the escalator to the lingerie department. When they arrived, it was uncharacteristically empty, with no sales attendant in sight. Sitting on the counter near them were two or three boxes and a see-through bodysuit in lilac gray.

31.     Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit.

32.     Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

33.     Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself that she would make him put the bodysuit on over his pants.

34.     Strangely for Bergdorf's, the dressing room door was open and unlocked.

35.     Trump closed the door of the dressing room.

36.     Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips.

37.     Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter. She could hardly process the insanity of the situation. She also hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

38.     But Trump did not stop. He seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

6

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:28 PM
NYSCEF DOC. NO. 20
INDEX NO. 160694/2019
RECEIVED NYSCEF: 01/04/2020

39.     Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

40.     Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

41.     Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

42.     The whole attack lasted two to three minutes.

## II.    CARROLL CONFIDES IN TWO FRIENDS ABOUT THE RAPE

43.     As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

44.     Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

45.     "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a rape victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

46.     Carroll drove home and crawled straight into bed.

47.     Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM

NYSCEF DOC. NO. 20

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 11 of 246

rape. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

48.     Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

49.     Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

50.     Carroll was also afraid of being dragged through the mud if she reported the rape. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had raped her because she had entered that Bergdorf dressing room.

51.     Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

52.     Carroll thus chose silence.

53.     Carroll did not mention the rape again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

54.     Carroll has not had sex with anyone since that day when Trump raped her.

**A115**

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:28 PM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 20
RECEIVED NYSCEF: 01/03/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 12 of 246

### III.    CARROLL REMAINS SILENT FOR TWENTY YEARS

55.    For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

56.    Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

57.    One reader, for example, despaired in 1994, "My boss is always rubbing up against me . . . . He scares me because he's very powerful and could ruin me." Carroll responded: "Darling, if the old snake has done so much to help your career, why are you still an assistant? Sex harassers are filthy yellow sneaking cowards and must be won over, or crushed . . . . If all else fails, next time the old waterhead touches you, give him a knee in the groin. You've got nowhere to go but up."[2]

58.    Another reader had been raped when thirteen years old and sought advice from Carroll because her rapist had just been hired as a co-worker. Carroll responded: "[T]he gentleness of your [letter] speaks strongly for your forgiving nature; however, it makes my duty *very* difficult. Because now I must harden your soul. I must twist a little bit of steel—I'd try a big block of metal

_____

[2] *Reprinted in* E. JEAN CARROLL, A DOG IN HEAT IS A HOT DOG AND OTHER RULES TO LIVE BY 28-29 (1996).

9

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:28 PM
NYSCEF DOC. NO. 20
Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 13 of 246
INDEX NO. 160694/2019
RECEIVED NYSCEF: 01/04/2020

if I could—around your backbone, and persuade you to report your friend to the police."[3] Carroll added:

> "First, call your rape crisis center and speak with a counselor. Second, join a group of rape survivors—with their hardy support, you'll start constructing a world for *yourself* and leave the world the rapist built for you. And, third, find another job at once. (Do *not* tell your employer about the rape. Do *not* inform the rapist of these steps. Stay cool. He's dangerous.)"[4]

59.    In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

60.    But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

61.    During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearance.

62.    And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had raped her.  But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a

---

[3] *Id.* at 141-42.

[4] *Id.* at 142.

10

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM

NYSCEF DOC. NO. 20

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 14 of 246

media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

63.      Indeed, Carroll worried that she might make Trump *more* popular in states like Indiana by revealing the rape, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

64.      Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

65.      Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

IV.      **CARROLL DECIDES TO SPEAK OUT**

66.      On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women

11

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 20    Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 15 of 246    RECEIVED NYSCEF: 01/03/2020

in the film industry.[5] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

67.    Days later, several women accused Weinstein of rape.[6] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

68.    As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

69.    Carroll was moved by this experience. The walls that she had erected in her mind— the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being raped—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

70.    Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

---

[5] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

[6] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

12

**A119**

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM   INDEX NO. 160694/2019
NYSCEF DOC. NO. 20                                          RECEIVED NYSCEF: 01/03/2020

71.     These observations lead Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

72.     These internal reflections loomed larger in her mind—and became inescapable— as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

73.     Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

74.     While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

75.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who raped her when she was 52. Carroll described that attack in detail.

76.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her

13

inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

77.     In her book, Carroll truthfully described, in meticulous detail, the rape in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely—I'm not certain—inside me."[7]

78.     She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them, never sounded like much fun. Also, I'm a coward."[8]

79.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the rape on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut*, a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

80.     Carroll's book was released by St. Martin's Press on July 2, 2019.

---

[7] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[8] *Id.* at 244.

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM          INDEX NO. 160694/2019

NYSCEF DOC. NO. 20          Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 18 of 246   RECEIVED NYSCEF: 01/03/2020

## V.     TRUMP REPEATEDLY DENIES RAPING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

81.     In three statements—published on June 21, 22, and 24 respectively—Trump responded to Carroll by publicly, falsely, and maliciously smearing her reputation.

82.     On June 21, 2019, Trump issued the following public statement:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

83.     Upon information and belief, Trump's June 21 statement was first given to the press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[9]

---

[9]     *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

15

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM

NYSCEF DOC. NO. 20

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/03/2020

Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 19 of 246

84.     Trump's June 21 statement was subsequently shared online by other journalists and covered by many leading news sources as Trump's statement in response to Carroll.[10]

85.     In the June 21 statement, Trump falsely stated that he did not rape Carroll.

86.     In the June 21 statement, Trump falsely stated that he had never met Carroll.

87.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

---

[10] *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

16

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM
NYSCEF DOC. NO. 20

INDEX NO. 160694/2019
RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 20 of 246

88.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.

89.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.

90.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

91.     On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

17

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM    INDEX NO. 160694/2019

NYSCEF DOC. NO. 20    Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 21 of 246    RECEIVED NYSCEF: 01/03/2020

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[11]

92.    Like his first statement, Trump's June 22 statement regarding Carroll was widely reported in the national press.[12]

93.    In the June 22 statement, Trump falsely stated that he did not rape Carroll.

94.    In the June 22 statement, Trump falsely stated that he had no idea who Carroll was.

95.    In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

96.    In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent the rape accusation against him.

---

[11] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[12] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will": Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

18

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM    INDEX NO. 160694/2019

NYSCEF DOC. NO. 20    Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 22 of 246    RECEIVED NYSCEF: 01/04/2020

97.     Two days later, on June 24, 2019, *The Hill* released an interview in which Trump

made the following statement in response to Carroll: "I'll say it with great respect: Number one,

she's not my type. Number two, it never happened. It never happened, OK?"[13]

98.     Trump's statement in *The Hill* was widely reported by the national press.[14]

99.     This insulting statement was consistent with Trump's response to other accusations

of sexual assault. About one woman who claimed he groped her and tried to put his hand up her

skirt while they were seated next to each other on an airplane, Trump told crowds at a rally,

---

[13] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[14] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type'*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

19

"Believe me. She would not be my first choice. That I can tell you."[15] He reportedly called that same woman "the cunt on the airplane" when he ran into her at a charity gala years after the assault.[16] About a second woman, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look. You take a look. Look at her, [then] look at her words. You tell me what you think. I don't think so. I don't think so."[17] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[18]

100.    In the June 24 statement, Trump falsely stated that he did not rape Carroll.

101.    On June 27, Birnbach and Martin went on the record to corroborate Carroll.[19]

102.    Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh, he kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's go to the police. No. Come to my house. No. I want to go home. I'll take you to the

---

[15] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

[16] BARRY LEVINE & MONIQUE EL-FAIZY, ALL THE PRESIDENT'S WOMEN: DONALD TRUMP AND THE MAKING OF A PREDATOR 72 (2019).

[17] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[18] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, HOLLYWOOD REP. (Oct. 13, 2016).

[19] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. TIMES (June 27, 2019).

20

police. No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[20]

103.     Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you, you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[21]

104.     Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[22]

105.     Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[23]

## VI.    TRUMP'S FALSE STATEMENTS ABOUT CARROLL WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

106.     The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

107.     Trump knew who Carroll was at the time he raped her.

108.     Trump identified Carroll on sight when they met at Bergdorf Goodman.

109.     In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump*, N.Y. Times (June 27, 2019).

21

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM
NYSCEF DOC. NO. 20                                                INDEX NO. 160694/2019
                                                        RECEIVED NYSCEF: 01/03/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 25 of 246

110.    In 1987, Trump and Carroll were photographed at a party together:



111.    Trump has stated that he possesses "one of the great memories of all time."[24]

112.    Trump has also described himself as a "very stable genius."[25]

113.    In June 2019, Trump knew it was false to state that he had never met Carroll.

114.    In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

115.    In June 2019, Trump knew it was false to state that he had never raped Carroll.

116.    Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the rape accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

117.    Moreover, Trump lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he raped her at Bergdorf Goodman. And since all of these statements about Carroll were made to impute motives for lying, when in fact he

---

[24] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

[25] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

22

FILED: NEW YORK COUNTY CLERK 01/03/2020 09:38 PM          INDEX NO. 160694/2019

NYSCEF DOC. NO. 20          Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 26 of 246          RECEIVED NYSCEF: 01/03/2020

knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

118.    Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

119.    Carroll did not reveal Trump's rape for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a rape accusation—was false.

120.    To the contrary, Carroll feared that revealing Trump's rape would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

121.    With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

122.    Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

23

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM
NYSCEF DOC. NO. 20    Case 1:20-cv-07311-LAK    Document 108    Filed 12/22/22    Page 27 of 246

INDEX NO. 160694/2019
RECEIVED NYSCEF: 01/04/2020

123.    In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women

in almost exactly the same manner that he had raped Carroll:

> "I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was looking at, whom he had never met before]. You know, I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. Grab them by the pussy. You can do anything. . . . Oh, [she has] nice legs, huh?"[26]

124.    Based on Carroll's own experiences, Trump's 2005 statement was not "locker room

talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—

and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

125.    Indeed, Trump has openly suggested that sexual assault is inevitable when men and

women interact. In 2013, for instance, he tweeted: "26,000 unreported sexual assults [sic] in the

military . . . . What did these geniuses expect when they put men & women together?"[27]

126.    In addition to Carroll, Trump has been accused publicly by over a dozen women of

forcibly kissing them, groping them above or below the waist, or attempting to rape them—often

upon meeting him for the very first time. Those women include Jill Harth, Jessica Leeds, Cathy

Heller, Temple Taggart McDowell, Karena Virginia, Bridget Sullivan, Tasha Dixon, Mindy

McGillivray, Rachel Crooks, Natasha Stoynoff, Summer Zervos, and Cassandra Searles. Trump

has responded to their accusations in a manner eerily similar to the statements he made about

Carroll in June 2019.

127.    A recently published book by Barry Levine and Monique El-Faizy documents 67

incidents of alleged inappropriate behavior by Trump toward women, including 26 allegations of

unwanted sexual contact. Forty-three of the allegations of inappropriate behavior in the book had

---

[26] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

[27] Daniella Diaz, *Trump Defends Tweet on Military Sexual Assault*, CNN (Sept. 8, 2016).

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM

NYSCEF DOC. NO. 20

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/04/2020

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 28 of 246

not been previously reported.[28] The book traces "Trump's transformation from a kid from Queens to high school 'ladies' man' into a womanizing, model-chasing, porn-star-frequenting philanderer," who "repeatedly and systematically engaged in aggressive sexual pursuit of women over the course of many decades."[29] In one instance, Karen Johnson describes Trump hiding behind a tapestry at his Mar-a-Lago home during a party and, when she walked by to use the restroom, grabbing her by the genitals, pulling her toward him, and kissing her without consent.[30] In another, Kristin Anderson describes Trump putting his hands up her skirt and touching her vagina through her underwear in a Manhattan nightclub. Trump denied that could have happened because he never would have been at a nightclub alone.[31]

128.    Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her, just as he had sexually assaulted many other women over many years.

## VII.    CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

129.    Trump's false and insulting statements about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

130.    Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

131.    Carroll endured stoically when she kept secret the fact that Trump had raped her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since

---

[28] *See* LEVINE & EL-FAIZY, *supra* n.16, at 2.

[29] *Id.* at 2-3.

[30] *Id.* at 80-82, 88, 254.

[31] *Id.* at 250-51.

FILED: NEW YORK COUNTY CLERK 01/04/2020 09:38 PM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 20    Case 1.20-cv-07311-LAK    Document 108    Filed 12/22/22    RECEIVED NYSCEF: 01/04/2020    Page 29 of 246

used that platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

132.    These defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

133.    Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

134.    Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

135.    Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

136.    Carroll filed this lawsuit to obtain redress for those injuries.

## CAUSE OF ACTION: DEFAMATION

137.    Plaintiff Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

138.    Trump published statements to the media on June 21, 22, and 24, 2019.

139.    Each of those statements identified—and was "of or concerning"—Carroll.

140.    Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

141.    Trump's false statements regarding Carroll were defamatory *per se*.

142.    Trump's false and defamatory statements were published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

143.    Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

144.    Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

145.    Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Carroll prays for relief as follows:

a.  Ordering Trump to retract any and all defamatory statements;

b.  Ordering Trump to pay compensatory damages in an amount to be determined at trial;

c.  Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d.  Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Dated:  November 4, 2019

Respectfully submitted,

By:

_____

Roberta A. Kaplan
Matthew J. Craig
Martha E. Fitzgerald
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mcraig@kaplanhecker.com
mfitzgerald@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

28

# EXHIBIT B

Page 1

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5    E. JEAN CARROLL,              )
                Plaintiff,     )
6                               )
            -against-          )20-cv-7311(LAK)
7                               )
     DONALD J. TRUMP, in his   )
8    personal capacity,        )
                Defendant.     )
9    _____   )

10

11

12          ***CONFIDENTIAL***

13       VIDEOTAPED DEPOSITION OF

14           E. JEAN CARROLL

15         New York, New York

16       Friday, October 14, 2022

17

18

19

20   Reported By:

21   CATHI IRISH, RPR, CRR, CLVS

22

23

24

25

Page 186

CARROLL - CONFIDENTIAL

1  communication, we'll just go one by one,
2  with Laurie Abraham?
3
4  A.  Laurie was surprised that they
5  would fire a woman who would accuse a man
6  of rape.
7  Q.  Did she have any knowledge that
8  the reasons they accused you was because
9  of --
10  A.  She had no knowledge.  They had
11  the knowledge of the culture, the women I
12  spoke with, they had the knowledge of the
13  magazine culture and we would keep it on
14  that.  As for the individuals, neither
15  they nor I really, we weren't talking to
16  people who made the decision.  To this
17  day, I don't know who made the decision.
18  MS. HABBA:  Okay.  We can mark
19  this P-7.
20  (Exhibit P-7, document entitled
21  Conversation on:  DF99WWW24RY-
22  dms-ngarcia@hearst.com-08-04-2019.pdf,
23  marked for identification.)
24  BY MS. HABBA:
25  Q.  I'm going to show you a document

Page 187

CARROLL - CONFIDENTIAL

1  that was previously produced by Hearst in
2  connection with this instant litigation.
3  Do you see this correspondence?  This is
4  an internal Hearst communication.
5  A.  Um-hum.
6  Q.  Do you know who Nina Garcia is?
7  MS. KAPLAN:  I just want to get
8  the testimony clear.  You're seeing it
9  in front of you now.
10  THE WITNESS:  Um-hum.
11  MS. KAPLAN:  Did you say anything
12  else?  Did you say -- I don't want
13  to --
14  THE WITNESS:  I see it in front
15  of me.  Who's Kate?
16  BY MS. HABBA:
17  Q.  I was just going to walk you
18  through.
19  Do you see on the top, this was
20  produced by Hearst in production.  They
21  said -- do you see on the top it says
22  it's a conversation?
23  A.  Yes.
24  Q.  There are several letters that
25

Page 188

CARROLL - CONFIDENTIAL

1  are not relevant but DF99WWW24RY-
2  dms-ngarcia@hearst.com.
3
4  A.  Yes.
5  Q.  The date is 8/4/2019?
6  A.  Yes.
7  Q.  Okay.  Do you know who ngarcia at
8  Hearst would be?
9  A.  Who?
10  Q.  I'll state it differently.
11  A.  Oh, Nina Garcia.
12  Q.  Exactly.  Who is Ms. Garcia?
13  A.  Ms. Garcia is a well respected
14  editor in the magazine world.  She is the
15  editor-in-chief of Elle.  She's also one
16  of the stars of Project Runway.
17  Q.  She was the editor-in-chief at
18  Elle at this time?
19  A.  Yes.
20  Q.  Did you have a relationship with
21  Ms. Garcia?
22  A.  No, just an admirer of hers.  I
23  liked her style, I liked her on Project
24  Runway.
25  Q.  According to the contents of this

Page 189

CARROLL - CONFIDENTIAL

1  communication, it states "Hi, Kate, Emma
2  told me you are aware of the E. Jean
3  situation.  Sadly she will not reconsider
4  her exclusive with New York Magazine.
5  I've been talking to Erin Hobday about our
6  situation with HR, and Brandy about our PR
7  strategy.  Both feel prepared to move
8  forward.  I don't feel it sets the right
9  precedent if we keep her.  Let me know
10  your thoughts."
11  A.  Exactly.
12  Q.  Do you know who Erin --
13  MS. KAPLAN:  I think she was
14  going to say exactly.  Anything else?
15  THE WITNESS:  This is a shocking
16  e-mail for me because what precedent
17  are they talking about, does anybody
18  know?
19  BY MS. HABBA:
20  Q.  I'll ask you some more detailed
21  questions.
22  According to the contents of this
23  communication that I just read, it is said
24  that you would not reconsider your

48 (Pages 186 - 189)

Page 190

1     CARROLL - CONFIDENTIAL
2 exclusive with New York Magazine.
3     A.   Right.
4     Q.   Do you know what they are
5 referencing there?
6     A.   Yes, they would have preferred
7 the excerpt to run in Elle but I decided
8 to run it in New York Magazine.
9     Q.   Tell me who originally approached
10 you from Elle Magazine regarding your
11 exclusive with Elle Magazine and your
12 decision to share it with New York
13 Magazine.
14     A.   I told them after the fact.
15     Q.   Why didn't you give your
16 exclusive to Elle Magazine?
17     A.   Because they don't publish
18 anything of this length.  They don't
19 publish articles about women being raped.
20 It's just they are very careful about not
21 upsetting their readers and I don't
22 believe that they would have run anything
23 close to what New York ran.  They would
24 have cut it out very -- they wouldn't want
25 to have their readers upset by concerning

Page 191

1     CARROLL - CONFIDENTIAL
2 their columnist.
3     Q.   Had anybody at Elle Magazine
4 asked you for the exclusive on your story?
5     A.   After they heard I wanted to sell
6 it to New York, yes, they said let us run
7 it.
8     Q.   And how much did you sell it for
9 to New York Magazine?
10     A.   I think 7,000 -- $7,000 I think.
11     Q.   Did Elle Magazine offer you?
12     A.   No.
13     MS. KAPLAN:  Just so that
14     question is clear, you meant offer you
15     money?
16     MS. HABBA:  Yes.
17     THE WITNESS:  They offered me
18     nothing.
19 BY MS. HABBA:
20     Q.   They just wanted the exclusive
21 and you said no?
22     A.   Because I didn't believe they
23 would run a full excerpt.
24     Q.   Who discussed the decision to not
25 allow Elle to distribute the excerpt with

Page 192

1     CARROLL - CONFIDENTIAL
2 you?
3     A.   Well, my agent and I, but it was
4 pretty much a foregone conclusion we would
5 go with New York.
6     Q.   Who from Elle spoke to you or
7 your agent about getting the exclusive?
8     A.   Oh, they -- who from Elle?  Oh,
9 Emma, I call her Emma Woodhouse, Emma
10 Rosenblum called the publisher and said
11 we'd like first rights and the publisher
12 said no, we're giving it to New York
13 Magazine.
14     Q.   Were you part of that decision?
15     A.   I made the decision along with
16 the publisher and my agent.
17     Q.   Even though you worked for Elle
18 Magazine for over two decades?
19     A.   And I was planning to continue to
20 work for Elle.  To me it was a no-brainer.
21 This is a New York man with a New York
22 subject about a book about what women
23 think about men going across the country.
24 It's a New York story, not an Elle story.
25     Q.   Did anybody tell you they were

Page 193

1     CARROLL - CONFIDENTIAL
2 disappointed from Elle that you weren't
3 giving them the exclusive?
4     A.   Yes, in a phone call.
5     Q.   Who did that?
6     A.   Boy, I think it was Emma.  Emma.
7     Q.   When was that, do you recall?
8     A.   Right after they found out that I
9 was giving the excerpt to New York.  The
10 point is they valued me as a writer and
11 they wanted to run the excerpt and this is
12 before they saw the excerpt.  They never
13 saw that.  We never gave them the excerpt.
14     Q.   Did you appear on any media
15 outlets following the release of your
16 book?
17     A.   A few.
18     Q.   Do you know who Anderson Cooper
19 is?
20     A.   Yes.
21     Q.   Did his production team reach out
22 to you to arrange the interview?
23     A.   I believe, yes, his producer, I
24 believe.
25     Q.   Do you recall who that was?

49 (Pages 190 - 193)

Page 230

1           CARROLL - CONFIDENTIAL
2 you bought the dress with?
3     A.  Marcia Pinkstaff, Renata Joy,
4 J-O-Y, Marcia Pinkstaff.
5     Q.  Could you spell that?
6     A.  Marcia, C-I-A, and Pinkstaff,
7 P-I-N-K-S-T-A-F-F.
8     Q.  Do you still communicate with
9 these two friends?
10     A.  Renata, I get her newsletter, and
11 I haven't talked to Marcia for a while.
12     Q.  When is the last time you spoke
13 to Renata?
14     A.  Oh, 10 years maybe.
15     Q.  And Marcia?
16     A.  15, 20.
17     Q.  Do you know where they live?
18     A.  I think they are both in
19 New York.
20     Q.  Last question, do you keep track
21 of how many letters you get from your
22 readers at Elle?
23     A.  I never did until -- until this
24 happened, until the lawsuit happened.
25     Q.  When was that, 2019?

Page 231

1           CARROLL - CONFIDENTIAL
2     A.  Yeah.  Before that, I would
3 delete.  You know, after that I deleted
4 nothing and so --
5     Q.  So now you keep track meaning you
6 keep count or you just keep them?
7     A.  I don't delete anything anymore.
8     Q.  Do you keep count of your letters
9 that you receive?
10     A.  Yes.
11     Q.  And where do you keep count of
12 them?
13     A.  Oh, in Gmail.
14     Q.  In Gmail.  So you don't have a
15 spreadsheet that keeps track?
16     A.  No, no, I can just go through and
17 say January and just count the number of
18 Ask E. Jean letters.
19     MS. HABBA:  All right.
20     MS. KAPLAN:  Let me just correct
21 the record.  The document that we
22 introduced should have been, because I
23 have no idea what side of the case I'm
24 on anymore, it should be Plaintiff's
25 Exhibit 1 and the exhibits you

Page 232

1           CARROLL - CONFIDENTIAL
2 introduced --
3     MS. HABBA:  Is Defendant's per
4 these, yes.
5     MS. KAPLAN:  My bad.
6     MS. HABBA:  She's right, and
7 likewise I'll confuse us on Wednesday,
8 too.  Yes, so we can just make a note.
9 It speaks for itself.  Thank you.
10 We're done.
11     THE VIDEOGRAPHER:  We are off the
12 record at 4:18 p.m. and this concludes
13 today's testimony given by E. Jean
14 Carroll.
15     (Time noted:  4:19 p.m.)
16
17     _____
18           E. JEAN CARROLL
19
20 Subscribed and sworn to before me
21 this _____ day of _____, 2022.
22
23 _____
24     NOTARY PUBLIC
25

Page 233

1           CARROLL - CONFIDENTIAL
2        C E R T I F I C A T E
3 STATE OF NEW YORK   )
4                     : ss.
5 COUNTY OF NASSAU    )
6
7     I, CATHI IRISH, a Registered
8 Professional Reporter, Certified Realtime
9 Reporter, and Notary Public within and for
10 the State of New York, do hereby certify:
11     That E. JEAN CARROLL, the witness
12 whose deposition is hereinbefore set
13 forth, was duly sworn by me and that such
14 deposition is a true record of the
15 testimony given by the witness.
16     I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage, and that I am
19 in no way interested in the outcome of
20 this matter.
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this 17th day of October,
23 2022.
24
25     CATHI IRISH, RPR, CRR, CLVS

59 (Pages 230 - 233)

# EXHIBIT C

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>            *Plaintiff,*<br><br><br>    v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>            *Defendant.* | No. 20 Civ. 7311 (LAK) (JLC) |

**EXPERT REPORT OF PROFESSOR ASHLEE HUMPHREYS, PHD**

October 14, 2022

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

   A. Qualifications ............................................................................................ 1

   B. Assignment .............................................................................................. 2

   C. Summary of Opinions ............................................................................... 3

II.   CASE BACKGROUND ................................................................................ 6

   A. The Parties ............................................................................................... 6

      i.    E. Jean Carroll ................................................................................... 6

      ii.   Donald J. Trump ................................................................................ 6

   B. Allegedly Defamatory Statements ............................................................ 8

III.  THEORETICAL BACKGROUND ............................................................... 11

   A. Reputation and Reputational Damage ..................................................... 11

      i.    Reputational Repair ......................................................................... 12

      ii.   Person Brands and Brand Value ...................................................... 13

   B. Reputational Damage in a Complex Media System ................................. 15

      i.    The Media System ............................................................................ 15

      ii.   Social Media Impressions ................................................................ 17

      iii.  Traditional Media Impressions ........................................................ 21

   C. Assessing Damages for Defamation Online: Adapting Traditional Approaches to the
      Sphere of Social Media ........................................................................... 22

      i.    Rectifying Harm to Reputation Online ............................................. 22

   D. Media Exposure and Counter-Attitudinal Attitude Change........................ 24

IV.   IMPRESSIONS MODEL ............................................................................ 26

   A. Web Impressions...................................................................................... 26

   B. Social Media Impressions ........................................................................ 27

   C. Television Impressions ............................................................................. 31

   D. Print Impressions ..................................................................................... 33

   E. Total Impressions .................................................................................... 34

      i.    Other Impressions Not Calculated into Model .................................. 35

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**V.    IMPACT ASSESSMENT** ................................................................. **40**

　A. Qualitative Impact Assessment............................................... 41

　　i.    Reception to Ms. Carroll's Professional Work ................. 42

　　ii.   Elle's Readership ............................................................ 44

　　iii.  Search Interest................................................................ 46

　　iv.   Engagement Analysis...................................................... 49

　B. Quantitative Impact Assessment............................................. 58

　　i.    Readership Analysis........................................................ 59

**VI.   MODELING THE COSTS FOR REPUTATION REPAIR IN SOCIAL MEDIA.... 64**

　A. Modeling Reputation Repair on Social Media........................... 64

　　i.    Campaign Goals, Platforms, and Measurements ............. 65

　　ii.   Media Mix....................................................................... 66

　　iii.  Attitude Change Multiplier ............................................. 68

　　iv.   Potential Overlap in Impressions .................................... 69

　B. Costs of the Corrective Campaign ........................................... 70

**VII.  CONCLUSION** ............................................................................. **72**

**APPENDIX A.   PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY.............. 74**

**APPENDIX B.   MATERIALS CONSIDERED ................................................ 75**

**APPENDIX C.   GLOSSARY OF TERMS .................................................... 87**

**APPENDIX D.   WEB IMPRESSIONS MODEL .............................................. 90**

**APPENDIX E.   SOCIAL MEDIA IMPRESSIONS MODEL ............................... 100**

**APPENDIX F.   TV IMPRESSIONS MODEL ............................................... 105**

**APPENDIX G.   PRINT IMPRESSIONS MODEL........................................... 115**

**APPENDIX H.   EXAMPLES OF NEGATIVE COMMENTS AND POSTS ABOUT MS CARROLL ............................................................................... 116**

**APPENDIX I.    EXAMPLES OF DIRECT MESSAGES AND EMAILS TO MS. CARROLL ................................................................................ 117**

**APPENDIX J.    IMPACT MODEL ........................................................... 118**

**APPENDIX K.   DAMAGES MODEL ........................................................ 126**

**APPENDIX L.   LIST OF CONSERVATIVE STEPS TAKEN ............................ 133**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## I.  INTRODUCTION

### A.  Qualifications

I am a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management, Northwestern University. I hold a Doctorate in Marketing from the Kellogg School of Management with a concentration in Cultural Sociology and a Bachelor of Arts degree in Economics and Philosophy from Northwestern University.

I have been on the faculty at Northwestern University for 14 years, regularly teaching classes on Social Media, Consumer Research, and Marketing Research. I instruct students on both the strategic and analytical tasks of Marketing, which include assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding.

My current research focuses on social media and online communities. I am the author of *Social Media: Enduring Principles* (Oxford University Press, 2016), a review and synthesis of the empirical social science research on social media. My research on social media includes a project looking at the development of norms and institutions on social media platforms like Wikipedia and YouTube. I also have conducted recent research in the area of online search and search engine optimization, including a project in which I use text analysis to identify consumer goals that, when matched, can optimize advertising spending and increase click-through rates. In this work, I have developed and refined the method of automated text analysis, which I use to analyze textual data—a method I helped introduce to Marketing.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

My broader research agenda concerns the role of institutions in markets. My dissertation research examined how markets are created through shifts in social structure using the case of casino gambling in America. This research ("Megamarketing: The Creation of Markets as a Social Process, *Journal of Marketing*, 2010) was selected as a lead article in the *Journal of Marketing*.

I have received several accolades for my research. I was runner up for the Maynard Award for best paper in Marketing. I have also won the Sidney J. Levy award in 2010 for the contribution of my dissertation research to Consumer Culture Theory. In addition, I was named an MSI Young Scholar in 2012 and have been selected as an MSI Scholar in 2020, one of a select group of 35 Marketing Scholars who are counted "amongst the most prominent marketing scholars in the world," according to Barbara Kahn, MSI's Executive Director.

My full CV and list of matters in which I have testified is attached as Appendix A.

**B. Assignment**

I was engaged by Kaplan Heckler & Fink LLP on behalf of E. Jean Carroll to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statements ("Statements") that were made by Donald Trump on June 21, 22, and 24, 2019, and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of these Statements by estimating the percentage of people who may have been receptive to these Statements and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll in connection with the above-

Expert Report of Professor Humphreys                                                    2

**A146**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

captioned case.[1, 2]

The analysis detailed in this report provides an estimate of the impressions across social and traditional media channels and their reputational impact in order to assess reputational harm based on the information provided to me by Counsel and my independent research. Specifically, it takes into account the multi-channel dissemination of the Statements across social media like Twitter, traditional media like the *New York Times* and CNN, and websites like the *Huffington Post* and the *Washington Examiner*.

My analysis is presented as of October 14, 2022. On October 12, 2022, Mr. Trump made a new statement regarding Ms. Carroll, reiterating many of the defamatory claims against Ms. Carroll.[3] Given the recency of this statement, and that the extent of its dissemination is not yet known, it has not been incorporated into the models used to calculate damages to Ms. Carroll's reputation. I reserve the right to amend or supplement my opinions in consideration of this new information or if other new information becomes available to me.

### C.  Summary of Opinions

After reviewing the data provided in this case, performing independent research and analysis, and based on my own professional background, prior research, education, and more

---

[1]   I was assisted in the preparation of this report by a team of research assistants at Voluble Insights, whom I supervised. Throughout my report, I use the word "I" to refer to work conducted by myself or work Voluble implemented under my direction.

[2]   For the purposes of writing this report, I am being compensated at a rate of $600 per hour, subject to a 15 percent discount. I will be compensated at a rate of $1,000 per hour for deposition testimony, and at a rate of $1,000 per hour for trial testimony, subject to the same 15 percent discount. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in this report or subsequent testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

[3]   https://truthsocial.com/@realDonaldTrump/posts/109158644496040450;
https://truthsocial.com/@realDonaldTrump/posts/109158586745522514.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

than a decade of experience in the field of digital communication and marketing, I conclude the

following with a reasonable degree of certainty:

A. Person brands are well-known people who also possess a set of brand meanings and associations that have value. Person brands are formed through exposure in a media system. They have social and cultural capital and can become devalued when an unpredictable event occurs, or if a negative claim is made about the person. A person brand that has a general popular following can be especially harmed by negative claims, even if only a subset of the public believes the claims. Their reputation relies on a "generalized perception" among the public, and public opinions and individual beliefs can shift when people take cues from their surroundings, including what they learn in the media. The damage to a person brand can be severe and lasting, no matter if the person at issue is at fault or whether their primary followers believe the claims.

B. Once a popular advice columnist at *Elle* Magazine, Ms. Carroll had invested many years in forming and maintaining a person brand as a wise, personable, and insightful truth-seeker. As a celebrated writer, she had a broad readership, reaching about 4.5 million *Elle* readers.

C. Mr. Trump made the at-issue Statements on June 21, 22, and 24, 2019, about Ms. Carroll in response to her allegation that Mr. Trump had sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City. These Statements made by Mr. Trump, an extraordinarily high-profile person, have received wide and sustained dissemination and media coverage.

D. A measure of the dissemination of the Statements is possible using an information cascade model to estimate impressions on social media and with ratings, circulation, and web traffic data to estimate impressions on traditional media. I have identified between **142,334,424 and 188,155,507 impressions** generated by Mr. Trump's Statements ("Impressions Model"). This very high number of impressions reflects the prominence of Mr. Trump, but nonetheless is a conservative estimate for the reasons I detail in the description of the Impressions Model.

E. The impressions Mr. Trump's Statements generated across online and traditional media impacted Ms. Carroll's person brand. It is possible to quantify some, but not all, of the negative impact. Through a qualitative analysis of media coverage, search trends, and comments about Ms. Carroll, it is clear that there was a significant shift in the nature of Ms. Carroll's person brand. Associations with her shifted from her role as an advice columnist to her association with Mr. Trump. A high volume of negative and vicious messages has continued to be posted up to the present, indicating that her person brand has been, and continues to be harmed.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

F.  In an attempt to quantify at least a portion of the impact these Statements had on Ms. Carroll's brand, I applied academic research and industry estimates related to audience composition to estimate that, of the impressions collected, an average of 25.45% of the impression recipients were likely receptive to Mr. Trump's message, resulting in an estimated range of **34,075,512 to 42,936,354 receptive impressions** that should be corrected (*i.e.,* impressions that may have been received by those who likely found those Statements credible; "Impact Model").

G.  The utterance and circulation of Mr. Trump's Statements caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims. Ms. Carroll's reputational value has been diminished due to the Statements. This kind of reputational harm has long-lasting effect on her ability to capitalize on her person brand in the future because Ms. Carroll has lost control of her brand, which she worked for decades to develop.

H.  A holistic, integrated campaign is needed to effectively create attitudinal change and in turn repair reputational damage. In such a campaign, the corrective message would need to come from a trusted source and would need to ensure that the audience is exposed to the message multiple times. For example, one such solution to reputation repair is to enlist the help of multiple online intermediaries and sources that consumers trust. The campaign would need to take into account where the target audience gets their news. Using my estimates for the quantifiable impact of Mr. Trump's Statements (*i.e.*, the **34,075,512 to 42,936,354** receptive impressions that should be corrected) and research related to exposures required and media considerations costs, I estimate that the cost to counteract the impact of the defamatory claims is between **$3,333,058.72 and $20,998,861.18** ("Damages Model"). Given the above-stated needs of the campaign, I believe the minimum appropriate corrective campaign to run would be the middle range, from $9,999,176.17 to $12,599,316.71.

I.  My estimates of the impressions generated by the Statements, the quantification of the receptive impressions, and the costs of the corrective campaign are all conservative. Among other things, I consider only a subset of the impressions generated by Mr. Trump's Statements and do not attempt quantify the significant impact of Mr. Trump's status as then-President. Therefore, I undercount the receptive impressions and the costs needed to correct the receptive impressions.

The materials I considered are noted in this report, provided as appendices or native files,

and/or listed in Appendix B. A glossary of technical terms used throughout my report can be

found in Appendix C.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## II. CASE BACKGROUND

### A. The Parties

#### i.    E. Jean Carroll

Elizabeth Jean (E. Jean) Carroll is a journalist, author, former writer for *Saturday Night Live*, and former advice columnist for *Elle* Magazine.[4]  Ms. Carroll wrote for *Saturday Night Live* in the 1980s and hosted her own show called *Ask E. Jean* on MSNBC's predecessor, America's Talking, from 1994 to 1996.[5]  Her work was featured in numerous major publications including *Rolling Stone*, *GQ*, and *Playboy*. Ms. Carroll's column for *Elle* Magazine, "Ask E. Jean," was at the time it was published, the longest running advice column in the United States.[6]

Ms. Carroll is also the author of numerous books including *Female Difficulties: Sorority Sisters*, *Rodeo Queens*, *Frigid Women*, *Smut Stars*, *and Other Modern Girls*, *Hunter: The Strange and Savage Life of Hunter S. Thompson*, *A Dog in Heat Is a Hot Dog and Other Rules to Live By*, *Mr. Right, Right Now*, and *What Do We Need Men For?: A Modest Proposal*.[7]

#### ii.    Donald J. Trump

Donald John Trump is an American businessman, media personality, and politician who served as the 45th president of the United States from 2017 to 2021.[8] He was a real estate developer who owned and/or had his name on numerous hotels, casinos, golf courses, and other buildings in New York and around the world.[9] In 2004, Mr. Trump starred in "The Apprentice"

---

[4]     https://www.elle.com/author/4913/e-jean/
[5]     https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/
[6]     https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM
[7]     https://www.goodreads.com/author/show/30738.E_Jean_Carroll
[8]     https://www.britannica.com/biography/Donald-Trump
[9]     https://www.britannica.com/biography/Donald-Trump

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(later known as "The Celebrity Apprentice"), a reality television competition series where he judged aspiring business people based on his business experience.[10] He hosted for 14 seasons until 2015.[11]

In July 2016, Mr. Trump was nominated as the Republican presidential candidate and ultimately won the 2016 U.S. presidential election.[12] Throughout his time as president, Mr. Trump enjoyed significant support from Republican voters, with an average of 87% of Republicans saying they approved his handling of the job from 2017 through 2020.[13] After serving one term as president, Mr. Trump lost his bid for re-election and officially left the White House in January 2021.[14]

Since leaving office, there have been a number of investigations into Mr. Trump, his business dealings, and his handling of classified information.[15] Despite these investigations, polls show that support for Mr. Trump has remained consistent. Polls tracked by FiveThirtyEight show that Mr. Trumps maintained a favorability rating of around 40% from February 2021 through October 2022.[16] Favorability among Republican voters is even higher. A September 2022 New York Times-Siena College poll found that 90% of Republican respondents had either a very favorable or somewhat favorable impression of Mr. Trump.[17] Further, the same poll found

---

[10]  https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
[11]  https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
[12]  https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
[13]  https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/
[14]  https://time.com/5907973/donald-trump-loses-2020-election/;
      https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
[15]  https://time.com/6212677/donald-trump-investigations-explained/
[16]  https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
[17]  https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html

**A151**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that 91% of Republican respondents indicated they would vote for Mr. Trump, assuming he were the Republican nominee and President Biden were the Democratic nominee in the 2024 election.[18] In an August 2022 Ipsos poll, 59% of Republicans indicated that Mr. Trump should be the Republican party nominee for the 2024 election.[19]

### B.  Allegedly Defamatory Statements

Mr. Trump made a series of three Statements in which he made allegedly defamatory claims about Ms. Carroll.[20] These Statements were made in response to the allegation by Ms. Carroll in an excerpt from her forthcoming book that Mr. Trump sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City.[21]

The first of the three Statements was released by Mr. Trump on June 21, 2019:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident,

---

[18]   https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html

[19]   https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader

[20]   Throughout this report, when I use the phrase "defamatory statements," I mean "allegedly defamatory statements" and am basing my opinion on the assumption that these statements are defamatory.

[21]   https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[22]

The second Statement was made to reporters at the White House on June 22:

[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But

---

[22]   Complaint, ¶82

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.[23]

The final Statement was published in an interview with *The Hill* on June 24, 2019: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[24]

I understand that these three Statements contained several allegedly defamatory claims about Ms. Carroll, including: (1) that Mr. Trump did not rape Ms. Carroll, (2) that he had never met Ms. Carroll, (3) that he had no idea who Ms. Carroll was, (4) that she had made up the allegation to increase the sales of her book, (5) that she made up the allegation to carry out a political agenda, (6) that she made up the allegation as part of a conspiracy against him by the Democratic Party, (7) that she had falsely accused other men of sexual assault, and (8) that she had been paid money to invent the rape accusation against him.[25]

As discussed below, these three Statements received widespread circulation across print,

---

[23]   Complaint, ¶¶ 91
[24]   Complaint, ¶97
[25]   Complaint, ¶¶81-100

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

web, social, and traditional media outlets and directly impacted Ms. Carroll's brand.

### III. THEORETICAL BACKGROUND

#### A. Reputation and Reputational Damage

Reputation is fundamentally a social concept; one's reputation is determined by the social esteem held among a bounded group of people, up to and including the public sphere at large.[26] It has value in the sense that it gives someone social standing and respect in society. Reputation has been conceptualized as property—something that has economic value—and as dignity—something that has moral value.[27]

Reputation is determined in the sphere of generalized public opinion, which encompasses individual beliefs but is more than the sum of them, a "generalized perception."[28] What people think their friends, family, coworkers, and other members of their community think is an important determinate of an individual's belief, particularly if one does not have strong opinions about an issue or person. Over time, the beliefs of a subset of society, including what is represented in the media, can shift in public opinion and generalized associations as people take cues from those around them who believe differently.[29] If someone is receptive to a claim—if it is congruent with their other beliefs and/or if the claim comes from a source they trust—they

---

[26]   Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press.

[27]   Ardia, David S. (2010) "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," *Harvard Civil Rights-Civil Liberties Law Review*, 45(2), 261-328, p. 261.

[28]   Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press. Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." *Political Studies* 55, no. 1: 20-37.

[29]   Dewenter, Ralf, Melissa Linder, and Tobias Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," *European Journal of Political Economy*, 58, 245-61. Huang, J., *et al.* (2021). "Large-scale quantitative evidence of media impact on public opinion toward China," *Humanities and Social Sciences Communications,* 8(1), 1-8.

Expert Report of Professor Humphreys                    11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

may only need to be exposed to it once to form a belief.[30] If they are less receptive to the claim,

mere exposure, again from a trusted source, can eventually change attitudes through repetition.[31]

An individual's receptivity to a claim is based on the process through which people process new

information, form beliefs, and integrate beliefs with prior knowledge.[32] According to the balance

theory of attitudes,[33] when people do not have a belief about a person, it is relatively easy to

create a belief, particularly when it is congruent with their other beliefs.[34] However, once people

have a belief, it is harder to change that belief and requires multiple exposures, often from

several different, trusted sources.[35]

### i.   Reputational Repair

Reputational repair is a matter of public good and must occur in relation to the public

sphere and the sphere in which it was originally damaged. To quantify the damage to one's

reputation, one must look to the *cost to repair* rather than the *cost to inflict* reputational harm. I

---

[30]   Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21(1), 107-12, Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," *Social Networks*, 25 (1), 17-49.

[31]   Cialdini, Robert B (1987), *Influence*, Vol. 3: A. Michel Port Harcourt, Sterrett, David, Dan Malato, Jennifer Benz, Liz Kantor, Trevor Tompson, Tom Rosenstiel, Jeff Sonderman, and Kevin Loker (2019), "Who Shared It?: Deciding What News to Trust on Social Media," *Digital Journalism*, 7 (6), 783-801.

[32]   Ajzen, I. (1985). From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11-39).; Heider (1946); Cacioppo, J. T. and R. E. Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," *Current Issues and Research in Advertising*, 3 (1), 97-122.

[33]   Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21 (1), 107-12.

[34]   Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.; Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, *Journal of Information Technology & Politics*, 11:368–382; Festinger, L. (1962), "Cognitive dissonance." *Scientific American* 207(4): 93-106.; Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.

[35]   Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.; Housholder and LaMarre (2014); Weiss, Robert Frank (1969), "Repetition of Persuasion," *Psychological Reports*, 25 (2), 669-70.

---

**A156**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

therefore provide three models: a model that estimates the impressions that initially created the reputational beliefs, a model to estimate the percentage of readers or viewers who were receptive to those claims, and a model of damages that estimates the cost to repair reputational damage.

### ii.    Person Brands and Brand Value

Human, or person, brands are "well-known persona[e] who [are] the subject of marketing communications efforts," and have been shown to enhance consumers' feelings of autonomy and relatedness to the brand and others.[36] Starting from attachment theory, scholars have researched the ways in which consumers and audiences form attachments to people—who themselves become brands—through exposure in a media system.[37] Human brands are both biographical people and brands—constellations of meaning—and these two elements form interdependences as the actions of biographical people can affect their brand value.[38] Brand value is the aggregate of associations with a brand.[39] If those associations change, brand value can be diminished.

Person brands can become devalued when unpredictable or unforeseen events occur to them.[40] Fournier and Eckhardt (2019), for example, find that mortality, hubris, unpredictability, and social embeddedness underlie the value of human brands and have the potential to build or

---

[36]    Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. *Journal of Marketing*, 70(3), 104–119, p. 104.

[37]    Dyer (1979) Heavenly Bodies: Film Stars and Society; Thomson (2006); Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87; Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.

[38]    Fournier and Eckhardt (2019).

[39]    Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.

[40]    Dyer (1979) *Heavenly Bodies: Film Stars and Society*; Gamson (1994) *Claims to Fame: Celebrity in Contemporary America.*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

diminish brand value. As Fournier and Eckhardt say, "the meaning and daily manifestations of person-brands are inherently socially embedded in a web of relationships that the person-brand cannot control, escape, or ignore."[41] That is, if an unpredictable event or claim is made about the person, it affects their brand because of their embeddedness within a social system.[42] The damage to a person brand can be severe and lasting. This damage can persist, *even when* they are not at fault.[43] It can persist *even when* their primary fans or followers do not believe the claims.[44] Loss of value for a person brand, particularly a person brand that has a general popular following, can be harmed even if only a subset of the public believes the negative claims. Person brands have social and cultural capital.[45] This capital can become harmed, thereby affecting their overall brand value to a popular audience.

Although it may be difficult to repair reputational damage on social media, it is possible, actionable, and important to the restoration of reputation. As Ardia (2010) notes:

> Although the global communication networks that are the hallmarks of our networked society have brought new reputational challenges, they also provide novel solutions to prevent and ameliorate those harms. One such solution is to enlist, through legal and social incentives, the help of private online intermediaries such as content hosts and search providers. These intermediaries play a central role in community governance and are often in a position to

---

[41]    Fournier and Eckhardt (2019) p. 611.
[42]    Fournier and Eckhardt (2019).
[43]    David, John (2016), *How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business*: Red Wheel/Weiser.
[44]    Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," *Journal of consumer research*, 36 (6), 1016-32.
[45]    Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," *Journal of Advertising*, 50 (5), 528-47, Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," *Journal of the Academy of Marketing Science*, 41 (3), 373-87.

Expert Report of Professor Humphreys                    14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

recognize and respond to reputational harms.[46]

The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media.[47] Given the fracture of media audiences in the last 10 years, new forms of media are required to reach what was formerly a relatively unified "public" of news readers and TV viewers. Accordingly, an attempt to repair reputational harm must now account for new channels of communication and for the importance of sources in the communication process.

### B.  Reputational Damage in a Complex Media System

Assessing reputational damage is complex when the public sphere is fragmented by aspects of digital technology such as filter bubbles, political polarization, ranking algorithms, reputational cues, such as followers, and the proliferation of claims both true and false. Understanding how the "public sphere" is constructed online requires understanding how social media platforms filter and display content and how multiple platforms—traditional television and print in addition to web and social media—disseminate information.

### i.  The Media System

When a prominent person makes a claim, it enters the media system, a network of platforms and people who circulate information.[48] As illustrated in Figure 1 below, the media

---

[46]   Ardia (2010).

[47]   https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/

[48]   Chadwick, Andrew (2017), *The Hybrid Media System: Politics and Power*: Oxford University Press; Curran, James, Shanto Iyengar, Anker Brink Lund, and Inka Salovaara-Moring (2009) "Media System, Public Knowledge and Democracy: A Comparative Study," *European Journal of Communication*, 24 (1), 5-26; Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

system consists of press briefings or reports; Associated Press or other syndication; print and web coverage by major print and broadcast news outlets; podcasts and radio; social media posts on Twitter and Facebook or other platforms; comments, retweets, and likes to a story; and, in some instances, re-coverage of the claims themselves in traditional journalism or social media,[49] to say nothing of word-of-mouth conversation and other informal channels such as rumor or gossip.[50] The spread of information, particularly when it originates from a high-profile individual like Mr. Trump, is vast and sweeping. The claims of high-profile figures tend to receive more coverage, and more sustained coverage, than others due to the routines of the newsroom and reporting and the effects of status on public attention.[51]

---

[49]   Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," *Journal of Marketing Communications*, 20 (1-2), 117-28; Tuchman, Gaye (1978), *Making News: A Study in the Construction of Reality*, New York: Free Press; Curran (2009); Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," *Journalism Studies*, 9 (3), 447-63.

[50]   Rosnow, Ralph L. and Gary A. Fine (1976), *Rumor and Gossip: The Social Psychology of Hearsay*: Elsevier.

[51]   Grabe, Zhou & Barnett, 1999; Gans, Herbert J (2004), *Deciding What's News: A Study of Cbs Evening News, Nbc Nightly News, Newsweek, and Time*: Northwestern University Press; Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," *Public Administration Review*, 336-45; Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982 - 1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 1.  The Media System[52]**



Estimating the number of impressions for a Statement requires itemizing impressions from each source that disseminated the Statement. As Figure 1 above illustrates, that means that one would need to calculate and then sum the number of impressions from, at a minimum, (1) web and social media, (2) print, and (3) television.

## ii.   Social Media Impressions

On social media, impressions are estimated by calculating an information cascade.[53] To model the impact of the Statements, I rely on the prior work in sociology, computer science, and information systems concerning cascades and social networks. To understand what might be needed to change attitudes and repair reputation, I rely on research from social psychology and marketing concerning persuasion, media exposure, and developing effective integrated media

---

52    I have grayed out media types that I am not considering in my quantitative analysis.
53    Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," *Science*, 359 (6380), 1146-51.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

campaigns that include social media advertising. A brief overview of prior research is necessary to understand how impressions and damage are calculated.

*Networks and Information Cascades.* Unlike traditional media, messages travel on social media through a network—a system of users connected by exchanges of information. The network structure—how many connections one has and how many connections *those* connections have—can determine whether and how fast a message travels through the network. Social capital is represented in the network by the number of followers, or connections, one has, and greatly increases how broadly and deeply a message spreads. If one sends a message, it has the potential reach of not only all of one's followers, but all of *their* followers as well. Additionally, false news spreads more broadly, more deeply in the network, and faster online than true news.[54]

Social media is a hybrid of mass and face-to-face communication.[55] In mass media like television or news, there is typically one source that sends messages out to many readers or viewers (known as one-to-many communication). In face-to-face distribution of rumors, messages are transmitted from one person to another, usually one at a time. In social media, messages are transmitted both through hubs (one-to-many) and dyadically, creating chains of messages called information cascades. The time it takes for the message to move from one person to another in the information cascade is typically a day for traditional media but can be only a few hours to seconds for online communication, leading to rapid dissemination of both

---

[54]    Vosoughi *et al.* (2018).
[55]    Humphreys, A. (2015). Social Media: Enduring Principles, Oxford University Press.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

true and false news.[56]

*Impression Rate*. Although the number of followers is a measure of reach, it represents only the potential impressions of a message. Information competes for attention in any attention economy.[57] Although a message may be tweeted to all followers, it is not necessarily seen by that number of followers for a variety of reasons: only a subset of followers will sign on that day, they follow a certain number of accounts, or ranking algorithms may not prioritize the content. For these reasons, information scientists incorporate an impression rate when calculating social media impressions, which represents the chance that the message was seen by a follower.[58]

*Engagement Rate*. Engagement rate represents the percent of people who engage with—retweet or like—a post. It has two components: 'liking rate' and 'retweet rate'. Here, I computationally consider only a subset of the engagement rate: the retweet rate, which is defined as the percent chance that the message was retweeted (or quote tweeted).[59] Only a fraction of social media posts are seen, and only a fraction of those are retweeted or liked. While not directly used in my calculation of impressions, 'liking' can be used in some algorithms to rank or promote content. In short, content that is 'liked' by more people is likely to be prioritized and therefore to be viewed by more people.[60] Engagement can be used to understand impact in that it reflects response to the statement. In social and web forms of media, comments can further

---

[56]   Pfeffer *et al.* (2014); Vosoughi *et al.* (2018).
[57]   Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
[58]   Wang et al. (2016); https://martech.org/facebook-twitter-impressions/.
[59]   A quote tweet is a retweet with comment (https://help.twitter.com/en/using-twitter/types-of-tweets). When reporting the total number of retweets generated by a post, Twitter combines the number of retweets with the number of quote tweets.
[60]   Newswhip (2019). 2019 Guide to Publishing on Facebook. http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf.

Expert Report of Professor Humphreys                    19

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

constitute and amplify the impact of false information.[61]

*Impression vs. Individuals.* Scholarship on media viewership has provided two ways to measure audiences: as people and as impressions. New media like social and digital media tends to be measured in impressions[62] while old media tends to be measured in reach, or people.[63] One individual may receive multiple impressions. That is, some people may receive multiple exposures to a Statement while others may receive only one exposure. I assume that for media broadcast on television, one viewer represents one impression and do not consider the number of times a viewer was exposed to a statement during a broadcast, which is conservative. As I will discuss in the Damages section, I also lower my estimate of the number of exposures needed in a corrective campaign in order to account for the fact that the impressions generated by a corrective campaign may reach some people more frequently than others.

*Calculating Impressions.* To model the total number of impressions in an information cascade, one calculates and sums the number of impressions that occur at each level in the network.[64] To calculate the total number of impressions at each level requires also determining how many diffused to the next level of the network, multiplied by the chance those messages were seen, and then adding the number of impressions at the next level, and so on (see Figure 2 below).

---

[61]   Vosoughi *et al.* (2018).
[62]   https://theraveagency.com/blog/finding-the-value-in-twitter-impressions.
[63]   Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," *Journal of Marketing Research*, 17 (3), 307-15, Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," *Journal of Media Economics*, 1 (1), 61-74.
[64]   Vosoughi *et al.* (2018).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### Figure 2.  Information Cascade



- *Social media.* Social media impressions are measured based on the number of followers to an account, the account's estimated impression rate, the number of retweets, the impression rate of retweeters, and their number of followers at the second level.

The Impressions Model section details the particular parameters chosen given this prior literature and the data presented in the case.

### iii.   Traditional Media Impressions

Methods for calculating the number of impressions generated by traditional, mass media have been in use since at least 1942.[65] Because ratings are tied to advertising revenue, metrics are carefully audited by services like Nielsen and the Alliance for Audited Media (AAM).[66]

---

[65]   Buzzard, Karen (2012), *Tracking the Audience: The Ratings Industry from Analog to Digital.*
[66]   https://markets.nielsen.com/us/en/solutions/measurement/television/ and
https://auditedmedia.com/Solutions/Print-Publisher-Audits.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Paradigms for measuring circulation and readership are well established in media and communication scholarship.[67] I therefore use the following measures of impression:

- *Television.* Television impressions are measured through viewership, the ratings derived from independently audited services like Nielsen.[68]

- *Print.* Print impressions are measured through circulation, the number of readers as reported by the AAM.[69]

- *Web impressions.* Though existing online, articles published on websites tend to be more 'traditional' in nature because viewership can be estimated by the amount of traffic or page views. I use the number of daily users, discounted by the bounce rate (the percent of users who do not perform an action on the site).

- *Total impressions.* Total impressions are calculated as the total of impressions across social media, television, print, and web.

   **C. Assessing Damages for Defamation Online: Adapting Traditional Approaches to the Sphere of Social Media**

     **i.   Rectifying Harm to Reputation Online**

Traditional approaches to rectifying reputational harm involve attempts to repair reputation in the public sphere.[70] However, social media has complicated these traditional approaches in a few ways. Some aspects of social media such as filter bubbles and echo chambers have fragmented the public sphere such that it is unclear how or where reputation repair can and should take place. Secondly, trust in traditional media has declined across the ideological spectrum.[71] Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims both in social and

---

[67]   Gensch & Shaman (1980); Picard (1988).
[68]   https://markets.nielsen.com/us/en/solutions/measurement/television/
[69]   https://auditedmedia.com/Solutions/Print-Publisher-Audits
[70]   Ardia (2010).
[71]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

traditional media—and this is true regardless of political ideology.[72] Finally, increasing

polarization[73] in the American context means that attitudes have become more entrenched and

therefore harder to change.[74] In this section, I provide a brief overview of the theories necessary

for understanding how reputational harm can occur, and be repaired, through social media.

Prior cases have taken a traditional approach to assessing damages to reputation in the

public sphere. For example, in the case of *United States v. Macys.com, Inc.* (D. Del. July 26,

2000),[75] the remedy for alleged violation of consumers' expectations relating to product

shipping time was the purchase of banner advertising on search engines to inform consumers

about their rights when shopping online. However, the traditional approach represented by prior

cases fails to take into account the new and complex technological infrastructure for

communication, the erosion of trust in mass media particularly among the audience likely to be

receptive to the Statements (*i.e.*, people on the political right and/or supporters of Mr. Trump)[76]

and the importance of personal sources that are trusted by the individual for news online.

Persuasion online now includes influencers, social networking, and live video in addition to

search and display advertising. The educational campaign of *United States v. Bayer Corp.*, No.

07-01(HAA) (D.N.J. Jan. 4, 2007) is more akin to the current state of social media. In this case,

an educational campaign was required as remediation that included a consumer brochure,

---

[72] https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/

[73] https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/

[74] Conover, Michael, Jacob Ratkiewicz, Matthew Francisco, Bruno Gonçalves, Filippo Menczer, and Alessandro Flammini. "Political polarization on Twitter." In *Proceedings of the International AAAI Conference on Web and Social Media,* Vol. 5, No. 1, pp. 89-96. 2011; Prior, Markus. "Media and political polarization." *Annual Review of Political Science* 16 (2013): 101-127.

[75] https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf.

[76] https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

advertisement for that brochure, and placement of the information with key opinion leaders and gatekeepers, such as physicians. In this way, remediation for reputational harm entails working with multiple sources that consumers trust to counter false claims.

### D. Media Exposure and Counter-Attitudinal Attitude Change

To understand how to assess the costs for repairing reputational harm on social media, one must understand the process of attitude change, also known as persuasion.[77] Source, message, and even media type can play a role in how many exposures it requires to change attitudes.[78] For someone who holds a weak attitude or no attitude about someone or something, one exposure to a message from a reasonably credible source is likely to be enough to change attitudes.[79] However, for someone with entrenched beliefs, source and message quality become very important, and changing that belief requires more than a few exposures from a single source.[80] Due to confirmatory bias,[81] people are likely to attend to information that confirms or is congruent with their existing beliefs and ignore or discount information that is counter to them. The more entrenched the belief, the more exposures required to change attitudes. For these reasons, changing an attitude that is counter to one's existing set of beliefs is exceedingly hard and potentially requires multiple messages from multiple trusted sources.

Here, a trusted source means a person or entity that is trusted by the user or reader, not necessarily a source that would be deemed trustworthy by the public at large. Platforms like

---

[77]    Cialdini R. B., R. E. Petty, J. T. Cacioppo. (1981). Attitude and Attitude Change, *Annual Review of Psychology.*

[78]    Albarracin, D., and Shavitt, S. (2018). Attitudes and attitude change. *Annual Review of Psychology*, 69, 299–327; Cialdini *et al.* (1981).

[79]    Cialdini *et al.* (1981).

[80]    Cialdini *et al.* (1981).

[81]    Kahneman and Tversky (1974).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

newspapers and websites can be the source, but they can also convey the information of sources that may or may not be trusted. Research in psychology and communication shows that readers and viewers can distinguish between the media source and the individual source when interpreting a message.[82] For example, a reader may not trust the *New York Times* but may trust direct quotes attributed to a trusted source reported by the *New York Times*.

On social media, attitude change can be even more complex. Filter bubbles mean that users are likely to see only information that is congruent with their present and past beliefs and behaviors[83] and come from selective media sources that viewers trust.[84] Due to homophily, we tend to know and follow others who have the same attitudes that we do. As Garrett (2009) notes, multiple messages coming from multiple sources about the same event or fact create the impression for the user that the event is indeed true and that the belief is universally held.

In all media, but particularly social media, messages are received, trusted, and interpreted relative to their source. Social capital (*i.e.*, how many people you know) and status (*i.e.*, legitimacy) of a source is important. Messages that come from sources with no social capital (*i.e.*, no followers) do not have the same strength as those that come from sources with considerable social capital.[85] Because trust of unfamiliar sources is typically lacking online,[86]

---

[82]  Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013). "The Context of Content: The Impact of Source and Setting on the Credibility of News," *Recherches en Communication*, 40, 151-68.

[83]  Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."

[84]  https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/.

[85]  Kruglanski, A. W., and Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). *Psychological Review*, 118(3), 522–522. https://doi.org/10.1037/a0023709

[86]  Metzger, M. J., and Flanagin, A. J. (2013). Credibility and trust of information in online environments: The

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

known and trusted sources are particularly important when communicating messages attempting to change attitudes online.[87] In this sense, attitude change requires the message to come from *inside* the filter bubble and requires considering a number of trusted sources within the echo chamber to influence opinion.

In sum, if harm is caused amongst a population who do not trust traditional media, the most effective way to repair it is through alternative informational channels the audience trusts and that mirror where people get their news.[88]

## IV. IMPRESSIONS MODEL

The Impressions Model section details the particular parameters chosen given this prior literature and the data presented in the case. In order to estimate the number of impressions generated by the Statements, I reviewed and analyzed news coverage of the claims, including 53 online news articles, 55 social media posts, 63 television broadcasts, and 14 print articles.

### A. Web Impressions

The web impressions analysis is limited to the set of 52 online news articles[89] cited in the Complaint in footnotes 9-14. In these footnotes, the Complaint list a set of online sources that reported on the Statements.

---

use of cognitive heuristics. *Journal of Pragmatics*, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.

[87] Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," *Information Sciences*, 306, 34-52.

[88] For example, 35% of Republicans reported trusting national news media: https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

[89] Please note, my analysis incorporates 53 unique URLs as the June 21, 2019 article by Yahoo! News appeared on both news.yahoo.com and sports.yahoo.com.

Expert Report of Professor Humphreys                    26

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

To estimate the number of web impressions, I used data provided by Semrush, a company that provides website traffic statistics.[90] Semrush reports unique monthly visitors, and I transformed this measure to daily visitors by dividing unique monthly visitors by 30. Further, to account for people who visit the site but do not perform any other action, I multiplied daily visitors by 1 minus the bounce rate (see Figure 3 below). A table showing the online articles considered and the impressions estimate is included as Appendix D.

**Figure 3.  Equation 1**

$$\text{Web Impressions} = (\text{Unique Monthly Visitors}/30)*(1\text{-bounce rate})$$

### B.  Social Media Impressions

The social media impressions analysis is limited to the set of tweets that (a) link to one of the 53 online news stories I considered in my analysis of web impressions, (b) were published by the primary account of the publisher or the article's author, and (c) contain one of the defamatory claims contained in the Statements when viewed by a user (*i.e.*, a user who sees the tweets is exposed to a defamatory claim even if they do not click through to the article). A total of 55 tweets met the three criteria.

To measure social media impressions, one must estimate the percent of followers who saw a particular message. As described above, this is called the impression rate. Impression rates vary depending on the number of followers and the other contextual conditions in the system such as

---

[90]     https://www.semrush.com/kb/26-traffic-analytics

Expert Report of Professor Humphreys                                    27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

competition for attention on any given day.[91] Impression rates for Twitter are estimated at

between 1.3% to 2.6% for typical users.[92] However, that range can vary depending on number of

followers, publisher/non-publisher status, frequency and relevance of tweets, and other variables.

Sites aimed at creating shareable content, including political news, can have impression rates up

to 22%.[93] Account holders can directly view their impression rate for each tweet, but otherwise

the information is not publicly available. Buzzfeed, for example, has an impressions rate of 22%,

which is convergent with conventional marketing goals that aim for a rate of 20%,[94] but lower

than the 30% rate that Twitter suggested in 2014.[95]

   Based on all publicly available information, I provide estimates using two impression

rates. The first estimate comes from Wang *et al.*'s (2016) formula for calculating impressions

given the total number of followers in the cascade, retweets, and followers of the original tweet

(Equation 2a). Equation 2a can be used to estimate impressions for each account, given the

account's number of followers, the number of retweets, and the followers of the retweeters. This

means that each tweet has a unique impression rate. Wang *et al.* (2016) develop this equation

from a full set of data taken from Buzzfeed and Buzzfeed News and its associated accounts

(average followers at the time of Wang *et al.*'s analysis: Buzzfeed = 2.8 million, BuzzfeedNews

= 470,000). Based on a full set of data, they are able to provide an estimate of impressions given

---

[91]   Wang et al., 2016; https://martech.org/facebook-twitter-impressions/.
[92]   https://martech.org/facebook-twitter-impressions/
[93]   https://martech.org/facebook-twitter-impressions/
[94]   https://www.tweetbinder.com/blog/twitter-impressions/; https://marxcommunications.com/what-does-impressions-mean-on-twitter/
[95]   Ad Age (2014). "Twitter Tells Brands They Can Reach 30% of Their Followers for Free," https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

known and public data like followers and retweets. As a conservative step, I took into account the potential presence of bots as followers in my estimation although it may be unnecessary in this model.[96]

The impressions estimate generated by Equation 2a may be considered low for a number of reasons. First, Buzzfeed, from which the equation was developed, is an account that has had and continues to have considerably fewer followers than many accounts in our data set (*e.g.*, Buzzfeed$_{2022}$ = 6.3 million followers vs. New York Times$_{2022}$ = 54.4 million, Washington Post$_{2022}$ = 19.9 million).[97] Secondly, as large publications, people are likely to be exposed to these accounts because they are considered more legitimate than a site like Buzzfeed News.[98] Finally, because they are high status, "standard-bearers" of news, people often tweet them to share relevant, official news stories. In addition, I account for the potential presence of bots as followers, 12.6%, based on recent estimates in computer science.[99] The formula used to calculate impressions using Equation 2a is displayed in Figure 4 below. The formula is applied for each of the 55 tweets considered in the social media impressions analysis.

---

[96] This may be an unnecessarily conservative step, as Wang *et al.* (2016) formed their estimate of parameters from a set of known and actual impressions provided by Twitter, which may have already accounted for bots.

[97] Data were collected October 7th, 2022.

[98] https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/

[99] Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. *First Monday*, *24*(9). https://doi.org/10.5210/fm.v24i9.10213

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 4. Equation 2a**

$$\text{Social Media Impressions} = 10^{\wedge}(0.7396 \log(\mathit{TF}*(1\text{-bot rate}))$$
$$+$$
$$0.0473 \log(\mathit{PF}*(1\text{-bot rate})) + 0.1027 \log(\mathit{RT}))$$

Where:

    PF (primary followers) = number of followers of original tweet
    RT (retweets) = number of retweets to the original post
    TF (total followers) = average number of followers of all retweets*$RT^{100}$ + number of
    followers of original poster (PF)
    Bot rate = 0.126

Given the differences between Buzzfeed and some of the accounts in the Twitter dataset, I calculated a second estimate of impressions based on an impression rate of 20% (Equation 2b).[101] Not only was Buzzfeed itself purported to have a rate close to this, but it is also a rate used as a marketing "rule of thumb" as a benchmark for most major accounts.[102] Given the size and the influence of some of the accounts in the dataset, 20% is a reasonable and likely estimate for impression rate. Here, I again used 12.6% to account for potential bots.[103] In this equation, I include impressions at both the first level (*i.e.*, the number of followers of the original tweet and an impression rate of 20%) and the second level of the information cascade (*i.e.*, the number of

---

[100]   To collect the number of followers for all retweets, I used the Twitter API to search for both retweets and quote tweets (retweets with comment) of each of the 55 original tweets considered in the social media impressions analysis. I then filtered out any tweets that don't reference the original tweet (*e.g.*, retweets of quote tweets). After analyzing the data, I found a discrepancy between the number of retweets displayed on www.Twitter.com and the number of retweets I was able to collect. The discrepancy is likely due to users whose accounts are private and/or protected, meaning their data is not retrievable using Twitter's API. Using the list of retweets and quote tweets I assembled, I collected the Tweet IDs of each user who posted a retweet or quote tweet and used Brandwatch to collect the follower count of each of the users at the time they posted the retweet or quote tweet. I then averaged the follower counts of each retweeters or quote tweeter for each of the 55 original tweet and multiplied the average by the number of retweets.

[101]   https://martech.org/facebook-twitter-impressions/.

[102]   https://www.tweetbinder.com/blog/twitter-impressions/.

[103]   Luceri *et al.* (2019)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

retweets multiplied by the average number of followers held by people who retweeted and an impression rate of a "typical" Twitter user of 1%[104]). The formula used to calculate impressions using Equation 2b is displayed in Figure 5 below. The formula is applied for each of the 55 tweets considered in the social media impressions analysis. A table showing the tweets considered and the impressions estimate (using both Equation 2a and Equation 2b) is included as Appendix E.

**Figure 5. Equation 2b**

$$\text{Social Media Impressions} = \text{followers}_{\text{first-level}}*\text{first level impression rate }*(1\text{-bot rate})+\text{retweets}*\text{followers}_{\text{second-level}}*\text{second level impression rate}*(1\text{-bot rate})$$

Where:

> Followers$_{\text{first-level}}$ = number of followers of the original tweet
> First level impression rate = 0.2
> Bot rate = 0.126
> Followers$_{\text{second-level}}$ = average number of followers of all retweets[105]
> Second level impression rate = 0.01

### C. Television Impressions

To measure television impressions, I relied on the TV News Archive, a database maintained by the Internet Archive, a non-profit archive of content from television, internet, and audio, among many other sources.[106] The Internet Archive's TV News Archive allows users to

---

[104] https://martech.org/facebook-twitter-impressions/
[105] I used the same process described above to collect data on the average number of followers of all retweets. I collected a list of all retweets and quote tweets of the 55 original tweets using the Twitter API. Using that list, I collected the follower accounts of all users who published a retweet or quote tweet from Brandwatch. I then averaged the follower counts of each retweeters or quote tweeter for each original tweet and multiplied the average by the number of retweets.
[106] https://archive.org/details/tv

Expert Report of Professor Humphreys          31

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

search through the closed captioning of broadcasts. To identify broadcasts to incorporate into the

television impressions analysis, I searched through the closed captioning of broadcasts

mentioning "E Jean Carroll" from June 21, 2019, to June 27, 2019, from the following stations:

ABC, Fox, NBC, MSNBC, CBS, and CNN. After identifying the broadcasts, I searched through

the closed captioning to identify broadcasts that referenced the Statements. Please note, I

considered only broadcasts that included verbatim quotes from Mr. Trump's Statements. The

search yielded a total of 63 broadcasts.

To estimate the number of impressions these programs received, I consulted public reports

of viewership for each program from 2019,[107] which are usually derived from Nielsen. Where

possible, I collected the Live + Same Day[108] or P2+[109] ratings estimates for the program in which

a Statement appeared. If I was unable to find ratings estimates associated with a specific

program, I relied on the average total day viewership for the network for the quarter or year

closest to June 2019. To be conservative, I only counted ratings for a particular program once per

day, even if a program appeared multiple times in the search results. For instance, the search

results include two broadcasts of *Anderson Cooper 360* on June 21, 2019, one at 5pm-6pm

PDT[110] and another at 8pm-9pm PDT.[111] Even though both airings mention the Statements (and

---

[107]   *e.g.*, https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/.
        Wherever possible, I relied on ratings estimates from June 2019 or second quarter of 2019 or. In some
        instances, it was not possible to collect data from that time period. In these cases, I relied on data that
        averages viewers from 2018 to 2019 and from 2019 to 2020.
[108]   Live + Same Day is an estimate of the number of households that watched a program while it aired or
        watched it via DVR on the same day the program aired.
        (https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf;
        https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/)
[109]   P2+ is an estimate of the persons aged 2 or older who watched a program.
[110]   https://archive.org/details/CNNW_20190622_000000_Anderson_Cooper_360/
[111]   https://archive.org/details/CNNW_20190622_030000_Anderson_Cooper_360

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

thereby generated two separate impressions), my analysis only incorporates ratings for one airing. Similarly, CNN's *New Day with Alisyn Camerota and John Berman* appeared in the search results two times on June 22, 2019, once between 3am-4am PDT[112] and again between 4am-5am PDT.[113] *New Day* is a three-hour long morning show that the TV News Archive split into three hour-long blocks. I am only counting once instance of New Day in my calculations even though viewers would have been exposed to a Statement twice.[114] A table showing the broadcasts considered, the ratings estimate, and the source of the rating estimate is included as Appendix F.

### D.  Print Impressions

To capture the spread of the news stories in print as well as online, I searched for print articles covering the Statements from the publications I considered in my analysis of web impressions. Using ProQuest's U.S. Newstream database, a database of all U.S. news from 1980 to present,[115] I searched for newspaper articles containing "E Jean Carroll" in the publications of interest from June 21, 2019, to June 27, 2019. All articles returned by the search were reviewed to ensure they mentioned at least one of the Statements. The search yielded 11 articles from six news publications that mentioned the Statement.

---

[112]   https://archive.org/details/CNNW_20190625_100000_New_Day_With_Alisyn_Camerota_and_John_Berman/

[113]   https://archive.org/details/CNNW_20190625_110000_New_Day_With_Alisyn_Camerota_and_John_Berman/

[114]   Additionally, I am also not considering whether the statements appeared multiple times within a one-hour block.

[115]   https://about.proquest.com/en/products-services/nationalsnews_shtml/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

To estimate the number of print impressions, I used the data provided by the Alliance for Audited Media, a widely accepted standard for measuring print audience size that determines advertising rates.[116] I was able to find audience estimates for only five of the six publications. Only the nine articles from these five publications with audience estimates contributed to the print impressions estimate. A table showing the print articles considered and the circulation is included as Appendix G.

### E. Total Impressions

I calculated both a high and low estimate for impressions of Mr. Trump's Statements. The low estimate is calculated with social media impression rate using Equation 2a. The high estimate is calculated with industry standard impression rate to estimate social media impressions using Equation 2b.[117] To calculate the total impressions across media, I aggregated views/impressions for the (1) social media impressions, (2) TV impressions, (3) print impressions, and (4) web impressions (see Figure 6 below).

**Figure 6. Equation 3**

> **Total impressions = social media impressions + TV impressions + print impressions + web impressions**

Figure 7 below summarizes the results of the impressions analysis.

---

[116] https://auditedmedia.com/about/who-we-are

[117] Please note, in four cases the impressions associated with the "low" estimate are higher than the "high" estimate. Nonetheless, the "high" estimate is much higher than the "low" estimate overall.

**A178**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 7.  Total Impressions**

|  | **Social Media** | **Web** | **Print** | **TV** | **Total** |
|---|---|---|---|---|---|
| **High** | 63,040,041 | 13,922,234 | 2,613,232 | 108,580,000 | 188,155,507 |
| **Low** | 17,218,959 | 13,922,234 | 2,613,232 | 108,580,000 | 142,334,424 |

High=impression rate of 20% for first level followers, 1% for second level followers (Sullivan 2014)
Low=median impression rate of 5.2% (Wang *et al.* 2016)

The Statements generated between 142,334,424 and 188,155,507 impressions between June 21, 2019, and September 6, 2022, the time frame from which data were collected for this analysis.

### i.    Other Impressions Not Calculated into Model

There are a number of impressions that my estimate does not take into account. Equations 2a and 2b adjust for different impression rates, but they omit many significant sources of impressions due to data availability or clarity. This makes both estimates a considerable undercount of impressions.

*Web Impressions*. Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statements. Additionally, some of the articles I did consider were authored by the Associated Press[118] and

---

[118]    The analysis incorporates five versions of two Associated Press articles. Darlene Superville, Trump Denies Knowing NY Woman Accusing Him of Sexual Assault, ASSOCIATED PRESS (June 22, 2019); Darlene Superville, Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store, ABC NEWS (June 22, 2019); Associated Press, Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type", HOLLYWOOD REP. (June 25, 2019); Associated Press, Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type", CHI. TRIB. (June 24, 2019); Associated Press, Trump: Woman Who Accused Him of Sexual Assault Not His Type, DENVER POST (June 24, 2019).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Reuters.[119] Although it likely that identical (or very similar) versions of these articles appeared in

multiple publications, I did not count these impressions due to the inability to access traffic

numbers for each of these websites. For instance, the June 25, 2019, *Hollywood Reporter* article,

titled "Trump on E. Jean Carroll Sexual Assault Claim: 'She's Not My Type,'" appeared in at

least 20 additional publications.[120] Further, the June 22, 2019, Associated Press article, titled

"Trump Denies Knowing NY Woman Accusing Him of Sexual Assault" appeared in at least 7

additional publications.[121]

---

[119]   The analysis incorporates two versions of the same Reuters article: Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", BUS. INSIDER (June 25, 2019); and Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", REUTERS (June 25, 2019).

[120]   https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type; https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6; https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054; https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type; https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html; https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/; https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type; https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp; https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/;
https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/; and https://www.necn.com/news/local/trump-e-jean-carroll/220418/.

[121]   https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22; https://www.gazettenet.com/Carroll-26480259; https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial; https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; and https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Social Media Impressions*. I limited social media impressions to those generated from tweets published by the primary account of the publisher or the article author. While I did consider the retweets and quote tweets of the 55 original tweets, I did not consider retweets to quote tweets even though a user who navigates to a quote tweet will be shown the text of the original tweet. Data suggests that some of the quote tweets generated significant engagement. For instance, four quote tweets[122] of The Hill's original tweet[123] published at 7:40 am ET on June 25 generated over 100 retweets. One of those quote tweets generated over 2,000 retweets.[124] For comparison, the combined total of all retweets generated by the original tweets I considered was 5,560.

Additionally, I did not consider any tweets from other publishers of stories covering Mr. Trump's Statements, tweets from users who shared links to the 52 articles (or other articles containing the Statements), or tweets in which users repeated or otherwise amplified the Statements.

Additionally, the social media impressions analysis does not consider impressions generated on other platforms, such as Facebook and Reddit because it is difficult to find research or publicly available data on impression rates for platforms other than Twitter. Nonetheless, there is evidence that the 52 online news articles I considered in my web impressions analysis were shared widely on those platforms. Using CrowdTangle,[125] a social media insights tool

---

[122]   https://twitter.com/1/status/1142180829835255808; https://twitter.com/1/status/1142184727492878336;
        https://twitter.com/1/status/1142197820826501120; and https://twitter.com/1/status/1142226611380600832.
[123]   https://twitter.com/1/status/1143477200148189184.
[124]   https://twitter.com/Olivianuzzi/status/1142197820826501120.
[125]   Meta provides a free and publicly accessible CrowdTangle extension for the Chrome browser that allows

**A181**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

owned and operated by Meta,[126] I searched for instances where the 52 articles were shared on

Facebook and Reddit. CrowdTangle data were available for 39 of the news articles considered,[127]

yielding a total of 588 shares and 396,390 interactions, disseminating to 476,196,543

followers.[128] On average, the data from CrowdTangle suggest that each article was shared 15

times and generated more than 10,000 interactions per article. Given the high number of shares

and the overall number of followers associated with those shares, it is clear that my estimate of

social media impressions is a significant undercount of the actual impressions generated.

*Television Impressions.* I limited the television impressions analysis to broadcasts

contained in the Internet Archive's TV News Archive database from the following broadcasters:

ABC, Fox, NBC, MSNBC, CBS, and CNN. I did not include television shows that paraphrased

Mr. Trump's claims but did not directly quote. For example, *The Tucker Carlson Show*, which

averaged over 2.8 million viewers at the time,[129] covered the issue for 12 minutes on June 25,

2019,[130] but I did not include it. Additionally, I only counted ratings for a particular program

---

users to track shares of webpages across multiple social media platforms
(https://apps.crowdtangle.com/chrome-extension). For each share in CrowdTangle's database, the Chrome
extension provides a list of each share, the number of interactions (i.e., the number of reactions, upvotes,
likes, comments, and shares) generated by that share, and the total number of followers associated with the
share. (Followers are defined as "The sum of Page Likes, Instagram followers, Twitter followers, or
Subreddit subscribers for all of the matching results.") The browser extension does not track reach or
impressions generated by a post nor does the list of shares incorporate data from private or restricted
accounts.

[126] https://help.crowdtangle.com/en/articles/4201940-about-us

[127] It was not possible to find shares of the Washington Examiner article, likely due to the way the Washington
Examiner structures its URL. Instead of generating URLs with unique identifiers, articles are assigned tags
(in this case, the tag was "donald-trump") and stored on a single webpage in reverse chronological order. As a
result, using the CrowdTangle Chrome extension returns the shares of all articles assigned the "Donald
Trump" tag, rather than shares of the specific at-issue article.

[128] To arrive at the total number of followers, I summed together all the followers associated with each share. It
was not possible to deduplicate unique followers across different articles and channels.

[129] https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-show-in-cable-news-
as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c

[130] https://archive.org/details/tv.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

once in a day, even if a program was aired multiple times in day. I also did not consider the number of times a Statement was mentioned during a broadcast, even though multiple mentions of a Statement generate multiple impressions.

*Print Impressions.* I limited the print impressions analysis to publications that published an online news article that was cited in the Complaint. I did not count other print news articles about Carroll that may have mentioned the claims, even though I was able to find 33 print articles via ProQuest published between June 22, 2019, and September 28, 2022, that referenced the Statements.[131] None of these 33 articles overlapped with the 14 articles I considered in my analysis. Further, only five of the six publications contributed to the impressions estimate because I was unable to find publicly available circulation for all six publications.

*Other Sources of Impressions.* I did not include podcast impressions, although there is anecdotal evidence that these claims were discussed on podcasts and radio shows like *The Kevin Jackson Show* and the *New York Times' The Daily*.[132] I did not include impressions generated from people who were exposed to the Statements in article headlines while browsing Google News, Apple News, or other news aggregating applications. As well, I did not include face-to-face pass-along of the claims.

For these reasons, the estimate of impressions I provide is a conservative estimate in which several sources of further dissemination were not taken into account. A summary of

---

[131]   Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean"))

[132]   https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/, https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/, and https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

conservative steps taken in the impressions analysis is included in Appendix J.

## V.  IMPACT ASSESSMENT

In this section, I provide an impact assessment to evaluate the nature and amount of harm done to Ms. Carroll's person brand as a result of Mr. Trump's Statements. The impact of these Statements should be viewed both qualitatively and quantitatively.

In the qualitative assessment, I assess the nature of the Statements and their more generalized harm to a brand that faces a general (rather than niche) public. I also take into account the nature of the associations and their likely harm to the person brand of a professional woman and assess the long-term nature of this harm. These are dynamics that occur on the sociocultural level and therefore require more qualitative assessment. Further, they impact the generalized social perceptions of Ms. Carroll, thereby diminishing her reputational value to speak to a broad and diverse public. As such, this kind of reputational harm may impact her ability to capitalize on her person brand in the future.

I also provide a quantitative impact assessment to link the impressions estimate with the damages estimate. How many people saw and might have believed or been receptive to Mr. Trump's Statements? There are some who would have read/heard his Statement and dismissed it out of hand. While the Statement itself may represent some generalized harm, to calculate a fair estimate to rectify the more specific harm, one must take into account the fact that not everyone may have read/heard and readily believed Mr. Trump's Statements. Yet, political science provides tools for estimating the quantitative impact by incorporating the likelihood that a reader or viewer would have been receptive to Mr. Trump's Statements.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### A.  Qualitative Impact Assessment

To conduct the qualitative impact analysis, I relied on materials publicly available from before and after Mr. Trump's Statements on June 21, 22, and 24, 2019. These include media coverage of Ms. Carroll both before and after the Statements,[133] Amazon reviews of her books,[134] negative social media comments generated after the Statements, and negative messages sent privately to Ms. Carroll.

Prior to the Statements on June 21, 2019, Ms. Carroll was a popular advice columnist at *Elle* Magazine, where she had been a mainstay for 25 years.[135] Her brand personality was that of a sassy dating advice columnist and author of books on a range of topics, including dating, culture, and the life of Hunter S. Thompson. As the columnist of "Ask E. Jean" at *Elle*, she reached about 4.5 million readers, according to her publisher.[136] Ms. Carroll was known widely for her personable, modern advice for women.[137] Over the years of her popularity, she was heralded as "feminism's answer to Hunter S. Thompson."[138] She is the author of *A Dog in Heat is a Hot Dog and Other Rules to Live By*, (1996) and *Mr. Right, Right Now!* (2005), books that offer "sassy" dating and personal advice.[139]  Former *Elle* editor-in-chief Robbie Myers, who until

---

[133]   Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean")).

[134]   https://www.amazon.com/product-reviews/0060530286 and https://www.amazon.com/product-reviews/0525935681/.

[135]   Deposition of Robbie Myers, October 12, 2022, 31:20-22, 32:4-12; https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html.

[136]   https://web.archive.org/web/20200520030235/http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326. I was unable to find readership data prior to 2020.

[137]   Deposition of Robbie Myers, October 12, 2022, 23:7-24:4.

[138]   Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.

[139]   Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2017 was Ms. Carroll's boss,[140] described her as a gifted, beloved writer:

> "That's a -- the term that came to mind is sort of she's a baller, meaning she's --
> as a writer. She's a gifted writer. She is a journalist first and everything that she
> writes is informed by that, meaning the facts, but she -- she also, you know, has a
> lot of wit and I think that's why her readers loved her so much."[141]

Ms. Myers noted Ms. Carroll's "high public profile" and credited her with elevating the

national advice column genre and building trust with her readers by being witty but grounded in

the facts of journalism:

> "…I mean, what other people are doing is great, right, and it's fun and interesting,
> but women really trusted E. Jean and we got lots of feedback from readers that
> she helped them. Also, you know, they loved her voice because she puts a lot of
> funny in there or sort of -- but it's always undergirded by reporting."[142]

Ms. Myers stated that Ms. Carroll had made significant positive contributions to *Elle* in

helping to build the magazine's audience both in print and online, which resulted in both a raise

and increased space allotted to the "Ask. E. Jean" column.[143]

### i.   Reception to Ms. Carroll's Professional Work

Ms. Carroll was known to her readers as a "a sharp and funny social commentator, and a

terrific journalist,"[144] offering "sassy female insights."[145] Ms. Carroll was noted for dishing out

"SASSY BUT SANE ADVICE," "E. Jean's PUNCHY wisdom SHINES in compilation."[146]

"E. Jean Carroll, with her razor-sharp insights and wildly popular way of serving

---

140   Deposition of Robbie Myers, October 12, 2022, 9:11-13.
141   Deposition of Robbie Myers, October 12, 2022, 21:15-22.
142   Deposition of Robbie Myers, October 12, 2022, 22:12-18.
143   Deposition of Robbie Myers, October 12, 2022, 28:9-14, 28:18-21, and 32:9-12
144   https://www.amazon.com/gp/customer-
       reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
145   https://www.amazon.com/gp/customer-
       reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
146   Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

them up to the masses, is, above all else, a truth-seeker."[147]

> "She's a real writer, a sharp and funny social commentator, and a terrific journalist, and I love her voice. Smart readers will be particularly impressed with her skill reporting the current research in sex and marriage. I admire the way she covers the waterfront. She goes to rock-climbing spots, moto-cross tracks, gun clubs, university labs, millionaires' cocktail parties. About halfway through, I realized, this woman is an explorer. I think we're lucky that someone with her quality of mind and sense of humor has turned her attention to one of the most frustrating dilemmas of contemporary women: how to find someone real to love."

After June 2019, the associations with Ms. Carroll's person brand shifted. One way to examine the shift in associations is through word association, as represented in a word cloud.[148] As can be seen in Figure 8 and Figure 9 below, the semantic associations shifted from those associated with her role as a sassy news columnist ("love," "dating," and "men") to being associated with Mr. Trump, sexual assault, and this case ("defamation," "justice"). While some shift was attributable to the publication of her memoir and *New York Magazine* piece in which she detailed the alleged encounter with Mr. Trump,[149] an analysis of Google search data in Subsection iii below, illustrates that Mr. Trump's response, and not her initial claim, resulted in the escalating attention that she has received and played a considerable role in shifting the nature and valence of associations with her name.

---

[147]   https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
[148]   Humphreys and Wang (2018)
[149]   https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 8.  Before June 2019 (top 200 words in news articles about E. Jean Carroll)**



**Figure 9.  After June 2019 (top 200 words in news articles about E. Jean Carroll)**



**ii.    Elle's Readership**

It is also noteworthy to consider the composition of *Elle*'s readership. In 2019, 36% of the

**A188**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

American public identified as conservative.[150] *Elle* has a large and diverse readership in all

regions of the country.[151] Its readers have a median age of 41 and an income of $194,000 per

year.[152] Given the composition of the United States and the reach of *Elle's* readership, a

meaningful proportion of Elle readers, roughly 1 in 3 readers, is likely conservative. Further,

according to a poll conducted by YouGov,[153] 76% of Republicans polled either found the

allegations of sexual harassment and sexual assault made against Mr. Trump to be not credible or

needed more information about the claims, which I consider to mean that they are receptive to

believing the Statements in this case.[154] Taken together, this means that 26%[155] of *Elle* readers—

or about one in four—may have been receptive to Mr. Trump's Statements. While not all *Elle*

readers would have been receptive, a considerable portion would have.

One in four *Elle* readers being receptive to the Statements is a considerable portion of

readers to critically damage Ms. Carroll's brand as a columnist for the magazine. *Elle* reported

having 4.5 million readers in 2019,[156] meaning more than a million readers may have been

receptive to the claim that she was a "totally lying" about having been sexually assaulted by Mr.

Trump. Further, the shift in associations provoked by the Statements undermines generalized,

public perceptions of Ms. Carroll in ways that can unsettle prior perceptions about her. These

---

[150]   https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
[151]   AAM 2019
[152]   http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326;
https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html
[153]   https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll
[154]   The YouGov poll was conducted in 2020, after Ms. Carroll published the allegations about Mr. Trump.
[155]   26% is the product of multiplying the 34.7% of *Elle* who identify as conservative and the 76% of republicans polled who found the allegations of sexual harassment and sexual assault made against Mr. Trump to be either not credible or needed more information about the claims.
[156]   https://web.archive.org/web/20200520030235/http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326

Expert Report of Professor Humphreys                    45

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

readers also have friends, family, neighbors, and colleagues. They are part of the public at large. As sociologists argue, public perception can be colored not only by what an individual thinks, but also by what an individual's friends and family think.[157] For example, if someone not inclined to believe Mr. Trump's claims about Ms. Carroll is friends with or married to someone who does find them credible, this also imperils reputational value due to the nature of social influence, particularly over time.[158]

### iii.   Search Interest

Google Trends provides another way to assess the impact of Mr. Trump's Statements on Ms. Carroll's brand. Google Trends is a free tool that allows users to compare relative search interest on up to five different search terms and topics. Data on Google Trends are presented on a relative scaled from 0 to 100, indexed to the peak search volume achieved during the time period of interest. Using Google Trends, I can analyze the change in search volume related to E. Jean Carroll following *New York Magazine* publishing an excerpt from her memoir on June 21, 2019, and Mr. Trump making the Statements on June 21, 22, and 24, 2019.

The graph in Figure 10 below shows the relative search interest in E. Jean Carroll[159] from June 1, 2019, through June 30, 2022, for searches conducted in the United States.[160, 161] The data

---

[157]   Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," *Annual Review of Sociology*, 32, 53-78.

[158]   Ardia (2010).

[159]   I relied on the "E. Jean Carroll" topic (as opposed to terms) when conducting the search. Topics are groups of keywords and phrases Google categorizes as referring to the same concept. Searching by topic is beneficial as it allows the results to incorporate misspellings and different ways of referring to the concept of interest. https://support.google.com/trends/answer/4359550?hl=en

[160]   https://trends.google.com/trends/explore?date=2019-06-01%202019-06-30&geo=US&q=%2Fm%2F02qwtqv

[161]   When exporting data from Google Trends, Google will sometimes list the daily volume as "<1" when the relative volume is between 0 and 1. I have converted all instances of "<1" to 0.5.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

show two clear spikes in search volume. The first spike occurred on June 22, the day Mr. Trump

made his second Statement. The second occurred on June 24, the day that Mr. Trump made the

third Statement. Notably, the relative search volume on June 21 (the day *New York Magazine*

released an excerpt from Ms. Carroll's memoir) was 55, or nearly half the relative volume

generated on June 22 (94) and June 25 (100), indicating the Mr. Trump's response to Ms.

Carroll's accusation may have been at least as impactful as Ms. Carroll's allegations.

**Figure 10.  Daily Relative Search Interest for E. Jean Carroll for June 2019**



Another way to measure the impact of Mr. Trump's statement using data from Google

Trends is by analyzing the "related queries." Related queries are other searches users conducted

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

when searching for the topic of interest. Like search interest, related queries are indexed to the most commonly searched words and phrases and reported on a scale from 0 to 100. I reviewed the top related queries for searches of E. Jean Carroll to determine the degree to which consumers searching for Ms. Carroll were interested in her "Ask E. Jean" column compared to searches linking her to Mr. Trump.

The tables in Figure 11 below show the top related queries associated with searches of E. Jean Carroll[162] across three different time periods. The first time period (the "before" period) incorporates searches conducted from January 1, 2019, through June 20, 2019.[163] The second period (the "after – short" period) incorporates searches conducted from June 21, 2019, through November 3, 2019,[164] the day before Ms. Carroll filled the present lawsuit. The third period (the "after – long" period) incorporates searches conducted from November 4, 2019, through the end of the most recent month before I conducted my analysis, August 31, 2022.[165] Rows highlighted in green indicate related queries that link Ms. Carroll to her "Ask E. Jean" column; rows highlighted in yellow indicate related queries that link Ms. Carroll to Mr. Trump. As the data show, consumer associations for Ms. Carroll changed following her accusation and Mr. Trump's response. Prior to her allegations, related searches associated with Ms. Carroll's column were relatively high. After the allegations and Mr. Trump's response, queries related to Ms. Carroll's column disappear from the list and are replaced by queries linking Ms. Carroll to Mr. Trump.

---

162   Here too, I relied on the "E. Jean Carroll" topic when searching on Google Trends.
163   https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
164   https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
165   https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 11.  Top Related Queries for E. Jean Carroll**

| Before (01/01/19 – 06/20/19) | | After – Short (06/21/2019 – 11/03/19) | | After – Long (11/04/19 – 08/31/22) | |
|---|---|---|---|---|---|
| **Related Query** | **Relative Value** | **Related Query** | **Relative Value** | **Related Query** | **Relative Value** |
| e jean | 100 | jean carroll | 100 | jean carroll | 100 |
| ask e jean | 75 | e jean | 66 | e jean | 51 |
| jean carroll | 69 | e carroll | 60 | e carroll | 49 |
| dear abby | 14 | jean e carroll | 60 | jean e carroll | 48 |
| miss manners | 6 | e. jean | 23 | trump | 21 |
| | | e. jean carroll | 22 | e. jean carroll | 21 |
| | | trump | 16 | jean carroll trump | 18 |
| | | carroll trump | 15 | trump e jean carroll | 11 |
| | | trump jean carroll | 13 | trump rape | 5 |
| | | e jean carroll trump | 8 | e. jean carroll trump | 4 |
| | | jean carroll young | 6 | jean carroll young | 4 |
| | | e jean carroll young | 5 | jean carroll dna | 4 |
| | | donald trump | 3 | donald trump | 3 |
| | | trump rape | 3 | e jean carroll trump rape | 3 |
| | | e. jean carroll trump | 3 | trump dna | 3 |
| | | jean carroll donald trump | 3 | e jean carroll young | 2 |
| | | anderson cooper | 2 | e jean carroll dna | 2 |
| | | jean carroll anderson cooper | 2 | e jean carroll news | 2 |
| | | e.jean | 2 | e jean carroll donald trump | 2 |
| | | donald trump e jean carroll | 2 | e jean carroll twitter | 2 |
| | | jean carrol | 2 | e jean carroll case | 2 |
| | | john johnson | 1 | trump news | 2 |
| | | e.jean carroll | 1 | trump rape case | 1 |
| | | e jean carrol | 1 | jean carroll dress | 1 |
| | | e jean carroll anderson cooper | 1 | e jean carroll lawsuit | 1 |

iv.   **Engagement Analysis**

*Comments and Engagement on Social Media News Article Shares.* As an additional

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

qualitative indicator of the impact of these Statements in the public sphere, I examined

engagement on social media that resulted as a response to news articles covering Mr. Trump's

Statements. The news articles I analyzed in the Impressions Model and that were posted on

Twitter by the publications received 7,880 responses and 10,982 likes. Comments on these

articles repeated and agreed with Mr. Trump's Statements about Ms. Carroll, showing yet again

that his Statements about her resonated with some people. For example, on a *Washington Post*

article, one commenter said, "Baloney---For over 20 years silence and now since book is ready

for sale we need new sensation to boost sale."[166] Another commenter, on the *New York Magazine*

article, replied, "I could care less about this phony article being that the source is a leftist

mouthpiece for brainwashing and helping an agenda of the antiAmerican left Communist

Democrats in DC work toward Communism of our country.  TRUMP is doing a great job.  I

voted for him and will do it again in 2020.  New York has the worst Mayor ever in the entire

United States.  SUPPORT CAPITALISM AND SAVE OUR NATION.  VOTE TRUMP

2020!"[167]

   Since the news broke in June 2019, these same news publications have continued to cover

the story, which has extended the effect of Mr. Trump's Statements further into the present day.

To gain insight into whether the public continued to view Carroll negatively, I selected a sample

of four publications that covered Mr. Trump's Statements and were included in my Impressions

---

[166]   Colby Itkowitz, Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an
       Allegation He Denies, WASH. POST (June 21, 2019), https://www.washingtonpost.com/politics/magazine-
       columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-
       denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html.
[167]   Sarah Jones, E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman.", N.Y.
       MAG. (June 21, 2019), https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-
       accusation.html.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Model (New York Times, Daily Caller, Washington Examiner, and USA Today.) I identified

these news outlets' coverage of Ms. Carroll on Twitter and Facebook, after June 2019, when the

statements first appeared in news through when I conducted this analysis on September 28,

2022.[168] Searching for replies using three phrases that reference a subset of Mr. Trump's claims

("book sale," "sell her book" and "agenda") and three negative terms ("crazy," "whore," and

"bitch") led me to hundreds of negative comments about Ms. Carroll.  Figure 12 below includes

some of these comments, and Appendix H contains over a hundred additional examples.

---

[168]    On Twitter, I used the Twitter API to search for Carroll-related tweets authored by each of the four specified
news publication, using a query such as "e jean carroll from:usatoday since: 2019-07-01." On Facebook, I
went on each publication's Facebook Page and searched for posts mentioning "e jean carroll" since July
2019. I then collected all the comments and replies to these tweets and Facebook posts.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 12.  Sample of Replies Generated by Long-Term News Coverage[169]**



The nature of the engagement around this news coverage continues to reference Mr. Trump's Statements to this day and illustrates the changed tenor and malice of the associations with Ms. Carroll's name. For example, in response to recent press coverage, readers say, "… after all the women who have lied in court under oath about being raped by someone in or affiliated with the trump administration, yeah ima call this bitch a liar. …", and label her a "attention whore" and "lying bitch" in response to articles that contain the allegedly defamatory

---

169    https://twitter.com/1/status/1304903451625713664, https://twitter.com/1/status/1303742205648142336, https://twitter.com/1/status/1303700235210891265, https://twitter.com/1/status/1438311461110095873, https://twitter.com/1/status/1572592008316981250, https://twitter.com/1/status/1572467301315940352.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

claims. These negative messages are further indication of the lingering negative effect of Mr. Trump's claims about Ms. Carroll on her person brand.

*Posts on Twitter*. The negative and malicious nature of the messages to Ms. Carroll extend to social media more broadly as evidenced by posts with no direct connection to the original Statements.  Using the same search phrases as I did above led me to thousands of negative posts in response to or mentioning Ms. Carroll.[170]  Many of the replies and tweets I found explicitly reference and/or repeat Mr. Trump's defamatory claims about Ms. Carroll, as illustrated in Figure 13 below.

For example, RunnerMoe24 calls Ms. Carroll a "Liar…a disgusting person" and accuses her of making up the story to "draw sales for your book," as Mr. Trump claimed. These kinds of comments continue into the present, with Angerisinnate calling her a "sick, ugly, rejected old hag," and repeating Mr. Trump's claim that she is attempting to sell books as recently as September 2022.

---

[170]    I used Brandwatch to conduct this search. I searched for posts from January 1, 2019 through September 28, 2022 with the following query: (ejeancarroll OR "e jean carroll" OR "jean carroll" OR jeancarroll) OR engagingWith:ejeancarroll.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 13. Sample of Twitter Commentary about Ms. Carroll Following Mr. Trump's Statements[171]**

Patriot24
@RunnerMo24

Replying to @ejeancarroll

Liar, Liar. You are a disgusting person. Women like you are the reason people hesitate to believe women who are truly sexually assaulted. You are psychological messed up to lie about something like this to draw sales for your book because you're unknown by most. Seek help.

5:29 PM · Jun 21, 2019 · Twitter for Android

MCWAY2000
@MCWAY2000

Replying to @poconnell2 @annanavarro and @ejeancarroll

The same screwball woman who waited until she had a book to pimp...ahem...sell before off-handedly claiming that Trump felt her up 30+ years ago? Notice how all these loons claim something happens DECADES ago, but only when Trump was becoming (and actually became) president

11:18 AM · Aug 4, 2021 · Twitter Web App

Scott L. Harris
@PapaNeanderthal

Replying to @ShelbyTalcott @DailyCaller and 2 others

She's not going to bring charges against Trump because it never happened. She only looking for 3 things: Publicly for her book, $$$, & some political agenda.!..

2:02 PM · Jun 22, 2019 · Twitter for iPhone

Chas
@firethornranch

@ejeancarroll says @realDonaldTrump attacked her in the 90's. She didn't report it, she's writing a book, etc blah, blah! "Same song same verse a little louder a little worse!" Another person using the #FalseMedia for publicity and a way to sell her book for $. #BadFiction

6:14 PM · Jun 21, 2019 · Twitter for iPhone

Even the HORSE knows
@Angerisinnate

He wouldn't have touched THAT with YOURS! Sick, ugly, rejected old hags trying to UP their book sales should go to prison themselves. Even her story backs his claim that he wouldn't EVER. This just makes women look bad.

msn.com
Trump will be sued for sexual assault by writer E. Jean Carr...
E. Jean Carroll, who is already suing Trump for defamation, notified a judge overseeing the case of her intent to sue as ...

12:23 PM · Sep 21, 2022 · Twitter Web App

PinochetPilot
@pinochet_pilot

Replying to @ejeancarroll

Aren't you the lady that claimed trump sexually assaulted you? Lmao right. He has access to supermodels but he had time to go after you? Trump has a type, and it isn't crazy cat ladies. I guess if it helped your book sell 😂

8:26 PM · Sep 5, 2022 · Twitter for iPhone

FLOCCINAUCINIHILIPILIFICATION
@floccinaucini1

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda,"-Trump. E. Jean Carroll accussing Trump of rape in 1990 in ritzy department store, as bad as Kavanaugh's accuser! 😡 What a Dork Fish!

6:24 PM · Jun 21, 2019 · Twitter Web App



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Replies Directly to Ms. Carroll on Facebook and Instagram*. Additionally, I reviewed comments and replies to posts made by Ms. Carroll on her personal Facebook and Instagram, accounts where I found hundreds of negative and malicious messages and attacks on her character (see Figure 14 and Figure 15 below.) One, for example, says, "I hope you're sued into hell and back for these FALSE allegations." Another says, "Pathetic.... you are a true POS... cry wolf years later? 20+ years??? Your (sic) a sorry sack of shit... not brave... brave would have been to call it out then and there...."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 14.  Examples from Ms. Carroll's Facebook Page[172]**



---

[172]  https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ51tESLc41qzM8fSB
Vm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176;
https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ51tESLc41qzM8fSB
Vm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176;
https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLfMNXp7iaVe7cJ4e6n
8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725176;
https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPFJS9xmq4cbSBCFpS
CfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 15. Examples from Ms. Carroll's Instagram[173]**



The negative impression people have of Ms. Carroll persists to the present, as the hateful messages continue to be posted and continue to reference Mr. Trump's Statements (see, for example, Appendix H). While there are many messages of support for Ms. Carroll among the posts I reviewed, the fact that I was able to find a high volume of negative and vicious messages using a limited set of phrases is indicative of the persistent and ongoing harm to her person

---

[173]   https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673,
https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795,
https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171,
https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561,
https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

brand. Appendix I contains over 1,000 examples of these acerbic and hurtful public comments, both from responses to her personal accounts and from Twitter more generally.

In addition to these types of general social media comments, Ms. Carroll received many malicious direct messages and emails, over 80 examples of which can be found in Appendix I. These hateful messages continue into 2022, calling her a "liar and a fraud" and a "stupid bitch."[174] The direct messages to Ms. Carroll come from a wide range of platforms including email, Facebook, Twitter, and the submission email account for her "Ask E. Jean" column.

Overall, my qualitative impact analysis indicates that Ms. Carroll's person brand has been harmed by Mr. Trump's Statements. While her brand was associated with dating and advice prior to the Statements in 2019, after the Statements, her name is, and continues to be, associated with a different set of associations, and she is assailed publicly and continually online, often with direct reference to Mr. Trump's Statements. The news coverage of her and search traffic about her continues to be tied to Mr. Trump and his Statements. While some public attention came just after the publication of her book, the highest volume of attention came directly after Mr. Trump's Statements.

**B.  Quantitative Impact Assessment**

In addition to a qualitative analysis of the tenor and nature of the impact of Mr. Trump's Statements on Ms. Carroll's person brand, I conducted a quantitative analysis to assess the portion of impressions calculated in the impressions analysis that would have been made to a receptive audience (the "receptive impressions"). To approximate the receptive impressions, I

---

[174]    CARROLL_028059 and CARROLL_029774.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

used estimates of the percent of the readership/viewership who identify as Trump supporters and/or are Republicans and estimates of the percent of Republicans who did not find allegations of sexual harassment and sexual assault made against Mr. Trump to be credible. I then discounted the total number of impressions generated by the Statements (as calculated in the Impressions Model) by the estimated percent of receptive impressions.

**i.   Readership Analysis**

*Readership Based on Pew Data.* What percentage of the impressions were made to an audience that was inclined to believe them? To understand the impact of Mr. Trump's claims regarding Ms. Carroll, I used data from Pew Research's ongoing survey of American Trends. Pew Research is a non-partisan think-tank that does "data-driven social research."[175] Their American Trends panel survey provides information about Americans' political beliefs, and I use it to calculate the percent of readership that were receptive to his claims.[176] I used data from the survey Pew conducted between October 29 and November 11, 2019, making it a reasonable approximation of the composition of readership of the sources where the June 21, 22, and 24, 2019 Statements appeared (subscription periods tend to be on a yearly basis). The survey data and documentation are publicly available.[177] The Pew survey is "a national, probability-based online panel of adults living in households in the United States" and generated 12,043 responses collected from a nationally-representative sample.[178]

---

[175]   https://www.pewresearch.org/about/
[176]   https://www.pewresearch.org/our-methods/u-s-surveys/
[177]   The data from this study was downloaded and produced. Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019, https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/.
[178]   With a probabilistic sample of this size, the sampling error was ± 1.43 percentage points, https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The following variables were used in the analysis:

- SOURCEUSE: "Please click on all of the sources that you got political and election news from in the past week. This includes any way that you can get the source. If you are unsure, please DO NOT click it. **[KEEP IN SAME ORDER AS SOURCEHEARD]"**

- PARTY: "In politics today, do you consider yourself a: **ASK IF INDEP/SOMETHING ELSE (PARTY=3 or 4) OR MISSING:** PARTYLN As of today do you lean more to…"

- THERMO: "We'd like to get your feelings toward a number of people on a 'feeling thermometer.' A rating of zero degrees means you feel as cold and negative as possible. A rating of 100 degrees means you feel as warm and positive as possible. You would rate the person at 50 degrees if you don't feel particularly positive or negative toward them." (recoded to Trump receptive if value was >=50).

*Receptivity based on YouGov Poll.* Not every Republican is necessarily inclined to be receptive to Mr. Trump's Statements. For that reason, I corrected by discounting according to the percent of Republicans who either (1) found the various allegations of sexual harassment and assault made against Mr. Trump to not be credible (49%) or (2) needed more information (27%), for a total of 76%.[179] I did not include those who were unsure. These responses indicate a reasonable expectation that the respondent either already believed Mr. Trump's Statements or was open to believing them, given their other beliefs and their current lack of information (*i.e.*, they did not select that they did believe the allegations made against Mr. Trump were credible).

I performed the following calculations:

- *Percent Republicans* = percent of a publications' audience that are Republican[180]

- *Percent Receptive Republicans* = Percent Republicans * Percent of Republicans Receptive to the claims (.76, YouGov)

---

[179] https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll
[180] Republicans were identified as PARTY=1 in the raw data.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- *Percent Trump Supporters* = sum of all people who were receptive towards Mr. Trump[181]

Based on this analysis, I can conclude that an average of 25% of the total impressions were to individuals inclined to be receptive to the Statements of Mr. Trump. As can be seen in Figure 16 below, the minimum receptive audience was 11.25% (*Huffington Post*), while publications like the *Daily Caller* had a more receptive audience of 68.63%.

---

[181]   I considered all people who listed a "feeling thermometer" greater than or equal to 50 to be receptive to Mr. Trump (*i.e.*, THERMO>=50).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 16.  Percentages of Republican or Republican-Leaning Readers/Viewers and the Percentage of Trump Supporters for Each Publication[182]**

| Publication | Percent Republican | Percent Receptive Republicans | Trump Supporters |
|---|---|---|---|
| The New York Times | 16.3% | 12.39% | 13.7% |
| ABC | 34.7% | 26.37% | 32.5% |
| NBC | 31.0% | 23.56% | 29.5% |
| CBS | 33.7% | 25.61% | 31.6% |
| Washington Post | 18.1% | 13.76% | 14.6% |
| Time | 21.0% | 15.96% | 18.5% |
| Huffington Post | 14.8% | 11.25% | 12.4% |
| Daily Caller | 90.3% | 68.63% | 84.9% |
| Fox News | 69.8% | 53.05% | 68.2% |
| MSNBC | 20.5% | 15.58% | 19.9% |
| CNN | 23.6% | 17.94% | 23.3% |
| The Wall Street Journal | 38.7% | 29.41% | 31.6% |
| USA Today | 34.9% | 26.52% | 32.6% |
| Politico | 22.4% | 17.02% | 17.8% |
| BuzzFeed | 23.2% | 17.63% | 19.8% |
| Newsweek | 23.1% | 17.56% | 20.9% |
| Business Insider | 31.5% | 23.94% | 26.3% |
| The Hill | 32.1% | 24.40% | 26.6% |
| Washington Examiner | 65.7% | 49.93% | 58.4% |
| The Guardian | 19.2% | 14.59% | 16.7% |
| **Average** | | **25.25%** | |

To calculate the final number of impressions to a receptive audience, I took the lowest of

these variables, which is the Receptive Republicans, and multiplied the impressions generated by

---

[182]   Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

each media source by that percent. Data was not available for some of the publications

considered in the Impressions Model. I used the average for all other publications if data was

unavailable for a specific publication. Multiplying the impressions estimate from the Impressions

Model by the Percent Receptive Republicans yields the percent of impressions made to people

who were receptive to them. This estimate of the receptive impressions can then be carried

forward to assess how much it would cost to repair reputational damage with this population.

The formula used to calculate receptive impressions is displayed in Figure 17 below. The

formula is applied to each of the media analyzed in the Impressions Model.

**Figure 17.  Receptive Impressions Calculation**

> **Receptive Impressions = Percent Republicans * Percent of Receptive Republicans * Impressions Estimate**

Where:

> Percent Republican = percent of a publications' audience that are Republican
> Receptive Republicans = Republicans receptive to the claims (.76, YouGov)[183]
> Impressions Estimate = the total impressions from the Impressions Model

Figure 18 below summarizes the total receptive impressions generated by the Statements.

Appendix J includes the detailed results of the quantitative impact model.

**Figure 18.  Total Receptive Impressions**

|  | Social Media | Web | Print | TV | Total |
|---|---|---|---|---|---|
| **High** | 12,441,816 | 3,275,673 | 444,737 | 26,774,128 | 42,936,354 |
| **Low** | 3,580,974 | 3,275,673 | 444,737 | 26,774,128 | 34,075,512 |

---

[183]   If data related to Percent Republicans is not available, the equation is as follows: the average Percent Receptive Republicans (25.25%) * Impressions Estimate.

Expert Report of Professor Humphreys                63

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The quantitative impact analysis uses information about readership, political ideology, and receptivity given political ideology to calculate the number of impressions generated by Mr. Trump's Statements that were made to a receptive audience. Certainly, as detailed in the qualitative impact analysis and impression analysis, the Statements caused sufficient harm to Ms. Carroll's brand to a general public, meaning individuals across the ideological spectrum. The quantitative impact analysis provides an estimate of the target audience for a corrective campaign. That said, the total harm done to Ms. Carroll's brand in the eyes of the generalized public exceeds the very limited bounds of this quantitative impact and damages calculation. Appendix J includes a summary of the various reasons why the quantitative impact analysis is an undercount.

## VI. MODELING THE COSTS FOR REPUTATION REPAIR IN SOCIAL MEDIA

### A.  Modeling Reputation Repair on Social Media

As detailed in the theoretical background section above, defamation causes harm to one's reputation in the public sphere. As a corrective measure to repair reputation, an advertising and strategic communications plan can attempt to change attitudes that may have been affected by the Statements. This section details the methodology for calculating the costs to repair reputation damage via social media channels. The costs to repair the reputation are based on the estimates of the number of receptive impressions. The goal of the corrective campaign is to counteract the number of receptive impressions generated by the Statements, enabling Ms. Carroll to repair the damage done to her person brand by Mr. Trump. The best way to allocate spending on media for this kind of campaign would be to create a media mix that is based on how the target audience

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

gets their information.[184] Further, a particular group that does not trust traditional media, such as those who identify as Republicans and/or support Mr. Trump, requires alternative information channels that they do trust.

###    i.    Campaign Goals, Platforms, and Measurements

In my opinion, and given the prior literature summarized in Section II, a campaign to repair reputational damage must include (i) hiring influencers whom the audience regards as trusted sources, (ii) circulating statements in multiple media to replicate the echo chambers in which they originated, (iii) ensuring that the audience is exposed to the message multiple times in order to create attitude change, and (iv) extending for a long enough time to allow for dissemination, given what is known about the slow spread of true versus false claims online[185] and the multifaceted nature of effective corrective repair through online channels (*e.g.*, *United States v. Bayer Corp.*, No. 07-01(HAA) (D.N.J. Jan. 4, 2007). A holistic social media campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case.[186]

An effective social media campaign to repair reputational damage must be multi-pronged and include a mix of platforms and people. A typical social media campaign will combine display and search advertising along with hiring influencers to promote a message via blogs and on their Instagram, YouTube, and other channels. Production costs for video and to promote

---

[184]    Ardia 2010.
[185]    Vosoughi *et al.* (2018).
[186]    Shankar, V., and Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? *International Journal of Research in Marketing*; Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. *Journal of Research in Interactive Marketing*, 11(2), 185–197.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

content are often also included. Because the source—and not just the message—is so critical to attitude change, particularly on social media, it is important to work with credible and likeable sources likely to gain traction with the intended audience. For this reason, hiring social and mass media influencers is critical to one's ability to repair reputational damage.

ii. **Media Mix**

To allocate media budget and media spend across each platform, I relied on the Pew data previously cited in the impact analysis. Using the Pew data, I conducted an analysis of the ways individuals who identify as Trump supporters reported getting their news (see Figure 19 below). Respondents who identified as Trump supporters[187] were asked "what is the most common way you get political and election news?" News websites or apps were the most commonly cited media used, with 23.1%. I added this together with social media (13%) to allocate the online and influencer budget. The next most common responses were cable (21.3%), local (15.6%), and national network television (14%), which I allocated to the mass media budget. I allocated radio (9.1%) and print (3.4%) accordingly as well, using publicly available data on rates for these media channels.

---

[187]     I analyzed the media habits of Trump supporters (THERMO variable >50), as that was the closest reflection of the receptive Republican audience in the Pew data.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 19.  The Media Mix of Respondents who Identify as Trump Supporters**

| *NEWS_MOST_W57. What is the most common way you get political and election news?* | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **Print newspaper or magazines** | 162 | 3.4 | 3.4 | 3.4 |
| **Radio** | 438 | 9.1 | 9.1 | 12.5 |
| **Local television** | 748 | 15.6 | 15.6 | 28.1 |
| **National network television** | 669 | 14 | 14 | 42.1 |
| **Cable television** | 1020 | 21.3 | 21.3 | 63.3 |
| **Social media** | 623 | 13 | 13 | 76.3 |
| **News website or app** | 1109 | 23.1 | 23.1 | 99.5 |
| **Refused** | 26 | 0.5 | 0.5 | 100 |
| *Total* | 4795 | 100 | 100 | |
| | | *99.5* | | |

To estimate the cost for repair on each platform, two measurements are used as the industry standard. To assess the number of impressions, one can use the cost per thousand impressions, otherwise known as cost per mille (CPM) to estimate how many impressions would be gained for each dollar spent and cost per click (CPC) to estimate the number of engagements each dollar is likely to yield. For each channel, I calculated either the CPM or CPC multiplied by the number of receptive impressions generated by the Statements (as discussed, below I also incorporated an attitude-change multiplier to account for the fact it takes multiple exposures to change an existing attitude). I also included costs to have social and mass media influencers share the message across their channels, similar to the method in which Mr. Trump's Statements were spread and that mirrors the ways in which Trump supporters get their news, according to analysis of the Pew Research poll.[188]

Costs of advertising were calculated as CPM or CPC multiplied by the target number of

---

[188]   Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

impressions of each channel or platform. Whether to use CPM or CPC in a cost calculation

depends on the goal of the campaign. Annual industry benchmark reports of CPM and CPC for

different channels and platforms published by research firms and advertising networks are used

in the damages model to estimate costs for reputation repair. When the cost of advertising of a

specific channel could be calculated from either CPM or CPCI used CPC in the final cost of this

channel in order to ensure attitude change/conversion. For influencer promotion and mass media

advertising, only CPM was used for cost calculation because CPC is usually not available.

### iii.   Attitude Change Multiplier

As covered in the aforementioned psychological literature, an attitude is not changed by

one impression alone. In order to actually change attitudes, a campaign would need to serve

multiple impressions per person; showing someone a counter-attitudinal message one time will

not change their attitude. This is true in traditional media,[189] but it is particularly true in the

crowded attention marketplace of social media. While prior research has found that it requires

about 3 to 5 impressions to change an attitude in traditional advertising exposure, on social

media the number of exposures is likely much higher. Taking into account the attention

environment, the strength of attitudes, and the impression rate (likelihood of an exposure leading

to an actual impression), I estimate that a message would need to be seen approximately 3 to 5

times on social media *from a credible source* before it would lead to attitude change. With some

audiences, 7 times may be more appropriate. For some audiences, it would be impossible to

change attitudes.

---

[189]   Cacioppo and Petty (1980).

Expert Report of Professor Humphreys                                68

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

    **iv.**    **Potential Overlap in Impressions**

As mentioned above, the aim of the corrective campaign is to repair the harm to Ms. Carroll's brand caused by the receptive impressions. Yet the literature on attitude change multipliers is based on individuals and not impressions (*i.e.*, one individual would require between 3 and 5 impressions to change attitudes). It is possible that the proposed campaign, which is measured in impressions, could serve multiple impressions to one individual, even without an attitude change multiplier. In order to account for this potential overlap, I provide estimates as low as a multiplier of 1, which would undercover the number of impressions needed for attitude change. For informative purposes, the damages model that I include provides a range of attitude change multiples, from 1 to 5. However, owing to the need to include multiple exposures for everyone in the target audience,[190] I believe at least 3 impressions would be needed to change attitudes in this case.

Empirical data suggest that a multiplier of 1 is overly conservative, especially given the media habits of the audience who were likely receptive to the Statements. Using the Pew dataset referenced previously, I conducted an analysis of media habits of Trump supporters. The data show that Trump supporters[191] are more likely to use only one news source (37% vs. 27% for non-Trump supporters), and they are more likely to use cable news than non-Trump supporters (21% vs. 16%).[192] If the audience tends to consume one news source, it is unlikely that they will

---

[190]    Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).

[191]    Because the survey did not have a "receptive Republicans" measure and I could not infer it on an individual level, I used survey respondents who indicated support for Trump. According to my prior analysis, this percentage is roughly equivalent to receptive Republicans.

[192]    The most common way Trump supporters get their news is through a news website (23.1%), followed closely by cable television (21.3%). Although only 13% report commonly getting news from social media, 43.4%

**A213**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

receive multiple impressions from a campaign with a frequency multiplier of 1. A campaign that would actually change attitudes for this audience would need to show multiple impressions, particularly to those who only use one primary news source (the others would be likely to get multiple impressions if they use more than one news source).[193] Taking into account the potential overlap of impressions per person in this instance, the damages model therefore presents a conservative range from 1 impression—which I feel is an underestimate—to 5 impressions.

### B.  Costs of the Corrective Campaign

Figure 20 below shows the total costs of the corrective campaign. I include three costs: a low estimate, which incorporates an attitude change multiplier of 1; a medium estimate, which incorporates an attitude change multiplier of 3; and a high estimate, which incorporates an attitude change multiplier of 5. As detailed above, I believe a multiplier of at least 3 (the medium estimate) would constitute the minimum corrective campaign to run, given the importance of multiple exposures and the likelihood that the audience will receive them and be affected by them.[194] Appendix K includes the detailed results of the damages model.

---

report often or sometimes getting news from social media (17.9% reporting that they often get news from social media). The most common sources for political news by media can be found by analyzing the Pew Research 2019 dataset.  For each channel, I used the rates associated with the most common response, as listed in the Pew Survey (variables MAINSOPOL_USE_W57 and NEWS_MOST_W57). Respondents also provided an open-ended response about what media sources they use, which provided insight into the best channels for placement and guided rate selection.

[193]   Note that a campaign with a multiplier of 1 may result in some people seeing the same message more than once (say, for example on cable television), even if they only get their information from one news source. Nonetheless, a 1x multiplier mimics the number of initial impressions they received on a 1:1 basis, not a 3:1 basis, as I would suggest for counter-attitudinal messages.

[194]   Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).

Expert Report of Professor Humphreys          70

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 20.  Final Damages Calculations**

|                     | Low            | Medium          | High            |
| ------------------- | -------------- | --------------- | --------------- |
| **High Impressions** | $4,199,772.24  | $12,599,316.71  | $20,998,861.18  |
| **Low Impression**   | $3,333,058.72  | $9,999,176.17   | $16,665,293.62  |

High & low impressions from the Impressions Model
Low = 1x attitude change multiplier, Medium = 3x, High = 5x
In the campaign, I assume an impression rate of 5%[195] and
a bounce rate of 90%.[196]

The damages model presents a conservative estimate of the cost to run a multi-media campaign to correct attitudes amongst the audience most likely to have been receptive to the Statements (see Appendix J for the reasons why the damages model is conservative). It does not account for the harm to Ms. Carroll's brand in the public at large, but only among this specific receptive audience. The campaign takes into account readership and viewership patterns in the target audience, the number of receptive impressions, and the current advertising costs across media. In this case, the Statements came from Mr. Trump, a high-profile individual with a loyal following whom the media covered, and continues to cover, extensively. Given his status, Mr. Trump's Statements received a very large number of impressions. Of the large audience where these statements appeared, at least 25% were receptive to them. The estimate to correct reputational damage is therefore of the same magnitude as the inflicted harm.

---

[195]   The CPMs I rely on for Twitter, Facebook, and YouTube influencers are based on an influencer's number of followers or subscribers. For the reasons described above, not all a user's followers will see an influencer's post. As a result, to ensure the corrective campaign generates sufficient impressions, it is necessary to incorporate an impression rate. In this case, I am relying on an impression rate of 5% which is the median impression rate calculated using Equation 2a from the Impression Model.

[196]   The CPM I rely on for web blog influencers is based on site visits. To account for people who visit a blogger's website but do not perform any other action, I multiplied the impressions needed by a bounce rate of 90%, a typically bounce rate for blogs. (https://influencermarketinghub.com/glossary/bounce-rate/).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## VII. CONCLUSION

I conclude that Mr. Trump's Statements about Ms. Carroll have significantly harmed her person brand. My conclusion is based on my academic research and expertise and my analysis of the facts of this case and of data I collected regarding the dissemination of, and receptivity to, Mr. Trump's Statements; it is also supported by abundant qualitative evidence. The models I developed demonstrate how Mr. Trump's Statements spread to a receptive audience across online and traditional media platforms and provide the basis for calculating the cost of an effort to repair the damage done to Ms. Carroll's person brand. My conclusions are as follows:

- **Impressions Model Conclusion:** Mr. Trump's Statements made on June 21, 22, and 24, 2019, received between 142,334,424 and 188,155,507 impressions across social, digital, television, and print media. The extraordinary dissemination of the Statements is in keeping with the high profile and ongoing media coverage of Mr. Trump.  While extraordinary, this number of impressions is a conservative estimate for reasons I have previously delineated.

- **Impact Model Conclusion:** Of the impressions generated, an average of 25% of recipients were receptive to these Statements, resulting in between 34,075,512 and 42,936,354 impressions that should be corrected. Further, my qualitative assessment of the impact of the dissemination of Mr. Trump's Statements is that they caused short- and long-term harm to Ms. Carroll beyond the estimate of receptive impressions calculated in my Impact Model. Evidence from a number of sources indicates that there has been a shift in the perceptions associated with Ms. Carroll's person brand with the general public and specific perceptions amongst a group of people receptive to the claims.

- **Damages Model Conclusion:** The cost to counteract the impact of these Statements is between $3,333,058.72 and $20,998,861.18. I believe the minimum corrective campaign to repair reputational damage would be the middle range, from $9,999,176.17 to $12,599,316.71 for reasons outlined above. Because I took a conservative approach to calculating the Impressions input, this range represents a conservative estimate.

I reserve the right to revisit and supplement this analysis and amend these conclusions should additional informatin and/or documents become available, such as Mr. Trump's October 12 statement, reiterating many of the defamatory claims against Ms. Carroll, in response to a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

judge's denial of Mr. Trump's request to delay his deposition. I further reserve the right to

respond to opinions and issues raised by any opposing experts. Finally, I reserve the right to use

demonstrative and/or other exhibits to present the opinions expressed in this report and/or any

supplemental, amended, and/or rebuttal reports.

Dated: October 14, 2022

_____

Professor Ashlee Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX A.   <u>PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY</u>**


[Produced in Native Format]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX B.  <u>MATERIALS CONSIDERED</u>

**Bates Stamped Documents**

- CARROLL_024475-79
- CARROLL_024499
- CARROLL_024554
- CARROLL_024559
- CARROLL_024562
- CARROLL_024640-41
- CARROLL_024684
- CARROLL_024796
- CARROLL_024944
- CARROLL_024974
- CARROLL_025080
- CARROLL_026326
- CARROLL_026329
- CARROLL_026331
- CARROLL_026473
- CARROLL_026479
- CARROLL_026596
- CARROLL_028058-59
- CARROLL_028063-65
- CARROLL_028069
- CARROLL_028115
- CARROLL_028549
- CARROLL_028588
- CARROLL_028592
- CARROLL_029331
- CARROLL_029774-75
- CARROLL_030105-08
- CARROLL_030111-29
- CARROLL_030131-48
- CARROLL_030150-56

**Legal Filings and Depositions**

- Complaint, November 4, 2019.
- Deposition of Robbie Myers, October 12, 2012.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Academic Articles**

- Ajzen, I. (1985), From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11–39).
- Albarracin, D., & Shavitt, S. (2018). Attitudes and attitude change. Annual Review of Psychology, 69, 299–327.
- Ardia, D. S. (2010). Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law. Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 264.
- Ardia, David S. (2010), "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 261.
- Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013), "The Context of Content: The Impact of Source and Setting on the Credibility of News," Recherches en Communication, 40, 151-68.
- Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," Journal of Advertising, 50 (5), 528-47,
- Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.
- Cacioppo, John T and Richard E Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," Current issues and research in advertising, 3 (1), 97-122.
- Cialdini R B, R E Petty, J T Cacioppo, (1981) Attitude and Attitude Change, Annual Review of Psychology.
- Conover, M. et al (2011), "Political Polarization on Twitter." In Proceedings of the International AAAI Conference on Web and Social Media, 5:1, 89-96.
- Curran, J. et al (2009), "Media System, Public Knowledge and Democracy: A Comparative Study," European Journal of Communication, 24 (1), 5-26.
- Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
- Dewenter, R., M. Linder, and T. Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," European Journal of Political Economy, 58, 245-61.
- Festinger, L. (1962), "Cognitive dissonance." Scientific American 207(4): 93-106.
- Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," Journal of Marketing Research, 17 (3), 307-15.
- Grabe, M. E., Zhou, S., & Barnett, B. (1999). Sourcing and Reporting in News Magazine Programs: 60 Minutes versus Hard Copy. Journalism & Mass Communication Quarterly, 76(2), 293–311.
- Heider, Fritz (1946), "Attitudes and Cognitive Organization," The Journal of psychology, 21 (1), 107-12.
- Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, Journal of Information Technology & Politics, 11:368–382.
- Huang, J., et al. (2021), "Large-scale quantitative evidence of media impact on public opinion toward China," Humanities and Social Sciences Communications, 8(1): 1-8.
- Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," Social networks, 25 (1), 17-49.
- Humphreys, A. and R. Jen-Hui Wang, (2018) Automated Text Analysis for Consumer Research, Journal of Consumer Research, Volume 44, Issue 6, Pages 1274–1306.
- Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," Annual review of sociology, 32, 53-78.
- Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.
- Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.
- Kruglanski, A. W., & Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). Psychological Review, 118(3), 522–522. https://doi.org/10.1037/a0023709
- Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.
- Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," Information Sciences, 306, 34-52.
- Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. First Monday, 24(9). https://doi.org/10.5210/fm.v24i9.10213
- Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," Journal of consumer research, 36 (6), 1016-32.
- Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," Journalism Studies, 9 (3), 447-63.
- Metzger, M. J., & Flanagin, A. J. (2013). Credibility and trust of information in online environments: The use of cognitive heuristics. Journal of Pragmatics, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87.
- Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. Journal of Research in Interactive Marketing, 11(2), 185–197.
- Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," Journal of Marketing Communications, 20 (1-2), 117-28.
- Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," Journal of Media Economics, 1 (1), 61-74.
- Prior, Markus (2013) "Media and political polarization." Annual Review of Political Science 16: 101-127.
- Shankar, V., & Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? International Journal of Research in Marketing.
- Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." Political Studies 55, no. 1: 20-37.
- Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," Public Administration Review, 336-45.
- Singh, N., A. Singh, R. Sharma (2020), Predicting Information Cascade on Twitter Using Random Walk, Procedia Computer Science, 173, 201-209.
- Sterrett, D. et al (2019), "Who Shared It?: Deciding What News to Trust on Social Media," Digital Journalism, 7 (6), 783-801.
- Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. Journal of Marketing, 70(3), 104–119, p. 104.
- Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," Science, 359 (6380), 1146-51.
- Wang, L., Ramachandran, A., & Chaintreau, A. (2016). Measuring Click and Share Dynamics on Social Media: A Reproducible and Validated Approach. Proceedings of the International AAAI Conference on Web and Social Media, 10(2), 108-113.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California Press.
- Weiss, Robert Frank (1969), "Repetition of Persuasion," Psychological Reports, 25 (2), 669-70.
- Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982 - 1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.
- Zha, X. et al (2018). Exploring the effect of social media information quality, source credibility and reputation on informational fit-to-task: Moderating role of focused immersion. Computers in Human Behavior, 79, 227–237.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Books**

- Buzzard, Karen (2012), Tracking the Audience: The Ratings Industry from Analog to Digital.
- Chadwick, Andrew (2017), The Hybrid Media System: Politics and Power: Oxford University Press.
- Cialdini, Robert B (1987), Influence, Vol. 3: A. Michel Port Harcourt.
- David, John (2016), How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business: Red Wheel/Weiser.
- Dyer (1979) Heavenly Bodies: Film Stars and Society.
- Gamson (1994) Claims to Fame: Celebrity in Contemporary America.
- Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.
- Humphreys, A. (2015). Social Media: Enduring Principles, Oxford University Press.
- Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."
- Rosnow, Ralph L and Gary A Fine (1976), Rumor and Gossip: The Social Psychology of Hearsay: Elsevier.
- Tuchman, Gaye (1978), Making News: A Study in the Construction of Reality, New York: Free Press.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California press.

**Websites**

- http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf
- http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054
- https://about.proquest.com/en/products-services/nationalsnews_shtml
- https://archive.org/details/tv
- https://auditedmedia.com/about/who-we-are
- https://auditedmedia.com/Solutions/Print-Publisher-Audits
- https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/
- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
- https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
- https://hbr.org/2022/02/whats-the-point-of-a-personal-brand
- https://help.crowdtangle.com/en/articles/4201940-about-us

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
- https://help.twitter.com/en/using-twitter/types-of-tweets
- https://influencermarketinghub.com/what-is-personal-branding/
- https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/
- https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type
- https://markets.nielsen.com/us/en/solutions/measurement/television/
- https://markets.nielsen.com/us/en/solutions/measurement/television/ and
- https://martech.org/facebook-twitter-impressions/
- https://marxcommunications.com/what-does-impressions-mean-on-twitter/
- https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
- https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html.
- https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205
- https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
- https://sproutsocial.com/insights/social-media-algorithms/
- https://theraveagency.com/blog/finding-the-value-in-twitter-impressions
- https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf
- https://time.com/5907973/donald-trump-loses-2020-election/
- https://time.com/6212677/donald-trump-investigations-explained/
- https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll
- https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-01%202019-06-30&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv
- https://web.archive.org/web/20200520030235/http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/
- https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM
- https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
- https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286
- https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286
- https://www.amazon.com/product-reviews/0060530286
- https://www.amazon.com/product-reviews/0525935681/
- https://www.britannica.com/biography/Donald-Trump
- https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
- https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html
- https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
- https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.elle.com/author/4913/e-jean/
- https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-show-in-cable-news-as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c
- https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp
- https://www.foxnews.com/politics/trump-responds-jean-carroll-defamation-lawsuit-after-judge-denies-delay
- https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf
- https://www.gazettenet.com/Carroll-26480259
- https://www.goodreads.com/author/show/30738.E_Jean_Carroll
- https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/
- https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6
- https://www.investopedia.com/terms/c/cpm.asp
- https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader
- https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault
- https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/
- https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22
- https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/
- https://www.necn.com/news/local/trump-e-jean-carroll/220418/
- https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html
- https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
- https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
- https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html
- https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html
- https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type
- https://www.pewresearch.org/about/
- https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/
- https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/
- https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/
- https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/
- https://www.pewresearch.org/our-methods/u-s-surveys/
- https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/
- https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.semrush.com/kb/26-traffic-analytics
- https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages
- https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html
- https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type
- https://www.tweetbinder.com/blog/twitter-impressions/
- https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/
- https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp
- https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html.
- https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f

**Social Media Posts**

- http://twitter.com/Angerisinnate/statuses/1572622451607242801
- http://twitter.com/firethornranch/statuses/1142194188852895746
- http://twitter.com/floccinaucini1/statuses/1142196689148813313
- http://twitter.com/pinochet_pilot/statuses/1566945839679180800
- http://twitter.com/RunnerMo24/statuses/1142182659071860737
- http://twitter.com/ScottLHarris1/statuses/1142493161886892032
- https://truthsocial.com/@realDonaldTrump/posts/109158586745522514
- https://truthsocial.com/@realDonaldTrump/posts/109158644496040450
- https://twitter.com/1/status/1142180829835255808
- https://twitter.com/1/status/1142184727492878336
- https://twitter.com/1/status/1142197820826501120
- https://twitter.com/1/status/1142226611380600832
- https://twitter.com/1/status/1143477200148189184
- https://twitter.com/1/status/1303700235210891265
- https://twitter.com/1/status/1303742205648142336

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://twitter.com/1/status/1304903451625713664
- https://twitter.com/1/status/1438311461110095873
- https://twitter.com/1/status/1572467301315940352
- https://twitter.com/1/status/1572592008316981250
- https://twitter.com/AP/status/1580371759240548353
- https://twitter.com/MCWAY2000/status/1422939994235228162
- https://twitter.com/Olivianuzzi/status/1142197820826501120
- https://twitter.com/TristanSnell/status/1580390962115006464
- https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLf
  MNXp7iaVe7cJ4e6n8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725
  176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5
  1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5
  1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176
- https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPF
  JS9xmq4cbSBCFpSCfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764
- https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171
- https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795
- https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673
- https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673
- https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561

**TV Rating References**

- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-
  1234582089/
- https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
- https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-
  in-network-history
- https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-
  quarter-of-2019/
- https://thecomicscomic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
- https://www.adweek.com/tvnewser/evening-news-ratings-q2-2019-and-week-of-june-
  24/407844/
- https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-
  2019/407842/
- https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-
  24/407846/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
- https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
- https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html
- https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/

**Damages Model References**

- https://blog.hootsuite.com/twitter-statistics/
- https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf
- https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549
- https://www.webfx.com/social-media/pricing/influencer-marketing/
- https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost

**Print Publication Data References**

- Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
- Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.

**ProQuest Articles:**

- "America, listen to Ms. Carroll." The Washington Post. 26 June 2019: A.26.
- Abraham, Yvonne. "Silly liberals, don't be mad." Boston Globe. 27 June 2019: B.1.
- Baker, Peter; Vigdor, Neil. "Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type.'" New York Times. 25 June 2019: A.15.
- Bernard, Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Carpenter, Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.
- Colby Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex assault allegation against Trump draws muted political reaction." The Washington Post. 26 June 2019: A.6.
- Graham, Renée. "If this nation cared about sexual assault, Trump would not be president." Boston Globe. 26 June 2019: A.11.
- Henneberger, Melinda. "Don't ignore latest Trump rape allegation." USA TODAY. 25 June 2019: A.7.
- Hesse, Monica. "Reading between the lines in E. Jean Carroll's columns." The Washington Post. 26 June 2019: C.1.
- Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex allegation against Trump draws muted reaction" Chicago Tribune. 26 June 2019: 12.
- Pilkington, Ed. "Donald Trump accused of sexually assaulting writer E Jean Carroll." The Guardian. 21 June 2019: 39.
- Pilkington, Ed. "Why did the media downplay the latest sexual assault allegation against Trump?" The Guardian. 25 June 2019: 25.
- Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.
- Reinhard, Beth; Colby Itkowitz. "N.Y. writer says Trump assaulted her in the '90s." The Washington Post; Washington, D.C. [Washington, D.C] 22 June 2019: A.1.
- Rosenberg, Alyssa. "Trump will never be held accountable for his treatment of women." The Washington Post. 23 June 2019: A.23.
- Wagner, John. "Trump says latest accuser is 'lying.'" The Washington Post. 25 June 2019: A.3.
- Zaveri, Mihir. "Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist." New York Times. 23 June 2019: A.23.

**Databases**

- Brandwatch, https://www.brandwatch.com/
- Internet Archive TV News, https://archive.org/details/tv
- ProQuest, https://www.proquest.com/index
- Twitter API, https://developer.twitter.com/en/docs/twitter-api

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX C.  <u>GLOSSARY OF TERMS</u>

**Bounce Rate:** The percentage of users who leave a page without taking any action.

**Cost Per Click (CPC):** The cost an advertiser pays each time a user clicks on an advertisement.[197]

**Cost Per Mille (CPM):** The cost an advertiser pays per one thousand impressions generated by an advertisement on a web page.[198]

**Echo Chamber:** An environment where a person only encounters information or opinions that reflect and reinforce their own.[199]

**Engagement:**  Measures of audience involvement with or responsiveness to a particular message. Can include metrics such as likes, retweets, and comments/replies.

**Engagement Rate:**  The percentage of people who engage with a post. Engagement rate is calculated by dividing the number of impressions by the number of engagements.

**Filter Bubble:** An environment isolated by algorithms that prevent users from being exposed to information and perspectives they haven't already expressed an interest in.[200]

**Followers:** The total number of users who could potentially see another user's post.

**Impressions:** The total number of times a post or other piece of content has been displayed to users.[201]

**Impression Rate:** The percentage of a user's followers who are exposed to a post. Impression rates are unique to each account and are not publicly available. Nonetheless, academic researchers have developed a formula to estimate the impressions rate using follower counts.[202]

**Influencers:** People with specialized knowledge, authority, or insight into a specific niche or industry that can sway the opinions of a target audience.

**Information Cascade:** The way information is exchanged on social media networks. After a user posts content to social media, that user's followers observe that behavior and repeat the

---

[197] https://www.investopedia.com/terms/c/cpm.asp
[198] https://www.investopedia.com/terms/c/cpm.asp
[199] https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
[200] https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
[201] https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
[202] Wang et al., 2016

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

same process by reposting or sharing the original user's content. Through sharing and reposting, an unbroken chain of messages is formed with a common, singular origin, that keeps extending until individuals stop spreading or reposting it.[203]

**Media System:** A network of platforms, institutions, practices, and people understood as circulating information, who by interacting with one another, shape each other's opinions.[204]

**Network:** A system of users connected by exchanges of information.

**Network Structure:** The number of connections (*e.g.*, followers) one user has and the number of connections that user's connections have.

**Person Brand:** An actively curated image that projects how a person wants the public to view them. The brand image often consists of the person's unique combination of skills, experience, and personality.[205]

**Ranking Algorithm:** The algorithm each social media platform relies on to determine what content to display to each user.[206]

**Reach:** The total number of people who could potentially be exposed to a post or other piece of content.

**Retweet Rate:** The percentage of a user's followers who retweeted a post. The retweet rate is calculated by dividing the number of retweets by the number of followers.

**Social Capital:** The quality and quantity of social connections. Social capital can be measured by the number of connections a user has on a social media network. Users with high social capital are able to spread a message broadly and deeply on a network.

**Social Media Platform:** The websites and applications that focus on communication, community-based input, interaction, content-sharing, and collaboration. Some popular examples of social media platforms include Twitter, Facebook, Reddit, and YouTube.

**Source Credibility:** The extent to which the persons or entities generating information on social media are perceived to be trustworthy, knowledgeable, and believable.[207]

---

[203]   Vosoughi et al., 2018; Singh et al., 2020
        (https://www.sciencedirect.com/science/article/pii/S1877050920315283);
        https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/
[204]   https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205
[205]   https://hbr.org/2022/02/whats-the-point-of-a-personal-brand; https://influencermarketinghub.com/what-is-personal-branding/
[206]   https://sproutsocial.com/insights/social-media-algorithms/
[207]   Zha et al., 2018

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Unique Visitors:** The total number of unique visits to a given page. Each visitor to the site is counted once during the reporting period.[208]

---

[208]   https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 130 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX D.  WEB IMPRESSIONS MODEL

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|-----|-------|--------|------------------|---------|-------------------|-------------|-----------------|
| W-1 | US writer says Trump sexually assaulted her in mid-1990s[212] | Agence France-Presse (AFP) | 6/21/2019 | aljazeera.com | 3,200,000 | 0.4052 | 43,221 |
| W-2 | E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir[213] | Alexandra Alter | 6/21/2019 | newyorktimes.com | 60,400,000 | 0.4767 | 959,756 |
| W-3 | Trump On E. Jean Carroll Rape Allegation: 'I've Never Met This Person In My Life'[214] | Jenna Amatulli | 6/21/2019 | huffpost.com | 24,200,000 | 0.5484 | 442,376 |
| W-4 | Trump Responds To Rape Accuser: 'People Should Pay Dearly For Such False Accusations'[215] | Amber Athey | 6/21/2019 | dailycaller.com | 4,600,000 | 0.4859 | 74,505 |
| W-5 | Trump Says He 'Never Met' Author Who Has Accused Him of Sexual Assault[216] | Brian Bennett | 6/21/2019 | time.com | 12,800,000 | 0.3216 | 137,216 |

---

209   The total number of unique visitors to a given page in June 2019. Data collected from Semrush.
210   The percentage of users who leave a page without taking any action
211   Impressions estimate calculated using the following formula: (Unique Monthly Visitors/30)*(1-bounce rate)
212   https://www.aljazeera.com/news/2019/6/21/us-writer-says-trump-sexually-assaulted-her-in-mid-1990s
213   https://www.nytimes.com/2019/06/21/books/e-jean-carroll-trump.html
214   https://www.huffpost.com/entry/trump-response-e-jean-carroll-rape-allegation_n_5d0d4a42e4b0a394186226c52
215   https://dailycaller.com/2019/06/21/trump-rape-accusation-false-e-jean-carroll/
216   https://time.com/5612502/trump-jean-carroll-sexual-assault-allegation/

Expert Report of Professor Humphreys

90

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 131 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-6 | Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation[217] | Ellie Bufkin | 6/21/2019 | washingtonexaminer.com | 15,400,000 | 0.2133 | 109,494 |
| W-7 | Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s — 'Never Happened,' Trump Responds[218] | Adam Carlson | 6/21/2019 | people.com | 27,400,000 | 0.3455 | 315,557 |
| W-8 | Trump dismisses new sexual assault allegation[219] | Matthew Choi | 6/21/2019 | politico.com | 14,100,000 | 0.4098 | 192,606 |
| W-9 | Writer says she was raped by Trump in 1990s[220] | Casey Darnell | 6/21/2019 | news.yahoo.com | 13,900,000 | 0.4611 | 213,643 |
| W-10 | Writer says she was raped by Trump in 1990s[221] | Casey Darnell | 6/21/2019 | sports.yahoo.com | 11,000,000 | 0.4943 | 181,243 |
| W-11 | E. Jean Carroll Alleges President Donald Trump Assaulted Her[222] | EJ Dickson | 6/21/2019 | rollingstone.com | 9,800,000 | 0.4129 | 134,881 |
| W-12 | Trump responds to E Jean Carroll's allegations[223] | - | 6/21/2019 | theguardian.com | 28,100,000 | 0.4327 | 405,296 |

---

217  https://www.washingtonexaminer.com/tag/donald-trump?source=%2Fnews%2Ftrump-issues-blistering-denial-of-e-jean-carrolls-rape-allegation
218  https://people.com/politics/donald-trump-raped-e-jean-carroll/
219  https://www.politico.com/story/2019/06/21/trump-dismisses-new-sexual-assault-allegation-1376698
220  https://news.yahoo.com/writer-says-she-was-raped-by-trump-in-1990-s-190337681.html
221  https://sports.yahoo.com/writer-says-she-was-raped-by-trump-in-1990-s-190337681.html
222  https://www.rollingstone.com/culture/culture-news/e-jean-carroll-president-donald-trump-sexual-assault-851261/
223  https://www.theguardian.com/us-news/live/2019/jun/21/trump-iran-news-us-latest-tehran-strike-washington-2020?page=with:block-5d0d4b9e8f081e872734c692#block-5d0d4b9e8f081e872734c692

Expert Report of Professor Humphreys

91

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 132 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-13 | Magazine columnist accuses Trump of sexual assault more than two decades ago, an allegation he denies[224] | Beth Reinhard and Colby Itkowitz | 6/21/2019 | washingtonpost.com | 42,300,000 | 0.5450 | 768,450 |
| W-14 | E. Jean Carroll: "Trump attacked me in the dressing room of Bergdorf Goodman."[225] | Sarah Jones | 6/21/2019 | nymag.com | 8,100,000 | 0.4640 | 125,280 |
| W-15 | E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women[226] | Hilary Lewis | 6/22/2019 | hollywoodreporter.com | 11,500,000 | 0.3343 | 128,148 |
| W-16 | Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault[227] | Caitlin Mac Neal | 6/21/2019 | talkingpointsmemo.com | 1,800,000 | 0.5923 | 35,538 |
| W-17 | Longtime advice columnist E. Jean Carroll accuses Trump of sexual assault in 1990s[228] | Alex Pappas | 6/21/2019 | foxnews.com | 71,500,000 | 0.4955 | 1,180,942 |

Expert Report of Professor Humphreys

92

224  https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0c3e_story.html
225  https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html
226  https://www.hollywoodreporter.com/lifestyle/lifestyle-news/writer-e-jean-carroll-no-disrespectful-rape-charges-trump-1220447/
227  https://talkingpointsmemo.com/news/e-jean-carroll-donald-trump-sexual-assault
228  https://www.foxnews.com/politics/longtime-advice-columnist-e-jean-carroll-accuses-trump-of-sexual-assault-in-1990s

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 133 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|-----|-------|--------|------------------|---------|------------------------------|------------------|---------------------------|
| W-18 | Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims[229] | Daniel Politi | 6/22/2019 | slate.com | 10,500,000 | 0.3781 | 132,335 |
| W-19 | Author E. Jean Carroll accuses President Trump of sexual assault in 1990s[230] | Christina Prignano | 6/21/2019 | bostonglobe.com | 3,700,000 | 0.5045 | 62,222 |
| W-20 | Trump claims he's never met the columnist who just accused him of sexual assault despite photo evidence of them together[231] | Eliza Relman | 6/21/2019 | insider.com | 5,000,000 | 0.3806 | 63,433 |
| W-21 | Trump denies knowing NY woman accusing him of sexual assault[232] | Darlene Superville | 6/22/2019 | apnews.com | 13,700,000 | 0.2070 | 94,530 |
| W-22 | Trump Denies New Sexual Assault Allegation By Advice Columnist E. Jean Carroll[233] | Jessica Taylor | 6/21/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |

Expert Report of Professor Humphreys

93

---

229  https://slate.com/news-and-politics/2019/06/trump-slams-e-jean-carroll-accusation-sexual-assault-bergdorg-goodman.html
230  https://www.bostonglobe.com/news/politics/2019/06/21/author-jean-carroll-accuses-president-trump-sexual-assault/g3iN16JP6dqpiKSg0h9OlN/story.html
231  https://www.businessinsider.com/trump-says-e-jean-carroll-falsely-accused-him-sexual-assault-2019-6
232  https://apnews.com/article/politics-ap-top-news-new-york-donald-trump-sexual-assault-899e37dc570940a388d2245609ec328
233  https://www.npr.org/2019/06/21/734918876/trump-denies-new-sexual-assault-allegation-by-advice-columnist-e-jean-carroll

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 134 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-23 | Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s[234] | Josh Wingrove and Bloomberg | 6/21/2019 | fortune.com | 4,900,000 | 0.3350 | 54,717 |
| W-24 | Trump dismisses E. Jean Carroll rape allegation as 'fiction'[235] | - | 6/22/2019 | bbc.com | 30,500,000 | 0.4985 | 506,808 |
| W-25 | Woman Accuses Trump of Sexual Assault at New York Store in 1990s[236] | Josh Wingrove | 6/21/2019 | bloomberg.com | 18,100,000 | 0.3615 | 218,105 |
| W-26 | Remarks by President Trump Before Marine One Departure[237] | - | 6/22/2019 | white house | 2,100,000 | 0.3076 | 21,532 |
| W-27 | Trump goes on manic tirade after being asked about new rape allegation: Women get paid money to say bad things about me[238] | Matthew Chapman | 6/22/2019 | rawstory.com | 2,800,000 | 0.6100 | 56,933 |
| W-28 | Writer E. Jean Carroll made a claim of sexual assault against Trump. Here's what we know[239] | William Cummings | 6/25/2019 | usatoday.com | 43,100,000 | 0.3823 | 549,238 |

234  https://fortune.com/2019/06/21/e-jean-carroll-trump-rape-new-yorker/
235  https://www.bbc.com/news/world-us-canada-48727972
236  https://www.bloomberg.com/news/articles/2019-06-21/e-jean-carroll-accuses-trump-of-sexual-assault#xj4y7vzkg
237  https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-marine-one-departure-49/
238  https://www.rawstory.com/2019/06/trump-goes-on-manic-tirade-after-being-asked-about-new-rape-allegation-women-get-paid-money-to-say-bad-things-about-me/
239  https://www.usatoday.com/story/news/politics/onpolitics/2019/06/25/e-jean-carroll-what-we-know-sexual-assault-claim-against-trump/1546559001/

Expert Report of Professor Humphreys

94

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 135 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-29 | George Conway Says Trump's Credibility is 'Annihilated' After President Denies Knowing Alleged Assault Victim[240] | Gillian Edevane | 6/22/2019 | newsweek.com | 13,100,000 | 0.3319 | 144,930 |
| W-30 | It Hurt. And It Was Against My Will': Trump Accuser Stands By Her Story[241] | Lulu Garcia-Navarro and Daniella Cheslow | 6/22/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |
| W-31 | Trump repeats contested claim he does not know latest sexual assault accuser[242] | Amanda Holpuch | 6/22/2019 | theguardian.com | 28,100,000 | 0.4327 | 405,296 |
| W-32 | Trump compares himself to Kavanaugh in latest sexual assault allegation[243] | Colby Itkowitz, Beth Reinhard and David Weigel | 6/22/2019 | washingtonpost.com | 42,300,000 | 0.5450 | 768,450 |
| W-33 | Trump denies knowing NY woman accusing him of sexual assault[244] | Darlene Superville | 6/22/2019 | abcnews.go.com | 16,800,000 | 0.4084 | 228,704 |

Expert Report of Professor Humphreys

95

[240] https://www.newsweek.com/george-conway-says-trumps-credibility-annihilated-after-president-denies-knowing-alleged-1445387
[241] https://www.npr.org/2019/06/22/735080909/it-hurt-and-it-was-against-my-will-trump-accuser-stands-by-her-story
[242] https://www.theguardian.com/us-news/2019/jun/22/trump-sexual-assault-accuser-e-jean-carroll
[243] https://www.washingtonpost.com/politics/trump-compares-himself-to-kavanaugh-in-latest-sexual-assault-allegation/2019/06/22/81e2c1b4-9509-11e9-aadb-74e6b2b46f6a_story.html
[244] https://abcnews.go.com/Politics/wireStory/trump-faces-sexual-assault-allegation-issues-denial-63873470

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 136 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-34 | Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll[245] | Mihir Zaveri | 6/22/2019 | newyorktimes.com | 60,400,000 | 0.4767 | 959,756 |
| W-35 | Trump on E. Jean Carroll's Assault Allegations: 'She's Not My Type'[246] | Julia Arciga | 6/25/2019 | thedailybeast.com | 24,500,000 | 0.3059 | 249,818 |
| W-36 | EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type'[247] | Jordan Fabian and Saagar Enjeti | 6/24/2019 | thehill.com | 17,500,000 | 0.3991 | 232,808 |
| W-37 | Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"[248] | The Associated Press | 6/25/2019 | hollywoodreporter.com | 11,500,000 | 0.3343 | 128,148 |
| W-38 | Trump says famed advice columnist who accused him of sexual assault is 'not my type'[249] | The Associated Press | 6/24/2019 | chicagotribune.com | 8,300,000 | 0.4070 | 112,603 |
| W-39 | Trump: Woman who accused him of sexual assault not his type[250] | The Associated Press | 6/24/2019 | denverpost.com | 3,200,000 | 0.4071 | 43,424 |

245   https://www.nytimes.com/2019/06/22/us/e-jean-carroll-donald-trump.html
246   https://www.thedailybeast.com/trump-on-e-jean-carrolls-assault-allegations-shes-not-my-type
247   https://thehill.com/homenews/administration/450116-trump-vehemently-denies-e-jean-carroll-allegation-shes-not-my-type/
248   https://www.hollywoodreporter.com/news/politics-news/trump-says-accuser-e-jean-carroll-not-my-type-1220818/
249   https://www.chicagotribune.com/nation-world/ct-nw-e-jean-carroll-donald-trump-sexual-assault-allegation-20190625-wqtl77cbtra7fd2fuq64xls6b4-story.html
250   https://www.denverpost.com/2019/06/24/trump-addresses-sexual-assault-allegations/

Expert Report of Professor Humphreys

96

**A240**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-40 | Trump Says Columnist Who Accused Him Of Rape Is 'Not My Type'[251] | Amber Athey | 6/24/2019 | dailycaller.com | 4,600,000 | 0.4859 | 74,505 |
| W-41 | Trump, accused again of sexual misconduct, insults woman who said he assaulted her[252] | Peter Baker and Niel Vigdor | 6/25/2019 | bostonglobe.com | 3,700,000 | 0.5045 | 62,222 |
| W-42 | Trump On E. Jean Carroll Accusing Him Of Rape: 'She's Not My Type'[253] | Antonia Blumberg | 6/24/2019 | huffpost.com | 24,200,000 | 0.5484 | 442,376 |
| W-43 | Trump denies woman's sexual assault accusation: 'She's not my type'[254] | Reuters | 6/25/2019 | insider.com | 5,000,000 | 0.3806 | 63,433 |
| W-44 | Trump denies woman's sexual assault accusation: 'She's not my type'[255] | Reuters | 6/25/2019 | reuters.com | 11,900,000 | 0.3870 | 153,510 |
| W-45 | I believe the president': GOP stands by Trump on sexual assault allegation[256] | Burgess Everett Melanie Zanona | 6/25/2019 | politico.com | 14,100,000 | 0.4098 | 192,606 |

251  https://dailycaller.com/2019/06/24/trump-e-jean-carroll-rape-not-my-type/
252  https://www.bostonglobe.com/news/nation/2019/06/25/trump-accused-again-sexual-misconduct-insults-woman-who-said-assaulted-her/ebBy7ynB1nOEf96g2Pbwa4M/story.html
253  https://www.huffpost.com/entry/trump-e-jean-carroll-rape-allegation-denial_n_5d1157dce4b0a3941867fe0e
254  https://www.insider.com/trump-denies-womans-sexual-assault-accusation-shes-not-my-type-2019-6
255  https://www.reuters.com/article/usa-trump-women-idUSL2N23W0IF
256  https://www.politico.com/story/2019/06/25/trump-accuse-gop-1382385

Expert Report of Professor Humphreys

97

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 138 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|-----|-------|--------|------------------|---------|------------------------------|------------------|---------------------------|
| W-46 | Trump says he didn't rape author E. Jean Carroll: "She's not my type"[257] | Rebecca Falconer | 6/24/2019 | axios.com | 4,500,000 | 0.4717 | 70,755 |
| W-47 | The Real Meaning of Trump's 'She's Not My Type' Defense[258] | Megan Garber | 6/25/2019 | theatlantic.com | 15,600,000 | 0.2615 | 135,980 |
| W-48 | She's not my type': Trump again denies E. Jean Carroll's sexual misconduct allegation[259] | Rebecca Morin | 6/24/2019 | usatoday.com | 43,100,000 | 0.3823 | 549,238 |
| W-49 | A Look At President Trump's Pattern Of Responding To Accusations Of Sexual Misconduct[260] | Ari Shapiro and Anna North | 6/25/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |
| W-50 | Trump Responds to E. Jean Carroll Rape Allegation: 'She's Not My Type'[261] | Matt Stieb | 6/25/2019 | thecut.com | 5,200,000 | 0.4347 | 75,348 |
| W-51 | E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar[262] | Jia Tolentino | 6/25/2019 | newyorker.com | 6,900,000 | 0.4737 | 108,951 |

Expert Report of Professor Humphreys

98

---

257  https://www.axios.com/2019/06/24/trump-says-he-didnt-rape-author-e-jean-carroll-shes-not-my-type
258  https://www.theatlantic.com/entertainment/archive/2019/06/trump-e-jean-carroll-rape-allegation-not-my-type-defense/592555/
259  https://www.usatoday.com/story/news/politics/2019/06/24/trump-e-jean-carroll-shes-not-my-type/1554116001/
260  https://www.npr.org/2019/06/25/735930764/a-look-at-president-trumps-pattern-of-responding-to-accusations-of-sexual-miscon
261  https://www.thecut.com/2019/06/trump-on-e-jean-carroll-rape-claim-shes-not-my-type.html
262  https://www.newyorker.com/news/our-columnists/e-jean-carrolls-accusation-against-donald-trump-and-the-raising-and-lowering-of-the-bar

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 139 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-52 | Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"[263] | Jay Willis | 6/25/2019 | gq.com | 4,300,000 | 0.5004 | 71,724 |
| W-53 | Trump says sexual assault accuser E Jean Carroll 'not my type'[264] | - | 6/25/2019 | bbc.com | 30,500,000 | 0.4985 | 506,808 |
| | | | | | TOTAL WEB IMPRESSIONS | | 13,922,234 |

---

263    https://www.gq.com/story/trump-not-my-type
264    https://www.bbc.com/news/world-us-canada-48754959

Expert Report of Professor Humphreys

99

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 140 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX E.  SOCIAL MEDIA IMPRESSIONS MODEL

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-1 | @LauraLitvan[272] | N/A | 17,586 | 597 | 10,946 | 28,532 | 302,891 | 60,190 |
| S-2 | @nytimes[273] | W-2 | 43,602,518 | 123 | 1,062 | 43,603,580 | 1,517,403 | 7,622,861 |
| S-3 | @dailycaller[274] | W-4 | 509,377 | 82 | 1,404 | 510,781 | 50,916 | 90,045 |
| S-4 | @dailycaller[275] | W-4 | 509,211 | 241 | 4,319 | 513,530 | 111,412 | 98,107 |
| S-5 | @dailycaller[276] | W-4 | 509,023 | 379 | 1,846 | 510,869 | 97,086 | 95,090 |
| S-6 | @time[277] | W-5 | 16,073,840 | 34 | 702 | 16,074,542 | 605,662 | 2,809,916 |
| S-7 | @people[278] | W-7 | 7,515,391 | 17 | 598 | 7,515,989 | 310,072 | 1,313,779 |

265  Twitter's unique identifier for the original tweet
266  Number of followers of original tweet
267  Total number of retweets (and quote tweets) to the original tweet
268  Estimated average number of followers of all retweets. Estimate is based on retweets accessible via the Twitter API.
269  (Average RT Followers * Retweets) + Primary Followers
270  Equation 2a: $10^\wedge(0.7396 \log(\text{Total Followers})*(1\text{-bot rate})) + 0.0473 \log(\text{Primary Followers})*(1\text{-bot rate})) + 0.1027 \log(\text{Retweets}))$. Where:
     "Bot rate" is an estimate rate of bot activity on Twitter. I'm estimating a 12.6% bot rate.
271  Equation 2b: (primary followers * First Level Impression Rate ^ (1-bot rate of 12.6%)) + (Retweets * Second Level Impression Rate * (1-bot rate)). Where:
     "First Level Impression Rate" is an estimated impression rate for the original tweet. I'm estimating a 20% First Level Impression Rate.
     "Second Level Impression Rate" an estimated impression rate for the retweets of the original tweet. I'm estimating a 1% Second Level Impression Rate.
272  https://twitter.com/LauraLitvan/status/1421798190751211154
273  https://twitter.com/nytimes/status/1424698341706011477
274  https://twitter.com/DailyCaller/status/1430133795583344464
275  https://twitter.com/DailyCaller/status/1428096576538133248
276  https://twitter.com/DailyCaller/status/1424207388650078272
277  https://twitter.com/TIME/status/1142190416256782337
278  https://twitter.com/people/status/1142189984574836736

Expert Report of Professor Humphreys

**A244**

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 141 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-8 | @politico[279] | W-8 | 3,838,011 | 621 | 8,539 | 3,846,550 | 501,872 | 717,229 |
| S-9 | @politico[280] | W-8 | 3,838,042 | 168 | 3,051 | 3,841,093 | 253,407 | 675,370 |
| S-10 | @politico[281] | W-8 | 3,838,042 | 66 | 1,727 | 3,839,769 | 214,427 | 671,886 |
| S-11 | @politico[282] | W-8 | 3,838,042 | 67 | 1,805 | 3,839,847 | 215,038 | 671,947 |
| S-12 | @RollingStone[283] | W-11 | 6,278,602 | 16 | 1,584 | 6,280,186 | 268,022 | 1,097,721 |
| S-13 | @washingtonpost[284] | W-13 | 13,798,619 | 229 | 4,023 | 13,802,642 | 684,581 | 2,420,050 |
| S-14 | @Slate[285] | W-18 | 1,778,594 | 24 | 1,661 | 1,780,255 | 104,961 | 311,247 |
| S-15 | @Slate[286] | W-18 | 1,778,506 | 15 | 10,499 | 1,789,005 | 104,756 | 312,259 |
| S-16 | @Slate[287] | W-18 | 1,778,538 | 12 | 3,580 | 1,782,118 | 97,870 | 311,264 |
| S-17 | @Slate[288] | W-18 | 1,778,659 | 13 | 5,059 | 1,783,718 | 99,595 | 311,484 |
| S-18 | @Slate[289] | W-18 | 1,778,670 | 10 | 2,492 | 1,781,162 | 95,355 | 311,129 |
| S-19 | @Slate[290] | W-18 | 1,778,685 | 9 | 7,318 | 1,786,003 | 95,909 | 311,490 |
| S-20 | @Slate[291] | W-18 | 1,778,560 | 8 | 1,622 | 1,780,182 | 92,734 | 311,006 |
| S-21 | @Slate[292] | W-18 | 1,778,681 | 9 | 464 | 1,779,145 | 93,526 | 310,950 |

---

279   https://twitter.com/politico/status/1142187206834081792
280   https://twitter.com/politico/status/1422057346393620480
281   https://twitter.com/politico/status/1422057355563634305
282   https://twitter.com/politico/status/1422057364051312640
283   https://twitter.com/RollingStone/status/1421897153927980720
284   https://twitter.com/washingtonpost/status/1142240399312019458
285   https://twitter.com/Slate/status/1142815602077327361
286   https://twitter.com/Slate/status/1424920148204380160
287   https://twitter.com/Slate/status/1426176012202598400
288   https://twitter.com/Slate/status/1428849459432890560
289   https://twitter.com/Slate/status/1434367237112473700
290   https://twitter.com/Slate/status/1432964952041267230
291   https://twitter.com/Slate/status/1426901680020275200
292   https://twitter.com/Slate/status/1433552608500905089

Expert Report of Professor Humphreys

101

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 142 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-22 | @Slate[293] | W-18 | 1,778,697 | 5 | 692 | 1,779,389 | 88,022 | 310,946 |
| S-23 | @Slate[294] | W-18 | 1,778,705 | 3 | 2,678 | 1,781,383 | 83,682 | 310,988 |
| S-24 | @Slate[295] | W-18 | 1,778,696 | 5 | 1,481 | 1,780,177 | 88,166 | 310,981 |
| S-25 | @Slate[296] | W-18 | 1,778,673 | 7 | 547 | 1,779,220 | 91,129 | 310,945 |
| S-26 | @Slate[297] | W-18 | 1,778,701 | 3 | 1,903 | 1,780,604 | 83,601 | 310,967 |
| S-27 | @NPR[298] | W-22 | 7,770,046 | 94 | 956 | 7,771,002 | 382,281 | 1,358,989 |
| S-28 | @FortuneMagazine [299] | W-23 | 2,262,542 | 1 | 0 | 2,262,542 | 90,034 | 395,492 |
| S-29 | @BBCNews[300] | W-24 | 10,029,760 | 31 | 767 | 10,030,527 | 414,204 | 1,753,410 |
| S-30 | @BBCWorld[301] | W-24 | 25,250,057 | 66 | 3,758 | 25,253,815 | 930,727 | 4,415,878 |
| S-31 | @BBCWorld[302] | W-24 | 25,251,777 | 118 | 109,206 | 25,360,983 | 1,330,634 | 4,526,637 |
| S-32 | @RawStory[303] | W-27 | 198,447 | 39 | 7,764 | 206,211 | 38,345 | 37,335 |
| S-33 | @newsweek[304] | W-29 | 3,333,156 | 48 | 1,025 | 3,334,181 | 183,730 | 583,066 |
| S-34 | @NPR[305] | W-30 | 7,770,824 | 95 | 1,060 | 7,771,884 | 383,118 | 1,359,220 |

293   https://twitter.com/Slate/status/1143242046377025538
294   https://twitter.com/Slate/status/1143103358351360001
295   https://twitter.com/Slate/status/1143077862464983040
296   https://twitter.com/Slate/status/1142966568806227968
297   https://twitter.com/Slate/status/1143195574482677761
298   https://twitter.com/NPR/status/1142260932703334400
299   https://twitter.com/FortuneMagazine/status/1142556629906415616
300   https://twitter.com/BBCNews/status/1142225240942141440
301   https://twitter.com/BBCWorld/status/1142220276538720256
302   https://twitter.com/BBCWorld/status/1142380908311453696
303   https://twitter.com/RawStory/status/1142478448746749952
304   https://twitter.com/Newsweek/status/1142781858796703746
305   https://twitter.com/NPR/status/1142824913822244864

Expert Report of Professor Humphreys

102

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-35 | @guardiannews[306] | W-31 | 2,875,794 | 10 | 2,203 | 2,877,997 | 138,523 | 502,881 |
| S-36 | @washingtonpost[307] | W-32 | 13,801,157 | 450 | 2,709 | 13,803,866 | 744,815 | 2,423,097 |
| S-37 | @washingtonpost[308] | W-32 | 13,802,210 | 426 | 7,599 | 13,809,809 | 813,052 | 2,440,919 |
| S-38 | @nytimes[309] | W-34 | 43,606,559 | 102 | 3,864 | 43,610,423 | 1,495,243 | 7,625,871 |
| S-39 | @thedailybeast[310] | W-35 | 1,220,166 | 42 | 5,081 | 1,225,247 | 91,591 | 215,150 |
| S-40 | @thehill[311] | W-36 | 3,294,185 | 125 | 1,681 | 3,295,866 | 207,974 | 577,660 |
| S-41 | @thehill[312] | W-36 | 3,294,122 | 68 | 26,072 | 3,320,194 | 256,624 | 591,307 |
| S-42 | @thehill[313] | W-36 | 3,294,403 | 31 | 1,554 | 3,295,957 | 174,036 | 576,283 |
| S-43 | @thehill[314] | W-36 | 3,294,049 | 9 | 3,448 | 3,297,497 | 152,682 | 576,071 |
| S-44 | @dailycaller[315] | W-40 | 509,572 | 151 | 1,738 | 511,310 | 63,413 | 91,367 |
| S-45 | @dailycaller[316] | W-40 | 509,664 | 17 | 867 | 510,531 | 38,068 | 89,218 |
| S-46 | @huffpost[317] | W-42 | 11,437,397 | 266 | 4,559 | 11,441,956 | 615,996 | 2,009,856 |
| S-47 | @politico[318] | W-45 | 3,840,348 | 61 | 14,392 | 3,854,740 | 242,492 | 678,966 |
| S-48 | @axios[319] | W-46 | 277,660 | 46 | 1,481 | 279,141 | 30,111 | 49,130 |

306  https://twitter.com/guardiannews/status/1142535205041113167
307  https://twitter.com/washingtonpost/status/1142492789336346624
308  https://twitter.com/washingtonpost/status/1426154768895917
309  https://twitter.com/nytimes/status/1427944590522224512
310  https://twitter.com/thedailybeast/status/1433023402350202561
311  https://twitter.com/thehill/status/1434909178947171747
312  https://twitter.com/thehill/status/1434772001481189184
313  https://twitter.com/thehill/status/1435353016495303089
314  https://twitter.com/thehill/status/1434452354454636416
315  https://twitter.com/DailyCaller/status/1433114226095755265
316  https://twitter.com/DailyCaller/status/1434927903299970688
317  https://twitter.com/HuffPost/status/1433006515328958304
318  https://twitter.com/politico/status/1436483489451788624
319  https://twitter.com/axios/status/1143292968771604480

Expert Report of Professor Humphreys

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 144 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-49 | @usatoday[320] | W-48 | 3,812,700 | 18 | 1,852 | 3,814,552 | 183,849 | 666,751 |
| S-50 | @thecut[321] | W-50 | 1,411,305 | 5 | 12,513 | 1,423,818 | 75,654 | 247,243 |
| S-51 | @GQMagazine[322] | W-52 | 1,302,850 | 5 | 160 | 1,303,010 | 68,828 | 227,745 |
| S-52 | @GQMagazine[323] | W-52 | 1,302,856 | 3 | 3,926 | 1,306,782 | 65,717 | 227,842 |
| S-53 | @GQMagazine[324] | W-52 | 1,302,845 | 4 | 771 | 1,303,616 | 67,356 | 227,764 |
| S-54 | @BBCNews[325] | W-53 | 10,033,926 | 104 | 844 | 10,034,770 | 471,389 | 1,754,697 |
| S-55 | @BBCWorld[326] | W-53 | 25,264,091 | 362 | 1,322 | 25,265,413 | 1,116,377 | 4,420,345 |
| | TOTAL SOCIAL MEDIA IMPRESSIONS (LOW/HIGH) | | | | | | 17,218,959 | 63,040,041 |

320   https://twitter.com/USATODAY/status/1143375768682160128
321   https://twitter.com/TheCut/status/1435011666781061112
322   https://twitter.com/GQMagazine/status/1143610084611768320
323   https://twitter.com/GQMagazine/status/1143645060262694919
324   https://twitter.com/GQMagazine/status/1143952085978947586
325   https://twitter.com/BBCNews/status/1143451392058830848
326   https://twitter.com/bbcworld/status/1434143442875105 28

Expert Report of Professor Humphreys

**A248**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### APPENDIX F. TV IMPRESSIONS MODEL

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-1 | Anderson Cooper 360[328] | 6/21/2019 | 5:00pm-6:00pm PDT | CNN (San Francisco) | 877,000[329] |
| T-2 | Anderson Cooper 360[330] | 6/21/2019 | 8:00pm-9:00pm PDT | CNN (San Francisco) | N/A |
| T-3 | Cuomo Prime Time[331] | 6/21/2019 | 9:00pm-10:00pm PDT | CNN (San Francisco) | 936,000[332] |
| T-4 | CBS Evening News[333] | 6/21/2019 | 6:30pm-7:00pm PDT | KPIX (CBS) | 5,863,000[334] |
| T-5 | The Ten O'Clock News on KTVU Fox 2[335] | 6/21/2019 | 10:00pm-10:59pm PDT | KTVU (FOX) | 1,401,000[336] |
| T-6 | The Last Word With Lawrence O'Donnell[337] | 6/21/2019 | 10:00pm-11:00pm PDT | MSNBC West | 2,010,000[338] |

327 I only count ratings for a particular program once in a day. I use "N/A" to denote broadcasts that I am not counting.
328 https://archive.org/details/CNNW_20190622_000000_Anderson_Cooper_360/
329 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
330 https://archive.org/details/CNNW_20190622_030000_Anderson_Cooper_360/
331 https://archive.org/details/CNNW_20190622_040000_Cuomo_Prime_Time
332 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
333 https://archive.org/details/KPIX_20190622_013000_CBS_Evening_News
334 https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
335 https://archive.org/details/KTVU_20190622_050000_The_Ten_OClock_News_on_KTVU_Fox_2
336 https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
337 https://archive.org/details/MSNBCW_20190622_050000_The_Last_Word_With_Lawrence_ODonnell
338 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/

Expert Report of Professor Humphreys

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 146 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-7 | All In With Chris Hayes[339] | 6/21/2019 | 5:00pm-6:00pm PDT | MSNBC West | 1,552,000[340] |
| T-8 | The Rachel Maddow Show[341] | 6/21/2019 | 9:00pm-10:01pm PDT | MSNBC West | 2,561,000[342] |
| T-9 | CNN Newsroom Live[343] | 6/22/2019 | 1:00am-2:00am PDT | CNN (San Francisco) | 628,000[344] |
| T-10 | CNN Newsroom Live[345] | 6/22/2019 | 12:00am-1:00am PDT | CNN (San Francisco) | N/A |
| T-11 | CNN Newsroom With Ana Cabrera[346] | 6/22/2019 | 12:00pm-1:00pm PDT | CNN (San Francisco) | N/A |
| T-12 | New Day Weekend With Victor Blackwell and Christi Paul[347] | 6/22/2019 | 3:00am-4:00am PDT | CNN (San Francisco) | 534,000[348] |
| T-13 | New Day Weekend With Victor Blackwell and Christi Paul[349] | 6/22/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | N/A |
| T-14 | New Day Weekend With Victor Blackwell and Christi Paul[350] | 6/22/2019 | 5:00am-6:00am PDT | CNN (San Francisco) | N/A |

339  https://archive.org/details/MSNBCW_20190622_000000_All_In_With_Chris_Hayes
340  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
341  https://archive.org/details/MSNBCW_20190622_040000_The_Rachel_Maddow_Show
342  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
343  https://archive.org/details/CNNW_20190622_080000_CNN_Newsroom_Live
344  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
345  https://archive.org/details/CNNW_20190622_070000_CNN_Newsroom_Live
346  https://archive.org/details/CNNW_20190622_190000_CNN_Newsroom_With_Ana_Cabrera
347  https://archive.org/details/CNNW_20190622_100000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul
348  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
349  https://archive.org/details/CNNW_20190622_110000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul
350  https://archive.org/details/CNNW_20190622_120000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul

Expert Report of Professor Humphreys

106

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 147 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-15 | CNN Newsroom With Victor Blackwell and Christi Paul[351] | 6/22/2019 | 7:00am-8:00am PDT | CNN (San Francisco) | N/A |
| T-16 | CNN Newsroom With Fredricka Whitfield[352] | 6/22/2019 | 8:00am-9:00am PDT | CNN (San Francisco) | N/A |
| T-17 | Cavuto Live[353] | 6/22/2019 | 7:00am-9:00am PDT | Fox News West | 1,401,000[354] |
| T-18 | America's News HQ[355] | 6/22/2019 | 9:00am-11:00am PDT | Fox News West | 1,401,000[356] |
| T-19 | NBC Nightly News With Lester Holt[357] | 6/22/2019 | 5:30pm-5:59pm PDT | KNTV (NBC) | 6,769,000[358] |
| T-20 | CBS This Morning[359] | 6/22/2019 | 4:00am-5:59am PDT | KPIX (CBS) | 2,700,000[360] |
| T-21 | The Ten O'Clock News on KTVU Fox 2[361] | 6/22/2019 | 10:00pm-10:44pm PDT | KTVU (FOX) | 1,401,000[362] |

---

351  https://archive.org/details/CNNW_20190622_140000_CNN_Newsroom_With_Victor_Blackwell_and_Christi_Paul
352  https://archive.org/details/CNNW_20190622_150000_CNN_Newsroom_With_Fredricka_Whitfield
353  https://archive.org/details/FOXNEWSW_20190622_140000_Cavuto_Live
354  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
355  https://archive.org/details/FOXNEWSW_20190622_160000_Americas_News_HQ
356  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
357  https://archive.org/details/KNTV_20190623_003000_NBC_Nightly_News_With_Lester_Holt
358  https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/
359  https://archive.org/details/KPIX_20190622_110000_CBS_This_Morning
360  https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
361  https://archive.org/details/KTVU_20190623_050000_The_Ten_OClock_News_on_KTVU_Fox_2
362  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history

Expert Report of Professor Humphreys

107

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 148 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-22 | KTVU Mornings on 2 at 7am[363] | 6/22/2019 | 7:00am–10:00am PDT | KTVU (FOX) | 1,401,000[364] |
| T-23 | Up With David Gura[365] | 6/22/2019 | 5:00am–7:00am PDT | MSNBC West | 900,000[366] |
| T-24 | The Rachel Maddow Show[367] | 6/22/2019 | 6:00pm–7:00pm PDT | MSNBC West | 2,561,000[368] |
| T-25 | Weekends With Alex Witt[369] | 6/22/2019 | 9:00am–11:00am PDT | MSNBC West | 900,000[370] |
| T-26 | Cuomo Prime Time[371] | 6/24/2019 | 10:00pm–11:00pm PDT | CNN (San Francisco) | 936,000[372] |
| T-27 | CNN Tonight With Don Lemon[373] | 6/24/2019 | 11:00pm–12:00am PDT | CNN (San Francisco) | 833,000[374] |

Expert Report of Professor Humphreys

108

---

363  https://archive.org/details/KTVU_20190622_140000_KTVU_Mornings_on_2_at_7am
364  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
365  https://archive.org/details/MSNBCW_20190622_120000_Up_With_David_Gura
366  https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
367  https://archive.org/details/MSNBCW_20190623_010000_The_Rachel_Maddow_Show
368  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
369  https://archive.org/details/MSNBCW_20190622_160000_Weekends_With_Alex_Witt
370  https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
371  https://archive.org/details/CNNW_20190625_050000_Cuomo_Prime_Time
372  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time-time/407838/
373  https://archive.org/details/CNNW_20190625_060000_CNN_Tonight_With_Don_Lemon
374  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time-time/407838/

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 149 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-28 | CNN Newsroom With Brooke Baldwin[375] | 6/24/2019 | 12:00pm-1:00pm PDT | CNN (San Francisco) | 534,000[376] |
| T-29 | Situation Room With Wolf Blitzer[377] | 6/24/2019 | 3:00pm-4:00pm PDT | CNN (San Francisco) | 168,000[378] |
| T-30 | New Day With Alisyn Camerota and John Berman[379] | 6/24/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | 460,000[380] |
| T-31 | New Day With Alisyn Camerota and John Berman[381] | 6/24/2019 | 5:00am-6:00am PDT | CNN (San Francisco) | N/A |
| T-32 | Anderson Cooper 360[382] | 6/24/2019 | 5:00pm-6:00pm PDT | CNN (San Francisco) | 877,000[383] |
| T-33 | Cuomo Prime Time[384] | 6/24/2019 | 6:00pm-7:00pm PDT | CNN (San Francisco) | N/A |
| T-34 | CNN Tonight With Don Lemon[385] | 6/24/2019 | 7:00pm-8:00pm PDT | CNN (San Francisco) | N/A |

375 https://archive.org/details/CNNW_20190624_190000_CNN_Newsroom_With_Brooke_Baldwin
376 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
377 https://archive.org/details/CNNW_20190624_220000_Situation_Room_With_Wolf_Blitzer
378 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
379 https://archive.org/details/CNNW_20190624_110000_New_Day_With_Alisyn_Camerota_and_John_Berman
380 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
381 https://archive.org/details/CNNW_20190624_120000_New_Day_With_Alisyn_Camerota_and_John_Berman
382 https://archive.org/details/CNNW_20190625_000000_Anderson_Cooper_360
383 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
384 https://archive.org/details/CNNW_20190625_010000_Cuomo_Prime_Time
385 https://archive.org/details/CNNW_20190625_020000_CNN_Tonight_With_Don_Lemon

Expert Report of Professor Humphreys

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 150 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|-----|-------|------|------|---------|----------------------|
| T-35 | Anderson Cooper 360[386] | 6/24/2019 | 9:00pm-10:00pm PDT | CNN (San Francisco) | N/A |
| T-36 | The Last Word With Lawrence O'Donnell[387] | 6/24/2019 | 10:00pm-11:00pm PDT | MSNBC West | 2,010,000[388] |
| T-37 | First Look[389] | 6/24/2019 | 2:00am-3:00am PDT | MSNBC West | 385,000[390] |
| T-38 | Morning Joe[391] | 6/24/2019 | 3:00am-6:00am PDT | MSNBC West | 1,033,000[392] |
| T-39 | Andrea Mitchell Reports[393] | 6/24/2019 | 9:00am-10:00am PDT | MSNBC West | 839,000[394] |
| T-40 | CNN Tonight With Don Lemon[395] | 6/25/2019 | 12:00am-1:00am PDT | CNN (San Francisco) | 833,000[396] |
| T-41 | Early Start With Christine Romans and Dave Briggs[397] | 6/25/2019 | 2:00am-3:00am PDT | CNN (San Francisco) | 534,000[398] |

---

[386] https://archive.org/details/CNNW_20190625_040000_Anderson_Cooper_360
[387] https://archive.org/details/MSNBCW_20190625_050000_The_Last_Word_With_Lawrence_ODonnell
[388] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[389] https://archive.org/details/MSNBCW_20190624_090000_First_Look
[390] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[391] https://archive.org/details/MSNBCW_20190624_100000_Morning_Joe
[392] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[393] https://archive.org/details/MSNBCW_20190624_160000_Andrea_Mitchell_Reports
[394] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
[395] https://archive.org/details/CNNW_20190625_070000_CNN_Tonight_With_Don_Lemon
[396] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[397] https://archive.org/details/CNNW_20190625_090000_Early_Start_with_Christine_Romans_and_Dave_Briggs
[398] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Expert Report of Professor Humphreys

110

**A254**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-42 | New Day With Alisyn Camerota and John Berman[399] | 6/25/2019 | 3:00am-4:00am PDT | CNN (San Francisco) | N/A |
| T-43 | New Day With Alisyn Camerota and John Berman[400] | 6/25/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | 460,000[401] |
| T-44 | CNN Newsroom with Poppy Harlow and Jim Sciutto[402] | 6/25/2019 | 7:00am-8:00am PDT | CNN (San Francisco) | 534,000[403] |
| T-45 | World News Now[404] | 6/25/2019 | 2:42am-4:00am PDT | KGO (ABC) | 3,929,000[405] |
| T-46 | ABC World News Tonight With David Muir[406] | 6/25/2019 | 5:30pm-6:00pm PDT | KGO (ABC) | 9,390,000[407] |
| T-47 | Good Morning America[408] | 6/25/2019 | 7:00am-9:00am PDT | KGO (ABC) | 3,920,000[409] |

[399] https://archive.org/details/CNNW_20190625_100000_New_Day_With_Alisyn_Camerota_and_John_Berman
[400] https://archive.org/details/CNNW_20190625_110000_New_Day_With_Alisyn_Camerota_and_John_Berman
[401] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[402] https://archive.org/details/CNNW_20190625_140000_CNN_Newsroom_with_Poppy_Harlow_and_Jim_Sciutto
[403] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[404] https://archive.org/details/KGO_20190625_094200_World_News_Now
[405] https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
[406] https://archive.org/details/KGO_20190626_003000_ABC_World_News_Tonight_With_David_Muir
[407] https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
[408] https://archive.org/details/KGO_20190625_140000_Good_Morning_America
[409] https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/

Expert Report of Professor Humphreys

111

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 152 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-48 | The Late Show With Stephen Colbert[410] | 6/25/2019 | 11:35pm-12:37am PDT | KPIX (CBS) | 3,800,000[411] |
| T-49 | KPIX 5 News at 6:00PM[412] | 6/25/2019 | 6:00pm-6:30pm PDT | KPIX (CBS) | 5,468,000[413] |
| T-50 | CBS Evening News[414] | 6/25/2019 | 6:30pm-7:00pm PDT | KPIX (CBS) | 5,863,000[415] |
| T-51 | CBS This Morning[416] | 6/25/2019 | 7:00am-9:00am PDT | KPIX (CBS) | 2,700,000[417] |
| T-52 | Deadline: White House[418] | 6/25/2019 | 1:00pm-2:00pm PDT | MSNBC West | 1,378,000[419] |
| T-53 | First Look[420] | 6/25/2019 | 2:00am-3:00am PDT | MSNBC West | 385,000[421] |
| T-54 | Morning Joe[422] | 6/25/2019 | 3:00am-6:00am PDT | MSNBC West | 1,033,000[423] |

410 https://archive.org/details/KPIX_20190626_063500_The_Late_Show_With_Stephen_Colbert
411 https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html?login=email&auth=login-email&login=email&auth=login-email#:~:text=The%20latest%20season-to-date,viewers%20in%20that%20same%20period.
412 https://archive.org/details/KPIX_20190626_010000_KPIX_5_News_at_600PM
413 https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
414 https://archive.org/details/KPIX_20190626_013000_CBS_Evening_News
415 https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
416 https://archive.org/details/KPIX_20190625_140000_CBS_This_Morning
417 https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
418 https://archive.org/details/MSNBCW_20190625_200000_Deadline_White_House
419 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
420 https://archive.org/details/MSNBCW_20190625_090000_First_Look
421 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
422 https://archive.org/details/MSNBCW_20190625_100000_Morning_Joe
423 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/

Expert Report of Professor Humphreys

112

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 153 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-55 | MSNBC Live With Stephanie Ruhle[424] | 6/25/2019 | 6:00am-7:00am PDT | MSNBC West | 984,000[425] |
| T-56 | MSNBC Live With Hallie Jackson[426] | 6/25/2019 | 7:00am-8:00am PDT | MSNBC West | 887,000[427] |
| T-57 | MSNBC Live With Craig Melvin[428] | 6/25/2019 | 8:00am-9:00am PDT | MSNBC West | 800,000[429] |
| T-58 | Andrea Mitchell Reports[430] | 6/25/2019 | 9:00am-10:00am PDT | MSNBC West | 839,000[431] |
| T-59 | Late Night With Seth Meyers[432] | 6/26/2019 | 12:37am-1:37am PDT | KNTV (NBC) | 1,293,000[433] |
| T-60 | CBS Overnight News[434] | 6/26/2019 | 3:12am-4:00am PDT | KPIX (CBS) | 2,986,000[435] |
| T-61 | At This Hour With Kate Bolduan[436] | 6/27/2019 | 8:00am-9:00am PDT | CNN (San Francisco) | 534,000[437] |

424  https://archive.org/details/MSNBCW_20190625_130000_MSNBC_Live_With_Stephanie_Ruhle
425  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
426  https://archive.org/details/MSNBCW_20190625_140000_MSNBC_Live_With_Hallie_Jackson
427  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
428  https://archive.org/details/MSNBCW_20190625_150000_MSNBC_Live_With_Craig_Melvin
429  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
430  https://archive.org/details/MSNBCW_20190625_160000_Andrea_Mitchell_Reports
431  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
432  https://archive.org/details/KNTV_20190626_073700_Late_Night_With_Seth_Meyers
433  https://thecomicscomic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
434  https://archive.org/details/KPIX_20190626_101200_CBS_Overnight_News
435  https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
436  https://archive.org/details/CNNW_20190627_150000_At_This_Hour_With_Kate_Bolduan
437  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Expert Report of Professor Humphreys

113

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 154 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|-----|-------|------|------|---------|-----------------------|
| T-62 | ABC World News Tonight With David Muir[438] | 6/27/2019 | 3:30pm-4:00pm PDT | KGO (ABC) | 9,390,000[439] |
| T-63 | NBC Nightly News With Lester Holt[440] | 6/27/2019 | 7:00pm-7:30pm EDT | WRC (NBC) | 6,769,000[441] |
| | **TOTAL TV IMPRESSIONS ESTIMATE** | | | | **108,580,000** |

438  https://archive.org/details/KGO_20190627_223000_ABC_World_News_Tonight_With_David_Muir
439  https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
440  https://archive.org/details/WRC_20190627_230000_NBC_Nightly_News_With_Lester_Holt
441  https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/

Expert Report of Professor Humphreys

114

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 155 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX G.  PRINT IMPRESSIONS MODEL

| No. | Article Title | Publication | Date | Circulation[442] |
|---|---|---|---|---|
| P-1 | Donald Trump accused of sexually assaulting writer E Jean Carroll | The Guardian | 6/21/2019 | N/A |
| P-2 | N.Y. writer says Trump assaulted her in the '90s | Washington Post | 6/22/2019 | 229,475[443] |
| P-3 | Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist | New York Times | 6/23/2019 | 454,861[444] |
| P-4 | Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type' | New York Times | 6/25/2019 | 454,861[445] |
| P-5 | Trump says latest accuser is 'lying' | Washington Post | 6/25/2019 | 229,475[446] |
| P-6 | If this nation cared about sexual assault, Trump would not be president | Boston Globe | 6/25/2019 | 92,515[447] |
| P-7 | Don't ignore latest Trump rape allegation | USA Today | 6/25/2019 | 544,002[448] |
| P-8 | Why did the media downplay the latest sexual assault allegation against Trump? | The Guardian | 6/25/2019 | N/A |
| P-9 | Latest sex assault allegation against Trump draws muted political reaction | Washington Post | 6/26/2019 | 229,475[449] |
| P-10 | America, listen to Ms. Carroll | Washington Post | 6/26/2019 | 229,475[450] |
| P-11 | Latest sex allegation against Trump draws muted reaction | Chicago Tribune | 6/26/2019 | 149,093[451] |
| | | **TOTAL PRINT IMPRESSIONS** | | **2,613,232** |

---

442  I use "N/A" for publications for which I do not have circulation data.
443  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
444  Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
445  Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
446  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
447  Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
448  Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
449  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
450  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
451  Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.

Expert Report of Professor Humphreys

115

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX H.  <u>EXAMPLES OF NEGATIVE COMMENTS AND POSTS ABOUT</u>**

**<u>MS. CARROLL</u>**

[Produced in Native Format]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### APPENDIX I. <u>EXAMPLES OF DIRECT MESSAGES AND EMAILS TO MS. CARROLL</u>

[Produced in Native Format]

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 158 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX J. IMPACT MODEL

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-1 | | | 25.45% | 43,221 | 43,221 | 10,999 | 10,999 |
| Web | W-2 | 16.30% | 76.00% | 12.39% | 959,756 | 959,756 | 118,895 | 118,895 |
| Web | W-3 | 14.80% | 76.00% | 11.25% | 442,376 | 442,376 | 49,758 | 49,758 |
| Web | W-4 | 90.30% | 76.00% | 68.63% | 74,505 | 74,505 | 51,131 | 51,131 |
| Web | W-5 | 21.00% | 76.00% | 15.96% | 137,216 | 137,216 | 21,900 | 21,900 |
| Web | W-6 | 65.70% | 76.00% | 49.93% | 109,494 | 109,494 | 54,673 | 54,673 |
| Web | W-7 | | | 25.45% | 315,557 | 315,557 | 80,301 | 80,301 |
| Web | W-8 | 22.40% | 76.00% | 17.02% | 192,606 | 192,606 | 32,789 | 32,789 |
| Web | W-9 | | | 25.45% | 213,643 | 213,643 | 54,366 | 54,366 |
| Web | W-10 | | | 25.45% | 181,243 | 181,243 | 46,122 | 46,122 |
| Web | W-11 | | | 25.45% | 134,881 | 134,881 | 34,324 | 34,324 |
| Web | W-12 | 19.20% | 76.00% | 14.59% | 405,296 | 405,296 | 59,141 | 59,141 |

452   Percent of a publications' audience that are Republican, based on data from Pew Research. Cell is empty when data for the relevant publication is not available.

453   Republicans receptive to the claims (.76 YouGov). Cell is empty when Percent Republican data is not available for the relevant publication.

454   Calculated using the following formula: Percent Republicans * Receptive Republicans. When Percent Republican data is not available, I rely on the average Percent Receptive Republicans (25.25%)

455   The impressions estimate calculated in the Impressions Model. For social media posts, the high estimate is calculated using Equation 2a.

456   The impressions estimate calculated in the Impressions Model. For social media posts, the low estimate is calculated using Equation 2b.

457   Calculated using the following formula: Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (25.25%) * Impressions Estimate. The high receptive impressions estimate is based on the impressions estimate incorporating Equation 2a.

458   Calculated using the following formula: Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (25.25%) * Impressions Estimate. The low Receptive Impressions Estimate is based on the impressions estimate incorporating Equation 2b.

Expert Report of Professor Humphreys

118

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-13 | 18.10% | 76.00% | 13.76% | 768,450 | 768,450 | 105,708 | 105,708 |
| Web | W-14 | | | 25.45% | 125,280 | 125,280 | 31,880 | 31,880 |
| Web | W-15 | | | 25.45% | 128,148 | 128,148 | 32,610 | 32,610 |
| Web | W-16 | | | 25.45% | 35,538 | 35,538 | 9,043 | 9,043 |
| Web | W-17 | 69.80% | 76.00% | 53.05% | 1,180,942 | 1,180,942 | 626,466 | 626,466 |
| Web | W-18 | | | 25.45% | 132,335 | 132,335 | 33,676 | 33,676 |
| Web | W-19 | | | 25.45% | 62,222 | 62,222 | 15,834 | 15,834 |
| Web | W-20 | 31.50% | 76.00% | 23.94% | 63,433 | 63,433 | 15,186 | 15,186 |
| Web | W-21 | | | 25.45% | 94,530 | 94,530 | 24,055 | 24,055 |
| Web | W-22 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-23 | | | 25.45% | 54,717 | 54,717 | 13,924 | 13,924 |
| Web | W-24 | | | 25.45% | 506,808 | 506,808 | 128,969 | 128,969 |
| Web | W-25 | | | 25.45% | 218,105 | 218,105 | 55,502 | 55,502 |
| Web | W-26 | | | 25.45% | 21,532 | 21,532 | 5,479 | 5,479 |
| Web | W-27 | | | 25.45% | 56,933 | 56,933 | 14,488 | 14,488 |
| Web | W-28 | 34.90% | 76.00% | 26.52% | 549,238 | 549,238 | 145,680 | 145,680 |
| Web | W-29 | 34.90% | 76.00% | 26.52% | 144,930 | 144,930 | 38,441 | 38,441 |
| Web | W-30 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-31 | 19.20% | 76.00% | 14.59% | 405,296 | 405,296 | 59,141 | 59,141 |
| Web | W-32 | 18.10% | 76.00% | 13.76% | 768,450 | 768,450 | 105,708 | 105,708 |
| Web | W-33 | 34.70% | 76.00% | 26.37% | 228,704 | 228,704 | 60,314 | 60,314 |
| Web | W-34 | 16.30% | 76.00% | 12.39% | 959,756 | 959,756 | 118,895 | 118,895 |
| Web | W-35 | | | 25.45% | 249,818 | 249,818 | 63,572 | 63,572 |
| Web | W-36 | 32.10% | 76.00% | 24.40% | 232,808 | 232,808 | 56,796 | 56,796 |
| Web | W-37 | | | 25.45% | 128,148 | 128,148 | 32,610 | 32,610 |
| Web | W-38 | | | 25.45% | 112,603 | 112,603 | 28,655 | 28,655 |
| Web | W-39 | | | 25.45% | 43,424 | 43,424 | 11,050 | 11,050 |
| Web | W-40 | 90.30% | 76.00% | 68.63% | 74,505 | 74,505 | 51,131 | 51,131 |

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 160 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-41 | | | 25.45% | 62,222 | 62,222 | 15,834 | 15,834 |
| Web | W-42 | 14.80% | 76.00% | 11.25% | 442,376 | 442,376 | 49,758 | 49,758 |
| Web | W-43 | 31.50% | 76.00% | 23.94% | 63,433 | 63,433 | 15,186 | 15,186 |
| Web | W-44 | | | 25.45% | 153,510 | 153,510 | 39,064 | 39,064 |
| Web | W-45 | 22.40% | 76.00% | 17.02% | 192,606 | 192,606 | 32,789 | 32,789 |
| Web | W-46 | 22.40% | 76.00% | 17.02% | 70,755 | 70,755 | 12,045 | 12,045 |
| Web | W-47 | | | 25.45% | 135,980 | 135,980 | 34,603 | 34,603 |
| Web | W-48 | 34.90% | 76.00% | 26.52% | 549,238 | 549,238 | 145,680 | 145,680 |
| Web | W-49 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-50 | | | 25.45% | 75,348 | 75,348 | 19,174 | 19,174 |
| Web | W-51 | | | 25.45% | 108,951 | 108,951 | 27,725 | 27,725 |
| Web | W-52 | | | 25.45% | 71,724 | 71,724 | 18,252 | 18,252 |
| Web | W-53 | | | 25.45% | 506,808 | 506,808 | 128,969 | 128,969 |
| Social | S-1 | | | 25.45% | 302,891 | 60,190 | 77,078 | 15,317 |
| Social | S-2 | 16.30% | 76.00% | 12.39% | 1,517,403 | 7,622,861 | 187,976 | 944,320 |
| Social | S-3 | 90.30% | 76.00% | 68.63% | 50,916 | 90,045 | 34,943 | 61,796 |
| Social | S-4 | 90.30% | 76.00% | 68.63% | 111,412 | 98,107 | 76,460 | 67,329 |
| Social | S-5 | 90.30% | 76.00% | 68.63% | 97,086 | 95,090 | 66,628 | 65,259 |
| Social | S-6 | 21.00% | 76.00% | 15.96% | 605,662 | 2,809,916 | 96,664 | 448,463 |
| Social | S-7 | | | 25.45% | 310,072 | 1,313,779 | 78,905 | 334,322 |
| Social | S-8 | 22.40% | 76.00% | 17.02% | 501,872 | 717,229 | 85,439 | 122,101 |
| Social | S-9 | 22.40% | 76.00% | 17.02% | 253,407 | 675,370 | 43,140 | 114,975 |
| Social | S-10 | 22.40% | 76.00% | 17.02% | 214,427 | 671,886 | 36,504 | 114,382 |
| Social | S-11 | 22.40% | 76.00% | 17.02% | 215,038 | 671,947 | 36,608 | 114,392 |
| Social | S-12 | | | 25.45% | 268,022 | 1,097,721 | 68,205 | 279,341 |
| Social | S-13 | 18.10% | 76.00% | 13.76% | 684,581 | 2,420,050 | 94,171 | 332,902 |
| Social | S-14 | | | 25.45% | 104,961 | 311,247 | 26,710 | 79,204 |
| Social | S-15 | | | 25.45% | 104,756 | 312,259 | 26,658 | 79,462 |

Expert Report of Professor Humphreys

120

**A264**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Social | S-16 | | | 25.45% | 97,870 | 311,264 | 24,905 | 79,208 |
| Social | S-17 | | | 25.45% | 99,595 | 311,484 | 25,344 | 79,264 |
| Social | S-18 | | | 25.45% | 95,355 | 311,129 | 24,265 | 79,174 |
| Social | S-19 | | | 25.45% | 95,909 | 311,490 | 24,406 | 79,266 |
| Social | S-20 | | | 25.45% | 92,734 | 311,006 | 23,598 | 79,143 |
| Social | S-21 | | | 25.45% | 93,526 | 310,950 | 23,800 | 79,128 |
| Social | S-22 | | | 25.45% | 88,022 | 310,946 | 22,399 | 79,128 |
| Social | S-23 | | | 25.45% | 83,682 | 310,988 | 21,295 | 79,138 |
| Social | S-24 | | | 25.45% | 88,166 | 310,981 | 22,436 | 79,136 |
| Social | S-25 | | | 25.45% | 91,129 | 310,945 | 23,190 | 79,127 |
| Social | S-26 | | | 25.45% | 83,601 | 310,967 | 21,274 | 79,133 |
| Social | S-27 | | | 25.45% | 382,281 | 1,358,989 | 97,280 | 345,827 |
| Social | S-28 | | | 25.45% | 90,034 | 395,492 | 22,911 | 100,642 |
| Social | S-29 | | | 25.45% | 414,204 | 1,753,410 | 105,404 | 446,196 |
| Social | S-30 | | | 25.45% | 930,727 | 4,415,878 | 236,845 | 1,123,723 |
| Social | S-31 | | | 25.45% | 1,330,634 | 4,526,637 | 338,611 | 1,151,908 |
| Social | S-32 | | | 25.45% | 38,345 | 37,335 | 9,758 | 9,501 |
| Social | S-33 | 23.10% | 76.00% | 17.56% | 183,730 | 583,066 | 32,256 | 102,363 |
| Social | S-34 | | | 25.45% | 383,118 | 1,359,220 | 97,493 | 345,885 |
| Social | S-35 | 19.20% | 76.00% | 14.59% | 138,523 | 502,881 | 20,213 | 73,380 |
| Social | S-36 | 18.10% | 76.00% | 13.76% | 744,815 | 2,423,097 | 102,457 | 333,321 |
| Social | S-37 | 18.10% | 76.00% | 13.76% | 813,052 | 2,440,919 | 111,843 | 335,773 |
| Social | S-38 | 16.30% | 76.00% | 12.39% | 1,495,243 | 7,625,871 | 185,231 | 944,693 |
| Social | S-39 | | | 25.45% | 91,591 | 215,150 | 23,308 | 54,750 |
| Social | S-40 | 32.10% | 76.00% | 24.40% | 207,974 | 577,660 | 50,737 | 140,926 |
| Social | S-41 | 32.10% | 76.00% | 24.40% | 256,624 | 591,307 | 62,606 | 144,255 |
| Social | S-42 | 32.10% | 76.00% | 24.40% | 174,036 | 576,283 | 42,458 | 140,590 |
| Social | S-43 | 32.10% | 76.00% | 24.40% | 152,682 | 576,071 | 37,248 | 140,538 |

Expert Report of Professor Humphreys

121

**A265**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Social | S-44 | 90.30% | 76.00% | 68.63% | 63,413 | 91,367 | 43,519 | 62,703 |
| Social | S-45 | 90.30% | 76.00% | 68.63% | 38,068 | 89,218 | 26,125 | 61,229 |
| Social | S-46 | 14.80% | 76.00% | 11.25% | 615,996 | 2,009,856 | 69,287 | 226,069 |
| Social | S-47 | 22.40% | 76.00% | 17.02% | 242,492 | 678,966 | 41,282 | 115,587 |
| Social | S-48 | 25.45% | | 25.45% | 30,111 | 49,130 | 7,662 | 12,502 |
| Social | S-49 | 34.90% | 76.00% | 26.52% | 183,849 | 666,751 | 48,764 | 176,849 |
| Social | S-50 | | | 25.45% | 75,654 | 247,243 | 19,252 | 62,917 |
| Social | S-51 | | | 25.45% | 68,828 | 227,745 | 17,515 | 57,955 |
| Social | S-52 | | | 25.45% | 65,717 | 227,842 | 16,723 | 57,980 |
| Social | S-53 | | | 25.45% | 67,356 | 227,764 | 17,140 | 57,960 |
| Social | S-54 | | | 25.45% | 471,389 | 1,754,697 | 119,956 | 446,524 |
| Social | S-55 | | | 25.45% | 1,116,377 | 4,420,345 | 284,088 | 1,124,860 |
| Print | P-1 | | | | 0 | 0 | 0 | 0 |
| Print | P-2 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-3 | 16.30% | 76.00% | 12.39% | 454,861 | 454,861 | 56,348 | 56,348 |
| Print | P-4 | 16.30% | 76.00% | 12.39% | 454,861 | 454,861 | 56,348 | 56,348 |
| Print | P-5 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-6 | | | 25.45% | 92,515 | 92,515 | 23,543 | 23,543 |
| Print | P-7 | 34.90% | 76.00% | 26.52% | 544,002 | 544,002 | 144,291 | 144,291 |
| Print | P-9 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-8 | | | | 0 | 0 | 0 | 0 |
| Print | P-10 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-11 | 25.45% | | 25.45% | 149,093 | 149,093 | 37,940 | 37,940 |
| TV | T-1 | 34.70% | 76.00% | 26.37% | 9,390,000 | 9,390,000 | 2,476,331 | 2,476,331 |
| TV | T-2 | 34.70% | 76.00% | 26.37% | 9,390,000 | 9,390,000 | 2,476,331 | 2,476,331 |
| TV | T-3 | 20.50% | 76.00% | 15.58% | 1,552,000 | 1,552,000 | 241,802 | 241,802 |
| TV | T-4 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-5 | 23.60% | 76.00% | 17.94% | 877,000 | 877,000 | 157,299 | 157,299 |

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 163 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-7 | 23.60% | 76.00% | 17.94% | 877,000 | 877,000 | 157,299 | 157,299 |
| TV | T-8 | | | | 0 | 0 | 0 | 0 |
| TV | T-9 | 20.50% | 76.00% | 15.58% | 839,000 | 839,000 | 130,716 | 130,716 |
| TV | T-10 | 20.50% | 76.00% | 15.58% | 839,000 | 839,000 | 130,716 | 130,716 |
| TV | T-11 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-12 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-13 | 33.70% | 76.00% | 25.61% | 5,863,000 | 5,863,000 | 1,501,632 | 1,501,632 |
| TV | T-14 | 33.70% | 76.00% | 25.61% | 5,863,000 | 5,863,000 | 1,501,632 | 1,501,632 |
| TV | T-15 | 33.70% | 76.00% | 25.61% | 2,986,000 | 2,986,000 | 764,774 | 764,774 |
| TV | T-16 | 33.70% | 76.00% | 25.61% | 2,700,000 | 2,700,000 | 691,524 | 691,524 |
| TV | T-17 | 33.70% | 76.00% | 25.61% | 2,700,000 | 2,700,000 | 691,524 | 691,524 |
| TV | T-18 | 23.60% | 76.00% | 17.94% | 628,000 | 628,000 | 112,638 | 112,638 |
| TV | T-19 | | | | | | 0 | 0 |
| TV | T-20 | | | | | 0 | 0 | 0 |
| TV | T-21 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-22 | | | | | 0 | 0 | 0 |
| TV | T-23 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-24 | | | | | 0 | 0 | 0 |
| TV | T-25 | 23.60% | 76.00% | 17.94% | 833,000 | 833,000 | 149,407 | 149,407 |
| TV | T-26 | | | | | 0 | 0 | 0 |
| TV | T-27 | 23.60% | 76.00% | 17.94% | 833,000 | 833,000 | 149,407 | 149,407 |
| TV | T-28 | 23.60% | 76.00% | 17.94% | 936,000 | 936,000 | 167,881 | 167,881 |
| TV | T-29 | 23.60% | 76.00% | 17.94% | 936,000 | 936,000 | 167,881 | 167,881 |
| TV | T-30 | | | | | 0 | 0 | 0 |
| TV | T-31 | 20.50% | 76.00% | 15.58% | 1,378,000 | 1,378,000 | 214,692 | 214,692 |
| TV | T-32 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-33 | 20.50% | 76.00% | 15.58% | 385,000 | 385,000 | 59,983 | 59,983 |
| TV | T-34 | 20.50% | 76.00% | 15.58% | 385,000 | 385,000 | 59,983 | 59,983 |

Expert Report of Professor Humphreys

123

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-35 | 34.70% | 76.00% | 26.37% | 3,920,000 | 3,920,000 | 1,033,782 | 1,033,782 |
| TV | T-36 | 33.70% | 76.00% | 25.61% | 5,468,000 | 5,468,000 | 1,400,464 | 1,400,464 |
| TV | T-37 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-38 | 31.00% | 76.00% | 23.56% | 1,293,000 | 1,293,000 | 304,631 | 304,631 |
| TV | T-39 | 20.50% | 76.00% | 15.58% | 1,033,000 | 1,033,000 | 160,941 | 160,941 |
| TV | T-40 | 20.50% | 76.00% | 15.58% | 1,033,000 | 1,033,000 | 160,941 | 160,941 |
| TV | T-41 | 20.50% | 76.00% | 15.58% | 800,000 | 800,000 | 124,640 | 124,640 |
| TV | T-42 | 20.50% | 76.00% | 15.58% | 887,000 | 887,000 | 138,195 | 138,195 |
| TV | T-43 | 20.50% | 76.00% | 15.58% | 984,000 | 984,000 | 153,307 | 153,307 |
| TV | T-44 | 31.00% | 76.00% | 23.56% | 6,769,000 | 6,769,000 | 1,594,776 | 1,594,776 |
| TV | T-45 | 31.00% | 76.00% | 23.56% | 6,769,000 | 6,769,000 | 1,594,776 | 1,594,776 |
| TV | T-46 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-47 | | | | | | 0 | 0 |
| TV | T-48 | | | | 0 | 0 | 0 | 0 |
| TV | T-49 | 23.60% | 76.00% | 17.94% | 460,000 | 460,000 | 82,506 | 82,506 |
| TV | T-50 | | | | | | 0 | 0 |
| TV | T-51 | | | | 0 | 0 | 0 | 0 |
| TV | T-52 | 23.60% | 76.00% | 17.94% | 460,000 | 460,000 | 82,506 | 82,506 |
| TV | T-53 | 23.60% | 76.00% | 17.94% | 168,000 | 168,000 | 30,132 | 30,132 |
| TV | T-54 | 20.50% | 76.00% | 15.58% | 2,010,000 | 2,010,000 | 313,158 | 313,158 |
| TV | T-55 | 20.50% | 76.00% | 15.58% | 2,010,000 | 2,010,000 | 313,158 | 313,158 |
| TV | T-56 | 33.70% | 76.00% | 25.61% | 3,800,000 | 3,800,000 | 973,256 | 973,256 |
| TV | T-57 | 20.50% | 76.00% | 15.58% | 2,561,000 | 2,561,000 | 399,004 | 399,004 |
| TV | T-58 | 20.50% | 76.00% | 15.58% | 2,561,000 | 2,561,000 | 399,004 | 399,004 |
| TV | T-59 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-60 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-61 | 20.50% | 76.00% | 15.58% | 900,000 | 900,000 | 140,220 | 140,220 |
| TV | T-62 | 20.50% | 76.00% | 15.58% | 900,000 | 900,000 | 140,220 | 140,220 |

Expert Report of Professor Humphreys

124

**A268**

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 165 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-63 | 34.70% | 76.00% | 26.37% | 3,929,000 | 3,929,000 | 1,036,156 | 1,036,156 |
| | | | TOTAL RECEPTIVE IMPRESSIONS (LOW/HIGH) | | | | 34,075,512 | 42,936,354 |

Expert Report of Professor Humphreys

125

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 166 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX K.  DAMAGES MODEL

*High Impression Estimate, 1x Attitude Change Multiplier*

Impression Target:[459] 42,936,354
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight[460] | Target Impressions[461] | Adjusted Impressions[462] | CPM (per 1,000 impressions) | Total Cost[463] |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 2,790,863 | 2,790,863 | $6.46[464] | $18,028.98 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 2,790,863 | 2,790,863 | $14.40[465] | $40,188.43 |
| Influencer | Web Blog Influencer | 5.00% | 2,146,818 | 21,468,177 | $60.00[466] | $1,288,090.62 |
| | Twitter Influencer | 7.00% | 3,005,545 | 60,110,896 | $2.00[467] | $120,221.79 |
| | Facebook Influencer | 7.00% | 3,005,545 | 60,110,896 | $25.00[468] | $1,502,772.39 |
| | YouTube Influencer | 4.60% | 1,975,072 | 39,501,446 | $20.00[469] | $790,028.91 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 12,709,161 | 12,709,161 | $16.00[470] | $203,346.57 |
| | Cable TV (Excluding Primetime) | 21.30% | 9,145,443 | 9,145,443 | $10.00[471] | $91,454.43 |
| | Podcasts | 5.00% | 2,146,818 | 2,146,818 | $19.00[472] | $40,789.54 |
| | Radio | 4.10% | 1,760,391 | 1,760,391 | $4.00[473] | $7,041.56 |
| | Print newspapers | 3.40% | 1,459,836 | 1,459,836 | $67.00[474] | $97,809.01 |
| | **Total** | **100.00%** | **42,936,354** | | | **$4,199,772.24** |

---

[459]   The impressions estimate from the Impressions Model.
[460]   The percentage of impressions allocated to different media types. Allocations based on Trump supporters most common way of getting political and election news.
[463]   Calculated using the following formula: (Adjusted Impressions / 1000) * CPM.

Expert Report of Professor Humphreys

126

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| 462 | The number of impressions allocated to the media type, taking into account the impression rate for Twitter, Facebook, and YouTube influencers and the bounce rate for web blog influencers. For all other media types the Adjusted Impressions are the same as the Target Impressions. |
| 463 | Calculated using the following formula: (Adjusted Impressions / 1000) * CPM. |
| 464 | https://blog.hootsuite.com/twitter-statistics/ |
| 465 | https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost |
| 466 | https://www.webfx.com/social-media/pricing/influencer-marketing/ |
| 467 | https://www.webfx.com/social-media/pricing/influencer-marketing/ |
| 468 | https://www.webfx.com/social-media/pricing/influencer-marketing/ |
| 469 | https://www.webfx.com/social-media/pricing/influencer-marketing/ |
| 470 | https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparisonv OAAA.pdf |
| 471 | https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparisonv OAAA.pdf |
| 472 | https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparisonv OAAA.pdf |
| 473 | https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparisonv OAAA.pdf |
| 474 | https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549 |

Expert Report of Professor Humphreys

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 168 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 42,936,354
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 8,372,589 | 8,372,589 | $6.46 | $54,086.93 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 8,372,589 | 8,372,589 | $14.40 | $120,565.28 |
| Influencer | Web Blog Influencer | 5.00% | 6,440,453 | 64,404,531 | $60.00 | $3,864,271.86 |
| | Twitter Influencer | 7.00% | 9,016,634 | 180,332,687 | $2.00 | $360,665.37 |
| | Facebook Influencer | 7.00% | 9,016,634 | 180,332,687 | $25.00 | $4,508,317.17 |
| | YouTube Influencer | 4.60% | 5,925,217 | 118,504,337 | $20.00 | $2,370,086.74 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 38,127,482 | 38,127,482 | $16.00 | $610,039.72 |
| | Cable TV (Excluding Primetime) | 21.30% | 27,436,330 | 27,436,330 | $10.00 | $274,363.30 |
| | Podcasts | 5.00% | 6,440,453 | 6,440,453 | $19.00 | $122,368.61 |
| | Radio | 4.10% | 5,281,172 | 5,281,172 | $4.00 | $21,124.69 |
| | Print newspapers | 3.40% | 4,379,508 | 4,379,508 | $67.00 | $293,427.04 |
| | **Total** | **100.00%** | **128,809,062** | | | **$12,599,316.71** |

Expert Report of Professor Humphreys

128

Case 1:20-cv-07311-LAK  Document 108  Filed 12/22/22  Page 169 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 42,936,354
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 13,954,315 | 13,954,315 | $6.46 | $90,144.88 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 13,954,315 | 13,954,315 | $14.40 | $200,942.14 |
| Influencer | Web Blog Influencer | 5.00% | 10,734,089 | 107,340,885 | $60.00 | $6,440,453.10 |
| | Twitter Influencer | 7.00% | 15,027,724 | 300,554,478 | $2.00 | $601,108.96 |
| | Facebook Influencer | 7.00% | 15,027,724 | 300,554,478 | $25.00 | $7,513,861.95 |
| | YouTube Influencer | 4.60% | 9,875,361 | 197,507,228 | $20.00 | $3,950,144.57 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 63,545,804 | 63,545,804 | $16.00 | $1,016,732.86 |
| | Cable TV (Excluding Primetime) | 21.30% | 45,727,217 | 45,727,217 | $10.00 | $457,272.17 |
| | Podcasts | 5.00% | 10,734,089 | 10,734,089 | $19.00 | $203,947.68 |
| | Radio | 4.10% | 8,801,953 | 8,801,953 | $4.00 | $35,207.81 |
| | Print newspapers | 3.40% | 7,299,180 | 7,299,180 | $67.00 | $489,045.07 |
| | **Total** | **100.00%** | **214,681,770** | | | **$20,998,861.18** |

Expert Report of Professor Humphreys

129

Case 1:20-cv-07311-LAK   Document 108   Filed 12/22/22   Page 170 of 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 1x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 2,214,908 | 2,214,908 | $6.46 | $14,308.31 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 2,214,908 | 2,214,908 | $14.40 | $31,894.68 |
| Influencer | Web Blog Influencer | 5.00% | 1,703,776 | 17,037,756 | $60.00 | $1,022,265.36 |
| | Twitter Influencer | 7.00% | 2,385,286 | 47,705,717 | $2.00 | $95,411.43 |
| | Facebook Influencer | 7.00% | 2,385,286 | 47,705,717 | $25.00 | $1,192,642.92 |
| | YouTube Influencer | 4.60% | 1,567,474 | 31,349,471 | $20.00 | $626,989.42 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 10,086,352 | 10,086,352 | $16.00 | $161,381.62 |
| | Cable TV (Excluding Primetime) | 21.30% | 7,258,084 | 7,258,084 | $10.00 | $72,580.84 |
| | Podcasts | 5.00% | 1,703,776 | 1,703,776 | $19.00 | $32,371.74 |
| | Radio | 4.10% | 1,397,096 | 1,397,096 | $4.00 | $5,588.38 |
| | Print newspapers | 3.40% | 1,158,567 | 1,158,567 | $67.00 | $77,624.02 |
| | **Total** | **100.00%** | **34,075,512** | | | **$3,333,058.72** |

Expert Report of Professor Humphreys

**A274**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 6,644,725 | 6,644,725 | $6.46 | $42,924.92 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 6,644,725 | 6,644,725 | $14.40 | $95,684.04 |
| Influencer | Web Blog Influencer | 5.00% | 5,111,327 | 51,113,268 | $60.00 | $3,066,796.08 |
| | Twitter Influencer | 7.00% | 7,155,858 | 143,117,150 | $2.00 | $286,234.30 |
| | Facebook Influencer | 7.00% | 7,155,858 | 143,117,150 | $25.00 | $3,577,928.76 |
| | YouTube Influencer | 4.60% | 4,702,421 | 94,048,413 | $20.00 | $1,880,968.26 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 30,259,055 | 30,259,055 | $16.00 | $484,144.87 |
| | Cable TV (Excluding Primetime) | 21.30% | 21,774,252 | 21,774,252 | $10.00 | $217,742.52 |
| | Podcasts | 5.00% | 5,111,327 | 5,111,327 | $19.00 | $97,115.21 |
| | Radio | 4.10% | 4,191,288 | 4,191,288 | $4.00 | $16,765.15 |
| | Print newspapers | 3.40% | 3,475,702 | 3,475,702 | $67.00 | $232,872.05 |
| | **Total** | **100.00%** | **102,226,536** | | | **$9,999,176.17** |

Expert Report of Professor Humphreys

131

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 11,074,541 | 11,074,541 | $6.46 | $71,541.54 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 11,074,541 | 11,074,541 | $14.40 | $159,473.40 |
| Influencer | Web Blog Influencer | 5.00% | 8,518,878 | 85,188,780 | $60.00 | $5,111,326.80 |
| | Twitter Influencer | 7.00% | 11,926,429 | 238,528,584 | $2.00 | $477,057.17 |
| | Facebook Influencer | 7.00% | 11,926,429 | 238,528,584 | $25.00 | $5,963,214.60 |
| | YouTube Influencer | 4.60% | 7,837,368 | 156,747,355 | $20.00 | $3,134,947.10 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 50,431,758 | 50,431,758 | $16.00 | $806,908.12 |
| | Cable TV (Excluding Primetime) | 21.30% | 36,290,420 | 36,290,420 | $10.00 | $362,904.20 |
| | Podcasts | 5.00% | 8,518,878 | 8,518,878 | $19.00 | $161,858.68 |
| | Radio | 4.10% | 6,985,480 | 6,985,480 | $4.00 | $27,941.92 |
| | Print newspapers | 3.40% | 5,792,837 | 5,792,837 | $67.00 | $388,120.08 |
| **Total** | | **100.00%** | **170,377,560** | | | **$16,665,293.62** |

*Summary of Calculated Damages:*

| Attitude Change Multiplier | 1x | 3x | 5x |
|---|---|---|---|
| Low Receptive Impression Estimate | $3,333,058.72 | $9,999,176.17 | $16,665,293.62 |
| High Receptive Impression Estimate | $4,199,772.24 | $12,599,316.71 | $20,998,861.18 |

Expert Report of Professor Humphreys

132

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX L.   LIST OF CONSERVATIVE STEPS TAKEN**

| IMPRESSIONS MODEL | |
|---|---|
| Online News Articles Considered | • Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statements.<br><br>• Further, some of the articles from the Complaint were authored by the Associated Press and Reuters.[475] It is likely that identical (or very similar) versions of these articles appeared in multiple publications. For instance, the June 25, 2019 Hollywood Reporter article, titled "Trump on E. Jean Carroll Sexual Assault Claim: 'She's Not My Type,'" appeared in at least 20 additional publications.[476] Further, the June 22, 2019 Associated press article, titled "Trump Denies Knowing NY Woman Accusing |

---

[475]   The analysis incorporates two versions of the same Reuters article: Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", BUS. INSIDER (June 25, 2019); and Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", REUTERS (June 25, 2019).

[476]   https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type; https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6; https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054; https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type; https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html; https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/; https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type; https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp; https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/; and https://www.necn.com/news/local/trump-e-jean-carroll/220418/.

Expert Report of Professor Humphreys                                    133

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| | Him of Sexual Assault" appeared in at least 7 additional publications. [477] |
| Social Media Posts Considered | • I limited social media impressions to those generated from Tweets published by the primary account of the publisher or the article author. I did not consider, for example, retweets of quote tweets, any tweets from other publishers of stories covering Mr. Trump's Statements, tweets from users who shared links to the 52 articles (or other articles containing the Statements), or tweets in which users repeated or otherwise amplified the Statements. |
| | • Additionally, due to the opacity of other platforms, I do not account for impressions generated on any other social media platform, despite there being evidence the articles considered in the impressions analysis were spread widely online. |
| Print Articles Considered | • When identifying print articles, I limited the analysis to publications that published an online news article that was cited in the Complaint. |
| | • The 11 articles I found are an undercount of all print articles published that covered the Statements. I was able to find 33 print articles via ProQuest published between June 22, 2019, and September 28, 2022, that referenced the Statements. [478] None of these articles overlapped with the 14 articles I considered in my analysis. |

---

[477] https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22; https://www.gazettenet.com/Carroll-26480259; https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp; https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; and https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f.

[478] Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean"))

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

|  |  |
|---|---|
|  | • Only 9 of the 11 articles I found contributed to the impressions estimate as I was unable to find publicly available circulation for all 11 articles. |
| TV Broadcasts Considered | • I only considered TV broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: ABC, Fox, NBC, MSNBC, CBS, and CNN.<br><br>• Among the broadcasts I found on the TV News Archive, I only included broadcasts that included direct quotes from the Statements. Broadcasts that only included paraphrases of the Statements were not included. For example, The Tucker Carlson Show (ratings: 2,822,000) covered the issue for 12 minutes on June 25, 2019, but I did not include it.<br><br>• I only counted ratings for a particular program once in a day, even if a program was aired multiple times in day. I also did not consider the number of times a Statement was mentioned during a broadcast, even though multiple mentions of a Statement generate multiple impressions. |
| Other Sources of Impressions Not Considered | • I did not include impressions generated from podcasts or radio broadcasts that covered the Statements. There is anecdotal evidence that these claims were discussed on popular podcasts.[479]<br><br>• I did not include impressions generated from people who were exposed to the Statements in article headlines while browsing Google News, |

---

[479] See, for example, the June 27, 2019 broadcast of *The Daily* (https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/) and two June 26, 2019 broadcasts of *The Kevin Jackson Show* (https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/; https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| | Apple News, or other news aggregating applications. |
| | • I did not consider the impact of word-of-mouth on the transmission of the Statements. |
| Social Media Impression Calculation | • Since tweets are seen only by a subset of a user's followers, I incorporated an impression rate into the impressions model. When selecting an impression estimate, I relied on a model developed by information scientists who relied on data collected from Buzzfeed's accounts. Using their model, I relied on Buzzfeed's impression rate as the high end for impression rates despite the fact Buzzfeed is less prominent than many of the sources included in my impression calculation. |
| Online News Impressions Calculation | • I incorporated a website's bounce rate when calculating online news impressions to exclude users who navigated to a website without performing any actions. Nonetheless, it's possible that users could have navigated directly to the relevant article on the website and been exposed the Statement without taking any additional actions. |
| **QUANTITATIVE IMPACT MODEL** | |
| Negative Associations are Harmful | • Any impression generated that linked Ms. Carroll's person brand with the content of the Statements is harmful. Person brands need to be protected and any information that connects a person brand to 'lying' and other negative information is harmful, even if the person's fans or followers do not believe the claims. Nonetheless, I limited my estimate of the quantitative impact to potential readers and viewers who identify as Trump supporters and/or are Republicans who may find Trump's Statements credible. |
| Limited Set of Impressions as an Input | • The impact model relies on the impressions estimate and therefore does not account for the impact associated with impressions generated from additional online and print articles, TV |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | broadcasts, and social media posts covering the Statements. |
|---|---|
| **DAMAGES MODEL** | |
| Impressions and Impact as Inputs | • The damages model also relies on the impact model and therefore does not account for impressions generated by additional online and print articles, TV broadcasts, and social media posts that covered the Statements.<br><br>• The damages model also relies on the impact model and therefore is limited to the costs needed to repair the impressions generated by people who are likely to be receptive to the Statements. |
| Production Costs | • The damages model does not incorporate the production and operating costs associated with running the campaign. |
| Attitude Change Multiplier | • When calculating damages, I included attitude change multipliers (1x, 3x, and 5x) to account for the fact that it takes multiple impressions to change an attitude. I estimate that 3 exposures would be most appropriate.<br>• I incorporated the 1x attitude change multiplier to account for the fact that the same person may have been exposed to multiple impressions. Empirical data suggests that a multiplier of 1 is overly conservative, especially because Mr. Trump's supporters are more likely to use only one news source. |

# EXHIBIT D

**The New York Times** | https://www.nytimes.com/2020/02/21/style/ejean-carroll-fired-elle.html

# What Happened Between E. Jean Carroll and Elle Magazine?

Her contract was terminated early, but the fashion magazine maintains it wasn't because of her allegations against President Trump.

 

**By Katherine Rosman and Jessica Bennett**

Feb. 21, 2020

8 MIN READ

In the fall of 2017, when Nina Garcia, the fashion editor and "Project Runway" judge, became the editor in chief of Elle magazine, E. Jean Carroll felt she needed to fight for her job.

Ms. Garcia was remaking the staff and was scaling back on lucrative contracts the magazine offered freelance contributors like Ms. Carroll, who had written the Ask E. Jean advice column since 1993.

But rather than dash off a pleading email, as many writers might, Ms. Carroll did something more in line with her outsize personality: She showed up at the offices of Hearst Magazines, the publisher of Elle, with a stack of hula hoops. "I said, 'Here's some hula hoops, let's get it going girl!'" she recalled in a phone interview.

Ms. Garcia appeared to love it.

"Oh, my God, I adore E. Jean!" she said in a 2018 interview, about a year after taking over. "She's just so perfect for this generation. Her voice is so modern, quirky, and cheeky. While everybody on Twitter thinks they could be the E. Jean, she is the E. Jean!"

The same month that the interview ran, Ms. Garcia agreed to provide a blurb for Ms. Carroll's forthcoming memoir, "What Do We Need Men For?," praising her work at Elle. At that point, Ms. Carroll had shared the book's contents with very few people, and Ms. Garcia had not read it.

"E. Jean Carroll is a force of nature, whose natural vibrancy has held readers in rapture for decades," read Ms. Garcia's blurb, which was printed on the back cover.

In the book, which recounts stories from her life, Ms. Carroll accuses Donald Trump of raping her in a department store dressing room in the mid-1990s. The details were revealed in an excerpt in New York magazine in June of 2019, just before the book was published, and quickly picked up by news outlets around the world.

Mr. Trump denied ever meeting Ms. Carroll, calling her a liar. ("She's not my type," he told The Hill.) Several months later, she filed a defamation suit against him. She argued he had damaged her reputation and her career by denying that her story was true, and by saying that she took money from his political opponents to fabricate the allegation.

Elle covered the story, reporting on her book's revelations and the reaction to them on its website. It also ran a column in print (but not online) last fall in which Ms. Carroll explained why she had decided to come forward at last.

But by December 2019, Elle's regard for its columnist had changed. Ms. Carroll, 76, was contacted by a Hearst editor, Erin Hobday, who asked if she was free for a call; Ms. Carroll thought she was being invited to the company holiday party.

Instead, she was informed that her contract, which was supposed to go through July of this year, was being terminated. She was asked to invoice for the remaining four columns, which would not be published and for which Ms. Carroll said she still has not been paid.

"We and your readers so appreciate your many years of work for the magazine, and the wonderful columns you contributed to our publication," Ms. Hobday wrote in an email, adding: "We will miss you tremendously."

## 'A Beloved Voice'

On Feb. 18, Ms. Carroll wrote on Twitter: "Because Trump ridiculed my reputation, laughed at my looks, & dragged me through the mud, after 26 years, ELLE fired me. I don't blame Elle. It was the great honor of my life writing 'Ask E. Jean.' I blame @realdonaldtrump."

Earlier that day, her lawyers had disclosed in a court filing in connection to her defamation suit against Mr. Trump that Elle had killed the Ask E. Jean column, which had been published virtually every month for 26 years.

In response to a list of questions sent by The New York Times, a Hearst spokeswoman emailed a statement. "E. Jean Carroll was long a beloved voice in the pages of Elle, the decision not to renew her contract was a business decision and had nothing to do with politics," it said.

Even if Ms. Carroll did not blame Elle, others did, and were quick to say so. Soon, the hashtag #BoycottElleMagazine began appearing on Twitter.

"Extremely disappointing from the woman's mag that historically has done more hard hitting reporting and taken stands than most," Clara Jeffery, the editor of Mother Jones magazine, wrote on Twitter.

"If you ever wondered whether women's magazines are really on the side of women, I think this says all we need to know," said Nancy Jo Sales, a magazine writer.

Many editors who have worked with Ms. Carroll say Elle has lost an important voice. "E. Jean is an American original and to many, an icon," said Robbie Myers, the longtime editor of Elle, before Ms. Garcia.

"E. Jean was just so beloved," said Maggie Bullock, a former deputy editor at Elle. "It seems really sad that a women's publication that had the chance to align itself with a woman who was speaking her truth — and speaking truth to power — in a time like this, chose not to. What a shortsighted thing to do."

But inside the Hearst building in Midtown Manhattan this week, some journalists quietly fumed at what they saw as an inaccurate portrayal.

More than a dozen current and former Hearst employees, who spoke to The Times anonymously for fear they would face repercussions in their jobs, attributed Ms. Carroll's contract termination, at least in part, to a steep paycheck and a break in convention: Ms. Carroll had given away the news-breaking excerpt from her book to New York magazine — not Elle. (The New York cover story, "Hideous Men," was edited by Laurie Abraham, one of Ms. Carroll's former editors at Elle. Ms. Abraham now works at The Atlantic.)

Some said that Ms. Carroll's contention that Mr. Trump's insults cost her the columnist job was self-serving, since her defamation lawsuit against him will require her to prove she has been damaged by his remarks.

Ms. Carroll dismissed those comments. "The lawsuit is for all women who have been harassed, who cannot speak up and don't have the money to sue," Ms. Carroll said. "I am speaking out now for the women who have spoken out and have met their doom. Sometimes you speak out against a man in power and you lose your job."

Ms. Carroll has been credited with helping to shape the advice column genre and voice, inspiring modern-day iterations like Ask Polly, published by New York magazine, and "Dear Sugars," an advice column turned podcast.

"She didn't just toss off a bunch of fluff — she used research, referenced current events and politics, interviewed experts and actually gave real advice that often was as much about helping get a woman's career on track as a relationship," said Ms. Bullock, the former Elle editor, now a freelance writer. "Early on, Jean was inclusive and, you could argue, 'woke.'"

But the days of lucrative magazine contracts are largely a thing of the past. When Ms. Garcia took over Elle, Ms. Carroll was being paid $120,000 a year for 12 columns of about 1,800 words each. (At about $5.50 per word, that was more than twice the $2 per word usually paid to Elle's freelance writers for the print magazine.)

When Ms. Carroll's contract came up for renewal during Ms. Garcia's first year, editors went to bat for Ms. Carroll, arguing that her column had become synonymous with the Elle brand.

Ms. Garcia gave Ms. Carroll a new contract: $60,000 per year for 12 columns of 900 words.

## Changing of the Guard

The changes at Elle, many of them in response to the economic challenges of the magazine industry, reflect big shifts at its parent company, Hearst, which is also facing tension with employees who recently unionized.

In 2018, David Carey, the president of Hearst Magazines for eight years, stepped down. Troy Young, who had previously overseen the company's digital efforts, succeeded him. Since then, most of the high-profile editors who served under Mr. Carey have left. (In 2019, Mr. Carey was named by Hearst Corporation as senior vice president of public affairs and communications.)

Ms. Garcia has worked to put her own stamp on Elle. She has made the magazine more visual, and amped up its social media presence. She has dedicated less space to political features, which had been a hallmark of Elle under its previous editors. Its annual women-in-Washington "Power List" magazine feature and awards dinner was canceled under Ms. Garcia.

She has also worked hard to avoid ruffling feathers, according to some current and former employees. In a 2017 article about Whitney Wolfe, the founder of the dating app Bumble, several paragraphs detailing her perspective on feminism were removed from the digital version of the article after Ms. Wolfe complained that the quotes were taken out of context, according to four former staffers who were aware of the discussions. (Later, Hearst worked with Bumble to start Bumble Mag.)

Last winter, a profile of Dr. Jen Gunter, the ob-gyn (and New York Times columnist) who has been a critic of Gwyneth Paltrow and Goop, was killed after top editors expressed concern that it might upset Ms. Paltrow and her publicist Stephen Huvane, who represents a variety of celebrity clients, according to three former staffers. (Ms. Paltrow appeared on a November 2019 cover of Elle.)

Sources also said a profile of Lara Trump, the president's daughter-in-law, was published in the print magazine but not on the Elle website because of fear it would stoke rage online.

After sending the statement about Ms. Carroll, Hearst did not respond to questions about these editorial decisions.

## Shifting Loyalties

By the time Ms. Carroll was deciding where to excerpt her book — and publish her accusation that the sitting president had raped her years before — Ms. Carroll didn't consider Elle.

"Under Nina, Elle has been less into politics or news," Ms. Carroll said. "Nina's Elle is a fashion magazine. So I went with New York magazine, which knows how to break news."

That decision was revealed to Elle editors over drinks at the Russian Tea Room last spring, where Ms. Carroll and a few of the editors had gone to celebrate the upcoming publication of her book. It was there that she told the editors what the book was about — including what she had written about Mr. Trump — and that an excerpt containing this revelation would be running in New York magazine.

"They were extremely disappointed," Ms. Carroll said of the Elle editors.

They told Ms. Carroll that they were shocked, both by what she said had happened to her and by the fact that she had not given Elle first dibs on the excerpt.

By the terms of her contract, Ms. Carroll was not required to offer her story to Elle. But she agreed to help facilitate a phone call between Elle editors, her agent and a representative of her book publisher.

The excerpt still was published by New York.

When it came time to make budget cuts this past December, Hearst employees said, few felt lingering loyalty to Ms. Carroll. That's when Ms. Hobday told her she had been cut loose.

In a statement, Ms. Garcia, said: "E. Jean and I have known each other for more than two decades and she will always be part of the Elle DNA. We applaud and support her for coming forward with telling her story. The response to her allegations were not a factor in not renewing her contract."

Ms. Carroll is under no illusion that she was carrying the magazine into the next era. "I AM old, unhip and uncool, yes," she wrote on Twitter. But she doesn't believe Elle gave her the boot simply because it couldn't afford her. "I would have taken a new contract for less money," she said.

By Thursday, Ms. Carroll said she had received inquiries from four other publications asking if she would consider writing for them.

*A correction was made on Feb. 21, 2020: An earlier version of this article misspelled the surname of the editor of Mother Jones magazine. She is Clara Jeffery, not Jeffrey.*

────

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.     Learn more

Katherine Rosman is a features reporter on the Styles desk. She covers media, the business of fitness, and the politics of gender. She joined The Times in 2014.  @katierosman

Jessica Bennett is a writer and editor at The Times focused on gender and culture. She is the author of "Feminist Fight Club."  @jessicabennett  •  Facebook

A version of this article appears in print on , Section B, Page 5 of the New York edition with the headline: How Elle and Its Star Columnist Split