# 23-1045(L)
# 23-1146(CON)

## United States Court of Appeals
## for the Second Circuit



E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPELLANT'S APPENDIX
## VOLUME II OF V (Pages A285-A573)

HABBA MADAIO & ASSOCIATES LLP
MICHAEL T. MADAIO, ESQ.
ALINA HABBA, ESQ.
*Attorneys for Defendant-Appellant*
*Donald J. Trump*
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
(908) 869-1188
*mmadaio@habbalaw.com*
*ahabba@habbalaw.com*

[REPRODUCED ON RECYCLED PAPER]

# TABLE OF CONTENTS

*Page(s)*

U.S. District Court Docket Sheet ........................................................................A1-A33

Letter Motion to Stay, dated December 10, 2020 ...........................................A34-A35

Memorandum of Law in Support of Defendant's Motion
for Leave to Amend his Answer Pursuant to FRCP Rule
15(A), dated December 1, 2021 .......................................................................A36-A50

Memorandum Opinion, dated March 10, 2022 ...............................................A51-A73

Scheduling Order, dated May 4, 2022 ............................................................A74-A75

Letter Motion, dated September 28, 2022 .......................................................A76-A78

Letter Response, dated September 30, 2022 ....................................................A79-A83

Memorandum Opinion, dated October 12, 2022 .............................................A84-A99

Letter, dated November 21, 2022 ................................................................A100-A101

Notice of Motion for Summary Judgment, dated December
22, 2022 ......................................................................................................A102-A103

Declaration of Alina Habba, Esq. in Support of
Defendant's Motion for Summary Judgment, dated
December 22, 2022 .....................................................................................A104-A105

    Exhibit A – Complaint and Jury Demand, dated
    November 4, 2019 .............................................................................A106-A134

    Exhibit B – Deposition of E. Jean Carroll, held on
    October 14, 2022 ...............................................................................A135-A139

    Exhibit C – Expert Report of Professor Ashlee
    Humphreys, Ph.D., dated October 14, 2022 ......................................A140-A280

i

*Table of Contents(cont'd)*      *Page(s)*

Exhibit D – The New York Times Article, dated
February 21, 2020 ...............................................................................A281-A284

Exhibit E – Brief for Appellee E. Jean Carroll, dated
December 1, 2022 ...............................................................................A285-A349

Memorandum of Law in Support of Defendant's Motion
for Summary Judgment, dated December 22, 2022....................................A350-A396

Defendant's Local Rule 56.1 Statement of Material
Facts as to Which There is no Genuine Issue to be
Tried, dated December 22, 2022 ........................................................A397-A402

Plaintiff E. Jean Carroll Memorandum of Law in
Opposition to Defendant Donald J. Trump for Summary
Judgment, dated January 12, 2023 ................................................A403-A446

Plaintiff E. Jean Carroll's Response to Defendant Donald
J. Trump's Statement of Undisputed Material Facts
Pursuant to Local Civil Rule 56.1, dated January 12, 2023........................A447-A472

Declaration of Roberta A. Kaplan in Support of Plaintiff E.
Jean Carroll's Opposition to Defendant Donald J. Trump's
Motion for Summary Judgment, dated January 12, 2023 ...........................A473-A475

Exhibit 1 - Excerpts of Deposition of E. Jean Carroll,
dated October 14, 2022 ......................................................................A476-A550

Exhibit 2 - New York Magazine Article (Online
Version)...............................................................................................A551-A571

Exhibit 3 - June 21, 2019 Statement ....................................................A572-A573

Exhibit 4 - June 22, 2019 Statement ....................................................A574-A587

*Table of Contents(cont'd)*      *Page(s)*

Exhibit 5 - June 24, 2019 Statement ....................................................A588-A593

Exhibit 6 - Excerpts of Deposition of Donald J. Trump ...............................................................................................A594-A643

Exhibit 7 - Photograph of E. Jean Carroll and Donald Trump ...............................................................................................A644-A645

Exhibit 8 - Excerpts of Deposition of Lisa Birnbach, held on September 21, 2022.................................................A646-A654

Exhibit 9 - Excerpts of Deposition of Carol Martin, held on October 18, 2022 ....................................................A655-A660

Exhibit 10 - New York Magazine Article (Print Version).............................................................................................A661-A669

Exhibit 11 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, dated July 13, 2022 ............................................................................A670-A717

Exhibit 12 - Excerpts of Deposition of Roberta Myers, held on October 12, 2022........................................A718-A728

Exhibit 13 - Appendix H to Expert Report of Ashlee Humphreys .......................................................................A729-A795

Exhibit 14 - Appendix I to Expert Report of Ashlee Humphreys .......................................................................A796-A879

Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated January 19, 2023 ...........................A880-A894

*Table of Contents(cont'd)*                                        *Page(s)*

Plaintiff E. Jean Carroll's Surreply Brief in Opposition to
Defendant Donald J. Trump's Motion for Summary
Judgment, dated January 24, 2023 ...............................................A895-A904

Proposed Joint Pre-Trial Order ...................................................A905-A922

Joint Pretrial Order, dated February 13, 2023............................A923-A940

Letter Motion, dated March 17, 2023 .........................................A941-A942

Stipulation and [Proposed] Order ...............................................A943-A944

Letter addressed to Judge Lewis A. Kaplan from Roberta
A. Kaplan, dated May 22, 2023 ..................................................A945-A948

Plaintiff E. Jean Carroll's Memorandum of Law in Support
of Motion to Amend, dated May 22, 2023...................................A949-A954

Declaration of Roberta A. Kaplan in Support of Plaintiff's
Motion to Amend, dated May 22, 2023 ...............................................A955

     Exhibit A – First Amended Complaint and Demand
     for Jury Trial, dated May 22, 2023  ...................................A956-A997

     Exhibit B – Redlined First Amended Complaint and
     Demand for Jury Trial, dated May 22, 2023 ...................A998-A1043

Letter addressed to Judge Lewis A. Kaplan from Stephen
Terrell, dated June 9, 2023.......................................................A1044-A1045

Order, dated June 13, 2023 ....................................................A1046-A1047

Defendant's Answer to Plaintiff's First Amended
Complaint, Affirmative Defenses and Counterclaim, dated
June 27, 2023 ..........................................................................A1048-A1074

iv

*Table of Contents(cont'd)*                                                    *Page(s)*

Notice Of Plaintiff E. Jean Carroll's Motion to Dismiss
And Motion to Strike, dated July 11, 2023 ............................................... A1075-A1076

Plaintiff E. Jean Carroll's Memorandum of Law in Support
of Her Motion to Dismiss and Motion to Strike, dated July
11, 2023 ................................................................................................ A1077-A1113

Declaration of Roberta A. Kaplan in Support of Plaintiff's
Motion to Dismiss and Motion to Strike .................................................. A1114-A1115

    Exhibit A – Excerpts of Carroll II Trial Transcript ........................ A1116-A1166

    Exhibit B – Video of May 10, 2023 CNN Interview
    of E. Jean Carroll (previously provided to the court
    via DVD) ................................................................................................ A1167

    Exhibit C – Transcript of Carroll Interview on CNN ........................ A1168-1193

Memorandum of Law Regarding Plaintiff's Motion to File
an Amended Complaint, dated July 25, 2023 .......................................... A1194-A1198

Defendant's Memorandum of Law in Opposition to
Plaintiff's Motion to Dismiss and Motion to Strike, dated
July 25, 2023 ........................................................................................ A1199-A1233

Letter Addressed to Judge Lewis A. Kaplan from Roberta
A. Kaplan, dated July 25, 2023 ............................................................. A1234-A1235

Notice Of Motion to Stay Pending Appeal, dated July 27,
2023 .................................................................................................................. A1236

Memorandum of Law in Support of Defendant's Motion to
Stay Pending Appeal, dated July 27, 2023 .............................................. A1237-A1256

v

*Table of Contents(cont'd)* *Page(s)*

Plaintiff E. Jean Carroll's Reply Memorandum of Law in
Support of her Motion to Dismiss and Motion to Strike,
dated August 1, 2023................................................................A1257-A1272

Memorandum Opinion Granting Plaintiff's Motion to
Dismiss Defendant's Counterclaim and Certain Purported
Affirmative Defenses, dated August 7, 2023 ...........................A1273-A1296

Memorandum of Law in Further Support of Defendant's
Motion to Stay Pending Appeal, dated August 17, 2023.........A1297-A1309

Memorandum Opinion Denying Defendant's Motion to
Stay, dated August 18, 2023 ....................................................A1310-A1326

Order of USCA (Certified Copy)..............................................A1327-A1328

vi

# EXHIBIT E



Clerk of the Court
Received 12/01/2022 07:00 PM

NO. 22-SP-0745

# IN THE DISTRICT OF COLUMBIA
# COURT OF APPEALS

DONALD J. TRUMP, *et al.*,

*Appellants,*

v.

E. JEAN CARROLL,

*Appellee.*

On Certified Question of Law from the
United States Court of Appeals for the Second Circuit

## BRIEF FOR APPELLEE E. JEAN CARROLL

JOSHUA MATZ*
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

ROBERTA A. KAPLAN
MATTHEW J. CRAIG
RACHEL L. TUCHMAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883

*Counsel for Oral Argument

**LIST OF PARTIES AND *AMICI***

Pursuant to Rule 28(a)(2) of the Rules of the District of Columbia Court of Appeals, counsel identifies the following parties and attorneys who appeared in the lower court and have appeared in appellate proceedings in this action:

## D.C. Court of Appeals

For Appellee E. Jean Carroll: Roberta A. Kaplan, Joshua Matz, Raymond Tolentino, Matthew J. Craig, and Rachel L. Tuchman (Kaplan Hecker & Fink LLP)

For Appellant Donald J. Trump: Alina Habba and Michael Madaio (Habba Madaio & Associates LLP); Jason C. Greaves (Binnall Law Group, PLLC)

For Appellant United States of America: Brian M. Boyton, Mark R. Freeman, Mark B. Stern, Joshua M. Salzman, and Sean R. Janda

## U.S. Court of Appeals for the Second Circuit

For Plaintiff-Appellee E. Jean Carroll: Roberta A. Kaplan, Joshua Matz, and Raymond Tolentino (Kaplan Hecker & Fink LLP); Leah Litman

For Defendant-Appellant Donald J. Trump: Alina Habba and Michael Madaio (Habba Madaio & Associates LLP); Marc E. Kasowitz (Kasowitz Benson Torres LLP)

For Movant-Appellant United States of America: Jennifer B. Dickey, Sopan Joshi, Mark R. Freeman, Mark B. Stern, and Joshua M. Salzman

For *Amici Curiae* The Rape, Abuse & Incest National Network, Legal Momentum, The Women's Legal Defense and Education Fund, National Alliance to End Sexual Violence, The National Center for Victims of Crime, The New York City Alliance Against Sexual Assault, Safe Horizon, Inc., and Time's Up Foundation: Zoe Salzman (Emery Celli Brinckerhoff Abady Ward & Maazel LLP)

**U.S. District Court for the Southern District of New York**

For Plaintiff E. Jean Carroll: Roberta A. Kaplan, Joshua Matz, Shawn G. Crowley, and Matthew J. Craig (Kaplan Hecker & Fink LLP)

For Defendant Donald J. Trump: Alina Habba (Habba Madaio & Associates LLP); Marc E. Kasowitz, Christine A. Montenegro, and Paul J. Burgo (Kasowitz Benson Torres LLP)

For Movant United States of America: Jeffrey Bossert Clark, James G. Touhey, Jr., Stephen Terrell, and William Kerwin Lane III

For *Amicus Curiae* Government Accountability Project: John A. Kolar (Government Accountability Project); Ned Miltenberg (National Legal Scholars Law Firm, P.C.)

**New York State Supreme Court**

For Plaintiff E. Jean Carroll: Roberta A. Kaplan, Gabrielle E. Tenzer, Joshua Matz, Matthew J. Craig, Louis W. Fisher, and Martha E. Fitzgerald (Kaplan Hecker & Fink LLP)

For Defendant Donald J. Trump: Lawrence S. Rosen (LaRocca Hornik Rosen & Greenberg LLP); Marc E. Kasowitz, Christine A. Montenegro, and Paul J. Burgo (Kasowitz Benson Torres LLP)

# TABLE OF CONTENTS

LIST OF PARTIES AND *AMICI* .......................................................................... i

TABLE OF AUTHORITIES ............................................................................... v

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION .................................................................. 2

STATEMENT OF THE ISSUE ......................................................................... 2

STATEMENT OF THE CASE ........................................................................... 2

    A.    Factual Background ................................................................... 2

    B.    Procedural Background ............................................................. 5

STANDARD OF REVIEW .............................................................................. 10

SUMMARY OF ARGUMENT ......................................................................... 10

ARGUMENT ................................................................................................ 12

I.    THIS COURT NEED NOT DEFINE THE SCOPE OF EMPLOYMENT
    FOR THE PRESIDENT OF THE UNITED STATES ................................ 12

II.    TRUMP'S DEFAMATORY STATEMENTS TARGETING CARROLL
    WERE OUTSIDE THE SCOPE OF HIS FEDERAL EMPLOYMENT ...... 13

    A.    This Court Should Confirm the Rule that an Employee's
        Motive for Tortious Conduct is Crucial to Scope-of-
        Employment Analysis .......................................................... 15

        1.    The Early Development of *Respondeat Superior* Law in
            the District Identified Employee Intent as a Key
            Consideration ............................................................. 15

        2.    From 1976 to 1986, this Court Revisited its *Respondeat
            Superior* Doctrine but Adhered to the Restatement ......... 18

3.    Recent Cases Confirm that the District Adheres to the
Restatement and Treats Employee Motives as Crucial ............23

4.    The Vast Majority of Jurisdictions Similarly Treat
Employee Motive as Crucial to Scope-of-Employment
Analysis.................................................................................28

B.    Trump Acted Outside the Scope of his Employment as
President in Repeatedly Defaming and Insulting Carroll ..................30

C.    Appellants' Proposed Categorical Rule Conflicts with Settled
District Jurisprudence and American Constitutional Traditions.........38

1.    The Categorical Position Is Inconsistent with District
Law............................................................................................39

2.    The Categorical Position Offends Constitutional
Traditions ................................................................................41

3.    The Categorical Position Is Unsupported by Precedent ..........45

CONCLUSION......................................................................................50

## TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Aldridge v. Metro. Life Ins. Co.*,
No. 18 CVS 1050, 2019 WL 7374878 (N.C. Super. Ct. Dec. 31, 2019)............29

*Antonio v. SSA Sec., Inc.*,
110 A.3d 654 (Md. 2015) ...................................................................................29

*Armstrong v. Thompson*,
759 F. Supp. 2d 89 (D.D.C. 2011)................................................................ 34, 40

*Axman v. Washington Gaslight Co.*,
38 App. D.C. 150 (D.C. Cir. 1912) .............................................................. 16, 18

*Baker v. Saint Francis Hosp.*,
126 P.3d 602 (Okla. 2005) ................................................................................29

*Bernie v. Catholic Diocese of Sioux Falls*,
821 N.W.2d 232 (S.D. 2012).............................................................................29

*Blair v. District of Columbia*,
190 A.3d 212 (D.C. 2018) .............................................................. 24, 25, 26, 38

*Boykin v. District of Columbia*,
484 A.2d 560 (D.C. 1984) ............................................ 22, 23, 35, 36, 40, 41

*Bratton v. Calkins*,
870 P.2d 981 (Wash. Ct. App. 1994) .................................................................30

*Brown v. Argenbright Sec., Inc.*,
782 A.2d 752 (D.C. 2001) .............................................................. 24, 26, 35, 40

*Burroughs v. Com.*,
673 N.E.2d 1217 (Mass. 1996).........................................................................29

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022) .................................. 9, 10, 13, 14, 26, 31, 33, 36, 37

*Carroll v. Trump*,
498 F. Supp. 3d 422 (S.D.N.Y. 2020) .......................................... 7, 27, 31, 33, 50

*Carroll v. Trump*,
   590 F. Supp. 3d 575 (S.D.N.Y. 2022) ................................................................8

*Carroll v. Trump*,
   No. 20 Civ. 7311, 2022 WL 6897075 (S.D.N.Y Oct. 12, 2022)......................6, 9

*Clark v. McGee*,
   404 N.E.2d 1283 (N.Y. 1980) ..........................................................................50

*Clinton v. Jones*,
   520 U.S. 681 (1997) .......................................................... 7, 42, 44, 45

*Clo White Co. v. Lattimore*,
   590 S.E.2d 381 (Ga. 2003) ...............................................................29

*Council on American-Islamic Relations v. Ballenger*,
   444 F.3d 659 (D.C. Cir. 2006)................................................. 47, 48, 49

*District of Columbia v. Bamidele*,
   103 A.3d 516 (D.C. 2014) ................................ 17, 24, 25, 27, 35, 37, 40

*District of Columbia v. Coron*,
   515 A.2d 435 (D.C. 1986) ...................................................... 23, 34, 40

*District of Columbia v. Davis*,
   386 A.2d 1195 (D.C. 1978) ...............................................................18

*District of Columbia v. Jones*,
   919 A.2d 604 (D.C. 2007) ..................................................... 14, 45, 46

*Doe v. Forrest*,
   853 A.2d 48 (Vt. 2004).....................................................................29

*Does 1-10 v. Haaland*,
   973 F.3d 591 (6th Cir. 2020) ............................................................47

*Dragomir v. Spring Harbor Hosp.*,
   970 A.2d 310 (Me. 2009) .................................................................29

*Drew v. Pac. Life Ins. Co.*,
   496 P.3d 201 (Utah 2021) ................................................................29

*Engler v. Gulf Interstate Eng'g, Inc.*,
   280 P.3d 599 (Ariz. 2012) ....................................................29

*Fiano v. Old Saybrook Fire Co. No. 1, Inc.*,
   209 A.3d 629 (Conn. 2019) ................................................29

*Giudicessi v. State*,
   868 N.W.2d 418 (Iowa Ct. App. 2015) ..............................29

*Grease Monkey Int'l, Inc. v. Montoya*,
   904 P.2d 468 (Colo. 1995) ..................................................29

*Grimes v. B.F. Saul Co.*,
   47 F.2d 409 (D.C. Cir. 1931)......................................... 16, 36

*Hamed v. Wayne Cnty.*,
   803 N.W.2d 237 (Mich. 2011) ............................................29

*Harkness v. Platten*,
   375 P.3d 521 (Or. 2016) ......................................................29

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ............................................................34

*Hechinger Co. v. Johnson*,
   761 A.2d 15 (D.C. 2000) ............................................... 26, 38

*Herbin v. Hoeffel*,
   886 A.2d 507 (D.C. 2005) ...................................................24

*Howard University v. Best*,
   484 A.2d 958 (D.C. 1984) ........................................ 21, 22, 24

*Johnson v. Weinberg*,
   434 A.2d 404 (D.C. 1981) ........................... 20, 21, 22, 23, 24

*\*Jordan v. Medley*,
   711 F.2d 211 (D.C. Cir. 1983)............................................22

*Kase v. Ebert*,
   707 S.E.2d 456 (S.C. Ct. App. 2011) .................................29

*L.B. v. United States*,
515 P.3d 818 (Mont. 2022)......................................................................29

*Lyon v. Carey*,
533 F.2d 649 (D.C. Cir. 1976)......................................... 19, 20, 21, 22

*M.J. Uline Co. v. Cashdan*,
171 F.2d 132 (D.C. Cir. 1948)................................................................41

*\*Majano v. United States*,
469 F.3d 138 (D.C. Cir. 2006).......................................... 28, 35, 37, 40

*Mathis v. United States*,
579 U.S. 500 (2016) ...............................................................................26

*Meyers v. Nat'l Detective Agency, Inc.*,
281 A.2d 435 (D.C. 1971) ......................................................................17

*Nava v. Rivas-Del Toro*,
264 P.3d 960 (Idaho 2011) .....................................................................29

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ...............................................................................42

*Operation Rescue Nat'l v. United States*,
975 F. Supp. 92 (D. Mass. 1997)...........................................................47

*Osborn v. Haley*,
549 U.S. 2252 (2007) .............................................................................31

*Park Transfer Co. v. Lumbermens Mut. Cas. Co.*,
142 F.2d 100 (D.C. Cir. 1944)...................................................... 16, 17

*Parmenter v. J & B Enterprises, Inc.*,
99 So. 3d 207 (Miss. App. Ct. 2012).....................................................29

*Patterson v. Blair*,
172 S.W.3d 361 (Ky. 2005).....................................................................29

*\*Penn Central Transportation Co. v. Reddick*,
398 A.2d 27 (D.C. 1979) ........................................ 19, 20, 21, 34, 40, 41

*Perks v. Town of Huntington*,
   251 F. Supp. 2d 1143 (E.D.N.Y. 2003)...................................................36

*Pineda v. Chase Bank USA, N.A.*,
   186 A.3d 1054 (R.I. 2018)...................................................29

*Plains Res., Inc. v. Gable*,
   682 P.2d 653 (Kan. 1984)...................................................29

*Porter v. City of Manchester*,
   921 A.2d 393 (N.H. 2007)...................................................29

*Rivera v. Lew*,
   99 A.3d 269 (D.C. 2014)...................................................10

*Ross v. Mitsui Fudosan, Inc.*,
   2 F. Supp. 2d 522 (S.D.N.Y. 1998)...................................................36

*Sandman v. Hagan*,
   154 N.W.2d 113 (Iowa 1967)...................................................30

*Schecter v. Merchants Home Delivery, Inc.*,
   892 A.2d 415 (D.C. 2006)................................................ 24, 37

*Sherman v. State Dep't of Pub. Safety*,
   190 A.3d 148 (Del. 2018)...................................................29

*Sitton v. Massage Odyssey, LLC*,
   158 N.E.3d 156 (Ohio Ct. App. 2020)...................................................29

*Spitsin v. WGM Transp., Inc.*,
   97 A.3d 774 (Pa. Super Ct. 2014)...................................................29

*Spurlock v. Townes*,
   368 P.3d 1213 (N.M. 2016)...................................................29

*State v. Hoshijo ex rel. White*,
   76 P.3d 550 (Haw. 2003)...................................................29

*Strong v. K & K Invs., Inc.*,
   343 N.W.2d 912 (Neb. 1984)...................................................29

*Synergies3 Tec Servs., LLC v. Corvo*,
   319 So. 3d 1263 (Ala. 2020) ...............................................................29

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022)........................................................44

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................42

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) .................................................................. 6, 42

*United States v. Burr*,
   25 F. Cas. 30 (Va. Cir. Ct. 1807)........................................................43

*VECO, Inc. v. Rosebrock*,
   970 P.2d 906 (Alaska 1999) ...............................................................30

*Waldon v. Covington*,
   415 A.2d 1070 (D.C. 1980) ................................................................18

*Walters v. Homestaff Health Care*,
   No. Civ. 950146961S, 1996 WL 88058 (Conn. Super. Ct. Feb. 8, 1996) ...........36

*Williams v. United States*,
   71 F.3d 502 (5th Cir. 1995) ...............................................................47

*Wilson v. Libby*
   535 F.3d 697 (D.C. Cir. 2008).............................................................47

*Wuterich v. Murtha*,
   562 F.3d 375 (D.C. Cir. 2009).............................................................47

**Statutes**

28 U.S.C. § 1346(b)(1)...............................................................................6

28 U.S.C. § 2679(d)(2)...............................................................................6

D.C. Code § 11-723 ...................................................................................2

**Rules**

D.C. App. R. 22...........................................................................................2

**Other Authorities**

Br. of Donald J. Trump, *Trump v. United States*,
No. 22-13005 (11th Cir. Nov. 10, 2022) ...............................................................43

Br. of U.S., *Swalwell v. Trump*,
No. 21 Civ. 586 (D.D.C. July 27, 2021)...............................................................44

Catherine M. Sharkey, *Institutional Liability for Employees' Intentional Torts:
Vicarious Liability As A Quasi-Substitute for Punitive Damages*,
53 Val. U. L. Rev. 1 (2018)...............................................................29

James Wilson, Debates in the Convention of the State of Pennsylvania (Dec. 4,
1787), *in* The Debates in the Several State Conventions on the Adoption of the
Federal Constitution (Jonathan Elliot ed., Washington, 2d ed. 1836) ................42

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over
Defamation Suite Against Trump, Barr Says*,
N.Y. Times (Sept. 9, 2020)...............................................................6

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ...........................43

Mot. to Dismiss, *District of Columbia v. Trump*,
No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) ...........................................................43

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*,
No. 20-197 (U.S. Aug. 20, 2020) ........................................................................43

Restatement (Second) of Agency (1958)............................................... 14, 17, 34, 40

Restatement (Third) of Agency (2006)............................................................ 18, 27

William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law*
(1987)...............................................................18

## INTRODUCTION

In June 2019, E. Jean Carroll revealed that former President Donald J. Trump had sexually assaulted her decades earlier. Although Trump denied it, he did not stop there. He launched a series of vicious, personal attacks. He implied that she was too ugly to rape; that she had falsely accused other men of sexual assault; and that she had invented her story for money, or to sell books, or to advance a political plot. None of this was true. Trump knew who Carroll was when he attacked her, he knew who she was in 2019, and he knew what he was doing when he went on a rampage designed to punish and humiliate her for daring to reveal his decades-old crime.

The only two judges who have reached the issue found that these statements revealed a man pursuing a personal vendetta, not a federal officer advancing public purposes. On that basis, they concluded that Trump acted outside the scope of his federal employment under the District's law of *respondeat superior* (which applies under the Westfall Act). The majority of a Second Circuit panel, however, held that relevant District law is unclear—and therefore certified the question to this Court. Trump and the Department of Justice, for their part, have responded to that development by asking this Court to announce a categorical rule that elected officials always and automatically act within their employment whenever they address the public. This Court should reject that position and hold that Trump acted outside the scope of his federal employment when he repeatedly defamed Carroll in June 2019.

## STATEMENT OF JURISDICTION

On September 27, 2022, the United States Court of Appeals for the Second Circuit issued an opinion in which it certified a question of District law to this Court. *See* D.C. App. R. 22. On October 25, 2022, this Court agreed to consider the certified question *en banc*. The Court has jurisdiction pursuant to D.C. Code § 11-723.

## STATEMENT OF THE ISSUE

Under the laws of the District, were the allegedly libelous public statements made, during his term in office, by the President of the United States, denying allegations of misconduct, with regards to events prior to that term of office, within the scope of his employment as President of the United States?

## STATEMENT OF THE CASE

### A.    Factual Background[1]

One evening in the mid-1990s, Carroll went to shop at the Bergdorf Goodman department store in Manhattan after work. A28 ¶ 22. As she was exiting through the revolving glass doors on the north side of the building, Trump entered through the same doors from 58th Street. A28 ¶ 23. Trump recognized Carroll—they had met at least once before, they traveled in similar circles, and Carroll was then a frequent

---

[1] Citations to "A__" are to the Joint Appendix that is part of the record transmitted to this Court by the Second Circuit. Citations to "Dist. Ct. Doc. No. __" are to the United States District Court for the Southern District of New York docket, No. 20 Civ. 7311 (S.D.N.Y.). Citations to "NYSCEF Doc. No. __" are to the New York state court docket, No. 160694/2019 (N.Y. Sup. Ct.).

guest on the *Today* show as well as the host of her own daily *Ask E. Jean* television show. A28 ¶ 24. Trump put his hand up to stop Carroll, saying, "Hey, you're that advice lady!" A28 ¶ 25. Trump told Carroll that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to advise him. A28 ¶ 26. Carroll thought the encounter might make for a funny story, so she agreed to help Trump. *Id.*

Carroll suggested various items: first a handbag, then a hat. A28 ¶ 27. Trump decided on lingerie. A29 ¶ 29. When they arrived at the lingerie department, it was practically empty, with no attendant in sight. A29 ¶ 30. Trump snatched a see-through bodysuit and insisted that Carroll try it on. A29 ¶¶ 30-31. Bemused, Carroll responded that he should try it on himself. A29 ¶ 31.

Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on." A29 ¶ 32. He maneuvered Carroll into a dressing room, shut the door, and lunged at her—knocking her head against the wall. A29 ¶¶ 33-36. He then forcibly put his mouth on her lips. A29 ¶ 36. Shocked by Trump's behavior, Carroll shoved him back and burst out in awkward laughter, hoping that he would retreat. A29 ¶ 37. Instead, Trump seized both of Carroll's arms and pushed her up against the wall again. A29 ¶ 38. Trump then jammed his hand under her coatdress and pulled down her tights. *Id.* He opened his overcoat, unzipped his pants, pushed his fingers around Carroll's genitals, and forced his penis inside of her. A30 ¶ 39. Carroll resisted, struggling to break free. A30 ¶ 40. She tried to stomp Trump's foot. She tried to push him away.

*Id.* Finally, she raised her knee high enough to push him off her. *Id.* Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue. A30 ¶ 41.

Immediately after Trump attacked her, Carroll told two close friends about what had happened; both of them have since publicly confirmed her account of these events. A30-31 ¶¶ 43, 47. One urged her to report the crime, but the other warned her that Trump would ruin her life if she did. A30-31 ¶¶ 44-48. Carroll chose silence. She knew how brutal Trump could be and was convinced that nobody would believe her. Like so many other survivors of sexual assault, Carroll also blamed herself. A31 ¶¶ 49-50. Carroll did not mention the assault to another soul for over twenty years— not wanting to be perceived or to see herself as a victim of rape. A31 ¶ 53.

For the next two decades, Carroll pursued her career as a writer and advice columnist while concealing her own trauma. A32 ¶ 55; A33 ¶¶ 59-60. During the last month of the 2016 election, several women publicly revealed that Trump had engaged in sexual misconduct. A33 ¶ 61. During this period, however, Carroll was focused on attending to her dying mother, who was then in hospice care. A33-34 ¶ 62. Carroll feared that speaking up would provoke a media storm and destroy any peace in her mother's remaining time. *Id.* It was only after her mother died—and the #MeToo movement empowered survivors of sexual assault to come forward—that Carroll decided to reveal the truth. A34-36 ¶¶ 65-73. A writer to her core, determined to tell her story on her own terms, Carroll described Trump's attack in a book

released on July 2, 2019. A37 ¶¶ 77, 80. On June 21, 2019, *New York* magazine published an excerpt from Carroll's book detailing Trump's attack. A37 ¶ 79.

Trump then unleashed a series of vicious, personal attacks over a four-day period. He denied her accusation and insisted they had never met. A38-41 ¶¶ 81-96. But he went much further than that. He insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too unattractive for him to have raped her. A42 ¶ 97. He accused Carroll of lying about the rape to make money, to increase book sales, or to carry out a political agenda. A26 ¶ 11; A38 ¶ 82; A40 ¶¶ 88-90. He also implied that she had falsely accused other unspecified men of sexual assault. A40 ¶ 91; A41 ¶ 95. And Trump did all this while fully aware that he *in fact* had raped Carroll: he thus acted with actual malice in every sense of the term. A44-48 ¶¶ 106-28. He sought to punish and humiliate Carroll for speaking up, and to bury her in defamatory lies. Ultimately, his repeated attacks caused Carroll significant harm. A48-49 ¶¶ 129-36.

### B.   Procedural Background

To redress her injuries, Carroll filed a defamation action in New York court in November 2019. Trump first evaded service of the complaint. *See* NYSCEF Doc. Nos. 6, 15. He then sought dismissal based on a specious claim that the court lacked personal jurisdiction. *See* NYSCEF Doc. Nos. 33, 36. Finally, he sought a stay based

5

on a theory of absolute immunity unsupported by precedent—as was soon confirmed by *Trump v. Vance*, 140 S. Ct. 2412 (2020). *See* NYSCEF Doc. Nos. 49, 110.

By September 8, 2020, Trump faced a choice: either engage in discovery or appeal the denial of a stay. Instead, Trump induced the Department of Justice (DOJ) to intervene. At his urging, DOJ removed this case to federal court and sought to substitute the United States as defendant. *See* Dist. Ct. Doc. No. 3. The hook for that maneuver was the Westfall Act, which allows the United States to be sued for money damages in federal district court in certain circumstances. *See* 28 U.S.C. § 1346(b)(1). If a plaintiff sues a federal employee instead of suing the United States, the United States may move to substitute itself for that employee upon the Attorney General's (judicially reviewable) certification that the employee was "acting within the scope of his [federal] office or employment." 28 U.S.C. § 2679(d)(2).

Although Westfall Act removals are commonplace (*e.g.*, in cases involving car accidents caused by U.S. Postal Service employees), the circumstances here were exceedingly irregular. DOJ intervened ten months after the state court action was first filed, during which time neither Trump nor DOJ made "any suggestion that the government of the United States had anything whatever to do with [the case]." *Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *1 (S.D.N.Y Oct. 12, 2022). Attorney General William Barr later confirmed that DOJ had intervened at Trump's urging. *See* Katie Benner & Charlie Savage, *White House Asked Justice*

*Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020). And in a prior case where a President faced defamation claims based on his reaction to revelations of prior sexual misconduct, DOJ never suggested that the matter implicated the Westfall Act. *Cf. Clinton v. Jones*, 520 U.S. 681, 685 (1997).

DOJ's removal petition in this case presented the question whether Trump was covered by the Westfall Act—and, if so, whether he had committed his tortious acts within the scope of his employment. Following briefing and a hearing (where DOJ declined to present argument), Judge Kaplan denied DOJ's motion to substitute itself as the defendant. *Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020). He based this decision on two grounds: *first*, that the Westfall Act does not cover the President; and *second*, that Trump had acted outside the scope of his employment under District law, thereby forfeiting any Westfall Act protections. *Id.* at 443, 457.

In analyzing these issues, Judge Kaplan noted the awkwardness of applying scope-of-employment concepts to this case. Ordinarily, a principal can be held liable for certain acts by his agent (acts within the "scope of employment") because the principal can "control and direct the servant in the performance of his work and the manner in which the work is to be done." *Id.* at 448. But here, "holding that [Trump] is a 'servant' whom a 'master' 'has the right to control and direct' when he speaks to reporters, or otherwise, would be absurd." *Id.* Judge Kaplan elaborated: "No one

gives him permission to speak. No one can require him to say, or not to say, anything at all. No one has the authority to cut him off." *Id.* at 450.

More fundamentally, Judge Kaplan found that Trump had acted outside the scope of his employment because his conduct was "too little actuated by a purpose to serve the master." *Id*. As he explained: "President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office. Neither the media reports nor the underlying allegations have any relationship to his official duties." *Id.* at 455-56. Thus, "the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue." *Id.* at 457.

Trump and DOJ appealed Trump subsequently sought a stay, which was denied. Dist. Ct. Doc. No. 56. Months later, Trump sought leave to amend his answer to allege a counterclaim against Carroll. Dist. Ct. Doc. No. 64. Judge Kaplan denied that motion, too, observing that Trump's "litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity [Carroll] may have to present her case against him." *Carroll v. Trump*, 590 F. Supp. 3d 575, 588 (S.D.N.Y. 2022). Ultimately, the parties agreed to a discovery schedule. Dist. Ct. Doc. Nos. 76-77.

Meanwhile, the Second Circuit heard argument on December 3, 2021. There, Judge Guido Calabresi expressed confusion over the District's standard for scope-

of-employment analysis, and all three judges on the panel explored District law concerning employee action driven by private (as opposed to job-related) motives.

On September 27, 2022, a divided panel of the Second Circuit issued its decision. *See Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022). The majority (Judges Calabresi and William Nardini) held that the Westfall Act does apply to the President and certified to this Court the question whether Trump's defamatory statements targeting Carroll occurred within the scope of his federal employment. *See id*. at 780.

In dissent, Judge Denny Chin saw "no question that Trump was acting outside the scope of his employment when he made at least some of the alleged defamatory remarks about Carroll's accusations." *Id.* at 789. "In the context of an accusation of rape, the comment 'she's not my type' surely is not something one would expect the President of the United States to say in the course of his duties." *Id.* Together, "Carroll's allegations plausibly paint a picture of a man pursuing a personal vendetta against an accuser, not the United States' 'chief constitutional officer' engaging in 'supervisory and policy responsibilities of utmost discretion and sensitivity.'" *Id.*

The day after the Second Circuit issued its opinion, Trump filed a third motion to stay the proceedings. Dist. Ct. Doc. No. 92. Judge Kaplan denied this motion as well, finding that Trump "should not be permitted to run the clock out on [Carroll's] attempt to gain a remedy for what allegedly was a serious wrong." *Carroll*, 2022 WL 6897075, at *6. Fact and expert discovery in the district court have since closed.

**A307**

On October 25, 2022, this Court (proceeding *en banc*) accepted the Second Circuit's certified question and established a briefing schedule for the parties.

On November 24, 2022, Carroll filed a second action against Trump, in which she alleges one count of battery under New York law for the underlying rape and one count of defamation for a series of statements that Trump posted on Truth Social in October 2022. *See Carroll v. Trump*, No. 22 Civ. 10116 (S.D.N.Y.).

On November 29, 2022, recognizing this Court's expedited consideration of the appeal, Judge Kaplan set a trial date of April 10, 2022. Dist. Ct. Doc. No. 100.

## STANDARD OF REVIEW

The Second Circuit has certified a question of law that the Court addresses *de novo*. *See Rivera v. Lew*, 99 A.3d 269, 271 (D.C. 2014); *see also Carroll*, 49 F.4th at 772 ("[W]e review the scope of employment issue *de novo*.").

## SUMMARY OF ARGUMENT

The certified question asks this Court to decide whether Trump acted outside the scope of his employment in repeatedly defaming Carroll after she revealed that he had raped her decades before being elected to office. The Court should provide a direct answer to that question—and should make clear that Trump's conduct placed him beyond the scope of his employment. In doing so, the Court can address the Second Circuit's general uncertainty about District law, the proper understanding of

that law in this particular context, and the error in Trump and DOJ's request for this court to adopt a new, categorical rule applicable only to elected public officials.

**I.** Because the question here is whether Trump acted with private motives in defaming Carroll, the Court need not undertake a general definition of the scope of the President's employment.

**II.** Trump's defamatory statements targeting Carroll after she revealed that he had raped her were outside the scope of his employment as President: he acted with private motives, and not in furtherance of any official federal purpose or function, in seeking to punish and humiliate Carroll for revealing his decades-old crime.

**II.A.** The Second Circuit asked this Court to clarify whether, under District law, an employee's motives for tortious conduct can place him outside the scope of his employment. The answer to that question is "yes." Through most of the twentieth century, this Court consistently held that employees act outside their employment if they lack a purpose to serve their employer. Nearly four decades ago, this Court briefly considered an alternative approach (which the Second Circuit referred to as "internalization") that would prioritize the foreseeability of employee conduct and treat employee motives as irrelevant. But the Court almost immediately returned to its traditional emphasis on employee motivation. Ever since, it has adhered to the widely accepted rule that an employee acts outside the scope of his employment if

he is too little actuated by a job-related purpose in committing an intentional tort. The Court should confirm that this remains the law of the District.

**II.B.** The Second Circuit also asked this Court to clarify how its legal standard applies here. Because of the appeal's unusual procedural posture, that is a question of law. Given the Second Circuit's admission of uncertainty and the undue delays that have already plagued this case, the Court should reach that issue directly and hold that Trump acted outside the scope of his employment in repeatedly defaming Carroll. That conclusion, which has already been endorsed by Judges Chin and Kaplan, follows from the undisputed facts and from the application of precedent identifying indicia of personal motivation in the scope-of-employment setting.

**II.C.** Trump and DOJ, largely ignoring the facts of this case and the issues as framed by the Second Circuit, urge this Court to adopt a categorical rule that whenever an elected official speaks publicly on any matter of public concern, he is acting within the scope of his employment. This approach should be rejected: it defies core precepts of *respondeat superior* jurisprudence, offends our constitutional traditions, and is unsupported by (indeed, it is inconsistent with) precedent.

## ARGUMENT

## I.    THIS COURT NEED NOT DEFINE THE SCOPE OF EMPLOYMENT FOR THE PRESIDENT OF THE UNITED STATES

The Court has directed the parties to address the necessity of opining on "the scope of the President of the United States' employment." Order, *Trump v. Carroll*,

No. 22-SP-0745 (D.C. 2022). We believe that this is unnecessary; the Court can and should resolve this appeal without comprehensively defining the precise bounds of the President's employment. For purposes of the *respondent superior* analysis at issue here, the question is not whether Trump engaged in an act that by its very nature is beyond the scope of the President's employment. Instead, the only question is whether Trump's conduct—as alleged by Carroll in the Complaint—was too little actuated by a job-related purpose. The answer to that question turns on Trump's own motives (as evidenced by the nature and particular circumstances of his conduct), and on the distinction between personal and employment-related motives that has been applied in a wide range of *respondeat superior* cases for over a century.

That said, Trump and DOJ urge this Court to adopt a new, categorical rule that would effectively exempt the President (and other officials) from the standard scope-of-employment test. As we explain in Part II.C below, that proposal is meritless as a matter of agency law and inconsistent with constitutional traditions.

## II.    TRUMP'S DEFAMATORY STATEMENTS TARGETING CARROLL WERE OUTSIDE THE SCOPE OF HIS FEDERAL EMPLOYMENT

The Second Circuit has asked this Court to address whether Trump's repeated defamatory attacks on Carroll were undertaken within the scope of his employment. It certified that *respondeat superior* issue based partly on its belief that District law is torn between "two competing views." *Carroll v. Trump*, 49 F.4th 759, 776 (2d Cir. 2022). On one view, an employee acts outside the scope of employment where

13

he is "too little actuated by a purpose to serve the master." Restatement (Second) of Agency § 228 (1958). On the other view, when an employee's acts result from any foreseeable risks of running a business, their conduct is treated as within the scope of employment, thus forcing the employer to internalize all costs connected to its enterprise. *See Carroll*, 49 F.4th at 773-74. Importantly, an employee's state of mind when committing a tort can remove him from the scope of his employment under the Restatement approach, but not under a pure internalization approach.

As the Second Circuit recognized, this Court has expressly held that the District adheres to the Second Restatement. But looking mainly to a handful of cases from the mid-1980s, the Second Circuit asked this Court to clarify whether it had *sub silentio* abandoned the Restatement in favor of internalization.

In their briefs, Trump and DOJ largely ignore this question. Rather than address the general rule of *respondeat superior* liability in the District, they devote their attention to a different argument: namely, that there is a new and distinct rule of *respondeat superior* liability that they say applies only to certain high-ranking or elected public officials. Under this supposed rule, whenever such officials address the public on a matter of public concern, they are categorically held to have acted within the scope of their employment—without any consideration of motive or context. Trump and DOJ impute this rule to a few D.C. Circuit cases and to a single District precedent: *District of Columbia v. Jones*, 919 A.2d 604 (D.C. 2007), which

did not address any scope-of-employment issue (indeed, the phrases "scope of employment" and "*respondeat superior*" appear nowhere in the *Jones* opinion).

We first describe the general rule of *respondeat superior* doctrine in the District. We then apply that general rule in these particular circumstances. And we conclude by explaining the substantial errors in Trump and DOJ's position.

### A.   This Court Should Confirm the Rule that an Employee's Motive for Tortious Conduct is Crucial to Scope-of-Employment Analysis

The Second Circuit asked this Court to clarify District law concerning the general standard for *respondeat superior*. The Court should reaffirm its century-old adherence to the rule that an employee acts outside the scope of his employment if (at the moment he engaged in his tortious conduct) he was too little actuated by a purpose to serve his employer. This fact-intensive and context-sensitive rule is not only the longstanding law of the District, but it also reflects sound public policy and constitutes the decisive majority view among American jurisdictions. The handful of older cases cited by the Second Circuit reflected only a short-lived, abortive foray into merging internalization and Restatement concepts. More modern cases from the District have made clear that an employee's purposes remain central to the inquiry.

### 1. The Early Development of *Respondeat Superior* Law in the District Identified Employee Intent as a Key Consideration

In 1909, agents of the Washington Gaslight Company suspected that Anna Axman was stealing gas. So they broke into her house to inspect her gas meter. In

response, Axman sued their employer. That course of events led to an early pronouncement on *respondeat superior* law. *See Axman v. Washington Gaslight Co.*, 38 App. D.C. 150 (D.C. Cir. 1912). There, the court sought to strike a balance. On the one hand, if an employee's "recklessness or lack of judgment cause[s] loss or damage" while carrying out his employer's business, the employer who "selected and commissioned him" should be held accountable. *Id.* at 158. On the other hand, "the moment the agent turns aside from the business of the principal and commits an independent trespass, the principal is not liable." *Id.* Thus, employers could not be held liable where their employees acted in furtherance of "some real or fancied personal grievance," rather than to further their employer's business. *Id.* at 159.

Over the following decades, the D.C. Circuit issued several opinions building on *Axman*. In *Grimes v. B.F. Saul Co.*, 47 F.2d 409, 410 (D.C. Cir. 1931), it held that *respondeat superior* did not apply where a janitor employed by a real estate business assaulted a tenant in her apartment. The court reasoned that "[t]he act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor." *Id.* (citation omitted). This same principle controlled in *Park Transfer Co. v. Lumbermens Mut. Cas. Co.*, 142 F.2d 100 (D.C. Cir. 1944), which concerned a construction company's liability for an assault by one of its workers

who had been provoked with racist slurs. Citing *Axman* and *Grimes*, the court held

the worker was outside his employment: "unless an assault, or other tort, is actuated

in part at least by a purpose to serve a principal, the principal is not liable." *Id.*

In 1958, the Restatement (Second) of Agency arrived on the scene and

described four independent requirements of an employee's conduct, each of which

must be met to trigger *respondeat superior* liability: "(a) it is of the kind he is

employed to perform; (b) it occurs substantially within the authorized time and space

limits; (c) *it is actuated, at least in part, by a purpose to serve the master*, and (d) if

force is intentionally used by the servant against another, the use of force is not

unexpectable by the master." § 228 (emphasis added). In other words, "[c]onduct of

a servant is not within the scope of employment if it is different in kind from that

authorized, far beyond the authorized time or space limits, or *too little actuated by a*

*purpose to serve the master*." *Id.* (emphasis added). The Second Restatement thus

treated employee motivation as central to any scope-of-employment determination.

The Second Restatement's approach closely tracked existing District law—

and the District deepened its commitment to that view over the following decades.

*See District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014) ("We have

long endorsed the Second Restatement's approach."). In case after case, this Court

explained that an employee acts outside the scope of his employment if he was too

little actuated by a job-related purpose. *See Meyers v. Nat'l Detective Agency, Inc.*,

281 A.2d 435, 437 (D.C. 1971); *District of Columbia v. Davis*, 386 A.2d 1195, 1203 (D.C. 1978); *Waldon v. Covington*, 415 A.2d 1070, 1074 n.13 (D.C. 1980).

That rule flowed from sound public policy concerns. *Respondeat superior* developed from the premise that employers should have to bear the costs of conduct committed for their benefit. *See Axman*, 38 App. D.C. at 158. This is both fair and efficient: employers are morally and financially on the hook when conduct carried out at their direction (and for their benefit) causes harm to third parties. In practice, that rule pushes employers to exercise care in managing and supervising employees.

The calculus changes, however, when an employee acts largely on personal motives. In those cases, the employer is ill-equipped to prevent his conduct. *See* William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 208-09 (1987) ("If the employee is actuated by purely personal motives, the employer's practical ability to prevent the tort will be slight."). The economic and moral arguments for imposing liability in such circumstances are correspondingly frail. *See* Restatement (Third) of Agency § 7.07 cmt. b. (2006). Therefore, courts (including this one) hold that employees who are "too little actuated" by job-related motives have acted outside the scope of their employment under *respondeat superior*.

### 2. From 1976 to 1986, this Court Revisited its *Respondeat Superior* Doctrine but Adhered to the Restatement

Through 1976, this Court stated many times that purpose was crucial to its analysis. In the Second Circuit's view, however, this Court muddied the waters in a

series of decisions issued between 1976 to 1984. But a chronological review of those decisions makes clear that the District's flirtation with internalization was partial and short lived. By the late 1980s, the District's adherence to the Restatement stood firm.

That story begins with *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976)—an opinion issued by the D.C. Circuit, not by this Court. There, a mattress deliveryman had raped a customer after a dispute arose during a delivery. *Id.* at 650. Admitting that "the assault was perhaps at the outer bounds of *respondeat superior*," the court nonetheless concluded that the scope-of-employment issue should be decided by a jury, rather than by a judge. *Id.* at 651. It reasoned that the "dispute arose out of the very transaction which had brought [the employee] to the premises" and "out of the employer's instructions to get cash only before delivery." *Id.* at 652. On that basis, it believed a jury could potentially find that deliveryman's actions were not part of a "personal adventure," but instead reflected a job-related motivation. *Id.* at 651. As the Second Circuit noted in *Carroll*, this decision tended toward imposing employer liability for *any* foreseeable employee misconduct (*i.e.*, an internalization approach).

Three years later, this Court issued a more wide-ranging opinion on these issues: *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979). *Penn Central* involved a railroad employee who had attacked a taxi driver when the driver said he needed to use the restroom before departing. *See id.* at 29. The Court held that he had acted outside the scope of his employment. In doing so, it described the

traditional Restatement view and a "present trend [to] extend liability for intentional torts to situations where the employment provides a 'peculiar opportunity and … incentive for such loss of temper." *See id.* at 30-31. However, even for the latter approach, the Court treated motives as crucial: "The employer will not be held liable for those willful acts, intended by the agent only to further his own interest, not done for the employer at all." *Id.* at 31 (cleaned up). Ultimately, the Court seemed to apply *both* modes of analysis, holding on the one hand that the attack suggested a "personal as distinguished from business-related motive," but also that it was not foreseeable as "a direct outgrowth of the employee's instruction or job assignment, nor an integral part of the employer's business activity, interests or objectives." *Id.* at 32.

Two years later, in *Johnson v. Weinberg*, this Court followed *Lyon* in stepping toward an internalization model. *See* 434 A.2d 404 (D.C. 1981). There, a laundromat had directed its employees to empty out washing machines after each cycle. *Id.* at 406. When a customer lost his shirts and confronted an employee, the employee shot the customer. *Id.* In analyzing whether the laundromat itself could be held liable, this Court began with the Restatement, but suggested that if an employee's intentional tort resulted from any foreseeable job-related controversy, he was within the scope of his employment. *See id.* at 408-09. Relying on that logic—and citing the absence of any relationship between the customer and the employee that might suggest "that the tort was personal"—the Court held this to be an issue for the jury. *Id.* at 409.

**A318**

The zenith of this Court's trend toward a pure foreseeability analysis came in *Howard University v. Best*, 484 A.2d 958 (D.C. 1984). There, a former professor alleged that a dean had sexually harassed her on multiple occasions, including in front of other faculty members and during official meetings. *Id.* at 981-82. This Court devoted merely two paragraphs in a 27-page opinion to analyzing her claim that the University itself should be held liable. In those two paragraphs, it did not disavow the relevance of motives; instead, it reasoned only that the dean had acted within his employment because "many of the incidents of alleged sexual harassment occurred during faculty, administrative or other professional meetings." *Id.* at 987.

The Second Circuit's certification to this Court cited *Lyon*, *Penn Central*, *Johnson*, and *Best* as reflecting confusion in District law. In its view, these cases leaned toward treating motive as irrelevant to the scope-of-employee analysis. But this Court never went so far: it consistently adhered to the Second Restatement approach while in some cases privileging foreseeability as a paramount concern. The relevance of foreseeability was most clear when (unlike in this case) the employer exercised direct supervision and control over the relevant employee, and when the employer was positioned to take steps to avoid tortious conduct by his employees.

Importantly, however, none of these cases actually rejected a motive-based analysis. And in the years that followed, the Court recalibrated its jurisprudence, returning to the Restatement standard and affirming that motive remains crucial.

21

That retrenchment began as early as 1983, when then-Judge Antonin Scalia (joined by Judges Abner Mikva and Harry T. Edwards) provided a broad survey of District law in *Jordan v. Medley*, 711 F.2d 211 (D.C. Cir. 1983). Remarking on the recent invocation of foreseeability, Judge Scalia described District law as "less than entirely clear." *Id.* at 213. "It is possible," he wrote, "to apply this 'foreseeability' principle as a substitute for the requirement of intent to further the employer's business." *Id.* But that interpretation struck him as mistaken: foreseeability analysis had not, in practice, displaced motive; instead, it had liberalized a distinct part of the *respondeat superior* inquiry concerned with how closely the employee's act was connected to the employer's business. *See id. at* 214-15. On that basis, he held that District law adhered to the rule that an employee is beyond the scope of employment when acting for personal reasons rather than to further an employer's interests. *Id.*

One year later—and three weeks after the *Best* decision—this Court made clear that it agreed with *Jordan*. In *Boykin v. District of Columbia*, which concerned a school's liability for sexual misconduct by a teacher, the Court held that *Johnson* "approaches the outer limits of the liability that may be imposed under *respondeat superior*." 484 A.2d 560, 563 (D.C. 1984). It then narrowed and distinguished *Lyon*, as well. *See id.* at 563-64. Finally, it "agree[d]" with *Jordan*'s observation that "an approach that would substitute foreseeability for intent to further the employer's

business" would be "inconsistent with previous cases in this jurisdiction." *Id.* at 563 n.2; *see also id.* (emphasizing that *Johnson* itself did not actually adopt that rule).

Two years later, the Court doubled down on that position in *District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986). *Coron* invoked the Restatement as "clarify[ing] conduct that is not within the scope of employment," and held that the employee at issue had acted outside the scope of his employment because "at no time was [his] conduct in furtherance of [his employer's] interests." *Id.* at 437-38.

Chronology thus helps to clarify the Second Circuit's confusion about District law. In the late 1970s and early 1980s, the Court partly embraced a more expansive view of "scope of employment," drawing on ideas (like foreseeability) associated with internalization. In doing so, however, it merged those concerns with its longstanding commitment to an approach modeled by the Second Restatement (but dating back even earlier), which assigned heavy weight to whether the employee was too little actuated by a purpose to serve the master. Then, in a series of decisions issued from 1984 to 1986, the Court made clear that it had recalibrated its doctrine back to the settled Restatement model, which remains the law of the District.

### 3. Recent Cases Confirm that the District Adheres to the Restatement and Treats Employee Motives as Crucial

Since the 1980s, this Court has developed a stable and consistent approach to scope-of-employment analysis—one that follows the familiar Second Restatement model and subjects employee motives to fact-intensive scrutiny. Applying that

approach, this Court has rejected a view of scope of employment that would cover virtually all employee conduct. Indeed, over the past 21 years, this Court has *never* held that an employee's tortious conduct fell within the scope of employment as a matter of law. Instead, the Court has held either that the employee's conduct was clearly beyond the scope of employment, or that this was a fact question to be decided by a jury. And in each case, the Court has assigned substantial weight to the employee's motive for engaging in the alleged tortious conduct. *See, e.g.*, *Blair v. District of Columbia*, 190 A.3d 212, 226 (D.C. 2018); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014); *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006); *Herbin v. Hoeffel*, 886 A.2d 507, 509 (D.C. 2005); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001).

Two of the Court's most recent *respondeat superior* cases—both involving off-duty police officers—illustrate that approach. *District of Columbia v. Bamidele* involved off-duty officers who got into an altercation at a restaurant and, during the ensuing mayhem, attacked another patron. *See* 103 A.3d at 519. This Court held that they had acted outside the scope of their employment in doing so, relying on the rule that "conduct of a servant that is too little actuated by a purpose to serve the master is not within the scope of employment." *Id.* at 525 (cleaned up). Confirming its pivot from *Johnson* and *Howard*, the Court further clarified that its inquiry into the employees' motives was independent of any foreseeability analysis—and that, "at

least where intentional torts are concerned, it is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort." *Id.* Because the off-duty officers did not intend to take police action against the plaintiffs, and instead assaulted them as vengeance for a perceived personal affront, they had not acted within the scope of their employment. *Id.* at 526.

Four years later, in *Blair v. District of Columbia*, the Court applied the same legal framework where an off-duty officer (working as a bouncer at a bar) used force against a patron after identifying himself as an officer and instructing that patron to leave the premises. 190 A.3d at 216. Like *Bamidele*, *Blair* identified motivation and foreseeability as distinct requirements—and held that "[t]o be within the scope of employment, the tortious activity must be actuated, at least in part, by a purpose to further the master's business." *Id.* at 226 (cleaned up). On the facts before it, the Court concluded that a reasonable jury could find that the officer's "professional and personal motives for his actions toward [the patron] were significantly intertwined," and therefore reversed a grant of summary judgment. *Id.* at 227-29.

Together, *Bamidele* and *Blair* make clear that scope-of-employment analysis in the District requires a context-sensitive analysis of the employee's motives for his tortious conduct. These cases also confirm that where an employee is "too little actuated" by a purpose to serve their employer, they are outside the scope of their employment as a matter of law. And it follows from these cases, as well as the others

cited above, that the District does not adhere to an internalization approach. While

Carroll believes this is already clear, confirming these points would respond to a

significant aspect of the Second Circuit's confusion about District law.[2]

In that vein, the Court might use this opportunity to offer one point of further

clarification. Over time, the Court has used varied formulations to describe how the

purpose requirement should be applied. In some cases, it has stated that if even a

mere iota of an employee's motives for a tort were job-related, then the employee

acted within the scope of his employment. *E.g.*, *Blair*, 190 A.3d at 228. Elsewhere,

and consistent with the text of the Second Restatement, the Court has highlighted

the "too little actuated" standard (which was invoked by the district court in this

case)—and has further held that an employee's intentional tort is not within the scope

---

[2] The Second Circuit identified *Hechinger Co. v. Johnson*, 761 A.2d 15 (D.C. 2000), and *Brown v. Argenbright Security, Inc.*, 782 A.2d 752 (D.C. 2001), as cases that "stretched employer benefit very far." *Carroll*, 49 F.4th at 779. Respectfully, that is mistaken. *Hechinger* concerned a challenge to a jury verdict, and this Court held only that a reasonable jury could find that a supervisor acted within the scope of his employment in pushing a patron amid a heated altercation about whether the patron was entitled to certain items for free. 761 A.2d at 25. *Brown* concerned a security guard who improperly touched a woman while searching her; it held only that the scope-of-employment issue had to go to a jury, since "[w]hile it is probable that the vast majority of sexual assaults arise from purely personal motives," this guard may have had job-related reasons for how he searched a suspected shoplifter. 758 A.2d at 758. Both *Hechinger* and *Brown* reflect a straightforward application of the Second Restatement standard and neither altered settled District law. *Cf. Mathis v. United States*, 579 U.S. 500, 514 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same.").

of employment merely because his employment afforded the opportunity or means
to pursue a fundamentally personal motive. *E.g.*, *Bamidele*, 103 A.3d at 525-26.[3]

In practice, this is often a distinction without a difference. Here, for instance,
the record supports a finding that Trump acted outside the scope of his employment
under either standard. If the Court agrees, it need not go any further.

But if the Court finds that the difference matters, it should not apply an unduly
expansive view of Trump's scope of employment here, for reasons arising from the
fundamental policies that animate this doctrine. As explained above, *respondeat
superior* reflects the principle that an employer—who controls and supervises an
employee—should be held responsible when its employee harms third parties while
engaged in conduct for the employer's benefit. This case, however, defies that
principal-agent logic. As Judge Kaplan observed, the employer here (the American
electorate) has virtually no direct supervisory power or control over its employee
(the President), and it is poorly positioned to take any concrete steps to avoid or
sanction that employee's tortious actions. *See Carroll v. Trump*, 498 F. Supp. 3d
422, 450 (S.D.N.Y. 2020) ("No one even arguably directed or controlled President
Trump when he commented on the plaintiff's accusation, which had nothing to do

---

[3] The Restatement (Third) of Agency § 7.07 (2006) proposed restating the scope-of-
employment inquiry as whether the employee committed "an independent course of
conduct not intended by the employee to serve any purpose of the employer." Since
then, this Court has on numerous occasions adhered to the Second Restatement,
which remains a widely accepted authority. *See, e.g.*, *Bamidele*, 103 A.3d at 525.

with the official business of government, that he raped her decades before he took office. And no one had the ability to control him."). As a result, the understanding of employer control that ordinarily frames scope-of-employment analysis is on shaky footing when applied in this particular employment context. Moreover, this case does not involve mere negligence, but instead involves an intentional tort—which, by its nature, is more likely to evade employer control. *See Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006) (explaining that an intentional tort "by its nature is willful and thus more readily suggests personal motivation").

In these circumstances, it is logical and fair to ask whether job-related motives in fact contributed in some material respect to Trump's tortious conduct. Therefore, if necessary to resolve the issues presented here, the Court should clarify that Trump acted outside his employment if he was "too little actuated" by job-related motives.

### 4. The Vast Majority of Jurisdictions Similarly Treat Employee Motive as Crucial to Scope-of-Employment Analysis

For the reasons given above, this Court should confirm that an employee acts outside the scope of their employment when their intentional tortious conduct is too little actuated by a purpose to serve the master. Recognizing that this Court has at times looked to the law of other jurisdictions, it bears emphasis that such a holding would keep this Court aligned with the strong majority of state courts, which either

expressly state that rule or incorporate it through the Second Restatement.[4] *See*
Catherine M. Sharkey, *Institutional Liability for Employees' Intentional Torts:
Vicarious Liability As A Quasi-Substitute for Punitive Damages*, 53 Val. U. L. Rev.
1, 12 (2018) ("The majority position [among states] is that intentional torts are only
within the scope of employment when committed to serve the employer's interest.").

Like this Court did in the 1980s, many courts have considered and then
rejected a pure internalization approach. *E.g.*, *Patterson v. Blair*, 172 S.W.3d 361,

---

[4] *See, e.g.*, *Synergies3 Tec Servs., LLC v. Corvo*, 319 So. 3d 1263, 1273 (Ala. 2020);
*Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 601-02 (Ariz. 2012); *Grease
Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472 (Colo. 1995); *Fiano v. Old
Saybrook Fire Co. No. 1, Inc.*, 209 A.3d 629, 635 (Conn. 2019); *Sherman v. State
Dep't of Pub. Safety*, 190 A.3d 148, 157 (Del. 2018); *Clo White Co. v. Lattimore*,
590 S.E.2d 381, 382-83 (Ga. 2003); *Nava v. Rivas-Del Toro*, 264 P.3d 960, 964
(Idaho 2011); *State v. Hoshijo ex rel. White*, 76 P.3d 550, 562-63 (Haw. 2003);
*Giudicessi v. State*, 868 N.W.2d 418, 421-24 (Iowa Ct. App. 2015); *Antonio v. SSA
Sec., Inc.*, 110 A.3d 654, 658 (Md. 2015); *Hamed v. Wayne Cnty.*, 803 N.W.2d 237,
244 (Mich. 2011); *Plains Res., Inc. v. Gable*, 682 P.2d 653, 661 (Kan. 1984);
*Dragomir v. Spring Harbor Hosp.*, 970 A.2d 310, 314 (Me. 2009); *Burroughs v.
Com.*, 673 N.E.2d 1217, 1219 (Mass. 1996); *Parmenter v. J & B Enterprises, Inc.*,
99 So. 3d 207, 216 (Miss. App. Ct. 2012); *L.B. v. United States*, 515 P.3d 818, 825
(Mont. 2022); *Strong v. K & K Invs., Inc.*, 343 N.W.2d 912, 916 (Neb. 1984); *Porter
v. City of Manchester*, 921 A.2d 393, 399 (N.H. 2007); *Spurlock v. Townes*, 368 P.3d
1213, 1216 (N.M. 2016); *Aldridge v. Metro. Life Ins. Co.*, No. 18 CVS 1050, 2019
WL 7374878, at *20 (N.C. Super. Ct. Dec. 31, 2019); *Sitton v. Massage Odyssey,
LLC*, 158 N.E.3d 156, 159 (Ohio Ct. App. 2020); *Baker v. Saint Francis Hosp.*, 126
P.3d 602, 605-07 (Okla. 2005); *Harkness v. Platten*, 375 P.3d 521, 532 (Or. 2016);
*Spitsin v. WGM Transp., Inc.*, 97 A.3d 774, 778 (Pa. Super Ct. 2014); *Pineda v.
Chase Bank USA, N.A.*, 186 A.3d 1054, 1058-59 (R.I. 2018); *Kase v. Ebert*, 707
S.E.2d 456, 458 (S.C. Ct. App. 2011); *Bernie v. Catholic Diocese of Sioux Falls*,
821 N.W.2d 232, 238 (S.D. 2012); *Drew v. Pac. Life Ins. Co.*, 496 P.3d 201, 214
(Utah 2021); *Doe v. Forrest*, 853 A.2d 48, 54 (Vt. 2004).

366-69 (Ky. 2005); *Bratton v. Calkins*, 870 P.2d 981, 987 (Wash. Ct. App. 1994);

*VECO, Inc. v. Rosebrock*, 970 P.2d 906, 924 n.36 (Alaska 1999); *Sandman v. Hagan*,

154 N.W.2d 113, 118-19 (Iowa 1967). Thus, to the extent the Second Circuit implied

that internalization represents the prevailing approach, it was mistaken.

Accordingly, under District law—which follows the clear majority view—

Trump acted outside the scope of his federal employment in committing a series of

intentional torts against Carroll if he was too little actuated by a job-related purpose.

As we will next explain, the allegations here overwhelmingly support that finding.

### B.   Trump Acted Outside the Scope of his Employment as President in Repeatedly Defaming and Insulting Carroll

The Second Circuit certified to this Court the question whether Trump's

defamatory statements concerning Carroll were within the scope of his employment

as President. This certification partly reflected uncertainty about the general standard

for *respondeat superior*. But it also reflected uncertainty—expressed at argument—

concerning how this Court defines private- versus employment-related motives and

undertakes such inquiries. For that reason, and to facilitate a more expeditious

resolution of the case (which has been pending for over three years and is otherwise

ready for trial), the Court should directly resolve the certified question. Although

scope-of-employment issues are ordinarily reserved for juries, here the scope issue

presents a legal question properly decided by this Court: the relevant facts are

undisputed, and the scope-of-employment issue must be resolved within judicial

review of the Westfall Act determination. *See Carroll* 49 F.4th at 772, 781; *see also*

*Osborn v. Haley*, 549 U.S. 225, 251-52 (2007) (explaining lack of jury process).[5]

Under District law, the answer to the certified question is clear: Trump acted

outside the scope of his federal employment when he repeatedly defamed Carroll as

punishment for revealing that he had raped her decades earlier. Both federal judges

in this case who actually reached the issue have agreed that Trump "was not serving

any purpose of the federal government" in slandering Carroll. *Carroll*, 49 F.4th at

789 (Chin, J., dissenting); *see Carroll*, 498 F. Supp. 3d at 457 ("[T]he undisputed

facts demonstrate that President Trump was not acting in furtherance of any duties

owed to any arguable employer when he made the statements at issue.").

This conclusion flows directly from the factual record before the Court, which

consists exclusively of the particularized factual allegations in the Complaint (since

Trump and DOJ have not adduced any evidence of their own). *See* A44-48 ¶¶ 106-

28. Although those allegations must be accepted as true for purposes of this appeal,

Trump and DOJ hardly address them. To summarize: Trump knew exactly who

Carroll was when he raped her, A44-45 ¶¶ 106-12; he knew in June 2019 that he had

raped her and that his denials were false, A45 ¶¶ 113-15; he deliberately lied, and

spoke with no concern for the truth, in accusing Carroll of fabricating her account of

---

[5] We are not aware of a case under the Westfall Act where the threshold scope-of-employment issue was submitted to a jury rather than decided by a court.

the rape in exchange for payment, or as part of a political conspiracy, or as a plot to increase book sales, A45-46 ¶¶ 116-18; he deliberately lied, or spoke with no concern for the truth, in implying that Carroll had falsely accused other men of sexual assault, A46 ¶¶ 118-19; he not only lied about her with full knowledge that he was lying, but he also doubled down on his retaliation by describing her as too ugly for him to have raped her, A42 ¶ 97; and he engaged in these personal attacks because they were his *modus operandi*—before and during his time in office—for responding to reports that he had sexually assaulted women, A46-48 ¶¶ 122-27.

At bottom, Trump "knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth." A48 ¶ 128. Trump insulted Carroll's appearance to advance that same underlying lie. A42 ¶ 97. And Trump did not attack Carroll intending to advance any federal interest. Instead, he lied to protect himself from the truth and to destroy Carroll for daring to speak up. After knowingly lying about his decades old criminal act, "he surrounded that central lie with a swarm of related lies in an effort to explain why [Carroll] would invent an accusation of rape." A26 ¶ 13.[6]

---

[6] The record on appeal is undisputed and closed. We note for the Court's awareness, however, that since the Second Circuit issued its decision, the parties have completed fact discovery, including depositions of both Trump and Carroll in which issues such as Trump's mental state when he made the alleged defamatory statements and the truth of the statements themselves were fully explored.

Reviewing this evidence, Judge Kaplan saw "no basis for concluding that a D.C. court would ignore the nature and context of [Trump's] statements and hold that anything he says is within the scope of his employment." *Carroll*, 498 F. Supp. 3d at 453. To the contrary: "A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office" and that plainly had no "relationship to [Trump's] official duties." *Id.* at 453, 456.

This conclusion is bolstered by four additional considerations, each reflecting tried-and-true judicial measures of personal motivation for intentional torts.

*First*, the nature and content of Trump's statements powerfully indicate a personal motive. Trump did not simply deny Carroll's claim. Instead, with full awareness of his lies, Trump used the loudest megaphone on the planet to launch a shockingly personal attack. He implied Carroll was too ugly for him to sexually assault; he implied that she had falsely accused other unknown men of rape; and he devised a malicious narrative under which Carroll lied to make money or increase book sales. A26 ¶ 11. If this is not evidence of personal ill will and spite, it is hard to imagine what would be. Trump sought to destroy and humiliate Carroll after she revealed that he had raped her decades ago. There is no basis here to find that Trump had any presidential obligation to make these statements, or that Trump did so to advance any federal purpose. *See Carroll*, 49 F.4th at 789 (Chin, J., dissenting).

33

**A331**

The more natural conclusion—bolstered by this Court's precedents—is that Trump behaved "in an outrageous manner" and "inflict[ed] a punishment out of all proportion to the necessities of his master's business" because he had "departed from the scope of employment in performing the act." Restatement (Second) of Agency § 245 cmt. f. Where (as here), an employee "did not handle the situation in a manner expected" of his employment—and instead behaved like "an individual bent on personal vengeance for a perceived personal affront"—courts have not hesitated to find personal motivations. *See, e.g.*, *Coron*, 515 A.2d at 438. In *Penn Central*, for example, this Court found that the "violent and unprovoked nature of [an] attack indeed suggests a personal as distinguished from business-related motive." 398 A.2d at 32. And *Armstrong v. Thompson* applied District law to conclude that "an air of contempt and deprecation" in alleged defamatory statements strongly suggested "personal motives." 759 F. Supp. 2d 89, 95 (D.D.C. 2011). So too in this case.[7]

*Second*, Trump's conduct was not only outrageous, but it was intentional. Trump and DOJ gloss over the point, but it bears emphasis: Trump made each of these statements with actual malice—both literally and technically. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). That willful state of

---

[7] To be clear, the point is not simply that Trump departed from how prior Presidents generally conducted themselves when accused of wrongdoing. It is that his behavior toward Carroll—which far exceeded any public purpose and seemed calculated to punish and retaliate against her for revealing his earlier private sexual misconduct— evinced every recognized hallmark of a personally motivated attack.

mind powerfully supports finding that he acted for personal reasons, rather than in furtherance of his job duties. As the D.C. Circuit has recognized, "it would be unusual to find, as a matter of law, that an employee was acting within the scope of her employment [under D.C. law] when she committed an intentional tort." *Majano*, 469 F.3d at 141; *accord Bamidele*, 103 A.3d at 525. As a presumptive matter, intentional torts do not further any employer interests—and certainly should not be treated as automatically advancing the interests of the government. Indeed, it would send a troubling message for the Court to find that Trump's repeated defamatory attacks on Carroll were simply part of his job. No court has ever held that officials enjoy total civil immunity for willfully slandering private citizens as retribution for revealing private misconduct that they committed before taking office.

*Third*, the prior dealings between Trump and Carroll, as well as the sexual nature of Trump's misconduct, further establish personal motivation. This case is very different from proceedings in which there was "no evidence that the employee and [his victim] had had previous dealings that would indicate that the tort was personal." *Boykin*, 484 A.2d at 563. As alleged, Trump raped Carroll. He knew who she was when he did it, and he knew who she was when he defamed her. That is exactly the kind of "previous dealing[]" that suggests personal motive—particularly in the context of sexual misconduct and associated defamatory statements, which often involve and evoke personal motivations. *See, e.g.*, *Brown*, 782 A.2d at 758;

*Boykin*, 484 A.2d at 563; *Grimes*, 47 F.2d at 410; *see also, e.g.*, *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1166-67 (E.D.N.Y. 2003); *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."); *Walters v. Homestaff Health Care*, No. Civ. 950146961S, 1996 WL 88058, at *1 n.1 (Conn. Super. Ct. Feb. 8, 1996).

*Fourth*, and finally, the personal nature of Trump's conduct is illuminated by its striking consistency with the personal attacks he has launched for decades (and continues to launch) against women who accuse him of sexual misconduct. *See* A46-47 ¶¶ 122-27; *see also Carroll*, 49 F.4th at 789 (Chin, J., dissenting) (noting that Trump "made these comments because they were part of his 'playbook' of public response to credible reports that he had assaulted women"). Simply put, Trump's attacks on Carroll did not reflect anything unique to his high office, nor did they arise from any distinctively presidential consideration. Rather, they followed directly from a *modus operandi* stretching back decades into his life as a private citizen. And he has persisted in that *modus operandi* since leaving office. In October 2022, Trump again defamed Carroll, denigrating her as not his "type" and claiming that her story was a "[h]oax and a lie" and a "scam" to "promot[e] a really crummy book." Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 12, 2022, 10:38

PM). This stark consistency across time supports the conclusion that Trump's efforts to destroy and discredit Carroll were simply how he responds to any woman who accuses him of sexual abuse; they had nothing to do with any federal purpose.

Taken together, these considerations confirm what is clear from the face of Trump's statements: his attacks on Carroll, which sought to humiliate and punish her for revealing a crime he committed decades earlier, reflected "a man pursuing a personal vendetta against an accuser, not the United States' Chief Constitutional Officer engaging in supervisory and policy responsibilities of utmost discretion and sensitivity." *Carroll*, 49 F.4th at 789 (Chin, J., dissenting) (cleaned up).

Trump and DOJ contend that Trump's statements were job-related because they occurred while he spoke to the press. But this Court has long recognized that an employee can commit intentional torts outside the scope of his employment even "while he is on duty" and "even if those duties bear some causal relationship to the tort." *Bamidele*, 103 A.3d at 525; *see also Majano*, 469 F.3d at 142 ("[T]he key inquiry is the employee's intent at the moment the tort occurred."); *Schecter*, 892 A.2d at 427 ("[T]he moment the agent turns aside from the business of the principal and commits an independent trespass, the principal is not liable."). Here, as Judges Kaplan and Chin have concluded, that is exactly what happened. This Court should therefore answer the certified question by confirming under District law that Trump

acted beyond the scope of his employment when he targeted Carroll with repeated defamatory statements to punish and humiliate her.[8]

### C.   Appellants' Proposed Categorical Rule Conflicts with Settled District Jurisprudence and American Constitutional Traditions

Trump and DOJ have almost nothing to say about the District's *respondeat superior* precedents or (even more remarkably) the facts of this case. In their view, whenever an elected federal official "communicat[es] with the press and constituents on a matter of public concern," he is always automatically within the scope of his employment. DOJ Br. at 8; *accord* Trump Br. at 1 (asserting that "a public official's statements to the press definitively fall within the scope of employment").

This categorical position totally precludes any possibility that an elected federal official could act with purely (or decisively) personal motives while speaking publicly—no matter how private the subject matter, how unrelenting and incendiary the official's statements, how patently disconnected from any government business, or how plainly consistent with that official's prior personal conduct. Trump and DOJ

---

[8] Trump cites a few cases where juries found—or could reasonably have found—that an employee acted within the scope of his employment. Trump Br. at 25. None supports his position. In *Blair*, for instance, an off-duty police officer's "professional and personal motives" were "significantly intertwined" during an altercation outside a nightclub, largely because that officer had announced he was on duty, displayed his badge, and instructed people to leave the premises. *See* 190 A.3d at 216-17, 227-28. Even then, this Court left the issue for a jury. *See id.* at 229. In *Hechinger* the defendant pushed a patron amid a job-related dispute over the patron's right to take wood scraps from the store for free. *See* 761 A.2d at 25. These cases both involved much more powerful indicia of job-related motivation than are present here.

reason that public statements are always within an official's scope of employment because they may incidentally affect his perceived fitness to hold office. On that basis, Trump and DOJ ask this Court to announce a doctrine of categorical immunity for public officials, affording them *carte blanche* to use the public platform inherent in their office to defame any private citizen—anywhere, anytime, for any reason.

That categorical position is not (and should never be) the law. As we will show, it defies basic principles of *respondeat superior* jurisprudence, offends our constitutional traditions, and arises from a misreading of precedent. It is also wrong in a much deeper sense. No President should be heard to argue that he is free to willfully injure and punish a private citizen who revealed that he raped her because inflicting such punishment might incidentally help him politically. That reasoning dishonors the American Presidency and the rule of law—if anything, it most immediately calls to mind King Louis XIV's declaration, "L'état, c'est moi."

### 1. The Categorical Position Is Inconsistent with District Law

The first flaw in Trump and DOJ's position is that it defies District precedent (and the Second Restatement) by collapsing the settled, multi-factor standard for *respondeat superior* analysis into a single factor. As Trump and DOJ see it, the *only* relevant question is whether an official is speaking to the press about a matter of potential public concern. If so, they insist, the analysis is complete and the official was acting within the scope of their employment, since speaking to the public is the

type of thing that officials typically do as part of their jobs. But as this Court has repeatedly held, the fact that an employee is on duty (or is doing the kind of work he is employed to perform) is *never* the end of the inquiry. Instead, it is just one among several factors in a scope-of-employment analysis. *See Bamidele*, 103 A.3d at 525 ("It is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort."); *see also Majano*, 469 F.3d at 142; *Armstrong*, 759 F. Supp. 2d at 94; *Brown*, 782 A.2d at 758; *Coron*, 515 A.2d at 438; *Boykin*, 484 A.2d at 563; *Penn Central*, 398 A.2d at 30.

Indeed, a central premise of the District's multi-factor *respondeat superior* analysis is that an employee might satisfy one factor (*e.g.*, his conduct "is of the kind he is employed to perform"), but still fall outside the scope of his employment because he does not satisfy others (*e.g.*, his conduct occurred beyond authorized space and time limits, or was motivated by personal interests). *See* Restatement (Second) of Agency § 228. Trump and DOJ thus offend a fundamental precept of the District's *respondeat superior* jurisprudence by advocating a categorical rule that writes off most of the relevant legal standard—including any consideration of the employee's purposes, which (as we explained above) has long ranked among the crucial features of scope-of-employment analysis in the District.[9]

---

[9] This Court has issued many opinions finding that individuals otherwise engaged in the customary duties of their position veered outside their employment because some

40

**A338**

A related and equally fundamental flaw in Trump and DOJ's position is that it treats facts and context as totally irrelevant in defining employment for a whole category of employees. This would be unprecedented in District law, which has consistently applied a single fact-intensive standard to a wide range of settings. It would also defy the principle that "the determination of scope of employment is dependent upon the facts and circumstances of each case." *Penn Central*, 398 A.2d at 29. And it would collide with this Court's frequent admonition that "as a general rule, whether an employee is acting 'within the scope of his employment' is a question of fact for the jury." *Boykin*, 484 A.2d at 562. Accordingly, the Court should not accept Trump and DOJ's invitation to hold categorically (and as a matter of law) that the fact-intensive scope-of-employment test is automatically met whenever an elected official speaks in public, no matter the context and no matter his motives.

## 2. The Categorical Position Offends Constitutional Traditions

The arguments advanced by Trump and DOJ are not only inconsistent with *respondeat superior* doctrine; they are also offensive to our constitutional traditions.

---

intentional tort they committed was motivated by private purposes. *M.J. Uline Co. v. Cashdan*, 171 F.2d 132 (D.C. Cir. 1948), offers a vivid example. There, a hockey player hit the puck at a bystander in the middle of a game. The district court instructed the jury that the player was acting within the scope of his employment, but the D.C. Circuit reversed, since he "may have been, at the moment when he struck the blow, completely indifferent to the work he was employed to do and actuated only by anger or hostility toward the man he tried to injure." *Id.* at 134.

**A339**

There is no denying that the Presidency is a very broad job, and that one of the President's duties includes communicating with the public. *See Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020); *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Trump and DOJ would extrapolate from this premise that every time the President (among others) communicates with the public, he is necessarily engaged in conduct bearing on his duties, and in that respect is within the scope of his employment.

But the Presidency is not boundless—and not every public statement by the President is an official act. In rejecting royal rule, the Framers rightly foresaw that Presidents would engage in private acts with private motives that might well violate the law. To address that risk, James Wilson emphasized in the ratification debates that "[f]ar from being above the laws," the President "is amenable to them in his private character as a citizen."[10] Consistent with Wilson's guidance, the Supreme Court has held that the President may face civil liability for private acts beyond the "'outer perimeter' of his official responsibility," *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982); that he remains fully "subject to the laws for his purely private acts," *Clinton v. Jones*, 520 U.S. 681, 696 (1997); and that he can be investigated while in office for private crimes, *see Vance*, 140 S. Ct. at 2426-27. Time and again, the Court has declined to treat every act by the current President as an act by the Office of the

---

[10] James Wilson, Debates in the Convention of the State of Pennsylvania (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836).

Presidency. *See* Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000)
(recalling that the President "is a person as well as an institution").

This rule reflects experience. In the earliest days of the Republic, Chief Justice
Marshall saw that the demands of a President's "duties as chief magistrate" are not
so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas.
30, 34 (Va. Cir. Ct. 1807). More recently, Trump insisted that aspects of his conduct
while in office were entirely private, including profitable business deals with foreign
nations and censoring critics on Twitter. Although Trump was mistaken that these
claims freed him of legal constraint, these statements show that Trump subjectively
understood himself as acting in a purely personal capacity—and as pursuing private
motives—while dealing with the public throughout his tenure in office.[11]

Trump and DOJ thus go too far in contending that any public statement by a
President on a matter of public concern is automatically within his employment.

_____

[11] *See, e.g.*, Petition for Writ of Certiorari at 14, *Trump v. Knight First Amendment
Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("[B]locking third-party accounts from
interacting with the @realDonaldTrump account is a purely personal action.");
Mem. in Supp. of Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ.
1596 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that
President Trump was free to profit from private commercial transactions with foreign
powers, so long as he did not receive "compensation for services rendered …
in an official capacity or in an employment (or equivalent) relationship with a foreign
government"); *see also* Br. of Donald J. Trump, *Trump v. United States*, No. 22-
13005 (11th Cir. Nov. 10, 2022) (arguing—albeit unconvincingly—that classified
documents created during Trump's tenure in office and taken to Mar-a-Lago from
the White House should be considered "personal" rather than governmental records).

Indeed, Judge Amit Mehta of the D.C. District Court recently rejected a version of that claim in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46, 84 (D.D.C. 2022). Moreover, DOJ itself took a position in that case at odds with its filing here: it argued that an elected federal official (Rep. Mo Brooks) had acted outside the scope of his employment when he spoke at the January 6 rally, reasoning that Brooks's statements at the rally (which were public statements on a matter of public concern) were not "actuated … by a purpose to serve" his employer. *See* Br. of U.S. at 8-19, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. July 27, 2021) (opposing Westfall Act certification).[12]

If accepted, Trump and DOJ's position would collapse a core distinction between the presidential office and its temporary occupant. That categorical view would not only depart from the constitutional plan, but would also conflict with the Supreme Court's intensely fact-dependent analysis in related doctrinal contexts. Consider, for example, how *Clinton v. Jones* addressed the defamation claim that Paula Jones had alleged against Clinton and his associates (including his press secretary). *See* 520 U.S. at 685. Rather than hold that Clinton automatically enjoyed immunity as to this claim—as would seem to follow from Trump and DOJ's categorical position here—the Supreme Court proceeded cautiously, noting only that

---

[12] Judge Mehta did not reach this issue because he held that the claims against Brooks were foreclosed by the First Amendment. *See Thompson*, 590 F. Supp. 3d at 125-26.

the defamation claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities." *Id.* at 686. This modest observation reflects the Supreme Court's context-sensitive approach to the line between personal and presidential conduct, particularly where a president's private wrongs are at issue.[13]

For these reasons, too, the categorical position advocated by Trump and DOJ cannot be squared with our constitutional traditions concerning the Presidency.

### 3. The Categorical Position Is Unsupported by Precedent

Given the many flaws in their position, it is unsurprising that Trump and DOJ cannot identify any case that has endorsed it. Instead, they seek to attribute it to a single District case that in fact said nothing about *respondeat superior*, and to a couple of D.C. Circuit cases that are inapposite and distinguishable.

First consider District law: Trump and DOJ both cite *District of Columbia v. Jones*, which concerned a defamation claim by Marc Jones, former Deputy Chief of Staff to Mayor Anthony Williams. *See* 919 A.2d 604, 606 (D.C. 2007). Jones alleged that Williams defamed him in public statements responding to reports of official

---

[13] The position pressed by Trump and DOJ would have other nonsensical results. Imagine if a business-minded President appeared at one of his own privately-owned hotels and made false, unlawful statements about a competitor while urging listeners to stay at his hotel. Or consider a President who appeared at a campaign event and declared that he would publicly celebrate anybody who burned down his political opponent's private residence. Or take a President who publicly threatens his child's teacher to turn an "F" into an "A." In these scenarios, treating his conduct as automatically within the scope of his presidential employment—without any further analysis or consideration of motive—would be at odds with the rule of law.

misconduct in fundraising activities of the Mayor's Executive Office. *See id.* Williams sought dismissal based on absolute immunity. *See id.* at 610. Under settled District law, absolute immunity is very different than scope-of-employment analysis: "When determining whether an act qualifies for absolute immunity, the court *does not inquire* into an official's motives." *Id.* (emphasis added). Applying this rule, the Court held that Williams's motives for his statements were irrelevant. *See id.* at 610-11. It further held that Williams's statements—which concerned "Jones's performance on duty," "the Mayor's own knowledge of and responsibility for those actions," and "the conduct of persons serving in the Office of the Mayor"— were "within the 'outer perimeter' of [Williams's] duties." *Id.* at 608.

Jones has no bearing on this case. It did not involve *respondeat superior*; to the contrary, it involved a distinct legal doctrine that precludes any consideration of motive. Further, the statements at issue in *Jones* concerned the Mayor's knowledge of misconduct in his own office by a former senior staffer. The fact that such statements were within the outer perimeter of his official duties says nothing about whether Trump's statements attacking Carroll were within his employment. *Jones* certainly does not stand for the sweeping proposition that anything an elected official tells the press is always, automatically an official act or within his employment.

This leaves only Trump and DOJ's reliance on a few federal cases, most of which are easily set aside: they arose from workaday statements by Members of

**A344**

Congress on pending legislative or oversight matters, and they did not present any evidence of private motivation, targeted animus, or personal wrongdoing on the part of the federal official.[14] If anything, these cases cut *against* the categorical view pushed by Trump and DOJ, since the painstaking and exceptionally fact-intensive analysis that those courts undertook into the scope-of-employment inquiry would have been totally unnecessary if a categorical rule covered such circumstances.

Of course, Trump and DOJ rely most heavily on the D.C. Circuit's opinion in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006).[15] There, a congressman spoke to a reporter about the dissolution of his

---

[14] *See Does 1-10 v. Haaland*, 973 F.3d 591, 600-01 (6th Cir. 2020) (Rep. Deb Haaland and Senator Elizabeth Warren acted within employment while "reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall"); *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009) (Ranking Member of the House Appropriations Subcommittee on Defense acted within his employment in criticizing the Defense Secretary's handling of the Iraq War, including when he made a claim that a particular squad was responsible for civilian deaths in Haditha); *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) (Chairman of the House Appropriations Committee acted within employment when he criticized a lobbyist's conduct while discussing the status of a pending appropriations bill pushed by that same lobbyist); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 94-95 (D. Mass. 1997) (Senator Ted Kennedy acted within employment when he criticized a violent anti-abortion organization while speaking about a bill he had sponsored—which was set for a vote the next day—meant to protect access to women's health clinics from that very group).

[15] Trump and DOJ also cite *Wilson v. Libby*, but that case is easily distinguished on its facts, as it involved executive officials who made statements while motivated in substantial respects by executive branch debates over United States public and foreign policy. *See* 535 F.3d 697, 712-13 (D.C. Cir. 2008) (holding that senior

marriage (which he thought his constituents would care about) and, in the course of that discussion, glancingly stated that CAIR was the "fund-raising arm for Hezbollah." *Id.* at 662. When CAIR sued for libel, the D.C. Circuit upheld dismissal of its claim, concluding that the Congressman's "conduct was motivated—at least in part—by a legitimate desire to discharge his duty as a congressman," since it believed that there was a "nexus" between answering questions about his personal life and his ability to carry out a political agenda in Congress. *Id.* at 664-66.

Although this case and *Ballenger* both involve the discussion of an elected official's personal life, that is where the similarity ends. In *Ballenger*, the evidence did not disclose any particular reason for the statement about CAIR. There was no evidence of any animus or retaliatory motive. It appears the Congressman randomly made a single stray comment about CAIR—a group engaged in lobbying and governmental affairs—while explaining his wife's dissatisfaction with life in D.C.

Here, in contrast, there is overwhelming evidence that Trump willfully and repeatedly singled out Carroll for malicious, humiliating lies. He attacked her three times over four days. He implied that she was too ugly to rape. He accused her of falsifying experiences of sexual assault by other men. He concocted dark schemes and nefarious motives. He did all this against a private citizen (not a leading civil

---

officials who acted with the goal of defending the administration's handling of war-related intelligence were within the scope of their employment in revealing a CIA operative whose husband had published criticism of U.S. intelligence policy).

**A346**

rights and advocacy organization actively involved in political deliberations). And he acted with obvious private motives—consistent with his prior practice—to punish and retaliate against her for revealing his decades-old crime. Whereas the statement about CAIR in *Ballenger* registered as reckless, Trump knew exactly what he was doing (and who he was doing it to), and he targeted Carroll with vicious precision.

For these reasons, *Ballenger* is distinguishable on its facts. While there may be limited circumstances in which an official publicly discusses aspects of his private life for reasons related to his job, it simply does not follow that elected officials always and everywhere (as a matter of law) act within their employment when speaking about decades-old private misconduct. Trump and DOJ seek to extract that principle from *Ballenger*, but *Ballenger* itself denied any such broad-based rule of immunity for "gratuitous slander in the context of statements of a purely personal nature." *Id.* at 666. Indeed, it then emphasized that its result "cannot be divorced from its facts"—which differ mightily from those presented here. *See id.*

More fundamentally, as the Second Circuit explained while certifying the issue, this Court—not the D.C. Circuit—is the final arbiter of District law. Read fairly, *Ballenger* does not hold that elected officials categorically act within the scope of their official employment when defaming private citizens. Indeed, it would be dangerous and undemocratic to declare that whenever an official might benefit politically from slandering a private citizen who reveals their personal misconduct,

the law creates an irrebuttable presumption that they must have acted in furtherance of official motives in seeking to destroy that person. And to the extent *Ballenger* might be taken as supporting that doubtful proposition, it is well within this Court's authority to clarify the proper interpretation of District law. *See Carroll*, 498 F. Supp. 3d at 452 (concluding that "*Ballenger*'s reasoning is wanting").

*   *   *

In exchange for a promise to serve the country and all who live here, elected officials are vested with great power. It is a betrayal of this public trust to weaponize that power while pursuing selfish interests in punishing and humiliating those who reveal private malfeasance. Presidents are free to deny allegations of misconduct. But a White House job is not a promise of unlimited authority to brutalize victims of prior wrongdoing through vicious, personal, defamatory attacks. That is not the law—and this Court should not make it so. *See Clark v. McGee*, 404 N.E.2d 1283, 1286 (N.Y. 1980) ("Public office does not carry with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members.").

## CONCLUSION

For the reasons given above, the Court should answer the certified question by holding that under District law, Trump acted outside the scope of his employment when he made the defamatory statements about Carroll at issue in this case.

Dated:  Washington, D.C.   Respectfully submitted,
   December 1, 2022

               _____

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

Roberta A. Kaplan (*admitted pro hace vice*)
Matthew J. Craig (*admitted pro hace vice*)
Rachel L. Tuchman (*admitted pro hace vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mcraig@kaplanhecker.com
rtuchman@kaplanhecker.com

*Counsel for Appellee E. Jean Carroll*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2022, I caused the foregoing brief to be electronically filed with the District of Columbia Court of Appeals using the online e-filing system. Service will be accomplished on all parties through that system.

Joshua Matz

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| E. JEAN CARROLL, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD J. TRUMP, <br><br> *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

**A351**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ........................................................................................2

SUMMARY JUDGMENT STANDARD ..................................................................2

ARGUMENT ...........................................................................................................3

    I.      ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFEMATION CLAIM .........3

          A. The Evolution of Absolute Immunity Pre-*Nixon* ........................................5

          B. *Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity ......9

          C. The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President .............................11

    II.     PLAINTIFF'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ......19

          A. Plaintiff Has Failed to Establish Cognizable Damages ...........................20

             i.     The Statements Do Not Constitute Defamation *Per Se.* ................20

             ii.    Plaintiff Cannot Establish Her Entitlement to Special Damages...24

          B. Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of Statements ..................................................28

          C. The Vast Majority of the Statements are Nonactionable Opinions ..........31

    III.    THE EXTREME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED ........................................................................................34

CONCLUSION ......................................................................................................35

i

<u>**TABLE OF AUTHORITIES**</u>

*Cases*

*Aronson v. Wiersma,*

    65 N.Y.2d at 594, 493 N.Y.S.2d at 1008 .............................................................................23

*Aslanidis v. United States Lines, Inc.,*

    7 F.3d 1067, 1072 (2d Cir. 1993). .......................................................................................3

*Barr v. Matteo,*

    360 U.S. 564, 79 S. Ct. 1335 (1959)..............................................................................7, 8, 9

*Barret v. Harrington,*

    130 F.3d 246, 254-55 (6th Cir. 1997).................................................................................12

*Bradley v. Fisher,*

    80 U.S. 335, 20 L. Ed. 646 (1871)...................................................................................5, 6

*Brian v. Richardson,*

    87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 351 (1995).............................................................33

*Butz v. Economou,*

    438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)...................................................................5

*Cain v. Atelier Esthetique Inst. of Esthetics Inc.,*

    733 Fed.Appx. 8, 11 (2d Cir. 2018)...................................................................................19

*Camp v. Recreation Bd,*

    104 F. Supp. 10 (D.D.C. 1952)...........................................................................................7

*Carroll v. Trump,*

    498 F.Supp.3d 422, 456 (S.D.N.Y. 2020) ........................................................................13

*CBS v. FCC,*

    454 F.2d 1018, 1020 (D.C. Cir. 1971)...............................................................................17

*Celle v. Filipino Reporter Enters,*

    209 F.3d 163, 179 (2d Cir. 2010) .......................................................................25, 27

*Celotex v. Catrett,*

    477 U.S. 317, 322 (1986)..............................................................................................2

*Chastain v. Sundquist,*

    833 F.2d 311, 315 (D.C. Cir. 1987) .........................................................................11

*Church of Scientology Int'l v. Behar,*

    238 F.3d 168, 173-74 (2d Cir. 2001) ..................................................................19, 20

*Clinton v. Jones,*

    520 U.S. 681, 694 (1997)....................................................5, 9, 10, 11, 13, 17, 32

*Coleman v Grand,*

    18-CV-5663ENVRLM, 2021 WL 768167, at *9 [EDNY Feb. 26, 2021] ...........................20

*Cooper v. O'Connor,*

    99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) .....................................7

*Coppola v. Bear Stearns & Co.,*

    499 F.3d 144, 148 (2d Cir. 2007) ..............................................................................2

*Council on American-Islamic Relations v. Ballenger,*

    444 F.3d 659, 662 (D.C. Cir. 2006).........................................................13, 15, 17

*Cruz v. Reiner,*

    11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) ........3

*Cummings v. City of N.Y.,*

    No. 19-cv-7723 (CM)(OTW), 2020 U.S. Dist. LEXIS 31572, at *62 (S.D.N.Y. Feb. 24, 2020)

    .............................................................................................................................34

*Dickson v. Slezak,*

    73 A.D.3d 1249, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) ....................................................28

*District of Columbia v. Jones,*

    919 A.2d 604, 608-09 (D.C. 2007) ...........................................................................14, 15, 16

*Doe v. French,*

    2012 WL 129836 (2d Cir. January 18, 2012).........................................................................32

*Drug Research Corp. v. Curtis Publ'g Co,*

    7 N.Y.2d 435, 441, 166 N.E.2d 319, 322 (1960)...................................................................26

*Dworin v. Deutsch,*

    2008 WL 508019, at *4 .......................................................................................33, 34, 35

*Elias v. Rolling Stone LLC,*

    872 F.3d 97, 104 (2d Cir. 2017) ...........................................................................................19

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst,*

    184 U.S. App. D.C. 397, 400, 566 F.2d 289, 292 (1977) ....................................................16

*Ferri v. Ackerman,*

    444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979).............................................10

*Fowler v. New York Herald,*

    172 N.Y.S. 423 (1st Dep't 1918) ..........................................................................................30

*Franklin v. Daily Holdings, Inc.,*

    21 N.Y.S.3d 6, 11-12, 135 A.D.3d 87, 93 (1st Dept. 2015) ......................................25, 26, 27

*Gentile v. Grand St. Med. Associates,*

    79 A.D.3d 1351, 1354, 911 N.Y.S.2d 743............................................................................35

*Goetz v. Kunstler,*

    625 N.Y.S.2d 447, 459 (Sup. Ct., New York Cty. 1995) ......................................................35

*Golub v. Enquirer/Star Grp.,*

    89 N.Y.2d 1074, 1076 (1997) .................................................................................22

*Gregoire v. Biddle,*

    177 F.2d 579 (2d Cir. 1949) .................................................................................7

*Gurtler v. Union Parts Mfg. Co., Inc.,*

    285 A.D. 643, 646 (1st Dep't 1955) ....................................................................21

*Harlow v. Fitzgerald,*

    457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982).................................................4, 5

*Hobbs v. Imus,*

    266 A.D.2d, 36, 698 N.Y.S.2d 25.........................................................................32

*Huggins v. Povitch,*

    1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) ....................34, 35

*Immuno AG. v. Moor-Jankowski,*

    77 N.Y.2d 235, 254, 66 N.Y.S.2d 906, 917 (1991)..........................................33, 34

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.,*

    981 F. Supp. 124, 125, 128 (E.D.N.Y. 1997) ......................................................36

*In re Grand Jury Proceedings,*

    5 F. Supp. 2d 21, 25–26 (D.D.C. 1998)...............................................................18

*Jeffreys v. City of New York*,

    426 F.3d 549 (2d Cir. 2005) ...............................................................................3

*Kane v. Orange Cty. Publ'ns,*

    232 A.D.2d 526, 527, (App. Div. 2nd Dept. 1996*)* ............................................30

*Kforce, Inc. v. Alden Personnel, Inc.,*

    288 F.Supp.2d 513, 517 (S.D.N.Y. 2003) ..............................................22

*Klayman v. Obama,*

    125 F.Supp.3d 67, 86 (D.D.C. 2015) ..................................................12

*Knight v. U.S. Fire Ins. Co.,*

    804 F.2d 9, 12 (2d Cir. 1986) ...........................................................3

*Lang Sang v. Ming Hai,*

    951 F. Supp. 2d 504, 525 (S.D.N.Y. 2013) .........................................26

*Laughlin v. Garnett,*

    138 F.2d 931 (D.C. Cir. 1943) ...........................................................7

*Laughlin v. Rosenman,*

    163 F.2d 838 (D.C. Cir. 1947) ...........................................................7

*Lerman v Flynt Distrib. Co., Inc.,*

    745 F2d 123, 136-137 [2d Cir 1984] ..................................................20

*Liberman v. Gelstein,*

    80 N.Y.2d 429, 435 (1992) ..........................................................21, 25

*Mahoney v. Adirondack Pub. Co.,*

    71 N.Y.2d 31, 37 (1987) ..................................................................36

*Masson v. New Yorker Magazine, Inc.,*

    501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991)....................20

*Mandelblatt v. Perelman,*

    683 F. Supp. 379, 383 (S.D.N.Y. 1988) ..............................................28

*Matherson v. Marchello,*

    100 A.D.2d 233, 473 N.Y.S.2d 998 (2d Dept. 1984). ..............................26

*McDougal v Fox News Network, LLC,*

    No. 1:19-CV-11161 (MKV), 2020 WL 5731954 [S.D.N.Y. Sept. 24, 2020]). ....................20

*Mencher v. Chesley,*

    85 N.Y.S.2d 431 (N.Y. Sup. Ct. 1948) ...................................................................30

*Mitchell v. Forsyth,*

    472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985)....................................................4

*Morsette v. "The Final Call,*

    309 A.D.2d 249, 254 (1st Dep't 2003) ...................................................................36

*Moss v. Stockard,*

    580 A.2d 1011 (D.C. 1990*)* ...................................................................................15

*Murphy v. Cadillac Rubber & Plastics, Inc.,*

    946 F. Supp. 1108, 1124 (W.D.N.Y. 1996)...........................................................25

*New York Times Co. v. Sullivan,*

    376 U.S. 254, 280, 84 S. Ct. 710 (1964 ................................................................19

*Nixon v. Fitzgerald,*

    457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982)................1, 3, 4, 5, 9, 10, 11, 12, 17, 18, 19

*Papagianakis v. The Samos,*

    186 F.2d 257 (4th Cir. 1950) .................................................................................7

*Perez v Violence Intervention Program,*

    116 AD3d 601, 601, 984 N.Y.S.2d 348 [1st Dept 2014] .......................................20

*Pierson v. Ray,*

    386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967)................................................4, 10

*Present v. Avon Products, Inc.,*

    253 A.D.2d 183, 189 (1ˢᵗ Dep't 1999) ..................................................................36

*Preston v. Hobbs,*

    146 N.Y.S. 419 (1st Dep't 1914) ........................................................................30

*Project Veritas v. NY Times citing Prozeralik v Capital Cities Communications, Inc,*

    82 NY2d 466, 474 [1993] ...................................................................................19

*Prozeralik v. Capital Cities Commc'ns, Inc,*

    82 N.Y.2d 466, 479-80 (1993) ...........................................................................36

*Puranmalka v. Puranmalka,*

    39 N.Y.S.2d 802, 803 (N.Y. App. Div. 1989) ....................................................28

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*

    813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ..................................................22, 25

*Rankin v. McPherson,*

    483 U.S. 378, 387 (1987) ....................................................................................17

*Rappaport v. VV Pub. Corp.,*

    618 N.Y.S.2d 746, 751 (Sup. Ct., New York Cty. 1994) ....................................34

*Reynolds v. Pegler,*

    223 F.2d 429, 432 (2d Cir. 1955) .......................................................................30

*Rickerson v. Porsch,*

    2019 NY Slip Op 50369(U), 63 Misc. 3d 1204(A), 114 N.Y.S.3d 184 (Sup. Ct.). ..............22

*Robertson v. Doe,*

    2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ..........................................36

*Robertson v. Dowbenko,*

    443 F. App'x 659 (2d Cir. 2011) ..................................................................36, 37

*Rufeh v. Schwartz,*

    50 A.D.3d 1002, 1004-05 (2d Dep't 2008) .........................................................21

*Scott v. Harris,*

> 550 U.S. 372, 380 (2007)...................................................................................3

*Sharratt v. Hickey,*

> 20 A.D.3d 734, 736 (3d Dep't 2005)..................................................................27

*Shenkman v. O'Malley,*

> 157 N.Y.S.2d 290, 297-98 (1st Dep't 1956)......................................................30

*Siegel v. Metropolitan Life Ins. Co.,*

> 32 N.Y.S.2d 658 (1st Dep't 1942)......................................................................30

*Sleepy's LLC v Select Comfort Wholesale Corp.,*

> 779 F3d 191, 199 (2d Cir 2015) ............................................................28, 29, 30

*Snyder v. Phelps,*

> 562 U.S. 443, 453 (2011)....................................................................................17

*Spalding v. Vilas,*

> 161 U.S. 483, 16 S.Ct. 631 (1896)....................................................................6, 7

*Standard Nut Margarine Co. v. Mellon,*

> 72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) ...............................7

*Steinhilber v. Alphonse,*

> 68 N.Y.2d at 286, 508 N.Y.S.2d at 901 .......................................................32, 33

*Stepanov v. Dow Jones & Co.,*

> 987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014) ........................................................19

*Stern v. Cosby,*

> 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) .......................................................21

*Tacopina v. Kerick,*

> 14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016)...................21, 22

*Taylor v. Glotfelty,*

    201 F.2d 51 (6th Cir. 1952) ....................................................................................7

*Teichner v. Bellan,*

    181 N.Y.S.2d 842, 846 (App. Div. 1959)...............................................................28

*Torain v. Liu,*

    279 Fed. App'x 46, 47 (2d Cir. 2008)..............................................................33, 34

*Trump v. Hawaii,*

    138 S. Ct. 2392, 2417–18 (2018)...........................................................................17

*Trump v. Mazars USA, LLP,*

    140 S.Ct. 2019, 2034 (2020)..................................................................................18

*Trump v. Vance,*

    140 S. Ct. 2412, 2425 ....................................................................................10, 13

*Van-Go Transp. Co. Inc. v. New York City Board of Education,*

    971 F. Supp. 90, 98 (E.D.N.Y. 1997) ...................................................................22

*Weiner v. Doubleday & Co.,*

    142 A.D.2d 100, 105 (1st Dep't 1988) ..................................................................35

*Weinstock v. Columbia Univ.,*

    224 F.3d 33, 41 (2d Cir. 2000). ...............................................................................2

*Wilson v. Libby,*

    535 F.3d 697 (D.C. Cir. 2008)...............................................................................14

*Wuterich v. Murtha,*

    562 F.3d 375 (D.C. Cir. 2009) .........................................................................14, 32

*Yaselli v. Goff,*

    12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927)...........................................7

*Zellner v. Summerlin,*

    494 F.3d 344, 371 (2d Cir. 2007) ............................................................................3

*Zerman v. Sullivan & Cromwell,*

    677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) ...........................................................34

**Statutes and Rules**

Fed. R. Civ. P. 56 (c)(2)..........................................................................................2

Restatement (Second) of Torts, § 583..................................................................28

Restatement (Second) of Torts § 892...................................................................28

Restatement (Second) of Torts § 594...................................................................30

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion for summary judgment against the plaintiff, E. Jean Carroll ("Plaintiff"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

At the heart of this case lies a singular question of paramount importance: should a sitting President have the right to address the public on matters of grave national importance without fear of being dragged into harassing and burdensome lawsuits? The answer to this question will reverberate well beyond the instant dispute.

This action, which sounds in a single claim for defamation, seeks to impute civil liability upon Donald J. Trump, then-sitting President of the United States, for statements he made in response to Plaintiff's serious accusations which had ignited a media frenzy and threatened to cast a shadow upon his moral standing. President Trump issued the challenged statements as a necessary measure to maintain the public's trust and assure the American people that the heinous allegations were not true. This scenario perfectly illustrates how the President is an "easily identifiable target for suits to civil damages" and why there "exists the greatest public interest" in providing [the President] 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Nixon v. Fitzgerald,* 457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982). Indeed, "because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and would be "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 751-52. Thus, given the vital considerations at stake, there is no question that Plaintiff's run-of-the-mill defamation suit does not merit upending

decades of Supreme Court precedent which has consistently emphasized the monumental importance of endowing the President with absolute immunity for his official conduct.

Even setting aside the question of absolute immunity, Plaintiff's defamation claim is deficient as a matter of law and this Court should grant summary judgment in Defendant's favor for three additional reasons. *First*, the alleged defamatory statements were not targeted towards Plaintiff's professional competence and, therefore, are not defamatory *per se*. Since Plaintiff has also failed to substantiate any entitlement to special damages, her defamation claim fails as a matter of law because she has failed to establish any form of cognizable damages. *Second,* Plaintiff intentionally solicited the allegedly defamatory statements by levying heinous (and false) allegations against a sitting President, in a profoundly public manner, thereby necessitating him to issue a public denial. *Third*, the majority of Defendant's statements do not even qualify as defamation in a substantive respect, but instead are largely comprised of non-actionable opinion.

Therefore, this Court should grant summary judgment in Defendant's favor.

## STATEMENT OF FACTS

Pursuant to Local Civil Rule 56.1, the uncontested material facts relevant to this motion are set forth in Defendant's Statement of Uncontested Facts ("DSOF").

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to isolate and terminate claims that are factually unsupported so as to avoid costly and unnecessary trials. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). As such, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). In that regard, a particular fact will be deemed "material" only if

its existence or non-existence would "affect the outcome of the suit under governing law." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation and internal quotations omitted). Likewise, an issue will only be considered "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 148 (citation and internal quotations omitted). Thus, for factual issues to be considered genuine, they must have a real basis in the record. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). "The requirement of detecting a genuine issue of fact finds substance in the principle that despite some evidence in opposition to a summary judgment motion, if 'no reasonable jury could have believed' the opponent's version of the events, summary judgment is appropriate." *Cruz v. Reiner*, 11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1775 (2007)).

In order to withstand a motion for summary judgment, the plaintiff must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with specific and admissible evidence showing a genuine issue for trial on each element of her claim. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## ARGUMENT

### I.     ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFAMATION CLAIM

It is blackletter law that a President is "entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749. This wide-spanning, unqualified immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.; see also Mitchell v.*

*Forsyth,* 472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability."). It is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision making from second guessing by the courts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or adjudicative functions, and the President); *Mitchell*, 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Presidential immunity serves a vital function for the office of the presidency. Since the President is an "easily identifiable target for suits for civil damages" due to the "visibility of his office and the effect of his actions on countless people," there "exists the greatest public interest in providing [him] 'the maximum ability to deal fearlessly and impartially with' the duties of his office," *Nixon*, 457 U.S. at 751. Indeed, this protection benefits not only the President, but the nation as a whole, since "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and "could distract a President from his public duties." *Id.* at 752. By granting immunity for a President's official acts, he is able to function with "bold and unhesitating action." *Id.* at 744–45; *see also Pierson v. Ray,* 386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials).

Presidential immunity is rooted in the historical doctrine of absolute immunity, which recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727 (1982) (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)). As the doctrine has evolved over time, the Supreme Court has emphasized that the policy considerations underlying absolute immunity apply with special force to the President, who is the quintessential official "whose special functions or constitutional status requires complete protection from suit." *Harlow*, 457 U.S. 800 at 807. Thus, the Supreme Court has broadly applied absolute immunity to foreclose civil suits against the President in his individual capacity and has clarified that the protection extends to any and all "acts within the 'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 755; *see also Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997) ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

### A.  The Evolution of Absolute Immunity Pre-*Nixon*

As early as 1871, in *Bradley v. Fisher*, 80 U.S. 335, 20 L. Ed. 646 (1871), the Supreme Court recognized that public policy considerations weighed in favor of providing absolute immunity to public officials for actions taken within the scope of their official duties. In *Bradley*, a trial judge had disbarred an attorney who represented an alleged co-conspirator in the plot to assassinate President Lincoln. *Id.* at 342. The attorney sued the judge in question, arguing that the disbarment was malicious. *Id*. The Supreme Court, however, held that the judge was absolutely immune from civil suit for his judicial acts "even when such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly." *Id*. at 357. The *Bradley* court drew

on English common law and reasoned that that absolute immunity was needed to safeguard judicial independence and stated that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. *Id*. at 347. The *Bradley* court found it imperative to protect sincere judges from "vexatious actions." *Id*. at 349.

The Supreme Court extended the newly-minted doctrine of absolute immunity to federal executive officers in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631 (1896), where the Supreme Court addressed the question of whether a court could adjudicate a civil claim based on the allegedly malicious acts of an executive official. Relying upon *Bradley,* the Court found that "the allegation of malicious or corrupt motives could always be made, and, if the motives could be inquired into, judges would be subjected to the same vexatious litigation upon such allegation, whether the motives had or had not any real existence." *Spalding*, 161 U.S. at 494, 16 S.Ct. at 635. The Court also noted that this limitation on liability, and the justifications for it, "has a deep root in the common law [and] is to be found in the earliest judicial records, and it has been steadily maintained by an undisputed current of decisions in the English courts, amidst every change of policy, and through every revolution of their government." *Id*. at 494. Applying these same standards to the facts before it, the Supreme Court held that:

> the same general consideration of public policy and convenience which demand for judges . . . immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions apply, to a large extent, to [the heads of executive departments] when engaged in the discharge of duties imposed upon them by law . . . In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of government, if he were subjected to any such restraint.

*Id*. at 498.

A litany of cases would follow *Spalding*, wherein federal courts continued to expand the doctrine of absolute immunity to encompass a wide range of federal officials. *See, e.g.*, *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927) (special assistant to the Attorney General); *Standard Nut Margarine Co. v. Mellon*, 72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) (Treasury Secretary); *Cooper v. O'Connor*, 99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) (F.B.I. agent, Comptroller of the Currency); *Laughlin v. Garnett*, 138 F.2d 931 (D.C. Cir. 1943), cert. denied, 322 U.S. 738 (1944) (United States Attorney); *Laughlin v. Rosenman*, 163 F.2d 838 (D.C. Cir. 1947) (Special Counsel to the President); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950) (Attorney General); *Papagianakis v. The Samos*, 186 F.2d 257 (4th Cir. 1950), cer. denied, 341 U.S. 921 (1951) (immigration officer); *Taylor v. Glotfelty*, 201 F.2d 51 (6th Cir. 1952) (prison psychiatrist); *Camp v. Recreation Bd*., 104 F. Supp. 10 (D.D.C. 1952) (Interior Secretary).

Subsequently, in *Barr v. Matteo*, the Supreme Court recognized that the doctrine of absolute immunity encompasses an absolute privilege for federal executive officials who publish defamatory statements in the performance of their official duties. There, two employees of the Federal Office of Rent Stabilization sued the agency's Acting Director in relation to the publication of a press release in which he promised to suspend the employees for promoting an unpopular budget plan. *Barr v. Matteo*, 360 U.S. 564, 79 S. Ct. 1335 (1959). The former employees contended that the director's press release contained defamatory statements. *Id.* at 568. However, the Supreme Court ruled that the director was protected by absolute privilege when he issued the press release and dismissed the employees' claims, reasoning that communicating with the media by disseminating the press release "was an appropriate exercise of the discretion which an officer of

that rank must possess if the public service is to function effectively." *Id*. at 575. The Court went on to emphasize that "***[i]t would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty***." *Id.* (emphasis supplied).

In coming to this holding, the Supreme Court established the seminal rule that federal officials are absolutely immune from damages taken for actions taken within the "outer perimeter" of their duties. *Id*. The Supreme Court was well aware of the wide applicability of this standard, but explained that "the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted the relation of the act complained of to "matters committed by law to his control or supervision." *Id*. at 573 (internal citations omitted).

Importantly, the *Barr* Court refused to consider the plaintiffs' argument that the defendant had acted with malice, noting that "the claim of an unworthy purpose does not defeat the privilege." *Id*. at 575. The *Barr* Court acknowledged that conferring an absolute privilege may lead to "occasional instances of actual injustice," but reasoned that such a price is "a necessary one to pay for the greater good." *Id*. at 576. In coming to this conclusion, the Court weighed the competing public policy considerations at play:

> [O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or illfounded damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr*, 360 U.S. at 565, 79 S.Ct. 1335. The Supreme Court ultimately determined that shielding public officers from civil liability was the more compelling need, reasoning that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id.* at 572

**B.** ***Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity**

Relying on the above holdings, the Supreme Court, in *Nixon v. Fitzgerald*, affirmed that the doctrine of absolute immunity applies special force to the office of the presidency.

In *Nixon*, a government whistleblower attempted to sue President Nixon for wrongful termination, claiming that Nixon had unlawfully fired him in retaliation for damaging testimony that he had given before an oversight committee. The Supreme Court flatly rejected the contention that President Nixon could be subject to civil liability for his decision to terminate the whistleblower, and affirmed, in a sweeping decision, that "a former President of the United States is entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749. The Supreme Court recognized that this immunity—"presidential immunity"—is a "functionally mandated incident of the President's unique office," *id.*, which extends beyond the mere 'functional' immunity afforded to other federal officials such as judges, prosecutors, etc., *id.* at 755. Given the "special nature of the President's constitutional office and functions," the Supreme Court found it appropriate to define the scope of presidential immunity as encompassing any and all "acts within the '***outer perimeter'*** of [the President's] official responsibility," *id.* at 756 (emphasis added); *see also Clinton*, 520 U.S. at 694, 117 S.Ct. 1636 ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

Throughout the *Nixon* decision, the Supreme Court continually emphasized the indispensable nature of presidential immunity, noting that, without it, a President's ability to effectively serve his country would be severely hindered. The Supreme Court observed:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government. As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at 554, 87 S.Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753; *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (noting that the President's duties "are of unrivaled gravity and breadth."). In short, the Supreme Court acknowledged that, since the President's duties "must necessarily include[] the power to perform them without any obstruction or impediment whatsoever," it follows that "the President . . . must be deemed, in civil cases at least, to possess an official inviolability." *Nixon*, 457 U.S. at 776-77, 102 S.Ct. at 2701.

The Supreme Court was again asked to explore the contours of presidential immunity in *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636. In *Clinton*, an individual filed suit against President Clinton after she publicly accused him of sexual misconduct before he took office. *Id.* at 685. Unlike the case at bar, however, all of three claims under review by the Supreme Court arose from President Clinton's conduct *before* he was in office. *Id.* Due to this distinguishable factor, the *Clinton* court found that those causes of action were unrelated to any of his official duties as

President. *Id.* at 710. The *Clinton* court, however, took occasion to recognize the "high respect that is owed to the office of the Chief Executive," *id.* at 707, and to acknowledge that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Id.* at 697.

Notably, the underlying case in *Clinton* had involved a fourth defamation claim which did arise during President Clinton's time in office when he publicly responded to the plaintiff's allegations of misconduct. Although this claim was not at issue before the Supreme Court, the Court expressly noted that the claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities," thereby qualifying it for presidential immunity.

### C. The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President.

A thorough analysis of decades of case law leaves little room for doubt – a President is entitled to wide-ranging immunity for conduct that occurs within the "outer perimeter" of his official responsibilities. *Nixon*, 457 U.S. at 749.

Thus, as established in *Nixon*, in determining whether a President should be afforded absolute immunity, the relevant inquiry is whether the liability in a civil lawsuit is "predicated on [the President's] official acts." *Nixon,* 457 U.S. at 749.  A President's "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id.* at 756; *see also Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties"); *Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.").

The test is an objective one – it focused on the nature of the act in question, not the motive underlying it. *Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). Indeed, presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997)); even "***alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority***." *Nixon*, 457 U.S. at 757 (emphasis added). Thus, inquiry into the subjective motive or intent underlying the President's alleged conduct is simply improper. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.").[1]

The broad interpretation of this test is justified by historical tradition and functional considerations that are grounded in the President's "unique position in the constitutional scheme." *Nixon,* 457 U.S. at 749. The President must be immune from constant judicial scrutiny so that he may concentrate on the task of governing. *Id*. at 750 n.31. The passage of time has only intensified these concerns; the President holds "supervisory and policy responsibilities of utmost discretion and sensitivity," *id*. at 750, concerning "matters likely to arouse the most intense feelings[.]" *Id*. at 752. The President's prominence makes him "an easily identifiable target," yet the public interest demands that he be able "to deal fearlessly and impartially with the duties of his office." *Id*. at 752-53. Presidential immunity guards against "this personal vulnerability," *Id*. at 753, not just for his "particular functions," but for his official responsibilities more generally[.] *Id*. at 755-56.

[1] Plaintiff recently conceded this point in an appellate brief filed with the D.C. Court of Appeals, acknowledging that "absolute immunity . . . ***precludes any consideration of motive***." *See* Habba Dec., Ex. E, *Carroll v. Trump*, D.C. Court of Appeals, 22-SP-0745 (2022), App. Br. at 46.

**A374**

Further, the "outer perimeter" analysis must be viewed in the context of the President's wide-ranging duties. The Supreme Court has consistently acknowledged that the President's responsibilities are "of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that "[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear," *Clinton*, 520 U.S. at 698. In other words, considering the vastness and importance of his duties, and the multitude of functions he performs, it can be said that the President "never adjourns." *Id.* at 713 (Breyer. J., concurring in judgment).

One of those functions must include the President's ability to address matters of national concern and defend himself from grave accusations that impugn his character. Indeed, a well-established body of case law demonstrates that lower officials, who are not tasked with the same constitutional protections enjoyed by the President, have been found to have acted within the outer perimeter of their official responsibilities when speaking to the press.

Even under the narrower *respondeat superior* test applied in Westfall Act cases,[2] courts have consistently found that statements to the press, even when they involve personal matters, fall within the scope of an elected official's responsibilities. In *Council on American-Islamic Relations v. Ballenger*—a case the Second Circuit has described as "directly on point" with respect to the facts *sub judice*, *Carroll v. Trump*, 49 F.4th 759, 780 (2d Cir. 2022)—the Council on American-Islamic Relations sued congressman Ballenger for calling it the "fundraising arm for Hezbollah." *CAIR v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006). In applying the narrower scope-of-

---

[2] Although this Court previously found that Defendant's statements were not within the scope of employment for the purposes of the Westfall Act, it also acknowledged that absolute immunity is applied more broadly than the traditional scope of employment test. *Carroll v. Trump*, 498 F.Supp.3d 422, 456 (S.D.N.Y. 2020), *revd in part, vacated in part,* 49 F.4th 759 (2d Cir. 2022) ("[E]ven if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not enough under the District of Columbia's scope of employment doctrine.").

13

employment test, the D.C. Circuit found that the congressman's acted within the scope of his duties in making the allegedly defamatory statement when speaking to the press reasoning that "'"[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties'" because a "[m]ember's ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id*. at 664- 65. The D.C. Circuit identified "a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id*. at 665-66.

In a series of cases that followed, the D.C. Circuit applied the holding in *Ballenger* to similarly conclude that other high-ranking government officials were acting within the scope of their duties in similar dealings with the press. *See, e.g. Wuterich v. Murtha,* 562 F.3d 375 (D.C. Cir. 2009) (holding that congressman acted within the scope of his employment in disseminating a purportedly defamatory stated when responding to a question from a reporter; *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (finding that executive branch employees acted within the scope of their employment in "discredit[ing] public critics of the Executive Branch," even though the officials had acted in ways that were alleged to be unlawful and contrary to the national security of the United States.).

In a case that bears a striking resemblance to the matter *sub judice*, the D.C. Court of Appeals concluded that the Mayor of the District of Columbia acted within the scope of his duties when he allegedly issued defamatory statements to the media. *See District of Columbia v. Jones*, 919 A.2d 604, 608-09 (D.C. 2007). In *Jones,* after various news stations began to scrutinize the Mayor's fundraising activities, the Mayor placed his deputy chief of staff, Marc Jones on

administrative leave and then proceeded to terminate him. *Id*. at 606. During that time, the Mayor allegedly "made numerous remarks" to the media "placing primary responsibility" on the deputy chief of staff for any purported wrongdoing. *Id*. Shortly thereafter, Mr. Jones sued the Mayor for defamation, alleging that the Mayor's statements were "false and malicious" and that the allegations were made "to protect himself politically at the known expense of [Jones's] reputation, character, and integrity." *Id*.

The court in *Jones* proceeded to analyze whether it was appropriate to apply the doctrine of absolute immunity in that matter. Applying the absolute immunity test circumscribed in *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990), the court held that absolute immunity applies when the challenged conduct is (1) within the "outer perimeter" of official duties, and (2) the governmental function was "discretionary" rather than ministerial." *Id*. at 608 (citing *Moss,* 580 A.2d at 1020.) The court indicated that the test is rather expansive, finding that the court need only determine "whether the official acted 'in relation to matters committed by law to his control or supervision.'" *Id*. (*citing Moss*, 580 A.2d at 1020.).

Readily disposing of the first prong of that analysis, the court found that "*it cannot be questioned*" that responding to inquiries from the press fell within the "outer perimeter of the Mayor's official duties." *Jones*, 919 A.2d at 608 (quotation omitted). In coming to that conclusion, the *Jones* court relied on the principle set forth in *Ballenger* that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" The court explained that the allegedly defamatory statements concerned a mayoral staff member's activities "and the Mayor's own knowledge of and responsibility for those activities," and it is "certainly" the case that the Mayor's "official responsibilities" include "[i]nforming the public about the conduct of persons serving in the Office of the Mayor." *Id*.

The *Jones* court expressly rejected the plaintiff's contention that the statements fell outside the outer perimeter of the Mayor's duties because the underlying conduct he was discussing— allegations of improper fundraising—fell outside the scope of any official duties. As the Court explained, it is part of the Mayor's responsibilities to "account[] to the press and the public for the manner in which his staff conducted itself," regardless of whether the underlying conduct itself constituted part of the staff member's, or the Mayor's, official duties. *Jones*, 919 A.2d at 608 n.8.

Lastly, the court refused to inquire into the Mayor's motives in making the challenged statements, relying on a substantive body of law which specifically precludes this type of analysis. *Jones*, 919 A.2d at 610. The court cautioned that "[p]ermitting inquiry into the official's motives would defeat the very purpose of absolute immunity. A determined litigant could always assert an improper motive, and the official would be required to shoulder the burden of responding to discovery, and perhaps enduring a trial, to expose these motives." *Id*. at 611. The Court acknowledged that, in applying absolute immunity to such cases, it may result in personal injury that cannot be redressed, but ultimately concluded that such a "trade off" is necessary to "promote our mutual interest in in effective government." *Id*. (citing *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 292 (1977), "it is better to leave unredressed some defamations by officers acting out of malice or excess zeal, than to subject the conscientious to the constant dread of retaliation.").

Like in *Jones*, it cannot reasonably be questioned that the conduct at issue herein—namely, the communications made by Defendant to the press in response to the allegations raised by Plaintiff—fell squarely within the "outer perimeter" of Defendant's official duties as President. More than any other public official, the President "possesses an extraordinary power to speak to his fellow citizens," *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018), and is ubiquitous in the

public eye due to the "sheer prominence" of his position, *Nixon*, 457 at 753; *see also Clinton*, 520

U.S. at 698 ("[T]he Presidency concentrates executive authority "in a single head in whose choice

the whole Nation has a part, making him the focus of public hopes and expectations."); *CBS v.

FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot,

of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion

such appearances play a very basic role.").

　　Here, Defendant made the three alleged defamatory statements in direct response to

Plaintiff's allegations which impugned his character and, in turn, threatened his ability to

effectively govern the nation. As both the leader of the nation and head of the Executive Branch,

Defendant could not sit idly while a "media frenzy" erupted around allegations that attempted to

paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character,

the President had a duty to respond; at a minimum, this action was necessary to "maintain the

continued trust and respect of [his] constituents" and to "preserve his ability to carry out his []

responsibilities." *Ballenger*, 444 F.3d at 320 (internal quotations omitted); *see also*, *Barr*, 360 U.S.

at 575. ("It would be an unduly restrictive view of the scope of the duties of a policy-making

executive official to hold that a public statement of agency policy in respect to matters of wide

public interest and concern is not action in the line of duty."). Thus, it cannot be reasonably

disputed that Defendant's conduct was 'presidential' in nature because he was addressing an issue

of grave public concern that weighed on the character and competency of the leader of the nation.

*Snyder v. Phelps,* 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011) ("Speech deals with matters of

public concern when it can 'be fairly considered as relating to any matter of political, social, or

other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a

subject of general interest and of value and concern to the public.'"); *Rankin v. McPherson*, 483

U.S. 378, 387, 107 S. Ct. 2891, 2898 (1987)("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

Further, it bears repeating that the absolute immunity test is an *objective* one and inquiry into Defendant's subjective motive or intent in making the alleged defamatory statements is expressly prohibited. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). The only question is whether the objective nature of his conduct was within the scope of his official duties as President. This is undoubtedly the case. Defendant's statements were made in a White House press release in response to reporter's inquiries to the White House, and otherwise in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries. Simply stated, he was addressing an issue of national importance.

That Defendant himself was the subject of the accusations does not in any way diminish the level of public concern, nor does it remove it from the scope of his official responsibilities. In fact, due to their sheer prominence, it is commonly the case that the personal affairs of a President are a matter of public concern.  *See Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2034 (2020) (noting that because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs."); *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) (President Clinton's communications concerning how to respond to Monica Lewinsky affair were "in the President's performance of his official duties," because "the President does need to address personal matters in the context of his official decisions.").

Based on the foregoing, in accordance with long-established Supreme Court precedent, Defendant is entitled to "absolute immunity from damages liability" predicated on the statements he made to the media in response to the heinous allegations Plaintiff levied against him. *Nixon*, 457 U.S. at 749. Since such conduct was within the "'outer perimeter' of his official responsibility," the instant action must be dismissed in its entirety. *Id.* at 755.

## II.   PLAINTIFF's DEFAMATION CLAIM FAILS AS A MATTER OF LAW

Even setting aside the issue of absolute immunity, Plaintiff's defamation claim fails on a fundamental level since she has failed to establish a cognizable cause of action.

To state a claim for defamation under New York law, the plaintiff must allege "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 Fed.Appx. 8, 11 (2d Cir. 2018) (citing *Elias v. Rolling Stone LLC,* 872 F.3d 97, 104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.,* 987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014)).  In addition, as is the case here, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001) (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710 (1964)). "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Project Veritas v. N.Y. Times Co.,* 2021 NY Slip Op 31908(U) (Sup. Ct.).

### A.  Plaintiff Has Failed to Establish Cognizable Damages

In a defamation case, a plaintiff is required to prove that the defamation "either cause[d] special harm or constitute[s] defamation per se." *Peters v. Baldwin Union Free Sch. Dist*, 320 F.3d

164, 169 (2d Cir. 2003) (quoting *Dillon v. City of N.Y.*, 261 A.D.2d 34 (1st Dep't 1999)). Here, after the completion of fact discovery, Plaintiff has failed to establish any entitlement to damages whatsoever. Therefore, there is no genuine issue of material fact and Plaintiff's defamation claim fails as a matter of law.

> **i.    The Statements Do Not Constitute Defamation *Per Se*.**

The New York Court of Appeals has recognized four narrowly defined categories of statements which are considered to be defamatory *per se*, including statements: "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). In her Complaint, Plaintiff alleges that the statements fit within the second category because they "tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information." *See* Habba Dec., Exhibit A at ¶ 129. As discussed herein, Plaintiff's contention is misplaced.

"Determining whether a statement is defamatory per se is a question of law for the Court." *Stern v. Cosby*, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009). "To find that a statement qualifies as one that tends to injure another in his or her 'trade, business, or profession,' the statement must be made with reference to a matter of significance and importance for [the operation of the business], rather than a more general reflection upon the plaintiffs' character or qualities." *Rufeh v. Schwartz*, 50 A.D.3d 1002, 1004-05 (2d Dep't 2008) (citations omitted). "[W]ords [such] as 'cheat,' 'dishonest,' 'immoral' and many others, if *generally* applied are not slanderous per se, but become such if applied to the plaintiff's trade, business or profession" because "[i]t is not sufficient that [such words] tend to injure plaintiff in his business, they must have been spoken of him *in his*

*business.'*" *Gurtler v. Union Parts Mfg. Co., Inc.*, 285 A.D. 643, 646 (1st Dep't 1955) (emphasis

added). In other words, to qualify as defamation *per se*, the allegedly defamatory statement "must

be targeted at specific standards of performance that are *directly relevant* to the plaintiff's business

and must impute conduct that is 'of a kind incompatible with the proper conduct of the business,

trade, profession or office itself.'" *Tacopina v. Kerick*, 14-CV-749-LTS-FM, 2016 WL 1268268,

at *4 (S.D.N.Y. Mar. 31, 2016) (citing *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp,*

*LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011); *Van-Go Transp. Co. Inc. v. New York City Board*

*of Education*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997)).

Here, the alleged defamatory statements, which lack any correlation to Plaintiff's

professional capabilities, are not defamatory *per se*. The statements do not impugn, or even relate

to, any particular talent or ability needed to perform in Plaintiff's profession as a "writer and advice

columnist" *See* Habba Dec., Ex. A, at ¶ 55. Thus, the statements "do[] not, on [their] face, defame

[P]laintiff in her trade, business or profession." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

As outlined in the Complaint, the first alleged defamatory statements, the first statement,

made on June 21, 2019 (the "June 21 Statement"), states as follows:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at
> Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying
> to sell a new book—that **should** indicate her motivation. It **should** be sold in the
> fiction section.
>
> Shame on those who make up false stories of assault to try to get publicity for
> themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who
> falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it,
> particularly when there is zero evidence. Worse still for a dying publication to try
> to prop itself up by peddling fake news—it's an epidemic.
>
> Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No
> reports? No sales attendants around?? I would like to thank Bergdorf Goodman for
> confirming that they have no video footage of any such incident, because it never
> happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

*See* Habba Dec. Ex. A at ¶ 82. (emphasis added).

The second statement at issue, made on June 22, 2019 (the "June 22 Statement"), is

comprised of the following language:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

> You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.
>
> But here's a case, it's an absolute disgrace that she's allowed to do that.

*See* Habba Dec. Ex. A at ¶ 91.

The third and final statement, issued on June 24, 2019 (the "June 24 Statement"), provides as follows:

> I'll say with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?

*See* Habba Dec., Ex. A at ¶ 97.

Based on the contents of these statements, Defendant is entitled to summary judgment because the statements are incapable, as a matter of law, of the defamatory construction Plaintiff seeks to ascribe to them. Notably absent from the above statements is any language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a "writer and advice columnist," *Id*. at ¶ 55, much less one of "significance and importance," *Rufeh,* 50 A.D.3d at 1005. Even read in a light most favorable to Plaintiff, the statements are, at most, a general reflection upon her character or qualities, as they portray her as a dishonest individual who fabricated an account that "never happened." *Id*. at ¶ 82. Yet, it is well established that a "statement imputing . . . dishonesty to the plaintiff" may be construed as defamatory *per se* only if there is "some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the charge of incompetence or dishonesty to the particular profession or trade engaged in by plaintiff." *Van Lengen v. Parr,* 136 A.D.2d 964 (4th Dep't 1988). Since the alleged defamatory statements do not peculiarly relate to Plaintiff's occupation as a "writer and advice columnist." Habba Dec., Ex. A

**A385**

at ¶ 55, it cannot be said that they impute "conduct that is 'of a kind incompatible with the proper conduct" of her profession, *Tacopina*, 2016 WL 1268268 at *4.

Indeed, New York courts consistently find that these types of statements—which broadly refer to a person's dishonest nature—are insufficient to support a claim of defamation *per se*. *See, e.g., Davydov v. Youseffi*, 205 A.D.3d 881, 882 (1st Dep't 2022) ("While the plaintiff asserted in his affidavit that the defendant had called him a 'fraud' and that he 'operate[d] as a fake,' there are no allegations that these statements were specifically directed at the plaintiff in his professional capacity as a dentist."); *Pure Power Boot Camp*, LLC, 813 F. Supp. 2d at 551 (statements characterizing plaintiff as a "loose cannon" and a "liar" were not defamatory *per se* because the statements reflected personal characteristics rather than reflections of professional competence); *Ram v. Moritt*, 205 A.D. 516 (2d Dep't 1994) (finding that statements referring to the plaintiff, a doctor, as a "a 'liar,' a 'cheat,' and a 'debtor'" did not constitute defamation *per se* because they "did not address the plaintiff's professional status as a doctor[.]").

Plaintiff has failed to present any evidence to contrary, or otherwise substantiate how the statements could possibly be construed as defamation *per se*. Accordingly, Plaintiff has failed to establish defamation *per se* because her allegation that Defendant made a statement calling into question her general character and morality does not in any way reflect on her ability to perform in a professional capacity, or otherwise "injure [her] in [] her trade, business or profession." *Liberman*, 80 N.Y.2d at 435.

**ii.       Plaintiff's Cannot Establish Her Entitlement to Special Damages.**

Where, as here, the defamation alleged does not fall into one of the *per se* categories, the plaintiff must establish entitlement to special damages. *Mable Assets, LLC v. Rachmanov*, 192 A.D.3d 998, 1001 (2d Dep't 2021) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 434-435 (1992)).

To adequately plead special damages, a plaintiff must claim "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179 (2d Cir. 2010) (citation and internal quotation marks omitted). The special harm must be "alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts." *Cambridge Assoc. v. Inland Vale Farm Co.*, 116 A.D.2d 684, 686 (2d Dep't 1986); *see also Franklin v. Daily Holdings*, 135 A.D.3d 87, 93 (1st Dep't 2015) ("Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation."). "The particularity requirement is strictly applied, as courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai v. Cayre Group, Ltd.*, 726 F.Supp.2d 323, 330 (S.D.N.Y. 2010). Further, the requirement that special damages be pleaded with particularity flows not only from state law, but from the Federal Rules as well, which require that special damages be "specifically stated." Fed. R. Civ. P. 9(g). Accordingly, a plaintiff's failure to plead special damages with sufficient precision, in and of itself, warrants dismissal of a cause of action. *See Franklin*, 135 A.D.3d at 92.

In the instant matter, Plaintiff has failed to plead, substantiate, or otherwise prove her entitlement to special damages. From the outset, the bare allegations of harm plead in the Complaint fell remarkably short of the stringent standard applied by New York courts to establish special damages. Plaintiff's sole allegation of special damages consists of the unquantified, non-itemized claim that Plaintiff has received "roughly 50% fewer letters than she received during the same period in 2018." *See* Habba Dec., Ex. A at ¶ 134. This unspecified allegation fails to meet the requisite degree of specificity required to survive on a summary judgment motion. This is

especially true where Plaintiff has failed to establish that any loss in readership was causally related to the alleged defamatory statements, nor identified a single reader she purportedly lost. *See*, *Lang Sang v. Ming Hai*, 951 F. Supp.2d 504, 525 (S.D.N.Y. 2013) ("The individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized."); *Drug Research. v. Curtis Pub.*, 7 N.Y.2d 435, 441 (1960)  ("[I]f the special damage was a loss of customers, the persons who ceased to be customers, or who refused to purchase, must be named."). Even more damning, Plaintiff freely admitted during her deposition that she never kept track of the amount of letters that she received *until she filed the instant lawsuit*. *See* Habba Dec., Ex. B at 230:20-24; 231:2-7 (When asked whether she kept track of the amount of letters she received, Ms. Carroll testified that "I never did until – until this happened ... before that, I would delete. You know, after that I deleted nothing . . .). Thus, her claim—advanced in her Complaint—that she had received "roughly 50%" less letters over the course of the prior year is positively groundless.

Likewise, Plaintiff's allegation that "Trump has injured the reputation on which she makes her livelihood and attracts readers" similarly fails. *See* Habba Dec. Ex. A at ¶ 133. In an attempt to quantify her damages, Plaintiff submitted an expert report authored by Professor Ashlee Humphreys, PhD. *See generally, id.*, Exhibit C (the "Report"). The Report, however, exclusively assesses "the damage to Ms. Carroll's *reputation* and person brand." *Id.* at 2 (emphasis added). In summarizing her findings, for instance, Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "*reputational value* has been diminished due to the Statements." *Id*. at 5 (emphasis added). The Report entirely misses the mark and fails to identify any actionable harm since special damages require "the loss

**A388**

of something having economic or pecuniary value," *Franklin*, 135 A.D.3d at 93, and do not include

damages for "impairment of reputation and standing in the community, personal humiliation, and

mental anguish and suffering," *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 179 (2d Cir. 2000)

(citation omitted); *see also Salomone v. MacMillan Pub. Co., Inc.*, 77 A.D.2d 501, 502 (1st Dep't

1980) (noting that plaintiff "pleads no special damage" where he "claims damages for loss of

reputation and for mental anguish."); *Sharratt v. Hickey*, 20 A.D.3d 734, 736 (3d Dep't 2005)

("General testimony regarding humiliation and loss of reputation in the community is insufficient

to prove special damages."); *Franklin*, 135 A.D.3d at 93 ("[A]lthough plaintiff states the ways in

which he believes his career was damaged as a result of the article, he fails to state more than a

round figure of $3,000,000 when alleging his damages, which is insufficient to state special

damages."); *Garland v. Vermilyea*, 88 A.D.2d 1044 (3d Dep't 1982) ("The allegation that plaintiff

'was required to expend large sums of money' does not allege special damages for it is of

insufficient particularity . . . as is the claim that plaintiff has been damaged in the round figure of

$1,000,000.") (citations omitted); *Jordan v. Tucker, Albin and Assoc., Inc.*, 3-CV-6863-JMA-SIL,

2017 WL 2223918, at *10 (E.D.N.Y. May 19, 2017) ("'Emotional distress, 'hurt feelings,'

'embarrassment,' or 'chagrin' do not constitute 'special damages.'") (citations omitted).

Thus, due to Plaintiff's failure to identify the "loss of something having economic or

pecuniary value" with the requisite degree of particularity, she is unable to establish a claim for

special damages. Since Plaintiff is also unable to maintain a claim for defamation *per se*, her

defamation claim fails as a matter of law based on the absence of cognizable damages.

**B. Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of the Statements.**

New York courts have long recognized that consent is a complete defense to actions for

defamation which is unaffected by the motives of the speaker. *See* Restatement (Second) of Torts,

§ 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."); *id.* (comment f) ("The protection given by it is complete, and it is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication."); *see also Teichner v. Bellan,* 7 A.D.2d 247, 251 (4th Dep't 1959) (describing consent as "an absolute immunity or an absolute privilege upon the defendant.").

A plaintiff expresses apparent consent to the alleged defamation where her "words or conduct are reasonably understood by another to be intended as consent." Restatement (Second) of Torts § 892. Even where the plaintiff "does not in fact agree" to publication of the defamatory statement, her "words or acts or even [her] inaction may manifest a consent that will justify the other in acting in reliance upon them." Restatement (Second) of Torts § 892 cmt. c (emphasis added). When apparent consent is given, it is "as effective as consent in fact." Restatement (Second) of Torts § 892.

Second Circuit precedent provides that, in certain circumstances, a plaintiff's intentional eliciting of a statement which she expects will be defamatory constitutes her consent to the making of the statement. In *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191 (2d Cir. 2015), the plaintiff, Sleepy's, sent hired personnel into Select Comfort stores posing as customers to determine whether salespeople were disparaging Plaintiff and its merchandise. *Id*. at 194. Plaintiff's secret shoppers then intentionally elicited the alleged defamation from Select Comfort salespeople, finding that they regularly disparaged plaintiff's products. *Id*. Upon further investigation, Select Comfort was able to present evidence showing that plaintiff instructed its secret shoppers to ask about differences between Sleepy's products and Select Comfort's products to determine whether Select Comfort was denigrating its products. *Id*. at 201. The Second Circuit

ultimately remanded this issue to the District Court to determine whether plaintiff's defamation

claims were barred by plaintiff's consent. *Id*. at 202.

The Second Circuit went on to explain that, in assessing whether a plaintiff consents to the

publication of an alleged defamatory statement, the "more evidence that supports the proposition

that the plaintiff elicited the statement with a high degree of certainty that it would be defamatory,

for the purpose of enabling a lawsuit, the stronger the defendant's case for deeming the statement

consented to, thus barring the claim." *Sleepy's LLC*, 779 F.3d at 199. Referencing the Restatement

the Second Circuit found that this type of elicitation by the plaintiff is tantamount to "*decoying the*

*defendant into a lawsuit*" and thus cannot sustain a valid cause of action for defamation." *Id.* at

199 (citing Restatement (Second) of Torts, § 584 (comment d)) (emphasis added).

Based on this principle, the Second Circuit remanded the case for the district court to make

findings as to whether the plaintiff was "motivated by a good faith attempt to learn whether" the

defendant was "carrying on a consistent pattern of slander, or [was] merely a ruse to decoy [the

defendant] into a lawsuit, along with the closely related question [of] what was the degree of [the

plaintiff's] confidence or certainty at the time of each inquiry that such a pattern of slander existed."

*Id.* at 201. On remand from the Second Circuit, the District Court found that:

> "In short, because the evidence shows that [plaintiff] Sleepy's was both virtually
> certain that its inquiry would elicit allegedly slanderous statements and
> substantially motivated by the desire to bolster a contemplated lawsuit, Sleepy's
> consented to the publication of these allegedly defamatory statements.

*Sleepy's LLC*, 133 F. Supp. 3d at 500.

Here, similarly, Plaintiff's pattern of conduct demonstrates that she sought to intentionally

elicit a denial from Defendant of her inflammatory allegations, in the hopes that any such retort

could serve as a basis for defamation lawsuit. By her own admission, Plaintiff purposefully chose

to publish her account in *New York Magazine* to garner as much attention as possible. Plaintiff

chose not to consider *Elle* because ""under Nina, *Elle* has been less into politics or news," Ms. Carroll said. "Nina's *Elle* is a fashion magazine. So I went with New York magazine, *which knows how to break news.*" *See* Habba Dec., Ex. D. at 3. Plaintiff also testified that she decided to move forward with *New York Magazine* because she believed that *Elle* would not run a full excerpt of the story and that "they would not have run anything close to what New York ran." *See* Habba Aff., Ex. B at tr. 190:15-25.

In addition, the timing of Plaintiff making her claims is highly indicative of an intentional effort to solicit the allegedly defamatory remarks from Defendant. Despite the fact that the incident purportedly happened in 1995, Plaintiff waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States. The suspect timing can only lead to one logical conclusion – she publicized her account to maximize the national attention her story would receive. As discussed at length *supra*, Defendant's prominent position as the head of the executive branch left him with no choice but to defend himself against these heinous accusations. *See Wuterich*, 562 F.3d at 384 ("[A] congressman's ability to do his job as a legislator effectively is tied . . . to [his] relationship with the public and . . . his constituents."); *see also Clinton*, 520 U.S. at 698 (noting that the President is "the focus of public hopes and expectations.").

In short, Plaintiff sought to drum up a national outcry in response to her narrative, she succeeded, and she cannot now claim that the statements were defamatory when she actively solicited them. Therefore, Plaintiff's defamation claim must fail because she consented to the publication of the allegedly defamatory statements.

**C. The Vast Majority of the Statements are Nonactionable Opinions.**

To the extent Plaintiff's defamation claim survives at all, nearly all of the content contained in the statements are immaterial since they constitute protected opinion speech.

It is well settled that "expressions of an opinion, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 286 (1986) (citations omitted) (emphasis added); *Hobbs v. Imus*, 266 A.D.2d 36, 37 (1999); *Doe v. French*, 458 F. App'x 21, 22 (2d Cir. 2012*)*. Opinions can only be actionable if they imply that the speaker knows certain facts which are detrimental to the plaintiff and false *Steinhilber,* 68 N.Y.2d at 289. The question of whether a statement is one of fact or opinion is a question of law to be determined by the Court. *Id*. Courts examine the following four factors when determining whether a statement is protected opinion: (1) whether the specific language in the statements has a precise meaning which is readily understood (i.e. the language is not indefinite, ambiguous, hyperbolic, or figurative); (2) whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication, including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.  *Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008); *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995); *Steinhilber*, 68 N.Y.2d at 292. Applying these four factors, the Court of Appeals has mandated against a "hypertechnical parsing" of written or spoken words "for the purpose of identifying possible facts that might form the basis of a sustainable [defamation] action." *Dworin*, 2008 WL 508019, at *4 (internal quotations omitted). Instead, courts are required to examine the overall context in which the statements were made and "determine whether the reasonable reader [or listener] would have believed that the challenged statements were conveying facts about the… plaintiff." *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991).

Further, under New York law, it has been repeatedly held that statements made that address another person's state of mind or motivations are constitutionally protected opinion speech that cannot form the basis for a defamation claim. *See e.g., Huggins v. Povitch*, 1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) (statements that address someone's state of mind or motivations "are speculation and are generally not readily verifiable" and cannot form the foundation for a defamation claim); *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (statement that plaintiff aimed to "set up" brokerage houses "is nothing more than speculation about . . . motivations" and, as such, is a "clear statement of opinion" which "does not support a claim for libel.").

In accordance with this principle, the courts have repeatedly dismissed defamation claims where the alleged defamatory statements constituted opinions about a plaintiff's state of mind or personal motivations. *See e.g. Dworin*, 2008 WL 508019, at *5 (statements made to New York Post that plaintiff was a "disgruntled ex-employee" threatening to sue was opinion not susceptible to objective verification); *Gentile v. Grand St. Med.*, 79 A.D.3d 1351, 1354 (statements that plaintiff's motives for bringing sexual harassment lawsuit were that she "[did] not want work" and "want[ed] to make easy money" could not form basis of defamation claim as they were "not capable of being proven true or false"); *Weiner v. Doubleday*, 142 A.D.2d 100, 105 (1st Dep't 1988) (dismissing defamation claim for calling plaintiff "ugly" because "there can be no action for libel based upon opinion, expressed in the form of epithets"), *aff'd*, 74 N.Y.2d 586 (1989).

In her Complaint, Plaintiff contends that various aspects of the alleged defamatory statements, aside from the general repudiation of Plaintiff's allegations, are defamatory for the following reasons: (1) Defendant lacked any factual basis for stating that Plaintiff had falsely accused other men of sexual assault; (2) Defendant knew it was false to state he both never met

her and had no idea who Plaintiff was; (3) she fabricated her claims to increase her books sales; and (4) she fabricated her claims as part of a conspiracy with the Democratic Party or in exchange for payment. *See* Habba Aff., Ex. A ¶¶ 116-117. Each of these purported statements, however, are no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false. No reasonable reader would find the challenged comments defamatory. At most, Defendant was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims. This is particularly true here, given that Defendant was merely defending himself, and the integrity of his office, by publicly denying Plaintiff's allegations of unlawful conduct. *See, e.g., Indep. Living Aids v. Maxi-Aids*, 981 F. Supp. 124 (E.D.N.Y. 1997) (defendant's statement that plaintiff was "a liar," in the context of responding to plaintiff's accusations, "can only be understood as a denial of [plaintiff's] accusations," and constituted "personal opinion and rhetorical hyperbole, rather than objective fact").

Thus, aside from Defendant's repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation.

## III.   THE EXTEME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED

Plaintiff has not established that she has a right to punitive damages which requires that the statements be made with "common law malice—that is, with a desire to harm plaintiff or reckless disregard for the injurious effect the [statement] would have upon [her]." *Mahoney v. Adirondack Pub. Co.*, 71 N.Y.2d 31, 37 (1987).  Common law malice "focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity." *Morsette v. "The Final Call"*, 309 A.D.2d 249, 254 (1st Dep't 2003) (quoting *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993)).  To prove common law malice,

the speaker must be "*solely* motivated by a desire to injure plaintiff, and there must be some evidence that the animus was the one and only cause for the publication." *Morsette*, 309 A.D.2d at 255 (emphasis in original) (internal citations omitted.); s*ee also Robertson v. Doe*, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ("Under New York law, only a finding that [defendant] 'was **solely motivated** by a desire to injure plaintiff' can establish common-law malice."), *aff'd sub nom.*

As discussed at length herein, Defendant made the statements in direct response to heinous allegations levied against him by Plaintiff. Thus, these statements could not have been "motivated by a desire to injure plaintiff," since they were strictly made in Defendant's own defense. *Morsette*, 309 A.D.2d at 255. Indeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity. *See Kane v. Orange Cty.,* 232 A.D.2d 526, 527 (2d Dept. 1996) ("response to unfavorable publicity against [the defendant is] covered by a qualified privilege"); *see also* Restatement (Second) of Torts § 594 cmt. k (1977) ("A conditional privilege exists . . . when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself . . . Thus the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar.").

Therefore, Plaintiff is not entitled to punitive damages as she has failed to show that Defendant's statements were at all motivated by a desire to injure Plaintiff, much less solely motivated by such a desire.

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendant, Donald J. Trump, respectfully submits that summary judgment should be granted in his favor.

Dated: December 22, 2022                              Respectfully submitted,

                                                    Alina Habba, Esq.
                                                    Michael T. Madaio, Esq.
                                                    Habba Madaio & Associates LLP
                                                    1430 US Highway 206, Suite 240
                                                    Bedminster, New Jersey 07921
                                                                -and-
                                                    112 West 34th Street, 17th & 18th Floors
                                                    New York, New York 10120
                                                    Telephone: (908) 869-1188
                                                    Facsimile: (908) 450-1881
                                                    E-mail: ahabba@habbalaw.com

                                                    *Attorneys for Defendant, Donald J. Trump*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>    *Plaintiff,*<br><br>  v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>    *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO**
**WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

   Pursuant to Local Civil Rule 56.1., defendant, Donald J. Trump ("Defendant"), submits the

following statement of material facts as to which there is no genuine issue to be tried.

**STATEMENT OF FACTS**

   1.  According to the Complaint, Plaintiff alleges that she encountered Defendant at the

Bergdorf Goodman Store located at 754 5th Ave, New York, NY 10019. Plaintiff is unable to

specify a date or time period when the events giving rise to this Complaint allegedly occurred,

other than "between the fall of 1995 and the spring of 1996." *Id.* Plaintiff was approximately 52

years old at the time that the purported incident occurred. *See* Declaration of Alina Habba, ("Habba

Dec."), Exhibit A at ¶ 22.

1

2. Plaintiff, an advice columnist, alleges that Defendant recognized her on sight as the "advice lady" and asked her to help him selected a present for a woman who was not present with him at the store. *Id*. at ¶¶ 24-26.

3. Plaintiff alleges that the two eventually proceeded to take the escalator to either the sixth or seventh floor, where the lingerie department was located. *Id*. at ¶¶ 29-30

4. Plaintiff alleges that the floor they visited was entirely abandoned, and there were no sales attendants on the floor. Once there, Defendant allegedly insisted that Plaintiff try on the bodysuit. Defendant then purportedly led Plaintiff by the arm to the dressing rooms. *Id*. at ¶¶ 31-35.

5. At this point, Plaintiff alleges that Defendant purportedly closed the door to of the dressing room, pushed her against a wall, and began kissing her without her consent. She then claims that she pushed Defendant away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her until she managed to push him off and flee the store. *Id*. at ¶¶ 36-42.

6. Plaintiff testifies that she only contemporaneously disclosed the details of this alleged attack to two of her friends: Lisa Birnbach and Carol Martin. After sharing her account of the purported attack, Plaintiff did not speak of it, or even so much as dwell on the incident, until Defendant was elected President in 2016. *Id*. at ¶¶ 43-52.

7. Thereafter, Plaintiff decided to reveal these allegations publicly against Appellant for the first time with the release of the book entitled: 'What Do You Need Men For?" in or around May of 2019.  *Id*. at ¶ 74.

8. Plaintiff made a conscious decision to issue an excerpt of her book to *New York Magazine* as opposed to *Elle*, the magazine that formerly published her *Ask E. Jean* advice column.

Publicly, she has proffered the following justification for this decision: "Under Nina, Elle has been less into politics or news . . . Nina's Elle is a fashion magazine. So I went with New York Magazine, which knows how to break news." *See id.*, Exhibit D at 3.

9.      Additionally, Plaintiff testified that she chose *New York Magazine* over *Elle* because she didn't "believe that [*Elle*] would have run anything close to what New York ran." *See Id*. Exhibit B at 190:15-25.

10.      Following these public allegations set forth in Appellee's book, Plaintiff's defamation claim arises out of three statements in June 2019 made directly in response to Plaintiff's allegations (the "Statements"). *See id*., Ex. A at ¶ 81.

11.      On June 21, 2019, a statement circulated by the Deputy White House Press Secretary to the press denied the accusation and Appellant stated:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.

> Shame on those people who make up false stories of assault to try to get publicly for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

> Ms. Carroll & New York Magazine. No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

> False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

> If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

*Id*. at ¶ 82.

12.    On June 22, 2019, Defendant made the following statement to the White House press:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me. But here's a case, it's an absolute disgrace that she's allowed to do that.

*Id.* at ¶ 91.

13.    On June 24, 2019, Defendant issued a third statement in response to Plaintiff's allegations against him: "I'll say with great respect: Number one, she's not my type. Number two, It never happened. It never happened, OK?" Id. at ¶ 97.

4

14.    Following Defendant's repudiation of Plaintiff's claims, Plaintiff filed the instant complaint. *See generally, id.*

15.    The Complaint alleges, among other things, that the above referenced statements issued by the President were defamatory per se and caused her to "suffer reputational, emotional, and professional harm. *Id.*

16.    Plaintiff alleges that the Statements caused her professional harm by causing "injury to her reputation, honor, and dignity." *Id.* at ¶ 132.

17.    In a meager attempt to quantify this damage, Plaintiff alleges that she "received roughly 50% fewer letters than she received during the same period in 2018." *Id.* at ¶ 134.

18.    Plaintiff when deposed, however, candidly admitted that she never kept track of the letters she received from Elle Readers until 2019, after the lawsuit was filed. *See id.*, Exhibit B at 230:20-24; 231:2-7.

19.    Plaintiff also produced the expert report of Professor Ashlee Humphries, PhD to assess the damages Plaintiff purportedly suffered as a result of the Statements. *See generally, id.*, Exhibit C (the "Report").

20.    Upon examination, the Report almost exclusively focuses on the purported harm Plaintiff has allegedly sustained to her "reputation and person brand." *Id.* at 2.

21.    Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short - and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "reputational value has been diminished due to the Statements." *Id.* at 5.

Dated: December 22, 2022                    Respectfully submitted,

_____
Alina Habba, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT DONALD J. TRUMP'S MOTION FOP SUMMARY JUDGMENT**

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 1

    A. Factual Background ..................................................................................... 1

    B. Procedural History ...................................................................................... 7

STANDARD OF REVIEW ...................................................................................... 10

ARGUMENT ........................................................................................................... 10

    I.    TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS 10

    A. Trump Waived Any Claim to Absolute Immunity ................................. 10

        1. Legal Standard ................................................................................. 10

        2. Trump Waived His Absolute Immunity Defense ............................. 12

        3. There is No Excuse for Trump's Waiver .......................................... 13

        4. Alternatively, The Law of the Case Rule Precludes Trump's Position .......... 16

    B. Trump's Absolute Immunity Defense is Meritless ............................... 16

        1. Absolute Immunity Is Subject to Important Limits ........................ 17

        2. Trump's Categorical Position Should Be Rejected ......................... 19

        3. Trump Lacks Absolute Immunity for his Defamatory Statements ......... 24

    II.    TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS ................................ 27

    A. Trump's Statements Constituted Defamation Per Se............................. 27

    B. Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements ........ 30

    C. Trump's Statements Are Actionable as a Matter of Law ....................... 32

    D. Carroll is Entitled to Present the Punitive Damages Issue to the Jury.................. 35

CONCLUSION......................................................................................................... 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allam v. Meyers,*
   906 F. Supp. 2d 274 (S.D.N.Y. 2012) ...................................................................... 35

*Am. Acad. of Religion v. Napolitano,*
   573 F.3d 115 (2d Cir. 2009) .................................................................................... 34

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 106 S. Ct. 2505 (1986) ................................................................... 10

*Aramony v. United Way of Am.,*
   254 F.3d 403 (2d Cir. 2001) .................................................................................... 16

*Armstrong v. Simon & Schuster, Inc.,*
   85 N.Y.2d 373 (1995) .............................................................................................. 29

*Aronson v. Wiersma,*
   65 N.Y.2d 592 (1985) .............................................................................................. 30

*Banneker Ventures LLC v. Graham,*
   798 F.3d 1119 (D.C. Cir. 2015) ............................................................................. 19

*Barrett v. Harrington,*
   130 F.3d 246 (6th Cir. 1997) .................................................................................. 21

*Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs,*
   41 F.3d 600 (10th Cir. 1994) .................................................................................. 11

*Broker Genius Inc. v. Gainor,*
   810 F. App'x 27 (2d Cir. 2020) .............................................................................. 15

*Buckley v. Fitzsimmons,*
   509 U.S. 259, 113 S. Ct. 2606 (1993) ................................................................... 21

*Butler v. Catinella,*
   868 N.Y.S.2d 101 (2d Dep't 2008) ........................................................................ 13

*Carroll v. Trump,*
   49 F.4th 759 (2d Cir. 2022) ......................................................................... 8, 9, 25

*Carroll v. Trump,*
   120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020) ................................................................. 7

*Carroll v. Trump,*
    498 F. Supp. 3d 422 (S.D.N.Y. 2020)......................................................... 8, 24, 25, 27

*Carroll v. Trump,*
    590 F. Supp. 3d 575 (S.D.N.Y. 2022)............................................................. 9, 14, 15

*Carroll v. Trump,*
    No. 20 Civ. 7311, 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) ....................... 14, 15

*Carroll v. Trump,*
    No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020) .................... 8, 16

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000)........................................................................... 27, 29

*Celotex Corp v. Catrett,*
    477 U.S. 317, 106 S. Ct. 2548 (1986)................................................................... 10

*Chestnut v. City of Lowell,*
    305 F.3d 18 (1st Cir. 2002) ................................................................................... 11

*Clinton v. Jones,*
    520 U.S. 681, 117 S. Ct. 1636 (1997).............................................................. *passim*

*Cozzo v. Tangipahoa Par. Council,*
    279 F.3d 273 (5th Cir. 2002) ................................................................................ 11

*Davis v. Boeheim,*
    24 N.Y.3d 262 (2014) ............................................................................... 32, 33, 34

*Davydov v. Youssefi,*
    169 N.Y.S.3d 322 (1st Dep't 2022) ................................................................ 29, 30

*Doe v. McMillan,*
    412 U.S. 306, 93 S. Ct. 2018 (1973)..................................................................... 22

*Dworin v. Deutsch,*
    No. 06 Civ. 13265, 2008 WL 508019 (S.D.N.Y. Feb. 22, 2008) ........................... 34

*Edwards v. Nat'l Audubon Soc., Inc.*,
    556 F.2d 113 (2d Cir. 1977)................................................................................... 29

*Firestone v. Berrios,*
    42 F. Supp. 3d 403 (E.D.N.Y. 2013) .................................................................... 16

*Francis v. Costco Wholesale Corp.*,
    No. 19 Civ. 1979, 2021 WL 1298616 (S.D.N.Y. Apr. 7, 2021)............................. 10

*Gasperini v. Ctr. for Humans., Inc.*,
518 U.S. 415, 116 S. Ct. 2211 (1996) ................................................................... 13

*Gentile v. Grand Street Medical Assocs.*,
79 A.D.3d 1351 (3d Dep't 2010) ........................................................................... 34

*Gong v. Savage*,
169 N.Y.S.3d 511 (Table) (N.Y. Sup. Ct. N.Y. Cty. 2022) .................................. 29

*Gross v. New York Times Co.*,
82 N.Y.2d 146 (1993) ........................................................................................... 33

*Gurtler v. Union Parts Mfg. Co., Inc.*,
285 A.D. 643 (1st Dep't 1955) .............................................................................. 30

*Hamer v. Neighborhood Hous. Servs. of Chicago*,
138 S. Ct. 13 (2017) .............................................................................................. 11

*Huggins v. Povitch*,
No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996) .......................... 34

*Hunter v. Bryant*,
502 U.S. 224, 112 S. Ct. 534 (1991) ..................................................................... 15

*Hutchinson v. Proxmire*,
443 U.S. 111, 99 S. Ct. 2675 (1979) ..................................................................... 21

*In re Stock Exchanges Options Trading Antitrust Litig.*,
317 F.3d 134 (2d Cir. 2003) .................................................................................. 11

*Jones v. Clinton*,
72 F.3d 1354 (8th Cir. 1996) ................................................................................ 24

*Joyce v. Thompson Wigdor & Gilly LLP*,
No. 06 Civ. 15315, 2008 WL 2329227 (S.D.N.Y. June 3, 2008) ........................... 33

*Levy v. Nissani*,
115 N.Y.S.3d 418 (2d Dep't 2020) ........................................................................ 29

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*,
397 F.3d 77 (2d Cir. 2005) .................................................................................... 16

*McNamee v. Clemens*,
762 F. Supp. 2d 584 (E.D.N.Y. 2011) ................................................................... 31

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1, 110 S. Ct. 2695 (1990) ....................................................................... 33

*Morales v. Kavulich & Assocs., P.C.*,
    294 F. Supp. 3d 193 (S.D.N.Y. 2018)......................................................... 35

*Nevada v. Hicks*,
    533 U.S. 353, 121 S. Ct. 2304 (2001) ....................................................... 12

*Nixon v. Fitzgerald*,
    457 U.S. 731, 102 S. Ct. 2690 (1982)............................................... *passim*

*Pfizer, Inc. v. Stryker Corp.*,
    348 F. Supp. 2d 131 (S.D.N.Y. 2004)....................................................... 31

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
    813 F. Supp. 2d 489 (S.D.N.Y. 2011).................................................. 29, 30

*Ram v. Moritt*,
    612 N.Y.S.2d 671 (2d Dep't 1994) ........................................................... 30

*Reynaga Hernandez v. Skinner*,
    969 F.3d 930 (9th Cir. 2020) .................................................................... 11

*Rose v. AmSouth Bank of Fla.*,
    391 F.3d 63 (2d Cir. 2004)........................................................................ 14

*Saks v. Franklin Covey Co.*,
    316 F.3d 337 (2d Cir. 2003)........................................................... 11, 13, 14

*Satchell v. Dilworth*,
    745 F.2d 781 (2d Cir. 1984)...................................................................... 11

*Shmueli v. City of New York*,
    424 F.3d 231 (2d Cir. 2005)................................................................ 10, 12

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
    779 F.3d 191 (2d Cir. 2015)...................................................................... 30

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
    No. 07 Civ. 4018, 2020 WL 1244930 (E.D.N.Y. Mar. 16, 2020) ............ 30

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
    762 F.3d 165 (2d Cir. 2014)...................................................................... 11

*Stern v. Cosby*,
    645 F. Supp. 2d 258 (S.D.N.Y. 2009)................................................... 27, 35

*Tacopina v. Kerick*,
    No. 14 Civ. 749, 2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) .............. 30

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ...................................................... 23, 24

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................... 19, 22

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) .................................................................. 7, 8, 17

*United States v. Burr*,
    25 F. Cas. 30 (C.C.D. Va. 1807) ........................................................... 17

*United States v. Stein*,
    473 F. Supp. 2d 597 (S.D.N.Y. 2007) ................................................... 34

*Zerman v. Sullivan & Cromwell*,
    677 F. Supp. 1316 (S.D.N.Y. 1988) ..................................................... 34

*Zervos v. Trump*,
    74 N.Y.S.3d 442 (N.Y. Sup. Ct. 2018) ............................................ 33, 34

*Zervos v. Trump*,
    171 A.D.3d 110 (1st Dep't 2019) ........................................................... 7

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1 ........................................................................ 21

U.S. Const. art. II, § 1 ................................................................................ 20

U.S. Const. art. II, § 1, cl. 8 ...................................................................... 20

U.S. Const. art. II, § 2, cl. 1 ...................................................................... 20

U.S. Const. art. II, § 2, cl. 2 ...................................................................... 20

U.S. Const. art. II, § 3 ................................................................................ 20

**Rules**

Fed. R. Civ. P. 8(c) ............................................................................. 10, 11

Fed. R. Civ. P. 15(a) .................................................................................. 11

Fed. R. Civ. P. 16(b)(4) .............................................................................. 11

Fed. R. Civ. P. 56(a) .................................................................................. 10

NY CPLR § 3211 .......................................................................................... 7

**Other Authorities**

Doris Kearns Goodwin, *The Bully Pulpit* (2013) .......................................................................... 22

James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The
    Debates in the Several State Conventions on the Adoption of the Federal Constitution 480
    (Jonathan Elliot ed., Washington, 2d ed. 1836) ........................................................................ 18

Jeffrey K. Tulis, *The Rhetorical Presidency* (1987) ...................................................................... 22

Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon, Teac*hing
    American History. ........................................................................................................................ 20

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit
    Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020) ............................................................. 8

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ................................................. 18

Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss, *Swalwell v.
    Trump*,
    No. 21 Civ. 586 (D.D.C. May 24, 2021) .................................................................................... 15

Mem. in Support of Mot. to Dismiss, *District of Columbia v. Trump*,
    No. 17 Civ. 1596 (D. Md. Sept. 29, 2017)................................................................................. 18

Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at*
    https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/............ 23, 26

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*,
    No. 20-197 (U.S. Aug. 20, 2020)................................................................................................ 18

Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection
    Isn't Impeachable*, Wash. Post (Jan 29, 2020)......................................................................... 20

Sand, et al., *Modern Federal Jury Instructions* (2022)................................................................ 34

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.)................................................. 16

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.) ..................................................... 11

## INTRODUCTION

Now that this defamation case is ready for trial after three years of litigation, Defendant Donald J. Trump seeks summary judgment based mainly on his argument that absolute immunity bars Plaintiff E. Jean Carroll's claim. But Trump has waived that affirmative defense: he did not assert it in his answer, he did not mention it at any point prior to the filing of this summary judgment motion, and he took positions in state court that were clearly at odds with it. As a result, Trump can raise absolute immunity at this late stage only in the absence of prejudice to Carroll, undue delay, bad faith or dilatory motive, or futility—and each of those considerations independently prohibits excusing his waiver. Trump's absolute immunity theory is also meritless: his personal attacks on Carroll did not constitute the performance of any presidential function.

This leaves only a handful of other arguments asserted by Trump, each of which lacks merit. First, as explained in Carroll's recent opposition to Trump's motion to dismiss in *Carroll v. Trump*, No. 22 Civ. 10016, ECF 26, Carroll was not required to plead special damages because Trump's statements were defamatory *per se*. Second, it goes without saying that Carroll did not "consent" to Trump's defamation—and it is frivolous to assert that when a woman reveals sexual abuse by a powerful man, she somehow automatically consents to whatever defamatory abuse he may unleash as retribution. Third, precedent confirms that Trump's highly specific factual claims about Carroll's motives for speaking up are actionable as a matter of law and do not qualify as speculative opinion. Finally, Carroll is surely entitled to ask a jury to impose punitive damages.

## BACKGROUND

### A.    Factual Background

More than 25 years ago, Carroll left work at a studio in New Jersey where she had taped her daily television show ("Ask E. Jean") and headed to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. *See* Plaintiff E. Jean Carroll's Response to Defendant

Donald J. Trump's Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 24. Carroll did not find what she was looking for and was about to leave the store empty-handed. *Id.* She approached the revolving door on 58th Street, where she saw Trump. *Id.* ¶¶ 24-25. ██████████████████ ██████ and had previously met at a party. *Id.* ¶ 22. When Trump saw Carroll at Bergdorf's, he "held up [his] hand," so she "stopped and he came in." *Id.* ¶ 25. He said: "Hey, you're that advice lady." Carroll replied: "Hey, you're that real estate tycoon." *Id.*

Trump told Carroll that he was at Bergdorf's to buy a present for a girl and asked her to "come help [him]." *Id.* ¶ 26. Trump and Carroll began searching for a gift. Eventually, on Trump's suggestion, they went upstairs to the lingerie department. *Id.* ¶ 27. When they arrived, it was empty. *Id.* ¶ 28. Sitting on the glass counter near them were "three or four boxes" and "a see-through [lilac-greyish] bodysuit with a little bit of lace on it." *Id.* ¶ 29. Trump picked up the bodysuit, tossed it at Carroll, and said "go put this on." *Id.* ¶ 30. Bemused, Carroll "tossed it back to him" and said to him "it goes with your eyes." *Id.* Trump caught the bodysuit, held it up to Carroll's chest, and said "you're in good shape, this looks like it might fit you." *Id.* ¶ 31. Carroll had assumed they were engaging in "an enjoyable repartee," but then Trump abruptly grabbed her arm and said, "let's go put this on." *Id.* ¶¶ 32-33. As he maneuvered her into a fitting room, Carroll thought to herself, "this is hilarious, I'm going to make him put it on over his pants." *Id.* ¶ 33.

Trump, as it turns out, had a very different plan in mind. As soon as Carroll walked into the dressing room, Trump closed the door and lunged at her. *Id.* ¶¶ 34-35. He pushed her against the wall; she hit her head for the first time before "he had his hands on [her] arms" and "pushed [her] back a second time." *Id.* ¶¶ 34, 37. She "hit [her] head [again] and then he put his shoulder into [her]." *Id.* ¶ 37. As Carroll struggled, she began to realize that "this [was] a battle." *Id.* He grabbed both of her arms, held his weight on her up against the wall, jammed his hand under her

dress, and forcibly pulled down her tights. *Id.* Carroll "tried to get [her] arms up to push him back" but she "couldn't get [her] knee up because the pantyhose had been taken down." *Id.* ¶ 38. Carroll "felt [Trump's] fingers rummaging around" her genitals, and then his penis inside her. *Id.* ¶ 39. Finally, Carroll managed to escape by "push[ing] him with [her] hands and knee." *Id.* ¶ 40.

Carroll ran out of the Bergdorf's and onto Fifth Avenue, scared that Trump would "come after" her and "grab [her] again." *Id.* ¶¶ 40-41. Once outside, Carroll immediately called her friend, Lisa Birnbach. *Id.* ¶¶ 42, 44. When Birnbach picked up the phone, Carroll was "very agitated, very hyperventilating. Emotional. And she told [Birnbach] about what happened to her just really moments before she made the phone call." *Id.* ¶ 43. In that moment, Carroll "was in shock and disordered." *Id.* ¶ 42. She "felt unbalanced." *Id.* Birnbach explained to Carroll that what happened to her was rape—and urged her to go the police. *Id.* ¶ 44. Carroll resisted and swore Birnbach to secrecy. *Id.* ¶ 45. A day or two after the rape, Carroll confided in another close friend, Carol Martin. *Id.* ¶ 46. When Carroll told Martin what had occurred, Martin warned Carroll against revealing the assault because Trump was a powerful man, "he's got 200 lawyers, he'll bury you." *Id.*

Apart from her conversations with Birnbach and Martin, Carroll remained silent about the sexual assault for two decades. *Id.* ¶ 47. She was "embarrassed" and "ashamed," so she "said let's never talk about this again." *Id.* She recalls, "I always feel I can handle things myself." *Id.* She knew that sexual assault was pervasive but feared that "women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked." *Id.* ¶ 49. Carroll's silence, though, concealed trauma. After Trump raped her, "the music had stopped" and her "light was gone." *Id.* ¶ 50. Carroll never had sex or dated again; she "had no desire for desire"—she did not "have the desire to want sex." *Id.*

Years later, when Trump announced he was running for President, Carroll watched with "disbelief" and "heartache." *Id.* ¶ 51. But she did not come forward at the time because her mother, a respected Republican politician in Indiana, was dying. *Id.* ¶ 52. She knew that if she spoke up, "it would ruin" her mother's last days. *Id.* It would also come to nothing: "I didn't want to get fired from *Elle* and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about." *Id.* ¶ 53. Moreover, Carroll was horrified that some of Trump's supporters seemed to admire him *more* as woman after woman revealed that he had sexually assaulted them. *Id.*

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with the men in their lives. *Id.* ¶ 54. On the first day of her trip, "the Harvey Weinstein story broke" and Carroll watched "the flood of stories … as women started standing up." *Id.* ¶¶ 55, 57. Her book began to take a different shape, and Carroll started to create a list of terrible men she had encountered in her own life. *Id.* ¶ 55 Inspired by the women of the #MeToo movement—and understanding the importance of being honest with loyal readers of her column—Carroll decided she had to include Trump. *Id.* ¶ 57. Carroll's book was ultimately published in 2019. In advance of its release, *New York Magazine* published an eight-page excerpt containing, among other things, her account of being raped by Trump. *Id.* ¶ 59.

Trump responded by seeking to punish and humiliate Carroll. He denied her accusation and insisted they had never met. *Id.* ¶¶ 11-13, 61. But he went much further than that. He insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too ugly for him to have raped her. *Id.* ¶ 13. He said that Carroll's non-fiction book, with its accounts of what women on her road trip had told her (as well as her own autobiographical account of the rape), "should be sold in the fiction section." *Id.* ¶ 11.

He accused Carroll of "mak[ing] up false stories of assault to try to get publicity for [herself], or to sell [her] book." *Id.* He charged that Carroll had invented an allegation of rape to make money. *Id.* ¶¶ 11-12 And he implied that she had falsely accused other men of sexual assault. *Id.* ¶ 12.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Trump's attacks directly targeted Carroll's professional life. Carroll is a journalist, author, and advice columnist who built her career providing honest advice to women in response to their

**A416**

questions *Id.* ¶ 81. Indeed, her "entire career as an advice columnist rested on the fact that [she] could be trusted." *Id.* ¶ 88. And her advice column had run in *Elle* for 26 years, where it "was one of the most popular columns ever in the magazine." *Id.* ¶ 81. As explained by Roberta Myers (*Elle*'s editor-in-chief for 17 years), Carroll was "a destination, meaning readers would want to hear from her. She was an important part of what kept [*Elle*] popular." *Id.* ¶ 84. Myers elaborated that Carroll "is a journalist first and everything that she writes is informed by that, meaning the facts." *Id.* ¶ 87. As Carroll explained at her own deposition, while she was not surprised that Trump denied raping her, she actually thought he would insist that because she had been flirtatious with him she had somehow consented to having sex with him in the dressing room that day. *Id.* ¶ 62. She was shocked that Trump instead stated that he had never met her and the incident had never happened at all—statements that he subsequently reaffirmed at his deposition. *Id.* ¶¶ 62, 64-65.

But President Trump's charge that she had lied about everything—about meeting him, about the rape itself, about her motives for coming forward—had devastating consequences. As she had feared, Carroll became viewed "as a woman who's untrustworthy," and "a woman who can't be believed." *Id.* ¶ 89. She also received fewer letters from readers—and then was unexpectedly fired from *Elle* before her contract was up for renewal. *Id.* ¶ 90. An expert analysis confirms that Trump's statements reached an immense audience and harmed Carroll's reputation and professional endeavors. *See id.* ¶ 91 (analyzing dissemination of the statements and concluding they generated between 142,334,424 and 188,155,507 impressions); *id.* ¶ 92 (completing quantitative impact analysis to determine number of readers and listeners likely to believe Trump's statements by publication, averaging 25.25%)]. In short, Trump's defamation "shook th[e] whole foundation" of the career that Carroll had painstakingly built for herself as an author and journalist over many years, and "that was it." *Id.* ¶ 89.

### B.    Procedural History

Carroll filed this action in New York state court in November 2019. From the start, Trump engaged in a pattern of bad faith and dilatory measures. He began by evading service of the complaint, forcing Carroll to seek leave to serve him through alternatives means. NYSCEF No. 15.[1] Once served, Trump filed a motion to dismiss under NY CPLR 3211 that presented only a single, frivolous ground for dismissal: lack of personal jurisdiction in New York. *See* NYSCEF Nos. 33. This motion was denied. *See Carroll v. Trump*, 120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020).

After Trump's initial evasions failed, he filed an answer raising nine affirmative defenses. NYSCEF No. 68. Eight of them concerned the merits of Carroll's defamation claim or personal jurisdiction over him in New York. *Id.* ¶¶ 148-55. The sole remaining affirmative defense asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." *Id.* ¶ 147 (emphasis added). Trump's affirmative defenses did not include any assertion that the Supremacy Clause or Article II rendered him absolutely immune from liability in this proceeding.

Trump subsequently relied on his Supremacy Clause defense in seeking a stay of the case pending a decision by the New York Court of Appeals in *Zervos v. Trump*. The *Zervos* case concerned whether a civil suit could proceed against Trump in state court during his time in office. *See* 171 A.D.3d 110, 113 (1st Dep't 2019). In his stay motion, Trump argued only that the Supremacy Clause "bars state-court subject matter jurisdiction over actions against a U.S. President *while he or she is in office*." NYSCEF No. 49 at 6 (emphasis added); *accord id.* at 1-4.

While Trump's stay motion was pending, the U.S. Supreme Court decided *Trump v. Vance*, which held that the Constitution does not categorically preclude the issuance of a state criminal

---

[1] Citations to "NYSCEF No. __" are to the New York state court docket, No. 160694/2019 (N.Y. Sup. Ct.).

subpoena to a sitting President. *See* 140 S. Ct. 2412, 2421-29 (2020). In light of *Vance*, Carroll renewed her opposition to Trump's stay motion. Trump responded by asserting that *Vance* was limited to the criminal context: "[T]here is no pressing need for a state court to exercise control over a sitting President in a civil action, particularly because the action can be stayed *until the President is no longer in office*." NYSCEF No. 99 at 3 (emphasis added). Two days later, Trump expressly disclaimed any effort to evade litigation or liability once he was no longer President: "No one is seeking to 'escape accountability' here. Plaintiff is free to pursue this action *when the President is no longer in office*." NYSCEF No. 103 at 3 (cleaned up) (emphasis added).[2]

In August 2020, Justice Saunders denied Trump's stay motion. *See Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020). Trump then faced a choice: seek appellate relief or comply with his discovery obligations. Trump opted instead to pressure the United States Department of Justice (DOJ) to intervene under the Westfall Act. *See* Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020). At Trump's behest, the DOJ removed the case to this Court and filed a motion to substitute itself as the defendant. *See* Dist. Ct. Doc. No. 3.

This Court denied the DOJ's motion to substitute on two grounds: first, the Westfall Act does not cover the President; second, Trump's defamatory attacks on Carroll were not undertaken within the scope of his office or employment as President. *See Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020). Both Trump and the DOJ appealed. *See* Dist. Ct. Doc. Nos. 45, 46. On September 27, 2022—over a dissent by Judge Chin—a Second Circuit panel held that the Westfall Act does cover the President. *See Carroll v. Trump*, 49 F.4th 759, 767-72 (2d Cir. 2022). The

---

[2] At this point, Trump was represented by attorneys at the law firm of Kasowitz Benson Torres LLP.

majority then certified the scope-of-employment issue to the District of Columbia Court of Appeals, *see id.* at 772-81, which held oral argument sitting *en banc* on January 10, 2023.[3]

During the pendency of his appeal, Trump remained exceptionally active in this Court. He moved to stay proceedings twice, first on December 10, 2020, and then again on September 28, 2022. *See* Dist. Ct. Doc. Nos. 47, 92. This Court denied both motions. *See id.* at 56, 96. Trump also moved to amend his answer to add an anti-SLAPP affirmative defense and counterclaim against Carroll. *See id.* at 64. The Court denied that motion, too, observing that "Trump has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails." *Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). Indeed, the Court not only found Trump's amendment to be futile, but also determined that Trump had "delayed unduly in seeking leave to amend," that Trump had made the request to amend his answer "at least in part in bad faith," and that "granting the motion would prejudice the plaintiff unduly." *Id*. at 589.

Trump thereafter proposed, and Carroll agreed to, a discovery schedule. *See* Dist. Ct. Doc. Nos. 76, 77. Throughout discovery, Trump affirmatively invoked this Court's power to press and litigate his case: he obtained 30,469 pages of records from Carroll and hundreds more pursuant to nonparty subpoenas; he received 19 substantive interrogatory responses; and he deposed Carroll herself, numerous nonparty witnesses, and Carroll's expert witness. In contrast, Trump produced a mere handful of documents and discovery responses before sitting for a deposition.

Following the close of discovery, Trump submitted a proposed schedule for the remainder of the case. Although Trump urged the Court to schedule trial in May 2023, he did not reveal that he planned to inject a previously undisclosed affirmative defense into the action—even as he sought to push the summary judgment schedule closer to the trial date. Dist. Ct. Doc. Nos. 99, 102.

---

[3] A recording of that oral argument is available here: https://www.youtube.com/watch?v=EFX5Y8kp4Co.

**STANDARD OF REVIEW**

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant bears the burden of proof. *See id.* at 323, 106 S. Ct. at 2552. The court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Francis v. Costco Wholesale Corp.*, No. 19 Civ. 1979, 2021 WL 1298616, at *2 (S.D.N.Y. Apr. 7, 2021) (Kaplan, J.).

**ARGUMENT**

**I.     TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS**

**A.     Trump Waived Any Claim to Absolute Immunity**

Trump did not attempt to raise an absolute immunity argument until over three years into this litigation. He did not assert this affirmative defense in his answer, nor did he include it any of his voluminous filings in state or federal court. Instead, he took positions in state court plainly at odds with an assertion of absolute immunity—and more recently asked this Court to set a trial date without even mentioning that he planned to raise an unpleaded affirmative defense. Trump therefore waived any contention that absolute immunity defeats Carroll's case. And although the Court has discretion to excuse that waiver in the absence of bad faith or dilatory motive, prejudice to the plaintiff, undue delay of the proceedings, or futility, in this case each of those considerations *independently* forecloses any claim that Trump's waiver of absolute immunity should be excused.

**1.     Legal Standard**

Absolute immunity is an affirmative defense. *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). Under Federal Rule of Civil Procedure 8(c), "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." A "core purpose[]" of this

**A421**

rule is "to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). Accordingly, "[i]t is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case." Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.); *see Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014); *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984). This longstanding rule applies with full force to absolute immunity. *See Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded."); *accord Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 n.1 (9th Cir. 2020); *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003); *Chestnut v. City of Lowell*, 305 F.3d 18, 22 (1st Cir. 2002) (Torruella, J., concurring); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604-05 (10th Cir. 1994).

As the Second Circuit has explained, the waiver of an affirmative defense may be excused only in limited circumstances: namely, "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks*, 316 F.3d at 350. In those exceptional situations—and consistent with Federal Rules of Civil Procedure 15(a) and 16(b)(4)—"the district court may construe the motion for summary judgment as a motion to amend the defendant's answer." *Id.* at 350-51 (citations omitted).[4]

---

[4] Adhering to Second Circuit precedent, we describe Trump's conduct in this litigation as resulting in a waiver, even though it may also properly be characterized as a forfeiture under recent Supreme Court precedent. *See, e.g.*, *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) ("The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." (cleaned up)).

2.      **Trump Waived His Absolute Immunity Defense**

Trump waived his affirmative defense of absolute immunity by failing to raise it in his answer. That waiver is confirmed by his subsequent conduct in this litigation.

Trump's answer raised nine affirmative defenses, only one of which concerned official immunity in any respect. In his first affirmative defense, Trump asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." NYSCEF No. 68 at ¶ 147 (emphasis added). On its face, this defense did not invoke Article II, did not invoke absolute immunity, and did not claim total or permanent immunity from either litigation or liability. Neither in form nor in substance did it encompass absolute immunity, which "protects an official not only from liability but also from suit." *Shmueli*, 424 F.3d at 236.

Instead, this part of Trump's answer raised a very different argument: that the Supremacy Clause divested the state court of power to hear this case during Trump's presidential tenure. In other words, Trump claimed only that the state court temporarily lacked subject matter jurisdiction over him by virtue of his federal office. *See* NYSCEF No. 49 at 1 (contending that the "Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office"). That time-limited Supremacy Clause argument is fundamentally different from an assertion of absolute immunity in two respects. First, within its scope, absolute presidential immunity provides *permanent* rather than *temporary* immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748-49, 102 S. Ct. 2690, 2700-01 (1982). And second, in contrast to Trump's portrayal of his Supremacy Clause argument as jurisdictional, "there is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373, 121 S. Ct. 2304, 2317 (2001).

**A423**

Accordingly, the affirmative defense in Trump's answer simply had nothing to do with absolute immunity—and so Trump waived absolute immunity by failing to raise it in his answer.[5]

Trump's subsequent litigation conduct only confirmed that waiver. In state court, Trump repeatedly described his immunity position as limited to his tenure in office. *See* NYSCEF No. 99 at 3. More fundamentally, Trump affirmatively stated that "no one is seeking to 'escape accountability' here," and he conceded that "Plaintiff is free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Meanwhile, Trump neither sought to amend his answer nor sought appellate relief after his Supremacy Clause defense was rejected in state court. The subsequent removal of this case to federal court only gave Trump more opportunities to persist in his waiver: he failed to raise absolute immunity in his first stay motion, *see* Dist. Ct. Doc. No. 47; in his second stay motion, *see id.* at 92; in his motion to amend his answer to add an anti-SLAPP affirmative defense and counterclaim, *see id.* at 64, in agreeing to a joint proposed discovery schedule, *see id.* at 75; or in his letters to the Court concerning a proposed schedule for summary judgment briefing and trial proceedings, *see id.* at 99, 102. Stated simply, Trump waived absolute immunity when he filed his answer on January 23, 2020, and he deepened that waiver by litigating this case for almost three years before seeking to raise that defense.

### 3.    There is No Excuse for Trump's Waiver

In light of the Court's power to grant leave to amend an answer, the Court may "entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of

---

[5] To the extent Trump may argue that he raised absolute immunity by averring that the complaint fails to state a claim, that position is foreclosed by Second Circuit precedent. *See Saks*, 316 F.3d at 350 (collecting cases). To the extent Trump claims that state court procedural rules are different, he is mistaken, *see Butler v. Catinella*, 868 N.Y.S.2d 101, 106 (2d Dep't 2008) ("Affirmative defenses … as a general rule, would be deemed waived if not raised in the pleadings." (citation omitted)), and in all events federal procedural rules apply now that the case has been removed to federal court, *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219 (1996).

the proceedings." *Saks*, 316 F.3d at 350. Because Trump fails that standard several times over, the Court should not excuse Trump's waiver of the affirmative defense of absolute immunity.

First, Trump has clearly acted with bad faith and dilatory motive. In fact, this Court already reached that conclusion with specific respect to the propriety of granting Trump leave to amend his answer to add an unpleaded affirmative defense. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022) (denying Trump's motion for leave to amend his answer to include an anti-SLAPP defense and finding that Trump "has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails"); *see also id.* at 587-89 (describing the course of Trump's dilatory conduct). The Court then reaffirmed that finding of bad faith just three months ago. *See Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *6 (S.D.N.Y. Oct. 12, 2022) (adhering to the Court's earlier finding that "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him"). Whether seen as law of the case concerning Trump's entitlement to amend his answer or instead as highly relevant findings concerning Trump's bad faith and dilatory purpose, these decisions make clear that Trump's waiver should not be excused. Indeed, as noted above, Trump previously sought to shore up his state court stay motion by insisting that Carroll was "free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Now that he has left office—and his other stall tactics have failed—Trump should not be permitted to renege on that position by introducing yet another brand-new argument (which, if rejected, he will presumably seek to leverage into another interlocutory appeal). No party should be allowed to deliberately engage in such a "seriatim appeals" strategy.

Second, Trump did not seek to raise this defense "at the first pragmatically possible time," and allowing him to do so at this late juncture would "unfairly prejudice the opposing party." *Rose*

*v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004); *see Broker Genius Inc. v. Gainor*, 810 F. App'x 27, 32 (2d Cir. 2020) (upholding finding of waiver). The law of absolute immunity is not new—and Trump has known all the facts relevant to that potential defense from the outset of this case. *See* Mot. at 3-18. Moreover, immunity doctrines are meant to be raised and resolved "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991), and Trump has had no difficulty asserting absolute immunity at the outset of other civil damages cases, *see, e.g.*, Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss at 8-11, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. May 24, 2021). These facts not only confirm Trump's bad faith and dilatory purpose, but also highlight the substantial prejudice to Carroll that would result from allowing him to invoke an unpleaded affirmative defense that he could have raised much earlier. *See Carroll*, 590 F. Supp. 3d at 586 ("The defendant has not offered a satisfactory reason for the length of his delay in this case."). That prejudice includes a lack of notice concerning the need to respond to this affirmative defense throughout the now-concluded discovery process. It encompasses Trump's efforts to raise this issue only after having inflicted substantial burdens on Carroll and third parties in discovery (when a major purpose of absolute immunity is to gatekeep access to discovery in the first place). And it captures the potential for significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings. *See Carroll*, 2022 WL 6897075, at *6 ("Delay is a more serious concern in this case than usual …. [T]he defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.").

Finally, for the reasons set forth below in Part I.B, Trump's absolute immunity argument is meritless, and so his attempt to overcome or excuse his waiver would fail based on futility.

For each of these independent reasons—bad faith and dilatory motive, undue prejudice to the plaintiff, undue delay of the proceedings, and futility—the Court should find that Trump has waived any affirmative defense of absolute immunity and should not excuse that waiver.

### 4.   Alternatively, The Law of the Case Rule Precludes Trump's Position

In the event this Court concludes that Trump's first affirmative defense did include absolute immunity, the Court should nonetheless reject it as precluded by the law-of-the-case doctrine.

If one court decides a legal issue, "that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (citation omitted). That is especially true where "one judge or court is asked to consider the ruling of a different judge or court." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (quoting Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.)). This doctrine applies, as here, "when a state court case is removed to federal court." *Firestone v. Berrios*, 42 F. Supp. 3d 403, 412 (E.D.N.Y. 2013) (citation omitted).

Trump's first affirmative defense in this case maintained that the state court temporarily lacked jurisdiction under the Supremacy Clause. To the extent this qualified as an assertion of absolute immunity, it was rejected by the state trial court when considered directly in connection with Trump's motion to stay, *see Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130, at *2 (N.Y. Sup. Ct. Aug. 03, 2020), and Trump then chose *not* to appeal that determination. Therefore, Trump has either waived absolute immunity or, alternatively, law of the case precludes it.

### B.   Trump's Absolute Immunity Defense is Meritless

Even if it were not waived or precluded, Trump's absolute immunity defense should be rejected: it is foreclosed by precedent and would invite abuse by future officeholders. Because Trump's attacks on Carroll were private conduct beyond the scope of any Article II function, there is no basis for concluding that absolute immunity bars Carroll's defamation action.

**A427**

### 1.        Absolute Immunity Is Subject to Important Limits

As the "chief constitutional officer of the Executive Branch," the President "occupies a unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749-50, 102 S. Ct. at 2701. "His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020). Therefore, to avoid the "distortion of the Executive's decisionmaking process with respect to official acts that would stem from worry as to the possibility of damages," *id.* (citation omitted), courts have long held that the President enjoys absolute immunity from "damages liability for acts within the 'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704. This rule upholds the separation of powers by policing judicial intrusion on Article II functions.

If extended beyond official conduct, however, this doctrine poses a risk of abuse, since it would immunize the President for even egregious personal wrongs. The Supreme Court has thus held that the purposes of absolute immunity also define its limits. *See id.* at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes."). Because those purposes concern only the President's official acts, there is "no support for an immunity for *unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997). Simply put, the President does not receive immunity for acts beyond the "'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704; *see also Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645 (the President lacks immunity "for his purely private acts").

In practice, this limitation underscores the importance of discerning the scope of official presidential conduct. The Presidency is a demanding job. But as Chief Justice Marshall anticipated, the demands of a president's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14692D); *see*

17

*also* Clinton, 520 U.S. at 705 n.40, 117 S. Ct. at 1650 (Presidents "face a variety of demands on their time, … some private, some political, and some as a result of official duty"); Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000) (recalling that the President "is a person as well as an institution"). Indeed, the Framers foresaw that Presidents would engage in private conduct.[6] And while serving as President, Trump insisted that aspects of his conduct were wholly private, including profitable business deals with foreign nations and censoring critics on Twitter.[7]

Because Presidents engage in a shifting mix of personal and official acts, only some of which reflect presidential functions, the Supreme Court has provided additional guidance. *First*, plaintiffs cannot defeat immunity merely by alleging that the President's conduct was unlawful or motivated by an improper purpose. *See Nixon*, 457 U.S. at 756, 102 S. Ct. at 2705. *Second*, the President cannot invoke immunity merely by claiming that his conduct was "clearly taken *within* an official capacity," since the "scope of an immunity" even for otherwise official acts depends on "'performance of particular functions of his office.'" *Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (citation omitted). *Third*, a conception of absolute immunity that would encompass all presidential conduct is inconsistent with the teaching that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 695, 117 S. Ct. at 1644 (citation omitted). *Finally*, as the D.C. Circuit has recognized, the official seeking immunity (here,

---

[6] *See* James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836) ("Far from being above the laws, [the President] is amenable to them in his private character as a citizen.").

[7] Although Trump was mistaken in those contexts that his actions were not subject to constitutional constraint, Trump concededly understood himself to be acting in a purely private capacity during important interactions with the public during his tenure in office. *See, e.g.*, Petition for Writ of Certiorari at 14, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("Blocking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mem. in Supp. of Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that President Trump was free to profit from private commercial transactions with foreign powers, so long as he did not receive "compensation for services rendered … in an official capacity or in an employment (or equivalent) relationship with a foreign government").

the President) bears the burden of proof in establishing his entitlement to it for any particular act. *See, e.g.*, *Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015). Under this framework, the President enjoys robust protection for conduct undertaken as part of an Article II function, but lacks immunity for personal conduct outside the scope of his presidential role.

### 2.    Trump's Categorical Position Should Be Rejected

Trump asks this Court to hold that whenever the President addresses the public on a matter of "national concern," or "defend[s] himself from grave accusations that impugn his character," he has engaged in a presidential function shielded by absolute immunity. Mot. at 13. That proposed categorical rule—which treats the nature and context of his public statements as all but irrelevant—sweeps much too far. It defies precedent and tradition, and it should be rejected.

Starting with first principles, the Supreme Court has made clear that absolute immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Clinton*, 520 U.S. at 695, 117 S. Ct. at 1644. Thus, absolute immunity shields only particular presidential functions, rather than all conduct by the holder of the office. For that distinction to bear weight, presidential functions cannot be defined so expansively as to encompass everything a President might say. Yet that is what Trump urges here. Every statement by the President may—by simple virtue of who uttered it—be seen as involving a matter of "national concern." Similarly, the President could describe most (or all) of his statements as responses to those who "impugn his character." Trump's position therefore conflicts with *Clinton*: it would treat virtually every statement by a President as the performance of an official function, and would (in effect) assign unlimited immunity to the President himself rather than to his perceptibly presidential conduct.

To be sure, nobody doubts that the President "possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Certain exercises of

Article II authority inherently involve speech, including the Oath of Office, U.S. Const. art. II, § 1, cl. 8, the State of the Union, *id.* art. II, § 3, the Commander in Chief power, *id.* art. II, § 2, cl. 1, the pardon power, *id.*, and the nominating power, *id.* art. II, § 2, cl. 2. In many other settings, such as signing statements, veto threats, supervision of the executive branch, and certain personnel announcements, the President performs an official function by speaking about how he has exercised (or intends to exercise) aspects of "the executive Power." *Id.* art. II, § 1. Speech by the President about the operation and administration of the government, and about the execution of the laws that he has sworn to faithfully execute, is ordinarily part of his official functions as well.

But when the President speaks about personal and private matters bearing no relation to any historical, ongoing, or intended use of Article II authority—and bearing no relation to the operation and administration of the government—it is more tenuous to claim that he is engaged in a presidential function. In such cases, a context-sensitive assessment is necessary to honor the purposes and limits of absolute immunity. *See Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes …."). Holding otherwise (as Trump urges) would conflate the President's private interests with the functions of his office in circumstances far removed from any official undertaking.[8]

This fundamental point has been understood in every analogous setting: time and again, courts have denied absolute immunity to statements beyond the scope of official functions. *See Nixon*, 457 U.S. at 759, 102 S. Ct. at 2706 (Burger, C.J., concurring) ("President[s], like Members of Congress, judges, prosecutors, or congressional aides—all having absolute immunity—are not

---

[8] At Trump's first impeachment trial, his lawyer insisted that "if a president does something, which he believes will help him get elected in the public interest, that cannot be [an impeachable offense]." Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, Wash. Post (Jan 29, 2020). Similar logic underwrites Trump's position here that anything the President says is necessarily a presidential function. Of course, our nation has historically rejected analogous claims that "when the president does it, that means that it is not illegal." Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon*, Teaching American History.

immune for acts outside official duties."). Starting with other Executive Branch officials, the Supreme Court has held that prosecutors are not protected by absolute immunity for statements at press conferences, even though they "may be an integral part of a prosecutor's job" and "may serve a vital public function." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278, 113 S. Ct. 2606, 2618 (1993). So too for the Judiciary. As the Sixth Circuit has emphasized, judges lack absolute immunity for statements made to the press about matters and litigants pending before them: "Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense." *Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997). The same rule covers Congress, whose members (like the President) are accountable to the public through elections and may feel hindered if they cannot speak about matters of "national concern" or respond to accusations that "impugn their character." Members of Congress enjoy a constitutional immunity of their own under the Speech or Debate Clause—which, unlike Article II, *specifically* guarantees immunity for their "Speech." U.S. Const. art. I, § 6, cl. 1. But public statements uttered outside the context of official congressional proceedings constitute non-legislative activity and are *not* shielded by any absolute constitutional immunity—even when a legislator's statements may have "a significant impact on the other [legislators]," and even when statements are issued in furtherance of Congress's own "informing function." *See Hutchinson v. Proxmire*, 443 U.S. 111, 131-32, 99 S. Ct. 2675, 2686-87 (1979). Together, these cases concerning all three branches of government confirm that absolute immunity has *never* been held to encompass all public statements by federal officials, even if those statements may help facilitate the performance of their official functions or are issued in response to public criticism.[9]

---

[9] Strangely, Trump suggests that cases involving legislators and other executive branch officials support his position—and does so relying almost exclusively on cases involving Westfall Act immunity. *See* Mot. at 13-16. Those cases are not a reliable guide to ascertaining the scope of absolute immunity. In some circumstances absolute immunity is

Although the Presidency is unique in certain respects, that uniqueness does not transform every public statement into the performance of an official function. This conclusion is bolstered by original understanding, as well as by common sense. First consider history. *See Nixon*, 457 U.S. at 747, 102 S. Ct. at 2700. Tested against an originalist perspective, Trump's position is baseless: from the founding of the Republic through the early twentieth century, the President's rhetorical function was not understood to encompass public pronouncements on every matter of perceived private or national importance. *See generally* Jeffrey K. Tulis, *The Rhetorical Presidency* (1987). It was not until Presidents Woodrow Wilson, William Howard Taft, and Theodore Roosevelt that the "bully pulpit" came to be seen as a substantial part of the Presidency. *See id.*; *see also* Doris Kearns Goodwin, *The Bully Pulpit* (2013). In our own era, of course, the bully pulpit is established as a presidential function. *See Hawaii*, 138 S. Ct. at 2417-18. But its modern vintage—coupled with its lack of an originalist grounding, sustained contest over its proper scope, and the principle that absolute immunity must be limited—precludes Trump's maximalist position.

So does common sense; hypotheticals illustrate the point. Imagine if a President responded to criticism of his business acumen by appearing at one of his privately-owned hotels to make unlawful statements about a competitor while urging listeners to stay at his property. Or consider a President who appeared at a campaign event and declared that he would endorse anybody who burned down his political opponent's private residence. Or a President who responded to debates over electoral integrity by hosting events in which he urged supporters to engage in unlawful voter

---

broader than Westfall Act protections, and in some circumstances it may be narrower. When it comes to speech by legislators, for instance, the Westfall Act may provide comparatively broad protection by virtue of its application to *all* job-related duties that are actuated by a job-related purpose. In contrast, courts have more tightly limited absolute immunity, denying it to conduct undertaken within the scope of employment wherever that conduct is not in actual, objective furtherance of an official function. *See, e.g.*, *Doe v. McMillan*, 412 U.S. 306, 313, 93 S. Ct. 2018, 2025 (1973) ("[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause."); *see also Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (holding that conduct "clearly taken *within* an official capacity" lacks absolute immunity if not undertaken in performance of an official function).

intimidation. Or a President who retained a private residence, got into a property dispute with his neighbor, and willfully sought to incite local protesters to violence and trespass. Or a President who, first thing every morning, randomly picked the name of a critic on social media and then made sure to accuse them of some horrible crime in answering questions from the press that day. For each of these scenarios, Trump's position would shield the President with absolute immunity. Not only would those results be absurd; they would also entail a stark departure from the constitutional principles that animate presidential immunity, which exists to ensure that the President is not improperly diverted in the exercise of his traditional Article II functions.

It is therefore unsurprising that the courts have rejected Trump's proposed rule. This occurred directly in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46 (D.D.C. 2022). There, Judge Mehta described Trump's position as "too simplistic." *Id.* at 77. As he reasoned, "to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity?" *Id.* at 79. Ultimately, Judge Mehta found that "the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function." *Id.* at 81. Applying that rule to the facts in the case before him, he concluded that Trump lacked absolute immunity.[10]

Trump's proposed categorical rule is also at odds with *Clinton v. Jones*. There, as here, a plaintiff sued the President for defaming her after she revealed that he had engaged in sexual misconduct before taking office. More precisely, she alleged that "various persons authorized to

---

[10] On December 7, 2022, the D.C. Circuit—Chief Judge Srinavasan, Judge Rogers, and Judge Katsas—heard oral argument in Trump's appeal from Judge Mehta's ruling. *See* Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at* https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/.

speak for the President"—including his own White House aides and the official White House Spokesman—"publicly branded her a liar by denying that the incident had occurred." *Clinton*, 520 U.S. at 685, 117 S. Ct. at 1640. Under Trump's position, *Clinton* should have been an easy case: it involved a comparatively mild denial of alleged sexual misconduct, and that denial was issued by the President in coordination with his official White House agents and spokespersons.[11] But the Eighth Circuit described Clinton's entitlement to absolute immunity as "not free from doubt." *Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). And the Supreme Court declined to address whether Clinton's defamatory statements were "taken within the 'outer perimeter' of his official responsibilities," observing only that the allegations "arguably may involve conduct" within that outer perimeter. *Clinton*, 520 U.S. 686 & n.3, 117 S. Ct. at 1640 & n.3.

Like *Nixon* before it and Judge Mehta's decision more recently, *Clinton* made clear that absolute immunity requires a careful examination of the facts to see whether a particular act was undertaken in performance of a recognized presidential function. *See Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 ("[W]hen defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach."); *accord Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704; *Thompson*, 590 F. Supp. 3d at 76-81. That context-sensitive approach requires a rejection of Trump's proposed categorical rule—and also requires the denial of absolute immunity here.

### 3.   Trump Lacks Absolute Immunity for his Defamatory Statements

As this Court has already recognized, "while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not." *Carroll v. Trump* 498 F. Supp. 3d 422, 448

---

[11] The complaint in *Jones v. Clinton*, No. 94 Civ. 290 (E.D. Ark.), is available at https://www.washingtonpost.com/wp-srv/politics/special/pjones/docs/complaint.htm.

(S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022). Under the undeniably

unusual and extreme facts presented here, Trump has no legitimate claim to absolute immunity.

Although Trump never previously raised absolute immunity in this case, and Carroll lacked

notice of that issue, ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

            ██████████████████████████████████████████

"A comment about government action, public policy, or even an election is categorically different

than a comment about an alleged sexual assault that took place roughly twenty years before the

president took office. … President Trump's views on the plaintiff's sexual assault allegation may

be interesting to some, but they reveal nothing about the operation of government." *Carroll*, 498

F. Supp. 3d at 453. Simply put, Trump's attacks on Carroll had no connection to the exercise of

any Article II power, had nothing to do with the operation or administration of the government, did not concern any government policy or program or position, and did not reflect the execution of any presidential duty under the Take Care Clause. Moreover, the subject matter of Trump's attacks arose from his own private sexual misconduct years before he took his office, and his defamatory statements went far beyond a mere denial to encompass specific and highly personal remarks about a private citizen. This spree of defamatory statements not only was unusually vitriolic (including Trump's conceded implication that Carroll was too unattractive for him to have raped her), █████████████████████████████████████

████████████████████████████████████████

Nothing about Trump's many statements concerning Carroll had *any* connection to a presidential function. Even as compared to the *Clinton* case, which the Supreme Court appeared to view as a closer call, Trump's statements were more decisively private along every relevant dimension.[12]

All but conceding as much, Trump resorts to a sweeping claim that the President is entitled to open season whenever he addresses a matter of "public concern" or responds to "allegations which impugned his character." Mot. at 17. Analogous arguments have been repeatedly rejected as to other officials, *see supra* at 21, and that position should be rejected here as well: "[I]t would mean that a president is free [to] defame anyone who criticizes his conduct or impugns his character—without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to

---

[12] At oral argument in the *Blassingame* appeal, Trump conceded that he would not have enjoyed absolute immunity for an act of sexual assault while in office. *See supra* n.10, at 8:38-8:48. It would appear that Trump believes Presidents lack immunity if they rape someone *while* in office, but enjoy immunity if they rape someone *before* taking office and then (after being sworn in) use their bully pulpit to viciously destroy that person when they reveal the sexual assault.

their government employment, would undermine their ability to perform effectively while in office." *Carroll*, 498 F. Supp. 3d at 453.

While he served as President, Trump may have seen a benefit to punishing and humiliating women who revealed that he had sexual assaulted them. He may even have been right that he would benefit personally or politically by taking such actions. But that self-interested calculation does not render his defamatory statements a performance of *presidential* functions. Holding otherwise would obliterate the crucial line between office and occupant, collapsing presidential functions into anything that might advance the personal or electoral interests of the incumbent. That has never been the law in this country. It would dishonor the Constitution to declare that the President is free to willfully injure private citizens who reveal his own private misconduct.

## II.   TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS

### A.   Trump's Statements Constituted Defamation *Per Se*

While Trump asserts that no reasonable juror could find Carroll has established cognizable damages, damages are presumed because his statements were defamatory *per se*.

As explained in Carroll's opposition to Trump's motion to dismiss in *Carroll II*, No. 22 Civ. 10016, ECF 26, a statement qualifies as defamatory *per se* if it "affect[s] a person in [her] profession, trade, or business by imputing to [her] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (citation omitted). With respect to such statements, the law "dispenses with the special damages requirement … because [they] are considered so inflammatory and offensive that the law presumes the statements to have caused damage." *Stern v. Cosby*, 645 F. Supp. 2d 258, 289 (S.D.N.Y. 2009). When a statement "impugns the basic integrity or creditworthiness of a [person's] business," it is settled that "an action for defamation lies and injury is conclusively presumed." *Celle*, 209 F.3d at 180 (citation omitted).

A reasonable juror could find that standard to be met here. Carroll is a journalist, author, and advice columnist who built her career providing honest, trustworthy advice to women in response to intimate questions—many of which concerned sex, men, and relationships. Her career "rested on the fact that [she] could be trusted." Pl. 56.1 ¶ 88; *see also id.* ¶ 86 ("[W]omen really trusted E. Jean and [*Elle*] got lots of feedback from readers that she helped them."). For Carroll's community of loyal readers, integrity and credibility were essential.

In his defamatory statements, Trump took *direct aim* at that credibility. Each of his three statements targeted an autobiographical account in her non-fiction book and denounced it as false. His June 21 statement, moreover, directly and repeatedly attacked her as an author: it accused her of lying "to sell a new book," it said her book "*should* be sold in the fiction section," and it claimed that she wrote about being raped to "try to get publicity for [herself], or sell a book, or carry out a political agenda." *Id.* ¶ 11; ████████ It also implied a conspiracy between Carroll, *New York Magazine*, and "the Democratic Party." *Id.* ¶ 11; ████████ Trump's June 22 statement continued in the same vein, implying that she had falsely accused other men, stating that he had "no idea who she is," and attacking Carroll and her publisher. *Id.* ¶ 12; *see id.* ¶¶ 13, ██

A reasonable juror could easily find that these statements attacked Carroll not only in general terms, but also specifically in her trade and profession. Trump directly attacked an author and columnist—who specializes in honest advice to women about sex and men—with false claims that she lied about an experience of being raped (which she had revealed in her non-fiction book) and that she did so for despicable reasons that would eviscerate her professional credibility, integrity, and trust. Trump thereby "impugn[ed] the basic integrity or creditworthiness of [Carroll's] business," and attributed to her an "unfitness" in her profession as a writer and advice

**A439**

columnist. *Celle*, 209 F.3d at 180. He took direct aim not only at the veracity of her non-fiction book, but also at her reliability as an honest broker who could be trusted by her readers.

This conclusion is supported by *Celle v. Filipino Reporter Enterprises Inc*. There, a news commentator alleged that two statements were defamatory: one that suggested a judge had found him to be negligent, and one that suggested he had made false accusations about another person's financial obligations. *See* 209 F.3d at 185-86. The Second Circuit found the challenged statements to be defamatory *per se* under settled New York law because they "impugn[ed]" the plaintiff's "trustworthiness." *Id.* at 185.[13] So too here. Carroll has spent decades building an audience and community of loyal readers who trust her to provide accurate facts and trustworthy, honest advice. A statement by Trump accusing her of lying about being sexually assaulted—and of making fraudulent claims against others, and of lying in her article and book, and of doing all this for nefarious financial and political reasons—would surely "leave readers with the conclusion that [she] abused her position as a [writer]." *See id.*; *see also Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977) (statements accusing scholars of being "paid liars" were defamatory *per se*); *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 n.5 (1995) (statement that attorney suborned perjury was defamatory *per se*); *Levy v. Nissani*, 115 N.Y.S.3d 418, 421 (2d Dep't 2020); *Gong v. Savage*, 169 N.Y.S.3d 511 (Table), at *2 (N.Y. Sup. Ct. N.Y. Cty. 2022) (statement accusing researcher of stealing research was defamatory *per se*).

The cases that Trump cites do not support his position. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011); *Davydov v. Youssefi*, 169

---

[13] As to the first statement, the court noted that as a reporter in a tightly knit community, his "professional reputation would turn in large measure on the community's faith in the accuracy and fairness of his reporting," and "[t]he statement that a United States judge has found plaintiff negligent for spreading false information would leave readers with the conclusion that he abused his position as a news commentator." *Id.* As to the second claim, the court found it defamatory because it impugned his "trustworthiness," could lead "an average reader to believe [the plaintiff had] made 'false' accusations" about someone else, and could "cause listeners and advertisers … who read the article to question [his] professional integrity." *Id.* at 185-86.

N.Y.S.3d 322 (1st Dep't 2022); *Ram v. Moritt*, 612 N.Y.S.2d 671 (2d Dep't 1994). In *Davydov* and *Ram*, the plaintiffs (a doctor and dentist) had not been targeted in their professional capacity by statements calling them cheats and frauds. And the statements at issue in *Pure Power Boot Camp* were about the plaintiff's personal characteristics—alleging she treated her employees poorly or fired an employee for being gay—which the court found were not defamatory *per se* because they did "not impute fraud or misconduct to [her], nor do they suggest a general unfitness, incapacity, or inability to perform her duties." 813 F. Supp. 2d at 551. Trump's remaining cases are equally inapposite. *Gurtler v. Union Parts Mfg. Co., Inc.* concerned claims about the plaintiff's political affiliation that bore no relationship—not even "by way of innuendo"—to his professional endeavors. 285 A.D. 643, 647 (1st Dep't 1955). In *Tacopina v. Kerick*, claims that the plaintiff "disclos[ed] privileged information to federal prosecutors" did not "specifically discredit" him as an author. No. 14 Civ. 749, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016). And in *Aronson v. Wiersma*, the "mere expression of unhappiness with plaintiff's fulfilling her duties" was not "of significance" to her work as a linguist and researcher. 65 N.Y.2d 592, 594 (1985).

### B.   Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements

Trump next asserts that Carroll's claim is barred because she consented to his defamatory statements. *See* Mot. at 27-30. This argument is not only highly offensive, but it is also frivolous.

Consent is a rare, narrow defense to defamation. It applies where a person has the specific intent of eliciting a defamatory statement from the defendant and in that sense affirmatively agrees to its publication. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07 Civ. 4018, 2020 WL 1244930, at *7 (E.D.N.Y. Mar. 16, 2020). For instance, this defense may apply where a plaintiff sends a letter requesting a statement that they consider defamatory, or has a private investigator willfully elicit such a statement, or provides written consent to the publication of a defamatory claim, or obtains

a statement by impersonating a third party, or otherwise acts with the goal of eliciting a statement on which to base a defamation lawsuit. *See McNamee v. Clemens*, 762 F. Supp. 2d 584, 604-05 (E.D.N.Y. 2011) (collecting New York cases). Trump contends that Carroll provided such specific content in two respects: (1) choosing to publish with *New York Magazine*, which would run a full excerpt and had a broad circulation; and (2) revealing her account while Trump was President, since at that point he had "no choice but to defend himself." Mot. at 29-30.

Recalling that credibility judgments about the underlying sexual assault must be resolved in Carroll's favor at this stage, any reasonable juror would reject Trump's consent defense. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 136 n.11 (S.D.N.Y. 2004). At bottom, Trump insists that Carroll cannot sue him for defamation because she was asking for it. This insulting argument is foreclosed by Carroll's own deposition testimony, where Carroll explained that she was "shocked" by Trump's statements after her book excerpt was published. Pl. 56.1 ¶¶ 62-63. It is also wrong in a deeper sense. When a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response. The law does not vest perpetrators of sexual assault with a right to slander survivors who decide to come forward in a public manner. It is perverse to claim that the revelation of sexual abuse by a powerful man automatically invites (and somehow legally protects) further defamatory abuse. If anything, Trump gets it backwards: his position of political power made it *more* important, not *less* important, that he follow the law in responding to Carroll's revelation that he had assaulted her. Her decision to speak up—prompted by her mother's death and the phenomenon of the #MeToo movement—did not give Trump any warrant to break the law in seeking to punish her. Indeed, Trump's *modus operandi* of seeking to destroy women who accused

**A442**

him of sexual assault, which was on display before and after his term in office, undercuts any claim that his conduct here reflected anything unique to the political office he occupied in 2019.

Trump's defense that he had "no choice" in defaming Carroll is really no defense at all. Mot. at 30. Of course he had a choice. And because he chose to issue a series of brutal, defamatory statements rife with injurious lies about Carroll, he is not entitled to summary judgment.

### C.      Trump's Statements Are Actionable as a Matter of Law

Trump's third argument is that many (though concededly not all) of his statements were merely speculative expressions of opinion. Mot. at 30-31. In support of this theory, he asserts that statements "about a plaintiff's state of mind or personal motivations" qualify as "non-actionable opinions" and "are not capable of being proven true or false." *Id.* at 32-33. Trump is mistaken.

"Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false … only statements alleging facts can properly be the subject of a defamation action." *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014) (cleaned up). "An opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it is a mixed opinion and is actionable." *Id.* at 269 (cleaned up). "The dispositive inquiry … is 'whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff.'" *Id.* at 269-70 (citation omitted). In "distinguishing between fact and opinion," the Court asks "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 269-70 (citation omitted) (cleaned up).

Applying this familiar framework, courts have repeatedly held that statements concerning a person's motivation for conduct can be actionable if they imply a knowledge of facts about that

32

person. In *Davis v. Boeheim*, the New York Court of Appeals concluded that the defendants made actionable statements where they claimed that the plaintiffs (who had made allegations of sexual molestation) had lied and had done so to make money. *See id.* at 271-73. In *Zervos v. Trump*, the court concluded that Trump made actionable statements when he claimed that the plaintiff (who had accused him of sexual abuse) told "phony stories" that were "totally false" since the events supposedly "never happened" and she was "was motivated by fame and/or directed by Clinton or the Democrats." *See* 74 N.Y.S.3d 442, 445-46, 449 (N.Y. Sup. Ct. 2018) ("A reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe what defendant's statements convey: that plaintiff is contemptible because she 'fabricated' events for personal gain."). Many other decisions reflect similar logic. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S. Ct. 2695, 2705-06 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 150 (1993) (defendants made actionable statements where the "overall-thrust" of their publications was that "plaintiff had issued false or misleading reports about deaths occurring within his jurisdiction in order to protect the police"); *Joyce v. Thompson Wigdor & Gilly LLP*, No. 06 Civ. 15315, 2008 WL 2329227, at *9 (S.D.N.Y. June 3, 2008) (R&R finding that defendants made actionable statements where they claimed that the plaintiff had faked having breast cancer because she hoped to thereby avoid being fired).

Here, each of Trump's statements about Carroll's motives had a readily understood and precise meaning: that she had falsely accused other men of sexual assault; that Trump had never met her; and that she had lied about being assaulted by Trump to make money, to get publicity, to sell her book, or as part of a conspiracy with the Democratic party. Each of these statements can be proven objectively true or false. Moreover, in context, a reasonable observer would understand

Trump to be implying or stating concrete facts (not opinions) about Carroll based on knowledge not known to the public. *See Davis*, 24 N.Y.3d at 269-73; *Zervos*, 74 N.Y.S.3d at 448-49.

At bottom, Trump is wrong that claims about a person's motivations for revealing a sexual assault are inherently opinions rather than facts. It is commonplace for courts and juries to make fact findings about a person's motives. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 133 n.17 (2d Cir. 2009) ("[A] person's state of mind is a fact question to be proved the same as any other fact."); *accord United States v. Stein*, 473 F. Supp. 2d 597, 602-03 (S.D.N.Y. 2007) (Kaplan, J.); Sand, et al., *Modern Federal Jury Instructions*, at § 91-7 (2022). By imputing specific nefarious motives to Carroll—each of which she either *did* or *did not* possess—Trump committed actionable defamation. His effort to disavow the obvious import of his own statements, or to claim that a person can respond to allegations of sexual assault by imputing vile motives with factual particularity, is at odds with common sense, precedent. ███████████████████████ ████████████████████████████████████ His argument thus fails.[14]

---

[14] The cases that Trump cites involved very different kinds of statements. *See* Mot. at 32. In *Huggins v. Povitch*, for instance, a talk show guest said: "Uh, because there would be times when, uh, my husband would have hundreds of dollars in his pocket and I had to take the subway, my daughter and myself. And we have a Rolls-Royce in the garage, and he would say, the car is not available. I understand now that was psychological, uh, easing me into the point where, either get used to it or get mad, I think he wanted me to divorce him." No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996). The court reasonably understood that specific statement as "speculat[ion] on plaintiff's motivation for certain conduct" and held it to be non-actionable. *Id.* at *8. In *Zerman v. Sullivan & Cromwell*, the relevant news article explicitly made clear that it contained only speculation: "But lawyers for the five securities firms *speculate* that the Zermans have a different motive …." 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (emphasis added). In *Gentile v. Grand Street Medical Assocs.*, the statement at issue was "loose and generalized," referring vaguely to "several people in the community who do not want to work, hold jobs and want to make easy money, [who] find a few lawyers who make a living exploiting hard working people and corporations." 79 A.D.3d 1351, 1352-53 (3d Dep't 2010). Finally, in *Dworin v. Deutsch*, a news article "merely" referred to the plaintiff as a "disgruntled former employee," a phrase the court deemed "a matter of opinion based on the fact that he was 'threatening to sue'" his former employer. No. 06 Civ. 13265, 2008 WL 508019, at *8 (S.D.N.Y. Feb. 22, 2008).

**A445**

### D.    Carroll is Entitled to Present the Punitive Damages Issue to the Jury

Finally, Trump argues that Carroll should not be allowed to seek punitive damages. Mot. at 33-34. Here, too, he is wrong. Punitive damages are available where the defendant acted "with 'hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice.'" *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009) (citation omitted). The decision to award punitive damages involves evaluating the defendant's "moral culpability" and thus "rests within the sound discretion of the jury." *Allam v. Meyers*, 906 F. Supp. 2d 274, 291 (S.D.N.Y. 2012) (citation omitted). Where there is a need to "interpret[] the character of [the defendant's] actions," summary judgment is necessarily "inappropriate." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018). That rule controls here: Trump's repeated and highly inflammatory statements—which he issued from a position of power and influence—were maliciously calculated to punish, humiliate, and destroy a woman who he had raped and who he knew he had raped. *See also* ███████████ Under these circumstances, Carroll is entitled to put the propriety of punitive damages to a jury when this case is tried.

35

**CONCLUSION**

For the foregoing reasons, Trump's motion for summary judgment should be denied.

Dated:  New York, New York

January 12, 2023

Respectfully submitted,

_____

Roberta A. Kaplan

Shawn G. Crowley

Trevor W. Morrison (*pro hac vice*

application pending)

Matthew J. Craig

KAPLAN HECKER & FINK LLP

350 Fifth Avenue, 63rd Floor

New York, New York 10118

Telephone: (212) 763-0883

Fax: (212) 564-0883

rkaplan@kaplanhecker.com

scrowley@kaplanhecker.com

tmorrison@kaplanhecker.com

mcraig@kaplanhecker.com

Joshua Matz

KAPLAN HECKER & FINK LLP

1050 K Street NW, Suite 1040

Washington, DC 20001

Telephone: (212) 763-0883

Fax: (212) 564-0883

jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*