## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

E. JEAN CARROLL,

*Plaintiff*,

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant*.

---

No. 20 Civ. 7311 (LAK) (JLC)

---

### PLAINTIFF E. JEAN CARROLL'S RESPONSE TO DEFENDANT DONALD J. TRUMP'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, Plaintiff E. Jean Carroll submits the following responses to Defendant Donald J. Trump's Local Rule 56.1 Statement of Undisputed Material Facts, ECF 109-1, and a statement of additional material facts in support of her opposition to Trump's motion for summary judgment.

## I.   RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.      According to the Complaint, Plaintiff alleges that she encountered Defendant at the Bergdorf Goodman Store located at 754 5th Ave, New York, NY 10019. Plaintiff is unable to specify a date or time period when the events giving rise to this Complaint allegedly occurred, other than "between the fall of 1995 and the spring of 1996." *Id.* Plaintiff was approximately 52 years old at the time that the purported incident occurred. *See* Declaration of Alina Habba, ("Habba Dec."), Exhibit A at ¶ 22.

**Response:** Undisputed.

2.      Plaintiff, an advice columnist, alleges that Defendant recognized her on sight as the "advice lady" and asked her to help him selected a present for a woman who was not present with him at the store. *Id.* at ¶¶ 24-26.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that Trump said that he was at Bergdorf's to buy a present for "a girl."

3.      Plaintiff alleges that the two eventually proceeded to take the escalator to either the sixth or seventh floor, where the lingerie department was located. *Id*. at ¶¶ 29-30

**Response:** Disputed to the extent that the cited paragraphs of the Complaint do not allege

that the lingerie department was located on "the sixth or seventh floor."

4.      Plaintiff alleges that the floor they visited was entirely abandoned, and there were no sales attendants on the floor. Once there, Defendant allegedly insisted that Plaintiff try on the bodysuit. Defendant then purportedly led Plaintiff by the arm to the dressing rooms. *Id*. at ¶¶ 31-35.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that the

lingerie department "was uncharacteristically empty, with no sales attendant in sight," not that "the

floor they visited was entirely abandoned, and there were no sales attendants on the floor."

5.      At this point, Plaintiff alleges that Defendant purportedly closed the door to of the dressing room, pushed her against a wall, and began kissing her without her consent. She then claims that she pushed Defendant away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her until she managed to push him off and flee the store. *Id*. at ¶¶ 36-42.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that

Carroll "burst out in awkward laughter," not that she "laughed at him."

6.      Plaintiff testifies that she only contemporaneously disclosed the details of this alleged attack to two of her friends: Lisa Birnbach and Carol Martin. After sharing her account of the purported attack, Plaintiff did not speak of it, or even so much as dwell on the incident, until Defendant was elected President in 2016. *Id*. at ¶¶ 43-52.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint do not allege

that Carroll did not "even so much dwell on the incident, until Defendant was elected President."

Further disputed to the extent that the cited paragraphs of the Complaint do not constitute

"testi[mony]."

7.      Thereafter, Plaintiff decided to reveal these allegations publicly against Appellant for the first time with the release of the book entitled: 'What Do You Need Men For?" in or around May of 2019. *Id*. at ¶ 74.

**<u>Response</u>:** Disputed in that Trump mischaracterizes the cited paragraph of the Complaint,

which does not allege what Trump states as undisputed fact. The evidence establishes that Carroll

revealed her allegations against Donald Trump publicly for the first time on June 21, 2019, in *New*

*York Magazine*, prior to the release of her book, and that she did not consider including allegations

about Trump in her book until "four or five weeks into writing" it. Ex. 1 to Kaplan Decl. ("Carroll

Dep.") at 155:15-18; Ex. 2 to Kaplan Decl. ("Cut Article"). The evidence further establishes that

the title of Carroll's book is *What Do **We** Need Men For?* Carroll Dep. at 153:23.

     8.    Plaintiff made a conscious decision to issue an excerpt of her book to *New York*
*Magazine* as opposed to *Elle*, the magazine that formerly published her *Ask E. Jean* advice column.
Publicly, she has proffered the following justification for this decision: "Under Nina, Elle has been
less into politics or news … Nina's Elle is a fashion magazine. So I went with New York Magazine,
which knows how to break news." *See id.*, Exhibit D at 3. 9.

**<u>Response</u>:** Disputed to the extent it does not include a "citation to evidence which would

be admissible, set forth as required by Fed. R. Civ. P. 56(c)." S.D.N.Y. Local Civil Rule 56.1(d).

The evidence establishes that Carroll "made the decision along with the publisher and [her] agent"

to publish the excerpt of her book detailing the rape allegations in *New York Magazine*. Carroll

Dep. at 192:14-16. The excerpt also discussed Carroll's background, career, and other experiences

with sexual assault. *See* Cut Article. When asked in her deposition why she chose to publish in

*New York Magazine* instead of *Elle*, Carroll testified:

> Because [*Elle*] do[es]n't publish anything of [the excerpt's] length.
> They don't publish articles about women being raped. It's just they
> are very careful about not upsetting their readers and I don't believe
> that they would have run anything close to what New York ran. They
> would have cut it out very—they wouldn't want to have their readers
> upset [] concerning their columnist…. I didn't believe they would
> run a full excerpt.

*Id.* at 190:15-191:2, 191:22-23.

     9.    Additionally, Plaintiff testified that she chose *New York Magazine* over *Elle*
because she didn't "believe that [*Elle*] would have run anything close to what New York ran." *See*
*Id*. Exhibit B at 190:15-25.

**Response:** Undisputed.

10.     Following these public allegations set forth in Appellee's book, Plaintiff's defamation claim arises out of three statements in June 2019 made directly in response to Plaintiff's allegations (the "Statements"). *See id*., Ex. A at ¶ 81.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not allege

that Trump responded "directly" to Carroll's allegations.

11.     On June 21, 2019, a statement circulated by the Deputy White House Press Secretary to the press denied the accusation and Appellant stated:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.
>
> Shame on those people who make up false stories of assault to try to get publicly for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.
>
> Ms. Carroll & New York Magazine. No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.
>
> False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.
>
> If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations. *Id*. at ¶ 82.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not allege

that the statement was "circulated by the Deputy White House Press Secretary." Further disputed

to the extent that the above misquotes portions of Trump's statement, which should read:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met

this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.

Shame on **those who** make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine**:** No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

Compl. ¶ 82; *see also* Ex. 3 to Kaplan Decl. ("Trump Dep. Ex. 20").

12.     On June 22, 2019, Defendant made the following statement to the White House press:

[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson— a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is— it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me. But here's a case, it's an absolute disgrace that she's allowed to do that. *Id*. at ¶ 91.

> **Response:** Undisputed. *See also* Ex. 4 to Kaplan Decl. ("Trump Dep. Ex. 21").

13.     On June 24, 2019, Defendant issued a third statement in response to Plaintiff's allegations against him: "I'll say with great respect: Number one, she's not my type. Number two, It never happened. It never happened, OK?" *Id.* at ¶ 97.

**Response:** Disputed to the extent that the cited paragraph of the Complaint alleges that Trump "made [a third] statement," not that he "issued a third statement." Further disputed to the extent that Trump misquotes his statement, which said, "I'll say **it** with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" Compl. ¶ 97; *see also* Ex. 5 to Kaplan Decl. ("Trump Dep. Ex. 22").

14.     Following Defendant's repudiation of Plaintiff's claims, Plaintiff filed the instant complaint. See generally, *id.*

**Response:** Disputed to the extent that "[f]ollowing" suggests the instant action was filed immediately after Trump made his June 2019 statements. Carroll initially filed this action in New York State Court on November 4, 2019. *See* Compl.

15.     The Complaint alleges, among other things, that the above referenced statements issued by the President were defamatory per se and caused her to "suffer reputational, emotional, and professional harm. *Id.*

**Response:** Undisputed.

16.     Plaintiff alleges that the Statements caused her professional harm by causing "injury to her reputation, honor, and dignity." *Id.* at ¶ 132.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not include the words "professional harm."

17.     In a meager attempt to quantify this damage, Plaintiff alleges that she "received roughly 50% fewer letters than she received during the same period in 2018." *Id.* at ¶ 134.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not support the characterization "In a meager attempt to quantify this damage."

18.     Plaintiff when deposed, however, candidly admitted that she never kept track of the letters she received from Elle Readers until 2019, after the lawsuit was filed. See *id.*, Exhibit B at 230:20-24; 231:2-7.

**Response:** Undisputed.

19.     Plaintiff also produced the expert report of Professor Ashlee Humphries, PhD to assess the damages Plaintiff purportedly suffered as a result of the Statements. See generally, *id.*, Exhibit C (["Humphreys Rep."]).

**Response:** Disputed in that Trump mischaracterizes the purpose and scope of the report, which was:

> to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statements ("Statements") that were made by Donald Trump on June 21, 22, and 24, 2019, and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of these Statements by estimating the percentage of people who may have been receptive to these Statements and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll.

Humphreys Rep. at 2. Further disputed to the extent that Trump misspells the name of Professor

Ashlee Humphreys.

20.     Upon examination, the Report almost exclusively focuses on the purported harm
Plaintiff has allegedly sustained to her "reputation and person brand." *Id.* at 2.

**Response:** Disputed for the reasons stated in the response to paragraph 19.

21.     Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's
Statements caused short - and long-term harm to Ms. Carroll's person brand, shifting perceptions
associated with her person brand with the general public and specific perceptions amongst a group
of people receptive to the claims" and that Plaintiff's "reputational value has been diminished due
to the Statements." *Id.* at 5.

**Response:** Disputed as an incomplete statement of the conclusions of Prof. Humphreys'

report. *See, e.g.*, Humphreys Rep. at 3-5 (summary of opinions).

## II.     PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### A.     Trump Rapes Carroll

22.     Carroll and Trump once met at a party in the late 1980s, and long moved in similar

New York City circles. Carroll Dep. at 18:8-11, 45:20-23, 46:10-18, 48:13-18, 50:19-51:23, 96:2-

5; ███████████████████████████████████████████ Ex. 7 to

Kaplan Decl. ("Trump-Carroll Photo").

23.     They met again sometime in the fall of 1995 or the spring of 1996 at Bergdorf

Goodman on Fifth Avenue in New York City. Carroll Dep. 59:22-61:2.

24.     Carroll had gone to Bergdorf's after leaving work at a studio in New Jersey, where

she taped her "Ask E. Jean" television show, and as she was about to leave without having made

a purchase, she saw Trump through the revolving door as she was exiting onto 58th Street. *Id.* at

35:6-7, 81:13-21, 85:23-86:2, 96:2-4, 96:19-97:4.

25.     Carroll testified, "I was leaving the store. He was coming in. He held up his hand

as I was coming out so I stopped and he came in and he said hey, you're that advice lady…. I said

something like hey, you're that real estate tycoon." *Id.* at 96:2-9; *see also id.* at 96:21-22 ("[He] put up his hand to stop me from going out when he was coming in."), 98:18-20 ("Q. Why did you stop? A. It's the international symbol. It was aimed at me so I stopped.").

26.    After greeting Carroll, Trump said, "come help me buy a present." *Id.* at 99:7-8. Carroll asked, "who is the present for?" and Trump responded, "a girl," but did not give a name. *Id.* at 102:19-20.

27.    After rejecting Carroll's suggestion of handbags, and a brief perusal of hats, *id.* at 100:7-13, 103:5-6, Trump said, "I know, lingerie," *id.* at 103:22-104:2.

28.    Trump and Carroll rode the escalator to the floor with the lingerie, which Carroll noticed was empty. *Id.* at 104:14-24, 106:10-18.

29.    Upon entering the lingerie section, they saw that "on the counter were three or four boxes" and a "see-through body suit with a little bit of lace on it." *Id.* at 106:21-107:3; *see also id.* at 109:23-110:3 (describing the bodysuit as a "one-piece body suit" that was "[s]ee-through, lilac grayish-blue edged with a little bit of lace, very pretty").

30.    Trump "snatched it up" and "threw it" at Carroll, telling her to "go put this on." *Id.* at 109:11-12, 110:8. She "tossed it back to him," saying, "you put it on, it's your color," and telling him, "it goes with your eyes." *Id.* at 109:14-15, 110:8-10.

31.    Trump then "held it against [her] chest" and said, "you're in good shape, this looks like it might fit you." *Id.* at 110:24-111:3. She replied, "but it's your size." *Id.* at 111:5-6.

32.    Carroll testified, "This was banter. We're going back and forth. He's saying put this on, I'm saying you put it on. He's saying—I thought it was an enjoyable repartee." *Id.* at 111:6-9.

9

33.     After Carroll told him, "it's your size," "he took [her] arm and he said let's go put this on." *Id.* at 111:17-19. In response, Carroll explained, "I started laughing because I'm thinking to myself this is hilarious, I'm going to make him put it on over his pants. That's my plan. And then after I make him put it on over his pants I'm going to have a story that I can tell my friends at dinner." *Id.* at 111:19-25.

34.     Then, in "all one action":

> I stepped into the room, the door was banged closed and he pushed me up against the wall…. [H]e immediately pushed me up against the wall so hard that I banged my head …. It hurt. It jolted me and then he pushed me back again and I hit it again for a second time.

*Id.* at 115:15-17, 116:13-15, 119: 6-8.

35.     She testified further:

> [W]hen he first shoved me against the wall, [he] lunged and shoved me back and I hit my head, [and] he put his mouth against mine.

*Id.* at 127:19-21.

36.     Carroll explained, "I was so shocked that I didn't speak. What I did was I laughed."

*Id.* at 118:22-23. When asked why she was laughing, Carroll answered:

> A. Shock. Trying to recapture the camaraderie we had and sort of a feeling of a lark, we're on a lark, we're having an adventure, it's a lark, trying to recapture that and take it out of the realm where he had entered, trying to reduce any eroticism about it.
>
> Q. Was it erotic?
>
> A. Not to me.
>
> Q. Was he angry?
>
> A. No.
>
> Q. What was his demeanor?
>
> A. Intent.

*Id.* at 119:25-120:13.

37.     After Carroll had "hit [her] head twice," she testified:

> [T]hen he had his hands on my arms, pushed me back a second time, hit my head and then he put his shoulder into me, and he's a big man. He's—and he—guessing 220, maybe 225 at the time. I weighed 120. He was 100 more pounds. And that was one of the things that went through my mind was how big and heavy he was because his whole weight came, his shoulder came into me and so at this point I realized it was serious. I was shocked before because he put me against the wall but now I understood that this is—this is a battle, and he pulled down my tights…. [I]t went from good humor joshing into being up against the wall and then having that heavy weight against me.

*Id.* at 120:20-121:10, 121:16-18.

38.     After he pulled down her tights, she "tried to get [her] arms up to push him back," but "[t]he problem was [she] couldn't get [her] knee up because the pantyhose had been taken down." *Id.* at 122:13-17.

39.     Then he raped her:

> I felt his fingers rummaging around my vagina and this huge weight against me. My head hurt, this huge weight, I'm in a situation where I can't—I can't—at one point I remember saying this is Donald Trump, what the heck is going on? And then I felt his penis inside of me.

*Id.* at 123:6-13.

40.     Finally, Carroll "managed to get [her] knee up and push off." *Id.* at 125:8-9. When asked, "[s]o when you pushed him off with your knee, did he back off of you?," she answered, "Well, I pushed him with hands and knee and I didn't look to see what he was doing. I turned and got out." *Id.* at 127:4-9.

41.     As she fled down the escalator, Carroll testified, "I do remember going and having the fear that he may—may be coming after me" and would "maybe grab me again." *Id.* at 128:10-24.

42.     She exited on Fifth Avenue and immediately called her friend Lisa Birnbach. *Id.* at 130:13-14. Carroll "was in shock and disordered," and "felt unbalanced." *Id.* at 135:5-6.

43.     When Birnbach answered, she noticed that "E. Jean was very agitated, very hyperventilating. Emotional. And she told me about what happened to her just really moments before she made the phone call." Ex. 8 to Kaplan Decl. ("Birnbach Dep.") at 34:14-18. Birnbach explained that "[t]here was a moment that [Carroll] was laughing. But she was not laughing funny. She was laughing excited. Highly reactive." *Id.* at 35:20-23.

44.     Carroll then told Birnbach what "just happened," *id.* at 36:17-37:17, 38:10-24, 39:2-5, and Birnbach replied, "E. Jean, you've been raped," *id.* at 39:12-13. Birnbach told Carroll that she should go to the police, but Carroll refused. *See id.* at 39:14-20; Carroll Dep. at 134:15-21 ("I remember Lisa suggesting I go to the police and also Lisa suggesting that she go to the police with me and that idea was so, such a terrible—I couldn't picture myself going to the police so I shut that down.").

45.     Instead Carroll "swore [Birnbach] to secrecy," saying, "you and I will never discuss this again." Birnbach Dep. at 40:4-9.

46.     The "next day or the day after," Carroll told her friend Carol Martin what had happened. Carroll Dep. at 141:10-14; Ex. 9 to Kaplan Decl. ("Martin Dep.") at 27:24-28:18, 32:6-12. Martin "advised [Carroll] not to do anything," telling her "that Mr. Trump had many lawyers and he would bury her" if she brought this allegation. *Id.* at 33:8-24; *see also* Carroll Dep. at 143:19-21 ("[Martin] said tell no one, he's got 200 lawyers, he'll bury you.").

47.     Carroll did not tell another person for over two decades. She explained:

> I didn't want to talk about it ever again, ever. That was it, and I didn't want to hear about it ever again. I was embarrassed, I was ashamed at this point. I was raped, this is like—this was shocking and so I just said let's never talk about this again. … I didn't want

> to talk to anybody or tell the police. I just didn't—it was just
> something that I would keep to myself.

Carroll Dep. at 138:7-15, 144:9-12; *see also id.* at 144:18-19 ("I always feel I can handle things
myself.").

48.     In her deposition, she was asked about the use of the word "rape" to describe what

happened to her:

> Q. … [Y]ou had stated prior that you didn't like using the word
> "rape." Do you recall that?
>
> A. I recall feeling that.
>
> Q. Why did you feel that way?
>
> A. The word to me means something that generally speaking a man
> does to a woman, that she's powerless, that he has the power over
> her, rape. It means he's taken something from her and I didn't view
> it that way. I viewed ... what went on in that dressing room as a fight.
>
> Q. Did you feel like you won that fight?
>
> A. I don't think there are any winners there.

*Id.* at 138:19-139:10.

49.     When asked why she did not come forward sooner, she further testified:

> I'm going to say something that even surprises me because women
> who have been raped are looked at in this society as less, are looked
> at as spoiled goods, are looked at as rather dumb to let themselves
> get attacked. I mean even you have to say did you scream? I mean
> every woman who admits to being attacked has to answer that
> question, why didn't you scream, why did you come forward when
> you did, why didn't you come forward before ….

*Id.* at 147:16-148:7.

50.     Carroll never had sex or dated again, *id.* at 44:17-25, explaining that, after the rape,

"the music had stopped" and her "light was gone," *id.* at 41:3-4, 42:13-18. In her own words, she

explained, "I had no desire for desire. I don't have the desire to want sex. You have to want sex."

*Id.* at 43:5-7.

B.      **Carroll Comes Forward**

51.      In 2016, Trump announced his candidacy for President, and Carroll felt "[j]ust

almost disbelief and a little bit of heartache." *Id.* at 148:9-15.

52.      When asked why she did not come forward with her account at that time, she

testified:

> A. I was with my mother in Bloomington, Indiana. She was on her
> deathbed. She was a feisty redheaded Scottish woman, republican
> politician, so we gathered around for her last weeks.
>
> Q. Did you think she would be upset if she heard the allegations
> against Donald Trump?
>
> A. That's all she needed to hear on her death bed. Well, I was
> worried that it would ruin her last days and I just couldn't have done
> it. I just wouldn't have done it.

*Id.* at 148:20-149:10.

53.      Carroll further testified:

> Q. What do you mean by helping him?
>
> A. As more and more women came forward with accusations against
> the former president, his popularity seemed to go up.
>
> …
>
> Q. And that was part of the reason you didn't come out with it; is
> that correct?
>
> A. ... I was – didn't think it was -- I knew it would help him. I didn't
> want to get fired from Elle and I didn't want to lose my reputation
> and I didn't want to be looked at as soiled goods or stupid to go get
> yourself attacked in Bergdorf's. It was not something I would want
> to talk about.

*Id.* at 150:19-151:23.

54.      In 2017, Carroll took a road trip interviewing women for a book she was writing.

*Id.* at 153:22-23. She testified:

> I started the book because over the 26 years that I was writing the
> column, almost every single letter, whether it was about career or
> finances or children or romance, there was always a complaint about

14

> a man. So I spent 26 years saying get rid of him, get rid of him. So
> I thought why don't I just go on the road and ask women what do
> we need men for and let them tell me so I don't go through with my
> idea which is to put them, all the men, in Montana. That was the
> idea. That was what I was going to do. It had nothing to do with
> Donald Trump, nothing, and then the first day of the trip started. My
> intention was to go to towns named after women, only wear clothes
> designed by women, only eat in restaurants like Betty's Cafe run by
> women or owned by women, only listen to books by women in the
> car, listen to music by women. That was the whole thing. I get out
> of the car when I got to the small town and talk to the people, what
> do we need men for. I was getting fabulous answers.

*Id.* at 153:23-154:24.

55.     The same day her road trip started, "the Harvey Weinstein story broke." *Id.*

at 154:24-25. After this, she began "making a list" of the "hideous men" in her life." *Id.* at

155:13-14, 156:6. She explained that "[m]any other men were on it but [Trump] wasn't," and she

"didn't make th[e] decision to include him [in the book] until four or five weeks into writing the

book." *Id.* at 155:14-18.

56.     In her deposition, she testified about the prior sexual assaults she experienced. *See*

*id.* at 161:6-16, 173:7-175:8.

57.     Carroll decided to include Trump on her list because of "the flood of stories that

started as women started standing up" during the #MeToo movement. *Id.* at 155:2-3.

58.     When asked "[i]f it wasn't for the #MeToo movement, do you think you would

have spoken out against the defendant?," Carroll answered, "No, I don't think I would have." *Id.*

at 153:9-12.

59.     Prior to the release of the book, *New York Magazine* published an excerpt of the

book that included stories about Carroll's background, career, and experiences with sexual assault,

including being raped by Trump. *Id.* at 190:7-8; Cut Article; Ex. 10 to Kaplan Decl. (eight-page

print version of book excerpt).

60.     She made the decision "along with the publisher and [her] agent" to publish the

excerpt in *New York Magazine*. Carroll Dep. at 192:15-16. Carroll testified:

> Because [*Elle*] do[es]n't publish anything of [the excerpt's] length.
> They don't publish articles about women being raped. It's just they
> are very careful about not upsetting their readers and I don't believe
> that they would have run anything close to what New York ran. They
> would have cut it out very—they wouldn't want to have their readers
> upset [] concerning their columnist…. I didn't believe they would
> run a full excerpt.

*Id.* at 190:17-191:2, 191:22-23.

61.     Trump responded to the allegations with three statements made on June 21, 22, and

24, 2019, respectively. *See* ███████████████████ Trump Dep. Ex. 20; Trump Dep. Ex. 21;

Trump Dep. Ex. 22; *see also* Ex. 11 to Kaplan Decl., at 5-6, 16-17, 21 (Defendant's Responses

and Objections to Plaintiff's First Set of Requests for Admission).

62.     When asked in her deposition how she expected him to react to the allegations, she

explained:

> I didn't think he would deny it. I thought he would just say it didn't
> happen that way. She agreed to it or it was consensual sex.
>
> …
>
> I just was shocked that he absolutely denied it because he was there
> and he denied it. That's what gets me every time. He was there, he
> denied it.

Carroll Dep. at 166:2-6, 167:3-7.

63.     Carroll was also asked if, "[p]rior to releasing this article with The Cut, did [she]

anticipate that you might need to sue the defendant to hold him accountable?" She replied, "No, it

was the last thing I would ever think of." *Id.* at 167:17-22.

**C.**   ██████████████████████████████████

64.     ████████████████████████████████████████

██████████████████████████████████

16



65.











78.

79.

80.

### D.      Carroll Suffered Professional and Reputational Harm

81.      Carroll had been writing a regular advice column in *Elle* Magazine, titled *Ask E.*

*Jean*, since 1993. Carroll Dep. at 33:14-16, 175:15-17. She testified:

> [The column] had run in the magazine for 26 years. It was one of
> the most popular columns ever in the magazine. I loved my readers,
> loved them. They would pour their hearts out to me and I loved
> helping them, they helped me …. [There is a] foundation of trust
> that a columnist has with their readers. And those readers, I loved
> those readers. They are the best in the world.

*Id.* at 175:15-176:4, 176:7-10.

82.      When Carroll "was writing the [advice] column in [*Elle*], *Ask E. Jean* received

hundreds of letters every month." *Id.* at 38:3-5.

83.      Roberta Myers, Carroll's former boss and the editor-in-chief of *Elle* for 17 years,

testified that Carroll "was beloved" and "really important to the magazine," and she was "good at

[building an audience]." Ex. 12 to Kaplan Decl. ("Myers Dep.") at 28:9-13.

84.      Myers testified to Carroll's importance to the magazine:

> [I]f the magazine world is somewhat in decline, you actually want
> to keep those people who readers—you know, she's a destination,
> meaning readers would want to hear from her. She was an important
> part of what kept us [] popular. Also with the Internet we had another
> place to put her and put her—what she produced, right. So the
> audience actually got bigger for her.

*Id.* at 32:4-12.

85.      When asked about Carroll's reputation, Myers testified:

> E. Jean was—I mean, she's kind of a rock star, meaning, you know,
> she had a public profile before she came to Elle, people knew who
> she was. She was on television. She had a show on MSNBC. She

was hired by Roger Ailes. So she was public in that way, but she also worked for a lot of different places.

…

[In the office], people that didn't work with her and maybe hadn't met her, she would come up these dramatic stairs and it would be like E. Jean, you're great, you rock. Of course, when she was on the floor, you know, Elle's floor, people just loved to see her because also she would walk up to them and say "What are you working on, girl," you know.

*Id.* at 22:12-18, 25:11-18.

86.     She also testified to Carroll's impact on the magazine industry as a whole:

Q. Would you say she had an impact on advice column—the advice column genre more broadly?

A. Absolutely. I mean, it sort of exploded, you know, the other— some of our competitors … never had advice columnists. So I think that the term "advice columnist" has sort of like maybe kind of a dated feeling to it starting with Anne Landers and people who wrote in newspapers which were completely legitimate, but Elle was a national magazine which meant she was talking to the whole country.

Q. So other publications including competitors added advice columnists because of E. Jean?

A. Yes, but I will say that E. Jean was in a particular sort of category by herself. As I said, she had a high public profile before she came to Elle. I mean, what other people are doing is great, right, and it's fun and interesting, but women really trusted E. Jean and we got lots of feedback from readers that she helped them. Also, you know, they loved her voice because she puts a lot of funny in there or sort of— but it's always undergirded by reporting.

*Id.* at 23:5-24:4.

87.     When asked about Carroll's relationship with her readers, Myers continued:

Q. How would you describe E. Jean as a writer?

A. [T]he term that came to mind is sort of she's a baller … as a writer. She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts, but she—she also, you know, has a lot of wit and I think that's why her readers loved her so much.

*Id.* at 21:15-22.

88.     Carroll's "entire career as an advice columnist rested on the fact that [she] could be trusted." Carroll Dep. at 175:22-24. And during Myers's tenure at Elle, there were no concerns about Carroll's accuracy as a writer. Myers Dep. at 26:14-27:10.

89.     Carroll's reputation was severely damaged by Trump's June 2019 statements. After Trump's statements were published, Carroll "was looked at as a woman who's untrustworthy, looked at ... as a woman who can't be believed." Carroll Dep. at 172:12-14; *see also id.* at 176:2-4 ("So when the president said I'm a liar, it shook that whole foundation, that was it."). She received significant negative attention (both publicly and privately) following Trump's statements. Humphreys Rep. at 49-58; Ex. 13 to Kaplan Decl. (Appendix H to the Expert Report of Professor Ashlee Humphreys); Ex. 14 to Kaplan Decl. (Appendix I to the Expert Report of Professor Ashlee Humphreys).

90.     She received fewer letters after Trump made his statements and was terminated from *Elle* months before her contract was up for renewal. Carroll Dep. at 176:12-13, 176:25-177:12.

91.     The quantitative data shows that Trump's statements were widely disseminated. Based on a comprehensive analysis conducted by Professor Ashlee Humphreys, Ph. D., and using conservative estimates, Trump's defamatory statements generated between 142,334,424 and 188,155,507 impressions across various forms of media. *See* Humphreys Rep. at 26-30 & Appxs. D, E, F, G.

92.     Prof. Humphreys completed a quantitative impact analysis that showed 25.25% of readers and listeners were likely to believe Trump's statements. *Id.* at 58-63 & Appx. L. As a result, between 34,075,512 and 42,936,354 of the impressions generated by Trump's statements were likely received by people who were receptive to them. *Id.*

Dated: New York, New York
      January 12, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Telephone: (212) 742-2661
Facsimile: (212) 564-0883
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

E. JEAN CARROLL,

*Plaintiff*,

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

---

**DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF**
**PLAINTIFF E. JEAN CARROLL'S OPPOSITION TO**
**DEFENDANT DONALD J. TRUMP'S MOTION FOR SUMMARY JUDGMENT**

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Plaintiff's opposition to Defendant Donald J. Trump's motion for summary judgment.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the official transcript of Carroll's deposition, taken in this action on October 14, 2022.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the excerpt from Carroll's book published in *New York Magazine*, which appeared online on June 21, 2019, and which was marked as Plaintiff's Exhibit 4 during Carroll's October 14, 2022 deposition.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a tweet containing the statement that Trump made about Carroll on June 21, 2019, which was marked as Exhibit 20 during Trump's deposition, taken in this action on October 19, 2022.

1

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the press transcript containing the statement that Trump made about Carroll on June 22, 2019, which was marked as Exhibit 21 during Trump's October 19, 2022 deposition.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the June 24, 2019 *Hill* article containing the statement that Trump made about Carroll, which was marked as Exhibit 22 during Trump's October 19, 2022 deposition.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the official transcript of Trump's October 19, 2022 deposition.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of a photograph of Trump and Carroll, which was marked as Exhibit 23 during Trump's October 19, 2022 deposition.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of excerpts from the official transcript of Lisa Birnbach's deposition, which was taken in this action on September 21, 2022.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of excerpts from the official transcript of Carol Martin's deposition, which was taken in this action on October 18, 2022.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the excerpt from Carroll's book published in *New York Magazine*, which appeared in print in the June 24-July 7, 2019 edition, and which was marked as Exhibit 18 during Trump's October 19, 2022 deposition.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, dated July 13, 2022.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of excerpts from the official transcript of Roberta Myers' deposition, which was taken on October 12, 2022.

15.     Attached hereto as **Exhibit 13** is a true and correct copy of Appendix H to the Expert Report of Ashlee Humphreys, PhD, dated October 14, 2022.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of Appendix I to the Expert

Report of Ashlee Humphreys, PhD, dated October 14, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
              January 12, 2023                              _____
                                                            Roberta A. Kaplan

# EXHIBIT 1

Page 1

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5   E. JEAN CARROLL,            )
              Plaintiff,     )
6                             )
          -against-          )20-cv-7311(LAK)
7                             )
    DONALD J. TRUMP, in his   )
8   personal capacity,        )
              Defendant.      )
9   _____   )

10

11

12          ***CONFIDENTIAL***

13      VIDEOTAPED DEPOSITION OF

14          E. JEAN CARROLL

15        New York, New York

16      Friday, October 14, 2022

17

18

19

20   Reported By:

21   CATHI IRISH, RPR, CRR, CLVS

22

23

24

25

Page 18

```
 1              CARROLL - CONFIDENTIAL
 2    outstanding.
 3         Q.   Outstanding what?
 4         A.   Outstanding that I remember them
 5    and think fondly of our time together.
 6         Q.   Outstanding men is what you mean?
 7         A.   Yes.
 8         Q.   How did you meet your second
 9    husband?
10         A.   He was at Elaine's, I was at
11    Elaine's.  I was at the writer's table.
12    On Thursday night all the writers in
13    New York would in our set would gather at
14    the table.  He was at the end of the room.
15    He happened to push back his chair and
16    look at me and I pushed back my chair at
17    the same time and looked at him and that
18    was it.
19         Q.   Have you ever had acting,
20    classes, Ms. Carroll?
21         A.   No, I could probably use them.
22         Q.   So you met him and gave him a
23    look and you began dating; is that
24    correct?
25         A.   He gave me a look.
```

Page 33

```
 1              CARROLL - CONFIDENTIAL
 2    it.
 3        Q.   We can figure that out later.
 4             So you left Esquire in
 5    approximately 1999; is that correct?
 6        A.   No.
 7        Q.   No.
 8        A.   I never left Esquire.
 9        Q.   Okay.  I understand.  Your
10    stories weren't being picked up by Esquire
11    around 1999; is that correct?
12        A.   No, it was in the early 2000s.
13        Q.   Early 2000s.  And what about
14    Elle, when did you start work for Elle
15    magazine?
16        A.   1993.
17        Q.   And how much were you making when
18    you started at Elle, per article?
19        A.   6,000 a column.
20        Q.   And at what point did you start
21    working or getting your articles accepted
22    by Esquire again?
23        A.   That was always -- it was a
24    stream with Esquire.  It was -- writing
25    never stopped until -- I have no idea when
```

Page 35

```
  1              CARROLL - CONFIDENTIAL
  2   called America's Talking.
  3        Q.   And what did you do for NBC?
  4        A.   I had my own talk show.
  5        Q.   What was that talk show called?
  6        A.   It was based on the Ask E. Jean
  7   column so it was called Ask E. Jean.
  8        Q.   How much did you make from NBC
  9   for that show?
 10        A.   I don't remember.  I don't
 11   remember.  And I can't even guess.
 12        Q.   So you stated that up through
 13   1997 you were working for Elle, Esquire
 14   and NBC collectively; is that correct?
 15        A.   Yes, and there may have been
 16   other magazines that I wrote for during
 17   the time.  I remember TV Guide once, maybe
 18   Glamour.  I'm not sure.
 19        Q.   Let's go through each of them.
 20        A.   Oh, boy.
 21        Q.   Sorry.  For Elle magazine, when
 22   did -- I'm trying to state this
 23   articulately, I'm not a journalist, but
 24   when did you stop getting your articles
 25   accepted through Elle magazine?
```

Page 38

```
 1            CARROLL - CONFIDENTIAL
 2   website?
 3      A.   As I was writing the column, Ask
 4   E. Jean received hundreds of letters every
 5   month.  One afternoon I had a letter in my
 6   hand from a woman who felt bad about
 7   breaking up with her boyfriend because he
 8   was such a nice guy.  In this hand
 9   (indicating) I had a letter from a woman
10   looking for a nice guy.
11      Q.   You'll have to state what you
12   mean.
13         MS. KAPLAN:  In order to reflect
14      that, Ms. Carroll moved her two
15      fingers from each hand together, made
16      that gesture.
17   BY MS. HABBA:
18      Q.   So that's where you got the idea
19   when you got those two separate letters;
20   is that correct?
21      A.   (Witness nodded.)  Yes.
22      Q.   And how long were you working
23   with your sister?
24      A.   We worked together from 2000 to
25   2004 or 2005.
```

```
                                            Page 41

 1               CARROLL - CONFIDENTIAL

 2      is on it means it's available, wants to

 3      meet people.  I didn't have that.  My

 4      light was gone.

 5          Q.   But you had been looking on the

 6      website to see if there was anyone?

 7          A.   I'm always curious.

 8          Q.   Do you go out on dates?

 9               MS. KAPLAN:  Again, let's have a

10          time frame.

11      BY MS. HABBA:

12          Q.   Same time frame, let's stick with

13      that time frame, when you sold it to The

14      Knot.

15          A.   Every once in awhile but I rarely

16      let a new acquaintance get to the point

17      where he would ask me out or I would ask

18      him out.

19          Q.   So you would go to dinners; is

20      that correct?

21          A.   Yes, as friends.

22          Q.   Let me ask you this:  Did you

23      only date men?

24          A.   Yes.

25          Q.   Never dated women?
```

```
                                            Page 42
 1           CARROLL - CONFIDENTIAL
 2      A.    No.
 3      Q.    So who was your last significant
 4  relationship that you remember?
 5      A.    John Johnson.
 6      Q.    Who was the last man you dated
 7  that you recall?
 8      A.    I don't remember his name.
 9  That's how significant it was.
10      Q.    Do you remember approximately
11  when?
12      A.    No.  It's not for lack of trying.
13  I wanted to meet people.  I just -- the
14  music had stopped.
15      Q.    Why do you think the music had
16  stopped?
17      A.    Well, looking back on it, it may
18  have been what happened at Bergdorf's.
19      Q.    Is there anything else that you
20  think could have caused it?
21      A.    Luck, not -- not meeting people
22  that would make me want to spend time with
23  them.
24      Q.    Do you consider yourself asexual
25  at this moment?
```

```
                                              Page 43

 1              CARROLL - CONFIDENTIAL
 2      A.   No.
 3      Q.   So a sex drive is not the issue;
 4   is that correct?
 5      A.   I had no desire for desire.  I
 6   don't have the desire to want sex.  You
 7   have to want sex.
 8      Q.   Would you describe that as a sex
 9   drive for most people?
10      A.   Yes.
11      Q.   Have you ever tried to fix that
12   in any way, meaning getting help?
13      A.   Well, looking back perhaps maybe
14   I should have but in my own way, I started
15   a dating site and then I started another
16   dating site.  It's not that I was, you
17   know, staying in the house with a shawl
18   over my head.
19      Q.   What type of men do you like?
20           MS. KAPLAN:  Objection to form.
21           MS. HABBA:  Generally what type
22      of men do you like?
23           MS. KAPLAN:  You can answer.
24           THE WITNESS:  Men who live
25      fascinating lives, men who are kind,
```

```
                                                    Page 44
 1              CARROLL - CONFIDENTIAL
 2      men who have a great sense of humor,
 3      men who are fun to be with, men who
 4      love animals, men who love their
 5      mothers, men who like women, men who
 6      like other men, not sexually but like,
 7      you know, athletic men, adventurous
 8      men.
 9   BY MS. HABBA:
10      Q.   Do you like men who are
11   successful?
12      A.   Yes.
13           MS. KAPLAN:  Objection to form,
14      sorry.
15           THE WITNESS:  Yes.
16   BY MS. HABBA:
17      Q.   When is the last time you went
18   out with a man -- how do I state this --
19   in hopes of becoming more than friends?
20      A.   See, that's the thing.  You put
21   your finger on it.  I've never met anybody
22   since that time where I felt that hope of
23   wow, I hope this turns into something.
24      Q.   So when is last time you had sex?
25      A.   '94 or '95.
```

Page 45

```
 1               CARROLL - CONFIDENTIAL
 2      Q.   And how do you define sex?
 3      A.   Well, for what we're talking
 4  about today, I'm defining it as a man and
 5  a woman and a penis is inserted into the
 6  vagina.  I'm going to show you the.
 7           MS. HABBA:  Complaint.  We'll
 8      mark this as Exhibit P-1, please.
 9           (Exhibit P-1, complaint, marked
10      for identification.)
11  BY MS. HABBA:
12      Q.   Do you recognize this document,
13  Ms. Carroll?
14      A.   Yes.
15      Q.   Is this the complaint you filed
16  against the defendant, Donald Trump?  I
17  can represent to you that this is a filed
18  copy from the clerk.
19      A.   Yes.
20      Q.   In your complaint you state you
21  met the defendant at least once before
22  prior to the alleged attack; is that true?
23      A.   Yes.
24      Q.   And when did you first meet him?
25           MS. KAPLAN:  Do you have that
```

```
                                              Page 46
   1            CARROLL - CONFIDENTIAL
   2      paragraph?
   3            MS. HABBA:  Sure.  Actually I
   4      wanted her to answer the question and
   5      then I have a couple things to
   6      reference.
   7    BY MS. HABBA:
   8      Q.   Do you remember when you first
   9    met him?
  10      A.   I think it was when I was a
  11    writer at Saturday Night Live.
  12      Q.   What year was that?
  13      A.   1987.  We forgot put that on the
  14    jobs list.
  15      Q.   We can go back to that.  Thank
  16    you.
  17            When did you start working with
  18    SNL?
  19      A.   1987.
  20      Q.   1987.  And how long did you work
  21    with them?
  22      A.   One year.
  23      Q.   One year.  And are their any
  24    other jobs or forms of income source that
  25    I am forgetting?
```

Page 48

```
 1            CARROLL - CONFIDENTIAL
 2     is my life blood.
 3         Q.   And you wrote mostly about
 4     relationships; is that correct?
 5         A.   No.
 6         Q.   What did you write about usually,
 7     if there was a theme?
 8         A.   There was not a theme.
 9         Q.   Okay, fair enough.
10              So you met Donald Trump in 1987
11     you stated; is that right?
12         A.   I believe it was '87.
13         Q.   Where did you first meet him?
14         A.   It was at one of two parties.  It
15     was either an NBC party where John and I
16     were going because I worked with Saturday
17     Night Live or an ABC party where he was an
18     anchor, so it had to be one of those two.
19         Q.   And just for the record, by "he"
20     you mean your husband John?
21         A.   (Witness nodded.)
22              MS. KAPLAN:  You have to say.
23              THE WITNESS:  Yes.
24              MS. KAPLAN:  Thank you.
25     ///
```

Page 49

```
 1              CARROLL - CONFIDENTIAL
 2    BY MS. HABBA:
 3        Q.   Did you have any conversations
 4    with Donald Trump on that date?
 5        A.   Yes.
 6        Q.   And what was that conversation?
 7        A.   I don't recall it.
 8        Q.   Do you recall how long you spoke
 9    to Donald Trump?
10        A.   Six, five, six minutes.
11        Q.   Were you alone when you spoke to
12    the former president?
13        A.   No.
14        Q.   Who was there?
15        A.   My husband and Ivana Trump.
16        Q.   Did you speak with Ivana?
17        A.   Yes.
18        Q.   How long did you speak to her?
19        A.   It was a group conversation so
20    five or six minutes.
21        Q.   And you have no recollection of
22    the subject matter you discussed?
23        A.   It does not stand out in my mind.
24    I remember -- I remember it was not the
25    usual New York conversation.
```

Page 50

1              CARROLL - CONFIDENTIAL

2      Q.   What do you mean by that?

3      A.   Wow, I love your dress, Ivana.

4   It was not that kind of conversation.  It

5   was more.

6      Q.   So what you just said was not

7   stated, it was an example of what you

8   would --

9      A.   Not I would say.  The

10  conversation was not about -- it was --

11  because I would remember that if we talked

12  about dresses.  I would completely

13  remember that.  So it was not about that.

14  I don't remember what it was about.

15     Q.   Why would you remember if it was

16  about a dress you think?

17     A.   I always -- I usually remember

18  details like that.

19     Q.   Following the conversation, can

20  you please tell me any other time you met

21  Donald Trump?

22     A.   He said hello to me one time on

23  the street, waved.

24     Q.   When was that?

25     A.   '94 or '95.

Page 51

```
 1              CARROLL - CONFIDENTIAL
 2      Q.   Was that in New York?
 3      A.   Yes.
 4      Q.   Do you remember where in
 5 New York?
 6      A.   Yeah.  He was standing on the
 7 side of Fifth Avenue where the Trump
 8 building is and I was across the street on
 9 Fifth Avenue.
10      Q.   And what was the interaction?
11      A.   Nothing.  It was across traffic.
12 He waved.
13      Q.   Did he call your name?
14      A.   No.
15      Q.   So he was exiting Trump Tower and
16 waved?
17      A.   No, he was on that block.
18      Q.   Were you alone?
19      A.   Yes.
20      Q.   Did you say anything?
21      A.   No.
22      Q.   Did you wave back?
23      A.   Yes.
24      Q.   And after that interaction, what
25 was the next time you saw Donald Trump?
```

Page 59

```
1              CARROLL - CONFIDENTIAL
2    of Donald Trump prior to the alleged
3    attack?
4         A.    I thought he was a bon vivant,
5    man-about-town, real estate, big real
6    estate guy, generally a positive outlook.
7         Q.    Did you think he was attractive?
8         A.    Yes.
9         Q.    What made him attractive to you
10   at that time?
11        A.    He was tall, he was, you know,
12   great looking.  That's it.
13        Q.    Did you like speaking to him?
14        A.    Yes, I did, but I like speaking
15   to you.
16        Q.    Likewise.  Okay, I am going to
17   switch into the complaint so P-1 in front
18   of you which is the complaint.
19              When exactly did Donald Trump
20   purportedly assault you?
21        A.    Say that again?
22        Q.    When did Donald Trump assault
23   you?
24        A.    80 -- the fall of 1995 or -- the
25   fall of 1995 or the spring of '96.  It was
```

Page 60

```
 1                 CARROLL - CONFIDENTIAL
 2    during that six- or seven-month period.
 3        Q.   So you don't remember which year
 4    it was; is that correct?
 5        A.   No, it could be either one
 6    because it's just the fall of one or the
 7    spring of the other.
 8        Q.   Are there any details that would
 9    lead you to believe it occurred in 1995 or
10    1996 such as the weather that you can
11    recall?
12        A.   Yes.
13        Q.   What was the weather that day?
14        A.   I was wearing a wool dress and he
15    was wearing an overcoat, and it was
16    darkish outside so it was not in the
17    summer because it would have been much
18    lighter.
19        Q.   What led you to isolate the range
20    of the incident between those two years?
21        A.   Because what I had on and
22    narrowing it down as best as I could.
23        Q.   Did you do anything to try and
24    narrow it down as best as you could?
25        A.   (Witness nodded.)
```

Page 61

```
 1              CARROLL - CONFIDENTIAL

 2       Q.    Is that a yes?

 3       A.    I didn't.  Certainly

 4  investigators for New York Magazine and

 5  The New York Times tried to really nail it

 6  down.

 7       Q.    How did they try to do that?

 8       A.    The label on the dress, the shoes

 9  where I bought them.  We all pitched in

10  and tried to figure it out.

11       Q.    Who was a part of that process?

12       A.    New York Times fact-checking and

13  New York Times, there were four reporters

14  on the story.

15       Q.    Do you remember the reporters'

16  names?

17       A.    (Witness nodded.)

18       Q.    Could you please provide them?

19       A.    Megan Twohey.

20       Q.    Can you spell that?

21       A.    Megan Twohey, Jessica Bennett,

22  Katie Rossman and the book editor, Alter,

23  I forget her first name.

24       Q.    Can you spell that, A-L-T-E-R?

25       A.    A-L-T-E-R, Alexandra Alter.
```

Page 81

```
 1              CARROLL - CONFIDENTIAL
 2      A F T E R N O O N    S E S S I O N
 3           (Time noted:  12:45 p.m.)
 4    E.   J E A N    C A R R O L L,   resumed
 5       and testified as follows:
 6             THE VIDEOGRAPHER:  The time is
 7       12:45 p.m.  We're back on the record.
 8       You may proceed.
 9    CONTINUED EXAMINATION
10    BY MS. HABBA:
11       Q.   I'll just remind you that you are
12    still under oath, as you know.
13             Let's discuss the complaint.  You
14    stated that you had left work and went to
15    Bergdorf Goodman; is that correct?
16       A.   Yes.
17       Q.   And where was work?
18       A.   Work was in -- across the river,
19    across the George Washington Bridge in
20    Fort Lee, New Jersey.  It was an NBC
21    adjunct.
22       Q.   Why did you go to Bergdorf?
23       A.   Bergdorf has great sales.
24       Q.   Was there a sale at that point?
25       A.   I don't remember but I think that
```

```
                                              Page 85

 1              CARROLL - CONFIDENTIAL

 2       Q.   Was there anybody you were

 3   particularly friendly with?

 4       A.   Carol Martin.

 5       Q.   Was Carol Martin at work on the

 6   day in question?

 7       A.   No.

 8       Q.   No?

 9       A.   I don't know.

10       Q.   You don't know if she was at

11   work?

12       A.   I don't know.

13       Q.   Did you have any plans that day

14   following your visit to Bergdorf's?

15       A.   I can't recall.

16       Q.   Okay, were you planning on

17   meeting -- you don't recall if you were

18   planning on meeting anyone?

19       A.   I cannot recall.

20       Q.   Did you typically go to Bergdorf

21   after work?

22       A.   No.

23       Q.   Did you buy anything at Bergdorf

24   that day?

25       A.   I suspect not because I don't
```

Page 86

```
 1              CARROLL - CONFIDENTIAL
 2    remember having packages or a carrier bag.
 3         Q.   Did you have dinner after
 4    Bergdorf that day?
 5         A.   No, I couldn't eat.
 6         Q.   Did you see anyone after Bergdorf
 7    that day?
 8         A.   No.
 9         Q.   Were you dating anyone at this
10    time?
11         A.   Not that I recall.
12         Q.   Do you recall having any
13    boyfriends during the time period from
14    spring of the fall of '95 until spring of
15    '96?
16         A.   There may have been chaps
17    floating around in the atmosphere.  There
18    may have been some interest but boy, I
19    cannot remember specifically.  No.
20         Q.   Do you remember the last person
21    you slept with prior to this incident?
22         A.   Yes.
23         Q.   Who was that?
24         A.   John Johnson.
25         Q.   Do you remember how long ago that
```

Page 96

```
 1              CARROLL - CONFIDENTIAL
 2       A.    I was leaving the store.  He was
 3   coming in.  He held up his hand as I was
 4   coming out so I stopped and he came in and
 5   he said hey, you're that advice lady.
 6       Q.    Did you respond to him at that
 7   time?
 8       A.    I said something like hey, you're
 9   that real estate tycoon.
10       Q.    Had he ever previously referred
11   to you as the advice lady?
12            MS. KAPLAN:  Objection to form.
13   BY MS. HABBA:
14       Q.    That you know of, I should say.
15       A.    I don't know if he has or not.
16       Q.    Had you ever heard him call you
17   that in your prior encounters?
18       A.    No.
19       Q.    Did he gesture at you in any way
20   when he saw you?
21       A.    Put up his hand to stop me from
22   going out when he was coming in.
23       Q.    Was it a revolving door?
24       A.    Yes.
25       Q.    So he was on the other side of
```

Page 97

```
 1            CARROLL - CONFIDENTIAL
 2   the revolving door when he put his hands
 3   up?
 4       A.   He was outside.
 5       Q.   Just have the record reflect
 6   she's putting her hand up.
 7            Was defendant accompanied by
 8   anyone when he was walking in?
 9       A.   No.
10       Q.   Did he have security?
11       A.   No.
12       Q.   When you had seen the defendant
13   prior times, did he have security?
14       A.   I didn't see any security.
15       Q.   Did anyone else recognize the
16   defendant when he came in?
17            MS. KAPLAN:  Objection to form.
18       If you know.
19            THE WITNESS:  One shopper and a
20       sales attendant.
21   BY MS. HABBA:
22       Q.   I'm just going to back up really
23   quickly.  So he was outside the revolving
24   door; is that correct?
25       A.   (Witness nodded.)
```

Case 23-1045, Document 87-2, 10/02/2023, 3576561, Page54 of 127
**A500**

Page 98

```
 1              CARROLL - CONFIDENTIAL
 2              MS. KAPLAN:  I'm so sorry.
 3              MS. HABBA:  She's nodding.
 4              THE WITNESS:  Yes.
 5    BY MS. HABBA:
 6         Q.   You were inside the revolving
 7    door?
 8         A.   Yes.  I was inside Bergdorf's.
 9         Q.   So when he put his hand up, you
10    were inside the store and he was outside
11    the store; is that correct?
12         A.   Yes, yes, because I was heading
13    out through the revolving door.  He was
14    coming in so to stop me from coming out
15    the door he went like this (indicating).
16         Q.   And put up his hand, for the
17    record.
18              Why did you stop?
19         A.   It's the international symbol.
20    It was aimed at me so I stopped.
21         Q.   Were there other people walking
22    through the revolving door?
23         A.   There were very, very few people
24    in the store.
25         Q.   Why was that, if you know?
```

Page 99

1              CARROLL - CONFIDENTIAL

2       A.    It was evening.  It was 6:30,

3   probably going on 7.

4       Q.    What happened after he went

5   through the revolving door?

6       A.    He said hey, you're that advice

7   lady, and then he said come help me buy a

8   present.

9       Q.    And what did you say?

10      A.    I was delighted.

11      Q.    Why were you delighted?

12      A.    I'm an advice columnist, this is

13  my duty.

14      Q.    Were you delighted because it was

15  Donald Trump?

16      A.    It was a New York scene with

17  Donald Trump asking me to help advise him

18  on getting a present.

19      Q.    If it had been anyone other than

20  Donald Trump, would you have done it?

21      A.    Absolutely, yes.

22      Q.    So you said somebody recognized

23  Donald Trump at that time; is that

24  correct?

25      A.    Yes.

Page 100

```
 1              CARROLL - CONFIDENTIAL
 2        Q.   You mentioned two people; is that
 3   right?
 4        A.   (Witness nodded.)
 5        Q.   Can you explain to me when that
 6   happened?
 7        A.   I said handbags.  Handbags, that
 8   would be perfect.  So we entered, we
 9   walked, we started walking and he was
10   going to have no part of the handbag
11   thing, so then I said hats because at the
12   time hats and handbags were fairly close,
13   actually mixed together.
14        Q.   Was this on the ground floor of
15   Bergdorf?
16        A.   Um-hum.
17        Q.   When did the first person
18   recognize Donald Trump?
19        A.   Well, we were looking at --
20   heading towards the handbags in the area.
21   She gaped up at him.
22        Q.   She being a customer or the
23   person that worked there?
24        A.   No, customer.
25        Q.   Customer.  Did she say anything
```

Page 102

```
 1                CARROLL - CONFIDENTIAL
 2        A.   I do not recall anything specific
 3   that she said.  She seemed very pleased to
 4   see him.
 5        Q.   Did she help either of you?
 6        A.   No, we walked past her.
 7        Q.   Did he acknowledge her?
 8        A.   In the '90s, he seemed to be very
 9   friendly to people so he was like nodding.
10        Q.   Do you recall any defining
11   characteristics of the person that helped
12   in the hat or handbag section?
13        A.   (Witness nodded.)  No.
14        Q.   So what happened next?
15        A.   I wish I did.
16        Q.   So what happened next?
17        A.   I had suggested a handbag, he was
18   not interested in the handbag.  Oh, before
19   that, I said who is the present for?  And
20   he said a girl.  And that's why I
21   suggested handbags and he wouldn't do that
22   so I said hats, you can't go wrong with a
23   hat.  Look at the hats.  So we went to the
24   hats.
25        Q.   And I believe you had stated in
```

Page 103

```
 1            CARROLL - CONFIDENTIAL
 2    your book, which we'll talk about, that he
 3    went to a fur hat; is that correct?
 4            MS. KAPLAN:  You have to say.
 5            THE WITNESS:  Yes, he went right
 6        for the fur hat and was petting it.
 7        That is a vision.  He had it in his
 8        hand.
 9    BY MS. HABBA:
10        Q.   And then what happened?
11        A.   He asked me how old I was.
12        Q.   And your response to that was
13    what?
14        A.   52.
15        Q.   And what happened after that?
16        A.   He told me how old I was.  He
17    said you're so old.
18        Q.   And what did you say in response
19    to that, if anything?
20        A.   I do not recall but I hope it was
21    something saucy.
22        Q.   And what happened after that?
23        A.   Then he got the idea of lingerie.
24        Q.   How do you know that?
25        A.   Because he said lingerie.  He
```

Page 104

```
 1            CARROLL - CONFIDENTIAL
 2   said I know, lingerie.
 3       Q.   Did you ask him to identify the
 4   girl that he was shopping for?
 5       A.   In a roundabout way.
 6       Q.   What does that mean?
 7       A.   I asked him how old she was,
 8   that's why he asked me how old I was.
 9       Q.   Did he answer your question?
10       A.   No.
11       Q.   So the hat and the bags were on
12   the ground level; is that correct?
13       A.   Yes.
14       Q.   At that point did you leave the
15   ground floor?
16       A.   Yes.
17       Q.   And where did you go?
18       A.   After he said I know, lingerie,
19   we went up the escalator.
20       Q.   Do you know what floor you went
21   to?
22       A.   I don't recall but it seems to me
23   it was like the sixth floor.  It was a
24   long ride.
25       Q.   And there was nobody else but the
```

Case 23-1045, Document 87-2, 10/02/2023, 3576561, Page60 of 127

**A506**

Page 106

```
 1              CARROLL - CONFIDENTIAL
 2    layout of the floor with the lingerie on
 3    it once you got there?
 4        A.   From memory, now I had been in
 5    Bergdorf's after this so my vision may be
 6    prejudiced but I remember it was on the
 7    floor with the cruise section, you know,
 8    vacation clothes, bathing suits, and I
 9    think evening gowns.
10        Q.   Do you remember if the lingerie
11    was close to the escalator when you got
12    off?
13        A.   No, we walked to get there.
14    That's why I'm clear that there was nobody
15    on the floor, nobody.
16        Q.   When you say nobody on the floor,
17    you mean not even customers?
18        A.   Not even customers.
19        Q.   So what happens next once you get
20    to the lingerie section?
21        A.   There's a -- as you enter the
22    lingerie section on the left there's a
23    counter and on the counter were three or
24    four boxes and there was nobody there.
25    And on the counter was a body suit,
```

Page 107

```
 1            CARROLL - CONFIDENTIAL
 2    see-through body suit with a little bit of
 3    lace on it and he picked it up.
 4         Q.   So that body suit was just on the
 5    counter, it wasn't hanging with the other
 6    lingerie?
 7         A.   No, when we were there, there
 8    were no racks, it was just boxes, things
 9    were put under a counter, a glass counter.
10         Q.   What do you mean by boxes?
11         A.   Boxes that held, you know, pretty
12    frilly little items.
13         Q.   So was everything on shelves in
14    the lingerie department?
15         A.   I only remember the counter.
16         Q.   The counter, when you say the
17    counter, you mean the counter where you
18    would check out; is that right?
19         A.   Um-hum.
20         Q.   And there was one piece of
21    lingerie on that counter?
22         A.   Yeah, and a couple of boxes and
23    there may have been lingerie hanging over
24    the right on the racks, I didn't see it.
25         Q.   And there was no one on that
```

Case 23-1045, Document 87-2, 10/02/2023, 3576561, Page62 of 127

**A508**

Page 109

```
 1              CARROLL - CONFIDENTIAL
 2      It was a counter with boxes and a body
 3      suit.
 4  BY MS. HABBA:
 5      Q.   Did the counter display items in
 6  it?
 7      A.   I don't remember seeing things
 8  displayed but I don't remember.
 9      Q.   So what happened after he picked
10  up the lingerie?
11      A.   He snatched it up and he said go
12  put this on.
13      Q.   What happened then?
14      A.   I said you put it on, it's your
15  color.
16      Q.   What color was it?
17      A.   Gray blue.
18      Q.   Gray blue.  Do you remember the
19  brand?
20      A.   No.  It was a very beautiful
21  piece of lingerie though.
22      Q.   What did it look like?
23      A.   See-through, lilac grayish-blue
24  edged with a little bit of lace, very
25  pretty.
```

Page 110

          1              CARROLL - CONFIDENTIAL

          2      Q.    And what type of lingerie was it?

          3      A.    It was a one-piece body suit.

          4      Q.    So what happened next?

          5      A.    He threw it back at me and he

          6   said go put this on.

          7      Q.    Did he hand it to you?

          8      A.    No, he threw it at me.  So I

          9   tossed it back to him and said it goes

         10   with your eyes.

         11      Q.    Did he catch it?

         12      A.    Yeah, he caught it like this

         13   (indicating).

         14      Q.    She can't, she has to articulate.

         15      A.    He held it like this

         16   (indicating).

         17           MS. KAPLAN:  Videographer, are

         18       you getting this all on the video?

         19           THE VIDEOGRAPHER:  Yes.

         20   BY MS. HABBA:

         21      Q.    He caught it and held it to his

         22   chest, is that what you're doing with your

         23   hands?

         24      A.    He went like this and then he

         25   held it against my chest and said you're

Page 111

```
 1              CARROLL - CONFIDENTIAL
 2    in good shape, this looks like it might
 3    fit you.
 4         Q.   Okay.  And then what happened?
 5         A.   And then I said but it's your
 6    size.  This was banter.  We're going back
 7    and forth.  He's saying put this on, I'm
 8    saying you put it on.  He's saying -- I
 9    thought it was an enjoyable repartee.
10         Q.   And when you say it was his size,
11    was it a large size piece of lingerie?
12         A.   It was a joke to say that.
13         Q.   Okay.  I just want to clarify for
14    the record.
15         A.   No, it was not a huge piece.
16         Q.   What happened next?
17         A.   And then I said it's your size
18    and he took my arm and he said let's go
19    put this on, and I started laughing
20    because I'm thinking to myself this is
21    hilarious, I'm going to make him put it on
22    over his pants.  That's my plan.  And then
23    after I make him put it on over his pants
24    I'm going to have a story that I can tell
25    my friends at dinner.
```

Page 115

1              CARROLL - CONFIDENTIAL

2    dressing room was open?

3       A.   Because the door was open.

4       Q.   Were the other doors closed?

5       A.   I don't have a vision of it.  I

6    cannot call it up.  I can't call it up.

7       Q.   How do you know that there wasn't

8    somebody in the dressing rooms?

9       A.   I don't know that.

10      Q.   Did you hear anybody?

11      A.   No.

12      Q.   So what happened after he

13   gestured with his hand for you to go into

14   the dressing room?

15      A.   It's all one action.  I stepped

16   into the room, the door was banged closed

17   and he pushed me up against the wall.

18      Q.   I'm just going to slow you down,

19   I apologize, I'm sure this is difficult to

20   talk about but the door was banged you

21   said.  Did he slam the door?

22      A.   He closed it (indicating).

23      Q.   With force?

24      A.   He closed it.

25      Q.   Did it have a lock on it?

Page 116

```
 1              CARROLL - CONFIDENTIAL
 2       A.   I have no idea.
 3       Q.   Do you remember him locking the
 4  door?
 5       A.   No, I don't believe he locked the
 6  door.
 7       Q.   Was this a wood door that would
 8  have hidden the entire room?
 9            MS. KAPLAN:  Again you have to
10       say.
11            THE WITNESS:  I'm just still
12       thinking about your last question.
13       I'm sure he didn't lock it because he
14       immediately pushed me up against the
15       wall so hard that I banged my head so
16       I don't think he was locking it.
17  BY MS. HABBA:
18       Q.   Was there a mirror in the room?
19       A.   Yes.
20       Q.   Where was the mirror in relation
21  to where your head was?
22       A.    It was right, there was a chair
23  on the left and I was pushed up against
24  the wall (indicating).  If the mirror is
25  here and the chair is here, this wall,
```

Case 23-1045, Document 87-2, 10/02/2023, 3576561, Page67 of 127
**A513**

Page 118

```
 1            CARROLL - CONFIDENTIAL
 2    when you walked in and that's where he
 3    allegedly pushed you against the wall?
 4            MS. KAPLAN:  Again you have to
 5        say.
 6            THE WITNESS:  Yes, yes.
 7    BY MS. HABBA:
 8        Q.  Okay.
 9        A.   There may have been a second
10    mirror but that also may have been a
11    window, I can't remember.
12        Q.  Do you remember what the
13    furniture looked like in that room?
14        A.   I remember there was a chair and
15    a table, a little tiny table and that's
16    all I remember.
17        Q.  Do you remember what the carpet
18    was?
19        A.   No.
20        Q.  Okay, so after you bumped your
21    head, did you say anything?
22        A.   I was so shocked that I didn't
23    speak.  What I did was I laughed.
24        Q.  Where did you bump your head
25    exactly?
```

Page 119

```
 1              CARROLL - CONFIDENTIAL
 2      A.   Right in the back of it.
 3      Q.   In the center of it?
 4      A.   Yes.
 5      Q.   Did it hurt?
 6      A.    It hurt.  It jolted me and then
 7   he pushed me back again and I hit it again
 8   for a second time.
 9      Q.   Was it loud?
10      A.   Inside my head, I remember
11   hearing a bang but...
12      Q.   Would somebody have heard it if
13   they were in the dressing room next door?
14      A.   Yes.
15      Q.   Would an attendant have heard it
16   if they were outside the dressing room?
17      A.   An attendant would have heard, I
18   believe so.
19      Q.   What happened next?
20      A.   An attendant would have heard me
21   laughing loudly.
22      Q.   I know you've addressed this
23   numerous times publicly but why were you
24   laughing?
25      A.   Shock.  Trying to recapture the
```

Page 120

1            CARROLL - CONFIDENTIAL

2    camaraderie we had and sort of a feeling

3    of a lark, we're on a lark, we're having

4    an adventure, it's a lark, trying to

5    recapture that and take it out of the

6    realm where he had entered, trying to

7    reduce any eroticism about it.

8        Q.   Was it erotic?

9        A.   Not to me.

10       Q.   Was he angry?

11       A.   No.

12       Q.   What was his demeanor?

13       A.    Intent.

14       Q.    In any manner did the defendant

15   lunge at you?

16       A.    When he pushed me up against the

17   wall, he lunged at me and pushed me up

18   against the wall.

19       Q.    What happened next?

20       A.    I hit my head twice and then he

21   had his hands on my arms, pushed me back a

22   second time, hit my head and then he put

23   his shoulder into me, and he's a big man.

24   He's -- and he -- guessing 220, maybe 225

25   at the time.  I weighed 120.  He was 100

Page 121

```
 1              CARROLL - CONFIDENTIAL

 2     more pounds.  And that was one of the

 3     things that went through my mind was how

 4     big and heavy he was because his whole

 5     weight came, his shoulder came into me and

 6     so at this point I realized it was

 7     serious.  I was shocked before because he

 8     put me against the wall but now I

 9     understood that this is -- this is a

10     battle, and he pulled down my tights.

11          Q.   Did you feel like he was trying

12     to hurt your head when he --

13          A.   No, no.  No.  He was not trying

14     to hurt me.  He was trying to rape me and

15     it was -- it was a situation which I never

16     would have -- when it went from good humor

17     joshing into being up against the wall and

18     then having that heavy weight against me.

19          Q.   What did he do after that?

20          A.   He pulled down my tights.

21          Q.   Had you said anything at this

22     point?

23          A.   I cannot believe that I didn't

24     say anything but I don't remember that I

25     said anything.  That doesn't mean I didn't
```

```
                                               Page 122

  1              CARROLL - CONFIDENTIAL

  2    say anything but I -- I can't imagine

  3    being quiet.  I can't imagine not saying

  4    anything but I can't remember saying

  5    anything.

  6        Q.   Did you scream?

  7        A.   No.

  8        Q.   Did you push him?

  9        A.   Yes.

 10        Q.   Where?

 11        A.   I had my purse in this hand.

 12        Q.   In your right hand?

 13        A.   Right hand.  And I tried to get

 14    my arms up to push him back, to push him

 15    back.  The problem was I couldn't get my

 16    knee up because the pantyhose had been

 17    taken down.

 18        Q.   So he had hit your head twice

 19    prior to taking your pantyhose off

 20    according to you; right?

 21        A.   He didn't take the pantyhose off.

 22        Q.   He did not?

 23             MS. KAPLAN:  Again --

 24             THE WITNESS:  No, he did not take

 25        the pantyhose off.
```

Page 123

1              CARROLL - CONFIDENTIAL

2     BY MS. HABBA:

3         Q.   Okay.  So what happened?

4         A.   Pulled them down.

5         Q.   And then what happened?

6         A.   And then I felt his fingers

7     rummaging around my vagina and this huge

8     weight against me.  My head hurt, this

9     huge weight, I'm in a situation where I

10    can't -- I can't -- at one point I

11    remember saying this is Donald Trump, what

12    the heck is going on?  And then I felt his

13    penis inside of me.

14        Q.   So sorry to get into details

15    but --

16        A.   No, I understand.

17        Q.   If you're against the wall, it

18    was his right shoulder that you are

19    describing was pushing into you?

20        A.   Left, I think.

21        Q.   His left shoulder, sorry, because

22    you did touch your left side so I assumed

23    it was the right.  So it was his left

24    shoulder and he used his right hand?

25        A.   I don't know.  I couldn't see his

Page 125

```
 1              CARROLL - CONFIDENTIAL
 2       Q.   How long did that last?
 3       A.   Very short time.
 4       Q.   Approximately how long do you
 5  think?
 6       A.   Very brief.  It was very brief.
 7       Q.   And then what happened?
 8       A.   I managed to get my knee up and
 9  push off and get him out and push off.
10       Q.   And then what happened?
11       A.   I went out the door and went
12  away.
13       Q.   So before you went out the door,
14  did you put your tights back on?
15       A.   No, they were never off.
16       Q.   I'm not following, I guess, how
17  he managed to put his fingers on you and
18  have sex with you if he never took them
19  off.
20       A.   He pulled them down.
21       Q.   He pulled them down.  So did you
22  pull them up at any point?
23       A.   I don't remember pulling them up
24  but I must have.
25       Q.   So when this was done you pulled
```

Page 127

```
 1            CARROLL - CONFIDENTIAL
 2   is that correct?
 3       A.   Yes.
 4       Q.   Thank you.  So when you pushed
 5   him off with your knee, did he back off of
 6   you?
 7       A.   Well, I pushed him with hands and
 8   knee and I didn't look to see what he was
 9   doing.  I turned and got out.
10       Q.   Did you scream?
11       A.   No.
12       Q.   Did you say anything to him?
13       A.   No.
14       Q.   Did you look at him?
15       A.   No, I didn't.
16       Q.   Did you kiss him at any point
17   when you were in the dressing room?
18       A.   When he -- when we first came in,
19   when he first shoved me against the wall,
20   lunged and shoved me back and I hit my
21   head, he put his mouth against mine.
22       Q.   Did you kiss him back?
23       A.   I was so shocked I was laughing.
24       Q.   When he was kissing you?
25       A.   Yes, because I thought this is --
```

Page 128

```
 1              CARROLL - CONFIDENTIAL
 2    this is -- this is not kosher.  I suddenly
 3    realized.
 4         Q.   So you turned around and leave
 5    the dressing room and what do you do?
 6         A.   I believe I went down the
 7    escalator which would have been a long
 8    ride but I can't imagine finding the
 9    elevator, you know, pressing the button.
10    I don't remember that.  I do remember
11    going and having the fear that he may --
12    may be coming after me, just slightly in
13    the back of my head.
14         Q.   You were worried he would chase
15    you; is that correct?
16         A.   (Witness nodded.)
17              MS. KAPLAN:  Again, let's get the
18         answer.
19              THE WITNESS:  Not chase but come
20         after me.
21    BY MS. HABBA:
22         Q.   What do you mean by that?
23         A.   Just follow me, maybe grab me
24    again.
25         Q.   Did you feel at any point that he
```

Page 130

```
 1              CARROLL - CONFIDENTIAL
 2   the elevator?
 3      A.    Right.
 4      Q.    Do you recall which exit you left
 5   from at Bergdorf?
 6      A.    Not the specific one but it was
 7   on Fifth Avenue.
 8      Q.    Was the street crowded when you
 9   exited?
10      A.    Not very.
11      Q.    Was it dark?
12      A.    Yes.
13      Q.    What did you do after you left?
14      A.    Called Lisa Birnbach.
15      Q.    Who is Lisa Birnbach?
16      A.    She's my friend and I had an
17   overwhelming urge to call and say you're
18   not going to believe what just happened to
19   me.
20      Q.    How long were you friends with
21   Ms. Birnbach prior to the attack?
22      A.    We met in '90 or '89 so four or
23   five years.
24      Q.    And how often would you speak
25   with her prior to the attack?
```

Page 134

1          CARROLL - CONFIDENTIAL

2     Q.   Where were you standing when you

3   called Ms. Birnbach?

4     A.   On Fifth Avenue.

5     Q.   Were you right outside Bergdorf?

6     A.   (Witness nodded.)

7     Q.   How long was that phone call?

8     A.   I don't know.

9     Q.   Do you remember --

10    A.   It was not brief but it was not

11  long.

12    Q.   Do you remember the content of

13  that conversation?

14    A.   Lisa remembers more about it than

15  I do.  I remember calling her.  And I

16  remember Lisa suggesting I go to the

17  police and also Lisa suggesting that she

18  go to the police with me and that idea was

19  so, such a terrible -- I couldn't picture

20  myself going to the police so I shut that

21  down.

22    Q.   How did you shut that down?

23    A.   No, I'm not going to the police.

24    Q.   At any point were you crying on

25  that phone call?

Page 135

1              CARROLL - CONFIDENTIAL

2        A.   No.

3        Q.   Do you recall what your

4    disposition was on that phone call?

5        A.   I was in shock and disordered.  I

6    felt unbalanced which was a strange

7    feeling for me.

8        Q.   When you say unbalanced were you

9    actually physically unbalanced?

10       A.   Yes.

11       Q.   Did you sit down at any point

12   or --

13       A.   No.

14       Q.   Did you need to get a water or do

15   anything to take care of yourself after

16   that moment?

17       A.   No, what I wanted to do, I needed

18   to talk to somebody, talk to Lisa.  Then I

19   just wanted to go home.

20       Q.   Is that what you did?

21       A.   (Witness nodded.)

22       Q.   So did you go to a parking garage

23   to get your car or did you go straight

24   home?

25       A.   The parking garage.

Page 138

```
 1              CARROLL - CONFIDENTIAL
 2              MS. KAPLAN:  Are you talking
 3         about at any point in time?
 4              MS. HABBA:  Outside of the
 5         litigation, of course, prior to the
 6         litigation.
 7              THE WITNESS:  No, we agreed right
 8         then and there this is it.  I didn't
 9         want to talk about it ever again,
10         ever.  That was it, and I didn't want
11         to hear about it ever again.  I was
12         embarrassed, I was ashamed at this
13         point.  I was raped, this is like --
14         this was shocking and so I just said
15         let's never talk about this again.
16    BY MS. HABBA:
17         Q.   Let's talk about that word
18    "rape."  You had stated, and I'm happy to
19    pull it up or just say, you had stated
20    prior that you didn't like using the word
21    "rape."  Do you recall that?
22         A.   I recall feeling that.
23         Q.   Why did you feel that way?
24         A.   The word to me means something
25    that generally speaking a man does to a
```

Page 139

```
 1              CARROLL - CONFIDENTIAL
 2    woman, that she's powerless, that he has
 3    the power over her, rape.  It means he's
 4    taken something from her and I didn't view
 5    it that way.  I viewed it what went on in
 6    that dressing room as a fight.
 7         Q.   Did you feel like you won that
 8    fight?
 9         A.   I don't think there are any
10    winners there.
11         Q.   On that day you got in your car
12    and drove home; is that correct?
13         A.   (Witness nodded.)
14         Q.   And you didn't speak to any other
15    family members or friends throughout the
16    night?
17         A.   No, by this time I realized -- I
18    didn't want to talk to anybody about it.
19         Q.   Approximately what time did you
20    get home?
21         A.   I have no idea.
22         Q.   Did you stop anywhere on your way
23    home?
24         A.   No.
25         Q.   What did you do when you got
```

```
                                            Page 141
 1            CARROLL - CONFIDENTIAL
 2   the attack?
 3      A.   The next day I certainly remember
 4   the pain in my head.  Then went to work.
 5      Q.   Normal time?
 6      A.   I don't know.
 7      Q.   But you don't recall calling out
 8   sick; is that correct?
 9      A.   No, no, no, no, I would never.
10      Q.   Did you tell anybody at work what
11   happened?
12      A.   Yes, I told Carol Martin.
13      Q.   When did you tell Carol Martin?
14      A.   The next day or the day after.
15      Q.   How did you tell her?
16      A.   Well, it was strange because I
17   promised I would never tell anybody and I
18   told Lisa to never tell anybody and the
19   first thing I do is see Carol Martin at
20   work and I say I have to tell her.  And it
21   was backstage.  We both did our shows in
22   the same studio.  We met backstage.  I
23   said I've got to talk to you.  I gave her
24   a few details and she said let's talk at
25   my house tonight so we met at her house
```

Page 143

```
 1              CARROLL - CONFIDENTIAL
 2      Q.    How were you aware of that?
 3      A.    She was a New York anchorwoman at
 4   CBS and she, you know, she was one of the
 5   great anchors during the '80s and she
 6   would tell the audience about the lawsuits
 7   against the former president on racism and
 8   she just didn't like him.
 9      Q.    Were there lawsuits that she had
10   been reporting on about him prior to this
11   time?
12      A.    If you're reading the news, she
13   was giving the news, she also wrote the
14   news, and reporting on her New York
15   audience and he was definitely a news
16   maker and she, you know, if you're a
17   reporter in New York in those days you did
18   a lot of reporting about him.
19      Q.    What did Ms. Martin say to you?
20      A.    She said tell no one, he's got
21   200 lawyers, he'll bury you.
22      Q.    And what did you respond?
23      A.    I said I agree.
24      Q.    And what happened after that?
25      A.    That was it.  Then we rehashed
```

Page 144

1              CARROLL - CONFIDENTIAL

2      the whole thing again, went back to it

3      again, and that was it.

4          Q.   Why did you take Ms. Martin's

5      advice over Ms. Birnbach's?

6          A.   I just would not go to the police

7      about something that happened to me like

8      this.  After Lisa said this is assault, it

9      was rape, I didn't want to talk to anybody

10     or tell the police.  I just didn't -- it

11     was just something that I would keep to

12     myself.

13         Q.   Why didn't you tell the police

14     about what happened with your ex-husband

15     John?

16         A.   I would never think of it.

17         Q.   Why is that?

18         A.   I always feel I can handle things

19     myself.

20         Q.   After speaking with Ms. Martin,

21     did you tell anybody else about the attack

22     outside of related to this litigation?

23         A.   No.

24         Q.   Did you visit any doctors?

25         A.   No.

Page 147

```
 1              CARROLL - CONFIDENTIAL
 2   why was -- let me scratch that.
 3           During the last two decades, have
 4   you ever interacted with the defendant
 5   again directly?
 6       A.   No.
 7       Q.   Were you aware that the
 8   president -- that the defendant was a
 9   presidential candidate prior to the 2016
10   election?
11       A.   Yes.
12       Q.   And are you aware that he ran in
13   2000 as a potential member of the reform
14   party?
15       A.   No.
16       Q.   Did you ever consider coming
17   forward with your account prior to #MeToo?
18       A.   Never.
19       Q.   Why not?
20       A.   Just -- I'm going to say
21   something that even surprises me because
22   women who have been raped are looked at in
23   this society as less, are looked at as
24   spoiled goods, are looked at as rather
25   dumb to let themselves get attacked.  I
```

Page 148

1                    CARROLL - CONFIDENTIAL

2    mean even you have to say did you scream?

3    I mean every woman who admits to being

4    attacked has to answer that question, why

5    didn't you scream, why did you come

6    forward when you did, why didn't you come

7    forward before and so no, I didn't -- I

8    would have been fired.

9        Q.   How did you feel when you found

10   out that the defendant announced he was

11   running for president in 2016?

12       A.   I thought oh, boy.

13       Q.   What does oh, boy mean?

14       A.   Just almost disbelief and a

15   little bit of heartache.  I felt really

16   bad, you know.

17       Q.   Why did you feel bad?

18       A.   I didn't think he would be a good

19   candidate.

20       Q.   Why didn't you come forward with

21   your account at that time?

22       A.   I was with my mother in

23   Bloomington, Indiana.  She was on her

24   deathbed.  She was a feisty redheaded

25   Scottish woman, republican politician, so

Page 149

```
 1            CARROLL - CONFIDENTIAL
 2    we gathered around for her last weeks.
 3        Q.   Did you think she would be upset
 4    if she heard the allegations against
 5    Donald Trump?
 6        A.   That's all she needed to hear on
 7    her death bed.  Well, I was worried that
 8    it would ruin her last days and I just
 9    couldn't have done it.  I just wouldn't
10    have done it.
11        Q.   Do you know if your mother
12    supported Donald Trump for president in
13    2016?
14        A.   I wish you could have been there
15    when she was in hospice, every nurse that
16    came in she gave the talk about Hillary is
17    going to pay for your kids' college
18    education so she was a feminist from the
19    cradle.  She was a great feminist so she
20    was a total Hillary person.
21        Q.   But you had stated prior which is
22    why I asked that she was --
23        A.   Republican.
24        Q.   -- a republican.  Was that the
25    first time --
```

Page 150

```
 1            CARROLL - CONFIDENTIAL

 2       A.   She also voted for Obama.  We all

 3    made a big deal about it.

 4       Q.   Why was that?

 5       A.   It was a sea change.

 6       Q.   That was the first time that she

 7    changed her politics as far as you knew?

 8       A.   First time she told us.

 9       Q.   Would you have come forward

10    sooner if you thought Donald Trump

11    wouldn't become president if you spoke out

12    about your account?

13            MS. KAPLAN:  Objection to form

14       but you can answer.

15            THE WITNESS:  No, because I

16       believe that the women who were coming

17       out were helping him, helping.

18    BY MS. HABBA:

19       Q.   What do you mean by helping him?

20       A.   As more and more women came

21    forward with accusations against the

22    former president, his popularity seemed to

23    go up.

24       Q.   Was that part of why you didn't

25    come out?
```

Page 151

```
 1              CARROLL - CONFIDENTIAL
 2      A.    Only a very, very small part.
 3      Q.    So if you had known that it would
 4  have made him less popular, to say it
 5  differently, would you have come out?
 6      A.    I know that it wouldn't have made
 7  him less popular.  It would have made him
 8  more popular.
 9      Q.    And that was part of the reason
10  you didn't come out with it; is that
11  correct?
12      A.    Yeah, I was --
13           MS. KAPLAN:  Objection to form.
14      You can answer.
15           THE WITNESS:  I was -- didn't
16      think it was -- I knew it would help
17      him.  I didn't want to get fired from
18      Elle and I didn't want to lose my
19      reputation and I didn't want to be
20      looked at as soiled goods or stupid to
21      go get yourself attacked in
22      Bergdorf's.  It was not something I
23      would want to talk about.
24  BY MS. HABBA:
25      Q.    Did you follow the polling prior
```

**A535**

Page 153

1              CARROLL - CONFIDENTIAL

2        A.   I would never tell my mother,

3    never tell my mother.

4        Q.   How about your sisters?

5        A.   No, never told them.

6        Q.   And your brother?

7        A.   No.  We're close but we don't

8    tell each other that kind of thing.

9        Q.   If it wasn't for the #MeToo

10   movement, do you think you would have

11   spoken out against the defendant?

12       A.   No, I don't think I would have.

13       Q.   Why is that?

14       A.   It's just as it was the perfect

15   storm.

16       Q.   Did you consult with anyone prior

17   to making your decisions?

18       A.   No, no.

19       Q.   So when exactly did you decide to

20   recount this alleged attack with Donald

21   Trump?

22       A.   I went on a road trip to write a

23   book called What Do We Need Men For.  I

24   started the book because over the 26 years

25   that I was writing the column, almost

Page 154

```
 1            CARROLL - CONFIDENTIAL
 2    every single letter, whether it was about
 3    career or finances or children or romance,
 4    there was always a complaint about a man.
 5    So I spent 26 years saying get rid of him,
 6    get rid of him.  So I thought why don't I
 7    just go on the road and ask women what do
 8    we need men for and let them tell me so I
 9    don't go through with my idea which is to
10    put them, all the men, in Montana.  That
11    was the idea.  That was what I was going
12    to do.  It had nothing to do with Donald
13    Trump, nothing, and then the first day of
14    the trip started.  My intention was to go
15    to towns named after women, only wear
16    clothes designed by women, only eat in
17    restaurants like Betty's Cafe run by women
18    or owned by women, only listen to books by
19    women in the car, listen to music by
20    women.  That was the whole thing.  I get
21    out of the car when I got to the small
22    town and talk to the people, what do we
23    need men for.  I was getting fabulous
24    answers.  But the same day it started the
25    Harvey Weinstein story broke and if you
```

Page 155

```
 1              CARROLL - CONFIDENTIAL
 2    remember, the flood of stories that
 3    started as women started standing up.
 4        Q.   How much of your coming out with
 5    this story --
 6              MS. KAPLAN:  Were you done with
 7        your answer?
 8              MS. HABBA:  I'm sorry.
 9              THE WITNESS:  But I didn't decide
10        to do --
11              MS. HABBA:  My apologies.
12              THE WITNESS:  -- to talk about
13        the incident in Bergdorf's.  I was
14        making a list.  Many other men were on
15        it but he wasn't on it.  I didn't make
16        that decision to include him until
17        four or five weeks into writing the
18        book.
19    BY MS. HABBA:
20        Q.   What turned you on making that
21    decision or who if there was a reason?
22        A.   Well, the book --
23              MS. KAPLAN:  Objection to form.
24        You can answer.
25              THE WITNESS:  What we're talking
```

Page 156

```
 1           CARROLL - CONFIDENTIAL
 2      about here is 11 pages of a book.  A
 3      book is this thick (indicating) and
 4      that part was just this part
 5      (indicating) so he was one of the
 6      hideous men in my life so I finally
 7      put him in and I wrote it just as a
 8      part of this long string of hideous
 9      men I've run into in my life.  So it
10      was not written with him to head the
11      list or he's the most hideous, no, he
12      was not an afterthought but I didn't
13      completely decide until I was into the
14      book.
15  BY MS. HABBA:
16      Q.   And who did you first discuss
17  putting him in the book with?
18      A.   Nobody.
19      Q.   At some point I assume you had to
20  make that editorial change; correct?
21      A.   No, I was writing chapters and
22  switching them around and when I was
23  getting ready for the proposal, I had to
24  send an e-mail to my agent saying by the
25  way, you're going to be surprised, and
```

Page 161

```
 1              CARROLL - CONFIDENTIAL
 2   attacked so I called the police.
 3       Q.   Was that the only time you've
 4   called the police?
 5       A.   (Witness nodded.)
 6       Q.   You also claimed that a girl
 7   scout leader sexually abused you every day
 8   for a two-week period when you were 12; is
 9   that correct?
10       A.   Yes.
11       Q.   Did you bring that up to anyone
12   previously or report this --
13       A.   Never --
14       Q.   Sorry, I have to finish my
15   question -- or report this alleged
16   assault?
17       A.   To people who know me, this was a
18   shocking revelation in this book.  It
19   wasn't about the former president, it was
20   about camp because so many of my friends
21   had been to that camp and I heard from
22   women across the United States he did the
23   same thing to, you know.  That attack has
24   stayed with me every day.
25       Q.   And in not coming forward
```

Page 166

```
 1              CARROLL - CONFIDENTIAL
 2    ever expect anything.  So what I said, I
 3    didn't think he would deny it.  I thought
 4    he would just say it didn't happen that
 5    way.  She agreed to it or it was
 6    consensual sex.
 7         Q.   Wouldn't that have been him
 8    saying that you were a liar?
 9         A.   No, it would have been him saying
10    yeah, it happened and then we could have
11    disagreed and then I could have vehemently
12    said no, I did not consent.
13         Q.   Would you have sued him if that
14    is what happened?
15         A.   I have no idea.
16         Q.   If someone felt that they were
17    wrongfully accused of an egregious
18    conduct, would you expect them not to deny
19    it?
20              MS. KAPLAN:  Objection to form.
21              THE WITNESS:  It depends on what
22         happened.  If it's obvious that it
23         happened.
24    BY MS. HABBA:
25         Q.   Do you think this was obvious?
```

Page 167

```
1              CARROLL - CONFIDENTIAL
2              MS. KAPLAN:  Objection to form.
3              THE WITNESS:  Again, I just was
4        shocked that he absolutely denied it
5        because he was there and he denied it.
6        That's what gets me every time.  He
7        was there, he denied it.
8   BY MS. HABBA:
9        Q.   Was Les Moonves, was he there?
10       A.   (Witness nodded.)
11             MS. KAPLAN:  You've got to say.
12             THE WITNESS:  Yes.
13  BY MS. HABBA:
14       Q.   And did he deny it?
15       A.   Very quietly but he denied 19 in
16  the same bunch.
17       Q.   Prior to releasing this article
18  with The Cut, did you anticipate that you
19  might need to sue the defendant to hold
20  him accountable?
21       A.   No, it was the last thing I would
22  ever think of, would not -- no.
23       Q.   Had you consulted with an
24  attorney and --
25       A.   No.
```

Page 172

```
 1           CARROLL - CONFIDENTIAL
 2    BY MS. HABBA:
 3        Q.   Were the timing of your
 4    allegations related to the former
 5    president's run for reelection?
 6        A.   No.
 7        Q.   Was it something you considered?
 8        A.   No.
 9        Q.   How did the defendant's
10    statements impact your personal life?
11        A.   Totally affected it.  I lost my
12    job.  I'm looked at as a woman who's
13    untrustworthy, looked at now as a woman
14    who can't be believed.  I'm looked at as a
15    woman who was stupid and dumb enough to
16    have happen to her what happened to her.
17        Q.   You just said that you're looked
18    at as a woman stupid enough to have had
19    happen to her what happened to her; is
20    that correct?
21        A.   (Witness nodded.)
22        Q.   How does that relate to Donald
23    Trump, the perception rather?
24        A.   He raped me and after that
25    everything I thought was quickly over and
```

Page 173

```
 1            CARROLL - CONFIDENTIAL
 2   behind me but it turned out not to be so.
 3       Q.   And you realized this when the
 4   #MeToo movement that we discussed came
 5   out; is that correct?
 6       A.   Yes.
 7       Q.   How many times in your life have
 8   you been sexually assaulted or raped?
 9       A.   When I was a child, when I was 5,
10   another child, not knowing what he was
11   doing shoved a stick up my vagina or rock,
12   I can't remember which, so that was an
13   assault when I was 5.
14            At Indiana University on a drive
15   in the country in Brown County, a boy
16   pulled over and I -- he called me a prick
17   tease and so I scooted out and jumped out
18   the car and he caught me and threw me on
19   the ground, got on top of me and pulled
20   out a knife.
21            At a military academy, my friend
22   and I were visiting her parents' friends
23   who I think he was the dean of admissions
24   and a boy threw me on the ground and then
25   chased me through it was called the
```

Page 174

```
 1              CARROLL - CONFIDENTIAL
 2    military -- chased me across the campus
 3    with his friends cheering him on.
 4              I was thrown on the ground when I
 5    was 12 by a neighbor's nephew.  Luckily
 6    the mother and the daughter came out and
 7    caught him.
 8              Moonves in the elevator.  I
 9    didn't include a dentist.  There are
10    people in there I didn't even include.
11        Q.   So it's a dentist?
12        A.   A dentist.
13        Q.   Who is the dentist?
14        A.   Oh, I don't remember his name.
15        Q.   Was he your dentist?
16        A.   Yes.  I went to him.
17        Q.   Where was that dentist located?
18        A.   Pardon?
19        Q.   Where was the dentist?
20        A.   In New York.
21        Q.   And what happened there?
22        A.   While he was taking care of my
23    teeth he would lean in and grind against
24    my leg but I didn't include stuff.
25        Q.   But is there anything else that
```

Page 175

```
 1              CARROLL - CONFIDENTIAL
 2    you didn't include?
 3         A.   I can't recall right now.
 4         Q.   So seven times?
 5         A.   Growing up, when you're a woman
 6    in the '70s and '80s just walking around
 7    up and down the street, it was a very
 8    different time.
 9         Q.   So you stated that you believe
10    the defendant's statements impacted your
11    employment with Elle Magazine; is that
12    correct?
13         A.   Um-hum.
14         Q.   In what way?
15         A.   Well, I had an advice column and
16    that advice column, it had run in the
17    magazine for 26 years.  It was one of the
18    most popular columns ever in the magazine.
19    I loved my readers, loved them.  They
20    would pour their hearts out to me and I
21    loved helping them, they helped me, and
22    then being called a liar, my entire career
23    as an advice columnist rested on the fact
24    that I could be trusted not to give
25    anybody any bullshit.  It had to be
```

Page 176

```
 1              CARROLL - CONFIDENTIAL
 2      absolutely the truth.  So when the
 3      president said I'm a liar, it shook that
 4      whole foundation, that was it.
 5          Q.   When you say that foundation, you
 6      mean your employment?
 7          A.   The foundation of trust that a
 8      columnist has with their readers.  And
 9      those readers, I loved those readers.
10      They are the best in the world.
11          Q.   Did the readers stop reading?
12          A.   I started to receive less
13      letters.
14          Q.   Let's go back to your employment.
15      Your employment was terminated by Elle
16      Magazine; correct?
17          A.   Um-hum.
18              MS. KAPLAN:  You've got to say --
19              THE WITNESS:  Yes.
20      BY MS. HABBA:
21          Q.   What do you believe the reason
22      is?
23          A.   Because Donald Trump called me a
24      liar.
25          Q.   You were ultimately terminated
```

Page 177

```
 1            CARROLL - CONFIDENTIAL
 2   from Elle Magazine; right?
 3       A.   Yes.
 4       Q.   Do you know when that was?
 5       A.   Yes.  I got the call December
 6   2019 and it took effect in March.
 7       Q.   So they let you stay on until
 8   March; is that correct?
 9       A.   I had already written the columns
10   all the way through March.  Also they
11   wouldn't want me to go because March is
12   one of their big issues.
13       Q.   But if you're saying that because
14   you were called a liar, the readers
15   weren't sending you as many letters, why
16   would they want you on in March for the
17   big issue?
18       A.   Because it had already been
19   written, edited and it was already at the
20   factory, at the distributor, had been
21   printed.
22       Q.   Are you done answering?
23       A.   (Witness nodded.)
24       Q.   Do you believe that the
25   termination was solely as a result of the
```

**A548**

Page 190

1              CARROLL - CONFIDENTIAL
2     exclusive with New York Magazine.
3         A.    Right.
4         Q.    Do you know what they are
5     referencing there?
6         A.    Yes, they would have preferred
7     the excerpt to run in Elle but I decided
8     to run it in New York Magazine.
9         Q.    Tell me who originally approached
10    you from Elle Magazine regarding your
11    exclusive with Elle Magazine and your
12    decision to share it with New York
13    Magazine.
14        A.    I told them after the fact.
15        Q.    Why didn't you give your
16    exclusive to Elle Magazine?
17        A.    Because they don't publish
18    anything of this length.  They don't
19    publish articles about women being raped.
20    It's just they are very careful about not
21    upsetting their readers and I don't
22    believe that they would have run anything
23    close to what New York ran.  They would
24    have cut it out very -- they wouldn't want
25    to have their readers upset by concerning

Page 191

```
 1           CARROLL - CONFIDENTIAL
 2   their columnist.
 3       Q.   Had anybody at Elle Magazine
 4   asked you for the exclusive on your story?
 5       A.   After they heard I wanted to sell
 6   it to New York, yes, they said let us run
 7   it.
 8       Q.   And how much did you sell it for
 9   to New York Magazine?
10       A.   I think 7,000 -- $7,000 I think.
11       Q.   Did Elle Magazine offer you?
12       A.   No.
13           MS. KAPLAN:  Just so that
14       question is clear, you meant offer you
15       money?
16           MS. HABBA:  Yes.
17           THE WITNESS:  They offered me
18       nothing.
19   BY MS. HABBA:
20       Q.   They just wanted the exclusive
21   and you said no?
22       A.   Because I didn't believe they
23   would run a full excerpt.
24       Q.   Who discussed the decision to not
25   allow Elle to distribute the excerpt with
```

**A550**

Page 192

```
 1          CARROLL - CONFIDENTIAL
 2   you?
 3       A.   Well, my agent and I, but it was
 4   pretty much a foregone conclusion we would
 5   go with New York.
 6       Q.   Who from Elle spoke to you or
 7   your agent about getting the exclusive?
 8       A.   Oh, they -- who from Elle?  Oh,
 9   Emma, I call her Emma Woodhouse, Emma
10   Rosenblum called the publisher and said
11   we'd like first rights and the publisher
12   said no, we're giving it to New York
13   Magazine.
14       Q.   Were you part of that decision?
15       A.   I made the decision along with
16   the publisher and my agent.
17       Q.   Even though you worked for Elle
18   Magazine for over two decades?
19       A.   And I was planning to continue to
20   work for Elle.  To me it was a no-brainer.
21   This is a New York man with a New York
22   subject about a book about what women
23   think about men going across the country.
24   It's a New York story, not an Elle story.
25       Q.   Did anybody tell you they were
```

# EXHIBIT 2

# Hideous Men

thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html

June 21, 2019

first person June 21, 2019

## Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life.

By E. Jean Carroll Photograph By Amanda Demme



EXHIBIT P-4
DATE: 10|14|22
Cathi Irish, RPR, CRR



E. Jean Carroll. Photo: Amanda Demme for New York Magazine

**My first rich boy** pulled down my underpants. My last rich boy pulled down my tights. My first rich boy — I had fixed my eyes on his face long enough to know — was beautiful, with dark gray eyes and long golden-brown hair across his forehead. I don't know what he grew up to be. My last rich boy was blond. He grew up to be the president of the United States.

The first rich boy's name was James. He was raped by his grandfather. He was raped by his uncles. He was beaten by his father. My mother told me the stories much later. When James was 6, he was taken away from his father and given to a rich couple, Arthur and Evelyn.

Arthur and Evelyn were best friends with my parents, Tom and Betty. One day my parents gave a party. Everyone brought their kids. Arthur and Evelyn drove up from Indianapolis with James to the redbrick schoolhouse where we lived, deep in the hills north of Fort Wayne. As the parents drank cocktails in our big yard with the scent of the blooming wads of cash infusing every inch of Indiana just after WWII, the kids played up on the hill beside the schoolhouse.

James was 7 and a half or 8, a bloodthirsty, beautiful, relentless boy. He ordered everyone around, even the older kids. To me he said, "I'm going to shove this up you again."

We'd played this game before. Our families had gone on a camping trip to Pokagon State Park, and I learned that an object could be shoved up the place where I tinkled. I don't remember now what it was, probably a stick, or maybe a rock. It felt like being cut with a knife. I remember I bled.

"I don't want to," I said.

We were standing on the hill. James looked at me with his feral gray eyes.

He wadded up a piece of fabric — it was a light blue-violet shade and looked fluffy, like a bunched-up hairnet.

"Put this in your underpants," he said.

He pulled up my dress and crammed the balled-up material down my pants. Late at night, when the guests had gone home, I took off my dress, pulled down my pants. And there it still was, the wadded-up thing.

James and I played so many ferocious games while camping that summer: hooking each other with fishhooks, holding each other underwater, tying each other up, shooting each other with cap guns, chasing each other with garter snakes, dumping hot embers on each other's heads. I am not putting him on the Most Hideous Men of My Life List — whether he belongs there is for him to decide. It is his uncles, his father, his grandfather who belong on such a list.

Now, about this Most Hideous Men of My Life List: It is a list of the 21 most revolting scoundrels I have ever met. I started it in October 2017, the day Jodi Kantor and Megan Twohey published their Harvey Weinstein bombshells in the New York *Times*. As the riotous, sickening stories of #MeToo surged across the country, I, like many women, could not help but be reminded of certain men in my own life. When I began, I was not sure which among all the foul harassers, molesters, traducers, swindlers, stranglers, and no-goods I've known were going to make the final accounting. I considered Matt Lauer, Bill O'Reilly, and the giant dingleberry Charlie Rose, all guys whose TV shows I was on many times and who made headlines during the rise of #MeToo. But in the end, they do not make my Hideous List.

Hunter S. Thompson … now, *there's* a good candidate. I know. I wrote his biography. Does Hunter, the greatest degenerate of his generation, who kept yelling, "Off with your pants!" as he sliced the leggings from my body with a long knife in his hot tub, make the list? Naw.

And if having my pants hacked off by a man lit to the eyebrows with acid, Chivas Regal, Champagne, grass, Chartreuse, Dunhills, cocaine, and Dove Bars does not make the list — because to me there is a big difference between an "adventure" and an "attack" — who, in God's name, *does* make my Hideous List?

After almost two years of drawing and redrawing my list, I've come to realize that, though my hideosity bar is high, my criteria are a little cockeyed. It is a gut call. I am like Justice Potter Stewart. I just know a hideous man when I see one. And I have seen plenty. For 26 years, I have been writing the "Ask E. Jean" column in *Elle,* and for 26 years, no matter what problems are driving women crazy — their careers, wardrobes, love affairs, children, orgasms, finances — there comes a line in almost every letter when the cause of the correspondent's quagmire is revealed. And that cause is men.

Viz.: the man who thinks 30 seconds of foreplay is "enough," the man who cheats on his wife, the man who passes women over for promotion, the man who steals his girlfriend's credit cards, the man who keeps 19 guns in the basement, the man who tells his co-worker she "talks too much in meetings," the man who won't bathe, the man who beats his girlfriend's dog, the man who takes his female colleagues' ideas, the man who tries to kill his rich wife by putting poison in her shampoo. Every woman, whether consciously or not, has a catalogue of the hideous men she's known.

As it turns out, a Hideous Man marks practically every stage of my life. And so, Reader, from this cavalcade of 21 assholes, I am selecting a few choice specimens. One or two may not be pleasant for you to read about, I apologize. But if we all just lean over and put our heads between our knees, the fainting feeling will pass. No one need be carried from the room.



Carroll being crowned Miss Indiana University in 1963. Photo: Elinor Hendrix/Courtesy of the author

**When I entered Indiana University,** I was the most boy-crazy 17-year-old in the nation.

If you'd met me my freshman year, you would never have imagined I was born to be an advice columnist. But imagine it now. Thirteen miles from the Bloomington campus, there I am: young Jeanie Carroll, driving with a boy down a hilly back road in Brown County State Park, where IU students go on October Sundays to supposedly look at the famous leaves.

My situation in life — my father being a Beta Theta Pi from Wabash College, my mother being a Kappa Delta from UCLA, my wild wish to pledge either Pi Beta Phi or Kappa Kappa Gamma, my rah-rah disposition, my total ignorance of what is going on in the world, the fact that I never crack a book — all are equally against my becoming a columnist, the first requirement of which is acknowledging that there are other beings on the planet besides boys.

How I end up in that car, who the boy is … well, I don't remember. I've been looking through my 1961 datebook, and each day is so chock-full of the names of boys who called me, the names of boys whom I expected to call me and didn't, the names of boys who did call me but I didn't care if they called me, the names of boys who if they didn't call me I was never going to speak to again, the names of boys who if they called me I would not pick up the phone,

and the names of boys I would have my roommate, Connie, call and ask if they called me while she was on the line with a boy who was begging me to call him back, I can't figure out who this boy is. But meet No. 1 on the Most Hideous Men of My Life List.

He belongs to that class of boys who are not athletes and so must make their mark on campus with their devastating looks or gobs of money. I don't remember this boy having either. I remember this boy's thing is his car. It is a stick shift. Nobody knows how to "drive a stick," he says, except him and A. J. Foyt, the Indianapolis 500 winner, and so I am amazed when he releases the clutch like he's stepping on a yellow-jacket nest and grinds the gears when he pulls over in the dirt and stops.

I look around. "I gotta get back to the dorm," I say.

He turns off the engine.

"Youuuuuuuu liiiittttttttttllllllllllll prrrrrrrrrrrrik teeeeeeeeeeez," he says. This opening compliment, "You little prick tease," is paid to every girl at some point or other in 1961, and I don't wait to be paid another. I open the car door and slide out.

What am I wearing? Tennis shoes, jeans, big sweatshirt, and — *blam,* he lunges from the car and bolts his arms around me. We crash, like felled trees, to the ground.

We land in grass covered in yellow leaves. Thanks to Mr. Weber, my high-school biology teacher, I can, with 100 percent confidence, say those yellow leaves are poplar leaves. They crackle as I struggle to get up.

Straddling me, the boy looks zonked out of his mind with the possibilities. He pushes my sweatshirt up to my neck.

I remember the thought flashes through my mind that could I have foreseen the circumstance of a boy throwing me down and pushing my sweatshirt up to my chin, I would not have worn a padded bra. A padded bra makes a girl look like she lacks something.

"I don't want to wrestle," I say. "Get off!"

He pins my arms over my head by my wrists.

"Get off!" I say again.

He is holding my wrists with both his hands, and, before I can react, he changes his hold to one hand and, with his free hand, pulls a knife out of his back pocket.

"See this?" he whispers.

I look at it. At the time, I own two Girl Scout knives, a Girl Scout knife-safety certificate, and my own personal hatchet, and the neighbor kids believe I have reached a height of felicity rarely attained on Illsley Place, our street, because of my winning 30 rounds of mumblety-peg, a game where we throw pocketknives at each other's bare feet. So, yes, I can "see" his knife. It's a jackknife, a knife with a folding blade, dark brownish-gray, made out of some kind of horn, about five or six inches. If he opens it, it will measure, end to end, 10 or 11 inches. It's not the knife. Well, it is the knife, but it's the look on his face that scares me.

"Get off," I say.

He pushes my bra up over my breasts. I can smell his excitement; it's like electrified butter, and I zero in on the fact that he must use two hands to open the knife.

"Get off!" I say.

"I am gonna get off," he whispers.

He lets go of both of my wrists for two seconds to open the knife, and I roll out from under him and run.

I was voted Best Girl Athlete in high school, but I was a high jumper, not a runner. I outrun this boy nonetheless. And on a twisty back road through tangled orange-and-scarlet thickets, a young couple in a car pick me up about a quarter-hour after I escape. The girl says, "I'll bet a boy tried something with you," and I say, "Yeah," and that is the last word I utter about the attack until now.

Had I been an artist, I could have carried the front seat of the car the boy was driving wherever I went on Indiana University's campus to protest his assault like Emma Sulkowicz carrying her mattress around Columbia University in the greatest art show of 2014, but I didn't think of it. Perhaps hauling around just the gearshift would have sufficed. But, like many women who are attacked, when I had the most to say, I said the least.

Let's just double-check my diary: Do I write that I went to the campus police and reported the boy? Do I say I went to the university health clinic and talked with a therapist? No. I say:

> BE IT KNOWN—
>
> That from this day forth I will not except [sic] or go on any dates that are not of my choice — they must be boys who are to my liking [I can't read what I crossed out here]. I have to [sic] many things to do — rather than waste my time with CREEPY BOYS.
>
> (signed) Jeanie Carroll

**A559**



E. Jean Carroll. Photo: Amanda Demme for New York Magazine

**After college** and bumming around Africa, I arrive in Chicago, ready to start my so-called career. I meet one of those semi-good-looking, brown-haired, unimpeachably but forgettably dressed young men who are vice-presidents because their fathers own the company, in this case an employment agency–and–accounting firm–type thing, which, despite the gloss of its golden promise, no longer exists.

He hires me to help "land new accounts."

"You start tonight," he says.

"Great!" I say.

"We're meeting the people from Marshall Field's. Be at the Pump Room at eight o'clock."

"Wow!" I say. "The Pump Room!"

Congo-green paisley taffeta dinner suit, whisk-broom eyelashes, Rorschach-inkblot eye shadow, stacked heels, Marquis de Sade hair bow, and skirt up to *here,* I arrive in the Pump Room. I remember lots of white linen. Sparkling silver. The maître d' escorts me to a booth, where No. 13 on the Most Hideous Men of My Life List rises to greet me and says, "They canceled."

"Oh dear," I reply.

"Never mind," he says. "Sit down."

He orders drinks, an extra glass of ice, tells me in detail about the new suit he is wearing, and then says, surprised, "Oh damn! My ex-wife just walked in."

My false eyelashes spring open like parasols.

A smashingly put-together woman with a flamboyant mane of rich red hair is being escorted with an older chap (he is probably all of 35) to a table across the room. When they are seated, my boss raises his glass to her. She nods and raises one eyebrow at him.

"She's a cunt," he says.

Ten minutes later, an odd thing happens. My boss's ex-wife takes her chap's hand and raises it to her lips. A moment later, my boss takes my hand and raises it to his lips.

I jerk my hand away.

"Just a welcome smooch," he says. "Don't be bourgeois."

He orders another drink. Across the room, my boss's ex-wife glances at us and puts her two very, very red open lips on her chap's cheek and — well, there is no verb available — squishes her lips up and down and sorta rolls them around his face like she is the press-and-steam girl at a dry cleaner.

By now, the question has occurred to you: Why does this woman seem so unfazed by all this horrible crap?
After she concludes, my boss picks up the glass filled with ice, globs in a mouthful, crunches it for a few seconds, and then plants his freezing lips and tongue on my face.

I nearly fly out of the booth.

"GET OFF!" I cry. "Ewwwwwww!"

"You're soooo boooooooozzzzshwaaaaahh," says my boss.

"Keep it in your mouth, mister!" I say. "Where's the waiter? I need more bread and butter!"

I am not a foodie. Give me a three-cheese foot-long with a mound of red onions on it or a couple of Amy's organic black-bean burritos and I'm happy. But wild, half-witted, greener-than-green Jeanie Carroll, 50 years before #MeToo, 40 years before women even begin expecting things could be different Jeanie Carroll, who takes her licks and doesn't look back, is not about to pass up a dinner in the goddamn Pump Room!

I have the filet mignon. (One of the last times I ever eat meat, so disgusting is this night.)

My boss? He orders another drink and becomes more and more excited, slobbering on my hand like a Doberman playing with his squeaky toy, and meanwhile my boss's ex-wife — who I now, half a century later, suspect was actually his wife and this was a little game they played to spice things up — starts rubbing her chap's leg.

My boss and I can't really see her doing it, as the table linen hangs nearly to the floor, but it is clear from the feverish action of her upper body that she is rubbing and rubbing and rubbing, and when her chap's eyes close, she goes on rubbing until, with his face still smeared with lipstick and looking like a sophomore standing on the free-throw line in a tied game, the chap stands up, heaves a wad of cash on the table, grabs the wife, and they scamper toward the exit. My boss asks for the check.

My Jean Rhys *Good Morning, Midnight* room in the old Hotel Eastgate on Ontario Street no longer exists. But at the time, it is only a dozen or so blocks away, and my boss insists on driving me home. It is my first ride in a Mercedes. I am surprised at how uncomfortable the stiff leather seats are. Two or three blocks from my place, my boss runs a red light, stomps the brakes, skids to a halt, and, jabbering about "that cunt" or "a cunt" or "all cunts," jams his hand between my legs so hard I bang my head into the dashboard trying to protect myself. I open the car door and bound into the traffic.

My boss must be doing the following things: pulling over, getting out, etc., because as I am about to turn in to the Hotel Eastgate, I look back and see him weaving toward me in a drunken trot. I remember that his legs look menacingly short. I run into the empty hotel lobby. Spurt past the desk. No manager in sight. Check the elevators. Decide to take the stairs two at a time. Hit the second floor. Feeling for the room key in my jacket pocket, I run down the hall, and as I try to put the key in the door, my boss catches me from behind and clamps his

teeth on the nape of my neck. I kick backward at his shins, manage to get the key to work, jab a backward elbow into his ribs, squeeze into my room, and push, push, push the door closed.

Have you ever shut a dog outside who wants to come in? My boss scratches and whimpers at that door for the next quarter of an hour. The next day, I get a new job — and never has my lack of all talent been put to better advantage — as a greeter-and-seater at Gino's East, the Chicago pizza joint beloved by mob guys, journos, and TV glamorosi, and do not so much as call No. 13 to tell him I quit.

**Do I attract hideous men?** Possibly. But I've also encountered many creeps, villains, dickwads,and chumps simply because I've been around a long time. I was mostly single, free of encumbrances, and working in the '60s, '70s, '80s, and '90s, when a woman could scarcely walk down the street without getting hit on or take a job without being underpaid.

So … we may proceed to No. 15 on the Most Hideous Men of My Life List: Les Moonves, chairman of the board, president, and chief executive officer of the CBS Corporation.

This happens in the time — one of the happiest of my happy life — when I am booming around the country writing for *Esquire*. I have been interviewing Moonves in the lounge of the Hotel Nikko in Beverly Hills for a story (presciently titled by my editor "Dangerous Minds," February 1997), and the short, gravel-voiced Moonves apparently takes one look at me — a 50-something journalist in a pair of old brown-and-beige oxfords — and his life is no longer his own.

After the interview is finished (and for a man like Moonves, talking about himself for an hour and a half is as good as downing two gallons of Spanish fly), he follows me to the elevator. When I turn to say good-bye, he says: "You're smart."

I say: "Thank you!"

He says: "Smart enough to choose an out-of-the-way hotel," and he steps into the elevator behind me and, his pants bursting with demands, goes at me like an octopus. I don't know how many apertures and openings you possess, Reader, but Moonves, with his arms squirming and poking and goosing and scooping and pricking and prodding and jabbing, is looking for fissures I don't even know I own, and — by God! — I am not certain that even if I pull off one of his arms it won't crawl after me and attack me in my hotel bed. Hell, I am thrilled I escape before he expels his ink.

Naturally, I do not mention this in the article. I am a member of the Silent Generation. We do not flap our gums. We laugh it off and get on with life. (Moonves, for his part, told *New York* he "emphatically denies" the incident occurred.)



Carroll cheerleading at Indiana University in 1965. Photo: Courtesy of the author

By now, Silent Generation aside, the question has occurred to you: Why does this woman seem so unfazed by all this horrible crap? Well, I am shallower than most people. I do not dwell on the past. I feel greater empathy for others than for myself. I do not try to control everything. But mainly, I think it is because I have done the thing no Indiana University football team has ever done in history — I have won a national championship: Miss

Cheerleader USA. And they fly me to Washington, D.C., to meet President Lyndon Johnson in the Rose Garden. My photo (in a swimsuit!) plays on front pages across the nation. I get a big scholarship and appear on the TV quiz show *To Tell the Truth*.

This championship is, in fact, so important to the Indiana athletic department that they put me on billboards all over the state of Indiana — giant images of an ecstatic Jeanie escaped from her bottle, soaring above the stunned crowd in the Indiana University football stadium, a big i on my crimson sweater, cheerleading skirt aswirl, legs split like the atom.

And, well, I've never really come down … have I?

I'm up there, perpetually, eternally, forever in mid-leap, urging the crowd to never lose hope. I was a cheerleader in grade school. I was a cheerleader in high school. My sisters, Cande and Barbie, were cheerleaders; my brother, Tom, was a pole vaulter, so he jumped too. Today I open a letter for my column, I read the question, and what do I do? I start shouting and yelling and cheering at the correspondent to pick herself up and go on. And, by God! The correspondent *does* pick herself up and *does* go on! Because if she doesn't, I keep yelling at her. And every now and then I shout at myself, "Get the hell up, E. Jean! You half-wit! My God! Get on with it!"

And many women my age just "get on with it" too. It is how we handle things: Chin up! Stop griping! We do not cast ourselves as victims because we do not see ourselves as victims. While the strategy has worked for me, I wish I hadn't waited so long to say something about two of my Hideous Men.

**Beauty contests are** such a rage when I am growing up that my camp — a Girl Scout camp! — holds yearly pageants. So it happens that the first beauty contest I am nominated for is Miss Camp Ella J. Logan. (Later I'll win Miss Indiana University, no doubt due to my "talent": I take to the stage dressed as Edith Sitwell and perform a dramatic reading of *Dick and Jane*.)

There is no talent portion at camp, alas. We contestants walk up and down the dock; the judges, who've roared across the lake in a magnificent Chris-Craft and who are now seated in deck chairs, call my name.

I walk over and whisper: "What?"

They whisper: "You are Miss Camp Ella J. Logan."

After they put the papier-mâché crown on my head, the cape on my shoulders, and give me the baton covered in Reynolds Wrap, Old Cam, No. 6 on the Most Hideous Men of My Life List, the waterfront director, takes me out in a boat and runs his hands under my shirt and up my shorts. He is breathing and moving his hand slowly and hotly, and I fight no battles in my head. My mind goes white. This is Cam. This is the man who has watched me grow from an 8-year-old Brownie Scout, and his notice is an honor. This is Cam, who teaches me to swim

and dive and awards me the coveted White Cap! This is Cam, who continues to run his hand inside my shorts and under my blouse — even in the dining room during dinner, under the table, squeezing my thighs, shoving his fingers — saying, "You're my girl. You're my girl. You're my girl," and making me Girl Scout–promise "not to tell anyone."

I am astonished by what I'm about to write: I keep laughing.
He does this until I go home. I am 12.

My friends will be stunned to read this. My sisters and brother will be speechless. But Aly Raisman, the great Olympian gymnast, and the more than 150 young women who spoke out in court about Lawrence Nassar, the USA Gymnastics team doctor, will not be shocked. Nassar abused some of the young women in front of their own mothers. Nobody saw it.

And old Cam? He writes a book called *The Girl Scout Man.* It is listed in "rather remarkable" condition, though there is some "light foxing and some very modest yellowing of the pages," on Abe Books, the rare-books dealer. Here is a shortened version of its description:

> "This loving homage to Girl Scouting is a record of many of the experiences and incidents and occurrences spanning the over twenty-five years of dedicated service of Cam Parks, done mostly at Camp Ella J. Logan, near Fort Wayne, Indiana, on the shore of Dewart Lake. If you, Reader, are an alumnus of Logan … memories of time spent at this camp may well be sweeping over you right now."

No thank you.

As a Scout, I returned to Camp Ella J. Logan year after year, becoming tall and womanly, receiving letters from boys with swak written on the backs of the envelopes, going on weeklong canoe trips, and completing my counselor-in-training program.

Cam I avoided. Never once did I speak to him or look at him again, but my brain does not avoid him. He and his maroon swim trunks may have been dead these last 40 years, but old Cam and the boat are the events — of all the events in my life — that somehow swim constantly back into my head. And it's Cam who, when he dies at the age of 72 and the story starts going around that he was "suddenly dismissed" from coaching, causes me the most pain.

I could have spoken up! Maybe not when I was 12. But when I was 25. He died when I was 34. I might have stopped him.

**Which brings me to** the other rich boy. Before I discuss him, I must mention that there are two great handicaps to telling you what happened to me in Bergdorf's: (a) The man I will be talking about denies it, as he has denied accusations of sexual misconduct made by at least 15 credible women, namely, Jessica Leeds, Kristin Anderson, Jill Harth, Cathy Heller, Temple Taggart McDowell, Karena Virginia, Melinda McGillivray, Rachel Crooks, Natasha Stoynoff,

Jessica Drake, Ninni Laaksonen, Summer Zervos, Juliet Huddy, Alva Johnson, and Cassandra Searles. (Here's what the White House said: "This is a completely false and unrealistic story surfacing 25 years after allegedly taking place and was created simply to make the President look bad.") And **(b)** I run the risk of making him more popular by revealing what he did.

His admirers can't get enough of hearing that he's rich enough, lusty enough, and powerful enough to be sued by and to pay off every splashy porn star or *Playboy* Playmate who "comes forward," so I can't imagine how ecstatic the poor saps will be to hear their favorite Walking Phallus got it on with an old lady in the world's most prestigious department store.



On the *Ask E. Jean* show, which aired from 1994 to 1996. Photo: Courtesy of the author

This is during the years I am doing a daily *Ask E. Jean* TV show for the cable station America's Talking, a precursor to MSNBC launched by Roger Ailes (who, by the way, is No. 16 on my list).

Early one evening, as I am about to go out Bergdorf's revolving door on 58th Street, and one of New York's most famous men comes in the revolving door, or it could have been a regular door at that time, I can't recall, and he says: "Hey, you're that advice lady!"

And I say to No. 20 on the Most Hideous Men of My Life List: "Hey, you're that real-estate tycoon!"

I am surprised at how good-looking he is. We've met once before, and perhaps it is the dusky light but he looks prettier than ever. This has to be in the fall of 1995 or the spring of 1996 because he's garbed in a faultless topcoat and I'm wearing my black wool Donna Karan coatdress and high heels but not a coat.

"Come advise me," says the man. "I gotta buy a present."

"Oh!" I say, charmed. "For whom?"

"A girl," he says.

"Don't the assistants of your secretaries buy things like that?" I say.

"Not this one," he says. Or perhaps he says, "Not this time." I can't recall. He is a big talker, and from the instant we collide, he yammers about himself like he's Alexander the Great ready to loot Babylon.

As we are standing just inside the door, I point to the handbags. "How about—"

"No!" he says, making the face where he pulls up both lips like he's balancing a spoon under his nose, and begins talking about how he once thought about buying Bergdorf 's.

"Or … a hat!" I say enthusiastically, walking toward the handbags, which, at the period I'm telling you about — and Bergdorf's has been redone two or three times since then — are mixed in with, and displayed next to, the hats. "She'll love a hat! You can't go wrong with a hat!"

I don't remember what he says, but he comes striding along — greeting a Bergdorf sales attendant like he owns the joint and permitting a shopper to gape in awe at him — and goes right for a fur number.

"Please," I say. "No woman would wear a dead animal on her head!"

What he replies I don't recall, but I remember he coddles the fur hat like it's a baby otter.

"How old is the lady in question?" I ask.

"How old are you?" replies the man, fondling the hat and looking at me like Louis Leakey carbon-dating a thighbone he's found in Olduvai Gorge.

"I'm 52," I tell him.

"You're so old!" he says, laughing — he was around 50 himself — and it's at about this point that he drops the hat, looks in the direction of the escalator, and says, "Lingerie!" Or he may have said "Underwear!" So we stroll to the escalator. I don't remember anybody else greeting

him or galloping up to talk to him, which indicates how very few people are in the store at the time.

I have no recollection where lingerie is in that era of Bergdorf's, but it seems to me it is on a floor with the evening gowns and bathing suits, and when the man and I arrive — and my memory now is vivid — no one is present.

There are two or three dainty boxes and a lacy see-through bodysuit of lilac gray on the counter. The man snatches the bodysuit up and says: "Go try this on!"

"*You* try it on," I say, laughing. "It's your color."

"Try it on, come *on,*" he says, throwing it at me.

"It goes with your eyes," I say, laughing and throwing it back.

"You're in good shape," he says, holding the filmy thing up against me. "I wanna see how this looks."

"But it's *your* size," I say, laughing and trying to slap him back with one of the boxes on the counter.

"Come on," he says, taking my arm. "Let's put this on."

*This is gonna be hilarious,* I'm saying to myself — and as I write this, I am staggered by my stupidity. As we head to the dressing rooms, I'm laughing aloud and saying in my mind: *I'm gonna make him put this thing on over his pants!*

There are several facts about what happens next that are so odd I want to clear them up before I go any further:

*Did I report it to the police?*

No.

*Did I tell anyone about it?*

Yes. I told two close friends. The first, a journalist, magazine writer, correspondent on the TV morning shows, author of many books, etc., begged me to go to the police.

"He raped you," she kept repeating when I called her. "He raped you. Go to the police! I'll go with you. We'll go together."

My second friend is also a journalist, a New York anchorwoman. She grew very quiet when I told her, then she grasped both my hands in her own and said, "Tell no one. Forget it! He has 200 lawyers. He'll bury you." (Two decades later, both still remember the incident clearly and

**A569**

confirmed their accounts to *New York.*)

*Do I have photos or any visual evidence?*

Bergdorf's security cameras must have picked us up at the 58th Street entrance of the store. We would have been filmed on the ground floor in the bags-and-hats sections. Cameras also must have captured us going up the escalator and into the lingerie department. New York law at the time did not explicitly prohibit security cameras in dressing rooms to "prevent theft." But even if it had been captured on tape, depending on the position of the camera, it would be very difficult to see the man unzipping his pants, because he was wearing a topcoat. The struggle might simply have read as "sexy." The speculation is moot, anyway: The department store has confirmed that it no longer has tapes from that time.

*Why were there no sales attendants in the lingerie department?*

Bergdorf Goodman's perfections are so well known — it is a store so noble, so clubby, so posh — that it is almost easier to accept the fact that I was attacked than the fact that, for a very brief period, there was no sales attendant in the lingerie department. *Inconceivable* is the word. Sometimes a person won't find a sales attendant in Saks, it's true; sometimes one has to look for a sales associate in Barneys, Bloomingdale's, or even Tiffany's; but 99 percent of the time, you will have an attendant in Bergdorf's. All I can say is I did not, in this fleeting episode, see an attendant. And the other odd thing is that a dressing-room door was open. In Bergdorf's dressing rooms, doors are usually locked until a client wants to try something on.

*Why haven't I "come forward" before now?*

Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the 15 women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them, never sounded like much fun. Also, I am a coward.



Carroll, Donald and Ivana Trump, and Carroll's then-husband, television-news anchor John Johnson, at an NBC party around 1987. Photo: Courtesy of the author

**So now I will tell you** what happened:

The moment the dressing-room door is closed, he lunges at me, pushes me against the wall, hitting my head quite badly, and puts his mouth against my lips. I am so shocked I shove him back and start laughing again. He seizes both my arms and pushes me up against the wall a second time, and, as I become aware of how large he is, he holds me against the wall with his shoulder and jams his hand under my coat dress and pulls down my tights.

I am astonished by what I'm about to write: I keep laughing. The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, thrusts his penis halfway — or completely, I'm not certain — inside me. It turns into a colossal struggle. I am wearing a pair of sturdy black patent-leather four-inch Barneys high heels, which puts my height around six-one, and I try to stomp his foot. I try to push him off with my one free hand — for some reason, I keep holding my purse with the other — and I finally get a knee up high enough to push him out and off and I turn, open the door, and run out of the dressing room.

The whole episode lasts no more than three minutes. I do not believe he ejaculates. I don't remember if any person or attendant is now in the lingerie department. I don't remember if I run for the elevator or if I take the slow ride down on the escalator. As soon as I land on the main floor, I run through the store and out the door — I don't recall which door — and find myself outside on Fifth Avenue.

And that was my last hideous man. The Donna Karan coatdress still hangs on the back of my closet door, unworn and unlaundered since that evening. And whether it's my age, the fact that I haven't met anyone fascinating enough over the past couple of decades to feel "the sap rising," as Tom Wolfe put it, or if it's the blot of the real-estate tycoon, I can't say. But I have never had sex with anybody ever again.

*From* What Do We Need Men For? A Modest Proposal, *by E. Jean Carroll. Copyright © 2019 by the author and reprinted by permission of St. Martin's Publishing Group. James, Arthur, and Evelyn are pseudonyms.*

*Makeup by Caitlin Wooters at Art Department; Hair by Clay Nielsen at Art Department.*

*\*This article appears in the June 24, 2019, issue of* New York *Magazine.* **Subscribe Now!**

Donald Trump, His Attack, and 20 Other Hideous Men

**A572**

# EXHIBIT 3

**A573**

← **Tweet**



**Laura Litvan** ✓
@LauraLitvan

    ...

NEW: President Trump responds to sexual assault allegations by E. Jean Carroll, saying `I've never met this person in my life'

---

**Statement from President Donald J. Trump:**

"Regarding the "story" by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book–that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda–like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news–it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

---

5:17 PM · Jun 21, 2019 · Twitter Web Client

**378** Retweets   **219** Quote Tweets   **909** Likes

            



EXHIBIT
DJT 20
10·19·22