# Chats



**Janice Christian**

To: Facebook account copy (facebook-EJeanCarroll.zip)

If you are the woman who wrote a book and are the Trump Rape accuser. No one in their right mind would ever think of RAPE as SEXY furtherrmore I think you're only trying to sell a book and I don't really think that happened.I have serious doubts,but if it did I would not think of it as Sexy.Rape is a violation lady.Get over yourself .Good luck with that book I'm sure it won't see #1

06/24/2019
05:32:56
PM
(UTC-4)

**Janice Christian**

To: Facebook account copy (facebook-EJeanCarroll.zip)

If you really said this you're a nutjob.Women love the idea of being drug into a cave bya a man.Maybe YOU do ,not me .What the HELL is wrong with you ?
https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/
https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/
https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/
https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/

https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/

https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/

https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/

https://summit.news/2019/06/25/trump-rape-accuser-once-said-women-love-idea-of-being-dragged-into-a-cave-by-a-man/

06/25/2019
06:45:52
AM
(UTC-4)

1

# Chats

1 Norm Sargent 0

6/24/2019

NS

Norm Sargent

To: Facebook account copy (facebook-EJeanCarroll.zip)

You are a lying cunt. I only wish THAT could be proven and YOU would go to jail, when will you fucking liberals give up?? I only pray NOONE BUYS YOUR FUCKING BOOK, you are an embarrassment to all women who have actually been sexually assaulted! Any shrink worth their degree knows your actions show you are nothing more than an attention seeking, profit seeking cunt (yes cunt in the clinical term)

06/24/2019 05:48:11 PM (UTC-4)

# Chats



Confidential

CARROLL_030137

# Chats



Confidential

CARROLL_030138

# Chats



Confidential                                                                                 CARROLL_030139

# Chats



| 3 | Amanda Lama | 0 |

6/27/2019

**Amanda Lama**

To: Facebook account copy (facebook-EJeanCarroll.zip)

Your a wicked woman and you've now been caught out in your horiffic lie.
Dear Fox News,
Do you have any up dates on E Jean Carroll Who released a book and in it she states Trump raped her. Well if your interested I looked on a site called Mr Regan and they stated she brokers the idea of fantasy rape in here book and has taken the story verbatim from an episode of Law and order about fantasy rape svu and he actually shows the clip from the TV....( I have seen the clip ) and I've posted it to all the news stations you have prompted your elf on I'd go into hiding if we're you....I knew you lied, Shame on you and I hope you never get to work again such horrific lies, imagine what his young son is going through and his wife. Ive also sent it to Trump. what a wicked thing to do...You should and I hope go to jail.We call people like you cunts....

06/27/2019
05:57:54
AM
(UTC-4)

6/28/2019

**Amanda Lama**

To: Facebook account copy (facebook-EJeanCarroll.zip)

E. Jean Carroll is a fraud – and now we know she is also a plagiarist. Her false Trump rape story that appears in her book came straight from an episode of Law and Order: Special Victims Unit—Episode 11, Season 13. Do you doubt it? The victim was raped in a Bergdorf Goodman, exactly where she said that her rape took place. Of course it could just be a coincidence, like the time my Uncle Jed was shooting at some food, when up through the ground came a bubbling crude. That happened just before we moved to Beverly Hills.
From The Gateway Pundit
CNN's Anderson Cooper on Monday interviewed E. Jean Carroll, a woman who alleged Donald Trump raped her in a Bergdorf Goodman dressing room in the 1990's.
Bergdorf Goodman is a very high-end department store packed with attentive salespeople and security which makes Carroll's claims even more preposterous.
Anderson Cooper was left speechless and stuttering and decided to cut to commercial break after E. Jean Carroll called rape "sexy."
"I think most people think of rape as being sexy," Carroll said. "They think of the fantasies."
The woman is not well.
And it appears she is also a plagiarist.
Carroll's story is eerily similar to an episode of Law and Order from season 13 — right down to the rape fantasy in a Bergdorf Goodman dressing room.

06/27/2019
11:58:29
PM
(UTC-4)

**Amanda Lama**

To: Facebook account copy (facebook-EJeanCarroll.zip)

messages/stickers_used/851587_369239346556147_162929011_n_369239343222814.png

851587_369239346
556147_162929011
_n_3692393432228
14.png

06/27/2019
11:58:39
PM
(UTC-4)

1

CARROLL_030140

# Chats

4 Greg Luther 0

6/26/2019

GL Greg Luther
To: Facebook account copy (facebook-EJeanCarroll.zip)

You know I've had the sadness of watching you on one of those worthless channels, talking about you being groped by then Donald Trump. Your explaination was that you were hoping to get him to put on some see thru dress overtop of his suit. Then he forced himself on you. I wonder if you are desperate for attention, or just another example of women that know they are basically insignificant. If society can come up with a way to bring strong baby boys into the world without having to come out of your old and discusting vaginas then your only value would be to swallow the unwanted babies that make it very inconvenient for men to enjoy their lives. Men have always been in command, and will continue generation after generation to make sure women understand their place in this world. With all of the liberating things in our great republic to have happened why do you suppose women still get paid less then men? Maybe if you spent less time on your knees and back trying to climb the corporate food chain you might actually earn some respect.

06/26/2019 07:34:20 PM (UTC-4)

GL Greg Luther
To: Facebook account copy (facebook-EJeanCarroll.zip)

If you are the woman that you say you are then surely you can put me in my place intellectually. Call me if you dare! 843-368-0260

06/26/2019 07:35:33 PM (UTC-4)

7/1/2019

GL Greg Luther
To: Facebook account copy (facebook-EJeanCarroll.zip)

Yes, that

07/01/2019 02:39:00 AM (UTC-4)

GL Greg Luther
To: Facebook account copy (facebook-EJeanCarroll.zip)

is what I thought. A guttless, weak female!

07/01/2019 02:39:27 AM (UTC-4)

# Chats



Confidential

CARROLL_030142

# Chats

2 Bill Kilby 0

6/27/2019

BK

Bill Kilby
To: Facebook account copy (facebook-EJeanCarroll.zip)

My sister was raped once. It's nothing to keep quiet about. Especially if it is a rich bastard you can sue. Hmmm 3 more bleeding heart fading socialist personalities come out with a rape claim from 20 years ago. Right when election talk gears up and right around the Democratic Convention. Hmmm Coincidence? Must be writing a new book. You ladies really don't have a conscience do you? What are you getting paid for this charade? I am sure there some abortions need accomplished down the street. Why don't you go help them and write a book about that. Make sure to include plenty of photos for added effect. .

06/27/2019 03:11:33 PM (UTC-4)

12/25/2019

BK

Bill Kilby
To: Facebook account copy (facebook-EJeanCarroll.zip)

Merry Christmas!

12/25/2019 09:41:20 AM (UTC-5)

**A865**

# Chats



○ 1                      Gary Lee                      0 ↗

6/27/2019

**Gary Lee**

To: Facebook account copy (facebook-EJeanCarroll.zip)

"Would you have sex with Donald Trump for $17,000? (Even if you could A) give the money to Charity? B) Close your eyes? And he's not allowed to speak?) LOL How long have you been fantasizing about having sex with TRUMP? At least for 7 years... longer?

06/27/2019
05:08:40
PM
(UTC-4)

1

CARROLL_030144

**A866**

# Chats



Ken Nelson

To: Facebook account copy (facebook-EJeanCarroll.zip)

My dog wouldn't hump ur leg, y do u think u can try and fabricate a rape story? Oh yeah u wrote a book... Go back on ur meds

06/27/2019
11:30:55
PM
(UTC-4)

1

Confidential

CARROLL_030145

# Chats



# Chats



Confidential                                                                       CARROLL_030147

# Chats

4 Daniel Neumann 0

7/6/2019

DN Daniel Neumann
To: Facebook account copy (facebook-EJeanCarroll.zip)

Go look in the mirror and tell me honestly that you can convince anyone that somebody would want to even fuck you. Keep selling those books asshole□□□

07/06/2019 04:47:35 PM (UTC-4)

7/20/2019

DN Daniel Neumann
To: Facebook account copy (facebook-EJeanCarroll.zip)

The second rule is, don't vote for some ant American muslim whore □□

07/20/2019 01:36:54 AM (UTC-4)

2/6/2020

DN Daniel Neumann
To: Facebook account copy (facebook-EJeanCarroll.zip)

After that piece of Schitt tried to frame Kavanaugh, I wouldn't doubt that you somehow found some DNA to smear on your □.
Beyond a reasonable doubt! You will lose.
You liberal assholes cannot be trusted one inch!

02/06/2020 12:46:21 PM (UTC-5)

2/20/2020

DN Daniel Neumann
To: Facebook account copy (facebook-EJeanCarroll.zip)

Get on with your life you miserable fuck!!!!
Get some help for that TDS.

02/20/2020 01:23:25 PM (UTC-5)

# Chats



Confidential

CARROLL_030150

**A871**

# Chats



| 1 | Larry Thomas | 0 |

1/31/2020

**Larry Thomas**
To: Facebook account copy (facebook-EJeanCarroll.zip)

So, you wait 30 fucking years to claim you have been raped by Trump. You sure planned that perfect, you lying cunt! You fucking liberals never know when to quit! Go fuck yourself, you sorry liberal piece of shit! Go to hell while you are at it, bitch!

01/31/2020
05:01:24
AM
(UTC-5)

1

# Chats



| 1 | Barbara Dinius | 0 |

2/1/2020

**BD** 🔵 Barbara Dinius
To: Facebook account copy (facebook-EJeanCarroll.zip)

WTF are you trying to pull?? rape 30 years ago what a fucking joke!! who the hell is paying you?? IF i were Trump i wouldn't submit to any DNA so the government could plant it!! YOU ARE A JOKE!! and i'm ashamed you are from the same town i am from!! Oh i see you want a book deal. People who ACCUSE others of rape and they are found out to be lying should and will go to PRISON!!

01/31/2020
10:34:21
PM
(UTC-5)

1

CARROLL_030152

# Chats



Confidential

CARROLL_030153

# Chats

3 Ruby Shankles 0

2/18/2020

RS **Ruby Shankles**
To: Facebook account copy (facebook-EJeanCarroll.zip)

WOW YOU ARE SOME KIND OF BITCH. JUST HAVE TO ASK HOW MUCH SOROS AND THE COMMUNIST DEMOCRAPS ARE SHOVING UP YOUR ASS.

02/18/2020 02:49:12 PM (UTC-5)

RS **Ruby Shankles**
To: Facebook account copy (facebook-EJeanCarroll.zip)

WHY WOULD TRUMP WANT TO SCREW YOU WHEN HE HAS BEAUTIFUL WIFE.

02/18/2020 02:50:35 PM (UTC-5)

RS **Ruby Shankles**
To: Facebook account copy (facebook-EJeanCarroll.zip)

YOU MUST BE ONE SCREWED UP BITCH.

02/18/2020 02:50:46 PM (UTC-5)

# Chats



Confidential                                                                CARROLL_030155

# Chats



Confidential

| Message | |
|---|---|
| **From:** | Tschuler (via Twitter) [notify@twitter.com] |
| **on behalf of** | Tschuler (via Twitter) <notify@twitter.com> [notify@twitter.com] |
| **Sent:** | 9/9/2020 12:50:15 AM |
| **To:** | E. Jean Carroll [ejeancarroll@gmail.com] |
| **Subject:** | Tschuler (@Tschuler11) has sent you a Direct Message on Twitter! |





## Tschuler sent you a Direct Message.

I knew you lied to America peoples about Trump raped you. That is last minute announcement about Trump raped you at near Election Day. I totally don't believe you said. I believed someone bribed you something false complaint. You're motherfucker then go to hell. I believed you made up your minds against Trump. You're liar wonan

**Reply**

Settings | Help | Opt-out | Download app

Twitter, Inc. 1355 Market Street, Suite 900 San Francisco, CA 94103

Confidential

Confidential

CARROLL_028064

**A879**

I knew you lied to America peoples about Trump raped you. That is last minute announcement about Trump raped you at near Election Day. I totally don't believe you said. I believed someone bribed you something false complaint. You're motherfucker then go to hell. I believed you made up your minds against Trump. You're liar wonan

8:50 PM

CARROLL_028065

Confidential

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| E. JEAN CARROLL,<br><br>       *Plaintiff,*<br><br>  v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>       *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

<div align="center">

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

</div>

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

ARGUMENT .......................................................................................................1

    I.     DEFENDANT DID NOT WAIVE HIS ENTITLEMENT TO PRESIDENTIAL IMMUNITY ...............................................................................................1

    II.    ALTERNATIVELY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE CONSTRUED AS A MOTION TO AMEND HIS ANSWER ........5

    III.    DEFENDANT'S ENTITLEMENT TO PRESIDENTIAL IMMUNITY IS WELL ESTABLISHED ............................................................................................7

    IV.    PLAINTIFF'S DEFAMATION PER SE CLAIM FAILS A MATTER OF LAW .7

        A.  Plaintiff Cannot Meet The Elements Necessary to Plead Defamation Per Se ...9

        B.  Plaintiff Consented to the Defamation ................................................9

CONCLUSION ....................................................................................................10

<div align="center">

### <u>TABLE OF AUTHORITIES</u>

</div>

***Cases***

*Albert v. Loksen,*

    239 F.3d 256, 265 (2d Cir. 2001) ........................................................................8

*Anthony v. City of N.Y.,*

    339 F.3d 129, 138, n. 5 (2d Cir. 2003). .............................................................5

*Barret v. Harrington,*

    130 F.3d 246, 254-55 (6th Cir. 1997);..............................................................7

*Block v. First Blood Assocs.,*

    988 F.2d 344, 350 (2d Cir. 1993). .....................................................................5

*Carroll v. Trump,*

    2-cv-10016 (LAK), 2023 U.S. Dist. LEXIS 6953, at *2 (S.D.N.Y. Jan. 13, 2023) ................6

*Clapper v. Amnesty Int'l USA,*

    568 U.S. 398, 408, 133 S. Ct. 1138, 1146 (2013*)* ...................................................3

*Clinton v. Jones,*

    520 U.S. 681, 694, 117 S.Ct. 1636, 1644 (1997)..................................................3, 7

*Trs. of ALA-Lithographic Pension Plan v. Crestwood Printing Corp.,*

    127 F. Supp. 2d at 479 ...........................................................................5

*Dickson v. Slezak,*

    73 A.D.3d 1249, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) .......................................9

*Gonzalez v. Thaler,*

    565 U.S. 134, 141, 132 S.Ct. 641, 648 (2012)....................................................5

*Harlow v. Fitzgerald,*

    457 U.S. 800, n. 17 (1982)......................................................................1, 2

*Ins. Corp. of Ireland, Ltd. v Cie. des Bauxites de Guinee,*

   456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982).....................................................4

*Kendall v. United States,*

   12 Pet. 524, 610, 9 L.Ed. 1181 (1838)..................................................................1

*Klayman v. Obama,*

   125 F.Supp.3d 67, 86 (D.D.C. 2015)......................................................................7

*Loving v. United States,*

   517 U.S. 748, 757 (1996)........................................................................................3

*Mandelblatt v. Perelman,*

   683 F. Supp. 379, 383 (S.D.N.Y. 1988) .................................................................9

*Monahan v. N.Y.C. Dep't of Corr.,*

   214 F.3d 275, 283 (2d Cir. 2000) ...........................................................................6

*Nixon v. Fitzgerald,*

   57 U.S. 731, 743, 102 S.Ct 2690, 2698 (1982)......................................1, 2, 3, 5, 8, 9

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*

   813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ...........................................................9

*Raines v. Byrd,*

   521 U.S. 811, 820 (1997)........................................................................................3

*Rinaldi v. Holt, Rinehart & Winston, Inc.,*

   42 N.Y.2d 369, 379 (1977)....................................................................................9

*Sleepy's LLC v Select Comfort Wholesale Corp.,*

   779 F3d 191, 199 (2d Cir 2015) ............................................................................9

*State Teachers Ret. Bd. v. Fluor Corp.,*

   654 F.2d 843, 856 (2d Cir. 1981). .........................................................................5

**A884**

*Teichner v. Bellan*,

    181 N.Y.S.2d 842, 846 (App. Div. 1959) .................................................................9

*Thompson v. Cty. of Franklin*,

    15 F.3d 245 (2d Cir. 1994). .......................................................................................4

*Thompson v. Trump,*

    590 F. Supp. 3d 46 (D.D.C. 2022) ............................................................................8

*Trump v. Mazars USA LLP,*

    140 S.Ct. 2019, 2035 (2020) .....................................................................................4

*Trump v. Vance,*

    140 S. Ct. 2412, 2426 (2020) ....................................................................................2

*United States v. Nixon*,

    418 U.S. 683, 703-713, 94 S.Ct. 3090, 3105-3110 (1974) .......................................3

*Youngstown Sheet & Tube Co. v. Sawyer*,

    343 U.S. 579, 72 S.Ct. 863 (1952) ...........................................................................3

**Rules and Statutes**

Rule 56 of the Federal Rules of Civil Procedure ............................................................1

Commentaries on the Constitution of the United States § 1563 .....................................2

Fed. R. Civ. P. 12(h)(3) ..................................................................................................4

Rule 15(a)(2) ...............................................................................................................5, 6

Restatement (Second) of Torts, § 583 (1977) ................................................................9

Defendant, Donald J. Trump ("Defendant") respectfully submits this memorandum of law in further support of his motion for summary judgment against Plaintiff, E. Jean Carroll ("Plaintiff").

## ARGUMENT

## I.   PRESIDENTIAL IMMUNITY CANNOT BE WAIVED

In her opposition brief, Plaintiff contends that Defendant waived his entitlement to absolute immunity by neglecting to raise it in his Answer, which was filed in the state court proceedings. However, this argument is flawed in its premise since the type of absolute immunity at issue here—presidential immunity—is a "functionally mandated incident of the President's unique office" which, when applicable, inherently precludes the judiciary from exercising jurisdiction over the head of the Executive Department for acts taken within the scope of his official duties. *Nixon v. Fitzgerald*, 457 U.S. 731, 743, 102 S.Ct 2690, 2698 (1982). Thus, given its unique rooting in the separation of powers doctrine, presidential immunity is not waivable.

The Supreme Court has declared that "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Nixon*, 457 U.S. at 750, 102 S.Ct at 2701; *see also Harlow v. Fitzgerald*, 457 U.S. 800, n. 17 (1982) (noting that presidential immunity "derives in principle part from factors unique to [the President's] constitutional responsibilities and station."). Indeed, "[t]he executive power is vested in [the] President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Nixon*, 457 U.S. at 754, 102 S.Ct. at 2703 (citing *Kendall v. United States*, 12 Pet. 524, 610, 9 L.Ed. 1181 (1838)). In view of the "singular importance of his duties," there exists an overarching concern that "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 751, 102 S.Ct. at 2702; *see also Trump v. Vance*,

1

140 S. Ct. 2412, 2426 (2020) (noting that the "dominant concern" which justifies presidential

immunity is the risk of "distortion of the [President's] 'decisionmaking process' with respect to

official acts that would stem from 'worry as to the possibility of damages.'") (citation omitted).

Thus, unlike "[s]uits against other officials [which] . . . generally do not invoke separation-

of-powers considerations," *Harlow*, 457 U.S. at n. 17 (1982), presidential immunity is an "essential

Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of

powers," *Nixon*, 457 U.S. at 743, 749, 102 S.Ct. at 2698, 2701. As explicated by the Supreme

Court in *Nixon v. Fitzgerald*:

> "There are . . . incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among these, must necessarily be included the power to perform them . . . The president ***cannot***, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases at least, to possess an ***official inviolability***."

*Id.* at 749, 2701 (citations omitted) (emphasis added).

The *Nixon* court went on to explain that a court is divested of jurisdiction in cases where

presidential immunity applies, as the separation of powers doctrine flatly prohibits a court from

imposing civil liability upon a President for his official acts:

> [O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . or to vindicate the public interest in an ongoing criminal prosecution . . . the exercise of jurisdiction has been held warranted. ***In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not.***

*Id.* at 754, 2703 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863

(1952); *United States v. Nixon*, 418 U.S. 683, 703-713, 94 S.Ct. 3090, 3105-3110 (1974))

(emphasis added).

2

The synthesis between presidential immunity and the separation of powers doctrine was further confirmed in *Clinton v. Jones*, when the Supreme Court clarified that the "dominant concern" in *Nixon* was not that a sitting President might be "distracted by the need to participate in litigation during the pendency of his office" but that his "decisionmaking process" may be distorted due to "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. at 694, 117 S.Ct. at 1636. While the *Clinton* court concluded that President Clinton was not entitled to presidential immunity, the Court's decision was premised upon its finding that the conduct at issue had taken place *before* President Clinton was in office; therefore, the Court reasoned, "[w]hatever the outcome of this case, there is ***no possibility*** that the decision will curtail the scope of the official powers of the Executive Branch." *Clinton*, 520 U.S. at 682, 117 S.Ct. at 1638 (emphasis added); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) (stating "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties" (citations omitted)).

The Supreme Court's holdings in *Nixon* and *Clinton* are consistent with the principle that the separation of powers doctrine is a creature of Article III standing which "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 1146 (2013*)* ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."); *see also Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.") (internal quotation marks omitted). Article III standing, in turn, is an issue of subject matter jurisdiction. *Ins. Corp. of Ireland, Ltd. v. Cie. des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982) ("Subject-matter jurisdiction, then, is an Art. III as well as a statutory

requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign."); *Thompson v. Cty. of Franklin*, 15 F.3d 245, 248 n.3 (2d Cir. 1994) (noting that courts have an "independent obligation to insure that federal jurisdiction is not extended beyond the limits of Article III.").

Subject matter jurisdiction, critically, is a jurisdictional necessity that cannot be waived. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Gonzalez v. Thaler*, 565 U.S. 134, 141, 132 S.Ct. 641, 648 (2012) ("Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety.")*; Ins. Corp. of Ireland*, 456 U.S. at 702, 102 S.Ct. at 2099 ("No action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.") (citations omitted)).

Here, even though Defendant has been sued in his individual capacity, the separation of powers concerns are implicated all the same. Indeed, the "interbranch conflict here does not vanish simply because . . . the President sued in his personal capacity." *Trump v. Mazars USA LLP*, 140 S.Ct. 2019, 2035 (2020). "The President is the only person who alone composes a branch of government," and therefore "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Id.* (quoting *The Federalist* No. 51). Nor is it of any moment that Defendant is a former President, as opposed to a sitting President, since the Supreme Court has affirmed that "a *former* President of the United States is entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749; *see also Clinton*, 520 U.S. at 693 ("[T]hat

rationale provided the principal basis for our holding that a *former* President of the United States was 'entitled to absolute immunity for damages liability predicated on his official acts.'") (citing *Nixon*, *supra*) (emphasis added).

In short, whether presidential immunity applies in this case is a non-waivable question of subject matter jurisdiction. If it does not apply, the case may properly proceed to trial. If it does, however, then judicial review of Defendant's official acts as President would "inevitably inhibit the processes of the Executive Branch decision making and impede the functioning of the Office of the President." *Nixon*, 457 U.S. at 763 (Burger, J., concurring). Therefore, this Court is "obligated to consider *sua sponte*" this issue, and to consider whether exercising its jurisdiction is proper under the separation of powers doctrine. *Gonzalez v. Thaler*, 565 U.S. 134, 141, 132 S.Ct. 641, 648 (2012) (citations omitted).

## II.   ALTERNATIVELY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE CONSTRUED AS A MOTION TO AMEND HIS ANSWER

In the alternative, should this Court accept Plaintiff's position regarding waiver, Defendant should be permitted to assert presidential immunity as a defense in the interest of justice. Pursuant to Rule 15(a)(2), a "court has discretion, when a party omits a defense, to nevertheless allow the defense at any time 'when justice so requires.'" *Trs. of ALA-Lithographic v. Crestwood Printing*, 127 F. Supp. 2d 475, 478-79 (S.D.N.Y. 2001). Further, a "district court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend the defendant's answer." *Anthony v. City of N.Y.*, 339 F.3d 129, 138, n. 5 (2d Cir. 2003).

In deciding whether to exercise such discretion, a court considers "the presence or absence of such factors as undue delay, bad faith, undue prejudice to opposing party, or futility of amendment." *Crestwood Printing Corp.*, 127 F. Supp. 2d at 479 (citations omitted). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district

court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d
Cir. 1981). Instead, a court must consider whether amendment would "(i) require the opponent to
expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly
delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in
another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Each factor weighs heavily in favor of permitting the Defendant to raise the defense of
presidential immunity. *First*, Plaintiff would not be required to expend any additional resources to
conduct discovery and prepare for trial. Indeed, Plaintiff's counsel has already represented that
"discovery in the present action has already addressed almost all of the issues relevant to the
Second Action." *See* ECF No. 98. *Second*, permitting Plaintiff to raise this affirmative defense
would not delay resolution of the dispute, but instead accelerate it. If indeed Defendant was acting
within the "outer perimeter" of his presidential duties when addressing the media on a matter of
public concern—a point which is firmly supported by decades of constitutional jurisprudence—
then this matter is resolved and the litigation is concluded. *Third*, Plaintiff would not be prevented
from bringing a timely action in another action. Indeed, Plaintiff has already filed a second action,
*Carroll v. Trump*, No. 22-cv-10016 (Carroll II), in which this Court stated that the issues in both
cases are "exactly the same." *See Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 U.S. Dist.
LEXIS 6953, at *2 (S.D.N.Y. Jan. 13, 2023).

Further, under Rule 15(a)(2), the Court should "freely give" leave to amend "when justice
so requires." Fed. R. Civ. P. 15(a)(2).  The Rule encourages courts to determine claims "on the
merits" rather than disposing of claims or defenses based on "mere technicalities." *Monahan v.
N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) Here, as recognized by the Supreme Court,
there exists "the greatest public interest in providing an official "the maximum ability to deal

fearlessly and impartially with the duties of his office." *Nixon*, 457 U.S. at 749. This overriding

constitutional concern necessitates a determination on the merits.

As such, Defendant respectfully requests that, in the alternative, this Court should construe

Defendant's Motion for Summary Judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave

to amend his answer.

### III.   DEFENDANT'S ENTITLEMENT TO PRESIDENTIAL IMMUNITY IS WELL ESTABLISHED

As set forth in considerable length in Defendant's moving papers, Defendant's entitlement

to presidential immunity is firmly supported by Supreme Court precedent. Plaintiff attempts to

circumvent this fact by characterizing Defendant's alleged conduct as malicious, retaliatory or

otherwise wrongful. Yet, in doing so, Plaintiff fails to recognize that "immunities are grounded in

'the nature of the function performed," rather than in the lawful or unlawful motivations of the

person performing them. *Clinton*, 520 U.S. at 693. Indeed, presidential immunity is "not overcome

by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015)

(quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997); even "alleged wrongful acts

. . . lay well within the outer perimeter" of the President's authority. *Nixon*, 457 U.S. at 757. Thus,

despite Plaintiff's best effort to argue otherwise, inquiry into the subjective motive or intent

underlying Defendant's alleged conduct is simply improper. *See Nixon*, 457 U.S. at 756 ("[A]n

inquiry into the President's motives could not be avoided under the kind of 'functional' theory

asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.").

Plaintiff's remaining contentions that presidential immunity should not apply here are

unavailing. Indeed, the Supreme Court has stressed that presidential immunity it is "a functionally

mandated incident of the President's unique office, rooted in the constitutional tradition of the

separation of powers and supported by our history" and has acknowledged that there "exists the

**A892**

greatest public interest" in upholding the protections afforded thereunder. *Nixon*, 457 U.S. at 749. In fact, the Supreme Court has specifically noted that the *lack* of presidential immunity would be a "detriment[] not only [to] the President and his office, but also the Nation that the Presidency was designed to serve." *Id.* at 753. It has also squarely rejected Plaintiff's contention that the application of presidential immunity here would "dishonor the Constitution." Pl. Mem. at 27; *compare to Nixon*, 457 U.S. at 758 ("The existence of alternative remedies and deterrents *will not place the President 'above the law.'*") (emphasis added).

Further, Plaintiff misstates the holding of *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022). Contrary to Plaintiff's arguments, the *Thompson* court affirmed that the president's speech is an "unquestionably a critical function of the presidency." *Id*. at 79. It further recognized that "to deny a President immunity from civil damages is no small step." *Id*. at 83. In *Thompson*, the court ultimately determined that the Defendant was not entitled to absolute immunity because they were done in his capacity as a candidate and "***entirely*** concern his efforts to remain in office for a second term." *Id*. at 84 (emphasis added).

At bottom, it cannot conceivably be argued that the Defendant's statements bore "no relation to the operation and administration of government." *See* Pl. Mem. at 20. Indeed, Plaintiff made her accusations a matter of public concern, by publishing a magazine article and book levying serious accusations against Defendant which undoubtedly brought his fitness to govern into question. Defendant's rebuttals were then issued in a White House press release and in response to reporters' questions at the White House. A holding limiting the President's ability to defend himself from grave accusations of this kind, which bring into question his fitness for office and ability to lead, would forever fetter the Presidency.

### IV.    <u>PLAINTIFF'S DEFAMATION PER SE CLAIM FAILS A MATTER OF LAW</u>

**A.  Plaintiff Cannot Meet The Elements Necessary to Plead Defamation Per Se.**

Plaintiffs argument that the challenged statements are defamatory per se similarly fail.  A claim for "defamation" is an umbrella term that incorporates the "twin torts of libel and slander." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (citations omitted). To invoke the exceptional case of a per se defamatory statement, the allegation must be: "(1) a statement charging an individual with a serious crime; (2) a statement that tends to injure another in his or her trade, business, or profession; (3) a statement that claims an individual has a 'loathsome disease;' or (4) a statement 'imputing unchastity to a woman.'" *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011).  Libel per se, on the other hand, consists of a statement that "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehart*, 42 N.Y.2d 369, 379 (1977).

Of the three challenged statements, only the June 21 statement can be considered under the libel per se standard, while the remaining two, which were spoken to reporters in response to their questions, should be considered under the more stringent slander per se standard. It is respectfully submitted that the challenged statements fail to meet either standard. As set forth in Defendant's original motion, the Statements do not reference Plaintiff's profession as an advice columnist, nor do they touch upon Plaintiff's "Ask E. Jean" column. The Statements are instead serve as a direct rebuttal to Plaintiff's allegations and serve as no more than a general characterization of Plaintiff's characters or qualities. As such, the Statements cannot constitute defamation per se.

**B.  Plaintiff Intentionally Solicited the Alleged Defamatory Statements.**

It is well established that consent is a valid defense to defamation under New York law. *Sleepy's LLC v Select Comfort Wholesale Corp*., 779 F3d 191, 199 (2d Cir. 2015) (citation

omitted); s*ee also Teichner v. Bellan,* 181 N.Y.S.2d 842, 846 (App. Div. 1959) (describing consent as "an absolute immunity or an absolute privilege upon the defendant."); Restatement (Second) of Torts, § 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.").

Plaintiff's conduct here squarely falls within this sphere, as Plaintiff's conduct demonstrates that she sought to gain maximum exposure for her claims and place Defendant into a position where he was forced to defend himself against her heinous allegations. Despite claiming that her assault took place in 1995, she waited over two decades before bringing these allegations to light, when the Defendant was two years into his presidency. She chose to publicize her claims in a manner that would receive maximum publicity – by releasing them through New York magazine "which knows how to break news." *See* Habba Dec., Ex. D. at 3. As such, the Defendant was compelled to respond and rebut Plaintiff's accusations. Her intent to further inflame the public was made evident when Plaintiff made rounds through the media to advance her claims even after the challenged statements were made.[1] Therefore, Defendant has successfully demonstrated that Plaintiff intentionally solicited the alleged defamatory statements from Defendant.

## CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that summary judgment be awarded in his favor.

Dated: January 19, 2023                    Respectfully submitted,

Alina Habba, Esq.
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP

---

[1] By way of example, Plaintiff was interviewed on primetime CNN by well-known commentator Anderson Cooper on June 24, 2019,. *See https://cnn.it/3XLaHrF.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

E. JEAN CARROLL,

        *Plaintiff*,

    v.

DONALD J. TRUMP, in his personal capacity,

        *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

---

**PLAINTIFF E. JEAN CARROLL'S SURREPLY BRIEF IN OPPOSITION**
**TO DEFENDANT DONALD J. TRUMP'S MOTION FOR SUMMARY JUDGMENT**

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**A896**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................. 1

CONCLUSION .............................................................................................................................. 6

## TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*Beechwood Restorative Care Center v. Leeds*,
    436 F.3d 147 (2d Cir. 2006)..........................................................................................2

*Boyd v. Carroll*,
    624 F.2d 730 (5th Cir. 1980) .........................................................................................2

*Bradley v. Fisher*,
    80 U.S. 335, 20 L. Ed. 646 (1871)................................................................................2

*Burnham v. Friedland*,
    No. 21-3888, 2022 WL 3046966 (6th Cir. Aug. 2, 2022) ............................................2

*Clinton v. Jones*,
    520 U.S. 681, 117 S. Ct. 1636 (1997)...........................................................................3

*Cohen v. United States*,
    2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022).............................................................3

*Collyer v. Darling*,
    98 F.3d 211 (6th Cir. 1996) ..........................................................................................2

*Cozzo v. Tangipahoa Parish Council*,
    279 F.3d 273 (5th Cir. 2002) .........................................................................................2

*Desi's Pizza, Inc. v. City of Wilkes-Barre*,
    321 F.3d 411 (3d Cir. 2003)...........................................................................................2

*District of Columbia v. Trump*,
    959 F.3d 126 (4th Cir. 2020) .........................................................................................3

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428, 131 S. Ct. 1197 (2011)...........................................................................4

*Imbler v. Pachtman*,
    424 U.S. 409, 96 S. Ct. 984 (1976)...............................................................................2

*In re Kendall*,
    712 F.3d 814 (3d Cir. 2013)...........................................................................................2

*K&D, LLC v. Trump Old Post Office, LLC*,
    2018 WL 6173449 (D.D.C. Nov. 26, 2018) ..................................................................3

*McCray v. Biden*,
    574 F. Supp. 3d 1 (D.D.C. 2021) ................................................ 4

*Nevada v. Hicks*,
    533 U.S. 353, 121 S. Ct. 2304 (2001) ................................... 1, 2

*Nixon v. Fitzgerald*,
    457 U.S. 731, 102 S. Ct. 2690 (1982) ................................ 1, 3, 4

*Shmueli v. City of New York*,
    424 F.3d 231 (2d Cir. 2005) ..................................................... 2

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ........................................... 4

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) .................................................... 4

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ...................................................... 1, 3, 5

*Tully v. Barada*,
    599 F.3d 591 (7th Cir. 2010) .................................................. 2

*United States v. Reynolds*,
    345 U.S. 1, 73 S. Ct. 528 (1953) ............................................. 4

**Other Authorities**

Memorandum in Support of Motion to Dismiss on Behalf of Defendant in His Individual
    Capacity, ECF 112-1, *District of Columbia v. Trump*,
    No. 8:17 Civ. 01596 (D. Md. May 1, 2018) ............................ 4

Reply in Support of Motion to Dismiss on Behalf of Defendant in His Individual Capacity,
    ECF 118, *District of Columbia v. Trump*,
    No. 8:17 Civ. 01596 (D. Md. May 25, 2018) .......................... 4

**A899**

## PRELIMINARY STATEMENT

Defendant Donald J. Trump does not deny that he waived his absolute immunity defense. Nor does he deny that he sought strategic advantage in state court from his assurance that "no one is seeking to 'escape accountability here'" because "Plaintiff is free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3 (cleaned up). Instead, Trump asserts that absolute presidential immunity is jurisdictional and therefore cannot be waived. Reply at 1-5. This position is mistaken: it misreads *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 102 S. Ct. 2690, 2701 (1982); it departs from separation of powers principles and common law traditions; it is at odds with Trump's own filings in numerous cases; and it would produce anomalous consequences.

## ARGUMENT

*Nixon v. Fitzgerald* held that absolute presidential immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." 457 U.S. at 749, 102 S. Ct. at 2701. In arriving at this view, the Supreme Court first surveyed its common law precedents concerning official immunity for judges and prosecutors. *See id.* at 744-48, 102 S. Ct. at 2698-2700. It then drew upon those same cases while discussing the "policies and principles" that supported its understanding of presidential immunity as a constitutional matter. *See id.* at 748-54, 102 S. Ct. at 2700-03; *see also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) (noting that the *Nixon* Court "drew a careful analogy to the common law absolute immunity of judges and prosecutors"). These common law cases thus constitute the background against which *Nixon* developed its presidential immunity doctrine.

Under those cases, absolute immunity (including for judges and prosecutors) has long been treated as non-jurisdictional in nature. *See* Carroll Br. at 10-11. As the Supreme Court emphasized in *Nevada v. Hicks*, "[t]here is no authority whatever for the proposition that absolute- and

1

qualified-immunity defenses pertain to the court's jurisdiction." 533 U.S. 353, 373, 121 S. Ct. 2304, 2317 (2001); *accord Burnham v. Friedland*, No. 21-3888, 2022 WL 3046966, at *2 (6th Cir. Aug. 2, 2022) (Thapar, J., concurring) ("[J]udicial immunity isn't a jurisdictional doctrine; it's an affirmative defense that goes to the merits."). Consistent with that principle, courts have repeatedly explained that absolute immunity can be waived and forfeited based on litigation conduct. *See, e.g.*, *In re Kendall*, 712 F.3d 814, 822 n.4 (3d Cir. 2013) (Virgin Islands judge); *Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010) (prosecutor); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) (health department officials); *Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002) (police); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) (state attorney general); *Boyd v. Carroll*, 624 F.2d 730, 732-33 (5th Cir. 1980) (judge). And federal courts have uniformly described absolute immunity as an affirmative defense that must be pleaded by the defendant-officer. *See* Carroll Br. at 11; *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) (Alito, J.).

Those principles apply even though the absolute immunity of judges and prosecutors rests on traditions and justifications grounded in our constitutional structure. Judges enjoy absolute immunity to protect a core Article III principle: "[T]hat independence without which no judiciary can be either respectable or useful." *Bradley v. Fisher*, 80 U.S. 335, 347, 20 L. Ed. 646 (1871). Similarly, prosecutors (as quasi-judicial agents) are cloaked with immunity to avoid harassment that may lead them to "shade [their] decisions instead of exercising the independence of judgment required by [their] public trust." *Imbler v. Pachtman*, 424 U.S. 409, 422-23, 96 S. Ct. 984, 991 (1976). In both cases, the importance of the justifications for absolute immunity has not led courts to transmute the immunity into a jurisdictional rule; instead, courts have applied absolute immunity within its scope while recognizing that it may be waived or forfeited if not properly invoked.

Nothing about *Nixon* suggests a rupture from this established understanding of absolute immunity. To the contrary, *Nixon* flows from the same tradition—though rather than ground its immunity directly in the common law (which developed before the institution of the Presidency), it invoked our "constitutional heritage and structure." 457 U.S. at 748, 102 S. Ct. at 2700.

Since *Nixon*, moreover, courts and litigants have broadly evinced an understanding that absolute immunity is *not* jurisdictional in nature. In both *Clinton v. Jones* and *Trump v. Vance*, neither the briefs submitted by the parties nor the opinion issued by the Supreme Court described absolute presidential immunity as implicating subject matter jurisdiction. *See generally Clinton*, 520 U.S. 681, 117 S. Ct. 1636 (1997); *Vance*, 140 S. Ct. 2412. Nor has any federal appellate court held that absolute presidential immunity bears on subject matter jurisdiction—and when the issue has arisen, respected jurists have suggested that it does not. *See, e.g.*, *District of Columbia v. Trump*, 959 F.3d 126, 141 (4th Cir. 2020) (en banc) (Niemeyer, J., dissenting) ("[A]ny question of subject matter jurisdiction—including, as relevant here, the issue of Article III standing—must be considered *before* the merits of the [President's] immunity defense." (emphasis added)).

This logic is also reflected in district court decisions that have dismissed claims on the merits without first considering an absolute presidential immunity defense (which, if it were jurisdictional, would have to precede the merits). *See, e.g.*, *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at *10 n.6 (S.D.N.Y. Nov. 14, 2022) (Liman, J.). Indeed, in at least one such case, the court noted that Trump had expressly agreed at oral argument that "absolute presidential immunity" was *not* a "threshold issue[] that must be decided before reaching the merits." *K&D, LLC v. Trump Old Post Off., LLC*, No. 17 Civ. 731, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) (Leon, J.). And in the Emoluments Clause litigation, Trump raised an absolute immunity defense independently of his defenses framed as "jurisdictional," without once

referring to that defense as bearing on the court's jurisdiction. *See District of Columbia v. Trump*, No. 8:17 Civ. 01596 (D. Maryland), at ECF 112-1 and 118 (Trump's motion to dismiss briefing).[1]

To be sure, the *Nixon* Court styled part of its discussion as referring to "jurisdiction." *See* 457 U.S. at 753-54, 102 S. Ct. at 2703. But that was long before the Supreme Court's modern effort to "bring some discipline to the use of this term." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435, 131 S. Ct. 1197, 1202 (2011). Indeed, in this part of its discussion, *Nixon* did not invoke cases understood as addressing subject matter jurisdiction. *See* 457 U.S. at 753-54, 102 S. Ct. at 2703 (discussing the Steel Seizure case, the Nixon tapes case, and a case upholding the Presidential Recordings and Materials Preservation Act). *Nixon* instead referred to "jurisdiction" in the informal sense characteristic of that period—and as part of its broader weighing of interests to decide whether to recognize absolute immunity at all. This part of its reasoning does not reflect the articulation of a formal jurisdictional rule and has not since been understood as doing so.[2]

Nor would the separation of powers principles cited by *Nixon* support treating absolute presidential immunity as jurisdictional. As noted above, absolute immunity doctrines that secure other constitutional values are subject to waiver. *See supra* at 2. And other incidents of Article II, such as executive privilege, have also been interpreted as requiring affirmative invocation and being subject to intentional waiver. *See United States v. Reynolds*, 345 U.S. 1, 7-8, 73 S. Ct. 528, 532 (1953); *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021). More fundamentally, the policy concerns that led the Supreme Court to recognize absolute immunity in this setting—the risk of distracting a sitting President, or diverting him from fearless and impartial attention to his duties—

---

[1] In *Thompson v. Trump*, 590 F. Supp. 3d 46, 69 (D.D.C. 2022), though, Judge Mehta did include absolute immunity within his discussion of subject matter jurisdiction, seemingly in response to Trump's framing of the issue.

[2] The leading modern jurisdictional question in this context concerns not the absolute immunity of a former officeholder, but instead the very different question of when courts possess jurisdiction to issue declaratory or injunctive relief against the incumbent President. *See McCray v. Biden*, 574 F. Supp. 3d 1, 8-11 (D.D.C. 2021).

do not require that the immunity be nonwaivable. *See Vance*, 140 S. Ct. at 2425-26. Until this case, no current or former President has waived his absolute immunity from a civil damages suit, and only in rare cases would that be expected to occur. So there is little risk that Article II functions would be undermined or infringed by application of the traditional rule that absolute immunity is a non-jurisdictional affirmative defense that must be properly invoked by the President.

Further, if Trump's view were right, strange consequences would follow: courts would be obliged to *sua sponte* raise and adjudicate absolute immunity even if it were deliberately waived or disavowed (which might itself spark concerns about judicial intrusion on Article II prerogatives), and a court's failure to raise this issue *sua sponte* at the very outset of a lawsuit before addressing any merits defenses would be reversible error (in which case numerous federal courts have overstepped their jurisdiction). Given all this, where a President waives their absolute immunity, it is proper to hold them to it, particularly where that waiver is expressed in clear terms and was undertaken as part of a calculated gambit for some discernible strategic advantage.

Of course, that is what happened here: Trump not only failed to raise absolute immunity, but affirmatively told the state court that he did not seek to "escape accountability" and that Carroll was "free to pursue this action" after his tenure in office. NYSCEF No. 103 at 3. He made those representations as part of a calculated effort to increase the odds that the state court would stay all proceedings until the conclusion of his presidential term. After that tactic failed, he then waited until three full years into the case before even mentioning absolute immunity, and in the interim borrowed the power of the Court to undertake intrusive discovery into Carroll (and her friends and family) and sought to countersue her within this very proceeding on anti-SLAPP grounds. In these circumstances, whether applying ordinary waiver rules or any heightened standard (though Trump does not advocate for one), the Court should conclude that Trump has waived this defense.

**CONCLUSION**

For the foregoing reasons, Trump's motion for summary judgment should be denied.

Dated: New York, New York
       January 24, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro
  hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff,* | |
| v. | No. 20 Civ. 7311 (LAK) (JLC) |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

### JOINT PRETRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.

## I.    NATURE OF THE CASE

### A.    Plaintiff's Proposed Statement of the Case

In the fall of 1995 or spring of 1996, Plaintiff E. Jean Carroll, a journalist, writer, and advice columnist, encountered Defendant Donald J. Trump at the Bergdorf Goodman department store in New York City. Playful banter took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her. After Carroll managed to escape, she immediately called her friend Lisa Birnbach and told her what had happened. A day or two after the rape, Carroll confided in another close friend, Carol Martin. Carroll blamed herself for what had happened, felt embarrassment and shame, and feared what would happen if she spoke out. She swore her two friends to secrecy and did not speak about the rape again for more than two decades.

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with men. Inspired by the #MeToo movement, Carroll decided to include in her book her own negative experiences with men, including Trump's attack at Bergdorf's many years before. Carroll's book was published in 2019, and in advance of its release, on June 21, 2019, *New York Magazine* published an excerpt containing, among other things, Carroll's account of being raped by Trump.

Trump responded by publicly, falsely, and maliciously smearing Carroll's reputation three times over a four-day period. On June 21, 22, and 24, 2019, Trump denied that he raped Carroll and insisted they had never met. He also accused Carroll of lying about the rape to make money, to increase book sales, or to carry out a political agenda. He implied that she had falsely accused other unspecified men of sexual assault. And he insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too unattractive for him to have raped her. Trump made these statements knowing full well that they were false. He knew he had raped Carroll, and he has admitted not having any evidence supporting his claims about her financial or political motivation or about her supposedly false accusations against other men.

Trump's three defamatory statements caused Carroll to suffer reputational, emotional, and professional harm. She demands that Trump retract his statements and seeks compensatory and punitive damages.

**B.      Defendant's Proposed Statement of the Case**

This action involves a single cause of action for defamation against the Defendant, Donald J. Trump, then sitting President of the United States, for statements he made in response to Plaintiff's allegations of sexual misconduct.  Plaintiff's contentions arise out of an alleged incident

which she claims occurred at the Bergdorf Goodman store in New York, New York on an uncertain date "between the fall of 1995 and the spring of 1996." Defendant wholly denies the veracity of Plaintiff's claim and maintains that his denial of her allegations was truthful.

Accordingly, Defendant respectfully demands judgment dismissing the Complaint in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

## II.   JURY/NON-JURY

Carroll and Trump both request that this action be tried by jury. The parties estimate that the trial will take between 5 and 7 days.

## III.   STIPULATED FACTS

None.

## IV.   EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes, (b) by plaintiff on rebuttal, or (c) if good cause for its exclusion from the pretrial order is shown.

### A.   Plaintiff's Exhibits

The following is a list of exhibits Plaintiff intends to offer in her case-in-chief:

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-1 | Trump's June 21, 2019 statement (Laura Litvan tweet) (Defendant Dep. Ex. 20) | | | |
| PX-2 | Trump's June 22, 2019 statement (transcript of remarks before Marine One departure) (MP-001795) (Defendant Dep. Ex. 21) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-3 | Trump's June 24, 2019 statement (article from *The Hill*: Jordan Fabian and Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*) (Defendant Dep. Ex. 22) | | | |
| PX-4 | Trump's October 12, 2022 statement (Truth Social post) (Defendant Dep. Ex. 28) | | | |
| PX-5 | E. Jean Carroll's book: *What Do We Need Men For? A Modest Proposal* (2019) (Defendant Dep. Ex. 19) | Hearsay | | |
| PX-6 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 21, 2019) (online version) (Plaintiff Dep. Ex. 4) | Hearsay | | |
| PX-7 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 24, 2019) (print version) (CARROLL_024386, Plaintiff Dep. Ex. 3 (cover); CARROLL_024378 (article)) | Hearsay | | |
| PX-8 | *New York Magazine* article: Lisa Birnbach, *Mi Casa Es Su Casa* (Feb. 12, 1996) (Defendant Dep. Ex. 1) | Hearsay | | |
| PX-9 | *People* article: Natasha Stoynoff, *Happy Anniversary* (Jan. 16, 2006) | Hearsay | | |
| PX-10 | Publishing contract between E. Jean Carroll and St. Martin's Press, dated June 8, 2018 (CARROLL_015939) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-11 | Contract between E. Jean Carroll and Hearst Magazine Media, dated January 28, 2019 (CARROLL_025665) | | | |
| PX-12 | Photo of E. Jean Carroll, John Johnson, Donald J. Trump, and Ivanka Trump (CARROLL_030211) (Defendant Dep. Ex. 23; Plaintiff Dep. Ex. 2) | | | |
| PX-13 | Photo of E. Jean Carroll from Miss Indiana photo shoot (CARROLL_030203) | | | |
| PX-14 | Photo of E. Jean Carroll in 1998 (CARROLL_030201) | | | |
| PX-15 | Photo of E. Jean Carroll eating at a restaurant, for the "Ask E. Jean" column (CARROLL_030242) | | | |
| PX-16 | Photo of E. Jean Carroll looking out a window, for the "Ask E. Jean" column (CARROLL_030229) | | | |
| PX-17 | Photo of Natasha Stoynoff with Donald Trump and others at Mar-a-Lago in December 2005 | Irrelevant & unduly prejudicial | | |
| PX-18 | Photo of Jessica Leeds in 1978 | Irrelevant & unduly prejudicial | | |
| PX-19 | Television graphic for *Ask E. Jean* Show (1995) | | | |
| PX-20 | Bergdorf Goodman floorplan, dated March 23, 1990 (BG_0001) | | | |
| PX-21 | Bergdorf Goodman floorplan, dated November 8, 1999 (BG_0011) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-22 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030804) | | | |
| PX-23 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030809) | | | |
| PX-24 | Bergdorf Goodman Fifth Avenue Sixth Floor Plan, dated April 12, 1996, and certified by the New York Department of Buildings (CARROLL_030840) | | | |
| PX-25 | Access Hollywood video recording of Donald J. Trump speaking to Billy Bush in September 2005 (Defendant Dep. Ex. 35) | Irrelevant & unduly prejudicial | | |
| PX-26 | September 26, 2016 Presidential debate video (Stoynoff Dep. Ex. 3; Leeds Dep. Ex. 1) | Irrelevant & unduly prejudicial | | |
| PX-27 | October 13, 2016 West Palm Beach campaign rally video (14:28-15:32) (Defendant Dep. Ex. 40) | Irrelevant & unduly prejudicial | | |
| PX-28 | October 13, 2016 West Palm Beach campaign rally video (17:32-17:57) | Irrelevant & unduly prejudicial | | |
| PX-29 | October 13, 2016 West Palm Beach campaign rally video (17:58-19:23) (Defendant Dep. Ex. 36) | Irrelevant & unduly prejudicial | | |
| PX-30 | October 14, 2016 Greensboro, NC campaign rally video (17:10-18:30) | Irrelevant & unduly prejudicial | | |

**A911**

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-31 | October 14, 2016 Greensboro, NC campaign rally video (24:34-25:06) (Defendant Dep. Ex. 38) | Irrelevant & unduly prejudicial | | |
| PX-32 | October 21, 2016 Gettysburg, PA campaign rally video (9:44-10:06) | Irrelevant & unduly prejudicial | | |
| PX-33 | Video recording of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-34 | Video recording of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-35 | Video recording of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-36 | Video recording of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-37 | Video recording of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-38 | Transcript of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-39 | Transcript of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-40 | Transcript of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-41 | Transcript of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |

7

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-42 | Transcript of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-43 | Prof. Ashlee Humphreys demonstrative exhibit | | | |
| PX-44 | Tweets @ejeancarroll by @typonow and @kittywaymo (June 21, 2019) (CARROLL_030264) | | | |
| PX-45 | Tweets @ejeancarroll by @battlebornVT, @nycfla2, @MattSkyFather, @jillybean0313, @ProfSchlitzo7, @TrumpVoter9 (June 21 and 22, 2019) (CARROLL_030256) | Irrelevant (does not cite to Trump statements) | | |
| PX-46 | Tweet @ejeancarroll by @rightside4me (June 22, 2019) (CARROLL_030263) | | | |
| PX-47 | Tweet @ejeancarroll by @theboydoutdoors (June 28, 2019) (CARROLL_030251) | Irrelevant & does not cite to statement | | |
| PX-48 | Email to e.jean@askejean.com from marianneofmaui@aol.com (June 21, 2019) (CARROLL_024499) | Id. | | |
| PX-49 | Email to ejean@askejean.com from Anonymous (June 22, 2019) (CARROLL_024554) | Id. | | |
| PX-50 | Email to e.jean@askejean.com from sports_justice@gmx.com (June 22, 2019) (CARROLL_024559) | Id. | | |
| PX-51 | Email to e.jean@askejean.com from aaarocket37@gmail.com (June 22, 2019) (CARROLL_024562) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-52 | Email to e.jean@askejean.com from meg814@msn.com (June 22, 2019) (CARROLL_024640) | Id. | | |
| PX-53 | Email to ejeancarroll@gmail.com from lahey.s@shaw.ca (June 22, 2019) (CARROLL_024641) | Id. | | |
| PX-54 | Email to e.jean@askejean.com from dwdwdw10@hotmail.com (June 23, 2019) (CARROLL_024684) | Id. | | |
| PX-55 | Email to comment@askejean.com from coupclan1962@gmail.com (June 23, 2019) (CARROLL_024796) | Id. | | |
| PX-56 | Email to e.jean@askejean.com from rob702@gmx.com (June 25, 2019) (CARROLL_024944) | Id. | | |
| PX-57 | Email to e.jean@askejean.com; dori.weintraub@stmartins.com; slazin@aevitascreative.com; and awarren@aevitascreative.com from sports_justice@gmx.com (June 25, 2019) (CARROLL_024974) | Id. | | |
| PX-58 | Email to comment@askejean.com from zanderzax407@gmail.com (June 27, 2019) (CARROLL_025080) | | | |
| PX-59 | Email to ejean@askejean.com from Anonymous (Jan. 4, 2020) (CARROLL_026329) | Irrelevant & does not cite to statement | | |
| PX-60 | Email to e.jean@askejean.com from scottie7389@outlook.com (Jan. 10, 2020) (CARROLL_026331) | Id. | | |
| PX-61 | Email to e.jean@askejean.com from imaseeker1@aol.com (Feb. 19, 2020) (CARROLL_026479) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-62 | Email to e.jean@askejean.com from bobruberry@hotmail.com (Sept. 8, 2020) (CARROLL_028058) | Id. | | |
| PX-63 | Email notification of Tweet @ejeancarroll by @tschuler (Sept. 9, 2020) (CARROLL_028063) | Id. | | |
| PX-64 | Email to ejeancarroll@gmail.com from samlupowitz@aol.com (Sept. 9, 2020) (CARROLL_028069) | Id. | | |
| PX-65 | Email to ejeancarroll@gmail.com from lsprywa@gmail.com (Sept. 9, 2020) (CARROLL_028115) | Id. | | |
| PX-66 | Facebook message from Joseph Rowland to E. Jean Carroll (Oct. 21, 2020) (CARROLL_028549) | Id. | | |
| PX-67 | Email to e.jean@askejean.com from nwrsupertech@yahoo.com (Oct. 27, 2020) (CARROLL_028588) | Id. | | |
| PX-68 | Email to e.jean@askejean.com from kuke@dakotacom.net (June 8, 2021) (CARROLL_029331) | Id. | | |
| PX-69 | Facebook message from Isaac Blanchard to E. Jean Carroll (Mar. 11, 2022) (CARROLL_029774) | Id. | | |
| PX-70 | Facebook message from Michael Drury to E. Jean Carroll (June 21, 2019) (CARROLL_030118) | Id. | | |
| PX-71 | Facebook messages from Brian Flowers to E. Jean Carroll (June 22, 2019) (CARROLL_030119) | Id. | | |
| PX-72 | Facebook messages from VJ Zimmerman to E. Jean Carroll (June 22, 2019) (CARROLL_030120) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-73 | Facebook message from Renee Shipley to E. Jean Carroll (June 22, 2019) (CARROLL_030121) | Id. | | |
| PX-74 | Facebook message from Steve Barnet to E. Jean Carroll (June 22, 2019) (CARROLL_030122) | Id. | | |
| PX-75 | Facebook message from Patrick Harris to E. Jean Carroll (June 22, 2019) (CARROLL_030123) | | | |
| PX-76 | Facebook message from Karen Marie Jacobsen Strunk to E. Jean Carroll (June 23, 2019) (CARROLL_030124) | Irrelevant & does not cite to statement | | |
| PX-77 | Facebook messages from Kathleen Woolard to E. Jean Carroll (June 22, 2019; July 24, 2019) (CARROLL_030126) | | | |
| PX-78 | Facebook message from Tim Wolffis to E. Jean Carroll (June 23, 2019) (CARROLL_030127) | Irrelevant & does not cite to statement | | |
| PX-79 | Facebook messages from Nellie Marsell to E. Jean Carroll (June 23, 2019) (CARROLL_030128) | Id. | | |
| PX-80 | Facebook message from David Alan to E. Jean Carroll (June 24, 2019) (CARROLL_030131) | Id. | | |
| PX-81 | Facebook messages from Jeff Tucker to E. Jean Carroll (June 24, 2019; Sept. 8, 2020) (CARROLL_030133) | Id. | | |
| PX-82 | Facebook message from Patrick McDowell to E. Jean Carroll (June 24, 2019) (CARROLL_030134) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-83 | Facebook message from Norm Sargent to E. Jean Carroll (June 24, 2019) (CARROLL_030136) | Id. | | |
| PX-84 | Facebook message from Jamie Lynn Ockerman to E. Jean Carroll (June 25, 2019) (CARROLL_030137) | Id. | | |
| PX-85 | Facebook message from S.K. Bernethy to E. Jean Carroll (June 25, 2019) (CARROLL_030138) | Id. | | |
| PX-86 | Facebook message from Michael Hartman to E. Jean Carroll (June 26, 2019) (CARROLL_030142) | Id. | | |
| PX-87 | Facebook messages from Bill Kilby to E. Jean Carroll (June 27, 2019; Dec. 25, 2019) (CARROLL_030143) | Id. | | |
| PX-88 | Facebook message from Ken Nelson to E. Jean Carroll (June 27, 2019) (CARROLL_030145) | Id. | | |
| PX-89 | Facebook message from Memphis Raine to E. Jean Carroll (July 4, 2019) (CARROLL_030147) | Id. | | |
| PX-90 | Facebook message from Joanie Petersen to E. Jean Carroll (Nov. 8, 2019) (CARROLL_030150) | Id. | | |
| PX-91 | Facebook message from Larry Thomas to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030151) | Id. | | |
| PX-92 | Facebook message from Bonnie Elizabeth Daily to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030153) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-93 | Facebook messages from Ruby Shankles to E. Jean Carroll (Feb. 18, 2020) (CARROLL_030154) | Id. | | |
| PX-94 | Facebook message from Jen Burton to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030155) | Id. | | |
| PX-95 | Facebook message from Stuart Campbell to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030156) | Id. | | |
| PX-96 | Tweet @ejeancarroll by @firethornranch (June 21, 2019) | Id. | | |
| PX-97 | Tweet by @floccinaucini1 (June 21, 2019) | | | |
| PX-98 | Tweet @ejeancarroll by @RunnerMo24 (June 21, 2019) | Irrelevant & does not cite to statement | | |
| PX-99 | Tweet @ShelbyTalcott and @DailyCaller by @PapaNeanderthal (June 22, 2019) | Id. | | |
| PX-100 | Tweet @nytimes by @DizZieNewz (Sept. 9, 2020) | | | |
| PX-101 | Tweet @nytimes by @nterruptedgirl (Sept. 12, 2020) | | | |
| PX-102 | Tweet @dcexaminer by @BruceWe77516428 (Sept. 16, 2021) | | | |

**B.    Defendant's Exhibits**

The following is a list of exhibits Defendant intends to offer in his case-in-chief:

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-A | Bergdorf Goodman Floor Plan, floors one through ten, dated March 23, 1990 (BG_0001-0010) | None. | Yes. | Yes. |
| DX-B1 | Bergdorf Goodman, Sixth Floor Renovation Plans (CARROLL_030800; 30804 – 30807- 30809; 30821; 30824; 30827; 30829; 30839-30840.) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B2 | Bergdorf Goodman, Sixth Floor Demolition Plans (CARROLL_030801; 30803; 30810; 30820) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B3 | Bergdorf Goodman, Sixth Floor Architectural Plans (CARROLL_030802; 30808; 30811 – 30819; 30822-30823; 30825 – 30826; 30828; 30830 – 30838) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-C | Expert Report of Robert J. Fisher dated November 13, 2022 | FRE 401, 403, 702, 703, 801, and 802; FRCP 26(a)(2)(D)(ii); *Daubert v. Merrell Dow Pharms.*, *Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); Stipulation re Operative Version of Report. | No. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-D | Transcript of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-E | Video Recording of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-F | Transcript of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-G | Video Recording of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-H | Transcript of the Deposition of Lisa Birnbach dated September 21, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-I | Transcript of the Deposition of Carol Martin dated October 18, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

## V. GENERAL PROVISIONS, STIPULATIONS, AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.

See chart above in Section IV for stipulations and objections with respect to exhibits.

## VI. PLAINTIFF'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Plaintiff may call at trial the following:

- E. Jean Carroll
- Lisa Birnbach
- Carol Martin
- Cande Carroll
- Stephanie Grisham
- Roberta Myers
- Natasha Stoynoff
- Jessica Leeds
- Cheryl Beall
- Robert Salerno
- Prof. Ashlee Humphreys

## VII.   DEFENDANT'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Excepting rebuttal or impeachment, Defendant may call at trial the following:

- Donald J. Trump
- Lisa Birnbach
- Anderson Cooper
- David Haskell
- Elizabeth Dysssegaard
- Erin Hobday
- Laurie Abraham
- Sarah Lazin
- Robert J. Fisher

## VIII.   RELIEF SOUGHT

Carroll seeks an order that Trump retract all defamatory statements and seeks compensatory and punitive damages for the harms caused by Trump's defamatory statements. Carroll also seeks pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Defendant respectfully demands judgment dismissing this action in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

Dated: February 9, 2023                              Respectfully submitted,


/s/ Alina Habba                                      /s/ Roberta A. Kaplan
Alina Habba                                          Roberta A. Kaplan
Michael Madaio                                       Shawn Crowley
HABBA MADAIO & ASSOCIATES LLP                        Trevor Morrison
1430 U.S. Highway 206, Suite 240                     Matthew J. Craig
Bedminster, NJ 07921                                 KAPLAN HECKER & FINK LLP
Phone: (908) 869-1188                                350 Fifth Avenue, 63rd Floor
ahabba@habbalaw.com                                  New York, New York 10118
mmadaio@habbalaw.com                                 Phone: (212) 763-0883
                                                     rkaplan@kaplanhecker.com
                                                     scrowley@kaplanhecker.com
*Counsel for Defendant Donald J. Trump*              tmorrison@kaplanhecker.com
                                                     mcraig@kaplanhecker.com


                                                     Joshua Matz
                                                     KAPLAN HECKER & FINK LLP
                                                     1050 K Street NW, Suite 1040
                                                     Washington, D.C. 20001
                                                     Phone: (212) 763-0883
                                                     jmatz@kaplanhecker.com

                                                     *Counsel for Plaintiff E. Jean Carroll*



IT IS SO ORDERED this _____ day of _____, 2023.


_____
The Hon. Lewis A. Kaplan
United States District Judge

18

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/13/2023

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

E. JEAN CARROLL,

                    *Plaintiff,*

          v.                                    No. 20 Civ. 7311 (LAK) (JLC)

DONALD J. TRUMP, in his personal capacity,

                    *Defendant.*

---

## JOINT PRETRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to Fed. R.

Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order

herein.

**I.     NATURE OF THE CASE**

**A.     Plaintiff's Proposed Statement of the Case**

In the fall of 1995 or spring of 1996, Plaintiff E. Jean Carroll, a journalist, writer, and

advice columnist, encountered Defendant Donald J. Trump at the Bergdorf Goodman department

store in New York City. Playful banter took a dark turn when Trump seized Carroll, forced her up

against a dressing room wall, pinned her in place with his shoulder, and raped her. After Carroll

managed to escape, she immediately called her friend Lisa Birnbach and told her what had

happened. A day or two after the rape, Carroll confided in another close friend, Carol Martin.

Carroll blamed herself for what had happened, felt embarrassment and shame, and feared what

would happen if she spoke out. She swore her two friends to secrecy and did not speak about the

rape again for more than two decades.

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with men. Inspired by the #MeToo movement, Carroll decided to include in her book her own negative experiences with men, including Trump's attack at Bergdorf's many years before. Carroll's book was published in 2019, and in advance of its release, on June 21, 2019, *New York Magazine* published an excerpt containing, among other things, Carroll's account of being raped by Trump.

Trump responded by publicly, falsely, and maliciously smearing Carroll's reputation three times over a four-day period. On June 21, 22, and 24, 2019, Trump denied that he raped Carroll and insisted they had never met. He also accused Carroll of lying about the rape to make money, to increase book sales, or to carry out a political agenda. He implied that she had falsely accused other unspecified men of sexual assault. And he insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too unattractive for him to have raped her. Trump made these statements knowing full well that they were false. He knew he had raped Carroll, and he has admitted not having any evidence supporting his claims about her financial or political motivation or about her supposedly false accusations against other men.

Trump's three defamatory statements caused Carroll to suffer reputational, emotional, and professional harm. She demands that Trump retract his statements and seeks compensatory and punitive damages.

**B.    Defendant's Proposed Statement of the Case**

This action involves a single cause of action for defamation against the Defendant, Donald J. Trump, then sitting President of the United States, for statements he made in response to Plaintiff's allegations of sexual misconduct.  Plaintiff's contentions arise out of an alleged incident

which she claims occurred at the Bergdorf Goodman store in New York, New York on an uncertain date "between the fall of 1995 and the spring of 1996." Defendant wholly denies the veracity of Plaintiff's claim and maintains that his denial of her allegations was truthful.

Accordingly, Defendant respectfully demands judgment dismissing the Complaint in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

## II.   JURY/NON-JURY

Carroll and Trump both request that this action be tried by jury. The parties estimate that the trial will take between 5 and 7 days.

## III.   STIPULATED FACTS

None.

## IV.   EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes, (b) by plaintiff on rebuttal, or (c) if good cause for its exclusion from the pretrial order is shown.

### A.   Plaintiff's Exhibits

The following is a list of exhibits Plaintiff intends to offer in her case-in-chief:

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-1 | Trump's June 21, 2019 statement (Laura Litvan tweet) (Defendant Dep. Ex. 20) | | | |
| PX-2 | Trump's June 22, 2019 statement (transcript of remarks before Marine One departure) (MP-001795) (Defendant Dep. Ex. 21) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-3 | Trump's June 24, 2019 statement (article from *The Hill*: Jordan Fabian and Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*) (Defendant Dep. Ex. 22) | | | |
| PX-4 | Trump's October 12, 2022 statement (Truth Social post) (Defendant Dep. Ex. 28) | | | |
| PX-5 | E. Jean Carroll's book: *What Do We Need Men For? A Modest Proposal* (2019) (Defendant Dep. Ex. 19) | Hearsay | | |
| PX-6 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 21, 2019) (online version) (Plaintiff Dep. Ex. 4) | Hearsay | | |
| PX-7 | *New York Magazine* article: *Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life* (June 24, 2019) (print version) (CARROLL_024386, Plaintiff Dep. Ex. 3 (cover); CARROLL_024378 (article)) | Hearsay | | |
| PX-8 | *New York Magazine* article: Lisa Birnbach, *Mi Casa Es Su Casa* (Feb. 12, 1996) (Defendant Dep. Ex. 1) | Hearsay | | |
| PX-9 | *People* article: Natasha Stoynoff, *Happy Anniversary* (Jan. 16, 2006) | Hearsay | | |
| PX-10 | Publishing contract between E. Jean Carroll and St. Martin's Press, dated June 8, 2018 (CARROLL_015939) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-11 | Contract between E. Jean Carroll and Hearst Magazine Media, dated January 28, 2019 (CARROLL_025665) | | | |
| PX-12 | Photo of E. Jean Carroll, John Johnson, Donald J. Trump, and Ivanka Trump (CARROLL_030211) (Defendant Dep. Ex. 23; Plaintiff Dep. Ex. 2) | | | |
| PX-13 | Photo of E. Jean Carroll from Miss Indiana photo shoot (CARROLL_030203) | | | |
| PX-14 | Photo of E. Jean Carroll in 1998 (CARROLL_030201) | | | |
| PX-15 | Photo of E. Jean Carroll eating at a restaurant, for the "Ask E. Jean" column (CARROLL_030242) | | | |
| PX-16 | Photo of E. Jean Carroll looking out a window, for the "Ask E. Jean" column (CARROLL_030229) | | | |
| PX-17 | Photo of Natasha Stoynoff with Donald Trump and others at Mar-a-Lago in December 2005 | Irrelevant & unduly prejudicial | | |
| PX-18 | Photo of Jessica Leeds in 1978 | Irrelevant & unduly prejudicial | | |
| PX-19 | Television graphic for *Ask E. Jean Show* (1995) | | | |
| PX-20 | Bergdorf Goodman floorplan, dated March 23, 1990 (BG_0001) | | | |
| PX-21 | Bergdorf Goodman floorplan, dated November 8, 1999 (BG_0011) | | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-22 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030804) | | | |
| PX-23 | Bergdorf Goodman Fifth Avenue Sixth Floor Construction Plan, dated May 19, 1995, and certified by the New York Department of Buildings (CARROLL_030809) | | | |
| PX-24 | Bergdorf Goodman Fifth Avenue Sixth Floor Plan, dated April 12, 1996, and certified by the New York Department of Buildings (CARROLL_030840) | | | |
| PX-25 | Access Hollywood video recording of Donald J. Trump speaking to Billy Bush in September 2005 (Defendant Dep. Ex. 35) | Irrelevant & unduly prejudicial | | |
| PX-26 | September 26, 2016 Presidential debate video (Stoynoff Dep. Ex. 3; Leeds Dep. Ex. 1) | Irrelevant & unduly prejudicial | | |
| PX-27 | October 13, 2016 West Palm Beach campaign rally video (14:28-15:32) (Defendant Dep. Ex. 40) | Irrelevant & unduly prejudicial | | |
| PX-28 | October 13, 2016 West Palm Beach campaign rally video (17:32-17:57) | Irrelevant & unduly prejudicial | | |
| PX-29 | October 13, 2016 West Palm Beach campaign rally video (17:58-19:23) (Defendant Dep. Ex. 36) | Irrelevant & unduly prejudicial | | |
| PX-30 | October 14, 2016 Greensboro, NC campaign rally video (17:10-18:30) | Irrelevant & unduly prejudicial | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-31 | October 14, 2016 Greensboro, NC campaign rally video (24:34-25:06) (Defendant Dep. Ex. 38) | Irrelevant & unduly prejudicial | | |
| PX-32 | October 21, 2016 Gettysburg, PA campaign rally video (9:44-10:06) | Irrelevant & unduly prejudicial | | |
| PX-33 | Video recording of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-34 | Video recording of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-35 | Video recording of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-36 | Video recording of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-37 | Video recording of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-38 | Transcript of the deposition of Cande Carroll dated October 4, 2022 | Hearsay | | |
| PX-39 | Transcript of the deposition of Stephanie Grisham dated October 6, 2022 | Hearsay | | |
| PX-40 | Transcript of the deposition of Natasha Stoynoff dated October 13, 2022 | Irrelevant & unduly prejudicial | | |
| PX-41 | Transcript of the deposition of Jessica Leeds dated October 13, 2022 | Irrelevant & unduly prejudicial | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-42 | Transcript of the deposition of Donald J. Trump dated October 19, 2022 | | | |
| PX-43 | Prof. Ashlee Humphreys demonstrative exhibit | | | |
| PX-44 | Tweets @ejeancarroll by @typonow and @kittywaymo (June 21, 2019) (CARROLL_030264) | | | |
| PX-45 | Tweets @ejeancarroll by @battlebornVT, @nycfla2, @MattSkyFather, @jillybean0313, @ProfSchlitzo7, @TrumpVoter9 (June 21 and 22, 2019) (CARROLL_030256) | Irrelevant (does not cite to Trump statements) | | |
| PX-46 | Tweet @ejeancarroll by @rightside4me (June 22, 2019) (CARROLL_030263) | | | |
| PX-47 | Tweet @ejeancarroll by @theboydoutdoors (June 28, 2019) (CARROLL_030251) | Irrelevant & does not cite to statement | | |
| PX-48 | Email to e.jean@askejean.com from marianneofmaui@aol.com (June 21, 2019) (CARROLL_024499) | Id. | | |
| PX-49 | Email to ejean@askejean.com from Anonymous (June 22, 2019) (CARROLL_024554) | Id. | | |
| PX-50 | Email to e.jean@askejean.com from sports_justice@gmx.com (June 22, 2019) (CARROLL_024559) | Id. | | |
| PX-51 | Email to e.jean@askejean.com from aaarocket37@gmail.com (June 22, 2019) (CARROLL_024562) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-52 | Email to e.jean@askejean.com from meg814@msn.com (June 22, 2019) (CARROLL_024640) | Id. | | |
| PX-53 | Email to ejeancarroll@gmail.com from lahey.s@shaw.ca (June 22, 2019) (CARROLL_024641) | Id. | | |
| PX-54 | Email to e.jean@askejean.com from dwdwdw10@hotmail.com (June 23, 2019) (CARROLL_024684) | Id. | | |
| PX-55 | Email to comment@askejean.com from coupclan1962@gmail.com (June 23, 2019) (CARROLL_024796) | Id. | | |
| PX-56 | Email to e.jean@askejean.com from rob702@gmx.com (June 25, 2019) (CARROLL_024944) | Id. | | |
| PX-57 | Email to e.jean@askejean.com; dori.weintraub@stmartins.com; slazin@aevitascreative.com; and awarren@aevitascreative.com from sports_justice@gmx.com (June 25, 2019) (CARROLL_024974) | Id. | | |
| PX-58 | Email to comment@askejean.com from zanderzax407@gmail.com (June 27, 2019) (CARROLL_025080) | | | |
| PX-59 | Email to ejean@askejean.com from Anonymous (Jan. 4, 2020) (CARROLL_026329) | Irrelevant & does not cite to statement | | |
| PX-60 | Email to e.jean@askejean.com from scottie7389@outlook.com (Jan. 10, 2020) (CARROLL_026331) | Id. | | |
| PX-61 | Email to e.jean@askejean.com from imaseeker1@aol.com (Feb. 19, 2020) (CARROLL_026479) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-62 | Email to e.jean@askejean.com from bobruberry@hotmail.com (Sept. 8, 2020) (CARROLL_028058) | Id. | | |
| PX-63 | Email notification of Tweet @ejeancarroll by @tschuler (Sept. 9, 2020) (CARROLL_028063) | Id. | | |
| PX-64 | Email to ejeancarroll@gmail.com from samlupowitz@aol.com (Sept. 9, 2020) (CARROLL_028069) | Id. | | |
| PX-65 | Email to ejeancarroll@gmail.com from lsprywa@gmail.com (Sept. 9, 2020) (CARROLL_028115) | Id. | | |
| PX-66 | Facebook message from Joseph Rowland to E. Jean Carroll (Oct. 21, 2020) (CARROLL_028549) | Id. | | |
| PX-67 | Email to e.jean@askejean.com from nwrsupertech@yahoo.com (Oct. 27, 2020) (CARROLL_028588) | Id. | | |
| PX-68 | Email to e.jean@askejean.com from kuke@dakotacom.net (June 8, 2021) (CARROLL_029331) | Id. | | |
| PX-69 | Facebook message from Isaac Blanchard to E. Jean Carroll (Mar. 11, 2022) (CARROLL_029774) | Id. | | |
| PX-70 | Facebook message from Michael Drury to E. Jean Carroll (June 21, 2019) (CARROLL_030118) | Id. | | |
| PX-71 | Facebook messages from Brian Flowers to E. Jean Carroll (June 22, 2019) (CARROLL_030119) | Id. | | |
| PX-72 | Facebook messages from VJ Zimmerman to E. Jean Carroll (June 22, 2019) (CARROLL_030120) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-73 | Facebook message from Renee Shipley to E. Jean Carroll (June 22, 2019) (CARROLL_030121) | Id. | | |
| PX-74 | Facebook message from Steve Barnet to E. Jean Carroll (June 22, 2019) (CARROLL_030122) | Id. | | |
| PX-75 | Facebook message from Patrick Harris to E. Jean Carroll (June 22, 2019) (CARROLL_030123) | | | |
| PX-76 | Facebook message from Karen Marie Jacobsen Strunk to E. Jean Carroll (June 23, 2019) (CARROLL_030124) | Irrelevant & does not cite to statement | | |
| PX-77 | Facebook messages from Kathleen Woolard to E. Jean Carroll (June 22, 2019; July 24, 2019) (CARROLL_030126) | | | |
| PX-78 | Facebook message from Tim Wolffis to E. Jean Carroll (June 23, 2019) (CARROLL_030127) | Irrelevant & does not cite to statement | | |
| PX-79 | Facebook messages from Nellie Marsell to E. Jean Carroll (June 23, 2019) (CARROLL_030128) | Id. | | |
| PX-80 | Facebook message from David Alan to E. Jean Carroll (June 24, 2019) (CARROLL_030131) | Id. | | |
| PX-81 | Facebook messages from Jeff Tucker to E. Jean Carroll (June 24, 2019; Sept. 8, 2020) (CARROLL_030133) | Id. | | |
| PX-82 | Facebook message from Patrick McDowell to E. Jean Carroll (June 24, 2019) (CARROLL_030134) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-83 | Facebook message from Norm Sargent to E. Jean Carroll (June 24, 2019) (CARROLL_030136) | Id. | | |
| PX-84 | Facebook message from Jamie Lynn Ockerman to E. Jean Carroll (June 25, 2019) (CARROLL_030137) | Id. | | |
| PX-85 | Facebook message from S.K. Bernethy to E. Jean Carroll (June 25, 2019) (CARROLL_030138) | Id. | | |
| PX-86 | Facebook message from Michael Hartman to E. Jean Carroll (June 26, 2019) (CARROLL_030142) | Id. | | |
| PX-87 | Facebook messages from Bill Kilby to E. Jean Carroll (June 27, 2019; Dec. 25, 2019) (CARROLL_030143) | Id. | | |
| PX-88 | Facebook message from Ken Nelson to E. Jean Carroll (June 27, 2019) (CARROLL_030145) | Id. | | |
| PX-89 | Facebook message from Memphis Raine to E. Jean Carroll (July 4, 2019) (CARROLL_030147) | Id. | | |
| PX-90 | Facebook message from Joanie Petersen to E. Jean Carroll (Nov. 8, 2019) (CARROLL_030150) | Id. | | |
| PX-91 | Facebook message from Larry Thomas to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030151) | Id. | | |
| PX-92 | Facebook message from Bonnie Elizabeth Daily to E. Jean Carroll (Jan. 31, 2020) (CARROLL_030153) | Id. | | |

| Exhibit No. | Document Description | Defendant's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| PX-93 | Facebook messages from Ruby Shankles to E. Jean Carroll (Feb. 18, 2020) (CARROLL_030154) | Id. | | |
| PX-94 | Facebook message from Jen Burton to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030155) | Id. | | |
| PX-95 | Facebook message from Stuart Campbell to E. Jean Carroll (Oct. 27, 2020) (CARROLL_030156) | Id. | | |
| PX-96 | Tweet @ejeancarroll by @firethornranch (June 21, 2019) | Id. | | |
| PX-97 | Tweet by @floccinaucini1 (June 21, 2019) | | | |
| PX-98 | Tweet @ejeancarroll by @RunnerMo24 (June 21, 2019) | Irrelevant & does not cite to statement | | |
| PX-99 | Tweet @ShelbyTalcott and @DailyCaller by @PapaNeanderthal (June 22, 2019) | Id. | | |
| PX-100 | Tweet @nytimes by @DizZieNewz (Sept. 9, 2020) | | | |
| PX-101 | Tweet @nytimes by @nterruptedgirl (Sept. 12, 2020) | | | |
| PX-102 | Tweet @dcexaminer by @BruceWe77516428 (Sept. 16, 2021) | | | |

**B.     Defendant's Exhibits**

The following is a list of exhibits Defendant intends to offer in his case-in-chief:

13

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-A | Bergdorf Goodman Floor Plan, floors one through ten, dated March 23, 1990 (BG_0001-0010) | None. | Yes. | Yes. |
| DX-B1 | Bergdorf Goodman, Sixth Floor Renovation Plans (CARROLL_030800; 30804 – 30807- 30809; 30821; 30824; 30827; 30829; 30839-30840.) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B2 | Bergdorf Goodman, Sixth Floor Demolition Plans (CARROLL_030801; 30803; 30810; 30820) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-B3 | Bergdorf Goodman, Sixth Floor Architectural Plans (CARROLL_030802; 30808; 30811 – 30819; 30822-30823; 30825 – 30826; 30828; 30830 – 30838) | Judge Kaplan's Individual Practices re Individually Listing Exhibits; FRE 401 and 403. | Yes. | No. |
| DX-C | Expert Report of Robert J. Fisher dated November 13, 2022 | FRE 401, 403, 702, 703, 801, and 802; FRCP 26(a)(2)(D)(ii); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); Stipulation re Operative Version of Report. | No. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-D | Transcript of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-E | Video Recording of the Deposition of E. Jean Carroll dated October 14, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-F | Transcript of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-G | Video Recording of the Deposition of E. Jean Carroll dated January 31, 2023 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 412, 801, and 802. | Yes. | No. |
| DX-H | Transcript of the Deposition of Lisa Birnbach dated September 21, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

| Exhibit No. | Document Description | Plaintiff's Objections | Stipulation to Authenticity | Stipulation to Admissibility |
|---|---|---|---|---|
| DX-I | Transcript of the Deposition of Carol Martin dated October 18, 2022 | Depending on the portions to be designated, Plaintiff may object under FRE 106, 401, 403, 602, 801, and 802. | Yes. | No. |

## V.   GENERAL PROVISIONS, STIPULATIONS, AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.

See chart above in Section IV for stipulations and objections with respect to exhibits.

## VI.   PLAINTIFF'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Plaintiff may call at trial the following:

- E. Jean Carroll
- Lisa Birnbach
- Carol Martin
- Cande Carroll
- Stephanie Grisham
- Roberta Myers
- Natasha Stoynoff
- Jessica Leeds
- Cheryl Beall
- Robert Salerno
- Prof. Ashlee Humphreys

## VII.   DEFENDANT'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be permitted to testify in either party's case-in-chief absent good cause shown.

Excepting rebuttal or impeachment, Defendant may call at trial the following:

- Donald J. Trump
- Lisa Birnbach
- Anderson Cooper
- David Haskell
- Elizabeth Dysssegaard
- Erin Hobday
- Laurie Abraham
- Sarah Lazin
- Robert J. Fisher

## VIII.   RELIEF SOUGHT

Carroll seeks an order that Trump retract all defamatory statements and seeks compensatory and punitive damages for the harms caused by Trump's defamatory statements. Carroll also seeks pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Defendant respectfully demands judgment dismissing this action in its entirety together with costs, disbursements, and all other relief this Court deems just and proper.

Dated: February 9, 2023

/s/ Alina Habba
Alina Habba
Michael Madaio
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, NJ 07921
Phone: (908) 869-1188
ahabba@habbalaw.com
mmadaio@habbalaw.com

*Counsel for Defendant Donald J. Trump*

Respectfully submitted,

/s/ Roberta A. Kaplan
Roberta A. Kaplan
Shawn Crowley
Trevor Morrison
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Phone: (212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Phone: (212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

IT IS SO ORDERED this 13th day of February, 2023.

The Hon. Lewis A. Kaplan
United States District Judge

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

March 17, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

Re:      *Carroll v. Trump*, No. 20 Civ. 07311 (LAK)

Dear Judge Kaplan:

I write on behalf of all parties concerning the trial date in this case (*Carroll I*), as well as the trial date in *Carroll v. Trump*, No. 22 Civ. 10016 (*Carroll II*).

The trial date in *Carroll I* is currently set for April 10, 2023, ECF No. 100, and the trial date in *Carroll II* is currently set for April 25, 2023, *see Carroll II*, ECF No. 49. The Court has stated its intention to address at a later date whether to try these actions together. *See Carroll II*, ECF No. 49. As the parties have begun their pretrial preparations—and have submitted motions related to the trial proceedings—they have also met and conferred concerning the possibility of a single consolidated trial, which would advance important interests of efficiency and judicial economy. Following those discussions, and consistent with the attached stipulation, the parties jointly and respectfully request that the Court consolidate the trials in *Carroll I* and *Carroll II*, subject to the following proposed terms and conditions that are agreed to by both parties:

- The consolidated trial shall start on April 25, 2023.

- The consolidated trial shall cover liability and damages for both *Carroll I* and *Carroll II*.

- The jury shall use a special verdict form to separately identify the damages, if any, attributable to each claim in *Carroll I* and *Carroll II*.

- Under Federal Rules of Civil Procedure 54(b) and 58(b)(2), the Court shall enter judgment on *Carroll I* only after all interlocutory appeals are finally resolved.

KAPLAN HECKER & FINK LLP                                                                    2

- The parties shall not seek any stay of the trial date in either *Carroll I* or *Carroll II*.

- The parties shall waive any objection to the trial judgment in *Carroll II* based on its consolidation with *Carroll I*.

- On April 17, 2023, the parties shall jointly notify the District of Columbia Court of Appeals of the upcoming jury trial schedule and respectfully request that the court defer issuing any decision until the conclusion of the trial.

This joint proposal is consistent with Federal Rule of Civil Procedure 42(a), which is "a valuable and important tool of judicial administration, invoked to expedite trial and eliminate unnecessary repetition and confusion." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (internal quotations omitted). Indeed, consolidation is favored where it would "reduce the costs for all parties, and avoid the possible risk of inconsistent rulings." *Darezzo v. 200 Ninth Rest. LLC*, No. 14 Civ. 5099, 2015 WL 195852, at *3 (S.D.N.Y. Jan. 14, 2015).

The parties believe that trying *Carroll I* and *Carroll II* together serves these interests. Your Honor has recognized that the same factual question is "central" to both actions. *Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *7 (S.D.N.Y. Oct. 12, 2022). As such, evidence relating to this central factual question "is relevant to both cases," *id.*, and will be presented at both trials. Because of the overlapping nature of these proceedings, a single trial will reduce costs across the board, avoid the risk of inconsistent factual rulings or jury confusion, and economize matters for the Court (as well as for both parties' witnesses). Finally, the parties are confident that their joint proposal accounts for any issues that might arise relating to the D.C. Court of Appeals' ultimate answer to the certified question and any subsequent action that the Second Circuit might take.

A Stipulation and Proposed Order memorializing the parties' proposed plan for consolidation is attached. The parties are available to discuss this proposal if helpful to the Court.

Respectfully submitted,

Roberta A. Kaplan

cc: All Counsel of Record

(Attachment)

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant.*

No. 20 Civ. 7311 (LAK)

---

### STIPULATION AND [PROPOSED] ORDER

WHEREAS the Court entered a Scheduling Order setting a trial date of April 10, 2023 in this action (*Carroll I*), ECF No. 100;

WHEREAS the Court entered a Scheduling Order in the related action *Carroll v. Trump*, No. 22 Civ. 10016 (*Carroll II*) setting a trial date of April 25, 2023, *Carroll II*, ECF No. 49;

WHEREAS Federal Rule of Civil Procedure 42(a) provides that the Court may order that actions be joined or consolidated in whole or in part if they involve "common issues of law or fact," Fed. R. Civ. P. 42(a);

WHEREAS *Carroll I* and *Carroll II* involve a common question of law or fact, ECF No. 96;

WHEREAS the parties have met and conferred on this matter and jointly request that *Carroll I* and *Carroll II* be consolidated for trial on April 25, 2023;

IT IS ACCORDINGLY STIPULATED AND AGREED that:

- The consolidated trial shall start on April 25, 2023.

- The consolidated trial shall cover liability and damages for both *Carroll I* and *Carroll II*.

- The jury shall use a special verdict form to separately identify the damages, if any, attributable to each claim in *Carroll I* and *Carroll II*.

- Under Federal Rules of Civil Procedure 54(b) and 58(b)(2), the Court shall enter judgment on *Carroll I* only after all interlocutory appeals are finally resolved.

- The parties shall not seek any stay of the trial date in either *Carroll I* or *Carroll II*.

- The parties hereby waive any objection to the trial judgment in *Carroll II* based on its consolidation with *Carroll I*.

- On April 17, 2023, the parties shall jointly notify the District of Columbia Court of Appeals of the upcoming jury trial schedule and respectfully request that the court defer issuing any decision until the conclusion of the trial.

Dated: March 17, 2023

Roberta A. Kaplan
Shawn Crowley
Trevor Morrison (admitted *pro hac vice*) Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Phone: (212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Alina Habba
Michael Madaio
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, NJ 07921
Phone: (908) 869-1188
ahabba@habbalaw.com
mmadaio@habbalaw.com

*Counsel for Defendant Donald J. Trump*

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street, Suite 1040
Washington, D.C. 20001
Phone: (212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

IT IS SO ORDERED this _____ day of _____, 2023

_____
The Hon. Lewis A. Kaplan
United States District Judge

**A945**

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL     212.763.0883
DIRECT EMAIL    rkaplan@kaplanhecker.com

May 22, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *Carroll v. Trump*, No. 20 Civ. 7311 (LAK) ("*Carroll I*")

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll to propose a schedule for further proceedings in the above-referenced action.

\* \* \*

As Your Honor is aware, at this point, there are four key issues that need to be dealt with in this matter known as *Carroll I*: (1) the United States's pending motion to substitute itself as the defendant under the Westfall Act; (2) Defendant Donald J. Trump's pending summary judgment motion, which principally relies on an assertion of absolute presidential immunity; (3) the implications of the recent jury verdict in *Carroll v. Trump*, No. 22 Civ. 10016 (LAK) ("*Carroll II*"); and (4) Carroll's concurrently-filed motion to amend her complaint. We address each of these points below and then propose a schedule to move these issues forward in order to reach a final resolution of this matter.

**Westfall Act**: The D.C. Court of Appeals has now answered the scope-of-employment question certified by the Second Circuit, and the Second Circuit has remanded the case to this Court for further proceedings. Importantly, the D.C. Court of Appeals made clear that this Court's understanding of D.C. law—on the basis of which this Court originally denied the United States's motion to substitute—was fundamentally correct. *See Carroll v. Trump*, 498 F. Supp. 3d 422, 450–56 (S.D.N.Y. 2020). Specifically, the D.C. Court of Appeals held that D.C. "adheres to the 'traditional view' of the scope of employment inquiry of *respondeat superior* set forth in the Restatement (Second) of Agency § 228," it confirmed that the "focus is on the subjective state of mind of the tortfeasor-employee," it clarified that D.C. "retains the 'too little actuated' standard," and it rejected the categorical reading of *CAIR v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), on which both Donald J. Trump and the United States previously relied. *See Trump v. Carroll*, No. 22-SP-745, 2023 WL 2920882, at \*4, \*9, \*12, \*14 (D.C. Apr. 13, 2023). Given that ruling, as well

KAPLAN HECKER & FINK LLP                                                    2

as the extensive discovery that has already occurred here (including Donald Trump's deposition), we respectfully submit that the Court should permit expedited supplemental briefing in the event that the United States does not withdraw its previous Westfall Act certification.[1] Because Trump already gave extensive and thorough deposition testimony regarding his June 2019 defamatory statements, Carroll does not request any Westfall Act-related discovery at this time, nor does she believe that any such discovery would be necessary to decide the issue.

**Presidential Immunity**: In the event that the United States is not substituted, Trump will remain the only defendant and his pending summary judgment motion will await disposition. That summary judgment motion has now been fully briefed. *See* ECF 109, 113, 122, 125. Trump's principal argument for summary judgment is based on an assertion of absolute presidential immunity. Even though Trump concedes that he waived that affirmative defense, he now insists it is nonwaivable. *See* ECF 122, 125. As reflected in the proposed schedule below, we respectfully request that the Court consider addressing both the Westfall Act issue and Trump's absolute immunity argument at the same time. The relevant facts heavily overlap, the underlying issues are fairly related, and this approach would facilitate efficient appellate review and avoid the prospect of piecemeal appeals. *Cf. Carroll*, 498 F. Supp. 3d at 443 (denying motion to substitute on two independently sufficient grounds "to avoid the possibility of an unnecessary remand should a higher court disagree on the 'employee' question").

**Implications of the Verdict in *Carroll II***: Just four days after the Second Circuit remanded *Carroll I*, trial began in *Carroll II*. After a two-week trial, the jury determined that Trump had committed battery and defamation, and awarded Plaintiff $5 million in compensatory and punitive damages. On their face, the defamatory statements at issue in *Carroll I* and *Carroll II* are materially identical. Moreover, the core question underlying the defamation claim in both actions is "whether Mr. Trump sexually assaulted Ms. Carroll." *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 3000562, at *3 (S.D.N.Y. Mar. 20, 2023). As a result, the preclusive effect of the *Carroll II* jury verdict leaves nothing to resolve with respect to the merits of the *Carroll I* defamation claim, beyond the amount of Carroll's damages. Resolution of the Westfall Act and summary judgment issues will therefore either terminate this case or permit a streamlined disposition of the few remaining factual issues.[2]

**Proposed Amended Complaint**: Concurrently with the filing of this letter, Carroll has moved to amend her complaint in the present action. The proposed amendment seeks to facilitate the resolution of the scope-of-employment issue and, to that end, adds information bearing on that issue drawn from the discovery process. The proposed amendment also adds allegations

---

[1] The Justice Department has broad discretion to withdraw a Westfall Act certification under 28 C.F.R. § 15.4(c), which provides that any "certification under this section may be withdrawn if a further evaluation of the relevant facts or the consideration of new or additional evidence calls for such action." *See also Becker v. Fannin Cty., Ga.*, No. 09 Civ. 0047, 2012 WL 3113908, at *7–9 (N.D. Ga. Jul. 3, 2012) (resubstituting individual defendant after withdrawal of certification in FTCA case).

[2] The preclusive effect of the *Carroll II* judgement is unaltered by Trump's notice of appeal in that action. New York law controls the preclusive effect of the jury's verdict, *Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 508 n.3 (2d Cir. 2020) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508, 121 S. Ct. 1021, 149 (2001)). And under New York law, "the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (internal quotation omitted).

KAPLAN HECKER & FINK LLP                                                    5

concerning the verdict in *Carroll II* and Trump's public response to that verdict, which involved repeating on CNN the statements the *Carroll II* jury found to be defamatory, allegations that we believe are now directly relevant to the issue of punitive damages on the defamation claim in *Carroll I. See, e.g.*, *Carroll II* Jury Charge, Trial Tr. at 1434–35 ("[P]unitive damages in relation to a libel claim—the defamation claim—may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. . . . A statement is made with malice or it's made maliciously . . . if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights."). The nature of Carroll's underlying claim for defamation against Trump based on his 2019 statements, however, remains the same.

<div align="center">* * *</div>

As outlined above, given the preclusive effect of *Carroll II*, there are only a few steps that remain to bring this action to a close. Accordingly, Plaintiff respectfully proposes the following schedule:

| | |
|---|---|
| June 7, 2023 | Opposition to Plaintiff's motion to amend |
| June 14, 2023 | Plaintiff's reply in support of motion to amend |
| June 21, 2023 | Motion to substitute (if any) |
| July 19, 2023 | Plaintiff's opposition to motion to substitute |
| July 31, 2023 | Reply in support of motion to substitute |

In accordance with this schedule, the United States's motion to substitute (if any) and Trump's already-fully briefed summary judgment motion would be ripe for simultaneous disposition.

We have proposed the above plan and schedule to counsel for both Defendant and the United States. Defendant does not consent—and threatened to file a separate case against E. Jean Carroll in retaliation and possibly to seek sanctions.[3] The United States's position is as follows:

> The United States believes that it would be most appropriate for the court to fully adjudicate the motion to amend the complaint before any briefing schedule is set regarding the Westfall Act issue. Any briefing regarding substitution should be addressed to the operative complaint. The United States therefore suggests that the parties meet and confer and submit a joint proposed briefing schedule on the issue of substitution 30 days after the court rules on the motion to amend the complaint. If the court nonetheless chooses to set a briefing schedule regarding substitution, the United States requires at least sixty days to make any filing. This time is needed so that

---

[3] Counsel for Trump were unable to meet and confer on these issues until the morning of May 22, which accounts for the delay in sending this letter to the Court after the verdict in *Carroll II*.

**A948**

KAPLAN HECKER & FINK LLP                                                    4

> government counsel can review deposition and other discovery material that the United States has not previously had an opportunity to consider and that the parties have suggested may be relevant to the substitution issue.

We obviously disagree with both Defendant and the United States on these issues. Our proposed schedule takes into account the fact that, as Your Honor has noted, Plaintiff is almost 80 years old,[4] as well as the fact that Defendant is now running again for president. Our proposed schedule affords the United States ample time in which to assess its position on the Westfall Act issue and does so without unduly delaying these proceedings. Plaintiff E. Jean Carroll is eager to get this case, originally filed in late 2019, resolved while she remains in good health and before Donald Trump's time and attention are consumed entirely by his presidential campaign.

We appreciate the Court's consideration of this matter.

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record (via ECF)

---

[4] *See Carroll v. Trump*, 590 F. Supp. 3d 575, 588 (S.D.N.Y. 2022).

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

        *Plaintiff,*

    v.

DONALD J. TRUMP, in his personal capacity,

        *Defendant.*

No. 20 Civ. 7311 (LAK)

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO AMEND

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

## PRELIMINARY STATEMENT

The parties have been litigating this case since November 2019. Defendant Donald J. Trump, for his part, has sought to delay and evade these proceedings in every way he could. As part of that effort, Trump has claimed various immunities emanating from his status as President in June 2019 when he committed the defamation that gave rise to this action. Trump's claim to immunity under the Westfall Act is now back before this Court, following consideration by both the Second Circuit and the D.C. Court of Appeals. The D.C. Court of Appeals reaffirmed this Court's understanding of D.C. *respondeat superior* law (which controls the scope-of-employment inquiry for Westfall Act purposes), and the Second Circuit remanded the case so that the Court may render a decision in conformity with the D.C. court's decision. The entire certification process has lasted more than 31 months to date.

In the meantime, the facts and circumstances have changed. In order to facilitate final resolution of the scope-of-employment issue, Plaintiff E. Jean Carroll now moves to amend her complaint to add relevant facts bearing on that issue that were disclosed in the discovery process in this action. Carroll's proposed amendment also accounts for the recent verdict in the related action, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) ("*Carroll II*"), as well as Trump's recent public comments about Carroll following that verdict. Given the absence of any delay by Carroll, and the absence of any prejudice to Trump, the motion should be granted.

## ARGUMENT

Under Federal Rule of Civil Procedure 15(a)(2), leave to amend a complaint should be "freely give[n] . . . when justice so requires." The "rule" in the Second Circuit "has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quoting *AEP Energy Servs. Gas*

*Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). "Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Id.* (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

Here, Carroll's proposed amendment principally includes three categories of additional allegations: (1) allegations drawing from Trump's deposition in this action that demonstrate his personal motive in defaming Carroll; (2) allegations accounting for the verdict in *Carroll II*; and (3) allegations regarding Trump's continued defamatory statements about Carroll following that verdict. *See* Ex. A. to Kaplan Decl. These allegations are all responsive to the D.C. Court of Appeals' recent decision, holding that D.C. "adheres to the 'traditional view' of the scope of employment inquiry of *respondeat superior* set forth in the Restatement (Second) of Agency § 228," which requires a court to inquire into "the subjective state of mind of the tortfeasor-employee" to determine "whether the employee was, in fact, motivated by a purpose to serve their employer." *Trump v. Carroll*, No. 22-SP-745, 2023 WL 2920882, at *4, *9 (D.C. Apr. 13, 2023). Trump's own deposition testimony about the total lack of official process surrounding his June 2019 defamatory statements reflects his personal motivation in making them. And his malicious repetition of materially identical defamatory statements about Carroll in October 2022 and May 2023—long after his presidency had ended—only underscores the personal nature of his June 2019 conduct. *See id.* at *12 (as part of scope-of-employment inquiry, a factfinder "is free to consider any probative, relevant evidence tending to establish the employee's purpose behind their conduct, regardless of how temporally remote that may be from the moment of the tort"). Trump's later public statements about Carroll are also relevant to Carroll's entitlement to punitive damages. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 184 (2d Cir. 2000) ("prior or subsequent defamations" and "subsequent statements of the defendant" are relevant to punitive damages for

defamation claim (quoting *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643 n.12 (1979)).

Moreover, given the straightforward nature of these allegations, Carroll easily satisfies the "permissive standard" of Rule 15.[1] *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)).

*First*, there has been no undue delay or bad faith because Carroll's proposed amendment responds to very recent developments and could not have been offered before now. The scope-of-employment issue that Carroll's amended complaint mainly addresses has been on appeal since November 25, 2020, *see* ECF 45, 46, and the certified question to the D.C. Court of Appeals invited that court to reach a final determination of whether Trump acted within the scope of his employment in defaming Carroll in June 2019, *see Carroll v. Trump*, 49 F.4th 759, 781 (2d Cir. 2022). It was not until the D.C. Court of Appeals clarified its *respondeat superior* law (without resolving the ultimate scope-of-employment issue), and the Second Circuit then remanded the case to this Court for further proceedings on April 21, 2023, that Carroll's proposed amendment was relevant. ECF 149, 150. And given the centrality of the original complaint to the appellate courts' consideration of Trump's immunity under the Westfall Act, *see Carroll*, 49 F.4th at 761–63, amending the pleading during the pendency of an appeal would not have been proper. *Cf. Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982). The new allegations

---

[1] While no scheduling order in this case has set a deadline for motions to amend, *see* ECF 76, 77, 88, 100, 102, even if the Court were to construe this motion as a motion to amend a scheduling order, Carroll still easily satisfies the "good cause" standard of Rule 16(b)(4). "A finding of 'good cause' depends on the diligence of the moving party," and, in the context of a motion to amend, the court "may also weigh other relevant factors including, in particular, whether allowing the amendment of the pleading at the present stage of the litigation will prejudice the opposing party." *Flanagan v. New York City Dep't of Education*, No. 13 Civ. 8456, 2019 WL 6647870, at *1 (S.D.N.Y. Nov. 7, 2019) (Kaplan, J.). For substantially the same reasons detailed in this motion, Carroll has shown good cause to amend any scheduling order that the Court might find controlling.

**A953**

relating to the May 9, 2023 jury verdict in *Carroll II* and Trump's subsequent statements about Carroll, of course, could not have been made any earlier.

    *Second*, the proposed amendment would obviously cause no prejudice to Donald Trump. The allegations drawing from Trump's own deposition concern facts already known to him, and courts regularly grant parties leave to amend "to conform the pleadings to the evidence unearthed by discovery." *Mellon Bank F.S.B. v. Alexander Wescott & Co.*, No. 98 Civ. 2650, 1999 WL 504914, at *5 (S.D.N.Y. July 16, 1999) (internal quotation omitted); *accord Stonewell Corp. v. Conestoga Title Ins. Co.*, No. 04 Civ. 9867, 2010 WL 647531, at *2 (S.D.N.Y. Feb. 18, 2010). Trump's deposition testimony would be properly considered in connection with additional Westfall Act briefing in any event. The same is true for new allegations relating to the jury verdict in *Carroll II* as well as Trump's recent defamatory statements. Those allegations reflect public and undisputed facts, including the existence of a jury verdict against Trump. *Daelim Trading Co. v. Giagni Enters., LLC*, No. 10 Civ. 2944, 2012 WL 5995119, at *3 (S.D.N.Y. Oct. 16, 2012) (where "the content of the proposed amendment is not unexpected," the amendment "does not cause defendants undue prejudice"). Most critically, the proposed amendment does not change the nature of Carroll's single cause of action against Trump in the slightest, and raises no new issues requiring additional discovery or further motion practice. Where an amendment does not "require the opponent to expend significant additional resources" or "significantly delay the resolution of the dispute," no prejudice will be found. *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 350).

    *Finally*, the proposed amendment is not futile. A motion to amend may be denied on the ground of futility if the amended pleading would be subject to dismissal for failure to state a claim. *See Thea v. Kleinhandler*, 807 F.3d 492, 496–97 (2d Cir. 2015). Carroll's amended complaint,

however, does not add any new claims or alter the nature of Carroll's pending defamation claim in any way.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff leave to amend her complaint.

Dated: New York, New York
      May 22, 2023

Respectfully submitted,

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**A955**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, <br><br> *Plaintiff*, <br><br> v. <br><br> DONALD J. TRUMP, in his personal capacity, <br><br> *Defendant*. | No. 20 Civ. 7311 (LAK) |

### DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF
### PLAINTIFF E. JEAN CARROLL'S MOTION TO AMEND

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Carroll's motion to amend.

3.      Attached hereto as **Exhibit A** is a true and correct copy of Carroll's proposed Amended Complaint.

4.      Attached hereto as **Exhibit B** is a true and correct copy of a comparison in redline between Carroll's proposed Amended Complaint and Carroll's original Complaint filed in this action.

Dated:    New York, New York
          May 22, 2023

_____
Roberta A. Kaplan

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>                              *Plaintiff*,<br><br>        v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>                              *Defendant*. | No. 20 Civ. 7311 (LAK)<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff E. Jean Carroll, by and through her attorneys at Kaplan Hecker & Fink LLP, alleges as follows:

### INTRODUCTION

1.      Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual assault behind a wall of defamatory falsehoods and deflections. The sexual assault of a woman is a violent crime; compounding that crime with acts of malicious libel and slander is abhorrent. Yet that is what Defendant Donald J. Trump did to Plaintiff E. Jean Carroll—repeatedly, over several years, and even after a jury of six men and three women in this District unanimously found him liable for sexual abuse and defamation based on a statement that was substantially similar to the ones at issue in this lawsuit.

2.      Roughly 27 years ago, what began as playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and sexually assaulted her.

3.      In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

4.      Carroll chose silence—and remained silent for over two decades.

5.      Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of sexual assault was rarely believed, a woman who accused a rich, famous, violent man of such conduct would risk losing everything. She therefore reasonably concluded that if she accused Donald Trump of assault, he would bury her in threats, and she would probably lose her job and reputation, not to mention everything she had worked for and achieved, all of which turned out to be true.

6.      Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but actually grew *more* popular with some supporters as a result of the controversy.

7.      Carroll's mother, a former Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.      But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.      For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think

clearly, and to seek justice. When readers overcome with doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10.     Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's sexual assault in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11.     When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the sexual assault. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of assault. For good measure, he insulted her physical appearance.

12.     Each of these statements was false. Each of them was defamatory.

13.     Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he sexually abused her, and he knew who she was in 2019.

He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of sexual assault. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

14.     These lies were familiar to Trump. He had used them before, when other women stated that he had grabbed or groped them.

15.     Trump's June 2019 defamatory statements injured Carroll, adding to the harm she suffered from his underlying sexual assault. They inflicted emotional pain and suffering, they damaged her reputation, and they caused substantial professional harm.

16.     But Trump's defamatory lies did not stop in 2019. He made additional, substantially similar false claims about Carroll again in October 2022 when he was a private citizen. This time, Trump posted similar smears—once again asserting that he never sexually abused Carroll, denied having known her, and asserted that she was too ugly to have assaulted—to his more than four million followers on his own social media platform, Truth Social, damaging her reputation even further.

17.     On May 9, 2023, after a two-week trial in the Southern District of New York, a nine-person jury found that Trump had sexually abused Carroll and that his 2022 statement denying the assault on Truth Social was defamatory. The jury awarded Carroll $5 million in damages: $2.02 million for the assault, and $2.98 million for the defamation.

18.     But Trump, undeterred by the jury's verdict, persisted in maliciously defaming Carroll yet again. On the very next day, May 10, 2023, Trump lashed out against Carroll during a televised, primetime "town hall" event hosted by CNN. He doubled down on his prior defamatory statements, asserting to an audience all too ready to cheer him on that "I never met this woman. I

never saw this woman," that he did not sexually assault Carroll, and that her account—which had just been validated by a jury of Trump's peers one day before—was a "fake," "made up story" invented by a "whack job." Those statements resulted in enthusiastic cheers and applause from the audience on live TV.

19.     Carroll filed this lawsuit to obtain redress for her injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

20.     Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and former advice columnist for *Elle* magazine. She is a domiciliary of the State of New York.

21.     Defendant Donald J. Trump is the former President of the United States, and he is sued here only in his personal capacity. While in office, Trump filed several lawsuits in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald J. Trump for President, Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v. Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136 (D.D.C.). At the time Carroll filed this suit, Trump was also a domiciliary of the State of New York.

## JURISDICTION AND VENUE

22.     Carroll initiated this action in the Supreme Court of the State of New York on November 4, 2019. The Attorney General's delegate then issued a certification pursuant to 28 U.S.C. § 2679(d)(2), and the United States removed the action to this Court on September 8, 2020. This Court thus has subject matter jurisdiction of this action. *See Osborn v. Haley*, 549 U.S. 225, 245 (2007).

23.     Venue is proper pursuant to 28 U.S.C. § 2679(d)(2). It is also proper pursuant to 28

U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in

this District.

24.     Personal jurisdiction over Trump is proper pursuant to C.P.L.R. § 301, as Trump

was a domiciliary of the State of New York at the time Carroll initiated this action.

### FACTUAL ALLEGATIONS

### I.     TRUMP SEXUALLY ASSAULTS CARROLL AT BERGDORF GOODMAN

25.     One evening in the spring of 1996, Carroll left work and went to Bergdorf

Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains

a regular shopper at Bergdorf's.

26.     That evening, Carroll did not find whatever she was looking for and prepared to

leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th

Street, Trump arrived and entered through that very same door, which was cater-cornered across

from the Plaza Hotel.

27.     Trump instantly recognized Carroll on sight. They had met at least once before and

had long traveled in the same New York City media circles. In this period, Carroll was doing the

daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger

Ailes. Trump himself had appeared on Ailes's talk show, *Straight Forward*, on that network in

November 1995. And Carroll's show re-ran each night at 11 p.m., right before the nightly re-run

of Ailes's show. She was also on a frequent guest and commentator on the widely watched *Today*

show and *Good Morning America*.

28.     Trump and Carroll had previously been photographed at a party together:



29.     At the 58th Street revolving glass doorway of Bergdorf's, Trump put up his hand to stop Carroll from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

30.     Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

31.     Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

32.     As Trump petted the fur hat, Carroll asked how old "the girl" was. Trump did not answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years old, he taunted her, "You're so *old*!"

33.     Trump then had an idea: He would buy lingerie instead.

34.     Trump and Carroll rode up the escalator to the lingerie department. When they arrived, it was empty, with no sales attendant in sight, as was not uncommon past 6 p.m. on a Thursday night in the spring of 1996. Sitting on the counter near them were two or three boxes and a see-through bodysuit in lilac gray.

35.     Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit.

36.     Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

37.     Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself that she would make him put the bodysuit on over his pants.

38.     As was not uncommon at Bergdorf's during this period, the dressing room door was open and unlocked.

39.     Trump closed the door of the dressing room.

40.     Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips.

41.     Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter. She could hardly process the insanity of the situation. She also hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

42.     But Trump did not stop. He seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

43.     Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

44.     Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

45.     Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

46.     The whole attack lasted only a few minutes.

## II.     CARROLL CONFIDES IN TWO FRIENDS ABOUT THE SEXUAL ASSAULT

47.     As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

48.     Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

49.     "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

50.     Carroll drove home and crawled straight into bed.

51.     Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the incident. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

52.     Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

53.     Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

54.     Carroll was also afraid of being dragged through the mud if she reported the sexual assault. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had assaulted her because she had entered that Bergdorf dressing room.

55.     Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

56.     Carroll thus chose silence.

57.     Carroll did not mention the sexual assault again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

### III.     CARROLL REMAINS SILENT FOR TWENTY YEARS

58.     For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

59.     Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was

appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

60.     In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

61.     But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

62.     During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearances.

63.     And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had assaulted her. But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

64.     Indeed, Carroll worried that she might make Trump *more* popular in states like Indiana by revealing the sexual assault, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

65.     Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

66.     Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

## IV.    CARROLL DECIDES TO SPEAK OUT

67.     On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women in the film industry.[2] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

---

[2] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

Case 23-1045, Document 89-2, 10/02/2023, 3576572, Page114 of 221

**A969**

68.     Days later, several women accused Weinstein of rape.[3] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

69.     As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

70.     Carroll was profoundly moved by this experience. The walls that she had erected in her mind—the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being sexually assaulted—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

71.     Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

72.     These observations led Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely

---

[3] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

73.     These internal reflections loomed larger in her mind—and became inescapable—as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

74.     Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

75.     While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

76.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who sexually abused her when she was 52. Carroll described that attack in detail.

77.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to

act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

78.     In her book, Carroll truthfully described, in meticulous detail, the sexual assault in Bergdorf Goodman:

"The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely, I'm not certain— inside me."[4]

79.     She also explained why she had not come forward earlier:

"Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them doesn't sound like much fun. Also, I'm a coward."[5]

80.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the sexual assault on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut*, a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

81.     Carroll's book was released by St. Martin's Press on July 2, 2019.

## V.     TRUMP REPEATEDLY DENIES SEXUALLY ASSAULTING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

82.     In three statements—published on June 21, 22, and 24, 2019, respectively—Trump responded to Carroll by denying the attack and publicly, falsely, and maliciously smearing her reputation.

83.     On June 21, 2019, Trump issued the following public statement:

---

[4] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[5] *Id.* at 244.

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

84.     Upon information and belief, Trump's June 21, 2019 statement was first given to

the press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[6]

85.     Trump's June 21, 2019 statement was subsequently shared online by other

journalists and covered by many leading news sources as Trump's statement in response to

Carroll.[7]

---

[6]     *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

[7] *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam

86. In the June 21, 2019 statement, Trump falsely stated that he did not sexually assault Carroll.

87. In the June 21, 2019 statement, Trump falsely stated that he had never met Carroll.

88. In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

89. In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented her allegations as a ploy for increased book sales.

90. In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented her allegations to carry out a political agenda.

---

Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

91.     In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented her allegations as part of a conspiracy with the Democratic Party.

92.     On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[8]

93.     Like his first statement, Trump's June 22, 2019 statement regarding Carroll was widely reported in the national press.[9]

94.     In the June 22, 2019 statement, Trump falsely stated that he did not sexually assault Carroll.

95.     In the June 22, 2019 statement, Trump falsely stated that he had no idea who Carroll was.

96.     In the June 22, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

97.     In the June 22, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent allegations against him.

---

[8] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[9] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will": Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

98.     Two days later, on June 24, 2019, *The Hill* released an interview in which Trump made the following statement in response to Carroll: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[10]

99.     Trump's statement in *The Hill* was widely reported by the national press.[11]

100.     This insulting statement was consistent with Trump's response to other accusations of sexual assault. About one woman, Jessica Leeds, who claimed he groped her and tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump told crowds at a rally, "Believe me, she would not be my first choice, that I can tell you."[12] He called Leeds

---

[10] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[11] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type'*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

[12] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

"the cunt on the airplane" when he ran into her at a charity gala years after the assault.[13] About a second woman, Natasha Stoynoff, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look, you take a look. Look at her, [then] look at her words, you tell me what you think. I don't think so."[14] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[15]

101.    In the June 24, 2019 statement, Trump falsely stated that he did not sexually assault Carroll.

102.    On June 27, 2019, Birnbach and Martin went on the record to corroborate Carroll.[16]

103.    Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh. He kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's go to the police. [Carroll said,] No. [Birnbach said,] Come to my house. [Carroll said,] No. I want to go home. [Birnbach said,] I'll take you to the police. [Carroll said,] No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[17]

---

[13] Barry Levine & Monique El-Faizy, All the President's Women: Donald Trump and the Making of a Predator 72 (2019).

[14] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[15] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, Hollywood Rep. (Oct. 13, 2016).

[16] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. Times (June 27, 2019).

[17] *Id.*

104.     Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you [Carroll], you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[18]

105.     Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[19]

106.     Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[20]

## VI.   TRUMP'S FALSE STATEMENTS ABOUT CARROLL IN JUNE 2019 WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

107.     The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

108.     Trump knew who Carroll was at the time he sexually assaulted her. And Trump also knew who Carroll was when he made his false statements in June 2019.

109.     Trump was photographed with Carroll in the years prior to the assault.

110.     Trump identified Carroll on sight as the "advice lady" when they met at Bergdorf Goodman.

111.     In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

112.     Trump has stated that he possesses "one of the great memories of all time."[21]

---

[18] *Id.*

[19] *Id.*

[20] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump*, N.Y. TIMES (June 27, 2019).

[21] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

113.    Trump has also described himself as a "very stable genius."[22]

114.    In June 2019, Trump knew it was false to state that he had never met Carroll.

115.    In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

116.    In June 2019, Trump knew it was false to state that he had never sexually assaulted Carroll.

117.    Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

118.    Trump has admitted that he lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he sexually assaulted her at Bergdorf Goodman. Trump had no knowledge of Carroll's financial circumstances or the details of Carroll's book deal, and he had no knowledge of Carroll's political affiliation or party registration. Trump did not personally investigate any of the relevant factual circumstances, nor did he instruct anyone else on his White House staff to do so. Indeed, Trump has admitted that neither he nor anyone on his staff reached out to Bergdorf Goodman prior to his June 2019 statements, in which he thanked the store for "confirming they have no video footage of any such incident." Additionally, although Trump requested in his June 21, 2019 statement to be notified if "anyone has information that the Democratic party is working with Ms. Carroll," he testified in his deposition that he could recall no one ever providing any such information. And since all of these statements about Carroll were made to impute motives for lying, when in fact he knew that

---

[22] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

119.    Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. When he made his June 2019 statements, Trump had not read the excerpt of Carroll's book in which certain of these allegations appeared and had no knowledge of their truth or falsity. As of his October 19, 2022 deposition, Trump had not read the excerpt or any other part of Carroll's book either. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

120.    Carroll did not reveal Trump's sexual assault for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a sexual assault accusation—was false.

121.    To the contrary, Carroll feared that revealing Trump's sexual assault would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

122.    With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

123.    Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

124.    In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women in almost exactly the same manner that he had sexually assaulted Carroll:

> "I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was looking at, whom he had never met before]. You know, I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. . . . Grab 'em by the pussy. You can do anything. . . . Ooh, [she has] nice legs, huh?"[23]

125.    Based on Carroll's own experiences, Trump's 2005 statement was not "locker room talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

126.    Indeed, Trump has emphasized that stars have been able to grab women by their genitals for "the last million years"—a circumstance that he suggested might be "fortunate[]" for stars like him.

127.    Trump thus knew he was lying when he said that Carroll had fabricated her accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth, for purely personal reasons. He knew she was telling the truth because he knew who she was and he knew that he had sexually assaulted her, just as he had sexually assaulted other women over many years.

## VII.    TRUMP'S FALSE STATEMENTS ABOUT CARROLL IN JUNE 2019 WERE MADE FOR PURELY PERSONAL REASONS

128.    In making the June 2019 statements, Trump was motivated by purely personal reasons, rather than presidential or official reasons.

129.    At the time Trump made his statements in June 2019, nobody in the White House (to Trump's knowledge) had undertaken any research into Carroll or her allegations.

---

[23] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

130.    Thus, at the time Trump made his statements in June 2019, neither Trump nor (to his knowledge) any of his White House aides had conducted any research or investigation into Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors (or lack thereof), her reasons for speaking up, or the veracity of her allegations concerning experiences of sexual misconduct at the hands of other men.

131.    At the time Trump made his statements in June 2019, neither Trump nor (to his knowledge) any of his White House aides had contacted Bergdorf Goodman about this matter.

132.    At the time Trump made his statements in June 2019, Trump had not read Carroll's book excerpt and had no firsthand knowledge of her statements concerning his sexual assault.

133.    At his deposition in this case, Trump did not identify *any* White House personnel as involved in investigating, preparing, strategizing, or creating his June 2019 statements. Nor did he identify any other administration official as playing any role at all in the June 2019 statements, or any official meetings focused on Carroll's allegations or his response that he attended, organized, requested, or proposed.

134.    For example, Trump testified that he did not recall speaking about Carroll's allegations with Mick Mulvaney (Trump's acting Chief of Staff at the time of his June 2019 statements) or Emma Doyle (his Principal Deputy Chief of Staff). He testified that he did not speak with Sarah Sanders (his Press Secretary at the time of the June 2019 statements) or Hope Hicks (his Communications Director). And he has alternately denied speaking to or said he had "not much" conversation with Stephanie Grisham (whom Trump promoted to Press Secretary and Communications Director on June 25, 2019).

135.    In fact, at Trump's deposition, the *only* individuals at all associated with the Executive Branch with whom Trump recalled speaking about Carroll's allegations were two of his

family members: First Lady Melania Trump and his daughter, Ivanka Trump, who served in an unpaid advisory position during Trump's presidency.

136.    The fact that Trump discussed Carroll's allegations only with his wife and daughter— and did not discuss Carroll's allegations or his response in June 2019 with White House or Executive Branch political officials—reflects the personally motivated nature of his conduct.

137.    The nature and content of Trump's statement further betrayed his personal motives, and revealed his ill will and spite toward Carroll. Trump did not simply deny Carroll's allegations in his June 2019 statements, but instead launched deeply personal attacks. Trump implied that Carroll was too ugly for him to sexually assault, falsely stated that Carroll had previously lodged fake allegations of sexual misconduct against other men, and invented a baseless narrative that Carroll fabricated her accusation for money, to promote a book, or to further a political conspiracy—without possessing or pointing to one iota of support for those claims.

138.    When asked at his deposition in this action whether his statements were intended to punish Carroll, Trump initially denied it, but then stated: "She made a false charge. People shouldn't be allowed to make false charges."

139.    Trump's private motives are underscored by the fact that he later made materially identical defamatory statements about Carroll (detailed below) in his capacity as a private citizen. These statements included substantively similar, strikingly personal lies. In October 2022, for example, Trump again defamed Carroll, denigrating her as not his "type" and claiming that he didn't know her, had never met her, and her account of being sexually assaulted by him was a "[h]oax and a lie" and a "scam" to "promot[e] a really crummy book." More recently, in May 2023 and following an adverse jury verdict, Trump demeaned Carroll once more, making light of his assault by referring to it as "hanky-panky" and stating that he had "no idea who the hell she is."

140.   This pattern of personally motivated attacks not only persisted long after Trump left elected office; it also preceded his election in 2016. Trump has a long history of viciously demeaning women who credibly accuse him of sexual assault. It's his personal *modus operandi*. Put differently, Trump has a playbook that he uses to attack women who reveal his own sexual misconduct, and that conduct arises from private motives rather than any governmental purpose.

## VIII.   CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

141.   Trump's false and insulting claims about Carroll in June 2019 were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

142.   Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

143.   Carroll endured stoically when she kept secret the fact that Trump had sexually assaulted her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since used his platform—now as a candidate for President—to repeatedly attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

144.   Trump's defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who sexually assaulted her, as well as injury to her reputation, honor, and dignity.

145.   Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

146.   Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the

President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

147.    In all, and based on conservative assumptions, Trump's June 2019 defamatory statements generated between 142,334,424 and 188,155,507 impressions across various media. An estimated 34,075,512 to 42,936,354 of these were receptive impressions—*i.e.*, impressions involving individuals likely to believe Trump's false claims about Carroll. As a result, the minimum appropriate corrective campaign, as calculated by Professor Ashlee Humphreys, would cost at least $10 million.

148.    Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

149.    Carroll filed this lawsuit to obtain redress for those injuries.

## IX.    A JURY FINDS TRUMP LIABLE FOR BATTERY AND DEFAMATION IN *CARROLL II*

150.    As part of his defense to this action, Trump has claimed various immunities from liability by virtue of his status as President at the time he made his June 2019 defamatory statements. Trump's efforts to obtain immunity have contributed to years of delay that have extended forward to today.

151.    These delays have given Trump further opportunity to inflict further harm on Carroll. In due course, he seized on it.

152.    On October 12, 2022, nearly three years after Carroll filed this action, Trump posted a lengthy message on his personal account on Truth Social, a social media platform created by

Trump as an alternative to Twitter. In that statement, Trump substantially repeated his June 2019

defamatory statements:

> "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in
> this Country, but especially in New York State (just look at Peekaboo James), is a
> broken disgrace. You have to fight for years, and spend a fortune, in order to get
> your reputation back from liars, cheaters, and hacks. This decision is from the Judge
> who was just overturned on my same case. I don't know this woman, have no idea
> who she is, other than it seems she got a picture of me many years ago, with her
> husband, shaking my hand on a reception line at a celebrity charity event. She
> completely made up a story that I met her at the doors of this crowded New York
> City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie,
> just like all the other Hoaxes that have been played on me for the past seven years.
> And, while I am not supposed to say it, I will. This woman is not my type! She has
> no idea what day, what week, what month, what year, or what decade this so-called
> 'event' supposedly took place. The reason she doesn't know is because it never
> happened, and she doesn't want to get caught up with details or facts that can be
> proven wrong. If you watch Anderson Cooper's interview with her, where she was
> promoting a really crummy book, you will see that it is a complete Scam. She
> changed her story from beginning to end, after the commercial break, to suit the
> purposes of CNN and Andy Cooper. Our Justice System is broken along with
> almost everything else in our Country."

He then continued:

> "In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a
> woman who I had nothing to do with, didn't know, and would have no interest in
> knowing her if I ever had the chance. Now all I have to do is go through years more
> of legal nonsense in order to clear my name of her and her lawyer's phony attacks
> on me. This can only happen to 'Trump'!"[24]

153.    Trump published the October 12, 2022 statement to his more than four million

followers on Truth Social. Around the same time, Trump emailed the statement to a listserv of

supporters, and it was widely reported in the press, reaching millions upon millions of people.

154.    On November 24, 2022, Carroll sued Trump for defamation for the harms that she

incurred as a result of the October 12, 2022 statement. *See Carroll v. Trump*, No. 22 Civ. 10016

---

[24] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 12, 2022, 10:38 PM),
https://truthsocial.com/@realDonaldTrump/posts/109158644496040450.

(S.D.N.Y.) ("*Carroll II*"). As part of that lawsuit, Carroll also brought a claim for battery pursuant to New York's Adult Survivors Act relating to the underlying sexual assault. That Act revived certain battery claims for a one-year period if the conduct of the defendant would have constituted a sex offense as defined in Article 130 of the New York Penal Law. C.P.L.R. § 214-j.

155.    Trial in *Carroll II* began on April 25, 2023. The Court empaneled an anonymous jury of nine members, including six men and three women.

156.    Over the next two weeks, Carroll presented eleven witnesses who corroborated key aspects of her account. Those included Birnbach and Martin, the two friends who Carroll told of the assault right after it happened; two former employees of Bergdorf's who worked at the store during the period when the assault occurred; a psychological expert who testified that Carroll's reaction to and damages from the assault were consistent with responses to sexual trauma more generally; a defamation damages expert who testified regarding the significant harm that Carroll's reputation suffered as a result of the October 12, 2022 statement; two women who Trump had assaulted in remarkably similar ways; Carroll's sister; Carroll's former boss at *Elle* magazine; and Carroll herself. An aggressive cross-examination of Carroll, in which Trump's attorney sought to undermine her credibility by asking why she didn't scream when Trump assaulted her and whether having someone "rummage around in" her vagina was different than having someone insert a finger in her vagina, took up almost two full trial days.

157.    Trump, for his part, chose not to testify—or to attend any of the trial at all. Instead, he let the jury hear from him only through video excerpts of the deposition taken in this action on October 19, 2022. Trump called no witnesses of his own.

158.    After the parties rested and presented their closing arguments, the Court instructed the jury on the morning of May 9, 2023. Less than three hours later, the jury reached a verdict.

159.    On the first count, battery, the jury found in favor of Carroll. The jury determined

by a preponderance of the evidence that Trump sexually abused her in the dressing room at

Bergdorf's—*i.e.*, that Trump subjected Carroll to sexual contact (meaning any touching of the

sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either

person), without her consent, by the use of forcible compulsion (meaning intentionally to compel

by the use of physical force). *See* N.Y.P.L. § 130.65. The jury awarded Carroll $2 million in

compensatory damages for this claim.

160.    The jury also determined by a preponderance of the evidence that Trump's sexual

abuse was willfully or wantonly negligent, reckless, or done with a conscious disregard of Carroll's

rights or was so reckless as to amount to such disregard. Accordingly, the jury awarded Carroll

$20,000 in punitive damages.

161.    On the second count, defamation, the jury also found in favor of Carroll. It

determined by a preponderance of the evidence that Trump's October 12, 2022 statement—in

which Trump denied knowing Carroll, claimed he "had nothing to do with" her, and insisted that

Carroll had "completely made up" the incident at Bergdorf's—was defamatory.[25] The jury further

determined by clear and convincing evidence that Trump's statement was false and that Trump

had made it with actual malice. After determining that Carroll was injured by Trump's statement,

the jury awarded her $2.7 million in compensatory damages.

---

[25] The jury was directed to consider those portions of the October 12, 2022 about Carroll—
*i.e.*, where Trump called Carroll's accusation "a complete con job" and "a Hoax, and a lie"; stated
that Carroll "completely made up a story that I met her at the doors of this crowded New York
City department store and, within minutes 'swooned' her"; claimed that his sexual abuse "never
happened" and that "Carroll is not telling the truth"; asserted that Carroll "changed her story from
beginning to end" during a CNN interview; insinuated that Carroll fabricated her accusation as
part of "a complete Scam" to "promot[e] a really crummy book"; asserted that he "didn't know"
and "had nothing to do with" Carroll; stated that he "would have no interest in knowing her if [he]
ever had the chance"; and insisted that she was not his "type."

162.    The jury also found that Trump had acted maliciously, out of hatred, ill will, or spite, or with wanton, reckless, or willful disregard of Carroll's rights in making his October 12, 2022 statement and awarded Carroll $280,000 in punitive damages.

163.    In total, the jury held Trump liable for $5 million in damages.

## X.    TRUMP AGAIN DENIES SEXUALLY ABUSING CARROLL AND MAKES A SLEW OF FALSE, INSULTING CLAIMS ABOUT HER

164.    Immediately after the verdict was announced, Trump began lashing out in response. He started by posting various messages and videos on his Truth Social account decrying the verdict, and disparaging Carroll, the jury, and the judicial system more generally.

165.    Mere minutes after the verdict became public, Trump repeated the defamatory lie that he had no idea who Carroll was and again claimed that her accusation of sexual assault was politically motivated: "I HAVE ABSOLUTELY NO IDEA WHO THIS WOMAN IS. THIS VERDICT IS A DISGRACE – A CONTINUATION OF THE GREATEST WITCH HUNT OF ALL TIME!"[26]

166.    Shortly after midnight that night, Trump followed up with another Truth Social post attacking the "partisan Judge & Jury on the just concluded Witch Hunt Trial," and again insisting that the "Hoax" (Carroll's suit and the ensuing trial) was part of a political conspiracy.[27]

---

[26]    Donald J. Trump (@realDonaldTrump), Truth Social (May 9, 3:29 PM), https://truthsocial.com/@realDonaldTrump/posts/110340379870475514.

[27]    Donald J. Trump (@realDonaldTrump), Truth Social (May 10, 12:34 AM), https://truthsocial.com/@realDonaldTrump/posts/110342521655891366.

167.     Less than an hour later, Trump once again insisted that Carroll's accusation and suit were a "Rigged Hoax," "yet another TRAVESTY OF JUSTICE," and "a continuation of the greatest political Witch Hunt of all time!!!"[28]

168.     Then, in the evening of May 10, 2023, CNN hosted a primetime town hall event in New Hampshire. Trump received questions from the audience and the event's moderator, Kaitlan Collins. Early in the broadcast, Collins turned to the prior day's jury verdict. Trump responded to her questions by repeating many of the same defamatory statements for which the jury had just found him liable the day before:

COLLINS: This was a jury of nine people who found you –

TRUMP: That's right.

COLLINS: – liable of sexual abuse. Do you think that – that will deter women from voting for you?

TRUMP: No, I don't think so because I think the whole thing – just so you understand – ready? I never met this woman. I never saw this woman. This woman said I met her at the front door of Bergdorf Goodman which I never go into other than for a couple of charities. I met her in the front door. She was about 60 years. This is like 22, 23 years ago. I met her in the front door of Bergdorf Goodman. I was immediately attracted to her and she was immediately attracted to me. And we had this great chemistry. We're walking into a crowded department store. We had this great chemistry. And a few minutes later, we end up in a room, a dressing room of Bergdorf Goodman, right near the cash register. And then she found out that there were locks in the door. She said, I found one that was open. She found one, she learned this at trial. She found one that was open. What kind of a woman meet somebody and brings them up and within minutes, you're playing hanky-panky in a dressing room, okay? I don't know if she was married then or not. John Johnson, I feel sorry for you, John Johnson.

COLLINS: Mr. President, can I – can I ask you this?

TRUMP: Think of it, think of this –

COLLINS: I know you're recounting what you said but, Mr. President –

---

[28]    Donald  J.  Trump  (@realDonaldTrump),  Truth  Social  (May  10,  1:20  AM), https://truthsocial.com/@realDonaldTrump/posts/110342704670441764.

TRUMP: But let me just, if I could because you asked a question.

COLLINS: This was a jury though –

TRUMP: Just so you understand, because I was walking in at a department – because I was very famous then and I owned the Plaza Hotel right next door and I owned the buildings around it. I'm not going into a dressing room of a crowded department store. Then I say, if she was being raped – and by the way, they said she wasn't raped, okay? That was her charge. It wasn't –

COLLINS: They found that you sexually abused her.

TRUMP: Oh, that was – say what the – they didn't – they said he didn't rape her.

COLLINS: They did not say –

TRUMP: And I didn't do anything else either. You know what? Because I have no idea who the hell she is. I don't know who this woman is.

COLLINS: But, Mr. President, can I – can I ask you given your recounting and your version –

TRUMP: I don't know who – and I tell you this. Are you ready?

COLLINS: But, Mr. President, can I – can I ask you because –

TRUMP: And I swear on my children, which I never do. I have no idea who this woman. This is a fake story, made up story. We had a horrible Clinton-appointed judge. He was horrible. He allowed her to put everything in. He allowed us to put nothing in. This is a fake story.

COLLINS: Mr. President, you're recounting your version of events here right now to the audience. You reference the trial. You did not go to the trial and actually testify.

TRUMP: That's right.

COLLINS: Do you wish that you had testified?

TRUMP: No, it wouldn't have made a difference. This is rigged deal. This was a – my lawyer said, sir, you don't have to do it. I actually said, I think I should, it would be disrespectful. They said, sir, don't do it. This is fake story and you don't want to give it credibility.

COLLINS: One thing you –

TRUMP: That's why I didn't go.

COLLINS: One thing you did do in this –

TRUMP: And I swear and I've never done that, and I swear to – I have no idea who the hell – she's a whack job.[29]

169.    During the exchange, Trump falsely stated that he did not sexually abuse Carroll, that he has no idea who Carroll was, and that Carroll's now-proven accusation was a "fake" and "made up story" created by a "whack job." Trump also insulted Carroll's character and downplayed his sexual abuse of her by asking "what kind of woman meets someone" and then "within minutes" plays "hanky-panky in a dressing room."

170.    Approximately 3.3 million viewers watched the CNN broadcast during which this exchange took place.[30] Viewers heard the studio audience applauding and laughing along uproariously to Trump's comments. The entire segment ran from 8:00 p.m. to 9:15 p.m. During that time, CNN was the most-watched cable news network, more than doubling the ratings of Fox News and MSNBC.[31] CNN reported that the program was the network's second most-viewed single-candidate town hall since 2016.[32]

171.    Trump's statements about Carroll were also widely reported in the press.[33]

---

[29] *READ: Transcript of CNN's Town Hall with Former President Donald Trump*, CNN (May 11, 2023).

[30] Ted Johnson, *CNN's Donald Trump Town Hall Wins Time Slot With 3.3 Million Viewers — Update*, DEADLINE (May 11, 2023).

[31] *Id.*

[32] *Id.*

[33] *E.g.*, Benjamin Weiser, Lola Fadulu, and Kate Christobek, *E. Jean Carroll May Sue Trump a Third Time After 'Vile' Comments on CNN*, N.Y. TIMES (May 11, 2023); Claire Lampen, *Donald Trump Still Claims He Doesn't Know E. Jean Carroll*, CUT (May 11, 2023); Steve Peoples, *Trump turned his liabilities into laugh lines at CNN town hall, underscoring GOP rivals' challenge*, ASSOCIATED PRESS (May 11, 2023); Peter Sblendorio, *Donald Trump's 'disastrous' CNN town hall elicits strong reactions*, N.Y. DAILY NEWS (May 11, 2023); Kierra Frazier, *CNN's own employees are disparaging the Trump town hall*, POLITICO (May 11, 2023); Abigail Weinberg, *Trump Mocked E. Jean Carroll Live on CNN. The Audience Laughed*, MOTHER JONES (May 11, 2023); Laura Italiano and Natalie Musumeci, *Sex-assault survivors unleash a firestorm of anger at CNN letting Trump try to re-victimize E. Jean Carroll by dismissing his abuse as 'hanky*

172.     Supporters of Trump echoed many of the lies and demeaning remarks that Trump made about Carroll. One Twitter user wrote: "@ejeancarroll You've not won a thing. You've just proven what men have known for years: once women are short of cash you fabricate a crock of shite to fund your plastic lifestyle. A two-bit money grabbing whore who belongs in an asylum.

---

panky', INSIDER (May 11, 2023); *Fact-checking Trump's CNN town hall in New Hampshire*, CNN (May 11, 2023); Christian Blauvelt, *CNN Trump Town Hall Backlash Grows After Verdict in E. Jean Carroll Case*, INDIE WIRE (May 10, 2023);  Kyler Alvord, *Trump Draws Laughter, Applause as He Mocks E. Jean Carroll During CNN Town Hall*, PEOPLE MAG. (May 11, 2023); Brian Bennett, *Trump Uses CNN Town Hall to Mock E. Jean Carroll After a Jury Found Him Liable For Sexually Abusing Her*, TIME (May 10, 2023); *Trump takes aim at E. Jean Carroll at CNN town hall after lawsuit loss*, AXIOS (May 10, 2023); Jill Colvin, *Trump Digs In On Election Lies, Insults Accuser During CNN Town Hall Event*, ASSOCIATED PRESS (May 11, 2023); Domenico Montanaro, *Trump Continues Lies About Election And Lashes Out After N.Y. Verdict In Town Hall*, NPR (May 10, 2023); Kevin Breuninger, *Trump pushes false election claims, mocks E. Jean Carroll to applause during CNN town hall*, CNBC (May 10, 2023); Nikki McCann Ramirez, *Trump Mocks E. Jean Carroll at Town Hall, as His Fans Cheer Him On*, ROLLING STONE (May 10, 2023); Brett Samuels, *Trump calls E. Jean Carroll a 'whack job' after sexual abuse verdict*, HILL (May 10, 2023); Ursula Purano, *Trump Abused and Defamed E. Jean Carroll All Over Again on CNN*, DAILY BEAST (May 10, 2023); Patrick Reilly, *Trump claims E. Jean Carroll trial was rigged after he was found liable of sexual abuse, defamation* , N.Y. POST (May 10, 2023); Chris Stein, *Trump town hall live: ex-president repeats election lies and denies sexual abuse verdict to mostly Republican crowd*, GUARDIAN (May 10, 2023); Michelle L. Price, *What to know about Trump's CNN town hall: Lies about election and abortion, attacks on accuser*, ASSOCIATED PRESS (May 10, 2023); Isaac Arnsdorf and Maeve Reston, *Trump's CNN town hall: Defending rioters, mocking sexual assault, threatening default*, WASH. POST (May 10, 2023); Jeremy Herb, *Trump again refuses to concede 2020 election while taking questions from New Hampshire GOP primary voters*, CNN (May 10, 2023); Kathryn Watson, Jacob Rosen, and Olivia Rinaldi, *Trump CNN town hall highlights include comments on E. Jean Carroll verdict, Jan. 6 and more*, CBS NEWS (May 11, 2023); Allan Smith, *Trump dismisses his sex abuse verdict and gloats that it will help his 2024 bid*, NBC NEWS (May 10, 2023); Nathan Layne and Tim Reid, *Trump jokes about sexual abuse verdict, repeats election falsehoods*, REUTERS (May 10, 2023); Brent D. Griffiths, *Trump insulted the woman he was found liable of sexually abusing — and CNN's audience laughed about it*, INSIDER (May 11, 2023); Ed Kilgore, *Trump's CNN Town Hall Was a MAGA Rally*, N.Y. MAG. (May 10, 2023); Brian Niemietz, *Donald Trump bashes E. Jean Carroll, repeats 2020 election lies in CNN town hall*, N.Y. DAILY NEWS (May 10, 2023); Mel Leonor Barclay, *Trump uses CNN town hall to insult a woman he assaulted*, 19TH (May 10, 2023); Meredith Deliso and Will McDuffie, *Trump denies knowing E. Jean Carroll during CNN town hall: 'I swear on my children'*, ABC NEWS (May 10, 2023); Ryan Gajewski, *CNN Town Hall Audience Members Laugh, Cheer as Trump Talks About E. Jean Carroll Sexual Abuse Verdict*, HOLLYWOOD REP. (May 10, 2023).

Such antics are typical of cretins."[34] Another wrote: "They laughed when Trump provided a scenario, absolutely so absurd, in which a woman would meet a stranger & go into a dressing room for 'hanky panky' - that is what garnered the laugh. Americans know @ejeancarroll LIED to stop Trump 2024 run."[35] Yet another: "can someone please JFK this lunatic. @ejeancarroll is the most vile disgusting piece of rotten smelly putrid shit i have ever fucking seen."[36]

173.    These and other similar messages are exactly what Trump intended. Trump used a national platform to demean and mock Carroll. He egged on a laughing audience as he made light of his violent sexual assault, called Carroll names, implied that Carroll was asking to be assaulted, and dismissed the jury's verdict vindicating Carroll.

174.    At the jury trial that took place in the related action between April 25 and May 9, 2023, this Court instructed the jury concerning an award of punitive damages in connection with Trump's October 12, 2022 defamatory statement as follows: "[P]unitive damages . . . may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. . . . A statement is made with malice or it's made maliciously . . . if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights."  Both "prior or subsequent defamations" and "subsequent statements of the defendant" may reflect a defendant's malice. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 184–85 (2d Cir. 2000) (quoting *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979)). Trump's defamatory statements post-verdict show the depth of his malice toward Carroll since it

---

[34] Hank (@HankJoho), Twitter (May 13, 2023, 4:47 PM), https://twitter.com/ HankJoho/status/1657487688772235264.

[35] Dawn (@Dogs4Dawn), Twitter (May 11, 2023, 8:40 AM), https://twitter.com/ Dogs4Dawn/status/1656640433651429376.

[36] Keke Gayle McGavock (@alovelykink), Twitter (May 13, 2023, 3:02 PM), https:// twitter.com/alovelykink/status/1657461413877633026.

is hard to imagine defamatory conduct that could possibly be more motivated by hatred, ill will, or spite. This conduct supports a very substantial punitive damages award in Carroll's favor both to punish Trump, to deter him from engaging in further defamation, and to deter others from doing the same.

### CAUSE OF ACTION: DEFAMATION

175.    Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

176.    Trump published statements to the media on June 21, 22, and 24, 2019.

177.    Each of those statements identified—and was "of or concerning"—Carroll.

178.    Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

179.    Trump's false statements in June 2019 regarding Carroll were defamatory *per se*.

180.    These false and defamatory statements were published throughout New York state and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

181.    Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

182.    Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

183.    Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Carroll prays for relief as follows:

a.  Ordering Trump to retract any and all defamatory statements;

b.  Ordering Trump to pay compensatory damages in an amount to be determined at trial, but in no event less than $10 million;

c.  Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d.  Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff E. Jean Carroll hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  New York, New York
       May 22, 2023

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1051 K Street NW, Suite 1040
Washington, D.C. 20001
(202) 742-2661
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*

**A998**

# EXHIBIT B

~~SUPREME COURT OF THE STATE OF NEW YORK~~
~~COUNTY OF NEW YORK~~**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------

~~E. JEAN CARROLL,~~

                                    ~~*Plaintiff*,~~                                    ~~Index No. _____~~

~~_____ -against-~~

                                                                                        ~~**COMPLAINT AND**
                                                                                        **JURY DEMAND**~~

~~DONALD J. TRUMP, in his personal~~
~~capacity,~~

                                    ~~*Defendant*.~~

--------------------------------

E. JEAN CARROLL,

                                    *Plaintiff*,
                v.                                              No. 20 Civ. 7311 (LAK)

DONALD J. TRUMP, in his personal capacity,              **FIRST AMENDED COMPLAINT**
**AND DEMAND FOR JURY**
                                    *Defendant*.              **TRIAL**

Plaintiff E. Jean Carroll ~~("Plaintiff" or "Carroll")~~**,** by and through her attorneys at Kaplan

Hecker & Fink LLP, alleges as follows:

**INTRODUCTION**

1.      Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual

assault behind a wall of defamatory falsehoods and deflections. The ~~rape~~sexual assault of a woman

is a violent crime; compounding that crime with acts of malicious libel and slander is abhorrent.

Yet that is what Defendant Donald J. Trump did to Plaintiff E. Jean Carroll~~.~~ — repeatedly, over

several years, and even after a jury of six men and three women in this District unanimously found

him liable for sexual abuse and defamation based on a statement that was substantially similar to the ones at issue in this lawsuit.

2.    Roughly ~~23~~27 years ago, what began as playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and ~~raped~~sexually assaulted her.

3.    In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

4.    Carroll chose silence—and remained silent for over two decades.

5.    Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of ~~rape~~sexual assault was rarely believed, a woman who accused a rich, famous, violent man of ~~rape~~such conduct would ~~probably lose~~risk losing everything. She therefore reasonably concluded that if she accused Donald Trump of ~~rape~~assault, he would bury her in threats ~~and lawsuits~~, and she would probably lose her job and reputation, not to mention everything she had worked for and achieved, all of which turned out to be true.

6.    Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but actually grew *more* popular with some supporters as a result of the controversy.

7.    Carroll's mother, a ~~respected~~former Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last

**A1001**

days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.      But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.      For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think clearly, and to seek justice. When readers overcome with ~~the~~ doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10.      Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's ~~rape~~_sexual assault_ in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11.      When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the ~~rape~~_sexual assault_. But there was more: he also denied ever

3

having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of ~~lying about the rape~~fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of ~~rape~~assault. For good measure, he insulted her physical appearance.

12.     Each of these statements was false. Each of them was defamatory.

13.     Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he ~~raped~~sexually abused her, and he knew who she was in 2019. He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of ~~rape.~~sexual assault. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

14.     These lies were familiar to Trump. He had used them before, when other women stated that he had grabbed~~,~~ or groped~~, or raped~~ them.

15.     Trump's June 2019 defamatory statements injured Carroll, adding to the harm she suffered from his underlying sexual assault. They inflicted emotional pain and suffering, they damaged her reputation, and they caused substantial professional harm.

16.     But Trump's defamatory lies did not stop in 2019. He made additional, substantially similar false claims about Carroll again in October 2022 when he was a private citizen. This time, Trump posted similar smears—once again asserting that he never sexually abused Carroll, denied having known her, and asserted that she was too ugly to have assaulted—to his more than four

million followers on his own social media platform, Truth Social, damaging her reputation even further.

17.    On May 9, 2023, after a two-week trial in the Southern District of New York, a nine-person jury found that Trump had sexually abused Carroll and that his 2022 statement denying the assault on Truth Social was defamatory. The jury awarded Carroll $5 million in damages: $2.02 million for the assault, and $2.98 million for the defamation.

18.    But Trump, undeterred by the jury's verdict, persisted in maliciously defaming Carroll yet again. On the very next day, May 10, 2023, Trump lashed out against Carroll during a televised, primetime "town hall" event hosted by CNN. He doubled down on his prior defamatory statements, asserting to an audience all too ready to cheer him on that "I never met this woman. I never saw this woman," that he did not sexually assault Carroll, and that her account—which had just been validated by a jury of Trump's peers one day before—was a "fake," "made up story" invented by a "whack job." Those statements resulted in enthusiastic cheers and applause from the audience on live TV.

~~16.~~19.   Carroll filed this lawsuit to obtain redress for ~~those~~her injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

**THE PARTIES**

~~17.~~20.   Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and former advice columnist for *Elle* magazine. She is a ~~resident~~domiciliary of the State of New York.

~~18.~~21.   Defendant Donald J. Trump is ~~currently the~~ former President of the United States, ~~although~~and he is sued here only in his personal capacity. ~~Since taking~~While in office, Trump ~~has~~ filed several lawsuits in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald*

*J. Trump for President, Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v. Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136 (D.D.C.). At the time Carroll filed this suit, Trump ~~is~~was also ~~defending~~ a ~~related case pending in this Court. *See Zervos v. Trump*, No. 150522/2017 (N.Y. Sup. Ct., N.Y. Cty.). Trump is a resident~~domiciliary of the State of New York.

~~**JURY DEMAND**~~

~~19.     Plaintiff E. Jean Carroll hereby demands a trial by jury.~~

**JURISDICTION ~~&~~AND VENUE**

~~20.     This Court has jurisdiction pursuant to NY CPLR § 301.~~

~~21.     Venue is proper in this county pursuant to NY CPLR § 503 and § 509.~~


22.     Carroll initiated this action in the Supreme Court of the State of New York on November 4, 2019. The Attorney General's delegate then issued a certification pursuant to 28 U.S.C. § 2679(d)(2), and the United States removed the action to this Court on September 8, 2020. This Court thus has subject matter jurisdiction of this action. *See Osborn v. Haley*, 549 U.S. 225, 245 (2007).

23.     Venue is proper pursuant to 28 U.S.C. § 2679(d)(2). It is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

24.     Personal jurisdiction over Trump is proper pursuant to C.P.L.R. § 301, as Trump was a domiciliary of the State of New York at the time Carroll initiated this action.

**FACTUAL ALLEGATIONS**

I.    **TRUMP** ~~RAPES~~**SEXUALLY ASSAULTS** **CARROLL AT BERGDORF GOODMAN**

~~22.~~25.  One evening ~~between the fall of 1995 and~~in the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

~~23.~~26.  That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

~~24.~~27.  Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. Trump himself had appeared on Ailes's talk show, *Straight Forward*, on that network in November 1995. And Carroll's show re-ran each night at 11 p.m., right before the nightly re-run of Ailes's show. She was also on a frequent guest and commentator on the widely watched *Today* show and *Good Morning America*.

28.      Trump and Carroll had previously been photographed at a party together:



25.29.  At the 58th Street revolving glass doorway of Bergdorf's, Trump put up his hand to stop ~~her~~Carroll from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good ~~lucks~~looks, responded by saying, "Hey, you're that real estate tycoon!"

26.30.  Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

27.31.  Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

28.32.  As Trump ~~cuddled~~petted the fur hat, Carroll asked how old "the girl" was. Trump did not answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years old, he taunted her, "You're so *old*!"

29.33.  Trump then had an idea: He would buy lingerie instead.

30.34.  Trump and Carroll rode up the escalator to the lingerie department. When they arrived, it was ~~uncharacteristically~~ empty, with no sales attendant in sight, as was not uncommon past 6 p.m. on a Thursday night in the spring of 1996. Sitting on the counter near them were two or three boxes and a see-through bodysuit in lilac gray.

31.35.  Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit.

32.36.  Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

33.37.  Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself that she would make him put the bodysuit on over his pants.

34.38.  Strangely forAs was not uncommon at Bergdorf's during this period, the dressing room door was open and unlocked.

35.39.  Trump closed the door of the dressing room.

36.40.  Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips.

37.41.  Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter. She could hardly process the insanity of the situation. She also hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

38.42.  But Trump did not stop. He seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

39.43.  Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

40.44.  Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

41.45.  Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

42.46.  The whole attack lasted ~~two to three~~only a few minutes.

## II.   CARROLL CONFIDES IN TWO FRIENDS ABOUT THE ~~RAPE~~SEXUAL ASSAULT

43.47.  As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

44.48.  Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

45.49.  "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a ~~rape~~ victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

46.50.  Carroll drove home and crawled straight into bed.

47.51.  Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the ~~rape~~incident. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

48.52.  Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

49.53.  Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

50.54.  Carroll was also afraid of being dragged through the mud if she reported the rape.sexual assault. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had rapedassaulted her because she had entered that Bergdorf dressing room.

51.55.  Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

52.56.  Carroll thus chose silence.

53.57.  Carroll did not mention the rapesexual assault again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

54.      Carroll has not had sex with anyone since that day when Trump raped her.

III.    **CARROLL REMAINS SILENT FOR TWENTY YEARS**

55.58.  For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask*

*E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

56.59.  Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

57.      One reader, for example, despaired in 1994, "My boss is always rubbing up against me . . . . He scares me because he's very powerful and could ruin me." Carroll responded: "Darling, if the old snake has done so much to help your career, why are you still an assistant? Sex harassers are filthy yellow sneaking cowards and must be won over, or crushed . . . . If all else fails, next time the old waterhead touches you, give him a knee in the groin. You've got nowhere to go but up."²

58.      Another reader had been raped when thirteen years old and sought advice from Carroll because her rapist had just been hired as a co-worker. Carroll responded: "[T]he gentleness of your [letter] speaks strongly for your forgiving nature; however, it makes my duty *very* difficult. Because now I must harden your soul. I must twist a little bit of steel—I'd try a big block of metal if I could—around your backbone, and persuade you to report your friend to the police."³ Carroll added:

"First, call your rape crisis center and speak with a counselor. Second, join a group of rape survivors—with their hardy support, you'll start constructing a world for *yourself* and leave the world the rapist built for you. And, third, find another job at

_____

²*Reprinted in* E. JEAN CARROLL, A DOG IN HEAT IS A HOT DOG AND OTHER RULES TO LIVE BY 28–29 (1996).

³*Id.* at 141–42.

~~once. (Do *not* tell your employer about the rape. Do *not* inform the rapist of these steps. Stay cool. He's dangerous.)"~~[4]

~~59.~~60.  In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

~~60.~~61.  But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

~~61.~~62.  During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their ~~appearance~~appearances.

~~62.~~63.  And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had ~~raped~~assaulted her.  But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

---

[4] ~~*Id.* at 142.~~

63.64.  Indeed, Carroll worried that she might make Trump *more* popular in states like Indiana by revealing the ~~rape~~sexual assault, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

64.65.  Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

65.66.  Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

## IV.   CARROLL DECIDES TO SPEAK OUT

66.67.  On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women in the film industry.[5] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

---

[5] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

67.68.  Days later, several women accused Weinstein of rape.[6] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

68.69.  As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

69.70.  Carroll was profoundly moved by this experience. The walls that she had erected in her mind—the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being rapedsexually assaulted—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

70.71.  Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

71.72.  These observations leadled Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her

---

[6] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

(largely female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

72.73.  These internal reflections loomed larger in her mind—and became inescapable—as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

73.74.  Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

74.75.  While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

75.76.  Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who rapedsexually abused her when she was 52. Carroll described that attack in detail.

76.77.  Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to

act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

77.78.   In her book, Carroll truthfully described, in meticulous detail, the ~~rape~~sexual assault in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely—~~—~~, I'm not certain—inside me."[7]

78.79.   She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them~~, never sounded~~ doesn't sound like much fun. Also, I'm a coward."[8]

79.80.   At noon on June 21, 2019, *New York* magazine published Carroll's account of the ~~rape~~sexual assault on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut,* a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

80.81.   Carroll's book was released by St. Martin's Press on July 2, 2019.

## V.   TRUMP REPEATEDLY DENIES ~~RAPING~~SEXUALLY ASSAULTING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

81.82.   In three statements—published on June 21, 22, and 24, 2019, respectively—Trump responded to Carroll by denying the attack and publicly, falsely, and maliciously smearing her reputation.

82.83.   On June 21, 2019, Trump issued the following public statement:

---

[7] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[8] *Id.* at 244.

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

83.84.  Upon information and belief, Trump's June 21, 2019 statement was first given to the press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[9]

84.85.  Trump's June 21, 2019 statement was subsequently shared online by other journalists and covered by many leading news sources as Trump's statement in response to Carroll.[10]

---

[9]  *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

[10]  *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam

85.86.  In the June 21, 2019 statement, Trump falsely stated that he did not ~~rape~~sexually assault Carroll.

86.87.  In the June 21, 2019 statement, Trump falsely stated that he had never met Carroll.

87.88.  In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

88.89.  In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented ~~the rape accusation~~her allegations as a ploy for increased book sales.

89.90.  In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented ~~the rape accusation~~her allegations to carry out a political agenda.

_____

Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

90.91.  In the June 21, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusationher allegations as part of a conspiracy with the Democratic Party.

91.92.  On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[11]

~~92.~~93.  Like his first statement, Trump's June 22, 2019 statement regarding Carroll was widely reported in the national press.[12]

~~93.~~94.  In the June 22, 2019 statement, Trump falsely stated that he did not ~~rape~~sexually assault Carroll.

~~94.~~95.  In the June 22, 2019 statement, Trump falsely stated that he had no idea who Carroll was.

~~95.~~96.  In the June 22, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

~~96.~~97.  In the June 22, 2019 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent ~~the rape accusation~~allegations against him.

---

[11] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[12] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will"*: *Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

97.98.  Two days later, on June 24, 2019, *The Hill* released an interview in which Trump

made the following statement in response to Carroll: "I'll say it with great respect: Number one,

she's not my type. Number two, it never happened. It never happened, OK?"[13]

98.99.  Trump's statement in *The Hill* was widely reported by the national press.[14]

99.100.      This insulting statement was consistent with Trump's response to other

accusations of sexual assault. About one woman, Jessica Leeds, who claimed he groped her and

tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump

told crowds at a rally, "Believe me. She, she would not be my first choice. That, that I can tell

---

[13] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[14] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type"*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

you."[15] He ~~reportedly~~ called ~~that same woman~~Leeds "the cunt on the airplane" when he ran into

her at a charity gala years after the assault.[16] About a second woman, Natasha Stoynoff, who

claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing

him for a magazine, Trump said to crowds at another rally, "Take a look.~~You~~, you take a look.

Look at her, [then] look at her words.~~You~~, you tell me what you think.~~I don't think so.~~ I don't

think so."[17] Indeed, Trump often responds to claims that he has behaved inappropriately by

simultaneously attacking the individual's credibility and attractiveness. When a female journalist

quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted

later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[18]

~~100.~~101.      In the June 24, 2019 statement, Trump falsely stated that he did not

~~rape~~sexually assault Carroll.

~~101.~~102.      On June 27, 2019, Birnbach and Martin went on the record to corroborate

Carroll.[19]

~~102.~~103.      Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll]
did say, he put his penis in me. And I said—my face just did it. What? He raped
you? And [Carroll] said, eh~~, he.~~ He kept pulling down—he pulled down my tights.
He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's
go to the police. [Carroll said,] No. [Birnbach said,] Come to my house. [Carroll

---

[15] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

[16] BARRY LEVINE & MONIQUE EL-FAIZY, ALL THE PRESIDENT'S WOMEN: DONALD TRUMP AND THE MAKING OF A PREDATOR 72 (2019).

[17] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[18] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, HOLLYWOOD REP. (Oct. 13, 2016).

[19] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. TIMES (June 27, 2019).

said,] No. I want to go home. [Birnbach said,] I'll take you to the police. [Carroll said,] No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[20]

~~103.~~104.        Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you, [Carroll], you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[21]

~~104.~~105.        Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[22]

~~105.~~106.        Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[23]

## VI.   TRUMP'S FALSE STATEMENTS ABOUT CARROLL IN JUNE 2019 WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

~~106.~~107.        The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

~~107.~~108.        Trump knew who Carroll was at the time he ~~raped~~sexually assaulted her. And Trump also knew who Carroll was when he made his false statements in June 2019.

109.    Trump was photographed with Carroll in the years prior to the assault.

~~108.~~110.        Trump identified Carroll on sight as the "advice lady" when they met at Bergdorf Goodman.

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump*, N.Y. TIMES (June 27, 2019).

~~109.~~111.        In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

~~110.    In 1987, Trump and Carroll were photographed at a party together:~~



~~111.~~112.        Trump has stated that he possesses "one of the great memories of all time."[24]

~~112.~~113.        Trump has also described himself as a "very stable genius."[25]

~~113.~~114.        In June 2019, Trump knew it was false to state that he had never met Carroll.

~~114.~~115.        In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

~~115.~~116.        In June 2019, Trump knew it was false to state that he had never ~~raped~~sexually assaulted Carroll.

---

[24] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

[25] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

116.117.      Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the ~~rape~~ accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

117.118.      ~~Moreover,~~ Trump has admitted that he lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he ~~raped her at Bergdorf Goodman.~~ sexually assaulted her at Bergdorf Goodman. Trump had no knowledge of Carroll's financial circumstances or the details of Carroll's book deal, and he had no knowledge of Carroll's political affiliation or party registration. Trump did not personally investigate any of the relevant factual circumstances, nor did he instruct anyone else on his White House staff to do so. Indeed, Trump has admitted that neither he nor anyone on his staff reached out to Bergdorf Goodman prior to his June 2019 statements, in which he thanked the store for "confirming they have no video footage of any such incident." Additionally, although Trump requested in his June 21, 2019 statement to be notified if "anyone has information that the Democratic party is working with Ms. Carroll," he testified in his deposition that he could recall no one ever providing any such information. And since all of these statements about Carroll were made to impute motives for lying, when in fact he knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

118.119.      Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. When he made his June 2019 statements, Trump had not read the excerpt of Carroll's book in which certain of these allegations

appeared and had no knowledge of their truth or falsity. As of his October 19, 2022 deposition, Trump had not read the excerpt or any other part of Carroll's book either. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

119.120.    Carroll did not reveal Trump's rapesexual assault for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a rapesexual assault accusation—was false.

120.121.    To the contrary, Carroll feared that revealing Trump's rapesexual assault would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

121.122.    With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

122.123.    Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

123.124.        In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting

women in almost exactly the same manner that he had ~~raped~~sexually assaulted Carroll:

> "I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was
> looking at, whom he had never met before]. You know, I'm automatically attracted
> to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even
> wait. And when you're a star, they let you do it. You can do anything. . . . Grab
> ~~them~~'em by the pussy. You can do anything. . . . ~~Oh~~Ooh, [she has] nice legs,
> huh?"[26]

124.125.      Based on Carroll's own experiences, Trump's 2005 statement was not

"locker room talk" or mere braggadocio. It was a true description of how Trump believes he can

treat women—and of how he *has* treated them on many occasions, including at Bergdorf

Goodman.

~~125.    Indeed, Trump has openly suggested that sexual assault is inevitable when men and~~

~~women interact. In 2013, for instance, he tweeted: "26,000 unreported sexual assults [sic] in the~~

~~military . . . . What did these geniuses expect when they put men & women together?"[27]~~

~~126.    In addition to Carroll, Trump has been accused publicly by over a dozen women of~~

~~forcibly kissing them, groping them above or below the waist, or attempting to rape them—often~~

~~upon meeting him for the very first time. Those women include Jill Harth, Jessica Leeds, Cathy~~

~~Heller, Temple Taggart McDowell, Karena Virginia, Bridget Sullivan, Tasha Dixon, Mindy~~

~~McGillivray, Rachel Crooks, Natasha Stoynoff, Summer Zervos, and Cassandra Searles. Trump~~

~~has responded to their accusations in a manner eerily similar to the statements he made about~~

~~Carroll in June 2019.~~

127.126.      ~~A recently published book by Barry Levine and Monique El-Faizy~~

~~documents 67 incidents of alleged inappropriate behavior by Trump toward women, including 26~~

---

[26] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

~~[27] Daniella Diaz, *Trump Defends Tweet on Military Sexual Assault*, CNN (Sept. 8, 2016).~~

~~allegations of unwanted sexual contact. Forty-three of the allegations of inappropriate behavior in~~ ~~the book had not been previously reported.[28] The book traces "Trump's transformation from a kid~~ ~~from Queens to high school 'ladies' man' into a womanizing, model-chasing, porn-star-~~ ~~frequenting philanderer," who "repeatedly and systematically engaged in aggressive sexual pursuit~~ ~~of women over the course of many decades."[29] In one instance, Karen Johnson describes Trump~~ ~~hiding behind a tapestry at his Mar-a-Lago home during a party and, when she walked by to use~~ ~~the restroom, grabbing her by the genitals, pulling her toward him, and kissing her without~~ ~~consent.[30] In another, Kristin Anderson describes Trump putting his hands up her skirt and~~ ~~touching her vagina through her underwear in a Manhattan nightclub. Trump denied that could~~ ~~have happened because he never would have been at a nightclub alone.[31]~~ Indeed, Trump has emphasized that stars have been able to grab women by their genitals for "the last million years"—a circumstance that he suggested might be "fortunate[]" for stars like him.

127.    Trump thus knew he was lying when he said that Carroll had fabricated her ~~rape~~ accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth~~.~~, for purely personal reasons. He knew she was telling the truth because he knew who she was and he knew that he had ~~raped~~sexually assaulted her, just as he had sexually assaulted ~~many~~ other women over many years.

---

~~[28] *See* LEVINE & EL-FAIZY, *supra* n.16, at 2.~~

~~[29] *Id.* at 2-3.~~

~~[30] *Id.* at 80-82, 88, 254.~~

~~[31] *Id.* at 250-51.~~

## VII.   TRUMP'S FALSE STATEMENTS ABOUT CARROLL IN JUNE 2019 WERE MADE FOR PURELY PERSONAL REASONS

128.   In making the June 2019 statements, Trump was motivated by purely personal reasons, rather than presidential or official reasons.

129.   At the time Trump made his statements in June 2019, nobody in the White House (to Trump's knowledge) had undertaken any research into Carroll or her allegations.

130.   Thus, at the time Trump made his statements in June 2019, neither Trump nor (to his knowledge) any of his White House aides had conducted any research or investigation into Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors (or lack thereof), her reasons for speaking up, or the veracity of her allegations concerning experiences of sexual misconduct at the hands of other men.

131.   At the time Trump made his statements in June 2019, neither Trump nor (to his knowledge) any of his White House aides had contacted Bergdorf Goodman about this matter.

132.   At the time Trump made his statements in June 2019, Trump had not read Carroll's book excerpt and had no firsthand knowledge of her statements concerning his sexual assault.

133.   At his deposition in this case, Trump did not identify *any* White House personnel as involved in investigating, preparing, strategizing, or creating his June 2019 statements. Nor did he identify any other administration official as playing any role at all in the June 2019 statements, or any official meetings focused on Carroll's allegations or his response that he attended, organized, requested, or proposed.

134.   For example, Trump testified that he did not recall speaking about Carroll's allegations with Mick Mulvaney (Trump's acting Chief of Staff at the time of his June 2019 statements) or Emma Doyle (his Principal Deputy Chief of Staff). He testified that he did not speak with Sarah Sanders (his Press Secretary at the time of the June 2019 statements) or Hope Hicks

(his Communications Director). And he has alternately denied speaking to or said he had "not much" conversation with Stephanie Grisham (whom Trump promoted to Press Secretary and Communications Director on June 25, 2019).

135.   In fact, at Trump's deposition, the *only* individuals at all associated with the Executive Branch with whom Trump recalled speaking about Carroll's allegations were two of his family members: First Lady Melania Trump and his daughter, Ivanka Trump, who served in an unpaid advisory position during Trump's presidency.

136.   The fact that Trump discussed Carroll's allegations only with his wife and daughter— and did not discuss Carroll's allegations or his response in June 2019 with White House or Executive Branch political officials—reflects the personally motivated nature of his conduct.

137.   The nature and content of Trump's statement further betrayed his personal motives, and revealed his ill will and spite toward Carroll. Trump did not simply deny Carroll's allegations in his June 2019 statements, but instead launched deeply personal attacks. Trump implied that Carroll was too ugly for him to sexually assault, falsely stated that Carroll had previously lodged fake allegations of sexual misconduct against other men, and invented a baseless narrative that Carroll fabricated her accusation for money, to promote a book, or to further a political conspiracy—without possessing or pointing to one iota of support for those claims.

138.   When asked at his deposition in this action whether his statements were intended to punish Carroll, Trump initially denied it, but then stated: "She made a false charge. People shouldn't be allowed to make false charges."

139.   Trump's private motives are underscored by the fact that he later made materially identical defamatory statements about Carroll (detailed below) in his capacity as a private citizen. These statements included substantively similar, strikingly personal lies. In October 2022, for

example, Trump again defamed Carroll, denigrating her as not his "type" and claiming that he didn't know her, had never met her, and her account of being sexually assaulted by him was a "[h]oax and a lie" and a "scam" to "promot[e] a really crummy book." More recently, in May 2023 and following an adverse jury verdict, Trump demeaned Carroll once more, making light of his assault by referring to it as "hanky-panky" and stating that he had "no idea who the hell she is."

~~128.~~140.    This pattern of personally motivated attacks not only persisted long after Trump left elected office; it also preceded his election in 2016. Trump has a long history of viciously demeaning women who credibly accuse him of sexual assault. It's his personal *modus operandi*. Put differently, Trump has a playbook that he uses to attack women who reveal his own sexual misconduct, and that conduct arises from private motives rather than any governmental purpose.

### ~~VII.~~**VIII.**    **CARROLL SUFFERS REPUTATIONAL AND OTHER HARM**

~~129.~~141.    Trump's false and insulting ~~statements~~claims about Carroll in June 2019 were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

~~130.~~142.    Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

~~131.~~143.    Carroll endured stoically when she kept secret the fact that Trump had ~~raped~~sexually assaulted her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since used ~~that~~his platform—now as a candidate for President—to repeatedly attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

132.144.        TheseTrump's defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who rapedsexually assaulted her, as well as injury to her reputation, honor, and dignity.

133.145.        Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

134.146.        Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

147.    In all, and based on conservative assumptions, Trump's June 2019 defamatory statements generated between 142,334,424 and 188,155,507 impressions across various media. An estimated 34,075,512 to 42,936,354 of these were receptive impressions—*i.e.*, impressions involving individuals likely to believe Trump's false claims about Carroll. As a result, the minimum appropriate corrective campaign, as calculated by Professor Ashlee Humphreys, would cost at least $10 million.

135.148.        Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

~~136.~~149.  Carroll filed this lawsuit to obtain redress for those injuries.

## IX.  A JURY FINDS TRUMP LIABLE FOR BATTERY AND DEFAMATION IN *CARROLL II*

150.  As part of his defense to this action, Trump has claimed various immunities from liability by virtue of his status as President at the time he made his June 2019 defamatory statements. Trump's efforts to obtain immunity have contributed to years of delay that have extended forward to today.

151.  These delays have given Trump further opportunity to inflict further harm on Carroll. In due course, he seized on it.

152.  On October 12, 2022, nearly three years after Carroll filed this action, Trump posted a lengthy message on his personal account on Truth Social, a social media platform created by Trump as an alternative to Twitter. In that statement, Trump substantially repeated his June 2019 defamatory statements:

> "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country."

He then continued:

"In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"[32]

153.    Trump published the October 12, 2022 statement to his more than four million followers on Truth Social. Around the same time, Trump emailed the statement to a listserv of supporters, and it was widely reported in the press, reaching millions upon millions of people.

154.    On November 24, 2022, Carroll sued Trump for defamation for the harms that she incurred as a result of the October 12, 2022 statement. *See Carroll v. v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) ("*Carroll II*"). As part of that lawsuit, Carroll also brought a claim for battery pursuant to New York's Adult Survivors Act relating to the underlying sexual assault. That Act revived certain battery claims for a one-year period if the conduct of the defendant would have constituted a sex offense as defined in Article 130 of the New York Penal Law. C.P.L.R. § 214-j.

155.    Trial in *Carroll II* began on April 25, 2023. The Court empaneled an anonymous jury of nine members, including six men and three women.

156.    Over the next two weeks, Carroll presented eleven witnesses who corroborated key aspects of her account. Those included Birnbach and Martin, the two friends who Carroll told of the assault right after it happened; two former employees of Bergdorf's who worked at the store during the period when the assault occurred; a psychological expert who testified that Carroll's reaction to and damages from the assault were consistent with responses to sexual trauma more generally; a defamation damages expert who testified regarding the significant harm that Carroll's reputation suffered as a result of the October 12, 2022 statement; two women who Trump had

---

[32] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 12, 2022, 10:38 PM), https://truthsocial.com/@realDonaldTrump/posts/109158644496040450.

assaulted in remarkably similar ways; Carroll's sister; Carroll's former boss at *Elle* magazine; and Carroll herself. An aggressive cross-examination of Carroll, in which Trump's attorney sought to undermine her credibility by asking why she didn't scream when Trump assaulted her and whether having someone "rummage around in" her vagina was different than having someone insert a finger in her vagina, took up almost two full trial days.

157.    Trump, for his part, chose not to testify—or to attend any of the trial at all. Instead, he let the jury hear from him only through video excerpts of the deposition taken in this action on October 19, 2022. Trump called no witnesses of his own.

158.    After the parties rested and presented their closing arguments, the Court instructed the jury on the morning of May 9, 2023. Less than three hours later, the jury reached a verdict.

159.    On the first count, battery, the jury found in favor of Carroll. The jury determined by a preponderance of the evidence that Trump sexually abused her in the dressing room at Bergdorf's—*i.e.*, that Trump subjected Carroll to sexual contact (meaning any touching of the sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either person), without her consent, by the use of forcible compulsion (meaning intentionally to compel by the use of physical force). *See* N.Y.P.L. § 130.65. The jury awarded Carroll $2 million in compensatory damages for this claim.

160.    The jury also determined by a preponderance of the evidence that Trump's sexual abuse was willfully or wantonly negligent, reckless, or done with a conscious disregard of Carroll's rights or was so reckless as to amount to such disregard. Accordingly, the jury awarded Carroll $20,000 in punitive damages.

161.    On the second count, defamation, the jury also found in favor of Carroll. It determined by a preponderance of the evidence that Trump's October 12, 2022 statement—in

which Trump denied knowing Carroll, claimed he "had nothing to do with" her, and insisted that Carroll had "completely made up" the incident at Bergdorf's—was defamatory.[33] The jury further determined by clear and convincing evidence that Trump's statement was false and that Trump had made it with actual malice. After determining that Carroll was injured by Trump's statement, the jury awarded her $2.7 million in compensatory damages.

162. The jury also found that Trump had acted maliciously, out of hatred, ill will, or spite, or with wanton, reckless, or willful disregard of Carroll's rights in making his October 12, 2022 statement and awarded Carroll $280,000 in punitive damages.

163. In total, the jury held Trump liable for $5 million in damages.

## X. TRUMP AGAIN DENIES SEXUALLY ABUSING CARROLL AND MAKES A SLEW OF FALSE, INSULTING CLAIMS ABOUT HER

164. Immediately after the verdict was announced, Trump began lashing out in response. He started by posting various messages and videos on his Truth Social account decrying the verdict, and disparaging Carroll, the jury, and the judicial system more generally.

165. Mere minutes after the verdict became public, Trump repeated the defamatory lie that he had no idea who Carroll was and again claimed that her accusation of sexual assault was politically motivated: "I HAVE ABSOLUTELY NO IDEA WHO THIS WOMAN IS. THIS

---

[33] The jury was directed to consider those portions of the October 12, 2022 about Carroll—*i.e.*, where Trump called Carroll's accusation "a complete con job" and "a Hoax, and a lie"; stated that Carroll "completely made up a story that I met her at the doors of this crowded New York City department store and, within minutes 'swooned' her"; claimed that his sexual abuse "never happened" and that "Carroll is not telling the truth"; asserted that Carroll "changed her story from beginning to end" during a CNN interview; insinuated that Carroll fabricated her accusation as part of "a complete Scam" to "promot[e] a really crummy book"; asserted that he "didn't know" and "had nothing to do with" Carroll; stated that he "would have no interest in knowing her if [he] ever had the chance"; and insisted that she was not his "type."

VERDICT IS A DISGRACE – A CONTINUATION OF THE GREATEST WITCH HUNT OF ALL TIME!"[34]

166.    Shortly after midnight that night, Trump followed up with another Truth Social post attacking the "partisan Judge & Jury on the just concluded Witch Hunt Trial," and again insisting that the "Hoax" (Carroll's suit and the ensuing trial) was part of a political conspiracy.[35]

167.    Less than an hour later, Trump once again insisted that Carroll's accusation and suit were a "Rigged Hoax," "yet another TRAVESTY OF JUSTICE," and "a continuation of the greatest political Witch Hunt of all time!!!"[36]

168.    Then, in the evening of May 10, 2023, CNN hosted a primetime town hall event in New Hampshire. Trump received questions from the audience and the event's moderator, Kaitlan Collins. Early in the broadcast, Collins turned to the prior day's jury verdict. Trump responded to her questions by repeating many of the same defamatory statements for which the jury had just found him liable the day before:

COLLINS: This was a jury of nine people who found you –

TRUMP: That's right.

COLLINS: – liable of sexual abuse. Do you think that – that will deter women from voting for you?

TRUMP: No, I don't think so because I think the whole thing – just so you understand – ready? I never met this woman. I never saw this woman. This woman said I met her at the front door of Bergdorf Goodman which I never go into other than for a couple of charities. I met her in the front door. She was about 60 years. This is like 22, 23 years ago. I met her in the front door of Bergdorf Goodman. I was immediately attracted to her and she was immediately attracted to me. And we

---

[34]   Donald J. Trump (@realDonaldTrump), Truth Social (May 9, 3:29 PM), https://truthsocial.com/@realDonaldTrump/posts/110340379870475514.

[35]   Donald J. Trump (@realDonaldTrump), Truth Social (May 10, 12:34 AM), https://truthsocial.com/@realDonaldTrump/posts/110342521655891366.

[36]   Donald J. Trump (@realDonaldTrump), Truth Social (May 10, 1:20 AM), https://truthsocial.com/@realDonaldTrump/posts/110342704670441764.

had this great chemistry. We're walking into a crowded department store. We had this great chemistry. And a few minutes later, we end up in a room, a dressing room of Bergdorf Goodman, right near the cash register. And then she found out that there were locks in the door. She said, I found one that was open. She found one, she learned this at trial. She found one that was open. What kind of a woman meet somebody and brings them up and within minutes, you're playing hanky-panky in a dressing room, okay? I don't know if she was married then or not. John Johnson, I feel sorry for you, John Johnson.

COLLINS: Mr. President, can I – can I ask you this?

TRUMP: Think of it, think of this –

COLLINS: I know you're recounting what you said but, Mr. President –

TRUMP: But let me just, if I could because you asked a question.

COLLINS: This was a jury though –

TRUMP: Just so you understand, because I was walking in at a department – because I was very famous then and I owned the Plaza Hotel right next door and I owned the buildings around it. I'm not going into a dressing room of a crowded department store. Then I say, if she was being raped – and by the way, they said she wasn't raped, okay? That was her charge. It wasn't –

COLLINS: They found that you sexually abused her.

TRUMP: Oh, that was – say what the – they didn't – they said he didn't rape her.

COLLINS: They did not say –

TRUMP: And I didn't do anything else either. You know what? Because I have no idea who the hell she is. I don't know who this woman is.

COLLINS: But, Mr. President, can I – can I ask you given your recounting and your version –

TRUMP: I don't know who – and I tell you this. Are you ready?

COLLINS: But, Mr. President, can I – can I ask you because –

TRUMP: And I swear on my children, which I never do. I have no idea who this woman. This is a fake story, made up story. We had a horrible Clinton-appointed judge. He was horrible. He allowed her to put everything in. He allowed us to put nothing in. This is a fake story.

COLLINS: Mr. President, you're recounting your version of events here right now to the audience. You reference the trial. You did not go to the trial and actually testify.

TRUMP: That's right.

COLLINS: Do you wish that you had testified?

TRUMP: No, it wouldn't have made a difference. This is rigged deal. This was a – my lawyer said, sir, you don't have to do it. I actually said, I think I should, it would be disrespectful. They said, sir, don't do it. This is fake story and you don't want to give it credibility.

COLLINS: One thing you –

TRUMP: That's why I didn't go.

COLLINS: One thing you did do in this –

TRUMP: And I swear and I've never done that, and I swear to – I have no idea who the hell – she's a whack job.[37]

169.    During the exchange, Trump falsely stated that he did not sexually abuse Carroll, that he has no idea who Carroll was, and that Carroll's now-proven accusation was a "fake" and "made up story" created by a "whack job." Trump also insulted Carroll's character and downplayed his sexual abuse of her by asking "what kind of woman meets someone" and then "within minutes" plays "hanky-panky in a dressing room."

170.    Approximately 3.3 million viewers watched the CNN broadcast during which this exchange took place.[38] Viewers heard the studio audience applauding and laughing along uproariously to Trump's comments. The entire segment ran from 8:00 p.m. to 9:15 p.m. During that time, CNN was the most-watched cable news network, more than doubling the ratings of Fox

---

[37] *READ: Transcript of CNN's Town Hall with Former President Donald Trump*, CNN (May 11, 2023).

[38] Ted Johnson, *CNN's Donald Trump Town Hall Wins Time Slot With 3.3 Million Viewers — Update*, DEADLINE (May 11, 2023).

News and MSNBC.[39] CNN reported that the program was the network's second most-viewed single-candidate town hall since 2016.[40]

 171. Trump's statements about Carroll were also widely reported in the press.[41]

---

[39] *Id.*

[40] *Id.*

[41] *E.g.*, Benjamin Weiser, Lola Fadulu, and Kate Christobek, *E. Jean Carroll May Sue Trump a Third Time After 'Vile' Comments on CNN*, N.Y. Times (May 11, 2023); Claire Lampen, *Donald Trump Still Claims He Doesn't Know E. Jean Carroll*, Cut (May 11, 2023); Steve Peoples, *Trump turned his liabilities into laugh lines at CNN town hall, underscoring GOP rivals' challenge*, Associated Press (May 11, 2023); Peter Sblendorio, *Donald Trump's 'disastrous' CNN town hall elicits strong reactions*, N.Y. Daily News (May 11, 2023); Kierra Frazier, *CNN's own employees are disparaging the Trump town hall*, Politico (May 11, 2023); Abigail Weinberg, *Trump Mocked E. Jean Carroll Live on CNN. The Audience Laughed*, Mother Jones (May 11, 2023); Laura Italiano and Natalie Musumeci, *Sex-assault survivors unleash a firestorm of anger at CNN letting Trump try to re-victimize E. Jean Carroll by dismissing his abuse as 'hanky panky'*, Insider (May 11, 2023); *Fact-checking Trump's CNN town hall in New Hampshire*, CNN (May 11, 2023); Christian Blauvelt, *CNN Trump Town Hall Backlash Grows After Verdict in E. Jean Carroll Case*, Indie Wire (May 10, 2023); Kyler Alvord, *Trump Draws Laughter, Applause as He Mocks E. Jean Carroll During CNN Town Hall*, People Mag. (May 11, 2023); Brian Bennett, *Trump Uses CNN Town Hall to Mock E. Jean Carroll After a Jury Found Him Liable For Sexually Abusing Her*, Time (May 10, 2023); *Trump takes aim at E. Jean Carroll at CNN town hall after lawsuit loss*, Axios (May 10, 2023); Jill Colvin, *Trump Digs In On Election Lies, Insults Accuser During CNN Town Hall Event*, Associated Press (May 11, 2023); Domenico Montanaro, *Trump Continues Lies About Election And Lashes Out After N.Y. Verdict In Town Hall*, NPR (May 10, 2023); Kevin Breuninger, *Trump pushes false election claims, mocks E. Jean Carroll to applause during CNN town hall*, CNBC (May 10, 2023); Nikki McCann Ramirez, *Trump Mocks E. Jean Carroll at Town Hall, as His Fans Cheer Him On*, Rolling Stone (May 10, 2023); Brett Samuels, *Trump calls E. Jean Carroll a 'whack job' after sexual abuse verdict*, Hill (May 10, 2023); Ursula Purano, *Trump Abused and Defamed E. Jean Carroll All Over Again on CNN*, Daily Beast (May 10, 2023); Patrick Reilly, *Trump claims E. Jean Carroll trial was rigged after he was found liable of sexual abuse, defamation*, N.Y. Post (May 10, 2023); Chris Stein, *Trump town hall live: ex-president repeats election lies and denies sexual abuse verdict to mostly Republican crowd*, Guardian (May 10, 2023); Michelle L. Price, *What to know about Trump's CNN town hall: Lies about election and abortion, attacks on accuser*, Associated Press (May 10, 2023); Isaac Arnsdorf and Maeve Reston, *Trump's CNN town hall: Defending rioters, mocking sexual assault, threatening default*, Wash. Post (May 10, 2023); Jeremy Herb, *Trump again refuses to concede 2020 election while taking questions from New Hampshire GOP primary voters*, CNN (May 10, 2023); Kathryn Watson, Jacob Rosen, and Olivia Rinaldi, *Trump CNN town hall highlights include comments on E. Jean Carroll verdict, Jan. 6 and more*, CBS News (May 11, 2023); Allan Smith, *Trump dismisses his sex abuse verdict and gloats that it will help his 2024 bid*, NBC News (May 10, 2023); Nathan Layne and Tim Reid, *Trump jokes about sexual abuse*

**A1040**

172.    Supporters of Trump echoed many of the lies and demeaning remarks that Trump made about Carroll. One Twitter user wrote: "@ejeancarroll You've not won a thing. You've just proven what men have known for years: once women are short of cash you fabricate a crock of shite to fund your plastic lifestyle. A two-bit money grabbing whore who belongs in an asylum. Such antics are typical of cretins."[42] Another wrote: "They laughed when Trump provided a scenario, absolutely so absurd, in which a woman would meet a stranger & go into a dressing room for 'hanky panky' - that is what garnered the laugh. Americans know @ejeancarroll LIED to stop Trump 2024 run."[43] Yet another: "can someone please JFK this lunatic. @ejeancarroll is the most vile disgusting piece of rotten smelly putrid shit i have ever fucking seen."[44]

~~137.~~173.    These and other similar messages are exactly what Trump intended. Trump used a national platform to demean and mock Carroll. He egged on a laughing audience as he made light of his violent sexual assault, called Carroll names, implied that Carroll was asking to be assaulted, and dismissed the jury's verdict vindicating Carroll.

---

*verdict, repeats election falsehoods*, REUTERS (May 10, 2023); Brent D. Griffiths, *Trump insulted the woman he was found liable of sexually abusing — and CNN's audience laughed at it*, INSIDER (May 11, 2023); Ed Kilgore, *Trump's CNN Town Hall Was a MAGA Rally*, N.Y. MAG. (May 10, 2023); Brian Niemietz, *Donald Trump bashes E. Jean Carroll, repeats 2020 election lies in CNN town hall*, N.Y. DAILY NEWS (May 10, 2023); Mel Leonor Barclay, *Trump uses CNN town hall to insult a woman he assaulted*, 19TH (May 10, 2023); Meredith Deliso and Will McDuffie, *Trump denies knowing E. Jean Carroll during CNN town hall: 'I swear on my children'*, ABC NEWS (May 10, 2023); Ryan Gajewski, *CNN Town Hall Audience Members Laugh, Cheer as Trump Talks About E. Jean Carroll Sexual Abuse Verdict*, HOLLYWOOD REP. (May 10, 2023).

[42]  Hank (@HankJoho), Twitter (May 13, 2023, 4:47 PM), https://twitter.com/HankJoho/status/1657487688772235264.

[43]  Dawn (@Dogs4Dawn), Twitter (May 11, 2023, 8:40 AM), https://twitter.com/Dogs4Dawn/status/1656640433651429376.

[44]  Keke Gayle McGavock (@alovelykink), Twitter (May 13, 2023, 3:02 PM), https://twitter.com/alovelykink/status/1657461413877633026.

174.    At the jury trial that took place in the related action between April 25 and May 9, 2023, this Court instructed the jury concerning an award of punitive damages in connection with Trump's October 12, 2022 defamatory statement as follows: "[P]unitive damages . . . may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. . . . A statement is made with malice or it's made maliciously . . . if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights." Both "prior or subsequent defamations" and "subsequent statements of the defendant" may reflect a defendant's malice. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 184–85 (2d Cir. 2000) (quoting *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979)). Trump's defamatory statements post-verdict show the depth of his malice toward Carroll since it is hard to imagine defamatory conduct that could possibly be more motivated by hatred, ill will, or spite. This conduct supports a very substantial punitive damages award in Carroll's favor both to punish Trump, to deter him from engaging in further defamation, and to deter others from doing the same.

**CAUSE OF ACTION: DEFAMATION**

138.175.    Plaintiff Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

139.176.    Trump published statements to the media on June 21, 22, and 24, 2019.

140.177.    Each of those statements identified—and was "of or concerning"—Carroll.

141.178.    Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

142.179.    Trump's false statements in June 2019 regarding Carroll were defamatory *per se*.

143.180.     Trump'sThese false and defamatory statements were published throughout New York Statestate and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

144.181.     Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

145.182.     Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

146.183.     Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Carroll prays for relief as follows:

a. Ordering Trump to retract any and all defamatory statements;

b. Ordering Trump to pay compensatory damages in an amount to be determined at trial, but in no event less than $10 million;

c. Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d. Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff E. Jean Carroll hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: New York, New York
  May 22, 2023

                 _____

                 Roberta A. Kaplan
                 Michael Ferrara
                 Shawn G. Crowley
                 Trevor W. Morrison (admitted *pro hac vice*)
                 Matthew J. Craig
                 KAPLAN HECKER & FINK LLP
                 350 Fifth Avenue, 63rd Floor
                 New York, New York 10118
                 (212) 763-0883
                 rkaplan@kaplanhecker.com
                 mferrara@kaplanhecker.com
                 scrowley@kaplanhecker.com
                 tmorrison@kaplanhecker.com
                 mcraig@kaplanhecker.com

                 Joshua Matz
                 KAPLAN HECKER & FINK LLP
                 1051 K Street NW, Suite 1040
                 Washington, D.C. 20001
                 (202) 742-2661
                 jmatz@kaplanhecker.com

                 *Attorneys for Plaintiff E. Jean Carroll*



**U.S. Department of Justice**

Civil Division

| | |
|---|---|
| *Torts Branch, Federal Tort Claims Office* | *Telephone (202) 353-1651* |
| *P.O. Box 888* | *Facsimile (202) 616-5200* |
| *Washington, DC  20044* | |
| JGT:KLW:CSP:STerrell/DJ# 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 | |

June 9, 2023

**BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

     RE:    *Carroll v. Trump*, No. 1:20-cv-7311-LAK

Dear Judge Kaplan:

     As directed by the Order of June 1, 2023 (ECF No. 163), we submit this letter to advise the Court of the United States' position as to whether the filing of a new complaint in this action would render the government's previous Westfall Act certification ineffective and moot the government's motion to substitute itself for Mr. Trump.

     Since the government executed the Westfall Act certification, this Court rendered a decision denying the government's motion to substitute, the United States Court of Appeals for the Second Circuit vacated that decision and remanded the case for further proceedings in light of the intervening decision by the Court of Appeals of the District of Columbia clarifying D.C.'s law of *respondeat superior*, plaintiff proposed an amended complaint, and the parties to this case undertook discovery in parallel proceedings.  Given these collective developments, the prior certification and motion to substitute have been overtaken by events.  The Attorney General should therefore be given the opportunity to decide anew whether to certify that Mr. Trump was acting within the scope of his office as President at the time of the incidents out of which the plaintiff's claim arose, and to do so with respect to the allegations that are set forth in the operative complaint.  And, in light of the numerous potentially relevant developments, it is unnecessary for this Court to resolve whether the filing of the proposed new complaint, standing alone, would render the prior certification ineffective.

     Accordingly, we respectfully request that the Court afford the United States time after the Court decides the motion for leave to amend to allow the United States to reach a determination as to the scope-of-employment question. As set forth in our prior submission, we think the Court should first resolve plaintiff's pending motion to amend her complaint and then order the parties to meet and confer and submit a joint proposed briefing schedule on the issue of substitution 30

Hon. Lewis A. Kaplan
Page 2

days after the Court rules on the motion to amend the complaint.

Sincerely,

Stephen R. Terrell

cc:      Counsel of Record (by ECF)

**A1046**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

E. JEAN CARROLL,

                Plaintiff,

      -against-

                                              20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge*.

        1.     The plaintiff's motion for leave to amend [Dkt 155] is granted.   A memorandum opinion may follow.  The amended complaint is deemed served and filed today.

        2.     Defendant has requested that the Court, "[s]hould the Court . . . deny Plaintiff's Motion to Amend" [Dkt 164, at 19], grant defendant permission to file a supplemental motion for summary judgment.  As the Court has granted plaintiff's motion, that request is moot.

        3.     The United States concedes that subsequent events have "overtaken" both (1) the government's 2020 certification that the defendant acted within the scope of his employment in making his allegedly defamatory statements, and (2) the government's 2020 motion to substitute the United States for the defendant in this case under the Westfall Act.  It nevertheless has requested time following determination of the motion for leave to amend for the government to determine its present position on the scope of employment question.  In all the circumstances, any further submission by the United States (including any new or amended certification and/or motion to

2

substitute) and/or the defendant with respect to substitution of the United States for the defendant

shall be served and filed no later than July 13, 2023.  Any response by the plaintiff shall be served

and filed no later than July 27, 2023.  Any reply(ies) by the United States and/or the defendant shall

be served and filed no later than August 3, 2023.

SO ORDERED.

Dated:        June 13, 2023

_____
Lewis A. Kaplan
United States District Judge

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
E-mail: mmadaio@habbalaw.com
*Attorneys for Defendant/Counterclaimant Donald J. Trump*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff,* | |
| v. | **DEFENDANT'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM** |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

Defendant, Donald J. Trump, ("Defendant"), by and through his attorneys at Habba Madaio

& Associates LLP, subject to and reserving all rights, for his Answer to Plaintiff's First Amended

Complaint, says:

### <u>INTRODUCTION</u>

1.      Defendant denies the allegations set forth in Paragraph 1 of the First Amended

Complaint.

2.      Defendant denies the allegations set forth in Paragraph 2 of the First Amended

Complaint.

3.      Defendant denies the allegations set forth in Paragraph 3 of the First Amended Complaint.

4.      Defendant denies the allegations set forth in Paragraph 4 of the First Amended Complaint.

5.      Defendant denies the allegations set forth in Paragraph 5 of the First Amended Complaint.

6.      Defendant denies the allegations set forth in Paragraph 6 of the First Amended Complaint.

7.      Defendant denies the allegations set forth in Paragraph 7 of the First Amended Complaint.

8.      Defendant denies the allegations set forth in Paragraph 8 of the First Amended Complaint.

9.      Defendant denies the allegations set forth in Paragraph 9 of the First Amended Complaint.

10.      Defendant denies the allegations set forth in Paragraph 10 of the First Amended Complaint.

11.      Defendant denies the allegations set forth in Paragraph 11 of the First Amended Complaint.

12.      Defendant denies the allegations set forth in Paragraph 12 of the First Amended Complaint.

13.      Defendant denies the allegations set forth in Paragraph 13 of the First Amended Complaint.

14.     Defendant denies the allegations set forth in Paragraph 14 of the First Amended Complaint.

15.     Defendant denies the allegations set forth in Paragraph 15 of the First Amended Complaint.

16.     Defendant denies the allegations set forth in Paragraph 16 of the First Amended Complaint.

17.     Defendant admits only that the jury in *E. Jean Carroll v. Donald J. Trump,* Civil Action No. 22-cv-10016 ("*Carroll II*") released its verdict on May 9, 2023 but otherwise denies Plaintiff's characterizations and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

18.     Defendant denies the allegations set forth in Paragraph 18 of the First Amended Complaint.

19.     Defendant denies the allegations set forth in Paragraph 19 of the First Amended Complaint.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the First Amended Complaint.

21.     As to Paragraph 21, Defendant admits only that he served as the 45th President of the United States and is a resident of the State of Florida.

### JURISDICTION AND VENUE

22.     Defendant admits the allegations contained in Paragraph 22 of the First Amended Complaint.

23.     Defendant denies the allegations set forth in Paragraph 23 of the First Amended Complaint as the allegations set forth a legal conclusion.

24.     Defendant denies the allegations set forth in Paragraph 24 of the First Amended Complaint as the allegations set forth a legal conclusion.

## FACTUAL ALLEGATIONS

25.     Defendant denies the allegations set forth in Paragraph 25 of the First Amended Complaint.

26.     Defendant denies the allegations set forth in Paragraph 26 of the First Amended Complaint.

27.     Defendant denies the allegations set forth in Paragraph 27 of the First Amended Complaint.

28.     As to Paragraph 28, Defendant admits only that the photograph exists, but otherwise denies the Plaintiff's allegations and respectfully refers the Court to the cited photograph for the true, accurate, and contextual meaning thereof.

29.     Defendant denies the allegations set forth in Paragraph 29 of the First Amended Complaint.

30.     Defendant denies the allegations set forth in Paragraph 30 of the First Amended Complaint.

31.     Defendant denies the allegations set forth in Paragraph 31 of the First Amended Complaint.

32.     Defendant denies the allegations set forth in Paragraph 32 of the First Amended Complaint.

33.     Defendant denies the allegations set forth in Paragraph 33 of the First Amended Complaint.

34.     Defendant denies the allegations set forth in Paragraph 34 of the First Amended Complaint.

35.     Defendant denies the allegations set forth in Paragraph 35 of the First Amended Complaint.

36.     Defendant denies the allegations set forth in Paragraph 36 of the First Amended Complaint.

37.     Defendant denies the allegations set forth in Paragraph 37 of the First Amended Complaint.

38.     Defendant denies the allegations set forth in Paragraph 38 of the First Amended Complaint.

39.     Defendant denies the allegations set forth in Paragraph 39 of the First Amended Complaint.

40.     Defendant denies the allegations set forth in Paragraph 40 of the First Amended Complaint.

41.     Defendant denies the allegations set forth in Paragraph 41 of the First Amended Complaint.

42.     Defendant denies the allegations set forth in Paragraph 42 of the First Amended Complaint.

43.     Defendant denies the allegations set forth in Paragraph 43 of the First Amended Complaint.

44.     Defendant denies the allegations set forth in Paragraph 44 of the First Amended Complaint.

45.     Defendant denies the allegations set forth in Paragraph 45 of the First Amended Complaint.

46.     Defendant denies the allegations set forth in Paragraph 46 of the First Amended Complaint.

47.     Defendant denies the allegations set forth in Paragraph 47 of the First Amended Complaint.

48.     Defendant denies the allegations set forth in Paragraph 48 of the First Amended Complaint.

49.     Defendant denies the allegations set forth in Paragraph 49 of the First Amended Complaint.

50.     Defendant denies the allegations set forth in Paragraph 50 of the First Amended Complaint.

51.     Defendant denies the allegations set forth in Paragraph 51 of the First Amended Complaint.

52.     Defendant denies the allegations set forth in Paragraph 52 of the First Amended Complaint.

53.     Defendant denies the allegations set forth in Paragraph 53 of the First Amended Complaint.

54.     Defendant denies the allegations set forth in Paragraph 54 of the First Amended Complaint.

55.     Defendant denies the allegations set forth in Paragraph 55 of the First Amended Complaint.

56.     Defendant denies the allegations set forth in Paragraph 56 of the First Amended Complaint.

57.     Defendant denies the allegations set forth in Paragraph 57 of the First Amended Complaint.

58.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58 of the First Amended Complaint.

59.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59 of the First Amended Complaint.

60.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60 of the First Amended Complaint.

61.     Defendant denies the allegations set forth in Paragraph 61 of the First Amended Complaint.

62.     Defendant denies the allegations set forth in Paragraph 62 of the First Amended Complaint.

63.     Defendant denies the allegations set forth in Paragraph 63 of the First Amended Complaint.

64.     Defendant denies the allegations set forth in Paragraph 64 of the First Amended Complaint.

65.     Defendant denies the allegations set forth in Paragraph 65 of the First Amended Complaint.

66.     Defendant denies the allegations set forth in Paragraph 66 of the First Amended Complaint.

67.     Defendant denies the allegations set forth in Paragraph 67 of the First Amended Complaint.

68.     Defendant denies the allegations set forth in Paragraph 68 of the First Amended Complaint.

69.     Defendant denies the allegations set forth in Paragraph 69 of the First Amended Complaint.

70.     Defendant denies the allegations set forth in Paragraph 70 of the First Amended Complaint.

71.     Defendant denies the allegations set forth in Paragraph 71 of the First Amended Complaint.

72.     Defendant denies the allegations set forth in Paragraph 72 of the First Amended Complaint.

73.     Defendant denies the allegations set forth in Paragraph 73 of the First Amended Complaint.

74.     Defendant denies the allegations set forth in Paragraph 74 of the First Amended Complaint.

75.     Defendant denies the allegations set forth in Paragraph 75 of the First Amended Complaint.

76.     Defendant denies the allegations set forth in Paragraph 76 of the First Amended Complaint.

77.     Defendant denies the allegations set forth in Paragraph 77 of the First Amended Complaint.

78.     Defendant denies the allegations set forth in Paragraph 78 of the First Amended

Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

79.     Defendant denies the allegations set forth in Paragraph 79 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

80.     Defendant denies the allegations set forth in Paragraph 80 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

81.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 81 of the First Amended Complaint.

82.     Defendant denies the allegations set forth in Paragraph 82 of the First Amended Complaint.

83.     Defendant denies the allegations set forth in Paragraph 83 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

84.     Defendant denies the allegations set forth in Paragraph 84 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

85.     Defendant denies the allegations set forth in Paragraph 85 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

86.     Defendant denies the allegations set forth in Paragraph 86 of the First Amended Complaint.

87.     Defendant denies the allegations set forth in Paragraph 87 of the First Amended Complaint.

88.     Defendant denies the allegations set forth in Paragraph 88 of the First Amended Complaint.

89.     Defendant denies the allegations set forth in Paragraph 89 of the First Amended Complaint.

90.     Defendant denies the allegations set forth in Paragraph 90 of the First Amended Complaint.

91.     Defendant denies the allegations set forth in Paragraph 91 of the First Amended Complaint.

92.     Defendant denies the allegations set forth in Paragraph 92 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

93.     Defendant denies the allegations set forth in Paragraph 93 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

94.     Defendant denies the allegations set forth in Paragraph 94 of the First Amended Complaint.

95.     Defendant denies the allegations set forth in Paragraph 95 of the First Amended Complaint.

96.     Defendant denies the allegations set forth in Paragraph 96 of the First Amended Complaint.

97.     Defendant denies the allegations set forth in Paragraph 97 of the First Amended
Complaint.

98.     Defendant denies the allegations set forth in Paragraph 98 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

99.     Defendant denies the allegations set forth in Paragraph 99 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

100.    Defendant denies the allegations set forth in Paragraph 100 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

101.    Defendant denies the allegations set forth in Paragraph 101 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

102.    Defendant denies the allegations set forth in Paragraph 102 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

103.    Defendant denies the allegations set forth in Paragraph 103 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

104.    Defendant denies the allegations set forth in Paragraph 104 of the First Amended
Complaint and respectfully refers the Court to the cited documents for the true, accurate, and
contextual meaning thereof.

105.     Defendant denies the allegations set forth in Paragraph 105 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

106.     Defendant denies the allegations set forth in Paragraph 106 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

107.     Defendant denies the allegations set forth in Paragraph 107 of the First Amended Complaint.

108.     Defendant denies the allegations set forth in Paragraph 108 of the First Amended Complaint.

109.     Defendant denies the allegations set forth in Paragraph 109 of the First Amended Complaint.

110.     Defendant denies the allegations set forth in Paragraph 110 of the First Amended Complaint.

111.     Defendant denies the allegations set forth in Paragraph 111 of the First Amended Complaint.

112.     Defendant admits only that he has made the referenced statement set forth in Paragraph 112 but otherwise denies the Plaintiff's characterizations and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

113.     Defendant admits only that he has made the referenced statement set forth in Paragraph 113 but otherwise denies the Plaintiff's characterizations and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

114.    Defendant denies the allegations set forth in Paragraph 114 of the First Amended Complaint.

115.    Defendant denies the allegations set forth in Paragraph 115 of the First Amended Complaint.

116.    Defendant denies the allegations set forth in Paragraph 116 of the First Amended Complaint.

117.    Defendant denies the allegations set forth in Paragraph 117 of the First Amended Complaint.

118.    Defendant denies the allegations set forth in Paragraph 118 of the First Amended Complaint.

119.    Defendant denies the allegations set forth in Paragraph 119 of the First Amended Complaint.

120.    Defendant denies the allegations set forth in Paragraph 120 of the First Amended Complaint.

121.    Defendant denies the allegations set forth in Paragraph 121 of the First Amended Complaint.

122.    Defendant denies the allegations set forth in Paragraph 122 of the First Amended Complaint.

123.    Defendant denies the allegations set forth in Paragraph 123 of the First Amended Complaint.

124.    Defendant denies the allegations set forth in Paragraph 124 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

125.     Defendant denies the allegations set forth in Paragraph 125 of the First Amended Complaint.

126.     Defendant denies the allegations set forth in Paragraph 126 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

127.     Defendant denies the allegations set forth in Paragraph 127 of the First Amended Complaint.

128.     Defendant denies the allegations set forth in Paragraph 128 of the First Amended Complaint.

129.     Defendant denies the allegations set forth in Paragraph 129 of the First Amended Complaint.

130.     Defendant denies the allegations set forth in Paragraph 130 of the First Amended Complaint.

131.     Defendant denies the allegations set forth in Paragraph 131 of the First Amended Complaint.

132.     Defendant denies the allegations set forth in Paragraph 132 of the First Amended Complaint.

133.     Defendant denies the allegations set forth in Paragraph 133 of the First Amended Complaint.

134.     Defendant denies the allegations set forth in Paragraph 134 of the First Amended Complaint.

135.     Defendant denies the allegations set forth in Paragraph 135 of the First Amended Complaint.

136.     Defendant denies the allegations set forth in Paragraph 136 of the First Amended Complaint.

137.     Defendant denies the allegations set forth in Paragraph 137 of the First Amended Complaint.

138.     Defendant denies the allegations set forth in Paragraph 138 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

139.     Defendant denies the allegations set forth in Paragraph 139 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

140.     Defendant denies the allegations set forth in Paragraph 140 of the First Amended Complaint.

141.     Defendant denies the allegations set forth in Paragraph 141 of the First Amended Complaint.

142.     Defendant denies the allegations set forth in Paragraph 142 of the First Amended Complaint.

143.     Defendant denies the allegations set forth in Paragraph 143 of the First Amended Complaint.

144.     Defendant denies the allegations set forth in Paragraph 144 of the First Amended Complaint.

145.     Defendant denies the allegations set forth in Paragraph 145 of the First Amended Complaint.

146.    Defendant denies the allegations set forth in Paragraph 146 of the First Amended Complaint.

147.    Defendant denies the allegations set forth in Paragraph 147 of the First Amended Complaint.

148.    Defendant denies the allegations set forth in Paragraph 148 of the First Amended Complaint.

149.    Defendant denies the allegations set forth in Paragraph 149 of the First Amended Complaint.

150.    Defendant denies the allegations set forth in Paragraph 150 of the First Amended Complaint.

151.    Defendant denies the allegations set forth in Paragraph 151 of the First Amended Complaint.

152.    Defendant denies the allegations set forth in Paragraph 152 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

153.    Defendant denies the allegations set forth in Paragraph 153 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

154.    Defendant denies the allegations set forth in Paragraph 154 of the First Amended Complaint as the allegations set forth a legal conclusion.

155.    Defendant admits only that the trial in *Carroll II* commenced on April 25, 2023.

156.    Defendant denies the allegations set forth in Paragraph 156 of the First Amended Complaint as the allegations set forth a legal conclusion.

157.    Defendant denies the allegations set forth in Paragraph 157 of the First Amended Complaint.

158.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 158 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

159.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 159 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

160.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 160 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

161.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 161 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

162.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 162 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

163.    Defendant admits only that the jury in *Carroll II* issued its verdict on May 9, 2023 but otherwise denies the remaining allegations contained in Paragraph 163 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

164.    Defendant denies the allegations set forth in Paragraph 164 of the First Amended Complaint.

165.    Defendant denies the allegations set forth in Paragraph 165 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

166.    Defendant denies the allegations set forth in Paragraph 166 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

167.    Defendant denies the allegations set forth in Paragraph 167 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

168.    Defendant denies the allegations set forth in Paragraph 168 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

169.    Defendant denies the allegations set forth in Paragraph 169 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

170.    Defendant denies the allegations set forth in Paragraph 170 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and

contextual meaning thereof.

171.    Defendant denies the allegations set forth in Paragraph 171 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

172.    Defendant denies the allegations set forth in Paragraph 172 of the First Amended Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

173.    Defendant denies the allegations set forth in Paragraph 173 of the First Amended Complaint.

174.    Defendant denies the allegations set forth in Paragraph 174 of the First Amended Complaint.

<div align="center">

**CAUSE OF ACTION: DEFAMATION**

</div>

175.    Defendant incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

176.    Defendant denies the allegations set forth in Paragraph 176 of the First Amended Complaint.

177.    Defendant denies the allegations set forth in Paragraph 177 of the First Amended Complaint.

178.    Defendant denies the allegations set forth in Paragraph 178 of the First Amended Complaint.

179.    Defendant denies the allegations set forth in Paragraph 179 of the First Amended Complaint.

180.     Defendant denies the allegations set forth in Paragraph 180 of the First Amended Complaint.

181.     Defendant denies the allegations set forth in Paragraph 181 of the First Amended Complaint.

182.     Defendant denies the allegations set forth in Paragraph 182 of the First Amended Complaint.

183.     Defendant denies the allegations set forth in Paragraph 183 of the First Amended Complaint.

## DEMAND FOR RELIEF

184.     Defendant denies that Plaintiff is entitled to any of the relief requested in the *ad damnum* clause of the First Amended Complaint or any relief.

## GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in the First Amended Complaint. Defendant denies any allegations contained in the headings and subheadings throughout the First Amended Complaint. Defendant denies all allegations, declarations, claims or assertions in the First Amended Complaint that are not specifically admitted in this Answer.

## ADDITIONAL DEFENSES

As separate, additional defenses to the First Amended Complaint and the purported causes of action therein, but without assuming the burden of proof with regard to these defenses, Defendant alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

1.     Plaintiff's claim is barred because the alleged defamatory statements are privileged

and protected under the doctrine of presidential absolute immunity.

## **SECOND AFFIRMATIVE DEFENSE**

2.      The Complaint fails to state a cause of action.

## **THIRD AFFIRMATIVE DEFENSE**

3.      The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

## **FOURTH AFFIRMATIVE DEFENSE**

4.      The alleged defamatory statements are true.

## **FIFTH AFFIRMATIVE DEFENSE**

5.      Some or all of the statements at issue are matters of opinion that are not capable of being proven true or false.

## **SIXTH AFFIRMATIVE DEFENSE**

6.      The alleged defamatory statements constitute fair comment.

## **SEVENTH AFFIRMATIVE DEFENSE**

7.      The alleged defamatory statements are with respect to a public person.

## **EIGHTH AFFIRMATIVE DEFENSE**

8.      The alleged defamatory statements are not reasonably capable of the defamatory meaning attributed to them by Plaintiff.

## **NINTH AFFIRMATIVE DEFENSE**

9.      The claims set forth in Plaintiff's Complaint are unconstitutional.

## **TENTH AFFIRMATIVE DEFENSE**

10.     Plaintiff's claims are barred because her damages, if any, were caused by acts of third persons, for which Defendant is not responsible.

<div align="center">

**ELEVENTH AFFIRMATIVE DEFENSE**

</div>

11.      Plaintiff is a public figure for purposes of this case, and Defendant did not publish

with actual malice.

<div align="center">

**TWELFTH AFFIRMATIVE DEFENSE**

</div>

12.      Plaintiff is not entitled to punitive damages as a matter of law.

<div align="center">

**THIRTEENTH AFFIRMATIVE DEFENSE**

</div>

13.      Plaintiff is not entitled to injunctive relief as a matter of law.

<div align="center">

**FOURTEENTH AFFIRMATIVE DEFENSE**

</div>

14.      Plaintiff is not entitled to counsel fees and/or costs as a matter of law.

<div align="center">

**FIFTEENTH AFFIRMATIVE DEFENSE**

</div>

15.      Plaintiff has not sufficiently pled defamation or defamation *per se*.

<div align="center">

**SIXTEENTH AFFIRMATIVE DEFENSE**

</div>

16.      Plaintiff has failed to plead damages with the required specificity.

<div align="center">

**SEVENTEENTH AFFIRMATIVE DEFENSE**

</div>

17.      Neither Defendant nor the challenged statements proximately caused any injury

that the Plaintiff allegedly suffered.

<div align="center">

**EIGHTEENTH AFFIRMATIVE DEFENSE**

</div>

18.      Plaintiff has not suffered special damages.

<div align="center">

**NINETEENTH AFFIRMATIVE DEFENSE**

</div>

19.      Defendant, as sitting President, made the challenged statements within the scope of

his employment, and is therefore immune from suit under the Westfall Act.

<div align="center">

**TWENTIETH AFFIRMATIVE DEFENSE**

</div>

20.      Plaintiff's claims are time-barred by the applicable statute(s) of limitations.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

21.     The alleged defamatory statements are, in part, privileged and protected under N.Y. Civ. Rights Law § 74.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

22.     Plaintiff's claims are barred, in whole or in part, by the doctrine of *res judicata.*

### TWENTY-THIRD AFFIRMATIVE DEFENSE

23.     Plaintiff's claims are barred, in whole or in part, by the doctrine of collateral estoppel.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

24.     Plaintiff is barred in equity from claiming or recovering any relief set forth in the First Amended Complaint because of her conduct under the doctrine of unclean hands.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

25.     By virtue of the tortious conduct and defamatory statements made by Plaintiff against Defendant, Plaintiff is barred in whole or in part from recovering for the claims made in her First Amended Complaint.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

26.     Defendant hereby reserves the right to assert all affirmative defenses available under any applicable federal and state law, and to assert any cross-claims, counterclaims and third-party claims when and if they become appropriate in this action.

### COUNTERCLAIM AGAINST E. JEAN CARROLL

Defendant/Counterclaimant, Donald J. Trump ("Counterclaimant"), by way of Counterclaim against Plaintiff/Counterclaim Defendant, E. Jean Carroll ("Counterclaim Defendant"), says:

## THE PARTIES

1.      Counterclaimant, Donald J. Trump, is an individual who is a resident of the State of Florida.

2.      Counterclaim Defendant, E. Jean Carroll, is an individual who is a resident of the State of New York.

## JURISDICTION, VENUE AND COMPLIANCE WITH F.R.C.P. 13

3.      This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

5.      Pursuant to F.R.C.P. 13(a), this Counterclaim is properly brought before this Court as it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim.

6.      This counterclaim is properly brought before this Court as it arises from the same transaction or occurrence that is the subject matter of the opposing party's claim, as set forth in the First Amended Complaint, and because it does not require adding another party over whom this Court cannot acquire jurisdiction.

## CAUSE OF ACTION
### DEFAMATION

1.      On June 21, 2019, Counterclaim Defendant first accused Counterclaimant of raping her after publishing a book excerpt in New York Magazine entitled "Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my

life."

2.      Since that time, Counterclaim Defendant has repeatedly accused Counterclaimant

of raping her in a series of public statements, which include, but are not limited to, the following:

- " If you're asking why the COVID-19 rate is so low in Germany and so high in America, it is because Germany has a leader and America has a rapist."[1]

- "Jenn Budd! Hail, valiant woman! It is NOT weird! I called what happened a "tussle!" I called it a "fight!" I called what happened "against my will!" It took a quarter of a century to call what @realDonaldTrump did to me "rape."[2]

- "All 9,023 lawyers of the DOJ won't be able to save Trump when the Adult Survivors Act passes. The very moment it's LAW, I am suing Donald Trump for rape. The best civil rights attorneys in the nation-- @kaplanrobbie and @JoshuaMatz8 ARE READY!"[3]

- "My name is E. Jean Carroll. I'm a survivor of sexual assault. I stayed silent for years after I was attacked, and by staying silent lost my chance to hold my attacker accountable. I was raped by Donald Trump. And while my rapist may be famous, my story is, sadly, extremely common."[4]

3.      Thereafter, on May 10, 2023, Counterclaim Defendant appeared on CNN for a

television interview (the "Interview"), following the jury verdict on May 9, 2023, in the case of *E.*

*Jean Carroll v. Donald J. Trump,* Civil Action No. 22-cv-10016[5] ("*Carroll II*").

4.      During the Interview, Counterclaim Defendant was specifically asked about the

jury unanimously finding Counterclaimant not liable for rape in *Carroll II*.

5.      In response to that specific inquiry, Counterclaim Defendant disregarded the jury's

finding that Counterclaimant did not rape her, and replied: "oh yes he did, oh yes he did."

6.      Further, during the Interview, following the conclusion of the trial in *Carroll II,*

---

1 E. Jean Carroll (@ejeancarroll), Twitter Apr. 6, 2020, 12:47 PM) https://bit.ly/3Pt940N
2 E. Jean Carroll (@ejeancarroll), Twitter Jan. 4, 2021, 9:53 PM) https://bit.ly/46s3Isw.
3 E. Jean Carroll (@ejeancarroll), Twitter (Jan. 12, 2022, 11:27 AM) https://bit.ly/442qN3s.
4 E. Jean Carroll, *Why I Waited 23 Years to Speak Up*, Ask E. Jean (April 25, 2022), https://bit.ly/3NNBmls.
5 CNN, "E. Jean Carroll says Trump is 'incorrect' about civil trial jury," YouTube (May 10, 2023),
https://bit.ly/3WRSXeF

Counterclaim Defendant explained her exchange with the attorney representing Counterclaimant in the trial of *Carroll II,* Joseph Tacopina, Esq.

7.      Specifically, Counterclaim Defendant stated in the Interview that she emphatically told Mr. Tacopina at the conclusion of the trial that "he did it and you know it," again reaffirming her claim that Counterclaimant raped her.

8.      Counterclaim Defendant made these statements knowing each of them were false or with reckless disregard for their truth or falsity.

9.      The Interview was on television, social media and multiple internet websites, with the intention of broadcasting and circulating these defamatory statements among a significant portion of the public.

10.      Counterclaim Defendant made these false statements with actual malice and ill will with an intent to significantly and spitefully harm and attack Counterclaimant's reputation, as these false statements were clearly contrary to the jury verdict in *Carroll II* whereby Counterclaimant was found not liable for rape by the jury.

11.      Counterclaim Defendant's actions of wantonly and falsely accusing the Counterclaimant on multiple occasions of committing rape constitute defamation *per se,* as Counterclaim Defendant accused Counterclaimant of rape, which clearly was not committed, according to the jury verdict in *Carroll II.*

12.      Due to Counterclaim Defendant's repeated falsehoods and defamatory statements made against the Counterclaimant, Counterclaimant has been the subject of significant harm to his reputation, which, in turn, has yielded an inordinate amount of damages sustained as a result.

**PRAYER FOR RELIEF**

**WHEREFORE,** Defendant/Counterclaimant respectfully requests that this Court:

(1) Deny any and all relief sought by Plaintiff in this First Amended Complaint;

(2) Deny any and all purported damages sought by Plaintiff in the First Amended

Complaint;

(3) Order Plaintiff to retract her defamatory statements against the Defendant;

(4) Award Defendant compensatory and punitive damages as a result of Plaintiff's

defamatory statements made against the Defendant; and

(5) Award counsel fees, costs, and any further relief as this Court may be deem just and

proper.

Dated:  New York, New York
      June 27, 2023

                                              _____
                                           Alina Habba, Esq.
                                           Michael T. Madaio, Esq.
                                           HABBA MADAIO & ASSOCIATES LLP
                                           1430 US Highway 206, Suite 240
                                           Bedminster, New Jersey 07921
                                           -and-
                                           112 West 34th Street, 17th & 18th Floors
                                           New York, New York 10120
                                           Telephone: (908) 869-1188
                                           Facsimile: (908) 450-1881
                                           E-mail: ahabba@habbalaw.com
                                           E-mail: mmadaio@habbalaw.com
                                           *Counsel for Defendant/Counterclaimant*
                                           *Donald J. Trump*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff*, | |
| v. | No. 20 Civ. 7311 (LAK) |
| DONALD J. TRUMP, in his personal capacity | |
| *Defendant*. | |

## NOTICE OF PLAINTIFF E. JEAN CARROLL'S MOTION TO DISMISS AND MOTION TO STRIKE

PLEASE TAKE NOTICE that Plaintiff E. Jean Carroll hereby moves this Court, before the Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, located at 500 Pearl Street, New York, NY 10007, on a date to be set by the Court, for an order granting Carroll's motion to dismiss Defendant Donald J. Trump's counterclaim under Federal Rule of Civil Procedure 12(b)(6) and to strike certain affirmative defenses under Federal Rule of Civil Procedure 12(f).

This motion is supported by the annexed memorandum of law and the declaration of Roberta A. Kaplan and accompanying exhibits.

Dated: New York, New York
      July 11, 2023

Respectfully submitted,

_____

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*