# 23-1045(L)
# 23-1146(CON)

## United States Court of Appeals
## for the Second Circuit



E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPELLANT'S APPENDIX
## VOLUME V OF V (Pages A1077-A1328)

---

HABBA MADAIO & ASSOCIATES LLP
MICHAEL T. MADAIO, ESQ.
ALINA HABBA, ESQ.
*Attorneys for Defendant-Appellant
Donald J. Trump*
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
(908) 869-1188
*mmadaio@habbalaw.com*
*ahabba@habbalaw.com*

[REPRODUCED ON RECYCLED PAPER]

# **TABLE OF CONTENTS**

*Page(s)*

U.S. District Court Docket Sheet ....................................................................A1-A33

Letter Motion to Stay, dated December 10, 2020 ...........................................A34-A35

Memorandum of Law in Support of Defendant's Motion
for Leave to Amend his Answer Pursuant to FRCP Rule
15(A), dated December 1, 2021 .......................................................................A36-A50

Memorandum Opinion, dated March 10, 2022 ...............................................A51-A73

Scheduling Order, dated May 4, 2022 .............................................................A74-A75

Letter Motion, dated September 28, 2022 .......................................................A76-A78

Letter Response, dated September 30, 2022 ....................................................A79-A83

Memorandum Opinion, dated October 12, 2022 ............................................A84-A99

Letter, dated November 21, 2022 .................................................................A100-A101

Notice of Motion for Summary Judgment, dated December
22, 2022 .......................................................................................................A102-A103

Declaration of Alina Habba, Esq. in Support of
Defendant's Motion for Summary Judgment, dated
December 22, 2022 .....................................................................................A104-A105

    Exhibit A – Complaint and Jury Demand, dated
    November 4, 2019 .............................................................................A106-A134

    Exhibit B – Deposition of E. Jean Carroll, held on
    October 14, 2022 ..............................................................................A135-A139

    Exhibit C – Expert Report of Professor Ashlee
    Humphreys, Ph.D., dated October 14, 2022 ......................................A140-A280

i

*Table of Contents(cont'd)*        *Page(s)*

Exhibit D – The New York Times Article, dated
February 21, 2020 ...............................................................A281-A284

Exhibit E – Brief for Appellee E. Jean Carroll, dated
December 1, 2022 ...............................................................A285-A349

Memorandum of Law in Support of Defendant's Motion
for Summary Judgment, dated December 22, 2022......................................A350-A396

Defendant's Local Rule 56.1 Statement of Material
Facts as to Which There is no Genuine Issue to be
Tried, dated December 22, 2022 ........................................A397-A402

Plaintiff E. Jean Carroll Memorandum of Law in
Opposition to Defendant Donald J. Trump for Summary
Judgment, dated January 12, 2023 ................................................A403-A446

Plaintiff E. Jean Carroll's Response to Defendant Donald
J. Trump's Statement of Undisputed Material Facts
Pursuant to Local Civil Rule 56.1, dated January 12, 2023.......................A447-A472

Declaration of Roberta A. Kaplan in Support of Plaintiff E.
Jean Carroll's Opposition to Defendant Donald J. Trump's
Motion for Summary Judgment, dated January 12, 2023...........................A473-A475

Exhibit 1 - Excerpts of Deposition of E. Jean Carroll,
dated October 14, 2022 ......................................................A476-A550

Exhibit 2 - New York Magazine Article (Online
Version)..................................................................A551-A571

Exhibit 3 - June 21, 2019 Statement ....................................................A572-A573

Exhibit 4 - June 22, 2019 Statement ................................................A574-A587

*Table of Contents(cont'd)*                                            *Page(s)*

Exhibit 5 - June 24, 2019 Statement ...................................................A588-A593

Exhibit 6 - Excerpts of Deposition of Donald J. Trump ..................................................................................A594-A643

Exhibit 7 - Photograph of E. Jean Carroll and Donald Trump ..................................................................................A644-A645

Exhibit 8 - Excerpts of Deposition of Lisa Birnbach, held on September 21, 2022.................................................A646-A654

Exhibit 9 - Excerpts of Deposition of Carol Martin, held on October 18, 2022 ...................................................A655-A660

Exhibit 10 - New York Magazine Article (Print Version)................................................................................A661-A669

Exhibit 11 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, dated July 13, 2022 ...............................................................A670-A717

Exhibit 12 - Excerpts of Deposition of Roberta Myers, held on October 12, 2022.......................................A718-A728

Exhibit 13 - Appendix H to Expert Report of Ashlee Humphreys .............................................................A729-A795

Exhibit 14 - Appendix I to Expert Report of Ashlee Humphreys .............................................................A796-A879

Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated January 19, 2023 ...........................A880-A894

*Table of Contents(cont'd)*                                                     *Page(s)*

Plaintiff E. Jean Carroll's Surreply Brief in Opposition to
Defendant Donald J. Trump's Motion for Summary
Judgment, dated January 24, 2023 ...............................................A895-A904

Proposed Joint Pre-Trial Order ...................................................A905-A922

Joint Pretrial Order, dated February 13, 2023...............................A923-A940

Letter Motion, dated March 17, 2023 ...........................................A941-A942

Stipulation and [Proposed] Order ................................................A943-A944

Letter addressed to Judge Lewis A. Kaplan from Roberta
A. Kaplan, dated May 22, 2023 ....................................................A945-A948

Plaintiff E. Jean Carroll's Memorandum of Law in Support
of Motion to Amend, dated May 22, 2023....................................A949-A954

Declaration of Roberta A. Kaplan in Support of Plaintiff's
Motion to Amend, dated May 22, 2023 ..................................................A955

    Exhibit A – First Amended Complaint and Demand
    for Jury Trial, dated May 22, 2023  .....................................A956-A997

    Exhibit B – Redlined First Amended Complaint and
    Demand for Jury Trial, dated May 22, 2023 ....................A998-A1043

Letter addressed to Judge Lewis A. Kaplan from Stephen
Terrell, dated June 9, 2023........................................................A1044-A1045

Order, dated June 13, 2023 .......................................................A1046-A1047

Defendant's Answer to Plaintiff's First Amended
Complaint, Affirmative Defenses and Counterclaim, dated
June 27, 2023 ..........................................................................A1048-A1074

iv

*Table of Contents(cont'd)*                                               *Page(s)*

Notice Of Plaintiff E. Jean Carroll's Motion to Dismiss
And Motion to Strike, dated July 11, 2023 ...............................A1075-A1076

Plaintiff E. Jean Carroll's Memorandum of Law in Support
of Her Motion to Dismiss and Motion to Strike, dated July
11, 2023 .......................................................................A1077-A1113

Declaration of Roberta A. Kaplan in Support of Plaintiff's
Motion to Dismiss and Motion to Strike...................................A1114-A1115

    Exhibit A – Excerpts of Carroll II Trial Transcript ......................A1116-A1166

    Exhibit B – Video of May 10, 2023 CNN Interview
    of E. Jean Carroll (previously provided to the court
    via DVD) .....................................................................A1167

    Exhibit C – Transcript of Carroll Interview on CNN .......................A1168-1193

Memorandum of Law Regarding Plaintiff's Motion to File
an Amended Complaint, dated July 25, 2023 ...........................A1194-A1198

Defendant's Memorandum of Law in Opposition to
Plaintiff's Motion to Dismiss and Motion to Strike, dated
July 25, 2023 ...............................................................A1199-A1233

Letter Addressed to Judge Lewis A. Kaplan from Roberta
A. Kaplan, dated July 25, 2023 ...........................................A1234-A1235

Notice Of Motion to Stay Pending Appeal, dated July 27,
2023...........................................................................A1236

Memorandum of Law in Support of Defendant's Motion to
Stay Pending Appeal, dated July 27, 2023...............................A1237-A1256

v

*Table of Contents(cont'd)*          *Page(s)*

Plaintiff E. Jean Carroll's Reply Memorandum of Law in
Support of her Motion to Dismiss and Motion to Strike,
dated August 1, 2023.................................................................A1257-A1272

Memorandum Opinion Granting Plaintiff's Motion to
Dismiss Defendant's Counterclaim and Certain Purported
Affirmative Defenses, dated August 7, 2023 ...........................A1273-A1296

Memorandum of Law in Further Support of Defendant's
Motion to Stay Pending Appeal, dated August 17, 2023.........A1297-A1309

Memorandum Opinion Denying Defendant's Motion to
Stay, dated August 18, 2023 ....................................................A1310-A1326

Order of USCA (Certified Copy)..............................................A1327-A1328

vi

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E. JEAN CARROLL,

        *Plaintiff,*

   v.

DONALD J. TRUMP, in his personal capacity

        *Defendant.*

No. 20 Civ. 7311 (LAK)

---

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW
IN SUPPORT OF HER MOTION TO DISMISS AND MOTION TO STRIKE**

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................ 2

ARGUMENT .............................................................................................................................. 8

    I.   TRUMP FAILS TO STATE A CLAIM ........................................................................ 9

       A.  Carroll's Real-Time Reaction to the Jury's Determination on Rape Did Not
           Constitute Defamation ........................................................................................ 10

           1.  Carroll's Statement Is Substantially True ........................................................ 10

           2.  Carroll's Statement Was Not Made with Actual Malice ................................. 15

           3.  Carroll's Statement Is a Fair and True Report of the *Carroll II* Trial.............. 16

       B.  Carroll Did Not Commit Defamation When She Described Her Conversation with
           Opposing Counsel ............................................................................................... 20

    II.  TRUMP'S COUNTERCLAIM IS IMPROPER AT THIS STAGE OF THE CASE ....... 22

    III.  TRUMP'S AFFIRMATIVE DEFENSES THAT HAVE ALREADY BEEN
          REJECTED SHOULD BE STRICKEN ................................................................. 27

CONCLUSION ........................................................................................................................ 28

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abkco Music, Inc. v. William Sagan*,
    No. 15 Civ. 4025, 2016 WL 2642224 (S.D.N.Y. May 6, 2016) ............................................. 17

*Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*,
    No. 17 Civ. 1338, 2021 WL 3269010 (E.D.N.Y. July 30, 2021)........................................... 27

*Albert v. Loksen*,
    239 F.3d 256 (2d Cir. 2001) ................................................................................................... 9

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    823 F.3d 51 (2d Cir. 2016) ..................................................................................................... 9

*Aronson v. Wiersma*,
    65 N.Y.2d 592 (1985)............................................................................................................. 22

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009) ................................................................................... 8

*Barbash v. STX Fin., LLC*,
    No. 20 Civ. 123, 2020 WL 6586155 (S.D.N.Y. Nov. 10, 2020)............................................. 9

*Bauer v. Baud*,
    No. 22 Civ. 1822, 2023 WL 2307413 (S.D.N.Y. Mar. 1, 2023)............................................. 14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................................................. 8, 22

*Birkenfeld v. UBS AG*,
    172 A.D.3d 566 (1st Dep't 2019) ......................................................................................... 10

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)............................................................................. 15, 22

*Biro v. Conde Nast*,
    807 F.3d 541 (2d Cir. 2015)........................................................................................... 10, 15

*Brimelow v. N.Y. Times Co.*,
    No. 20 Civ. 222, 2020 WL 7405261 (S.D.N.Y. Dec. 16, 2020) ............................................. 9

*Brimelow v. N.Y. Times Co.*,
    No. 21-66, 2021 WL 4901969 (2d Cir. Oct. 21, 2021)................................................ 9, 15, 16

*Brooklyn Union Gas Co. v. Exxon Mobil Corp.*,
  478 F. Supp. 3d 417 (E.D.N.Y. 2020) ................................................................... 27

*Calvin Klein Trademark Tr. v. Wachner*,
  129 F. Supp. 2d 248 (S.D.N.Y. 2001) ............................................................. 18, 19

*Carroll v. Trump*,
  No. 22 Civ. 10016, 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023) ................. 16, 17, 18, 19, 20

*Carroll v. Trump,*
  No. 20 Civ. 7311, 2023 WL 4393067 (S.D.N.Y. July 5, 2023) ...................................... *passim*

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ................................................................................. 8

*Chau v. Lewis*,
  935 F. Supp. 2d 644 (S.D.N.Y. 2013) ............................................................. 2, 10

*Chau v. Lewis*,
  771 F.3d 118 (2d Cir. 2014) ...................................................................... 2, 10, 11

*Clark v. Clark*,
  No. 93-47-CA, 1993 WL 528464 (Fla. Cir. Ct. June 22, 1993) ........................... 14

*Clark v. Clark*,
  641 So. 2d 866 (Fla. Dist. Ct. App. 1994) ......................................................... 14

*Conason v. Megan Holding, LLC*,
  25 N.Y.3d 1 (2015) ........................................................................................ 14

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004) .............................................................. 21

*Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*,
  981 F. Supp. 112 (E.D.N.Y. 1997) ................................................................... 11

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
  551 F. Supp. 3d 320 (S.D.N.Y. 2021) ......................................................... 17, 19

*Cummings v. City of New York*,
  No. 19 Civ. 7723, 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ........................... 19

*Daleiden v. Planned Parenthood Fed'n of Am.*,
  No. 21-2068, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) ..................................... 17

*Davitashvili v. Grubhub Inc.*,
   No. 20 Civ. 3000, 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022)............................... 8

*DiStiso v. Cook*,
   691 F.3d 226 (2d Cir. 2012) ................................................................................. 15

*Donoghue v. Gad*,
   No. 21 Civ. 7182, 2022 WL 3156181 (S.D.N.Y. Aug. 8, 2022)............................... 5

*Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.*,
   No. 17 Civ. 124, 2020 WL 1031271 (S.D.N.Y. Mar. 2, 2020)............................... 27

*Fine v. ESPN, Inc.*,
   11 F. Supp. 3d 209 (N.D.N.Y. 2014) .................................................................... 18

*Fossil Grp., Inc. v. Angel Seller LLC*,
   627 F. Supp. 3d 180 (E.D.N.Y. 2022)............................................................. 23, 25

*Franklin v. Daily Holdings, Inc.*,
   135 A.D.3d 87 (1st Dep't 2015)........................................................................... 111

*Free Holdings Inc. v. McCoy*,
   No. 22 Civ. 881, 2023 WL 2561576 (S.D.N.Y. Mar. 17, 2023)............................. 21

*GEOMC Co. v. Calmare Therapeutics Inc.*,
   918 F.3d 92 (2d Cir. 2019)........................................................... 9, 23, 24, 25, 28

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016) ................................................................................... 5

*Gonzalez v. Gray*,
   69 F. Supp. 2d 561 (S.D.N.Y. 1999).................................................................... 18

*Gonzalez v. Gray*,
   216 F.3d 1072 (2d Cir. 2000)......................................................................... 18, 20

*Guccione v. Hustler Mag., Inc.*,
   800 F.2d 298 (2d Cir. 1986) ................................................................................ 12

*Harrell v. Miller*,
   No. 21 Civ. 6714, 2022 WL 375289 (S.D.N.Y. Feb. 8, 2022)............................... 13

*Holy Spirit Ass'n v. N.Y. Times Co.*,
   49 N.Y.2d 63 (1979)....................................................................................... 18, 19

*Hughes v. Twenty-First Century Fox, Inc.*,
    304 F. Supp. 3d 429 (S.D.N.Y. 2018) ................................................................. 16

*Hybrid Athletics, LLC v. Hylete, Inc.*,
    No. 3:17 Civ. 1767, 2019 WL 6358246 (D. Conn. Nov. 27, 2019) ........................ 24

*In re Livent, Inc. Noteholders Secs. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................. 21

*James v. Gannett Co.*,
    40 N.Y.2d 415 (1976) .......................................................................................... 22

*Jewell v. NYP Holdings, Inc.*,
    23 F. Supp. 2d 348 (S.D.N.Y. 1998) ............................................................. 10, 11

*Kinsey v. N.Y. Times Co.*,
    991 F.3d 171 (2d Cir. 2021) ................................................................................ 18

*Konikoff v. Prudential Ins. Co. of Am.*,
    No. 94 Civ. 6863, 1999 WL 688460 (S.D.N.Y. Sept. 1, 1999) ............................. 16

*Konikoff v. Prudential Ins. Co. of Am.*,
    234 F.3d 92 (2d Cir. 2000) .................................................................................. 16

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014) .................................................................................. 8

*Mulder v. Donaldson, Lufkin & Jenrette*,
    611 N.Y.S.2d 1019 (Sup. Ct., N.Y. Cty. 1994) ................................................... 19

*Mulder v. Donaldson, Lufkin & Jenrette*,
    623 N.Y.S.2d 560 (1995) ..................................................................................... 19

*Nunes v. NBCUniversal Media, LLC*,
    No. 22 Civ. 1633, 2022 WL 17251981 (S.D.N.Y. Nov. 28, 2022) .................. 10, 11

*Pasternack v. Shrader*,
    863 F.3d 162 (2d Cir. 2017) ................................................................................ 24

*People v. Blodgett*,
    37 A.D.2d 1035 (3d Dep't 1971) ........................................................................... 4

*People v. Starnes*,
    206 A.D.3d 1133 (3d Dep't 2022) ....................................................................... 13

*People v. Velett*,
    205 A.D.3d 1143 (3d Dep't 2022) ............................................................ 2, 13

*Pepper v. United States*,
    562 U.S. 476, 131 S. Ct. 1229 (2001) .......................................................... 27

*Printers II, Inc. v. Pros. Pub., Inc.*,
    784 F.2d 141 (2d Cir. 1986) ......................................................................... 11

*Ramsay-Nobles v. Keyser*,
    No. 16 Civ. 5778, 2018 WL 6985228 (S.D.N.Y. Dec. 18, 2018) ............................. 24

*Sheindlin v. Brady*,
    597 F. Supp. 3d 607 (S.D.N.Y. 2022) ......................................................... 17

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
    No. 06 Civ. 11407, 2007 WL 4820968 (S.D.N.Y. Sept. 18, 2007) ......................... 17

*Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.*,
    No. 17 Civ. 8528, 2022 WL 836890 (S.D.N.Y. Mar. 21, 2022) ...................... 23, 24

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
    No. 18 Civ. 5075, 2020 WL 3472597 (S.D.N.Y. June 25, 2020) ........................... 27

*Vetere v. Associated Press, Inc.*,
    No. 88 Civ. 4115, 1989 WL 39664 (S.D.N.Y. Apr. 17, 1989) .............................. 12

*Wheeler v. Twenty-First Century Fox*,
    322 F. Supp. 3d 445 (S.D.N.Y. 2018) ......................................................... 15

**STATUTES**

10 U.S.C. § 920 ................................................................................................... 13

Cal. Penal Code § 263.1 ..................................................................................... 13

N.Y. C.P.L.R. § 214-j ..................................................................................... 3, 4

N.Y. Civ. Rights Law § 74 ...................................................................... 17, 18, 19, 22

N.Y. Correct. Law § 168-a ................................................................................... 2

N.Y.P.L. § 70.02 ................................................................................................. 2

N.Y.P.L. § 130.65 ....................................................................................... 2, 123

**Rules**

Federal Rule of Civil Procedure 12 ............................................................... 8, 9, 15, 22

Federal Rule of Civil Procedure 15 ...................................................................... 9, 28

**Other Authorities**

Ben Protess et al., *Donald Trump Faces Several Investigations. Here's Where They Stand.*, N.Y. Times (June 16, 2023) ................................................................................ 26

David Aaron, *How Much Prison Time Does Former President Trump Face? Applying the U.S. Sentencing Guidelines*, Just Security (June 12, 2023) ...................................... 26

Erica Orden, *Trump Now Faces Four Trials Over Six-Month Span During Critical Phase of 2024 Campaign*, Politico (June 15, 2023) .................................................... 26

*Important Dates in the 2024 Presidential Race,* Ballotpedia ...................................... 26

Katelyn Polantz, *Special Counsel Asks for December Trial Date for Trump in Mar-a-Lago Documents Case*, CNN (June 23, 2023) ..................................................... 26

New York Bill Jacket, 2011 S.B. 1882, Ch. 26, Governor Andrew M. Cuomo Statement of Appproval .................................................................................................. 13

New York Bill Jacket, 2011 S.B. 1882, Ch. 26, Senator Joseph A. Griffo Letter in Support ...... 13

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1488 (3d ed.) ....................................... 23

**PRELIMINARY STATEMENT**

In May 2023, Donald J. Trump lost a two-week trial in the related case known as *Carroll II*, No. 22 Civ. 10016 (S.D.N.Y.), after the jury had deliberated for less than three hours. In light of E. Jean Carroll's gut-wrenching testimony describing how Trump sexually assaulted her in a department store dressing room—as well as testimony from *ten* other witnesses, not one of whom testified on behalf of Trump—the unanimous jury found that Trump had sexually abused Carroll and that he had subsequently defamed her when he claimed that she had made up her story to sell a book. In essence, the jury in *Carroll II* found that Carroll was telling the truth and that Trump was not. Since that time, Trump has alternated between calling the trial in *Carroll II* a complete sham and illogically claiming vindication based on the jury verdict.

Trump's "tit for tat" counterclaim is nothing more than his latest effort to spin his loss at trial. Trump alleges that Carroll defamed him and caused him "inordinate" harm by implying in a post-trial interview that when he sexually assaulted her, he not only used his fingers, but also his penis. While that might read like an article penned by Andy Borowitz in the *New Yorker* or by a writer at the *Onion*, it's actually the theory of the counterclaim that Trump now purports to assert in this action. But here in federal court, where logic and reason rather than satire prevail, it is clear that Trump's new counterclaim for defamation should be dismissed with prejudice.

First and foremost, Trump's counterclaim should be dismissed because it fails to state a claim upon which relief can be granted. Trump alleges that Carroll falsely asserted that he raped her during a television interview on the morning of May 10, the day after the trial ended. But the two statements Trump picks out from that ten-minute interview cannot possibly constitute defamation as a matter of law. Read in their entirety—as the law requires—Carroll's statements are not plausibly susceptible of a defamatory meaning, are substantially true, were uttered without

1

actual malice, and are protected by the fair reporting privilege. Indeed, the New York criminal

statute that corresponds to the claim on which the jury found Trump liable (sexual abuse) not only

carries a prison sentence of up to seven years, but requires a convicted defendant to register as a

sex offender for the rest of his life. *See* N.Y.P.L. § 70.02(1)(c), (3)(c); N.Y. Correct. Law § 168-

a(3)(a)(i), (7)(b). It is most commonly associated in New York with the prosecution of child sex

offenses. *See, e.g.*, N.Y.P.L. § 130.65(c), (d); *People v. Velett*, 205 A.D.3d 1143, 1143 (3d Dep't

2022). In other words, the fact that the civil jury found by a preponderance of the evidence that

Trump engaged in that offense does not differ substantially from a statement that Trump engaged

in rape. The "gist" and the "sting" of both—especially in the context of the CNN interview here—

are substantially the same. *Chau v. Lewis*, 935 F. Supp. 2d 644, 662 (S.D.N.Y. 2013), *aff'd*, 771

F.3d 118 (2d Cir. 2014).

Trump's counterclaim should also be dismissed on the independent and alternative ground

that a new counterclaim asserted this late in an action should, as a general rule, not be permitted if

it exceeds the scope of the new claims set forth in a plaintiff's amended pleading. Here, Carroll's

recently amended complaint contains no new claims. There is thus no basis for allowing Trump to

proceed with a counterclaim, which would impose on Carroll undue burden and significant

expense, not to mention hold up yet again this otherwise trial-ready, much-delayed case.

## BACKGROUND

This Court is familiar with the parties' history. In June 2019, when Trump was still

President of the United States, Carroll spoke publicly for the first time about how Trump had

sexually assaulted her in a Bergdorf Goodman dressing room in the mid-1990s. *See Carroll v.

Trump*, No. 20 Civ. 7311, 2023 WL 4393067, at *2 (S.D.N.Y. July 5, 2023). In response, Trump

lashed out, issuing a series of defamatory statements over the course of four days in which he

denied Carroll's "accusation, stated that he 'has no idea who this woman is,' and suggested that she fabricated her accusation for ulterior and improper purposes, including to increase sales of her then-forthcoming book in which she discusses having been sexually assaulted by [] Trump and other men." *Id.* at *1. Based on these statements, Carroll sued Trump for defamation in November 2019. *Id.* at *4. Largely due to Trump's dilatory tactics, Carroll's single defamation claim based on Trump's June 2019 statements has now been pending for more than three and a half years. *Id.* at *12.

During that time, the New York legislature passed the Adult Survivors Act ("ASA"), which temporarily revived certain battery claims so long as they satisfied the definition of a sexual offense under New York law. *See* C.P.L.R. § 214-j. Shortly before the ASA took effect, Trump also found occasion to defame Carroll yet again, this time in a statement he posted to Truth Social on October 12, 2022. *Carroll*, 2023 WL 4393067, at *1. Therefore, on Thanksgiving of last year, Carroll filed another suit against Trump, bringing a battery claim for the sexual assault and for defamation based on his October 2022 statement. *See Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) ("*Carroll II*").

Capitalizing on the discovery that had already taken place in the current action, *Carroll II* went to trial on April 25, 2023. The jury heard an overwhelming amount of credible evidence describing Trump's violent sexual assault, his subsequent defamatory statements, and the harms that Carroll suffered. On the stand, Carroll recounted the relevant events in graphic and painful detail. She testified that after a chance encounter in the spring of 1996, she accompanied Trump to the lingerie department to help him pick out a gift for a "girl." *See* Ex. A ("*Carroll II* Trial Tr.") at 170–73, 356. Trump ultimately led her into a dressing room and, once inside, "immediately shut the door and shoved [her] up against the wall," banging her head. *Id.* at 177. Trump then "pulled

down [her] tights" and inserted his fingers into her vagina. *Id.* at 179–80. Carroll testified that "it was a horrible feeling because … he put his hand inside of [her] and curved his finger," which "was extremely painful, extremely painful." *Id.* at 180–81. Carroll also testified that she then felt Trump's penis inside her, but also acknowledged that she could not see it because Trump's body was pressed up so closely against hers, and she managed to push Trump off her and escape seconds later. *Id.* at 181, 636. Carroll went on to explain how the attack and Trump's defamatory statements denying it had negatively impacted her life. *See, e.g.*, *id.* at 181, 215–16, 221, 225–26, 320, 322–24. Carroll's testimony was supported by the consistent testimony of eight additional fact witnesses and two expert witnesses. Trump chose not to present any witnesses and decided not to testify on his own behalf.

At the end of the two-week trial in *Carroll II*, on May 9, 2023, the jury deliberated for approximately two and a half hours. On the first count of battery, the jury was asked to evaluate whether Trump had, by a preponderance of the evidence, committed an ASA predicate sex offense, thereby reviving Carroll's claim. *See* C.P.L.R. § 214-j. Consistent with the parties' proposals, the jury was presented with three possible ASA predicates under New York's criminal code: rape, sexual abuse, and forcible touching. *Carroll II*, ECF 174. The Court instructed the jury to address each predicate in that order until they found that Trump's conduct fit one of those offenses, if at all. *Id*. The jury answered "no" on rape and "yes" on sexual abuse—and it awarded Carroll a total of $2.02 million in damages on that claim. *Id.* [1]

---

[1] As the Court instructed the *Carroll II* jury, under the New York Penal Law, rape requires proof that the defendant engaged in sexual intercourse with the victim and did so without the victim's consent by the use of forcible compulsion. *Carroll II* Trial Tr. at 1416. "Sexual intercourse" is defined as "any penetration, however slight, of the penis into the vaginal opening." *Id.* at 1417. Sexual abuse, by contrast, similarly requires proof that the defendant subjected the victim to sexual contact and did so without the victim's consent by the use of forcible compulsion. *Id.* at 1418. "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either person." *Id.* "Sexual part" is defined as "an organ of human reproduction." *Id.*; *see People v. Blodgett,* 37 A.D.2d 1035, 1036 (3d Dep't 1971).

On the second count of defamation, the jury found that Trump's October 2022 Truth Social post—in which Trump again denied knowing Carroll, claimed he "had nothing to do with" her, and insisted that the incident at Bergdorf's "never happened" and was "completely made up"— was defamatory. *Id.* In order to do so, the jury determined by clear and convincing evidence that Trump's statement was false, meaning that it was "highly probable" and "beyond any 'substantial doubt'" that his statement was not substantially true, and that Trump had made this false statement with actual malice. *Carroll II* Trial Tr. at 1439. The jury awarded Carroll a total of $2.98 million for this claim, including $280,000 in punitive damages based on a finding that Trump had made the October 2022 statement about Carroll "with deliberate intent to injure, or … hatred or ill will or spite," or "with willful or wanton or reckless disregard of another's rights." *Carroll II*, ECF 174; *Carroll II* Trial Tr. at 1435.

The next morning, on May 10, Carroll participated in a live televised interview on CNN. ¶ 3.[2] The segment was just over ten minutes long and involved Carroll, her counsel, and two CNN reporters. *See* Ex. B (CNN interview video); Ex. C (CNN interview transcript).[3] The segment opened with one reporter providing background on the case, including that the jury had found that "Trump sexually abused Carroll in a department store dressing room in the '90s and then defamed her by denying her claim." Ex. B. The reporter then played a video clip released by Trump shortly after the verdict where he states as follows: "What else can you expect from a Trump hating,

---

[2] Standalone "¶ __" references are to the counterclaim that Trump included in his answer to Carroll's amended complaint. *See* ECF 171.

[3] Trump's counterclaim references the interview Carroll gave on CNN on May 10, 2023. ¶¶ 3–8. But the counterclaim does not include or attach the full transcript from that interview. Because the CNN interview is incorporated by reference in the counterclaim, the Court can consider it fully, along with any other matters of which judicial notice may be taken such as what happened at the *Carroll II* trial. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *Donoghue v. Gad*, No. 21 Civ. 7182, 2022 WL 3156181, at *2 (S.D.N.Y. Aug. 8, 2022). The interview is available at https://www.youtube.com/watch?v=PPrBo2_fyAI&t=144s. The transcript of the interview is available at https://transcripts.cnn.com/show/ctmo/date/2023-05-10/segment/05 and https://transcripts.cnn.com/show/ctmo/date/2023-05-10/segment/06.

Clinton appointed judge, who went out of his way to make sure that the result of this trial was as negative as it could possibly be? Speaking to and in control of a jury from an anti-Trump area, which is probably the worst place in the United States for me to get a fair trial, will be appealing this decision, it's a disgrace." *Id.* With the end of that video, the interview began.

What followed during the interview was a series of questions from the two CNN reporters about the case, the jury verdict, and the trial. One reporter started off by reminding Carroll how she had said at one point that she was "here to try and get my life back." *Id.* Carroll responded, "That was why yesterday … I was such a happy woman. I felt like we had accomplished that." *Id.* The same reporter then asked Carroll to "talk about what you were thinking as the jury's decisions were read off in your mind." *Id.* Carroll and her counsel responded with comments about the makeup of the jury and the overall excitement of the moment. *Id.* The following exchange then occurred:

> Reporter: What about when that first finding was found? This jury found that Trump did not rape you. What about that moment?
>
> Carroll: Robbie can explain the legal.
>
> Reporter: Sure. And I want you to, but I just wonder, E. Jean, what went through your head when you heard that?
>
> Carroll: Well, I just immediately say in my own head, oh, yes, he did—oh, yes, he did. So that's my response.
>
> Counsel: So, look, New York law on sexual crimes like this is complicated, and it's not probably appropriate for morning viewers. But the truth of the matter is, is that sexual abuse, which he was found guilty of, is a very, very serious offense. I'm not going to get into the body parts situation with you, but people go to jail for sexual abuse. It's a very serious offense, and most importantly, E. Jean brought this case because she wanted her name back, as you said at the very beginning, she got her name back and the jury found that he lied. And he lied about her maliciously.

*Id.*

The conversation then shifted to other issues in the case, such as the eleven witnesses presented by Carroll and their testimony. *Id.* The conversation also addressed how the verdict destroyed the false narrative of the "perfect victim" of sexual assault—one "who always screamed, a woman who immediately reported, a woman whose life is supposed to fold up, and she's never supposed to experience happiness again." *Id.* Of course, all of these topics were the subject of questioning by Trump's lawyer at trial and were discussed by Carroll's counsel during his closing rebuttal argument at the end of trial. *See, e.g.*, *Carroll II* Trial Tr. at 405–08, 411–12, 434–35, 437–38, 550–52, 646–47, 1406–08. At this point, the interview turned to a post-verdict exchange between Carroll and Trump's lawyer in the courtroom:

> Reporter: There in the courtroom was an encounter, an exchange, between you and the president's lawyer, Joe Tacopina. He came up, you shook hands, I believe. What did he say?
>
> Carroll: Well, Joe Tacopina is very likeable. He's sort of like an 18th century strutting peacock. And people like him. So, when he sticks out his hand to—first, he congratulated Robbie. And then, he was congratulating people on the team. And as I put my hand forward, I said, "he did it and you know it." Then we shook hands, and I passed on.

Ex. B.

Throughout the interview, the chyron on the bottom of the screen read, "TRUMP FOUND LIABLE," with two additional sentences underneath it: "TRUMP CALLS VERDICT A 'WITCH HUNT,' VOWS TO APPEAL $5M JUDGMENT," and "E. Jean Carroll | Won Sexual Abuse, Defamation Case Against Donald Trump." *Id.* That chyron continued to display these words as the panelists turned away from Tacopina and toward other topics, such as the impact of the jury's verdict, potential avenues for Trump to appeal, Trump's failure to attend the trial or testify, and the ASA. *Id.*

On May 22, 2023, Carroll moved to amend her complaint in this action. ECF 155. Her proposed amendment included allegations: (1) drawing from Trump's deposition in this action that demonstrate his personal motive for defaming Carroll in June 2019; (2) accounting for the verdict in *Carroll II*; and (3) describing Trump's statements about Carroll following that verdict. The proposed amendment did not add any new claims. The Court granted Carroll's motion. ECF 169.

On June 27, Trump answered Carroll's first amended complaint. His answer largely duplicated his previous answer in *Carroll II*, but this time, he added a counterclaim for defamation based on Carroll's post-trial CNN interview. *See* ECF 171. In a barebones pleading, Trump now alleges that Carroll defamed him by saying "oh yes he did, oh yes he did" when asked by a reporter what she was thinking when she heard the first part of the jury's verdict. ¶ 5. Trump also alleges that Carroll defamed him by recounting that she told Trump's lawyer that "[Trump] did it and you know it" during their brief courtroom exchange following the jury verdict. ¶ 7.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). Although a court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor," *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014), it "does not credit 'mere conclusory statements' nor 'threadbare recitals of the elements of a cause of action.'" *Davitashvili v. Grubhub Inc.*, No. 20 Civ. 3000, 2022 WL 958051, at *4 (S.D.N.Y. Mar. 30, 2022) (Kaplan, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)). In deciding a motion to dismiss, a court may also consider documents "incorporated by reference" in or "integral to" the complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), and may take

"judicial notice of facts that are publicly available if their accuracy cannot reasonably be questioned," *Barbash v. STX Fin., LLC*, No. 20 Civ. 123, 2020 WL 6586155, at *2 (S.D.N.Y. Nov. 10, 2020) (citing *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016)). As many courts have recognized, "[b]ecause a defamation suit 'may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself,' courts should, where possible, resolve defamation actions at the pleading stage." *Brimelow v. N.Y. Times Co.*, No. 20 Civ. 222, 2020 WL 7405261, at *4 (S.D.N.Y. Dec. 16, 2020), *aff'd*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021).

Where a new counterclaim is improper, the counterdefendant may move to dismiss it pursuant to Rule 12(b)(6). That procedure is necessary because a counterclaim asserted in an answer to an amended complaint would not have been the subject of a motion to amend pursuant to Rule 15, and the counterdefendant would thus have had no "opportunity to oppose" the counterclaim before it was asserted. *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 101 (2d Cir. 2019). In deciding such a motion to dismiss, a court may "exercise the discretion the court would have been entitled to use if the counterclaimant had moved under Rule 15 to file the new counterclaim." *Id.*

I.   **TRUMP FAILS TO STATE A CLAIM**

To properly state a cause of action for defamation, a plaintiff must plausibly allege "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting [defamation] per se, and (vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001) (citation omitted). Because he is a public figure, the level of fault Trump must show to satisfy (v) is that the allegedly defamatory "statements were made with 'actual malice'—that is, with knowledge that the statements were

false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir.

2015). As demonstrated below, Trump's counterclaim does not satisfy parts (ii), (v), and (vii) of

this standard.

### A.   Carroll's Real-Time Reaction to the Jury's Determination on Rape Did Not Constitute Defamation

#### 1.   Carroll's Statement Is Substantially True

In response to a reporter's question about her immediate reaction to the jury's rape

determination, Carroll initially referred to her lawyer to "explain the legal." Ex. B. She then added

that she "[said] in [her] own head, oh, yes, he did—oh, yes, he did." *Id.* This statement about

Carroll's recollection was not defamatory as a matter of law because it was substantially true.

Truth is a complete defense to defamation. *See Birkenfeld v. UBS AG*, 172 A.D.3d 566 (1st

Dep't 2019). Assessing whether a statement is true—and thus non-defamatory—is not a "binary"

question. *Chau v. Lewis*, 935 F. Supp. 2d 644, 662 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir.

2014). "Some statements are held to be non-actionable because they are completely true." *Id.* But,

as relevant here, some statements are "held to be substantially true where the admitted truth

becomes more tenuous, but still the overall 'gist' or 'sting' cannot be said to be 'substantially'

different." *Id.* (cleaned up). Under this substantial truth principle, a statement cannot qualify as

defamatory unless "the difference between the statement and reality is 'plainly substantial.'" *Id.*

(quoting *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 367 (S.D.N.Y. 1998)).

In conducting that analysis, "[c]ourts typically compare the complained of language with

the alleged truth." *Nunes v. NBCUniversal Media, LLC*, No. 22 Civ. 1633, 2022 WL 17251981, at

*4 (S.D.N.Y. Nov. 28, 2022) (citation omitted). They then assess whether "the overall 'gist or

substance of the challenged statement' is true," *Chau*, 771 F.3d at 129, and "would not have a

different effect on the mind of the reader from that which the pleaded truth would have produced,"

*Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dep't 2015). "Whether a statement is substantially true is an issue of law properly decided on a motion to dismiss." *Nunes*, 2022 WL 17251981, at *4.

     *Chau v. Lewis* exemplifies this approach. There, the Second Circuit evaluated a defamation claim arising from a statement concerning "Plaintiffs' investment 'in nothing but CDOs backed by the triple-B tranche of a mortgage bond.'" 771 F.3d at 130–31. Although this characterization was inaccurate, the Second Circuit held the statement to be non-defamatory as a matter of law. *Id.* It reasoned that even if the defendant had published the strict truth—*i.e.*, that not even half of the plaintiffs' portfolios were backed by A-/A3 securities or better—"the effect on the reader would have been appreciably the same." *Id.* at 130. In other words, when considered in the context in which the statement was made, no reader would come away with a "different impression" of the plaintiff's business. *Id.*; *see also id.* at 131 (same for statement that plaintiff took home $26 million a year in fees from selling these securities, when he actually took home considerably less than that).

     Similar conclusions have been reached under various other different fact patterns. Courts, for example, have considered the following statements to be "substantially true": (1) making  the "literally false" statement that the defendant was overdue in paying debts, when the defendant had disputed the "bill with such vigor that it was apparent that [it] would not pay the bill when due," *Printers II, Inc. v. Pros. Pub., Inc.*, 784 F.2d 141, 146–47 (2d Cir. 1986); (2) labeling plaintiff a "prime suspect" and "main suspect," when he was in fact just "a suspect," *Jewell*, 23 F. Supp. 2d at 369; (3) reporting that plaintiff was "forced to leave the military … for less than satisfactory service," when he had submitted a request for discharge "for the good of the service" in order to avoid a court martial, *Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 981 F. Supp. 112, 120–

21 (E.D.N.Y. 1997); (4) stating that plaintiff was a member of the American Nazi Party, when he

had in fact participated in a march organized by the National Socialist White People's Party, *Vetere*

*v. Associated Press, Inc.*, No. 88 Civ. 4115, 1989 WL 39664, at *1–*2 (S.D.N.Y. Apr. 17, 1989);

and (5) implying that plaintiff was an adulterer, even though he had stopped cheating on his wife,

but had committed adultery for more than a decade prior, *Guccione v. Hustler Mag., Inc.*, 800 F.2d

298, 302–03 (2d Cir. 1986).

Under that line of authority, Trump's defamation claim cannot stand. For starters, Trump

does not allege that Carroll lied about her own recollections. In other words, he does not claim that

she lied when she told CNN's reporters that she had thought "oh, yes, he did—oh, yes, he did"

while listening to the jury verdict. Nor does Trump claim that Carroll falsely told the CNN

reporters that the jury found Trump liable for rape. Instead, Trump alleges that by reciting her own

undisputed internal thoughts, Carroll falsely implied that Trump had raped her. ECF 171 ¶ 5.

In assessing whether that implication is defamatory, the question is not whether it was

defamatory to claim that Trump raped Carroll in a context where he had never met her. Rather, the

real question is whether it is defamatory to claim that Trump raped her as that term is used in the

New York Penal Law, when a jury had found not only that Trump had in fact met Carroll, but that

he had also sexually abused her, as that term is used in the New York Penal Law. And the answer

to this question is straightforward: Carroll's statement on CNN was substantially true because its

overall gist and substance was true, and because there is no meaningful difference in the effect that

would be produced in the minds of viewers.

As noted above, the jury found Trump liable for inserting his fingers into Carroll's vagina

(sexual abuse), but not for inserting his penis into her vagina (rape). First degree sexual abuse in

New York is a class D felony that carries a potential prison term of up to seven years. *See* N.Y.P.L.

§§ 70.02(1)(c), (3)(c), 130.65. A conviction for sexual abuse in the first degree requires the defendant to register as a sex offender for life. N.Y. Correct. Law § 168-a(3)(a)(i), (7)(b) (defining "sexually violent offender" as someone who is convicted of, *inter alia*, sexual abuse in the first degree); *id.* § 168-h(2) (requiring sexually violent offender to be registered and verified "annually for life"). It is frequently used to indict child sex offenders. *See, e.g.*, *People v. Velett*, 205 A.D.3d 1143, 1143 (3d Dep't 2022); *People v. Starnes*, 206 A.D.3d 1133, 1136 (3d Dep't 2022) (upholding sexual abuse in the first degree conviction where thirteen year-old victim testified that defendant "reached his hand into the bath and digitally penetrated the victim's vagina" against her consent); *Harrell v. Miller*, No. 21 Civ. 6714, 2022 WL 375289, at *1 (S.D.N.Y. Feb. 8, 2022) (describing conviction for sexual abuse in the first degree, among other sexual crimes, where habeas petitioner pulled down the fifteen year-old victim's pants and "inserted two fingers into [her] vagina," which caused the victim to "cr[y] in pain," and then "took out his penis," "rubbed it against" the victim's vagina, and "unsuccessfully tried to penetrate her"). *See also* New York Bill Jacket, 2011 S.B. 1882, Ch. 26, Governor Andrew M. Cuomo Statement of Approval (explaining that N.Y.P.L § 130.65 was amended in 2011 to provide "greater protections … to young sexual abuse victims"); *id.*, Senator Joseph A. Griffo Letter in Support (the amended legislation added "a new subdivision to Sexual Abuse in the First Degree [§ 130.65(d)], making it a class D violent felony offense for a child under the age of thirteen to be subjected to sexual contact by a person who is twenty-one years old or older"). In other jurisdictions, forcibly inserting a finger into a woman's vagina, as the jury found Trump did here, would, in fact, constitute rape. *See, e.g.*, 10 U.S.C. § 920 (defining rape to include "the penetration, however slight, of the vulva ... of another by any part of the body or any object"); Cal. Penal Code § 263.1 ("[A]ll forms of nonconsensual sexual assault may be considered rape for purposes of the gravity of the offense."). As a result, the

13

truth (that Trump sexually abused Carroll) did not differ so substantially from Carroll's statement

on CNN (that she recalled thinking he had raped her) so as to render her remark defamatory. *See*

*Bauer v. Baud*, No. 22 Civ. 1822, 2023 WL 2307413, at *6  (S.D.N.Y. Mar. 1, 2023); *see also*

*Clark v. Clark*, No. 93-47-CA, 1993 WL 528464, at *2 (Fla. Cir. Ct. June 22, 1993) (report was

substantially true when newspaper said a deputy sheriff had been arrested for rape when he had

actually been charged with sexual battery), *aff'd*, 641 So. 2d 866 (Fla. Dist. Ct. App. 1994).

Any doubt on that score is resolved by all of the contemporaneous circumstances

surrounding Carroll's statement: listeners of the CNN interview were informed of exactly what the

jury had found, and Carroll was simply sharing the immediate (and non-legal) thoughts that had

entered her head as the verdict was read. Ex. B. If it can be substantially true to call someone an

adulterer when he has stopped cheating on his wife, or to call someone a member of the American

Nazi Party when he had marched with a different fascist group, then any implication from Carroll's

account of her internal thoughts was also substantially true in context. *See Bauer*, 2023 WL

2307413, at *6 (rejecting plaintiff's "wrong distinction" for substantial truth analysis when it

contradicted objective (and incorporated) documentary evidence). At bottom, the "*true* bridge

between" Trump's conduct and Carroll's statement is "small enough to render the 'gist' or 'sting'

of the statements unchanged." *Id*. (emphasis in original).

This conclusion is independently supported by the principle of collateral estoppel. *See*

*Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 17 (2015) (elements of collateral estoppel). The

jury in *Carroll II* found by clear and convincing evidence that Trump defamed Carroll when he

denied her allegation of sexual assault. *Carroll II*, ECF 174. In other words, the jury found that

there was a high probability that Carroll's account of what happened at the department store was

itself substantially true. For that reason, Carroll's repeating her reaction to the jury verdict—a

reaction that reflected the very account that she had testified to in court and that was disputed in

connection with the *Carroll II* defamation claim—represented a substantially true statement. And

for the reasons already given, a substantially true statement cannot be defamatory.

###### 2.    Carroll's Statement Was Not Made with Actual Malice

Trump's counterclaim must be dismissed under Rule 12(b)(6) for still another reason:

Trump fails to plausibly allege that Carroll made the challenged statement "with knowledge that

[it was] false or with reckless disregard of whether [it was] false or not." *Brimelow v. N.Y. Times

Co.*, No. 21-66, 2021 WL 4901969, at *2 (2d Cir. Oct. 21, 2021) (citation omitted). "[G]iven the

difficulty of proving [such] actual malice, as well as the fact that actual malice must be proven by

clear and convincing evidence in order for a plaintiff to succeed, it stands to reason that Rule

12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's

defamation claim." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013), *aff'd*, 807 F.3d

541 (2d Cir. 2015) (citation omitted).

Here, Trump alleges only that "[Carroll] made these false statements with actual malice

and ill will with an intent to significantly and spitefully harm and attack [Trump's] reputation, as

these false statements were clearly contrary to the jury verdict in *Carroll II* whereby [Trump] was

found not liable for rape by the jury." ¶ 10. But it is black letter law that such conclusory and

boilerplate allegations "must be discarded at the outset." *Biro*, 963 F. Supp. 2d at 279–81;

("[P]leading 'actual-malice buzzwords' is simply not enough to nudge a case into discovery.");

*see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("A court cannot credit a plaintiff's

merely speculative or conclusory assertions."); *Wheeler v. Twenty-First Century Fox*, 322 F. Supp.

3d 445, 456 n.9 (S.D.N.Y. 2018) ("[c]onclusory statements" of actual malice "will not suffice").

Once Trump's conclusory allegation is set aside, nothing remains. "The element of actual

malice in a defamation claim focuses primarily on what a defendant knew or believed at the time

a purportedly false statement was made." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp.

3d 429, 453 (S.D.N.Y. 2018). Yet here, Trump offers no allegations about Carroll's own thought

process when she made the allegedly defamatory statement. Nor does he offer any allegations

meant to support an inferential finding of actual malice. Instead, the facts he pleads, and the facts

incorporated by reference into his pleading, render it *implausible* to conclude that Carroll acted

with actual malice. During the CNN interview, Carroll answered a question that asked her to

explain what she was thinking at the time she heard the verdict on her battery claim. Ex. B. Trump

does not allege that she lied or misrepresented her own recollection. *See* ECF 171. Moreover,

Carroll expressly deferred discussion of the legal issues to her counsel—and offered her memory

of events during a segment that otherwise fully described the jury verdict (including its finding

that Trump had not raped her within the meaning of the New York Penal Law). *See* Ex. B. Nothing

about these allegations makes it plausible to believe that Carroll lied or acted without regard for

the truth. *See Konikoff v. Prudential Ins. Co. of Am.*, No. 94 Civ. 6863, 1999 WL 688460, at *28

(S.D.N.Y. Sept. 1, 1999) ("[I]naccurate or imprecise language, even if critical of the plaintiff, does

not suffice to demonstrate malice where the underlying facts have been disclosed." (collecting

cases)), *aff'd*, 234 F.3d 92 (2d Cir. 2000). As a result, there is "no combination of allegations from

which one could plausibly infer that [Carroll] was purposely avoiding the truth" when she was

asked to recite what she was thinking when she heard the jury's verdict. *Brimelow*, 2021 WL

4901969, at *3.

### 3. Carroll's Statement Is a Fair and True Report of the *Carroll II* Trial

Trump's counterclaim also fails for a third reason: it seeks to impose liability on a statement

that is clearly shielded by the fair and true reporting privilege. *See Carroll v. Trump*, No. 22 Civ.

10016, 2023 WL 2669790, at *5 (S.D.N.Y. Mar. 28, 2023) (addressing this privilege in the *Carroll*

*II* case).

"New York law recognizes certain privileges that shield an individual from liability for defamation." *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 629 (S.D.N.Y. 2022). Under Section 74 of the New York Civil Rights Law, "a civil action cannot be maintained against any person for the publication of a fair and true report of any judicial proceeding." *Carroll*, 2023 WL 2669790, at *5 (quoting N.Y. Civ. Rights Law § 74). This privilege exists to encourage the public dissemination of information about judicial proceedings and extends beyond the institutional press to "any person, firm or corporation." *Id.* (citation omitted). Moreover, it is not limited to comments made at any particular point in a judicial proceeding. *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 331–32 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, No. 21-2068, 2022 WL 1013982 (2d Cir. Apr. 5, 2022).

As this Court has recognized, a statement falls within the fair and true reporting privilege where two elements are met: (1) it constitutes a report on a judicial proceeding, and (2) it is fair and true. *Carroll*, 2023 WL 2669790, at *5–*7. Unlike Trump's October 2022 statement at issue in *Carroll II*, Carroll's statement here satisfies both requirements. *See Abkco Music, Inc. v. William Sagan, Norton LLC*, No. 15 Civ. 4025, 2016 WL 2642224, at *4, *7 (S.D.N.Y. May 6, 2016) (granting motion to dismiss where statement was protected by fair reporting privilege and collecting cases doing same); *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06 Civ. 11407, 2007 WL 4820968, at *3 (S.D.N.Y. Sept. 18, 2007) ("It is for the Court to determine as a matter of law if a publication is a 'fair and true' report under section 74, unless the Court determines that an issue of fact remains.").

Carroll's statement about the jury verdict certainly qualifies as a "report" of a judicial proceeding. For a statement to qualify as a "report" under Section 74, an "ordinary viewer or reader" must be able to "determine from the [statement] itself that the [statement] is reporting on

17

[a judicial] proceeding." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178–79 (2d Cir. 2021) (final alterations in original) (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014)). Where context makes it "impossible for the ordinary viewer [or reader] to determine whether [the publication] was reporting on a judicial proceeding, the absolute privilege does not apply." *Carroll*, 2023 WL 2669790, at *5 (alterations in original) (quoting *Kinsey*, 991 F.3d at 178). But a "report" can otherwise take many forms and can encompass even "statements or allegations that go beyond matters in a proceeding." *Fine*, 11 F. Supp. 3d at 216–17; *see also Gonzalez v. Gray*, 69 F. Supp. 2d 561, 568 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000) (collecting cases). Thus, the privilege applies wherever the "content or context" confirm that a statement is "sufficiently connected" to a legal proceeding and is not merely an independent attack focused "exclusively on underlying events." *Carroll*, 2023 WL 2669790, at *6.

Applying those principles here, Carroll's statement is clearly a "report" of the *Carroll II* trial proceeding—which was the overriding, unmistakable subject of her CNN interview. Indeed, this was clear in context: Carroll made her statement during a post-trial interview about the trial verdict, on a screen plastered with chyrons about the trial verdict, in which reporters asked Carroll and her lawyer questions about the trial proceedings and Trump's stated intention to appeal the verdict. There is no plausible basis for inferring that Carroll's statement was not a "report" of the trial: she was quite literally reporting on her thought process as the jury issued its verdict on her own claim. This was not an independent attack focused on the "underlying events." Any viewer would instantly grasp that CNN's interview and Carroll's statements were reporting on the case.

And that report was both fair and true. For purposes of Section 74, a report is considered fair and true "if its substance is substantially accurate." *Id.* at *7 (quoting *Calvin Klein Trademark Tr. v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001); *accord Holy Spirit Ass'n v. N.Y. Times*

*Co.*, 49 N.Y.2d 63, 67 (1979)). The question is only whether a statement "is a substantially accurate description of the claims *made in the … proceeding.*" *Mulder v. Donaldson, Lufkin & Jenrette*, 611 N.Y.S.2d 1019, 1023–24 (Sup. Ct., N.Y. Cty. 1994), *aff'd*, 623 N.Y.S.2d 560 (1995) (emphasis added). That holds true even if the "allegations are erroneous," since "section 74's privilege is purposely designed to immunize reporting on the allegations made in proceedings regardless of the veracity of those underlying allegations." *Cummings v. City of New York*, No. 19 Civ. 7723, 2020 WL 882335, at *19 (S.D.N.Y. Feb. 24, 2020) (cleaned up). A report is "substantially accurate" if it "suggest[s] [no] more serious conduct than that actually suggested in the official proceeding." *Carroll*, 2023 WL 2669790, at *7 (quoting *Calvin Klein Trademark Tr.*, 129 F. Supp. 2d at 253). To gauge the accuracy of the statement, "the language … should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n*, 49 N.Y.2d at 68; *see also Ctr. for Med. Progress*, 551 F. Supp. 3d at 331 (litigant "cannot cherry-pick one of several definitions of a word, take the word entirely out of context, and claim that such definition precludes a finding that the Challenged Statements were substantially accurate").

Trump alleges that Carroll's comment—"oh yes he did, oh yes he did"—"disregarded the jury's finding that [Trump] did not rape her." ¶ 5. But whether her single statement accurately reflected the jury's finding is not the relevant inquiry. The question is whether Carroll's comment suggests "conduct more serious than the conduct *alleged* in the underlying court case[]." *Ctr. for Med. Progress*, 551 F. Supp. 3d at 331 (emphasis added). Clearly, it does not. When Carroll took the witness stand just a few days prior to hearing the jury's verdict, she explained to the jury that she thought Trump had inserted his penis into her vagina. *Carroll II* Trial Tr. at 181, 636. Both at opening and closing argument, her counsel asked the jury to find that Trump had raped Carroll under the New York Penal Law. *Id.* at 46, 1258. Carroll's report of her thoughts in hearing the jury

**A1104**

verdict was thus "substantively equivalent" to her position in the case. *Gonzalez v. Gray*, 216 F.3d 1072, at *1 (2d Cir. 2000).

As the Court no doubt recalls, Trump moved for summary judgment in *Carroll II* on the ground that his October 2022 Truth Social statement was a fair and true report of his answer in *Carroll I*. *See Carroll*, 2023 WL 2669790, at *6. The Court denied that motion, concluding that no reasonable juror could find "the content or context" of Trump's statement to be a report of a judicial proceeding. *Id*. The Court reached that conclusion because Trump's statement was "an amalgamation of Mr. Trump's personal views and comments on a wide range of subjects," with only "passing references" to the judicial proceeding, and Trump's comments about Carroll focused "exclusively on underlying events" rather than a "judicial proceeding relating to those events." *Id.* at *6–*7 (cleaned up). Here, Carroll's statement on CNN could hardly be more different. The interview was styled as a report on the very judicial proceeding between Carroll and Trump that had just concluded the day before. Carroll's comment concerned the jury verdict specifically. Moreover, whereas Trump's statement in *Carroll II* implied "a far broader and more corrosive conspiracy than anything that was at issue in *Carroll I*," *id.* at *9, the statement at issue here was perfectly consistent with (and merely described) Carroll's own testimony in *Carroll II*. Carroll simply repeated on CNN her recollection that Trump had used his penis to penetrate her—a position that had been fully aired and explored at trial, and that was therefore shielded by Section 74.

**B.     Carroll Did Not Commit Defamation When She Described Her Conversation with Opposing Counsel**

Trump separately alleges that Carroll defamed him in the CNN interview by describing an in-court, post-verdict exchange with his lawyer, Joseph Tacopina, where she stated: "[H]e did it and you know it." ¶ 7. Trump does not (and could not) allege that Carroll's statement was literally

false in the sense that she inaccurately described her conversation with Tacopina. Nor does Trump

allege that Carroll falsely characterized Tacopina's actual beliefs about Trump's guilt—a theory

that would turn on Carroll's opinion about Tacopina's subjective state of mind. Carroll did not

"imply that [she] [was] aware of any undisclosed facts that would lend a factual connotation to

[her] speculation," *Condit v. Dunne*, 317 F. Supp. 2d 344, 369 (S.D.N.Y. 2004), nor does Trump

allege that Carroll somehow commented on Tacopina's own subjective beliefs with actual malice,

*Free Holdings Inc. v. McCoy*, No. 22 Civ. 881, 2023 WL 2561576, at *15 (S.D.N.Y. Mar. 17,

2023).

Instead, Trump alleges that Carroll's retelling of her exchange with Tacopina "reaffirm[ed]

her claim that [Trump] raped her." ¶ 7. But this allegation stumbles at the start, since it depends

on a characterization of Carroll's statement that is inconsistent with the statement itself. *See In re*

*Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court

need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would

render a claim incoherent, or that are contradicted … by documents upon which its pleadings rely,

or by facts of which the court may take judicial notice." (citation omitted)).

Neither Carroll's statement about what she said to Tacopina, nor the question posed to her

by the CNN interviewer, used the word "rape." Ex. B. So there is nothing on the face of her

statement that suggests she was specifically referring to rape when she said "he did it." And the

context of her statement renders any such inference implausible. As Carroll related it on CNN, her

exchange with Tacopina occurred right after the verdict was announced. At that time, Tacopina

congratulated Carroll's counsel and then Carroll herself on the trial victory; Carroll (in the

statement here at issue) responded to Tacopina's congratulations by telling him, "He did it and you

know it." *Id.* On its face, this statement was a reaction to—and an endorsement of—the jury verdict

that Trump had sexually abused and defamed her. *See Carroll II*, ECF 174. In other words, Trump *did* do it (and, in Carroll's subjective estimation, Tacopina knew that he did it). A reasonable viewer of the CNN interview would not understand this statement as a claim that Trump raped Carroll.

In asserting otherwise, Trump would have this Court conclude that by using the pronoun "it," Carroll specifically meant "rape," as that term is defined in the New York Penal Law. But the "it" as used by Carroll at the time is not "susceptible of the meaning" that Trump "ascribe[s]" to it. *James v. Gannett* Co., 40 N.Y.2d 415, 419 (1976). Trump's interpretation requires "straining to place a particular interpretation on the published words" that, as discussed, is untethered to the context and the content of Carroll's statement. *Id.* at 420; *see also Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985) (defamation claims cannot be supported by "strained or artificial construction"). In that crucial sense, Trump's defamation claim is not "plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.

But there is more: Trump's defamation claim based on this statement fails for the same two additional reasons given above. *First*, it fails for want of any plausible allegation of malice, since all that Trump pleads are "actual-malice buzzwords." *Biro*, 963 F. Supp. 2d at 279–80 (citation omitted). And *second*, it fails by virtue of Section 74's fair and true reporting privilege, since Carroll's statement was a report of events that occurred in the courtroom and Trump does not deny that her account is accurate.

## II.   TRUMP'S COUNTERCLAIM IS IMPROPER AT THIS STAGE OF THE CASE

Trump's counterclaim not only fails on the merits (and should therefore be dismissed for failure to state a claim under Rule 12(b)(6)), but it is also procedurally improper.

The Second Circuit recently clarified the standard that applies when a counterclaim is asserted in response to an amended complaint. More specifically, the Second Circuit addressed

whether the counterclaim "may respond as broadly as one included in an answer to an original complaint or whether it must respond only to the new allegations of an amended complaint." *GEOMC Co.*, 918 F.3d at 99. For a counterclaim "presented at an early stage of the litigation," the Second Circuit held that "the new counterclaim may normally be as broad as those filed in response to an original complaint." *Id.* at 100. But the opposite rule applies to a counterclaim asserted "[a]t a late stage of the litigation." *Id.* At that point, "a new counterclaim that raises issues beyond the scope of the new claims made in the most recent amended complaint will usually cause escalating prejudice to the counterdefendant and undue expansion of litigation that the court is charged with managing." *Id.* Thus, a late-stage counterclaim that "exceeds the scope of the plaintiff's new claims" should "normally not be permitted." *Id*; *accord Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.*, No. 17 Civ. 8528, 2022 WL 836890, at *8 (S.D.N.Y. Mar. 21, 2022) (dismissal of late-stage counterclaim turns on "(1) how far into the litigation the new counterclaim[ is] asserted," and "(2) whether the counterclaim raises issues beyond the scope of the new claims made in the … [a]mended [c]omplaint" (citation omitted)).

Trump's counterclaim indisputably arrives at a late stage of this nearly four-year litigation. Discovery has been closed since November 2022; Trump's summary judgment motion has been decided; motions *in limine* are fully briefed and substantially resolved; a joint pretrial order has been submitted; and trial is scheduled to begin on January 15, 2024. ECF 77, 100, 129, 145, 170, 173. Trump himself has acknowledged that this case is "ready to proceed to trial." ECF 164 at 9. The Second Circuit has recognized that "the risk of substantial prejudice increases with the passage of time," *GEOMC Co.*, 918 F.3d at 100 (quoting Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1488 (3d ed.)), and courts have found far less mature cases to still be at "a late stage" in determining that dismissal of a counterclaim is warranted, *see Fossil Grp., Inc. v. Angel Seller LLC*, 627 F.

Supp. 3d 180, 196 (E.D.N.Y. 2022) (counterclaim came at late stage where "fact discovery [was] largely complete"); *Thor 680 Madison Ave. LLC*, 2022 WL 836890, at *8 (same where counterclaim was filed "eighteen months after this action was filed and after the close of fact discovery" and while "the parties were in the midst of briefing cross-motions for summary judgment"); *see also Hybrid Athletics, LLC v. Hylete, Inc.*, No. 3:17 Civ. 1767, 2019 WL 6358246, at *5 (D. Conn. Nov. 27, 2019) (counterclaim came at "advanced stage" even though discovery was ongoing).

Nor can there be any dispute that Trump's counterclaim raises issues "beyond the scope of the new claims" in Carroll's amended pleading. *GEOMC Co.*, 918 F.3d at 100. This is explained by the simple fact that Carroll's "amended complaint did not add any new claims or otherwise change the focus of her original complaint." *Carroll*, 2023 WL 4393067, at *2 n.6; *see* ECF 156 at 2 (explaining limited nature of new allegations, which respond to the scope-of-employment issue as recently clarified by the D.C. Court of Appeals). In the absence of any new claims against him, Trump's counterclaim obviously fails the Second Circuit's test. *See, e.g.*, *Ramsay-Nobles v. Keyser*, No. 16 Civ. 5778, 2018 WL 6985228, at *5 (S.D.N.Y. Dec. 18, 2018) (rejecting counterclaim that "add[ed] a whole new issue for litigation" in response to an amended complaint that "did not generate new issues or theories" or alter claims against the counterdefendant, but instead "simply added more detail to the original allegations").

And if Trump's counterclaim is not dismissed, Carroll will be forced "to expend significant additional resources to conduct discovery and prepare for trial." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (citation omitted). Although discovery has fully explored whether Trump sexually assaulted Carroll, *Carroll II*, ECF 19, Carroll would need (and be entitled) to take discovery to defend against Trump's new claim that Carroll's "repeated falsehoods and defamatory

statements" have caused "significant harm to his reputation, which, in turn, has yielded an inordinate amount of damages." ¶ 12. That, in turn, would probably include, at a minimum, document discovery relating to Trump's financial situation before and after the alleged defamation, another deposition of Trump, and expert discovery.[4] It may also require nonparty discovery of Trump's presidential campaign (to respond to any claim that Trump was injured in his political pursuits) and of Trump's *Carroll II* counsel (as one of the allegedly defamatory statements concerned comments Carroll made to him).

Following that additional discovery, there would be additional summary judgment briefing and, if Trump survived summary judgment, trial. A trial that included Trump's counterclaim would be far broader than a trial on Carroll's single claim of defamation. By virtue of collateral estoppel, the jury verdict in *Carroll II* resolved most of the triable issues present in this action, leaving only a narrow dispute as to damages. *See* ECF 168 at 8–9. Trying the counterclaim, by contrast, would require resolution of additional factual questions and the participation of additional witnesses whose testimony would not otherwise be needed. *See GEOMC Co.*, 918 F.3d at 102 (affirming rejection of counterclaims that "greatly expand the relatively narrow scope of [the] case" (citation omitted)); *Fossil Grp., Inc.*, 627 F. Supp. 3d at 188 (denying leave to assert counterclaim that "would necessitate a lengthy period of time for additional fact and expert discovery").

All of this would substantially delay resolution of Carroll's original defamation claim against Trump even in the best of circumstances. But here the circumstances are actually far worse. Trump is running for president, with 56 primary elections and caucuses expected to take place

---

[4] Trump would presumably take the position that discovery on his counterclaim would involve four other statements, identified by Trump for the first time dating back to April 2020. ¶ 2. The statute of limitations on those alleged instances of defamation has passed, and Trump not once sought to raise them in this action, even when he previously sought leave to amend his answer. ECF 59. For the avoidance of doubt, Trump has confirmed in writing that "the cause of action set forth in the Counterclaim is solely premised on the statements made by the plaintiff/counterclaim-defendant, E. Jean Carroll, during her May 10, 2023 appearance on CNN."

between January and June 2024. *Important Dates in the 2024 Presidential Race*, Ballotpedia.[5]

Trump already has four other trials scheduled between now and March 2024. Erica Orden, *Trump*

*Now Faces Four Trials over Six-Month Span During Critical Phase of 2024 Campaign*, Politico

(June 15, 2023);[6] Katelyn Polantz, *Special Counsel Asks for December Trial Date for Trump in*

*Mar-a-Lago Documents Case*, CNN (June 23, 2023).[7] Trump currently faces two separate criminal

indictments, *United States v. Trump*, No. 9:23 Cr. 80101 (S.D. Fl. 2023); *People v. Trump*, Ind.

No. 71543-23 (N.Y. Sup. Ct., N.Y. Cty. 2023), with a sentencing guidelines range on his federal

charges of potentially 210 to 262 months, even if all sentences were to run concurrently, *see* David

Aaron, *How Much Prison Time Does Former President Trump Face? Applying the U.S.*

*Sentencing Guidelines*, Just Security (June 12, 2023).[8] And there is the possibility of at least two

more criminal indictments in the coming months. Ben Protess et al., *Donald Trump Faces Several*

*Investigations. Here's Where They Stand.*, N.Y. Times (June 16, 2023).[9]

 Delay, of course, is exactly what Trump wants. Carroll "now has litigated this case for

more than three and a half years[,] completed discovery, engaged in extensive motion practice,

resisted the government's attempt to defeat her claim before [this] Court, the Second Circuit and

the D.C. Court of Appeals, and devoted untold hours and resources to pursuing her claim." *Carroll*,

2023 WL 4393067, at *12. Trump's own actions, however, "have been dilatory throughout the

litigation." *Id.* (citation omitted). He has pursued a strategy of "slow-rolling his defenses, asserting

or inventing a new one each time his prior effort to delay the case fails." *Id.* (citation omitted). His

---

[5] https://ballotpedia.org/Important_dates_in_the_2024_presidential_race.

[6] https://www.politico.com/news/2023/06/15/trump-trial-date-carroll-lawsuit-00102328.

[7] https://www.cnn.com/2023/06/23/politics/trump-federal-trial-date-special-counsel/index.html.

[8] https://www.justsecurity.org/86901/how-much-prison-time-does-former-president-trump-face-applying-the-u-s-sentencing-guidelines.

[9] https://www.nytimes.com/article/trump-investigations-civil-criminal.html.

"conduct both in this case and in *Carroll II*" has "only [] corroborated the Court's earlier hypothesis of his dilatory motive." *Id.* The Court has already acknowledged these considerations in its recent decision denying Trump's request to amend his answer to add the affirmative defense of absolute immunity, *id.* at *9–*13, and should take them into account again in dismissing Trump's counterclaim as procedurally improper at this time.

## III.   TRUMP'S AFFIRMATIVE DEFENSES THAT HAVE ALREADY BEEN REJECTED SHOULD BE STRICKEN

Although courts generally proceed cautiously in deciding whether to strike affirmative defenses, courts routinely strike affirmative defenses that raise issues that were previously decided in the case. *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075, 2020 WL 3472597, at *5, *13–*14 (S.D.N.Y. June 25, 2020) (invoking law of the case doctrine and striking affirmative defense "to the extent that it seeks to relitigate the legal sufficiency of claims already decided"). *See also, e.g.*, *Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.*, No. 17 Civ. 124, 2020 WL 1031271, at *2 (S.D.N.Y. Mar. 2, 2020) (striking affirmative defense because "[t]here is no need to litigate the same issue again"); *Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*, No. 17 Civ. 1338, 2021 WL 3269010, at *3 (E.D.N.Y. July 30, 2021) (striking affirmative defense where it was based on an argument that was already "considered and rejected"); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 478 F. Supp. 3d 417, 437 (E.D.N.Y. 2020) (striking affirmative defense that the court had "already determined … [was] not warranted"). This is so because "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pepper v. United States*, 562 U.S. 476, 506, 131 S. Ct. 1229, 1250 (2001) (citation omitted).

Here, the Court should strike Trump's First, Third, Fifth, Twelfth, and Fifteenth Affirmative Defenses because the Court considered and rejected each of these defenses in denying

Trump's motion for summary judgment. *Compare Carroll*, 2023 WL 4393067, at \*5–\*13 (rejecting Trump's presidential immunity defense); *id.* at \*13–\*14 (holding that "Carroll adequately has alleged that Mr. Trump's statements are libelous *per se*"); *id.* at \*15–\*17 (holding that "Trump's statements were factual assertions rather than expressions of opinion"); *id.* at \*19–\*20 (rejecting Trump's argument that Carroll "failed to establish … the prerequisites to a punitive damages award" as a matter of law), *with* ECF 171 at 20–21 ¶ 1 (asserting presidential immunity defense); *id.* at 21 ¶ 3 (asserting defense based on Constitutional immunities); *id.* at 21 ¶ 5 (asserting that Trump's statements are non-actionable opinion); *id.* at 22 ¶ 12 (asserting that plaintiff is not entitled to punitive damages as a matter of law); *id.* at 22 ¶ 15 (asserting that plaintiff "has not sufficiently pled" defamation or defamation *per se*).

## CONCLUSION

The Court should grant Carroll's motion to dismiss on both independent grounds discussed above: (1) Trump fails to state a claim for defamation; and (2) his counterclaim is procedurally improper. In doing so, the Court will avoid the possibility of piecemeal resolution of the issues and resolve a claim that implicates Carroll's First Amendment rights. *GEOMC Co.*, 918 F.3d at 101 ("In ruling on a motion to dismiss a new counterclaim, a district court can either assess the new counterclaim's legal sufficiency or exercise the discretion the court would have been entitled to use if the counterclaimant had moved under Rule 15 to file the new counterclaim."). In addition, the Court should grant Carroll's motion to strike Trump's First, Third, Fifth, Twelfth, and Fifteenth Affirmative Defenses.

Dated: New York, New York
      July 11, 2023

Respectfully submitted,

_____

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

           *Plaintiff,*

    v.

DONALD J. TRUMP, in his personal capacity,

           *Defendant.*

No. 20 Civ. 7311 (LAK)

### DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF
### PLAINTIFF E. JEAN CARROLL'S MOTION TO DISMISS AND MOTION TO STRIKE

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.     I respectfully submit this declaration in support of Carroll's motion to dismiss and motion to strike.

3.     Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the official transcript of the trial in *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.).

4.     **Exhibit B** is a true and correct copy of the video recording of Carroll's May 10, 2023 interview on CNN, available at https://www.youtube.com/watch?v=PPrBo2_fyAI, which is referenced in Defendant Donald J. Trump's counterclaim, ECF 171 at 25 ¶ 3 n.5, and which is being submitted to the Court via DVD.

5.     Attached hereto as **Exhibit C** is a true and correct copy of the rough transcript of Carroll's May 10, 2023 interview, which CNN has made available at https://

transcripts.cnn.com/show/ctmo/date/2023-05-10/segment/05   and   https://transcripts.cnn.com/

show/ctmo/date/2023-05-10/segment/06.

Dated:     New York, New York
           July 11, 2023                                    _____
                                                            Roberta A. Kaplan

# EXHIBIT A

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                     Plaintiff,              New York, N.Y.
4
             v.                              22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                     Defendant.
7    ------------------------------x         Jury Trial

8                                            April 25, 2023
                                             9:55 a.m.
9

10   Before:

11                      HON. LEWIS A. KAPLAN,

12                                           District Judge
                                                 and a Jury
13

14                          APPEARANCES

15   KAPLAN HECKER & FINK LLP
          Attorneys for Plaintiff
16   BY:  ROBERTA A. KAPLAN
          MICHAEL J. FERRARA
17        SHAWN G. CROWLEY
          MATTHEW J. CRAIG

18

19   TACOPINA SEIGEL & DeOREO
          Attorneys for Defendant
20   BY:  JOSEPH TACOPINA
          CHAD D. SEIGEL
21        MATTHEW G. DeOREO

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24

25   W. PERRY BRANDT
          Attorney for Defendant

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page49 of 214

**A1118**

1   whatever he wanted to.

2           Donald Trump has said:  I've never met E. Jean

3   Carroll.  I never went to Bergdorf's.  She's not my type.  As

4   the evidence will show, these are lies, and they are just some

5   of the lies that you will hear from Donald Trump throughout

6   this trial.

7           I am going to sit down in a minute, but before I do, I

8   want to say a word about what you are going to be asked to

9   decide at the end of this trial, once you have heard from all

10  of the witnesses and the evidence is in.  As Judge Kaplan told

11  you and as he will explain in more detail before you

12  deliberate, Ms. Carroll brought two claims against Donald

13  Trump, so there will be two claims that you need to decide.

14          The first claim, as Judge Kaplan described, is for

15  what's called battery, and that has to do with what happened in

16  the Bergdorf Goodman dressing room back in 1996.  I expect that

17  Judge Kaplan will instruct you that battery covers a range of

18  conduct, from forcibly grabbing or groping someone without

19  their consent to rape.  If you find that Donald Trump did any

20  one of those things, he is liable for battery.

21          Ms. Carroll's second claim, as Judge Kaplan said, is

22  for defamation.  That has to do with the harm that Donald Trump

23  did to Ms. Carroll's reputation and good name.  The key

24  question for that claim is whether Trump was lying in that

25  October 2022 Truth Social post that you saw, whether he was

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
              v.                            22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                    Defendant.
7    ------------------------------x        Jury Trial

8                                           April 26, 2023
                                            10:10 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                               and a Jury

13
                        APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

```
 1    to Bergdorf's?

 2    A.  I am guessing that it was a sale.

 3    Q.  Do you recall sitting here today?

 4    A.  No.

 5    Q.  Did you buy anything that day?

 6    A.  I don't think I did because I didn't have carrier bags with

 7    me.  I didn't have shopping bags.

 8    Q.  Do you recall how long you were in the store?

 9    A.  No.

10    Q.  When did you first see Mr. Trump that day?

11    A.  I was leaving the store, and I was exiting the 58th Street

12    entrance, and I was just about to go out the door.  He was

13    standing on the other side of it and put up his hand.

14    Q.  You're putting up your hand to indicate what, Ms. Carroll,

15    so it's clear?

16    A.  It's universal signal for stop.

17    Q.  What did you do?

18    A.  I stopped.

19    Q.  What happened next?

20    A.  And he came through the door and he said, hey, you are that

21    advice lady.

22    Q.  How did you respond?

23    A.  I said, hey, you're that real estate tycoon.

24    Q.  What was your impression of Donald Trump at that time when

25    you saw him at Bergdorf's?
```

1    A.  Very personable, engaging.

2    Q.  What happened after you said, hey, you're that real estate

3    tycoon?

4    A.  He said, I need to buy a gift, come help me.  Come help me.

5    Come advise me.

6    Q.  Did you agree?

7    A.  I was delighted.

8    Q.  Why?

9    A.  Well, it was such a funny New York scene.  I'm a born

10   advice columnist.  I love to give advice, and here was Donald

11   Trump asking me for advice about buying a present.  It was a

12   wonderful prospect for me.

13   Q.  Who was he shopping for, if you know?

14   A.  I asked him.  I said:  Who is it for?  He said:  A girl.

15   And then I asked him, trying to figure out who it would be:

16   How old is she?  And he replied with:  How old are you?

17   Q.  What did you say?

18   A.  I said 52.

19   Q.  How did he respond?

20   A.  He said:  You are so old.

21   Q.  Was that in a fresh way or in a sort of teasing way?

22   A.  No.  It was humorous the way he said it.

23   Q.  What did the two of you do next?

24   A.  At the time, in '96, the little circular alcove we were

25   standing in had displayed three or four handbags, which were so

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page53 of 214

**A1122**

1    beautiful and such works of art I thought, wow, any girl would

2    love one of these handbags.  But he didn't like the idea of a

3    handbag.  So we went -- we turned to the left, went walk

4    through the first floor to the hats.  I thought a hat would be

5    great, and she is going to love a hat.

6    Q.  As far as you were able to tell -- what floor of Bergdorf

7    were you on at this point?

8    A.  First floor.

9    Q.  As far as you were able to tell, did anyone recognize you

10   or Mr. Trump?

11   A.  There was a shopper.  She was tiny, because I remember her

12   staring up at him in awe.  She recognized him.  He was very

13   pleasant.

14   Q.  Anyone else?

15   A.  There was a sales attendant, and she was also very pleased

16   to see him.  He was pleased to see her.

17   Q.  What, if any, words did they exchange?

18   A.  I think he said hello, how are you doing, how are you.

19   Q.  What happened after hats?

20   A.  He was holding -- he picked up a hat that was a fur hat and

21   he was petting it like a little cat or a dog.  And as he was

22   petting it he said, I know, lingerie.

23   Q.  Lingerie meaning underwear?

24   A.  Yes.

25   Q.  Where was the lingerie -- the lingerie section, I guess, in

1   the store?  Where was that located?

2   A.  I didn't know where it was.  I do now know where it is.

3   But he led the way to the escalator, and we started to go up

4   the escalator.

5   Q.  What floor do you recall lingerie being on at that time?

6   A.  Six.

7   Q.  Was there anything sort of discomforting to you about the

8   fact that Mr. Trump had proposed the lingerie?

9   A.  No.  By this time -- first of all, he was very talkative.

10  In the escalator he talked about how great Bergdorf's was.  At

11  one time he was thinking of buying Bergdorf's.  I was

12  absolutely enchanted -- I could only think of it as a scene,

13  such a great story, so I was delighted to go to lingerie with

14  him.

15  Q.  Were you chatting --

16  A.  Yes.  He was very funny, yeah.

17  Q.  Do you recall what the two of you were discussing as you

18  made your way to the lingerie area?

19  A.  He was talking about Bergdorf's.  I don't remember

20  precisely.

21  Q.  What was the tone of the conversation?

22  A.  Very joshing and light.

23  Q.  Who, if anyone else, in the store did you see as you rode

24  up to the lingerie area?

25  A.  I wasn't looking.  I was watching him and watching that I

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page55 of 214

**A1124**

1   Q.  In your mind, at the time, Ms. Carroll, had things --

2   withdrawn.

3           Had you been flirting sort of much this time with

4   Mr. Trump?

5   A.  Yeah.  I was flirting the whole time, probably.

6   Q.  At this point now, when Mr. Trump has proposed going to the

7   dressing room, have things escalated in your mind?

8   A.  The comedy was escalating, and I thought it was getting

9   funnier and funnier.

10  Q.  Did you ever think about saying, no, I'm not going in?

11  A.  No.  It didn't occur to me.  I didn't really think about

12  going into the dressing room.  I thought of it as sort of an

13  open area.  I thought the door was open, we walked in.  I

14  didn't picture anything about what was about to happen.  Didn't

15  picture it.

16  Q.  What happened once you -- first off, was the dressing room

17  open or closed?

18  A.  The door was opened.  That open door has plagued me for

19  years because I just walked into it, just walked in.

20  Q.  Let's take it one step at a time.  What happened once you

21  entered the dressing room?

22  A.  He immediately shut the door and shoved me up against the

23  wall and shoved me so hard my head banged.

24  Q.  What were you thinking at that moment?

25  A.  I was extremely confused and suddenly realizing that what I

1   A.  I remember him being -- he was very large, and his whole

2   weight came against my chest and held me up there, and he

3   leaned down and pulled down my tights.

4   Q.  What, if anything, were you doing while that was happening?

5   A.  I was pushing him back.  It was quite clear that I was not

6   going -- I didn't want anything else to happen.  It was quite

7   clear.  I pushed him back.  This arm was pinned down.  This arm

8   had my purse.  Trying to get him back.

9   Q.  At any point during this encounter, do you recall saying

10  no?

11  A.  No, I don't recall saying it.  I may have said it.

12          MR. FERRARA:  Just one moment, your Honor.

13  Q.  At any point during this encounter did you scream?

14  A.  I don't remember screaming.  I'm not a screamer.  I'm a

15  fighter.  I'm much more physical than I am vocal.

16  Q.  What about his head?  What is happening?

17  A.  His head was beside mine breathing.  First, he put his

18  mouth against me.

19  Q.  Do you mean he kissed you?

20  A.  Yes.

21  Q.  Did you kiss him back?

22  A.  No.  I didn't consider it a kiss.  It was such -- it was a

23  shocking thing for him to suddenly put his mouth against mine.

24  I thought what.  What.  What.  No.

25  Q.  Do you think -- based on what you were experiencing, do you

1   believe that if someone had been nearby, they would have been

2   able to hear what was happening in the dressing room?

3   A.  They would have heard the head hitting and definitely would

4   have heard me laughing.

5   Q.  You described Mr. Trump as a -- you described Mr. Trump as

6   sort of, I think, larger than you?

7   A.  Yeah.

8   Q.  Do you recall approximately what the difference or how tall

9   are you?

10  A.  At the time I was five-nine.  Because I'm 79, I have sort

11  of all compacted down due to gravity, but at the time I was

12  five-nine.  I was wearing four-inch heels.  So it put me about

13  level with Donald Trump, who I think is six-two.  I was

14  six-one.  And I weighed at the time about 120, and I believe he

15  weighed about 100 more pounds.

16  Q.  Were you afraid while this was happening?

17  A.  I was in -- this is going to sound strange.  I was almost

18  too frightened to think if I was afraid or not.  I was

19  stamping.  My whole reason for being alive in that moment was

20  to get out of that room.

21  Q.  How were you trying to accomplish that?

22  A.  Stamping and trying to wiggle out from under him.  But he

23  had pulled down my tights and his hand went -- his fingers went

24  into my vagina, which was extremely painful, extremely painful.

25  It was a horrible feeling because he curved, he put his hand

```
 1   inside of me and curved his finger.  As I'm sitting here today,

 2   I can still feel it.  It was --

 3   Q.  Then what happened?

 4   A.  Then he inserted his penis.

 5   Q.  What did you do in that moment?

 6   A.  I tried --

 7   Q.  Do you need a moment, Ms. Carroll?

 8   A.  You asked me what I did in that moment.  I always think

 9   back to why I walked in there to get myself in that situation,

10   but I'm proud to say I did get out.  I got my knee up.  I got

11   my knee up and pushed him back.

12   Q.  Was anything in your hands?

13   A.  My handbag.

14   Q.  Why were you holding your handbag?

15   A.  I have no idea.

16   Q.  I want to be -- I want to make sure I understand it.

17        How were you able to -- were you able to see what

18   Mr. Trump was doing with his hand, or are you telling us what

19   you experienced sort of physically by feeling it?

20   A.  He was against me, his whole shoulder -- I couldn't see

21   anything.  I couldn't see anything that was happening.  But I

22   could certainly feel it.  I could certainly feel that pain in

23   the finger jamming up.

24   Q.  How long was your dress?

25   A.  Mid knee.  Mid knee.
```

```
 1   Q.  Where were Mr. Ailes' studios in relation to your studio --

 2   or set?  Let me --

 3   A.  Sets.  They kept Roger's set on the sets -- we -- many of

 4   the shows use the same studio, so they break the sets between

 5   shows and then put them up.  Roger had -- he did live shows in

 6   New Jersey and he did live shows also in New York.  So we ran

 7   into each other almost every day in Fort Lee.

 8   Q.  When you say "we," who do you --

 9   A.  Roger and I.

10   Q.  Do you recall ever seeing Mr. Trump on Mr. Ailes' set?

11   A.  No.

12   Q.  And do you recall -- sitting here today, Ms. Carroll, do

13   you know when exactly that interview was filmed or aired?

14   A.  I have a pretty good idea.

15   Q.  When do you think that was filmed or aired?

16   A.  Well, whenever that big parade was.

17   Q.  Okay.  So let's -- so thank you for just going back to

18   that.

19            Let's come back, though, now to where we were, sort of

20   where we had left off before lunch.

21            I think we had finished discussing the assault and

22   sort of your immediate steps that you took.  Looking sort of

23   further out, have you had a romantic relationship since the

24   assault?

25   A.  No.
```

1   Q.  Why not?

2   A.  I -- the short answer is because Donald Trump raped me.

3   Q.  How did that affect you in a way -- can you describe for

4   the jurors why that assault left you unable to form a romantic

5   connection?

6   A.  What I did was I flirted with Donald Trump.  I laughed with

7   him.  I tried to be -- tried to engage him.  I laughed at his

8   jokes.  I found him charming.  And what happened to me when I

9   was flirting?  I got into serious trouble.  And so I, after

10  that event, I found it's impossible for me -- if I meet a man

11  who is a possibility, it's impossible for me to even -- well,

12  to even look at him and smile.  And in order to fall in love or

13  have dinner with someone, you've got to at least look at them

14  in the eye and smile, and I couldn't -- I couldn't force myself

15  to show a man that I liked that I liked them.  I couldn't do

16  it.  It just led to terrible consequences, hence, I didn't meet

17  anybody.

18  Q.  I'm sorry to ask this so directly, but have you had sex

19  since Donald Trump assaulted you?

20  A.  No.

21  Q.  This person you just described to us as sort of having shut

22  down, is that how you portrayed yourself on television

23  following the assault or in public appearances?

24  A.  No, I have a, I have a, I have a public self, which is

25  vibrant and wanting to help everyone, and always, always upbeat

```
 1              MR. TACOPINA:  I'm sorry.  I really just don't --

 2              THE COURT:  Sustained.

 3              MR. FERRARA:  I will withdraw that question.

 4    BY MR. FERRARA:

 5    Q.  How do you feel about not having been in a relationship

 6    since the mid '90s?

 7    A.  I feel I have lost out.  I'm sorry.  I am a happy person

 8    basically, but I'm aware that I have lost out on one of the

 9    glorious experiences of any human being.  Being in love with

10    somebody else, making dinner with them, walking the dog

11    together.  I don't have that.  I am -- and just cuddling on the

12    sofa, watching TV, and eating popcorn.  I am aware of how much

13    I have lost and I feel, here's the thing, I feel like I should

14    be able to overcome it.

15    Q.  I want to come back to your second marriage to Mr. Johnson,

16    John Johnson.  Was there violence in that relationship?

17    A.  Yes.

18    Q.  What kind of violence?

19    A.  Well, we were -- it was a very passionate marriage, very

20    passionate, very hot, very tempestuous, lots of fun, I mean, we

21    would laugh so hard I would literally fall out of my chair.

22              But on the flip side of that is we argued.  We were

23    dog and cat.

24    Q.  Was there violence?

25    A.  Yes.
```

```
 1   A.  Because he -- Cam didn't -- it was not violent.

 2   Q.  Has -- sorry?

 3   A.  The incident in Bergdorf's was very violent.

 4   Q.  I want to -- for clarification, was the -- you mentioned

 5   William Goldman.  Was your relationship with William Goldman

 6   before or after Mr. Trump assaulted you?

 7   A.  Before.

 8   Q.  Have you ever been diagnosed with any mental health

 9   conditions such as PTSD or depression?

10   A.  No.

11   Q.  Have you taken any medication for depression or anxiety?

12   A.  No.

13   Q.  Are you a happy person, Ms. Carroll?

14   A.  I am a happy person.  I know it seems strange to hear me

15   after today, but I'm basically a happy person.  But I think I

16   could work on a few things.

17   Q.  How often, if at all, do you think about the assault that

18   night at Bergdorf's?

19   A.  Well, that very night the visions would wash over me.  I

20   couldn't -- it was horrible.  Not only did it happen in

21   Bergdorf, but it happened over and over and over in my mind

22   because I did not have the ability to strike to get the visions

23   out of my head.

24          As I learned to deal with the sudden intrusions, I got

25   better and better at moving them aside.  And so they -- I've
```

1  had them ever since the attack.  They were more frequent right

2  after the attack and they stayed about -- I had -- I would be

3  going about my normal day, I would be walking the dog, I would

4  be hiking on -- hiking, and suddenly up would come the vision.

5  Those types of intrusions happened regularly.  I didn't know

6  when they would come, I didn't know when to expect them, but

7  they would absolutely take over my brain.  I would move them

8  aside.  So that was fairly frequent.

9  Q.  Can you give the jurors a sense or examples of what -- what

10  would you see?  What does a vision sort of look like?

11  A.  Just recently, I pulled over to the side of the high -- of

12  the road on my way home because it was late and I thought I

13  would rest my eyes and just take a quick nap.  I closed my

14  eyes.  I must have fallen asleep.  Because when I woke, I felt

15  Donald Trump again on top of me, his huge -- I thought for a

16  minute I was going to die because I couldn't breathe.  That's

17  the sudden, horrible kind.

18        But normally I would be cooking pasta or just going

19  about my normal day, and in would slide just a picture of him

20  going like this into the dressing room or hitting my head or

21  feeling his fingers jammed up inside of me and then with effort

22  I could move those out of my mind.  I think everybody has

23  visions coming up.

24  Q.  Were there specific -- are there specific things, were

25  there specific things that triggered these visions?

N4RMCAR2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                   Plaintiff,                 New York, N.Y.
 4
             v.                               22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                   Defendant.
 7   ------------------------------x          Jury Trial

 8                                            April 27, 2023
                                              10:50 a.m.
 9
     Before:
10
                       HON. LEWIS A. KAPLAN,
11
                                              District Judge
12                                              and a Jury

13                         APPEARANCES

14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

N4RMCAR2                         Carroll - Direct

1    Q.  Why did you agree in the first place?

2    A.  I was a big admirer of Ivy's work.

3    Q.  Why did you stop filming?

4    A.  Because this lawsuit became very important, and Ivy and I

5    decided together, we should cease.

6    Q.  Have you received any payments for that documentary?

7    A.  No.

8    Q.  I want to call your attention -- I think this is sort of

9    the last topic.  I want to call your attention to October of

10   2022.

11   A.  Yes.

12   Q.  Do you recall, what, if any, additional relevant statements

13   did Donald Trump make at that time?

14   A.  Just when I had managed to get my Substack up and running,

15   get my career a little bit back and feeling that things were

16   going to be OK, Donald Trump posted on social media every

17   single thing that I was suing him for.  He repeated it on

18   October 12 and then added the fact that he thought the justice

19   system in America was broken, and one of the prime examples of

20   the justice system being broken was my suing him.

21   Q.  Let me show you what has been marked for identification as

22   Plaintiff's Exhibit 4.

23           Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

 1  keep moving.

 2  Q.  Are you on Truth Social, Ms. Carroll?

 3  A.  Yes.

 4  Q.  How did you find out about this statement?

 5  A.  I heard from several people that he had posted it.

 6  Q.  How, if at all, do you believe this statement affected your

 7  reputation?

 8  A.  I really thought I was gaining back a bit of ground.  I

 9  thought, it's starting to go and I felt, you know, happy that,

10  you know, I was back on my feet, had garnered some readers, and

11  feeling pretty good, and then, boom, he knocks me back down

12  again.

13  Q.  Were you surprised by the statement?

14  A.  Stunned.

15  Q.  Why?

16  A.  Because I'm suing him for saying these very things.

17  Q.  In light of Mr. Trump's October 22 statement, did you file

18  a second lawsuit?

19  A.  Yes.

20  Q.  Is that second lawsuit why we are here today?

21  A.  Yes.  This is why we are here.

22  Q.  What did you sue him for in the second lawsuit?

23  A.  I sued him for defamation of character.

24  Q.  Anything else?

25  A.  Yes.  I also sued him for assault.

```
 1   Q.  Why didn't you sue him for assault in the first lawsuit?
 2   A.  Because the time period allowed was -- it had passed, and I
 3   could not do it.
 4   Q.  What happened that allowed you to do it -- to sue him for
 5   assault in the second lawsuit?
 6   A.  The state assembly and the state senate passed what they
 7   called the Adult Survivors Act, and it gave survivors of sexual
 8   assault, sexual abuse, sexual harassment a one-year window to
 9   come forward and bring suit against the people.
10   Q.  Had you advocated for passage of that law?
11   A.  Yes.
12   Q.  Why.
13   A.  Because I understand why women, particularly, and some men
14   do not come forward and tell what happened.  It takes sometimes
15   years to get the courage to face the person who hurt you, if at
16   all.  It takes years.  And some maturity and some age.  It
17   takes -- there are many people, reasons why people don't report
18   it, and this act gives us a chance to be heard.
19   Q.  What, if any, I'll call it sort of public response did you
20   experience after Mr. Trump made his October 2022 statement?
21   A.  It was not very nice.
22   Q.  What do you recall?
23   A.  Just a wave of slime.  It was very seedy comments, very
24   denigrating.  Almost an endless stream of people repeating what
25   Donald Trump says, I was a liar and I was in it for the money,
```

1   can't wait for the payoff, working for the democrats, over and

2   over.  But the main thing was way too ugly.  It is very hard to

3   get up in the morning and face the fact that you're receiving

4   these messages you are just too ugly to go on living,

5   practically.

6   Q.  Let me show you what has been marked for identification as

7   Plaintiff's Exhibit 45.

8           Do you recognize this, Ms. Carroll?

9   A.  Yeah.  I think it was -- it appeared -- yeah.

10  Q.  What is it?

11  A.  It's a tweet.

12  Q.  What is the date?

13  A.  October 13.

14  Q.  Of what year?

15  A.  2022.

16  Q.  Is your name mentioned?

17  A.  I guess that is me.

18          MR. FERRARA:  Your Honor, plaintiff offers 45.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 45 received in evidence)

21          MR. FERRARA:  Mr. Lam, we can publish this for the

22  jurors.  Thank you.

23          If we just focus on the tweet in the upper left, the

24  sort of main tweet.

25  Q.  Ms. Carroll, this was the day after Mr. Trump's statement?

N4r2Car3                          Carroll – Cross

1   give you a specific date of the alleged incident, either,

2   right?

3   A.  No.

4   Q.  They couldn't.

5   A.  No.

6   Q.  You couldn't.

7   A.  No.

8   Q.  No one.

9   A.  I wish to heaven we could give you a date.  I wish we could

10  give you a date.

11  Q.  In fact, they couldn't even tell you the year, whether it

12  was 1995 or 1996?

13  A.  Oh, no, no.  Lisa believes that because she published a

14  sort of a bombshell *New York* magazine piece about Mar-a-Lago

15  being opened as a club and Donald Trump had personally invited

16  Lisa to come down to do the story of the opening of the club,

17  *New York* magazine published it February –– in February.  I'm

18  not quite sure of the date.  Lisa believes she never would have

19  accepted that assignment if it had happened before she went

20  down to Florida.  So that places it definitely in 1996.

21  Q.  Okay.  And certainly you or them couldn't tell you whether

22  it was the fall or the spring.  You have testified to that?

23  A.  No, Lisa believes that it was in the spring of '96 because

24  of the *New York* magazine articles.  She swears up and down that

25  she would never go if she had heard about what Trump did to me

N4RMCAR4                        Carroll - Cross

1   Q.  It's your testimony that when Donald Trump, this big and

2   heavy man, lunged at you and banged your head against the wall

3   so hard it hurt, you still didn't think it was serious at that

4   point?

5   A.  I was trying to figure out what the hell was going on.

6   This is a man.  This is Donald Trump.  I thought I knew him.

7   We had just been laughing 12, 15 seconds before.  And here I am

8   being pushed up against the wall.  I had no idea.  It took me

9   several seconds to process what the heck was going on.  It

10  didn't make any sense.  It didn't make any sense at all.

11          Then he put his mouth against mine.  Then I

12  understood.  OK.

13  Q.  In fact, you viewed what went on in that dressing room as a

14  fight.

15  A.  Yes.

16  Q.  In fact, in response to this supposedly serious situation

17  that you viewed as a fight, where you got physically hurt, it's

18  your story that you not only didn't scream out, but you started

19  laughing?

20  A.  I did not scream.  I started laughing.  That is right.  I

21  don't think I started laughing.  I think I was laughing going

22  into the dressing room, and I think I laughed pretty

23  consistently after the kiss to absolutely throw cold water on

24  anything he thought was about to happen.  Laughing is a very

25  good -- I use the word weapon -- to calm a man down if he has

```
 1   any erotic intention.
 2   Q.  According to you, after Donald Trump had you against the
 3   wall, he pulled your tights down?
 4   A.  Yes.
 5   Q.  It's your story that at some point you felt his penis
 6   inside of you?
 7   A.  Yes.
 8   Q.  But before that, it's your sworn testimony that you felt
 9   his fingers, what you said was rummaging around your vagina?
10   A.  It's an unforgettable feeling.
11   Q.  Now, when you say rummaging around your vagina, that's
12   different than inserting a finger inside your vagina.
13   A.  At first he rummaged around and then he put his finger
14   inside me.
15   Q.  In your book you wrote that he was forcing his fingers
16   around my private area and then thrust his penis halfway
17   completely, I'm not certain, inside me.  Is that accurate?
18   A.  Yes.
19   Q.  And this attack or this fight, based on your word, this
20   fight that you were in, could have taken as long as three
21   minutes?
22   A.  From entering the dressing room to my leaving it, I don't
23   think it could be any more than three minutes.  I may be wrong.
24   I didn't have a stopwatch, but it was about three minutes.
25   Q.  Even though you understood you were in the middle of this
```

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page72 of 214

**A1141**

Case 1:20-cv-07311-LAK   Document 176-1   Filed 07/11/23   Page 26 of 51        407

N4RMCAR4                          Carroll - Cross

 1    supposed battle, you never screamed at Donald Trump or screamed
 2    for help?
 3    A.  I'm not a screamer.
 4    Q.  You said that yesterday, I'm not a screamer, right?
 5    A.  I'm not a screamer.  Here is the thing.  I was too much in
 6    a panic to screech.  I was fighting.
 7    Q.  When you're fighting and being sexually assaulted and
 8    raped, because you are not a screamer, as you describe it, you
 9    wouldn't scream?
10    A.  I'm not a screamer.  You can't beat up on me for not
11    screaming.
12    Q.  I'm not beating up on you.  I'm asking you questions,
13    Ms. Carroll.
14    A.  No.  Women who come forward, one of the reasons they don't
15    come forward is because they are always asked why didn't you
16    scream.  Some women scream.  Some women don't.  It keeps women
17    silent.
18    Q.  And, according to you, this attack wasn't taking place in
19    some secluded place in the middle of nowhere in a forest.  That
20    was in a crowded department store in New York City.
21    A.  Yes.  Not crowded, though.
22    Q.  Right.  The inconceivable part, right?
23            MR. FERRARA:  Objection, your Honor.
24            THE COURT:  Sustained.
25    Q.  When you spoke with Dr. Lebowitz after filing your lawsuit,

1   you were still trying to come up with an explanation for your

2   story as why you did not scream.

3   A.  I wasn't coming up with a story.  It's usually -- I would

4   say more than usually under discussion when a woman is raped

5   and she doesn't scream.  It's usually discussed, why didn't she

6   scream.  Why didn't you scream, E. Jean?  Why didn't you

7   scream?  It's what a woman -- you better have a good excuse why

8   you didn't scream.  Because if you didn't scream, you weren't

9   raped.  I'm telling you, he raped me, whether I screamed or

10  not.

11  Q.  You need a minute, Ms. Carroll?

12  A.  No.  You go right on.

13  Q.  Aside from you not being a screamer, another reason you

14  gave for possibly not screaming was because you were wondering

15  if the pressure Donald Trump's shoulder placed against your

16  chest interfered with your ability to scream, correct?

17  A.  It could be.  I don't need an excuse for not screaming.

18  Q.  OK.

19          Despite that, you certainly wish your story included

20  you having screamed?

21  A.  Of course I do.  More people would have believed me if I

22  had screamed.

23  Q.  Aside from not being a screamer, and perhaps his chest was

24  interfering with your ability to scream, along the same lines

25  at some point you prepared a list of questions -- list of

N4r2Car5                        Carroll – Cross

1    BY MR. TACOPINA:

2    Q.  So that's a question that you anticipate being asked and

3    that question was why didn't you scream?

4    A.  Right.

5    Q.  And you wrote down "too much adrenaline powering through me

6    to think to scream."  Do you see that?

7    A.  Yeah.

8    Q.  So that's the third potential reason why you didn't scream

9    you have testified to.

10   A.  It's another reason why I didn't scream.

11   Q.  Now, according to this, screaming would have been a purely

12   voluntary action you need to think about before doing?

13   A.  Mr. Tacopina, if I was going to make up a lie, I would have

14   lied when I was writing this and say I screamed my head off.  I

15   didn't.  When I came forward, I told the truth.  I said I

16   didn't scream.  We could probably come up with more reasons I

17   didn't scream, but I did not scream.  I did not scream.

18   Q.  Well, Ms. Carroll, the reason why you wrote that you wish

19   you had screamed was why?  Why did you write you wish you had

20   screamed?

21   A.  Because more people would have believed me.

22   Q.  How about more people may have heard you and helped you?

23   Is that a possibility?

24   A.  No, I didn't want to make a scene.

25   Q.  Oh.  So you didn't scream while you were getting violently

N4r2Car5                         Carroll - Cross

1   raped because didn't you want to make a scene?

2               MR. FERRARA:  Objection, your Honor.

3               THE COURT:  Overruled.

4   Q.  You could answer.

5   A.  Repeat your question.

6   Q.  Sure.  So you didn't scream while you were getting

7   violently raped because you didn't want to make a scene.

8   A.  That's right.  That's probably why I didn't scream.

9   Q.  Okay.

10              Now, with the specifics to the rape allegation, Donald

11  Trump, you said, had his penis inside of you while your tights

12  were obviously still down?

13  A.  Yes.

14  Q.  And to be clear, it's your story that Donald Trump did not

15  take off your tights?

16  A.  No, no, just pulled down.  They were still above the knees.

17  Q.  They were above the knees.

18  A.  Um-hmm.

19  Q.  And because your tights were above the knees, you couldn't

20  get your knee up?

21  A.  I couldn't get it all the way up.  I finally got it up,

22  though.

23  Q.  Okay.

24              And it's your story that you tried to stomp on his

25  foot.

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page76 of 214

**A1145**

N4r2Car5                          Carroll - Cross

1    night.

2    Q.  Okay.  Do you remember the time?

3    A.  It was right after work, 5 or 6.

4    Q.  Okay.  And according to you, after hearing your story,

5    Ms. Martin told you to tell no one about it.

6    A.  Emphatically.

7    Q.  Emphatically.

8           And it's your testimony you took Ms. Martin's advice

9    not to go to the police?

10   A.  That's the advice I wanted, and so that's the advice I

11   followed.

12   Q.  So after speaking to Ms. Martin, you never told anyone else

13   about this alleged attack apart from that related to this

14   litigation and subsequently the book that came out in 2019,

15   correct?

16   A.  That's correct.

17   Q.  Now, the reason, I think you testified yesterday, was Carol

18   Martin told you not to go to the police because Donald Trump

19   was powerful?

20   A.  Yes.

21   Q.  And you were frightened of Donald Trump at the time.

22   A.  He was not only powerful, he was rich, he was famous, and,

23   as Carol put it, he has 200 lawyers.

24   Q.  And because of him being powerful, you didn't go to the

25   police.  You didn't want to tell your story.

1  A.  I don't -- no, I did not want to tell my story.  I did not

2  want to -- I was ashamed of myself.

3  Q.  But one of the reasons Carol Martin told you not to tell

4  the story to anyone and one of the reasons you have testified

5  that you never told the story to anyone was because of Donald

6  Trump's power.

7  A.  I was afraid Donald Trump would retaliate, which exactly is

8  what he did.  That's exactly.  One of my biggest fears came

9  absolutely true.

10  Q.  Okay.

11  A.  He has two tables full of lawyers here today.  It came

12  absolutely true.

13  Q.  We have about the same amount of lawyers.  Not everyone is

14  a lawyer, Ms. Carroll, but regardless of that --

15         THE COURT:  Come on, Mr. Tacopina, let's move along.

16         MR. TACOPINA:  Yes, sir.

17  BY MR. TACOPINA:

18  Q.  So instead you waited for Donald Trump to become arguably

19  the most powerful man in the world, president of the

20  United States of America, to tell your story to everybody.

21  A.  I waited until other women -- I was not a pioneer.  I'm a

22  follower.  I saw other women coming forward after Harvey

23  Weinstein and I thought who am I?  Who am I not to stay silent?

24  Also, I was 78 or 79.  I just thought I've been silent too

25  long.

N4r2Car5                          Carroll - Cross

1    on you?

2    A.  They couldn't be seen.  You can't see inside my vagina as I

3    am driving home.  No, you can't see it.

4    Q.  How about the head?  You said your head --

5    A.  No.  My hair would cover it.  It was probably a bump on the

6    back.  I could feel the bump, but that's covered.

7    Q.  Did you show Carol Martin the bump?

8    A.  No.

9    Q.  No, you didn't.

10   A.  Well --

11          THE COURT:  There is no question.

12   A.  I don't know.

13          THE COURT:  Ms. Carroll, there is no question.

14          THE WITNESS:  Okay.

15   BY MR. TACOPINA:

16   Q.  And you never went to the police to report this alleged

17   incident?

18          MR. FERRARA:  Objection.  Asked and answer.

19          THE COURT:  Mr. Tacopina --

20          MR. TACOPINA:  Did I ask that already?

21          THE COURT:  I'm out -- well, I'm not going to be

22   guilty of hyperbole, but plenty.

23          MR. TACOPINA:  Okay, your Honor.

24   BY MR. TACOPINA:

25   Q.  Well, let me ask you this question anew.  You would agree

N4r2Car5                        Carroll - Cross

1   that not reporting this alleged attack to the police is a very

2   odd fact, to use your words?

3   A.  No, that's not an odd fact.  As a matter of fact, it --

4   many women do not go to the police.  I understand why.

5   Q.  Okay.  So it's not an odd fact that you didn't report it to

6   the police.

7   A.  No, it's not.  It's the usual fact.

8            MR. TACOPINA:  Put up AA in evidence, please.

9   Q.  It's from your book, Ms. Carroll, page 242, lines 9-12.

10  Actually, let's get counsel get situated.  AA in evidence, page

11  242, lines 9-12.

12           MR. FERRARA:  Just one moment, your Honor.

13           (Counsel confer)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N512car1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
    E. JEAN CARROLL,
 3
                  Plaintiff,              New York, N.Y.
 4
            v.                            22 Civ.10016 (LAK)
 5
    DONALD J. TRUMP,
 6
                  Defendant.
 7  ------------------------------x       Jury Trial

 8                                        May 1, 2023
                                          9:30 a.m.
 9
    Before:
10
                      HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                          and a Jury

13                         APPEARANCES

14
    KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
    BY:   ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
    TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
    BY:   JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22  HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23  BY:   ALINA HABBA
          MICHAEL T. MADAIO
24

25  W. PERRY BRANDT
          Attorney for Defendant
```

N512Car3                         Carroll - Cross

1    BY MR. TACOPINA:

2    Q.  Okay.  So what you were saying was that obviously you were

3    making more money with your Substack podcast than you had done

4    previously?

5    A.  Yes.

6    Q.  Okay.  And the reason you were able to make more money with

7    your podcast following your accusations against Donald Trump is

8    because of the number of people who subscribed to your podcast.

9            MR. FERRARA:  Objection.

10           THE COURT:  Overruled.

11   A.  In part, yes.

12   Q.  Now, it would be fair to say, Ms. Carroll, that your life

13   has been fabulous since your book came out.

14   A.  That is what I like my life to appear to be.

15   Q.  Okay.  As a matter of fact, that's what you said, correct,

16   in the past?

17   A.  I say it quite a bit.  That is how I want people to

18   perceive me.  Underneath my private self is another thing

19   altogether.

20   Q.  Well, you were going on all these TV shows and podcasts

21   after the allegations came out and, for example, in December of

22   2019, you -- that was one month after you filed your initial

23   lawsuit against Donald Trump, right?  December 2019?

24   A.  Yes.

25   Q.  Yeah.  So you appeared on a podcast called the Maris

N512Car3                        Carroll - Cross

1    Review, BV.

2              Please show it to the witness.

3              Do you remember the Maris Review podcast?

4    A.  Yes.

5    Q.  We don't have to play that now.  It's okay.  Take it down.

6              During that podcast, you confirmed that your life had

7    been fabulous since the book came out, right?

8              THE COURT:  Sustained as to form.

9              MR. TACOPINA:  Yeah.

10   BY MR. TACOPINA:

11   Q.  During that podcast, you confirmed or you stated that your

12   life had been fabulous since the book came out.

13   A.  I always say my life is fabulous.  No matter who asks me,

14   what time of day, I will always reply it's fabulous.

15   Q.  Except in this courtroom in front of this jury?

16   A.  In this courtroom I am being forced to tell the truth.

17   Q.  So all these TV shows and all these podcasts and in your

18   book where you say how great your life is, that's all lies?

19   A.  No.  I want -- if I walked in the courtroom today and you

20   said:  Hi, E. Jean.  How are you?  I would have said:  Fine.

21   I'm fabulous.  It is my -- it is the way I present myself to

22   the world.  It's E. Jean the writer, E. Jean the advice

23   columnist.  I am the one, rightly or wrongly, I see myself as

24   solving other people's problems.  That is what my Substack is.

25   That is what I have done for almost 29 years.  So I always say

N512Car3                              Carroll - Cross

1    I'm fine.  The column is not called E. Jean Asks Other People

2    For Their Advice.  It's called Ask E. Jean.  I put up a front.

3    Q.  Right.  I'm not talking --

4    A.  That's what I said.

5    Q.  -- about your column, your advice column, Ms. Carroll, I'm

6    talking when you go on TV or radio or interviews or podcasts

7    and are asked about the incident with Donald Trump, you always

8    say that you are fabulous now.

9    A.  Of course I do.

10   Q.  Okay.

11   A.  I don't want anyone to know I suffered.  I did not and

12   still don't, unfortunately, during this trial I have to reveal

13   what is actually going on, but up until now, I would be ashamed

14   to know -- let people know what is actually going on.

15   Q.  You also explain on that podcast that you were receiving

16   lots of support --

17   A.  Um-hmm.

18   Q.  -- since your book came out?

19   A.  Um-hmm.

20   Q.  Yes?

21           THE COURT:  Please answer with words.

22   A.  Yes.

23   Q.  And you confirm you were receiving lots of love?

24   A.  Yes.

25   Q.  In fact, you were receiving several invitations to parties

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page84 of 214

**A1153**

N515car6                           Carroll - Redirect

1   somehow still alive.  That was -- really.  It took me minutes,

2   well seconds, and then minutes.  And even when Lisa said it, it

3   took a real effort for me to take it in.

4   Q.  Was -- sorry.

5   A.  Yes.  Lisa is the one who focused my brain for that moment.

6   It was Lisa saying that.

7   Q.  Was there ever any doubt in your mind that Mr. Trump had

8   penetrated you with his fingers and penis?

9   A.  Oh, never a doubt about that.

10  Q.  Was there a doubt in your mind that you tried to shove him

11  away?

12  A.  Oh, no.  There was never a doubt about that.

13  Q.  Was there ever a doubt in your mind regarding whether you

14  had consented to this, to what he had done to you?

15  A.  Never.  The minute that door shut I -- there was no

16  consent.

17  Q.  Was there ever a doubt in your mind that you hit him in the

18  head with your purse?

19  A.  I believe I hit him in the head with my purse that year.

20  Q.  Was there ever a doubt in your mind that you tried to fight

21  him off?

22  A.  No.  Never.  That's how I got out.

23  Q.  Before you spoke to Ms. Birnbach how, if at all, have you

24  processed all of that information?

25  A.  Before I had?

Case 23-1045, Document 90-1, 10/02/2023, 3576578, Page85 of 214

**A1154**

1    persona.  So, are you happy or are you not happy now?

2    A.  I'm happy.

3    Q.  OK.

4    A.  With undertones.

5    Q.  Happy with undertones?

6    A.  Of -- of --

7    Q.  OK.  Shall I go on?

8    A.  Of unhappiness.

9    Q.  The answer is you are happy with undertones of unhappiness?

10   A.  Yes.  It goes up and down, it is not always totally buoyant

11   and gleeful and happy.  There are times when I feel unhappy, of

12   course.

13   Q.  You testified on redirect that you were astonished that in

14   2023 someone would ask you about not screaming.  Do you

15   remember saying that?

16   A.  Yes.

17   Q.  Do you understand, Ms. Carroll, that I'm not judging what

18   is the appropriate reaction for any true rape victim, I was

19   questioning the fact that you gave four different answers for

20   not screaming?

21           THE COURT:  Sustained.  The jury will disregard that

22   remark.

23   Q.  Well, the reason you gave for not screaming was, one, you

24   are not a screamer.

25   A.  Right.

N515car6                        Carroll - Recross

1   Q.  You also said that Donald Trump's chest interfered with

2   your screaming?

3   A.  I guess I did.

4   Q.  Do you recall saying that you had too much adrenaline to

5   think to scream?

6   A.  That makes sense.

7   Q.  OK.  And then lastly you said you didn't scream because you

8   didn't want to make a fuss?

9   A.  I'm sure all -- you can have many reasons for not

10  screaming.

11  Q.  You understand that's what I was asking you about?

12  A.  Yes.

13          THE COURT:  Now, look.  You understand that that's not

14  an appropriate question so move on.

15          MR. TACOPINA:  OK, your Honor.  I thought based on the

16  answer it was but I'm sorry, I will move on.

17          THE COURT:  Mr. Tacopina, you get to have a closing

18  argument in this case and it is after I instruct the jury.

19          MR. TACOPINA:  OK.  Fine.

20          THE COURT:  Or before, actually, but...

21  BY MR. TACOPINA:

22  Q.  In evidence is Defendant's Exhibit AR that was already

23  introduced into evidence, subject to redaction, but the portion

24  we have shown before we will show again.  Ms. Carroll, you

25  prepared questions, you recall, when you were getting ready for

N582CAR1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      E. JEAN CARROLL,
 3
                    Plaintiff,              New York, N.Y.
 4
              v.                            22 Civ.10016 (LAK)
 5
      DONALD J. TRUMP,
 6
                    Defendant.
 7    ------------------------------x       Jury Trial

 8                                          May 8, 2023
                                            9:10 a.m.
 9
      Before:
10
                          HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                           and a Jury

13                          APPEARANCES

14
      KAPLAN HECKER & FINK LLP
15         Attorneys for Plaintiff
      BY:  ROBERTA A. KAPLAN
16         MICHAEL J. FERRARA
           SHAWN G. CROWLEY
17         MATTHEW J. CRAIG

18
      TACOPINA SEIGEL & DeOREO
19         Attorneys for Defendant
      BY:  JOSEPH TACOPINA
20         CHAD D. SEIGEL
           MATTHEW G. DeOREO
21

22    HABBA MADAIO & ASSOCIATES, LLP
           Attorneys for Defendant
23    BY:  ALINA HABBA
           MICHAEL T. MADAIO
24

25    W. PERRY BRANDT
           Attorney for Defendant
```

N585car2                        Summation - Ms. Kaplan

1    using the word rape.  But as we heard Dr. Lebowitz explain,

2    E. Jean's refusal to call what happened to her rape or to

3    identify herself as a victim does not mean that she was not

4    sexually assaulted.

5               Now, another way that Donald Trump responds to all of

6    this is by trying to get you to believe in the big lie.  What

7    do I mean when I say the big lie?  I mean that Mr. Trump's

8    lawyers need you to find that not only E. Jean Carroll, but

9    also Lisa Birnbach and Carol Martin are all lying, that they

10   are all part of some part of coordinated conspiracy, that they

11   somehow joined forces and agreed to come up with a story about

12   an assault that happened nearly 30 years ago simply because

13   they hate Donald Trump.  I'm sorry.  Seriously?  That's just

14   ridiculous.

15              First of all, there is no evidence -- not a shred --

16   that any such conspiracy exists.  No testimony.  No documents.

17   Nowhere in all of those pages of e-mails and texts between

18   E. Jean Carroll, Lisa Birnbach, and Carol Martin did you see

19   anything suggesting that they all agreed to come up with a lie

20   that Donald Trump raped E. Jean Carroll.  In fact, you saw the

21   opposite of that.  You heard Ms. Martin read from a text she

22   sent to a friend in 2021 -- a friend, so it is not Lisa

23   Birnbach and she is not texting E. Jean Carroll -- another

24   friend, in which she expressed frustration that she was dealing

25   with the publicity from this case and she suggested that that

N585car6                    Rebuttal – Mr. Ferrara

1   didn't care about the person you lost?  Of course not.  And

2   Dr. Lebowitz explained this to you too.  She told you that

3   Ms. Carroll doesn't blame Bergdorf's.  It wasn't the store that

4   assaulted her, it was Donald Trump.  That's at page 883 of the

5   transcript.  Or, the point about having, you know, kept the

6   dress she was wearing when Trump assaulted her.  This is

7   something Ms. Carroll told you herself.  If she is going to

8   lie, why not say she destroyed the dress?  Why not say I

9   destroyed it, I don't have it anymore.  Who could ever prove

10  her wrong?  Because she told you the truth, good or bad.  She

11  kept the dress because it was beautiful and it was her nicest

12  dress, and Dr. Lebowitz explained that.

13          Or how about watching *The Apprentice*?  Dr. Lebowitz

14  explained the reaction Ms. Carroll had when Ms. Carroll first

15  saw the trailer for *The Apprentice*.  You guys remember this?

16  Ms. Carroll was sitting in a meeting and someone showed the

17  trailer for *The Apprentice* and Ms. Carroll completely froze and

18  couldn't speak.  This is at page 884 of the transcript.  But at

19  the same time, as Dr. Lebowitz told you, *The Apprentice* was a

20  show that everyone in Ms. Carroll's social circle was watching

21  at that time and if she hadn't, she would have sort of stood

22  out.

23          I think the point is that Ms. Carroll is entitled to

24  find happiness again in her life, to focus on the positive

25  things in life and work to be the happiest, best version of

```
 1   herself, and it feels like the defense has this idea of the
 2   perfect rape victim and in their version it goes something like
 3   this:  The perfect rape victim doesn't flirt.  The perfect rape
 4   victim screams.  The perfect rape victim never goes back to
 5   where they were raped.  The perfect rape victim tells the
 6   police but otherwise never discusses the rape publicly.  The
 7   perfect rape victim burns whatever clothes they were wearing.
 8   The perfect rape victim never laughs again, never jokes around.
 9   The perfect rape victim never again has success in their
10   career.  The perfect rape victim never looks at their rapist
11   again.  The perfect rape victim never tries to hold their
12   rapist accountable, never gets their day in court.  And, the
13   perfect rape victim is never happy again.
14           That's the defense's out-of-date, out-of-touch view.
15   It is as wrong as it is offensive.  Dr. Lebowitz explained to
16   you why it is wrong.  For example, she talked about victims who
17   don't scream, even if they're being raped in the stacks of the
18   public library.  That's at page 857 of the transcript.  But you
19   also know it is wrong because you heard from three victims of
20   sexual assault in this case, three of Donald Trump's victims
21   and they told you the same thing.  Ms. Carroll couldn't process
22   what was happening and was extremely confused when Trump
23   attacked her.  That's what she told you, that's at page 177.
24   Jessica Leeds told you that when Trump started groping her on
25   the airplane she didn't scream or shout and to this day she
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N585car6                         Rebuttal - Mr. Ferrara

1    still doesn't know why.  That's at 742.  And Natasha Stoynoff,

2    the *People* magazine writer, described how after Trump assaulted

3    her at Mar-a-Lago, she went into auto-pilot, as she put it, and

4    finished the interview with Trump and his wife Melania.  That's

5    at 993.

6              Three women, all assaulted by Trump, none of them

7    screamed, none of them discussed it with their employers, none

8    of them wanted to fired or sued.  All of them went on with

9    their lives and careers and found happiness despite what

10   happened to them.  And because they did, the defense wants you

11   to believe they were never assaulted.  But, you know Donald

12   Trump assaulted every one of them.  They told you that and he

13   told you that when he described how he treats women on the

14   *Access Hollywood* tape.

15             THE COURT:  Let's try to wrap it up in the next five

16   minutes.

17             MR. FERRARA:  Yes, sir.  I have one minute and a half,

18   your Honor.

19             THE COURT:  OK.

20             MR. FERRARA:  The long and short of it is this, ladies

21   and gentlemen:  Donald Trump's entire defense rests on calling

22   everyone a liar.  He needs you to believe Ms. Carroll is a

23   liar; Lisa Birnbach, Carol Martin, liars.  Natasha Stoynoff and

24   Jessica Leeds, he has to call them liars.  Even Robert Salerno

25   and Cheryl Beall, I guess they're lying, too, when they talk

N592CAR1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                   Plaintiff,              New York, N.Y.
4
           v.                              22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                   Defendant.
7  ------------------------------x        Jury Trial

8                                         May 9, 2023
                                          10:05 a.m.
9
   Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                          and a Jury

13                        APPEARANCES

14
   KAPLAN HECKER & FINK LLP
15      Attorneys for Plaintiff
   BY:  ROBERTA A. KAPLAN
16      MICHAEL J. FERRARA
        SHAWN G. CROWLEY
17      MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19      Attorneys for Defendant
   BY:  JOSEPH TACOPINA
20      CHAD D. SEIGEL
        MATTHEW G. DeOREO
21

22  HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
23  BY:  ALINA HABBA
        MICHAEL T. MADAIO
24

25  W. PERRY BRANDT
        Attorney for Defendant

N592Car1                       Charge

 1   crimes.  Ms. Carroll claims that Mr. Trump is liable to her for

 2   battery on three different and alternative bases, each of which

 3   corresponds to a criminal law definition of a different sex

 4   crime.  Mr. Trump denies that he is liable to her for battery

 5   on any of these three different and alternative bases.

 6   Accordingly, the first set of questions in the verdict form has

 7   to do with whether or not Ms. Carroll has established that

 8   Mr. Trump's conduct, if any, came within any of those criminal

 9   law definitions.  But I emphasize to you that this is a civil

10   case for damages.  It is not a criminal case.

11          Now, if you look on the verdict form, you will see the

12   first question is whether Ms. Carroll proved by a preponderance

13   of the evidence that Mr. Trump raped her.  It's a yes/no

14   question.  I am going to explain the preponderance of the

15   evidence standard, which is incorporated in that question,

16   later on.  But right now I am going to tell you the required

17   elements of rape under the New York law.

18          In order to establish that Mr. Trump raped her,

19   Ms. Carroll must prove each of two elements by a preponderance

20   of the evidence.

21          The first element is that Mr. Trump engaged in sexual

22   intercourse with her.

23          The second element is that Mr. Trump did so without

24   Ms. Carroll's consent by the use of forcible compulsion.  So

25   let me define each one of those terms.

N592Car1                              Charge

 1              "Sexual intercourse" means any penetration, however

 2       slight, of the penis into the vaginal opening.  In other words,

 3       any penetration of the penis into the vaginal opening,

 4       regardless of the distance of penetration, constitutes an act

 5       of sexual intercourse.  Sexual intercourse does not necessarily

 6       require erection of the penis, emission, or an orgasm.

 7              Now, of course, I hope you will forgive me for this

 8       very explicit language, but I have no alternative——nobody has

 9       in this case——in discussing the elements of the alleged

10       battery.

11              I also used the phrase "forcible compulsion," and what

12       that means is intentionally to compel by the use of physical

13       force.

14              If you find that Ms. Carroll has proved by a

15       preponderance of the evidence both of those two elements, you

16       will answer Question 1 "yes."  If you answer Question 1 "yes,"

17       I instruct you that Mr. Trump thus committed battery against

18       Ms. Carroll.  There would be no need to consider whether he

19       committed battery on either of the other two alternative bases.

20       Remember, I said there were three alternatives.  So if you

21       answer Question 1 "yes," you will skip question 2 and question

22       3 on the verdict form and go right on to question 4.  If you

23       find that Ms. Carroll has not proven either of the two elements

24       of rape by a preponderance of the evidence, you must answer

25       "no" to Question 1 and go on to Question 2, which deals with

N592Car1                         Charge

1    the second of the three alternative bases for the battery

2    claim.

3            The second theory of battery corresponds to something

4    called sexual abuse.  Sexual abuse has two elements.  In order

5    to establish that Mr. Trump sexually abused her, Ms. Carroll

6    must prove each of two elements by a preponderance of the

7    evidence.

8            The first element is that Mr. Trump subjected

9    Ms. Carroll to sexual contact.

10           The second element is that he did so without

11   Ms. Carroll's consent by the use of forcible compulsion.

12           So let me define "sexual contact" for you.  Sexual

13   contact for this purpose means any touching of the sexual or

14   other intimate parts of a person for the purpose of gratifying

15   the sexual desire of either person.  It includes the touching

16   of the actor by the victim, as well as the touching of the

17   victim by the actor, and the touching may be either directly or

18   through clothing.

19           Now, I just used the term or the phrase "sexual or

20   intimate part" in defining sexual contact.  For this purpose, a

21   "sexual part" is an organ of human reproduction.

22           So far as intimate part is concerned, the law does not

23   specifically define which parts of the body are intimate.

24   Intimacy, moreover, is a function of behavior and not just

25   anatomy.  Therefore, if any touching occurred, the manner and

N592Car1                         Charge

1    play.  I previously instructed you about "actual malice" with

2    regard to Question 8.  With regard to Question 10, I'm using

3    the words "malice" or "maliciously," not the phrase "actual

4    malice," and the word "malice" and the word "maliciously" for

5    purposes of Question 10 means something different from "actual

6    malice."  A statement is made with malice or it's made

7    maliciously for the purpose of Question 10 if it's made with

8    deliberate intent to injure or made out of hatred or ill will

9    or spite or made with willful or wanton or reckless disregard

10   of another's rights.

11           If you answer "yes" to the first part of Question

12   10—in other words, if you find that Mr. Trump acted with

13   malice, as I have just defined that term for you, in making the

14   October 12 statement about Ms. Carroll—you will write down an

15   amount, if any, that you find Mr. Trump should pay to

16   Ms. Carroll in punitive damages for the defamation.  If you

17   answer "no" to that first part of Question 10—that is, you

18   find that Mr. Trump's statement was not made maliciously—you

19   may not award punitive damages.  Ms. Carroll bears the burden

20   of proving by a preponderance of the evidence that Mr. Trump

21   acted in accordance with this standard.

22           In arriving at your decision as to the amount of

23   punitive damages, you should consider here with respect to the

24   defamation punitive damage claim:

25           The nature and reprehensibility of what Mr. Trump did

N592Car1                        Charge

1    the issues in Question 7, which is the falsity of the statement
2    of October 12 and Question 8, actual malice, by clear and
3    convincing evidence, you must decide against her on those
4    issues.  What does "clear and convincing evidence" mean?  Clear
5    and convincing evidence is a more exacting standard than proof
6    by a preponderance of the evidence, where you need believe only
7    that a party's claim is more likely true than not.  On the
8    other hand, clear and convincing evidence, clear and convincing
9    proof, is not as high a standard as the burden of proof applied
10   in criminal cases, beyond a reasonable doubt.  Clear and
11   convincing proof leaves no real substantial doubt in your mind.
12   It is proof that establishes in your mind not only the
13   proposition -- not only that the proposition at issue is
14   probable, but also that it is highly probable.  It is enough if
15   Ms. Carroll establishes that Mr. Trump's statement was
16   false——which is Question 7——and that he made the statement with
17   actual malice——that's Question 8——beyond any "substantial
18   doubt"; she does not have to dispel every "reasonable doubt."
19        Now, you folks, the nine of you, are the sole and
20   exclusive judges of the facts.  I certainly do not mean to
21   indicate any opinion as to the facts or as to what your verdict
22   ought to be.  The rulings I have made during this trial are not
23   any indication of any views on my part about what your decision
24   ought to be or as to who should prevail here.  I express no
25   such opinion with respect to what you ought to do here.

# EXHIBIT B

Video of May 10, 2023 CNN Interview of E. Jean Carroll
*Provided to the Court via DVD*

# EXHIBIT C

# TRANSCRIPTS

**Transcript Providers**

**Shows By Category:**

**Return to Transcripts main page**

## CNN This Morning

**New York Representative George Santos Facing Charges from Federal Prosecutors; Thousands of Migrants Camping at U.S. Border as Title 42 Set to Expire; Rep. Michael Lawler (R-NY) Interviewed on New York City Mayor Eric Adams's Plan to Send Migrants to Live in Hotel in Rockland County. Aired 8-8:30a ET.**

Aired May 10, 2023 - 08:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.


[08:00:00]

PHIL MATTINGLY, CNN ANCHOR: And Congressman George Santos could turn himself in as soon as today after being charged by federal prosecutors. And if that's not enough news for you, tomorrow the controversial Title 42 border policy ends, and the number of migrants crossing into the U.S. is already on the rise.

POPPY HARLOW, CNN ANCHOR: Look out to Friday, time is quickly running out to raise the debt limit, and President Biden is set to hold another round of talks with top congressional leaders as our nation faces a potentially catastrophic default.

This all is covered right now as this hour of CNN THIS MORNING starts.

Here's where we start. As CNN first reported, embattled New York Republican Congressman George Santos is now facing federal criminal charges and could appear in court as soon as today. The charges remain under seal. They are in the Eastern District of New York. But the Justice Department has reportedly been looking into whether he broke campaign finance laws. Santos has been resisting calls from Democrats and some New York Republicans to resign ever since reports revealed he lied about much of his personal history and his work

experience.

Our Brynn Gingras is covering this live outside the courthouse for more. When do we expect them to be unsealed, and what reporting do you have on what they are likely tied to?

BRYNN GINGRAS, CNN CORRESPONDENT: Yes, Poppy, much of the reporting coming from our colleague Mark Morales and Evan Perez, learning that George Santos could appear at the courthouse behind me as early as today. If he comes for this indictment that we're hearing has been filed, he would have to be, just like any other citizen, actually walk up those long stairway to the door. Of course, he is not necessarily like every other citizen. He will probably be swarmed by press when, if he shows up today.

Again, as you mentioned, this indictment under seal. It's not clear what charges the congressman could face. But we do know from previous CNN reporting that he has faced a lot of scrutiny about how he's made his money and contributions that he made, a loan to his campaign in 2022 about more than $700,000. Where did that money come from? This is all something we have reported that federal prosecutors in New York were looking into. There has been scrutiny about campaign expenditures. So of course, that will all be determined when the indictment is unsealed, which we think possibly today we will wet more information about that.

What we do know is that the Republican congressman, who again, just took office in January, he did not vote last night in Washington, D.C. Instead, he boarded a plane to come here to New York. So it's very possible we will see him here in Central Islip later today, Poppy.

HARLOW: Brynn, thank you very much for that reporting.

MATTINGLY: Title 42 expires tomorrow. According to President Biden, it's, quote, going to be chaotic for a while. Now, you will recall this is the pandemic-era border policy that allowed border authorities to quickly deport certain migrants. U.S. officials estimate more than 150,000 migrants are camped along the southern border right now. A DHS official tells CNN border officials encountered 10,000 migrants yesterday alone. CNN's David Culver is in Ciudad Juarez, Mexico. And David, your reporting down there has been very eye-opening. What are you seeing and hearing today as we get closer to this deadline?

DAVID CULVER, CNN CORRESPONDENT: It's interesting, Phil. You mentioned President Biden warning about this being potentially chaotic. We saw some of that chaos play out a bit overnight. We were actually monitoring a lot of the border wall here. And what you are looking while we're on the Mexico side is the U.S. side, that is technically U.S. soil where you see a lot of the migrants behind me just waking up in the morning

chill here in Ciudad Juarez. And while they are on U.S. soil, they still haven't been processed to the other side of the border wall.

What we saw overnight was an increased presence of Texas National Guard, a mix, from what we could see, also U.S. Army soldiers. And it seemed at one point they were going to push those migrants back on to the Mexico side. Now, that didn't happen. And so then you saw migrants thinking, maybe they are going to process us. But that adds to this confusion. And it's confusion that has being playing out over several months, and it has led to at moments, some excitement, some hope, and then disappointment as they realize they are still here, still waiting, and really amidst really tough conditions.

(BEGIN VIDEO CLIP)

CULVER: Echoing across the sandy landscape on the U.S. southern border, young voices shouting for water.

UNIDENTIFIED FEMALE: Agua!

CULVER: Already on Texas soil technically, having already illegally crossed the Rio Grande, hundreds of migrants camp out between the barbed wire and border wall waiting to be processed for asylum. Title 42 still in effect. For this group that means they could be immediately expelled by U.S. border officials. The pandemic-era policy offering no guarantees for their asylum claims to be heard.

[08:05:02]

If it expires Thursday, Title 8 takes over, requiring asylum officers to process each claim, potentially overwhelming border officials, already strained.

Worsening this humanitarian crisis, the heat, some 90 degrees at midday. You see people bundled up in winter coats and blankets, useful for the night chill and to shield themselves from the scorching sun. We want some Mexican locals arrive to help the group of migrants, mostly from other parts of Latin America. They carry boxes of pizza, bags of snacks, water, and soda. But it's not a handout. They sell them to desperate customers who then crawl back under the barbed wire with their purchase as others wait for their fill.

But this, only a small portion of the tens of thousands in Ciudad Juarez determined to cross. Near to the city center, scenes similar to what is already happening and perhaps more of what's to come in U.S. border towns.

So for those migrants here in Ciudad Juarez who aren't in a shelter and aren't camping out along the border, some of them are just trying to find places to call home for a few days, a few weeks. One young woman told me she has been here six months. We're essentially in a construction zone that has been an abandoned building turned into a makeshift shelter of sorts. A lot of tents around me. Some have used blankets to cordon off certain areas, and then put a mattress, if they are lucky, or just some bedding on the floor. And you look around on the outside, and you can see clothes hanging up. This is where they have set themselves up ahead of any potential crossing.

This as more migrants by the hundreds, if not thousands, arrive hourly into this Mexican border city. Long dangerous journeys behind them, and by no means is this their last stop. They crowd around a hose of running water to wash up and drink. This man skipping the line, going to the source, bathing under the leak. Back at the wall, rumblings of hope. A truck from the U.S. side approaches, water shooting from the sides, helping to cool the hot sand, but also sparking false hope. Some in the crowd rush to fill their empty bottles as others warn it's not for drinking. That doesn't quench desperation.

(END VIDEO TAPE)

CULVER: I think one of the visuals we have as we see a lot of the crowds building up, many migrants coming here to Ciudad Juarez and along the Mexico border with anticipations and hopes to eventually cross, is that there is this massive wave and that it's going to all come down tomorrow.

But in talking to a lot of these migrants, Phil, you realize, they are not looking at tomorrow necessarily as the date that they are going to cross. It's very individualized. Many of them plan perhaps to try tomorrow, maybe today, maybe in a few weeks. It's determined by their own situation. So while we may see a surge, it could be really just wave after wave after wave rather than one mass tidal wave that I think a lot of us are envisioning with the crowd that we see on this side. MATTINGLY: David Culver, great reporting. Thanks so much.

HARLOW: Republican county officials in two upstate New York communities are continuing to push back against New York City Mayor Eric Adams. They have declared a state of emergency in hopes of stopping the mayor's plan to send hundreds of asylum seekers to hotels in their counties. Listen to this.

(BEGIN VIDEO CLIP)

ED DAY, ROCKLAND COUNTY EXECUTIVE: We are not going to accept what essentially is a New York City shelter here in Rockland County. And in point of fact, what they are trying to do, the way it's been

described secondhand, is against the zoning laws of the town of Orangetown. And there will be a court case there, and, frankly, if you force the issue, what's happening is the law is being broken here. So that's a criminal event.

(END VIDEO CLIP)

HARLOW: We'll talk about that and a lot more with Republican Congressman Mike Lawler. His district covers Rockland County. That executive of Rockland you just heard from, it's one of the suburban communities that has been critical of Mayor Adams's plan. It's good to have you, Congressman. Thanks so much.

REP. MICHAEL LAWLER (R-NY): You as well. Thanks for having me, Poppy.

HARLOW: Do you agree with the county executive we just heard from, or is there a role that Rockland and the communities in your district can and should play in taking in some of these migrants?

LAWLER: I agree with the county executive. Rockland County is not a sanctuary county. New York City chose to be a sanctuary city back in 2016. When southern state governors who were overwhelmed and inundated over the last two years chose to send migrants to New York City, Eric Adams called it morally bankrupt that they were doing that without coordination and cooperation with city officials.

[08:10:00]

He is now doing the very thing he decried by dictating to these municipalities that they are going to drop off hundreds if not thousands of migrants into their communities without any coordination or cooperation. Rockland County's homeless population is roughly 70 people. This would be five times that, that the mayor is seeking to drop off into this one hotel in Rockland County. They do not have the resources nor capabilities with their social service departments, with our non-profit agencies, to handle this massive influx.

By the way, I would just point out, we have already, in Rockland County, taken in many migrants. Our one school district took in 1,000 migrant students this past September. So this is not a situation where we are not participating. We're not helping where we can. But the county does not have the capabilities of New York City to handle this. And New York just got $1 billion in the state budget -- HARLOW: That's right.

LAWLER: -- by the governor to handle this, $1 billion.

HARLOW: And it is New York City that is funding what would take place in Rockland County. They're paying for it.

LAWLER: Except for four months -- and the problem is -- for four months, Poppy. And we asked them on a conference call yesterday, I asked the mayor's office, after the four months, who is paying for it? And they said, well, we'll try to round them up and bring them back to New York City. I said if they choose not to come back to New York City, who is paying for it? They said we don't know. That's unacceptable.

HARLOW: Congressman, New York City has processed some 60,000 migrants since last spring, 40,000 remain in New York City, and the mayor is talking about starting off with 30 migrants, getting up to 340, which is the number that you cited. And they are paying for it. Just to put a button on this issue, is there no role in which you believe the counties in your district can help, especially when it is being funded for this four months period, at least, by the city of New York?

LAWLER: Respectfully, I think you are simplifying the issue here.

Number one, the mayor is saying we are going to start out with 30, get up to 340. They want to fill the hotel, which can handle 340 people very quickly. And they said this is a pilot program, which means this is the beginning, not the end. So you're talking about hundreds, if not thousands more coming into the county. This is their initial decision that they are looking to do.

In addition, as the county executive pointed out, the hotel does not have a C.O. to operate as a shelter. So to turn a hotel, which can only take transient residents for up to 30 days, into a four-month shelter that houses 340 people, provides health care, laundry services, food and living, is totally unacceptable.

In addition, what happens during the day with these folks? They can't get a job. They can't get access to employment. And so who is actually taking care of them? This hotel is within a mile of two universities and a high school, and you're talking about sending single male adults up here.

It is totally unacceptable the way the mayor has handled this and the way the city has without any coordination or cooperation and communication well in advance -- they knew they were doing this, and chose not to discuss it with town and county officials until the very moment that they were looking to send them here.

There is a temporary restraining order in place barring the hotel from accepting them because it's in violation of the town code. So we'll see what happens. But I don't see this going well given the way the mayor and the

governor have handled it.

HARLOW: On the debt ceiling, President Biden is coming to your district to speak later today about these debt ceiling negotiations that, admittedly, by both sides went nowhere yesterday at the critical meeting at the White House. And Speaker McCarthy was asked point blank, do you think America will default on its debt? And he said, I don't know.

Can you, Representative, guarantee your constituents that America will not default on its debt this summer, maybe as early as June 1st?

LAWLER: So Poppy, throughout this entire discussion I have had three parameters. The president must negotiate with the speaker and Senate majority leader, we must cut spending, and we must not default. Those have been my three parameters throughout. It's why I'm going to the president's speech today in my district to hear what he has to say, but also to take the opportunity to make the point to him that we have to work together.

All of us have a responsibility. Speaker McCarthy asked the president to meet. They met back in February, and then it took 97 days for the president to accept another meeting. That is totally unacceptable.

HARLOW: Just to --

LAWLER: And the day after this meet, now he is coming to my district to decry the, quote-unquote, "MAGA Republicans holding the country hostage". That is not the way you deal with this.

The president as vice president negotiated with house Republicans previously, and that's what he should do again.

[08:15:00]

HARLOW: He did, and the argument from the White House would be they learned a lot from what devolved after those negotiations in 2011. But just to get a yes or no answer, can you guarantee your constituents that we will not default this summer at this point? Or are you like McCarthy, I don't know?

LAWLER: I -- look, I am fully committed to making sure that we do not default, we cannot default.

HARLOW: OK.

LAWLER: All of us have an obligation to negotiate, and I'll just point out, House Republicans are the only ones who have passed a bill to raise the debt ceiling. Chuck Schumer could say until he's blue in the face that he wants to pass a clean debt ceiling, he doesn't have the votes to do that.

HARLOW: You --

LAWLER: And so, everybody has an obligation to put their big boy pants on and negotiate.

HARLOW: Let's talk about George Santos, he's going to be in court, possibly as early as today, and federal charges against him will be unsealed. Look, you have long called for him to step down. You reiterated that in the press release from your office yesterday. What should Kevin McCarthy do? What do you want the speaker to do of your party?

LAWLER: Well, I have said repeatedly, that George Santos should resign, and he should. His conduct is unbecoming, it's embarrassing, and it's disgraceful. We'll see what the charges are today. I know the speaker was asked about it yesterday, he made clear that, you know, he has a view on this that there's a process.

HARLOW: Now, this is all he said. Let me play it for our viewers. This is all he said, here it is.

LAWLER: Yes.

(BEGIN VIDEO CLIP)

REP. KEVIN MCCARTHY (R-CA): I'll look at the charges, yes.

(END VIDEO CLIP)

HARLOW: Should he do more than look at the charges?

LAWLER: Now, there was -- respectfully, Poppy, he had a press conference later in the day, and he was asked further about it. And he went in to explain the process that he has employed in the past when members have been charged. He's allowed them to go through the criminal process. But he has removed them from committees. George Santos is not sitting on committees, and so, obviously, he will not be participating in any committees, that's the speaker's process.

My belief is that George Santos needs to go, he needs to resign. I've said that repeatedly and believe if he had any decency or dignity, he would. We will see how this plays out. But obviously, he's not longing for this world in terms of being in elected office. And so, it's frankly a matter of time.

HARLOW: We'll see. He is planning to run again.

Before you go, I do want to ask you about the federal jury here in New York yesterday finding former President Trump sexually abused and defamed the writer E. Jean Carroll. And the jury awarded her a $5 million verdict for battery and defamation. Does this make you unwilling to support President Trump in 2024?

LAWLER: No, I said on your show the day after the election that I'd like to see the party move in a different direction. I think we need a robust primary process. Ultimately, the Republican voters in the primary will determine who our nominee is.

But the former president has a lot of legal challenges afoot. You know, including obviously yesterday's verdict. Other investigations, charges that have been brought in New York City, and he needs to answer for it. And I'm sure Kaitlan will ask them about it tonight. And he should answer for these charges that have been brought.

HARLOW: In case your party's nominee, will you support him and vote for him?

LAWLER: Look, I'd like to see a robust primary process. I've said in the past, and I reiterate again, I'd like to see the party move in a different direction. But I'm not going to talk about hypotheticals of where we are at the end of the day. You know, the Republican Party needs to be focused on the future and focused on the challenges facing the American people and not perceived grievances of the past or legal challenges facing a candidate.

HARLOW: Congressman Michael Lawler, thank you for being on, on such an important day, especially in your district. I know you'll be with the president a little later today. We appreciate it.

LAWLER: Thank you.

HARLOW: Thanks. Phil.

PHIL MATTINGLY, CNN ANCHOR: A New York Jury has found the former President Donald Trump liable

for sexually abusing and defaming writer E. Jean Carroll. He's been ordered to pay $5 million in damages. E. Jean Carroll is here with us live in studio, for her first CNN interview since the verdict. Stay tuned.

[08:20:00]

(COMMERCIAL BREAK)

HARLOW: Welcome back -- welcome back to CNN This Morning.

Quote, "The world finally knows the truth". That statement coming from writer E. Jean Carroll after she won her civil lawsuit against Donald Trump. A federal jury in Manhattan found that Trump sexually abused Carroll in a department store dressing room in the 90s and then defamed her by denying her claim. Trump has been ordered to pay Carroll $5 million. The former president reacting to the ruling on his truth social platform listen to this.

(BEGIN VIDEO CLIP)

DONALD TRUMP, FORMER PRESIDENT OF UNITED STATES: What else can you expect from a Trump hating Clinton appointed judge, who went out of his way to make sure that the result of this trial was as negative as it could possibly be? Speaking to and in control of a jury from an anti-Trump area, which is probably the worst place in the United States for me to get a fair trial, will be appealing this decision it's a disgrace.

(END VIDEO CLIP)

HARLOW: We should note that it was an anonymous jury. Joining us now is E. Jean Carroll and her attorney Roberta Kaplan. Welcome to CNN This Morning. We're glad you're here.

E. JEAN CARROLL, WON SEXUAL ABUSE, DEFAMATION CASE AGAINST DONALD TRUMP: Well, thank you for having us.

HARLOW: We all remember that you said, E. Jean, I'm trying to get my life back.

CARROLL: Yes.

HARLOW: And here to try to get my life back.

CARROLL: That was like, yesterday was so -- I was such a happy woman. I felt like we had accomplished that.

HARLOW: You did.

CARROLL: Yes.

MATTINGLY: Talk about what you were thinking as the jurist decisions were read off in your mind through --

CARROLL: We were sitting there, like this, Robbie's hand, it was like holding a block of ice. And we didn't have any idea what the Jury was going to do. The Former President is incorrect, the jury was not from Manhattan. Where was it from Robbie?

ROBERTA KAPLAN, E. JEAN CARROLL'S ATTORNEY: Mostly West Chester north.

CARROLL: Yes, six men, three women. His kind of jury actually and so, when the verdict came in, she squeezed my hands so hard. I almost yelped, but it was a great moment.

HARLOW: What about when that first finding was found? This jury found that Trump did not rape you. What about that moment?

[08:25:10]

CARROLL: Robbie can explain the legal?

HARLOW: Sure. And I want you too, but I just wonder, E. Jean, what went through your head when you heard that?

CARROLL: Well, I just immediately say in my own head, oh, yes, he did -- oh, yes, he did. See, that's my response.

KAPLAN: So, look, New York law on sexual crimes like this is complicated, and it's not probably, appropriate for morning viewers. But the truth of the matter is, is that sexual abuse, which he was found guilty of, is a very,

very serious offence. I'm not going to get into the body part situation with you, but it's a people go to jail for sexual abuse. It's a very serious offence, and most importantly, E. Jean brought this case because she wanted her name back, as you said, at the very beginning, she got her name back and the jury found that he lied. And he lied about her maliciously.

MATTINGLY: I don't think anybody was surprised by some of the stuff we heard from the Former President last night. Obviously, you've addressed him talking about the jury. Another thing that he and his lawyers have often spoken about is the lack of disclosure about a big Democratic donor funding part of this case. Was there a reason it wasn't disclosed, and did you view this as political in any way?

CARROLL: No, I just completely -- I just completely forgot that he even existed.

HARLOW: In your deposition?

CARROLL: Yes, in my deposition.

HARLOW: OK, Trump lawyers have called that Roberta assign of bias, it raises questions about the motives of bringing this case. And I wonder what the reaction is.

KAPLAN: So, every single witness, every one of those 11 witnesses who testified in this case, testified under oath and told the truth, not because they don't like Trump, but because it was the truth. That's what this case was about. Who was telling the truth? The jury decided that E. Jean was telling the truth. And there may be of witnesses who don't like Trump, there may have been jurors that Joe Tacopina said in his opening who don't like Trump. But that process was about the truth under the law and that's what the jury found.

MATTINGLY: I don't want to make this a political conversation. But the kind of dissonance between the moment yesterday on the front pages of all the newspapers.

HARLOW: All of them.

MATTINGLY: Getting your life back, something you've been thinking about and going through for decades. And then at the same time looking over and seeing, that man is also the front runner for the Republican nomination for president. And you listen to Republicans who were asked about this yesterday, and it is some version of what we heard for six years prior. They want to talk about it. DOJ, say there's something corrupt about the process. Well, how do you kind of reconcile that moment?

CARROLL: Here's how I -- yesterday, the old view of what the perfect victim looks like, totally changed.

MATTINGLY: What do you mean?

CARROLL: The old view of the perfect victim was a woman who always screamed, a woman who immediately reported, a woman whose life is supposed to fold up, and she's never supposed to experience happiness again, that was just shut down with this verdict. The death of the perfect victim has happened. Now, this verdict is for all women. This is not really about me, it's for every single woman.

HARLOW: There in the courtroom was an encounter and exchange between you and the President's lawyer, Joe Tacopina. He came up, you shook hands, I believe. What did he say?

CARROLL: Well, Joe Tacopina is very likeable. He's sort of like an 18th century strutting peacock. And he's people like him. So, when he sticks out his hand to -- first, he congratulated Robbie. And then, he was congratulating people on the team. And as I put my hand forward, I said, he did it and you know it. Then we shook hands, and I passed on.

HARLOW: Did he say anything and respond? CARROLL: No, he's a -- he's a hell fellow well met, he went on shaking

hands and smiling.

MATTINGLY: The response you got afterwards? You know, you are making the point, this is for all women. I think that there were a significant number of women who are certainly behind you in the case, who back to you in the case. In the hours since, I don't think we had a lot of time, I had to check your phone or calls or emails. What's the response been, given what you're laying out in terms of the perfect victim being shattered?

CARROLL: There are no words -- there are no words. I just now, saw the headlines. We -- I'm really sort of taking in the moment and the overwhelming flood of a lot of hate, that's part of it. But an overwhelming amount of relief and joy and the feeling of at last and the surge. There's a sort of feeling of victory that at last somebody has held him accountable in a courtroom. Thanks to Robbie Kaplan. So, it's such a mash overwhelming emotion.

[08:30:00]

TRANSCRIPTS Transcript Providers

Shows By Category:

Return to Transcripts main page

## CNN This Morning

**E. Jean Carroll and Her Attorney are Interviewed about her Lawsuit; Jim Steyer is Interviewed about AI; Key Report out on Inflation; Trump GOP Front-Runner Despite Legal Clouds. Aired 8:30-9a ET**

Aired May 10, 2023 - 08:30 ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[08:30:00]

E. JEAN CARROLL, WON SEXUAL ABUSE, DEFAMATION CASE AGAINST DONALD TRUMP: Accountable in a courtroom, thanks to Robbie Kaplan. So it's this - it's such a mash of overwhelming emotions, it's hard to put into words.

POPPY HARLOW, CNN ANCHOR: What about appeals? We heard the president say they'll appeal. Our Paula Reid, with her brilliant legal analysis on the program earlier talked about that that's going to be - this is a tough appeal to make and what -- what would the grounds be when the Trump team didn't present a defense and he didn't step foot in that courtroom. Your perspective?

ROBERTA KAPLAN, E. JEAN CARROLL'S ATTORNEY: So, you heard Donald Trump in that tape say that the judge here, Judge Kaplan, no relation to me, went out of his way to be unfair. Actually, the opposite is true. Judge Kaplan, in this case, went out of his way to be fair to Donald Trump. He gave him multiple opportunities to show up in that courtroom and testify, and Donald Trump decided not to. There are no issues in this case on appeal. They'll make them, but there are no serious issues on this appeal. And your colleague is absolutely right.

HARLOW: If Trump had come into -- well, first, do you wish he can come?

CARROLL: Yes, I do.

HARLOW: And what would you have said to him?

CARROLL: I would have loved to have seen Robbie put him on the stand. Loved it. I just would have loved it. If you've seen any portions of the deposition, that was Robbie doing the questioning.

HARLOW: We have.

CARROLL: It would have been a glorious moment. However, he was -- I think he was frightened. I think he was frightened. I think he was frightened of her.

PHIL MATTINGLY, CNN ANCHOR: What's next? I mean this has to be an all- consuming -- CARROLL: I'm going to go get a dog for my dog, because I've been - so,

he needs somebody to play with. So, I'm going to get a dog. I'm going to go to the pound. Get a nice dog for my dog.

HARLOW: $5 million. Are you going to see it?

CARROLL: Oh, I -- you know what, I was even unaware of how much it was. Robbie had to tell me. This is not about the money. It's not about the money. This is accomplishing something that I set out to do many years ago is to get my name back, and that's what we did.

KAPLAN: But you will see it, I promise you, E. Jean Carroll.

MATTINGLY: That's what I was going to ask - I'm going to ask you next.

HARLOW: Ask the lawyer.

MATTINGLY: (INAUDIBLE).

**A1185**

KAPLAN: I promise you that E. Jean will see each and every penny of that $5 million.

HARLOW: Can I end on something that I think is really important in all of this, and it's the fact that New York passed this law -

CARROLL: Yes.

HARLOW: The Adult Survivors Act. They passed it just a few years ago. Were it not for that law, you never would have been able to bring this case. And I just think it speaks to the importance for a lot of other survivors.

CARROLL: Exactly. This would never - I would never have this window, this year of having the ability to bring a lawsuit for rape. Robbie can explain it better.

KAPLAN: Well, E. Jean actually helped to get that law passed. It passed last year. We filed -- it was Thanksgiving Day. It was the first day you could sue. We filed just after midnight on Thanksgiving. And there are a lot of other women throughout the state and, hopefully, throughout this country that they will get other laws like this passed in other states. And New York women should use this law while it's still around, which is until next Thanksgiving.

CARROLL: Yes, because there's a reason women stay silent. They're ashamed and they're frightened and they're worried about their -- this law gives us that one-year window. It's a brilliant law.

HARLOW: E. Jean Carroll, Roberta Kaplan, thank you very much.

MATTINGLY: Thank you, guys, for coming on. Appreciate you sharing your story.

CARROLL: Thank you. Thank you. Thank you so much.

KAPLAN: Thank you. MATTINGLY: All right, new federal recommendations that teenagers undergo training before using social media. Plus, what a new poll reveals about how much children are already using AI and what parents -- that's terrifying -- and what parents should know.

HARLOW: I know.

MATTINGLY: The results may surprise you.

HARLOW: We're worried for our - for our kids.

(COMMERCIAL BREAK)

[08:37:29]

HARLOW: Welcome back.

First on CNN, as AI chatbots become more powerful and a bigger part of our lives, a major new poll finds parents are lagging behind their children on technology. I know that's not a surprise, but we're going to tell you why it's concerning. The survey from Common Sense Media reveals that while both groups feel optimistic for the potential of AI, only 30 percent of parents say they've used ChatGPT. I have not. Have you?

MATTINGLY: I have.

HARLOW: OK, at least Phil has.

MATTINGLY: Not well, but -

HARLOW: Compared to 58 percent of students between ages 12 and 18. Now another key findings, kid are using it without their parents' or their teachers' knowledge. And students who use ChatGPT for school are already three times more likely to use it than a search engine like Google. Last week the White House announced a series of measures to address the challenges of AI as some lawmakers are calling for regulation. Listen to this from Democratic Senator Michael Bennet, what he told us.

(BEGIN VIDEO CLIP)

REP. MICHAEL BENNET (D-CO): We are having an epidemic of adolescent mental health issues in America today. I'm not saying that's all social media's responsibility, but a huge piece of that is, and they've gone completely unregulated here.

(END VIDEO CLIP)

HARLOW: Let's talk to Jim Steyer, CEO and the founder of Common Sense Media. They commissioned this

survey about all of this. It's a national nonprofit and it advocates for safe technology and media for kids and their families.

Jim, it's good to have you. Good morning. JIM STEYER, CEO AND FOUNDER, COMMON SENSE MEDIA: Great to be here,

Poppy.

HARLOW: What's the big takeaway?

STEYER: The big takeaway is that ChatGPT and AI is coming down the tracks like a freight train. It's going to be a huge issue in our kids' lives. And we parents have to get to know what's going on here because it's really going to affect kids' lives, but also how they perform in school. And right now kids know a lot more about it than our - than parents like you and me know.

MATTINGLY: I refuse to knowledge that my children are better at technology than I am, as inevitable as it is.

STEYER: (INAUDIBLE).

MATTINGLY: But it raises an interesting question in the sense of the velocity of the take up of ChatGPT is unprecedented. I mean you're talking like 100 million people. Kids are obviously involved in that.

When it comes to school, which, I think, was my first immediate concern, what are we seeing in terms of the ability to utilize this in the near term immediately on assignments, on studying, on cheating to some degree?

STEYER: Well, Phil, it's a great question because seriously ChatGPT and other forms of AI will transform your kids, my kids, Poppy's kids' education in the coming years. It makes them able to write essays, to do research much more quickly, even than current search does.

[08:40:05]

So, it's going to change the way they get educated.

But the - but as you mentioned, parents are really concerned kids can cheat with it, could become too dependent on it as opposed to doing the work themselves. And so we are going to have to make sure that as

these major new AI platforms, like ChatGPT, come into massive use, that there are clear rules, that schools know how they're being used, and, quite frankly, that parents like you and me and Poppy also manage this in occur kids' lives. And we have to get comfortable with ChatGPT and other platforms, period.

HARLOW: I think - I think we have to manage it. Parents have a big responsibility in this. I totally agree. Schools, to an extent. I also think companies have a responsibility. And I'm interested in what you think about what Sam Altman, the CEO and founder of OpenAI, told my friend Rebecca Jarvis. She sat down with him for ABC News. And here's what he said to her.

(BEGIN VIDEO CLIP)

SAM ALTMAN, CEO, OPENAI: I think it doesn't work to do all this in a lab. You've got to get these products out into the world and make contact with reality. Make our mistakes while the stakes are low. I think people should be happy that we're a little bit scared of this.

HARLOW: He said, you can't figure it all out in a lab. You've got to release it to the world. What do you think?

STEYER: It's a really good question.

So, I met with Sam this week and we've been meeting - I've been meeting with the people who run Google, who are the other major players right now, with chatbots. And I'm saying the very top people in the company. Number one, I think the realized this is going to have an incredible impact on society and particularly on young people. Number two, as Senator Bennet was saying in that clip earlier, there's -- our government is going to have to step up and regulate this. They failed to do that with social media, and we can see the results. But there's clearly going to have to be government regulation and leadership here. And right now they're behind the eight ball again.

But I do think it's going to be incumbent upon OpenAI, that's Sam's company, and on Google and a couple of the other major players to rein this technology in and not to experiment with it too much. And that is going to be relying, therefore, on the goodwill of large corporations. So that's why people like Common Sense Media are around, because we have to hold them accountable. And, quite frankly, this is a major experiment on our kids' lives, on their education, and right now it's being completely conducted by large companies. So, we have to get involved as parents now.

HARLOW: Look, you were the one who was in the room with Sam, with the Google execs. Did they tell you

they would rein it in? Sundar Pichai, the CEO of Google, told me in 2019, if AI gets too far ahead of us we may have to pull it back despite how profitable it could be. Did they make any commitments to you?

STEYER: You know, they did in a broad sense, Poppy. And, honestly, I've - we've known Sam and also Satya Nadella, who runs Microsoft, who's the big funder of OpenAI, and Sundar and James Manyika, the head of AI at Google, I think they actually care about this. I feel more optimistic, honestly, that the folks who are running these big AI platforms are concerned about the potential downsides and consequences than, for example, 15 years ago when social media was introduced and you had Mark Zuckerburg running Facebook and buying Instagram.

I do think there is a greater sense of corporate social responsibility, and that's really important and we need to hold them to that. But at the same time, our government cannot continue to just live in a vacuum where they don't issue any kinds of regulatory structure because that leaves it essentially to the good will of corporations and then to parents like you and me and Phil. And I think that ultimately this could be an extraordinary benefit for society, but the downsides are also extraordinary. So, all of us have to get involved in this AI debate and our government has to finally take the lead.

MATTINGLY: I'm a little skeptical of us having a lot of eggs in the Congress doing things basket, but, Jim, this is fascinating. STEYER: I agree.

MATTINGLY: There's so much to learn and it's super important for every parent, every person. Thanks so much for being on.

HARLOW: Thank you, Jim.

STEYER: Thanks for having me, guys.

MATTINGLY: And released just moments ago, a key report on inflation. Our business team crunching those numbers. We'll tell you what they found, coming up next.

(COMMERCIAL BREAK)

[08:48:09]

MATTINGLY: Well, just moments ago, a key report showing inflation slowing again in April.

Let's get right to CNN's chief business correspondent Christine Romans.

Christine, how much?

CHRISTINE ROMANS, CNN CHIEF BUSINESS CORRESPONDENT: What went up fast is coming down very slowly. But this is more deceleration in the inflation story here. And 4.9 percent, that is the CPI, the Consumer Price Index, over the past year. It was 5 percent last month. So you can see a little bit better. And then month on month, 0.4 percent. This is pretty much right in line, maybe even a little bit lighter than economists had been expecting.

And you can see the trend. I love to show, the trend is your friend, in all of these numbers. Never take just one of these numbers. Take a look at them together and you can see that we've seen peaking in the inflation story.

This is the smallest 12-month increase in two years now. That's good news. Ten months in a row of just a little bit of deceleration.

So, these prices are still too high, no question. And when you look within these numbers, shelter was 60 percent of it. Shelter, that's a sticky -- we call it sticky inflation. You also saw gas prices. Used car prices were up. So those are some of the biggest categories that we saw. Still have a lot of work to do. The Fed would like to see 2 percent inflation. So, 4.9 percent is still too hot, but slowing. Slowing. Slowing slowly. I think it shows you that the Fed's rate hikes are working, but again coming down much more slowly than they went up in terms of price increases.

MATTINGLY: Faster, faster.

HARLOW: We'll take it.

ROMANS: I know. MATTINGLY: We'll take it.

HARLOW: We'll take it a little.

Thank you.

ROMANS: I know. Just -

HARLOW: Thank you, Christine.

MATTINGLY: Well, Donald Trump found liable for sexual abuse and defamation. That's just one of the negative headlines he's seen in recent months. But new polling suggests Republican voters might not care. Harry Enten is here with this morning's number.

(COMMERCIAL BREAK)

[08:54:02]

MATTINGLY: Well, as we've been reporting, a federal jury in New York found Donald Trump liable for sexually abusing and defaming writer E. Jean Carroll. And that's just one bad headline. In the last few months, he's also doubled down on what he said on the "Access Hollywood" tape, federal investigators have escalated their probe into his handling of classified documents at Mar-a-Lago, he's facing growing legal scrutiny over his role in trying to overturn the 2020 election. Oh, also, he's been charged with 34 felony counts of falsifying business records.

But, this should be familiar, polling suggests Trump is still the GOP frontrunner. And we're going to need to know why, and that's why we have this individual who's going to tell us exactly why, senior data reporter Harry Enten.

What's up?

HARRY ENTEN, CNN SENIOR DATA REPORTER: All right. So, this morning's number is three. Why? Because Trump has led Biden nationally in three ABC News/"Washington Post" polls this cycle. He led in zero national polls that are - that CNN would put on air during the entire 2020 cycle.

[08:55:05]

So Biden clearly in a weaker position versus Trump than he was four years ago. Yet, you know, I have to point out something, I don't like to just look at one poll singularly, I like to look at a lot of them. So, Biden versus Trump nationally recently, this ABC News/"Washington Post" poll got a lot of play with Trump up 6, but look at these other ones, IPSOS, Biden plus 5, "Wall Street Journal," Biden plus 3, Quinnipiac, Biden plus 2.

But on the whole, I think the picture should say that if you thought that Joe Biden was going to run away with the 2024 election, that's not the case. At this point it looks very, very tight, guys.

HARLOW: And at the top of his party for Trump.

ENTEN: That's exactly right. So, take a look at this trend line. The top choices for GOP nominee. And look at what's going on here. We've got Donald Trump. We've got Ron DeSantis. Back in January, look at that, Trump was up by only 11 points. And he was only at 43 percent. Jump ahead to March, 45 percent to 28. Look now, on average, Trump has a 30-point advantage, over 50 percent.

And I want to give you an indication of how strong that is looking forward, right, because polls are just a snapshot in time. Well, look at those who polled near or better than Trump's level at this point in non-incumbent primaries. Bob Dole in '96, won the nomination. George W. Bush in 2000, won the nomination. Al Gore in 2000, won the nomination. Hillary Clinton in 2016, won the nomination. So, people polling in Trump's position have generally gone on to win the nomination.

And I'll point out one little last nugget. Members of Congress or governors endorsing Trump, so far in the 2024 cycle, more than 60. In the entire 2016 primary season, just 15. So the fact is Trump has very good polling. He has the backing of a lot of members of his party. At this point the Trump train looks very difficult to stop. But, of course, we still have many months to go until the primary.

MATTINGLY: It's very early.

Can I just point out one thing, though?

HARLOW: Oh, someone's competing with you on the magic wall, Harry.

MATTINGLY: Look at - what is it? Can we zoom in on this source. Harry's aggregate. Is this like a secret internal system that we don't know about, because I saw that. I was like, whoa, I kind of want to know what that is but I also don't want to know what that is.

ENTEN: A chef never reveals his recipes.

HARLOW: OK.

MATTINGLY: Harry Enten, you're the best, as always, and your aggregate.

ENTEN: Thank you. Thank you.

MATTINGLY: Thanks so much.

HARLOW: Thanks, Harry.

A reminder, Kaitlan will moderate an exclusive CNN town hall with former President Trump. That airs tonight live from New Hampshire, 8:00 p.m. Eastern.

Thanks for joining us. We'll see you here tomorrow.

CNN NEWS CENTRAL is right after this.

Good job. Thank you.

(COMMERCIAL BREAK)

[09:00:00]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-25-2023
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                       Plaintiff,

            -against-                                20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM REGARDING PLAINTIFF'S
### MOTION TO FILE AN AMENDED COMPLAINT

LEWIS A. KAPLAN, *District Judge.*

        This is a defamation case against Donald Trump brought by writer E. Jean Carroll

based on certain statements Mr. Trump made in 2019 shortly after Ms. Carroll first publicly accused

him of sexually assaulting ("raping") her in the mid 1990s. The Court granted Ms. Carroll's motion

for leave to amend her complaint on June 13, 2023.[1] This memorandum sets forth in brief its reasons

for doing so.

        The amended complaint made three main sets of changes. First, it added allegations

based upon the jury's verdict in a second very closely related case ("*Carroll II*"), including

substitution of the phrase "sexual assault" (or derivatives of that phrase) for the word "rape" (or

derivatives of that word) wherever that word (or its derivatives) appeared in the original complaint.[2]

---

[1]     Dkt 169.

[2]     The Court assumes familiarity with its prior decisions, which describe in detail the facts and
procedural histories of both this case ("*Carroll I*") and *Carroll II*. Dkt 32, *Carroll v. Trump*,
498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir.

2

Second, it set forth alleged facts concerning Mr. Trump's recent statements following the *Carroll II* verdict in which he again claimed that he does not know Ms. Carroll and that no such incident occurred between them. Third, it added allegations drawn from Mr. Trump's deposition in this case that allegedly demonstrate his personal motive in defaming Ms. Carroll.[3]  Importantly, as the Court noted in its decision denying Mr. Trump's motion for summary judgment, "[t]he amended complaint did not add any new claims or otherwise change the focus of [Ms. Carroll's] original complaint."[4]

Mr. Trump opposed Ms. Carroll's motion. He sought to justify a denial of leave to amend chiefly on the ground that the substitution of "sexual assault" for the word "rape" would have

_____

2022); Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); Dkt 145, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt Dkt 173, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 4393067 (S.D.N.Y. July 5, 2023); Doc. No. 22-cv-10016 (*Carroll II*), Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023), *Carroll II*, Dkt 212, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, (S.D.N.Y. July 19, 2023).

Except where preceded by *"Carroll II"*, "Dkt" references are to the docket in this case.

[3]   The amended complaint specified also that "the minimum appropriate corrective campaign" to repair the alleged harm to Ms. Carroll's reputation allegedly caused by Mr. Trump's statements, as calculated by her damages expert, "would cost at least $10 million." Dkt 157-1 (Pl. Amend. Compl.) at 29 ¶ 147.

The allegations in the amended complaint that allegedly demonstrate Mr. Trump's personal motive presumably were added in relation to the then-pending issue of the United States government's decision with respect to certifying under the Westfall Act that Mr. Trump was acting within the scope of his employment as President when he made the allegedly defamatory statements.  On July 11, 2023, the United States informed the Court and parties of its decision not to make that certification in this case. Dkt 177.

[4]   *Carroll*, 2023 WL 4393067, at *2 n.6.

3

"an extraordinary impact on the substance of [Ms. Carroll's] allegations, particularly in light of the jury verdict in *Carroll II*, which [(Mr. Trump claimed)] preclude[d] a finding that [Mr. Trump] defamed [Ms. Carroll] by denying that he raped her."[5]

Mr. Trump's principal argument is just wrong. As this Court explained in its recent decision denying Mr. Trump's motion in *Carroll II* for a new trial on damages or other relief, the *Carroll II* jury's answer to the special verdict question concerning whether Mr. Trump "raped" Ms. Carroll established *only* that she had failed to prove that he penetrated her vagina *with his penis.* Indeed, the jury's finding that Mr. Trump sexually abused her implicitly determined that he had penetrated her vagina with his fingers, a form of "rape" as that word often is used.[6]  In consequence, even if the jury's response to the "rape" question in *Carroll II* had issue preclusive effect (*i.e.*, were binding) in this case, a matter on which the Court does not now express any view, it would not have the effect that Mr. Trump contends.

Mr. Trump argued also that leave to amend should have been denied because the substitution of the phrase "sexual assault" for the word "rape" in the amended complaint would fundamentally alter or transform the nature of this case. But that argument too is without merit.

Ms. Carroll's claim that Mr. Trump defamed her in his 2019 statements never has hinged on the precise manner in which she claimed he raped here, "rape" being a term of various meanings.[7]  It instead has been centered on whether Mr. Trump defamed her by asserting that she

---

[5]      Dkt 164 (Def. Opp. Mem.) at 11.

[6]      *Carroll*, 2023 WL 4612082, at *2 n.2-4.

[7]      *Id.*

4

made up an entirely fictitious account of a forcible sexual assault by Mr. Trump in order to increase sales of her new book and/or carry out a political agenda, among other things. While Ms. Carroll has used the word "rape," the controversy between the parties always has centered on whether Mr. Trump attacked Ms. Carroll sexually, thus rendering his 2019 statements false and defamatory, not about the specific anatomical details of the assault. Nor did Mr. Trump's response to the allegation draw any such distinctions. He contended that he had never met Ms. Carroll, did not even know who she was, and that nothing at all ever had happened between them. She was, in his assertion, simply a liar acting out of improper motives. Moreover, all of the details concerning the alleged encounter between Mr. Trump and Ms. Carroll, if any, were explored in discovery in excruciating detail. Mr. Trump has not been prejudiced by granting Ms. Carroll leave to amend with respect to this or any of the other changes.

Next, Mr. Trump's argument that the additional allegations with respect to Mr. Trump's remarks concerning Ms. Carroll during the CNN Town Hall event the night after the jury's verdict in *Carroll II* should have been denied as futile because they are protected by the fair reporting privilege is without merit. The fair reporting privilege, which provides that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding," bears no application here.[8]  The amended complaint does not make any claim or cause of action based on Mr. Trump's statements during CNN's town hall. Instead, the allegations concerning Mr. Trump's post-*Carroll II* remarks are included as "subsequent statements of the defendant," which may be considered to establish that Mr. Trump made the 2019 statements that

---

[8]
    N.Y. Civ. Rights Law § 74.

5

allegations concerning Mr. Trump's post-*Carroll II* remarks are included as "subsequent statements

of the defendant," which may be considered to establish that Mr. Trump made the 2019 statements

that always have been the subject of this action with the deliberate intent to injure or out of hatred,

ill will, or spite ("common law malice") in order for Ms. Carroll to obtain punitive damages.[9] Mr.

Trump did not cite any authority, and the Court has found none, for the proposition that statements

that might be privileged if they were the subject of a defamation claim – which Mr. Trump's

remarks are not – cannot be considered for the distinct purpose of assessing punitive damages.

There accordingly is no merit to any of Mr. Trump's arguments in opposition to Ms.

Carroll's motion for leave to amend her complaint.

Dated:       July 25, 2023

_____

Lewis A. Kaplan
United States District Judge

---

[9]   *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 184–85 (2d Cir. 2000) ("Punitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel. . . . Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote. *See, e.g.*, *Herbert v. Lando*, 441 U.S. 153, 164 n. 12 . . . (1979) ('any competent evidence, either direct or circumstantial, can be resorted to [to establish common law malice], and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, *subsequent statements of the defendant*, circumstances indicating the existence of rivalry, [and] ill will, or hostility between the parties')." (alterations in original) (emphasis added)). *See also* Dkt 157-1 (Pl. Amend. Compl.) at 38-39 ¶ 174 ("Trump's defamatory statements post-verdict show the depth of his malice toward Carroll since it is hard to imagine defamatory conduct that could possibly be more motivated by hatred, ill will, or spite.").

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

E. JEAN CARROLL,

    *Plaintiff,*

  v.

DONALD J. TRUMP, in his personal capacity,

    *Defendant.*

---

Civil Action No.: 1:20-cv-7311-LAK-JLC

---

## **DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS AND MOTION TO STRIKE**

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
   -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
   mmadaio@habbalaw.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

BACKGROUND ....................................................................................................... 1

ARGUMENT ............................................................................................................ 3

    I.    Plaintiff Post-Verdict Statements Were Defamatory and Not Privileged .......................... 4

        A.  Plaintiff's Statement that Defendant "Did" Rape Her is Defamatory .......................... 4

            1.   Plaintiff's Statements Were Unequivocally False and Directly Contradicted the Jury's Verdict ............................................................................................. 5

            2.   Defendant Has Sufficiently Alleged Actual Malice .......................................... 8

            3.   The Fair and True Reporting Privilege Does Not Apply ................................. 11

                 i.   Plaintiff's Statements are Not a "Report of an Official Proceeding .... 12

                ii.   Plaintiff's Statements are Not "Fair and True" ................................... 15

        B.  Plaintiff's Publication of Her Post-Verdict Statements to Defense Counsel is Defamatory ........................................................................................ 18

    II.   DEFENDANT'S COUNTERCLAIM IS PROCEDURALLY PROPER........................ 19

    III.  NONE OF DEFENDANT'S AFFIRMATIVE DEFENSES SHOULD BE STRICKEN . 22

CONCLUSION ....................................................................................................... 28

<u>**TABLE OF AUTHORITIES**</u>

*Cases*

*Arrow Commc'ns Labs., Inc. v. Pico Prods., Inc.,*
    606 N.Y.S.2d 114, 115 (4th Dep't 1993) ................................................................6

*Biro v. Conde Nast,*
    807 F.3d 541, 545 (2d Cir. 2015) ........................................................................5

*Bose Corp. v. Consumers Union of United States, Inc.,*
    692 F.2d 189, 196 (1st Cir. 1982) ........................................................................5

*Branca v. Mayesh,*
    101 A.D.2d 872, 476 N.Y.S.2d 187, 188–89 (2d Dep't 1984) ...............................15

*Cafferty v. Southern Tier Publishing Co.,*
    226 N.Y. 87, 93 (1919) .........................................................................................7

*Carroll v. Trump,*
    No. 22-CV-10016 (LAK), 2023 WL 2669790, at *6 (S.D.N.Y. Mar. 28, 2023) .................11

*Carroll v. Donald J. Trump,*
    Case No. 1:22-cv-1001 (S.D.N.Y 2022)....................................................................5

*Celle v. Filipino Rep. Enterprises Inc.,*
    209 F.3d 163, 176 (2d Cir. 2000) ......................................................................7, 8, 9, 10

*Cholowsky v. Civiletti,*
    69 A.D.3d 110, 114 (2d Dept. 2009) .......................................................................12

*Clark v. AII Acquisition, LLC,*
    886 F.3d 261, 264 (2d Cir. 2018) ..................................................................27, 28

*Cohen v. Stephen Wise Free Synagogue,*
    No. 95 CIV. 1659 (PKL), 1996 WL 159096, at *5 (S.D.N.Y. Apr. 4, 1996) .................24

*Conti v. Doe,*
    535 F. Supp. 3d 257, 272 (S.D.N.Y. 2021) .............................................................5

*Davis v. Boeheim,*
    4 N.Y.3d 262, 272, 22 N.E.3d 999, 1006 (2014).............................................6, 7, 18

*D'Annunzio v. Ayken, Inc.,*
    876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012) ...........................................................5

*Daniel Goldreyer, Ltd. V. Van de Wetering,*
  217 A.D.2d 434, 436 (1st Dep't 1995) ................................................................17

*Deutsch v. Health Ins. Plan of Greater New York,*
  573 F. Supp. 1443, 1445 (S.D.N.Y. 1983) .....................................................25, 26

*Dillon v. City of New York,*
  261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999).................................9

*Easton v. Pub. Citizens, Inc.,*
  No. 91-cv-1639 (JSM), 1991 WL 280688, at *7 (S.D.N.Y. Dec. 26, 1991)..........14

*Enigma Software Group USA v. Bleeping Computer,*
  194 F.Supp. 3d 263, 286 (S.D.N.Y. 2016) ..........................................................7

*Feldman v. Comp. Trading, LLC,*
  No. 19-CV-4452 (RPK) (RLM), 2021 WL 930222, at *2 (E.D.N.Y. Mar. 11, 2021) ..........26

*Flamm v. Am. Ass'n of Univ. Women,*
  201 F.3d 144, 152 (2d Cir. 2000) .......................................................................6
*Fine v. ESPN, Inc.,*
  11 F.Supp. 3d, 209, 216-218 (N.D.N.Y. 2014) ...................................................14

*Fossil Grp., Inc. v. Angel Seller LLC,*
  No. 20-CV-2441(WFK) (TAM), 2021 WL 5409605, at *4 (E.D.N.Y. Aug. 27, 2021) ........19

*Freeze Right Refrigeration and Air Conditioning Services, Inc. v. City of New York,*
  101 A.D.2d 175, 475 N.Y.S.2d 383, 388–89 (1st Dep't 1984)...............................5

*Fine v. ESPN, Inc.,*
  11 F.Supp. 3d, 209, 216-218 (N.D.N.Y. 2014) .....................................................5

*Geiger v. Town of Greece,*
  311 F. App'x 413, 417 (2d Cir. 2009) ................................................................15

*GEOMC Co. v. Calmare Therapeutics Inc.,*
  918 F.3d 92, 100 ...............................................................................19, 23, 24

*Gilmore v. Shearson/American Express, Inc.,*
  811 F.2d 108, 112 (2d Cir. 1987) .....................................................................27

*Goldman v. Reddington,*
  417 F. Supp. 3d 163, 173 (E.D.N.Y. 2019) ..........................................................6

*Guiffre v. Maxwell,*
  165 F.Supp.3d 147, 151 (S.D.N.Y. 2013). .....................................................6, 18

iii

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
   491 U.S. 657, 667 (1989)..........................................................................8

*Harris v. City of N.Y.,*
   186 F.3d 243, 249 (2d Cir. 1999) ..........................................................25

*Harris v. Steinem,*
   571 F.2d 119, 123 (2d Cir. 1978) ..........................................................21

*Jewell v. NYP Holdings, Inc.,*
   23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) ..............................................8

*Jones v. Ford Motor Credit Co.,*
   358 F.3d 205, 209 (2d Cir.2004) ...........................................................21

*Karedes v. Ackerly Group, Inc.,*
   423 F.3d 107, 114 (2d Cir. 2005) ..........................................................15

*Karp v. Hill & Knowlton, Inc.,*
   631 F. Supp. 360, 363 (S.D.N.Y. 1986) ...........................................14, 15

*Katz v. Donna Karan Co. Store, L.L.C.,*
   872 F.3d 114, 118 (2d Cir. 2017). ...........................................................9

*Kinsey v. New York Times Co.,*
   991 F.3d 171, 178 (2d Cir. 2021) ..........................................................16

*Levine v. Merrill Lynch,*
   No. 09 CIV. 304 (PGG), 2009 WL 10691070, at *1, 4 (S.D.N.Y. Dec. 22, 2009)...............23

*Lipsky v. Commonwealth United Corp.,*
   551 F.2d 887, 893 (2d Cir. 1976) ..........................................................23

*McFadden v. Monroe Cty. Sheriff,*
   No. 00 Civ. 6034, 2002 WL 1348508, at *3 (W.D.N.Y. Apr. 16, 2002) ............................25

*McRedmond v. Sutton Place Rest. & Bar, Inc.,*
   851 N.Y.S.2d 478, 480 (2008)................................................................15

*Meloff v. New York Life Ins. Co.,*
   240 F.3d 138, 146 (2d Cir.2001) .............................................................5

*Milkovich v. Lorain J. Co.,*
   497 U.S. 1, 2, 110 S. Ct. 2695, 2697, 111 L. Ed. 2d 1 (1990)..................................6

*New York Times Co. v. Sullivan,*

iv

376 U.S. 254, 279–80 (1964)..................................................................................8

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC,*
   No. 20CV2875LDHPK, 2022 WL 900604, at *9 (E.D.N.Y. Mar. 28, 2022) .......................9

*Orb Factory, Ltd. v. Design Sci. Toys, Ltd.,*
   No. 96 CIV. 9469 (RWS), 1999 WL 191527, at *19 (S.D.N.Y. Apr. 7, 1999) ...................24

*Palin v. New York Times Company,*
   940 F.3d 804, 815 (2d Cir. 2019) ...........................................................................9

*Pfeffer v. Mark,*
   No. 98-CV-6771(ILG), 2000 WL 516891, at *2 (E.D.N.Y. Mar. 16, 2000) .........................5

*Pisani v. Staten Island Univ. Hosp.,*
   440 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) ....................................................15, 17

*Porsch v. LLR, Inc.,*
   380 F. Supp. 3d 418, 429 (S.D.N.Y. 2019) ...........................................................22

*Rodriguez v City of New York,*
   18 CIV. 4805 (NRB), 2021 WL 5360120, at *4 (S.D.N.Y. Nov. 16, 2021) .........................26

*Ramsay-Nobles v. Keyser,*
   No. 16-CV-5778 (CM), 2018 WL 6985228, at *3 (S.D.N.Y. Dec. 18, 2018) .....................19

*Rosenblum v. Thomson Reuters (Markets) LLC,*
   984 F. Supp. 2d 141, 145 (S.D.N.Y. 2013) ...........................................................9

*Salcer v. Envicon Equities Corp.,*
   478 U.S. 1015 (1986).............................................................................22, 25

*Shields v. Citytrust Bancorp, Inc.,*
   25 F.3d 1124, 1128 (2d Cir. 1994) ...................................................................25, 26

*Tardif v. City of New York,*
   302 F.R.D. 31, 32 (S.D.N.Y. 2014)....................................................................23

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
   No. 18-CV-5075 (LJL), 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) .................9, 10

*United Mine Workers v. Gibbs,*
   383 U.S. 715, 725 (1966)..............................................................................5

*US Dominion, Inc. v. Fox News Network, LLC,*
   No. 21 Civ. 03- 257, 2021 WL 5984265, at *25 (Del. Super. Ct. Dec. 16, 2021) ................21

*VNB Realty, Inc. v. Bank of Am. Corp.,*
     No. 11-cv-6805 (DLC), 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013)........................5
*Wenz v. Becker,*
     948 F. Supp. 319, 322 (S.D.N.Y. 1996) ..........................................................................11, 12

*Wexler v. Alegion,*
     *(UK) Ltd.,* 374 F. Supp. 3d 302, 313 (S.D.N.Y. 2019)...........................................................13

*William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.,*
     744 F.2d 935, 939 (2d Cir. 1984) .............................................................................................22

Young v. Gannett Satellite Info. Network, Inc.,
     734 F.3d 544, 548 (6th Cir. 2013) ............................................................................................1

**Rules, Statutes, and Miscellaneous**

Federal Rule of Civil Procedure 12 ................................................................................................3

Federal Rule of Civil Procedure 13 .......................................................................................20, 21

Federal Rule of Civil Procedure 15 ................................................................................................5

N.Y. Civ. Rights Law § 74 ...............................................................................11, 12, 13, 15, 16

Restatement (Second) of Torts § 558 (1976)..................................................................................4

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1430...................................................................21

6 Wright & Miller, § 1488 ...........................................................................................................19

Defendant/Counterclaimant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in opposition to the Motion to Dismiss and Motion to Strike (the "Motion") filed by the plaintiff and Counterclaim Defendant, E. Jean Carroll ("Plaintiff"), on July 11, 2023 (ECF 174). For the reasons set forth herein, the Motion should be denied in its entirety.

**BACKGROUND**

Defendant recognizes the Court's familiarity with the parties' history and procedural posture of this action and the companion case, *E. Jean Carroll v. Donald J. Trump*, No. 1:22-cv-1001 (S.D.N.Y 2022) ("*Carroll II*").

In June of 2019, Plaintiff, for the first time, launched public accusations against Defendant, then-sitting President of the United States, claiming that he raped her at some point in the mid-1990s. *See generally* ECF 1. In response, Defendant issued three separate statements refuting Plaintiff's allegations. Plaintiff then filed her action in the Supreme Court of the State of New York on November 4, 2019. Plaintiff's single-count complaint alleged that Defendant defamed her when he made the challenged statements. *Id.*

Thereafter, on November 24, 2022, Plaintiff filed *Carroll II*, a second civil action against Defendant. The *Carroll II* complaint also detailed Plaintiff's account of the alleged Bergdorf Goodman incident and included a cause of action under the Adult Survivor's Act, as well as a new defamation claim stemming from Defendant's October 12, 2022 statement relating to the litigation *sub judice*.

Trial commenced in *Carroll II* on April 25, 2022. The consistent theme throughout Plaintiff's testimony was her claim that she had been raped by Defendant in the mid-1990s. After hearing the testimony of Plaintiff and her "outcry" witnesses, as well as all other evidence in the

case, the jury found that Defendant had not raped Plaintiff within the relevant definition of New York's Penal Law. *Carroll II*, ECF 174. Thereafter, Defendant timely filed a notice of appeal of the *Carroll II* judgment, and the matter is pending before the Second Circuit. *Carroll II*, ECF 179.

On May 10, 2023, the morning following the *Carroll II* verdict, Plaintiff and her counsel, Roberta Kaplan, appeared on the televised news program, *CNN This Morning*.[1] During the interview, Plaintiff was asked to comment on the jury's finding that she was not raped by Defendant, and the following interaction took place:

> Reporter: What about when that first finding was found? This jury found that Trump did not rape you. What about that moment?
>
> Plaintiff: Robbie can explain the legal.
>
> Reporter: Sure. And I want you to, but I just wonder, E. Jean, what went through your head when you heard that?
>
> Plaintiff: Well, I just immediately say in my own head, oh, yes, he did—oh, yes, he did. So that's my response.

ECF 175 at 6.

After answering a series of additional questions, the interview shifted towards Plaintiff's recollection of an exchange between her and Defendant's trial counsel, Joseph Tacopina.

> Reporter: There in the courtroom was an encounter, an exchange, between you and the president's lawyer, Joe Tacopina. He came up, you shook hands, I believe. What did he say?
>
> Plaintiff: Well, Joe Tacopina is very likeable. He's sort of like an 18th century strutting peacock. And people like him. So, when he sticks out his hand to—first, he congratulated Robbie. And then, he was congratulating people on the team. And as I put my hand forward, I said, "he did it and you know it." Then we shook hands, and I passed on.

ECF 175 at 7.

---

[1] CNN, "E. Jean Carroll says Trump is 'incorrect' about civil trial jury," YouTube (May 10, 2023), https://bit.ly/3WRSXeF.

Shortly thereafter, Plaintiff moved to amend her complaint in the instant action. *See* ECF 155. The proposed allegations included in her amendments were substantial which included: (1) removing virtually every reference to her original allegation that Defendant raped her; (2) certain allegations pertaining to whether Defendant was acting within the scope of his office as President of the United States when making the challenged statements; and (3) Plaintiff alleges that Defendant's post-verdict statements made during a televised CNN Town Hall program should serve as grounds to increase any punitive damages awarded against the Defendant. *Id*. This Court granted Plaintiff's motion. *See* ECF 169.

In response to Plaintiff's Amended Complaint, Defendant filed an Amended Answer with Counterclaim on June 27, 2023. *See* ECF 171. Defendant answered each of Plaintiff's amended allegations, put forth various affirmative defenses, and raised a counterclaim based on the defamatory statements that Plaintiff made during her CNN interview.

## <u>ARGUMENT</u>

In considering a motion to dismiss a counterclaim, the court applies the same standards as a motion to dismiss a complaint. *See, Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075 (LJL), 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020). When considering a motion to dismiss a complaint under Rule 12, the Court must "accept[ ] all of the [counterclaim's] factual allegations as true and draw[ ] all reasonable inferences in the plaintiff's favor." *See Katz v. Donna Karan Co. Store, L.L.C.*, 872 F.3d 114, 118 (2d Cir. 2017). A claim should not be dismissed if the plaintiff has stated facts sufficient to state a claim to relief that is plausible on its face. *Rosenblum v. Thomson Reuters (Markets) LLC*, 984 F. Supp. 2d 141, 145 (S.D.N.Y. 2013). Furthermore, plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 145 (S.D.N.Y. 2013).

**I.    DEFENDANT ASSERTS A COGNIZABLE CLAIM FOR DEFAMATION**

Defendant's counterclaim sets forth a viable claim for defamation with respect to two statements that Plaintiff made during her May 10, 2023 interview on CNN.

The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii)  that is false, (iii) published to a third party, (iv) "of and concerning" the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege. *See, e.g., Dillon v. City of New York*, 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (citing Restatement (Second) of Torts § 558 (1976)); *see also Albert v. Loksen*, 239 F.3d 256, 266 (2d Cir. 2001) (setting forth the same elements for a slander claim under New York law).

In the instant matter, it is readily apparent that Defendant's counterclaim satisfies all of the above elements. Therefore, for the reasons set forth below, Defendant has asserted a cognizable claim for defamation.

**A.  Plaintiff's Statement that Defendant "Did" Rape Her is Defamatory**

Defendant has satisfied each of the elements for defamation when pleading that Plaintiff defamed him by repudiating the jury's finding in *Carroll II* and declaring that Defendant raped her. First, Defendant sufficiently pled that Plaintiff made a false statement by reaffirming her previous assertion that Defendant had committed rape, even after the jury's verdict in Carroll II. Second, Plaintiff knew it was false or acted in reckless disregard of its truth or falsity when she again accused Defendant of rape. Third, Plaintiff's statements are not protected by the fair and true reporting privilege. Therefore, Defendant's counterclaim sets forth a valid claim for defamation.

1.  **Plaintiff's Statements Were Unequivocally False and Directly Contradicted the Jury's Verdict.**

Plaintiff contends that her statement repudiating the jury's verdict was "substantially true" because she was simply "reciting her own undisputed internal thoughts" when she repudiated a key aspect of the jury's verdict on a nationally syndicated news program. *See* ECF 175 at 12. This argument, however, is misguided and inconsistent with binding authority as to what constitutes defamation under New York law.

"Substantial truth" is assessed on "the understanding of the 'average reader.'" *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir.2001). In this way, a "statement is 'substantially true' only if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Conti v. Doe,* 535 F. Supp. 3d 257, 272 (S.D.N.Y. 2021) (internal quotation marks omitted) (quoting *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998)).

New York courts have developed a three-prong test for determining whether a statement should be considered to be "substantially true." First, courts "must give the disputed language a fair reading in the context of the publication as a whole." *Karedes v. Ackerly Group, Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) (quoting *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000). Second, courts "are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous." *Id.* Third, courts are to read statements "as they would be read and understood by the public to which they are addressed" and not with the precision with which judges and lawyers read documents. *Id.*

Here, Plaintiff's statement was demonstrably false. Plaintiff does not dispute, nor can she, that the jury in *Carroll II* determined that Defendant did not rape her. Notwithstanding the jury's

finding, Plaintiff appeared on national television the next day and clearly, and unequivocally, contradicted that finding:

> Reporter: . . . [W]hat went through your head when you heard that [the jury found that Trump did not rape you]?

> Plaintiff: Well, I just immediately say in my own head, oh, yes, he did—oh, yes, he did. So that's my response.

ECF 175 at 6.

It is undeniable that, in making the above statement, the message Plaintiff communicated to CNN viewers is that Defendant raped her. *See Arrow Commc'ns Labs., Inc. v. Pico Prods., Inc.,* 606 N.Y.S.2d 114, 115 (4th Dep't 1993) (finding statements defamatory because "read in context, [they] convey the unmistakable impression that they are statements of fact."); *see also Guiffre v. Maxwell*, 165 F.Supp.3d 147, 151 (S.D.N.Y. 2013) (Kaplan, J.) ("'The dispositive inquiry is whether, on the basis of the overall context in which the assertion were made, a reasonable reader could have concluded that the statements were *conveying facts about the plaintiff*.'") (citing *Davis v. Boeheim*, 24 N.Y.3d 262, 998 N.Y.S.2d 131, 22 N.E.3d 999 (2014)). Plaintiff's statement unambiguously conveyed a simple fact – the jury got it wrong because, as Plaintiff put it, the rape "did" occur. *See Goldman v. Reddington*, 417 F. Supp. 3d 163, 173 (E.D.N.Y. 2019) (finding plaintiff adequately pleaded falsity where plaintiff "unambiguously disavow[ed]" the defamatory statement and "present[ed] specific facts ... to plausibly allege" the statements were not true). In view of the jury's finding, there is simply no argument that Plaintiff's statement was "substantially true" as a matter of law.

In attempting to counter this point, Plaintiff disingenuously argues that she was merely "reciting her own undisputed internal thoughts" because her statement was couched as being "in her own head." *See* ECF 175 at 12. However, this argument is merely a red herring, as it is squarely

foreclosed by binding precedent. Indeed, the Second Circuit has clarified that "[t]he mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement," *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 152 (2d Cir. 2000) (citations omitted). Similarly, the Supreme Court has confirmed that "[s]imply couching a statement . . . in terms of opinion . . . does not dispel the factual implications contained in the statement." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 2, 110 S. Ct. 2695, 2697, 111 L. Ed. 2d 1 (1990). Likewise, the New York Court of Appeals has consistently rejected these types of 'technical' arguments, noting that "libel law is not a system of technicalities, but reasonable regulations whereby the public may be furnished news and information, but not false stories about any one." *Cafferty v. S. Tier Pub. Co.*, 226 N.Y. 87, 93 (1919). Thus, "notwithstanding [Plaintiff's] qualifier phrases, '[t]he impression created by [her] words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely [her] opinion.'" *Enigma Software Group USA v. Bleeping Computer*, 194 F.Supp. 3d 263, 286 (S.D.N.Y. 2016) (citing *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F.Supp. 661, 688 (S.D.N.Y. 1991). In other words, simply because Plaintiff attempted to couch her statement as being her "own internal thoughts," the defamatory effect is not lost.

Further, Plaintiff's attempt to distinguish the various uses of the term "rape" is similarly unavailing. While it is true that "rape" has different meanings in different jurisdictions, and in different context, that fact is wholly irrelevant here. In her motion papers, Plaintiff concedes that her statement on CNN "concerned the jury verdict specifically." *See* ECF 175 at 20. In other words, she was not commenting on whether she was 'raped' as the term is used colloquially or in other jurisdictions; she was directly responding to the jury's finding in *Caroll II* that there was no 'rape' as the term is defined in N.Y. Penal Law. Thus, it is beyond dispute that her statement runs contrary

to the *Carroll II* jury's finding, or that, at a minimum, a reasonable jury could interpret her statement as applying in this context. *Celle*, 209 F.3d at 178 ("If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood."); *see also*, *Davis*, 24 N.Y.3d at 272 (2014) ("It may well be that [the challenged statements] are subject to defendants' interpretation ... the motion to dismiss must be denied if the communication at issue, taking the words in their ordinary meaning and in context, is also susceptible to a defamatory connotation.") (internal quotation omitted).

Therefore, Plaintiff has no basis to contend that the challenged statement was substantially true, and Defendant should be permitted to proceed with his counterclaim.

## 2.  Defendant Has Sufficiently Alleged Actual Malice

To show actual malice, a plaintiff must prove that the defendant either knew her statements were false or acted with reckless disregard as to whether they were false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). As the Supreme Court has explained, while "the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition, we have made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal quotation marks, citations, and alterations omitted).

Although the "actual malice" standard is demanding, the Second Circuit has made clear that it is not an "insurmountable" hurdle, especially at the pleadings stage. *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). Rather, "at the pleading stage" actual malice may be inferred "from allegations that refer[] to the nature and circumstances of the alleged defamation or previous

8

dealings with the defendant." *Id*. at 546. In this way, a person acts with reckless disregard when she publishes the statement at issue entertaining serious doubts as to the truth of the statement or having a high degree of awareness that the statement is probably false. *Harte–Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). "Although actual malice is subjective, a 'court typically will infer actual malice from objective facts.'" *Celle*, 209 F.3d at 183 (quoting *Bose Corp. v. Consumers Union, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982)).

Plaintiff argues that Defendant's allegation of actual malice fails because it is conclusory. *See* ECF 175 at 15. However, Plaintiff's contention is entirely off base. Defendant pleaded actual malice with specificity by alleging that "[c]ounterclaim Defendant made these false statements with actual malice and ill will with an intent to significantly and spitefully harm and attack Counterclaimant's reputation, as these false statements were *clearly contrary to the jury verdict in Carroll II* whereby Counterclaimant was found not liable for rape by the jury." ECF 171 at 26, ¶ 10 (emphasis added). On this motion to dismiss, drawing all inferences in Defendant's favor, there is little doubt that Defendant has put forth a sufficient showing of actual malice, especially where the jury's verdict leaves no room for doubt as to whether or not Defendant was found liable of rape. This is particularly true at the pleading stage, given that defendants to a defamation claim rarely admit their true state of mind. *See Celle*, 209 F.3d at 183 ("whether [defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts.") (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982)).

While a showing of actual malice often turns on the sufficiency of circumstantial evidence, this case is unique in that there is already a prevailing authority that has found Plaintiff's statement to be false —the jury's verdict in *Carroll II*. As per a well-established body of case law, defamatory

statements made in direct contradiction to publicly available information are deemed to be made with actual malice. *See*, *e.g.*, *NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC,* No. 20-CV-2875, 2022 WL 900604, at *9 (E.D.N.Y. Mar. 28, 2022), reconsideration denied, No. 20-CV-2875, 2023 WL 2667006 (E.D.N.Y. Mar. 27, 2023) (finding actual malice where the challenged statements were readily contradicted in public documents); *Palin v. New York Times Company,* 940 F.3d 804, 815 (2d Cir. 2019) (evidence that the editor of the column was editor-in-chief of a major magazine and reviewed numerous articles rejecting any connection of plaintiff to the shooting at issue, was evidence of the editor's "opportunity to know the journalistic consensus that the connection was lacking gives rise to the inference that he actually did know); *Celle,* 209 F.3d at 186–87 (a variance between the text and headline and the defamatory sub-headline was circumstantial evidence he knew that the thrust of the sub-headline was false); *Young v. Gannett Satellite Info. Network, Inc.,* 734 F.3d 544, 548 (6th Cir. 2013) (newspaper author had read an arbitrator's report containing several items she should have seen as "red flags" contradicting her conclusion).

Turning to the case at hand, Plaintiff made her statement with full knowledge that a jury of her peers rejected her assertion that Defendant raped her, as defined under New York Penal Law, and expressly disavowed this finding on national television. Plaintiff's contention that she relied on counsel to explain the legal implication of the verdict only weakens her argument. In *Carroll II,* this Court issued an opinion detailing how Plaintiff's prior understanding of rape came from a broader definition that is understood in society to go beyond sexual intercourse. *Carroll II*, ECF 212 at 3-5. Even if this was her original understanding (which is not conceded), it is not conceivable that Plaintiff was referring to the colloquial definition of the term since she was responding to a specific question about the verdict rendered by the jury in *Carroll II*. Indeed, after instructing her counsel to provide a 'legal' explanation as to the jury's verdict, Plaintiff went on to

emphatically claim that Defendant had raped her in *direct response* to a question regarding the

jury's finding as it related to the definition of rape in the New York Penal Law. Thus, it is readily

apparent that Plaintiff acted with knowing falsity or, at a minimum, reckless disregard for the truth

when she knowingly repudiated the jury's determination that this specific act had not occurred.

Based on the foregoing, Defendant has sufficiently alleged that Plaintiff acted with actual

malice in making her defamatory statements.

### 3.   The Fair and True Reporting Privilege Does Not Apply

Civil Rights Law § 74 provides, in pertinent part: "A civil action cannot be maintained . .

. for the publication of a fair and true report of any judicial proceeding." N.Y. Civ. Rights Law §

74.

"The purpose of providing immunity to fair and true reports of judicial proceedings is said

to be to encourage the dissemination of information concerning the judicial branch of government

and thereby to serve the public interest 'in having proceedings of courts of justice public, not

secret, for the greater security thus given for the proper administration of justice.'" *Carroll v.*

*Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790, at *6 (S.D.N.Y. Mar. 28, 2023) ("*Carroll*

*II*") (citing *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012)). "Originally 'a

qualified privilege for newspapers publishing 'a fair and true report' of 'any judicial, legislative,

or other public official proceedings,'" the law was amended in 1930 "to make the privilege

absolute" and ten years later "was extended from newspapers to 'any person, firm or corporation.'"

*Id.* (citing *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (2d Dept. 2009))

Pursuant to Section 74, out-of-court statements are privileged only if two requirements are

met: "(1) the allegedly defamatory statement is connected to a judicial proceeding; and (2) the

statement fairly and accurately reports the judicial proceeding." *See Wenz v. Becker*, 948 F. Supp. 319, 322 (S.D.N.Y. 1996).

In the instant matter, Plaintiff is unable to satisfy either requirement. First, the subject statements are not a 'report' on a judicial proceeding since it is focused exclusively on underlying events and are accurately described as 'commentary' on the jury's verdict. Second, the statements are not "fair and true" accounts because the content of said statements are not substantially accurate. Therefore, the fair and true reporting privilege does not apply.

### i. Plaintiff's Statements are Not a "Report" of an Official Proceeding

"Allegedly defamatory statements are protected by Section 74 only where the statements report on a judicial proceeding." *Wenz*, 948 F. Supp. at 323. The party asserting the privilege bears the burden of demonstrating that this requirement is met. *See Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 596 (2d Dep't 2009). "Doubt regarding whether the report is 'of' a proceeding is resolved against the privilege." *US Dominion, Inc. v. Fox News Network, LLC*, No. 21 Civ. 03- 257, 2021 WL 5984265, at *25 (Del. Super. Ct. Dec. 16, 2021) (applying New York law).

The standard to determine "whether a report qualifies for the fair and true reporting privilege is whether 'the ordinary viewer or reader' can 'determine from the publication itself that the publication is reporting on [a judicial] proceeding.'" *Carroll II*, 2023 WL 2669790, at *6 (S.D.N.Y. Mar. 28, 2023) (citing *Kinsey v. New York Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021)). "In other words, '[i]f the context in which the statement [is] made make[s] it impossible for the ordinary viewer [or reader] to determine whether [the publication] was reporting on a judicial proceeding, the absolute privilege does not apply.'" *Id.* As this Court noted previously:

> "'An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice; the ordinary viewer or reader must be able to determine from the publication itself that the publication is reporting on the proceeding . . . Thus, there must be some perceptible connection between the challenged report and

the[ ] proceeding . . .  How 'direct' this connection must be has not been clearly defined . . . And, in light of the broad construction of § 74 . . . reports that bear a more attenuated relationship to a proceeding have been deemed sufficiently connected. [(citing cases)]'

'However, a report's mere mention of [a judicial] proceeding does not automatically extend the privilege to an entire publication; the privilege may apply to some portions of a report and not others . . . If context indicates that a challenged portion of a publication *focuses exclusively on underlying events*, rather than [a judicial] proceeding relating to those events, that portion is insufficiently connected to the proceeding to constitute a report of that proceeding. . . . Furthermore, [t]he privilege *does not extend to commentary on the proceeding* or to additional facts not established in the proceedings.'"

*Id.* (citing *Fine v. ESPN, Inc.*, 11 F.Supp. 3d, 209,  216-218 (N.D.N.Y. 2014) (emphasis added).

Here, the fair and true reporting privilege is not applicable because an "ordinary viewer" of the CNN interview would not have been able to determine that Plaintiff's statements were "reporting on [a judicial] proceeding" in light of the context in which they were made. *Kinsey*, 991 F.3d at 178. Far from merely "reporting on" the *Carroll II* trial in any objective sense, Plaintiff— a party to those proceedings—was providing commentary on the jury's findings based upon her purported personal knowledge of the underlying facts. As Plaintiff previously argued, in taking the contrary position in *Carroll II*, "there is particularly good reason to doubt that a statement qualifies as a 'report' on a judicial proceeding when the statement is made by a party to the case, rather than by a reporter," *Carroll II*, ECF 79 at 8, because, in such a scenario, "the odds are much greater—given their obvious interest—that they have . . . engaged in 'commentary on the proceeding,' *id.* (citing *Fine*, 11 F. Supp. 3d at 218), or have 'focused on underlying events," *Wexler v. Alegion (UK) Ltd.,* 374 F. Supp. 3d 302, 313 (S.D.N.Y. 2019). Both exceptions to the fair and true reporting privilege are applicable here.

13

*First*, it is readily apparent that Plaintiff's statements—responding "oh yes he did, oh yes he did" when asked about the jury's finding "that [Defendant] did not rape [her]"; and telling opposing counsel "he did it, and you know it"—are "focus[ed] exclusively on underlying events." *Fine*, 11 F.Supp. 3d at 218. These comments are directed towards the underlying conduct that is alleged to have occurred in Bergdorf Goodman dressing room in the mid-1990s, and, more specifically, whether Defendant "did" commit these acts.

As such, there is no material difference between these statements and the alleged defamatory statement that was the subject of *Carroll II*, wherein Defendant stated, in pertinent part, that Plaintiff had "completely made up a story that [he] met her at the doors of this crowded New York City [d]epartment [s]tore." *See Carroll II*, 2023 WL 2669790, at *17. In assessing whether Defendant's statement was covered by the fair and true reporting privilege, this Court determined that it was not because it was "'focus[ed] exclusively on underlying events' – namely, the substance of Ms. Carroll's rape accusation – 'rather than a[] [judicial] proceeding relating to those events.'" *Id.* (citing *Fine*, 11 F.Supp. 3d at 217; *Easton v. Pub. Citizens, Inc.*, No. 91-cv-1639 (JSM), 1991 WL 280688, at *7 (S.D.N.Y. Dec. 26, 1991), *aff'd sub nom.*, 969 F.2d 1043 (2d Cir. 1992); *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363 (S.D.N.Y. 1986)). The same holds true for Plaintiff's statements here, as they go towards "the substance of Ms. Carroll's rape accusation" in an identical fashion. *Id.*

*Second*, Plaintiff's statements constitute commentary on the *Carroll II* proceedings by setting forth Plaintiff's evaluation of—and rejection of—the jury's verdict.

In *Karp v. Hill & Knowlton, Inc.*, after the Second Circuit issued a decision in a related fraud action, the defendant released a public statement claiming that "[t]he [Second Circuit's] ruling supports our claim[ ] that [the plaintiff] defrauded Buckingham[.]" 631 F. Supp. at 362. In

14

determining that this statement was not protected by the fair and true reporting privilege, the district court explained:

> "[The defendant's] one word assessment of the Second Circuit's opinion does not publish that opinion, or otherwise expose the public to the workings of the judicial system. Rather, it conclusionally evaluates the circuit court's opinion. The Civil Rights Law does not protect such bald-faced commentary about the judicial branch and the proceedings therein."

*Id.* at 363 (citing *Freeze Right Refrigeration and Air Conditioning Services, Inc. v. City of New York,* 475 N.Y.S.2d 383, 388–89 (1st Dep't 1984); *Branca v. Mayesh,* 476 N.Y.S.2d 187, 188–89 (2d Dep't 1984)).

Here, similarly, Plaintiff's statements "conclusionally evaluates" the jury's verdict in *Carroll II. Id.* By disputing the jury's finding that Defendant did not rape her—through her assertion that the underlying event in question did in fact occur—Plaintiff is providing "bald-faced commentary" as to the accuracy of the verdict in *Carroll II. Id.* Thus, Plaintiff's statements cannot be considered a "report" on *Carroll II* since they are accurately described as "commentary" on the case.

Based on the foregoing, Plaintiff's statements do not fall within the purview of Section 74 because they do not constitute a "report" on *Carroll II.*

**ii.      Plaintiff's Statements are Not "Fair and True"**

For a report to be "fair and true" within the meaning of Section 74, the substance of the publication must also be "substantially accurate." *McRedmond v. Sutton Place Rest. & Bar, Inc.*, 851 N.Y.S.2d 478, 480 (2008); *Geiger v. Town of Greece*, 311 F. App'x 413, 417 (2d Cir. 2009). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005). A report, for purposes of Section 74, is not fair and true if it

15

"transform[s] allegations … into fact." *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) (emphasis omitted).

"When a report of a pleading is the subject of a request for immunity under section 74, a comparison of the pleading and the subsequent report of that pleading is the starting point for the analysis." *Carroll II*, 2023 WL 2669790, at *19 (citing *Karp*, 631 F. Supp. at 363).

With respect to Plaintiff's statement recounting her interaction with defense counsel, Plaintiff fails to identify *any* official proceeding or pleading that she purports to have been reporting on. Instead, she merely claims, in conclusory fashion, that her statement was a "report of events that occurred in the courtroom and [Defendant] does not deny that her accounts is accurate." *See* ECF 175 at 22. Yet, Plaintiff fails to reckon with the fact that her statement refers to a casual interaction between herself and opposing counsel that occurred *after* the *Carroll II* verdict had been rendered and outside of any official proceeding. *See* ECF 171 at 26 (alleging that Plaintiff's statement referred to an interaction that took place "following the conclusion of the trial in *Carroll II*."). Plaintiff cannot credibly argue that pleasantries exchanged after the close of trial should be construed as part of the court's official proceedings merely because the interaction "occurred in the courtroom." *Id.; see Kinsey v. New York Times Co.*, 991 F.3d 171, 180 (2d Cir. 2021) ("The key question is whether the reader is able to determine that the report is *of a proceeding*.") (emphasis added). Therefore, this statement is clearly outside the purview of Section 74.

As for Plaintiff's other statement, "oh yes he did, oh yes he did," Plaintiff admits that this "comment concerned the jury verdict specifically." *See* ECF 175 at 20. Thus, the proper analysis involves a "comparison" of Plaintiff's statement and the contents of the jury verdict form. *Karp*, 631 F. Supp. at 363; *see also Carroll II*, 2023 WL 2669790, at *19 (performing "[a] comparison

of [Defendant's] comments about [Plaintiff] in his October 12 statement and his assertions in his

answer *in Carroll*[.]").

The jury verdict form, states, in pertinent part, "Did [Plaintiff] prove, by a preponderance

of the evidence, that . . . [Defendant] raped [Plaintiff]," to which the jury answered, "No." *Carroll*

*II*, ECF 174 at 1. Meanwhile, the statement Plaintiff claims was a "report" on the jury verdict was

the following interaction during the CNN interview:

> Reporter: What about when that first finding was found? This jury found that
> Trump did not rape you. What about that moment?
>
> Plaintiff: Robbie can explain the legal.
>
> Reporter: Sure. And I want you to, but I just wonder, E. Jean, what went through
>
> your head when you heard that?
>
> Plaintiff: Well, I just immediately say in my own head, ***oh, yes, he did—oh, yes,***
> ***he did. So that's my response***.

*See* ECF 175 at 6 (emphasis added).

Plaintiff's statement is not a "substantially accurate" report of the jury verdict; to the

contrary, Plaintiff expressly disavows the jury's finding that the rape did not occur and claims that

it is incorrect. In doing so, Plaintiff "transform[s] *allegations* . . . into *fact." Pisani*, 440 F. Supp.

2d at 178. Thus, her statement undoubtedly has a "different effect on the mind" of CNN viewers

than the "actual truth" of what the jury recorded in its verdict form. In other words, her statement

"suggests more serious conduct than that actually suggested" in the verdict form. *Daniel*

*Goldreyer, Ltd. V. Van de Wetering*, 217 A.D.2d 434, 436 (1st Dep't 1995).

Therefore, Plaintiff's statements do not qualify as a "fair and true" report of any of the

proceedings held in *Carroll II*.

### B. Plaintiff's Publication of Her Post-Verdict Statements to Defense Counsel is Defamatory

In her motion papers, Plaintiff argues that her second statement—recounting on CNN her post-verdict interaction with defense counsel when she told him "he did it, and you know it"—is not defamatory. But Plaintiff is mistaken; this statement, like the first, presents a cognizable claim for defamation.

Plaintiff chiefly argues that the "it" referred to in her statement was sexual abuse, not rape, and that her statement to Mr. Tacopina was "[o]n its face . . . a reaction to—and endorsement of—the jury verdict." But the context in which the statement was made indicates otherwise. Indeed, moments earlier in the same CNN interview, Plaintiff had just described how her initial reaction to the jury's verdict was not an endorsement but a *rejection* of the finding that Defendant had not raped her. She then goes on to describe her interaction with opposing counsel—which occurred "right after the verdict was announced"—and told him "he did it, and you know it." The substance of this statement can easily be interpreted to be conveying the same thought she had moments earlier: the jury was wrong to find that the rape had not occurred, and, in Plaintiff's estimation, Mr. Tacopina knew it. *See Davis*, 24 N.Y.3d at 268 ("[I]f, upon any reasonable view of the stated facts, plaintiff would be entitled to recovery for defamation, the complaint must be deemed to sufficiently state a cause of action" that survives a motion to dismiss.") (collecting citations); *see also Guiffre*, 165 F.Supp.3d at 154 ("It is a reasonable reading that in 'referring to the statement that was made,' Defendant was implying the content of the previous day's press release . . . [w]hether another listener could interpret Defendant's self-described reference merely as a declination to comment does not defeat the fact that Plaintiff's alleged reading is plausible.").

As for Plaintiff's arguments concerning substantial truth, actual malice and the fair and true reporting privilege, those arguments fail for the same reasons described *supra*.

Therefore, the second portion of Defendant's counterclaim, pertaining to Plaintiff's statements regarding her interactions with defense counsel, put forth a cognizable claim for defamation.

## II.    DEFENDANT'S COUNTERCLAIM IS PROCEDURALLY PROPER

"The timing as to when and how a party must file counterclaims is not specified in [Fed. R. Civ. P.] 15, or [Fed. R. Civ. P.] 13, which addresses counterclaims." *Fossil Grp., Inc. v. Angel Seller LLC*, No. 20-CV-2441(WFK) (TAM), 2021 WL 5409605, at *4 (E.D.N.Y. Aug. 27, 2021), report and recommendation adopted, 2021 WL 4520030 (E.D.N.Y. Oct. 4, 2021) (citing *Ramsay-Nobles v. Keyser*, No. 16-CV-5778 (CM), 2018 WL 6985228, at *3 (S.D.N.Y. Dec. 18, 2018)). As a result, the Federal Rules of Civil Procedure do "not provide clear guidance as to whether and/or when a Defendant can assert a new counterclaim or defense in an amended pleading as a matter of right, when the Defendant did not raise these claims in response to earlier pleadings." *Ramsay-Nobles*, 2018 WL 6985228, at *3.

Recently, in *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92 (2d Cir. 2019), the Second Circuit clarified the proper method by which a Defendant should present new counterclaims. Specifically, the Second Circuit provided that a party is permitted to include a new counterclaim without leave of the court or otherwise consent of the opposing party when it is made within 14 days after service of an amended complaint. *Id*. at 101. Further, the Second Circuit made clear that a new counterclaim may be permitted at a later stage in the litigation as long as the counterclaim does not "exceed the scope of Plaintiff's new claims" and does not unduly prejudice a plaintiff. *Id*. at 100 (quoting 6 Wright & Miller, § 1488).

In filing his counterclaim, Defendant acted in accordance with the Second Circuit's guidance. The counterclaim arises from statements Plaintiff made in a televised interview on May

10, 2023. Plaintiff did not delay in bringing this counterclaim, and indeed it was timely filed within 14 days after Plaintiff filed her amended complaint. ECF 171.

Further, the counterclaim does not in any way exceed the scope of Plaintiff's original complaint. In her amended complaint, Plaintiff elected to include post-verdict statements made by Defendant as a way of amplifying her entitlement to damages. Specifically, in her Amended Complaint, Plaintiff states that his post-verdict comments were intended to "demean and mock [Plaintiff]". ECF 157, Ex. A, at ¶173. Plaintiff then goes on to restate the jury instructions provided in *Carroll II* with respect to punitive damages and alleged that Defendant's "defamatory statements post-verdict show the depth of his malice toward [Plaintiff]. *Id*. at ¶ 174. She then concludes that these statements merit a "very substantial punitive damages award in [Plaintiff's] favor" which would be designed to "punish [Defendant], to deter him from engaging in further defamation, and to deter others from doing the same." *Id*. Plaintiff's Amended Complaint thus seeks to modify her entitlement to damages by incorporating post-verdict statements of the opposing party. Defendant, in response, is seeking to do precisely the same thing, albeit in the form of a counterclaim since that is his only available form of relief at this stage in litigation. Thus, the scope of the changes are identical, and Defendant has not "exceeded" the scope of the amended complaint.

Moreover, at this juncture, the Defendant is not only permitted but *compelled* to raise his defamation claim because it qualifies as a compulsory counterclaims Rule 13(a) of the Federal Rules of Civil Procedure defines a compulsory counterclaim as a claim that "(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claims; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). In differentiating compulsory from permissive counterclaims, the Second Circuit looks to the "logical relationship" between the claim and counterclaim, analyzing whether essential facts

of various claims are so logically connected that considerations of judicial economy and fairness

dictate that all issues be resolved in one lawsuit, and thus precise identity of issues and evidence

between claim and counterclaim is not required. *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir.

1978).  Counterclaims based on state law are part of the same case or controversy when they share

a "common nucleus of operative fact" with the plaintiff's claims. *United Mine Workers v. Gibbs*,

383 U.S. 715, 725 (1966).

Here, there can be no reasonable dispute that Defendant's counterclaim is compulsory, as

it "arises out of the transaction or occurrence that is the subject matter of the opposing party's

claim." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir.2004) (quoting Fed. R. Civ. P.

13(a)). The counterclaim stems from the parties' competing accounts as to the nature and existence

of the purported sexual assault at Bergdorf Goodman and goes to the heart of Plaintiff's original

allegations. As Defendant's counterclaim is plainly compulsory, it would be waived if not raised

in the instant action. This provides a "compelling" reason to permit its inclusion in the case at bar.

*See Pfeffer v. Mark*, No. 98-CV-6771(ILG), 2000 WL 516891, at *2 (E.D.N.Y. Mar. 16, 2000)

(explaining that because compulsory counterclaims "would not be assertable in a subsequent case

were they omitted here . . . the argument for allowing amendment here is especially compelling"

(internal quotation marks omitted)); Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1430 (3d ed.

2013) ("When the omitted counterclaim is compulsory, the reasons for allowing its introduction

by amendment become even more persuasive, since an omitted compulsory counterclaim cannot

be asserted in subsequent cases [at least in the federal courts] and the pleader will lose the

opportunity to have the claim adjudicated."). Defendant would therefore be unduly prejudiced

should this Court strike his counterclaim.

Further, Plaintiff's argument that Defendant's counterclaim should be dismissed because it would expand the scope of this litigation is wholly unavailing. Pending this Court's decision on the preclusive effect of the jury's verdict in *Carroll II*, discovery would likely be largely confined to the damages sustained by Defendant as a result of the defamatory statement. With trial scheduled for January 15, 2024, there appears to be ample time for the parties to engage in the necessary discovery practice without moving back the trial date. Therefore, Plaintiff will not be unduly prejudiced by the inclusion of Defendant's counterclaim.

**III.    None of Defendant's Affirmative Defenses Should be Stricken**

Plaintiff's contention that five of the affirmative defenses set forth in Defendant's Amended Answer—the First, Third, Fifth, Twelfth, and Fifteenth Affirmative Defenses—should be stricken is misplaced. These defenses remain valid and, therefore, must be preserved.

Pursuant to Federal Rule of Civil Procedure 12(f) "the court may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike an affirmative defense are disfavored and are routinely denied unless there is no chance, on any set of facts or any interpretation of the law, that the defense is colorable. *See William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984), vacated on other grounds sub nom, *Salcer v. Envicon Equities Corp.*, 478 U.S. 1015 (1986); *see also Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 429 (S.D.N.Y. 2019) ("Motions to strike under Rule 12(f) 'should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.'") (quoting *VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11-cv-6805 (DLC), 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013)).

"In order to prevail on a motion to strike [an affirmative defense], a plaintiff must show that: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense." *GEOMC Co., Ltd.*, 918 F.3d at 96. This standard is "demanding," *Tardif v. City of New York,* 302 F.R.D. 31, 32 (S.D.N.Y. 2014), and the Second Circuit has cautioned that "courts should not tamper with the pleadings unless there is a strong reason for so doing," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (citations omitted).

Here, Plaintiff argues, without elaboration, that "the Court should strike [Defendant's] First, Third, Fifth, Twelfth, and Fifteenth Affirmative Defenses because the Court considered and rejected each of these defenses in denying [Defendant's] motion for summary judgment." *See* ECF 175 at 27-28. At the outset, since Plaintiff fails to address the third prong—prejudice—she has waived any argument in this regard.

Further, Plaintiff is mistaken that the Court's Order dated July 5, 2023 is sufficient grounds to strike Defendant's First, Third, Fifth, Twelfth, and Fifteenth Affirmative Defenses. *See generally Carroll*, No. 20 Civ. 7311, 2023 WL 4393067 (S.D.N.Y. July 5, 2023) (the "MSJ Order"). In the MSJ Order, the Court came short of finding that there was "*no* question of fact" and "*no* question of law" that "might allow the defense[s] to succeed." *GEOMC Co., Ltd.,* 918 F.3d at 96 (emphasis added); *see also Tardif v. City of New York*, 302 F.R.D. 31, 36 (S.D.N.Y. 2014) (denying motion to strike affirmative defense because "there are questions of fact and law that might allow the defense to succeed"); *Levine v. Merrill Lynch*, No. 09 CIV. 304 (PGG), 2009 WL 10691070, at *1, 4 (S.D.N.Y. Dec. 22, 2009) (holding that "Plaintiffs have failed to demonstrate that there is no question of fact or substantial question of law that might permit these

defenses to succeed" and noting, "Defendants are not, at this stage, required to prove their affirmative defenses"); *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, No. 96 CIV. 9469 (RWS), 1999 WL 191527, at *19 (S.D.N.Y. Apr. 7, 1999) ("Because DST's affirmative defenses may raise issues of fact and law, the motion to strike DST's affirmative defenses is denied"); *Cohen v. Stephen Wise Free Synagogue*, No. 95 CIV. 1659 (PKL), 1996 WL 159096, at *5 (S.D.N.Y. Apr. 4, 1996) ("[B]ecause it is far from certain that defendant's statute of limitations affirmative defense with respect to the § 8-502 claim is legally insufficient, plaintiff's motion to strike must be denied").

For instance, with respect to Defendant's Twelfth Affirmative Defense, this Court determined only that Defendant "failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied." *Carroll*, 2023 WL 4393067 at *20. This Court did not find that there is "no question of fact" which could potentially lead to Defendant successfully raising this defense at trial. *GEOMC Co., Ltd.,* 918 F.3d at 96 (emphasis added). In addition, Plaintiff's Amended Complaint adds an entirely new theory of punitive damages, relating to statements Defendant made on May 10, 2023, which Defendant has not yet had an opportunity to challenge. Therefore, it would be inappropriate to strike Plaintiff's Twelfth Affirmative Defense at this time.

Likewise, with respect to Defendant's Fifth Affirmative Defense, the Court specifically declined to rule as to whether the June 24, 2019 statement ("I'll say it with great respect: Number one, she's not my type. Number two, it never happened."), could be considered as non-actionable opinion. *Carroll*, 2023 WL 4393067 at *17 n. 85 ("Neither party addresses specifically [Defendant's] June 24, 2019 statement . . . [a]s the parties have not adequately addressed this point,

the Court does not now decide it."). Thus, striking Defendant's Fifth Affirmative Defense would be similarly premature.

Moreover, with respect to Defendant's Fifteenth Affirmative Defense, the Court found only that Plaintiff had "sufficiently pleaded a claim of libel *per se*." *Carroll*, 2023 WL 4393067 at *14, but did not go so far as to find that there is "no chance, on any set of facts or any interpretation of the law, that the defense is colorable." *Salcer*, 744 F.2d at 939. Thus, Defendant's Fifteenth Affirmative Defense must also survive.

As for Defendant's First and Third Affirmative Defenses—asserting the defense of presidential immunity—although this Court has held that the presidential immunity defense was waived when it was not raised in Defendant's initial Answer, *see generally Carroll*, 2023 WL 4393067, this defense has now been properly and timely raised since it was asserted in connection with Defendant's Amended Answer.

It is well settled that an amended complaint "supersedes the original, and renders it of no legal effect." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977)); *see also Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir. 1999) (an "Amended Complaint is the legally effective pleading for Rule 12(b)(6) purposes") (citation omitted). Thus, "an answer to an amended complaint is not itself an amended pleading . . . [a] defendant filing such an answer is not amending his original answer, he is instead responding for the first time to new issues raised in the plaintiff's amended pleading." *Deutsch v. Health Ins. Plan of Greater New York*, 573 F. Supp. 1443, 1445 (S.D.N.Y. 1983); *see also McFadden v. Monroe Cty. Sheriff*, No. 00 Civ. 6034, 2002 WL 1348508, at *3 (W.D.N.Y. Apr. 16, 2002) (explaining that defendants' response to the amended complaint "was not an amended answer, but merely an answer" and so defendants were permitted to raise previously

unpled affirmative defense); *Rodriguez v City of New York*, 18 CIV. 4805 (NRB), 2021 WL 5360120, at *4 (S.D.N.Y. Nov. 16, 2021) ("Just as plaintiff asserted new allegations in his [amended complaint], defendants are also permitted to assert new defenses in response."). In other words, "[a]n amended complaint represents a plaintiff's second bite at the apple, and a defendant should be accorded the same privilege." *Deutsch,* 573 F. Supp. at 1445.

In this context, the only "defenses and objections that are irrevocably waived by answering an original complaint are those that 'involve the core issue of a party's willingness to submit a dispute to judicial resolution,' such as objections to 'lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service.' *Id.*" *Shields*, 25 F.3d at 1124; *see also Feldman v. Comp. Trading, LLC*,  No. 19-CV-4452 (RPK) (RLM), 2021 WL 930222, at *2 (E.D.N.Y. Mar. 11, 2021) ("When an amended complaint has been filed, "the only defenses that are waived because they were not contained in an earlier answer are 'those that involve the core issue of a party's willingness to submit a dispute to judicial resolution, such as objections to lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service.'") (citing *Shields*, 25 F.3d at 1128); *see also* 5C Charles Alan Wright & Arthur A. Miller, Federal Practice & Procedure § 1392 (3d ed. 2020) (explaining that defenses set out in Rule 12(h)(2) are not waived merely because they were not raised in the first responsive pleading).

In the matter *sub judice*, this Court has already determined that presidential immunity is not a jurisdictional matter. *See Carroll*, 2023 WL 4393067 at *7 ("[T]he fact that presidential immunity is grounded in separation of powers principles does not convert it into a jurisdictional issue. Mr. Trump relies chiefly on two points in support of his argument to the contrary. Neither withstands analysis."); *id.* at *8 ("Mr. Trump's argument that absolute presidential immunity is jurisdictional runs afoul of many of the same principles on which the immunity is based."). While

Defendant does not concur with or adopt the Court's ruling,[2] the Court's determination has been

clearly stated. Given the Court's holding that presidential immunity is not jurisdictional in nature,

it follows that said immunity is not a "core issue of a party's willingness to submit a dispute to

judicial resolution." *Shields*, 25 F.3d at 1124. Therefore, consistent with the Court's reasoning,

Defendant's presidential immunity defense could not have been "irrevocably waived," *id.*, by any

failure to raise it in his initial Answer, and Defendant's subsequent assertion of this defense in his

Amended Answer effectively "revive[d]" it, *Gilmore v. Shearson/American Express, Inc.*, 811

F.2d 108, 112 (2d Cir. 1987).

Moreover, given the position she advanced in opposition to Defendant's motion for

summary judgment, Plaintiff is judicially estopped from arguing that absolute presidential

immunity is not a merits-based, non-jurisdictional defense. *See* ECF 125 at 1 ("[A]bsolute

immunity [including for judges and prosecutors] has long been treated as non-jurisdictional in

nature."); *id.* at 3 ("Since Nixon, moreover, courts and litigants have broadly evinced an

understanding that absolute immunity is not jurisdictional in nature."); *id.* at 3 ("This logic is also

reflected in district court decisions that have dismissed claims on the merits without first

considering an absolute presidential immunity defense [which, if it were jurisdictional, would have

to precede the merits]) (citing *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at

*10 n.6 (S.D.N.Y. Nov. 14, 2022) (Liman, J.); *id*. at 5 (Referring to "the traditional rule that

absolute immunity is a non-jurisdictional affirmative defense that must be properly invoked by the

President."); *see also Clark v. AII Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018) ("[T]he

equitable doctrine of judicial estoppel . . . 'prevents a party from asserting a factual position in one

---

[2] Defendant has appealed the Court's July 5, 2023 Order and reserves all rights and arguments on appeal.

27

legal proceeding that is contrary to a position that it successfully advanced in another proceeding.").

Based on the foregoing, Plaintiff's motion to strike Defendant's First, Third, Fifth, Twelfth, and Fifteenth Affirmative Defenses must be denied in its entirety.

<u>**CONCLUSION**</u>

For the reasons set forth herein, Defendant respectfully requests that Plaintiff's Motion to Dismiss and Motion to Strike be denied in its entirety.

Dated: New York, New York        Respectfully submitted
      July 25, 2023

                              Alina Habba, Esq.
                              Michael T. Madaio, Esq.
                              Habba Madaio & Associates LLP
                              1430 US Highway 206, Suite 240
                              Bedminster, New Jersey 07921
                                    -and-
                              112 West 34th Street, 17th & 18th Floors
                              New York, New York 10120
                              Telephone: (908) 869-1188
                              Facsimile: (908) 450-1881
                              E-mail: ahabba@habbalaw.com
                                      mmadaio@habbalaw.com

                              *Attorneys for Defendant, Donald J. Trump*

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0883
DIRECT EMAIL    rkaplan@kaplanhecker.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-26-2023

July 25, 2023

**VIA COURIER**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007



RECEIVED
JUL 26 2023
JUDGE KAPLAN'S CHAMBERS

Re:    *Carroll v. Trump*, 20 Civ. 7311 (LAK) ("*Carroll I*")

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll with respect to Your Honor's July 19, 2023 Order directing each party to "file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims *Carroll II* has preclusive effective in this action." ECF 178. We understand this Order as directing the parties to submit any targeted summary judgment motions they may wish to make in *Carroll I* raising preclusion arguments based on *Carroll II*.

In light of the jury's verdict in *Carroll II*, it is our position that trial in the present action need only address narrow issues relating to damages. As we will explain in our briefing, two of the disputed elements of Carroll's defamation claim can be resolved entirely by collateral estoppel: specifically, the elements of *defamatory meaning* and *falsity*. The remaining three elements of Carroll's defamation claim are affected by collateral estoppel, but require a slightly different approach for pre-trial resolution. As to the elements of *publication* and being statements *of and concerning the plaintiff*, there has never been any genuine dispute of material fact on these points (and Trump did not seek to dispute these elements in *Carroll II*), and so we propose to incorporate into our papers a request for targeted summary judgment on these elements.

That leaves only the element of actual malice—that is, whether Defendant Donald J. Trump made his June 2019 statements knowing that they were false or with serious doubts as to their truth. In *Carroll II*, the jury found that Trump acted with actual malice in October 2022 when he denied assaulting Carroll and accused her of fabricating her statements. The *Carroll II* jury also found that Trump acted in a manner (and with a mental state) rendering him culpable for punitive damages. Those findings are preclusive in this action as to Trump's state of mind in making the October 2022 statement. It is our position that those jury findings, together with Trump's deposition in this action, foreclose any claim that Trump acted with actual malice in October 2022 but somehow did not do so in making substantively identical statements in June 2019. Therefore,

KAPLAN HECKER & FINK LLP                                                          2

we propose to incorporate into our briefing papers a request for targeted summary judgment on the element of actual malice.

Because these summary judgment arguments are still dependent on what the *Carroll II* jury found—and because Your Honor has directed that "[n]o fact or proposition of law not identified in such a motion shall be regarded as having been established by *Carroll II*"—our plan (as set forth above) is to brief these points as part of Plaintiff's forthcoming motion. Should Your Honor prefer that we proceed differently, we of course will comply with any further order from the Court.

Respectfully submitted,

Roberta A. Kaplan

cc:    Counsel of Record

**A1236**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff,* |  |
| v. | **NOTICE OF MOTION TO STAY** |
|  | **PENDING APPEAL** |
| DONALD J. TRUMP, in his personal capacity, |  |
| *Defendant.* |  |

**PLEASE TAKE NOTICE** that the defendant, Donald J. Trump ("Defendant"), hereby moves this Court, before the Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, located at 500 Pearl Street, New York, NY 10007, on a date to be set by the Court, for an order granting Defendant's motion to stay this case pending resolution of his appeal of this Court's July 5, 2023 Order (ECF No. 173) under Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure.

This motion is supported by the annexed memorandum of law, any arguments or evidence presented in reply, and all arguments or evidence presented at a hearing or with leave of Court.

Dated: New York, New York  
     July 27, 2023

Respectfully submitted,

_____  
Michael T. Madaio, Esq.  
HABBA MADAIO & ASSOCIATES LLP  
1430 U.S. Highway 206, Suite 240  
Bedminster, New Jersey 07921  
    -and-  
112 West 34th Street, 17th & 18th Floors  
New York, New York 10120  
Telephone: (908) 869-1188  
Facsimile: (908) 450-1881  
E-mail: mmadaio@habbalaw.com  
*Attorneys for Defendant, Donald J. Trump*

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL, | |
| Plaintiff, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| -against- | |
| DONALD J. TRUMP, in his personal capacity, | |
| Defendant. | |

<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO STAY PENDING APPEAL</u>

Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th St, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: mmadaio@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT .....................................................................................................2

    I.      The Stay Factors Weigh Heavily in Favor of Granting Defendant Relief..............2

      A.   Defendant Has Shown Sufficient Probability of Success on the Merits......................2

      B.   Defendant Will Suffer Irreparable Harm If No Stay Is Granted ................................7

      C.   Plaintiff Will Not Suffer Harm from a Stay Pending Appeal ...................................10

      D.   The Public Interest Favors a Stay ............................................................................11

    II.     This Court Has Been Divested of Jurisdiction Pending Appeal ............................13

CONCLUSION..................................................................................................14

<u>**TABLE OF AUTHORITIES**</u>

*Cases*

*Ashcroft v. Iqbal,*
    556 U.S. 662, 685 (2009)......................................................................................7

*Behrens v. Pelletier,*
    516 U.S. 299, 308 (1996)...................................................................................7, 9

*Blue Ridge Investments, L.L.C. v Republic of Argentina,*
    735 F.3d 72, 79-81 (2d Cir. 2013) .........................................................................6

*Bradley v. Jusino,*
    No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009).................9

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
    598 F3d 30, 37 (2d Cir 2010) ...............................................................................3

*Clinton v. Jones,*
    520 U.S. 681, 694 (1997)......................................................................................5

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541, 69 S.Ct. 1221 (1949); ................................................................6, 8

*Compare Barea v. State Univ. of New York at Albany,*
    1:05CV1523(GLS/DRH), 2005 WL 3531463, at *1 (N.D.N.Y. 2005)..................3

*District of Columbia v. Jones,*
    919 A.2d 604, 611 (D.C. 2007) ............................................................................7

*Dubose v. Pierce,*
    761 F2d 913, 920 (2d Cir 1985) ...........................................................................3

*Eddy v Virgin Is. Water and Power Auth.,*
    256 F.3d 204, 209 (3d Cir 2001) .......................................................................6, 7

*EM Ltd. v Banco Cent. De La Republica Argentina,*
    800 F3d 78, 82 (2d Cir 2015) ............................................................................6, 8

*Ferri v. Ackerman,*
    444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979)...........................12

*Free Ent. Fund v. Public CO. Acctg.,*
    561 U.S. 477 (2010)..........................................................................................5, 10

*Freytag v. Commissioner,*
    501 U.S. 868, 879-880, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) ...........................................6

*Garcia v. Bloomberg,*
    No. 11 Civ. 6957(JSR), 2012 WL 3127173, at *1 (S.D.N.Y. 2012).......................................9

*Goshtasby v. Bd. of Trs.,*
    123 F.3d 427, 428 (7th Cir 1997) ..........................................................................................9

*Griggs v. Provident Consumer Discount Co.,*
    459 U.S. 56, 58 (1982)..........................................................................................................13

*Gunter v. Carrion,*
    335 Fed Appx 130, 131 (2d Cir 2009)....................................................................................3

*Harlow v. Fitzgerald,*
    457 U.S. 800, n. 17 (1982)..................................................................................................4, 5

*Helstoski v. Meaner,*
    442 U.S. 500, 99 S. Ct. 2445 (1979)......................................................................................6

*Hernandez v Cook County Sheriff's Off.,*
    634 F.3d 906, 912-13 (7th Cir 2011) ......................................................................................7

*Imbler v. Pachtman,*
    424 U.S. 409, 419 n.13 (1976)...............................................................................................8

*In re World Trade Ctr. Disaster Site Litig.,*
    503 F3d 167, 170 (2d Cir 2007) ...................................................................................1, 8, 11

*In re Country Squire Assoc. of Carle Place, L.P.,*
    203 B.R. 182, 183 (B.A.P. 2d Cir 1996) ................................................................................8

*In re Facebook, Inc., IPO Sec. & Derivative Litig.,*
    42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) ..............................................................................9

*Ins. Corp. of Ireland, Ltd. v. Cie. des Bauxites de Guinee,*
    456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982)...................................................................5

*Kendall v. United States,*
    12 Pet. 524, 610, 9 L.Ed. 1181 (1838)...................................................................................4

*Locurto v. Safir,*
    264 F.3d 154, 164 (2d Cir 2001) ............................................................................................9

*Maricultura del Norte, S. de R.L. de C.V. v. WorldBusiness Capital, Inc.,*
    No. 14 CIV. 10143 (CM), 2019 WL 2117645, at *3-4, 6 (S.D.N.Y. Apr. 26, 2019) ...........13

*Minotti v. Lensink,*
    98 F.2d 607, 608 (2d Cir. 1986) ...................................................................................6

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985)...................................................................................6, 7, 8, 9

*Mohammed v. Reno,*
    309 F3d 95, 100 (2d Cir 2002) ..............................................................................1, 2

*MyWebGrocer, LLC v. Hometown Info, Inc.,*
    375 F3d 190, 192 (2d Cir 2004) ...................................................................................3

*New York v. United States,*
    505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)....................................6

*Nixon v. Fitzgerald,*
    457 U.S. 731, 744, 102 S. Ct. 2690, 2698, 73 L. Ed. 2d 349 (1982).............4, 5, 6, 10, 12, 13

*Pasco ex rel. Pasco v. Knoblauch,*
    566 F.3d 572, 577 (5th Cir. 2009) ...............................................................................7

*Pierson v. Ray,*
    86 U.S., at 554, 87 S.Ct., at 1218 ..............................................................................12

*Raines v. Byrd,*
    521 U.S. 811, 820 (1997)............................................................................................5

*San Filippo v U.S. Tr. Co. of New York, Inc.,*
    737 F2d 246, 254 (2d Cir 1984) ...................................................................................8

*Siegert v. Gilley,*
    500 U.S. 226, 232 (1991)............................................................................................8

*Trump v. Mazars USA LLP,*
    140 S.Ct. 2019, 2035 (2020)........................................................................................4

*Trump v. Vance,*
    481 F Supp 3d 161, 164 (S.D.N.Y. 2020) ..............................................................3, 4, 5, 12

*United States v. Rodgers,*
    101 F.3d 247, 251 (2d Cir 1996) ...............................................................................13

*Williams v. Brooks,*
   996 F.2d 728, 730 n.2 (5th Cir 1993) .......................................................................9

**Rules and Statutes**

28 U.S.C. § 1291.........................................................................................................................7

Fed. R. Civ. P. 12(h)(3).............................................................................................................5

Rule 8(a)(1)(A) ...........................................................................................................................1

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion, pursuant to Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure to stay this case pending resolution of his appeal of this Court's July 5, 2023 Order (ECF No. 173) (the "Order") denying Defendant's motion for summary judgment filed on December 22, 2022 (ECF No. 107) (the "Motion for Summary Judgment"), which is currently pending before the United States Court of Appeals for the Second Circuit under case no. 23-0793 (the "Appeal"). For the reasons discussed herein, Defendant's motion should be granted in its entirety.

## PRELIMINARY STATEMENT

Pursuant to the instant application, Defendant seeks a stay of this action pending resolution of his appeal of this Court's denial of his Motion for Summary Judgment. As outlined herein, the factors for determining whether a stay is appropriate weigh heavily in Defendant's favor.  First, Defendant has a substantial likelihood of success on that appeal because—as fully set forth in Defendant's underlying motion papers—the claims asserted by the plaintiff, E. Jean Carroll ("Plaintiff") against Defendant are wholly barred by the doctrine of absolute presidential immunity, which is a non-waivable issue of subject matter jurisdiction by way of the separation of powers doctrine.  Second, absent a stay of proceedings, Defendant will be irreparably harmed since his immunity defense will be rendered moot, while Plaintiff will sustain little, if any, prejudice. Third, given the important public policy considerations at play, there is an immense public interest in staying this action to permit the Second Circuit to issue a ruling on Defendant's presidential immunity defense.

Therefore, for the reasons set forth herein, a stay of this action pending resolution of the Appeal is warranted, necessary, and appropriate at this time.

<u>**ARGUMENT**</u>

**I.  <u>THE STAY FACTORS WEIGH HEAVILY IN FAVOR OF GRANTING DEFENDANT RELIEF.</u>**

"The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007).

While these four factors are relatively settled, the exact phrasing differs between opinions even in this Circuit—especially regarding the first factor. *See Mohammed v. Reno,* 309 F.3d 95, 100 (2d Cir. 2002) ("Although courts have discussed and applied these four criteria on numerous occasions, some uncertainty has developed as to the first factor because of the various formulations used to describe the *degree* of likelihood of success that must be shown"). Regardless of the standard applied, the factors clearly support granting a stay based on the specific circumstances at hand.

**A.  Defendant Has Shown Sufficient Probability of Success on the Merits**

As recognized above, the Second Circuit has formulated the relevant test for likelihood of success in various ways:

> "[o]n occasion [this Circuit has] required 'a probability of the movant's prevailing that is better than 50 percent.' . . . On the other hand, we have also used 'possibility' rather than 'probability,' usually requiring a 'substantial possibility' of success. . . *Dubose* expressed the standard as "a substantial possibility, although less than a likelihood, of success.' "

*Mohammed,* 309 F.3d at 101 (internal quotations and revisions omitted) (citing *Dubose v. Pierce,* 761 F.2d 913, 920 (2d Cir. 1985), overturned on grounds unrelated to the stay).

2

Ultimately, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors." *Mohammed*, 309 F.3d at 101 (internal quotation marks omitted).

More recent holdings have gone even further, recognizing the appropriateness of staying litigation where there is at least a "serious question going to the merits" pending appeal. *See Trump v. Vance*, 481 F.Supp.3d 161, 164 (S.D.N.Y. 2020) (movants seeking a stay pending appeal must show "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation.") (quoting *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004)).

This is significantly less than the "substantial likelihood of success" test necessary for obtaining injunctive relief that has the effect of granting substantially all of the relief requested. *Compare Barea v. State Univ. of New York at Albany,* No. 1:05-CV-1523(GLS/DRH), 2005 WL 3531463, at *1 (N.D.N.Y. 2005) with *Gunter v. Carrion,* 335 Fed. Appx. 130, 131 (2d Cir. 2009). In fact, the Second Circuit has explicitly held that even where decisions regarding stays pending appeal utilize phrasing such as "likely to succeed on the merits," this "[does] not suggest that this factor requires a showing that the movant is more likely than not to succeed on the merits." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 37 (2d Cir. 2010) (internal quotations omitted).

Here, it is virtually beyond dispute that an important question has been presented to the Second Circuit to resolve on appeal, as the issue of whether presidential immunity can be waived is a novel question of law which has significant ramifications on the level of autonomy afforded to the Executive Branch.

As an initial matter, there is no question that the Second Circuit has jurisdiction to immediately review the Court's finding that Defendant waived the defense of presidential immunity pursuant to the collateral order doctrine. *See generally Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221 (1949); *see also Nixon*, 457 U.S. at 731, 102 S.Ct. 2690 (denial of presidential immunity was immediately appealable); *Helstoski v. Meaner*, 442 U.S. 500, 99 S. Ct. 2445 (1979) (denial of Congressman's claim for absolute immunity under the Speech or Debate Clause was immediately appealable); *Mitchell v. Forsyth*, 472 U.S. 511 (1985) (denial of claim of qualified immunity by former attorney general was immediately appealable); *Will v. Hallock*, 564 U.S. 345, 353, 126 S. Ct. 952, 959 (2006) ("In *Nixon*, *supra*, we stressed the 'compelling public ends, rooted in . . . the separation of powers,' that would be compromised by failing to allow immediate appeal of a denial of absolute Presidential immunity[.]") (citing *Nixon*, *supra*). Indeed, the Second Circuit has routinely held that denials of immunity based on a theory of *waiver* are immediately appealable just as any other denial of such immunity. *See*, *e.g.*, *EM Ltd. v Banco Cent. De La Republica Argentina*, 800 F.3d 78, 82 (2d Cir. 2015) (holding denial of foreign sovereign immunity as waived was immediately appealable); *Blue Ridge Investments, L.L.C. v Republic of Argentina*, 735 F.3d 72, 79-81 (2d Cir. 2013) (holding denial of foreign sovereign immunity as waived was immediately appealable); *Minotti v. Lensink*, 798 F.2d 607, 608 (2d Cir. 1986) (holding denial of Eleventh Amendment immunity as waived was immediately appealable).

Numerous other circuits have also held that an order finding that an immunity has been waived is immediately appealable. *See Eddy v Virgin Is. Water and Power Auth.*, 256 F.3d 204, 209 (3d Cir 2001) ("The district court's holding that the [immunity] defense was waived can be considered an appealable final order for purposes of 28 U.S.C. § 1291, under which we have jurisdiction to review 'final orders' of a district court, because it conclusively forecloses the

defendants' entitlement not to stand trial and is separate from the merits of Henricks's claim.") (brackets added); *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (Holding that the Fifth Circuit had jurisdiction under the collateral order doctrine to determine whether individual defendants waived the defense of quailified immunity by failing to raise it until their motion for summary judgment); *Hernandez v Cook County Sheriff's Off.*, 634 F.3d 906, 912-13 (7th Cir 2011) ("Accordingly, a finding of waiver is a legal determination which enables appellate review of the denial of qualified immunity."). Therefore, appealability does not present a procedural hurdle for Defendant; he is entitled to an immediately appeal the Order pursuant to the collateral order doctrine.

As for the substantive merits of Defendant's appeal, while Defendant's arguments are set forth at length in his underlying moving and reply papers, *see* ECF Nos. 109 and 122, which are incorporated by reference herein, Defendant reiterates both that presidential immunity is a fundamentally unique and important form of immunity which is intended to shield against the "threatened breach of essential Presidential prerogatives under the separation of powers," and, thus, is non-waivable by its very nature. *Nixon v. Fitzgerald*, 457 U.S. 731, 744, 102 S. Ct. 2690, 2698 (1982). Indeed, "[t]he President is the only person who alone composes a branch of government," and therefore "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Trump v. Mazars USA LLP*, 140 S.Ct. 2019, 2035 (2020) (quoting *The Federalist* No. 51).

The Supreme Court has declared that "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Nixon*, 457 U.S. at 750, 102 S. Ct. at 2701; *see also Harlow v. Fitzgerald*, 457 U.S. 800, n. 17 (1982) (noting that presidential immunity "derives in principle part from factors unique to [the President's] constitutional responsibilities and

station."). Indeed, "[t]he executive power is vested in [the] President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Nixon*, 457 U.S. at 754, 102 S. Ct. at 2703 (citing *Kendall v. United States*, 12 Pet. 524, 610, 9 L.Ed. 1181 (1838)). In view of the "singular importance of his duties," there exists an overarching concern that "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 751, 102 S. Ct. at 2702; *see also Vance*, 140 S. Ct. at 2426 (noting that the "dominant concern" which justifies presidential immunity is the risk of "distortion of the [President's] 'decision making process' with respect to official acts that would stem from 'worry as to the possibility of damages.'") (citation omitted).

Hence, unlike "[s]uits against other officials [which] . . . generally do not invoke separation-of-powers considerations," *Harlow*, 457 U.S. at n. 17, presidential immunity is an "essential Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of powers," *Nixon*, 457 U.S. at 749. This point was further elaborated on in *Clinton v. Jones*, when the Supreme Court clarified that the "dominant concern" in *Nixon* was not that a sitting President might be "distracted by the need to participate in litigation during the pendency of his office" but that his "decision making process" may be distorted due to "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. 681, 694 (1997); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) (stating "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties" (citations omitted).

Thus, given the interplay between the separation of powers doctrine, Article III standing, and subject matter jurisdiction—as set forth at length in Defendant's motion papers, *see* ECF

6

122—there is a compelling argument that presidential immunity is a non-waivable issue of subject matter jurisdiction. *See Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.") (internal quotation marks omitted); *Ins. Corp. of Ireland, Ltd. v. Cie. des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982) ("Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign."); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Free Ent. Fund v. Public CO. Acctg.*, 561 U.S. 477 (2010) ("[T]he separation of powers does not depend on the views of individual Presidents . . . nor on whether 'the encroached-upon branch approves the encroachment[.]'") (citing *Freytag v. Commissioner,* 501 U.S. 868, 879-880, 111 S.Ct. 2631 (1991); *New York v. United States,* 505 U.S. 144, 182, 112 S.Ct. 2408 (1992)).

In short, Defendant has set forth a substantial likelihood of success on the Appeal, and, at a minimum, there certainly is an important, novel and compelling argument as to the viability of his presidential immunity defense. Therefore, this prong weighs heavily in Defendant's favor.

### B.      Defendant Will Suffer Irreparable Harm If No Stay Is Granted

Given the immunity-based question at the heart of the Appeal, the risk that Defendant will be irreparably harmed absent a stay is patent.

"The purpose of conferring absolute immunity is to protect officials not only from ultimate liability but also from all the time-consuming, distracting, and unpleasant aspects of a lawsuit . . ." *District of Columbia v. Jones*, 919 A.2d 604, 611 (D.C. 2007); *see also Mitchell*, 472 U.S. at 525 ("[T]he essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action."). Assertions of immunity provide protection "not merely

to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (interior quotation marks and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) ("The basic thrust of the qualified immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery.") (interior quotation marks and citation omitted).

Immunity provisions, whether absolute or qualified, serve to spare officials from unwarranted liability as well as "demands customarily imposed upon those defending a long drawn-out lawsuit," and are "effectively lost if a case is erroneously permitted to go to trial." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (quoting in part *Mitchell*, 472 U.S. at 525). It follows that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). This is the very reason that denials of immunity are one of the few categories of orders subject to interlocutory appeals. *See*, *e.g.*, *San Filippo v U.S. Tr. Co. of New York, Inc.*, 737 F2d 246, 254 (2d Cir 1984) ("The Supreme Court has held on several occasions that interlocutory orders denying claims of absolute immunity are appealable under *Cohen* . . .") (gathering cases); *EM Ltd. v Banco Cent. De La Republica Argentina*, 800 F3d 78, 82 (2d Cir 2015) (decision that defendant had waived foreign sovereign immunity was immediately appealable).

In other words, the entire purpose of an immunity is inherently and unavoidably frustrated when a Court acknowledges the viability of an immunity only *after* the conclusion of litigation, at which point the immunity from suit has already been irreparably and indisputably forfeited. *See In re Country Squire Assoc. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (noting that it is the "quintessential form of prejudice" when "absent a stay pending appeal . . . the appeal will be rendered moot."); *see also Mitchell,* 472 U.S. at 526 ("The entitlement [of qualified

immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial") (emphasis in original); *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007) ("any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit."); *Locurto v. Safir*, 264 F.3d 154, 164 (2d Cir. 2001) (holding that qualified immunity explicitly includes the right to avoid trial and "pre-trial burdens," including discovery) (citing to *Behrens v. Pelletier*, 516 U.S. 299 (1996)); *Garcia v. Bloomberg*, No. 11 Civ. 6957(JSR), 2012 WL 3127173, at *1 (S.D.N.Y. 2012) (finding that "qualified immunity is an entitlement to 'immunity from suit,' including the right to avoid even pre-trial discovery"); *see also Mitchell*, 472 U.S. at 526 ("The entitlement [of qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial") (emphasis added).

In this context, it is axiomatic that irreparable harm results when a defendant is forced to proceed forward with a matter while the issue of whether an immunity applies has yet to be resolved. *Goshtasby v. Bd. of Trs.*, 123 F.3d 427, 428 (7th Cir. 1997) ("[I]f the defendant is correct that it has immunity, its right to be free of litigation is compromised, and lost to a degree, if the district court proceeds while the appeal is pending.")*; see also, e.g., Williams v. Brooks*, 996 F.2d 728, 730 n.2 (5th Cir 1993) (immunity "'is effectively lost' if a case is erroneously permitted to proceed at the district court level while an interlocutory appeal of a denial of immunity is pending.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)*; In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting the argument that divestiture is not automatic in the qualified immunity context);

9

*Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at *2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

Here, Defendant has raised the defense of absolute presidential immunity since the Complaint seeks to impose liability for conduct Defendant is alleged to have undertaken while he was a sitting President. At present, trial is currently schedule for January 15, 2024. If this case proceeds forward absent a stay, it is all but certain that Defendant will be required to proceed to trial without final resolution as to whether his presidential immunity defense is viable. In such a scenario, the presidential immunity defense will be "effectively lost." *Mitchell,* 472 U.S. at 526; see also *Nixon*, 457 US at 749, 102 S. Ct. at 2701 (noting that a President is entitled to "absolute immunity from damages liability predicated on [his] official acts," and that such immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history.").

Therefore, the immediately appealable nature of Defendant's presidential immunity defense, his substantial likelihood of success on the merits of his Appeal, and the imminent harm that will result without the imposition of a stay, all weigh in favor of granting the instant application.

**C.      Plaintiff Will Not Suffer Harm from a Stay Pending Appeal**

It is axiomatic that where harm to the plaintiff is a factor to be considered before staying an appeal, the very existence of a stay, without more, cannot constitute that harm or it would otherwise be a meaningless factor. While no delay is ideal, here Plaintiff will suffer no more harm than any other litigant and less than many.

Plaintiffs must show significant and particularized hardship to outweigh the irreparable harm defendants will suffer when litigation is not stayed pending review of their claim for immunity, and Plaintiff is unable to make this unique showing. See e.g., *In Re World Trade Ctr.*, 503 F.3d at 170. In the case of *In Re World Trade Ctr.,* regarding toxic fumes inhaled by workers at the "ground zero site" of the World Trade Center disaster, the court recognized that the defendants faced irreparable harm if litigation was not stayed pending appeal of their claim of immunity. *Ibid.* In order to overcome that irreparable harm, it took a showing that many of the plaintiffs faced life-threatening injuries and that other plaintiffs had already died while litigation was pending. *Id.* at 171.

Here, Plaintiff is unable to demonstrate that the harm she would suffer should this Court grant a stay of proceedings. While it is true that this action has been pending for several years, Plaintiff was able to utilize discovery gathered in this action to proceed to trial in an expedited basis in the related matter of *Carroll II.* In this context, the harm of delay is significantly diminished. Indeed, it cannot be reasonably disputed that Defendant's entitlement to be heard on the threshold question of whether he is entitled to absolute immunity from liability outweighs Plaintiff's desire to expeditiously hold a *second* trial on similar and related claims. Therefore, this factor tips in Defendant's favor.

### D.      The Public Interest Favors a Stay

When an appeal to determine whether immunity applies remains pending, "there is a public interest in vindicating the immunity of any of the defendants who might be entitled to immunity from suit" by staying litigation until the question of that immunity has been resolved. *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d at 170 (finding that such public interest was only

overcome upon a showing of a competing public interest in allowing the litigation to reach trial

and possibly "result in compensation for at least some Plaintiffs during their lifetimes").

With respect to the interests involved in the instant matter, the immunity claimed by

Defendant is "rooted in the constitutional tradition of the separation of powers and supported by

our history," based on the President's "unique position in the constitutional scheme." *Nixon*, 457

U.S. at 749, 102 S. Ct. at 2701. The Supreme Court has confirmed that there "exists the greatest

public interest in providing" the President immunity from his official acts, and that deprivation of

such immunity would be to the "detriment of not only the President and his office but also the

Nation that the Presidency was designed to serve." *Id.* at 752 (internal quotations omitted).

Indeed, in *Nixon v. Fitzgerald*, the Supreme Court emphasized the indispensable nature of

this protection, noting that, without it, a President's ability to effectively serve his country would

be severely hindered. In particular, the Supreme Court reasoned:

> Because of the singular importance of the President's duties, diversion of his
> energies by concern with private lawsuits would raise unique risks to the effective
> functioning of government. As is the case with prosecutors and judges—for whom
> absolute immunity now is established—a President must concern himself with
> matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at
> 554, 87 S.Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such
> cases that there exists the greatest public interest in providing an official "the
> maximum ability to deal fearlessly and impartially with" the duties of his office.
> *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979).
> This concern is compelling where the officeholder must make the most sensitive
> and far-reaching decisions entrusted to any official under our constitutional system.
> Nor can the sheer prominence of the President's office be ignored. In view of the
> visibility of his office and the effect of his actions on countless people, the President
> would be an easily identifiable target for suits for civil damages. Cognizance of this
> personal vulnerability frequently could distract a President from his public duties,
> to the detriment of not only the President and his office but also the Nation that the
> Presidency was designed to serve.

*Id.* at 752-753; *see also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves

the public interest in preserving the independence and decisiveness necessary of government

officials); *Vance*, 140 S.Ct. at 2425 (noting that the President's duties "are of unrivaled gravity and breadth.").

Thus, given the "compelling public ends" served by the doctrine of presidential immunity, it is incontrovertible that there are immense public interests at play, and that the public interest weighs heavily in favor of a stay pending resolution of these vital questions. *Nixon*, 457 U.S. at 758, 102 S. Ct. at 2705.

## II.  THIS COURT HAS BEEN DIVESTED OF JURISDICTION PENDING APPEAL

This action must also be stayed on the independent basis that this Court is currently divested of jurisdiction. Interlocutory appeals divest trial courts of jurisdiction "over those aspects of the case involved in the appeal," and as presidential immunity confers immunity from suit in its entirety, appeals involving immunity from suit therefore pertain to—and divest jurisdiction from the trial court over—the entirety of the litigation. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance— it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").

It has ultimately been established that because this appeal involves immunity from suit, which protects a defendant from the expense of pre-trial litigation, an appeal from that denial of that immunity divests the Court of jurisdiction to oversee litigation of that appeal. *See*,  *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir 1996) ("A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals."); *Maricultura del Norte, S. de R.L. de C.V. v. WorldBusiness Capital, Inc.*, No. 14 CIV. 10143 (CM), 2019 WL 2117645, at *3-4, 6 (S.D.N.Y. Apr. 26, 2019) (denying motion to compel because "ordering discovery at this stage would be premature" until "the Court of Appeals issues its mandate"). Thus, as demonstrated

above, the finding that Defendant waived the defense of presidential immunity has divested this Court of jurisdiction until the Court of Appeals resolves the outstanding question of whether Defendant is immune from having to engage in this lawsuit.

<u>**CONCLUSION**</u>

For all the reasons above, Defendant respectfully requests that this Court grant a stay of this action pending resolution of the Appeal.

Dated:  July 27, 2023                          Respectfully submitted,
      New York, New York

                                  Michael T. Madaio, Esq.
                                  HABBA MADAIO & ASSOCIATES LLP
                                  1430 U.S. Highway 206, Suite 240
                                  Bedminster, New Jersey 07921
                                     -and-
                                  112 West 34th Street, 17th & 18th Floors
                                  New York, New York 10120
                                  Phone: (908) 869-1188
                                  Fax: (908) 450-1881
                                  Email: mmadaio@habbalaw.com
                                  *Attorneys for Defendant Donald J. Trump*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff*, | |
| v. | No. 20 Civ. 7311 (LAK) |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant*. | |

## PLAINTIFF E. JEAN CARROLL'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF HER MOTION TO DISMISS AND MOTION TO STRIKE

<div align="right">

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

</div>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 1

    I.   TRUMP FAILS TO STATE A CLAIM FOR DEFAMATION ....................... 1

        A.  "Oh, Yes, He Did—Oh, Yes, He Did" ........................................ 1

        B.  "He Did It and You Know It" ......................................................... 5

    II.  TRUMP'S LATE-STAGE COUNTERCLAIM IS PROCEDURALLY IMPROPER ...... 6

    III. THE COURT SHOULD STRIKE CERTAIN AFFIRMATIVE DEFENSES .................. 8

CONCLUSION ............................................................................................................. 10

**A1259**

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Aronson v. Wiersma,*
    65 N.Y.2d 592 (1985) ........................................................................................................ 5

*Biro v. Condé Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) .................................................................................. 4

*Biro v. Condé Nast,*
    807 F.3d 541 (2d Cir. 2015) ................................................................................................ 4

*Brimelow v. N.Y. Times, Co.,*
    No. 21-66, 2021 WL 4901969 (2d Cir. Oct. 21, 2021) ........................................................ 4

*Carroll  v. Trump,*
    No. 22 Civ. 10016, 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023) ...................................... 6

*Carroll v. Trump,*
    No. 20 Civ. 7311, 2023 WL 4393067 (S.D.N.Y. July 5, 2023) ................................. 7, 9, 10

*Carroll v. Trump,*
    No. 22 Civ. 10016, WL 4612082 (S.D.N.Y. July 19, 2023) ............................................ 2, 3

*Carroll v. Trump,*
    No. 20 Civ. 7311, 2023 WL 4744176 (S.D.N.Y. July 25, 2023) ......................................... 2

*Chau v. Lewis,*
    935 F. Supp. 2d 644 (S.D.N.Y. 2013) .............................................................................. 1, 2

*Chau v. Lewis,*
    771 F.3d 118 (2d Cir. 2014) ................................................................................................ 1

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.,*
    551 F. Supp. 3d 320 (S.D.N.Y. 2021) ................................................................................. 5

*Daleiden v. Planned Parenthood Fed'n of Am.,*
    No. 21-2068, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) ...................................................... 5

*Davis v. Boeheim,*
    24 N.Y.3d 262 (2014) ...................................................................................................... 6, 9

*Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.,*
    No. 17 Civ. 124, 2020 WL 1031271 (S.D.N.Y. Mar. 2, 2020) ............................................ 8

*Fine v. ESPN, Inc.*,
  11 F. Supp. 3d 209 (N.D.N.Y. 2014) ................................................................. 6

*Franklin v. Daily Holdings, Inc.*,
  135 A.D.3d 87 (1st Dep't 2015) ....................................................................... 2

*GEOMC Co. v. Calmare Therapeutics Inc.*,
  918 F.3d 92 (2d Cir. 2019) .......................................................................... 6, 7

*Giuffre v. Maxwell*,
  165 F. Supp. 3d 147 (S.D.N.Y. 2016) ............................................................... 6

*Gonzalez v. Gray*,
  216 F.3d 1072 (2d Cir. 2000) ......................................................................... 5

*Karedes v. Ackerly Grp., Inc.*,
  423 F.3d 107 (2d Cir. 2005) ........................................................................... 3

*Karp v. Hill & Knowlton, Inc.*,
  631 F. Supp. 360 (S.D.N.Y. 1986) .................................................................. 4

*Kinsey v. N.Y. Times Co.*,
  991 F.3d 171 (2d Cir. 2021) ........................................................................... 4

*Pfeffer v. Mark*,
  No. 98 Civ. 6771, 2000 WL 516891 (E.D.N.Y. Mar. 16, 2000) ...................... 7

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ........................................................................ 10

*Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.*,
  No. 17 Civ. 8528, 2022 WL 836890 (S.D.N.Y. Mar. 21, 2022) ....................... 7

*Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*,
  No. 99 Civ. 4677, 2001 WL 1702151 (S.D.N.Y. Jan. 11, 2002) ...................... 7

**STATUTES**

N.Y. Civ. Rights Law § 74 ............................................................................. 4

**RULES**

Federal Rule of Civil Procedure 13 ................................................................ 7

Federal Rule of Civil Procedure 15 ................................................................ 7

**OTHER AUTHORITIES**

Alan Feuer et al., *Trump Faces Major New Charges in Documents Case*, N.Y. Times
(July 27, 2023) ................................................................................................................ 8

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1430 (3d ed. 2013) ................................................ 7

**PRELIMINARY STATEMENT**

Donald J. Trump continues to insist that a jury's finding that he forcibly shoved his fingers, but not his penis into E. Jean Carroll's vagina somehow exonerates him. But despite his strenuous efforts to distinguish between the crimes of which he's been accused, a jury determined that he committed sexually abusive conduct that formally qualifies as rape in many jurisdictions and that certainly constitutes rape within the colloquial sense of the term, as this Court has already recognized based on a careful study of the issue. Therefore, the allegedly defamatory statement by Carroll that is the sole focus of Trump's purported counterclaim is substantially true and cannot support liability as a matter of law.

For this and other reasons, Trump's defamation counterclaim—asserted almost four years into this action—should be dismissed. The affirmative defenses that Trump now asserts again after the Court rejected them should be stricken. And this case, properly narrowed, should proceed to trial.

**ARGUMENT**

I.    **TRUMP FAILS TO STATE A CLAIM FOR DEFAMATION**

A.    **"Oh, Yes, He Did—Oh, Yes, He Did"**

Trump has no credible answer to any of the three independent reasons for dismissal of his counterclaim.

*Substantial truth.* Under New York precedent, the relevant question is whether it was substantially true to imply that Trump raped Carroll after the *Carroll II* jury found that Trump sexually abused her by forcibly penetrating her with his fingers. Truth in this context is not a "binary" question. *Chau v. Lewis*, 935 F. Supp. 2d 644, 662 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014). A court must instead consider the overall "gist" or "sting" of the alleged defamatory

statement, *id.*, asking if it would have a "different effect on the mind of [a listener] from that" of the actual truth, *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dep't 2015).

In his opposition brief, Trump ignores that controlling legal principle. ECF 181 ("Opp.") at 5–8. He doesn't grapple with *any* of the "substantial truth" precedents that provide the relevant framework. ECF 175 ("Mot.") at 10–12. He doesn't address the "sting" of the *Carroll II* verdict—that he was found liable for conduct that would amount to rape in many places outside of New York, *see Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 4612082, at *2 (S.D.N.Y. July 19, 2023), or that a criminal conviction for first-degree sexual abuse would require him to register as a sex offender for the rest of his life, *see* Mot. 12–14. And he studiously ignores Carroll's independent argument that collateral estoppel forecloses his counterclaim. Mot. 14–15.

Most remarkably, Trump fails even to acknowledge this Court's prior determination that Trump "'raped' [Carroll] in the sense of that term broader than the New York Penal Law definition." *Carroll*, 2023 WL 4612082, at *20. As the Court has explained, the jury's "finding that Ms. Carroll failed to prove that she was 'raped' within the meaning of the New York Penal Law does not mean that she failed to prove that Mr. Trump 'raped' her as many people commonly understand the word 'rape.' Indeed, as the evidence at trial … makes clear, the jury found that *Mr. Trump in fact did exactly that*." *Id.* at *2 (emphasis added); *accord id.* at *21 (referring to "jury's implicit finding that Mr. Trump digitally raped Ms. Carroll"); *Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 4744176, at *2 (S.D.N.Y. July 25, 2023) (noting the jury "implicitly determined that he had penetrated her vagina with his fingers, a form of 'rape' as that word often is used").

Against all this, Trump blithely asserts that his counterclaim raises a black-and-white question of whether he raped Carroll—which, he says, the jury "demonstrably" resolved in his favor. Opp. 5; *see id.* at 7 (declaring it "irrelevant" that rape has different meanings in different

jurisdictions because the jury here found "no 'rape'" under New York law). But as we have already explained, this position is defective twice over. First, Trump misstates the relevant legal standard—even advancing a "three-prong test" for substantial truth that is found nowhere in the case that he cites. *See Karedes v. Ackerly Grp., Inc.*, 423 F.3d 107, 113–14 (2d Cir. 2005) (setting forth three considerations for determining "whether a statement or publication is defamatory" before turning to the separate element of "falsity," which requires "substantial, not literal, accuracy"). Second, Trump "misinterprets the jury's verdict," for the reasons that this Court has already explained. *Carroll*, 2023 WL 4612082, at *3.[1] Accordingly, by virtue of the substantial truth doctrine, Trump fails to state a defamation claim upon which relief can be granted.

  ***Actual malice.*** Trump fares no better with respect to actual malice. He concedes that the standard is "demanding," Opp. 8, and takes no issue with the caselaw proscribing reliance on conclusory allegations or "actual-malice buzzwords," Mot. 15. But Trump nevertheless insists that he sufficiently pleads actual malice because he alleges that Carroll's "statements were clearly contrary to the jury verdict in *Carroll II*," and statements "made in direct contradiction to publicly available information are deemed to be made with actual malice." Opp. 9–10.

  Once again, Trump's position rests on a fundamental misunderstanding of the jury verdict. The jury *did* find that Trump raped Carroll within the commonly understood meaning of that word. *Carroll*, 2023 WL 4612082, at *2, *20–*21. And here, where Carroll explicitly referred legal questions about the meaning of the jury verdict to her attorney and made no effort whatsoever to mischaracterize the jury's finding on rape under the New York Penal Law, the verdict itself provides no basis to infer that her statement (in which she reflected on her contemporaneous,

---

[1] While Trump also argues that Carroll's statement is not protected as a matter of opinion because "prefatory phrases" like "I think" may still contain factual implications, Opp. 7 (citation omitted), Carroll does not even make that argument.

subjective reaction to that verdict from a non-legal perspective) was knowingly or recklessly false. *Brimelow v. N.Y. Times, Co.*, No. 21-66, 2021 WL 4901969, at *2–*3 (2d Cir. Oct. 21, 2021). Absent any allegations about Carroll's state of mind during the CNN interview, the conclusory sentence in Trump's pleading referring to actual malice is "simply not enough to nudge [his counterclaim] into discovery." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279–80 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015).

*Fair reporting privilege.* Trump's purported counterclaim is also independently foreclosed by the legal privilege set forth in Section 74 of the New York Civil Rights Law.

Here, Trump argues that Carroll's statement was not a "report" on a judicial proceeding because it either was "directed towards the underlying conduct that is alleged to have occurred in Bergdorf Goodman" or was "commentary on the *Carroll II* proceedings." Opp. 14. But the question is whether an "ordinary viewer" could determine that the statement was "reporting on [a judicial] proceeding." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178–79 (2d Cir. 2021). In this regard, Trump ignores the context of the CNN interview—from its detailed discussion of the jury verdict and many other aspects of the trial to the trial-related chyrons that were plastered across the screen. That context would leave no doubt in a viewer's mind that the interview itself (and the surrounding discussion) was a report on the trial that had just ended the day before. Mot. 18.[2]

Trump also argues that Carroll's statement was not "fair and true" because it did not provide a "'substantially accurate' report of the jury verdict." Opp. 17. But the question posed to Carroll referred to the jury's "first finding … that Trump did not rape you," and Carroll's answer

---

[2] The "commentary" case on which Trump relies is easily distinguished. In *Karp v. Hill & Knowlton, Inc.*, the press release contained a "one word assessment of the Second Circuit's opinion" stating that "[t]he ruling support[ed]" a party's claim, when, in fact, it did not. 631 F. Supp. 360, 362–63 (S.D.N.Y. 1986). The court did not consider the statement a fair and true report because it did not "publish [the court's] opinion, or otherwise expose the public to the workings of the judicial system." *Id.* Here, by contrast, the CNN interview was an in-depth exploration of the trial, which reported the parties' respective positions and the various aspects of the jury verdict.

did not quibble in any way with what the reporter had just said or obscure the nature of the verdict itself. ECF 176-2. Moreover, the key question is whether Carroll's statement suggests "conduct more serious than the conduct alleged in the underlying court case[]." *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 331 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, No. 21-2068, 2022 WL 1013982 (2d Cir. Apr. 5, 2022). Coming just days after Carroll testified to rape on the witness stand and her attorney argued rape under New York law during summation, Carroll's statement was obviously "substantively equivalent" to her position in the case. *Gonzalez v. Gray*, 216 F.3d 1072, at *1 (2d Cir. 2000).

### B.    "He Did It and You Know It"

Trump offers only a few arguments in support of his separate claim that Carroll defamed him by recounting on CNN her remark to Joe Tacopina that "he did it and you know it." ¶ 7.

On falsity, Trump argues that the "it" in Carroll's statement necessarily means rape as defined by the New York Penal Law, making it false for the same reasons as her statement "oh, yes, he did." Opp. 18. But a defamation claim cannot survive based on a "strained or artificial construction," *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985), and the facts alleged do not permit the interpretation that Trump posits: neither Carroll nor the CNN interviewer used the word "rape," and her comment to Tacopina came in response to his congratulations on the verdict in her favor (*i.e.*, the verdict finding Trump liable for sexual battery and defamation). *See* Mot. 21–22.

To be sure, Trump insists that a reasonable jury could infer rape because "moments earlier" Carroll had answered the interviewer's question about her reaction to the jury's rape verdict. Opp. 18. But those "moments" were actually multiple minutes, during which time the interview covered a host of other topics, including the implications of the jury's sexual abuse finding, an evidentiary issue that arose before trial, the witnesses and jurors, and the "perfect victim" narrative that was a defense theme. ECF 176-2. Even the cases that Trump cites extend only so far as a "reasonable

view of the stated facts"—and Trump's attempt to link the "it" to an entirely separate statement is

not reasonable. *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014); *Giuffre v. Maxwell*, 165 F. Supp.

3d 147, 153–54 (S.D.N.Y. 2016) (where defendant stated, "I'm referring to the statement that was

made," it was plausible that he was referring to prior day's statement, "particularly in the absence

of any other 'statement that was made'"). Yet even if Trump's reading of "it" were plausible, his

claim would still fail because Carroll's statement was substantially true. *See supra* at 1–3.

On actual malice, Trump simply reiterates his reliance on his single-sentence conclusory

allegation, Opp. 18, which is insufficient for the reasons discussed above. *See supra* at 3–4.

On the fair reporting privilege, Trump argues that Carroll's "statement recounting her

interaction with defense counsel" cannot be a report on an "official proceeding" because it

occurred in a courtroom. Opp. 16. But a "report" for these purposes may take many forms and

encompass "[s]tatements or allegations that go beyond matters in a proceeding." *Fine v. ESPN,

Inc.*, 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014). The relevant question is whether the "content or

context" confirm that a statement is "sufficiently connected" to a legal proceeding and is not

merely an independent attack focused "exclusively on underlying events." *Carroll v. Trump*,

No. 22 Civ. 10016, 2023 WL 2669790, at *6 (S.D.N.Y. Mar. 28, 2023). Given that Carroll's

comment to Tacopina was made in the courtroom and concerned the jury verdict issued moments

earlier, and that Carroll later recounted it in an interview reporting on the trial that had just ended,

her statement is a "report" as that term is used in the applicable caselaw. *See* Mot. 17–18.

## II.  TRUMP'S LATE-STAGE COUNTERCLAIM IS PROCEDURALLY IMPROPER

Trump's counterclaim should also be dismissed because it comes nearly four years into the

case and plainly exceeds the scope of Carroll's amended complaint. *See GEOMC Co. v. Calmare

Therapeutics Inc.*, 918 F.3d 92, 99–100 (2d Cir. 2019). Trump doesn't dispute that *GEOMC Co.*

sets the relevant standard, Opp. 19, but commits multiple errors in arguing that he satisfies it.

Trump first argues that "the counterclaim does not in any way exceed the scope of Plaintiff's *original* complaint." Opp. 20 (emphasis added). But the relevant question is whether Trump's counterclaim raises issues "beyond the scope of the new claims" in Carroll's *amended* complaint, not her original complaint. *GEOMC Co.*, 918 F.3d at 100. As this Court has recognized, there are no new claims, *Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 4393067, at *2 n.6 (S.D.N.Y. July 5, 2023), so Trump's counterclaim can be dismissed on this basis alone.

Next, Trump argues that he should be allowed to bring his counterclaim because it is compulsory under Rule 13(a). Opp. 20–21. That, too, ignores *GEOMC Co.*, since the Second Circuit was clear that there was "no need to consider Rule 13's distinction between compulsory and permissive counterclaims." 918 F.3d at 99 n.11; *see also Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.*, No. 17 Civ. 8528, 2022 WL 836890, at *8–*9 & n.3 (S.D.N.Y. Mar. 21, 2022) (dismissing counterclaims based on *GEOMC Co.* that would otherwise qualify as compulsory). In reviewing a new counterclaim asserted in response to an amended complaint, a court may use Rule 15 standards to dismiss it. *See GEOMC Co.*, 918 F.3d at 101. In such circumstances, a defendant has no absolute right to assert a counterclaim even if it would have been considered compulsory under Rule 13 had it existed at the time of original pleading. *Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*, No. 99 Civ. 4677, 2001 WL 1702151, at *5 (S.D.N.Y. Jan. 11, 2002).[3]

Trump further argues that no prejudice would come from allowing his late-stage counterclaim because "there appears to be ample time for the parties to engage in the necessary discovery practice without moving back the trial date." Opp. 22. Trump grossly understates the

---

[3] The authorities in Trump's opposition concern entirely distinct procedural postures. Opp. 21. In *Pfeffer v. Mark*, the defendants had asserted a compulsory counterclaim in their original answer, and the court considered whether to grant leave to replead when dismissing that counterclaim for failure to state a claim. No. 98 Civ. 6771, 2000 WL 516891, at *2 (E.D.N.Y. Mar. 16, 2000). The cited portion of Wright & Miller simply explains Rule 13(f), through which a party may seek leave "to amend the pleadings and assert a counterclaim that was omitted 'through oversight, inadvertence, or excusable neglect or if justice so requires.'" Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1430 (3d ed. 2013).

discovery that his counterclaim would require and ignores the additional motion practice and trial preparation that would inevitably ensue. Mot. 24–25. Moreover, Trump does not address the reasons why Carroll is justifiably concerned about delay. Mot. 25–27. The last promise Trump made to comply with a trial date ("I give you my word. … If you say April, I'm trying it in April. I'm not running from this obligation.") was followed by three separate adjournment requests. Conf. Tr. at 13, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y. Feb. 7, 2023); *Carroll II*, ECF 61, 106, 108. Delay is no doubt Trump's goal, as evidenced by the most recent motion to stay he filed just days ago. ECF 185. Especially with his legal problems mounting,[4] Trump should not be allowed to maintain a counterclaim that he will inevitably use to cause further delay here.

## III.   THE COURT SHOULD STRIKE CERTAIN AFFIRMATIVE DEFENSES

While Trump relies on general caselaw that disfavors striking affirmative defenses, Opp. 22–24, he ignores the special considerations that apply in a case like this one, where a defendant presses an affirmative defense that has already been rejected. In such circumstances, the law-of-the-case doctrine means that "[t]here is no need to litigate the same issue again," and the defense may be stricken. *Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.*, No. 17 Civ. 124, 2020 WL 1031271, at *2 (S.D.N.Y. Mar. 2, 2020); *see* Mot. 27 (collecting cases).[5]

With respect to his defense of **nonactionable opinion** (Fifth Affirmative Defense), Trump concedes that his June 21 and 22 statements were not statements of opinion, but suggests that his June 24 statement—in which he claimed that the sexual assault "never happened"—might be. Opp. 24. The Court didn't address this issue on summary judgment because Trump never raised

---

[4] *E.g.*, Alan Feuer et al., *Trump Faces Major New Charges in Documents Case*, N.Y. Times (July 27, 2023), https://www.nytimes.com/2023/07/27/us/politics/trump-documents-carlos-de-oliveira-charged.html.

[5] Carroll's motion inadvertently listed Trump's Third Affirmative Defense. Mot. 27–28. That was an error, and we apologize for any confusion. Because that defense was not resolved by the Court's recent summary judgment decision, Carroll does not seek to strike it on law-of-the-case grounds.

it, and Trump does not now explain how a statement denying that a sexual assault "happened" does anything but "convey[] facts about" Carroll and the underlying events. *Davis*, 24 N.Y.3d at 270 (citation omitted). Given that a jury has determined *as a factual matter* that Trump sexually assaulted Carroll, it strains credulity for him to suggest that he intends to raise opinion as a defense. *See also* Opp. 6–7 (arguing that whether he raped Carroll is *not* a question of opinion).

With respect to **punitive damages** (Twelfth Affirmative Defense), Trump insists that "this Court determined only that Defendant 'failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied.'" Opp. 24 (quoting *Carroll*, 2023 WL 4393067, at *20). But that's exactly the point. As written, Trump's affirmative defense is that Carroll is "not entitled to punitive damages as a matter of law," ECF 171 at 22 ¶ 12—meaning the jury is precluded from awarding punitive damages at trial. Trump can advance whatever *factual* positions he wants, but the Court's summary judgment decision certainly allows the jury to decide the question of punitive damages.

With respect to **defamation *per se*** (Fifteenth Affirmative Defense), Trump admits that the Court held that Carroll "had 'sufficiently pleaded a claim of libel *per se*.'" Opp. 25 (quoting *Carroll*, 2023 WL 4393067, at *14). But a pleading failure is exactly the argument in his defense. *See* ECF 171 at 22 ¶ 15 ("Plaintiff has not sufficiently pled defamation or defamation *per se*.").

Finally, with respect to the affirmative defense of **absolute presidential immunity** (First Affirmative Defense), Trump argues that despite his waiver of immunity, *see Carroll*, 2023 WL 4393067, at *5, "the defense has now been properly and timely raised since it was asserted in connection with Defendant's Amended Answer," Opp. 25. The law is clear, however, that defenses that "involve the core issue of a party's willingness to submit a dispute to judicial resolution, such as objections to lack of personal jurisdiction, improper venue, insufficiency of process and

insufficiency of service," are "irrevocably waived" if not raised in the initial answer and cannot be revived in an answer to an amended pleading. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (cleaned up). Absolute presidential immunity is one such defense since the "fundamental purpose of presidential immunity is to avoid diversion of the president's energies and distracting a President from his or her public duties by subjecting the president to concern with private lawsuits." *Carroll*, 2023 WL 4393067, at *11 (cleaned up). In developing the doctrine, the Supreme Court left a president with the "ability to choose whether or not to defend himself or herself in a civil lawsuit in federal court," *id.* at *8, and Trump chose to defend himself here. *E.g.*, *Carroll v. Trump*, No. 160694/2019 (N.Y. Sup. Ct.), NYSCEF No. 103 at 3 (letter from Trump's attorney: "Plaintiff is free to pursue this action when the President is no longer in office."). This record establishes what the Second Circuit has called the "core issue," or Trump's "willingness to submit a dispute to judicial resolution." *Shields*, 25 F.3d at 1128.[6] By failing to assert absolute immunity when he was required to do so—and for multiple years thereafter—Trump waived his absolute presidential immunity defense. *See Carroll*, 2023 WL 4393067, at *5, *11.

**CONCLUSION**

For the reasons above and in Carroll's opening brief, the Court should grant Carroll's motion to dismiss the counterclaim on substantive and procedural grounds, and should grant Carroll's motion to strike.

---

[6] While Trump argues that presidential immunity is *not* an issue of subject matter of jurisdiction, Opp. 26, that in no way helps him here. Since an objection to subject matter jurisdiction can never be waived, the "irrevocably waived" defenses discussed in *Shields* necessarily have to be defenses of a different kind. 25 F.3d at 1128.

Dated: New York, New York
      August 1, 2023

Respectfully submitted,

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                              Plaintiff,


         -against-                                    20-cv-7311 (LAK)


DONALD J. TRUMP, in his personal capacity,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OPINION GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM AND CERTAIN PURPORTED AFFIRMATIVE DEFENSES

         Appearances:


                         Roberta Kaplan
                         Joshua Matz
                         Shawn Crowley
                         Matthew Craig
                         Trevor Morrison
                         Michael Ferrara
                         KAPLAN HECKER & FINK LLP

                         *Attorneys for Plaintiff*

                         Alina Habba
                         Michael T. Madaio
                         HABBA MADAIO & ASSOCIATES LLP

                         *Attorneys for Defendant*

2

LEWIS A. KAPLAN, *District Judge.*

This is a defamation case against Donald Trump brought by writer E. Jean Carroll for certain statements Mr. Trump made in 2019, while he was President, in response to Ms. Carroll's public accusation that he sexually assaulted ("raped") her in the mid 1990s. In a closely related second case ("*Carroll II*"), Ms. Carroll brought a defamation claim for Mr. Trump's comparable 2022 statement as well as a sexual battery claim pursuant to the Adult Survivors Act ("ASA"). The battery claim became permissible as a result of the ASA, a new law enacted by New York in 2022, which created a one-year period within which persons who were subjected as adults to conduct that would have constituted a sex offense under the New York Penal Law could sue their alleged assaulters for damages even if their civil claims otherwise would have been expired.

*Carroll II* was tried in this Court in April and May 2023. Ms. Carroll testified that Mr. Trump assaulted her in the dressing room of a New York department store in what most likely was the spring of 1996 by, among other things, forcibly penetrating her vagina with his fingers and with his penis. The essence of her account was corroborated by two "outcry" witnesses in whom she had confided shortly after the attack and six other fact witnesses. Mr. Trump relied exclusively on attempting to discredit Ms. Carroll's proof and on portions of his deposition testimony that came in on Ms. Carroll's case. He did not testify in person, attend the trial, or present any defense evidence.

The jury's unanimous verdict was almost entirely in favor of Ms. Carroll. It found that Mr. Trump "sexually abused" Ms. Carroll, which is defined in the New York Penal Law as sexual contact by forcible compulsion and is a felony punishable by a term of imprisonment and registration as a sex offender. It determined also that Mr. Trump defamed Ms. Carroll in his 2022 statement. It awarded Ms. Carroll $2.02 million in compensatory and punitive damages on her sexual

3

battery claim and $2.98 million in compensatory and punitive damages on her defamation claim.

The only issue on which the jury did not find in Ms. Carroll's favor was whether she proved that Mr. Trump "raped" her within the narrow, technical meaning of that term in the New York Penal Law. The jury in *Carroll II* was instructed that it could find that Mr. Trump "raped" Ms. Carroll only if it found that he forcibly penetrated Ms. Carroll's vagina *with his penis*. It could not find that he "raped" her if it determined that Mr. Trump forcibly penetrated Ms. Carroll's private sexual parts with his fingers – which commonly is considered "rape" in other contexts – because the New York Penal Law definition of rape is limited to penile penetration. As the Court explained in its recent decision denying Mr. Trump's motion for a new trial on damages and other relief in *Carroll II*, based on all of the evidence at trial and the jury's verdict as a whole, the jury's finding that Mr. Trump "sexually abused" Ms. Carroll implicitly determined that he forcibly penetrated her digitally – in other words, that Mr. Trump in fact did "rape" Ms. Carroll as that term commonly is used and understood in contexts outside of the New York Penal Law.

The day after the jury's verdict, Ms. Carroll and her counsel gave interviews with the media where they discussed the trial and Ms. Carroll's reaction to the verdict. On June 27, 2023, in his answer to Ms. Carroll's amended complaint in this action, *Carroll I*,[1] Mr. Trump asserted for the

---

[1]    "The amended complaint made three main sets of changes. First, it added allegations based upon the jury's verdict in [*Carroll II*], including substitution of the phrase 'sexual assault' (or derivatives of that phrase) for the word 'rape' (or derivatives of that word) wherever that word (or its derivatives) appeared in the original complaint. Second, it set forth alleged facts concerning Mr. Trump's recent statements following the *Carroll II* verdict in which he again claimed that he does not know Ms. Carroll and that no such incident occurred between them. Third, it added allegations drawn from Mr. Trump's deposition in this case that allegedly demonstrate his personal motive in defaming Ms. Carroll. Importantly, as the Court noted in its decision denying Mr. Trump's motion for summary judgment [in this case], '[t]he amended complaint did not add any new claims or otherwise change the focus of [Ms. Carroll's] original complaint.' *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL

4

first time a defamation counterclaim against Ms. Carroll. He alleged that Ms. Carroll, in an interview

with CNN following the *Carroll II* verdict, "disregarded the jury's finding that [Mr. Trump] did not

rape her" by (1) stating that when she heard that the jury's response was "no" to the question of

whether she proved that Mr. Trump raped her, she responded "oh yes he did, oh yes he did", and (2)

stating that at the conclusion of the trial, she said to Mr. Trump's counsel "he [(Mr. Trump)] did it

and you know it."[2]

The matter now is before the Court on Ms. Carroll's motion to dismiss Mr. Trump's

counterclaim and to strike certain affirmative defenses in his answer. For the reasons stated below,

Ms. Carroll's motion to dismiss the counterclaim is granted. Her motion to strike certain affirmative

defenses is granted in part and denied in part.

### Facts

*The "Rape" Question in Carroll II*

Ms. Carroll's sexual battery claim in *Carroll II* involved three independent and

alternative theories of liability: rape, sexual abuse, and forcible touching. Each theory corresponded

to a definition of a sex crime by the same name in the New York Penal Law. It was necessary to

define these acts in the precise terms of the New York Penal Law because the ASA requires that the

alleged conduct for which a person is able to bring a sexual battery claim within the temporary claim

revival period "would constitute a sexual offense as defined in article one hundred thirty of the penal

---

4744176, at *1 (S.D.N.Y. July 25, 2023) (quoting *Carroll v. Trump*, No. 20-CV-7311
(LAK), 2023 WL 4393067 at *2 n.6 (S.D.N.Y. July 5, 2023)).

2   Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 25-26 ¶¶ 5-7.

5

law."[3] The special verdict form provided to the jury accordingly consisted of three liability questions

relating to Ms. Carroll's sexual battery claim: whether Ms. Carroll proved by a preponderance of the

evidence that (1) "Mr. Trump raped Ms. Carroll?", (2) "Mr. Trump sexually abused Ms. Carroll?",

and (3) "Mr. Trump forcibly touched Ms. Carroll?".[4]

       The Court instructed the jury that the "first set of questions in the verdict form has

to do with whether or not Ms. Carroll has established that Mr. Trump's conduct, if any, came within

any of th[e] criminal law definitions," and proceeded to instruct the jury on each such definition.[5]

With respect to the first question on the verdict form, whether Ms. Carroll proved that Mr. Trump

raped her, the Court instructed the jury in accordance with the New York Penal Law's definition of

---

[3]
    N.Y. CPLR § 214-j ("Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of *conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law* committed against such person who was eighteen years of age or older . . . which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived . . . .") (emphasis added).

[4]
    *Carroll II*, Doc. No. 22-cv-10016, Dkt 174 (Verdict) at 1.

    "Pursuant to Federal Rule of Civil Procedure 49, which governs jury verdict forms and questions, '[t]he court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact.' A special verdict stands in contrast to a general verdict form, which typically asks jurors to answer only the ultimate questions of liability and the damages amounts, if any. The Court here used a special verdict form that was substantially similar to the parties' proposed forms, consisting of factual questions going to liability and damages, organized by the two claims [(battery and defamation)]." *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, at *12 (S.D.N.Y. July 19, 2023).

[5]
    *Carroll II*, Doc. No. 22cv10016, Dkt 201 (Trial Tr.) at 1416:6-9.

6

rape, as relevant here, that:

> "In order to establish that Mr. Trump raped her, Ms. Carroll must prove each
> of two elements by a preponderance of the evidence.
>
> "The first element is that Mr. Trump engaged in *sexual intercourse* with her.
>
> "The second element is that Mr. Trump did so without Ms. Carroll's consent
> by the use of forcible compulsion. . . .
>
> "'Sexual intercourse' means any penetration, however slight, *of the penis* into
> the vaginal opening. In other words, any penetration of the penis into the vaginal
> opening, regardless of the distance of penetration, constitutes an act of sexual
> intercourse. Sexual intercourse does not necessarily require erection of the penis,
> emission, or an orgasm."[6]

The instructions with respect to the rape question thus made clear that if the jury found that Mr.

Trump forcibly penetrated Ms. Carroll's vagina with his fingers, but not also with his penis, it was

obliged to answer "no" to the rape question. However, if it found that Mr. Trump forcibly penetrated

Ms. Carroll digitally, it was obliged to answer "yes" to the sexual abuse question, as the New York

Penal Law definition of "sexual abuse" encompasses such conduct. For the reasons stated in the

Court's recent decision denying Mr. Trump's motion for a new trial in *Carroll II*:

> "The jury's finding of sexual abuse therefore necessarily implies that it found
> that Mr. Trump forcibly penetrated her vagina. And since the jury's answer to [the
> rape question] demonstrates that it was unconvinced that there was penile

---

[6]    *Id.* at 1416:18-1417:6 (emphasis added).

7

penetration, the only remaining conclusion is that it found that Mr. Trump forcibly

penetrated her vagina with his fingers – *in other words, that he 'raped' her in the*

*sense of that term broader than the New York Penal Law definition*."[7]

The jury's answer of "no" to the question of whether Ms. Carroll proved that Mr. Trump "raped" her

therefore established *only* that the jury was unconvinced that he penetrated her *with his penis*.

*Ms. Carroll's Statements After the Jury's Verdict in Carroll II*

On May 10, 2023, the day after the jury's verdict in *Carroll II*, Ms. Carroll and her

counsel gave interviews with the media, including on the television program *CNN This Morning*.

During that interview, Ms. Carroll made the following statements:

"[Reporter]: What about when that first finding was found? This jury found that

Trump did not rape you. What about that moment?

[Ms. Carroll]: Robbie [(Ms. Carroll's counsel)] can explain the legal.

[Reporter]: Sure. And I want you to, but I just wonder, E. Jean, what went through

your head when you heard that?

[Ms. Carroll]: Well, I just immediately say in my own head, *oh, yes, he did -- oh, yes,*

*he did*. See, that's my response."

. . .

---

[7]

*Carroll*, 2023 WL 4612082, at *20 (emphasis added).

In any event, the Court alternatively found, in accordance with Rule 49, that Mr. Trump did
forcibly digitally penetrate Ms. Carroll's vagina. *Id.* at *19 n.70 ("As the jury's response to
Question 2 [(the sexual abuse question)] was an implicit finding that Mr. Trump forcibly
digitally penetrated Ms. Carroll's vagina, no explicit independent finding by the Court is
necessary. Nevertheless, the Court alternatively finds that he did so.").

**A1280**

8

"[Reporter]: There in the courtroom was an encounter and exchange between you and

the President's lawyer, Joe Tacopina. He came up, you shook hands, I believe. What

did he say?

[Ms. Carroll]: Well, Joe Tacopina is very likeable. He's sort of like an 18th century

strutting peacock. And he's people like him [*sic*]. So, when he sticks out his hand to

– first, he congratulated Robbie. And then, he was congratulating people on the team.

And as I put my hand forward, I said, *he did it and you know it*. Then we shook

hands, and I passed on."[8]

*Mr. Trump's Counterclaim and Affirmative Defenses*

Mr. Trump alleges in his counterclaim that Ms. Carroll's statements during the CNN

interview on May 10, 2023 "repeated falsehoods and defamatory statements" that caused "significant

harm to [Mr. Trump's] reputation."[9]  He alleges that her statement "oh yes he did, oh yes he did" in

response to the reporter's question about her reaction "disregarded the jury's finding that [Mr.

Trump] did not rape her" and that her statement to Mr. Trump's counsel that "he did it and you know

it" "again reaffirm[ed] her claim that [Mr. Trump] raped her."[10]  He contends that:

"[Ms. Carroll] made these statements knowing each of them were false or

with reckless disregard for their truth or falsity.

---

[8]
Dkt 176-3, Ex. C to Decl. of Roberta A. Kaplan, Tr. of CNN Interview, at 11-13 (emphasis added).

[9]
Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 26 ¶ 12.

[10]
*Id.* at 25 ¶ 5, 26 ¶ 7.

**A1281**

9

. . .

> [Ms. Carroll] made these false statements with actual malice and ill will with an intent to significantly and spitefully harm and attack [Mr. Trump's] reputation, as these false statements were clearly contrary to the jury verdict in *Carroll II* whereby [Mr. Trump] was found not liable for rape by the jury.

> [Ms. Carroll's] actions of wantonly and falsely accusing [Mr. Trump] on multiple occasions of committing rape constitute defamation *per se*, as [Ms. Carroll] accused [Mr. Trump] of rape, which clearly was not committed, according to the jury verdict in *Carroll II*."[11]

He accordingly seeks compensatory and punitive damages, an order requiring Ms. Carroll to retract her defamatory statements, and other relief.

Mr. Trump raises also in his answer certain affirmative defenses that Ms. Carroll argues should be stricken "because the Court considered and rejected each of these defenses in denying [Mr.] Trump's motion for summary judgment."[12]  They are discussed below.

### *Discussion*

*Legal Standard*

The standards governing a motion to dismiss are well established. As the Second Circuit has explained:

---

[11]  *Id.* at 26 ¶¶ 8, 10, 11.

[12]  Dkt 175 (Pl. Mem.) at 27-28.

10

"'[A] complaint [or counterclaim] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'

*Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007))."[13]

Although the Court must accept as true all factual allegations, it "should not accept as true allegations that amount to mere 'legal conclusions.'"[14] Furthermore, a complaint or counterclaim "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[15] "'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding [a] motion to dismiss, without converting the proceeding to one for summary judgment."[16]

With respect to Ms. Carroll's motion to strike certain of Mr. Trump's affirmative defenses, Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading

---

[13]    *King v. City of New York*, No. 22-231, 2023 WL 2398679, at *1 (2d Cir. Mar. 8, 2023) (first alteration in original).

[14]    *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[15]    *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

[16]    *Id.* (second alteration in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied*, 503 U.S. 960 (1992)).

11

an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[17]  The

Second Circuit has stated that:

> "We conclude that the plausibility standard of *Twombly* applies to
>
> determining the sufficiency of all pleadings, including the pleading of an affirmative
>
> defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying
>
> the plausibility standard to any pleading is a 'context-specific' task."[18]

It has set forth also certain considerations in relation to a motion to strike an affirmative defense

including, as relevant here, that "an affirmative defense is improper and should be stricken if it is a

legally insufficient basis for precluding a plaintiff from prevailing on its claims."[19]


*Mr. Trump's Defamation Claim Fails With Respect To Falsity*

Ms. Carroll argues that Mr. Trump has failed to state a legally sufficient claim for

defamation both because her statements were at least "substantially true" and because Mr. Trump

has not adequately pled actual malice.  In view of the following analysis of the falsity-substantial

truth issue, there is no need to address the sufficiency of Mr. Trump's actual malice allegations.

In order to make out a defamation case, a public figure plaintiff or counterclaimant

such as Mr. Trump "must show that the statements [the plaintiff] complains of were (1) of and

concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false,

---

[17]     Fed. R. Civ. P. 12(f).

[18]     *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019) (citation omitted).

[19]     *Id.* at 98.