# 23-1045(L)
# 23-1146(CON)

## United States Court of Appeals
## for the Second Circuit



E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPELLANT'S SPECIAL APPENDIX

---

HABBA MADAIO & ASSOCIATES LLP
MICHAEL T. MADAIO, ESQ.
ALINA HABBA, ESQ.
*Attorneys for Defendant-Appellant
Donald J. Trump*
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
(908) 869-1188
*mmadaio@habbalaw.com*
*ahabba@habbalaw.com*

# TABLE OF CONTENTS

*Page(s)*

Opinion and Order, dated October 26, 2020 ............................................. SPA1-SPA61

Notice of Appeal, dated November 25, 2020 ....................................................... SPA62

Memorandum Opinion Denying Defendant's Motion for
Summary Judgment (Corrected), dated June 29, 2023,
Corrected July 5, 2023 ..................................................................... SPA63-SPA108

Notice of Appeal, dated July 19, 2023 .............................................................. SPA109

Memorandum Opinion Granting Plaintiff's Motion to
Dismiss Defendant's Counterclaim and Certain Purported
Affirmative Defenses, dated August 7, 2023 ..................................... SPA110-SPA133

Notice of Appeal, dated August 10, 2023 ......................................................... SPA134

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                Plaintiff,

         -against-                             20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

               Roberta A. Kaplan
               Joshua A. Matz
               KAPLAN HECKER & FINK LLP
               *Attorneys for Plaintiff*

               Stephen R. Terrell
               William K. Lane III
               James G. Touhey, Jr.
               Director, Torts Branch, Civil Division
               JEFFREY BOSSERT CLARK
               ACTING ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION
               *Attorneys for Movant*

               John A. Kolar
               *Attorney for Amicus Curiae Government Accountability Project, Inc.*

**SPA2**

Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Statutory Context – The FTCA and the Westfall Act. . . . . . . . . . . . . . . . . . . . . . . 4
    The Events Giving Rise to This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    I.     Whether the President Is an "Employee" Under the Westfall Act . . . . . . . . . . . 14
          A.     The Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          B. .   The Legislative History – The *Westfall* Decision and the Westfall Act
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          C.     *Franklin v. Massachusetts* and Lack of Clear Statement to Include the
              President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          D.     Decisions of Other Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    II.    Scope of Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          A.     Choice of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          B.     Scope of Employment Under D.C. Law . . . . . . . . . . . . . . . . . . . . . . . 39
              1.     Master-Servant Relationship. . . . . . . . . . . . . . . . . . . . . . . . . 41
              2.     Scope of Employment Test. . . . . . . . . . . . . . . . . . . . . . . . . . . 45
          C.     Scope of Employment Under New York Law . . . . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

LEWIS A. KAPLAN, *District Judge.*

        The plaintiff in this case, E. Jean Carroll, published a book excerpt in 2019 in which she wrote that, in the 1990s, businessman Donald J. Trump, as he then was, raped her in a dressing room of a New York City department store. Almost immediately after publication of Ms. Carroll's excerpt, Mr. Trump – who by then was president – told the press that Ms. Carroll had made up the rape story. In substance, he called Ms. Carroll a liar and stated that he never met her. So Ms. Carroll sued him in New York State court. She claims that his statements accusing her of lying about the alleged rape were false, that they injured her reputation, and that she is entitled to damages from him. The legal terms are that Ms. Carroll asserts that President Trump's statements were defamatory – libelous and slanderous.

        The question whether Mr. Trump in fact raped Ms. Carroll appears to be at the heart of her lawsuit. That is so because the truth or falsity of a defendant's alleged defamatory statements can be dispositive of any defamation case. Although the Court eventually may need to resolve this issue, this opinion concerns a threshold question. To make the significance of that question clear, we must digress into some technical detail.

        Ms. Carroll sued the president in his individual (or personal) capacity, as distinguished from suing him as the president (*i.e.*, in his official capacity). In other words, she claims that the president personally harmed her and that he, not the U.S. government, should pay any damages to which she may be entitled.

        For nearly a year, this lawsuit proceeded in state court as an ordinary defamation case between Ms. Carroll and President Trump. The president defended the case as a private individual. He was represented by his personal lawyers, not by the U.S. Department of Justice ("DOJ") or other government lawyers. And although he claimed that he could not be sued

2

because he currently is president, the state court rejected that argument and denied a stay of further proceedings, which would have included pretrial discovery.[1]

It was at that point that the U.S. government inserted itself into the case. It "removed" the case from the state court to this one – that is, it filed a paper certifying that a designee of the Attorney General had determined that the president's statements to the press were part of his job as president and that this case therefore could be moved into federal court. For reasons that will appear, that certificate – whether it is right or wrong – conclusively authorized the removal of the case, and no one claims otherwise. But the DOJ did something else too, and that is what now is before the Court.

The government moves to substitute the United States for President Trump as the defendant. It does so in essence on the theory that this is not truly a lawsuit against President Trump as a private individual. Instead, the government argues, this is really a lawsuit against the United States because Ms. Carroll has sued an "employee" of the United States of America for actions within the scope of his employment. The government thus asserts that this case is virtually identical in principle to a lawsuit against a Postal Service driver for causing a car accident while delivering the mail. But the word "virtually" in the last sentence is necessary because there is an important difference between this case and the case of the hypothetical mail driver. Here is the catch.

---

[1] Dkt. 14-111.

**SPA5**

3

The United States of America is a sovereign nation.  It therefore shares with other nations what is called sovereign immunity.  This means that it cannot be sued for money damages except to the extent that it explicitly has agreed to being sued.[2]

Within certain limits, the United States has so agreed in a statute called the Federal Tort Claims Act (the "FTCA").  The FTCA authorizes damages claims for negligence and certain other civil wrongs committed by government employees within the scope of their employment.  The postal driver hypothetical is a classic example of a case that generally would be covered by the statute.  But the FTCA specifically excepts libel and slander cases from the United States's consent to be sued.  Thus, if this really is a suit against the United States, it is one to which the United States seemingly has not waived its sovereign immunity.  So if President Trump is an "employee of the Government" within the meaning of the FTCA, and if his statements about Ms. Carroll were within "the scope of his employment," it could well be argued that this case must be dismissed because the United States has sovereign immunity.[3]  In that

---

[2]

Sovereign immunity derives from the principle that "the law ascribes to the king the attribute of sovereignty, or pre-eminence. . . .  Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him.  For all jurisdiction implies superiority of power . . . ." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 234-235 (1765) (quoted in *Alden v. Maine*, 527 U.S. 706, 715 (1999)).

[3]

This point has been made in the media.  *E.g.*, Barbara McQuade, *Barr's Defense of Trump in E. Jean Carroll's Suit Could Give Presidents Carte Blanche,* (Oct. 21, 2020), https://www.nbcnews.com/opinion/barr-s-defense-trump-e-jean-carroll-s-suit-could-n12 44088; James D. Zirin, *The Strange Case of 'Carroll v. Trump' – An Adventure in Wonderland* (Sept. 11, 2020), https://billmoyers.com/story/the-strange-case-of-carroll-v-trump-an-adventure-in-wonde rland/.  The Court  expresses no opinion on this question, which is not now before it.

**SPA6**

4

event, Ms. Carroll would be left with no remedy, even if the president's statements were false and defamatory.

This is the nutshell version of this case.  But for the present purpose of deciding the government's motion to substitute, the dispositive questions are two:

- Is the president an "employee of the Government" within the meaning of the FTCA?

- Even if the president is an "employee of the Government" as the FTCA defines that term, were his statements concerning Ms. Carroll within the scope of his "employment" under the law of the relevant jurisdiction?

The answer to both questions is "no." While the president possesses all of the executive power of the United States, he is not an "employee" within the meaning of the FTCA. The FTCA's definition of that term does not include presidents.  And even if the president were an employee under that statute, his statements concerning Ms. Carroll were not within the scope of his employment under the law of the relevant jurisdiction, which for reasons explained below is Washington, D.C.

*Facts*

Before turning to the details of this dispute, the Court places them in context by reviewing the constitutional and statutory framework in which this motion is situated.

*Statutory Context – The FTCA and the Westfall Act*

We already have introduced the principle of sovereign immunity.  It remains to mention a closely related principle, namely that federal employees and the president long

5

enjoyed absolute official immunity with respect to lawsuits in federal courts charging them with liability for performance of their official functions.[4]

In 1946, Congress enacted the FTCA.  The statute was a major step to provide compensation to victims of certain torts – *i.e.*, civil wrongs such as negligence – committed by federal employees.  As relevant here, the FTCA provides that the district courts of the United States

> "have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[5]

Although the FTCA's precise workings are complicated, its basic function is simple.  With numerous qualifications and exceptions, the statute allows a person injured by an "employee of the Government" who is "acting within the scope of his office or employment" to sue the United States for tort damages, notwithstanding its sovereign immunity, if the United States would be liable as an employer under the law of the state where the act or omission occurred.  Thus, Congress adopted the view that (1) a suit for damages against a federal employee acting within the scope of his or her employment in substance is a suit against the United States, (2) in such a case the United States would be substituted as the defendant for the individual employee, and (3) the United States is responsible for defending such lawsuits in the

---

[4]     *See, e.g., Barr v. Matteo,* 360 U.S. 564, 597 (1959).

[5]     28 U.S.C. § 1346(b)(1).

**SPA8**

6

name of the United States and for paying any damages awarded.  The individual employee sued in his or her official capacity is not a proper defendant in such a case.

The FTCA does not authorize suits against government employees in their individual or personal capacities.  But state law often does.  Thus, even after the FTCA was enacted, federal employees were exposed to tort actions against them in their individual capacities in some states.

In 1988, the Supreme Court held in *Westfall v. Erwin*[6] that federal government employees are not absolutely immune from state tort claims based on conduct performed within the scope of their employment except in certain circumstances.[7]  This decision opened the door to individual liability for federal employees wider than previously had been understood.

Congress moved promptly to close that door.  In 1988, it enacted the Federal Employees Liability Reform and Tort Compensation Act of 1988, more commonly known as the Westfall Act.[8]  The statute's "core purpose . . . is to relieve covered employees from the cost and effort of defending [a] lawsuit, and to place those burdens on the Government's shoulders."[9]  Pursuant to the Westfall Act:

> "The remedy against the United States provided by sections 1346(b) [the FTCA] and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

---

[6]

484 U.S. 292 (1988).

[7]

*Id.* at 299.

[8]

The statute as amended is codified at 28 U.S.C. § 2679.

[9]

*Osborn v. Haley*, 549 U.S. 225, 252 (2007).

employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.  Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred."[10]

In essence, the quoted provision bars tort claims against government employees acting within the scope of their employment.   But it provides plaintiffs with a different remedy: a lawsuit against the United States under the FTCA.  Under subsection (c) of the Westfall Act, "[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any [of the above described] damage or injury."[11]

Because the Westfall Act operates where a lawsuit could have been brought against the United States under the FTCA, the statutes share the same threshold requirements.  Thus, in order for the Westfall Act to apply, the defendant must be an "employee of the Government" who was acting within the scope of his or her employment.  Under Subsection (d) of the Westfall Act, the Attorney General makes an initial determination as to both issues:

"Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[12]

---

[10]   28 U.S.C. § 2679(b)(1).

[11]   *Id.* § 2679(c).

[12]   *Id.* § 2679(d)(1).

**SPA10**

8

If the Attorney General issues a certification and the action is pending in state court, the Westfall Act requires that the action be removed to federal court.[13]  If the Attorney General declines to issue a certification, "the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."[14]  Either way, if the court is satisfied that the threshold requirements are met, the action "shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA]."[15]

The Attorney General's certification is conclusive only "*for purposes of removal*"[16] – that is to say, only for purposes of whether the action shall continue in federal rather than state court.  As the Supreme Court has held, such a certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee."[17]  "The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification . . . ."[18]  Hence, the federal court to which the action has been removed must determine for itself whether the

---

[13]     *Id.* § 2679(d)(2).

[14]     *Id.* § 2679(d)(3).

[15]     *Id.* § 2679(d)(4).

[16]     *Osborn*, 549 U.S. at 242 (emphasis in original) (quoting 28 U.S.C. § 2697(d)(2)).

[17]     *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995).

[18]     *Id.* at 436-37.

9

individual defendant is covered by the statute and, if so, whether the actions of which that defendant is accused or committed were within the scope of the defendant's federal employment. If those conditions both are met, the United States is made the defendant and the individual defendant is dismissed from the case. If either condition is not met, the case proceeds against the individual defendant in his or her personal capacity.

*The Events Giving Rise to This Lawsuit*

According to the complaint, Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996.[19] Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store.[20] The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit.[21] Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent.[22] She claims that she pushed Mr. Trump away and laughed at him, and that

---

[19]  Dkt. 3-3 at 5.

[20]  *Id.*

[21]  *Id.* at 6.

[22]  *Id.*

10

he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store.[23]

Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days.[24]  She did not, however, make the allegations public at that time.[25]  They remained private for many years.

In 2017, the plaintiff began drafting a book about twenty-one men who had left ugly marks on her life.[26]  One of those men was Donald Trump.[27]  On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.[28]  The book was published on July 2, 2019.[29]

Roughly two hours after the excerpt was published in *New York* magazine, the president issued a public statement to media outlets.  It said:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago.  I've never met this person in my life.  She is trying to sell a new book – that should indicate her motivation.  It should be sold

---

[23]
  *Id.* at 6-7.

[24]
  *Id.* at 7.

[25]
  *Id.* at 8.

[26]
  *Id.* at 13.

[27]
  *Id.*

[28]
  *Id.* at 14.

[29]
  *Id.*

11

in the fiction section.  Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh.  It's just as bad for people to believe it, particularly when there is zero evidence.  Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine: No pictures?  No surveillance?  No video?  No reports?   No sales attendants around??   I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault.  All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible.  The world should know what's really going on.  It is a disgrace and people should pay dearly for such false accusations."[30]

The next day, June 22, 2019, a reporter at the White House confronted President

Trump about the story.[31]  They had the following exchange:

[Reporter:] Mr. President, you had said earlier that you never met E. Jean Carroll.  There was a photograph of you and her in the late 1980's —

[President Trump:] I have no idea who this woman is.  This is a woman who has also accused other men of things, as you know.  It is a totally false accusation.  I think she was married — as I read; I have no idea who she is — but she was married to a, actually, nice guy, Johnson — a newscaster.

[Reporter:] You were in a photograph with her.

[President Trump:] Standing with [my] coat on in a line – give me a break – with my back to the camera.  I have no idea who she is.  What she did is – it's terrible, what's going on.  So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

---

[30]  *Id.* at 15.

[31]  *Id.* at 17.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that – and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is – none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York – which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things – that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[32]

President Trump commented on the story a third time on June 24, 2019, when he gave an interview to *The Hill*. As relevant here, he stated: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[33]

*Procedural Background*

On November 4, 2019, the plaintiff filed this lawsuit in the New York Supreme

---

[32]   *Id.* at 17-18.

[33]   *Id.* at 19.

13

Court, New York County, against President Trump in his personal capacity.[34]  On the basis of

the June 21, June 22, and June 24 statements, she alleged that the president defamed her under

New York law.[35]

The lawsuit proceeded in state court for ten months during which time the court

resolved, among other things, a motion to dismiss and several motions to stay.[36]  On September

8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S.

Department of Justice, certified on behalf of the Attorney General "on the basis of the

information now available with respect to the incidents alleged in the [plaintiff's] complaint, that

Defendant Donald J. Trump was acting within the scope of his office as the President of the

United States at the time of the alleged conduct."[37]  Shortly after, the government filed in this

Court a notice of removal.[38]  It filed also a motion, pursuant to the Westfall Act, to substitute

itself in place of President Trump as the defendant.[39]  It is that motion that now is ripe for

decision.

---

[34]

*Id.* at 1.

[35]

*Id.* at 26-27.

[36]

*See, e.g.*, Dkts. 14-36, 14-111.

[37]

Dkt. 3-4.

[38]

Dkt. 6.

[39]

Dkt. 3.

14

*Discussion*

The government's motion to substitute turns on whether the Attorney General's certification that President Trump was an employee of the government acting within the scope of his employment was correct.  As noted at the outset of this opinion, that question raises two subsidiary issues: (1) whether the President of the United States is an "employee of the Government" and, if the answer to this question is "yes," (2) whether President Trump was acting within the scope of his employment when he made the allegedly defamatory statements.[40]

I.      *Whether the President Is an "Employee" Under the Westfall Act*

As noted above, the Westfall Act applies to any "employee of the Government."[41] That phrase is defined in 28 U.S.C. § 2671, a provision enacted by the Act of June 25, 1948 as part of a "Tort Claims Procedure" package.  The statute reads:

"As used in this chapter and sections 1346(b) [the FTCA] and 2401(b) of this title, the term [[42]] * * *

---

[40]

For reasons explained below, D.C. law applies to this issue.

[41]

28 U.S.C. § 2679(b)(1).

[42]

The Act of June 25, 1948 contains an em dash in this location, signifying that the "As used in this chapter" clause applies to all three of the definitions that follow.  *See* Act of June 25, 1948, ch. 646, 62 Stat. 982, *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf.  In 1962, Congress amended the definition of "federal agency," the first defined term.  In doing so, it omitted the em dash and combined the "As used in this chapter" clause with the paragraph defining "federal agency." *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307, *available at* https://www.govinfo.gov/content/pkg/STATUTE-80/pdf/STATUTE-80-Pg306.pdf.  The failure to retain the em dash appears to have been a scrivener's error.  For one thing, the term "federal agency" is not used in Section 1346(b).  And taking Congress literally would require a belief that, in updating the definition of "federal agency," it silently chose to un-define "employee of the Government" as that term is used in the chapter where it is found

15

"'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18."[43]

The term "federal agency" also is defined by Section 2671:

"'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."[44]

These definitions apply to both the Westfall Act provisions codified in 28 U.S.C. § 2679 and the

FTCA provisions codified in 28 U.S.C. § 1346(b).[45]

Neither Ms. Carroll nor the government has cited any case addressing the

question whether the President of the United States is an "employee of the Government" under

---

and in Section 1346(b) while inexplicably keeping it in the definition section. Whatever the case may be, the Supreme Court has stated that both definitions apply to Section 1346(b). *See Logue v. United States*, 412 U.S. 521, 525-26 (1973).

[43]

28 U.S.C. § 2671.

[44]

*Id.*

[45]

Section 2679, where the Westfall Act provisions are codified, is part of the chapter in which the definition is contained. *See also* note 42, *supra*.

16

Section 2671 specifically or the Westfall Act or FTCA more generally.  And the Court is aware

of none.  We therefore begin the search for an answer to this question with the statutory text.[46]

      A.     *The Plain Language*

Section 2671's definition of "employee of the Government" says that the term

"includes" five categories of government personnel:

1.    "officers or employees of any federal agency,"

2.    "members of the military . . . ,"

3.    "members of the National Guard [in certain circumstances],"

4.    "persons acting on behalf of a federal agency in an official capacity, temporarily
or permanently in the service of the United States," and

5.    "any officer or employee of a Federal public defender organization."

Categories 2, 3 and 5 obviously do not apply to the president.  Nor does category

4, which "is designed to cover special situations such as government officials who serve without

pay, or an employee of one government agency who is loaned to and works under the direct

supervision of another government agency."[47]  Thus, the remaining question is whether

---

[46]

    *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

[47]

    *Leone v. United States*, 910 F.2d 46, 51 (2d Cir. 1990); *see also Logue*, 412 U.S. at 531
(noting that the legislative history of the provision suggests that "the language is designed
to cover special situations such as the 'dollar-a-year' man who is in the service of the
Government without pay, or an employee of another employer who is placed under direct
supervision of a federal agency pursuant to contract or other arrangement").

17

presidents are "officers or employees of any federal agency."[48]   Unfortunately, the terms "officers" and "employees" are not defined.[49]

The president is a *constitutional* officer.   He occupies the highest office in our nation, which is created by Article II of the Constitution.   But that is not what Section 2671 requires.   It speaks only of "officers . . . *of any federal agency*," not officers of the United States within the meaning of the Constitution.   So we turn to the question whether the president is an

---

[48]   The government argues for the first time in its reply brief that the use of the word "includes" indicates that the five categories that follow it are exemplary, not exclusive.   In other words, the use of the word "includes" invites courts to rewrite Section 2671 by expanding "employees of the Government" to include categories of individuals that Congress did not see fit to identify.   This contention fails.

In any case, the Court would reject this argument.   "[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns."   *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).   As discussed below, if Congress had intended to include an individual as significant and obvious as the president in this statute, it would have done so clearly.   *See Franklin v. Massachusetts*, 505 U.S. 788 (1992).   Moreover, and also discussed below, there are compelling reasons to conclude that Congress did not intend the major expansion of federal tort exposure that would arise if the FTCA applied to the president's conduct.

As an initial matter, counsel for the government at oral argument waived on the record all arguments raised for the first time in the government's reply brief.   *See* Tr. at 4:13-24 (Oct. 21, 2020) (agreeing, in exchange for precluding the plaintiff from filing a surreply, "to invoke the time-honored principle that new arguments raised for the first time in a reply brief will not be considered").   This argument therefore is waived.   *See also Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

[49]   The original definition of "employee of the Government" does not shed any additional light on this question.   It reads:

"'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." Act of June 25, 1948, c. 646, 62 Stat. 982.

18

officer "of any federal agency" within the meaning of Section 2671.  As noted above, Section

2671 states that the term "federal agency" "includes the executive departments, the judicial and

legislative branches, the military departments, independent establishments of the United States,

and corporations primarily acting as instrumentalities or agencies of the United States."[50]

At the outset, it is apparent that this definition does not include the entire

executive branch.  Although Congress referred to "the executive departments," the fact that the

phrase is plural makes clear that Congress did not mean "the executive branch."  Congress knew

how to refer to an entire branch of government, as evidenced by the fact that the very next words

of the statute are "the judicial and legislative branches."[51]  The plain meaning of this language is

---

[50]

The 1948 version of the statute, which since has been amended, stated:

"[T]he term- 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States."  *Id.*

The singular "independent establishment" appears to have been a typographical error.  It was changed to "independent establishments" in the 1966 amendment.  *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307.

[51]

The Supreme Court drew the same inference with regard to a related section of the same statute, the Act of June 25, 1948.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) ("It is difficult to reconcile the Government's . . . reading with the fact that two of the Act's other exceptions specifically reference an 'act or omission.'  *See* 28 U.S.C. § 2680(a).  The Government's request that we read that phrase into the [FTCA's] foreign country exception, when it is clear that Congress knew how to specify 'act or omission' when it wanted to, runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" (quoting 2A Norman J. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th rev. ed. 2000))).

Although the original statute did not refer to the judicial and legislative branches, this fact does not offer any reason to conclude that Congress's use of "executive departments" in 1948 was intended as a reference to the executive branch as a whole.  The phrase "executive

19

that members of Congress, federal judges, and the staffs of both all are included in the term "federal agency."  But the entire executive branch is not.  Only those parts of the executive branch that fall within the other terms of the definition are included.

Here, the arguably relevant parts of the "federal agency" definition are "the executive departments" and "independent establishments."  The governing statutes do not define either term.  Although the government asserts that the president is covered by the Westfall Act, its five page memorandum in support of its motion neither cites to Section 2671 nor argues that either of the plausibly relevant terms applies to the president.[52]

Of course, one of the best ways to understand what Congress meant by "federal agency" is to examine how it used that term.  The definition applies to Sections 1346(b) and 2401(b), to which it refers specifically, as well as the remaining sections of the Act of June 25, 1948, which are codified as amended at 28 U.S.C. §§ 2672-2680.  Six of these eleven statutory sections use the term "federal agency."  And four of them[53] suggest strongly that the term applies to what one ordinarily thinks of as a federal agency or executive department: a unit of government housed within the executive branch, such as the Department of Defense, the Department of State, or the Central Intelligence Agency,[54] and not a single constitutional officer,

---

departments" did not mean "executive branch" in 1948.  And the fact that Congress added the phrase "judicial and legislative branches" immediately following "executive departments" demonstrates that it was aware of the difference and employed it intentionally. *See id.*

[52]   *See* Dkt. 3-1.

[53]   The other provisions, 28 U.S.C. §§ 2679 and 2680, shed no additional light on this issue.

[54]   *Cf. Executive Agency*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An executive-branch department whose activities are subject to statute and whose contracts are

20

the president.  The statutes likewise make clear in several ways that "federal agency" does not refer to the executive branch as a whole or to any particular unit of the executive branch of which the president is an "officer," if any such unit existed.

First, under 28 U.S.C. § 2672, "[t]he head of each Federal agency or his designee" is permitted, pursuant to any regulations promulgated by the Attorney General, to settle claims for money damages against the United States caused by "any employee of the agency while acting within the scope of his office or employment" provided that any award "in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his designee."  In the original 1948 statute, the dollar amount was just $1,000.[55]  It is difficult to imagine that Congress intended, without any explicit affirmative statement, to require the president to seek the approval of the Attorney General, one of his subordinates, before settling, on behalf of the federal government, claims against the United States.  And to suggest that the president could be an "officer" of a federal agency without being its head would contravene our constitutional design, which vests in the president "the 'executive power' – all of it."[56]  The far more natural reading is that when Congress referred to "executive departments" and "federal

---

subject to judicial review.  One example is the National Aeronautics and Space Agency.");
*see also, e.g.*, *Department of Defense*, *id.* ("An executive department of the federal government . . . ."); *Department of State*, *id.* ("The cabinet-level department of the federal government responsible for advising the President in formulating and executing foreign policy."); *Central Intelligence Agency*, *id.* ("An independent federal agency that compiles intelligence information, conducts counterintelligence activities outside the United States, and advises the President and the National Security Council on matters of foreign intelligence and national security.").

[55]

Act of June 25, 1948, c. 646, 62 Stat. 982.

[56]

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).

**SPA23**

21

agencies," it was referring to entities such as the Department of Defense and the Central Intelligence Agency.

Second, under 28 U.S.C. § 2673, Congress required that "[t]he head of each federal agency shall report annually to Congress all claims paid by it under section 2672 of this title, stating the name of each claimant, the amount claimed, the amount awarded, and a brief description of the claim." The government has presented no evidence that any president ever has authorized a payment on an FTCA claim or supplied such a report to Congress on behalf of an agency of which he is the head, if any such agency existed.

Third, 28 U.S.C. § 2675(a) provides that a plaintiff who wishes to sue under the FTCA "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This would make little sense if it were applied to the president. Certainly, the government has not suggested that an individual with a tort claim based on actions of the president first must present that claim to the president and obtain the president's final written denial before bringing suit under the FTCA. Similar inferences may be drawn from 28 U.S.C. § 2401(b), which sets a statute of limitations for presenting tort claims to an agency and filing them in court following the agency's determination.

Because the president is at the apex of the executive branch, many think of him, in a colloquial sense, as the "head" of many federal departments, agencies, and organizations. At the very least, one might imagine that he leads some agency at the core of the executive branch. The government has not attempted to identify any such agency in its papers, but the two most obvious candidates are the Executive Office of the President ("EOP") and the president's cabinet. But neither entity fits the bill. The head of the EOP, which is a network of agencies, is

22

the president's chief of staff.[57]   And even if one were to call the cabinet an "executive

department" or "independent establishment" – a dubious contention – the president himself is

not a member of the cabinet, although the vice president is.[58]

        Indeed, the basic civics lessons on the White House's website draw a clear

distinction between "the executive branch," "the executive departments," and "federal agencies."

Its page on "The Executive Branch" states that the Constitution vests in the president "[t]he

power of the Executive Branch" and that "[f]ifteen executive departments – each led by an

appointed member of the President's Cabinet – carry out the day-to-day administration of the

federal government."[59]   It states also that the "executive departments" "are joined in this [effort]

by other executive agencies such as the [Central Intelligence Agency] and Environmental

---

[57]

  THE EXECUTIVE BRANCH, WHITE HOUSE,
  https://www.whitehouse.gov/about-the-white-house/the-executive-branch/  ("The  EOP,
  overseen by the White House Chief of Staff, has traditionally been home to many of the
  President's closest advisers.").

[58]

  THE CABINET, WHITE HOUSE,
  https://www.whitehouse.gov/about-the-white-house/the-cabinet/  ("President  Donald  J.
  Trump's Cabinet includes Vice President Mike Pence and the heads of the 15 executive
  departments – the Secretaries of Agriculture, Commerce, Defense, Education, Energy,
  Health and Human Services, Homeland Security, Housing and Urban Development,
  Interior, Labor, State, Transportation, Treasury, and Veterans Affairs, and the Attorney
  General.  Additionally, the Cabinet includes the White House Chief of Staff and heads of
  the Environmental Protection Agency, Office of Management and Budget, United States
  Trade Representative, Central Intelligence Agency, Office of the Director of National
  Intelligence, and Small Business Administration.").

[59]

  THE EXECUTIVE BRANCH, WHITE HOUSE,
  https://www.whitehouse.gov/about-the-white-house/the-executive-branch/.

23

Protection Agency, the heads of which are not part of the Cabinet, but who are under full authority of the President."[60]

The phrase "independent establishments" does not rescue the government's argument. As Judge Sullivan once observed, "[a]lthough the Second Circuit has never definitively interpreted what 'independent establishment' means, it has suggested that independent establishments are defined by a 'substantial governmental role in funding and oversight.'"[61] The opinion to which he referred is *Johnson v. Smithsonian Institution*,[62] in which the Second Circuit cited favorably a D.C. Circuit opinion stating with respect to the Smithsonian Institution that "the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition."[63]

Although the FTCA does not define "independent establishments," Congress defined the term in 1966 when it enacted 5 U.S.C. § 104. That definition does not apply to the FTCA, but it is instructive as to how Congress understood the relevant language. It states:

"For the purpose of [Title 5], 'independent establishment' means—

"(1) an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an

---

[60]

    *Id.*

[61]

    *U.S. S.E.C. v. Syron*, 934 F. Supp. 2d 609, 623 (S.D.N.Y. 2013) (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999)).

[62]

    189 F.3d 180, 189 (2d Cir. 1999).

[63]

    *Id.* (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. The Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (panel opinion reprinted as appendix to opinion en banc)).

24

Executive department, military department, Government corporation, or part thereof, or part of an independent establishment; and

"(2) the Government Accountability Office."[64]

The D.C. Circuit has held that this definition does not apply to "the Executive Residence."[65]  And DOJ's Office of Legal Counsel – in two different presidential administrations – took the position that the definition does not apply to the Executive Office of the President.[66]

The government has identified no component of the United States of which the president is an officer or employee that satisfies these understandings of the phrase "independent establishments."   Moreover, and as will be discussed, the idea that the chief executive of the United States could be an officer or employee of an entity for which there is a "substantial governmental role in funding and oversight" makes little sense.

    *B. .*   *The Legislative History – The* Westfall *Decision and the Westfall Act*

There is still another strong reason supporting the view that president is not an "employee of the Government" within the meaning of the Westfall Act.  That reason is apparent from the context in which the statute was enacted.

---

[64]    5 U.S.C. § 104.

[65]    *See Haddon v. Walters*, 43 F.3d 1488, 1489 (D.C. Cir. 1995).

[66]    *See* Mem. for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 & n.15 (Sept. 17, 2009).  On two earlier occasions, however, the Office of Legal Counsel took the opposite view.  *See id.* at 15 n.14.

**SPA27**

25

In 1982, the Supreme Court decided in *Nixon v. Fitzgerald*[67] that the president "*is entitled to absolute immunity* from damages liability predicated on his official acts."[68]  So when the Supreme Court decided *Westfall* just six years later and held that "federal officials *are not absolutely immune* from state-law tort liability for all actions committed within the outer perimeter of their duties," it clearly was not referring to the president.[69]  When *Westfall* referred generally to "federal officials," it merely expanded the potential amenability to suit and liability of that more limited group of individuals.

Congress was well aware of this background when it passed the Westfall Act.  As the Supreme Court later wrote, "[w]hen Congress wrote the Westfall Act, which covers federal employees generally . . . , the legislators had one purpose firmly in mind."[70]  That purpose was "to 'return Federal employees to the status they held prior to the *Westfall* decision.'"[71]  There was no need to extend the protections of the Westfall Act to the president, whom the Supreme Court evidently recognized was not a "federal employee," for the very good reason that the president already had "absolute immunity from damages liability predicated on his official acts"

---

[67]

    457 U.S. 731 (1982).

[68]

    *Id.* at 749 (emphasis added).

[69]

    *Westfall*, 484 U.S. at 299 (emphasis added).

[70]

    *Gutierrez*, 515 U.S. at 425.  Senator Grassley, the principal sponsor of the bill, explained that the purpose of the Westfall Act was to solve the "immediate crisis of personal liability exposure for the entire Federal Work force," "particularly rank-and-file civil servants," occasioned by the *Westfall* decision.  134 Cong. Rec. 14265 (June 13, 1988) (Sen. Grassley).

[71]

    *Id.* (quoting H.R. Rep. No. 100-700, p. 4 (1988)).

26

by virtue of *Nixon v. Fitzgerald*.[72]

Unless one ignores *Nixon*, it is impossible to read *Westfall* as applying to the president.  Given that the "one purpose" of the Westfall Act was to "return Federal employees to the status they held prior to the *Westfall* decision," Congress presumptively was aware that neither Section 2671 nor the FTCA applied to the president.  It therefore had no reason to extend the Westfall Act to that office.

    *C.*    Franklin v. Massachusetts *and Lack of Clear Statement to Include the President*

The foregoing discussion provides numerous grounds for concluding that the president is not an "employee of the Government."  At best, the government might argue the statute is silent on the issue and, on that basis, it should be read expansively to include the president.

The Court rejects the view that the statute is silent on the matter, an argument that the government in any event has waived.  But even granting the point for the sake of argument, any statutory silence would not help the government.  Instead, it would provide an additional reason to conclude that the failure to mention the president should be understood as *excluding* him from the scope of the Westfall Act and Section 2671.

---

[72]

    Congress was well aware of this fact.  *See* H.R. Rep. 100-700, 100th Cong., 2d Sess. 5 (June 14, 1988) ("The United States is liable under the Federal Tort Claims Act. * * * 'under circumstances where the United States, if a private person, would be liable * * *' 28 U.S.C. 1346(b).  Thus ordinary tort defenses, such as contributory negligence, assumption of risk, estoppel, waiver, and res judicata, as applicable, continue to be available to the United States.  *The United States would also be able to continue to assert other functional immunities, such as Presidential and prosecutorial immunity, recognized in the constitution and judicial decisions*. (emphasis added)).

27

Under the Administrative Procedure Act ("APA"), plaintiffs have a cause of action to petition courts for review of "agency action."  In *Franklin v. Massachusetts*,[73] the Supreme Court considered whether "agency action" included the conduct of the president.  It held that "the President is not an agency within the meaning of the Act."[74]

*Franklin* does not resolve the question of whether the president is an employee of a federal agency under Section 2671.  But the following line of reasoning, portions of which are not limited to the APA, is directly on point:

> "The APA defines 'agency' as 'each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include – (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia.'  The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either.  Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA.  *We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion*.  *Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 748, n.27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).  As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."[75]

*Franklin* not only prohibits courts from presuming, absent "an express statement by Congress," that Congress "intended the President's performance of his statutory duties to be reviewed for abuse of discretion." By relying on *Nixon*, it makes clear that the same reasoning applies when a plaintiff sues the president for tort damages predicated on acts allegedly done in

---

[73]

505 U.S. 788 (1992).

[74]

*Id.* at 796.

[75]

*Id.* at 800-01 (emphasis added).

28

the scope of his employment – lawsuits that, by definition, challenge the president's performance of his job.  The government is asking this Court to do precisely what *Franklin* forbids: to take a statute that, at best from the government's standpoint, is silent on the question of whether it applies to the president – and in fact strongly appears to exclude him – and hold that Congress intended to authorize lawsuits by private plaintiffs requiring federal courts to review his official acts.  This would run afoul of *Franklin.*

One could attempt to distinguish *Franklin* on the ground that an FTCA claim is pled against the United States, while the president himself was among the defendants in *Franklin*.  But *Franklin* itself defeats that argument.  *Franklin*'s holding – like the APA itself – is agnostic to the identity of the defendant.  The relevant question is who committed the "agency action."[76]  In fact, the Supreme Court spent several pages emphasizing this point, because its ultimate holding that the president's actions were not reviewable shielded all the defendants from suit, including the Secretary of Commerce and other lower-level officials.[77]

---

[76]    *See, e.g.*, *id.* at 801 ("Although the President's *actions* may still be reviewed for constitutionality, we hold that *they* are not reviewable for abuse of discretion under the APA." (emphasis added)).

[77]    *See id.* at 796 ("The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'  5 U.S.C. § 704.  At issue in this case is whether the 'final' action that appellees have challenged is that of an 'agency' such that the federal courts may exercise their powers of review under the APA.  We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act.  Accordingly, there is no final agency action that may be reviewed under the APA standards."); *id.* at 799 ("Because it is the President's personal transmittal of the report to Congress that settles the apportionment, until he acts there is no determinate agency action to challenge.  The President, not the Secretary, takes the final action that affects the States."); *id.* at 800 ("As enacted, 2 U.S.C. § 2a provides that the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress.  That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not

**SPA31**

29

The same focus is present here.  The function of an FTCA lawsuit is to decide whether a government employee's official conduct was tortious and, if so, to compensate one injured by that conduct.  When the employee is the president, his actions are the ones under review.  It does not matter whether his name appears in the caption of the case.  Thus, as *Franklin*'s reliance on *Nixon* makes plain, the lack of "an express statement by Congress" indicating that the president's actions are reviewable through FTCA lawsuits is decisive.

One other point about *Franklin* deserves attention.  The outcome of that case was that the president's conduct was not subject to review in an APA suit.  Here the poles in some sense are reversed.  If the Court holds that the president's conduct cannot be challenged in tort suits under the FTCA, this case most likely will move forward, albeit against President Trump in his individual or personal capacity.  But that difference does not affect the result here.

To begin, nothing in *Franklin* forbids courts from reviewing the president's official actions.  The case provides instead a rule of statutory interpretation: that a court should not assume, absent a clear statement, that *Congress* authorized such review in a *federal statute*.  Here, the plaintiff's cause of action arises under *state common law*.  *Franklin* says nothing about such claims.  And in fact, it is the government, rather than Ms. Carroll, that is arguing that a federal statute (the FTCA) authorizes review of the president's official actions, albeit in a case in which it argues the United States should be substituted for the president.

Why, then, would holding that the FTCA authorizes review of the president's official actions most likely secure the dismissal of this lawsuit?  The reason is that the FTCA's

_____

merely ceremonial or ministerial.  Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an "agency" within the meaning of the Act.").

30

waiver of sovereign immunity contains an exception for libel and slander claims.[78]   For that
reason, and that reason alone, permitting FTCA lawsuits challenging the president's job
performance would close the door on this particular lawsuit.

But what would happen in cases involving the many types of torts for which the
United States *has* waived its sovereign immunity – cases in which no FTCA exception applies?
The answer, if the Court agrees with the government, is that those lawsuits could move forward
– the precise problem that *Franklin* sought to avoid.   In essence, the government is arguing that,
so long as none of the exceptions applies, the FTCA authorizes plaintiffs to sue the United States
for money damages when the president, acting within the scope of his employment, engages in
an "act or omission" that allegedly is negligent or wrongful under state law and causes them
injury.

The President of the United States wields the entire executive power of the
federal government.   Each day, he or she makes decisions that affect the lives of hundreds of
millions of Americans in countless ways.   It is difficult to fathom that Congress – without any
textual indication, and with considerable evidence to the contrary – intended for the FTCA to
authorize tort lawsuits that bring the president's official conduct into question.[79]   "Congress . . .

---

[78]   28 U.S.C. § 2680(h) (exempting from the FTCA claims arising out of, among other things,
libel and slander).

[79]   One might surmise that *Nixon* would prevent such an expansion of federal tort exposure.
It would not.   *Nixon* holds that *the president* is absolutely immune from suit with respect
to official conduct.   The defendant in an FTCA suit is the United States.   Moreover,
Congress could not have relied on this backstop when it passed the FTCA.   The FTCA and
its procedural provisions were enacted in the 1940s.   *Nixon* was decided in 1982.

Nor is it sufficient to say that other legal doctrines such as the need for proximate causation
might protect the government against liability in such cases.   Even if the government

31

does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."[80]

> D.      *Decisions of Other Courts*

The government relies on several cases in other circuits for the proposition that "elected officials" in general are government employees under the Westfall Act.  None of those cases so held.  And none supports the argument that the statute applies to the president.

*Council on American Islamic Relations v. Ballenger*,[81] a D.C. Circuit case discussed in more detail below on another issue, held that certain statements of a Member of Congress – not the president – had been made within the scope of his employment.  But the parties did not brief the question whether a Member of Congress (or any elected official) is an "employee of the Government," and the D.C. Circuit did not even mention the issue.[82]  *Wuterich v. Murtha*,[83] another D.C. Circuit decision concerning a Member of Congress that relied on *Ballenger*, similarly did not acknowledge the existence of the issue.

---

sometimes would prevail on these arguments, the cases would need to be defended at least to a certain point, and the president's conduct would be reviewed in the same manner as any other federal employee's.

[80]

 *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[81]

 444 F.3d 659 (D.C. Cir. 2006).

[82]

 *See* Brief of Appellant, *Council on Am. Islamic Relations v. Ballenger*, No. 05-5161 (D.C. Cir. Dec. 22, 2005); Brief for Appellee, *id.* (D.C. Cir. Feb. 3, 2006); Reply Brief of Appellant, *id.* (D.C. Cir. Feb. 16, 2006).

[83]

 562 F.3d 375 (D.C. Cir. 2009).

32

The Sixth Circuit held recently in *Does 1-10 v. Haaland*[84] that Members of Congress are "employees of the Government" under the Westfall Act.  But its conclusion turned on the fact that Section 2671 defines "federal agency" to include "the judicial and legislative branches" and thereby "expands sovereign immunity to the entire legislative branch."[85]  As discussed above, Section 2671's definition of "federal agency" does not use the phrase "executive branch."  It refers to "the executive *departments*, [and] the judicial and legislative *branches*."[86]

Like *Does 1-10*, two older decisions from the First and Fifth Circuits held that Members of Congress are employees under the Westfall Act.  Neither contains significant reasoning, and the few points they raise are particular to Congress.[87]  The government's remaining cases neither raise nor resolve the issue.[88]

---

[84]

No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020).

[85]

*Id.* at *4.

[86]

The Sixth Circuit relied also on the fact that the Supreme Court once held "that a Representative is 'an officer acting under the authority of the United States' for purposes of a criminal statute that punishes individuals who 'falsely assume or pretend to be an officer or employee acting under the authority of the United States.'"  *Id.* at *4 (quoting *Lamar v. United States*, 241 U.S. 103, 111-12 (1916)).  This holding has no relevancy when the alleged federal employee is the president.

[87]

*See Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (noting that "in 1988, Congress extended coverage under the FTCA to officers and employees of the legislative and judicial branches"); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998) (concluding that because no Members of Congress spoke up about their possible exclusion from the Westfall Act when they debated the statute, the Members presumably understood the statute to include them, and that holding otherwise would be irrational).

[88]

*See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017).

33

* * *

The president is not an "employee of the Government" under the Westfall Act.
The text of the Act of June 25, 1948 offers numerous strong indications that Congress did not
intend for this term to apply to him.  Congress clearly held that view when it passed the Westfall
Act in 1988.  And the *Franklin* decision forbids the Court from reading the president into the
FTCA without a clear statement from Congress.  Moreover, holding that the president is an
"employee of the Government" within the meaning of the Act could ignite a significant
expansion of federal tort exposure – without any evidence of a congressional intent to do so – by
authorizing lawsuits that could involve review of the president's job performance.

As the president is not an "employee of the Government" within the meaning of
the Westfall Act, the Attorney General's certification was erroneous.

II.      *Scope of Employment*

The holding that the president of the United States is not an "employee of the
Government," as Congress defined that term, is sufficient to resolve the government's motion.
But the parties have briefed also the question of whether, if the president is a government
employee, President Trump's allegedly defamatory statements were made within the scope of his
employment.  And it is appropriate to address that issue as well in order to avoid the possibility
of an unnecessary remand should a higher court disagree on the "employee" question.

A.      *Choice of Law*

Under Second Circuit law, the question of whether government employees are
acting within the scope of their employment for the purposes of the FTCA is resolved "in

34

accordance with the respondeat superior law of the jurisdiction where the tort occurred."[89]  The origin of this rule and its precise meaning are complicated issues that will be discussed momentarily.  For present purposes, it suffices to note that the rule is derived from a provision of the FTCA stating that the government's ultimate liability turns on "the law of the place where the act or omission occurred."[90]

The parties disagree over which jurisdiction's law applies to the scope of employment issue.  The government argues that because President Trump's allegedly defamatory statements were made in the District of Columbia, the Court should apply D.C. law.  Ms. Carroll, though not disputing that the statements were made in Washington, D.C., argues that the tort occurred where she was injured, which was New York.  Both parties, however, assert that the outcome would be the same under the *respondeat superior* doctrine of either jurisdiction.[91]

As to the question of where the tort occurred for FTCA purposes, the Court agrees with the government.  The governing case law refers to the place of the tort, not the place

---

[89]  *See, e.g.*, *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016); *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007).

*Respondeat superior* is a Latin phrase meaning "let the superior make answer."  The substance of the doctrine is that an employer is liable for any injuries wrongly inflicted by its employee within the scope of the employment.  *See Respondeat Superior*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019).  The doctrine applies also to principal and agent and to master and servant.

[90]  *See Fountain*, 838 F.3d at 135 (quoting 28 U.S.C. § 1346(b)(1)).

[91]  *See* Dkt. 16 at 31 n.18 (plaintiff arguing that "[a]lthough New York laws governs and supplies a more restrictive rule of respondeat superior liability than does D.C., the ultimate outcome would be the same under D.C. law"); Dkt. 21 at 13 (government arguing that "[t]he outcome under New York law would be no different")

of injury.  And the FTCA's reference to the "act or omission" makes the conclusion absolutely clear.

But the apparently simple question of which law applies is more nuanced than the parties acknowledge.  The complication turns on whether the Court must apply the D.C. *respondeat superior* doctrine or whether it instead must apply D.C.'s choice of law rules to determine which jurisdiction's *respondeat superior* doctrine applies.

At first blush, the FTCA appears to require the choice of law path.  The statute predicates the government's liability on "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[92]  This language seems to suggest that a federal court hearing an FTCA claim should apply the same law as would a local court in the relevant jurisdiction.  In *Richards v. United States*,[93] the Supreme Court took that view by holding that the FTCA "requires application of the whole law of the [jurisdiction] where the act or omission occurred," which includes that jurisdiction's choice of law rules.[94]

The issue in *Richards* was which jurisdiction's law applied to the question of liability – not whose *respondeat superior* doctrine applied.  But nothing in the opinion distinguished between those questions or suggests that they might require a different type of

---

[92]  28 U.S.C. § 1346(b)(1).

[93]  369 U.S. 1 (1962).

[94]  *Id.* at 11; *see also Winston v. United States*, 305 F.2d 253, 272 n.20 (2d Cir. 1962) (reading *Richards* as interpreting the FTCA "language to mean the 'whole law' of that place, including its conflict of law rules").

36

analysis.  And the FTCA provides no textual basis for distinguishing between them.  It would be odd to read the statute to require that courts apply the *respondeat superior* doctrine of the place where the act or omission occurred, but they must begin with that jurisdiction's choice of law rules when determining the law applicable to liability.  Moreover, treating the *respondeat superior* issue differently may violate *Richards*.  A scope of employment finding is a necessary component of liability in a suit against an employer.

However, a separate line of cases suggests that federal courts may have developed different rules for liability and scope of employment, seemingly without considering the possible inconsistency.  In *Williams v. United States*,[95] decided seven years before *Richards*, the Supreme Court reviewed a Ninth Circuit decision that applied federal law to the scope of employment question.  In a two sentence *per curiam* opinion, the Supreme Court vacated and remanded on the ground that "[t]his case is controlled by the California doctrine of respondent superior."[96] The Court did not set forth its reasoning.

There are two plausible explanations for that result.  One is that the Court, consistent with the reading it later gave in *Richards*, looked to the whole law of California, the place where the act or omission occurred, and found that California's choice of law rules required application California *respondeat superior* doctrine.  The other is that California's *respondeat superior* doctrine applied by virtue of the FTCA itself – *i.e.*, California was where the act or omission occurred.

---

[95]   350 U.S. 857 (1955) (per curiam).

[96]   *Id.*

37

All twelve of the geographic courts of appeals have said specifically that the

FTCA requires courts to apply "the *respondeat superior* law" of the jurisdiction where the act or

omission occurred.[97]  But all twelve of those courts have stated also that courts must apply "the

law" of the relevant jurisdiction without indicating whether they are referring to (a) that

jurisdiction's "whole law," which includes its choice of law rules, or (b) the jurisdiction's

---

[97]    *See, e.g.*, *Nasuti v. Scannell*, 906 F.2d 802, 806 n.1 (1st Cir. 1990) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of respondeat superior of the state in which the negligent or wrongful conduct occurred."); *Fountain*, 838 F.3d at 135 ("We interpret the FTCA's 'scope of employment' requirement in accordance with the respondeat superior law of the jurisdiction where the tort occurred."); *McSwain v. United States*, 422 F.2d 1086, 1088 (3d Cir. 1970) ("Such liability for the acts or omissions of a civilian or military federal employee is determined by the law of respondeat superior of the state in which the act or omission occurred."); *Ross v. Bryan*, 309 F.3d 830, 834 (4th Cir. 2002) ("To determine whether Bryan's acts were within the scope of his employment, we must apply Virginia respondeat superior law."); *Garza v. United States*, 809 F.2d 1170, 1171 (5th Cir. 1987) ("Whether military personnel are acting within the line of duty is determined by applicable state rules of respondeat superior."); *United States v. Taylor*, 236 F.2d 649, 653 (6th Cir. 1956) ("[T]he standard of governmental liability under the Federal Tort Claims Act is with respect to both military and civilian employees that imposed by the respondeat superior doctrine of the state."); *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992) ("[W]e have followed the Court's ruling in *Williams* and looked to state law of respondeat superior to determine whether a person was acting "in the line of duty."); *United States v. Farmer*, 400 F.2d 107, 109 (8th Cir. 1968) ("[T]he question of whether a Government employee is acting within the scope of his office or employment must be determined by the respondeat superior rule of the state where the negligent act occurred."); *United States v. McRoberts*, 409 F.2d 195, 197 (9th Cir. 1969) ("In resolving the sole issue before us, we must apply the respondeat superior principles of California, the state wherein the alleged tort was committed."); *Nichols v. United States*, 796 F.2d 361, 365 n.4 (10th Cir. 1986) ("Whether he was 'acting within the scope of his office or employment' at the time his act caused injury to Nichols is determined by reference to the respondeat superior law of the state in which the accident occurred."); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996) ("'Line of duty,' in turn, draws its meaning from the applicable state law of respondeat superior."); *Nelson v. United States*, 838 F.2d 1280, 1282 (D.C. Cir. 1988) ("'Line of duty,' in turn, takes its meaning from the applicable state law of respondeat superior.").

38

*respondeat superior* doctrine without regard to its choice of law rules.[98]  It is not crystal clear

which of these approaches is the law, although that fact that most of the decisions in both groups

cite *Williams* and none conducts a choice of law analysis strongly suggests that the former view

controls.  Nevertheless, this Court need not and does not resolve this issue.

    Although the *respondeat superior* doctrines of New York and the District of

Columbia are not identical, they dictate the same outcome on these facts, largely for the same

reasons.  As will appear, *respondeat superior* liability does not apply under the law of either

---

[98]

> *See, e.g.*, *Borrego v. United States*, 790 F.2d 5, 6 (1st Cir. 1986) ("Whether or not a particular act is within the scope of employment is a matter to be determined in accordance with the law of the place in which the alleged negligent act or omission occurred."); *Mandelbaum v. United States*, 251 F.2d 748, 750 (2d Cir. 1958) ("Under [the FTCA] the law applicable to this case is that of New York [where the act or omission occurred].  And subsequent to the decision below the Supreme Court [in *Williams*] has made it absolutely clear that . . . the state law controls."); *Matsko v. United States*, 372 F.3d 556, 559 (3d Cir. 2004) ("We assess whether Kotor was acting within the scope of his employment under the law of Pennsylvania, because that is where the incident occurred."); *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1156 (4th Cir. 1997) ("In answering [the scope of employment] question, we apply the law of the state where the conduct occurred."); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred."); *Arbour v. Jenkins*, 903 F.2d 416, 421-22 (6th Cir. 1990) ("Whether an employee's actions are within the scope of his employment for purposes of the Westfall Act is an issue that must be determined in accordance with the law of the state where the incident occurred."); *Guthrie v. United States*, 392 F.2d 858, 859 (7th Cir. 1968) (holding, because the act or omission occurred in Wisconsin, that "[t]he state law of Wisconsin is decisive on this issue"); *Brown v. Armstrong*, 949 F.2d 1007, 1012 n.7 (8th Cir. 1991) ("Under the FTCA, the law of the place of the alleged tort governs the scope-of-employment question."); *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) ("This phrase must be applied according to the law of the state where the alleged tort occurred."); *United States v. Hainline*, 315 F.2d 153, 155 (10th Cir. 1963) ("In actions brought under the Act, the scope of employment is determined by the state law."); *Green v. Hill*, 954 F.2d 694, 698 (11th Cir. 1992) ("The issue of whether an employee acted within the scope of his employment is determined by the law of the state where the alleged tort occurred."); *United States v. Baker*, 265 F.2d 123, 123 (D.C. Cir. 1959) (noting that "the law of Virginia, where the accident occurred, would control the question of 'scope of employment'").

jurisdiction unless the employer exercises, or has the ability to exercise, control over the employee's relevant actions.[99]   Because the control factor is dispositive and would reach an identical result under either D.C. or New York law, there is no true conflict between D.C. and New York law for the purpose of D.C.'s governmental interest analysis.   In fact, and as noted at the outset, both parties assert that the outcome would be the same under New York and D.C. law.   "Since there is 'no real conflict' . . . it is unnecessary for [the Court] to engage in the choice-of-law exercise . . . ."[100]

        B.     *Scope of Employment Under D.C. Law*

        "'*Respondeat superior* is a doctrine of vicarious liability' that imposes liability on employers for tortious and negligent 'acts of [their] employees committed within the scope of their employment.'"[101]   "Generally, 'whether an employee is acting within the scope of his

---

[99]

        *Compare Fountain*, 838 F.3d at 135 ("Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'" (brackets omitted) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 471 (1969))), *with Tolu v. Ayodeji*, 945 A.2d 596, 602 (D.C. 2008) ("The decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." (ellipsis omitted) (quoting *Safeway Stores v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)).

[100]

        *Barimany v. Urban Pace LLC*, 73 A.3d 964, 968 (D.C. 2013) (quoting *Taylor v. Canady*, 536 A.2d 93, 96 (D.C. 1988)).

[101]

        *Blair v. D.C.*, 190 A.3d 212, 225 (D.C. 2018) (quoting *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006)).

40

employment is a question of fact for the jury.'"[102]  However, the issue becomes a question of law "if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment."[103]

As to the legal question, the D.C. Court of Appeals has adopted Section 228 of the Restatement (Second) of Agency.[104]  In that court's words, D.C. law holds that "[i]n order to succeed under a *respondeat superior* theory of liability, [a party] must show [1] that a master-servant relationship existed between [the employer] and [its] workers or contractors, and

---

[102]

    *Id.* (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001)).

[103]

    *Id.* at 226 (quoting *Brown*, 782 A.2d at 757).

    Whether the provision about sending this issue to a jury applies here is unclear.  The reason for the lack of clarity is that the scope of employment issue arises as a threshold question about the Westfall Act's applicability, rather than as an element of the plaintiff's cause of action that might be resolved at trial.  For reasons explained below, however, the Court holds that the matter is decided appropriately as a question of law in this case.

[104]

    *See, e.g.*, *District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014); *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987); *Wuterich*, 562 F.3d at 383.  The full provision reads:

    "(1) Conduct of a servant is within the scope of employment if, but only if:

        (a) it is of the kind he is employed to perform;

        (b) it occurs substantially within the authorized time and space limits;

        (c) it is actuated, at least in part, by a purpose to serve the master, and

        (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

    "(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

[2] that the incident at issue occurred while the workers or contractors were acting within the scope of their employment."[105]  The Court begins with the master-servant issue.

### 1.    *Master-Servant Relationship*

"The terms 'master' and 'servant' are defined as follows:

> "(1) A master is a principal who employs an agent to perform service in his affairs *and who controls or has the right to control the physical conduct of the other* in the performance of the service.

> "(2) A servant is an agent employed by a master to perform service in his affairs *whose physical conduct in the performance of the service is controlled or is subject to the right to control* by the master."[106]

"The decisive test [for the existence of a master-servant relationship] is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."[107]  "[T]here is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no

---

[105]    *Tolu*, 945 A.2d at 601-02 (brackets omitted) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)); *see Moorehead v. D.C.*, 747 A.2d 138, 142 (D.C. 2000) (same).

[106]    *Safeway*, 448 A.2d at 856 n.6 (quoting RESTATEMENT (SECOND) OF AGENCY § 2) (emphasis added).

[107]    *Tolu*, 945 A.2d at 602 (ellipsis omitted) (quoting *Safeway*, 448 A.2d at 860); *cf.* RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c) (noting that "one is a servant only if, as to his physical conduct in the performance of the service, he is subject to the control or to the right to control of the master"); *id.* § 220(1) (similar).  The Supreme Court has made the same observation about the "control" element's centrality to one's status as a servant. *See Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003) ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.  The general definition of the term 'servant' in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master.").

control or right to control by the master."[108]   D.C. courts consider five factors in determining whether a master-servant relationship exists:  "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."[109]

"The President of the United States possesses an extraordinary power to speak to his fellow citizens . . . ."[110]  While he is a "public servant," holding that he is a "servant" whom a "master" "has the right to control and direct" when he speaks to reporters, or otherwise, would be absurd.

First, except for the payment of a salary, not one of the five factors relied upon by D.C. courts to determine whether a master-servant relationship exists is satisfied here.  The president is selected by the electoral college, not the executive branch or any part of it.  The government does not have the power to discharge him in any circumstances, unless one construes impeachment, or removal under the Twenty-Fifth Amendment, as forms of discharge. And while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not.[111]

---

108

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

109

*See, e.g.*, *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901, 906 (D.C. 2009) (quoting *Safeway*, 448 A.2d at 860); *Bostic v. D.C.*, 906 A.2d 327, 331 (D.C. 2006) (same) (quoting *Giles*, 487 A.2d at 611).

110

*Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018).

111

Although the government waived this argument, one could contend that the president cannot meaningfully perform his job without responding to public sexual assault allegations.

43

The "decisive" factor, however, is the fourth and most important: control. The president is the chief executive of the United States government. No one, inside or outside of the executive branch, has "the power to control the [president's] conduct."

That conclusion is found in the first sentence of the president's job description. Under Article II of the Constitution, "[t]he executive Power shall be vested in a President of the United States of America."[112]  As Justice Scalia explained in his famous dissent in *Morrison v. Olson*,[113] "this does not mean *some of* the executive power, but *all of* the executive power."[114] "The entire 'executive Power' belongs to the President alone."[115]

Not only does the president's sole possession of the executive power place him atop the chain of command of the executive branch. "Article II confers on the President 'the general administrative *control* of those executing the laws.'"[116]  "The buck stops with the President, in Harry Truman's famous phrase."[117]

---

Because this argument is better characterized as a question of whether the president acted within the scope of his employment, rather than a question of whether he is a "servant" under the "control" of a "master," the Court addresses this theory below.

[112] U.S. Const. Art. II, § 1, cl. 1.

[113] 487 U.S. 654 (1988).

[114] *Id.* at 705.

[115] *Seila*, 140 S. Ct. at 2197.

[116] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (emphasis added).

[117] *Id.*

44

To hold that someone else exercises control over the president would turn the Constitution on its head.  And it would subvert the requirement that the president "shall take Care that the Laws be faithfully executed."[118]  As explained recently by the Supreme Court:

> "The . . . constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections.  In that scheme, individual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision *and control* of the elected President.  Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'"[119]

Interpreting this authority, Justices Thomas and Kavanaugh have opined that components of the executive branch "that wield substantial power with no accountability to either the President or the people . . . 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'"[120]

As noted above, "there is no liability for the conduct of one who . . . is doing work as to which there is no control or right to control by the master."[121]  Such control is absent

---

[118]

U.S. Const. Art. II, § 3.

[119]

*Seila*, 140 S. Ct. at 2203 (quoting 1 Annals of Cong. 499 (J. Madison)); *see also, e.g.*, *Free Enter. Fund*, 561 U.S. at 514 ("Without [the] power [to remove and control subordinates], the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." (quoting The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)); *id.* at 492 ("As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, *overseeing*, and *controlling* those who execute the laws.'" (emphasis added) (quoting 1 Annals of Cong. 463 (J. Madison))).

[120]

*Seila*, 140 S. Ct. at 2212 (Thomas, *J.*, concurring in part) (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting)).

[121]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

45

whenever the president discharges his duties.  And it is non-existent when the president exercises his "extraordinary power to speak to his fellow citizens"[122] by addressing the press.  No one gives him permission to speak.  No one can require him to say, or not to say, anything at all.  No one has the authority to cut him off.  And the statements he makes, as well as the topics he discusses, are entirely of his own choosing.

These points are clearer still on the facts of this case.  No one even arguably directed or controlled President Trump when he commented on the plaintiff's accusation, which had nothing to do with the official business of government, that he raped her decades before he took office.  And no one had the ability to control him.

President Trump is not a "servant" controlled by a "master" within the meaning of the District of Columbia's scope of employment doctrine.  Thus, his allegedly defamatory statements were not "actuated, at least in part, by a purpose to further the master's business."[123] He was not acting within the scope of his employment when he made them, and the Attorney General's certification under the Westfall Act was erroneous.[124]

2.      *Scope of Employment Test*

The president is no one's servant.  But assume, for the sake of argument, that he were an employee of the United States whose master were something vaguely described as "the

---

[122]

*Trump*, 138 S. Ct. at 2417.

[123]

*Blair*, 190 A.3d at 225.

[124]

Because the Court concludes as a matter of law that President Trump is not a servant, it concludes also that no reasonable jury could find that his actions were done within the scope of his employment.

**SPA48**

46

public," which "controlled" him indirectly through its role in choosing the electoral college members[125] or in electing the Members of Congress who can impeach and remove him.  Even then, the Court would hold that President Trump was not acting within the scope of his employment when he made the allegedly defamatory statements.

Under D.C. law, "[t]o be within the scope of employment, the tortious activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this 'intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.'"[126]  The "at least in part" language demonstrates that the action need not "be wholly in furtherance of the employer's business."[127]  That said, a slight purpose to serve the master is not enough.  "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[128]  Finally, "the employee's 'tortious conduct must be foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments.'"[129]

---

[125]

This view is impossible to reconcile with the "control" element of D.C. law.  "The public" is not an employer, and it does not have the authority to control the president's performance of his job when he makes statements to reporters or otherwise.  Nor, because of the electoral college system, is the president directly elected by the public.  And while our system of checks and balances gives Congress (and the judiciary) certain powers that the president lacks, no branch of government "controls" another in anything resembling the same manner that an employer controls an employee.

[126]

*Blair*, 190 A.3d at 226 (quoting *Bamidele*, 103 A.3d at 525).

[127]

*Id.*

[128]

*See, e.g.*, *Bamidele*, 103 A.3d at 525 (quoting Restatement (Second) of Agency § 228(2)); *Brown*, 782 A.2d at 758 (same).

[129]

*Blair*, 190 A.3d at 226 (alteration omitted) (quoting *Bamidele*, 103 A.3d at 525).

47

At its core, the government's argument is that speaking to reporters is part of the president's job.  Thus, it argues, whenever the president speaks to reporters – no matter the topic – he is acting within the scope of his employment.  For this proposed rule, the government relies on the D.C. Circuit's *Ballenger* decision.  A discussion of *Ballenger* will be helpful to explaining why the Court is not persuaded.

The defendant in *Ballenger* was Rep. Cass Ballenger, a Member of Congress.  Ballenger's chief of staff gave an interview to a reporter who asked a question about Ballenger's recent separation from his wife.[130]  Ballenger later called the reporter "from his congressional office during regular business hours" and stated, among other things, that the separation was amicable and that his wife was uncomfortable living across the street from the plaintiff, an Islamic institution.[131]  The journalist reported this comment, and the plaintiff sued Ballenger for defamation.[132]

Shortly after the lawsuit was filed, the Department of Justice certified that Ballenger "acted within the scope of his employment as an employee of the United States when he made the allegedly defamatory statement."[133]  The district court agreed and dismissed the case under the FTCA's exemption for libel and slander claims.[134]

---

[130]   *Ballenger*, 444 F.3d at 661.

[131]   *Id.* at 662.

[132]   *Id.* at 663.

[133]   *Id.*

[134]   *Islamic Council on Am. Islamic Relations, Inc. v. Ballenger*, 366 F. Supp. 2d 28, 30 (D.D.C. 2005).

48

The D.C. Circuit affirmed.  Like the district court, it did not acknowledge the question of whether a Member of Congress is an "employee of the Government" pursuant to the Westfall Act or a "servant" under a master's control.  But it nonetheless found that Ballenger acted within the scope of his employment when he made the comment at issue.

The D.C. Circuit began by rejecting the plaintiff's argument "that Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform."[135] Instead, it reasoned that D.C. law and the Westfall Act "direct[] courts to look beyond alleged intentional torts themselves."[136]  Finding that the "'underlying dispute or controversy' was the phone call between Ballenger and [the reporter] discussing the marital separation," it held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'"[137]  The court did not explain its use of the word "authorized" nor offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters, much less to discuss his marital status with them.  Nor, when it reached the question of whether speaking to reporters is conduct "actuated, even in part, to serve *the master*," did the court offer any theory as to who is the "master" of a Member of Congress or who controls a Member's discussions with the press.[138]  The D.C. Circuit appears to have

---

[135] *Ballenger*, 444 F.3d at 664.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 665.  Although the court quoted this standard several times, its analysis failed to engage with it.

49

overlooked these requirements by focusing only on whether the "conduct was motivated – at least in part – by a legitimate desire to discharge his duty as a congressman."[139]

Even on the issues it addressed, *Ballenger*'s reasoning is wanting. Its explanation for why a Member of Congress acts within the scope of his employment is presented in the following paragraph:

> "[The plaintiff] resists this conclusion on two grounds. First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern. The circumstances of the conversation belie this suggestion. The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested in the separation. Given this level of public interest, we find CAIR's absolutist view at odds with reality. Moreover, it is telling that [the reporter] felt at liberty to ask [Ballenger's chief of staff] – rather than Ballenger himself – about the marital separation."[140]

There are two problems with this passage. The first is that it is unpersuasive. Gossip about a congressperson's marriage may very well be interesting to the public. But that fact does not transform it into the official business of the United States Congress. The job description of a congressperson does not include transparency about one's personal life.

In addition, *Ballenger* misstates D.C. law – and not only in the manner described above. A plaintiff is not required, as the court asserted, to show that the defendant's "statement was *purely* private, unrelated to any matter of public concern."[141] A real but insubstantial

---

[139]

> *Id.* This language tracks Section 228(1)(a) of the Restatement. But that is only one element of the definition of scope of employment. *See* RESTATEMENT (SECOND) OF AGENCY § 228(1) (listing four elements); *see also, e.g.*, *id.* § 228(1)(c) (requiring that the conduct be "actuated, at least in part, by a purpose to serve the master").

[140]

> *Ballenger*, 444 F.3d at 665.

[141]

> *Id.* (emphasis added).

50

purpose to serve the master is insufficient. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[142]

The implications of *Ballenger*'s holding also are troubling.  The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment.  Setting aside the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

*Ballenger* acknowledged this concern.  But it made no attempt to assuage it.  It noted merely that the case was limited to its facts.[143]

A subsequent panel of the D.C. Circuit did not accept the invitation to read *Ballenger* so narrowly.  In *Wuterich*, the court held that *Ballenger* controlled where a Member of Congress was sued for defamation based on his comments about the Iraq War.[144]  Unlike

---

[142]

> *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).  Although *Ballenger* includes this language when it quotes the entirety of Section 228, its analysis does not engage with it.

[143]

> *See Ballenger*, 444 F.3d at 666 ("This case, like every judicial decision, cannot be divorced from its facts.  To be sure, it involves a statement by a congressman to the press.  But our *ratio decidendi* necessarily depends on the context in which the statement was made.  *See* KARL LLEWELLYN, THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those 'who think that precedent produces or ever did produce a certainty that did not involve matters of judgment and of persuasion . . . simply do not know our system of precedent in which they live.').  We lack the power to render an opinion on any case or controversy not properly before us.").

[144]

> *Wuterich*, 562 F.3d at 384.

*Ballenger*, however, *Wuterich* considered the relationship between the congressperson's remarks and his official duties. It relied on the fact that "the underlying conduct – interviews with the media about the pressures on American troops in the ongoing Iraq war – is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress," particularly because he "was the Ranking Member of the Appropriations Committee's Subcommittee on Defense and had introduced legislation to withdraw American troops from Iraq."[145]

The Court declines to apply a *Ballenger*-like principle to the president on the facts of this case. Perhaps the president, were he in service of a "master," would act within the scope of his employment when he comments on matters having a non-negligible nexus to his official duties. But there is no basis for concluding that a D.C. court would ignore the nature and content of his statements and hold that anything he says is within the scope of his employment. A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office. And the public's reasons for being interested in these comments are different as well. The president's views on the former topics are interesting because they alert the public about what the government is up to. President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government.

---

[145] *Id.* at 384-85. These facts are irrelevant under *Ballenger*'s broader holding that essentially any comment a Member of Congress makes to the press is done within the scope of his or her employment. That said, *Wuterich* did not purport to narrow *Ballenger* or limit the case to its facts.

52

The government's best argument on this point is that President Trump's statements about Ms. Carroll were within the scope of his employment in that refuting her accusation furthered his ability to govern effectively because the accusation was reported widely and charged him with the commission of a serious crime. But there are at least three answers to that objection.

As an initial matter, the government first made the argument in its reply brief, thereby foreclosing the plaintiff from responding to it. As previously discussed, it thereby waived the argument as its counsel agreed in open court, as previously discussed.

Second, the Court would reject the argument even if it were not waived. While the government's position is not entirely without merit, it goes much too far. Accepting it would mean that a president is free defame anyone who criticizes his conduct or impugns his character – without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to their government employment, would undermine their ability to perform effectively while in office.

Finally, even if the president's comments here had some nexus to his official duties, that nexus would be too weak. As stated several times now, "'[c]onduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[146] That is the case here.

---

[146] *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

53

Beyond the District of Columbia precedent already discussed, support for this conclusion comes from the Supreme Court's decision in *Clinton v. Jones*.[147]  Much like in this case, a plaintiff sued the sitting president for defamation after she accused him of engaging in sexual misconduct before he took office.[148]  Her theory was that "various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred."[149]

As relevant here, the Supreme Court held that President Clinton was not absolutely immune from suit by virtue of his office where the claims against him were based on his "*unofficial* conduct."[150]  As to most of the plaintiff's claims, the Court explained, "it is perfectly clear that the alleged misconduct of [President Clinton] was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office."[151]  The one possible exception was the alleged defamatory comments that were made while he was in office.  The Court noted that the defamation claim "arguably may involve

---

[147]

520 U.S. 681 (1997).

[148]

*Id.* at 685-86; *see also Jones v. Clinton*, 72 F.3d 1354, 1357 (8th Cir. 1996) (1997) ("Her complaint also includes two supplemental state law claims, one against Mr. Clinton for intentional infliction of emotional distress and the other against both Mr. Clinton and Trooper Ferguson for defamation.").

[149]

*Clinton*, 520 U.S. at 685.

[150]

*Id.* at 694 (emphasis in original); *see also id.* at 695 ("As our opinions have made clear, immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." (citation and quotation marks omitted)).

[151]

*Id.* at 686.

**SPA56**

54

conduct within the outer perimeter of the President's official responsibilities."[152]   But because that issue was "not before [the Court]," it declined to consider whether the president's absolute immunity extended to these comments.[153]

Although both doctrines call for some assessment of whether the defendant was engaged in the performance of his job, the absolute immunity doctrine is different than D.C.'s scope of employment doctrine.   But as to the president's job description, *Clinton* suggests that a sitting president's comments about a sexual assault allegation fall somewhere between being outside the scope of his duties and "arguably . . . within [their] outer perimeter."   At least where D.C. law is concerned, conduct that is "too little actuated by a purpose to serve the master" does not suffice.[154]   It is difficult to see how conduct that at most is in the "outer perimeter" of the president's job duties could be actuated in any meaningful degree to serve his master, whomever that may be.

In this regard, the Court notes also that all of the remaining Westfall Act defamation decisions relied upon by the government are distinguished easily from this case – and not merely because each of them concerned a Member of Congress.   Although the Sixth Circuit's *Does 1-10* case involved a defamation claim against a Senator who commented "on an event of widespread public interest," the decision applied Kentucky's scope of employment

---

[152]

    *Id.*

[153]

    *Id.* at 686 n.3.

[154]

    *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

55

law.[155]  According to the Supreme Court of Kentucky decision relied upon by the Sixth Circuit,

Kentucky's doctrine is similar to the Restatement (Third) of Agency approach.[156]  While that

approach resembles in some ways Section 228 of the Restatement (Second) of Agency,[157] the

drafters intentionally omitted the "too little actuated" standard discussed above:

> "Under § 228(2), conduct is not within the scope of employment if it is 'too little
> actuated by a purpose to serve' the employer.  Under § 235, conduct is not within
> the scope of employment 'if it is done with no intention' to perform an authorized
> service or an incidental act.  These formulations are not entirely consistent; an act
> motivated by *some* purpose to serve the employer could still be '*too little
> actuated*' to be within the scope of employment.
>
> *In contrast*, under subsection (2) of [Section 7.07 of the Restatement (Third)], an
> employee's conduct is outside the scope of employment when it occurs within an
> independent course of conduct intended to serve *no purpose* of the employer."[158]

As explained, the "too little actuated" caveat is decisive on these facts to the extent that one

considers President Trump's comments to have been actuated in some small part to serve

whomever one believes to be his "master."  Thus, the Sixth Circuit's interpretation of Kentucky

law is of no moment here.

The government's remaining cases involve the laws of different jurisdictions or

Members of Congress who commented on matters related clearly to their job duties.  *Wuterich*

---

[155]

No. 19-6347, 2020 WL 5242402, at *2, 6.

[156]

*Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) ("Kentucky's approach . . . [focuses
on whether the servant's] purpose, however misguided, is wholly or in part to further the
master's business.").

[157]

A key difference is that the Restatement (Third) abandons the foreseeability element of the
Restatement (Second).  *See* RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006), cmt.

[158]

*Id.* (citation omitted, emphasis added).

56

involved D.C. law but concerned remarks that the D.C. Circuit found were "unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress."[159]  *Williams v. United States*[160] involved a Texas congressperson's comments "concerning the status of an appropriations bill to restore the Battleship Texas."[161]   And the case applied Texas's scope of employment doctrine, which differs from the Restatement (Second) approach.[162]  And *Operation Rescue National v. United States*[163] did not consider whether the defendant's comments were made within the scope of his employment because the issue was not raised on appeal.   The district court did consider that issue, but it did so under Massachusetts law where the defendant, a Senator, commented on a "bill, of which he was the prime sponsor, [that] was to be debated in the Senate the following day."[164]

President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office.  Neither the media reports nor the underlying allegations have any relationship to his official duties.   And even if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not

---

[159]   *Wuterich*, 562 F.3d at 384-85.

[160]   71 F.3d 502 (5th Cir. 1995).

[161]   *Id.* at 504, 506.

[162]   *See id.* at 506 (citing *Mata v. Andrews Transp., Inc.*, 900 S.W.2d 363, 366 (Tex. App. 1995)).

[163]   147 F.3d 68, 69 (1st Cir. 1998).

[164]   *Id.* at 68-69.

57

enough under the District of Columbia's scope of employment doctrine.

> C.     *Scope of Employment Under New York Law*

If the Court were to apply New York law, it would reach the same conclusion largely for the same reasons.

"Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'"[165]  "Whether an employee acted within the scope of employment is a fact-based inquiry."[166]

For all the reasons already outlined, any person or group that might be characterized as President Trump's employer neither controls, nor could control, his activities. And even if that were not so, the government's argument would fail also because the president's actions were not taken "in furtherance of the duties he owes to his employer," whoever or whatever that may be.

When applying the "in furtherance" requirement, New York courts "consider, among other factors,

---

[165]

> *Fountain*, 838 F.3d at 135 (brackets omitted) (quoting *Hamm*, 483 F.3d at 138 (quoting *Lundberg*, 25 N.Y.2d at 471)).

[166]

> *Rivera v. State*, 34 N.Y.3d 383, 90 (2019).  Although it is fact heavy, "the question may be resolved on summary judgment, particularly when the material facts are undisputed."  *Id.* This language arguably does not apply here because the scope of employment question arises as a threshold issue, rather than as a merits issue on summary judgment or even a Rule 12 motion.  But in either event, the issue is resolved appropriately by the Court because the material facts are not in dispute.

58

'the connection between the time, place and occasion for the act; the history of
the relationship between employer and employee as spelled out in actual practice;
whether the act is one commonly done by such an employee; the extent of
departure from normal methods of performance; and whether the specific act was
one that the employer could reasonably have anticipated' (i.e., whether it was
foreseeable)."[167]

Conduct "committed for wholly personal motives" is not done in furtherance of

any duties owed to the employer.[168]   And at least as a general matter, "New York courts

consistently have held that sexual misconduct and related tortious behavior arise from personal

motives and do not further an employer's business, even when committed within the

employment context."[169]   That said, "[i]nvoking respondeat superior both in defamation cases

and in sexual harassment cases is not unprecedented."[170]   As in all cases, "the determination of

whether a particular act was within the scope of the servant's employment is . . . heavily

dependent on factual considerations."[171]

As explained above, the undisputed facts demonstrate that President Trump was

not acting in furtherance of any duties owed to any arguable employer when he made the

statements at issue.   His comments concerned an alleged sexual assault that took place several

decades before he took office, and the allegations have no relationship to the official business of

---

[167]

*Rivera*, 34 N.Y.3d at 389-90 (2019) (quoting *Riviello v Waldron*, 47 N.Y.2d 297, 304
(1979)); *see also Fountain*, 838 F.3d at 138 (applying these factors to the "in furtherance"
inquiry).

[168]

*See, e.g.*, *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002).

[169]

*Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

[170]

*Rausman v. Baugh*, 682 N.Y.S.2d 42 (App. Div. 2d 1998).

[171]

*Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

**SPA61**

59

the United States.  To conclude otherwise would require the Court to adopt a view that virtually everything the president does is within the public interest by virtue of his office.  The government has provided no support for that theory, and the Court rejects it as too expansive.

*Conclusion*

The President of the United States is not an "employee of the Government" within the meaning of the relevant statutes.  Even if he were such an "employee," President Trump's allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment.  Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.

SO ORDERED.

Dated:        October 26, 2020

_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

E. JEAN CARROLL,                                  :
                                                  :
                              Plaintiff,          :     No. 20-cv-7311 (LAK)
                                                  :
            - v -                                 :     **ECF Case**
                                                  :
DONALD J. TRUMP, in his personal capacity,        :     **NOTICE OF APPEAL**
                                                  :
                              Defendant.          :
------------------------------------------------------------- x

      PLEASE TAKE NOTICE that President Donald J. Trump, by and through his

undersigned counsel, hereby appeals to the United States Court of Appeals for the Second

Circuit from the Opinion and Order of the Hon. Lewis A. Kaplan, U.S.D.J., entered October 27,

2020 (Dkt. 32), attached hereto as Exhibit A, denying the United States' Motion to Substitute the

United States as Defendant (Dkt. 3).

Dated: New York, New York
       November 25, 2020

                              Respectfully submitted,

                              KASOWITZ BENSON TORRES LLP

                              By:___*/s/ Marc E. Kasowitz*_____
                                 Marc E. Kasowitz
                                 Christine A. Montenegro
                                 Paul J. Burgo

                              1633 Broadway
                              New York, New York 10019
                              (212) 506-1700

                              *Attorneys for Defendant Donald J. Trump*

To:    All Counsel of Record (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                          Plaintiff,

           -against-                                              20-cv-7311 (LAK)

DONALD J. TRUMP,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Corrected)**

           Appearances:

                                    Roberta Kaplan
                                    Joshua Matz
                                    Shawn Crowley
                                    Matthew Craig
                                    Trevor Morrison
                                    Michael Ferrara
                                    KAPLAN HECKER & FINK LLP

                                    *Attorneys for Plaintiff*

                                    Alina Habba
                                    Michael T. Madaio
                                    HABBA MADAIO & ASSOCIATES LLP

                                    *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

           This is a defamation case brought by writer E. Jean Carroll against President Donald

2

Trump, as he then was, for statements Mr. Trump made in June 2019 shortly after Ms. Carroll

publicly accused him of sexual assault. In those statements, Mr. Trump denied Ms. Carroll's

accusation, stated that he "has no idea who this woman is," and suggested that she fabricated her

accusation for ulterior and improper purposes, including to increase sales of her then-forthcoming

book in which she discusses having been sexually assaulted by Mr. Trump and other men.

In a second and very closely related case ("*Carroll II*"), Ms. Carroll sued Mr. Trump

for the alleged sexual assault itself and for defamation based on a statement that Mr. Trump

published on his social media platform in October 2022 that was substantially similar to his June

2019 statements. That case was tried in April and May 2023. The jury unanimously found that Mr.

Trump had sexually abused Ms. Carroll and defamed her in his October 2022 statement.[1]  It awarded

Ms. Carroll a total of $5 million in compensatory and punitive damages: $2.02 million for her sexual

assault claim, and $2.98 million for her defamation claim.[2]

In this case ("*Carroll I*"), Ms. Carroll seeks damages and other relief for defamation

---

[1]
It found also that Ms. Carroll had not established that Mr. Trump "raped" her within the relevant definition of that term in the New York Penal Law.

[2]
The Court assumes familiarity with its prior decisions, which describe in detail the facts and procedural histories of both cases. Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); Dkt 145, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Doc. No. 22-cv-10016 (*Carroll II*), Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023).

Except where preceded by *"Carroll II"*, "Dkt" references are to the docket in this case.

3

for Mr. Trump's June 2019 statements only.[3]  The matter now is before me on  Mr. Trump's motion

for summary judgment dismissing the action on four grounds:

(1)     Mr. Trump is entitled to absolute presidential immunity

(2)     Mr. Trump's statements were not defamatory *per se* and Ms. Carroll cannot

establish special damages

(3)      the majority of Mr. Trump's statements were nonactionable opinion

(4)     Ms. Carroll consented to Mr. Trump's allegedly defamatory statements.[4]

He argues also that punitive damages in any case would be unwarranted on Ms. Carroll's defamation

claim. His arguments are without merit.


### Facts

*Mr. Trump's Allegedly Defamatory June 2019 Statements*

Ms. Carroll's accusation that Mr. Trump sexually assaulted her first became public

on June 21, 2019, when *New York* magazine published on the Internet an excerpt from her then-

forthcoming book in which Ms. Carroll described Mr. Trump's alleged assault of her, which she

referred to as "rape."  Over the next several hours and days, Mr. Trump issued three allegedly

---

[3]
    When Ms. Carroll brought this lawsuit in 2019, she presumably was foreclosed from suing
for sexual battery by New York's then-existing statute of limitations. As noted above, the
Adults Survivors Act enacted by New York in 2022 temporarily revived the ability to bring
such claims without regard to the otherwise applicable statute of limitations. She therefore
was permitted to bring that claim in her second lawsuit now referred to as *Carroll II*.

[4]
    For avoidance of confusion: In his memorandum, Mr. Trump argues what is identified as
ground four here before what is identified as ground three here. This opinion discusses Mr.
Trump's arguments in the sequence noted above.

4

defamatory statements in response to Ms. Carroll's accusation.

*Statement One*

Two hours and seventeen minutes after Ms. Carroll's accusation became public, Mr. Trump published this statement on Twitter[5]:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

> "Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

> "Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

> "False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

---

[5] Mr. Trump testified in his deposition that he provided the statement to his staff to give to the press. Dkt 135-3 (Def. Dep.) at 59:20-23.

5

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[6]

*Statement Two*

The next day, Mr. Trump made the following comments that were reported in the national press and published in a White House press release entitled "Remarks by President Trump Before Marine One Departure" issued on June 22, 2019:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

"[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

"[Reporter]: You were in a photograph with her.

"[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going

---

[6]

Dkt 157-1 (Pl. Amend. Compl.) at 15-16, ¶ 83.

On June 13, 2023, this Court granted Ms. Carroll's motion to amend her complaint. The amended complaint did not add any new claims or otherwise change the focus of her original complaint. Unless indicated otherwise, citations to Ms. Carroll's complaint are to the amended complaint.

6

on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

"And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

"New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

"It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

"You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

**SPA69**

7

"But here's a case, it's an absolute disgrace that she's allowed to do that."[7]


*Statement Three*

Finally, on June 24, 2019, Mr. Trump stated in an interview with the newspaper *The Hill*: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[8]


*Ms. Carroll's Defamation Claim*

Ms. Carroll initiated this lawsuit against Mr. Trump in November 2019 for defaming her in these statements. The case originally began in a state court in New York before being removed to this Court for reasons explained in the Court's previous decisions.[9]  Ms. Carroll alleges that:

"When [her] account [of the alleged assault] was published, Trump lashed out with a series of false and defamatory statements. He denied the sexual assault. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also

---

[7]     *Id.* at 18, ¶ 92.

[8]     *Id.* at 20, ¶ 98.

[9]     *E.g.*, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312, at *4 (S.D.N.Y. Feb. 15, 2023); *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022), *remanded in part*, 66 F.4th 91 (2d Cir. 2023).

8

deliberately implied that she had falsely accused other men of assault. For good measure, he insulted her physical appearance."[10]

The core of Ms. Carroll's defamation claim is that Mr. Trump lied in accusing her of fabricating her sexual assault allegation against him in order to increase sales of her book and for other improper purposes and that he thus caused Ms. Carroll professional and reputational harm as well as emotional pain and suffering.

*Mr. Trump's Answer*

In his formal answer to Ms. Carroll's complaint, which originally was filed in state court in February 2020, Mr. Trump raised nine affirmative defenses, including as relevant here that:

- "[t]he [c]omplaint fails to state a cause of action,"

- "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States,"

- "[t]he allegedly defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States,"

- "Plaintiff is not entitled to punitive damages as a matter of law,"

- "Plaintiff has not sufficiently alleged defamation *per se*," and

---

[10] Dkt 157-1 (Pl. Amend. Compl.) at 3, ¶ 11.

9

- "Plaintiff has failed to plead damages with the required specificity."[11]

Noticeably missing from this list is any mention of the absolute presidential immunity defense that Mr. Trump now asserts for the first time.[12]

### *Discussion*

*Legal Standard*

The standards for summary judgment are well established.  In brief:

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law.  . . . In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. . . . To grant the motion, the court must determine that there is no genuine issue of material fact to be tried. . . . The Supreme Court teaches that 'all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' . . .  It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the

---

[11]

Dkt 14-69 (Def. Answer).

[12]

Nor did Mr. Trump seek to add this defense to his answer when he moved to amend his answer in January 2022 to add an affirmative defense and counterclaim based on New York's "anti-SLAPP" law.  Dkt 63.

10

jury, not for the court on a motion for summary judgment.'"[13]

"A material fact is one that might 'affect the outcome of the suit under the governing law,' and a

dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [fact

finder] could return a verdict for the nonmoving party.'"[14]

*Ground One: Absolute Presidential Immunity*

In *Nixon v. Fitzgerald*,[15] the Supreme Court held that the President of the United

States is entitled to "absolute Presidential immunity from damages liability for acts within the 'outer

perimeter' of his official responsibility."[16]   Mr. Trump argues that the allegedly defamatory

statements in this case came within this "outer perimeter" because he made those statements "in

direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his

ability to effectively govern the nation."[17]

Before the Court even may address the merits of Mr. Trump's absolute immunity

defense, it must decide a threshold question: whether Mr. Trump is barred from raising this defense

---

[13]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (alterations in original) (citations omitted).

[14]   *Madison Nat. Life Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 462 F. App'x 102, 103–04 (2d Cir. 2012) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[15]   457 U.S. 731 (1982).

[16]   *Id.* at 756.

[17]   Dkt 109 (Def. Mem.) at 17.

**SPA73**

11

because he waived it by failing to raise it earlier. Mr. Trump does not dispute that, under the controlling rules of civil procedure, he waived the defense by failing to plead it as an affirmative defense in his answer.[18]  Instead, he contends that any such waiver can have no effect because absolute presidential immunity is an unwaivable obstacle to any court exercising subject matter jurisdiction over any claim within its ambit. In the alternative, if the Court determines that absolute presidential immunity can be waived, Mr. Trump argues that his motion for summary judgment should be construed as a motion for leave to amend his answer so that he can assert the absolute immunity defense.  Neither argument is persuasive.

*Absolute Presidential Immunity Can Be Waived*

Mr. Trump argues that "whether presidential immunity applies in this case is a non-waivable question of subject matter jurisdiction."[19]  His argument relies on the theory that absolute presidential immunity is non-waivable because it is different from absolute immunity available to judges and prosecutors – which decidedly is waivable – due to what he claims, mistakenly, is "its

---

[18]  In the table of contents to Mr. Trump's reply brief, the first argument heading reads: "Defendant did not waive his entitlement to presidential immunity."  Dkt 122 (Def. Reply Mem.) at i. However, that heading never reappears in his brief. Instead, the first heading of his argument section is "Presidential immunity cannot be waived," followed by his argument that Ms. Carroll's claim that he waived his absolute immunity defense by failing to raise it in his answer "is flawed in its premise" because absolute presidential immunity is not waivable. *Id.* at 1. In a recent letter, Mr. Trump again did not dispute that he waived the defense and instead wrote that he "unequivocally stated that absolute immunity is a non-waivable question of subject matter jurisdiction." Dkt 160 at 2. It accordingly is clear that Mr. Trump does not dispute that if absolute presidential immunity can be waived, he in fact waived it in this case.

[19]  Dkt 122 (Def. Reply Mem.) at 5.

12

unique rooting in the separation of powers doctrine."[20]

Absolute presidential immunity is no such anomaly. There is nothing so exceptional about absolute immunity available to a president that makes it non-waivable unlike other types of absolute immunity. For starters, "[m]ost immunities are affirmative defenses."[21]  Failure to assert an affirmative defense, including absolute immunity, in an answer or other responsive pleading results in waiver of that defense.[22]  Moreover, as the Supreme Court has stated, "[t]here is no

---

[20]

 *Id.* at 1.

[21]

 *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003). *See also San Filippo v. U.S. Tr. Co. of New York*, 737 F.2d 246, 252 (2d Cir. 1984) ("In their answer and amended answer, defendants asserted several affirmative defenses, including their absolute immunity from § 1983 liability for their grand jury testimony or prior discussions with the prosecutor.").

[22]

 As noted above, Mr. Trump's answer first was filed in a state court in New York before this case was removed to this Court. Assuming his answer was governed by New York's Civil Practice Law and Rules, he was required to plead absolute immunity as an affirmative defense in his answer or in a pre-answer motion.  N.Y. CPLR § 3018(b) ("A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading."); *Pitts v. State*, 166 A.D.3d 1505, 1506 (4th Dept. 2018) ("Defendant waived that affirmative defense [of governmental function immunity] inasmuch as defendant did not plead it in its amended answer.") (citing cases).

 The result would be the same if Mr. Trump's answer were governed by Federal Rule of Civil Procedure 8(c), which requires a party to "affirmatively state any . . . affirmative defense" in responding to a pleading. *E.g.*, 5 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1278 (4th ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by [Rule] 8(c) results in the waiver of that defense and its exclusion from the case.") (citing cases); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) ("Appellees mention an absolute immunity defense in passing, but that defense is considered waived since it only appears in a footnote. . . .  And we decline to overlook the waiver."); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) ("Absolute immunity is an affirmative defense that should be asserted in an answer."); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) ("It is well established that unless affirmatively pleaded, the defenses of qualified and absolute immunity are waived."); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994) ("[T]his

13

authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction."[23]   To prevail in his argument, Mr. Trump must demonstrate that absolute immunity available to a president deviates from these well-settled norms. He has not done so.

The focal point of Mr. Trump's reasoning is the foundation of absolute presidential immunity in separation of powers principles.  His argument goes: (1) absolute presidential immunity is grounded in the separation of powers doctrine, (2) "the separation of powers doctrine is a creature of Article III standing" and "Article III standing, in turn, is an issue of subject matter jurisdiction,"[24] and (3) absolute presidential immunity therefore is an unwaivable obstacle to the exercise of subject matter jurisdiction. His theory fails for two reasons. First, absolute presidential immunity is not the only type of absolute immunity that raises separation of powers concerns. Second, and more importantly, "separation of powers" is not a magic phrase that automatically transforms any issue it touches into an impediment to the exercise of subject matter jurisdiction. Indeed, a determination that absolute presidential immunity is an issue of subject matter jurisdiction would present its own separation of powers concerns and contravene many of the same principles that underpin absolute presidential immunity.

The Supreme Court in *Nixon v. Fitzgerald* determined that absolute presidential

---

[23]   Court has long held that both qualified and absolute immunity are affirmative defenses that must be pleaded."); *Cozzo v. Tangipahoa Par. Council--President Gov't*, 279 F.3d 273, 283 (5th Cir. 2002) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded.").

[24]   *Nevada v. Hicks*, 533 U.S. 353, 373 (2001). *See also Mordkofsky v. Calabresi*, 159 F. App'x 938, 939 (11th Cir. 2005) ("[J]udicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction.").

Dkt 122 (Def. Reply Mem.) at 3.

14

immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."[25]   In reaching its decision, the Court discussed common law precedents that recognized immunity for government officials, including absolute immunity for judges and prosecutors.[26]   These precedents, the Court noted, "have been guided by the Constitution, federal statutes, and history" and "at least in the absence of explicit constitutional or congressional guidance," they "have been informed by the common law."[27]   With respect to absolute presidential immunity, the Court explained:

> "Because the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure. Historical inquiry thus merges almost at its inception with the kind of 'public policy' analysis appropriately undertaken by a federal court. This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers."[28]

The heart of the separation of powers doctrine invoked in *Fitzgerald* is respect for the independence of the three branches of government. "In the often-quoted words of Justice Jackson: 'While the Constitution diffuses power the better to secure liberty, it also contemplates that practice

---

[25]
    457 U.S. at 749.

[26]
    *Id.* at 744-48.

[27]
    *Id.* at 747.

[28]
    *Id.* at 748.

15

will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'"[29]  Accordingly, one of the central bases justifying absolute *judicial* immunity is the need to protect the "independence without which no judiciary can be either respectable or useful."[30]  Absolute *prosecutorial* immunity, although perhaps a bit removed from the constitutional doctrine of separation of powers, similarly is rooted in the "concern that harassment by unfounded litigation" could "shade [a prosecutor's] decisions instead of exercising the independence of judgment required by his public trust."[31]  Given the overlaps in reasoning, it is unsurprising that the Court in *Fitzgerald* compared explicitly the absolute immunity it recognized for the president with that already recognized for judges and prosecutors.[32]

[29]
> *Morrison v. Olson*, 487 U.S. 654, 694 (1988) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J., concurring)).

[30]
> *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). *See also id.* ("If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away.").

[31]
> *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).

[32]
> 457 U.S. at 758 ("For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends."); *id.* at 751-52 ("As is the case with prosecutors and judges— for whom absolute immunity now is established—a President must concern himself with matters likely to 'arouse the most intense feelings.') (citation omitted). *See also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) ("We instead [[in *Fitzgerald*]] drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties" by the prospect of civil liability for official acts.") (quoting *Fitzgerald*, 457 U.S. at 751-752 & n.32).

> Perhaps aware of these comparisons, Mr. Trump does not argue specifically that absolute presidential immunity is distinct from absolute judicial and prosecutorial immunity by its foundation in separation-of-powers principles.  Instead, he cites a footnote in *Harlow v. Fitzgerald*, in which the Supreme Court stated that "the recognition of absolute immunity

**SPA78**

16

Moreover, the fact that presidential immunity is grounded in separation of powers principles does not convert it into a jurisdictional issue. Mr. Trump relies chiefly on two points in support of his argument to the contrary. Neither withstands analysis.

First, he quotes the following from *Fitzgerald*:

> "[O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . or to vindicate the public interest in an ongoing criminal prosecution . . . the exercise of jurisdiction has been held warranted. In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not."[33]

Mr. Trump's selected passage, however, omits the sentence preceding it, that "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."[34]   Even more to the point, "[j]urisdiction . . . is a word of many, too many,

---

for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." 457 U.S. 800, 811 n.17 (1982). *Harlow*, however, dealt with the scope of immunity available to aides and advisers of the President and held that presidential aides are entitled to qualified, rather than absolute, immunity.  It therefore is inapposite here.

[33]

Dkt 122 (Def. Reply Mem.) at 2 (alterations in original) (emphasis omitted) (quoting *Fitzgerald*, 457 U.S. at 754).

[34]

*Fitzgerald*, 457 U.S. at 753-54.

**SPA79**

17

meanings."[35]  And the Court in *Fitzgerald* did not use the word "jurisdiction" in reference to a federal court's fundamental ability to adjudicate a case on its merits. Indeed, it there specifically left unresolved the "the immunity question as it would arise if Congress expressly had created a damages action against the President of the United States."[36]  If the Court had understood presidential immunity as a restriction on a court's exercise of subject matter jurisdiction, there would have been no need for the Court to have left that question open. The possibility would have been foreclosed by the long-standing principle that Congress cannot expand the scope of federal courts' jurisdiction beyond what is permitted by Article III.[37]

This detail helps to underscore the confusion in Mr. Trump's second point that "the separation of powers doctrine is a creature of Article III standing."[38]  As the cases Mr. Trump quotes make clear, it is Article III standing that "is built on separation-of-powers principles," not *vice versa*.[39]  Therefore, although Article III standing of course is an issue of subject matter jurisdiction, it does not follow that the separation of powers doctrine in all circumstances is as well.  Mr. Trump's

---

[35]  *Wilkins v. United States*, 143 S. Ct. 870, 875 (2023) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006)).

[36]  *Fitzgerald*, 457 U.S. at 748 n.27.

[37]  *Marbury v. Madison*, 5 U.S. 137, 138 (1803); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 65 (1996); *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 66 (2d Cir. 2012) ("Neither we nor Congress may [expand the federal courts' subject matter jurisdiction], for the Constitution alone defines the outer limits of subject-matter jurisdiction.").

[38]  Dkt 122 (Def. Reply Mem.) at 3.

[39]  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

18

argument in this respect lacks logical coherence and plainly is frivolous.

More fundamentally, Mr. Trump's argument that absolute presidential immunity is jurisdictional runs afoul of many of the same principles on which the immunity is based. As the Supreme Court stated in *Clinton v. Jones*,[40] the "dominant concern [in *Fitzgerald*] was with the diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision."[41]  The Court was concerned with intruding on the president's scope of authority and ability to make decisions to govern effectively. It sought to protect the president's autonomy, not diminish it by denying the president the ability to choose whether or not to defend himself or herself in a civil lawsuit in federal court. As law professor Akhil Amar and former Acting Solicitor General Neal Katyal wrote:

> "[The president's] immunity is of course waivable . Surely the President in whatever spare time he has should be allowed to litigate civil damage actions — or to watch basketball for that matter — but he should not be legally obliged to do either. As a practical matter, politics may sometimes create strong pressure to litigate now — or, again, to watch a basketball game — but political pressure should not be confused with legal obligation. In a civil damage action in the early 1960s, then-President John Kennedy asserted litigation immunity under a statute. When that failed, he settled the case instead of asserting presidential immunity . . . ."[42]

---

[40]  520 U.S. 681 (1997).

[41]  *Id.* at 694 n.19.

[42]  Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 HARV. L. REV. 701, 726 n.53 (1995).

19

Yet the rule Mr. Trump advocates would remove this choice from the president. Under Mr. Trump's

approach, each time a president is sued in federal court, the court would be obligated to raise and

resolve the issue of absolute presidential immunity *sua sponte* and, if the defense applied, it would

be obligated to dismiss the case for want of subject matter jurisdiction *even if* the president wished

to litigate in that case. Such a requirement would contradict the results in many of the other civil

lawsuits filed against Mr. Trump for actions during his presidency, in at least one of which, as Ms.

Carroll points out, Mr. Trump agreed with the plaintiff that absolute presidential immunity was not

a "threshold issue[] that must be decided before reaching the merits."[43]  More importantly, it would

risk encroachment by the judiciary into the president's domain by eliminating the president's ability

to choose. There is no indication in *Fitzgerald* or in its progeny that absolute presidential immunity

ever was meant to be so patronizing.


*Leave to Amend Mr. Trump's Answer Is Not Warranted*

In the alternative, Mr. Trump argues that the Court should construe his motion for

summary judgment as a motion for leave to amend his answer to resurrect the previously waived

absolute presidential immunity defense. The standard governing this request is clear. Although Rule

---

[43]

*K&D, LLC v. Trump Old Post Off., LLC*, No. CV 17-731 (RJL), 2018 WL 6173449, at *3 n.2 (D. D.C. Nov. 26, 2018), *aff'd*, 951 F.3d 503 (D.C. Cir. 2020) (emphasis omitted).

There possibly is an argument that Mr. Trump is judicially estopped from taking the opposite position now in this case. *See Clark v. AII Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018) ("[T]he equitable doctrine of judicial estoppel . . . 'prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.'") (citation omitted).  Given that neither party has briefed this issue and it is unnecessary to my decision, I do not address it here.

20

15(a) provides that leave to amend "shall be freely given when justice so requires,"[44] "it is within the sound discretion of the district court to grant or deny leave to amend."[45]   "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[46]

Mr. Trump's request is denied on two independent grounds. First, it is denied on the ground that the proposed amendment would be futile. In the alternative, it is denied on the ground that Mr. Trump delayed unduly in raising his presidential immunity defense and granting his request would prejudice Ms. Carroll unfairly.

*Futility of Mr. Trump's Proposed Amendment*

A motion for leave to amend an answer to assert an affirmative defense may be denied as futile when the affirmative defense would be meritless.[47]   "In fact, it is unexceptional for federal courts to deny leave to amend on the basis of futility where the proposed amended pleading would not withstand a motion to dismiss."[48]

---

[44]  Fed. R. Civ. P. 15(a).

[45]  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted).

[46]  *Id.*

[47]  *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, 403 F. App'x 530, 532–33 (2d Cir.2010); *Fireman's Fund Ins. Co. v. Krohn*, No. 91-cv-3546 (PKL), 1993 WL 299268, at *3 (S.D.N.Y. Aug. 3, 1993) (citing cases).

[48]  *Carroll v. Trump*, 590 F. Supp. 3d 575, 579 (S.D.N.Y. 2022) (citing cases).

**SPA83**

21

As noted above, the president is entitled to absolute immunity from liability in civil damages lawsuits "for acts within the 'outer perimeter' of [the president's] official responsibility."[49] The expansive scope of this immunity is based on "the special nature of the President's constitutional office and functions," the president's "discretionary responsibilities in a broad variety of areas, many of them highly sensitive," and the "difficult[y] [in] determin[ing] which of the President's innumerable 'functions' encompass[] a particular action."[50]  Implicit in that statement of the scope of presidential immunity, however, is the acknowledgment that there indeed is an "outer perimeter" of the president's official duties, and that the president is not immune from liability for acts outside that perimeter. As the Supreme Court explained in *Jones*:

> "The principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct. . . .  As we explained in *Fitzgerald*, 'the sphere of protected action must be related closely to the immunity's justifying purposes.' . . . Because of the President's broad responsibilities, we recognized in that case an immunity from damages claims arising out of official acts extending to the 'outer perimeter of his authority.' . . . But we have never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity."
>
> "Moreover, when defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach. 'Frequently our

---

[49]  *Fitzgerald*, 457 U.S. at 756.

[50]  *Id*.

22

decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office.'. . . As our opinions have made clear, immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'"[51]

Mr. Trump argues that he is entitled to absolute presidential immunity because he "made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation."[52]  He states that:

> "As both the leader of the nation and head of the Executive Branch, [he] could not sit idly while a 'media frenzy' erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to 'maintain the continued trust and respect of [his] constituents' and to 'preserve his ability to carry out his [] responsibilities.' . . . Thus, it cannot be reasonably disputed that [Mr. Trump's] conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation."[53]

Mr. Trump accordingly contends that his responses to Ms. Carroll's accusation "fell squarely within

---

[51]     520 U.S. at 692–95 (emphasis in original) (citations omitted).

[52]     Dkt 109 (Def. Mem.) at 17.

[53]     *Id.* (citations omitted).

the 'outer perimeter' of [his] official duties as President."[54]

       The fatal flaw in Mr. Trump's reasoning is that he ignores the precise acts that are the subject of this lawsuit. For the sake of argument, the Court assumes that, when Mr. Trump responded to Ms. Carroll's sexual assault accusation, he was addressing a matter of public concern because the accusation "impugned his character and, in turn, threatened his ability to effectively govern the nation."[55] It accepts also, for the sake of argument, that the president's speech on a matter of public concern comes within the president's official responsibilities. These points, however, do not lead to the conclusion that Mr. Trump's statements in this case came within the outer perimeter of his official duties as president. As Judge Mehta thoughtfully wrote in another case where Mr. Trump asserted an absolute presidential immunity defense, an analysis with which this Court agrees:

       "[T]o say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: '[T]o construct an immunity from suit for unofficial acts

---

[54]

    *Id.* at 16.

[55]

    *Id.* at 17. *See Snyder v. Phelps,* 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'") (citations omitted).

grounded purely in the identity of [the President's] office is unsupported by precedent.'. . . And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: 'Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty.'. . . Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

"Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to 'punch' a protester 'in the face right now.' Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is blocking the legislation of running a child-trafficking operation. Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support. In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech. To be sure, these scenarios may seem far-fetched, but they illustrate an important point: blanket immunity cannot shield a President from suit merely because his words touch on

matters of public concern. *The context in which those words are spoken and what is said matter*."[56]

The conduct at issue here consists not only of what Mr. Trump did (*i.e.*, make public statements in response to Ms. Carroll's accusation) but also, and importantly, the *content* of his statements (*i.e.*, what he said in his statements). Mr. Trump did not merely deny Ms. Carroll's accusation of sexual assault. Instead, he accused Ms. Carroll of lying about him sexually assaulting her in order to increase sales of her book, gain publicity, and/or carry out a political agenda. Even assuming that the president's decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that the president's own personal attacks on his or her accuser equally fall within that boundary. Mr. Trump does not identify any connection between the allegedly defamatory content of his statements – that Ms. Carroll fabricated her sexual assault accusation and did so for financial and personal gain – to any official responsibility of the president. Nor can the Court think of any possible connection.

The justifying purposes of presidential immunity support this determination. The fundamental purpose of presidential immunity is to avoid "diversion of [the president's] energies" and "distract[ing] a President from his [or her] public duties" by subjecting the president to "concern with private lawsuits."[57] It is not a "get out of damages liability free" card that permits the president to say or do anything he or she desires even if that conduct is disconnected entirely from an official function. On the facts presented here, there is no concern that the president "would [be] subject ...

---

[56]

    *Thompson v. Trump*, 590 F. Supp. 3d 46, 79–80 (D. D.C. 2022) (emphasis added) (citations omitted).

[57]

    *Fitzgerald*, 457 U.S. at 751–53.

**SPA88**

26

to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose."[58]   The question of whether presidential immunity applies in this case turns not on an allegation that Mr. Trump acted unlawfully or made the statements with actual and common law malice, but on whether the act itself – accusing an individual who has charged the president with a personal wrongdoing of fabricating the charge for ulterior and improper purposes – is within the outer perimeter of the president's official responsibility.[59]   Subjecting the president to damages liability for making a personal attack that is unrelated to the president's official responsibilities would not threaten to distract the president from his or her official duties.

> *Undue Delay and Unfair Prejudice*

> Leave to amend is denied also on the basis of undue delay, dilatory motive, bad faith and/or prejudice to the opposing party.

>> "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith. . . . However, '*the longer the period of an unexplained delay, the less will be required of the*

[58]

*Id.* at 756.

[59]

Mr. Trump compares this case to *Barr v. Matteo*, 360 U.S. 564 (1959), where the Supreme Court determined that the director of a federal agency was protected by an absolute privilege in a libel action brought by former employees based on a press release in which the director announced his intention to suspend the employees. The Court stated that "[t]e fact that the action here taken was within the outer perimeter of [the director's] line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint."   *Id.* at 575.  The decision in that case makes no difference to the analysis here.  As noted above, the question of whether presidential immunity applies here does not require crediting Ms. Carroll's allegation of malice or any consideration of Mr. Trump's motives.  His accusation against Ms. Carroll, which forms the basis of Ms. Carroll's defamation claim, suffices to render his presidential immunity defense meritless.

*nonmoving party in terms of a showing of prejudice.*' . . . In determining what

constitutes 'prejudice,' we consider whether the assertion of the new claim would:

(I) require the opponent to expend significant additional resources to conduct

discovery and prepare for trial; (ii) significantly delay the resolution of the dispute;

or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction....

'Mere delay, however, absent a showing of bad faith or undue prejudice, does not

provide a basis for a district court to deny the right to amend.'"[60]

Mr. Trump's three-year delay in raising his presidential immunity defense, for which he offers no

explanation, coupled with the unfair prejudice that would result from an amendment for this purpose

to Ms. Carroll, warrant denial of leave to amend.

The Court has set forth in its prior opinions the record of Mr. Trump's efforts to delay

both this case and *Carroll II*.[61]  Those details need not be repeated here. It suffices for present

purposes to note that the Court denied Mr. Trump's prior request for leave to amend his answer in

January 2022.  Mr. Trump then sought leave to amend to assert an affirmative defense and

counterclaim based on New York's "anti-SLAPP" law and to argue that Ms. Carroll's defamation

---

[60]

    *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (emphasis added) (citations omitted).

[61]

    *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2960061 (S.D.N.Y. Apr. 17, 2023) (denying Mr. Trump's application for a month-long postponement of the trial of *Carroll II*); *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023) (denying Mr. Trump's offer to provide a DNA sample in exchange for production by Ms. Carroll of an undisclosed appendix to a report examining the DNA found on the dress Ms. Carroll wore when she was assaulted); *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) (denying Mr. Trump's motion to substitute the United States for him as the defendant and to stay the action); *Carroll v. Trump*, 590 F. Supp. 3d 575  (S.D.N.Y. 2022) (denying Mr. Trump's motion for leave to amend his answer).

claim is baseless and intended for harassment.  That motion was denied on two alternative grounds.

First, on the basis that the proposed amendment would be futile.  Second, on the additional ground

that Mr. Trump's motion was delayed unduly and made at least in part for a dilatory purpose. As the

Court explained:

> "[D]efendant's actions have been dilatory throughout the litigation. As [Ms.
> Carroll] aptly puts it, he 'has slow-rolled his defenses, asserting or inventing a new
> one each time his prior effort to delay the case fails. . . . Taken together, these actions
> [(the history of defendant's motions to stay and other litigation conduct)] demonstrate
> that defendant's litigation tactics have had a dilatory effect and, indeed, strongly
> suggest that he is acting out of a strong desire to delay any opportunity plaintiff may
> have to present her case against him."[62]

Since that decision was issued in March 2022, Mr. Trump's conduct both in this case and in *Carroll

II* – as discussed in detail in my prior decisions and incorporated herein by reference – only has

corroborated the Court's earlier hypothesis of his dilatory motive.

These facts perhaps would suffice on their own to deny Mr. Trump's request for leave

to amend. But the Court does not rely solely on them in denying the relief Mr. Trump seeks. The

unfair prejudice to Ms. Carroll if leave to amend were granted also is clear.

The effect of granting leave, and thus relieving Mr. Trump of his prior waiver, even

assuming his absolute immunity defense were meritorious, would be the dismissal of this case.  And,

to be sure, the dismissal, in and of itself, would not be *unfair* prejudice to Ms. Carroll because it

---

[62]

*Carroll*, 590 F. Supp. 3d at 588.

would reflect the fact that there was an insurmountable obstacle to her claim in the first place. But such a dismissal cannot be considered in isolation. Ms. Carroll now has litigated this case for more than three and a half years. She has completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before Court, the Second Circuit and the D.C. Court of Appeals, and devoted untold hours and resources to pursuing her claim. And that weighs very heavily in the analysis. For, if Mr. Trump's absolute immunity argument were valid, his failure to assert it at the outset of this lawsuit needlessly, unfairly, and inexcusably subjected Mr. Carroll to all of those burdens. The undue delay in asserting the defense thus was inherently and unfairly prejudicial even if this Court is mistaken in concluding that it is legally insufficient.

Finally, there is the one more consideration. If Mr. Trump were granted leave to amend and this Court were to reject his absolute immunity claim, the order doing so likely would be appealable. No doubt Mr. Trump would appeal. And an appeal likely would cause "significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings."[63] Were this Court's rejection of his defense upheld on appeal, those additional delays would further prejudice Ms. Carroll unfairly. She now is 79 years old and, as just mentioned, has been litigating this case for more than three and a half years. There is no basis to risk prolonging the resolution of this litigation further by permitting Mr. Trump to raise his absolute immunity defense now at the eleventh hour when he could have done so years ago.

For all these reasons, leave to amend would be unjustified.

---

[63]     Dkt 113 (Pl. Opp. Mem.) at 15.

*Ground Two: Defamatory Per Se*

Mr. Trump's remaining arguments concern the substance of his allegedly defamatory statements. First, he argues that his statements were not defamatory *per se*. As this Court stated in denying Mr. Trump's motion to dismiss Ms. Carroll's defamation claim in *Carroll II* on the same basis:

> "There are two categories of defamation under New York law: *libel*, for written statements, and *slander*, for spoken statements. Written statements actionable as libel include statements published on social media outlets and on the Internet....
>
> "A written statement is libelous *per se* if it '*tends* to disparage a person in the way of his [or her] office profession or trade.' A writing also is libelous *per se* if it 'tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her].' . . .
>
> "Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation of the higher standard applied to slander *per se* with the lower standard for libel *per se*. Mr. Trump argues that there are 'four narrowly defined categories of statements which are considered to be defamatory *per se*,' and that Ms. Carroll has failed to state a claim for defamation *per se* 'because it does not, on its face, defame [P]laintiff in her trade, business or profession,' one of the four categories. However, nearly every authority Mr. Trump cites, including the case identifying those four categories and the cases describing the category of injury in one's profession are slander *per se*, not libel, cases. Unlike a libelous *per se* statement, a slanderous *per*

*se* statement 'must be made with reference to a matter of significance and importance

for that purpose [(of defaming a person in his or her trade, business, or profession)],

rather than a more general reflection upon the plaintiff's character or qualities.'

Moreover, if a complaint fails to allege sufficient facts to state a claim for slander *per*

*se*, 'the plaintiff must show . . . that the statement complained of caused him or her

special harm" – generally "the loss of something having economic or pecuniary

value.' The more stringent standard for slander *per se* is grounded in sound logic:

'What gives the sting to the writing is its permanence of form. The spoken word

dissolves, but the written one abides and perpetuates the scandal.'"[64]

Much of the same analysis applies to Mr. Trump's argument with respect to his 2019

statements. Mr. Trump concedes that his June 21, 2019 statement, which he provided in written form

to his staff to distribute to the press, "can be considered under the libel per se standard."[65]  His other

two statements similarly sound in libel rather than slander. "Where a defamatory statement is oral,

but is expected by the speaker to be reduced to writing and published, and is subsequently

communicated in written form, such statement constitutes a libel."[66]  "A statement made to a person

known to be by the speaker to be a working newspaper reporter, for example, will be treated as libel,

---

[64]
    *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507, at *10-11 (S.D.N.Y. Jan. 13, 2023) (emphases and alterations in original).

[65]
    Dkt 122 (Def. Reply Mem.) at 9.

[66]
    *Park Knoll Assocs. v. Schmidt*, 89 A.D.2d 164, 168 (2d Dept. 1982), *rev'd on other grounds*, 59 N.Y.2d 205 (1983) (citing ROBERT D. SACK, LIBEL AND SLANDER AND RELATED PROBLEMS § 2:3, p. 44)); *see also Macineirghe v. Cnty. of Suffolk*, No. 13-cv-1512 (ADS)(SIL), 2015 WL 4459456, at *9 (E.D.N.Y. July 21, 2015).

provided the statement is thereafter communicated in written form."[67]  Mr. Trump made the other

two June 2019 statements to individuals he knew to be reporters. He does not argue that he did not

understand his remarks would be publicly reported in writing.[68]  All three of Mr. Trump's June 2019

statements therefore properly are assessed under the libel *per se* standard.

      Ms. Carroll adequately has alleged that Mr. Trump's statements are libelous *per se*.

As in his 2022 statement, in his 2019 statements – particularly in his first two statements issued on

June 21, 2019 and June 22, 2019, respectively – he accuses Ms. Carroll of making up a "totally false

accusation" "to sell a new book" and "for the sake of publicity." As the Court wrote previously:

> "Ms. Carroll is a 'writer, advice columnist, and journalist.' Honesty and
>
> credibility are critical to these professions, which rely heavily on the trust and
>
> confidence of their audiences. A writer who writes about his or her own experiences,
>
> as Ms. Carroll did, depends on his or her readers believing the writer, which they may
>
> be less inclined to if the writer is called dishonest. The October 12 statement – in
>
> addition to accusing Ms. Carroll of 'completely ma[king] up a story' about Mr.
>
> Trump – states that Ms. Carroll 'changed her story from beginning to end' during an
>
> interview 'where she was promoting a . . . book.' Drawing all reasonable inferences

---

[67]    ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:3 (4th ed. 2011).

[68]    Indeed, with respect to the June 22, 2019 statement that Mr. Trump made to reporters before boarding Marine One, when Mr. Trump was asked during his deposition whether it is "fair to say that when [he] made comments while [he was] president on [his] way to somewhere . . . on [his] way to boarding Air Force One or Marine One that a transcript would be created like this [(transcript of the June 22, 2019 statement)] and released by [his] press office," he responded "oftentimes."  Dkt 117-6 (Def. Dep.) at 64:4-10.

33

in favor of plaintiff, the October 12 statement on the whole can be construed as Ms.

Carroll falsely accusing Mr. Trump of rape in order to promote her book and increase

its sales. Based on the facts alleged in the complaint, Ms. Carroll has sufficiently

pleaded a claim of libel *per se* because the October 12 statement may have affected

her in her profession by 'imputing to [her] . . . fraud, dishonesty, [and/or] misconduct

. . . .'"[69]

Similarly, Mr. Trump's 2019 statements reasonably can be construed as tending to

disparage Ms. Carroll in the way of her profession and/or by exposing her to hatred, contempt or

aversion or inducing an evil or unsavory opinion of her in the minds of a substantial number of the

community. Mr. Trump's contention that the statements "do not reference Plaintiff's profession as

an advice columnist, nor do they touch upon Plaintiff's 'Ask E. Jean' column" is inapposite to the

libel *per se* standard, which requires no such specific references.[70]  Nor was Ms. Carroll required to

plead special damages because she has sufficiently pleaded the elements of a libel *per se* claim.  Mr.

Trump's second argument to dismiss Ms. Carroll's claim therefore is without merit.


*Ground Three: Nonactionable Opinion*

Related also to the substance of his allegedly defamatory statements, Mr. Trump

argues that "nearly all of the content contained in the statements are immaterial since they constitute

---

[69]

    *Carroll*, 2023 WL 185507, at *11 (emphases and alterations in original).

[70]

    Dkt 122 (Def. Reply Mem.) at 9.

34

protected opinion speech."[71]   Specifically, he contends that "aside from [his] repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation."[72]

Statements of opinion are not actionable as defamation "however unreasonable the opinion or vituperous the expressing of it may be."[73]   "While it is clear that expressions of opinion receive absolute constitutional protection . . . , determining whether a given statement expresses fact or opinion may be difficult. The question is one of law for the court and one which must be answered on the basis of what the average person hearing or reading the communication would take it to mean."[74]

The New York Court of Appeals has identified three factors relevant to determining whether an average person would understand a statement as conveying fact or opinion:

"'(1) [W]hether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to

---

[71]   Dkt 109 (Def. Mem.) at 30.

[72]   *Id.* at 33.

[73]   *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977).

[74]   *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986).

be opinion, not fact[.]'"

"The third factor 'lends both depth and difficulty to the analysis' . . . , and requires that the court consider the content of the communication as a whole, its tone and apparent purpose. Thus, we have adopted a holistic approach to this inquiry. Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.'"[75]

"The dispositive inquiry . . . is whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff."[76]

Mr. Trump has not addressed the first and third factors. In any event, both weigh against his position. Mr. Trump "used specific, easily understood language to communicate" that Ms. Carroll made up a false story about Mr. Trump sexually assaulting her to increase sales of her book, to get publicity, and/or for political reasons.[77]   Indeed, the third sentence of his June 21, 2019 statement makes plain his central message that "[s]he [(Ms. Carroll)] is trying to sell a new book – that should indicate her motivation." Considering each statement as a whole, there is nothing vague or ambiguous about the statements that would make it difficult for an average reader to appreciate

---

[75]

*Davis v. Boeheim*, 24 N.Y.3d 262, 269–70 (2014) (citations omitted).

[76]

*Id.* (alterations in original) (internal quotation marks and citation omitted).

[77]

*Id.* at 271.

36

their main point: that Ms. Carroll lied and her motives for lying.

The contexts in which the statements were made also convey that they were assertions of fact. The heading of the June 21, 2019 statement reads "Statement from President Donald J. Trump" and was prepared by Mr. Trump to distribute to the press. The June 22, and June 24, 2019 statements were made to reporters, the former expected by Mr. Trump to be transcribed and released by his press office and the latter made by Mr. Trump in the course of an exclusive interview with a newspaper focused on political coverage. Unlike other contexts that courts have determined tended to signal expressions of opinion, such as the Republican presidential primary debate or a character-limited post on Twitter,[78] the circumstances here indicate that Mr. Trump's apparent purpose was to state that Ms. Carroll falsely accused him of sexual assault for financial and/or personal gain as a matter of fact, not as a matter of his personal belief or opinion.

The only factor that Mr. Trump touches upon is the second, whether the statements are capable of being proven true or false. Mr. Trump argues that his statements are "no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false" and he "was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims."[79] Courts have determined that statements that an individual made a false accusation or lied for financial or for personal gain are capable of

---

[78]

   *Jacobus v. Trump*, 51 N.Y.S.3d 330, 342 (N.Y. Sup. Ct. 2017), *aff'd*, 156 A.D.3d 452 (1st Dept. 2017).

[79]

   Dkt 109 (Def. Mem.) at 33.

being proven true or false.[80]  Importantly, Mr. Trump did not use speculative language in stating Ms.

Carroll's motives for falsely accusing him of sexual assault. Instead, he stated "[s]hame on those

who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out

a political agenda" and "you can't do that for the sake of publicity."  In another portion of his June

21, 2019 statement, he wrote "[t]he world should know what's really going on" after requesting

anyone who "has information that the Democratic Party is working with Ms. Carroll" to notify Mr.

Trump and his staff. The specificity of Mr. Trump's statements makes clear that he was not merely

guessing or speculating as to Ms. Carroll's motive. Instead, he attributes to Ms. Carroll specific and

objectively verifiable motives for fabricating her sexual assault accusation.

       The cases Mr. Trump cites are inapposite. For example, "the loose and generalized

statement that [the plaintiffs who brought a sexual harassment lawsuit] 'do not want to work' or

'hold jobs' and simply 'want to make easy money' . . ."[81] and the statement "I think he wanted me

to divorce him,"[82] are a far cry from Mr. Trump's clear and definite statement that Ms. Carroll "is

---

[80]

      *E.g.*, *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225 n.4 (2d Cir. 1985) ("In *Edwards*, we distinguished the epithet 'liar' from the epithet 'paid liar.' We found that unlike calling someone a liar, charging someone with being a paid liar was an assertion of fact. We explained: '[T]o call the appellees, all of whom were university professors, paid liars clearly involves defamation that far exceeds the bounds of the prior controversy.... And, to say a scientist is paid to lie implies corruption, and not merely a poor opinion of his scientific integrity. Such a statement requires a factual basis....'") (alteration in original) (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977)); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382 (1977) ("The ordinary and average reader would likely understand the use of these words [(that the plaintiff is "probably corrupt")], in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions.").

[81]

      *Gentile v. Grand St. Med. Assocs.*, 79 A.D.3d 1351, 1353 (3d Dept. 2010).

[82]

      *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996).

trying to sell a new book–that should indicate her motivation," among other assertions he made. Although some courts have been reluctant to find statements concerning a "plaintiff's frame of mind and motivation" to be capable of being objectively verifiable,[83] whether or not that is so is a case-specific determination dependent on the specific statements at issue and the other factors relevant to this analysis. Here, although there perhaps was a subjective component to Mr. Trump's statements that Ms. Carroll was trying to increase sales of her book and gain publicity, in these circumstances, her "state of mind is a fact question [susceptible to proof] the same as any other fact."[84]

All three factors therefore weigh in favor of a determination that Mr. Trump's statements were factual assertions rather than expressions of opinion.[85]

---

[83]

    *E.g., Treppel v. Biovail Corp.*, No. 03-cv-3002 (PKL), 2004 WL 2339759, at \*14 (S.D.N.Y. Oct. 15, 2004), *on reconsideration*, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005); *Coleman v. Grand*, 523 F. Supp. 3d 244, 264 (E.D.N.Y. 2021).

    In *Immuno AG. v. Moor-Jankowski*, the New York Court of Appeals stated that "[s]peculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel." 74 N.Y.2d 548, 560 (1989). The court's judgment was vacated, 497 U.S. 1021 (1990), and that statement did not appear again in the court's opinion on remand. 77 N.Y.2d 235 (1991). Notably, the original opinion cited to *Rinaldi v. Holt* (cited above, *supra* n. 80). In *Rinaldi*, however, Judge Gabrielli wrote in his dissent: "[a]s the majority quite properly observes, the charge that plaintiff is 'probably corrupt' is a statement of fact and not an expression of opinion," and in a footnote to that statement, he wrote "[a] charge of corruption goes essentially to the motive behind an individual's acts. As one court has noted, '(t)he state of a man's mind is as much a fact as the state of his digestion' (*Edgington v. Fritzmaurice*, 29 Ch.D. 459, 483 (CA))." 42 N.Y.2d at 954 & n.1. It therefore is possible that some of the modern case law on whether a statement as to an individual's state of mind is objectively verifiable is based in part on a misconstruction of the precedents on this issue.

[84]

    *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 134 (2d Cir. 2009) (quoting *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 838 (2d Cir.1994) (Van Graafeiland, J., dissenting)).

[85]

    Neither party addresses specifically Mr. Trump's June 24, 2019 statement, in which he said only: "I'll say it with great respect: Number one, she's not my type. Number two, it never

*Ground Four: Consent*

       Mr. Trump contends also that Ms. Carroll's claim is barred because she consented to Mr. Trump's allegedly defamatory statements. Under New York law, "[c]onsent is a bar to a recovery for defamation under the general principle of *volenti non fit injuria* or, as it is sometimes put, the plaintiff's consent to the publication of the defamation confers an absolute immunity or an absolute privilege upon the defendant[.]."[86]  "Decisions of New York's intermediate appellate courts have established that the consent of the person defamed to the making of a defamatory statement bars that person from suing for the defamation, and that, in some circumstances, a person's intentional eliciting of a statement she expects will be defamatory can constitute her consent to the making of the statement."[87]  As the Second Circuit has stated:

       "The contours and purposes of the rule are somewhat illuminated by the Restatement (Second) of Torts (1977), which in defamation cases has been cited with approval by the highest court of New York. . . . Section 583 of the Restatement provides, 'Except as stated in § 584, the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for

---

happened. It never happened, OK?".  In her complaint, Ms. Carroll alleges that all three June 2019 statements were defamatory. However, as stated above, the crux of Ms. Carroll's defamation claim lies in Mr. Trump's statements that Ms. Carroll lied for financial and/or personal gain. Indeed, Mr. Trump appears to ground his argument that "the majority" of his statements are nonactionable opinion on the assumption that Ms. Carroll does not allege his "general repudiation of Plaintiff's allegations" in itself was defamatory. Dkt 109 (Def. Mem.) at 32. As the parties have not adequately addressed this point, the Court does  not now decide it.

[86]

    *Teichner v. Bellan*, 7 A.D.2d 247, 251 (4th Dept. 1959).

[87]

    *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015) (citing cases).

defamation.' Comment d to this Section says, 'It is not necessary that the other know

that the matter to the publication of which he consents is defamatory in character. It

is enough that . . . he has reason to know that it may be defamatory.' As an

illustration, the Restatement notes that a summarily discharged school teacher who

'demands that the reason for his dismissal be made public . . . has consented to the

publication [of the reason] though it turns out to be defamatory.' Restatement

(Second) of Torts § 583 cmt. d (1977)."[88]

The Reporter's Note to Section 583 of the Restatement provides that "[t]he plaintiff's consent is a

defense even though he procures the publication for the purpose of decoying the defendant into a

lawsuit."[89]  The Restatement states also that:

> "[c]onsent means that the person concerned *is in fact willing* for the conduct
>
> of another to occur. Normally this willingness is manifested directly to the other by
>
> words or acts that are intended to indicate that it exists. It need not, however, be so
>
> manifested by words or by affirmative action. It may equally be manifested by silence
>
> or inaction, if the circumstances or other evidence indicate that the silence or inaction
>
> is intended to give consent. Even without a manifestation, consent may be proved by
>
> any competent evidence to exist in fact, and when so proved it is as effective as if
>
> manifested."[90]

---

[88]

    *Id.* (alteration in original) (citations omitted).

[89]

    WILLIAM L. PROSSER AND JOHN W. WADE, RESTATEMENT (SECOND) OF TORTS § 583 (1977).

[90]

    *Id.*  § 892, Comment b (1979) (emphasis added).

Mr. Trump argues that Ms. Carroll consented to Mr. Trump's allegedly defamatory remarks because she (1) "purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible" and (2) "waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States," leaving him "with no choice but to defend himself against th[e] heinous allegations."[91]  Neither of these points demonstrates that Ms. Carroll had any reason to expect Mr. Trump to make statements that would be defamatory. Indeed, Mr. Trump's argument amounts to suggesting that any time an individual comes forward with an accusation of wrongdoing against a public official, that person thereby consents to the official stating anything he or she wishes in response, no matter how calumnious. As Ms. Carroll aptly states, "[w]hen a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response."[92]

The only evidence that Ms. Carroll possibly "had reason to anticipate that [Mr. Trump's] response [to her accusation] might be a defamatory one"[93] – which Mr. Trump entirely ignores – comes from her own words in the excerpt of her book published in *New York* Magazine:

> "*Why haven't I 'come forward' before now?*
>
> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the 15 women who've come forward with credible stories about how the man [(Mr. Trump)] grabbed, badgered, belittled,

---

[91]    Dkt 109 (Def. Mem.) at 29-30.

[92]    Dkt 113 (Pl. Opp. Mem.) at 31.

[93]    *Handlin v. Burkhart*, 220 A.D.2d 559, 559 (2d Dept. 1995).

mauled, molested, and assaulted them, only to see the man turn it around, deny,

threaten, and attack them, never sounded like much fun. Also, I am a coward."[94]

It nevertheless fails to establish consent. First, as observed by another court in this circuit, "[a]

review of case law indicates that the type of consent accepted as a complete[] defense to a

defamation action is *specific* consent, typically initiated by the plaintiff, which clearly indicates that

the plaintiff was aware of and agreed to the possibility that defamatory statements might be

published."[95]  Ms. Carroll's generalized concern that she might be subject to the same attacks that

other women, as she stated, have experienced after coming forward with their accusations against

Mr. Trump does not demonstrate her awareness of and agreement to the possibility that Mr. Trump

might defame her in response to her specific accusation of sexual assault and rape.

Second, there is no evidence to suggest that Ms. Carroll had reason to know the type

or content of a public statement, if any, Mr. Trump might make in response to her accusation, let

alone that she agreed to it. "Implicit in the concept of consent is the conception that the consenting

party have the power to control the publication. Thus, there can be no finding of consent where, as

here, there is no effective control over the dissemination of the defamatory material."[96]  Indeed, when

asked in her deposition how she expected Mr. Trump would react to her sexual assault accusation,

---

[94]
 E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump -assault-e-jean-carroll-other-hideous-men.html.

[95]
 *McNamee v. Clemens*, 762 F. Supp. 2d 584, 604–05 (E.D.N.Y. 2011) (emphasis added) (citing cases).

[96]
 *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 104 (E.D.N.Y. 1997).

43

Ms. Carroll testified that:

> "I didn't think he would deny it.  I thought he would just say it didn't happen
> that way.  She agreed to it or it was consensual sex. . . . I just was shocked that he
> absolutely denied it because he was there and he denied it. That's what gets me every
> time. He was there, he denied it.[97]

She testified also that she "ha[s] no idea" if she would have sued Mr. Trump if he had instead said
that it was consensual sex because "it would have been him saying yeah, it happened and then we
could have disagreed and then I could have vehemently said no, I did not consent."[98]

Drawing all factual inferences in favor of Ms. Carroll, as the Court must on this
motion for summary judgment, Ms. Carroll's testimony makes clear that any generalized concern
Ms. Carroll harbored based on Mr. Trump's "den[ials], threat[s], and attack[s]" against his other
accusers did not translate to her consenting to the possibility the same would occur with her.[99]

*Punitive Damages*

Lastly, Mr. Trump argues that Ms. Carroll's punitive damages claim should be
dismissed because she cannot demonstrate that Mr. Trump acted with common law malice.

"Punitive damages may only be assessed under New York law if the plaintiff has

---

[97]

Dkt 116-1 (Pl. Dep.) at 166:2-6, 167:3-7.

[98]

*Id.* at 166:9-15.

[99]

In the alternative, there at least is a genuine issue of material fact based on the evidence as
to whether Ms. Carroll consented to Mr. Trump's allegedly defamatory statements,
precluding dismissal as a matter of law on summary judgment.

44

established common law malice in addition to the other elements of libel. . . . To do so, plaintiffs must prove by a preponderance of the evidence that the libelous statements were made out of 'hatred, ill will, [or] spite.'"[100]  The Appellate Division, First Department, one of New York's intermediate appellate courts, has "held that a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was 'the one and only cause for the publication.'"[101] "Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote."[102]

Mr. Trump contends that his "statements could not have been 'motivated by a desire to injure plaintiff'" because "they were strictly made in Defendant's own defense."[103]  His argument merely presents his characterization of his own conduct, which of course is favorable to him. He fails

---

[100]

*Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 184 (2d Cir. 2000).

[101]

 *Morsette v. "The Final Call"*, 309 A.D.2d 249, 255 (1st Dept. 2003) (emphasis in original) (citation omitted).

[102]

*Celle*, 209 F.3d at 185.

[103]

Dkt 109 (Def. Mem.) at 34 (quoting *Morsette*, 309 A.D. at 255).

In passing, Mr. Trump raises also the point that "[i]ndeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity." *Id.* at 34 (citing cases).  First, his argument arguably has been waived because it was not raised in his answer and is "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013). In any event, any such claim of a qualified privilege – as with his main argument against punitive damages – depends on weighing the evidence of Mr. Trump's motives for making the allegedly defamatory statements.

45

to address any of the relevant evidence, including, for example, his deposition testimony with respect to the circumstances in which he made the statements and whether he ever read the *New York* magazine article or Ms. Carroll's book that contain her sexual assault accusation.

Furthermore, it is relevant – although not dispositive – that the jury in *Carroll II* in fact awarded punitive damages to Ms. Carroll  for her defamation claim for Mr. Trump's 2022 statement, which as discussed above substantially is similar to Mr. Trump's statements in this case. To do so, the jury was required to find and did find that Ms. Carroll proved (1) Mr. Trump knew it was false or acted in reckless disregard of its truth or falsity when he made the statement accusing Ms. Carroll of lying about her sexual assault accusation to promote her book (actual malice) and (2) Mr. Trump made the statement with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights (common law malice). This outcome undermines Mr. Trump's argument that the same result is impossible in this closely related case.

In all the circumstances, Mr. Trump has failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied.

46

*Conclusion*

For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied.

SO ORDERED.

Dated:        June 29, 2023

Corrected:   July 5, 2023

_____

Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    1:20-cv-7311-LAK-JLC

                        *Plaintiff*,

            v.                                      **<u>NOTICE OF APPEAL</u>**

DONALD J. TRUMP, in his personal capacity,

                        *Defendant*,
-----------------------------------------------------------X

        Notice is hereby given that the Defendant, Donald J. Trump, appeals to the United States

Court of Appeals for the Second Circuit from the Memorandum Opinion (Corrected) of the Hon.

Lewis A. Kaplan. U.S.D.J., entered July 5, 2023 (Dkt. 173), attached hereto as Exhibit A, denying

Defendant's Motion for Summary Judgment (Dkt. 107).


Dated: New York, New York              HABBA MADAIO & ASSOCIATES LLP
        July 19, 2023

                                       _____
                                       Michael T. Madaio, Esq.
                                       1430 US Highway 206, Suite 240
                                       Bedminster, New Jersey 07921
                                                    -and-
                                       112 West 34th Street, 17th & 18th Floors
                                       New York, New York 10120
                                       mmadaio@habbalaw.com
                                       Telephone: (908) 869-1188
                                       Facsimile: (908) 450-1881


To:     All Counsel of Record (via ECF)

Case 23-1045, Document 91, 10/02/2023, 3576580, Page112 of 136

**SPA110**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 2 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 1 of 24

USDC ____
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-7-2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                    Plaintiff,

        -against-                                      20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OPINION GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM AND CERTAIN PURPORTED AFFIRMATIVE DEFENSES

        Appearances:

                    Roberta Kaplan
                    Joshua Matz
                    Shawn Crowley
                    Matthew Craig
                    Trevor Morrison
                    Michael Ferrara
                    KAPLAN HECKER & FINK LLP

                    *Attorneys for Plaintiff*

                    Alina Habba
                    Michael T. Madaio
                    HABBA MADAIO & ASSOCIATES LLP

                    *Attorneys for Defendant*

Case 23-1045, Document 91, 10/02/2023, 3576580, Page113 of 136

**SPA111**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 3 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 2 of 24

2

LEWIS A. KAPLAN, *District Judge.*

      This is a defamation case against Donald Trump brought by writer E. Jean Carroll for certain statements Mr. Trump made in 2019, while he was President, in response to Ms. Carroll's public accusation that he sexually assaulted ("raped") her in the mid 1990s. In a closely related second case ("*Carroll II*"), Ms. Carroll brought a defamation claim for Mr. Trump's comparable 2022 statement as well as a sexual battery claim pursuant to the Adult Survivors Act ("ASA"). The battery claim became permissible as a result of the ASA, a new law enacted by New York in 2022, which created a one-year period within which persons who were subjected as adults to conduct that would have constituted a sex offense under the New York Penal Law could sue their alleged assaulters for damages even if their civil claims otherwise would have been expired.

      *Carroll II* was tried in this Court in April and May 2023. Ms. Carroll testified that Mr. Trump assaulted her in the dressing room of a New York department store in what most likely was the spring of 1996 by, among other things, forcibly penetrating her vagina with his fingers and with his penis. The essence of her account was corroborated by two "outcry" witnesses in whom she had confided shortly after the attack and six other fact witnesses. Mr. Trump relied exclusively on attempting to discredit Ms. Carroll's proof and on portions of his deposition testimony that came in on Ms. Carroll's case. He did not testify in person, attend the trial, or present any defense evidence.

      The jury's unanimous verdict was almost entirely in favor of Ms. Carroll. It found that Mr. Trump "sexually abused" Ms. Carroll, which is defined in the New York Penal Law as sexual contact by forcible compulsion and is a felony punishable by a term of imprisonment and registration as a sex offender. It determined also that Mr. Trump defamed Ms. Carroll in his 2022 statement. It awarded Ms. Carroll $2.02 million in compensatory and punitive damages on her sexual

Case 23-1045, Document 91, 10/02/2023, 3576580, Page114 of 136

**SPA112**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 4 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 3 of 24

3

battery claim and $2.98 million in compensatory and punitive damages on her defamation claim.

The only issue on which the jury did not find in Ms. Carroll's favor was whether she proved that Mr. Trump "raped" her within the narrow, technical meaning of that term in the New York Penal Law. The jury in *Carroll II* was instructed that it could find that Mr. Trump "raped" Ms. Carroll only if it found that he forcibly penetrated Ms. Carroll's vagina *with his penis*. It could not find that he "raped" her if it determined that Mr. Trump forcibly penetrated Ms. Carroll's private sexual parts with his fingers – which commonly is considered "rape" in other contexts – because the New York Penal Law definition of rape is limited to penile penetration. As the Court explained in its recent decision denying Mr. Trump's motion for a new trial on damages and other relief in *Carroll II*, based on all of the evidence at trial and the jury's verdict as a whole, the jury's finding that Mr. Trump "sexually abused" Ms. Carroll implicitly determined that he forcibly penetrated her digitally – in other words, that Mr. Trump in fact did "rape" Ms. Carroll as that term commonly is used and understood in contexts outside of the New York Penal Law.

The day after the jury's verdict, Ms. Carroll and her counsel gave interviews with the media where they discussed the trial and Ms. Carroll's reaction to the verdict. On June 27, 2023, in his answer to Ms. Carroll's amended complaint in this action, *Carroll I*,[1] Mr. Trump asserted for the

---

[1] "The amended complaint made three main sets of changes. First, it added allegations based upon the jury's verdict in [*Carroll II*], including substitution of the phrase 'sexual assault' (or derivatives of that phrase) for the word 'rape' (or derivatives of that word) wherever that word (or its derivatives) appeared in the original complaint. Second, it set forth alleged facts concerning Mr. Trump's recent statements following the *Carroll II* verdict in which he again claimed that he does not know Ms. Carroll and that no such incident occurred between them. Third, it added allegations drawn from Mr. Trump's deposition in this case that allegedly demonstrate his personal motive in defaming Ms. Carroll. Importantly, as the Court noted in its decision denying Mr. Trump's motion for summary judgment [in this case], '[t]he amended complaint did not add any new claims or otherwise change the focus of [Ms. Carroll's] original complaint.' *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL

Case 23-1045, Document 91, 10/02/2023, 3576580, Page115 of 136

**SPA113**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 5 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 4 of 24

4

first time a defamation counterclaim against Ms. Carroll. He alleged that Ms. Carroll, in an interview with CNN following the *Carroll II* verdict, "disregarded the jury's finding that [Mr. Trump] did not rape her" by (1) stating that when she heard that the jury's response was "no" to the question of whether she proved that Mr. Trump raped her, she responded "oh yes he did, oh yes he did", and (2) stating that at the conclusion of the trial, she said to Mr. Trump's counsel "he [(Mr. Trump)] did it and you know it."[2]

The matter now is before the Court on Ms. Carroll's motion to dismiss Mr. Trump's counterclaim and to strike certain affirmative defenses in his answer. For the reasons stated below, Ms. Carroll's motion to dismiss the counterclaim is granted. Her motion to strike certain affirmative defenses is granted in part and denied in part.

*Facts*

*The "Rape" Question in Carroll II*

Ms. Carroll's sexual battery claim in *Carroll II* involved three independent and alternative theories of liability: rape, sexual abuse, and forcible touching. Each theory corresponded to a definition of a sex crime by the same name in the New York Penal Law. It was necessary to define these acts in the precise terms of the New York Penal Law because the ASA requires that the alleged conduct for which a person is able to bring a sexual battery claim within the temporary claim revival period "would constitute a sexual offense as defined in article one hundred thirty of the penal

---

           4744176, at *1 (S.D.N.Y. July 25, 2023) (quoting *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 4393067 at *2 n.6 (S.D.N.Y. July 5, 2023)).

[2]           Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 25-26 ¶¶ 5-7.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page116 of 136

SPA114

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 6 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 5 of 24

5

law."[3] The special verdict form provided to the jury accordingly consisted of three liability questions

relating to Ms. Carroll's sexual battery claim: whether Ms. Carroll proved by a preponderance of the

evidence that (1) "Mr. Trump raped Ms. Carroll?", (2) "Mr. Trump sexually abused Ms. Carroll?",

and (3) "Mr. Trump forcibly touched Ms. Carroll?".[4]

The Court instructed the jury that the "first set of questions in the verdict form has

to do with whether or not Ms. Carroll has established that Mr. Trump's conduct, if any, came within

any of th[e] criminal law definitions," and proceeded to instruct the jury on each such definition.[5]

With respect to the first question on the verdict form, whether Ms. Carroll proved that Mr. Trump

raped her, the Court instructed the jury in accordance with the New York Penal Law's definition of

---

[3]

N.Y. CPLR § 214-j ("Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of *conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law* committed against such person who was eighteen years of age or older . . . which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived . . . .") (emphasis added).

[4]

*Carroll II*, Doc. No. 22-cv-10016, Dkt 174 (Verdict) at 1.

"Pursuant to Federal Rule of Civil Procedure 49, which governs jury verdict forms and questions, '[t]he court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact.' A special verdict stands in contrast to a general verdict form, which typically asks jurors to answer only the ultimate questions of liability and the damages amounts, if any. The Court here used a special verdict form that was substantially similar to the parties' proposed forms, consisting of factual questions going to liability and damages, organized by the two claims [(battery and defamation)]." *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, at *12 (S.D.N.Y. July 19, 2023).

[5]

*Carroll II*, Doc. No. 22cv10016, Dkt 201 (Trial Tr.) at 1416:6-9.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page117 of 136

**SPA115**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 7 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 6 of 24

6

rape, as relevant here, that:

> "In order to establish that Mr. Trump raped her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.
>
> "The first element is that Mr. Trump engaged in *sexual intercourse* with her.
>
> "The second element is that Mr. Trump did so without Ms. Carroll's consent by the use of forcible compulsion. . . .
>
> "'Sexual intercourse' means any penetration, however slight, *of the penis* into the vaginal opening. In other words, any penetration of the penis into the vaginal opening, regardless of the distance of penetration, constitutes an act of sexual intercourse. Sexual intercourse does not necessarily require erection of the penis, emission, or an orgasm."[6]

The instructions with respect to the rape question thus made clear that if the jury found that Mr. Trump forcibly penetrated Ms. Carroll's vagina with his fingers, but not also with his penis, it was obliged to answer "no" to the rape question. However, if it found that Mr. Trump forcibly penetrated Ms. Carroll digitally, it was obliged to answer "yes" to the sexual abuse question, as the New York Penal Law definition of "sexual abuse" encompasses such conduct. For the reasons stated in the Court's recent decision denying Mr. Trump's motion for a new trial in *Carroll II*:

> "The jury's finding of sexual abuse therefore necessarily implies that it found that Mr. Trump forcibly penetrated her vagina. And since the jury's answer to [the rape question] demonstrates that it was unconvinced that there was penile

_____

[6] *Id.* at 1416:18-1417:6 (emphasis added).

Case 23-1045, Document 91, 10/02/2023, 3576580, Page118 of 136

**SPA116**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 8 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 7 of 24

7

penetration, the only remaining conclusion is that it found that Mr. Trump forcibly

penetrated her vagina with his fingers – *in other words, that he 'raped' her in the*

*sense of that term broader than the New York Penal Law definition.*"[7]

The jury's answer of "no" to the question of whether Ms. Carroll proved that Mr. Trump "raped" her

therefore established *only* that the jury was unconvinced that he penetrated her *with his penis.*


*Ms. Carroll's Statements After the Jury's Verdict in Carroll II*

On May 10, 2023, the day after the jury's verdict in *Carroll II*, Ms. Carroll and her

counsel gave interviews with the media, including on the television program *CNN This Morning*.

During that interview, Ms. Carroll made the following statements:

"[Reporter]: What about when that first finding was found? This jury found that

Trump did not rape you. What about that moment?

[Ms. Carroll]: Robbie [(Ms. Carroll's counsel)] can explain the legal?

[Reporter]: Sure. And I want you to, but I just wonder, E. Jean, what went through

your head when you heard that?

[Ms. Carroll]: Well, I just immediately say in my own head, *oh, yes, he did -- oh, yes,*

*he did*. See, that's my response."

. . .

---
[7]

*Carroll*, 2023 WL 4612082, at *20 (emphasis added).

In any event, the Court alternatively found, in accordance with Rule 49, that Mr. Trump did
forcibly digitally penetrate Ms. Carroll's vagina. *Id.* at *19 n.70 ("As the jury's response to
Question 2 [(the sexual abuse question)] was an implicit finding that Mr. Trump forcibly
digitally penetrated Ms. Carroll's vagina, no explicit independent finding by the Court is
necessary. Nevertheless, the Court alternatively finds that he did so.").

Case 23-1045, Document 91, 10/02/2023, 3576580, Page119 of 136

**SPA117**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 9 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 8 of 24

8

"[Reporter]: There in the courtroom was an encounter and exchange between you and the President's lawyer, Joe Tacopina. He came up, you shook hands, I believe. What did he say?

[Ms. Carroll]: Well, Joe Tacopina is very likeable. He's sort of like an 18th century strutting peacock. And he's people like him [*sic*]. So, when he sticks out his hand to – first, he congratulated Robbie. And then, he was congratulating people on the team. And as I put my hand forward, I said, *he did it and you know it*. Then we shook hands, and I passed on."[8]

*Mr. Trump's Counterclaim and Affirmative Defenses*

Mr. Trump alleges in his counterclaim that Ms. Carroll's statements during the CNN interview on May 10, 2023 "repeated falsehoods and defamatory statements" that caused "significant harm to [Mr. Trump's] reputation."[9] He alleges that her statement "oh yes he did, oh yes he did" in response to the reporter's question about her reaction "disregarded the jury's finding that [Mr. Trump] did not rape her" and that her statement to Mr. Trump's counsel that "he did it and you know it" "again reaffirm[ed] her claim that [Mr. Trump] raped her."[10] He contends that:

"[Ms. Carroll] made these statements knowing each of them were false or with reckless disregard for their truth or falsity.

---

[8]     Dkt 176-3, Ex. C to Decl. of Roberta A. Kaplan, Tr. of CNN Interview, at 11-13 (emphasis added).

[9]     Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 26 ¶ 12.

[10]    *Id.* at 25 ¶ 5, 26 ¶ 7.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page120 of 136

SPA118

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 10 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 9 of 24

9

. . .

> [Ms. Carroll] made these false statements with actual malice and ill will with an intent to significantly and spitefully harm and attack [Mr. Trump's] reputation, as these false statements were clearly contrary to the jury verdict in *Carroll II* whereby [Mr. Trump] was found not liable for rape by the jury.
>
> [Ms. Carroll's] actions of wantonly and falsely accusing [Mr. Trump] on multiple occasions of committing rape constitute defamation *per se*, as [Ms. Carroll] accused [Mr. Trump] of rape, which clearly was not committed, according to the jury verdict in *Carroll II*."[11]

He accordingly seeks compensatory and punitive damages, an order requiring Ms. Carroll to retract her defamatory statements, and other relief.

Mr. Trump raises also in his answer certain affirmative defenses that Ms. Carroll argues should be stricken "because the Court considered and rejected each of these defenses in denying [Mr.] Trump's motion for summary judgment."[12] They are discussed below.

## *Discussion*

*Legal Standard*

The standards governing a motion to dismiss are well established. As the Second Circuit has explained:

---

[11]   *Id.* at 26 ¶¶ 8, 10, 11.

[12]   Dkt 175 (Pl. Mem.) at 27-28.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page121 of 136

**SPA119**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 11 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 10 of 24

10

"'[A] complaint [or counterclaim] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007))."[13]

Although the Court must accept as true all factual allegations, it "should not accept as true allegations that amount to mere 'legal conclusions.'"[14] Furthermore, a complaint or counterclaim "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[15] "'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding [a] motion to dismiss, without converting the proceeding to one for summary judgment."[16]

With respect to Ms. Carroll's motion to strike certain of Mr. Trump's affirmative defenses, Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading

---

[13]
       *King v. City of New York*, No. 22-231, 2023 WL 2398679, at *1 (2d Cir. Mar. 8, 2023) (first alteration in original).

[14]
       *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[15]
       *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

[16]
       *Id.* (second alteration in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied*, 503 U.S. 960 (1992)).

Case 23-1045, Document 91, 10/02/2023, 3576580, Page122 of 136

**SPA120**

Case 1:20-cv-07311-LAK    Document 203-1    Filed 08/10/23    Page 12 of 25
Case 1:20-cv-07311-LAK    Document 200    Filed 08/07/23    Page 11 of 24

11

an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[17]  The

Second Circuit has stated that:

> "We conclude that the plausibility standard of *Twombly* applies to
> determining the sufficiency of all pleadings, including the pleading of an affirmative
> defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying
> the plausibility standard to any pleading is a 'context-specific' task."[18]

It has set forth also certain considerations in relation to a motion to strike an affirmative defense

including, as relevant here, that "an affirmative defense is improper and should be stricken if it is a

legally insufficient basis for precluding a plaintiff from prevailing on its claims."[19]


*Mr. Trump's Defamation Claim Fails With Respect To Falsity*

Ms. Carroll argues that Mr. Trump has failed to state a legally sufficient claim for

defamation both because her statements were at least "substantially true" and because Mr. Trump

has not adequately pled actual malice.  In view of the following analysis of the falsity-substantial

truth issue, there is no need to address the sufficiency of Mr. Trump's actual malice allegations.

In order to make out a defamation case, a public figure plaintiff or counterclaimant

such as Mr. Trump "must show that the statements [the plaintiff] complains of were (1) of and

concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false,

---

[17]  Fed. R. Civ. P. 12(f).

[18]  *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019) (citation omitted).

[19]  *Id.* at 98.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page123 of 136

**SPA121**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 13 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 12 of 24

12

and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the

truth."[20]  "[W]hen falsity is an element of a state defamation claim, federal courts have required

plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement

false. . . . In particular, several courts of appeals have affirmed dismissals of defamation claims

because the material in the complaint cannot be reasonably understood except as being true or

substantially true."[21]  "'[A] statement is substantially true if the statement would not have a different

effect on the mind of the reader from that which the pleaded truth would have produced.'"[22]  To

determine whether a statement is substantially true, "[c]ourts typically compare the complained of

language with the alleged truth to determine whether the truth would have a different effect on the

_____

[20]

    *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

[21]

    *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017). *See also, e.g., Nunes v. NBCUniversal Media, LLC*, No. 22-cv-1633 (PKC), 2022 WL 17251981, at *4 (S.D.N.Y. Nov. 28, 2022) ("Whether a statement is substantially true is an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion."); *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 65 (S.D.N.Y. 2021) ("The issue of whether a statement is substantially true may present an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion."); *Marom v. Pierot*, No. 18-cv-12094 (VB) (JCM), 2020 WL 6572509, at *4 (S.D.N.Y. Aug. 30, 2020), *report and recommendation adopted*, No. 18 CV 12094 (VB), 2020 WL 6565199 (S.D.N.Y. Nov. 9, 2020) ("'Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint...must plead facts that, if proven, would establish that the defendant's statements were not substantially true.' . . . Consistent with this requirement, a plaintiff asserting a claim of defamation must not only identify the allegedly defamatory statement, 'but also the respect in which it was allegedly false.')" (first ellipsis in original) (citations omitted); *Verragio, Ltd. v. AE Jewelers, Inc.*, No. 15-cv-6500 (CM), 2017 WL 4125368, at *8 (S.D.N.Y. Aug. 23, 2017) (dismissing counterclaim for defamation on ground of substantial truth).

[22]

    *Tannerite Sports, LLC*, 864 F.3d at 247 (quoting *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dept. 2015)).

Case 23-1045, Document 91, 10/02/2023, 3576580, Page124 of 136

**SPA122**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 14 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 13 of 24

13

mind of the average reader."[23]  "When the truth is so near to the facts as published that fine and

shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge

of libel, no legal harm has been done."[24]  But Mr. Trump has not plausibly alleged that Ms. Carroll's

statements during the CNN interview were not at least substantially true.

The only basis for Mr. Trump's assertion of falsity is the fact that the jury in *Carroll*

*II* was not persuaded that Mr. Trump had "raped" her within the meaning of the New York Penal

Law – in other words, that it did not find that he penetrated her vagina with his penis.[25]  And that

indeed was its decision.  But that is insufficient to state a claim for defamation here for two reasons.

The argument presupposes (1) that the jury's answer to the Penal Law "rape" question in *Carroll II*

would establish falsity and, if it did, (2)  that it is binding on Ms. Carroll in this case. Both of those

presuppositions are incorrect. Indeed, the jury's verdict in *Carroll II* establishes, as against Mr.

Trump, the fact that Mr. Trump "raped" her, albeit digitally rather than with his penis. Thus, it

establishes against him the substantial truth of Ms. Carroll's "rape" accusations. In any case, the

*Carroll II* jury's Penal Law rape finding does not even establish, as against Ms. Carroll, Mr. Trump's

contention that he did not penetrate her with his penis, *i.e.*, that he did not rape her within the

meaning of the Penal Law. The Court begins with the latter point.

--------------------------------

23

      *Franklin.*, 135 A.D.3d at 94.

24

      *Cafferty v. S. Tier Pub. Co.*, 226 N.Y. 87, 93 (1919).

25

      *See, e.g.*, Dkt 181 (Def. Opp. Mem.) at 5-6 ("Here, Plaintiff's statement was demonstrably
      false. Plaintiff does not dispute, nor can she, that the jury in *Carroll II* determined that
      Defendant did not rape her. . . . In view of the jury's finding, there is simply no argument
      that Plaintiff's statement was 'substantially true' as a matter of law.").

Case 23-1045, Document 91, 10/02/2023, 3576580, Page125 of 136

**SPA123**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 15 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 14 of 24

14

*The Jury's Penal Law Rape Finding in Carroll II Is Not Conclusive in this Case*

In order for Ms. Carroll to have defamed Mr. Trump by asserting that he "raped" her as that term is defined in the New York Penal Law (even assuming that her post-verdict statements reasonably could be construed as meaning what Mr. Trump claims it meant),[26] Mr. Trump was required to plead sufficient facts to allege that her statements were false or at least not substantially true. But, as noted, the only basis for Mr. Trump's claim of falsity is the jury's answer to the Penal Law rape question in *Carroll II*. Thus, he invokes the doctrine of issue preclusion, also referred to as collateral estoppel, to contend that the jury's verdict on the Penal Law rape question precludes Ms. Carroll from contending that Mr. Trump in fact penetrated her with his penis.[27]

The parties agree that "a party is collaterally estopped from relitigating an issue if a four-part test is met: '(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair

---

[26]

The parties dispute whether Ms. Carroll was referring to "rape" within the meaning of the New York Penal Law or "rape" as that term is understood more broadly in the allegedly defamatory statements. Drawing all reasonable inferences in favor of Mr. Trump, as the Court must on this motion to dismiss, the Court assumes without now deciding that Ms. Carroll was referring to rape within the meaning of the New York Penal Law in the two allegedly defamatory statements.

[27]

*See also* Dkt 194 (Def. Mem. Issue Preclusion) at 4-6.

Although Mr. Trump has appealed the judgment in *Carroll II*, "it is well established that the fact that . . . an appeal from the judgment has . . . been taken does not divest the judgment of finality for the purposes of collateral estoppel." *Samhammer v. Home Mut. Ins. Co. of Binghamton*, 120 A.D.2d 59, 64 (3d Dept. 1986). *See also Anonymous v. Dobbs Ferry Union Free Sch. Dist.*, 19 A.D.3d 522, 522 (2d Dept. 2005) ("The rule in New York is that the 'pendency of an appeal does not prevent the use of the challenged judgment as the basis of' collateral estoppel.") (citation omitted). It is well established also – and neither party contends otherwise – that the preclusive effect of the *Carroll II* judgment is governed by New York law, as *Carroll II* was a diversity case. *E.g.*, *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001).

Case 23-1045, Document 91, 10/02/2023, 3576580, Page126 of 136

**SPA124**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 16 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 15 of 24

15

opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'"[28] Mr. Trump contends, however, that:

> "[T]he issue of falsity has been conclusively established in Defendant's favor with respect to the claim for defamation asserted in his counterclaim. . . . First, there is little question that the issue of whether Defendant raped Plaintiff has always been a central question in both *Carroll I* and *Carroll II*. . . . Second, the issue was actually determined in *Carroll II* when the jury expressly found that Plaintiff failed to demonstrate by a preponderance of the evidence that she was raped by Defendant. . . . Third, the parties had a full and fair opportunity to litigate the issue throughout *Carroll II*'s proceedings and trial, and despite Plaintiff's extensive testimony advancing her claim that she was raped, the jury rejected her account and returned a verdict in Defendant's favor. Finally, it is readily apparent that the issue of whether Plaintiff was raped was a material aspect to the jury's finding."[29]

But Mr. Trump entirely ignores the fourth element of the collateral estoppel test, whether the issue was "'necessary to support a valid and final judgment on the merits.'"[30]

---

[28]
    *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted). *See also* Dkt 194 (Def. Mem. Issue Preclusion) at 1 ("Under New York law, collateral estoppel applies when 'the issue in the second action [(1)] is identical to an issue which was raised, [(2)] necessarily decided and material in the first action, and [(3)] the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.'") (quoting *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000)).

[29]
    Dkt 194 (Def. Mem. Issue Preclusion) at 4.

[30]
    *Boguslavsky*, 159 F.3d at 720 (citation omitted). *See also, e.g., PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 491 (2d Cir. 2004) ("[A] party is estopped from relitigating an issue *when that issue was necessary to the resolution of the prior action*, and the party

Case 23-1045, Document 91, 10/02/2023, 3576580, Page127 of 136

**SPA125**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 17 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 16 of 24

16

 As noted above and in a prior decision in this case, the issue of whether Mr. Trump

"raped" Ms. Carroll within the meaning of the Penal Law was in this case for one and only one

reason.  As the parties agreed, Ms. Carroll was entitled under the ASA to sue Mr. Trump for sexual

battery in 2022, despite the years that had passed since the parties' encounter, only if she could

establish that Mr. Trump's conduct met *any one* of three alternative definitions of sex crimes set out

in the Penal Law – rape, sexual abuse or forcible touching.  The jury was required to answer "yes"

to only one of these three theories in order to award damages. It found that Mr. Trump had abused

Ms. Carroll sexually, thus satisfying the requirement of the ASA.  The issues of whether he "raped"

or "forcibly touched" her were entirely extraneous given the sexual abuse finding.  Indeed, the

verdict form could have omitted the rape question entirely, and the judgment in *Carroll II* would

have been unaffected.

 The *Carroll II* jury's answer to the Penal Law "rape" question therefore was

unnecessary and immaterial.  Accordingly, it is not binding on Ms. Carroll in this case. In

consequence, there is no merit to Mr. Trump's argument that the jury's finding on the Penal Law

"rape" question established that Ms. Carroll's statements were false even if her statements

reasonably could be construed as referring to "rape" in that specialized Penal Law sense, a subject

on which this Court now expresses no view.

 *In Any Case, Ms. Carroll's Statements Were Substantially True*

 Unlike the jury's finding on the Penal Law "rape" question, its finding on the sexual

---

against whom estoppel is invoked had a full and fair opportunity to contest that issue in the
previous litigation.") (emphasis added) (collecting New York cases).

Case 23-1045, Document 91, 10/02/2023, 3576580, Page128 of 136

SPA126

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 18 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 17 of 24

17

abuse question – and specifically its implicit determination that Mr. Trump digitally raped her – is conclusive with respect to this case. As a result, Ms. Carroll's statements are "substantially true."

        The finding that Mr. Trump digitally raped Ms. Carroll is conclusive because it was necessary to support the judgment in *Carroll II*. As recounted above and in the Court's recent new trial decision in *Carroll II*, "the only remaining conclusion" based on all of the evidence at trial was that the jury implicitly found that Mr. Trump forcibly penetrated Ms. Carroll's vagina with his fingers.[31] "[T]here was ample, arguably overwhelming evidence, that Mr. Trump forcibly digitally penetrated Ms. Carroll, thus fully supporting the jury's sexual abuse finding."[32] The finding of forcible digital penetration "is fully supported by Ms. Carroll's repeated and clear testimony on the digital penetration (more than the penile penetration), Dr. Lebowitz [(Ms. Carroll's damages expert for her battery claim)] specifically mentioning Ms. Carroll squirming in response to an intrusive memory of Mr. Trump's fingers in her vagina, and the evidence at trial taken as a whole. It also is bolstered by the amount of the jury's verdict."[33] Indeed, the finding of digital rape is essential to support the size of the jury's damages award on the battery claim – over $2 million. It accordingly is the "truth," as relevant here, that Mr. Trump digitally raped Ms. Carroll.

        As stated above, a statement is substantially true if it "would not have a different

---

[31]     *Carroll*, 2023 WL 4612082, at *20.

    Moreover, as noted above, the Court in any event determined, in the alternative and pursuant to Rule 49, that Mr. Trump digitally raped Ms. Carroll.

[32]     *Id.*

[33]     *Id.*

Case 23-1045, Document 91, 10/02/2023, 3576580, Page129 of 136

**SPA127**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 19 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 18 of 24

18

effect on the mind of the reader from that which the pleaded truth would have produced."[34]  Here, the "pleaded truth" would have been that Mr. Trump forcibly penetrated Ms. Carroll's vagina with his fingers. The difference between Ms. Carroll's allegedly defamatory statements – that Mr. Trump "raped" her as defined in the New York Penal Law – and the "truth" – that Mr. Trump forcibly digitally penetrated Ms. Carroll – is minimal. Both are felonious sex crimes.  If Ms. Carroll had stated that Mr. Trump "raped" her by forcibly digitally penetrating her vagina instead of referring also (allegedly) to forcible penile penetration, there would have been no different effect on the mind of an average listener. Indeed, both acts constitute "rape" in "common modern parlance, its definition in some dictionaries, in some federal and state criminal statutes, and elsewhere."[35]  Given that the anatomical difference between the alleged falsehood and the truth is a "fine and shaded distinction[] [that] must be drawn" in order "to sustain a charge of libel" based on Ms. Carroll's interview statements, "no legal harm has been done."[36]

Mr. Trump accordingly fails to state a claim for defamation because (1) he fails plausibly to allege that Ms. Carroll's statements were not true, and (2) in the alternative, Ms. Carroll's allegedly defamatory statements were substantially true as a matter of law.

*Mr. Trump's Affirmative Defenses*

Ms. Carroll argues that the Court should strike Mr. Trump's first, third, fifth, twelfth,

---

[34]

*Tannerite Sports, LLC*, 864 F.3d at 247 (quoting *Franklin*, 135 A.D.3d at 94).

[35]

*Carroll*, 2023 WL 4612082, at *2 & n. 2-4.

[36]

*Cafferty*, 226 N.Y. at 93.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page130 of 136

**SPA128**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 20 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 19 of 24

19

and fifteenth affirmative defenses because the Court "considered and rejected each of these defenses in denying [Mr.] Trump's motion for summary judgment."[37]   She relies on the law-of-the-case doctrine, which provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[38] Her argument is persuasive with respect to some, but not all, of Mr. Trump's purported affirmative defenses.

Mr. Trump's fifth and fifteenth affirmative defenses are that "[s]ome or all of the statements at issue are matters of opinion that are not capable of being proven true or false" and that "[p]laintiff has not sufficiently pled defamation or defamation *per se*," respectively.[39] In its decision denying Mr. Trump's motion for summary judgment, the Court determined that "Mr. Trump's statements were factual assertions rather than expressions of opinion" and that Ms. Carroll adequately alleged that his 2019 statements are defamatory *per se*.[40]   Nothing in Ms. Carroll's amended complaint – which, as the Court has explained, "did not add any new claims or otherwise change the focus of her original complaint" – would change the Court's prior analysis or decision with respect to those defenses.[41] However, as the Court noted in its summary judgment decision:

"Neither party addresses specifically Mr. Trump's June 24, 2019 statement, in which he said only: 'I'll say it with great respect: Number one, she's not my type.

---

[37]   Dkt 175 (Pl. Mem.) at 27-28.

[38]   *Pepper v. United States*, 562 U.S. 476, 506 (2011) (citation omitted).

[39]   Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 21, ¶ 5, 22 ¶ 15.

[40]   *Carroll*, 2023 WL 4393067, at *14-17.

[41]   *Id.* at *2 n.6.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page131 of 136

SPA129

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 21 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 20 of 24

20

Number two, it never happened. It never happened, OK?'. In her complaint, Ms. Carroll alleges that all three June 2019 statements were defamatory. However, as stated above, the crux of Ms. Carroll's defamation claim lies in Mr. Trump's statements that Ms. Carroll lied for financial and/or personal gain. Indeed, Mr. Trump appears to ground his argument that 'the majority' of his statements are nonactionable opinion on the assumption that Ms. Carroll does not allege his 'general repudiation of Plaintiff's allegations' in itself was defamatory. . . . As the parties have not adequately addressed this point, the Court does not now decide it."[42]

Given that the Court has not previously decided the application, if any, of Mr. Trump's fifth and fifteenth affirmative defenses Mr. Trump's June 24, 2019 statement, it does not strike those defenses to the extent they might concern only that statement. Those two affirmative defenses, however, are stricken insofar as they apply to anything else.

Mr. Trump's twelfth affirmative defense is that Ms. Carroll "is not entitled to punitive damages as a matter of law."[43] But the Court rejected that claim when it determined, in denying Mr. Trump's motion for summary judgment, that "Mr. Trump has failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied."[44] Mr. Trump's argument that the Court "did not find that there is 'no question of fact' which could potentially lead to Defendant successfully raising this defense at trial" is

---

[42]     *Id.* at *17, n. 85.

[43]     Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 22 ¶ 12.

[44]     *Carroll*, 2023 WL 4393067, at *20.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page132 of 136

**SPA130**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 22 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 21 of 24

21

irrelevant because Mr. Trump's stated defense is that she is not entitled to punitive damages *as a matter of law* – in other words, that she would not be entitled to punitive damages irrespective of the evidence at trial.[45]

He contends also that the amended complaint "adds an entirely new theory of punitive damages, relating to statements Defendant made on May 10, 2023, which Defendant has not yet had an opportunity to challenge."[46] The amended complaint added allegations with respect to Mr. Trump's remarks concerning Ms. Carroll during the CNN Town Hall event on May 10, 2023 as "subsequent statements of the defendant" "which may be considered to establish that Mr. Trump made the 2019 statements that always have been the subject of this action with the deliberate intent to injure or out of hatred, ill will, or spite ('common law malice') in order for Ms. Carroll to obtain punitive damages" with respect to the 2019 statements.[47] She asserts no stand-alone claim based on the post-*Carroll II* verdict statements. The Court's decision with respect to Mr. Trump's defense therefore is unaffected by the inclusion of his subsequent statements in Ms. Carroll's amended complaint. The Court accordingly strikes the twelfth affirmative defense on the grounds that it already decided that this defense is legally insufficient and that nothing in the amended complaint warrants any different result.[48]

---

45

Dkt 181 (Def. Opp. Mem.) at 24.

46

*Id.*

47

*Carroll v. Trump*, 2023 WL 4744176, at *2.

48

*See, e.g., Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-cv-5075 (LJL), 2020 WL 3472597, at *14 (S.D.N.Y. June 25, 2020) ("The Court strikes the First Affirmative Defense to the extent that it seeks to relitigate the legal sufficiency of claims

Case 23-1045, Document 91, 10/02/2023, 3576580, Page133 of 136

SPA131

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 23 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 22 of 24

22

Mr. Trump's first defense is absolute presidential immunity. But the Court previously determined that Mr. Trump waived that defense by failing to raise it in the first three years of litigating this case and, in any case, that it would have been insufficient as a defense.[49] Mr. Trump rejoins that "although this Court has held that the presidential immunity defense was waived when it was not raised in Defendant's initial [a]nswer . . . his defense has now been properly and timely raised since it was asserted in connection with Defendant's [a]mended [a]nswer."[50] He misunderstands, however, the relevant standard. "A defendant who is responding to an amended complaint cannot amend his answer as of right without any regard to the amendments taken by his adversary."[51] There is nothing new in the amended complaint that would make Mr. Trump's presidential immunity defense any more viable or persuasive now than it would have been before. The fact that he has raised it now in an answer does not (1) undo the fact that he waived the defense by failing to raise it in the first three years of litigating this case or (2) change the Court's decision that his purported defense would have been insufficient in any case. The opportunity to answer an amended complaint is not a free pass to correct past wrongs without any justification or basis for doing so. The Court accordingly strikes Mr. Trump's first affirmative defense.

Mr. Trump's third affirmative defense is that "[t]he alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the

---

already decided.").

[49] *Carroll*, 2023 WL 4393067, at *8-9.

[50] Dkt 181 (Def. Opp. Mem.) at 25.

[51] *Pereira v. Cogan*, No. 00-cv-619 (RWS), 2002 WL 1822928, at *4 (S.D.N.Y. Aug. 7, 2002).

**SPA132**

23

Constitution of the United States."[52]  Ms. Carroll does not adequately explain her request to strike this defense. To the extent Mr. Trump claims that his third defense "assert[s] the defense of presidential immunity,"[53] the Court strikes it for the same reasons stated above for striking Mr. Trump's first defense asserting absolute presidential immunity. To the extent, however, that it concerns a different defense or issue not previously decided, the Court does not now decide to strike the defense in those other respects, if any, as the parties have not adequately addressed it.

---

[52]    Dkt 171 (Def. Answer to Pl. Amend. Compl.) at 21 ¶ 3.

[53]    Dkt 181 (Def. Opp. Mem.) at 25.

  Although Mr. Trump asserts in his opposition here that this defense relates to presidential immunity, he made no such argument with respect to that defense – which also was included in his original answer – when he moved for summary judgment on the basis of absolute presidential immunity.  In any event, to the extent he now claims it is related to presidential immunity, it is stricken for the same reasons explained above.

Case 23-1045, Document 91, 10/02/2023, 3576580, Page135 of 136
**SPA133**

Case 1:20-cv-07311-LAK   Document 203-1   Filed 08/10/23   Page 25 of 25
Case 1:20-cv-07311-LAK   Document 200   Filed 08/07/23   Page 24 of 24

24

### *Conclusion*

For the foregoing reasons, Ms. Carroll's motion to dismiss Mr. Trump's counterclaim (Dkt 174) is granted.  Her motion to strike Mr. Trump's affirmative defenses (Dkt **174**) is granted in part and denied in part as follows:

(1) Mr. Trump's first and twelfth affirmative defenses are stricken in their entirety.

(2) Mr. Trump's fifth and fifteenth affirmative defenses are stricken except to the extent, if any, that they relate to Mr. Trump's June 24, 2019 statement.

(3) Mr. Trump's third affirmative defense is stricken to the extent it asserts an absolute presidential immunity defense, and is not stricken in any other respect, if there is any.  It is denied in its remaining respects.

SO ORDERED.

Dated:        August 7, 2023

_____

Lewis A. Kaplan
United States District Judge

**SPA134**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
E. JEAN CARROLL,                                    Civil Action No.:
                                                    1:20-cv-7311-LAK-JLC

             *Plaintiff*,

    v.                                          <u>**NOTICE OF APPEAL**</u>

DONALD J. TRUMP, in his personal capacity,

             *Defendant*,
-------------------------------------------------------------X

      Notice is hereby given that the Defendant, Donald J. Trump, appeals to the United States

Court of Appeals for the Second Circuit from the Memorandum Opinion Granting Plaintiff's

Motion to Dismiss Defendant's Counterclaim and Certain Purported Defenses of the Hon. Lewis

A. Kaplan, U.S.D.J., entered August 7, 2023 (Dkt. 200), attached hereto as Exhibit A, granting

Defendant's Motion to Dismiss Counterclaim and Strike Certain Affirmative Defenses (Dkt. 174).


Dated: New York, New York                   HABBA MADAIO & ASSOCIATES LLP
       August 10, 2023

                                Michael T. Madaio, Esq.
                                1430 US Highway 206, Suite 240
                                Bedminster, New Jersey 07921
                                -and-
                                112 West 34th Street, 17th & 18th Floors
                                New York, New York 10120
                                mmadaio@habbalaw.com
                                Telephone: (908) 869-1188
                                Facsimile: (908) 450-1881


To:    All Counsel of Record (via ECF)