# 23-1045(L)
# 23-1146(CON)

## United States Court of Appeals
## for the Second Circuit



E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLANT

HABBA MADAIO & ASSOCIATES LLP
MICHAEL T. MADAIO, ESQ.
ALINA HABBA, ESQ.
*Attorneys for Defendant-Appellant
Donald J. Trump*
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
(908) 869-1188
*mmadaio@habbalaw.com*
*ahabba@habbalaw.com*

[REPRODUCED ON RECYCLED PAPER]

## **<u>TABLE OF CONTENTS</u>**

*<u>Page</u>*

TABLE OF AUTHORITIES ...................................................................... *iii*

ISSUES PRESENTED FOR REVIEW ....................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................1

JURISDICTIONAL STATEMENT .........................................................6

SUMMARY OF THE ARGUMENT ......................................................7

LEGAL ARGUMENT.............................................................................11

I.    Defendant-Appellant Properly Invoked His Presidential Immunity
Defense..........................................................................................11

    A.  Presidential Immunity Is Non-Waivable Under the Separation-of-
Powers Doctrine.........................................................................12

        i.  The Separation-of-Powers Doctrine Restrains The Judicial
Branch's Ability to Exercise Jurisdiction Over A President's
Official Conduct .................................................................13

        ii.  The District Court's Decision Overlooked Supreme Court
Precedent And Was Based On Flawed Reasoning..............27

          a.    Presidential Immunity Is Distinguishable From Absolute
Immunity For Judges and Prosecutors ...........................28

          b.    The Nixon Court Expressly Defined Presidential Immunity
As A Jurisdictional Matter ...........................................30

          c.    The District Court's Construction of Presidential Immunity
Undermines Presidential Autonomy And Contravenes The
Separation-Of-Powers Doctrine....................................32

B.  Even If Presidential Immunity Is Waivable, Defendant-Appellee Should Have Been Permitted Leave To Amend To Assert His Presidential Immunity Defense..................................................................34

    i.  Presidential Immunity Is Not A Futile Defense...................................35

    ii.  There Was No Bad Faith Or Undue Delay In Seeking Leave To Amend ..................................................................................................36

C.  In The Alternative, Defendant-Appellee Properly Raised His Presidential Immunity Defense In Response To Plaintiff-Appellee's Amended Complaint ...................................................................................40

II.  The Subject Statements Are Protected By Presidential Immunity .................44

A.  Defendant-Appellant's Conduct Was Within The 'Outer Perimeter' Of His Official Presidential Duties...........................................................45

B.  The District Court Utilized An Improper Standard To Assess The Viability Of Defendant-Appellant's Presidential Immunity Argument  ..................................................................................................51

III.  The District Court Has Been Divested Of Jurisdiction...................................55

CONCLUSION ........................................................................................................61

FEDERAL RULES OF APPELLATE PROCEDURE FORM 6 CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 32.1(a)....................62

# TABLE OF AUTHORITIES

*Cases*                                                                    *Page(s)*

*Albert v. Loksen*,
  239 F.3d 256, 265 (2d Cir. 2001) ........................................................57

*Anthony v. City of N.Y.*,
  339 F.3d 129, 138, n. 5 (2d Cir. 2003) .............................................34

*Aronson v. Wiersma*,
  65 N.Y.2d 592, 594 (1985)................................................................59

*Austin v. Healey*,
  5 F.3d 598 (2d Cir. 1993) ................................................................25

*Bao Guo Zhang v. Shun Lee Palace*, ,
  No. 17-CV-00840 (VSB), 2021 WL 634717, at *5
  (S.D.N.Y. Feb. 16, 2021)................................................................42

*Barr v. Matteo*,
  360 U.S. 564, 575 (1959).................................................45, 47, 48, 51

*Barret v. Harrington*,
  130 F.3d 246, 254-55 (6th Cir. 1997)...............................................46

*Block v. First Blood Associates*,
  988 F.2d 344, 351 (2d Cir. 1993) .................................................39, 40

*Blue Ridge v. Republic of Argentina*,
  735 F.3d 72, 79-81 (2d Cir. 2013) .....................................................6

*Bradley v. Fisher*,
  80 U.S. 335, 349 (1872).....................................................................28

*Buckley v. Valeo*,
  424 U.S. 1, 122 (1976).......................................................12, 29, 30

*Carroll v. Trump*,
  49 F.4th 759, 763 (2d Cir. 2022) ........................................................2

*Carroll v. Trump*,
66 F.4th 91, 94 (2d Cir. 2023) .............................................................3

*CBS v. FCC*,
454 F.2d 1018, 1020 (D.C. Cir. 1971)...............................................47

*Celle v. Filipino Reporter Enterprises*,
209 F.3d 163, 179-80 (2d Cir. 2000)............................................57, 58

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398, 408 (2013)..................................................................23

*Clinton v. Jones*,
520 U.S. 681, 682 (1997)..........................................21, 22, 33, 45, 46

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986).........................................................................23

*Council on American Islamic Relations v. Ballenger*,
444 F.3d 659. 665 (D.C. Cir. 2006)............................................50, 51

*Davydov v. Youseffi*,
205 A.D.3d 881, 882 (1st Dep't 2022) ..............................................60

*Dole Food Co. v. Patrickson*,
548 U.S. 468, 479-80 (2003) ...........................................................29

*Eastman Kodak Co. v. Henry Bath, LLC*,
936 F.3d 86, 98 (2d Cir. 2019) ........................................................35

*EM Ltd. v. Banco Cent.*,
800 F.3d 78, 82 (2d Cir. 2015) ..........................................................6

*Executive Trim Construction. v. Gross*,
525 F.Supp.3d 357, 369-70 (N.D.N.Y. 2021) ............................57, 58

*Ferri v. Ackerman*,
444 U.S. 193, 204 (1979)..................................................................28

*Foman v. Davis*,
371 U.S. 178, 182 (1962)..................................................................34

*Gilmore v. Shearson/American Exp.*,
  811 F.2d 108, 112 (2d Cir. 1987) .......................................................41, 42, 43, 44

*Griggs v. Provident Consumer Discount,*
  459 U.S. 56, 58 (1982).......................................................................................55

*Harlow v. Fitzgerald*
  457 U.S. 800 (1982)...............................................................21, 29, 30, 56

*Kendall v. United States,*
  12 Pet. 524 (1838)...............................................................14, 19, 31

*Kforce, Inc. v. Alden Pers.*,
  288 F.Supp.2d 513, 516 (S.D.N.Y. 2003) ...........................................................59

*Klayman v. Obama,*
  125 F.Supp.3d 67, 86 (D.D.C. 2015)...................................................................46

*Kuretski v. CIR*,
  755 F.3d 929, 937 (D.C. Cir. 2014)....................................................................25

*Liberman v. Gelstein*,
  80 N.Y.2d 429, 435 (1992) .......................................................................57 59

*Lo Duca v. United States*,
  93 F. 3d 1100, 1104 (2d Cir. 1996) ...................................................................25

*Lombardo v. Stoke*,
  18 N.Y.2d 394, 400 (1966) .......................................................................50

*Lucente v. Int'l Bus. Machs. Corp.*,
  310 F.3d 243, 258 (2d Cir. 2002) ..............................................................35, 43

*Lujan v. Defenders of Wildlife*,
  504 U.S. 566, 577 (1992)....................................................................23, 34

*Luther M. Ragin. v. Harry Macklowe*,
  126 F.R.D. 475, 478 (S.D.N.Y. 1989)................................................................36

*Marsh v. Sheriff of Cayuga County*,
  36 Fed App'x 10, 11 (2d Cir. 2002) ..................................................................36

*Massachusetts v. Mellon*,
  262 U.S. 447, 489 (1923)....................................................................12

*McFadden v. Monroe Cty. Sheriff*,
  No. 00-cv-6034, 2002 WL 1348508, at *3 (W.D.N.Y. Apr. 16, 2002) .......41, 42

*Mistretta v. United States*,
  488 U.S. 361, 412 (1989)..............................................................13, 33

*Monahan v. N.Y.C. Dep't of Corr.*,
  214 F.3d 275, 284 (2d Cir. 2000) ................................................39, 40

*Muskrat v. United States*,
  219 U.S. 346, 355 (1911)....................................................................13

*Nat'l Mut. v. Tidewater Transfer*,
  337 U.S. 582, 590 (1949)....................................................................12

*Nixon v. Administrator of General Services*,
  433 U.S. 425, 443 (1977)..........................................................14, 30, 33

*Nixon v. Fitzgerald*
  457 U.S. at 754, n. 37 (1982)....................................................*passim*

*Pani v. Empire BCBS*,
  152 F.3d 67, 75 (2d Cir. 1998) ............................................................49

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114, 119 (2d Cir. 2012) .........................................................35

*Pereira v. Cogan*,
  No. 00-cv-619 (RWS), 2002 WL 1822928, at *4 (S.D.N.Y. Aug. 7, 2002)......44

*Peters v. Baldwin Union*,
  320 F.3d 164, 169 (2d Cir. 2003) .........................................................56

*Pierson v. Ray*,
  386 U.S. 547, 555 (1967).....................................................................28

*Pinaud v. County of Suffolk*,
  52 F.3d 1139, 1149 (2d Cir.1995) ........................................................53

*Premier Medical Systems v. NeuroLogica Corp.*,
   2022 WL 603999, at *12-*13 (S.D.N.Y. Feb. 28, 2022) .............................57, 58

*Pure Power Boot Camp v. Warrior Fitness*,
   813 F.Supp.2d 489, 550 (S.D.N.Y. 2011.....................................................57, 60

*Ram v. Moritt*,
   205 A.D. 516 (2d Dep't 1994)..........................................................................60

*Ramirez v. Bernstein*,
   No. 17 CV 3825 (VB), 2020 WL 7230729, at *3 (S.D.N.Y. Dec. 7, 2020) ......40

*Rankin v. McPherson*,
   483 U.S. 378, 387 (1987).................................................................................49

*Richardson Greenshields Sec. v. Lau*,
   825 F.2d 647, 653 n. 6 (2d Cir.1987) ..............................................................37

*Rinaldi v. City of New York*,
   756 F.Supp. 111, 115 n. 3 (S.D.N.Y. 1990) .....................................................38

*Rodriguez v. City of New York*,
   18 CIV. 4805 (NRB), 2021 WL 5360120, at *4 (S.D.N.Y. Nov. 16,
   2021) .................................................................................................................42

*Rufeh v. Schwartz*,
   50 A.D.3d 1002, 1005 (2d Dep't 2008)............................................................60

*Ruotolo v. City of New York*,
   514 F.3d 184, 192 (2d Cir. 2008) ...............................................................36, 38

*Samuels, Kramer & Co. v. CIR*,
   930 F.2d 975, 987 (2d Cir. 1991) .................................................12, 13, 25, 26

*Shields v. Citytrust Bancorp*,
   25 F.3d 1124, 1128 (2d Cir. 1994). A1199-1233 .....................................*passim*

*Shmueli v. City of New York*,
   424 F.2d 231, 238 (2d Cir. 2005) ....................................................................53

*Snyder v. Phelps*,
    562 U.S. 443, 453 (2011)......................................................................49

*Sorano v. Taggart*,
    642 F. Supp.2d 45, 55-56 (S.D.N.Y. 2009)........................................38

*Spalding v. Vilas*,
    161 U.S. 483, 498 (1896)......................................................................49

*State Teachers Ret. Bd. v. Fluor Corp*.,
    654 F.2d 843, 856 (2d Cir. 1981) ..................................................37, 39

*Steinberg v. Colum. Pictures Indus*.,
    663 F. Supp. 706, 715 (S.D.N.Y. 1987) ............................................35

*Stephenson v. Doe*,
    332 F.3d 68, 76 (2d Cir. 2003) ...........................................................38

*Thompson v. Trump*,
    590 F.Supp.3d 46, 79 (D.D.C. 2022)............................................46, 47

*Trump v. Hawaii*,
    138 S. Ct. 2392, 2417–18 (2018)........................................................47

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019, 2034 (2020)..............................................................14

*Trump v. Vance*,
    140 S. Ct. 2412, 2425 (2020)..............................................................46

*U.S. Fid. v. Jim's Elec*.,
    No. 05-CV-0440A (SR), 2010 WL 1408968, at *4
    (W.D.N.Y. Feb. 3, 2010) ....................................................................40

*United States v. Brown*,
    381 U.S. 437, 442-43 (1965) ..............................................................12

*United States v. Nixon*,
    418 U.S. 683 ........................................................................................16

_United States v. Rodgers_,
  101 F.3d 247, 251 (2d Cir. 1996) ........................................................56

_Wellness Inter. Network v. Sharif_,
  575 U.S. 665, 675-676 (2015) ...........................................................25

_Williams v. United States_,
  71 F.3d 502, 507 (5th Cir. 1995) .......................................................50

_Youngstown Sheet & Tube Co._,
  343 U.S. 579 (1952)..................................................................19, 31

_Zysk v. Fidelity Tit._,
  14 A.D.3d 609, 610 (2d Dep't 2005)..................................................60

## **_Statutes/Regulations/Miscellaneous_**

5C Wright & Miller, Federal Practice & Procedure § 1392 (3d ed. 2020) ............42

28 U.S.C. §2671 ................................................................................6

28 U.S.C. §2674 ................................................................................6

28 U.S.C. §2679 ................................................................................6

28 U.S.C. §2679(d)(2)...................................................................2, 6

Fed. R. Civ. P. 12(b)(6).................................................................35, 42

Rule 12(h)(2) of the Federal Rules of Civil Procedure...........................42

Rule 15(a) of the Federal Rules of Civil Procedure ...............................34

Rule 15(a)(2) of the Federal Rules of Civil Procedure............................3

Defendant-Appellant, Donald J. Trump ("Defendant-Appellant"), respectfully submits this memorandum of law in support of his appeal from the July 5, 2023 Opinion and Order (SPA63-108) of the United States District Court for the Southern District of New York, the Honorable Lewis A. Kaplan, denying Defendant-Appellant's Motion for Summary Judgment, and the August 7, 2023 Memorandum Opinion (SPA110-133) Granting Plaintiff's Motion to Dismiss Defendant's Counterclaim and Strike Certain Affirmative Defenses.

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court err by not permitting Defendant-Appellant to raise presidential immunity as a defense?

2. Did the District Court err in finding that Defendant-Appellant's conduct did not fall within the outer perimeter of his presidential duties?

3. Was the District Court permitted to retain jurisdiction of the underlying matter after Defendant-Appellant filed an interlocutory appeal sounding in immunity?

4. Did the District Court properly conclude that the challenged statements were defamatory *per se*, even where the statements did not make reference to Plaintiff-Appellee's trade or profession?

## FACTUAL AND PROCEDURAL BACKGROUND

In June of 2019, Plaintiff-Appellee, E. Jean Carroll ("Plaintiff-Appellee") made public accusations against Defendant-Appellant, then-sitting President of the

United States, alleging that he had sexually assaulted her in the mid-1990s. A120. In response, Defendant-Appellant issued three separate statements in June 2019 publicly refuting her allegations. The first statement was emailed by the Deputy White House Press Secretary to the press denying her accusations. A573. Defendant-Appellant issued the second statement while responding to reporters' wide-ranging questions on the South Lawn of the White House on his way to the presidential helicopter, Marine One, and denied Plaintiff-Appellee's allegations a second time. A575-587. The third statement was issued in response to questions from reporters during a 45-minute interview in the Oval Office, where Defendant-Appellant again reaffirmed his denial of the accusations. A589-592.

On November 4, 2019, Plaintiff-Appellee commenced an action in the Supreme Court of the State of New York, New York County, entitled *Carroll v. Trump*, Index No. 160694/2019, raising a single defamation claim against Defendant-Appellant. A106-134.

The United States subsequently certified that Defendant-Appellant's conduct was within the scope of his presidential duties under the Westfall Act. SPA4. On this basis, the action was removed to the Southern District of New York (the "District Court") pursuant to 28 U.S.C. § 2679(d)(2). *See generally Carroll v. Trump*, 49 F.4th 759, 763 (2d Cir. 2022). The Westfall Act immunity was the subject of a multi-year appeal before this Court, which was eventually remanded back to the District Court.

*Carroll v. Trump*, 66 F.4th 91, 94 (2d Cir. 2023). The issue of whether Defendant-Appellant was subject to immunity under the Westfall Act was ultimately rendered moot. A1044-1045.

On December 22, 2022, Defendant-Appellant moved for summary judgment dismissing this action on the basis that, among other things, Defendant-Appellant is shielded by presidential immunity and the challenged statements are not defamatory *per se*. A50-396.

On January 12, 2023, Plaintiff-Appellee filed an opposition to Defendant's Motion for Summary Judgment, asserting that Defendant-Appellant had previously waived his ability to assert presidential immunity. A403-446.

Thereafter, on January 19, 2023, Defendant-Appellant filed a reply which argued, among other things, that presidential immunity is a non-waivable jurisdictional question pursuant to the separation-of-powers doctrine. A880-894. Alternatively, Defendant-Appellant also sought leave to assert presidential immunity as a defense under Rule 15(a)(2) to the extent the District Court found that it had been waived. A889-891.

In an Order dated July 5, 2023 (the "July Order"), the District Court denied Defendant-Appellant's motion for summary judgment, finding, among other things, that (i) presidential immunity is waivable and was waived by Defendant-Appellant; (ii) Defendant-Appellant's request for leave to amend is unwarranted because the

proposed amendment is futile and unfairly prejudicial to Plaintiff-Appellee; and (iii) Defendant-Appellant's statements were libel *per se* because they could have been construed as tending to disparage Plaintiff-Appellee in her profession. *See generally*, SPA63-108.

On July 19, 2023, Defendant-Appellant timely appealed the July Order. SPA109.

Meanwhile, Plaintiff-Appellee had previously sought leave to amend her Complaint on May 22, 2023, which the District Court granted on June 13, 2023. A1046-1047. Thereafter, on June 27, 2023, Defendant-Appellant timely filed his Answer to the Amended Complaint, which asserted the defense of presidential immunity. A1048-1074.

On July 11, 2023, Plaintiff-Appellee filed a Motion to Dismiss Defendant-Appellant's Counterclaim and to Strike. A1075-1193. With respect to Defendant-Appellant's presidential immunity defense, Plaintiff-Appellee proffered only a sparse argument that the defense should be stricken because the District Court previously rejected it in its July Order. A1111-1112. Defendant-Appellant opposed the motion on July 25, 2023, arguing that he permissibly raised his presidential immunity defense in response to Plaintiff-Appellee's newly-amended complaint, which "supersede[d] the original, and render[ed] it of no legal effect." *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994). A1199-1233. Plaintiff-

Appellee submitted her reply on August 1, 2023, arguing that Defendant-Appellant's presidential immunity defense is excluded by *Shields* because it relates to his willingness to submit to judicial resolution. A12571272.

In an Order dated August 7, 2023 (the "August Order"), the District Court granted Plaintiff-Appellee's motion and struck presidential immunity as a defense. ASPA110-133. Specifically, the Defendant-Appellant ruled that Defendant-Appellant was not permitted to raise his presidential immunity defense because it had already been waived. SPA131.

On August 10, 2023, Defendant-Appellant timely appealed the August Order, which has since been consolidated with the appeal of the July Order, to comprise the instant appeal. SPA134.

On July 27, 2023, Defendant-Appellant filed a motion before the District Court to stay all proceedings pending resolution of the instant appeal, arguing both that a stay would cause Defendant-Appellant irreparable harm, and that the District Court was divested of jurisdiction. A1236. The District Court denied Defendant-Appellant's request, finding both that a stay is not warranted under the relevant standard and certifying Defendant-Appellant's appeal as "frivolous," thereby allowing the District Court to retain jurisdiction. A1310-1326.

## JURISDICTIONAL STATEMENT

This action was initially commenced by Plaintiff-Appellee in New York State Supreme Court, New York County. Pursuant to the Westfall Act, codified at 28 U.S.C. §§ 2671, 2674 and 2679, the United States Department of Justice certified that Defendant-Appellant "was acting within the scope of his office as the President of the United States at the time of the alleged conduct," and, as a result, the action was removed to the District Court pursuant to Section 2679(d)(2).

This appeal is before this Court by virtue of Defendant-Appellant's appeals of the July Order and the August Order (collectively, the "Orders"). The Orders are immediately appealable under the collateral order doctrine since they both pertain to the District Court's denial of Defendant-Appellant's presidential immunity defense. *See Nixon v. Fitzgerald*, 457 U.S. 731 (1982) (denial of presidential immunity is immediately appealable). In addition, this Court has routinely held that a denial of immunity based on a theory of *waiver* is immediately appealable, *see*, *e.g.*, *EM Ltd. v. Banco Cent.*, 800 F.3d 78, 82 (2d Cir. 2015) (finding that foreign sovereign immunity was waived was immediately appealable); *Blue Ridge v. Republic of Argentina*, 735 F.3d 72, 79-81 (2d Cir. 2013) (same). Therefore, this Court has jurisdiction to hear the instant appeal.

## SUMMARY OF THE ARGUMENT

This appeal presents several unsettled questions of law of profound public importance. The answers to these questions will reverberate well beyond the instant dispute; if correctly resolved, this Court's decision will serve to maintain the delicate balance between the Judicial Branch and Executive Branch and to strengthen the President's ability to make challenging and consequential decisions without fear or apprehension.

Pursuant to Article II of the United States Constitution, the President is vested with the sole responsibility for an entire branch of government. His job entails "innumerable functions" which require him to "make the most sensitive and far-reaching decisions entrusted to any official under [the] constitutional scheme." *Nixon*, 457 U.S. at 752-56. Given the "special nature" of his office and the "singular importance" of his duties, the Supreme Court has held that the President is entitled to "absolute immunity from damages liability predicated on his official acts." *Id.* at 749. This wide-spanning immunity—'presidential immunity'—is an "essential Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of powers." *Id.* at 743. The Supreme Court has consistently acknowledged that "there exists the greatest public interest" in maintaining this protection, and that its absence would "raise unique risks to the effective functioning of government." *Id.* at 752.

The underlying action, which sounds in a single claim for defamation, seeks to impute civil liability upon Defendant-Appellant, then-sitting President of the United States, for publicly responding to a heinous allegation levied against him by Plaintiff-Appellee. However, for the many reasons discussed herein, Defendant-Appellee's conduct is not properly the subject of a civil damages claim since his conduct is shielded by presidential immunity. The District Court's rejection of this defense was clearly made in error; more importantly, this flawed decision will have wide-ranging implications which threaten to disrupt the separation-of-powers between the Judicial Branch and the Executive Branch, and significantly diminish the latitude of protection afforded to all Presidents under the presidential immunity doctrine. Accordingly, the District Court's holding must be reversed on several grounds.

*First*, the District Court's finding that Defendant-Appellant waived his presidential immunity defense is at odds with centuries of constitutional jurisprudence. As evidenced by Supreme Court decisions dealing with similar inter-branch conflicts between the judiciary and the President, presidential immunity implicates the utmost separation-of-powers concerns and goes toward the larger question of whether a court is able to exercise jurisdiction over a case at all. As such, this defense is simply not waivable.

Further, even if it is waivable, the District Court erred in denying Defendant-Appellant's request for leave to amend to assert presidential immunity as a defense. This is particularly true in light of the liberal amendment standard, the strength of Defendant-Appellant's presidential immunity argument, and the important constitutional considerations at play.

In addition, even assuming *arguendo* that presidential immunity is waivable, was in fact waived, and leave to amend was rightfully denied by the District Court, Defendant-Appellant *still* properly asserted presidential immunity by pleading it in his Answer to Plaintiff-Appellee's Amended Complaint, which "supersede[d] the original [complaint], and render[ed] it of no legal effect." *Shields*, 25 F.3d at 1128. Thus, it is incontrovertible that Defendant-Appellant sufficiently invoked his presidential immunity defense.

*Second*, presidential immunity is a meritorious defense. It is simply beyond dispute that it is part of a President's official responsibilities to address issues of national concern and to engage with the press. Further, as the leader of the nation and figurehead for the American people, the President has a duty to address attacks on his character which inevitably threaten his ability to effectively govern the country. Thus, Defendant-Appellant could not sit idly by while a media frenzy erupted around allegations that attempted to paint him as a rapist. He had a presidential duty to respond, and to address the media and the nation as a whole.

Thus, his three statements—which were disseminated to the media through an official White House press release and on-location interviews at the White House lawn—were irrefutably part of his official responsibilities and are therefore immunized from liability. Indeed, as recognized by the Supreme Court, this is precisely the type of conduct that the presidential immunity doctrine is intended to protect, and why it is so necessary that the President be afforded the "maximum ability to deal fearlessly and impartially with the duties of his office." *Nixon*, 457 U.S. at 752. The District Court's denial of Defendant-Appellant's presidential immunity defense, therefore, was reversible error.

*Third*, even setting aside the question of presidential immunity, Plaintiff-Appellee's defamation claim still fails as a matter of law because the subject statements were not targeted towards Plaintiff-Appellee's professional competence and, therefore, cannot be considered to be defamatory *per se*. Since Plaintiff-Appellee also failed to substantiate, or even allege, any entitlement to special damages, her cause of action is deficient.

In sum, Plaintiff-Appellee's complaint is legally defective and worthy of dismissal on multiple grounds. Given the spuriousness of her claim, and the important constitutional and institutional interests at stake, the instant controversy should not be permitted to upend decades of separation-of-powers jurisprudence nor erode the wide-spanning protections afforded under the presidential immunity

doctrine. Therefore, for the reasons outlined herein, the District Court's decision must be overturned.

## LEGAL ARGUMENT

### I.    Defendant-Appellant Properly Invoked His Presidential Immunity Defense

Historical Supreme Court jurisprudence, coupled with the modern understanding of the separation-of-powers framework, confirms that presidential immunity, when applicable, poses an inter-branch conflict which creates an insurmountable hurdle to a court's jurisdiction. This constitutional principle forecloses the District Court's finding that Defendant-Appellant waived his right to presidential immunity. Moreover, even assuming presidential immunity can be waived, the District Court mistakenly denied Defendant-Appellant's motion to amend and include it as a defense, given the liberal amendment standard, the compelling nature of the Defendant-Appellant's argument for presidential immunity, and the significant constitutional factors involved. Finally, even if all else fails, Defendant-Appellant properly raised his presidential immunity argument in response to Plaintiff-Appellee's Amended Complaint under the relevant *Shields* standard. *Shields,* 25 F.3d at 1128.

Therefore, for the reasons set forth below, Defendant-Appellant is entitled to claim presidential immunity in the underlying matter.

### A. Presidential Immunity Is Non-Waivable Under the Separation-of-Powers Doctrine

"In framing the Constitution, the Founding Fathers adopted a system of checks and balances to ensure that no one component of government would exercise too much power." *Samuels, Kramer & Co. v. CIR*, 930 F.2d 975, 987 (2d Cir. 1991). Indeed, the Framers "built into the tripartite Federal Government…a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley* v. *Valeo,* 424 U.S. 1, 122 (1976). This "principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the [Constitution]." *Id.* at 124. As such, the separation-of-powers between the three co-equal coordinate branches functions as a "a bulwark against tyranny," *United States v. Brown*, 381 U.S. 437, 442-43 (1965), and is "fundamental in our system," *Nat'l Mut. v. Tidewater Transfer*, 337 U.S. 582, 590 (1949)*.*

This foundational tenet—which prohibits one branch from "assum[ing] a position of authority over the governmental acts of another and co-equal department," *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923)—served as the basis for the Supreme Court's proclamation that a President is entitled to a sweeping immunity from civil suit for acts taken in his official capacity, *see generally Nixon*, 457 U.S. 731. Given this interplay between the separation-of-powers doctrine and presidential immunity, an impermissible inter-branch conflict will always arise when

a court seeks to impute civil liability on a President for the performance of his official acts.

Therefore, for the reasons outlined below, presidential immunity is a non-waivable defense.

### i. The Separation-of-Powers Doctrine Restrains The Judicial Branch's Ability to Exercise Jurisdiction Over A President's Official Conduct

"Historically, separation-of-powers jurisprudence has focused on the extent to which one branch aggrandizes its power at the expense of another branch or encroaches on the authority specifically reserved for a co-equal branch." *Samuels*, 930 F.2d at 988 (citing *Mistretta v. United States*, 488 U.S. 361, 412 (1989)). In other words, each branch must operate within its own strict confines, and not usurp the authority or independence of another branch. The role of each branch is clear:

> "The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts....[N]either department may invade the province of the other."

*Mellon*, 262 U.S. at 488.

With respect to the Judicial Branch, the Supreme Court has cautioned that courts should "carefully abstain from exercising any power that is not strictly judicial in its character, and which is not clearly confided to [the courts] by the Constitution." *Muskrat v. United States,* 219 U.S. 346, 355 (1911). "[F]rom its earliest history [the

13

judiciary] has consistently declined to exercise any powers other than those which are strictly judicial in their nature." *Id*. at 356.

As for the Executive Branch, the separation-of-powers inquiry "focuses on the extent to which [the act of another branch] prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977). The President is the central—and, in some respects the *only*—figure who is relevant to this analysis. Indeed, Article II, § 1 vests the entire "executive Power" in the "President," which means that "[t]he President is the only person who alone composes a branch of government," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). Given his "unique position in the constitutional scheme," *Nixon*, 457 U.S. at 749, it is not surprising that courts "traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint," *id.* at 753 (citations omitted); *see also id.* at 754, n. 34 ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department[.]") (citing *Kendall v. United States*, 12 Pet. 524 (1838)).

This underlying principle—that the judiciary must not impede upon the independence and autonomy of the President—has been historically codified by the courts. As demonstrated through a line of Supreme Court decisions, set forth *infra*, when confronted with this type of inter-branch conflict, the judiciary has repeatedly

14

refrained from exercising jurisdiction over the President's official conduct, except in the most extraordinary and imperative circumstances, and, even then, only to the most limited extent possible. The common thread running through these cases is the Supreme Court's recognition that—by virtue of the President's distinct position in the constitutional hierarchy—the separation-of-powers doctrine functions as a safeguard to insulate him from the influence and control of the other branches.

As early as the 1800s, it was established that the judiciary is prohibited from interfering with the President's ability to carry out his official duties. In *Mississippi v. Johnson*, the State of Mississippi sued to enjoin President Andrew Johnson "from executing or in any manner carrying out…the Reconstruction Acts." 71 U.S. 475 (1867). In evaluating whether the judiciary was vested with the authority to enjoin the President in his official conduct, the Supreme Court considered whether the exercise of such jurisdiction would run afoul of the separation-of-powers doctrine, *i.e*, the "general principles which forbid judicial interference with the exercise of Executive discretion." *Id.* at 499. In determining that jurisdiction was not warranted in such a scenario, the Court pointed to the "apparently unbroken historical tradition…implicit in the separation-of-powers" that "the President[,] [a]s the executive department[,]" cannot be "restrained in its action by the judicial department." *Id*. at 500. The Court opined that "[t]he impropriety of such interference [is] clear" because it would inevitably lead to an irresolvable "collision"

15

between coequal "departments of the government." *Id*. at 500–01. Thus, the Court concluded that the judiciary has "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id*. By issuing its edict, the Supreme Court recognized for the first time that the judiciary is prohibited from exercising jurisdiction in cases that would unduly interfere with the President's ability to execute his official duties.

More than 100 years later, in *United States v. Nixon*, the Supreme Court held that a President does not enjoy absolute immunity from federal criminal trial subpoenas for information covered by executive privilege. 418 U.S. 683. This decision, however, was premised on the Court's "historic commitment to the rule of [criminal] law" and the notion that "the ends of criminal justice would be defeated" absent complete disclosure of facts in criminal cases. *Id.* at 710. The Court simultaneously held that presidential communications are "presumptively privileged" because such privilege is "fundamental to the operation of Government and inextricably rooted in the separation-of-powers under the Constitution," *id*. at 708, and "relates to the effective discharge of a President's powers," *id*. at 711. The Court also emphasized that the judiciary must always be cautious not to encroach upon the independence of the Executive Branch, noting that "in determining whether [an action] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from

accomplishing its constitutionally assigned functions." *Id.* at 711-712. Ultimately, the Court was satisfied that it was able to resolve the subject dispute "in a manner that preserves the essential function of each branch," thereby obviating any separation-of-powers concern that would otherwise prevent the judiciary from exercising jurisdiction over the case. *Id.* at 707 (1974).

Next, in *Nixon v. Fitzgerald*, the Supreme Court issued a seminal holding which applied the previously established separation-of-powers principles to hold, for the first time, that the President's official conduct is "beyond the reach" of the judiciary when it comes to the imposition of civil liability. 457 U.S. at 754, n. 37 (1982).

In *Nixon*, a government whistleblower attempted to sue former President Nixon for wrongful termination, claiming that the then-President had unlawfully fired him in retaliation for damaging testimony that he had given before an oversight committee. The Supreme Court—recognizing the "special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation-of-powers," *id.* at 743—flatly rejected the contention that President Nixon could be subject to civil liability for his decision to terminate the whistleblower, and affirmed, in a sweeping decision, that "a former President of the United States is entitled to absolute immunity from damages liability predicated on his official acts," *id.* at 749.

In recognizing this new form of immunity—which the Court termed "presidential immunity"—the Court "dr[e]w its evidence primarily from our constitutional heritage and structure," and performed a "[h]istorical inquiry…involv[ing] policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers." *Id.* at 748. This analysis led the Court to determine that the "most compelling arguments" in favor of adopting a wide-spanning immunity for a President "arise from the Constitution's separation of powers and the Judiciary's historic understanding of that doctrine." *Id.* at 750, n. 31.

In this respect, the Court acknowledged that "the President occupies a unique position in the constitutional scheme," *id.* at 749, and emphasized that his "unique status under the Constitution distinguishes him from other executive officials," *id.* at 750. Namely, the Court pointed to Article II of the Constitution, which provides that "executive Power [is] vested in [the] President," establishing him as "the chief constitutional officer of the Executive Branch" and entrusting him with "discretionary responsibilities in a broad variety of areas," all of which arise "[u]nder the Constitution and the laws of the United States." *Id.* at 756. The Court took note that these duties are "charged constitutionally" and involve "incidental powers, belonging to the executive department, which are necessarily implied from the

18

nature of the functions[] which are confided to it"; as such, the Constitution's grant of authority to the President "must necessarily [] include[] the power to perform them." *Id.* (citations omitted).

Accordingly, the Court held that presidential immunity is a "functionally mandated incident of the President's unique office" which is "rooted in the constitutional tradition of the separation of powers." *Id.* at 749. The Court recognized this holding to be an extension of prior precedent which mandates "judicial deference and restraint" in exerting jurisdiction over the President, *see id.* at 754, n. 34 (citing *Mississippi*, *supra*; *Kendall*, *supra*), and distinguished it from other cases in which it found the exercise of such jurisdiction to be permissible:

> It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States...But our cases also have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch…When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance, cf. *Youngstown Sheet & Tube Co. v. Sawyer, supra*, or to vindicate the public interest in an ongoing criminal prosecution, see *United States v. Nixon, supra* —the exercise of jurisdiction has been held warranted. ***In the case of this merely private suit for damages based on a President's official acts, we hold it is not.***

*Id.* at 754 (emphasis added). The Court acknowledged, in no uncertain terms, that the judiciary's exercise of jurisdiction is "bar[red]" when presidential immunity applies.

Ultimately, in applying its "outer perimeter" test, the Court determined that "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which the [Air Force] Secretary will conduct the business of the Air Force," and, therefore, President Nixon's conduct "lay well within the outer perimeter of his authority." *Id.* His conduct was therefore unreviewable. *Id.*

In his concurring opinion, Chief Justice Burger wrote separately to "underscore that the Presidential immunity derives from and is mandated by the constitutional doctrine of separation of powers." *Id.* at 758 (Burger, J., concurring). He reiterated the points made by the majority and emphasized that presidential immunity is a constitutional necessity which is founded *entirely* upon separation-of-powers principles, as a safeguard against the judiciary's undue intrusion into the Presidential decision-making process:

> "Absolute immunity for a President for acts within the official duties of the Chief Executive is either to be found in the constitutional separation of powers or it does not exist. The Court today holds that the Constitution mandates such immunity and I agree.
>
> The essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches…[T]he Judiciary always must be hesitant to probe into the elements of Presidential decisionmaking...Such judicial intervention should not be tolerated absent imperative constitutional necessity. The Court's opinion correctly observes that judicial intrusion through private damages actions improperly impinges on and hence interferes with the independence that is imperative to the functioning of the office of a President."

*Id.* at 761 (citations omitted).

In a companion case, *Harlow v. Fitzgerald*, the Supreme Court addressed the extent to which Nixon's presidential aides were immunized from suit, finding that they were only entitled to qualified immunity. 457 U.S. 800 (1982). The Court, however, took occasion to clarify its decision in *Nixon*, noting that, unlike presential aides, a President's entitlement to presidential immunity is "derive[d] in principal part from factors unique to [the President's] constitutional responsibilities and station," and that "[s]uits against other officials…generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." *Id.* at 811, n. 17. As such, the Supreme Court reiterated the unique deference afforded to the President under the separation-of-powers doctrine, even when compared to subordinate officials within his own office.

Subsequently, in *Clinton v. Jones*, the Supreme Court heard its second (and, to date, last) presidential immunity case. In *Clinton*, a plaintiff sued President Clinton for alleged sexual misconduct prior to taking office. President Clinton argued that, as a sitting President, he was immune from suit in federal court under the Supremacy Clause.

As with *Nixon*, the *Clinton* Court's analysis was largely centered around the separation-of-powers doctrine. Taking heed of the notion that "the separation of powers doctrine requires that a branch not impair another in the performance of its

constitutional duties," the Court ultimately determined that no such risk existed due to the temporal nature of the conduct at issue. *Clinton*, 520 U.S. at 701 (citation omitted). Specifically, the Court found that the separation-of-powers doctrine was not offended because Clinton was being sued for conduct that had taken place *before* he was President. Thus, the Court reasoned, "[w]hatever the outcome of this case, there is *no possibility* that the decision will curtail the scope of the official powers of the Executive Branch" because "the litigation of questions that relate to the *unofficial* conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial or executive power." *Id.* at 701 (emphasis added). For this reason, the Court found that, as a general proposition, the "federal courts have power to determine the legality of [the President's] *unofficial conduct*," *id.* at 705 (emphasis added), and held that, in this particular instance—since the separation-of-powers doctrine was not contravened—the judiciary "ha[d] jurisdiction to decide th[e] case," *id.* at 710.

As established from the above-referenced line of cases, from *Mississippi* to *Clinton*, it is clear that the separation-of-powers doctrine does not permit the judiciary to encroach upon the President's sphere of official conduct except in the most narrowly-tailored circumstances. Per *Nixon*, a "merely private suit for damages based on a President's official acts" is plainly not one of those limited exceptions –

the "danger[] of intrusion on the authority and function of the Executive Branch" is inherently too high. *Nixon*, 457 U.S. at 754.

It follows that whether a private suit against a President is "based on [his] official acts" is a threshold issue that goes towards whether a court is authorized to exercise jurisdiction over the subject matter of a case at all. *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."); *Lujan v. Defenders of Wildlife*, 504 U.S. 566, 577 (1992) (finding that the separation-of-powers doctrine is violated, and Article III standing is lacking, when the judiciary "'assume[s] a position of authority over the governmental acts of another and co-equal department' and [] become[]s 'virtually continuing monitors of the wisdom and soundness of Executive action.'") (citation omitted).

This proposition is bolstered by Supreme Court precedent which instructs that the separation-of-powers doctrine is a constitutional prerequisite that cannot be waived by an individual party. Particularly, in *Commodity Futures Trading Comm'n v. Schor*, the Supreme Court was tasked with determining whether Congress could assign traditional judicial functions to a non-Article III entity, the Commodities Futures Trading Commission, to adjudicate customer disputes against commodities brokers. 478 U.S. 833 (1986). The Court reasoned that, although a litigant may

possess a "personal right" to waive Article III entitlement, this personal waiver "cannot be dispositive," *id.* at 851, when there are broader "structural principles" involved since this creates an inherent "constitutional difficulty." *Id.* In doing so, the Court identified the separation-of-powers doctrine as one of these "structural principles" and emphasized its absolute, non-waivable nature:

> "[O]ur precedents establish that Article III…serves as 'an inseparable element of the constitutional system of checks and balances'…thereby preventing 'the encroachment or aggrandizement of one branch at the expense of the other.' ***To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty*** for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2. ***When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.***"

*Id.* at 850-51 (emphasis added). The key question, the Court noted, is whether a party's waiver of an individual right "impermissibly threatens the institutional integrity" of a particular branch. *Id.* at 851. If it does, the separation-of-powers doctrine is "contravened" and the waiver cannot be effective. *Id.* Ultimately, the *Schor* Court determined that the facts in that case "raise[d] no question of the aggrandizement of congressional power at the expense of another branch" and therefore presented "no genuine threat" under a separation-of-powers analysis. *Id.* at 856-57. As such, the parties' individual waiver of their constitutional rights was deemed to be effective. *Id.*

Critically, in the aftermath of *Schor*, courts have consistently reaffirmed that the separation-of-powers doctrine is a "structural principle" which cannot be waived on an individual basis. *See*, *e.g.*, *Lo Duca v. United States*, 93 F. 3d 1100, 1104 (2d Cir. 1996) ("Since the argument proffered by Lo Duca involves constitutional notions of separation-of-powers, the Government's response that Lo Duca has waived his claims 'cannot be dispositive.'") (citing *Schor*, *supra*); *see also Austin v. Healey*, 5 F.3d 598 (2d Cir. 1993) ("[B]ecause Austin's second claim, the constitutional argument, implicates the balance struck by our Constitution among the three branches of government, notions of forfeiture or waiver 'cannot be dispositive.'") (citing *Schor*, *supra*); *Samuels*, 930 F.2d at 984 ("[S]tructural protections…stand on a different footing from personal constitutional rights."); *Wellness Inter. Network v. Sharif*, 575 U.S. 665, 675-676 (2015) (reiterating the holding in *Schor* that "to the extent this structural principle [i.e., the separation-of-powers doctrine] is implicated in a given case…the parties cannot by consent cure the constitutional difficulty."); *Kuretski v. CIR,* 755 F.3d 929, 937 (D.C. Cir. 2014) (relying on *Schor* to hold that "[b]ecause the [defendants] raise a structural claim in addition to any 'personal' claim'…they did not waive their structural challenge" and "have standing to bring their separation-of-powers claim."). This construction of the separation-of-powers doctrine is necessary to maintain the structural and institutional integrity of the tripartite federal government. Indeed, "[w]ere such

institutional interests—as distinguished from personal constitutional rights—so easily waived," the separation-of-powers doctrine would "effectively be rendered null and void." *Samuels*, 930 F.2d at 984.

To that end, given its unique rooting in the separation-of-powers doctrine, presidential immunity implicates a structural safeguard which operates to bar any court from exercising jurisdiction over a claim within its ambit. *Schor*, 478 U.S. at 851. At its core, presidential immunity is a "functionally mandated incident of the President's unique office" which serves to insulate the President's autonomy and prevent the judicial branch from interfering with the discharge of his official functions. *Nixon*, 457 U.S. at 749. The indispensable nature of this protection is "implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation-of-powers," *id.* at 748, because "judicial intrusion through private damages actions improperly impinges on and hence interferes with the independence that is imperative to the functioning of the office of a President," *id.* at 761 (Burger, J., concurring). In this respect, the presidential immunity doctrine is part of the "unbroken historical tradition…implicit in the separation-of-powers" that "the President[,] [a]s the executive department[,]" cannot be "restrained in its action by the judicial department." *Mississippi*, 71 U.S. at 500. A court is simply not constitutionally

authorized to exercise dominion and control over the President's official conduct, or to impute liability for the performance of his official acts.

At bottom, when the President is a defendant in a civil suit, the question of whether the allegations relate to conduct taken within the 'outer perimeter' of his official duties is a threshold issue which dictates whether the judiciary is authorized to exercise dominion over the case. If the suit seeks to impose liability for the President's official conduct, then the separation-of-powers doctrine serves as an absolute bar to the court's jurisdiction. Therefore, contrary to the District Court's finding, the defense of presidential immunity can never be waived.

### ii. The District Court's Decision Overlooked Supreme Court Precedent And Was Based On Flawed Reasoning

In the July Order, the District Court demonstrated a failure to appreciate the intricacies of presidential immunity and its nuanced interplay with the separation-of-powers doctrine. For instance, it overlooked the distinct nature of presidential immunity as compared to lesser form of absolute immunity afforded to judges and prosecutors; it misapprehended unequivocal language in the seminal case of *Nixon v. Fitzgerald*, which outlined the contours of a court's jurisdiction when dealing with presidential immunity; and it deviated from Supreme Court precedent concerning the wide-spanning scope of presidential immunity. Consequently, the District Court's decision must be overturned.

### a. Presidential Immunity Is Distinguishable From Absolute Immunity For Judges and Prosecutors

In the July Order, the District Court correctly acknowledged that Defendant-Appellant's argument is founded upon the proposition that "presidential immunity is non-waivable because it is different from absolute immunity available to judges and prosecutors." SPA73. The District Court, however, erred when it rejected this premise and determined that "[t]here is nothing so exceptional about absolute immunity available to a president that makes it non-waivable unlike other types of immunities." SPA74. This conclusion is at odds with the Supreme Court's historical framing of presidential immunity, which has consistently treated it as distinct from other, lesser forms of absolute immunity.

For judges and prosecutors, absolute immunity is "seen to derive from the *common law* and *public policy*," *Nixon*, 457 U.S. at 759, n. 2 (Burger, J., concurring) (emphasis added). Indeed, "[t]he point of immunity for [judges and prosecutors] is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions[.]" *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979). The idea is that judges and prosecutors "should be at liberty to exercise their functions with independence and without fear of consequences," *Pierson v. Ray*, 386 U.S. 547, 555 (1967) (citations omitted), and to operate "without favor and without fear," *Bradley v. Fisher*, 80 U.S. 335, 349 (1872).

It is true, as the District Court noted, that the *Nixon* Court relied on some of these same considerations to justify the existence of presidential immunity. *See Nixon*, 457 U.S. at 751-52 ("As is the case with prosecutors and judges—for whom absolute immunity is now established—a President must concern himself with matters likely to 'arouse the most intense feelings."). However, the District Court failed to recognize that the *Nixon* Court's primary justification for imbuing the President with absolute immunity was an entirely different basis – the separation-of-powers doctrine. *See id*; *see also Dole Food Co. v. Patrickson*, 548 U.S. 468, 479-80 (2003) ("The immunity recognized in *Nixon* was also based on a further rationale, one not applicable here: the constitutional separation-of-powers."); *Harlow*, 457 U.S. at 800, n. 17 (noting that presidential immunity is "derive[d] in principal part from factors unique to [the President's] constitutional responsibilities and station."). In fact, in *Nixon*, the Court expressly acknowledged that "the *most compelling* arguments [for presidential immunity] arise from the Constitution's separation of powers and the Judiciary's historic understanding of that doctrine." *Id.* at 750, n. 31 (emphasis added).

Indeed, as outlined in Section I(A) above, it is beyond dispute that presidential immunity is "rooted in the constitutional tradition of the separation of powers," *id.*, because it serves the historical function of safeguarding "against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley,* 424 U.S. at

122. Thus, since "[c]ourts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint," *Nixon*, 457 U.S. at 753, there is a "special solicitude" afforded to "claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers." *Id.* at 743; *see also Administrator of General Services*, 433 U.S. at 443 (the separation of powers "focuses on the extent to which [the act of another branch] prevents the Executive Branch from accomplishing its constitutionally assigned functions.").

These fundamental constitutional concerns are simply not present for other, lesser forms of immunity. *See Nixon*, 457 U.S. at 759, n. 2 (Burger, J., concurring) ("[T]he Constitution provides no hint that either judges, prosecutors, or congressional aides should be so protected."); *see also Harlow*, 457 U.S. at 800, n. 17 ("Suits against other officials...generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.").

Therefore, the District Court failed to recognize that presidential immunity stands apart from other forms of immunity and presents a unique obstacle to a court's ability to exercise jurisdiction due to its rooting in the separation-of-powers doctrine.

### b. The *Nixon* Court Expressly Defined Presidential Immunity As A Jurisdictional Matter

The District Court erred by failing to adhere to the Supreme Court's holding in *Nixon v. Fitzgerald*, which unequivocally stated that the judiciary's "exercise of

jurisdiction" is "bar[red]" when presidential immunity applies. *Nixon*, 457 U.S. at 754. In rejecting this proposition, the District Court attempted to distinguish the *Nixon* Court's use of the word "jurisdiction" as not "refer[ring] to a federal court's fundamental ability to adjudicate a case on its merits." SPA79. However, a closer inspection of *Nixon* demonstrates that this is simply not accurate.

In *Nixon*, the Court's discussion of jurisdiction was inextricably intertwined with its separation-of-powers analysis. Specifically, the Court pointed to prior precedent which counsels "judicial deference and restraint" in exerting dominion over the President, *see Nixon*, 457 U.S. at 754, n. 34 (citing *Mississippi*, 4 Wall. at 501; *Kendall*, 12 Pet. at 610), and took notice of its obligation to "balance the constitutional weight of the intertest to be served against the dangers of intrusion on the authority and functions of the Executive Branch," *id.* at 755. In performing this balancing test, the Court distinguished the facts of *Nixon* from prior decisions in which the judiciary's "exercise of jurisdiction" had been deemed "warranted"— including *Youngstown Sheet & Tube Co.,* 343 U.S. 579 (1952), and *United States v. Nixon*, *supra*—noting that, in those cases, the judiciary acted "not in derogation of the separation of powers, but to maintain their proper balance." *Id.* "In the case of [a] merely private suit[s] for damages based on a President's official acts," on the other hand, the Court categorically decided that the exercise of such jurisdiction is *not* "warranted." *Id.* The Court further emphasized this point by including a footnote

which refers to the President's official conduct as being "beyond the reach" of the judiciary since his "powers are derived from the constitution." *See Nixon*, 467 U.S. at 753, n. 34.

Simply put, there is only one logical takeaway from the Court's separation-of-powers evaluation: a court intrudes upon the authority and function of the Executive Branch when it seeks it to impose civil liability upon the President for his official acts; in such a scenario, the exercise of jurisdiction is strictly prohibited. The District Court's denial of this proposition constitutes reversible error.

### c. The District Court's Construction of Presidential Immunity Undermines Presidential Autonomy And Contravenes The Separation-Of-Powers Doctrine

The District Court not only rejected Defendant-Appellant's argument that presidential immunity, when viable, contravenes the separation-of-powers doctrine and precludes a court from exercising jurisdiction over a case; it took it a step further and reasoned that treating said immunity as a jurisdictional bar would offend separation-of-powers principles by "risk[ing] encroachment by the judiciary into the president's ability to choose" whether to assert it. SPA80. Respectfully, the District Court's position is at odds with the underlying purpose of the separation-of-powers doctrine and the manner in which it has been historically applied.

It is the "concern of encroachment and aggrandizement" that has "animated [the Supreme Court's] separation-of-powers jurisprudence and aroused [its]

32

vigilance against the 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.'" *Mistretta*, 488 U.S. at 380. The Court's concern has always been focused on preventing one branch from usurping the authority of another or otherwise interfering with its ability to carry out its official functions. *See*, *e.g.*, *Mellon,* 262 U.S. at 487 ("The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."); *see also Administrator of General Services*, 433 U.S. at 443 (the separation of powers "focuses on the extent to which [the act of another branch] prevents the Executive Branch from accomplishing its constitutionally assigned functions.").

Contrary to the District Court's contention, affirming that presidential immunity is a defense based in the separation-of-powers doctrine does not, in and of itself, create a separation-of-powers dilemma. Though such a holding implies that a President cannot individually choose to waive the defense, this fact, on its own, does not "curtail the scope of the official powers of the Executive Branch," since defending civil lawsuits is not part of a President's official duties. *Clinton v. Jones*, 520 U.S. 681, 682 (1997).

The District Court's construction of presidential immunity, meanwhile, presents significant "dangers of intrusion on the authority and function of the Executive Branch," *Nixon*, 457 U.S. at 754, by permitting an individual waiver—

intentional or unintentional—to pierce the separation-of-powers doctrine and allow the judiciary to "assume[s] a position of authority over the governmental acts of another and co-equal department,' *Lujan*, 504 U.S. at 575 (citations omitted). This is not only inconsistent with the historical purpose of the separation-of-powers doctrine, it also offends "institutional interests that [individual] parties cannot be expected to protect," *Schor,* 478 U.S. at 850, and threatens to upend the balance between the three independent and co-equal branches.

Therefore, the District Court's reasoning was flawed and inconsistent with the traditional understanding of the separation-of-powers doctrine.

### B. Even If Presidential Immunity Is Waivable, Defendant-Appellee Should Have Been Permitted Leave To Amend To Assert His Presidential Immunity Defense

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court shall grant leave to amend "freely…when justice so requires." Leave to amend will be granted absent a showing of undue delay, bad faith, futility, or prejudice to the defendant. *Foman v. Davis*, 371 U.S. 178, 182 (1962). A "district court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend the defendant's answer." *Anthony v. City of N.Y.*, 339 F.3d 129, 138, n. 5 (2d Cir. 2003). Typically, "courts have been more lenient in the context of motions for summary judgment" in allowing answer amendments to raise

affirmative defenses. *Steinberg v. Colum. Pictures Indus.*, 663 F. Supp. 706, 715 (S.D.N.Y. 1987).

Even assuming *arguendo* that presidential immunity is waivable (it is not), the District Court abused its discretion by denying Defendant-Appellant's request for leave to amend to assert his presidential immunity defense, which he made in connection with his motion for summary judgment. A880-894. Both of the District Court's justifications for denying Defendant-Appellant's request—futility and undue delay—fail as a matter of law.

### i. Presidential Immunity Is Not A Futile Defense

"When the denial of leave to amend is based on a determination that amendment would be futile, a reviewing court conducts a de novo review." *Eastman Kodak Co. v. Henry Bath, LLC*, 936 F.3d 86, 98 (2d Cir. 2019).

Courts assess futility by determining whether the proposed claim could survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See, e.g., Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."). Further, "futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies[.]" *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

As outlined in greater detail in Section II below, Defendant-Appellant's presidential immunity defense easily surpasses the futility standard because he has advanced a meritorious argument that the subject statements were made within the 'outer perimeter' of his presidential duties. Since this defense is valid, the District Court clearly erred in finding it to be futile.

### ii. There Was No Bad Faith Or Undue Delay In Seeking Leave To Amend

The District Court similarly erred when it denied Defendant-Appellant's request for leave to amend on the basis of "undue delay, dilatory motive, bad faith and/or prejudice" to Plaintiff-Appellee. SPA88.

"As long as amendment of pleadings does not prejudice plaintiffs, defendants will not be precluded from adding additional defenses about which they had knowledge." *Luther M. Ragin. v. Harry Macklowe*, 126 F.R.D. 475, 478 (S.D.N.Y. 1989). In determining whether an amendment would cause undue prejudice, courts will consider whether "the assertion of the new defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute." *Marsh v. Sheriff of Cayuga County*, 36 Fed App'x 10, 11 (2d Cir. 2002); *see also Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008).

Here, the District Court primarily cited Defendant-Appellant's purported "three-year delay" in raising his defense in support of its opinion. SPA89. However,

it is well-established that "[m]ere delay…absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981); *Richardson Greenshields Sec. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987) (surveying cases holding that a year-and-a-half delay between the defendant's answer and motion for leave to file an amended answer did not constitute undue delay absent a finding of undue prejudice to plaintiffs).

Thus, the passage of time alone is insufficient to support a finding of undue delay. This is particularly relevant here, where any purported 'delay' was not one of Defendant-Appellant's making. This Court is well apprised of the extensive, years-long appeals process which surrounded the issue of whether Defendant-Appellant is entitled to immunity under the Westfall Act. While the Westfall Act issue loomed over this case—from the date of the Attorney General's certification on September 8, 2020 until the Department of Justice withdrew its certification on June 9. 2023 (A1044-1045)—the entire case hung in the balance as this dispositive issue awaited determination on appeal. The convoluted procedural posture of this case, at a minimum, disproves any notion that Defendant-Appellant intentionally acted in bad faith by failing to raise his presidential immunity defense during this intervening period. Thus, in the absence of bad faith, the timing of Defendant-Appellant's presidential immunity defense cannot be construed as unduly prejudicial.

Nor is it tenable to find that Defendant-Appellant acted in bad faith by raising his immunity defense at the summary judgment stage. Indeed, New York courts routinely permit immunity defenses to be raised at this stage in litigation, even when not previously pleaded. *See*, *e.g., Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (Finding that qualified immunity defense was not waived when it was not plead in answer but was "asserted…in other pretrial submissions."); *Rinaldi v. City of New York*, 756 F.Supp. 111, 115 n. 3 (S.D.N.Y. 1990) ("Defendants who do not assert qualified immunity in their answer can still raise qualified immunity…at summary judgment."); *Sorano v. Taggart*, 642 F. Supp.2d 45, 55-56 (S.D.N.Y. 2009) (permitting defendant to raise qualified immunity defense for the first time in motion for summary judgment).

Another significant and fatal flaw in the District Court's decision is that it failed to plausibly identify the undue prejudice that Plaintiff-Appellee would have suffered if Defendant-Appellant's request for leave to amend would have been granted. Indeed, the District Court should have assessed whether the sought-after amendment would have resulted in Plaintiff-Appellee being required to "expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Ruotolo*, 514 F.3d at 192. But the District Court failed to undertake this analysis at all; it did not find that Plaintiff-Appellee would need to conduct *any* additional discovery if leave were granted, let

alone "expend significant additional resources to conduct discovery[.]" *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (emphasis added); *see also Fluor Corp.*, 654 F.2d at 856 (holding that district court abused its discretion in denying motion to amend where "amendment w[ould] not involve a great deal of additional discovery" or "result in serious difficulty").

In fact, no additional discovery would have been required by virtue of Defendant-Appellant raising his presidential immunity defense. The presidential immunity argument was already briefed and submitted, in full, in his motion for summary judgment. All the District Court needed to do was rule on it. If the defense were found to be valid, the suit would be dismissed in its entirety; if it were found to be insufficient, the case would proceed to trial.

The District Court, however, acknowledged that "dismissal, in and of itself, would not be *unfair* prejudice to Ms. Carroll because it would reflect the fact that there was an insurmountable obstacle to her claim in the first place" but then improperly found that the time and expense that Plaintiff-Appellee had *previously* incurred in prosecuting her claim constituted undue prejudice. SPA91. This is simply not a permissible basis to support a finding of undue prejudice under the law. It is well established that complaints of "the time, effort and money…expended in litigating [the] matter," without more, do not constitute prejudice sufficient to warrant denial of leave to amend. *Block v. First Blood Associates*, 988 F.2d 344, 351

(2d Cir. 1993); *see also Monahan*, 214 F.3d at 284 ("the fact that one party has spent time and money preparing for trial will usually not be deemed prejudice sufficient to warrant a deviation from the rule broadly allowing amendment to pleadings"); *Ramirez v. Bernstein*, No. 17 CV 3825 (VB), 2020 WL 7230729, at *3 (S.D.N.Y. Dec. 7, 2020) (finding no undue prejudice even where discovery reached an advanced stage and was nearly completed with respect to Plaintiff's claims); *U.S. Fid. v. Jim's Elec.*, No. 05-CV-0440A (SR), 2010 WL 1408968, at *4 (W.D.N.Y. Feb. 3, 2010) (same). The District Court's admission that this consideration "weigh[ed] very heavily" in its analysis is therefore wholly improper. SPA91. The District Court should have focused its analysis on the relevant factor of what *additional* resources Plaintiff-Appellee would have been required to expend to counter Defendant-Appellant's presidential immunity defense, which, of course, is none.

Therefore, the District Court erred when it declined to grant Defendant-Appellant's request for leave to amend to assert his presidential immunity defense.

### C. In The Alternative, Defendant-Appellee Properly Raised His Presidential Immunity Defense In Response To Plaintiff-Appellee's Amended Complaint

Alternatively, even assuming *arguendo* presidential immunity was waived and the District Court properly denied his request for leave to amend, Defendant-

Appellant still properly asserted the defense by subsequently raising it in his Answer to Plaintiff-Appellee's Amended Complaint.

Recently, on May 22, 2023, Plaintiff-Appellee filed a motion to amend her complaint, which was granted by the District Court on June 13, 2023. A1046-1047. In response to the newly-filed Amended Complaint, Defendant-Appellant filed an Answer which asserted presidential immunity as a defense. A1067-1068. The District Court, however, struck the presidential immunity defense on the basis that it had "previously determined that [Defendant-Appellant] waived that defense[.]" SPA131. In doing so, the District Court applied an incorrect standard and overlooked binding precedent which establishes that Defendant-Appellant properly raised his presidential immunity defense in response to Plaintiff-Appellant's Amended Complaint.

It is well settled that an amended complaint "supersedes the original, and renders it of no legal effect." *Shields,* 25 F.3d at 1128 (citations omitted). Importantly, this means that affirmative defenses that could have been—but were not—raised in an original answer may be raised in an answer to an amended complaint. *See Gilmore v. Shearson/American Exp.*, 811 F.2d 108, 112 (2d Cir. 1987) ("Rule 15 of the Federal Rules of Civil Procedure does not expressly limit the defenses that can be alleged in response to an amended pleading[.]"); *McFadden v. Monroe Cty. Sheriff*, No. 00-cv-6034, 2002 WL 1348508, at *3 (W.D.N.Y. Apr. 16,

2002) (explaining that defendants' response to the amended complaint "was not an amended answer, but merely an answer and so defendants were permitted to raise previously unpled affirmative defenses."); *Bao Guo Zhang v. Shun Lee Palace*, , No. 17-CV-00840 (VSB), 2021 WL 634717, at *5 (S.D.N.Y. Feb. 16, 2021) (finding that previously-waived Fed. R. Civ. P. 12(b)(6) defenses were properly asserted in answer to amended complaint); *Rodriguez v. City of New York*, 18 CIV. 4805 (NRB), 2021 WL 5360120, at *4 (S.D.N.Y. Nov. 16, 2021) ("Just as plaintiff asserted new allegations in his [amended complaint], defendants are also permitted to assert new defenses in response.").

In this context, the only defenses that are "irrevocably waived" by failing to assert them in an initial answer are "those that 'involve the core issue of a party's willingness to submit a dispute to judicial resolution,' such as objections to 'lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service.'" *Shields*, 25 F.3d at 1128 (citing *Gilmore*, 811 F.2d at 112); *see also* 5C Wright & Miller, Federal Practice & Procedure § 1392 (3d ed. 2020) (explaining that defenses set out in Rule 12(h)(2) are not waived merely because they were not raised in the first responsive pleading). All other defenses can be properly asserted in response to an amended complaint, even if they were not previously raised. *Shields*, 25 F.3d at 1128.

In accordance with the pleading standard set forth in *Gilmore*, *Shields* and their progeny, it is readily apparent that Defendant-Appellant timely raised his presidential immunity defense in his Answer to Plaintiff-Appellee's Amended Complaint. As for whether presidential immunity involves a "core issue of a party's willingness to submit a dispute to judicial resolution," that answer hinges on whether the defense is jurisdictional in nature, as Defendant-Appellant contends in Section I(A) above. *Id.* If it is not—as the District Court held—then it follows that presidential immunity does not involve a "core issue of a party's willingness to submit a dispute to judicial resolution," but, rather is an "effort to achieve judicial resolution of the controversy." *Id.* Thus, given the District Court's prior finding, it should have determined that Defendant-Appellant's presidential immunity defense was not "irrevocably waived," *id.*, by any failure to raise it in his initial Answer, and that his subsequent assertion of the defense in his Answer to the Amended Complaint effectively "revive[d]" it, *Gilmore*, 811 F.2d at 112. *See also Lucente*, 310 F.3d at 260 ("[A] court may not deprive an affected party of the right to file a response to an amended pleading if the party so desires.").

The District Court, however, struck Defendant-Appellant's presidential immunity defense and merely stated, in conclusory fashion, that "[t]he opportunity to answer an amended complaint is not a free pass to correct past wrongs without justification or basis for doing so." SPA131. To arrive at this conclusion, the District

Court overlooked the applicable pleading rules established in binding Second Circuit precedent, *Gilmore* and *Shields*, and instead relied on an unreported Southern District case, *Pereira v. Cogan*, No. 00-cv-619 (RWS), 2002 WL 1822928, at *4 (S.D.N.Y. Aug. 7, 2002), which it mistakenly referred to as the "relevant standard." *Id*. Even if *Pereira* was binding precedent (it is not), the holding does not purport to establish the sort of hardline rule that the District Court seemed to suggest; rather, the *Pereira* court merely surveyed various authorities and concluded that "the case law addressing this particular scenario…is all over the map." *Pereira*, 2002 WL 1822928 at *2. Further, since the *Pereira* court, like the District Court, overlooked the Second Circuit's holdings in *Gilmore* and *Shields*, the *Pereira* decision is irrelevant.

Accordingly, should this Court reject Defendant-Appellant's argument that presidential immunity is a non-waivable, jurisdictional defense, it must also find that it does not "involve a core issue of a party's willingness to submit a dispute to judicial resolution." *Shields*, 25 F.2d at 1128. In this scenario, it is incontrovertible that Defendant-Appellant properly asserted presidential immunity in his Answer to Plaintiff-Appellee's Amended Complaint.

## II.    The Subject Statements Are Protected By Presidential Immunity

It cannot be reasonably disputed that Plaintiff-Appellee's theory of liability is premised upon "acts within the 'outer perimeter' of [Defendant-Appellant's] official

capacity" as President. *Nixon*, 457 U.S. at 755. In denying this proposition, the District Court deviated from well-established Supreme Court precedent and failed to adhere to the general principles guiding presidential immunity. When properly assessed, however, there is no question that Defendant-Appellant's conduct comfortably lays within the 'outer-perimeter' of his official responsibilities.

## A. Defendant-Appellant's Conduct Was Within The 'Outer Perimeter' Of His Official Presidential Duties

As established in the seminal case of *Nixon v. Fitzgerald*, in evaluating whether a President should be afforded absolute immunity, the relevant inquiry is whether the liability in a civil lawsuit is "predicated on his official acts." *Nixon,* 457 U.S. at 749. This "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id.* at 756; *see also Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'— that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.").

Importantly, the test is an objective one – it is focused on the nature of the act in question, not the motive underlying it. *See Nixon*, 457 U.S. at 756 (rejecting a subjective test because it would "subject the President to trial on virtually every allegation than an action was unlawful, or was taken for a forbidden purpose," which would "deprive [presidential] immunity of its intended effect."); *Barr v. Matteo*, 360 U.S. 564, 575 (1959) ("[T]he claim of an unworthy purpose does not defeat the

45

privilege [of absolute immunity].”); *Clinton*, 520 U.S. at 693 (noting that “immunities are grounded in ‘the nature of the function performed,’ rather than in the lawful or unlawful motivations of the person performing them.”). In other words, presidential immunity is “not overcome by ‘allegations of bad faith or malice,’” *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997)), and even “alleged wrongful acts…lay well within the outer perimeter” of the President’s authority.” *Nixon*, 457 U.S. at 757.

Further, the “outer perimeter” analysis must be viewed in the context of the President’s wide-ranging duties. The Supreme Court has consistently acknowledged that the President’s responsibilities are “of unrivaled gravity and breadth,” *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that “[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear,” *Clinton*, 520 U.S. at 698. Given the President’s “innumerable functions” and “discretionary responsibilities in a broad variety of areas,” *Nixon*, 457 U.S. at 756, it can be accurately stated that the President “never adjourns.” *Clinton*, 520 U.S. at 713 (Breyer. J., concurring).

Undoubtedly, one of the President’s most vital functions is his ability to address the public on matters of national concern. *See*, *e.g.*, *Thompson v. Trump*, 590 F.Supp.3d 46, 79 (D.D.C. 2022) (“[S]peech is unquestionably a critical function of

the presidency."); [1] *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf."); *Savage v. Trump*, et al, Case No.: 211002495 at *13 (Pa. Sup. July 31, 2023) ("Speaking to the public on matters of public concern is part of a President's official duties."); *CBS v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role."). Accordingly, a President's actions are highly protected when he acts in this capacity.

In *Barr v. Matteo*, the Supreme Court dealt with a similar factual scenario as the one presented here. There, two employees of the Federal Office of Rent Stabilization sued the agency's Acting Director in relation to the publication of a press release in which he promised to suspend the employees for promoting an unpopular budget plan. *See generally Barr*, 360 U.S. 564 (1959). The former employees contended that the director's press release contained defamatory

---

[1] Notably, the District Court cited to the *Thompson* case at length in denying Defendant-Appellant's presidential immunity argument. However, the District Court failed to appreciate the contextual underpinnings of that case, which differ vastly from the instant circumstance. In *Thompson*, the court acknowledged that "[t]o deny a President immunity from civil damages is no small step," but nonetheless found that presidential immunity was inapplicable because Defendant-Appellant had been acting in his capacity as a *candidate*, not a President, with respect to the conduct at issue in that case. *Id.* at 83. That same justification cannot apply here, as it cannot be conceivably argued that Defendant-Appellant was acting in any other official capacity when he issued the subject statements.

statements. *Id.* at 568. However, the Supreme Court ruled that the director was shielded by absolute immunity because the issuance of the press release was "an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." *Id.* at 575. In so finding, the Court pointed to the fact that "[t]he issuance of press releases was standard agency practice, as it has become with many governmental agencies in these times," and that the Agent Director's "own integrity in his public capacity[] had been directly and severely challenged" in charges that were "given wide publicity." *Id.* at 574. The Court went on to emphasize that "*[i]t would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty*." *Id.* (emphasis added). In coming to this holding, the *Barr* Court also refused to consider the plaintiffs' argument that the defendant had acted with malice, noting that "[t]he fact that the action here was taken within the outer perimeter of [his] line of duty is enough to render the [immunity] applicable, despite the allegation of malice in the complaint[.]" *Id.* at 575.

Here, similarly, it is beyond dispute that Defendant-Appellant was acting, at a minimum, within the 'outer perimeter' of his official responsibilities when he responded to Plaintiff-Appellee's allegations. Like in *Barr*, one of the statements was issued in an official White House press release, while the other two were given

in direct response to reporters' questions at the White House. In addition to denying the substance of Plaintiff-Appellee's allegations, the statements also addressed numerous highly political issues, including Justice Kavanaugh's confirmation hearing, the role of media in politics, the state of the Federal Reserve, and current foreign affairs, all in response to reporter inquiries. A575-587, A591. Thus, it cannot be reasonably disputed that these statements addressed issues of public concern. *See*, *e.g.*, *Snyder v. Phelps,* 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'…or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."); *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). On this basis alone, Defendant-Appellant's conduct in issuing the statements fell within the 'outer perimeter' of his official duties since the statements have a clear "connection with the general matters committed by law to the [President's] control or supervision, and [is not] manifestly or palpably beyond his [presidential] authority." *Pani v. Empire BCBS*, 152 F.3d 67, 75 (2d Cir. 1998) (quotation omitted); *see also Spalding v. Vilas*, 161 U.S. 483, 498 (1896).

Further, when viewed in full context, there is simply no question that Defendant-Appellant was acting in a presidential capacity when he made the subject statements. By virtue of the grave accusations levied by Plaintiff-Appellee, Defendant-Appellant, a sitting President, was faced with a media frenzy surrounding a story that threatened to impugn his character and impede his ability to effectively govern. In this type of scenario, whether applying the 'outer perimeter' test for absolute immunity or the narrower *respondeat superior* test applied in Westfall Act cases, courts have consistently found that statements issued to the press which are aimed at defending against harmful allegations fall within the scope of an official's responsibilities. *See, e.g.*, *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659. 665 (D.C. Cir. 2006) (statement to reporter during interview about his separation from his spouse was within scope of employment, noting that a congressman has a duty to "maintain the continued trust and respect of [his] constituents" and to "preserve his ability to carry out his [] responsibilities."); *Lombardo v. Stoke*, 18 N.Y.2d 394, 400 (1966) (state school official absolutely immune for issuing public statement in response to allegations of bias, noting that the allegations "directly and severely challenged" the official's "integrity' and had been "given wide publicity."); *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) ("[A] primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents.").

Here, similarly, the subject statements were made in direct response to allegations which threatened to impugn Defendant-Appellant's character and affect his ability to effectively govern the nation. As both the leader of the nation and head of the Executive Branch, Defendant-Appellant could not sit idly while a 'media storm' erupted around sensationalized allegations that attempted to paint the sitting President as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, Defendant-Appellant had a duty to respond; at a minimum, this action was necessary to "maintain the continued trust and respect of [his] constituents" and to "preserve his ability to carry out his [] responsibilities." *Ballenger*, 444 F.3d at 320 (internal quotations omitted); *see also Barr*, 360 U.S. at 575.

Thus, it cannot be reasonably disputed that Defendant-Appellant's conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation.

## B. The District Court Utilized An Improper Standard To Assess The Viability Of Defendant-Appellant's Presidential Immunity Argument

The District Court erred in finding that Defendant-Appellant is not entitled to assert presidential immunity in the case *sub judice*.

Notably, although the District Court rejected Defendant-Appellant's claim that presidential immunity applies, it accepted Defendant-Appellant's two central components of Defendant-Appellant's argument. First, it accepted the contention that Defendant-Appellant was "addressing a matter of public concern because the

accusation [had] 'impugned his character and, in turn, threatened his ability to effectively govern the nation,'" SPA85. Second, it accepted the proposition that "the president's speech on a matter of public concern comes within the president's official responsibilities." *Id*. This should have been the end of the District Court's inquiry. It is well settled that, in assessing whether presidential immunity applies, a court's review must be limited to assessing the *objective* nature of the act in question; it is not permitted to perform a an "inquiry into the President's motives," because this type of subjective analysis "deprive[s] absolute immunity of its intended effect." *Nixon*, 457 U.S. at 756.

Nonetheless, the District Court proceeded to perform precisely the type of "highly intrusive inquiry" that the Supreme Court has prohibited, finding: "[e]ven assuming that [Defendant-Appellant's] decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that [Defendant-Appellant's] *own personal attacks* on his [] accuser equally fall within that boundary." SPA87 (emphasis added); *see also* SPA88 (characterizing the subject statements as a "personal attack" against Plaintiff-Appellee). In construing Defendant-Appellant's statements as a "personal attack" against Plaintiff-Appellee, the District Court failed to utilize the objective approach that is required for assessing a claim of presidential immunity. Indeed, there is simply no meaningful distinction to be drawn between Fitzgerald's allegation that

52

President Nixon engaged in a "conspiracy…to besmirch [Fitzgerald's] reputation" for "reasons purely personal to [Nixon]," *Nixon*, 457 U.S. at 739, n. 18, and the District Court's finding that Defendant-Appellant "accus[ed] an individual who charged [him] with personal wrongdoing of fabricating the charge for ulterior and improper purposes," SPA88. Both of these "alleged wrongful acts lay well within the outer perimeter of [the President's] authority." *Nixon*, 457 U.S. at 757; *see also Shmueli v. City of New York*, 424 F.2d 231, 238 (2d Cir. 2005) ("[T]he nature of absolute immunity is such that it 'accords protection from…any judicial scrutiny of the motive for and reasonableness of an official action.") (citations omitted); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1149 (2d Cir.1995) (noting that "virtually all acts, regardless of motivation, associated with [a prosecutor's] function as an advocate" are shielded by absolute immunity).

More specifically, the District Court also found that presidential immunity could not apply to Defendant-Appellant's statement that Plaintiff-Appellee had "fabricated" her claims and that she did so for financial and personal gain. SPA87. Yet, in so finding, the District Court failed to recognize that this was only a minor portion of Defendant's statement, which largely focused on the larger denial of the heinous allegations levied by Plaintiff-Appellee. Further, this arbitrary distinction between what the District Court considered to be 'official conduct' and 'unofficial conduct' of a President, is wholly unconvincing. Essentially, the District Court

concluded that Defendant-Appellant was acting within the 'outer perimeter' of his presidential duties when he denied that he committed a rape and never met the alleged victim, but somehow crossed the threshold into unprotected behavior when he vocalized the logical and reasonable inference that a false accusation—which, by its very nature, is fabricated—was made for a self-serving purpose. Simply put, these portions of Defendant-Appellant's statements are inextricably intertwined, and cannot be as neatly split as the District Court seemed to imply.

Moreover, on a practical level, permitting courts to engage in this type of hyper-sensitive and granular analysis of a President's speech undermines the very purpose of presidential immunity. The Supreme Court has acknowledged that the President must have "the maximum ability to deal fearlessly and impartially with the duties of his office" since he is obligated to "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Nixon*, 457 U.S. at 752. As an "easily identifiable target for suits for civil damages," the President must be afforded a wide-ranging immunity so that "cognizance of this personal vulnerability" will not "distract [him] from his public duties." *Id.* at 752-53.

Yet, taken to its logical conclusion, the District Court's holding will indelibly destroy the protections afforded by presidential immunity. Under the District Court's proposed construction of presidential immunity, anytime a President speaks,

litigants would have free reign to parse through the precise wording of his language to identify specific portions—no matter how minor—that could be construed as actionable. Liability would even attach when a President merely speculates as to a person's motive for undertaking a particular course of conduct, even when discussing issues of paramount public interest. Such a rule would collapse the protections afforded by presidential immunity and effectively require the President to have a lawyer stand beside him at every press conference to confer with before answering any question for fear of accidentally opening himself up to suit. This concern with rendering a President "unduly cautious in the discharge of his official duties" is precisely what the *Nixon* Court sought to avoid. *Nixon*, 457 U.S. at 752, n. 32.

Based on the foregoing, the District Court clearly erred as a matter of law in rejecting Defendant-Appellant's presidential immunity claim.

## III.  The District Court Has Been Divested Of Jurisdiction

The District Court erred as a matter of law in finding that it retained jurisdiction of the underlying matter.

Interlocutory appeals divest trial courts of jurisdiction "over those aspects of the case involved in the appeal." *See Griggs v. Provident Consumer Discount*, 459 U.S. 56, 58 (1982). Since presidential immunity confers immunity from suit in its entirety, the District Court is divested of jurisdiction from the entirety of the

underlying litigation pending resolution of this issue on appeal. *See*, *e.g.*, *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) ("A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals."); *Harlow*, 457 U.S. at 818 ("Until this threshold immunity question is resolved, discovery should not be allowed.").

As noted in its August 18, 2023 Order, the District Court would only retain jurisdiction over the action if the instant appeal were frivolous. A1326. Yet, for all the reasons outlined herein, this appeal is meritorious and, at a minimum, it is clearly not frivolous. Thus, the District Court's finding of frivolity was improper.

Accordingly, this Court should affirm that the District Court has been divested of jurisdiction until the appeals process has been exhausted and final adjudication has been reached on all immunity-related issues involved in the instant appeal.

## IV. The Subject Statements Are Not Defamation *Per Se*

In a defamation case, a plaintiff is required to prove that the defamation "either cause[d] special harm or constitute[s] defamation per se." *Peters v. Baldwin Union*, 320 F.3d 164, 169 (2d Cir. 2003) (citation omitted).

As set forth in the July Order, the District Court did not find that Plaintiff-Appellee established, or even alleged, special damages. Rather, the District Court held that Plaintiff-Appellee adequately demonstrated that her claim constituted libel *per se*. This finding was premised upon the theory that libel *per se* claims are held

56

to a looser standard than those for defamation *per se*. Defendant-Appellant respectfully submits that this decision was made in error.

A claim for "defamation" is an umbrella term that incorporates the "twin torts of libel and slander," *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (citations omitted). There are four narrowly defined categories of statements which are considered to be defamatory *per se*: those "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).

Indeed, multiple courts have held claims of libel *per se* to this precise standard, without differentiating from defamation *per se* or slander *per se*. *See, e.g.*, *Celle v. Filipino Reporter Enterprises*, 209 F.3d 163, 179-80 (2d Cir. 2000) ("New York recognizes certain statements as *defamatory per se*...[t]he line between statements that are *defamatory per se* and those that require proof of special damages remains fuzzy.") (emphasis added); *Pure Power Boot Camp v. Warrior Fitness*, 813 F.Supp.2d 489, 550 (S.D.N.Y. 2011) (relying on the standard four category test for defamation *per se* in a case regarding claims that a written email was defamatory); *Premier Medical Systems v. NeuroLogica Corp.*, 2022 WL 603999, at *12-*13 (S.D.N.Y. Feb. 28, 2022) (same); *Executive Trim Construction. v. Gross*, 525 F.Supp.3d 357, 369-70 (N.D.N.Y. 2021) (same). Notably, all of these opinions

referred to the claims as simply 'defamation' and discussed whether the subject statements constituted 'defamation *per se*'—despite concerning written statements that would have clearly fallen under the category of 'libel' if the courts had found it necessary to specify. *See id*.

While some older cases have phrased the test for *per se* showings in more general terms while discussing libel, that does not mean that libel *per se* is judged under a different standard than defamation *per se*. Indeed, if a defendant's behavior cannot be found to have been defamatory *per se*, it is impossible for that behavior to be libelous *per se* because libel is simply one form of defamation.

Defendant-Appellant respectfully submits that the difference in language between some decisions discussing libel is indicative more of the language used in older cases, when it was perhaps more common to distinguish between slander or libel, and that under the modern standard articulated in *Celle*, *Premier Medical Systems* and *Executive Trim Construction*, where it has since been established that all defamation has the same, more specific test for *per se* showings.

Under the modern defamation *per se* standard, there is little doubt that the alleged defamatory statements—which lack any correlation to Plaintiff-Appellant's professional capabilities—are not defamatory *per se*. The statements do not impugn, or even relate to, any particular talent or ability needed to perform in Plaintiff's profession as a "writer and advice columnist." A966. Thus, the statements "do[] not,

on [their] face, defame [P]laintiff in her trade, business or profession." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

As the New York Court of Appeals explained, the "trade, business or profession" category is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself…[t]he statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Liberman v Gelstein*, 80 N.Y.2d 429, 436 (1992) (citations omitted); *see also Kforce, Inc. v. Alden Pers.,* 288 F.Supp.2d 513, 516 (S.D.N.Y. 2003) ("statements must allege a link between a particular profession and a particular disreputable vice of that profession" (citations omitted)).

While multiple statements gave rise to this action, any argument that the subject statements were defamatory ultimately boils down to the idea that, at most, Defendant-Appellant accused Plaintiff-Appellee of making a false allegation against him for the purpose of garnering publicity and to sell books. Such an inference would be insufficient to constitute defamation *per se* as a matter of law, even if true. Notably absent from the subject statements is any language aimed at a particular skill or trait which reflects upon Plaintiff-Appellee's competency as a "writer and advice columnist," (A966); thus, the statements amount to nothing more than a general reflection of—or rhetorical hyperbole expressing an opinion of—the

plaintiff's character or qualities. *Rufeh v. Schwartz*, 50 A.D.3d 1002, 1005 (2d Dep't 2008) (defamation *per se* not satisfied because the "alleged defamatory statements…constituted nothing more than a general reflection upon the plaintiffs' character or qualities."); *see also Zysk v. Fidelity Tit.*, 14 A.D.3d 609, 610 (2d Dep't 2005) ("The average listener would certainly understand [defendant's] statements to be rhetorical hyperbole expressing her opinion of the plaintiff's character. Such statements are not actionable.").

Indeed, New York courts consistently find that these types of statements—which broadly refer to a person's dishonest nature—are insufficient to support a claim of defamation *per se*. *See, e.g., Davydov v. Youseffi*, 205 A.D.3d 881, 882 (1st Dep't 2022) ("While the plaintiff asserted in his affidavit that the defendant had called him a 'fraud' and that he 'operate[d] as a fake,' there are no allegations that these statements were specifically directed at the plaintiff in his professional capacity as a dentist."); *Pure Power Boot Camp*, 813 F.Supp.2d at 551 (statements characterizing plaintiff as a "loose cannon" and a "liar" were not defamatory *per se* because the statements reflected personal characteristics rather than reflections of professional competence); *Ram v. Moritt*, 205 A.D. 516 (2d Dep't 1994) (finding that statements referring to the plaintiff, a doctor, as a "'liar,' a 'cheat,' and a 'debtor' did not constitute defamation *per se* because they "did not address the plaintiff's professional status as a doctor").

Applying these principles to the statements in question, it is clear that the statements do not constitute defamation *per se*, thereby warranting reversal of the District Court's decision.

## <u>CONCLUSION</u>

For the forgoing reasons, this Court should reverse the District Court's Orders.

Dated:  September 28, 2023                    Respectfully submitted,
       New York, New York

                             _/s/ Alina Habba_____
                             Alina Habba, Esq.
                             Michael T. Madaio, Esq.
                             HABBA MADAIO & ASSOCIATES LLP
                             1430 U.S. Highway 206, Suite 240
                             Bedminster, New Jersey 07921
                                  -and-
                             112 West 34th Street, 17th & 18th Floors
                             New York, New York 10120
                             Phone: (908) 869-1188
                             Fax: (908) 450-1881
                             Email: ahabba@habbalaw.com
                                     mmadaio@habbalaw.com

                             *Attorneys for Defendant-Appellant,*
                             *Donald J. Trump*

**FEDERAL RULES OF APPELLATE PROCEDURE FORM 6**
**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 32.1(a)**

**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1. This brief complies with the type-volute limitation of Local Rule 32.1 (a)(4)(A) because:

This brief contains 13,876 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word, in 14 pt. font size, Times New Roman.

/s/ Alina Habba_____
ALINA HABBA, ESQ.

Addendum Annexed Hereto:

Unreported Decision and Order
"Savage v. Trump, et al."
Court of Common Pleas of Philadelphia
No. 2495

| SAVAGE, | | COURT OF COMMON PLEAS |
| | Plaintiff | PHILADELPHIA COUNTY |
| v. | | OCTOBER TERM, 2021 |
| TRUMP, et al., | | No. 2495 |
| | Defendants | |
| SAVAGE, | | COURT OF COMMON PLEAS |
| | Plaintiff | PHILADELPHIA COUNTY |
| v. | | MAY TERM, 2023 |
| TRUMP, | | No. 0012 |
| | Defendant | |

## <u>ORDER</u>

AND NOW, this 31th day of July, 2023, it is hereby ORDERED that:

1. The Motion by Defendants Donald J. Trump and Donald J. Trump for President for Judgment on the Pleadings is DENIED.

2. Defendant Donald J. Trump is GRANTED Presidential immunity and legislative immunity with respect to the statement he gave at the Gettysburg Hearing on November 25, 2020.

3. Defendant Donald J. Trump is GRANTED Presidential immunity with respect to his tweet from November 27, 2020.

4. The stay of discovery with respect to Defendants Donald J. Trump and Donald J. Trump for President is lifted and will proceed according to the revised Case Management Order filed today.

**BY THE COURT**:



**MICHAEL E. ERDOS,** **J.**

211002495-Savage Vs Trump Etal

21100249500322

Case #: 211002495
Control #: 23050512

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

## CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| JAMES SAVAGE | : | Case ID: 211002495 |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP et al. | : | |
| | : | Control: 23050512 |

| | | |
|---|---|---|
| JAMES SAVAGE | : | Case ID: 230500012 |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP | : | |
| | : | |

## MEMORANDUM OF LAW

**ERDOS, J.**                                                                    **July 31, 2023**

The Court writes to explain its reasoning for granting Presidential immunity to Defendant

Donald Trump regarding certain statements he made in 2020. His 2022 letter to the House Select

1

Committee to Investigate the January 6th Attack on the United States Capitol does not afford him Presidential immunity because he was not the President at the time that he sent it.[1]

Plaintiff James Savage, a voting machine supervisor in Delaware County, Pennsylvania, filed lawsuits in 2021 and 2023, since consolidated, alleging that former President Donald Trump, former Mayor Rudolph Giuliani, two Delaware County poll watchers and others conspired to defame him and place him in a false light by publicly and falsely claiming that he tampered with the 2020 Presidential election results. He alleges that as a consequence of Defendants' unlawful conduct he received death threats and suffered two heart attacks. The statements made by Trump were during a Pennsylvania State Senate Majority Policy Committee hearing in Gettysburg, Pennsylvania on November 5, 2020, in a Twitter tweet on November 27, 2020, and in a letter sent to the House Select Committee to Investigate the January 6th Attack on the United States Capitol[2] on October 13, 2022.[3] They read as follows:

**The Gettysburg Hearing:**

Thank you very much. I've been watching the hearing on OAN and saw it on a couple of other great networks, but I really appreciate being asked to speak. I'm in the Oval Office right now, and it's very interesting to see what's going on. This was an election that we won easily. We won it by a lot.

---

[1] The Court did not analyze whether such immunity would have applied had he sent such a letter during his Presidency.

[2] Plaintiff alleges that Trump also contemporaneously posted this letter on his Truth Social account.

[3] Even if Presidential immunity did not apply to the Gettysburg Hearing statement, Trump would be shielded from liability by legislative immunity, which will be addressed by the Court in the event that the issue is appealed.

2

A big energy official was on this morning on an important show and said, "There's no way Trump didn't win Pennsylvania, because the energy industry was all for him. I saw with my eyes what happened," and he told me horror stories, absolute horror stories. So this was, very sad to say it, this election was rigged and we can't let that happen. We can't let it happen for our country. And this election has to be turned around, because we won Pennsylvania by a lot. And we won all of these swing States by a lot.

Anybody watching television the night of the election was saying, "Wow." I was called by the biggest political people. "Congratulations, sir, on a big win." And all of a sudden, ballots were dumped all over the place, and a lot of horrible things happened and everybody in that room, I want to thank all of the people that signed affidavits and all of the speakers. You're fantastic people. You're great patriots.

I want to thank the senators for being there. And it's so important, day before Thanksgiving, it really represents somebody. Between the voter suppression and all of the horrible things that happened to poll watchers. We have poll watcher affidavits piled up to the ceiling. They're all over. They were treated horribly all over, all of these swing States, I mean virtually all of the swing States, and many other things were happening that were horrible, just horrible.

But the poll watchers weren't allowed to watch. They were in many cases whisked out of the room. Not only into pens that were 20, 30, 40, 60, 100 feet away where you couldn't even see. They were using binoculars. People are reporting that they had to use binoculars, and that didn't work. If you were a Republican poll watcher, you were treated like a dog and the Democrats had no problem, but they were rough.

3

They were literally pushed out, and it was rough tactics. This is what happened here. This is not the United States of America what happened, and I think everybody knows that. That's why you're there, and that's why you're so vehement about it. We have many, many cases, many, many cases of people walking in, an elderly woman walks in looking forward to voting November 3rd and says, "Oh good. Where would I go about voting?" "I'm sorry. You've already voted. Your ballot is in." They said, "No, I didn't vote. I didn't vote." "No, your ballot is in. You've already voted." In all cases for Biden, by the way. She said, "No, no, I want to vote." "Nope, your ballot is in." And then they give her a provisional ballot to sign, which goes nowhere.

It's a disgrace that this is happening to our country. We won this election by a lot. We got 74 million votes. And if you would have said 74 million votes the day before the election, every single professional in the business would have said there's no way of beating that. We got 11 million votes more than we had four years before in 2016, and we got many votes more than Ronald Reagan had when he won 49 States, that nobody would've said we even had a chance of losing. And all you had to do is take a look at the numbers at 10 o'clock in the evening when everybody thought the election was virtually over, and then very weird things happened.

But they're not weird to professionals, and they're not weird to Dominion and other people that operate machines. And they're not weird to the people that handle the ballots where they were flooding the market. People were getting two and three and four ballots in their home. People that were dead were signing up for ballots. Not only were they coming in

4

68

and putting in a ballot, but dead people were requesting ballots and they were dead for years and they were requesting ballots.

The whole world is watching us. The whole world is watching the United States of America and we can't let 'em get away with it. And we have Judges that are afraid to make a decision. We have Judges that don't want to do the same thing. A very good lawyer said, "Well, sir, I mean, that's a big statement for a Judge to overthrow an election." I said, "Really? If he got hundreds of thousands of votes more than he was entitled to get through all of the things that I'm listening to right now, and you're just covering a few of them, we have hundreds and hundreds of affidavits of stories that are even worse than the stories I'm hearing. Why wouldn't they overturn an election?"

Certainly, overturn it in your state, because we have other States that are just as bad. If you look at Michigan with Detroit, you look at the things that happened in Detroit where you have a voter, but you have more votes than you have voters. You take a look at Detroit, Michigan, you have more votes than you have voters. Then you have two people that don't want to certify. They don't want to certify, and they're harassed violently. And they turned off the cameras during the harassment for two hours. Then they said, "Wow." And they were afraid and they voted. Then they went back to sign and they couldn't do it because they said, "We can't do it because this is corrupt. This is horrible what's taken place." Think of it, more votes than you have voters, but that was the least of it. They have things that were as bad as that. And this is going on all over, all over. We're doing very well in a lot of States, a lot of good things are happening in Georgia. We're getting little help from

government, but a lot of good things happening in Georgia, Wisconsin, and Michigan. They're seeing what happened in Detroit.

And we sure are looking at what's happening in Pennsylvania and Philadelphia. What happened in Philadelphia, they keep the poll watchers not only in pens, but they keep them out of the building. And the only reason they got back into the building was they got a court order. Then the definition of "back into the building" was very far away where they couldn't see anything. And they talk about closed circuit television, except you couldn't see it because the picture was so unclear you didn't even know what they were doing. They could have been playing a baseball game. So it's a very sad thing for our country to have this.

They have to turn over the results. It would be easy for me to say, "Oh, let's worry about four years from now." No, this election was lost by the Democrats. They cheated. It was a fraudulent election. They flooded the market. They defrauded everybody with ballots. I just want to thank everybody for being there. You're doing a tremendous service. This is a very important moment in the history of our country, and you're doing a tremendous service to our country. And don't worry about bravery because the people that talk the most, they're not the ones you have to worry about. And these are all talkers, they intimidate, but these are not people that you're going to ultimately have to... They push you around. They pushed our poll workers out. Our poll watchers were pushed out of the building. Some got back in, they were put in pens, but these are not people...

Don't be intimidated by these people, but they're bad people. They're horrible people, and they're people that don't love our country. So we don't have to worry about four

6

70

years right now, we have to worry about what happened on November 3rd and previous to November 3rd. And by the way, after November 3rd, when people put votes in and they put 'em in illegally, they put 'em in after the polls closed. And one of our great Supreme Court Justices made mention of that. And I can't imagine that any Justice or anybody looking at it could be thrilled when they vote after the election is over.

So I want to thank everybody very much for being there. I want to thank the State Senate, they're respected people, tremendous people. And you're doing a tremendous service for our country. If something was done wrong, if this election was won fraudulently, and that's what happened, it was a fraud. And we're talking about, very importantly, many more ballots, many more votes than the number we need. In other words, if we needed 50,000 votes, we're not talking about we found nine dead people that voted. Of course, there were many more than that, numbers that nobody even believes. No, we're talking about numbers that are far in excess of the 50,000. Far in excess in another State where we lost by 10,000, and they went absolutely wild because we got far more votes than they thought possible.

And they've just stepped on the gas. And they got caught, just like they got caught spying on my campaign. They got caught exactly. They got caught doing this.
So I really appreciate it. And the country appreciates it, and we have to turn the election over because there's no doubt. We have all the evidence. We have all the affidavits. We have everything. All we need is to have some Judge listen to it properly without having a political opinion or having another kind of a problem, because we have everything. And by the way, the evidence is pouring in now as we speak.

7

And I want to thank Rudy Giuliani for having the courage to do this. There were a lot of lawyers that backed down because they were being screamed at. Rudy is the greatest Mayor in the history of New York, and there's a reason. He's got great courage and he doesn't care. He wants to do what's right. And I told him the other day, "Rudy, you were the greatest Mayor in the history of New York," and you see what happened to New York without Rudy. You were the greatest Mayor, but this is more important. What you are doing now is far more important than being a great Mayor of the City of New York and being its greatest Mayor by far. By the way, by far. This is going to be your crowning achievement, because you're saving our country. Thank you all very much. Thank you.

**The Tweet:**

"BIG NEWS: Pennsylvania Poll Watcher: USB Drive uploaded to machines, gave Biden thousands of votes. Says 47 USB Drives are now missing. EVERY UPLOAD GAVE BIDEN 50,000 VOTES. @OANN"

**The Letter (Appendix):**

Pennsylvania

- In Pennsylvania, as of February 2021, there were 121,240 more votes than voters. By law, Pennsylvania cannot certify an Election with this type of discrepancy.

- A lawsuit filed in Delaware County revealed video evidence of Election officials discussing destroying Election evidence from November 2020. "It's a felony," one official says after talking about the need to "get rid" of voting "pads and second scanners." Videos and

8

72

sources involved in the litigation say the Delaware County officials "violated numerous Election laws and needed to hide evidence," and that the destruction of records was "done to ensure records eventually provided actually matched the Election results that were reported in Nov. 2020."

- Attorney General Bill Barr ordered U.S. Attorney Bill McSwain to stand down and not investigate Election irregularities, even after McSwain reported that his office "received various allegations of voter fraud and election irregularities."[4]

## I.     Presidential Precedent

Trump argues that Presidential immunity protects him from liability with respect to his Gettysburg Hearing remarks and his tweet. The Court agrees.

Presidential immunity was first directly addressed by the United States Supreme Court in Nixon v. Fitzgerald. 457 U.S. 731 (1982). The Court held that, in light of "the special nature of the President's constitutional office and functions" and in order to provide "the maximum ability to deal fearlessly and impartially with the duties of his office," the President enjoys "absolute immunity from civil damages liability predicated on his official acts." Id. at 749, 752, 756 (citations omitted). Specifically, in order to qualify for Presidential immunity, the conduct at issue must fall "within the 'outer perimeter' of his official responsibility." Id. at 756. The Court observed that "diversion of [a President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government." Id. at 751. It also recognized that "a President must concern himself with matters likely to arouse the most intense feelings" and that

---

[4] Trump moves for dismissal of the case because none of the statements mention Plaintiff by name. Plaintiff successfully counters that inferentially the statements refer to him. This is an issue for trial.

9

examining the motivation behind a President's actions was to be avoided as "highly intrusive." Id. at 752, 756 (citations omitted).

In that case, the conduct at issue was President Nixon's allegedly retaliatory firing of A. Ernest Fitzgerald, a management analyst with the Air Force, during a departmental reorganization. The Court stated that analyzing the President's motive for his conduct was improper; rather, because one of the President's duties was "the authority to prescribe reorganizations and reductions in force," the firing fell within the outer perimeter of his official responsibilities. Id. at 756–57.

The High Court next took up the issue of Presidential immunity during President Clinton's tenure in the Oval Office. In Clinton v. Jones, 520 U.S. 681 (1997), Paula Jones alleged that, while Governor of Arkansas, Clinton sexually harassed her, and that a state police officer and others under the President's control and in conspiracy with him made defamatory statements about her when responding to reporters about the incident. In denying the President's request for temporary Presidential immunity until his term ended, the Court found that the alleged sexual misconduct "was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office." Id. at 686. The Court noted, however, that his public response to Jones' claims arguably was inside "the outer perimeter of the President's official responsibilities." Id.[5] It concluded that "[w]ith respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined primarily by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." Id. at 696.

---

[5] Since the statements to reporters occurred before Clinton became President, the Court must have meant that the statements might have been protected by Presidential immunity had they been made during his Presidency.

10

Since <u>Clinton</u>, the Supreme Court has not again addressed a claim of Presidential immunity within the context of a civil damages lawsuit. But this may soon change. The Trump Presidency, especially the events surrounding the 2020 election, has triggered a number of lawsuits in which the former President has claimed Presidential immunity. See <u>Thompson v. Trump</u>, 590 F.Supp.3d. 46 (D.D.C. 2022) (three consolidated cases brought under the Ku Klux Klan Act by eleven members of Congress and two Capital Police Officers alleging that Trump and others acted in concert to prevent them from performing their duties on January 6th by inciting the riot); <u>Michigan Welfare Rights Org. v. Trump</u>, CV 20-3388 (EGS), 2022 WL 17249218 (D.D.C. Nov. 28, 2022) (Michigan Welfare Rights Organization, the NAACP and two voters allege under the Voting Rights Act and the Ku Klux Klan Act that Trump conspired with others both to threaten and intimidate state election officials with regards to certifying the election results and to disenfranchise and overturn the will of voters by installing Trump's own slate of electors); <u>Carroll v. Trump</u>, 20-CV-7311 (LAK), 2023 WL 4393067 (S.D.N.Y. July 5, 2023) (accusation by Plaintiff that Trump defamed her in response to her allegations against him of sexual assault).

In these cases, none of which have yet to go to trial and all of which are currently on appeal, the test for Presidential immunity has been put to the test. In <u>Thompson</u>, Judge Mehta stated that "this is not an easy issue," and that "[t]o deny a President immunity is no small step." 590 F. Supp at 74, 83. She recognized that "speech is unquestionably a critical function of the presidency." <u>Id.</u> at 79. And she found that the issue of election integrity with respect to the 2020 Presidential election was a matter of public concern. <u>Id.</u> at 79. But she stressed that speaking on a matter of public concern does not automatically confer Presidential immunity upon the President:

11

"The context in which those words are spoken and what is said matter." Id. at 79–80 (emphasis omitted).

Judge Mehta next rejected a test of Presidential immunity that hinged on whether the President was acting as the President or as a candidate: "[T]he line between President and candidate will not always be clear," and a "first-term President is always, in a sense, a candidate for office." Id. at 80.[6] She also reiterated the Supreme Court's admonition in Nixon that the test for immunity cannot depend on the motive of the President. Id. at 81.

Judge Mehta decided that "in evaluating a Presidential claim of absolute immunity, a court must consider the relationship of the challenged conduct to the claimed corresponding function of the President." Id. at 82. She found that Trump's criticism of state officials, his direct contact with local election officials and state legislators in States including Pennsylvania, and his conduct regarding the January 6th riot were "plainly [. . .] directed at securing incumbency" and thus were "not official acts." Id. at 82–83. Likewise, she found that the President's comments about alleged election fraud "reflected an electoral purpose." Id. at 83. She thus denied Trump Presidential immunity. Id. at 84–85.

Similarly, in Michigan Welfare Rights, Judge Sullivan concluded that Trump's alleged conduct was for a solely personal, political, and thus unofficial purpose, namely, remaining in office, and that such activity was "well beyond the contours of presidential immunity." Michigan Welfare Rights at *12. Given the alleged threats and intimation, he rejected Trump's claim that the contesting of election results was to defend the Constitution. Id. at *13.

---

[6] See also Trump v. Mazars USA, 140 S. Ct. 2019, 2034 (2020) ("[T]here is not always a clear line between [the President's] personal and official affairs.").

12

In Carroll, Judge Kaplan found that while publicly responding to the plaintiff's allegations might be part of Trump's official responsibilities, his personal attacks against her were not. Carroll at *10–11. He clarified that he was not examining Trump's underlying motivation; rather, "the act itself [of] accusing an individual who has charged the president with a personal wrongdoing of fabricating the charge for ulterior and improper purposes" fell outside "the outer perimeter of the president's official responsibility." Id. at *11. He further stated that Presidential immunity "is not a 'get out of damages liability free' card that permits the President to say or do anything he or she desires even if that conduct is disconnected entirely from an official function." Id. Accordingly, he held that Trump was not entitled to such immunity. Id. at *10–11.

## II.    Present Proceeding

Speaking to the public on matters of public concern is part of a President's official duties. Indeed, the President's use of the "bully pulpit" to address the Nation has historically been an important feature of the office. See Trump v. Hawaii, 138 S. Ct. 2392, 2417–18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf."). As the United States Department of Justice recently argued during the Thompson appeal:

> The traditional "bully pulpit" of the Presidency [. . .] is not limited to speech concerning matters for which the President himself bears constitutional or statutory responsibility. The public looks to the President, as leader of the Nation, for guidance and reassurance even on matters over which the Executive Brance—or the federal government as a whole—has no direct control. From the actions of Congress and the Judiciary, to the policies of state and local governments, to the conduct of private corporations and individuals, the President can and must engage with the public on matters of public concern. Such speech is an important traditional

13

> function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in Nixon for courts to superintend the President's speech to his constituents and to other officeholders by entertaining civil damages suits arising out of speech merely because it concerns the conduct of a coordinate Branch or an entity outside the federal government.

Brief for United States as Amicus Curiae at 12, Thompson v. Trump, Nos. 22-5069. 22-7030, 22-7031 (D.C. Cir. argued Dec.7, 2022).

Here, then-President Trump's Gettysburg remarks and his tweet were public. Moreover, the topic of these statements—claims from third parties and the President himself about irregularities in the Presidential election which on their face called into question the integrity of the election and whether now-President Joseph Biden had been duly elected—was undoubtedly a matter of great public concern. See Snyder v Phelps, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social or other concern to the community or when it is a subject of legitimate news interest.") (Internal quotation marks and citations omitted).

Trump's assertions of course stood to benefit him personally. The stakes could not have been higher with respect to his political future and his status as "leader of the free world." But that does not mean that they were outside the "outer perimeter of his official responsibility." Nixon, 457 U.S. at 756. This is so notwithstanding the following:

1) Trump himself may have sowed the seeds of doubt about the integrity of the election well before it took place.

2) No court has yet to find any widescale fraud or significant vote tally inaccuracies regarding the election.[7]

---

[7] See, e.g., JOHN DANFORTH ET AL., LOST, NOT STOLEN: THE CONSERVATIVE CASE THAT TRUMP LOST AND BIDEN WON THE 2020 PRESIDENTIAL ELECTIONS 1 (2022) (group of eight conservative former

14

3) Trump's motivation behind his statements could have been to overturn the election results even if he actually believed that he had fairly lost.

Determining Trump's mindset when he said what he said is not the role of the Court. See Nixon, 457 U.S. at 756. Neither is it the Court's place to assess the wisdom of his comments. On their face, his remarks dealt with the cornerstone of our democracy—elections. Indeed, his responsibilities as President include taking care that the laws be faithfully executed[8] and, per his oath of office, defending the Constitution. U.S. CONST. art. II, §§ 1,3.[9] Other legal proceedings may examine the propriety of his statements and actions while he was the President and whether, as the plaintiffs in this and other cases contend, it was this conduct which served as the actual

---

judges, Republican Senators and Republican-appointed officials find that none of the 64 lawsuits filed at the time of their report "present evidence of fraud or inaccurate results significant enough to invalidate the results of the 2020 Presidential Election"). Of those cases, only 2 of the 19 filed in Pennsylvania resulted in a victory for the plaintiffs. One involved the Pennsylvania Secretary of State extending the deadline for accepting verifying identification in contravention of a state statute, Donald J. Trump for President v. Boockvar, No. 602 MD 2020 (Pa. Commw. Ct. Nov. 12, 2020). The other involved the Secretary allowing provisional ballots to be submitted, rather than segregated, where the corresponding absentee or mail-in ballots were presumed to be deficient, Hamm v. Boockvar, 600 M.D. 2020 (Pa. Commw. Ct. 2020) In both cases, a state court enjoined the Secretary from taking these actions and ordered that the ballots in question be segregated. Thus, her actions did not affect the ultimate vote tally. While some of the lawsuits addressed in the Danforth report had an evidentiary hearing before a Judge, none proceeded to a jury trial. Interestingly, the instant matter could thus mark the first time a jury is asked to decide whether there was fraud in the 2020 Presidential election.

[8] See Nixon, 457 U.S. at 750 (citing U.S. CONST. art. II, § 3) (one of the President's official responsibilities is "to take Care that the Laws be faithfully executed"); but see Thompson, 590 F. Supp. at 78 (interpreting the Take Care Clause only to apply to actions taken by the Executive Branch).

[9] Can a President publicly say whatever he or she wants if it touches on a matter of public concern and still be immune from civil damages liability? Maybe. After all, allowing judges and juries to referee the President's speech to his constituents could hamstring his or her "ability to deal fearlessly and impartially with the duties of his office," Nixon, 457 U.S. at 752. Moreover, immunity from liability in a civil matter does not bar impeachment and criminal prosecution as other possible sanctions. But a strong argument can be made that, as Judges Mehta and Kaplan decided, the President, though otherwise acting in an area of official responsibility, can nevertheless cross beyond the "outer perimeter" – say, for example, by encouraging an insurrection. Even under this framework, however, Trump's remarks at Gettysburg and in his tweet were in bounds. Thus, the Court need not decide this important question about the contours of Presidential immunity.

15

threat to our democracy. But this case is not the proper place to do so.[10] Here, Trump is entitled to Presidential immunity.

BY THE COURT:

_____

**MICHAEL ERDOS, J.**

DATE: July 31, 2023

---

[10] That said, Plaintiff has not lost his right at trial to demonstrate Trump's thinking. In fact, proof of the requisite *mens rea* is an element of both defamation and false light in Pennsylvania. Presidential immunity limits which statements can form the basis of liability but does not shield a Defendant from a deeper dive into those allegedly unlawful statements for which no immunity exists. Thus, as with the other Defendants and their statements, Plaintiff can present evidence to a jury regarding not only Trump's 2022 letter to Congress and the harm it caused him, but also Trump's knowledge, beliefs and motivation when he sent it.

16