# 23-1045(L)

## 23-1146(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

—v.—

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 20-CV-7311

## BRIEF FOR APPELLEE

JOSHUA MATZ
KATE HARRIS
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

ROBERTA A. KAPLAN
TREVOR W. MORRISON
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883

*Attorneys for Appellee*
*E. Jean Carroll*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUES...........................................................2

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF THE CASE.............................................................3

I.     FACTUAL BACKGROUND .......................................................3

  A.  Carroll's Early Life and Career ............................................3

  B.  Trump Sexually Assaults Carroll .........................................4

  C.  Carroll's Path from Silence to Speaking Up .........................6

  D.  Trump Responds by Seeking to Humiliate Carroll ...............7

II.    PROCEDURAL BACKGROUND ...............................................8

  A.  State Court Proceedings......................................................9

    1. Trump's Evasions Begin ..............................................9

    2. Trump Waives and then Disavows Immunity..................9

  B.  Westfall Act Proceedings ...................................................10

  C.  Trump Files His First Attempted Counterclaim.....................11

  D.  Trump Initiates Discovery—and then Seeks to Obstruct It ....12

  E.  Carroll Files a Second Lawsuit.............................................14

  F.  Trump Seeks Summary Judgment Based on Immunity—but Requests an Expedited Trial While that Motion is Pending.........................15

  G.  *Carroll II* Trial Proceedings ..............................................16

i

H.   Federal Court Proceedings Since the *Carroll II* Trial ...............................17

1.   Trump's Post-Verdict Statements ............................................................17

2.   Carroll Amends Her Complaint and Trump Answers.............................19

3.   Judge Kaplan Denies Trump's Summary Judgment Motion Based on Presidential Absolute Immunity.................................................................19

4.   Trump Continues Litigating for A Full Month Before Unsuccessfully Seeking a Stay from Judge Kaplan...........................................................20

5.   Judge Kaplan Dismisses the Counterclaim and Strikes Trump's Attempt to Resurrect His Immunity Defense ........................................................22

6.   Judge Kaplan Grants Summary Judgment to Carroll on the Merits of Her Defamation Claim in this Action..............................................................23

7.   This Court Denies a Stay but Expedites the Appeals..............................23

STANDARD OF REVIEW ............................................................................24

SUMMARY OF ARGUMENT .......................................................................24

ARGUMENT ...................................................................................................26

I.   THE DISTRICT COURT PROPERLY REJECTED TRUMP'S DEFENSE OF PRESIDENTIAL ABSOLUTE IMMUNITY ......................................26

A.   Presidential Absolute Immunity Can be Waived ......................................26

1.   In Defining this Immunity, the Supreme Court Drew a Careful Analogy to Waivable Common Law Defenses.......................................................26

2.   Prior Presidential and Judicial Practice Confirm that Presidential Absolute Immunity is Waivable.................................................................30

3.   Separation of Powers Principles Further Support this Understanding of Presidential Absolute Immunity...............................................................35

B.   Judge Kaplan Properly Denied Leave to Amend ......................................39

1. Judge Kaplan Did Not Abuse His Discretion in Denying Leave Based on Bad Faith, Undue Delay, and Prejudice ....................................................40

    a. Bad Faith ..................................................................................40

    b. Undue Delay and Prejudice ................................................44

    c. Separation of Powers Principles ........................................45

2. Futility ..................................................................................................46

II. THE DISTRICT COURT PROPERLY STRUCK THE FIRST AFFIRMATIVE DEFENSE TO THE AMENDED COMPLAINT ..........50

III. TRUMP'S REMAINING CONTENTIONS ARE MERITLESS...............53

A. Judge Kaplan Retained Jurisdiction Following Trump's Initial Notice of Interlocutory Appeal ........................................................................53

B. This Court Lacks Jurisdiction Over Trump's Defamation Damages Argument—Which, In Any Event, is Meritless ........................................54

CONCLUSION ........................................................................................56

ADDENDUM A: TIMELINE OF KEY EVENTS ..................................57

CERTIFICATE OF COMPLIANCE ........................................................60

CERTIFICATE OF SERVICE .................................................................61

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
46 F.4th 489 (6th Cir. 2022) ............................................................................52

*Allen v. Biden*,
No. 21 Civ. 01150, 2021 WL 3472740 (D. Ariz. Aug. 6, 2021)........................33

*Anthony v. City of N.Y.*,
339 F.3d 129 (2d Cir. 2003)..............................................................................40

*Apostol v. Gallion*,
870 F.2d 1335 (7th Cir. 1989)................................................................... 26, 54

*Arbaugh v. Y&H Corporation*,
546 U.S. 500 (2006).........................................................................................29

*Baptist Health v. Smith*,
477 F.3d 540 (8th Cir. 2007)............................................................................44

*Barrett v. Harrington*,
130 F.3d 246 (6th Cir. 1997)............................................................................48

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993)..............................................................................44

*Bolmer v. Oliveira*,
594 F.3d 134 (2d Cir. 2010)..............................................................................55

*Bradley v. Fisher*,
80 U.S. 335 (1871)............................................................................................28

*Britt v. Garcia*,
457 F.3d 264 (2d Cir. 2006).................................................................... 3, 26, 55

*Brundage v. U.S. Info. Agency*,
248 F.3d 1156 (7th Cir. 2000)..........................................................................33

iv

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993) ...................................................................... 48

*Burton v. Ghosh*,
    961 F.3d 960 (7th Cir. 2020) ..................................................... 51, 52

*Byars v. Malloy*,
    No. 3:11 Civ. 17 2011, WL 4538073 (D. Conn. Sept. 29, 2011) ................ 33, 34

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) ............................................................ 13

*Carroll v. Trump*,
    66 F.4th 91 (2d Cir. 2023) .............................................................. 16

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000) ....................................................... 26, 55

*Cheney v. U.S. Dist. Court for D.C.*,
    542 U.S. 367 (2004) ...................................................................... 36

*Chisom v. Roemer*,
    501 U.S. 380 (1991) ...................................................................... 31

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...................................................................... 37

*Clinton v. Jones*,
    520 U.S. 681 (1997) ........................................................... 25, 31, 47

*Cohen v. Am. Airlines, Inc.*,
    13 F.4th 240 (2d Cir. 2021) ............................................................ 24

*Cohen v. Obama*,
    No. 09 Civ. 704, 2009 WL 10708689 (W.D. Okla. Aug. 10, 2009) .................. 34

*Cohen v. United States*,
    No. 21 Civ. 10774, 2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022) ................. 33

*Collyer v. Darling*,
   98 F.3d 211 (6th Cir. 1996)......................................................28

*Comm. on Judiciary of the U.S. House of Representatives v. McGahn*,
   968 F.3d 755 (D.C. Cir. 2020) .............................................36

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986)...............................................................37

*Cozzo v. Tangipahoa Par. Council*,
   279 F.3d 273 (5th Cir. 2002)................................................28

*D.C. v. Trump*,
   959 F.3d 126 (4th Cir. 2020).................................................33

*El-Masri v. United States*,
   479 F.3d 296 (4th Cir. 2007).................................................37

*Freytag v. Comm'r of Internal Revenue*,
   501 U.S. 868 (1991).................................................................37

*Gilmore v. Shearson/Am. Express Inc.*,
   811 F.2d 108 (2d Cir. 1987)........................................ 26, 50, 51, 52

*Grace v. Rosenstock*,
   228 F.3d 40 (2d Cir. 2000)....................................................44

*Griggs v. Provident Consumer Discount*,
   459 U.S. 56 (1982)..................................................................53

*Henderson ex rel. Henderson v. Shinseki*,
   562 U.S. 428 (2011)...............................................................29

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979)................................................................48

*Idrogo v. U.S. Army*,
   18 F. Supp. 2d 25 (D.D.C. 1998)..........................................33

*Imbler v. Pachtman*,
424 U.S. 409 (1976) .......................................................................... 28

*In re World Trade Center Disaster Site Litig.*,
503 F.3d 167 (2d Cir. 2007) ............................................... 26, 53, 54

*Jackson v. Bush*,
448 F. Supp. 2d 198 (D.D.C. 2006) .................................................. 33

*Jones v. Clinton*,
974 F. Supp. 712 (E.D. Ark. 1997) .................................................. 33

*K&D, LLC v. Trump Old Post Off, LLC*,
No. 17 Civ. 731, 2018 WL 6173449 (D.D.C. Nov. 26, 2018) ........... 32

*Krinsk v. SunTrust Banks, Inc.*,
654 F.3d 1194 (11th Cir. 2011) ........................................................ 51

*MacGregor v. Milost Glob., Inc.*,
No. 1:17 Civ. 6691, 2019 WL 2453340 (S.D.N.Y. Apr. 19, 2019) .... 40

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) ............................................................. 40

*McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.*,
849 F.2d 761 (2d Cir. 1988) ........................................... 26, 50, 51, 52

*Melendez v. Sirius XM Radio, Inc.*,
50 F.4th 294 (2d Cir. 2022) .............................................................. 24

*N.L.R.B. v. Noel Canning*,
573 U.S. 513 (2014) .......................................................................... 30

*Neary v. Weichert*,
489 F. Supp. 3d 55 (E.D.N.Y. 2020) ................................................ 34

*Net MoneyIN Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ........................................................ 43

*Nevada v. Hicks*,
    533 U.S. 353 (2001) ................................................................28

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ................................................................33

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ................................................................46

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ................................................... *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................23

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ................................................................41

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ................................................................37

*Saks v. Franklin Covey Co.*,
    316 F.3d 337 (2d Cir. 2003) ...................................................40

*Schaefer v. State Ins. Fund*,
    207 F.3d 139 (2d Cir. 2000) ...................................................24

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ........................................... 24, 51

*Shmueli v. City of N.Y.*,
    424 F.3d 231 (2d Cir. 2005) ...................................................28

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ........................................48

*Trump v. Carroll*,
    292 A.3d 220 (D.C. 2023) ......................................................16

viii

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ........................................................47

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ..................................... 37, 46

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ................................ 10, 25, 27, 31

*Tully v. Barada*,
    599 F.3d 591 (7th Cir. 2010) ..............................................28

*United States ex rel. Nicholson v. MedCom Carolinas, Inc.*,
    42 F.4th 185 (4th Cir. 2022) ..............................................43

*United States v. Burr*,
    25 F. Cas. 30 (C.C.D. Va. 1807) .......................................47

*United States v. Nixon*,
    418 U.S. 683 (1974) ....................................... 29, 36, 37

*United States v. Reynolds*,
    345 U.S. 1 (1953) ..............................................................37

*Wall v. Trump*,
    No. 19 Civ. 7413, 2019 WL 4639951 (S.D.N.Y. Sept. 24, 2019) .......................34

*Williams v. Wilkie*,
    320 F. Supp. 3d 191 (D.D.C. 2018) ..................................34

*Yates v. City of Cleveland*,
    941 F.2d 444 (6th Cir. 1991) ..............................................54

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..........................................................29

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ..............................................................30

## FEDERAL RULES

Federal Rule of Civil Procedure 9 ............................................................51

Federal Rule of Civil Procedure 12 ............................................... 31, 33

## OTHER AUTHORITIES

Br. for Appellee,
*Cohen v. Trump*, No. 23-25 (2d Cir. July 24, 2023)............................32

Br. for Appellees,
 *Browning v. Clinton*, No. 98-1992 (D.C. Cir. Jan. 25, 2002)............................32

Br. for Appellees,
*Saunders v. Bush*, No. 92-1962 (5th Cir. Dec. 21, 1992) ....................................31

*Congressional Oversight of the White House*,
45 Op. O.L.C. __, 2021 WL 222744 (Jan. 8, 2021) ............................................38

*Immunity of the Assistant to the President and Director of the Office of Political
 Strategy and Outreach from Congressional Subpoena*,
38 Op. O.L.C. __, 2014 WL 10788678 (Jul. 15, 2014)......................................39

Mem. in Supp. of President Clinton's Mot. for Judgment on the Pleadings,
*Jones v. Clinton,* No. 94 Civ. 290 (E.D. Ark. July 3, 1997)................................31

Mot. to Dismiss,
*Bundy v. Navarro*, No. 16 Civ. 1047 (D. Nev. July 15, 2016) ............................31

Mot. to Dismiss,
*Keyter v. Bush*, No. 03 Civ. 02496 (D.D.C. Feb. 2, 2004) ..................................31

Mot. to Dismiss,
*Klayman v. Obama*, No. 16 Civ. 2010 (N.D. Tex. Sept. 19, 2016).....................31

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
43 Op. O.L.C. __, 2019 WL 2315338 (May 20, 2019) .......................................38

Trump Reply Br.,
    *D.C. v. Trump*, No. 18-2488 (4th Cir. Feb. 21, 2019) .....................................1, 32

# INTRODUCTION

Four years ago, Appellant Donald J. Trump made a representation to the Fourth Circuit: "Absolute immunity is a defense on the merits, not a limit on the Court's jurisdiction."[1] He now asks this Court to hold that the opposite is true. But Trump was right the first time, as confirmed by Supreme Court precedent, the overwhelming weight of Executive and Judicial prior practice, and core separation of powers principles. These authorities establish that presidential absolute immunity is a waivable, non-jurisdictional affirmative defense. And Trump does not deny that he knowingly waived it as part of a strategic gambit in the early stages of this case.

Instead, as a fallback, Trump argues that Judge Kaplan abused his discretion in denying leave to raise this defense for the first time after three years of litigation. Once again, Trump contradicts himself. In July 2020, while seeking a temporary stay during his presidential term, Trump made this representation: "No one is seeking to 'escape accountability' here. Plaintiff is free to pursue this action when the President is no longer in office."[2] Now, however, Trump seeks to assert that Appellee E. Jean Carroll was never free to pursue this action at all. Judge Kaplan appropriately exercised his discretion in rejecting Trump's reversal. Most fundamentally, and as we will demonstrate, Trump's conduct of the litigation reflected manifest bad faith—

---

[1] Trump Reply Br. at 1, *D.C. v. Trump*, No. 18-2488 (4th Cir. Feb. 21, 2019).

[2] SA.49 (cleaned up).

and his abrupt assertion of absolute immunity after years of unexplained delay posed substantial prejudice to Carroll. For that reason, which reflects the unique history of this case and Trump's own strategic decisions, Trump's position must be rejected. In all events, Trump's immunity claim is meritless and was rightly deemed futile.

Trump's remaining arguments fare no better: they are foreclosed by precedent or jurisdictionally improper. Therefore, the decisions below should be affirmed.

## STATEMENT OF THE ISSUES

These consolidated interlocutory appeals present four issues:

1. Whether Judge Kaplan erred in holding that the President is permitted to waive his own defense of presidential absolute immunity to a civil suit.

2. Whether Judge Kaplan abused his discretion in denying leave to amend the answer when Trump sought at summary judgment to reverse his own earlier waiver and disavowal of presidential absolute immunity.

3. Whether Judge Kaplan lost jurisdiction over this case after Trump appealed from the denial of his presidential absolute immunity defense.

4. Whether this Court has jurisdiction in these interlocutory appeals to review Judge Kaplan's denial of Trump's summary judgment motion concerning the adequacy of Carroll's evidence of defamation damages.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under the collateral order doctrine to review Judge Kaplan's rulings concerning matters of presidential absolute immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731 (1982). However, this Court lacks jurisdiction to review Judge Kaplan's denial of Trump's summary judgment motion concerning Carroll's evidence of damages. *See Britt v. Garcia*, 457 F.3d 264, 273 (2d Cir. 2006).

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND[3]

#### A.    Carroll's Early Life and Career

Growing up in rural Indiana, Carroll longed to become a writer. She began pitching articles at 12 years old—and kept on through her studies (even as she was crowned the "Miss Indiana University" beauty queen). A.564. Eventually, she moved to New York, where she wrote countless articles and an advice column, *Ask E. Jean*, which became one of the longest-running advice columns in history. A.966.

By the mid-1990s, Carroll had written two books, was an Emmy-nominated writer for Saturday Night Live, and had her own TV show that aired nationwide. A.566, A.961. She dated and socialized and enjoyed her exciting Manhattan life—until one terrible day when, suddenly, her "light was gone." SA.116.

---

[3] Citations to "Br. at __" are to Appellant's brief, "A.__" are to Appellant's Appendix, "SPA.__" are to Appellant's Special Appendix, "SA.__" are to Appellee's Supplemental Appendix, and "ECF __" are to this Court's docket.

### B.    Trump Sexually Assaults Carroll

That day occurred in the spring of 1996. After work, Carroll left a TV studio in New Jersey and headed to Bergdorf Goodman, the luxury department store in Manhattan. *See* SA.111. She didn't find what she was looking for, so she prepared to leave. *Id.* As she approached the revolving door on 58th Street, she saw Trump. SA.111-12. They knew people in the same social circles and had previously met at a charity event. SA.111. When Trump saw Carroll leaving Bergdorf's, he "held up [his] hand." *Id.* Carroll stopped. *Id.* Trump then said, "Hey, you're that advice lady." Carroll replied: "Hey, you're that real estate tycoon." SA.112.

Trump told Carroll he was at Bergdorf's to buy a present for a girl and asked Carroll to "come help [him]." *Id.* After some light banter about hats and handbags, they took the elevator upstairs at Trump's suggestion. *Id.* When they arrived in the lingerie department, it was empty. *Id.* Sitting on the glass counter near them was "a see-through [lilac-greyish] bodysuit." *Id.* Trump picked up the bodysuit, tossed it at Carroll, and said "go put this on." *Id.* Bemused, Carroll "tossed it back to him" and said "it goes with your eyes." *Id.* Trump caught the bodysuit, held it up to Carroll, and said "you're in good shape, this looks like it might fit you." *Id.* Abruptly, Trump grabbed her arm and said, "let's go put this on." SA.113. He then maneuvered her toward a fitting room. Convinced this was merely lighthearted "repartee," Carroll

4

thought to herself, "this is hilarious, I'm going to make him put [the bodysuit] on over his pants." *Id.* It didn't occur her not to trust being alone with him.

As soon as Carroll entered the dressing room, Trump shut the door and lunged at her. *Id.* He pushed her against the wall; she hit her head, and then "he had his hands on [her] arms" and "pushed [her] back a second time." SA.113-14. She "hit [her] head [again] and then he put his shoulder into [her]." SA.114. As Carroll's initial shock began to wear off, she realized "this [was] a battle." *Id.* Trump grabbed her arms, used his bodyweight to press her against the wall, jammed his hand under her dress, and pulled down her tights. *Id.* Carroll "tried to get [her] arms up to push him back," but she "couldn't get [her] knee up because the pantyhose had been taken down." *Id.* Suddenly, Carroll "felt [Trump's] fingers rummaging around" her genitals, and then she briefly felt his penis inside her. *Id.* Moments later, Carroll managed to escape by "push[ing] him with [her] hands and knee." *Id.*

Carroll ran out of Bergdorf's, scared that Trump would come after her. *Id.* Once outside, Carroll called her friend, Lisa Birnbach. SA.115. When Birnbach picked up, Carroll was "in shock and disordered." *Id.* She "felt unbalanced." *Id.* Birnbach explained to Carroll that what had happened to her was rape—and urged her to go to the police. *Id.* Flush with panic, Carroll swore Birnbach to secrecy. *Id.* A day or two after the rape, Carroll confided in another close friend, Carol Martin.

*Id.* Martin warned Carroll not to reveal the attack. Trump was a powerful man, she said: "He's got 200 lawyers, he'll bury you." *Id*.

## C. Carroll's Path from Silence to Speaking Up

Apart from her conversations with Birnbach and Martin, Carroll remained silent about Trump's assault. SA.115-16. She blamed herself, and felt "embarrassed" and "ashamed." *Id.* She knew sexual assault was pervasive but feared that "women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked." SA.116. Carroll's silence, though, hid trauma. Ever since Trump's attack, "the music had stopped." *Id.* Carroll never had sex or dated again: she "had no desire for desire." *Id.*

Years later, when Trump announced that he was running for President, Carroll watched with "disbelief." SA.117. But she did not come forward at the time because her mother, a Republican politician in Indiana, was dying. *Id.* She knew that if she spoke up, "it would ruin" her mother's last days. *Id.* It would also come to nothing: "I didn't want to get fired from *Elle* and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about." *Id.*

Everything changed for Carroll in late 2017. By then, she was on a road trip interviewing women. She planned to write a book about their experiences with the men in their lives. SA.117-18. On the first day of her trip, "the Harvey Weinstein

story broke" and Carroll watched "the flood of stories … as women started standing up." SA.118. The book proposal began to evolve, and Carroll created a list of terrible men she had encountered in her life—men who had wronged her in ways large and small that stuck with her over the years. *Id.* Through that list, she sought to explore the many effects (good and bad) that men can have on women's lives. As Carroll drew inspiration from the women of the #MeToo movement, she decided to tell her readers the whole truth about her life experiences. She had to include Trump's assault. *Id.* And she was going to do it on her own terms, in her own voice.

Carroll's book was published in July 2019. SPA.12. On June 21, 2019—in advance of its release date—*New York Magazine* selected and published an excerpt containing, among other things, her account of being assaulted by Trump. *Id.*

### D. Trump Responds by Seeking to Humiliate Carroll

Trump reacted to Carroll's accusation by launching a series of brutal, highly personal attacks. He denied assaulting her—but also went much further than that. Through three statements, he accused Carroll of fabricating the account for money, or publicity, or a political conspiracy. A.573, A.580-82. He claimed that he had never met or known her at all. A.573, A.580-82. He implied that she had falsely accused other unnamed men of sexual assault. A.580-82. He even insulted her appearance, insisting that he could not have assaulted her because "she's not my type"—in other words, that Carroll was too unattractive for him to have attacked her. A.590.

7

These attacks were devastating to Carroll. As a journalist and author, she had built her career providing honest advice and reporting. SA.126-28. But trust earned over decades can be broken in an instant. Trump did just that. His three statements produced between 142 to 188 million impressions on social media and elsewhere. SA.128. As a result, Trump shook the foundation of Carroll's career. By impugning her integrity, and accusing her of shocking fabrications, he sabotaged her credibility and readership. SA.126-28. Carroll was fired from *Elle* before her contract was up for renewal. SA.128. All the while, Carroll was besieged with attacks online. A.195-201. The damage that Trump caused still reverberates in Carroll's life. SA.128.

## II.    PROCEDURAL BACKGROUND[4]

Faced with Trump's onslaught, Carroll sought to protect herself through the law. In November 2019, she filed suit in New York state court, alleging a single claim of defamation. She hoped to restore her reputation in court. Nearly four years later—after proceedings in New York state court, the Southern District of New York, the Second Circuit, and the D.C. Court of Appeals—Carroll has prevailed on the merits of her claim. She awaits only a jury trial to decide damages. But Trump now seeks to void the entire case. He does so based on an immunity defense that he expressly disavowed several years ago. Trump's effort to reverse a strategic decision

---

[4] For the Court's reference, we have attached—as Addendum A—a short timeline summarizing key moments in the procedural history of this litigation.

8

that he now regrets is consistent with his pattern of bad faith gamesmanship through this litigation—a pattern that Judge Kaplan has documented in a series of opinions.

### A.    State Court Proceedings

#### 1.    Trump's Evasions Begin

Initially, Trump sought to evade this case altogether. He began by refusing to accept service of the Complaint, forcing Carroll to seek leave to serve him through alternative means. *See* SA.1. Trump next sought dismissal based on a spurious assertion that he was no longer subject to personal jurisdiction in New York. SA.5-10. The court rejected this defense, noting that Trump had failed to offer a shred of evidence. SA.11-12. Following the failure of that motion to dismiss, Carroll served discovery requests. Rather than respond, Trump sought a stay pending an appellate ruling in *Zervos v. Trump*—even though, two months earlier, while requesting that Carroll's case be assigned randomly (and not to the judge overseeing *Zervos*), Trump had described *Zervos* as "'unrelated' in every respect" to this suit. SA.3-4, SA.13.

#### 2.    Trump Waives and then Disavows Immunity

By this point, Trump was required to file an answer. SA.35. In it, he raised nine defenses—but did *not* assert presidential absolute immunity. Instead, he argued only that the Supremacy Clause temporarily shielded him "from suit in state court *while serving as President of the United States*." SA.45-46 (emphasis added). Trump then sought a stay on that same basis. SA.20 (seeking stay "while he [is] in office").

9

After Trump filed his stay motion, however, the Supreme Court decided *Trump v. Vance*, 140 S. Ct. 2412 (2020), holding that Trump's presidential office did not categorically immunize him from a state grand jury subpoena.

When Carroll cited *Vance* to argue that a stay should be denied, Trump made a crucial strategic choice: he sought to persuade the judge that granting a temporary stay would *not* prevent Carroll from pursuing her case or obtaining a recovery after he left office. In other words, to bolster his request for a short-term stay, he disavowed any assertion of complete immunity from litigation or liability. Thus, in response to Carroll's claim that he sought to "escape accountability" by relying on a presidential immunity argument, Trump wrote: "[N]o one is seeking to 'escape accountability' here. *Plaintiff is free to pursue this action when the President is no longer in office*." SA.49 (cleaned up, emphasis added). Trump then doubled down, explaining that "temporary Presidential immunity" would not place him "above the law": "Plaintiff's repetition of the assertion that a postponement of the proceedings would place the President 'above the law' [] does not make it so ..." *Id.* Trump compared his request to "the automatic stay granted bankruptcy debtors," explaining that his immunity required only "that civil cases in state court be postponed." *Id.*

### B.  Westfall Act Proceedings

In August 2020, Trump's stay motion was denied. SA.50-53. Facing the onset of fact discovery, Trump solicited the Department of Justice (DOJ) to remove this

case under the Westfall Act and to seek substitution of the United States as the defendant. The case was thus removed to the Southern District of New York.

In October 2020, Judge Kaplan denied DOJ's motion to substitute. SPA.6. He based this decision on two alternative grounds: first, that the Westfall Act does not cover presidents at all; and second, that even if the Westfall Act could apply, Trump's statements were outside the scope of his federal employment because his purpose in making them was personal and punitive rather than job related. *Id.*

### C.    Trump Files His First Attempted Counterclaim

After Judge Kaplan denied DOJ's motion to substitute, Trump and DOJ both appealed. SA.54, SPA.62. Trump then sought a stay, asserting that Judge Kaplan had been stripped of jurisdiction by those appeals. A.34-35. When Judge Kaplan denied that motion, SA.56, Trump did not seek appellate relief. To the contrary, he sought to expand the case by seeking leave to add a new defense and counterclaim based on amendments to New York's anti-SLAPP law. A.36-50. Judge Kaplan denied that motion as meritless. A.51, A.56-A66. In addition, Judge Kaplan found that Trump had acted with "undue delay," since Trump had waited 14 months after New York amended its anti-SLAPP statute. A.66-68. More broadly, Judge Kaplan noted Trump's bad faith, writing that Trump "has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails." A.69-72.

11

### D.  Trump Initiates Discovery—and then Seeks to Obstruct It

Following the rejection of his proposed counterclaim, and consistent with his choice to aggressively litigate the merits, Trump forged ahead in seeking to defeat Carroll's defamation claim. He proposed (and Carroll accepted) a discovery schedule. A.74. From May to September 2022, Trump invoked the jurisdiction of the District Court to obtain 30,469 pages of documents from Carroll and hundreds more pages through nonparty subpoenas. A.79. He also invoked the District Court's authority to depose Carroll, as well as nonparties who testified under subpoenas. In contrast, Trump produced only eight documents and four incomplete discovery responses—missing every single deadline applicable to those obligations. A.79-80.

Given the nature of the parties' claims and defenses, including Trump's prior disavowal of absolute immunity, Carroll did not undertake discovery concerning whether Trump's conduct was within the outer bounds of his presidential functions. She did not ask Trump about it. She did not pursue third party witnesses who may have had relevant information. And she did not engage in any expert discovery on that topic. Instead, her discovery requests focused overwhelmingly on the merits of her defamation claim—and sought to avoid issues of executive privilege that might unnecessarily delay the case. Carroll engaged in only limited inquiries concerning Trump's conduct in the White House, and those inquiries were addressed to entirely distinct issues: proving Trump's actual malice in making the June 2019 statements,

12

and proving that his purpose for making the statements was personal rather than job-related (since Trump's motivations were relevant to the Westfall Act issue).

Trump's deposition was scheduled for October 19, 2022. Shortly before his deposition, this Court partially resolved his pending Westfall Act appeal, holding that the Westfall Act did cover the President but certifying the scope-of-employment inquiry to the D.C. Court of Appeals. *See Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022). Trump responded by seeking a stay, which Judge Kaplan denied, noting that Trump's position was foreclosed by his own litigation conduct. A.76-79, A.84-99.

Following the denial of his stay motion, Trump was deposed. Under oath, he embraced and re-emphasized the defamatory meaning and implication of his June 2019 statements; he also affirmed that he stood by every one of his accusations against Carroll. SA.119-22. When pressed on his claim that Carroll was too unattractive for him to have assaulted her, Trump repeated it: "And that's 100 percent true. She's not my type … There's no way I would ever be attracted to her." SA.122. However, when shown a photo including himself and Carroll from a party several years before the attack, Trump *twice* misidentified Carroll as his ex-wife Marla Maples, insisting it was Marla even as he pointed straight at Carroll. *Id.*

As relevant to actual malice and the Westfall Act, Carroll's counsel also explored Trump's subjective purpose for making the June 2019 statements. From this line of inquiry, it emerged that when Trump made his statements, neither he nor

anybody else in the White House had undertaken any research into Carroll or her allegations. SA.122-23. Trump admitted that he had never read Carroll's book or magazine excerpt. SA.125. Nor did Trump identify any White House personnel as involved in strategizing or creating his June 2019 statements. SA.122-23.

Trump's deposition marked the end of fact discovery. On November 21, 2022, Trump filed a proposed schedule for the remainder of this case. A.100-01. There, he asked Judge Kaplan to schedule trial in May 2023—and made no mention of any immunity defense (or other supposed barrier to jurisdiction) he might seek to raise.

### E.  Carroll Files a Second Lawsuit

Three days later, on November 24, 2022, Carroll filed a separate suit against Trump alleging two new claims: a battery claim for the underlying sexual assault (this claim was revived by New York's Adult Survivors Act) and a defamation claim for a statement that Trump had posted on his social media platform in October 2022. *See Carroll v. Trump*, 22 Civ. 10016 (S.D.N.Y.). Carroll had provided advance notice of her intent to file that suit, SA.59, which came to be known as *Carroll II*. Ultimately, Judge Kaplan ruled that discovery from *Carroll I* would be admissible in *Carroll II*, and ordered limited additional discovery unique to the new case.[5]

---

[5] *See* SA.230-33.

14

### F.    Trump Seeks Summary Judgment Based on Immunity—but Requests an Expedited Trial While that Motion is Pending

Several weeks later, Trump filed his summary judgment motion in *Carroll I*. A.350. There, more than three years into the litigation, Trump sought to invoke presidential absolute immunity. In her opposition, Carroll pointed out that Trump had waived this defense many times over—most notably in July 2020, when he stated that "Plaintiff is free to pursue this action when [he] is no longer in office." *See* A.403, A.420-430. Trump did not disagree. Instead, he asserted that his absolute immunity defense is jurisdictional and thus non-waivable. *See* A.885-89.

But even after making this argument—which amounted to a claim that Judge Kaplan had *never* possessed jurisdiction over the case—Trump did not seek a stay. Instead, he did the opposite: on March 17, 2023, Trump joined a motion urging that *Carroll I* and *Carroll II* be consolidated for a trial to start on April 25, 2023. A.941-42. Trump thus asked the District Court to hold an expedited trial of *Carroll I* over six months ago. In making that request, moreover, Trump did not ask Judge Kaplan to first rule on his summary judgment motion. To the contrary, he agreed that "the consolidated trial shall cover liability and damages for both *Carroll I* and *Carroll II*." *Id.*[6] Ultimately, though, Judge Kaplan decided to try *Carroll II* first.

---

[6] This motion also provided that "the Court shall enter judgment on *Carroll I* only after all interlocutory appeals are finally resolved." That referred only to the Westfall Act appeal, since no other interlocutory appeals were pending at the time.

Meanwhile, the Westfall Act appeal in this case had continued. On April 13, 2023, the D.C. Court of Appeals issued an opinion clarifying District law in response to this Court's certified question about the scope-of-employment issue. *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023). This Court then remanded the appeal to the District Court based on that ruling. *Carroll v. Trump*, 66 F.4th 91, 92 (2d Cir. 2023).

Thus, as of April 2023, discovery in this case had concluded, most pre-trial motions had been resolved, the Westfall Act issue had been remanded to Judge Kaplan, and Trump's summary judgment motion remained pending. At that point, progress in this action temporarily paused while *Carroll II* was tried to a jury.

### G. *Carroll II* Trial Proceedings

From April 25, 2023 through May 9, 2023, a nine-person jury heard evidence in *Carroll II*. Carroll (who is 79 years old) testified for a full day on direct and for nearly two full days on cross-examination. Carroll then called ten more witnesses to support her case. Lisa Birnbach and Carol Martin confirmed what Carroll had told them about the attack shortly after it occurred. Cheryl Beall and Robert Salerno, former Bergdorf Goodman employees, explained that key details of Carroll's account were consistent with their knowledge of the store at the time. Jessica Leeds and Natasha Stoynoff testified that Trump had sexually assaulted them in a strikingly similar fashion. Carroll's sister testified that she and Carroll had been raised never to speak of such things as sexual assault. Leslie Lebowitz, a clinical psychologist,

16

testified that Carroll suffered from conditions consistent with her account of being sexually assaulted. Ashlee Humphreys, another expert, testified about damages for Trump's October 2022 statement. And Roberta Myers, the former editor-in-chief of *Elle*, testified about Carroll's integrity as a journalist and popularity as a columnist.

Trump, for his part, chose not to call any witnesses, not to appear at the trial, and not to testify in his own defense. However, the jury heard recorded testimony from Trump's deposition in the case, including his denial of the assault.

On May 9, 2023, after deliberating less than three hours, the jury unanimously held Trump liable for battery based on a finding that he had sexually abused Carroll. *See* SA.234-35. As Judge Kaplan has since explained, the *Carroll II* jury found that Trump forcibly inserted his fingers into Carroll's vagina, and thus "'raped' her in the broader sense of that word which … includes any penetration by any part of an accused's body (including a finger or fingers) or any other object." SA.278. In addition, the jury unanimously held Trump liable for defamation based on his October 2022 statement. *See* SA.235-36. The jury awarded Carroll a total of $5 million in compensatory and punitive damages. *Id.*

## H. Federal Court Proceedings Since the *Carroll II* Trial

### 1. Trump's Post-Verdict Statements

The day of the *Carroll II* verdict, Trump made this public statement:

> I have absolutely no idea who this woman is. This verdict is a disgrace – a continuation of the greatest witch hunt of all time![7]

Trump continued his attacks the next day:

> This Clinton appointed Judge, Lewis Kaplan, hated President Donald J. Trump more than is humanly possible. He is a terrible person, completely biased ….[8]

That evening, on a CNN Town Hall, Trump made numerous statements about Carroll and Judge Kaplan, including this one:

> I have no idea who this woman. This is a fake story, made up story. We had a horrible Clinton-appointed judge. He was horrible … I have no idea who the hell—she's a whack job.[9]

Trump has since continued his defamatory attacks on Carroll. For instance, he made this statement in late August 2023:

> The woman that I never met that they accused me of rape; that's being run by a Democrat, a Democrat operative, and paid for by the Democrat Party… These are sick people. These are evil people.[10]

---

[7] Donald J. Trump (@realDonaldTrump), Truth Social (May 9, 3:29 PM), https://truthsocial.com/@realDonaldTrump/posts/110340379870475514.

[8] Donald J. Trump (@realDonaldTrump), Truth Social (May 10, 1:20 AM), https://truthsocial.com/@realDonaldTrump/posts/110342704670441764.

[9] *READ: Transcript of CNN's Town Hall with Former President Donald Trump*, CNN (May 11, 2023).

[10] Glenn Beck, *Asking Donald Trump if He Would Campaign From JAIL* at 3:11:00, BlazeTV (Aug. 30, 2023).

### 2. Carroll Amends Her Complaint and Trump Answers

On May 22, 2023, Carroll moved to amend her complaint in this action. A.949-54. These amendments served two purposes. First, Carroll sought to facilitate the resolution of the Westfall Act issue by adding allegations about Trump's purpose in making the June 2019 statements (these allegations were drawn from his own deposition testimony). Second, Carroll added allegations about the *Carroll II* verdict and Trump's public response, since those issues were relevant to punitive damages. Carroll did not add any new claims or modify her sole defamation claim.

On June 13, 2023, Judge Kaplan granted leave to file the amended complaint. A.1046-47. On June 27, 2023, Trump filed his answer. In it, he purported to assert (as his first affirmative defense) "the doctrine of presidential absolute immunity." A.1067-68. Trump also attempted to lodge yet another counterclaim against Carroll. A.1070-74. Specifically, Trump alleged that Carroll had defamed him by accusing him of "rape," whereas the *Carroll II* jury—on its special verdict form for the battery claim—had found that he engaged in "sexual abuse." *Id.*

### 3. Judge Kaplan Denies Trump's Summary Judgment Motion Based on Presidential Absolute Immunity

On June 29, 2023, Judge Kaplan denied Trump's summary judgment motion. SA.130. He first held that presidential absolute immunity is waivable. SPA.73-81. Here, Judge Kaplan explained that the Supreme Court in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), had expressly analogized the immunity it recognized to judicial and

prosecutorial immunity (both of which are waivable). SPA.74-76. He added that those official immunities also implicate separation of powers principles, and that the involvement of separation of powers concerns has never been understood to automatically convert a doctrine into a jurisdictional barrier. SPA.78-80. Judge Kaplan also emphasized that *Nixon* "sought to protect the president's autonomy, not diminish it by denying the president the ability to choose whether or not to defend himself or herself in a civil lawsuit in federal court." SPA.80.

Judge Kaplan then addressed Trump's alternative argument that he should be granted leave to amend his answer to resurrect his presidential absolute immunity defense. Here, Judge Kaplan exercised his discretion to deny leave on two grounds. *First*, he determined that Trump's assertion of immunity was futile, since Trump's June 2019 statements about Carroll fell beyond the outer perimeter of his official duties. SPA.82-87. *Second*, after surveying Trump's sustained gamesmanship, he denied leave based on undue delay, bad faith, and prejudice to Carroll. SPA.88-91.

Finally, Judge Kaplan denied Trump's motion for summary judgment based on various alleged deficiencies in Carroll's defamation claim. SPA.92-108.

### 4. Trump Continues Litigating for A Full Month Before Unsuccessfully Seeking a Stay from Judge Kaplan

At this point, if he truly believed that Judge Kaplan lacked jurisdiction over the case, Trump could have immediately filed a notice of interlocutory appeal and sought a stay. Instead, he waited four full weeks. That delay, moreover, was overtly

strategic. In early July 2023, DOJ was reassessing its position on whether to certify anew that Trump should enjoy Westfall Act immunity; it had previously withdrawn its original Westfall Act certification based on the *Carroll II* verdict and the *en banc* opinion of the D.C. Court of Appeals. SPA.1044-47. Trump very much wanted such a certification—and, apparently, he had no objection to continued District Court proceedings while he waited on DOJ's decision. On July 11, 2023, however, DOJ stated that it would not issue him a new Westfall Act certification. SA.176-82.

A week later—on July 19, 2023—Judge Kaplan issued an order directing the parties to identify "each fact or proposition of law, if any, as to which the moving party claims *Carroll II* has preclusive effect in this action." SA.183. Several hours later, Trump filed a notice of interlocutory appeal from the denial of his summary judgment motion. SPA.109. But he still didn't seek a stay. Then, on July 25, 2023, it became even clearer to Trump that he faced risk at trial here: Carroll filed a letter explaining that summary judgment would be warranted on all merits elements of her defamation claim (due partly to collateral estoppel), leaving only damages. SA.184.

The next day, Trump sought a stay in the District Court, claiming that Judge Kaplan had erred in his analysis of the legal issues and that the verdict in *Carroll II* undercut Carroll's interest in seeing this case through to its end. A.1237-56.

In response, Carroll explained that Trump's position failed on the merits. *See* SA.186-94. She also identified two reasons why it is important for this case to reach

21

a jury verdict. *First*, she endured distinct and substantial harm from Trump's June 2019 statements—which (unlike the statement in *Carroll II*) were issued not by a former officeholder on social media years after Carroll spoke up, but rather by a sitting President at the White House in immediate response to her revelation that he had assaulted her. *Second*, the compensatory and punitive damages awarded in *Carroll II* have clearly failed to deter Trump from repeating the same defamatory statements. At trial in this action, Carroll will offer proof of Trump's attacks to support an award of punitive damages—in part, to specifically deter Trump from continuing to target her. As Carroll explained, holding a trial in this matter will thus afford the civil justice system an opportunity to more fully remedy and protect her.

On August 18, 2023, Judge Kaplan denied Trump's motion to stay. A.1310-26. In so doing, he certified that Trump's position on appeal is frivolous, given Trump's complete failure to address any of the reasons his motion had been rejected.

### 5. Judge Kaplan Dismisses the Counterclaim and Strikes Trump's Attempt to Resurrect His Immunity Defense

While the stay was litigated, Judge Kaplan dismissed Trump's defamation counterclaim, finding that Trump had failed plausibly to allege falsity and that Carroll's statements describing his sexual assault as "rape" were substantially true. A.1283-90. He also struck Trump's first affirmative defense to Carroll's amended complaint (where Trump had attempted to resurrect the immunity that he had previously disavowed). In so doing, Judge Kaplan emphasized that "a defendant who

22

is responding to an amended complaint cannot amend his answer as of right without any regard to the amendments taken by his adversary." A.1294 (citation omitted). Here, "there is nothing new in the amended complaint that would make Mr. Trump's presidential immunity defense any more viable or persuasive now than it would have been before." *Id.* Trump appealed on August 10, 2023. SPA.134.

### 6. Judge Kaplan Grants Summary Judgment to Carroll on the Merits of Her Defamation Claim in this Action

Nearly a month later, following consideration of cross-motions for summary judgment, Judge Kaplan entered summary judgment for Carroll on the merits of her defamation claim. SA.208. Thus, apart from the issues that Trump seeks to press in these appeals, all that remains in this litigation is a trial to determine damages.

### 7. This Court Denies a Stay but Expedites the Appeals

While Judge Kaplan resolved the parties' summary judgment motions, Trump sought an emergency stay from this Court. He asserted that his notices of appeal had divested Judge Kaplan of jurisdiction and that, in all events, a stay was warranted under the traditional four-factor test set forth in *Nken v. Holder*, 556 U.S. 418 (2009). ECF 27. In response, Carroll explained that Trump was not entitled to a stay under *Nken*'s four-factor standard, and that Judge Kaplan had retained jurisdiction for several independent reasons. ECF 38-1. Following oral argument, a motions panel of this Court denied Trump's stay motion. ECF 60. In so doing, it applied the *Nken* standard. *Id.* It also ordered expedited briefing and argument on these appeals. *Id.*

23

## STANDARD OF REVIEW

The denial of a summary judgment motion is reviewed *de novo*. *See Schaefer v. State Ins. Fund*, 207 F.3d 139, 142 (2d Cir. 2000). The denial of leave to amend based on bad faith, undue delay, or undue prejudice to the opposing party is reviewed for abuse of discretion. *See Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 247 (2d Cir. 2021). The conclusion that leave to amend should be denied based on futility is reviewed *de novo*. *See Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 309 (2d Cir. 2022). A decision striking an affirmative defense is reviewed *de novo*. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994).

## SUMMARY OF ARGUMENT

**I.** Judge Kaplan correctly found that Trump waived his presidential absolute immunity defense. Trump does not deny waiving this defense under the governing rules of waiver. Instead, he argues that it is non-waivable as a matter of law because it arises from the separation of powers and is therefore jurisdictional in character.

This argument fails for three principal reasons. *First*, in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Supreme Court grounded presidential absolute immunity in a tradition of official immunities that originated at common law, took shape within our separation of powers, and have long been understood as waivable. The analysis in *Nixon* forecloses Trump's position. *Second*, prior presidential filings and judicial opinions evince a supermajority understanding that presidential absolute immunity

24

goes to the merits, rather than jurisdiction. In *Clinton v. Jones*, 520 U.S. 681 (1997), and *Trump v. Vance*, 140 S. Ct. 2412 (2020), neither the parties nor the Supreme Court itself described the defense of presidential absolute immunity as jurisdictional. *Finally*, separation of powers principles—as articulated by the Supreme Court and the Executive Branch—support the view that presidents may choose whether to raise absolute immunity or instead meet personal-capacity civil complaints on the merits. Holding otherwise would disrespect presidential autonomy and invite inter-branch conflict. Trump's claim that this immunity must be jurisdictional because it involves the separation of powers is analytically incoherent and precluded by precedent.

In the alternative, Trump contends that even if his absolute immunity defense was waivable (and was thus waived), Judge Kaplan should have granted him leave to raise it at summary judgment. This argument fails for two reasons. First and most fundamentally, Judge Kaplan appropriately exercised his discretion to deny leave to amend based on bad faith, undue delay, and prejudice to Carroll—a conclusion that is only bolstered by the separation of powers principles underlying presidential absolute immunity. In addition, leave was rightly denied on grounds of futility.

**II.** Judge Kaplan correctly held that Carroll's amendment of her complaint after the *Carroll II* verdict did not wipe the slate clean and reverse Trump's waiver of presidential absolute immunity. An amended complaint "does not automatically revive all of the defenses and objections that a defendant has waived in response to

25

the original complaint." *Gilmore v. Shearson/Am. Express Inc.*, 811 F.2d 108, 112 (2d Cir. 1987), *overruled on other grounds by McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.*, 849 F.2d 761 (2d Cir. 1988). Here, under the *Gilmore* standard, the amended complaint did not reverse Trump's waiver of immunity.

**III.** Trump's remaining contentions are meritless. Judge Kaplan retained his jurisdiction following Trump's initial notice of interlocutory appeal. *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167 (2d. Cir. 2007); *Apostol v. Gallion*, 870 F.2d 1335 (7th Cir. 1989). And this Court lacks jurisdiction to review the denial of Trump's summary judgment motion concerning defamation damages, *see Britt v. Garcia*, 457 F.3d 264 (2d Cir. 2006), which in all events was correctly decided, *see Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000).

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY REJECTED TRUMP'S DEFENSE OF PRESIDENTIAL ABSOLUTE IMMUNITY

### A. Presidential Absolute Immunity Can be Waived

#### 1. In Defining this Immunity, the Supreme Court Drew a Careful Analogy to Waivable Common Law Defenses

Presidential absolute immunity was first recognized by *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), which held that such immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749. In arriving at that

view, *Nixon* invoked a tradition of immunities that originated at common law and evolved within our separation of powers. It is black letter law that those immunities are waivable and non-jurisdictional. *Nixon* did not mark a rupture from that rule.

From the very outset of its analysis, *Nixon* grounded itself in the tradition of official immunities that took shape at common law. *Id.* at 744-46. After surveying the principal precedents, *Nixon* explained that judges and prosecutors are shielded with absolute immunity for both historical and policy-driven reasons. *Id.* at 745-47. *Nixon* then observed that a similar analysis governs presidential immunity—though the inquiry is informed less by history (since the Presidency did not exist at common law) and more by our "constitutional heritage and structure." *Id.* at 748. Thus, rather than adopt a *sui generis* approach, *Nixon* situated itself within the existing structure of official immunities—and began by "applying the principles of our cases to claims of this kind." *Id.* at 749. It then made good on that promise, comparing presidents to judges and prosecutors while elaborating the "policies and principles" that supported presidential immunity. *See id.* at 748, 751-52. Ultimately, *Nixon* held that "for the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends." *Id.* at 758. *Nixon* thereby "drew a careful analogy to the common law absolute immunity of judges and prosecutors" while defining the purpose and basis of presidential absolute immunity. *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020).

Against that background, there is no basis to suspect that presidential absolute immunity is fundamentally different in kind from judicial and prosecutorial absolute immunity. And, as the Supreme Court has held, "[t]here is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373 (2001). Consistent with that principle, courts have repeatedly held absolute immunity can be waived by litigation conduct. *See Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010); *Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996); *see also Shmueli v. City of N.Y.*, 424 F.3d 231, 236 (2d Cir. 2005) (absolute immunity is an "affirmative defense").

Rules of waiver apply in these settings even though the absolute immunity of judges and prosecutors—like that of presidents—is grounded in the separation of powers. Judges enjoy absolute immunity to protect a core facet of Article III: "[T]hat independence without which no judiciary can be either respectable or useful." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). Similarly, prosecutors enjoy immunity to avoid harassment that may lead them to "shade [their] decisions instead of exercising the independence of judgment required by [their] public trust." *Imbler v. Pachtman*, 424 U.S. 409, 422-23 (1976). The importance of the justifications for absolute immunity has not led courts to transmute it into a jurisdictional limitation; instead, courts apply immunity within its scope while recognizing it may be waived.

28

Although Judge Kaplan recognized as much, Trump says nothing at all in response. Instead, he cites one paragraph of *Nixon* that refers to "jurisdiction." 457 U.S. at 753-54. But that was long before the modern effort to "bring some discipline to the use of this term." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).[11] As the text of the opinion reflects—and as Judge Kaplan noted—*Nixon* did not mean "jurisdiction" in the sense of "a federal court's fundamental ability to adjudicate a case on its merits." SPA.79. Indeed, that could not be what *Nixon* meant: if this immunity were a constitutionally mandated jurisdictional limit on federal courts, *Nixon* would not have left open the possibility that immunity would *not* apply to a damages cause of action against presidents created by Congress. *See* 457 U.S. at 748 n.27. Moreover, the precedents that *Nixon* cites in connection with its reference to jurisdiction plainly do not support Trump's reading. *See* 457 U.S. at 754 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and *United States v. Nixon*, 418 U.S. 683 (1974)). *Nixon*'s reference to "jurisdiction" instead occurred in its weighing of interests as to whether absolute immunity should apply to presidents at all. The Court was not circumscribing its own jurisdiction, but rather

---

[11] *Arbaugh v. Y&H Corporation*, 546 U.S. 500 (2006), exemplifies this effort. There, the Supreme Court clarified that Title VII's limited geographical reach should not be understood as truly "jurisdictional," despite a prior case having decided the same issue under "a lack of subject-matter jurisdiction label" and having "copied the petitioners' characterizations" of key terms "as jurisdictional." *Id.* at 512-13.

was deciding whether courts should generally be open to hearing damages suits against presidents (which is what would happen if absolute immunity did not apply).

It thus follows from *Nixon*—and the tradition of immunities that it invoked— that presidential absolute immunity can be disavowed. This immunity did not erupt *sua sponte* from the separation of powers. Instead, *Nixon* applied the principles of prior cases to hold that presidents (like judges and prosecutors) may invoke absolute immunity—which, in turn, has always been subject to rules of waiver and forfeiture.

### 2. Prior Presidential and Judicial Practice Confirm that Presidential Absolute Immunity is Waivable

That interpretation of *Nixon* is also powerfully supported by prior presidential and judicial practice. History is important in this case: when addressing matters that implicate the separation of powers, courts often consider how the parties in interest have understood their prerogatives. *See N.L.R.B. v. Noel Canning*, 573 U.S. 513, 528-29 (2014). The prior practice of a branch of government can thus clarify how the separation of powers operates in a given context. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015). Even when history is "not all on one side," the overall balance may offer "strong support" for a particular understanding. *Id.*

Here, the overall balance is decisively against Trump's position. Twice in the past three decades, the Supreme Court has addressed claims of presidential absolute immunity. Yet in *Clinton v. Jones* and *Trump v. Vance*, none of the briefs submitted by the parties (and none of the Court's own opinions) described presidential absolute

30

immunity as implicating federal court jurisdiction. *See Clinton*, 520 U.S. 681 (1997); *Vance*, 140 S. Ct. 2412 (2020). Like the proverbial "dog that did not bark," this silence speaks volumes. *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991).

But there is more. In a supermajority of the publicly available filings from the past thirty years, presidents represented by DOJ have described absolute immunity in merits-based rather than jurisdictional terms. In these briefs, they have invoked their immunity under Federal Rule of Civil Procedure 12(b)(6) (rather than Rule 12(b)(1)); they have addressed it apart from issues denoted as jurisdictional; and, most notably, they have not described absolute immunity as limiting jurisdiction.[12] While there are some counterexamples, they reflect a minority of the filings.[13]

The same pattern holds where presidents were represented by private counsel. For instance, after the Supreme Court ruled against him, President Clinton asked the district court to dismiss Paula Jones's defamation claim under Rule 12(c), arguing that her "allegations fail to state a claim for defamation" because he enjoyed absolute immunity as to that cause of action.[14] Similarly, five years later and invoking Rule

---

[12] *E.g.*, Mot. to Dismiss at 2, 14-18, *Bundy v. Navarro*, No. 16 Civ. 1047 (D. Nev. July 15, 2016); Mot. to Dismiss at 1, 3-4, *Keyter v. Bush*, No. 03 Civ. 02496 (D.D.C. Feb. 2, 2004); Br. for Appellees at 11-12 & n.4, *Saunders v. Bush*, No. 92-1962 (5th Cir. Dec. 21, 1992).

[13] *E.g.*, Mot. to Dismiss at 14-15, *Klayman v. Obama*, No. 16 Civ. 2010 (N.D. Tex. Sept. 19, 2016).

[14] Mem. in Supp. of President Clinton's Mot. for Judgment on the Pleadings at 36, *Jones v. Clinton*, No. 94 Civ. 290 (E.D. Ark. July 3, 1997).

12(b)(6), Clinton invoked absolute immunity as a basis for the D.C. Circuit to affirm the dismissal of a *Bivens* case against him for failure to state a claim.[15] Both of these briefs framed absolute immunity as a merits defense, not a jurisdictional limitation.

No president, however, has expressed that view so often (or so forthrightly) as Trump himself. Four years ago, in the Emoluments Clause litigation, here is what he told the Fourth Circuit: "Absolute immunity is a 'a defense on the merits, not a limit on the Court's jurisdiction.'" Trump Reply Br. at 1, *D.C. v. Trump*, No. 18-2488 (4th Cir. Feb. 21, 2019). This was consistent with Trump's position a year earlier in *K&D, LLC v. Trump Old Post Off, LLC*, where, as Judge Leon recounted: "[D]uring the oral argument the parties agreed that neither absolute presidential immunity nor federal preemption are threshold issues that *must* be decided before reaching the merits." No. 17 Civ. 731, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) (emphasis in original). Most recently, on appeal in *Cohen v. United States*, Trump raised no concern about Judge Liman dismissing a claim on the merits without first resolving his assertion of presidential absolute immunity.[16]

Trump's willingness to "deliberately chang[e] positions according to the exigencies of the moment" makes clear how little he thinks of the "integrity of the

---

[15] Br. for Appellees at 1, 25, *Browning v. Clinton*, No. 98-1992 (D.C. Cir. Jan. 25, 2002).

[16] Br. for Appellee, *Cohen v. Trump*, No. 23-25 (2d Cir. July 24, 2023).

judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). More fundamentally, though, his repeated treatment of presidential absolute immunity as non-jurisdictional coheres with the dominant presidential practice since *Nixon*.

Consistent with Executive Branch practice, a supermajority of federal courts since *Nixon* have described presidential absolute immunity as a merits defense under Rule 12(b)(6). *See Byars v. Malloy*, No. 3:11 Civ. 17, 2011 WL 4538073, at *5 (D. Conn. Sept. 29, 2011) (holding that a presidential "absolute immunity defense does not deprive a court of subject matter jurisdiction"); *accord D.C. v. Trump*, 959 F.3d 126, 141 (4th Cir. 2020) (en banc) (Niemeyer, J., dissenting). Thus, courts have largely addressed *Nixon* immunity defenses within the rubric of failure to state a claim.[17] And many courts have resolved cases on merits grounds while declining to reach presidential absolute immunity claims briefed by the parties (which they could not properly do if it were jurisdictional).[18]

While a minority of federal courts have presumed a contrary view, those cases are distinguishable on three grounds. *First*, in many of them, the court was right that

---

[17] *E.g.*, *Allen v. Biden*, No. 21 Civ. 01150, 2021 WL 3472740, at *1-2 (D. Ariz. Aug. 6, 2021); *Jackson v. Bush*, 448 F. Supp. 2d 198, 200-02 (D.D.C. 2006); *Idrogo v. U.S. Army*, 18 F. Supp. 2d 25, 29 (D.D.C. 1998).

[18] *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at *10 n.6 (S.D.N.Y. Nov. 14, 2022); *Brundage v. U.S. Info. Agency*, 248 F.3d 1156, at *3 n.3 (7th Cir. 2000) (unpublished); *Jones v. Clinton*, 974 F. Supp. 712, 715 (E.D. Ark. 1997).

it lacked jurisdiction, but wrong to believe this resulted from absolute immunity: in those cases, the President was sued in his official capacity, which meant sovereign rather than absolute immunity controlled (and sovereign immunity has always been recognized as jurisdictional). *See Byars*, 2011 WL 4538073, at *4-5.[19] *Second*, in some cases that cursorily referred to presidential absolute immunity in jurisdictional terms, it was ambiguous whether the President was sued in his official or personal capacity—and it would be reasonable to interpret the circumstances of those cases as indicating an official capacity suit.[20] *Finally*, although some judges have raised presidential absolute immunity *sua sponte* to dismiss suits filed by prisoners, that does not reflect a belief that this doctrine is jurisdictional in character; instead, it reflects only the preliminary screening requirements imposed by the PLRA.[21]

Accordingly, the overwhelming weight of post-*Nixon* precedent evinces an understanding that presidential absolute immunity is an affirmative merits defense. Neither *Clinton* nor *Vance* described this immunity as limiting federal jurisdiction, and the decisive majority practice of the lower courts is at odds with such a view. Taken together with decades of Executive Branch practice, that body of precedent

---

[19] *E.g.*, *Cohen v. Obama*, No. 09 Civ. 704, 2009 WL 10708689, at *2-3 (W.D. Okla. Aug. 10, 2009); *Neary v. Weichert*, 489 F. Supp. 3d 55, 63 (E.D.N.Y. 2020).

[20] *See, e.g.*, *Williams v. Wilkie*, 320 F. Supp. 3d 191, 198 n.7 (D.D.C. 2018).

[21] *E.g.*, *Wall v. Trump*, No. 19 Civ. 7413, 2019 WL 4639951, at *2 (S.D.N.Y. Sept. 24, 2019).

confirms that neither the Executive nor the Judiciary has viewed *Nixon* as erecting a jurisdictional barrier that precludes presidents from waiving immunity.

### 3. Separation of Powers Principles Further Support this Understanding of Presidential Absolute Immunity

This interpretation of *Nixon* is bolstered by separation of powers principles. As *Nixon* observed, the President is entrusted by the Constitution "with supervisory and policy responsibilities of utmost discretion and sensitivity." 457 U.S. at 750. Deciding whether and how to exercise those responsibilities is, in large measure, left to the President's discretion. *See id.* The major purpose of absolute immunity is to ensure the President can exercise this discretion "fearlessly and impartially." *Id.* at 752. And that exact same consideration explains why the President has discretion to waive this immunity if he so chooses: if a current or former president believes it best to answer a personal-capacity civil complaint on the merits, rather than by asserting absolute immunity, respect for the "special nature" of his position supports honoring that choice. *Id.* at 756. As Judge Kaplan explained, *Nixon* "sought to protect the president's autonomy, not diminish it by denying the president the ability to choose whether or not to defend himself in a civil lawsuit in federal court." SPA.80.

Holding otherwise would disserve the interest in presidential discretion and autonomy that gave rise to absolute immunity in the first place. If a president prefers that a court not pronounce on the outer limit of his office, or if he perceives some advantage to addressing a civil complaint on the merits, then courts should not

prohibit him from making that choice. *Cf. Comm. on Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 787 (D.C. Cir. 2020) (en banc) (Griffith, J., dissenting) (explaining that courts should not "require the [political] branches to submit to *our* views of *their* constitutional prerogatives on *our* timeline").[22]

Nor would the interests of the Judicial Branch favor forcing a decision on absolute immunity when the President has disavowed it. In cases implicating the separation of powers, "'occasions for constitutional confrontation'" between the Executive and Judiciary "should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389-90 (2004) (quoting *Nixon*, 418 U.S. at 692).

Against all this, Trump invokes "the separation-of-powers doctrine," Br. at 13, and collects cases from contexts having nothing to do with presidential absolute immunity. He appears to argue that if a rule is based on "the separation-of-powers doctrine," it cannot be waived. That argument misunderstands the Constitution.

There is no monolithic "separation-of-powers doctrine" that applies uniformly across all legal contexts. *See* John F. Manning, *Separation of Powers as Ordinary*

---

[22] In arguing otherwise, Trump asserts that courts cannot exercise jurisdiction without resolving "the question of whether the allegations relate to conduct taken within the 'outer perimeter' of [the President's] official duties." Br. at 27. But that analysis gets it backwards. If the President chooses not to assert absolute immunity, and instead defends a case on other grounds, then the scope of his presidential authority simply isn't part of the case. A court that finds him liable in that scenario will not be "imput[ing] liability for the performance of [the President's] official acts," *id.*, because at that point the case will have nothing to say about his office.

*Interpretation*, 124 Harv. L. Rev. 1939, 1988 (2011). Instead, a wide range of doctrines concerning Legislative, Executive, and Judicial powers are understood to implement our plan of government, and these doctrines do not all work the same way. Some involve non-waivable requirements. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-09 (2013); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850-51 (1986). But many do not. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231 (1995) ("[T]he proposition that legal defenses based upon doctrines central to the courts' structural independence can never be waived simply does not accord with our cases."). There is "no support in principle or in precedent or in policy" for a "blanket rule that arguments premised on the Constitution's structural separation of powers are not waivable." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in the judgment) (cleaned up).

Judges and Presidents have long understood that point. While the doctrine of executive privilege is "rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. 683, 708 (1974), "executive privilege also can be waived," *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021). Similarly, although the state secrets privilege "performs a function of constitutional significance," *El-Masri v. United States*, 479 F.3d 296, 303 (4th Cir. 2007), this privilege is waived unless affirmatively asserted, *see United States v. Reynolds*, 345 U.S. 1, 7-8 (1953).

Still more instructive is Executive Branch precedent concerning the immunity of the President and his senior advisers from compelled testimony before Congress. DOJ's Office of Legal Counsel (OLC) has long viewed that immunity as absolute. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, 2019 WL 2315338, at *2 & n.1 (May 20, 2019). OLC has also emphasized that this immunity implicates core separation of powers concerns. *See Congressional Oversight of the White House*, 45 Op. O.L.C. __, 2021 WL 222744, at *15-20 (Jan. 8, 2021). In doing so, OLC has expressly analogized immunity from compelled congressional testimony to the absolute presidential immunity recognized in *Nixon*. *See id.* at *19 (citing *Nixon* and observing that "[t]he President's energies may be inappropriately diverted by congressional oversight just as they may be by private litigation"). Yet OLC has also repeatedly confirmed that the President may waive this immunity through "accommodations between the political branches," and that such a waiver preserves the separation of powers values at stake. *Testimonial Immunity Before Congress*, 2019 WL 2315338, at *8. As OLC has noted, "voluntary testimony by a senior presidential adviser represents an affirmative exercise of presidential autonomy," since the President is free to weigh "the benefit of providing such testimony" against "the potential for harassment and harm to Executive Branch confidentiality." *Immunity of the Assistant to the President and Director of the Office*

*of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, 2014 WL 10788678, at *3 n.2 (Jul. 15, 2014).

So too here. Allowing a current or former president to disavow a defense of absolute immunity does not undermine presidential authority or the separation of powers. Instead, it upholds the purposes of immunity under *Nixon*, preserves the prerogatives of the Executive Branch, avoids embroiling the Judiciary in needless inter-branch conflict, and coheres with longstanding practice and precedent.

Moreover, there is virtually no risk that courts will impose waiver findings on presidents without a proper basis. Only in rare and singular cases would presidents (and their counsel) decide to waive immunity. As a practical matter, then, upholding such waivers when they occur poses little danger to presidential prerogatives.

For these reasons, Trump's assertion that presidential absolute immunity is jurisdictional—or non-waivable—should be rejected by this Court.

### B.    Judge Kaplan Properly Denied Leave to Amend

Trump does not (and cannot) deny that if presidential absolute immunity is non-jurisdictional, then he waived it. Instead, he argues in the alternative that Judge Kaplan should have granted him leave at the summary judgment stage to amend his answer to assert it. That position is meritless for two independent reasons: Trump's conduct reflected bad faith and prejudiced Carroll, and his position is futile.

39

> **1. Judge Kaplan Did Not Abuse His Discretion in Denying Leave Based on Bad Faith, Undue Delay, and Prejudice**

Where a party has waived an affirmative defense but seeks leave to raise it at the summary judgment stage, they may do so only "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, … or undue delay of the proceedings." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003); *see Anthony v. City of N.Y.*, 339 F.3d 129, 138 n.5 (2d Cir. 2003) (Sotomayor, J.). In such cases, "the district court may construe the motion for summary judgment as a motion to amend the defendant's answer." *Saks*, 316 F.3d at 350-51. "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Here, Judge Kaplan did not abuse his discretion by denying leave based on Trump's bad faith gamesmanship, Trump's unexplained and undue delay in raising this defense, and the ensuing prejudice to Carroll. That conclusion is only bolstered by the separation of powers principles inherent in presidential absolute immunity.

> ### a. Bad Faith

For starters, this appeal perfectly exemplifies the principle that "[b]ad faith may be revealed through the procedural history of the case." *MacGregor v. Milost Glob., Inc.*, No. 1:17 Civ. 6691, 2019 WL 2453340, at *5 (S.D.N.Y. Apr. 19, 2019).

When Carroll first filed suit, Trump evaded service and delayed proceedings with a specious personal jurisdiction defense. He then unsuccessfully sought a stay

based on the pendency of an appeal he had previously described as "'unrelated' in every respect." SA.4. When the time came to file his answer, moreover, Trump did *not* assert that his presidential office rendered him immune from suit or liability. *Contra Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."). Instead, he waived that defense, asserting only temporary immunity.

And this was no ordinary waiver: Trump *affirmatively disavowed* any effort to "escape accountability" through an immunity defense. As part of a strategic bid to shore up his stay motion, he made an unequivocal representation to the court that "Plaintiff is free to pursue this action when the President is no longer in office." SA.49. Nobody relying on absolute immunity from suit or liability would say that.

Over the next two-and-a-half years of litigation—including the entirety of fact and expert discovery—Trump never once mentioned absolute immunity. Trump blames this on the ongoing Westfall Act proceedings. Br. at 37. But the record proves otherwise. During the pendency of his Westfall Act appeal, Trump sought leave to amend his answer to include an anti-SLAPP defense and counterclaim (which failed partly because he had waited 14 months without any explanation). Clearly, Trump had no hesitation about raising new affirmative defenses in this period. Besides, Trump had ample opportunity to surface any absolute immunity claims during the discovery process. Instead, after setting discovery in motion, Trump stonewalled all

41

requests directed to him, and missed every applicable court deadline, while taking advantage of federal jurisdiction to subpoena evidence for his own benefit. At no point did Trump identify presidential absolute immunity as a relevant defense.

In December 2022, over three years into the litigation, Trump first sought to raise presidential absolute immunity in a summary judgment motion.[23] When pressed, he did not dispute waiving this defense. Instead, he sought to escape that result by advancing arguments diametrically at odds with his own position in numerous recent federal cases. Then, while his motion was pending, he not only failed to seek a stay but instead urged Judge Kaplan to hold an expedited trial.

Judge Kaplan denied that motion and held a trial in *Carroll II*. Following this trial, Trump issued outrageous attacks on both Carroll and Judge Kaplan—including attacks that willfully reprised the exact statements a unanimous jury had just held to be defamatory. When Carroll amended her complaint in this case to reflect that point, Trump responded with an outlandish counterclaim: he alleged that it was defamatory for her to say Trump raped her, since the jury had found only (only!) that he forcibly penetrated her vagina with his fingers while violently ramming her against a wall.

At this point, Judge Kaplan denied Trump's presidential absolute immunity argument. Once again, Trump responded with procedural gamesmanship: rather than

---

[23] At the time Trump raised this argument, the Westfall Act appeals were still unfolding, which further confirms that Trump did not view the pendency of those appeals as somehow impeding his ability to assert an absolute immunity defense.

file an appeal and seek a stay, Trump delayed for a month for tactical reasons. He had no objection to district court jurisdiction while he thought it might benefit him.

Bad faith is a "many-faceted concept." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 198 (4th Cir. 2022). Trump's conduct in this litigation exemplifies many of those facets. He disavowed his immunity defense for strategic reasons and, having come to regret that choice, sought to go back on his word. In doing so, he flagrantly contradicted his own position in multiple recent cases. He also made a tactical choice to wait until *after* discovery had closed—and thus after he could be questioned about it at his deposition—to first spring this argument on Carroll. Meanwhile, Trump took full advantage of federal jurisdiction to burden Carroll and many nonparties with subpoenas meant to advance his defense (even as he shamelessly shirked his own discovery obligations). Shortly after first raising this immunity argument, moreover, Trump urged Judge Kaplan to hold an expedited trial on liability and damages—behavior plainly at odds with his own position. When Trump lost at trial in *Carroll II*, he responded with disturbing (and, especially in the current environment, dangerous) attacks on Carroll and Judge Kaplan. And after his summary judgment motion was rejected, Trump only persisted in his procedural chicanery in deciding whether and when to appeal and seek a stay.

This gamesmanship was independently sufficient to justify Judge Kaplan's exercise of discretion in denying leave to amend. *See Net MoneyIN, Inc. v. VeriSign,*

*Inc.*, 545 F.3d 1359, 1373 (Fed. Cir. 2008) (upholding denial of leave where party had "expressly disavowed" a claim and later sought leave to raise it after the close of discovery); *Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007) (upholding denial of leave where party sought to raise new defenses after the close of discovery).

### b.    Undue Delay and Prejudice

Judge Kaplan's decision is also justified by Trump's undue delay in raising his immunity defense—and by the ensuing prejudice to Carroll. Courts deny leave when "the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties." *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000). Here, Trump did not merely "delay" in raising his absolute immunity defense. He failed to raise it at the outset of the case in November 2019; he waived it in his answer in February 2020; and he disavowed it by letter in July 2020. He then waited until December 2022 to file his motion. This delay was obviously "inordinate." And he has never even attempted to explain it.

Carroll suffered prejudiced from Trump's delay. "The longer the period of an unexplained delay, the less will be required of the non-moving party in terms of a showing of prejudice." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (cleaned up). Carroll invested many years into litigating a case that Trump now claims was barred from the get-go. Moreover, because Trump waited until *after* discovery to first raise this defense, Carroll had no reason to engage in discovery on

this point or to explore it with Trump at his deposition. To be sure, Carroll inquired into Trump's state of mind, since that is relevant to actual malice and Westfall Act immunity. But Trump's mental state for the challenged conduct is legally irrelevant to his absolute immunity defense. *See Nixon*, 457 U.S. at 756-57. And while Carroll was able to repurpose some of the mental state discovery to support her opposition to Trump's summary judgment motion, that hardly means "no additional discovery would have been required by virtue of [Trump] raising his presidential immunity defense." Br. at 39. Had she been put on notice of this lurking issue, Carroll would obviously have pressed on it during Trump's deposition. She may also have called experts on history or prior presidential practice to support her position, or she may have engaged in appropriate nonparty discovery. Trump's disavowal of this immunity, and his attempted reversal post-discovery, was thus highly prejudicial.

### c.    Separation of Powers Principles

Under all these circumstances—including Judge Kaplan's repeated and well-supported findings of bad faith, undue delay, and prejudice—there would be no serious question about the denial of leave to any ordinary civil litigant. In effect, however, Trump asks for an exception to the rules, as reflected in his assertion that leave is required by "the important constitutional considerations at play." Br. at 9.

But those considerations, to the extent they are relevant, cut squarely against Trump. At the time he waived and then disavowed any claim of absolute immunity,

45

Trump was serving as President. At the time Trump sought to reverse course and undo his own prior decisions, he was no longer in office. "As between a former and an incumbent President, 'only the incumbent is charged with performance of the executive duty under the Constitution.'" *Trump*, 20 F.4th at 33 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448 (1977)). Thus, when Trump waived and disavowed immunity, he did so while possessed of presidential authority—whereas his subsequent reversal occurred when he no longer held Article II power. *See Nixon*, 433 U.S. at 449. To be sure, absolute immunity shields incumbent and former presidents alike for acts committed in office. *See* 457 U.S. at 749. But in assessing Trump's waiver decision, it matters that he seeks to undo his own presidential act.

Simply put, presidential power rarely includes a right to declare "backsies," especially after leaving office. When a President exercises his authority to sign a treaty, veto legislation, or grant a pardon, he cannot later take it back. As President, Trump not only waived but also positively disavowed any claim to immunity—and, in so doing, exercised his Article II authority. Allowing Trump as a private citizen to undo that choice would undermine, not advance, separation of powers principles.

## 2. Futility

For each of the reasons explained above, Judge Kaplan properly exercised his discretion in denying Trump leave to amend. Judge Kaplan also correctly denied leave on another independent basis: the futility of Trump's immunity defense.

Carroll extensively briefed this issue below. *See* SA.83-94. In short, Trump is entitled to presidential absolute immunity only for acts within the "outer perimeter" of his official functions. *Nixon*, 457 U.S. at 756. There is "no support for an immunity for *unofficial* conduct." *Clinton*, 520 U.S. at 694. While the Presidency is a demanding job, the demands of a president's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807). Thus, presidents cannot prevail on immunity claims merely by insisting that their conduct was "taken *within an* official capacity," since the "scope of an immunity"—even for official acts—depends on the "performance of particular functions of [the] office." *Clinton*, 520 U.S. at 694.

Here, nobody doubts that the President "possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Speech by the President about the operation and administration of the government, and about the execution of the laws that he has sworn to execute, is ordinarily part of his official functions as well. But when the President speaks about personal and private matters bearing no relation to any historical, ongoing, or intended use of Article II authority—and bearing no relation to the operation or administration of the federal government—it is tenuous to claim that he is truly engaged in a presidential function. In such cases, a more context-sensitive assessment of the challenged conduct is necessary. *See, e.g.*, *Nixon*, 457 U.S. at 755.

47

This point has been understood in every analogous setting. Prosecutors are not protected by absolute immunity for statements at press conferences, even though they "may be an integral part of a prosecutor's job." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993). So too for judges. *See Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997) ("Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense."). And for legislators. *See Hutchinson v. Proxmire*, 443 U.S. 111, 131-33 (1979) (public statements uttered outside of official congressional proceedings are not shielded by the Speech or Debate Clause). These cases confirm that absolute immunity has *never* been held to encompass all public statements by federal officials, even those related to official functions or responsive to criticism.

Although the Presidency is unique in certain respects, that uniqueness does not transform every public statement into the performance of an official function. Judge Mehta confirmed this point in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46 (D.D.C. 2022). There, Judge Mehta engaged in an exceptionally thorough study of the issue, concluding that "the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function." *Id.* at 81. Applying this rule to the facts before him, Judge Mehta determined that Trump lacked presidential absolute immunity.

48

As Judge Kaplan determined, the application of these principles here requires the rejection of Trump's immunity defense: "Even assuming that the president's decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that the president's own personal attacks on his or her accuser fall equally within that boundary." SPA.87. Trump's attacks on Carroll had no connection to the exercise of any Article II power, had nothing to do with the operation or administration of the government, did not concern any government policy or program or position, and did not reflect the execution of any presidential duty. Moreover, the subject matter of Trump's attacks arose from his own private sexual misconduct decades before taking office—and his defamatory statements went far beyond a mere denial to include repeated, specific, and incendiary personal attacks on a private citizen. In these respects, there was no link between Trump's attacks on Carroll and any presidential function.

While he served as President, Trump may have seen a benefit to punishing and humiliating women who revealed that he had sexually assaulted them. But that calculation does not render his defamatory attacks a performance of presidential functions. It would dishonor the Constitution—and the presidential office that it creates—to declare that the President engages in official functions whenever he willfully defames private citizens who reveal his private sexual misconduct.

49

## II.   THE DISTRICT COURT PROPERLY STRUCK THE FIRST AFFIRMATIVE DEFENSE TO THE AMENDED COMPLAINT

Trump next asserts that Judge Kaplan erred in striking presidential absolute immunity as a defense from his answer to Carroll's amended complaint. Br. at 40-44. There is no merit to this argument, which misstates and then misapplies the law.

The governing case is *Gilmore v. Shearson/Am. Express Inc.*, 811 F.2d 108 (2d Cir. 1987), *overruled on other grounds by McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.*, 849 F.2d 761 (2d Cir. 1988). In *Gilmore*, the defendant waived its right to compel arbitration but sought to reverse course after the plaintiff filed an amended complaint. This Court rejected that maneuver and, in so doing, explained three legal principles that also control here. *First*, "[a]lthough an amended complaint ordinarily supersedes the original pleading, it *does not* automatically revive all of the defenses and objections that a defendant has waived in response to the original complaint." *Id.* at 112 (citations omitted, emphasis added). *Second*, the defenses that are not automatically revived by the filing of an amended complaint are those that "involve[] the core issue of a party's willingness to submit a dispute to judicial resolution," such as "lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service." *Id. Finally*, to revive any such defense, a defendant "must show that the amended complaint contains charges that, in fairness, should nullify its earlier waiver and allow it to reassess its strategy"—a

standard that is met where the plaintiff's amendments "changed the scope or theory of [the plaintiff's] claims" in ways relevant to forgiving the waiver. *Id.* at 113.

Six years later, this Court applied *Gilmore* in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994). *Shields* held that a defendant's failure to raise Rule 9(b) in response to a complaint did not preclude them from citing it while seeking dismissal of an amended complaint. Invoking *Gilmore*, the Court held that Rule 9(b) does not go to a "party's willingness to submit to judicial resolution." *Id.*

The Eleventh Circuit subsequently embraced *Gilmore* in *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194 (11th Cir. 2011). Following *Gilmore*, *Krinsk* held that "the filing of an amended complaint does not automatically revive all defenses or objections that the defendant may have waived in response to the initial complaint." *Id.* at 1202. Simply put, "courts will permit the defendant to rescind his earlier waiver … only if it is shown that the amended complaint unexpectedly changes the scope or theory of the plaintiff's claims." *Id.* (citing *Gilmore*, 811 F.2d at 113).

That principle has been widely endorsed. In *Burton v. Ghosh*, for example, the Seventh Circuit rejected the argument that "district courts [must] allow new affirmative defenses whenever a plaintiff files an amended complaint." 961 F.3d 960, 966 (7th Cir. 2020). Instead, it held that the analysis depends on whether "an amended complaint fundamentally changes the scope or theory of the case" in ways

"relevant to the new defense." *Id.* at 967, 968; *accord ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 509 (6th Cir. 2022) (adopting similar rule).

Under *Gilmore* and its progeny, Judge Kaplan appropriately struck Trump's attempt to resurrect his waived presidential absolute immunity defense in his answer to Carroll's amended complaint. *Gilmore* makes clear that the revival of this defense was *not* automatic by mere virtue of the filing of an amended complaint. 811 F.2d at 112. Automatic revival occurs only for defenses that do not involve "the core issue of a party's willingness to submit a dispute to judicial resolution." *Id.* And that "core issue" is exactly what presidential absolute immunity is about: immunity from suit and also from liability. *See, e.g.*, *Nixon*, 457 U.S. at 757-58. Thus, Carroll's amended complaint did not automatically revive Trump's waived immunity defense.[24]

Therefore, Trump's defense was revived only if Carroll's amended complaint "changed the scope or theory" of her case in ways that require forgiving Trump's waiver. *Gilmore*, 811 F.2d at 113. As Judge Kaplan concluded, it did not: "There is nothing new in the amended complaint that would make Mr. Trump's presidential immunity defense any more viable or persuasive now than it would have been before." A.1294. Carroll's amendments did not seek to impose any new form of

---

[24] Trump asserts that a defense concerns "a party's willingness to submit a dispute to judicial resolution" only if it is jurisdictional. Br. at 43. That is inconsistent with *Gilmore*, which cited several non-jurisdictional defenses (*e.g.*, a right to arbitrate) in articulating its standard. 849 F.2d at 112. Moreover, most jurisdictional defenses cannot be waived, and so the *Gilmore* framework would not apply at all.

52

liability on Trump, nor did they otherwise alter the nature or shape of the case in any respect relevant to an absolute immunity defense. Instead, they concerned only the *Carroll II* verdict and Trump's associated public statements (which bore on the issue of punitive damages) and Trump's own testimony regarding his purpose for making the June 2019 statements (which is legally irrelevant to absolute immunity and concerned information long known to Trump). Accordingly, there is no fairness concern with Judge Kaplan's decision, which simply held Trump to his earlier strategic waiver and precluded an improper response to the amended complaint.

## III.   TRUMP'S REMAINING CONTENTIONS ARE MERITLESS

### A.   Judge Kaplan Retained Jurisdiction Following Trump's Initial Notice of Interlocutory Appeal

After Judge Kaplan denied Trump's summary judgment motion, Trump waited two weeks and then filed a notice of appeal on July 19, 2023. Citing *Griggs v. Provident Consumer Discount*, 459 U.S. 56 (1982), Trump contends that Judge Kaplan immediately lost jurisdiction upon the filing of that notice. Br. at 55-56.

Trump is mistaken for three reasons. First, his position is foreclosed by *In re World Trade Center Disaster Site Litigation*, 503 F.3d 167 (2d Cir. 2007). There, as here, the district court denied summary judgment motions based on immunity from suit and the defendants then took an interlocutory appeal. *See id.* at 169. This Court initially stayed all district court proceedings. *Id.* But after oral argument, this Court vacated that stay. *Id.* at 171. It reasoned that the "motion to vacate the stay is

inextricably intertwined with the issue of whether the Appellants' notice of appeal from the denial of their [immunity motions] divested the District Court of jurisdiction to proceed with the litigation." *Id.* at 169 (citation omitted). It added that "whether to vacate the stay and whether to restore the District Court's jurisdiction" were "issues that involve similar if not identical considerations in the circumstances of this case." *Id.* at 170. And as to all these questions together, the *WTC* Court applied the four-factor stay test. *Id.* at 170-71. Under that test, Trump's position fails, as a panel of this Court has already found in denying his stay motion. ECF at 60.

Alternatively, Trump's objection to continued District Court jurisdiction fails both because his appeal is frivolous and because of the dilatory, bad faith manner in which he first sought to assert his immunity from suit. *See Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989); *accord Yates v. City of Cleveland*, 941 F.2d 444, 448-49 (6th Cir. 1991); *id.* at 450-51 (Joiner, J., concurring).[25]

### B.   This Court Lacks Jurisdiction Over Trump's Defamation Damages Argument—Which, In Any Event, is Meritless

Trump separately asserts that Judge Kaplan erred in denying his motion for summary judgment as to whether his June 2019 statements were defamatory *per se*. Br. at 56-60. But the denial of summary judgment as to that issue is a non-final order

---

[25] Speaking practically, Trump's point matters little. If this Court otherwise affirms Judge Kaplan's rulings on immunity but finds that the notice of appeal temporarily stripped him of jurisdiction, Judge Kaplan would be free on remand to re-adopt the opinions he has issued since Trump first filed his notice of appeal.

and thus cannot be immediately appealed. *See Bolmer v. Oliveira*, 594 F.3d 134, 140 (2d Cir. 2010). Although a court may exercise pendant appellate jurisdiction over non-final orders that are "inextricably intertwined" with or "necessary to ensure meaningful review" of otherwise appealable ones, *Britt v. Garcia*, 457 F.3d 264, 273 (2d Cir. 2006), neither circumstance exists here. Whether a juror could find that Trump's statements were defamatory *per se* has nothing to do with immunity.

Regardless, Trump's position is meritless for the reasons given by Judge Kaplan. A statement is defamatory *per se* if it "affect[s] a person in [her] profession, trade, or business by imputing to [her] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000). When a statement "impugns the basic integrity or creditworthiness of a [person's] business," it is settled that "an action for defamation lies and injury is conclusively presumed." *Id.* Here, Trump's statements are defamatory *per se* under that standard. Carroll is a journalist, reporter, and advice columnist who built her career providing honest, trustworthy advice to women about intimate matters. A reasonable juror could easily find that Trump's June 2019 statements—which accused her of fabricating a sexual assault accusation to sell a new book, for publicity, or in furtherance of a political conspiracy—imputed fraud, dishonesty, or misconduct in her trade or profession.

## CONCLUSION

For the reasons given above, the decisions below should be affirmed.

Dated: Washington, D.C.
       October 13, 2023

Respectfully submitted,

*/s/ Joshua Matz*
Joshua Matz
Kate Harris
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com
kharris@kaplanhecker.com


Roberta A. Kaplan
Trevor W. Morrison
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
tmorrison@kaplanhecker.com

*Counsel for Appellee E. Jean. Carroll*

56

# ADDENDUM A: TIMELINE OF KEY EVENTS

## STATE COURT PROCEEDINGS

| Date | Event |
|------|-------|
| Nov. 4, 2019 | Complaint filed |
| Nov. 13, 2019 | Order granting leave for service by alternative means |
| Jan. 10, 2020 | Order rejecting Trump's personal jurisdiction defense |
| Feb. 4, 2020 | Trump seeks stay pending appeal in *Zervos v. Trump* |
| Feb. 28, 2020 | Trump files Answer |
| July 9, 2020 | United States Supreme Court decides *Trump v. Vance* |
| July 10, 2020 | Carroll cites *Vance* to renew opposition to stay motion |
| July 16, 2020 | Trump files letter disavowing immunity |
| Aug. 6, 2020 | Order denying Trump's stay motion |

## FEDERAL COURT PROCEEDINGS

| Date | Event |
|------|-------|
| Sept. 8, 2020 | DOJ removes under Westfall Act and moves to substitute |
| Oct. 27, 2020 | Judge Kaplan denies DOJ's substitution motion |
| Nov. 25, 2020 | Trump/DOJ appeal denial of substitution |
| Dec. 10, 2020 | Trump seeks stay pending appeal |
| Sept. 15, 2021 | Judge Kaplan denies stay pending appeal |
| Dec. 1, 2021 | Trump seeks leave to amend his Answer (anti-SLAPP) |
| Mar. 11, 2022 | Judge Kaplan denies leave to amend the Answer |
| May 5, 2022 | Parties file proposed discovery schedule |
| May to Nov. 2022 | Discovery |
| Sept. 27, 2022 | Second Circuit issues first opinion in Westfall Act appeal & certifies question to D.C. Court of Appeals |
| Sept. 28, 2022 | Trump seeks stay from Judge Kaplan |
| Oct. 12, 2022 | Judge Kaplan denies stay |

| | |
|---|---|
| Oct. 12, 2022 | Trump posts statement online defaming Carroll |
| Oct. 19, 2022 | Trump deposition |
| Nov. 16, 2022 | Close of discovery[26] |
| Nov. 21, 2022 | Trump files proposed post-discovery scheduling order |
| Nov. 24, 2022 | Carroll files Complaint in *Carroll II* |
| Nov. 30, 2022 | Judge Kaplan sets schedule for pre-trial proceedings |
| Dec. 2022 to Jan. 2023 | Motion for summary judgment briefing |
| Dec. 22, 2022 | Trump files brief raising absolute immunity |
| Jan. 12, 2022 | Carroll files opposition noting waiver of immunity |
| Jan. 19, 2022 | Trump files reply asserting non-waivability |
| Jan. 24, 2022 | Carroll files sur-reply |
| Feb. 13, 2023 | Judge Kaplan enters Joint Pre-trial Order |
| Feb. 16 to Mar. 9, 2023 | Carroll and Trump litigate motions in limine |
| Mar. 17, 2023 | Parties move to consolidate *Carroll I* and *Carroll II* trials |
| Mar. 20, 2023 | Judge Kaplan sets *Carroll II* to be tried first |
| Apr. 13, 2023 | D.C. Court of Appeals issues opinion concerning Second Circuit's certified question in Westfall Act appeal |
| Apr. 21, 2023 | Second Circuit remands appeal to Judge Kaplan |
| Apr. 25 to May 9, 2023 | *Carroll II* trial |
| May 9, 2023 | Trump publicly attacks Carroll and Judge Kaplan |
| May 10, 2023 | Trump publicly attacks Carroll and Judge Kaplan |
| May 22, 2023 | Carroll moves to file Amended Complaint |
| June 13, 2023 | Judge Kaplan grants Carroll's motion to amend |
| June 27, 2023 | Trump files Amended Answer and Counterclaim |
| June 29, 2023 | Judge Kaplan denies Trump's summary judgment motion |

---

[26] One expert deposition took place outside of the discovery window.

| July 11, 2023 | Carroll moves to dismiss counterclaim and strike defenses |
| --- | --- |
| July 25, 2023 | Trump opposes Carroll's motion |
| Aug. 1, 2023 | Carroll files a reply in support of her motion |
| July 11, 2023 | DOJ rescinds Westfall Act certification |
| July 19, 2023 (9:56 AM) | Judge Kaplan directs parties to brief collateral estoppel |
| July 19, 2023 (11:24 AM) | Trump appeals from denial of summary judgment |
| July 26, 2023 | Carroll files letter explaining her intention to seek partial summary judgment on the merits of her defamation claim |
| July 27, 2023 | Trump files stay motion |
| Aug. 2-30, 2023 | Parties litigate cross-motions for summary judgment |
| Aug. 7, 2023 | Judge Kaplan dismisses Trump's counterclaim and strikes his first affirmative defense (absolute immunity) |
| Aug. 10, 2023 | Trump appeals from order striking immunity defense |
| Aug. 18, 2023 | Judge Kaplan denies Trump's stay motion |
| Aug. 24, 2023 | Trump seeks emergency stay from Second Circuit |
| Aug. 30, 2023 | Trump again attacks Carroll and Judge Kaplan |
| Sept. 6, 2023 | Judge Kaplan grants summary judgment to Carroll on the merits of her defamation claim |
| Sept. 13, 2023 | Second Circuit denies stay and expedites appeal |

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits requirements of Local Rule 32.1(a)(4) because this brief contains 13,888 words, excluding the parts of the document excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated:  October 13, 2023                    */s/ Joshua Matz*
                                            Joshua Matz

                                            *Counsel for Appellee E. Jean. Carroll*

## CERTIFICATE OF SERVICE

I, Joshua Matz, counsel for Plaintiff-Counter-Defendant-Appellee and a member of the Bar of this Court, certify that, on October 13, 2023, copies of the foregoing brief and accompanying Supplemental Appendix were filed with the Clerk through the Court's electronic filing system.

Dated: October 13, 2023

*/s/ Joshua Matz*
Joshua Matz

*Counsel for Appellee E. Jean Carroll*