# 23-1045(L)

## 23-1146(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

—v.—

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 20-CV-7311

## APPELLEE'S SUPPLEMENTAL APPENDIX

JOSHUA MATZ
KATE HARRIS
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

ROBERTA A. KAPLAN
TREVOR W. MORRISON
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883

*Attorneys for Appellee*
*E. Jean Carroll*

# TABLE OF CONTENTS

PAGE

NY Supreme Court, Executed *Ex Parte* Order of Judge
Kaplan Permitting Alternative Service,
dated November 13, 2019 ................................. SA-1

NY Supreme Court, Letter from Defendants re 'Judge
Shopping', dated December 5, 2019 ...................... SA-3

NY Supreme Court, Memorandum of Law in Support of
Defendant's Motion to Dismiss and to Stay Discovery,
dated January 3, 2020 ................................... SA-5

NY Supreme Court, Decision and Order of the Honorable
Doris Ling-Cohan, dated January 8, 2020............... SA-11

NY Supreme Court, Defendant's Notice of Motion for a Stay
of Proceedings, dated February 4, 2020.................. SA-13

NY Supreme Court, Memorandum of Law of President
Donald J. Trump in Support of Motion for a Stay of
Proceedings, dated February 4, 2020 ................... SA-15

NY Supreme Court, Defendant's Answer,
dated January 23, 2020 ................................. SA-34

NY Supreme Court, Trump's response to Plaintiff's letter,
dated July 16, 2020.................................... SA-47

NY Supreme Court, Decision and Order of the Honorable
Verna L. Saunders on Motion to Stay,
dated August 6, 2020 ................................... SA-50

Notice of Appeal, dated November 25, 2020................ SA-54

ii

Text Entry Order Denying Letter Motion to Stay,
    dated September 15, 2021 .............................. SA-56

Letter from Roberta A. Kaplan to Judge Kaplan re plans to
    file ASA case, dated August 8, 2022.................... SA-57

Plaintiff E. Jean Carroll's Memorandum of Law in
    Opposition to Defendant Donald J. Trump's Motion for
    Summary Judgment (unredacted),
    dated January 12, 2023 ................................ SA-60

Plaintiff E. Jean Carroll's Response to Defendant
    Donald J. Trump's Statement of Undisputed Material
    Facts Pursuant to Local Civil Rule 56.1 (unredacted),
    dated January 12, 2023 ............................... SA-104

Memorandum Opinion Denying Defendant's Motion for
    Summary Judgment, dated June 29, 2023 .............. SA-130

Letter from DOJ, dated July 11, 2023...................... SA-176

Order re Issue Preclusion Claims, dated July 19, 2023...... SA-183

Letter to court from Roberta A. Kaplan,
    dated July 26, 2023................................... SA-184

Plaintiff E. Jean Carroll's Memorandum of Law in
    Opposition to Defendant Donald J. Trump's Motion to
    Stay, dated August 10, 2023 .......................... SA-186

Memorandum Opinion re Collateral Estoppel,
    dated September 6, 2023 .............................. SA-205

*Carroll II*, Pretrial and Scheduling Order,
    dated December 21, 2022.............................. SA-230

*Carroll II*, Verdict Form, dated May 9, 2023 .............. SA-234

iii

*Carroll II*, Memorandum Opinion Denying Defendant's Rule
59 Motion, dated July 19, 2023 . . . . . . . . . . . . . . . . . . . . . . . . SA-238

**SA-1**

FILED: NEW YORK COUNTY CLERK 11/13/2019 09:03 AM   INDEX NO. 160694/2019
NYSCEF DOC. NO. 15   RECEIVED NYSCEF: 11/13/2019

Hon. Deborah A. Kaplan
J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

E. JEAN CARROLL,

> *Plaintiff,*

-against-

Index No. 160694/2019

DONALD J. TRUMP, in his personal capacity,

> *Defendant.*

[PROPOSED] ORDER PERMITTING ALTERNATIVE SERVICE

Upon the annexed affirmation of Roberta A. Kaplan, Esq., dated November 8, 2019, and

all supporting papers annexed thereto, it is hereby:

ORDERED that service of process shall be directed pursuant to CPLR § 308(5) upon

Defendant Donald J. Trump as follows:

~~Until such time that counsel for Defendant in this action has been identified,~~ Plaintiff E.

Jean Carroll shall be permitted to serve Defendant by mailing the summons and all other papers to

Defendant at the two addresses below, *by overnight mail and by first class mail* and emailing a copy of such papers to Defendant's attorneys

below:

> Donald J. Trump
> Trump Tower
> 725 Fifth Avenue
> New York, NY 10022
>
> Donald J. Trump
> White House
> 1600 Pennsylvania Ave NW
> Washington, DC 20500
>
> Richard F. Brueckner
> Law Offices of Alan S. Futerfas
> rbrueckner@futerfaslaw.com

## SA-2

Counsel to Respondent Donald J. Trump
*People v. Trump*, Index. No. 451130/2018 (N.Y. Sup. Ct.)

William S. Consovoy
Consovoy McCarthy PLLC
will@consovoymccarthy.com
Counsel to Plaintiff-Appellant Donald J. Trump
*Trump v. Vance*, No. 19-3204 (2d Cir.)

Joanna C. Hendon
Spears & Imes LLP
jhendon@spearsimes.com
Counsel to Defendant Donald J. Trump
*Doe v. Trump Corp.*, No. 18 Civ. 9936 (S.D.N.Y.)

Marc E. Kasowitz
Kasowitz Benson Torres LLP
mkasowitz@kasowitz.com
Counsel to Defendant Donald J. Trump
*Zervos v. Trump*, Index No. 15022/2017 (N.Y. Sup. Ct., N.Y. Cty.)

Lawrence S. Rosen
LaRocca Hornik Rosen Greenberg & Blaha LLP
LRosen@LHRGB.com
Counsel to Defendant Donald J. Trump
*Galicia v. Trump*, Index No. 24973/2015E (N.Y. Sup. Ct., Bronx Cty.)

Patrick Strawbridge,
Consovoy McCarthy PLLC
Patrick@consovoymccarthy.com;
Counsel to Plaintiff-Appellant Donald J. Trump
*Trump v. Deutsche Bank AG*, No. 19-1540 (2d Cir.)

Once counsel for Defendant in this action has been identified, Plaintiff shall be permitted

to serve the summons and all papers on Defendant's counsel via email until such time that counsel

has entered a notice of appearance in this action.

Dated: November 12, 2019

*It is further ORDERED that all mailings and emails must be accompanied by a copy of this ex parte order.*

ENTER:

Hon. Deborah A. Kaplan
J.S.C.

2

**SA-3**

FILED: NEW YORK COUNTY CLERK 12/05/2019 03:11 PM

NYSCEF DOC. NO. 25

INDEX NO. 160694/2019

RECEIVED NYSCEF: 12/05/2019

# LaRocca Hornik Rosen
## & Greenberg LLP
### COUNSELORS AT LAW

The Trump Building
40 Wall Street
32nd Floor
New York, NY 10005
212.530.4823
212.530.4815 FAX

LHRGB.COM

Freehold Commons
83 South Street
3rd Floor
Freehold, NJ 07728
732.409.1144
732.409.0350 FAX

Frank J. LaRocca ᴅᴏ
Jonathan L. Hornik
Lawrence S. Rosen
Rose Greenberg ∆
Amy D. Carlin ∆
Patrick T. McPartland ∆
David N. Kittredge ∆
Jonathan F. Ball ◊
Jared E. Blumetti
Katelyn Canning
Florence R. Goffman ∆◊
Sherry Hamilton ∆
Peter Kelegian ∆
Drew Tanner ◊
Lauren Weissman-Falk

∆ New York Bar Only
◊ New Jersey Bar Only
◊ Of Counsel Attorneys
◊ Certified Matrimonial Law Attorney

DIRECT DIAL: 212.530.4822
EMAIL: LROSEN@LHRGB.COM

December 5, 2019

**VIA NYSCEF & FEDEX**
Hon. Deborah A. Kaplan
Administrative Justice
Supreme Court of the State of New York
County of New York
60 Centre Street, Room 609
New York, New York 10007

> Re:  E. Jean Carroll v. Donald J. Trump
>       Supreme Court, New York County, Index No. 160694/2019

Dear Justice Kaplan:

We represent defendant Donald J. Trump in the above-captioned action, and write to briefly respond to plaintiff's December 3, 2019 correspondence in which plaintiff seemingly appears—for the second time—to be engaging in improper judge-shopping. *See* NYSCEF Doc. Nos. 23-24.

In her initial RJI, filed November 8, 2019, plaintiff attempted to have this non-commercial case assigned to Justice Schecter of the Commercial Division on the purported grounds that it was "related to" the case entitled *Summer Zervos v. Donald J. Trump*, Index No. 150522/2017. That request by plaintiff was denied and, in accordance with this Court's IAS protocols, the instant case was randomly assigned to Justice Ling-Cohan. *See* 22 NYCRR § 202.3(b) ("[a]ssignments shall be made by the clerk of the court pursuant to a method of ***random selection***") (*emphasis added*).

Undeterred, on November 21, 2019, plaintiff curiously sent to Justices Schecter and Ling-Cohan an *ex parte* letter purportedly seeking to confirm whether her request to assign this case to Justice Schecter had been "processed," this despite the Court's electronic filing system clearly identifying Justice Ling-Cohan as the Justice assigned to this case.[1]  This letter was ultimately

---

[1] Despite admittedly being in possession of President Trump's attorneys' contact information and e-mail addresses, plaintiff instead mailed a copy of her November 21, 2019 letter to President Trump at Trump Tower (where he no longer resides) and to the White House (where plaintiff presumably knew that there would be a significant delay in the letter reaching President Trump or his counsel, if ever).

**SA-4**

FILED: NEW YORK COUNTY CLERK 12/05/2019 03:11 PM

NYSCEF DOC. NO. 25

INDEX NO. 160694/2019

RECEIVED NYSCEF: 12/05/2019

forwarded to Your Honor's attention in connection with plaintiff's December 3, 2019 correspondence.

In point of fact, these separate defamation cases—which involve different plaintiffs, different alleged statements that were made in different places, at different times, and in different contexts—are "unrelated" in every respect, except that the defendant is President Trump and the claims are for defamation.

Indeed, by plaintiff's logic this case should be assigned not to Justice Schecter, but rather to Justice Jaffe, who dismissed a very similar defamation case that was brought against President Trump by Cheryl Jacobus (a dismissal that was upheld by the First Department and denied further review by the Court of Appeals). *See Jacobus v. Trump*, 55 Misc.3d 470, 51 N.Y.S.3d 330 (Sup. Ct. N.Y. Cty. 2017), *aff'd* 156 A.D.3d 452, 64 N.Y.S.3d 889 (1st Dept. 2017), *lv. denied* 31 N.Y.3d 903 (2018). The Uniform Civil Rules require, however, that cases be assigned according to a method of "***random selection***." It was presumably for this reason that the *Zervos* case was randomly assigned to Justice Schecter, not Justice Jaffe, and the instant case was randomly assigned to Justice Ling-Cohan, and not to Justice Schecter.

In light of the foregoing, plaintiff's instant request to reassign this case from Justice Ling-Cohan to Justice Schecter should be denied.

Respectfully submitted,

Lawrence S. Rosen

cc: Counsel of record (*via NYSCEF*)

2

**SA-5**

FILED: NEW YORK COUNTY CLERK 01/03/2020 01:28 PM INDEX NO. 160694/2019

NYSCEF DOC. NO. 33                                                           RECEIVED NYSCEF: 01/03/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

E. JEAN CARROLL,

               Plaintiff,

           - against -

DONALD J. TRUMP, in his personal capacity,

               Defendant.

-------------------------------------------------------------------X

          Index No.  160694/2019

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND TO STAY DISCOVERY

*On the brief:*
*Lawrence S. Rosen, Esq.*
*Patrick McPartland, Esq.*
*Jared E. Blumetti, Esq.*

**LAROCCA HORNIK ROSEN**
**& GREENBERG LLP**
40 Wall Street, 32nd Floor
New York, New York 10005
T: (212) 530-4822, 4837, 4831
E: LROSEN@LHRGB.COM
   PMCPARTLAND@LHRGB.COM
   JBLUMETTI@LHRGB.COM
*Attorneys for defendant*
*Donald J. Trump*

**SA-6**

FILED: NEW YORK COUNTY CLERK 01/03/2020 01:28 PM

NYSCEF DOC. NO. 33

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/03/2020

Defendant Donald J. Trump, by his attorneys, LaRocca Hornik Rosen & Greenberg LLP, respectfully submits this memorandum of law in support of his application for an order (i) dismissing plaintiff's Complaint, pursuant to CPLR 3211(a)(8), for lack of personal jurisdiction, and (ii) staying the discovery deadlines set forth in the Court's December 12, 2019 Order (the "Preliminary Conference Order") pending a hearing on the instant motion.

## PRELIMINARY STATEMENT

This defamation lawsuit must be dismissed in its entirety because this Court does not have personal jurisdiction over President Trump.  Under well-established New York law, defamatory statements made outside of New York State do not, on their own, provide a basis for personal jurisdiction even when the purported statements were published to New York readers/listeners, or were directed towards or caused harm to a New York citizen.

Here, plaintiff admits in her Complaint that each of the alleged defamatory statements were made by President Trump not while he was in New York, but rather while he was in Washington D.C.  Her lone assertion that President Trump is a "resident" of New York—besides being erroneous (he has resided in Washington D.C. for the past three years)—is insufficient to confer personal jurisdiction over him for the alleged statements.

Given that a dismissal for lack of personal jurisdiction will dispose of this action in its entirety in New York, it is respectfully requested that the Court stay the discovery deadlines set forth in the Preliminary Conference Order pending a hearing on this threshold jurisdictional issue.

1

**SA-7**

FILED: NEW YORK COUNTY CLERK 01/03/2020 01:28 PM

NYSCEF DOC. NO. 33

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/03/2020

## ARGUMENT

### I.

### THE COURT LACKS PERSONAL
### JURISDICTION OVER PRESIDENT TRUMP

Beyond a conclusory assertion that this Court has personal jurisdiction over President Trump under CPLR 301, plaintiff's sole allegation in the Complaint supporting *in personam* jurisdiction over him is that he is a New York "resident." *See ¶¶ 18, 20 of the Complaint, which is attached as* **Exhibit A** *to the Affirmation of Lawrence S. Rosen, dated January 3, 2020 (the "Rosen Affirm.")*. This, of course, is untrue, as the Court can take judicial notice that the President of the United States has resided in the White House for the past three years. Regardless, residency does not establish jurisdiction under CPLR 301. *See e.g. Chen v. Guo Liang Lu*, 144 A.D.3d 735, 737, 41 N.Y.S.3d 517, 520 (2d Dept. 2016) (jurisdiction under CPLR 301 is determined by an individual's domicile, reasoning that "[a]n individual may have multiples residences, but only one domicile").

Given that President Trump was not physically served in New York State,[1] there are no other grounds for *in personam* jurisdiction under CPLR 301. As such, plaintiff may only obtain jurisdiction over President Trump through New York's long-arm statute. *See* CPLR 302(a). However, it is blackletter law that the mere making of an alleged defamatory statement outside of New York State does not confer jurisdiction under New York's long-arm statute, even where the alleged defamatory statement purportedly causes harm to, or is aimed at, a New York citizen. *See* CPLR 302(a)(3) ("a court may exercise personal jurisdiction over any non-domiciliary…[who]

---

[1] Plaintiff obtained an *ex parte* order allowing for service on President Trump to be effectuated through his attorneys. *Rosen Affirm.*, Exh. B.

2

SA-8

commits a tortious act without the state causing injury to person or property within the state, ***except as to a cause of action for defamation of character***") (*emphasis added*).

Here, by plaintiff's own admission, each of the alleged defamatory statements were made in Washington D.C. and, therefore, cannot provide a basis for jurisdiction on their own. *See e.g. SPCA of Upstate New York, Inc. v. American Working Collie Ass'n*, 18 N.Y.3d 400, 405, 940 N.Y.S.2d 525, 528 (2012) (no jurisdiction over defamation claim stemming from alleged defamatory internet posts in Vermont regarding plaintiff's purported treatment of animals on its premises in New York, even though the posts' probable purpose was to warn New Yorkers about plaintiff's conduct in their community); *Talbot v. Johnson Newspaper Corp.*, 71 N.Y.2d 827, 829, 527 N.Y.S.2d 729, 731 (1988) (no jurisdiction over defamation claim stemming from alleged defamatory statements in California regarding defendant's prior observations of a New York university basketball coach acting severely intoxicated on various occasions during her prior enrollment at the school); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 253 (2d Cir. 2007) (no jurisdiction over defamation claim stemming from alleged defamatory internet posts in Iowa regarding New York-based moving company operating interstate illegally and not carrying cargo insurance because "making defamatory statements outside of New York about New York residents does not, without more, provide a basis for jurisdiction, even when those statements are published in media accessible to New York readers"); *Trachtenberg v. Failedmessiah.com*, 43 F.Supp.3d 198, 203 (E.D.N.Y. 2014) (no jurisdiction over defamation claim stemming from alleged defamatory internet posts in Minnesota regarding preschool teacher's arrest in New York for alleged sexual abuse of a child despite plaintiff's assertions that defendant's "internet activity [was] expressly targeted at or directed to New York").

The only recognized exception to this statutory rule is inapplicable here. Specifically, plaintiff would need to demonstrate that the alleged defamatory statements were "substantially

3

FILED: NEW YORK COUNTY CLERK 01/03/2020 01:28 PM

NYSCEF DOC. NO. 33

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/03/2020

related" to a "transaction of business" by President Trump in New York. *See SPCA*, 18 N.Y.3d at

404, 940 N.Y.S.2d at 527–28. In her Complaint, plaintiff does not (and cannot) make any such

allegations, as she acknowledges in her Complaint that the alleged defamatory statements were

made directly in response to her own statements that President Trump sexually assaulted her during

a personal meeting some twenty odd years ago (and, thus, were not the result of any "transaction

of business"). *See e.g. Best Van Lines, Inc.*, 490 F.3d at 248 ("the single act of uttering a

defamation, not matter how loudly, is not a transaction of business that may provide the foundation

for personal jurisdiction") (*internal quotations and alterations omitted*); *SPCA*, 18 N.Y.3d at 405,

940 N.Y.S.2d at 528 (alleged defamatory internet posts in Vermont regarding plaintiff's purported

treatment of animals on its premises in New York did not constitute a transaction of business in

New York); *Trachtenberg*, 43 F.Supp.3d at 203 (alleged defamatory internet posts in Minnesota

regarding preschool teacher's arrest in New York for alleged sexual abuse of a child did not

constitute a transaction of business in New York); *Farahmand v. Dalhousie University*, 958

N.Y.S.2d 645, * 3 (Sup. Ct. N.Y. Cty. 2011) (Ling-Cohan, J.) ("plaintiff has not demonstrated that

defendant transacted business with plaintiff within this state, at any time, nor was there a

transaction of business within New York between defendant and some other entity that led to [the

alleged defamation]").

    For all of these reasons, plaintiff's Complaint should be dismissed in its entirety for lack

of personal jurisdiction. Moreover, the discovery deadlines set forth in the Preliminary Conference

Order should be stayed pending a hearing on this application. *Rosen Affirm., Exh. C.* As noted

above, the gravamen of plaintiff's defamation claim concerns what did or did not transpire during

a purported personal meeting between the parties more than twenty years ago. Any discovery in

this case—which will necessarily involve intrusive and burdensome document and testimonial

discovery from party and non-party witnesses regarding purported events dating back to the mid-

4

**SA-10**

FILED: NEW YORK COUNTY CLERK 01/03/2020 01:28 PM
NYSCEF DOC. NO. 33

INDEX NO. 160694/2019

RECEIVED NYSCEF: 01/03/2020

1990's—should be stayed pending a hearing on whether this Court even has personal jurisdiction over President Trump in this action.[2]  *See e.g. Chan v. Zoullas*, 943 N.Y.S.2d 790, * 3 (Sup. Ct. N.Y. Ct. 2012) (referencing the Supreme Court's discretion to stay discovery during the pendency of a dispositive motion).

## CONCLUSION

Based on the foregoing, President Trump respectfully requests that the Court (i) dismiss plaintiff's Complaint on the grounds that the Court lacks personal jurisdiction over him, and (ii) stay the discovery deadlines in the Preliminary Conference Order pending a hearing on this application.

Dated: New York, New York
        January 3, 2020

**LAROCCA HORNIK ROSEN**
**& GREENBERG LLP**

By: _____

Lawrence S. Rosen
Patrick McPartland
Jared E. Blumetti
40 Wall Street, 32nd Floor
New York, New York 10005
T: (212) 530-4822, 4837, 4831
E: LROSEN@LHRGB.COM
    PMCPARTLAND@LHRGB.COM
    JBLUMETTI@LHRGB.COM

*Attorneys for Donald J. Trump*

---

[2] Indeed, plaintiff has already served a non-party subpoena *duces tecum* in this action seeking various documents and information dating back to *1994*.  Upon information and belief, this non-party has since objected to the substance, scope, and burdensome nature of plaintiff's subpoena.

5

**SA-11**

INDEX NO. 160694/2019

NYSCEF DOC. NO. 36

RECEIVED NYSCEF: 01/10/2020

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  **HON. DORIS LING-COHAN**

*Justice*

PART   **IAS MOTION 36**

--------------------------------------------------------------------X

E. JEAN CARROLL

Plaintiff,

- v -

DONALD TRUMP,

Defendant.

--------------------------------------------------------------------X

INDEX NO.   160694/2019

MOTION DATE   N/A

MOTION SEQ. NO.   001

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 28, 29, 30, 31, 32, 33, 34

were considered on this motion to/for   **DISMISS**   .

Defendant Donald Trump ("Trump") seeks that this Court sign his Order to Show Cause to dismiss for lack of personal jurisdiction and for an interim stay of discovery.

Upon the foregoing documents, it is

ORDERED that the Court declines to sign the within Order to Show Cause submitted by defendant Trump, as the moving papers fail to contain an affidavit by him, to support his argument that this Court lacks personal jurisdiction over him. Although defendant Trump, through his counsel, claims lack of personal jurisdiction, notably, there is not even a tweet, much less an affidavit by defendant Trump in support of his motion. Instead, as to his claim of lack of personal jurisdiction, defendant asserts, through his attorney in a mere Memorandum of Law in Support, that this Court should "take judicial notice that the President of the United States has resided in the White House for the past three years." (Memorandum of Law in Support, at 2, ¶1). However, judicial notice is not appropriate here, as "[a] court may only apply judicial notice to matters 'of common and general knowledge, well established, and authoritatively settled, not

**160694/2019 CARROLL, E. JEAN vs. TRUMP, DONALD J.**
**Motion No. 001**

Page 1 of 2

INDEX NO. 160694/2019

NYSCEF DOC. NO. 36                                   RECEIVED NYSCEF: 01/10/2020

doubtful or uncertain [;] the test is whether sufficient notoriety attaches to the fact to make it proper to assume its existence without proof.'" (*Dollas v W.R. Grace and Co.*, 225 AD2d 319, 320 [1st Dept 1996], quoting *Ecco High Frequency Corp. v Amtorg Trading Corp.*, 81 NYS 2d 610 [Sup Ct, NY County 1948], *affd* 274 AD 982 [1st Dept 1948]).

The Court notes that, not only was no affidavit from defendant Trump supplied in support of this application, but even the defendant's attorney's affirmation does not assert a basis (evidentiary or otherwise) for dismissal; rather, the affirmation acts as a mere conduit to provide documents relating to the procedural posture of the case. (Lawrence Rosen Affirmation).

Moreover, there is no basis for a stay of discovery deadlines in this case.

In the future, all Orders to Show Cause shall be presented in the following manner:

(1)     Notice to the other side as per 22 NYCRR §202.7(f) and the Court shall also be provided with courtesy hard copies in hand, of all papers; and

(2)     Movant shall seek an appropriate "time, date and place" as per 22 NYCRR §202.7(f), for presentation of any application, from the Part's court attorney by telephone, prior to filing.

| 1/6/2020 | | | DORIS LING-COHAN, J.S.C. | |
|---|---|---|---|---|
| DATE | | | | |

| CHECK ONE: | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | GRANTED | X DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

J:\Judge_Ling-Cohan\OSC\Denied\Carroll v Trump 01606942019 001.docx

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.                    Page 2 of 2
Motion No.  001

**SA-13**

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 43

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------- x
                                     :

E. JEAN CARROLL,                   :    Index No. 160694/2019
                                       :

             Plaintiff,         :    Hon. Verna L. Saunders
                                       :

         - against-           :    Mot. Seq. No. 002
                                       :

DONALD J. TRUMP,               :    **NOTICE OF MOTION**
                                       :

             Defendant.        :
                                       :

------------------------------------- x

      **PLEASE TAKE NOTICE** that, upon the Affirmation of Marc. E. Kasowitz, dated February 4, 2020, in support of this motion, the exhibits thereto, the accompanying memorandum of law dated February 4, 2020, as well as any other papers, pleadings and proceedings in this action, defendant President Donald J. Trump will move this Court at the Motion Submissions Part Courtroom, Room 130, 60 Centre Street, New York, New York on February 13, 2020, at 9:30 AM, or as soon thereafter as counsel can be heard, for an order staying proceedings pursuant to CPLR § 2201, pending the decision of the Court of Appeals on his appeal from *Zervos v. Trump*, 171 A.D.3d 110 (1st Dep't 2019), *lv and stay pending appeal granted*¸ 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U) (1st Dep't Jan. 7, 2020)).

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the parties' stipulation of January 31, 2020, so-Ordered by the Court on February 4, 2020, plaintiff shall file any opposition papers no later than February 7, 2020.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the parties' stipulation of January 31, 2020, so-Ordered by the Court on February 4, 2020, defendant shall file reply papers no later than February 11, 2020.

SA-14

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 43

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

**PLEASE TAKE FURTHER NOTICE** that, pursuant to their stipulation of January 31, 2020, so-Ordered by the Court on February 4, 2020, the parties shall appear for oral argument on March 4, 2020, or as soon thereafter as counsel can be heard.

Dated:  February 4, 2020

KASOWITZ BENSON TORRES LLP

By: _____ */s/Marc E. Kasowitz*___
    Marc E. Kasowitz
    Christine A. Montenegro
    Paul J. Burgo

1633 Broadway
New York, New York 10019
(212) 506-1700
MKasowitz@Kasowitz.com
CMontenegro@Kasowitz.com
PBurgo@Kasowitz.com

LAROCCA HORNIK ROSEN &
GREENBERG LLP
40 Wall Street, 32nd Floor
New York, New York 10005
(212) 530-4822

*Attorneys for Defendant,*
*President Donald J. Trump*

TO: Counsel of Record

**SA-15**

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------ x
                                  :

E. JEAN CARROLL,                 :   Index No. 160694/2019

                                    :

                     Plaintiff,       :   Hon. Verna L. Saunders

                                    :

                - against-         :   Mot. Seq. No. 002

                                    :

DONALD J. TRUMP,              :

                                    :

                     Defendant.     : 

                                    :
------------------------------------------ x

 

**MEMORANDUM OF LAW OF PRESIDENT DONALD J. TRUMP
IN SUPPORT OF MOTION FOR A STAY OF PROCEEDINGS**

KASOWITZ BENSON TORRES LLP

  Marc E. Kasowitz
  Christine A. Montenegro
  Paul J. Burgo
  1633 Broadway
  New York, New York 10019
  (212) 506-1700

LAROCCA HORNIK ROSEN &
GREENBERG LLP

  40 Wall Street, 32nd Floor
  New York, New York 10005
  (212) 530-4822

*Attorneys for Defendant,*
*President Donald J. Trump*

SA-16

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

PRIOR PROCEEDINGS .......................................................................................................... 4

ARGUMENT ............................................................................................................................. 6

    A.    If the Court of Appeals Reverses *Zervos v. Trump*, This Action Must be
          Dismissed or Stayed.................................................................................................. 7

    B.    Official Immunity Claims Must be Decided at the Outset of the Case. ................. 8

    C.    The Courts are Constitutionally Required to Give Deference to the
          President.................................................................................................................... 8

    D.    The Requested Stay is Warranted Under CPLR § 2201. ...................................... 11

CONCLUSION........................................................................................................................ 13

i

**SA-17**

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Assenzio v A.O. Smith Water Prods.,*
   No. 190008/12, 2015 WL 5283301 (Sup. Ct., N.Y. Cnty. Aug. 28, 2015) ...........................11

*Behrens v. Pelletier,*
   516 U.S. 299 (1996).........................................................................................................................8

*Belabarodaya v. Carepro of NY, Inc.,*
   No. 152534/2018, 2018 WL 3733304 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) .....................4, 11

*Belopolsky v. Renew Data Corp.,*
   41 A.D.3d 322 (1st Dep't 2007) ..............................................................................................12

*Cheney v. U.S. Dist. Court for D.C.,*
   542 U.S. 367 (2004).....................................................................................................................2, 9

*Clinton v. Jones,*
   520 U.S. 681 (1997)............................................................................................. *passim*

*Felder v. Casey,*
   487 U.S. 131 (1988)...................................................................................................................11

*Galicia v. Trump,*
   No. 24973/15E, M-7413 (1st Dep't Oct. 24, 2019) ...........................................................4, 10

*Haywood v. Drown,*
   556 U.S. 729 (2009)...................................................................................................................10

*Hegarty v. Somerset Cnty.,*
   25 F.3d 17 (1st Cir. 1994).............................................................................................................8

*Hunter v. Bryant,*
   502 U.S. 224 (1991)......................................................................................................................8

*Jones v. Clinton,*
   No. 95-1167, BL-62 (8th Cir. Apr. 16, 1996).....................................................................3, 10

*Landis v. N. Am. Co.,*
   299 U.S. 248 (1936)...................................................................................................................13

*Lerner v. Karageorgis Lines, Inc.,*
   66 N.Y.2d 479 (1985)................................................................................................................11

ii

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM   INDEX NO. 160694/2019

NYSCEF DOC. NO. 49                                   RECEIVED NYSCEF: 02/04/2020

*Liu v. New York City Police Dep't,*
    216 A.D.2d 67 (1st Dep't 1995) ............................................................8

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982).............................................................2, 9, 13

*Nixon v. Sirica,*
    487 F.2d 700 (D.C. Cir. 1973) .......................................................3, 10

*OneBeacon Am. Ins. Co. v. Colgate-Palmolive Co.,*
    96 A.D.3d 541 (1st Dep't 2014) .....................................................4, 11

*In re Reynders v. Conway,*
    79 A.D.2d 863 (4th Dep't 1980) .........................................................11

*Trump v. Deutsche Bank AG,*
    --- S.Ct. ----, 2019 WL 6797733 (U.S. Dec. 13, 2019)........................3, 9

*Trump v. Mazars USA, LLP,*
    --- S.Ct. ----, 2019 WL 6328115 (U.S. Nov. 25, 2019), ......................2, 9

*Trump v. Mazars USA, LLP,*
    940 F.3d 710 (D.C. Cir. 2019) ...........................................................10

*Trump v. Vance,*
    941 F.3d 631 (2d Cir. 2019)................................................................6

*Trump v. Vance,*
    No. 19-3204, 2019 WL 5703884 (2d Cir. Oct. 7, 2019)..................3, 9, 10

*In re Trump,*
    781 F. App'x 1 (D.C. Cir. 2019) ......................................................3, 9

*In re Trump,*
    928 F.3d 360 (4th Cir. 2019) .........................................................3, 10

*United States v. Burr,*
    25 F.Cas. 187 (C.C. Va. 1807)........................................................2, 9

*United States v. Nixon,*
    418 U.S. 683 (1974).........................................................2, 3, 9, 12

*Uptown Healthcare Mgmt., Inc. v. Rivkin Radler LLP,*
    116 A.D.3d 631 (1st Dep't 2014) .................................................12, 13

*Zervos v. Trump,*
    171 A.D.3d 110 (1st Dep't 2019) ................................................ *passim*

iii

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

*Zervos v. Trump*,
    2020 WL 63397, 2020 N.Y. Slip Op. 60193(U)...........................................................1, 5, 6, 7

**Statutes and Other Authorities**

U.S. Const. art VI, cl. 2....................................................................................................... *passim*

CPLR § 2201........................................................................................................................1, 4, 11

Patrick M. Connors, Practice Commentaries, McKinney's Cons. Laws of NY
    Annotated, CPLR C2201:11 ......................................................................................................11

iv

**SA-20**

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

Defendant President Donald J. Trump respectfully submits this memorandum of law in support of his motion for a stay of proceedings, pursuant to CPLR § 2201, pending the decision of the Court of Appeals on his appeal from *Zervos v. Trump*, 171 A.D.3d 110 (1st Dep't 2019), *lv and stay pending appeal granted*¸ 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U) (1st Dep't Jan. 7, 2020)).[1]

## PRELIMINARY STATEMENT

This defamation action against the President of the United States may not proceed if the Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office.  That precise issue, which the U.S. Supreme Court has called an "important constitutional issue," *Clinton v. Jones*, 520 U.S. 681, 690-91 (1997), is now squarely before the Court of Appeals on the President's pending appeal from the First Department's 3-2 decision in *Zervos v. Trump*.

In *Zervos*, the First Department, in granting President Trump leave to appeal, also granted the President's motion to stay the proceedings "pending hearing and determination of the appeal by the Court of Appeals."  *Zervos v. Trump*, 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U).  If President Trump is successful on that appeal, this Court would be without jurisdiction to hear this action while President Trump is in office, and that threshold issue should be decided by the Court of Appeals before this action proceeds.  Like *Zervos*, this action should be stayed pending that decision.

The requested stay here is mandated not only because it would permit resolution of the President's claim that he is immune from suit in state court while in office, but also because of

---

[1] Submitted herewith in support of the motion is the affirmation of Marc E. Kasowitz, dated February 4, 2020 ("Kasowitz Aff.").  References to "Ex." are to exhibits to the Kasowitz Aff.

SA-21

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

the unique role of the President under Article II of the Constitution.  *See Clinton v. Jones*, 520

U.S. at 697-98 (Supreme Court had "no dispute" with the fundamental premise that the President

"occupies a unique office with powers and responsibilities so vast and important that the public

interest demands that he devote his undivided time and attention to his public duties").

Accordingly, courts are required under the U.S. Constitution to give deference to the President.

*See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 391-92 (2004) ("Special considerations

applicable to the President . . . suggest that the courts should be sensitive to requests by the

Government for interlocutory appeals . . . ."); *Clinton v. Jones*, 520 U.S. at 707 ("The high

respect that is owed to the office of the Chief Executive . . . is a matter that should inform

the conduct of the entire proceeding, including the timing and scope of discovery."); *Nixon v.

Fitzgerald*, 457 U.S. 731, 753 (1982) ("Courts traditionally have recognized the President's

constitutional responsibilities and status as factors counseling judicial deference and restraint.");

*United States v. Nixon*, 418 U.S. 683, 715 (1974) (Courts must extend the President "that high

degree of respect due the President of the United States."); *United States v. Burr*, 25 F.Cas. 187,

192 (No. 14,694) (C.C. Va. 1807) (John Marshall, C.J., sitting by designation) (Courts may not

"proceed against the President as against an ordinary individual.").

Given this constitutionally required deference, courts routinely grant requests by the

President for stays pending appeal or for interlocutory appeals on constitutional issues.  *See, e.g.*,

*Trump v. Mazars USA, LLP*, --- S.Ct. ----, 2019 WL 6328115 (Mem) (U.S. Nov. 25, 2019) (No.

19A545) (granting President Trump's application for a stay, pending disposition of his petition

for writ of certiorari and, if granted, judgment of the Court, on the constitutionality, under the

Separation of Powers doctrine, of a Congressional subpoena to President's accountant seeking

pre-presidential, private documents), *cert. granted*, --- S.Ct. ----, 2019 WL 6797734 (Mem) (U.S.

2

**SA-22**

Dec. 13, 2019) (No. 19-715); *Trump v. Deutsche Bank AG*, --- S.Ct. ----, 2019 WL 6797733 (Mem) (U.S. Dec. 13, 2019) (No. 19A640) (same); *United States v. Nixon*, 418 U.S. at 714 ("[e]nforcement of the subpoena duces tecum [directed to President Nixon] was stayed pending this Court's resolution of the issues," including whether, under the Separation of Powers doctrine, a federal district court may issue a subpoena to the President in a criminal action); *Trump v. Vance*, No. 19-3204, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019) (granting stay of enforcement of state grand jury subpoena seeking the President's documents from his accountant, given "the unique issues raised by the appeal," including whether, under the Supremacy Clause, a state grand jury may issue a subpoena seeking the President's records); *In re Trump*, 781 F. App'x 1, 2 (D.C. Cir. 2019) (district court abused its discretion in denying the President's request for an immediate interlocutory appeal from denial of his motion to dismiss claim that he violated the Foreign Emoluments Clause of the U.S. Constitution, because the issues raised were "unsettled" and potentially "dispositive"); *In re Trump*, 928 F.3d 360, 364 (4th Cir. 2019) (granting President permission to file interlocutory appeal and staying district court proceedings pending that appeal from district court's orders, which denied the President's motion to dismiss and permitted discovery on claims he violated the Emoluments Clauses), *reh'g granted*, 780 Fed. Appx. 36 (Mem); *Jones v. Clinton*, No. 95-1167, BL-62 (8th Cir. Apr. 16, 1996) (granting President Clinton's motion to stay pending President Clinton's appeal to the U.S. Supreme Court on whether the Separation of Powers doctrine bars federal court jurisdiction over actions against the President arising from his unofficial conduct); *Nixon v. Sirica*, 487 F.2d 700, 721 (D.C. Cir. 1973) (directing district court to stay the action to allow the President to appeal the district court's determinations compelling disclosure of materials subject to the President's claim of Article II privilege); *Galicia v. Trump*, No. 24973/15E, M-7413 (1st Dep't Oct. 24,

SA-23

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

2019) (granting the President a stay pending appeal on whether the state trial court could, consistent with Article II of the U.S. Constitution, require the President to appear for deposition).

The requested stay here under these circumstances is thus authorized and mandated. Under CPLR § 2201, which authorizes courts to "grant a stay of proceedings in a proper case, upon such terms as may be just," New York courts grant stays pending appeals in other actions where those appeals would, as here, resolve a dispositive issue. *See, e.g.*, *OneBeacon Am. Ins. Co. v. Colgate-Palmolive Co.*, 96 A.D.3d 541, 541 (1st Dep't 2014) (affirming grant of stay under CPLR § 2201, and holding that "[t]he duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay [pending appeal in a related action in another state] outweigh any prejudice to plaintiff"); *Belabarodaya v. Carepro of NY, Inc.*, No. 152534/2018, 2018 WL 3733304, at *2 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) (granting stay pending appeals to the Court of Appeals in two separate actions addressing a dispositive issue). Moreover, not only is a stay constitutionally required, but a stay would also avoid "duplication of effort, waste of judicial resources, and [the] possibility of inconsistent rulings." *OneBeacon*, *supra*. Accordingly, the stay should be granted.

## PRIOR PROCEEDINGS

Like this action, *Zervos* is an alleged defamation action against President Trump in Supreme Court, New York County. In *Zervos*, the President moved to dismiss on the ground, among others, that the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, bars state courts from exercising jurisdiction over the President while he or she is in office. On March 20, 2018, Justice Schecter denied the President's motion, *Zervos*, 59 Misc.3d 790 (Sup. Ct., N.Y. Cnty. 2018), and on March 14, 2019, the First Department affirmed in a 3-2 decision, *Zervos*, 171 A.D.3d at 120.

4

SA-24

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

Several days after filing this action in November 2019, plaintiff sought to have it reassigned to Justice Schecter on the grounds that this action and *Zervos* "present similar, and often novel, legal issues," including "the same argument[s] that Trump made, and Justice Schecter considered, in *Zervos*," and that "[a]ssigning two different Justices to these cases would both amplify the Court's workload unnecessarily and risk conflicting rulings." (Kasowitz Aff., Ex. A (NYSCEF Nos. 3 at ¶¶ 6, 8, 24 at ¶¶ 9, 10, 12).)[2]

On December 12, 2019, this Court entered a Preliminary Conference Order ordering that document requests be served by February 6, 2020, with responses due March 6, that party depositions be completed by April 6, 2020, and that "[t]he filing of a dispositive motion, including a Motion to Dismiss, will not stay discovery." (Kasowitz Aff., Ex. B (NYSCEF No. 27).)

Plaintiff has served the President with numerous and burdensome discovery requests, including notices to admit, interrogatories, two sets of document requests, and a notice for physical examination. (Kasowitz Aff. ¶ 6.)

On January 3, 2020, defendant filed a proposed order to show cause and accompanying motion to dismiss the complaint for lack of jurisdiction and to stay discovery pending the Court's decision on the motion to dismiss. (NYSCEF Nos. 28-33.) On January 6, 2020, this Court declined to sign the order to show cause. (NYSCEF No. 36.)

The next day, on January 7, 2020, the First Department in *Zervos* granted President Trump leave to appeal to the Court of Appeals. *Zervos*, 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U). The First Department also granted President Trump's motion to "stay . . .

---

[2] Plaintiff's request to reassign the action was denied by letter, dated December 9, 2019, from Hon. Deborah A. Kaplan, Administrative Judge for Civil Matters, Supreme Court of the State of New York.

SA-25

proceedings pending hearing and determination of the appeal by the Court of Appeals." *Id.* On

January 17, 2020, in *Zervos*, President Trump filed in the Court of Appeals his preliminary

appeal statement. On January 21, 2020, the Court of Appeals issued a briefing schedule under

which the appeal will be fully briefed by May 11, 2020. (Kasowitz Aff., Ex. C.)

On February 4, 2020, the Court so-Ordered the parties' stipulation adjourning all

discovery deadlines by the amount of time from January 31 to the date of the Court's decision on

this motion, plus five business days. (Kasowitz Aff., Ex. D at 2.)

## ARGUMENT

Whether the U.S. Constitution bars state-court subject matter jurisdiction over actions

against a U.S. President while he or she is in office is now squarely before the Court of Appeals

on the President's appeal from the First Department's 3-2 decision in *Zervos v. Trump*, 171

A.D.3d 110. A stay of this action is thus mandated until the Court of Appeals decides that issue,

which the U.S. Supreme Court in *Clinton v. Jones*, 520 U.S. at 690-91, called an "important

constitutional issue[]."

In *Clinton v. Jones*, the Supreme Court held that the Separation of Powers doctrine does

not bar federal court jurisdiction over an action against the President arising from alleged private

conduct, on the ground that the federal Judicial Branch is a coequal branch with the Executive

Branch of the federal government. The Supreme Court took pains, however, to note that it was

"not necessary to consider or decide whether a comparable claim might succeed in a state

tribunal" under the Supremacy Clause, which might "present a more compelling case for

immunity." *Id.* at 691. *See also Trump v. Vance*, 941 F.3d 631, 642-43 (2d Cir. 2019)

(acknowledging, without deciding, that "the President may be correct that state courts lack the

authority to issue him orders"), *cert. granted*, --- S.Ct. ----, 2019 WL 6797730 (Mem) (U.S. Dec.

6

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM
NYSCEF DOC. NO. 49

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/04/2020

13, 2019) (No. 19-635); *Zervos v. Trump*, 171 A.D.3d at 113 (whether state courts can hear

actions against a sitting president is a "constitutional issue of first impression").

      **A.**     **If the Court of Appeals Reverses *Zervos v. Trump*,**
             **This Action Must be Dismissed or Stayed.**

     In *Zervos v. Trump*, 171 A.D.3d at 113, the First Department, acknowledging that it was

deciding a "constitutional issue of first impression," held, citing *Clinton v. Jones*, that the

"Supremacy Clause does not deprive a state court of its power and authority to decide [the]

case," *id.* at 128. Two justices in dissent, however, correctly noted that the holding in *Clinton v.

Jones*, on its face, does not extend to state courts and concluded that the Supremacy Clause bars

state-court jurisdiction over a sitting President because "subjecting the President to a state trial

court's jurisdiction imposes upon him a degree of control by the State of New York that

interferes with his ability to carry out his constitutional duty of executing the laws of the United

States." *Id.* at 131. The First Department granted the President leave to appeal its 3-2 decision

to the Court of Appeals and granted the President's motion to stay proceedings "pending hearing

and determination of the appeal by the Court of Appeals." *Zervos v. Trump*, 2020 WL 63397,

2020 N.Y. Slip Op. 60193(U).

     This action should be stayed as well. The issue on appeal in *Zervos* is squarely present in

this action, and if resolved by the Court of Appeals in favor of the President, this Court would be

without jurisdiction to hear this action, which must be dismissed or stayed while President

Trump is in office. Accordingly, this threshold issue -- whether the President is immune from

suit in state court while in office -- should be decided by the Court of Appeals before this action

proceeds.

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

### B.     Official Immunity Claims Must be Decided at the Outset of the Case.

To avoid negating a claim of official immunity -- here, the President's constitutional right to immunity from suit in state court while in office -- the courts have repeatedly made clear that courts should decide such claims at the beginning of the case, before discovery.  *See, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (Immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery …, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'") (emphasis in original) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."); *Hegarty v. Somerset Cnty.*, 25 F.3d 17, 18 (1st Cir. 1994) ("[I]mmunity from suit includes protection from the burdens of discovery . . . [and] the stay of discovery, of necessity, ordinarily must carry over through the *appellate court's* resolution of [the immunity question], so long as the appeal is non-frivolous.") (emphasis in original); *Liu v. New York City Police Dep't*, 216 A.D.2d 67, 69 (1st Dep't 1995) (assertion of immunity is "an issue of law which the court should decide at the earliest possible stage of the litigation").

### C.     The Courts are Constitutionally Required to Give Deference to the President.

*A fortiori*, when the official asserting immunity is the President, the immunity issue must be decided first.  A stay would permit resolution of the President's claim that he is immune from suit in state court while in office, and is also mandated because of the unique role of the President under Article II of the Constitution.  *See Clinton v. Jones*, 520 U.S. at 697-98 (Court had "no dispute" with the premise that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties").  Accordingly, courts are required to give

**SA-28**

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

deference to the President of the United States under the U.S. Constitution. *See Cheney*, 542 U.S. at 391-92 ("Special considerations applicable to the President . . . suggest that the courts should be sensitive to requests by the Government for interlocutory appeals . . . ."); *Clinton v. Jones*, 520 U.S. at 707 ("The high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery."); *Nixon v. Fitzgerald*, 457 U.S. at 753 ("Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."); *United States v. Nixon*, 418 U.S. at 715 (1974) (Courts must extend the President "that high degree of respect due the President of the United States."); *United States v. Burr*, 25 F.Cas. at 192 (Courts may not "proceed against the President as against an ordinary individual.").

Given this constitutionally required deference, courts thus routinely grant a President's request for a stay pending appeal or interlocutory appeal on constitutional issues like the one presented here. *See Trump v. Mazars USA*, *supra* (granting President Trump's motion to stay, pending disposition of his petition for writ of certiorari, and, if granted, judgment of the Court, on the constitutionality, under the Separation of Powers doctrine, of a Congressional subpoena to President's accountant seeking pre-presidential, private documents); *Trump v. Deutsche Bank*, *supra* (same); *United States v. Nixon*, 418 U.S. at 714 ("[e]nforcement of the subpoena duces tecum [directed to President Nixon] was stayed pending this Court's resolution of the issues," including whether, under the Separation of Powers doctrine, a federal district court may issue a subpoena to the President in a criminal action); *Trump v. Vance*, *supra* at *1 (granting stay of enforcement of state grand jury subpoena seeking the President's documents from his accountant, given "the unique issues raised by this appeal," including whether, under the Supremacy Clause, a state grand jury may issue a subpoena seeking the President's records); *In*

9

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

*re Trump*, 781 F. App'x at 2 (district court abused its discretion in denying the President's request for an immediate interlocutory appeal from denial of his motion to dismiss claim that he violated the Foreign Emoluments Clause of the U.S. Constitution, because the issues raised were "unsettled" and potentially "dispositive"); *In re Trump*, 928 F.3d at 364 (granting President permission to file interlocutory appeal and staying district court proceedings pending that appeal from district court's orders, which denied the President's motion to dismiss and permitted discovery on claims he violated the Emoluments Clauses); *Jones v. Clinton*, *supra* (granting President Clinton's motion to stay pending President Clinton's appeal to the U.S. Supreme Court on whether the Separation of Powers doctrine bars federal court jurisdiction over actions against the President arising from his unofficial conduct); *Nixon v. Sirica*, 487 F.2d at 721 (directing district court to stay the action to allow the President to appeal the district court's determinations compelling disclosure of materials subject to the President's claim of Article II privilege); *Galicia v. Trump*, *supra* (granting the President a stay pending appeal on whether the trial court could, consistent with Article II of the U.S. Constitution, require the President to appear for deposition).[3]

Moreover, under the Supremacy Clause, a substantive federal right -- including the President's right to judicial deference -- takes precedence over any state procedures that would nullify that right. *See Haywood v. Drown*, 556 U.S. 729, 736, 740-41 (2009) ("[A]lthough States retain substantial leeway to establish the contours of their judicial systems, they lack authority to

---

[3] The principle that the President is entitled to a stay pending appeal is so well recognized that, in *Trump v. Vance*, *supra*, after the Second Circuit granted an initial, administrative stay, No. 19-3204, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019), the parties -- including the New York County District Attorney, the Department of Justice, and the President -- all acknowledged that a stay pending President Trump's appeal was necessary. *See* Appellee's Letter, *Trump v. Vance*, No. 19-3204 (2d Cir. Oct. 21, 2019), ECF No. 136 (memorializing parties' agreement to a stay pending appeal and petition for *certiorari*). *See also Trump v. Mazars USA, LLP*, 940 F.3d 710, 718 (D.C. Cir. 2019) ("By agreement of the parties, Mazars need not comply with the subpoena during the pendency of this expedited appeal."), *cert. granted*, --- S.Ct. ----, 2019 WL 6797734 (Mem) (U.S. Dec. 13, 2019) (No. 19-715).

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

nullify a federal right. . . . A State's authority to organize its courts, while considerable, remains subject to the strictures of the Constitution."); *Felder v. Casey*, 487 U.S. 131, 151 (1988) ("Just as federal courts are constitutionally obligated to apply state law to state claims, *see* [*Erie R. Co. v. Tumpkins*, 304 U.S. 64 (1983)], so too the Supremacy Clause imposes on state courts a constitutional duty 'to proceed in such manner that all the substantial rights of the parties under controlling federal law [are] protected.'") (citation omitted); *Lerner v. Karageorgis Lines, Inc.*, 66 N.Y.2d 479, 485 (1985) ("[A] state court may not limit a party's [federal] substantive rights by applying its own procedural rules . . . .").

**D.    The Requested Stay is Warranted Under CPLR § 2201.**

The requested stay is thus unquestionably warranted under CPLR § 2201, which authorizes this Court to "grant a stay of proceedings in a proper case, upon such terms as may be just." Under CPLR § 2201, courts stay proceedings where, as here, "the point of law involved in the case, and potentially dispositive of it, is about to be definitively decided in another case presently on appeal before a court whose decisions bind the trial court." Patrick M. Connors, Practice Commentaries, McKinney's Cons. Laws of NY Annotated, CPLR C2201:11 (citation omitted). *See also In re Reynders v. Conway*, 79 A.D.2d 863, 864 (4th Dep't 1980) ("[T]he court had the power to stay petitioners['] . . . action until the . . . appeal was argued in the Court of Appeals."); *Belabarodaya*, *supra* at *2 (granting stay pending two appeals to the Court of Appeals in other cases on a dispositive issue); *Assenzio v A.O. Smith Water Prods.*, No. 190008/12, 2015 WL 5283301, at *1-2 (Sup. Ct., N.Y. Cnty. Aug. 28, 2015) (granting stay pending appeal in a separate case that would have a "significant impact" on the action.)

A stay would also avoid "the duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay [which] outweigh any prejudice to plaintiff." *OneBeacon Am. Ins. Co.*, *supra* at 541, 541 (affirming grant of stay under CPLR

11

## SA-31

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

§ 2201, and holding that "[t]he duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay [pending appeal in a related action in another state] outweigh any prejudice to plaintiff"); *see also Uptown Healthcare Mgmt., Inc. v. Rivkin Radler LLP*, 116 A.D.3d 631, 631 (1st Dep't 2014) (affirming granting of a stay pending ruling in a separate case in federal court which presented "common question of law and fact"); *Belopolsky v. Renew Data Corp.*, 41 A.D.3d 322, 322 (1st Dep't 2007) (affirming stay pending resolution of related case between different parties where the resolution "may dispose of or limit issues which are involved in the subsequent action").[4]

The balance of the equities also favors granting a stay. Absent a stay, the President would be deprived of his constitutional right to immunity from this action while in office, including his immunity to the extensive and burdensome discovery requests plaintiff has served under the Court's scheduling order. (*See* Kasowitz Aff. ¶ 6.) In this regard, the U.S. Supreme Court has made clear that courts may not, consistent with the Constitution, require a President to "place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling . . . ." *United States v. Nixon*, 418 U.S. at 692. The only appropriate procedure, therefore, is to stay this action, including all discovery and scheduling orders, to enable the Court of Appeals to review and decide whether the President, under the Supremacy Clause, is subject to such discovery and orders in the first place.

Moreover, if this action proceeds, the burden would extend to the public interest. The unnecessary distraction of the "President from his public duties [works] to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve."

---

[4] Plaintiff herself argued that this action should be designated as a related case to *Zervos* and reassigned to Justice Schecter based on overlapping and novel legal issues and judicial economy. (*See supra* at 5.)

12

SA-32

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM

NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

*Nixon v. Fitzgerald*, 457 U.S. at 753.  In such a circumstance, a party "may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936); *see also Uptown Healthcare Mgmt.*, 116 A.D.3d at 631 ("[T]he duplication of effort, waste of judicial resources, and possibility of inconsistent rulings in the absence of a stay outweigh any prejudice to plaintiff resulting from the stay.") (citation omitted).

## **CONCLUSION**

A stay of all proceedings pending the decision of the Court of Appeals in *Zervos v. Trump* should be granted.

13

**SA-33**

FILED: NEW YORK COUNTY CLERK 02/04/2020 11:59 PM
NYSCEF DOC. NO. 49

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/04/2020

Dated: New York, New York.
      February 4, 2020

Respectfully submitted,

KASOWITZ BENSON TORRES LLP


By:   */s/ Marc E. Kasowitz*
      Marc E. Kasowitz
      Christine A. Montenegro
      Paul J. Burgo

      1633 Broadway
      New York, New York 10019
      T: (212) 506-1700
      E: mkasowitz@kasowitz.com
         cmontenegro@kasowitz.com
         pburgo@kasowitz.com

LAROCCA HORNIK ROSEN &
      GREENBERG LLP
      Lawrence S. Rosen
      Patrick McPartland
      Jared E. Blumetti

      40 Wall Street 32nd Floor
      New York, New York 10005
      T: (212) 530-4822, 4837, 4831
      E: lrosen@lhrgb.com
         pmcpartland@lhrgb.com
         jblumetti@lhrgb.com

*Attorneys for Defendant Donald J. Trump*

14

SA-34

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

# Exhibit B

SA-35

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

E. JEAN CARROLL,                                    Index No.: 160694/19

               Plaintiff,

        -against-                                    **ANSWER**

DONALD J. TRUMP, in his personal capacity,

              Defendant.

-------------------------------------------------------------------X

Defendant Donald J. Trump ("President Trump"), subject to and reserving all rights to his

immunity, under the Supremacy Clause of the United States Constitution, Article IV, Section II, of a

sitting United States President from being sued in state court while serving as President, for his

answer to the complaint:

1.     Denies the allegations contained in paragraph 1 of the Complaint.

2.     Denies the allegations contained in paragraph 2 of the Complaint.

3.     Denies the allegations contained in paragraph 3 of the Complaint.

4.     Denies the allegations contained in paragraph 4 of the Complaint.

5.     Denies the allegations contained in paragraph 5 of the Complaint.

6.     Denies the allegations contained in paragraph 6 of the Complaint.

7.     Denies the allegations contained in paragraph 7 of the Complaint.

8.     Denies the allegations contained in paragraph 8 of the Complaint.

9.     Denies the allegations contained in paragraph 9 of the Complaint.

10.    Denies the allegations contained in paragraph 10 of the Complaint.

11.    Denies the allegations contained in paragraph 11 of the Complaint.

12.    Denies the allegations contained in paragraph 12 of the Complaint.

SA-36

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

13.     Denies the allegations contained in paragraph 13 of the Complaint.

14.     Denies the allegations contained in paragraph 14 of the Complaint.

15.     Denies the allegations contained in paragraph 15 of the Complaint.

16.     Denies the allegations contained in paragraph 16 of the Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint.

18.     Denies the allegations contained in paragraph 18 of the Complaint.

19.     The allegation contained in paragraph 19 of the Complaint asserts a demand for a jury trial for which no response is required.

20.     Denies the allegations contained in paragraph 20 of the Complaint.

21.     Denies the allegations contained in paragraph 21 of the Complaint.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.     Denies the allegations contained in paragraph 23 of the Complaint.

24.     Denies the allegations contained in paragraph 24 of the Complaint.

25.     Denies the allegations contained in paragraph 25 of the Complaint.

26.     Denies the allegations contained in paragraph 26 of the Complaint.

27.     Denies the allegations contained in paragraph 27 of the Complaint.

28.     Denies the allegations contained in paragraph 28 of the Complaint.

29.     Denies the allegations contained in paragraph 29 of the Complaint.

30.     Denies the allegations contained in paragraph 30 of the Complaint.

31.     Denies the allegations contained in paragraph 31 of the Complaint.

32.     Denies the allegations contained in paragraph 32 of the Complaint.

SA-37

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

33.    Denies the allegations contained in paragraph 33 of the Complaint.

34.    Denies the allegations contained in paragraph 34 of the Complaint.

35.    Denies the allegations contained in paragraph 35 of the Complaint.

36.    Denies the allegations contained in paragraph 36 of the Complaint.

37.    Denies the allegations contained in paragraph 37 of the Complaint.

38.    Denies the allegations contained in paragraph 38 of the Complaint.

39.    Denies the allegations contained in paragraph 39 of the Complaint.

40.    Denies the allegations contained in paragraph 40 of the Complaint.

41.    Denies the allegations contained in paragraph 41 of the Complaint.

42.    Denies the allegations contained in paragraph 42 of the Complaint.

43.    The allegations contained in paragraph 43 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 43 of the Complaint.

44.    Denies the allegations contained in paragraph 44 of the Complaint.

45.    Denies the allegations contained in paragraph 45 of the Complaint.

46.    Denies the allegations contained in paragraph 46 of the Complaint.

47.    Denies the allegations contained in paragraph 47 of the Complaint.

48.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint.

49.    Denies the allegations contained in paragraph 49 of the Complaint.

50.    Denies the allegations contained in paragraph 50 of the Complaint.

51.    Denies the allegations contained in paragraph 51 of the Complaint.

52.    Denies the allegations contained in paragraph 52 of the Complaint.

**SA-38**

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

53. Denies the allegations contained in paragraph 53 of the Complaint.

54. Denies the allegations contained in paragraph 54 of the Complaint.

55. Denies the allegations contained in paragraph 55 of the Complaint.

56. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 of the Complaint.

57. The allegations contained in paragraph 57 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint.

58. The allegations contained in paragraph 58 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Complaint.

59. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Complaint.

60. Denies the allegations contained in paragraph 60 of the Complaint.

61. Denies the allegations contained in paragraph 61 of the Complaint.

62. Denies the allegations contained in paragraph 62 of the Complaint.

63. Denies the allegations contained in paragraph 63 of the Complaint.

64. Denies the allegations contained in paragraph 64 of the Complaint.

65. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint.

66. The allegations contained in paragraph 66 of the Complaint can neither be admitted

SA-39

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 66 of the Complaint.

67.     The allegations contained in paragraph 67 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 of the Complaint.

68.     Denies the allegations contained in paragraph 68 of the Complaint.

69.     Denies the allegations contained in paragraph 69 of the Complaint.

70.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint.

71.     Denies the allegations contained in paragraph 71 of the Complaint.

72.     Denies the allegations contained in paragraph 72 of the Complaint.

73.     Denies the allegations contained in paragraph 73 of the Complaint.

74.     Denies the allegations contained in paragraph 74 of the Complaint.

75.     Denies the allegations contained in paragraph 75 of the Complaint.

76.     Denies the allegations contained in paragraph 76 of the Complaint.

77.     The allegations contained in paragraph 77 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 77 of the Complaint.

78.     The allegations contained in paragraph 78 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 78 of the Complaint.

79.     Denies the allegations contained in paragraph 79 of the Complaint.

**SA-40**

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM    INDEX NO. 160694/2019

NYSCEF DOC. NO. 68    RECEIVED NYSCEF: 02/28/2020

80.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint.

81.     Denies the allegations contained in paragraph 81 of the Complaint.

82.     Denies the allegations contained in paragraph 82 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

83.     The allegations contained in paragraph 83 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 83 of the Complaint.

84.     The allegations contained in paragraph 84 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 84 of the Complaint.

85.     Denies the allegations contained in paragraph 85 of the Complaint.

86.     Denies the allegations contained in paragraph 86 of the Complaint.

87.     Denies the allegations contained in paragraph 87 of the Complaint.

88.     Denies the allegations contained in paragraph 88 of the Complaint.

89.     Denies the allegations contained in paragraph 89 of the Complaint.

90.     Denies the allegations contained in paragraph 90 of the Complaint.

91.     The allegations contained in paragraph 91 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 91 of the Complaint and respectfully refers the Court to any alleged statements for their full and complete content and context.

92.     The allegations contained in paragraph 92 of the Complaint can neither be admitted

6

SA-41

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 92 of the Complaint.

93.    Denies the allegations contained in paragraph 93 of the Complaint.

94.    Denies the allegations contained in paragraph 94 of the Complaint.

95.    Denies the allegations contained in paragraph 95 of the Complaint.

96.    Denies the allegations contained in paragraph 96 of the Complaint.

97.    The allegations contained in paragraph 97 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 97 of the Complaint and respectfully refers the Court to any alleged statement for its full and complete content and context.

98.    The allegations contained in paragraph 98 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 98 of the Complaint.

99.    The allegations contained in paragraph 99 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 99 of the Complaint.

100.    Denies the allegations contained in paragraph 100 of the Complaint.

101.    The allegations contained in paragraph 101 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 101 of the Complaint.

102.    The allegations contained in paragraph 102 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth

SA-42

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

of the allegations contained in paragraph 102 of the Complaint.

103.    The allegations contained in paragraph 103 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint.

104.    The allegations contained in paragraph 104 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint.

105.    The allegations contained in paragraph 105 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 of the Complaint.

106.    Denies the allegations contained in paragraph 106 of the Complaint.

107.    Denies the allegations contained in paragraph 107 of the Complaint.

108.    Denies the allegations contained in paragraph 108 of the Complaint.

109.    Denies the allegations contained in paragraph 109 of the Complaint.

110.    Denies allegations contained in paragraph 110 of the Complaint and respectfully refers the Court to any alleged photographs for their full and accurate depictions.

111.    The allegations contained in paragraph 111 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 111 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

SA-43

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

112.    The allegations contained in paragraph 112 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 112 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

113.    Denies the allegations contained in paragraph 113 of the Complaint.

114.    Denies the allegations contained in paragraph 114 of the Complaint.

115.    Denies the allegations contained in paragraph 115 of the Complaint.

116.    Denies the allegations contained in paragraph 116 of the Complaint.

117.    Denies the allegations contained in paragraph 117 of the Complaint.

118.    Denies the allegations contained in paragraph 118 of the Complaint.

119.    Denies the allegations contained in paragraph 119 of the Complaint.

120.    Denies the allegations contained in paragraph 120 of the Complaint.

121.    Denies the allegations contained in paragraph 121 of the Complaint.

122.    Denies the allegations contained in paragraph 122 of the Complaint.

123.    The allegations contained in paragraph 123 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 123 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

124.    Denies the allegations contained in paragraph 124 of the Complaint

125.    The allegations contained in paragraph 125 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 125 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

**SA-44**

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM          INDEX NO. 160694/2019

NYSCEF DOC. NO. 68                                                                RECEIVED NYSCEF: 02/28/2020

126.    Denies the allegations contained in paragraph 126 of the Complaint.

127.    The allegations contained in paragraph 127 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 127 of the Complaint.

128.    Denies the allegations contained in paragraph 128 of the Complaint.

129.    Denies the allegations contained in paragraph 129 of the Complaint.

130.    Denies the allegations contained in paragraph 130 of the Complaint.

131.    Denies the allegations contained in paragraph 131 of the Complaint.

132.    Denies the allegations contained in paragraph 132 of the Complaint.

133.    Denies the allegations contained in paragraph 133 of the Complaint.

134.    Denies the allegations contained in paragraph 134 of the Complaint.

135.    Denies the allegations contained in paragraph 135 of the Complaint.

136.    Denies the allegations contained in paragraph 136 of the Complaint.

**FIRST CAUSE OF ACTION**

137.    Paragraphs 1 through 136 are realleged.

138.    Denies the allegations contained in paragraph 138 of the Complaint.

139.    Denies the allegations contained in paragraph 139 of the Complaint.

140.    Denies the allegations contained in paragraph 140 of the Complaint.

141.    Denies the allegations contained in paragraph 141 of the Complaint.

142.    Denies the allegations contained in paragraph 142 of the Complaint.

143.    Denies the allegations contained in paragraph 143 of the Complaint.

144.    Denies the allegations contained in paragraph 144 of the Complaint.

145.    Denies the allegations contained in paragraph 145 of the Complaint.

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM

NYSCEF DOC. NO. 68

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

## DEMAND FOR RELIEF

146.    President Trump denies that plaintiff is entitled to any relief requested in the *ad damnum* clause of the Complaint or any other relief.

## FIRST AFFIRMATIVE DEFENSE

147.    Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States.

## SECOND AFFIRMATIVE DEFENSE

148.    The Complaint fails to state a cause of action.

## THIRD AFFIRMATIVE DEFENSE

149.    The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

## FOURTH AFFIRMATIVE DEFENSE

150.    The alleged defamatory statements are true.

## FIFTH AFFIRMATIVE DEFENSE

151.    Plaintiff's claim is barred because her damages, if any, were caused by acts of third persons, for which defendant is not responsible.

## SIXTH AFFIRMATIVE DEFENSE

152.    Plaintiff is not entitled to punitive damages as a matter of law.

## SEVENTH AFFIRMATIVE DEFENSE

153.    Plaintiff has not sufficiently alleged defamation *per se*.

## EIGHTH AFFIRMATIVE DEFENSE

154.    Plaintiff has failed to plead damages with the required specificity.

11

SA-46

## NINTH AFFIRMATIVE DEFENSE

155.    The Court lacks personal jurisdiction over President Trump.


WHEREFORE, defendant Donald J. Trump respectfully demands judgment dismissing the

Complaint in its entirety, together with costs, disbursements, and all such other relief as this Court

deems just and proper.

Dated: New York, New York
       January 23, 2020

                                        **LAROCCA HORNIK ROSEN
                                        & GREENBERG LLP**


                              By: _____
                                        Lawrence S. Rosen, Esq.
                                        Amy D. Carlin, Esq.
                                        Patrick McPartland, Esq.
                                        40 Wall Street, 32nd Floor
                                        New York, New York 10005
                                        T: (212) 530-4822, 4836, 4837
                                        E: LROSEN@LHRGB.COM
                                           ACARLIN@LHRGB.COM
                                           PMCPARTLAND@LHRGB.COM

                                        *Attorneys for Donald J. Trump*


To:    Roberta Kaplan, Esq.
       Kaplan Hecker & Fink LLP
       350 Fifth Avenue, Suite 7110
       New York, NY 10118

12

**SA-47**

# Kasowitz Benson Torres llp

| | 1633 BROADWAY | Atlanta |
|---|---|---|
| Marc E. Kasowitz | NEW YORK, NEW YORK 10019 | Houston |
| Direct Dial: (212) 506-1710 | (212) 506-1700 | Los Angeles |
| Direct Fax: (212) 835-5010 | FAX: (212) 506-1800 | Miami |
| MKasowitz@Kasowitz.com | | Newark |
| | | San Francisco |
| | | Silicon Valley |
| | | Washington DC |

July 16, 2020

<u>VIA NYSCEF</u>

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

Re:     *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

I write on behalf of defendant President Donald J. Trump to correct certain assertions in plaintiff's July 15, 2020 letter ("PL") to the Court.

First, plaintiff asserts that the President's argument is based on a contention that state courts are "inferior" or "incapable" (PL at 1, 2). That is not so. The President's argument -- that under Article II and the Supremacy Clause, a President is temporarily immune while in office from being sued in state court -- is based on the federal structure of the Constitution, which every state ratified and by which every state is bound.[1] Ironically, it is plaintiff, not the President, who seems to believe that the Court could be "distract[ed]" by legal arguments. (PL at 2.)

Second, plaintiff asserts that the President's argument is "desperate," "novel," and "extreme." (PL at 1, 2.) Even allowing for rhetorical flourish, that characterization is completely off base: the President's argument was raised in 1997 by the Supreme Court itself in *Clinton v. Jones* -- where the Supreme Court characterized that supposedly "desperate," "novel" and "extreme" argument as an "important constitutional issue[]," which it recognized could "present a more compelling case for immunity" than a "comparable claim" in federal court. 520 U.S. 681, 690-91, 691 n.13 (1997). And not only did nothing in the Supreme Court's decision in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), address that issue, but the

---

[1]     Under plaintiff's "logic," the U.S. Supreme Court's holding in *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which vacated orders upholding Congressional subpoenas, must have been based on the Supreme Court's view that Congress is inferior to or less capable than the state prosecutor in its *Vance* decision, which affirmed an order upholding the prosecutor's criminal subpoena to the President. Such a conclusion would, of course, be as baseless as plaintiff's assertion concerning the President's argument here. *See also* Reply Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1, at 1 ("No one questions the capability of state courts.").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 2

Supreme Court the same day, in *Mazars*, made sure not to include the issue of state court civil cases in its description of its Presidential immunity jurisprudence -- it plainly did so because the important constitutional issue has not yet been decided. (*See* Defendant's July 14, 2020 Letter to the Court ("DL") at 1-2 (quoting *Mazars*, 2020 WL 3848061, at *4).)

Third, plaintiff grossly mischaracterizes the Supreme Court Presidential immunity cases she cites. (PL at 1.) Rather than dismiss or downplay, as plaintiff does, the unique status of the President under the Constitution, every case cited by plaintiff reaffirms that status. In *United States v. Nixon*, while the Supreme Court rejected an "absolute privilege of confidentiality for all Presidential communications," it adopted a "presumptive privilege for Presidential communications." 418 U.S. 683, 703, 708 (1974). In *Clinton v. Jones*, while the Supreme Court allowed civil damages suits against a President in federal courts, it specifically left unresolved not only the issue at stake here, but also whether any court -- state or federal -- "may compel the attendance of the President at a specific time or place," 520 U.S. at 690-91, and reaffirmed that courts may not "proceed against the President as against an ordinary individual." *Id.* at 704 n.39 (citation omitted).[2]

And, in *Mazars*, the Supreme Court in fact granted the President's appeal and -- after having earlier stayed the proceedings, *see Mazars*, 2020 WL 3848061, at *6 -- vacated the decisions below upholding the Congressional subpoenas, *id.* at *12. The Court agreed with the President that, because of the "President's unique constitutional position," Congressional subpoenas to the President "implicate special concerns" not applicable to other citizens -- regardless of whether the information sought is "personal or official." *Id.* at *11-12. Thus, contrary to plaintiff's assertion, *Mazars* did not reject the President's "argument that his private papers should . . . be treated the same as his official papers." (PL at 2.) In fact, the Supreme Court specifically pointed out that "a subpoena for personal papers may pose a heightened risk of . . . impermissible purposes," such as harassment. *Mazars*, 2020 WL 3848061, at *11.

Although the Supreme Court in *Mazars* did find, with respect to the Congressional subpoenas at issue, that "a categorical approach" to assessing the "distinctions between [among other things] official and personal information," was inappropriate, it did so because such an approach "would represent a significant departure from the longstanding way of doing business between the branches.'" *Mazars*, 2020 WL 3848061, at *9. However, there is no "longstanding way of doing business" between state courts and the President. Rather, as shown (DL at 2),

---

[2]     *See also Mazars*, 2020 WL 3848061, at *11 ("The President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation."); *Vance*, 2020 WL 3848062, at *7 (the "President 'occupies a unique position in the constitutional scheme'" and "Article II guarantees the independence of the Executive Branch" (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982))); *Clinton v. Jones*, 520 U.S. at 697-98 (the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties"); *Nixon v. Fitzgerald*, 457 U.S. at 749 ("immunity [is] a functionally mandated incident of the President's unique office"); *United States v. Nixon*, 418 U.S. at 710, 715 ("courts have traditionally shown the utmost deference to Presidential responsibilities" and the President has a "singularly unique role under Art. II").

### KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 3

while Congress, like the federal judiciary, is a coequal branch of government and may therefore exercise "*partial agency* in, or [] *controul* over," the Executive Branch, *Clinton v. Jones*, 520 U.S. at 702-03 (emphasis in original) (citation omitted), state courts, as *Vance* confirmed, are not coequal branches and may not do so. *See Vance*, 2020 WL 3848062, at *8.

Finally, no one is seeking to "escape accountability" here (PL at 2). Plaintiff is free to pursue this action when the President is no longer in office. Plaintiff's repetition of the assertion that a postponement of proceedings would place the President "above the law" (*id.* at 1) does not make it so, and has been squarely rejected by the Supreme Court (DL at 4).[3]

\*     \*     \*

The bottom line is that the issue of temporary Presidential immunity has not yet been decided by the Court of Appeals in *Zervos* -- which itself is stayed pending that decision -- or by the U.S. Supreme Court. Under these circumstances, there is every reason to stay this case, which raises the identical issue, as well.

Respectfully submitted,

Marc E. Kasowitz

cc:     Counsel of Record

---

[3]     That the Supremacy Clause mandates that civil cases in state court be postponed, does not make the President "above the law" any more than, say, the automatic stay granted bankruptcy debtors places them "above the law."

# SA-50

INDEX NO. 160694/2019

NYSCEF DOC. NO. 110                                    RECEIVED NYSCEF: 08/06/2020

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | |
|---|---|---|
| PRESENT: **HON. VERNA L. SAUNDERS** | PART | IAS MOTION 36 |
| *Justice* | | |

----------------------------------------------------------------------X

| | | |
|---|---|---|
| E. JEAN CARROLL, | INDEX NO. | 160694/2019 |
| Plaintiff, | MOTION SEQ. NO. | 002 |
| - v - | | |
| DONALD TRUMP, | **DECISION + ORDER ON** | |
| Defendant. | **MOTION** | |

----------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 002) 43, 44, 45, 46, 47, 48, 49, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 97, 98, 101, 102, 105, 106

were read on this motion to/for _____**STAY**_____ .

     Plaintiff, E. Jean Carroll, commenced this defamation action seeking damages stemming from defendant Donald Trump's alleged defamatory statements made in connection with plaintiff's allegations of sexual assault at the hands of defendant.

     Defendant, who is currently serving as President of the United States, moves the court pursuant to CPLR § 2201 seeking a stay of the proceedings pending the decision of the Court of Appeals on defendant's appeal from *Zervos v Trump*, 171 AD3d 110 ( 1st Dept 2019) wherein the Appellate Division, First Department affirmed an order of the Supreme Court, New York County denying defendant's motion seeking a dismissal of the defamation action. In the alternative, defendant seeks a stay of the action on the ground that he is currently sitting as President of the United States.

     Defendant, in sum and substance, argues that this action will not lie if it is barred by the Supremacy Clause of the United States Constitution prohibiting state court subject matter jurisdiction over a sitting United States President. Defendant asserts that this very issue is pending before the Court of Appeals in the *Zervos* action and that when granting leave to appeal, the First Department also granted a stay of those proceedings.[1] Defendant thus claims a stay of the instant proceeding is warranted as the outcome of the *Zervos* action will determine whether this court has jurisdiction over defendant while he is in office. Defendant further argues that New York courts often grant stays pending appeals in other actions where the decision on those appeals resolve a

---

[1] *Zervos v Trump*, 2020 WL 63397, 2020 NY Slip Op 60193(U).

**160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.**                    Page 1 of 4
Motion No.  002

INDEX NO. 160694/2019

NYSCEF DOC. NO. 110                                                      RECEIVED NYSCEF: 08/06/2020

dispositive issue, as is the case here. Defendant contends that due to the unique role of the President under Article II of the Constitution, deference is required, and a stay mandated.

In opposition, plaintiff argues that defendant's motion serves as a further delaying tactic and that stays are reserved for extraordinary circumstances. Plaintiff asserts that no such circumstances exist here where there is binding appellate precedent and the determination of the pending appeal is not imminent. Furthermore, plaintiff contends that defendant's reliance upon case law where a stay was granted pending an appeal in the same action is misplaced. Moreover, plaintiff argues that the constitutional immunity afforded to the President applies to official conduct, not personal or unofficial conduct as is alleged in this case. Plaintiff avers that defendant's engagement in other personal litigation during his presidency undermines the argument that a stay in this action is necessary.

In support of plaintiff's primary contention that a stay is inappropriate where binding appellate authority exists, plaintiff cites to *Miller v Miller*, 109 Misc 2d 982 [Sup Ct, Suffolk County 1981], wherein the court declined to issue a stay pending the Court of Appeals decision as it was bound by the Appellate Court decision and the Court of Appeals decision was not imminent. Plaintiff contends that the cases cited by defendant in support of a stay are easily distinguishable from this action as those matters either involved identical issues and parties; were fully briefed and awaiting oral argument at the time a stay was requested; or, there was no binding appellate authority on point.

In reply, defendant reiterates the arguments advanced in the moving papers and adds that as the *Zervos* appeal will be fully briefed by May 11, 2020 a stay of this action pending the appeal of the *Zervos* case is warranted as its decision will inform jurisdiction of this action.

In the *Zervos* case, this court held that:

"[n]othing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility. Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions. There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action… [T]here is absolutely no authority for dismissing or staying a civil action related purely to unofficial conduct because defendant is the President of the United States. Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible direct control . . . over the President." (*Zervos v Trump*, 59 Misc 3d 790 [Sup Ct, NY County 2018], internal citations omitted).

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.                                        Page 2 of 4
Motion No.  002

2 of 4

**SA-52**

INDEX NO. 160694/2019

NYSCEF DOC. NO. 110

RECEIVED NYSCEF: 08/06/2020

On appeal, the Appellate Division, First Department noted that the *Zervos* action presented a constitutional issue of first impression: "whether the Supremacy Clause of the United States Constitution requires a state court to defer litigation of a defamation action against a sitting President until his terms end." (*Zervos,* supra). Ultimately, the Appellate Division's decision to affirm the Supreme Court's ruling unequivocally resolved this issue holding that pursuant to the United States Supreme Court's decision in *Clinton v Jones,* 520 US 681 [1997] "the presidency and the President are indeed separable" and thus, "the President is presumptively subject to civil liability for conduct that has taken place in his private capacity." (*Zervos,* supra at 124).

At issue here is whether this action should be stayed pending a decision from the Court of Appeals regarding the First Department's decision to affirm this court's ruling on *Zervos*.

Pursuant to CPLR § 2201, which authorizes the granting of a stay "in a proper case, upon such terms as may be just," stays are in the sound discretion of the trial court. However, the First Department has ruled that stays should be exercised "sparingly and only when other remedies are inadequate and the equities invoked apparent and strong." (See generally, *Croker v NY Trust Co.,* 206 AD 11 [1st Dept 1923]). Nevertheless, it is axiomatic that this court is bound by the decisions of the Appellate Division, First Department unless same has been overturned by the Court of Appeals.

In this instance, defendant implores the court to stay this action until the Court of Appeals has ruled on a separate action, arguing that the appeal is fully briefed and thus, imminent. Conversely, plaintiff objects avowing that there is no immediate date set for arguments or likelihood that a decision is imminent and thus, the court is bound by the binding appellate precedent which specifically addresses the issue in contention. While the arguments advanced by both parties are compelling, they have been rendered moot in light of the recent United States Supreme Court decision in *Trump v Vance,* 591 U.S. __, __, 140 S Ct 2412 [2020]. In *Trump v Vance,* the U.S. Supreme Court held that "Article II and the Supremacy Clause do not categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President." (Slip Op at 1.) The *Vance* Court reasoned that as the Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties, absolute immunity is not necessary or appropriate under Article II or the Supremacy Clause as state courts and prosecutors are expected to observe constitutional limitations and, if they fail to

160694/2019 CARROLL, E. JEAN vs. TRUMP, DONALD J.
Motion No. 002

Page 3 of 4

**SA-53**

INDEX NO. 160694/2019

NYSCEF DOC. NO. 110                                    RECEIVED NYSCEF: 08/06/2020

do so, federal law allows a President to challenge any constitutional influence. (Slip Op at 17.) While the *Vance* Court's decision permits the issuance of a criminal subpoena to a sitting President, it's analysis and conclusions address the same issues and questions raised by defendant in this action, as well as, the *Zervos* action: whether the Supremacy Clause of the Constitution bars a state court from exercising jurisdiction over a sitting President of the United States during his term. No, it does not. Further, the holding in *Vance* is not limited solely to criminal proceedings. In fact, the *Vance* Court concluded,

> Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard[ ] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. (Slip Op at 21, internal citations omitted.)

This court construes the holding in *Vance* applicable to all state court proceedings in which a sitting President is involved, including those involving his or her unofficial/personal conduct. Accordingly, the application for a stay is denied and it is hereby

ORDERED, defendant's motion is denied in accordance with the foregoing; and it is further

ORDERED, that the parties are to appear for a telephonic compliance conference on September 30, 2020 at 11:00 AM; and it is further

ORDERED, that any requested relief not expressly addressed herein has been considered and is hereby denied.

This constitutes the decision and order of the court.

_____
**August 3, 2020**

                                    _____
                                    **HON. VERNA L. SAUNDERS, JSC**

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | X | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.                    Page 4 of 4
Motion No.  002

**SA-54**

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:     (202) 353-1651
Facsimile:     (202) 616-5200
Email:          stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>                     Plaintiff,<br><br>          -against-<br><br> DONALD J. TRUMP, in his personal capacity,<br><br>                     Defendant. | **ECF Case**<br><br>No. 1:20-cv-7311-LAK-JLC |

## NOTICE OF APPEAL

Notice is hereby given that the United States appeals to the United States Court of

Appeals for the Second Circuit from the Order entered in this action on October 27, 2020, ECF

No. 32.

 Dated: November 25, 2020                              JEFFREY BOSSERT CLARK

Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director

 S/ Stephen R. Terrell
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:    (202) 353-1651
Facsimile:    (202) 616-5200
Email: stephen.terrell2@usdoj.gov

| | | | |
|---|---|---|---|
| ☐ 56 | Sep. 15, 2021 | Request | ORDER denying without prejudice 47 Letter Motion to Stay re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 09/15/2021) |

SA–56

**DOCKET**

# KAPLAN HECKER & FINK LLP

360 FIFTH AVENUE | 63rd FLOOR
NEW YORK, NEW YORK 10110

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0883
DIRECT EMAIL   rkaplan@kaplanhecker.com



August 8, 2022

**VIA COURIER**

The Honorable Lewis A. Kaplan
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

        *Re:*    *Carroll v. Trump*, No. 20 Civ. 07311 (LAK) (JLC)

Dear Judge Kaplan:

      We write on behalf of Plaintiff to: (1) provide the Court a brief update on discovery; and (2) inform the Court of a case that Plaintiff plans to file against Defendant pursuant to New York's Adult Survivors Act as soon as that statute authorizes us to do so on November 24, 2022.[1] We will file the case in this District and, as required by the Local Rules, mark it as related to the present action. Although we recognize that it is unusual to preview a yet-to-be-filed lawsuit for an adversary or judge, we wanted Your Honor to be aware of Plaintiff's anticipated filing so that the Court has full information as it considers scheduling and case management issues.

      **Status of Discovery.** To date, discovery in the above-referenced defamation case has been entirely one way. Upon entry of a protective order,[2] Plaintiff is prepared to produce 30,267 pages of material responsive to Defendant's documents requests. She has already provided substantive responses to 19 interrogatories.

---

[1] Pursuant to the provision on letters in Your Honor's Individual Practices, we have filed this letter by having a commercial courier deliver a hardcopy to the Daniel Patrick Moynihan United States Courthouse.
[2] On August 1, 2022, Plaintiff filed a letter motion requesting that the Court enter a standard protective order after Defendant refused to engage on the matter for five weeks. *See* ECF 82. On August 3, two days after we filed that motion, Defendant's counsel sent proposed edits to a draft protective order that we had originally shared on June 27. Within the hour, we followed up with two clarifying questions about those edits. As of today, we have not heard back from Defendant's counsel.

KAPLAN HECKER & FINK LLP                                                   2

Defendant, by contrast, has barely participated in the discovery process at all. He served his responses to Plaintiff's requests for production 17 days late, asserting an identical boilerplate response to each and every request. Included in his pro forma objections were overbroad and inexplicable privilege assertions, such as his invocation of the deliberative process and executive privileges in response to requests covering time periods before and after Defendant's presidency. Although we met and conferred with Defendant's counsel on July 21 and 22 in order to better understand Defendant's position, his responses remained murky. So we followed up by letter on July 29, asking whether Defendant was taking the position that there was not a single document in his possession, custody, or control responsive to any one of Plaintiff's 45 document requests, or whether Defendant was instead withholding documents on the basis of one or more objections. We made clear that if there were responsive documents that Defendant was not producing, he should state "with specificity the grounds for objecting to the request, including the reasons," and "whether any responsive materials are being withheld on the basis of [each] objection." Fed. R. Civ. Proc. 34(b)(2)(B)–(C); *see Michael Kors, L.L.C. v. Su Yan Ye*, No. 18 Civ. 2684, 2019 WL 1517552, at *3 (S.D.N.Y. Apr. 8, 2019) ("A number of courts have held that an objection that does not appropriately explain its grounds is forfeited."). While we followed up on our letter on August 4, we still have not received a response. Our understanding is that Defendant remains unwilling to produce any documents in discovery, even once a protective order is in place.[3]

True to form, Defendant's late responses to Plaintiff's interrogatories were similarly deficient. Each response contained nearly identical boilerplate objections, with Defendant purporting to provide answers only to two interrogatories.[4] Of particular relevance here, Defendant contended that each of our interrogatories exceeded the scope of Local Rule 33.3 because "a *request for production or deposition*" is a "*more practical method of obtaining the information sought*" (emphasis added). The irony of this objection is obvious given that Defendant has stated that he does not intend to produce a single document.

That takes us to the issue of Defendant's deposition. While it is true that I stated back in February in Your Honor's courtroom that we did not need to take Defendant's deposition, we based that decision on our expectation that document discovery and interrogatory responses would be sufficient to elucidate Defendant's defenses in this case. But a deposition now appears to be the only way to do so, especially since we seek to avoid further delay by way of Rule 30(b)(6) depositions regarding document collection efforts or motions to compel, as even those steps, which may involve attempts at interlocutory appeal, still may not lead to the production of relevant information. To be clear, the deposition of Defendant need not take very long—what Plaintiff seeks to understand at this point is Defendant's theory of the case and the facts underlying it before the close of fact discovery. Accordingly, we plan to notice Defendant's deposition and will work with his counsel to facilitate that deposition, just as we have in another matter in this District in

---

[3] During one of our meet-and-confers, counsel for Defendant suggested that we should seek documents from the Trump Campaign. Although it is our position that documents held by the Trump Campaign, even if not in Defendant's possession, are certainly within Defendant's control, we have engaged in several meet-and-confers with counsel for the Campaign. We have not yet received any documents from the Trump Campaign either.

[4] In response to an interrogatory seeking the identification of witnesses with knowledge relating to Plaintiff's defamation claims, Defendant referred only to categories of witnesses associated with Plaintiff or Bergdorf Goodman, and he refused to provide any information about any witnesses with whom he has spoken about Plaintiff or this action. The only other interrogatory Defendant answered sought identification of physical evidence of Defendant's sexual assault, to which he stated that the assault "did not occur."

KAPLAN HECKER & FINK LLP                                                          3

which we are counsel. *See* Joint Letter to M.J. Cave, *McKoy v. Trump Corp.*, No. 18 Civ. 9936 (S.D.N.Y. July 25, 2022), ECF 448 (updating court on efforts to complete party depositions).

**The ASA Action.** As noted above, we also wish to inform the Court that Plaintiff intends to file an action against Defendant pursuant to the Adult Survivors Act on the earliest possible filing date, or November 24, 2022. *See* N.Y. C.P.L.R. § 214-J. Like the Child Victims Act, N.Y. C.P.L.R. § 214-g, the Adult Survivors Act provides a one year "look back" in which adult survivors of sexual misconduct may bring civil claims that would otherwise be time-barred. In her ASA case, Plaintiff will assert causes of action for battery and intentional infliction of emotional distress (IIED)—the types of claims that the Adult Survivors Act was intended to cover. *Cf., e.g., Giuffre v. Andrew*, No. 21 Civ. 6702, 2022 WL 118645, at \*15–\*16 & n.98 (S.D.N.Y. Jan. 12, 2022) (Kaplan, J.) (denying motion to dismiss battery and IIED claims brought pursuant to parallel Child Victims Act).

Although we appreciate that it is unorthodox to preview a plan to file a new complaint before it is filed, we thought it would be useful to do so here given the significant factual overlap between the two cases. The allegations in the ASA complaint will be nearly identical to allegations already contained in Plaintiff's existing defamation complaint since both cases have at their core the same factual question: namely, did Defendant sexually assault Plaintiff in a Bergdorf Goodman dressing room in the mid-1990s. In fact, the only real differences between the two pleadings will be: (1) the absence of allegations concerning Defendant's defamatory statements in her ASA complaint; and (2) the nature of Plaintiff's damages, which is obviously different in a case for battery/IIED than it is in a case for defamation.[5]

Upon filing Plaintiff's ASA case, we will mark the two cases related under Local Civil Rule 1.6. Given the similarities between the two cases, we think that coordination of the actions will be appropriate. In our view, because the parties will already have substantially completed the discovery in this case by November 24, and the facts between the two cases overlap to such a significant degree, we believe that there is no reason why both actions could not be tried together starting on February 6, 2023, in accordance with the schedule established by the Court. ECF 77.

\*     \*     \*

We are available to answer any questions and of course would be happy to participate in a status/scheduling conference if Your Honor believes that would be useful.

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record (via email)

---

[5] In the ASA case, Plaintiff will rely on a psychological expert for testimony regarding the harms that she experienced as a result of the underlying sexual assault. Plaintiff commits to providing Defendant that expert's report at the outset of her new action and will make that expert available for a deposition.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

               *Plaintiff*,

      v.

DONALD J. TRUMP, in his personal capacity,

               *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOP SUMMARY JUDGMENT

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**SA-61**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 1

    A.  Factual Background ................................................................... 1

    B.  Procedural History ................................................................... 7

STANDARD OF REVIEW ................................................................................ 10

ARGUMENT ..................................................................................................... 10

    I.     TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS 10

    A.  Trump Waived Any Claim to Absolute Immunity ........................... 10

        1.  Legal Standard ................................................................ 10

        2.  Trump Waived His Absolute Immunity Defense ........................... 12

        3.  There is No Excuse for Trump's Waiver ................................ 13

        4.  Alternatively, The Law of the Case Rule Precludes Trump's Position .......... 16

    B.  Trump's Absolute Immunity Defense is Meritless ......................... 16

        1.  Absolute Immunity Is Subject to Important Limits ....................... 17

        2.  Trump's Categorical Position Should Be Rejected ....................... 19

        3.  Trump Lacks Absolute Immunity for his Defamatory Statements ............. 24

    II.    TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS ............................. 27

    A.  Trump's Statements Constituted Defamation Per Se........................ 27

    B.  Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements ......... 30

    C.  Trump's Statements Are Actionable as a Matter of Law ................... 32

    D.  Carroll is Entitled to Present the Punitive Damages Issue to the Jury................. 35

CONCLUSION.................................................................................................... 36

i

**SA-62**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allam v. Meyers*,
  906 F. Supp. 2d 274 (S.D.N.Y. 2012)..................................................... 35

*Am. Acad. of Religion v. Napolitano*,
  573 F.3d 115 (2d Cir. 2009)............................................................. 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505 (1986).................................................... 10

*Aramony v. United Way of Am.*,
  254 F.3d 403 (2d Cir. 2001)............................................................. 16

*Armstrong v. Simon & Schuster, Inc.*,
  85 N.Y.2d 373 (1995)................................................................... 29

*Aronson v. Wiersma*,
  65 N.Y.2d 592 (1985)................................................................... 30

*Banneker Ventures LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015).......................................................... 19

*Barrett v. Harrington*,
  130 F.3d 246 (6th Cir. 1997) ........................................................... 21

*Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*,
  41 F.3d 600 (10th Cir. 1994) ........................................................... 11

*Broker Genius Inc. v. Gainor*,
  810 F. App'x 27 (2d Cir. 2020) ......................................................... 15

*Buckley v. Fitzsimmons*,
  509 U.S. 259, 113 S. Ct. 2606 (1993).................................................... 21

*Butler v. Catinella*,
  868 N.Y.S.2d 101 (2d Dep't 2008) ...................................................... 13

*Carroll v. Trump*,
  49 F.4th 759 (2d Cir. 2022) ....................................................... 8, 9, 25

*Carroll v. Trump*,
  120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020) .................................................. 7

**SA-63**

*Carroll v. Trump*,
   498 F. Supp. 3d 422 (S.D.N.Y. 2020)........................................................ 8, 24, 25, 27

*Carroll v. Trump*,
   590 F. Supp. 3d 575 (S.D.N.Y. 2022)............................................................ 9, 14, 15

*Carroll v. Trump*,
   No. 20 Civ. 7311, 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) ...................... 14, 15

*Carroll v. Trump*,
   No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020)................... 8, 16

*Celle v. Filipino Reporter Enters. Inc.*,
   209 F.3d 163 (2d Cir. 2000)........................................................................... 27, 29

*Celotex Corp v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548 (1986) .................................................................. 10

*Chestnut v. City of Lowell*,
   305 F.3d 18 (1st Cir. 2002) .................................................................................. 11

*Clinton v. Jones*,
   520 U.S. 681, 117 S. Ct. 1636 (1997)............................................................ *passim*

*Cozzo v. Tangipahoa Par. Council*,
   279 F.3d 273 (5th Cir. 2002) ............................................................................... 11

*Davis v. Boeheim*,
   24 N.Y.3d 262 (2014) .......................................................................... 32, 33, 34

*Davydov v. Youssef*,
   169 N.Y.S.3d 322 (1st Dep't 2022) ............................................................... 29, 30

*Doe v. McMillan*,
   412 U.S. 306, 93 S. Ct. 2018 (1973)................................................................... 22

*Dworin v. Deutsch*,
   No. 06 Civ. 13265, 2008 WL 508019 (S.D.N.Y. Feb. 22, 2008) ......................... 34

*Edwards v. Nat'l Audubon Soc., Inc.*,
   556 F.2d 113 (2d Cir. 1977)................................................................................ 29

*Firestone v. Berrios*,
   42 F. Supp. 3d 403 (E.D.N.Y. 2013) .................................................................. 16

*Francis v. Costco Wholesale Corp.*,
   No. 19 Civ. 1979, 2021 WL 1298616 (S.D.N.Y. Apr. 7, 2021)............................ 10

iii

*Gasperini v. Ctr. for Humans., Inc.*,
  518 U.S. 415, 116 S. Ct. 2211 (1996) ........................................................................ 13

*Gentile v. Grand Street Medical Assocs.*,
  79 A.D.3d 1351 (3d Dep't 2010) .............................................................................. 34

*Gong v. Savage*,
  169 N.Y.S.3d 511 (Table) (N.Y. Sup. Ct. N.Y. Cty. 2022) ...................................... 29

*Gross v. New York Times Co.*,
  82 N.Y.2d 146 (1993) ................................................................................................ 33

*Gurtler v. Union Parts Mfg. Co., Inc.*,
  285 A.D. 643 (1st Dep't 1955) .................................................................................. 30

*Hamer v. Neighborhood Hous. Servs. of Chicago*,
  138 S. Ct. 13 (2017) .................................................................................................. 11

*Huggins v. Povitch*,
  No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996) ............................ 34

*Hunter v. Bryant*,
  502 U.S. 224, 112 S. Ct. 534 (1991) ........................................................................ 15

*Hutchinson v. Proxmire*,
  443 U.S. 111, 99 S. Ct. 2675 (1979) ........................................................................ 21

*In re Stock Exchanges Options Trading Antitrust Litig.*,
  317 F.3d 134 (2d Cir. 2003) ...................................................................................... 11

*Jones v. Clinton*,
  72 F.3d 1354 (8th Cir. 1996) .................................................................................... 24

*Joyce v. Thompson Wigdor & Gilly LLP*,
  No. 06 Civ. 15315, 2008 WL 2329227 (S.D.N.Y. June 3, 2008) ............................ 33

*Levy v. Nissani*,
  115 N.Y.S.3d 418 (2d Dep't 2020) .......................................................................... 29

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*,
  397 F.3d 77 (2d Cir. 2005) ........................................................................................ 16

*McNamee v. Clemens*,
  762 F. Supp. 2d 584 (E.D.N.Y. 2011) ...................................................................... 31

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1, 110 S. Ct. 2695 (1990) .......................................................................... 33

*Morales v. Kavulich & Assocs., P.C.*,
  294 F. Supp. 3d 193 (S.D.N.Y. 2018) ....................................................................... 35

*Nevada v. Hicks*,
  533 U.S. 353, 121 S. Ct. 2304 (2001) ...................................................................... 12

*Nixon v. Fitzgerald*,
  457 U.S. 731, 102 S. Ct. 2690 (1982) ............................................................. *passim*

*Pfizer, Inc. v. Stryker Corp.*,
  348 F. Supp. 2d 131 (S.D.N.Y. 2004) ...................................................................... 31

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
  813 F. Supp. 2d 489 (S.D.N.Y. 2011) ................................................................. 29, 30

*Ram v. Moritt*,
  612 N.Y.S.2d 671 (2d Dep't 1994) .......................................................................... 30

*Reynaga Hernandez v. Skinner*,
  969 F.3d 930 (9th Cir. 2020) ................................................................................... 11

*Rose v. AmSouth Bank of Fla.*,
  391 F.3d 63 (2d Cir. 2004) ...................................................................................... 14

*Saks v. Franklin Covey Co.*,
  316 F.3d 337 (2d Cir. 2003) ......................................................................... 11, 13, 14

*Satchell v. Dilworth*,
  745 F.2d 781 (2d Cir. 1984) .................................................................................... 11

*Shmueli v. City of New York*,
  424 F.3d 231 (2d Cir. 2005) ............................................................................... 10, 12

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  779 F.3d 191 (2d Cir. 2015) .................................................................................... 30

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  No. 07 Civ. 4018, 2020 WL 1244930 (E.D.N.Y. Mar. 16, 2020) ............................ 30

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
  762 F.3d 165 (2d Cir. 2014) .................................................................................... 11

*Stern v. Cosby*,
  645 F. Supp. 2d 258 (S.D.N.Y. 2009) ................................................................. 27, 35

*Tacopina v. Kerick*,
  No. 14 Civ. 749, 2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) .............................. 30

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022) .............................................................. 23, 24

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................................ 19, 22

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) ............................................................................ 7, 8, 17

*United States v. Burr*,
   25 F. Cas. 30 (C.C.D. Va. 1807) ..................................................................... 17

*United States v. Stein*,
   473 F. Supp. 2d 597 (S.D.N.Y. 2007) .............................................................. 34

*Zerman v. Sullivan & Cromwell*,
   677 F. Supp. 1316 (S.D.N.Y. 1988) ................................................................. 34

*Zervos v. Trump*,
   74 N.Y.S.3d 442 (N.Y. Sup. Ct. 2018) ...................................................... 33, 34

*Zervos v. Trump*,
   171 A.D.3d 110 (1st Dep't 2019) ...................................................................... 7

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1 ...................................................................................... 21

U.S. Const. art. II, § 1 .............................................................................................. 20

U.S. Const. art. II, § 1, cl. 8 .................................................................................... 20

U.S. Const. art. II, § 2, cl. 1 .................................................................................... 20

U.S. Const. art. II, § 2, cl. 2 .................................................................................... 20

U.S. Const. art. II, § 3 .............................................................................................. 20

**Rules**

Fed. R. Civ. P. 8(c) ............................................................................................ 10, 11

Fed. R. Civ. P. 15(a) ................................................................................................ 11

Fed. R. Civ. P. 16(b)(4) ........................................................................................... 11

Fed. R. Civ. P. 56(a) ................................................................................................ 10

NY CPLR § 3211 ....................................................................................................... 7

**Other Authorities**

Doris Kearns Goodwin, *The Bully Pulpit* (2013) ........................................................................ 22

James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The
    Debates in the Several State Conventions on the Adoption of the Federal Constitution 480
    (Jonathan Elliot ed., Washington, 2d ed. 1836) ........................................................................ 18

Jeffrey K. Tulis, *The Rhetorical Presidency* (1987) .................................................................... 22

Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon, Teac*hing
    American History .......................................................................................................................... 20

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit
    Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020) ............................................................ 8

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ................................................. 18

Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss, *Swalwell v.
    Trump*,
    No. 21 Civ. 586 (D.D.C. May 24, 2021) ................................................................................... 15

Mem. in Support of Mot. to Dismiss, *District of Columbia v. Trump*,
    No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) ................................................................................ 18

Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at*
    https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/ ............ 23, 26

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*,
    No. 20-197 (U.S. Aug. 20, 2020) ............................................................................................... 18

Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection
    Isn't Impeachable*, Wash. Post (Jan 29, 2020) ........................................................................ 20

Sand, et al., *Modern Federal Jury Instructions* (2022) ............................................................... 34

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.) .................................................. 16

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.) ....................................................... 11

**SA-68**

## INTRODUCTION

Now that this defamation case is ready for trial after three years of litigation, Defendant Donald J. Trump seeks summary judgment based mainly on his argument that absolute immunity bars Plaintiff E. Jean Carroll's claim. But Trump has waived that affirmative defense: he did not assert it in his answer, he did not mention it at any point prior to the filing of this summary judgment motion, and he took positions in state court that were clearly at odds with it. As a result, Trump can raise absolute immunity at this late stage only in the absence of prejudice to Carroll, undue delay, bad faith or dilatory motive, or futility—and each of those considerations independently prohibits excusing his waiver. Trump's absolute immunity theory is also meritless: his personal attacks on Carroll did not constitute the performance of any presidential function.

This leaves only a handful of other arguments asserted by Trump, each of which lacks merit. First, as explained in Carroll's recent opposition to Trump's motion to dismiss in *Carroll v. Trump*, No. 22 Civ. 10016, ECF 26, Carroll was not required to plead special damages because Trump's statements were defamatory *per se*. Second, it goes without saying that Carroll did not "consent" to Trump's defamation—and it is frivolous to assert that when a woman reveals sexual abuse by a powerful man, she somehow automatically consents to whatever defamatory abuse he may unleash as retribution. Third, precedent confirms that Trump's highly specific factual claims about Carroll's motives for speaking up are actionable as a matter of law and do not qualify as speculative opinion. Finally, Carroll is surely entitled to ask a jury to impose punitive damages.

## BACKGROUND

### A.    Factual Background

More than 25 years ago, Carroll left work at a studio in New Jersey where she had taped her daily television show ("Ask E. Jean") and headed to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. *See* Plaintiff E. Jean Carroll's Response to Defendant

1

Donald J. Trump's Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 24. Carroll did not find what she was looking for and was about to leave the store empty-handed. *Id.* She approached the revolving door on 58th Street, where she saw Trump. *Id.* ¶¶ 24-25. They knew people in the same circles and had previously met at a party. *Id.* ¶ 22. When Trump saw Carroll at Bergdorf's, he "held up [his] hand," so she "stopped and he came in." *Id.* ¶ 25. He said: "Hey, you're that advice lady." Carroll replied: "Hey, you're that real estate tycoon." *Id.*

Trump told Carroll that he was at Bergdorf's to buy a present for a girl and asked her to "come help [him]." *Id.* ¶ 26. Trump and Carroll began searching for a gift. Eventually, on Trump's suggestion, they went upstairs to the lingerie department. *Id.* ¶ 27. When they arrived, it was empty. *Id.* ¶ 28. Sitting on the glass counter near them were "three or four boxes" and "a see-through [lilac-greyish] bodysuit with a little bit of lace on it." *Id.* ¶ 29. Trump picked up the bodysuit, tossed it at Carroll, and said "go put this on." *Id.* ¶ 30. Bemused, Carroll "tossed it back to him" and said to him "it goes with your eyes." *Id.* Trump caught the bodysuit, held it up to Carroll's chest, and said "you're in good shape, this looks like it might fit you." *Id.* ¶ 31. Carroll had assumed they were engaging in "an enjoyable repartee," but then Trump abruptly grabbed her arm and said, "let's go put this on." *Id.* ¶¶ 32-33. As he maneuvered her into a fitting room, Carroll thought to herself, "this is hilarious, I'm going to make him put it on over his pants." *Id.* ¶ 33.

Trump, as it turns out, had a very different plan in mind. As soon as Carroll walked into the dressing room, Trump closed the door and lunged at her. *Id.* ¶¶ 34-35. He pushed her against the wall; she hit her head for the first time before "he had his hands on [her] arms" and "pushed [her] back a second time." *Id.* ¶¶ 34, 37. She "hit [her] head [again] and then he put his shoulder into [her]." *Id.* ¶ 37. As Carroll struggled, she began to realize that "this [was] a battle." *Id.* He grabbed both of her arms, held his weight on her up against the wall, jammed his hand under her

2

dress, and forcibly pulled down her tights. *Id.* Carroll "tried to get [her] arms up to push him back" but she "couldn't get [her] knee up because the pantyhose had been taken down." *Id.* ¶ 38. Carroll "felt [Trump's] fingers rummaging around" her genitals, and then his penis inside her. *Id.* ¶ 39. Finally, Carroll managed to escape by "push[ing] him with [her] hands and knee." *Id.* ¶ 40.

Carroll ran out of the Bergdorf's and onto Fifth Avenue, scared that Trump would "come after" her and "grab [her] again." *Id.* ¶¶ 40-41. Once outside, Carroll immediately called her friend, Lisa Birnbach. *Id.* ¶¶ 42, 44. When Birnbach picked up the phone, Carroll was "very agitated, very hyperventilating. Emotional. And she told [Birnbach] about what happened to her just really moments before she made the phone call." *Id.* ¶ 43. In that moment, Carroll "was in shock and disordered." *Id.* ¶ 42. She "felt unbalanced." *Id.* Birnbach explained to Carroll that what happened to her was rape—and urged her to go the police. *Id.* ¶ 44. Carroll resisted and swore Birnbach to secrecy. *Id.* ¶ 45. A day or two after the rape, Carroll confided in another close friend, Carol Martin. *Id.* ¶ 46. When Carroll told Martin what had occurred, Martin warned Carroll against revealing the assault because Trump was a powerful man, "he's got 200 lawyers, he'll bury you." *Id.*

Apart from her conversations with Birnbach and Martin, Carroll remained silent about the sexual assault for two decades. *Id.* ¶ 47. She was "embarrassed" and "ashamed," so she "said let's never talk about this again." *Id.* She recalls, "I always feel I can handle things myself." *Id.* She knew that sexual assault was pervasive but feared that "women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked." *Id.* ¶ 49. Carroll's silence, though, concealed trauma. After Trump raped her, "the music had stopped" and her "light was gone." *Id.* ¶ 50. Carroll never had sex or dated again; she "had no desire for desire"—she did not "have the desire to want sex." *Id.*

**SA-71**

Years later, when Trump announced he was running for President, Carroll watched with "disbelief" and "heartache." *Id.* ¶ 51. But she did not come forward at the time because her mother, a respected Republican politician in Indiana, was dying. *Id.* ¶ 52. She knew that if she spoke up, "it would ruin" her mother's last days. *Id.* It would also come to nothing: "I didn't want to get fired from *Elle* and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about." *Id.* ¶ 53. Moreover, Carroll was horrified that some of Trump's supporters seemed to admire him *more* as woman after woman revealed that he had sexually assaulted them. *Id.*

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with the men in their lives. *Id.* ¶ 54. On the first day of her trip, "the Harvey Weinstein story broke" and Carroll watched "the flood of stories … as women started standing up." *Id.* ¶¶ 55, 57. Her book began to take a different shape, and Carroll started to create a list of terrible men she had encountered in her own life. *Id.* ¶ 55 Inspired by the women of the #MeToo movement—and understanding the importance of being honest with loyal readers of her column—Carroll decided she had to include Trump. *Id.* ¶ 57. Carroll's book was ultimately published in 2019. In advance of its release, *New York Magazine* published an eight-page excerpt containing, among other things, her account of being raped by Trump. *Id.* ¶ 59.

Trump responded by seeking to punish and humiliate Carroll. He denied her accusation and insisted they had never met. *Id.* ¶¶ 11-13, 61. But he went much further than that. He insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too ugly for him to have raped her. *Id.* ¶ 13. He said that Carroll's non-fiction book, with its accounts of what women on her road trip had told her (as well as her own autobiographical account of the rape), "should be sold in the fiction section." *Id.* ¶ 11.

He accused Carroll of "mak[ing] up false stories of assault to try to get publicity for [herself], or to sell [her] book." *Id.* He charged that Carroll had invented an allegation of rape to make money. *Id.* ¶¶ 11-12 And he implied that she had falsely accused other men of sexual assault. *Id.* ¶ 12.

At his deposition in this case, Trump doubled down on each of these statements. *Id.* ¶¶ 64-68. When pressed on his claim that Carroll was too unattractive for him to have sexually assaulted her, for instance, he reiterated it: "And that's 100 percent true. She's not my type. … There's no way I would ever be attracted to her." *Id.* ¶ 69. However, when shown a photograph including himself and Carroll from a party several years before the rape, Trump *twice* misidentified Carroll as his ex-wife Marla Maples—insisting that it was Marla smiling at him in the photo even as he pointed straight at Carroll. *Id.* ¶¶ 70-71. Ultimately, Trump's lawyer had to correct his mistake (which obviously undercut any assertion that Carroll was not "his type"). *Id.* ¶ 70.

Trump's total lack of knowledge about Carroll was unsurprising. When Trump made his statements in June 2019, nobody in the White House had undertaken any research into Carroll or her allegations. *Id.* ¶ 72. Trump admitted during the deposition that he had never read Carroll's book or magazine excerpt. *Id.* ¶ 78. Moreover, neither Trump nor (to his knowledge) any of his White House aides conducted any research or investigation into Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors, her reasons for speaking up, or the veracity of her allegations concerning experiences of sexual misconduct at the hands of other men. *Id.* ¶¶ 72-77. Nor did Trump identify any White House personnel as involved in investigating, preparing, strategizing, or creating the defamatory statements he made about Carroll in June 2019. *Id.* ¶ 72.

Trump's attacks directly targeted Carroll's professional life. Carroll is a journalist, author, and advice columnist who built her career providing honest advice to women in response to their

questions *Id.* ¶ 81. Indeed, her "entire career as an advice columnist rested on the fact that [she] could be trusted." *Id.* ¶ 88. And her advice column had run in *Elle* for 26 years, where it "was one of the most popular columns ever in the magazine." *Id.* ¶ 81. As explained by Roberta Myers (*Elle*'s editor-in-chief for 17 years), Carroll was "a destination, meaning readers would want to hear from her. She was an important part of what kept [*Elle*] popular." *Id.* ¶ 84. Myers elaborated that Carroll "is a journalist first and everything that she writes is informed by that, meaning the facts." *Id.* ¶ 87. As Carroll explained at her own deposition, while she was not surprised that Trump denied raping her, she actually thought he would insist that because she had been flirtatious with him she had somehow consented to having sex with him in the dressing room that day. *Id.* ¶ 62. She was shocked that Trump instead stated that he had never met her and the incident had never happened at all—statements that he subsequently reaffirmed at his deposition. *Id.* ¶¶ 62, 64-65.

But President Trump's charge that she had lied about everything—about meeting him, about the rape itself, about her motives for coming forward—had devastating consequences. As she had feared, Carroll became viewed "as a woman who's untrustworthy," and "a woman who can't be believed." *Id.* ¶ 89. She also received fewer letters from readers—and then was unexpectedly fired from *Elle* before her contract was up for renewal. *Id.* ¶ 90. An expert analysis confirms that Trump's statements reached an immense audience and harmed Carroll's reputation and professional endeavors. *See id.* ¶ 91 (analyzing dissemination of the statements and concluding they generated between 142,334,424 and 188,155,507 impressions); *id.* ¶ 92 (completing quantitative impact analysis to determine number of readers and listeners likely to believe Trump's statements by publication, averaging 25.25%)]. In short, Trump's defamation "shook th[e] whole foundation" of the career that Carroll had painstakingly built for herself as an author and journalist over many years, and "that was it." *Id.* ¶ 89.

### B.   Procedural History

Carroll filed this action in New York state court in November 2019. From the start, Trump engaged in a pattern of bad faith and dilatory measures. He began by evading service of the complaint, forcing Carroll to seek leave to serve him through alternatives means. NYSCEF No. 15.[1] Once served, Trump filed a motion to dismiss under NY CPLR 3211 that presented only a single, frivolous ground for dismissal: lack of personal jurisdiction in New York. *See* NYSCEF Nos. 33. This motion was denied. *See Carroll v. Trump*, 120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020).

After Trump's initial evasions failed, he filed an answer raising nine affirmative defenses. NYSCEF No. 68. Eight of them concerned the merits of Carroll's defamation claim or personal jurisdiction over him in New York. *Id.* ¶¶ 148-55. The sole remaining affirmative defense asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." *Id.* ¶ 147 (emphasis added). Trump's affirmative defenses did not include any assertion that the Supremacy Clause or Article II rendered him absolutely immune from liability in this proceeding.

Trump subsequently relied on his Supremacy Clause defense in seeking a stay of the case pending a decision by the New York Court of Appeals in *Zervos v. Trump*. The *Zervos* case concerned whether a civil suit could proceed against Trump in state court during his time in office. *See* 171 A.D.3d 110, 113 (1st Dep't 2019). In his stay motion, Trump argued only that the Supremacy Clause "bars state-court subject matter jurisdiction over actions against a U.S. President *while he or she is in office*." NYSCEF No. 49 at 6 (emphasis added); *accord id.* at 1-4.

While Trump's stay motion was pending, the U.S. Supreme Court decided *Trump v. Vance*, which held that the Constitution does not categorically preclude the issuance of a state criminal

---

[1] Citations to "NYSCEF No. __" are to the New York state court docket, No. 160694/2019 (N.Y. Sup. Ct.).

subpoena to a sitting President. *See* 140 S. Ct. 2412, 2421-29 (2020). In light of *Vance*, Carroll

renewed her opposition to Trump's stay motion. Trump responded by asserting that *Vance* was

limited to the criminal context: "[T]here is no pressing need for a state court to exercise control

over a sitting President in a civil action, particularly because the action can be stayed *until the*

*President is no longer in office*." NYSCEF No. 99 at 3 (emphasis added). Two days later, Trump

expressly disclaimed any effort to evade litigation or liability once he was no longer President:

"No one is seeking to 'escape accountability' here. Plaintiff is free to pursue this action *when the*

*President is no longer in office*." NYSCEF No. 103 at 3 (cleaned up) (emphasis added).[2]

In August 2020, Justice Saunders denied Trump's stay motion. *See Carroll v. Trump*, No.

160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020). Trump then faced a choice: seek

appellate relief or comply with his discovery obligations. Trump opted instead to pressure the

United States Department of Justice (DOJ) to intervene under the Westfall Act. *See* Katie Benner

& Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump,*

*Barr Says*, N.Y. Times (Sept. 9, 2020). At Trump's behest, the DOJ removed the case to this Court

and filed a motion to substitute itself as the defendant. *See* Dist. Ct. Doc. No. 3.

This Court denied the DOJ's motion to substitute on two grounds: first, the Westfall Act

does not cover the President; second, Trump's defamatory attacks on Carroll were not undertaken

within the scope of his office or employment as President. *See Carroll v. Trump*, 498 F. Supp. 3d

422, 457 (S.D.N.Y. 2020). Both Trump and the DOJ appealed. *See* Dist. Ct. Doc. Nos. 45, 46. On

September 27, 2022—over a dissent by Judge Chin—a Second Circuit panel held that the Westfall

Act does cover the President. *See Carroll v. Trump*, 49 F.4th 759, 767-72 (2d Cir. 2022). The

---

[2] At this point, Trump was represented by attorneys at the law firm of Kasowitz Benson Torres LLP.

majority then certified the scope-of-employment issue to the District of Columbia Court of Appeals, *see id.* at 772-81, which held oral argument sitting *en banc* on January 10, 2023.[3]

During the pendency of his appeal, Trump remained exceptionally active in this Court. He moved to stay proceedings twice, first on December 10, 2020, and then again on September 28, 2022. *See* Dist. Ct. Doc. Nos. 47, 92. This Court denied both motions. *See id.* at 56, 96. Trump also moved to amend his answer to add an anti-SLAPP affirmative defense and counterclaim against Carroll. *See id.* at 64. The Court denied that motion, too, observing that "Trump has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails." *Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). Indeed, the Court not only found Trump's amendment to be futile, but also determined that Trump had "delayed unduly in seeking leave to amend," that Trump had made the request to amend his answer "at least in part in bad faith," and that "granting the motion would prejudice the plaintiff unduly." *Id*. at 589.

Trump thereafter proposed, and Carroll agreed to, a discovery schedule. *See* Dist. Ct. Doc. Nos. 76, 77. Throughout discovery, Trump affirmatively invoked this Court's power to press and litigate his case: he obtained 30,469 pages of records from Carroll and hundreds more pursuant to nonparty subpoenas; he received 19 substantive interrogatory responses; and he deposed Carroll herself, numerous nonparty witnesses, and Carroll's expert witness. In contrast, Trump produced a mere handful of documents and discovery responses before sitting for a deposition.

Following the close of discovery, Trump submitted a proposed schedule for the remainder of the case. Although Trump urged the Court to schedule trial in May 2023, he did not reveal that he planned to inject a previously undisclosed affirmative defense into the action—even as he sought to push the summary judgment schedule closer to the trial date. Dist. Ct. Doc. Nos. 99, 102.

---

[3] A recording of that oral argument is available here: https://www.youtube.com/watch?v=EFX5Y8kp4Co.

**SA-77**

## STANDARD OF REVIEW

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant bears the burden of proof. *See id.* at 323, 106 S. Ct. at 2552. The court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Francis v. Costco Wholesale Corp.*, No. 19 Civ. 1979, 2021 WL 1298616, at *2 (S.D.N.Y. Apr. 7, 2021) (Kaplan, J.).

## ARGUMENT

## I.   TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS

### A.   Trump Waived Any Claim to Absolute Immunity

Trump did not attempt to raise an absolute immunity argument until over three years into this litigation. He did not assert this affirmative defense in his answer, nor did he include it any of his voluminous filings in state or federal court. Instead, he took positions in state court plainly at odds with an assertion of absolute immunity—and more recently asked this Court to set a trial date without even mentioning that he planned to raise an unpleaded affirmative defense. Trump therefore waived any contention that absolute immunity defeats Carroll's case. And although the Court has discretion to excuse that waiver in the absence of bad faith or dilatory motive, prejudice to the plaintiff, undue delay of the proceedings, or futility, in this case each of those considerations *independently* forecloses any claim that Trump's waiver of absolute immunity should be excused.

#### 1.   Legal Standard

Absolute immunity is an affirmative defense. *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). Under Federal Rule of Civil Procedure 8(c), "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." A "core purpose[]" of this

## SA-78

rule is "to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). Accordingly, "[i]t is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case." Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.); *see Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014); *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984). This longstanding rule applies with full force to absolute immunity. *See Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded."); *accord Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 n.1 (9th Cir. 2020); *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003); *Chestnut v. City of Lowell*, 305 F.3d 18, 22 (1st Cir. 2002) (Torruella, J., concurring); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604-05 (10th Cir. 1994).

As the Second Circuit has explained, the waiver of an affirmative defense may be excused only in limited circumstances: namely, "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks*, 316 F.3d at 350. In those exceptional situations—and consistent with Federal Rules of Civil Procedure 15(a) and 16(b)(4)—"the district court may construe the motion for summary judgment as a motion to amend the defendant's answer." *Id.* at 350-51 (citations omitted).[4]

---

[4] Adhering to Second Circuit precedent, we describe Trump's conduct in this litigation as resulting in a waiver, even though it may also properly be characterized as a forfeiture under recent Supreme Court precedent. *See, e.g.*, *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) ("The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." (cleaned up)).

###### 2.     Trump Waived His Absolute Immunity Defense

Trump waived his affirmative defense of absolute immunity by failing to raise it in his answer. That waiver is confirmed by his subsequent conduct in this litigation.

Trump's answer raised nine affirmative defenses, only one of which concerned official immunity in any respect. In his first affirmative defense, Trump asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." NYSCEF No. 68 at ¶ 147 (emphasis added). On its face, this defense did not invoke Article II, did not invoke absolute immunity, and did not claim total or permanent immunity from either litigation or liability. Neither in form nor in substance did it encompass absolute immunity, which "protects an official not only from liability but also from suit." *Shmueli*, 424 F.3d at 236.

Instead, this part of Trump's answer raised a very different argument: that the Supremacy Clause divested the state court of power to hear this case during Trump's presidential tenure. In other words, Trump claimed only that the state court temporarily lacked subject matter jurisdiction over him by virtue of his federal office. *See* NYSCEF No. 49 at 1 (contending that the "Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office"). That time-limited Supremacy Clause argument is fundamentally different from an assertion of absolute immunity in two respects. First, within its scope, absolute presidential immunity provides *permanent* rather than *temporary* immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748-49, 102 S. Ct. 2690, 2700-01 (1982). And second, in contrast to Trump's portrayal of his Supremacy Clause argument as jurisdictional, "there is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373, 121 S. Ct. 2304, 2317 (2001).

**SA-80**

Accordingly, the affirmative defense in Trump's answer simply had nothing to do with absolute immunity—and so Trump waived absolute immunity by failing to raise it in his answer.[5]

Trump's subsequent litigation conduct only confirmed that waiver. In state court, Trump repeatedly described his immunity position as limited to his tenure in office. *See* NYSCEF No. 99 at 3. More fundamentally, Trump affirmatively stated that "no one is seeking to 'escape accountability' here," and he conceded that "Plaintiff is free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Meanwhile, Trump neither sought to amend his answer nor sought appellate relief after his Supremacy Clause defense was rejected in state court. The subsequent removal of this case to federal court only gave Trump more opportunities to persist in his waiver: he failed to raise absolute immunity in his first stay motion, *see* Dist. Ct. Doc. No. 47; in his second stay motion, *see id.* at 92; in his motion to amend his answer to add an anti-SLAPP affirmative defense and counterclaim, *see id.* at 64, in agreeing to a joint proposed discovery schedule, *see id.* at 75; or in his letters to the Court concerning a proposed schedule for summary judgment briefing and trial proceedings, *see id.* at 99, 102. Stated simply, Trump waived absolute immunity when he filed his answer on January 23, 2020, and he deepened that waiver by litigating this case for almost three years before seeking to raise that defense.

### 3.      There is No Excuse for Trump's Waiver

In light of the Court's power to grant leave to amend an answer, the Court may "entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of

---

[5] To the extent Trump may argue that he raised absolute immunity by averring that the complaint fails to state a claim, that position is foreclosed by Second Circuit precedent. *See Saks*, 316 F.3d at 350 (collecting cases). To the extent Trump claims that state court procedural rules are different, he is mistaken, *see Butler v. Catinella*, 868 N.Y.S.2d 101, 106 (2d Dep't 2008) ("Affirmative defenses … as a general rule, would be deemed waived if not raised in the pleadings." (citation omitted)), and in all events federal procedural rules apply now that the case has been removed to federal court, *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219 (1996).

the proceedings." *Saks*, 316 F.3d at 350. Because Trump fails that standard several times over, the Court should not excuse Trump's waiver of the affirmative defense of absolute immunity.

First, Trump has clearly acted with bad faith and dilatory motive. In fact, this Court already reached that conclusion with specific respect to the propriety of granting Trump leave to amend his answer to add an unpleaded affirmative defense. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022) (denying Trump's motion for leave to amend his answer to include an anti-SLAPP defense and finding that Trump "has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails"); *see also id.* at 587-89 (describing the course of Trump's dilatory conduct). The Court then reaffirmed that finding of bad faith just three months ago. *See Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *6 (S.D.N.Y. Oct. 12, 2022) (adhering to the Court's earlier finding that "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him"). Whether seen as law of the case concerning Trump's entitlement to amend his answer or instead as highly relevant findings concerning Trump's bad faith and dilatory purpose, these decisions make clear that Trump's waiver should not be excused. Indeed, as noted above, Trump previously sought to shore up his state court stay motion by insisting that Carroll was "free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Now that he has left office—and his other stall tactics have failed—Trump should not be permitted to renege on that position by introducing yet another brand-new argument (which, if rejected, he will presumably seek to leverage into another interlocutory appeal). No party should be allowed to deliberately engage in such a "seriatim appeals" strategy.

Second, Trump did not seek to raise this defense "at the first pragmatically possible time," and allowing him to do so at this late juncture would "unfairly prejudice the opposing party." *Rose*

*v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004); *see Broker Genius Inc. v. Gainor*, 810 F. App'x 27, 32 (2d Cir. 2020) (upholding finding of waiver). The law of absolute immunity is not new—and Trump has known all the facts relevant to that potential defense from the outset of this case. *See* Mot. at 3-18. Moreover, immunity doctrines are meant to be raised and resolved "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991), and Trump has had no difficulty asserting absolute immunity at the outset of other civil damages cases, *see, e.g.*, Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss at 8-11, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. May 24, 2021). These facts not only confirm Trump's bad faith and dilatory purpose, but also highlight the substantial prejudice to Carroll that would result from allowing him to invoke an unpleaded affirmative defense that he could have raised much earlier. *See Carroll*, 590 F. Supp. 3d at 586 ("The defendant has not offered a satisfactory reason for the length of his delay in this case."). That prejudice includes a lack of notice concerning the need to respond to this affirmative defense throughout the now-concluded discovery process. It encompasses Trump's efforts to raise this issue only after having inflicted substantial burdens on Carroll and third parties in discovery (when a major purpose of absolute immunity is to gatekeep access to discovery in the first place). And it captures the potential for significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings. *See Carroll*, 2022 WL 6897075, at *6 ("Delay is a more serious concern in this case than usual …. [T]he defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.").

Finally, for the reasons set forth below in Part I.B, Trump's absolute immunity argument is meritless, and so his attempt to overcome or excuse his waiver would fail based on futility.

For each of these independent reasons—bad faith and dilatory motive, undue prejudice to the plaintiff, undue delay of the proceedings, and futility—the Court should find that Trump has waived any affirmative defense of absolute immunity and should not excuse that waiver.

### 4.        Alternatively, The Law of the Case Rule Precludes Trump's Position

In the event this Court concludes that Trump's first affirmative defense did include absolute immunity, the Court should nonetheless reject it as precluded by the law-of-the-case doctrine.

If one court decides a legal issue, "that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (citation omitted). That is especially true where "one judge or court is asked to consider the ruling of a different judge or court." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (quoting Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.)). This doctrine applies, as here, "when a state court case is removed to federal court." *Firestone v. Berrios*, 42 F. Supp. 3d 403, 412 (E.D.N.Y. 2013) (citation omitted).

Trump's first affirmative defense in this case maintained that the state court temporarily lacked jurisdiction under the Supremacy Clause. To the extent this qualified as an assertion of absolute immunity, it was rejected by the state trial court when considered directly in connection with Trump's motion to stay, *see Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130, at *2 (N.Y. Sup. Ct. Aug. 03, 2020), and Trump then chose *not* to appeal that determination. Therefore, Trump has either waived absolute immunity or, alternatively, law of the case precludes it.

### B.        Trump's Absolute Immunity Defense is Meritless

Even if it were not waived or precluded, Trump's absolute immunity defense should be rejected: it is foreclosed by precedent and would invite abuse by future officeholders. Because Trump's attacks on Carroll were private conduct beyond the scope of any Article II function, there is no basis for concluding that absolute immunity bars Carroll's defamation action.

16

**SA-84**

### 1.    Absolute Immunity Is Subject to Important Limits

As the "chief constitutional officer of the Executive Branch," the President "occupies a unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749-50, 102 S. Ct. at 2701. "His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020). Therefore, to avoid the "distortion of the Executive's decisionmaking process with respect to official acts that would stem from worry as to the possibility of damages," *id.* (citation omitted), courts have long held that the President enjoys absolute immunity from "damages liability for acts within the 'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704. This rule upholds the separation of powers by policing judicial intrusion on Article II functions.

If extended beyond official conduct, however, this doctrine poses a risk of abuse, since it would immunize the President for even egregious personal wrongs. The Supreme Court has thus held that the purposes of absolute immunity also define its limits. *See id.* at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes."). Because those purposes concern only the President's official acts, there is "no support for an immunity for *unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997). Simply put, the President does not receive immunity for acts beyond the "'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704; *see also Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645 (the President lacks immunity "for his purely private acts").

In practice, this limitation underscores the importance of discerning the scope of official presidential conduct. The Presidency is a demanding job. But as Chief Justice Marshall anticipated, the demands of a president's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14692D); *see*

17

*also* Clinton, 520 U.S. at 705 n.40, 117 S. Ct. at 1650 (Presidents "face a variety of demands on their time, … some private, some political, and some as a result of official duty"); Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000) (recalling that the President "is a person as well as an institution"). Indeed, the Framers foresaw that Presidents would engage in private conduct.[6] And while serving as President, Trump insisted that aspects of his conduct were wholly private, including profitable business deals with foreign nations and censoring critics on Twitter.[7]

Because Presidents engage in a shifting mix of personal and official acts, only some of which reflect presidential functions, the Supreme Court has provided additional guidance. *First*, plaintiffs cannot defeat immunity merely by alleging that the President's conduct was unlawful or motivated by an improper purpose. *See Nixon*, 457 U.S. at 756, 102 S. Ct. at 2705. *Second*, the President cannot invoke immunity merely by claiming that his conduct was "clearly taken *within* an official capacity," since the "scope of an immunity" even for otherwise official acts depends on "'performance of particular functions of his office.'" *Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (citation omitted). *Third*, a conception of absolute immunity that would encompass all presidential conduct is inconsistent with the teaching that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 695, 117 S. Ct. at 1644 (citation omitted). *Finally*, as the D.C. Circuit has recognized, the official seeking immunity (here,

---

[6] *See* James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836) ("Far from being above the laws, [the President] is amenable to them in his private character as a citizen.").

[7] Although Trump was mistaken in those contexts that his actions were not subject to constitutional constraint, Trump concededly understood himself to be acting in a purely private capacity during important interactions with the public during his tenure in office. *See, e.g.*, Petition for Writ of Certiorari at 14, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("Blocking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mem. in Supp. of Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that President Trump was free to profit from private commercial transactions with foreign powers, so long as he did not receive "compensation for services rendered … in an official capacity or in an employment (or equivalent) relationship with a foreign government").

18

the President) bears the burden of proof in establishing his entitlement to it for any particular act. *See, e.g.*, *Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015). Under this framework, the President enjoys robust protection for conduct undertaken as part of an Article II function, but lacks immunity for personal conduct outside the scope of his presidential role.

### 2.    Trump's Categorical Position Should Be Rejected

Trump asks this Court to hold that whenever the President addresses the public on a matter of "national concern," or "defend[s] himself from grave accusations that impugn his character," he has engaged in a presidential function shielded by absolute immunity. Mot. at 13. That proposed categorical rule—which treats the nature and context of his public statements as all but irrelevant—sweeps much too far. It defies precedent and tradition, and it should be rejected.

Starting with first principles, the Supreme Court has made clear that absolute immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Clinton*, 520 U.S. at 695, 117 S. Ct. at 1644. Thus, absolute immunity shields only particular presidential functions, rather than all conduct by the holder of the office. For that distinction to bear weight, presidential functions cannot be defined so expansively as to encompass everything a President might say. Yet that is what Trump urges here. Every statement by the President may—by simple virtue of who uttered it—be seen as involving a matter of "national concern." Similarly, the President could describe most (or all) of his statements as responses to those who "impugn his character." Trump's position therefore conflicts with *Clinton*: it would treat virtually every statement by a President as the performance of an official function, and would (in effect) assign unlimited immunity to the President himself rather than to his perceptibly presidential conduct.

To be sure, nobody doubts that the President "possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Certain exercises of

Article II authority inherently involve speech, including the Oath of Office, U.S. Const. art. II, § 1, cl. 8, the State of the Union, *id.* art. II, § 3, the Commander in Chief power, *id.* art. II, § 2, cl. 1, the pardon power, *id.*, and the nominating power, *id.* art. II, § 2, cl. 2. In many other settings, such as signing statements, veto threats, supervision of the executive branch, and certain personnel announcements, the President performs an official function by speaking about how he has exercised (or intends to exercise) aspects of "the executive Power." *Id.* art. II, § 1. Speech by the President about the operation and administration of the government, and about the execution of the laws that he has sworn to faithfully execute, is ordinarily part of his official functions as well.

But when the President speaks about personal and private matters bearing no relation to any historical, ongoing, or intended use of Article II authority—and bearing no relation to the operation and administration of the government—it is more tenuous to claim that he is engaged in a presidential function. In such cases, a context-sensitive assessment is necessary to honor the purposes and limits of absolute immunity. *See Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes …."). Holding otherwise (as Trump urges) would conflate the President's private interests with the functions of his office in circumstances far removed from any official undertaking.[8]

This fundamental point has been understood in every analogous setting: time and again, courts have denied absolute immunity to statements beyond the scope of official functions. *See Nixon*, 457 U.S. at 759, 102 S. Ct. at 2706 (Burger, C.J., concurring) ("President[s], like Members of Congress, judges, prosecutors, or congressional aides—all having absolute immunity—are not

---

[8] At Trump's first impeachment trial, his lawyer insisted that "if a president does something, which he believes will help him get elected in the public interest, that cannot be [an impeachable offense]." Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, Wash. Post (Jan 29, 2020). Similar logic underwrites Trump's position here that anything the President says is necessarily a presidential function. Of course, our nation has historically rejected analogous claims that "when the president does it, that means that it is not illegal." Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon*, Teaching American History.

immune for acts outside official duties."). Starting with other Executive Branch officials, the Supreme Court has held that prosecutors are not protected by absolute immunity for statements at press conferences, even though they "may be an integral part of a prosecutor's job" and "may serve a vital public function." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278, 113 S. Ct. 2606, 2618 (1993). So too for the Judiciary. As the Sixth Circuit has emphasized, judges lack absolute immunity for statements made to the press about matters and litigants pending before them: "Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense." *Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997). The same rule covers Congress, whose members (like the President) are accountable to the public through elections and may feel hindered if they cannot speak about matters of "national concern" or respond to accusations that "impugn their character." Members of Congress enjoy a constitutional immunity of their own under the Speech or Debate Clause—which, unlike Article II, *specifically* guarantees immunity for their "Speech." U.S. Const. art. I, § 6, cl. 1. But public statements uttered outside the context of official congressional proceedings constitute non-legislative activity and are *not* shielded by any absolute constitutional immunity—even when a legislator's statements may have "a significant impact on the other [legislators]," and even when statements are issued in furtherance of Congress's own "informing function." *See Hutchinson v. Proxmire*, 443 U.S. 111, 131-32, 99 S. Ct. 2675, 2686-87 (1979). Together, these cases concerning all three branches of government confirm that absolute immunity has *never* been held to encompass all public statements by federal officials, even if those statements may help facilitate the performance of their official functions or are issued in response to public criticism.[9]

---

[9] Strangely, Trump suggests that cases involving legislators and other executive branch officials support his position—and does so relying almost exclusively on cases involving Westfall Act immunity. *See* Mot. at 13-16. Those cases are not a reliable guide to ascertaining the scope of absolute immunity. In some circumstances absolute immunity is

Although the Presidency is unique in certain respects, that uniqueness does not transform every public statement into the performance of an official function. This conclusion is bolstered by original understanding, as well as by common sense. First consider history. *See Nixon*, 457 U.S. at 747, 102 S. Ct. at 2700. Tested against an originalist perspective, Trump's position is baseless: from the founding of the Republic through the early twentieth century, the President's rhetorical function was not understood to encompass public pronouncements on every matter of perceived private or national importance. *See generally* Jeffrey K. Tulis, *The Rhetorical Presidency* (1987). It was not until Presidents Woodrow Wilson, William Howard Taft, and Theodore Roosevelt that the "bully pulpit" came to be seen as a substantial part of the Presidency. *See id.*; *see also* Doris Kearns Goodwin, *The Bully Pulpit* (2013). In our own era, of course, the bully pulpit is established as a presidential function. *See Hawaii*, 138 S. Ct. at 2417-18. But its modern vintage—coupled with its lack of an originalist grounding, sustained contest over its proper scope, and the principle that absolute immunity must be limited—precludes Trump's maximalist position.

So does common sense; hypotheticals illustrate the point. Imagine if a President responded to criticism of his business acumen by appearing at one of his privately-owned hotels to make unlawful statements about a competitor while urging listeners to stay at his property. Or consider a President who appeared at a campaign event and declared that he would endorse anybody who burned down his political opponent's private residence. Or a President who responded to debates over electoral integrity by hosting events in which he urged supporters to engage in unlawful voter

---

broader than Westfall Act protections, and in some circumstances it may be narrower. When it comes to speech by legislators, for instance, the Westfall Act may provide comparatively broad protection by virtue of its application to *all* job-related duties that are actuated by a job-related purpose. In contrast, courts have more tightly limited absolute immunity, denying it to conduct undertaken within the scope of employment wherever that conduct is not in actual, objective furtherance of an official function. *See, e.g.*, *Doe v. McMillan*, 412 U.S. 306, 313, 93 S. Ct. 2018, 2025 (1973) ("[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause."); *see also Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (holding that conduct "clearly taken *within* an official capacity" lacks absolute immunity if not undertaken in performance of an official function).

**SA-90**

intimidation. Or a President who retained a private residence, got into a property dispute with his neighbor, and willfully sought to incite local protesters to violence and trespass. Or a President who, first thing every morning, randomly picked the name of a critic on social media and then made sure to accuse them of some horrible crime in answering questions from the press that day. For each of these scenarios, Trump's position would shield the President with absolute immunity. Not only would those results be absurd; they would also entail a stark departure from the constitutional principles that animate presidential immunity, which exists to ensure that the President is not improperly diverted in the exercise of his traditional Article II functions.

It is therefore unsurprising that the courts have rejected Trump's proposed rule. This occurred directly in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46 (D.D.C. 2022). There, Judge Mehta described Trump's position as "too simplistic." *Id.* at 77. As he reasoned, "to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity?" *Id.* at 79. Ultimately, Judge Mehta found that "the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function." *Id.* at 81. Applying that rule to the facts in the case before him, he concluded that Trump lacked absolute immunity.[10]

Trump's proposed categorical rule is also at odds with *Clinton v. Jones*. There, as here, a plaintiff sued the President for defaming her after she revealed that he had engaged in sexual misconduct before taking office. More precisely, she alleged that "various persons authorized to

---

[10] On December 7, 2022, the D.C. Circuit—Chief Judge Srinavasan, Judge Rogers, and Judge Katsas—heard oral argument in Trump's appeal from Judge Mehta's ruling. *See* Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at* https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/.

speak for the President"—including his own White House aides and the official White House Spokesman—"publicly branded her a liar by denying that the incident had occurred." *Clinton*, 520 U.S. at 685, 117 S. Ct. at 1640. Under Trump's position, *Clinton* should have been an easy case: it involved a comparatively mild denial of alleged sexual misconduct, and that denial was issued by the President in coordination with his official White House agents and spokespersons.[11] But the Eighth Circuit described Clinton's entitlement to absolute immunity as "not free from doubt." *Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). And the Supreme Court declined to address whether Clinton's defamatory statements were "taken within the 'outer perimeter' of his official responsibilities," observing only that the allegations "arguably may involve conduct" within that outer perimeter. *Clinton*, 520 U.S. 686 & n.3, 117 S. Ct. at 1640 & n.3.

Like *Nixon* before it and Judge Mehta's decision more recently, *Clinton* made clear that absolute immunity requires a careful examination of the facts to see whether a particular act was undertaken in performance of a recognized presidential function. *See Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 ("[W]hen defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach."); *accord Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704; *Thompson*, 590 F. Supp. 3d at 76-81. That context-sensitive approach requires a rejection of Trump's proposed categorical rule—and also requires the denial of absolute immunity here.

### 3.    Trump Lacks Absolute Immunity for his Defamatory Statements

As this Court has already recognized, "while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not." *Carroll v. Trump*, 498 F. Supp. 3d 422, 448

---

[11] The complaint in *Jones v. Clinton*, No. 94 Civ. 290 (E.D. Ark.), is available at https://www.washingtonpost.com/wp-srv/politics/special/pjones/docs/complaint.htm.

(S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022). Under the undeniably

unusual and extreme facts presented here, Trump has no legitimate claim to absolute immunity.

Although Trump never previously raised absolute immunity in this case, and Carroll lacked

notice of that issue, the discovery process partly illuminated the context of Trump's statements.

Trump never read (or even saw) Carroll's article or book before he set out to destroy her. He did

not undertake any investigation whatsoever into Carroll, her background, or her claims, nor did he

ask anyone in the White House to do so. He had no idea what Carroll even looked like—and, when

first presented with a photo of himself with Carroll during the deposition, twice mistook Carroll

for his second wife, at least until his lawyer corrected him. At the time he made the defamatory

statements at issue, Trump had no knowledge of Carroll's financial arrangements, her publication

contract, her book sales, her political leanings, her connections to political actors, or her reasons

for speaking up—in other words, he knew nothing (and made no effort to learn anything) about

the defamatory attacks he aimed at Carroll, and had no recollection of involving White House staff

or aides in those attacks (or seeking their advice). He does not recall any specific basis to have

believed when he defamed her that Carroll had falsely accused any other particular man of sexual

assault. He did not engage in any notable way with White House aides in making his defamatory

statements, and there was no effort within the White House to investigate Carroll's claim.

On its face, this conduct did not constitute the performance of any presidential function:

"A comment about government action, public policy, or even an election is categorically different

than a comment about an alleged sexual assault that took place roughly twenty years before the

president took office. … President Trump's views on the plaintiff's sexual assault allegation may

be interesting to some, but they reveal nothing about the operation of government." *Carroll*, 498

F. Supp. 3d at 453. Simply put, Trump's attacks on Carroll had no connection to the exercise of

any Article II power, had nothing to do with the operation or administration of the government, did not concern any government policy or program or position, and did not reflect the execution of any presidential duty under the Take Care Clause. Moreover, the subject matter of Trump's attacks arose from his own private sexual misconduct years before he took his office, and his defamatory statements went far beyond a mere denial to encompass specific and highly personal remarks about a private citizen. This spree of defamatory statements not only was unusually vitriolic (including Trump's conceded implication that Carroll was too unattractive for him to have raped her), but was also undertaken with no official executive process and hardly any White House involvement (beyond someone handing a reporter a copy of Trump's statement on June 21, 2019). Nothing about Trump's many statements concerning Carroll had *any* connection to a presidential function. Even as compared to the *Clinton* case, which the Supreme Court appeared to view as a closer call, Trump's statements were more decisively private along every relevant dimension.[12]

     All but conceding as much, Trump resorts to a sweeping claim that the President is entitled to open season whenever he addresses a matter of "public concern" or responds to "allegations which impugned his character." Mot. at 17. Analogous arguments have been repeatedly rejected as to other officials, *see supra* at 21, and that position should be rejected here as well: "[I]t would mean that a president is free [to] defame anyone who criticizes his conduct or impugns his character—without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to

---

[12] At oral argument in the *Blassingame* appeal, Trump conceded that he would not have enjoyed absolute immunity for an act of sexual assault while in office. *See supra* n.10, at 8:38-8:48. It would appear that Trump believes Presidents lack immunity if they rape someone *while* in office, but enjoy immunity if they rape someone *before* taking office and then (after being sworn in) use their bully pulpit to viciously destroy that person when they reveal the sexual assault.

their government employment, would undermine their ability to perform effectively while in office." *Carroll*, 498 F. Supp. 3d at 453.

While he served as President, Trump may have seen a benefit to punishing and humiliating women who revealed that he had sexual assaulted them. He may even have been right that he would benefit personally or politically by taking such actions. But that self-interested calculation does not render his defamatory statements a performance of *presidential* functions. Holding otherwise would obliterate the crucial line between office and occupant, collapsing presidential functions into anything that might advance the personal or electoral interests of the incumbent. That has never been the law in this country. It would dishonor the Constitution to declare that the President is free to willfully injure private citizens who reveal his own private misconduct.

## II.    TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS

### A.    Trump's Statements Constituted Defamation *Per Se*

While Trump asserts that no reasonable juror could find Carroll has established cognizable damages, damages are presumed because his statements were defamatory *per se*.

As explained in Carroll's opposition to Trump's motion to dismiss in *Carroll II*, No. 22 Civ. 10016, ECF 26, a statement qualifies as defamatory *per se* if it "affect[s] a person in [her] profession, trade, or business by imputing to [her] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (citation omitted). With respect to such statements, the law "dispenses with the special damages requirement … because [they] are considered so inflammatory and offensive that the law presumes the statements to have caused damage." *Stern v. Cosby*, 645 F. Supp. 2d 258, 289 (S.D.N.Y. 2009). When a statement "impugns the basic integrity or creditworthiness of a [person's] business," it is settled that "an action for defamation lies and injury is conclusively presumed." *Celle*, 209 F.3d at 180 (citation omitted).

27

A reasonable juror could find that standard to be met here. Carroll is a journalist, author, and advice columnist who built her career providing honest, trustworthy advice to women in response to intimate questions—many of which concerned sex, men, and relationships. Her career "rested on the fact that [she] could be trusted." Pl. 56.1 ¶ 88; *see also id.* ¶ 86 ("[W]omen really trusted E. Jean and [*Elle*] got lots of feedback from readers that she helped them."). For Carroll's community of loyal readers, integrity and credibility were essential.

In his defamatory statements, Trump took *direct aim* at that credibility. Each of his three statements targeted an autobiographical account in her non-fiction book and denounced it as false. His June 21 statement, moreover, directly and repeatedly attacked her as an author: it accused her of lying "to sell a new book," it said her book "*should* be sold in the fiction section," and it claimed that she wrote about being raped to "try to get publicity for [herself], or sell a book, or carry out a political agenda." *Id.* ¶ 11; *see id.* ¶ 66. It also implied a conspiracy between Carroll, *New York Magazine*, and "the Democratic Party." *Id.* ¶ 11; *see id.* ¶¶ 67, 75. Trump's June 22 statement continued in the same vein, implying that she had falsely accused other men, stating that he had "no idea who she is," and attacking Carroll and her publisher. *Id.* ¶ 12; *see id.* ¶¶ 13, 68.

A reasonable juror could easily find that these statements attacked Carroll not only in general terms, but also specifically in her trade and profession. Trump directly attacked an author and columnist—who specializes in honest advice to women about sex and men—with false claims that she lied about an experience of being raped (which she had revealed in her non-fiction book) and that she did so for despicable reasons that would eviscerate her professional credibility, integrity, and trust. Trump thereby "impugn[ed] the basic integrity or creditworthiness of [Carroll's] business," and attributed to her an "unfitness" in her profession as a writer and advice

28

columnist. *Celle*, 209 F.3d at 180. He took direct aim not only at the veracity of her non-fiction book, but also at her reliability as an honest broker who could be trusted by her readers.

This conclusion is supported by *Celle v. Filipino Reporter Enterprises Inc*. There, a news commentator alleged that two statements were defamatory: one that suggested a judge had found him to be negligent, and one that suggested he had made false accusations about another person's financial obligations. *See* 209 F.3d at 185-86. The Second Circuit found the challenged statements to be defamatory *per se* under settled New York law because they "impugn[ed]" the plaintiff's "trustworthiness." *Id.* at 185.[13] So too here. Carroll has spent decades building an audience and community of loyal readers who trust her to provide accurate facts and trustworthy, honest advice. A statement by Trump accusing her of lying about being sexually assaulted—and of making fraudulent claims against others, and of lying in her article and book, and of doing all this for nefarious financial and political reasons—would surely "leave readers with the conclusion that [she] abused her position as a [writer]." *See id.*; *see also Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977) (statements accusing scholars of being "paid liars" were defamatory *per se*); *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 n.5 (1995) (statement that attorney suborned perjury was defamatory *per se*); *Levy v. Nissani*, 115 N.Y.S.3d 418, 421 (2d Dep't 2020); *Gong v. Savage*, 169 N.Y.S.3d 511 (Table), at *2 (N.Y. Sup. Ct. N.Y. Cty. 2022) (statement accusing researcher of stealing research was defamatory *per se*).

The cases that Trump cites do not support his position. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011); *Davydov v. Youssefi*, 169

---

[13] As to the first statement, the court noted that as a reporter in a tightly knit community, his "professional reputation would turn in large measure on the community's faith in the accuracy and fairness of his reporting," and "[t]he statement that a United States judge has found plaintiff negligent for spreading false information would leave readers with the conclusion that he abused his position as a news commentator." *Id.* As to the second claim, the court found it defamatory because it impugned his "trustworthiness," could lead "an average reader to believe [the plaintiff had] made 'false' accusations" about someone else, and could "cause listeners and advertisers … who read the article to question [his] professional integrity." *Id.* at 185-86.

**SA-97**

N.Y.S.3d 322 (1st Dep't 2022); *Ram v. Moritt*, 612 N.Y.S.2d 671 (2d Dep't 1994). In *Davydov* and *Ram*, the plaintiffs (a doctor and dentist) had not been targeted in their professional capacity by statements calling them cheats and frauds. And the statements at issue in *Pure Power Boot Camp* were about the plaintiff's personal characteristics—alleging she treated her employees poorly or fired an employee for being gay—which the court found were not defamatory *per se* because they did "not impute fraud or misconduct to [her], nor do they suggest a general unfitness, incapacity, or inability to perform her duties." 813 F. Supp. 2d at 551. Trump's remaining cases are equally inapposite. *Gurtler v. Union Parts Mfg. Co., Inc.* concerned claims about the plaintiff's political affiliation that bore no relationship—not even "by way of innuendo"—to his professional endeavors. 285 A.D. 643, 647 (1st Dep't 1955). In *Tacopina v. Kerick*, claims that the plaintiff "disclos[ed] privileged information to federal prosecutors" did not "specifically discredit" him as an author. No. 14 Civ. 749, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016). And in *Aronson v. Wiersma*, the "mere expression of unhappiness with plaintiff's fulfilling her duties" was not "of significance" to her work as a linguist and researcher. 65 N.Y.2d 592, 594 (1985).

### B.    Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements

Trump next asserts that Carroll's claim is barred because she consented to his defamatory statements. *See* Mot. at 27-30. This argument is not only highly offensive, but it is also frivolous.

Consent is a rare, narrow defense to defamation. It applies where a person has the specific intent of eliciting a defamatory statement from the defendant and in that sense affirmatively agrees to its publication. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07 Civ. 4018, 2020 WL 1244930, at *7 (E.D.N.Y. Mar. 16, 2020). For instance, this defense may apply where a plaintiff sends a letter requesting a statement that they consider defamatory, or has a private investigator willfully elicit such a statement, or provides written consent to the publication of a defamatory claim, or obtains

30

a statement by impersonating a third party, or otherwise acts with the goal of eliciting a statement on which to base a defamation lawsuit. *See McNamee v. Clemens*, 762 F. Supp. 3d 584, 604-05 (E.D.N.Y. 2011) (collecting New York cases). Trump contends that Carroll provided such specific content in two respects: (1) choosing to publish with *New York Magazine*, which would run a full excerpt and had a broad circulation; and (2) revealing her account while Trump was President, since at that point he had "no choice but to defend himself." Mot. at 29-30.

Recalling that credibility judgments about the underlying sexual assault must be resolved in Carroll's favor at this stage, any reasonable juror would reject Trump's consent defense. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 136 n.11 (S.D.N.Y. 2004). At bottom, Trump insists that Carroll cannot sue him for defamation because she was asking for it. This insulting argument is foreclosed by Carroll's own deposition testimony, where Carroll explained that she was "shocked" by Trump's statements after her book excerpt was published. Pl. 56.1 ¶¶ 62-63. It is also wrong in a deeper sense. When a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response. The law does not vest perpetrators of sexual assault with a right to slander survivors who decide to come forward in a public manner. It is perverse to claim that the revelation of sexual abuse by a powerful man automatically invites (and somehow legally protects) further defamatory abuse. If anything, Trump gets it backwards: his position of political power made it *more* important, not *less* important, that he follow the law in responding to Carroll's revelation that he had assaulted her. Her decision to speak up—prompted by her mother's death and the phenomenon of the #MeToo movement—did not give Trump any warrant to break the law in seeking to punish her. Indeed, Trump's *modus operandi* of seeking to destroy women who accused

31

him of sexual assault, which was on display before and after his term in office, undercuts any claim that his conduct here reflected anything unique to the political office he occupied in 2019.

Trump's defense that he had "no choice" in defaming Carroll is really no defense at all. Mot. at 30. Of course he had a choice. And because he chose to issue a series of brutal, defamatory statements rife with injurious lies about Carroll, he is not entitled to summary judgment.

### C.     Trump's Statements Are Actionable as a Matter of Law

Trump's third argument is that many (though concededly not all) of his statements were merely speculative expressions of opinion. Mot. at 30-31. In support of this theory, he asserts that statements "about a plaintiff's state of mind or personal motivations" qualify as "non-actionable opinions" and "are not capable of being proven true or false." *Id.* at 32-33. Trump is mistaken.

"Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false … only statements alleging facts can properly be the subject of a defamation action." *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014) (cleaned up). "An opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it is a mixed opinion and is actionable." *Id.* at 269 (cleaned up). "The dispositive inquiry … is 'whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff.'" *Id.* at 269-70 (citation omitted). In "distinguishing between fact and opinion," the Court asks "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 269-70 (citation omitted) (cleaned up).

Applying this familiar framework, courts have repeatedly held that statements concerning a person's motivation for conduct can be actionable if they imply a knowledge of facts about that

person. In *Davis v. Boeheim*, the New York Court of Appeals concluded that the defendants made actionable statements where they claimed that the plaintiffs (who had made allegations of sexual molestation) had lied and had done so to make money. *See id.* at 271-73. In *Zervos v. Trump*, the court concluded that Trump made actionable statements when he claimed that the plaintiff (who had accused him of sexual abuse) told "phony stories" that were "totally false" since the events supposedly "never happened" and she was "was motivated by fame and/or directed by Clinton or the Democrats." *See* 74 N.Y.S.3d 442, 445-46, 449 (N.Y. Sup. Ct. 2018) ("A reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe what defendant's statements convey: that plaintiff is contemptible because she 'fabricated' events for personal gain."). Many other decisions reflect similar logic. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S. Ct. 2695, 2705-06 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 150 (1993) (defendants made actionable statements where the "overall-thrust" of their publications was that "plaintiff had issued false or misleading reports about deaths occurring within his jurisdiction in order to protect the police"); *Joyce v. Thompson Wigdor & Gilly LLP*, No. 06 Civ. 15315, 2008 WL 2329227, at *9 (S.D.N.Y. June 3, 2008) (R&R finding that defendants made actionable statements where they claimed that the plaintiff had faked having breast cancer because she hoped to thereby avoid being fired).

Here, each of Trump's statements about Carroll's motives had a readily understood and precise meaning: that she had falsely accused other men of sexual assault; that Trump had never met her; and that she had lied about being assaulted by Trump to make money, to get publicity, to sell her book, or as part of a conspiracy with the Democratic party. Each of these statements can be proven objectively true or false. Moreover, in context, a reasonable observer would understand

Trump to be implying or stating concrete facts (not opinions) about Carroll based on knowledge not known to the public. *See Davis*, 24 N.Y.3d at 269-73; *Zervos*, 74 N.Y.S.3d at 448-49.

At bottom, Trump is wrong that claims about a person's motivations for revealing a sexual assault are inherently opinions rather than facts. It is commonplace for courts and juries to make fact findings about a person's motives. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 133 n.17 (2d Cir. 2009) ("[A] person's state of mind is a fact question to be proved the same as any other fact."); *accord United States v. Stein*, 473 F. Supp. 2d 597, 602-03 (S.D.N.Y. 2007) (Kaplan, J.); Sand, et al., *Modern Federal Jury Instructions*, at § 91-7 (2022). By imputing specific nefarious motives to Carroll—each of which she either *did* or *did not* possess—Trump committed actionable defamation. His effort to disavow the obvious import of his own statements, or to claim that a person can respond to allegations of sexual assault by imputing vile motives with factual particularity, is at odds with common sense, precedent, and his own deposition (where he agreed that he made these precise claims about Carroll, *see supra* at 5). His argument thus fails.[14]

---

[14] The cases that Trump cites involved very different kinds of statements. *See* Mot. at 32. In *Huggins v. Povitch*, for instance, a talk show guest said: "Uh, because there would be times when, uh, my husband would have hundreds of dollars in his pocket and I had to take the subway, my daughter and myself. And we have a Rolls-Royce in the garage, and he would say, the car is not available. I understand now that was psychological, uh, easing me into the point where, either get used to it or get mad, I think he wanted me to divorce him." No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996). The court reasonably understood that specific statement as "specul[ion] on plaintiff's motivation for certain conduct" and held it to be non-actionable. *Id.* at *8. In *Zerman v. Sullivan & Cromwell*, the relevant news article explicitly made clear that it contained only speculation: "But lawyers for the five securities firms *speculate* that the Zermans have a different motive …." 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (emphasis added). In *Gentile v. Grand Street Medical Assocs.*, the statement at issue was "loose and generalized," referring vaguely to "several people in the community who do not want to work, hold jobs and want to make easy money, [who] find a few lawyers who make a living exploiting hard working people and corporations." 79 A.D.3d 1351, 1352-53 (3d Dep't 2010). Finally, in *Dworin v. Deutsch*, a news article "merely" referred to the plaintiff as a "disgruntled former employee," a phrase the court deemed "a matter of opinion based on the fact that he was 'threatening to sue'" his former employer. No. 06 Civ. 13265, 2008 WL 508019, at *8 (S.D.N.Y. Feb. 22, 2008).

**D.      Carroll is Entitled to Present the Punitive Damages Issue to the Jury**

Finally, Trump argues that Carroll should not be allowed to seek punitive damages. Mot. at 33-34. Here, too, he is wrong. Punitive damages are available where the defendant acted "with 'hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice.'" *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009) (citation omitted). The decision to award punitive damages involves evaluating the defendant's "moral culpability" and thus "rests within the sound discretion of the jury." *Allam v. Meyers*, 906 F. Supp. 2d 274, 291 (S.D.N.Y. 2012) (citation omitted). Where there is a need to "interpret[] the character of [the defendant's] actions," summary judgment is necessarily "inappropriate." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018). That rule controls here: Trump's repeated and highly inflammatory statements—which he issued from a position of power and influence—were maliciously calculated to punish, humiliate, and destroy a woman who he had raped and who he knew he had raped. *See also* Pl. 56.1 ¶¶ 79-80. Under these circumstances, Carroll is entitled to put the propriety of punitive damages to a jury when this case is tried.

**SA-103**

## CONCLUSION

For the foregoing reasons, Trump's motion for summary judgment should be denied.

Dated:  New York, New York
        January 12, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
   application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

36

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant*. | No. 20 Civ. 7311 (LAK) (JLC) |

**PLAINTIFF E. JEAN CARROLL'S RESPONSE TO**
**DEFENDANT DONALD J. TRUMP'S STATEMENT OF UNDISPUTED**
**MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, Plaintiff E. Jean Carroll

submits the following responses to Defendant Donald J. Trump's Local Rule 56.1 Statement of

Undisputed Material Facts, ECF 109-1, and a statement of additional material facts in support of

her opposition to Trump's motion for summary judgment.

**I.    RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

1.      According to the Complaint, Plaintiff alleges that she encountered Defendant at the
Bergdorf Goodman Store located at 754 5th Ave, New York, NY 10019. Plaintiff is unable to
specify a date or time period when the events giving rise to this Complaint allegedly occurred,
other than "between the fall of 1995 and the spring of 1996." *Id.* Plaintiff was approximately 52
years old at the time that the purported incident occurred. *See* Declaration of Alina Habba, ("Habba
Dec."), Exhibit A at ¶ 22.

**Response:** Undisputed.

2.      Plaintiff, an advice columnist, alleges that Defendant recognized her on sight as the
"advice lady" and asked her to help him selected a present for a woman who was not present with
him at the store. *Id.* at ¶¶ 24-26.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that

Trump said that he was at Bergdorf's to buy a present for "a girl."

SA-105

3.      Plaintiff alleges that the two eventually proceeded to take the escalator to either the sixth or seventh floor, where the lingerie department was located. *Id*. at ¶¶ 29-30

**Response:** Disputed to the extent that the cited paragraphs of the Complaint do not allege

that the lingerie department was located on "the sixth or seventh floor."

4.      Plaintiff alleges that the floor they visited was entirely abandoned, and there were no sales attendants on the floor. Once there, Defendant allegedly insisted that Plaintiff try on the bodysuit. Defendant then purportedly led Plaintiff by the arm to the dressing rooms. *Id*. at ¶¶ 31-35.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that the

lingerie department "was uncharacteristically empty, with no sales attendant in sight," not that "the

floor they visited was entirely abandoned, and there were no sales attendants on the floor."

5.      At this point, Plaintiff alleges that Defendant purportedly closed the door to of the dressing room, pushed her against a wall, and began kissing her without her consent. She then claims that she pushed Defendant away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her until she managed to push him off and flee the store. *Id*. at ¶¶ 36-42.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that

Carroll "burst out in awkward laughter," not that she "laughed at him."

6.      Plaintiff testifies that she only contemporaneously disclosed the details of this alleged attack to two of her friends: Lisa Birnbach and Carol Martin. After sharing her account of the purported attack, Plaintiff did not speak of it, or even so much as dwell on the incident, until Defendant was elected President in 2016. *Id*. at ¶¶ 43-52.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint do not allege

that Carroll did not "even so much dwell on the incident, until Defendant was elected President."

Further disputed to the extent that the cited paragraphs of the Complaint do not constitute

"testi[mony]."

7.      Thereafter, Plaintiff decided to reveal these allegations publicly against Appellant for the first time with the release of the book entitled: 'What Do You Need Men For?" in or around May of 2019. *Id*. at ¶ 74.

2

**SA-106**

**Response:** Disputed in that Trump mischaracterizes the cited paragraph of the Complaint, which does not allege what Trump states as undisputed fact. The evidence establishes that Carroll revealed her allegations against Donald Trump publicly for the first time on June 21, 2019, in *New York Magazine*, prior to the release of her book, and that she did not consider including allegations about Trump in her book until "four or five weeks into writing" it. Ex. 1 to Kaplan Decl. ("Carroll Dep.") at 155:15-18; Ex. 2 to Kaplan Decl. ("Cut Article"). The evidence further establishes that the title of Carroll's book is *What Do **We** Need Men For?* Carroll Dep. at 153:23.

8.      Plaintiff made a conscious decision to issue an excerpt of her book to *New York Magazine* as opposed to *Elle*, the magazine that formerly published her *Ask E. Jean* advice column. Publicly, she has proffered the following justification for this decision: "Under Nina, Elle has been less into politics or news … Nina's Elle is a fashion magazine. So I went with New York Magazine, which knows how to break news." *See id.*, Exhibit D at 3. 9.

**Response:** Disputed to the extent it does not include a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." S.D.N.Y. Local Civil Rule 56.1(d). The evidence establishes that Carroll "made the decision along with the publisher and [her] agent" to publish the excerpt of her book detailing the rape allegations in *New York Magazine*. Carroll Dep. at 192:14-16. The excerpt also discussed Carroll's background, career, and other experiences with sexual assault. *See* Cut Article. When asked in her deposition why she chose to publish in *New York Magazine* instead of *Elle*, Carroll testified:

> Because [*Elle*] do[es]n't publish anything of [the excerpt's] length. They don't publish articles about women being raped. It's just they are very careful about not upsetting their readers and I don't believe that they would have run anything close to what New York ran. They would have cut it out very—they wouldn't want to have their readers upset [] concerning their columnist…. I didn't believe they would run a full excerpt.

*Id.* at 190:15-191:2, 191:22-23.

9.      Additionally, Plaintiff testified that she chose *New York Magazine* over *Elle* because she didn't "believe that [*Elle*] would have run anything close to what New York ran." *See Id*. Exhibit B at 190:15-25.

**SA-107**

**Response:** Undisputed.

10.   Following these public allegations set forth in Appellee's book, Plaintiff's defamation claim arises out of three statements made in June 2019 made directly in response to Plaintiff's allegations (the "Statements"). *See id*., Ex. A at ¶ 81.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not allege

that Trump responded "directly" to Carroll's allegations.

11.   On June 21, 2019, a statement circulated by the Deputy White House Press Secretary to the press denied the accusation and Appellant stated:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.
>
> Shame on those people who make up false stories of assault to try to get publicly for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.
>
> Ms. Carroll & New York Magazine. No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.
>
> False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.
>
> If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations. *Id*. at ¶ 82.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not allege

that the statement was "circulated by the Deputy White House Press Secretary." Further disputed

to the extent that the above misquotes portions of Trump's statement, which should read:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met

this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.

Shame on **those who** make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine**:** No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

Compl. ¶ 82; *see also* Ex. 3 to Kaplan Decl. ("Trump Dep. Ex. 20").

12.     On June 22, 2019, Defendant made the following statement to the White House press:

[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me. But here's a case, it's an absolute disgrace that she's allowed to do that. *Id*. at ¶ 91.

**Response:** Undisputed. *See also* Ex. 4 to Kaplan Decl. ("Trump Dep. Ex. 21").

13.     On June 24, 2019, Defendant issued a third statement in response to Plaintiff's allegations against him: "I'll say with great respect: Number one, she's not my type. Number two, It never happened. It never happened, OK?" *Id.* at ¶ 97.

**Response:** Disputed to the extent that the cited paragraph of the Complaint alleges that

Trump "made [a third] statement," not that he "issued a third statement." Further disputed to the

extent that Trump misquotes his statement, which said, "I'll say **it** with great respect: Number one,

she's not my type. Number two, it never happened. It never happened, OK?" Compl. ¶ 97; *see also*

Ex. 5 to Kaplan Decl. ("Trump Dep. Ex. 22").

14.     Following Defendant's repudiation of Plaintiff's claims, Plaintiff filed the instant complaint. See generally, *id.*

**Response:** Disputed to the extent that "[f]ollowing" suggests the instant action was filed

immediately after Trump made his June 2019 statements. Carroll initially filed this action in New

York State Court on November 4, 2019. *See* Compl.

15.     The Complaint alleges, among other things, that the above referenced statements issued by the President were defamatory per se and caused her to "suffer reputational, emotional, and professional harm. *Id.*

**Response:** Undisputed.

16.     Plaintiff alleges that the Statements caused her professional harm by causing "injury to her reputation, honor, and dignity." *Id.* at ¶ 132.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not

include the words "professional harm."

17.     In a meager attempt to quantify this damage, Plaintiff alleges that she "received roughly 50% fewer letters than she received during the same period in 2018." *Id.* at ¶ 134.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not

support the characterization "In a meager attempt to quantify this damage."

18.     Plaintiff when deposed, however, candidly admitted that she never kept track of the letters she received from Elle Readers until 2019, after the lawsuit was filed. See *id.*, Exhibit B at 230:20-24; 231:2-7.

**Response:** Undisputed.

19.     Plaintiff also produced the expert report of Professor Ashlee Humphries, PhD to assess the damages Plaintiff purportedly suffered as a result of the Statements. See generally, *id.*, Exhibit C (["Humphreys Rep."]).

**Response:** Disputed in that Trump mischaracterizes the purpose and scope of the report,

which was:

> to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statements ("Statements") that were made by Donald Trump on June 21, 22, and 24, 2019, and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of these Statements by estimating the percentage of people who may have been receptive to these Statements and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll.

Humphreys Rep. at 2. Further disputed to the extent that Trump misspells the name of Professor

Ashlee Humphreys.

20.    Upon examination, the Report almost exclusively focuses on the purported harm
Plaintiff has allegedly sustained to her "reputation and person brand." *Id.* at 2.

**Response:** Disputed for the reasons stated in the response to paragraph 19.

21.    Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's
Statements caused short - and long-term harm to Ms. Carroll's person brand, shifting perceptions
associated with her person brand with the general public and specific perceptions amongst a group
of people receptive to the claims" and that Plaintiff's "reputational value has been diminished due
to the Statements." *Id.* at 5.

**Response:** Disputed as an incomplete statement of the conclusions of Prof. Humphreys'

report. *See, e.g.*, Humphreys Rep. at 3-5 (summary of opinions).

## II.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### A.    **Trump Rapes Carroll**

22.    Carroll and Trump once met at a party in the late 1980s, and long moved in similar

New York City circles. Carroll Dep. at 18:8-11, 45:20-23, 46:10-18, 48:13-18, 50:19-51:23, 96:2-

5; Ex. 6 to Kaplan Decl. ("Trump Dep.") at 18:12-21:12, 22:15-25:14, 34:12-36:13; Ex. 7 to

Kaplan Decl. ("Trump-Carroll Photo").

23.    They met again sometime in the fall of 1995 or the spring of 1996 at Bergdorf

Goodman on Fifth Avenue in New York City. Carroll Dep. 59:22-61:2.

24.    Carroll had gone to Bergdorf's after leaving work at a studio in New Jersey, where

she taped her "Ask E. Jean" television show, and as she was about to leave without having made

a purchase, she saw Trump through the revolving door as she was exiting onto 58th Street. *Id.* at

35:6-7, 81:13-21, 85:23-86:2, 96:2-4, 96:19-97:4.

25.    Carroll testified, "I was leaving the store. He was coming in. He held up his hand

as I was coming out so I stopped and he came in and he said hey, you're that advice lady…. I said

something like hey, you're that real estate tycoon." *Id.* at 96:2-9; *see also id.* at 96:21-22 ("[He]

put up his hand to stop me from going out when he was coming in."), 98:18-20 ("Q. Why did you

stop? A. It's the international symbol. It was aimed at me so I stopped.").

26.     After greeting Carroll, Trump said, "come help me buy a present." *Id.* at 99:7-8.

Carroll asked, "who is the present for?" and Trump responded, "a girl," but did not give a name.

*Id.* at 102:19-20.

27.     After rejecting Carroll's suggestion of handbags, and a brief perusal of hats, *id.* at

100:7-13, 103:5-6, Trump said, "I know, lingerie," *id.* at 103:22-104:2.

28.     Trump and Carroll rode the escalator to the floor with the lingerie, which Carroll

noticed was empty. *Id.* at 104:14-24, 106:10-18.

29.     Upon entering the lingerie section, they saw that "on the counter were three or four

boxes" and a "see-through body suit with a little bit of lace on it." *Id.* at 106:21-107:3; *see also id.*

at 109:23-110:3 (describing the bodysuit as a "one-piece body suit" that was "[s]ee-through, lilac

grayish-blue edged with a little bit of lace, very pretty").

30.     Trump "snatched it up" and "threw it" at Carroll, telling her to "go put this on." *Id.*

at 109:11-12, 110:8. She "tossed it back to him," saying, "you put it on, it's your color," and telling

him, "it goes with your eyes." *Id.* at 109:14-15, 110:8-10.

31.     Trump then "held it against [her] chest" and said, "you're in good shape, this looks

like it might fit you." *Id.* at 110:24-111:3. She replied, "but it's your size." *Id.* at 111:5-6.

32.     Carroll testified, "This was banter. We're going back and forth. He's saying put

this on, I'm saying you put it on. He's saying—I thought it was an enjoyable repartee." *Id.*

at 111:6-9.

33.     After Carroll told him, "it's your size," "he took [her] arm and he said let's go put

this on." *Id.* at 111:17-19. In response, Carroll explained, "I started laughing because I'm thinking

to myself this is hilarious, I'm going to make him put it on over his pants. That's my plan. And

then after I make him put it on over his pants I'm going to have a story that I can tell my friends

at dinner." *Id.* at 111:19-25.

34.     Then, in "all one action":

> I stepped into the room, the door was banged closed and he
> pushed me up against the wall…. [H]e immediately pushed
> me up against the wall so hard that I banged my head …. It
> hurt. It jolted me and then he pushed me back again and I hit it
> again for a second time.

*Id.* at 115:15-17, 116:13-15, 119: 6-8.

35.     She testified further:

> [W]hen he first shoved me against the wall, [he] lunged and
> shoved me back and I hit my head, [and] he put his mouth
> against mine.

*Id.* at 127:19-21.

36.     Carroll explained, "I was so shocked that I didn't speak. What I did was I laughed."

*Id.* at 118:22-23. When asked why she was laughing, Carroll answered:

> A. Shock. Trying to recapture the camaraderie we had and sort of a
> feeling of a lark, we're on a lark, we're having an adventure, it's a
> lark, trying to recapture that and take it out of the realm where he
> had entered, trying to reduce any eroticism about it.
>
> Q. Was it erotic?
>
> A. Not to me.
>
> Q. Was he angry?
>
> A. No.
>
> Q. What was his demeanor?
>
> A. Intent.

*Id.* at 119:25-120:13.

10

37.     After Carroll had "hit [her] head twice," she testified:

> [T]hen he had his hands on my arms, pushed me back a second time,
> hit my head and then he put his shoulder into me, and he's a big
> man. He's—and he—guessing 220, maybe 225 at the time. I
> weighed 120. He was 100 more pounds. And that was one of the
> things that went through my mind was how big and heavy he was
> because his whole weight came, his shoulder came into me and so
> at this point I realized it was serious. I was shocked before because
> he put me against the wall but now I understood that this is—this is
> a battle, and he pulled down my tights…. [I]t went from good humor
> joshing into being up against the wall and then having that heavy
> weight against me.

*Id.* at 120:20-121:10, 121:16-18.

38.     After he pulled down her tights, she "tried to get [her] arms up to push him back,"
but "[t]he problem was [she] couldn't get [her] knee up because the pantyhose had been taken
down." *Id.* at 122:13-17.

39.     Then he raped her:

> I felt his fingers rummaging around my vagina and this huge weight
> against me. My head hurt, this huge weight, I'm in a situation where
> I can't—I can't—at one point I remember saying this is Donald
> Trump, what the heck is going on? And then I felt his penis inside
> of me.

*Id.* at 123:6-13.

40.     Finally, Carroll "managed to get [her] knee up and push off." *Id.* at 125:8-9. When
asked, "[s]o when you pushed him off with your knee, did he back off of you?," she answered,
"Well, I pushed him with hands and knee and I didn't look to see what he was doing. I turned and
got out." *Id.* at 127:4-9.

41.     As she fled down the escalator, Carroll testified, "I do remember going and having
the fear that he may—may be coming after me" and would "maybe grab me again." *Id.*
at 128:10-24.

11

42.      She exited on Fifth Avenue and immediately called her friend Lisa Birnbach. *Id.* at

130:13-14. Carroll "was in shock and disordered," and "felt unbalanced." *Id.* at 135:5-6.

43.      When Birnbach answered, she noticed that "E. Jean was very agitated, very

hyperventilating. Emotional. And she told me about what happened to her just really moments

before she made the phone call." Ex. 8 to Kaplan Decl. ("Birnbach Dep.") at 34:14-18. Birnbach

explained that "[t]here was a moment that [Carroll] was laughing. But she was not laughing funny.

She was laughing excited. Highly reactive." *Id.* at 35:20-23.

44.      Carroll then told Birnbach what "just happened," *id.* at 36:17-37:17, 38:10-24,

39:2-5, and Birnbach replied, "E. Jean, you've been raped," *id.* at 39:12-13. Birnbach told Carroll

that she should go to the police, but Carroll refused. *See id.* at 39:14-20; Carroll Dep. at 134:15-

21 ("I remember Lisa suggesting I go to the police and also Lisa suggesting that she go to the

police with me and that idea was so, such a terrible—I couldn't picture myself going to the police

so I shut that down.").

45.      Instead Carroll "swore [Birnbach] to secrecy," saying, "you and I will never discuss

this again." Birnbach Dep. at 40:4-9.

46.      The "next day or the day after," Carroll told her friend Carol Martin what had

happened. Carroll Dep. at 141:10-14; Ex. 9 to Kaplan Decl. ("Martin Dep.") at 27:24-28:18, 32:6-

12. Martin "advised [Carroll] not to do anything," telling her "that Mr. Trump had many lawyers

and he would bury her" if she brought this allegation. *Id.* at 33:8-24; *see also* Carroll Dep. at

143:19-21 ("[Martin] said tell no one, he's got 200 lawyers, he'll bury you.").

47.      Carroll did not tell another person for over two decades. She explained:

> I didn't want to talk about it ever again, ever. That was it, and I
> didn't want to hear about it ever again. I was embarrassed, I was
> ashamed at this point. I was raped, this is like—this was shocking
> and so I just said let's never talk about this again. … I didn't want

12

**SA-116**

to talk to anybody or tell the police. I just didn't—it was just something that I would keep to myself.

Carroll Dep. at 138:7-15, 144:9-12; *see also id.* at 144:18-19 ("I always feel I can handle things myself.").

48.     In her deposition, she was asked about the use of the word "rape" to describe what

happened to her:

> Q. … [Y]ou had stated prior that you didn't like using the word "rape." Do you recall that?
>
> A. I recall feeling that.
>
> Q. Why did you feel that way?
>
> A. The word to me means something that generally speaking a man does to a woman, that she's powerless, that he has the power over her, rape. It means he's taken something from her and I didn't view it that way. I viewed ... what went on in that dressing room as a fight.
>
> Q. Did you feel like you won that fight?
>
> A. I don't think there are any winners there.

*Id.* at 138:19-139:10.

49.     When asked why she did not come forward sooner, she further testified:

> I'm going to say something that even surprises me because women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked. I mean even you have to say did you scream? I mean every woman who admits to being attacked has to answer that question, why didn't you scream, why did you come forward when you did, why didn't you come forward before ….

*Id.* at 147:16-148:7.

50.     Carroll never had sex or dated again, *id.* at 44:17-25, explaining that, after the rape,

"the music had stopped" and her "light was gone," *id.* at 41:3-4, 42:13-18. In her own words, she

explained, "I had no desire for desire. I don't have the desire to want sex. You have to want sex."

*Id.* at 43:5-7.

**SA-117**

      **B.**     **Carroll Comes Forward**

     51.     In 2016, Trump announced his candidacy for President, and Carroll felt "[j]ust

almost disbelief and a little bit of heartache." *Id.* at 148:9-15.

     52.     When asked why she did not come forward with her account at that time, she

testified:

> A. I was with my mother in Bloomington, Indiana. She was on her deathbed. She was a feisty redheaded Scottish woman, republican politician, so we gathered around for her last weeks.
>
> Q. Did you think she would be upset if she heard the allegations against Donald Trump?
>
> A. That's all she needed to hear on her death bed. Well, I was worried that it would ruin her last days and I just couldn't have done it. I just wouldn't have done it.

*Id.* at 148:20-149:10.

     53.     Carroll further testified:

> Q. What do you mean by helping him?
>
> A. As more and more women came forward with accusations against the former president, his popularity seemed to go up.
>
> …
>
> Q. And that was part of the reason you didn't come out with it; is that correct?
>
> A. ... I was – didn't think it was -- I knew it would help him. I didn't want to get fired from Elle and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about.

*Id.* at 150:19-151:23.

     54.     In 2017, Carroll took a road trip interviewing women for a book she was writing.

*Id.* at 153:22-23. She testified:

> I started the book because over the 26 years that I was writing the column, almost every single letter, whether it was about career or finances or children or romance, there was always a complaint about

> a man. So I spent 26 years saying get rid of him, get rid of him. So
> I thought why don't I just go on the road and ask women what do
> we need men for and let them tell me so I don't go through with my
> idea which is to put them, all the men, in Montana. That was the
> idea. That was what I was going to do. It had nothing to do with
> Donald Trump, nothing, and then the first day of the trip started. My
> intention was to go to towns named after women, only wear clothes
> designed by women, only eat in restaurants like Betty's Cafe run by
> women or owned by women, only listen to books by women in the
> car, listen to music by women. That was the whole thing. I get out
> of the car when I got to the small town and talk to the people, what
> do we need men for. I was getting fabulous answers.

*Id.* at 153:23-154:24.

55.     The same day her road trip started, "the Harvey Weinstein story broke." *Id.*
at 154:24-25. After this, she began "making a list" of the "hideous men" in her life." *Id.* at
155:13-14, 156:6. She explained that "[m]any other men were on it but [Trump] wasn't," and she
"didn't make th[e] decision to include him [in the book] until four or five weeks into writing the
book." *Id.* at 155:14-18.

56.     In her deposition, she testified about the prior sexual assaults she experienced. *See
id.* at 161:6-16, 173:7-175:8.

57.     Carroll decided to include Trump on her list because of "the flood of stories that
started as women started standing up" during the #MeToo movement. *Id.* at 155:2-3.

58.     When asked "[i]f it wasn't for the #MeToo movement, do you think you would
have spoken out against the defendant?," Carroll answered, "No, I don't think I would have." *Id.*
at 153:9-12.

59.     Prior to the release of the book, *New York Magazine* published an excerpt of the
book that included stories about Carroll's background, career, and experiences with sexual assault,
including being raped by Trump. *Id.* at 190:7-8; Cut Article; Ex. 10 to Kaplan Decl. (eight-page
print version of book excerpt).

60.     She made the decision "along with the publisher and [her] agent" to publish the

excerpt in *New York Magazine*. Carroll Dep. at 192:15-16. Carroll testified:

> Because [*Elle*] do[es]n't publish anything of [the excerpt's] length.
> They don't publish articles about women being raped. It's just they
> are very careful about not upsetting their readers and I don't believe
> that they would have run anything close to what New York ran. They
> would have cut it out very—they wouldn't want to have their readers
> upset [] concerning their columnist…. I didn't believe they would
> run a full excerpt.

*Id*. at 190:17-191:2, 191:22-23.

61.     Trump responded to the allegations with three statements made on June 21, 22, and

24, 2019, respectively. *See* Trump Dep. at 64:23-70:7; Trump Dep. Ex. 20; Trump Dep. Ex. 21;

Trump Dep. Ex. 22; *see also* Ex. 11 to Kaplan Decl., at 5-6, 16-17, 21 (Defendant's Responses

and Objections to Plaintiff's First Set of Requests for Admission).

62.     When asked in her deposition how she expected him to react to the allegations, she

explained:

> I didn't think he would deny it. I thought he would just say it didn't
> happen that way. She agreed to it or it was consensual sex.
>
> …
>
> I just was shocked that he absolutely denied it because he was there
> and he denied it. That's what gets me every time. He was there, he
> denied it.

Carroll Dep. at 166:2-6, 167:3-7.

63.     Carroll was also asked if, "[p]rior to releasing this article with The Cut, did [she]

anticipate that you might need to sue the defendant to hold him accountable?" She replied, "No, it

was the last thing I would ever think of." *Id.* at 167:17-22.

**C.     Trump Doubles Down on His Statements and Continues to Insult Carroll**

64.     In his deposition, Trump reaffirmed and stood by his three June 2019 statements:

> Q. Sitting here today, do you stand by this [June 21] statement?

16

A. Yes.

Q. Sitting here today, are there any inaccuracies in this statement that you now know of?

A. Not that I can see, no.

…

Q. I take it you stand by that [June 22] statement today?

A. Yes.

Q. Sitting here today, are you aware of any inaccuracies in your statement? …

A. No. … [T]he statement is, in my opinion, correct.

…

Q. … I take it, sir, that you stand by that [June 24] statement today?

A. Yes, I do.

Q. And I take it that from what we've been discussing so far that you don't see any inaccuracies in that statement?

…

A. No. No.

Trump Dep. at 60:3-8, 67:7-18, 69:21-70:5.

65.    Trump repeated that he never met Carroll:

Q. In your June 21 statement that's marked as Exhibit 20, you say— and this is the Littman tweet—"I never met this person in my life."

A. Yes.

Q. Was that a true statement when you made it on June 21, 2019?

A. It was a true statement when I made it.

…

Q. So if I can understand your testimony, sir, you're saying that at the time you made the statement …, you were not aware of ever having met Ms. Carroll? You have since seen a photograph that shows you with Ms. Carroll on a receiving line; correct?

A. Along with a lot of other people.

…

Q. So the answer to my question is yes, that after you made the statement, you became aware that there's a photo of you with Ms. Carroll in a receiving line; correct?

17

A. At some point … I saw there was a photo on a receiving line, yes.

*Id.* at 80:4-10, 80:17-23, 81:7-14.

66.    Trump repeated that Carroll made up the rape to sell a book:

Q. [I]n your June 21 statement ... you said that Ms. Carroll was trying to sell a new book and that you said shame on those who make up false stories of assault to try to get publicity for themselves or sell a book?

A. Yeah, that's right.

*Id.* at 87:6-12.

67.    Trump repeated that Carroll made up the rape to carry out a political agenda:

Q. Another thing that you say in your June 21 statement is that Ms. Carroll was trying to carry out a political agenda?

A. Yeah.

Q. How did you know she had a political agenda if you didn't know who she was?

A. Somebody told me early on that she was somehow aligned with Hillary Clinton. She was either aligned with her or—I thought aligned with her.

Q. Who told you that?

…

A. I don't know. I don't know who said it, but somebody had mentioned it since, that she was somehow into that whole world.

*Id.* at 88:14-24, 89:6-8.

68.    Trump repeated that Carroll falsely accused other men of sexual assault:

Q. Now, in your June 22nd statement, … you claim that Ms. Carroll had falsely accused other men of sexual assault; correct?

A. That's what I heard, yes.

Q. And you believed that was a true claim?

A. It's what I heard.

…

Q. … Did whoever told you that she accused other men of things also tell you that all those accusations were false?

18

# SA-122

A. No.

…

Q. ... Did anyone tell that you that the accusations she has made about other men were false?

A. I don't know.

*Id.* at 91:3-9, 92:8-11, 92:16-20.

69.      When pressed on his statement suggesting that Carroll was too ugly to rape, Trump testified that "[P]hysically she's not my type, and now that I've gotten indirectly to hear things about her, she wouldn't be my type in any way, shape, or form." *Id.* at 94:10-13. He further testified that "that's 100 percent true. She's not my type. … There's no way I would ever be attracted to her." *Id.* at 142:13-143:3.

70.      When confronted with the photo of Carroll and himself from a party before the rape, Trump twice misidentified Carroll as his ex-wife Marla Maples, insisting it was Maples smiling at him in the photo, when in fact the woman he was pointing to was Carroll herself:

A: [I]t's Marla. [*pointing at Carroll*]

Q. You're saying Marla is in this photo?

A. That's Marla, yeah. That's my wife.

Q. Which woman are you pointing to?

MS. HABBA: No, that's Carroll.

THE WITNESS: Oh, I see.

Q. The person you just pointed to was E. Jean Carroll.

*Id.* at 82:9-17; *see* Trump-Carroll Photo.

71.      The photo did not depict Maples, but rather Carroll, Carroll's then-husband John Johnson, Trump, and Trump's then-wife Ivana Trump. Carroll Dep. at 49:11-15; Trump-Carroll Photo.

72.      Trump made his June 2019 statements on his own, without any guidance or direction from anyone else, and without any research or investigation into Carroll or her

19

accusations. Trump Dep. at 60:3-8, 67:7-18, 69:21-70:5, 88:7-13. He was unable to identify any other White House personnel as involved in investigating, preparing, strategizing, or creating the defamatory statements he made about Carroll in June 2019. *Id.* at 99:4-103:23.

73.   Trump admitted that no one ever reached out to Bergdorf's.

> Q. So before you made your statements that it never happened in 2019, did you or anyone on your staff reach out to anyone at Bergdorf Goodman?
>
> A. I didn't have to reach out to anybody because it didn't happen.
>
> …
>
> Q. After you made the statements that you made in June of 2019, did you or anyone working for you reach out to Bergdorf Goodman?
>
> A. After the statement was made? No.

*Id.* at 78:6-10, 79:4-9.

74.   Neither Trump nor anyone working for him did any research on Carroll:

> Q. Before you made this statement that appears in DJT 20, do you know whether you or anyone working for you did any research on Ms. Carroll?
>
> A. … [N]ot that I know of.

*Id.* at 88:7-13.

75.   He similarly had no evidence to support his accusation that she was carrying out a political agenda or working with the Democratic party:

> Q. Before issuing your statement on June 21, did you learn what political party Ms. Carroll belonged to?
>
> A. No, I didn't know that.
>
> Q. Before you issued your June 21 statement, did you have any documents indicating that she was pursuing a political agenda?
>
> A. No.
>
> …
>
> Q. At the end of your statement, your June 21 statement, you say: "If anyone has information that the Democratic party is working

with Ms. Carroll or New York Magazine, please notify us as soon as possible." Did anyone ever notify you?

A. I don't know.

Q. Sitting here today, you can't recall anyone who notified you?

A. I don't know, yeah.

*Id.* at 89:18-25, 90:2-11.

76.    Although he implied in his June 22 statement that Carroll falsely accused men of similar things, Trump repeated that he could not explain where he got that information:

Q. Now, in your June 22nd statement, … you claim that Ms. Carroll had falsely accused other men of sexual assault; correct?

A. That's what I heard, yes.

Q. And you believed that was a true claim?

A. It's what I heard.

Q. From whom had you heard it?

A. I don't know. I don't know.

*Id.* at 91:3-11.

77.    At the time of his statements, Trump had no knowledge regarding Carroll's financial situation, the arrangement between Carroll and her publisher, or her book sales:

Q. Before you made that statement, did you have any knowledge one way or the other of the financial arrangements between Ms. Carroll and the publisher of her book?

A. No.

Q. Did you even know who her publisher was?

A. No.

Q. Did you ever see her book contract?

A. No.

Q. Did you know anything about Ms. Carroll's financial situation?

A. No.

Q. Did you know anything about her expected book sales?

A. No idea.

21

*Id.* at 87:13-88:3.

78.     Trump issued all three statements without reading the excerpt in *New York Magazine* or the book itself—indeed, until his deposition, Trump had never even seen Carroll's book:

> Q. At any point in time, did you read this article?
>
> …
>
> A. No, I don't believe I did.
>
> Q. [This is] a book by E. Jean Carroll. It says What Do We Need Men For, and if you look at the publication date, it says first edition July 2019…. Sitting here today, sir, have you ever read this book either in its entirety or any portion of this book?
>
> A. No, never have. I've never seen the book actually.

*Id.* at 54:22-55:18.

79.     Trump continuously insulted Carroll in his deposition, stating: "It's a big, fat hoax. She's a liar and she's a sick person in my opinion. Really sick," *id.* at 148:11-13; "[S]he made it up probably to sell her book or for her own ego, because she's … a very deranged, sick person, to make it up," *id.* at 216:4-8; "And I think that's her big claim to fame, you know, that she shook my hand at some celebrity event," *id.* at 81:3-5; "There's something a little off with her mentally, *id.* at 121:16-17; "I will sue her after this is over, and that's the thing I really look forward to doing," *id.* at 130:18-19; "I think she's a wack job," *id.* at 137:14-15; "I know nothing about this nut job," *id.* at 141:19-20; "[W]hen people accuse me of something, I think I have a right to be insulting," *id.* at 192:10-11; "That's a sick woman that would say that. Only a sick—there's something wrong with her," *id.* at 217:2-4.

80.     Trump also testified that he would repeat his insults to anyone who would listen:

> I told people that there was a false, disgusting lie made about me because I would say that to a lot of people. Even if they didn't ask, I was very offended by this. This woman is sick. There's something wrong with her, and it's a false story. So I would go around saying

that to people, yes. So it's possible that I would say that to legislators.

*Id.* at 103:12-19.

> **D.**   **Carroll Suffered Professional and Reputational Harm**

81.   Carroll had been writing a regular advice column in *Elle* Magazine, titled *Ask E. Jean*, since 1993. Carroll Dep. at 33:14-16, 175:15-17. She testified:

> [The column] had run in the magazine for 26 years. It was one of the most popular columns ever in the magazine. I loved my readers, loved them. They would pour their hearts out to me and I loved helping them, they helped me …. [There is a] foundation of trust that a columnist has with their readers. And those readers, I loved those readers. They are the best in the world.

*Id.* at 175:15-176:4, 176:7-10.

82.   When Carroll "was writing the [advice] column in [*Elle*], *Ask E. Jean* received hundreds of letters every month." *Id.* at 38:3-5.

83.   Roberta Myers, Carroll's former boss and the editor-in-chief of *Elle* for 17 years, testified that Carroll "was beloved" and "really important to the magazine," and she was "good at [building an audience]." Ex. 12 to Kaplan Decl. ("Myers Dep.") at 28:9-13.

84.   Myers testified to Carroll's importance to the magazine:

> [I]f the magazine world is somewhat in decline, you actually want to keep those people who readers—you know, she's a destination, meaning readers would want to hear from her. She was an important part of what kept us [] popular. Also with the Internet we had another place to put her and put her—what she produced, right. So the audience actually got bigger for her.

*Id.* at 32:4-12.

85.   When asked about Carroll's reputation, Myers testified:

> E. Jean was—I mean, she's kind of a rock star, meaning, you know, she had a public profile before she came to Elle, people knew who she was. She was on television. She had a show on MSNBC. She

was hired by Roger Ailes. So she was public in that way, but she also worked for a lot of different places.

…

[In the office], people that didn't work with her and maybe hadn't met her, she would come up these dramatic stairs and it would be like E. Jean, you're great, you rock. Of course, when she was on the floor, you know, Elle's floor, people just loved to see her because also she would walk up to them and say "What are you working on, girl," you know.

*Id.* at 22:12-18, 25:11-18.

86.     She also testified to Carroll's impact on the magazine industry as a whole:

Q. Would you say she had an impact on advice column—the advice column genre more broadly?

A. Absolutely. I mean, it sort of exploded, you know, the other—some of our competitors … never had advice columnists. So I think that the term "advice columnist" has sort of like maybe kind of a dated feeling to it starting with Anne Landers and people who wrote in newspapers which were completely legitimate, but Elle was a national magazine which meant she was talking to the whole country.

Q. So other publications including competitors added advice columnists because of E. Jean?

A. Yes, but I will say that E. Jean was in a particular sort of category by herself. As I said, she had a high public profile before she came to Elle. I mean, what other people are doing is great, right, and it's fun and interesting, but women really trusted E. Jean and we got lots of feedback from readers that she helped them. Also, you know, they loved her voice because she puts a lot of funny in there or sort of—but it's always undergirded by reporting.

*Id.* at 23:5-24:4.

87.     When asked about Carroll's relationship with her readers, Myers continued:

Q. How would you describe E. Jean as a writer?

A. [T]he term that came to mind is sort of she's a baller … as a writer. She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts, but she—she also, you know, has a lot of wit and I think that's why her readers loved her so much.

*Id.* at 21:15-22.

88.     Carroll's "entire career as an advice columnist rested on the fact that [she] could be trusted." Carroll Dep. at 175:22-24. And during Myers's tenure at Elle, there were no concerns about Carroll's accuracy as a writer. Myers Dep. at 26:14-27:10.

89.     Carroll's reputation was severely damaged by Trump's June 2019 statements. After Trump's statements were published, Carroll "was looked at as a woman who's untrustworthy, looked at ... as a woman who can't be believed." Carroll Dep. at 172:12-14; *see also id.* at 176:2-4 ("So when the president said I'm a liar, it shook that whole foundation, that was it."). She received significant negative attention (both publicly and privately) following Trump's statements. Humphreys Rep. at 49-58; Ex. 13 to Kaplan Decl. (Appendix H to the Expert Report of Professor Ashlee Humphreys); Ex. 14 to Kaplan Decl. (Appendix I to the Expert Report of Professor Ashlee Humphreys).

90.     She received fewer letters after Trump made his statements and was terminated from *Elle* months before her contract was up for renewal. Carroll Dep. at 176:12-13, 176:25-177:12.

91.     The quantitative data shows that Trump's statements were widely disseminated. Based on a comprehensive analysis conducted by Professor Ashlee Humphreys, Ph. D., and using conservative estimates, Trump's defamatory statements generated between 142,334,424 and 188,155,507 impressions across various forms of media. *See* Humphreys Rep. at 26-30 & Appxs. D, E, F, G.

92.     Prof. Humphreys completed a quantitative impact analysis that showed 25.25% of readers and listeners were likely to believe Trump's statements. *Id.* at 58-63 & Appx. L. As a result, between 34,075,512 and 42,936,354 of the impressions generated by Trump's statements were likely received by people who were receptive to them. *Id.*

Dated: New York, New York
      January 12, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Telephone: (212) 742-2661
Facsimile: (212) 564-0883
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                Plaintiff,

        -against-                                20-cv-7311 (LAK)

DONALD J. TRUMP,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Appearances:

        Roberta Kaplan
        Joshua Matz
        Shawn Crowley
        Matthew Craig
        Trevor Morrison
        Michael Ferrara
        KAPLAN HECKER & FINK LLP

        *Attorneys for Plaintiff*

        Alina Habba
        Michael T. Madaio
        HABBA MADAIO & ASSOCIATES LLP

        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        This is a defamation case brought by writer E. Jean Carroll against President Donald

**SA-131**

2

Trump, as he then was, for statements Mr. Trump made in June 2019 shortly after Ms. Carroll

publicly accused him of sexual assault. In those statements, Mr. Trump denied Ms. Carroll's

accusation, stated that he "has no idea who this woman is," and suggested that she fabricated her

accusation for ulterior and improper purposes, including to increase sales of her then-forthcoming

book in which she discusses having been sexually assaulted by Mr. Trump and other men.

In a second and very closely related case ("*Carroll II*"), Ms. Carroll sued Mr. Trump

for the alleged sexual assault itself and for defamation based on a statement that Mr. Trump

published on his social media platform in October 2022 that was substantially similar to his June

2019 statements. That case was tried in April and May 2023. The jury unanimously found that Mr.

Trump had sexually abused Ms. Carroll and defamed her in his October 2022 statement.[1]  It awarded

Ms. Carroll a total of $5 million in compensatory and punitive damages: $2.02 million for her sexual

assault claim, and $2.98 million for her defamation claim.[2]

In this case ("*Carroll I*"), Ms. Carroll seeks damages and other relief for defamation

---

[1]

It found also that Ms. Carroll had not established that Mr. Trump "raped" her within the
relevant definition of that term in the New York Penal Law.

[2]

The Court assumes familiarity with its prior decisions, which describe in detail the facts and
procedural histories of both cases. Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y.
2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK),
2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); Dkt 145, *Carroll v. Trump*, No. 20-cv-7311
(LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Doc. No. 22-cv-10016 (*Carroll II*),
Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13,
2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312
(S.D.N.Y. Feb. 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK),
2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No.
22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96,
*Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023).

Except where preceded by *"Carroll II"*, "Dkt" references are to the docket in this case.

for Mr. Trump's June 2019 statements only.[3]  The matter now is before me on  Mr. Trump's motion

for summary judgment dismissing the action on four grounds:

    (1)       Mr. Trump is entitled to absolute presidential immunity

    (2)       Mr. Trump's statements were not defamatory *per se* and Ms. Carroll cannot

              establish special damages

    (3)        the majority of Mr. Trump's statements were nonactionable opinion

    (4)       Ms. Carroll consented to Mr. Trump's allegedly defamatory statements.[4]

He argues also that punitive damages in any case would be unwarranted on Ms. Carroll's defamation

claim. His arguments are without merit.


### Facts

*Mr. Trump's Allegedly Defamatory June 2019 Statements*

         Ms. Carroll's accusation that Mr. Trump sexually assaulted her first became public

on June 21, 2019, when *New York* magazine published on the Internet an excerpt from her then-

forthcoming book in which Ms. Carroll described Mr. Trump's alleged assault of her, which she

referred to as "rape."  Over the next several hours and days, Mr. Trump issued three allegedly

---

[3]      When Ms. Carroll brought this lawsuit in 2019, she presumably was foreclosed from suing for sexual battery by New York's then-existing statute of limitations. As noted above, the Adults Survivors Act enacted by New York in 2022 temporarily revived the ability to bring such claims without regard to the otherwise applicable statute of limitations. She therefore was permitted to bring that claim in her second lawsuit now referred to as *Carroll II*.

[4]      For avoidance of confusion: In his memorandum, Mr. Trump argues what is identified as ground four here before what is identified as ground three here. This opinion discusses Mr. Trump's arguments in the sequence noted above.

**SA-133**

4

defamatory statements in response to Ms. Carroll's accusation.

*Statement One*

Two hours and seventeen minutes after Ms. Carroll's accusation became public, Mr. Trump published this statement on Twitter[5]:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

---

[5]    Mr. Trump testified in his deposition that he provided the statement to his staff to give to the press. Dkt 135-3 (Def. Dep.) at 59:20-23.

5

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[6]

*Statement Two*

The next day, Mr. Trump made the following comments that were reported in the national press and published in a White House press release entitled "Remarks by President Trump Before Marine One Departure" issued on June 22, 2019:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

"[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

"[Reporter]: You were in a photograph with her.

"[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going

---

[6]

Dkt 157-1 (Pl. Amend. Compl.) at 15-16, ¶ 83.

On June 13, 2023, this Court granted Ms. Carroll's motion to amend her complaint. The amended complaint did not add any new claims or otherwise change the focus of her original complaint. Unless indicated otherwise, citations to Ms. Carroll's complaint are to the amended complaint.

6

on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

"And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

"New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

"It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

"You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

7

"But here's a case, it's an absolute disgrace that she's allowed to do that."[7]

*Statement Three*

Finally, on June 24, 2019, Mr. Trump stated in an interview with the newspaper *The Hill*: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[8]

*Ms. Carroll's Defamation Claim*

Ms. Carroll initiated this lawsuit against Mr. Trump in November 2019 for defaming her in these statements. The case originally began in a state court in New York before being removed to this Court for reasons explained in the Court's previous decisions.[9]  Ms. Carroll alleges that:

> "When [her] account [of the alleged assault] was published, Trump lashed out with a series of false and defamatory statements. He denied the sexual assault. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of fabricating her allegations in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also

---

[7]     *Id.* at 18, ¶ 92.

[8]     *Id.* at 20, ¶ 98.

[9]     *E.g.*, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312, at *4 (S.D.N.Y. Feb. 15, 2023); *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022), *remanded in part*, 66 F.4th 91 (2d Cir. 2023).

8

deliberately implied that she had falsely accused other men of assault. For good measure, he insulted her physical appearance."[10]

The core of Ms. Carroll's defamation claim is that Mr. Trump lied in accusing her of fabricating her sexual assault allegation against him in order to increase sales of her book and for other improper purposes and that he thus caused Ms. Carroll professional and reputational harm as well as emotional pain and suffering.

*Mr. Trump's Answer*

In his formal answer to Ms. Carroll's complaint, which originally was filed in state court in February 2020, Mr. Trump raised nine affirmative defenses, including as relevant here that:

- "[t]he [c]omplaint fails to state a cause of action,"

- "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States,"

- "[t]he allegedly defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States,"

- "Plaintiff is not entitled to punitive damages as a matter of law," and

- "Plaintiff has not sufficiently alleged defamation *per se*," and

---

[10] *Id.* at 3, ¶ 11.

- "Plaintiff has failed to plead damages with the required specificity."[11]

Noticeably missing from this list is any mention of the absolute presidential immunity defense that Mr. Trump now asserts for the first time.[12]

### *Discussion*

*Legal Standard*

The standards for summary judgment are well established.  In brief:

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law.  . . . In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. . . . To grant the motion, the court must determine that there is no genuine issue of material fact to be tried. . . . The Supreme Court teaches that 'all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' . . .  It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the

---

[11]     Dkt 14-69 (Def. Answer).

[12]     Nor did Mr. Trump seek to add this defense to his answer when he moved to amend his answer in January 2022 to add an affirmative defense and counterclaim based on New York's "anti-SLAPP" law.  Dkt 63.

10

jury, not for the court on a motion for summary judgment.'"[13]

"A material fact is one that might 'affect the outcome of the suit under the governing law,' and a

dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [fact

finder] could return a verdict for the nonmoving party.'"[14]


*Ground One: Absolute Presidential Immunity*

       In *Nixon v. Fitzgerald*,[15] the Supreme Court held that the President of the United

States is entitled to "absolute Presidential immunity from damages liability for acts within the 'outer

perimeter' of his official responsibility."[16]   Mr. Trump argues that the allegedly defamatory

statements in this case came within this "outer perimeter" because he made those statements "in

direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his

ability to effectively govern the nation."[17]

       Before the Court even may address the merits of Mr. Trump's absolute immunity

defense, it must decide a threshold question: whether Mr. Trump is barred from raising this defense

---

[13]
     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (alterations in original) (citations omitted).

[14]
     *Madison Nat. Life Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 462 F. App'x 102, 103–04 (2d Cir. 2012) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[15]
     457 U.S. 731 (1982).

[16]
     *Id.* at 756.

[17]
     Dkt 109 (Def. Mem.) at 17.

because he waived it by failing to raise it earlier. Mr. Trump does not dispute that, under the controlling rules of civil procedure, he waived the defense by failing to plead it as an affirmative defense in his answer.[18]  Instead, he contends that any such waiver can have no effect because absolute presidential immunity is an unwaivable obstacle to any court exercising subject matter jurisdiction over any claim within its ambit. In the alternative, if the Court determines that absolute presidential immunity can be waived, Mr. Trump argues that his motion for summary judgment should be construed as a motion for leave to amend his answer so that he can assert the absolute immunity defense.  Neither argument is persuasive.

*Absolute Presidential Immunity Can Be Waived*

Mr. Trump argues that "whether presidential immunity applies in this case is a non-waivable question of subject matter jurisdiction."[19]  His argument relies on the theory that absolute presidential immunity is non-waivable because it is different from absolute immunity available to judges and prosecutors – which decidedly is waivable – due to what he claims, mistakenly, is "its

---

18

    In the table of contents to Mr. Trump's reply brief, the first argument heading reads: "Defendant did not waive his entitlement to presidential immunity."  Dkt 122 (Def. Reply Mem.) at I. However, that heading never reappears in his brief. Instead, the first heading of his argument section is "Presidential immunity cannot be waived," followed by his argument that Ms. Carroll's claim that he waived his absolute immunity defense by failing to raise it in his answer "is flawed in its premise" because absolute presidential immunity is not waivable. *Id.* at 1. In a recent letter, Mr. Trump again did not dispute that he waived the defense and instead wrote that he "unequivocally stated that absolute immunity is a non-waivable question of subject matter jurisdiction." Dkt 160 at 2. It accordingly is clear that Mr. Trump does not dispute that if absolute presidential immunity can be waived, he in fact waived it in this case.

19

    Dkt 122 (Def. Reply Mem.) at 5.

12

unique rooting in the separation of powers doctrine."[20]

    Absolute presidential immunity is no such anomaly. There is nothing so exceptional about absolute immunity available to a president that makes it non-waivable unlike other types of absolute immunity. For starters, "[m]ost immunities are affirmative defenses."[21]  Failure to assert an affirmative defense, including absolute immunity, in an answer or other responsive pleading results in waiver of that defense.[22]  Moreover, as the Supreme Court has stated, "[t]here is no

---

[20]

    *Id.*

[21]

    *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003). *See also San Filippo v. U.S. Tr. Co. of New York*, 737 F.2d 246, 252 (2d Cir. 1984) ("In their answer and amended answer, defendants asserted several affirmative defenses, including their absolute immunity from § 1983 liability for their grand jury testimony or prior discussions with the prosecutor.").

[22]

    As noted above, Mr. Trump's answer first was filed in a state court in New York before this case was removed to this Court. Assuming his answer was governed by New York's Civil Practice Law and Rules, he was required to plead absolute immunity as an affirmative defense in his answer or in a pre-answer motion.  N.Y. CPLR § 3018(b) ("A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading."); *Pitts v. State*, 166 A.D.3d 1505, 1506 (4th Dept. 2018) ("Defendant waived that affirmative defense [of governmental function immunity] inasmuch as defendant did not plead it in its amended answer.") (citing cases).

    The result would be the same if Mr. Trump's answer were governed by Federal Rule of Civil Procedure 8(c), which requires a party to "affirmatively state any . . . affirmative defense" in responding to a pleading. *E.g.*, 5 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1278 (4th ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by [Rule] 8(c) results in the waiver of that defense and its exclusion from the case.") (citing cases); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) ("Appellees mention an absolute immunity defense in passing, but that defense is considered waived since it only appears in a footnote. . . .  And we decline to overlook the waiver."); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) ("Absolute immunity is an affirmative defense that should be asserted in an answer."); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) ("It is well established that unless affirmatively pleaded, the defenses of qualified and absolute immunity are waived."); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994) ("[T]his

13

authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction."[23]  To prevail in his argument, Mr. Trump must demonstrate that absolute immunity available to a president deviates from these well-settled norms. He has not done so.

The focal point of Mr. Trump's reasoning is the foundation of absolute presidential immunity in separation of powers principles.  His argument goes: (1) absolute presidential immunity is grounded in the separation of powers doctrine, (2) "the separation of powers doctrine is a creature of Article III standing" and "Article III standing, in turn, is an issue of subject matter jurisdiction,"[24] and (3) absolute presidential immunity therefore is an unwaivable obstacle to the exercise of subject matter jurisdiction. His theory fails for two reasons. First, absolute presidential immunity is not the only type of absolute immunity that raises separation of powers concerns. Second, and more importantly, "separation of powers" is not a magic phrase that automatically transforms any issue it touches into an impediment to the exercise of subject matter jurisdiction. Indeed, a determination that absolute presidential immunity is an issue of subject matter jurisdiction would present its own separation of powers concerns and contravene many of the same principles that underpin absolute presidential immunity.

The Supreme Court in *Nixon v. Fitzgerald* determined that absolute presidential

---

[23]   Court has long held that both qualified and absolute immunity are affirmative defenses that must be pleaded."); *Boyd v. Carroll*, 624 F.2d 730, 732–33 (5th Cir.1980) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded.").

[24]   *Nevada v. Hicks*, 533 U.S. 353, 373 (2001). *See also Mordkofsky v. Calabresi*, 159 F. App'x 938, 939 (11th Cir. 2005) ("[J]udicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction.").

Dkt 122 (Def. Reply Mem.) at 3.

14

immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."[25]  In reaching its decision, the Court discussed common law precedents that recognized immunity for government officials, including absolute immunity for judges and prosecutors.[26]  These precedents, the Court noted, "have been guided by the Constitution, federal statutes, and history" and "at least in the absence of explicit constitutional or congressional guidance," they "have been informed by the common law."[27]  With respect to absolute presidential immunity, the Court explained:

> "Because the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure. Historical inquiry thus merges almost at its inception with the kind of 'public policy' analysis appropriately undertaken by a federal court. This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers."[28]

The heart of the separation of powers doctrine invoked in *Fitzgerald* is respect for the independence of the three branches of government. "In the often-quoted words of Justice Jackson: 'While the Constitution diffuses power the better to secure liberty, it also contemplates that practice

---

[25]   457 U.S. at 749.

[26]   *Id.* at 744-48.

[27]   *Id.* at 747.

[28]   *Id.* at 748.

15

will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'"[29]   Accordingly, one of the central bases justifying absolute *judicial* immunity is the need to protect the "independence without which no judiciary can be either respectable or useful."[30]   Absolute *prosecutorial* immunity, although perhaps a bit removed from the constitutional doctrine of separation of powers, similarly is rooted in the "concern that harassment by unfounded litigation" could "shade [a prosecutor's] decisions instead of exercising the independence of judgment required by his public trust."[31]   Given the overlaps in reasoning, it is unsurprising that the Court in *Fitzgerald* compared explicitly the absolute immunity it recognized for the president with that already recognized for judges and prosecutors.[32]

---

[29]

*Morrison v. Olson*, 487 U.S. 654, 694 (1988) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J., concurring)).

[30]

*Bradley v. Fisher*, 80 U.S. 335, 347 (1871). *See also id.* ("If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away.").

[31]

*Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).

[32]

457 U.S. at 758 ("For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends."); *id.* at 751-52 ("As is the case with prosecutors and judges— for whom absolute immunity now is established—a President must concern himself with matters likely to 'arouse the most intense feelings.') (citation omitted). *See also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) ("We instead [(in *Fitzgerald*)] drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties" by the prospect of civil liability for official acts.'") (quoting *Fitzgerald*, 457 U.S. at 751-752 & n.32).

Perhaps aware of these comparisons, Mr. Trump does not argue specifically that absolute presidential immunity is distinct from absolute judicial and prosecutorial immunity by its foundation in separation-of-powers principles.  Instead, he cites a footnote in *Harlow v. Fitzgerald*, in which the Supreme Court stated that "the recognition of absolute immunity

16

Moreover, the fact that presidential immunity is grounded in separation of powers principles does not convert it into a jurisdictional issue. Mr. Trump relies chiefly on two points in support of his argument to the contrary. Neither withstands analysis.

First, he quotes the following from *Fitzgerald*:

> "[O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . or to vindicate the public interest in an ongoing criminal prosecution . . . the exercise of jurisdiction has been held warranted. In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not."[33]

Mr. Trump's selected passage, however, omits the sentence preceding it, that "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."[34]   Even more to the point, "[j]urisdiction . . . is a word of many, too many,

---

[33]   for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." 457 U.S. 800, 811 n.17 (1982). *Harlow*, however, dealt with the scope of immunity available to aides and advisers of the President and held that presidential aides are entitled to qualified, rather than absolute, immunity.  It therefore is inapposite here.

[33]   Dkt 122 (Def. Reply Mem.) at 2 (alterations in original) (emphasis omitted) (quoting *Fitzgerald*, 457 U.S. at 754).

[34]   *Fitzgerald*, 457 U.S. at 753-54.

17

meanings."[35]  And the Court in *Fitzgerald* did not use the word "jurisdiction" in reference to a federal court's fundamental ability to adjudicate a case on its merits. Indeed, it there specifically left unresolved the "the immunity question as it would arise if Congress expressly had created a damages action against the President of the United States."[36]  If the Court had understood presidential immunity as a restriction on a court's exercise of subject matter jurisdiction, there would have been no need for the Court to have left that question open. The possibility would have been foreclosed by the long-standing principle that Congress cannot expand the scope of federal courts' jurisdiction beyond what is permitted by Article III.[37]

This detail helps to underscore the confusion in Mr. Trump's second point that "the separation of powers doctrine is a creature of Article III standing."[38]  As the cases Mr. Trump quotes make clear, it is Article III standing that "is built on separation-of-powers principles," not *vice versa*.[39]  Therefore, although Article III standing of course is an issue of subject matter jurisdiction, it does not follow that the separation of powers doctrine in all circumstances is as well.  Mr. Trump's

---

[35]     *Wilkins v. United States*, 143 S. Ct. 870, 875 (2023) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006)).

[36]     *Fitzgerald*, 457 U.S. at 748 n.27.

[37]     *Marbury v. Madison*, 5 U.S. 137, 138 (1803); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 65 (1996); *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 66 (2d Cir. 2012) ("Neither we nor Congress may [expand the federal courts' subject matter jurisdiction], for the Constitution alone defines the outer limits of subject-matter jurisdiction.").

[38]     Dkt 122 (Def. Reply Mem.) at 3.

[39]     *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

18

argument in this respect lacks logical coherence and plainly is frivolous.

More fundamentally, Mr. Trump's argument that absolute presidential immunity is jurisdictional runs afoul of many of the same principles on which the immunity is based. As the Supreme Court stated in *Clinton v. Jones*,[40] the "dominant concern [in *Fitzgerald*] was with the diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision."[41]  The Court was concerned with intruding on the president's scope of authority and ability to make decisions to govern effectively.  It sought to protect the president's autonomy, not diminish it by denying the president the ability to choose whether or not to defend himself or herself in a civil lawsuit in federal court. As law professor Akhil Amar and former Solicitor General Neal Katyal wrote:

> "[The president's] immunity is of course waivable . Surely the President in whatever spare time he has should be allowed to litigate civil damage actions — or to watch basketball for that matter — but he should not be legally obliged to do either. As a practical matter, politics may sometimes create strong pressure to litigate now — or, again, to watch a basketball game — but political pressure should not be confused with legal obligation. In a civil damage action in the early 1960s, then-President John Kennedy asserted litigation immunity under a statute. When that failed, he settled the case instead of asserting presidential immunity . . . ."[42]

---

[40]  520 U.S. 681 (1997).

[41]  *Id.* at 694 n.19.

[42]  Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 HARV. L. REV. 701, 726 n.53 (1995).

19

Yet the rule Mr. Trump advocates would remove this choice from the president. Under Mr. Trump's

approach, each time a president is sued in federal court, the court would be obligated to raise and

resolve the issue of absolute presidential immunity *sua sponte* and, if the defense applied, it would

be obligated to dismiss the case for want of subject matter jurisdiction *even if* the president wished

to litigate in that case. Such a requirement would contradict the results in many of the other civil

lawsuits filed against Mr. Trump for actions during his presidency, in at least one of which, as Ms.

Carroll points out, Mr. Trump agreed with the plaintiff that absolute presidential immunity was not

a "threshold issue[] that must be decided before reaching the merits."[43]  More importantly, it would

risk encroachment by the judiciary into the president's domain by eliminating the president's ability

to choose. There is no indication in *Fitzgerald* or in its progeny that absolute presidential immunity

ever was meant to be so patronizing.


*Leave to Amend Mr. Trump's Answer Is Not Warranted*

In the alternative, Mr. Trump argues that the Court should construe his motion for

summary judgment as a motion for leave to amend his answer to resurrect the previously waived

absolute presidential immunity defense. The standard governing this request is clear. Although Rule

---

[43]

*K&D, LLC v. Trump Old Post Off., LLC*, No. CV 17-731 (RJL), 2018 WL 6173449, at *3 (D. D.C. Nov. 26, 2018), *aff'd*, 951 F.3d 503 (D.C. Cir. 2020) (emphasis omitted).

There possibly is an argument that Mr. Trump is judicially estopped from taking the opposite position now in this case. *See Clark v. AII Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018) ("[T]he equitable doctrine of judicial estoppel . . . 'prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.'") (citation omitted).  Given that neither party has briefed this issue and it is unnecessary to my decision, I do not address it here.

**SA-149**

20

15(a) provides that leave to amend "shall be freely given when justice so requires,"[44] "it is within the sound discretion of the district court to grant or deny leave to amend."[45] "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[46]

Mr. Trump's request is denied on two independent grounds. First, it is denied on the ground that the proposed amendment would be futile. In the alternative, it is denied on the ground that Mr. Trump delayed unduly in raising his presidential immunity defense and granting his request would prejudice Ms. Carroll unfairly.

*Futility of Mr. Trump's Proposed Amendment*

A motion for leave to amend an answer to assert an affirmative defense may be denied as futile when the affirmative defense would be meritless.[47] "In fact, it is unexceptional for federal courts to deny leave to amend on the basis of futility where the proposed amended pleading would not withstand a motion to dismiss."[48]

---

[44]

Fed. R. Civ. P. 15(a).

[45]

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted).

[46]

*Id*.

[47]

*Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, 403 F. App'x 530, 532–33 (2d Cir.2010)*; Fireman's Fund Ins. Co. v. Krohn*, No. 91-cv-3546 (PKL), 1993 WL 299268, at *3 (S.D.N.Y. Aug. 3, 1993) (citing cases).

[48]

*Carroll v. Trump*, 590 F. Supp. 3d 575, 579 (S.D.N.Y. 2022) (citing cases).

As noted above, the president is entitled to absolute immunity from liability in civil damages lawsuits "for acts within the 'outer perimeter' of [the president's] official responsibility."[49] The expansive scope of this immunity is based on "the special nature of the President's constitutional office and functions," the president's "discretionary responsibilities in a broad variety of areas, many of them highly sensitive," and the "difficult[y] [in] determin[ing] which of the President's innumerable 'functions' encompass[] a particular action."[50]  Implicit in that statement of the scope of presidential immunity, however, is the acknowledgment that there indeed is an "outer perimeter" of the president's official duties, and that the president is not immune from liability for acts outside that perimeter. As the Supreme Court explained in *Jones*:

> "The principal rationale for affording certain public servants immunity from
> suits for money damages arising out of their official acts is inapplicable to unofficial
> conduct. . . .  As we explained in *Fitzgerald*, 'the sphere of protected action must be
> related closely to the immunity's justifying purposes.' . . . Because of the President's
> broad responsibilities, we recognized in that case an immunity from damages claims
> arising out of official acts extending to the 'outer perimeter of his authority.' . . .  But
> we have never suggested that the President, or any other official, has an immunity
> that extends beyond the scope of any action taken in an official capacity."
>
> "Moreover, when defining the scope of an immunity for acts clearly taken
> *within* an official capacity, we have applied a functional approach. 'Frequently our

---

[49]   *Fitzgerald*, 457 U.S. at 756.

[50]   *Id.*

decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office.'. . . As our opinions have made clear, immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'"[51]

Mr. Trump argues that he is entitled to absolute presidential immunity because he "made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation."[52]  He states that:

> "As both the leader of the nation and head of the Executive Branch, [he] could not sit idly while a 'media frenzy' erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to 'maintain the continued trust and respect of [his] constituents' and to 'preserve his ability to carry out his [] responsibilities.' . . . Thus, it cannot be reasonably disputed that [Mr. Trump's] conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation."[53]

Mr. Trump accordingly contends that his responses to Ms. Carroll's accusation "fell squarely within

---

[51] 520 U.S. at 692–95 (emphasis in original) (citations omitted).

[52] Dkt 109 (Def. Mem.) at 17.

[53] *Id.* (citations omitted).

the 'outer perimeter' of [his] official duties as President."[54]

The fatal flaw in Mr. Trump's reasoning is that he ignores the precise acts that are the subject of this lawsuit. For the sake of argument, the Court assumes that, when Mr. Trump responded to Ms. Carroll's sexual assault accusation, he was addressing a matter of public concern because the accusation "impugned his character and, in turn, threatened his ability to effectively govern the nation."[55]  It accepts also, for the sake of argument, that the president's speech on a matter of public concern comes within the president's official responsibilities. These points, however, do not lead to the conclusion that Mr. Trump's statements in this case came within the outer perimeter of his official duties as president. As Judge Mehta thoughtfully wrote in another case where Mr. Trump asserted an absolute presidential immunity defense, an analysis with which this Court agrees:

> "[T]o say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: '[T]o construct an immunity from suit for unofficial acts

---

[54]  *Id.* at 16.

[55]  *Id.* at 17.  *See Snyder v. Phelps,* 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'") (citations omitted).

grounded purely in the identity of [the President's] office is unsupported by precedent.'. . . And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: 'Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty.'. . . Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

"Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to 'punch' a protester 'in the face right now.' Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is blocking the legislation of running a child-trafficking operation. Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support. In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech. To be sure, these scenarios may seem far-fetched, but they illustrate an important point: blanket immunity cannot shield a President from suit merely because his words touch on

matters of public concern. *The context in which those words are spoken and what is said matter.*"[56]

The conduct at issue here consists not only of what Mr. Trump did (*i.e.*, make public statements in response to Ms. Carroll's accusation) but also, and importantly, the *content* of his statements (*i.e.*, what he said in his statements). Mr. Trump did not merely deny Ms. Carroll's accusation of sexual assault. Instead, he accused Ms. Carroll of lying about him sexually assaulting her in order to increase sales of her book, gain publicity, and/or carry out a political agenda. Even assuming that the president's decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that the president's own personal attacks on his or her accuser equally fall within that boundary. Mr. Trump does not identify any connection between the allegedly defamatory content of his statements – that Ms. Carroll fabricated her sexual assault accusation and did so for financial and personal gain – to any official responsibility of the president. Nor can the Court think of any possible connection.

The justifying purposes of presidential immunity support this determination. The fundamental purpose of presidential immunity is to avoid "diversion of [the president's] energies" and "distract[ing] a President from his [or her] public duties" by subjecting the president to "concern with private lawsuits."[57] It is not a "get out of damages liability free" card that permits the president to say or do anything he or she desires even if that conduct is disconnected entirely from an official function. On the facts presented here, there is no concern that the president "would be subject . . .

---

[56] *Thompson v. Trump*, 590 F. Supp. 3d 46, 79–80 (D. D.C. 2022) (emphasis added) (citations omitted).

[57] *Fitzgerald*, 457 U.S. at 751–53.

26

to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden

purpose."[58]  The question of whether presidential immunity applies in this case turns not on an

allegation that Mr. Trump acted unlawfully or made the statements with actual and common law

malice, but on whether the act itself – accusing an individual who has charged the president with a

personal wrongdoing of fabricating the charge for ulterior and improper purposes – is within the

outer perimeter of the president's official responsibility.[59]  Subjecting the president to damages

liability for making a personal attack that is unrelated to the president's official responsibilities

would not threaten to distract the president from his or her official duties.


*Undue Delay and Unfair Prejudice*

Leave to amend is denied also on the basis of undue delay, dilatory motive, bad faith

and/or prejudice to the opposing party.

"The rule in this Circuit has been to allow a party to amend its pleadings in

the absence of a showing by the nonmovant of prejudice or bad faith. . . . However,

'*the longer the period of an unexplained delay, the less will be required of the*

---

[58]      *Id.* at 756.

[59]      Mr. Trump compares this case to *Barr v. Matteo*, 360 U.S. 564 (1959), where the Supreme Court determined that the director of a federal agency was protected by an absolute privilege in a libel action brought by former employees based on a press release in which the director announced his intention to suspend the employees. The Court stated that "[t]e fact that the action here taken was within the outer perimeter of [the director's] line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint."  *Id.* at 575.  The decision in that case makes no difference to the analysis here.  As noted above, the question of whether presidential immunity applies here does not require crediting Ms. Carroll's allegation of malice or any consideration of Mr. Trump's motives.  His accusation against Ms. Carroll, which forms the basis of Ms. Carroll's defamation claim, suffices to render his presidential immunity defense meritless.

*nonmoving party in terms of a showing of prejudice*.' . . . In determining what
constitutes 'prejudice,' we consider whether the assertion of the new claim would:
(I) require the opponent to expend significant additional resources to conduct
discovery and prepare for trial; (ii) significantly delay the resolution of the dispute;
or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction....
'Mere delay, however, absent a showing of bad faith or undue prejudice, does not
provide a basis for a district court to deny the right to amend.'"[60]

Mr. Trump's three-year delay in raising his presidential immunity defense, for which he offers no
explanation, coupled with the unfair prejudice that would result from an amendment for this purpose
to Ms. Carroll, warrant denial of leave to amend.

The Court has set forth in its prior opinions the record of Mr. Trump's efforts to delay
both this case and *Carroll II*.[61]   Those details need not be repeated here. It suffices for present
purposes to note that the Court denied Mr. Trump's prior request for leave to amend his answer in
January 2022.   Mr. Trump then sought leave to amend to assert an affirmative defense and
counterclaim based on New York's "anti-SLAPP" law and to argue that Ms. Carroll's defamation

---

[60]

      *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (emphasis added) (citations
omitted).

[61]

      *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2960061 (S.D.N.Y. Apr. 17, 2023)
(denying Mr. Trump's application for a month-long postponement of the trial of *Carroll II*);
*Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023)
(denying Mr. Trump's offer to provide a DNA sample in exchange for production by Ms.
Carroll of an undisclosed appendix to a report examining the DNA found on the dress Ms.
Carroll wore when she was assaulted); *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL
6897075 (S.D.N.Y. Oct. 12, 2022) (denying Mr. Trump's motion to substitute the United
States for him as the defendant and to stay the action); *Carroll v. Trump*, 590 F. Supp. 3d
575  (S.D.N.Y. 2022) (denying Mr. Trump's motion for leave to amend his answer).

28

claim is baseless and intended for harassment.  That motion was denied on two alternative grounds.

First, on the basis that the proposed amendment would be futile.  Second, on the additional ground

that Mr. Trump's motion was delayed unduly and made at least in part for a dilatory purpose. As the

Court explained:

> "[D]efendant's actions have been dilatory throughout the litigation. As [Ms.
>
> Carroll] aptly puts it, he 'has slow-rolled his defenses, asserting or inventing a new
>
> one each time his prior effort to delay the case fails. . . . Taken together, these actions
>
> [(the history of defendant's motions to stay and other litigation conduct)] demonstrate
>
> that defendant's litigation tactics have had a dilatory effect and, indeed, strongly
>
> suggest that he is acting out of a strong desire to delay any opportunity plaintiff may
>
> have to present her case against him."[62]

Since that decision was issued in March 2022, Mr. Trump's conduct both in this case and in *Carroll*

*II* – as discussed in detail in my prior decisions and incorporated herein by reference – only has

corroborated the Court's earlier hypothesis of his dilatory motive.

These facts perhaps would suffice on their own to deny Mr. Trump's request for leave

to amend. But the Court does not rely solely on them in denying the relief Mr. Trump seeks. The

unfair prejudice to Ms. Carroll if leave to amend were granted also is clear.

The effect of granting leave, and thus relieving Mr. Trump of his prior waiver, even

assuming his absolute immunity defense were meritorious, would be the dismissal of this case.  And,

to be sure, the dismissal, in and of itself, would not be *unfair* prejudice to Ms. Carroll because it

---

[62]    *Carroll*, 590 F. Supp. 3d at 588.

would reflect the fact that there was an insurmountable obstacle to her claim in the first place. But such a dismissal cannot be considered in isolation. Ms. Carroll now has litigated this case for more than three and a half years. She has completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before Court, the Second Circuit and the D.C. Court of Appeals, and devoted untold hours and resources to pursuing her claim. And that weighs very heavily in the analysis. For, if Mr. Trump's absolute immunity argument were valid, his failure to assert it at the outset of this lawsuit needlessly, unfairly, and inexcusably subjected Mr. Carroll to all of those burdens. The undue delay in asserting the defense thus was inherently and unfairly prejudicial even if this Court is mistaken in concluding that it is legally insufficient.

Finally, there is the one more consideration. If Mr. Trump were granted leave to amend and this Court were to reject his absolute immunity claim, the order doing so likely would be appealable. No doubt Mr. Trump would appeal. And an appeal likely would cause "significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings."[63]  Were this Court's rejection of his defense upheld on appeal, those additional delays would further prejudice Ms. Carroll unfairly. She now is 79 years old and, as just mentioned, has been litigating this case for more than three and a half years. There is no basis to risk prolonging the resolution of this litigation further by permitting Mr. Trump to raise his absolute immunity defense now at the eleventh hour when he could have done so years ago.

For all these reasons, leave to amend would be unjustified.

---

[63]   Dkt 113 (Pl. Opp. Mem.) at 15.

30

*Ground Two: Defamatory Per Se*

Mr. Trump's remaining arguments concern the substance of his allegedly defamatory statements. First, he argues that his statements were not defamatory *per se*. As this Court stated in denying Mr. Trump's motion to dismiss Ms. Carroll's defamation claim in *Carroll II* on the same basis:

"There are two categories of defamation under New York law: *libel*, for written statements, and *slander*, for spoken statements. Written statements actionable as libel include statements published on social media outlets and on the Internet....

"A written statement is libelous *per se* if it '*tends* to disparage a person in the way of his [or her] office profession or trade.' A writing also is libelous *per se* if it 'tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her].' . . .

"Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation of the higher standard applied to slander *per se* with the lower standard for libel *per se*. Mr. Trump argues that there are 'four narrowly defined categories of statements which are considered to be defamatory *per se*,' and that Ms. Carroll has failed to state a claim for defamation *per se* 'because it does not, on its face, defame [P]laintiff in her trade, business or profession,' one of the four categories. However, nearly every authority Mr. Trump cites, including the case identifying those four categories and the cases describing the category of injury in one's profession are slander *per se*, not libel, cases. Unlike a libelous *per se* statement, a slanderous *per*

*se* statement 'must be made with reference to a matter of significance and importance

for that purpose [(of defaming a person in his or her trade, business, or profession)],

rather than a more general reflection upon the plaintiff's character or qualities.'

Moreover, if a complaint fails to allege sufficient facts to state a claim for slander *per*

*se*, 'the plaintiff must show . . . that the statement complained of caused him or her

special harm" – generally "the loss of something having economic or pecuniary

value.' The more stringent standard for slander *per se* is grounded in sound logic:

'What gives the sting to the writing is its permanence of form. The spoken word

dissolves, but the written one abides and perpetuates the scandal.'"[64]

Much of the same analysis applies to Mr. Trump's argument with respect to his 2019

statements. Mr. Trump concedes that his June 21, 2019 statement, which he provided in written form

to his staff to distribute to the press, "can be considered under the libel *per se* standard."[65]  His other

two statements similarly sound in libel rather than slander. "Where a defamatory statement is oral,

but is expected by the speaker to be reduced to writing and published, and is subsequently

communicated in written form, such statement constitutes a libel."[66]  "A statement made to a person

known to be by the speaker to be a working newspaper reporter, for example, will be treated as libel,

---

[64]

    *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507, at *10-11 (S.D.N.Y. Jan. 13, 2023) (emphases and alterations in original).

[65]

    Dkt 122 (Def. Reply Mem.) at 9.

[66]

    *Park Knoll Assocs. v. Schmidt*, 89 A.D.2d 164, 168 (2d Dept. 1982), *rev'd on other grounds*, 59 N.Y.2d 205 (1983) (citing ROBERT D. SACK, LIBEL AND SLANDER AND RELATED PROBLEMS § 2:3, p. 44)); *see also Macineirghe v. Cnty. of Suffolk*, No. 13-cv-1512 (ADS)(SIL), 2015 WL 4459456, at *9 (E.D.N.Y. July 21, 2015).

32

provided the statement is thereafter communicated in written form."[67]  Mr. Trump made the other

two June 2019 statements to individuals he knew to be reporters. He does not argue that he did not

understand his remarks would be publicly reported in writing.[68]  All three of Mr. Trump's June 2019

statements therefore properly are assessed under the libel *per se* standard.

        Ms. Carroll adequately has alleged that Mr. Trump's statements are libelous *per se*.

As in his 2022 statement, in his 2019 statements – particularly in his first two statements issued on

June 21, 2019 and June 22, 2019, respectively – he accuses Ms. Carroll of making up a "totally false

accusation" "to sell a new book" and "for the sake of publicity." As the Court wrote previously:

> "Ms. Carroll is a 'writer, advice columnist, and journalist.' Honesty and
> credibility are critical to these professions, which rely heavily on the trust and
> confidence of their audiences. A writer who writes about his or her own experiences,
> as Ms. Carroll did, depends on his or her readers believing the writer, which they may
> be less inclined to if the writer is called dishonest. The October 12 statement – in
> addition to accusing Ms. Carroll of 'completely ma[king] up a story' about Mr.
> Trump – states that Ms. Carroll 'changed her story from beginning to end' during an
> interview 'where she was promoting a . . . book.' Drawing all reasonable inferences

---

[67]    ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:3 (4th ed. 2011).

[68]    Indeed, with respect to the June 22, 2019 statement that Mr. Trump made to reporters before boarding Marine One, when Mr. Trump was asked during his deposition whether it is "fair to say that when [he] made comments while [he was] president on [his] way to somewhere . . . on [his] way to boarding Air Force One or Marine One that a transcript would be created like this [(transcript of the June 22, 2019 statement)] and released by [his] press office," he responded "oftentimes."  Dkt 117-6 (Def. Dep.) at 64:4-10.

# SA-162

33

in favor of plaintiff, the October 12 statement on the whole can be construed as Ms.

Carroll falsely accusing Mr. Trump of rape in order to promote her book and increase

its sales. Based on the facts alleged in the complaint, Ms. Carroll has sufficiently

pleaded a claim of libel *per se* because the October 12 statement may have affected

her in her profession by 'imputing to [her] . . . fraud, dishonesty, [and/or] misconduct

. . . .'"[69]

Similarly, Mr. Trump's 2019 statements reasonably can be construed as tending to

disparage Ms. Carroll in the way of her profession and/or by exposing her to hatred, contempt or

aversion or inducing an evil or unsavory opinion of her in the minds of a substantial number of the

community. Mr. Trump's contention that the statements "do not reference Plaintiff's profession as

an advice columnist, nor do they touch upon Plaintiff's 'Ask E. Jean' column" is inapposite to the

libel *per se* standard, which requires no such specific references.[70]  Nor was Ms. Carroll required to

plead special damages because she has sufficiently pleaded the elements of a libel *per se* claim.  Mr.

Trump's second argument to dismiss Ms. Carroll's claim therefore is without merit.


*Ground Three: Nonactionable Opinion*

Related also to the substance of his allegedly defamatory statements, Mr. Trump

argues that "nearly all of the content contained in the statements are immaterial since they constitute

---

[69]  *Carroll*, 2023 WL 185507, at *11 (emphases and alterations in original).

[70]  Dkt 122 (Def. Reply Mem.) at 9.

34

protected opinion speech."[71]   Specifically, he contends that "aside from [his] repudiation of

Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the

alleged defamatory statements is protected opinion speech. Therefore, these statements are not

actionable as defamation."[72]

Statements of opinion are not actionable as defamation "however unreasonable the

opinion or vituperous the expressing of it may be."[73]   "While it is clear that expressions of opinion

receive absolute constitutional protection . . . , determining whether a given statement expresses fact

or opinion may be difficult. The question is one of law for the court and one which must be answered

on the basis of what the average person hearing or reading the communication would take it to

mean."[74]

The New York Court of Appeals has identified three factors relevant to determining

whether an average person would understand a statement as conveying fact or opinion:

"'(1) [W]hether the specific language in issue has a precise meaning which

is readily understood; (2) whether the statements are capable of being proven true or

false; and (3) whether either the full context of the communication in which the

statement appears or the broader social context and surrounding circumstances are

such as to signal . . . readers or listeners that what is being read or heard is likely to

---

[71]    Dkt 109 (Def. Mem.) at 30.

[72]    *Id.* at 33.

[73]    *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977).

[74]    *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986).

be opinion, not fact[.]'"

"The third factor 'lends both depth and difficulty to the analysis' . . . , and requires that the court consider the content of the communication as a whole, its tone and apparent purpose. Thus, we have adopted a holistic approach to this inquiry. Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.'"[75]

"The dispositive inquiry . . . is whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff."[76]

Mr. Trump has not addressed the first and third factors. In any event, both weigh against his position. Mr. Trump "used specific, easily understood language to communicate" that Ms. Carroll made up a false story about Mr. Trump sexually assaulting her to increase sales of her book, to get publicity, and/or for political reasons.[77]   Indeed, the third sentence of his June 21, 2019 statement makes plain his central message that "[s]he [(Ms. Carroll)] is trying to sell a new book – that should indicate her motivation." Considering each statement as a whole, there is nothing vague or ambiguous about the statements that would make it difficult for an average reader to appreciate

---

[75]

  *Davis v. Boeheim*, 24 N.Y.3d 262, 269–70 (2014) (citations omitted).

[76]

  *Id.* (alterations in original) (internal quotation marks and citation omitted).

[77]

  *Id.* at 271.

36

their main point: that Ms. Carroll lied and her motives for lying.

   The contexts in which the statements were made also convey that they were assertions of fact. The heading of the June 21, 2019 statement reads "Statement from President Donald J. Trump" and was prepared by Mr. Trump to distribute to the press. The June 22, and June 24, 2019 statements were made to reporters, the former expected by Mr. Trump to be transcribed and released by his press office and the latter made by Mr. Trump in the course of an exclusive interview with a newspaper focused on political coverage. Unlike other contexts that courts have determined tended to signal expressions of opinion, such as the Republican presidential primary debate or a character-limited post on Twitter,[78] the circumstances here indicate that Mr. Trump's apparent purpose was to state that Ms. Carroll falsely accused him of sexual assault for financial and/or personal gain as a matter of fact, not as a matter of his personal belief or opinion.

   The only factor that Mr. Trump touches upon is the second, whether the statements are capable of being proven true or false. Mr. Trump argues that his statements are "no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false" and he "was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims."[79] Courts have determined that statements that an individual made a false accusation or lied for financial or for personal gain are capable of

---

[78]

  *Jacobus v. Trump*, 51 N.Y.S.3d 330, 342 (N.Y. Sup. Ct. 2017), *aff'd*, 156 A.D.3d 452, 64 N.Y.S.3d 889 (1st Dept. 2017).

[79]

  Dkt 109 (Def. Mem.) at 33.

37

being proven true or false.[80]  Importantly, Mr. Trump did not use speculative language in stating Ms. Carroll's motives for falsely accusing him of sexual assault. Instead, he stated "[s]hame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda" and "you can't do that for the sake of publicity."  In another portion of his June 21, 2019 statement, he wrote "[t]he world should know what's really going on" after requesting anyone who "has information that the Democratic Party is working with Ms. Carroll" to notify Mr. Trump and his staff. The specificity of Mr. Trump's statements makes clear that he was not merely guessing or speculating as to Ms. Carroll's motive. Instead, he attributes to Ms. Carroll specific and objectively verifiable motives for fabricating her sexual assault accusation.

The cases Mr. Trump cites are inapposite. For example, "the loose and generalized statement that [the plaintiffs who brought a sexual harassment lawsuit] 'do not want to work' or 'hold jobs' and simply 'want to make easy money' . . ."[81] and the statement "I think he wanted me to divorce him,"[82] are a far cry from Mr. Trump's clear and definite statement that Ms. Carroll "is

---

[80]  *E.g.*, *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225 n.4 (2d Cir. 1985) ("In *Edwards*, we distinguished the epithet 'liar' from the epithet 'paid liar.' We found that unlike calling someone a liar, charging someone with being a paid liar was an assertion of fact. We explained: '[T]o call the appellees, all of whom were university professors, paid liars clearly involves defamation that far exceeds the bounds of the prior controversy.... And, to say a scientist is paid to lie implies corruption, and not merely a poor opinion of his scientific integrity. Such a statement requires a factual basis....'") (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977)); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382 (1977) ("The ordinary and average reader would likely understand the use of these words [(that the plaintiff is "probably corrupt")], in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions.").

[81]  *Gentile v. Grand St. Med. Assocs.*, 79 A.D.3d 1351, 1353 (3d Dept. 2010).

[82]  *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996).

SA-167

38

trying to sell a new book–that should indicate her motivation," among other assertions he made. Although some courts have been reluctant to find statements concerning a "plaintiff's frame of mind and motivation" to be capable of being objectively verifiable,[83] whether or not that is so is a case-specific determination dependent on the specific statements at issue and the other factors relevant to this analysis. Here, although there perhaps was a subjective component to Mr. Trump's statements that Ms. Carroll was trying to increase sales of her book and gain publicity, in these circumstances, her "state of mind is a fact question [susceptible to proof] the same as any other fact."[84]

All three factors therefore weigh in favor of a determination that Mr. Trump's statements were factual assertions rather than expressions of opinion.[85]

---

[83]

E.g., Treppel v. Biovail Corp., No. 03-cv-3002 (PKL), 2004 WL 2339759, at *14 (S.D.N.Y. Oct. 15, 2004), on reconsideration, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005); Coleman v. Grand, 523 F. Supp. 3d 244, 264 (E.D.N.Y. 2021).

In Immuno AG. v. Moor-Jankowski, the New York Court of Appeals stated that "[s]peculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel." 74 N.Y.2d 548, 560 (1989). The court's judgment was vacated, 497 U.S. 1021 (1990), and that statement did not appear again in the court's opinion on remand. 77 N.Y.2d 235 (1991). Notably, the original opinion cited to Rinaldi v. Holt (cited above, supra n. 71). In Rinaldi, however, Judge Gabrielli wrote in his dissent: "[a]s the majority quite properly observes, the charge that plaintiff is 'probably corrupt' is a statement of fact and not an expression of opinion," and in a footnote to that statement, he wrote "[a] charge of corruption goes essentially to the motive behind an individual's acts. As one court has noted, '(t)he state of a man's mind is as much a fact as the state of his digestion' (Edgington v. Fritzmaurice, 29 Ch.D. 459, 483 (CA))." 42 N.Y.2d at 954 & n.1. It therefore is possible that some of the modern case law on whether a statement as to an individual's state of mind is objectively verifiable is based in part on a misconstruction of the precedents on this issue.

[84]

Am. Acad. of Religion v. Napolitano, 573 F.3d 115, 134 (2d Cir. 2009) (quoting In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 838 (2d Cir.1994) (Van Graafeiland, J., dissenting)).

[85]

Neither party addresses specifically Mr. Trump's June 24, 2019 statement, in which he said only: "I'll say it with great respect: Number one, she's not my type. Number two, it never

*Ground Four: Consent*

  Mr. Trump contends also that Ms. Carroll's claim is barred because she consented to Mr. Trump's allegedly defamatory statements. Under New York law, "[c]onsent is a bar to a recovery for defamation under the general principle of *volenti non fit injuria* or, as it is sometimes put, the plaintiff's consent to the publication of the defamation confers an absolute immunity or an absolute privilege upon the defendant[.]."[86] "Decisions of New York's intermediate appellate courts have established that the consent of the person defamed to the making of a defamatory statement bars that person from suing for the defamation, and that, in some circumstances, a person's intentional eliciting of a statement she expects will be defamatory can constitute her consent to the making of the statement."[87] As the Second Circuit has stated:

    "The contours and purposes of the rule are somewhat illuminated by the

    Restatement (Second) of Torts (1977), which in defamation cases has been cited with

    approval by the highest court of New York. . . . Section 583 of the Restatement

    provides, 'Except as stated in § 584, the consent of another to the publication of

    defamatory matter concerning him is a complete defense to his action for

---

happened. It never happened, OK?". In her complaint, Ms. Carroll alleges that all three June 2019 statements were defamatory. However, as stated above, the crux of Ms. Carroll's defamation claim lies in Mr. Trump's statements that Ms. Carroll lied for financial and/or personal gain. Indeed, Mr. Trump appears to ground his argument that "the majority" of his statements are nonactionable opinion on the assumption that Ms. Carroll does not allege his "general repudiation of Plaintiff's allegations" in itself was defamatory. Dkt 109 (Def. Mem.) at 32. As the parties have not adequately addressed this point, the Court does not now decide it.

[86]

  *Teichner v. Bellan*, 7 A.D.2d 247, 251 (4th Dept. 1959).

[87]

  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015) (citing cases).

40

defamation.' Comment d to this Section says, 'It is not necessary that the other know

that the matter to the publication of which he consents is defamatory in character. It

is enough that . . . he has reason to know that it may be defamatory.' As an

illustration, the Restatement notes that a summarily discharged school teacher who

'demands that the reason for his dismissal be made public . . . has consented to the

publication [of the reason] though it turns out to be defamatory.' Restatement

(Second) of Torts § 583 cmt. d (1977)."[88]

The Reporter's Note to Section 583 of the Restatement provides that "[t]he plaintiff's consent is a

defense even though he procures the publication for the purpose of decoying the defendant into a

lawsuit."[89]   The Restatement states also that:

> "[c]onsent means that the person concerned *is in fact willing* for the conduct
>
> of another to occur. Normally this willingness is manifested directly to the other by
>
> words or acts that are intended to indicate that it exists. It need not, however, be so
>
> manifested by words or by affirmative action. It may equally be manifested by silence
>
> or inaction, if the circumstances or other evidence indicate that the silence or inaction
>
> is intended to give consent. Even without a manifestation, consent may be proved by
>
> any competent evidence to exist in fact, and when so proved it is as effective as if
>
> manifested."[90]

---

[88]     *Id.* (alteration in original) (citations omitted).

[89]     WILLIAM L. PROSSER AND JOHN W. WADE, RESTATEMENT (SECOND) OF TORTS § 583 (1977).

[90]     *Id.*  § 892 (1979) (emphasis added).

**SA-170**

41

Mr. Trump argues that Ms. Carroll consented to Mr. Trump's allegedly defamatory remarks because she (1) "purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible" and (2) "waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States," leaving him "with no choice but to defend himself against th[e] heinous allegations."[91]   Neither of these points demonstrates that Ms. Carroll had any reason to expect Mr. Trump to make statements that would be defamatory. Indeed, Mr. Trump's argument amounts to suggesting that any time an individual comes forward with an accusation of wrongdoing against a public official, that person thereby consents to the official stating anything he or she wishes in response, no matter how calumnious. As Ms. Carroll aptly states, "[w]hen a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response."[92]

The only evidence that Ms. Carroll possibly "had reason to anticipate that [Mr. Trump's] response [to her accusation] might be a defamatory one"[93] – which Mr. Trump entirely ignores – comes from her own words in the excerpt of her book published in *New York* Magazine:

"*Why haven't I 'come forward' before now?*

"Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the 15 women who've come forward with credible stories about how the man [(Mr. Trump)] grabbed, badgered, belittled,

---

91      Dkt 109 at 29-30.

92      Dkt 113 (Pl. Opp. Mem.) at 31.

93      *Handlin v. Burkhart*, 220 A.D.2d 559, 559 (2d Dept. 1995).

42

mauled, molested, and assaulted them, only to see the man turn it around, deny,

threaten, and attack them, never sounded like much fun. Also, I am a coward."[94]

It nevertheless fails to establish consent. First, as observed by another court in this circuit, "[a]

review of case law indicates that the type of consent accepted as a complete[] defense to a

defamation action is *specific* consent, typically initiated by the plaintiff, which clearly indicates that

the plaintiff was aware of and agreed to the possibility that defamatory statements might be

published."[95] Ms. Carroll's generalized concern that she might be subject to the same attacks that

other women, as she stated, have experienced after coming forward with their accusations against

Mr. Trump does not demonstrate her awareness of and agreement to the possibility that Mr. Trump

might defame her in response to her specific accusation of sexual assault and rape.

Second, there is no evidence to suggest that Ms. Carroll had reason to know the type

or content of a public statement, if any, Mr. Trump might make in response to her accusation, let

alone that she agreed to it. "Implicit in the concept of consent is the conception that the consenting

party have the power to control the publication. Thus, there can be no finding of consent where, as

here, there is no effective control over the dissemination of the defamatory material."[96]  Indeed, when

asked in her deposition how she expected Mr. Trump would react to her sexual assault accusation,

---

[94]

E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump -assault-e-jean-carroll-other-hideous-men.html.

[95]

*McNamee v. Clemens*, 762 F. Supp. 2d 584, 604–05 (E.D.N.Y. 2011) (emphasis added) (citing cases).

[96]

*Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 104 (E.D.N.Y. 1997).

Ms. Carroll testified that:

> "I didn't think he would deny it.  I thought he would just say it didn't happen
>
> that way.  She agreed to it or it was consensual sex. . . . I just was shocked that he
>
> absolutely denied it because he was there and he denied it. That's what gets me every
>
> time. He was there, he denied it.[97]

She testified also that she "ha[s] no idea" if she would have sued Mr. Trump if he had instead said

that it was consensual sex because "it would have been him saying yeah, it happened and then we

could have disagreed and then I could have vehemently said no, I did not consent."[98]

Drawing all factual inferences in favor of Ms. Carroll, as the Court must on this

motion for summary judgment, Ms. Carroll's testimony makes clear that any generalized concern

Ms. Carroll harbored based on Mr. Trump's "den[ials], threat[s], and attack[s]" against his other

accusers did not translate to her consenting to the possibility the same would occur with her.[99]

*Punitive Damages*

Lastly, Mr. Trump argues that Ms. Carroll's punitive damages claim should be

dismissed because she cannot demonstrate that Mr. Trump acted with common law malice.

"Punitive damages may only be assessed under New York law if the plaintiff has

---

[97]   Dkt 116-1 (Carroll Dep.) at 166:2-6, 167:3-7.

[98]   *Id.* at 166:9-15.

[99]   In the alternative, there at least is a genuine issue of material fact based on the evidence as
       to whether Ms. Carroll consented to Mr. Trump's allegedly defamatory statements,
       precluding dismissal as a matter of law on summary judgment.

44

established common law malice in addition to the other elements of libel. . . . To do so, plaintiffs must prove by a preponderance of the evidence that the libelous statements were made out of 'hatred, ill will, [or] spite.'"[100]  The Appellate Division, First Department, one of New York's intermediate appellate courts, has "held that a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was 'the one and only cause for the publication.'"[101] "Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote."[102]

Mr. Trump contends that his "statements could not have been 'motivated by a desire to injure plaintiff'" because "they were strictly made in Defendant's own defense."[103]  His argument merely presents his characterization of his own conduct, which of course is favorable to him. He fails

---

[100]

*Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 184 (2d Cir. 2000).

[101]

 *Morsette v. "The Final Call"*, 309 A.D.2d 249, 255 (1st Dept. 2003) (emphasis in original) (citation omitted).

[102]

*Celle*, 209 F.3d at 185.

[103]

Dkt 109 (Def. Mem.) at 34 (quoting *Morsette*, 309 A.D. at 255).

In passing, Mr. Trump raises also the point that "[i]ndeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity." *Id.* at 34 (citing cases).  First, his argument arguably has been waived because it was not raised in his answer and is "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013). In any event, any such claim of a qualified privilege – as with his main argument against punitive damages – depends on weighing the evidence of Mr. Trump's motives for making the allegedly defamatory statements.

to address any of the relevant evidence, including, for example, his deposition testimony with respect to the circumstances in which he made the statements and whether he ever read the *New York* magazine article or Ms. Carroll's book that contain her sexual assault accusation.

Furthermore, it is relevant – although not dispositive – that the jury in *Carroll II* in fact awarded punitive damages to Ms. Carroll  for her defamation claim for Mr. Trump's 2022 statement, which as discussed above substantially is similar to Mr. Trump's statements in this case. To do so, the jury was required to find and did find that Ms. Carroll proved (1) Mr. Trump knew it was false or acted in reckless disregard of its truth or falsity when he made the statement accusing Ms. Carroll of lying about her sexual assault accusation to promote her book (actual malice) and (2) Mr. Trump made the statement with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights (common law malice). This outcome undermines Mr. Trump's argument that the same result is impossible in this closely related case.

In all the circumstances, Mr. Trump has failed to establish that there is not a genuine issue of material fact as to whether the prerequisites to a punitive damages award in this case have been satisfied.

46

*Conclusion*

For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied.

SO ORDERED.

Dated:          June 29, 2023

_____
Lewis A. Kaplan
United States District Judge



**U.S. Department of Justice**

Civil Division

*Torts Branch, Federal Tort Claims Office*
*P.O. Box 888*
*Washington, DC 20044*
JGT:JGTouhey/DJ# 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

*Telephone (202) 616-4400*
*Facsimile (202) 616-5200*

July 11, 2023

**By ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

  RE: *Carroll v. Trump*, No. 1:20-cv-7311-LAK

Dear Judge Kaplan:

  Attached please find a letter to the parties conveying the Department of Justice's determination not to certify under the Westfall Act.

      Sincerely,

      BRIAN M. BOYNTON
      Principal Deputy Assistant Attorney General

    By:

      JAMES G. TOUHEY, JR.
      Director, Torts Branch

cc: Counsel of Record (by ECF)

Attachment



**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*          *Washington, DC 20044*

July 11, 2023

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
ahabba@habbalaw.com
mmadaio@habbalaw.com

Roberta Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
rkaplan@kaplanhecker.com

      Re:    *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y.)

Dear Counsel:

    I write to inform you that, in light of the D.C. Court of Appeals' clarification of the standard for *respondeat superior* liability under D.C. law, *see Trump v. Carroll*, 292 A.3d 220 (D.C. 2023), as well as new factual developments, the Department of Justice is declining to certify under the Westfall Act, 28 U.S.C. § 2679(d), that defendant Donald J. Trump was acting within the scope of his office and employment as President of the United States when he made the statements that form the basis of the defamation claims in plaintiff's Amended Complaint in this action.

**The D.C. Court of Appeals Decision**

    Under the Westfall Act, federal employees are entitled to absolute immunity from personal tort liability for conduct occurring within the scope of their employment. *See* 28 U.S.C. § 2679. State tort law governs the scope-of-employment inquiry under the Act. Here, the parties agree that D.C. *respondeat superior* law governs. *Carroll v. Trump*, 49 F.4th 759, 766 & n.6 (2d Cir. 2022). The District of Columbia "generally adheres" to the Restatement (Second) of Agency's formulation of the *respondeat superior* standard, as set forth in § 228. *See Carroll*, 292 A.3d at 225; *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987).

The D.C. Court of Appeals clarified the meaning of this standard in response to the Second Circuit's certification in this case.  The Court explained that the question under § 228(1)(c)—whether the conduct "is actuated, at least in part, by a purpose to serve" the employer—contains distinct components, two of which are relevant here: the "purpose" element and the "quantum" element.  *Carroll*, 292 A.3d at 233-34.

The purpose element "is an inquiry into the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer."  *Id.* at 234. This element focusses on the *subjective* state of mind of the employee, notwithstanding prior D.C. Court of Appeals decisions suggesting that the inquiry was an objective one.  *E.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986).  The Court explained that any history between the employee and the victim may also be relevant to this determination of subjective intent: "Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance."  *Carroll*, 292 A.3d at 235.

The quantum element requires that the employee be motivated "at least in part" by a purpose to serve the employer.  The requirement "does not foreclose that an employee could be concurrently motivated by a personal purpose," nor that such personal purpose could be the employee's predominant motivation.  *Id.* at 235-36.  But "if the employee's conduct is 'too little actuated' by [a public] purpose, then the employee's conduct would be outside the scope of employment."  *Id.* at 236.  The Court declined to "parse out an exact threshold" at which an employee is "actuated at least in part" by a purpose to serve their employer but "too little actuated" by that purpose for their conduct to fall within the scope of employment, instead "entrust[ing] this question to the factfinder."  *Id.* at 237.  The Court explained:  "In other words, the factfinder must determine that an employee's partial purpose to serve their employer was more than an insignificant interest.  It is a balancing and weighing of the evidence, both direct and circumstantial, to determine whether the quantum of purpose is more than insignificant."  *Id.*

Finally, with respect to the D.C. Circuit's decision in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), the Court of Appeals made two observations:  First, it noted that *Ballenger* did not adopt a categorical rule holding that "the conduct of elected officials speaking to the press is always within the scope of that official's employment," and the Court declined to itself adopt such a categorical rule.  *Carroll*, 292 A.3d at 239-240 ("We have never adopted a rule that has determined that a certain type of conduct is per se within (or outside of) the scope of employment, and we decline to do so now.").  Second, it noted that the *Ballenger* court's holding "rested on undisputed, affirmative evidence in the record that [Ballenger's] purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities," *id.* at 239, and suggested that in this respect, the record before the *Ballenger* court was distinct from the record in this case, "which is disputed by the parties."  *Id.* at 239 n.23.

2

**SA-179**

**Analysis**

      Applying the clarified D.C. *respondeat superior* standard, the Department has determined that it lacks adequate evidence to conclude that the former President was sufficiently actuated by a purpose to serve the United States Government to support a determination that he was acting within the scope of his employment when he denied sexually assaulting Ms. Carroll and made the other statements regarding Ms. Carroll that she has challenged in this action.[1]  The evidence of Mr. Trump's state of mind, some of which has come to light only after the Department last made a certification decision, does not establish that he made the statements at issue with a "more than insignificant" purpose to serve the United States Government.  *Id.* at 237.

      No direct evidence of the former President's state of mind in making these statements is available.  As the D.C. Court of Appeals noted, this case stands in contrast to *Ballenger*, in which the Congressman offered "undisputed, affirmative evidence," *id.* at 239, by way of his affidavit, on which the district court relied in finding that he was acting, at least in part, "for the purpose of preserving his effectiveness as a congressman."  *Ballenger*, 444 F.3d at 663 (quotation marks and citation omitted).

      Moreover, the circumstantial evidence of Mr. Trump's *subjective* intent in making the allegedly defamatory statements does not support a determination in this case that he was sufficiently motivated by a desire to serve the United States Government.  There is some evidence that could, in some circumstances, support a certification.  The former President was responding to allegations that could have called into question his fitness to hold the office of the Presidency.  In addition, the statements at issue were drafted or made at the White House, in response to inquiries made to or at the White House, through official channels that Presidents often use to communicate with the media: a statement issued by the press office to a daily press pool, a press "gaggle" on the White House lawn, and an interview in the Oval Office.  *See, e.g.*, *Does 1-10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) ("Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.").

      The D.C. Court of Appeals, however, has now made clear that D.C. law does not hold that *any* statement, whatever its actual purpose, is by definition made for official purposes simply because it is made using official channels of communication.  *See Carroll*, 292 A.3d at 232 ("The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy.").  Additionally, the Court of Appeals' clarification that *Ballenger* did not establish a "categorical" rule "that would hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment," *id.* at 239, confirms that the context in which the former President made these statements does not end our inquiry even if it would, on its own, give rise to an inference that he was acting for an official purpose.

---

[1] In her Amended Complaint, Ms. Carroll no longer challenges Mr. Trump's denial of having raped her.

Instead, the Department must also consider whether the allegedly tortious action arose out of a work-related incident. *See id.* at 232 (explaining that "the District of Columbia case precedents have focused on whether the conduct was an 'outgrowth of a job-related controversy,'" which has been "framed as an inquiry into whether the conduct was the 'outgrowth of the employees' instructions or job assignments'" (citation omitted)).[2] The D.C. Court of Appeals explained that this inquiry may be informed by whether the alleged tortfeasor and the victim had a prior history that would suggest that the alleged tortfeasor was personally motivated. *See id.* at 234 ("Likewise, we have viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim."). Here, although the statements themselves were made in a work context, the allegations that prompted the statements related to a purely personal incident: an alleged sexual assault that occurred decades prior to Mr. Trump's Presidency. That sexual assault was obviously not job-related. As a general matter, an elected official's ability to retain the trust of his constituents—including by addressing their concerns and informing them of his views on issues that they care about, or by discussing personal matters that may pertain to the public's confidence in him—is an important part of his ability to effectively perform his job. But that background principle cannot overcome countervailing evidence that an official who made defamatory statements was insufficiently actuated by a public purpose, to justify a finding that he was acting within the scope of his employment. *See, e.g.*, *Lyons v. Brown*, 158 F.3d 605, 610 (1st Cir. 1998) (noting that "whatever justification [the defendant] might have for his actions could be overcome if his actual purpose was to retaliate"). The evidence of personal motivation that has been developed in this case outweighs any public-purpose inference one might draw in other circumstances.

*First*, Mr. Trump's statements regarding Ms. Carroll continued after the former President left office, as indicated by new allegations in the Amended Complaint. *See Carroll v. Trump*, No. 20-cv-07311, Dkt. No. 157, Ex. A (Amended Complaint), ¶ 152 (October 12, 2022 Truth Social post that the *Carroll II* jury found defamatory); ¶ 165 ("Mere minutes after the verdict [in *Carroll II*] became public, Trump repeated the defamatory lie that he had no idea who Carroll was" on his Truth Social account); *id.* ¶¶ 166-67 (two additional Truth Social posts the night after the jury verdict, calling Ms. Carroll's allegations a "Hoax" and suggesting that the accusations and subsequent trial were part of a political conspiracy); *id.* ¶ 168 (stating, during a CNN town hall on May 10, 2023, "I never saw this woman"; labelling Ms. Carroll's accusations a "fake story"; and calling her "a whack job"). The later statements are substantially similar to the three June 2019 statements at issue in this action, and because he was no longer the President when he made the later statements, Mr. Trump could not have been motivated by any interest in serving the United States Government. These post-Presidency statements, which were not before the Department during the original scope certification in this case, tend to undermine the claim that the former President made very similar statements at issue in *Carroll I* out of a desire to

---

[2] Although this language comes from the Court of Appeals' discussion of the first prong of its *respondeat superior* test—whether the allegedly tortious conduct was "of the kind" the person is employed to perform, *see Carroll*, 292 A.3d at 232—the Court also considered it relevant for purposes of determining the defendant's subjective state of mind under the third prong. *See id.* at 235 ("[I]nquiries into whether the tort was the outgrowth of a job-related controversy allow the factfinder to make inferences about whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated.").

serve the Government.

*Second*, the prior history between Ms. Carroll and Mr. Trump supports a determination that the former President's statements were not sufficiently motivated by a purpose to serve the Government.  As noted above, the D.C. Court of Appeals "ha[s] viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim."  *Carroll*, 292 A.3d at 234; *id.* at 235 ("Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance.").  And a jury has now found that Mr. Trump sexually assaulted Ms. Carroll long before he became President.  That history supports an inference that Mr. Trump was motivated by a "personal grievance" stemming from events that occurred many years prior to Mr. Trump's presidency.  *Id.* at 235.[3]

*Third*, certain aspects of the content of the statements at issue and subsequent statements by Mr. Trump go far beyond merely denying Ms. Carroll's accusation.  *See, e.g.*, Amended Compl. ¶ 83 ("Shame on those who make up false stories of assault to try to get publicity for themselves or sell a book or carry out a political agenda."); *id.* ("It is a disgrace, and people should pay dearly for such false accusations."); *id.* ¶ 92 ("This is a woman who has also accused other men of things . . . she's made this charge against others. . . I was one of the many men that she wrote about."); *id.* ("I have no idea who she is, none whatsoever."); *id.* ("[T]here were numerous cases where women were paid money to say bad things about me . . . those women did wrong things . . . here's a case, it's an absolute disgrace that she's allowed to do that."); *id.* ¶ 98 & n. 10; Jordan Fabian & Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type,"* The Hill (June 24, 2019), at 11 ("[S]he made this charge up.  And by the way, she's made it up about, or she's said it about other people too."); *id.* ("I'll say it with great respect, number one, she's not my type.").  In his deposition, Mr. Trump indicated that he "wanted people to know" that "she's . . . a very deranged, sick person[.]"  Deposition of Donald J. Trump, *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y. Oct. 19, 2022), at 216:3-8.  The "tone of [the relevant statements] strongly suggests that [defendant's] motivation . . . did not spring from a desire to serve . . . the United States."  *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011).

\*     \*     \*

The Department must "take a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct," as is "appropriate under the facts presented," *Carroll*, 292 A.3d at 235.  After "balancing and weighing [] the evidence," *id.* at 237, from Mr. Trump's deposition, the jury verdict in *Carroll II*, and the new allegations in the Amended

---

[3] The Westfall Act affords the Attorney General or his designee broad latitude to make factual determinations relevant to applying the scope-of-employment standard.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 (1995); *cf. Osborn v. Haley*, 549 U.S. 225, 247 (2007).  For this reason, the Department is not bound by the jury's findings.  At the same time, in this case, there does not appear to be a basis to disregard the jury's conclusions, which were made after weighing the relevant evidence presented by both parties in that case.

**SA-182**

Complaint, the Department has determined that there is no longer a sufficient basis to conclude that the former President was motivated by "more than an insignificant" desire to serve the United States Government, *id*.  Accordingly, the Department hereby declines to issue a new Westfall Act certification.

Sincerely,

Brian M. Boynton
Principal Deputy Assistant Attorney General

**SA-183**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

Plaintiff,

-against-                                                     20-cv-7311 (LAK)

DONALD J. TRUMP,

Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-19-2023
```

**ORDER RE ISSUE PRECLUSION CLAIMS**

LEWIS A. KAPLAN, *District Judge.*

        Recent submissions by the parties suggest that each may contend that *Carroll II* has an issue preclusive effect in this action. In order to identify and resolve any such claims, the Court hereby establishes the following procedure.

        1.      On or before **August 2, 2023**, each party shall file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims *Carroll II* has preclusive effect in this action. The motion shall be supported by a memorandum of law setting forth the bases for the moving party's claim. No fact or proposition of law not identified in such a motion shall be regarded as having been established by *Carroll II.*

        2.    Answering and reply papers with respect to any such motion shall be filed on or before **August 16, 2023** and **August 23, 2023**, respectively.

        SO ORDERED.

Dated:      July 19, 2023

                          /s/ Lewis A. Kaplan

                              Lewis A. Kaplan
                         United States District Judge

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-26-2023

July 25, 2023

**VIA COURIER**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007



RECEIVED
JUL 26 2023
JUDGE KAPLAN'S CHAMBERS

Re:   *Carroll v. Trump*, 20 Civ. 7311 (LAK) ("*Carroll I*")

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll with respect to Your Honor's July 19, 2023 Order directing each party to "file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims *Carroll II* has preclusive effective in this action." ECF 178. We understand this Order as directing the parties to submit any targeted summary judgment motions they may wish to make in *Carroll I* raising preclusion arguments based on *Carroll II*.

In light of the jury's verdict in *Carroll II*, it is our position that trial in the present action need only address narrow issues relating to damages. As we will explain in our briefing, two of the disputed elements of Carroll's defamation claim can be resolved entirely by collateral estoppel: specifically, the elements of *defamatory meaning* and *falsity*. The remaining three elements of Carroll's defamation claim are affected by collateral estoppel, but require a slightly different approach for pre-trial resolution. As to the elements of *publication* and being statements *of and concerning the plaintiff*, there has never been any genuine dispute of material fact on these points (and Trump did not seek to dispute these elements in *Carroll II*), and so we propose to incorporate into our papers a request for targeted summary judgment on these elements.

That leaves only the element of actual malice—that is, whether Defendant Donald J. Trump made his June 2019 statements knowing that they were false or with serious doubts as to their truth. In *Carroll II*, the jury found that Trump acted with actual malice in October 2022 when he denied assaulting Carroll and accused her of fabricating her statements. The *Carroll II* jury also found that Trump acted in a manner (and with a mental state) rendering him culpable for punitive damages. Those findings are preclusive in this action as to Trump's state of mind in making the October 2022 statement. It is our position that those jury findings, together with Trump's deposition in this action, foreclose any claim that Trump acted with actual malice in October 2022 but somehow did not do so in making substantively identical statements in June 2019. Therefore,

KAPLAN HECKER & FINK LLP                                                          2

we propose to incorporate into our briefing papers a request for targeted summary judgment on the element of actual malice.

Because these summary judgment arguments are still dependent on what the *Carroll II* jury found—and because Your Honor has directed that "[n]o fact or proposition of law not identified in such a motion shall be regarded as having been established by *Carroll II*"—our plan (as set forth above) is to brief these points as part of Plaintiff's forthcoming motion. Should Your Honor prefer that we proceed differently, we of course will comply with any further order from the Court.

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff*, | |
| v. | No. 20 Civ. 7311 (LAK) |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant*. | |

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION TO STAY**

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ............................................................................................................ 2

    I.     TRUMP IS NOT ENTITLED TO A STAY PENDING APPEAL ................................... 2

          A.   Trump Is Unlikely to Succeed on the Merits of His Appeal ..................................... 2

          B.   Trump Will Not Suffer Irreparable Injury Absent a Stay ........................................... 4

          C.   A Stay Will Cause Carroll to Suffer Substantial Injury ............................................. 8

          D.   The Public Interest Weighs Against a Stay ................................................................. 10

    II.    THIS COURT HAS NOT BEEN DIVESTED OF JURISDICTION ............................. 11

CONCLUSION ........................................................................................................ 14

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Barretta v. Wells Fargo Bank, N.A.*,
    693 F. App'x 26 (2d Cir. 2017) .................................................................... 11

*Carroll v. Trump*,
    590 F. Supp. 3d 575 (S.D.N.Y. 2022) ........................................................... 7

*Carroll v. Trump*,
    635 F. Supp. 3d 229 (S.D.N.Y. 2022) .................................................. 2, 5, 8, 9, 12

*Carroll v. Trump*,
    No. 20 Civ. 7311, 2023 WL 4393067 (S.D.N.Y. July 5, 2023) .............. 3, 4, 6, 9, 11

*Carroll v. Trump*,
    No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ........................... 6

*Clinton v. Jones*,
    520 U.S. 681, 117 S. Ct. 1636 (1997) ............................................................ 4

*Cohen v. United States*,
    No. 21 Civ. 10774, 2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022) ...................... 3

*District of Columbia v. Trump*,
    No. 8:17 Civ. 1596 (D. Md.) ...................................................................... 4

*District of Columbia v. Trump*,
    959 F.3d 126 (4th Cir. 2020) ...................................................................... 3

*Griggs v. Provident Consumer Discount Co.*,
    459 U.S. 56, 103 S. Ct. 400 (1982) ......................................................... 11, 12

*Hirschfeld v. Bd. of Elections*,
    984 F.2d 35 (2d Cir. 1993) ......................................................................... 7

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007) .............................................................. 2, 11, 12, 12

*K&D, LLC v. Trump Old Post Off., LLC*,
    No. 17 Civ. 731, 2018 WL 6173449 (D.D.C. Nov. 26, 2018) .............................. 4

*Leroy v. Hume*,
    563 F. Supp. 3d 22 (E.D.N.Y. 2021) ............................................................ 11

*Loria v. Gorman*,
  306 F.3d 1271 (2d Cir. 2002) ............................................................................................. 12

*New York v. United States Dep't of Com.*,
  339 F. Supp. 3d 144 (S.D.N.Y. 2018) ................................................................................. 7

*Nken v. Holder*,
  556 U.S. 418, 129 S. Ct. 1749 (2009) ................................................................................. 2

*Owens v. Taliban*,
  No. 22 Civ. 1949, 2023 WL 2368981 (S.D.N.Y. Mar. 6, 2023) .............................................. 2

*People v. Trump*,
  Ind. No. 71543-23 (N.Y. Sup. Ct., N.Y. Cnty. 2023) ............................................................. 9

*Plummer v. Quinn*,
  No. 07 Civ. 6154, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008)............................................. 12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806, 65 S. Ct. 993 (1945) ..................................................................................... 5

*S.E.C. v. Daspin*,
  557 F. App'x 46 (2d Cir. 2014)............................................................................................ 8

*S.E.C. v. WorldCom, Inc.*,
  452 F. Supp. 2d 531 (S.D.N.Y. 2006) .................................................................................. 4

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995)................................................................................................. 8

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ..................................................................................................... 4

*Trump v. Vance*,
  481 F. Supp. 3d 161 (S.D.N.Y. 2020).................................................................................. 2

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
  No. 16 Civ. 8507, 2020 WL 359907 (S.D.N.Y. Jan. 21, 2020) ........................................... 8, 9

*United States v. Rodgers*,
  101 F.3d 247 (2d Cir. 1996)............................................................................................. 12

*United States v. Trump*,
  No. 9:23 Cr. 80101 (S.D. Fl.)............................................................................................. 9

*V.S. v. Muhammad*,
   No. 07 Civ. 213, 2008 WL 5068877 (E.D.N.Y. Nov. 24, 2008) .......................................... 12

**OTHER AUTHORITIES**

Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701 (1995) ......................................................................... 3

Erica Orden, *Trump Now Faces Four Trials over Six-Month Span During Critical Phase of 2024 Campaign*, Politico (June 15, 2023) .................................................................... 9

Hugo Lowell & Chris Stein, *Trump's Mar-a-Lago Classified Documents Trial to Begin in May 2024*, Guardian (July 21, 2023) ........................................................................ 9

*Important Dates in the 2024 Presidential Race*, Ballotpedia ......................................... 9

*Keeping Track of the Trump Investigations*, N.Y. Times (last updated Aug. 1, 2023) ................. 9

**SA-191**

## PRELIMINARY STATEMENT

Defendant Donald J. Trump comes nowhere close to justifying his request for a stay of proceedings pending the resolution of his latest interlocutory appeal. Most fundamentally, he fails to show any likelihood of success on appeal. In asserting otherwise, Trump neither cites nor quotes (nor otherwise addresses) the Court's thorough opinion explaining that his immunity defense was both waivable and waived. Nor does Trump challenge the Court's alternative holding that his immunity defense fails on the merits. Trump's decision not to engage with this Court's analysis, or to address the underlying futility of his position, is reason enough to deny his motion.

But there is more. With respect to irreparable injury, Trump's conduct defeats any claim that it would be inequitable for him to see this case through to its end. Trump affirmatively waived his immunity in pursuit of strategic advantage in state court; he zealously litigated in federal court for years without mentioning this issue; during that time, he attempted to lodge a counterclaim against Carroll and borrowed this Court's power to undertake intrusive discovery; even after he first sought to raise an absolute immunity argument, Trump tried to lodge a second counterclaim; and when the Court finally rejected his position, Trump did not immediately file an appeal and seek a stay, but instead waited *a full month* for overtly strategic and self-serving reasons. This conduct eviscerates Trump's insistence that continued litigation would work irreparable harm.

That leaves only two remaining considerations, both of which further undermine Trump's position. *First*, granting a stay would substantially harm Carroll, who has waited years for justice in this case, is of an advanced age, and has endured continued outrageous attacks by Trump even since the *Carroll II* verdict. *Second*, the public maintains a powerful interest in finality, which would be poorly served by the effectively indefinite delay that would result from granting Trump's motion. For these reasons, Trump's motion for a stay of proceedings should be denied.

1

**ARGUMENT**

**I.    TRUMP IS NOT ENTITLED TO A STAY PENDING APPEAL**

"In general, the question whether to stay proceedings is addressed to the trial court's discretion." *Carroll v. Trump*, 635 F. Supp. 3d 229, 235 (S.D.N.Y. 2022). In exercising that discretion, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) ("*In re WTC*") (cleaned up). Courts balance the stay factors so that "the degree to which a factor must be present varies with the strength of the other factors, meaning that 'more of one [factor] excuses less of the other.'" *Id.* (citation omitted). A stay is "not a matter of right, even if irreparable injury might otherwise result to the appellant." *Owens v. Taliban*, No. 22 Civ. 1949, 2023 WL 2368981, at *1 (S.D.N.Y. Mar. 6, 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 427, 129 S. Ct. 1749, 1757 (2009)). Here, every factor cuts against Trump's motion.

**A.    Trump Is Unlikely to Succeed on the Merits of His Appeal**

First and foremost, Trump's motion should be denied because he has not established "the requisite strong likelihood of success." *Carroll*, 635 F. Supp. 3d at 235. Trump works hard to lower the bar for himself in describing this obligation, *see* Trump Br. 3, but the bottom line is that he utterly fails to show any error in the Court's decision denying his summary judgment motion. *See Nken*, 556 U.S. at 434, 129 S. Ct. at 1761 (requiring more than a "mere possibility" of success).[1]

---

[1] In citing *Trump v. Vance*, 481 F. Supp. 3d 161 (S.D.N.Y. 2020), Trump selectively lifts some language without including an important caveat. Read properly, *Vance* does not hold that a movant need only show "at least 'a serious question going to the merits' pending appeal." Trump Br. 3 (quoting *Vance*, 481 F. Supp. 3d at 164). Rather, *Vance* explained that a "movant must show '(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *Vance*, 481 F. Supp. 3d at 164 (citation

**SA-193**

Indeed, Trump stumbles at the outset by failing to address this Court's reasoned holding that his assertion of absolute presidential immunity is meritless. *See Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 4393067, at *9–*11 (S.D.N.Y. July 5, 2023). Although the Court addressed this point while denying leave to amend based on futility, its reasoning constitutes an independent and adequate basis for the denial of Trump's summary judgment motion. Yet Trump says nothing about this holding in his motion for a stay—and has thus waived and forfeited any such arguments. *See* Trump Br. 5–7. Trump cannot show a strong likelihood of success on the merits of his interlocutory appeal when he offers no response at all to the Court's unequivocal holding that his claim of absolute presidential immunity fails as a matter of law.

Trump fares no better on the waiver issue. Rather than engage with the Court's analysis, he asserts in broad strokes that he was right, and the Court was wrong. He does not include a single quotation of (or citation to) the Court's opinion, and he makes no effort to state with specificity where and how he believes the Court erred. Nor does he address any of the other authorities that disagree with his position: he does not explain what Judge Niemeyer got wrong in describing absolute presidential immunity as non-jurisdictional,[2] what Judge Liman missed in reaching the merits of a claim without first considering such an immunity defense,[3] why Akhil Amar and Neal Katyal were mistaken in their study of the issue,[4] or how this supposedly obvious theory of

---

omitted). Here, given the numerous flaws in Trump's merits position and the other stay factors that decidedly favor Carroll (as discussed below), Trump's motion fails under either version of the legal standard as articulated in *Vance*.

[2] *See District of Columbia v. Trump*, 959 F.3d 126, 141 (4th Cir. 2020) (en banc) (Niemeyer, J., dissenting).

[3] *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at *10 n.6 (S.D.N.Y. Nov. 14, 2022).

[4] Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701, 726 n.53 (1995).

jurisdiction escaped mention in the last two on-point Supreme Court decisions.[5] Trump also makes

the choice to ignore cases in which he personally proceeded with the opposite legal position.[6]

More fundamentally, Trump offers no direct rejoinder to the Court's reading of precedent.

In a stay posture, that choice is all but fatal. It also contrasts starkly with the Court's own careful

study of Trump's arguments—a study that led the Court to describe Trump's position as deviating

from "well-settled norms," *Carroll*, 2023 WL 4393067, at *5, as "present[ing] its own separation

of powers concerns," *id.* at *6, as advancing a premise that "lacks logical coherence," *id.* at *7,

and as running "afoul of many of the same principles on which the immunity is based," *id.* at *8.

At the risk of stating the obvious, a position beset by so many (and such grave) flaws is unlikely

to prevail on appeal, especially where its advocate declines to respond to judicial analysis.

For these reasons—and for those set forth in Carroll's summary judgment stage briefs—

Trump has not established a strong likelihood of success on appeal. No appellate court has accepted

the position he now advances; numerous respected authorities have expressly rejected it; and this

Court's constitutional analysis correctly stated and applied the governing legal principles.

**B.      Trump Will Not Suffer Irreparable Injury Absent a Stay**

Trump's motion should also be denied on the independent ground that any injury ensuing

from the denial of a stay will be self-inflicted and the result of his own strategic gamesmanship.

*See, e.g.*, *S.E.C. v. WorldCom, Inc.*, 452 F. Supp. 2d 531, 532 (S.D.N.Y. 2006) (denying stay

motion that "fail[ed] to comport with the most elementary principles of equity").

Where absolute presidential immunity applies, it is virtually always invoked at the very

outset of a case. Such diligent invocation is necessary for it to serve its core purpose as a shield

---

[5] *Clinton v. Jones*, 520 U.S. 681, 117 S. Ct. 1636 (1997); *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020).

[6] *K&D, LLC v. Trump Old Post Off., LLC*, No. 17 Civ. 731, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) (Leon, J.); *District of Columbia v. Trump*, No. 8:17 Civ. 1596 (D. Md.), at ECF 112-1 and 118.

from litigation and not just a defense to liability. *See* Trump Br. 7–8. Here, however, Trump's

conduct of the case has made a self-serving mockery of that purpose, undermining his last-minute

assertion that proceeding to trial (which is all that remains) would inequitably or intolerably burden

him. *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.

Ct. 993, 997 (1945) ("[H]e who comes into equity must come with clean hands.").

After this case was first filed in state court, Trump waived his immunity from suit as part

of a strategic effort to bolster his request for a temporary stay of proceedings; to that end, he stated

that "no one is seeking to escape accountability here" because Carroll was "free to pursue this

action when [he was] no longer in office." NYSCEF No. 103 at 3 (cleaned up). When that effort

failed, Trump pressured the Department of Justice to remove this case to federal court under the

Westfall Act. *See* ECF 1. After Your Honor denied the ensuing motion to substitute, *see* ECF 32,

Trump and the Department of Justice filed notices of appeal, *see* ECF 45, 46. But then, during the

pendency of those interlocutory appeals, Trump moved to substantially expand the scope of this

action—and to gain a tactical advantage—by adding an anti-SLAPP counterclaim against Carroll.

*See* ECF 59. Following the denial of that motion, *see* ECF 73, Trump proposed (and Carroll

agreed) to undertake discovery, *see* ECF 75. Trump thereupon borrowed this Court's power to

obtain over 30,000 pages of records from Carroll, to issue a volley of nonparty subpoenas, and to

depose Carroll and 5 additional witnesses. Meanwhile, Trump himself produced a pittance of

documents and stonewalled Carroll's requests. Although he sat for a deposition, it was only after

a last-minute motion to stay pending appeal was denied. ECF 96. In denying that motion, this

Court emphasized Trump's weak showing of irreparable injury, noting that his odds of success on

appeal "cannot be said to be likely," "discovery in this case has virtually concluded," and Trump's

"conduct so far" had undercut his position. *Carroll*, 635 F. Supp. 3d at 236.

**SA-196**

Since then, Trump has only further eviscerated any credible assertion of irreparable injury. In December 2022, he sought summary judgment based partly on presidential absolute immunity, despite never mentioning this issue in over three years of litigation and waiving it in state court. ECF 107, 109. While that motion was pending, Trump conferred with Carroll and the parties submitted a joint pretrial order, which the Court adopted. ECF 128, 129. Trump also litigated numerous motions *in limine*, many of which the Court resolved. ECF 130–145.[7] The parties then submitted a joint motion to consolidate trial in this matter with the *Carroll II* trial. ECF 147, 148 (denying motion). After the trial in *Carroll II*, Trump opposed Carroll's motion to amend her complaint and sought to bolster his position by proposing to lodge a counterclaim against Carroll. ECF 164, 171. Thus, even after first seeking to raise his immunity defense, Trump actively litigated the case and once again attempted to allege an entirely new claim against Carroll.

On June 29, 2023, the Court denied Trump's summary judgment motion. *Carroll*, 2023 WL 4393067, at *20; ECF 172. At that point, Trump could have immediately filed a notice of interlocutory appeal and sought a stay. Instead, he waited 28 days. Four full weeks. This delay was overtly strategic: Trump apparently hoped that the Justice Department would issue a new Westfall Act certification and was willing to wait on that potential benefit. ECF 177 (declining new certification on July 11, 2023). He perhaps also hoped that his newly asserted counterclaim would improve his position—a hope that was dashed eight days later, when the Court denied his motion for a new trial in *Carroll II* in an opinion that rejected the core premise of his counterclaim in *Carroll I* (namely, that the *Carroll II* jury had found that he did not rape Carroll). *See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023). Finally, in the days that

---

[7] If cross-applied to this proceeding, as they should be, the Court's decisions on the motions *in limine* submitted in *Carroll II* would resolve the bulk of the outstanding *Carroll I* evidentiary issues (though of course the parties may wish to submit additional motions *in limine* in advance of the trial scheduled for January 2024).

immediately preceded Trump's decision to seek a stay, it became much clearer to him that he faced substantial legal risk in *Carroll I*: the Court issued an order on July 19, 2023 directing the parties to address whether the *Carroll II* verdict precluded any issues in *Carroll I*, ECF 178; and on July 25, 2023, Carroll filed a letter setting forth her view that summary judgment would be warranted on all merits elements of her claim, leaving only a damages trial in *Carroll I*, ECF 182. Trump then filed his stay motion the very next day—on July 26, 2023—after these intervening procedural and substantive developments had weakened rather than strengthened his litigation position.

Putting it together: Trump could have raised absolute presidential immunity when this suit was filed in November 2019. Instead, he affirmatively and strategically waived it in state court. He then zealously litigated the case in federal court—including through aggressive party and non-party discovery, and an attempted counterclaim against Carroll—until December 2022. At that point, having never mentioned presidential absolute immunity as a defense, he sought to raise it on a novel theory of non-waivability that was inconsistent with his litigating position in other recent cases. While this summary judgment motion was pending, Trump pressed ahead and attempted to lodge yet another counterclaim against Carroll. When the Court ultimately denied his summary judgment motion, Trump did not seek immediate equitable relief. He instead waited a full month, during which time he apparently hoped to obtain multiple strategic advantages in the litigation. Only after he came up short did Trump finally submit a motion to stay.

This behavior reflects Trump's pattern of bad-faith, dilatory conduct. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). It also takes the wind out of his sails on the issue of irreparable injury. *See, e.g.*, *New York v. United States Dep't of Com.*, 339 F. Supp. 3d 144, 148 (S.D.N.Y. 2018) (holding that "'inexcusable delay in filing' a motion to stay 'severely undermines the … argument that absent a stay irreparable harm would result'" (quoting *Hirschfeld v. Bd. of*

7

*Elections*, 984 F.2d 35, 39 (2d Cir. 1993)); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[F]ailure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."). Indeed, as a result of Trump's own litigation strategy, many of the irreparable harms that he warns against are already in the rear-view mirror. *See* Trump Br. 7–9 (discussing discovery).

Looking ahead, little remains. Discovery is complete. A joint pretrial order has been adopted. ECF 129. The Court has resolved Trump's counterclaim and ruled on amendments to the pleadings. ECF 169, 200. The Court will soon be set to resolve the parties' motions concerning preclusion—a determination that could significantly narrow the case. *See* ECF 189, 193. This leaves only motions *in limine*, many of which have already been decided, and the trial itself, which should be much shorter and more straightforward than the two-week jury trial in *Carroll II*.

In these unusual circumstances, Trump's complaint about irreparable injury rings hollow and hypocritical. It certainly comes nowhere close to justifying the entry of a stay. Indeed, even if Trump has made out some showing of harm based on the prospect of standing trial, that showing fails to carry his motion—particularly given the weakness of his merits position and his own unclean hands in seeking to raise these arguments. *See Carroll*, 635 F. Supp. 3d at 236; *see also, e.g.*, *S.E.C. v. Daspin*, 557 F. App'x 46, 49 (2d Cir. 2014); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507, 2020 WL 359907, at *4, *6 (S.D.N.Y. Jan. 21, 2020) (denying stay pending appeal despite concluding that movant "will be irreparably harmed absent a stay").

### C.    A Stay Will Cause Carroll to Suffer Substantial Injury

Granting a stay would not only unjustly reward Trump's gamesmanship, but it would also inflict substantial harm on Carroll, who "has litigated this case for more than three and a half years[,] completed discovery, engaged in extensive motion practice, resisted the government's attempt to defeat her claim before [this] Court, the Second Circuit and the D.C. Court of Appeals,

and devoted untold hours and resources to pursuing her claim." *Carroll*, 2023 WL 4393067, at

*12. In contrast, Trump has waged a war of attrition designed to impede these proceedings. *Id.* at

*12 & n.61. Requiring Carroll to endure further delay—possibly years of it—would thus be deeply

unfair. As the Court has already found, Trump "should not be permitted to run the clock out on

plaintiff's attempt to gain a remedy for what allegedly was a serious wrong," especially given that

"both plaintiff and defendant … already are of advanced age." *Carroll*, 635 F. Supp. 3d at 237.[8]

The burdens of delay are especially concerning here because a stay could cause a spiral of

further delays. Trump is running for president and, if he prevails in the Republican primary, he

may well seek to stay any trials scheduled for mid-to-late 2024. *See Important Dates in the 2024

Presidential Race*, Ballotpedia. In addition, Trump has four other trials scheduled between now

and May 2024. *See* Hugo Lowell & Chris Stein, *Trump's Mar-a-Lago Classified Documents Trial

to Begin in May 2024*, Guardian (July 21, 2023); Erica Orden, *Trump Now Faces Four Trials over

Six-Month Span During Critical Phase of 2024 Campaign*, Politico (June 15, 2023). And Trump

currently faces three criminal indictments, with the reported possibility of at least one more. *United

States v. Trump*, 23 Cr. 257 (D.D.C.); *United States v. Trump*, No. 9:23 Cr. 80101 (S.D. Fl.);

*People v. Trump*, Ind. No. 71543-23 (N.Y. Sup. Ct., N.Y. Cnty. 2023); *Keeping Track of the Trump

Investigations*, N.Y. Times (last updated Aug. 1, 2023). If trial in this case is stayed until after the

resolution of Trump's most recent interlocutory appeal, a rescheduled trial may have to compete

with the end of Trump's presidential campaign, any number of other civil and criminal trials, the

possibility of a prison sentence, and/or conceivably the start of a second Trump presidency.

---

[8] Trump asserts that the burden is on Carroll to demonstrate "significant and particularized hardship to outweigh the irreparable harm defendant[] will suffer." Trump Br. 11. He is mistaken. The "moving party bears the heavy burden of establishing that" the stay factors support his position. *U.S. Bank Nat'l Ass'n*, 2020 WL 359907, at *1.

The current trial date avoids those pitfalls; a stay inevitably triggers them. Accordingly, granting a stay would substantially burden Carroll, who filed this case nearly four years ago.

This leads to one final point. Trump suggests that the jury verdict in *Carroll II* mitigates any harm of delay. Trump Br. 11. Not so. Carroll endured distinct, significant harm from Trump's June 2019 statements—which were issued not by a former officeholder on social media years after Carroll spoke up, but rather by a sitting President at the White House in virtually immediate response to her revelation that he had sexually assaulted her. As the record establishes, Carroll's damages from the June 2019 statement are substantial in their own right. She has an independent right to remedy for that harm. A jury verdict affirming this point is essential to make her whole. Such a verdict would also serve two separate, vital purposes in remedying Carroll's injuries: (1) confirming that Trump does not stand above the law and may be held accountable for abusing his bully pulpit to seek to punish and humiliate her; and (2) affording an opportunity for Carroll to obtain punitive damages against Trump based upon conduct including (though not limited to) the many outrageous public attacks he has leveled against her since the *Carroll II* verdict.[9] It is crystal clear that the compensatory and punitive damages awarded in *Carroll II* were insufficient to deter Trump from repeating the very same defamatory statements as before. A jury trial in *Carroll I* will afford the justice system an opportunity to more fully remedy and protect Carroll; staying these proceedings all but indefinitely would reward Trump's behavior and exacerbate injuries to Carroll.

**D.    The Public Interest Weighs Against a Stay**

This leaves only consideration of the public interest, which weighs against a stay for three reasons. *First*, "the Second Circuit has recognized that 'there is a public interest in having plaintiffs who might be entitled to recovery receive compensation while still living and able to use it to

---

[9] Indeed, it is offensive for Trump to claim that the *Carroll II* verdict mitigates harm to Carroll when he has gone out of his way to trash that verdict, attack the Court, and willfully repeat statements found to be false and defamatory.

10

improve the quality of their lives.'" *Leroy v. Hume*, 563 F. Supp. 3d 22, 31 (E.D.N.Y. 2021)
(cleaned up) (quoting *In re WTC*, 503 F.3d at 170–71). For the reasons given above, granting a
stay risks unduly prolonging this matter, which Carroll has been litigating for many years. *See
Carroll*, 2023 WL 4393067, at *13 ("[Carroll] now is 79 years old and . . . has been litigating this
case for more than three and a half years. There is no basis to risk prolonging the resolution of this
litigation further by permitting Mr. Trump to raise his absolute immunity defense now at the
eleventh hour when he could have done so years ago."). *Second*, more generally, "there is a public
interest in finality" of litigation that supports the denial of a stay. *Barretta v. Wells Fargo Bank,
N.A.*, 693 F. App'x 26, 28 (2d Cir. 2017). *Finally*, the public interest would be served by the
resolution of this matter, in which Trump (a current candidate for elected office) is alleged to have
used the bully pulpit to defame a private citizen for revealing his personal misconduct.

Together, these interests outweigh Trump's claim that the public is interested in vindicating
claims of official immunity. *See* Trump Br. 11–13. As Trump concedes, the Second Circuit found
this immunity-related interest "overcome upon a showing of a competing public interest in
allowing the litigation to reach trial and possibly 'result in compensation for at least some Plaintiffs
during their lifetimes.'" *Id.* at 12 (quoting *In re WTC*, 503 F.3d at 170). Moreover, Trump's own
conduct throughout this litigation has been at odds with any commitment on his part to vindicating
a public interest in official immunities—and that interest is obviously lessened when the official
in question has made (but later comes to regret) a strategic choice to waive their own immunity.

## II.    THIS COURT HAS NOT BEEN DIVESTED OF JURISDICTION

In a single page at the very end of his brief (which makes clear what he really thinks of the
argument), Trump asserts that his filing of an interlocutory appeal divested the Court of jurisdiction
over the "entirety" of this action because this appeal involves immunity from suit. Trump Br. 13
(citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982)).

Trump is mistaken—as this Court necessarily recognized when it denied Trump's motion to stay proceedings following the initial interlocutory appeal of the Westfall Act question. *See* ECF 56 (denying without prejudice a stay motion based on a similar misreading of *Griggs*).

Simply put, the Second Circuit has made clear that "[t]he divestiture of jurisdiction rule is … not a *per se* rule." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (emphasis added). Instead, "it is a judicially crafted rule" grounded in "concerns of efficiency." *Id.* Consistent with that understanding, the Second Circuit held in *In re WTC* that the question whether district court proceedings should continue pending an appeal from a denial of immunity is guided by the same four factors that usually apply to stays pending appeal. *See* 503 F.3d at 169–70; *see also Carroll*, 635 F. Supp. 3d at 236 ("In [*In re WTC*], the Second Circuit held that the prospect that 'any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit' was to be balanced against the other factors under consideration." (citation omitted)). Applying that traditional test, *In re WTC* vacated a previously entered stay because it had come to perceive there to be a "lesser probability" that the defendants would succeed on the merits of their immunity claims. 503 F.3d at 170. Notably, the Second Circuit reached this conclusion even though the defendants in that case (like Trump here) argued that *Griggs* precluded the district court from exercising jurisdiction. *See id.* at 169–70; *accord Loria v. Gorman*, 306 F.3d 1271, 1279–80 (2d Cir. 2002) (recognizing the district court had denied motions for a stay pending appeal of an order denying a qualified immunity defense); *Plummer v. Quinn*, No. 07 Civ. 6154, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) (applying four-factor test to motion to stay pending appeal of denial of qualified immunity); *V.S. v. Muhammad*, No. 07 Civ. 213, 2008 WL 5068877 (E.D.N.Y. Nov. 24, 2008) (applying four-factor analysis even though some defendants had appealed the denial of qualified immunity defenses). Under *In re*

**SA-203**

*WTC*—which Trump properly treats as the controlling framework for all but a single page of his brief—the traditional test applies here and (as explained above) forecloses Trump's motion.

**SA-204**

## CONCLUSION

For the foregoing reasons, the Court should deny Trump's motion for a stay.


Dated:  New York, New York
        August 10, 2023

Respectfully submitted,

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

E. JEAN CARROLL,

                    Plaintiff,

          -against-                                                20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                    Defendant.

------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-6-2023

## MEMORANDUM OPINION

Appearances:

                    Roberta Kaplan
                    Joshua Matz
                    Shawn Crowley
                    Matthew Craig
                    Trevor Morrison
                    Michael Ferrara
                    KAPLAN HECKER & FINK LLP
                    *Attorneys for Plaintiff*

                    Alina Habba
                    Michael T. Madaio
                    HABBA MADAIO & ASSOCIATES LLP
                    *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

          This is a defamation case against Donald Trump brought by writer E. Jean Carroll for

certain allegedly defamatory statements he made while he was president in 2019 in response to Ms.

2

Carroll's public accusation that he sexually assaulted ("raped") her in the mid 1990s. In a closely

related second case known as *Carroll II*, Ms. Carroll brought two other claims against Mr. Trump.[1]

The first was a sexual battery claim pursuant to the Adult Survivors Act ("ASA"), a new law enacted

by New York in 2022 that created a one-year period within which persons who were sexually

assaulted as adults could sue their alleged assaulters even if their claims otherwise would have been

untimely. The second was a defamation claim for a statement published by Mr. Trump on social

media in 2022. In that statement, like in his 2019 statements, Mr. Trump denied Ms. Carroll's

accusation, stated that he did not know her, and claimed that she fabricated her accusation for ulterior

and improper purposes.

Carroll II was tried in this Court in April and May 2023. The jury unanimously

determined that Mr. Trump "sexually abused" Ms. Carroll as that term is defined in the New York

---

[1]

The Court assumes familiarity with its prior decisions in this case ("*Carroll I*") and in *Carroll II*, which detail the facts and procedural histories of both cases. *E.g.*, Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575; Dkt 96, *Carroll v. Trump*, 2022 WL 6897075; Dkt 145, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 173, *Carroll v. Trump*, 2023 WL 4393067; Dkt 200, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 5017230, (S.D.N.Y. Aug. 7, 2023); Dkt 208, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 5312894, (S.D.N.Y. Aug. 18, 2023); Doc. No. 22-cv-10016 (*Carroll II*), Dkt 38, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb, 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023), *Carroll II*, Dkt 212, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, (S.D.N.Y. July 19, 2023).

Unless otherwise indicated, Dkt references are to the docket in this case.

**SA-207**

3

Penal Law.[2] It found also that he defamed her in his 2022 statement. In doing so, it found by a preponderance of the evidence that his statement was *defamatory* – that it tended to disparage Ms. Carroll in the way of her profession and/or exposed her to contempt or an evil or unsavory opinion in the minds of a substantial number of people in the community. It found also by clear and convincing evidence that his statement was *false* (not substantially true) and made with *actual malice* (knowing that the statement was false or with reckless disregard to its truth or falsity). It awarded Ms. Carroll $5 million in damages: $2.02 million in compensatory and punitive damages for her battery claim, and $2.98 million in compensatory and punitive damages for her defamation claim.

The matter now is before the Court on the parties' competing motions with respect to the issue preclusive (or "collateral estoppel") effect of the jury's verdict in *Carroll II* in this action. Ms. Carroll argues also that she is entitled to summary judgment on each liability element of her defamation claim in *Carroll I*. She accordingly contends that the trial in this case need address only the issue of damages. Mr. Trump disputes the issue preclusive effect of the *Carroll II* jury's findings on liability. He contends instead that the verdict in *Carroll II* requires that any compensatory damages that might be awarded to Ms. Carroll in this case must be limited by the compensatory

---

2

For the reasons discussed in the Court's recent decisions, "based on all of the evidence at trial and the jury's verdict as a whole, the jury's finding that Mr. Trump 'sexually abused' Ms. Carroll implicitly determined that he forcibly penetrated her digitally – in other words, that Mr. Trump in fact did 'rape' Ms. Carroll as that term commonly is used and understood in contexts outside of the New York Penal Law." *Carroll*, 2023 WL 5017230, at *1. *See also id.*, 2023 WL 4612082, at *20. In the alternative, the Court found, pursuant to Federal Rule of Civil Procedure 49, that "Mr. Trump forcibly digitally penetrated Ms. Carroll's vagina." *Id.*, 2023 WL 4612082, at *19 n.70.

**SA-208**

4

damages the jury awarded in *Carroll II*.[3]  For the reasons discussed below, Ms. Carroll's motion for

partial summary judgment is granted. The trial in this case shall be limited to the issue of damages

only. Mr. Trump's motion is denied.

## Facts

*Mr. Trump's 2019 Statements*

Ms. Carroll's accusation that Mr. Trump sexually assaulted ("raped") her first became

public on June 21, 2019, when *New York* magazine published on the Internet an excerpt from Ms.

Carroll's then-forthcoming book in which she described the incident with Mr. Trump. In the ensuing

hours and days, Mr. Trump issued three statements that are the subjects of this case:

*Statement One – June 21, 2019*

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me

at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is

trying to sell a new book – that should indicate her motivation. It should be sold in

the fiction section.

Shame on those who make up false stories of assault to try to get publicity for

themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who

---

[3]    Mr. Trump moved also to preclude Ms. Carroll "from arguing that her defamatory statement
was not false" in relation to his previously filed counterclaim alleging that Ms. Carroll
defamed him in her interview statements following the *Carroll II* verdict. Dkt 194 (Def.
Mem.) at 3. On August 7, 2023, this Court dismissed Mr. Trump's counterclaim. Dkt 200.
Accordingly, Mr. Trump's application with respect to his previously filed counterclaim is
denied on the ground that it is moot.

5

falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[4]

*Statement Two – June 22, 2019*

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's —

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married – as I read; I have no idea who she is – but she was married to a,

---

[4]   Dkt 157-1 (Pl. Amend. Cpt.) at 15-16, ¶ 83.

6

actually, nice guy, Johnson – a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line – give me a break – with my back to the camera. I have no idea who she is. What she did is – it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that – and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is – none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York – which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were

7

numerous cases where women were paid money to say bad things about me. You

can't do that. You can't do that. And those women did wrong things – that women

were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[5]

*Statement Three – June 24, 2019*

"I'll say it with great respect: Number one, she's not my type. Number two,

it never happened. It never happened, OK?"[6]

*Mr. Trump's 2022 Statement*

On October 12, 2022, Mr. Trump published the following statement, which was the

subject of Ms. Carroll's defamation claim in *Carroll II*, on Truth Social, his social media platform:

"This 'Ms. Bergdorf Goodman case' is a complete con job[.] . . . She

completely made up a story that I met her at the doors of this crowded New York

---

[5]

*Id.* at 18, ¶ 92.

[6]

*Id.* at 20, ¶ 98.

Mr. Trump contends that the jury in *Carroll II* did not consider the portion of his statement
that Ms. Carroll is not his type. Ms. Carroll counters that she "has never argued that this
portion of [Mr.] Trump's June 24, 2019 statement is false or defamatory" and instead
contends that this portion "is relevant because it reveals [Mr.] Trump's mental state and
malicious intent." Dkt 213 (Pl. Second Reply Mem.) at 4, n. 2. That leaves only the second
portion of Mr. Trump's June 24, 2019 statement, "[I]t never happened. It never happened,
OK?". Given that neither party adequately has addressed whether or not summary judgment
should be granted or denied as to that allegedly defamatory portion of the June 24, 2019
statement, the Court does not now decide the issue.

8

City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie[.] . . . She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . . In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."[7]

*The Jury's Findings in Carroll II*

As this Court previously has set forth, the jury in *Carroll II* made the following explicit findings reflected in its special verdict form, which consisted of factual questions going to liability and damages on both of Ms. Carroll's claims. With respect to Ms. Carroll's sexual battery claim, the jury found by a preponderance of the evidence that:

- "Mr. Trump sexually abused Ms. Carroll.

- Mr. Trump injured her in doing so.

- Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as

---

[7]  *Carroll II*, 22cv10016, Dkt 1 (Cpt.) 18, ¶ 92.

9

to amount to such disregard.

- Ms. Carroll was entitled to compensatory and punitive damages on the sexual battery claim of $2.02 million ($2 million in compensatory damages and $20,000 in punitive damages)."[8]

With respect to her defamation claim, the jury found by clear and convincing evidence that:

- "Mr. Trump's October 12, 2022 statement was . . . false (*i.e.*, not substantially true).

- Mr. Trump made that statement with actual malice – that is, that when he made the statement, Mr. Trump knew that it was false, had serious doubts as to its truth, or had a high degree of awareness that the statement probably was false."[9]

It found also by a preponderance of the evidence that:

- "Mr. Trump's October 12, 2022 statement was defamatory [(*i.e.*, that the statement tended to disparage Ms. Carroll in the way of her profession and/or exposed her to contempt or an evil or unsavory opinion in the minds of a substantial number of people in the community)] . . . .

- Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement.

- Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless,

---

[8]   *Carroll*, 2023 WL 4612082, at *16 (footnote, internal quotation marks, and emphases omitted).

[9]   *Id.* at *16-17 (footnote, internal quotation marks, and emphases omitted).

10

or willful disregard of the rights of another.

• Ms. Carroll was entitled to $2.98 million in compensatory and punitive damages on the defamation claim relating to the October 12, 2022 statement ($1.7 million in compensatory damages for the reputation repair program only, $1 million in compensatory damages for damages other than the reputation repair program, and $280,000 in punitive damages)."[10]

## *Discussion*

### *Legal Standard*

The parties' motions concern the standards governing issue preclusion ("collateral estoppel") as well as summary judgment. In this case, New York law governs the issue preclusive effect of the jury's verdict in *Carroll II*.[11]  Under New York law, "[c]ollateral estoppel comes into

---

[10]    *Id.*(footnotes, internal quotation marks, and emphases omitted).

The "reputation repair program" refers to the efforts to repair the harm to Ms. Carroll's reputation caused by Mr. Trump's 2022 statement based on the testimony of Ms. Carroll's expert, Professor Ashlee Humphreys.

[11]    *E.g., Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir.), *certified question accepted*, 36 N.Y.3d 1077, *and certified question answered*, 37 N.Y.3d 591 (2021).

Mr. Trump has appealed the *Carroll II* judgment and claims that he "will be vigorously contesting the jury's verdict before the [Second Circuit]." Dkt 206 (Def. First Opp. Mem.) at 3. He concedes, however, that under New York law "the 'pendency of an appeal does not prevent the use of the challenged judgment as the basis of collateral estoppel[.]'" *Id.* (quoting *Anonymous v. Dobbs Ferry Union Free Sch. Dist.*, 19 A.D.3d 522, 522 (2d Dept. 2005)). His assertion that he "reserves all rights to seek to vacate any preclusive effect that the *Carroll II* judgment may be granted in the instant action" should the Circuit decide in his favor in his appeal is of no relevance or import to this decision. *Id.*

11

play when four conditions are fulfilled: '(1) the issues in both proceedings are identical, (2) the issue

in the prior proceeding was actually litigated and decided, (3) there was a full and fair opportunity

to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a

valid and final judgment on the merits.'"[12]

The standards governing summary judgment are well settled:

"Summary judgment may be granted only where there is no genuine issue as

to any material fact and the moving party . . . is entitled to a judgment as a matter of

law. . . . In ruling on a motion for summary judgment, a court must resolve all

ambiguities and draw all factual inferences in favor of the nonmoving party. . . . To

grant the motion, the court must determine that there is no genuine issue of material

fact to be tried."[13]

A party may be entitled to summary judgment based upon the application of facts established by

reason of collateral estoppel.[14]

---

[12]

*Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 17 (2015) (quoting *Alamo v. McDaniel*, 44 A.D.3d 149, 153, (1st Dept.2007)).

Ms. Carroll points out that "New York courts are divided on whether there is an additional, fifth requirement: namely, that the specific issue must also be decisive of the present action to have preclusive effect." Dkt 190 (Pl. Mem.) at 11. As Mr. Trump does not rely on any contention that any of the findings in *Carroll II* should be denied issue preclusive effect because it was not decisive, there is no need to address this question.

[13]

*McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citations omitted).

[14]

*E.g.*, *SEC v. Lorin*, No. 90-CV-7461 (PNL), 1993 WL 77372, at *1 (S.D.N.Y. Mar. 15, 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993) ("The SEC is entitled to summary judgment by reason of collateral estoppel as to those facts alleged by the SEC in its complaint that were necessarily found to have been established by the jury in its return of a verdict of guilty on the five counts of the criminal indictment against [the defendant]."); *Carney v. Illarramendi*,

12

*Mr. Trump's 2019 Statements Were Defamatory*

To prevail on her defamation claim, Ms. Carroll bears the burden of proving by a

preponderance of the evidence that Mr. Trump's 2019 statements (1) were published to a third party,

(2) were of and concerning Ms. Carroll, and (3) were likely to be understood as defamatory by the

ordinary person.[15]  In addition, she must prove by clear and convincing evidence that Mr. Trump's

statements were (4) false, and (5) published with actual malice, "that is, [with] either knowledge of

falsity or reckless disregard of the truth."[16]

The jury in *Carroll II* found that Mr. Trump defamed Ms. Carroll in his 2022

statement. In doing so, it determined – in accordance with the Court's instructions – that Mr.

Trump's 2022 statement "tend[ed] to disparage a person in the way of that person's business or

office or profession or trade" or that "it tend[ed] to expose someone to hatred or contempt or

aversion or to induce an evil or an unsavory opinion of that person in the minds of a substantial

number of people in the community, even though it may impute no moral turpitude to the person."[17]

As Ms. Carroll contends, "the content of the June 2019 statements and the October

_____

No. 3:12-CV-00165 (SRU), 2018 WL 1472510, at *10 (D. Conn. Mar. 26, 2018), *aff'd*, 768 F. App'x 88 (2d Cir. 2019) ("Because the material facts are established by operation of collateral estoppel, all that remains is to determine whether the receiver is entitled to judgment as a matter of law.").

[15]

*E.g.*, *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

Mr. Trump does not dispute the first two liability elements, that his 2019 statements were published to a third party and that they were of and concerning Ms. Carroll. Summary judgment therefore is granted in favor of Ms. Carroll with respect to those two elements.

[16]

*Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

[17]

*Carroll II*, 22cv10016, Dkt 201 (Trial Tr.) at 1429:17-23 (emphasis added).

13

2022 statements are 'substantially the same.'"[18]  In each of his first two 2019 statements, Mr. Trump

claimed that Ms. Carroll lied about him sexually assaulting her for improper and ulterior purposes.[19]

He asserted also in those statements a variation of his claim in his 2022 statement that "E. Jean

Carroll is . . . a woman who I had nothing to do with, [and] didn't know . . . ."[20]  Accordingly, given

that the substantive content of Mr. Trump's 2022 statement, which the jury in *Carroll II* found to

be defamatory, is identical to the substantive content of Mr. Trump's 2019 statements, the jury's

finding in *Carroll II* is controlling in this case.

Mr. Trump contends that "the substance of the June 2019 statements differs in several

significant respects from the October 2022 statement."[21]  He argues first that "the October 2022

statement does not contain any allegation that Plaintiff fabricated the allegations in order to promote

---

18

    Dkt 190 (Pl. Mem.) at 16 (quoting *Napoli v. Breaking Media, Inc.*, 187 A.D.3d 1026, 1028 (2d Dept. 2020)).

19

    *E.g.., Carroll II*, 22cv10016, Dkt 1 (Cpt.) 18, ¶ 92 ("She [(Ms. Carroll)] completely made up a story[.] . . . It is a Hoax and a lie[.] . . . If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper."); Dkt 157-1 (Pl. Amend. Cpt.) at 16, ¶ 83 ("She is trying to sell a new book – that should indicate her motivation. . . . Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda."); *Id.* at 18, ¶ 92 ("It is a totally false accusation. . . . When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.").

20

    *E.g.*, Dkt 157-1 (Pl. Amend. Cpt.) at 16, ¶ 83 ("I've never met this person [(Ms. Carroll)] in my life."); *Id.* at 18, ¶ 92 ("I have no idea who this woman is.").

21

    Dkt 211 (Def. Second Opp. Mem.) at 12.

14

her book."[22] Second, he points to the fact that "the statement made no mention of Plaintiff furthering a political agenda, nor did it assert that she was receiving funding from outside sources to further her claims."[23] These points, however, undermine rather than support Mr. Trump's position.

If the jury in *Carroll II*, as Mr. Trump argues, did not determine that his 2022 statement was defamatory because it accused Ms. Carroll of fabricating her sexual assault allegation to promote her book and/or for political purposes, then by Mr. Trump's own logic, the jury must have determined that his statement was defamatory on the ground that it accused Ms. Carroll of lying about the sexual assault. That issue is common to and decisive of the defamatory nature of Mr. Trump's 2019 statements. The possibility that Mr. Trump's 2019 statements were more egregiously defamatory than his 2022 statement (an issue that the Court need not resolve here) does not diminish the issue preclusive effect of the jury's finding in *Carroll II*. The question is whether Mr. Trump defamed Ms. Carroll in his 2019 statements, not whether he defamed her in those statements to an extent *greater* than he did in his 2022 statement.

In any event, Mr. Trump does not address *at all* Ms. Carroll's alternative argument that she is "entitled to summary judgment because no reasonable juror could find that [Mr.] Trump's June 2019 statements lacked defamatory meaning: he accused [Ms.] Carroll of fabricating a sexual assault allegation in order to make money, advance political goals, and achieve other plainly improper purposes."[24] She contends that "[s]uch statements, especially when issued by the sitting

---

22

  *Id.*

23

  *Id.*

24

  Dkt 190 (Pl. Mem.) at 17.

President and broadcast widely, would inevitably tend to expose [Ms.] Carroll to hatred and contempt or to induce an unsavory opinion of her in the minds of a substantial number of people in the community."[25]  In the absence of any opposition by Mr. Trump, let alone any showing of the existence of a genuine issue of material fact with respect to the defamatory meaning of his 2019 statements, the Court agrees that Ms. Carroll is entitled to summary judgment on this element regardless of any issue preclusive effect of the verdict in *Carroll II*.[26]

*Mr. Trump's 2019 Statements Were False*

        The jury's verdict in *Carroll II* plainly established that Mr. Trump's 2019 statements were false (not substantially true). In *Carroll II*, the truth or falsity of Mr. Trump's 2022 statement – which, as set forth above, accused Ms. Carroll of lying about Mr. Trump sexually assaulting her for improper and ulterior purposes – depended upon whether Mr. Trump sexually assaulted Ms. Carroll. The jury answered that question in the affirmative twice. First, it found by a preponderance of the evidence that Mr. Trump sexually abused Ms. Carroll. Second, it determined by clear and convincing evidence that Mr. Trump's 2022 statement was false. As this Court instructed the jury:

        "[W]hether Mr. Trump's [2022] statement is false or true depends *largely or*

---

25

    *Id.*

26

    *See Curry v. Roman*, 217 A.D.2d 314, 318-19 (4th Dept. 1995) ("Once the court concludes that the statements are reasonably susceptible of a defamatory connotation, it becomes a jury function, if the words are susceptible of several different meanings, to determine whether that was the sense in which the words were likely to be understood by the ordinary and average reader or listener . . . . If the words, however, are unambiguous and admit but one meaning, the court should resolve the issue . . . . We conclude that the words used by defendants, which accused plaintiffs of specific criminal conduct . . . , were clear and unambiguous, and were defamatory as a matter of law.") (citations omitted).

16

*entirely* on whether you find that Mr. Trump raped or sexually abused or forcibly
touched or otherwise sexually attacked Ms. Carroll."[27]

Pursuant to the presumption that the jury followed the Court's instructions, its finding that Mr.
Trump's 2022 statement was false necessarily implies that it determined by clear and convincing
evidence that Ms. Carroll did not fabricate her sexual assault accusation.

Mr. Trump's 2019 statements raise this identical issue. "The core of Ms. Carroll's
defamation claim [in this case] is that Mr. Trump *lied in accusing her of fabricating her sexual
assault allegation against him in order to increase sales of her book and for other improper
purposes* and that he thus caused Ms. Carroll professional and reputational harm as well as emotional
pain and suffering."[28] The truth or falsity of Mr. Trump's 2019 statements therefore depends – like
the truth or falsity of his 2022 statement – on whether Ms. Carroll lied about Mr. Trump sexually
assaulting her. The jury's finding that she did not therefore is binding in this case and precludes Mr.
Trump from contesting the falsity of his 2019 statements.[29]

---

[27]    *Carroll II*, 22cv10016, Dkt 201 (Trial Tr.) at 1431:2-6 (emphasis added).

[28]    *Carroll*, 2023 WL 4393067, at *4 (emphasis added).

[29]    In theory, it is possible that the jury in *Carroll II* could have determined that Mr. Trump's
2022 statement was false because Ms. Carroll did not possess any nefarious purpose,
without regard to whether she lied about the assault. Mr. Trump does not make this
argument. In fact, he repeatedly contends the opposite. *E.g.*, Dkt 206 (Def. First Opp. Mem.)
at 5 ("The only question that the jury considered on the issue of falsity was whether it
believed that the sexual assault occurred."); Dkt 211 (Def. Second Opp. Mem.) at 13-14
("[I]n the context of the October 2022 statement, the jury was singularly tasked with
determining whether the sexual assault occurred[.]"); ("[T]he jury was specifically tasked
to consider whether the sexual assault occurred[.]");("At bottom, the only true question the
*Carroll II* jury was tasked with finding is whether it believed that the sexual assault
occurred."). Moreover, crediting this theoretical possibility would require assuming that (1)
the jury did not follow the Court's instruction that is stated above, and (2) the jury found

17

Mr. Trump's contrary arguments are all unpersuasive. He contends that "the jury was not asked to – and in fact did not – consider whether the October 2022 statement was made pursuant to a 'nefarious purpose' to [Ms. Carroll's] sexual assault allegations, nor whether [Mr. Trump] lied when he claimed that he did not know [Ms. Carroll]."[30] His argument defies common sense and mischaracterizes Ms. Carroll's defamation claim. Of course, the jury's finding that the sexual assault occurred necessarily implies that Ms. Carroll did not lie about it for a nefarious or any other purpose and that Mr. Trump met and knew her.[31] In any event, Ms. Carroll did not sue Mr. Trump simply for stating that he did not know her. His statement that he did not know her is a subcomponent of the core of Ms. Carroll's defamation claim, which, as stated above, is that Mr. Trump defamed her in this case and in *Carroll II* by accusing her of concocting a sexual assault allegation for improper

---

that the statement was not substantially true *solely* because it was convinced that Ms. Carroll did not lie – if she did – "to suit the purposes of CNN and Andy Cooper" "where she was promoting a really crummy book." *Carroll II*, 22cv10016, Dkt 1 (Cpt.) 18, ¶ 92. There is no support for either proposition. In any event, Mr. Trump does not dispute, and implicitly concedes by his repeated assertions, that the jury in *Carroll II* found by clear and convincing evidence that his 2022 statement was false because it determined that Ms. Carroll did not fabricate her sexual assault accusation.

30      Dkt 206 (Def. First Opp. Mem.) at 5.

31      Mr. Trump argues also that "a finding that [he] lied when he asserted that [Ms. Carroll] may have been motivated for financial or political purposes was clearly not essential to the ultimate judgment, given that the jury had not been instructed as such, nor were these assertions even contained in the October 12[, 2022] Statement." Dkt 211 (Def. Second Opp. Mem.) at 14. For the reasons discussed above, his argument is inapposite. Even assuming for the sake of argument that Mr. Trump's 2022 statement did not include those specific assertions, the jury's determination in *Carroll II* that Ms. Carroll did not fabricate her sexual assault accusation necessarily subsumes any assertion that she did so for any reason.

Mr. Trump's other argument, that the jury's finding that he sexually abused Ms. Carroll cannot be afforded preclusive effect because that finding was made by a preponderance of the evidence rather than by clear and convincing evidence, similarly is irrelevant. Neither the Court nor Ms. Carroll rely on the jury's sexual abuse finding to determine that the verdict in *Carroll II* establishes the falsity of Mr. Trump's 2019 statements.

18

purposes. There accordingly is no merit to Mr. Trump's arguments with respect to the falsity of his 2019 statements.

*Mr. Trump's 2019 Statements Were Made With Actual Malice*

   The verdict in *Carroll II* established also that Mr. Trump's 2019 statements were made with actual malice. "To show actual malice, a plaintiff must prove that the defendant either knew his statements were false or acted with reckless disregard as to whether they were false."[32] A defendant acted with reckless disregard if he or she was "entertaining serious doubts as to the truth of the statement or having a high degree of awareness that the statement is probably false."[33] In *Carroll II*, the jury found by clear and convincing evidence that Mr. Trump made the 2022 statement with actual malice. In other words, it determined – as this Court instructed the jury – that:

   "Mr. Trump, when he made his October 12[, 2022] statement, *knew that it was false, had serious doubts as to its truth, or had a high degree of awareness that the statement probably was false.*"[34]

To be more specific, the jury found that Mr. Trump knew that his statement that Ms. Carroll lied about him sexually assaulting her for improper and ulterior purposes was false or that he acted with reckless disregard whether it was false.

   Whether Mr. Trump made the 2019 statements with actual malice raises the same

---

[32]
  *Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021).

[33]
  *Id.*

[34]
  *Carroll II*, 22cv10016, Dkt 201 (Trial Tr.) at 1431:25-1432:3 (emphasis added).

issue. Accordingly, as Ms. Carroll argues, "[n]o reasonable person could believe that [Mr.] Trump acted with actual malice in October 2022, but lacked it in June 2019."[35] "To do so, [a reasonable person] would have to believe that [Mr.] Trump willfully lied (or doubted the truth of his own statement) in October 2022, but somehow did not willfully lie (or doubt his own statements) in June 2019, even though the statements were substantively identical, even though [Mr.] Trump's attacks on [Ms.] Carroll never wavered and never varied, and even though [Mr.] Trump (by his own admission) made absolutely no effort in this time period to investigate the issue or to discover any new information about the truth of [Ms.] Carroll's underlying allegations."[36]

Alternatively, even if the jury's finding in *Carroll II* that Mr. Trump made his 2022 statement with actual malice was not issue preclusive in this case, Ms. Carroll nonetheless has satisfied her burden on summary judgment. As discussed above, the jury's finding that Mr. Trump's 2022 statement was false is controlling in this case. And that is significant with respect to actual malice because, as Ms. Carroll argues, given that Mr. Trump's "2022 statement concerned his own personal conduct and knowledge, no reasonable juror could find that [Mr.] Trump's October 2022 statement was false, but also conclude that Trump was unaware of the relevant facts in June 2019."[37] Moreover, as Ms. Carroll points out:

"The record makes clear that [Mr.] Trump's conduct in 2019 reflected gross and willful disregard for the truth. As [Mr.] Trump testified, he never read [Ms.]

---

[35]

Dkt 190 (Pl. Mem.) at 20.

[36]

*Id.*

[37]

*Id.* at 21.

Carroll's book or the excerpt of it published in *New York* Magazine, . . . he never contacted Bergdorf's despite representing otherwise in his public statements, . . . [Mr.] Trump had absolutely no personal knowledge as to [Ms.] Carroll's financial circumstances, the details of [Ms.] Carroll's book deal, or her political affiliation or party registration, . . . nor did he remember anyone contacting him with such information despite asking for people do so in his June 21[, 2019] statement, . . . [Mr.] Trump took no steps to investigate [Ms.] Carroll's account, nor did he direct anyone in the White House or the administration to do so, . . . and [Mr.] Trump did not consult with any other White House or administration official (apart from his wife and daughter) in making the June 2019 statements . . . ."[38]

Mr. Trump does not point to any genuine issue of material fact with respect to whether he knew that his 2019 statements were false or acted with reckless disregard to their truth or falsity.[39] Indeed, he has not contended – either here or in *Carroll II* – that he would not have acted with actual malice even if his denial that the alleged incident ever occurred was proven false. He instead argues that "the record does not establish . . . that [Mr. Trump] published the June 2019

---

[38]    *Id.* at 21-22 (citations omitted).

[39]    In his response to Ms. Carroll's Rule 56.1 Statement of Facts, Mr. Trump disputes some of the facts recited by Ms. Carroll that are reproduced above. For example, he contends that "the cited deposition testimony of Defendant can support only that he could not recall each and every person he may have spoken with about Plaintiff's allegations" and that "the cited deposition testimony of Defendant can support only that he could not [*sic*] whether a member of his team performed research as it relates to Plaintiff's claims." Dkt 212 (Def. Response to Pl. 56.1 Statement) at 6, ¶ 14, 7, ¶ 17.  Based upon this record and in these circumstances, these disagreements do not constitute genuine issues of material fact.  Even accepting Mr. Trump's versions of these facts, Ms. Carroll has satisfied her burden on summary judgment with respect to actual malice.

statements with actual malice" because (1) "the jury in *Carroll II* was specifically precluded from considering the statements made in June 2019," and (2) there is not "any actual solidarity" between the 2019 statements and the 2022 statement because the 2022 statement "does not contain a single reference to [Ms. Carroll's] potential political motivations, nor does it directly state that [Ms. Carroll] made her allegations to advance her book sales."[40]

Both arguments are unpersuasive. Although he is correct that the Court instructed the jury in *Carroll II* not to consider the 2019 statements, that point does not change the fact that the jury considered and decided issues that are common to both cases – including whether Mr. Trump falsely accused Ms. Carroll of fabricating her sexual assault charge and, if that were so, that he did it with knowledge that his accusation was false and the he knew it was false or acted with reckless disregard as to its truth. And his second argument is irrelevant to actual malice. It again misses the common sense point. If he knew his statements concerning Ms. Carroll were false (or had a high degree of awareness of probable falsity) – as the jury in *Carroll II* found – he of course knew that she did not lie for political or any other reasons. The jury's verdict in *Carroll II*, as well as (and alternatively) the undisputed facts, establish that Mr. Trump's 2019 statements were made with actual malice.

*The Carroll II Verdict Does Not Warrant a Reduction Of Any Damages In Carroll I*

Mr. Trump contends that any damages award Ms. Carroll might receive in this case "must be limited in accordance with the judgment of *Carroll II*."[41]  As noted above, the jury in

---

[40]    Dkt 211 (Def. Second Opp.) at 17.

[41]    Dkt 194 (Def. Mem.) at 7.

22

*Carroll II* awarded Ms. Carroll $2.7 million in compensatory damages for her defamation claim –

$1.7 million for the reputation repair program based on Professor Humphreys's testimony, and $1

million for damages other than the reputation repair program. Professor Humphreys submitted an

expert report in this case as well, in which she calculated that "the minimum appropriate corrective

campaign . . . would cost at least $10 million."[42] Ms. Carroll alleges also – as she did in *Carroll II*

with respect to Mr. Trump's 2022 statement – that his 2019 statements caused her professional harm

as well as emotional pain and suffering.

Mr. Trump first argues that any compensatory damages in this case other than those

in relation to the reputation repair program "cannot exceed the one million dollar award in *Carroll

II*" because in *Carroll II*, he argues that Ms. Carroll "explained that the damage she suffered as a

result of the October 12, 2022 statement was identical to – potentially even greater than – the harm

she incurred as a result of the June 2019 statements."[43] He relies on Ms. Carroll's testimony at trial

in *Carroll II* that the messages she received after Mr. Trump's 2022 statement were "*equally

disparaging and hurtful*" to those she received after his 2019 statements, "but these [(post-2022

messages)] particularly hurt because [she] thought [she] had made it through and there they are

again."[44] He contends that Ms. Carroll's "testimony that the impact of the October 2022 statement

---

[42]

        Dkt 157-1 (Pl. Amend. Cpt.) at 29 ¶ 147. *See also* Dkt 204 (Pl. Opp. Mem.) at 2 ("In her
expert report, Professor Humphreys designed a program to remedy the negative impressions
associated with [Mr.] Trump's June 2019 statements; she estimated that the cost of such a
reputation repair program would fall between $3,333,058.72 and $20,998,861.18, depending
upon factors she described, with a conservative, middle range between $9,999,176.17 and
$12,599,316.71.").

[43]

        Dkt 194 (Def. Mem.) at 7-8.

[44]

        *Carroll II*, 22cv10016, Dkt 189 (Trial Tr.) at 329:5-7 (emphasis added).

23

was 'equally disparaging and hurtful' as that of the June 2019 statements" is controlling in this case because it satisfies the four elements of issue preclusion.[45]   There is no merit to Mr. Trump's argument.

As an initial matter, issue preclusion is available only with respect to determinations by the Court or jury of issues necessary to support the judgment. It has nothing to do with testimonial statements by parties. Mr. Trump's contention thus mixes apples with oranges.

In any case, his argument misinterprets the jury's findings on damages in *Carroll II.* This Court instructed the jury that, with respect to compensatory damages other than the reputation repair program, it should:

> "[A]ward an amount that, in the exercise of your good judgment and common
> sense, you decide is fair and just compensation for the injury to the plaintiff's
> reputation and the humiliation and mental anguish in her public and private life
> which you decide was caused by the defendant's [2022] statement. In fixing that
> amount, if you fix one, you should consider the plaintiff's standing in the community,
> the nature of Mr. Trump's statement made about Ms. Carroll, the extent to which the
> statement was circulated, the tendency of the statement to injure a person such as Ms.
> Carroll, and all of the other facts and circumstances in the case."[46]

At no point was the jury instructed to determine whether the harm Ms. Carroll suffered as a result of Mr. Trump's 2022 statement was equal to the harm she allegedly suffered as a result of his 2019

---

[45]   Dkt 209 (Def. Reply Mem.) at 2.

[46]   *Carroll II*, 22cv10016, Dkt 201 (Trial Tr.) at 1433:1-11.

statements. Nor is there any permissible inference from the jury's $1 million award in *Carroll II* that

it implicitly determined Ms. Carroll could not be accorded more for the alleged harm she suffered

from Mr. Trump's 2019 statements simply based on Ms. Carroll's "equally disparaging and hurtful"

testimony. Indeed, as Mr. Trump acknowledges, the Court explicitly instructed the jury that "the

question of whether there was any adverse effect by virtue of the 2019 statements and, if there was,

how much adverse effect is not at issue in this case. It is not for you to determine."[47] Given that the

issue Mr. Trump seeks to "carr[y] over" from the *Carroll II* trial to this action was never actually

decided, there is no basis to prospectively cap any damages award Ms. Carroll might receive other

than for the reputation repair program at $1 million.[48]

        Nor is there any merit to Mr. Trump's second argument, *i.e.*, that any award Ms.

Carroll might receive in relation to the reputational repair program must be reduced by $1.7 million

to avoid double recovery. Mr. Trump contends that "[g]iven that the two programs are identical in

their design and function, there will be a complete overlap in their remedial effect on [Ms. Carroll's]

reputation."[49] His argument ignores the fact that even if Professor Humphreys "utilized the same

methodologies and criteria" to determine the reputation repair programs in *Carroll I* and *Carroll II*,

those proposed programs – and the ultimate calculations Professor Humphreys reaches – are different

in both cases.[50] In any event, Mr. Trump fails to demonstrate how the jury in *Carroll II* decided the

---

[47]     *Id.*, Dkt 197 at 1158:3-6.

[48]     Dkt 209 (Def. Reply Mem.) at 2.

[49]     Dkt 194 (Def. Mem.) at 15.

[50]     *Id.* at 14.

monetary value, if any, to accord to Professor Humphreys' reputational repair program with respect

to Mr. Trump's 2019 statements. For the reasons stated above, it of course did not do so. I have

considered Mr. Trump's other arguments and found them all unpersuasive.[51]

### Conclusion

For the foregoing reasons, Ms. Carroll's motion for partial summary judgment (Dkt

189) is granted except with respect to Mr. Trump's June 24, 2019 statement.  Mr. Trump's motion

with respect to the issue preclusive effect of the *Carroll II* verdict in this action (Dkt 193) is denied.

SO ORDERED.

Dated:        September 6, 2023

_____

Lewis A. Kaplan
United States District Judge

---

[51]       In a footnote, Ms. Carroll "contend[s] that it would be appropriate for the Court to consider
drawing on its inherent authority to issue an order to show cause why [Mr.] Trump's counsel
should not be required to pay our attorneys' fees in connection with responding to his
motion" "[g]iven the manifest frivolity of [Mr.] Trump's legal arguments."  Dkt 204 (Pl.
Opp. Mem.) at 9 n.2.  The Court declines to do so in this instance.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                    Plaintiff,

        -against-

DONALD J. TRUMP,

                   Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-21-2022
```

22-cv-10016 (LAK)

## PRETRIAL AND SCHEDULING ORDER

LEWIS A. KAPLAN, *District Judge.*

        The Court has received a joint proposed discovery plan from and conducted a pretrial and scheduling conference with counsel for both parties. The following reflects the determinations made as a result of those consultations.

        1.      No discovery taken in *Carroll v. Trump*, 20-cv-7311 (LAK) (hereinafter "*Carroll I*") shall be inadmissible in this action on the basis that it was taken in *Carroll I* and not in this action. Each of the parties may object to the admissibility in this action of discovery derived from *Carroll I* on any other independent basis.

        2.      The discovery taken in *Carroll I,* which has been completed, fully explored the question whether the defendant sexually assaulted the plaintiff as she alleges. That is the central issue both in *Carroll I* and in this case. Recognizing that there might be issues raised by this case that were not presented by *Carroll I,* this Court's order of December 2, 2022 (Dkt 10) directed the parties to provide "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that

2

it is needed." The Court explored that subject with counsel at the conference as well.  On the basis of the parties' written and oral submissions, the Court has concluded that the only such issues are damages, including emotional or psychological damages, allegedly suffered by plaintiff as a result of the alleged sexual assault as distinguished from the defamation alleged in *Carroll I*, and the defendant's October 12, 2022 statement.  Unless otherwise ordered, discovery will be limited to those subjects.

3.     Unless otherwise ordered, plaintiff's discovery is limited to (a) furnishing defendant with the report of a forensic psychologist who, plaintiff states, will offer expert testimony regarding plaintiff's damages from the alleged sexual assault and a second report from plaintiff's original damages expert, who plaintiff states will offer expert testimony regarding the damages allegedly resulting from defendant's October 12, 2022 statement, and (b) appropriate Rule 26(b)(4) discovery with respect to newly proposed testimony of any expert witnesses whom defendant proposes to call.

4.     Unless otherwise ordered, defendant's discovery is limited to (a) conducting an independent psychological or psychiatric examination of plaintiff with respect to any emotional or psychological damages as a result of the alleged sexual assault and defendant's October 12, 2022 statement, (b) furnishing plaintiff with the reports of (i) defendant's expert who will offer testimony with respect to plaintiff's alleged emotional or psychological damages as a result of the alleged sexual assault and defendant's October 12, 2022 statement, and  (ii) defendant's damages expert, Robert Fisher, who defendant states will offer expert testimony demonstrating that plaintiff was not damaged by defendant's October 12, 2022 statement, (c) conducting an additional deposition of the plaintiff, not to exceed three hours absent agreement of all counsel or leave of court, only on the subject of damages, including any emotional or psychological damage, allegedly suffered by her as

3

a result of the alleged sexual assault and the publication of defendant's October 12, 2022 statement, and (d) appropriate Rule 26(b)(4) discovery with respect to newly proposed testimony of any expert witnesses whom plaintiff proposes to call.

5.     Nothing in paragraphs 3 and 4 forecloses interrogatories and requests for production of documents  consistent with the limitation set forth in paragraph 2.

6.     In the event defendant moves to dismiss the complaint in this action, he may move simultaneously for a stay of discovery pending determination of the motion.  Absent a specific, further order of the Court to the contrary, however, the parties shall commence discovery and proceed notwithstanding the pendency of any motion.

7.     The following schedule shall govern further proceedings in this case:

| Deadline | Date |
|---|---|
| Rule 26(a) initial disclosures<br><br>Service of interrogatories, document production requests, and any request for independent psychological or psychiatric examination of the plaintiff.<br><br>Service of plaintiff's new or supplemental expert reports | January 9, 2023 |
| Responses to any written discovery requests | January 23, 2023 |
| Completion of additional deposition of plaintiff<br><br>Service of defendant's new or supplemental rebuttal expert reports | January 30, 2023 |
| Completion of expert discovery | February 6, 2023 |
| Exchange of premarked trial exhibits | February 9, 2023 |
| Filing of joint pretrial order | February 16, 2023 |
| Filing of any motions for summary judgment and motions *in limine* | February 23, 2023 |
| Filing of any oppositions to motions for summary judgment and motions *in limine* | March 9, 2023 |

4

| Filing of any replies in support of motions for summary judgment and motions *in limine* | March 16, 2023 |
| Filing of joint proposed special verdict form, proposed jury instructions, and proposed *voir dire* examinations | March 30, 2023 |
| Commencement of trial | April 17, 2023 |

8.    The Court will resolve the question whether to consolidate or jointly try

*Carroll I* with this case at a later date.

SO ORDERED.

Dated:        December 21, 2022

_____

Lewis A. Kaplan
United States District Judge

**SA-234**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED 5/9/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                Plaintiff,

      -against-                              22-cv-10016 (LAK)

DONALD J. TRUMP,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**VERDICT FORM**

<u>Battery</u>

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

    1.    Mr. Trump raped Ms. Carroll?

                YES _____          NO __✓__

                *[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 2.]*

    2.    Mr. Trump sexually abused Ms. Carroll?

                YES __✓__        NO _____

                *[If you answered "Yes," skip to Question 4.  If you answered "No," continue to Question 3.]*

    3.    Mr. Trump forcibly touched Ms. Carroll?

                YES _____          NO _____

                *[If you answered "Yes," continue to Question 4.  If you answered "No," skip to Question 6.]*

    4.    Ms. Carroll was injured as a result of Mr. Trump's conduct?

                YES __✓__        NO _____

                If "Yes," insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.

                $ __2,000,000__ — (2 million)

2

If "No," insert $1.

$ _____

*[Continue to Question 5, whether you answered "Yes" or "No."]*

5.   Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard?

YES  ✓            NO ____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 20,000 — (twenty thousand)

*[Continue to Question 6, whether you answered "Yes" or "No."]*

## Defamation

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

6.   Mr. Trump's statement was defamatory?

YES  ✓            NO ____

*[If you answered "Yes," continue to Question 7. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by clear and convincing evidence, that**

7.   Mr. Trump's statement was false?

YES  ✓            NO ____

*[If you answered "Yes," continue to Question 8. If you answered "No," stop here and return your verdict.]*

8.   Mr. Trump made the statement with actual malice?

YES  ✓            NO ____

*[If you answered "Yes," continue to Question 9. If you answered "No," stop here and return your verdict.]*

3

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

9.   Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement?

YES  ✓          NO _____

If "Yes," insert a dollar amount for any damages other than the reputation repair program.

$ 1,000,000. — (1 million)

If "Yes," insert a dollar amount for any damages for the reputation repair program only.

$ 1,700,000. — (1.7 million)

If "No," insert $1.

$ _____

*[Continue to Question 10, whether you answered "Yes" or "No."]*

10.   In making the statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another?

YES  ✓          NO _____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 280,000. — (two hundred eighty thousand)

*[Please write your juror number (not you seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated:  5/9 _____ , 2023

4

Juror numbers:

| | |
|---|---|
| 10 | 58 |
| 37 | 77 |
| 39 | 80 |
| 44 | 81 |
| 48 | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                    Plaintiff,

        -against-                          22-cv-10016 (LAK)

DONALD J. TRUMP,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7-19-2023_

## MEMORANDUM OPINION DENYING
## DEFENDANT'S RULE 59 MOTION

Appearances:

Roberta Kaplan
Joshua Matz
Shawn Crowley
Matthew Craig
Trevor Morrison
Michael Ferrara
KAPLAN HECKER & FINK LLP

*Attorneys for Plaintiff*

Joseph Tacopina
Matthew G. DeOreo
Chad Derek Seigel
TACOPINA SEIGEL & DEOREO, P.C.

Alina Habba
Michael T. Madaio
HABBA MADAIO & ASSOCIATES LLP

*Attorneys for Defendant*

2

LEWIS A. KAPLAN, *District Judge.*

In 2019, E. Jean Carroll first publicly claimed that businessman Donald J. Trump, as he then was, sexually assaulted ("raped") her in the mid-1990s. Mr. Trump responded almost immediately by charging that Ms. Carroll's claim was entirely false, that no such thing ever had happened, and that Ms. Carroll falsely accused Mr. Trump for ulterior and improper purposes. He repeated that contention in 2022 and yet again more recently. Ms. Carroll consequently sued Mr. Trump twice.

Ms. Carroll's first lawsuit (*"Carroll I"*), commenced in 2019, alleges that Mr. Trump's 2019 statements were defamatory. While that case was delayed for years for reasons that need not be recapitulated here, it now is scheduled for trial in January 2024.

This, the second case (*"Carroll II"*), also contains a defamation claim, albeit one based on Mr. Trump's comparable 2022 statement. But *Carroll II* made an additional claim – one for damages for the sexual assault. That claim could not have been made in 2019 because the statute of limitations almost doubtless would have expired long before. But the claim was made possible in 2022 by the enactment that year of New York's Adult Survivors Act (the "ASA"), which temporarily revived the ability of persons who were sexually assaulted as adults to sue their alleged assaulters despite the fact that an earlier statute of limitations had run out.

This case, *Carroll II,* was tried in April and May 2023. Ms. Carroll contended that Mr. Trump had assaulted her in a dressing room at a New York department store where, among other things, he forcibly penetrated her vagina with his fingers and his penis. She testified in person for most of three days and was cross-examined intensively. Her sexual assault claim was corroborated by two "outcry" witnesses in whom Ms. Carroll had confided shortly after the attack, and was supported by six other fact witnesses. Mr. Trump's defense – based exclusively on an

3

attempt to discredit Ms. Carroll and her other witnesses – in substance was that no assault ever had occurred, that he did not even know Ms. Carroll, and that her accusations were a "Hoax." Mr. Trump, however, did not testify in person or even attend the trial despite ample opportunity to do so.

The jury's unanimous verdict in *Carroll II* was almost entirely in favor of Ms. Carroll. The only point on which Ms. Carroll did not prevail was whether she had proved that Mr. Trump had "raped" her within the narrow, technical meaning of a particular section of the New York Penal Law – a section that provides that the label "rape" as used in criminal prosecutions in New York applies only to vaginal penetration by a penis. Forcible, unconsented-to penetration of the vagina or of other bodily orifices by fingers, other body parts, or other articles or materials is not called "rape" under the New York Penal Law. It instead is labeled "sexual abuse."[1]

As is shown in the following notes, the definition of rape in the New York Penal Law is far narrower than the meaning of "rape" in common modern parlance, its definition in some dictionaries,[2] in some federal and state criminal statutes,[3] and elsewhere.[4]  The finding that Ms.

---

[1]  "Sexual abuse" involving sexual contact by forcible compulsion (sexual abuse in the first degree) nevertheless is a felony punishable by a term of imprisonment and requiring sex offender registration. N.Y. Penal Law §§ 70.02(1)(c) (sexual abuse in the first degree is a Class D violent felony), 3(c) ("For a class D felony, the term must be at least two years and must not exceed seven years . . .."); N.Y. Correct. Law §§ 168-a(3)(a)(i) (defining "[s]exually violent offense" to include a conviction of sexual abuse in the first degree), 7(b) (defining "[s]exually violent offender" as "a sex offender who has been convicted of a sexually violent offense defined in subdivision three of this section").

[2]  One dictionary, for example, defines rape as "unlawful sexual intercourse *or any other sexual penetration* of the vagina, anus, or mouth of another person, with or without force, *by a sex organ, other body part, or foreign object*, without the consent of the person subjected to such penetration."  "[R]ape," Dictionary.com, https://www.dictionary.com/browse/rape (last accessed July 14, 2023) (emphasis added). The most recent edition of Black's Law Dictionary defines rape in part as "[u]nlawful sexual activity (esp. intercourse) with a person (usu[ally] a female) without consent and usu[ally] by force or threat of injury" and

4

Carroll failed to prove that she was "raped" within the meaning of the New York Penal Law does

---

it defines "intercourse" in the sexual sense as "*[p]hysical sexual contact*, esp. involving the penetration of the vagina by the penis."  Black's Law Dictionary 966, 1511 (11th ed. 2019).

3  *E.g.,* 10 U.S.C. § 920(g)(1)(C) (Uniform Code of Military Justice) (defining "sexual act" for purposes of rape and sexual assault as, *inter alia*, "the penetration, however slight, of the vulva or penis or anus of another *by any part of the body or any object*, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person") (emphasis added); WAYNE R. LAFAVE, SUBST. CRIM. L., § 17.2(a) & n. 43 (3d ed.) ("In recent years, revision of rape laws have often brought about coverage of a broader range of conduct than is encompassed within the common law term 'carnal knowledge.'... As for the acts covered, the new statutes 'fall into three categories: those that continue the narrow notion that rape should punish only genital copulation; those that agree with the Model Code that rape laws should be expanded to include anal and oral copulation; and *those that go beyond the Model Code to include digital or mechanical penetration* as well as genital, anal, and oral sex.") (emphasis added) (citing state statutes).

In fact, "rape" as defined in the relevant part of the New York Penal Law – forcible, unconsented-to penetration of the vagina by a penis – constitutes "sexual assault" under the Code of Criminal Justice of the State of New Jersey.  N.J. Stat. Ann. §§ 2C:14-2c.(1) ("[a]n actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person" and does so "using coercion or without the victim's affirmative and freely-given permission") and 2C:14-1c ("'Sexual penetration' means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction."). New Jersey, like some other states, does not statutorily define any crime as "rape."  As indicated by the foregoing, New Jersey's penal code – unlike New York's – treats digital and other modes of penetration in the same manner as penile penetration.

4  The American Psychological Association, for example, defines rape as "the nonconsensual oral, anal, or vaginal penetration of an individual by another person *with a part of the body or an object*, using force or threats of bodily harm or taking advantage of the individual's inability to give or deny consent. U.S. laws defining rape vary by state, but the crime of rape is no longer limited to . . . vaginal penetration . . . ." APA Dictionary of Psychology, "Rape," AMERICAN PSYCHOLOGICAL ASSOCIATION, https://dictionary.apa.org/rape (last accessed July 14, 2023) (emphasis added).

The United States Attorney General announced in January 2012 a new definition of rape for the purpose of the Federal Bureau of Investigation's Uniform Crime Report Summary Reporting System by, among other changes, "recogniz[ing] that rape with an object can be as traumatic as penile/vaginal rape." U.S. Department of Justice, *An Updated Definition of Rape*, Jan. 6, 2012, https://www.justice.gov/archives/opa/blog/updated-definition-rape (new definition of "rape" as "[t]he penetration, no matter how slight, of the vagina or anus *with any body part or object*, or oral penetration by a sex organ of another person, without the consent of the victim") (emphasis added).

**SA-242**

5

not mean that she failed to prove that Mr. Trump "raped" her as many people commonly understand the word "rape." Indeed, as the evidence at trial recounted below makes clear, the jury found that Mr. Trump in fact did exactly that.

So why does this matter? It matters because Mr. Trump now contends that the jury's $2 million compensatory damages award for Ms. Carroll's sexual assault claim was excessive because the jury concluded that he had not "raped" Ms. Carroll.[5] Its verdict, he says, could have been based upon no more than "groping of [Ms. Carroll's] breasts through clothing or similar conduct, which is a far cry from rape."[6] And while Mr. Trump is right that a $2 million award for such groping alone could well be regarded as excessive, that undermines rather than supports his argument. His argument is entirely unpersuasive.

This jury did not award Ms. Carroll more than $2 million for groping her breasts through her clothing, wrongful as that might have been. There was no evidence at all of such behavior. Instead, the proof convincingly established, and the jury implicitly found, that Mr. Trump deliberately and forcibly penetrated Ms. Carroll's vagina with his fingers, causing immediate pain and long lasting emotional and psychological harm. Mr. Trump's argument therefore ignores the bulk of the evidence at trial, misinterprets the jury's verdict, and mistakenly focuses on the New York Penal Law definition of "rape" to the exclusion of the meaning of that word as it often is used in everyday life and of the evidence of what actually occurred between Ms. Carroll and Mr. Trump.

There is no basis for disturbing the jury's sexual assault damages. And Mr. Trump's

---

[5]    The jury awarded Ms. Carroll $20,000 in punitive damages, in addition to the $2 million in compensatory damages.

[6]    Dkt 205 (Def. Mem.) at 1.

6

arguments with respect to the defamation damages are no stronger.

### Facts

*The Evidence at Trial*

Ms. Carroll's case in chief constituted all of the evidence at trial. Mr. Trump neither testified nor called any witnesses. Apart from portions of his deposition that came in on Ms. Carroll's case, there was no defense evidence at all. The defense consisted entirely of (1) an attempt to discredit Ms. Carroll's proof on cross-examination, and (2) Mr. Trump's testimony during his deposition that Ms. Carroll's account of the alleged events at the department store was a hoax.

### Sexual Battery

#### Liability

The principal evidence as to Mr. Trump's liability for the sexual assault was the testimony of Ms. Carroll, of the two "outcry" witnesses and of two other women who claimed to have been sexually assaulted by Mr. Trump, the so-called *Access Hollywood* video, and Mr. Trump's remarkable comments about that video during his deposition.

#### Ms. Carroll

In her first public accusation of sexual assault – "rape" – against Mr. Trump, which was published in June 2019 as an excerpt of her then-forthcoming book, Ms. Carroll described the assault in relevant part as follows:

"The moment the dressing-room door [(at Bergdorf Goodman, a department store in New York)] is closed, he lunges at me, pushes me against the wall, hitting

my head quite badly, and puts his mouth against my lips. I am so shocked I shove him back and start laughing again. He seizes both my arms and pushes me up against the wall a second time, and, as I become aware of how large he is, he holds me against the wall with his shoulder and jams his hand under my coat dress and pulls down my tights. . . . The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, *unzips his pants, and, forcing his fingers around my private area, thrusts his penis halfway — or completely, I'm not certain — inside me*. It turns into a colossal struggle.[7]

At trial, Ms. Carroll testified:

- "He [(Mr. Trump)] immediately shut the [(dressing room)] door and shoved me up against the wall and shoved me so hard my head banged."

- "I pushed him back, and he thrust me back against the wall again, banging my head again."

- "He put his shoulder against me and hold [*sic*] me against the wall."

- "I remember him being -- he was very large, and his whole weight came against my chest and held me up there, and he leaned down and pulled down my tights."

- "I was pushing him back. . . . I pushed him back. This arm was pinned down. This arm had my purse. Trying to get him back."

- "His head was beside mine breathing. First, he put his mouth against me."

---

[7] E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump -assault-e-jean-carroll-other-hideous-men.html (emphasis added).

Case 23-1045, Document 106, 10/13/2023, 3581250, Page249 of 300
SA-245
Case 1:22-cv-10016-LAK    Document 212    Filed 07/19/23    Page 8 of 59

8

- "[I was] [s]tamping and trying to wiggle out from under him. *But he had pulled down my tights and his hand went -- his fingers went into my vagina, which was extremely painful, extremely painful. It was a horrible feeling because he curved, he put his hand inside of me and curved his finger. As I'm sitting here today, I can still feel it.*"

- "Then he inserted his penis."

- "He was against me, his whole shoulder -- I couldn't see anything. I couldn't see anything that was happening. *But I could certainly feel it. I could certainly feel that pain in the finger jamming up.*"[8]

After a day and a half of direct testimony, Ms. Carroll was subjected to a lengthy cross examination during which she testified:

"Q. It's your story that at some point you felt his penis inside of you?

A. Yes.

Q. But before that, *it's your sworn testimony that you felt his fingers, what you said was rummaging around your vagina*?

A. *It's an unforgettable feeling.*

Q. Now, when you say rummaging around your vagina, that's different than inserting a finger inside your vagina.

A. *At first he rummaged around and then he put his finger inside me.*

Q. In your book you wrote that he was forcing his fingers around my private area and then thrust his penis halfway completely, I'm not certain, inside me. Is that accurate?

---

[8]  Dkt 187 (Trial Tr.) at 177:22-181:23 (emphasis added).

9

A. Yes."[9]

*The Outcry Witnesses*

Ms. Carroll confided in two of her friends, Lisa Birnbach and Carol Martin (the "outcry" witnesses), about the attack shortly after it occurred. Almost immediately after Ms. Carroll escaped from Mr. Trump and exited the store, she called Ms. Birnbach. Ms. Carroll testified that during that call:

> "A. I said, you are not going to believe what just happened. I just needed to tell her. I said I met Donald Trump in Bergdorf's. We went lingerie shopping and I was so dumb I walked in a dressing room and he pulled down my tights."
>
> . . .
>
> Q. What else did you say?
>
> A. Well, she asked me, she said, after she heard he had pulled down my tights, she asked me, did he insert his penis? I said yes. And then Lisa said the words: Probably why I called her. She said he raped you. He raped you, E. Jean. You should go to the police. I said: No way. Then she said: I will go with you."[10]

The next day, or the day after that, Ms. Carroll told Ms. Martin about the attack. Ms. Carroll testified:

> "I said [(to Ms. Martin)]: Carol, you are not going to believe it. I had a run-in with Donald Trump at Bergdorf's. She said -- she saw my face. She said: We can't talk

---

[9]    Dkt 189 (Trial Tr.) at 406:5-18 (emphasis added).

[10]    Dkt 187 (Trial Tr.) at 186:4-19.

**SA-247**

10

here. We were back behind the studio. She said: Let's talk tonight at my house.

. . .

I took her through step by step what happened. And Carol is a very unjudgmental, open-hearted friend. But she was -- she gave me the exact -- her concern was very different than Lisa's. Carol's concern was, do not go to the police."[11]

Both Ms. Birnbach and Ms. Martin testified about their conversations with Ms. Carroll. Ms. Birnbach testified in relevant part:

"Q. What was the first thing that Ms. Carroll said when you picked up the phone?

A. She said, Lisa, you are not going to believe what happened to me.

. . .

Q. What did she say after she said, Lisa, you are not going to believe what just happened?

A. E. Jean said that she had, after work that day, she had gone to Bergdorf's to look around, and she was on her way out -- and I believe it was a revolving door -- and she said on the other side of the glass from her going in, as she was going out, Donald Trump said to her, *Hey, you're the advice lady*. And she said, *You're the real estate guy*. And he said, *You're so good at advice, you are so smart, why don't you help me pick out a present for a friend*? So she thought she would, it sounded like a funny thing, this guy, who is famous. And she went back in the store and tried to, in my -- in my memory tried to show him things[.] . . . They went upstairs, eventually finding themselves in the lingerie department, and there was no one behind the

---

[11]    *Id.* at 190:5-20.

counter but there was a little bodysuit --

 . . .

Q. What did she say happened after they got to the lingerie department?

A. He said, *Why don't you try this on?* And she, continuing sort of the jokey banter that they had, she said, *Why don't you try it on?* And then the next thing that happened is they were both in the dressing room and he slammed her against the wall. And then, as she was trying to move, he -- he slammed his whole arm, pinned her against the wall with his arm and shoulders, and with his free hand pulled down her tights. And E. Jean said to me many times, *He pulled down my tights. He pulled down my tights.* Almost like she couldn't believe it. She was still processing what had just happened to her. It had just happened to her. *He pulled down my tights.* And then he penetrated her.

Q. Did she say how he penetrated her?

A. Yes. She said with his penis.

Q. What did you say after Ms. Carroll described this to you?

A. As soon as she said that . . . and I said, I whispered, *E. Jean, he raped you.* . . . "[12]

Two days later, Ms. Martin testified in pertinent part:

"Q. And what did she say -- again, taking this piece by piece, what did she say happened?

A. She introduced it by saying, *You won't believe what happened to me the other*

---

[12]  Dkt 193 (Trial Tr.) at 688:5-690:9 (emphases in original).

**SA-249**

12

*night*. As I recall. And I didn't know what to expect and so, I just turned to her and

she said, *Trump attacked me*.

. . .

Q. Now, Ms. Carroll says to you that *Trump attacked me*. Do you recall what you

said next, if anything?

A. Yeah. I was completely floored. I didn't quite know what was coming next. She

is leaning in to me, and I'm saying, *What are you talking about?* But the next thing

that came to my mind was if she was OK and that's what I asked her. So I said, *Are

you OK?* Because she seemed -- her affect was, I would say, anxious and excitable,

but she could be that way sometimes but that part was different in her affect. But

what she was saying didn't make any sense at first.

Q. And when you asked her was she OK, did she respond?

A. She said -- she probably said I don't know. She kept telling me what happened,

*that he attacked me*. I think she said 'pinned me' is what she said and I still didn't

know what that meant.

Q. So, to the best of your recollection -- I understand it would be crazy if you could

remember every word, but what did she tell you that day about what had happened

to her at Bergdorf Goodman?

A. Basically, she backtracked. I kept asking her to backtrack. It wasn't a linear

conversation, as you would expect, because it was news, it was I didn't know what

I am hearing here, and she was clearly agitated, anxious. And she said she was at

Bergdorf's the night before -- probably two nights, if I recall -- and that she ran into

Mr. Trump going in one of the revolving doors. And she said that they started up a

**SA-250**

13

conversation. My sense is that she engaged him, or vice versa, because that's not uncommon for E. Jean. He recognized her, she recognized him.

. . .

Q. And what else did she tell you about what happened once they were inside Bergdorf Goodman?

A. So, she related that they sort of started kibbitzing or talking back and forth, it was apparently friendly, and she said that he was looking for a gift. And so, she engaged him that way suggesting certain things. I don't remember all of the things. But this must have gone on for a few minutes and then, somehow, they started up the stairs -- escalator, she said.

Q. And did she tell you what happened after they got off the escalator?

A. Yeah. And again, this was disjointed because I would stop and ask her, *What do you mean? What do you mean?* And she was explaining as she's going that once they reached a level -- and I don't know Bergdorf's that well, but once they reached a level where there was -- there were dressing rooms, and she said at that point that he attacked her. Those were the words that I remember but I still said, *What do you mean? You look OK. You look* -- and she had been at work so I couldn't put it together. And she didn't use the word 'rape,' that I recall. I have said that before. But she said it was a frenzy. She said, *I was fighting. I was fighting.* She kept saying that."[13]

---

[13] Dkt 197 (Trial Tr.) at 1028:22-1032:6 (emphases in original).

14

*Other Alleged Survivors*

The jury heard also from two other women who allegedly were sexually assaulted by Mr. Trump: Jessica Leeds and Natasha Stoynoff.[14]  Ms. Leeds claims she was seated beside Mr. Trump on a flight to New York in 1978 or 1979 when he allegedly assaulted her. She testified:

> "A. Well, what happened was they served a meal, and it was a very nice meal, as Braniff was -- was -- reputation to do, and it was cleared and we were sitting there when all of a sudden Trump decided to kiss me and grope me.
>
> Q. What led to that? Was there conversation?
>
> A. There was no conversation. It was like out of the blue.
>
> . . .
>
> Q. What did you -- so describe, if you would, what he did exactly.
>
> A. Well, it was like a tussle. He was -- his hands and -- he was trying to kiss me, he was trying to pull me towards him. He was grabbing my breasts, he was -- it's like he had 40 zillion hands, and it was a tussling match between the two of us. And *it was when he started putting his hand up my skirt* that that kind of gave me a jolt of strength, and I managed to wiggle out of the seat and I went storming back to my seat in the coach."[15]

---

[14]

The testimony of Mss. Leeds and Stoynoff was received pursuant to Federal Rule of Evidence 415, which provides that "evidence that the [defendant] committed any other sexual assault" may be admitted in "a civil case involving a claim for relief based on a party's alleged sexual assault." Fed. R. Evid. 415(a).  The Court's analysis is contained in a prior decision and need not be repeated here. *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023).

[15]

Dkt 193 (Trial Tr.) at 741:13-742:6 (emphasis added).

15

On cross examination, she testified also:

> "Q. And it is your story that after you were done eating, the flight attendant cleared
> your tray tables and this man suddenly attacked you?
>
> A. Correct.
>
> Q. It is your story this man grabbed you with his hands, tried to kiss you, grabbed
> your breasts, and pulled you towards him?
>
> A. Correct.
>
> Q. And pulled himself onto you?
>
> A. It's not -- no, not onto me but he was leaning-in to me, pushing me against the
> back of the seat.
>
> Q. OK. And then according to you he, at one point, put his hand on your knee?
>
> A. *He started putting his hand up my skirt*.
>
> Q. *OK, on your leg and up your skirt?*
>
> A. *Correct.*"[16]

Ms. Leeds confirmed that "if the man had just stuck with the upper part of [her] body, [she] might
not have gotten that upset" and that "it is only when he eventually started putting his hands up
[her] skirt that [she] said I don't need this[.]"[17]  On re-direct she explained:

> "Q. Why did you find it less upsetting when he had his hands above your skirt than
> when they went into your skirt, when his hand went into your skirt?
>
> A. That's sort of the demarcations -- I mean, people -- men -- would frequently pat

---

[16]  *Id.* at 771:19-772:8 (emphasis added).

[17]  *Id.* at 774:24-775:2, 775:13-16.

**SA-253**

16

you on the shoulder and grab you or something like that and you just -- it is not serious and you don't -- you don't -- *but when somebody starts to put their hand up your skirt, you know they're serious and this is not good*."[18]

Ms. Stoynoff, then a reporter for a magazine, encountered Mr. Trump in 2005 at Mar-a-Lago, his residence in Florida, on an assignment to interview him and his wife, Melania. Ms. Stoynoff testified:

"Q. So where did you go with Mr. Trump after he said, I want to show you this room?

A. So we -- I followed him, and we went in through these back doors and down a hall, as I recall it, and turned right into a room.

Q. Who was with you at that point?

A. As I recall, just he and I.

Q. So what happened next?

A. So we -- we walked into a room, and I'm looking in this room, and I went in first and I'm looking around, I'm thinking, wow, really nice room, wonder what he wants to show me, and he -- I hear the door shut behind me. And by the time I turn around, he has his hands on my shoulders and he pushes me against the wall and starts kissing me, holding me against the wall.

Q. Was anyone else in the room at this time?

A. Nobody else.

Q. What did you -- how did you react?

A. I started -- I tried to push him away.

---

[18] *Id.* at 787:6-14 (emphasis added).

**SA-254**

17

Q. Had you -- had anything been said up until that point when you walked into the room? Did he say anything or did you say anything?

A. No, not that I recall.

. . .

Q. So what -- I think you said you tried to shove him away. What happened?

A. He came toward me again, and I tried to shove him again.

Q. What was he doing sort of -- what was he doing with, let's say, the rest of his face or body?

A. Well, he was kissing me and, you know, he was against me and just holding my shoulders back.

Q. Did you -- what, if anything, did you say while this was happening?

A. I didn't say words. I couldn't. I tried. I mean, I was just flustered and sort of shocked and I -- no words came out of me. I tried, though. I remember just sort of mumbling.

. . .

Q. How long -- do you recall how long that went on for?

A. A few minutes.

Q. How did it end?

A. A butler came into the room.

. . .

Q. How did Mr. Trump react when the butler came in?

A. He stopped doing what he was doing.

Q. Were you able to perceive whether the butler saw what had been happening?

SA-255

18

A. I don't know if he saw, but to my mind, I gave him a kind of a 'get me out of here' look, and I felt like he understood.

Q. So what happened, what happened next?

A. The butler led us back to the couch area, and Melania was on her way, and Trump said a few things to me.

Q. What did he say to you?

A. *He said, Oh, you know we are going to have an affair, don't you? You know, don't forget what -- don't forget what Marla said, best sex she ever had. We are going to go for steak, we are going to go to Peter Luger's. We're going to have an affair.*

. . .

Q. . . . Before the butler came into the room, *did Mr. Trump do anything to you that suggested he was going to stop on his own*?

A. *No.*"[19]

*The Access Hollywood Tape*

The so-called *Access Hollywood* tape, a recorded exchange among Mr. Trump and others as they arrived for the shooting of a television episode that was broadcast nationwide repeatedly during the 2016 presidential campaign, was played twice for the jury.[20]  In that video, Mr.

---

[19]
    Dkt 195 (Trial Tr.) at 989:24-996:7 (emphasis added).

[20]
    Like the testimony of Mss. Leeds and Stoynoff, the Court initially determined that the *Access Hollywood* tape was admissible on the ground that a jury reasonably could find it was evidence that Mr. Trump "committed any other sexual assault" pursuant to Rule 415. *Carroll*, 2023 WL 2441795 at *3-4. At trial, however, it became clear that reliance on Rule 415 was unnecessary because the video was offered for a purpose other than to show the

**SA-256**

Trump stated that he previously had "moved on [a woman] like a bitch, but [he] couldn't get there."

He said also in the following exchange:

> Trump: "Maybe it's a different one."
>
> Billy Bush: "It better not be the publicist. No, it's, it's her."
>
> Trump: "Yeah that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful -- I just start kissing them. It's like a magnet. Just kiss. I don't even wait. *And when you're a star they let you do it. You can do anything.*"
>
> Bush: "Whatever you want."
>
> Trump: "*Grab them by the pussy. You can do anything.*"

In the following excerpt of his deposition, which was played for the jury, Mr. Trump testified that:

> "*Q. And you say -- and again, this has become very famous -- in this video, 'I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything, grab them by the pussy. You can do*

---

defendant's propensity to commit sexual assault. Instead, it was offered – as Ms. Carroll's counsel argued in rebuttal summation – as "a confession." Dkt 199 (Trial Tr.) at 1403:24. Given that Mr. Trump states in the video that he "just start[s] kissing" women without "even wait[ing]" and that a "star" (such as himself) could "grab [women] by the pussy," it "has the tendency to make [the] fact [of whether he sexually assaulted Ms. Carroll] more or less probable than it would be without the evidence" because one of the women he referred to in the video could have been Ms. Carroll. Fed. R. Evid. 401. *See also, e.g.*, *United States v. Cordero*, 205 F.3d 1325 (2d Cir. 2000) (unpublished opinion) ("Proof of similar acts may be admitted so long as such evidence is offered 'for any purpose other than to show a defendant's criminal propensity.'") (citation omitted); *Woolfolk v. Baldofsky*, No. 19-CV-3815(WFK) (ST), 2022 WL 2600132, at *2 (E.D.N.Y. July 8, 2022) ("Evidence of prior crimes, wrongs, or acts, however, may be admissible if offered 'for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403.'") (citation omitted). Accordingly, the Court did not include the *Access Hollywood* tape in its instructions to the jury on the evidence of Mr. Trump's alleged sexual assaults of other women, and neither party objected to its exclusion from that portion of the charge.

# SA-257

20

*anything. That's what you said; correct?"*

*A. Well, historically, that's true with stars.*

*Q. True with stars that they can grab women by the pussy?*

*A. Well, that's what -- if you look over the last million years, I guess that's been largely true. Not always, but largely true. Unfortunately or fortunately.*

Q. And you consider yourself to be a star?

A. I think you can say that, yeah.

Q. And -- now, you said before, a couple of minutes ago, that this was just locker room talk?

A. It's locker room talk.

Q. And so does that mean that you didn't really mean it?

A No. It's locker room talk. I don't know. It's just the way people talk."[21]

*Damages for Sexual Assault (Battery) Claim*

The damages evidence at trial consisted primarily of Ms. Carroll's own testimony as well as the testimony of Dr. Leslie Lebowitz, a clinical psychologist with expertise in trauma and in sexual trauma who evaluated Ms. Carroll for this case. Dr. Lebowitz testified in detail on the psychological harm of the assault by Mr. Trump on Ms. Carroll. She explained that:

"There were three dominant ways that I felt that she [(Ms. Carroll)] had been harmed. She has suffered from painful, intrusive memories for many years; she endured a diminishment in how she thought and felt about herself; and, perhaps most

---

[21] Dkt 138-1 (Def. Dep. Designations) at 174:5-175:4 (emphasis added).

prominently, she manifests very notable avoidance symptoms which have curtailed her romantic and intimate life and caused profound loss."[21]

Dr. Lebowitz testified also that, although Ms. Carroll did not meet the full criteria to have been diagnosed with post-traumatic stress disorder ("PTSD"), Ms. Carroll exhibited symptoms in at least some of the four categories that are necessary for a diagnosis of PTSD, including "avoidance symptoms, . . . alterations in her thoughts and feelings about herself, and ... intrusions."[22]  She explained that Ms. Carroll blamed herself for the assault and that the assault "made her feel like she was worth less than she had been before" and "[s]he felt degraded and diminished."[23] As an example of an intrusive memory, which Dr. Lebowitz defined as "when some part of the traumatic experience, either what it felt like or it felt like in your body or in your emotions, just pierces your consciousness and lands in the middle of your experience and essentially hijacks your attention," Dr. Lebowitz testified that at one point during her interview with Ms. Carroll, she "began to squirm in her seat because she was actually reexperiencing Mr. Trump's fingers inside of her, what she alleges to be Mr. Trump's fingers inside of her."[24] She explained also Ms. Carroll's comment that she felt she had died and somehow still was alive as a manifestation of "what it feels like psychologically" because "what rape does is it so violates that sense of humanity and independence and selfhood than people feel psychologically that they are being killed. They feel

---

[21]    Dkt 193 (Trial Tr.) at 829:22-830:2.

[22]    Dkt 195 (Trial Tr.) at 853:13-15.

[23]    *Id.* at 876:2-4.

[24]    *Id.* at 861:8-19.

**SA-259**

22

at risk. They feel like their personhood is being murdered . . . ."[25]  Dr. Lebowitz summarized the psychological impact of Mr. Trump's assault on Ms. Carroll as follows:

> "Because she was frightened and rendered helpless in a way that had never happened to her before and because she blamed herself and because the meaning of that event and the feelings associated with it were simply too big for her to cope with in her usual ways, *it became a stuck point in her life*, something that she had to walk around in her day-to-day basis; and, in doing that, in working so hard to stay away from those feelings of helplessness and vulnerability, she gave up one of the great sources of joy and connection in her life, which was the opportunity to be intimate with a man, and that was a huge loss for her."[26]

*Defamation*

*Liability*

Most of the evidence of Mr. Trump's liability for the defamation claim based on his 2022 statement was coextensive with the evidence of his liability for the sexual assault. The crux of Mr. Trump's 2022 statement was that Ms. Carroll lied about him sexually assaulting her and that her entire accusation was a "Hoax" concocted to increase sales of her then-forthcoming book. To prove that Mr. Trump defamed her, Ms. Carroll needed to prove that his statement was false (i.e., not substantially true), that he knew the statement was false when he made it or acted in reckless

---

[25]    *Id.* at 864:19-865:12.

[26]    *Id.* at 888:10-20 (emphasis added).

disregard of whether or not it was true (actual malice), and that the statement tended to disparage Ms. Carroll in the way of her profession or expose her to hatred or contempt in the minds of a substantial number of people in the community.

The evidence that Mr. Trump sexually assaulted Ms. Carroll proved also the falsity of his statement, which contended that Ms. Carroll's entire account – not any particular sexual act – was a fabrication. With respect to its defamatory import, in addition to showing the jury examples of Internet hate messages Ms. Carroll received from people she did not know, Ms. Carroll testified:

"Q. How, if at all, do you believe this statement affected your reputation?

A. I really thought I was gaining back a bit of ground. I thought, it's starting to go and I felt, you know, happy that, you know, I was back on my feet, had garnered some readers, and feeling pretty good, and then, boom, he knocks me back down again.

. . .

Q. What, if any, I'll call it sort of public response did you experience after Mr. Trump made his October 2022 statement?

A. It was not very nice.

Q. What do you recall?

A. Just a wave of slime. It was very seedy comments, very denigrating. Almost an endless stream of people repeating what Donald Trump says, I was a liar and I was in it for the money, can't wait for the payoff, working for the democrats, over and over. But the main thing was way too ugly. It is very hard to get up in the morning and face the fact that you're receiving these messages you are just too ugly to go on

24

living, practically."[28]

Ms. Carroll further testified that in comparison to the "tweets or messages [she] received after Mr. Trump made his first remarks in June of 2019," the messages that came after October 2022 "were equally, equally disparaging and hurtful, but these particularly hurt because I thought I had made it through and here they are again."[29]

In excerpts of Mr. Trump's deposition that were played for the jury, Mr. Trump confirmed that he wrote the statement "all myself"[30] and testified that:

"I still don't know this woman.  I think she's a wack job.  I have no idea.  I don't know anything about this woman other than what I read in stories and what I hear.  I know nothing about her."[31]

*Damages for Defamation Claim*

The damages evidence consisted primarily of Ms. Carroll's testimony as to the harm she suffered, which is described above, plus the testimony of Professor Ashlee Humphreys with respect to a "reputation repair program" to correct the harm to Ms. Carroll's reputation caused by Mr. Trump's statement.

" . . . [T]he nature of the work [(for Professor Humphreys)] was to look at a

---

[28]    Dkt 189 (Trial Tr.) at 322:6-324:5.

[29]    *Id.* at 329:2-7.

[30]    Dkt 138-1 (Def. Dep. Designations) at 134:13.

[31]    *Id.* at 137:14-17.

**SA-262**

25

> statement that was posted on social media and to understand the spread of that
> statement, how many people saw it, how broadly did it spread, then to look at the
> impact that statement might have had on Ms. Carroll's reputation, if any, and finally
> to estimate, well, how much would it cost to repair that reputation."[32]

Professor Humphreys testified about her process and various calculations. She used an "impression model" to determine approximately how many people saw Mr. Trump's 2022 statement. She determined that across various forms of media, including on the Internet, social media, print media, and television, "the final estimate . . . was between 13.7 million and 18 million impressions," which she explained likely "was an undercount."[33] She stated that "after June 2019 . . . of course there was a lot more volume of statements about her [(Ms. Carroll)] and they contained pretty negative associations including that she was a liar, the perpetrator of a scam, a hoax. Things like that."[34] With respect to Ms. Carroll's reputation before and after the 2022 statement, she testified:

> "So, what I noticed is that those meetings [*sic*] existed after June 2019, but
> the frequency of the posting with those associations had started to decline. However,
> after the statement on October 12th, the frequency of the negative associations, the
> volume of them again escalated."[35]

Professor Humphreys accordingly "concluded that there was a relationship" between Mr. Trump's

---

[32]    Dkt 197 (Trial Tr.) at 1114:2-8.

[33]    *Id.* at 1127:24-25, 1128:16-19.

[34]    *Id.* at 1130:9-12.

[35]    *Id.* at 1130:18-22.

**SA-263**

26

2022 statement and Ms. Carroll's reputation "given the timing and the fact that they [(posts with negative associations)] were in kind of direct response to his [(Mr. Trump's)] statement, as well as the particular language, words like 'liar' etc."[36]  She looked at approximately how many people likely believed Mr. Trump's statement, and determined that "between 3.7 million and 5.6 million people saw Mr. Trump's statement and likely believed it."[37]  Finally, she explained that to repair Ms. Carroll's reputation, there would need to be "a campaign to put out positive message" about her (a "reputational repair campaign" or "reputation repair program").[38]  In total, Professor Humphreys calculated that the cost of such a campaign to repair Ms. Carroll's reputation on the low end would be $368,000 and on the high end would be $2.7 million.[39]

*The Structure of the Verdict*

Both parties submitted proposed "special verdict" forms to distribute to the jury. Pursuant to Federal Rule of Civil Procedure 49, which governs jury verdict forms and questions, "[t]he court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact."[40]  A special verdict stands in contrast to a general verdict form, which typically asks jurors to answer only the ultimate questions of liability and the damages amounts, if

---

[36]    *Id.* at 1130:25-1131:3.

[37]    *Id.* at 1134:16-19.

[38]    *Id.* at 1136:10-13.

[39]    *Id.* at 1142:11-20.

[40]    Fed. R. Civ. P. 49(a)(1).

27

any.

The Court here used a special verdict form that was substantially similar to the parties' proposed forms, consisting of factual questions going to liability and damages, organized by the two claims.  Neither party raised any objection to the Court's verdict form nor demanded that any specific questions other than those on the special verdict form be submitted to the jury. In accordance with Rule 49, the Court "g[a]ve the instructions and explanations necessary to enable the jury to make its findings on each submitted issue" contained in the verdict form.[41]  Accordingly, the meaning of the jury's answers to each question on the verdict form depends upon the instructions given as to what it had to conclude in order to answer the questions.

*Sexual Battery Instructions*

The liability questions for Ms. Carroll's sexual battery claim were whether Ms. Carroll proved by a preponderance of the evidence that (1) "Mr. Trump raped Ms. Carroll?", (2) "Mr. Trump sexually abused Ms. Carroll?", (3) "Mr. Trump forcibly touched Ms. Carroll?".[42]  These three theories of liability (rape, sexual abuse, and forcible touching) were the same three proposed by both parties. As the Court instructed the jury:

> "Ms. Carroll claims that Mr. Trump is liable to her for battery on three different and alternative bases, each of which corresponds to a criminal law definition of a different sex crime. Mr. Trump denies that he is liable to her for battery on any of these three different and alternative bases. . . . Accordingly, the first

---

[41]    Fed. R. Civ. P. 49(a)(2).

[42]    Dkt 174 (Verdict) at 1.

**SA-265**

28

set of questions in the verdict form has to do with whether or not Ms. Carroll has established that Mr. Trump's conduct, if any, came within any of those criminal law definitions."[43]

The Court then instructed the jury on the definitions of the three different sex crimes.

On the first question – whether Ms. Carroll proved that Mr. Trump "raped" her – the Court instructed the jury in accordance with the New York Penal Law's definition of rape:[44]

> "In order to establish that Mr. Trump raped her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.
>
> The first element is that Mr. Trump engaged in *sexual intercourse* with her.
>
> The second element is that Mr. Trump did so without Ms. Carroll's consent by the use of forcible compulsion. . . .
>
> 'Sexual intercourse' means any penetration, however slight, *of the penis* into the vaginal opening. In other words, *any penetration of the penis* into the vaginal opening, regardless of the distance of penetration, constitutes an act of sexual intercourse. Sexual intercourse does not necessarily require erection *of the penis*, emission, or an orgasm.
>
> . . .
>
> I also used the phrase 'forcible compulsion,' and what that means is intentionally to compel by the use of physical force.

---

[43]   Dkt 201 (Trial Tr.) at 1416:1-9.

[44]   It was necessary to obtain findings under the New York Penal Law definitions because the timeliness of the battery claim under the Adult Survivors Act depended on such findings. N.Y. CPLR § 214-j.

. . .

> If you find that Ms. Carroll has proved by a preponderance of the evidence both of those two elements, you will answer Question 1 'yes.' If you answer Question 1 'yes,' I instruct you that Mr. Trump thus committed battery against Ms. Carroll. There would be no need to consider whether he committed battery on either of the other two alternative bases. . . . If you find that Ms. Carroll has not proven either of the two elements of rape by a preponderance of the evidence, you must answer 'no' to Question 1 and go on to Question 2, which deals with the second of the three alternative bases for the battery claim."[45]

Thus, the instructions required the jury to answer Question 1 "No" unless it found that Ms. Carroll had proved that Mr. Trump penetrated her vagina *with his penis*. Penetration by any other body part did not suffice.

> With respect to the second question, whether Ms. Carroll proved that Mr. Trump "sexually abused" her within the meaning of the New York Penal Law, the Court instructed the jury:

> "The second theory of battery corresponds to something called sexual abuse. Sexual abuse has two elements. In order to establish that Mr. Trump sexually abused her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.

> The first element is that Mr. Trump subjected Ms. Carroll to sexual contact.

> The second element is that he did so without Ms. Carroll's consent by the use of forcible compulsion.

---

[45] Dkt 201 (Trial Tr.) at 1416:18-1418:2 (emphasis added).

**SA-267**

30

. . . Sexual contact for this purpose means *any touching of the sexual or other intimate parts* of a person for the purpose of gratifying the sexual desire of either person. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, and the touching may be either directly or through clothing.

. . . For this purpose, *a 'sexual part' is an organ of human reproduction*. So far as intimate part is concerned, the law does not specifically define which parts of the body are intimate. Intimacy, moreover, is a function of behavior and not just anatomy. Therefore, if any touching occurred, the manner and circumstances of the touching may inform your determination whether Mr. Trump touched any of Ms. Carroll's intimate parts. You should apply your common sense to determine whether, under general societal norms and considering all the circumstances, any area or areas that Mr. Trump touched, if he touched any, were sufficiently personal or private that it would not have been touched in the absence of a close relationship between the parties. . . .

If you find that Ms. Carroll has proved by a preponderance of the evidence both of the two elements that I just referred to, the two elements of sexual abuse, then you will answer 'yes' to Question 2. If you answer yes to Question 2, I instruct you that Mr. Trump thus committed battery against Ms. Carroll. There would be no need to consider whether he committed battery on the third alternative test. . . . If you find that Ms. Kaplan [*sic*] has not proven either of the two elements of sexual abuse by a preponderance of the evidence, you must answer 'no' to Question 2 and proceed to Question 3, which deals with the third of the three alternative bases for the battery

claim."[46]

Thus, if the jury found that Mr. Trump penetrated Ms. Carroll's vagina with his fingers, it was obliged to answer Question 2 "Yes" assuming the other element was satisfied.

Questions 4 and 5 dealt with compensatory and punitive damages, respectively, for Ms. Carroll's battery claim. Question 4 asked whether Ms. Carroll proved that she was injured as a result of Mr. Trump's conduct, and if so, to insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.  The Court instructed the jury:

"My instructions to you on the law of damages should not be taken by you as a hint that you should find for the plaintiff. That is for you to decide by answering the questions I have put to you based on the evidence presented. But if you answer 'yes' to any of Question 1, Question 2, or Question 3, you will have determined that Ms. Carroll has prevailed on her claim of battery. In that event, it will be your task to determine from the evidence a dollar amount, if any, that would justly and adequately compensate Ms. Carroll for any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Mr. Trump's alleged rape, sexual abuse, or forcible touching as the case may be.

You may award damages only for those injuries that you find Ms. Carroll has proved by a preponderance of the evidence. Compensatory damages may not be based on speculation or sympathy. They must be based on the evidence presented at trial and only on that evidence.

---

[46] *Id.* at 1418:3-1420:8 (emphasis added).

Now, if you answer 'yes' to Question 4 . . . she [(Ms. Carroll)] would be

entitled to a dollar amount to compensate her adequately and fairly for any physical

injury, pain and suffering, mental anguish, emotional distress, and the other things

I just mentioned a moment ago, that she suffered by virtue of Mr. Trump's alleged

battery, in other words, his alleged rape, sexual abuse, or forcible touching, as the

case may be. Damages may be awarded based on a plaintiff's subjective testimony

of pain, but the plaintiff's proof must satisfactorily establish that the injury is more

than minimal."[47]


*Defamation Instructions*

The factual questions for the defamation liability issue were (1) whether Ms. Carroll

proved by a preponderance of the evidence that Mr. Trump's statement was defamatory and (2)

whether Ms. Carroll proved by clear and convincing evidence his statement was (a) false and (b)

made with actual malice. As relevant to Mr. Trump's arguments in this motion, the Court instructed

the jury that:

"Question 7, as you see on the verdict form, asks whether Ms. Carroll has

proved by something called clear and convincing evidence that Mr. Trump's

---

[47]

*Id.* at 1422:17-1423:25.

Question 5 on punitive damages asked whether Ms. Carroll proved by a preponderance of
the evidence that Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done
with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to
such disregard. If so, it asked how much Mr. Trump should pay to Ms. Carroll in punitive
damages. Given that Mr. Trump does not dispute the jury's $20,000 award in punitive
damages for Ms. Carroll's battery claim, the Court's instructions on this question need not
be reproduced here.

statement was false. . . . A statement is false if it is not substantially true. You will

determine from the evidence presented what the truth was and then compare that

with Mr. Trump's October 12 statement, taking that statement according to its

ordinary meaning, the ordinary meaning of its words.

As you probably already have guessed, *whether Mr. Trump's statement is*

*false or true depends largely or entirely on whether you find that Mr. Trump raped*

*or sexually abused or forcibly touched or otherwise sexually attacked Ms. Carroll.*

. . .

Question 8, in substance, asks you to determine whether Ms. Carroll has

proved by clear and convincing evidence that Mr. Trump made the statement with

what the law calls actual malice. Actual malice for this purpose . . . means that Mr.

Trump made the statement knowing that it was false or acted in reckless disregard

of whether or not it was true. Reckless disregard means that when he made the

October 12 statement, he had serious doubts as to the truth of the statement or made

the statement with a high degree of awareness that it was probably false. So Question

8 asks you to decide whether Ms. Carroll proved by clear and convincing evidence

that Mr. Trump, when he made his October 12 statement, knew that it was false, had

serious doubts as to its truth, or had a high degree of awareness that the statement

probably was false."[48]

The question on compensatory damages was broken down into several parts.  First,

it asked whether Ms. Carroll proved by a preponderance of the evidence that Ms. Carroll was injured

---

[48] *Id.* at 1430:17-1432:3 (emphasis added).

**SA-271**

34

as a result of Mr. Trump's publication of the October 12, 2022 statement. If so, it asked that the jury (1) insert a dollar amount for any damages other than the reputation repair program, and (2) insert a dollar amount for any damages for the reputation repair program only.  The Court instructed the jury that:

> "In the event Mr. Trump is liable for defamation, you will award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement. In fixing that amount, if you fix one, you should consider the plaintiff's standing in the community, the nature of Mr. Trump's statement made about Ms. Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Ms. Carroll, and all of the other facts and circumstances in the case. These damages can't be proved with mathematical certainty. Fair compensation may vary, ranging from one dollar, if you decide that there was no injury, to a substantial sum if you decide that there was substantial injury.

> Now, in this case, Question 9, I have divided the damages determination into two parts . . . . The first part of Question 9, right at the top, the yes/no question asks you to decide whether Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I just described. . . . If the answer is 'yes,' you first will fill in the amount you award for all defamation damages, excluding the reputation repair program. You will leave that out if you put in a figure in the first blank. That was of course the testimony of Professor Humphreys. Second, you will

**SA-272**

35

fill in the amount, if any, that you award for the reputation repair program only."[49]

The last question on the form, on punitive damages for the defamation claim, asked whether in making the 2022 statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another.  If so, it asked how much, if any, Mr. Trump should pay to Ms. Carroll in punitive damages.  The Court instructed the jury:

> "In addition to the claim for punitive damages for the defamation, Ms. Carroll asks also that you award punitive damages for the defamation. Similar to my earlier instructions to you regarding punitive damages on the battery claim, punitive damages in relation to a libel claim – the defamation claim – may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. Now, this is where that difference between 'actual malice,' which I already talked about, and 'malice' or 'maliciously' comes into play. . . . A statement is made with malice or it's made maliciously for the purpose of Question 10 if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights.
>
> If you answer 'yes' to the first part of Question 10 – in other words, if you find that Mr. Trump acted with malice, as I have just defined that term for you, in making the October 12 statement about Ms. Carroll – you will write down an amount, if any, that you find Mr. Trump should pay to Ms. Carroll in punitive damages for the defamation. If you answer 'no' to that first part of Question 10 – that is, you find that Mr. Trump's statement was not made maliciously – you may not

---

[49] *Id.* at 1432:25-1434:7.

award punitive damages. . . .

   In arriving at your decision as to the amount of punitive damages, you should

consider here with respect to the defamation punitive damage claim:

   The nature and reprehensibility of what Mr. Trump did if he defamed her;

that would include the character of the wrongdoing and Mr. Trump's awareness of

what harm the conduct caused or was likely to cause. In considering the amount of

punitive damages to award, you should weigh that factor heavily;

   You should consider the actual and potential harm created by Mr. Trump's

conduct; and

   You should consider Mr. Trump's financial condition and the impact of your

award of punitive damages, if any, on Mr. Trump."[50]

This concluded the Court's substantive instructions on the law, as relevant to Mr. Trump's motion.


*The Jury's Decision*

   In accordance with the Court's instructions, which the jury is presumed to have

followed,[51] the jury made the following explicit findings based on its answers to the verdict form.

On the sexual battery claim, the jury found that:

  •  Mr. Trump *sexually abused* Ms. Carroll.

  •  Mr. Trump *injured her* in doing so.

  •  "Mr. Trump's conduct was *willfully or wantonly negligent, reckless, or done*

---

[50]  *Id.* at 1434:17-1436:10.

[51]  *E.g.*, *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998).

**SA-274**

37

> *with a conscious disregard of the rights of Ms. Carroll*, or was so reckless as to amount to such disregard".[50]

- Ms. Carroll was entitled to compensatory and punitive damages on the sexual battery claim of *$2.02 million* ($2 million in compensatory damages and $20,000 in punitive damages).

On the defamation claim, it found that:

- Mr. Trump's October 12, 2022 statement was *defamatory* and *false* (*i.e.*, "not substantially true").

- Mr. Trump made that statement "with actual malice" – that is, that when he made the statement, Mr. Trump *"knew that it was false", "had serious doubts as to its truth",* or *"had a high degree of awareness that the statement probably was false."*[51]

- "Ms. Carroll was *injured* as a result of Mr. Trump's publication of the October 12, 2022 statement."[52]

- "Mr. Trump *acted maliciously, out of hatred,  ill will, spite or wanton, reckless, or willful disregard* of the rights of another."[53]

- Ms. Carroll was entitled to *$2.98 million* in compensatory and punitive

---

[50]    Dkt 174 (Verdict) at 2 (emphasis added).

[51]    Dkt 201 (Trial Tr.) at 1432:1-3 (emphasis added).

[52]    Dkt 174 (Verdict) at 3 (emphasis added).

[53]    *Id.* (emphasis added).

damages on the defamation claim relating to the October 12, 2022 statement ($1.7 million in compensatory damages for the "reputation repair program" only, $1 million in compensatory damages for damages other than the reputation repair program, and $280,000 in punitive damages).

### *Discussion*

Mr. Trump's motion is addressed only to the jury's damages awards, specifically its compensatory damages award for Ms. Carroll's sexual battery claim, and its compensatory and punitive damages awards for the defamation claim.  He does not challenge the Court's instructions or the jury's liability verdict.  All of his arguments are unpersuasive.

*The Legal Standard*

A "trial judge enjoys 'discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence,' and . . . '[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'"[56]  "In considering motions for a new trial and/or remittitur, '[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'"[57]

---

[56]  *Lore v. City of Syracuse*, 670 F.3d 127, 176–77 (2d Cir. 2012) (alterations in original) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996)).

[57]  *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Gasperini*, 518 U.S. at 435).

39

"Ordinarily, a court should not grant a new trial 'unless it is convinced that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.' . . . Nevertheless, the standard for granting a new trial under Rule 59 is less stringent than the standard under Rule 50."[58] Specifically, unlike the standard on a Rule 50 motion, on a Rule 59 motion: "(1) a new trial . . . may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[59] "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility."[60]

With respect to determining whether the jury's damages awards come within the confines of state law, "[u]nder New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'"[61] "To

---

[58]

*Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 475 (S.D.N.Y. 1998) (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988)).

In *Mono*, the Court identified "an unresolved *Erie* issue – whether the state or federal standard of review applies in a motion for a new trial in a diversity action. New York law does not distinguish between a motion for a new trial and a motion for a judgment notwithstanding the verdict. . . . Thus, if state law applies to defendants' Rule 59 motion, the standard of review would be whether the jury could have reached its verdict on 'any fair interpretation of the evidence.'" *Id.* at 475, n.2 (citations omitted). However, as in *Mono*, "[b]ecause the evidence presented at trial [in *Carroll II*] satisfies both the federal and state standards, I need not determine which jurisdiction's law controls [Mr. Trump's] motion for a new trial." *Id.*

[59]

*Iverson v. Surber*, No. 13-CV-633 (RA), 2018 WL 6523176, at *1 (S.D.N.Y. Nov. 13, 2018), *aff'd*, 800 F. App'x 50 (2d Cir. 2020) (citation omitted).

[60]

*Id.* (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

[61]

*Stampf*, 761 F.3d at 204 (quoting N.Y. CPLR § 5501(c)).

**SA-277**

40

determine whether a jury award is excessive within the meaning of [New York Civil Practice Law and Rules] § 5501(c), New York courts compare it with awards in similar cases."[62]   The relevant standard "is not whether an award deviates *at all* from past awards – it is whether an award deviates *materially* from *reasonable compensation*."[63]

*Compensatory Damages - Sexual Battery Claim*

   *Mr. Trump Digitally and Forcibly Penetrated Ms. Carroll*'s *Vagina*

        Mr. Trump argues that the Court should grant a new trial or remittitur with respect to the jury's award of compensatory damages for Ms. Carroll's sexual battery claim chiefly on the ground that "the [j]ury found that [Ms. Carroll] was not raped but was sexually abused by [Mr. Trump] during the 1995/96 Bergdorf Goodman incident."[64]   According to Mr. Trump, "[s]uch abuse could have included groping of Plaintiff's breasts through clothing or similar conduct, which is a far cry from rape. Therefore, an award of $2 million for such conduct, which admittedly did not cause any diagnosed mental injury to Plaintiff, is grossly excessive under the applicable case law."[65]   Mr. Trump's argument is incorrect at every step.

        First, the definition of "rape" in the New York Penal Law – which the jury was obliged to apply in responding to Question 1 on the verdict form – requires forcible penetration of

---

[62]
        *Id.*

[63]
        *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008) (emphasis in original).

[64]
        Dkt 205 (Def. Mem.) at 1.

[65]
        *Id.*

the victim's vagina *by the accused's penis*.[66]  Accordingly, the jury's negative answer to Question

1 means *only* that the jury was unpersuaded that Mr. Trump's penis penetrated Ms. Carroll's vagina.

It does not mean that he did not forcibly insert his fingers into her – that he "raped" her in the

broader sense of that word which, as discussed above, includes any penetration by any part of an

accused's body (including a finger or fingers) or any other object.[67]

       Second, Mr. Trump's argument ignores the fact that the verdict in this case was a

---

[66]     The New York Penal Law states that "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . 1. By forcible compulsion . . . ." N.Y. Penal Law § 130.35.  It provides also that "'[s]exual intercourse' has its ordinary meaning and occurs upon any penetration, however slight." *Id.* § 130.00. New York courts have interpreted "sexual intercourse" as involving *penile* penetration. *E.g.*, *People v. Berardicurti*, 167 A.D.2d 840, 841 (4th Dept. 1990) ("The trial court properly instructed the jury that, to constitute sexual intercourse, penetration 'need not be deep' and that '[a]ny penetration of the penis into the vaginal opening, regardless of the distance or amount of penetration' constitutes sexual intercourse.") (citation omitted); *People v. Peet*, 101 A.D.2d 656, 656 (3d Dept. 1984), *aff'd*, 64 N.Y.2d 914 (1985) ("[T]he use of one's finger has already been sufficiently proscribed by section 130.65 of the Penal Law  [(sexual abuse in the first degree)] . . . ."); *Williams v. McCoy*, 7 F. Supp. 2d 214, 220-21 (E.D.N.Y. 1998) (rejecting petitioner's argument that "the trial judge erred in instructing the jury on the elements of rape because he neglected to explain that rape requires penile – as opposed to digital – penetration" because "[a] jury of competent adults surely understood the 'ordinary meaning' of 'sexual intercourse' to require penile penetration"). This Court accordingly instructed the jury that sexual intercourse required penile penetration of the vagina, and neither party objected to that definition.

[67]     It is not entirely surprising that the jury did not find penile penetration but, as discussed below, implicitly found digital penetration.  Ms. Carroll testified about the specific physical memory and excruciating pain of the digital penetration at great length and in greater detail than the penile penetration. She acknowledged that she could not see exactly what Mr. Trump inserted but testified on the basis of what she felt. Dkt 187 (Trial Tr.) at 181:20-23 ("I couldn't see anything. I couldn't see anything that was happening. But I could certainly feel it. *I could certainly feel that pain in the finger jamming up.*") (emphasis added). Moreover, the jury might have been influenced by defense counsel's ardent summation in which he virtually begged the jury not to answer the "rape" question against Mr. Trump. Dkt 199 (Trial Tr.) at 1370:5-10 ("To condemn someone as a rapist is a decision you would have to live with for the rest of your lives. Don't let her throw that burden on you. Don't let her throw her burden on you to have to carry forever. You know this didn't happen, that Donald Trump raped E. Jean Carroll in a Bergdorf Goodman changing room. You know it didn't happen.").

42

special verdict governed by Rule 49 of the Federal Rules of Civil Procedure. The form of the

verdict, including the fact that it did not ask the jury to decide exactly what conduct Mr. Trump

committed in the event it found for Ms. Carroll as to sexual abuse – was approved by Mr. Trump

as well as by Ms. Carroll.[68]  In these circumstances,

> "A party waives the right to a jury trial on any issue of fact raised by the
> pleadings or evidence but not submitted to the jury unless, before the jury retires, the
> party demands its submission to the jury. *If the party does not demand submission,
> the court may make a finding on the issue. If the court makes no finding, it is
> considered to have made a finding consistent with its judgment on the special
> verdict.*"[69]

Neither party made any such demand here. So the jury (or the Court) is deemed to have made a

finding in accord with the judgment on the special verdict unless the Court makes a contrary

finding.[70]  In other words, the jury is deemed to have found that the specific conduct in which Mr.

---

[68]

    Dkt 199 (Trial Tr.) at 1208:12-21 (Both Ms. Carroll's counsel and Mr. Trump's counsel
stating that they have no objection to the verdict form).

[69]

    Fed. R. Civ. P. 49(a)(3).

[70]

    *Roberts v. Karimi,* 251 F.3d 404, 407 (2d Cir. 2001) ("When a jury is specially instructed,
and 'an issue [is] omitted' without objection, it 'shall be deemed' that a finding was made
'in accord with the judgment on the special verdict,' *unless* the court makes a finding to the
contrary.") (alterations and emphasis in original) (citation omitted); *Marbellite Co. v.
Naitonal Sign & Signal Co.,* 2 Fed. App'x 118, 120 (2d Cir. 2001) ("If the court fails to
make a finding on the issue, it will be deemed to have made a finding that is harmonious
with the judgment entered on the special verdict."); *Getty Petroleum Corp. v. Island
Transpp. Corp.,* 878 F.2d 650, 655-56 (2d Cir. 1989) (in special verdict case, affirming on
basis of implicit jury finding or, in the alternative, on basis of implicit finding in statement
of the trial court).

As the jury's response to Question 2 was an implicit finding that Mr. Trump forcibly
digitally penetrated Ms. Carroll's vagina, no explicit independent finding by the Court is

Trump actually engaged was such that the damages award was justified provided the evidence permitted such a finding.[71] And for reasons discussed in greater detail below, the evidence of the attack generally coupled with forcible digital penetration of Ms. Carroll justified the damages awarded regardless of the jury's finding adverse to Ms. Carroll on the New York Penal Law rape question.

Ms. Carroll testified that the sexual assault – the "rape" – of which she accused Mr. Trump involved especially painful, forced digital penetration, which as recounted above she described graphically and emphatically to the jury. The testimony of the outcry witnesses, Mss. Birnbach and Martin, corroborated the essence of Ms. Carroll's account of a violent, traumatic sexual assault.  Ms. Leeds's testimony that Mr. Trump attacked her, culminating in putting his hand on her leg and up her skirt, suggests that Mr. Trump has a propensity for attempting forcibly to get his hands on and into women's sexual organs. Mr. Trump's own words from the *Access Hollywood* tape and from his deposition – that (a) stars "[u]nfortunately or fortunately" "c[ould] do anything" they wished to do to women, including "grab[bing] them by the pussy" and (b) he considers himself

---

necessary. Nevertheless, the Court alternatively finds that he did so.

[71]     As the Second Circuit has put it:

> "A district court has a duty to reconcile the jury's answers on a special verdict form with any reasonable theory consistent with the evidence, and to attempt to harmonize the answers if possible under a fair reading of those answers. . . . The court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, . . . and if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained. . . . The district court should refer to the entire case and not just the answers themselves." *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1311 (2d Ci. 1993) (citations omitted).

Thus, the Court is obliged to construe the jury's answer to Question 2 with reference to the entire case and in a manner that renders it consistent with the $2 million award for sexual assault.

**SA-281**

44

to be a "star" – could have been regarded by the jury as a sort of personal confession as to his behavior. Thus, there was ample, arguably overwhelming evidence, that Mr. Trump forcibly digitally penetrated Ms. Carroll, thus fully supporting the jury's sexual abuse finding.

Mr. Trump's attempt to minimize the sexual abuse finding as perhaps resting on nothing more than groping of Ms. Carroll's breasts through her clothing is frivolous. There was no evidence whatever that Mr. Trump groped Ms. Carroll's breasts, through her clothing or otherwise. The only evidence of bodily contact between Mr. Trump and Ms. Carroll other than the digital and alleged penile penetration was Ms. Carroll's testimony that Mr. Trump (a) "shoved" and "thrust" her against the wall, (b) "put his shoulder against [her] and h[eld] [her] against the wall," (c) "his whole weight came against [her] chest and held [her] up there," (d) he "pulled down [her] tights," (e) her "arm was pinned down" while she pushed him back, and (f) "he put his mouth against [hers]." The jury was instructed that one of the essential elements of sexual abuse under the New York Penal Law is "sexual contact," defined as "touching of the sexual or intimate parts." None of these actions, other than putting his mouth against hers and perhaps pulling down her tights, was sexual contact.[72] The jury's finding of sexual abuse therefore necessarily implies that it found that

---

[72]    Mr. Trump does not argue that the jury's sexual abuse finding was based on Ms. Carroll's testimony that he put his mouth against hers (or any of the other actions listed above). Even assuming this non-consensual kiss was "touching of [a] sexual or intimate part[]," there is no basis to assume that the jury found Mr. Trump sexually abused her based on that contact but not on digital penetration. Ms. Carroll testified that "it was a shocking thing for him to suddenly put his mouth against [hers]," Dkt 187 (Trial Tr.) at 179:22-23, and that she thinks she "laughed pretty consistently after the kiss to absolutely throw cold water on anything he thought was about to happen," Dkt 189 (Trial Tr.) at 405:22-24.  She did not testify as to any physical pain and lasting trauma of the non-consensual kiss, or of any other bodily contact between her and Mr. Trump, as she did repeatedly of the digital penetration. A determination that this jury found Mr. Trump sexually abused Ms. Carroll solely on the basis of a non-consensual kiss would require ignoring all this testimony and accepting a far less malign, albeit still wrongful, version of events that is contradicted by the overwhelming weight of the evidence.

Mr. Trump forcibly penetrated her vagina. And since the jury's answer to Question 1 demonstrates that it was unconvinced that there was penile penetration, the only remaining conclusion is that it found that Mr. Trump forcibly penetrated her vagina with his fingers – in other words, that he "raped" her in the sense of that term broader than the New York Penal Law definition.  And this conclusion is fully supported by Ms. Carroll's repeated and clear testimony on the digital penetration (more than the penile penetration), Dr. Lebowitz specifically mentioning Ms. Carroll squirming in response to an intrusive memory of Mr. Trump's fingers in her vagina, and the evidence at trial taken as a whole. It also is bolstered by the amount of the jury's verdict.

*The Jury's $2 Million Damages Award Is Not Excessive*

The trial evidence of the harm to Ms. Carroll as a result of being assaulted and digitally raped supports the jury's $2 million award as reasonable compensation for her pain and suffering. Ms. Carroll testified in detail with respect to the physical, emotional, and psychological injury she suffered after the incident with Mr. Trump. She expressed that in "the seconds, the minutes following [the assault] . . . my overwhelming thought was I had died and was somehow still alive."[73]  She testified that when she called Ms. Birnbach immediately after the assault, "I had not processed it. I had not processed what was going on. I felt the hand jammed, and I felt the back of my head hurting."[74]  The night of the assault, she testified "[m]y head hurt, my vagina felt pain ... ."[75]  In relation to the specific act of being digitally raped, Ms. Carroll testified that it was

---

[73]     Dkt 191 (Trial Tr.) at 635:23-636:1.

[74]     Dkt 187 (Trial Tr.) at 185:15-17.

[75]     *Id.* at 188:18.

46

"extremely painful," "a horrible feeling," "unforgettable," and that the day after the assault she "felt

[her] vagina still hurt from his fingers."[76]  She testified also about not being able to maintain a

romantic relationship or have sex for the past two decades since the "very violent" incident with Mr.

Trump and about experiencing "visions" or "sudden intrusions" which she has "had . . . ever since

the attack" and that "would absolutely take over [her] brain."[77]  These visions included her "feel[ing]

Donald Trump again on top of [her] . . . [she] thought for a minute [she] was going to die because

[she] couldn't breathe" and while going about her day "in would slide just a picture of him going

like this into the dressing room or hitting [her] head or feeling his fingers jammed up inside of

[her]."[78]  Ms. Carroll's testimony and Dr. Lebowitz's testimony, which is summarized above, of the

long-lasting emotional and psychological trauma that Ms. Carroll experienced as a result of the

incident with Mr. Trump demonstrate that the jury's $2 million award was motivated not by

sympathy, but by competent evidence of harm to Ms. Carroll.

      In view of the jury's implicit finding that Mr. Trump digitally raped Ms. Carroll, Mr.

Trump's argument and references to examples of damages awards "in the 'low six-figure range'"

where a plaintiff's "intimate parts were groped by a defendant" plainly are irrelevant.[79]  Many of the

---

[76]

    *Id.* at 180:24-25; Dkt 189 (Trial Tr.) at 406:10, 432:7-8.

[77]

    Dkt 187 (Trial Tr.) at 225:3, 225:19-226:7.

[78]

    *Id.* at 226:14-21.

[79]

    Dkt 205 (Def. Mem.) at 14-16.

    Mr. Trump's argument that Ms. Carroll's "alleged damages are identical to plaintiffs in other
cases asserting . . . a [loss of consortium claim], namely that Plaintiff argued to the Jury that
she should be compensated for living a life since early 1996 without companionship," also
is unavailing.  Dkt 211 (Def. Reply Mem.) at 1; *see also* Dkt 205 (Def. Mem.) at 13. His
theory ignores all of the other types of harm to Ms. Carroll that were discussed in her and

47

cases Mr. Trump cites are distinguishable also for the reasons identified by Ms. Carroll.[80]  To be

sure, there are New York cases in which plaintiffs who were sexually assaulted and/or raped were

awarded lower damages than was Ms. Carroll.[81]  There also, however, are cases with facts and

injuries comparable to those here in which plaintiffs were awarded similar or higher compensatory

damages.[82]  "Although a review of comparable cases is appropriate," the Court "need not average

---

Dr. Lebowitz's testimony, and in any case mistakenly conflates the loss of companionship in the context of a loss of consortium claim with the inability to form a romantic connection and have sex as a result of trauma arising from sexual assault.

[80]

Dkt 207 (Pl. Opp. Mem.) at 15-16 ("In some [of Mr. Trump's 'comparator'] cases, the plaintiff was awarded the exact amount of compensatory damages that the plaintiff herself had requested, often as part of a damages inquest conducted by a magistrate judge during default judgment proceedings. . . . As a result, those cases obviously have little to nothing to say about the damages that a jury might have awarded on a full evidentiary record developed at trial, as occurred here. Other cases cited by Trump involved evidentiary issues not present in this case. . . . And not one of the cases Trump cites involved evidence of injury covering a 25-year-plus period. That distinguishes Carroll's case from all of the cases on which Trump relies, and it was entirely reasonable for the jury to account for the harm that Carroll has experienced ever since the assault in 1996 in determining compensatory damages.") (citations omitted).

[81]

*See* Dkt 205 (Def. Mem.) at 15-16 (citing cases).

[82]

*E.g.*, *Ortiz v. New York City Hous. Auth.*, 22 F. Supp. 2d 15, 39 (E.D.N.Y. 1998), *aff'd*, 198 F.3d 234 (2d Cir. 1999) (jury's $3 million compensatory damages award for plaintiff who was raped at gunpoint, diagnosed with PTSD, and suffered "dramatic[] change[s]" to the quality of her life did not deviate materially from reasonable compensation) (citing cases).

Ms. Carroll cites to three cases, one of which is *Ortiz*, in which the plaintiffs were awarded more than Ms. Carroll was. *Breest v. Haggis*, No. 161137/2017, 2023 WL 374404 (N.Y. Sup. Ct., N.Y. Cty. Jan. 24, 2023) ($7.5 million); *Egan v. Gordon*, No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) ($13.8 million). Mr. Trump correctly observes certain differences between those cases and this one, including in the details of the rapes and in the fact that the plaintiffs in those cases were diagnosed with PTSD whereas Ms. Carroll was not. Those differences, however, do not render these cases of no value in determining the appropriate range of reasonable compensation. Indeed, the greater severity of the harm in those cases might explain why the awards were greater than the amount awarded to Ms. Carroll, while still demonstrating that $2 million is not outside the bounds in circumstances such as these.

the high and low awards; [it may] focus instead on whether the verdict lies within the reasonable range."[83]  It accordingly suffices for present purposes that the jury's award of $2 million falls within a reasonable range of the amounts awarded to plaintiffs in comparable sexual assault and rape cases.

In these circumstances, and based on all of the evidence presented at trial, the jury's compensatory damages award to Ms. Carroll for her sexual battery claim did not deviate materially from reasonable compensation so as to make it excessive under New York law.

*Compensatory Damages - Defamation Claim*

Mr. Trump argues that "the general compensatory damages for the defamation claim should be no more than $100,000, and no more than $368,000 (the low estimate provided by Professor Humphreys) for the reputation repair campaign."[84]  He contends that the jury's awards should be reduced to these amounts because "the jury awards in this case for these categories of damages were speculative and based upon alleged harms caused by the June 2019 statements."[85]  He makes eleven specific arguments, at least seven of which are based on challenges to the testimony of Professor Humphreys, Ms. Carroll's defamation damages expert.  None ultimately is persuasive.

*Professor Humphreys's Testimony*

Mr. Trump makes the following challenges to Professor Humphreys's testimony:

---

[83]

    *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017).

[84]

    Dkt 205 (Def. Mem.) at 18.

[85]

    *Id.*

1.   "Professor Humphreys testified about the purported harm arising from the June 2019 Statements and even compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, but did not do a comparison between her reputational harm before and after the October 12, 2022 Statement. . . .   Therefore, Professor Humphreys must have included the alleged harm from the June 2019 Statements as part of her damages analysis."

2.   "Professor Humphreys testified that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social [(Mr. Trump's social media platform)] and Twitter to anything more specific than somewhere 'between 1.5 million and 5.7 million times,' which is an error rate of 74%. . . . Such an analysis is thus pure speculation."

3.   "Professor Humphreys testified that the people who read and believed the October 12, 2022 Statement were 'republicans [who] typically believe Mr. Trump.' . . . Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of the October 12, 2022 Statement, and that Plaintiff's reputation with such supporters would not have changed due to such statement."

4.   "Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is 'a campaign to put out positive messages about' Plaintiff. . . . However, Professor Humphreys did not

explain how existing Trump supporters would have changed their minds about Plaintiff from merely seeing positive messages about Plaintiff. Professor Humphreys also testified that she has never done a reputation repair campaign before, and thus, her opinion on this issue should be given little weight."

5.  "Professor Humphreys testified that (a) the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement . . . and (b) she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiffs rape allegation from reading the June 2019 Statements. . . . Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. Additionally, her testimony only supports the argument that the October 2022 Statement did not cause Plaintiff any harm in addition to any harm that was caused by the June 2019 Statements, because people already had made up their minds as to the veracity of Plaintiffs accusations as of the June 2019 Statements."

6.  "Professor Humphreys's cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million . . . , which is an error rate of 86 percent. This is especially troublesome since Professor Humphreys testified that she has never done a reputation repair campaign before."

7.    "Professor Humphreys also testified that she did not analyze any of Plaintiffs
numerous media appearances where Plaintiff enhanced her reputation with
regard to her allegations against Defendant. . . . In fact, Plaintiff conceded
that she received a vast amount of positive support from the public after
making her accusation against Defendant. . . . Even though Professor
Humphreys admitted that Plaintiff received positive support from the public
after the rape allegation, she did not factor such support into her analysis of
the harm allegedly caused by the October 12, 2022 Statement. . . .
Accordingly, her analysis of reputational harm is pure speculation."[86]

Ms. Carroll points out that Mr. Trump's arguments concerning Professor Humphreys
"get at the core of Professor Humphreys's reliability as an expert, something Trump could have
challenged under Federal Rule of Evidence 702 [(which governs the admissibility of expert
testimony)] or raised on cross-examination."[87]  His failure to do so, she contends, waived his present
complaints. Mr. Trump counters, however, that his challenges are timely because they go to the
weight, not the admissibility, of Professor Humphreys's testimony and because he preserved the
issues by raising them on cross examination at trial.[88]   Thus, there is a threshold question with

---

[86]    Dkt 205 (Def. Reply Mem.) at 19-21.

[87]    Dkt 207 (Pl. Opp. Mem.) at 19.

[88]    Dkt 205 (Def. Reply Mem.) at 3.  *See Disability Advocs., Inc. v. Paterson*, No. 03-CV-3209
(NGG) (MDG), 2009 WL 1312112, at *7 (E.D.N.Y. May 8, 2009) ("Thus, while Defendants
are free to conduct vigorous cross-examine of Plaintiff's experts at trial and may argue in
their post-trial briefing that the court should accord the opinions of those experts little or no
weight, they may not renew their challenge to the admissibility of those opinions.");
*Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 446 (S.D.N.Y. 2007) ("[E]ven
where a post-trial challenge to the admissibility of expert evidence is barred, a trial court

52

respect to whether Mr. Trump waived those arguments in relation to Professor Humphreys's testimony by failing to raise them previously, as a Rule 59 motion generally is not a proper vehicle to raise new arguments or legal theories.[89]

On reflection, the Court concludes that Mr. Trump's arguments listed above go primarily to the weight, rather than the admissibility, of Professor Humphreys's testimony. "Generally, arguments that the assumptions relied on by an expert are unfounded go to the weight rather than the admissibility of the evidence."[90]  Most of Mr. Trump's arguments concern certain assumptions Professor Humphreys made or did not make in forming her expert opinion (*e.g.*, whether she included the alleged harm from the 2019 statements in her analysis, whether and how she considered Mr. Trump's supporters who viewed his 2022 statement, and whether she took into account Ms. Carroll's media appearances). The Court therefore considers Mr. Trump's challenges

---

remains free to grant a new trial if it weighs the prevailing party's scientific proof and finds it wanting.").

[89]  *MJAC Consulting, Inc. v. Barrett*, No. 04-cv-6078 (WHP), 2006 WL 2051129, at *3 (S.D.N.Y. July 24, 2006) (citing cases).

[90]  *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 270 (S.D.N.Y. 2001). *See also AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW) (SN), 2019 WL 1254763, at *3 (S.D.N.Y. Mar. 19, 2019)*, objections overruled*, No. 1:15-CV-3411(GHW), 2019 WL 2992016 (S.D.N.Y. July 8, 2019) ("Any contentions that the expert's 'assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448, at *1 (S.D.N.Y. Dec. 29, 2015) ("'Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); *Colombo v. CMI Corp.*, 26 F. Supp. 2d 574, 576 (W.D.N.Y. 1998) ("Although a district court 'may ... inquire into the reliability and foundation of any expert opinion to determine admissibility,' *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987), '[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.' *Id.*") (ellipsis and alteration in original).

53

to Professor Humphreys's testimony as having been timely raised.[91]  Nevertheless, Mr. Trump's

arguments are unavailing on the merits.

His contention that Professor Humphreys "did not do a comparison between [Ms.

Carroll's] reputational harm before and after the October 12, 2022 Statement" and she therefore

"must have included the alleged harm from the June 2019 Statements as part of her damages

analysis" is contradicted by the record. Professor Humphreys testified that in her analysis, although

she "noticed . . . that those meetings [(public statements of negative associations with Ms. Carroll)]

existed after June 2019,  . . . the frequency of the posting with those associations had started to

decline. However, after the statement on October 12th, the frequency of the negative associations,

the volume of them again escalated."[92]  She testified also that she "only looked at the reputational

harm from the October 12[, 2022] statement" and that the cost she estimated to repair Ms. Carroll's

reputation following Mr. Trump's 2019 statements – the subject of *Carroll I* – was "higher" than

---

[91]

        Mr. Trump's two "error" rate arguments arguably go more to the admissibility of Professor Humphreys's testimony and therefore would be waived. *E.g.*, *AU New Haven, LLC*, 2019 WL 1254763, at *23 (stating that a high error rate "would be a valid basis to exclude an expert with scientific knowledge under *Daubert*"). But there is a vast difference between an error rate, on the one hand, and an expert opining that a quantity falls within a certain range, on the other.  For example, an appraiser who values a piece of real state as falling in the range of $12 million to $14 million has not made an "error"; the expert is merely giving an opinion that a willing buyer and a willing seller would conclude a sale within that range. In any event, Mr. Trump's arguments that there were high error rates in Professor Humphreys's calculations fail to demonstrate that the jury's compensatory damages award was erroneous or against the weight of the evidence. Indeed, it is plausible that the jury took the so-called error rates, along with any other purported weaknesses in Professor Humphreys's testimony, into account in awarding damages well below the high end of Professor Humphreys's estimated range. Dkt 197 (Trial Tr.) at 1142:14-16 ("[O]n the low, low end it would be [$368,000], and on the high end it would be 2.7 million.").

[92]

        Dkt 197 (Trial Tr.) at 1130:18-22.

54

the cost she estimated to repair Ms. Carroll's reputation following the 2022 statement.[93]  Moreover,

to remove any doubt, the Court specifically instructed the jury that "the question of whether there

was any adverse effect by virtue of the 2019 statements and, if there was, how much adverse effect

is not at issue in this case. It is not for you to determine."[94]  There accordingly is no basis to assume

that the jury award for the 2022 statement improperly included damages for the 2019 statements.

Mr. Trump's remaining challenges to Professor Humphreys's testimony similarly fail

to support his argument for a new trial on or a reduction in the damages. Professor Humphreys's

testimony was not "pure speculation" because she "did not analyze any of Plaintiffs numerous media

appearances where Plaintiff enhanced her reputation with regard to her allegations against

Defendant."  Professor Humphreys testified that "in terms of reputation," the "positive responses

or comments [do not] offset negative responses."[95]  She explained: "if you imagine, like, at the place

where you work, if 20 percent of your colleagues think that you stole money where you work, let's

say you have a hundred colleagues and 20 of them think that you stole money, that still has an

impact on your work life and your day-to-day reputation, and so I think that 20 percent is still

important."[96]

Nor are his arguments that Professor Humphreys "did not take into consideration the

fact that Trump's supporters [who read and believed the 2022 statement] likely would never have

---

[93]
       *Id.* at 1158:12-23.

[94]
       *Id.* at 1158:3-6.

[95]
       *Id.* at 1135:9-11.

[96]
       *Id.* at 1135:11-17.

supported or believed Plaintiff regardless of the [2022 statement]" and "did not explain how existing Trump supporters [or people who had made up their minds already based on the 2019 statements] would have changed their minds about Plaintiff" through her proposed reputation repair program grounds to minimize the weight of her testimony. Mr. Trump's counsel cross examined Professor Humphreys on these points. Professor Humphreys explained that in her view, it is "very likely that [the 2022 statement] was seen by some new people."[97]

The jury considered all of Professor Humphreys's testimony, including the purported flaws Mr. Trump's counsel attempted to draw out on cross examination and in summation, and determined that her testimony still was worthy of sufficient weight to reach the $1.7 million it awarded for the reputation repair program. None of Mr. Trump's challenges to that testimony, considered separately or collectively, supports a determination that the jury's compensatory damages award was seriously erroneous, egregious, or against the weight of the evidence.

### *Mr. Trump's Other Arguments and Awards in Comparable Defamation Cases*

Mr. Trump's other objections to the jury's compensatory damages award for Ms. Carroll's defamation claim are without merit.  He contends that the jury's award was excessive because:

"[T]he overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed Plaintiff when he denied her rape allegation. . . . [T]he Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed. Accordingly, all that was left of Plaintiff's

---

[97] *Id.* at 1135:10-11.

defamation claim was that Defendant defamed Plaintiff by stating that 'he has no

idea who Carroll was[,]' . . . which is far less damaging to Plaintiff's reputation than

accusing Plaintiff of lying about the alleged rape."[98]

His argument is grounded entirely on false premises.

The crux of Ms. Carroll's defamation claim was that Mr. Trump defamed her by

stating that she lied about him sexually assaulting her in order to increase sales of her new book or

for other inappropriate purposes.  Her claim, as noted above, never was limited to the specific

definition of "rape" in the New York Penal Law, which requires penile penetration. Nor was any

specific "portion[] of the defamation claim based upon an alleged rape."  Mr. Trump did not

deny specifically "raping" Ms. Carroll or specifically penetrating her with his penis as opposed to

with another body part in his 2022 statement. He instead accused her of lying about the incident

as a whole, of "completely ma[king] up a story" that was a "Hoax and a lie."[99]  There is thus no

factual or legal support for Mr. Trump's made-up version of Ms. Carroll's defamation claim.[100]

---

[98]        Dkt 205 (Def. Mem.) at 18-19.

[99]        Dkt 1 (Compl.) at 18, ¶ 92.

[100]       Mr. Trump's remaining arguments similarly lack merit. His contention that the jury "clearly
must have [awarded compensatory damages for the June 2019 statements]" because Ms.
Carroll "did not even attempt the separate the harm caused by the June 2019 Statements and
the October 12, 2022 Statement" in her testimony fails for the same reasons discussed above
with respect to his "double recovery" argument based on Professor Humphreys's testimony.
Dkt 205 (Def. Mem.) at 19.  It also is inaccurate because, as noted above, Ms. Carroll in fact
did compare the post-2022 messages she received to the post-2019 messages and stated that
the post-2022 messages were "equally disparaging and hurtful, but these particularly hurt
because [she] thought [she] had made it through and there they are again." Dkt 189 (Trial
Tr.) at 329:5-7. Moreover, even if Ms. Carroll had not clearly separated the harm from the
2019 statements from the 2022 statement, it would not demonstrate that the jury's award was
against the weight of the evidence. The same is true for Mr. Trump's argument that in
summation, Ms. Carroll's counsel stated "public statements" as opposed to the singular 2022
"statement." Dkt 205 (Def. Mem.) at 19. As noted above, the Court's instruction to the jury

**SA-294**

57

Mr. Trump argues also that the jury's damages award deviates materially from the compensatory damages awards in other defamation cases in New York. Similar to the review of damages awards in sexual assault and rape cases, there certainly are cases – including those cited by Mr. Trump – in which plaintiffs in defamation cases in New York received compensatory damages awards considerably lower than the amount awarded to Ms. Carroll.[101]  The facts of those cases, however, were materially different from the facts and evidence in this case.  In many of those cases, the defamatory statements were published in far less public forums (*e.g.*, a "local newspaper"),[102] and none involved the scale of attention and influence commanded when the defendant in this case chooses to speak publicly. The cases Mr. Trump cites "do not compare in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a 'hoax,' and accused you of making up a horrific accusation to sell a 'really crummy book.'"[103] And, as Ms. Carroll cites, there are cases in New York in which defamation plaintiffs have been awarded compensatory damages higher than the amount awarded to Ms. Carroll, demonstrating that the jury's award here is not excessive and falls within the range of reasonable compensation.[104]

---

to ignore any harm arising from the 2019 statements overrides Mr. Trump's concern in this respect. Finally, his argument that Ms. Carroll testified she made more money after leaving *Elle* magazine and therefore suffered no financial harm from the 2022 statement is irrelevant. Ms. Carroll did not argue that she was owed compensatory damages for financial harm resulting from the 2022 statement.

[101]    Dkt 205 (Def. Mem.) at 16-17.

[102]    *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (N.Y. App. Div. 3d Dep't 2009).

[103]    Dkt 207 (Pl. Opp. Mem.) at 24.

[104]    *Id.* at 23-25.

58

Mr. Trump accordingly has failed to meet his burden of demonstrating that a new trial or remittitur is warranted on the jury's compensatory damages award for Ms. Carroll's defamation claim.

*Punitive Damages - Defamation Claim*

Lastly, Mr. Trump argues that the jury's $280,000 punitive damages award for Ms. Carroll's defamation claim violated due process principles. He principally argues that the punitive damages award for Ms. Carroll's defamation claim should be no more than $5,000 because his conduct with regard to the 2022 statement is "barely reprehensible, if at all, because he was defending himself against a false accusation of rape."[105]  "The Supreme Court [has] outlined three 'guideposts' to facilitate its review of state court punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'"[106] Mr. Trump's argument plainly is foreclosed by the analysis set forth above and by the Court's determination that the jury implicitly found Mr. Trump did in fact digitally rape Ms. Carroll.

Moreover, the evidence presented at trial and the jury's findings that Mr. Trump made the 2022 statement knowing that it was false (or with reckless disregard of its truth or falsity) and with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights firmly establish the high reprehensibility of Mr. Trump's

---

[105]

Dkt 205 (Def. Mem.) at 23.

[106]

*Stampf*, 761 F.3d at 209 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

**SA-296**

59

defamatory statement. In these circumstances, the jury's $280,000 punitive damages award was not excessive and did not violate due process.

I have considered Mr. Trump's other arguments and found them all unpersuasive.

## *Conclusion*

The jury in this case did not reach "a seriously erroneous result." Its verdict is not "a miscarriage of justice." Mr. Trump's motion for a new trial on damages or a remittitur (Dkt 204) is denied.

SO ORDERED.

Dated:     July 19, 2023

_____
Lewis A. Kaplan
United States District Judge