# 23-1045(L)
# 23-1146(CON)

## United States Court of Appeals
## for the Second Circuit



E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLANT

HABBA MADAIO & ASSOCIATES LLP
MICHAEL T. MADAIO, ESQ.
ALINA HABBA, ESQ.
*Attorneys for Defendant-Appellant*
*Donald J. Trump*
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
(908) 869-1188
*mmadaio@habbalaw.com*
*ahabba@habbalaw.com*

## **<u>TABLE OF CONTENTS</u>**

*<u>Page</u>*

TABLE OF AUTHORITIES....................................................................... *iii*

LEGAL ARGUMENT ...............................................................................1

I.   Presidential Immunity Is Not Waivable ............................................1

    A.   Plaintiff-Appellee Ignores Historical Separation-Of-Powers
        Precedent And Fails To Appreciate The Distinct Nature Of
        Presidential Immunity...............................................................1

    B.   Plaintiff-Appellee Mischaracterizes The Holdings Of Schor
        and Freytag......................................................................3

    C.   Centuries of Supreme Court Jurisprudence Comport With
        Defendant-Appellant's View of Presidential Immunity ........................6

    D.   Affirming That Presidential Immunity Is Non-Waivable
        Maintains The Proper Balance Between The Judicial And
        Executive Branches ...............................................................9

II.   Leave to Amend Should Have Been Granted ...........................................14

    A.    Defendant-Appellant Did Not Act In Bad Faith...............................14

    B.   There Is No Undue Delay Or Prejudice To Plaintiff-Appellee.............19

    C.   Defendant-Appellant's Litigation Conduct Does Not Constitute A
        'Presidential Act' ...............................................................22

    D.   Presidential Immunity Is Not A Futile Defense...............................23

III.   The Challenged Statements Are Subject To Presidential Immunity ...........23

IV.   Defendant-Appellant Properly Raised Presidential Immunity In His
     Answer To The Amended Complaint ...............................................26

V.    The District Court Has Been Divested of Jurisdiction ..................................29

VI.   Plaintiff-Appellee Cannot Establish Defamation Per Se...............................30

CONCLUSION ........................................................................................................33

# TABLE OF AUTHORITIES

***Cases***                                                              ***Page(s)***

*Altschuler v. Univ. of Penn.*,
   95-CV-249-LLS, 1998 WL 113989 (S.D.N.Y. Mar. 13, 1998),
   *aff'd sub nom.*, 201 F.3d 430 (2d Cir. 1999)......................................................27

*Barr v. Matteo*,
   360 U.S. 564 (1959) ...................................................................................24, 25

*Bastien v. Office of Campbell*,
   390 F.3d 1301 (10th Cir. 2004) ..........................................................................11

*Blagman v. Apple*,
   12-CV-5453, 2014 WL 2106489 (S.D.N.Y. May 19, 2014) ...............................18

*Britt v. Garcia*,
   457 F.3d 264 (2d Cir. 2006) .........................................................................31, 32

*Castillo v. Rodas*,
   09-cv-9919-AJN, 2014 WL 1257274 (S.D.N.Y. Mar. 25, 2014)........................27

*Cheney v. U.S. Dist. Court for D.C.*,
   42 U.S. 367 (2004) ..............................................................................10, 12, 13

*Christie v. Obama*,
   2:13-CV-00596, 2013 WL 1969802 (W.D. Penn. May 13, 2013) ........................9

*Chughtai v. Obama*,
   153 F. Supp. 3d 765 (E.D. Penn. 2015) ................................................................9

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986) ...........................................................................................3, 4

*Commonwealth of Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ......................................................................................10, 14

*Daelim Trading v. Giagni Enters.*,
   10-CV-2944, 2012 WL 5995119 (S.D.N.Y. Oct. 16, 2012)................................21

*Fasano v. Li,*
    47 F.4th 91 (2d Cir. 2022) ......................................................................28

*Feldman v. Comp. Trading,*
    19-CV-4452, 2021 WL 930222 (E.D.N.Y. Mar. 11, 2021) ...............................28

*Fezzani v. Bear, Stearns & Co.,*
    2022 WL 782751 (S.D.N.Y. Mar. 15, 2022) .........................................15

*Free Enter. Fund v. Pub. Co.,*
    561 U.S. 477 (2010) ......................................................................5, 11

*Freytag v. Comm'r of IRS,*
    501 U.S. 868 (1991) ...........................................................3, 4, 5, 11

*Gilmore v. Shearson/Am. Express,*
    811 F.2d 108 (2d Cir. 1987) ...........................................26, 27, 28, 29

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ..............................................................................2

*In re Parmalat Securities Litigation,*
    421 F.Supp.2d 703 (S.D.N.Y. 2006) ...................................................28

*In Re World Trade Ctr. Disaster Site Litig.*
    503 F.3d 167 (2d Cir. 2007) ...............................................................29

*Klayman v. Obama,*
    125 F.Supp.3d 67 (D.D.C. 2015) .........................................................9

*Lujan v. Defenders of Wildlife,*
    504 U.S. 566 (1992) ...........................................................................11

*Maki v. Trump,*
    20-CV-12890, 2021 WL 940754 (E.D. Mich. Jan. 7, 2021)...................9

*Mississippi v. Johnson,*
    71 U.S. 475, 500 (1867)................................................................1, 6, 7

*Mistretta v. United States,*
    488 U.S. 361 (1989) ...........................................................................12

*Monahan v. N.Y.C.*,
   214 F.3d 275 (2d Cir. 2000) ..................................................................20

*Neary v. Weichert*,
   489 F. Supp. 55 (E.D.N.Y. 2020) ............................................................9

*Nixon v. Administrator of General Services*,
   433 U.S. 425 (1977) .............................................................................11

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) .......................................................................*passim*

*NLRB v. Canning*,
   134 S.Ct. 2550 (2014) ............................................................................5

*NLRB v. New York Tel.*,
   930 F.2d 1009 (2d Cir. 1991) ...............................................................16

*Oneida Indian Nation v. Cnty. of Oneida*,
   199 F.R.D. 61 (N.D.N.Y. 2000) ............................................................15

*Perez v. Escobar Constr.*
   342 F.R.D. 378 (S.D.N.Y. 2022) ...........................................................20

*Pierson v. Ray*,
   386 U.S. 547 (1967) .........................................................................2, 25

*Primetime 24 v. DirecTV*,
   99-CV-3307, 2000 WL 426396 (S.D.N.Y. April 20, 2000) ..................18

*Rachman Bag v. Liberty Mut.*,
   46 F.3d 230 (2d Cir. 1995) ...................................................................19

*Randolph Foundation v. Duncan*,
   00-CV-1172, 2002 WL 32862 (S.D.N.Y. Jan. 11, 2002) .....................18

*Richardson v. Lau*,
   825 F.2d 647 (2d Cir. 1987) .................................................................19

*SEC v. Rayat*,
   21-CV-4777, 2022 WL 3656314 (S.D.N.Y. Aug. 24, 2022) ...........14, 15

*Shields v. Citytrust Bancorp.,*
 25 F.3d 1124 (2d Cir. 1994) ..............................................................26, 27, 28, 29

*Spalding v. Vilas*,
 161 U.S. 483 (1896) ...........................................................................5, 25

*State Teachers v. Fluor Corp.,*
 654 F.2d 843 (2d Cir. 1981) ..............................................................19

*Thompson v. Trump,*
 590 F.Supp.3d 46 (D.D.C. 2022) .......................................................9

*Trump v. Mazars*,
 140 S.Ct. 2019 (2020) ........................................................................8

*Trump v. Vance,*
 140 S.Ct. 2412 (2020) ........................................................................7

*U.S. v. Bon Secours*,
 567 F. Supp. 3d 429 (S.D.N.Y. 2021) ................................................20

*Williams v. Wilke*,
 320 F.Supp.3d 191 (D.D.C. 2018) .....................................................8

*Zhang v. Shun Lee,*
 17-CV-00840-VSB, 2021 WL 634717 (S.D.N.Y. Feb. 16, 2021) .......28

## Other Authorities

Br. for Petitioner,
 *Clinton v. Jones*, 1996 WL 448096 (U.S.), at *14 (U.S. Pet. Brief 1996)............7

Rep. Br. for Petitioner,
 *Clinton v. Jones,* 1996 WL 582481 (U.S.), at *2 (U.S. Reply Brief 1996) .........8

## Statutes/Regulations/Miscellaneous

Fed. R. Civ. P. 12(b)(1) ..............................................................................8

Fed. R. Civ. P. 12(b)(2)-(5) .......................................................................27, 28

Fed. R. Civ. P. 12(b)(6) ..............................................................................8, 28, 29

Fed. R. Civ. P. 12(h) ............................................................28

Fed. R. Civ. P. 12(h)(1) ........................................................27

Defendant-Appellant, Donald J. Trump ("Defendant-Appellant"), respectfully submits this reply brief in further support of his appeal from the July 5, 2023 Opinion and Order (SPA63-108) of the United States District Court for the Southern District of New York, the Honorable Lewis A. Kaplan, denying Defendant-Appellant's Motion for Summary Judgment, and the August 7, 2023 Memorandum Opinion (SPA110-133) granting Plaintiff's Motion to Dismiss Defendant's Counterclaim and Strike Certain Affirmative Defenses.

## LEGAL ARGUMENT

## I.     Presidential Immunity Is Not Waivable

### A. Plaintiff-Appellee Ignores Historical Separation-Of-Powers Precedent And Fails To Appreciate The Distinct Nature Of Presidential Immunity

Remarkably, throughout the entirety of Plaintiff-Appellee's 56-page brief, she offers little, if any, direct retort to the arguments advanced by Defendant-Appellant in his moving brief. When it comes to the question of whether presidential immunity can be waived, this silence is particularly glaring.

Plaintiff-Appellee has nothing to say about the centuries of historical jurisprudence—from *Mississippi v. Johnson* through *Clinton v. Jones*—which collectively establish that the Judiciary must refrain from exerting control over the President's official conduct and interfering with his executive function. She makes no attempt to distinguish these cases nor explain why this Court should depart from

centuries of precedent to hold that a President can be held civilly liable for the performance of his presidential duties. With nothing to say, Plaintiff-Appellee declines to address the issue at all.

Instead, Plaintiff-Appellee merely repeats the District Court's reasoning that presidential immunity is no different than the absolute immunity afforded to judges and prosecutors. But she fails to reconcile this position with the wealth of case law which makes clear that presidential immunity stands apart because it is "rooted in the constitutional tradition of the separation-of-powers doctrine." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also id.* at 750, n. 31 ("[T]he most compelling arguments [for presidential immunity] arise from the Constitution's separation of powers and the Judiciary's historic understanding of that doctrine."); *Harlow v. Fitzgerald*, 457 U.S. 800, n. 17 (1982) (noting that presidential immunity is "derive[d] in principal part from factors unique to [the President's] constitutional responsibilities and station."). Absolute immunity for judges and prosecutors, on the other hand, is strictly based in common law and public policy and does not precipitate any inter-branch conflict. *Pierson v. Ray*, 386 U.S. 547, 553-554 (1967) ("Few doctrines were more solidly established at *common law* than the [absolute] immunity of judges[.]") (emphasis added); *Nixon*, 457 U.S. at 759, n. 2 (Burger, J., concurring) ("Absolute immunity for judges and prosecutors is seen to derive from the common law and public policy[.]").

This distinction is crucial because the separation-of-powers doctrine serves as the foundation of Defendant-Appellant's argument that presidential immunity is non-waivable. Conversely, common law and public policy play no part in this analysis. Thus, Plaintiff-Appellee's attempt to analogize presidential immunity to the absolute immunity enjoyed by prosecutors and judges is irrelevant to the questions at issue in this appeal. Accordingly, this comparison is nothing more than a red herring.

## B. Plaintiff-Appellee Mischaracterizes The Holdings Of *Schor* and *Freytag*

Plaintiff-Appellee contends that Defendant-Appellant "misunderstands" the rule established in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) and claims that *Freytag v. Comm'r of IRS,* 501 U.S. 868, 895 (1991) forecloses Defendant-Appellant's position. In so arguing, Plaintiff-Appellee demonstrates her failure to grasp the non-waivability standard established in these cases.

Plaintiff-Appellee acknowledges that the *Schor* Court outlined that certain rights and defenses are "non-waivable," Opp.[1] at 37, due to their inextricable ties to the "institutional interests" that the separation-of-powers doctrine serves to protect. *Schor*, 478 U.S. at 850-51. Yet, despite this, Plaintiff-Appellee points to the

---

[1] Citations to Opp. are to Brief for Plaintiff-Appellee.

concurring opinion in *Freytag* for the proposition that *Schor* does not establish a "blanket rule that arguments premised on the Constitution's separation of powers are not waivable." Opp. at 37 (citing *Freyt*ag, 501 U.S. at 895 (Scalia, J., concurring)). Putting aside the non-binding nature of Justice Scalia's statement, it is irrelevant whether any such "blanket rule" exists. Indeed, presidential immunity is precisely the type of defense that the Supreme Court views as non-waivable due to the "structural principal" that it implicates and the "constitutional difficulty" that arises when the Judiciary is tasked with judging the propriety of presidential conduct. *Id.* The majority decision in *Freytag* is in accord.

In *Freytag*, the Supreme Court assessed the constitutionality of a statute that allowed certain tax cases to be heard by non-Article III judges in special tax courts. The plaintiffs, who had received an unfavorable ruling from a special tax court, argued that the statute violated the Appointments Clause (Article II, § 2 of the Constitution) and posed a separation-of-powers issue since it usurped the appointment power from the Executive Branch. The defendant, the Commissioner of the Internal Revenue Service, argued that there was no separation-of-powers concern because the Executive Branch had expressly approved of the statute and affirmed that it did not threaten any "legislative encroachment on the Presidential prerogatives under the Appointments Clause[.]" *Id.* at 879. The Supreme Court, however, was "not persuaded" by this argument. *Id.* at 880. Pointing to the "strong

interest in the federal judiciary in maintaining the constitutional plan of separation of powers," the Court noted that the "structural interests protected by the Appointments Clause are…of the entire Republic." *Id.* at 880. As such, the Court proclaimed that "***neither Congress nor the Executive can agree to waive this structural protection***." *Id.* at 879-80 (emphasis added).

The same can be said for presidential immunity, which is intended to benefit "not only the President and his office but also the Nation that the Presidency was designed to serve." *Nixon*, 457 U.S. at 753. It is well-established that "there exists the greatest public interest" in maintaining this protection, *id.* at 745 (quoting *Spalding v. Vilas*, 161 U.S. 483, 498 (1896), and that its absence would "seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government," *id.* at 752. Thus, like the Appointments Clause, the "structural principles embodied by" presidential immunity seek to uphold the greater institutional interests of the tripartite government. *Freytag*, 501 U.S. at 880. Accordingly, the President "cannot agree to waive this structural protection." *Id.*; *see also Free Enter. Fund v. Pub. Co.*, 561 U.S. 477, 497 (2010) ("[T]he separation of powers does not depend…on whether 'the encroached-upon branch approves the encroachment.'") (citation omitted); *see also NLRB v. Canning,* 134 S.Ct. 2550, 2594 (2014) (Scalia, J., concurring) ("[T]he political branches cannot by agreement alter the constitutional structure").

Based on the foregoing, Plaintiff-Appellee has failed to meaningfully rebut the proposition that presidential immunity is non-waivable.

## C. Centuries of Supreme Court Jurisprudence Comport With Defendant-Appellant's View of Presidential Immunity

Plaintiff-Appellee argues that "prior presidential and judicial practice" support her position. Opp. at 30. However, Plaintiff-Appellee disregards a wealth of Supreme Court precedent which defines the limits of the Judiciary's authority to engage in an inter-branch clash with the Executive Branch. Since civil claims predicated on official Executive conduct will always give rise to such a conflict, these cases are inherently germane to this analysis. And they firmly establish that the Judiciary must refrain from invading the providence of the President in the performance of his official duties.

"Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint," *Nixon*, 457 U.S. at 753. A line of cases—each of which is examined at length in Defendant-Appellant's moving brief, *see* App. Br. at 13-27—evince the "unbroken historical tradition…implicit in the separation-of-powers" that "the President[,] [a]s the executive department[,]" cannot be "restrained in its action by the judicial department." *Mississippi v. Johnson*, 71 U.S. 475, 500 (1867); *see also Clinton*, 520 U.S. at 718-19 (Breyer, J., concurring). These cases highlight the many ways the separation-of-powers doctrine insulates the President from the influence and control

of the other branches and they delineate the circumstances in which judicial interference is appropriate and when it is not. And, as established in the landmark case of *Nixon v. Fitzgerald*, "[i]n the case of [a] merely private suit for damages," the exercise of such jurisdiction is never warranted when the challenged conduct is, in fact, "based on a President's official acts[.]" *Nixon,* 457 U.S. at 754.

Despite the importance of this case law, Plaintiff-Appellee outright ignores the majority of these cases, only barely mentioning *Nixon* and *Clinton.* With respect to *Nixon*, Plaintiff-Appellee hardly engages with the extensive analysis put forth in Defendant-Appellant's moving brief, and merely echoes the District Court's reasoning. Since Defendant-Appellant has already addressed the many flaws in the District Court's strained reading of *Nixon*, Plaintiff-Appellee's rehashing of these same points does nothing to move the needle.

As for *Clinton*, Plaintiff-Appellee attempts to distinguish it by claiming that "none of the briefs submitted by the parties described presidential [] immunity as implicating federal court jurisdiction."[2] Opp. at 30. Plaintiff-Appellee is wrong. *See Clinton v. Jones*, 1996 WL 448096 (U.S.), at *14 (U.S. Pet. Brief 1996) (relying on *Nixon* and *Mississippi* to argue that judicial exercise of jurisdiction over a sitting

---

[2] Plaintiff-Appellee also makes this assertion about *Trump v. Vance*, but *Vance* dealt with the threatened intrusion of Presidential prerogative by a state-level actor and, therefore, centered around the Supremacy Clause. 140 S.Ct. 2412 (2020). Even still, the *Vance* Court took occasion to note that, if a state action threatened to create a "conflict between judicial proceeding and [the President's] public duties," then the Judicial Branch would be required to "ensure that such 'interference with the President's duties would not occur." *Id.* at 2431.

President would be an "abrupt break with well-established principles of American jurisprudence."); *Clinton v. Jones,* 1996 WL 582481 (U.S.), at *2 (U.S. Reply Brief 1996) (arguing for dismissal based on "the historic tradition that courts are to refrain from asserting jurisdiction over a President[.]"). More to the point, whether a federal court had jurisdiction to hear the case was not at issue in *Clinton* since presidential immunity was not asserted as a defense to the plaintiff's claims in that appeal; rather, it was invoked on general separation-of-powers principles in an attempt to temporarily stay litigation proceedings until after President Clinton was out of office. *See generally Clinton*, 520 U.S. 681. But since the conduct at issue occurred *before* President Clinton was in office—and was therefore "unofficial conduct"—this argument was unavailing. *Id.* at 682.

In her opposition papers, Plaintiff-Appellee merely cites an arbitrary collection of cases that have dealt with presidential immunity under the rubric of Fed. R. Civ. P. 12(b)(6). But, as Plaintiff-Appellee admits, there are many cases that have treated presidential immunity as a Fed. R. Civ. P. 12(b)(1) defense.[3] *See*, *e.g.*, *Williams v. Wilke*, 320 F.Supp.3d 191, 198, n. 7 (D.D.C. 2018) ("[B]ecause the alleged acts of President Trump fall within the outer perimeter of his official responsibilities, the Court will dismiss the case against him for lack of subject matter

---

[3] Plaintiff-Appellee attempts to distinguish some of these cases on the basis that "it was ambiguous whether the President was sued in his official or personal capacity," Opp. at 34, but this distinction is irrelevant since an "interbranch conflict [] does not vanish simply because…the President [is] sued in his personal capacity." *Trump v. Mazars*, 140 S.Ct. 2019, 2035 (2020).

jurisdiction."); *Klayman v. Obama*, 125 F.Supp.3d 67, 87 (D.D.C. 2015) (finding claims are subject to presidential immunity and dismissing for lack of subject matter jurisdiction); *Maki v. Trump*, 20-CV-12890, 2021 WL 940754 (E.D. Mich. Jan. 7, 2021) (same); *Neary v. Weichert*, 489 F. Supp. 55 (E.D.N.Y. 2020) (same); *Chughtai v. Obama*, 153 F. Supp. 3d 765 (E.D. Penn. 2015) (same); *Christie v. Obama*, 2:13-CV-00596, 2013 WL 1969802 (W.D. Penn. May 13, 2013) (same); *see also Thompson v. Trump,* 590 F.Supp.3d 46, 69-70 (D.D.C. 2022) (treating presidential immunity as an issue of subject matter jurisdiction).

Regardless, *Nixon v. Fitzgerald* remains the only binding authority that is truly on point here. Since *Nixon* was the only instance in which the Supreme Court affirmatively found that challenged conduct fell within the 'outer perimeter' of a President's official duties, it is the only time it had to grapple with the implications of the same. And, as discussed at length in Defendant-Appellant's moving brief, the *Nixon* Court confirmed that, in this context, the Judiciary is not permitted to "exercise [] jurisdiction" over such a claim. *Nixon*, 457 U.S. at 754. Given the clarity and significance of the Supreme Court's proclamation, Plaintiff-Appellee's reliance on inferior and impertinent authorities carries no weight.

### D. Affirming That Presidential Immunity Is Non-Waivable Maintains The Proper Balance Between The Judicial And Executive Branches

Like the District Court, Plaintiff-Appellee claims that affirming the absolute, non-waivable nature of presidential immunity would somehow undermine

presidential autonomy, rather than uphold it. This argument misses the mark and fundamentally misunderstands the purpose that presidential immunity is intended to serve.

Plaintiff-Appellee primarily contends that it would compromise the President's independence to place the Judiciary in a position where it must "forc[e] a decision" on whether presidential immunity applies, even when the President wishes to proceed with a civil action. Opp. at 36. She claims that such a predicament would create a "'constitutional confrontation' between the Executive and Judiciary, which 'should be avoided wherever possible." *Id.* (citing *Cheney v. U.S. Dist. Court for D.C.*, 42 U.S. 367, 389-90 (2004)). While Plaintiff-Appellee is correct that long-standing separation-of-powers principles require courts to avoid entanglement in "constitutional confrontation[s]," she misidentifies where the confrontation lies in this scenario. *Id.*

The purpose of the separation-of-powers doctrine is to ensure that "neither department may invade the province *of the other*" and that "neither may control, direct, or restrain the action *of the other.*" *Commonwealth of Massachusetts v. Mellon,* 262 U.S. 447, 487 (1923) (emphasis added). Here, there is simply no risk that the Judiciary would be intruding upon any Executive function by proactively disposing of improper civil claims that are asserted against the President. Simply put, voluntarily participating in an otherwise-unactionable civil damages case is not

part of the President's duties and does not serve any Executive function. Nor would it be permissible for the President to willingly opt into this type of inter-branch conflict since "the separation of powers does not depend…on whether 'the encroached-upon branch approves the encroachment.'" *Free Enter. Fund*, 561 U.S. at 497; *see also Freytag*, 561 U.S. at 880 ("[N]either Congress nor the Executive can agree to waive this structural protection.").

In actuality, the "constitutional confrontation" arises from the commencement and continuation of a civil damages claim predicated on presidential conduct. By attempting to impute civil liability on the President in the performance of his official duties, the Judiciary is impermissibly interfering with Executive function and intruding upon the President's independence and autonomy. *See*, *e.g.*, *Bastien v. Office of Campbell*, 390 F.3d 1301 (10th Cir. 2004) ("[A]ny imposition of liability on a public official may impair that official's performance of official duties"); *see also Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977) (the separation-of-powers "focuses on the extent to which [the act of another branch] prevents the Executive Branch from accomplishing its constitutionally assigned functions."). In addition, in such a scenario, the Judiciary is "assum[ing] a position of authority over the governmental acts of another and coequal department' and [] becom[ing] the virtually continuing monitors of the wisdom and soundness of Executive action." *Lujan v. Defenders of Wildlife*, 504 U.S. 566, 577 (1992); *see*

*also Mistretta v. United States*, 488 U.S. 361, 385 (1989) (The separation-of-powers doctrine "prevent[s] the Judiciary from encroaching into areas reserved for the other Branches[.]"). In other words, separation-of-powers principles simply do not allow this type of "constitutional confrontation" to take place. *Cheney*, 542 U.S. at 389.

The case Plaintiff-Appellee relies upon—*Cheney v. U.S. Dist. Court for D.C.*—confirms that it is incumbent upon the courts, not the parties, to proactively avoid these inter-branch conflicts. *Cheney* involved a challenge to yet-to-be-served discovery demands aimed at then-Vice President, Dick Cheney, who had not yet had an opportunity to assert his right to executive privilege. The D.C. Circuit declined to hear the appeal on the basis that, at the time of the appeal, any anticipated "separation of powers conflict…remain[ed] hypothetical," and that merely "requir[ing] the Vice President to assert privilege does not create [an] unnecessary confrontation between two branches of Government[.]" *Id.* at 377. However, upon review, the Supreme Court soundly rejected this reasoning. Wary of the ever-present threat of an "unwarranted impairment of another branch in the performance of its duties," the Supreme Court noted that the D.C. Circuit had "labored under the mistaken assumption that the *assertion* of executive privilege is a necessary precondition to the Government's separation-of-powers objections." *Id.* at 391 (emphasis added). In the Supreme Court's view, courts should take preventative steps to obviate any inter-

branch conflict that will give rise to a separation-of-powers issue, even before the parties have an opportunity to levy their objection:

> Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These 'occasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible…In recognition of these concerns…district courts [should] explore other avenues, short of forcing the Executive to invoke privilege[.]

*Id.* at 389-90 (citing *Nixon*, 418 U.S. at 692). Therefore, Plaintiff-Appellee's reliance on *Cheney* is entirely misplaced, and this holding supports Defendant-Appellant's position.

Lastly, Plaintiff-Appellee contends that "there is virtually no risk that courts will impose waiver findings on presidents without a proper basis." Opp. at 39. But that is precisely what has happened here. Defendant-Appellant properly asserted his presidential immunity defense in his motion summary judgment; he sought leave to amend his answer to include the defense; and he included the defense in his response to Plaintiff-Appellee's amended complaint. Despite these numerous, legitimate attempts to raise the defense, the District Court repeatedly refused to consider the issue and insisted that it had been irrevocably waived. Given the "special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives

under the separation-of-powers," *Nixon*, 457 U.S. at 743, and the "high respect that is owed to the office of the Chief Executive" when he is a party to an action, *Clinton*, 520 U.S. at 707, a court must not be afforded the discretion to continually reject the Executive's repeated attempts to shield his official conduct from liability and proceed to "invade the providence" of another branch on a whim. *Mellon,* 262 U.S. at 487. This type of judicial action does not "preserve[] the prerogatives of the Executive Branch," but severely undermine them. Opp. at 39.

Therefore, the historical understanding of the separation-of-powers principles weighs heavily in favor of Defendant-Appellant's view of presidential immunity as absolute and non-waivable.

## II.    Leave to Amend Should Have Been Granted

Defendant-Appellant has demonstrated that presidential immunity cannot be waived due to its inextricable ties to the separation-of-powers doctrine. Even if it is waivable, and was in fact waived by Defendant-Appellant, Plaintiff-Appellee has failed to advance any compelling argument as to why Defendant-Appellant's alternative request for leave to amend was properly denied.

### A. Defendant-Appellant Did Not Act In Bad Faith

Plaintiff-Appellee engages in a one-sided, long-winded restatement of the procedural posture of the underlying litigation, replete with hyperbole and unsubstantiated conjecture. *See SEC v. Rayat*, 21-CV-4777, 2022 WL 3656314, at

*11 (S.D.N.Y. Aug. 24, 2022) ("Bad faith as used with respect to a motion to amend does not serve as an invitation for the party opposing amendment to raise every generalized grievance it has with respect to the litigation tactics and style of the movant."). Nonetheless, her skewed narrative does not establish bad faith, since she is unable to demonstrate that Defendant-Appellant moved "solely to gain a tactical advantage," *Oneida Indian Nation v. Cnty. of Oneida*, 199 F.R.D. 61, 80 (N.D.N.Y. 2000), or to "annoy, harass, and delay." *Fezzani v. Bear, Stearns & Co.*, 2022 WL 782751, at *2 (S.D.N.Y. Mar. 15, 2022).

Even assuming *arguendo* that presidential immunity is waivable, there is nothing in the record which evinces that Defendant-Appellant "affirmatively disavowed" his presidential immunity defense. Opp. at 41. Plaintiff-Appellee repeatedly cites to a statement made by Defendant-Appellant's prior counsel that Plaintiff-Appellee would be "free to pursue this action when the President is no longer in office." SA49. However, this cherry-picked statement does not stand for the sweeping proposition that Plaintiff-Appellee claims. Importantly, this statement was made in connection with a *stay application* which sought to pause proceedings for the duration of Defendant-Appellant's presidential term. In this respect, the statement was only meant to convey that the parties would resume litigation after his term ended and the sought-after stay was lifted. It was not intended to—and did

not—specifically waive any of Defendant-Appellant's defenses in the underlying case. Indeed, such a wide-ranging result would defy logic.

Under Plaintiff-Appellee's theory, this single statement made by prior counsel should have waived *all* substantive defenses raised by Defendant-Appellant in his original answer, since, in her view, the statement dispelled any chance for Defendant-Appellant to dismiss the case before trial. But Plaintiff-Appellee never argued that Defendant-Appellant waived his defense that the Complaint failed to allege defamation *per se*; or that the challenged statements constituted non-actionable opinion; or that the Complaint failed to state a claim; or any other defense raised by Defendant-Appellant during the course of the underlying proceedings. Nor could she. Thus, Plaintiff-Appellee's own conduct reveals that she never believed that prior counsel's statement—which merely imparted that Plaintiff-Appellee could "pursue" the underlying action after a stay was lifted—constituted any sort of affirmative waiver. Regardless, such an abused and overly broad reading of this statement is not in accord with the established rules of waiver. *See NLRB v. New York Tel.*, 930 F.2d 1009, 1011 (2d Cir. 1991) ("The [p]arty asserting waiver bears the weighty burden of establishing that a clear and unmistakable waiver has occurred.").

Next, Plaintiff-Appellee attempts to downplay the impact that the Westfall Act proceedings—which were held before this Court and the D.C. Court of

Appeals—had on the procedural posture of this case. These proceedings spanned multiple years; encompassed extensive briefing, numerous appearances for oral argument, and multiple appellate decisions; and pertained to issues affecting Defendant-Appellant's standing as a defendant. The length and complexity of these proceedings certainly affected Defendant-Appellant's ability to raise a similar and overlapping immunity defense in the underlying action. At a minimum, it helps explain any purported delay.

Plaintiff-Appellee further attempts to bolster her bad faith argument by claiming that Defendant-Appellant did not engage in the discovery process in good faith. Opp. at 41-42. This conclusory allegation is belied by the record. Plaintiff-Appellee never once sought court intervention in any discovery-related matter in the underlying action. If Plaintiff-Appellee truly believed that she was being "stonewalled" in her discovery efforts, she should have—and would have—filed the appropriate motion. Thus, her claim that Defendant-Appellant failed to engage in discovery proceedings is wholly unsubstantiated and at odds with her own conduct.

Plaintiff-Appellee also fails to demonstrate that there was anything improper about Defendant-Appellant's decision to raise presidential immunity at the summary judgment stage. Indeed, she conspicuously fails to address the numerous cases cited by Defendant-Appellant wherein courts have permitted parties to proceed in a similar manner. *See* App. Br. at 38.

Further, Plaintiff-Appellee's repeated assertion that Defendant-Appellant sought an "expedited trial" is entirely disingenuous. Opp. at 42. In actuality, after Defendant-Appellant had notified Plaintiff-Appellee of his intention to file a motion to stay before this Court pending resolution of his Westfall Act immunity appeal, the parties agreed to jointly request a consolidated trial of *Carroll I* and *Carroll II* and set aside enforcement of any judgment pending final adjudication of all immunity-related defenses (*i.e.,* Westfall Act and presidential immunity) on appeal. A941-42. In other words, Defendant-Appellant expressly reserved his right to pursue his presidential immunity defense in the underlying proceeding and any subsequent appellate proceedings.

Plaintiff-Appellee relies only on Defendant-Appellant's purported delay in attempting to establish bad faith. But courts have consistently rejected the notion that delay alone constitutes bad faith. *See*, *e.g.*, *Blagman v. Apple*, 12-CV-5453, 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) ("To the extent that the defendants claim that [plaintiff's] delay was strategic…they provide no showing of bad faith apart from the delay itself."); *Randolph Foundation v. Duncan*, 00-CV-1172, 2002 WL 32862, at *3 (S.D.N.Y. Jan. 11, 2002) ("[T]he fact that a party may have had evidence to support a proposed amendment earlier in the litigation does not, by itself, give rise to an inference of bad faith."); *Primetime 24 v. DirecTV*, 99-CV-3307, 2000 WL 426396, at *5 (S.D.N.Y. April 20, 2000) (same).

Thus, Plaintiff-Appellee has not shown that Defendant-Appellant acted in bad faith in the underlying proceedings.

## B. There Is No Undue Delay Or Prejudice To Plaintiff-Appellee

Plaintiff-Appellee's argument concerning undue delay and prejudice fares no better. It is well-established that "[m]ere delay [] absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

Consistent with this principle, courts consistently permit leave to amend even where the delay seemed substantial. *See*, *e.g.*, *Richardson v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir. 1987) (collecting cases where leave to amend granted after delays ranging from two to five years); *Rachman Bag v. Liberty Mut.*, 46 F.3d 230, 235 (2d Cir. 1995) (affirming district court's decision to grant leave to amend despite four-year delay).

Plaintiff-Appellee has consistently failed to demonstrate how she suffered *any* prejudice from Defendant-Appellant's request for leave to amend. This is because she cannot. Plaintiff-Appellee dedicates most of her brief to describing the procedural history of the underlying action while devoting just a single paragraph to identifying the prejudice she claims to have suffered. And the two arguments that she can muster are clearly without merit.

First, Plaintiff-Appellee's complains that she has "invested many years" into litigating the underlying action. Opp. at 44. However, a wealth of case law confirms that this is not a legitimate basis to deny Defendant-Appellant's request for leave to amend. *See*, *e.g.*, *Block*, 988 F.2d at 351 (holding that complaints of "the time, effort and money…expended in litigating [the] matter," without more, do not constitute prejudice sufficient to warrant denial of leave to amend."); *Monahan v. N.Y.C.*, 214 F.3d 275, 284 (2d Cir. 2000) ("[T]he fact that one party has spent time and money preparing for trial will usually not be deemed prejudice[.]").

Second, Plaintiff-Appellee offers a vague assertion that she would have "pressed" harder on Defendant-Appellant's presidential immunity defense in discovery, and she "may" have called on unnamed "experts on history" or other "unnamed parties." Opp. at 45. These speculative assertions do not satisfy the weighty burden of establishing undue prejudice. Indeed, "vague and unsupported statements" about potential, unidentified discovery that could have been gathered, without further explanation, simply does not suffice. *Perez v. Escobar Constr.* 342 F.R.D. 378, 382 (S.D.N.Y. 2022); *see also U.S. v. Bon Secours*, 567 F. Supp. 3d 429, 441 (S.D.N.Y. 2021) (noting that "conclusory assertions" cannot establish prejudice).

Moreover, Plaintiff-Appellee *did* inquire into these precise issues during the course of discovery proceedings. Given the then-ongoing Westfall Act proceedings,

Plaintiff-Appellee questioned Defendant-Appellant at length about issues relating to whether his conduct was within the scope of his employment as President. In fact, the discovery she obtained was subsequently incorporated into Plaintiff-Appellee's Amended Complaint, which included the following allegations: (i) "[i]n making the June 2019 statements, Trump was motivated by purely personal reasons, rather than presidential or official reasons; (ii) no White House personnel were "involved in investigating, preparing, strategizing, or creating his June 2019 statements; and (iii) that his conduct "arises from private motives rather than any governmental purpose." A982-984. The fact that Plaintiff-Appellee was able to probe Defendant-Appellant on whether his actions were within the scope of his employment demonstrates that she has not been deprived of the opportunity to conduct discovery on whether his conduct was within the 'outer perimeter' of his official responsibilities. *See Daelim Trading v. Giagni Enters.*, 10-CV-2944, 2012 WL 5995119, at \*3 (S.D.N.Y. Oct. 16, 2012) (where "the content of the proposed amendment is not unexpected," the amendment "does not cause defendants undue prejudice").

Given Plaintiff-Appellee failure to articulate how she has sustained any prejudice, Defendant-Appellant's request for leave to amend should have been granted.

## C. Defendant-Appellant's Litigation Conduct Does Not Constitute A 'Presidential Act'

Plaintiff-Appellee's novel argument that Defendant-Appellant's purported waiver of his immunity defense constitutes a 'presidential act' is plainly without merit.

Even assuming the argument is properly raised for the first time on appeal, it nonetheless must be disregarded by this Court since it lacks logical coherence. It is also entirely unsupported by any relevant authority or case law.

Contrary to Plaintiff-Appellee's contention, the holding in *Nixon* confirms that presidential immunity serves to protect presidents even after they leave office. *Nixon*, 457 U.S. at 749 ("[A] *former* President of the United States is entitled to absolute immunity from damages liability predicated on his official acts.") (emphasis added). The operative question is simply whether the allegations in the complaint relate to a time when they were a sitting President. But, under Plaintiff-Appellee's theory, a President would be arbitrarily bound by any decision made in the course of litigation—whether an official or personal capacity suit—simply because it occurred during his time in office. This proposition is nothing short of preposterous.

Further, Plaintiff-Appellee's expansive view of what constitutes a 'presidential act' is particularly jarring given the position that she has taken throughout the course of the underlying litigation. Effectively, Plaintiff-Appellee

22

argues that an alleged waiver of a defense in a civil lawsuit directed against a President in his *personal capacity* constitutes an official Executive act. In the very same breath, she argues that a President is not acting in his official capacity when he makes statements to the media—through an official White House press release and on-location interviews at the White House lawn—regarding an issue of paramount public concern and in response to allegations impugning his character. Thus, Plaintiff-Appellee's contradictory view of what constitutes a 'presidential act' simply cannot be reconciled with her defense in this case.

As such, Plaintiff-Appellee's argument is wholly disingenuous and should not be countenanced by this Court.

### D. Presidential Immunity Is Not A Futile Defense

For the reasons outlined in Section III below, Plaintiff-Appellee cannot demonstrate that the challenged statements were made in an unofficial capacity, much less demonstrate that this position is futile. As such, the futility prong has not been satisfied.

### III. The Challenged Statements Are Subject To Presidential Immunity

In her brief, Plaintiff-Appellee fails to substantively address whether Defendant-Appellant's statements are protected by presidential immunity, only discussing the issue in the futility context. On this basis alone, she has failed to offer

any legitimate rebuttal. Notwithstanding, the scant argument raised by Plaintiff-Appellee on this point is baseless since it neglects the relevant standard of law.

It is well-established that courts must utilize an objective standard when determining whether conduct falls within the 'outer perimeter' of a President's official conduct. "Inquiry into the President's motives" is prohibited because it would "subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose," thereby "depriv[ing] presidential immunity of its intended effect." *Nixon*, 457 U.S. at 756; *see also Barr v. Matteo*, 360 U.S. 564, 575 (1959) ("[T]he claim of an unworthy purpose does not defeat the privilege [of absolute immunity].").

Yet, Plaintiff-Appellee ignores this principle entirely. She urges—without any justification and against the weight of Supreme Court precedent—that a "context-sensitive assessment of the challenged conduct is necessary" and proceeds to advance a wholly subjective argument as to why Defendant-Appellant's purported motive placed his conduct outside the 'outer perimeter' of his presidential responsibilities.[4] Opp. at 47.

For instance, Plaintiff-Appellee grounds her argument in the conclusory and subjective assumption that Defendant-Appellant "willfully defame[d] [a] private

---

[4] Notably, Plaintiff-Appellee concedes that Defendant-Appellant's "purpose for making the June 2019 statements" is "*legally irrelevant* to absolute immunity." Opp. at 53 (emphasis added).

citizen[] who reveal[ed] his private sexual misconduct," *id.* at 49; she repeatedly characterizes the subject statements as a "personal attack" against her, [5] Opp. at 49; she asserts that Defendant-Appellant acted in an "incendiary" manner, *id.*; and she claims that his conduct was intended to "punish[] and humiliate[]" her. *Id.*

These references to the impropriety of Defendant-Appellant's motive are a telltale sign that Plaintiff-Appellee is attempting to ascribe an "unworthy purpose" to the challenged conduct. *Barr*, 360 U.S. at 575. But, to reiterate, an improper purpose for an official act does not rob the act of its official character; "[t]he motive that impelled [the defendant] to do that of which the plaintiff complains is [] wholly immaterial." *Spalding*, 161 U.S. at 499; *see also*, *e.g.*, *Nixon*, 457 U.S. at 757 (noting that even "alleged wrongful acts lay well within the outer perimeter of [the President's] authority."); *Pierson*, 386 U.S. at 554 (absolute immunity applies "even when the [defendant] is accused of acting maliciously and corruptly.").

Therefore, Plaintiff-Appellee's subjective argument is fatally flawed and it is clear that Defendant-Appellant's conduct was within the 'outer perimeter' of his official duties as President.

---

[5] In fact, Plaintiff-Appellee characterizes the subject statements as an "attack" a total of *twelve* times in her Brief. *See* Opp. at 18, 22, 42-43, 49.

**IV.   Defendant-Appellant Properly Raised Presidential Immunity In His Answer To The Amended Complaint**

Plaintiff-Appellee is unable to proffer any viable counterargument with respect to the proposition that presidential immunity was properly asserted in Defendant-Appellant's Answer to Plaintiff-Appellee's Amended Complaint.

Notably, Plaintiff-Appellee acknowledges that *Gilmore* and *Shields* govern for the purposes of this analysis and concedes, effectively, that the District Court's reliance on an unreported Southern District case was improper.  Further, Plaintiff-Appellee agrees that, under the *Gilmore* and *Shields* standard, "[a]utomatic revival occurs [] for defenses that do not involve 'the core issue of a party's willingness to submit a dispute to judicial resolution.'" Opp. at 52 (citing *Gilmore v. Shearson/Am. Express*, 811 F.2d 108, 112 (2d Cir. 1987)).

To avoid the "automatic revival" of Defendant-Appellant's presidential immunity defense, Plaintiff-Appellee attempts to argue that presidential immunity is a defense that relates to a "core issue of a party's willingness to submit a dispute to judicial resolution." *Gilmore*, 811 F.2d at 112. But this postulation is entirely at odds with the position Plaintiff-Appellee asserts throughout the remainder of her brief – that presidential immunity is a defense that "goes to the merits" of a claim. Opp. at 24-25; *see also id.* at 32 (referring to presidential immunity as "a merits defense, not a jurisdictional limitation"); *id.* at 34 ("presidential absolute immunity is an affirmative merits defense"). Under *Shields*, a merits-based defense—*i.e.*, a

defense which constitutes an "effort to achieve judicial resolution of the controversy"—is "automatically revive[d]" when responding to an amended complaint. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see also Altschuler v. Univ. of Penn.*, 95-CV-249-LLS, 1998 WL 113989, at *2 (S.D.N.Y. Mar. 13, 1998), *aff'd sub nom.*, 201 F.3d 430 (2d Cir. 1999) (permitting defendant to raise merits-based defense in answer to amended complaint because it is an "effort to achieve judicial resolution of the controversy.").

Further, Plaintiff-Appellee's sweeping position that all immunity-based defenses involve the "core issue of a party's willingness to submit a dispute to judicial resolution" misapprehends the standard set forth in *Gilmore* and *Shields*. *Gilmore*, 811 F.2d at 112. In both *Gilmore* and *Shields*, four specific defenses were identified as relating to "a party's willingness to submit a dispute to judicial resolution" – namely, "lack of personal jurisdiction, improper venue, insufficiency of process, and insufficiency of service." *Id.* Notably, these are the same defenses enumerated in Fed. R. Civ. P. 12(b)(2)-(5), which, pursuant to Fed. R. Civ. P. 12(h)(1), are waived if not pleaded at the earliest possible opportunity. Accordingly, New York courts have consistently equated defenses which relate to the "core issue of a party's willingness to submit a dispute to judicial resolution" with those enumerated in Fed. R. Civ. P. 12(b)(2)-(5). *See, e.g.*, *Castillo v. Rodas*, 09-cv-9919-AJN, 2014 WL 1257274, at *15, n. 15 (S.D.N.Y. Mar. 25, 2014) (noting that

"defenses involving 'core issue[s] of a party's willingness to submit a dispute to judicial resolution'" means "only to the kinds of defenses listed in Federal Rule of Civil Procedure 12(b)(2)-(5).") (citing *Gilmore*, *supra*); *In re Parmalat Securities Litigation*, 421 F.Supp.2d 703, 713, n. 90 (S.D.N.Y. 2006) (noting that defenses "aimed at 'judicial resolution of the controversy'" can be revived in response to an amended complaint, and specifically pointing to Fed. R. Civ. P. 12(h)) (citing *Shields*, *supra*); *Feldman v. Comp. Trading*, 19-CV-4452, 2021 WL 930222, at *2 (E.D.N.Y. Mar. 11, 2021) (referencing Fed. R. Civ. P. 12(h) and noting that the "fail[ure] to state a claim is not one of th[e] defenses" which "involve the core issue of a party's willingness to submit a dispute to judicial resolution[.]") (citing *Shields*, *supra*); *Fasano v. Li*, 47 F.4th 91, 105 (2d Cir. 2022) ("[T]he Rule 12 defenses that are waived by a failure to assert them early are only those listed in Rule 12(b)(2)-(5)."); *Zhang v. Shun Lee,* 17-CV-00840-VSB, 2021 WL 634717, at *5 (S.D.N.Y. Feb. 16, 2021) ("Defendants' present motion pursuant to Fed. R. Civ. P. 12(b)(6) does not attempt to raise any of the [] defenses [enumerated in Fed. R. Civ. P. 12(b)(2)-(5)]...[t]herefore, Defendants' objections have not been waived under *Gilmore*.") (citing *Shields*, *supra*).

Since presidential immunity does not fall within any of the defenses enumerated in Fed. R. Civ. P. 12(b)(2)-(5), it does not involve a "core issue of a

party's willingness to submit a dispute to judicial resolution." *Gilmore*, 811 F.2d at 112. Therefore, Plaintiff's position is misguided.

On a more practical level, Plaintiff-Appellee's entire argument as to why presidential immunity is waivable rests on her theory that it is a "merits defense under Rule 12(b)(6)." Opp. at 33. If this position is accepted, it follows that presidential immunity is an "effort to achieve judicial resolution of the controversy" which would be "automatically revive[d]" when responding to an amended complaint. *Shields*, 25 F.3d at 1128. If it is rejected, then Defendant-Appellant's separation-of-powers argument prevails. Either way, the result is that Defendant-Appellant's presidential immunity defense has not been forfeited.

## V. The District Court Has Been Divested of Jurisdiction

Long-standing precedent confirms that the District Court has been divested of jurisdiction pending resolution of Defendant-Appellant's immunity-related defense.

Plaintiff-Appellee argues that the holding in *In Re World Trade Ctr. Disaster Site Litig.* upends the long-standing divestiture rule. 503 F.3d 167 (2d Cir. 2007), but she conveniently overlooks that the *WTC* Court found that the lower court was initially divested of its jurisdiction and only "restored" it after recognizing the unique and exigent circumstances present in that case. *Id.* at 171. *WTC* involved an entire class of plaintiffs who had suffered life-threatening injuries and who were dying at

an alarming rate, prompting the *WTC* court to "hasten[] the trial that might result in compensation for at least some plaintiffs during their lifetimes[.]" *Id.* at 170.

Here, no such dire or extraordinary circumstances exist. Thus, the District Court was divested of jurisdiction upon the filing of Defendant-Appellant's notice of appeal since the instant appeal is plainly not frivolous. Therefore, the District Court has been divested of jurisdiction.

## VI. Plaintiff-Appellee Cannot Establish Defamation *Per Se*

As outlined in Defendant-Appellant's moving brief, only statements *specifically* concerning a plaintiff's competency in their trade or business constitute defamation *per se*, excluding statements that merely impugn a plaintiff's character in general. The District Court applied, and Plaintiff-Appellee argues for, a much looser standard for libel *per se* that would encompass any statement about a plaintiff when it has the tendency to impact their trade or business—even if the statement was not specifically about that subject matter. Opp. at 54-55. Here, the subject statements do not include any language aimed particularly at Plaintiff-Appellee's competency as a "writer and advice columnist" (A966), and thus the statements amount to nothing more than a general reflection of—or rhetorical hyperbole expressing an opinion of—her general character.

Plaintiff-Appellee's further argument that this Court lacks jurisdiction is simply without merit. Opp. at 55. The two issues are effectively two facets of the

same question, namely, how to qualify the nature of the statements' subject matter: (1) whether the statements were about issues within the scope of the President's official duties and (2) whether they were about Plaintiff-Appellee's trade or business.

Notably, Plaintiff-Appellee only relies on a single, entirely inapposite case for her contention that these issues are unrelated. *Ibid*. (*citing Britt v. Garcia*, 457 F.3d 264, 273 (2d Cir. 2006)). In *Britt*, this Court refused to extend jurisdiction in an appeal regarding qualified immunity to cover the separate question of whether "there was a complete absence of evidence in the record to support" the plaintiff's underlying claim. *Britt v. Garcia*, 457 F.3d at 273. However, that refusal was explicitly due, in part, to the fundamentally disconnected nature of that second question and that the Court "would be required to review the entire trial record" to answer it. *Ibid*. Importantly, the Court noted that "[s]uch an inquiry would be different from, and significantly broader than, that needed to determine" the first issue of immunity." *Ibid*.

Here, the defamation *per se* issue simply involves another facet of the same question underlying the immunity issue already before this Court and only relies on factual predicates neither party disputes—the existence and publication of the statements and Plaintiff-Appellee's career as a writer and advice columnist. In other words, the two questions before the Court here are: (1) 'what is the nature of the

31

statements in question (for the purpose of presidential immunity)?' compared to the virtually identical (2) 'what is the nature of the statements in question (for the purpose of *per se* defamation)?' Conversely, the questions before the Court in *Britt* were: (1) 'did immunity apply?' compared to the much broader (2) 'did the trial court record show plaintiff met her burden of showing her case in chief?'

These two facets of fundamentally the same issue are clearly intertwined and are similarly limited in scope, and therefore should be reviewed together.

## **CONCLUSION**

For the forgoing reasons, this Court should reverse the District Court's Orders.


Dated:  October 18, 2023                    Respectfully submitted,
      New York, New York


          */s/ Alina Habba*_____
          Alina Habba, Esq.
          Michael T. Madaio, Esq.
          HABBA MADAIO & ASSOCIATES LLP
          1430 U.S. Highway 206, Suite 240
          Bedminster, New Jersey 07921
              -and-
          112 West 34th Street, 17th & 18th Floors
          New York, New York 10120
          Phone: (908) 869-1188
          Fax: (908) 450-1881
          Email: ahabba@habbalaw.com
               mmadaio@habbalaw.com
          *Attorneys for Defendant-Appellant,*
          *Donald J. Trump*

**FEDERAL RULES OF APPELLATE PROCEDURE FORM 6**
**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 32(a)**

**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P.32(a)(7)(B) because:

This brief contains 6,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word, in 14 pt. font size, Times New Roman.

/s/ Alina Habba_____
ALINA HABBA, ESQ.