## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

        *Plaintiff-Appellee,*

    v.

DONALD J. TRUMP,

        *Defendant-Appellant.*

Nos. 23-1045, 23-1146

## BRIEF OF PLAINTIFF-APPELLEE E. JEAN CARROLL IN OPPOSITION TO EMERGENCY MOTION TO STAY ISSUANCE OF THE MANDATE AND STAY DISTRICT COURT PROCEEDINGS

JOSHUA MATZ
KATE HARRIS
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com
kharris@kaplanhecker.com

ROBERTA A. KAPLAN
TREVOR W. MORRISON
MATTHEW J. CRAIG
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION .........................................................................1

ARGUMENT ...............................................................................1

   I.  This Court Should Not Stay the Mandate .......................................1

     A.  There is No "Substantial Question" Because the Supreme Court is Unlikely to Review and Reverse this Court's Ruling...................................................2

     B.  Trump Cannot Show "Good Cause" for a Stay ...........................................4

     C.  Principles of Equity Foreclose Trump's Position ........................................5

   II.  This Court Should Not Stay the District Court Proceedings..........................5

     A.  The District Court Retains Jurisdiction to Try the Case .............................6

       1.  Legal Standard............................................................................6

       2.  Application of Law.........................................................................9

     B.  Trump Cannot Satisfy the Traditional Stay Criteria ...............................11

       1.  Substantial Likelihood of Success on the Merits....................................11

       2.  Irreparable Harm .........................................................................12

       3.  Harm to Carroll ..........................................................................14

       4.  The Public Interest .......................................................................15

CONCLUSION.............................................................................17

CERTIFICATE OF COMPLIANCE....................................................18

CERTIFICATE OF SERVICE ..........................................................19

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Apostol v. Gallion*,
 870 F.2d 1335 (7th Cir. 1989)........................................................7, 8

*Carroll v. Trump*,
 No. 20 Civ. 7311, 2023 WL 5312894 (S.D.N.Y. Aug. 18, 2023)..................11

*Clinton v. Jones*,
 520 U.S. 681 (1997) ..........................................................................4

*Coinbase, Inc. v. Bielski*,
 599 U.S. 736 (2023) ..................................................................... 7, 11

*Griggs v. Provident Consumer Discount Co.*,
 459 U.S. 56 (1982) .........................................................................5, 6

*In re World Trade Center Disaster Site Litig.*,
 503 F.3d 167 (2d Cir. 2007)........................................................... 7, 14

*Johnson v. Bechtel Assocs. Pro. Corp.*,
 801 F.2d 412 (D.C. Cir. 1986) ............................................................9

*Jones v. Clinton*,
 879 F. Supp. 86 (E.D. Ark. 1995) ......................................................11

*Khulumani v. Barclay Nat'l Bank Ltd.*,
 509 F.3d 148 (2d Cir. 2007).............................................................1, 5

*Mississippi v. Johnson*,
 71 U.S. 475 (1867) ...........................................................................5

*Nevada v. Hicks*,
 533 U.S. 353 (2001) ..........................................................................3

*New York v. United States Dep't of Com.*,
 339 F. Supp. 3d 144 (S.D.N.Y. 2018)..............................................13

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ..................................................................4

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................11

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) ................................................................12

*Uniformed Fire Officers Ass'n v. de Blasio*,
    973 F.3d 41 (2d Cir. 2020) .....................................................11

*United States v. DeFries*,
    129 F.3d 1293 (D.C. Cir. 1997) ...............................................8

*United States v. Krzyske*,
    857 F.2d 1089 (6th Cir. 1988) ..................................................8

*United States v. Rivera*,
    844 F.2d 916 (2d Cir. 1988) .....................................................7

*United States v. Rodgers*,
    101 F.3d 247 (2d Cir. 1996) ..................................................7, 8

*United States v. Rodríguez-Rosado*,
    909 F.3d 472 (1st Cir. 2018) ....................................................8

*United States v. Silver*,
    954 F.3d 455 (2d Cir. 2020) ..................................................2, 4

*United States v. Trump*,
    No. 23 Civ. 257, 2023 WL 8615775 (D.D.C. Dec. 13, 2023) ........11

*Yates v. Cleveland*,
    941 F.2d 444 (6th Cir. 1991) ....................................................8

**FEDERAL RULES**

Federal Rule of Appellate Procedure 8(a) ................................................1

Federal Rule of Appellate Procedure 27(d)(2)(A)....................................................18

Federal Rule of Appellate Procedure 41(d)(1) ........................................................1

## OTHER AUTHORITIES

20 *Moore's Federal Practice – Civil* § 303.32 (3d ed. 2023) ..................................7

Br. for Petr., *Coinbase v. Bielski*, No. 22-105 (Jan. 20, 2023) ..................................9

Trump Reply Br., *D.C. v. Trump*, No. 18-2488 (4th Cir. Feb. 21, 2019)...............12

Wright & Miller, 16A Fed. Prac. & Proc. Juris. § 3949.1 (5th ed.) .........................8

## INTRODUCTION

The Court should deny Defendant-Appellant Donald J. Trump's "Emergent Motion for Stay of Mandate and Stay of District Court Proceedings." No. 23-1045, ECF 139. It is doubtful that this Court must issue a mandate to restore the jurisdiction of the District Court, since a motions panel and the merits panel both concluded that the District Court retained jurisdiction during Trump's appeals. Regardless, Trump utterly fails to carry his burden in seeking to stay issuance of the mandate pursuant to Federal Rule of Appellate Procedure 41(d). Nor does Trump succeed in justifying a stay of District Court proceedings under Rule 8(a). A motions panel of this Court has already denied such relief; the only change since then is a ruling against Trump on the merits. And even considering Trump's request anew—since he has indicated he may seek further relief at the United States Supreme Court—it fails at every step. Trump's latest delay tactic in this long-running case should therefore be denied.

## ARGUMENT

### I.    This Court Should Not Stay the Mandate

To justify a stay of the mandate pending the filing of a petition for a writ of certiorari, Trump must show that "the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). Even if that high standard is satisfied, the "decision to grant the stay [remains] a matter of discretion." *Khulumani v. Barclay Nat'l Bank Ltd.*, 509 F.3d 148, 152 (2d Cir. 2007).

Here, as we explain in Part II.A.2, there is good reason to doubt that a mandate is necessary: this Court has twice held that Trump's notice of appeal did not divest the District Court of jurisdiction, and so the usual function of a mandate (restoring district court jurisdiction) is not implicated. If the Court agrees with that position— or if it grants Carroll's concurrent motion to issue the mandate and/or clarify the maintenance of district court jurisdiction—then Trump's motion fails at the outset.

But even if a mandate were to issue, Trump's motion would still be meritless. He cannot satisfy either of Rule 41(d)'s requirements, let alone both. And apart from the strictures of Rule 41, equity precludes Trump's request for discretionary relief.

## A. There is No "Substantial Question" Because the Supreme Court is Unlikely to Review and Reverse this Court's Ruling

"The standard for presenting a 'substantial question' is high." *United States v. Silver*, 954 F.3d 455, 458 (2d Cir. 2020). To meet it, Trump must demonstrate a "reasonable probability that four justices will vote to grant certiorari" and a "fair prospect that five justices will vote to reverse the Panel's judgment." *Id.* (cleaned up). There is no split of authority on whether presidential absolute immunity from civil damages claims can be waived. Nor is this an issue that affects other pending cases. As a result, in seeking to establish that this question qualifies as "substantial" under Rule 41(d), Trump resorts to generalized statements about the importance of absolute immunity. Br. at 3-4. But the baseline understanding in our legal system is that "[t]here is no authority whatever for the proposition that absolute- and qualified-

2

immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373 (2001). Moreover, given that the waivability of this particular immunity defense has never previously come up (or at least, has never been disputed), there is no reason to think this Court's decision imperils "the effective functioning of the tripartite government." Br. at 3. And considering the press of far weightier matters at the Supreme Court—including several cases involving the same defendant—there is not a reasonable probability that the Supreme Court will grant review in this case.

That conclusion is supported by every relevant consideration. *First*, the panel ruling reinforced rather than varied from longstanding norms, since prior presidents have repeatedly described their immunity as a merits defense. ECF 105 ("Appellee Br.") at 30-35. Indeed, several presidents have resolved or settled civil cases while in office. ECF 132 ("Op.") at 17 n.41. *Second*, as a practical matter, this issue would arise again only if a future president were to waive their immunity (which Trump concedes he did) and then later seek to change their mind. That is not especially likely to occur—and it is most unlikely to occur in a circumstance where the president's dilatory litigation conduct is so unexplained and prejudicial that a court denies leave to amend to raise this defense. *Finally*, a major purpose of absolute immunity is to protect presidential discretion, so it is unlikely that the Supreme Court would grant review in order to eliminate presidential discretion in deciding whether

to invoke this immunity. *See* Op. at 17 ("A President's autonomy *should* be protected; thus, a President should be able to litigate if he chooses to do so.").

Trump makes much of this Court's characterization of the waivability issue as "vexing." But this Court's analysis did not suggest that it faced genuine difficulty in deciding the issue. As the Court concluded, every relevant case—including *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)—supported its holding. Op. at 12-21. Trump's position, in turn, amounted to nothing more than a misreading of some "scattered" language in caselaw. *Id.* at 13. Apparently, what made this issue "vexing" was not the closeness of the question, but rather the need for a court to resolve it at all, since the issue arose only by virtue of Trump's irregular litigation conduct.

### B. Trump Cannot Show "Good Cause" for a Stay

Independently, Trump's motion should be denied for failure to show good cause. "A stay is not a matter of right, even if irreparable injury might otherwise result." *Silver*, 954 F.3d at 460. In his motion, Trump presents only a single argument concerning Rule 41(d)'s distinct "good cause" requirement: namely, that "there is a significant likelihood of success on appeal." Br. at 4. For the reasons set forth by the Court, and in Carroll's appellee brief, Trump is mistaken. Indeed, Trump does not even address most of the Court's thorough opinion. He disputes only its waivability holding—and, even there, ignores most of the Court's analysis, devoting just two paragraphs to reiterating his mistaken contentions about *Nixon*, *Clinton v. Jones*, 520

U.S. 681 (1997), and *Mississippi v. Johnson*, 71 U.S. 475 (1867), without showing why the Court's detailed study of those cases was faulty. *See* Br. at 20-21. Because this is the only basis given by Trump to support a finding of "good cause" under Rule 41(d), he cannot satisfy that requirement and his motion should be denied.

### C.    Principles of Equity Foreclose Trump's Position

In any event, a stay of the mandate under Rule 41(d) is a discretionary matter. *See Khulumani*, 509 F.3d at 152. Accounting for Trump's gamesmanship at every stage of this case, and his continued inability to offer a credible explanation for it, *see* Op. at 24-25, equity does not support affording him discretionary relief, especially where, as here, his apparent purpose is to indefinitely escape a trial.

## II.    This Court Should Not Stay the District Court Proceedings

Trump separately seeks a stay of district court proceedings. But this Court has already considered—and denied—that request. When Trump filed his notices of interlocutory appeal, he sought a stay of all district court proceedings. He argued then (just like he argues now) that trial proceedings were precluded by *Griggs v. Provident Consumer Discount Corporation*, 459 U.S. 56 (1982), and that he was alternatively entitled to a stay under the traditional four-factor test. *See* No. 23-1045, ECF 27 (motion) & 54-1 (reply in support of motion). Following briefing and oral argument, Judges Raggi, Lohier, and Carney unanimously denied Trump's motion under the traditional four-factor test. *Id.*, ECF 60. Since then, there have been two

material developments: first, this Court has held that Trump's position fails on the merits, Op. at 3-30; and second, this Court has held that Judge Kaplan retained jurisdiction over the case after Trump filed his notices of appeal, *id.* at 30-32. These developments only further support the original denial of Trump's stay motion.

For that reason alone, this Court can and should deny Trump's request. In the interest of thoroughness, however, and recognizing that Trump may seek further emergency relief at the Supreme Court, we address his position on the merits.

## A.    The District Court Retains Jurisdiction to Try the Case

Trump opens by arguing that this Court must issue a stay because the District Court has been divested of jurisdiction. That argument depends on two premises: *first*, that when Trump filed his notice of appeal, the District Court was automatically divested of jurisdiction, Br. at 6; and *second*, that this "divesture rule applies until the appeal has been *fully* resolved and all potential avenues for appeal have been exhausted … including those before this Court and/or the Supreme Court," Br. at 9. For the reasons that follow, neither of Trump's premises withstands scrutiny.

### 1.    Legal Standard

An appeal has two bookends. It begins with a notice of appeal, which—as the Supreme Court explained in *Griggs*—"confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." 459 U.S. at 58. An appeal later ends with the issuance of the mandate,

whereby a court of appeals returns jurisdiction to the district court. *See United States v. Rivera*, 844 F.2d 916, 921 (2d Cir. 1988) ("[J]urisdiction follows the mandate.").

Applying *Griggs* (a.k.a. the "divestiture rule"), many courts have held that the filing of a notice of interlocutory appeal from the denial of an immunity defense generally divests the district court of jurisdiction and requires a stay of further proceedings. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 742 n.4 (2023) (collecting cases); *but see In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 169-71 (2d Cir. 2007) ("*In re WTC*"). As those courts have noted, however, a defendant's litigation conduct can defeat the application of this divestiture rule. *See Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989) ("Defendants may waive or forfeit their right not to be tried."); *accord Coinbase*, 599 U.S. at 745. Where an appeal is frivolous, or where a defendant has used "claims of immunity in a manipulative fashion," they may "surrender any entitlement to obtain an appellate decision before trial." *Apostol*, 870 F.2d at 1339; *see also Yates v. Cleveland*, 941 F.2d 444, 448-49 (6th Cir. 1991). This Court has thus held that "our application of the divestiture rule must be faithful to the principle of judicial economy from which it springs," and the rule "should not be employed to defeat its purposes or to induce endless paper shuffling." Op. at 32 (first quoting *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996); and then quoting 20 *Moore's Federal Practice – Civil* § 303.32 (3d ed.

2023)); *accord United States v. Rodríguez-Rosado*, 909 F.3d 472, 478 (1st Cir. 2018).[1] The divestiture rule under *Griggs* is thus limited in important respects.

The divestiture rule is also limited in scope: it applies only *after* a notice of appeal has been filed, but *before* the court of appeals has issued its mandate. That is because the "issuance of the mandate" by an appellate court causes the district court to "regain jurisdiction." *Rodgers*, 101 F.3d at 251; *accord Apostol*, 870 F.2d at 1337.

Thus, the divestiture rule described in *Griggs* and *Coinbase* does not apply after the court of appeals issues its mandate. *See, e.g.*, *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (applying divestiture rule and explaining that "the district court does not regain jurisdiction over those issues *until the court of appeals issues its mandate*" (emphasis added)); *Apostal*, 870 F.2d at 1340 (applying divestiture rule and holding that stays triggered by notices of appeal from the denial of immunity defenses "will terminate automatically on *the issuance of mandate*" (emphasis added)); *see also Rodríguez-Rosado*, 909 F.3d at 477; *United States v. Krzyske*, 857 F.2d 1089, 1093 (6th Cir. 1988) (Merritt, J., dissenting) ("[T]he filing of a timely and sufficient notice of appeal transfers jurisdiction from the district court to the court of appeals with respect to any matters involved in the appeal … *until the*

---

[1] *See also* Wright & Miller, 16A Fed. Prac. & Proc. Juris. § 3949.1 (5th ed.) ("[T]he principle that a pending appeal ousts district court jurisdiction has been softened so as to guard against the risk that a litigant might manipulate the doctrine for purposes of delay.").

*district court receives the mandate of the court of appeals*." (emphasis added));

*Johnson v. Bechtel Assocs. Pro. Corp.*, 801 F.2d 412, 415 (D.C. Cir. 1986)

("Issuance of the mandate formally marks the end of appellate jurisdiction.

Jurisdiction returns to the tribunal to which the mandate is directed, for such

proceedings as may be appropriate.").[2]

### 2.      Application of Law

As should now be clear, there is no merit to Trump's claim that the divestiture

rule (as articulated in *Griggs* and *Coinbase*) requires this Court to stay further district

court proceedings. We will address several distinct grounds for that conclusion.

*First*, as the Court has already held, the divestiture rule does not apply to this

case and so the District Court retained jurisdiction. The Court based its conclusion

on principles of judicial efficiency. *See* Op. at 30-32. That understanding is further

supported by two considerations: (1) the District Court's certification that Trump's

appeal is frivolous, *see* Op. at 31 (declining to decide frivolity); and (2) the standard

set forth in *Apostol*, pursuant to which Trump's litigation conduct was precisely the

---

[2] This understanding was echoed by the successful Petitioner in *Coinbase*. *See* Br. for Petr. at 21, *Coinbase v. Bielski*, No. 22-105 (Jan. 20, 2023) (noting that the divestiture rule applies "until the court of appeals issues its mandate").

sort of improper "manipulation" that forfeited his right to avoid trial on the merits during his appeal, *see* ECF at 38-1 (Carroll Stay Opposition Br.) at 19-20.[3]

*Second*, there is good reason to doubt whether the issuance of a mandate is necessary here to restore the District Court's jurisdiction (in which case the issuance of the Court's opinion terminated any possible application of the divestiture rule). In seeking a stay pending appeal, Trump cited the divestiture rule—and the motions panel rejected his position. ECF 60. In litigating the appeal, Trump raised that point again—and the merits panel similarly rejected it. Op. at 30-32. This Court has thus twice held that the District Court retained jurisdiction during the pendency of Trump's appeal. If the District Court never lost jurisdiction, then a mandate is not necessary to restore it. In that sense, the issuance of a mandate would be superfluous: the Court has made it clear that the District Court remains vested with jurisdiction.

*Finally*, in an abundance of caution and to clarify the record in advance of any application that Trump may file at the Supreme Court, Carroll has filed a motion asking that the Court issue its mandate and/or clarify the maintenance of district court jurisdiction. Granting such relief would further allay any conceivable question concerning the applicability of the divestiture rule as this case proceeds to trial.

---

[3] Because the Court's opinion addressed only whether the District Court had jurisdiction during the pendency of the appeal—and not whether the District Court would have jurisdiction to try the case after the panel opinion was issued (but prior to the issuance of a mandate)—we address these issues for the sake of thoroughness.

Against all this, Trump merely asserts that the divestiture rule applies through a petition for certiorari. Br. at 9. He offers no support for that claim apart from a citation to *Coinbase*, which says no such thing. *See* 599 U.S. at 741. And Trump's remaining points are equally meritless.[4] Accordingly, his motion cannot succeed.

## B. Trump Cannot Satisfy the Traditional Stay Criteria

Trump fares no better under the traditional stay criteria. *See Nken v. Holder*, 556 U.S. 418 (2009). In fact, a panel of this Court has already rejected his position.

## 1. Substantial Likelihood of Success on the Merits

Starting with the principal factor—which Trump buries at the end, *see* Br. at 18-22—Trump cannot make a "strong showing that he is likely to succeed on the merits." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). Indeed, this Court has already held his position to be meritless, and Trump's motion offers nothing but an incomplete, unconvincing rejoinder to that thorough analysis. *See also Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 5312894, at *4 (S.D.N.Y. Aug. 18, 2023) (Kaplan, J.) (denying stay pending appeal and remarking that Trump "does not address any of this Court's reasoning in rejecting his argument").

---

[4] Trump's reliance on *Jones v. Clinton*, 879 F. Supp. 86 (E.D. Ark. 1995), and *United States v. Trump*, No. 23 Civ. 257, 2023 WL 8615775 (D.D.C. Dec. 13, 2023), is misplaced. Br. at 7. Most fundamentally, those are district court decisions issued at the outset of an appeal, whereas this Court faces the issue after resolving Trump's appeal. And Trump's gamesmanship in this case—including his unexplained, undue, and highly prejudicial delay in raising immunity—sets it apart from those proceedings.

## 2.    Irreparable Harm

Turning to irreparable injury, Trump complains about the burdens of litigation while ignoring his own choices. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands."). While absolute immunity serves important purposes, it can achieve them only if invoked diligently. Here, Trump's intentional litigation strategy has made a mockery of that principle, undermining his last-minute assertion that proceeding to a short jury trial on damages would burden him intolerably.

The procedural history of this case is well known to the Court. *See* Appellee Br. at 8-24. As relevant, Trump could have raised presidential absolute immunity when this suit was filed in November 2019. Instead, he waived it in state court as part of a strategic gambit. When that failed, he solicited a notice of removal to federal court—where he pursued aggressive party and non-party discovery and attempted to lodge a counterclaim against Carroll. His gamesmanship in the case then persisted for years. It was not until December 2022 that Trump sought to assert immunity on a theory of non-waivability squarely at odds with his position in another recent case.[5] While this motion was pending, moreover, Trump sought to lodge yet another counterclaim against Carroll. In that period, Trump also asked Judge Kaplan to *expedite* the trial in this case—the very same trial that he now claims would

---

[5] Trump Reply Br. at 1, *D.C. v. Trump*, No. 18-2488 (4th Cir. Feb. 21, 2019).

constitute irreparable injury. Even after Judge Kaplan denied that motion and later denied his immunity defense, Trump did not seek swift relief. He waited a month, hoping to obtain other strategic advantages. Only after he came up short did Trump first seek to stay proceedings pending the resolution of these interlocutory appeals.

As a result, Trump's motion arrives with unclean hands. Indeed, because of Trump's own strategy, many of the harms that he warns against are already in the rear-view mirror. In these circumstances—and facing only a limited damages trial likely to last just a few days—Trump shows no harm warranting a stay. *See New York v. United States Dep't of Com.*, 339 F. Supp. 3d 144, 148 (S.D.N.Y. 2018) ("'Inexcusable delay in filing' a motion to stay 'severely undermines the … argument that absent a stay irreparable harm would result.'" (citation omitted)).

In passing, Trump also asserts that further litigation would unduly interfere with his Sixth Amendment right to prepare for the criminal cases pending against him. Unsurprisingly, Trump cites not authority for that proposition, which lacks any basis in law or fact: Trump's criminal trials are months away, he has a small army of lawyers representing him, and there is no reason to believe that a short damages trial in this matter would burden his legal rights in any other pending case.[6]

---

[6] Trump also raises a concern about media coverage of this trial affecting the pool of potential jurors for his criminal matters. Br. at 16-17. This is not a serious argument. Those trials are at least three months away; they involve distinct subjects; most of them are occurring in other jurisdictions; any potential juror prejudice can

### 3. Harm to Carroll

Trump suggests that a stay would impose a mere inconvenience on Carroll. Br. at 17-18. Not so. A stay would not only unjustly reward Trump's continuing procedural gamesmanship, but would also inflict substantial harm on Carroll, who is 80 years old and has litigated this case for over four years. *See In re WTC*, 503 F.3d at 170. As Trump well knows—and presumably hopes—a stay would be especially burdensome to Carroll because it could cause a spiral of further delays in light of Trump's presidential campaign and other pending civil and criminal matters. Indeed, if the Court grants a stay of proceedings, this case may never reach a jury.

Delay would also injure Carroll for an independent reason: notwithstanding the verdict in *Carroll II* holding him liable for battery and defamation, Trump has continued (including during this appeal) to repeat many of the same attacks on Carroll. *See generally* Ex. A; *id.* at 7 (Trump statement on December 7, 2023: "This disgusting Slob, a Democrat Political Operative, is the same guy who funded a woman who I knew absolutely nothing about, sued me for Rape, for which I was found NOT GUILTY. She didn't remember the year, decade, or much else! In Interviews she said some amazingly 'inconsistent' things. Disgraceful Trial—Very unfair."); *id.* at 6 (Trump statement on November 29, 2023: "I got sued, decades

---

be addressed through *voir dire*; and it is Trump's own public statements about this case and others that pose the greatest risk of prejudice to the integrity of proceedings.

14

later (she has no idea when her made up event took place!), by a woman – I HAD NO IDEA WHO SHE WAS. It was a made up fairytale that was brought and funded by political operatives for purposes of Election Interference."); *id.* at 6 (Trump statement on August 30, 2023: "The woman that I never met that they accused me of rape; that's being run by a Democrat, a Democrat operative, and paid for by the Democrat Party … These are sick people. These are evil people."); *see also id.* at 4 (Trump statement on May 10, 2023: "I have no idea who this woman [is]. This is a fake story, made up story. We had a horrible Clinton-appointed judge. He was horrible … I have no idea who the hell—she's a whack job.").

At the jury trial in this case, Carroll will offer proof of Trump's continuing public attacks to support a substantial award of punitive damages—in part, to specifically deter Trump from continuing to attack her. Holding a trial in this matter will thus afford the civil justice system an opportunity to more fully remedy and protect Carroll. In contrast, staying proceedings all but indefinitely would reward Trump's behavior and exacerbate concrete, ongoing injuries to Carroll.

### 4. The Public Interest

That leaves the public interest. There is a powerful public interest in a final, expeditious resolution of this case—in which Trump, a candidate for elected office, is alleged to have used his bully pulpit (and more recently his own social media platform) to brutalize a private citizen for revealing his personal sexual misconduct.

Against this, Trump invokes two supposedly countervailing interests. He first cites the public's general interest in official immunities, as well as the constitutional significance of presidential absolute immunity. Br. at 11-13. But the only issue in dispute here is whether such immunity can be waived. There is no great public interest attached to that narrow question—and from a systematic perspective, it is unlikely to ever come up again. *See supra* Part I.A. Moreover, Trump is hardly an obvious champion of the public interest in preserving official immunities in this case: he strategically waived his immunity, failed to raise it for three years, and then abruptly asserted it without any explanation for his delay or the ensuing prejudice. Considering all this, the public interest that Trump cites has no real application here.

Nor does the First Amendment. Trump claims that the trial should be stayed to protect the rights of his supporters to hear him speak. Br. at 14-15. Whatever its value as a campaign talking point, that is sheer nonsense as matter of constitutional law. The First Amendment does not excuse Trump from participating in the judicial process merely because doing so may inconvenience his campaign schedule. There is no burden on anybody's First Amendment rights from his attendance at trial—that is, if he ultimately chooses to attend. And Trump's point is particularly absurd here. He has already been held liable for sexually abusing and defaming Carroll. The purpose of the forthcoming trial is merely to assess damages for specific defamatory statements—including punitive damages that may deter further attacks. Of course

16

Trump would rather be elsewhere, speaking about something else. But in a society governed by the rule of law, Trump must face an accounting for his misconduct.

## CONCLUSION

For the foregoing reasons, Trump's motion should be denied.

Dated:  Washington, D.C.                         Respectfully submitted,
         December 26, 2023

*/s/ Joshua Matz*
JOSHUA MATZ
KATE HARRIS
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com
kharris@kaplanhecker.com

ROBERTA A. KAPLAN
TREVOR W. MORRISON
MATTHEW J. CRAIG
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rkaplan@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

*Counsel for Plaintiff-Appellee*

17

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits requirements of Fed. R. App. P. 27(d)(2)(A) because this brief contains 4,239 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated:  December 26, 2023        */s/ Joshua Matz*
                                        Joshua Matz

                                        *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I, Joshua Matz, counsel for Plaintiff-Appellee and a member of the Bar of this Court, certify that, on December 26, 2023, a copy of the attached brief of Plaintiff-Appellee E. Jean Carroll in opposition to Defendant-Appellant Donald J. Trump's "Emergent Motion for Stay of Mandate and Stay of District Court Proceedings" was filed with the Clerk through the Court's electronic filing system.

Dated: December 26, 2023               */s/ Joshua Matz*
                                       Joshua Matz

                                       *Counsel for Plaintiff-Appellee*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

E. JEAN CARROLL,

          *Plaintiff-Appellee*,

    v.                                Nos. 23-1045, 23-1146

DONALD J. TRUMP,

          *Defendant-Appellant*.

**DECLARATION OF JOSHUA MATZ IN SUPPORT OF**
**PLAINTIFF E. JEAN CARROLL'S OPPOSITION TO EMERGENCY**
**MOTION TO STAY ISSUANCE OF THE MANDATE AND STAY**
**DISTRICT COURT PROCEEDINGS**

I, Joshua Matz, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff-Appellee E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Carroll's opposition to Defendant-Appellant Donald J. Trump's "Emergent Motion for Stay of Mandate and Stay of District Court Proceedings."

3.      Attached hereto as **Exhibit A** is a true and correct copy of selected public statements by Trump since the verdict in *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.).

Dated:   Washington, D.C.              */s/ Joshua Matz*
         December 26, 2023             Joshua Matz

# EXHIBIT A

**Selected Public Statements by Donald J. Trump Since the *Carroll II* Verdict**

## MAY 9, 2023: TRUTH SOCIAL STATEMENTS

- "I HAVE ABSOLUTELY NO IDEA WHO THIS WOMAN IS. THIS VERDICT IS A DISGRACE – A CONTINUATION OF THE GREATEST WITCH HUNT OF ALL TIME!"

  o https://truthsocial.com/@realDonaldTrump/posts/110340379870475514

- "VERY UNFAIR TRIAL!"

  o https://truthsocial.com/@realDonaldTrump/posts/110340693890735488

- "WHAT ELSE CAN YOU EXPECT FROM A TRUMP HATING, CLINTON APPOINTED JUDGE, WHO WENT OUT OF HIS WAY TO MAKE SURE THAT THE RESULT WAS AS NEGATIVE AS IT COULD POSSIBLY BE, SPEAKING TO, AND IN CONTROL OF, A JURY FROM AN ANTI-TRUMP AREA WHICH IS PROBABLY THE WORST PLACE IN THE U.S. FOR ME TO GET A FAIR "TRIAL.""

  o https://truthsocial.com/@realDonaldTrump/posts/110341037861272906

- Video Statements:

  o "This was a very unfair trial. That's all you have to say. [It] was a very unfair trial."

    ▪ https://truthsocial.com/@realDonaldTrump/posts/110341679071502131

  o "I have absolutely no idea who this woman is. The verdict is a disgrace, a continuation of the greatest witch hunt of all time. Absolutely a shame."

    ▪ https://truthsocial.com/@realDonaldTrump/posts/110341680295215530

  o "What else can you expect from a Trump-hating, Clinton-appointed judge who went out of his way to make sure that the result of this trial was as negative as it could possibly be. Speaking to and in control of a jury from an anti-Trump area, which is probably the worst place in the United States for me to get a fair trial. We'll be appealing this decision, it's a disgrace. I don't even know who this woman is. I have no idea who she is, where she came from. This is another scam, it's a political witch hunt, and somehow, we're gonna have to fight this stuff. We can not let our country go into this abyss;

this is disgraceful. You have somebody running for office, you have a woman that's financed and lied about it. She totally lied about it. By Democrat operatives, like, just about the biggest one there is. And she said that wasn't true. They found that she lied about it, and the judge wasn't even I guess letting it be put in as evidence. The whole thing is a scam, and it's a shame, it's a disgrace to our country."

- ▪ https://truthsocial.com/@realDonaldTrump/posts/110341681988271203

## MAY 10, 2023: TRUTH SOCIAL STATEMENTS

- "After listening to the Anderson Cooper tape of the Carroll interview where she said "rape is sexy," and other totally incriminating things, it is not possible to believe that this woman, who I do not know and have never met before (except on a crowded celebrity photo line), could be credible or convincing to a Judge & Jury. Why did Cooper SUDDENLY call for a commercial break, and why was Carroll a totally different person after the break? What took place during the break for such drastic change?"

  - o https://truthsocial.com/@realDonaldTrump/posts/110342629389312163

- "This Clinton appointed Judge, Lewis Kaplan, hated President Donald J. Trump more than is humanly possible. He is a terrible person, completely biased, and should have RECUSED himself when asked to do so. He quickly refused! This case should never have been allowed to be tried in this completely partisan venue, perhaps the worst for me in the Nation! The whole Rigged Hoax is yet another TRAVESTY OF JUSTICE, a continuation of the greatest political Witch Hunt of all time!!!"

  - o https://truthsocial.com/@realDonaldTrump/posts/110342704670441764

- "I HAVE NO IDEA WHO THIS WOMAN, WHO MADE A FALSE AND TOTALLY FABRICATED ACCUSATION, IS. HOPEFULLY JUSTICE WILL BE SERVED ON APPEAL!"

  - o https://truthsocial.com/@realDonaldTrump/posts/110344508749115738

## MAY 10, 2023: CNN TOWN HALL INTERVIEW

TRUMP: …This woman, I don't know her. I never met her. I have no idea who she is. I had a picture taken years ago with her and her husband, nice guy John Johnson. He was a newscaster, very nice man. She called him an ape, happens to be African-American. Called him an ape – the judge wouldn't allow us to put that in. Her dog or her cat was named vagina, the judge wouldn't allow to put that in. All these things, he – but with her, they can put in anything, "Access Hollywood"

COLLINS: This was a jury of nine people who found you –

TRUMP: That's right

COLLINS: – liable of sexual abuse. Do you think that – that will deter women from voting for you?

TRUMP: No, I don't think so because I think the whole thing – just so you understand –ready? I never met this woman. I never saw this woman. This woman said I met her at the front door of Bergdorf Goodman which I never go into other than for a couple of charities. I met her in the front door. She was about 60 years. This is like 22, 23 years ago. I met her in the front door of Bergdorf Goodman. I was immediately attracted to her and she was immediately attracted to me. And we had this great chemistry. We're walking into a crowded department store. We had this great chemistry. And a few minutes later, we end up in a room, a dressing room of Bergdorf Goodman, right near the cash register. And then she found out that there were locks in the door. She said, I found one that was open. She found one, she learned this at trial. She found one that was open. What kind of a woman meet somebody and brings them up and within minutes, you're playing hanky-panky in a dressing room, okay? I don't know if she was married then or not. John Johnson, I feel sorry for you, John Johnson.

COLLINS: Mr. President, can I – can I ask you this?

TRUMP: Think of it, think of this –

COLLINS: I know you're recounting what you said but, Mr. President –

TRUMP: But let me just, if I could because you asked a question.

3

COLLINS: This was a jury though –

TRUMP: Just so you understand, because I was walking in at a department – because I was very famous then and I owned the Plaza Hotel right next door and I owned the buildings around it. I'm not going into a dressing room of a crowded department store. Then I say, if she was being raped – and by the way, they said she wasn't raped, okay? That was her charge. It wasn't –

COLLINS: They found that you sexually abused her.

TRUMP: Oh, that was – say what the – they didn't – they said he didn't rape her.

COLLINS: They did not say –

TRUMP: And I didn't do anything else either. You know what? Because I have no idea who the hell she is. I don't know who this woman is.

COLLINS: But, Mr. President, can I—can I ask you given your recounting and your version –

TRUMP: I don't know who—and I tell you this. Are you ready?

COLLINS: But, Mr. President, can I—can I ask you because –

TRUMP: And I swear on my children, which I ever do. I have no idea who this woman. This is a fake story, made up story. We had a horrible Clinton-appointed judge. He was horrible. He allowed her to put everything in. He allowed us to put nothing in. This is a fake story."

https://www.cnn.com/2023/05/11/politics/transcript-cnn-town-hall-trump/index.html

## MAY 23, 2023: TRUTH SOCIAL STATEMENTS

- "I don't know E. Jean Carroll, I never met her or touched her ￼(except on a celebrity line with her African American husband who she disgustingly called the "Ape,"), I wouldn't want to know or touch her, I never abused her or raped her or took her to a dressing room 25 years ago in a crowded department store where the doors are LOCKED, she has no idea when, or did anything else to her,

except deny her Fake, Made Up Story, that she wrote in a book. IT NEVER HAPPENED, IS A TOTAL SCAM, UNFAIR TRIAL!"

o https://truthsocial.com/@realDonaldTrump/posts/110417777996621361

- "Page 2: The Carroll case is part of the Democrats playbook to tarnish my name and person, much like the now fully debunked Russia, Russia, Russia Hoax, the 51 Intelligence Agents, FBI/Twitter Files, and so much more. It is being funded and tried by Democrat operatives, although this was denied by them, and when they got caught in the lie, the Clinton appointed judge would not let us use it in trial. Time will prove him to be highly partisan & very unfair. Where's the dress she said she had?"

o https://truthsocial.com/@realDonaldTrump/posts/110417846464005356

- Quote Truth of first listed statement on May 23, with accompanying video of EJC on Anderson Cooper.

o https://truthsocial.com/@realDonaldTrump/posts/110418234501420922

## MAY 24, 2023: TRUTH SOCIAL STATEMENT

- "Is she, in actuality, a stalker?"

o https://truthsocial.com/@realDonaldTrump/posts/110424386452180138

## JULY 12, 2023: TRUTH SOCIAL STATEMENTS

- "Page 1: The DOJ will not defend me in the E. Jean Carroll civil case, which is all part of the political Witch Hunt, lawyered up by a political operative who I just beat in another case, financed by a big political funder, and 'judged' by a Clinton appointee who truly hates 'TRUMP.' The statements that I made about Carroll are all true. I didn't Rape her (I won that at trial) and other than for this case, I have NO IDEA WHO SHE IS, WHAT SHE LOOKS LIKE, OR ANYTHING ABOUT HER…"

o https://truthsocial.com/@realDonaldTrump/posts/110700658213984237

- "Page 2: The Carroll civil case against me is a Miscarriage of Justice and a total Scam. The trial was very unfair, with the other side being able to do and present virtually anything they wanted, and our side being largely and wrongfully shut down by an absolutely hostile, biased, and out of control judge. My lawyers, due

to their respect for the Office of the President and the incredulity of the case, did not want me to testify, or even be at the trial…"

o https://truthsocial.com/@realDonaldTrump/posts/110700815543746376

- "Page 3: The net result of this horrible INJUSTICE, where a completely unknown to me woman made up a ridiculous story, wrote it in a book to increase publicity and sales, I correctly disputed the story and got sued for Defamation, whereupon a hostile Judge and Jury shockingly awarded a woman who I don't know, have never known, and don't want to know, $5,000,000, while at the same time throwing out the Fake Rape claim. WE ARE STRONGLY APPEALING THIS TRAVESTY OF JUSTICE!!!"

o https://truthsocial.com/@realDonaldTrump/posts/110700915073200793

## AUGUST 30, 2023: INTERVIEW WITH GLENN BECK ON THE GLENN BECK PROGRAM

- "The woman that I never met that they accused me of rape; that's being run by a Democrat, a Democrat operative, and paid for by the Democrat Party… you know, so many of these things, I have a couple of other lawsuits, all funded against me by the Democrat [sic] Party. These are sick people. These are evil people."

o https://www.youtube.com/watch?v=IHz7sJvTD6Q at 03:11:00.

## NOVEMBER 29, 2023: TRUTH SOCIAL STATEMENT

- "I hope that Mayor Eric Adam's, Andrew Cuomo, and all of the others that got sued decades later, and with no proof, will fight it on being totally unfair and UNCONSTITUTIONAL. I got sued, decades later (she has no idea when her made up event took place!), by a woman – I HAD NO IDEA WHO SHE WAS. It was a made up fairytale that was brought and funded by political operatives for purposes of Election Interference."

o https://truthsocial.com/@realDonaldTrump/posts/111492289073450486

## <u>DECEMBER 7, 2023: TRUTH SOCIAL STATEMENT</u>

- "This disgusting Slob, a Democrat Political Operative, is the same guy who funded a woman who I knew absolutely nothing about, sued me for Rape, for which I was found NOT GUILTY. She didn't remember the year, decade, or much else! In Interviews she said some amazingly "inconsistent" things. Disgraceful Trial—Very unfair. I was asked by my lawyer not to attend—"It was beneath me, and they have no case." That was not good advice."

  - https://truthsocial.com/@realDonaldTrump/posts/111542183787096947

7